Stephen M. Zeitlin (Bar No. 1106962)
David A. Zeitlin (Bar No. 2957082)
Zeitlin & Zeitlin, P.C.
50 Court Street, Suite 506
Brooklyn, NY 11201
Telephone: (718) 522-5644
*david@zeitlinlawfirm.com*

Shawn E. Shearer (TX Bar No. 24049493)
The Law Office of Shawn Shearer, P.C.
3839 McKinney Avenue, Suite 155-254
Dallas, Texas 75204
Telephone (214) 434-1594
*shawn@shearerlaw.pro*
(Pro Hac Vice Application Pending)

Attorneys for Plaintiff
Steven B. Barger

**CV 17 - 4869**

**BLOCK, J.**

**BLOOM, M.J.**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN B. BARGER, an individual<br><br>Plaintiff<br><br>v.<br><br>FIRST DATA CORPORATION, a Delaware corporation;<br><br>FRANK BISIGNANO, an individual;<br><br>DAN CHARRON, an individual;<br><br>ANTHONY MARINO, an individual;<br><br>KAREN WHALEN, an individual;<br><br>LORI GRAESSER, an individual; and<br><br>RHONDA JOHNSON, an individual<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT AND JURY DEMAND** |

**COMPLAINT AND JURY DEMAND**                    1

## COMPLAINT AND JURY DEMAND

Plaintiff Steven B. Barger ("Barger" or "Plaintiff") complains against First Data Corporation ("First Data"), Frank Bisignano ("Bisignano"), Dan Charron ("Charron"), and Anthony Marino ("Marino"); Karen Whalen ("Whalen"), Lori Graesser ("Graesser"), and Rhonda Johnson ("Johnson")(each of First Data, Bisignano, Charron, Marino, Whalen and Johnson are referred to herein individually as a "Defendant" and collectively as "Defendants"), and hereby states, as follows:

## SUMMARY OF CLAIM

1.      This is an employment discrimination lawsuit brought to seek redress for the violation of the Plaintiff's federally protected rights under the Family and Medical Leave Act ("FMLA"). Plaintiff seeks backpay, frontpay, interest, liquidated damages, punitive and special damages, and attorney's fees and costs of litigation.

2.      This Complaint's FMLA claims, supported by the factual allegations set forth herein, are summarized as follows:

(i)     Barger was an "eligible employee" with a "serious health condition" and the Defendants were his "employers" from June 2014 to February 2017.

(ii)    First Data approved Barger's FMLA leave for the period from October 24, 2016 to January 16, 2017;

(iii)   Barger received medical clearance to return to work and delivered that clearance to First Data's Vice President of Human Resources on January 10, 2017;

(iv)    On January 10, 2017, First Data's Vice President of Human Resources and Barger agreed that Barger would return to his position on January 17, 2017;

(v)     Three days later, on January 13, 2017, Barger was advised by First Data's Vice President of Human Resources that he was being terminated and not to return to work as they had agreed.

(vi)    Defendants did not allow Barger to return to work at the end of his FMLA leave;

(vii)   Defendants did not restore Barger to his position or an equivalent position at the end of his FMLA leave;

(viii)  Defendants did not offer Barger any other positions despite advertising

hundreds of available job openings;

(ix)    First Data notified Barger of his termination three days after he provided his medical clearance to return from FMLA leave;

(x)    Defendants prohibited Barger from entering First Data's office upon expiration of his FMLA leave despite Barger having received, and delivered to First Data, his physician's clearance to return to work;

(xi)    Defendants interfered with Barger's exercise of his rights under the FMLA to take and return from leave;

(xii)    Defendants retaliated by terminating Barger for his exercise of his right to return from FMLA leave to an equivalent or other position;

(xiii)    Defendants permanently transferred control of the Training Group, instead of temporarily transferring as they represented and were legally required to do, while Barger remained on FMLA protected leave;

(xiv)    First Data's sophisticated and experienced human resources department knew that their actions towards Barger were violations of the FMLA;

(xv)    Defendants' explanations of performance issues and a RIF are *ex post-facto* pretext to cover for the actual reason for termination;

(xvi)    Defendants (erroneously) believed Barger would die from cancer or retire and remain on long-term disability, and did not take FMLA required actions to preserve Barger's job or equivalent position;

(xvii)    Barger was fired because he exercised his FMLA protected right to return; and in the process Barger lost his salary, bonus, stock options, restricted stock, long-term disability benefits, group life insurance benefits, group life supplement benefits, and (most importantly) his job that First Data was required to preserve (when hundreds of openings for positions were being advertised by First Data at the time of Barger's termination); and

(xviii)    First Data is a sophisticated enterprise with experienced officers and a special Leave Management Team within its human resources group, and the Defendants' actions were knowing and willful violations of the FMLA.

## RELATED EEOC PROCESS

3.    On March 6, 2017, the Atlanta District Office of the Equal Employment Opportunity Commission ("EEOC") received a Charge of Discrimination filed by Barger against Defendant First Data (the "EEOC Charge) alleging violations of the Americans with Disabilities Act ("ADA"), the Age Discrimination in Employment Act ("ADEA"), and retaliation related to

1   Barger's raising of these issues prior to termination, all related to the same events described

2   below. See Exhibit A attached hereto.

3        4.    Exhibit A is a true and correct copy of the EEOC Charge.

4        5.    The terms of the EEOC Charge are incorporated herein by this reference to Exhibit

5   A.

6        6.    In response to the EEOC Charge, First Data filed its position statement with the

7   EEOC by letter dated July 18, 2017 ("Defendant's Position Statement").

8        7.    Exhibit B is a true and correct copy of the Defendant's Position Statement.

9        8.    The Defendant's Position Statement was filed more than 120 days into the

10   EEOC's 180 day investigation period. 29 CFR §1614.408.

11       9.    In response to the Defendant's Position Statement, Barger filed a rebuttal by letter

12   dated August 7, 2017 ("Plaintiff's EEOC Rebuttal").

13      10.    Exhibit C is a true and correct copy of the Plaintiff's EEOC Rebuttal.

14      11.    The terms of the Plaintiff's EEOC Rebuttal are incorporated herein by this

15   reference to Exhibit C.

16      12.    The EEOC has not issued a Notice of Right to Sue under 29 U.S.C §1601.28, as of

17   the date hereof.

18      13.    The Plaintiff's FMLA claims set forth herein are not subject to the EEOC's

19   review.

20      14.    If a Notice of Right to Sue is issued by the EEOC in response to the EEOC

21   Charge, the Plaintiff may seek to amend this Complaint to include additional counts against the

22   Defendant under the ADA and ADEA, and Plaintiff may seek to amend this Complaint to the

23   extent discovery uncovers additional causes of action.

24                  **JURISDICTION AND VENUE**

25      15.    This action involves application of the Family and Medical Leave Act of 1993, 29

26   U.S.C. § 2601 et seq.

27      16.    This court has jurisdiction pursuant to 29 U.S.C. § 2617(a)(2) (jurisdiction over

28   FMLA claims) and 28 U.S.C. § 1331 (original jurisdiction over civil actions arising under the

1   Constitution, laws and treaties of the United States).

2   17.   Defendant First Data does business in the State of New York and in this district, is

3   a resident of New York and this district, and maintains personnel records in this district's

4   jurisdiction.

5   18.   Defendants Bisignano, Charron, Marino, Whalen, Graesser, and Johnson (the

6   "Individual Defendants") are officers of First Data Corporation and maintain permanent and part-

7   time offices at First Data's corporate locations in the New York City, and/or directly report to

8   superior officers that maintain offices in New York City.

9   19.   Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b).

10                                          **PARTIES**

11   20.   Barger is an individual formerly employed by First Data and resided in the State of

12   Georgia during all times material to this Complaint.

13   21.   The Defendant First Data Corporation is a Delaware corporation doing business in

14   this district, having a place of business in this district at 378 Burns St, Forest Hills, NY 11375,

15   1307 Walt Whitman Rd, Melville, NY 11747, among others, and has an executive headquarters

16   located in Manhattan, NYC, and can be served at its registered agent in New York: Corporation

17   Service Company, 80 State Street, Albany, NY 12207.

18   22.   Defendant Bisignano is First Data's Chairman & Chief Executive Officer ("CEO")

19   and maintains an office at First Data's executive headquarters.

20   23.   Defendant Charron is First Data's Executive Vice President ("EVP"), Head of

21   Global Business Solutions, and conducts business on behalf of First Data, including attending

22   meetings of First Data's executive committee, in New York City, and maintains a part-time office

23   at First Data's executive headquarters.

24   24.   Defendant Marino is First Data's EVP Human Resources ("HR") of First Data and

25   maintains an office at First Data's executive headquarters. Upon information and belief, Mr.

26   Marino maintains a residence in New York City.

27   25.   Defendant Whalen is First Data's Senior Vice President ("SVP") of HR assigned

28   as a business partner to the Global Business Solutions Group headed by Charron, and maintains

an office at First Data's Long Island office.

26.     Defendant Graesser is Assistant General Counsel of First Data and reports to Adam Rosman, First Data's General Counsel, who maintains an office in First Data's executive headquarters.

27.     Defendant Johnson is First Data's Vice President ("VP") of HR assigned as a business partner to the Global Business Solutions Group headed by Charron and reports directly to Whalen.

28.     Plaintiff Barger was continuously employed by First Data from June 2014 to February 28, 2017.

29.     Bisignano (First Data Chairman & CEO), Charron (First Data EVP, Head of Global Business Solutions), Marino (First Data EVP EVP), Whalen (SVP HR), and Johnson (VP HR) were, at all times material hereto, agents, employees and servant of the master, First Data, and were acting within the course and scope of each of their agency or employment authority, and as such, with the knowledge, express or implied of First Data.

