**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEVEN B. BARGER, an individual | **Case No. 1:17-cv-4869** |
| Plaintiff | |
| v. | |
| FIRST DATA CORPORATION, *et al.* | |
| Defendants. | |

**REPLY**

**IN SUPPORT OF**

**PLAINTIFF'S MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(c)**

Steven B. Barger ("Plaintiff"), through his undersigned counsel, submits this Reply in Support of Plaintiff's Motion for Partial Judgment on the Pleadings pursuant to Rule 12(c) ("Motion") against Defendants First Data, Bisignano, Charron and Marino and in response to the Opposition of Defendants ("Opposition").[1] In deciding the Motion, the Court may consider the Complaint, the Answer, any written documents attached to them and any matter of which the court can take judicial notice for the factual background of the case. *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir.2009). Capitalized terms used, but not otherwise defined, herein have the meaning ascribed in the Motion and its supporting Memorandum.

## I.   "DON'T CALL IT A COMEBACK" – James Todd Smith (aka LL Cool J)

The FMLA was the result of Congress balancing the need to resolve the conflict of employees needing to choose between tending to their health concerns and keeping their jobs. Congress established that Americans have two important workplace rights: the entitlement to take leave and the entitlement "<u>to be</u>" restored upon completion of leave. Unpaid leave without restoration is nothing more than termination.

Plaintiff Barger was diagnosed with throat cancer in February 2016 (he underwent 30+ radiation treatments, continued his schedule, and did not take leave). Mr. Barger underwent laryngectomy surgery in September 2016 (he did not take leave, he worked from his hospital bed and nearby hotel while recovering). Mr. Barger returned home in October to continue recovery (he did not take leave and worked from his home). In November 2016, Defendants forced Mr.

---

[1] The Motion does not seek judgment against Defendants Whalen and Johnson at this time. Both were employees within HR at the time of Plaintiff's termination. Neither outranked Plaintiff nor had direct supervision or corporate reporting over Plaintiff. If discovery proceeds, facts will develop to show that these two defendants did exercise sufficient control under *Gradziado* to be deemed "employers" for purposes of the alleged FMLA violations. On the other hand, Defendants admit Mr. Bisignano is the Chief Executive Officer of First Data. The CEO has the authority to fire or terminate any employee of the company and therefore is an "employer." Defendants admit Marino (EVP HR) wrote Plaintiff to require him to take leave and to cease working on First Data business, demonstrating Marino's control of Plaintiff's working schedule and conditions. Mr. Charron was EVP responsible for the Training Group when Plaintiff began his leave. An employee's supervisor has the power to hire and fire. Bisignano, Charron, and Marino are "employers" for purposes of the FMLA based on the facts admitted in the Answer. No matter resolution of the "employer" status of individual defendants, the Answer and Opposition do not deny First Data was an "employer", and therefore First Data is liable for the violations of the FMLA set forth in the Motion.

**Reply in Support of Plaintiff's Motion for Partial Judgment**
**on the Pleadings Pursuant to Fed. R. Civ. P. 12(c)**

Barger to take leave, and Plaintiff complied. Less than 60 days later, on January 10th, Mr. Barger delivered, and Defendants accepted, an FMLA required physician's return to work authorization. Then, with just two business hours left before Mr. Barger's return to work, Defendant Johnson called Mr. Barger's cell phone to unceremoniously terminate him and tell him he could not return to the office as scheduled.

If Mr. Barger, with the strength to recover from radiation and surgery, and the desire to return to work as quickly as possible, can be terminated under these circumstances without any resulting FMLA violation, we all need to admit that the FMLA has been gutted and is worthless, and all the work toward its passage was for nothing. *See* <u>Exhibit</u> D. Most Americans do not have the wherewithal to put up a fight against a $12 billion revenue, publically-traded company, whose executives have Citi and Willis pedigrees, and flagrantly admits violations of the law. The fortitude, strength and fight that brought Mr. Barger from the precipice due to cancer to requesting restoration to his work, is the same fortitude, strength and fight that must be applied against blatant, admitted violations of the rights of employees under federal law.

## II.   DEFENDANTS ADMIT VIOLATING THE FMLA – RESTORATION WAS REQUIRED UPON ACCEPTING A PHYSICIAN'S AUTHORIZATION

The Answer admits all facts leading to only one valid, legal conclusion: Defendants interfered with Plaintiff's entitlement to restoration under the FMLA. Rather than use their available 25 pages to demonstrate otherwise, the Opposition relies on a new affidavit of Jennifer Voycheske, HR Manager in First Data's Omaha office (with the Exhibits thereto, the "Affidavit") that merely outlines First Data's disability insurance benefits, payroll software, and communication struggles with MetLife (an insurance company with no relevance). Ironically, "First Data" has many issues with its data, when data is its business. The Affidavit gives insight into First Data's dysfunctional HR practices, and the disability insurance benefits information contained therein neither addresses nor disproves Plaintiff's FMLA interference claims. The Affidavit is full of non-sequiturs, designed to appear contradictory to Defendants' Answer in an attempt to manufacture fact issues. The Opposition's listing of paragraphs of the Complaint that

**Reply in Support of Plaintiff's Motion for Partial Judgment
on the Pleadings Pursuant to Fed. R. Civ. P. 12(c)**

are "denied" in the Answer does not create fact issues, as those listed "denied" paragraphs are irrelevant to Plaintiff's interference claim in this Motion.[2] Defendants' relevant admissions are set forth in <u>Exhibits</u> A-1 & A-2 hereto. The Opposition is nothing but another time-waster designed to obscure the truth and deny Plaintiff his timely resolution.

This case is simple. The Answer admits, and the Opposition does not deny: (i) First Data was Plaintiff's "employer" for purposes of the FMLA; (ii) *McDonnell Douglas* burden shifting does not apply to interference claims under the FMLA; (iii) in November 2016 Defendants forced Plaintiff to take FMLA leave; (iv) in November 2016 Plaintiff applied for, and Defendants approved, FMLA leave through January 16, 2017; (v) Plaintiff's return to work required a physician's authorization letter per Defendant First Data's chosen FMLA leave policy; (vi) 29 C.F.R. §825.216, provides that the trigger date for the right to restoration is the date on which the employee requests reinstatement; [3] (vii) the delivery of a physician's authorization triggers the

---

[2] Under Fed. R. Civ. P. 11, Defendants' counsel was obligated to perform a reasonable inquiry as to the factual contentions and responses in the Answer. The sudden appearance of the Voycheske Affidavit purporting to *retroactively* change dates and periods that contradict the Answer should be viewed with significant skepticism. Defense counsel had nine months to perform inquiry before filing the Answer, and now attempts to confuse facts admitted in that Answer in a transparent attempt to create a fact issue where none exists. Nothing asserted in the Affidavit occurred after the Answer was filed. Either Defendants' counsel failed to engage in a reasonable inquiry prior to filing the Answer, or there is an attempted fabrication of events, or both. This behavior is consistent with Complaint allegations regarding Defendant First Data's Twitter feed containing jobs available on the day of Plaintiff's termination being deleted after counsel was notified to place a legal hold. Plaintiff delivered the Motion to Defendants' counsel February 6th. On February 7th, the Court's scheduling order approved the Motion briefing schedule. On February 8th, Defendants served an amended Rule 26(a) disclosures to include Ms. Voycheske as a disclosed witness (a year after the events disclosed in the Affidavit). The Opposition then completely relies on the Affidavit. This timing strains credulity. <u>Upon receipt of the Opposition, February 20th, Plaintiff noticed a deposition of Ms. Voycheske for February 23rd in Omaha where she is employed. Defense counsel refused to produce Ms. Voycheske.</u> ***"Something is rotten in the state Denmark"*** **– William Shakespeare.**

[3] The Opposition contains no retort to the future tense "<u>to be</u>" and the past tense "restor<u>ed</u>" in 29 U.S.C. §2614(a). The Opposition admits the question of the validity of 29 C.F.R. §825.216 is an issue of first impression in the 2nd Circuit and relies upon the *Yashenko* decision in the 4th Circuit (the grammatical tense conflict between "<u>to be</u>" and "restor<u>ed</u>" was not presented to that court). For the reasons set forth in the Motion, *Yashenko* was decided improperly. 29 C.F.R. §825.216 directly conflicts with both (i) the clear and unambiguous language of 29 U.S.C. §2614(a)(3) and (ii) the DOL's regulation in 29 C.F.R. §825.214 requiring reinstatement when an employee is replaced or a position restructured to accommodate an employee's absence during leave. For purposes of the analysis in this Reply, the Plaintiff assumes the validity of the 29 C.F.R. §825.216, which clearly states, and the Opposition does not deny, that an employer may not lay-off an employee that has requested reinstatement. This Reply should not be construed as a waiver of Plaintiff's position that 29 C.F.R. §825.216(a) is not entitled to deference under *Chevron* and its progeny. If the Court would like to explore this issue now, the Plaintiff respectfully requests additional briefing to provide the Court the necessary analysis of *Chevron,* as it has been developed to date, to discuss Article III deference to Article II regulations that are in conflict with an Article I statute.

**Reply in Support of Plaintiff's Motion for Partial Judgment**
**on the Pleadings Pursuant to Fed. R. Civ. P. 12(c)**

obligation to restore from FMLA leave; (viii) on January 10, 2017, Plaintiff provided, and Defendants accepted, his physician's authorization for Plaintiff's reinstatement; (ix) after accepting the required physician's authorization, Defendants failed to restore Plaintiff to his position or an equivalent position; and (x) Plaintiff's job had not been eliminated but transferred to Ms. Ording in Melville. In other words, Defendants admit they interfered with Plaintiff's entitlement "to be" restored under the FMLA upon requesting reinstatement.

Exhibits A-1 and A-2 hereto set forth Defendant's numerous admissions, paragraph by paragraph, and compare Plaintiff's Complaint and Exhibits to Defendants' Answer. Based on those documents, Plaintiff and Defendants are in complete agreement about all facts relevant to determining Defendant's strict liability in this case. To wit: (i) the dates when FMLA leave requested and was granted, (ii) the period of time for which FMLA leave was approved; (iii) the conditions of FMLA leave and return; (iv) Plaintiff's satisfaction of the conditions to return; and (v) Defendants' unqualified acceptance of the physician's authorization. At the time the physician's authorization was delivered and accepted, Defendants had an absolute duty to restore Plaintiff. *Brumbalogh v. Camelot* 427 F.3d 996 (6th Cir. 2005).

Defendant's Opposition to this Motion relies solely upon their Answer to ¶2(a)(ii) of the Complaint: Complaint- "**First Data approved Barger's FMLA leave for the period from October 24, 2016 to January 16, 2017**"; Answer- "**Admitted**. By way of further answer, **ADDITIONAL FMLA leave was approved retroactively** to cover the period from September 5, 2016 through November 28, 2016" (emphasis added).

"ADDITIONAL FMLA LEAVE" approved "retroactively" is not the same as retroactively eliminating, adjusting, or re-characterizing previously approved FMLA leave.[4] Nothing in the Opposition retracts Defendants' "Admitted" response to ¶2(a)(ii) in the Answer – First Data approved Barger's FMLA leave for the period from October 24, 2016 to January 16, 2017. The

---

[4] 29 U.S.C. §2653 provides: the FMLA is not to be "construed to discourage employers from adopting or retaining leave policies more generous that the policies that comply with the requirements of the FMLA."

**Reply in Support of Plaintiff's Motion for Partial Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c)**

Affidavit simply presents irrelevant information about First Data's HR inadequacies hoping this Court will misinterpret the existence of internal HR communication and processing issues as creating non-existent fact issues with regards to Plaintiff's statutory entitlements under the FMLA. Defendants chose the point in the Answer at which to admit their approval of Plaintiff's additional FMLA leave, and that point was the admission to ¶2(a)(ii). The placement of the "additional FMLA leave" averment in the Answer to this specific paragraph of the Complaint was intentional and means Defendants meant FMLA leave "additional" to that already approved as alleged in the Complaint and admitted in the Answer. As set forth in Exhibits A-1 & A-2, the admissions in the Answer alone provide all the justification for this Motion and for determining Defendants' liability.

The Plaintiff relied on the instruction, emails and letters from Defendants regarding his leave [Complaint Exhibits F & G] when making decisions regarding leave and return. Defendant Marino (HR EVP) required Plaintiff to take leave on November 19th. In December Defendant Johnson (HR VP) assured Plaintiff his leave was approved through January 16th. Now, over a year later, Ms. Voycheske, an HR manager, provides emails in an awkward attempt to prove that Plaintiff's FMLA leave had been exhausted in November, just days after EVP Marino first told Plaintiff to request leave and weeks before VP Johnson advised Plaintiff that his leave had been approved through January 16th. The Affidavit should be ignored as it only addresses disability insurance employee benefits, but if considered, Ms. Voycheske's *ex post facto* recreation merely supports Plaintiff's interference claim by further admitting violations of the FMLA.[5] Voycheske

---

[5] If the Court chooses to examine the Affidavit, take note that on page 1 of Exhibit 1 to the Affidavit, Voycheske provides an e-mail dated January 5, 2017, 4:24 pm CST, from Plaintiff wherein Plaintiff wrote to her: "I plan on returning Jan 17. Will get dr. approval on 10th." The Affidavit provides, on page 1 of Exhibit 3, an email less than two-and-a-half hours later, 6:40 pm CST, wherein Voycheske notifies other First Data employees, contractors and insurance administrators of her ad hoc recalculation of Plaintiff's FMLA leave dates and revision of the "FMLA panels" in the system. Yet, Voycheske does not bother to respond to Plaintiff's earlier e-mail to notify him that (i) Voycheske had changed his leave dates in the system and that her newly created records show his leave had been "exhausted" more than a month prior to this e-mail exchange of January 5th, or (ii) his physician's authorization, which First Data required to return from FMLA leave, was no longer required because he was no longer on FMLA leave. The Affidavit claims Voycheske mailed, by US Post, a letter to Plaintiff with recalculated leave dates, dated January 5, 2017 (Thursday night), after Voycheske had just learned of Plaintiff's restoration request and his intent to obtain physician's authorization the following Tuesday morning. What is clear from the timeline of the emails, this letter could not possibly have been mailed before close of business on January 5th, or at any time that day between

admits she interfered by changing leave dates in the HR system after being advised by Plaintiff that he was requesting reinstatement from FMLA leave.

