# **EXHIBIT 3**

# THE LAW OFFICE OF SHAWN SHEARER, P.C.

3839 McKINNEY AVENUE, SUITE 155-254
DALLAS, TEXAS 75204
OFFICE: (972) 803-4499
SHAWN@SHEARERLAW.PRO

May 3, 2018

**THE PURPOSE OF THIS LETTER IS TO RESOLVE A DISCOVERY DISPUTE**

<u>Via Electronic Mail</u>

Gary B. Eidelman
Saul Ewing Arnstein & Lehr
500 E. Pratt Street, Suite 900
Baltimore Maryland 21202

>   Re:   *Steven Barger v. First Data Corporation et al.*
>         Civil Case No. 1:17-cv-4869

Dear Gary:

This letter is in response to your letter of April 30, 2018 outlining Defendants' disputes with scope and topics included in Plaintiff's Notice of Rule 30(b)(6) Depositions dated April 23, 2018. [1] It seems inconceivable, but in this case par for the course for obstruction of discovery by the Defendants, that you attempted to find grounds to object to every single topic proposed for a 30(b)(6) deposition. Every single one.

---

[1] In footnote 1 to your letter about June 13, 2018 as a placeholder for 30(b)(6) depositions. The time for completing discovery (August 31) is quickly approaching and not one deposition has taken place. Your account of the twice failed depositions of Ms. Voycheske and Ms. Steffen is inaccurate. Those depositions were intended to address the issues raised in Ms. Voycheske's Affidavit filed in Support of the Defendants' Response to Plaintiff's Motion for Judgment on the Pleadings under Rule 12(c). Depositions should have occurred prior to the required filing of Plaintiff's reply. February 21st by letter I proposed depositions on February 23rd in Omaha. Hours later, by letter, you refused to produce Ms. Voycheske for deposition on the 23rd. You requested / received a protective order preventing a third-party subpoena about the Affidavit and its exhibits, which are contradictory to Defendants' other stated defenses. March 8th, I noticed depositions of Ms. Voycheske and Ms. Steffen in Omaha for March 14th and you accepted. The sad passing of your mother-in-law on March 11th interfered with your direct participation in those depositions, and you requested two weeks leave from this case. Not wanting to cancel the Omaha court reporters a second time, mindful of discovery time constraints, I offered to cut the time for each deponent in half (less than 2 hours each), with you attending via video/ audio, your choice to begin at 9 am or 2 pm, and a continuance to a later date for follow-up questions. This deposition date was not the same as that of your mother-in-law's memorial service. You refused to allow a partner, associate, or First Data's local law firm to attend in person for two depositions. You suggested that Ms. Cooper would handle matters during your two week absence, but as you see from the attached, she was consistently unavailable. Your firm's inability to field an attorney for less than four hours use meant depositions were canceled. Your delays forced Plaintiff to change strategy and depositions will now occur top down. Authority is a significant issue in this litigation, given the employer definition issues for purposes of the FMLA.  Mr. Bisignano's deposition is May 23rd in NYC. If that deposition does not occur, I will bring the clear discovery obstruction to Judge Bloom. You noted your unavailability for June 13. It is my understanding that you are unavailable because you are attending a conference. I understand part of the delay from Voycheske's deposition was you were also attending a conference. Today I received an out-of-office e-mail saying you are at a conference. The Plaintiff's case cannot be continually delayed because you are in Florida or California or, today, Canada, at conferences. You have plenty of back-up and these depositions can be defended by one of the other 800 lawyers in your firm, including the two female lawyers who appear in this case, yet you will not let defend a deposition.

Had you conducted a good faith effort to find actual common ground on the 30(b)(6) topics, as opposed to merely throwing the proverbial kitchen sink at Plaintiff by objecting to each and every topic to both increase your billable hours and waste my time, I could understand your effort. But instead, you insist on memorializing your futility in writing. This is the discovery process. First Data is a defendant. It must testify. You spent fifteen pages and thousands of your client's dollars feigning objections of relevance to perfectly legitimate 30(b)(6) topics, yet you bear no visible signs of understanding that it is ALSO your responsibility to be relevant. What you are doing, is attempting to substitute irrelevant documents and repetitive, nonresponsive witnesses for relevant documents and necessary witnesses. This behavior is completely consistent with your handling of my client's case to date, and continues to demonstrate your basic lack of understanding that accounting, corporate governance, information and technology are all central to this case in addition to any typical documentation and discovery that may be required in other employment cases you defend. There is no "standard case" in any area of law. That you are not accustomed to dealing personally and directly with senior management at First Data, such as Mr. Bisignano, Mr. Marino, and Mr. Charron, does not exempt their participation in Plaintiff's case. You find the fact that this case requires you to enlist the CEO's and EVP's participation to be "unduly burdensome" because you are not accustomed to having to directly engage top management at First Data. In this case, those individuals are the only relevant decision-makers.

