# EXHIBIT D

Barger Steven B. 081018 Rough Draft

1

1      ROUGH DRAFT/REALTIME OUTPUT
2      This ROUGH DRAFT/Realtime file is an
3  uncertified, unedited rough draft of the proceedings,
4  and is not to be used in any way as a final transcript.
5  The realtime rough draft may be used in place of or in
6  addition to or only to enhance notes taken during the
7  proceeding.  Anyone choosing to cross-examine or prepare
8  a witness using a rough draft is doing so with full
9  knowledge the rough draft is uncertified, and that they
10 are doing so at their own risk.
11      Realtime rough drafts are not to be shared,
12 copied, faxed or in any way distributed in any form
13 (written or electronic); however, your experts and
14 co-counsel and staff have limited internal use of same
15 with the understanding that all realtime rough draft
16 and/or computerized forms, if any, will be destroyed and
17 replaced with the final certified copy upon its
18 completion.  This is an unofficial transcript, which
19 should NOT be relied upon for purposes of verbatim
20 citation of testimony.
21      This transcript has not been checked,
22 proofread, or corrected.  Corrections will be made in
23 the preparation of the certified transcript, resulting
24 in differences in content, page and line numbers,
25 punctuation and formatting.

2

1  Case:   BARGER v. FIRST DATA, ET AL

```
                    Barger Steven B. 081018 Rough Draft
20      A     Right.
21      Q     -- which says if it started in March, the
22   first month would be April 15th, that would be $30,000?
23      A     Right, right.
24      Q     Do you see that?  Correct?
25      A     I do.
```

                                                                    23

```
1       Q     And then the next invoice is May 15th, 2014?
2       A     Got it.
3       Q     Right?  So that would be the second month of
4    the consulting arrangement, correct?
5       A     Yup.
6       Q     And then the third invoice is June 15th of
7    2014.  Do you see that?
8       A     Yeah.
9       Q     And that would be another $30,000?
10      A     Yup.
11      Q     Right.  And then there is the next invoice is
12   June 20th of 2,014.  Do you see that?
13      A     Yeah.
14      Q     And that corresponds with Bates numbers
15   FDC00052613.  Do you see that?
16      A     Yeah.
17      Q     How much is that invoice for?
18      A     50,000.
19      Q     And what is that for?
20      A     That would most likely an agreement with Joe
21   and I be for First Data's use of any of my proprietary
22   information that I had used during that time and would
```

Barger Steven B. 081018 Rough Draft

23  use going forward and you should probably ask him about
24  that because that's what that's for.
25       Q    Well, it says final fee for business

24

1   consulting services 2014?
2        A    Right.
3        Q    March through June.
4        A    Yeah.
5        Q    And this is your invoice?
6        A    Yeah.
7        Q    Right?  Where does it say on this invoice that
8   you are licensing your proprietary information to First
9   Data?
10       A    It doesn't.
11       Q    And what proprietary information do you have
12  that you were licensing to First Data?
13       A    It would simply be all the concepts that I've
14  used over the years.
15       Q    Are those trademarked?
16            MR. SHEARER:  Objection.  Go ahead.
17       Q    Do you have a trademark on your proprietary
18  materials?
19       A    Some are copyrighted.
20       Q    Okay.  And was there a licensing agreement
21  that you entered into with First Data?
22       A    No.  This was Joe's way of me getting paid for
23  that, that's it.  I told you my relationship with Joe
24  over 30 some years is to a point where we say, all

Page 22

Barger Steven B. 081018 Rough Draft

25  right, here is how things need to be, fine, take care of

25

1   it and it's over with.  That has continued for 30 years
2   because at the end of the day I would trust everything
3   that he was going to do and he would trust everything
4   that I was going to do, period.  So this got entered in
5   to cover that aspect of the business and that it may be
6   labeled the wrong way, but it was the intent behind it.
7        Q    Well, why -- why wasn't that included in the
8   $30,000 a month?
9        A    The 30,000 was my time only.
10       Q    Were you using your business concepts during
11  the period that you were doing consulting prior to --
12       A    Always have.
13       Q    So I have to ask, again, if you didn't charge
14  for it before, why are you charging for it now?
15       A    What do you mean if I didn't charge for it
16  before?
17       Q    You said that this $50,000 payment was
18  authorized by Joe Plumeri so that you would use your
19  proprietary materials at First Data, correct?
20       A    Right.
21       Q    But you were already using your proprietary
22  materials at First Data and that was included in the
23  $30,000 a month of time?
24            MR. SHEARER:  Objection.  You can answer.
25       A    No, it wasn't.

