# EXHIBIT A

Barger Steven B. 081018 Rough Draft

1

```
 1               ROUGH DRAFT/REALTIME OUTPUT
 2               This ROUGH DRAFT/Realtime file is an
 3   uncertified, unedited rough draft of the proceedings,
 4   and is not to be used in any way as a final transcript.
 5   The realtime rough draft may be used in place of or in
 6   addition to or only to enhance notes taken during the
 7   proceeding.  Anyone choosing to cross-examine or prepare
 8   a witness using a rough draft is doing so with full
 9   knowledge the rough draft is uncertified, and that they
10   are doing so at their own risk.
11               Realtime rough drafts are not to be shared,
12   copied, faxed or in any way distributed in any form
13   (written or electronic); however, your experts and
14   co-counsel and staff have limited internal use of same
15   with the understanding that all realtime rough draft
16   and/or computerized forms, if any, will be destroyed and
17   replaced with the final certified copy upon its
18   completion.  This is an unofficial transcript, which
19   should NOT be relied upon for purposes of verbatim
20   citation of testimony.
21               This transcript has not been checked,
22   proofread, or corrected.  Corrections will be made in
23   the preparation of the certified transcript, resulting
24   in differences in content, page and line numbers,
25   punctuation and formatting.
```

⚱

2

```
 1  Case:   BARGER v. FIRST DATA, ET AL
                       Page 1
```

```
                    Barger Steven B. 081018 Rough Draft
10              Have you seen these before?
11      A     Yeah.
12      Q     Okay.  Do these appear to be text messages
13  between you and Mr. Hack?
14      A     They do.
15      Q     Do you recall any text messages between you
16  and Mr. Hack that are not in this document?
17      A     No, I can't remember.
18      Q     Do you have any reason to believe that
19  Mr. Hack deleted any of these -- any text messages?
20      A     I wouldn't have an opinion.
21      Q     So do you believe that these constitute all of
22  the text messages between you and Mr. Hack?
23      A     I have no idea.
24      Q     Okay.  When was the last time you spoke to
25  Jeff Hack?
```

82

```
 1      A     I don't remember.
 2      Q     Okay.  Why didn't you sue Jeff Hack in this
 3  case when you sued Mr. Bisignano, Mr. Marino,
 4  Mr. Charron, Ms. Johnson, Ms. Whalen and originally
 5  Ms. Graesser?
 6      A     I don't know.  Maybe I didn't think he had
 7  anything to do with it.
 8      Q     So he was your immediate supervisor, right?
 9      A     Yeah.
10      Q     So --
11      A     Are you saying I should have sued him?
12      Q     I'm asking why
```

Barger Steven B. 081018 Rough Draft

13  else.
14      A    Right.
15           MR. SHEARER:  Objection.
16      Q    You sued Mr. Hack's supervisor Mr. Charron,
17  why didn't you sue Mr. Hack who was your supervisor at
18  the time that you were laid off?
19      A    I didn't think that he had anything to do with
20  it.
21      Q    Well, why did you think the other ones had
22  things to do with it?
23      A    Because I thought they were the ones making
24  the decisions.
25      Q    And you had no knowledge at all that Mr. Hack

83

1  wasn't making any decisions?
2      A    No.
3      Q    And he was your supervisor?
4      A    Right.
5      Q    And had been your supervisor for over a year?
6      A    Right.
7      Q    Did he tell you that he had nothing to do with
8  the decision?
9      A    I don't remember.
10     Q    Okay.  And it never crossed your mind at all?
11     A    Never.  Never.
12     Q    That Mr. -- and why?
13     A    I didn't think it's something he would do.
14     Q    You didn't think it was something that he

Barger Steven B. 081018 Rough Draft

15  would do, but you thought it was something that the
16  others would do?
17      A    Apparently.
18      Q    Well, not apparently.  You filed a lawsuit?
19      A    Right.
20      Q    It can't be based on apparently -- you can't
21  be apparently.  You have to have a belief.  You have to
22  have facts.
23      A    I needed to find out.  I wanted whoever is
24  responsible for not allowing me to come back to work and
25  that's why I had no idea who it was so that's why.

84

1       Q    So now I understand so because you weren't
2   sure about who was responsible you decided to sue
3   everyone so you could find out who was responsible?
4            MR. SHEARER:  Objection.
5       Q    Is that what you did?
6       A    I don't remember.
7       Q    I just want to clarify your testimony or I
8   want to make sure that I got it right.
9            You said when I asked you the questions about
10  why you sued the individuals, you said I needed to find
11  out, I wanted whoever is responsible for not allowing me
12  to come back to work and that's why I had no idea it
13  was, so that's why, so that's why you sued
14  Mr. Bisignano, Mr. Marino, Mr. Charron, Ms. Whalen,
15  Ms. Johnson and Ms. Graesser, so you could find out who
16  made the decision?
17           MR. SHEARER:  Objection.

Barger Steven B. 081018 Rough Draft

18    A    I thought they all made the decision.

19    Q    You thought they all made, but that Mr. Hack
20  had no part in it?

21    A    Had no part at all. I didn't have any reason
22  to think he did.

23    Q    Okay. Turn, if you would, in Exhibit 147 to
24  the page, the second-to-last page, which is FDC00052696.
25  Do you see that?

85

1    A    Yeah.

2    Q    And there is a text message from you I'll
3  represent that I believe that you're the gray shaded one
4  and Mr. Hack is the darker one?

5    A    Right.

6    Q    And on January 3rd, 2017, now, this is before
7  you were notified that you had been terminated, right?

8    A    Right.

9    Q    And you write to Mr. Hack need to talk about
10  my return?

11    A    Right.

12    Q    Is sales transformation and training under HR
13  now?

14    A    Right.

15    Q    Question mark why did you ask him that
16  question?

17    A    Because Tony had told me that robin was the
18  interim person heading up the training.

19    Q    So why if Mr. Marino had told you that, why

Barger Steven B. 081018 Rough Draft

25    A    I do.

239

1    Q    I think we've just established that during the
2 course of those negotiations First Data increased its
3 monetary offer to you; is that correct?
4         MR. SHEARER:  Objection.
5    A    I don't know the dates of when that happened,
6 no.
7    Q    Okay.  You don't know that the severance
8 agreements that you received that raised the number to
9 $500,000 were before February 28?
10    A    I see this one in February.
11    Q    Right.  And this is an increase from the first
12 offer.
13    A    Right.
14    Q    So --
15         MR. SHEARER:  Objection.
16    Q    So can you please tell me how -- how the
17 defendants engaged in bad faith negotiations of
18 severance with you when they increased the offer?
19    A    I wasn't in that meeting.  I don't know.
20    Q    Well, it's your complaint, you allege --
21    A    My attorney is telling me it was in bad faith
22 and I agree with my attorney.
23    Q    So if your attorney told you that it was bad
24 faith for the company to increase its severance offer to
25 you, that was okay for you to put this in your complaint