# EXHIBIT E

Barger Steven B. 081018 Rough Draft (2)

1

```
 1            ROUGH DRAFT/REALTIME OUTPUT
 2            This ROUGH DRAFT/Realtime file is an
 3  uncertified, unedited rough draft of the proceedings,
 4  and is not to be used in any way as a final transcript.
 5  The realtime rough draft may be used in place of or in
 6  addition to or only to enhance notes taken during the
 7  proceeding.  Anyone choosing to cross-examine or prepare
 8  a witness using a rough draft is doing so with full
 9  knowledge the rough draft is uncertified, and that they
10  are doing so at their own risk.
11            Realtime rough drafts are not to be shared,
12  copied, faxed or in any way distributed in any form
13  (written or electronic); however, your experts and
14  co-counsel and staff have limited internal use of same
15  with the understanding that all realtime rough draft
16  and/or computerized forms, if any, will be destroyed and
17  replaced with the final certified copy upon its
18  completion.  This is an unofficial transcript, which
19  should NOT be relied upon for purposes of verbatim
20  citation of testimony.
21            This transcript has not been checked,
22  proofread, or corrected.  Corrections will be made in
23  the preparation of the certified transcript, resulting
24  in differences in content, page and line numbers,
25  punctuation and formatting.
```

⚥

2

```
 1  Case:   BARGER v. FIRST DATA, ET AL
```

Barger Steven B. 081018 Rough Draft (2)

11 correct?
12     MR. SHEARER: Objection.
13  A  Yeah.
14  Q  And --
15  A  I was told over the phone, yeah.
16  Q  Told over the phone.
17     Your employment with First Data ended on
18 February 28, 2017, correct?
19  A  Yeah. I know there was an extended date. I
20 don't know the date exactly, but...
21  Q  And you continued -- once you returned to
22 work, or gave the notice that you were coming back to
23 work, the company put you back on full salary for the
24 second part of January and all of February, correct?
25  A  From January through February, is that what

57

1 you're saying?
2  Q  Yes, sir.
3  A  I can't say they didn't. If I got checks, I'm
4 guessing they did, yeah.
5  Q  Okay.
6  A  I don't remember it.
7  Q  Okay. I show you what's been marked as
8 Deposition Exhibit 139 which corresponds with
9 FDC0000001824 and 25.
10  A  Yeah.
11  Q  These are -- are you familiar with these types
12 of pay stubs that show your compensation?

Barger Steven B. 081018 Rough Draft (2)

13    A    Yeah, yeah.
14    Q    Right?  And for the pay period of January
15   16th, 2017 through January 31st, 2017, your gross pay
16   was $22,000.  Do you see that?
17    A    I do.
18    Q    And then for the second document in this
19   packet the pay period February 1, 2017 until February
20   15th, 2017 you were paid at that point in time $20,000,
21   right?
22    A    I got it.
23    Q    And then for the second part of February from
24   February 16th, 2017 until February 28th, 2017 you were
25   paid $20,000, right?

58

1    A    Okay.
2    Q    And that corresponds with the annual $480,000
3   that you were being paid when you were a full-time
4   employee, right?
5    A    It does.
6    Q    And to your knowledge, did you receive any
7   other payments from First Data after February 28, 2017?
8    A    I don't know.  I don't know.
9    Q    While you were -- strike that.
10         Prior to you returning or providing a doctor's
11   note that you were ready to return, you completed an
12   application for long-term disability with MetLife,
13   correct?
14         MR. SHEARER:  Objection.
15    A    All I remember is I was told I needed to go on

Barger Steven B. 081018 Rough Draft (2)

21  escrow if they weren't cashed?
22      A    I gave them to my attorney and he put them in
23  escrow.
24      Q    Did you sign the back of checks endorsing them
25  to Mr. Shearer?

♀

61

1       A    I don't remember.  I don't remember what I did
2   with them.  All I know is I wanted to come back to work
3   and I was being asked since I'm going off short term and
4   I've been approved to come back that I wanted to make
5   certain the bases were covered with long term.  But when
6   I got my first checks I'm thinking, no, I'm going back
7   to work, so I'm not going to cash these, so I never did.
8       Q    Showing you what's been marked as Deposition
9   Exhibit 141, this is the first check that you received
10  from MetLife, which is Bates stamped SBB-000964?
11      A    It could well be, yes I don't know if it is I
12  don't have the check in front of me.  This represents
13  the check.
14      Q    Showing you what's been marked as Deposition
15  Exhibit 142, these are photocopies of two checks and I
16  think you said you received two checks?
17      A    Yup.  Yup.
18      Q    These are the two checks that you received
19  from MetLife?
20           MR. SHEARER:  Objection.
21      A    Right, got it.
22      Q    Right?  And you testified that the reason that

Barger Steven B. 081018 Rough Draft (2)
23  you didn't cash these checks is because you were going
24  back to work, right?
25      A    Yeah.  And I told the MetLife person that on

