UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


STEVEN B. BARGER,                 *   Case No. 17-CV-04869 (FB)
                                  *
            Plaintiff,            *   Brooklyn, New York
                                  *   September 4, 2018
      v.                          *
                                  *
FIRST DATA CORPORATION, et al.,   *
                                  *
            Defendants.           *
                                  *
* * * * * * * * * * * * * * * *   *

       TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
              BEFORE THE HONORABLE LOIS BLOOM
               UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          SHAWN SHEARER, ESQ.
                            Law Office of Shawn Shearer
                            3839 McKinney Avenue, #155-254
                            Dallas, TX  75204

                            DAVID A. ZEITLIN, ESQ.
                            Zeitlin & Zeitlin, P.C.
                            50 Court Street, Suite 506
                            Brooklyn, NY  11201

For the Defendants:         GARY B. EIDELMAN, ESQ.
                            Saul Ewing Arnstein & Lehr, LLP
                            One PPG Place, Suite 3010
                            Pittsburgh, PA  15222




Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

1          (Proceedings commenced at 2:11 p.m.)

2                    THE CLERK:  Civil cause for a status conference,

3     docket no. 17-CV-4869, Barger against First Data Corporation,

4     et al.

5                    Will the parties please state your names for the

6     record.

7                    MR. SHEARER:  Shawn Shearer, of The Law Office of

8     Shawn Shearer, for the plaintiff.

9                    MR. ZEITLIN:  And also on behalf of the plaintiff,

10    as local counsel, the Law Office of Zeitlin & Zeitlin, by

11    David Zeitlin.  Good morning.  Good afternoon.

12                   MR. EDELMAN:  Good afternoon, Your Honor.  Gary

13    Eidelman, from Saul Ewing Arnstein & Lehr, for the defendants.

14                   THE CLERK:  The Honorable Lois Bloom presiding.

15                   THE COURT:  Good afternoon, Mr. Shearer, Mr. Zeitlin

16    and Mr. Eidelman.

17                   This is actually a discovery conference in

18    plaintiff's employment discrimination case where plaintiff is

19    alleging violation of his rights under the FMLA and the ADA.

20                   So, again, it's at this point, very close to the end

21    of discovery, and the Court has gotten four motions to compel,

22    Mr. Shearer, in the past week and a half from you.

23                   Now, again, I understand that you believe that this

24    is the way to litigate the case.  You were admitted pro hac

25    vice.  I have you in no other cases.

1          I have to say quite honestly I think you might be

2     losing some of your perspective about the case -- because

3     you're representing your father-in-law -- filing four motions

4     to compel in a week and a half.

5          Again, nothing is going to prevent you from filing a

6     motion in this court.  But I think that when Judge Block

7     denied your motion in July, he cautioned you to consider the

8     merits of any future motion.  And when you moved to compel

9     back in June, I held a conference the next day and denied your

10    motion.

11         I think you're in earnest, trying to do your best

12    work for your father-in-law's case, but I really do think you

13    might be losing some perspective on this.

14         Let me just say I do understand that they hired

15    somebody the same day that they fired your father-in-law,

16    January 13th.  I get that.

17         I also get that if their defense to your father-in-

18    law's discrimination case is a reduction in force, which is

19    what they've said, I understand how having somebody hired at a

20    high salary, presumably high salary, would raise at least

21    hackles, if not more than hackles, on your back, and you want

22    to get at that information.  I got you on that.

23         But then when I read what the press release was --

24    which was supplied by Mr. Edelman -- and that you have had the

25    depositions of the people who were involved in the hiring of

4

1    Mr. Jackson -- and in my mind -- and we're here to talk about

2    this today -- in my mind, we're talking about two extremely

3    different jobs.

4              What Mr. Jackson was hired to do was intellectual --

5    IT work and security work.  What your father-in-law was hired

6    to do was training.  Completely different jobs.  Would you

7    agree with that as a basic premise.

8              MR. SHEARER:  I do agree with that.

9              THE COURT:  So I'm thinking what would Mr. Jackson

10   be able to contribute other than his salary?  Okay.  What

11   would he be able to contribute at a deposition towards the

12   discrimination case that your father-in-law is bringing here?

13             MR. SHEARER:  I think the issue is that when you

14   look at the testimony of the other witnesses, budgetary

15   authority is governed by whoever the executive person --

16             THE COURT:  I have read all of those that you

17   submitted.

18             MR. SHEARER:  Okay.

19             THE COURT:  And what your premise is, or at least

20   what I think you're trying to get the Court to agree with is

21   that if a major corporation decides to cut money one place,

22   but then adds it to another place, that that could never be a

23   reduction in force.  And I don't know that there's any case

24   law that supports you on that.

25             MR. SHEARER:  Well, I don't think the issue is a

5

1  reduction in force. The issue is whether an equivalent

2  position was maintained for someone on FMLA. And at the point

3  the decision was made --

4          THE COURT: An equivalent position to your father-

5  in-law's position.

6          MR. SHEARER: That's true.

7          THE COURT: Not to Mr. Jackson's position, which was

8  a new hire, a lateral from another IT position with another

9  security firm.

10          So, again, your father-in-law, Mr. Barger and Mr.

11  Jackson had very different jobs.

12          MR. SHEARER: But the testimony from Ms. Benhart

13  last week --

14          THE COURT: Could you just bring your mic closer,

15  sir.

16          MR. SHEARER: The testimony of Ms. Benhart last week

17  was at this point in time any executive vice president was on

18  a one-for-one, hire/fire. That is, if you hired -- if you

19  were going to hire an SVP, you had to fire one.

20          THE COURT: But there is no dispute that your

21  father-in-law was fired.

22          MR. SHEARER: That's correct.

23          THE COURT: And there's no dispute that Mr. Jackson

24  was hired on that same date.

25          MR. SHEARER: That is correct.

6

1          THE COURT:  So why would we need his deposition?

2     He, who knows nothing about how the internal works of First

3     Data would, you know, affect your father-in-law?

4          MR. SHEARER:  Well, I couldn't get the answer.  But

5     two depositions that I took, Mr. Charron and Mr. Bisignano, I

6     asked them about their interview process with Mr. Jackson --

7          THE COURT:  I saw that.

8          MR. SHEARER:  -- and I believe --

9          THE COURT:  I read all of that.

10          MR. SHEARER:  -- I believe what they're saying is

11     that at the time Mr. Barger was forced on to leave, they

12     forced him to stop working, is approximately the same time

13     that they started to interview Mr. Jackson.

14          And it's at the same time that the company is on

15     this one for one set off program where Mr. Charron would have

16     needed to fire an SVP in order to hire one.

17          And it seems coincidental to me that they forced Mr.

18     Barger on to leave at the same time they started Mr. Jackson's

19     interviews.  And --

20          THE COURT:  But, again, my question to you is nobody

21     is disputing that on the same date that your father-in-law was

22     fired that Mr. Jackson was hired.  Nobody's disputing that.

23          MR. SHEARER:  And I think the question is was the

24     date they forced my client on to leave approximately the same

25     date that they started to interview Mr. Jackson, to bring him

1    in, and that the two were linked much earlier than that.  And

2    when he was forced on leave --

3            THE COURT:  But how would Mr. Jackson know anything

4    about when they started the wheels in motion?

5            MR. SHEARER:  Well, he would know when they talked

6    to him first.

7            THE COURT:  It is irrelevant to your case.  Your

8    case is a reduction in force case where you're going to have

9    to prove that this was not a reduction in force.  Right?  They

10   have to prove it was.  I'm sorry.

11           MR. SHEARER:  But I have -- they have to prove --

12           THE COURT:  You have to prove it's discrimination.

13           MR. SHEARER:  -- my client was included in a

14   reduction in force.

