**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

---

STEVEN B. BARGER, an individual,            Civil Case No. 1:17-cv-04869-FB-LB

       Plaintiff,

v.

FIRST DATA CORPORATION, et al.,

       Defendants.

---

## DECLARATION OF GARY B. EIDELMAN

I, Gary B. Eidelman, an attorney at law, being of full age, hereby certifies as follows:

1.      I am a Partner of the law firm of Saul Ewing Arnstein & Lehr LLP, counsel for Defendants First Data Corporation, Frank Bisignano, Dan Charron, Anthony Marino, Karen Whalen, and Rhonda Johnson. As such, I am fully familiar with the facts stated herein, and make this declaration in support of Defendants' Opposition to Plaintiff's Rule 72(a) Objection (*see* ECF No. 64).

2.      Attached hereto as Exhibit A is a true and correct copy of the April 23, 2018 Notice of 30(b)(6) Deposition.

3.      Attached hereto as Exhibit B is a true and correct copy of Defendant First Data's letter dated April 30, 2018.

4.      Attached hereto as Exhibit C is a true and correct copy of the letter and Revised Notice of 30(b)(6) Deposition.

5.      Attached hereto as Exhibit D is a true and correct copy of the May 22, 2018 Notice of 30(b)(6) Deposition.

6.      Attached hereto as Exhibit E is a true and correct copy of the email and attachment dated May 24, 2018.

7.      Attached hereto as Exhibit F is a true and correct copy of the Transcript of Hearing dated September 4, 2018.

8.      Attached hereto as Exhibit G is a true and correct copy of the email dated July 2, 2018.

9.      Attached hereto as Exhibit H is a true and correct copy of excerpts of Defendant Johnson's deposition transcript.

10.     Attached hereto as Exhibit I is a true and correct copy of excerpts of Plaintiff's deposition transcript.

11.     Attached hereto as Exhibit J is a true and correct copy of the email dated July 20, 2018, titled "Barger v. First Data – Voycheske Deposition Postponement."

12.     Attached hereto as Exhibit K is a true and correct copy of the email dated August 1, 2018, titled "August 9 depositions."

13.     Attached hereto as Exhibit L is a true and correct copy of the letter from Shawn Shearer dated July 4, 2018.

14.     Attached hereto as Exhibit M is a true and correct copy of the email chain between counsel regarding deposition scheduling.

15.     I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

*/s/ Gary B. Eidelman*
Gary B. Eidelman

Dated:  September 27, 2018

# EXHIBIT A

Shawn E. Shearer (*Pro Hac Vice*)
The Law Office of Shawn Shearer, P.C.
3839 McKinney Avenue, Suite 155-254
Dallas, Texas 75204
Telephone (214) 434-1594
*shawn@shearerlaw.pro*

Attorneys for Plaintiff
Steven B. Barger

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEVEN B. BARGER, an individual<br><br>Plaintiff<br><br>v.<br><br>FIRST DATA CORPORATION, *et al.*<br><br>Defendants. | **Case No. 1:17-cv-4869** |

<u>**NOTICE OF RULE 30(b)(6) DEPOSITION**</u>

PLEASE TAKE NOTICE that pursuant to Rules 30(b)(6) of the Federal Rules of Civil

Procedure, the Plaintiff in the above-captioned case (the "Plaintiff") will take the oral deposition,

under oath, of the First Data Corporation ("First Data") through one or more officers, directors,

agents or other representatives who shall be designated to testify on First Data's behalf regarding

all information known or reasonably available to First Data with respect to the subject matters

identified in <u>Exhibit</u> A. Plaintiff requests that First Data provide written notice at least five (5)

business days before the deposition of the name(s) and employment position(s) of the

individual(s) designated to testify on First Data's behalf.

This deposition shall commence on June 13, 2018 Regus – One Glenlake Parkway, Suite

650 & 700, Atlanta, Georgia, 30328, or at such other time and location as agreed upon by the

parties, and shall be taken before a duly certified court reporter and notary public or other person

Notice of Deposition – First Data Corporation 30(b)(6)                    1

authorized by law to administer oaths. The deposition will be recorded by stenographic and video means.

Dated: April 23, 2018

THE LAW OFFICE OF SHAWN SHEARER, P.C.

Shawn Shearer (*Pro Hac Vice*)
3839 McKinney Avenue, Suite 155-254
Dallas, TX 75204
Tele: (214) 434-1594
*shawn@shearerlaw.pro*

Attorneys for Plaintiff

**EXHIBIT A**
**Barger v. First Data et al.**

## DEFINITIONS

As used below, the terms defined below have the following meanings:

1. "First Data" means First Data Corporation, and all its majority owned subsidiaries.

2. "Plaintiff" means Steven B. Barger, the plaintiff in this case.

3. "Complaint" means the Complaint and Supplemental Complaint filed by Plaintiff in this case.

4. "Answer" means the Answer the Complaint and the Answer to the Supplemental Complaint filed by any of the defendants in this case.

5. The terms "and" shall mean 'or" and "or" shall mean "and" as necessary to call for the broadest possible answer.

6. The term "any" shall also mean "all" and *vice versa*.

7. The term "concerning" or "relating" shall mean relating to, referring to, describing, evidencing, constituting, consisting of, discussing, containing, reflecting, mentioning, pertaining to, citing, summarizing, analyzing, or bearing any other logical or factual connection.

8. All of the following shall apply and are intended to bring within the scope of these requests any response that might otherwise be omitted. The use of a word in any tense shall be construed as the use of that word in all tenses. The singular includes the plural, and the plural includes the singular. The term "including" means "including but not limited to." The terms "and" and "or" encompass both "and" and "or" (thus, "and" or "or" means "and/or"). Words in the masculine, feminine or neuter form shall include all of the other genders as well.

## TOPICS

## TOPIC 1 –ACCOUNTING AND FINANCIAL DISCLOSURE

    (a) First Data's accounting (financial accounting, general ledger accounting, and tax accounting) policies and procedures, and the policies, and the procedure for documenting and auditing those accounting policies and procedures.

    (b) First Data's accounting processes and procedures (financial accounting, general ledger accounting, and tax accounting) for treatment of compensation for employment and benefits, such as hourly employee compensation, salaried employee compensation, paid-time-off ("PTO"), unpaid leave, paid leave, vacation pay, sick time, personal time, personal days, FMLA leave, all other types of leave arrangements, hourly-PTO, salaried PTO, and any alternative compensation  and benefit arrangements.

    (c) First Data's accounting (financial accounting, general ledger accounting, and tax accounting) for employees on payroll, receiving payment of short-term disability benefits, or receiving payment of long-term disability benefits, and any combination of the above, including a description of, and explanation of, the accounting treatment and meaning of the accounting technical terms used in First Data's document production to date (e.g. references to "SD6" in the context of disability payments, and other accounting coding references, terminology, and references used within First Data).

    (d) First Data's written and unwritten internal processes and procedures for preparing and filing First Data's financial reports and disclosures with the SEC (10-Q, 10-K, 8-K, 14A, S-1, S-3, S-8, Forms 3, 4 and 5, etc.), as well as the processes and procedures for obtaining auditors consent, audit committee approval, board approval, and signatures of required officers for those filings.

    (e) First Data's financial disclosures within its SEC filings, including without limitation, the accounting treatment and financial statement disclosure of reserves, cost controls, restructuring charges, and the 2018 fourth quarter tax treatment.

    (f) The preparation and disclosure process, and content of, the Management Discussion and Analysis section of First Data's 10-Qs and 10-Ks for the quarterly and annual periods during First Data fiscal years 2016, 2017, and 2018.

    (g) First Data's processes and procedures for receiving, processing, and addressing employee concerns and reports of accounting irregularities, including all audit committee for receiving and responding to employee or auditor accounting policy and implementation concerns and/or issues reported.

    (h) First Data's processes and procedures for the creation, amendment, and audit of its internal control policies and procedures.

(i) First Data's internal control policies and procedures for all technological systems used by First Data's human resources department, payroll, and its supporting functions, including without limitation the internal control policies and procedures for all mobile applications deployed to any First Data employee or contractor by First Data, the origin/designer/d of all mobile applications deployed, and all persons or entities receiving information collected or sent by those mobile applications.

(j) First Data's current internal controls and procedures applicable to employee and independent contractor compensation and benefits.

(k) First Data's accounting (financial accounting, general ledger accounting, and tax accounting) for all aspects of a "reduction-in-force", as that term is used in the Answer in this case, including without limitation all aspects of the differences in accounting treatment between terminations in a "reduction-in-force" and a termination outside of a "reduction-in-force", if any.

(l) First Data's methods, processes and systems for determining the number of employees of First Data at any given time.

(m) First Data's processes, procedures, documentation, delegation, resolutions, and grants of authority regarding employee and officer authority to expend corporate funds, commit the corporation to contracts, and to settle disputes regarding the business and litigation First Data.

## TOPIC 2 – INFORMATION TECHNOLOGY

(a) Functionality, access, and business purposes of all the information technology systems referred to within Defendants' document production, and and other systems involved in Plaintiff's scope of employment, including the Palantir technology utilized in products and services provided by First Data (e.g. Insightics, Insight, etc.), in other technology and systems sold and marketed by First Data, and within and included within the product offerings that employees trained by Plaintiff were tasked by First Data to sell. These systems, include, but are not limited to, GOOD, MSS, OOO, 1DC account, internal e-mail, systems used by the e-mail "loahelp", Palantir programs, apps, and systems, all cloud, internally hosted or externally hosted systems (including SAAS systems) for communications with MetLife regarding disability insurance benefits, systems used in all screen shots produced in the initial document production, Hagerstown Mainframe (North/South/Concord/BANA) and Denver Mainframe (SY1/EFTPS), PeopleSoft, VPN, and any other internally hosted, cloud hosted or SAAS systems utilized by First Data in its human resources, compensation, and accounting functions.

(b)  The functionality and data recording and retention capabilities of all mobile applications and programs, including Good and any Palantir based applications and programs, used by Plaintiff as part of First Data's employee mobile operating

functionality to access First Data's information systems (including third-party systems to which First Data has access or from which First Data receives data and information).

(c) First Data's social media content, connectivity, access, and internal controls and procedures (including any content, connectivity, access and internal controls for outsourced social media content editors, providers, crawlers, etc.).

(d) First Data's capabilities, procedures, implementation, and retention of information gathered from employee mobile devices, and/or applications used by employee mobile devices to access First Data's systems, including without limitation Good and VPN.

## TOPIC 3 – HUMAN RESOURCES AND EMPLOYEE BENEFITS

(a) First Data's disability insurance benefits, including the negotiation and execution of the operative documents for First Data's disability insurance benefits in place during the relevant periods of the current litigation.

(b) Term and conditions of all equity-based compensation plans and agreements relevant to the stock option and restricted stock awards by First Data to Plaintiff, and any other equity-based compensation plans and agreements in effect between January 2013 and February 2017.

(c) Terms and conditions of all of First Data's severance, separation, OWBPA, WARN, reduction-in-force, and any other similar employment termination plans, policies, agreements, and procedures in effect between January 2013 and present.

(d) First Data's plans, policies and procedures for the implementation and execution of any "reduction-in-force" (as that term is used in the Answer) during the period between January 2014 and present.

(e) First Data's plans, policies and procedures for the implementation and execution of the FMLA, ADA, other leave, terms and conditions of employment, and other relevant terms and conditions of employment included with the document production by First Data in this case.

(f) The circumstances and conditions under which First Data has provided any OWBPA disclosures between January 2014 and present.

(g) First Data's methods, processes and systems for determining the number of employees of First Data at any given time.

## TOPIC 4 – CORPORATE GOVERNANCE AND CORPORATE RECORDS

(a) General description of First Data's legal hold process including all details of that policy and specific steps that were taken in this case to implement a legal hold, including without limitation, the timing of issuing the legal hold and to whom it was issued, substance of the legal hold communication (if the communication is not considered privileged), process for tracking and follow-up with the legal hold sources to ensure understanding and compliance with the hold process, whether there are any auto-delete processes in place at First Data, and if so, whether there where and what steps were taken to disable them and when those steps were taken.

(b) First Data's process, procedure, documentation, and retention of information for the implementation of any "reduction-in-force", as that term is used in the Answer, during any time after January 1, 2015, including, without limitation, First Data's process, procedure and documentation of the decision to implement a "reduction-in-force", First Data's process, procedure, and documentation of any approvals by the board, committee of the board, management committee, human resources, and/or management to implement a "reduction-in-force", and the criteria used to select potential and actual individuals to be included in that "reduction-in-force"

(c) First Data's process, procedure, location, and responsibility for the maintenance of corporate governance records, including, without limitation, minutes of the board of directors, minutes of any committee of the board of directors, minutes of any committee of management or officers, maintenance of records regarding the implementation of any "reduction-in-force" (as used in the Answer), and any other official action (e.g. contracts) by an officer or agent of First Data related to governance records.

(d) First Data's processes, procedures, documentation, delegation, resolutions, and grants of authority regarding employee and officer authority to expend corporate funds, commit the corporation to contracts, and to settle disputes regarding the business and litigation First Data.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 23, 2018, I transmitted the attached document and a copy of the same to the following CM/ECF registrant via e-mail to each of their CM/ECF registered e-mail addresses:

>   Gary Eidelman
>   Saul Ewing Arnstein & Lehr
>   500 E. Pratt Street, Suite 900
>   Baltimore Maryland 21202-3133
>
>   Gillian Cooper
>   Saul Ewing Arnstein & Lehr
>   650 College Road East, Suite 400
>   Princeton, NJ 08540-6603
>
>   *Attorneys for Defendants*

/s/ Shawn Shearer_____

# EXHIBIT B



Gary B. Eidelman

Phone: (410) 332-8975

Fax: (410) 332-8976

Gary.Eidelman@saul.com

www.saul.com

April 30, 2018

### THE PURPOSE OF THIS LETTER IS TO RESOLVE A DISCOVERY DISPUTE UNDER FED. R. CIV. P. 20(C) AND LOCAL RULE 26.5

**Via Electronic and First Class Mail**

Shawn E. Shearer, Esquire
The Law Office of Shawn Shearer, P.C.
3839 McKinney Avenue, Suite 155-254
Dallas, TX 75204

      **Re:** ***Steven B. Barger v. First Data Corporation et al.***
           **Civil Case No. 1:17-cv-4869**

Dear Shawn:

      This letter acknowledges receipt of the Notice of Rule 30(b)(6) Depositions ("Notice") and accompanying cover e-mail dated April 23, 2018.[1] Before addressing each of the topics you have identified in the Notice, we must first take note of language contained in your April 23, 2018 email in which you wrote:

> With regard to your commentary as to the review of the 30(b)(6) topics, you know that the standard to be applied is not relevance.

Not only is your statement wrong, but it also demonstrates a fundamental misunderstanding about the purpose of discovery under the Federal Rules of Civil Procedure. Relevancy has and always will be the cornerstone of discovery. The 2015 amendments to the

---

[1] We presume that you selected June 13, 2018 as a deposition date in Atlanta as a placeholder. Be advised that we are not available on that date, but once we come to an agreement on the topics that are relevant for a 30(b)(6) witness(es), we will work with you to schedule depositions at mutually agreeable dates, times and locations as we have done so far with respect to the upcoming depositions of Frank Bisignano, Josh King, Robin Ording, Karen Whalen and Tony Marino. As set forth below, we have also identified Jennifer Voycheske, Amy Steffen and Stephanie Pulverenti as fact and 30(b)(6) witnesses who have relevant knowledge and information, all of whom are in Omaha. Unfortunately, their scheduled depositions in late March needed to be postponed due to my mother in law's death and funeral, but they remain available to be deposed.

500 E. Pratt Street ⚬ Suite 900 ⚬ Baltimore, MD 21202-3133

Phone: (410) 332-8600 ⚬ Fax: (410) 332-8862

DELAWARE  FLORIDA  ILLINOIS  MARYLAND  MASSACHUSETTS  NEW JERSEY  NEW YORK  PENNSYLVANIA  WASHINGTON, DC

A DELAWARE LIMITED LIABILITY PARTNERSHIP

Shawn E. Shearer, Esq.
April 30, 2018
Page 2

Federal Rules have made this even more abundantly clear with the inclusion of proportionality as a key element of all discovery.

This case is not a securities class action or a shareholders' derivative suit, nor does it involve a mass data breach, or a class or collective action under wage and hour laws, which is what even the most cursory of reviews of the topics contained in the Notice would suggest it is. Rather, in his Complaint and Supplemental Complaint, Plaintiff Steven Barger has set forth two causes of action creating the following legal issues: (i) did First Data and the individual Defendants interfere with his rights under the Family and Medical Leave Act by not reinstating his employment; (ii) did First Data and the individual Defendants retaliate against Barger for exercising his FMLA rights; and (iii) did First Data fail to accommodate Barger's disability under the Americans with Disabilities Act. First Data and the individual Defendants deny these allegations and assert that Barger's employment was terminated for legitimate business reasons by being including in a reduction in force as part of a company-wide reorganization. These are the issues for which discovery is appropriate.

It seems evident that Plaintiff seeks to use discovery in this case for purposes that have nothing to do with his claims under the FMLA and ADA. This is illustrated by your April 20, 2018 email which makes reference to a recent article in Bloomberg. In that email you wrote:

> When three First Data executives, Bisignano (CEO), Chiarello (President) and Cavicchia (SVP) are all mentioned in connection with a Peter Theil software enterprise that monitors employee communications, and related to Zuckerberg, Musk and privacy invasions, and Mr. Bisignano is implicated as a leak of JP Morgan Chase information to the New York Times while he was CEO of First Data, all of the information regarding the systems included in your document production as relevant the Plaintiff and his employment are very relevant issues to be addressed as part of Plaintiff's discovery. This is in addition to the fact that First Data is a data collection and aggregation company that, as part of its business model, aggregates transaction information and sells it as part of its business. As you know, Judge Block is currently serving on the 9th Circuit, where any actions against Theil, Zuckerberg, or Musk may be brought. I think he will be interested in this issue.

Nothing in the article you mention has any relevance to Barger's claims that he was discharged for being sick. It appears that your reference to the article is a desperate effort to create some nexus to depose Pete Cavicchia, a First Data executive, who has nothing to do with this case. For that reason, we reject your threat from one of your latest emails that "Mr. Cavicchia [mentioned in the article] will be deposed, whether or not it is as a 30(b)(6) designee." For the record, the Rules do not allow the Plaintiff to determine who will serve as First Data's corporate witnesses.

We have been cooperating and will continue to cooperate and provide discovery. For those topics that are relevant to Barger's claims under the FMLA and ADA, we have and will designate 30(b)(6) witnesses to testify as to each of the topics. However, the Notice is replete

Shawn E. Shearer, Esq.
April 30, 2018
Page 3

with topics that have nothing to do with this case. It is this lack of relevancy that forms the basis of our client's objections to many of the topics in the Notice.

### A.    Legal Standards for Rule 30(b)(6) Topics

Rule 30(b)(6) permits a notice of deposition to be directed to an organization. The party seeking the deposition must serve a notice of deposition that describes "with ***reasonable particularity*** the matters for examination." (emphasis added). Under this standard, the topics contained in the notice must not be overbroad. *See Eng-Hatcher v. Sprint Nextel Corp.*, 2008 WL 4104015, at *4 (S.D.N.Y. Aug. 28, 2008) ("[A]n overly broad Fed.R.Civ.P. 30(b)(6) notice subjects the noticed party to an impossible task, because, where it is not possible to identify the outer limits of the areas of inquiry noticed, compliant designation is not feasible."). Instead, the topics noticed must be specific as to subject area and have discernible boundaries, which means that topics must be explicitly stated. *Uni-Sys., LLC v. U.S. Tennis Ass'n*, 2017 WL 4081904, at *4 (E.D.N.Y. Sept. 13, 2017) ("[G]eneric descriptions of categories are insufficient to provide defendants with information sufficient to satisfy the 'reasonable particularity' standard.").

"A Rule 30(b)(6) deposition notice, like other forms of discovery, is subject to the limitations under Rule 26 of the Federal Rules of Civil Procedure." *City of New York v. Fedex Ground Package Sys., Inc.*, 2016 WL 1718261, at *5 (S.D.N.Y. Apr. 27, 2016). Despite that the rules of discovery are intended to be given a broad and liberal construction, the rules do not permit discovery of matters that are not relevant to the issues in the case. *Estee Lauder, Inc. v. Fragrance Counter, Inc.*, 189 F.R.D. 269, 274 (S.D.N.Y. 1999).

Rule 30(b)(6) topics, as constrained by Rule 26, must be tailored to the claims and defenses at issue in the case. Rule 26(b)(1) dictates the scope of discovery:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Under Rule 26(b)(1), information is discoverable "if it is relevant to any party's claim or defense and is proportional to the needs of the case." *N. Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*, 2018 WL 1515711, at *9 (E.D.N.Y. Mar. 28, 2018) (citing Rule 26 Advisory Committee Notes to 2015 Amendments).

Under this standard, "[t]he party seeking discovery must make a *prima facie* showing that the discovery sought is more than merely a fishing expedition." *Barbara v. MarineMax, Inc.*, 2013 WL 1952308, at *2 (E.D.N.Y. May 10, 2013). Before the objecting party is required to advance reasons to dispute relevancy, the requesting party must make the initial showing of why

Shawn E. Shearer, Esq.
April 30, 2018
Page 4

the information sought is relevant in the first place. *Winfield v. City of New York*, 2018 WL 716013, at *4 (S.D.N.Y. Feb. 1, 2018) ("The party seeking discovery bears the initial burden of proving the discovery is relevant, and then the party withholding discovery on the grounds of burden, expense, privilege, or work product bears the burden of proving the discovery is in fact privileged or work product, unduly burdensome and/or expensive.").

The Federal Rules also dictate that relevant information sought must be proportional to the needs of the case. Proportionality and relevancy are intertwined topics that work on a sliding scale, meaning that "the greater the relevance of the information in issue, the less likely its discovery will be found to be disproportionate." *Vaigasi*, 2016 WL 616386, at *14. Even where discovery sought is relevant, the proportionality test requires that the request be tailored to the FMLA and ADA claims at issue in the instant litigation. *N. Shore-Long Island,* 2018 WL 1515711, at *1. *Liberty Mut. Fire Ins. Co. v. J.&S. Supply Corp.*, 2015 WL 13649824, at *5 (S.D.N.Y. June 29, 2015).

This letter, which is intended to resolve a discovery dispute, in part identifies those topics we contend lack the requisite relevancy to Barger's FMLA and ADA claims. The letter also identifies the witnesses who you can question as to topics that are relevant. We invite Plaintiff to carry his burden of demonstrating that the disputed topics are relevant and are not being interposed for an improper purpose.

### B.    Responses and Objections to Plaintiff's Proposed Rule 30(b)(6) Topics

The Notice contains 28 separate topics broken down by category: Topic 1 (Accounting and Financial Disclosure): Topic 2 (Information Technology); Topic 3 (Human Resources and Employee Benefits); and Topic 4 (Corporate Governance and Corporate Records). We will discuss each category in turn.

### Topic 1 -Accounting And Financial Disclosure

(a)      *First Data's accounting (financial accounting, general ledger accounting, and tax accounting) policies and procedures, and the policies, and the procedure for documenting and auditing those accounting policies and procedures.*

**Objection to Topic 1(a)**: Defendant objects to Topic 1(a) because First Data's overall accounting, general ledger, tax accounting policies and procedures, and the auditing of those policies and procedures are not relevant or proportional to Barger's individualized claims for wrongful termination under the FMLA and ADA. First Data will provide witnesses who can testify as to the economics of Barger's employment and his inclusion in the reorganization.

With respect to this topic and others below, the following facts are undisputed. Throughout his employment, Barger was an at-will employee. His offer letter provided for a starting annual base salary of $480,000 and incentive compensation of $250,000. In December of 2016, First Data paid Barger an incentive bonus in cash of $174,000 while he was on leave, even though bonuses are not typically paid until the following February. This was the same bonus

Shawn E. Shearer, Esq.
April 30, 2018
Page 5

amount he had been paid for 2015 even though the bonus pool was 5% less. There was no provision in his offer letter for severance.

First Data has and will continue to produce documents demonstrating that Barger was included in a cost-saving reorganization of the Company beginning in 2017 which impacted close to 350 mid- to high-level employees. The documents provide supporting details on the approximately $44 million in projected annual compensation and fringe benefit savings to be achieved from the termination of the group of employees, including Barger. The documents also provide information on the one-time costs for severance that the Company was projected to incur from the millions of dollars set aside to pay severance to the employees, including Barger. First Data has also produced documents which show that an existing employee, Robin Ording, assumed the leadership of the Sales Transformation Group, while continuing her other duties and responsibilities. Sales Transformation is the group that had been led by Barger. These documents also detail the cost-saving measures undertaken by Ording, which led to a reduction of over $2 million in North America payroll expense for 2017.

First Data's accounting and audit procedures are not relevant to the claims or defenses in this action and are not proportional to the needs of the case. Without waiving its objections, if Barger has questions about the compensation and benefits saved by the reorganization that may be relevant to his individualized claims of discrimination, he will have the opportunity to question CEO Frank Bisignano and EVP Tony Marino, both of whom were intimately involved in the process. To the extent that testimony on this topic arises in one of the already-scheduled or to-be-scheduled depositions, Defendant may stipulate to that portion of the testimony as being provided under Rule 30(b)(6).

(b)     *First Data's accounting processes and procedures (financial accounting, general ledger accounting, and tax accounting) for treatment of compensation for employment and benefits, such as hourly employee compensation, salaried employee compensation, paid-time-off ("PTO"), unpaid leave, paid leave, vacation pay, sick time, personal time, personal days, FMLA leave, all other types of leave arrangements, hourly-PTO, salaried PTO, and any alternative compensation and benefit arrangements.*

**Objection to Topic 1(b)**: Defendant incorporates by reference its Objection to Topic 1(a). By way of further objection, First Data's overall accounting practices and policies regarding compensation, benefits, and various forms of leave for exempt and non-exempt employees are not at issue in this case and have nothing to do with Plaintiff's FMLA and ADA claims for wrongful discharge. Without waiving its objections, if Plaintiff has questions regarding his compensation and benefits, including his FMLA, ADA, STD and LTD leaves of absence, First Data has already identified three fact and 30(b)(6) witnesses (Jennifer Voycheske, Amy Steffen and Stephanie Pulverenti) who have specific knowledge of and are available to testify to First Data's leave and benefits policies as regards to Barger. To the extent that testimony on this topic arises in one of the already-scheduled or to-be-scheduled depositions, Defendant may stipulate to that portion of the testimony as being provided under Rule 30(b)(6).

