**EXHIBIT I**

**TO**

**PLAINTIFF'S REPLY IN SUPPORT OF 72(a)**


Served Rule 11 Motion re: *McKennon* Assertions in Motion to Extend Discovery

Shawn E. Shearer (TX Bar No. 24049493)
The Law Office of Shawn Shearer, P.C.
3839 McKinney Avenue, Suite 155-254
Dallas, Texas 75204
Telephone (972) 803-4499
*shawn@shearerlaw.pro*

Attorneys for Plaintiff
Steven B. Barger

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN B. BARGER, an individual<br><br>Plaintiff<br><br>v.<br><br>FIRST DATA CORPORATION et al.<br><br>Defendants. | **Case No. 1:17-cv-4869-FB-LB**<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SANCTIONS PURSUANT TO RULE 11 OF THE FEDERAL RULES OF CIVIL PROCEDURE**<br><br>**(Assigned to the Honorable Frederic Block)** |

**TO THE COURT AND TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD**

**NOTICE IS HEREBY GIVEN** that Plaintiff STEVEN B. BARGER ("Plaintiff") moves the

Court for an Order imposing sanctions under Federal Rule 11(c) for the filing and maintaining

the allegations and factual statements responses to specific allegations contained in the

Defendants' Request for Extension of Discovery Period [ECF No. 54] on the following grounds:

(1) The filing and maintaining of the statement that "Since First Data based the amount of

    money to pay Barger on his representations of what he was earning, First Data needs

    discovery into this 'after acquired evidence' in connection with his claim for

    damages."("<u>After-Acquired Evidence Statement</u>") is contrary to the testimony given by

**MOTION FOR RULE 11(c) SANCTIONS**          1

Defendant Whalen (former SVP of First Data) on May 31st and Defendant Marino (EVP of First Data) on June 1st. The evidence of Plaintiff's billings as a consultant prior to his employment by First Data is not after-acquired, and in fact, knowledge of Mr. Barger's rate for consulting was a negotiated term between sophisticated parties, and Mr. Barger's compensation upon employment (a raise from his consulting compensation) was a debated proposition inside of Defendant First Data back in 2014 – the information upon which the request for extension was made is 4-years stale. The information is not "after-acquired" for purposes of *McKennon*, it was actually "pre-acquired", and both the factual basis and legal basis upon which the extension of time was sought was knowingly contradictory to the evidence and law.

(2) Defense counsel ignored the Defense witness testimony contrary to the After-Acquired Evidence Statement. Compensation to be paid to Plaintiff as an employee was discussed within the Defendant First Data prior to the employment of Mr. Barger and the decision was made to hire Mr. Barger in 2014 by the Vice Chairman of the Board at a rate of pay despite the contrary recommendations of subordinate officers at First Data.  The evidence surrounding Plaintiff's hiring is not after-acquired, it was acquired pre-hiring, not post-termination. All suggestions otherwise, and application of McKennon, are based on knowingly incorrect facts and knowingly incorrect applications of the law and should be sanctioned.

This Motion for Sanctions will be based upon this Notice and the accompanying Memorandum of Points and Authorities.

DATED:        August 29, 2018

                                    Respectfully Submitted,

                                    THE LAW OFFICE OF SHAWN SHEARER, P.C.

                                    _____/s/ Shawn Shearer_____
                                    SHAWN SHEARER
                                    shawn@shearerlaw.pro

                                    Attorney for Plaintiff
                                    Steven B. Barger

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION AND PROCEDURAL HISTORY

This case is an employment discrimination lawsuit brought to seek redress for the violation of the Plaintiff's federally protected rights under the Family and Medical Leave Act ("FMLA") and the Americans with Disabilities Act ("ADA") initially filed on August 18, 2017. Pursuant to the Court's Scheduling Order on January 18, 2018, the parties were ordered to complete all fact discovery by August 31, 2018.[1] By letter motion [ECF No. 54] ("Request for Extension"), a copy of which is attached as Exhibit A, Defendants requested to extend fact discovery through September 28, 2018 on the basis that third-party discovery was required to obtain evidence on "after-acquired evidence" as to Plaintiff's pre- First Data employment billings arising from Plaintiff's deposition on August 15, 2018. Defendant's Request for Extension was granted 48 hours later, before Plaintiff could file an opposition, by minute entry on August 17, 2018.

### II.    LEGAL STANDARDS

Under Rule 11, by presenting the Request for Extension to the Court, Defense Counsel certified that to the best of the signatory's (and the signatories law firm) knowledge, information, and belief formed "after inquiry reasonable under the circumstances", that (i) the Request for Extension was not being presented for any improper purpose, such as to harass, cause

---

[1] **Discovery commenced January 18, 2018 and Defendants did not notice the Plaintiff for deposition until July 10th (six months after discovery began), and the deposition occurred on August 10, 2018.** After seven months of discovery lethargy (not even deposing the Plaintiff), Defendants requested an extension of discovery based on information supposedly "acquired" in Plaintiff's deposition. But, as set forth herein, – all of the information had been in Defendants' possessions for years and months Plaintiff's. Had Defendants properly used the prior **seven months** of discovery to depose THE PLAINTIFF, no request to extended time would have been necessary and this case would be proceeding to trial on schedule. Moreover, the question for *McKennon* is not when outside counsel received the information the question is when the Defendant received the information, and Defendant First Data has known everything since 2014 – Mr. Eidelman learning of facts in discovery that were already known to his client years before is not "after-acquired evidence", it is merely Mr. Eidelman and Defense Counsel getting up to speed on the events of the prior four years.

**MOTION FOR RULE 11(c) SANCTIONS**         4

unnecessary delay or needlessly increase the cost of litigation, (ii) the legal contentions are warranted by existing law or by nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; and (iii) the factual contentions are warranted on the evidence. Fed. R. Civ. P. 11(b). If the court, after notice and opportunity to respond, determines Rule 11(b) has been violated, the court may impose an appropriate sanction any attorney, law firm, or party that violated the rule or is responsible for a violation, and a law firm may be held jointly responsible for the acts of its partner, associate or employee. Fed. R. Civ. P. 11(c)(1).

Throughout the Federal Rules of Civil Procedure, there is a general theme that the Court is authorized to protect the sanctity of its proceedings. The Supreme Court has described fraud on the court as "a wrong against the institutions set up to protect and safeguard the public." *Hazel Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944). Rules 11, 16, 26, 37, and 41 of the Federal Rules of Civil Procedure all divine a general equitable principle that the Court is empowered to sanction activity, especially misrepresentations of known acts and the application of law, contrary to the proper operation of the judicial system. *See* Jonathan M. Stern, *Untangling A Tangled Web Without Trial*, 66 J. Air L. & Com. 1251, 1272–1285 (Summer 2001) (collecting cases).

### III.   SIGNING AND PRESENTING THE REQUEST FOR EXTENSION IS SANCTIONABLE UNDER RULE 11 AND THE GENERAL AUTHORITY OF THE COURT TO PROTECT THE PROPER OPERATION OF THE JUDICIAL SYSTEM

The Request for Extension was based upon an unsupportable application of *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352 (1995). For *McKennon* to apply, the first step in the analysis is to determine whether information was discovered after the adverse employment action was taken. There has been nothing new discovered. The rate of pay of Plaintiff while a consultant and upon negotiation of employment was not a secret, and as the Defense witnesses

**MOTION FOR RULE 11(c) SANCTIONS**          5

have testified, was debated back in 2014 – IT IS NOT NEW INFORMATION. **No evidence has been discovered post-Plaintiff's termination that was not already in First Data's possession pre-Plaintiff's hiring.**

The Request for Extension begins its analysis on the basis that Mr. Barger, at the time working as an employee of The Barger Group, LLC, was hired by First Data as consultant at the rate of $30,000 per month during the first quarter of 2014 and was then hired as an employee of First Data, earning $40,000 per month (plus benefits and equity) on June 30, 2014. In other words, after observing Mr. Barger's work for nearly six months, First Data decided to increase its expenditure on Mr. Barger's services to obtain his exclusive attention away from other clients for whom he was consulting. There is absolutely no evidence that either the $30,000 per month consulting fee or the $40,000 per month salary were based on Mr. Barger's personal income prior to 2014.

The questioning of Plaintiff Barger at his deposition regarding his personal tax returns cannot possibly be informative of Plaintiff Barger's billings and revenue for his prior employer. And, Mr. Barger's billings and revenue for his prior employer and his personal income prior to his employment by First Data are irrelevant for any *McKennon* analysis. Just like you cannot determine Defense Counsel Gary Eidelman's billable hours and collections for Saul Ewing by looking at his personal tax return, you cannot determine Plaintiff Barger's billables and collections as a consultant from looking at his personal tax returns. Moreover, Mr. Barger's billables and personal collections prior to his employment by First Data have absolutely nothing to do with the salary under which he worked for three years while at First Data.

Plaintiff Barger's billables, collections and compensation are red-herrings diverting from the real issue. THERE IS NO AFTER-ACQUIRED EVIDENCE AND DEFENSE COUNSEL

**MOTION FOR RULE 11(c) SANCTIONS**          6

KNEW SUCH WHEN THE REQUEST FOR EXTENSION WAS FILED.

The documents produced by Defendants from 2014 demonstrate that the pre-employment consulting arrangement between First Data and Plaintiff Barger was a negotiated transaction between two sophisticated parties. Exhibit B. The Consulting Agreement contained a typical integration clause (Bates No. FDC 53146) providing:

> This Agreement constitutes the complete and exclusive statement between the parties and supersedes and merges all prior proposals and all other agreements, oral or written, between the parties relating to the subject matter of the Agreement.

The Consulting Agreement also contained a typical disclaimer of drafter, indicating the terms and conditions of the document were negotiated by two willing parties and not a contract of adhesion or a contract entered without diligence or under duress.

> First Data and the Consultant have jointly participated in the negotiation of this Agreement.  This Agreement shall be construed as if drafted jointly by First Data and Consultant, and no presumptions arise favoring any party by virtue of authorship or of any provision of this Agreement.

Between the integration clause and the joint drafting clause, there is no evidence that Plaintiff Barger's hourly rates as a consultant for other clients was at all a consideration in the entry of the Consulting Agreement. In fact, First Data specifically agreed in the joint drafting of the Consulting Agreement, through the integration clause, that the Consulting Agreement supersedes all prior discussions. Any discussion regarding the basis of the transaction was integrated away in a jointly negotiated and drafted agreement. The compensation paid to Plaintiff Barger's former employer under the pre-employment Consulting Agreement is irrelevant to the *McKennon* analysis.[2] First Data was fully apprised of the terms of the negotiated agreement it entered in

---

[2] This is not a breach of contract case against Barger Group, LLC. It is not the forum for First Data to be seeking information to be developing any potential cause of action against a non-party to Plaintiff Barger's FMLA and ADA claims arising out of his illegal termination.

**MOTION FOR RULE 11(c) SANCTIONS**          7

2014 – those terms are not after-acquired evidence.

A decision was made by First Data to terminate the Consulting Agreement and employ Mr. Barger directly for a salary of $40,000 per month, $250,000 cash bonus, equity awards, and benefits. This was an increase of $10,0000 per month over that First Data was paying for a consultant who was also working for other clients – First Data knowingly chose to increase the compensation to Plaintiff as an employee over that First Data had been paying to Plaintiff's employer as a consultant. A business decision was made after observing Mr. Barger's consulting work for six months to hire him as an employee of First Data.

