UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN B. BARGER,<br><br>    Plaintiff,<br><br>v.<br><br>FIRST DATA CORPORATION, *et al.*,<br><br>    Defendants. | Civil Case No. EDNY: 1:17-cv-04869-FB-LB |

**DEFENDANTS' LOCAL RULE 56.1(a)
STATEMENT OF UNDISPUTED MATERIAL FACTS**

Under to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1(a), Defendants First Data Corporation, Frank Bisignano, Dan Charron, Anthony Marino, Karen Whalen, and Rhonda Johnson submit this Local Rule 56.1(a) Statement of Undisputed Material Facts in connection with their Motion and Memorandum in Support for Summary Judgment.[1]

**A.    Defendant First Data Corporation**

1. Defendant First Data Corporation is a financial services company that provides, among other things, credit, debit, check, and electronic payment solutions. The Company offers a suite of systems, services, and products to businesses and financial institutions. Exhibit 1 at 4.[2]

2. First Data employs approximately 22,000 people. Ex. 1 at 14; Exhibit 2 at 17:7-9.

3. First Data has policies strictly prohibiting discrimination on the basis of an employee's disability or any other protected characteristic. Exhibit 3.

4. First Data employees may utilize a multi-faceted complaint resolution procedure to raise issues of alleged discrimination, harassment, and retaliation. Ex. 3.

---

[1] These facts are undisputed for purposes of this motion only.
[2] All exhibits are attached to the Declaration of Gary B. Eidelman, Esq. dated January 14, 2019.

5. Employees are informed of First Data's EEO policies and procedures and may report discrimination, retaliation, or harassment to anyone in management, to a member of the HR Department, or by calling First Data's Ethics Hotline. Ex. 3.

6. Retaliation for engaging in protected activity is prohibited. Exhibit Ex. 3.

7. Plaintiff Steven Barger acknowledged receipt of First Data's employee policies. Exhibit 4.

**B. Barger's Employment at First Data**

8. On June 12, 2014, Barger received an offer of employment with First Data. Exhibit 5.

9. Barger began working at First Data on June 30, 2014. Exhibit 6 at 26:24-27:1; Exhibit 7.

10. Joseph Plumeri extended the offer to Barger. Ex. 6 at 259:17-18, 25.

11. Upon Barger's hiring, Plumeri became Barger's supervisor. Ex. 6 at 123:2-15.

12. Barger's job offer stated that his employment was "at will" and could be terminated at any time, for any reason. Ex. 5.

13. First Data offered Barger the position of Senior Vice of President of Sales Transformation, which had a total annual compensation opportunity of $730,000, $480,000 of base compensation, and up to $250,000 of variable incentive compensation. Ex. 5.

14. Barger received a sign-on bonus equity grant of 300,000 options that would vest equally over the ensuing three years. Ex. 5.

15. For 2014, Barger's salary was $480,000. Exhibit 8.

16. In 2015, Barger was paid his 2014 bonus of $250,000 at outlined in his offer letter. Ex. 8; Exhibit 9.

17. For 2015, Barger's salary remained $480,000. Ex. 8.

18. On February 9, 2016, Barger was paid his 2015 bonus of $174,000, of which $34,800 was paid in cash and the balance was a grant of equity. Ex. 8; Exhibit 10.

19. In 2016, Barger's salary remained $480,000. Ex. 8.

20. In December of 2016, Barger was paid his 2016 bonus of $174,000 all in cash. Exhibit 11.

21. Barger was hired to help First Data with its sales transformation efforts. Ex. 7.

22. Subsequently, Barger was assigned to lead the Sales Training Group (the Group) in August 2014. Exhibit 12 at 93:9-24, 104:14-105:6; Ex. 6 at 115:9-16.

23. In August 2015, Jeffrey Hack replaced Plumeri as Barger's direct supervisor when Hack assumed leadership of the Group. Exhibit 13 at 39:17-40:8; Ex. 7.

