# EXHIBIT A
# STEVE BARGER DECLARATION

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEVEN B. BARGER, an individual<br><br>Plaintiff<br><br>v.<br><br>FIRST DATA CORPORATION et al.<br><br>Defendants. | Case No. 1:17-cv-4869-FB-LB |

**DECLARATION OF STEVE BARGER
IN SUPPORT OF PLAINTIFF STEVE BARGER'S
RULE 56 MOTIONS FOR SUMMARY JUDGMENT**

I, Steve Barger, hereby declare and certify as follows:

1. My name is Steven Barger. I am 74 years of age and I am competent to provide this written sworn testimony under oath. I am the Plaintiff in the above described action.

2. This Declaration is based on my personal knowledge.

3. I am a citizen of the State of Alabama residing in Birmingham, I also maintain a residence in Atlanta, Georgia.

**Personal Background**

4. I was born on September 14, 1944 in the small, rural town of Boone, Iowa. My mother was an Iowa farm girl and my father served on the USS Iowa during the war. At age 2, my family moved to the small town of Hammond, Indiana, at age 5 we moved to Las Salle, Illinois, and at age 8 we moved to Dixon, Illinois. While growing-up in the rural mid-west I mowed lawns, raked leaves, shoveled snow, and baled-hay for extra money. I also practiced basketball everyday until dark. I was interested in architecture and taught myself "perspective" drawing and began designing houses before entering high school. I was inspired by the work of

**Declaration of Steven Barger** 1

Frank Lloyd Wright and Buckminster Fuller. When I was 15, I won the Illinois state competition for architectural rendering. In 1962 I became the starting point guard for Dixon High School. After high school, I enrolled at Iowa State University and played freshman basketball. At the time, I found school difficult (I know now I had dyslexia) and I dropped-out and obtained a job in as a commercial artist for Look magazine, where I met my wife (now we have been married 54 years in June). In 1963, I enrolled at Northeast Missouri State University (now known as Truman State). I graduated in 1967 with a bachelor's degree in education and my first child (a daughter) was born. In 1968, my second child was born (a son), and I became the first executive director of the YMCA in Kirksville, Missouri. I soon took my first high school teaching job in Gilbert, Iowa where I taught history and coached the basketball team. While in Gilbert I designed and built the Gilbert Community Park by myself in the summer of 1968. In 1969 I accepted a new teaching and coaching position in Lake Park, Iowa and for extra money, painted houses during the summer. My third child (a son) was born in 1970, and in 1974, I stopped teaching in public school to paint houses full time. I moved our family to Chariton, Iowa where I sold real estate, and owned and operated a bowling alley and had a house painting business. In Chariton, I met my first mentor who was the founder of Hawkeye Bank Corporation, an Iowa state bank, and in 1978 I sold my businesses and went to work for Hawkeye Bank. I was elected to the Chariton City Council, and I was honored to win the Iowa Governor's Leadership Award in 1979. I began developing marketing concepts for all of Hawkeye Bank's branches and operations throughout Iowa. At that time I developed the first bank based investor center in the United States. In 1980, I moved with my family to Des Moines to work in the Hawkeye Bank corporate headquarters and served on an American Bank Marketing Association National Advisory Board.

**Declaration of Steven Barger**                                                                                                2

5.  In 1983, I met my second mentor, Mr. Joe Plumeri, then EVP of Sales and Marketing for Shearson Lehman Brothers. Mr. Plumeri had learned about the investor centers at Hawkeye Bank and he asked me to come speak to a group about how banks could enter the brokerage business. After giving three presentations to Shearson Lehman's top producers, I was recruited by Mr. Plumeri to bring my marketing and cultural ideas to Shearson Lehman Brothers. I began working with Mr. Plumeri at Shearson Lehman, with my first office on the 106th floor of Two World Trade. I moved the family to New Jersey. I was the director of Sales and Training for Shearson Lehman Brothers until 1987. During this time, I developed the concept of "The Value Gap", a concept Mr. Plumeri still uses today, and I also developed a program called "It's Nobody's Business but Yours," which both Mr. Plumeri and I continued to use throughout our careers.

