**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| STEVEN B. BARGER, an individual<br><br>Plaintiff<br><br>v.<br><br>FIRST DATA CORPORATION et al.<br><br>Defendants. | **Case No. EDNY 1:17-cv-4869-FB-LB** |

**PLAINTIFF'S RESPONSE**
**TO**
**DEFENDANTS' LOCAL RULE 561.1(a)**
**STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Civil Rule 56.1 of the United States District Court for the Eastern District of New York, Plaintiff Steven Barger ("Plaintiff" or "Barger") submits the following Response ("Plaintiff's Rule 56.1 Response") to the Local Rule 56.1(a) Statement of Undisputed Material Facts ("DSOF") filed by Defendants First Data Corporation ("First Data"), Frank Bisignano ("Bisignano"), Dan Charron ("Charron"), Anthony Marino ("Marino"), Karen Whalen ("Whalen"), and Rhonda Johnson ("Johnson"). This Response is being filed in connection with Plaintiff's Opposition to Defendants Motion for Summary Judgment. Simultaneously with the filing of Plaintiff's Rule 56.1 Response, the Plaintiff is also filing Plaintiff's Motion and Memorandum in support of Plaintiff's Motion for Summary Judgment and Plaintiff's Local Rule 56.1 Statement ("PSOF").[1]

---

[1] In footnote 1 of the DSOF, Defendants include a disclaimer that their statement of facts are undisputed for purposes of their motion for summary judgment only. This disclaimer is ineffective. The Defendants cannot be permitted to contradict their statement of undisputed facts in this proceeding. In submitting Plaintiff's Motion for Summary Judgment filed contemporaneously with this Response to DSOF, Defendants have made representations to this court and are judicially estopped from taking a contrary position in this case.. In preparing Plaintiff's motion

A.      **Defendant First Data Corporation**

**1.**      Defendant First Data Corporation is a financial services company that provides, among

other things, credit, debit, check, and electronic payment solutions. The Company offers a suite

of systems, services, and products to businesses and financial institutions. Exhibit 1 at 4.

> **Plaintiff's Response:** Admit. First Data operates in 100 countries reaching over 6
>
> million business locations and over 4,000 financial institutions. In 2017, First Data
>
> processed 93 billion transactions globally, or approximately 3,000 transactions per
>
> second. Ex. 1 at 4. First Data has announced that it is being acquired in a transaction
>
> valued at $22 billion. Shearer Dec Ex 129

**2.**      First Data employs approximately 22,000 people. Ex. 1 at 14; Exhibit 2 at 17:7-9.

> **Plaintiff's Response:** Admit, provided employee statistics provided in Ex. 1 at 14 are as

of December 31, 2017. In addition to the 22,000 employees, First Data also has 6,000 individual

independent contractors. Exhibit 2 at 17:7-9. Backfilling positions is First Data's standard

operating procedure following "restructurings."PSOF ¶ 2, 253-256.

**3.**      First Data has policies strictly prohibiting discrimination on the basis of an employee's

disability or any other protected characteristic. Exhibit 3.

> **Plaintiff's Response:** Admit Exhibit 3 is a true and correct copy of First Data's Equal
>
> Employment Opportunity Policy.

---

and its response to Defendant's motion, Plaintiff, to the extent statements of facts are admitted below, has relied
upon Defense counsel's and Defendants' representation of the facts contained in the DSOF. Plaintiff's responses
below are for purposes of opposing Defendant's Motion pursuant to Rule 56 and in support of Plaintiff's Motion
pursuant to Rule 56, to be filed as complete briefings on February 28, 2019. References to "PSOF" herein refer to
Plaintiff's Loacal Rule 56.1(a) Statement of Undisputed Facts in support of Plaintiff's motion pursuant to Rule 56.

4.     First Data employees may utilize a multi-faceted complaint resolution procedure to raise issues of alleged discrimination, harassment, and retaliation. Ex. 3.

>   **Plaintiff's Response:** Admit Ex.3 is a true and correct copy of First Data's Equal Employment Opportunity Policy and that policy provides for complaint resolution procedures.

5.     Employees are informed of First Data's EEO policies and procedures and may report discrimination, retaliation, or harassment to anyone in management, to a member of the HR department, or by calling First Data's Ethics Hotline. Ex. 3.

>   **Plaintiff's Response:** Admit

6.     Retaliation for engaging in protected activity is prohibited. Exhibit Ex. 3.

>   **Plaintiff's Response:** Admit Ex.3 is a true and correct copy of First Data's Equal Employment Opportunity Policy and that policy purports to prohibit retaliation for engaging in protected activity.

7.     Plaintiff Steven Barger acknowledged receipt of First Data's employee policies. Exhibit 4.

>   **Plaintiff's Response:** Admit

**B.     Barger's Employment at First Data**

8.     On June 12, 2014, Barger received an offer of employment with First Data. Exhibit 5.

>   **Plaintiff's Response:** Admit.

**9.**   Barger began working at First Data on June 30, 2014. Exhibit 6 at 26:24-27:1; Exhibit 7.

**Plaintiff's Response:** Admit with the clarification that Barger became an employee of First Data on June 30, 2014. Barger served as a consultant to First Data from January 2014 through June 30, 2014. PSFO ¶24.

**10.**   Joseph Plumeri extended the offer to Barger. Ex. 6 at 259:17-18, 25.

**Plaintiff's Response:** Admit. But see PSOF ¶191. Whalen  also involved in the process of negotiating and extending the offer of employment to Barger).

**11.**   Upon Barger's hiring, Plumeri became Barger's supervisor. Ex. 6 at 123:2-15.

**Plaintiff's Response:** Admit. Deny that Ex. 6 at 123:2-15 is evidence of Plumeri's supervisor status.

**12.**   Barger's job offer stated that his employment was "at will" and could be terminated at any time, for any reason. Ex. 5.

**Plaintiff's Response:** Admit.

**13.**   First Data offered Barger the position of Senior Vice of President of Sales Transformation, which had a total annual compensation opportunity of $730,000, $480,000 of base compensation, and up to $250,000 of variable incentive compensation. Ex. 5.

**Plaintiff's Response:** Admit.

14.     Barger received a sign-on bonus equity grant of 300,000 options that would vest equally over the ensuing three years. Ex. 5.

      **Plaintiff's Response:** Admit.

15.     For 2014, Barger's salary was $480,000. Exhibit 8.

      **Plaintiff's Response:** Admit.

16.     In 2015, Barger was paid his 2014 bonus of $250,000 at outlined in his offer letter. Ex. 8; Exhibit 9.

      **Plaintiff's Response:** Admit.

17.     For 2015, Barger's salary remained $480,000. Ex. 8.

      **Plaintiff's Response:** Admit.

18.     On February 9, 2016, Barger was paid his 2015 bonus of $174,000, of which $34,800 was paid in cash and the balance was a grant of equity. Ex. 8; Exhibit 10.

      **Plaintiff's Response:** Admit.

19.     In 2016, Barger's salary remained $480,000. Ex. 8.

      **Plaintiff's Response:** Admit.

20.     In December of 2016, Barger was paid his 2016 bonus of $174,000 all in cash. Exhibit 11.

      **Plaintiff's Response:** Admit.

**21.**  Barger was hired to help First Data with its sales transformation efforts. Ex. 7.

> **Plaintiff's Response:** Admit. See PSOF ¶¶19-27 for Plaintiff's description of the
>
> meaning of "sales transformation." Shearer Dec Ex. ¶ 19, 21, 22

**22.**  Subsequently, Barger was assigned to lead the Sales Training Group (the Group) in August

2014. Exhibit 12 at 93:9-24, 104:14-105:6; Ex. 6 at 115:9-16.

> **Plaintiff's Response:** Deny. Plaintiff was assigned to lead the Sales Training Group in
>
> addition to his other responsibilities leading the "sales transformation" effort. PSOF
>
> ¶¶32-34

**23.**  In August 2015, Jeffrey Hack replaced Plumeri as Barger's direct supervisor when Hack

assumed leadership of the Group. Exhibit 13 at 39:17-40:8; Ex. 7.

> **Plaintiff's Response:** Plaintiff began reporting to Jeffrey Hack in "late fall" 2015. Ex 13
>
> 40:5-8. Plaintiff objects to the reference to Ex. 7 as it states nothing about Barger's
>
> reporting relationship to Mr. Hack.

**24.**  Barger continued to report to Hack for the remainder of his employment at First

Data. Ex. 6 at 83:7-12.

> **Plaintiff's Response:** Deny in part. Barger was forced to take FMLA leave on or about
>
> November 21, 2016. PSOF ¶¶6--74 Mr. Hack's employment with First Data was
>
> terminated at some point between November 2016 and February 28, 2017, and no
>
> evidence has been produced as to the exact date of Mr. Hack's termination. When Ms.

Ording became "interim leader" taking Barger's position while he was on leave. PSOF ¶ 59), Ms. Ording reported to Marino (EVP HR). PSOF ¶¶167-168. Barger's reporting relationship while on leave is uncertain. Immediately prior to commencing leave, Barger reported to Hack, but upon his taking leave his position as leader of the sales training team, taken on an interim basis by Ms. Ording, reported to Marino.

