# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

STEVEN B. BARGER,

              Plaintiff,

v.

FIRST DATA CORPORATION, *et al.*,

              Defendants.

Civil Case No. 1:17-cv-04869-FB-LB

## DEFENDANTS' LOCAL RULE 56.1(b) OPPOSITION TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND COUNTERSTATEMENT OF MATERIAL FACTS

Under Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1(b),

Defendants First Data Corporation, Frank Bisignano, Dan Charron, Anthony Marino, Karen

Whalen, and Rhonda Johnson submit this Local Rule 56.1(b) Opposition to Plaintiff's Statement

of Undisputed Material Facts (PSOF) and Counterstatement of Material Facts.[1]

## OPPOSITION TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.  Key Facts

1.     Marino testified that Barger was terminated because "he was returning" from leave to

come back to work to earn his salary. Exhibit 8 at 209:25-211:14.

**Response**:       Disputed. The deposition testimony speaks for itself and contains no such

statement by Marino. In the passage cited by Barger, Marino discussed the severance packages

---

[1] Defendants apologize to the Court for the length of this document. The purpose of a Statement of Material Facts is to set forth non-argumentative facts that are supported by evidence. Because of the innumerable false, misleading characterizations of testimony, and recasting of facts by Barger, Defendants were forced to correct the record so that the Court would not be misled by facts Barger claims are not disputed for more than 50 statements. *See, e.g.*, Responses to ¶¶ Nos. 41, 116, 137, 150, 151-54, 165, 170-73, 177, 179-82, 193, 194, 197-99, 202, 204, 206, 209, 220, 221, 223, 224, 226-28, 234, 236, 238, 240, 241, 244, 247, 252, 253, 255, 261, 263, 272, 278-83, 290, 291, 329. Many of Barger's Statement of Facts were also repetitive. The facts are admitted for purposes of this motion only.

that had been offered to Barger, including the Company's final severance offer, which was in excess of $900,000. Pl. Ex. 8 at 208:13-211:22.

2.     Bisignano, CEO of First Data" [sic[2]] testified that First Data is always restructuring and always making adjustments. Ex 3 103:21-107:10[.]

**Response**:     Admitted.

3.     Bisignano testified that he is recruiting new employees every day and "I [Bisgnano] [sic] don't wait for jobs to be open to be talking to people." Ex 3 122:17-18.

**Response**:     Admitted in part, objection in part. **Immaterial**. The cited evidence misquotes Bisignano's testimony. Pl. Ex. 3 at 122:17-18. ("I don't wait for jobs to open up to be talking to people.").

**B.     First Data's Policies**

4.     First Data's Employee Handbook provides that First Data's FMLA leave policy provides that when an owner-associate (i.e. employee) is on FMLA, the job is protected. Ex 8 at 60:561:4; Ex 15 at 8-14 (labeled page 47 through 53 of 71).

**Response:**     Admitted that the FMLA policy states that it will be enforced "in accordance with any applicable federal and/or state law." Pl. Ex. 15 at 49/71. Federal laws and regulations do not provide absolute immunity and job protection during FMLA leave. *See* 29 U.S.C. § 2614(A)(3); 29 C.F.R. § 825.216(a)(1).

5.     First Data's Employee Handbook provides that the company may change an employee's job responsibilities or compensation at any time. Ex 8 at 30:13-31:15; Ex 15 at 3 (labeled page 7 of 71)[.]

**Response:**     Admitted. **Immaterial**.

---

[2] Plaintiff's Rule 56.1 Statement of Material Facts is replete with typographical errors, which Defendants have noted with a [sic] so as to not confuse the Court as to the accuracy of the recited paragraphs from Plaintiff's SOMF.

6.      First Data's Employee Handbook recognizes First Data's obligation to reasonably accommodate those employees with disabilities. Ex 15 at 2 (labeled page 6 of 71)[.]

**Response:**      Admitted.

7.      First Data's Employee Handbook provides that exempt employees are entitled to receive their full salary for any work week in which they perform any work, regardless of the number of days or hours worked in that work week. Ex 8 at 40:16-45:5; ; [sic] Ex 15 at 4 (labeled page 6 of 72)[.]

**Response:**      Admitted. **Immaterial**.

8.      Barger was an exempt employee for purposes of First Data's Employee Handbook. Ex 8 at 40:25-41:6[.]

**Response:**      Admitted. **Immaterial**.

9.      First Data's US Family Medical Leave policy provides that when an owner-associate (i.e. employee) is on FMLA leave, the employee's job is protected. Ex 16 at 2.

**Response:**      Defendants incorporate their response to PSOF ¶ 4.

10.     First Data's US American's with Disabilities Act policy provides that if an owner-associate is not eligible for FMLA leave, First Data may provide a "reasonable accommodation" in a form that may extend, or be in addition to, other leave. Ex 17 at 1[.]

**Response:**      Admitted.

11.     First Data's ADA policy provides for "job restoration to the same or equivalent position upon return from approved leave." Ex 17 at 1[.]

**Response:**      Admitted.

12.     First Data prepared and distributed a Health and Life Benefits Summary Plan Description ("SPD") to its employees describing, in part, its short-term disability benefits. Ex 65.

**Response:**     Admitted that the SPD is made available by First Data. **Immaterial**.

13.    The SPD provides under the "Eligibility for Benefits Section" that:

>   To receive STD [short-term disability] benefits, you must have an illness or injury that prevents you from being able to perform the <u>basic</u> duties of your job.

<u>Ex 65</u> at p.8 of exhibit (p.196 of SPD)(emphasis added).

**Response:**     Admitted. **Immaterial**.

14.    The SPD provides under the "When Benefits Begin" section that:

>   Before the STD Plan pays benefits, you must be disabled <u>and unable to work</u> for the longer of: 14 days or the number of days you are eligible for benefits under your business unit's sick leave/sick bank.

<u>Ex 65</u> at p. 9 of exhibit (p. 197 of SPD) (emphasis added).

**Response:**     Admitted. **Immaterial**.

15.    The SPD provides under the Long-Term Disability -Additional Plan Rules section that:

>   Before the LTD [long-term disability] plans pay benefits, you must be disabled <u>and unable to work</u> during the entire "elimination period" which begins on the first day of your total disability. Your elimination period is 90 days. If you return to work during the elimination period for more than 4 hours, that period is considered a day of work and does not count towards your satisfying the elimination period.

<u>Ex 65</u> at p.15 of exhibit (p. 203 of SPD)(emphasis added)[.]

**Response:**     Admitted. **Immaterial**.

**C.    <u>The Plaintiff - Pre-employment with First Data to December 2015</u>**

16.    Plaintiff was born in September 1944. Admitted in ¶ 30 Answer [ECF No. 19] to ¶30 of

the Complaint [ECF No. 1] ("Complaint and Answer" or "C&A")[.]

**Response:**     Admitted. **Immaterial**.

17.    Prior to being hired by First Data, Plaintiff's career included 40 years of experience as an

executive in the financial services industry and as a consultant to major financial institutions.

S.Barger Dec. ¶ 1 to 8[.]

**Response:**     Admitted. **Immaterial**.

18.     From early 2011 through June 2014 Barger worked as a consultant with his billings paid

to The Barger Group, LLC and billed approximately $25,000 per month for his services between

January 1, 2011 and June 30, 2013. Ex 121 at p.2-3, Respo17:nse to Interrogatory 17.; S.Barger

Dec. ¶10[.]

**Response**:     Disputed. Paragraph 10 of Barger's Declaration contradicts Barger's deposition

testimony: "I was making 20, 25,000 a month." *See infra* Defs. 56.1(b) Cntr. Stmt. ¶ 4 (emphasis

added).

19.     In January 2014, Barger was serving as an independent contractor working for The

Barger Group and made a presentation to Lebenthal Holdings management committee. S.Barger

Dec. ¶ 11 to 12.

**Response:**     Admitted. **Immaterial**.

20.     Barger proposed compensation for his consulting services to Lebenthal as the following:

a one-time fee for intellectual property ($60,000), a two-year consulting retainer of $20,000 per

month, and on-going advisor fee of $1,000/month/team and reimbursement of travel expenses.

S.Barger Dec. ¶11; Ex. 18 at 3.

**Response:**     Admitted. **Immaterial**.

21.     Mr. Joe Plumeri ("Plumeri"), Vice Chairman of First Data, was a member of Lebenthal's

board of directors and learned of Mr. Barger's presentation. S.Barger Dec ¶12[.]

**Response:**     Admitted. **Immaterial**.

22.     Plumeri approached Barger to consider consulting for First Data instead of consulting for

Lebenthal and proposed a consulting fee of $30,000, and Barger verbally agreed to that

arrangement with Plumeri acting for First Data. S.Barger Dec ¶12[.]

**Response:**     Disputed. Barger's consulting fee of $30,000 was set at that amount after Barger told Plumeri he was *making* $20,000 to $25,000 per month. *See infra* Defs. 56.1(b) Cntr. Stmt. ¶¶ 4-5. By way of further response, Barger was not making $20,000 to $25,000 per month, because in 2013 he made a total of $16,210 in consulting income. Defs. 56.1 Stmt. Ex. 51.

23.     Barger and Plumeri had worked together for more than three decades as executives at major Wall Street financial firms. S.Barger Dec ¶ 14 to 15; Ex 11 at 93:4-8[.]

**Response:**     Admitted. **Immaterial**.

24.     Barger commenced his consulting work for First Data in January 2014 by doing preliminary work to understand the company and prepare of [sic] plan of action and statement of work. S.Barger Dec ¶13.

**Response:**     Admitted. **Immaterial**.

25.     The statement of work was reduced to writing. Ex. 19[.]

**Response:**     Admitted. **Immaterial**.

26.     The scope of consulting work are set forth in Ex 19 and included company-wide, not just sales training, activities and transformation around changing the culture inside of First Data's entire operation. S.Barger Dec ¶17[.]

**Response:**     Admitted. **Immaterial**.

27.     First Data issued a purchase order for $400,000 of consulting work. Ex 20[.]

 **Response:**     Admitted. **Immaterial**.

28.     In June 2014, Barger was offered employment with First Data. Rule 56.1(a) in Support of Defendant's Motion for Summary Judgment ("DSOF") ¶8, and Barger's first day as an employee of First Data was June 30, 2014. DSOF ¶ 9[.]

**Response:**     Admitted.

29.     Barger and his wife moved from Birmingham, Alabama to Atlanta, Georgia where Barger officed [sic] in First Data's Atlanta facilities. S.Barger Dec ¶23[.]

 **Response:**     Admitted. **Immaterial**.

30.     Upon hiring, Plumeri became Barger's supervisor, DSOF ¶ 11, Barger assumed the position of Senior Vice President of Sales Transformation which had a total annual compensation opportunity of $730,000, $480,000 of base compensation and up to $250,000 of variable incentive compensation. DSOF ¶ 13. Barger's annual salary remained $480,000 his entire tenure with First Data and he received bonuses of $250,000 cash in 2015 for fiscal year $34,800 cash and restricted stock valued at $ 139,200 in February 2016 for fiscal year and $174,000 in cash in December 2016 for fiscal year 2016. DSOF ¶ 15,16,17, 18, 19, 20.

**Response:**     Admitted.

31.     Upon his hiring, the scope of Barger's duties was to continue his work as outlined in the consulting statement of work. S.Barger Dec ¶ 20 to 22.

**Response:**     Admitted.

32.     A few months after his arrival, Plumeri asked Barger to also assume responsibility for the Sales Training Group with Bryan Fricke and his staff reporting to Barger. Ex. 11 at 93:9-17; S.Barger Dec ¶ 24 to 25.

**Response:**     Admitted.

33.     Mr. Fricke resigned his employment during the third quarter of 2014. Ex 11 at 93:18-21; Kelly Dec ¶ 5 to 10; S.Barger Dec ¶ 24 to 25[.]

**Response:**     Admitted.

34.     Barger did not seek to replace Mr. Fricke and assumed Mr. Fricke's management

responsibilities in addition to those responsibilities for which he was originally hired. S.Barger Dec ¶ 24 to 25[.]

**Response:**     Admitted.

35.     In August 2015, Plumeri ceased day to day involvement with the company and Jeffery Hack replaced Plumeri as Barger's direct supervisor. DSOF ¶ 23.

**Response:**     Admitted.

36.     From August 2015 through sometime between December 2016 and January 2017, Hack reported to Defendant Charron. S.Barger Dec ¶28; DSOF ¶_ [sic][.]

**Response:**     Admitted.

37.     From the time of taking over the Sales Training Group, Barger continued to perform his original duties and responsibilities in addition to assuming management of Mr. Fricke's group. See Ex 21 (Barger's self-assessment for 2014); Ex 22 (Barger's self-assessment for 2015); Ex 23; S.Barger Dec ¶28[.]

**Response:**     Disputed. The presentations that Barger and Plumeri made to business associates changed upon Marino's hiring. Marino instituted a program known as "First Day Way" in which numerous employees including Marino, Ording, and Barger made presentations to employees around the country. *See infra* Defs. 56.1(b) Cntr. Stmt. ¶ 3. **Immaterial.**

### D.     Barger's Health Condition and Work from January 2016 to September 6, 2016

38.     In or around February 2016, Barger was diagnosed with throat cancer and underwent radiation treatments from March 2016 until May 2016. DSOF ¶ 72-73.

**Response:**     Admitted.

39.     While he was undergoing radiation treatments, Barger continued to work for First Data, did not take leave of absence or use paid-time-off due to his illness. DSOF ¶ 74, ECF No. 1,

HJ101-110.

**Response:**     Admitted.

40.     In July 2016, Whalen advised Hack, Johnson, and Carron [sic] that First Data needed to

hire someon [sic] to "serve as Steve's right hand for an extended period of time." <u>Ex 24.</u>

**Response:**     Admitted in part, objection in part. The cited evidence refers to an email

composed by Whalen, who wrote: "I agree with Rhonda [Johnson] <u>that we should pursue a</u>

<u>successor</u> who can serve as Steve's right-hand for an extended period of time. There is a

significant gap between Steve and his current directs today." Pl. Ex. 24 (emphasis added).

41.     By email on July 20, 2016, Johnson advised Whalen that Barger "was fired [sic] to focus

on Sales Transformation and when Bryan Fricke left, Steve assumed that role . . . he is spread-

out too thin . . ." <u>Ex 26</u>; <u>see</u> also similar statement by Johnson in <u>Ex 27</u>.

**Response:**     Objection, the cited evidence mischaracterizes Pl. Ex. 27, in which Johnson

wrote:

> I have a 1:1 with Barger this Friday, but feel that Jeff and Dan need to speak with
> him <u>over the next two weeks</u> around this topic and that <u>we're moving forward</u>
> <u>with a successor</u>. He was hired to focus on Sales Transformation and when Bryan
> Fricke left Steve assumed that role. My thought is that they should focus the
> conversation towards that approach as Steve is somewhat sensitive to this topic.
> However he did agree during my former conversation with him few weeks ago
> that <u>a successor was needed.</u> I focused on the fact that the current state is not best
> for the team, he is spread too thin and it would take some time to bring someone
> up to speed.

Pl. Ex. 26 (emphasis added).

42.     In August 2016, Barger learned the radiation had not been effective and he required

laryngectomy surgery. <u>DSOF</u> ¶ 75.

**Response:**     Admitted.

43.     Defendant Bisignano connected Barger with his physician Dr. Lou Harrison. <u>DSOF</u> ¶

9

76[.]

**Response:**     Admitted.

44.     Barger traveled from his Atlanta home to Tampa, Florida and underwent laryngectomy

surgery on September 6, 2017 [sic]. <u>S.Barger Dec</u> ¶37; <u>DSOF</u> ¶77[.]

**Response:** Admitted.

**E.     <u>Barger's Health and Remote Access Work September 6, 2016 to November 18, 2019</u>**

**<u>[sic]</u>**

45.     The morning after his surgery, September 7, 2016, Barger began e-mailing and texting

his First Data team and began working on First Data business. <u>Ex 9</u> at 74:13-19, 75:21-76 [sic],

76:20-77:7[.]

**Response:**     Admitted in part, objection in part. Ording testified that Barger sent a text

message to someone in his Group. Pl. Ex. 9 at 74:13-19; 75:21-77:7.

