# EXHIBIT A

Transcript of Steven J. Shapiro, Ph.D
Conducted on October 30, 2018

1 (1 to 4)

---

**Page 1**

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - -x
STEVEN B. BARGER,          :
        Plaintiff,         :
           v.              :   Civil Action No.
FIRST DATA                 :   1:17-cv-04869
CORPORATION, et al,        :
        Defendant.         :
- - - - - - - - - - - - - -x


              Deposition of
         STEVEN J. SHAPIRO, PH.D.
            New York, New York
         Tuesday, October 30, 2018
               9:32 a.m.




Job No.: 213997
Pages: 1 - 44
Reported By: Nancy Mahoney, CCR/RPR
```

**Page 2**

```
Deposition of STEVEN J. SHAPIRO, PH.D., held at
the offices of:



     Saul Ewing Arnstein & Lehr LLP
     1270 Avenue of the Americas
     New York, New York 10020
     212.980.7200




Pursuant to agreement, before Nancy Mahoney,
Notary Public in and for the state of New York.
```

**Page 3**

```
              A P P E A R A N C E S
ON BEHALF OF PLAINTIFF BARGER:
     SHAWN SHEARER, ESQUIRE
     shawn@shearerlaw.pro
     LAW OFFICES OF SHAWN SHEARER
     3839 McKinney Avenue
     Suite #155-254
     Dallas, Texas 75204
     972.803.4499

ON BEHALF OF DEFENDANT FIRST DATA:
     GARY B. EIDELMAN, ESQUIRE
     gary.eidelman@saul.com
     MICHAEL P. CIANFICHI, ESQUIRE
     michael.cianfichi@saul.com
     SAUL EWING ARNSTEIN & LEHR LLP
     Lockwood Place
     500 East Pratt Street
     Baltimore, MD 21202
     410.332.8600


ALSO PRESENT:
     Joseph T. Gardemal, III
```

**Page 4**

```
                C O N T E N T S
EXAMINATION OF STEVEN J. SHAPIRO, PH.D.      PAGE
By Mr. Eidelman                                5



                  E X H I B I T S
              (Attached to transcript)


