# EXHIBIT A



Gary B. Eidelman

Phone: (410) 332-8975

Fax: (410) 332-8976

Gary.Eidelman@saul.com

www.saul.com

August 15, 2018

**Via ECF**
Honorable Lois Bloom, U.S.M.J.
U. S. District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      **Re:**   ***Steven B. Barger v. First Data Corporation et al.***
             **Civil Case No. 1:17-cv-4869**
             **Request for Extension of Discovery Period**

Dear Judge Bloom:

      Plaintiff Steven Barger's deposition took place last Friday, August 10, 2018. He was unable to answer a number of substantive questions regarding fees he charged First Data, claiming that Philip D. Morgan, his accountant and Grant Barger, his son who ran Barger Group LLC, could answer those questions. Defendants want to serve subpoenas *duces tecum* on Morgan, Barger Group LLC, and Grant Barger before taking their depositions. Because fact discovery in this case ends on August 31, 2018, Defendants request an extension of the discovery deadline to allow sufficient time for these subpoenas to issue and depositions to take place. The granting of this extension will not impact the overall schedule because expert discovery does not close until September 28, 2018.[1]

      **A.**     ***Barger's Testimony Regarding Compensation.*** Beginning on or about March 15, 2014, Barger was hired by First Data as a consultant at the rate of $30,000 per month. On June 30, 2014, he became a full time employee of First Data, earning $40,000 per month, in addition to incentive compensation and equity. In ¶34 of his Complaint, Barger alleged that:

            In deciding to accept the position with First Data, and leave his consulting
            business to move to Atlanta, Barger relied upon the representation of First Data

---

[1] On Sunday, August 13, 2018, the undersigned asked Barger's counsel to consent to these depositions occurring after the fact discovery cutoff. *See* August 12, 2018 email from Gary B. Eidelman, Esq. to Shawn Shearer, Esq., attached as **Ex. A**. Opposing counsel declined, which has necessitated this letter motion. *See* August 13, 2018 letter from Shawn Shearer, Esq. to Gary B. Eidelman, Esq., attached as **Ex. B**.

Honorable Lois Bloom, U.S.M.J.
August 15, 2018
Page 2

that the future financial benefit of equity grants he would receive from First Data would more than offset the reduction of his base income.

*See* ECF No. 1 (emphasis supplied). Barger went on to allege in ¶36 of his Complaint that:

Barger was informed, during the negotiation of his possible employment, that First Data was in the process of preparing for a $3.5 billion private equity offering as a precursor to its planned public offering of equity, and that the public offering would involve KKR selling shares to the market to liquidate a portion of its investment in First Data, and that the offering would create a market for the shares to be issued upon Barger's exercise of his stock options included in his proposed compensation package as an incentive for Barger to join First Data and leave his lucrative consulting business.

*Id.* (emphasis supplied). In Barger's Answer to Defendant First Data's Interrogatory No. 17, which requested information regarding his work history, Barger stated that from 2005 until he was hired by First Data, he worked as a "full time consultant" at the rate of $3,000 per day plus expenses. *See* Barger Answer to First Data Interrogatory No. 17, attached as **Ex. C.**

Joseph Plumeri, at the time a First Data senior executive, relied on Barger's representations regarding the amount of his monthly income in establishing the rate for the consulting agreement and ultimately his compensation for employment. During discovery, Barger produced his income tax returns for 2010-2017, which paint a far different picture from his claims of a "lucrative consulting business" that he was induced to leave. *See* ECF No. 1 at ¶36. For instance, Schedule C of his 2013 federal income tax return (the year before he was hired as a consultant/employee by First Data) indicates that Barger had gross receipts of less than $17,000 for the entire year (less than 6 days of consulting fees at his alleged $3,000 a day rate) and that after expenses were applied, his 2013 adjusted gross income was a negative number. His AGI for 2012 also was a negative number. His 2014 tax returns do not reflect the almost $200,000 in consulting fees First Data paid him under the Consulting Agreement before he became a W2 employee.[2]

Barger could not answer questions regarding these discrepancies or anything about his tax returns, claiming that we needed to question his accountant about his tax returns. *See* excerpts from Barger's "rough" deposition transcript, attached as **Ex. D** at 47-49, 59, 64, 206. He also testified that Barger Group LLC (his son's company) billed for his consulting services and then distributed to him a fraction of what was billed. *Id.* at 37-40. There exists a large discrepancy between his 3 ½ months of consulting services under the Consulting Agreement and what was actually billed and collected by Barger Group LLC.[3]

---

[2] Plaintiff marked the referenced income tax returns "Confidential" so they are not attached. If the Court requests, they can be produced *in camera.*