## GENERAL ALLEGATIONS
## BARGER'S EMPLOYMENT WITH FIRST DATA

30.     Barger was born in September 1944 and is now 72 years of age.

31.     Plaintiff Barger has been an executive in the financial services industry for 40 years. During that time, Mr. Barger served as an executive of CitiGroup Financial Services, Primerica, Shearson/Smith Barney, and First Data. Plaintiff Barger also operated his own consulting business with major financial institutions as clients. [The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]

32.     In June 2014, Barger accepted a position as "Senior Vice President – Sales Force Effectiveness" with First Data. [The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]

33.     Upon accepting employment with First Data, Barger and his wife moved to Atlanta, Georgia.

34.     In deciding to accept the position with First Data, and leave his consulting business to move to Atlanta, Barger relied upon the representation of First Data that the future financial benefit of equity grants he would receive from First Data would more than offset the reduction of his base income.

35.     When Barger was hired in June 2014, First Data was not publically traded, and KKR & Co., L.P. (traded under the New York Stock Exchange under the symbol KKR), owned directly, and through its affiliates, subsidiaries, and managed funds, more than 75% of First Data's outstanding equity interest.

36.     Barger was informed, during the negotiation of his possible employment, that First Data was in the process of preparing for a $3.5 billion private equity offering as a precursor to its planned public offering of equity, and that the public offering would involve KKR selling shares to the market to liquidate a portion of its investment in First Data, and that the offering would create a market for the shares to be issued upon Barger's exercise of his stock options included in his proposed compensation package as an incentive for Barger to join First Data and leave his lucrative consulting business.

37.     First Data's officers, employees, and agents represented to Barger that part of his function at First Data would be to assist in transforming the company's sales force and sales philosophy in preparation for the private equity offering and subsequent public offering. This job description was consistent with Barger's long career aiding publically traded financial service companies identify issues, articulate and define policies, and develop their sales forces.

38.     First Data's public offering occurred in October 2015.

39.     Barger served as Senior Vice President – Sales Force Effectiveness his entire tenure with First Data.

40.     During his entire tenure with First Data, Barger was based, and maintained his office, at First Data's office located at 5565 Glenridge Connector, Atlanta, Georgia.

41.     Barger's annual salary remained $480,000 his entire tenure with First Data. [The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]

42.     Barger did not receive any increase in annual salary during his employment by

First Data. [The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]

43.    For his service in 2014, 2015, and 2016, Barger received bonus payments from First Data as follows: 2014 - $250,000 gross cash payment; 2015 - $20,389 net cash payment and a grant of 12,912 First Data restricted stock units; and 2016 - $174,000 gross cash payment.

44.    On July 22, 2014, Barger was granted options to purchase 100,182 shares of First Data common stock at an exercise price of $12.65 per share, with the options vesting annually on July 22nd in one-third increments over a three year period (the "Stock Options") (share numbers and exercise price are adjusted for stock splits following the initial grant).

45.    On February 24, 2016, as part of his bonus for services provided in 2015, Barger received 12,912 restricted stock units (the "Restricted Stock Units") vesting annually on February 24th over a three year period in the amounts of 2,582 shares in 2017, 5,165 shares in 2018, and 5,165 shares in 2019.

46.    Barger was hired to lead the drive the transformation of First Data's sales from selling a "utility" merely processing services into a sales force selling value-added, business consulting services in addition to transaction processing.

47.    Barger began this sales transformation process by changing the language used to describe the company's business by introducing the terms of "genuine concern" for the customer's business, and changing the role of the sales force from simply sales to "business consultants" to instill the revised vision across the organization.

48.    Barger developed his "business needs analysis" for use by First Data's sales force to analyze customer's businesses and to provide customer's data and information to assist the customer in the operation and development of their business.

49.    Barger's "business needs analysis" was designed for First Data to improve its consultations with First Data customers to provide services beyond merely payment processing.

50.    Barger developed a robust, proprietary, business needs analysis mobile application to be deployed to First Data sales force that could generate business and product recommendations for clients that were tailored to the client's specific business needs.

COMPLAINT AND JURY DEMAND                                8

51.     Barger developed materials to implement the planned transformation of First Data from competing in the transaction processing business based solely on processing service pricing to competing on a value basis by providing additional services involving providing First Data's customers with value-added services.

52.     Barger implemented a training regimen for the First Data including presentations and break-out session activities to introduce the sales transformation, and to prepare and transform the sales force into business consultants that engage First Data clients differently than they had in the past.

53.     Barger traveled extensively making presentations to the worldwide sales force outlining First Data's plan to move from its low-cost sales philosophy (competing solely on providing a lower price for processing) to a value-based philosophy using his "business needs analysis" system and process to provide First Data's customers with value-added services and benefits to assist First Data's customers' business with data and business advice provided by First Data.

54.     Barger conducted numerous in-person, large scale meetings with break-out working sessions across the United States, and in Europe for First Data's international sales, to explain the new philosophy, and to instruct the sales force on integrating the business needs analysis and "value" philosophy into their day-to-day operations in the field. More than 1,000 individuals, over the course of 25 different meetings, went through Barger's three-day training program.

55.     From June 2014 to August 2014, Barger did not have any individuals directly reporting to him as SVP of First Data, and during this time period, he interacted with a broad scope of employees across multiple sales channels within First Data. [The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]

56.     In 2014, First Data conducted and completed a $3.5 billion private equity offering that was sold, in part, based on the new business and sales philosophy.

57.     After First Data observed Barger's initial sales transformation performance, First Data added, and Barger accepted, increasing responsibilities and duties in addition to the sales

transformation work he was originally hired to perform.

58.     In August 2014, at First Data's request, Barger agreed to take on additional responsibilities and was appointed to lead First Data's "Training Group." The Training Group consisted of Training Specialists, located on every continent, who developed and implemented sales training programs for new products and services. [The Defendant's Position Statement admits the facts in this paragraph.]

59.     Barger's immediate supervisor while he was leading the Training Group was Jeffery Hack ("Hack"), First Data EVP, who in turn reported to Defendant Charron. [The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]

60.     As head of the Training Group, Barger received weekly progress reports from all of his direct reports and held weekly conference calls to discuss issues and obstacles in team members achieving their objectives with the assistance of their peers on the call.

61.     From August 2014 to December 2015, Barger traveled to London twice to meet and conduct multi-day meeting sessions with the Training Group's international team members. \

62.     From August 2014 to December 2015 Barger consistently traveled within the US to meet US team members.

63.     During 2015, Barger assisted all of the "heads of business" (primarily senior vice presidents in charge of various, distinct, business units and segments within First Data) in developing the unit business plans, unit intern programs, training curricula for their business areas, assisting in the preparation of business needs analysis by the sales force for their clients, and assisted in developing those leaders ideas on how to integrate their distinct unit into the overall First Data business plan.

64.     Barger's participation in the projects described in the previous paragraph was not within the scope of Barger's original agreement or assignment upon being hired.

65.     These requests for Barger's assistance on additional projects reflects First Data's desire for Barger to take additional responsibilities, First Data's recognition of the value of Barger's leadership and decades of experience, as well as Barger's willingness to expand his duties and responsibilities.

66.     During the 2014 and 2015 process of First Data's private equity offering and the preparation for its October 2015 public offering, in addition to the sales transformation work Barger was originally hired to perform, the additional responsibilities Barger had agreed to assume heading the Training Group (including the time and travel involved), and Barger's work with heads of business across various company business units (all outlined above), at First Data's request, Barger agreed to undertake additional responsibility to assist the accountants, lawyers, consultants, employees and other professionals in developing descriptions of First Data's sales transformation for use in the business description and forward-looking statements in First Data's securities disclosures and investment road show materials.

67.     During 2014 and 2015, Barger developed the "Doctrine of Genuine Concern" to be used as the guiding business philosophy of the First Data global sales enterprise. This Doctrine was used and presented by members of management in the equity sale road shows and sales presentations.

68.     During 2015, in addition to all the additional duties (outlined above), Barger agreed to undertake an additional project involving an aggressive schedule of travel across the country to meet with senior leadership (VP level and above in all First Data areas outside of sales) in large ballroom settings for presentations regarding management's vision for the future of the company, the sales transformation processes, the change in culture, and the company's new philosophy, so that the areas outside of sales could provide the needed support to the company's planned evolution. These presentations alone, not including preparation time, consumed approximately 24 days of presentations in approximately 6 cities. Barger was one of four executives selected by First Data to speak at all of these meetings. Participants at these meetings gave Barger outstanding ratings and comments on his performance and presentation.

69.     In mid-2015, Barger was asked by Defendant Charron to prepare a plan for Barger to consolidate more areas of the company under his leadership.

70.     Defendant Charron EVP requested that Barger plan to assume additional responsibilities knowing that Barger had already expanded his duties significantly from his initial sales force transformation he had originally hired to perform.

71. Defendant Charron's request for Barger to plan for assuming additional duties and responsibilities, shows Defendant Charron's confidence in Barger, and Defendant Charron's desire to further expand the benefit of Barger's decades of experience and concepts across the company.

72. In August 2015, Defendant Johnson (VP HR) was assigned as the HR "business partner" to the First Data Global Business Solutions unit headed by Defendant Charron.

73. Defendant Johnson's arrival as a business partner to the Global Business Solutions group in August 2015, was more than a year after Plaintiff Barger was hired by First Data and after Plaintiff Barger assumed all of the duties and responsibilities described in the allegations above.

74. From August 2015 through January 10, 2017, Defendant Johnson and Barger always reported up through their respective departments to different EVPs. During this period, Defendant Johnson reported through the HR organization to Defendant Whalen (SVP HR) and Defendant Marino (EVP HR), and Barger, in his role as head of the Training Group, reported through EVP Hack to EVP Defendant Charron within the Global Business Solutions organization.