There remains one inescapable reality based the facts that were (i) alleged in the Complaint, (ii) affirmed in the Answer, (iii) alleged in the Motion, and (iv) affirmed again in the Opposition -- Defendants are liable because they voluntarily chose to require, and then accepted, a physician's authorization as the final condition for completion of Plaintiff's return from FMLA leave. There is only one statutorily valid mechanism for Defendant to require a broad physician's certificate of fitness as a condition to return – the FMLA. If Plaintiff was not returning from FMLA leave, Defendants could not require, and could not accept, an FMLA physician's certificate of fitness.[6] The only conclusion is that the Plaintiff obtained, and Defendants accepted, a physician's authorization because Plaintiff was returning from FMLA leave.

Defendants admit that during the period between September and November 2016, Plaintiff did not request, and Defendants did not require Plaintiff to take FMLA leave. [Complaint &

---

4:30 and 6:40 pm when Ms. Voycheske expresses her confusion with the situation by e-mail. At no point during January 5th to 10th does Voycheske notify or claim to notify Plaintiff that he does not need to provide the physician's authorization to return from FMLA leave he indicated he would provide on January 10th. When Plaintiff obtained and provided his physician's authorization letter on January 10th, Defendant Johnson (VP HR) accepted it. If Voycheske (manager of HR) changed the leave dates in the HR system, not just the disability insurance benefits dates in the system, Defendant Johnson should not have accepted the authorization. BUT SHE DID.

The Affidavit remains wholly irrelevant to the Motion. If the Court wishes to consider its content, the only relevant information is the admission that Defendant First Data, through its HR Department, intentionally interfered with Plaintiffs right to return to work when Ms. Voycheske confused disability insurance benefits with FMLA leave, and she changed the FMLA leave dates in the system after Plaintiff had already advised her of his request for reinstatement. This admission by Voycheske only compounds Defendants problem. The Affidavit should be disregarded as an irrelevant discussion of insurance benefits. Despite its overall uselessness, it does confirm that Plaintiff requested reinstatement from FMLA leave and then was not restored after his employer manufactured revised, retroactive leave dates in the system. The Affidavit also (i) fails to specify exactly what kind of leave Plaintiff was utilizing upon his alleged "exhaustion" of FMLA leave and (ii) provides no insight into a definition of "retroactively" that conflicts with Defendants' admission of "additional FMLA leave" in the Answer. Plaintiff was granted additional FMLA leave "retroactively" because Defendant Marino forced Plaintiff to apply for FMLA leave on November 19, 2016. Once Defendant First Data received Plaintiff's written leave request, it was given legal effect as of October 24th with leave ending January 16th. The Affidavit at best only indicates "additional FMLA leave" was retroactively added for the period of September 5th through October 23rd, with leave still ending on January 16th.

[6] Without the protections in the FMLA permitting physcian's authorizations to return, the Defendants requirement and unqualified acceptance of Plaintiff's physician authorization may violate the ADA and possibly HIPAA.

**Reply in Support of Plaintiff's Motion for Partial Judgment**
**on the Pleadings Pursuant to Fed. R. Civ. P. 12(c)**

Answer ¶¶102, 118-124; Exhibit A-1 & A-2] Defendants First Data, Bisignano, Charron, and Marino were aware of the reason for Plaintiff's absence during this period. [Complaint & Answer ¶113]. Defendants admit Plaintiff was not given an application to request FMLA leave until after November 18, 2016. By letter dated December 15, 2016, the Defendants approved the leave requested by Plaintiff for the period of October 24, 2016 to January 15, 2017. [Complaint Exhibit G] On January 5th, Plaintiff specifically advised Defendants (and their proxy, Ms. Voycheske) that he would obtain his FMLA required physician's authorization on January 10th, and return from leave on January 17th (the 16th being the MLK holiday). Defendants admit that the physicians' authorization was delivered and accepted as scheduled.

Defendants admit the leadership of the Training Group was transferred on an "interim" basis to Ms. Ording during Plaintiff's FMLA leave. Defendants admit Ms. Ording assumed all of Plaintiff's duties and that she continues to perform those duties. Plaintiff's position was not eliminated, it was restructured and moved to Melville. 29 C.F.R. §825.214 provides that even if Plaintiff had been replaced or his position restructured to accommodate his absence, he was entitled to reinstatement to an equivalent position. Defendants admit they failed to reinstate in violation of 29 C.F.R. §825.214.[7]

## III.   DISABILITY INSURANCE **IS NOT** FMLA LEAVE

The Opposition and Affidavit do not change any admitted facts or create any factual issues. In ¶5 of the Affidavit, Ms. Voycheske swears (emphasis added):

---

[7] In Section IV.C on pages 10 & 11 of the Opposition, Defendants admit to another FMLA violation. Defendants admit on January 13, 2017 Plaintiff was directed not to return to the office and that his termination was to be effective on February 28, 2017. [Complaint & Answer ¶166] Defendants then assert Plaintiff was restored during this period to a job that involved full pay and staying home to negotiate a severance agreement. This "restoration," if credible, was not to an equivalent position. The job duties and responsibilities of sitting at home for six-weeks negotiating severance are not the same as the responsibilities of running the Training Group of a multi-national, publically traded, company. This asserted "restoration" flies in the face of 29 C.F.R. §825(a)(1), if it survives *Chevron*, that provides: "Restoration to a job slated for lay-off when the employee's original position is not would not meet the requirement of an equivalent position. . ." If Defendants are correct (which is disputed, but reading in the light most favorable to the non-moving party) and Plaintiff was "restored," then Defendants admit Plaintiff was restored to a position slated for lay-off while his original position still existed and was transferred to Ms. Ording and she continues in that position today. Defendants admit they violated the FMLA. 29 C.F.R. §825.216(a)(1).

**Reply in Support of Plaintiff's Motion for Partial Judgment
on the Pleadings Pursuant to Fed. R. Civ. P. 12(c)**

> **My current duties and responsibilities include** managing First Data
> employee's leave of absence, including but not limited to **leaves
> under the Family and Medical Leave Act ("FMLA") AND** First
> Data's **short-term and long-term disability plans**.[8]

Ms. Voycheske's own description of her duties demonstrates the irrelevance of the Affidavit

for purposes of determining FMLA liability. Plaintiff concedes there is a difference between

statutory FMLA entitlements subject of the Motion and the administration of privately provided

disability insurance benefits. All the Affidavit's attached e-mails and screenshots relate to First

Data's employee disability insurance benefits administered by MetLife, not statutory FMLA

leave. The scope of Ms. Voycheske's job responsibilities, MetLife's disability insurance policy

eligibility date calculations, and the other assertions in the Affidavit, have no relevance to an

employee's statutory right to FMLA protected leave and restoration. The Defendants' admissions

in the Answer (not Ms. Voycheske's e-mail ramblings about insurance policy administration) are

controlling. The manner in which First Data decided to compensate Plaintiff while he was

undergoing radiation, surgery, prosthetic implantation, and recovery has no bearing on when

Plaintiff requested FMLA protected leave as required by Defendant Marino(November), when

First Data approved that FMLA leave as reflected in the FMLA approval letter (December),  or

when that requested and approved FMLA leave ended (January 16th). The Affidavit does not

need to be considered at all because it is extraneous and does not create any issue of fact relevant

to Plaintiff's FMLA interference claims subject of the Motion.

The distinction between FMLA leave and disability insurance employee benefits also is

admitted by the Defendants in the Answer. [Complaint & Answer ¶¶2(i), 120-124, 152-160,

162][9]. *See* Exhibits A-1 & A-2. Defendants admit Plaintiff refused to take leave while

---

[8] The statements made in the Affidavit regarding Ms. Voycheske's duties use the terms "includes" and "including" twice. This means that she has other duties as well. Defendants have chosen only two of her various duties to intentionally create a conflation of short-term disability and FMLA leave, but only Ms. Voycheske's FMLA leave related responsibilities are relevant.

[9] With respect to each of these paragraphs, the Answer merely states that the "document speaks for itself" or is a "legal conclusion" not requiring a response. Accordingly, for Rule 12(c) purposes, the Court may consider the documents attached to the Complaint, and, doing so, should follow the instructions in the Answer – divine what the document speaks, which is self-evident, and reach the necessary legal conclusions. The Answer does not deny the contents or authenticity of the documents. The Exhibits to the Complaint demonstrate Defendants know the

**Reply in Support of Plaintiff's Motion for Partial Judgment
on the Pleadings Pursuant to Fed. R. Civ. P. 12(c)**

undergoing surgery and recovery, and that not until after November 19, 2016 when Defendant Marino directed Plaintiff to provide both his completed FMLA leave request to First Data and his separate short-term disability employee benefit papers to MetLife, did Plaintiff request leave. Defendants admit Plaintiff requested, and they approved, FMLA leave for the period October 24, 2016 through January 16, 2017. Defendant Johnson (VP of HR), by e-mails to Plaintiff on December 15 & 16, 2017 wrote [Complaint & Answer ¶¶153-157; Exhibit F of Complaint; Exhibits A-1 & A-2] (emphasis added):

> **[First Data's] HR Center** . . . **approved your request through the 12 week FMLA period ending January 16, 2017**. . . A Short Term Disability claim has not yet been filed.

> **I [Johnson] was advised all was taken care of from a leave perspective, which is accurate [First Data's Human Resources Center] advised yesterday that SHORT TERM DISABILITY IS A SEPARATE PROCESS**.

Defendants Johnson (VP of HR) and Marino (EVP of HR) admit that FMLA leave and short-term disability benefits are distinct and different. The Motion did not include these admissions in Answer because they are irrelevant to interference claims subject of this Motion, and even after the Opposition and Affidavit, they remain irrelevant despite Defendants' desire to assert them to this Court. The Court must not allow the Opposition to attempt to use a subordinate HR manager without full information about Plaintiff's FMLA leave, to override the representations of corporate officers made weeks earlier in an attempt to manufacture a fact issue by conflating FMLA statutory rights with employee insurance benefits.

## IV.  DAMAGES

The FMLA provides damages for back-pay, interest on back-pay, front-pay, liquidated damages equal to twice awarded back-pay, front-pay and interest, and costs and expenses. Plaintiff's employment was terminated exactly one year ago. Calculation of back-pay and interest is simple based on Defendants' admissions in the Answer as to Plaintiff's salary, bonuses

---

difference between FMLA leave and disability insurance benefits. The two processes are distinct and the manner of counting days for each does not need to be consistent. Defendants are creating a false factual issue.

**Reply in Support of Plaintiff's Motion for Partial Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c)**

and equity awards. Front-pay is an equitable remedy within the discretion of the Court. *Dominic v. Con. Ed. Co. of NY*, 822 F.2d 1249, 1256-1257 (2d Cir. 1987). The Court may take judicial notice of the fact that a 72-year old veteran of Wall Street is more than capable of working to the age of 78. This Court needs no evidence on this matter. Moreover, the Court may take judicial notice of the U.S. Bureau of Labor Statistics data regarding the significant percentage of the population continuing to work after age 70. *See* <u>Exhibit</u> B. The Court also may take notice that financial services positions in Atlanta paying $730,000 per year, plus equity awards, available to a 72-year old cancer survivor are rare to non-existent, making mitigation into a comparable or substantially similar position nearly impossible. As set forth in <u>Exhibit</u> C, based on Defendant's admissions, Plaintiff is entitled to the total award of damages, including all elements, as calculated therein.

## V.    CONCLUSION

Congress established the FMLA to ensure that American employees receive two important workplace entitlements: entitlement to leave from work and entitlement "<u>to be</u>" restored to work. Defendants admit interfering with Plaintiff's right to restoration from FMLA protected leave, and Plaintiff is entitled to the remedies Congress imposed for such violations. If there is any Plaintiff entitled to recovery under the FMLA, it is the one in this case. Plaintiff's motion as to the Defendants' liability under the FMLA should be granted and damages awarded as set forth in <u>Exhibit</u> C.


Dated: February 27, 2017

THE LAW OFFICE OF SHAWN SHEARER, P.C.

      /s/ Shawn Shearer

Shawn Shearer (*Pro Hac Vice*)
3839 McKinney Avenue, Suite 155-254
Dallas, TX 75204
Tele: (214) 434-1594
*shawn@shearerlaw.pro*
Attorneys for Plaintiff

**Reply in Support of Plaintiff's Motion for Partial Judgment
on the Pleadings Pursuant to Fed. R. Civ. P. 12(c)**

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that a true and correct copy of Plaintiff Steve Barger ("Plaintiff") Reply in Support of Motion for Partial Judgment on the Pleadings Pursuant to Fed. R.Civ. P. 12(c) with exhibits and this Certification of service were served on the following counsel via electronic mail and ECF.