When this case began, I gave you fair warning that I knew about your history of non-escalation. I told you repeatedly that this Plaintiff was atypical for an employment case because despite the large size of First Data's organization there are only a handful of relevant witnesses able to testify with any authority or accuracy about Plaintiff's tenure of employment and the circumstances of his illegal dismissal, and that these witnesses are at the top of the organization. I have given you unlimited opportunity to identify the person or persons directly responsible for Plaintiff's illegal firing. I told you that I had worked in-house before, and that it was very treacherous for First Data to allow an SVP to walk out without a release, because it would expose all your senior executives to discovery. As it happens, I recently listened to a voicemail you left for me in early 2017, the first week you were on this case, where you laugh at my client, and behave as if his demands are both unreasonable and beneath you. Yet over a year later, you have not so much as provided an accurate official organizational chart that would speak to the chain of authority that existed when Plaintiff was illegally terminated. Your own witnesses, in their own words and emails, cannot agree on exactly what the state of Plaintiff's employment and compensation at First Data was, as late as March of 2017. Yet, inexplicably, you decided to provide a sworn statement attached to your Rule 12(c) Response provided by a human resources operative, located in Omaha, which contradicts every other argument you have put forth in this case. Further, you have proceeded as if her affidavit testimony is the governing, definitive information available to Plaintiff, when in reality, it is wholly irrelevant to the case. In your hackneyed attempt to create the illusion of fact issues that do not exist, you tied yourself to a series of events that undermine the rest of your defense. And now, you desperately want to deprive Plaintiff of his right to discover information and testimony relevant to the very defenses you, yourself, raised, by artificially narrowing the scope of investigation so that your contacts and friends in Omaha can provide unneeded, repetitive testimony under the guise of the 30(b)(6) standard and you will therefore be exempted from having to do that which you most fear: the

need to go discuss this case with senior management, including First Data's General Counsel, First Data's CEO Bisignano, First Data's EVP Charron, and First Data's EVP Marino.

Escalate this matter to the people who have the authority and information to either settle it, or provide the requisite documentation and testimony. The human resources Vice President and managers in Omaha do not have the information regarding the dealings among the SVPs, EVPs, and CEO in New York and Atlanta.

Simply put, this tactic is not going to work. Much like the now retired Peyton Manning, your continuing cries of "Omaha" are currently devoid of meaning. Nothing could illustrate this point better than your desperation to release Ms. Graesser from this case. Once Ms. Graesser received her release, this case took a very odd turn, to say the least. You presented an answer to Plaintiff's 12(c) Motion that completely contradicts all other pled defenses. Every email you have provided has been run through the email view of an employee who works in Omaha, (other than the one you provided in Ms. Voycheske's affidavit, which inexplicably was retrieved from the email server of Saul Ewing associate, Ms. Lindsay Kennedy, who made an official appearance in this case a few days after Plaintiff requested the metadata of that email.) You have not provided any searches from Mr. Bisignano's email. The only emails or documents you have provided from Mr. Marino are ones which involve people who work out of the Omaha office. They are not emails from Mr. Marino's server. The list goes on, and I will be even more specific in the eventual Motion to Compel that Plaintiff will no doubt have to file in order to obtain necessary documents from his former employers and superiors.

I understand that you typically work directly with Ms. Graesser on First Data employment cases. It was more than clear that during the time she was a named party in this case, you felt hamstrung without her full availability. This obvious dependence belies the formulaic manner of defense to which you have become accustomed in your employment cases with Defendant First Data. It is a matter of public record that Ms. Voycheske has provided important testimony about "changing leave dates" in other First Data cases for you. We all love the "if it ain't broke, don't fix it" opportunities in life. Unfortunately for you, this case falls far outside the scope of the cases you and Ms. Voycheske typically consult and work on together. There is no employee in Omaha who was at a higher position of employment at First Data than Plaintiff at the time of his illegal firing. Plaintiff has named the individuals who he believes are responsible for his illegal firing. They work in New York and Atlanta. That Ms. Graesser has ready access and/or a "standard" way of disposing of FMLA cases through date changing, mistakes or clerical errors that originate in her Omaha office, does not make that method effective or relevant to Plaintiff.  I told you this information over a year ago. When you presented your contradictory answer to Plaintiff's 12(c) Motion, I told you again. Not only did it NOT raise fact issues as to the necessary elements of the 12(c) Motion with regards to liability on interference or with regard to damages, it effectively has estopped you from following through on your earlier stated defenses. You have gained exactly nothing, and now constantly scramble to keep Plaintiff away from the information he is entitled to receive and information necessary to prove your clients' misconduct that is only in you clients' possession. Multiple representations are tricky. And now that you have added two ex-employees, (Josh King and Fuji Fitton-Gordon) along with the now former employee/Defendant Ms. Whalen, to your representation in order to play keep away with their testimony, your responsibilities to each party grows ever more rife with pitfalls.