Page 23

Barger Steven B. 081018 Rough Draft
2  as a consultant, right?
3    A   Okay.  Very good.
4    Q   Well, do you agree with me?
5    A   Yeah.
6    Q   You've already testified today that, and I
7  think we've shown it as well from the complaint, that
8  you decided to join First Data because Joe Plumeri asked
9  you to in part, though, because of the compensation that
10  you would receive from First Data would replace the
11  lucrative consulting business that you had going on,
12  yes?
13       MR. SHEARER:  Objection.
14    A   Yeah.
15       (Deposition Exhibit 134, marked for
16  identification.)
17    Q   Mr. Barger, showing you what's marked as
18  Deposition Exhibit 134, which is a document produced by
19  you in this case, which is the -- your 2013 1040 for you
20  and Mrs. Barger which corresponds with SBB-001356 to
21  1363, and ask you if you recognize this?
22    A   I do.
23    Q   So can you explain to me, sir, how Deposition
24  Exhibit 134 equates with your testimony that prior to
25  joining First Data in 2014 you had a lucrative

41

1  consulting business for which the First Data
2  compensation would replace when in 2013 your adjusted
3  gross income was a negative $15,212?
4    A   I was -- all the income I made in my

Page 37

Barger Steven B. 081018 Rough Draft

5  consulting company went into the Barger Group, didn't
6  come to me it was through my consulting company and my
7  son ran called the Barger Group.
8      Q   And that's an LLC, is it not?
9      A   Yeah.
10     Q   And don't you understand that an LLC is a
11 pass-through organization?
12         MR. SHEARER:  Objection.
13     A   I'm not sure what that means.
14     Q   Well, let me back this up a minute.
15         So did the Barger Group pay you money?
16     A   I ran all of my money through the Barger Group
17 and Grant got paid everything in the Barger Group, so...
18     Q   So what did you get paid?
19     A   I got monthly money.
20     Q   How much did you get?
21     A   I would have to go back and look.  I have no
22 idea.
23     Q   Well, I think the 2013 tax return will tell
24 us.  So let's go to the page that corresponds with
25 SBB-001358 and under part 1 is income.  Is it your

42

1  testimony that in 2013 the Barger Group only paid you
2  $16,210?
3      A   That's what it looks like.
4      Q   Is that the lucrative consulting --
5      A   Lucrative consulting would be what the Barger
6  Group earned that year.

Barger Steven B. 081018 Rough Draft

7   Q    Well, where did that money go?
8   A    To my son.  He ran the Barger Group.  I just
9   worked for him.
10  Q    And your son -- so you're charging $3,000 a
11  day to all these companies and your son only paid you
12  $16,210?
13  A    Yeah.  I had other money.  He got the rest of
14  it.
15  Q    What other money did you have?
16  A    I had money in savings.  I had money that I
17  lived off of.  Actually, I'm not sure how I decide to
18  live my life is germane to this case.  Why is how much I
19  make or how much I spend germane to this case?
20  Q    Well, I get to ask the questions, sir.  This
21  isn't my deposition; this is your deposition.
22       I'm asking you is it your testimony that for
23  this lucrative -- this lucrative consulting arrangement
24  that you entered in with First Data that started at
25  $30,000 a month that the year prior to that you only

43

1   earned $16,210 in consulting fees?
2   A    No.
3   Q    You earned more than that?
4   A    I did.
5   Q    So your testimony is that all went to your
6   son?
7   A    It all went to the Barger Group, everything
8   got paid to the Barger Group.
9   Q    So if we subpoenaed the records of the Barger