62

1   the phone when she said I was sending the checks, I said
2   I'm going back to work.
3       Q    Okay.  Well on February 6, 2017, which is the
4   date of the first check, 141, Deposition Exhibit 141 --
5       A    Yeah.
6       Q    -- by that point in time you knew you weren't
7   going back to work, right?
8       A    I knew that -- I knew that they didn't want me
9   to go back to work.  I did not know that I was not going
10  back to work, no, because I knew that I was going to
11  fight this so I could go back to work.  But I thought if
12  I cashed the long-term disability checks it would be an
13  acknowledgment that I wasn't coming back to work so I
14  didn't cash them.
15      Q    Why didn't you return them back to MetLife?
16      A    I gave them to my attorney; he made the
17  decision.
18      Q    Mr. Shearer made the decision?
19           MR. SHEARER:  Objection.  We're getting --
20  this is attorney-client privileged information.
21           MR. EIDELMAN:  Hold on a minute.  Let's
22  discuss what attorney-client information is.  Mr. Barger
23  has now testified that he didn't cash the checks, he
24  gave them to you and that you did something with them.
25      A    I told him I did not -- I was not going to
                          Page 57

```
 1  cash the checks.  I wanted to hold them in escrow until
 2  this was satisfied, that was my direct orders.  I did
 3  not want anybody to think that I cashed them and put
 4  them in my account.  I wanted to make certain that they
 5  knew if there was any way that I could go back to work,
 6  I was not going to be on long-term disability, period,
 7  that's the end of it.
 8       Q    Okay.  But is it your testimony and your
 9  understanding that the checks had been cashed and are in
10  an escrow account that they are actually in a bank
11  account?
12       A    Yes.
13       Q    So did you endorse the checks to Mr. Shearer?
14       A    I don't recall what I did with them.
15       Q    So either you endorsed them to Mr. Shearer or
16  he endorsed them?
17       A    I endorsed them I probably did.
18       Q    So they are in a bank account somewhere?
19       A    Yes.
20       Q    And at no time did you ever just return them
21  to MetLife saying I don't want to be on long-term
22  disability, here is your money back?
23       A    No, no.
24       Q    You understand, Mr. Barger, that long-term
25  disability benefits are taxable income?
```

Barger Steven B. 081018 Rough Draft (2)

64

1   A   I'm sure they are, yeah.
2   Q   Did you report the MetLife checks for the two
3   that you received, one in the amount of $27,705 and the
4   other one in the amount of $13,852.50, did you report
5   them on your tax return?
6   A   I don't know.  You have to ask my accountant.
7   Q   And to this day you have not returned that
8   money to MetLife, correct?
9   A   Correct.
10  Q   Showing you what's been marked as Deposition
11  Exhibit what number is that 141?  Is that correct?  142,
12  I'm sorry.  142, I'm sorry.
13      MR. SHEARER:  I think we're on 143.
14  Q   I apologize.  I apologize.
15      Showing you what's been marked as Deposition
16  Exhibit 143, can you identify that, please?
17  A   Looks like a 1099 from a company called Oasis
18  Outsourcing.
19  Q   And what is Oasis Outsourcing?
20  A   They are an HR outsourcing company that does
21  HR services for companies who don't want to keep it
22  inhouse.  They act as a co-employer.
23  Q   Did you provide consulting services to Oasis
24  in 2017 after you left First Data?
25  A   I did.

65

1   Q   And did you do that again through your son's

Barger Steven B. 081018 Rough Draft (2)

7  needed to go out on leave after you told him that you
8  were having another surgery that was going to keep you
9  in the hospital for six days and four weeks of full
10 recovery, right?
11     A    Right, I thought that was true.
12     Q    Okay.  So that's it, right, it's either not
13 letting you come back to work or to company telling you
14 that you had to go on leave after you said you needed
15 another surgery?
16     A    That's all I can remember.
17          MR. SHEARER:  Objection, same objection.
18     Q    Okay.  After you were terminated how many
19 companies did you apply to to work for as an employee?
20     A    I had difficulty getting interviews.  One of
21 the things I wanted to go back, tried to go back
22 initially and start my consulting business so I
23 contracted -- or contacted the people I knew at the
24 various wire houses from UBS, to Morgan Stanley, to
25 Wells Fargo, to MFS, sent out trial balloons to see if

257

1  we could get back to where they would sponsor me.
2      Q    As a consultant?
3      A    As a consultant.
4      Q    Okay.  Let me ask my question again.  How many
5  companies did you apply to to be an employee after you
6  were terminated from First Data?
7      A    There weren't any that paid what I was
8  being -- that I made, so I didn't apply.

                    Barger Steven B. 081018 Rough Draft (2)
 9       Q     One more time?
10       A     I didn't apply to very many.
11       Q     Did you apply to any as an employee?
12       A     Physical as writing out an employment -- or
13   going in for an interview, no.
14       Q     Did you formally apply to any companies?
15             MR. SHEARER:  Objection.
16       A     No.
17       Q     The answer is no, right?
18       A     No.
19       Q     Okay.  Did First Data terminate your
20   employment because you had tracheotomy surgery?
21       A     I think it played a role in it.
22       Q     And on what basis do you say that it played a
23   role?
24       A     The fact that you already have information
25   that I was offending people with my discussion about it

                                                           258

 1   that's already part of the record.  So I'm thinking you
 2   mean to tell me that they are viewing me as being the
 3   ugly duckling, what's going on here.
 4       Q     So it's your testimony that comments that
 5   employees made to Ms. Johnson that they were
 6   uncomfortable with you discussing in detail your
 7   condition was a part of the decision that led to the
 8   termination of your employment?
 9       A     It was a fact that that was even repeated and
10   put into record and that that was a -- one of the
11   reasons that was suggested that instead of using it as a

Barger Steven B. 081018 Rough Draft (2)

22  Q  Did you contact Mr. Marino's assistant Fuji?
23  A  I think, yeah, my attorney did.
24  Q  Your attorney did.  Did you contact Fuji?
25  A  No.

263

1   Q  Did you contact Peg Johnson?
2   A  My attorney did.
3   Q  Did you contact Peg Johnson?
4   A  I don't remember if she called me.
5   Q  After you left First Data, did you ever apply
6   for another position with First Data?
7   A  No.
8   Q  I'm sorry?
9   A  No.
10  Q  No.  Okay.