15           THE COURT:  And you have to prove that the reduction

16   in force is a pretext for discrimination.  That's what the

17   case is about.

18           MR. SHEARER:  And part of that is that the plan was

19   to terminate him at the time that he -- they forced him to

20   take leave.

21           THE COURT:  But, wait.  Let's go back to when they

22   forced him to take leave.  Because that leads us to the

23   Voycheske dispute here.  So the Voycheske dispute -- and if I

24   recall correctly, Ms. Voycheske was the one who you tried to

25   get the daycare records from her child's daycare.  Is that

8

1      correct?

2              MR. SHEARER:  From her former daycare provider.

3              THE COURT:  But it was Ms. Voycheske who you now say

4      you didn't want to depose because she's not an officer or

5      manager.  But you were interested so much in her before that

6      you were trying to get the daycare records from her child's

7      daycare?

8              MR. SHEARER:  Right.  And her story has changed

9      significantly in the two -- and once she changed her story

10     again, I didn't want to depose her.  It's clear that the two

11     declarations in and of themselves contradict and there was no

12     reason to take up --

13             THE COURT:  Why don't you tell me what the point is

14     that you're trying to make with Ms. Voycheske with the

15     *Fountain* materials.

16             Because, again, my feeling is they are not disputing

17     that there were backdated forms.  Because you're -- again, I'm

18     just synthesizing -- you're saying that he was forced out on

19     FMLA leave, a date was given, that date was inputted into the

20     system.

21             And then according to what Mr. Eidelman's most

22     recent letter to the Court was your father-in-law had

23     submitted different dates when he was looking for his leave

24     from the disability people, the MetLife people.

25             And so when they got the letter saying that the

1    operation was in September, they then changed the FMLA

2    approved leave to be dated from the same date that your client

3    had submitted for his leave request to MetLife.  Isn't that

4    what the date change was?

5              MR. SHEARER:  I would disagree with several facts.

6              THE COURT:  So give me the date that he was forced

7    to take FMLA leave under your --

8              MR. SHEARER:  He was advised on November 18th by

9    text message -- no, by -- a letter dated November 18th was

10   sent to him by EVP Tony Marino, who is the head of the human

11   resources department, that arrived to his home I believe --

12   that was a Saturday -- a Friday -- and it arrived at his home

13   on Monday.

14             Over that weekend, the two of them text messaged --

15   a text exchange -- and Mr. Marino advised him that he was

16   going to have to transition to -- the first date is -- leave

17   programs -- and that is November 18th, 19th, in that area.

18             THE COURT:  Okay.  So November 18th you're saying is

19   the date that they forced him to take leave from?

20             MR. SHEARER:  That's correct.

21             THE COURT:  And so what is the problem with what Ms.

22   Voycheske has supposedly put in in affidavits that conflicts?

23             MR. SHEARER:  Well, Mr. Barger did have his surgery

24   on September 6th.  That surgery was conducted by a surgeon

25   recommended to him by CEO Bisignano.  Mr. Bisignano also

1    helped him arrange the meetings with that physician.  EVP Dan

2    Charron, EVP Jeff Hack --

3              THE COURT:  I'm sorry.  You're giving me too many

4    names.  I was asking what did Ms. Voycheske change that you're

5    talking to me about?

6              MR. SHEARER:  What I'm saying is that on September

7    6th, when Mr. Barger had his surgery, nearly five officers of

8    First Data ranked EVP, CEO, SVP were aware of the surgery.

9              THE COURT:  I get -- I get that.

10             MR. SHEARER:  So Ms. Voycheske learning in January

11   of 2016 as a manager of leave in Omaha that Mr. Barger had

12   surgery on September 6th is not the question.

13             First Data not only knew he had surgery on September

14   6th to remove his larynx, but all of the senior management at

15   First Data knew that.  The knowledge was there.

16             And the fact that Ms. Voycheske didn't know it

17   doesn't change --

18             THE COURT:  But what is it --

19             MR. SHEARER:  -- doesn't change --

20             THE COURT:  -- what is it that you're trying to

21   impute that she did wrong with regard to the leave?

22             MR. SHEARER:  Right.  Correct.  Mr. Barger continued

23   to work remotely from September 6th through November 18th.

24             THE COURT:  Then why did he give that date when he

25   was asking for disability leaves?

11

1          MR. SHEARER:  Well, Mr. Barger thought the question

2     was what -- and he testified to this at his deposition -- he

3     thought that the question -- when was your last day at the

4     office.  He thought when you --

5          THE COURT:  He thought that was the question?

6          MR. SHEARER:  Yes.  Yes, he did.

7          THE COURT:  Well, again, I'm interested in hearing

8     what you think Ms. Voycheske's prior sworn testimony has

9     anything to do -- that was an intermittent leave case.  Kudos

10    to you that you're searching the whole country to see any

11    First Data cases and you come up with a summary judgment

12    motion.

13         But, one, I have absolutely no doubt that that

14    testimony a year prior is irrelevant to your case.

15         Two, as far as who holds the deposition transcripts,

16    I have no idea.  They may be confidential.  It may have been

17    subject to a mutual protective order in that case.  There is

18    nothing in the law that prohibits parties to a litigation to

19    designating deposition testimony as confidential.

20         And that they put part of it into the court record,

21    and so you were able to view parts of it, which you gave me,

22    which I've read, I don't find there to be any basis --

23         MR. SHEARER:  I think it should --

24         THE COURT:  -- to compel them to turn over any of

25    that deposition.  You say they were a subsidiary.  Ms.

12

1    Voycheske apparently was hired -- I don't know -- three years

2    ago.  The *Fountain* case was about intermittent leave that went

3    back into the 2009 or thereabouts.

4            So, again, you're talking about things that are so

5    tangentially related here, Mr. Shearer, that I don't get what

6    you're trying to prove. I do understand that you believe that

7    they are not disclosing everything that you've asked for.  I

8    get that.

9            So, again, even though I don't think that you have

10   the right to depose Jackson, I would order them to turn over

11   the request to admit because whether or not you could use

12   that, who knows.

13           But you want to nail them down that they hired

14   somebody at the same time they fired your father-in-law and it

15   was for at the same or a large number salary.  Okay.  I don't

16   see that as being unreasonable.

17           But I do see it as a frolic and a detour in what is

18   your essential case to prove.  You have to prove

19   discrimination.

20           So, again, I understand you're trying to show that

21   their reduction in force is a pretext, but I don't get how any

22   of these other things that you're asking me to compel go to

23   the issue of discrimination.

24           MR. SHEARER:  When you go through the documents, and

25   the spreadsheets, and the planning, and the documentation of

1    what we're using the term reduction in force -- even though

2    that's not in the regulations -- but whatever we're thinking

3    of as a reduction in force, I don't believe that those

4    documents reflect that Mr. Barger was included in a reduction

5    in force until such time as he exercised his right to return

6    by providing First Data of his doctor's release to return to

7    work on January 10th.

8              THE COURT:  That's fine.  That's fine.  There's no

9    dispute.

10             MR. SHEARER:  But it was at that point that Mr.

11   Jackson (sic), at his returning, messed up Mr. Charron's

12   budget where he has to hire one/fire one.  They thought Mr.

13   Barger was going to stay on leave.

14             It was only his exercising his right to return that

15   caused him to get fired.  And he wasn't in the RIF.  And their

16   documents show that he was added after the fact as a cover

17   just for this defense.

18             THE COURT:  Okay.  So you'll make your argument.

19             But that doesn't mean that you need to depose Mr.

20   Jackson --

21             MR. SHEARER:  No.

22             THE COURT:  -- who knew nothing about any of this

23   when he came on.

24             MR. SHEARER:  I just need the answers to two

25   questions.  When did you start interviewing and what did you

1    pay him?  That is it.  And that's all I've been asking.  I've

2    tried every means.