(c)     *First Data's accounting (financial accounting, general ledger accounting, and tax*

Shawn E. Shearer, Esq.
April 30, 2018
Page 6

*accounting) for employees on payroll, receiving payment of short-term disability benefits, or receiving payment of long-term disability benefits, and any combination of the above, including a description of, and explanation of, the accounting treatment and meaning of the accounting technical terms used in First Data's document production to date (e.g. references to "SD6" in the context of disability payments, and other accounting coding references, terminology, and references used within First Data).*

**Objection to Topic 1(c)**: Defendant incorporates by reference its Objection to Topic 1(b). By way of further objection, there are no allegations in the Complaint or Supplemental Complaint that Plaintiff was not paid short-term disability or long-term disability. Without waiving its objections, First Data has produced documents regarding these leave policies and correspondence demonstrating efforts by First Data employees to provide advice and support to Barger and his wife in connection with his application for leave benefits. Jennifer Voycheske, Amy Steffen and Stephanie Pulverenti can provide testimony to Barger if he has any questions regarding his leave. To the extent that testimony on this topic arises in one of the already-scheduled or to-be-scheduled depositions, Defendant may stipulate to that portion of the testimony as being provided under Rule 30(b)(6).

(d)      *First Data's written and unwritten internal processes and procedures for preparing and filing First Data's financial reports and disclosures with the SEC (10-Q, 10-K, 8-K, 14A, S-1, S-3, S-8, Forms 3, 4 and 5, etc.), as well as the processes and procedures for obtaining auditors consent, audit committee approval, board approval, and signatures of required officers for those filings.*

**Objection to Topic 1(d)**: Defendant objects to Topic 1(d) as lacking relevancy. As noted above, the individual employment discrimination claims in this case do not implicate federal securities laws or relate in any way to filings with federal regulatory agencies. This is a single plaintiff employment discrimination case and the damages Barger seeks are not material for purposes of federal securities laws. Defendant further objects to Topic 1(d) as failing to state with particularity the information being sought.[2]

(e)      *First Data's financial disclosures within its SEC filings, including without limitation, the accounting treatment and financial statement disclosure of reserves, cost controls, restructuring charges, and the 2018 fourth quarter tax treatment.*

**Objection to Topic 1(e)**: Defendant incorporates by reference its Objection to Topic 1(d). Plaintiff also seeks information on the fourth quarter of 2018 which does not exist. Defendant further objects to Topic 1(e) as failing to state with particularity the information being

---

[2] This topic is also vague because it is unclear what the requested designee should be prepared to speak about. This topic does not conform to the Rule 30(b)(6) "reasonable particularity" requirement. *Uni-Sys., LLC v. U.S. Tennis Ass'n*, 2017 WL 4081904, at *4 (E.D.N.Y. Sept. 13, 2017) ("[G]eneric descriptions of categories are insufficient to provide defendants with information sufficient to satisfy the 'reasonable particularity' standard."); *see also Eng-Hatcher v. Sprint Nextel Corp.*, 2008 WL 4104015, at *4 (S.D.N.Y. Aug. 28, 2008) ("[A]n overly broad Fed.R.Civ.P. 30(b)(6) notice subjects the noticed party to an impossible task, because, where it is not possible to identify the outer limits of the areas of inquiry noticed, compliant designation is not feasible.").

Shawn E. Shearer, Esq.
April 30, 2018
Page 7

sought. *See* fn.2.

(f)　　*The preparation and disclosure process, and content of, the Management Discussion and Analysis section of First Data's 10-Qs and 10-Ks for the quarterly and annual periods during First Data fiscal years 2016, 2017, and 2018.*

**Objection to Topic 1(f)**: Defendant incorporates by reference its Objection to Topics 1(d) & 1(e). If Plaintiff has any questions regarding references to the reorganization stated in the 10-Q for Q1 filed in May 2017 and the 10-Q for Q2 filed in August 2017, he will have the opportunity to question CEO Frank Bisignano at his deposition.

(g)　　*First Data's processes and procedures for receiving, processing, and addressing employee concerns and reports of accounting irregularities, including all audit committee for receiving and responding to employee or auditor accounting policy and implementation concerns and/or issues reported.*

**Objection to Topic 1(g)**: Defendant objects to Topic 1(g) as not relevant or proportional to the claims for discrimination or the defenses in this case. There are no allegations in the Complaint or Supplemental Complaint that Barger raised concerns or reported any accounting irregularities in connection with his employment. First Data's procedures for handling accounting irregularities are not an issue in this discrimination case. Defendant further objects to Topic 1(g) as failing to state with particularity the information being sought. *See* fn.2.

(h)　　*First Data's processes and procedures for the creation, amendment, and audit of its internal control policies and procedures.*

**Objection to Topic 1(h)**: Defendant objects to Topic 1(h) as not relevant or proportional to the claims for discrimination or the defenses in this case. There are no allegations in the Complaint or Supplemental Complaint that Barger raised concerns regarding First Data's internal controls, which are not an issue in this discrimination case. Defendant further objects to Topic 1(h) as failing to state with particularity the information being sought. *See* fn.2.

(i)　　*First Data's internal control policies and procedures for all technological systems used by First Data's human resources department, payroll, and its supporting functions, including without limitation the internal control policies and procedures for all mobile applications deployed to any First Data employee or contractor by First Data, the origin/designer/d of all mobile applications deployed, and all persons or entities receiving information collected or sent by those mobile applications.*

**Objection to Topic 1(i)**: Defendant objects to Topic 1(i) as not relevant or proportional to the claims for discrimination or the defenses in this case. There are no allegations in the Complaint or Supplemental Complaint that issues regarding the technological systems used by First Data's human resources department or anything connected to the mobile applications deployed to any First Data employee or contractor by First Data, have anything to do with Barger's claims that he was discriminated against in violation of the FMLA and ADA.

Shawn E. Shearer, Esq.
April 30, 2018
Page 8

Defendant further objects to Topic 1(i) as failing to state with particularity the information being sought. *See* fn.2.

Without waiving its objections, First Data has identified witnesses in Omaha who are prepared to testify as the human resources systems involved in the administration of his FMLA leave. To the extent Barger is trying to raise an issue with regard to his connectivity with First Data while he was on leave, First Data will stipulate that until November 22, 2016, Barger had mobile connectivity and was able to communicate with First Data employees through his First Data email account and that he sent and received email from First Data. First Data will also stipulate that on or about November 22, 2016, Barger's connectivity was disconnected due to his medical leave. After November 22, 2016, Barger communicated with First Data employees via his personal email account and via text messages. Barger can question Tony Marino, Karen Whalen and Rhonda Barger regarding the disabling of his access. To the extent that testimony on this topic arises in one of the already-scheduled or to-be-scheduled depositions, Defendant may stipulate to that portion of the testimony as being provided under Rule 30(b)(6).

     (j)     *First Data's current internal controls and procedures applicable to employee and independent contractor compensation and benefits.*

**Objection to Topic 1(j)**: Defendant objects to Topic 1(j) as vague, ambiguous and without meaning. Defendant further objects on the grounds that the information sought is not relevant to the claims or defenses at issue in this case because there are no allegations in the Complaint or Supplemental Complaint that Defendant was not properly compensated during his employment or that he did not receive the benefits to which he was entitled. Defendant further states that Barger was an employee so any discovery regarding independent contractors is nonsensical. Defendant further objects to Topic 1(j) as failing to state with particularity the information being sought. *See* fn.2.

Without waiving its objections, First Data identifies Tony Marino, Karen Whalen, Rhonda Johnson, Jennifer Voycheske, Amy Steffen and Stephanie Pulverenti as witnesses who can testify as to Barger's compensation and benefits. To the extent that testimony on this topic arises in one of the already-scheduled or to-be-scheduled depositions, Defendant may stipulate to that portion of the testimony as being provided under Rule 30(b)(6).

     (k) *First Data's accounting (financial accounting, general ledger accounting, and tax accounting) for all aspects of a "reduction-in-force", as that term is used in the Answer in this case, including without limitation all aspects of the differences in accounting treatment between terminations in a "reduction-in-force" and a termination outside of a "reduction-in-force", if any.*

**Objection to Topic 1(k):** Defendant incorporates by reference its Objections to Topics 1(a) & 1(b). Defendant further objects to Topic 1(k) as failing to state with particularity the information being sought. *See* fn.2.

     (l)     *First Data's methods, processes and systems for determining the number of*

Shawn E. Shearer, Esq.
April 30, 2018
Page 9

*employees of First Data at any given time.*

**Objection to Topic 1(l):** Defendant objects to Topic 1(l) to the extent it is required to produce a witness to testify as to the methods, processes, and systems it uses to determine the number of its employees and further objects on the grounds that First Data's method for counting employees is not relevant to Barger's claims.

Without waiving this objection, Defendant is producing First Data employees as witnesses, including the CEO and the EVP of Human Resources, who can testify as to the number of First Data employees. This information is also published in the Company's annual report. To the extent that Plaintiff seeks this information to satisfy the jurisdictional requirements of the FMLA and the ADA, First Data will stipulate that it employs the requisite number of employees to be considered an employer for purposes of these statutes.

(m)   *First Data's processes, procedures, documentation, delegation, resolutions, and grants of authority regarding employee and officer authority to expend corporate funds, commit the corporation to contracts, and to settle disputes regarding the business and litigation First Data.*

**Objection to Topic 1(m).** Defendant objects to Topic 1(m) on the grounds that corporate authority is not at issue in this case. Without waiving its objection, Plaintiff is deposing Frank Bisignano, First Data's CEO, so he can ask him questions about authority to pay Barger his full bonus in 2016, to include him in the reorganization, or to offer him a generous severance package.

### Topic 2 - Information Technology

(a)   *Functionality, access, and business purposes of all the information technology systems referred to within Defendants' document production, and other systems involved in Plaintiff's scope of employment, including the Palantir technology utilized in products and services provided by First Data (e.g. Insightics, Insight, etc.), in other technology and systems sold and marketed by First Data, and within and included within the product offerings that employees trained by Plaintiff were tasked by First Data to sell. These systems, include, but are not limited to, GOOD, MSS, OOO, 1DC account, internal e-mail, systems used by the e-mail "loahelp", Palantir programs, apps, and systems, all cloud, internally hosted or externally hosted systems (including SAAS systems) for communications with MetLife regarding disability insurance benefits, systems used in all screen shots produced in the initial document production, Hagerstown Mainframe (North/South/Concord/BANA) and Denver Mainframe (SY1/EFTPS), PeopleSoft, VPN, and any other internally hosted, cloud hosted or SAAS systems utilized by First Data in its human resources, compensation, and accounting functions.*

**Objection to Topic 2(a)**: Defendant objects to Topic 2(a) because its information and technology systems are not at issue in this case in which Barger is claiming that he was wrongfully terminated in violation of the FMLA and ADA. Defendant further objects on the grounds that to the extent there is a shred of relevancy, this topic is not stated with reasonable

Shawn E. Shearer, Esq.
April 30, 2018
Page 10

particularity. In *Winfield v. City of New York*, 2018 WL 840085, at *4 (S.D.N.Y. Feb. 12, 2018), the court observed that depositions regarding data systems are generally conducted for two primary reasons:

> (1) to learn about where and how ESI is created or obtained, accessed, stored, maintained, backed up and preserved, and/or destroyed; and (2) to learn about specific software programs and data that may or will be analyzed by experts, including sources of data, completeness of data, validity of data, meaning of various data fields and categories, reporting capabilities, and other technical details about the data. They serve to aid discovery and the search for relevant information and/or provide an explanation of data produced and authentication of ESI.

*Id.* at 5. At best, only Number 1 above has any possible connection with this case.

The "reasonable particularity" standard requires the 30(b)(6) topics to be specific as to subject area and have discernible boundaries, which means that topics must be explicitly stated. *Uni-Sys., LLC v. U.S. Tennis Ass'n*, 2017 WL 4081904, at *4 (E.D.N.Y. Sept. 13, 2017) ("[G]eneric descriptions of categories are insufficient to provide defendants with information sufficient to satisfy the 'reasonable particularity' standard."). The topics should also be substantively and temporally relevant to the claims or defenses, given that 30(b)(6) notices are still "subject to the limitations under Rule 26 of the Federal Rules of Civil Procedure." *City of New York v. Fedex Ground Package Sys., Inc.*, 2016 WL 1718261, at *5 (S.D.N.Y. Apr. 27, 2016). In cases like this one, where the proposed topics seem to concern "discovery on discovery" and/or complex data, "even greater specificity is required to ensure that the witness can prepare for the deposition, that the deposition is productive, and that the parties' time is not wasted on topics that do not relate to core claims or defenses." *Winfield,* 2018 WL 840085, at *5.

Addressing the important interests in specificity for 30(b)(6) topics, the *Winfield* court determined that the following three factors should be considered to determine whether a notice satisfies the specificity requirement:

(1)    the nature of the topics;

(2)    whether the descriptions of the topics include examples of questions and clarifying information such as references to specific named policies, documents, incidents, and the like; and

(3)    whether a reasonable person reading the notice would understand how to prepare for the deposition.

*Id.* The court went on the state that in the data systems context, a number of other factors are considered to determine if the notice complies with the reasonable particularity standard:

(1)    the number of data systems identified in the notice;

Shawn E. Shearer, Esq.
April 30, 2018
Page 11

       (2)     the level of specificity required about each system;

       (3)     the number of witnesses needed to respond to the topics identified in the notice;

       (4)     the costs and burden on the corporate party to adequately prepare the witnesses; and

       (5)     the availability of other methods to obtain all or some of the information sought that might be less burdensome or costly, particularly in light of the number of topics and witnesses required by the notice.

*Id.* at *6.

No reasonable person(s) could adequately prepare for a 30(b)(6) deposition(s) for Topic 2(a), particularly when I previously advised you that much of what you have listed are not systems, but either a reference to emails or components of a data network. *See N. Shore-Long Island,* 2018 WL 1515711, at *11 ("Where the breadth and volume of the data requested is potentially vast, proportionality principles require tailoring production to the subject matter of the litigation and the parties involved.").[3]

Without waiving its objections, First Data can produce a witness to testify regarding how email is maintained and secured at First Data if that is what you are really seeking. Please advise if you would like us to identify a 30(b)(6) witness for this purpose. If there is other specific information regarding First Data's information technology systems or data network that is relevant to Barger's claims of discrimination, I invite you to amend Topic 2(a) with the requisite specificity.

      (b)  *The functionality and data recording and retention capabilities of all mobile applications and programs, including Good and any Palantir based applications and programs, used by Plaintiff as part of First Data's employee mobile operating functionality to access First Data's information systems (including third-party systems to which First Data has access or from which First Data receives data and information).*

**Objection to Topic 2(b)**: Defendant incorporates by reference its Objections to Topics 1(i) and 2(a).

      (c)    *First Data's social media content, connectivity, access, and internal controls and procedures (including any content, connectivity, access and internal controls for outsourced social media content editors, providers, crawlers, etc.).*

**Objection to Topic 2(c)**: Defendant incorporates by reference its Objections to Topic 2(a). Without waiving its objection, First Data will produce a witness in New York to testify as

---

[3] Topic 2(a) also requests a corporate designee to discuss "the Palantir technology utilized in products and services provided by First Data." This topic request is apparently based on your April 20, 2018 email, where you made reference to Judge Block's purported interest in Palantir, something that has nothing to do with Barger's case.

Shawn E. Shearer, Esq.
April 30, 2018
Page 12

to the use of its social media for recruiting. To the extent that testimony on this topic arises in one of the already-scheduled or to-be-scheduled depositions, Defendant may stipulate to that portion of the testimony as being provided under Rule 30(b)(6).

(d)     *First Data's capabilities, procedures, implementation, and retention of information gathered from employee mobile devices, and/or applications used by employee mobile devices to access First Data's systems, including without limitation Good and VPN.*

**Objection to Topic 2(d)**: Defendant incorporates by reference its Objections to Topics 1(i), 2(a) & 2(b).

**Topic 3 - Human Resources And Employee Benefits**

(a)     *First Data's disability insurance benefits, including the negotiation and execution of the operative documents for First Data's disability insurance benefits in place during the relevant periods of the current litigation.*

**Objection to Topic 3(a)**: Defendant objects to Topic 3(a) on the grounds that the information sought is not relevant to the claims in this case. There is no claim in this case under ERISA for denial of benefits under First Data's disability insurance programs. There is also absolutely no connection between First Data's negotiation of its long term insurance contracts and Barger's claims. Without waiving its objections, First Data has produced the summary plan description for its benefits programs and has identified Jennifer Voycheske, Amy Steffen, and Stephanie Pulverenti who can respond to questions as to Barger's entitlement to short term and long term disability benefits. To the extent that testimony on this topic arises in one of the already-scheduled or to-be-scheduled depositions, Defendant may stipulate to that portion of the testimony as being provided under Rule 30(b)(6).

(b)     *Term and conditions of all equity-based compensation plans and agreements relevant to the stock option and restricted stock awards by First Data to Plaintiff, and any other equity-based compensation plans and agreements in effect between January 2013 and February 2017.*

**Objection to Topic 2(b)**: Defendant objects to Topic 2(b) as irrelevant to the claims at issue in this case to extent that it seeks testimony on "any equity-based agreements in effect between January 2013 and February 2017" that do not involve Barger, who did not become a First Data employee until June 2014. Without waiving its objections, First Data has produced documents relating to Barger's stock options and restricted stock awards and will produce a witness at a time, date, and location to be determined to answer questions about the terms and conditions of Barger's awards.

(c)     *Terms and conditions of all of First Data's severance, separation, OWBPA, WARN, reduction-in-force, and any other similar employment termination plans, policies, agreements, and procedures in effect between January 2013 and present.*

Shawn E. Shearer, Esq.
April 30, 2018
Page 13

**Objection to Topic 2(c)**: Defendant objects to Topic 2(c) as being not relevant or proportional to the claims in this single plaintiff employment discrimination lawsuit. Defendant further objects on the grounds that there are no claims in this case under the Older Workers Benefit Protection Act or the Worker Adjustment Retraining and Notification Act. Defendant further objects to this request to the extent it seeks information outside the time frame of the issues in Barger's Complaint and Supplemental Complaint -- September 2016 – March 2017.

Without waiving its objections, First Data has produced the severance agreement that was presented to Barger on January 13, 2017, and has also produced documents regarding the reorganization that included him at that time. Plaintiff can question numerous witnesses about the terms and conditions of his severance agreement and the reduction in force including Tony Marino, Karen Whalen, and Rhonda Johnson, all of whom were in the Human Resources Department at the time of his termination. To the extent that testimony on this topic arises in one of the already-scheduled or to-be-scheduled depositions, Defendant may stipulate to that portion of the testimony as being provided under Rule 30(b)(6).

(d)     *First Data's plans, policies and procedures for the implementation and execution of any "reduction-in-force" (as that term is used in the Answer) during the period between January 2014 and present.*

**Objection to Topic 3(d)**: Defendant objects to Topic 3(d) to the extent it seeks discovery on any reduction in force not involving Barger as being irrelevant to the individualized claims in this FMLA and ADA case. Without waiving its objections, First Data has produced numerous documents regarding the reduction in force that included Barger. Barger can question the individual Defendants regarding the subject reduction in force. To the extent that testimony on this topic arises in one of the already-scheduled or to-be-scheduled depositions, Defendant may stipulate to that portion of the testimony as being provided under Rule 30(b)(6).

(e)     *First Data's plans, policies and procedures for the implementation and execution of the FMLA, ADA, other leave, terms and conditions of employment, and other relevant terms and conditions of employment included with the document production by First Data in this case.*

**Response to Topic 3(e)**: Defendant has already identified Jennifer Voycheske, Amy Steffen, and Stephanie Pulverenti as fact and 30(b)(6) witnesses who can testify as to Barger's FMLA and ADA leave. Barger can also question Tony Marino, Karen Whalen, and Rhonda Johnson as to the other terms and conditions of his employment. To the extent that testimony on this topic arises in one of the already-scheduled or to-be-scheduled depositions, Defendant may stipulate to that portion of the testimony as being provided under Rule 30(b)(6).

(f)     *The circumstances and conditions under which First Data has provided any OWBPA disclosures between January 2014 and present.*

**Objections to Topic 3(f)**: Defendant objects to Topic 3(f) as not being relevant to the claims in this case. Plaintiff has not sued First Data for age discrimination so the OWBPA is not relevant to any claims or defenses. Defendant further objects to the temporal scope of this topic

Shawn E. Shearer, Esq.
April 30, 2018
Page 14

as being overly broad and burdensome, not proportional to the needs of this case and seeks information outside the time frame of the issues in Barger's Complaint and Supplemental Complaint -- September 2016 – March 2017.

(g)    *First Data's methods, processes and systems for determining the number of employees of First Data at any given time.*

**Objections to Topic 3(f)**: Topic 3(f) is identical to Topic 1(l). Defendant incorporates by reference its Objection to Topic 1(l).

### Topic 4 - Corporate Governance And Corporate Records

(a)    *General description of First Data's legal hold process including all details of that policy and specific steps that were taken in this case to implement a legal hold, including without limitation, the timing of issuing the legal hold and to whom it was issued, substance of the legal hold communication (if the communication is not considered privileged), process for tracking and follow-up with the legal hold sources to ensure understanding and compliance with the hold process, whether there are any auto-delete processes in place at First Data, and if so, whether there where and what steps were taken to disable them and when those steps were taken.*

**Objection to Topic 4(a)**: Defendant objects to Topic 4(a) on the grounds that it seeks information and communications protected by the attorney-client privilege and work product doctrines. "[L]itigation hold letters are generally protected from discovery as privileged or attorney-work product unless a preliminary showing of spoliation is made." *Tracy v. NVR, Inc.*, 2012 WL 1067889, at *6 (W.D.N.Y. Mar. 26, 2012) (quoting *Major Tours, Inc. v. Colorel*, 2009 WL 2413631 (D.N.J. 2009)). To the extent this topic seeks information related to Plaintiff's allegation of destruction of evidence of job postings (see Compl. ¶¶ 270-275), Defendant has produced to Plaintiff a complete list of all of its available jobs from September 2016 to April 2018 (FDC00047377). Plaintiff will also have the opportunity to question the witness designated for Topic 2(c) regarding the use of social media to promote job openings, including Twitter.

(b)    *First Data's process, procedure, documentation, and retention of information for the implementation of any "reduction-in-force", as that term is used in the Answer, during any time after January 1, 2015, including, without limitation, First Data's process, procedure and documentation of the decision to implement a "reduction-in-force", First Data's process, procedure, and documentation of any approvals by the board, committee of the board, management committee, human resources, and/or management to implement a "reduction-in-force", and the criteria used to select potential and actual individuals to be included in that "reduction-in-force"*

**Objection to Topic 4(b)**: Defendant objects to Topic 4(b) to the extent that it seeks discovery of information outside of the reduction in force that involved Barger. Without waiving its objections, Barger will have the opportunity to question the individual Defendants who have knowledge of the process used to select Barger for inclusion in the early 2017 reduction in force. Barger will also have the opportunity to question CEO Frank Bisignano regarding any issues

Shawn E. Shearer, Esq.
April 30, 2018
Page 15

relating to the need for Board approval. To the extent that testimony on this topic arises in one of the already-scheduled or to-be-scheduled depositions, Defendant may stipulate to that portion of the testimony as being provided under Rule 30(b)(6).

     (c)    *First Data's process, procedure, location, and responsibility for the maintenance of corporate governance records, including, without limitation, minutes of the board of directors, minutes of any committee of the board of directors, minutes of any committee of management or officers, maintenance of records regarding the implementation of any "reduction-in-force" (as used in the Answer), and any other official action (e.g. contracts) by an officer or agent of First Data related to governance records.*

    **Objection to Topic 4(c)**: Defendant incorporates by reference its objections to Topic 1(d) – (f). Defendant further objects to Topic 4(c) on the grounds that First Data's corporate governance records are not relevant to FMLA and ADA claims. Defendant further objects on the grounds that First Data's process, procedure, locations, and responsibility for corporate records, including minutes of the Board of Directors, have nothing to do with Barger's claims of discrimination. Defendant further objects on the grounds that contracting authority of officers or agents of First Data is not an issue in this case of discrimination. Without waiving this objection, Barger will have the opportunity to question CEO Frank Bisignano, EVP Dan Charron, and EVP Tony Marino (all of whom are Section 16 officers of First Data), as to the authority to include Barger in the reduction in force and any requisite Board approval.

     (d)    *First Data's processes, procedures, documentation, delegation, resolutions, and grants of authority regarding employee and officer authority to expend corporate funds, commit the corporation to contracts, and to settle disputes regarding the business and litigation First Data.*

    **Objections to Topic 4(d)**: Topic 4(d) is identical to Topic 1(m). Defendant incorporates by reference its Objection to Topic 1(m).

---

    Fed. R. Civ. P. 26(c) requires that a motion for protective order include a certification "that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action." Our intent is to resolve this dispute so that First Data can produce witnesses who are prepared to answer your questions about topics that are relevant to this lawsuit. Please advise when we can schedule a conference call to discuss the matters described in this letter. I look forward to hearing from you at your earliest convenience.

Very truly yours,

Gary B. Eidelman

cc:  Counsel of record

# EXHIBIT C

# THE LAW OFFICE OF SHAWN SHEARER, P.C.

3839 McKINNEY AVENUE, SUITE 155-254
DALLAS, TEXAS 75204
OFFICE: (972) 803-4499
SHAWN@SHEARERLAW.PRO

May 3, 2018

## THE PURPOSE OF THIS LETTER IS TO RESOLVE A DISCOVERY DISPUTE

**Via Electronic Mail**

Gary B. Eidelman
Saul Ewing Arnstein & Lehr
500 E. Pratt Street, Suite 900
Baltimore Maryland 21202

> Re: ***Steven Barger v. First Data Corporation et al.***
> **Civil Case No. 1:17-cv-4869**

Dear Gary:

This letter is in response to your letter of April 30, 2018 outlining Defendants' disputes with scope and topics included in Plaintiff's Notice of Rule 30(b)(6) Depositions dated April 23, 2018. [1] It seems inconceivable, but in this case par for the course for obstruction of discovery by the Defendants, that you attempted to find grounds to object to every single topic proposed for a 30(b)(6) deposition. Every single one.