Prior to filing the Request for Extension, Defense Counsel knew that the decision to hire Plaintiff at his compensation level was a decision debated inside of First Data. The evidence of this debate was not after-acquired, it was as old as 2014 when the decision was made to hire Mr. Barger instead of continuing with him as a consultant.[3]

Defendant Whalen testified at her deposition on May 31, 2018 (three months prior to the Request for Extension) that as internal discussions regarding Mr. Barger's compensation was discussed pre-hiring (Exhibit C):

> He came in at a comp level that I was astounded by and disagreed with openly.
> (Whalen 92:20-22)

---

[3] Simply because that in 2018 outside counsel learned of events that occurred in 2014 that were known to employees of First Data in 2014, does not make that knowledge "after-acquired". The question is not when counsel learned the information, the question is when the Defendant learned the information. First Data had all the information it needed to enter into a consulting agreement with an integration clause and then employ Mr. Barger at an increased rate in 2014.  The fact that Saul Ewing, defense counsel, just learned such, does not make that discovery after-acquired evidence for purpose of *McKennon*.

**MOTION FOR RULE 11(c) SANCTIONS**          8

Ms. Whalen also explained in her testimony on May 31, 2018, the reason why Plaintiff was

employed at the decided compensation level (and it was not because of representations as to his

billable hours as a consultant):

> [Plaintiff] and Joe Plumeri had worked together to turn around large sales forces. And he always was the guy with Joe. And <u>Joe felt that he could add value here as part of the sales transformation effort</u>. (Whalen 93:4-8)

Defendant Marino echoed the statements of Defendant Whalen when he testified on June

1, 2018 as follows (<u>Exhibit</u> D):

> I believe that that was a mistake to hire him at the rate in which he was paid. In fact, I believe <u>Ms. Whalen testified yesterday that she completely disagreed with Mr. Plumeri when he made the decision to do so</u>. . . . I think that in Mr. Barger's case he was hired by Joe Plumeri. And my deposition and Ms. Whalen's deposition, we believe he was hired at a rate of pay that far exceeded the responsibilities of the job. And <u>Ms. Whalen</u>, I believe, <u>went on the record of that</u>. I support that. (Marino 186:7-187:16)

In other words, the issue of Mr. Barger's salary compensation paid by First Data was debated

internally within First Data back in 2014 before the offer of employment was made.  At the time

these discussions were ongoing, Mr. Plumeri was the Vice Chairman of the Board of First Data,

Ms. Whalen was a Senior Vice President, and Mr. Marino was not yet employed by First Data.

Mr. Plumeri, after considering his decades of history with Mr. Barger and the recent input of his

subordinate Defendant Whalen, made the decision to hire Mr. Barger at the salary of $40,000 per

month plus benefits and equity. Mr. Plumeri was fully informed, and First Data through its

officers Plumeri and Whalen was fully informed, in 2014 when the hiring decision was made. [4]

Nothing new has been or needs to be discovered.

---

[4] Joe Plumeri at the time of hiring the Plaintiff was the Vice Chairman of the Board of Directors and an officer of First Data Corporation. Mr. Plumeri has decades of experience as a senior executive on Wall Street and has written a NYT best seller on management.  Mr. Plumeri is not a rookie easily capable of being duped on a simple employment hire. <u>Exhibit</u> F is the biography of Mr. Plumeri from the First Data corporate website. Mr. Barger did not put one over on Mr. Plumeri, which is what has to be believed possible to even approach any *McKennon* analysis.

This case was filed in August 2017, more than three years after Mr. Plumeri, Vice Chairman of the Board of Directors, made a decade long informed and educated decision to establish Plaintiff's compensation. There is no "after-acquired evidence". The evidence was "pre-acquired" as shown by Defendant Whalen's testimony that she openly advised Mr. Plumeri back in 2014 before Plaintiff was hired as an employee.[5] First Data did not suddenly find evidence that its own employees disagreed with a 2014 decision made by First Data's Vice Chairman of the Board that had input of subordinates, and to suggest otherwise is an intentional misapplication of the law to known facts (facts of which have been misrepresented to the court). The sworn testimony is that the Vice Chairman of the Board (Plumeri) of First Data and a Senior Vice President of First Data (Whalen) had pre-employment discussions regarding the business decision as to Barger's salary and compensation in 2014. Moreover, Defendant Marino testified that this issue had continued during Mr. Barger's employment at First Data.  There is no after-acquired evidence. The supposed evidence upon which the motion to extend was based has been out in the open for years.

   The issue is not whether Mr. Barger was over compensated – no matter the level of his compensation – the issue in this case is that no matter his compensation, while on FMLA leave Plaintiff Barger was entitled to a statutory right TO BE REINSTATED at his pre-leave pay.

>      On return from FMLA leave, an employee is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position **with equivalent benefits, pay, and other terms and conditions of employment.**   An employee is entitled to reinstatement even if the employee has been replaced or his or her position has been restructured to accommodate the employee's absence. 29 C.F.R. 825.214

---

[5] The Plaintiff completely disagrees that his compensation was out of market or out of line for his responsibilities, but for Defendants to present to the court that issues around his compensation were newly discovered as part of this litigation is a complete misrepresentation of facts known by the Defendants prior to the commencement of this litigation.

*McKennon* is inapplicable to Plaintiff's right to return. Internal disagreements as to compensation amounts do not change Plaintiff's entitlement to restoration to an equivalent position with the same pay as had been debated internally by First Data for years.

For purposes of *McKennon* the issue is whether First Data obtained evidence after the commencement of this litigation that if known earlier would have resulted in Plaintiff's termination. There is no such evidence, in fact the testimony is the opposite. First Data hired Plaintiff as a consultant. The consulting agreement was a negotiated document integrating all prior discussions. First Data received, processed and paid all of Plaintiff's consulting invoices. First Data then hired Plaintiff as an employee at an increased rate of pay, benefits, and equity. Both the consulting and hiring terms were internally discussed by First Data <u>BACK IN 2014</u> prior to entering those relationships with Mr. Barger.

Defense Counsel was aware of these testified facts when the Request to Extend was filed on the false basis of having discovered new evidence that required both an extension of time and the harassment of non-parties with extensive document production requests over private matters involving tax returns, former employer financials statements, etc. <u>See</u> <u>Exhibit</u> E.

## IV.    CONCLUSION AND REQUEST FOR RELIEF

Defendants knowingly misrepresented the facts surrounding Plaintiff Barger's PRE-EMPLOYMENT relationship with Mr. Plumeri and with First Data for purposes of obtaining an extension of time solely for the purposes of  harassing non-parties, increasing the cost and time of this litigation, and increasing the burden on all parties (and non-parties) from Defendants' late, tardy, delinquent, and oppressive discovery efforts, all based on a fabrication of "after-acquired evidence".

Defense counsel knew from sworn testimony given at the end of May 2018 that the rate of

Mr. Barger's pay was determined by Mr. Plumeri, not because of Plaintiff's billable rate, but because Mr. Plumeri had worked with Plaintiff for years and wanted Plaintiff to assist in the transformation of the sales team and believed he would bring "value" as testified by Defendant Whalen. This information was confirmed by Mr. Barger in his deposition when he testified that he requested a consulting fee of $20,000 and Plumeri, Vice Chairman of the Board of First Data, offered $30,000.

The Request for Extension under the subterfuge of "after-acquired evidence" was a fraud on the court. There is no after-acquired evidence. The concept is the figment of Defense Counsel's imagination and intentional disregard for testified facts, and sanctionable.

The request for an extension of time was designed merely to delay these proceedings, increase Plaintiff's costs, impose burdens on third-parties, invade the privacy and financial information of third parties, and generally embarrass Plaintiff publicly through these filings and through subpoenas of members of his community.

The filing and maintaining of the statement: "Since First Data based the amount of money to pay Barger on his representations of what he was earning, First Data needs discovery into this 'after acquired evidence' in connection with his claim for damages." is contrary to the testimony given by Defendant Whalen (former SVP of First Data) and Defendant Marino (EVP of First Data). The evidence is not after-acquired, and in fact, knowledge of Mr. Barger's negotiated rate for consulting was a negotiated term between sophisticated parties and Mr. Barger's compensation upon employment was a debated proposition inside of Defendant First Data even before Mr. Barger was hired.

Plaintiff requests the following relief:

(i)     The extension of time for fact discovery, being based upon knowingly inaccurate

representations of facts, should be immediately revoked and fact discovery ordered completed in this matter;

(ii)     Plaintiff should be awarded attorney's fees in connection with all matters related to the filing of this motion and in evaluating Defendants' third-party discovery attempts following the granting of ECF No. 54, and all expenses and fees incurred in connection therewith; and

(iii)    As an equitable penalty for falsely representing facts to the Court, Defendants should be barred from raising *McKennon* as a defense in any manner arising out of the process of entering the Consulting Agreement or the negotiations of the terms of Mr. Barger's hiring.

DATED:          August 29, 2018

                                        Respectfully Submitted,

                                        THE LAW OFFICE OF SHAWN SHEARER, P.C.

                                        _____/s/ Shawn Shearer_____
                                        SHAWN SHEARER
                                        shawn@shearerlaw.pro
                                        Attorney for Plaintiff
                                        Steven B. Barger

# EXHIBIT A



Gary B. Eidelman
Phone: (410) 332-8975
Fax: (410) 332-8976
Gary.Eidelman@saul.com
www.saul.com

August 15, 2018

<u>**Via ECF**</u>
Honorable Lois Bloom, U.S.M.J.
U. S. District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   ***Steven B. Barger v. First Data Corporation et al.***
>        **Civil Case No. 1:17-cv-4869**
>        **Request for Extension of Discovery Period**

Dear Judge Bloom:

Plaintiff Steven Barger's deposition took place last Friday, August 10, 2018. He was unable to answer a number of substantive questions regarding fees he charged First Data, claiming that Philip D. Morgan, his accountant and Grant Barger, his son who ran Barger Group LLC, could answer those questions. Defendants want to serve subpoenas *duces tecum* on Morgan, Barger Group LLC, and Grant Barger before taking their depositions. Because fact discovery in this case ends on August 31, 2018, Defendants request an extension of the discovery deadline to allow sufficient time for these subpoenas to issue and depositions to take place. The granting of this extension will not impact the overall schedule because expert discovery does not close until September 28, 2018.[1]

> **A.    *Barger's Testimony Regarding Compensation*.** Beginning on or about March 15, 2014, Barger was hired by First Data as a consultant at the rate of $30,000 per month. On June 30, 2014, he became a full time employee of First Data, earning $40,000 per month, in addition to incentive compensation and equity. In ¶34 of his Complaint, Barger alleged that:

> In deciding to accept the position with First Data, and leave his consulting business to move to Atlanta, Barger relied upon the representation of First Data

---

[1] On Sunday, August 13, 2018, the undersigned asked Barger's counsel to consent to these depositions occurring after the fact discovery cutoff. *See* August 12, 2018 email from Gary B. Eidelman, Esq. to Shawn Shearer, Esq., attached as **Ex. A**. Opposing counsel declined, which has necessitated this letter motion. *See* August 13, 2018 letter from Shawn Shearer, Esq. to Gary B. Eidelman, Esq., attached as **Ex. B**.

Honorable Lois Bloom, U.S.M.J.
August 15, 2018
Page 2

that the future financial benefit of equity grants he would receive from First Data <u>would more than offset the reduction of his base income</u>.