24. Barger continued to report to Hack for the remainder of his employment at First Data. Ex. 6 at 83:7-12.

**C.     The Parties and Other Relevant Individuals**

25. Defendant Frank Bisignano has been First Data's CEO since 2013. Exhibit 14 at 33:20-23.

26. Bisignano did not hire Barger. Ex. 6 at 265:10-16.

27. Bisignano did not terminate Barger. Ex. 6 at 269:7-9; Exhibit 15 at Response No. 1.

28. Bisignano did not set Barger's compensation. Ex. 6 at 261:2-14, 268:13-15.

29. Bisignano did not set Barger's work schedule. Ex. 6 at 269:7-272:7.

30. Bisignano did not maintain employment records for Barger. Ex. 6 at 269:3-6.

31. Barger was not Bisignano's direct report. ECF No. 1, Compl. ¶ 74.

32. Defendant Anthony Marino has been the Executive Vice of President of Human Resources since March 2015. Ex. 2 at 9:9-18.

33. Marino did not hire Barger. Ex. 6 at 265:10-16.

34. Marino did not terminate Barger. Ex. 15 at Response No. 1; Ex. 6 at 268:22-23.

35. Marino did not set Barger's compensation. Ex. 6 at 261:2-14, 268:13-15.

36. Marino did not set Barger's work schedule. Ex. 6 at 268:24-25.

37. Marino did not maintain employment records for Barger. Ex. 6 at 269:3-6.

38. Barger was not Marino's direct report. ECF No. 1, Compl. ¶ 74.

39. Defendant Daniel Charron joined First Data in early 2015. Ex. 13 at 18:22-19:1.

40. Charron's title is Executive Vice President and he leads First Data's Global Business Solutions (GBS) organization. Ex. 13 at 21:17-18.

41. Charron is a member of First Data's Management Committee and reports directly to Bisignano. Ex. 15 at Response No. 1.

42. Charron suffers from a hearing disability and wears hearing aids. Ex. 14 at 65:25-66:6.

43. Defendant Karen Whalen was employed as Senior Vice President of Human Resources, at First Data where she worked for 32 years, until January 2018. Ex. 12 at 10:25-11:3, 18:15-17.

44. Whalen reported to Marino from 2013 until her employment ended. Ex. 12 at 17:13-18:14.

45. Whalen did not hire Barger. Ex. 6 at 265:10-16.

46. Whalen did not terminate Barger. Ex. 15 at Response No. 1.

47. Whalen did not set Barger's compensation. Ex. 6 at 261:2-14, 268:13-15.

4

48. Whalen did not set Barger's work schedule. Ex. 6 at 266:3-6.

49. Whalen did not maintain employment records for Barger. Ex. 6 at 266:7-10.

50. Barger was not Whalen's direct report. ECF No. 1, Compl. ¶ 74.

51. Defendant Rhonda Johnson was a Vice President of Human Resources, at First Data. She began employment in August 2008. Exhibit 16 at 15:5-20.

52. Johnson's duties included partnering with First Data business executives to provide strategic human resources advice, helping to manage a human resources support team, leading organizational design and strategic workforce planning initiatives, and creating and implementing talent management initiatives. Ex. 16 at 18:12-22.

53. In August 2015, Johnson began assisting Barger with HR support. Ex. 16 at 29:20-32:1, 44:25-45:6.

54. Johnson reported to Whalen. Ex. 16 at 35:19-23.

55. Johnson did not hire Barger. Ex. 6 at 265:10-16.

56. Johnson did not terminate Barger. Ex. 6 at 260:20; Ex. 15 at Response No. 1.

57. Johnson did not set Barger's compensation. Ex. 6 at 261:2-14, 268:13-15.

58. Johnson did not set Barger's work schedule. Ex. 6 at 260:21-25.

59. Johnson did not maintain employment records for Barger. Ex. 6 at 261:23-262:10.

60. Barger was not Johnson's direct report. ECF No. 1, Compl. ¶ 74.

61. Jeffrey Hack was an Executive Vice President in GBS. Ex. 13 at 22:2-8.

62. Hack reported to Charron and Bisignano. Ex. 13 at 40:9-17.

63. Hack's employment with First Data ended in February 2017. Ex. 2 at 119:21-120:3.

64. Hack reported to Charron. Ex. 13 at 40:9-17.

5

65. From September 1, 2015, until his termination, Hack was Barger's direct supervisor. Ex. 6 at 83:7-10; Ex. 15 at Response No. 1; Ex. 7.