6.  I left Shearson Lehman in 1987 and started my own financial advisor consulting business. During this consulting period, I created copyrighted marketing and sales concepts and wrote a book "Purpose, Driven, Principle Based and Client Centered," which was a workbook of several hundred pages of my program. My consulting business focused on providing advice, consulting, and marketing concept to financial advisors. In 1990, 23 of "Barrons' 100 'Best Advisors'" were my clients. During this period, I also created the "ClienTalk" feedback system and the "Doctrine of Genuine Concern." All concepts that I would later bring to be implemented at First Data.

7.  In 1992, Mr. Plumeri, who had just been named CEO and President of Shearson Lehman Brothers**,** asked me to return to the company as Senior Executive Vice President of Training and Business Development, a position which I accepted. While in this position I created the concept of "Client Valued Business Management". I was a distinguished speaker at the

**Declaration of Steven Barger**   3

Wharton Business School 1994-1998. After the merger with Smith Barney, Plumeri and I were transferred to the Citigroup, Primerica subsidiary, where Mr. Plumeri served as President and CEO of Primerica and I served as the EVP of business development and training. When Primerica became a shining star for Citigroup, Mr. Plumeri and I were then asked to return to New York implement our sales programs inside of Citibank. Plumeri then left to become the CEO and Chairman of the Willis Group in London, I "semi-retired." to Arizona. I use the term "semi-retired" loosely. During this period, I felt a drive to continue working, coaching, and motivating, and I maintained a small consulting practice.

8. My career has included more than 40 years as an executive in the financial services industry and as a consultant to major financial institutions.

**Consulting/Plumeri/Clover/Data Collection & Distribution**

9. In 2013, I was working as a consultant in an independent contractor arrangement with The Barger Group, LLC ("The Barger Group"). In this role, I provided consulting services to clients of The Barger Group. These clients were primarily in the financial services industry.

10. The consulting revenue I generated for The Barger Group during 2011 through 2013 was approximately $20,000 to $30,000 per month. During this period of consulting, the clients of The Barger Group, with whom I worked, included Fifth Third, UBS, Massachusetts Financial Services, Morgan Stanley Smith Barney, and others.

11. In December 2013, I conducted a presentation for the Management Committee of Lebenthal Holdings, and I was in the initial stages of establishing a multi-year consulting engagement with Lebenthal and had begun the planning and scoping of a multi-year sales transformation and cultural transformation. I developed a seven-year plan for sales culture training and transformation for Lebenthal. The terms of the Lebenthal engagement were to be a

$60,000 one-time fee for use of The Barger Group's intellectual property, $20,000 per month for a two-year retainer, $1,000 per month for each team within Lebenthal that I was advising/consulting/coaching, and all travel expenses were to be paid by Lebenthal.

12. My friend, mentor, and colleague for decades, Mr. Joe Plumeri, was a member of the Board of Lebenthal, and he was also Vice Chairman of First Data Corporation ("First Data"). Following the presentation to Lebenthal, Mr. Plumeri approached me to initiate discussions about me providing consulting services to First Data instead of committing my time to Lebenthal and my other clients. Over the next several weeks Mr. Plumeri and I continued discussions regarding plans for my consultation with First Data in lieu of my accepting the engagement consulting with Lebenthal that would consume a significant bulk of my time for the next seven years. In January 2014, I begin working on gathering the information to provide Mr. Plumeri and First Data for the scope of a proposed consulting arrangement between The Barger Group and First Data. Mr. Plumeri, as a member of the Board of Lebenthal and as my friend and colleague for three decades, was aware of the terms under which The Barger Group was to be engaged by Lebenthal while we were discussing the potential engagement by First Data. The Barger Group decided to decline the Lebenthal engagement and accepted by verbal agreement with Mr. Plumeri for a consulting engagement with First Data for the payment of $30,000 per month by First Data to The Barger Group for consulting services, plus First Data's reimbursement of The Barger Group's travel and lodging expenses, payment of pre-existing intellectual property rights, and payment to The Barger Group of amounts necessary to pay existing clients a return of their pre-paid consulting fees because my time would not allow my work for First Data and completion of those pre-paid services. Because of my commitment to First Data, I withdrew from the opportunity presented by the Lebenthal engagement.