**C.**     **The Parties and Other Relevant Individuals**

**25.**    Defendant Frank Bisignano has been First Data's CEO since 2013. Exhibit 14 at 33:20-23.

    **Plaintiff's Response:** Admit.

**26.**    Bisignano did not hire Barger. Ex. 6 at 265:10-16.

    **Plaintiff's Response:** Deny. PSOF ¶¶2-3,147-151

**27.**    Bisignano did not terminate Barger. Ex. 6 at 269:7-9; Exhibit 15 at Response No. 1.

    **Plaintiff's Response:** Deny Ex. 15 at 269:9-11. PSOF ¶¶152-158

**28.**    Bisignano did not set Barger's compensation. Ex. 6 at 261:2-14, 268:13-15.

    **Plaintiff's Response:** Deny. See PSOF ¶¶151, 160, 161

**29.**    Bisignano did not set Barger's work schedule. Ex. 6 at 269:7-272:7.

    **Plaintiff's Response:** Objection:. Assumes Barger had a set work scheduled to be set that is not in evidence. Bisignano was Barger's employer for purposes of the FMLA. See

PSOF ¶¶147-165

30.  Bisignano did not maintain employment records for Barger. Ex. 6 at 269:3-6.

**Plaintiff's Response:** Deny. As CEO, Bisignano was responsible for all operations of

First Data. PSOF ¶3, 147, 148

31.  Barger was not Bisignano's direct report. ECF No. 1, Compl. ¶ 74.

**Plaintiff's Response:** Admit. Bisignano testified that "I am the CEO and accountable

for everything" PSOF ¶148

32.  Defendant Anthony Marino has been the Executive Vice of President of Human Resources

since March 2015. Ex. 2 at 9:9-18.

**Plaintiff's Response:** Admit.

33.  Marino did not hire Barger. Ex. 6 at 265:10-16.

**Plaintiff's Response:** Admit.

34.  Marino did not terminate Barger. Ex. 15 at Response No. 1; Ex. 6 at 268:22-23.

**Plaintiff's Response:** Deny. See PSOF ¶166

35.  Marino did not set Barger's compensation. Ex. 6 at 261:2-14, 268:13-15.

**Plaintiff's Response:** Deny. See PSOF ¶169

**36.**   Marino did not set Barger's work schedule. Ex. 6 at 268:24-25.

> **Plaintiff's Response:** Objection. Assumes Barger had a set work scheduled to be set
>
> that is not in evidence. Marino was Barger's employer for purposes of the FMLA. See
>
> PSOF ¶¶166-183.

**37.**   Marino did not maintain employment records for Barger. Ex. 6 at 269:3-6.

> **Plaintiff's Response:** Deny. Marino is the head (Executive Vice President) of First
>
> Data's Human Resources Department that maintains employment records.

**38.**   Barger was not Marino's direct report. ECF No. 1, Compl. ¶ 74.

> **Plaintiff's Response:** Deny in part. Barger was forced to take FMLA leave on or about
>
> November 21, 2016. At the time of taking leave, Barger reported to Mr. Hack. Mr.
>
> Hack's employment with First Data was terminated at some point between November
>
> 2016 and February 28, 2017, and no evidence has been produced as to the exact date of
>
> Mr. Hack's termination. When Ms. Ording became "interim leader" taking Barger's
>
> position while he was on leave (DSOF below), Ms. Ording reported to Marino (EVP
>
> HR). PSOF ¶168. Barger's reporting relationship while on leave is uncertain.
>
> Immediately prior to commencing leave, Barger reported to Hack, but upon his taking
>
> leave his position as leader of the sales training team, taken on an interim basis by Ms.
>
> Ording, reported to Marino.

**39.**   Defendant Daniel Charron joined First Data in early 2015. Ex. 13 at 18:22-19:1.

> **Plaintiff's Response:** Admit.

**40.**   Charron's title is Executive Vice President and he leads First Data's Global Business

Solutions (GBS) organization. Ex. 13 at 21:17-18.

> **Plaintiff's Response:** Admit.

**41.**   Charron is a member of First Data's Management Committee and reports directly to

Bisignano. Ex. 15 at Response No. 1.

> **Plaintiff's Response:** Admit.

**42.**   Charron suffers from a hearing disability and wears hearing aids. Ex. 14 at 65:25- 66:6.

> **Plaintiff's Response:** Admit in Part, Deny in part. Admit Charron has "hearing issues"
>
> Ex. 14 at 66:6. No evidence has been produced that Charron wears hearing aids.

**43.**   Defendant Karen Whalen was employed as Senior Vice President of Human Resources, at

First Data where she worked for 32 years, until January 2018. Ex. 12 at 10:25-

11:3, 18:15-17.

> **Plaintiff's Response:** Admit in part. Whalen was employed by First Data for 32 years.
>
> Whalen's last position with First Data was Senior Vice President of Human Resources.
>
> There is no evidence that Whalen was a Senior Vice President at First Data for 32 years.

**44.**   Whalen reported to Marino from 2013 until her employment ended. Ex. 12 at 17:13-18:14.

> **Plaintiff's Response:** Deny. In 2013, Whalen was the co-head of human resources
>
> reporting directly to Bisignano. Whalen began reporting to Marino in March 2015. Ex.

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF RULE 56 MOTION**          10

<u>12</u> at 17:13-17.

45.   Whalen did not hire Barger. <u>Ex. 6</u> at 265:10-16.

**Plaintiff's Response:** <u>Deny:</u> Whalen was the Plaintiff's contact through the hiring

process and "put Plaintiff through the hiring process." <u>Ex. 6</u> at 265:2-7. Whalen voiced

her opinion to attempt to influence decision-maker on the hiring of Plaintiff and his

compensation. PSOF ¶191

46.   Whalen did not terminate Barger. <u>Ex. 15</u> at Response No. 1.

**Plaintiff's Response:** <u>Deny</u>. Whalen was directly involved in the decision to terminate

Barger. PSOF ¶¶193, 196, 198, 203-205, 309, 210-211.

47.   Whalen did not set Barger's compensation. <u>Ex. 6</u> at 261:2-14, 268:13-15.

**Plaintiff's Response:** <u>Deny</u>. Whalen was directly involved and attempted to influence

Barger's compensation upon his hiring. PSOF¶¶208, 212, 213.

48.   Whalen did not set Barger's work schedule. <u>Ex. 6</u> at 266:3-6.

**Plaintiff's Response:** Plaintiff objects. Assumes Barger had a set work scheduled to be

set that is not in evidence. Bisignano was Barger's employer for purposes of the FMLA.

<u>See</u> PSOF ¶¶190-213.

49.   Whalen did not maintain employment records for Barger. <u>Ex. 6</u> at 266:7-10.

**Plaintiff's Response:** <u>Deny</u>. Whalen was directly involved in the collection and

dissemination of employment records and participated in the planning of Barger's

termination and maintained records related to that participation. PSOF ¶190-213.

**50.**   Barger was not Whalen's direct report. ECF No. 1, Compl. ¶ 74.

> **Plaintiff's Response:** <u>Admit</u>.

**51.**   Defendant Rhonda Johnson was a Vice President of Human Resources, at First Data. She

began employment in August 2008. <u>Exhibit 16</u> at 15:5-20.

> **Plaintiff's Response:** <u>Admit in part</u>. Johnson was Vice President of Human Resources
>
> at all times relevant to this case. No evidence exists that she was a Vice President her
>
> entire tenure with First Data that began in 2008.

**52.**   Johnson's duties included partnering with First Data business executives to provide

strategic human resources advice, helping to manage a human resources support team, leading

organizational design and strategic workforce planning initiatives, and creating and

implementing talent management initiatives. <u>Ex. 16</u> at 18:12-22.

> **Plaintiff's Response:** <u>Admit</u> Johnsons duties <u>include</u>, but are not limited to the listing
>
> set forth above.

**53.**   In August 2015, Johnson began assisting Barger with HR support. <u>Ex. 16</u> at

29:20-32:1, 44:25-45:6.

> **Plaintiff's Response:** <u>Admit</u>.

54.   Johnson reported to Whalen. Ex. 16 at 35:19-23.

    **Plaintiff's Response:** Admit that all times relevant to this case, Johnson reported to

Whalen.

55.   Johnson did not hire Barger. Ex. 6 at 265:10-16.

    **Plaintiff's Response:** Admit.

56.   Johnson did not terminate Barger. Ex. 6 at 260:20; Ex. 15 at Response No. 1.

    **Plaintiff's Response:** Deny. See PSOF ¶¶216, 218, 219, 239

57.   Johnson did not set Barger's compensation. Ex. 6 at 261:2-14, 268:13-15.

    **Plaintiff's Response:** Deny. Johnson was directly involved in Barger's benefit

application process. PSOF¶¶224, 229, 240, 234.

58.   Johnson did not set Barger's work schedule. Ex. 6 at 260:21-25.

    **Plaintiff's Response:** Plaintiff objects. Assumes Barger had a set work scheduled to be

set that is not in evidence. Bisignano was Barger's employer for purposes of the FMLA.

See PSOF ¶¶214-239.

59.   Johnson did not maintain employment records for Barger. Ex. 6 at 261:23-262:10.

    **Plaintiff's Response:** Deny. Johnson was directly involved in maintaining employment

records as human resources liaison to Barger. DSOF ¶52 above. PSOF ¶¶ 219, 221, 225,

226

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF RULE 56 MOTION**    13

60. Barger was not Johnson's direct report. ECF No. 1, Compl. ¶ 74.

    **Plaintiff's Response:** <u>Admit</u>.


61. Jeffrey Hack was an Executive Vice President in GBS. <u>Ex. 13</u> at 22:2-8.

    **Plaintiff's Response:** <u>Admit</u> Jeffery Hack was an executive vice president in GBS for almost all relevant periods in this case. Mr. Hack was terminated by First Data while Barger was on leave. There is no evidence of the date of Mr. Hack's termination.


62. Hack reported to Charron and Bisignano. <u>Ex. 13</u> at 40:9-17.

    **Plaintiff's Response:** <u>Admit</u>.


63. Hack's employment with First Data ended in February 2017. <u>Ex. 2</u> at 119:21-120:3.

    **Plaintiff's Response:** <u>Deny</u>. There is no evidence of the exact date of Hack's termination. <u>Ex. 2</u> 120:4-23.