46.     Barger returned home to Atlanta after his initial post-surgical recovery in mid-October

2014. <u>S.Barger Dec</u> ¶43[.]

**Response:**     Admitted. **Immaterial**.

47.     The entire period Barger was in Tampa, he worked nearly every day on First Data

business remotely using cell phones, laptops, video meetings, conference calls with texting

ability for his participation in discussions. <u>S.Barger Dec</u> ¶ 42 to 44; Kelly Dec ¶ 14-17.

**Response:**     Objection. Pl. Ex. 29 does not establish that he was working "nearly every day."

48.     From the time he returned home in October 2016 through November 21, 2016, Barger

continued to work on First Data business daily using remote technological access. <u>S.Barger Dec</u>

42 to 44; <u>Kelly Dec</u> ¶ 16 to 17

**Response:**     Objection. Pl. Ex. 29 does not establish that he was working "nearly every day."

49.     Barger requested, and First Data provided Barger software and hardware capabilities for remote meeting access from his home during October and November 2016. Kelly Dec ¶17.

**Response:**     Objection, the cited evidence does not support PSOF ¶ 49.

50.     From the date of his surgery, September 6, 2016 through November 21, 2016, Barger worked remotely on First Data business daily. See Ex 29 (which contains more than 700 pages comprising a sampling of Barger's First Data work e-mails on a daily basis during this period); Ex 6 at 83:23-85:3, 95:17-96:8, 97: 11-99:6, 102:20-104:13, 112:9-10, 117:22-120:3; Ex 8 at 102:5-103:6, 112:24-113:4; Ex 33, Ex 36, Ex 38, Ex 39, Ex 40, Ex 41, Ex 49, Ex 92.

**Response:**     Objection, the cited evidence of Pl. Ex. 29 does not support that Barger was working during this period.

51.     Senior management of First Data was aware that Barger was working remotely from September 9, 2016 through November 21, 2016. Ex 30 (Johnson aware on September 9, 2016); Ex 31 (Hack aware on September 9, 2016), Ex 32; Ex 34; Ex 35, Ex 36; S.Barger Dec ¶ 44 to 45.

**Response:**     Objection, the cited evidence fails to establish that Barger was working.

52.     On November 16, 2016, Johnson advised Hack by email that "Steve [Barger] is able to set up video chat with Tony [Marino], if Tony finds that approach best. Steve uses text during video to communicate and I've found this approach effective and more personal." Ex 37 (emphasis added) [.]

**Response:**     Admitted.

53.     Marino testified that First Data's [sic] made an intentional decision not to place Barger on leave of absence from September 6, 2016 through November 18, 2016. Ex 11 at 77:6-21.

**Response:**     Objection because the cited testimony refers not to Marino's deposition but to

Whalen's deposition where she testified "if we're talking specifically about Steve, that was the intent, was not to put him on a formal leave at that point in time, but to keep him on payroll." Pl. Ex. 11 at 77:18-21.

54.     First Data made a conscious decision to continue paying Barger working [sic] on normal full payroll without leave of absence or short-term disability for the period between September 6, 2016 and November 19, 2016. Ex_8 at 58:14-25, 76:4-17, 83:25-84:9, 87:3-88:11.

**Response:**     Admitted.

55.     Barger did not use paid-time-off during the period from September 6, 2016 through November 19, 2016. Ex_6 at 164:3-165:4, Ex_8 at 98:25-99:5; Ex 98.

**Response:**     Disputed. The short-term disability benefits policy requires a 14 day waiting period during which employees must exhaust any accrued, unused, paid time off. Pl. Ex 65 at p. 9 of exhibit (p. 197 of SPD); Pl. Ex. 15 at 47/71. Barger received paid time off during the stated period. Def's Ex. 23.

56.     Barger did not take a leave of absence between September 6, 2016 and November 21, 2016. Ex 11 at 108:19-25; Ex_6 at 113:6-13, 123:20-124:4; Ex_8 at 91:21-92:6; Ex 37; Ex 46

**Response:**     Disputed. Barger told First Data that he stopped working on September 4, 2016. Defs. Stmt. ¶ 109, Defs' Ex. 23, Defs. Ex. 26 at ¶ 4.

57.     As of November 22, 2016, Barger had not requested a leave of absence. Ex 8 at 151:4-24; Ex 46.

**Response:**     Disputed. On November 8, 2016, Barger texted Marino and advised that he was "going in for additional repair surgery next week. 6 days in hospital. 4 weeks full recovery." Defs. Ex. 19 at 1.

12

**F.**      **Remote Access and Work at First Data**

58.      Working from home, using remote access to First Data's systems, conference calls, and

video calls, while sick or attending to other responsibilities, are common ways to work and

manage employees as practiced by First Data executives. Ex 2 at 37:20-39:11; Ex 3 42:21-43:6,

51:5-18, 128:22-129:6; Ex_8 at 49:6-19; Ex_9 at 34:10-35:25, 48:19-49:1, 65:24-67:10, 68:8-21,

69:23-70:5; Ex 10 at 21:12-22:21; Ex 11 at 62:23-63:15, 64:13-24, 77:22-79:12[.]

**Response:**      Admitted. **Immaterial**.

59.      Robin Ording, Barger's "interim" and then permanent replacement testified that she

manages her responsibilities remotely using technology. Ex 9 at 34:10-35:25.

**Response:**      Admitted. **Immaterial**.

**G.**      **Barger's Forced Leave of Absence**

60.      On November 3, 2016, Marino visited Plaintiff at his personal residence. C&A ¶128[.]

**Response:**      Admitted.

61.      On November 16, 2016 Johnson emailed Hack and Marino and strongly recommends

[sic] that Barger be forced to take a leave of absence. Ex 6 at 111:8-113:13; Ex 37[.]

**Response:**      Admitted in part, objection in part. Marino is not included in the referenced Pl.

Ex. 37.

62.      Marino prepared a letter dated November 18, 2016 ("Forced Leave Letter") advising

Barger that he was to be placed on leave and sends the letter by Federal Express to arrive

November 20, 2016 . Ex. 8 at 90:3-94:24; Ex 46[.][3]

**Response:**      Admitted.

63.      The drafting of the Forced Leave Letter had taken several days prior to November 18,

---

[3] Defendants interpose a continuing objection to the characterization of Marino's letter as "Forced Leave Letter." There is no such language in the letter dated November 18, 2016, that refers to Marino's letter in that fashion.

2016 and involved at least Marino, Johnson and Pulverenti. Ex 90[.]

**Response:**   Admitted. **Immaterial**.

64.   The Forced Leave Letter provided "procedurally, we must begin to transition you [Barger] to our standard leave of absence programs." Ex 46 at 1 (emphasis added); see also Ex 8 at 91:11-20[.]

**Response:**   Admitted.

65.   The Forced Leave Letter provided "I [Marino] have included the paperwork that you will be required to complete to begin this process." Ex 46 at 1 (emphasis added) [.]

**Response:**   Admitted.

66.   The Forced Leave Letter provided "While on short-term disability, your access to work must be curtailed until a doctor medically clears you to return to work." Ex 46 at 1.

**Response:**   Admitted.

67.   The Forced Leave Letter provided "Beginning today through 14 calendar days of short-term disability application, First Data will continue to pay your regular salary." Ex 46 at 2[.]

**Response:**   Admitted. **Immaterial**.

68.   The Forced Leave Letter provided "Once the MetLife Authorization form is submitted and approved, short-term disability will begin." Ex 46 at 2[.]

**Response:**   Admitted. **Immaterial**.

69.   On November 19, 2016, at 7:55 a.m, Marino engaged in a text message exchange with Barger regarding Barger being transitioned to leave and disability. Ex. 8 at 72:19-78:8, 73:15-24, 79:22-86:18, 88:21-90:2.

**Response:**   Admitted.

70.   In the initial text on November 19, 2016, Marino texted Barger and informed him the

Forced Leave Letter would be delivered by FedEx and that First Data was requiring Barger to "begin the disability process", that "We've [First Data] held off on this but now it is procedurally where we are. This will allow you . . . not to be burdened by First Data work. We will announce Robin [Ording] as the interim leader on Monday . . .. [sic] Ex 45 at 1[.]

**Response:**     Admitted.

71.     Five minutes later, Barger responded to Marino "You are removing me from my job? I'm fired." Ex8 at 80:2-81:11; Ex 45 at 1[.]

 **Response:**     Admitted.

72.     Marino replied "No not fired like any employee required to move to short term disability until Dr. releases you medically to return to work. When you return your salary restored and you will be given a comparable job. We've held off on this as long as we could." Ex 8 at 82:5-12; Ex 45 at 1[.]

 **Response:**     Admitted.

73.     Later on November 19, 2016 Barger asked Marino "So does this mean I can't go to work and have meetings" and Marino testified that he interpreted Barger's question as Barger asking to continue working instead of going on leave. Ex 8 at 88:25-89:5 Ex 45 at 1

 **Response:**     Admitted.

74.     Marino responded by text "Yes this means you need to shut down for a little while. . . you will fully concentrate on getting strong and back soon." Ex 45 at 1[.]

 **Response:**     Admitted.

75.     On November 20, 2016, Barger was just beginning his 90-days of short-term disability as of that date. Ex 42.

 **Response:**     Disputed. Barger's short-term disability benefits were not approved by MetLife

until January 6, 2017, retroactive to September 4, 2016. Defs. Ex. 31.

76.     On November 21, 2016, Barger signed two documents, a MetLife Authorization to

Disclose form and a form setting forth terms of leave, and Johnson sent these forms by email to

Jennifer Voycheske (Manager in Leave Management). Ex. 6 at138:24-139:8; Ex 47.

 **Response:**     Admitted.

77.     Also on November 21, 2016, Barger advised Marino by text that Dr. Harrison in Tampa

was very concerned about possible inoperable lymph node cancer. Ex. 8 at 85:8-86:16

 **Response:**     Admitted.

78.     The diagnoses of the need for a second surgery was incorrect. Ex 1 at 29:11-29:24,

32:20-23[.]

 **Response:**     Admitted. **Immaterial**.

79.     On November 22, 2016, Marino advised Bisignano, Hack, Charron that Barger was being

moved to leave. Ex. 8 at 171:24-172:19; Ex 111[.]

 **Response:**     Admitted.

80.     On November 23, 2016, Barger was advised that he had not completed all the forms and

that his OA Associates while on leave form was missing page 3. Ex. 6 at 139:4140:16; Ex 56[.]

 **Response:**     Admitted.

81.     On November 23, 2016, a request for Barger's leave was submitted without all of his

completed forms by "human resources" to Leave Management with a requested leave start date

of November 21, 2016. Ex 52[.]

 **Response:**     Objection. The cited evidence does not support PSOF ¶ 81.

82.     On November 23, 2016, First Data's Leave Management Team advised Hack, Barger's

supervisor, that a leave request for Barger had been made with his last day worked of November

18, 2016. Ex 54[.]

**Response:**       Admitted.

83.       On December 3, 2016, Barger was again informed that LOA help was missing forms he

had already signed. Ex. 6 at 44:10-17[.]

**Response:**       Objection. This cited evidence does not support PSOF ¶ 83.

84.       On December 6, 2016, Barger was informed again that his responsibilities while on leave

form had not been received by Leave Management. E. 6 at 141:22-143:10; Ex 48; Ex 53[.]

**Response:**       Admitted.

85.       On December 7 and 8, 2016, Johnson was informed that Leave Management Barger still

had not received his physician's information form. Ex. 6 at 148:18-149:13; Ex 50

**Response:**       Admitted.

86.       On December 15, 2016, Leave Management issued a letter to Barger and emails to

Johnson and Hack designating approved FMLA leave for the period of October 24, 2016 to

January 16, 2017. Ex_6 at 150:23-151:21; Ex. 8 at 104:25-108: Ex 43; Ex 44; Ex 61[.]

**Response:**       Admitted.

87.       On December 15, 2016, Johnson advised Barger that his FMLA leave had been approved

for October 24, 2016 through January 16, 2017.Ex 6 at 152:8-11; Ex 59[.]

**Response:**       Admitted.

88.       On December 15, 2016, Johnson was advised by Voycheske that Barger had not

submitted his application forms for short-term disability benefits. Ex. 6 at 150:5-22; Ex 50[.]

**Response:**       Admitted. **Immaterial**.

89.       On December 15, 2016, Johnson advised Barger that he needs to complete his short-term

disability forms and deliver them to MetLife. Ex 6 at 152:12-153:22, Ex 59[.]

**Response:**      Admitted. **Immaterial**.

90.      In the same December 15, 2016 email from Johnson to Barger, Johnson advised Barger that Barger needs to contact MetLife and "ask if they can back date it". Ex 6 at 153:23-154:19; Ex 59[.]

**Response:**      Admitted. Objects to the characterization of cited evidence. Johnson relayed advice from First Data's HR Service Center and was not providing advice of her own. Pl. Ex. 59.

91.      On December 16, 2016, Voycheske and Leave Management advised that because Barger was salaried, his last day of work would need to be verified by his manager, at the time Jeff Hack. Ex 58.

**Response:**      Admitted.

92.      On December 16, 2016 Leave Management advised Johnson that Barger had unused paid-time-off available in the amount of more than 210 hours. Ex 66[.]

**Response:**      Admitted. **Immaterial**.

93.      By email on December 16, 2016, Barger asked Johnson "What was my official last day working. MetLife wants to know." Ex 6 at 154:20-155:8; Ex 59.

**Response:**      Admitted.

94.      On December 20, 2016, Barger went to the office to talk to Johnson and his staff. Ex 78[.]

**Response:**      Admitted. **Immaterial**. The cited evidence states that Barger went to the office to say "Merry Christmas." Pl. Ex. 78.

95.      On December 28, 2016, Hack informs Marino that Barger indicated that he will be returning to work in January. Ex 8 at 182:16-183:7; Ex 77; Ex 82[.]

**Response:**      Admitted.

96.     On January 5, 2017, Barger's short-term disability still had not been approved because documents were missing for the approval process. Ex. 6 at 179:22-180:5; Ex 62[.]

**Response:**     Admitted.

97.     On January 5, 2016, Barger advised Voycheske that his plan was to return on January 17, 2017. Ex 80[.]

**Response:** Admitted.

98.     On January 6, 2016, at 4:00 p.m., Whalen informed Johnson that Barger was still not being reflected in First Data's human resource system (PeopleSoft) as being on leave. Ex. 6 at 192:11-194:8; Ex 57[.]

**Response:**     Objection as misleading, because the cited evidence states that the issue was resolved earlier that afternoon. Pl. Ex. 57. **Immaterial**.

99.     On January 6, 2017, at 5:31 p.m., Ording informed Marino that Barger had been in the office during that week advising the employees that he would be back to work on January 17, 2016, and Marino responded to that email at 5:45 pm to Ording, Steffen and Johnson that he is "assuming he [Barger] is aware we need medical clearance before he returns" . Ex. 6 at 194:19-195 [sic]:21; Ex_8 at 117:14-118:10; Ex 63; Ex 75[.]

**Response:**     Admitted.

100.    On January 6, 2017, after 5:45 pm, Steffen advised Marino, Ording and Johnson that "At this point his [Barger's] STD is in jeopardy because MetLife doesn't have all the paperwork from his Dr." Ex 63[.]

**Response:**     Admitted. **Immaterial**.

101.    On Saturday and Sunday, January 6 and 7, 2017, an email exchange occured [sic] among Whalen, Johnson, and members of the Leave Management Team in which Whalen advised the

group that she "Just spoke with Tony [Marino] and he wants to be absolutely sure that we have clearance from Steve's doctor's before he returns to work. Rhonda [Johnson] also spoke about our plan once he returns." Ex 101[.]

**Response:**    Admitted, but Barger misquotes the document.

102.    Johnson testified that the "plan once he returns" on January 6, 2017 in Whalen's email was that when Barger returned he would be placed in a position to be determined and her assumption was that Barger would return and continue to run the First Data Way program. Ex 6 at 201:9-202:5[.]

**Response:**    Admitted with clarification that that the testimony was not that Barger would be returning on January 6, 2017, but instead the cited evidence shows that the cited conversation involving Johnson occurred on January 7, 2017. Pl. Ex. 6 at 201:17.