STEVEN J. SHAPIRO, PH.D.                     PAGE

Exhibit 1  Expert Report of Steven J.          6
           Shapiro, Ph.D., Bates stamp SBB-002084
           through 2132
```

Page 5

PROCEEDINGS
STEVEN J. SHAPIRO, PH.D.,
after having been first duly sworn or affirmed to testify to the truth, was examined and testified as follows:
EXAMINATION BY COUNSEL FOR THE DEFENDANT FIRST DATA BY GARY EIDELMAN:

Q Good morning, Dr. Shapiro. Can you please state your full name for the record.

A It's Steven, first name Steven with a v, middle initial J, last name Shapiro.

Q Good morning again, Dr. Shapiro. My name is Gary Eidelman. I'm a lawyer at Saul Ewing Arnstein & Lehr. We had an opportunity to greet each other before the deposition began this morning.

Along with me today is my colleague Mike Cianfichi from Saul Ewing, and also Joseph T. Gardemal, III who is our expert who is with Alvarez & Marsal, and Shawn Shearer is here as well for Mr. Barger.

Since you've likely had your deposition taken many times before, is it okay if I dispense with the rules or do you need me to give them to you?

Page 6

A I think I'll be fine on that.

Q Very good. I appreciate that.

(Exhibit 1 Expert Report of Steven J. Shapiro, Ph.D., Bates stamp SBB-002084 through 2132 marked for identification and attached to the transcript.)

Q Showing you what's been marked as Deposition Exhibit 1, Shapiro Exhibit 1. Can you identify that for me, please.

A Yes. This is the report that I prepared in this case on September 28th of this year.

Q Am I correct that this document has a number of Bates numbers in actually all four corners, that Bates numbers SBB-002084 through 208 -- excuse me, 2090 constitute your opinion. Is that right?

A Well, it would be in terms of the text.

Q In terms of the text, correct.

A It does not include exhibits.

Q Correct. And then the exhibits begin on SBB-002091, and they continue through 2110?

A That's correct.

Q And then following that, beginning on 002111 continuing through 2127 is your CV.

A I do not have a copy of my CV attached to

Page 7

this.

Q Oh, you don't? Then we should get that.
(A recess was taken.)
BY MR. EIDELMAN:

Q Am I correct that in Exhibit 1 that Bates 002111 to 2127 is your CV?

A Yes.

Q And that 2128 to 2132 is your schedule of testimony from January 2014 to the present?

A Yes.

Q Very good. Thank you.

Dr. Shapiro, when were you retained by the plaintiff to produce an expert report in this matter?

A I don't have my records in front of me, but, to the best of my recollection, it was in early September of this year.

Q Did you charge the plaintiff for your services?

A Yes, I did.

Q And what were your fees?

A $400 per hour for the time involved in preparing a report.

Q How many hours did you spend?

A Roughly -- again, I don't have my billing

Page 8

records in front of me but roughly six hours.

Q So the work product that's in front of me cost approximately $2,400?

A I believe that's correct.

Q Were you assisted in preparing this report by anyone?

A No.

Q On page 2 of your report and page 3 of your report corresponding to Bates 2085 and 2086, there is the sources that you relied upon. Am I correct?

A Yes.

Q Were any other materials considered by you in preparing this report?

A Other than the documents listed on Bates 002085 and 002086, there are other secondary data sources that I also referenced and they are mentioned in footnotes -- or cited in footnotes, I should say, throughout the report.

Q Did you speak to the plaintiff, Mr. Barger, in connection with preparing the report?

A No.

Q Did you speak with Mr. Shearer in connection with preparing the report?

Page 9

1  A  I believe so, yes.
2  Q  Did he provide you with any factual
3  information for you to use in preparing your
4  report?
5  A  The only factual information I believe
6  would have been things such as date of birth,
7  Mr. Barger's background, and then the documents
8  and bullet points on pages 00 -- sorry, Bates 0 --
9  let's try again, Bates 002085 through 002086 were
10 provided to me by Mr. Shearer.
11 Q  Did you review the plaintiff's testimony
12 from his deposition in this case?
13 A  No.
14 Q  Why not?
15 A  It was not provided to me.
16 Q  Is that something that you normally ask
17 for?
18 A  What I normally ask for would be documents
19 that would be relevant to preparing an analysis of
20 lost compensation.  In a matter like this,
21 sometimes I'm provided depositions of the
22 plaintiff; other times I'm not.
23 Q  But you didn't ask for the deposition of
24 the plaintiff?
25 A  No.

Page 10

1  Q  What professional standards did you follow
2  in performing the production of this expert
3  report?
4  A  Best way I could put it is just following
5  standards that would be used by an economist
6  preparing an analysis of lost compensation.
7  Q  I read in your introduction to your report
8  that you are the past president of the National
9  Association of Forensic Economists, or NAFE.
10 A  Yes.
11 Q  Is that right?
12 A  That is correct.
13 Q  And that you are still an executive editor
14 of the Journal of Forensic Economics?
15 A  That's correct.
16 Q  What is forensic economics?
17 A  Forensic economics would be the
18 application of economics to matters involving
19 litigation.
20 Q  And in utilizing those procedures or
21 processes, are there certain methods and protocols
22 that are followed in conducting such analyses?
23 A  Well, I think in general terms there are
24 in terms of -- based on peer-reviewed literature