[3] On June 20, 2014, Barger Group LLC submitted an invoice for $50,000 for "final consulting services" for the period March-June 2014. There is no provision in the Consulting Agreement between Barger and First Data for such a fee. Barger testified that the payment was for the use of his intellectual property but could not cite to a license

**B.     *The Requested Discovery Goes to Barger's Damages*.** Barger is seeking almost $16 million in damages, including 10 years of front pay. Plaintiff's allegations in the Complaint and his answers to interrogatories regarding the "lucrative consulting business" he left to join First Data are not supported by the documents he produced or his testimony. Since First Data based the amount of money to pay Barger on his representations of what he was earning, First Data needs discovery into this "after-acquired evidence" in connection with his claims for damages. First Data witnesses will testify that had the Company known of either Barger's misrepresentations about his consulting fees and/or his $50,000 bill for intellectual property, action would have been taken against him, up to and including termination.

In *McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 361-62 (1995), the Supreme Court ruled that after-acquired evidence cannot be used to bar relief under an employment discrimination statute.[4] However, the Court ruled that after-acquired evidence may render an employee ineligible for front pay, reinstatement and limit the amount of back pay to the period between when the unlawful discrimination occurred and the date on which the discovery of the after-acquired evidence was made. Judge Block has recognized and applied the rationale of *McKennon* to deny an award of front pay. *See Norris v. New York City Coll. of Tech.*, 2009 WL 82556, at *10 (E.D.N.Y. Jan. 14, 2009). Courts in the Second Circuit have recognized the applicability of *McKennon. See, e.g., Vichare v. AMBAC Inc.,* 106 F.3d 457, 468 (2d Cir. 1996) (applying rationale of *McKennon* to deny front pay); *Altman v. New Rochelle Public School District*, 2014 WL 2809134, at *14-15 (S.D.N.Y. June 19 2014). *See also EEOC v. Rose Casual Dining, L.P.,* 2004 WL 614806, at *10 (E.D.P.A. Mar. 5, 2004) (granting defendant summary judgment on issue of reinstatement and front pay where the plaintiff had inflated her prior salary); *Jones v. Ravens, Inc.*, 108 F. Supp. 2d 803, 812 (N.D. Oh. 2000) (holding defendant not liable under the ADA and finding that the after-acquired evidence doctrine barred any damages because plaintiff inflated his salary during salary negotiations).

**C.     *The Request for an Extension is Reasonable*.** This is the first request for an extension of discovery in this matter. Defendants have produced more than 51,000 pages of documents and have responded or still need to respond to multiple sets of interrogatories, 15 sets of document requests, and requests for admissions. To date, Plaintiff has taken eight depositions with two more scheduled in Omaha on August 21st and 22nd. Plaintiff will not be prejudiced by this extension of time and the requested extension will not impact the briefing deadlines.

For these reasons, Defendants request that the discovery cutoff be extended to permit them to subpoena documents from and take the depositions of Philip D. Morgan, Plaintiff's accountant and Grant Barger, his son who ran Barger Group LLC, on or before September 28, 2018.

Respectfully submitted,

/s/

Gary B. Eidelman

cc:     Counsel of Record (via ECF)

---

agreement. *See* **Ex. D** at 21-23. More importantly, the Consulting Agreement specifies that use of whatever intellectual property Barger may have used was included in the consulting fee.
[4] Unlike *McKennon*, Defendants do not concede that Plaintiff has or can establish liability under the FMLA or ADA.

# EXHIBIT A

**Eidelman, Gary B.**

---

| | |
|---|---|
| **From:** | Eidelman, Gary B. |
| **Sent:** | Sunday, August 12, 2018 9:57 PM |
| **To:** | 'Shawn Shearer' |
| **Cc:** | David@zeitlinlawfirm.com; Cooper, Gillian A.; Kennedy, Lindsey C.; Eidelman, Gary B. |
| **Subject:** | Scheduling matters |

Shawn:

I am writing with respect to several scheduling items.

1. Given Mr. Barger's testimony that Marilyn Barger suffers from depression, we do not wish to cause her any unnecessary stress. Even though Mrs. Barger is identified on Plaintiff's disclosures as a fact witness who has full knowledge of the dispute, we will forgo taking her deposition if you agree that she will not be submitting any affidavits or testifying in this case. Please let us know ASAP so that we can respond to her personal counsel.

2. As I mentioned, Amy Steffen has just taken in 2 foster children which makes travel difficult. Accordingly, we can produce Ms. Steffen and Kathi Benhardt in Omaha: Ms. Steffen on August 21 and Ms. Benhardt on August 22. Please let us know the time and locations where you would like to depose them.