75. Defendant Johnson's observations of Barger from August 2015 through the end of October 2015, included the time while Barger and all senior management were working, in one way or another, on the public offering completed in October 2015.

76. Defendant Johnson observed Barger for the subsequent three months of November 2015 through January 2016, which included numerous holidays and employee travel.

77. In early February 2016, Barger was unexpectedly diagnosed with throat cancer. Barger then underwent radiation treatments from March to May 2016, laryngectomy surgery in September 2016, and recovery from surgery from October 2016 through December 2016.

78. Defendant Johnson had only three months (November through January - during the holidays and with the related, usual employee travel and vacations) to observe Barger after the public offering and before his cancer diagnosis.

79. First Data and its HR group/department/function maintains a documented policy

and system for (i) employees to receive from their direct superior/supervisor periodic written performance reviews, and (ii) for periodic meetings to occur between superior/supervisor and subordinate to be held to discuss performance reviews, subordinate performance issues, and subordinate career development.

80.    At no point during Barger's entire tenure at First Data, did Barger ever receive a written performance review from Hack (Barger's immediate supervisor in his role leading the Training Group), from Defendant Charron, from any of the other Defendants, or from any other First Data employee, officer or agent.

81.    At no point during Barger's entire tenure at First Data, was Barger ever asked or instructed to attend a personal performance review meeting with Hack, Defendant Charron, any of the other Defendants, or with any other First Data employee, officer or agent, to discuss a written performance review.

82.    The Defendant's Position Statement does not reference Barger receiving a written performance review, or any performance review meeting between Barger and his superior, under the First Data's documented HR policies, procedures and processes.

83.    In mid-2016, Barger learned that First Data HR had engaged a consultant that was conducting what is known as "360 degree" review of personnel in a First Data department outside of Barger's area of responsibility. Of Barger's own volition, Barger requested that he also be personally evaluated using the same "360 degree" process HR was using to evaluate personnel in the other First Data unit.

84.    During a "360 degree" review, the HR department and the engaged HR consultant collect information from the participant (in this case Barger), the participant's direct reports, the participant's supervisor (in this case, Hack), and designated peers of the participant. The consultant aggregated the responses and issued a report of the results.

85.    In late September 2016, Barger received his "360 degree" report prepared by the consultants, which included the performance review of his direct supervisor at the time.

86.    Not one of the Individual Defendants, or anyone else at First Data, ever asked Barger to discuss the "360 degree" report he received.

COMPLAINT AND JURY DEMAND                    13

87.    In Barger's "360 degree" report, Barger received an overall leadership rating (a combination of all the scores across all the competencies evaluated in the review) from his manager, EVP Hack, of 4.5 out of a 5 point scale, placing Barger in the top 10% of all leaders (including those outside of First Data) evaluated using this review system.

88.    During the first week of January 2017, Hack received notice of his termination of employment with First Data.

89.    None of the Defendants advised Barger, in writing or otherwise, of Hack's termination from employment.

90.    After Hack's termination, Barger was never informed by any of the Defendants as to who replaced Hack as Barger's direct superior.

91.    Barger and his counsel have made at least three request for First Data to identify the individual (with corporate authority) that terminate Barger's employment.

92.    First Data has yet to identify which individual took the action to terminate Barger's employment.

## GENERAL ALLEGATIONS
## BARGER'S ILLNESS, SURGERY, LEAVE AND TERMINATION

93.    In late February 2016, Barger's physicians discovered a nodule on his vocal cord suspected of being cancerous. Barger underwent a biopsy and was diagnosed with an invasive form of squamous cell carcinoma on his vocal cords for which his physicians recommended radiation treatment.

94.    Barger promptly advised Defendant Charron and Defendant Marino of his cancer diagnosis and his physicians' radiation recommendations. [The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]

95.    Within days after advising Charron and Marino, the news quickly spread to Defendant Bisignano (Chairman & CEO) and Defendant Johnson (VP of HR in Atlanta) who became aware of Mr. Barger's condition. [The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]

96.     Defendant Bisignano (Chairman and CEO), insisted that Mr. Barger receive a second opinion from Dr. Louis Harrison, Chair of the Radiation Oncology Department at Moffitt Cancer Center in Tampa, Florida ("Dr. Harrison"). [The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]

97.     Defendant Bisignano told Barger that Dr. Harrison was a close friend, Dr. Harrison had effectively treated Defendant Bisignano for throat cancer, and Barger should go see Dr. Harrison. [The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]

98.     Defendant Bisignano assisted Barger in obtaining an appointment with Dr. Harrison.

99.     Barger traveled from Atlanta to Tampa to be examined by Dr. Harrison as urged by Defendant Bisignano. [The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]

100.    After examining Barger, Dr. Harrison concurred with the diagnosis and radiation treatment recommendation of Barger's Atlanta physicians.

101.    From March 28, 2016 through May 5, 2016, Barger underwent 28 separate radiation treatments in Atlanta, receiving five treatments per week for six weeks.

102.    During the period of Barger's radiation treatments, Barger rejected any suggestion that he need to take medical leave" and that during his radiation he would continue working. [The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]

103.    During his radiation treatments, Barger maintained his normal work patterns. Each radiation treatment lasted approximately 45 minutes from Barger's arrival at the radiation facility until his departure back to the office.

104.    Barger returned to his First Data office in Atlanta after each radiation treatment.

105.    Barger did not miss any days of work during his radiation treatments.

106.    Barger continued to work most weekend days in the office during the radiation regimen.

107.    Barger performed all of the functions of his job (including the expanded

1   responsibilities he had assumed in 2014 and 2015) during the period he received radiation

2   treatments.

3       108.    After completing the radiation treatment regimen, Barger continued his normal

4   work pattern and traveled on First Data business.

5       109.    At no point during Barger's radiation treatments did Barger receive notice, written

6   or otherwise, that First Data has any issues with his performance.

7       110.    At no point during Barger's radiation did First Data assign any of Barger's duties

8   to any other officers or employees.

9       111.    In August 2016, Barger returned to his Atlanta physicians for an evaluation of the

10  effectiveness of the radiation treatments. Barger's physicians concluded that the radiation had

11  been ineffective in addressing the cancerous growth on his larynx, and advised Barger that a

12  laryngectomy (surgical removal of the voice box) was required to prevent the spread of

13  carcinoma into his lymph system, which likely would be fatal.

14      112.    Dr. Harrison, whom Defendant Bisignano urged Barger to consult, scheduled

15  Barger for laryngectomy surgery by Dr. Tapan Padhya at the Moffitt Cancer Center in Tampa,

16  Florida.

17      113.    Plaintiff Barger advised Defendants Bisignano, Marino, Charron, and Johnson that

18  his laryngectomy surgery was scheduled for Tuesday, September 6, 2016 in Tampa, Florida [The

19  facts set forth in this paragraph were admitted in the Defendant's Position Statement.]

20      114.    Barger traveled to Tampa, Florida and underwent laryngectomy surgery on

21  September 6, 2016. The surgery was highly invasive and included separating the connection

22  between Barger's esophagus and trachea, removing the larynx, creating a stoma (a hole in his

23  throat just above his collar bone and sternum) through which Barger would breath, inserting a

24  prosthetic device (a valve to move air from the trachea to the esophagus for use in speaking after

25  Barger healed from surgery), and inserting a tube into Barger's stomach that exited his side for

26  feeding while Barger's esophagus healed from surgery.

27      115.    Barger remained in the Moffitt Cancer Center for several weeks after surgery.

28  Upon being discharged from the hospital, Barger resided in a nearby hotel, returning to his Tampa

physicians for examinations numerous times per week.

116.    Barger experienced complications in healing from the laryngectomy surgery, and he re-entered the Moffitt Cancer Center for additional surgery to address these issues (including additional skin grafts to the stoma in his throat).

117.    Barger was again discharged from the hospital, and after nearly seven weeks in Tampa, in and out of the hospital and hotel, Barger returned to his home in Atlanta.

118.    After Barger had surgery in September 2016, he again refused to take leave and he insisted that he keep working. [The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]

119.    First Data admits that during, and for more than two months after surgery, it was Barger's choice to refuse leave, and First Data did not force him to take leave.  [The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]

120.    First Data admits and wrote in the Position Statement (page 5):

> Despite [Barger] being out of the office due to surgery, [First Data] respected his decision [not to take leave], did not force him to take leave of absence, and continued to pay him through regular payroll . . .

121.    During his entire time in Tampa, Barger worked on First Data business nearly every day.

122.    During his entire time in Tampa for surgery and recovery, Barger kept First Data's senior management aware of his condition, he continued to communicate with his team and management at First Data [The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]

123.    Barger had more than six weeks of available paid-time-off covering the period from September 4, 2016 through October 23, 2016 ("Barger's PTO Period")[The facts set forth in this paragraph were admitted in the Position Statement.]

124.    At no time during Barger's PTO Period was Barger informed, in writing or otherwise, that First Data had issues with his performance.

125.    At no time during Barger's PTO Period were Barger's duties and responsibilities

COMPLAINT AND JURY DEMAND                                17

1   reassigned to any other officer or employee of First Data.

2        126.   Barger returned to Atlanta from Tampa in mid-October 2016.

3        127.   On or about November 3, 2016, Defendant Marino (First Data EVP of HR) flew

4   by private jet to Atlanta and visited Barger at his personal residence. [The facts set forth in this

5   paragraph were admitted in the Defendant's Position Statement.]