Gary Eidelman                     Gillian Cooper
Saul Ewing Arnstein & Lehr LLP    Saul Ewing Arnstein & Lehr LLP
500 Pratt Street, Suite 900       650 College Road East, Suite 4000
Baltimore, MD 21022-3133          Princeton, NJ 08540-6603
*Gary.Eidelman@saul.com*          *Gillian.Cooper@saul.com*

Attorneys for Defendants.


Dated: February 27, 2017

THE LAW OFFICE OF SHAWN SHEARER, P.C.

       /s/ Shawn Shearer
Shawn Shearer (*Pro Hac Vice*)
3839 McKinney Avenue, Suite 155-254
Dallas, TX 75204
Tele: (214) 434-1594
*shawn@shearerlaw.pro*
Attorneys for Plaintiff

**Reply in Support of Plaintiff's Motion for Partial Judgment**
**on the Pleadings Pursuant to Fed. R. Civ. P. 12(c)**

## EXHIBITS

EXHIBIT A          Defendant's Admissions
      A-1          Complaint & Answer Admissions by Paragraph
      A-2          Defendants' EEOC Response Admissions


EXHIBIT B          BLS Statistics


EXHIBIT C          Damages Calculation
      C-1          Backpay Calculation
      C-2          Interest on Backpay Calculation
      C-3          Frontpay Calculation
      C-4          Historical Nasdaq Closing Prices


EXHIBIT D          FMLA Legislative History

i

# **EXHIBIT A**

## **TO**

## **REPLY**
## **IN SUPPORT OF**
## **PLAINTIFF'S MOTION FOR PARTIAL JUDGMENT ON THE**
## **PLEADINGS PURSUANT TO FED. R. CIV. P. 12(c)**

## **DEFENDANTS' ADMISSIONS**

## EXHIBIT A-1

### TO

### REPLY
### IN SUPPORT OF
### PLAINTIFF'S MOTION FOR PARTIAL JUDGMENT ON THE
### PLEADINGS PURSUANT TO FED. R. CIV. P. 12(c)

### Complaint & Answer Admissions by Paragraph

EXHIBIT A-1 TO REPLY IN SUPPORT OF MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS PURSUANT TO RULE 12(c)

| ¶ | COMPLAINT [ECF No. 1] | ANSWER [ECF No. 19] | ANALYSIS |
|---|---|---|---|
| 2(ii) | First Data approved Barger's FMLA leave for the period from October 24, 2016 to January 16, 2017; | **Admitted**. By way of further answer, **ADDITIONAL** FMLA leave was approved retroactively to cover the period from September 5, 2016 through November 28, 2016. | • ADMITS FMLA LEAVE APPROVED THROUGH JANUARY 16, 2017<br><br>• DEFENDANTS PLED "ADDITIONAL" LEAVE, NOT NO LEAVE. FMLA PERMITS AND ENCOURAGES EMPLOYERS TO GO ABOVE AND BEYOND 12-WEEKS UNPAID LEAVE |
| 102 | During the period of Barger's radiation treatments, Barger rejected any suggestion that he need to take medical leave" and that during his radiation he would continue working. **[The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]** | **Admitted**. By way of further answer, Defendants state that any allegations regarding the Position Statement filed with the EEOC, a document which **speaks for itself**, should be stricken because the sole cause of action in the Complaint is for a violation of the FMLA for which the EEOC has no enforcement responsibility or jurisdiction. | • EEOC LANGUAGE IN ANSWER IS IMMATERIAL AND IMPERTIENT – See above. The averment is a question of fact within Defendants' knowledge requiring simply an "admit". Contrary to Defendants' assertion, the EEOC Response discusses the FMLA, See Exhibit A-2<br><br>• DEFENDANTS ADMIT PLAINTIFF REFUSED LEAVE AND FIRST DATA DID NOT FORCE LEAVE DURING RADIATION TREATMENTS |

EXHIBIT A-1 TO REPLY IN SUPPORT OF MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS PURSUANT TO RULE 12(c)

| ¶ | COMPLAINT [ECF No. 1] | ANSWER [ECF No. 19] | ANALYSIS |
|---|---|---|---|
| 118 | After Barger had surgery in September 2016, he again refused to take leave and he insisted that he keep working. **[The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]** | **Admitted**. By way of further answer, Defendants state that any allegations regarding the Position Statement filed with the EEOC, a document which **speaks for itself**, should be stricken because the sole cause of action in the Complaint is for a violation of the FMLA for which the EEOC has no enforcement responsibility or jurisdiction. | • EEOC LANGUAGE IN ANSWER IS IMMATERIAL AND IMPERTIENT – See above. The averment is a question of fact within Defendants' knowledge requiring simply an "admit". Contrary to Defendants' assertion, the EEOC Response discusses the FMLA, See Exhibit A-2<br><br>• DEFENDANTS ADMIT PLAINTIFF REFUSED LEAVE AND FIRST DATA DID NOT FORCE LEAVE AFTER PLAINTIFF'S SURGERY |
| 119 | First Data admits that during, and for more than two months after surgery, it was Barger's choice to refuse leave, and First Data did not force him to take leave. **[The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]** | **Admitted**. By way of further answer, Defendants state that any allegations regarding the Position Statement filed with the EEOC, a document which **speaks for itself**, should be stricken because the sole cause of action in the Complaint is for a violation of the FMLA for which the EEOC has no enforcement responsibility or jurisdiction. | • EEOC LANGUAGE IN ANSWER IS IMMATERIAL AND IMPERTIENT – See above. The averment is a question of fact within Defendants' knowledge requiring simply an "admit". Contrary to Defendants' assertion, the EEOC Response discusses the FMLA, See Exhibit A-2<br><br>• DEFENDANTS ADMIT PLAINTIFF REFUSED LEAVE AFTER SURGERY AND FIRST DATA DID NOT FORCE PLAINTIFF TO TAKE FMLA LEAVE |

EXHIBIT A-1 TO REPLY IN SUPPORT OF MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS PURSUANT TO RULE 12(c)

| ¶ | COMPLAINT [ECF No. 1] | ANSWER [ECF No. 19] | ANALYSIS |
|---|---|---|---|
| 120 | First Data admits and wrote in the Position Statement (page 5):<br><br>Despite [Barger] being out of the office due to surgery, **[First Data]** respected his decision [not to take leave], **did not force him to take leave of absence, and continued to pay him through regular payroll** . . . | Defendants admit that the allegations in Paragraph 120 refer to a document which **speaks for itself**. By way of further answer, Defendants state that any allegations regarding the Position Statement filed with the EEOC should be stricken because the sole cause of action in the Complaint is for a violation of the FMLA for which the EEOC has no enforcement responsibility or jurisdiction. | • DEEMED ADMITTED – Rule 8(b)(6)<br><br>• EEOC LANGUAGE IN ANSWER IS IMMATERIAL AND IMPERTIENT – See above. The averment is a question of fact within Defendants' knowledge requiring simply an "admit". Contrary to Defendants' assertion, the EEOC Response discusses the FMLA, See Exhibit A-2 |
| 121 | During his entire time in Tampa, Barger worked on First Data business nearly every day. | Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 121 of the Complaint and leave Plaintiff to his proofs. | • CONTRADICTS DEFENDANTS' REPRESENTATIONS TO THE EEOC. See Exhibit A-2 |
| 122 | During his entire time in Tampa for surgery and recovery, Barger kept First Data's senior management aware of his condition, he continued to communicate with his team and management at First Data **[The facts set forth in this paragraph were admitted in the Defendant's Position Statement.]** | **Admitted**. By way of further answer, Defendants state that any allegations regarding the Position Statement filed with the EEOC, a document which **speaks for itself**, should be stricken because the sole cause of action in the Complaint is for a violation of the FMLA for which the EEOC has no enforcement responsibility or jurisdiction. | • EEOC LANGUAGE IN ANSWER IS IMMATERIAL AND IMPERTIENT – See above. The averment is a question of fact within Defendants' knowledge requiring simply an "admit Contrary to Defendants' assertion, the EEOC Response discusses the FMLA, See Exhibit A-2<br><br>• DEFENDANTS ADMIT PLAINTIFF CONTINUED TO WORK WHILE RECOVERING IN TAMPA HOSPITAL |

EXHIBIT A-1 TO REPLY IN SUPPORT OF MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS PURSUANT TO RULE 12(c)

| ¶ | COMPLAINT [ECF No. 1] | ANSWER [ECF No. 19] | ANALYSIS |
|---|---|---|---|
| 123 | Barger had more than six weeks of available paid-time-off covering the period from September 4, 2016 through October 23, 2016 ("Barger's PTO Period")[The facts set forth in this paragraph were admitted in the Position Statement.] | Admitted. By way of further answer, Defendants state that any allegations regarding the Position Statement filed with the EEOC, a document which **speaks for itself**, should be stricken because the sole cause of action in the Complaint is for a violation of the FMLA for which the EEOC has no enforcement responsibility or jurisdiction. | • DEEMED ADMITTED – Rule 8(b)(6)  • "SPEAKS FOR THEMSELVES" IS NOT A DENIAL FOR PURPOSES OF RULE 8(b)  • EEOC LANGUAGE IN ANSWER IS IMMATERIAL AND IMPERTIENT – See above. The averment is a question of fact within Defendants' knowledge requiring simply an "admit Contrary to Defendants' assertion, the EEOC Response discusses the FMLA, See Exhibit A-2 |
| 124 | At no time during Barger's PTO Period was Barger informed, in writing or otherwise, that First Data had issues with his performance. | Admitted. | • ADMITS NO PERFORMANCE ISSUES RAISED IN SEPTEMBER AND OCTOBER 2017 |
| 135 | In his November 18, 2016 letter to Barger (see Exhibit D), Defendant Marino clearly states that as of that date Barger's FMLA application and approval process had not yet begun. | Defendants **admit** that the allegations in Paragraph 135 of the Complaint refer to documents which **speak for themselves.** | • DEEMED ADMITTED – Rule 8(b)(6)  • "SPEAKS FOR THEMSELVES" IS NOT A DENIAL FOR PURPOSES OF RULE 8(b)  • DEFENDANTS ADMIT FMLA APPLICATION LEAVE REQUEST HAD NOT YET BEGUN AS OF NOVEMBER 18, 2016. |

EXHIBIT A-1 TO REPLY IN SUPPORT OF MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS PURSUANT TO RULE 12(c)

| ¶ | COMPLAINT [ECF No. 1] | ANSWER [ECF No. 19] | ANALYSIS |
|---|---|---|---|
| 136 | The following text message exchange (<u>Exhibit</u> E) between Barger and Marino (EVP of HR) occurred on November 19, 2016:<br><br>Marino to Barger:  Later today you will get a fed ex from me that <u>will require you to</u> **begin** <u>disability claims process</u> (short term and then if necessary long term). <u>We've held off on this but now procedurally we are where we are.</u> This will allow you to focus all of your energies on getting better and not be burdened by First Data work. <u>We will announce Robin as the</u> **interim** <u>leader on Monday so your team will have support.</u> We are all praying for your recovery and I personally look forward to our time on the links for years to come. Shoot me a note if you have any questions after you get the fed ex.<br><br>Barger to Marino:  You are removing me from my job. <u>I am fired?</u><br><br>Marino to Barger:  <u>No not fired</u> like any employee required to move to short term disability until your Dr. releases you medically to return to work. <u>When you return your salary restored and you will be given a comparable job.</u> . . . | Defendants **admit** that the allegations in Paragraph 136 of the Complaint refer to documents which **speak for themselves.** | • DEEMED ADMITTED – Rule 8(b)(6)<br><br>• "SPEAKS FOR THEMSELVES" IS NOT A DENIAL FOR PURPOSES OF RULE 8(b)<br><br>• DEFENDANTS ADMIT LEAVE AND SHORT-TERM DISABILITY PROCESS DID NOT BEGIN UNTIL AFTER NOVEMBER 18, 2016<br><br>• DEFENDANTS ADMIT KNOWLEDGE OF FMLA REQUIREMENT TO RESTORE PLAINTIFF AT THE END OF LEAVE |

EXHIBIT A-1 TO REPLY IN SUPPORT OF MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS PURSUANT TO RULE 12(c)

| ¶ | COMPLAINT [ECF No. 1] | ANSWER [ECF No. 19] | ANALYSIS |
|---|---|---|---|
| 152 | After being advised by Marino on November 19th that First Data had decided that Barger must take leave, Barger requested FMLA leave from First Data from October 24, 2016 through January 16, 2017. | **Admitted** | **<u>DEFENDANTS ADMITS LEAVE REQUESTED FROM 10/24/16 THROUGH 01/16/17</u>** |
| 153 | In an e-mail from Defendant Johnson (VP HR in Atlanta) to Plaintiff Barger on December 15, 2016, Defendant Johnson wrote:<br><br>**<u>[First Data's] HR Service Center</u>** has advised they received medical documentation from your doctor and **<u>approved your leave request through the 12 week FMLA period ending 1/16/17</u>**. . .<br><br>Action needed: <u>A Short Term Disability claim has not yet been filed. Therefore, your short term disability pay will not start until a claim is filed with MetLife and the necessary medical information is received by MetLife</u> **(<u>not FD) [First Data]</u>**). Please have your wife contact MetLife and advise that she needs to start a short term disability claim on your behalf. | Defendants **admit** that the allegations in Paragraph 153 of the Complaint refer to a document which **speaks for itself**. | • DEEMED ADMITTED – Rule 8(b)(6)<br><br>• "SPEAKS FOR ITSELF" IS NOT A DENIAL FOR PURPOSES OF RULE 8(b)<br><br>• **DEFENDANTS ADMIT FMLA LEAVE APPROVED THROUGH JANUARY 16, 2017** |
| 154 | On December 16, 2016, Barger responded to Johnson by e-mail:<br><br>You told me everything was taken care of. Now we have to file with MetLife. Are we going to loose [SIC] my coverage of STD? | Defendants **admit** that the allegations in Paragraph 154 of the Complaint refer to a document which **speaks for itself**. | • DEEMED ADMITTED – Rule 8(b)(6)<br><br>• "SPEAKS FOR ITSELF" IS NOT A DENIAL FOR PURPOSES OF RULE 8(b) |