------------------------------------------------------------
**THE LAW OFFICE OF SHAWN SHEARER, P.C.**
3839 McKinney Avenue, Suite 155-254, Dallas, TX 75204

      I am attaching and serving a revised Notice of Rule 30(b)(6) Deposition dated as of May 3, 2018.  The revisions to Exhibit A to the Notice outlining the topics for the 30(b)(6) depositions have been revised to take into account some, but not all of your concerns. In making these revisions, it appeared to me that there actually is a fifth topic area to be addressed – Work Force Planning and Analysis (i.e. First Data's workforce reduction planning and implementation process). I am attaching a marked version of Exhibit A showing the changes from the Exhibit A attached to the April 23 Notice and the current May 3 Notice.

      I do not believe there is a reason to get into a debate as to the breadth and scope of Plaintiff's entitlement to depose corporate representatives of the Defendant, First Data, in this case. Suffice it to say, based upon the review of documents produced to date, it is clear that there has not been a thorough search of Defendants Bisignano (CEO), Marino (EVP), and Charron (EVP), the only parties to this litigation with superior corporate rank and authority to Plaintiff at the time he was terminated from employment.  All of the production to date reflects mere searches of the human resources department. A thorough deposition regarding the searches conducted to date, the systems, and the corporate rcords keeping process is the onlyw ay for Plaintiff to obtain confirmation of what is clear through the production.

      It clearly has not set-in with you or your clients inside of First Data's human resources group and their in-house legal team that this is not a typical ADA or FMLA case. The individuals involved, the Plaintiff and CEO Bisignano, have worked together on and off for more than two decades. The Plaintiff himself, even after being terminated, has better access to Mr. Bisignano than has Defense Counsel. Only the CEO or one of the EVPs involved (Marino and Charron) possibly could have had the authority to terminate Plaintiff's employment. Given this, we are still here, nearly 18 months later, and there has been no production from searches of Bisignano's documents and there have been no depositions of any First Data officers. I understand that in normal employment cases, protecting senior management is strategic. But, in this case, it was senior management that made the adverse employment decisions and senior management must testify.

      Offering Ms. Voycheske (manager), Ms. Steffen (VP) and Ms. Pulverenti (VP), all within the HR department in Omaha (the place from which you derive your work and engagement) is not sufficient. As evidenced by Defendants' own production, Ms. Voycheske, Ms. Steffen and Ms. Pulverenti are typically all consulting each other on specific issues, and primarily their discussion revolves around First Data's ongoing confusion about Plaintiff's compensation from late 2016 until March of 2017.  Ms. Voycheske appears to be the proverbial "jack of all trades - master of none" (which could account for the reason she appears so often in First Data lawsuits admitting that she has made mistakes and recalculating days.) She is tasked with various and shifting responsibilities that include aspects of employee leave, but has no apparent knowledge of accounting practices, IT, corporate governance or workforce planning and analytics. She is not an officer, and therefore has absolutely no information to offer about any alleged "RIF" or the arrangements and accommodations reached between the Plaintiff (SVP) and the EVPs and CEO (New York & Atlanta) above him. While Ms. Pulverenti clearly has a depth of knowledge in the Employee Benefits division of First Data, (28 years) there is no indication in her job description or elsewhere that she has held any other position at First Data, or that she has any knowledge of accounting practices, IT, corporate governance or workforce planning and analytics. She has no

knowledge of any alleged "RIF" related information nor statistics related to such. It appears to Plaintiff as if we are right back at Defendants' ill-conceived Response to Plaintiff's 12(c) Motion, with a Benefits administrator attempting to explain (and re-explain) exactly how and why Plaintiff's compensation is or was calculated and how or why it keeps changing. There is a clear distinction between disability insurance compensation, and FMLA leave and ADA leave, and even more distinction from accomodations agreed between Plaintiff and his superior officers in Atlanta and New York, none of which is within Ms. Pulverenti's knowledge. Ms. Steffen appears to have some knowledge about how the different parts of Defendant First Data work in tandem. She has held positions which appear to have a VP level of knowledge about collaborative efforts. However, Ms. Steffens is not an accountant, an IT specialist, she is not responsible for corporate governance and does not hold any title related to workforce planning or any form of analytics. She has no information related to the planning or execution of any alleged "RIF" at First Data nor any statistics or analysis of its meaning.