Page 39

Barger Steven B. 081018 Rough Draft

10  Group, it would show you that the Barger Group only paid
11  you $16,210 in 2013?
12      A    Yeah.
13      Q    We're not done with that yet.
14           Turning to the page that is expenses for
15  business use of your home which corresponds with
16  SBB-001362.  Do you see that?
17      A    I do.
18      Q    And this is a -- this is where you took
19  expenses, personal expenses off your taxes?
20      A    Okay.
21      Q    This is your tax return, sir.  I'm asking you.
22      A    Apparently I did.
23      Q    Okay.  So even though everything ran through
24  the Barger group, you then in addition to whatever
25  expenses the Barger group had where all your money ran

44

1   through, you took deductions for personal expenses,
2   right?
3       A    Yeah.
4       Q    And included under that is you took a
5   deduction for $18,000 in rent in 2013.  Do you see that?
6   It would be line 18.
7       A    I do.
8       Q    And you calculated that somehow or your
9   accountant calculated that the value of your home office
10  for you earning $16,210 was $18,000 in rent?
11      A    Apparently he did a good job.

Page 40

Barger Steven B. 081018 Rough Draft

51

```
 1  First Data.
 2      Q    Okay.  On line 19 -- excuse me.  I apologize.
 3  On line 18 you show rent of $22,900.
 4      A    Okay.
 5      Q    Do you see that?
 6      A    Yeah.
 7      Q    Can you explain to me why the amount that you
 8  took as an expense for rent in 2014 jumped from $18,000
 9  in 2013 to $22,900 in 2014 for only six months?
10      A    You would have to ask my accountant.  I don't
11  know.
12      Q    Okay.  But you recognize that by taking these
13  expenses it lowers the amount of taxable income that you
14  have to pay on the money that you receive from the
15  operations of a business, you understand that, right?
16      A    So you're saying I owe more taxes?
17      Q    No, sir.  I'm saying you understand that by
18  putting business expenses on your tax return you did so
19  to offset the income that you received from operating
20  the consulting business, you understand that's the
21  purpose of business expenses?
22      A    Yeah, sure.
23      Q    So you don't know why this jumped from $1,500
24  a month all the way up to 22,900 for six months?
25      A    Maybe the rent increased.  I don't know.
```

52

Barger Steven B. 081018 Rough Draft

1   Q   The rent increased on the -- was this an
2 apartment that you were living in?
3   A   It was a house.
4   Q   Oh. Did the rent increase do you know?
5   A   I don't know. You would have to ask my
6 accountant.
7   Q   Okay. Well, we just might do that.
8       Are you a gambler?
9   A   I have gambled, yeah.
10  Q   And you report your winnings and losses on
11 your taxes?
12  A   Of course.
13      (Deposition Exhibit 136, marked for
14 identification.)
15  Q   Showing you what's been marked as Deposition
16 Exhibit 136 which corresponds with SBB-001345 to 1355,
17 this is a document produced in this case and it's your
18 2012 1040. Do you see that?
19  A   I do.
20  Q   And in 2012, which was the time period when
21 you were operating the lucrative consulting business,
22 your adjusted gross income was a negative $17,735,
23 right?
24  A   That's what my accountant says.
25  Q   And that year, if you go to Schedule C,

53

1 001348, the amount of money that you received in income,
2 which had to be as a consultant is what it says, was

Page 48

Barger Steven B. 081018 Rough Draft

3  $15,602, right?
4  A    That's what he says.
5  Q    That's what he says or that's what your tax
6  return said?
7  A    That's what his -- he put on my tax return and
8  I agreed to.
9  Q    Right you signed your taxes, right?
10 A    Yes, I did.
11      (Deposition Exhibit 137, marked for
12 identification.)
13 Q    Showing you what's been marked as Deposition
14 Exhibit 137, corresponding with SBB-001336 to 1344, I
15 represent that these were produced by you in this case
16 and this is your 2011 1040.  Do you see that?
17 A    I do.
18 Q    And this year for 2011 your AGI on line 37 of
19 page 1 was $35,202, right, Mr. Barger?
20 A    Yeah.
21 Q    And then on page 3 of this document, which is
22 your Schedule C profit or loss from a business, the
23 gross receipts that you had this year were $77,071.  Do
24 you see that?
25 A    Okay.  Yeah.