3              THE COURT:  I don't think that's all you've been

4    asking quite frankly.

5              MR. SHEARER:  On this topic.

6              THE COURT:  That's really --

7              MR. SHEARER:  No.  On this topic, that's really the

8    question I've been asking.

9              THE COURT:  Okay.  You want to be heard I imagine,

10   Mr. Eidelman?

11             We're sort of having a free-ranging conversation

12   about two of the four things that I've been presented with.

13   The first two were the deposition of E.J. Jackson, which I am

14   ruling he is not entitled to a deposition of E.J. Jackson,

15   E.J. Jackson being hired on the same day that Mr. Barger was

16   fired does not mean that Mr. Jackson has relevant testimony

17   regarding this discrimination case.

18             In fact, it's been established just on the letters

19   to me -- and I believe you're not contesting this, Mr.

20   Shearer, that Mr. Jackson's job was completely different than

21   the job that Mr. Barger was doing.

22             And, again, I cannot just give you a deposition

23   gratuitously of someone because they were hired the same day,

24   even though I do think that those -- the confluence of those

25   dates raises an eyebrow, at least, if not some hackles.

1              Okay, Mr. Eidelman.

2              MR. EIDELMAN:  Judge, I really don't have much more

3       to add with regard to those, the topics that you've talked

4       about.

5              There are a lot of facts in this case that will come

6       out in summary judgment relating to Mr. Barger's inclusion in

7       the RIF.  The fact that 27 other senior vice presidents and

8       his own boss, Mr. Jeff Hack, who put him on the list, were

9       included in the reduction in force.  Those are --

10             THE COURT:  And he was the only one that wasn't

11      deposed -- Hack -- isn't that correct?

12             MR. EIDELMAN:  No.  Mr. Hack, frankly, is the only

13      one who wasn't named as a defendant.  And he has not been

14      deposed.  That is correct, Judge.

15             So with respect to that, we'll save that for summary

16      judgment.

17             I agree with your comments regarding a deposition of

18      Mr. Jackson.  I understand the Court is likely to compel us to

19      provide an answer to that admission.

20             I will say, Your Honor, that if you look at the

21      deposition transcripts that Mr. Shearer took of Mr. Charron,

22      and he asked the question do you know what he was making and

23      he said, no, I'm not certain, there was no followup.  There

24      was no was he making more than 300,000?  It was just he moved

25      on.

16

1        THE COURT:  I understand.

2        MR. EIDELMAN:  But we will, Your Honor, if you

3   compel us to, if you order that we should provide an answer to

4   that admission, we most certainly will of course.

5        THE COURT:  Look.  Why did I have you both come here

6   today?  Because we've extended discovery until the end of

7   September.  That's going to be it.  And that's for both sides.

8   And that means that we're close to the finish here.

9        So discovery is to be completed by both sides by

10  September 28th.  And any pre-motion conference request needs

11  to be made to Judge Block by October 12th.

12       So I understand you're both beleaguered by each

13  other at this point.  The case, unfortunately, did not resolve

14  early.  And you have been, you know, playing this like it's a

15  a major tennis tournament with two very good hitters on either

16  side of the court.  But quite frankly, I feel a bit like the

17  tennis ball and I don't need to keep getting hit.

18       This was, in my mind, an unnecessary -- unnecessary

19  to bring four motions to compel.  It's been said over and over

20  again that discovery is the single greatest source of cost and

21  delay in civil litigation.

22       That the initial motion to compel back in June was

23  denied in a conference the very next day.  I am trying to give

24  the message to the litigants here that you need to work these

25  things out.  But I see this was an impossibility.

1        And so I spent a good amount of time going through

2    each of these exhibits and getting a feel for what's been

3    going on.  And that's why I'm saying to you that I feel like,

4    you know, this has been a frolic and a lark and taking you

5    away from your main burden here, which is to prove

6    discrimination.

7        Talking about Voycheske and changing determinations

8    unilaterally, and yet there's a September 6th surgery date, I

9    understand what your argument will be.  Your argument will be

10   that Bisignano and other people knew that he was operated on

11   because they were in touch with him.  That doesn't mean that

12   the personnel person filling out the forms contacts the CEO.

13       For goodness sake, Mr. Shearer, that makes no sense

14   to me.  It makes no sense to me that Mr. Bisignano is going to

15   contact his human resource person and say Mr. Barger went out

16   for surgery on September 6th.  Let's process some forms for

17   him.  That makes no sense.

18       MR. SHEARER:  Right.  And I think it makes no sense

19   that a manager of human resources in Omaha has the unilateral

20   authority to override the decisions that were made by the CEO

21   and --

22       THE COURT:  That's how you're going to paint it as

23   she overrode, but I don't know that the facts will support

24   that.

25       Again, if he put in papers for long-term disability

1    leave that did not comport with what he had put in for FMLA

2    leave -- I understand your point that you felt that he was

3    being forced to take FMLA leave, but you're saying that's in

4    November.

5         So if they process it as of November, which is I

6    believe the dates that were given, and then he submits long-

7    term disability that goes back to September 6th, you're going

8    to blame the company for making that change so that it

9    comports with what he put in to long-term disability?

10        MR. SHEARER:  Yes, I am.

11        THE COURT:  Why?

12        MR. SHEARER:  Because the company already knew that

13   he was working from home and the hospital.  He was on an ADA

14   accommodation from September 6th to November 18th.

15        THE COURT:  That's in --

16        MR. SHEARER:  That's why they --

17        THE COURT:  That's in writing?

18        MR. SHEARER:  No.  But that's what -- but I can

19   produce emails from every single day between September 6th and

20   November 18th when he was told to take leave.  You don't tell

21   somebody on leave to take leave.

22        THE COURT:  But there was no FMLA specific request

23   made by Mr. Barger.

24        MR. SHEARER:  No, not until November.

25        THE COURT:  So there was no accommodation request

1    made where there is something in writing from First Data

2    saying, yes, you can work from home, not an issue, we're going

3    to list you as working from home.

4              MR. SHEARER:  Well, that -- I mean, I think that

5    goes into the IT issues that have -- are part of the 10(b)(5),

6    which is the manager, which is Jeff Hack, who -- the reason he

7    wasn't named as a defendant -- we found out -- we thought he

8    had been terminated before Mr. Barger and that he wasn't

9    involved in the decision until we got the discovery in this

10   case.  That's why he's not named and that's why he wasn't

11   deposed.

12             THE COURT:  I'm sorry.  I didn't follow.

13             MR. SHEARER:  He was trying to say --

14             THE COURT:  You know more about the case than I do.

15             MR. SHEARER:  That's a sideline.

16             I mean, Mr. Barger was working directly with

17   Defendant Charron remotely for that entire period from

18   September 6th through November 18th.  They even sent IT people

19   over to set up his home office where he could work.

20             THE COURT:  When did they send the IT people?

21             MR. EIDELMAN:  When he got home in October.

22             THE COURT:  So not from September 6th?

23             MR. EIDELMAN:  No.  That's correct.  But they were

24   FedExing him materials on a weekly basis.

25             THE COURT:  Again, I'm not here to decide the

1   ultimate issue.  I am only here to say that you have to be

2   reasonable in what you're requesting and in making motions to

3   the Court.  And I've only gotten to two.

4          I've gotten to the motion to compel E.J. Jackson.

5   And that motion, I told you the reasons on the record why I'm

6   denying that motion.

7          But I am directing them to respond -- I think it was

8   only three requests to admit -- at least those are the ones I

9   -- was it more than 400, more than 450?  Just state what his

10  salary was for God's sakes.

11          MR. EIDELMAN:  Will do.

12          THE COURT:  Okay.  So the next was the Voycheske

13  deposition -- which I've tried to lead you to my understanding

14  of why you requested it -- that you want the entire

15  transcript.