---

[1] In footnote 1 to your letter about June 13, 2018 as a placeholder for 30(b)(6) depositions. The time for completing discovery (August 31) is quickly approaching and not one deposition has taken place. Your account of the twice failed depositions of Ms. Voycheske and Ms. Steffen is inaccurate. Those depositions were intended to address the issues raised in Ms. Voycheske's Affidavit filed in Support of the Defendants' Response to Plaintiff's Motion for Judgment on the Pleadings under Rule 12(c). Depositions should have occurred prior to the required filing of Plaintiff's reply. February 21st by letter I proposed depositions on February 23rd in Omaha. Hours later, by letter, you refused to produce Ms. Voycheske for deposition on the 23rd. You requested / received a protective order preventing a third-party subpoena about the Affidavit and its exhibits, which are contradictory to Defendants' other stated defenses. March 8th, I noticed depositions of Ms. Voycheske and Ms. Steffen in Omaha for March 14th and you accepted. The sad passing of your mother-in-law on March 11th interfered with your direct participation in those depositions, and you requested two weeks leave from this case. Not wanting to cancel the Omaha court reporters a second time, mindful of discovery time constraints, I offered to cut the time for each deponent in half (less than 2 hours each), with you attending via video/ audio, your choice to begin at 9 am or 2 pm, and a continuance to a later date for follow-up questions. This deposition date was not the same as that of your mother-in-law's memorial service. You refused to allow a partner, associate, or First Data's local law firm to attend in person for two depositions. You suggested that Ms. Cooper would handle matters during your two week absence, but as you see from the attached, she was consistently unavailable. Your firm's inability to field an attorney for less than four hours use meant depositions were canceled. Your delays forced Plaintiff to change strategy and depositions will now occur top down. Authority is a significant issue in this litigation, given the employer definition issues for purposes of the FMLA. Mr. Bisignano's deposition is May 23rd in NYC. If that deposition does not occur, I will bring the clear discovery obstruction to Judge Bloom. You noted your unavailability for June 13. It is my understanding that you are unavailable because you are attending a conference. I understand part of the delay from Voycheske's deposition was you were also attending a conference. Today I received an out-of-office e-mail saying you are at a conference. The Plaintiff's case cannot be continually delayed because you are in Florida or California or, today, Canada, at conferences. You have plenty of back-up and these depositions can be defended by one of the other 800 lawyers in your firm, including the two female lawyers who appear in this case, yet you will not let defend a deposition.

Had you conducted a good faith effort to find actual common ground on the 30(b)(6) topics, as opposed to merely throwing the proverbial kitchen sink at Plaintiff by objecting to each and every topic to both increase your billable hours and waste my time, I could understand your effort. But instead, you insist on memorializing your futility in writing. This is the discovery process. First Data is a defendant. It must testify. You spent fifteen pages and thousands of your client's dollars feigning objections of relevance to perfectly legitimate 30(b)(6) topics, yet you bear no visible signs of understanding that it is ALSO your responsibility to be relevant. What you are doing, is attempting to substitute irrelevant documents and repetitive, nonresponsive witnesses for relevant documents and necessary witnesses. This behavior is completely consistent with your handling of my client's case to date, and continues to demonstrate your basic lack of understanding that accounting, corporate governance, information and technology are all central to this case in addition to any typical documentation and discovery that may be required in other employment cases you defend. There is no "standard case" in any area of law. That you are not accustomed to dealing personally and directly with senior management at First Data, such as Mr. Bisignano, Mr. Marino, and Mr. Charron, does not exempt their participation in Plaintiff's case. You find the fact that this case requires you to enlist the CEO's and EVP's participation to be "unduly burdensome" because you are not accustomed to having to directly engage top management at First Data. In this case, those individuals are the only relevant decision-makers.

When this case began, I gave you fair warning that I knew about your history of non-escalation. I told you repeatedly that this Plaintiff was atypical for an employment case because despite the large size of First Data's organization there are only a handful of relevant witnesses able to testify with any authority or accuracy about Plaintiff's tenure of employment and the circumstances of his illegal dismissal, and that these witnesses are at the top of the organization. I have given you unlimited opportunity to identify the person or persons directly responsible for Plaintiff's illegal firing. I told you that I had worked in-house before, and that it was very treacherous for First Data to allow an SVP to walk out without a release, because it would expose all your senior executives to discovery. As it happens, I recently listened to a voicemail you left for me in early 2017, the first week you were on this case, where you laugh at my client, and behave as if his demands are both unreasonable and beneath you. Yet over a year later, you have not so much as provided an accurate official organizational chart that would speak to the chain of authority that existed when Plaintiff was illegally terminated. Your own witnesses, in their own words and emails, cannot agree on exactly what the state of Plaintiff's employment and compensation at First Data was, as late as March of 2017. Yet, inexplicably, you decided to provide a sworn statement attached to your Rule 12(c) Response provided by a human resources operative, located in Omaha, which contradicts every other argument you have put forth in this case. Further, you have proceeded as if her affidavit testimony is the governing, definitive information available to Plaintiff, when in reality, it is wholly irrelevant to the case. In your hackneyed attempt to create the illusion of fact issues that do not exist, you tied yourself to a series of events that undermine the rest of your defense. And now, you desperately want to deprive Plaintiff of his right to discover information and testimony relevant to the very defenses you, yourself, raised, by artificially narrowing the scope of investigation so that your contacts and friends in Omaha can provide unneeded, repetitive testimony under the guise of the 30(b)(6) standard and you will therefore be exempted from having to do that which you most fear: the

need to go discuss this case with senior management, including First Data's General Counsel, First Data's CEO Bisignano, First Data's EVP Charron, and First Data's EVP Marino.

Escalate this matter to the people who have the authority and information to either settle it, or provide the requisite documentation and testimony. The human resources Vice President and managers in Omaha do not have the information regarding the dealings among the SVPs, EVPs, and CEO in New York and Atlanta.

Simply put, this tactic is not going to work. Much like the now retired Peyton Manning, your continuing cries of "Omaha" are currently devoid of meaning. Nothing could illustrate this point better than your desperation to release Ms. Graesser from this case. Once Ms. Graesser received her release, this case took a very odd turn, to say the least. You presented an answer to Plaintiff's 12(c) Motion that completely contradicts all other pled defenses. Every email you have provided has been run through the email view of an employee who works in Omaha, (other than the one you provided in Ms. Voycheske's affidavit, which inexplicably was retrieved from the email server of Saul Ewing associate, Ms. Lindsay Kennedy, who made an official appearance in this case a few days after Plaintiff requested the metadata of that email.) You have not provided any searches from Mr. Bisignano's email. The only emails or documents you have provided from Mr. Marino are ones which involve people who work out of the Omaha office. They are not emails from Mr. Marino's server. The list goes on, and I will be even more specific in the eventual Motion to Compel that Plaintiff will no doubt have to file in order to obtain necessary documents from his former employers and superiors.

I understand that you typically work directly with Ms. Graesser on First Data employment cases. It was more than clear that during the time she was a named party in this case, you felt hamstrung without her full availability. This obvious dependence belies the formulaic manner of defense to which you have become accustomed in your employment cases with Defendant First Data. It is a matter of public record that Ms. Voycheske has provided important testimony about "changing leave dates" in other First Data cases for you. We all love the "if it ain't broke, don't fix it" opportunities in life. Unfortunately for you, this case falls far outside the scope of the cases you and Ms. Voycheske typically consult and work on together. There is no employee in Omaha who was at a higher position of employment at First Data than Plaintiff at the time of his illegal firing. Plaintiff has named the individuals who he believes are responsible for his illegal firing. They work in New York and Atlanta. That Ms. Graesser has ready access and/or a "standard" way of disposing of FMLA cases through date changing, mistakes or clerical errors that originate in her Omaha office, does not make that method effective or relevant to Plaintiff.  I told you this information over a year ago. When you presented your contradictory answer to Plaintiff's 12(c) Motion, I told you again. Not only did it NOT raise fact issues as to the necessary elements of the 12(c) Motion with regards to liability on interference or with regard to damages, it effectively has estopped you from following through on your earlier stated defenses. You have gained exactly nothing, and now constantly scramble to keep Plaintiff away from the information he is entitled to receive and information necessary to prove your clients' misconduct that is only in you clients' possession. Multiple representations are tricky. And now that you have added two ex-employees, (Josh King and Fuji Fitton-Gordon) along with the now former employee/Defendant Ms. Whalen, to your representation in order to play keep away with their testimony, your responsibilities to each party grows ever more rife with pitfalls.

I am attaching and serving a revised Notice of Rule 30(b)(6) Deposition dated as of May 3, 2018.  The revisions to Exhibit A to the Notice outlining the topics for the 30(b)(6) depositions have been revised to take into account some, but not all of your concerns. In making these revisions, it appeared to me that there actually is a fifth topic area to be addressed – Work Force Planning and Analysis (i.e. First Data's workforce reduction planning and implementation process). I am attaching a marked version of Exhibit A showing the changes from the Exhibit A attached to the April 23 Notice and the current May 3 Notice.

I do not believe there is a reason to get into a debate as to the breadth and scope of Plaintiff's entitlement to depose corporate representatives of the Defendant, First Data, in this case. Suffice it to say, based upon the review of documents produced to date, it is clear that there has not been a thorough search of Defendants Bisignano (CEO), Marino (EVP), and Charron (EVP), the only parties to this litigation with superior corporate rank and authority to Plaintiff at the time he was terminated from employment.  All of the production to date reflects mere searches of the human resources department. A thorough deposition regarding the searches conducted to date, the systems, and the corporate rcords keeping process is the onlyw ay for Plaintiff to obtain confirmation of what is clear through the production.

It clearly has not set-in with you or your clients inside of First Data's human resources group and their in-house legal team that this is not a typical ADA or FMLA case. The individuals involved, the Plaintiff and CEO Bisignano, have worked together on and off for more than two decades. The Plaintiff himself, even after being terminated, has better access to Mr. Bisignano than has Defense Counsel. Only the CEO or one of the EVPs involved (Marino and Charron) possibly could have had the authority to terminate Plaintiff's employment. Given this, we are still here, nearly 18 months later, and there has been no production from searches of Bisignano's documents and there have been no depositions of any First Data officers. I understand that in normal employment cases, protecting senior management is strategic. But, in this case, it was senior management that made the adverse employment decisions and senior management must testify.

Offering Ms. Voycheske (manager), Ms. Steffen (VP) and Ms. Pulverenti (VP), all within the HR department in Omaha (the place from which you derive your work and engagement) is not sufficient. As evidenced by Defendants' own production, Ms. Voycheske, Ms. Steffen and Ms. Pulverenti are typically all consulting each other on specific issues, and primarily their discussion revolves around First Data's ongoing confusion about Plaintiff's compensation from late 2016 until March of 2017.  Ms. Voycheske appears to be the proverbial "jack of all trades - master of none" (which could account for the reason she appears so often in First Data lawsuits admitting that she has made mistakes and recalculating days.) She is tasked with various and shifting responsibilities that include aspects of employee leave, but has no apparent knowledge of accounting practices, IT, corporate governance or workforce planning and analytics. She is not an officer, and therefore has absolutely no information to offer about any alleged "RIF" or the arrangements and accommodations reached between the Plaintiff (SVP) and the EVPs and CEO (New York & Atlanta) above him. While Ms. Pulverenti clearly has a depth of knowledge in the Employee Benefits division of First Data, (28 years) there is no indication in her job description or elsewhere that she has held any other position at First Data, or that she has any knowledge of accounting practices, IT, corporate governance or workforce planning and analytics. She has no

Gary Eidelman
May 3, 2018                                                                                    Page 5

knowledge of any alleged "RIF" related information nor statistics related to such. It appears to
Plaintiff as if we are right back at Defendants' ill-conceived Response to Plaintiff's 12(c)
Motion, with a Benefits administrator attempting to explain (and re-explain) exactly how and
why Plaintiff's compensation is or was calculated and how or why it keeps changing. There is a
clear distinction between disability insurance compensation, and FMLA leave and ADA leave,
and even more distinction from accomodations agreed between Plaintiff and his superior officers
in Atlanta and New York, none of which is within Ms. Pulverenti's knowledge. Ms. Steffen
appears to have some knowledge about how the different parts of Defendant First Data work in
tandem. She has held positions which appear to have a VP level of knowledge about
collaborative efforts. However, Ms. Steffens is not an accountant, an IT specialist, she is not
responsible for corporate governance and does not hold any title related to workforce planning or
any form of analytics. She has no information related to the planning or execution of any alleged
"RIF" at First Data nor any statistics or analysis of its meaning.

        While Human Resources may be a category for consideration for 30(b)(6) witnesses,
three witnesses, all of whom interact consistently on the same limited topics, seems wholly
unproductive. For your convenience, I have attached the job descriptions of each of these
proposed witnesses to this letter. In addition, none of the three was involved in Plaintiff's work
in Atlanta. All three are out-ranked by Plaintiff. None of the three was involved in the Plaintiff's
accommodation and leave while he was with First Data. In fact, the documents you have
produced clearly demonstrate that all three were unaware of Plaintiff's medical condition until
November 2016, and all three were confused as to the situation throughout November 2016
through March 2017, even months after Plaintiff's termination. None of these three HR
employees in Omaha has any information about Plaintiff's employment, the technological
systems used to maintain records, nor the strategy, process and planning conducted in New York
regarding the supposed "RIF", defense, on which Defendant First Data relies. None of the three
has the experience, background, or corporate knowledge of the financial accounting and financial
planning details that are fundamental to understanding this case, your pretext "RIF" defense, and
the financial pretext under which Plaintiff was terminated.

        The entire purpose of delegating 30(b)(6) witnesses for a corporation, is so that the
process of information gathering can be streamlined. The very suggestion that three people
within the same arena, all of whom are limited to the same topics, in any way achieves that goal
is preposterous. It is obvious that you are using your own friendly connections and go-to's from
earlier cases to attempt a circumvention of Plaintiff's reasonable discovery of relevant
information in favor of what makes things easy for you personally. This is a practice you have
applied in all areas of this case, as stated above in the footnote. Plaintiff will not tolerate it any
more.  Answers to the real and critical questions in this case are not found in Omaha. They are
found in New York and Atlanta. It is not the Defense's place to be directing Plaintiff's discovery.

        Given that Exhibit A to the 30(b)(6) Notice has been revised, I will address your
comments generally by topic area.

## OVERVIEW

Application of Legal Standards

  In evaluating the concepts of proportionality and burden, you apparently fail to recognize that you are representing the entity FIRST DATA CORPORATION. First Data is a data processing and retention behemoth. First Data's Annual Report on Form 10-K for its fiscal year ending December 31, 2017, describes itself as follows:

> First Data Corporation sits at the center of global electronic commerce. . . We serve our clients in **over 100 countries**, reaching over **6 million business locations** and over **4,000 financial institutions**. We believe we have the **industry's largest distribution network**, driven by our partnerships with many of the world's leading financial institutions, our direct sales force, and a network of distribution partners. We are the **largest merchant acquirer, issuer processor, and independent network services provider in the world**, enabling businesses to accept electronic payments, helping financial institutions issue credit, debit and prepaid cards, and routing secure transactions between them. **In 2017, we processed 93 billion transactions globally, or approximately 3,000 per second. In our largest market, the United  States, we processed approximately $2.1 trillion of payment volume, <u>which represents over 10% of United States gross domestic product (GDP) last year.</u>**

  Not only does First Data "process" all of these transactions in the macro sense, First Data also collects information regarding those transactions, saves it, processes it, aggregates it, and then sells that information. First Data's ONLY business is processing, collecting, aggregating, analyzing, and distributing data. First Data is perfectly capable of quickly locating the information Plaintiff has requested. There are but a few individuals, perhaps two or three, inside senior management who can answer all of Plaintiff's 30(b)(6) questions. The lack of effort on the part of your firm, inside counsel, and human resources personal to seek and collect information from executive officers is no excuse when this case itself involves an illegally terminated former Senior Vice President of First Data. Moreover, because of the Plaintiff's position and salary, and the amount of back-pay alone that has accrued, the amount in controversy in this case is significant and Plaintiff is entitled to demand greater discovery efforts from the Defendants than has been shown to date. If, in fact, First Data employs a "RIF" as a matter of workforce control, (which seems doubtful at this stage given Defendants' production), senior human resources executives, IT senior officers, and senior officer accountants should be well versed and prepared to articulate all aspects of its use. No aspect of the sole defense Defendant First Data relies on is burdensome. It is your clients' chosen defense, and as such, by definition is subject to thorough discovery.

Gary Eidelman

May 3, 2018                                                                                                Page 7

Frank Bisignano Deposition

Throughout your letter of April 30, 2018, you repeatedly point to Plaintiff's opportunity to depose Mr. Bisignano. You are correct that Plaintiff intends to depose Mr. Bisignano on May 23, 2018 in Manhattan as scheduled. I want to be clear that if that deposition (for which I cooperated for months in good faith to schedule) does not occur as scheduled, I will have to file a motion to compel. You cannot hide Mr. Bisignano for months citing his busy schedule, set a date, point to the existence of that deposition as a reason for the 30(b)(6) topics to be revised, and then cancel or postpone that deposition. If you do cancel or postpone Mr. Bisignano's deposition, the bad faith in the Defendants conduct will be obvious and at issue.

Barger Compensation Dispute

In your April 30, 2018 letter, you state that the facts surrounding Plaintiff Barger's compensation are undisputed. Absolutely nothing can be further from the truth. Such a statement is in direct contradiction to the Voycheske Affidavit you submitted in support of the Defendant's Response to Plaintiff's Motion pursuant to Rule 12(c). Are you, as counsel for Defense, suggesting that the Voycheske Affidavit is a fabrication?  Throughout the Defendants' 12(c) Response, and the Voycheske Affidavit, the confusion as to origin and amount of Plaintiff's compensation (e.g.  salary, paid-time off, short term disability,  long term disability, unpaid leave, paid by First Data, paid by MetLife, etc.) was occurring internally within First Data constantly from November 2016 through February 2017 (even after Plaintiff was notified of his termination, and even after Plaintiff was terminated). First Data internally could not even figure out Plaintiff's compensation. In addition, Plaintiff's confusion about compensation is demonstrated in numerous e-mails produced by Defendants. Given the inconsistencies between your objections to the 30(b)(6) topics and your position taken in the Response to the Rule 12(c) Motion, do you wish to retract Ms. Voycheske's sworn statement?

Reduction-in-Force Defense/Pretext

Defendants have raised the defense that the Plaintiff was terminated as part of a "reduction-in-force" and not in violation of the FMLA and ADA. Suffice it to say, there is not one piece of evidence produced so far that indicates that this is true. Not a single document sent to Mr. Barger or me from January 2017 until June 2017 even mentioned the existence of a "Reduction-in-Force."

Reduction in salary expense in and of itself cannot be the sole justification for a termination in violation of the FMLA or the ADA. If merely reducing salary expense was a sufficient justification, there would be no such thing as an illegal termination under the FMLA or ADA, as each such termination would be subject to the business justification of a salary reduction.

Judge Bloom advised both of us at the first hearing before her, that if there was a "RIF" defense, we should both be prepared for the discovery process necessary to analyze the bona fides of the "RIF."

In the case at hand, it is clear from First Data's 10-K, that the "RIF" is nothing more than an accounting façade. Salary and benefit expense may decrease, but a restructuring cost is incurred. However, when discussing financial results with the street, First Data points to a non-GAPP financial measure they call "Adjusted Net Income" which is actual GAPP net income ignoring certain expenses such as "restructuring costs" (the euphemism First Data uses for costs related to termination of employees). When you net the reduced salary expense against the restructuring costs, there is no actual impact on First Data's GAAP financial statements. There is no business justification for the "RIF." This especially true when First Data continues to hire and back-fill positions – that means the force actually is never reduced.

This is not a case of a "reduction-in-force" due to a plant closure or shutting down of a production line. This is not a financially distressed employer ($12 billion in revenue and $1.465 billion in net income and $6 billion in net worth at the end 2017 as reported in First Data's 10-K). This is a fabricated merry-go-round of employees-in and employees-out (now over several years) disguised and called a "RIF", and then used as pretext to defend against illegal conduct. In this context, simply saying "RIF" is not enough to defend against violations of the ADA and FMLA. Your "RIF" defense is nothing more than First Data's excuse for violating every legislative employee protection in the country, federal and state, with impunity.

Plaintiff is entitled to undertake deposition testimony on the supposed "RIF", how it was planned, how the cost saving was modeled and projected, and how the actual results for 2017 compare to the projections and the model. Plaintiff is also entitled to discover by deposition how Plaintiff (if he was actually included in the "RIF") was included in the modeling and projections of the supposed cost saving. It will be difficult for Defendants to show that there was any financial gain from terminating Plaintiff at a time he remained on leave. At that time, Plaintiff was not on any First Data benefits, and Plaintiff was being paid under First Data's long-term disability benefits.  Meaning, the cost to First Data of Plaintiff being on leave on January 10, 2017 was exactly $0. The Plaintiff was not included in the "RIF." It was when, and only when, Plaintiff provided Defendant First Data his return to work authorization indicating he would return to work that he was terminated on January 13, 2017, and then subsequently that termination was justified as being part of an alleged, unproven "RIF."

Plaintiff is also entitled to discovery on the issue of pretext, and in particular, the use of the "RIF" as an excuse for otherwise illegal conduct. To address this issue, Plaintiff is again entitled to discovery as to the "RIF" modeling and projection process compared to actual results. Your April 30, 2018 letter continually refers to the reduction in force being "projected" to save on salary and benefits (none of which included the Plaintiff).

As the ex-Federal Reserve Chairman Alan Greenspan has said with regard to all the projections and estimation involved in his job:

> "We really can't forecast all that well, and yet we pretend
> we can, but we really can't."

From my review of the documents, First Data cannot forecast either, and in fact, is probably worse than Mr. Greenspan at the task. It is not a defense to merely say…" there is a "RIF" which WILL save salary and expense because the models and projections SAY it will

save salary and expense, therefore we are immune from any claim of illegal termination, but we don't have to provide any models, projections or results…"  All modeling by First Data was done by non-accountants, not using GAAP, and not involving the financial accounting department. It is also clear from the document production that the projections and models were built upon company-wide averages and unsupportable estimates.  The documents also indicate that the financial modeling is being massaged to reach the results that management needs in order to justify pre-determined decisions, (a.k.a. "pretext") and are not an actual attempt to predict future reality.

The projections of cost savings are a farce, a subterfuge, and in this case nothing more than a pretext for violations of the ADA and the FMLA. The Plaintiff is entitled to discovery on the defense that the Defendants have raised.

Adequacy of Discovery Efforts

The Plaintiff is entitled to discovery as to the extent and effort of the Defendants' attempt to discover relevant evidence. In your letter, you mocked the reference to Mr. Bisignano (CEO), Mr. Chairello (President) Mr. Cavicchia (SVP Cybersecurity) being involved in the use of software and programs designed by Palantir to spy and capture information on employees of JP Morgan Chase while the three were employed there. The reported conduct even includes Mr. Cavicchia, while he was still at JP Morgan Chase, continuing to collect information on Jaime Dimon and other JP Morgan Chase employees using the Palantir system after Mr. Bisignano left JP Morgan Chase, and then providing that information to Mr. Bisignano who was then at First Data.

https://www.bloomberg.com/features/2018-palantir-peter-thiel/

It is a perfectly legitimate inquiry for Plaintiff to ask the question of whether these same three individuals, now all senior executives at First Data, have deployed a similar system of employee monitoring, and if so, to ask if that system has been searched by Defense Counsel for relevant evidence in this case. As noted above, the production to date shows no effort to collect relevant information from Mr. Bisignano, Mr. Charron and Mr. Marino (or that of Mr. Hack Plaintiff's prior supervisor). To have absolutely no e-mail sent by Mr. Bisignano referencing Mr. Barger is impossible. To have absolutely no e-mail sent by Mr. Bisignano discussing the "RIF" is absolutely impossible. All that has been produced are documents collected from a few of your contacts in First Data's human resources department, primarily in Omaha, and documents produced from Saul Ewing's own e-mail server. That is not an adequate attempt at production. Plaintiff is entitled to discover by deposition where information regarding his employment and termination is held within First Data's systems (especially given Plaintiff's access to First Data's systems was cut out of the ordinary course when he was forced to take leave). Depositions to determine the location of documents and ESI is required.

We know that First Data uses Palantir technology within its products sold to its merchant customers. This is the technology that allows First Data to collect information about each of the 3,000 transactions it processes a minute, combine and aggregate that data, and then disclose the aggregated data to others. For example, if a customer makes a purchase at Target, First Data's systems are capable of taking that information, running it through the Palantir big data

processing system along with all the other transactions, and producing a report for purchases made by all individuals residing in a particular zip code. The data aggregation and processing capabilities are amazing and, to the American public, terrifying. We know that First Data has contractual agreements with Palantir. We know that three senior executives of First Data used Palantir technology to spy on employees of JP Morgan Chase. The Plaintiff is entitled to know if there is relevant information contained in such a system at First Data.

It strains credulity to suggest that a company like First Data that prides itself on being the foremost aggregator of data in the world would consider simple discovery production requests and straightforward 30(b)(6) questions to be burdensome. There has been ample opportunity to settle if Defendant First Data does not want this information to be discussed in this forum. First Data has no problem selling the data it gleans at 3000 transactions per second as its executives see fit. This is not a company that values privacy. Rather it is a company that exists to break down the barriers of privacy. Amazingly, despite this chosen business model, Mr. Bisignano and his executives seem to believe that their data should remain private. There is a way to achieve that goal. It's called – SETTLEMENT. Defendant First Data chose its defense, and the defense is a complex, economic and accounting based answer. When they chose that defense, they were well aware of the implications. Judge Bloom warned us that a "RIF" defense would head down this discovery road.

The very idea that this company should not have to face the choices that all litigants in the U.S. court system face – settle or provide discovery – rings particularly hollow where Defendant First Data is concerned. Plaintiff agrees that Mr. Bisignano and his cohorts are the self-proclaimed "Kings of Data" and as such have easy access to the information Plaintiff both seeks and is entitled to receive. There is no third option available (e.g. cheat, withhold) where evidence is concerned. Settle, or produce and testify. It would seem that a company that prides itself on unceremoniously whacking employees for "failure to produce" would understand quite well that their own "failure to produce" will subject them to the same harsh realities.