*See* ECF No. 1 (emphasis supplied). Barger went on to allege in ¶36 of his Complaint that:

> Barger was informed, during the negotiation of his possible employment, that First Data was in the process of preparing for a $3.5 billion private equity offering as a precursor to its planned public offering of equity, and that the public offering would involve KKR selling shares to the market to liquidate a portion of its investment in First Data, and that the offering would create a market for the shares to be issued upon Barger's exercise of his stock options included in his proposed compensation package as an incentive for Barger to join First Data <u>and leave his lucrative consulting business</u>.

*Id.* (emphasis supplied). In Barger's Answer to Defendant First Data's Interrogatory No. 17, which requested information regarding his work history, Barger stated that from 2005 until he was hired by First Data, he worked as a "full time consultant" at the rate of $3,000 per day plus expenses. *See* Barger Answer to First Data Interrogatory No. 17, attached as **Ex. C.**

Joseph Plumeri, at the time a First Data senior executive, relied on Barger's representations regarding the amount of his monthly income in establishing the rate for the consulting agreement and ultimately his compensation for employment. During discovery, Barger produced his income tax returns for 2010-2017, which paint a far different picture from his claims of a "lucrative consulting business" that he was induced to leave. *See* ECF No. 1 at ¶36. For instance, Schedule C of his 2013 federal income tax return (the year before he was hired as a consultant/employee by First Data) indicates that Barger had gross receipts of less than $17,000 for the entire year (less than 6 days of consulting fees at his alleged $3,000 a day rate) and that after expenses were applied, his 2013 adjusted gross income was a negative number. His AGI for 2012 also was a negative number. His 2014 tax returns do not reflect the almost $200,000 in consulting fees First Data paid him under the Consulting Agreement before he became a W2 employee.[2]

Barger could not answer questions regarding these discrepancies or anything about his tax returns, claiming that we needed to question his accountant about his tax returns. *See* excerpts from Barger's "rough" deposition transcript, attached as **Ex. D** at 47-49, 59, 64, 206. He also testified that Barger Group LLC (his son's company) billed for his consulting services and then distributed to him a fraction of what was billed. *Id.* at 37-40. There exists a large discrepancy between his 3 ½ months of consulting services under the Consulting Agreement and what was actually billed and collected by Barger Group LLC.[3]

---

[2] Plaintiff marked the referenced income tax returns "Confidential" so they are not attached. If the Court requests, they can be produced *in camera*.

[3] On June 20, 2014, Barger Group LLC submitted an invoice for $50,000 for "final consulting services" for the period March-June 2014. There is no provision in the Consulting Agreement between Barger and First Data for such a fee. Barger testified that the payment was for the use of his intellectual property but could not cite to a license

**B.** *The Requested Discovery Goes to Barger's Damages.* Barger is seeking almost $16 million in damages, including 10 years of front pay. Plaintiff's allegations in the Complaint and his answers to interrogatories regarding the "lucrative consulting business" he left to join First Data are not supported by the documents he produced or his testimony. Since First Data based the amount of money to pay Barger on his representations of what he was earning, First Data needs discovery into this "after-acquired evidence" in connection with his claims for damages. First Data witnesses will testify that had the Company known of either Barger's misrepresentations about his consulting fees and/or his $50,000 bill for intellectual property, action would have been taken against him, up to and including termination.

In *McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 361-62 (1995), the Supreme Court ruled that after-acquired evidence cannot be used to bar relief under an employment discrimination statute.[4] However, the Court ruled that after-acquired evidence may render an employee ineligible for front pay, reinstatement and limit the amount of back pay to the period between when the unlawful discrimination occurred and the date on which the discovery of the after-acquired evidence was made. Judge Block has recognized and applied the rationale of *McKennon* to deny an award of front pay. *See Norris v. New York City Coll. of Tech.*, 2009 WL 82556, at *10 (E.D.N.Y. Jan. 14, 2009). Courts in the Second Circuit have recognized the applicability of *McKennon. See, e.g., Vichare v. AMBAC Inc.,* 106 F.3d 457, 468 (2d Cir. 1996) (applying rationale of *McKennon* to deny front pay); *Altman v. New Rochelle Public School District,* 2014 WL 2809134, at *14-15 (S.D.N.Y. June 19 2014). *See also EEOC v. Rose Casual Dining, L.P.,* 2004 WL 614806, at *10 (E.D.P.A. Mar. 5, 2004) (granting defendant summary judgment on issue of reinstatement and front pay where the plaintiff had inflated her prior salary); *Jones v. Ravens, Inc.*, 108 F. Supp. 2d 803, 812 (N.D. Oh. 2000) (holding defendant not liable under the ADA and finding that the after-acquired evidence doctrine barred any damages because plaintiff inflated his salary during salary negotiations).

**C.** *The Request for an Extension is Reasonable.* This is the first request for an extension of discovery in this matter. Defendants have produced more than 51,000 pages of documents and have responded or still need to respond to multiple sets of interrogatories, 15 sets of document requests, and requests for admissions. To date, Plaintiff has taken eight depositions with two more scheduled in Omaha on August 21st and 22nd. Plaintiff will not be prejudiced by this extension of time and the requested extension will not impact the briefing deadlines.

For these reasons, Defendants request that the discovery cutoff be extended to permit them to subpoena documents from and take the depositions of Philip D. Morgan, Plaintiff's accountant and Grant Barger, his son who ran Barger Group LLC, on or before September 28, 2018.

Respectfully submitted,

/s/

Gary B. Eidelman

cc: Counsel of Record (via ECF)

---

agreement. *See* **Ex. D** at 21-23. More importantly, the Consulting Agreement specifies that use of whatever intellectual property Barger may have used was included in the consulting fee.
[4] Unlike *McKennon*, Defendants do not concede that Plaintiff has or can establish liability under the FMLA or ADA.

# EXHIBIT A

**Eidelman, Gary B.**

| | |
|---|---|
| **From:** | Eidelman, Gary B. |
| **Sent:** | Sunday, August 12, 2018 9:57 PM |
| **To:** | 'Shawn Shearer' |
| **Cc:** | David@zeitlinlawfirm.com; Cooper, Gillian A.; Kennedy, Lindsey C.; Eidelman, Gary B. |
| **Subject:** | Scheduling matters |

Shawn:

I am writing with respect to several scheduling items.

1. Given Mr. Barger's testimony that Marilyn Barger suffers from depression, we do not wish to cause her any unnecessary stress. Even though Mrs. Barger is identified on Plaintiff's disclosures as a fact witness who has full knowledge of the dispute, we will forgo taking her deposition if you agree that she will not be submitting any affidavits or testifying in this case. Please let us know ASAP so that we can respond to her personal counsel.

2. As I mentioned, Amy Steffen has just taken in 2 foster children which makes travel difficult. Accordingly, we can produce Ms. Steffen and Kathi Benhardt in Omaha: Ms. Steffen on August 21 and Ms. Benhardt on August 22. Please let us know the time and locations where you would like to depose them.

3. Based on Mr. Barger's testimony, we now need to subpoena documents from and depose his accountant Phillip D. Morgan, Grant Barger and/or The Barger Group. With fact discovery closing on August 31, there is likely not enough time to both serve subpoenas and depose them before that date. Can we come to an agreement among counsel to take their depositions after the discovery cutoff in September? If so, we will work with you to coordinate mutually agreeable dates for their depositions. If not, we plan to ask Judge Bloom to extend the discovery cutoff for the limited purpose of taking this discovery.

4. As a reminder, the federal court has scheduled a telephone hearing for August 14 on the motion to compel Julie Kelly's deposition. As you know, we provided Ms. Kelly with dates in August when she can be deposed. We will let you know what the court decides and if a date is set so that you can attend if you want.

5. Finally, we believe that Mr. Barger's testimony establishes that there was and is no factual basis to have named Rhonda Johnson, Karen Whalen, Frank Bisignano or Lori Graesser as individual defendants under the FMLA. It is one thing to file a lawsuit and then amend to include additional witnesses if the evidence establishes liability. It is another thing to make specific allegations in a lawsuit from the beginning of a case and then try to find out what happened. The case law often describes this as a prohibited fishing expedition.

It is a serious thing to name someone as a defendant in a civil lawsuit. Mr Barger testified that the reason all of the individuals were named is because "***I needed to find out. I wanted whoever is responsible for not allowing me to come back to work and that's why I had no idea who it was so that's why.***" Mr. Barger did not need to name each of these individuals as defendants in their personal capacity to find out what happened in his case. He could have deposed them as witnesses. It is evident that his naming them was for an improper purpose designed to harass and cause undue legal expense. When asked for details to support claims against these defendants, his testimony was often that we need to ask his lawyer. That is no answer since you are not a witness. Given his testimony and theirs, it is evident that the allegations against these individuals did not have any factual support nor have facts been developed that would support them being defendants under the FMLA. We believe this is exactly what Rule 11 of the Federal Rules of Civil Procedure prohibits. If Mr. Barger agrees to dismiss his FMLA claims against Johnson, Whalen, Bisignano and Graesser with prejudice, we will not seek Rule 11 sanctions and attorneys' fees against him. Otherwise, we have every intention of doing so.



**Gary B. Eidelman**
**SAUL EWING ARNSTEIN & LEHR LLP**
500 E. Pratt Street
Suite 900 | Baltimore, MD 21202-3133
Tel: 410.332.8975 | Fax: 410.332.8976 | Mobile: 410.303.8832
Gary.Eidelman@saul.com | www.saul.com

*Follow our blog, WISE: Workplace Initiatives and Strategies for Employers, here*
\* Please note that our Firm name and my email address have changed.

# EXHIBIT B

Case 1:17-cv-04869-FB-LB Document 54-2 Filed 08/15/18 Page 2 of 3 PageID #: 862

# THE LAW OFFICE OF SHAWN SHEARER, P.C.

3839 McKINNEY AVENUE, SUITE 155-254

DALLAS, TEXAS 75204

OFFICE: (972) 803-4499

SHAWN@SHEARERLAW.PRO

August 13, 2018

**<u>Via E-Mail</u>**

Gary Eidelman

Saul Ewing Arnstein & Lehr LLP

500 Pratt Street, Suite 900

Baltimore, MD 21022-3133

Gary:

In response to your most recent demands of August 12, 2018 -

1.  I suggest you discuss Mrs. Barger's deposition with her attorney.

2.  Mr. Grant Barger has his own attorney, and it is my understanding that you will be hearing from his attorney today. I do not believe there is any further information Plaintiff can or will provide you, through an accountant or otherwise. If you wish to utilize third party subpoenas, I suggest you do so quickly as the period for discovery is nearly over.

3.  You will receive deposition notices today for the upcoming depositions of Ms. Amy Steffen and Ms. Kathi Benhardt.

4.  Ms. Kelly already appeared for her scheduled deposition on June 25, 2018. You confirmed her appearance to me on the record in a deposition in this case on June 27, 2018.  What you decide to tell a Federal judge in Ohio about that reality is strictly your choice.

5.  Plaintiff will not agree to any extension of the discovery period. Any attempt by Defendant's Counsel to obtain an extension will be met with opposition. Be prepared to answer for your six week hiatus from discovery during March and April of 2018, your six recorded no shows, including the no show of your own noticed deposition in Ohio, as well as Mr. Rosman's no show and refusal to answer questions regarding the notice to Plaintiff in the matter of the timing of Defense Counsel's cancellation of Defendant Bisignano's May 23, 2018 deposition.