66. Robin Ording was hired by First Data in early 2015. Exhibit 17 at 13:17-19.

67. Her current position is Vice President of Talent Development. Ex. 17 at 31:14-32:8.

68. Ording's responsibilities include overseeing talent development and succession globally, and overseeing performance management practices, which includes goal setting, development planning, mid-year and end-of-year performance reviews, and philosophy and strategies around those practices, sales training, client referral programs, and feedback and psychometric tools. Ex. 17 at 31:14-32:8.

69. Kathi Benhardt is a Vice President of Human Resources. Exhibit 18 at 14:19-20.

70. Benhardt has worked for the Company since 2005. Ex. 18 at 9:8-9.

71. Benhardt leads the Company's global workforce planning and analytics function. Ex. 18 at 12:9-18.

**D.    Barger's Health Issues**

72. In or around February 2016, Barger was diagnosed with throat cancer. ECF No. 1, Compl. ¶ 77.

73. Barger underwent radiation treatments from March 2016, until May 2016. ECF No. 1, Compl. ¶ 77.

74. While he was receiving radiation treatment, Barger continued to work for First Data. ECF No. 1, Compl. ¶¶ 101-110; Ex. 2 at 64:12-65:15; Ex. 17 at 30:3-6.

75. In August 2016, Plaintiff learned that he needed laryngectomy surgery. ECF No. 1, Compl. ¶ 111.

6

76. Because Bisignano suffered from the same type of throat cancer for which he underwent surgery in 2010, Bisignano connected Barger with his physician, Dr. Lou Harrison. Ex. 14 at 135:22-136:8; ECF No. 1, Compl. ¶ 98.

77. On September 6, 2016, Barger underwent surgery in Tampa, Florida. ECF No. 1, Compl. ¶ 114.

78. In November 2016, Plumeri and Marino visited Barger to "cheer up [their] friend." Ex. 2 at 68:23-69:4.

79. Marino was "very good friends" with Barger. Ex. 2 at 68:23-69:17; Ex. 6 at 173:13-15.

80. Barger testified that Marino and Plumeri visited him to "find out if I was okay." Ex. 6 at 163:14-23; Ex. 2 at 71:13-18.

81. After the visit, on November 8, 2016, Barger texted Marino, writing "Thanks for the wonderful visit. Personal things are the only ones that count. . . . Love you Tony." Exhibit 19 at 1.

82. In that same text message, Barger advised Marino that he required an additional surgery, writing that he is "[g]oing in for additional repair surgery next week. 6 days in hospital. 4 weeks full recovery. Should be talking round Christmas time." Ex. 19 at 1.

83. After receiving the text message, Marino decided that Barger needed to concentrate on his recovery. Ex. 19 at 1; Ex. 2 at 158:9-159:15.

84. On November 18, 2016, First Data sent Barger a letter advising him that he would be transitioned to the Company's leave of absence and short-term disability programs. Exhibit 20; Ex. 2 at 90:3-92:21.

7

85. In the letter, Marino wrote Barger should "focus all of [his] time and attention on [his] recovery." Ex. 20.

86. Enclosed with the letter sent to Barger on November 18, 2016, was First Data's package of leave of absence and disability benefits application forms. Ex. 20.

87. On November 21, 2018, Barger sent Marino a text message indicating that his cancer may be fatal and inoperable. Ex. 19 at 2.

88. Barger wrote: "I need to discuss my options with you and [Plumeri]. They need to be transferred into my wife's name and make certain they are all issued. All my other accounts will be in her name also. I need your help in getting my finances together. Dr. Harrison at Moffitt was very concerned about the lymph node cancer being inoperable. Don't know length of time but need your help for my family security." Ex. 19 at 2.