**Declaration of Steven Barger**                                                                5

13. In providing these consulting services to First Data, I made numerous trips from my home in Birmingham to First Data's offices in Atlanta and New York to gather information to scope the project, which was to implement a company-wide and world-wide transformation of the company's culture from merely a provider of processing services to a solution and technological services provider.

14. I have worked directly with Mr. Plumeri for years in my previous positions. Together, Mr. Plumeri and I had implemented other similar cultural sales transformation process in the financial industry, and according to Mr. Plumeri we increased the values of companies by billions of dollars. During 1997, 1998 and 1999, I worked at Primerica & CitiBank. Mr. Plumeri was my direct superior and approved my compensation packages during these time periods. My average annual W-2 ordinary income from 1997 through 1999, all approved by Mr. Plumeri, was $2.5 million.

15. Mr. Plumeri and I have been colleagues and friends for more than 30 years. Mr. Plumeri has been very familiar with my work and my compensation as an employee and a consultant, including my salary, bonuses and consulting rates, during that entire period.

16. During my career, I developed a copyrighted concept that I called the "value gap." This concept has been incorporated into my transformation programs since its creation. Mr. Plumeri, on page 116 of his best-selling book "The Power of Being Yourself: A Game Plan for Success By Putting Passion Into Your Life and Work" acknowledges and credits me with the development of the concept of the "value gap", and on page 202 of that same book Mr. Plumeri includes me in his acknowledgements section.

17. The Barger Group continued providing consulting services, a scope of work was developed, and implementation of the plans for commencing the cultural transformation began in

March and April 2014. The basic concept for beginning the implementation of the sales culture transformation involved the expanding deployment of First Data's recently acquired "Clover" system and First Data's then "Insightics" and internal data capabilities. The concept being that these systems, if deployed properly, and the sales staff (and all support functions) educated, First Data could become a business consultant to merchants of all sizes, not just a transaction processing company.  This planned transformation would be based on the information gathering capabilities of First Data and Clover, and the subsequent transformation of that collected data into a saleable product for use by merchants in operating, planning and conducting their business. The product would include applications running on the Clover cloud-based infrastructure gathering data from all transactions in which First Data is involved and then "anonomizing" that information and reselling it to merchants as a business and market analysis tool. The plan was to transform First Data from merely selling transaction processing, negotiating on transaction rates, and selling/leasing terminal equipment, to company selling a robust business analysis system and selling its sales person's knowledge of that system, its capabilities, and its application to the merchant's particular business needs. The title of these sales employees was changed from "account executive" to "business consultant." The mindset of the entire company would need to be changed world-wide. From my prior experience implementing similar cultural changes during my career, a project of cultural change like the one proposed would take at least seven to ten years to completely and effectively implement across all aspects and areas of a company the size and geographic scope of First Data.

**Offer and Acceptance of Employment with First Data**

18. Mr. Plumeri offered me the initial terms and conditions of my initial employment (position, salary, bonus, equity) at First Data after discussions with Joe Plumeri, First Data's

Vice Chairman, and Karen Whalen. These terms and conditions were set forth in an offer letter signed by both me and Mr. Plumeri. The terms offered by Mr. Plumeri, and accepted by me, provided for my hiring as a Senior Vice President of First Data at an annual salary of $480,000, $250,000 annual cash bonus, and grants of stock options. I viewed this increase in compensation as being consideration for my leaving the freedom of my consulting business, where I could work for multiple clients on varied projects, and on my working schedule, for the security of steady employment, but for a single employer with the demands of working again in a large corporate enterprise and for one client.

19. I was hired as an employee of Defendant First Data Corporation ("First Data") with a title of Senior Vice President, effective June 30, 2014.

20. I accepted the position with First Data because I was being tasked to fully implement the proposed program and cultural transformation across the company, with the understanding that this program was a long-term commitment to see the project through its seven to ten-year life-cycle.