64. Hack reported to Charron. <u>Ex. 13</u> at 40:9-17.

    **Plaintiff's Response:** See response to ¶61 above.


65. From September 1, 2015, until his termination, Hack was Barger's direct supervisor. <u>Ex. 6</u> at 83:7-10; <u>Ex. 15</u> at Response No. 1; <u>Ex. 7</u>.

    **Plaintiff's Response:** <u>Deny in part.</u> Barger was forced to take FMLA leave on or about November 21, 2016. At the time of taking leave, Barger reported to Mr. Hack. Mr.

Hack's employment with First Data was terminated at some point between November 2016 and February 28, 2017, and no evidence has been produced as to the exact date of Mr. Hack's termination. When Ms. Ording became "interim leader" taking Barger's position while he was on leave (DSOF below), Ms. Ording reported to Marino (EVP HR). PSOF ¶167. Barger's reporting relationship while on leave is uncertain. Immediately prior to commencing leave, Barger reported to Hack, but upon his taking leave his position as leader of the sales training team, taken on an interim basis by Ms. Ording, reported to Marino.

66.    Robin Ording was hired by First Data in early 2015. <u>Exhibit 17</u> at 13:17-19.

      **Plaintiff's Response:** <u>Admit</u>.

67.    Her current position is Vice President of Talent Development. <u>Ex. 17</u> at 31:14-32:8.

      **Plaintiff's Response:** <u>Admit</u> based upon Plaintiff's belief that "her" is in reference to Robin Ording and her title had not changed since her deposition

68.    Ording's responsibilities include overseeing talent development and succession globally, and overseeing performance management practices, which includes goal setting, development planning, mid-year and end-of-year performance reviews, and philosophy and strategies around those practices, sales training, client referral programs, and feedback and psychometric tools. <u>Ex. 17</u> at 31:14-32:8.

      **Plaintiff's Response:** <u>Admit</u> Ordings duties <u>include</u>, but are not limited to the listing set

forth above.

**69.** Kathi Benhardt is a Vice President of Human Resources. Exhibit 18 at 14:19-20.

    **Plaintiff's Response:** Admit.

**70.** Benhardt has worked for the Company since 2005. Ex. 18 at 9:8-9.

    **Plaintiff's Response:** Admit.

**71.** Benhardt leads the Company's global workforce planning and analytics function.

Ex. 18 at 12:9-18.

    **Plaintiff's Response:** Admit.

**D.**    **Barger's Health Issues**

**72.** In or around February 2016, Barger was diagnosed with throat cancer. ECF No. 1,

Compl. ¶ 77.

    **Plaintiff's Response:** Admit.

**73.** Barger underwent radiation treatments from March 2016, until May 2016. ECF

No. 1, Compl. ¶ 77.

    **Plaintiff's Response:** Admit.

**74.** While he was receiving radiation treatment, Barger continued to work for First Data. ECF

No. 1, Compl. ¶¶ 101-110; Ex. 2 at 64:12-65:15; Ex. 17 at 30:3-6.

**Plaintiff's Response:** <u>Admit</u>.

75.   In August 2016, Plaintiff learned that he needed laryngectomy surgery. ECF No.

1, Compl. ¶ 111.

**Plaintiff's Response:** <u>Admit</u>.

76.   Because Bisignano suffered from the same type of throat cancer for which he underwent

surgery in 2010, Bisignano connected Barger with his physician, Dr. Lou Harrison. <u>Ex. 14</u> at

135:22-136:8; ECF No. 1, Compl. ¶ 98.

**Plaintiff's Response:**  <u>Admit</u>. <u>Bisignano has continued working for more than 8 years</u>

<u>following throat cancer surgery</u>.

77.   On September 6, 2016, Barger underwent surgery in Tampa, Florida. ECF No. 1,

Compl. ¶ 114.

**Plaintiff's Response:** <u>Admit</u>.

78.   In November 2016, Plumeri and Marino visited Barger to "cheer up [their]

friend." <u>Ex. 2</u> at 68:23-69:4.

**Plaintiff's Response:** <u>Admit</u> on of the reasons Plumeri and Marino state was the reason

for the visit was to "cheer up [their] friend." Plaintiff believes there were other motives,

such as evaluating the Plaintiff's health condition and ability to continue working.

79.   Marino was "very good friends" with Barger. <u>Ex. 2</u> at 68:23-69:17; <u>Ex. 6</u> at

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF RULE 56 MOTION**          17

173:13-15.

> **Plaintiff's Response:** <u>Admit</u> Marino testified that he was "very good friends" with
>
> Barger. <u>Deny</u> that Marino was "very good friends" with Barger. <u>See</u> this entire case.

**80.**   Barger testified that Marino and Plumeri visited him to "find out if I was okay."

<u>Ex. 6</u> at 163:14-23; <u>Ex. 2</u> at 71:13-18.

> **Plaintiff's Response:** <u>Admit</u>.

**81.**   After the visit, on November 8, 2016, Barger texted Marino, writing "Thanks for the

wonderful visit. Personal things are the only ones that count. . . . Love you Tony." <u>Exhibit 19</u>

at 1.

> **Plaintiff's Response:** <u>Admit</u>.

**82.**   In that same text message, Barger advised Marino that he required an additional

surgery, writing that he is "[g]oing in for additional repair surgery next week. 6 days in hospital.

4 weeks full recovery. Should be talking round Christmas time." <u>Ex. 19</u> at 1.

> **Plaintiff's Response:** <u>Admit</u> that Barger's text to Marino on November 8, 2016 contained
>
> the statement above. However, Barger did not have additional surgery as was contemplated
>
> in his November 8, 2018 text message. PSOF ¶327.

**83.**   After receiving the text message, Marino decided that Barger needed to concentrate on his

recovery. <u>Ex. 19</u> at 1; <u>Ex. 2</u> at 158:9-159:15.

> **Plaintiff's Response:** <u>Plaintiff objects</u>. <u>Ex. 19</u> at 1 does not indicate Marino's motivation or

reason for decision. Also, Ex. 2 does not contain deposition pages 158 or 159 to make a record of this assertion. Admit – Marino's decision was based on his perception of Barger's health condition.


**84.**   On November 18, 2016, First Data sent Barger a letter advising him that he would be transitioned to the Company's leave of absence and short-term disability programs. Exhibit 20; Ex. 2 at 90:3-92:21.

> **Plaintiff's Response**: Admit in part, deny in part. Admit Marino sent a letter dated November 18, 2016 to Barger, Exhibit 20 is not a complete copy of the letter dated November 18, 2016. See ECF No. 1 Exhibit D (which contains the second page of the letter not included in Exhibit 20). Deny that the referenced letter says he "would be transitioned" to leave and disability programs. The referenced letter says "we must now begin to transition you to our standard leave of absence programs. This includes your transition to our short-term disability program." Ex. 20. (emphasis added). The letter Ex 20, directed Barger to begin the process of stopping work.


**85.**   In the letter, Marino wrote Barger should "focus all of [his] time and attention on [his] recovery." Ex. 20.

> **Plaintiff's Response:** Deny. In the referenced letter, Marino wrote: "This will provide you with the ability to focus all of your time and attention on your recovery." Ex. 20. Admit Marino's decision was based on his perception of Barger's health condition.


**86.**   Enclosed with the letter sent to Barger on November 18, 2016, was First Data's

package of leave of absence and disability benefits application forms. <u>Ex. 20</u>.

    **Plaintiff's Response**:  <u>Deny</u>. Page 2 of the referenced letter (ECF Compl. Exhibit D at 2)

documents are listed as included with the letter. No evidence exists that those documents

were actually included or that Barger received those attachments with the letter.


**87.**    On November 21, 2018, Barger sent Marino a text message indicating that his

cancer may be fatal and inoperable. <u>Ex. 19</u> at 2.

    **Plaintiff's Response:** <u>Admit in part, deny in part</u>. Admit that the text message by Barger on

November 21 "Dr. Harrison at Moffit was very concerned about the lymph node cancer

being inoperable." <u>Deny</u> that Barger wrote in the text message anything about fatality. <u>Ex. 19</u>

at 2.


**88.**    Barger wrote: "I need to discuss my options with you and [Plumeri]. They need to be

transferred into my wife's name and make certain they are all issued. All my other accounts will

be in her name also. I need your help in getting my finances together. Dr. Harrison at Moffitt was

very concerned about the lymph node cancer being inoperable. Don't know length of time but

need your help for my family security." <u>Ex. 19</u> at 2.

    **Plaintiff's Response:** <u>Admit</u>. Plaintiff is assuming this is a reference to Barger's text on

November 21, 2016. The diagnoses as referenced in that e-mail was later determined to be

incorrect, there was no cancer in Barger's lymph system and no additional surgery was

necessary. PSOF ¶307


**89.**    Marino responded that "I will pull everything together ASAP." <u>Ex. 19</u> at 2.

**Plaintiff's Response:** Admit. Plaintiff is assuming the reference is to Marino's November 21, 2016 text.

90.    The very next day, on November 22, 2016, Marino followed up to Barger that Marino made a special arrangement for Barger to be paid his 2016 bonus on December 15, 2016, rather than in the first quarter of the following year when bonuses were normally paid. Marino had arranged for Barger to be paid his bonus, fully in cash without any equity component. Ex. 19 at 2; Ex. 2 at 87:3-88:15.