103.    On January 10, 2017, Barger hand-delivered his physician's return to work authorization to Johnson and at 1:30 p.m. January 10th Johnson advised the Leave Management Team that she had received the form and provided the Leave Management Team a copy of Barger's form. Ex 6 at 204:7-206:7; Ex 127.

**Response:**    Admitted.

104.    On January 10, 2017, at 2:42 p.m. eastern standard time, Johnson advised Whalen and Marino that Barger had submitted his return to work authorization and that Steffen had confirmed that no other documentation was needed for his return on January 17, and Marino acknowledge receipt of that information. Ex 8 at 204:25-206:2; Ex 85[.]

**Response:**    Admitted.

105.    Amy Steffen advised the human resources team involved, including Whalen and Johnson, that First Data's stated policy was that the return to work form must be provided no later than the

day of return. Ex 83 (emphasis added) [.]

**Response:**      Admitted.

106.     January 17, 2017 was the Tuesday after the MLK holiday on Monday, January 16, 2017.
Judicial Notice of Dates[.]

**Response:**      Admitted.

107.     On Friday, January 13, 2017, in the afternoon, First Data cut Barger's physical access to
the First Data office and Johnson, at the direction of Marino, called Barger at around 6:00 p.m.
and advised him that he was being terminated and not to come into the office the following
business day. Ex 6 at 207:5-25, 208:5-210:17; Ex 128[.]

**Response:**      Admitted.

108.     On January 17, 2017, Barger emailed Johnson indicating that he was getting contacted by
employees wanting to know why he did not return and asking what tell them. Ex 136[.]

**Response:**      Admitted. **Immaterial**.

109.     During the week of January 16, 2016, a conference call was held by Ording and Marino
with Barger's former direct reports at which the direct reports were told that Barger was not
returning to work because he was "retiring" and Ording would be assuming his responsibilities
for the sales training team. Kelly Dec. at ¶21[.]

**Response:**      Admitted. **Immaterial**.

110.     The announcement of Barger's "retirement" the week of January 16, 2017 was
inconsistent with announcement's Ms. Kelly had seen at First Data in prior quarters and years in
which the announcement include a statement that the position was eliminated or the termination
was part of a companywide reduction. Kelly Dec ¶22[.]

**Response:**      Admitted that Kelly's declaration makes this statement. **Immaterial**.

**H.**     **Revocation of Barger's Remote Access Accommodation**

111.     Amy Steffen, Vice President responsible for the Leave Management Team during the period including November 2016 through January 2017, testified that it was not normal procedure to cut-off an employee's access to First Data's systems (VPN, email, Good Application - the mobile mail application) when an employee went on FMLA leave. Ex 10 at 56:2-6.

**Response:**     Admitted.

112.     Marino testified that there was no standard policy for cutting an employee's access to First Data's network when they went on FMLA leave. Ex 8 at 52:24-53:4, 158:15-17[.]

**Response:**     Admitted.

113.     On November 21, 2016, at Marino's direction, First Data cut Barger's completely cut Barger's [sic] access to the First Data network and systems. Ex 6 at 129:21-130:25, 133:13-135:25, Ex 68, Ex 69, Ex 70, Ex 71.

**Response:**     Admitted.

114.     Both Marino and Johnson testified that the reason Barger's access to First Data's systems was cut was because they knew he wanted to continue to work and they wanted to make sure he stopped working and concentrate on his health. Ex 6 at 134:13-18; Ex 8 at 157:25159:15.

**Response:**     Admitted that Marino testified that the two reasons Barger's access to First Data's systems was cut off were because Barger indicated that his cancer may be inoperable and he wanted Barger to focus on his health, and also because Barger's behavior had become inappropriate. Pl. Ex. 8 at 158:14-159:15. Admitted that Johnson testified that Barger's access was cut off because "we did want him to focus on himself." Pl. Ex. 6 at 134:18.

115.     As a result of Barger's access to First Data's systems being cut on November 21, 2016,

Barger was unable to receive forms and emails related to his leave of absence and disability

applications sent after that date. Ex 6 at 144:10-22; Ex 8 at 180:9-182:10; Ex 11 at 51:22-52:24

Ex 49, Ex 72[.]

**Response:**      Disputed. Barger continued to communicate regularly with First Data's Leave

Management Team up until his time of termination. See Defendants' 56.1 Stmt. ¶¶100-117;

PSOF ¶¶ 80, 83-85, 87, 89, 90 93, 97.

## I.    Barger's Declared Intent to Return from Leave

116.    In November 2016, Barger made clear to First Data management that he did not want to

take leave and wanted to work. Ex 6 at 112:9-10; Ex 92[.]

**Response:**      Objection as mischaracterizing the cited evidence. The cited evidence, which is

the testimony of Johnson, states as follows:

> Steve made it very clear that he wanted to continue to work. Told him to focus on
> himself, and Steve, again, said, you know, I want to continue. Unfortunately, with
> his absence and some of the occurrences -- I know you'd mentioned earlier about
> the incident with, you know, him showing up on video with, you know, to his
> team with bare-chested, et cetera -- that's when they brought that to my attention.
> It had become to the point where Steve would become engaged and answer a few
> e-mails, then he would be disengaged for a while, so some things would transpire.
> This was also the time period where... when he'd been out, he had given an
> employee a compensation adjustment without telling anyone else. So the
> employee had reached out and wanted to know where their compensation pay was
> in their paycheck.

Pl. Ex. 6 at 112:9-25. **Immaterial**.

117.    On November 19, 2016 Barger indicated to Marino by text messages that he wanted to

continue working. Ex 45.

**Response:**      Admitted.

118.    On December 22, 2016 Marino and Whalen learned that Barger had been in First Data's

office and had advised members of First Data management that he intended to return from leave

in January 2017. Ex_8 at 1143-114:20 Ex_9 at 101:14-103:2, 104:12-106:4; <u>Ex 11</u> at 74:310; <u>Ex</u>
<u>73</u>.

**Response:**     Admitted.

119.    On December 28, 2016 Barger texted his supervisor Jeff Hack that he planned to

return from leave on January 15, 2016 [sic] and Jeff Hack advised Marino of that text and

Barger's intention to return on January 5 [sic], 2016. <u>Ex 8</u> at 182:16-183:7; <u>Ex 77</u>.

**Response:**     Admitted in part, objection in part. The cited evidence in support of this statement

(Pl. Ex. 77) reflects that Hack emailed Marino on December 28, 2016, not January 5, 2017.

120.    On January 4, 2017, Ording advised Johnson and Whalen that Barger had been in the

Atlanta office and had stated he would be returning to work on January 16, 2017. <u>Ex 6</u> at

179:22-180:5; Ex_9 at 111:6-19, 112:16-21; <u>Ex 11</u> at 74-11-19; <u>Ex 62</u>; <u>Ex 74, Ex 79</u>.

**Response:**     Admitted.

121.    On January 5, 2017, Barger advised Leave Management that he would be obtaining his

physicians clearance on January 10, 2017 and return to work on January 17, 2017. <u>Ex 80</u>.

**Response:**     Admitted.

122.    On January 6, 2017, Ording advised Marino, Johnson and [sic] that Barger was returning

on January 16, 2017. <u>Ex 8</u> at 114:24-115:11; <u>Ex 9</u> at 116:15-118:16, 123:1-5; <u>Ex 75</u>; <u>Ex 81</u>

**Response:**     Disputed. The cited evidence states that Barger was returning on January 17,

2017, not on the 16th. Pl. Ex. 75.

123.    On January 7 and 8, 2017, Marino Amy Steffen (Head of Leave Management), Jennifer

Voycheske, Whalen, Johnson, were planning for Barger's return when he obtained his

physicians clearance. <u>Ex 6</u> at 196:9-197:8201:9-202:5; <u>Ex 81</u>; <u>Ex 101</u>.

**Response:**     Objection, the cited evidence demonstrates that Marino, Steffen, Voycheske,

Whalen, and Johnson were discussing, not planning, for Barger's return. **Immaterial**.

124.    On January 10, 2017, Barger obtained his physician's clearance to return to work, delivered it to Johnson by hand and Johnson advised Marino she had received the release to work. <u>Ex 11</u> at 139:23-140:3; C&A ¶164

**Response:**    Admitted.

125.    Marino testified that Barger was terminated because "he was returning" from leave to come back to work. <u>Ex 8</u> at 209:25-211:14.

**Response:**    Disputed. PSOF ¶ 125 is identical to PSOF ¶ 1 and First Data incorporates its response to PSOF ¶ 1.

**J.    <u>First Data's Leave Management Team are Trained in FMLA Compliance</u>**

126.    When asked "Who are the FMLA experts in HR?" Whalen testified in response that First Data has a leave management team that is part of the HR service center. <u>Ex 11</u> at 27:11-13[.]

**Response:**    Admitted.

127.    Whalen managed the leave management team from 2008 to 2011. <u>Ex 11</u> at 27:2128:6[.]

**Response:**    Admitted. **Immaterial**.

128.    The Leave Management Team is a group of four or five people who are experts on a variety of different types of leave that are "very trained" up according to Whalen's testimony. <u>Ex 11</u> at 51:9-21[.]

**Response:**    Admitted.

129.    Marino testified that First Data's "experts" on leave and short-term disability are in the leave management department. <u>Ex 8</u> at 61:10-20[.]

**Response:**    Admitted.

130.    Johnson testified that she is a trained, and certified, human resources professional with

training in the FMLA and ADA. Ex 6 23:17-24:10.

**Response:**     Admitted.

**K.**     **Barger was an employee protected by the ADA and FMLA**

131.     Plaintiff was hired as an employee of Defendant First Data Corporation ("First Data")

with a title of Senior Vice President, and Barger was continually employed as a Senior Vice

President of First Data in its Atlanta office from June 30, 2014 to February 28, 2017. C&A

¶28[.]

**Response:**     Admitted.

132.     On each and every date between June 30, 2015 through November 21, 2016, Plaintiff had

been employed for at least 1,250 hours of service with First Data in the previous 12- month

period. S.Barger Dec ¶51

**Response:**     Admitted.

133.     Defendants admit that Barger was an "eligible employee" (as defined in 29 U.S.C. §

2611(2)) entitled to 12 weeks of FMLA leave pursuant to 29 U.S.C. §2612(a)(1)(D). C&A ¶32

&76[.]

**Response:**     Admitted.

134.     Defendants admit that Barger's cancer diagnoses, surgery, and recovery were all "serious

health conditions" as defined in 29 U.S.C. §2611(11). C&A ¶159[.]

**Response:**     Admitted.

135.     Barger did not take FMLA leave during his radiation treatments during March and

April 2016. C&A ¶102[.]

**Response:**     Admitted.

136.     When Barger learned surgery was required he advised Bisignano, Marino,

Charron and Johnson that his surgery was scheduled for September 6, 2016 in Tampa <u>C&A</u> ¶113[.]

**Response:**      Admitted.

137.    Plaintiff did not take leave and continued to work remotely during his surgical recovery. <u>C&A</u> ¶118[.]

**Response:**      Objection. PSOF ¶ 137 mischaracterizes ¶ 118 of the Complaint.

138.    Defendants admit that it was Barger's choice to refuse leave during radiation, surgery and more than two months of his recovery. <u>C&A</u> ¶119[.]

**Response:**      Admitted.

139.    Defendants admit First Data did not force Plaintiff to take leave during his radiation, surgery and recovery period prior to November 19, 2016. <u>C&A</u> ¶119[.]

**Response:**      Admitted.

140.    In First Data's EEOC Position Statement, First Data stated that "[H]e [Barger] refused to take a leave of absence and insisted he would work during his recovery. Despite him [Barger] being out of the office due to surgery, the Company respected his decision, did not force him to take a leave of absence, and continued to pay him through the regular payroll because he claimed he was working, reading email, and generally doing his job." <u>Ex 130</u> at p.5[.]

**Response:**      Admitted.

141.    During Plaintiff's entire tenure as an employee of First Data, Plaintiff was not a Federal officer or employee. <u>S.Barger Dec</u> ¶52[.]

**Response:**      Admitted. **Immaterial**.

142.    Plaintiff's First Data office was located at First Data's office building located at 5565 Glenridge Connector, Atlanta Georgia 30342 ("Glenridge Connector Office"). <u>S.Barger Dec</u>

¶53[.]

**Response:**     Admitted.

143.    During his entire tenure as an employee of First Data more than 50 First Data employees

were employed by First Data at, or within, 75 miles of the Glenridge Connector Office. ").

S.Barger Dec ¶54[.]

**Response:**     Admitted.

144.    During the surgery on September 6, 2016, Barger's voicebox was removed and he

was unable to use his implanted voice prosthetic until around Thanksgiving of 2016. S.Barger

Dec ¶50[.]

**Response:**     Admitted. **Immaterial**.

**L.      First Data is an Employer/Covered Entity for the FMLA and ADA**

145.    First Data is engaged in commerce and employed more than 50 employees each working

day during each calendar year from 2013 through 2017. DSOF ¶ 1, 2.

**Response:**     Admitted.

146.    First Data admits that for the period of time from January 1, 2016 through January 12

2017 Defendant First Data was an "employer" as that term is defined in the Family and Medical

Leave Act in 29 U.S.C. §2611(4). Ex 117 at 2 ¶ 1; C&A ¶32&76

**Response:**     Admitted.

**M.      Bisignano was Barger's Employer under the FMLA**

147.    Defendant Bisignano, CEO of First Data, testified "I run the company, I run the day to

day. I run the strategic plan. I am in charge of the company. There has never been a question

about that." Ex. 3 at 112:25-113:6[.]

**Response:**     Admitted.

148.    Bisignano testified "I'm the CEO and accountable for everything." Ex. 3 at 261:15-16[.]

**Response:**     Admitted.

149.    Bisignano is responsible for making decisions on restructuring charges, terminations, and setting restructuring goals. Ex. 4 at 43:18-44:9; Ex. 11 at 37:17-21[.]

**Response:**     Admitted, with the clarification that the cited evidence in support of the statement contained in PSOF ¶ 149 reflects that Bisignano, along with the management committee, is responsible for the stated issues. Pl. Ex. 11 at 37:17-21.

150.    Under First Data's corporate governance, the Leave Management Team is authorized to approve or disapprove leaves of absence through delegations of authority all deriving from Bisignano's authority as Chief Executive Officer. Ex. 8 at 106:12-108:2[.]

**Response:**     Objection, as the cited evidence mischaracterizes Marino's testimony, which states as follow:

Q (Mr. Shearer) All right. And I guess this is purely a corporate governance question. That is, the CEO grants authority to you to run HR; you grant authority to Amy Steffen to run the leave management team; and Amy Steffen grants authority to the leave management team to send these letters; is that correct?
Mr. Eidelman: Objection. You can answer.
A. (Mr. Marino) I think that's probably a good characterization.

Pl. Ex. 8 at 107:16-25. **Immaterial**.

151.    Any First Data corporate expenditure in excess of $250,000 requires Bisignano's approval and several hundred approvals of expenditures in excess of $250,000 are made by Bisignano each month. Ex. 3 at 162:6-163:10; Ex 4 at 30:4-21; Ex 8 at 109:114-110:20[.]

**Response:**     Objection, as the cited evidence mischaracterizes Bisignano's testimony, who testified as to his approval of procurements, not expenditures. **Immaterial**.

152.    Bisignano has the authority to terminate any employee reporting into Charron's organization. Ex. 5 at 69:11-13[.]

**Response:**     Objection, the cited evidence mischaracterizes Charron's testimony, which related

to the termination of Hack, not Barger, which was as follows:

Q (Mr. Shearer) So Mr. Bisignano has the ability to terminate an employee that reports to you?
A (Mr. Charron) Yes.
Q Without a consultation with you?
A No, I was aware of the conversations he was having with Jeff. Jeff was on the management
committee. Frank manages all of the executives on the management committee.
Q What were the reasons that Mr. Bisignano had for terminating Mr. Hack?
A I think you'd have to ask Mr. Bisignano . . . .

Pl. Ex. 5 at 69:11-21.

153.    Bisignano establishes standards for restructurings and terminations and commands his

direct reports to meet his headcount numbers. Ex. 5 at 87:17-88:12[.]