25 in the field that one would be normally, for

Page 11

1  example, discounting future losses to present
2  value depending on legal standards in the
3  jurisdiction in which one is doing an analysis or
4  it might be interest accruing to past losses, and
5  that's in order to get a present value of the
6  losses.
7      Since typically losses consist of a past
8  income stream and a future income stream,
9  typically in a matter, damages would be the
10 present value of the income stream but for the
11 event -- I'll use the phrase "event" that's the
12 subject of litigation, less any actual income
13 stream that's being earned since that time, if
14 there is such an income stream.
15 Q  Do you believe that one needs to be an
16 expert witness in order to calculate present value
17 of income?
18 A  Does one need to be an expert?  Well,
19 that's a hard question to answer.  I mean -- and
20 the reason I say that is I think relying on -- in
21 a court setting relying on lay people to do it,
22 number one.  Number one, even though yes, it does
23 involve algebra and arithmetic -- and I'll be the
24 first to concede that point, which I realize
25 you're kind of getting to in your question --

Page 12

1  nonetheless, I have -- I have seen lawyers, for
2  example, do the calculations themselves and
3  dispense with an expert, and the calculations can
4  be shaky; there could be issues with what's
5  assumed in terms of the particular investment
6  vehicle as well.
7  Q  Okay.  Thank you.  Thank you.
8      We went through it earlier that your CV --
9  excuse me, your expert report also includes a
10 table of the cases that you've testified in
11 from -- effective January of 2014.
12     Have any opponents in any litigation
13 matter in which you have worked sought to have
14 your opinions excluded?
15 A  Yes.
16 Q  Can you name those cases for me?  Are they
17 on this chart which is the tail end of your expert
18 report beginning on 2128?
19 A  I do not see any of them on here because
20 it would have been prior to 2014.
21 Q  What was that case or cases, if you
22 recall?
23 A  One was Simmons versus Simmons, a divorce
24 action in Connecticut.  I was retained by
25 Connecticut counsel to -- I was asked to generate

17

1  A  I believe that I was typing away and that
2  "and" should have been a period before "health
3  benefits."
4     Q  Before health benefits or after health
5  benefits?
6  A  Well, compensation would have included
7  base salary, annual bonuses and health benefits,
8  period.
9     Q  And health benefits, period.  So the "and"
10 can go before there.  Got it.
11    Where did you obtain the information
12 regarding Mr. Barger's base salary in preparing
13 your report?
14 A  I believe that would have been -- that
15 would have been from communications from
16 Mr. Shearer, and I believe that was also addressed
17 in the June 12th, 2014 letter from Joe Plumeri of
18 First Data Corporation which was basically the
19 offer of employment.  I believe that may have been
20 also on the pay stubs that I referenced also.  I
21 don't have them in front of me.
22    Q  And so you were calculating your damages
23 based on compensation which included base salary,
24 annual bonuses.  Did you obtain annual bonus
25 information from the same series of documents,

18

1  both the offer letter as well as the pay
2  statements?
3  A  Pay statements and also there were
4  summaries that were also -- there was a
5  compensation summary as well as summaries that
6  showed stock grants to Mr. Barger as well.
7     Q  You also indicate that you were
8  calculating damages based on lost health benefits?
9  A  Yes.
10    Q  Where did you obtain information that
11 Mr. Barger was obtaining health benefits from
12 First Data?
13 A  I believe I obtained that from
14 Mr. Shearer.  I don't remember if that's listed in
15 the compensation summary or not.
16    Q  Are you aware that Mr. Barger elected not
17 to take health benefits while employed at First
18 Data?
19 A  No, I was not.
20    Q  Would that change your calculations if it
21 was determined that Mr. Barger had elected not to
22 take health benefits from First Data?
23 A  As I'm sitting here right now, I don't
24 know the answer to that.
25    Q  Well, you calculated -- in your report you

19

1  calculate the lost value of the health benefits
2  that Mr. Barger supposedly was receiving, correct?
3     A  Yes.
4     Q  And, in fact, you used an average of
5  health benefits based on a report which you list
6  in Exhibit 5 -- excuse me, in footnote 5, right?
7     A  That's correct.
8     Q  Those are not the actual health benefits
9  that would have been incurred at First Data
10 anyway, right; this is just an average number that
11 you used?
12    A  That's correct.
13    Q  If you had believed that Mr. Barger was in
14 fact getting health benefits from First Data, why
15 would you have not asked what the value of those
16 benefits were in order to create an accurate
17 report?
18    A  If I could get those values, I would have
19 used them.  It's been my experience, though, in
20 doing litigation many times the employer cost of
21 those benefits isn't available when I'm preparing
22 a report.  If it were, I would rely on it.
23    Q  Well, did you ask anyone for them?
24    A  I just asked Mr. Shearer for whatever
25 documents related to compensation that he had that

20

1  had been produced in the case.
2     Q  Did Mr. Shearer tell you that Mr. Barger