3. Based on Mr. Barger's testimony, we now need to subpoena documents from and depose his accountant Phillip D. Morgan, Grant Barger and/or The Barger Group. With fact discovery closing on August 31, there is likely not enough time to both serve subpoenas and depose them before that date. Can we come to an agreement among counsel to take their depositions after the discovery cutoff in September? If so, we will work with you to coordinate mutually agreeable dates for their depositions. If not, we plan to ask Judge Bloom to extend the discovery cutoff for the limited purpose of taking this discovery.

4. As a reminder, the federal court has scheduled a telephone hearing for August 14 on the motion to compel Julie Kelly's deposition. As you know, we provided Ms. Kelly with dates in August when she can be deposed. We will let you know what the court decides and if a date is set so that you can attend if you want.

5. Finally, we believe that Mr. Barger's testimony establishes that there was and is no factual basis to have named Rhonda Johnson, Karen Whalen, Frank Bisignano or Lori Graesser as individual defendants under the FMLA. It is one thing to file a lawsuit and then amend to include additional witnesses if the evidence establishes liability. It is another thing to make specific allegations in a lawsuit from the beginning of a case and then try to find out what happened. The case law often describes this as a prohibited fishing expedition.

It is a serious thing to name someone as a defendant in a civil lawsuit. Mr Barger testified that the reason all of the individuals were named is because "***I needed to find out. I wanted whoever is responsible for not allowing me to come back to work and that's why I had no idea who it was so that's why.***" Mr. Barger did not need to name each of these individuals as defendants in their personal capacity to find out what happened in his case. He could have deposed them as witnesses. It is evident that his naming them was for an improper purpose designed to harass and cause undue legal expense. When asked for details to support claims against these defendants, his testimony was often that we need to ask his lawyer. That is no answer since you are not a witness. Given his testimony and theirs, it is evident that the allegations against these individuals did not have any factual support nor have facts been developed that would support them being defendants under the FMLA. We believe this is exactly what Rule 11 of the Federal Rules of Civil Procedure prohibits. If Mr. Barger agrees to dismiss his FMLA claims against Johnson, Whalen, Bisignano and Graesser with prejudice, we will not seek Rule 11 sanctions and attorneys' fees against him. Otherwise, we have every intention of doing so.



**Gary B. Eidelman**
**SAUL EWING ARNSTEIN & LEHR LLP**
500 E. Pratt Street
Suite 900 | Baltimore, MD 21202-3133
Tel: 410.332.8975 | Fax: 410.332.8976 | Mobile: 410.303.8832
Gary.Eidelman@saul.com | www.saul.com

*Follow our blog, WISE: Workplace Initiatives and Strategies for Employers, **_here_***
\* Please note that our Firm name and my email address have changed.

# EXHIBIT B

# THE LAW OFFICE OF SHAWN SHEARER, P.C.

3839 McKINNEY AVENUE, SUITE 155-254
DALLAS, TEXAS 75204
OFFICE: (972) 803-4499
SHAWN@SHEARERLAW.PRO

August 13, 2018

**Via E-Mail**

Gary Eidelman
Saul Ewing Arnstein & Lehr LLP
500 Pratt Street, Suite 900
Baltimore, MD 21022-3133

Gary:

In response to your most recent demands of August 12, 2018 -

1.   I suggest you discuss Mrs. Barger's deposition with her attorney.

2.   Mr. Grant Barger has his own attorney, and it is my understanding that you will be hearing from his attorney today. I do not believe there is any further information Plaintiff can or will provide you, through an accountant or otherwise. If you wish to utilize third party subpoenas, I suggest you do so quickly as the period for discovery is nearly over.

3.   You will receive deposition notices today for the upcoming depositions of Ms. Amy Steffen and Ms. Kathi Benhardt.

4.   Ms. Kelly already appeared for her scheduled deposition on June 25, 2018. You confirmed her appearance to me on the record in a deposition in this case on June 27, 2018.  What you decide to tell a Federal judge in Ohio about that reality is strictly your choice.

5.   Plaintiff will not agree to any extension of the discovery period. Any attempt by Defendant's Counsel to obtain an extension will be met with opposition. Be prepared to answer for your six week hiatus from discovery during March and April of 2018, your six recorded no shows, including the no show of your own noticed deposition in Ohio, as well as Mr. Rosman's no show and refusal to answer questions regarding the notice to Plaintiff in the matter of the timing of Defense Counsel's cancellation of Defendant Bisignano's May 23, 2018 deposition.