6        128.   At the time of Defendant Marino's November 3, 2016 visit to Plaintiff Barger's

7   home, Plaintiff Barger was only 60 days out from major surgery, he was still in the early stages of

8   recovery, he was reliant on a feeding tube, and he was unable to speak except for only a few short

9   quiet statements because of the significant surgical work on his trachea and esophagus. During

10  this meeting Barger spoke the best he could and used a white board to communicate when

11  needed. [The facts set forth in this paragraph were admitted in the Defendant's Position

12  Statement.]

13       129.   Defendant Marino observed Barger in his condition on November 3, 2016, and has

14  not had in-person contact with Mr. Barger since. [The facts set forth in this paragraph were

15  admitted in the Defendant's Position Statement.]

16       130.   No employee, officer or director from First Data personally observed Plaintiff

17  Barger between November 3, 2016 and January 10, 2017. [The facts set forth in this paragraph

18  were admitted in the Defendant's Position Statement.]

19       131.   Shortly after visiting to Barger's residence, Marino advised Barger by letter and

20  text messages (attached to the original EEOC Charge letter) that

21          a.   First Data had decided that Barger should be placed on First Data's standard
22               leave;

23          b.   Barger's compensation would be moved from regular payroll to First Data's
                 short-term, and then long-term, disability benefits and insurance policies; and
24

25          c.   Barger was to cease working on First Data business and not return to the office
                 while on leave.

26  See Exhibit D (letter) and Exhibit E (texts) attached hereto, the terms of which are incorporated

27  by this reference.

28

132.     Exhibit D is a true and correct copy of the letter dated November 18, 2016 sent from Marino to Barger, and received by Barger by overnight delivery on November 19, 2016.

133.     Exhibit E contains a true and correct copy of the text message exchange between Barger and Marino on November 19, 2016.

134.     The November 18, 2016 letter from Marino (EVP of HR) to Barger (Exhibit D) stated (emphasis added):

> Dear Steve [Barger], . . .
>
> Procedurally, <u>we must now begin to transition you to our standard leave of absence programs</u>. This includes your transition to our short-term disability program. <u>I have included paperwork that you will be required to complete to **begin** this process.</u>
>
> <u>While on short-term disability, your access to work must be curtailed</u> until such time that a doctor medically clears you to return to work. This will provide you with the ability to focus all of your time and attention on your recovery.
>
> <u>Your dedication to First Data is greatly appreciated and we wish you a speedy and successful recovery.</u>
>
> Warm regards,
> Anthony Marino
> Executive Vice President
> Head of Human Resources

135.     In his November 18, 2016 letter to Barger (see Exhibit D), Defendant Marino clearly states that as of that date Barger's FMLA application and approval process had not yet begun.

136.     The following text message exchange (Exhibit E) between Barger and Marino (EVP of HR) occurred on November 19, 2016:

> Marino to Barger:   Later today you will get a fed ex from me that <u>will require you to **begin** disability claims process</u> (short term and then if necessary long term). We've held off on this but now procedurally we are where we are. This will allow you to focus all of your energies on getting better and not be burdened by First Data work. <u>We will announce Robin as the **interim** leader on Monday so your team will have support.</u> We are all praying for your recovery and I personally look

forward to our time on the links for years to come. Shoot me a note if you have any questions after you get the fed ex.

Barger to Marino:    You are removing me from my job. <u>I am fired?</u>

<u>Marino to Barger:</u>    <u>No not fired</u> like any employee required to move to short term disability until your Dr. releases you medically to return to work. <u>When you return your salary restored</u> and you will be given a comparable job. . . .

137.    "Robin" referred to in Defendant Marino's November 19, 2016 text message to Barger is Robin Ording, a First Data VP in HR reporting up through EVP Marino. [The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]

138.    November 19, 2016 was the first time anyone at First Data communicated to Barger, after his diagnosis in February 2016, in writing or otherwise, that Barger's duties where in any way changing.

139.    Prior to being forced to take leave, as leader of the Training Group, Barger reported to Hack, who in turn reported to Charron, Head of Global Sales Solutions.

140.    Robin Ording, "interim" leader upon Barger's leave, reported to Marino, EVP of HR.

141.    No officer of First Data, including the Individual Defendants, ever advised Barger, in writing or otherwise, that Barger's performance was a reason for the change in his duties on the "interim" basis reflected in Defendant Marino's November 19th text messages.

142.    Barger was never advised, in writing or otherwise, that the Training Group would report through the human resources group headed by Defendant Marino rather than to Hack, Barger's immediate superior.

143.    Hack was never notified of Defendant Marino's November 18th and 19th communications and correspondence to Barger.

144.    Robin Ording's age is in her mid-forties [The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]

145.    Defendant Marino's age is in his early-fifties. [The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]

146.    Robin Ording replaced Barger as head of the Training Group and has continued in that role through the date hereof, and has provided First Data the same services that were transferred to her from Barger as described in Defendant Marino's text message of November 19, 2016.

147.    Barger was aware that First Data uses "reduction-in-force" ("RIF") policy as a style of management

148.    During a RIF, multiple employees are terminated, or "fired" simultaneously or in rapid succession after planning, documentation and implementation involving HR and all other senior managers whose organizations are to be affected.

149.    When Defendant Marino notified Barger by text message that Barger was being required to take leave, Barger immediately texted Defendant Marino back and asked the question "I am fired?".

150.    In his November 19th text, in response to Barger's question "I am fired?", Defendant Marino represented and assured Barger that he was "not fired," and that upon Barger's return Barger's his salary would be restored and he would be given a comparable job.

151.    Barger relied upon Defendant Marino's representations and assurances as an EVP of First Data

152.    After being advised by Marino on November 19th that First Data had decided that Barger must take leave, Barger requested FMLA leave from First Data from October 24, 2016 through January 16, 2017.

153.    In an e-mail from Defendant Johnson (VP HR in Atlanta) to Plaintiff Barger on December 15, 2016, Defendant Johnson wrote:

> **[First Data's] HR Service Center** has advised they received medical documentation from your doctor and **approved your leave request through the 12 week FMLA period ending 1/16/17**. . .
>
> Action needed: A Short Term Disability claim has not yet been filed. Therefore, your short term disability pay will not start until a claim is filed with MetLife and the necessary medical information is received by MetLife **(not FD [First Data])**. Please have your wife contact MetLife and advise that she needs to start a short term disability claim on your behalf.

154.    On December 16, 2016, Barger responded to Johnson by e-mail:

> You told me everything was taken care of. Now we have to file with MetLife. Are we going to loose [SIC] my coverage of STD?

155.    Later on December 16, 2016, Defendant Johnson wrote by e-mail to Barger:

> Hi Steve, **I was advised all was taken care of from a leave perspective, which is accurate.** [First Data's Human Resources Service Center] advised yesterday that **Short Term Disability is a separate process** . . .

156.    The December 15th and 16th e-mail exchange is attached hereto as Exhibit F, the terms of which are incorporated herein by this reference.

157.    Exhibit F is a true and correct copy of the December 15th and 16th e-mail exchange between Barger and Johnson.

158.    By letter dated December 15, 2016 (the "FMLA Approval Letter"), a copy of which is attached hereto as Exhibit G, the terms of which are incorporated herein, First Data approved Barger's request for FMLA leave for the period commencing October 24, 2016 and ending January 16, 2017.

159.   The FMLA Approval Letter of December 15, 2016 from First Data to Barger stated (emphasis added):

> Dear Steve [Barger]:
>
> <u>Your request for a leave of absence meets the criteria and qualifies as leave under the Family and Medical Leave Act ("FMLA"), and therefore has been approved for the following dates:</u>
>
> <u>Leave Start Date</u>:            10/24/2016
> <u>Expected Return to Work Date</u>:   01/16/2017
>
> **<u>Your FMLA approved time exhausts on 01/16/2017.</u>** . . .
>
> In addition, because your leave request is due to your own serious health condition, the attached Physician's Return to Work form must be completed and sent to Leave Management prior to your return. . .
>
> Sincerely
> Leave Management Team
> First Data HR Service Center

160.   The letter dated December 15, 2016 attached hereto as <u>Exhibit</u> G is a true and correct copy of the letter, with attachments, drafted and sent on or about December 15, 2016 by First Data to Barger regarding Barger's FMLA leave request approval.

161.   Defendant Marino's executive assistant at the time of Barger's leave request and approval (i) was not involved in Barger's leave application and approval process, and (ii) did not communicate or correspond with Barger or his wife.

162.   In the Defendant's Position Statement (sixth paragraph on page 13), First Data admits and states:

> First Data approved Mr. Barger's request for FMLA leave commencing October 24, 2016 with that approved FMLA leave ending January 16, 2017.

163.   At no time during the period of October 24, 2016 through January 16, 2017 (Barger's Leave Period") was Barger informed, in writing or otherwise, that First Data had issues with his performance.

COMPLAINT AND JURY DEMAND                                      23

164.    On January 10, 2017 each of the following occurred:

     a.    Barger received clearance from his physician to return to work and his physician's office provided a written return to work authorization to Barger (the physician's return to work authorization is attached hereto as Exhibit H, the terms of which are incorporated herein by reference);

     b.    Barger used his First Data issued security key card to enter First Data's Atlanta office, and hand delivered a copy of the physician's return to work authorization to Defendant Johnson, VP HR in Atlanta; and

     c.    Barger and Defendant Johnson agreed that Barger would return to work on Tuesday January 17, 2017, the business day after Barger's approved FMLA leave exhausted on Monday, January 16, 2017 (which was the Martin Luther King holiday).

165.    Exhibit H is a true and correct copy of the return to work authorization provided by Barger to Johnson on January 10, 2017.