EXHIBIT A-1 TO REPLY IN SUPPORT OF MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS PURSUANT TO RULE 12(c)

| ¶ | COMPLAINT [ECF No. 1] | ANSWER [ECF No. 19] | ANALYSIS |
|---|---|---|---|
| 155 | Later on December 16, 2016, Defendant Johnson wrote by e-mail to Barger:<br><br>Hi Steve, **I was advised all was taken care of from a leave perspective, which is accurate.** [First Data's Human Resources Service Center] advised yesterday that **Short Term Disability is a separate process** . . . | Defendants **admit** that the allegations in Paragraph 155 of the Complaint refer to a document which **speaks for itself**. | • DEEMED ADMITTED – Rule 8(b)(6)<br><br>• "SPEAKS FOR ITSELF" IS NOT A DENIAL FOR PURPOSES OF RULE 8(b)<br><br>• ADMITS LEAVE AND SHORT-TERM DISABILITY ARE SEPARATE PROCESSES |
| 156 | The December 15th and 16th e-mail exchange is attached hereto as Exhibit F, the terms of which are incorporated herein by this **refer**ence. | Defendants **admit** that the allegations in Paragraph 156 of the Complaint refer to a document which **speaks for itself**. | • DEEMED ADMITTED – Rule 8(b)(6)<br><br>• "SPEAKS FOR ITSELF" " IS NOT A DENIAL FOR PURPOSES OF RULE 8(b) |
| 157 | Exhibit F is a true and correct copy of the December 15th and 16th e-mail exchange between Barger and Johnson. | Defendants **admit** that the allegations in Paragraph 157 of the Complaint refer to a document which **speaks for itself**. | • DEEMED ADMITTED – Rule 8(b)(6)<br><br>• "SPEAKS FOR ITSELF" IS NOT A DENIAL FOR PURPOSES OF RULE 8(b) |
| 158 | By letter dated December 15, 2016 (the "FMLA Approval Letter"), a copy of which is attached hereto as Exhibit G, the terms of which are incorporated herein, First Data approved Barger's request for FMLA leave for the period commencing October 24, 2016 and ending January 16, 2017. | Defendants **admit** that the allegations in Paragraph 158 of the Complaint refer to a document which **speaks for itself**. | • DEEMED ADMITTED – Rule 8(b)(6)<br><br>• "SPEAKS FOR ITSELF" IS NOT A DENIAL FOR PURPOSES OF RULE 8(b) |

EXHIBIT A-1 TO REPLY IN SUPPORT OF MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS PURSUANT TO RULE 12(c)

| ¶ | COMPLAINT [ECF No. 1] | ANSWER [ECF No. 19] | ANALYSIS |
|---|---|---|---|
| 159 | The FMLA Approval Letter of December 15, 2016 from First Data to Barger stated (emphasis added):<br><br>Dear Steve [Barger]:<br><br>Your request for a leave of absence meets the criteria and qualifies as leave under the Family and Medical Leave Act ("FMLA"), and therefore has been approved for the following dates:<br><br>Leave Start Date:          10/24/2016<br><br>Expected Return to Work Date:  01/16/2017<br><br>**Your FMLA approved time exhausts on 01/16/2017. . . .**<br><br>In addition, because your leave request is due to your own serious health condition, the attached Physician's Return to Work form must be completed and sent to Leave Management prior to your return. . .<br><br>　　　Sincerely<br>　　　Leave Management Team<br>　　　First Data HR Service Center | Defendants **admit** that the allegations in Paragraph 159 of the Complaint refer to a document which **speaks for itself**. | • DEEMED ADMITTED – Rule 8(b)(6)<br><br>• "SPEAKS FOR ITSELF" IS NOT A DENIAL FOR PURPOSES OF RULE 8(b) |
| 160 | The letter dated December 15, 2016 attached hereto as Exhibit G is a true and correct copy of the letter, with attachments, drafted and sent on or about December 15, 2016 by First Data to Barger regarding Barger's FMLA leave request approval. | Defendants **admit** that the allegations in Paragraph 160 of the Complaint refer to a document which **speaks for itself**. | • DEEMED ADMITTED – Rule 8(b)(6) - averments require Rule8(b)(1)(B) admit or deny.<br><br>• "SPEAKS FOR ITSELF" IS NOT A DENIAL FOR PURPOSES OF RULE 8(b) |

**EXHIBIT A-1 TO REPLY IN SUPPORT OF MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS PURSUANT TO RULE 12(c)**

| ¶ | COMPLAINT [ECF No. 1] | ANSWER [ECF No. 19] | ANALYSIS |
|---|---|---|---|
| 162 | In the Defendant's Position Statement (sixth paragraph on page 13), First Data admits and states:<br><br>First Data approved Mr. Barger's request for FMLA leave commencing October 24, 2016 with that approved FMLA leave ending January 16, 2017. | Defendants **admit** that the allegations in Paragraph 162 of the Complaint refer to a document which **speaks for itself**. By way of further answer, Defendants state that any allegations regarding the Position Statement filed with the EEOC should be stricken because the sole cause of action in the Complaint is for a violation of the FMLA for which the EEOC has no enforcement responsibility or jurisdiction. | • DEEMED ADMITTED – Rule 8(b)(6)<br><br>• "SPEAKS FOR ITSELF" IS NOT A DENIAL FOR PURPOSES OF RULE 8(b)<br><br>• EEOC LANGUAGE IN ANSWER IS IMMATERIAL AND IMPERTIENT – See above. The averment is a question of fact within Defendants' knowledge requiring simply an "admit". Contrary to Defendants' assertion, the EEOC Response discusses the FMLA, See Exhibit A-2 |
| 164 | On January 10, 2017 each of the following occurred: | Answering the allegations of Paragraph 164(a) – (c) of the Complaint: | |
| 164(a) | Barger received clearance from his physician to return to work and his physician's office provided a written return to work authorization to Barger (the physician's return to work authorization is attached hereto as Exhibit H, the terms of which are incorporated herein by reference); | Defendant **admits** that that the allegations in subparagraph (a) refer to a document which **speaks for itself**. Defendants further admit that they are without knowledge or information as to the truth of the remaining allegations and leave Plaintiff to his proofs. | • ADMITS PLAINTIFF RECEIVED PHYSICIAN'S AUTHORIZATION TO RETURN TO WORK.<br><br>• "SPEAKS FOR ITSELF" IS NOT A DENIAL FOR PURPOSES OF RULE 8(b) |

EXHIBIT A-1 TO REPLY IN SUPPORT OF MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS PURSUANT TO RULE 12(c)

| ¶ | COMPLAINT [ECF No. 1] | ANSWER [ECF No. 19] | ANALYSIS |
|---|---|---|---|
| 164(b) | Barger used his First Data issued security key card to enter First Data's Atlanta office, and hand delivered a copy of the physician's return to work authorization to Defendant Johnson, VP HR in Atlanta; and | Defendant Johnson **admits** that Plaintiff hand delivered a copy of Exhibit H to the Complaint to her on January 10, 2017, a document which **speaks for itself**, but Defendants are without knowledge or information as to the truth of the remaining allegations and leave Plaintiff to his proofs. | • ADMITS EXHIBIT H (PHYSICIAN'S RETURN TO WORK) DELIVERED TO JOHNSON ON 01/10/17<br><br>• LACK OF REASONABLE INQUIRY – Barger's use of his security key card is solely within the knowledge of Defendants. Reasonable inquiry into security keycard use on 01/10/17 would have revealed the information to admit. |
| 165 | <u>Exhibit</u> H is a true and correct copy of the return to work authorization provided by Barger to Johnson on January 10, 2017. | Defendants **admit** that the allegations in Paragraph 165 of the Complaint refer to a document which **speaks for itself**. | • DEEMED ADMITTED – Rule 8(b)(6)<br><br>• AUTHENTICITY OF PHYSCIAN'S AUTHORIZATION IS NOT IN QUESTION<br><br>• "SPEAKS FOR ITSELF IS NOT A DENIAL FOR PURPOSES OF RULE 8(b) |

## EXHIBIT A-2

### TO

### REPLY
### IN SUPPORT OF
### PLAINTIFF'S MOTION FOR PARTIAL JUDGMENT ON THE
### PLEADINGS PURSUANT TO FED. R. CIV. P. 12(c)

### Defendants' EEOC Response Admissions

EXHIBIT A-2 TO REPLY IN SUPPORT OF MOTION FOR PARTIAL JUDGMENT ON THE
PLEADINGS PURSUANT TO RULE 12(c)

### ADMISSIONS BY DEFENDANT FIRST DATA
### IN THE EEOC RESPONSE (Exhibit G to the Complaint [ECF No. 1])

| First Data EEOC Response Page # | First Data Statements to EEOC (emphasis added) |
|---|---|
| Page 4 | In early 2016, Barger revealed to [First Data] that he had been diagnosed with throat cancer and described the [radiation] treatment plan he would be undergoing. Upon learning of his medical condition, Johnson advised Barger of First Data's medical leave policies as she would with any other employee, including the availability of leave under the Family Medical Leave Act (FMLA). **Barger categorically rejected any suggestion that he needed medical leave and emphatic that under no circumstances would he take time off.** He insisted to Johnson and members of his team that he should not be treated differently while he was undergoing chemotherapy [SIC] and would continue working the entire time because "work was his life." **Barger continued to work during the initial phase of his illness.** |
| Page 4 | **In the summer of 2016**, Barger's condition worsened, his health started to deteriorate, and he was scheduled for major throat surgery. Before the surgery he called the Training Group together at a meeting, and once again, was very explicit about the procedure. **He also told that group** "his life is his work" and **even though he was about to have major surgery, he would not be taking time off to recuperate and he expected to be copied on every e-mail**. |
| Page 5 | Barger had throat surgery in September 2016. As noted above, **HE REFUSED TO TAKE A LEAVE OF ABSENCE** and insisted that he would work during his recovery. Despite him being out of the office due to surgery, **[FIRST DATA] RESPECTED HIS DECISION, DID NOT FORCE HIM TO TAKE A LEAVE OF ABSENCE, AND CONTINUED TO PAY HIM THROUGH THE REGULAR PAY ROLL** because he claimed he was working, reading e-mail, and generally doing his job. |
| Page 5 | **On November 16, 2016 [SIC] Marino sent FMLA paperwork to Barger**. Barger had exhausted whatever paid time off he had, so **Marino advised him that [First Data] would put him on short-term disability so that he could continue to receive some income while he was out on FMLA leave.** |

# EXHIBIT B

## TO

## REPLY
## IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PARTIAL JUDGMENT ON THE
## PLEADINGS PURSUANT TO FED. R. CIV. P. 12(c)

## LABOR STATISTICS DATA

A to Z Index | FAQs | About BLS | Contact Us          Subscribe to E-mail Updates     GO

Follow Us  | What's New | Release Calendar | Blog

Search BLS.gov

| Home | Subjects | Data Tools | Publications | Economic Releases | Students | Beta |

# Employment Projections

SHARE ON:    EPP   FONT SIZE: 

| EP HOME |
| EP NEWS RELEASES |
| EP TABLES |
| EP PUBLICATIONS |
| EP FAQS |
| CONTACT EP |

## Civilian labor force participation rate, by age, sex, race, and ethnicity

Other available formats: (XLSX)