While Human Resources may be a category for consideration for 30(b)(6) witnesses, three witnesses, all of whom interact consistently on the same limited topics, seems wholly unproductive. For your convenience, I have attached the job descriptions of each of these proposed witnesses to this letter. In addition, none of the three was involved in Plaintiff's work in Atlanta. All three are out-ranked by Plaintiff. None of the three was involved in the Plaintiff's accommodation and leave while he was with First Data. In fact, the documents you have produced clearly demonstrate that all three were unaware of Plaintiff's medical condition until November 2016, and all three were confused as to the situation throughout November 2016 through March 2017, even months after Plaintiff's termination. None of these three HR employees in Omaha has any information about Plaintiff's employment, the technological systems used to maintain records, nor the strategy, process and planning conducted in New York regarding the supposed "RIF", defense, on which Defendant First Data relies. None of the three has the experience, background, or corporate knowledge of the financial accounting and financial planning details that are fundamental to understanding this case, your pretext "RIF" defense, and the financial pretext under which Plaintiff was terminated.

The entire purpose of delegating 30(b)(6) witnesses for a corporation, is so that the process of information gathering can be streamlined. The very suggestion that three people within the same arena, all of whom are limited to the same topics, in any way achieves that goal is preposterous. It is obvious that you are using your own friendly connections and go-to's from earlier cases to attempt a circumvention of Plaintiff's reasonable discovery of relevant information in favor of what makes things easy for you personally. This is a practice you have applied in all areas of this case, as stated above in the footnote. Plaintiff will not tolerate it any more.  Answers to the real and critical questions in this case are not found in Omaha. They are found in New York and Atlanta. It is not the Defense's place to be directing Plaintiff's discovery.

Given that Exhibit A to the 30(b)(6) Notice has been revised, I will address your comments generally by topic area.

# **OVERVIEW**

Application of Legal Standards

In evaluating the concepts of proportionality and burden, you apparently fail to recognize that you are representing the entity FIRST DATA CORPORATION. First Data is a data processing and retention behemoth. First Data's Annual Report on Form 10-K for its fiscal year ending December 31, 2017, describes itself as follows:

> First Data Corporation sits at the center of global electronic commerce. . . We serve our clients in **over 100 countries**, reaching over **6 million business locations** and over **4,000 financial institutions**. We believe we have the **industry's largest distribution network**, driven by our partnerships with many of the world's leading financial institutions, our direct sales force, and a network of distribution partners. We are the **largest merchant acquirer, issuer processor, and independent network services provider in the world**, enabling businesses to accept electronic payments, helping financial institutions issue credit, debit and prepaid cards, and routing secure transactions between them. **In 2017, we processed 93 billion transactions globally, or approximately 3,000 per second. In our largest market, the United States, we processed approximately $2.1 trillion of payment volume, which represents over 10% of United States gross domestic product (GDP) last year.**

Not only does First Data "process" all of these transactions in the macro sense, First Data also collects information regarding those transactions, saves it, processes it, aggregates it, and then sells that information. First Data's ONLY business is processing, collecting, aggregating, analyzing, and distributing data. First Data is perfectly capable of quickly locating the information Plaintiff has requested. There are but a few individuals, perhaps two or three, inside senior management who can answer all of Plaintiff's 30(b)(6) questions. The lack of effort on the part of your firm, inside counsel, and human resources personal to seek and collect information from executive officers is no excuse when this case itself involves an illegally terminated former Senior Vice President of First Data. Moreover, because of the Plaintiff's position and salary, and the amount of back-pay alone that has accrued, the amount in controversy in this case is significant and Plaintiff is entitled to demand greater discovery efforts from the Defendants than has been shown to date. If, in fact, First Data employs a "RIF" as a matter of workforce control, (which seems doubtful at this stage given Defendants' production), senior human resources executives, IT senior officers, and senior officer accountants should be well versed and prepared to articulate all aspects of its use. No aspect of the sole defense Defendant First Data relies on is burdensome. It is your clients' chosen defense, and as such, by definition is subject to thorough discovery.

Frank Bisignano Deposition

Throughout your letter of April 30, 2018, you repeatedly point to Plaintiff's opportunity to depose Mr. Bisignano. You are correct that Plaintiff intends to depose Mr. Bisignano on May 23, 2018 in Manhattan as scheduled. I want to be clear that if that deposition (for which I cooperated for months in good faith to schedule) does not occur as scheduled, I will have to file a motion to compel. You cannot hide Mr. Bisignano for months citing his busy schedule, set a date, point to the existence of that deposition as a reason for the 30(b)(6) topics to be revised, and then cancel or postpone that deposition. If you do cancel or postpone Mr. Bisignano's deposition, the bad faith in the Defendants conduct will be obvious and at issue.