54

1  Q    Is there something that happened between 2011
2  where you received $77,000 in consulting fees to 2012
3  and 2013 where they dramatically decreased?
4  A    Other than the fact that I started working
5  with my son at the Barger Group.

Page 49

Barger Steven B. 081018 Rough Draft

64

1     A     I'm sure they are, yeah.
2     Q     Did you report the MetLife checks for the two
3  that you received, one in the amount of $27,705 and the
4  other one in the amount of $13,852.50, did you report
5  them on your tax return?
6     A     I don't know.  You have to ask my accountant.
7     Q     And to this day you have not returned that
8  money to MetLife, correct?
9     A     Correct.
10    Q     Showing you what's been marked as Deposition
11 Exhibit what number is that 141?  Is that correct?  142,
12 I'm sorry.  142, I'm sorry.
13          MR. SHEARER:  I think we're on 143.
14    Q     I apologize.  I apologize.
15          Showing you what's been marked as Deposition
16 Exhibit 143, can you identify that, please?
17    A     Looks like a 1099 from a company called Oasis
18 Outsourcing.
19    Q     And what is Oasis Outsourcing?
20    A     They are an HR outsourcing company that does
21 HR services for companies who don't want to keep it
22 inhouse.  They act as a co-employer.
23    Q     Did you provide consulting services to Oasis
24 in 2017 after you left First Data?
25    A     I did.

65

1     Q     And did you do that again through your son's

Barger Steven B. 081018 Rough Draft

12 him.
13     MR. SHEARER: Objection on asking -- how he
14 made a decision for tax purposes in this case is
15 privileged information.
16     MR. EIDELMAN: No. He just said it was his
17 accountant.
18     Q    So I want to be clear about something, Mr.
19 Shearer. You deducted fees that you paid to Mr. Shearer
20 on your tax return for your business in 2017 in the
21 amount of $36,500, right?
22     A    You're going to have to ask my accountant.
23     Q    Do you know what you -- do you know what you
24 otherwise would have spent $36,500 on in legal fees in
25 2017?

70

1     A    I have no idea.
2     Q    And you paid Mr. Shearer in 2017, correct?
3     A    I think that's privileged, isn't it?
4     Q    Well, it's on your tax return. I'm entitled
5 to find out what your legal and professional services
6 for $36,500 were that you reported to the United States
7 government on your tax return in 2017.
8     A    You have to ask my accountant.
9     Q    Do you have any legal -- do you have any other
10 legal cases going on besides this one?
11     A    No.
12     Q    Have you paid any lawyers other than Mr.
13 Shearer --

```
                    Barger Steven B. 081018 Rough Draft
19          (Recess 5:30 p.m. - 6:05 p.m.)
20          (Deposition Exhibit 171, marked for
21   identification.)
22   BY MR. EIDELMAN:
23      Q   We're back on the record.
24          I just wanted to do a housekeeping matter with
25   you, Mr. Barger.  Earlier today we had some testimony
```

224

```
 1   about your tax returns and your 1040, et cetera.  Who is
 2   your accountant?
 3      A   A guy named Philip in Birmingham, Alabama.
 4      Q   Is it Philip Morgan?
 5      A   Yeah.
 6      Q   Philip Morgan CPA?
 7      A   Yeah.
 8      Q   And Mr. Morgan is the person that I would need
 9   to ask questions about about your tax returns?
10      A   Yeah.
11      Q   Do you have any objection to me taking
12   Mr. Morgan's deposition for purposes of inquiring about
13   your taxes?
14      A   That's fine with me.
15      Q   So if Mr. Morgan's name appears on any tax
16   returns, he's the person that I would ask questions to
17   is that right?
18      A   That's fine with me.
19      Q   And if his name isn't on any tax returns, who
20   would I ask those questions to?
```