16          As I said, one, I don't think you're entitled to it.

17  Two, I don't see what that helps you to prove here.  You want

18  there to be something to prove that Voycheske's veracity and

19  pattern of record-keeping snafus resolves against employees on

20  leave.  And you can make whatever arguments you want out of

21  the testimony.

22          But I don't believe you're entitled to a deposition

23  from an independent case brought against a subsidiary a year

24  before this case was started.  So your request for the entire

25  transcript of all Voycheske depositions in *Fountain* is denied.

1    So really I wanted to be here today to put our minds

2 together about how we could get discovery done.  And I'm

3 looking at the last of the two issues.  And the last of the

4 two issues are the 12(b)(6) issue.

5    And I'm not even sure -- let me see -- it's the ten

6 deposition limit and the 30(b)(6) issue.  Those were ECF-55

7 and ECF-56.  And, again, 56 is where you sought the deposition

8 of E.J. Jackson; 55 is where you were again seeking to compel

9 30(b)(6) depositions and to impose sanctions for failure to

10 appear twice at properly noticed 30(b)(6) depositions.

11    This is where it really pained me to read, Mr.

12 Shearer, how much you put into this.  I can't imagine that

13 when you were a lawyer to anybody but your father-in-law that

14 you would have done what was at least in my mind put into the

15 calendar, the letters, the emails back and forth.

16    I think you're a little too close on this one to the

17 people that you're representing and that maybe you don't see

18 it the way the Court will see it.

19    Saying that you intend to show up for a deposition,

20 whether it be in Omaha or Los Angeles, when he's writing

21 emails saying nobody is going to be there, and yet you hire

22 the court reporter, and you go on the record, as if you

23 expected them to be there, doesn't make it any more

24 reasonable.

25    MR. SHEARER:  Well, if you look at Mr. Eidelman's

1    emails to me, when he says that he will not produce E.J.

2    Jackson, he will not produce Adam Rosman without a court

3    order, in order for me to come to you for an order -- and I've

4    chosen not to other than Mr. Jackson here -- I have to issue

5    the subpoena and I have to have something to ask you to

6    compel.  So I did that to create the record for the case we

7    needed in a motion to compel in those cases.

8            THE COURT:  But let me just suggest to you, sir, I

9    have not been inattentive.

10           In fact, when you made your last motion to compel, I

11   had you on within a day of getting that motion.  I have in

12   every way tried to indicate to you that I understand that

13   you're litigating a case for somebody that you believe was

14   discriminated against and that you need to get information

15   from the defendants because everybody knows that in

16   discrimination cases the information is somewhat asymmetrical.

17           I have not told you if you can't agree to something

18   with Mr. Eidelman that you should never write to the Court.

19   Here you made four motions to compel in a very short period of

20   time.  Why it couldn't be one motion to compel I have no idea

21   on four different topics.

22           But be that as it may, I really take -- I take you

23   at your word and still it does not appear to be reasonable.

24   It appears to be irrational.

25           MR. SHEARER:  I was thinking that the fact discovery

1    for me ended on August 31st.  That the extension of fact

2    discovery for Mr. Eidelman was limited to the two witnesses,

3    third-party witnesses, that he was seeking.  And so I wanted

4    to get my motions to compel in before the end of my fact

5    discovery.

6              THE COURT:  And what about the idea of saying you've

7    now extended, Judge, for them -- and there are three or four

8    other matters that we still need to tend to.  You don't think

9    that I would have been receptive to hearing that from you in

10   the same manner that I heard from him, by letter, that he

11   needed an extension of time?

12             MR. SHEARER:  Well, I'm sorry, Your Honor.  I

13   thought that's what I was doing.

14             THE COURT:  With the four motions to compel, that's

15   what you thought you were doing?  Attaching Exhibits A through

16   F or, you know, I can't even tell you how many exhibits

17   because there are quite a few.  And then they have to counter

18   your motions.

19             So I'm putting it on the record now if down the road

20   you're successful for your client, I cannot allow this to

21   multiply the fees that would be requested because that would

22   be an abuse of the discretion of the Court.  I was available

23   to the parties.  I was able to sit down to resolve within one

24   day the last dispute which was brought to my attention in

25   June.

1          So you cannot claim -- even though I didn't rule in

2     your favor -- that I've been inattentive and just let the

3     deadlines go by.

4          I would not have been inattentive had I gotten a

5     letter from you at the same time as I got the letter from Mr.

6     Eidelman where he was requesting an extension of the discovery

7     deadline because he said he had two non-party witnesses that

8     he needed to depose.

9          Had you chimed in, Judge, I would like that same

10    opportunity because we have these things that are outstanding,

11    I probably would have convened the same conference to try to

12    get this worked out.

13         So going back to the issue of the 30(b)(6), there is

14    a case in the Southern District which was pointed out.  It's

15    very different.  It's the *Winfield case.  It's* against the

16    City of New York.  It's by my colleague, Katherine Parker.

17         And it goes into great detail about the balance that

18    the Court is required to strike when dealing with 30(b)(6) and

19    that 30(b)(6) should not be used to enlarge the number of

20    depositions.

21         But at the same time, it's logical that sometimes

22    the information that is going to be requested on categories

23    will be outside of what one person knows about an

24    organization.

25         And that case, which was against the City of New

1    York, about housing allotments to poor people and the policies

2    and the underlying collection of data, the 30(b)(6) deposition

3    was to collect information about how the information is kept

4    by the City of New York.

5              And there were different agencies that had different

6    portions of the information that the plaintiffs were trying to

7    collect.  And it was a class action lawsuit.  It wasn't a

8    single plaintiff lawsuit.  And they decided, Judge Parker

9    decided, to have a 30(b)(6) by committee and to rule on the

10   categories of information.

11             But the upshot, Mr. Shearer, for this case, in my

12   mind was, again, going back to the rule, that you have to

13   identify with reasonable particularity what it is that you

14   need to be -- what you're going to depose the witness on.  And

15   that 30(b)(6)'s reasonable particularity requirement must be

16   enforced strictly.

17             And so I know that we had a prior conference where

18   we tried to whittle down what information you really needed,

19   and that was in order to try to get the right people to attend

20   the 30(b)(6) depositions.

21             So with that as the backdrop, Mr. Shearer, why don't

22   you tell me what it is -- because I've looked at each of the

23   categories -- that you say you still need information on?

24             And I'd like to just say one category I do not

25   believe you have any basis for is the litigation hold

1    category.  So please don't go to that category.  That was the

2    last on the list.

3           But I find that the litigation hold is not central

4    to your claim of discrimination.  There's been no claim made

5    to the Court that there was evidence requested, that there's

6    spoliation that you are alleging.

7           I don't know where you were coming up with that as a

8    category that you wanted somebody to testify about, but that

9    is off the table.  Not only is it not relevant, it's going to

10   lead to all sorts of privilege battles, and it's not central

11   to the focus of the case, which is whether or not there was

12   discrimination by First Data against your client.  So why

13   don't you tell me as to the other topics.

14          MR. SHEARER:  Yes.  The first one that I requested a

15   witness on in the motion was Topic 1C, which is First Data's

16   internal control policies and procedures for the technological

17   systems used by First Data's Human Resources Department,

18   payroll and leave management.

19          THE COURT:  So just talk to me.  What is it that you

20   believe you need?

21          Because, again, I don't see them disputing your

22   version that your client went out, was operated on in

23   September.  I don't see them disputing that there was a letter

24   in November that put him on leave.

25          I don't see them disputing that then when the long-

1    term disability claim came through that Ms. Voycheske changed

2    the date to the September 6th surgery.  I don't see any of

3    that as being a disputed matter.