## 30(b)(6) TOPICS

Topic 1 – Accounting and Financial Disclosure

As noted above, the Plaintiff is entitled to understand the financial disclosures of First Data. In particular, Plaintiff is entitled to test the *bona fides* of the projections used in implementing the supposed "RIF" against the actual results. As noted above, the entire justification for the "RIF" in your April 30 letter relies on projections.

Projections have no real meaning or application in the accounting world.  Projections can be created from thin air if necessary and used as cover for any type of action or justification by management – i.e. a pretextual basis for illegal action. Moreover, even granting you that projections are a valid form of accounting, the only possible relevant use of them would be through comparison of the projection to the actual result placed on a continuum, and then analyzed. If the projections have any validity at all, their accuracy should be higher for the closer-in time periods following their creation (i.e. 2017 actuals should be very close to the projections for 2017 prepared in January 2017). This is something that can and must be proven.

Plaintiff cannot take Defendant's "word" for the accuracy of its projections.  If the projections are a farce with no basis in actual accounting or actual results, the supposed "RIF" process and projections are nothing but subterfuge intentionally used to raise your pretext defense as cover for an illegal termination. The process of preparing the projections and the process for preparing the actuals are directly relevant to obtaining proof that the supposed "RIF" is nothing more than pretext. Defendants attempted obstruction in this matter falls directly inline with defendant First Data's unrealistic desire to control all aspects of data at all times. For example, the information regarding a consumer transaction at Target belongs to First Data even though First Data did not make a purchase or sale at the register. In other words, Defendant simply wants to say "it is true because we projected that it was going to be true." That is wholly insufficient.  There are ways to distinguish a supposed "RIF" from other types of firings. Defendant cannot obscure Plaintiff's access to those methods. You have pled the "RIF" as a defense. The fact that you have put the "RIF" savings numbers at issue as the justification for the Plaintiff's termination means Plaintiff is entitled to discovery on all aspects of the preparation of those projections and their accuracy given actual results.

The 30(b)(6) accounting and financial disclosure topics have been revised to focus on the actual accounting issues at hand, and several have been deleted to streamline the inquiry. However, your objections to Topic 1(b) is particularly without merit. The accounting treatment of salary, bonus, severance, LTD and STD, and leave are critical to understanding how Plaintiff impacted First Data's financials before his termination and after his termination. If my accounting senses are correct, First Data has no financial justification for the termination of Plaintiff. The only justification for his termination was the exercise of his right to return to work from approved FMLA leave and to return to the office after his ADA accommodation of remote working was completed.

Topic 2 – Information Technology

As noted above, based on the production to date, there are significant issues as to whether First Data has conducted an actual search of all the Defendants records. The Plaintiff's understanding of systems used by First Data essential for the Plaintiff to address those issues. Both of the justifications for depositions regarding systems outlined in *Winfield v. City of New York* are present in this case. The Plaintiff is seeking to learn about where and how ESI is created, obtained, accessed, stored, maintained, backed-up and preserved. Plaintiff is also seeking to learn about specific software programs and data that may be analyzed (including sources of data, completeness of data, validity of data, meaning of data fields and categories, reporting capabilities, and other technical details of the data).

The 30(b)(6) topics have been revised to attempt to meet your concerns. However, all of the specific systems listed in the revised topic list are systems referenced in Defendants' document production or used and sold by Plaintiff in his job. Moreover, many of those same systems are included in the exhibits to Ms. Voycheske's affidavit in support of the Defendants' Rule 12(c) Motion Response. If these systems are important enough to include in a sworn affidavit provided by Defendant as the sole defense to Plaintiff's request for judgement on liability and damages based on Defendant's interference in his federally protected right to return from FMLA leave, these systems must be important enough for the Plaintiff to discover their

purpose, use, and capabilities. If Defendant does not wish to have those particularities subject to discovery, counsel may simply pull Defendants' Answer to the 12(c) which relies upon those issues. At that time, Plaintiff can revisit the issue and decide if there exists any need for their further discussion.

The inquiries into the remote access systems and applications are also essential to Plaintiff's case and responses to the affirmative defenses. Plaintiff continued to work daily from remote locations from the day after his surgery until Mr. Marino forced Plaintiff to take leave. Understanding these systems will demonstrate that Plaintiff never took leave and continued to work the entire period of his recovery until forced, against his will, to take leave. Defendant's admitted denial of Plaintiff's access to these systems after forcing leave not only constitutes a flagrant violation of his request for an ADA accommodation, it also ensures that Defendant First Data is the only vanguard of this information. Defendant First Data took this action to establish total dominance and control over this information. As such, First Data alone is required to provide it to Plaintiff for discovery.

Topic 3 – Human Resources and Employee Benefits

The 30(b)(6) topics have been narrowed to just the benefits, plans and policies that impacted Plaintiff.

Plaintiff strongly disagrees with your analysis of the relevance of the Older Workers Benefits Protection Act. Plaintiff knows of, and has produced, OWBPA disclosures distributed by First Data during 2017. The fact that these disclosures exist indicates First Data is well aware of how to comply with the OWBPA. It also shows that Plaintiff was not in an OWBPA termination because he did not receive such a disclosure. The facts as to when First Data decides to issue OWBPA disclosures is directly relevant to the question of whether the "RIF" defense is merely pretext. Plaintiff seeks relief based on a claim of wrongful termination and discrimination. Defendant First Data chose a "RIF" defense to Plaintiff's complaint. Whether or not Plaintiff was actually a part of the alleged "RIF" is central to Defendant's position. There are demonstrable ways to determine whether a "RIF" occurred, and further, whether or not Plaintiff was part of any "RIF" that may have occurred. One of them is inclusion or exclusion of the OWBPA document in First Data's termination communications with Plaintiff. That Plaintiff chose not to bring additional potential claims against Defendant First Data does not preclude him from seeking information needed to verify Defense's claim that his termination was due to inclusion in an alleged "RIF." In other words, the OWBPA disclosure has multiple uses. For the record, Plaintiff recognizes that age discrimination certainly was a claim available to him, and thanks Defendant's counsel for that acknowledgement.

Topic 4 – Corporate Governance and Records

A *bona fide* reduction-in-force would include all of the proper corporate documentation – committee meeting materials, board meeting materials, board minutes, committee minutes, management committee minutes, etc. No such documents have yet to be produced. Plaintiff is entitled to discover whether First Data engages in the normal practice of maintaining these types of records, and if not, why not, and if so, why there are no records of the events related to the "RIF" defense.

---------------------------------------------------------------
**THE LAW OFFICE OF SHAWN SHEARER, P.C.**
3839 McKinney Avenue, Suite 155–254, Dallas, TX 75204

Your objections to a request for a description of the legal hold <u>process</u> is without any legal basis. The request does not seek privileged information or information as to the content of the legal hold letter. Rather, the request seeks deposition testimony as to the legal hold policies and procedures, the specific steps taken to preserve evidence in this case, the timing of the issuance of the legal hold notice, and the process for tracking and insuring compliance with the hold. None of that information is privileged and all of it is relevant to Defendants' obligations. This also must be viewed in the light of the allegations of spoliation of evidence directly relevant to the issues in this case as alleged in the Complaint, and in light of the demands by Plaintiff's counsel for First Data to institute a legal hold as early as January 2017. Merely providing data regarding job openings in Defendant's production does not suffice to address the veracity of Defendant First Data's process required to legally comply with notices given to both in-house and outside counsel in this case as early as the expressed date of January of 2017, and technically in November of 2016. Nor does it address the unmistakable missing social media job postings referenced in Plaintiff's Complaint.

<u>Topic 5 – Work Force Planning and Analytics</u>

A new topic has been added to separate the concepts of planning/projections from actual financial reporting and GAAP accounting discussed in Topic 1. If the planning/projections are the basis of the "RIF" defense, Plaintiff is entitled to deposition testimony regarding the processes, procedures, estimates, and assumptions utilized in the preparation of those projections to determine whether the projections are bona fide or whether the projections are nothing more than pretext to cover for illegal terminations.

We have a teleconference scheduled for May 10th to address these issues and those raised in your April 30, 2018 letter. In addition, on that call, I would like to discuss the status of your response to Plaintiff's outstanding requests for productions. I look forward to talking with you.

Very truly yours,

Shawn E. Shearer

cc:     Gillian Cooper
        Lindsey Cooper
        David Zeitlin

Attachments:
        Marked 30(b)(6) Exhibit A
        Out of Office Notifications
        Job Descriptions
        Notice of Deposition Pursuant to Rule 30(b)(6) (Revised)

---------------------------------------------------------------
**THE LAW OFFICE OF SHAWN SHEARER, P.C.**
3839 McKinney Avenue, Suite 155-254, Dallas, TX 75204

Shawn E. Shearer (*Pro Hac Vice*)
The Law Office of Shawn Shearer, P.C.
3839 McKinney Avenue, Suite 155-254
Dallas, Texas 75204
Telephone (214) 434-1594
*shawn@shearerlaw.pro*

Attorneys for Plaintiff
Steven B. Barger

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN B. BARGER, an individual | **Case No. 1:17-cv-4869** |
| Plaintiff | |
| v. | |
| FIRST DATA CORPORATION, *et al.* | |
| Defendants. | |

### NOTICE OF RULE 30(b)(6) DEPOSITION (REVISED)

PLEASE TAKE NOTICE that pursuant to Rules 30(b)(6) of the Federal Rules of Civil

Procedure, the Plaintiff in the above-captioned case (the "Plaintiff") will take the oral deposition,

under oath, of the First Data Corporation ("First Data") through one or more officers, directors,

agents or other representatives who shall be designated to testify on First Data's behalf regarding

all information known or reasonably available to First Data with respect to the subject matters

identified in Exhibit A. Plaintiff requests that First Data provide written notice at least five (5)

business days before the deposition of the name(s) and employment position(s) of the

individual(s) designated to testify on First Data's behalf.

This deposition shall commence on June 13, 2018 Regus – One Glenlake Parkway, Suite

650 & 700, Atlanta, Georgia, 30328, or at such other time and location as agreed upon by the

parties, and shall be taken before a duly certified court reporter and notary public or other person

authorized by law to administer oaths. The deposition will be recorded by stenographic and

video means.

Dated: May 3, 2018

THE LAW OFFICE OF SHAWN SHEARER, P.C.

Shawn Shearer (*Pro Hac Vice*)
3839 McKinney Avenue, Suite 155-254
Dallas, TX 75204
Tele: (214) 434-1594
*shawn@shearerlaw.pro*

Attorneys for Plaintiff

**EXHIBIT A**
**Barger v. First Data et al.**

**DEFINITIONS**

As used below, the terms defined below have the following meanings:

1. "First Data" means First Data Corporation, and all its majority owned subsidiaries.

2. "Plaintiff" means Steven B. Barger, the plaintiff in this case.

3. "Complaint" means the Complaint and Supplemental Complaint filed by Plaintiff in this case.

4. "Answer" means the Answer the Complaint and the Answer to the Supplemental Complaint filed by any of the defendants in this case.

5. The terms "and" shall mean 'or" and "or" shall mean "and" as necessary to call for the broadest possible answer.

6. The term "any" shall also mean "all" and *vice versa*.

7. The term "concerning" or "relating" shall mean relating to, referring to, describing, evidencing, constituting, consisting of, discussing, containing, reflecting, mentioning, pertaining to, citing, summarizing, analyzing, or bearing any other logical or factual connection.

8. All of the following shall apply and are intended to bring within the scope of these requests any response that might otherwise be omitted. The use of a word in any tense shall be construed as the use of that word in all tenses. The singular includes the plural, and the plural includes the singular. The term "including" means "including but not limited to." The terms "and" and "or" encompass both "and" and "or" (thus, "and" or "or" means "and/or"). Words in the masculine, feminine or neuter form shall include all of the other genders as well.

## TOPICS

### TOPIC 1 –ACCOUNTING AND FINANCIAL DISCLOSURE

(a) First Data's accounting (financial accounting, general ledger accounting, and tax accounting) policies and procedures, and the policies, and the procedure for documenting and auditing those accounting policies and procedures.

(b) First Data's accounting processes and procedures (financial accounting, general ledger accounting, and tax accounting) for treatment of compensation for employment and benefits, such as hourly employee compensation, salaried employee compensation, paid-time-off ("PTO"), unpaid leave, paid leave, vacation pay, sick time, personal time, personal days, FMLA leave, all other types of leave arrangements, hourly-PTO, salaried PTO, and any alternative compensation  and benefit arrangements.

(c) First Data's accounting (financial accounting, general ledger accounting, and tax accounting) for employees on payroll, receiving payment of short-term disability benefits, or receiving payment of long-term disability benefits, and any combination of the above, including a description of, and explanation of, the accounting treatment and meaning of the accounting technical terms used in First Data's document production to date (e.g. references to "SD6" in the context of disability payments, and other accounting coding references, terminology, and references used within First Data).

(d) First Data's processes and procedures for preparing and filing First Data's financial reports and disclosures with the SEC with respect to the disclosures (financial and otherwise) contained therein regarding First Data's employee compensation practices, historical employee compensation and termination practices, and forward-looking statements as to employee costs, employee termination costs, and First Data's disclosed cost controls.

(e) First Data's financial disclosures within its SEC filings regarding the accounting treatment and financial statement disclosure of law suit liability reserves, cost controls (reduction in force), restructuring charges (charges related to severance and terminations), and the 2017 fourth quarter tax treatment (solely for purposes of comparing employee termination "savings" to net income given a large one-time event in the fourth quarter of 2017).

(f) First Data's processes and procedures for the creation, amendment, and audit of its internal control policies and procedures related to the categorization and treatment of payments to employees and former employees, by First Data and by any third-party insurer, under GAAP and also under the non-GAAP financial measure defined as "Adjusted Net Income" disclosed in First Data's SEC filings.

(g) First Data's accounting (financial accounting, general ledger accounting, and tax accounting) for all aspects of a "reduction-in-force", as that term is used in the Answer in this case, including without limitation all aspects of the differences in accounting treatment between terminations in a "reduction-in-force" and a termination outside of a "reduction-in-force", if any.

## TOPIC 2 – INFORMATION TECHNOLOGY

(a) Functionality, access, and business purposes of all the information technology systems (i) referred to within Defendants' document production, and (ii) involved in Plaintiff's scope of employment, including the technology and systems the sales force trained by Plaintiff's Sales Transformation Group sold and marketed for First Data. These systems, based on Plaintiff's discovery review to date (and based on the exhibits to the Voycheske Affidavit in support of Defendants' response to Plaintiff's Rule 12(c) Motion) include GOOD, MSS, OOO, 1DC account, internal e-mail, systems used by the e-mail "loahelp", Palantir programs, apps, and systems, all cloud, internally hosted or externally hosted systems (including SAAS systems) for communications with MetLife regarding disability insurance benefits, systems used in all screen shots produced in the initial document production, Hagerstown Mainframe (North/South/Concord/BANA) and Denver Mainframe (SY1/EFTPS), PeopleSoft, VPN, and any other internally hosted, cloud hosted or SAAS systems utilized by First Data in its human resources, compensation, and accounting functions.

(b)  The functionality and data recording and retention capabilities of all mobile applications and programs, including Good and any Palantir based applications and programs, used by Plaintiff as part of First Data's employee mobile operating functionality to access First Data's information systems (including third-party systems to which First Data has access or from which First Data receives data and information).

(c) First Data's social media content, connectivity, access, and internal controls and procedures (including any content, connectivity, access and internal controls for outsourced social media content editors, providers, crawlers, etc.) for posting and deleting available positions for employment with First Data and is subsidiaries.

(d) First Data's capabilities and procedures to collect information from mobile devices and/or mobile applications used by First Data employees, including without limitation what is referred to within Defendants' document production as Good and VPN, and the policies and capabilities for retaining the information collected from those devices or applications.

(e) First Data's technological systems used by First Data's human resources department, payroll, and its supporting functions.

## TOPIC 3 – HUMAN RESOURCES AND EMPLOYEE BENEFITS

(a) First Data's employee disability insurance benefits and group life insurance benefits in force during Plaintiff's tenure of employment with First Data.

(b) Term and conditions of all equity-based compensation plans and agreements relevant to the stock option and restricted stock awards by First Data to Plaintiff.

(c) Terms and conditions of all of First Data's severance, separation, OWBPA, WARN, reduction-in-force, and any other similar employment termination plans, policies, agreements, and procedures in effect during the period of Plaintiff's employment by First Data.

(d) The circumstances and conditions under which First Data has provided any OWBPA from the time of Plaintiff's employment by First Data until present.

(e) First Data's plans, policies and procedures for the implementation and execution of the FMLA, ADA, other leave, terms and conditions of employment, and other relevant terms and conditions of employment included with the document production by First Data in this case.

## TOPIC 4 – CORPORATE GOVERNANCE AND CORPORATE RECORDS

(a) General description of First Data's legal hold process including all details of that policy and specific steps that were taken in this case to implement a legal hold, including without limitation, the timing of issuing the legal hold and to whom it was issued, substance of the legal hold communication (if the communication is not considered privileged), process for tracking and follow-up with the legal hold sources to ensure understanding and compliance with the hold process, whether there are any auto-delete processes in place at First Data, and if so, whether there where and what steps were taken to disable them and when those steps were taken.

(b) First Data's process, procedure, documentation, and retention of information for the implementation of any "reduction-in-force", as that term is used in the Answer, during any time after January 1, 2015 through December 31, 2017, including, without limitation, First Data's process, procedure and documentation of the decision to implement a "reduction-in-force", First Data's process, procedure, and documentation of any approvals by the board, committee of the board, management committee, human resources, and/or management to implement a "reduction-in-force", and the criteria used to select potential and actual individuals to be included in that "reduction-in-force"

(c) First Data's process, procedure, location, and responsibility for the maintenance of corporate governance records, including, without limitation, minutes of the board of directors, minutes of any committee of the board of directors, minutes of any committee of management or officers, maintenance of records regarding the implementation of any

"reduction-in-force" (as used in the Answer), and any other official action (e.g. contracts) by an officer or agent of First Data related to governance records.

(d) First Data's processes, procedures, documentation, delegation, resolutions, and grants of authority regarding employee and officer authority to expend corporate funds, commit the corporation to contracts, and to settle disputes regarding the business and litigation First Data.

## TOPIC 5 – WORK FORCE PLANNING AND ANALYTICS

(a) First Data's processes, procedures, documentation, and planning for the creation of, and as to the content of, documents produced, in draft and final form (as full reports or executive summaries) in Defendants' document production to date entitled "OA Impact Analysis," "OA Impact Executive Summary", or similar words and acronyms referring to First Data's analysis and planning of the impact of terminations on departments within First Data and the financial impact of terminations on First Data as a whole.

(b) The estimation processes and formulas used in preparing and modeling cost savings, headcount, and other data included in the drafts and final versions of all reports and documents included in Defendants' document production to date reflecting First Data's employee and management planning and projecting the future financial and other impacts of employee terminations (e.g. the processes and formula's for creating the spreadsheets, tables, and slides included in all the various OA Impact documents included in Defendants' production).

(c) The processes, procedures, documentation of the creation of, and the content of, the Sales Transformation Review Internal Consulting Reports (draft, complete and executive summary) included in Defendants' document production to date.

(d) First Data's processes and procedures for the development and modification of the spreadsheets included in Defendants' production to date with Bates numbers FDC00048216 through FDC00048233, and the content of those spreadsheets.

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 3, 2018, I transmitted the attached document and a copy of the same to the following CM/ECF registrant via e-mail to each of their CM/ECF registered e-mail addresses:

> Gary Eidelman
> Saul Ewing Arnstein & Lehr
> 500 E. Pratt Street, Suite 900
> Baltimore Maryland 21202-3133

> Gillian Cooper
> Saul Ewing Arnstein & Lehr
> 650 College Road East, Suite 400
> Princeton, NJ 08540-6603

> Lindsey Kennedy
> Saul Ewing Arnstein & Lehr
> One PPG Place, Suite 3010
> Pittsburgh, PA 15222

> *Attorneys for Defendants*

_____

# EXHIBIT D

Shawn E. Shearer (*Pro Hac Vice*)
The Law Office of Shawn Shearer, P.C.
3839 McKinney Avenue, Suite 155-254
Dallas, Texas 75204
Telephone (214) 434-1594
*shawn@shearerlaw.pro*

Attorneys for Plaintiff
Steven B. Barger

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN B. BARGER, an individual | **Case No. 1:17-cv-4869** |
| Plaintiff | |
| v. | |
| FIRST DATA CORPORATION, *et al.* | |
| Defendants. | |

### NOTICE OF RULE 30(b)(6) DEPOSITION

PLEASE TAKE NOTICE that pursuant to Rules 30(b)(6) of the Federal Rules of Civil

Procedure, the Plaintiff in the above-captioned case (the "Plaintiff") will take the oral deposition,

under oath, of the First Data Corporation ("First Data") through one or more officers, directors,

agents or other representatives who shall be designated to testify on First Data's behalf regarding

all information known or reasonably available to First Data with respect to the subject matters

identified in Exhibit A. Plaintiff requests that First Data provide written notice at least five (5)

business days before the deposition of the name(s) and employment position(s) of the

individual(s) designated to testify on First Data's behalf.

This deposition shall commence at **9:00 am on June 7, 2018, to continue beginning at**

**9:00 a.m. on June 8, 2018, if needed, at Regus – 1299 Farnam Street, Suite 300, Omaha,**

**Nebraska, 68102**, or at such other time and location as agreed upon by the parties, and shall be

taken before a duly certified court reporter and notary public or other person authorized by law to administer oaths. The deposition will be recorded by stenographic and video means.

Dated: May 22, 2018

THE LAW OFFICE OF SHAWN SHEARER, P.C.

Shawn Shearer (*Pro Hac Vice*)
3839 McKinney Avenue, Suite 155-254
Dallas, TX 75204
Tele: (214) 434-1594
*shawn@shearerlaw.pro*

Attorneys for Plaintiff

**EXHIBIT A**
**Barger v. First Data et al.**

## DEFINITIONS

As used below, the terms defined below have the following meanings:

1. "First Data" means First Data Corporation, and all its majority owned subsidiaries.

2. "Plaintiff" means Steven B. Barger, the plaintiff in this case.

3. "Complaint" means the Complaint, as supplemented to date, filed by Plaintiff in this case.

4. "Answer" means the Answer and Answer to Supplement filed by any of the Defendants in this case.

5. The terms "and" shall mean 'or" and "or" shall mean "and" as necessary to call for the broadest possible answer.

6. The term "any" shall also mean "all" and *vice versa*.

7. The term "concerning" or "relating" shall mean relating to, referring to, describing, evidencing, constituting, consisting of, discussing, containing, reflecting, mentioning, pertaining to, citing, summarizing, analyzing, or bearing any other logical or factual connection.

8. The term "internal controls" refers only to the accounting definition of the term – the methods put in place by a company to ensure the integrity of financial and accounting information, meet operational and profitability targets, and transmit management policies throughout the organization.

   All of the following shall apply and are intended to bring within the scope of these requests any response that might otherwise be omitted. The use of a word in any tense shall be construed as the use of that word in all tenses. The singular includes the plural, and the plural includes the singular. The term "including" means "including but not limited to." The terms "and" and "or" encompass both "and" and "or" (thus, "and" or "or" means "and/or"). Words in the masculine, feminine or neuter form shall include all of the other genders as well.

## TOPICS

### TOPIC 1 –ACCOUNTING AND FINANCIAL DISCLOSURE

(a) First Data's processes and procedures for the accounting treatment of the types of First Data employee compensation and benefits received by, offered to, or available to, Plaintiff while an employee of First Data.

(b) First Data's processes and procedures for the accounting treatment of litigation reserves related to employment litigation as disclosed within First Data's Form 10-K for fiscal year 2017 filed with the SEC.

(c) First Data's internal control policies and procedures for the technological systems used by First Data's human resources department, payroll, and leave management.

(d) The differences in First Data's accounting treatment of an employee termination in a "reduction-in-force" (as that term is used in the Answer to the Complaint) compared to an employee termination outside of a "reduction-in-force."

### TOPIC 2 – INFORMATION TECHNOLOGY

(a) The functionality, access, and business purposes of the information technology systems from which First Data cut Plaintiff's access upon Plaintiff's leave in November 2016.

(b) First Data's processes and procedures for posting available employment opportunities at First Data, and removing filled or withdrawn positions, on employment sites (e.g. the Indeed web site referenced in Exhibit K to the Complaint) and employment opportunity postings on social media sites (e.g. the @FirstDataJobs Twitter account referenced in Exhibit K to the Complaint).

### TOPIC 3 – HUMAN RESOURCES AND EMPLOYEE BENEFITS

(a) The processes that were available to Plaintiff to apply to receive First Data's disability insurance benefits, the process through which Plaintiff did apply to receive First Data's disability insurance benefits, and the terms of the disability insurance policies under which Plaintiff applied for benefits.

(b) Terms and conditions of all equity-based compensation plans and agreements relevant to the stock option and restricted stock awards by First Data to Plaintiff.

(c) First Data's plans, policies and procedures for the implementation and execution of any "reduction-in-force" (as that term is used in the Answer to the Complaint) during the period between January 2015 and February 2017.

(d) First Data's plans, policies and procedures for the implementation of FMLA, ADA, and other leave programs.

## TOPIC 4 – CORPORATE GOVERNANCE AND CORPORATE RECORDS

(a) General description of First Data's legal hold process including all details of that policy and specific steps that were taken in this case to implement a legal hold.

(b) First Data's process and procedures for retaining information created during the planning and implementation of any "reduction-in-force" during the time between January 1, 2015 and February 28, 2017.

# EXHIBIT E

**From:** Eidelman, Gary B.
**Sent:** Thursday, May 24, 2018 9:44 PM
**Subject:** Reimbursement and Proposed Deposition Dates
**To:** Shawn Shearer
**Cc:** david@zeitlinlawfirm.com; Kennedy, Lindsey C.; Cooper, Gillian A.; Lantz, Roseanne A.; Eidelman, Gary B.

Shawn:

My Firm is preparing a check in the amount of $2,199.51 as reimbursement for the hotel in NYC and full airfares to Omaha and NYC. We are assuming that you did not get credit for the hotel booking or any of those flights.  The check will be processed and in the mail next week.