Case 1:17-cv-04869-FB-LB Document 74-2 Filed 10/03/18 Page 24 of 73 PageID #: 1769
Case 1:17-cv-04869-FB-LB Document 54-2 Filed 08/15/18 Page 3 of 73 PageID #: 863

Page 2

6.  I am uncertain in which depositions you have been sitting, but all the ones I have been in point to a clear conspiracy with regard to Mr. Barger's illegal termination. Mr. Barger said as much during his deposition. Furthermore, Defense Counsel's signed reply to the EEOC combined with Defendant's Answer to Plaintiff's Complaint is enough to justify Plaintiff's inclusion of all named defendants. It is interesting that you should mention Ms. Graesser, as the testimony thus far combined with multiple conspiratorial emails, MetLife's document production and the appearance of the Second Voycheske Declaration has given me reason to consider pleading former Defendant Graesser back into the case. I will let you know what I decide on that matter as soon as possible.  In the meantime, either Rule 11 me, or don't.


    Very truly yours,



    Shawn E. Shearer

**THE LAW OFFICE OF SHAWN SHEARER, P.C.**

Case 1:17-cv-04869-FB-LB Document 54-3 Filed 08/15/18 Page 1 of 3 PageID #: 3640

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN B. BARGER, an individual | **Case No. 1:17-cv-4869-FB-LB** |
| Plaintiff | **PLAINTIFF STEVEN BARGER'S ANSWERS AND OBJECTIONS TO DEFENDANT FIRST DATA CORPORATION'S FIRST SET OF INTERROGATORIES** |
| v. | |
| FIRST DATA CORPORATION, *et al.* | |
| Defendants. | |

Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the local Rules of this District, Plaintiff Steven B. Barger ("Barger," "Plaintiff" or "I"), by and through his undersigned attorneys, hereby answers the First Set of Interrogatories propounded by First Data Corporation ("First Data" or "you") as follows:

## GENERAL OBJECTIONS

The following general objections apply to the interrogatories as a whole and to each interrogatory contained therein and shall be deemed incorporated by reference into each and every objection made herein to a specific interrogatory:

1.     Plaintiff objects to the interrogatories to the extent they require or purport to require disclosure of information, materials, or documents protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, immunity, statute, law, or rule. Any statement herein to the effect that Plaintiff will provide information in response to an interrogatory is limited to information that does not fall within the scope of any relevant privilege.

2.     Plaintiff objects to the interrogatories to the extent they seek information prepared in anticipation of litigation or for trial until and unless Plaintiff, by the requisite showing of need and cause, obtains an order requiring the disclosure of said information.

regarding his disability, and no response is necessary to this clear and deliberate mocking of Plaintiff.

Nevertheless, subject to the stated and general objections and without waiver, Plaintiff discussed his diagnosis and treatment at numerous points between February 2016 and September 6, 2016 with all of the named individual Defendants, Jeff Hack, members of Plaintiff's Training Group, and other employees he mentored and interacted with in the course of his employment. Plaintiff discussed his diagnoses and treatment with Defendant Bisignano and Defendant Bisignano recommended he receive a second opinion and arranged for Plaintiff's visit to Mr. Bisignano's physician in Tampa.

**INTERROGATORY NO. 17.** Describe, in detail, your work history, including but not limited to each and every position (whether as an employee, independent contractor, self-employment, or otherwise) that you have held from 2000, through the present, including in your Answer with respect to each such position, the identity of the employer/business or entity/person for whom you performed services, your job title(s) and job functions, the date the employment commenced, the date employment terminated, the reason for termination, and the rate of pay at termination.

**Answer**:      Plaintiff objects that this interrogatory is overly broad, burdensome and oppressive to list all individuals with whom Plaintiff worked as a consultant over an 18-year period. Plaintiff's work involved training and teaching numerous individuals. Plaintiff further objects that Plaintiff's employment prior to First Data is not relevant to the claims or defenses in this case. Plaintiff further objects to this interrogatory as it is not reasonably likely to lead to admissible evidence. Subject to the stated and general objections and without waiver, Plaintiff suffered a heart attack in 2000, took some time off, and then took on a light schedule as a self-employed consultant through 2005. From 2005 through Plaintiff being hired by First Data, Plaintiff worked a full schedule as a self-employed consultant working for multiple companies simultaneously, including the following: UBS (Paul Santucci, Denis Drescher, John Decker, Jim Ducey), Merrill Lynch (Jon Lawrence), Massachusetts Financial Services (MFS) (Gary Polson), Morgan Stanley (Rich Franchella, Phil Shafer, Ned Dubilo, Frank Hill, Jim Tracey, Rich Hazzouri, Robin Connelly), Ameriprise (Scott Hirsch, Gary Nuccio), Core States (Bill Spiropoulos), FifthThird Bank (Dave Hinman), RBC (Rob Spawn), LPL (Robert Fragasso, Tif Joyce), Oppenheimer (Mar Ferro), Wells Fargo/FiNet (Ron Sallet). Plaintiff's rate was $3,000/day plus expenses. Plaintiff was then hired as a consultant to First Data and then became employed by First Data and stopped

consulting for other businesses.

**INTERROGATORY NO. 18.** Itemize and describe in detail the damages you seek in this action (whether economic, non-economic, or other) against Defendant, including the nature and amount of damages for each cause of action in your Complaint, the legal and factual basis for each item of damages that you seek, the basis and method for computation of each item of damages, and all documents that refer to, relate to, and/or concern the subject matter of and your Answer to this Interrogatory.

**Answer**: Plaintiff objects that this interrogatory is overly broad and burdensome to list in detail the legal and factual basis justifying all of the damages sought. Plaintiff further objects that expert discovery has not been conducted and Plaintiff is not in a position to determine the basis and methods for computation of each item of damages. Plaintiff further objects that damages are still occurring and a response to this interrogatory is impossible. Plaintiff further objects that not all damages have been discovered and cannot be listed as requested. Subject to the stated and general objections and without waiver, based on the facts as alleged in the Complaint and Supplemental Complaint, for violations of the FMLA, Plaintiff is seeking front-pay, back-pay, interest on back-pay, fees & costs, double damages as liquidated damages, and all other damages and remedies available under FMLA, and such other damages and equitable relief as entitled by law. Plaintiff's preliminary calculation of a portion of these damages as of February 28, 2018 was attached as Exhibit C to the Reply in Support of Plaintiff's Motion for Partial Judgment on the Pleadings Pursuant to Federal Rule of Civil Procedure 12(c).

**INTERROGATORY NO. 19.** Itemize and describe in detail the damages you seek in this action (whether economic, non-economic, or other) against Defendant, including the nature and amount of damages for each cause of action in your Supplemental Complaint, the legal and factual basis for each item of damages that you seek, the basis and method for computation of each item of damages, and all documents that refer to, relate to, and/or concern the subject matter of and your Answer to this Interrogatory.

**Answer**: Plaintiff objects that this interrogatory is overly broad and burdensome to list in detail the legal and factual basis justifying all of the damages sought. Plaintiff

## VERIFICATION

I, Steven B. Barger, hereby state, based on reasonable inquiry, that any facts contained in the foregoing Answer and Objections to First Data Corporation's First Set of Interrogatories are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

Dated this 3rd day of April, 2018

_____
Steven B. Barger

# EXHIBIT D

Barger Steven B. 081018 Rough Draft

1

```
 1              ROUGH DRAFT/REALTIME OUTPUT
 2          This ROUGH DRAFT/Realtime file is an
 3   uncertified, unedited rough draft of the proceedings,
 4   and is not to be used in any way as a final transcript.
 5   The realtime rough draft may be used in place of or in
 6   addition to or only to enhance notes taken during the
 7   proceeding.  Anyone choosing to cross-examine or prepare
 8   a witness using a rough draft is doing so with full
 9   knowledge the rough draft is uncertified, and that they
10   are doing so at their own risk.
11          Realtime rough drafts are not to be shared,
12   copied, faxed or in any way distributed in any form
13   (written or electronic); however, your experts and
14   co-counsel and staff have limited internal use of same
15   with the understanding that all realtime rough draft
16   and/or computerized forms, if any, will be destroyed and
17   replaced with the final certified copy upon its
18   completion.  This is an unofficial transcript, which
19   should NOT be relied upon for purposes of verbatim
20   citation of testimony.
21          This transcript has not been checked,
22   proofread, or corrected.  Corrections will be made in
23   the preparation of the certified transcript, resulting
24   in differences in content, page and line numbers,
25   punctuation and formatting.
```

⚥

2

```
 1   Case:  BARGER v. FIRST DATA, ET AL
```

```
                    Barger Steven B. 081018 Rough Draft
20      A     Right.
21      Q     -- which says if it started in March, the
22  first month would be April 15th, that would be $30,000?
23      A     Right, right.
24      Q     Do you see that?  Correct?
25      A     I do.
```

♀

23

```
 1      Q     And then the next invoice is May 15th, 2014?
 2      A     Got it.
 3      Q     Right?  So that would be the second month of
 4  the consulting arrangement, correct?
 5      A     Yup.
 6      Q     And then the third invoice is June 15th of
 7  2014.  Do you see that?
 8      A     Yeah.
 9      Q     And that would be another $30,000?
10      A     Yup.
11      Q     Right.  And then there is the next invoice is
12  June 20th of 2,014.  Do you see that?
13      A     Yeah.
14      Q     And that corresponds with Bates numbers
15  FDC00052613.  Do you see that?
16      A     Yeah.
17      Q     How much is that invoice for?
18      A     50,000.
19      Q     And what is that for?
20      A     That would most likely an agreement with Joe
21  and I be for First Data's use of any of my proprietary
22  information that I had used during that time and would
```

Barger Steven B. 081018 Rough Draft

23  use going forward and you should probably ask him about

24  that because that's what that's for.

25      Q    Well, it says final fee for business

24

1   consulting services 2014?

2       A    Right.

3       Q    March through June.

4       A    Yeah.

5       Q    And this is your invoice?

6       A    Yeah.

7       Q    Right?  Where does it say on this invoice that

8   you are licensing your proprietary information to First

9   Data?

10      A    It doesn't.

11      Q    And what proprietary information do you have

12  that you were licensing to First Data?

13      A    It would simply be all the concepts that I've

14  used over the years.

15      Q    Are those trademarked?

16          MR. SHEARER:  Objection.  Go ahead.

17      Q    Do you have a trademark on your proprietary

18  materials?

19      A    Some are copyrighted.

20      Q    Okay.  And was there a licensing agreement

21  that you entered into with First Data?

22      A    No.  This was Joe's way of me getting paid for

23  that, that's it.  I told you my relationship with Joe

24  over 30 some years is to a point where we say, all

Barger Steven B. 081018 Rough Draft
25  right, here is how things need to be, fine, take care of

1   it and it's over with.  That has continued for 30 years
2   because at the end of the day I would trust everything
3   that he was going to do and he would trust everything
4   that I was going to do, period.  So this got entered in
5   to cover that aspect of the business and that it may be
6   labeled the wrong way, but it was the intent behind it.
7        Q    Well, why -- why wasn't that included in the
8   $30,000 a month?
9        A    The 30,000 was my time only.
10       Q    Were you using your business concepts during
11  the period that you were doing consulting prior to --
12       A    Always have.
13       Q    So I have to ask, again, if you didn't charge
14  for it before, why are you charging for it now?
15       A    What do you mean if I didn't charge for it
16  before?
17       Q    You said that this $50,000 payment was
18  authorized by Joe Plumeri so that you would use your
19  proprietary materials at First Data, correct?
20       A    Right.
21       Q    But you were already using your proprietary
22  materials at First Data and that was included in the
23  $30,000 a month of time?
24            MR. SHEARER:  Objection.  You can answer.
25       A    No, it wasn't.