89. Marino responded that "I will pull everything together ASAP." Ex. 19 at 2.

90. The very next day, on November 22, 2016, Marino followed up to Barger that Marino made a special arrangement for Barger to be paid his 2016 bonus on December 15, 2016, rather than in the first quarter of the following year when bonuses were normally paid. Marino had arranged for Barger to be paid his bonus, fully in cash without any equity component. Ex. 19 at 2; Ex. 2 at 87:3-88:15.

91. No one else at First Data received their bonus early that year. Ex. 2 at 87:3-88:15.

92. Barger also received 100% of his same bonus as the prior year, despite that the overall bonus pool was down 5% for other employees. Ex. 2 at 87:3-88:15; Ex. 13 at 79:15-24.

8

### E. Barger's Family Medical Leave Act (FMLA) Leave

93. After Marino sent Barger the leave package, Johnson assisted him by answering his questions about medical leave and assisted him with his various applications and forms. Ex. 16 at 122:1-23, 127:21-129:10, 139:15-140:1; Ex. 6 at 190:1-7.

94. First Data and Marino went above and beyond for Barger in order to support him while he was ill. Ex. 2 at 87:3-88:15.

95. On December 15, 2016, Barger received a payment in the amount of $174,000 for his 2016 bonus. Ex. 11.

96. On December 14, 2016, Barger returned to First Data the FMLA certification completed by his physician, Dr. Harry Baddour, indicating that his period of disability began on October 22, 2016, with an expected return to work date of March 1, 2017. Exhibit 21 at 1-2.

97. On December 15, 2016, First Data sent Barger a letter approving Barger's request for FMLA leave with a leave start date of October 24, 2016, consistent with the FMLA certification provided by Barger. Exhibit 22.

98. The FMLA approval letter informed Barger that his 12 weeks of FMLA leave would exhaust on January 16, 2017. Ex. 22.

99. The FMLA approval letter advised Barger to contact MetLife to initiate the short-term disability claims process. Ex. 22.

100. On December 21, 2016, Jennifer Voycheske, First Data's Manager of Human Resources Operations, contacted Barger to advise him that his accrued paid leave had exhausted, and he would need to transition to short-term disability. Exhibit 23; Exhibit 24 at ¶ 10.

9

101. Voycheske's duties and responsibilities include managing First Data employees' leaves of absence, including but not limited to leaves under the FMLA and First Data's short-term and long-term disability plans. Ex. 24 at ¶ 5.

102. As part of these duties and responsibilities, Voycheske tracked available leave and leave taken, communicated with employees about their leave, pay and benefits, and coordinated with First Data's third party administrator, MetLife, which handles short-term and long-term disability claims for First Data. Ex. 24 at ¶ 5.

103. First Data has access to MetLife's database to monitor employees on leave. Ex. 24 at ¶ 15; Exhibit 25 at 62:21-63:4, 92:22-93-3.

104. In her December 21, 2016, email to Barger, Voycheske advised Barger that he should contact MetLife to approve his short-term disability payments, which would pay him 66.67% of his normal rate of pay. Ex. 23 at 4.

105. Voycheske was familiar with Barger's leave of absence resulting from his surgery, which began in the Fall of 2016. She communicated with Barger and his wife, Marilyn Barger, several times in late 2016 and January 2017, about his leave and associated benefits. Ex. 24 at ¶ 6.

106. On January 5, 2017, Voycheske followed up on the December 21, 2016 email, informing Barger that First Data had not received notice from MetLife that his short-term disability payments had been approved. Ex. 23 at 4; Ex. 24 at ¶ 11.

107. That same day, on January 5, 2017, Barger replied and advised Voycheske that MetLife had approved his short-term disability benefits, with a disability date of September 4, 2016, continuing through October 15, 2016. The disability date was new information to First Data. Ex. 23 at 2; Ex. 24 at ¶ 12.

108. On January 5, 2017, Voycheske replied to that email: "Our records from your physician indicates you didn't start missing work until 10/22/16. When did you start missing work?" Ex. 23 at 1; Ex. 24 at ¶ 13.