21. The concepts of this transformation were included in First Data's private equity offering materials and road show presentations and were incorporated into First Data's description of business included in its initial public offering.

22. After I was first hired as an employee, I was a Senior Vice President reporting directly to Mr. Plumeri. My responsibilities were comprised of implementing the cultural transformation process originally developed in my consulting role across the entire First Data enterprise.

23. Upon my hiring, my wife and I moved to from Birmingham, Alabama to Atlanta Georgia.

**Employment with First Data 2014 to 2015**

24.  When I was first hired as an employee, Mr. Bryan Fricke was a Vice President and responsible for the sales training group and reported directly to Mr. Plumeri. I did not have any responsibility for the sales training group upon my hiring. My task was corporate-wide.

25.  After my hiring, Mr. Fricke, unexpected to me, resigned from his position leaving First Data a decision on how the management of the sales training team should be handled following his departure. Because the sales training team would be the beginning of the planned corporate-wide transformation, Mr. Plumeri asked, and I agreed, to add the management of the sales training team to my responsibilities I had originally been hired to perform.

26.  True and correct copies of my self-assessments of the tasks I performed in 2014 and 2015 are attached Shearer Decl. <u>Exhibits</u> 21 & 22. As set forth in the description of my completed tasks, my work, plans and accomplishments during 2014 and 2015 were more than taking Mr. Fricke's position as head of the sales training team.

27.  At no time during my entire tenure at First Data did I ever receive a formal, human resources standard corporate process, written evaluation of my work or accomplishments from Mr. Plumeri, Mr. Hack or Mr. Charron. I did perform my portion of the review process by completing my self-assessments.

28.  In 2015, Mr. Plumeri withdrew from his day-to-day participation in the operations of First Data, but he remained a member of First Data's Board of Directors and Vice Chairman. I began reporting to Executive Vice President Jeff Hack.  In early 2015, First Data hired Executive Vice President, Defendant Dan Charron. While the reporting structure was fluid and not formalized, I reported to Mr. Hack who reported to Mr. Charron and we were all within the group identified at First Data as the Global Business Solutions Group ("GBS"). Even after Mr.

Plumeri left day-to-day operations, I continued with my responsibilities for the corporate-wide cultural transformation by making presentations initiating the new program to all facets of the company, as well as taking on Mr. Fricke's former responsibilities as head of the sales training group.

**Replacement/Backfill for Mr. Fricke's Position**

29.     Ms. Rhonda Johnson, a defendant, was a member of the human resources department and the liaison/business partner between human resources and GBS when I became a member of the GBS group. In her new role as my human resources business partner, we met and discussed my organization and we discussed seeking a backfill for Mr. Fricke's position. This became internally known as a "successor" for the head of the sales training group. At no time during my conversations with Ms. Johnson regarding a "successor" did I ever indicate that it was my plan to leave First Data. At no time did I believe, or indicate that, my discussions with First Data management were regarding replacing me entirely. All of the discussions surrounding finding a "successor" were regarding finding a backfill replacement to assume Mr. Fricke's former responsibilities as head of the training group that I had assumed in addition to my other responsibilities for the company-wide cultural transformation implementing the data integration and data products based on the Clover and Insightics capabilities.

**Cancer Diagnoses/Treatment/Surgery**

30.     In late February 2016, my physicians discovered a small nodule on my left vocal cord suspected to be cancerous. Upon receiving the results of the biopsy, I was diagnosed with an invasive form of squamous cell carcinoma – cancer of the vocal cords. My physicians recommended radiation treatment in hopes of avoiding surgery. After receiving my diagnoses and radiation treatment plans, I personally advised Joe Plumeri (Vice Chairman), Dan Charron

**Declaration of Steven Barger**                                                                                                                    10

(EVP Head of Glodal Business Solutions) and Anthony Marino (EVP Human Resources) of the circumstances and my physician's recommendations. Over the next few days, Mr. Bisignano (Chairman & CEO), Guy Chairello (President), Jeff Hack (EVP Global Business Solutions), and Rhonda Johnson (VP of HR), became aware of my condition, diagnoses and proposed treatment.