**Plaintiff's Response:** Admit in part, Deny in Part. Admit that a decision was made to pay Barger's bonus on December 15, 2016. No evidence exists to confirm or deny that Marino made these arrangements, only that he communicated the decision by "the Company." Ex. 2 at 87:10-14.

91.    No one else at First Data received their bonus early that year. Ex. 2 at 87:3-88:15.

**Plaintiff's Response:** Deny. Marino's testimony is that "Nobody in the company would have received **their** bonus, and **this** is 12/15." This is not evidence that "No one else at First Data received their bonus early that year." as asserted in this ¶ 91.C.f. Ex. 2 87:14-16.

92.    Barger also received 100% of his same bonus as the prior year, despite that the overall bonus pool was down 5% for other employees. Ex. 2 at 87:3-88:15; Ex. 13 at 79:15-24.

**Plaintiff's Response:** Deny. Plaintiff's bonus was supposed to be $250,000 in cash per year. See Ex. 7.

E.    **Barger's Family Medical Leave Act (FMLA) Leave**

**93.**  After Marino sent Barger the leave package, Johnson assisted him by answering

his questions about medical leave and assisted him with his various applications and forms. Ex.

16 at 122:1-23, 127:21-129:10, 139:15-140:1; Ex. 6 at 190:1-7.

> **Plaintiff's Response:** Admit. Johnson provided assistance to Barger in competing his leave
>
> request forms after November 18, 2016.

**94.**  First Data and Marino went above and beyond for Barger in order to support him

while he was ill. Ex. 2 at 87:3-88:15.

> **Plaintiff's Response:** Deny. Marino only testified that he believed First Data and Marino
>
> went above and beyond for Barger.

**95.**  On December 15, 2016, Barger received a payment in the amount of $174,000 for

his 2016 bonus. Ex. 11.

> **Plaintiff's Response:** Admit.

**96.**  On December 14, 2016, Barger returned to First Data the FMLA certification completed by

his physician, Dr. Harry Baddour, indicating that his period of disability began on October 22,

2016, with an expected return to work date of March 1, 2017. Exhibit 21 at 1-2.

> **Plaintiff's Response:**
>
> Deny. The certification was delivered directly from Dr. Baddour's office to First Data,
>
> and not delivered by Barger. Plaintiff's healthcare providers testified that they never
>
> talked to First Data, knew Barger was employed by Firs Data or knew Barger's job
>
> responsibilities. PSOF ¶¶ 303-305, 313-315. Plaintiff further denies that "disability" and

"leave" are synonymous terms. Many disabled individuals work without being on leave.

Dr. Baddour's nurse, Ashley Parish, testified that "March 1" on the form was not written

by her. PSOF ¶318-319. Defendants Exhibit 21 does not use the term "disabled" but

rather uses the defined the term "incapacitated" to mean "inability to perform regular

daily activities, to attend school, or to work because of the condition, treatment therefor,

or recovery therefrom. Ex. 21 at page 1. Dr. Baddour's office did not know the functions

of Plaintiff's position. PSOF ¶¶ 305,313-315. There is no evidence First Data provided

Dr. Baddour a listing of any functions of Plaintiff's position. Plaintiff's physician and

nurse did not know Plaintiff's job. ¶¶305,313-315. Plaintiff Barger continued to work on

First Data business daily from September 7, 2016 through November 21, 2017. PSOF

¶¶45-57

97.   On December 15, 2016, First Data sent Barger a letter approving Barger's request for

FMLA leave with a leave start date of October 24, 2016, consistent with the FMLA certification

provided by Barger. Exhibit 22.

> **Plaintiff's Response:** Admit that First Data sent Barger a letter approving FMLA leave
>
> with a start date of October 24, 2016 as a designation letter pursuant to 29 C.F.R. §
>
> 825.301. Deny that Barger himself submitted a certification. See response to ¶96 (Barger
>
> worked until November 21, 2017). Barger was forced onto leave and the leave request
>
> was submitted by First Data human resources to begin on November 21, 2017. Shearer
>
> Dec Ex 54

98.   The FMLA approval letter informed Barger that his 12 weeks of FMLA leave would

exhaust on January 16, 2017. Ex. 22.

> **Plaintiff's Response:** Admit. The FMLA designation letter pursuant to 29 CFR 825.301
>
> dated December 15, 2016 informed Barger that his 12 week FMLA leave began on
>
> October 24, 2016 (¶97 above) and exhausted on January 16, 2017.

99.  The FMLA approval letter advised Barger to contact MetLife to initiate the short-term
disability claims process. Ex. 22.

> **Plaintiff's Response:** Admit. The short-term disability application process did not begin
>
> prior to the FMLA approval letter dated December 15, 2016. Ex. 22. Deny for the
>
> following reasons.  Barger was required to seek disability payments. The demand for an
>
> application is subterfuge for collecting, without cause, Plaintiff's medical information.
>
> PSOF ¶¶330-335.

100.  On December 21, 2016, Jennifer Voycheske, First Data's Manager of Human Resources
Operations, contacted Barger to advise him that his accrued paid leave had exhausted, and he
would need to transition to short-term disability. Exhibit 23; Exhibit 24 at ¶ 10.

> **Plaintiff's Response:** Admit - Jennifer Voycheske sent and Barger received the e-mail
>
> on December 21, 2016 Exhibit 23. Deny - Accrued paid leave had exhausted at the times
>
> described in that e-mail. Shearer Dec. ¶ 134. The veracity of the Voycheske Declarations
>
> (Exhibit 24 & 26)  has been addressed by Plaintiff in the briefing of Plaintiff's Motion
>
> pursuant to Rule 72(a). ECF Nos. 64 & 74.

101.  Voycheske's duties and responsibilities include managing First Data employees' leaves of

absence, including but not limited to leaves under the FMLA and First Data's short-term and long-term disability plans. Ex. 24 at ¶ 5.

> **Plaintiff's Response**: Admit – Voycheske's duties included "managing" FMLA leaves of absence. See denial below. Deny – Voycheske's  duties included "managing" First Data's short-term and long term disability plans. First Data does not have a short-term disability plan. PSOF ¶¶330-335. Voycheske's "managing" amounted to data entry and tracking, but Voycheske did not have authority to determine working/non-working status of Barger. The veracity of the Voycheske Declarations (Exhibit 24 & 26)  has been addressed by Plaintiff in the briefing of Plaintiff's Motion pursuant to Rule 72(a). ECF Nos. 64 & 74.

**102.**  As part of these duties and responsibilities, Voycheske tracked available leave and leave taken, communicated with employees about their leave, pay and benefits, and coordinated with First Data's third party administrator, MetLife, which handles short-term and long-term disability claims for First Data. Ex. 24 at ¶ 5.

> **Plaintiff's Response**: Admit – Voycheske "tracked" available leave time and communicated with employees. Deny – Voycheske "coordinated" with third-party administrators. First Data does not have third-party administrators for its FMLA leave program. PSOF ¶334. First Data does not have a short-term disability plan PSOF ¶¶331, 332. Voycheske did not "coordinate" but asked questions of MetLife about disability benefits and looked at MetLife provided screens provided by MetLife. Ex. 24 at ¶15. The veracity of the MetLife screenshots referenced in Voycheske Declaration (Exhibit 24) has been addressed by Plaintiff in the briefing of Plaintiff's Motion pursuant to Rule

72(a). ECF Nos. 64 & 74. The veracity of the Voycheske Declarations (Exhibit 24 & 26) has been addressed by Plaintiff in the briefing of Plaintiff's Motion pursuant to Rule 72(a). ECF Nos. 64 & 74.

**103.** First Data has access to MetLife's database to monitor employees on leave. Ex. 24 at ¶ 15; Exhibit 25 at 62:21-63:4, 92:22-93-3.

   **Plaintiff's Response**: Deny – MetLife does not administer First Data's FMLA leave program and does not have a database monitoring First Data's employees on FMLA leave. PSOF ¶¶330-335. First Data does not have a short-term disability plan. PSOF ¶332. The veracity of the Voycheske Declarations (Exhibits 24 & 26) , in particular the "screenshots" from the MetLife interface, has been addressed by Plaintiff in the briefing of Plaintiff's Motion pursuant to Rule 72(a) [ECF Nos. 64 & 74] providing direct evidence and arguments that the "screenshots" are not what they purport to be and were not taken on the dates upon which they are claimed to have been taken. Objection. - Plaintiff sought Rule 30(b)(6) discovery on the information technology issues related to the interface with MetLife's systems and trice denied discovery on these issues without a Rule 26 motion for protective order ever being filed.. A telephonic hearing on Plaintiff's motion to compel such 30(b)(6) testimony was held with Judge Bloom on June 12, 2018 after which Judge Bloom denied Plaintiff's access to IT information regarding the interface with MetLife. A second Motion to Compel IT information regarding the information was denied by Judge Bloom on August 27, 2018, and Plaintiff's Motion pursuant to Rule 72(a) to compel discovery on this issue was denied.  [Motion to Compel 30(b)(6) depositions ECF Nos. 46, 48, 49; Minute Order 06/12/2108; ECF No. 55,

Minute Order 08/27/2018; Rule 72(a) Motion to Compel 30(b)(6) Witnesses ECF Nos.

64, 70, 74; Order on Rule 72(a) Motion ECF No. 86]   Plaintiff reasserts the remedy of

issue preclusion for First Data's failure to designate and produce Rule 30(b)(6) witnesses

on IT issues related to the MetLife interface as set forth in ECF 64 and 74.


**104.**   In her December 21, 2016, email to Barger, Voycheske advised Barger that he should

contact MetLife to approve his short-term disability payments, which would pay him

66.67% of his normal rate of pay. Ex. 23 at 4.