**Response:**     Objection, the cited evidence mischaracterizes Charron's testimony, which states

as follows:

Q (Mr. Shearer) So when Mr. Bisignano puts out the word to reduce GBS ten percent, your
3,000, whoever you have in the top 3,000, do you have to get rid of ten percent of them? Is that
the way that that would work?
A (Mr. Charron) That was the objective, yes, to look at that.
Q So each EC member had to identify ten percent of whoever in their group was in the top
3,000?
A Yes, their workforce, yeah.
Q Okay. And were you given any guidelines as to how to select those people?
 A We would look at the same thing we had talked about earlier, whether or not you could
consolidate functions, whether or not they're redundant, there's other areas can be brought
together. So there's organizational structure changes as well.

Pl. Ex. 5 at 87:17-88:10.

154.    Bisignano is the impetus, director and commander of all large restructuring termination

events. Ex. 4 at 94:14-95:10[.]

**Response**:     Objection, the cited evidence mischaracterizes Cagwin's testimony, which was as

follows:

Q (Mr. Shearer) Okay. So if they blur together and they're always happening, how do you
determine that it's a restructuring; that is, a project?

A (Mr. Cagwin) Because as we're defining things, we're taking them off. So there's the -- we're going to -- we believe we have too many managers right now, so we need to go and how do we... reduce our management headcount? Or, we believe we have too many SVPs; what are we going to do, how can we streamline it so we can re-employ the money elsewhere.

So there are discrete projects that Frank is challenging folks to think through and execute on it. Then that information is actually individuals are tracked, monitored, and when they're exiting, it's tracked.

As long as they exit, you know you're going to get the savings out of it. The headcount and costs go down. And whether you're tracking that on one page for project A and a separate page for project B or you put the two on the same page, you're monitoring as the path moves along. And you know when they come to an end.

Pl. Ex. 4 at 94:14-95:10.

155.    Bisignano and the management committee are responsible for all critical First Data policies. Ex. 2 at 19:21 - 20:7[.]

**Response**:      Admitted. **Immaterial**.

156.    The critical policies and goals of any restructuring are not written, but are handed down through the organization verbally from Bisignano and the management committee. Ex. 2 at 17:2-21[.]

**Response**:      Disputed. The cited evidence does not PSOF ¶ 156. In the cited testimony, Benhardt testified regarding the topic of organizational design. Pl. Ex. 2 at 13:25-17:21.

157.    Bisignano, CEO, provides directives to drive restructuring events at First Data. Ex. 2 at 49:12-50:12[.]

**Response:**      Objection. The cited evidence does not support PSOF ¶ 157.

158.    Bisignano is the "ultimate person" to make the decision to reduce headcount. Ex. 2 at 116:11-20[.]

**Response:**      Admitted.

159.    Mr. Bisignano testified that it was his "job to make sure at the end of the day the cumulative effect of performance management equals actual on-the-filed [sic] performance, and

that [sic] my job to have the oversight responsibility. . ." Ex. 3 at 173:4-8[.]

**Response**: Objection. Barger misquotes Bisignano's testimony about the 10% of the Top 3,000

RIF, which was as follows:

A. (Mr. Bisignano)     But, it is my job to make sure at the end of the day the cumulative effect of performance management equals actual on-the-field performance, and that's my job to have the oversight responsibility of that, and when the data came in, I felt that more work needed to be done.

Pl. Ex. 3 at 173:4-8.

160.    Bisignano testified that he was responsible for changing First Data's incentive

compensation policies. Ex. 3 174:11-18[.]

**Response:** Objection, the cited evidence does not support PSOF ¶ 160. **Immaterial**.

161.    Bisignano testified that he reviews incentive compensation payment throughout the entire

company. Ex. 3 at 179:11-20[.]

**Response:**     Admitted.

162.    Bisignano has the authority to allow or disallow requisitions for new hiring as he testified

that if he knew there was a search for a successor to Barger he would have never

allowed it or shut it down., [sic] and would have stopped additional requisitions for additional

jobs. Ex. 3 at 83:20-24[.]

**Response:**     Objection, the cited evidence does not support PSOF ¶ 162. Bisignano's

testimony that he would not have approved a successor for Barger is reflected in Pl. Ex. 3 at

182:15-184:11.

163.    Bisignano testified that he was the Chief Diversity Officer at First Data. Ex. 3 at 225:20-

21[.]

**Response:**     Admitted.

164.    Bisignano recruited and interviewed Senior Vice President EJ Jackson. Ex. 3 at 237:14-

21[.]

**Response**:     Admitted. **Immaterial**.

165.    Bisignano establishes policies and procedures for the treatment of employees while being terminated and testified that it is a "tremendous obligation to do the right thing by all employees . . . and when we have to let someone go, I want it to be compassionate. I want it done well." Ex. 3 at 254:7-256:11[.]

**Response:**     Objection, the cited evidence mischaracterizes and misquotes Bisignano's testimony.

N.    **Marino and Charron were Barger's Employer under the FMLA**

166.    Marino and Charron made the decision to terminate Barger and Marino directed Johnson to call Barger to inform him of that decision. Ex. 3 at 196:21-197:6 Ex. 6 at 209:25210:17; Ex. 8 at 216:13-19, 218:12-18; Ex. 11 at 50:14-18[.]

**Response:**     Admitted in part, disputed in part. Hack, as Barger's supervisor, made the decision to terminate Barger, which was approved by Charron. Defs. 56.1 Stmt. ¶ 137-38, Defs. Ex. 39. Admitted that after the decision was made, Marino directed Johnson to call Barger to inform him of his position elimination.

167.    Robin Ording was Barger's interim replacement while he was on leave and she directly reported to Marino. Ex. 9 at 50:7-14[.]

**Response**:     Admitted.

168.    Ording, as interim leader of Barger's group, reported to Marino and consulted with Hack. Ex. 9 at 51:21-52:7[.]

**Response**:     Admitted.

169.    Compensation at First Data is not decided by any single manager, but all compensation

decisions must pass through the Human Resources department headed by Marino. Ex. 9 at 85:17-86:10 Comp must go through HR[.]

**Response:**      Admitted. **Immaterial**.

170.     Disseminating information regarding Barger's return from leave to his organization would be handled by Marino and Johnson. Ex. 9 at 123:1-124:3[.]

**Response:** Objection, the cited evidence mischaracterizes Marino's testimony. Ex. 9 at 123:1-124:3.

171.     Marino and Charron made the decision to change Ording's status as interim replacement of Barger to permanent replacement of Barger. Ex. 11 at 30:12-23[.]

**Response**: Objection, the cited evidence mischaracterizes Whalen's testimony, which related to moving the Sales Training Group from GBS to HR.

172.     Marino was uniquely involved in Barger's leave of absence by deciding to force Barger on to leave and by writing the Forced Leave Letter, which is not his usual involvement in leave matters. Ex. 8 at 93:13-24[.]

**Response**: Objection, the cited evidence mischaracterizes Marino's testimony, which was as follows:

> I want to make sure he's getting taken care of in the best possible way. You know, it's not typical, by the way, that the head of human resources would ever send this letter. You know, I sent this letter because I wanted to make sure that Steve was receiving the absolute best care and advice that we, as a company, could provide him. In fact, there's not one other letter that I've sent to an individual since I've been in my role as chief human resource officer.

Pl. Ex. 8 at 93:13-24.

173.     Marino was directly involved in establishing the conditions of Barger's return from leave and forcing confirmation from his direct reports that Barger must obtain his physician's return to work letter before he would be allowed to return from leave. Ex. 8 at 115:12-17[.]

**Response**:        Objection, the cited evidence mischaracterizes Marino's testimony that the

requirement to obtain a return to work authorization is "standard procedure." Pl. Ex. 8 at 116:4.

Barger (as all employees) was obligated to submit a return to work authorization from his

physician pursuant to First Data policy, not because Marino personally forced him to. The First

Data FMLA Policy states in the section "Returning From Leave":

> An employee taking leave because of his or her own serious health condition
> except if he or she is taking intermittent leave is required to provide medical
> certification showing they are fit to resume work An employee will not be
> permitted to resume work until it is provided

Pl. Ex. 15 at 53/71.

174.    Marino approves and signs-off on every senior vice president hired at First Data. <u>Ex. 8</u> at

125:5-126:10[.]

**Response:**        Admitted. **Immaterial**.

175.    Marino exercised influence within the First Data organization to have responsibility of

the Sales Training Group headed by Barger moved from Charron to Marino. Ex. 8 141:14-142:6;

<u>Ex 55</u>[.]

**Response:**        Objection, the cited evidence does not support PSOF ¶ 175. Additionally, Pl. Ex.

55 is an email from Johnson to HRHelpDesk concerning Barger's application for short-term

disability benefits and has no relation to the organization or management of the Sales Training

Group. **Immaterial**.

176.    Marino directed that Barger's access to First Data's systems be cut when Barger went on

leave. <u>Ex. 8</u> at 160:14-161:5[.]

**Response:**        Admitted.

177.    Marino establishes goals for the implementation of plans to reduce headcount. Ex. 2 at

59:7-60:1[.]

**Response:**     Objection, the cited evidence mischaracterizes Benhardt's testimony. Pl. Ex. 2 at 59:7-60:1.

178.     Marino instructs and directs the policies and procedures for implementing restructurings and terminations. <u>Ex. 2</u> at 17:2-21, 18:14-21, 19:4-20:7[.]

**Response:**     Objection, the cited evidence does not support PSOF ¶ 178. In the cited testimony, Benhardt testified regarding the topic of organizational design. Pl. Ex. 2 at 13:25-20:7.

179.     Marino provides policy guidance and direction to the planners of termination "events". <u>Ex. 2</u> at 20:16-24[.]

**Response:**     Objection, the cited evidence mischaracterizes Benhardt's testimony, which related to organizational design and not termination events. Pl. Ex. 2 at 13:25-20:7.

180.     Marino and Charron had the authority, and did exercise that authority, to make compensation decisions regarding Barger. <u>Ex. 8</u> at 222:13-25[.]

**Response:**     Objection, the cited evidence mischaracterizes Marino's testimony, which related to Barger's severance package, which was as follows.

A (Mr. Marino) Let me clarify, Mr. Shearer. We didn't make a decision to vest his equity. What we made the decision to do was, as his equity was lapsing, to provide a cash equivalent for the value of that equity.
Q (Mr. Shearer) And that was your decision?
A That was certainly within my and Dan Charron, who was his boss, our
authority as managing committee members to try to do what we thought was absolutely right for Steve. It's absolutely within our authority to be able to do that, along with, you know, advising and providing counsel in support from our legal department.

Pl. Ex. 8 at 222:13-223:2.

181.     Marino, Charron and Johnson are directly involved in the planning of large termination events. <u>Ex. 2</u> at 33:14-23, 34:3-21, 43:5-18, 49:12-50:12; 57:10-13[.]

**Response**:     Objection, the cited evidence does not support PSOF ¶ 181 and mischaracterizes

Benhardt's testimony. Her testimony does not reference Johnson, but was related to the 10% of the Top 3,000 RIF. Pl. Ex. 2 at 33:14-23, 34:3-21, 43:5-18, 49:12-50:12; 57:10-13.

182.    Marino, Charron and Whalen are directly involved in managing organizational design. Ex. 2 at 64:4-14[.]

**Response**:       Objection, the cited evidence mischaracterizes Benhardt's testimony, which was as follows:

A. (Ms. Benhardt) The manager or the leader of a business, often in consultation or partnership with advice from their HR partner, will look at their organization and examine what's right for their business, how will they be set up for success.
Q. (Mr. Shearer) Do you know in the case of Mr. Barger in 2016, 2017 who -- who would that individual be that would be looking at the organizational design that included Mr. Barger?
A. At that time it would have been a combination of his boss or the head of the group, so Dan Charron. I believe he worked -- he might have worked directly for Jeff Hack along with their HR partner, Karen Whalen, Rhonda Johnson along with the individual who was temporarily managing the group.

Pl. Ex. 2 at 63:23-64:14.

183.    Marino and Charron made the decision to move the training group from reporting to Charron's Global Business Solutions Group to Marino's Human Resources Group. Ex. 3 at 160:21-161[.]

**Response**:       Admitted in part, objection in part. Defendants admit that Marino and Charron made the decision to move the Sales Training Group into the HR department. Pl. Ex. 11 at 30:12-23. The cited evidence does not support PSOF ¶ 183 because the cited deposition testimony of Bisignano related to how inefficient the Sales Training Group was under Barger's leadership. *Id.*

184.    Charron and Whalen were directly involved in the planning and search for a successor to Fricke's position after Barger had taken responsibility for the Sales Training Group. Ex. 6 at 52:2-8[.]

**Response**:       Admitted. **Immaterial**.

185.    Charron had the authority to override the compensation decision made by Heck [sic], Barger's direct supervisor. Ex. 5 at 41:8-13[.]

**Response**:    Admitted. **Immaterial**.

186.    Charron's approval for Barger's 2016 bonus was required. Ex. 5 at 79:19-80:7

**Response**:    Admitted.

187.    Charron influenced and controlled the decision to terminate Barger. Ex. 5 98:311, 122:21-123:4[.]

**Response**:    Admitted.

188.    Termination events and reductions in headcount are analyzed by executive committee member (Charron being the Global Business Solutions EC member), and human resources generalists (Johnson) plan reductions and notification dates in consultation with the executive committee member. Ex. 2 at 33:24-34:2, 160:4-8[.]

**Response:**    Admitted in part, objection in part. The cited evidence does not support that Johnson or HR generalists "plan reductions."

189.    First Data responded to interrogatories that "Charron approved the recommendation to include Barger on the list of GBS employees to be terminated." Ex 118 at p.2-3 response to ¶1[.]

**Response:**    Admitted.

**O.    Whalen was Barger's Employer under the FMLA**

190.    Whalen, Senior Vice President of Human Resources, was the senior human resources officer responsible for collecting and disseminating information regarding Barger's leave and return from leave. Ex. 9 at 104:12-106:4; Ex 73[.]

**Response**:    Objection, the cited evidence does not support PSOF ¶ 190.

191.    Whalen was directly involved in the hiring of Barger and had input on his salary and

compensation. Ex 8 at 187:5-19[.]

**Response:**     Disputed. The cited portion of Marino's testimony (Pl. Ex. 8) does not support the proposition that Whalen was directly involved in the hiring of Barger. Marino testified that Plumeri hired Barger. Pl. Ex. 8 at 187:10-19. Barger admitted that it was Plumeri who hired him. Defendants' Exhibit 6 at 259:17-18, 25. *See also* Defs. 56.1 Stmt. ¶¶ 45, 47.

192.     Whalen was heavily involved in the planning and implementation of the restructuring of the sales transformation group. Ex. 11 at 31:13-32:3[.]

**Response**:     Admitted.

193.     Whalen was involved in and influenced the decision to maintain Barger on normal payroll following his surgery. Ex. 11 at 77:6-21[.]

**Response:**     Objection, the cited evidence mischaracterizes Whalen's testimony.

194.     Whalen supervised, received reports, and influenced Johnson's relationship with Barger as the human resources generalist for Barger's group of employees. Ex. 11 at 88:24-89:19[.]

**Response**:     Objection, the cited evidence mischaracterizes Whalen's testimony.

195.     Whalen was directly involved in the compensation and hiring decisions, including negotiation of compensation and equity benefits. Ex. 11 at 112:24-117:23[.]

**Response**:     Admitted. **Immaterial**.

196.     Whalen was directly involved in the decision as to whether to search for a potential "successor" to Barger. Ex. 6 at 52:2-8[.]

**Response**:     Admitted. **Immaterial**.

197.     Whalen, through a discussion with Johnson and Marino, influenced and agreed with the decision to force Barger onto leave. Ex. 6 at 114:5-23[.]

**Response**:     Objection as mischaracterizing the testimony, which speaks for itself. Pl. Ex. 6 at

114:5-23. First Data did not "force" Barger onto leave. Barger applied for FMLA leave after receiving the FMLA materials from First Data. Defs. 56.1 Stmt. ¶¶ 93-97.

198.    Whalen and coordinated notifying Barger that he was going to be forced onto leave. Ex. 6 at 116:21-117:20[.]

**Response**:    Objection as mischaracterizing the testimony, which speaks for itself. Pl. Ex. 6 at 116:21-117:20. First Data did not "force" Barger onto leave. Barger applied for FMLA leave after receiving the FMLA materials from First Data. Defs. 56.1 Stmt. ¶¶ 93-97.