3  was getting health benefits from First Data?
4     A  Yes.
5     Q  Would it have been helpful for you to know
6  that Mr. Barger had elected not to take health
7  insurance benefits from First Data in preparing
8  your report of alleged damages that he suffered?
9     A  Yes.
10    Q  If Mr. Barger had not in fact taken health
11 benefits, am I correct that the calculation of
12 health benefits that you included in your expert
13 report would be valued at zero?
14    A  That's correct.
15    Q  Going back to page 3 of your expert
16 report, in the what I think is now the second full
17 paragraph under Paragraph 3a of Damages, Lost
18 Compensation, you wrote, "I have prepared
19 calculations of Mr. Barger's losses under the
20 separate assumptions that at the time of
21 termination he would have worked an additional
22 five years and that he would have worked an
23 additional ten years at First Data."
24       Did I read that correctly?
25    A  That's correct.

**Page 21**

1  Q  What is your basis for determining that
2  Mr. Barger would have worked for an additional
3  five years?
4  A  I was asked to assume that in preparing my
5  report. When I say assume that, assume that range
6  of years going forward from his termination date.
7  Q  So you were told to assume two periods of
8  time, that he would have worked for five years or
9  that he would have worked for ten years?
10  A  That's correct.
11  Q  And who told you to assume that?
12  A  Mr. Shearer.
13  Q  Did you consider any other periods of time
14  to do your calculation? Why not 20 years?
15  A  No, I did not.
16  Q  What documents did you review to support
17  your opinion that Mr. Barger would have worked for
18  another five years?
19  A  I did not review any documents.
20  Q  So I take it you that didn't review any
21  documents to support your opinion that Mr. Barger
22  would have worked for an additional ten years?
23  A  That's correct.
24  Q  Am I correct that in your analysis you are
25  assuming that Mr. Barger who was 72-and-a-half

**Page 22**

1  years at the time of termination would continue to
2  work for First Data for an additional five years
3  through age 77-and-a-half?
4  A  That's correct.
5  Q  Did you look at any empirical data or
6  labor force-related documents to support this
7  assumption that he would have worked for an
8  additional five years?
9  A  No, I did not.
10  Q  Doesn't that mean that your damages
11  analysis is purely speculative and unsupported but
12  basically just a calculation on Mr. Shearer's
13  order to you to calculate damages at five years
14  and ten years?
15  A  I don't think it's speculative. I was
16  asked to assume that. I don't know what
17  additional evidence Mr. Shearer is going to have
18  at trial concerning that.
19  Q  Well, what evidence he has at trial, would
20  that affect your expert report? Would that affect
21  your expert opinion if he presented other
22  information at trial?
23  A  Well, it would affect the reasonableness
24  of the range of years going forward.
25  Q  Would it have been appropriate for you to

**Page 23**

1  look at average unemployment rates to more
2  effectively calculate what the anticipated work
3  period would have been for Mr. Barger?
4  A  I'm not sure what you mean by average
5  unemployment rate. Average for whom?
6  Q  Unemployment tables dictating how long
7  somebody is typically out of work for in that
8  industry. Would that not have been an appropriate
9  measure to look at in calculating the period of
10  time that Mr. Barger may have suffered damages?
11  A  No, I don't believe so.
12  Q  Are you familiar with work life expectancy
13  tables?
14  A  Yes, I am.
15  Q  Is that something that you use in your
16  work?
17  A  I have used them in my work.
18  Q  Is that something that is used in
19  accordance with the protocols of peer-reviewed
20  literature?
21  A  In peer-reviewed literature they are used,
22  although there are also experts who have problems
23  with the work life expectancy tables.
24  Q  Do you have you problems with the work
25  life expectancy tables?

**Page 24**

1  A  No, I do not.
2  Q  Would it have been appropriate to use a
3  work life expectancy table in this case for a
4  plaintiff who was age 72-and-a-half at the time of
5  termination in calculating damages?
6  A  I'm not sure about that because, again,
7  that work life expectancy table assumes -- makes
8  assumptions that an individual fits the average
9  pattern for someone of that age group, A, being
10  alive; and B, being part of the labor force. And
11  it doesn't factor in, for example, motivation.
12      I mean, Mr. Barger was not a young man
13  when he took this job on, and if I went by work
14  life expectancy tables, he's already above
15  average, so to speak, in terms of taking on a
16  responsible position like that at the age he did
17  since he was -- you know, since he had not been
18  there very long; he was roughly 70 years old when
19  he started that job.
20  Q  So is it your testimony -- I want to
21  understand your testimony. Is it your testimony
22  because he was motivated to work that it would not
23  have been appropriate to look at work life
24  expectancy tables?
25  A  I'm just suggesting that work life

**Page 25**

1 expectancy tables for someone who's motivated like
2 him, who has not retired, might understate --
3 potentially understate his work life expectancy
4 going forward.
5     Q  Would that be the case for somebody who