6.   I am uncertain in which depositions you have been sitting, but all the ones I have been in point to a clear conspiracy with regard to Mr. Barger's illegal termination. Mr. Barger said as much during his deposition. Furthermore, Defense Counsel's signed reply to the EEOC combined with Defendant's Answer to Plaintiff's Complaint is enough to justify Plaintiff's inclusion of all named defendants. It is interesting that you should mention Ms. Graesser, as the testimony thus far combined with multiple conspiratorial emails, MetLife's document production and the appearance of the Second Voycheske Declaration has given me reason to consider pleading former Defendant Graesser back into the case. I will let you know what I decide on that matter as soon as possible.  In the meantime, either Rule 11 me, or don't.

Very truly yours,

Shawn E. Shearer

**THE LAW OFFICE OF SHAWN SHEARER, P.C.**

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEVEN B. BARGER, an individual | **Case No. 1:17-cv-4869-FB-LB** |
| Plaintiff | **PLAINTIFF STEVEN BARGER'S ANSWERS AND OBJECTIONS TO DEFENDANT FIRST DATA CORPORATION'S FIRST SET OF INTERROGATORIES** |
| v. | |
| FIRST DATA CORPORATION, *et al.* | |
| Defendants. | |

Pursuant to Rule 33 of the Federal Rules of Civil Procedure and the local Rules of this District, Plaintiff Steven B. Barger ("Barger," "Plaintiff" or "I"), by and through his undersigned attorneys, hereby answers the First Set of Interrogatories propounded by First Data Corporation ("First Data" or "you") as follows:

## GENERAL OBJECTIONS

The following general objections apply to the interrogatories as a whole and to each interrogatory contained therein and shall be deemed incorporated by reference into each and every objection made herein to a specific interrogatory:

1. Plaintiff objects to the interrogatories to the extent they require or purport to require disclosure of information, materials, or documents protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege, immunity, statute, law, or rule. Any statement herein to the effect that Plaintiff will provide information in response to an interrogatory is limited to information that does not fall within the scope of any relevant privilege.

2. Plaintiff objects to the interrogatories to the extent they seek information prepared in anticipation of litigation or for trial until and unless Plaintiff, by the requisite showing of need and cause, obtains an order requiring the disclosure of said information.

regarding his disability, and no response is necessary to this clear and deliberate mocking of Plaintiff.

Nevertheless, subject to the stated and general objections and without waiver, Plaintiff discussed his diagnosis and treatment at numerous points between February 2016 and September 6, 2016 with all of the named individual Defendants, Jeff Hack, members of Plaintiff's Training Group, and other employees he mentored and interacted with in the course of his employment. Plaintiff discussed his diagnoses and treatment with Defendant Bisignano and Defendant Bisignano recommended he receive a second opinion and arranged for Plaintiff's visit to Mr. Bisignano's physician in Tampa.

**INTERROGATORY NO. 17.**        Describe, in detail, your work history, including but not limited to each and every position (whether as an employee, independent contractor, self-employment, or otherwise) that you have held from 2000, through the present, including in your Answer with respect to each such position, the identity of the employer/business or entity/person for whom you performed services, your job title(s) and job functions, the date the employment commenced, the date employment terminated, the reason for termination, and the rate of pay at termination.

**Answer**:        Plaintiff objects that this interrogatory is overly broad, burdensome and oppressive to list all individuals with whom Plaintiff worked as a consultant over an 18-year period. Plaintiff's work involved training and teaching numerous individuals. Plaintiff further objects that Plaintiff's employment prior to First Data is not relevant to the claims or defenses in this case. Plaintiff further objects to this interrogatory as it is not reasonably likely to lead to admissible evidence. Subject to the stated and general objections and without waiver, Plaintiff suffered a heart attack in 2000, took some time off, and then took on a light schedule as a self-employed consultant through 2005. From 2005 through Plaintiff being hired by First Data, Plaintiff worked a full schedule as a self-employed consultant working for multiple companies simultaneously, including the following: UBS (Paul Santucci, Denis Drescher, John Decker, Jim Ducey), Merrill Lynch (Jon Lawrence), Massachusetts Financial Services (MFS) (Gary Polson), Morgan Stanley (Rich Franchella, Phil Shafer, Ned Dubilo, Frank Hill, Jim Tracey, Rich Hazzouri, Robin Connelly), Ameriprise (Scott Hirsch, Gary Nuccio), Core States (Bill Spiropoulos), FifthThird Bank (Dave Hinman), RBC (Rob Spawn), LPL (Robert Fragasso, Tif Joyce), Oppenheimer (Mar Ferro), Wells Fargo/FiNet (Ron Sallet). Plaintiff's rate was $3,000/day plus expenses. Plaintiff was then hired as a consultant to First Data and then became employed by First Data and stopped

consulting for other businesses.