166.    On the afternoon of Friday, January 13, 2017, merely three days after Barger and Defendant Johnson (acting as an authorized officer of First Data) agreed to Barger returning to work the following business day, Defendant Johnson, (an officer of First Data and experienced HR professional that had committed on behalf of First Data to Barger's return to work the next business day) completely changed First Data's representations and agreements on behalf of First Data, and told Barger by phone that:

     a.    Barger was being terminated by First Data;

     b.    The effective date of Barger's termination was February 28, 2017;

     c.    Barger's return to work as agreed by Defendant Johnson on behalf of First Data and Barger on January 10th was cancelled; and

     d.    Barger should not return to the office to work on January 17th as planned.

[The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]

167.    On the January 13, 2017 phone call between Defendant Johnson, acting as an officer of First Data with actual and apparent authority as First Data's vice president of human resources, and Plaintiff Barger, Defendant Johnson never mentioned a company-wide reduction-

in-force as the reason for Barger's termination.

168. None of the documents sent to Barger by First Data on and after the January 13, 2017 call between Defendant Johnson and Plaintiff Barger mentioned a company-wide reduction-in-force.

169. During the period between January 13, 2017 and February 28, 2017, Barger and First Data, through their counsel (including Defendant Graesser), attempted to negotiate a mutually agreed severance agreement.

170. During the severance negotiation, Barger raised issues regarding his FMLA, ADA, and ADEA claims and the value of his release.

171. First Data's severance negotiations during this period, including the conduct of Defendant Graesser, were not in good faith and in retaliation for Barger (who was still an employee) raising the FMLA, ADA and ADEA issues.

172. At no time during the seven weeks of severance agreement negotiations did First Data offer to restore Barger to his position, offer to place Barger in an equivalent position, or offer Barger a vacant position of any type.

173. At no time during the seven weeks of severance agreement negotiations, and for months thereafter, did First Data or its counsel indicate, in writing or verbally, indicate to Barger or his counsel, that Barger's termination was part of a company-wide reduction in force.

174. Barger's termination from employment by First Data was effective as of February 28, 2017 without a severance agreement or release having been reached between Barger and First Data.

175. On February 27, 2017, First Data had hundreds of job opening postings advertising available employment opportunities at First Data across the US and in other countries. See Exhibit K.

176. Each Individual Defendant (Bisignano, Marino, Charron, Whalen, Graesser, and Johnson) possessed the power to control Barger's employment with First Data, to fire Barger, to exercise supervisory authority over Barger, to determine Barger's compensation, and to maintain records regarding Barger's employment.

177.    Upon Barger's termination from employment, all of Barger's unvested Stock Options and unvested Restricted Stock Units were forfeited by Barger.

178.    Upon termination, Barger was no longer covered by First Data's group life insurance policy available to all employees regardless of medical condition, or the supplemental life coverage under that policy for which Barger paid premiums for nearly three years.

179.    Barger can no longer economically obtain life insurance coverage because of his cancer diagnosis and treatment.

180.    Barger has sought, but has not obtained, substantially similar employment since his termination by First Data on February 28, 2017.

181.    While seeking employment since his termination, Barger has voluntarily spent time counseling other cancer survivors that have undergone similar procedures as his.

182.    Since January 10, 2017, First Data posts almost daily through its Twitter (@FirstDataJobs) and on job posting aggregators, available employment positions.

183.    Of all of the available positions posted by First Data since January 10, 2016, Barger has not been offered a single one.

184.    Barger's counsel advised First Data and First Data's counsel in January 2017 to anticipate litigation and preserve all relevant evidence.

185.    Since being advised to preserve relevant evidence, First Data's @FirstDataJobs Twitter feed deleted numerous job postings that were available on February 28, 2017.

186.    First Data attempted to disguise these deletions by coordinating the date of July 28, 2016 and July 30, 2017. See Exhibits K & L.

187.    After First Data received notice to preserve all relevant evidence, First Data, or its agent, intentionally deleted all job postings and tweets between July 28, 2016 and July 30, 2017 on the Twitter account @FirstDataJobs.

## COUNT I
## VIOLATIONS OF THE FAMILY MEDICAL LEAVE ACT

### A. The FMLA Applies to All Defendants as to Barger's Leave, Return, and Termination

188.    Barger incorporates and restates each of the preceding paragraphs of this Complaint as if fully set forth herein.

189.    First Data was Barger's "employer" as that term is defined in the FMLA, 29 U.S.C. §2611(4).

190.    Defendant Bisignano, as Chairman & CEO of First Data, was Barger's "employer" as that term is defined in the FMLA, 29 U.S.C. §2611(4).

191.    Defendant Marino, as EVP HR of First Data, was Barger's "employer" as that term is defined in the FMLA, 29 U.S.C. §2611(4).

192.    Defendant Charron, as EVP, Head of Global Business Solutions of First Data, was Barger's "employer" as that term is defined in the FMLA, 29 U.S.C. §2611(4).

193.    Defendant Whalen, as SVP HR, was Barger's "employer" as that term is defined in the FMLA, 29 U.S.C. §2611(4).

194.    Defendant Whalen, as SVP HR, was Barger's "employer" as that term is defined in the FMLA, 29 U.S.C. §2611(4).

195.    Defendant Graesser, as Assistant General Counsel reporting to General Counsel Adam Rosman, is responsible for legal matters related to Frist Data's human resources department, had negotiating authority in discussions regarding Barger's termination, authority to agree to Barger's compensation package, was Barger's "employer" as that term is defined in the FMLA, 29 U.S.C. §2611(4).

196.    Defendant Johnson, VP HR in the Atlanta office of First Data assigned as a business partner to the Global Business Solutions group, was Barger's "employer" as that term is defined in FMLA, 29 U.S.C. 29 U.S.C. §2611(4).

197.    Barger was an "eligible employee" as that term is defined in the FMLA, 29 U.S.C. §2611(2).

198.    Barger's cancer was a "serious health condition" for purposes of the FMLA. 29 U.S.C. §2612(a)(1)(D).

199.    Barger's cancer, surgery, and recovery were each a "serious health condition" for purposes of the FMLA. 29 U.S.C. §2612(a)(1)(D).

**B.  All Defendants Violated the FMLA by Prohibiting Barger's Return from FMLA Leave**

200.    Barger refused, and was not required by First Data, to take FMLA leave from the time of his diagnosis through the time Defendant Marino advised Barger on November 19, 2016 that First Data was requiring him to take FMLA leave. [The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]

201.    Barger received the documentation to complete for requesting FMLA leave on or about November 19 2016. [The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]

202.    Barger completed the FMLA forms and requested FMLA leave for the period from October 24, 2016 through January 16, 2017. [The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]

203.    In response to Barger's FMLA leave request, First Data approved Barger's FMLA leave for the period October 24, 2016 through January 16, 2017:

a.  In the e-mail exchange of December 15 and 16, 2016 between Barger and Defendant Johnson (Exhibit F), Johnson (i) confirmed Barger's request for FMLA leave for the period of October 24, 2016 through January 16, 2017 had been approved by First Data, and (ii) advised Barger that the short-term disability insurance claim process was separate and distinct from the FMLA leave approval, with the FMLA leave handled by First Data's HR team, and the disability insurance claim process being handled by MetLife.

b.  The FMLA Leave Approval letter (Exhibit G) from First Data's Leave Management Team dated December 16, 2016 advised Barger that his FMLA leave was approved for the period October 24, 2016 through January 16, 2017.

     c.   The following statements were by made by First Data in its Position Statement filed with the EEOC (See Exhibit B):

       i.   First Data admits that Barger rejected the notion of his need to take, and did not take, leave during his radiation treatments. [Page 4 of the Position Statement]

       ii.   First Data admits that during surgery and recovery Barger did not take and First Data did not require Barger to take leave. [Page 5 of the Position Statement]

       iii.   First Data admits "On November 16, 2016, Marino sent FMLA paperwork to Barger. Barger had exhausted whatever paid time off he had, so Marino advised him that the Company would put him on short-term disability so that he could continue to receive income while he was on FMLA leave." [Page 5 of the Position Statement]

       iv.   "First Data states that Barger insisted that he not go out on leave and that First Data continued to pay his regular salary [following surgery]." [Page 13 of the Position Statement]

       v.   In the 16th paragraph of the initial EEOC Charge (Exhibit A), Barger alleged that "First Data approved Mr. Barger's request for FMLA leave commencing October 24, 2016 with that approved FMLA leave ending January 16, 2017." On page 13 of the Position Statement - "First Data admits that it approved Barger's request for FMLA leave as alleged in the third sentence of the 16th paragraph of the [Factual Background section of the initial EEOC Charge]."

204.    On January 10, 2017, Barger provided First Data his physician's return to work authorization (Exhibit H), and Barger committed to return to work on January 17, 2017 (the first business day after expiration of his FMLA approved leave). [The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]

205.    Any eligible employee who takes FMLA leave is entitled on return from leave to be restored by the employer to the position of employment held by the employee or restored to an equivalent position of employment. 29 U.S.C. §2614(a)(1).

206.    Barger was entitled to restoration of his position upon providing his physician release and timely returning from approved FMLA leave. See 29 U.S.C. § 2614(1).

207.    Department of Labor regulation 29 C.F.R. §825.214 provides:

> On return from FMLA leave, an employee is <u>entitled</u> to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment. An employee is <u>entitled</u> to such reinstatement even if the employee has been replaced or his or her position has been restricted to accommodate the employee's absence.

208.    In violation of 29 U.S.C. §2615(a)(1), each Defendant interfered with, restrained and denied Barger's exercise of his rights under 29 U.S.C. § 2614(1), by:

    a.  Denying Barger's right to return to the same or equivalent position upon completion of his FMLA approved leave;

    b.  Even if Barger's position had been eliminated, no Defendant offered Barger an equivalent position;

    c.  Even if Barger's position had been eliminated, no Defendant offered Barger any position of reduced responsibilities and benefits (e.g. the vice president position heading the Training Group, which First Data admits it needed); and

    d.  Prohibiting Barger from returning to the office as planned on January 17, 2017.