**Table 3.3 Civilian labor force participation rate, by age, sex, race, and ethnicity, 1996, 2006, 2016, and projected 2026 (in percent)**

| Group | Participation rate | | | | Percentage-point change | | | Annual growth rate | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1996 | 2006 | 2016 | 2026 | 1996–06 | 2006–16 | 2016–26 | 1996–06 | 2006–16 | 2016–26 |
| Total, 16 years and older | 66.8 | 66.2 | 62.8 | 61.0 | -0.6 | -3.4 | -1.8 | -0.1 | -0.5 | -0.3 |
| 16 to 24 | 65.5 | 60.6 | 55.2 | 52.5 | -4.9 | -5.4 | -2.7 | -0.8 | -0.9 | -0.5 |
| 16 to 19 | 52.3 | 43.7 | 35.2 | 31.7 | -8.6 | -8.5 | -3.5 | -1.8 | -2.1 | -1.0 |
| 20 to 24 | 76.8 | 74.6 | 70.5 | 68.8 | -2.2 | -4.1 | -1.7 | -0.3 | -0.6 | -0.2 |
| 25 to 54 | 83.8 | 82.9 | 81.3 | 81.6 | -0.9 | -1.6 | 0.3 | -0.1 | -0.2 | 0.0 |
| 25 to 34 | 84.1 | 83.0 | 81.6 | 81.8 | -1.1 | -1.4 | 0.2 | -0.1 | -0.2 | 0.0 |
| 35 to 44 | 84.8 | 83.8 | 82.4 | 82.3 | -1.0 | -1.4 | -0.1 | -0.1 | -0.2 | 0.0 |
| 45 to 54 | 82.1 | 81.9 | 80.0 | 80.7 | -0.2 | -1.9 | 0.7 | 0.0 | -0.2 | 0.1 |
| 55 and older | 30.3 | 38.0 | 40.0 | 38.9 | 7.7 | 2.0 | -1.1 | 2.3 | 0.5 | -0.3 |
| 55 to 64 | 57.9 | 63.7 | 64.1 | 66.6 | 5.8 | 0.4 | 2.5 | 1.0 | 0.1 | 0.4 |
| 55 to 59 | 68.5 | 72.0 | 71.5 | 73.9 | 3.5 | -0.5 | 2.4 | 0.5 | -0.1 | 0.3 |
| 60 to 64 | 45.8 | 52.5 | 55.8 | 59.6 | 6.7 | 3.3 | 3.8 | 1.4 | 0.6 | 0.7 |
| 60 to 61 | 56.2 | 60.6 | 63.2 | 66.6 | 4.4 | 2.6 | 3.4 | 0.8 | 0.4 | 0.5 |
| 62 to 64 | 38.4 | 46.7 | 50.4 | 55.0 | 8.3 | 3.7 | 4.6 | 2 | 0.8 | 0.9 |
| 65 and older | 12.1 | 15.4 | 19.3 | 21.8 | 3.3 | 3.9 | 2.5 | 2.4 | 2.3 | 1.2 |
| 65 to 74 | 17.5 | 23.6 | 26.8 | 30.2 | 6.1 | 3.2 | 3.4 | 3.0 | 1.3 | 1.2 |
| 65 to 69 | 21.9 | 29.0 | 32.2 | 36.6 | 7.1 | 3.2 | 4.4 | 2.8 | 1.1 | 1.3 |
| 70 to 74 | 12.5 | 17.0 | 19.2 | 22.7 | 4.5 | 2.2 | 3.5 | 3.1 | 1.2 | 1.7 |
| 75 and older | 4.7 | 6.4 | 8.4 | 10.8 | 1.7 | 2 | 2.4 | 3.1 | 2.8 | 2.5 |
| 75 to 79 | 6.8 | 9.6 | 12.1 | 15.1 | 2.8 | 2.5 | 3.0 | 3.5 | 2.3 | 2.2 |
| | | | | | | | | | | |
| Men, 16 years and older | 74.9 | 73.5 | 69.2 | 66.2 | -1.4 | -4.3 | -3.0 | -0.2 | -0.6 | -0.4 |
| 16 to 24 | 68.8 | 63.3 | 56.5 | 52.6 | -5.5 | -6.8 | -3.9 | -0.8 | -1.1 | -0.7 |
| 16 to 19 | 53.2 | 43.7 | 35.3 | 30.8 | -9.5 | -8.4 | -4.5 | -1.9 | -2.1 | -1.4 |
| 20 to 24 | 82.5 | 79.6 | 73.0 | 70.0 | -2.9 | -6.6 | -3.0 | -0.4 | -0.9 | -0.4 |
| 25 to 54 | 91.8 | 90.6 | 88.5 | 87.6 | -1.2 | -2.1 | -0.9 | -0.1 | -0.2 | -0.1 |
| 25 to 34 | 93.2 | 91.7 | 88.8 | 87.6 | -1.5 | -2.9 | -1.2 | -0.2 | -0.3 | -0.1 |
| 35 to 44 | 92.4 | 92.1 | 90.6 | 89.8 | -0.3 | -1.5 | -0.8 | 0.0 | -0.2 | -0.1 |
| 45 to 54 | 89.1 | 88.1 | 86.3 | 85.2 | -1.0 | -1.8 | -1.1 | -0.1 | -0.2 | -0.1 |
| 55 and older | 38.3 | 44.9 | 46.2 | 43.4 | 6.6 | 1.3 | -2.8 | 1.6 | 0.3 | -0.6 |
| 55 to 64 | 67.0 | 69.6 | 70.2 | 70.1 | 2.6 | 0.6 | -0.1 | 0.4 | 0.1 | 0.0 |
| 55 to 59 | 77.9 | 77.7 | 77.4 | 76.8 | -0.2 | -0.3 | -0.6 | 0.0 | 0.0 | -0.1 |
| 60 to 64 | 54.3 | 58.6 | 62.0 | 63.4 | 4.3 | 3.4 | 1.4 | 0.8 | 0.6 | 0.2 |
| 60 to 61 | 66.2 | 67.2 | 69.8 | 69.4 | 1.0 | 2.6 | -0.4 | 0.2 | 0.4 | -0.1 |

Footnotes:
 1 The "all other groups" category includes (1) those classified as being of multiple racial origin and (2) the race categories of (2a) American Indian and Alaska Native or (2b) Native Hawaiian and Other Pacific Islanders.
Note: Dash indicates no data collected for category. Details may not sum to totals because of rounding.

Source: Employment Projections program, U.S. Bureau of Labor Statistics

https://www.bls.gov/emp/ep_table_303.htm

1/3

2/24/2018

Civilian labor force participation rate by age, sex, race, and ethnicity

| Group | Participation rate | | | | Percentage-point change | | | Annual growth rate | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1996 | 2006 | 2016 | 2026 | 1996–06 | 2006–16 | 2016–26 | 1996–06 | 2006–16 | 2016–26 |
| 62 to 64 | 45.7 | 52.4 | 56.1 | 59.5 | 6.7 | 3.7 | 3.4 | 1.4 | 0.7 | 0.6 |
| 65 and older | 16.9 | 20.3 | 24.0 | 25.9 | 3.4 | 3.7 | 1.9 | 1.8 | 1.7 | 0.8 |
| 65 to 74 | 22.9 | 28.8 | 31.5 | 34.7 | 5.9 | 2.7 | 3.2 | 2.3 | 0.9 | 1.0 |
| 65 to 69 | 27.5 | 34.4 | 36.9 | 40.5 | 6.9 | 2.5 | 3.6 | 2.3 | 0.7 | 0.9 |
| 70 to 74 | 17.3 | 21.6 | 23.8 | 27.8 | 4.3 | 2.2 | 4.0 | 2.2 | 1.0 | 1.6 |
| 75 and older | 7.3 | 9.5 | 11.7 | 13.6 | 2.2 | 2.2 | 1.9 | 2.7 | 2.1 | 1.5 |
| 75 to 79 | 9.7 | 13.2 | 15.3 | 18.0 | 3.5 | 2.1 | 2.7 | 3.1 | 1.5 | 1.6 |
| | | | | | | | | | | |
| Women, 16 years and older | 59.3 | 59.4 | 56.8 | 56.1 | 0.1 | -2.6 | -0.7 | 0.0 | -0.4 | -0.1 |
| 16 to 24 | 62.2 | 57.9 | 53.8 | 52.3 | -4.3 | -4.1 | -1.5 | -0.7 | -0.7 | -0.3 |
| 16 to 19 | 51.3 | 43.7 | 35.1 | 32.7 | -7.6 | -8.6 | -2.4 | -1.6 | -2.2 | -0.7 |
| 20 to 24 | 71.3 | 69.5 | 68.0 | 67.6 | -1.8 | -1.5 | -0.4 | -0.3 | -0.2 | -0.1 |
| 25 to 54 | 76.1 | 75.5 | 74.3 | 75.7 | -0.6 | -1.2 | 1.4 | -0.1 | -0.2 | 0.2 |
| 25 to 34 | 75.2 | 74.4 | 74.5 | 76.0 | -0.8 | 0.1 | 1.5 | -0.1 | 0.0 | 0.2 |
| 35 to 44 | 77.5 | 75.9 | 74.5 | 74.8 | -1.6 | -1.4 | 0.3 | -0.2 | -0.2 | 0.0 |
| 45 to 54 | 75.4 | 76.0 | 73.9 | 76.4 | 0.6 | -2.1 | 2.5 | 0.1 | -0.3 | 0.3 |
| 55 and older | 23.9 | 32.3 | 34.7 | 34.9 | 8.4 | 2.4 | 0.2 | 3.1 | 0.7 | 0.1 |
| 55 to 64 | 49.6 | 58.2 | 58.4 | 63.4 | 8.6 | 0.2 | 5.0 | 1.6 | 0.0 | 0.8 |
| 55 to 59 | 59.8 | 66.7 | 65.9 | 71.1 | 6.9 | -0.8 | 5.2 | 1.1 | -0.1 | 0.8 |
| 60 to 64 | 38.2 | 47.0 | 50.1 | 56.0 | 8.8 | 3.1 | 5.9 | 2.1 | 0.6 | 1.1 |
| 60 to 61 | 47.2 | 54.6 | 57.0 | 63.9 | 7.4 | 2.4 | 6.9 | 1.5 | 0.4 | 1.1 |
| 62 to 64 | 31.8 | 41.5 | 45.3 | 51.0 | 9.7 | 3.8 | 5.7 | 2.7 | 0.9 | 1.2 |
| 65 and older | 8.6 | 11.7 | 15.5 | 18.3 | 3.1 | 3.8 | 2.8 | 3.1 | 2.9 | 1.7 |
| 65 to 74 | 13.1 | 19.2 | 22.7 | 26.2 | 6.1 | 3.5 | 3.5 | 3.9 | 1.7 | 1.4 |
| 65 to 69 | 17.2 | 24.2 | 28.0 | 33.2 | 7.0 | 3.8 | 5.2 | 3.5 | 1.5 | 1.7 |
| 70 to 74 | 8.8 | 13.1 | 15.2 | 18.3 | 4.3 | 2.1 | 3.1 | 4.1 | 1.5 | 1.9 |
| 75 and older | 3.1 | 4.4 | 6.1 | 8.6 | 0.8 | 1.2 | 4.9 | 3.9 | 4.0 | 8.8 |
| 75 to 79 | 4.7 | 7.0 | 9.5 | 12.7 | 2.3 | 2.5 | 3.2 | 4.1 | 3.1 | 2.9 |
| | | | | | | | | | | |
| Race: | | | | | | | | | | |
| White | 67.2 | 66.5 | 62.9 | 61.1 | -0.7 | -3.6 | -1.8 | -0.1 | -0.6 | -0.3 |
| Men | 75.8 | 74.3 | 69.8 | 66.8 | -1.5 | -4.5 | -3.0 | -0.2 | -0.6 | -0.4 |
| Women | 59.1 | 59.0 | 56.3 | 55.6 | -0.1 | -2.7 | -0.7 | 0.0 | -0.5 | -0.1 |
| | | | | | | | | | | |
| Black | 64.1 | 64.1 | 61.6 | 59.9 | 0.0 | -2.5 | -1.7 | 0.0 | -0.4 | -0.3 |
| Men | 68.7 | 67.0 | 64.1 | 61.1 | -1.7 | -2.9 | -3.0 | -0.3 | -0.4 | -0.5 |
| Women | 60.4 | 61.7 | 59.4 | 58.8 | 1.3 | -2.3 | -0.6 | 0.2 | -0.4 | -0.1 |
| | | | | | | | | | | |
| Asian | 65.8 | 66.2 | 63.2 | 62.8 | 0.4 | -3.0 | -0.4 | 0.1 | -0.5 | -0.1 |
| Men | 73.4 | 75.0 | 72.1 | 71.4 | 1.6 | -2.9 | -0.7 | 0.2 | -0.4 | -0.1 |
| Women | 58.8 | 58.3 | 55.5 | 55.3 | -0.5 | -2.8 | -0.2 | -0.1 | -0.5 | 0.0 |
| | | | | | | | | | | |
| All other groups[1] | – | 65.9 | 64.1 | 59.7 | – | -1.8 | -4.4 | – | -0.3 | -0.7 |
| Men | – | 72.1 | 68.8 | 61.7 | – | -3.3 | -7.1 | – | -0.5 | -1.1 |
| Women | – | 60.1 | 59.7 | 57.6 | – | -0.4 | -2.1 | – | -0.1 | -0.4 |
| | | | | | | | | | | |
| Ethnicity: | | | | | | | | | | |
| Hispanic origin | 66.5 | 68.7 | 65.8 | 65.9 | 2.2 | -2.9 | 0.1 | 0.3 | -0.4 | 0.0 |
| Men | 79.6 | 80.7 | 76.0 | 74.4 | 1.1 | -4.7 | -1.6 | 0.1 | -0.6 | -0.2 |
| Women | 53.4 | 56.1 | 55.8 | 57.4 | 2.7 | -0.3 | 1.6 | 0.5 | -0.1 | 0.3 |
| | | | | | | | | | | |
| Other than Hispanic origin | 66.8 | 65.8 | 62.2 | 59.8 | -1.0 | -3.6 | -2.4 | -0.2 | -0.6 | -0.4 |

Footnotes:
  1 The "all other groups" category includes (1) those classified as being of multiple racial origin and (2) the race categories of (2a) American Indian and Alaska Native or (2b) Native Hawaiian and Other Pacific Islanders.
Note: Dash indicates no data collected for category. Details may not sum to totals because of rounding.