Barger Compensation Dispute

In your April 30, 2018 letter, you state that the facts surrounding Plaintiff Barger's compensation are undisputed. Absolutely nothing can be further from the truth. Such a statement is in direct contradiction to the Voycheske Affidavit you submitted in support of the Defendant's Response to Plaintiff's Motion pursuant to Rule 12(c). Are you, as counsel for Defense, suggesting that the Voycheske Affidavit is a fabrication? Throughout the Defendants' 12(c) Response, and the Voycheske Affidavit, the confusion as to origin and amount of Plaintiff's compensation (e.g. salary, paid-time off, short term disability, long term disability, unpaid leave, paid by First Data, paid by MetLife, etc.) was occurring internally within First Data constantly from November 2016 through February 2017 (even after Plaintiff was notified of his termination, and even after Plaintiff was terminated). First Data internally could not even figure out Plaintiff's compensation. In addition, Plaintiff's confusion about compensation is demonstrated in numerous e-mails produced by Defendants. Given the inconsistencies between your objections to the 30(b)(6) topics and your position taken in the Response to the Rule 12(c) Motion, do you wish to retract Ms. Voycheske's sworn statement?

Reduction-in-Force Defense/Pretext

Defendants have raised the defense that the Plaintiff was terminated as part of a "reduction-in-force" and not in violation of the FMLA and ADA. Suffice it to say, there is not one piece of evidence produced so far that indicates that this is true. Not a single document sent to Mr. Barger or me from January 2017 until June 2017 even mentioned the existence of a "Reduction-in-Force."

Reduction in salary expense in and of itself cannot be the sole justification for a termination in violation of the FMLA or the ADA. If merely reducing salary expense was a sufficient justification, there would be no such thing as an illegal termination under the FMLA or ADA, as each such termination would be subject to the business justification of a salary reduction.

Judge Bloom advised both of us at the first hearing before her, that if there was a "RIF" defense, we should both be prepared for the discovery process necessary to analyze the bona fides of the "RIF."

In the case at hand, it is clear from First Data's 10-K, that the "RIF" is nothing more than an accounting façade. Salary and benefit expense may decrease, but a restructuring cost is incurred. However, when discussing financial results with the street, First Data points to a non-GAPP financial measure they call "Adjusted Net Income" which is actual GAPP net income ignoring certain expenses such as "restructuring costs" (the euphemism First Data uses for costs related to termination of employees). When you net the reduced salary expense against the restructuring costs, there is no actual impact on First Data's GAAP financial statements. There is no business justification for the "RIF." This especially true when First Data continues to hire and back-fill positions – that means the force actually is never reduced.

This is not a case of a "reduction-in-force" due to a plant closure or shutting down of a production line. This is not a financially distressed employer ($12 billion in revenue and $1.465 billion in net income and $6 billion in net worth at the end 2017 as reported in First Data's 10-K). This is a fabricated merry-go-round of employees-in and employees-out (now over several years) disguised and called a "RIF", and then used as pretext to defend against illegal conduct. In this context, simply saying "RIF" is not enough to defend against violations of the ADA and FMLA. Your "RIF" defense is nothing more than First Data's excuse for violating every legislative employee protection in the country, federal and state, with impunity.

Plaintiff is entitled to undertake deposition testimony on the supposed "RIF", how it was planned, how the cost saving was modeled and projected, and how the actual results for 2017 compare to the projections and the model. Plaintiff is also entitled to discover by deposition how Plaintiff (if he was actually included in the "RIF") was included in the modeling and projections of the supposed cost saving. It will be difficult for Defendants to show that there was any financial gain from terminating Plaintiff at a time he remained on leave. At that time, Plaintiff was not on any First Data benefits, and Plaintiff was being paid under First Data's long-term disability benefits. Meaning, the cost to First Data of Plaintiff being on leave on January 10, 2017 was exactly $0. The Plaintiff was not included in the "RIF." It was when, and only when, Plaintiff provided Defendant First Data his return to work authorization indicating he would return to work that he was terminated on January 13, 2017, and then subsequently that termination was justified as being part of an alleged, unproven "RIF."

Plaintiff is also entitled to discovery on the issue of pretext, and in particular, the use of the "RIF" as an excuse for otherwise illegal conduct. To address this issue, Plaintiff is again entitled to discovery as to the "RIF" modeling and projection process compared to actual results. Your April 30, 2018 letter continually refers to the reduction in force being "projected" to save on salary and benefits (none of which included the Plaintiff).