4              MR. SHEARER:  This is going to go to the disputed

5    matter between the surgery and the forced leave, that period

6    of time between September 6th and November 18th.  During all

7    of the depositions there are two systems that the human

8    resources department uses.

9              One is called the OOO, which stands for Out of

10   Office System.  The question that has never really been

11   answered on that by any of the witnesses is who can change the

12   information in there for an employee.

13              And this is where employees would record their

14   vacation time, their sick time, their leave time, all the paid

15   time off, and it's unclear who has access to make changes to

16   that system.

17              And that's important because Mr. Barger, I do not

18   believe, was ever placed on vacation or sick time or personal

19   time during that period of time.

20              But somehow when the dates get changed by Ms.

21   Voycheske in January, that system is modified by somebody.

22   And it wasn't modified by Mr. Hack, who was his supervisor,

23   who had been terminated.

24              So the question that I have is who could go in and

25   recalculate Mr. Barger's --

28

1          THE COURT:  Did you ask that precise interrogatory

2     who went in and changed Mr. Barger?  Not in the hypothetical

3     who can go in.  But you're asking about a particular change

4     that was made on Mr. Barger's account?

5          MR. SHEARER:  Correct.

6          THE COURT:  Did you ever ask who made that change?

7          MR. SHEARER:  I've asked, not specifically.  I've

8     asked about who has authority to make changes.

9          THE COURT:  I don't care who has the authority.  I

10    really don't.

11         MR. SHEARER:  I did at the time because it might

12    have been somebody I wanted to depose.

13         THE COURT:  But did you ever ask who made the change

14    on Mr. Barger's account?

15         MR. SHEARER:  Not specifically that way, but I've

16    asked everybody I have deposed.

17         THE COURT:  You've asked everybody you deposed how?

18         MR. SHEARER:  Did you put the time -- did you make

19    the change in the system?

20         THE COURT:  But you never asked who did --

21         MR. SHEARER:  They said, no, I can't.

22         THE COURT:  -- because there must --

23         MR. SHEARER:  They said -- their answer is I

24    couldn't do that.

25         THE COURT:  Yes.  But did you ever ask who did make

1   the change?  Because there has to be some IT footprint.

2          MR. SHEARER:  That's the -- that's what -- no, I did

3   not ask specifically who made the change?

4          THE COURT:  Why didn't you ask that specific

5   question?  Why do we need an IT person to come testify as to

6   who can change the info on a system if you never asked the

7   precise question that you really need the answer to?

8          MR. SHEARER:  Well, it's pretty clear that nobody

9   knows other than the IT person.

10          THE COURT:  I don't know that's true because you

11   never asked the question, Mr. Shearer.

12          MR. SHEARER:  Okay.

13          THE COURT:  Mr. Eidelman?

14          MR. EIDELMAN:  Judge, I don't see a need at all for

15   an IT expert in this case.  I agree with you.

16          The documents -- as the Court has said, there isn't

17   -- there isn't a dispute as to the sequencing of events.  The

18   issues in this case is whether or not First Data unlawfully

19   terminated Mr. Barger because he was on FMLA leave, said he

20   wanted to come back from FMLA leave.  Those are the issues.

21          There will be a question as to whether or not it was

22   legitimate, and I think it was under the regulations, when Mr.

23   Barger told the company -- first told the company that what

24   happened was -- as is seen in the emails -- that he spoke to

25   the people at MetLife and they had approve his short-term

1    disability going all the way back to September.

2              THE COURT:  September 6th.

3              MR. EIDELMAN:  And what Mr. Voycheske writes to him

4    and says is that's not what our records indicate.  When did

5    you go out on leave and when were you out?  And he says I was

6    out on this date.  And it will be up to -- whether or not it's

7    a dispute --

8              THE COURT:  The trier of fact.

9              MR. EIDELMAN:  -- it will be up to a trier of fact

10   to determine whether or not his interpretation of the question

11   when did you stop working means when did you stop going into

12   the office -- which I find incredible for a man on Wall Street

13   making over half a million dollars a year to come up with that

14   as an excuse.  Putting that aside, there's no issues there.

15              And with respect to the sequencing of things, the

16   fact of the matter is, is that there has been testimony as to

17   what happened with Mr. Barger when he went out on leave, how

18   he was assisted by a vice president of human resources, the

19   defendant, Rhonda Johnson, to fill out the forms, how he had

20   difficulty filling out the forms.  She went over to his house,

21   helped him fill out the forms.  These forms are the standard

22   protocol for getting out on leave.

23              And, yes, originally it was set -- as I think

24   October 24th was the date his doctor put on the FMLA form --

25   that's when it started until he came and told the company that

1      he started his leave much earlier.  Why he told the company

2      that, I have my suspicions.

3               And I think it goes to the issues of when would he

4      have salary continuation to go on for?  Because the earlier

5      short-term disability starts, you deal with the waiting

6      period, you then get the 90 days of short-term disability,

7      then you go on long-term disability.  He did that.  The

8      company didn't do that.

9               But I'll say, Judge, there still will be the

10     question on summary judgment is assuming arguendo that the

11     company wasn't justified in putting it back to September, was

12     the company justified in terminating him as part of a

13     reduction in force?  Those are the issues in this case.

14              And having this IT expert -- and, Your Honor, I

15     believe we dealt with this before with you -- when the same

16     issue came up on the telephone conference that we had -- and

17     you said go ask your questions as to what's happened, you

18     don't need an IT expert.

19              I will tell you, Judge, it's undisputed that when

20     Mr. Barger went out on leave two things happened

21     technologically.

22              One, he stopped having access to his emails through

23     something called the Good app.  That's been testified to.

24     It's undisputed that that's the app that employees can use to

25     get their business emails at First Data.  And his was

32

1  disconnected.  And his VPN, his ability to log in remotely,

2  was disconnected.  That's undisputed.  So I don't know what

3  technology experts are needed for anything.

4          These letters are in the record.  They are hard

5  copies of the letters.  There's no -- there's no changing of

6  dates here.  There's no reason to change the dates here other

7  than when -- I say there's no reason to hide what the date

8  changes were because the documents are there.

9          So that's, Your Honor, our belief that there is

10  absolutely no reason or basis to have some technology person

11  come in and testify.

12          I will say, Judge, that at Ms. Benhart's deposition

13  -- Ms. Benhart was deposed I think a week ago or so in Omaha,

14  Nebraska -- was asked a lot of questions about the

15  spreadsheets that were put together that incorporated Mr.

16  Barger's name starting in late November, and the total sum of

17  dollars that was saved through this reduction, Ms. Benhart

18  testified a lot about technology and what's used and

19  spreadsheets and stuff like that.  Those are the relevant

20  issues in this case, Judge.

21          So it's our position that having somebody testify

22  about the internal policies and control procedures for the

23  technological systems that are used is irrelevant and has no

24  basis for a deposition.

25          THE COURT:  Could I just hear from you?  I don't

1 want to cut you off -- you had said there were two systems.

2    MR. SHEARER:  There are three.  Yeah.

3    THE COURT:  And it started with 000.  Now there are

4 three?

5    MR. SHEARER:  Yeah.  The other one is a system

6 called PeopleSoft.  It sometimes goes by MSS, Management Self

7 Service System.  There's emails from Ms. Whalen, Defendant

8 Whalen, and others indicating --

9    THE COURT:  I'm sorry.  PeopleSoft.  So there's Out

10 of Office.  And you wanted to know who can --

11    MR. SHEARER:  Yeah.

12    THE COURT:  -- change info for an employee.

13    And what's PeopleSoft Management?  I'm sorry.  I

14 don't --

15    MR. SHEARER:  Yeah.  They call it PeopleSoft

16 sometimes.  And sometimes it gets --

17    THE COURT:  And it's Management --

18    MR. SHEARER:  -- referred to Management --

19    MR. EIDELMAN:  If I may, Your Honor?  PeopleSoft is

20 the company's human resources information system.  It is --

21 that's the brand name for it.  It's the system that many,

22 many, many, many employers in this country use to keep track

23 of information regarding employees.  So it's called

24 PeopleSoft.

25    THE COURT:  So it's a management software?

1          MR. EIDELMAN:  No.  It's not -- well, it is

2     software, but it's a human resources information system.