I have also secured multiple proposed dates for depositions of: Defendant Frank Bisignano, Defendant Dan Charron, Defendant Rhonda Johnson and First Data employees Matt Cagwin, Oliver St. George, Jennifer Voycheske, Amy Steffen and Stephanie Pulverenti who we are designating as our 30(b)(6) deponents. If you desire to also have Ms. Voycheske, Ms. Steffen or Ms. Pulverenti testify as fact witnesses because of their involvement with Mr. Barger's leave, you can take just one deposition of each of them and we will deal with designating the testimony accordingly.  Please see the attached chart for June and July dates.  If we need to go into August, that will take some more time.  If I have not provided a particular date, it is because we are unavailable.

Please let us know what dates work for each witness.

We also need to discuss scheduling Mr. Barger's deposition in NYC.

Thank you,



**Gary B. Eidelman**
**SAUL EWING ARNSTEIN & LEHR LLP**
500 E. Pratt Street
Suite 900 | Baltimore, MD 21202-3133
Tel: 410.332.8975 | Fax: 410.332.8976 | Mobile: 410.303.8832
Gary.Eidelman@saul.com | www.saul.com

**WISE:**
Workplace Initiatives and Strategies for Employers

*Follow our blog, WISE: Workplace Initiatives and Strategies for Employers, here*
* Please note that our Firm name and my email address have changed.

*Barger v. First Data Corporation et al.*
**Witness Availability Chart**
**June & July 2018**

| Date | Witness | Location | Time Issues | Notes |
|------|---------|----------|-------------|-------|
|  |  |  |  |  |
| **Monday, June 4** | Cagwin | Atlanta | 8 am – 3 pm |  |
|  | St. George | NYC |  |  |
|  |  |  |  |  |
| **Tuesday, June 26** | Bisignano | NYC | After 10:30 am |  |
|  | St. George | NYC |  |  |
|  | Charron | Atlanta or NYC | 1 pm – 5 pm | Location dependent upon DC schedule |
|  | Johnson | Atlanta |  |  |
|  | Cagwin | Atlanta | 11 am – 5 pm |  |
|  | Steffen | Omaha |  |  |
|  | Pulverenti | Omaha |  |  |
|  | Voycheske | Omaha |  |  |
|  |  |  |  |  |
| **Wednesday, June 27** | Johnson | Atlanta |  |  |
|  | Cagwin | Atlanta | 9 am – 5 pm |  |
|  | St. George | NYC |  |  |
|  | Steffen | Omaha |  |  |
|  | Pulverenti | Omaha |  |  |
|  | Voycheske | Omaha |  |  |
|  |  |  |  |  |
| **Thursday, June 28** | Cagwin | NYC | 11 am – 5 pm |  |
|  | St. George | NYC |  |  |
|  | Johnson | Atlanta |  |  |
|  | Steffen | Omaha |  |  |
|  | Pulverenti | Omaha |  |  |
|  | Voycheske | Omaha |  |  |
|  |  |  |  |  |
| **Friday, June 29** | Bisignano | NYC |  |  |
|  | Johnson | NYC or Atlanta |  |  |
|  | Cagwin | NYC or Atlanta | 1 pm – 5 pm |  |
|  | Steffen | Omaha |  |  |
|  | Pulverenti | Omaha |  |  |
|  | Voycheske | Omaha |  |  |
|  |  |  |  |  |
| **Tuesday, July 3** | Steffen | Omaha |  |  |
|  | Voycheske | Omaha |  |  |
|  |  |  |  |  |

1

| | | | | |
|---|---|---|---|---|
| **Thursday, July 4** | **Steffen** | **Omaha** | | |
| | **Voycheske** | **Omaha** | | |
| | | | | |
| **Friday, July 6** | **Steffen** | **Omaha** | | |
| | **Voycheske** | **Omaha** | | |
| | | | | |
| **Wedneday, July 11** | **Charron** | **Atlanta or NYC** | **1 pm – 5 pm** | **Location dependent upon DC schedule** |
| | **Voycheske** | **Omaha** | | |
| | **Pulverenti** | **Omaha** | | |
| | | | | |
| **Thursday, July 12** | **Bisignano** | **NYC** | | |
| | **St. George** | **NYC** | | |
| | **Cagwin** | **Atlanta** | **9 am – 5 pm** | |
| | **Johnson** | **Atlanta or NYC** | | |
| | **Pulverenti** | **Omaha** | | |
| | **Voycheske** | **Omaha** | | |
| | | | | |
| **Friday, July 13** | **Johnson** | **Atlanta** | | |
| | **Cagwin** | **Atlanta** | **9 am – 5 pm** | |
| | **St. George** | **NYC** | | |
| | **Pulverenti** | **Omaha** | | |
| | | | | |
| **Monday, July 16** | **Johnson** | **Atlanta or NYC** | | |
| | **St. George** | **NYC** | | |
| | **Pulverenti** | **Omaha** | | |
| | | | | |
| **Tuesday, July 17** | **Johnson** | **Atlanta or NYC** | | |
| | **St. George** | **NYC** | | |
| | **Pulverenti** | **Omaha** | | |
| | | | | |
| **Thursday, July 19** | **Johnson** | **Atlanta** | | |
| | **Pulverenti** | **Omaha** | | |
| | | | | |
| **Friday, July 20** | **Bisignano** | **NYC** | | |
| | **St. George** | **NYC** | | |
| | **Johnson** | **Atlanta or NYC** | | |
| | **Pulverenti** | **Omaha** | | |
| | | | | |
| **Monday, July 23** | **Johnson** | **Atlanta** | | |
| | **Cagwin** | **Atlanta** | **9 am – 5 pm** | |
| | **St. George** | **NYC** | | |

| | | | | |
|---|---|---|---|---|
| | Pulverenti | Omaha | | |
| | Voycheske | Omaha | | |
| | | | | |
| | | | | |
| Tuesday, July 24 | Johnson | Atlanta | | |
| | Cagwin | Atlanta | 9 am – 5 pm | |
| | Steffen | Omaha | | |
| | Pulverenti | Omaha | | |
| | Voycheske | Omaha | | |
| | | | | |
| Wednesday, July 25 | Cagwin | Atlanta | 9 am – 5 pm | |
| | Steffen | Omaha | | |
| | Pulverenti | Omaha | | |
| | Voycheske | Omaha | | |
| | | | | |
| Thursday, July 26 | Cagwin | Atlanta | 9 am- 5 pm | |
| | St. George | NYC | | |
| | Steffen | Omaha | | |
| | Pulverenti | Omaha | | |
| | Voycheske | Omaha | | |
| | | | | |
| Monday, July 30 | St. George | NYC | | |
| | Steffen | Omaha | | |
| | Pulverenti | Omaha | | |
| | Voycheske | Omaha | | |
| | | | | |
| Monday, July 31 | St. George | NYC | | |
| | Steffen | Omaha | | |
| | Pulverenti | Omaha | | |
| | Voycheske | Omaha | | |

24575871.1 05/24/2018

# EXHIBIT F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


STEVEN B. BARGER,              *   Case No. 17-CV-04869 (FB)
                              *
          Plaintiff,          *   Brooklyn, New York
                              *   September 4, 2018
     v.                       *
                              *
FIRST DATA CORPORATION, et al., *
                              *
          Defendants.         *
                              *
* * * * * * * * * * * * * * * *

TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
BEFORE THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:        SHAWN SHEARER, ESQ.
                          Law Office of Shawn Shearer
                          3839 McKinney Avenue, #155-254
                          Dallas, TX  75204

                          DAVID A. ZEITLIN, ESQ.
                          Zeitlin & Zeitlin, P.C.
                          50 Court Street, Suite 506
                          Brooklyn, NY  11201

For the Defendants:       GARY B. EIDELMAN, ESQ.
                          Saul Ewing Arnstein & Lehr, LLP
                          One PPG Place, Suite 3010
                          Pittsburgh, PA  15222




Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

```
 1              (Proceedings commenced at 2:11 p.m.)

 2              THE CLERK:  Civil cause for a status conference,

 3   docket no. 17-CV-4869, Barger against First Data Corporation,

 4   et al.

 5              Will the parties please state your names for the

 6   record.

 7              MR. SHEARER:  Shawn Shearer, of The Law Office of

 8   Shawn Shearer, for the plaintiff.

 9              MR. ZEITLIN:  And also on behalf of the plaintiff,

10   as local counsel, the Law Office of Zeitlin & Zeitlin, by

11   David Zeitlin.  Good morning.  Good afternoon.

12              MR. EDELMAN:  Good afternoon, Your Honor.  Gary

13   Eidelman, from Saul Ewing Arnstein & Lehr, for the defendants.

14              THE CLERK:  The Honorable Lois Bloom presiding.

15              THE COURT:  Good afternoon, Mr. Shearer, Mr. Zeitlin

16   and Mr. Eidelman.

17              This is actually a discovery conference in

18   plaintiff's employment discrimination case where plaintiff is

19   alleging violation of his rights under the FMLA and the ADA.

20              So, again, it's at this point, very close to the end

21   of discovery, and the Court has gotten four motions to compel,

22   Mr. Shearer, in the past week and a half from you.

23              Now, again, I understand that you believe that this

24   is the way to litigate the case.  You were admitted pro hac

25   vice.  I have you in no other cases.
```

3

1          I have to say quite honestly I think you might be

2     losing some of your perspective about the case -- because

3     you're representing your father-in-law -- filing four motions

4     to compel in a week and a half.

5          Again, nothing is going to prevent you from filing a

6     motion in this court.  But I think that when Judge Block

7     denied your motion in July, he cautioned you to consider the

8     merits of any future motion.  And when you moved to compel

9     back in June, I held a conference the next day and denied your

10    motion.

11         I think you're in earnest, trying to do your best

12    work for your father-in-law's case, but I really do think you

13    might be losing some perspective on this.

14         Let me just say I do understand that they hired

15    somebody the same day that they fired your father-in-law,

16    January 13th.  I get that.

17         I also get that if their defense to your father-in-

18    law's discrimination case is a reduction in force, which is

19    what they've said, I understand how having somebody hired at a

20    high salary, presumably high salary, would raise at least

21    hackles, if not more than hackles, on your back, and you want

22    to get at that information.  I got you on that.

23         But then when I read what the press release was --

24    which was supplied by Mr. Edelman -- and that you have had the

25    depositions of the people who were involved in the hiring of

4

1   Mr. Jackson -- and in my mind -- and we're here to talk about

2   this today -- in my mind, we're talking about two extremely

3   different jobs.

4           What Mr. Jackson was hired to do was intellectual --

5   IT work and security work.  What your father-in-law was hired

6   to do was training.  Completely different jobs.  Would you

7   agree with that as a basic premise.

8           MR. SHEARER:  I do agree with that.

9           THE COURT:  So I'm thinking what would Mr. Jackson

10  be able to contribute other than his salary?  Okay.  What

11  would he be able to contribute at a deposition towards the

12  discrimination case that your father-in-law is bringing here?

13          MR. SHEARER:  I think the issue is that when you

14  look at the testimony of the other witnesses, budgetary

15  authority is governed by whoever the executive person --

16          THE COURT:  I have read all of those that you

17  submitted.

18          MR. SHEARER:  Okay.

19          THE COURT:  And what your premise is, or at least

20  what I think you're trying to get the Court to agree with is

21  that if a major corporation decides to cut money one place,

22  but then adds it to another place, that that could never be a

23  reduction in force.  And I don't know that there's any case

24  law that supports you on that.

25          MR. SHEARER:  Well, I don't think the issue is a

5

1   reduction in force.  The issue is whether an equivalent

2   position was maintained for someone on FMLA.  And at the point

3   the decision was made --

4           THE COURT:  An equivalent position to your father-

5   in-law's position.

6           MR. SHEARER:  That's true.

7           THE COURT:  Not to Mr. Jackson's position, which was

8   a new hire, a lateral from another IT position with another

9   security firm.

10          So, again, your father-in-law, Mr. Barger and Mr.

11  Jackson had very different jobs.

12          MR. SHEARER:  But the testimony from Ms. Benhart

13  last week --

14          THE COURT:  Could you just bring your mic closer,

15  sir.

16          MR. SHEARER:  The testimony of Ms. Benhart last week

17  was at this point in time any executive vice president was on

18  a one-for-one, hire/fire.  That is, if you hired -- if you

19  were going to hire an SVP, you had to fire one.

20          THE COURT:  But there is no dispute that your

21  father-in-law was fired.

22          MR. SHEARER:  That's correct.

23          THE COURT:  And there's no dispute that Mr. Jackson

24  was hired on that same date.

25          MR. SHEARER:  That is correct.

6

1          THE COURT:  So why would we need his deposition?

2    He, who knows nothing about how the internal works of First

3    Data would, you know, affect your father-in-law?

4          MR. SHEARER:  Well, I couldn't get the answer.  But

5    two depositions that I took, Mr. Charron and Mr. Bisignano, I

6    asked them about their interview process with Mr. Jackson --

7          THE COURT:  I saw that.

8          MR. SHEARER:  -- and I believe --

9          THE COURT:  I read all of that.

10         MR. SHEARER:  -- I believe what they're saying is

11   that at the time Mr. Barger was forced on to leave, they

12   forced him to stop working, is approximately the same time

13   that they started to interview Mr. Jackson.

14         And it's at the same time that the company is on

15   this one for one set off program where Mr. Charron would have

16   needed to fire an SVP in order to hire one.

17         And it seems coincidental to me that they forced Mr.

18   Barger on to leave at the same time they started Mr. Jackson's

19   interviews.  And --

20         THE COURT:  But, again, my question to you is nobody

21   is disputing that on the same date that your father-in-law was

22   fired that Mr. Jackson was hired.  Nobody's disputing that.

23         MR. SHEARER:  And I think the question is was the

24   date they forced my client on to leave approximately the same

25   date that they started to interview Mr. Jackson, to bring him

7

1   in, and that the two were linked much earlier than that.  And

2   when he was forced on leave --

3           THE COURT:  But how would Mr. Jackson know anything

4   about when they started the wheels in motion?

5           MR. SHEARER:  Well, he would know when they talked

6   to him first.

7           THE COURT:  It is irrelevant to your case.  Your

8   case is a reduction in force case where you're going to have

9   to prove that this was not a reduction in force.  Right?  They

10  have to prove it was.  I'm sorry.

11          MR. SHEARER:  But I have -- they have to prove --

12          THE COURT:  You have to prove it's discrimination.

13          MR. SHEARER:  -- my client was included in a

14  reduction in force.

15          THE COURT:  And you have to prove that the reduction

16  in force is a pretext for discrimination.  That's what the

17  case is about.

18          MR. SHEARER:  And part of that is that the plan was

19  to terminate him at the time that he -- they forced him to

20  take leave.

21          THE COURT:  But, wait.  Let's go back to when they

22  forced him to take leave.  Because that leads us to the

23  Voycheske dispute here.  So the Voycheske dispute -- and if I

24  recall correctly, Ms. Voycheske was the one who you tried to

25  get the daycare records from her child's daycare.  Is that

8

1    correct?

2            MR. SHEARER:  From her former daycare provider.

3            THE COURT:  But it was Ms. Voycheske who you now say

4    you didn't want to depose because she's not an officer or

5    manager.  But you were interested so much in her before that

6    you were trying to get the daycare records from her child's

7    daycare?

8            MR. SHEARER:  Right.  And her story has changed

9    significantly in the two -- and once she changed her story

10   again, I didn't want to depose her.  It's clear that the two

11   declarations in and of themselves contradict and there was no

12   reason to take up --

13           THE COURT:  Why don't you tell me what the point is

14   that you're trying to make with Ms. Voycheske with the

15   *Fountain* materials.

16           Because, again, my feeling is they are not disputing

17   that there were backdated forms.  Because you're -- again, I'm

18   just synthesizing -- you're saying that he was forced out on

19   FMLA leave, a date was given, that date was inputted into the

20   system.

21           And then according to what Mr. Eidelman's most

22   recent letter to the Court was your father-in-law had

23   submitted different dates when he was looking for his leave

24   from the disability people, the MetLife people.

25           And so when they got the letter saying that the

1    operation was in September, they then changed the FMLA

2    approved leave to be dated from the same date that your client

3    had submitted for his leave request to MetLife.  Isn't that

4    what the date change was?

5              MR. SHEARER:  I would disagree with several facts.

6              THE COURT:  So give me the date that he was forced

7    to take FMLA leave under your --

8              MR. SHEARER:  He was advised on November 18th by

9    text message -- no, by -- a letter dated November 18th was

10   sent to him by EVP Tony Marino, who is the head of the human

11   resources department, that arrived to his home I believe --

12   that was a Saturday -- a Friday -- and it arrived at his home

13   on Monday.

14             Over that weekend, the two of them text messaged --

15   a text exchange -- and Mr. Marino advised him that he was

16   going to have to transition to -- the first date is -- leave

17   programs -- and that is November 18th, 19th, in that area.

18             THE COURT:  Okay.  So November 18th you're saying is

19   the date that they forced him to take leave from?

20             MR. SHEARER:  That's correct.

21             THE COURT:  And so what is the problem with what Ms.

22   Voycheske has supposedly put in in affidavits that conflicts?

23             MR. SHEARER:  Well, Mr. Barger did have his surgery

24   on September 6th.  That surgery was conducted by a surgeon

25   recommended to him by CEO Bisignano.  Mr. Bisignano also

10

1    helped him arrange the meetings with that physician.  EVP Dan

2    Charron, EVP Jeff Hack --

3              THE COURT:  I'm sorry.  You're giving me too many

4    names.  I was asking what did Ms. Voycheske change that you're

5    talking to me about?

6              MR. SHEARER:  What I'm saying is that on September

7    6th, when Mr. Barger had his surgery, nearly five officers of

8    First Data ranked EVP, CEO, SVP were aware of the surgery.

9              THE COURT:  I get -- I get that.

10             MR. SHEARER:  So Ms. Voycheske learning in January

11   of 2016 as a manager of leave in Omaha that Mr. Barger had

12   surgery on September 6th is not the question.

13             First Data not only knew he had surgery on September

14   6th to remove his larynx, but all of the senior management at

15   First Data knew that.  The knowledge was there.

16             And the fact that Ms. Voycheske didn't know it

17   doesn't change --

18             THE COURT:  But what is it --

19             MR. SHEARER:  -- doesn't change --

20             THE COURT:  -- what is it that you're trying to

21   impute that she did wrong with regard to the leave?

22             MR. SHEARER:  Right.  Correct.  Mr. Barger continued

23   to work remotely from September 6th through November 18th.

24             THE COURT:  Then why did he give that date when he

25   was asking for disability leaves?

11

1          MR. SHEARER:  Well, Mr. Barger thought the question

2     was what -- and he testified to this at his deposition -- he

3     thought that the question -- when was your last day at the

4     office.  He thought when you --

5          THE COURT:  He thought that was the question?

6          MR. SHEARER:  Yes.  Yes, he did.

7          THE COURT:  Well, again, I'm interested in hearing

8     what you think Ms. Voycheske's prior sworn testimony has

9     anything to do -- that was an intermittent leave case.  Kudos

10    to you that you're searching the whole country to see any

11    First Data cases and you come up with a summary judgment

12    motion.

13         But, one, I have absolutely no doubt that that

14    testimony a year prior is irrelevant to your case.

15         Two, as far as who holds the deposition transcripts,

16    I have no idea.  They may be confidential.  It may have been

17    subject to a mutual protective order in that case.  There is

18    nothing in the law that prohibits parties to a litigation to

19    designating deposition testimony as confidential.

20         And that they put part of it into the court record,

21    and so you were able to view parts of it, which you gave me,

22    which I've read, I don't find there to be any basis --

23         MR. SHEARER:  I think it should --

24         THE COURT:  -- to compel them to turn over any of

25    that deposition.  You say they were a subsidiary.  Ms.

12

```
 1    Voycheske apparently was hired -- I don't know -- three years
 2    ago.  The Fountain case was about intermittent leave that went
 3    back into the 2009 or thereabouts.
 4            So, again, you're talking about things that are so
 5    tangentially related here, Mr. Shearer, that I don't get what
 6    you're trying to prove. I do understand that you believe that
 7    they are not disclosing everything that you've asked for.  I
 8    get that.
 9            So, again, even though I don't think that you have
10    the right to depose Jackson, I would order them to turn over
11    the request to admit because whether or not you could use
12    that, who knows.
13            But you want to nail them down that they hired
14    somebody at the same time they fired your father-in-law and it
15    was for at the same or a large number salary.  Okay.  I don't
16    see that as being unreasonable.
17            But I do see it as a frolic and a detour in what is
18    your essential case to prove.  You have to prove
19    discrimination.
20            So, again, I understand you're trying to show that
21    their reduction in force is a pretext, but I don't get how any
22    of these other things that you're asking me to compel go to
23    the issue of discrimination.
24            MR. SHEARER:  When you go through the documents, and
25    the spreadsheets, and the planning, and the documentation of
```

13

what we're using the term reduction in force -- even though

that's not in the regulations -- but whatever we're thinking

of as a reduction in force, I don't believe that those

documents reflect that Mr. Barger was included in a reduction

in force until such time as he exercised his right to return

by providing First Data of his doctor's release to return to

work on January 10th.

THE COURT:  That's fine.  That's fine.  There's no

dispute.

MR. SHEARER:  But it was at that point that Mr.

Jackson (sic), at his returning, messed up Mr. Charron's

budget where he has to hire one/fire one.  They thought Mr.

Barger was going to stay on leave.

It was only his exercising his right to return that

caused him to get fired.  And he wasn't in the RIF.  And their

documents show that he was added after the fact as a cover

just for this defense.

THE COURT:  Okay.  So you'll make your argument.

But that doesn't mean that you need to depose Mr.

Jackson --

MR. SHEARER:  No.

THE COURT:  -- who knew nothing about any of this

when he came on.

MR. SHEARER:  I just need the answers to two

questions.  When did you start interviewing and what did you

14

```
 1    pay him?  That is it.  And that's all I've been asking.  I've

 2    tried every means.

 3             THE COURT:  I don't think that's all you've been

 4    asking quite frankly.

 5             MR. SHEARER:  On this topic.

 6             THE COURT:  That's really --

 7             MR. SHEARER:  No.  On this topic, that's really the

 8    question I've been asking.

 9             THE COURT:  Okay.  You want to be heard I imagine,

10    Mr. Eidelman?

11             We're sort of having a free-ranging conversation

12    about two of the four things that I've been presented with.

13    The first two were the deposition of E.J. Jackson, which I am

14    ruling he is not entitled to a deposition of E.J. Jackson,

15    E.J. Jackson being hired on the same day that Mr. Barger was

16    fired does not mean that Mr. Jackson has relevant testimony

17    regarding this discrimination case.

18             In fact, it's been established just on the letters

19    to me -- and I believe you're not contesting this, Mr.

20    Shearer, that Mr. Jackson's job was completely different than

21    the job that Mr. Barger was doing.

22             And, again, I cannot just give you a deposition

23    gratuitously of someone because they were hired the same day,

24    even though I do think that those -- the confluence of those

25    dates raises an eyebrow, at least, if not some hackles.
```

15

```
 1              Okay, Mr. Eidelman.

 2              MR. EIDELMAN:  Judge, I really don't have much more

 3    to add with regard to those, the topics that you've talked

 4    about.

 5              There are a lot of facts in this case that will come

 6    out in summary judgment relating to Mr. Barger's inclusion in

 7    the RIF.  The fact that 27 other senior vice presidents and

 8    his own boss, Mr. Jeff Hack, who put him on the list, were

 9    included in the reduction in force.  Those are --

10              THE COURT:  And he was the only one that wasn't

11    deposed -- Hack -- isn't that correct?

12              MR. EIDELMAN:  No.  Mr. Hack, frankly, is the only

13    one who wasn't named as a defendant.  And he has not been

14    deposed.  That is correct, Judge.

15              So with respect to that, we'll save that for summary

16    judgment.

17              I agree with your comments regarding a deposition of

18    Mr. Jackson.  I understand the Court is likely to compel us to

19    provide an answer to that admission.

20              I will say, Your Honor, that if you look at the

21    deposition transcripts that Mr. Shearer took of Mr. Charron,

22    and he asked the question do you know what he was making and

23    he said, no, I'm not certain, there was no followup.  There

24    was no was he making more than 300,000?  It was just he moved

25    on.
```

16

1          THE COURT:  I understand.

2          MR. EIDELMAN:  But we will, Your Honor, if you

3    compel us to, if you order that we should provide an answer to

4    that admission, we most certainly will of course.

5          THE COURT:  Look.  Why did I have you both come here

6    today?  Because we've extended discovery until the end of

7    September.  That's going to be it.  And that's for both sides.

8    And that means that we're close to the finish here.

9          So discovery is to be completed by both sides by

10   September 28th.  And any pre-motion conference request needs

11   to be made to Judge Block by October 12th.

12         So I understand you're both beleaguered by each

13   other at this point.  The case, unfortunately, did not resolve

14   early.  And you have been, you know, playing this like it's a

15   a major tennis tournament with two very good hitters on either

16   side of the court.  But quite frankly, I feel a bit like the

17   tennis ball and I don't need to keep getting hit.

18         This was, in my mind, an unnecessary -- unnecessary

19   to bring four motions to compel.  It's been said over and over

20   again that discovery is the single greatest source of cost and

21   delay in civil litigation.

22         That the initial motion to compel back in June was

23   denied in a conference the very next day.  I am trying to give

24   the message to the litigants here that you need to work these

25   things out.  But I see this was an impossibility.

17

And so I spent a good amount of time going through
each of these exhibits and getting a feel for what's been
going on.  And that's why I'm saying to you that I feel like,
you know, this has been a frolic and a lark and taking you
away from your main burden here, which is to prove
discrimination.

Talking about Voycheske and changing determinations
unilaterally, and yet there's a September 6th surgery date, I
understand what your argument will be.  Your argument will be
that Bisignano and other people knew that he was operated on
because they were in touch with him.  That doesn't mean that
the personnel person filling out the forms contacts the CEO.

For goodness sake, Mr. Shearer, that makes no sense
to me.  It makes no sense to me that Mr. Bisignano is going to
contact his human resource person and say Mr. Barger went out
for surgery on September 6th.  Let's process some forms for
him.  That makes no sense.

MR. SHEARER:  Right.  And I think it makes no sense
that a manager of human resources in Omaha has the unilateral
authority to override the decisions that were made by the CEO
and --

THE COURT:  That's how you're going to paint it as
she overrode, but I don't know that the facts will support
that.