Page 23

Barger Steven B. 081018 Rough Draft

2  as a consultant, right?

3      A    Okay.  Very good.

4      Q    Well, do you agree with me?

5      A    Yeah.

6      Q    You've already testified today that, and I

7  think we've shown it as well from the complaint, that

8  you decided to join First Data because Joe Plumeri asked

9  you to in part, though, because of the compensation that

10  you would receive from First Data would replace the

11  lucrative consulting business that you had going on,

12  yes?

13          MR. SHEARER:  Objection.

14      A    Yeah.

15          (Deposition Exhibit 134, marked for

16  identification.)

17      Q    Mr. Barger, showing you what's marked as

18  Deposition Exhibit 134, which is a document produced by

19  you in this case, which is the -- your 2013 1040 for you

20  and Mrs. Barger which corresponds with SBB-001356 to

21  1363, and ask you if you recognize this?

22      A    I do.

23      Q    So can you explain to me, sir, how Deposition

24  Exhibit 134 equates with your testimony that prior to

25  joining First Data in 2014 you had a lucrative

41

1  consulting business for which the First Data

2  compensation would replace when in 2013 your adjusted

3  gross income was a negative $15,212?

4      A    I was -- all the income I made in my

Page 37

Barger Steven B. 081018 Rough Draft

5  consulting company went into the Barger Group, didn't
6  come to me it was through my consulting company and my
7  son ran called the Barger Group.
8       Q    And that's an LLC, is it not?
9       A    Yeah.
10      Q    And don't you understand that an LLC is a
11 pass-through organization?
12           MR. SHEARER:  Objection.
13      A    I'm not sure what that means.
14      Q    Well, let me back this up a minute.
15           So did the Barger Group pay you money?
16      A    I ran all of my money through the Barger Group
17 and Grant got paid everything in the Barger Group, so...
18      Q    So what did you get paid?
19      A    I got monthly money.
20      Q    How much did you get?
21      A    I would have to go back and look.  I have no
22 idea.
23      Q    Well, I think the 2013 tax return will tell
24 us.  So let's go to the page that corresponds with
25 SBB-001358 and under part 1 is income.  Is it your

42

1  testimony that in 2013 the Barger Group only paid you
2  $16,210?
3       A    That's what it looks like.
4       Q    Is that the lucrative consulting --
5       A    Lucrative consulting would be what the Barger
6  Group earned that year.

Page 38

Barger Steven B. 081018 Rough Draft

7    Q    Well, where did that money go?

8    A    To my son.  He ran the Barger Group.  I just

9  worked for him.

10    Q    And your son -- so you're charging $3,000 a

11  day to all these companies and your son only paid you

12  $16,210?

13    A    Yeah.  I had other money.  He got the rest of

14  it.

15    Q    What other money did you have?

16    A    I had money in savings.  I had money that I

17  lived off of.  Actually, I'm not sure how I decide to

18  live my life is germane to this case.  Why is how much I

19  make or how much I spend germane to this case?

20    Q    Well, I get to ask the questions, sir.  This

21  isn't my deposition; this is your deposition.

22         I'm asking you is it your testimony that for

23  this lucrative -- this lucrative consulting arrangement

24  that you entered in with First Data that started at

25  $30,000 a month that the year prior to that you only

43

1  earned $16,210 in consulting fees?

2    A    No.

3    Q    You earned more than that?

4    A    I did.

5    Q    So your testimony is that all went to your

6  son?

7    A    It all went to the Barger Group, everything

8  got paid to the Barger Group.

9    Q    So if we subpoenaed the records of the Barger

Barger Steven B. 081018 Rough Draft

10    Group, it would show you that the Barger Group only paid
11    you $16,210 in 2013?
12        A    Yeah.
13        Q    We're not done with that yet.
14             Turning to the page that is expenses for
15    business use of your home which corresponds with
16    SBB-001362.  Do you see that?
17        A    I do.
18        Q    And this is a -- this is where you took
19    expenses, personal expenses off your taxes?
20        A    Okay.
21        Q    This is your tax return, sir.  I'm asking you.
22        A    Apparently I did.
23        Q    Okay.  So even though everything ran through
24    the Barger group, you then in addition to whatever
25    expenses the Barger group had where all your money ran

⚲

                                                        44

1     through, you took deductions for personal expenses,
2     right?
3         A    Yeah.
4         Q    And included under that is you took a
5     deduction for $18,000 in rent in 2013.  Do you see that?
6     It would be line 18.
7         A    I do.
8         Q    And you calculated that somehow or your
9     accountant calculated that the value of your home office
10    for you earning $16,210 was $18,000 in rent?
11        A    Apparently he did a good job.

Barger Steven B. 081018 Rough Draft

1  First Data.

2      Q    Okay.  On line 19 -- excuse me.  I apologize.
3  On line 18 you show rent of $22,900.

4      A    Okay.

5      Q    Do you see that?

6      A    Yeah.

7      Q    Can you explain to me why the amount that you
8  took as an expense for rent in 2014 jumped from $18,000
9  in 2013 to $22,900 in 2014 for only six months?

10      A    You would have to ask my accountant.  I don't
11  know.

12      Q    Okay.  But you recognize that by taking these
13  expenses it lowers the amount of taxable income that you
14  have to pay on the money that you receive from the
15  operations of a business, you understand that, right?

16      A    So you're saying I owe more taxes?

17      Q    No, sir.  I'm saying you understand that by
18  putting business expenses on your tax return you did so
19  to offset the income that you received from operating
20  the consulting business, you understand that's the
21  purpose of business expenses?

22      A    Yeah, sure.

23      Q    So you don't know why this jumped from $1,500
24  a month all the way up to 22,900 for six months?

25      A    Maybe the rent increased.  I don't know.

Barger Steven B. 081018 Rough Draft

 1     Q    The rent increased on the -- was this an
 2   apartment that you were living in?
 3     A    It was a house.
 4     Q    Oh.  Did the rent increase do you know?
 5     A    I don't know.  You would have to ask my
 6   accountant.
 7     Q    Okay.  Well, we just might do that.
 8          Are you a gambler?
 9     A    I have gambled, yeah.
10     Q    And you report your winnings and losses on
11   your taxes?
12     A    Of course.
13          (Deposition Exhibit 136, marked for
14   identification.)
15     Q    Showing you what's been marked as Deposition
16   Exhibit 136 which corresponds with SBB-001345 to 1355,
17   this is a document produced in this case and it's your
18   2012 1040.  Do you see that?
19     A    I do.
20     Q    And in 2012, which was the time period when
21   you were operating the lucrative consulting business,
22   your adjusted gross income was a negative $17,735,
23   right?
24     A    That's what my accountant says.
25     Q    And that year, if you go to Schedule C,

♀

53

 1   001348, the amount of money that you received in income,
 2   which had to be as a consultant is what it says, was

Barger Steven B. 081018 Rough Draft
3   $15,602, right?

4       A    That's what he says.

5       Q    That's what he says or that's what your tax

6   return said?

7       A    That's what his -- he put on my tax return and

8   I agreed to.

9       Q    Right you signed your taxes, right?

10      A    Yes, I did.

11           (Deposition Exhibit 137, marked for

12  identification.)

13      Q    Showing you what's been marked as Deposition

14  Exhibit 137, corresponding with SBB-001336 to 1344, I

15  represent that these were produced by you in this case

16  and this is your 2011 1040.  Do you see that?

17      A    I do.

18      Q    And this year for 2011 your AGI on line 37 of

19  page 1 was $35,202, right, Mr. Barger?

20      A    Yeah.

21      Q    And then on page 3 of this document, which is

22  your Schedule C profit or loss from a business, the

23  gross receipts that you had this year were $77,071.  Do

24  you see that?

25      A    Okay.  Yeah.

                                                        54

1       Q    Is there something that happened between 2011

2   where you received $77,000 in consulting fees to 2012

3   and 2013 where they dramatically decreased?

4       A    Other than the fact that I started working

5   with my son at the Barger Group.

Page 49

Barger Steven B. 081018 Rough Draft

64

1    A    I'm sure they are, yeah.

2    Q    Did you report the MetLife checks for the two

3  that you received, one in the amount of $27,705 and the

4  other one in the amount of $13,852.50, did you report

5  them on your tax return?

6    A    I don't know.  You have to ask my accountant.

7    Q    And to this day you have not returned that

8  money to MetLife, correct?

9    A    Correct.

10    Q    Showing you what's been marked as Deposition

11  Exhibit what number is that 141?  Is that correct?  142,

12  I'm sorry.  142, I'm sorry.

13         MR. SHEARER:  I think we're on 143.

14    Q    I apologize.  I apologize.

15         Showing you what's been marked as Deposition

16  Exhibit 143, can you identify that, please?

17    A    Looks like a 1099 from a company called Oasis

18  Outsourcing.

19    Q    And what is Oasis Outsourcing?

20    A    They are an HR outsourcing company that does

21  HR services for companies who don't want to keep it

22  inhouse.  They act as a co-employer.

23    Q    Did you provide consulting services to Oasis

24  in 2017 after you left First Data?

25    A    I did.

65

1    Q    And did you do that again through your son's

Page 59

Barger Steven B. 081018 Rough Draft

12 him.

13       MR. SHEARER:  Objection on asking -- how he
14 made a decision for tax purposes in this case is
15 privileged information.

16       MR. EIDELMAN:  No.  He just said it was his
17 accountant.

18    Q    So I want to be clear about something, Mr.
19 Shearer.  You deducted fees that you paid to Mr. Shearer
20 on your tax return for your business in 2017 in the
21 amount of $36,500, right?

22    A    You're going to have to ask my accountant.

23    Q    Do you know what you -- do you know what you
24 otherwise would have spent $36,500 on in legal fees in
25 2017?

                                                    70

1    A    I have no idea.

2    Q    And you paid Mr. Shearer in 2017, correct?

3    A    I think that's privileged, isn't it?

4    Q    Well, it's on your tax return.  I'm entitled
5 to find out what your legal and professional services
6 for $36,500 were that you reported to the United States
7 government on your tax return in 2017.

8    A    You have to ask my accountant.

9    Q    Do you have any legal -- do you have any other
10 legal cases going on besides this one?

11    A    No.

12    Q    Have you paid any lawyers other than Mr.

13 Shearer --

Page 64

Barger Steven B. 081018 Rough Draft

19          (Recess 5:30 p.m. - 6:05 p.m.)

20          (Deposition Exhibit 171, marked for

21  identification.)

22  BY MR. EIDELMAN:

23      Q    We're back on the record.

24           I just wanted to do a housekeeping matter with

25  you, Mr. Barger.  Earlier today we had some testimony

224

1  about your tax returns and your 1040, et cetera.  Who is

2  your accountant?

3      A    A guy named Philip in Birmingham, Alabama.

4      Q    Is it Philip Morgan?

5      A    Yeah.

6      Q    Philip Morgan CPA?

7      A    Yeah.

8      Q    And Mr. Morgan is the person that I would need

9  to ask questions about about your tax returns?

10     A    Yeah.

11     Q    Do you have any objection to me taking

12  Mr. Morgan's deposition for purposes of inquiring about

13  your taxes?

14     A    That's fine with me.

15     Q    So if Mr. Morgan's name appears on any tax

16  returns, he's the person that I would ask questions to

17  is that right?