109. On January 5, 2017, Barger wrote in response to Voycheske's question on when he "stopped working": "9/4. My operation was 9/6." Ex. 23 at 1; Exhibit 26 at ¶ 4.

110. After receiving this new leave start date from Barger, Voycheske confirmed with MetLife that its records indicated that Barger stopped working as of September 4, 2016 for purpose of short-term disability. Exhibit 27; Exhibit 28; Ex. 24 at ¶15; Ex. 26 at ¶ 5.

111. Based on Barger's email and MetLife's database, Barger's FMLA leave start date was adjusted to September 5, 2016, the date after he indicated he stopped working. Exhibit 29; Ex. 24 at ¶¶ 17-18; Ex. 26 at ¶ 4.

112. Voycheske mailed a letter to Barger on January 5, 2017, advising him that his 12 weeks of FMLA leave had expired on November 28, 2016. Ex. 29; Ex. 24 at ¶¶ 17-18.

113. Voycheske was authorized to adjust FMLA leave start dates. Ex. 25 at 85:13-20; Ex. 24 at ¶ 21.

114. The January 5, 2017, letter advised Barger that additional leave was being requested from his business unit. Ex. 29; Ex. 16 at 180:24-181:11; Exhibit 30.

115. MetLife sent letters to Barger confirming September 4, 2016, as the date his disability began for purposes of short-term disability benefits. Exhibit 31.

116. Barger never contacted Voycheske or anyone from First Data's leave management office about the adjusted FMLA leave commencement date of September 5, 2016. Ex. 24 at ¶ 20.

11

117. On January 10, 2017, Barger submitted a return to work authorization signed electronically by Ashley Parrish, RN, on January 10, 2017, indicating "Steven Barger is a patient of Dr. Harry Baddour. He is cleared to return to work on 01/17/17 without any restrictions." Exhibit 32.

**F.     Planning for the December 2016/January 2017 RIF**

118. In mid-November 2016, First Data began planning a RIF. Ex. 18 at 60:14-66:17; Ex. 2 at 165:3-166:15.

119. In mid-November 2016, and continuing through December 2016 and January 2017, there were multiple email discussions about including Barger in the RIF. Exhibit 33.

120. Bisignano decided the late 2016 RIF had not achieved significant enough headcount expenses savings for the Company as part of his broader restructuring and turnaround plan and that additional position eliminations would be required. Ex. 18 at 118:4-21; Ex. 2 at 119:3-15; Ex. 14 at 191:5-192:16.

121. On January 5, 2017, Marino emailed his HR leadership team informing that "Today, [Bisignano] decided to reduce 10% of the headcount in the Top 3000." Exhibit 34.

122. The RIF's goal was to reduce annual expenses. Ex. 2 at 18:12-19:16.

123. The top 3,000 compensated employees were identified through a list using total compensation. Ex. 18 at 48:19-24.

124. The RIF was to save between $45 to $50 million dollars in annual savings, which would be an approximate 2% reduction in wage cost to First Data. Ex. 2 at 19:13-22.

125. The 10% of the top 3,000 expanded on the RIF that began in November 2016. Ex. 2 at 119:6-15.

126. To execute on the RIF and its goals, GBS management developed lists of potential employees for the RIF in discussion with their HR partners. Ex. 13 at 73:15-21; Ex. 15 at Response No. 12; Exhibit 35 at Response No. 1.

127. In determining whether a GBS employee should be included in the RIF, GBS management looked at redundant roles, roles where different groups could be consolidated under single management, and layers of management that were not needed. Ex. 13 at 72:14-25, 88:3-10.

128. HR employees did not have the authority to determine which employees were included in the RIF, that decision making authority rested with GBS management. Ex. 13 at 97:3-9.

**G.     Review and Recommendation for the Sales Training Group**

129. As part of the RIF, Patricia Hadler, SVP of Operations Internal Consulting, conducted a review of the Sales Training Group. Ex. 17 at 128:4-20.

130. This analysis began in late 2016, and culminated in a report to Marino and the Management Committee on January 7, 2017. Exhibit 36.