31. I spoke with Mr. Bisignano at a management retreat a few weeks later. Mr. Bisignano suggested that I receive a second opinion from Dr. Louis Harrison, Chair of the Radiation Oncology Department at Moffit Cancer Center in Tampa, Florida. Mr. Bisignano advised me that Dr. Harrison had treated him and that he was a close personal friend. I traveled to Tampa to seek Dr. Harrison's opinion and he concurred with the diagnoses and proposed radiation treatment.

32. From March 28, 2016 through May 5, 2016, I underwent 28 separate radiation treatments in Atlanta. I received five radiation treatments per week for six-weeks. During this period, I maintained my normal work pattern (7 a.m. to 9 p.m.), I returned to the office after each radiation treatment (each treatment lasted approximately 45 minutes from arrival at the radiation facility until my departure back to the office), and I did not miss any days of work, I did not take any paid-time off ("PTO"), and I continued to work in the office nearly every weekend. During my radiation treatments, I fully performed the functions of my job, and I was not informed by any management personnel that I was not performing my job.

33. From May 2016 through August 2016, after the radiation treatments, I continued to work my normal schedule of 12-plus hours a day, weekends, and traveling on company business. During this period I did not take any days off from work.

34. In mid-August 2016, I returned to my physicians in Atlanta for an evaluation of the effectiveness of the radiation treatments. I was advised that the radiation had been ineffective

**Declaration of Steven Barger**  11

in addressing cancer's growth and I was advised by my physicians to have laryngectomy surgery to prevent the spread of the cancer into my lymph system.

35.     I was not comfortable with the wait-time for surgery in Atlanta, so I contacted Dr. Harrison in Tampa and he arranged for me to have surgery by Dr. Padhya at Moffitt Cancer Center in Tampa on September 6, 2016.

36.     I advised Mr. Bisignano, Mr. Charron, Mr. Hack, Ms. Johnson, Mr. Marino and Mr. Plumeri of my scheduled surgery date. Ms. Whalen became aware of the scheduled surgery through Mr. Marino and Ms. Johnson.

37.     On Sunday, September 4, 2016, my wife, my son, Grant Barger, and I traveled to Tampa. I underwent laryngectomy surgery on September 6, 2016. This surgery involved separating the connection between my esophagus and trachea, creating a stoma (a hole in my throat just above my collar bone and sternum) through which I can breathe, and inserting a prosthetic device through a puncture connecting my trachea to my esophagus for use in speaking after surgical healing, and inserting a feeding tube into my stomach that exited my side for nourishment while the surgery to my throat healed. The surgery also included moving flaps from my pectoral muscles into my neck as tissue for reconstruction of my neck area.

38.     The day after surgery, I began working on First Data business from my hospital bed using e-mail, texting, and other technological capabilities.

39.     From the day after my surgery, September 6, 2016, until November 21, 2016 (a period of 76 days), I worked on First Data business using these technological capabilities on a daily basis (including weekend), with a few days (under 5) as exceptions.

40.     I remained in the hospital for several weeks recovering. I worked on First Data business remotely every day while hospitalized other than my date of surgery.

41. After a few weeks in the hospital, I was discharged and spent several weeks in a nearby hospital hotel and was called upon nurses that would help my wife and son with rebandaging and care for my wounds. I experienced complications in healing due to damage to tissue from the radiation treatments and I re-entered the hospital for another reconstructive surgery. I continued to work on First Data business every day.

42. My son Grant Barger was with me in Tampa the entire time I was there and he took care of making sure my technology was working so that I could continue to work on First Data business. On October 5, 2016, my iPhone fell from my bed and broke on the hospital floor. I sent Grant to the store to obtain a new iPhone for me so that I could have it up and running in time to attend a scheduled First Data meeting. Grant also picked up the overnight packages sent to me regularly at the hospital and the hotel from First Data with documents for my review, and comment or approval.