> **Plaintiff's Response**: Admit. On December 21, 2016, Barger had not contacted MetLife
>
> to apply for short-term disability benefits.


**105.**   Voycheske was familiar with Barger's leave of absence resulting from his surgery, which

began in the Fall of 2016. She communicated with Barger and his wife, Marilyn Barger, several

times in late 2016 and January 2017, about his leave and associated benefits. Ex. 24 at ¶ 6.

> **Plaintiff's Response**: Deny – On December 21, 2016, Voycheske was not familiar with
>
> Barger's position or leave of absence prior to November 21, 2017 when she didn't even
>
> know if Barger was a salaried or hourly employee. Shearer Dec Ex 138 ___There is no
>
> evidence that Ms. Voycheske communicated with Barger or his wife from the date of his
>
> surgery September 6, 2016 until November 2016. The veracity of the Voycheske
>
> Declarations (Defendants Exhibits 24 & 26)  has been addressed by Plaintiff in the
>
> briefing of Plaintiff's Motion pursuant to Rule 72(a). ECF Nos. 64 & 74.


**106.**   On January 5, 2017, Voycheske followed up on the December 21, 2016 email, informing


**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF RULE 56 MOTION**          27

Barger that First Data had not received notice from MetLife that his short-term disability payments had been approved. Ex. 23 at 4; Ex. 24 at ¶ 11.

> **Plaintiff's Response**: Admit that on January 5, 2017, Voycheske e-mailed Barger to discuss short-term disability and informed Barger that she had not received notice from First Data that MetLife had approved short-term disability payments. Deny that First Data has a short-term disability plan. PSOF ¶332 MetLife is not First Data's FMLA leave administrator. PSOF ¶334 Deny. Affirmatively assert that the Voycheske communications only related to short-term disability benefits, and none of them ratlate to Barger's status on FMLA leave.

**107.**  That same day, on January 5, 2017, Barger replied and advised Voycheske that MetLife had approved his short-term disability benefits, with a disability date of September 4, 2016, continuing through October 15, 2016. The disability date was new information to First Data. Ex. 23 at 2; Ex. 24 at ¶ 12.

> **Plaintiff's Response**: Deny. The date of Barger's surgery was known by First Data's executive management before it happened on September 6, 2016. Voycheskeke learning of the curgery date information does not change whether Barger was on leave or not on leave from September 6th through November 19th.
>
> On page 2 of Ex. 23, Barger sent an e-mail to Voycheske on January 5, 2017 at 3:07 p.m. indicating that "Ruth called and said she approved pay from 9/4 until 10/15." There is no indication that Barger was referring to short-term disability. Barger had received full-pay during the period from 9/4/16 to 10/15/16. On page 1 of Ex. 23 Barger wrote an e-mail to Voycheske on January 5, 2017 at 5:28 p.m. indicating his last day at work was 9/4 and

his operation was 9/6. Barger testified that his understanding of Ms. Voycheske's question of him was when the last day he went into the office was. The issue iof Barger's representation as to the meaning of "last day worked" is a question of fact for a jury. POF ¶336-341 . The veracity of the Voycheske Declarations (Exhibits 24 & 26) has been addressed by Plaintiff in the briefing of Plaintiff's Motion pursuant to Rule 72(a). ECF Nos. 64 & 74.

**108.** On January 5, 2017, Voycheske replied to that email: "Our records from your physician indicates you didn't start missing work until 10/22/16. When did you start missing work?" Ex. 23 at 1; Ex. 24 at ¶ 13.

> **Plaintiff's Response:** Admit the content of Voycheske's e-mail sent at 4:19 pm on January 5, 2017. Deny that the documents from the physician indicated that Barger missed work beginning on 10/22/16. Objection – the truth of the content of the physician's statement constitutes inadmissible hearsay. The veracity of the declaration of the Voycheske Declaration (Exhibit 24) has been addressed by Plaintiff in the briefing of Plaintiff's Motion pursuant to Rule 72(a). ECF Nos. 64 & 74.

**109.** On January 5, 2017, Barger wrote in response to Voycheske's question on when he "stopped working": "9/4. My operation was 9/6." Ex. 23 at 1; Exhibit 26 at ¶ 4.

> **Plaintiff's Response:** Deny. Ms. Voycheske's question of Barger was "Our records from your physician indicates that you didn't start missing work until 10/22/16. When did you start missing work?" Ex. 23 at page 1. Barger never indicated in this e-mail exchange that he had ever stopped working. Barger did not stop working until forced onto leave PSOF ¶¶45-

57. <u>Admit</u> Barger responded "9/4. My operation was 9/6." Barger testified that he believed the question to be when his last day was in the office, not a question of when he stopped working on First Data business.

**110.**  After receiving this new leave start date from Barger, Voycheske confirmed with MetLife that its records indicated that Barger stopped working as of September 4, 2016 for purpose of short-term disability. <u>Exhibit 27</u>; <u>Exhibit 28</u>; <u>Ex. 24</u> at ¶15; <u>Ex. 26</u> at ¶ 5.

**Plaintiff's Response:** <u>Deny</u>. Defendants' evidence only shows the date of Barger's surgery, nothing shows he was unable to perform the basic functions of his job, there fore he was not eligible for short-term siability and MetLife andaFirst Data had no business investigating his medical condition. PSOF¶¶12-15 The cited exhibits do not provide evidence Barger provided a "new leave start date" to Voycheske. On November 19, 2016, Barger did not want to take leave when forced by Marino when he texted Marino on that date "You are removing me from my job? I'm fired?" and "So does this mean I can't go to work and have meetings." <u>Ex. 19</u> at page 1 Voycheske's questions in <u>Ex. 23</u> are all related to short-term disability benefits not to FMLA leave. The leave start date of 10/24/16 was established in the leave designation letter dated December 15, 2016. <u>Ex. 22</u>. (Plaintiff disagrees with the 10/24/16 leave start date, leave could not have started until 11/19/16, at the earliest, when Marino sent the text message in <u>Ex. 22</u>) MetLife's records referenced by Defendants in this paragraph do not indicate Barger "stopped working." The MetLife records merely indicate the date of disability (which is the 09/04/16, the business day prior to Barger's surgery, not the same thing as the date he stopped working or the beginning of leave). <u>See</u> <u>e.g.</u>, <u>Ex. 28</u>. <u>See</u> <u>also</u> PSOF ¶¶45-57. Plaintiff repeats his assertions about the veracity of the Voycheske affidavits

set forth above.

111.  Based on Barger's email and MetLife's database, Barger's FMLA leave start date was

adjusted to September 5, 2016, the date after he indicated he stopped working. Exhibit 29;

Ex. 24 at ¶¶ 17-18; Ex. 26 at ¶ 4.

> **Plaintiff's Response:** Deny. As noted above, MetLife is not First Data's FMLA leave
>
> administrator. First Data does not have a short-term disability plan. The veracity of the
>
> Voycheske Declarations (Exhibits 24 & 26) has been addressed by Plaintiff in the
>
> briefing of Plaintiff's Motion pursuant to Rule 72(a). ECF Nos. 64 & 74. Barger did not
>
> request leave at all until forced on November 21, 2016. Barger waws workig September
>
> 6th through November 21st. PSOF ¶¶45-57

112.  Voycheske mailed a letter to Barger on January 5, 2017, advising him that his 12 weeks of

FMLA leave had expired on November 28, 2016. Ex. 29; Ex. 24 at ¶¶ 17-18.

> **Plaintiff's Response:** Deny. Judicial notice of the federal post office hours in Omaha may be
>
> taken. The post offices in Omaha were closed on Thursday, January 5, 2017 at the time Ms.
>
> Voycheske claims to have mailed the letter. Further, Barger did not receive the letter
>
> Voycheske purports to have sent. S.Barger Dec ¶58.

113.  Voycheske was authorized to adjust FMLA leave start dates. Ex. 25 at 85:13-20;

Ex. 24 at ¶ 21.

> **Plaintiff's Response:** Deny. See Plaintiff's Memorandum of Law in Support of his Motion
>
> for Summary Judgment and Plaintiff's Opposition to Defendants' Motion for Summary

Judgment. No one is legally authorized to adjust the date of commencement of leave once leave was designated by the letter dated December 15, 2016 (Ex. 22).

**114.** The January 5, 2017, letter advised Barger that additional leave was being requested from his business unit. Ex. 29; Ex. 16 at 180:24-181:11; Exhibit 30.

> **Plaintiff's Response:** Objection Ex. 16 does not contain pages 180 to 181. Deny – see response to ¶ 113 above. Admit that Exhibit 30 is an e-mail from First Data's leave management team to Mr. Hack dated December 15, 2016 advising Hack that Barger's leave was approved for the period of 10/24/16 through 01/16/17. Deny the letter of January 5, 2017 was ever sent by Voycheske or received by Barger. See Plaintiff's reponse to ¶112 above..

**115.** MetLife sent letters to Barger confirming September 4, 2016, as the date his disability began for purposes of short-term disability benefits. Exhibit 31.

> **Plaintiff's Response**: Deny. There is no evidence that these letters were sent or received. Plaintiff reasserts his objections set forth above regarding (i) MetLife not being First Data's FMLA administrator, (ii) First Data does not have a short-term disability plan; and (iii) disability and leave are not equivalent terms. Barger was not eligible for short-term disability because he was working (performing at least his basic duties) from September 6th through November 19th. PSOF ¶¶13-15; Shearer Dec Ex 29.

**116.** Barger never contacted Voycheske or anyone from First Data's leave management office about the adjusted FMLA leave commencement date of September 5, 2016. Ex. 24 at ¶ 20.