199.    Requests for extension of Barger's leave required Johnson to route the request to Whalen. Ex. 6 at 188:25-189:7; Ex 100[.]

**Response:**    Objection as mischaracterizing the evidence, a document which speaks for itself. Pl. Ex. 100.

200.    Whalen reviewed the status of Barger's leave in the human resources information technology systems and followed-up on the proper status of Barger's leave in those systems when corrections were required. Ex. 6 at 192:11-16; Ex 57[.]

**Response:**    Admitted that Pl. Ex. 57 indicates one instance of Whalen checking on the accuracy of Barger's leave status in the HR information systems, and that the cited portion of Johnston's testimony (Ex. 6) is merely Johnson reading aloud the same email cited in Ex. 57.

201.    Whalen was directly involved in the discussions surrounding the return of Barger and the position to which he would return, if any. Ex 76[.]

**Response:**    Admitted.

202.    When Barger delivered is [sic] physician's return to work notice, Johnson advised Whalen and Marino that [sic] were supervising his leave process that Barger was returning. Ex. 8 at 204:25-205:10; Ex 85[.]

**Response:**      Objection, the cited evidence mischaracterizes Pl. Ex. 85.

203.      Whalen was directly involved in influencing organizational changes inside of Charron's

Global Businss [sic] Solutions group, which included Barger's group. Ex. 5 at 81:22-82:6.

**Response**:      Admitted. **Immaterial**.

204.      Whalen provided advice and influence to Charron's decisions on whether to include

employees on a list to be considered for termination and followed up to coordinate

communications following notifications. Ex. 5 at 88:14-89:10; Ex 96[.]

**Response:**      Objection, the cited evidence mischaracterizes Charron's testimony, which was as

follows:

Q (Mr. Shearer) This is an e-mail chain from January 9th. Well, the first one is on January 6th.
Tony writes to you and Karen Whalen: Here's your top 3,000 list. Need back ten percent lighter.
Correct?
A (Mr. Charron) That's what it says, correct.
Q Why did Karen Whalen receive this?
A She worked for Tony Marino.
Q Was she going to be involved in your decision of who was included on the list?
A Yeah, she would be working with me on the consolidated list. As well as Jeff.
Q What was her input into deciding who was on the list?
A Her job was not to identify the people on the list, but to work with us to make sure and give us
guidance on organizational things, changes that we do, all of the data that we use to look at the
organizational constructs, number of direct reports, functions, et cetera. She would provide all of
that.
Q So Karen Whalen provided you advice on the organizational structure post-terminations?
A We would talk through that.

Pl. Ex. 5 at 88:14-89:10 (emphasis added).

205.      Charron, Marino and Whalen were the three individuals involved in creating Charron's

top 3000 cut list. Defendants' Exhibit 39[.]

**Response**:      Disputed. Hack first included Barger among his direct reports in GBS to be

included in the 10% of the Top 3,000 RIF. Hack's list was added to Charron's list of direct

reports to create one list for all of GBS. Defs. Ex. 39, Defs. Ex. 41.

206.    Whalen had input and influence on Charron's decision to terminate Barger. Ex. 5 at

122:25-123:24[.]

**Response**:    Objection, the cited evidence mischaracterizes Charron's testimony, which was as

follows:

Q (Mr. Shearer) And if you do not agree to Mr. Barger's inclusion on that list, would he be on
the list?
A (Mr. Charron) I would have a discussion with Jeff and, you know, HR if I didn't... if I thought
he shouldn't have been on the list, yeah.
Q What about Karen Whalen, if she didn't think he should be on the list, would that same type of
discussion happen?
A I'm sorry?
Q Would Karen Whalen, if she didn't think he should be on the list, would that same discussion
happen?
A Yes. Anybody that's on the list, and our HR legal group would have conversations with us.
Q So does anybody own the decision to put somebody on the list?
A Yes. The direct manager does.
Q And what about that person's direct manager?
A Yes, I think they approve it.
Q And does the HR group need to approve it as well?
A Yes, those lists are submitted to HR, and they go through the analysis, make sure everything --
they consolidate it. If there's issues, they have conversation with us.
Q Any planning compensation of employees in . . . .

Pl. Ex. 5 at 122:25-123:24. Whalen did not terminate Barger. Defs. 56.1 Stmt. ¶ 46.

207.    Whalen worked with and influenced the compensation decisions made by Charron. Ex. 5

at 123:25-124:6[.]

**Response**:    Objection, the cited evidence does not support PSOF ¶ 207. The cited evidence,

which is Charron's testimony, was as follows:

Q (Mr. Shearer) Any planning compensation of employees in your group, including employees
underneath your direct reports, so do you have the ability to set compensation for those people?
A (Mr. Charron) Outside of...
Q When it comes around to annual compensation decisions, when Jeff Hack proposes to give
raises to . . . .

Pl. Ex. 5 at 123:25-124-6.

208.    Whalen worked with, and influenced, the organizational design of Charron's GBS group.

Ex. 2 at 64:4-14; Ex. 59[.]

**Response:**     Objection, the cited evidence does not support PSOF ¶208.

209.     Whalen was responsible for the organization and timing of mass termination events. Ex. 2 at 70:8-71:14[.]

**Response:**     Objection, the cited evidence mischaracterizes Benhardt's testimony. She did not testify that Whalen was responsible for the organization or timing of a mass termination event. Pl. Ex. 2 at 70:8-71:14. Rather, she testified that Whalen "would have worked with her team of generalists to develop a schedule" to manage communications of the RIF notifications in November 2016 but explicitly stated that Whalen did not develop it alone. Pl. Ex. 2 at 71:12-14.

210.     Whalen and Johnson were responsible for developing and influence the choices made by Charron on termination decisions. Ex. 2 70:18-71:15[.]

**Response**:     Disputed. Charron testified that "her [Whalen's] job was not to identify the people on the list, but to work with us to make sure and give us guidance on organizational things, changes that we do, all of the data that we use to look at the organizational constructs, number of direct reports, functions, et cetera." Pl. Ex. 5 at 88:25-89:7. The business unit, not HR, had the authority to include an employee in the RIF. Defs' Ex. 13 at 97:3-9.

211.     Whalen was directly involved in the determination of termination compensation packages. Ex. 2 at 123:11-18[.]

**Response:**     Objection, the cited evidence does not support PSOF ¶ 211 that Whalen was involved in determining compensation packages. The 8 lines of testimony cited relate to Benhardt (not Whalen) answering questions about compensation packages for individuals in the RIF. Pl. Ex. 2 at 123:11-18.

212.     Whalen was directly involved in transmitting compensation policy and controls from

Bisignano and the management committee to Johnson and others within the human resources department. Ex 91[.]

**Response:**      Admitted. **Immaterial**.

213.    Whalen coordinated the compensation package for Barger to be used by Benhardt in her modeling of terminations. Ex. 2 at 153:10-24; Ex 102[.]

**Response:**      Objection, the cited evidence does not support PSOF ¶ 213 that Whalen coordinated any compensation package for Barger. Pl. Ex. 102 relates to a discussion between Marino, Benhardt, and Eileen Nage about Barger's compensation package and bonus payment. There is no evidence in Ex. 102 indicating that Whalen coordinated it. The cited portion of Benhardt's deposition refers to Benhardt testifying generally that Whalen was "the senior HR partner that's responsible for supporting the line of business that Steve Barger worked in." Pl. Ex. 2 at 153:22-24.

**P.      Johnson was Barger's Employer under the FMLA**

214.    Johnson was the sole person that [sic] suggested and influenced the decision to force Barger onto leave. Ex. 6 at 111:19-24; Ex 37[.]

**Response**:      Disputed. While Johnson had input, the decision to put Barger on leave was made by Marino after he received Barger's text message advising up his need for additional surgery. Defs. 56.1 Stmt. ¶¶ 82-86.

215.    Defendants admit Johnson accepted Barger's physician's return to work authorization. C&A ¶164[.]

**Response**:      Admitted.

216.    Johnson made the call to Barger to notify him of his termination. Ex. 6 at 208:19209:8[.]

**Response**:      Admitted that Marino directed Johnson to call Barger to inform him of his

termination. Pl. Ex. 6 at 209:25-210:18. Johnson did not terminate Barger. Defs. 56.1 Stmt. ¶ 56.

217.    Johnson strongly recommended and influenced Marino to force Barger onto leave. Ex 6 at 111:19-24; Ex 37

**Response**:    Defendants incorporate their response to PSOF ¶ 214.

218.    Johnson told Plaintiff on January 13, 2017 that he should not return to work or come to First Data's offices as scheduled on January 17, 2017. C&A ¶166[.]

**Response**:    Admitted.

219.    Johnson was the human resources generalist responsible for the planning of the termination of Barger in consultation with Charron. Ex. 2 at 160:4-8[.]

**Response**:    Disputed, the cited testimony does not support PSOF ¶ 219. Defendants dispute that Johnson was responsible for planning the termination of Barger. Defs. Ex. 6 at 260:20; Defs. Ex. 15 at Response No. 1; Defs. Ex. 39; Defs. Ex. 40 at Response No. 1; Defs. Ex. 41. Barger testified that he did not think that Johnson made the decision to terminate his employment. Defs. Ex. 6 at 260:14-20.

220.    Definitive information about Barger's leave status would be transmitted by Johnson to those that needed to know the information. Ex. 9 at 123:1-124:3[.]

**Response:**    Objection, the cited evidence mischaracterizes Ording's testimony, which was that Johnson or Marino would communicate the official status of Barger's return from leave to Ording. Pl. Ex. 9 at 123:16-124:3.

221.    Johnson keeps employee comment and report records. Ex. 11 at 46:20-47:3[.]

**Response:**    Objection, the cited evidence mischaracterizes Whalen's testimony, which was as follows:

Q (Mr. Shearer) You mentioned something about inappropriate comments in this group. Are there any records of those inappropriate comments?

A (Ms. Whalen) I believe that Rhonda may have documented some comments, but I also know she spoke directly with Steve about those comments and gave him realtime feedback.
Q Are complaints about inappropriate comments logged by Ms. Johnson as they are received?
A Yes.
Q Do you know where she keeps that log?
A She would record it generally in -- I'm assuming an email.
Q Did you ever see any emails addressing specific inappropriate comments from Rhonda regarding the sales training group?
A I believe I did.

Pl. Ex. 11 at 46:12-47:819.

222.    Whalen testified that Johnson was "the primary driver" of the notification of Barger of his termination. Ex. 11 at 49:22-50:4[.]

**Response**:    Admitted.

223.    Johnson testified that her duties and responsibilities include providing influence and input on hiring and compensation decisions within the business unit she is assigned by HR to support. Ex. 6 at 18:12-20:23[.]

**Response:**    Objection, the cited evidence mischaracterizes Johnson's testimony, which was that she would be consulted for HR support but does not support her having "input" because hiring and compensation decisions ultimately rest with the business leaders. Pl. Ex. 6 at 18:12-20:23.

224.    Johnson testified that she influenced Barger's decisions regarding his organizations structure, resources, and gaps. Ex. 6 at 40:1-11[.]

**Response:**    Objection, the cited evidence mischaracterizes Johnson's testimony.

225.    Johnson testified that she receives employee reports and complaints and then transmits those human resources conversations on personnel issues to Barger. Ex. 6 at 47:1048:9 [sic][.]

**Response**:    Admitted. **Immaterial**.

226.    Johnson receives human resources complaints and makes determinations and influences

succession planning. <u>Ex. 6</u> at 50:1-53:5[.]

**Response:**      Objection, the cited evidence mischaracterizes Johnson's testimony, which was as

follows:

Q (Mr. Shearer) Okay. Did you ever make a written record of any of these complaints about Mr.
Barger's comments?
A (Ms. Johnson) (There was no response.)
Q About other people, their weight, other health concerns? Did you write those down anywhere?
A I did speak to Steve, and... and you have all my e-mails, so I'd have to look and see.
Q But there is a no employee file where complaints about inappropriate comments are recorded?
A Steve told me, in my one-on-one, that he -- what he said to individuals.
Q So the employee didn't come to you?
A One employee did. But they didn't say what Steve said. They said they felt Steve was treating
him differently, and... I asked for details. He just said Steve is -- he just felt Steve was treating
him a little differently.
Q So this push for finding a successor to Mr. Barger, was that out of your own initiative or
were others inside of First Data requesting that you promote that agenda?
A So, it was a corporate decision that we generally have successors. You may not have one for
everyone.
Q But in this specific case, was anybody telling you to find a -- get Steve out of here; find a
replacement?
A There was conversations around successors, which we have across the company, but no one
said, Get Steve out of here. No one said, Find a replacement.
Q So how did you come up with the idea to find a replacement?
A There was -- we were looking for a successor before Steve transitioned to Jeff Hack, at one
point.
Q And when we're using "successor," this is where I'm having trouble with it, because of Miss --
Bryan Fricke's group was absorbed. And so when we say successor, are we talking about
successor to what Mr. Barger was originally hired to do or successor of what Mr. Barger was
doing, which included Mr. Fricke's group?
A A successor could mean a variety of things. Someone who comes in, starts learning the
business, they're ready to take over at some point in time in the future, but the team needed
managing.
Q The document Number 65, this kind of continues the same theme of the search for the
successor. And this one is dated July 21, 2016, July 20 and July 18. So it's a week later.
A Mhm-hm (affirmative).
Q This is, as I see it, Jeff Hack and Dan Charron and Karen Whalen all weighing in that they
agree that the successor is a good idea. Do you agree with that?
A (Witness examining document.) Yes.
Q Your e-mail, which is the second one down on the page, dated July 20, is written to Karen
Whalen, your superior, again. And in the first sentence, you say, I feel it's critical to launch --
that we launch a search for Steve Barger's successor quickly. So these last few e-mails, you're
using terms like critical, ASAP, quickly.
A Mhm-hm (affirmative).

Q What did you view the problem in July to be?
A I remember this one very well. This was just after he advised me that he had, again, told one of his owner associates that she was not -- he felt she was not being -- she was not -- it was a challenge for her to get another job because of her weight. We had spoken twice on that subject. And when Tony came to town, Steve came to see me afterwards and said, Rhonda, you know, I've confessed to Tony everything I've said.
Q Did you write that down anywhere, that conversation you had with the owner associate?
A I didn't have a conversation with the owner associate. I had the conversation with Steve.
Q Did you record that anywhere?
A I was in his office during a one-on-one.

Pl. Ex. 6 at 50:1-53:5.

227.    Johnson has testified that as used internally, the term "successor" means "Someone who comes in, starts learning the business, they're ready to take over at some point in time in the future." Ex 6 at 51:11-21[.]

**Response:**    Objection, the cited evidence mischaracterizes Johnson's testimony, which was that successor "could mean a variety of things." Pl. Ex. 6 at 51:18-21. The cited testimony is an example of what "successor" could mean, not that it is a complete definition. *Id.*

228.    Marino testified that Johnson is responsible for the intake and documentation of employee complaints and maintain the business unit's human resources records. Ex. 8 at 100:5-14[.]

**Response:**    Objection, the cited evidence mischaracterizes Marino's testimony, which was as follows:

Q (Mr. Shearer) Okay. Were these complaints that you received logged, recorded, written down in writing?
A (Mr. Marino) You know, I believe Rhonda Johnson on our staff is the one who was the intake for much of this. And that, you know, she was the human resources generalist supporting Mr. Barger's group. And, you know, had close contact with Mr. Barger's department.

Pl. Ex. 8 at 100:5-14. Johnson did not maintain employment records for Barger. Defs. 56.1 Stmt. ¶ 59.

229.    Johnson provided assistance and guidance to Barger in completing his leave and short-

term disability forms and delivered those forms to the Leave Management Team. Ex. 6 at 127-21-128:21, 176:20-177:7; Ex 28: Ex 80[.]

**Response:**      Admitted.

230.    Johnson's assistance provided to Barger was outside of her normal process Ex. 6 at 124:1-4, 154:11-19[.]

**Response:**      Admitted.

231.    Johnson issued the instruction to cut-off Barger's access to First Data's network and systems. Ex. 6 at 129:25-130:10, 130:19-21, 133:13-135:25; Ex 69[.]