6 contracted cancer while he was employed at that
7 age?  Wouldn't that mitigate towards using work
8 life expectancy tables for somebody who was not in
9 good health?
10     A  For someone who was not in good health, I
11 would be very leery of using life expectancy
12 tables because, again, to impute the length of
13 time working would require medical expertise that
14 I don't have as an economist.
15     Q  But it would be okay to just estimate
16 damages out to ten years for somebody who, you
17 know, had a bout of cancer and also had a previous
18 heart attack; it's appropriate in your estimation
19 to just calculate dates of five years and ten
20 years without relying on any empirical data?
21     A  Yes, it is.  I mean, again, I'm assuming
22 that Mr. Shearer will have other information that
23 I don't have that would support that.
24     Q  So what other information would you need
25 in order to modify your report in any way that

**Page 26**

1 would otherwise help support your conclusions here
2 that Mr. Barger would have worked for an
3 additional five years or that he would have worked
4 for an additional ten years?  What information
5 don't you have that you think is going to be
6 produced at trial?
7     A  As I'm sitting here, I don't know the
8 answer to that.
9     Q  Did you consider the risk or possibility
10 that Mr. Barger could have been terminated in a
11 subsequent reduction in force in calculating the
12 five-year or the ten-year period of time for
13 damages?
14     A  No, I did not.
15     Q  Were you aware of the fact that Mr. Barger
16 was involved in the search for his successor as
17 early as October of 2014?
18        MR. SHEARER:  Objection.
19     A  No, I was not.
20     Q  Would that have impacted your analysis if
21 Mr. Barger was involved in the search for his
22 successor of determining a period of damages of
23 five years?
24     A  As I'm sitting here, I do not know the
25 answer to that.  I would have to see what that

**Page 27**

1 information is, and then I could make an
2 assessment of that.
3     Q  If you would have considered that
4 Mr. Barger was terminated in a subsequent
5 reduction in force or that he was replaced, would
6 that impact your damages calculation?
7     A  Well, if I made that assumption, yes, it
8 would.
9     Q  It would shorten the periods of time for
10 which you calculated damages?
11     A  If I made that assumption, it would, yes.
12     Q  Did you consider Mr. Barger's medical
13 history when you terminated his work life -- when
14 you completed your calculations?
15     A  No, I did not.
16     Q  In fact, your work life expectancy wasn't
17 derived from a table but it was Mr. Shearer's
18 direction to you to use work life expectancy of
19 five years and work life expectancy of ten years?
20     A  That's correct.
21     Q  Could I have performed the analysis that
22 you did in calculating what Mr. Barger's damages
23 would have been at five years?
24        MR. SHEARER:  Objection.
25     A  If you followed all the steps here and I

**Page 28**

1 guess if you're comfortable with doing a present
2 value analysis and you're comfortable with getting
3 the various interest rate measures and applying
4 them and setting up the appropriate spreadsheet,
5 the answer would be yes.
6     Q  On page 4 of your expert report in the top
7 paragraph, you wrote as follows -- and I believe
8 it is the second full sentence, "I have also
9 prepared calculations of loss under the assumption
10 that, in the absence of termination, Mr. Barger
11 receives the same base salary that he was earning
12 at the time of his termination over the remainder
13 of his employment at First Data and that his
14 annual bonuses equal $250,000 in cash as specified
15 in his offer of employment."
16        Do you see that?
17     A  Yes.
18     Q  Why do you believe that it was appropriate
19 to assume that Mr. Barger's variable compensation
20 for the remainder of his employment would have
21 equaled his initial variable compensation of
22 $250,000?
23     A  I included that only because -- there was
24 a very short historical period over which he
25 worked at First Data, and the $250,000 was

**Page 33**

1  damages calculation?  
2      A  Well, if I assumed a bonus of $174,000,  
3  obviously the losses would be lower.  
4      Q  Back on page 4 of your report, and this is  
5  the last paragraph before we get to number 1.  You  
6  wrote, "I have also prepared calculations of loss  
7  that assume that Mr. Barger would have received  
8  salary increases if he had remained employed at  
9  First Data with bonuses that reflect historic  
10 bonus activity from 2014 to 2016 or an annual  
11 $250,000 bonus that increases over time."  
12     Did I read that correctly?  
13     A  Yes.  
14     Q  Did Mr. Barger's base salary ever increase  
15 during his tenure at First Data?  
16     A  It was my understanding it had not.  
17     Q  What is the basis for your assumption that  
18 Mr. Barger would have received salary increases?  
19     A  Well, the basis for that assumption is  
20 that if one were computing a loss going forward  
21 either five or ten years, that to assume -- I  
22 think it would have been speculative to just  
23 assume that his compensation would never have  
24 grown in the future.  And by preparing the range  
25 of compensation numbers that I did, I've covered  

**Page 34**

1  the case where, in fact, it doesn't grow as well  