**INTERROGATORY NO. 18.**    Itemize and describe in detail the damages you seek in this action (whether economic, non-economic, or other) against Defendant, including the nature and amount of damages for each cause of action in your Complaint, the legal and factual basis for each item of damages that you seek, the basis and method for computation of each item of damages, and all documents that refer to, relate to, and/or concern the subject matter of and your Answer to this Interrogatory.

**Answer**:    Plaintiff objects that this interrogatory is overly broad and burdensome to list in detail the legal and factual basis justifying all of the damages sought. Plaintiff further objects that expert discovery has not been conducted and Plaintiff is not in a position to determine the basis and methods for computation of each item of damages. Plaintiff further objects that damages are still occurring and a response to this interrogatory is impossible. Plaintiff further objects that not all damages have been discovered and cannot be listed as requested. Subject to the stated and general objections and without waiver, based on the facts as alleged in the Complaint and Supplemental Complaint, for violations of the FMLA, Plaintiff is seeking front-pay, back-pay, interest on back-pay, fees & costs, double damages as liquidated damages, and all other damages and remedies available under FMLA, and such other damages and equitable relief as entitled by law. Plaintiff's preliminary calculation of a portion of these damages as of February 28, 2018 was attached as Exhibit C to the Reply in Support of Plaintiff's Motion for Partial Judgment on the Pleadings Pursuant to Federal Rule of Civil Procedure 12(c).

**INTERROGATORY NO. 19.**    Itemize and describe in detail the damages you seek in this action (whether economic, non-economic, or other) against Defendant, including the nature and amount of damages for each cause of action in your Supplemental Complaint, the legal and factual basis for each item of damages that you seek, the basis and method for computation of each item of damages, and all documents that refer to, relate to, and/or concern the subject matter of and your Answer to this Interrogatory.

**Answer**:    Plaintiff objects that this interrogatory is overly broad and burdensome to list in detail the legal and factual basis justifying all of the damages sought. Plaintiff

## VERIFICATION

I, Steven B. Barger, hereby state, based on reasonable inquiry, that any facts contained in the foregoing Answer and Objections to First Data Corporation's First Set of Interrogatories are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

Dated this 3rd day of April, 2018

Steven B. Barger

# EXHIBIT D

```
 1                ROUGH DRAFT/REALTIME OUTPUT
 2            This ROUGH DRAFT/Realtime file is an
 3  uncertified, unedited rough draft of the proceedings,
 4  and is not to be used in any way as a final transcript.
 5  The realtime rough draft may be used in place of or in
 6  addition to or only to enhance notes taken during the
 7  proceeding.  Anyone choosing to cross-examine or prepare
 8  a witness using a rough draft is doing so with full
 9  knowledge the rough draft is uncertified, and that they
10  are doing so at their own risk.
11            Realtime rough drafts are not to be shared,
12  copied, faxed or in any way distributed in any form
13  (written or electronic); however, your experts and
14  co-counsel and staff have limited internal use of same
15  with the understanding that all realtime rough draft
16  and/or computerized forms, if any, will be destroyed and
17  replaced with the final certified copy upon its
18  completion.  This is an unofficial transcript, which
19  should NOT be relied upon for purposes of verbatim
20  citation of testimony.
21            This transcript has not been checked,
22  proofread, or corrected.  Corrections will be made in
23  the preparation of the certified transcript, resulting
24  in differences in content, page and line numbers,
25  punctuation and formatting.
```

⚲

2

```
 1  Case:  BARGER v. FIRST DATA, ET AL
```

Barger Steven B. 081018 Rough Draft

20    A    Right.

21    Q    -- which says if it started in March, the

22   first month would be April 15th, that would be $30,000?

23    A    Right, right.

24    Q    Do you see that?  Correct?

25    A    I do.

♀

23

1    Q    And then the next invoice is May 15th, 2014?

2    A    Got it.

3    Q    Right?  So that would be the second month of

4   the consulting arrangement, correct?

5    A    Yup.

6    Q    And then the third invoice is June 15th of

7   2014.  Do you see that?

8    A    Yeah.

9    Q    And that would be another $30,000?

10    A    Yup.

11    Q    Right.  And then there is the next invoice is

12   June 20th of 2,014.  Do you see that?

13    A    Yeah.

14    Q    And that corresponds with Bates numbers

15   FDC00052613.  Do you see that?

16    A    Yeah.

17    Q    How much is that invoice for?

18    A    50,000.

19    Q    And what is that for?

20    A    That would most likely an agreement with Joe

21   and I be for First Data's use of any of my proprietary

22   information that I had used during that time and would

Barger Steven B. 081018 Rough Draft

23  use going forward and you should probably ask him about

24  that because that's what that's for.