## C. **Defendants Violated the FMLA by not Offering an Alternative Position to Barger upon his Return**

209.    Upon return from FMLA approved leave, if an equivalent position is not available, an employer must offer an otherwise available position, even if at a reduced pay or benefits from the original position.

210.    As alleged above, Barger's duties and responsibilities were much broader than merely heading the Training Group.

211.    No one employee assumed all of the duties and responsibilities Barger held at the time of taking leave or at the time he was terminated.

212.    Any attempt to justify Barger's termination as part of a reduction-in-force is pretext because his aggregate duties and responsibilities, performed by Barger alone, have been assumed by multiple employees.

213.   In the Defendant's Position Statement (Exhibit B page 6), First Data admits (taking this statement at its face, despite it being pretext as alleged in Count I, Section F below), "[First Data] decided that it was unnecessary for a SVP to lead the Training Group and that a VP level employee would suffice. . . ."

214.   At no time, from Barger's notice of return to work on January 10, 2017 through his termination on February 28, 2017, did First Data, or any of the Defendants, offer Barger the ability to return from approved FMLA leave as VP to lead the Training Group.

215.   At no time, from Barger's notice of return to work on January 10, 2017 through his termination on February 28, 2017, did First Data, or any of the Defendants, offer Barger the ability to return from approved FMLA leave to a position with First Data, including the failure to offer Barger any of the following:

   a.   An equivalent position within First Data;

   b.   Any open position available at First Data (despite hundreds of open positions being advertised as available – See Exhibit K), whether or not that position would involve a reduction in responsibility, salary, or benefits; or

   c.   An open position at First Data that may require relocation within the United States or to First Data offices outside of the United States whether or not that position would involve a reduction in responsibility, salary, or benefits.

**D.  Defendants Violated the FMLA by Retaliating Against Barger's FMLA Right to Return from FMLA Approved Leave**

216.   The Defendants actions with respect to Barger's duties and responsibilities after Defendant Marino's November 3, 2016 visit to Barger's residence, were based on Marino's observations, and the Defendants' resulting assumption (improper and illegal), that Barger would not be returning to work because he would likely die, retire, or remain on disability.

217.   Barger never communicated, in writing or otherwise, to the Defendants that he intended to retire or remain on disability.

218.   Despite Defendant Marino indicating in his November 19, 2016 texts to Barger

1    that Robin Ording was being installed as an "interim" leader of the Training Group, the

2    Defendants decided that because Barger was so unlikely to return (based on Marino's short and

3    limited observations on November 3rd) that the control of the Training Group would be

4    permanently transferred to Robin Ording even though Barger was still on unexpired FMLA leave

5    approved by First Data.

6         219.    On January 10, 2017, Barger was receiving long-term disability benefits paid by

7    MetLife, First Data's disability insurer.

8         220.    Barger was terminated solely in retaliation for his exercise of his FMLA right to

9    return from FMLA approved leave.

10        221.    Barger was still employed by First Data between January 13, 2017 and February

11   28, 2017.

12        222.    The bad faith negotiations between January 13, 2017 and February 2017 between

13   Barger and First Data were in retaliation for Barger raising issues under the FMLA, ADA, and

14   ADEA.

15        223.    First Data would not have terminated Barger had he not tried to exercise his right

16   to return to work.

17        224.    The result of the Defendants termination of Barger included (i) Barger losing his

18   employment, salary, and bonuses; (ii) Barger's loss of his unvested Stock Options and Restricted

19   Stock (which were used as an inducement for Barger to accept employment with First Data), (iii)

20   Barger is no longer eligible for long-term disability benefits because he was able to return to

21   work; and (iv) Barger lost his group life and supplemental life insurance and he is no longer

22   economically uninsurable, and he lost his employment.

23        225.    All the Defendants based their decisions with respect to Barger's employment on

24   the assumption that Barger would die or be unable to return to work, based on Defendant

25   Marino's observations, and the Defendants permanently transferred Barger's Training Group

26   responsibilities (not all his responsibilities) while he remained on First Data approved FMLA

27   leave.

28

226.    The three day temporal proximity between (i) January 10th when Barger delivered his medical authorization to return to work and Barger agreed with Defendant Johnson that he would return upon expiration of his FMLA approved leave, and (ii) Defendant Johnson's January 13th notification to Barger that his employment was terminated, gives rise to an inference of retaliatory intent against Barger's exercise of his right to return under the FMLA, and that retaliation resulted in Barger's termination.

227.    In violation of 29 U.S.C. §2615(a)(1), each Defendant retaliated against Barger, by taking the adverse employment action of termination only upon his exercise of his FMLA protected right to return from FMLA approved leave.

228.    In violation of 29 U.S.C. §2615(a)(1), each Defendant engaged in bad faith negotiations of severance with Barger while he was employed and raising issues under the FMLA, ADA and ADEA.

### E. **Defendants' Willful Violation Justify FMLA Liquidated Damages**

229.    First Data violated the FMLA with full knowledge of its obligations to restore Barger to his position or to an equivalent position, to offer an alternative position, and to refrain from retaliating against Barger for exercising his right to leave and right to return from leave:

   a.    Defendant Marino is the Executive Vice President of First Data's Human Resources department and has had decades of experience in the human resources field, knowledge of the FMLA, and experience in hiring and firing decisions. Marino's bio setting forth his extensive human resources experience from First Data's publically available web site is attached as Exhibit I.

   b.    Exhibit I is a true and correct copy of Marino's bio information included on First Data's url site included therein as of the date hereof.

   c.    Defendant Graesser is the Assistant General Counsel of First Data, reports to the General Counsel, Adam Rosman, has more than 21 years of human resources, employment and labor law experience at First Data, and is responsible for the legal advice of First Data's Human resources department.

d.     Defendant Johnson is a Vice President in First Data's Human Resources Department with significant years of experience in the human resources field, knowledge of the FMLA, and experience in hiring and firing decisions.

e.     Defendants Marino, Graesser, and Johnson, and the First Data human resources organization reporting to EVP Marino, were involved in First Data's processing and approval of Barger's FMLA leave request, terminating Barger's employment, and prohibiting Barger's return to employment from FMLA leave.

f.     Defendant Graesser with more than 21 years of employment law experience advises First Data's human resources department in legal compliance and negotiates and litigates employee terminations.

g.     First Data has established a leave dedicated group within its human resources department, the Leave Management Team at the First Data HR Service Center (see the signatory to the FMLA Approval Letter).

h.     One of First Data's Leave Management Team's responsibilities is to assure First Data's operations comply with the FMLA.

i.     First Data's specialized Leave Management Team wrote and issued the December 15, 2016 FMLA Approval Letter approving Barger's FMLA leave for the period between October 24, 2016 and January 16, 2017.

j.     First Data's sophistication in establishing a special leave group within its human resources function under Defendant Marino's control and the legal counsel of Defendant Graesser shows First Data's, Marino's, Graesser's, and Johnson's knowledge that Barger had a right to return to work under the FMLA.

k.     First Data knowingly acted contrary to its FMLA obligation by refusing Barger's return and restoration, and by terminating Barger just prior to his scheduled return from approved FMLA leave.

l.     Marino's November 19, 2016 text messages to Barger (Exhibit E), sent two months before Barger's leave expired, show Marino knew First Data's obligations under the FMLA, as Marino's language closely tracks the right to return and salary restoration

concepts within the FMLA and its implementing regulations:

> Barger to Marino:     You are removing me from my job. <u>I am fired?</u>
>
> <u>Marino to Barger:</u>     <u>No not fired</u> like any employee required to move to short term disability until your Dr. releases you medically to return to work. <u>When you return your salary restored and you will be given a comparable job.</u> . . .

m.     Marino's November 19, 2016 text messages to Barger (<u>Exhibit</u> E), show Marino's acknowledgement that while Barger was recovering from surgery his job was being filled by another employee only on a "<u>interim</u>" basis while Barger was on FMLA leave, thus Marino knew that Barger was entitled to return to his position upon conclusion of FMLA leave:

> Marino to Barger:     Later today you will get a fed ex from me that will require you to begin disability claims process (short term and then if necessary long term). We've held off on this but now procedurally we are where we are. This will allow you to focus all of your energies on getting better and not be burdened by First Data work. <u>We will announce Robin as the **interim** leader on Monday so your team will have support.</u> We are all praying for your recovery and I personally look forward to our time on the links for years to come. Shoot me a note if you have any questions after you get the fed ex.

n.     On December 22, 2016, just days after the First Data approved Barger's FMLA leave by letter dated December 15, 2016, Defendants Marino and Whalen posted an article on each of their LinkedIn pages espousing their understanding and knowledge of the FMLA and their commitment to ideals embodied in the FMLA. (<u>See</u> <u>Exhibit</u> N). Defendants Marino, Whalen and Johnson, EVP, SVP and VP in First Data's human resources department, knew their obligations under the FMLA on January 10, 2017 when Barger presented, and Johnson accepted, his return to work authorization from his physician.

230.     Defendants' violations of the FMLA were not based on Defendants' good faith

and reasonable belief that refusal to allow Barger to return timely from his FMLA leave, refusal to restore Barger to his employment, salary, pay and benefits of his or an equivalent position, and termination of Barger, were compliant with FMLA.

231.    The actions of Defendants in violating the FMLA were taken with each of them knowing their obligations under the FMLA.

**F.  Pre-text**

232.    Any potential alternative explanations for Barger's termination by Defendants are without merit and are pre-text offered simply to cloud and obfuscate the real reason Barger was terminated - Barger was terminated because he exercised his FMLA protected rights to take leave, and most importantly, Barger had the audacity not to die or retire, but to exercise his FMLA right to return from his unexpired FMLA leave after his recovery from cancer surgery.