Source: Employment Projections program, U.S. Bureau of Labor Statistics

| Group | Participation rate | | | | Percentage-point change | | | Annual growth rate | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1996 | 2006 | 2016 | 2026 | 1996–06 | 2006–16 | 2016–26 | 1996–06 | 2006–16 | 2016–26 |
| Men | 74.4 | 72.3 | 67.8 | 64.2 | -2.1 | -4.4 | -3.7 | -0.3 | -0.6 | -0.6 |
| Women | 59.9 | 59.8 | 57.0 | 55.8 | 0.0 | -2.8 | -1.2 | 0.0 | -0.5 | -0.2 |
| | | | | | | | | | | |
| White non-Hispanic | 67.3 | 66.1 | 62.3 | 59.8 | -1.2 | -3.8 | -2.5 | -0.2 | -0.6 | -0.4 |
| Men | 75.3 | 73.0 | 68.3 | 64.5 | -2.3 | -4.7 | -3.8 | -0.3 | -0.7 | -0.6 |
| Women | 59.8 | 59.6 | 56.6 | 55.4 | -0.2 | -3.0 | -1.2 | 0.0 | -0.5 | -0.2 |
| | | | | | | | | | | |
| Age of baby boomers | 32 to 50 | 42 to 60 | 52 to 70 | 62 to 80 | | | | | | |

**Footnotes:**
[1] The "all other groups" category includes (1) those classified as being of multiple racial origin and (2) the race categories of (2a) American Indian and Alaska Native or (2b) Native Hawaiian and Other Pacific Islanders.
Note: Dash indicates no data collected for category. Details may not sum to totals because of rounding.

Source: Employment Projections program, U.S. Bureau of Labor Statistics

Back to top

**Last Modified Date:** October 24, 2017

RECOMMEND THIS PAGE USING:   Facebook   Twitter   LinkedIn

**TOOLS**
Areas at a Glance
Industries at a Glance
Economic Releases
Databases & Tables
Maps

**CALCULATORS**
Inflation
Injury And Illness

**HELP**
Help & Tutorials
FAQs
Glossary
About BLS
Contact Us

**INFO**
What's New
Careers @ BLS
Find It! DOL
Join our Mailing Lists
Linking & Copyright Info

**RESOURCES**
Inspector General (OIG)
Budget and Performance
No Fear Act
USA.gov
Benefits.gov
Disability.gov

Freedom of Information Act | Privacy & Security Statement | Disclaimers | Customer Survey | Important Web Site Notices

U.S. Bureau of Labor Statistics | Office of Occupational Statistics and Employment Projections, PSB Suite 2135, 2 Massachusetts Avenue, NE Washington, DC 20212-0001
www.bls.gov/EMP | Telephone: 1-202-691-5700 | Contact EMP

https://www.bls.gov/emp/ep_table_303.htm    3/3

# Career Outlook





# Older workers: Labor force trends and career options

*Mitra Toossi and Elka Torpey | May 2017*

You enter the labor force, you work until a certain age, and you retire. Or maybe you don't. More and more people are working into their later years, a trend that is expected to continue.

According to the U.S. Bureau of Labor Statistics (BLS), about 40 percent of people ages 55 and older were working or actively looking for work in 2014. That number, known as a labor force participation rate, is expected to increase fastest for the oldest segments of the population—most notably, people ages 65 to 74 and 75 and older—through 2024. In contrast, participation rates for most other age groups in the labor force aren't projected to change much over the 2014–24 decade.



Keep reading to learn more about the changing age composition of the labor force. You'll find BLS data on older workers, including occupations in which they're concentrated and career options such as self-employment and part-time jobs. If you're considering something different for a later-in-life career, this information might give you some ideas.

## A changing labor force

The labor force is people ages 16 and older who are either working or actively looking for work. It excludes active-duty military personnel and the institutionalized population, such as prison inmates.

BLS data reveal how the age makeup of the U.S. labor force is changing. (See chart 1.) From 1970 until the end of the 20th century, older workers—which BLS defines as those ages 55 and older—made up the smallest segment of the labor force. In the 1990s, however, these older workers began to increase their share of the labor force, while workers in younger age groups started to have declines in their labor force shares. And by 2003, the older age group no longer had the smallest share.



Chart 1. U.S. labor force shares by age, 1970 to 2014 and projected 2014–24 (percent)

Source: U.S. Bureau of Labor Statistics.

By 2024, BLS projects that the labor force will grow to about 164 million people. That number includes about 41 million people who will be ages 55 and older—of whom about 13 million are expected to be ages 65 and older.

And, although they make up a smaller number of workers overall, the 65- to 74-year-old and 75-and-older age groups are projected to have faster rates of labor force growth annually than any other age groups. (See chart 2.) Over the entire 2014–24 decade, the labor force growth rate of the 65- to 74-year-old age group is expected to be about 55, and the labor force growth rate of the 75-and-older age group is expected to be about 86 percent, compared with a 5-percent increase for the labor force as a whole.



Chart 2. Annual growth rate in labor force by age, projected 2014–24 (percent)

Source: U.S. Bureau of Labor Statistics.

This increase is being fueled by the aging baby-boom generation, a large group of people born between 1946 and 1964. By 2024, baby boomers will have reached ages 60 to 78. And some of them are expected to continue working even after they qualify for Social Security retirement benefits.

People are working later in life for a number of reasons. They are healthier and have a longer life expectancy than previous generations. They are better educated, which increases their likelihood of staying in the labor force. And changes to Social Security benefits and employee retirement plans, along with the need to save more for retirement, create incentives to keep working.



# Later-in-life career options

With people staying in the labor force longer, planning for a career later in life may be increasingly important. Here are a few options to consider if you're looking to do something new.

## Occupations with older workers

Maybe you've spent your career in an office and would love to get into the outdoors. Or perhaps you're retiring as a teacher and would prefer to get a job giving tours of a local museum.

Workers ages 55 and older were employed across many types of occupations in 2016, according to BLS. (See chart 3.) More than 42 percent of these workers were in management, professional, and related occupations, a somewhat higher proportion than that for all workers.



**Chart 3. Employment of workers ages 55 and older, by occupation group, 2016 (thousands)**

Source: U.S. Bureau of Labor Statistics.

BLS data can also show where older workers are concentrated. In each of the following selected occupations, workers ages 55 and older made up at least one-third of the occupation's total employment in 2016:

- Archivists, curators, and museum technicians
- Bus drivers
- Clergy
- Furniture finishers
- Jewelers and precious stone and metal workers
- Legislators
- Medical transcriptionists
- Proofreaders and copy markers
- Property, real estate, and community association managers
- Real estate brokers and sales agents
- Tax preparers
- Travel agents

## Self-employment

Self-employment is an option that may offer increased flexibility and autonomy. If you've always wanted to be your own boss, what kind of business might you like to own? Would you rather freelance, perhaps as a gig worker?



BLS data show that workers in older age groups have higher rates of self-employment than do workers in younger groups. (See chart 4.) Knowledge and resources gained through years of experience may put older workers in a good position to work for themselves.



Chart 4. Self-employment (unincorporated) by age, 2016 (percent)

Source: U.S. Bureau of Labor Statistics.

Selected occupations in which self-employment was common in 2016, according to BLS, include:

- Animal trainers
- Craft artists
- Door-to-door sales workers, news and street vendors, and related workers
- Farmers, ranchers, and other agricultural managers
- Fine artists, including painters, sculptors, and illustrators
- Fishing and hunting workers
- Hairdressers, hairstylists, and cosmetologists
- Massage therapists
- Musicians, singers, and related workers
- Photographers
- Tailors, dressmakers, and sewers
- Writers and authors

## Part-time employment

Perhaps you enjoy your job but would prefer fewer hours. Maybe you're counting on a little income to pay for a favorite hobby. Consider joining the ranks of part-timers, an option many workers pursue to stay active.

BLS data show that about 27 percent of workers ages 55 and older, and 18 percent of workers ages 25 to 54, were part time (usually 1 to 34 hours per week) in 2016. (See chart 5.) For workers ages 65 and older, the rate of part-time employment is even higher: 40 percent.



**Chart 5. Part-time employment of workers ages 25 to 54 and ages 55 and older, 2016 (percent)**

Source: U.S. Bureau of Labor Statistics.

U.S. BUREAU OF LABOR STATISTICS

Career Outlook

Plenty of jobs can be part time. Here are selected occupations with relatively high percentages of part-time workers in 2016, according to BLS:

- Amusement and recreation attendants
- Cashiers
- Combined food preparation and serving workers, including fast food
- Counter attendants, cafeteria, food concession, and coffee shop
- Crossing guards
- Dental hygienists
- Embalmers and funeral attendants
- Hosts and hostesses, restaurant, lounge, and coffee shop
- Library technicians
- Models, demonstrators, and product promoters
- Transportation attendants, except flight attendants
- Ushers, lobby attendants, and ticket takers.



# For more information

Learn more about the occupations in this article, and many others, in the *Occupational Outlook Handbook*.

Detailed projections of the labor force are available from the BLS Employment Projections program. See this *Spotlight on Statistics*, "A look at the future of the labor force to 2060," for some of the most up-to-date projections.

Still other labor force data, including those for part-time and self-employed workers and for workers by age, are available from the Current Population Survey (CPS). The *Monthly Labor Review* article "Occupational choices of

⭐ U.S. BUREAU OF LABOR STATISTICS                                                    Career Outlook

the elderly" analyzes CPS data to compare occupational distributions of workers ages 45 to 65 with those over 65.

Related *Career Outlook* articles include:

Senior shift: Activities change as we age

New year, new career: 5 tips for changing occupations

Working in a gig economy

Younger baby boomers and number of jobs held

Careers for creative people

Self-employment: What to know to be your own boss

Projections of the labor force, 2014–24

---

*Mitra Toossi and Elka Torpey are economists in the Office of Occupational Statistics and Employment Projections, BLS. They can be reached at toossi.mitra@bls.gov and torpey.elka@bls.gov, respectively.*

**SUGGESTED CITATION:**

Mitra Toossi and Elka Torpey, "Older workers: Labor force trends and career options," *Career Outlook,* U.S. Bureau of Labor Statistics, May 2017.

### RELATED CONTENT

My Next Move
Small Business Administration
Social Security Administration
National Council on Aging
AARP

### RELATED SUBJECTS

Career planning | Flexible jobs | Labor force | Occupations | Part-time jobs | Retirement | Self-employed

# EXHIBIT C

## TO

## REPLY
## IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PARTIAL JUDGMENT ON THE
## PLEADINGS PURSUANT TO FED. R. CIV. P. 12(c)

## DAMAGES CALCULATIONS

**Back-up Comprised of the following attached:**

**C-1   Backpay Calculation**
**C-2   Backpay Interest Calculation**
**C-3   Frontpay Calculation**
**C-4   Historical NASDAQ Closing Prices of First Data**

**EXHIBIT C**
**DAMAGES BASED ON THE FMLA CLAIM PLEADINGS**

**Summary of FMLA Damages as of February 28, 2018**

**BACKPAY**

| | | |
|---|---|---|
| Backpay | $ 999,166.58 | [See Exhibit C-1 hereto] |
| Interest on Backpay | +    15,351.90 | [See Exhibit C-2 hereto] |
| Subtotal Backpay & Interest | $ 1,014,518.48 | |
| FMLA 2x Liquid. Damages | + 1,014,518.48 | [29 U.S.C. §2617(a)(1)(A)(ii)] |
| TOTAL BACKPAY AS OF 02/28/18 | $2,029,036.96 | |

**FRONT PAY**

| | | |
|---|---|---|
| Frontpay (to age 78) | $ 4,097,846.60 | [See Exhibit C-3 hereto] |
| FMLA 2x Liquid. Damages | + 4,097,846.60 | [ 29U.S.C. §2617(a)(1)(A)(ii)] |
| TOTAL FRONTPAY TO AGE 78 | $ 8,195,693.20 | |

**TOTAL DAMAGES**          **$10,224,730.16 + TBD Fees and Costs**
(excluding lost benefits and future equity awards)

- Note – requested frontpay award is to the Plaintiff's age of 78. If seeking judgment pursuant to Rule 56 after discovery or after trial, the Plaintiff will seek additional frontpay awards beyond age 78.