As the ex-Federal Reserve Chairman Alan Greenspan has said with regard to all the projections and estimation involved in his job:

> "We really can't forecast all that well, and yet we pretend
> we can, but we really can't."

From my review of the documents, First Data cannot forecast either, and in fact, is probably worse than Mr. Greenspan at the task. It is not a defense to merely say…" there is a "RIF" which WILL save salary and expense because the models and projections SAY it will

save salary and expense, therefore we are immune from any claim of illegal termination, but we don't have to provide any models, projections or results…" All modeling by First Data was done by non-accountants, not using GAAP, and not involving the financial accounting department. It is also clear from the document production that the projections and models were built upon company-wide averages and unsupportable estimates. The documents also indicate that the financial modeling is being massaged to reach the results that management needs in order to justify pre-determined decisions, (a.k.a. "pretext") and are not an actual attempt to predict future reality.

The projections of cost savings are a farce, a subterfuge, and in this case nothing more than a pretext for violations of the ADA and the FMLA. The Plaintiff is entitled to discovery on the defense that the Defendants have raised.

Adequacy of Discovery Efforts

The Plaintiff is entitled to discovery as to the extent and effort of the Defendants' attempt to discover relevant evidence. In your letter, you mocked the reference to Mr. Bisignano (CEO), Mr. Chairello (President) Mr. Cavicchia (SVP Cybersecurity) being involved in the use of software and programs designed by Palantir to spy and capture information on employees of JP Morgan Chase while the three were employed there. The reported conduct even includes Mr. Cavicchia, while he was still at JP Morgan Chase, continuing to collect information on Jaime Dimon and other JP Morgan Chase employees using the Palantir system after Mr. Bisignano left JP Morgan Chase, and then providing that information to Mr. Bisignano who was then at First Data.

https://www.bloomberg.com/features/2018-palantir-peter-thiel/

It is a perfectly legitimate inquiry for Plaintiff to ask the question of whether these same three individuals, now all senior executives at First Data, have deployed a similar system of employee monitoring, and if so, to ask if that system has been searched by Defense Counsel for relevant evidence in this case. As noted above, the production to date shows no effort to collect relevant information from Mr. Bisignano, Mr. Charron and Mr. Marino (or that of Mr. Hack Plaintiff's prior supervisor). To have absolutely no e-mail sent by Mr. Bisignano referencing Mr. Barger is impossible. To have absolutely no e-mail sent by Mr. Bisignano discussing the "RIF" is absolutely impossible. All that has been produced are documents collected from a few of your contacts in First Data's human resources department, primarily in Omaha, and documents produced from Saul Ewing's own e-mail server. That is not an adequate attempt at production. Plaintiff is entitled to discover by deposition where information regarding his employment and termination is held within First Data's systems (especially given Plaintiff's access to First Data's systems was cut out of the ordinary course when he was forced to take leave). Depositions to determine the location of documents and ESI is required.

We know that First Data uses Palantir technology within its products sold to its merchant customers. This is the technology that allows First Data to collect information about each of the 3,000 transactions it processes a minute, combine and aggregate that data, and then disclose the aggregated data to others. For example, if a customer makes a purchase at Target, First Data's systems are capable of taking that information, running it through the Palantir big data

processing system along with all the other transactions, and producing a report for purchases made by all individuals residing in a particular zip code. The data aggregation and processing capabilities are amazing and, to the American public, terrifying. We know that First Data has contractual agreements with Palantir. We know that three senior executives of First Data used Palantir technology to spy on employees of JP Morgan Chase. The Plaintiff is entitled to know if there is relevant information contained in such a system at First Data.

It strains credulity to suggest that a company like First Data that prides itself on being the foremost aggregator of data in the world would consider simple discovery production requests and straightforward 30(b)(6) questions to be burdensome. There has been ample opportunity to settle if Defendant First Data does not want this information to be discussed in this forum. First Data has no problem selling the data it gleans at 3000 transactions per second as its executives see fit. This is not a company that values privacy. Rather it is a company that exists to break down the barriers of privacy. Amazingly, despite this chosen business model, Mr. Bisignano and his executives seem to believe that their data should remain private. There is a way to achieve that goal. It's called – SETTLEMENT. Defendant First Data chose its defense, and the defense is a complex, economic and accounting based answer. When they chose that defense, they were well aware of the implications. Judge Bloom warned us that a "RIF" defense would head down this discovery road.