3          THE COURT:  So what was the MM?

4          MR. SHEARER:  MSS I've heard it referred to.  I

5     think it's Management Self Service.  I don't --

6          MR. EIDELMAN:  Well, Management Self Service is that

7     an employee has a portal that they can go into and say I've

8     now taken vacation.

9          By the way, there's no dispute that Mr. Barger

10    didn't take any vacation while he was employed, so I don't

11    think that's a dispute at all.

12         THE COURT:  I'm just trying to get a handle on --

13    first he said there were two systems that he needed to know

14    about.  I've heard from him about the OOO.

15         And I find it frankly beyond credibility that you

16    didn't ask the question who changed Mr. Barger's information

17    if that was what you were trying to get at, and you asked

18    everybody who can change it, and everybody said I don't know,

19    that you never asked in an interrogatory who changed the info.

20    Why would you not do that?  They'd have to tell you somebody

21    if you were trying to find out who you needed to depose.

22         Getting the IT people into this, I frankly don't see

23    why you would want to do that.

24         So tell me about the PeopleSoft HR info system and

25    the -- you said there was a third.

1          MR. SHEARER:  No.  The third was the MetLife

2     interface which we discussed before.  But I can -- like we --

3     that's --

4          THE COURT:  We don't need to talk about MetLife

5     interface.

6          MR. SHEARER:  Okay.

7          THE COURT:  Is that what you're telling me?

8          MR. SHEARER:  Well, I would like to.  But if you

9     want -- if you don't want me to, I mean --

10         THE COURT:  Well, you said there were three.

11         MR. SHEARER:  Yeah.

12         THE COURT:  I'm trying --

13         MR. EIDELMAN:  There are three.

14         THE COURT:  There were two originally.

15         MR. SHEARER:  Right.  PeopleSoft -- MetLife

16    interface.

17         THE COURT:  Okay.  So what is it that you want me to

18    know about these?

19         MR. SHEARER:  Well, PeopleSoft is -- this is the

20    first I've heard this.  Because from the document production,

21    Mr. Barger, when he was forced to take leave in November, had

22    a full set of available vacation, personal days, sick days,

23    and sick bank that was available to him.  And our version of

24    events is that those -- he should have started taking his

25    vacation, sick time from November 18th forward.

1                    Somebody in January went back --

2              THE COURT:  Wait.  Wait.  Let's step back for a

3    second.  So you said it was news to you that he could have

4    taken this as vacation?

5              MR. SHEARER:  No.  No.

6              THE COURT:  I'm trying to follow.

7              MR. SHEARER:  What was news to me was what -- I

8    thought Mr. Eidelman was going -- has been contesting whether

9    or not Mr. Barger could use vacation time, sick time, paid

10   time off from September 6th through November 18th, because in

11   January somebody went back and reclassified that time period

12   from full pay on the payroll to paid time off and short-term

13   disability.

14             THE COURT:  Do you want to speak to this?

15             MR. EIDELMAN:  I'd be delighted to, Judge.

16             First of all, let me say, Your Honor, there is no

17   claim in this case for unpaid vacation, or unpaid leave, or

18   unpaid short-term disability, unpaid long-term disability.

19   There's no ERISA claims in this case.  There's no breach of

20   contract rights.

21             THE COURT:  I understand.  Okay.

22             MR. EIDELMAN:  But let me just explain what happened

23   if I may.

24             So Mr. Barger goes -- has surgery in early

25   September.  And the company -- because he is a high-positioned

1      person who is very close with Tony Marino, the man that he

2      sued -- these guys played golf together, they were blood

3      brothers, so to speak, along with Joe Plumeri, these guys were

4      this group -- they did not require at that time Mr. Barger to

5      take any leave even though he was hospitalized and he had

6      surgery.  They just kept him on the regular payroll and he

7      continued to get his regular salary until November.

8            And in mid November, Mr. Barger wrote an email to

9      Mr. Marino saying I need to go out and have another surgery.

10     It's going to keep me in the hospital for an extended period

11     of time.  I will then have another recovery period of a month

12     or so.

13           It was at that time that Mr. Marino -- and this is

14     what he testified to at his deposition -- made the decision my

15     friend needs to take time off to get better.

16           Mr. Barger, undeniably is a man who lived to work.

17     We understand that.  Mr. Marino said I need him to stop

18     working so he can get better and that's when the company

19     decided to put him on leave.

20           Now recognizing that there's -- that leave had been

21     -- what the company then did is the following.  The company

22     then looked at, okay, how much vacation did Mr. Barger have at

23     that point in time so we could look at what buckets work?

24     Because it would be a windfall for --

25           THE COURT:  Can I just ask you for one moment?

38

1          MR. EIDELMAN:  Sure.  I'm sorry.

2          (Pause.)

3          THE COURT:  Okay.  I'm sorry.  I was just going to

4     lose my train of thought.  I heard the jangling of the door.

5     No.  It's quite okay.  Thank you.

6          MR. EIDELMAN:  No worries.  No worries, Judge.

7     Thank you.

8          So what the company did is it went back and it

9     looked at the buckets and it said, okay, Mr. Barger, they

10    originally thought he had 80 hours of vacation until Rhonda

11    Johnson, his HR person, says you know what?  No.  He's got

12    another 80.  It was in his employment contract.

13         So what they did was simply try to categorize what

14    the leave looked like in terms of he had already been paid all

15    of this money, let's figure out --

16         THE COURT:  He had 160 days of --

17         MR. EIDELMAN:  160 hours, excuse me.

18         THE COURT:  Hours.  Okay.

19         MR. EIDELMAN:  Right.  Plus he had sick leave that

20    he hadn't taken and he had some other leaves.  And this was

21    all geared towards putting Mr. Barger in a position of -- that

22    he would be able to have salary continuation for as long as he

23    needed it.  The company had no knowledge when he was going to

24    come back.

25         But the company, like many companies, has a variety

1    of benefit programs that are available to employees.  And once

2    you use up whatever leave you have, you can then go to short-

3    term disability and to long-term disability.

4            The evidence shows, Judge, that even in mid-December

5    Mr. Barger's short-term disability leave had not been approved

6    at that point in time, but he was going to be out of paid

7    leave, the company went ahead and authorized a paycheck to

8    cover that second half of December.  Ms. Steffen testified at

9    her deposition it's the first and only time she's ever done

10   it.

11           So there are a variety of issues that are going on

12   here in terms of what the company tried to do.  Unfortunately,

13   Mr. Barger believes he was discriminated against and that's

14   what this lawsuit is all about.

15           But these various records of the needing to have

16   somebody technologically talk about PeopleSoft doesn't support

17   or get to the issues of discrimination in this case.

18           THE COURT:  I'd like a very short reply on that

19   subject.

20           MR. SHEARER:  Yeah.  It goes to the question of was

21   he working under an ADA accommodation between September 6th

22   and --

23           THE COURT:  Why does the internal control technology

24   expert have anything to say about what he was working under?