Again, if he put in papers for long-term disability

18

1    leave that did not comport with what he had put in for FMLA

2    leave -- I understand your point that you felt that he was

3    being forced to take FMLA leave, but you're saying that's in

4    November.

5              So if they process it as of November, which is I

6    believe the dates that were given, and then he submits long-

7    term disability that goes back to September 6th, you're going

8    to blame the company for making that change so that it

9    comports with what he put in to long-term disability?

10             MR. SHEARER:  Yes, I am.

11             THE COURT:  Why?

12             MR. SHEARER:  Because the company already knew that

13   he was working from home and the hospital.  He was on an ADA

14   accommodation from September 6th to November 18th.

15             THE COURT:  That's in --

16             MR. SHEARER:  That's why they --

17             THE COURT:  That's in writing?

18             MR. SHEARER:  No.  But that's what -- but I can

19   produce emails from every single day between September 6th and

20   November 18th when he was told to take leave.  You don't tell

21   somebody on leave to take leave.

22             THE COURT:  But there was no FMLA specific request

23   made by Mr. Barger.

24             MR. SHEARER:  No, not until November.

25             THE COURT:  So there was no accommodation request

1   made where there is something in writing from First Data

2   saying, yes, you can work from home, not an issue, we're going

3   to list you as working from home.

4              MR. SHEARER:  Well, that -- I mean, I think that

5   goes into the IT issues that have -- are part of the 10(b)(5),

6   which is the manager, which is Jeff Hack, who -- the reason he

7   wasn't named as a defendant -- we found out -- we thought he

8   had been terminated before Mr. Barger and that he wasn't

9   involved in the decision until we got the discovery in this

10  case.  That's why he's not named and that's why he wasn't

11  deposed.

12             THE COURT:  I'm sorry.  I didn't follow.

13             MR. SHEARER:  He was trying to say --

14             THE COURT:  You know more about the case than I do.

15             MR. SHEARER:  That's a sideline.

16             I mean, Mr. Barger was working directly with

17  Defendant Charron remotely for that entire period from

18  September 6th through November 18th.  They even sent IT people

19  over to set up his home office where he could work.

20             THE COURT:  When did they send the IT people?

21             MR. EIDELMAN:  When he got home in October.

22             THE COURT:  So not from September 6th?

23             MR. EIDELMAN:  No.  That's correct.  But they were

24  FedExing him materials on a weekly basis.

25             THE COURT:  Again, I'm not here to decide the

1   ultimate issue.  I am only here to say that you have to be

2   reasonable in what you're requesting and in making motions to

3   the Court.  And I've only gotten to two.

4          I've gotten to the motion to compel E.J. Jackson.

5   And that motion, I told you the reasons on the record why I'm

6   denying that motion.

7          But I am directing them to respond -- I think it was

8   only three requests to admit -- at least those are the ones I

9   -- was it more than 400, more than 450?  Just state what his

10  salary was for God's sakes.

11         MR. EIDELMAN:  Will do.

12         THE COURT:  Okay.  So the next was the Voycheske

13  deposition -- which I've tried to lead you to my understanding

14  of why you requested it -- that you want the entire

15  transcript.

16         As I said, one, I don't think you're entitled to it.

17  Two, I don't see what that helps you to prove here.  You want

18  there to be something to prove that Voycheske's veracity and

19  pattern of record-keeping snafus resolves against employees on

20  leave.  And you can make whatever arguments you want out of

21  the testimony.

22         But I don't believe you're entitled to a deposition

23  from an independent case brought against a subsidiary a year

24  before this case was started.  So your request for the entire

25  transcript of all Voycheske depositions in *Fountain* is denied.

1          So really I wanted to be here today to put our minds

2      together about how we could get discovery done.  And I'm

3      looking at the last of the two issues.  And the last of the

4      two issues are the 12(b)(6) issue.

5          And I'm not even sure -- let me see -- it's the ten

6      deposition limit and the 30(b)(6) issue.  Those were ECF-55

7      and ECF-56.  And, again, 56 is where you sought the deposition

8      of E.J. Jackson; 55 is where you were again seeking to compel

9      30(b)(6) depositions and to impose sanctions for failure to

10     appear twice at properly noticed 30(b)(6) depositions.

11         This is where it really pained me to read, Mr.

12     Shearer, how much you put into this.  I can't imagine that

13     when you were a lawyer to anybody but your father-in-law that

14     you would have done what was at least in my mind put into the

15     calendar, the letters, the emails back and forth.

16         I think you're a little too close on this one to the

17     people that you're representing and that maybe you don't see

18     it the way the Court will see it.

19         Saying that you intend to show up for a deposition,

20     whether it be in Omaha or Los Angeles, when he's writing

21     emails saying nobody is going to be there, and yet you hire

22     the court reporter, and you go on the record, as if you

23     expected them to be there, doesn't make it any more

24     reasonable.

25         MR. SHEARER:  Well, if you look at Mr. Eidelman's

22

1  emails to me, when he says that he will not produce E.J.

2  Jackson, he will not produce Adam Rosman without a court

3  order, in order for me to come to you for an order -- and I've

4  chosen not to other than Mr. Jackson here -- I have to issue

5  the subpoena and I have to have something to ask you to

6  compel.  So I did that to create the record for the case we

7  needed in a motion to compel in those cases.

8          THE COURT:  But let me just suggest to you, sir, I

9  have not been inattentive.

10          In fact, when you made your last motion to compel, I

11  had you on within a day of getting that motion.  I have in

12  every way tried to indicate to you that I understand that

13  you're litigating a case for somebody that you believe was

14  discriminated against and that you need to get information

15  from the defendants because everybody knows that in

16  discrimination cases the information is somewhat asymmetrical.

17          I have not told you if you can't agree to something

18  with Mr. Eidelman that you should never write to the Court.

19  Here you made four motions to compel in a very short period of

20  time.  Why it couldn't be one motion to compel I have no idea

21  on four different topics.

22          But be that as it may, I really take -- I take you

23  at your word and still it does not appear to be reasonable.

24  It appears to be irrational.

25          MR. SHEARER:  I was thinking that the fact discovery

23

1       for me ended on August 31st.  That the extension of fact

2       discovery for Mr. Eidelman was limited to the two witnesses,

3       third-party witnesses, that he was seeking.  And so I wanted

4       to get my motions to compel in before the end of my fact

5       discovery.

6                THE COURT:  And what about the idea of saying you've

7       now extended, Judge, for them -- and there are three or four

8       other matters that we still need to tend to.  You don't think

9       that I would have been receptive to hearing that from you in

10      the same manner that I heard from him, by letter, that he

11      needed an extension of time?

12               MR. SHEARER:  Well, I'm sorry, Your Honor.  I

13      thought that's what I was doing.

14               THE COURT:  With the four motions to compel, that's

15      what you thought you were doing?  Attaching Exhibits A through

16      F or, you know, I can't even tell you how many exhibits

17      because there are quite a few.  And then they have to counter

18      your motions.

19               So I'm putting it on the record now if down the road

20      you're successful for your client, I cannot allow this to

21      multiply the fees that would be requested because that would

22      be an abuse of the discretion of the Court.  I was available

23      to the parties.  I was able to sit down to resolve within one

24      day the last dispute which was brought to my attention in

25      June.

24

1          So you cannot claim -- even though I didn't rule in

2     your favor -- that I've been inattentive and just let the

3     deadlines go by.

4          I would not have been inattentive had I gotten a

5     letter from you at the same time as I got the letter from Mr.

6     Eidelman where he was requesting an extension of the discovery

7     deadline because he said he had two non-party witnesses that

8     he needed to depose.

9          Had you chimed in, Judge, I would like that same

10    opportunity because we have these things that are outstanding,

11    I probably would have convened the same conference to try to

12    get this worked out.

13         So going back to the issue of the 30(b)(6), there is

14    a case in the Southern District which was pointed out.  It's

15    very different.  It's the *Winfield case.*  *It's* against the

16    City of New York.  It's by my colleague, Katherine Parker.

17         And it goes into great detail about the balance that

18    the Court is required to strike when dealing with 30(b)(6) and

19    that 30(b)(6) should not be used to enlarge the number of

20    depositions.

21         But at the same time, it's logical that sometimes

22    the information that is going to be requested on categories

23    will be outside of what one person knows about an

24    organization.

25         And that case, which was against the City of New

1    York, about housing allotments to poor people and the policies

2    and the underlying collection of data, the 30(b)(6) deposition

3    was to collect information about how the information is kept

4    by the City of New York.

5            And there were different agencies that had different

6    portions of the information that the plaintiffs were trying to

7    collect.  And it was a class action lawsuit.  It wasn't a

8    single plaintiff lawsuit.  And they decided, Judge Parker

9    decided, to have a 30(b)(6) by committee and to rule on the

10   categories of information.

11           But the upshot, Mr. Shearer, for this case, in my

12   mind was, again, going back to the rule, that you have to

13   identify with reasonable particularity what it is that you

14   need to be -- what you're going to depose the witness on.  And

15   that 30(b)(6)'s reasonable particularity requirement must be

16   enforced strictly.

17           And so I know that we had a prior conference where

18   we tried to whittle down what information you really needed,

19   and that was in order to try to get the right people to attend

20   the 30(b)(6) depositions.

21           So with that as the backdrop, Mr. Shearer, why don't

22   you tell me what it is -- because I've looked at each of the

23   categories -- that you say you still need information on?

24           And I'd like to just say one category I do not

25   believe you have any basis for is the litigation hold

26

1      category.  So please don't go to that category.  That was the

2      last on the list.

3           But I find that the litigation hold is not central

4      to your claim of discrimination.  There's been no claim made

5      to the Court that there was evidence requested, that there's

6      spoliation that you are alleging.

7           I don't know where you were coming up with that as a

8      category that you wanted somebody to testify about, but that

9      is off the table.  Not only is it not relevant, it's going to

10     lead to all sorts of privilege battles, and it's not central

11     to the focus of the case, which is whether or not there was

12     discrimination by First Data against your client.  So why

13     don't you tell me as to the other topics.

14          MR. SHEARER:  Yes.  The first one that I requested a

15     witness on in the motion was Topic 1C, which is First Data's

16     internal control policies and procedures for the technological

17     systems used by First Data's Human Resources Department,

18     payroll and leave management.

19          THE COURT:  So just talk to me.  What is it that you

20     believe you need?

21          Because, again, I don't see them disputing your

22     version that your client went out, was operated on in

23     September.  I don't see them disputing that there was a letter

24     in November that put him on leave.

25          I don't see them disputing that then when the long-

1    term disability claim came through that Ms. Voycheske changed

2    the date to the September 6th surgery.  I don't see any of

3    that as being a disputed matter.

4            MR. SHEARER:  This is going to go to the disputed

5    matter between the surgery and the forced leave, that period

6    of time between September 6th and November 18th.  During all

7    of the depositions there are two systems that the human

8    resources department uses.

9            One is called the OOO, which stands for Out of

10   Office System.  The question that has never really been

11   answered on that by any of the witnesses is who can change the

12   information in there for an employee.

13            And this is where employees would record their

14   vacation time, their sick time, their leave time, all the paid

15   time off, and it's unclear who has access to make changes to

16   that system.

17            And that's important because Mr. Barger, I do not

18   believe, was ever placed on vacation or sick time or personal

19   time during that period of time.

20            But somehow when the dates get changed by Ms.

21   Voycheske in January, that system is modified by somebody.

22   And it wasn't modified by Mr. Hack, who was his supervisor,

23   who had been terminated.

24            So the question that I have is who could go in and

25   recalculate Mr. Barger's --

1          THE COURT:  Did you ask that precise interrogatory

2     who went in and changed Mr. Barger?  Not in the hypothetical

3     who can go in.  But you're asking about a particular change

4     that was made on Mr. Barger's account?

5          MR. SHEARER:  Correct.

6          THE COURT:  Did you ever ask who made that change?

7          MR. SHEARER:  I've asked, not specifically.  I've

8     asked about who has authority to make changes.

9          THE COURT:  I don't care who has the authority.  I

10    really don't.

11         MR. SHEARER:  I did at the time because it might

12    have been somebody I wanted to depose.

13         THE COURT:  But did you ever ask who made the change

14    on Mr. Barger's account?

15         MR. SHEARER:  Not specifically that way, but I've

16    asked everybody I have deposed.

17         THE COURT:  You've asked everybody you deposed how?

18         MR. SHEARER:  Did you put the time -- did you make

19    the change in the system?

20         THE COURT:  But you never asked who did --

21         MR. SHEARER:  They said, no, I can't.

22         THE COURT:  -- because there must --

23         MR. SHEARER:  They said -- their answer is I

24    couldn't do that.

25         THE COURT:  Yes.  But did you ever ask who did make

1 the change?  Because there has to be some IT footprint.

2    MR. SHEARER:  That's the -- that's what -- no, I did

3 not ask specifically who made the change?

4    THE COURT:  Why didn't you ask that specific

5 question?  Why do we need an IT person to come testify as to

6 who can change the info on a system if you never asked the

7 precise question that you really need the answer to?

8    MR. SHEARER:  Well, it's pretty clear that nobody

9 knows other than the IT person.

10    THE COURT:  I don't know that's true because you

11 never asked the question, Mr. Shearer.

12    MR. SHEARER:  Okay.

13    THE COURT:  Mr. Eidelman?

14    MR. EIDELMAN:  Judge, I don't see a need at all for

15 an IT expert in this case.  I agree with you.

16    The documents -- as the Court has said, there isn't

17 -- there isn't a dispute as to the sequencing of events.  The

18 issues in this case is whether or not First Data unlawfully

19 terminated Mr. Barger because he was on FMLA leave, said he

20 wanted to come back from FMLA leave.  Those are the issues.

21    There will be a question as to whether or not it was

22 legitimate, and I think it was under the regulations, when Mr.

23 Barger told the company -- first told the company that what

24 happened was -- as is seen in the emails -- that he spoke to

25 the people at MetLife and they had approve his short-term

1   disability going all the way back to September.

2              THE COURT:  September 6th.

3              MR. EIDELMAN:  And what Mr. Voycheske writes to him

4   and says is that's not what our records indicate.  When did

5   you go out on leave and when were you out?  And he says I was

6   out on this date.  And it will be up to -- whether or not it's

7   a dispute --

8              THE COURT:  The trier of fact.

9              MR. EIDELMAN:  -- it will be up to a trier of fact

10  to determine whether or not his interpretation of the question

11  when did you stop working means when did you stop going into

12  the office -- which I find incredible for a man on Wall Street

13  making over half a million dollars a year to come up with that

14  as an excuse.  Putting that aside, there's no issues there.

15             And with respect to the sequencing of things, the

16  fact of the matter is, is that there has been testimony as to

17  what happened with Mr. Barger when he went out on leave, how

18  he was assisted by a vice president of human resources, the

19  defendant, Rhonda Johnson, to fill out the forms, how he had

20  difficulty filling out the forms.  She went over to his house,

21  helped him fill out the forms.  These forms are the standard

22  protocol for getting out on leave.

23             And, yes, originally it was set -- as I think

24  October 24th was the date his doctor put on the FMLA form --

25  that's when it started until he came and told the company that

1    he started his leave much earlier.  Why he told the company

2    that, I have my suspicions.

3         And I think it goes to the issues of when would he

4    have salary continuation to go on for?  Because the earlier

5    short-term disability starts, you deal with the waiting

6    period, you then get the 90 days of short-term disability,

7    then you go on long-term disability.  He did that.  The

8    company didn't do that.

9         But I'll say, Judge, there still will be the

10   question on summary judgment is assuming arguendo that the

11   company wasn't justified in putting it back to September, was

12   the company justified in terminating him as part of a

13   reduction in force?  Those are the issues in this case.

14        And having this IT expert -- and, Your Honor, I

15   believe we dealt with this before with you -- when the same

16   issue came up on the telephone conference that we had -- and

17   you said go ask your questions as to what's happened, you

18   don't need an IT expert.

19        I will tell you, Judge, it's undisputed that when

20   Mr. Barger went out on leave two things happened

21   technologically.

22        One, he stopped having access to his emails through

23   something called the Good app.  That's been testified to.

24   It's undisputed that that's the app that employees can use to

25   get their business emails at First Data.  And his was

32

1      disconnected.  And his VPN, his ability to log in remotely,

2      was disconnected.  That's undisputed.  So I don't know what

3      technology experts are needed for anything.

4                   These letters are in the record.  They are hard

5      copies of the letters.  There's no -- there's no changing of

6      dates here.  There's no reason to change the dates here other

7      than when -- I say there's no reason to hide what the date

8      changes were because the documents are there.

9                   So that's, Your Honor, our belief that there is

10     absolutely no reason or basis to have some technology person

11     come in and testify.

12                  I will say, Judge, that at Ms. Benhart's deposition

13     -- Ms. Benhart was deposed I think a week ago or so in Omaha,

14     Nebraska -- was asked a lot of questions about the

15     spreadsheets that were put together that incorporated Mr.

16     Barger's name starting in late November, and the total sum of

17     dollars that was saved through this reduction, Ms. Benhart

18     testified a lot about technology and what's used and

19     spreadsheets and stuff like that.  Those are the relevant

20     issues in this case, Judge.

21                  So it's our position that having somebody testify

22     about the internal policies and control procedures for the

23     technological systems that are used is irrelevant and has no

24     basis for a deposition.

25                  THE COURT:  Could I just hear from you?  I don't

33

1    want to cut you off -- you had said there were two systems.

2              MR. SHEARER:  There are three.  Yeah.

3              THE COURT:  And it started with 000.  Now there are

4    three?

5              MR. SHEARER:  Yeah.  The other one is a system

6    called PeopleSoft.  It sometimes goes by MSS, Management Self

7    Service System.  There's emails from Ms. Whalen, Defendant

8    Whalen, and others indicating --

9              THE COURT:  I'm sorry.  PeopleSoft.  So there's Out

10   of Office.  And you wanted to know who can --

11             MR. SHEARER:  Yeah.

12             THE COURT:  -- change info for an employee.

13             And what's PeopleSoft Management?  I'm sorry.  I

14   don't --

15             MR. SHEARER:  Yeah.  They call it PeopleSoft

16   sometimes.  And sometimes it gets --

17             THE COURT:  And it's Management --

18             MR. SHEARER:  -- referred to Management --

19             MR. EIDELMAN:  If I may, Your Honor?  PeopleSoft is

20   the company's human resources information system.  It is --

21   that's the brand name for it.  It's the system that many,

22   many, many, many employers in this country use to keep track

23   of information regarding employees.  So it's called

24   PeopleSoft.

25             THE COURT:  So it's a management software?

34

```
 1            MR. EIDELMAN:  No.  It's not -- well, it is
 2    software, but it's a human resources information system.
 3            THE COURT:  So what was the MM?
 4            MR. SHEARER:  MSS I've heard it referred to.  I
 5    think it's Management Self Service.  I don't --
 6            MR. EIDELMAN:  Well, Management Self Service is that
 7    an employee has a portal that they can go into and say I've
 8    now taken vacation.
 9            By the way, there's no dispute that Mr. Barger
10    didn't take any vacation while he was employed, so I don't
11    think that's a dispute at all.
12            THE COURT:  I'm just trying to get a handle on --
13    first he said there were two systems that he needed to know
14    about.  I've heard from him about the OOO.
15            And I find it frankly beyond credibility that you
16    didn't ask the question who changed Mr. Barger's information
17    if that was what you were trying to get at, and you asked
18    everybody who can change it, and everybody said I don't know,
19    that you never asked in an interrogatory who changed the info.
20    Why would you not do that?  They'd have to tell you somebody
21    if you were trying to find out who you needed to depose.
22            Getting the IT people into this, I frankly don't see
23    why you would want to do that.
24            So tell me about the PeopleSoft HR info system and
25    the -- you said there was a third.
```

35

                    MR. SHEARER:  No.  The third was the MetLife

interface which we discussed before.  But I can -- like we --

that's --

                    THE COURT:  We don't need to talk about MetLife

interface.

                    MR. SHEARER:  Okay.

                    THE COURT:  Is that what you're telling me?

                    MR. SHEARER:  Well, I would like to.  But if you

want -- if you don't want me to, I mean --

                    THE COURT:  Well, you said there were three.

                    MR. SHEARER:  Yeah.

                    THE COURT:  I'm trying --

                    MR. EIDELMAN:  There are three.

                    THE COURT:  There were two originally.

                    MR. SHEARER:  Right.  PeopleSoft -- MetLife

interface.

                    THE COURT:  Okay.  So what is it that you want me to

know about these?

                    MR. SHEARER:  Well, PeopleSoft is -- this is the

first I've heard this.  Because from the document production,

Mr. Barger, when he was forced to take leave in November, had

a full set of available vacation, personal days, sick days,

and sick bank that was available to him.  And our version of

events is that those -- he should have started taking his

vacation, sick time from November 18th forward.

36

1          Somebody in January went back --

2          THE COURT:  Wait.  Wait.  Let's step back for a

3     second.  So you said it was news to you that he could have

4     taken this as vacation?

5          MR. SHEARER:  No.  No.

6          THE COURT:  I'm trying to follow.

7          MR. SHEARER:  What was news to me was what -- I

8     thought Mr. Eidelman was going -- has been contesting whether

9     or not Mr. Barger could use vacation time, sick time, paid

10    time off from September 6th through November 18th, because in

11    January somebody went back and reclassified that time period

12    from full pay on the payroll to paid time off and short-term

13    disability.

14         THE COURT:  Do you want to speak to this?

15         MR. EIDELMAN:  I'd be delighted to, Judge.

16         First of all, let me say, Your Honor, there is no

17    claim in this case for unpaid vacation, or unpaid leave, or

18    unpaid short-term disability, unpaid long-term disability.

19    There's no ERISA claims in this case.  There's no breach of

20    contract rights.

21         THE COURT:  I understand.  Okay.

22         MR. EIDELMAN:  But let me just explain what happened

23    if I may.

24         So Mr. Barger goes -- has surgery in early

25    September.  And the company -- because he is a high-positioned

37

1  person who is very close with Tony Marino, the man that he

2  sued -- these guys played golf together, they were blood

3  brothers, so to speak, along with Joe Plumeri, these guys were

4  this group -- they did not require at that time Mr. Barger to

5  take any leave even though he was hospitalized and he had

6  surgery.  They just kept him on the regular payroll and he

7  continued to get his regular salary until November.

8         And in mid November, Mr. Barger wrote an email to

9  Mr. Marino saying I need to go out and have another surgery.

10 It's going to keep me in the hospital for an extended period

11 of time.  I will then have another recovery period of a month

12 or so.

13        It was at that time that Mr. Marino -- and this is

14 what he testified to at his deposition -- made the decision my

15 friend needs to take time off to get better.

16        Mr. Barger, undeniably is a man who lived to work.

17 We understand that.  Mr. Marino said I need him to stop

18 working so he can get better and that's when the company

19 decided to put him on leave.

20        Now recognizing that there's -- that leave had been

21 -- what the company then did is the following.  The company

22 then looked at, okay, how much vacation did Mr. Barger have at

23 that point in time so we could look at what buckets work?

24 Because it would be a windfall for --

25        THE COURT:  Can I just ask you for one moment?

38

```
1              MR. EIDELMAN:  Sure.  I'm sorry.

2         (Pause.)

3              THE COURT:  Okay.  I'm sorry.  I was just going to

4    lose my train of thought.  I heard the jangling of the door.

5    No.  It's quite okay.  Thank you.

6              MR. EIDELMAN:  No worries.  No worries, Judge.

7    Thank you.

8              So what the company did is it went back and it

9    looked at the buckets and it said, okay, Mr. Barger, they

10   originally thought he had 80 hours of vacation until Rhonda

11   Johnson, his HR person, says you know what?  No.  He's got

12   another 80.  It was in his employment contract.

13             So what they did was simply try to categorize what

14   the leave looked like in terms of he had already been paid all

15   of this money, let's figure out --

16             THE COURT:  He had 160 days of --

17             MR. EIDELMAN:  160 hours, excuse me.

18             THE COURT:  Hours.  Okay.

19             MR. EIDELMAN:  Right.  Plus he had sick leave that

20   he hadn't taken and he had some other leaves.  And this was

21   all geared towards putting Mr. Barger in a position of -- that

22   he would be able to have salary continuation for as long as he

23   needed it.  The company had no knowledge when he was going to

24   come back.

25             But the company, like many companies, has a variety
```

39

of benefit programs that are available to employees.  And once
you use up whatever leave you have, you can then go to short-
term disability and to long-term disability.

           The evidence shows, Judge, that even in mid-December
Mr. Barger's short-term disability leave had not been approved
at that point in time, but he was going to be out of paid
leave, the company went ahead and authorized a paycheck to
cover that second half of December.  Ms. Steffen testified at
her deposition it's the first and only time she's ever done
it.

           So there are a variety of issues that are going on
here in terms of what the company tried to do.  Unfortunately,
Mr. Barger believes he was discriminated against and that's
what this lawsuit is all about.

           But these various records of the needing to have
somebody technologically talk about PeopleSoft doesn't support
or get to the issues of discrimination in this case.

           THE COURT:  I'd like a very short reply on that
subject.

           MR. SHEARER:  Yeah.  It goes to the question of was
he working under an ADA accommodation between September 6th
and --

           THE COURT:  Why does the internal control technology
expert have anything to say about what he was working under?

           MR. SHEARER:  If the people that had the ability to

1    declare him on leave, declare him sick, declare him on

2    vacation, if those are his managers, and they're the

3    individuals that were well aware that he had his larynx

4    removed on September 6th and was disabled -- and it is a

5    serious health condition at that point -- if they knew and

6    they did not take action to put him on paid time off, did not

7    take action to put him on sick pay, sick leave -- and the

8    entire time, executive vice presidents -- to have -- to allow

9    a manager in Omaha in January to go back and override those

10   conscious decisions --

11            THE COURT:  That's Ms. Voycheske?  Is that Ms.

12   Voycheske?

13            MR. SHEARER:  Yes.  Yes.

14            THE COURT:  Okay.  So listen to me.  You're painting

15   a very different picture on both sides.  Of course that's not

16   my job today to determine which one is credible.

17            All I'm saying to you is his position is Marino and

18   his high up buddies were doing these things to help Mr.

19   Barger.

20            And you're saying there's something nefarious going

21   on because Ms. Voycheske should not in January be able to go

22   back and manipulate something.

23            But everybody agrees that there is a paper trail of

24   what happened in this case, so it's not dependent on internal

25   control technology.  It's dependent on your reading of the

41

1   paper trail one way or the other.