18     A    That's fine with me.

19     Q    And if his name isn't on any tax returns, who

20  would I ask those questions to?

Page 206

# EXHIBIT B

| **From:** | Steve Barger(steve@thebargergroup.com) |
|---|---|
| **To:** | Whalen, Karen |
| **CC:** | Ward, Kevin P; Diaz, Laura |
| **BCC:** | |
| **Subject:** | RE: Follow Up |
| **Sent:** | 04/06/2014 12:27:29 AM +0100 (GMT) |
| **Attachments:** | TBG W9.tiff; FD10.pdf; FD.pdf; FD8.pdf; FD9.pdf; FD Master Invoice 2.16.14.pdf; |

, Hi Karer

I can't tell you how comforting it is to have you and the FD team taking care of me. You are making this very easy for me.

Laura has been terrific.

Kevin Ward has been my reliable source for answers in Atlanta.

Thanks for your efforts re the corporate card. I understand. It makes sense.

I have attached the signature pages from the contract. Also our business ID number and liability insurance information. Don't want to send an invoice every month if I don't need to. I attached an invoice that could be used each month. Please have your people wire the funds on the 15th of each month using the instructions on the invoice.

Thank you for overseeing this request from Joe.

I am fully engaged in the discovery process and will be travelling extensively for the next several weeks. I will send you an invoice for my travel expenses as they are incurred.

Again,

Thanks

Steve

### Purpose Driven. Principle Based. Client Centered.

**Steve Barger**

**TheBargerGroup**

**480-225-8783**

steve@thebargergroup.com

www.thebargergroup.com

**From:** Whalen, Karen <Karen.Whalen@firstdata.com>
**Sent:** Saturday, April 05, 2014 3:15 PM
**To:** Steve Barger
**Cc:** Ward, Kevin P; Diaz, Laura
**Subject:** Follow Up

Hello Steve - I hope this finds you well! I trust you have received your consulting agreement - please let Kevin or me know if you have any questions.

Also, I spoke with both our CFO and Controller about a corporate card for you, and they are unwilling to do so because of tax implications. They prefer that you invoice us for all of your expenses. While I thought Joe had a corporate card, he does not. Sorry I could not be more helpful in that regard.

Enjoy the rest of your weekend, and I look forward to seeing you soon.

Best,

Karen

The information in this message may be proprietary and/or confidential, and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify First Data immediately by replying to this message and deleting it from your computer.

CONFIDENTIAL                                                                 FDC00053142

| Form **W-9**<br>(Rev. January 2011)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer<br>Identification Number and Certification** | **Give Form to the<br>requester. Do not<br>send to the IRS.** |
|---|---|---|

**Print or type**
**See Specific Instructions on page 2.**

Name (as shown on your income tax return)
Barger Group, LLC

Business name/disregarded entity name, if different from above

Check appropriate box for federal tax classification (required):
☐ Individual/sole proprietor  ☐ C Corporation  ☐ S Corporation  ☐ Partnership  ☐ Trust/estate

☑ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶   S

☐ Other (see instructions) ▶

☑ Exempt payee

Address (number, street, and apt. or suite no.)
6200 Foxwood Trail

Requester's name and address (optional)

City, state, and ZIP code
Birmingham, AL

List account number(s) here (optional)

---

### Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number
| | | | – | | | – | | | | |

Employer identification number
████████████████

---

### Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 4.

**Sign Here**   Signature of U.S. person ▶ *[signature]*   Date ▶ 2.1.11

---

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

## Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

**Note.** If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

• An estate (other than a foreign estate), or

• A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

Cat. No. 10231X   Form **W-9** (Rev. 1-2011)

CONFIDENTIAL

IN WITNESS THEREOF, the parties have executed this Work Order as of

FIRST DATA

By: _____

Name: KEVIN P. WARD

Title: VP (Human Resources)

Date: 4/4/2014

CONSULTANT

By: _____

Name: STEVEN BARGER

Title: CHRM. BARGER GROUP

Date: 4/4/2014

10

CONFIDENTIAL                                    FDC00053144

program in connection with a citation or prosecution for any criminal offense described in Section 14(b)(iii)(A) above. (Any crime described in this Section 14(b)(iii) is referred to in this Agreement as a "Crime of Dishonesty").

iv. If Consultant's or Consultant Personnel's background check reveals a Crime of Dishonesty during the period of the background check or that Consultant or Consultant Personnel appears on the OFAC Specially Designated Nationals and Blocked Persons list designated by the Office of Foreign Asset Control of the U.S. Department of the Treasury then Consultant or Consultant Personnel shall not be allowed to commence the contract and the Independent Consultant Agreement shall be null and void.

v. The background check described above must be performed at least every five (5) years.

**15.   Time.** Time is of the essence in the performance of Consultant's duties under this Agreement. Upon First Data's request, Consultant shall provide First Data with a status report of Consultant's activities including an explanation of actual or anticipated problem areas.

**16.   Insurance.** During the term of this Agreement and for one (1) year following the termination of this Agreement, Consultant must, at its own cost and expense, obtain and maintain in full force and effect, the following minimum insurance coverage; Consultant's purchase of insurance will not release Consultant of its obligations or liabilities under this Agreement:

a. Workers' compensation insurance in accordance with all applicable federal, state and local statutory requirements;

b. Automobile liability insurance (including bodily injury and property damage coverage) for all owned vehicles, with a combined single limit of $ ̲5̲0̲0̲,̲0̲0̲0̲ per person and per accident or the minimum limit required by law, whichever limit is greater; and

> **Comment [SLW1]:** Please insert current coverage consultant maintains and FDC Risk Management will review.

c. General liability insurance (including premises, operations, independent contractors, products/completed operations, personal injury, advertising injury, and liability assumed under an insured contract) on an occurrence basis with minimum single limit coverage of $ ̲1̲,̲0̲0̲0̲,̲0̲0̲0̲ per occurrence and $ ̲1̲,̲0̲0̲0̲,̲0̲0̲0̲ aggregate combined single limit.

> **Comment [SLW2]:** Please insert current coverage consultant maintains and FDC Risk Management will review.

**17.   Audit.** Consultant agrees that First Data, its internal or independent auditors, its governmental regulators, First Data Customers, or First Data Customers' representatives or regulators may, upon reasonable advance notice, inspect and audit Consultant's facilities, systems, and records (as applicable) relating to Consultant's obligations under this Agreement or to Consultant's provision of products or services to First Data. Any audit will be conducted during regular business hours and will be designed to minimize disruption to Consultant's operations. If requested by First Data's regulators or First Data Customers, Consultant will provide First Data with a copy of its audited quarterly or annual financial statements.

**18.   Notices.** Any notice given under this Agreement shall be in writing and shall be effective (i) upon receipt if delivered by hand or (ii) three (3) days after deposit in the U.S. mails, postage prepaid, certified mail return receipt requested, when addressed as follows:

To First Data:        First Data Corporation
                      5902 Pine Street
                      Omaha, NE 68106
                      Stop Code: PS-31
         Or via email: p2phelpdeskus@firstdata.com

7

CONFIDENTIAL                    FDC00053145

| With a copy to: | First Data Corporation |
| | 6855 Pacific Street |
| | Omaha, NE 68106 |
| | Attn: Counsel, Procurement |

To Consultant: *6200 Foxwood Trail BIRMINGHAM, AL 35242 STEVE @ THEBERGERGROUP. COM*

> **Comment [SLW3]:** Consultant address/email goes here.

Either party may change its address at any time by giving written notice of the change.

19.    **General.**   ==This Agreement constitutes the complete and exclusive statement of agreement between the parties, and supersedes and merges all prior proposals and all other agreements, oral and written, between the parties relating to the subject matter of this Agreement.==   This Agreement may be modified only in writing signed by both parties.  The waiver or failure of either party to exercise any right provided for herein shall not be deemed a waiver of any further right hereunder.  If any of the provisions of this Agreement are held invalid, illegal or unenforceable, the remaining provisions shall be unimpaired. This Agreement is personal to Consultant and Consultant may not assign or subcontract, its rights, duties or obligations under this Agreement to any person or entity.  This Agreement shall bind and benefit First Data, its successors and assigns.  This Agreement and performance hereunder and actions related hereto shall be governed by the internal laws of the State of Delaware without regard to conflict of law principles.  This Agreement may be executed in one or more counterparts (including by means of signature pages transmitted via facsimile or other electronic means), any one of which need not contain the signatures of more than one party.  Each such signature will be deemed to be: (a) an original; and (b) valid, binding, and enforceable.  All such counterparts taken together will constitute one and the same instrument.

20.    ==**No Presumption Against Drafter.**   First Data and Consultant have jointly participated in the negotiation of the terms of this Agreement. This Agreement shall be construed as if drafted jointly by First Data and Consultant, and no presumptions arise favoring any party by virtue of the authorship of any provision of this Agreement==

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

FIRST DATA

By: _____
(Signature)

Name: *KEVIN P. WARD*
(Please print)

Title: *VP HUMAN RESOURCES*

Date: *4/4/2014*

CONSULTANT

_____
(Signature)

Date: *4/4/2014*

8

CONFIDENTIAL                                        FDC00053146

**Exhibit A**
**Statement of Work #1**

**Project Description:** Sales Effectiveness Consulting

**Project Duration:** March 17, 2014 – December 31, 2014

**Consultant Personnel Performing the Services:** Steve Barger

**Fees and Payment:**     $30,000 per month

**Deliverables:**

TBG will develop materials, programs and resources to address the following items:

- Review all Sales, Marketing, Service, Training and Branding strategies.
- Create a common messaging voice for all levels of responsibilities (SVP to BC)
- Coordinate Sales, Service, Marketing and Training strategies
- Create a Client-Centered culture driven by a common Purpose and common Principles
- Have all First Data personnel understand the impact we have on the American economy
- Review field Sales processes
- Review field Sales Coaching processes
- Transform current Sales Reps into Business Consultants
- Create a tools and resources that fully support Business Consultancy vs. product sales
- Design and Implement a Coaching Program for BCs driven by SDs
- Facilitate the development of Client Centered Marketing materials that enhance the BC image
- Provide advice and counsel to all First Data departments requesting help
- Emotionally engage all First Data personnel in the company's Vision
- Align corporate and field behavior with the Metrics needed to run an efficient and profitable business model.
- Make First Data the destination-of-choice for Merchants and Business Consultants