131. Hadler's review followed Ording's review of the operations of the Group to improve its performance, which included a review of its personnel. Ex. 17 at 49:11-50:6.

132. Hadler's review recommended that there could be a total of $2.2 million in savings to First Data if the Group headcount was reduced from 71 to 55 employees. Exhibit 37 at 2.

133. Hadler's review recommended that the Group needed a leader "with strong learning & development background." Ex. 37 at 2.

134. Hadler's analysis revealed that the Group under Barger's leadership had ballooned since he had taken over, with a headcount increase of 46%, had a high attrition rate of 47%, and was operating inefficiently. Ex. 36; Ex. 2 at 136:23-137:18.

135. Marino forwarded Hadler's analysis to Bisignano, stating that he would reduce the headcount by 25 employees to return the group to its "core mission." Exhibit 38.

**H.     Barger's Position is Eliminated in the RIF**

136. Following the directive from Bisignano, Charron and Hack worked together to identify GBS employees for the RIF involving 10% of the top 3,000. Ex. 13 at 89:11-90:8.

137. On January 9, 2017, Hack moved Barger to the "confirmed" category of his RIF list for his direct reports. Exhibit 39.

138. Charron approved the decision to include Barger, and Hack's other direct reports, in the RIF. Ex. 13 at 98:10-11, 123:14-18; Ex. 15 at Response No. 1; Exhibit 40 at Response No. 1; Exhibit 41.

139. First Data eliminated Barger's position because the Company did not need an SVP level employee making a salary of $480,000, with up to $250,000 in bonus compensation, running the Group. Ex. 15 at Response No. 1, No. 3; Ex. 2 at 186:3-20.

140. First Data eliminated Barger's position because it was not a necessary position to accomplish the business objectives of the Company. Ex. 2 at 31:25-32; Exhibit 42.

141. Ultimately, 24 employees in the Group were terminated as part of this restructuring, including Barger. Exhibit 43; Ex. 17 at 26:4-9; Ex. 2 at 142:16-143:25.

142. There are currently 28 or 29 employees in the Group. Ex. 17 at 26:7-9.

143. A total of 362 employees were terminated as part of this RIF. Exhibit 44 at 2.

144.    A total of 26 employees at Barger's level (L-6) were terminated as part of this RIF. Ex. 44 at 2.

145.    The RIF was projected to save $43,684,044 in annual base and fringe expenses. Ex. 44 at 3.

146.    Due to RIFs, First Data employee headcount fell by 2,000 during the years 2016-2017, even though the Company acquired several companies during that time. Exhibit 45 at 21:9-17, 42:4-8, 48:14-25.

147.    First Data's RIFs in 2015, 2016, and 2017 resulted in a 2.70% increase in earnings before interest, tax, depreciation, and amortization during that period. Ex. 1 at 36.

148.    Barger testified that RIFs are a business strategy used by many companies as a management tool but that he disagreed with them. Ex. 6 at 112:16-113:18.

149.    Barger's FMLA leave played no role in the decision to include Barger in the RIF. Ex. 15 at Response No. 3; Ex. 6 at 160:20-22.

150.    Barger's disability played no role in the decision to include Barger in the RIF. Ex. 15 at Response No. 3; Ex. 6 at 160:3-14.

151.    Marino testified that First Data had 95 employees who were working under some form of reasonable accommodation in order to allow them to perform the essential functions of their jobs. Ex. 2 at 45:12-19.

**I.      Barger's Notification of his Position Elimination**

152.    Marino directed Johnson to inform Barger that his position had been eliminated. Ex. 16 at 209:25-210:2; Ex. 2 at 218:12-18.

15

153. On January 13, 2017, Johnson called Barger around 6:00 p.m. and informed Barger that his position of SVP, Sales Transformation had been eliminated. Ex. 16 at 208:19-25, 209:6-8; Ex. 6 at 155:2-3.

154. Barger acknowledged that his job had been eliminated. Exhibit 46.

155. Barger was placed on non-working notice until February 28, 2017, the effective date of his termination. ECF No. 1, Compl. ¶ 166(b); Ex. 7 at 6.