43. In mid-October 2016, I was released from Moffitt Cancer Center and returned home to Atlanta.

44. From the date of my surgery on September 6, 2016 to my return to Atlanta in mid-October, I kept senior management (including Bisignano, Marino, Johnson, Hack, Charron, Whalen, and Plumeri) aware of my condition and my work. I also communicated with my team in Atlanta and across the globe, attended videoconferences, conference calls, executed my executive approval responsibilities, and worked every day on First Data business.

45. At no time while I was in Tampa did any member of senior management of First Data indicate to me, verbally or in writing, that I should take leave or that any of my time should be considered PTO. The entire time I was in Tampa, I worked on First Data business and received regular pay-roll checks. At no time while I was in Tampa did I ever receive

**Declaration of Steven Barger** 13

communication from senior management that there were issues with my performance using the remote means available to me.

46. From the time I left Atlanta for Tampa on September 4, 2016 through my return to Atlanta in mid-October, no officer, director, or employee of First Data personally visited me, although I did communicate with my team and management through writing (e-mail, text, group chat), and audio and visual conference.

47. After returning home to Atlanta, complications with the healing of the "fistulas" (open wounds in the side of my neck) continued. As a result, saliva and mucous gathered in my lungs and I suffered pneumonia. I spent the night in the Emory hospital on October 24, 2016 at the direction of Dr. Baddour. I was released from the hospital on October 25, 2016 and returned home. I worked on First Data business on both October 24th and October 25th from home and from the hospital.

**Marino & Plumeri Visit – November 3, 2016**

48. On November 3, 2016, Mr. Plumeri and Mr. Marino traveled by private jet from New York to Atlanta to visit me at my personal residence. This meeting with Plumeri and Marino was my first in-person meeting with First Data personnel since my surgery. At the time of that visit, I was still healing for surgery, wounds still needed packed, I was dependent on my feeding tube, and I was unable to talk. I was also just days out of recovering from the pneumonia caused by wound leakage. I was in pain, lethargic, and communicated primarily by writing on a white-board. Nevertheless, I was happy to see my old and new friend, and their visit energized me to get back to work in the office.

49. From November 3, 2016 through November 19, 2016, I continued to work on First Data business daily.

50. From my return to Atlanta in mid-October to November 19, 2016, (i) I worked every day on First Data business remotely with full knowledge of my direct supervisors, senior management and human resources (Bisignano, Charron, Hack, Johnson, Marino, Whalen) and (ii) I did not request any PTO, none of my time was designated by First Data as PTO, and none of my time was designated by First Data as FMLA qualifying leave. The healing from surgery advanced enough so that I could begin using my voice prosthetic around Thanksgiving of 2016.

**FMLA and ADA Applicability**

51. On each date between June 30, 2015 (my one-year anniversary) through November 21, 2016, I had been employed by First Data for at least 12 months or more, and I had provided at least 1,250 hours of service as an employee of First Data in the previous 12-month period prior to that date.

52. During my entire tenure as an employee of First Data, Plaintiff I was not a Federal officer or employee.

53. My primary office location while employed by First Data was at First Data's office building, 5565 Glenridge Connector, Atlanta Georgia 30342 ("Glenridge Connector Office").

54. During my entire tenure as an employee of First Data, more than 50 First Data employees were employed by First Data at, or within, 75 miles of the Glenridge Connector Office.

55. First Data is engaged in commerce and during the calendar years of 2013 through 2017, inclusive, First Data employed more than 50 employees each working day.

**Leave Designation**

56. On December 15, 2016, I received an e-mail, and subsequently a letter dated

December 15, 2016, from First Data advising me that my FMLA leave request had been approved for a period from October 24, 2016 through January 16, 2017.

57. After receipt of the December 15, 2016 e-mail and the related letter described in the prior two paragraphs, I did not receive any e-mails or letters through US Post or private carriers that indicated that the original period of leave of indicated was wrong or was to be changed.

58. My wife and I checked the mail daily between January 1, 2016 and February 28, 2016. Our mail delivery at our home typically occurred late in the afternoon or early evening. I never received from First Data, or any of its employees or agents, electronically or by physical delivery, the letter, dated January 5, 2017, that was attached as Exhibit 4 to the Declaration of Jennifer Voycheske dated February 20, 2018.