**Plaintiff's Response**: <u>Deny</u>. Plaintiff reasserts his response to ¶111 through 115. Barger

contacted Johnson on 01/10/16 to deliver his physicians return to work authorization which

was accepted by First Data and Barger set a return date of 01/17/17. <u>Exhibit 32.</u>

117.  On January 10, 2017, Barger submitted a return to work authorization signed electronically

by Ashley Parrish, RN, on January 10, 2017, indicating "Steven Barger is a patient of Dr. Harry

Baddour. He is cleared to return to work on 01/17/17 without any restrictions."

<u>Exhibit 32</u>.

**Plaintiff's Response:** <u>Admit</u>. Plaintiff further states that <u>Exhibit 32</u> was hand-delivered by

Barger to Johnson, and Johnson accepted the return to work authorization, in First Data's

Atlanta office around noon on January 10, 2017. PSOF ¶¶103-105.

F.    <u>Planning for the December 2016/January 2017 RIF</u>

118.  In mid-November 2016, First Data began planning a RIF. <u>Ex. 18</u> at 60:14-66:17;

<u>Ex. 2</u> at 165:3-166:15.

**Plaintiff's Response**: <u>Objection</u>. No page 60 to  page 66 are presented as part of <u>Ex. 18</u>.

<u>Objection</u>.  No pages 165 to 166 are presented as part of <u>Ex. 2</u>. <u>Objection</u> "RIF" is not

defined. <u>Denied</u> – First Data does not plan a "RIF", First Data is always planning

terminations and "restructurings," it was business as usual, and should be subject to the laws

as usual.. PSOF ¶¶240-275.

119.  In mid-November 2016, and continuing through December 2016 and January 2017, there

were multiple email discussions about including Barger in the RIF. <u>Exhibit 33.</u>

**Plaintiff's Response**: Deny. Exhibit 33 does not indicate that Barger was being included in a "RIF" in December 2016. Barger was merely included in a "roster of names." Ex. 33 at page 2. Admit "kw" on page 1 of Ex. 33 refers to Whalen and Benhardt, in discussing Barger writes "Put it in as cash But I will check with kw."

120.   Bisignano decided the late 2016 RIF had not achieved significant enough headcount expenses savings for the Company as part of his broader restructuring and turnaround plan and that additional position eliminations would be required. Ex. 18 at 118:4-21; Ex. 2 at 119:3-15; Ex. 14 at 191:5-192:16.

  **Plaintiff's Response:** Deny there was a "turnaround" plan – None of the cited exhibits indicate any "broader restructuring and turnaround plan". First Data did not need a turn-around, First Data recently announce it was being sold for $22 billion. Shearer Dec Ex 129.

  Deny – there are no "RIFs" at First Data, First Data is always terminating and hiring, and treating those actions as "restructuring for accounting purposes.  PSOF ¶¶250-252. Admit Bisignano was involved in the decision making for terminations. Plaintiff reasserts objections above as to the definition of "RIF".

121.   On January 5, 2017, Marino emailed his HR leadership team informing that "Today, [Bisignano] decided to reduce 10% of the headcount in the Top 3000." Exhibit 34.

  **Plaintiff's Response:** Deny. In Exhibit 34, after Marino indicated that a decision was made "to reduce 10% of the headcount in the Top 3000" he was asked whether this reduction would be measured by "HC or $" [headcount or dollars] and Marino responded "Good question." Admit the email chain in Exhibit 34 begins with Marino informing the HR

leadership team that "FJB" had made a decision regarding headcount – "FJB" being

Defendant Bisignano making a decision as to terminations.


**122.** The RIF's goal was to reduce annual expenses. <u>Ex. 2</u> at 18:12-19:16.

 **Plaintiff's Response:** <u>Deny</u>. <u>See</u> PSOF¶¶250-252.


**123.** The top 3,000 compensated employees were identified through a list using total

compensation. <u>Ex. 18</u> at 48:19-24.

 **Plaintiff's Response:** <u>Deny</u>. First Data is constantly "restructuring." PSOF ¶¶240-249. No

time frame is alleged as part of this fact allegation.


**124.** The RIF was to save between $45 to $50 million dollars in annual savings, which would be

an approximate 2% reduction in wage cost to First Data. <u>Ex. 2</u> at 19:13-22.

 **Plaintiff's Response:** <u>Deny</u>. RIF is an undefined concept (see above). First Data is

constantly "restructuring" and does no follow-up to determine whether any savings occur.

PSOF ¶¶240-249. The number of employees and independent contractors at First Data

fluctuates and the aggregate number of employees plus independent contractors has

increased. PSOF ¶¶253-265.


**125.** The 10% of the top 3,000 expanded on the RIF that began in November 2016. <u>Ex. 2</u> at

119:6-15.

 <u>**Plaintiff's Response**</u>: <u>Deny</u>. RIF is an undefined concept. First Data is always

 "restructuring" and there is no discernable break in firings and hirings (backfills). PSOF

¶¶240-275.

**126.** To execute on the RIF and its goals, GBS management developed lists of potential employees for the RIF in discussion with their HR partners. Ex. 13 at 73:15-21; Ex. 15 at Response No. 12; Exhibit 35 at Response No. 1.

**Plaintiff's Response:** Deny. See Plaintiff's responses to ¶118 to ¶125 above regarding the "RIF.".

**127.** In determining whether a GBS employee should be included in the RIF, GBS management looked at redundant roles, roles where different groups could be consolidated under single management, and layers of management that were not needed. Ex. 13 at 72:14-25, 88:3-10.

**Plaintiff's Response**:  Deny. Barger was terminated because he exercised his right to return from leave. PSOF¶1. See Plaintiff's responses to ¶118 to ¶125 above regarding the "RIF."

**128.** HR employees did not have the authority to determine which employees were included in the RIF, that decision making authority rested with GBS management. Ex. 13 at 97:3-9.

**Plaintiff's Response**: Deny. Human resources employees are intimately involved with information gathering and influencing GBS management organizational structure. See Defendants' allegations above. See also PSOF ¶¶172, 173, 182, 188, 195, 205, 206, 208-2011, 236-238

**G.    Review and Recommendation for the Sales Training Group**

**129.**  As part of the RIF, Patricia Hadler, SVP of Operations Internal Consulting, conducted a review of the Sales Training Group. Ex. 17 at 128:4-20.

> **Plaintiff's Response**: Objections – This statement of fact was a subject of Plaintiff's 30(b)(6) topics for which witnesses were not produced and motions to compel denied. Plaintiff further objects that the cited material assumes facts not in evidence.  Deny. Any Internal Consulting review of the Sales Training Group occurred after Barger's notice of termination. Admit, Had Barger been there for the review, the analysis may have been different and different decision may have been made (there is no evidence to the contrary). We will never know because of Barger's illegal firing how Hadler's study would have concluded if Barger had participated. The burden is on the Defendants.

**130.**  This analysis began in late 2016, and culminated in a report to Marino and the Management Committee on January 7, 2017. Exhibit 36.

> **Plaintiff's Response:** Deny. Exhibit 36 is not a final report, it is the beginning of a preliminary analysis of the sales training group. In that Exhibit, Benhardt clearly states "This one is a little different and not as cut and dry – I am guessing there was some sort of business realisgnment that happened which added to HC growth . . . I would need to spend a little more time on this to really tell you what he has done and why – but this is a start." The final report on sales training by IC was not completed until after Plaintiff was terminated. We will never know because of Barger's illegal firing how Hadler's study would have concluded if Barger had participated.

**131.**  Hadler's review followed Ording's review of the operations of the Group to improve its

performance, which included a review of its personnel. <u>Ex. 17</u> at 49:11-50:6.

**Plaintiff's Response**: <u>Admit</u> Ms. Hadler's review did not occur while Ms. Ording was "interim" head of sales training. <u>Ex. 17</u> 49:11-50:6. Ms. Hadler's review occurred after Plaintiff's notice of termination. <u>See</u> Plaintiff's response to ¶¶129 and 130 above. Barger was not available to discuss and influence Hadler's report (she worked with Ording, Barger' "interim" replacement) because he was forced by Marino to take leave that he did not want to take. The results had he been there for the analysis . . . We will never know. <u>See</u> response to ¶ 129 above.

**132.** Hadler's review recommended that there could be a total of $2.2 million in savings to First Data if the Group headcount was reduced from 71 to 55 employees. <u>Exhibit 37</u> at 2.

**Plaintiff's Response:** <u>Deny</u>. <u>Exhibit 37</u> is clearly labeled a draft. There is no testimony to authenticate <u>Exhibit</u> 37, or its contents, as a final recommendation by anyone.

**133.** Hadler's review recommended that the Group needed a leader "with strong learning & development background." <u>Ex. 37</u> at 2.

<u>**Plaintiff's Response**</u>: <u>Admit</u> – Hadler's recommendation and the date of that recommendation being after Barger's notice of termination and after the date on which Barger had requested to return to work. <u>Admit</u> Hadler recommended that First Data "Identify a leader with a strong learning & development background. . ." <u>Ex. 37</u> at page 2. Ms. Ording does not have a learning and development background. <u>Shearer Dec Ex 9</u> at 20:5-7 (Ording testifies she does not have education in education)

**134.**  Hadler's analysis revealed that the Group under Barger's leadership had ballooned since he had taken over, with a headcount increase of 46%, had a high attrition rate of 47%, and was operating inefficiently. Ex. 36; Ex. 2 at 136:23-137:18.

**Plaintiff's Response**:

Deny - In Ex. 36 Hadler states that "this one is a little different and not as cut and dry – I am guessing there was some sort of business realignment that happened which added to his HC [head count] growth . . . . I would need to spend a little more time on this to really tell you what he has done and why – but it is a start." Barger's head count grew because he took on responsibility for the sales training group, in addition to his sales transformation duties for which he was hired, after Brian Fricke left First Data in late 2014. PSOF ¶¶31-37. We will never know due to the illegal firing.