**Response:**      Admitted that Marino directed Johnson to terminate Barger's access, Pl. Ex. 8 160:14-161:5.

232.    Marino testified that it was Johnson impetus behind the idea to cut Barger's network access and Johnson appealed to him to support that decision. Ex. 8 160:14-24[.]

**Response:**      Admitted, with clarification that Johnson issued the instruction based on Marino's approval and direction. Pl. Ex. 8 160:14-161:5.

233.    The Leave Management Team's email on January 5, 2017 purportedly revising Barger's approved leave dates was sent to Johnson instead of to Hack, Barger's supervisor, as was the case on November 23, 2016 and December 15, 2016. Ex. 6 at 180:24-182:21; Ex 125[.]

**Response**:      Admitted.

234.    Johnson was responsible for obtaining approval of Barger's leave as purportedly extended by Leave Management's revised approval dates on January 5, 2017. Ex. 6 at 185:22-187:4; Ex 126[.]

**Response**:      Objection, the cited evidence mischaracterizes Johnson's testimony, which was as follows:

Q (Mr. Shearer) Another e-mail from Miss Voycheske to yourself on January 5th. This one, I
believe, it's 6:30 at night. What is this form that appears to be in Miss Voycheske's e-mail? Do
you know what this is?
A (Ms. Johnson) (There was no response.)
Q It doesn't look like the FMLA forms that we've seen before.
A It's not a form. She's outlined information around a request.
Q No, this is -- she says it's a request to extend his leave.
A So, it says, Upon receipt of updated medical documentation, it has been brought to our
attention that Steve exhausted his FMLA leave time on 11/28/2016. Any additional leave time
beyond 11/28/16 requires business unit approval. According to Steve's physician, he is not
scheduled to return to work until approximately 3/1/2017.
Q Okay. And then, "However..."
A (Reading): However, Steve has indicated he plans to be released to return to work on
1/17/2017. Actual return date is unknown at this time. Is the business willing to approve the
extension of Steve's leave of absence through at least 1/17/2017, possibly 3/1/2017?
Q When it refers to the "business unit" approval, what business unit needs to approve?
A Jeff Hack.
Q Why did Miss Voycheske send this to you?
A Again, they would send, generally, employee information to the HR business partner to ch out
to the leader, get any approvals or respond.
Q Did you see Mr. Hack's approval?
A Yes.
Q Did he respond?
A I do recall that he approved.

Pl. Ex. 6 at 185:22-187:8.

235.     Marino testified that Johnson was "front line" in handling Barger's leave of absence. Ex.

8 at 159:16-160:13[.]

**Response:**      Admitted.

236.     Johnson had influence on the coordination and planning of termination events in the

Global Business Solutions Group by coordinating with Benhardt, Marino and Charronwith [sic]

Johnson, Marino and Charron. Ex. 2 at 33:14-23, 34:3-21[.]

**Response:**      Objection, the cited evidence mischaracterizes Benhardt's testimony, which

nowhere mentions Johnson. Pl. Ex. 2 at 33:14-34:21. The business unit, not HR, had the

authority to include an employee in the RIF. Defs' Ex. 13 at 97:3-9.

237.     Johnson influenced the organizational design of the reporting and employee structure

inside of GBS by working with Charron and Whalen on that design. Ex. 2 at 64:4-14; Ex 59.

**Response:** Objection, the cited testimony does not support PSOF ¶ 237.

238. Whalen and Johnson were responsible for developing and influencing Charron's potential termination list for Benhardt's planning model. Ex. 2 at 70:18-71:15[.]

**Response:** Objection, the cited evidence mischaracterizes Benhardt's testimony, which was as follows:

A. (Ms. Benhardt) No, we've done it both ways.
Q. (Mr. Shearer) Okay. How did you handle the event between November of two thousand -- well, from the time -- the event that this is discussed – that this document is discussing, how -- how were the communications handled in this event?
A. I did not develop the schedule centrally. Each generalist was responsible for arranging, meeting and notification times.
Q. And Rhonda Johnson was included on -- is she included on this?
A. No.
Q. Karen Whalen was included on this?
A. Correct.
Q. So would Karen Whalen have been the one – the HRG to manage the communications in the November to -- November -- this event that's covered by Exhibit 195?
A. She would have worked with her team of generalists to develop a schedule. I don't believe Karen would have developed it herself.

Pl. Ex. 2 at 70:19-71:14. Johnson did not terminate Barger. Defs. 56.1 Stmt. ¶ 56.

239. Barger was not added to Benhardt's reduction list until January 19, 2017 and Johnson was responsible for providing notification of inclusion to the list. Ex. 2 177:16-180:14; Ex 99[.]

**Response:** Disputed. Hack made the decision to include Barger in the RIF on January 9, 2017, a decision approved by Charron. Barger's name had appeared on RIF lists prior to January 17, 2017. Pl. Ex. 102 (demonstrating that Plaintiff was included in the RIF, dated Jan. 11); Pl. Ex. 2 at 153:13-19 ("I had received his name at various points prior to January 11th for the owner associate impact list"); Pl. Ex. 76; Pl. Ex. 77; Pl. Ex. 99; Defs. Ex. 39; Defs. Ex. 41; *See infra* Defs. 56.1(b) Cntr. Stmt. ¶ 10. Barger was notified of his termination on January 13, 2017, by

Johnson. Defs. 56.1 Stmt. ¶ 153. Benhardt testified that at times, she received names to be included on her RIF lists after the employees have been notified of their termination. Pl. Ex. 2 at 179:6-19.

**Q.    First Data Restructurings**

**1.    <u>First Data's Multiple Restructurings Per Year</u>**

240.    Restructurings are changes to the organizational structure at First Data that changes headcount or roles of incumbents as the company "morphs" with employees terminated or redeployed. <u>Ex 9</u> at 56:10-22.

**Response**:    Objection, the cited evidence mischaracterizes Ording's testimony, which was as follows:

Q (Mr. Shearer) How do you distinguish one reduction in force from another reduction in force?
A (Ms. Ording) So as the business strategy changes, the organizational structure would hence change; and, therefore, head count is -- the roles that people are -- that incumbents sit in may morph or be removed from the organizational structure. And as a result, they -- the incumbent sitting in that box, if you will, would be potentially part of the reduction in force, unless they were redeployed to another role.

Pl. Ex. 9 at 56:10-22. *See also* Cagwin's testimony regarding the definition of restructuring. Pl. Ex. 4 at 24:1-21.

241.    First Data has incurred at least one "restructuring" in each quarter for more than four and a half years, with most of those related to employee terminations. <u>Ex 4</u> at 56:20-57:4[.]

**Response**:    Objection, the cited evidence mischaracterizes Cagwin's testimony, in that he did not testify that there has been a restructuring in <u>every single</u> quarter. Pl. Ex. 4 at 57:1-4.

**Immaterial**.

242.    First Data is always "RIFing" and restructuring. <u>Ex. 2</u> at 36:18-37:2, 83:5-84:4, 166:4-12; <u>Ex. 3</u> at 199:24-200:16; <u>Ex. 4</u> at 25:15-26:14, 33:6-34:7, 56:20-57:4, 93:24-95:10, 95:11-96:3,

Ex. 5 at 111:10-116:2; Ex. 6 at 199:8-22; Ex. 10 at 11:4-12:14; Ex. 11 at 127:13128:22; Ex 81[.]

**Response**:      Objection, the cited testimony does not establish that First Data is "always

RIFing." **Immaterial**.

243.    Whalen was involved in "restructurings" across virtually all groups in "numerous"

events, some small and some larger. Ex 11 at 34:3-36:6

**Response**:      Admitted. **Immaterial**.

244.    The November 2016 "restructuring" continued to morph to include additional

terminations. Ex 8 at 119:3-25[.]

**Response**:      Objection, the cited evidence mischaracterizes Marino's testimony, which was as

follows:

Q (Mr. Shearer) How long did that process take to prepare the top 3,000 and the extra 10
percent?
A (Mr. Marino) So the top 3,000 was really a continuation of work that we had done on about
150 reductions in the November-December time frame, but the specific request that Frank and
I had discussed would have been in the January 5 time frame. And then an email from me would
have gone on out to the management committee members advising them of the top-3,000
reduction process and asking them to complete their work.
Q So when did you send that -- that email, do you believe?
A I believe January 5.
Q January 5 or so?
A Right.
Q Okay. What did -- when did -- was Jeff Hack terminated as part of that top-3,000 process?
A Yes.

Pl. Ex. 8 at 119:3-25.

245.    In implementing "restructurings", or "RIFs", First Data does not use any written criteria

for selecting employees, does not use a written plan for restructuring, does not use a third-party

to evaluate the employees selected, or set trackable financial goals. Ex 2 at 18:14-21, 144:6-13,

Ex 8 at 36:22-37:18; Ex. 11 36:18-37:12, 37:23-38:8, 38:9-20.

**Response**:      Admitted in part, objection in part. Defendants admit that First Data does not use

a third-party to evaluate its RIFs. The cited evidence does not support the remaining statements in PSOF ¶ 245. **Immaterial**.

246.    First Data does not have a fixed process or procedure for tracking the results of "restructurings" implemented. <u>Ex 4</u> at 91:1-93:23; <u>Ex 8</u> at 163:3-17[.]

**Response**:    Objection. The cited testimony does not support PSOF ¶ 246. **Immaterial**.

247.    First Data has no written plan and is always evaluating additional restructurings, hirings, and firings. <u>Ex 3</u> 199:24-200:16[.]

**Response**:    Objection, the cited evidence mischaracterizes Bisignano's testimony, which was as follows:

Q. (Mr. Shearer) Do you establish any written criteria for management to use in making determinations as to who is going to be included in a reduction, and who was going to not be included?
A. (Mr. Bisignano) I think the whole organization every day is being looked at for; to add people, to
where spend money on technology, or we need to redeploy sales, or where we need to redeploy capital, or do we need to redeploy balance sheets. We don't have written procedures on these things. It is -- it is -- it is -- you know, it is -- it is management's job, and, you know, we have a Management Committee. Everybody has their job, their role, their responsibility. It is very, very clear, and they own the outcomes, and, you know, they -- they do their job very well.

Pl. Ex. 3 at 199:24-200:16. **Immaterial**.

248.    Marino testified that First Data is always evaluating headcount, resources and trying to find an optimal mix. <u>Ex 8</u> at 33:20-34:11[.]

**Response**:    Admitted. **Immaterial**.

249.    The accounting for First Data's mass terminations involving more than $5 million in severance expense is set forth in First Data's Restructuring Accounting Policy. <u>Ex 109</u>[.]

**Response**:      Admitted. **Immaterial**.

**2.       Restructurings Do Not Save Costs**

250.    In fiscal years 2015, 2016, and 2017, First Data has reported that the vast majority of its annual "restructuring costs" are severance related expenses. Ex 4 at 67:17-68:6[.]

**Response:**      Admitted. **Immaterial**.

251.    First Data does not realize the savings asserted from restructurings due to reinvestment and backfilling positions. Ex 8 at 21:25-22:9[.]

**Response:**      Disputed by the evidence cited by Barger. Pl. Ex. 8 at 21:25-22:9; see also Pl. Ex. 3 194:5-195:23. **Immaterial**.

252.    "Restructurings increase First Data's costs. Ex 4 at 36:15-24, 34:11-35:24, 41:1116[.]

**Response:**      Objection, the cited evidence mischaracterizing the cited testimony. **Immaterial**.

**3.       First Data Backfills Terminated Positions/No Reduction In Headcount**

253.    First date [sic] does not implement hiring freezes. Ex 8 at 22:10-25[.]

**Response:**      Objection, the cited evidence mischaracterizes Marino's testimony, which was as follows:

Q (Mr. Shearer) When you were implementing this top 3,000 reduction, was a hiring freeze put in place for any part of the company?
A (Mr. Marino) We, you know, certainly would like, during that period of time, for attrition to be our friend. But in a company of 30,000 people, it's almost impossible to put in place a hiring freeze. We have, you know, hundreds -- thousands, rather, of people who do answering the telephone, which you have to be able to do for your clients. You have to be able to send out mail statements every day. So in a company of 30,000 people, it's rare and very difficult to say that there's an outright hiring freeze. Would you want to be able to limit that during that period of time? Sure.

Pl. Ex. 8 at 22:10-23:2. **Immaterial**.

254.    No policies or procedures are in place to prevent backfills of jobs eliminated. Ex 2 at 139:10-23, Ex 94[.]

**Response:**     Admitted. **Immaterial**.

255.    First Data is always looking for new hires. Ex 8 at 33:20-34:11[.]

**Response:**     Objection, the cited evidence mischaracterizes the cited testimony. **Immaterial**.

256.    First Data has new hire training in Atlanta every other week. Ex 4 at 80:11-81:10, Ex 95.

**Response:**     Admitted. **Immaterial**.

257.    At the time of Barger's termination, First Data had hundreds of available job postings

seeking employees. ECF No. 1, Cmplt, Exhibit K.

**Response:**     Admitted. **Immaterial**.

258.    Following terminations in a restructuring, positions are backfilled with new hires or

contractors. Ex 8 at 166:16-167:10; Ex 94[.]

**Response:**     Objection, the cited testimony does not support PSOF ¶ 258. **Immaterial**.

259.    Marino testified that backfilling has been a historical pattern at First Data. Ex 8 at 162:9-

164:11; Ex 94[.]

**Response:**     Objection, the cited testimony does not support PSOF ¶259. **Immaterial**.

260.    First Data cannot track inflows and outflows or measure the financial impact of a

reduction. Ex 5 at 111:10-116:2; Ex_8 at 217:11-218:11[.]

**Response:**     Disputed. Defs. Ex. 44.

261.    First Data's restructuring cost savings models do not take into account the backfilling of

positions following terminations. Ex 2 at 61:2-13, 66:18-67:2, 67:14-68:6, 69:1070:1, 68:21-

70:9, 84:9-85:24, 85:25-89:7, 89:21-24, 95:22-96:16; Ex4 at 91:1-92:4, 92:16-20; Ex. 8 at

169:19-171:10; Ex 94; Ex 106, Ex 107.

**Response:**     Objection, the cited evidence mischaracterizes the testimony and exhibits.

262.    First Data's compensation expenses have increased despite terminations due to backfills.

Ex2 at 138:6-138:25; Ex 94[.]

**Response:**     Disputed. Cagwin's testimony contradicts PSOF ¶ 262, which states as follows:

A (Mr. Cagwin) And the question to that is, if you look at the salaries and wages expenses in here, we've been able to lower those over the last three years, while doing some acquisitions, while expanding things like Clover, while expanding into ISB, and turned around a flat organization with no growth into a much more stable growth organization, all while actually lowering salaries expenses. In addition to that, salary inflation's been at two to three percent over the last three years, so without these actions, it would actually be up, not down.

Q (Mr. Shearer) So how much, over the last three years, do you believe salary expense is down over where it would have been without these restructuring initiatives?

A So, you're going to find salaries expense in two places in the document you alluded to earlier. One of them is going to be under your "cost of services" on page 43. And your employee-related items, the two first rows there in the middle of the page under "cost of services," salaries, wages and bonuses, and stock-based comp. And you'll notice for cost of services, we are down with those two things combined, 2015 to 2016, and they were down even more... 2016 to 2017. I can pull a calculator out and do the math, but you've got stock comps down 14 and 35 percent, respectively, and salaries are flat and down too, while salary inflation was two to three percent. So most companies would expect it would be up, not down, without these actions.

Q You're saying salary inflation of two if you kept same employee base, that should increase?

A Two to three percent.

Q Two to three percent. But it's down two percent, which is $40 million?

A Correct.

Q Ignoring for the inflation?

A Right.

Q It's 40 million without inflation.

A And if you add in inflation, you're looking more like a, over the three years, you're looking at more like a seven percent down on -- that's $110 million. I'm doing the math in my head, so it may be wrong.

Q No, I'm following you. And, but that cost, the $83 million --

A (Inaudible interruption.)

Q -- in 2017?

A But it's not only for this row, you also have to look back at salaries, wages -- selling, general, administrative. Go to the next page.

MR. EIDELMAN: Page 44?

THE WITNESS: Page 44.