2  as the case where it does grow.  
3      Q  But the facts that you had before you,  
4  which are not speculative, that in 2014 his base  
5  compensation was $480,000, correct?  
6      A  That's correct.  
7      Q  In 2015 his base compensation was  
8  $480,000, correct?  
9      A  That's correct.  
10     Q  In 2016 his base compensation was  
11 $480,000, correct?  
12     A  That's correct.  
13     Q  And at the beginning of 2017, his base  
14 compensation was $480,000, correct?  
15     A  That itself.  
16     Q  During that entire time period, there was  
17 no increase in his base compensation, correct?  
18     A  That's correct.  
19     Q  Did you speak with anybody at First Data  
20 to determine whether or not there's any basis for  
21 you to conclude that his compensation would have  
22 increased over time?  
23     A  No, I did not.  
24     Q  Did you review any documents to validate  
25 this assumption?  

**Page 35**

1      A  No, I did not.  
2      Q  Is your assumption that Mr. Barger's base  
3  salary and variable compensation would have  
4  increased 2.5 percent per year for the remainder  
5  of his employment consistent with the economic  
6  evidence that you reviewed in this case?  
7      A  Best answer I could give you is that we  
8  only had a very short period of time in which --  
9  in which we have any empirical evidence, and going  
10 forward -- and going forward I was attempting,  
11 assuming a longer term horizon where he's employed  
12 there, to include the average salary increase that  
13 a professional would be getting on a long-term  
14 basis based on historical statistics.  
15     Q  What historic statistics did you rely on  
16 as opposed to the economic data in this case to  
17 determine that he would have gotten a two and a  
18 half percent increase in his base and in his  
19 incentive compensation?  
20     A  I looked at the average salary increases  
21 based upon the employment cost index for wages and  
22 salaries for managers in private industry over the  
23 period from 2001 to 2017.  
24     Q  But I just want to go back to my question  
25 which I really don't think you answered, which is:  

**Page 36**

1  Is there any economic data in this case --  
2  although you call it a short time period -- but is  
3  there any economic data in this case that supports  
4  your assumption that his base salary would have  
5  increased 2.5 percent a year for the remainder of  
6  his -- of the damages period?  
7      A  Going back to the previous question, I  
8  misunderstood your question.  I thought you were  
9  asking me if there was evidence outside of the  
10 case.  
11     Q  No.  What I'm asking you now is:  With  
12 respect to this case and the data that you  
13 reviewed in this case, the data that you reviewed,  
14 which is reflected on pages 2 and 3, is there any  
15 economic evidence in this case that supports your  
16 assumption that Mr. Barger's base salary and  
17 variable compensation would have increased  
18 2.5 percent per year for the remainder of his  
19 employment?  
20         MR. SHEARER:  Objection.  
21     A  No, because the data covers a short period  
22 of time in which his salary had not grown.  
23     Q  And that short period of time is from 2014  
24 to 2017, correct?  
25     A  Yes.

41

Q Have you ever mitigated lost wages when calculating damages in prior disputes?
A Yes.
Q Why is this case different?
A Well, this case is different only because he's tried to mitigate operating a consulting business, and based on the evidence that I had, it isn't profitable.
Q Your --
A Let me finish.
   I have had other cases where individuals became self-employed post-termination, did earn profits, did earn income from those businesses, and if they were positive -- those were positive income streams, then I have included them as mitigation.
Q Your damages calculation is effective as of when?
A It's effective -- I was asked to value everything as of -- as of the beginning of 2019, end of 2018.
Q Your report was prepared at the end of September of 2018, correct?
A That's correct.
Q Did you ask for information on what

42

Mr. Barger's earnings had been for the first nine months of 2018 to determine whether or not he was turning a profit in his consulting business would have impacted the mitigation analysis that you did?
A No, I did not.
Q Why not?
A My experience with people operating Schedule C small businesses is that generally you don't know that until you compile everything at the end of the year. Certainly if his circumstances were to change based on a 2018 tax filing, then I would have to consider that in amending my report.
   MR. EIDELMAN: Off the record.
   (A recess was taken.)
Q I have no further questions. Thank you, Dr. Shapiro.
A Okay.
Q Dr. Shapiro, you have the right to read and sign your deposition.
A I'll read and sign it.
   (Off the record at 10:38 a.m.)

43

ACKNOWLEDGMENT OF DEPONENT

   I, STEVEN J. SHAPIRO, PH.D., do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

_____    _____
(Date)              (Signature)

44

CERTIFICATE

   I, Nancy Mahoney, Certified Court Reporter and Registered Professional Reporter and Notary Public within and for the State of New York, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.
   IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 31st day of October, 2018.
My commission expires: June 2, 2022

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF NEW YORK