25      Q    Well, it says final fee for business

♀

1   consulting services 2014?

2       A    Right.

3       Q    March through June.

4       A    Yeah.

5       Q    And this is your invoice?

6       A    Yeah.

7       Q    Right?  Where does it say on this invoice that

8   you are licensing your proprietary information to First

9   Data?

10      A    It doesn't.

11      Q    And what proprietary information do you have

12  that you were licensing to First Data?

13      A    It would simply be all the concepts that I've

14  used over the years.

15      Q    Are those trademarked?

16           MR. SHEARER:  Objection.  Go ahead.

17      Q    Do you have a trademark on your proprietary

18  materials?

19      A    Some are copyrighted.

20      Q    Okay.  And was there a licensing agreement

21  that you entered into with First Data?

22      A    No.  This was Joe's way of me getting paid for

23  that, that's it.  I told you my relationship with Joe

24  over 30 some years is to a point where we say, all

Barger Steven B. 081018 Rough Draft
25  right, here is how things need to be, fine, take care of

♀

                                                                25

1   it and it's over with.  That has continued for 30 years
2   because at the end of the day I would trust everything
3   that he was going to do and he would trust everything
4   that I was going to do, period.  So this got entered in
5   to cover that aspect of the business and that it may be
6   labeled the wrong way, but it was the intent behind it.
7        Q    Well, why -- why wasn't that included in the
8   $30,000 a month?
9        A    The 30,000 was my time only.
10       Q    Were you using your business concepts during
11  the period that you were doing consulting prior to --
12       A    Always have.
13       Q    So I have to ask, again, if you didn't charge
14  for it before, why are you charging for it now?
15       A    What do you mean if I didn't charge for it
16  before?
17       Q    You said that this $50,000 payment was
18  authorized by Joe Plumeri so that you would use your
19  proprietary materials at First Data, correct?
20       A    Right.
21       Q    But you were already using your proprietary
22  materials at First Data and that was included in the
23  $30,000 a month of time?
24            MR. SHEARER:  Objection.  You can answer.
25       A    No, it wasn't.

Barger Steven B. 081018 Rough Draft

2    as a consultant, right?

3        A    Okay.  Very good.

4        Q    Well, do you agree with me?

5        A    Yeah.

6        Q    You've already testified today that, and I

7    think we've shown it as well from the complaint, that

8    you decided to join First Data because Joe Plumeri asked

9    you to in part, though, because of the compensation that

10   you would receive from First Data would replace the

11   lucrative consulting business that you had going on,

12   yes?

13            MR. SHEARER:  Objection.

14       A    Yeah.

15            (Deposition Exhibit 134, marked for

16   identification.)

17       Q    Mr. Barger, showing you what's marked as

18   Deposition Exhibit 134, which is a document produced by

19   you in this case, which is the -- your 2013 1040 for you

20   and Mrs. Barger which corresponds with SBB-001356 to

21   1363, and ask you if you recognize this?

22       A    I do.

23       Q    So can you explain to me, sir, how Deposition

24   Exhibit 134 equates with your testimony that prior to

25   joining First Data in 2014 you had a lucrative

41

1    consulting business for which the First Data

2    compensation would replace when in 2013 your adjusted

3    gross income was a negative $15,212?

4        A    I was -- all the income I made in my

Page 37

Barger Steven B. 081018 Rough Draft

5   consulting company went into the Barger Group, didn't
6   come to me it was through my consulting company and my
7   son ran called the Barger Group.
8       Q    And that's an LLC, is it not?
9       A    Yeah.
10      Q    And don't you understand that an LLC is a
11  pass-through organization?
12           MR. SHEARER:  Objection.
13      A    I'm not sure what that means.
14      Q    Well, let me back this up a minute.
15           So did the Barger Group pay you money?
16      A    I ran all of my money through the Barger Group
17  and Grant got paid everything in the Barger Group, so...
18      Q    So what did you get paid?
19      A    I got monthly money.
20      Q    How much did you get?
21      A    I would have to go back and look.  I have no
22  idea.
23      Q    Well, I think the 2013 tax return will tell
24  us.  So let's go to the page that corresponds with
25  SBB-001358 and under part 1 is income.  Is it your

♀

42

1   testimony that in 2013 the Barger Group only paid you
2   $16,210?
3       A    That's what it looks like.
4       Q    Is that the lucrative consulting --
5       A    Lucrative consulting would be what the Barger
6   Group earned that year.