233.    The Plaintiff's EEOC Rebuttal (Exhibit C, the terms of which are incorporated herein) sets forth Barger's response to the Defendants' pretextual justifications set forth in the Defendant's Position Statement.

234.    Any attempt by Defendants' to rely upon Barger's performance as justification for his termination will simply be *ex post-facto* recreations of events.

    a.  Barger never received a written performance review Barger never received a negative written performance review.

    b.  Over the 18 months from June 2014 to January 2016, Barger was asked and accepted increasing responsibility from his initial hiring lead the sales transformation, to advise across the company on Barger's business needs analysis, to advise on preparation of equity offering disclosures and sales, traveling on nationwide road shows, traveling internationally, and being asked by Defendant Charron to develop plans for even further expanded responsibilities. This continuing expansion of responsibilities requested by First Data is not consistent with First Data's *ex post*-facto statements that Barger was a poor manager.

    c.  The results of the "360 degree" review of Barger's performance by his immediate

supervisor, Hack, direct reports, and peers, which was conducted in the latter half of 2016, reflect outstanding ratings and will not support any concocted claims of performance deficiencies.

   d.   Johnson's performance issue justifications in the Position Statement are not documented through First Data's HR performance review system and based solely on hearsay from unnamed sources.

   e.   If believed, the facts underlying the Defendant's Position Statement addressing "performance issues" were known by First Data during Barger's radiation, surgery, and recovery; and no action was taken on these hypothetical performance issues until Barger exercised his right to return to work.

235.   The after-acquired evidence doctrine is inapplicable to evidence in possession of the Defendants prior to Barger's termination. Any performance issues alleged by Defendants, by definition, must have been in Defendants' possession prior to Barger's leave or termination because Barger did not work during leave.

236.   Performance was not the issue. The issue that caused Barger to be terminated was that he did not die or retire as the Defendants expected. Barger was fired because he tried to come back to work from FMLA leave.

237.   Defendant Bisignano signed the CEO Action for Diversity & Inclusion pledge, personally committing to implementing the terms of that pledge in the operation of his and First Data's business.

238.   By signing the CEO Action for Diversity & Inclusion pledge, Defendant Bisignano  publically acknowledged that First Data and he recognized and understood

> The CEO Action for Diversity & Inclusion is the largest CEO-driven business commitment to advance diversity and inclusion within the workplace. This commitment is driven by a realization that addressing diversity and inclusion is not a competitive issue, but a societal issue. CEOs recognize that change starts with them. (See Exhibit M).

239.   By signing the CEO Action for Diversity & Inclusion pledge Defendant Bisignano pledged individually, and on behalf of First Data:

We will continue to make our workplaces trusting places to have complex, and sometimes difficult, conversations about diversity and inclusion: <u>We will create and maintain environments</u>, platforms, and forums <u>where our people feel comfortable reaching out to their colleagues to gain greater awareness of each other's experiences and perspectives. By encouraging an ongoing dialogue and not tolerating any incongruence with these values of openness, we are building trust, encouraging compassion and open-mindedness, and reinforcing our commitment to a culture of inclusivity.</u>
(<u>See</u> https://www.ceoaction.com/the-pledge/)

240.    By signing the CEO Action for Diversity & Inclusion pledge Defendant Bisignano individually, and on behalf of First Data and those in his organization, made a commitment to implementing all parts of the pledge. CEO Action for Diversity & Inclusion states:

As part of signing on to the CEO Action for Diversity & Inclusion™, <u>CEOs are committing to implementing all of the elements within the pledge.</u> (<u>Exhibit</u> M)

241.    By signing the CEO Action for Diversity and Inclusion pledge, Defendant Bisignano individually, and on behalf of First Data and those in his organization, committed to:

The CEO Action for Diversity & Inclusion are taking three essential actions. First, <u>each of the signatories are focused on cultivating workplaces that support open dialogue on complex, and sometimes difficult, conversations about diversity and inclusion.</u> (<u>Exhibit</u> M)

242.    Defendants Bisignano, Marino, Charron, Whalen, Graesser, Johnson and First Data have all failed in even approaching the goals of creating an atmosphere under Defendant Bisignano's pledge where people are comfortable reaching out to their colleagues to gain greater awareness of each other's experiences, of encouraging an ongoing dialogue, of not tolerating any incongruence with these values of openness, of building trust, encouraging compassion and open-mindedness, of reinforcing a commitment to a culture of inclusivity, or of focusing on cultivating a workplace that supports open dialogue on complex, sometimes difficult, conversations about diversity and inclusion..

243.    The Position Statement demonstrates exactly the opposite of this "supposed" pledge and commitment by Defendant Bisignano and First Data. The Position Statement reflects the Defendants disdain for employees with disabilities being in the presence of other employees, and open hostility to a dialogue about disabilities occurring at First Data's workplaces.

244.    Defendant Bisignano's pledge and commitments under the CEO Action for

Diversity and Inclusion were in place on July 18, 2017 when First Data's Position Statement was filed with the EEOC. Despite Defendant Bisignano's commitment to workplaces with open dialogue about difficult issues, Defendant Bisignano, in direct contravention of his pledge and commitments, allowed First Data to file a document with the EEOC in which Barger is criticized for merely speaking about his disability, and First Data used Barger's open dialogue on a difficult issue against him as justification for Barger's termination:

    a.  "Barger spoke often and explicitly about his health issues to his subordinates to the point that his sharing of the details made them feel uncomfortable." (Position Statement page 4)

    b.  "Before surgery, [Barger] called the Training Group together at a meeting, and once again, was very explicit about the procedure." (Position Statement page 4)

    c.  Employees in the Training Group came to Johnson and "expressed how uncomfortable they had been with Barger sharing intimate details of his medical condition." (Position Statement page 5)

245.    The filing of the Position Statement including such grounds for termination by First Data under the control of Defendant Bisignano is a clear violation of Defendant Bisignano's personal pledge and commitment towards diversity and creating an atmosphere of open dialogue.

246.    The Position Statement, contrary to Defendant Bisignano's pledge, directly says disabled employees at First Data should not discuss their disability at work and, if they do, they will be terminated for doing so.

247.    Defendant Bisignano was aware in creating an open dialogue about diversity and disability was part of First Data's stated policy and he publically pledged to uphold a policy of diversity, inclusion, and open dialogue of difficult issues.

248.    With knowledge, forethought, and intent, Defendant Bisignano (who had personal knowledge of Barger's condition and even insisted on Barger seeing a particular physician in Tampa) oversaw the termination of Barger in contravention of Defendant Bisignano's public pledge and the diversity and inclusion policies at First Data that he had put into place.

249.    Barger's discussion of his condition with his employees whose work would be impacted by Barger's absence during radiation treatments and laryngectomy surgery should have

1   been embraced by First Data under its policies and Defendant Bisignano's pledge, not used as an

2   attempt to justify Barger's termination.

3        250.    Defendant Bisignano never informed Barger in writing or verbally that Barger's

4   discussion of his cancer condition was inappropriate or unacceptable behavior under First Data's

5   policies.

6        251.    Nothing prohibits Barger advising the employees under his leadership of what to

7   expect while he was undergoing cancer treatment. Barger's job was to keep his team informed

8   about any events that would impact their performance. That the issue involved was a disability

9   does not mean the team should not be informed, and discussing his disability should not be a

10  criticism of Barger given First Data's policies, and Defendant Bisignano's commitment under the

11  CEO Action for Diversity & Inclusion pledge.

12       252.    These criticisms of Barger show Defendant Bisignano and First Data are not in

13  actuality committed to the goals they espouse, but rather these criticisms demonstrate that

14  Defendant Bisignano's publically stated goals as to diversity and inclusion are nothing more than

15  pretextual cover for illegal behavior by First Data and those reporting to Defendant Bisignano.

16       253.    Under First Data's policies and Defendant Bisignano's pledge individually and on

17  behalf of First Data, when employees allegedly came to Defendant Johnson stating they were

18  "uncomfortable" with Barger discussing his disability and treatment, Defendant Johnson should

19  have informed and counseled these unnamed employees about First Data's self-lauded inclusive

20  policies, Defendant Bisignano's pledge, First Data's tolerance for disabilities, the requirements of

21  the FMLA, ADA, and ADEA, and the policy and pledge of Defendant Bisignano and the

22  company to be inclusive and create a workplace where open dialogue regarding difficult issues is

23  encouraged.

24       254.    Instead of counseling those unnamed employees uncomfortable with discussions

25  of disabilities, in direct contravention of First Data's policies and Defendant Bisignano's CEO

26  pledge to diversity, First Data terminated Barger. First Data then had the audacity to write to the

27  EEOC that because Barger was demonstrating leadership in implementing First Data's policy, by

28  living example, by discussing complex and difficult issues surrounding his disability and

1  treatment, and the impact it would have on his co-workers during his treatment, First Data was
2  justified in terminating Barger.

3       255.   First Data's Position Statement justifying Barger's termination for these
4  conversations about his cancer cannot be a clearer example of retaliation against Barger for his
5  raising and discussing disability issues in the workplace.

6       256.   First Data, in its Position Statement, justifies the firing of an employee who
7  attempts to use his management role to demonstrate First Data's diversity policy, and Defendant
8  Bisignano's pledge, through his _actions_ (as opposed to merely the words and platitudes of the
9  Defendants).

10       257.   It was Defendant Johnson's job to counsel any employees who were creating an
11  atmosphere of hostility to disabilities. It was Defendant John's job to convey that these employees
12  needed to make adjustments to comply with First Data's policies, Defendant Bisignano's pledge,
13  and the law. Ms. Johnson forfeited a teaching moment, and instead First Data terminated Barger.