## Basis for Plaintiff's Calculations

| | |
|---|---|
| **Annual Salary - $480,000/yr**<br>o    Equivalent of $40,000 per month or $20,000 per bimonthly pay period | Admitted - Complaint & Answer ¶¶41, 42 |
| **Annual Bonus $250,000/yr**<br>o    Paid in February for prior annual period. | Admitted - Complaint & Answer ¶43<br><u>See</u> Complaint Exhibit J |
| **Date of Termination – 02/28/2017** | Admitted - Complaint & Answer ¶174 |
| **Unvested Restricted Stock Units on 02/28/17**<br>• 5,165 shares vesting 02/24/18<br>• 5,165 shares vesting 02/24/19 | Admitted - Complaint & Answer ¶45 |
| **Unvested Stock Options on 02/28/17**<br>• 31,367 shares @ $12.65/sh exercise price vesting 07/22/17 | Admitted - Complaint & Answer ¶44 |
| **Closing Price of First Data Common Stock**<br>• 07/21/17 - $18.52/sh<br>• 07/24/17 - $18.59/sh<br>• 02/23/18 - $16.04/sh | Judicial Notice of NASDAQ Closing Price Reports<br><u>See</u> Exhibit C-4 hereto |
| **IRS Interest Rate – 4% entire period between 03/01/17 and 02/28/17** | Judicial Notice of IRS Quarterly Rate Releases |
| **Backpay and Frontpay calculated through Plaintiff's age 78 (6.5 years after termination)** | Age of Plaintiff Admitted by Defendants – [Complaint & Answer ¶30] Judicial Notice of the capability to work to and past age 78 is requested. Judicial Notice of the BLS statistics attached as Exhibit B to the Reply |
| **Loss of benefits such as group life, 401(k) matching contributions, and future equity grants are excluded from these calculations and would be waived if judgment was entered on the Motion, but these elements will be tried.** | |

## EXHIBIT C-1 – BACKPAY AS OF 02/28/2018

| | |
|---|---:|
| Salary (03/01/17 – 02/28/18) | $ 480,000.00 |
| Bonus (2017 bonus paid 02//15/18) | 250,000.00 |
| Value of Options Vested 07/22/17[*] | 186,319.98 |
| Value of Restricted Stock Vested 02/24/18[**] | 82,846.60 |
| **TOTAL BACKPAY AS OF 02/28/2018** | **$ 999,166.58** |

[*] OPTION VALUE CALCULATION

    Shares vesting x (07/24/17 NASDAQ closing price - option exercise price)]

    31,367 shares x ($18.59 - $12.65) = $186,319.98

[**] RESTRICTED STOCK CALCULATION

    Shares Vesting x 02/23/18 NASDAQ closing price

    5,165 shares x 16.04 = $82,846.60

## EXHIBIT C-2 – INTEREST ON BACKPAY AS OF 02/28/2018

Interest calculated at 4.0% per annum (0.012% per day) based on IRS rate for entire period from 03/01/17 through 02/28/17. Average daily balanced based on $20,000 salary payments twice per month with first payment on 03/15/17, bonus in mid-February 2018, options vesting 07/22/17. **[Interest on restricted stock vesting 02/24 has not been included.]** No compounding of interest.  Average daily balance calculation and interest calculation set forth below.

| Pay Periods (03/01/17 – 02/28/18) | Aggregate Backpay beginning of period | | Days in Period | Value for Average Daily Balance Calculation |
|---|---|---|---|---|
| 03/01 – 03/15 | $        0.00 | x | 15 | $        0.00 |
| 03/16 – 03/31 | $   20,000.00 | x | 16 | $      320,000.00 |
| 04/01 – 04/15 | $   40,000.00 | x | 15 | $      600,000.00 |
| 04/16 – 04/30 | $   60,000.00 | x | 15 | $      900,000.00 |
| 05/01 – 05/15 | $   80,000.00 | x | 15 | $   1,200,000.00 |
| 05/16 - 05/31 | $  100,000.00 | x | 16 | $   1,600,000.00 |
| 06/01 – 06/15 | $  120,000.00 | x | 15 | $   1,800,000.00 |
| 06/16 – 06/30 | $  140,000.00 | x | 15 | $   2,100,000.00 |
| 07/01 – 07/15 | $  160,000.00 | x | 15 | $   2,400,000.00 |
| 07/16 – 07/22 | $  180,000.00 | x | 7 | $   1,260,000.00 |
| 07/23 – 07/31* | $  366,319.98 | x | 9 | $   3,296,879.82 |
| 08/01 – 08/15 | $  386,319.98 | x | 15 | $   5,794,799.70 |
| 08/16 – 08/31 | $  406,319.98 | x | 16 | $   6,501,119.68 |
| 09/01 – 09/15 | $  426,319.98 | x | 15 | $   6,394,799.70 |
| 09/16 – 09/30 | $  446,319.98 | x | 15 | $   6,694,799.70 |
| 10/01 – 10/15 | $  466,319.98 | x | 15 | $   6,994,799.70 |
| 10/16 – 10/31 | $  486,319.98 | x | 16 | $   7,781,119.68 |
| 11/01 – 11/15 | $  506,319.98 | x | 15 | $   7,594,799.70 |
| 11/16 – 11/30 | $  526,319.98 | x | 15 | $   7,894,799.70 |
| 12/01 – 12/15 | $  546,319.98 | x | 15 | $   8,194,799.70 |
| 12/16 - 12/31 | $  566,319.98 | x | 16 | $   9,061,119.68 |
| 01/01 – 01/15 | $  586,319.98 | x | 15 | $   8,794,799.70 |
| 01/16 – 01/31 | $  606,319.98 | x | 16 | $   9,701,119.68 |
| 02/01 – 02/15 | $  626,319.98 | x | 15 | $   9,394,799.70 |
| 02/16 – 02/28** | $  896,319.98 | x | 13 | $ 11,652,159.74 |
| 03/01 - | $  916,319.98 | x | 0 | $        0.00 |
| **Total** | | | | $127,926,715.58 |
| **Avg Daily Balance** | **Total** | ÷ | **365** | **$   350,484.15** |
| **Daily Interest** | **Avg Daily Bal** | **x** | **0.00012** | **$        42.06/day** |
| **BACKPAY INTEREST TOTAL** 365 days (03/01/17 to 02/28/18) | **Daily Interest** | **x** | **365** | **$   15,351.90** |

\* On 7/22/17 Options to purchase 31,367 shares vested. 31,367 shares x ($18.59 - $12.65) = $186,319.98

\*\* $250,000 bonus paid on 02/15/18 for annual period ending 12/31/17.

**EXHIBIT C-3 – FRONTPAY (03/01/2018 to 08/31/2023) – Plaintiff Age 78**

| | |
|---|---|
| **Salary** ($480,000/yr  x 5.5 years) | $ 2,640,000.00 |
| **Bonus** ($250,00/yr x 5.5 years) | 1,375,000.00 |
| **Restricted Stock*** | 82,846.60 |
| **TOTAL FRONTPAY** | **$ 4,097,846.60** |

* Restricted Stock vesting 02/24/19 is valued at the NASDAQ Closing Price on 02/23/18 (5,165 shares x 16.04) = $82,846.60

** Front pay calculation does not include lost future stock award grants or lost benefits. For purposes of judgment on the pleadings, Plaintiff is not seeking an award of these damages. But, if seeking judgment under Rule 56 or at trial, the Plaintff will seek all damages available and provable.

*** Front pay is calculated to Plaintiff's age 78 and requested in the Complaint. At any request for judgment pursuant to Rule 56 or at trial, Plaintiff will seek frontpay damages to further years of Plaintiff's working capabilities.

**EXHIBIT C-4 – HISTORICAL NASDAQ STOCK PRICES**

Case 1:17-cv-04869-FB-LB    Document 57-2    Filed 02/27/18    Page 50 of 58 PageID #: 576



E*TRADE Securities LLC

Home > Quotes > FDC > Historical Prices

## Historical Stock Prices

# FDC $16.04*    <span style="color:green">0.37</span>    <span style="color:green">2.36%</span>

*Delayed - data as of Feb. 23, 2018    Find a broker to begin trading FDC now

Get up to 10 years of daily historical stock prices & volumes.

Select the Timeframe:   3 Months

Results for: 3 Month, From 23-NOV-2017 TO 23-FEB-2018

| Date | Open | High | Low | Close / Last | Volume |
|------|------|------|-----|--------------|--------|
| 02/23/2018 | 15,78 | 16,04 | 15,71 | 16,04 | 6,142,409 |
| 02/22/2018 | 15,49 | 16,1 | 15,49 | 15,67 | 14,237,550 |
| 02/21/2018 | 15,87 | 15,95 | 15,42 | 15,44 | 6,199,479 |
| 02/20/2018 | 15,59 | 15,94 | 15,53 | 15,82 | 4,538,234 |
| 02/16/2018 | 15,72 | 15,93 | 15,62 | 15,66 | 5,558,374 |
| 02/15/2018 | 15,96 | 15,96 | 15,625 | 15,84 | 9,008,500 |
| 02/14/2018 | 15,62 | 15,97 | 15,57 | 15,84 | 10,173,840 |
| 02/13/2018 | 16,15 | 16,27 | 15,42 | 15,5 | 15,257,570 |
| 02/12/2018 | 16,07 | 16,75 | 16 | 16,32 | 24,955,200 |
| 02/09/2018 | 16,08 | 16,1 | 15,11 | 15,83 | 15,867,480 |
| 02/08/2018 | 16,64 | 16,7 | 15,81 | 15,93 | 12,986,840 |
| 02/07/2018 | 16,48 | 17 | 16,4 | 16,58 | 8,926,962 |
| 02/06/2018 | 16,05 | 16,73 | 15,91 | 16,48 | 6,803,883 |
| 02/05/2018 | 16,77 | 17,3 | 16,29 | 16,3 | 10,797,330 |
| 02/02/2018 | 17,52 | 17,64 | 17,15 | 17,15 | 5,086,516 |
| 02/01/2018 | 17,6 | 17,76 | 17,44 | 17,66 | 7,844,355 |
| 01/31/2018 | 17,79 | 17,84 | 17,56 | 17,7 | 3,861,103 |
| 01/30/2018 | 17,86 | 17,92 | 17,62 | 17,71 | 4,317,484 |
| 01/29/2018 | 18,26 | 18,4 | 17,99 | 18,06 | 4,761,678 |
| 01/26/2018 | 18,28 | 18,495 | 18,17 | 18,47 | 3,063,135 |
| 01/25/2018 | 18,25 | 18,38 | 18,07 | 18,23 | 4,446,238 |
| 01/24/2018 | 18,2 | 18,44 | 18,12 | 18,17 | 5,992,127 |
| 01/23/2018 | 18,25 | 18,38 | 17,85 | 18,15 | 5,454,679 |
| 01/22/2018 | 17,73 | 18,23 | 17,67 | 18,22 | 7,170,745 |
| 01/19/2018 | 17,78 | 18,04 | 17,7 | 18 | 6,567,393 |
| 01/18/2018 | 18 | 18,05 | 17,56 | 17,56 | 10,391,420 |
| 01/17/2018 | 17,63 | 17,75 | 17,31 | 17,6 | 3,312,209 |
| 01/16/2018 | 17,83 | 17,96 | 17,44 | 17,47 | 5,985,439 |
| 01/12/2018 | 17,89 | 17,93 | 17,6 | 17,66 | 5,815,157 |
| 01/11/2018 | 17,61 | 17,89 | 17,61 | 17,86 | 10,462,690 |
| 01/10/2018 | 17,27 | 17,695 | 17,15 | 17,62 | 8,915,860 |
| 01/09/2018 | 17,35 | 17,37 | 17,08 | 17,27 | 5,817,160 |
| 01/08/2018 | 17,23 | 17,32 | 17,08 | 17,24 | 4,245,893 |

NEWS FOR F

Tracking Larry
Management F
2/23/2018 11:14:

3 Big Takeawa
Quarter
2/23/2018 8:13:0

When It Come
Is Beating the
2/22/2018 11:26:

10 Most Under
Are Buying
2/16/2018 12:15:

First Data (FDC
Revenues Up
2/14/2018 1:48:0

More **FDC N**
Read **FDC P**
Subscrib

FINI

WA

Visit ou

| Date | Open | | | | |
|------|------|------|------|------|------|
| 01/05/2018 | 16.69 | 17.44 | 16.66 | 17.4 | 8,201,462 |
| 01/04/2018 | 16.73 | 16.78 | 16.39 | 16.65 | 7,966,885 |
| 01/03/2018 | 16.65 | 16.85 | 16.48 | 16.62 | 6,037,720 |
| 01/02/2018 | 16.81 | 16.88 | 16.65 | 16.65 | 3,136,772 |
| 12/29/2017 | 16.73 | 16.84 | 16.55 | 16.71 | 4,772,373 |
| 12/28/2017 | 16.87 | 16.92 | 16.57 | 16.72 | 3,296,200 |
| 12/27/2017 | 16.6 | 16.75 | 16.5 | 16.63 | 3,677,719 |
| 12/26/2017 | 16.53 | 16.58 | 16.4001 | 16.55 | 3,785,359 |
| 12/22/2017 | 16.33 | 16.76 | 16.33 | 16.62 | 5,088,095 |
| 12/21/2017 | 16.25 | 16.66 | 16.12 | 16.42 | 10,870,380 |
| 12/20/2017 | 16.51 | 16.58 | 16.15 | 16.17 | 3,828,044 |
| 12/19/2017 | 16.31 | 16.59 | 16.29 | 16.4 | 11,785,440 |
| 12/18/2017 | 16.56 | 16.62 | 16.25 | 16.26 | 8,525,415 |
| 12/15/2017 | 16.28 | 16.555 | 16.26 | 16.48 | 10,248,370 |
| 12/14/2017 | 16.54 | 16.63 | 16.25 | 16.26 | 5,747,321 |
| 12/13/2017 | 16.75 | 17.06 | 16.535 | 16.57 | 8,959,892 |
| 12/12/2017 | 16.36 | 16.775 | 16.3 | 16.73 | 5,661,119 |
| 12/11/2017 | 16.48 | 16.73 | 16.4 | 16.42 | 3,352,918 |
| 12/08/2017 | 16.65 | 16.65 | 16.36 | 16.52 | 4,357,585 |
| 12/07/2017 | 16.28 | 16.72 | 16.27 | 16.5 | 5,851,474 |
| 12/06/2017 | 16.09 | 16.41 | 16.05 | 16.25 | 5,722,031 |
| 12/05/2017 | 15.84 | 16.415 | 15.81 | 16.25 | 7,878,113 |
| 12/04/2017 | 16.49 | 16.5301 | 15.88 | 15.97 | 5,971,943 |
| 12/01/2017 | 16.35 | 16.45 | 15.93 | 16.29 | 3,428,295 |
| 11/30/2017 | 16.34 | 16.47 | 16.17 | 16.45 | 6,032,153 |
| 11/29/2017 | 16.73 | 16.84 | 16.17 | 16.17 | 9,006,689 |
| 11/28/2017 | 16.81 | 16.94 | 16.62 | 16.72 | 4,338,464 |
| 11/27/2017 | 16.73 | 16.89 | 16.66 | 16.75 | 3,134,380 |
| 11/24/2017 | 16.72 | 16.805 | 16.67 | 16.8 | 892,979 |

*This data reflects the latest intra-day delayed pricing.