The very idea that this company should not have to face the choices that all litigants in the U.S. court system face – settle or provide discovery – rings particularly hollow where Defendant First Data is concerned. Plaintiff agrees that Mr. Bisignano and his cohorts are the self-proclaimed "Kings of Data" and as such have easy access to the information Plaintiff both seeks and is entitled to receive. There is no third option available (e.g. cheat, withhold) where evidence is concerned. Settle, or produce and testify. It would seem that a company that prides itself on unceremoniously whacking employees for "failure to produce" would understand quite well that their own "failure to produce" will subject them to the same harsh realities.

## 30(b)(6) TOPICS

Topic 1 – Accounting and Financial Disclosure

As noted above, the Plaintiff is entitled to understand the financial disclosures of First Data. In particular, Plaintiff is entitled to test the *bona fides* of the projections used in implementing the supposed "RIF" against the actual results. As noted above, the entire justification for the "RIF" in your April 30 letter relies on projections.

Projections have no real meaning or application in the accounting world. Projections can be created from thin air if necessary and used as cover for any type of action or justification by management – i.e. a pretextual basis for illegal action. Moreover, even granting you that projections are a valid form of accounting, the only possible relevant use of them would be through comparison of the projection to the actual result placed on a continuum, and then analyzed. If the projections have any validity at all, their accuracy should be higher for the closer-in time periods following their creation (i.e. 2017 actuals should be very close to the projections for 2017 prepared in January 2017). This is something that can and must be proven.

Plaintiff cannot take Defendant's "word" for the accuracy of its projections. If the projections are a farce with no basis in actual accounting or actual results, the supposed "RIF" process and projections are nothing but subterfuge intentionally used to raise your pretext defense as cover for an illegal termination. The process of preparing the projections and the process for preparing the actuals are directly relevant to obtaining proof that the supposed "RIF" is nothing more than pretext. Defendants attempted obstruction in this matter falls directly inline with defendant First Data's unrealistic desire to control all aspects of data at all times. For example, the information regarding a consumer transaction at Target belongs to First Data even though First Data did not make a purchase or sale at the register. In other words, Defendant simply wants to say "it is true because we projected that it was going to be true." That is wholly insufficient. There are ways to distinguish a supposed "RIF" from other types of firings. Defendant cannot obscure Plaintiff's access to those methods. You have pled the "RIF" as a defense. The fact that you have put the "RIF" savings numbers at issue as the justification for the Plaintiff's termination means Plaintiff is entitled to discovery on all aspects of the preparation of those projections and their accuracy given actual results.

The 30(b)(6) accounting and financial disclosure topics have been revised to focus on the actual accounting issues at hand, and several have been deleted to streamline the inquiry. However, your objections to Topic 1(b) is particularly without merit. The accounting treatment of salary, bonus, severance, LTD and STD, and leave are critical to understanding how Plaintiff impacted First Data's financials before his termination and after his termination. If my accounting senses are correct, First Data has no financial justification for the termination of Plaintiff. The only justification for his termination was the exercise of his right to return to work from approved FMLA leave and to return to the office after his ADA accommodation of remote working was completed.

Topic 2 – Information Technology

As noted above, based on the production to date, there are significant issues as to whether First Data has conducted an actual search of all the Defendants records. The Plaintiff's understanding of systems used by First Data essential for the Plaintiff to address those issues. Both of the justifications for depositions regarding systems outlined in *Winfield v. City of New York* are present in this case. The Plaintiff is seeking to learn about where and how ESI is created, obtained, accessed, stored, maintained, backed-up and preserved. Plaintiff is also seeking to learn about specific software programs and data that may be analyzed (including sources of data, completeness of data, validity of data, meaning of data fields and categories, reporting capabilities, and other technical details of the data).

The 30(b)(6) topics have been revised to attempt to meet your concerns. However, all of the specific systems listed in the revised topic list are systems referenced in Defendants' document production or used and sold by Plaintiff in his job. Moreover, many of those same systems are included in the exhibits to Ms. Voycheske's affidavit in support of the Defendants' Rule 12(c) Motion Response. If these systems are important enough to include in a sworn affidavit provided by Defendant as the sole defense to Plaintiff's request for judgement on liability and damages based on Defendant's interference in his federally protected right to return from FMLA leave, these systems must be important enough for the Plaintiff to discover their

purpose, use, and capabilities. If Defendant does not wish to have those particularities subject to discovery, counsel may simply pull Defendants' Answer to the 12(c) which relies upon those issues. At that time, Plaintiff can revisit the issue and decide if there exists any need for their further discussion.