25           MR. SHEARER:  If the people that had the ability to

1    declare him on leave, declare him sick, declare him on

2    vacation, if those are his managers, and they're the

3    individuals that were well aware that he had his larynx

4    removed on September 6th and was disabled -- and it is a

5    serious health condition at that point -- if they knew and

6    they did not take action to put him on paid time off, did not

7    take action to put him on sick pay, sick leave -- and the

8    entire time, executive vice presidents -- to have -- to allow

9    a manager in Omaha in January to go back and override those

10   conscious decisions --

11            THE COURT:  That's Ms. Voycheske?  Is that Ms.

12   Voycheske?

13            MR. SHEARER:  Yes.  Yes.

14            THE COURT:  Okay.  So listen to me.  You're painting

15   a very different picture on both sides.  Of course that's not

16   my job today to determine which one is credible.

17            All I'm saying to you is his position is Marino and

18   his high up buddies were doing these things to help Mr.

19   Barger.

20            And you're saying there's something nefarious going

21   on because Ms. Voycheske should not in January be able to go

22   back and manipulate something.

23            But everybody agrees that there is a paper trail of

24   what happened in this case, so it's not dependent on internal

25   control technology.  It's dependent on your reading of the

1    paper trail one way or the other.

2         So as to the internal control technology expert, I

3    find that there is no reason to have to continue a 30(b)(6).

4         What's the next topic?

5         MR. SHEARER:  The next one is Topic 2B.  This was

6    contained inside a complaint on February 27th, which is the

7    day before Mr. Barger's last day.

8         There were numerous job postings indicating

9    available jobs at First Data that went back years, including

10   for the time period of July 16 -- July 2016 through February

11   2017, there were jobs there.

12        Somewhere between Mr. Barger's termination and the

13   filing of this case, exactly one year of job openings were

14   deleted.  That is the job availability postings historically

15   skipped from July of 2016 to July of 2017.  And I want to know

16   who was responsible for that?

17        Because the jobs -- available jobs at First Data on

18   the date that Mr. Barger was terminated is relevant to the

19   question of whether or not there were available positions

20   where Mr. Barger could have returned to following his FMLA

21   leave when his doctor provided his return to work

22   authorization.  If there was an available position, he should

23   have been offered it.

24        THE COURT:  I will certainly let Mr. Eidelman speak

25   to this.

42

1          But my recollection in reading the record is that

2     Mr. Barger did not apply for any other position and still has

3     not applied for any other position.

4          MR. SHEARER:  He has not.  The question is he should

5     have been offered one if it was available.

6          THE COURT:  But talk to me about the board and the

7     relevance of who is it that you want to testify about these

8     postings coming off of a board?  Who is it that you're looking

9     for?

10          MR. SHEARER:  I'm not sure.  I mean, I have been

11     given the name of a manager level employee.  I believe the

12     last name is St. George.

13          THE COURT:  Yes.  And you didn't want to depose him.

14     That was the social media guy that you decided you didn't want

15     to depose.

16          MR. SHEARER:  Well, I'm not sure that he qualifies

17     as an officer, director or managing agent.

18          THE COURT:  What does that have to do with who they

19     put up as a 30(b)(6)?  Because you said the same thing about

20     Voycheske.  You didn't want to depose Voycheske.  And then you

21     deposed her boss.  And her boss said I don't know.  I don't

22     handle that.  It's handled by my subordinate, which would have

23     been Voycheske.

24          And you chose not to depose Voycheske and you said

25     it's because she's not a manager, officer or a director.  What

1    does that have to do --

2              MR. SHEARER:  That comes right --

3              THE COURT:  -- with binding the corporation?

4              MR. SHEARER:  That comes right out of 30(b)(6).  It

5    said the designee needs to be an officer, director or managing

6    agent.  And if they're not, they don't have the authority to

7    bind the corporation.  They don't have sufficient control of

8    the corporation for their testimony to bind the corporation.

9              THE COURT:  I cannot imagine that -- again, I don't

10   know that you made that argument to me, but I cannot imagine

11   that there have not been people who are deposed who are lower

12   than managers, officers and directors.

13             For instance, in this case that I referred you to,

14   the *Winfield* case against the City of New York, I guarantee

15   you that the IT people from Housing Preservation and

16   Development and from the -- I'm sorry, I'm blanking on the

17   names of the other city agencies that were involved in the

18   case -- but I guarantee you that they were not managing

19   agents, officers or directors.

20             You want to speak to this?

21             MR. EIDELMAN:  Your Honor, this is -- that's not

22   what the rule says.  A corporation could appoint --

23             THE COURT:  Can you read the rule into the record,

24   please.

25             MR. EIDELMAN:  Yes.  I would certainly read the rule

1    into the record, Your Honor.

2          And parts of 30(b)(6) says the following: "The named

3    organization must then designate one or more officers,

4    directors or managing agents, or designate other persons whose

5    consent to testify on its behalf, and it may set up the

6    matters on which each person designated will testify."

7          THE COURT:  And so what does the other person part

8    of the rule mean to you?

9          MR. SHEARER:  I think that person needs to consent

10   to testify on its behalf.

11         But there also is the case -- and I would have to

12   supplement it -- but decided by the Second Circuit in which

13   30(b)(6) testimony can be subsequently supplemented by

14   affidavit or declaration.

15         And I want to make sure -- and my concern is that --

16         THE COURT:  Look.

17         MR. SHEARER:  -- if the position of a manager can be

18   overridden by a declaration --

19         THE COURT:  We were talking about this because you

20   chose not to depose Voycheske.  You chose to depose whoever it

21   was a week ago that you deposed.

22         MR. EIDELMAN:  Ms. Steffen.

23         MR. SHEARER:  Ms. Steffen.

24         THE COURT:  So I don't want to go off on this

25   tangent here.  But I would say to you that even if there is a

1    Second Circuit case saying that it could be supplemented down

2    the road, I think that's a rolling obligation.  That in civil

3    discovery if you find out information after you've given an

4    answer, you have a duty to supplement.

5            I don't think that goes to the question of whether

6    somebody can be designated as a 30(b)(6) witness if they're

7    not a managing officer or director.

8            So, again, I don't want to mix the apples and

9    oranges here because I've never heard that before and I've

10   been doing this job for 17 years.

11           MR. SHEARER:  Your Honor.

12           THE COURT:  It would be very difficult to understand

13   that you can only designate somebody who is a managing officer

14   or director.  It would -- in my mind, in all of these cases

15   where IT is at issue, those people are not managing officers

16   and directors of corporations.

17           MR. SHEARER:  I'd refer you to *Dubai Islamic Bank v.*

18   *CitiBank* in the Southern District, 2002.  It lists five

19   factors for determining whether someone is a managing agent or

20   not.

21           THE COURT:  But that's not what the question is.

22   The rule provides that you can designate somebody who's not a

23   managing agent.  It's now how are we going to decide if

24   somebody's a managing agent?

25           Look, I don't want to go off track because I still

1    have to decide on these last points.

2            So you were trying to tell me that you needed

3    somebody who was going to be able to testify here and we got

4    sidetracked because you were telling me -- I did recall that

5    there had been a deposition scheduled that got cancelled.  I

6    believe you were the one that cancelled that deposition.  And

7    I believe that was of the St. George person.

8            So I don't know what it is that you're looking for

9    now, but I really want to get to these last issues that you

10   have.

11           And then, again, they will have to answer your

12   questions about the salary from Mr. Jackson.  And I don't know

13   what else you have on your list of things that need to be

14   done.

15           MR. SHEARER:  Well, 3A, Mr. Eidelman continues to

16   insist that there is no ERISA claim, there is no short-term

17   disability claim, there's no long-term disability.

18           THE COURT:  That is correct.

19           MR. SHEARER:  That's absolutely correct.

20           But if you read the Voycheske affidavits, she's

21   taking information that MetLife collected for disability

22   insurance purposes and that's a completely different question.

23           Are you disabled for short-term disability is a

24   completely different question of do you have a serious health

25   condition?

47

1          And if she's going to rely upon the disability

2    insurance documentation and decisions by a third party to make

3    her own decision on the FMLA, we need to know what the

4    policies and procedures are, why they're collecting the

5    information for disability insurance that is being used to

6    make FMLA decisions?