2          So as to the internal control technology expert, I

3   find that there is no reason to have to continue a 30(b)(6).

4          What's the next topic?

5          MR. SHEARER:  The next one is Topic 2B.  This was

6   contained inside a complaint on February 27th, which is the

7   day before Mr. Barger's last day.

8          There were numerous job postings indicating

9   available jobs at First Data that went back years, including

10  for the time period of July 16 -- July 2016 through February

11  2017, there were jobs there.

12         Somewhere between Mr. Barger's termination and the

13  filing of this case, exactly one year of job openings were

14  deleted.  That is the job availability postings historically

15  skipped from July of 2016 to July of 2017.  And I want to know

16  who was responsible for that?

17         Because the jobs -- available jobs at First Data on

18  the date that Mr. Barger was terminated is relevant to the

19  question of whether or not there were available positions

20  where Mr. Barger could have returned to following his FMLA

21  leave when his doctor provided his return to work

22  authorization.  If there was an available position, he should

23  have been offered it.

24         THE COURT:  I will certainly let Mr. Eidelman speak

25  to this.

42

1          But my recollection in reading the record is that

2   Mr. Barger did not apply for any other position and still has

3   not applied for any other position.

4          MR. SHEARER:  He has not.  The question is he should

5   have been offered one if it was available.

6          THE COURT:  But talk to me about the board and the

7   relevance of who is it that you want to testify about these

8   postings coming off of a board?  Who is it that you're looking

9   for?

10          MR. SHEARER:  I'm not sure.  I mean, I have been

11   given the name of a manager level employee.  I believe the

12   last name is St. George.

13          THE COURT:  Yes.  And you didn't want to depose him.

14   That was the social media guy that you decided you didn't want

15   to depose.

16          MR. SHEARER:  Well, I'm not sure that he qualifies

17   as an officer, director or managing agent.

18          THE COURT:  What does that have to do with who they

19   put up as a 30(b)(6)?  Because you said the same thing about

20   Voycheske.  You didn't want to depose Voycheske.  And then you

21   deposed her boss.  And her boss said I don't know.  I don't

22   handle that.  It's handled by my subordinate, which would have

23   been Voycheske.

24          And you chose not to depose Voycheske and you said

25   it's because she's not a manager, officer or a director.  What

43

1     does that have to do --

2              MR. SHEARER:  That comes right --

3              THE COURT:  -- with binding the corporation?

4              MR. SHEARER:  That comes right out of 30(b)(6).  It

5     said the designee needs to be an officer, director or managing

6     agent.  And if they're not, they don't have the authority to

7     bind the corporation.  They don't have sufficient control of

8     the corporation for their testimony to bind the corporation.

9              THE COURT:  I cannot imagine that -- again, I don't

10    know that you made that argument to me, but I cannot imagine

11    that there have not been people who are deposed who are lower

12    than managers, officers and directors.

13             For instance, in this case that I referred you to,

14    the *Winfield* case against the City of New York, I guarantee

15    you that the IT people from Housing Preservation and

16    Development and from the -- I'm sorry, I'm blanking on the

17    names of the other city agencies that were involved in the

18    case -- but I guarantee you that they were not managing

19    agents, officers or directors.

20             You want to speak to this?

21             MR. EIDELMAN:  Your Honor, this is -- that's not

22    what the rule says.  A corporation could appoint --

23             THE COURT:  Can you read the rule into the record,

24    please.

25             MR. EIDELMAN:  Yes.  I would certainly read the rule

44

1   into the record, Your Honor.

2        And parts of 30(b)(6) says the following: "The named

3   organization must then designate one or more officers,

4   directors or managing agents, or designate other persons whose

5   consent to testify on its behalf, and it may set up the

6   matters on which each person designated will testify."

7        THE COURT:  And so what does the other person part

8   of the rule mean to you?

9        MR. SHEARER:  I think that person needs to consent

10  to testify on its behalf.

11       But there also is the case -- and I would have to

12  supplement it -- but decided by the Second Circuit in which

13  30(b)(6) testimony can be subsequently supplemented by

14  affidavit or declaration.

15       And I want to make sure -- and my concern is that --

16       THE COURT:  Look.

17       MR. SHEARER:  -- if the position of a manager can be

18  overridden by a declaration --

19       THE COURT:  We were talking about this because you

20  chose not to depose Voycheske.  You chose to depose whoever it

21  was a week ago that you deposed.

22       MR. EIDELMAN:  Ms. Steffen.

23       MR. SHEARER:  Ms. Steffen.

24       THE COURT:  So I don't want to go off on this

25  tangent here.  But I would say to you that even if there is a

1    Second Circuit case saying that it could be supplemented down

2    the road, I think that's a rolling obligation.  That in civil

3    discovery if you find out information after you've given an

4    answer, you have a duty to supplement.

5            I don't think that goes to the question of whether

6    somebody can be designated as a 30(b)(6) witness if they're

7    not a managing officer or director.

8            So, again, I don't want to mix the apples and

9    oranges here because I've never heard that before and I've

10   been doing this job for 17 years.

11           MR. SHEARER:  Your Honor.

12           THE COURT:  It would be very difficult to understand

13   that you can only designate somebody who is a managing officer

14   or director.  It would -- in my mind, in all of these cases

15   where IT is at issue, those people are not managing officers

16   and directors of corporations.

17           MR. SHEARER:  I'd refer you to *Dubai Islamic Bank v.*

18   *CitiBank* in the Southern District, 2002.  It lists five

19   factors for determining whether someone is a managing agent or

20   not.

21           THE COURT:  But that's not what the question is.

22   The rule provides that you can designate somebody who's not a

23   managing agent.  It's now how are we going to decide if

24   somebody's a managing agent?

25           Look, I don't want to go off track because I still

1    have to decide on these last points.

2          So you were trying to tell me that you needed

3    somebody who was going to be able to testify here and we got

4    sidetracked because you were telling me -- I did recall that

5    there had been a deposition scheduled that got cancelled.  I

6    believe you were the one that cancelled that deposition.  And

7    I believe that was of the St. George person.

8          So I don't know what it is that you're looking for

9    now, but I really want to get to these last issues that you

10   have.

11         And then, again, they will have to answer your

12   questions about the salary from Mr. Jackson.  And I don't know

13   what else you have on your list of things that need to be

14   done.

15         MR. SHEARER:  Well, 3A, Mr. Eidelman continues to

16   insist that there is no ERISA claim, there is no short-term

17   disability claim, there's no long-term disability.

18         THE COURT:  That is correct.

19         MR. SHEARER:  That's absolutely correct.

20         But if you read the Voycheske affidavits, she's

21   taking information that MetLife collected for disability

22   insurance purposes and that's a completely different question.

23         Are you disabled for short-term disability is a

24   completely different question of do you have a serious health

25   condition?

47

```
 1          And if she's going to rely upon the disability

 2     insurance documentation and decisions by a third party to make

 3     her own decision on the FMLA, we need to know what the

 4     policies and procedures are, why they're collecting the

 5     information for disability insurance that is being used to

 6     make FMLA decisions?

 7          THE COURT:  Can we agree to one thing?  Okay?  We

 8     can agree that Ms. Voycheske was acting on information that

 9     was filed by Mr. Barger.  Is that correct?

10          MR. SHEARER:  I would disagree with that.

11          THE COURT:  He didn't provide that information to

12     MetLife?

13          MR. SHEARER:  He said his surgery was on the 6th.

14     She said when was your last date working?  He says 9/4.  My

15     surgery was 9/6.

16          THE COURT:  Okay.  So that wasn't information that

17     your client provided?

18          MR. SHEARER:  I think you're -- I think we're

19     reading a lot more into -- Mr. Barger is being asked that on

20     January 5th.  At this point, he's told everybody he's coming

21     back to work.  And he gets his doctor's note on January 10th.

22          THE COURT:  Again, this is --

23          MR. SHEARER:  I don't think he was thinking about

24     disability.

25          THE COURT:  Mr. Shearer, this is your argument.
```

48

```
 1    This is not whether or not we're going to produce any more

 2    information.  This is your argument about what's already been

 3    produced.  This is not whether or not we're going to have

 4    another 30(b)(6) deposition.

 5          MR. SHEARER:  I'll tell you.  I don't believe that

 6    Ms. Voycheske got information from MetLife on January 5th.

 7          THE COURT:  Why didn't you depose her?  You chose

 8    not to.  Why didn't you depose her and ask her?  She has an

 9    affidavit.

10          MR. SHEARER:  Because I want to depose her boss.

11          THE COURT:  That was your choice, and you are

12    entitled to your choices.

13          MR. SHEARER:  But her boss said that --

14          THE COURT:  But you're entitled to then complain

15    that you didn't get your shot at asking the questions you want

16    to ask.

17          MR. SHEARER:  But then her boss testified that Ms.

18    Voycheske does not take care of disability insurance benefits.

19    That's the benefits department.

20          THE COURT:  Because that's MetLife, isn't it?

21          MR. SHEARER:  It's there's a separate department

22    under a different vice president that handles the disability

23    insurance.  And Ms. Voycheske will help make sure the forms

24    are processed, but she's not responsible for the benefits

25    program, not responsible for negotiating it, not responsible
```

1      for the benefit administration agreement.

2              THE COURT:  So who is it that you were expecting

3      would testify?

4              MR. SHEARER:  I believe it would be -- Ms.

5      Pulvirenti (ph) I believe.

6              THE COURT:  No.  No.  I'm not talking about the

7      name.  Give me again the topic from 3 --

8              MR. SHEARER:  Someone in First Data's --

9              THE COURT:  Give me exactly what 3B says, please.

10             MR. SHEARER:  3A.

11             THE COURT:  3A.  I'm sorry.

12             MR. SHEARER:  "The processes that were available to

13     plaintiff to apply to receive First Data's disability

14     insurance benefits, the process through which plaintiff did

15     apply to receive First Data's insurance benefits, and the

16     terms of the disability insurance policies under which

17     plaintiff applied for benefits."

18             THE COURT:  And what is your position, Mr. Edelman?

19             MR. EIDELMAN:  My position is it's not a claim in

20     this case first of all, Judge.  There's no claim for short or

21     long-term disability benefits.

22             And the fact of the matter is the evidence is

23     undisputed that Mr. Barger was paid long-term disability

24     benefits even when he went back on First Data's payroll.  I

25     questioned him about that.

50

1              THE COURT:  I understand --

2              MR. EIDELMAN:  You understand that.  But my position

3       --

4              THE COURT:  -- in escrow with Mr. Shearer.

5              MR. EIDELMAN:  My position is as follows with regard

6       to this topic.  He made a decision.  He made that decision to

7       depose Ms. Voycheske's boss.  And of course she said for the

8       day-to-day handling of it this is what Ms. Voycheske did.

9              One of the things that's getting lost here a little

10      bit -- this whole thing with MetLife -- Mr. Barger told the

11      information to MetLife first.  That's how -- that's how -- and

12      then when he communicated to Ms. Voycheske that MetLife has

13      approved me going back to that date, he shared that with

14      MetLife.  That was about disability.

15             So our point here, Your Honor, is I think this is

16      all this throw as much against -- as I can against the wall

17      and see what I can get to stick.

18             We have spent tens of thousands, if it's not

19      hundreds of thousands, having to deal with this kind of stuff

20      in discovery in this case, Judge.

21             Your Honor, I've got at least 16 -- 16 different

22      individual deposition notices in this case that got set,

23      cancelled, set, cancelled.  That's over and above the 30(b)(6)

24      ones that got done.

25             So, Judge, our position is is that Mr. Barger had

1    the opportunity to take Ms. Voycheske's deposition.  It was

2    scheduled for July 23rd.  He cancelled it on July 20th and

3    said I want to go take Amy Steffen instead and that's what

4    happened.  So he should be bound to live by that decision.

5         He's had five depositions of human resources

6    professionals in this case; obin Orbin, Karen Whalen, Rhonda

7    Johnson, Tony Marino.  Oh, six.  Excuse me.  Amy Steffen and

8    Kathy Benhart.  That's six depositions of people assigned to

9    the human resources department.

10        And it's our position that he had an opportunity to

11   take Ms. Voycheske's deposition.  He chose not to based on a

12   mistaken belief that because she's not an officer, director,

13   whatever, she can't be deposed.

14        THE COURT:  Well, again, whether or not it was

15   mistaken or calculated, it doesn't much matter.  We're at the

16   end of discovery now.  We're not going to continue doing this.

17        And I find that you have taken the depositions that

18   you need.  And depositions are not a constitutional right.

19   It's not like we're in a criminal matter here.  It's a civil

20   matter.

21        And I am bound to make sure that the case proceeds.

22   And as I said, discovery is the greatest source of cost and

23   delay.  Both sides have had their opportunities.

24        If you were telling me other than getting the motion

25   to compel granted in part as to the request to admit for Mr.

52

1      Jackson, I am denying the remainder of your motion to compel.

2           Was there anything else that needed to be addressed

3      on behalf of Mr. Barger today?

4           MR. SHEARER:  No, Your Honor.

5           THE COURT:  Anything further that needed to be

6      addressed on behalf of First Data today?

7           MR. EIDELMAN:  Your Honor, I hesitate to advise

8      this, but I will let the Court know this is likely to come

9      before you -- but last week I received a Rule 11 letter and a

10     motion for sanctions because of my request for an extension of

11     discovery to take those depositions.  That was sent to me last

12     week.  I --

13          THE COURT:  I would urge you, Mr. Shearer, to

14     reconsider your position on that.  That would go to Judge

15     Block, and Judge Block is ultimately going to be hearing any

16     summary judgment, not me.

17          So, again, I can't tell you what to do and I'm not

18     trying to say that I know better, but extensions of time are

19     granted every day of the week in this courthouse.  If I didn't

20     have lawyers asking me to extend the deadlines, I don't know

21     that I would get through the day.

22          So if that is the reason why you are asking for Rule

23     11 sanctions, I would just urge you to reconsider your

24     position.

25          And with that, we are adjourned.  Thank you very

53

1    much.

2              MR. EIDELMAN:  Thank you, Your Honor.

3              MR. SHEARER:  Thank you.

4         (Proceedings concluded at 3:21 p.m.)

5              I, CHRISTINE FIORE, court-approved transcriber and

6    certified electronic reporter and transcriber, certify that

7    the foregoing is a correct transcript from the official

8    electronic sound recording of the proceedings in the above-

9    entitled matter.

10

11   *Christine Fiore*

12   _____          September 10, 2018

13        Christine Fiore, CERT

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT G

**From:** Shawn Shearer [mailto:shawn@shearerlaw.pro]
**Sent:** Monday, July 02, 2018 8:11 PM
**To:** Eidelman, Gary B.; Cooper, Gillian A.; Kennedy, Lindsey C.
**Cc:** David Zeitlin
**Subject:** Barger v. First Data - Request to Designate 30(b)(6) Witnesses

Gary - This is an attempt to resolve a discovery dispute.

On May 22, 2016, the Plaintiff served the attached Notice of Rule 30(b)(6) Deposition in which Defendant First Data was notified of its obligation under Rule 30(b)(6) to designate one or more officers, directors, agents or other representatives to address the subtopics included within four topic areas contained in Exhibit A to that Notice. These depositions were scheduled to occur on June 7th and 8th and no protective order was ever requested. The process over the last three months on designation has been ad hoc with designees being named, withdrawn, cancelled, postponed, etc. First Data's written designations under Rule 30(b)(6) are significantly overdue.

At this point, I am requesting that First Data identify its designee to address each of the following issues set forth in Exhibit A to the Notice of Rule 30(b)(6). Rule 37(a)(3)(B)(2) provides remedies if a party fails to designate under Rule 30(b)(6).

With respect to the accounting issues set forth in Topic 1 of Exhibit A to the 30(b)(6) Notice, Mr. Cagwin adequately addressed most of those issues and our stipulation as to the accounting treatment of STD and LTD reached on the record last week is adequate for me. Although, I do not believe Mr. Cagwin was adequately prepared to address all of the accounting issues set forth in the Notice, and even though you had previously indicated that Mr. Bisignano would be able to serve as a 30(b)(6) designee on accounting issues, you attempted to block all of my inquiries into accounting areas with Mr. Bisignano on some unexplained theory that Mr. Cagwin answered the questions earlier in the week.  It is nonsense to even assert that an examining party is prohibited from asking the same questions to multiple witnesses, let alone asking the CEO regarding his analysis of the company's financial information.

I am also willing to forego discovery on Topic 2 (a) of the Notice regarding the systems from which Mr. Barger was cut.

Plaintiff is requesting that First Data promptly identify, in writing, which witnesses will serve as First Data's designee on each of the following topics contained in Exhibit A of the 30(b)(6) Notice:


**TOPIC 2 – INFORMATION TECHNOLOGY**

> **(b)  First Data's processes and procedures for posting available employment opportunities at First Data, and removing filled or withdrawn positions, on employment sites (e.g. the Indeed web site referenced in Exhibit K to the Complaint) and employment opportunity postings on social media sites (e.g. the @FirstDataJobs Twitter account referenced in Exhibit K to the Complaint).**


**TOPIC 3 – HUMAN RESOURCES AND EMPLOYEE BENEFITS**

(a)  **The processes that were available to Plaintiff to apply to receive First Data's disability insurance benefits, the process through which Plaintiff did apply to receive First Data's disability insurance benefits, and the terms of the disability insurance policies under which Plaintiff applied for benefits.**

(b)  **Terms and conditions of all equity-based compensation plans and agreements relevant to the stock option and restricted stock awards by First Data to Plaintiff.**

(c)  **First Data's plans, policies and procedures for the implementation and execution of any "reduction-in-force" (as that term is used in the Answer to the Complaint) during the period between January 2015 and February 2017.**

(d)  **First Data's plans, policies and procedures for the implementation of FMLA, ADA, and other leave programs.**

## TOPIC 4 – CORPORATE GOVERNANCE AND CORPORATE RECORDS

(a)  **General description of First Data's legal hold process including all details of that policy and specific steps that were taken in this case to implement a legal hold.**

(    (b)  **First Data's process and procedures for retaining information created during the planning and implementation of any "reduction-in-force" during the time between January 1, 2015 and February 28, 2017.**

In terms of counting 30(b)(6) depositions, The Notes of the Advisory Committee with respect to the 1993 Amendments to Rule 30(b)(6) noted "A deposition under Rule 30(b)(6) should, for purposes of this [10 deposition] limit be treated as a single deposition even though more than one person may be designated to testify."

Please provide your designations to me by the end of the day tomorrow (7/3/18) so that I may evaluate how to proceed with my motion for additional depositions. If you do not specifically identify in writing those individuals that will serve as First Data's designee on each of the above, yet to be addressed, issues, I also will need to seek an order pursuant to Rule 37 to compel the required designations.

Shawn E. Shearer
The Law Office of Shawn Shearer, P.C.
3839 McKinney Avenue #155-254
Dallas, TX 75204
(972) 803-4499
www.shearerlaw.pro

THIS EMAIL MAY CONTAIN CONFIDENTIAL AND/OR PRIVILEGED INFORMATION AND IS INTENDED FOR USE ONLY BY THE NAMED RECIPIENT. ANY OTHER USE OF THIS INFORMATION OR ANY ATTACHMENTS IS FORBIDDEN. IF YOU RECEIVE THIS EMAIL IN ERROR, PLEASE DELETE

# EXHIBIT H

# First Data | Steven Barger

# *28261 Johnson Rhonda 06-27-2018*

### *6/27/2018*

**Annotation Digest - Search Notes**

**Prepared by:**

Saul Ewing LLP

Tuesday, September 25, 2018

## TextMap Annotation Digest Report

**Case Name:**     First Data | Steven Barger
**Transcript:**     [6/27/2018] 28261 Johnson Rhonda 06-27-2018
**Note Search Terms:**  Rule72

---

**Pg: 131 Ln: 24 - Pg: 132 Ln: 4**

    **Annotation:**

```
131:24      Q    Who would make those changes to the
     25 software?
132: 1      A    The HR Solutions/HR Help Desk Team.  Because
      2 HR business partners, Karen Whalen, including Tony, we
      3 do not have access to make any changes to an employee
      4 directly into PeopleSoft.
```

    **Note:** Rule72

# EXHIBIT I

# First Data | Steven Barger

## *03 Barger, Steven B. 081018 Non-Timestamped ASCII*

### *8/10/2018*

**Annotation Digest - Search Notes**

**Prepared by:**

Saul Ewing LLP

Tuesday, September 25, 2018

# TextMap Annotation Digest Report

**Case Name:**        First Data | Steven Barger
**Transcript:**       [8/10/2018] 03 Barger, Steven B. 081018 Non-Timestamped ASCII
**Note Search Terms:**   Rule72

---

**Pg: 67 Ln: 5 - Pg: 68 Ln: 3**

   **Annotation:**
   67: 5       Q    Okay. I show you whats been marked as
      6    Deposition Exhibit 139, which corresponds with
      7    FDC 0000001824 and 25.
      8       A    Yeah.
      9       Q    These are -- are you familiar with these types
     10    of pay stubs that show your compensation?
     11       A    Yeah. Yeah.
     12       Q    Right?  For the pay period of January 16th,
     13    2017 through January 31st, 2017, your gross pay was
     14    $22,000. Do you see that?
     15       A    I do.
     16       Q    And then for the second document in this
     17    packet, the pay period February 1, 2017 until February
     18    15th, 2017, you were paid at that point in time $20,000,
     19    right?
     20       A    I got it.
     21       Q    And then for the second part of February, from
     22    February 16th, 2017 until February 28th, 2017, you were
     23    paid $20,000, right?
     24       A    Okay.
     25       Q    And that corresponds with the annual $480,000
   68: 1    that you were being paid when you were a full-time
      2    employee, right?
      3       A    It does.

   **Note:** Rule72

**Pg: 71 Ln: 12 - Pg: 74 Ln: 15**

   **Annotation:**
   71:12       Q    Showing you whats been marked as Deposition
     13    Exhibit 141, this is the first check that you received
     14    from MetLife, which is Bates stamped SBB-000964?
     15       A    It could well be, yeah. Well, I don't know if
     16    it is. I don't have the check in front of me. This
     17    represents the check.
     18       Q    Showing you whats been marked as Deposition
     19    Exhibit 142. These are photocopies of two checks, and I
     20    think you said you received two checks.
     21       A    Yup. Yup.
     22       Q    These are the two checks that you received
     23    from MetLife?
     24       A    Yup, got it.
     25         MR. SHEARER: Objection.
   72: 1    Q    Right?
      2       A    Yup.
      3       Q    And you testified that the reason that you
      4    didn't cash these checks is because you were going back
      5    to work, right?
      6       A    Yeah. And I told the MetLife person there on

# TextMap Annotation Digest Report

| | |
|---|---|
| **Case Name:** | First Data \| Steven Barger |
| **Transcript:** | [8/10/2018] 03 Barger, Steven B. 081018 Non-Timestamped ASCII |
| **Note Search Terms:** | Rule72 |

**Pg: 71 Ln: 12 - Pg: 74 Ln: 15**   continued...

**Annotation:**

```
72:  7   the phone; when she said I was sending the checks, I
     8   said Im going back to work.
     9      Q   Okay. Well, on February 6, 2017, which is the
    10   date of the first check, 141, Deposition Exhibit 141 —
    11      A   Yeah.
    12      Q   — by that point in time, you knew you werent
    13   going back to work, right?
    14      A   I knew that — I knew that they didnt want me
    15   to go back to work. I didnt know that I was not going
    16   back to work, no. Because I knew I was going to fight
    17   this so I could go back to work. But I thought if I
    18   cashed the long-term disability checks, it would be an
    19   acknowledgment that I wasnt coming back to work, so I
    20   never cashed them.
    21      Q   Why didnt you return them to MetLife?
    22      A   I gave them to my attorney; he made the
    23   decision.
    24      Q   Mr. Shearer made the decision?
    25         MR. SHEARER: Objection. We're getting —
73:  1   this is attorney-client privileged information.
     2         MR. EIDELMAN: Hold on a minute. Lets
     3   discuss what attorney-client information is. Mr. Barger
     4   has now testified that he didnt cash the checks, he
     5   gave them to you, and that you did something with them.
     6      A   I told him I did not — I was not going to
     7   cash the checks. I wanted to hold them in escrow until
     8   this was satisfied. That was my directories.
     9         I did not want anybody to think that I cashed
    10   them and put them in my account. I wanted to make
    11   certain that they knew if there was any way that I could
    12   go back to work, I was not going to be on long-term
    13   disability, period. Thats the end of it.
    14      Q   Okay. But is it your testimony and your
    15   understanding that the checks had been cashed and are in
    16   an escrow account, that they're actually in a bank
    17   account?
    18      A   Yes.
    19      Q   So did you endorse the checks to Mr. Shearer?
    20      A   I dont recall what I did with them.
    21      Q   So either you endorsed them to Mr. Shearer or
    22   he endorsed them?
    23      A   I endorsed them; I probably did.
    24      Q   So they're in a bank account somewhere?
    25      A   Yes.
74:  1      Q   And at no time did you ever just return them
     2   to MetLife saying: I dont want to be on long-term
     3   disability, here is your money back?
     4      A   No. No.
     5      Q   You understand, Mr. Barger, that long-term
     6   disability benefits are taxable income?
```

# TextMap Annotation Digest Report

**Case Name:**            First Data | Steven Barger
**Transcript:**           [8/10/2018] 03 Barger, Steven B. 081018 Non-Timestamped ASCII
**Note Search Terms:**    Rule72

**Pg: 71 Ln: 12 - Pg: 74 Ln: 15**   continued...

    **Annotation:**

```
74:  7     A   Im sure they are, yeah.
      8     Q   Did you report the MetLife checks for the two
      9   that you received, one in the amount of $27,705 and the
     10   other one in the amount of $13,852.50, did you report
     11   them on your tax return?
     12     A   I don't know. You have to ask my accountant.
     13     Q   And to this day you have not returned that
     14   money to MetLife, correct?
     15     A   Correct.
```

**Note:** Rule72

# EXHIBIT J

| | |
|---|---|
| **From:** | Eidelman, Gary B. |
| **Sent:** | Friday, July 20, 2018 7:50 AM |
| **To:** | 'Shawn Shearer' |
| **Cc:** | David Zeitlin; Cooper, Gillian A.; Kennedy, Lindsey C. |
| **Subject:** | RE: Barger v. First Data - Voycheske Deposition Postponement |

Shawn:

I am in receipt of your letter canceling Ms. Voycheske's deposition scheduled for this coming Monday, July 23, 2018. The decision to cancel her deposition is entirely your choice. If there are any costs that we incur due to your last minute cancellation of her deposition, I plan to send you an invoice. If you plan to schedule Ms. Voycheske's deposition for another date in August, I would encourage you not to just unilaterally pick a date in August, but run dates by us before-hand so that we can check on availability.