9

CONFIDENTIAL                                      FDC00053147

# EXHIBIT C

```
 1              CONFIDENTIAL - WHALEN
 2    directly to Rhonda with day-to-day issues.
 3    And that started happening very, very quickly.
 4    She was in Atalanta.  Many of them would go to
 5    see her.  But it was also very clear that
 6    Steve wanted to play more of that visionary,
 7    motivational speaker role.  And this team
 8    needed day-to-day operational leadership.
 9    They needed structure.  They needed
10    discipline.  They needed metrics.  And none of
11    that was present at that time.
12                    So when we were talking about a
13    successor, the view at that point was let --
14    bring in someone to do -- actually run sales
15    training and potentially move Steven to
16    another role that leveraged more of his
17    experience.
18                    The other compounding factor
19    was that Steve made an awful lot of money to
20    run a sales training organization.  He came in
21    at a comp level that I was astounded by and
22    disagreed with openly.  So part of it was us
23    saying, "You can't have a $700,000 plus leader
24    running this group and not really running it."
25              Q    Mr. Barger was -- what was the
```

```
 1                CONFIDENTIAL - WHALEN

 2     original reason that he was brought on to

 3     First Data?

 4              A     He and Joe Plumeri had worked

 5     together to turn around large sales forces.

 6     And he always was the guy with Joe.  And Joe

 7     felt that he could add value here as part of

 8     the sales transformation efforts.

 9              Q    Okay.  So he was brought in for

10     sales transformation.  Was he brought in to --

11     originally to be the head of sales training?

12              A    I don't believe so.

13              Q    So how did sales training

14     become Mr. Barger's responsibility?

15              A    Joe made the decision a couple

16     of months into Steve's arrival, and asked

17     Bryan Fricke to report directly to Steve.

18              Q    When did Bryan Fricke depart

19     First Data?

20              A    I would say third quarter

21     of 2014.

22              Q    Why did Mr. Fricke leave?

23              A    He did not like the work

24     environment with Steve and Joe.

25              Q    Okay.  How long had he with
```

```
 1              CONFIDENTIAL - WHALEN
 2        A    So when you say "sales
 3   transformation," I think sales transformation
 4   is a very broad term.  That means you're
 5   changing organizational structure.  That means
 6   you're changing compensation plans.  You're
 7   changing every aspect of sales.  Steve was not
 8   doing all that work.
 9              Steve was really, again, more
10   of the marketing guy working hand in hand with
11   Joe Plumeri, who, admittedly, Joe Plumeri is a
12   very captivating speaker.  Joe liked having
13   Steve by his side, but he wasn't actually
14   managing that work.
15        Q    Okay.  But he was doing more
16   than just running the sales training team.
17        A    He was working on other items,
18   like First Data Way, but he really -- he
19   really wasn't, in my view.  He wasn't doing
20   much outside of sales training.
21        Q    You did indicate you didn't
22   have much interaction with Steve on a
23   day-to-day basis, correct?
24        A    Well, when came in initially --
25   that was before I was reporting to Frank -- I
```

```
 1              CONFIDENTIAL - WHALEN
 2    was supporting Joe Plumeri.  So I did
 3    initially work with him on his contractor
 4    arrangement when Joe first brought him in, and
 5    then his offer.
 6              And there was --
 7         Q    And what time frame was that?
 8         A    So he was a contractor for us
 9    in the first part of -- I want to say late Q1,
10    Q2 of 2014, and then I believe he started with
11    us in July of 2014 as an employee.
12         Q    Okay.  What was he doing as a
13    contractor?
14         A    I think he was looking at some
15    of our sales training materials, really trying
16    to come up with a campaign that they could
17    roll out to the sales force.
18         Q    Do you know what he saw as
19    issues inside of the sales force that needed
20    to be addressed?
21         A    So I think he -- Joe did not
22    feel they were compensated correctly.  He
23    wanted more aggressive salespeople.  We had
24    significant employee attrition in the sales
25    world, so those were some of the items that he
```

1                    CONFIDENTIAL - WHALEN

2        was trying to solve for.

3                Q     Okay.  What is an ERG?

4                A     An employee resource group?

5                Q     Yeah.

6                A     So they are groups formed

7        around a common purpose:  To drive change,

8        drive more diverse and inclusive practices

9        across the firm.  To act as advisors,

10       actually, to our management committee.  So

11       many, many purposes, but ultimately to drive

12       greater diversity and greater employee

13       engagement.

14               Q     You had -- when did this --

15       did -- the search for a successor, when did

16       that begin?

17               A     I believe we had gone a couple

18       of rounds on successors, that we had started

19       initially thinking we -- and I don't know if

20       this was even 2014 or 2015 when Bryan Fricke

21       left -- somebody to take on the more

22       day-to-day operations of sales training,

23       someone who was more of a training expert.

24       This was more directed at:  Steve makes a lot

25       of money, Steve needs -- he really needs to go

# EXHIBIT D

```
 1              CONFIDENTIAL - ANTHONY MARINO
 2   do on day one.  I'm not on the look for the
 3   successor.  I mean, it was his
 4   responsibility --
 5              Q     If somebody is hired --
 6              A     -- to find a successor.
 7                    MR. EIDELMAN:  Please let him
 8              finish.
 9                    MR. SHEARER:  I thought he was
10              done.  I'm sorry.
11              Q     Why would somebody on their
12   first day start looking for their successor?
13              A     I didn't say his first day.  I
14   said that he was notified very early on that
15   he should find a successor.  Like anybody
16   should find a successor.
17                    Think about this, Mr. Shearer,
18   Mr. Barger was retired.  First Data hired him
19   at 69 years old, provided him with over three
20   years of employment worth nearly a million
21   dollars per year.  Of course, it would be a
22   logical plan in any good-run business to
23   ensure that that person also had somebody in
24   their organization who could someday run and
25   move the legacy forward of what they had
```

```
 1              CONFIDENTIAL - ANTHONY MARINO
 2    established.
 3              Q   Okay.  And now, you say in any
 4    good-run business, but isn't this the same
 5    business that hired Mr. Barger at a million
 6    dollars a year?
 7              A   I believe that that was a
 8    mistake hiring him at the rate in which he was
 9    paid.  In fact, I believe Ms. Whalen testified
10    yesterday that she completely disagreed with
11    Mr. Plumeri when he made the decision to do
12    so.
13              So I support Ms. Whalen's
14    assertion that that job should never have been
15    paid what Mr. Barger was earning, that three
16    quarters of a million dollars for the job in
17    the company, I would say, is completely
18    inappropriate.  So I support Ms. Whalen's
19    belief that we hired him improperly at that
20    high rate of pay.
21              Q   So how do you decide which
22    decisions by this organization are good
23    business decisions and which ones are poor
24    business decisions?
25              MR. EIDELMAN:  Objection.
```

```
 1              CONFIDENTIAL - ANTHONY MARINO

 2                    If you can answer.

 3          A     Yeah.  I don't understand the

 4   question.

 5          Q    Well, it seems like you pick

 6   and choose as to what decisions you call good

 7   business decisions and what decisions you call

 8   bad business decisions, but they're all being

 9   made by the same organization.

10          A    I think that in Mr. Barger's

11   case he was hired by Mr. Plumeri.  And my

12   deposition and Ms. Whalen's deposition, we

13   believe that he was hired at a rate of pay

14   that far exceeded the responsibilities of the

15   job.  And Ms. Whalen, I believe, went on the

16   record of that.  I support that.  So I believe

17   that the decision to hire Mr. Barger at that

18   rate of pay for the job that he was doing was

19   not a good decision.

20          Q    Okay.  So Mr. Plumeri made a

21   bad decision in this case?

22          A    Correct.

23          Q    Okay.  In response to that,

24   later in the morning, Jeff Hack returns an

25   email back to you, agreeing with your concepts
```

```
 1              CONFIDENTIAL - ANTHONY MARINO

 2         Correct.

 3         Q    Do you know if he was receiving

 4    long-term disability payments from MetLife

 5    around January 11?

 6         A    I don't know.

 7         Q    Do you know if Mr. Barger was

 8    on First Data's medical insurance?

 9              MR. EIDELMAN:  Objection.

10         Asked and answered.

11            You can answer again.

12         A    I don't know.

13         Q    Okay.  That's that.  I kind of

14    want to go back to the Joe Pulmeri discussion,

15    the hiring discussion.  Well, one of the first

16    things we talked about this morning in

17    Exhibit 1, the U.S. employee handbook --

18         A    Uh-huh.

19         Q    -- was that the salaries,

20    positions, could be reduced at any time?

21         A    Uh-huh.

22         Q    Why if this was such a -- why

23    if it was such a bad decision did First Data

24    not take any action to adjust the salary to

25    what would be, in your mind, commensurate with
```

```
 1              CONFIDENTIAL - ANTHONY MARINO
 2     the position?
 3              A    I'll answer it in general, and
 4     then I'll answer it in specific.  It's
 5     uncommon to take an executive and reduce their
 6     pay 50 percent, reduce their title, and then
 7     expect that they'll be motivated to come into
 8     work the next day.
 9                     I've not seen it done a lot.  I
10     suppose that if somebody volunteered that,
11     that would be great, and it would be
12     considered specific to Mr. Barger.  I think
13     that he -- again this is conjecture, but I
14     can't imagine him agreeing that, you know, the
15     next day he'd come into the office, and he'd
16     be a VP, and he'd have his salary reduced 50
17     percent, so it -- it could have happened, but,
18     you know, it's not common.
19              Q    You mentioned that he had been,
20     I would just call it, semi-retired prior to
21     coming into First Data, and it seemed like a
22     formerly semi-retired individual would be a
23     prime candidate for going to and asking will
24     he take a pay cut.
25              A    I think it would have been
```

# EXHIBIT E

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of New York

| | |
|---|---|
| Steven B. Barger | ) |
| *Plaintiff* | ) |
| v. | )   Civil Action No.   1:17-cv-04869-FB-LB |
| First Data Corporation, et al. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                        Phillip D. Morgan
_____
*(Name of person to whom this subpoena is directed)*

☑ *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Starnes Davis Florie LLC, 100 Brookwood Place 7th Floor, P.O. Box 598512 Birmingham, AL 35259 | Date and Time: 09/17/2018 10:00 am |
|---|---|

The deposition will be recorded by this method:   stenographer
_____

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:  See Exhibit A.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     08/27/2018

|  |  |
|---|---|
| *CLERK OF COURT* | |
| | OR |
| _____ | /s/ Gary B. Eidelman |
| *Signature of Clerk or Deputy Clerk* | _____ |
| | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Defendants
First Data Corporation
_____, who issues or requests this subpoena, are:

Gary Eidelman, Saul Ewing Arnstein & Lehr LLP, 500 E. Pratt St. Ste. 900, Baltimore, MD 21202, 410-332-8975

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

STEVEN B. BARGER, an individual,

      Plaintiff,

v.                              Civil Case No.: 1:17-cv-04869-FB-LB

FIRST DATA CORPORATION, et al.,

      Defendants.

### EXHIBIT A TO SUBPOENA PHILLIP MORGAN & COMPANY, PC

1. Your file on Steven B. Barger and Marilyn Barger.

2. Your file on Barger Group LLC.

3. Your file on Barger Consulting Group.

4. All federal and state tax returns prepared for Steven B. Barger and Marilyn Barger, for the tax years 2010-2017.

5. All work papers, supporting documents and ESI, and questionnaires in your possession, custody and control concerning the preparation and filing of federal and state tax returns for Steven B. Barger and Marilyn Barger, for the tax years 2010-2017.

6. Documents and ESI that reconcile profits and losses for purposes of Schedule C for the tax years 2010-2017 Steven B. Barger and Marilyn Barger.

7. All communications and ESI with Steven B. Barger and Marilyn Barger concerning their federal and state taxes for the tax years 2010-2017.

8. Documents and ESI supporting rent, utilities, vehicles, and any and all other expenses for purposes of business deductions for Steven B. Barger and Marilyn Barger for tax years 2010-2017.

9. All federal and state tax returns prepared for Barger Group LLC for the tax years 2010-2017.

10. All work papers, supporting documents, ESI, and questionnaires in your possession, custody and control concerning the preparation and filing of federal and state tax returns for Barger Group LLC for the tax years 2010-2017.

11.  Documents and ESI that reconcile profits and losses for purposes of Schedule C for the tax years 2010-2017 for Barger Group LLC.

12.  All communications and ESI with Barger Group LLC concerning its federal and state taxes for the tax years 2010-2017.