156. While on non-working notice from January 16, 2017, through February 28, 2017, First Data restored Barger's compensation. Exhibit 47.

157. Barger's last date of employment at First Data was February 28, 2017. ECF No. 1, Compl. ¶ 166(b).

158. Barger does not believe that he was terminated because he took leave. Ex. 6 at 160:20-22.

159. Barger does not believe he was terminated because he had cancer. Ex. 6 at 160:3-14.

160. Barger filed the lawsuit because "I know I wanted to come back to work and wasn't allowed to." Ex. 6 at 224:21-22.

161. Barger sued the individual Defendants because "I needed -- I needed to find out. I wanted whoever is responsible for not allowing me to come back to work, and that's why I had no idea who it was, so that's why." Ex. 6 at 94:12-15.

162. Barger refused to voluntarily dismiss his FMLA claims against individual defendants Bisignano, Whalen, and Johnson after it was pointed out that he had failed to generate any facts to support claims against them as "employers" under the FMLA, 29 U.S.C. § 2611. Ex. 14 at 263:2-264:8; Ex. 12 at 143:145:10.

163. During negotiations over Barger's severance package, First Data offered him a payment for 100% of the cash value of his unvested equity. Ex. 2 at 208:13-209:9.

**J.    Ording Assumes Barger's Sales Training Duties**

164. After Barger's position was eliminated, Ording (who had assumed Barger's duties temporarily following his surgery) assumed Barger's sales training responsibilities on a full-time basis in addition to her preexisting full-time job duties. Ex. 2 at 32:13-18; Ex. 40 at Response No. 3; Ex. 35 at Response No. 3.

165. Barger's "sales transformation" duties were moved across other parts of the Company that focus on the culture of sales. Ex. 17 at 41:5-17.

166. Ording restructured the sales training process by, for example, redesigning orientation to an adult learning style that extends over a six-month period, implementing new continuing education programs for the sales force, increasing the focus on sales solutions training, and decreasing costs by moving from Barger's expensive third-party training program to a more cost-effective in-house program. Ex. 17 at 43:12-45:6.

167. Ording assumed Barger's sales training duties without an increase in her base salary of $250,000 in 2016, and 2017. Ex. 17 at 12:20-24.

**K.    Barger's Failure to Mitigate**

168. Barger did not apply to a single job following his termination from First Data. Exhibit 48 at Response No. 20; Ex. 6 at 276:12-277:1.

169. "Plaintiff attempted to restart his consulting business" by starting a consulting business named "Barger Consulting." Ex. 48 at Response Nos. 20, 23.

170. Barger searched for clients for his consulting business for 4 months after he was terminated, from March 2017, through June 2017. Ex. 48 at Response No. 20.

171.  Barger obtained work from only one client, Oasis Outsourcing Inc. Ex. 48 at Response No. 20.

172.  For 2017 Barger Consulting earned $61,263 in revenue from Oasis Outsourcing Inc. Exhibit 49.

173.  For 2012 Barger reported on his Schedule C federal tax return business revenue of $15,602. Exhibit 50.

174.  For 2013 Barger reported on his Schedule C federal tax return business revenue of $16,210. Exhibit 51.

175.  For 2017, Barger Consulting reported business revenue of $61,263. Exhibit 52.

**SAUL EWING ARNSTEIN & LEHR LLP**
*A Delaware LLP*

*/s/ Gary B. Eidelman*
Gary B. Eidelman, Esq. (admitted *pro hac vice*)
500 E Pratt Street
Baltimore, Maryland 21202
T: (410) 332-8975
Gary.Eidelman@saul.com

Gillian A. Cooper, Esq.
650 College Road East, Suite 4000
Princeton, New Jersey 08540
T: (609) 452-5021
Gillian.Cooper@saul.com

New York Office
1270 Avenue of the Americas, Suite 2005
New York, New York 10020

*Attorneys for Defendants,*
*First Data Corporation, Frank Bisignano, Dan Charron, Anthony Marino, Karen Whalen, and Rhonda Johnson*

Dated: January 14, 2019
Baltimore, Maryland