**Notice of Intent to Return**

59. During the period between September 6, 2016 and from, what I am aware, January 13, 2017, Jeff Hack was an Executive Vice President within the GBS group at First Data to whom I reported on the operations under my leadership.

60. By text message to Mr. Hack on December 28, 2016, I wrote to him "I will be back on Jan. 15. Can't wait."

61. By text message to Mr. Hack on January 3, 2017, I wrote to Mr. Hack "Need to talk about my return. Is sales transformation and training under HR now?" Mr. Hack responded that same day by text "No. Robin is providing interim help." I replied to Mr. Hack that same day "I expect to return to my job. Is that your expectation?"

62. During the holiday period at the end of 2016, I visited the Glenridge Connector office on several occasions. One of those occasions was to attend the office holiday party being

held by my team at that office. During these visits, I informed my team, Robin Ording, Rhonda Johnson, and others I spoke with, that I was going to be returning to the office to work in mid-January.

63. On and before January 5, 2017, I also advised members of First Data's leave management team, in writing, that I was going to obtain my physicians release to work at my scheduled regular appointment on January 10, 2017 and then return to the office to work.

**Post Termination Work**

64. After my termination from First Data, I began working through my rolodex of prior contacts and my former colleagues I had advised over the years seeking employment or consulting work.

65. At my age and with my background for decades as an executive on Wall Street, and based on my expertise in the job market, one does not "apply" for a job. Rather, just the way I was hired by First Data by Joe Plumeri, you use your network of contacts to seek out potential available positions or you attempt, through these contacts, to create a position where one did not previously exist. I began this process of beginning my search and working through my decades of contacts and network within weeks after my termination from First Data on February 28, 2017.

66. I tried to explain this process during my deposition to Mr. Eidelman, but he cut me off and only asked if I had "applied" for positions. I indicated that I had made contacts with my network at the wirehouses, but he stopped my testimony and only wanted to know about "applications."

67. I did not receive any traction or interest in direct employment, but I did receive interest in my provision of consulting services.

**Declaration of Steven Barger** 17

68. Based on these offers, I began re-establishing a consulting business in mid-2017. It took some time to get my operation back up and working.

69. I made a reasonable effort, but I was unsuccessful in locating any position in the Atlanta area that paid near the equivalent of what I had been making at First Data.

70. In 2017 from March 1 to December 31, my consulting revenues were approximately $61,000 and in 2018 my consulting revenues were approximately $125,000, with the end-of-year calculations still not completed.

71. I have worked for 50 years since college. I have never filled out an application for work. I was recruited for every job that I have had. From teaching and coaching in two high schools in Iowa in the late 60s to selling real estate, to becoming EVP of Hawkeye Bancorporation,  SVP of Shearson Lehman Brothers, Barger Consulting, Travelers, Citigroup, Primerica, Citibank, Barger Consulting and First Data. My consulting business was built by referrals and networking. Having taught an Executive in Residence Program at Wharton for several years, I had a following in the industry that agreed with my writings and teachings about accepting responsibility for financial advice and counsel. The program was called "It's nobody's business...but yours". Many of today's fiduciary training programs had their roots in my writings and teachings. My consulting business is starting to pick up some speed. I network with executives in all major financial firms. Many of these executives were students or followers of my business philosophy during the 80s, 90s and 2000s. While working at First Data, I was away from Financial Services for nearly four years and it has taken some time to reconnect and have the right conversation at the right time to build that consulting business. If your purpose is to help other be successful you will always be employed. Since leaving First Data I have rekindled my connections within the financial services industry, talking with my contacts at Morgan

**Declaration of Steven Barger**                                                                                                  18

Stanley, Oppenheimer, Schwab, UBS, Ameritrade and others. These conversations have included my inquiries as to employment and as to providing consulting services. As recently as last week, I began conversations with some of these companies to potentially start new consulting arrangements.

    I declare under 28 U.S.C. §1746 and penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed on February 4, 2019

_____
Steve Barger