**135.**  Marino forwarded Hadler's analysis to Bisignano, stating that he would reduce the headcount by 25 employees to return the group to its "core mission." Exhibit 38.

**Plaintiff's Response:** Deny. See Plaintiff's response to ¶130 above. Marino forwarded Hadler's preliminary numbers that required more time to "really tell" what had happened with the head count. Hadler did not include the absorption of Fricke's group in her preliminary analysis. Ex. 38. See also Plaintiff's responses to ¶¶129-134 above.


**H.**      **Barger's Position is Eliminated in the RIF**

**136.**  136. Following the directive from Bisignano, Charron and Hack worked together to identify GBS employees for the RIF involving 10% of the top 3,000. Ex. 13 at 89:11-90:8.

**Plaintiff's Response:**  Deny. There is no evidence of the date of Hack's termination. See

Plaintiff's responses above. There is no authentication that Hack was involved, Charron was

unable to identify Hack's involvement. Ex. 13 at 89:11-90:8.


**137.** On January 9, 2017, Hack moved Barger to the "confirmed" category of his RIF

list for his direct reports. Exhibit 39.

> **Plaintiff's Response:** Deny. Hack was informed of Barger's intent to return in December
>
> 2016. PSOF ¶119. See Plaintiff's response to ¶136 above. Benhardt testified that because
>
> lists of terminations are fluid, an individual is not included in a reduction until they are
>
> notified. PSOF ¶266-267.


**138.** Charron approved the decision to include Barger, and Hack's other direct reports,

in the RIF. Ex. 13 at 98:10-11, 123:14-18; Ex. 15 at Response No. 1; Exhibit 40 at Response No.

1; Exhibit 41.

> **Plaintiff's Response:** Admit & Deny. Charron, and others participated and directed the
>
> firing of Barger. PSOF 166-239, see also Plaintiff's response to ¶¶136 and 137 above.


**139.** First Data eliminated Barger's position because the Company did not need an

SVP level employee making a salary of $480,000, with up to $250,000 in bonus compensation,

running the Group. Ex. 15 at Response No. 1, No. 3; Ex. 2 at 186:3-20.

> **Plaintiff's Response:** Deny. Plaintiff's position was not eliminated. Barger's responsibilities
>
> for the sales training group were transferred to Ording. PSOF ¶268-269. Also on the same
>
> date, of Barger's termination, First Data hired E.J. Jackson, who became a senior vice
>
> president reporting to Charron – Barger's  salary and title within Charron's GBS group

transferred to Jackson. PSOF ¶¶292-296. Barger's salary, title, and responsibilities all remained at First Data. Barger was terminated because he exercised his right to return from leave. PSOF ¶1.

**140.** First Data eliminated Barger's position because it was not a necessary position to accomplish the business objectives of the Company. Ex. 2 at 31:25-32; Exhibit 42.

 **Plaintiff's Response:** Deny. Seep Plaintiff's response to ¶139 above. Barger's position was necessary, it is why Ording assumed it. Restructuring of positions in the absence of an employee on FMLA leave with restoration of that employee to his position or an equivalent position violates the FMLA.

**141.** Ultimately, 24 employees in the Group were terminated as part of this restructuring, including Barger. Exhibit 43; Ex. 17 at 26:4-9; Ex. 2 at 142:16-143:25.

 **Plaintiff's Response**: Deny Defendant's refused in discovery to identify the "others" that were included in the termination described in First Data's Position Statement filed with the EEOC. Objection, the answer to this issue could have been obtained by Plaintiff through the conduct of Rule 30(b)(6) depositions, compulsion of which was denied. All terminations in the Group, other than Barger, occurred after Barger's termination. Admit, as alleged, First Data uses the term "restructuring" to refer to termination events.

**142.** There are currently 28 or 29 employees in the Group. Ex. 17 at 26:7-9.

 **Plaintiff's Response:** Admit.

**143.**  A total of 362 employees were terminated as part of this RIF. Exhibit 44 at 2.

**Plaintiff's Response:** Deny. Plaintiff reasserts his objections that RIF is not defined and incorporates his responses to ¶¶136-141 above.

**144.**  A total of 26 employees at Barger's level (L-6) were terminated as part of this RIF. Ex. 44 at 2.

**Plaintiff's Response:** Deny. Ex. 44 at 2 does not reflect 26 employees at Barger's level (L-6) as being terminated. Plaintiff reasserts his objections that RIF is not defined and incorporates his responses to ¶¶136-141 above.

**145.**  The RIF was projected to save $43,684,044 in annual base and fringe expenses. Ex. 44 at 3.

**Plaintiff's Response:** Admit. In February 2017, the OA Impact analysis (Exhibit 44) projected 2017 savings. Deny that any savings were realized because First Data does not track actual savings to projected savings. PSOF ¶¶250-265. Plaintiff reasserts his objections that RIF is not defined and incorporates his responses to ¶¶136-141 above.

**146.**  Due to RIFs, First Data employee headcount fell by 2,000 during the years 2016-2017, even though the Company acquired several companies during that time. Exhibit 45 at 21:9-17, 42:4-8, 48:14-25.

**Plaintiff's Response:** Deny. See PSOF ¶¶240-265. Bisignano testified that with the combination of employees and independent contractors, actual headcount increased. Backfilling of positions in common place at First Data, meaning terminations are quickly replaced with new

hires to perform the same function.. PSOF ¶¶255-267

**147.** First Data's RIFs in 2015, 2016, and 2017 resulted in a 2.70% increase in earnings before interest, tax, depreciation, and amortization during that period. Ex. 1 at 36.

    **Plaintiff's Response**:  Deny. Through backfilling of positions and use of independent contractors, savings were not realized. PSOF ¶250-265. First Data does not track or report on results of actual results compared to projections. PSOF¶¶250-265. First Data's assertion that "RIFs" have occurred in three straight years demonstrates Plaintiff's contention that there is no such thing as a "RIF" at First Data. PSOF ¶¶240-249 Plaintiff reasserts his objections that RIF is not defined and incorporates his responses to the paragraphs above.

**148.** Barger testified that RIFs are a business strategy used by many companies as a management tool but that he disagreed with them. Ex. 6 at 112:16-113:18.

    **Plaintiff's Response**: Admit Barger provided that testimony. Objection - Relevance– other companies practices are irrelevant to the case at hand. Plaintiff reasserts his objections that RIF is not defined and incorporates his responses above.

**149.** Barger's FMLA leave played no role in the decision to include Barger in the RIF. Ex. 15 at Response No. 3; Ex. 6 at 160:20-22.

    **Plaintiff's Response:** Deny. Exactly the opposite, Plaintiff's exercise of his right to return from leave was the motivating factor in terminating Barger. PSOF ¶ 1. Plaintiff reasserts his objections that RIF is not defined and incorporates his responses to ¶¶136-148 above.

**150.** Barger's disability played no role in the decision to include Barger in the RIF. <u>Ex. 15</u> at Response No. 3; <u>Ex. 6</u> at 160:3-14.

> **Plaintiff's Response:** <u>Deny</u>. Plaintiff reasserts his objections that RIF is not defined and incorporates his responses above. Plaintiff's disability was the sole cause of Plaintiff being forced onto unrequested leave by Marino. <u>See</u> PSOF ¶1

**151.** Marino testified that First Data had 95 employees who were working under some form of reasonable accommodation in order to allow them to perform the essential functions of their jobs. <u>Ex. 2</u> at 45:12-19.

> **Plaintiff's Response:** <u>Admit</u> that Marino testified as indicated. There are more than 22,000 employees at First Data (¶___ above) – simple math (95/22,000) concludes that less than 0.43% of First Data employees are disabled and requesting accommodations. The Court may take judicial notice of Census Bureau statistics demonstrating that nearly 20% of the United States population is disabled (i.e. disability appears in the general population 46 times more often than it does in First Data's work force).
>
> https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html

**I. <u>Barger's Notification of his Position Elimination</u>**

**152.** Marino directed Johnson to inform Barger that his position had been eliminated. <u>Ex. 16</u> at 209:25-210:2; <u>Ex. 2</u> at 218:12-18.

> **Plaintiff's Response:** <u>Deny</u>. Marino direct Johnson to contact Barger and notify him that he was terminated. Defendants admit that not writings exist sent to Barger that indicated that he was included in the "RIF" until after this litigation commenced. In <u>Ex. 16</u> at 209:25-210:2

Johnson only testifies that she was directed to call Barger to terminate him, she never testifies

that she was directed to inform him that his position was eliminated. Plaintiff's position was

not eliminated. <u>See</u> Plaintiff's response to ¶139 above.  Plaintiff reasserts his objections that

RIF is not defined and incorporates his responses above. <u>Objection</u> – <u>Ex. 2</u> attached does not

contain a page 218 and the reference in Defendants' allegation is unsupported.


**153.**  On January 13, 2017, Johnson called Barger around 6:00 p.m. and informed Barger that his

position of SVP, Sales Transformation had been eliminated. <u>Ex. 16</u> at 208:19-25,

209:6-8; <u>Ex. 6</u> at 155:2-3.

> **Plaintiff's Response:** <u>Deny</u>. Johnson only testified that she called Barger around 6:00 p.m.
>
> There is no testimony that Johnson informed Barger that he was included in a "RIF".
>
> Plaintiff's position was not eliminated. <u>See</u> Plaintiff's responses above.