A You'll notice there that our salaries wages, bonus and other is down five percent 2015 to 2016, and one percent from 2016 to 2017, while stock-based comp is down the first year-over-year basis, 2016 to 2015, and then up in 2017 to 2016. And the reason for the up, we did some acquisitions and gave the new management team some stock awards. But even if you combine those two, we're still down there. You put it all together, I believe we're down about four or five percent in 2017 relative to 2016.

Pl. Ex. 4 at 45:18-48:7. *See also* Defendants' response to PSOF ¶ 263.

263.    The 2016 restructuring event terminated 2,000 people to save $4 million because of the

revolving door of backfills. Ex 4 at 48:8-51:5, 42:9-16, 43:18.

**Response:**    Objection, the cited evidence mischaracterizes Cagwin's testimony, which was as

follows:

Q (Mr. Shearer) Why in 2016, on SG&A, you know, there's a big drop between 2015 to 2016,
$40 million, roughly, and only a 4 million drop from 2016 to 2017. How many -- and I'm trying
to understand. I thought there were a significant number of terminations in 2017.
A (Mr. Cagwin) There were. And you'll start seeing you've gotten some benefit in this year, **but
we also bought three companies last year,** which generally went to SG&A, because they were
ISOs, and ISOs are selling organizations. They don't have a lot of cost of services rep --
employees in their baselines. **So you have new costs coming in from those two acquisitions**.
You've had restructuring that have cost savings going out the door. So you still save one percent
with three things going on. You bought companies, you've had salary inflation, and you still
lowered cost.
Q So you acquire companies, which brings in new employees, and then you terminate existing
employees, and the net result of that is the $4 million savings in --
A Correct.
Q How many employees were terminated as part of restructuring in 2017?
A I don't know the answer to that question. I know our headcount's down 2,000 heads earlier. So
how many were restructuring versus hiring freezes versus attrition?
Q So we've terminated 2,000 people?
A We've reduced our headcount by 2,000 people.
Q There could be some attrition in there?
A There's attritions in there.

Pl. Ex. 4 at 48:8-49:15 (emphasis added).

264.    First Data's annual interest expense in 2017 was $937 million. Ex 4 at 31:1-17.

**Response:**    Admitted. **Immaterial**.

265.    Restrucurings [sic] cause immediate severance expense in the hopes of savings in the

future. 50:22-54:22.

**Response:**    Objection. No evidence cited to support PSOF ¶ 265.

### 4.    Defining Beginning and End of a Restructuring

266.    First Data's first step in beginning a restructuring is to define the entire existing employee

base and create a list of those employees and then select employees from that list. Ex 2 at 39:12-

25[.]

**Response:**      Admitted.

267.    Benhardt testified that the list of employees to be terminated changes and is always liquid and an employee is not confirmed to be in a reduction until that employee is notified of termination. Ex 2 at 112:20-113:15[.]

**Response:**      Admitted.

     **5.**      **Barger's Position was not Eliminated**

268.    Charron, in response to interrogatories, stated that "management made the decision that Robin Ording could take over the training group managed by Barger on an interim basis. . . She continues to manage the Sales Training Group." Ex 119 at p.23, Response to ¶3.

**Response:**      Admitted.

269.    Defendants admit that Ording assumed all of Barger's responsibilities for management of the sales training group. C&A at ¶146, 211; Ex 8 at 31:22-18[.]

**Response:**      Admitted.

     **6.**      **Barger was not in a Reduction in Force**

270. Benhardt testified that as of January 11, 2017 Barger was not on her list of employees to be included in the event. Ex 2 at 151:25-152:25; Ex 102.

**Response:**      Disputed. This paragraph is not supported by the cited evidence. Pl. Ex. 2 at 151:25-152:25; Pl. Ex. 102. In mid-November 2016, and continuing through December 2016 and January 2017, there were multiple email discussions about including Barger in the RIF. See Defs. Rule 56.1 Stmt. ¶ 119, Ex. 33. See also Defendants' response to PSOF ¶ 239.

271.    Barger was not added to Benhardt's files tracking the reduction until January 17, 2017. Ex.2 at 177:16-180:14, Ex 104, Ex 105[.]

**Response:**     Admitted in part, disputed in part. This paragraph is not supported by the cited evidence. In mid-November 2016, and continuing through December 2016 and January 2017, there were multiple email discussions about including Barger in the RIF. See Defs. Rule 56.1 Stmt. ¶ 119, Ex. 33. *See infra* Defs. 56.1(b) Cntr. Stmt. ¶ 10; Pl. Ex. 76; Pl. Ex. 77; Pl. Ex. 99. See also Defendants' response to PSOF ¶ 239.

272.    Benhardt testified that according to her records, no one in the "event" in the GBS group was notified of termination as part of the "event" between January 11, 2017 and January 19, 2017. Ex.2 at 160:9-25; Ex 97, Ex 98[.]

**Response:**     Objection, the cited evidence mischaracterizes Benhardt's testimony.

273.    Barger was in the GBS group [sic] was notified of his termination on January 13, 2017. ¶218 above.

**Response:**     Admitted.

274.    Johnson was responsible for reporting GBS terminations in the "event" to Benhardt. Ex 2 at 160:4-8.

**Response:**     Objection. The cited evidence does not support PSOF ¶274. **Immaterial**.

275.    On January 9, 2017, Benhardt was still trying to set timelines and parameters for the termination event alleged to include Barger. Ex 2 at 145:2-22; Ex 103; Ex 108[.]

**Response:**     Admitted. **Immaterial**.

**R.    Additional Evidence of Pretext**

276.    On November 22, 2016, Marino decided that forcing Barger on leave would allow him to "jigger" things around to create a savings. Exhibit 8 at 172:24-174:7; Ex 111[.]

**Response:**     Objection, the cited evidence does not support PSOF ¶276. There is no evidence that Marino "decided that forcing Barger on leave would allow him to 'jigger' things around to

create a savings." Pl. Ex. 8 at 172:24-174:7; Pl. Ex. 111.

277.    "Restructuring" receives different accounting treatment that [sic] normal operating

expenses. Ex 2 at 52:15-21[.]

**Response:**    Admitted.

278.    First Data uses its "Restructuring Accounting Policy" to manipulate its reported non-

GAAP financial measures such as EBITDA and Adjusted Net Income by excluding

"restructuring costs from the calculation. Ex 4 at 83:11-24, 85:11-21[.]

**Response:**    Objection, the cited evidence mischaracterizes Cagwin's testimony, which was as

follows:

Q (Mr. Shearer) Why do you need to make a distinction between a termination that is a
restructuring and a termination that is not a restructuring for accounting purposes?
A (Mr. Cagwin) Because the accounting rules require you, for a restructuring activity, to disclose
that restructuring activity in a footnote in your annual report.
Q This is purely a disclosure policy?
A There are downstream impacts of that decision, but the policy was written for the GAAP
requirements. And as we talked about earlier, once it's been classified as a restructuring, then it
would be included as an adjustment to our ANI and EBITDA. But the policy is around these
accounting requirements.
Q You said ANI?
A Adjusted net income. Apologies.
Q Okay. And EBITDA. Where does it come out of EBITDA as an adjustment to? Is it interest,
taxes, depreciation, amortization?
A No, none of those. We have defined EBITDA as it's laid out in our annual report and 10-K to
have other items excluded in addition to the generic definition of EBITDA.
MR. EIDELMAN: And you're referring to Exhibit 47?
THE WITNESS: I am.
A Would you like me to highlight the pages for you?
BY MR. SHEARER:
Q No. I think I'll find it.
A Okay.
Q I know where the EBITDA disclosure is.
A Okay.
Q So if it's a restructuring charge, it's still in net income, but for purposes of calculating
adjusted net income and EBITDA, the restructuring charges get backed out of income or
earnings?
A Gets backed out... in a positive increase to adjusted net income and adjusted EBITDA.
Q And it says "material changes." What is a material change in the context of employee

terminations?

A So if you look at the second page of the policy, there's a decision tree. And we put the: Is it material? Greater than $5 million in thresholds for a program.

Q Is that 5 million -- that was where my question was going to be. Is that 5 million in severance expense? Is that 5 million in reduced salary? What, 5 million of what?

A Costs. Cost for the programming. For the cost of the programming could include impairment on a building, salaries expense, project management to oversee the project, retention associated with the program. It could be any cost that are directly attributed to a restructuring initiative.

Q And is that net of any benefits from the restructuring program?

A No, it's just costs.

Pl. Ex. 4 at 83:11-85:21.

279.    EBITDA performance by First Data impacts executive bonuses. Ex 2 at 110:7-16, Ex 11 at 123:10-17[.]

**Response:**    Objection, the cited evidence mischaracterizes cited testimony. **Immaterial**.

280.    First Data uses its reductions-in-force to manipulate its accounting for equity based compensation. Ex 4 at 63:2-15, 64:18-20, 65:11-66:3[.]

**Response:**    Objection, the cited evidence mischaracterizes the cited testimony. **Immaterial**.

281.    First Data uses its "restructurings" to improve executive committee group performance by removing severance expense from the group's expenses in evaluating performance. Ex 4 at 99:3-16, Ex 5 at 101:12-102:9[.]

**Response:**    Objection, the cited evidence mischaracterizes the cited testimony. **Immaterial**.

282.    First Data uses terminations simply to incur other expenses (severance excluded from EBITDA) with the net result of offsetting any gains (decreased salary and bonus) on a GAAP basis. Ex 4 at 86:12-22.

**Response:**    Objection, the cited evidence mischaracterizes Cagwin's testimony, which was as follows:

> The second type could be the example we gave earlier, where you may be changing your work structure, trying to shrink it or grow it in certain parts. And there, you're moving activities – for example, earlier, you had the ten employees

and you're going down to nine, that work gets redeployed across the other nine employees. You may go reinvest that money in other departments, more value added or has higher growth potential than your department. But you are reorganizing the activities. You are redeploying the work.

Pl. Ex. 4 at 86:12-22. **Immaterial**.

283.    First Data uses end of the year terminations because the payment of severance upon termination avoids the accounting treatment of the payment of the same amount as bonuses if employment continues. Ex 11 at 123:7-125:8[.]

**Response:**      Objection, the cited evidence mischaracterizes the cited testimony. **Immaterial**.

284.    First Data announced that it was being acquired by Fiserv in a transaction to close later in 2019 at a purchase price of $22 billion to be paid in a stock exchange. Ex 129[.]

**Response:**      Admitted. **Immaterial**.

285.    No alternative accommodations other than forcing Barger to take a leave of absence were considered by the Defendants. Ex 6 at 124:9-126:10[.]

**Response:**      Admitted.

286.    On December 15, 2017, Barger was told by First Data that he had and [sic] additional 80 hours of paid-time-off available. Ex 6 at 169:21-169:14, Ex. 67[.]

**Response:**      Admitted in part, objection in part. Pl. Ex. 67 is not dated December 15, 2017, but it dated December 20, 2016.

287.    As of December 2016, First Data had experienced 16 consecutive weeks of headcount growth and 855 job requisitions were open. Ex 2 at 101:16-23, 103:24-104:15[.]

**Response:**      Admitted in part, objection in part. The cited evidence does not support PSOF ¶ 287 regarding 16 consecutive weeks of headcount growth. **Immaterial**.

288.    Employees other than Barger were offered, and received, cash payment for unvested equity as part of their termination package. Ex 2 at 126:6-127:10[.]

**Response:**     Disputed. Marino testified that no other employee received "all" of their unvested equity in a separation package. Pl. Ex. 8 at 87:21-88:15.

289.    On January 7, 2017, First Data had 635 job requisitions open. Ex 2 at 130:9131:4[.]

**Response:**     Admitted. **Immaterial**.

290.    On January 6, 2017, after learning Barger was returning, Marino indicates he wants human resources to take over training. Ex. 8 at 141:14-142:6[.]

**Response:**     Objection, the cited evidence mischaracterizes Marino's testimony, which was as follows:

Q (Mr. Shearer) And so you told Mr. Bisignano that Dan and Chris had asked you to take Mr.
Barger's organization; is that correct?
A (Mr. Marino) Correct.
Q When did they ask you to do that?
A You know, as -- some time in January, I believe, and that was predicated on
the great job that Robin was doing. You know, the view was that, you know, Robin came into a
department that was in shambles. She got the mission right-sized to the core, deliverables of that
team. And the team was functioning much better, and you know, the clients were very, very
pleased that their cost had gone down, but they were also getting great result --
Q Okay.

Pl. Ex. 8 at 141:14-142:6.

291.    In January 2017, management committee members were supposed to be self- funding any new hires by terminating other members of their group. Ex 2 at 132:24-136:24[.]

**Response:**     Disputed, the cited evidence does not support PSOF ¶ 291. Benhardt testified about an email that she sent to Marino in which she proposed to work with finance to build true and accurate budgets to account for headcount. Benhardt testified regarding an email that she sent to Marino on January 7, 2017. *See infra* Defs. 56.1(b) Cntr. Stmt. 11. **Immaterial**.

292.    On January 13, 2017, the date Barger was notified of his termination, he was an SVP in Charron's GBS Group, and First Data announced the hiring of Senior Vice President EJ Jackson within Charron's GBS Group. Ex 110.

**Response:**      Admitted. **Immaterial**.

293.    The negotiation for the hiring of EJ Jackson took several months prior to the announcement on January 13, 2017. Ex 3 at 237:14-19, 238:25-239:6, 238:16-25; Ex 5 at 118:15-119:7; Ex.7 at 46:23-28:21[.]

**Response:**      Objection, the cited testimony refers to an "interview process." that led to the hiring of EJ Jackson, who was not hired as Barger's replacement. Pl.. Ex 3 at 237:14-19, 238:25-239:6, 238:16-25; Pl. Ex 5 at 118:15-119:7. **Immaterial**.

294.    On January 13, 2017, Barger had been on forced leave of absence for several months (November 19, 2016 to January 13, 2017).

**Response:**      Objection. Plaintiff cites no evidence to support PSOF ¶ 294.

295.    Bisignano testified that investors were told in November 2016 that the ISG business, which was eventually headed by Jackson upon hire, was to be up and operational soon after that announcement. Ex 3 at 238:25-239:6[.]

**Response:**      Objection, the cited evidence does not support PSOF ¶ 295. Jackson was not hired until January 2017, so it is impossible for Bisignano to have made this statement in November 2016. PSOF ¶ 292. **Immaterial**.

296.    EJ Jackson's starting salary exceeded $350,000 per year Ex 123[.]

**Response:**      Admitted. **Immaterial**.

297.    Bisignano testified that counting heads is difficult because of the movement between employees and contractors, and that total compensation expense is up and not down. Ex 3 at 97:11-98:8[.]

**Response:**      Admitted. **Immaterial**.

298.    Bisignao [sic] testified that internal hiring and internal mobility is preferred to new

hiring. Ex 3 at 204:24-205:9[.]

**Response:**   Admitted. **Immaterial**.

299.   On January 27, 2016, Steffen, head of the Leave Management Group, requested to know the status of Barger's short-term disability application. Ex 64[.]

**Response:**   Admitted in part objection in part. The cited evidence, Pl. Ex. 64, is dated January 27, 2017, not 2016. **Immaterial**.

**S.   Disability Animus**

300.   In its EEOC Position Statement, First Data criticized Barger because he "spoke often and explicitly about his health issues to his subordinates to the point that his sharing of the details made them feel uncomfortable" and that employees in the training group express "how uncomfortable they had been with Barger openly sharing the most intimate details of his medical condition." Ex 130 at p.4-5[.]

**Response:**   Objection, as to the characterization of the cited evidence. The position statement speaks for itself.

301.   By interrogatory request to Barger in this case, Barger was asked to identify each employee with whom he "spoke" about your cancer diagnoses or treatment, the dates of these conversations, the particular topic(s) discussed. Ex 115 at p. 2 Interrogatory 16.

**Response:**   Admitted. **Immaterial**.

**T.   Barger's Medical Professional Testimony**

302.   Barger's physician in Atlanta, Dr. Harry Baddour ("Baddour") testified that he never communicates with his patients employers. Ex 1 at 7:5-8.

**Response:**   Admitted.

303.   Baddour testified that he did not know that Barger was employed by First Data. Ex 1 at

9:1-3[.]