Barger Steven B. 081018 Rough Draft

7      Q     Well, where did that money go?

8      A     To my son.  He ran the Barger Group.  I just

9   worked for him.

10     Q     And your son -- so you're charging $3,000 a

11  day to all these companies and your son only paid you

12  $16,210?

13     A     Yeah.  I had other money.  He got the rest of

14  it.

15     Q     What other money did you have?

16     A     I had money in savings.  I had money that I

17  lived off of.  Actually, I'm not sure how I decide to

18  live my life is germane to this case.  Why is how much I

19  make or how much I spend germane to this case?

20     Q     Well, I get to ask the questions, sir.  This

21  isn't my deposition; this is your deposition.

22           I'm asking you is it your testimony that for

23  this lucrative -- this lucrative consulting arrangement

24  that you entered in with First Data that started at

25  $30,000 a month that the year prior to that you only

♀

43

1   earned $16,210 in consulting fees?

2      A     No.

3      Q     You earned more than that?

4      A     I did.

5      Q     So your testimony is that all went to your

6   son?

7      A     It all went to the Barger Group, everything

8   got paid to the Barger Group.

9      Q     So if we subpoenaed the records of the Barger

Barger Steven B. 081018 Rough Draft

10  Group, it would show you that the Barger Group only paid
11  you $16,210 in 2013?
12      A   Yeah.
13      Q   We're not done with that yet.
14          Turning to the page that is expenses for
15  business use of your home which corresponds with
16  SBB-001362.  Do you see that?
17      A   I do.
18      Q   And this is a -- this is where you took
19  expenses, personal expenses off your taxes?
20      A   Okay.
21      Q   This is your tax return, sir.  I'm asking you.
22      A   Apparently I did.
23      Q   Okay.  So even though everything ran through
24  the Barger group, you then in addition to whatever
25  expenses the Barger group had where all your money ran

♀

                                                        44

1   through, you took deductions for personal expenses,
2   right?
3       A   Yeah.
4       Q   And included under that is you took a
5   deduction for $18,000 in rent in 2013.  Do you see that?
6   It would be line 18.
7       A   I do.
8       Q   And you calculated that somehow or your
9   accountant calculated that the value of your home office
10  for you earning $16,210 was $18,000 in rent?
11      A   Apparently he did a good job.

Barger Steven B. 081018 Rough Draft

1  First Data.

2      Q     Okay.  On line 19 -- excuse me.  I apologize.

3  On line 18 you show rent of $22,900.

4      A     Okay.

5      Q     Do you see that?

6      A     Yeah.

7      Q     Can you explain to me why the amount that you

8  took as an expense for rent in 2014 jumped from $18,000

9  in 2013 to $22,900 in 2014 for only six months?

10     A     You would have to ask my accountant.  I don't

11 know.

12     Q     Okay.  But you recognize that by taking these

13 expenses it lowers the amount of taxable income that you

14 have to pay on the money that you receive from the

15 operations of a business, you understand that, right?

16     A     So you're saying I owe more taxes?

17     Q     No, sir.  I'm saying you understand that by

18 putting business expenses on your tax return you did so

19 to offset the income that you received from operating

20 the consulting business, you understand that's the

21 purpose of business expenses?

22     A     Yeah, sure.

23     Q     So you don't know why this jumped from $1,500

24 a month all the way up to 22,900 for six months?

25     A     Maybe the rent increased.  I don't know.

Barger Steven B. 081018 Rough Draft

1    Q    The rent increased on the -- was this an

2 apartment that you were living in?

3    A    It was a house.

4    Q    Oh.  Did the rent increase do you know?

5    A    I don't know.  You would have to ask my

6 accountant.

7    Q    Okay.  Well, we just might do that.

8        Are you a gambler?

9    A    I have gambled, yeah.

10    Q    And you report your winnings and losses on

11 your taxes?

12    A    Of course.

13        (Deposition Exhibit 136, marked for

14 identification.)

15    Q    Showing you what's been marked as Deposition

16 Exhibit 136 which corresponds with SBB-001345 to 1355,

17 this is a document produced in this case and it's your

18 2012 1040.  Do you see that?

19    A    I do.

20    Q    And in 2012, which was the time period when

21 you were operating the lucrative consulting business,

22 your adjusted gross income was a negative $17,735,

23 right?

24    A    That's what my accountant says.

25    Q    And that year, if you go to Schedule C,

♀

53

1 001348, the amount of money that you received in income,

2 which had to be as a consultant is what it says, was

Barger Steven B. 081018 Rough Draft

3    $15,602, right?