14       258.   Defendants Bisignano, Marino and Whalen are all superiors to Defendant Johnson
15  and should have enforced First Data's policies and Defendant Bisignano's pledge and
16  commitment.

17       259.   Defendant Graesser is a member First Data's legal department responsible for
18  representing the company on human resources issues and she should not have allowed First Data
19  to draft and send a Position Statement containing statements that try to justify a termination based
20  on an employee discussing his disability in the workplace.

21       260.   First Data's commitments and pledges to diversity are nothing more than pretext to
22  allow a discriminatory environment against those with disabilities to thrive and continue inside
23  the First Data organization under the control of Defendant Bisignano (CEO and Chairman).
24  Actions speak louder than words.

25       261.   The Defendant's Position Statement filed with the EEOC outlines First Data's
26  position that when a First Data manager, such as Barger, implements First Data's stated policy
27  and Defendant Bisignano's pledge, by becoming a living example of how to properly handle
28  diversity, that manager is, by the Defendants own claim, justifiably terminated.

262. Defendant Bisignano not only allowed his organization (including all of the other Defendants) to engage in discrimination in violation of the FMLA, ADA and ADEA by terminating Barger, Defendant Bisignano also allowed his organization (including all of the Defendants) to knowingly used First Data's admitted acts of exclusion and stifling dialogue as pretext for an illegal termination in First Data's Position Statement.

263. In signing the CEO Action for Diversity and Inclusion, Defendant Bisignano publically declared that he, individually, and First Data (including the Defendants) had knowledge of the federal laws and regulations impacting diversity and inclusion (including the FMLA, ADA and ADEA), and Defendant Bisignano swore personally to see that those laws and the pledge he had taken were upheld and implemented within First Data.

264. First Data's behavior in terminating Barger on this justification is another example of retaliation. Barger's leadership, both legally compliant and in line with First Data's stated policies and Defendant Bisignano's pledge, resulted in his termination.

265. Defendant Johnson's statements in First Data's Position Statement demonstrate Barger was terminated because he implemented First Data policy and Defendant Bisignano's pledge.

266. Each Defendant knew that the action of terminating Barger was in violation of the FMLA and contrary to Defendant Bisignano's public pledge and commitment.

267. Any attempt to justify Barger's termination as part of a company-wide reduction-in-force ("RIF") will be an *ex post-facto* re-writing of history to try to defend First Data's illegal termination based on Barger exercising his FMLA protected right to return from leave, the failure to restore him to his position, and the failure to even offer him an alternative position (even while First Data stated all that was needed was a VP instead of a SVP in the position and hundreds of open positions were being advertised See Exhibit K).

    a. Barger was aware that planned RIF's were part of First Data's Management practices;

    b. By text message on November 19, 2016 to Defendant Marino, despite Barger never having received any communication from anyone at First Data regarding poor

performance or any other potentially justifiable issue for termination and knowing he was about to start the process for FMLA protected leave, Barger directly asked Defendant Marino if his being required to take leave meant that he was being fired (Exhibit D);

c.  On November 19, 2016, Defendant Marino's text messages indicate Barger was not being fired and that Barger would be returned to his position or comparable position after recovery –either no RIF involving Barger was planned, or Marino lied to Barger.

d.  On January 10, 2017, Barger used his First Data security key card, which was still active, to enter the Atlanta facility, and provided Defendant Johnson his return to work authorization. Defendant Johnson was Barger's local, Atlanta HR contact person with regards to his FMLA leave. Defendant Johnson had previously sent e-mails advising Barger of his leave approval (see Exhibit F). Barger and Defendant Johnson agreed Barger would return to work on January 17, 2017. Defendant Johnson (VP of HR) could not have been aware of a RIF involving Barger because Barger and Defendant Johnson mutually agreed to his return to work date.

e.  On January 10, 2017, had a RIF been in place that included Barger in the list of terminated employees, Barger's security key card would not have worked, and Defendant Johnson would have refused to accept Barger's return to work authorization and informed Barger that he was part of the RIF at that time. Instead, on January 10, 2017, Barger's security key card was operational, Defendant Johnson accepted Barger's return to work authorization, and Defendant Johnson and Barger established an agreed return to work for January 17, 2017.

f.  On the January 13, 2017 phone call between Defendant Johnson and Barger, Defendant Johnson did not indicate that Barger was being terminated as part of a RIF.

g.  In the letter and documents received by Barger on or about January 13, 2017 from First Data, Defendant Johnson did not indicate Barger was being terminated as part of a RIF.

h.  From January 13, 2017 through February 28, 2017, and then for months thereafter, First Data's counsel (both in-house and outside) and including Defendant Graesser

communicated numerous times in writing regarding Barger's termination, and not once in those writings (or even the conversations between counsel) was a RIF ever mentioned as the reason for Barger's termination.

i. At no time during the attempted negotiation of a severance agreement and potential release of claims between First Data's and Barger's counsel in January and February 2017 did First Data or First Data's counsel ever refer to a RIF as a potential defense to the FMLA, ADA, and ADEA claims being raised by Barger.

268. Barger's recovery, obtaining his doctor's clearance to work, and setting a return to work date (none of which First Data assumed would occur or anticipated) triggered Barger' termination. The temporal proximity of events makes the connection obvious. Barger notified First Data he would return to work and delivered his physician clearance on January 10, 2017. On January 13, 2017, just three days later Barger was terminated even though he had not been terminated, even though he had not been put on performance notice, disciplined, or in any way sanctioned throughout his entire cancer radiation and surgery ordeal.

269. Barger was fired because he exercised his right to return to work under the FMLA and any attempt to include him as part of a subsequent RIF is disingenuous and pre-text to cover illegal acts.

### G. Destruction of Evidence

270. Since January 10, 2017, First Data posts almost daily through its Twitter (@FirstDataJobs) and on job posting aggregators, available employment positions.

271. Of all of the available positions posted by First Data since January 10, 2017, Barger has not been offered a single one.

272. Barger's counsel advised First Data and First Data's counsel in January 2017 to anticipate litigation and preserve all relevant evidence.

273. Since being advised to preserve relevant evidence, First Data's @FirstDataJobs Twitter feed deleted numerous job postings that were available on February 28, 2017. Exhibit K.

274. First Data attempted to disguise its destruction of relevant evidence by

coordinating the date of July 28, **2016** and July 30, **2017**, and deleting all postings over the year between those dates. See Exhibits K & L.

275.    After First Data received notice to preserve all relevant evidence, First Data, or its agent, intentionally deleted all job postings and tweets between July 28, 2016 and July 30, 2017 on the Twitter account @FirstDataJobs.

**H. Remedies.**

276.    Under 29 U.S.C. §2617(a)(1) & (3), First Data's violations of the FMLA entitle Barger to such equitable relief as may be appropriate, and damages equal to the following:

(i)   Wages, salary, employment benefits, and other compensation denied or lost by Barger by reason of the violations; plus

(ii)  Interest on the amount described in (i) at the prevailing rate; plus

(iii) Liquidated damages equal to the sum of (i) and (ii); plus

(iv)  Reasonable attorney's fees, reasonable expert fees, and other costs.

277.    Barger's lost wages, salary, employment benefits and other compensation includes annual salary of $480,000, and annual bonuses of $250,000 (Exhibit J), the value of 18,455 Stock Options and 10,330 Restricted Stock Units forfeited upon Barger's termination, and the value of lost group life insurance.

278.    Barger is 72 years old and a cancer survivor/patient.

279.    Barger's "work-life" expectancy at age 72 is at least 10 years.

280.    At Barger's age and with his medical history, there is minimal likelihood of Barger finding substantially similar employment in Atlanta, or anywhere in the country where he could relocate, to that of his Senior Vice President position held at First Data (a New York Stock Exchange traded company, with world-wide operations and more than 20,000 employees, a market capitalization in excess of $14 billion, and annual revenues in excess of $11 billion).

281.    Negative inferences, if not sanctions or verdict, should be the remedy for First Data's knowing and intentional destruction of evidence during the period that they not only should have anticipated litigation, but actually where directly told to anticipate litigation.

**WHEREFORE**, Plaintiff requests that this Court enter judgment against the Defendants with respect to Count I for violations of the FMLA providing for the following relief:

(i)   Compensatory damages under 29 U.S.C. §2617(a)(1)(A)(i)(I) as back-pay, and front-pay to age 78, including lost wages, salary, bonuses, life insurance, stock options, and restricted stock units; and

(ii)  Interest on the compensatory damages determined under 29 U.S.C. §2617(a)(1)(A)(i)(I) at the prevailing rate (see U.S.C. §2617(a)(1)(A)(ii)); and

(iii) Liquidated damages under 29 U.S.C. §2617(a)(1)(A)(iii) in an amount equal to the sum of compensatory damages and interest; and

(iv)  Reasonable attorney's fees, reasonable expert witness fees, and other costs under 29 U.S.C. §2617(a)(3); and

(v)   That Plaintiff be granted a trial by jury as to all issues in this Complaint;

(vi)  Negative inferences or such other remedies be imposed for Defendants' destruction of evidence, as the Court deems appropriate; and

(vii) Such other and further relief, including equitable relief, as the Court deems appropriate.

ZEITLIN & ZEITLIN, P.C.                    THE LAW OFFICE OF SHAWN SHEARER, P.C.

By:                                        By:
David Zeitlin                              Shawn Shearer (Pro Hac Vice Application Pending)
50 Court Street, Suite 506                 3839 McKinney Avenue, Suite 155-254
Brooklyn, NY 11201                         Dallas, TX 75204
Tele: (718) 522-5644                       Tele: (214) 434-1594
david@zeitlinlawfirm.com                   shawn@shearerlaw.pro

Attorneys for Plaintiff