📊 Download this file in Excel Format

Sponsored Fina...
You'll never fo...
this cheap pe...

US 'too big to
overhaul Finan...

The No. 1 Sto...
Hill

The One Even...
in 2018 Dent R...



# EXHIBIT D

## TO

## REPLY
## IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PARTIAL JUDGMENT ON THE
## PLEADINGS PURSUANT TO FED. R. CIV. P. 12(c)

## FMLA LEGISLATIVE HISTORY

**EXHIBIT D**
**LEGISLATIVE HISTORY OF THE FMLA**

[1]**THE 99th CONGRESS**

| | |
|---|---|
| April 4, 1985 | H.R. 2020, Parental and Disability Leave Act of 1985 introduced in House of Representatives by Representative Patricia Schroeder, et al. Provided 18 weeks over a 24-month period of unpaid parental leave for the birth, adoption, or serious illness of a child, and 26 weeks over a 12-month period of unpaid medical leave for employees' own serious health conditions. Applied to employers with 5 or more employees. |
| October 17, 1985 | First Joint House Oversight Hearings on issue of parental and disability leave held by the subcommittees on Labor-Management Relations and Labor Standards of the Committee on Education and Labor, and the subcommittees on Civil Service and Compensation and Employee Benefits of the Committee on Post Office and Civil Service. |
| March 4, 1986 | H.R. 4300, Parental and Medical Leave Act of 1986 introduced by Representatives William Clay, Patricia Schroeder, et al. Provided 18 weeks of unpaid parental leave over a 24-month period for the birth, adoption, or serious illness of a child, and 26 weeks of medical leave over a 12- month period for employees' own serious health condition. Applied to employers with 15 or more employees. |
| April 6, 1986 | S. 2278, Parental and Medical Leave Act of 1986 introduced in Senate by Senators Christopher Dodd, Ted Kennedy, et al. Provided 18 weeks over a 24-month period of unpaid parental leave for the birth, adoption, or serious illness of a child, and 26 weeks over a 12-month period of medical leave for employees' own serious health conditions. Applied to employers with 15 or more employees. |
| April 9, 1986 | Joint Hearings on H.R. 4300 held by the House Post Office and Civil Service subcommittees on Civil Service and Compensation and Employee Benefits. |
| April 22, 1986 | Joint Hearings on H.R. 4300 held by the House Education and Labor subcommittees on Labor-Management Relations and Labor Standards. |
| May 8, 1986 | H.R. 4300 Reported out of Subcommittee on Compensation and Employee Benefits by voice vote. |
| June 11, 1986 | H.R. 4300 reported out of full House Committee on Post Office and Civil Service by roll-call vote of 18 to 0. |
| June 12, 1986 | H.R. 4300 reported out of House Subcommittee on Labor-Management Relations by roll-call vote of 8 to 6. |

---

[1] Donna R. Lenhoff and Lissa Bell, Government Support for Working Families and for Communities: Family Medical Leave as a Case Study. http://www.nationalpartnership.org/research-library/work-family/fmla/fmla-case-study-lenhoff-bell.pdf

**EXHIBIT D**
**LEGISLATIVE HISTORY OF THE FMLA**

| | |
|---|---|
| June 26, 1986 | H.R. 4300, as amended, reported out of House Committee on Education and Labor. Amendment adopted by roll-call vote of 22 to 10. |
| September 17, 1986 | Open rule approved for consideration of H.R. 4300 by the Committee on Rules, but 99th Congress adjourned before action was taken. |

## THE 100th CONGRESS

| | |
|---|---|
| January 6, 1987 | S. 249, Parental and Temporary Medical Leave Act of 1987 introduced. Provided 18 weeks of unpaid parental leave over a 24-month period and 26 weeks of unpaid medical leave over a 12-month period. Applied to employers with 15 or more employees. |
| February 3, 1987 | H.R. 925, Family and Medical Leave Act of 1987 introduced. Provided 18 weeks of unpaid family leave over a 24-month period for the birth, adoption, or serious illness of a child or parent, and 26 weeks of unpaid medical leave over a 12-month period for an employees' own serious health condition. Applied to employers with 15 or more employees. |
| February 19, 1987 | Hearing on S. 249 held in Washington, D.C., by Senate Subcommittee on Children, Families, Drugs, and Alcoholism. |
| February 25 and March 5, 1987 | Joint hearings held by House Committee on Education and Labor subcommittees on Labor-Management Relations and Labor Standards. |
| March 13, 1987 | H.R. 925 reported out of Subcommittee on Labor-Management Relations by voice vote. |
| April 2, 1987 | Hearing on H.R. 925 held by House subcommittees on Civil Service and Compensation and Employee Benefits of the Committee on Post Office and Civil Service. |
| April 23, 1987 | Hearing on S. 249 held in Washington, D.C., by Senate Subcommittee on Children, Families, Drugs, and Alcoholism. |
| May 5, 1987 | H.R. 925 reported out of House Subcommittee on Civil Service by vote of 3 to 0. |
| May 19, 1987 | H.R. 925 reported out of House Subcommittee on Compensation and Employee Benefits by voice vote. |
| June 15, 1987 | Hearing on S. 249 held in Boston by Senate Subcommittee on Children, Families, Drugs, and Alcoholism. |
| July 20, 1987 | Hearing on S. 249 held in Los Angeles by Senate Subcommittee on Children, Families, Drugs, and Alcoholism. |

**EXHIBIT D**
**LEGISLATIVE HISTORY OF THE FMLA**

| | |
|---|---|
| September 14, 1987 | Hearing on S. 249 held in Chicago by Senate Subcommittee on Children, Families, Drugs, and Alcoholism. |
| October 13, 1987 | Hearing on S. 249 held in Atlanta by Senate Subcommittee on Children, Families, Drugs, and Alcoholism. |
| October 29, 1987 | Hearing on S. 249 held in Washington, D.C., by Senate Subcommittee on Children, Families, Drugs, and Alcoholism. |
| November 17, 1987 | H.R. 925 reported out of House Committee on Education and Labor by roll-call vote of 21 to 11. Committee approved amendment "in nature of a substitute to" H.R. 925, offered by subcommittee ranking minority member Marge Roukema. Provided 10 weeks of unpaid family leave over a 24-month period and 15 weeks of unpaid medical leave over a 12-month period. Applied to employers with 50 or more employees for the first 3 years after enactment, and 35 employees thereafter. |
| February 3, 1988 | H.R. 925 reported out of House Committee on Post Office and Civil Service by voice vote. |
| June 8, 1988 | S. 2488, Parental and Medical Leave Act of 1988, introduced. Provided 10 weeks of unpaid parental leave for 24-month period and 13 weeks of medical leave for any 12-month period. Applied to employers with 20 or more employees. |
| July 14, 1988 | S. 2488 reported out of Senate Committee on Labor and Human Resources. |
| September 26, 1988 | S. 2488 brought to Senate floor for debate and filibustered. |
| October 7, 1988 | Senate failed to end filibuster on S. 2488 by cloture vote of 50 to 46. |

**THE 101st CONGRESS**

| | |
|---|---|
| February 2, 1989 | S. 345, Family and Medical Leave Act of 1989, introduced. Provided 10 weeks of family leave in any 24-month period for the birth or adoption of a child and for the care of a child or parent with a serious illness, and 13 weeks of medical leave in any 12-month period for employees' own health conditions. Applied to employers with 20 or more employees. |
| February 2, 1989 | H.R. 770, Family and Medical Leave Act of 1989, introduced. Provided 10 weeks of family leave in any 24-month period and 15 weeks of medical leave in any 12-month period. Applied to employers with 50 or more employees for 3 years after enactment, and 35 or more employees thereafter. |
| February 7, 1989 | Hearing on H.R. 770 held by House Subcommittee on Labor-Management Relations. |

**EXHIBIT D**
**LEGISLATIVE HISTORY OF THE FMLA**

February 28, 1989   H.R. 770 reported out of House Subcommittee on Labor-Management Relations by vote of 11 to 5.

\

March 8, 1989   H.R. 770 reported, as amended, out of full House Committee on Education and Labor by vote of 23 to 12. The amendments extended coverage to congressional employees and addressed the coverage of public elementary and secondary schoolteachers, as negotiated by National School Board Association and teachers' unions, among others.

April 19, 1989   S. 345 reported out of Committee on Labor and Human Resources by roll-call vote of 10 to 6.

May 8, 1990   Modified open rule consideration for H.R. 770 granted by House Committee on Rules.

May 10, 1990   First floor vote: H.R. 770 passed by a vote of 237 to 187, as amended by the GordonWeldon substitute, which reduced the period of leave from 15 weeks per year for medical leave and 10 weeks every 2 years for family leave to 12 weeks per year for all circumstances covered in the bill, expanded the small-employer exemption from 35 (effective 3 years after enactment) to 50 employees, and expanded the conditions of family leave to cover spouses with serious health conditions.

June 14, 1990   H.R. 770 approved by Senate, by unanimous consent.

June 29, 1990   H.R. 770 vetoed by President George Bush.

July 25, 1990   Attempt to override veto failed in House of Representatives by vote of 232 to 195.

## THE 102nd CONGRESS

January 3, 1991   H.R. 2, Family and Medical Leave Act of 1991 (identical to the bill vetoed by President Bush) introduced. Provided that employers with 50 or more employees grant 12 weeks of unpaid family and medical leave.

January 14, 1991   S. 5, Family and Medical Leave Act of 1991, introduced. Provided that employers with 50 or more employees grant 12 weeks of unpaid family and medical leave.

January 24, 1991   Hearing on S. 5 held by Senate Subcommittee on Children, Families, Drugs, and Alcoholism.

February 2, 1991   Hearing on H.R. 2 held by House Subcommittee on Labor-Management Relations.

March 7, 1991   H.R. 2 reported out of House Subcommittee on Labor-Management Relations by vote of 16 to 7.

4

**EXHIBIT D**
**LEGISLATIVE HISTORY OF THE FMLA**

| | |
|---|---|
| March 20, 1991 | H.R. 2 reported out of House Committee on Education and Labor, as amended, by voice vote. |
| May 30, 1991 | S. 5 reported out of Senate Committee on Labor and Human Resources. |
| June 27, 1991 | H.R. 2 reported out of Committee on Post Office and Civil Service. |
| October 2, 1991 | S. 5 passed in Senate by vote of 65 to 32, as amended by the Bond-Ford-Coats substitute, which tightened notice and eligibility requirements and created enforcement mechanism parallel to Fair Labor Standards Act, among other things. |
| November 13, 1991 | H.R. 2 passed in House of Representatives by vote of 253 to 177, as amended by the Gordon-Hyde substitute, which incorporated the Bond substitute passed by the Senate. |
| August 5, 1992 | House-Senate Conference Committee met. |
| August 11, 1992 | Conference report passed in the Senate by unanimous consent. |
| September 10, 1992 | Conference report passed in the House by vote of 241 to 161. |
| September 22, 1992 | President Bush vetoed the bill. |
| September 24, 1992 | Senate overrode veto by vote of 68 to 31. |
| September 30, 1992 | House of Representative failed to override veto by vote of 258 to 169. |

**THE 103rd CONGRESS**

| | |
|---|---|
| January 5, 1993 | H.R. 1, Family and Medical Leave Act of 1993 introduced. Provided that employers with 50 or more employees grant up to 12 weeks of unpaid family and medical leave. |
| January 21, 1993 | S. 5, Family and Medical Leave Act of 1993, introduced. Provided that employers with 50 or more employees grant up to 12 weeks of unpaid family and medical leave. |
| January 22, 1993 | Hearing on S. 5 held by Senate Subcommittee on Children, Families, Drugs, and Alcoholism. Labor Secretary Robert Reich testifies in favor of FMLA. |
| January 26, 1993 | Hearings on H.R. 1 held by House Subcommittee on Labor-Management Relations and Senate Committee on Labor and Human Resources. |
| January 26, 1993 | S. 5 reported out of Committee on Labor and Human Resources by vote of 13 to 4. |

**EXHIBIT D**
**LEGISLATIVE HISTORY OF THE FMLA**

| | |
|---|---|
| January 27, 1993 | H.R. 1, as amended, reported out of full House committee by a vote of 29 to 13. Two substitute amendments offered en bloc by Congressman Pat Williams were adopted to conform H.R. 1 to S. 5. |
| February 4, 1993 | H.R. 1, Family and Medical Leave Act of 1993, passed in the House of Representatives by vote of 247 to 152. |
| February 4, 1993 | S. 5, Family and Medical Leave Act of 1993, passed in the Senate by vote of 71 to 27. |
| February 5, 1993 | Family and Medical Leave Act signed into law by President Bill Clinton. |
| August 5, 1993 | FMLA effective date. |