The inquiries into the remote access systems and applications are also essential to Plaintiff's case and responses to the affirmative defenses. Plaintiff continued to work daily from remote locations from the day after his surgery until Mr. Marino forced Plaintiff to take leave. Understanding these systems will demonstrate that Plaintiff never took leave and continued to work the entire period of his recovery until forced, against his will, to take leave. Defendant's admitted denial of Plaintiff's access to these systems after forcing leave not only constitutes a flagrant violation of his request for an ADA accommodation, it also ensures that Defendant First Data is the only vanguard of this information. Defendant First Data took this action to establish total dominance and control over this information. As such, First Data alone is required to provide it to Plaintiff for discovery.

Topic 3 – Human Resources and Employee Benefits

The 30(b)(6) topics have been narrowed to just the benefits, plans and policies that impacted Plaintiff.

Plaintiff strongly disagrees with your analysis of the relevance of the Older Workers Benefits Protection Act. Plaintiff knows of, and has produced, OWBPA disclosures distributed by First Data during 2017. The fact that these disclosures exist indicates First Data is well aware of how to comply with the OWBPA. It also shows that Plaintiff was not in an OWBPA termination because he did not receive such a disclosure. The facts as to when First Data decides to issue OWBPA disclosures is directly relevant to the question of whether the "RIF" defense is merely pretext. Plaintiff seeks relief based on a claim of wrongful termination and discrimination. Defendant First Data chose a "RIF" defense to Plaintiff's complaint. Whether or not Plaintiff was actually a part of the alleged "RIF" is central to Defendant's position. There are demonstrable ways to determine whether a "RIF" occurred, and further, whether or not Plaintiff was part of any "RIF" that may have occurred. One of them is inclusion or exclusion of the OWBPA document in First Data's termination communications with Plaintiff. That Plaintiff chose not to bring additional potential claims against Defendant First Data does not preclude him from seeking information needed to verify Defense's claim that his termination was due to inclusion in an alleged "RIF." In other words, the OWBPA disclosure has multiple uses. For the record, Plaintiff recognizes that age discrimination certainly was a claim available to him, and thanks Defendant's counsel for that acknowledgement.

Topic 4 – Corporate Governance and Records

A *bona fide* reduction-in-force would include all of the proper corporate documentation – committee meeting materials, board meeting materials, board minutes, committee minutes, management committee minutes, etc. No such documents have yet to be produced. Plaintiff is entitled to discover whether First Data engages in the normal practice of maintaining these types of records, and if not, why not, and if so, why there are no records of the events related to the "RIF" defense.

---
**THE LAW OFFICE OF SHAWN SHEARER, P.C.**
3839 McKinney Avenue, Suite 155-254, Dallas, TX 75204

      Your objections to a request for a description of the legal hold <u>process</u> is without any legal basis. The request does not seek privileged information or information as to the content of the legal hold letter. Rather, the request seeks deposition testimony as to the legal hold policies and procedures, the specific steps taken to preserve evidence in this case, the timing of the issuance of the legal hold notice, and the process for tracking and insuring compliance with the hold. None of that information is privileged and all of it is relevant to Defendants' obligations. This also must be viewed in the light of the allegations of spoliation of evidence directly relevant to the issues in this case as alleged in the Complaint, and in light of the demands by Plaintiff's counsel for First Data to institute a legal hold as early as January 2017. Merely providing data regarding job openings in Defendant's production does not suffice to address the veracity of Defendant First Data's process required to legally comply with notices given to both in-house and outside counsel in this case as early as the expressed date of January of 2017, and technically in November of 2016. Nor does it address the unmistakable missing social media job postings referenced in Plaintiff's Complaint.

<u>Topic 5 – Work Force Planning and Analytics</u>

      A new topic has been added to separate the concepts of planning/projections from actual financial reporting and GAAP accounting discussed in Topic 1. If the planning/projections are the basis of the "RIF" defense, Plaintiff is entitled to deposition testimony regarding the processes, procedures, estimates, and assumptions utilized in the preparation of those projections to determine whether the projections are bona fide or whether the projections are nothing more than pretext to cover for illegal terminations.

We have a teleconference scheduled for May 10th to address these issues and those raised in your April 30, 2018 letter. In addition, on that call, I would like to discuss the status of your response to Plaintiff's outstanding requests for productions. I look forward to talking with you.

                                                  Very truly yours,

                                                  Shawn E. Shearer

cc:      Gillian Cooper
          Lindsey Cooper
          David Zeitlin

Attachments:
          Marked 30(b)(6) Exhibit A
          Out of Office Notifications
          Job Descriptions
          Notice of Deposition Pursuant to Rule 30(b)(6) (Revised)

---

**THE LAW OFFICE OF SHAWN SHEARER, P.C.**

3839 McKinney Avenue, Suite 155-254, Dallas, TX 75204