7          THE COURT:  Can we agree to one thing?  Okay?  We

8    can agree that Ms. Voycheske was acting on information that

9    was filed by Mr. Barger.  Is that correct?

10          MR. SHEARER:  I would disagree with that.

11          THE COURT:  He didn't provide that information to

12   MetLife?

13          MR. SHEARER:  He said his surgery was on the 6th.

14   She said when was your last date working?  He says 9/4.  My

15   surgery was 9/6.

16          THE COURT:  Okay.  So that wasn't information that

17   your client provided?

18          MR. SHEARER:  I think you're -- I think we're

19   reading a lot more into -- Mr. Barger is being asked that on

20   January 5th.  At this point, he's told everybody he's coming

21   back to work.  And he gets his doctor's note on January 10th.

22          THE COURT:  Again, this is --

23          MR. SHEARER:  I don't think he was thinking about

24   disability.

25          THE COURT:  Mr. Shearer, this is your argument.

48

1    This is not whether or not we're going to produce any more

2    information.  This is your argument about what's already been

3    produced.  This is not whether or not we're going to have

4    another 30(b)(6) deposition.

5              MR. SHEARER:  I'll tell you.  I don't believe that

6    Ms. Voycheske got information from MetLife on January 5th.

7              THE COURT:  Why didn't you depose her?  You chose

8    not to.  Why didn't you depose her and ask her?  She has an

9    affidavit.

10             MR. SHEARER:  Because I want to depose her boss.

11             THE COURT:  That was your choice, and you are

12   entitled to your choices.

13             MR. SHEARER:  But her boss said that --

14             THE COURT:  But you're entitled to then complain

15   that you didn't get your shot at asking the questions you want

16   to ask.

17             MR. SHEARER:  But then her boss testified that Ms.

18   Voycheske does not take care of disability insurance benefits.

19   That's the benefits department.

20             THE COURT:  Because that's MetLife, isn't it?

21             MR. SHEARER:  It's there's a separate department

22   under a different vice president that handles the disability

23   insurance.  And Ms. Voycheske will help make sure the forms

24   are processed, but she's not responsible for the benefits

25   program, not responsible for negotiating it, not responsible

1      for the benefit administration agreement.

2              THE COURT:  So who is it that you were expecting

3      would testify?

4              MR. SHEARER:  I believe it would be -- Ms.

5      Pulvirenti (ph) I believe.

6              THE COURT:  No.  No.  I'm not talking about the

7      name.  Give me again the topic from 3 --

8              MR. SHEARER:  Someone in First Data's --

9              THE COURT:  Give me exactly what 3B says, please.

10             MR. SHEARER:  3A.

11             THE COURT:  3A.  I'm sorry.

12             MR. SHEARER:  "The processes that were available to

13     plaintiff to apply to receive First Data's disability

14     insurance benefits, the process through which plaintiff did

15     apply to receive First Data's insurance benefits, and the

16     terms of the disability insurance policies under which

17     plaintiff applied for benefits."

18             THE COURT:  And what is your position, Mr. Edelman?

19             MR. EIDELMAN:  My position is it's not a claim in

20     this case first of all, Judge.  There's no claim for short or

21     long-term disability benefits.

22             And the fact of the matter is the evidence is

23     undisputed that Mr. Barger was paid long-term disability

24     benefits even when he went back on First Data's payroll.  I

25     questioned him about that.

50

1              THE COURT:  I understand --

2              MR. EIDELMAN:  You understand that.  But my position

3     --

4              THE COURT:  -- in escrow with Mr. Shearer.

5              MR. EIDELMAN:  My position is as follows with regard

6     to this topic.  He made a decision.  He made that decision to

7     depose Ms. Voycheske's boss.  And of course she said for the

8     day-to-day handling of it this is what Ms. Voycheske did.

9              One of the things that's getting lost here a little

10    bit -- this whole thing with MetLife -- Mr. Barger told the

11    information to MetLife first.  That's how -- that's how -- and

12    then when he communicated to Ms. Voycheske that MetLife has

13    approved me going back to that date, he shared that with

14    MetLife.  That was about disability.

15             So our point here, Your Honor, is I think this is

16    all this throw as much against -- as I can against the wall

17    and see what I can get to stick.

18             We have spent tens of thousands, if it's not

19    hundreds of thousands, having to deal with this kind of stuff

20    in discovery in this case, Judge.

21             Your Honor, I've got at least 16 -- 16 different

22    individual deposition notices in this case that got set,

23    cancelled, set, cancelled.  That's over and above the 30(b)(6)

24    ones that got done.

25             So, Judge, our position is is that Mr. Barger had

1    the opportunity to take Ms. Voycheske's deposition.  It was

2    scheduled for July 23rd.  He cancelled it on July 20th and

3    said I want to go take Amy Steffen instead and that's what

4    happened.  So he should be bound to live by that decision.

5           He's had five depositions of human resources

6    professionals in this case; obin Orbin, Karen Whalen, Rhonda

7    Johnson, Tony Marino.  Oh, six.  Excuse me.  Amy Steffen and

8    Kathy Benhart.  That's six depositions of people assigned to

9    the human resources department.

10          And it's our position that he had an opportunity to

11   take Ms. Voycheske's deposition.  He chose not to based on a

12   mistaken belief that because she's not an officer, director,

13   whatever, she can't be deposed.

14          THE COURT:  Well, again, whether or not it was

15   mistaken or calculated, it doesn't much matter.  We're at the

16   end of discovery now.  We're not going to continue doing this.

17          And I find that you have taken the depositions that

18   you need.  And depositions are not a constitutional right.

19   It's not like we're in a criminal matter here.  It's a civil

20   matter.

21          And I am bound to make sure that the case proceeds.

22   And as I said, discovery is the greatest source of cost and

23   delay.  Both sides have had their opportunities.

24          If you were telling me other than getting the motion

25   to compel granted in part as to the request to admit for Mr.

52

1    Jackson, I am denying the remainder of your motion to compel.

2              Was there anything else that needed to be addressed

3    on behalf of Mr. Barger today?

4              MR. SHEARER:  No, Your Honor.

5              THE COURT:  Anything further that needed to be

6    addressed on behalf of First Data today?

7              MR. EIDELMAN:  Your Honor, I hesitate to advise

8    this, but I will let the Court know this is likely to come

9    before you -- but last week I received a Rule 11 letter and a

10   motion for sanctions because of my request for an extension of

11   discovery to take those depositions.  That was sent to me last

12   week.  I --

13             THE COURT:  I would urge you, Mr. Shearer, to

14   reconsider your position on that.  That would go to Judge

15   Block, and Judge Block is ultimately going to be hearing any

16   summary judgment, not me.

17             So, again, I can't tell you what to do and I'm not

18   trying to say that I know better, but extensions of time are

19   granted every day of the week in this courthouse.  If I didn't

20   have lawyers asking me to extend the deadlines, I don't know

21   that I would get through the day.

22             So if that is the reason why you are asking for Rule

23   11 sanctions, I would just urge you to reconsider your

24   position.

25             And with that, we are adjourned.  Thank you very

53

1      much.

2              MR. EIDELMAN:  Thank you, Your Honor.

3              MR. SHEARER:  Thank you.

4          (Proceedings concluded at 3:21 p.m.)

5              I, CHRISTINE FIORE, court-approved transcriber and

6      certified electronic reporter and transcriber, certify that

7      the foregoing is a correct transcript from the official

8      electronic sound recording of the proceedings in the above-

9      entitled matter.

10

11     *Christine Fiore*

12     _____          September 10, 2018

13         Christine Fiore, CERT

14

15

16

17

18

19

20

21

22

23

24