You assertions regarding Ms. Voycheske's affidavits are meritless. The additional documents that she refers to in her supplemental declaration were produced months ago and do not change the substance of her testimony one iota. Whether she spoke to Mr. Barger or received an email from him on January 5, 2016, it was your client who told her when his leave began. Similarly, you have had the MetLife computer screen shot for months which indicates when they approved his STD leave.

For some reason, you blindly ignore statements regarding scheduling that we have made in prior correspondence. You seem to think that if you keep repeating the same thing, it will just happen. Specifically, on July 4, 2018, you unilaterally canceled the depositions that had been scheduled for Dallas for July 30 and 31. That certainly was your decision to make and we released the witnesses for those dates, along with Joe Plumeri for July 19. However, as a result of those cancellations, those days became free for other matters. We have told you time and time again that those dates are no longer available for depositions but you don't seem to be getting the message. **SO THERE BE NO CONFUSION, FIRST DATA WILL NOT PRODUCE ANY WITNESSES ON JULY 30 OR 31, 2018.** If you travel to NYC on those dates, do not expect First Data to reimburse you and your wife for any costs.

We will see you on August 10, 2018 for the Plaintiff's deposition at our offices in NYC.

Have a nice weekend.

**Gary B. Eidelman, Esq.**
Saul Ewing Arnstein & Lehr LLP
Office: 410.332.8975
Mobile: 410.303.8832

---

**From:** Shawn Shearer [mailto:shawn@shearerlaw.pro]
**Sent:** Friday, July 20, 2018 7:09 AM
**To:** Eidelman, Gary B.; Cooper, Gillian A.; Kennedy, Lindsey C.
**Subject:** Barger v. First Data - Voycheske Deposition Postponement

**EXTERNAL EMAIL** - This message originates from outside our Firm. Please consider carefully before responding or clicking links/attachments.

Gary, Gillian and Lindsey – Please see the attached letter withdrawing Ms. Voycheske's deposition notice for July 23, 2018. A new notice for her deposition will be sent for a date in mid- to late- August.

**Shawn E. Shearer**
The Law Office of Shawn Shearer, P.C.
3839 McKinney Avenue #155-254
Dallas, TX 75204
(972) 803-4499
www.shearerlaw.pro

THIS EMAIL MAY CONTAIN CONFIDENTIAL AND/OR PRIVILEGED INFORMATION AND IS INTENDED FOR USE ONLY BY THE NAMED RECIPIENT. ANY OTHER USE OF THIS INFORMATION OR ANY ATTACHMENTS IS FORBIDDEN. IF YOU RECEIVE THIS EMAIL IN ERROR, PLEASE DELETE ALL COPIES AND, IF POSSIBLE NOTIFY THE INTENDED RECIPIENT.

# EXHIBIT K

**From:**           Eidelman, Gary B.
**Sent:**           Wednesday, August 01, 2018 9:56 PM
**To:**             'Shawn Shearer'
**Cc:**             Kennedy, Lindsey C.; Cooper, Gillian A.; Eidelman, Gary B.; 'David Zeitlin'
**Subject:**       August 9 depositions

Shawn:

Sorry for the delayed response. I am writing in response to your request to schedule 30(b)(6) witness(es) on August 9, 2018 in NYC.  It is my understanding from your emails that the MetLife deposition scheduled for that day is now off.

With respect to Plaintiff's 30(b)(6) notice, we agree that Topic 1-Accounting and Financial Disclosure was covered by Matt Cagwin at his deposition so we are dealing with Topic 2 - Information Technology, Topic 3 – Human Resources and Employee Benefits and Topic 4 – Corporate Governance and Corporate Records.

It is our legal position that because of the disparate topics covered by Plaintiff's 30(b)(6) notice, no one witness could possibly be prepared by the corporation to testify as to all of these categories. Case law dictates that Rule 30(b)(6) cannot be used to circumvent the 10 deposition limit imposed by Rule 30, meaning that all 30(b)(6) depositions cannot count as just one.

To date, Plaintiff has taken 8 depositions, which by our count means Plaintiff has 2 left according to the rule.  We have checked availability with our client and we are prepared to produce 30(b)(6) witness(es) on August 9 as described below. However, depending on what you decide, we will not agree to exceed 10 depositions which may prevent you from deposing MetLife and Kathi Benhardt.

First Data's response to the remaining 30(b)(6) topics is as follows:

TOPIC 2 - INFORMATION TECHNOLOGY

(a) The functionality, access, and business purposes of the information technology systems from which First Data cut Plaintiff's access upon Plaintiff's leave in November 2016.

***Multiple fact witnesses have testified that access to the Good Application (used for business email) and the VPN (to log in remotely) was turned off for Mr. Barger when he went out on leave. We are prepared to designate that testimony as 30(b)(6) and not count the designation towards the 10 deposition total.***

(b) First Data's processes and procedures for posting available employment opportunities at First Data, and removing filled or withdrawn positions, on employment sites (e.g. the Indeed web site referenced in Exhibit K to the Complaint) and employment opportunity postings on social media sites (e.g. the @FirstDataJobs Twitter account referenced in Exhibit K to the Complaint).

***We have a witness who can be available on August 9 for this topic. We can use my office for the deposition. How long do you need for questions?  If you depose this designee, this will count as 1 deposition.***

TOPIC 3 - HUMAN RESOURCES AND EMPLOYEE BENEFITS

(a)  The processes that were available to Plaintiff to apply to receive First Data's disability insurance benefits, the process through which Plaintiff did apply to receive First Data's disability insurance benefits, and the terms of the disability insurance policies under which Plaintiff applied for benefits.

*We can have a witness available on August 9 to testify as to "[t]he processes that were available to Plaintiff to apply to receive First Data's disability insurance benefits, the process through which Plaintiff did apply to receive First Data's disability insurance benefits."*

*The specific terms of the disability insurance policies is a more technical question and requires a different witness who unfortunately is not available on August 9.  If you cannot obtain this information from the documents or from MetLife during that deposition, we are prepared to produce another witness, but the deposition will need to be in Omaha.  Given the connection between the topics in Topic 3(a), these two depositions would only count as 1 (30)(b)(6) deposition.*

(b)  Terms and conditions of all equity-based compensation plans and agreements relevant to the stock option and restricted stock awards by First Data to Plaintiff.

*We can have a witness available early on August 9 to testify for no more than 1 ½ hours as to the equity plans these topics, but it will need to be a telephone or video deposition. Your court reporter should be able to arrange this for you.  This deposition would count as 1 deposition. Alternatively, you could serve an interrogatory seeking answers to your questions about the equity plans.*

(c) First Data's plans, policies and procedures for the implementation and execution of any "reduction-in-force" (as that term is used in the Answer to the Complaint) during the period between January 2015 and February 2017.

*We have already objected to the time frame in Topic 3(c). I also believe that Tony Marino and Dan Charron testified as to these topics with respect to the Top 10% of the top 3000 exercise in January of 2017. We would be prepared to designate their testimony as 30(b)(6) and not count the designation as a separate deposition.*

(d) First Data's plans, policies and procedures for the implementation of FMLA, ADA, and other leave programs.

*We have a witness available on August 9 to testify as to First Data's FMLA, ADA and other leave programs.  Since this is connected to Topic 3(a), the deposition would be included as 1 deposition with Topic 3(a).*

TOPIC 4 - CORPORATE GOVERNANCE AND CORPORATE RECORDS

(a) General description of First Data's legal hold process including all details of that policy and specific steps that were taken in this case to implement a legal hold.

*We objected to this request when it was initially made. Nonetheless, you questioned all of the Defendants' witnesses who testified that they all received a legal hold from First Data. If you want to have us designate that testimony as 30(b)(6), we can do so and will not count the designation as a separate deposition.*

(b)  First Data's process and procedures for retaining information created during the planning and implementation of any "reduction-in-force" during the time between January 1, 2015 and February 28, 2017.

*We object to the date range of this request but are prepared to produce a witness to testify as to First Data's "process and procedures for retaining" information connected with the 10% of the Top 3000 RIF.  That witness is not available on August 9 but if scheduled, this 30(b)(6) deposition would count as 1 deposition. You could always serve and interrogatory requesting that First Data provide you with its process and procedures for information and document retention.  That would save you a witness.*

After you have considered the above, please let me ASAP know how you want to proceed on August 9 so I can lock in the 30(b)(6) witnesses. Again, we can use my office in mid-town. I look forward to hearing from you.



**Gary B. Eidelman**
**SAUL EWING ARNSTEIN & LEHR LLP**
500 E. Pratt Street
Suite 900 | Baltimore, MD 21202-3133
Tel: 410.332.8975 | Fax: 410.332.8976 | Mobile: 410.303.8832
Gary.Eidelman@saul.com | www.saul.com



*Follow our blog, WISE: Workplace Initiatives and Strategies for Employers, here*
* Please note that our Firm name and my email address have changed.

# EXHIBIT L

# THE LAW OFFICE OF SHAWN SHEARER, P.C.

3839 McKINNEY AVENUE, SUITE 155-254

DALLAS, TEXAS 75204

OFFICE: (972) 803-4499

SHAWN@SHEARERLAW.PRO

July 4, 2018

<u>**Via E-Mail**</u>

Gary B. Eidelman
Saul Ewing Arnstein & Lehr
500 E. Pratt Street, Suite 900
Baltimore Maryland 21202

> Re:  ***Steven Barger v. First Data Corporation et al.***
> **Civil Case No. 1:17-cv-4869**
> **Re: Deposition Schedule (Voycheske/Plumeri/30(b)(6)**

Gary:

I just received your e-mail today, July 4th. It would appear, as you had previously written in your "calendar" presented to the Court, you are, in fact, available to work, and ARE working on July 4th. As you are aware, Plaintiff had secured space and reporters to depose Ms. Voycheske today in Omaha, based on the representation by Defense counsel in its "calendar" that Ms. Voycheske and Defense counsel were available for deposition today, July 4, 2018. At Defense counsel's insistence, Plaintiff contemplated making another in a long line of accommodations to Defense counsel, and possibly deposing Ms. Voycheske as part of a group of potential 30(b)(6) witnesses that were going to convene in Dallas on July 30 and 31, 2018.

Given several events that have transpired over the past 48 hours, including the no show of EJ Jackson in Palo Alto, Defendants' continued refusal to designate specific 30(b)(6) witnesses on specific topics to which Defense counsel never objected, and Defense counsels' refusal to allow Plaintiff even eleven depositions, Plaintiff has made the following decisions.

Jennifer Voycheske (Plaintiff's Deposition Number 9) will be noticed for deposition, in Omaha, on July 23, 2018, beginning at 9am and continuing until 5 pm, with a one-hour break for lunch.

Plaintiff will not depose Mr. Plumeri at this time and hereby withdraws Mr. Plumeri's notice of deposition for July 19th. Please inform Mr. Plumeri that he is released from the scheduled July 19th deposition. Plaintiff will serve MetLife this week and notice its deposition (Plaintiff's Deposition Number 10) according to the city in which MetLife designates their representatives.

Once Ms. Voycheske completes her deposition and First Data designates its 30(b)(6) witnesses on the noticed topics, Plaintiff will decide if the depositions of Ms. Pulverenti [30(b)(6)], Ms. Benhardt, Mr. Jackson and Ms. Steffen [30(b)(6)] and/or anyone else, are needed, and make any potential necessary requests from the Court, accordingly. You can consider July 23, 2018 to be the "one" trip that Defense counsel is "willing to make" for his clients in this case.

Gary Eidelman
July 2, 2018                                                                                                    Page 2

As a side note, Plaintiff and Plaintiff's counsel, both originally being from Iowa, find
Defendants' counsel's continued contempt for the need to go to Omaha, offensive. While we
realize there is no Four Season's in Omaha, surely there is something Defense counsel can find
redeeming about America's heartland.

     Please inform Ms. Cooper that Defense counsel's forwarding of Plaintiff's notice of
intent to serve a subpoena on MetLife, as well as the correspondence attached to it, does not
constitute good service. See attached. Plaintiff's counsel will notify Saul Ewing this week of the
new date of intended service of MetLife, and respectfully requests that Plaintiff be allowed to
serve his own subpoenas. Defense counsel's continued interference and attempts to control
Plaintiff's deposition schedule are noted.

     Very truly yours,

Shawn E. Shearer

cc:    Gillian Cooper (via e-mail)
       Lindsey Kennedy (via e-mail)
       David Zeitlin (via e-mail)

---

**THE LAW OFFICE OF SHAWN SHEARER, P.C.**
3839 McKinney Avenue, Suite 155-254, Dallas, TX 75204

# EXHIBIT M

**From:** Eidelman, Gary B.
**Sent:** Thursday, May 24, 2018 9:44 PM
**Subject:** Reimbursement and Proposed Deposition Dates
**To:** Shawn Shearer
**Cc:** david@zeitlinlawfirm.com; Kennedy, Lindsey C.; Cooper, Gillian A.; Lantz, Roseanne A.; Eidelman, Gary B.

Shawn:

My Firm is preparing a check in the amount of $2,199.51 as reimbursement for the hotel in NYC and full airfares to Omaha and NYC. We are assuming that you did not get credit for the hotel booking or any of those flights.  The check will be processed and in the mail next week.

I have also secured multiple proposed dates for depositions of: Defendant Frank Bisignano, Defendant Dan Charron, Defendant Rhonda Johnson and First Data employees Matt Cagwin, Oliver St. George, Jennifer Voycheske, Amy Steffen and Stephanie Pulverenti who we are designating as our 30(b)(6) deponents. If you desire to also have Ms. Voycheske, Ms. Steffen or Ms. Pulverenti testify as fact witnesses because of their involvement with Mr. Barger's leave, you can take just one deposition of each of them and we will deal with designating the testimony accordingly.  Please see the attached chart for June and July dates.  If we need to go into August, that will take some more time.  If I have not provided a particular date, it is because we are unavailable.

Please let us know what dates work for each witness.

We also need to discuss scheduling Mr. Barger's deposition in NYC.

Thank you,



**Gary B. Eidelman**
**SAUL EWING ARNSTEIN & LEHR LLP**
500 E. Pratt Street
Suite 900 | Baltimore, MD 21202-3133
Tel: 410.332.8975 | Fax: 410.332.8976 | Mobile: 410.303.8832
Gary.Eidelman@saul.com | www.saul.com

*Follow our blog, WISE: Workplace Initiatives and Strategies for Employers, here*
* Please note that our Firm name and my email address have changed.

**From:** Eidelman, Gary B.
**Sent:** Tuesday, May 29, 2018 8:55 PM
**To:** Shawn Shearer
**Cc:** Cooper, Gillian A.; Kennedy, Lindsey C.; david@zeitlinlawfirm.com
**Subject:** Re: Deposition scheduling

That is correct. Only if there is a time listed does that indicate a limitation.

Gary B. Eidelman
Sent from my iPhone

On May 29, 2018, at 8:49 PM, Shawn Shearer <shawn@shearerlaw.pro> wrote:

> Gary – I have clearly been misreading your chart, it appears. I was under the impression that you would be putting time availability into the second column when you had contacted the witnesses and found the hours they were available on those dates.  I did not understand that their names under a date meant that they were available on those dates without limitation. I thought we were waiting on you to fill in the time column for each person on each date.  I will relook at the calendar now with the understanding that if a witness's name is under a date they are available on that date and the second column is only there to limit availability on that date. Let me know if I now have this table understood correctly.
>
> **Shawn E. Shearer**
> The Law Office of Shawn Shearer, P.C.
> 3839 McKinney Avenue #155-254
> Dallas, TX 75204
> (972) 803-4499
> www.shearerlaw.pro
>
> **THIS EMAIL MAY CONTAIN CONFIDENTIAL AND/OR PRIVILEGED INFORMATION AND IS INTENDED FOR USE ONLY BY THE NAMED RECIPIENT. ANY OTHER USE OF THIS INFORMATION OR ANY ATTACHMENTS IS FORBIDDEN. IF YOU RECEIVE THIS EMAIL IN ERROR, PLEASE DELETE ALL COPIES AND, IF POSSIBLE NOTIFY THE INTENDED RECIPIENT.**

---

**From:** Eidelman, Gary B. [mailto:Gary.Eidelman@saul.com]
**Sent:** Tuesday, May 29, 2018 7:30 PM
**To:** 'Shawn Shearer' <shawn@shearerlaw.pro>
**Cc:** Cooper, Gillian A. <Gillian.Cooper@saul.com>; Kennedy, Lindsey C. <Lindsey.Kennedy@saul.com>; david@zeitlinlawfirm.com; Eidelman, Gary B. <Gary.Eidelman@saul.com>
**Subject:** RE: Deposition scheduling

Shawn:

So as to avoid any issues, we will produce Amy Steffen, Stephanie Pulventeri and Jennifer Voycheske as <u>both</u> fact and 30(b)(6) witnesses.  That way you can ask all of them your questions about FD's leave programs and how Mr. Barger's leave was handled and get all of the answers you need.  They are available to be deposed on any of the numerous dates listed on the chart I

sent you last week which is attached again.  Please advise which of those dates from the chart you wish to depose them on, all of which are well before our discovery cutoff of August 31, 2018.

**Gary B. Eidelman, Esq.**
Saul Ewing Arnstein & Lehr LLP
Office: 410.332.8975
Mobile: 410.303.8832

---

**From:** Shawn Shearer [mailto:shawn@shearerlaw.pro]
**Sent:** Tuesday, May 29, 2018 6:26 PM
**To:** Eidelman, Gary B.
**Subject:** RE: Deposition scheduling

Gary – I will get back to you on dates and scheduling.

I am not making any decision as to who is a fact witness.  You have buried me in more than 60,000 pages (many whlly irrelevant and many redacted for absolutely no reason), not including gigantic native files of excel spreadsheets, and documents that when printed do not contain their bates stamp. There also has not been a single deposition yet. Voycheske canceled twice and Bisignano once. Cagwin pulled once. Protective orders on 30(b)(6). I actually have no clue as to the exact fact issue witnesses because I cannot get you to allow anyone to sit down and be deposed about the documents you have produced, which are voluminous for a ADA and FMLA case. I understand the tactic, been there and done that in-house at 7-Eleven. I also know the old crunch the Plaintiff at the end of discovery timeline trick. Your playbook is old and tiresome.

This exact issue as to who is a fact witnesses is why I wanted to do the 30(b)(6) first, so that I could focus the discovery after getting the broad picture, but you blocked that. Then I wanted to do top-down, Frank Bisignano CEO first, so that I could understand the authority structure and focus my inquiries, you blocked that. So I am now back to doing what you originally wanted, taking the 30(b)(6) witnesses (three of them) in Omaha as you offered before to address the 30(b)(6) issues. Now you are saying those three may become one and you are trying to block what you originally proposed. Now, in addition to back tracking on yourself again, you also are trying to have me waive my ability to depose the 30(b)(6) designees also as fact witnesses.

The answer is no to all of that. You told me I had three witnesses each with unique expertise in Omaha.  I accepted that. I need three witnesses all with unique expertise in Omaha on the date noticed.

Based on what I hear over this week's depositions in New York and from the three 30(b)(6) witnesses in Omaha next week, I will be better able to tell you those individuals I believe will be needed as fact witnesses.  I highly suspect Ms. Voycheske and Ms. Steffen will be required.

Stop the circus. Let's get going with these depositions.

**Shawn E. Shearer**
The Law Office of Shawn Shearer, P.C.
3839 McKinney Avenue #155-254
Dallas, TX 75204
(972) 803-4499
www.shearerlaw.pro

**THIS EMAIL MAY CONTAIN CONFIDENTIAL AND/OR PRIVILEGED INFORMATION AND IS INTENDED FOR USE ONLY BY THE NAMED RECIPIENT. ANY OTHER USE OF THIS INFORMATION OR ANY ATTACHMENTS IS FORBIDDEN. IF YOU RECEIVE THIS EMAIL IN ERROR, PLEASE DELETE ALL COPIES AND, IF POSSIBLE NOTIFY THE INTENDED RECIPIENT.**

**From:** Eidelman, Gary B. [mailto:Gary.Eidelman@saul.com]
**Sent:** Tuesday, May 29, 2018 3:09 PM
**To:** 'Shawn Shearer' <shawn@shearerlaw.pro>
**Cc:** Cooper, Gillian A. <Gillian.Cooper@saul.com>; Kennedy, Lindsey C. <Lindsey.Kennedy@saul.com>
**Subject:** Deposition scheduling

Shawn:

It is likely that we will discuss the deposition schedule this week (including a date for Mr. Barger's deposition), but in advance, I am writing in response to your recent email regarding the scheduling of various depositions based on the chart of availability that I sent you last week.

1.  Atlanta Depositions –

- Dan Charron - You indicate that you want to take Dan Charron's deposition starting at 9 am on Tuesday, June 26, 2018.  We confirm that Dan is available to be deposed in Atlanta on June 26, however, we have already advised (*see* Chart) that he is only available from  1 pm – 5 pm that day.  We propose to start his deposition at 1 pm.

- Matt Cagwin -  You indicated the desire to take Matt Cagwin's deposition on June 26, 2018 after Dan Charron's deposition.  As the chart indicates, Matt is available on June 26, but only between 11 and 5.  However, he is available from 9-5 on Wednesday, June 27, 2018.   May I suggest that you take his deposition on Wednesday, June 27 starting at 9 am.

- Rhonda Johnson – If you want to use the morning of June 26, we could do Rhonda's deposition at 9 am. Alternatively, Rhonda could be deposed on June 27 after Matt Cagwin or on Thursday, June 28.

As Mr. Barger knows, the FD's offices are not located downtown so if you can find a location close to the office for the depositions, that would be greatly appreciated.

2.  Frank Bisignano – we confirm Frank's deposition for Friday, June 29, 2018 in NYC.

3.  Omaha Depositions – On the chart we provided to you, we only included the dates in June and July when were available.  After checking schedules, we are not available on June 7 and 8, but provided numerous other dates for these depositions in June and July.  In response

3

to your request, we are looking at your 30(b)(6) questions and will advise whether or not just 1 of the 3 Omaha witnesses can testify as to all of the topics you have inquired about.  We take your email to mean that you do not intend to take any fact depositions from either Voycheske, Steffen or Pulverenti and, therefore, the only testimony to be taken in Omaha will relate to the 30(b)(6) topics and that you will not seek to elicit testimony on personal knowledge of what happened with Steve Barger. If we misunderstand your intention, please advise.

4.      EJ Jackson – Contrary to claiming that we have not responded with regard to your desire to take EJ Jackson's deposition when you will be in SF, we have repeatedly stated that Mr. Jackson's testimony has no relevance to this case.  We again confirm that we will not voluntarily produce Mr. Jackson should you notice his deposition.

Finally, the email with Lindsey Kennedy's name at the top was printed from her email account when we produced the documents that accompanied the Voycheske affidavit.  Sometimes this happens when a client sends an email to a lawyer and the lawyer prints out the document. We have not and are not asserting privilege to the contents of this email just because it was printed from a lawyer's computer.  The electronic version of this email without Lindsey's name on it has been produced: FDC00051392-93.

Thank you,

**Gary B. Eidelman**
**SAUL EWING ARNSTEIN & LEHR LLP**
500 E. Pratt Street
Suite 900 | Baltimore, MD 21202-3133
Tel: 410.332.8975 | Fax: 410.332.8976 | Mobile: 410.303.8832
Gary.Eidelman@saul.com | www.saul.com

***Follow our blog, WISE: Workplace Initiatives and Strategies for Employers, here***
* Please note that our Firm name and my email address have changed.

"Saul Ewing Arnstein & Lehr LLP (saul.com)" has made the following annotations:
+~~~~~~~~~~~~~~~~~~~~~~~+
This e-mail may contain privileged, confidential, copyrighted, or other legally protected information. If you are not the intended recipient (even if the e-mail address is yours), you may not use, copy, or retransmit it. If you have received this by mistake please notify us by return e-mail, then delete.
+~~~~~~~~~~~~~~~~~~~~~~~+

**From:** Eidelman, Gary B.
**Sent:** Friday, June 08, 2018 5:40 PM
**Subject:** RE: Barger v. First Data - Deposition of Jennifer Voycheske - June 13, 2018
**To:** Shawn Shearer
**Cc:** Cooper, Gillian A.; Kennedy, Lindsey C.

Shawn:

For weeks now, you have had a calendar of the dates (another copy attached) when we and Ms. Voycheske are available for her deposition yet you unilaterally pick a date that is not available. We are not available on June 11, 2018 for Ms. Voycheske's deposition and we will not produce her on that date. She is available on the following dates (when other depositions are not scheduled): July 3, 5, 6, 11, 12, 23, 24, 25, 26, 30 and 31.  Pick from one of those dates.  Do you intend on deposing Ms. Steffen and Pulverenti too?  If so, let us know which dates you select because we only plan to make one trip to Omaha for depositions in this case.

**Gary B. Eidelman, Esq.**
Saul Ewing Arnstein & Lehr LLP
Office: 410.332.8975
Mobile: 410.303.8832

---

**From:** Shawn Shearer [mailto:shawn@shearerlaw.pro]
**Sent:** Friday, June 08, 2018 5:14 PM
**To:** Eidelman, Gary B.; Cooper, Gillian A.; Kennedy, Lindsey C.
**Subject:** Barger v. First Data - Deposition of Jennifer Voycheske - June 13, 2018

Gary – Please see the attached Notice regarding Ms. Voycheske's deposition that has been postponed or no-showed repeatedly for more than four months.

Shawn E. Shearer
The Law Office of Shawn Shearer, P.C.
3839 McKinney Avenue #155-254
Dallas, TX 75204
(214) 434-1594
www.shearerlaw.pro

THIS EMAIL MAY CONTAIN CONFIDENTIAL AND/OR PRIVILEGED INFORMATION AND IS INTENDED FOR USE ONLY BY THE NAMED RECIPIENT. ANY OTHER USE OF THIS INFORMATION OR ANY ATTACHMENTS IS FORBIDDEN. IF YOU RECEIVE THIS EMAIL IN ERROR, PLEASE DELETE