13.  All tax returns prepared for Barger Consulting Group for the tax years 2010-2017.

14.  All work papers, supporting documents, ESI, and questionnaires in your possession, custody or control concerning the preparation and filing of tax returns for Barger Consulting Group for the tax years 2010-2017.

15.  Documents and ESI that reconcile profits and losses for purposes of Schedule C for the tax years 2010-2017 Barger Consulting Group.

16.  All communications and ESI with Barger Consulting Group concerning its federal and state taxes for the tax years 2010-2017.

17.  All communications and ESI that you have had with Steven B. Barger since August 10, 2018 concerning *Barger v. First Data Corporation et al*, United States District Court for the Eastern District of New York, Civil Action No. EDNY: 1:17-cv-04869-FB-LB.

18.  All communications and ESI that you have had with Shawn Shearer, Brenda Barger, or the Law Offices of Shawn Shearer since August 10, 2018 concerning *Barger v. First Data Corporation et al*, United States District Court for the Eastern District of New York, Civil Action No. EDNY: 1:17-cv-04869-FB-LB.

19.  All communications and ESI that you have had with Grant Barger since August 10, 2018 concerning *Barger v. First Data Corporation et al*, United States District Court for the Eastern District of New York, Civil Action No. EDNY: 1:17-cv-04869-FB-LB.

20.  Documents and ESI concerning Steven B. Barger's and Marilyn Barger's bank accounts between 2010 – 2017.

21.  Documents and ESI concerning Barger Group LLC's bank accounts between 2010 – 2017.

22.  Documents and ESI concerning Barger Consulting Group's bank accounts between 2010 -2017.

23.   All IRS Forms 1099, including Form 1099-B, issued to Steven B. Barger for tax years 2010-2017.

24.  All documents and ESI concerning corporate or partnership tax returns in which Steven B. Barger has an ownership interest.

25. All documents and ESI concerning consulting contracts between Barger Group LLC and entities or individuals for which it provided consulting services from 2010-2017.

26. All documents and ESI concerning invoices sent by Barger Group LLC to entities or individuals for which it provided consulting services for tax years 2010-2017.

27. Financial statements, including footnotes, concerning Barger Group LLC for tax years 2010-2017.

28. Documents and ESI concerning the billing rates and billable hours per year of Steven B. Barger for Barger Group LLC for tax years 2010-2017.

29. Documents and ESI concerning retainer fees and how they are determined for contracts between Barger Group LLC and its clients for tax years 2010-2017.

30. Documents and ESI concerning the process through which consulting fees are earned and billed at Barger Group LLC for tax years 2010-2017.

31. Documents and ESI concerning consulting services provided by Barger Group LLC for tax years 2010-2017 for which there is no documented consulting agreement.

32. Documents and ESI concerning and providing support for any and all travel, meals, entertainment, and other expenses incurred by Steven B. Barger in connection with consulting services provided by Barger Group LLC for tax years 2010-2017.

33. All documents and ESI concerning consulting contracts between Barger Consulting Group and entities or individuals for which it provided consulting services from 2010-2017.

34. All documents and ESI concerning invoices sent by Barger Consulting Group to entities or individuals for which it provided consulting services for tax years 2010-2017.

35. Financial statements, including footnotes, concerning Barger Consulting Group for tax years 2010-2017.

36. Documents and ESI concerning the billing rates and billable hours per year of Steven B. Barger for Barger Consulting Group for tax years 2010-2017.

37. Documents and ESI concerning retainer fees and how they are determined for contracts between Barger Consulting Group and its clients for tax years 2010-2017.

38. Documents and ESI concerning the process through which consulting fees are earned and billed at Barger Consulting Group for tax years 2010-2017.

39.     Documents and ESI concerning consulting services provided by Barger Consulting Group for tax years 2010-2017 for which there is no documented consulting agreement.

40.     Documents and ESI concerning and providing support for any and all travel, meals, entertainment, and other expenses incurred by Steven B. Barger in connection with consulting services provided by Barger Consulting Group for tax years 2010-2017.

For purposes of the Subpoena to Phillip Morgan & Company, PC and Attachment A to the Subpoena to Phillip Morgan & Company, PC, the following to instructions and definitions apply:

1.     "Document" means any papers, writings, or records of any type or source of authorship in your possession, custody, or control; or of which you have knowledge, wherever located, however produced or reproduced, or whether a draft, original, or copy.  By way of illustration and not limitation, the term "document" shall include memoranda of telephone conversations, summaries, diaries, or other records of personal conversations or interviews; and minutes, summaries, diaries, or other records of personal conversations or interviews; and minutes, summaries, or other records of any meetings, discussions, or conferences, as well as other notes, reports, records of any meetings, discussions or conferences, as well other notes, reports, records, data, memoranda, correspondence, notebooks, scrapbooks, diaries, minutes summaries, financial statements, ledgers, magnetic tape, or other sound recordings, telegrams, telecopies, facsimiles, telecopy and facsimile logs, electronic mail, letters, photographs, drawings, plans, studies, manuals, instructions, bids, specifications, graphs, sketches, blueprints, charts, curves, motion picture film, microfilm, computer records of any kind, photographs, photographic negatives, photocopies, photostats, descriptions, purchase orders, agreements, contracts, invoices, bills of lading, published or unpublished speeches, manuscripts or articles, transcripts, affidavits, depositions, printed matter, publications and any other retrievable intelligence, however recorded, memorialized or preserved.  Any original, draft or copy containing or having attached thereto any alterations, notes, comments or other material not included in each other original, draft or copy shall be deemed a separate document within the foregoing definitions.  "Document" includes all Electronically Stored Information

2.     "ESI" means electronically stored information and includes, but is not limited to, e-mails and attachments, voice mail, instant messaging, and other electronic communications, word processing documents, text files, hard drives, spreadsheets, graphics, audio and video files, databases, calendars, telephone logs, transaction logs, Internet usage files, offline storage or information stored on removable media (such as external hard drives, hard disks, floppy disks, memory sticks, flash drives, and backup tapes), information contained on laptops or other portable devices, and network access information and backup materials, TIF files, PDF files, Native Files and the corresponding Metadata which is ordinarily maintained.

3.     The term "concerning" means relating to, referring to, describing, evidencing, comprising, setting forth, showing, supporting, disclosing, explaining, summarizing, memorializing or constituting, whether directly or indirectly.

-4-

4.      The present tense includes the past and future tenses.  The singular includes the plural, and the plural includes the singular.  "All" means "any and all;" "any" means "any and all." "Including" means "including but not limited to." "And" and "or" encompass both "and" and "or."  Words in the masculine, feminine or neuter form shall include each of the other genders.

5.      The term "including" means including but not limited to.

6.      "Barger" refers to Steven D. Barger as well as his agents, servants, attorneys, representatives, or any other persons acting or purporting to act on his behalf.

7.      "Law Offices of Shawn Shearer" refers to the Law Offices of Shawn Shearer as well as its agents, employees, directors, investigators, attorneys, representatives or any other persons acting or purporting to act on its behalf.

# EXHIBIT F

Case 1:17-cv-04869-FB-LB Document 74-9 Filed 10/03/18 Page 72 of 73 PageID #: 1817

We would like to place cookies on your computer to help us make this web site better. By clicking onto anotl
page on this web site you agree that cookies will be used. If you wish to change your settings please refer to our
Privacy and Cookie Statement. (/en_us/privacy.html)

Continue

(/en_us/home.html)

# Joseph Plumeri

## Vice Chairman

Joe Plumeri is vice chairman of the First Data Board of Directors. Plumeri was originally appointed to the
Board and as a senior advisor to KKR in August 2013. Since then he also has been serving as senior
advisor to First Data Chairman and CEO Frank Bisignano, and as the head of First Data's client delivery,
innovation and marketing organization. He assumed the vice chairman role in May, 2014.

Since joining First Data, Plumeri has played a pivotal role in the company's transformation from a
transaction processor to a payments technology company and solutions provider to merchants and
financial institutions. He has spearheaded company-wide efforts to become more client-centric,
including realigning how the company delivers solutions to and serves its global and strategic accounts,
national merchants and enterprise clients, financial institutions, small business clients, bank partners and
agents and ISO clients. Creating a superior client experience is part of this effort to better serve clients,
build stronger relationships that foster business growth for clients, and deliver innovative solutions,
including the Clover™ Station (https://www.firstdata.com/en_us/about-first-data/media/clover-media-
kit.html), a transformational point-of-sale solution for small and medium sized businesses.

Prior to joining First Data, Plumeri served as chairman and Chief Executive Officer of Willis Group
Holdings plc. Under his leadership, Willis strengthened its position as one of the world's leading
insurance brokers through sector-leading organic growth and operating margins, strategic expansion, a
dedication to transparency and passionate client service.

Appointed to lead Willis in 2000, Plumeri returned the company, which was privately held by Kohlberg
Kravis Roberts (KKR), to public ownership in 2001. When he assumed leadership of Willis, the company's
share price was $3, rising to $43 when he stepped down as chairman in 2013. Among Plumeri's notable
milestones while at Willis, in addition to the extraordinary return to shareholders, was his public
leadership against conflicts of interest in the insurance industry. He also spearheaded Willis' $2.1 billion
acquisition of Hilb Rogal & Hobbs (HRH) in 2009, which was one of the largest transactions in the
insurance industry in the last decade, and drove the deal to rename the Sears Tower as Willis Tower,
then the tallest building in the Western Hemisphere.

Joseph Plumeri
(/en_us/about-first-data/board-directors/joseph-plumeri.html)

Before joining Willis, Plumeri had a 32-year career at Citigroup and its predecessor companies. As CEO of Citibank North America, he led the integration of the consumer businesses at Citicorp and Travelers Group. He also served as chairman and CEO of Travelers Primerica Financial Services, vice chairman of the Travelers Group, and president and managing partner of Shearson Lehman Brothers.

A widely admired leader in the insurance industry, Plumeri was named to Treasury & Risk magazine's list of "100 Most Influential People in Finance" in 2009 and 2010. He was also recognized by St. John's University School of Risk Management as Insurance Leader of the Year in 2006.

Plumeri's generous philanthropy over the decades has drawn many accolades, including appointment as the Grand Marshal of the 2011 Columbus Day Parade by the Columbus Citizen's Foundation. Plumeri also serves on the boards of the National Center on Addiction and Substance Abuse; Mount Sinai Medical Center; the Jackie Robinson Foundation; and the Churchill Museum at the Cabinet Ward Rooms in London.

An avid sportsman and baseball entrepreneur, Plumeri is an owner of the Trenton Thunder, the AA-affiliate of the New York Yankees, and the Trenton Blue Claws, the A-affiliate of the Philadelphia Phillies.

In 2015 Plumeri published his first book, a national best seller, *The Power of Being Yourself: A Game Plan for Success – by Putting Passion into Your Life and Work*. In his book, based on his life experiences, Plumeri offers simple yet profound guidance on how to stay positive, motivate yourself and others and, achieve success in your life and work. All of the author's proceeds from the book will be donated to the Make-a-Wish Foundation and the Center on Addiction and Substance Abuse at Columbia University.

Born in Trenton, N.J., Plumeri received his Bachelor of Arts in history and education from the College of William and Mary and attended New York Law School. In 2011, William and Mary awarded him an Honorary Doctorate of Public Service in honor of his philanthropic endeavors, where Plumeri delivered a speech to the 2011 graduates, titled "Go Play in Traffic (and Follow the Signs Along the Road)," that was recognized as one of the best commencement addresses of the year by the *New York Times*.