**154.**  Barger acknowledged that his job had been eliminated. <u>Exhibit 46</u>.

> **Plaintiff's Response**: <u>Objection</u> – <u>Exhibit 46</u> unauthenticated. <u>Deny</u>. In <u>Exhibit 46</u> Barger
>
> merely repeats the inaccurate information provided to him by Johnson. Barger's position was
>
> not eliminated.  <u>See</u> Plaintiff's response to ¶139 above.


**155.**  Barger was placed on non-working notice until February 28, 2017, the effective date of his

termination. ECF No. 1, Compl. ¶ 166(b); <u>Ex. 7</u> at 6.

> **Plaintiff's Response:** <u>Deny</u> <u>Ex. 7</u> at 6 referenced in the statement indicates Barger's
>
> termination date was 02/27/2017. This is inaccurate. <u>Admit</u>. Barger was notified on January
>
> 13, 2017 that he was not to return to work as planned on January 17, 2017 and that his last

day on First Data's payroll was February 28, 2017. Placement of an employee returning from

FMLA leave into a job slated for lay-off violates the FMLA. 29 C.F.R.§ 825.216(a)(1).

**156.** While on non-working notice from January 16, 2017, through February 28, 2017, First

Data restored Barger's compensation. Exhibit 47.

    **Plaintiff's Response:** Admit in part, Deny in part. Exhibit 47 accurately represents Barger's

    payroll records. Barger was on non-working notice. The amounts paid by First Data,

    therefore, were not "compensation" for Plaintiff's labor during this period.

**157.** Barger's last date of employment at First Data was February 28, 2017. ECF No. 1,

Compl. ¶ 166(b).

    **Plaintiff's Response:** Admit.

**158.** Barger does not believe that he was terminated because he took leave. Ex. 6 at

160:20-22.

    **Plaintiff's Response:** Deny. Taking leave and returning from leave are two sides of the same

    coin. Barger was terminated for attempting to return from leave. PSOF ¶1.

**159.** Barger does not believe he was terminated because he had cancer. Ex. 6 at 160:3-14.

    **Plaintiff's Response**:  Deny. Plaintiff believes that he was terminated for exercising his right

    to return from leave.

**160.** Barger filed the lawsuit because "I know I wanted to come back to work and

wasn't allowed to." Ex. 6 at 224:21-22.

    **Plaintiff's Response**: Admit. Barger testified as quoted.


**161.**  Barger sued the individual Defendants because "I needed -- I needed to find out. I wanted

whoever is responsible for not allowing me to come back to work, and that's why I had no idea

who it was, so that's why." Ex. 6 at 94:12-15.

    **Plaintiff's Response:** Ex. 6 at 94-12-15 called for Barger to make a legal conclusion. Barger

    sued the individual Defendants because they were his employers as alleged in the Complaint

    ECF No. 1. See PSOF 147-239


**162.**  Barger refused to voluntarily dismiss his FMLA claims against individual defendants

Bisignano, Whalen, and Johnson after it was pointed out that he had failed to generate any facts

to support claims against them as "employers" under the FMLA, 29 U.S.C. § 2611. Ex. 14 at

263:2-264:8; Ex. 12 at 143:145:10.

    **Plaintiff's Response:** Deny. Bisignano, Whalen and Johnson are employers for purposes

    of the FMLA. PSOF ¶¶147-239. Objection – Counsel's on the record statements in Ex.

    14 at 263:2-264:8and Ex. 12 at 143:145:10. are not admissible sworn statements. See

    PSOF and above objections, all named Defendants are employers.


**163.**  During negotiations over Barger's severance package, First Data offered him a payment for

100% of the cash value of his unvested equity. Ex. 2 at 208:13-209:9.

    **Plaintiff's Response**: Deny. All offers during negotiations of severance are inadmissible

    under FRE 406 and all offers were presented as an aggregate cash amount comprised of

numerous components, one of which was equity value. Had Barger remained on long-term

disability instead of attempting to return to work, his unvested equity would have vested and

he would have received the value of those shares.

**J. Ording Assumes Barger's Sales Training Duties**

**164.**  After Barger's position was eliminated, Ording (who had assumed Barger's duties

temporarily following his surgery) assumed Barger's sales training responsibilities on a full-time

basis in addition to her preexisting full-time job duties. Ex. 2 at 32:13-18; Ex. 40 at Response

No. 3; Ex. 35 at Response No. 3.

> **Plaintiff's Response:** Deny. This statement in ¶164  is internally contradictory. Barger's
>
> position could not have been eliminated if his responsibilities remained to be assumed. See
>
> Plaintiff's Response to ¶ 139 above.

**165.**  Barger's "sales transformation" duties were moved across other parts of the Company that

focus on the culture of sales. Ex. 17 at 41:5-17.

> **Plaintiff's Response**: Admit in combination, ¶164 and this ¶165 demonstrate Defendants''
>
> admission that Barger's duties and responsibilities were not eliminated, but were distributed
>
> as part of a restructuring. See **29** C.F.R. §825.14 ("An employee is entitled to such
>
> reinstatement even if the employee has been replaced or his or her position has been
>
> restructured to accommodate the employee's absence.")

**166.**  Ording restructured the sales training process by, for example, redesigning orientation to an

adult learning style that extends over a six-month period, implementing new continuing

education programs for the sales force, increasing the focus on sales solutions training, and

decreasing costs by moving from Barger's expensive third-party training program

to a more cost-effective in-house program. Ex. 17 at 43:12-45:6.

> **Plaintiff's Response**: Deny.

**167.**  Ording assumed Barger's sales training duties without an increase in her base salary of

$250,000 in 2016, and 2017. Ex. 17 at 12:20-24.

> **Plaintiff's Response**: Deny. No evidence exists as to Ording's salary before Barger's
>
> termination. The referenced Ex. 17 at 12:20-24 merely indicates Ording's base salary as of
>
> the date of her deposition in this case.

### K. Barger's Failure to Mitigate

**168.**  Barger did not apply to a single job following his termination from First Data. Exhibit 48 at

Response No. 20; Ex. 6 at 276:12-277:1

> **Plaintiff's Response**: Deny. Exhibit 48 at Response No. 20 indicates Barger attempted to
>
> rekindle his consulting business. Barger's testimony Ex. 6 276:3-9 indicates Barger used his
>
> Wall Street contacts (SVP's with 30 plus years of Wall Street experience do not "apply" for
>
> jobs, the use their network as Mr. Barger testified.)See also Barger Dec ¶15

**169.**  "Plaintiff attempted to restart his consulting business" by starting a consulting business

named "Barger Consulting." Ex. 48 at Response Nos. 20, 23.

> **Plaintiff's Response:**  Deny. Plaintiff has restarted his consulting business and is operating a
>
> a sole proprietor under the dba Barger Consulting. Ex. 48 at Response Nos. 20, 23.

**170.**  Barger searched for clients for his consulting business for 4 months after he was

terminated, from March 2017, through June 2017. Ex. 48 at Response No. 20.

    **Plaintiff's Response:** Admit and Supplement. Ex. 48 is Barger's interrogatory responses.

Barger continued his efforts to obtain additional consulting clients throughout 2017 and

2018. Barger's consulting revenue in 2018 were approximately $125,000. Barger Dec ¶70.


**171.**  Barger obtained work from only one client, Oasis Outsourcing Inc. Ex. 48 at

Response No. 20.

    **Plaintiff's Response:** Deny. See Plaintiff's response to ¶170 above.


**172.**  For 2017 Barger Consulting earned $61,263 in revenue from Oasis Outsourcing

Inc. Exhibit 49.

    **Plaintiff's Response:** Admit and Supplement. Barger continued his efforts to obtain

additional consulting clients throughout 2017 and 2018. See response to ¶170 above.


**173.**  For 2012 Barger reported on his Schedule C federal tax return business revenue of

$15,602. Exhibit 50.

    **Plaintiff's Response:** Admit in Part and Deny In Part. Exhibit 50 is a true and correct copy

of Barger's 2012 Schedule C and reflects Barger's profit and loss from business of $15,602.

During 2012, Barger was an independent contractor for The Barger Consulting Group, LLC

owned by Barger's son. During 2012, Barger generated revenue of $_____ for the Barger

Consulting Group. See PSOF ¶¶ ___ regarding revenue generated by Barger in 2012.

**174.** For 2013 Barger reported on his Schedule C federal tax return business revenue of $16,210. Exhibit 51.

> **Plaintiff's Response:** Admit in Part and Deny In Part. Exhibit 50 is a true and correct copy of Barger's 2013 Schedule C and reflects Barger's profit and loss from business of $16,210. During 2013, Barger was an independent contractor for The Barger Consulting Group, LLC owned by Barger's son. During 2013, Barger generated revenue of $325,000 for the Barger Consulting Group.

**175.** For 2017, Barger Consulting reported business revenue of $61,263. Exhibit 52.

> **Plaintiff's Response:** Admit. Plaintiff was terminated from employment with First Data effective February 28, 2017. The revenue reflected in Exhibit 52 is the consulting revenue earned by Barger during 2017 as a consultant operating as Barger Consulting, a sole proprietorship during.

DATED:        February 4, 2019

                              THE LAW OFFICE OF SHAWN SHEARER, P.C.

                              _____/s/ Shawn Shearer_____
                              SHAWN SHEARER
                              3839 McKinney Ave. #155-254
                              Dallas, TX 75204
                              (972) 803-4499
                              *shawn@shearerlaw.pro*

                              ZEITLIN & ZEITLIN, P.C.

                              _____/s/ David Zeitlin_____
                              DAVID ZEITLIN
                              50 Court Street, Suite 506
                              Brooklyn, NY 11201
                              (718) 596-6815
                              *david@zeitlinlawfirm.com*

Attorneys for Plaintiff
Steven B. Barger