**Response:**     Admitted in part, objection in part. Baddour testified that prior to the deposition, he did not know that Barger had been employed by First Data. Pl. Ex. 1 at 9:1-3. However, the Certification of Health Care Provider completed by Baddour indicated that it was from First Data. Defs. Ex. 21. **Immaterial**.

304.    Baddour testified that he did not speak with Barger about his employment. Ex 1 at 9:7-12[.]

**Response:**     Objection, the cited evidence mischaracterizes Baddour's testimony that that he "did not remember" if he spoke to Barger about his employment. Pl. Ex. 1 at 9:7-12.

**Immaterial.**

305.    Dr[.] Baddour testified that he did not know Barger's job duties. Ex 1 at 19:18-20:04[.]

**Response:**     Admitted. **Immaterial**.

306.    Dr. Baddour does not recall any discussion of placing a return to work date of March 1, 2017 on Barger's physician information form. Ex 1 at 23:11-24:1[.]

**Response:**     Admitted in part, objection in part. Baddour's testimony refers to the Certification of Health Care Provider form that Baddour signed, which states that Barger's return to work date was March 1, 2017. Defs. Ex. 21. **Immaterial**.

307.    With respect to Barger's appointment on January 20, 2017, Baddour testified that Barger's nly [sic] limitations were communication and that Baddour did not know Barger's job duties. Ex 1 at 42:15-43:13[.]

**Response:**     Objection, the cited evidence does not support PSOF ¶ 307. **Immaterial**.

308.    Baddour testified that the information recorded by MetLife as of January 10, 2017 was incorrect and that Barger had only no restrictions on speech. Ex 1 at 46:17-51:7, 52:1754:16,

56:3-56:20, 63:7-15.

**Response:**     Admitted. **Immaterial**.

309.    Baddour testified that the term "restriction" as he uses it means that he "cannot complete his job duties and functions as easily as he could prior to his surgery. He can't execute them as easily." Ex 1 at 64:3-9[.]

**Response:**     Admitted. **Immaterial**.

310.    Baddour testified that his use of "restriction" did not mean Barger could not go back to work and that people frequently go back to work with "restrictions." Ex 1 at 64:10-13[.]

**Response:**     Admitted. **Immaterial**.

311.    Baddour testified that on January 20, 2017 Barger's speech using his voice prosthetic was with excellent intelligibility. Ex 1 at 66:4-8.

**Response:**     Admitted. **Immaterial**.

312.    Baddour testified that on December 13, 2016, Barger's only restrictions were that he needed assistance feeding himself through the feeding tube and occasional wound dressing changes. Ex 1 at 67:25-68:19[.]

**Response:**     Admitted. **Immaterial**.

313.    Dr. Baddour's registered nurse, Ashley Parrish ("Parrish") testified that she never communicates with patients' employers. Ex 1A at 7:24-8:2

**Response:**     Admitted. **Immaterial**.

314.    Parrish testified that she did not know that Barger was employed by First Data. Ex 1A at 10-12.

**Response:**     Objection, the cited evidence does not support PSOF ¶ 314. **Immaterial**.

315.    Parrish testified that she did speak with Barger about his employment. Ex 1A at 9:13-15,

55:22-56:1[.]

**Response:**      Disputed. The cited evidence contradicts PSOF ¶ 315. Parrish testified that she

did *not* speak with Barger about his employment. Pl. Ex. 1A at 9:13-15; 55:22-56:1.

**Immaterial**.

316.    Parrish testified that after a surgery like Barger's patients can return to work with only

their speech limited. Ex 1A at 12:1-10[.]

**Response:**      Admitted. **Immaterial**.

317.    Parrish testified that a fistula like that being suffered by Barger following surgery would

not restrict work. Ex 1A at 12:24-13:5[.]

**Response:**      Admitted. **Immaterial**.

318.    Parrish testifies [sic] that the writing of a March 1, 2017 return date on the physicians

information form provided to MetLife is not her writing. Ex 1A at 15:8-16:10.

**Response:**      Admitted. **Immaterial**.

319.    Parrish testified that the March 1, 2017 date on the form made no sense because it

reflected too long of a recovery time. Ex 1A at 18:12-19[.]

**Response:**      Admitted. **Immaterial**.

320.    Parrish testified that Barger should have been able to go back to work prior to March 1,

2017. Ex 1A at 36:9-18[.]

**Response:**      Admitted. **Immaterial**.

321.    Parrish testified that as of December 13, 2016, Barger's main restriction was he may take

longer to talk and he was still using a feeding tube. Ex 1A at 19:24-20:13[.]

**Response:**      Admitted. **Immaterial**.

322.    Parrish testified that Barger's feeding tube was removed on January 10, 2017 and had not

been used in a month. Ex 1A at 29:10-30:15.

**Response:**     Admitted. **Immaterial**.

323.     Parrish testified that Barger's return to work authorization was based on his not having

needed a second surgery and that his feeding tube had been removed. Ex 1A at 6-10.

**Response:**     Objection, the cited evidence does not support PSOF ¶ 323. **Immaterial**.

324.     Parrish testified that the information she gave MetLife in January 2017 was derived from

her repeating to them the information from his FMLA form that had been signed a month earlier,

and that the information that was given to MetLife on [sic] in January was an inaccurate

description of Barger's then current condition. Ex 1A at 51:6-22, 52:20-53:11, 62:916[.]

**Response:**     Admitted. **Immaterial**.

325.     Parrish testified that a return to work date of March 1, 2017 was not true on January 10,

2017 and Parrish had no idea why MetLife's notes would indicate a return to work date of March

1, 2017. Ex 1A at 53:14-24[.]

**Response:**     Admitted in part, objection in part. The evidence shows that the return to work

date discussed in the cited testimony was based on information from Parrish's office. Pl. Ex. 1A

at 52:24-54:2. **Immaterial**.

326.     Parrish testified that if her office had performed Barger's surgery on September 6, 2016,

his initial return to date on the FMLA forms as she practices would have been December 6,

2016. Ex 1A at 60:8-11.

**Response:**     Admitted. **Immaterial**.

327.     Parrish testified that Barger's second surgery was canceled on December 9, 2016. Ex 1A

at 60:60-61:2 [sic][.]

**Response:**     Objection, the cited evidence of Parrish's testimony was that "I don't know if he

ever had it corrected. I thought he did have it corrected, but I can't confirm." Pl. Ex. 1A at 61:3-6.

328.    Parrish testified that neither MetLife nor First Data ever provided her a description of Barger's job and she did not know Barger's job duties. Ex 1A at 61:10-20.

**Response:**    Admitted. **Immaterial**.

**U.    Disability Benefit Accounting Stipulation**

329.    The parties have stipulated as to the treatment of accounting for short-term and long-term disability benefits are paid by First Data and are a First Data expense akin to salary and long-term disability insurance premiums are an expense to First Data, but the long-term disability benefits paid are an expense of the insurer and not First Data. Ex 6 at 8:25-13:2[.]

**Response**:    Objection as to Barger's mischaracterization of the stipulation. First Data stipulated that it pays short-term disability benefits directly, which are treated as a salary expense. With respect to long-term disability benefits, First Data pays premiums to MetLife and MetLife pays the long-term disability benefits. Pl. Ex. 6 at 8:25-13:2. **Immaterial**.

**V.    Disability and Leave Administration by MetLife**

330.    First Data admits in response to a Request for Admissions that:

> First Data does contract with MetLife to provide short-term disability benefit determinations and administrative services pursuant to a Disability Benefit Plan Advice-to-Pay Administrative Services Agreement (effective January 1, 2016).

Ex 116 at p. 6 ¶ 8.

**Response**:    Admitted in part, objection in part. PSOF ¶ 330 misquotes the cited evidence. **Immaterial**.

331.    In Section 2.F. on page 6 of the Advice-to-Pay Administrative Services Agreement between Metropolitan Life Insurance Company and First Data Corporation, dated January 1,

2006, as amended to date [Bates METLIFE000855-000898], First Data represented:

> [T]he Plan is an employee welfare benefit Plan as defined in ERISA.

Ex 124[.]

**Response**:      Objection, there is no page 6 in Pl. Ex. 124. **Immaterial**.

332.    First Data in response to Requests for Admission admitted that its short-term disability benefit is not an employee welfare benefit plan as defined in ERISA when its stated:

> First Data's short-term disability benefits are a form of exempt self- funded salary continuation paid from the Company's general assets, and are exempt from ERISA coverage. First Data's decision to include a description of its short term disability benefits in its Summary Plan Description (SPD) and the filing of a Form 5500 do not create an ERISA employee welfare benefit plan.

Ex 116 at p. 2-3, ¶7.

**Response**:      Admitted. **Immaterial**.

333.    First Data admits that it is unable to produce any written agreements, the parties to which include First Data and MetLife, pursuant to which MetLife was authorized to administer First Data's employee FMLA leave of absence program on behalf of First Data between September 1, 2016 and March 31, 2017. Ex 116 at response to ¶5.

**Response**:      Admitted. **Immaterial**. See Defendants' response to PSOF ¶ 334.

334.    First Data admits:

> MetLife does not administer First Data's FMLA leave program because First Data administers that program. However, as part of its administration of the FMLA leave program, First Data may obtain information from MetLife that it uses to administer the FMLA leave program as authorized by the Authorization to Disclose Information About Me form.

Ex 116 at 2 response to ¶5.

**Response:**      Admitted. **Immaterial**.

335.    The "Authorization to Disclose Information About Me" form states:

> I [Barger] understand that my employer has requested that MetLife integrate the claim services for disability benefits and request for leave under the FMLA . . . For purposes of determining my eligibility for disability benefits and/or Leave Request . . . I permit the following disclosures of information . . .".

Ex 47 at p.2[.]

**Response:**    Admitted in part, objection in part. PSOF ¶ 335 misquotes the cited evidence.

**Immaterial**.

## W.    **"Last Day Worked" Confusion**

336.    On December 16, 2016 Barger asks Johnson what his last day worked was for purposes of short-term disability. Ex 51[.]

**Response:**    Objection, the cited evidence does not support PSOF ¶ 336.

337.    On December 16, 2016, Johnson then asks Voycheske (Leave Management) what Barger's last day worked was. Ex 51[.]

**Response:**    Admitted in part, objection in part. The cited evidence does not support PSOF ¶ 337. In Pl. Ex. 51, Johnson emailed "HRhelpdesk" and "HR Service Center," copying Barger. Voycheske is not copied anywhere on the email chain. Pl. Ex. 51.

338.   On January 5, 2016, Voycheske asks Barger what his last day of work was. Ex 137[.]

**Response:**    Admitted in part, objection in part. Pl. Ex. 137 is an email dated January 5, 2017, not 2016.

339.   On January 25, 2017, Pulverenti asks Johnson what was Barger's last day worked. Ex 60[.]

**Response:**    Objection, the cited evidence misconstrues Pl. Ex. 60, where Pulverenti asks

Johnson what Barger's "last day worked will be" in reference to his separation from First Data. Pl. Ex. 60 does not relate to Barger's last date worked before taking FMLA leave.

340.    When Johnson was asked the question in her deposition "who, then, would be able to identify Mr. Barger's last day of work, in the system", Johnson testified "When you say last day worked," In what sense? On the premises?" Ex 6 at 155:12-15[.]

**Response:**      Admitted. **Immaterial**.

341.    When Johnson was asked the question in her deposition "This topic has me confused, because at one point you asked Jennifer Voycheske what Mr. Barger's last day of work was; at one point Miss Voycheske asked Mr. Barger what his last day of work is; and now Stephanie Pulverenti is asking you what Mr. Barger's last day of work is. Who should have the answer?" Johnson's testimony was "I cannot speculate on that. I'm not sure. I don't have any insight into whom." Ex 6 at 212:24-213:7[.]

**Response:**      Admitted. **Immaterial**.

### X.    <u>Damages</u>

342.    First Data stated in its EEOC Response that Barger "told his group that "his life is his work" and even though he was having major surgery, he would not be taking any time off to recuperate and he expected to be copied on every e-mail." Ex 130 at p.4[.]

**Response:**      Admitted. **Immaterial**.

343.    By email, Marino advised Joshua King that Barger found his prior semi-retirement to be "overrated". Ex 114[.]

**Response:**      Admitted. **Immaterial**.

344.    Barger's cultural transformation program he was hired to implement at First Data, from his experience, takes seven to ten years to fully implement across an organization the size of

First Data. <u>S.Barger Dec</u> ¶20[.]

**Response:**    Admitted that the Barger Declaration contains this statement. **Immaterial**.

345.    The work-life expectancy table relied upon by Defendants' expert, Gardemal, indicates the mean average is that a 72-year old male with a bachelor's degree in the work-force today will work for an additional 3.3 years, and that 10% of 72 year olds in the work force today will still be in the workforce for 7.5 or more years. <u>Ex 14</u>[.]

**Response:**    Objection. Barger cites an academic journal, which is not admissible evidence. Further, Barger cites information contained in Defendants' damages expert report, which is also inadmissible evidence. *Glowczenski v. Taser Int'l Inc.*, 2010 WL 1957289, at *2 (E.D.N.Y. May 13, 2010) ("Courts in this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of Fed. R. Civ. P 56(e), and cannot be used [on] a summary judgment motion without additional affidavit support."). Evidence involving damages calculations in this case must be expert testimony. **Immaterial**.

## COUNTERSTATEMENT OF MATERIAL FACTS

1.      After Bisignano became CEO of First Data in 2013, he began implementing financial management and operational changes in order to save the Company given its dire financial condition. Defs. Ex. 53 at 33:20-35:0; 47:5-49:11; 106:2-107:10.

2.      RIFs are a management tool used by Wall Street financial services firm to reduce headcount and improve financial performance. Defs. Ex. 54 at 106:12-107:1.

3.      The presentations that Barger and Plumeri made to business associates changed upon Marino's hiring. Marino instituted a program known as "First Data Way" in which numerous employees including Marino, Ording, and Barger made presentations to employees around the country. The focus of First Day Way was not solely sales transformation. Defs. Ex. 55 at 64:12-66:16.

4.      In connection with his hiring as a consultant at First Data, Barger told Plumeri that: "I was making 20, 25,000 a month." Defs. Ex. 54 at 17:20-21.

5.      Barger's consulting fee at First Data was set at $30,000 per month because he told Plumeri he was making $20,000 - $25,000 per month. Defs. Ex. 54 at 17:22-23.

6.      MetLife paid Barger long-term disability benefits for the period from December 4, 2016, through March 3, 2017 in the total amount of $41,557.50. Defs. Ex. 56.

7.      Barger never refunded any of the long-term disability benefits he collected from MetLife back to MetLife. Defs. Ex. 54 at 70:16-71:1.

8.      The 10% of the Top 3,000 RIF, which Barger was included, was referenced in First Data's 2017 10-K. Defs. Ex. 57 at 23:14-26:13.

9.      When asked whether he would have been included in the RIF had he not taken leave, Barger testified "I have no clue. I have no idea. I don't have a belief about that." Defs. Ex. 6 at 158:6-13.

10.     Barger was included in the RIF before raising complaints of an illegal termination. Pl. Ex. 76; Pl. Ex. 77; Pl. Ex. 99; Defs. Ex. 58; Defs. Ex. 59; Defs. Ex. 60 (RIF list - dated December 9, 2016); Defs. Ex. 61 (RIF list - dated December 16, 2016); Defs. Ex. 62 (RIF list dated December 22, 2016).

11.     On January 7, 2017, Benhardt emailed Marino regarding her proposal to work with finance to build true and accurate budgets to account for headcount. Defs. Ex. 63.

**SAUL EWING ARNSTEIN & LEHR LLP**
*A Delaware LLP*

*/s/ Gary B. Eidelman*
Gary B. Eidelman, Esq. (admitted *pro hac vice*)
500 E Pratt Street
Baltimore, Maryland 21202
T: (410) 332-8975
Gary.Eidelman@saul.com

Gillian A. Cooper, Esq.
650 College Road East, Suite 4000
Princeton, New Jersey 08540
T: (609) 452-5021
Gillian.Cooper@saul.com

New York Office
1270 Avenue of the Americas, Suite 2005
New York, New York 10020

*Attorneys for Defendants,*
*First Data Corporation, Frank Bisignano, Dan*
*Charron, Anthony Marino, Karen Whalen, and*
*Rhonda Johnson*

Dated: February 20, 2019
        Baltimore, Maryland