4        A    That's what he says.

5        Q    That's what he says or that's what your tax

6    return said?

7        A    That's what his -- he put on my tax return and

8    I agreed to.

9        Q    Right you signed your taxes, right?

10       A    Yes, I did.

11            (Deposition Exhibit 137, marked for

12    identification.)

13       Q    Showing you what's been marked as Deposition

14   Exhibit 137, corresponding with SBB-001336 to 1344, I

15   represent that these were produced by you in this case

16   and this is your 2011 1040.  Do you see that?

17       A    I do.

18       Q    And this year for 2011 your AGI on line 37 of

19   page 1 was $35,202, right, Mr. Barger?

20       A    Yeah.

21       Q    And then on page 3 of this document, which is

22   your Schedule C profit or loss from a business, the

23   gross receipts that you had this year were $77,071.  Do

24   you see that?

25       A    Okay.  Yeah.

♀

54

1        Q    Is there something that happened between 2011

2    where you received $77,000 in consulting fees to 2012

3    and 2013 where they dramatically decreased?

4        A    Other than the fact that I started working

5    with my son at the Barger Group.

Page 49

Barger Steven B. 081018 Rough Draft

64

1    A    I'm sure they are, yeah.

2    Q    Did you report the MetLife checks for the two

3 that you received, one in the amount of $27,705 and the

4 other one in the amount of $13,852.50, did you report

5 them on your tax return?

6    A    I don't know.  You have to ask my accountant.

7    Q    And to this day you have not returned that

8 money to MetLife, correct?

9    A    Correct.

10   Q    Showing you what's been marked as Deposition

11 Exhibit what number is that 141?  Is that correct?  142,

12 I'm sorry.  142, I'm sorry.

13        MR. SHEARER:  I think we're on 143.

14   Q    I apologize.  I apologize.

15        Showing you what's been marked as Deposition

16 Exhibit 143, can you identify that, please?

17   A    Looks like a 1099 from a company called Oasis

18 Outsourcing.

19   Q    And what is Oasis Outsourcing?

20   A    They are an HR outsourcing company that does

21 HR services for companies who don't want to keep it

22 inhouse.  They act as a co-employer.

23   Q    Did you provide consulting services to Oasis

24 in 2017 after you left First Data?

25   A    I did.

1    Q    And did you do that again through your son's

Barger Steven B. 081018 Rough Draft

12  him.

13       MR. SHEARER:  Objection on asking -- how he

14  made a decision for tax purposes in this case is

15  privileged information.

16       MR. EIDELMAN:  No.  He just said it was his

17  accountant.

18    Q    So I want to be clear about something, Mr.

19  Shearer.  You deducted fees that you paid to Mr. Shearer

20  on your tax return for your business in 2017 in the

21  amount of $36,500, right?

22    A    You're going to have to ask my accountant.

23    Q    Do you know what you -- do you know what you

24  otherwise would have spent $36,500 on in legal fees in

25  2017?

$

                                                        70

1    A    I have no idea.

2    Q    And you paid Mr. Shearer in 2017, correct?

3    A    I think that's privileged, isn't it?

4    Q    Well, it's on your tax return.  I'm entitled

5  to find out what your legal and professional services

6  for $36,500 were that you reported to the United States

7  government on your tax return in 2017.

8    A    You have to ask my accountant.

9    Q    Do you have any legal -- do you have any other

10  legal cases going on besides this one?

11    A    No.

12    Q    Have you paid any lawyers other than Mr.

13  Shearer --

Page 64

Barger Steven B. 081018 Rough Draft

19          (Recess 5:30 p.m. - 6:05 p.m.)

20          (Deposition Exhibit 171, marked for

21   identification.)

22   BY MR. EIDELMAN:

23      Q     We're back on the record.

24            I just wanted to do a housekeeping matter with

25   you, Mr. Barger.  Earlier today we had some testimony

224

1   about your tax returns and your 1040, et cetera.  Who is

2   your accountant?

3      A     A guy named Philip in Birmingham, Alabama.

4      Q     Is it Philip Morgan?

5      A     Yeah.

6      Q     Philip Morgan CPA?

7      A     Yeah.

8      Q     And Mr. Morgan is the person that I would need

9   to ask questions about about your tax returns?

10     A     Yeah.

11     Q     Do you have any objection to me taking

12   Mr. Morgan's deposition for purposes of inquiring about

13   your taxes?

14     A     That's fine with me.

15     Q     So if Mr. Morgan's name appears on any tax

16   returns, he's the person that I would ask questions to

17   is that right?

18     A     That's fine with me.

19     Q     And if his name isn't on any tax returns, who

20   would I ask those questions to?

Page 206