# EXHIBIT D

1       CONFIDENTIAL - ANTHONY MARINO
2   do on day one.  I'm not on the look for the
3   successor.  I mean, it was his
4   responsibility --
5           Q    If somebody is hired --
6           A    -- to find a successor.
7               MR. EIDELMAN:  Please let him
8       finish.
9               MR. SHEARER:  I thought he was
10      done.  I'm sorry.
11          Q    Why would somebody on their
12  first day start looking for their successor?
13          A    I didn't say his first day.  I
14  said that he was notified very early on that
15  he should find a successor.  Like anybody
16  should find a successor.
17              Think about this, Mr. Shearer,
18  Mr. Barger was retired.  First Data hired him
19  at 69 years old, provided him with over three
20  years of employment worth nearly a million
21  dollars per year.  Of course, it would be a
22  logical plan in any good-run business to
23  ensure that that person also had somebody in
24  their organization who could someday run and
25  move the legacy forward of what they had

CONFIDENTIAL - ANTHONY MARINO

established.

Q   Okay.  And now, you say in any good-run business, but isn't this the same business that hired Mr. Barger at a million dollars a year?

A   I believe that that was a mistake hiring him at the rate in which he was paid.  In fact, I believe Ms. Whalen testified yesterday that she completely disagreed with Mr. Plumeri when he made the decision to do so.

So I support Ms. Whalen's assertion that that job should never have been paid what Mr. Barger was earning, that three quarters of a million dollars for the job in the company, I would say, is completely inappropriate.  So I support Ms. Whalen's belief that we hired him improperly at that high rate of pay.

Q   So how do you decide which decisions by this organization are good business decisions and which ones are poor business decisions?

MR. EIDELMAN:  Objection.

|    | CONFIDENTIAL - ANTHONY MARINO |
|----|---|
| 1  |  |
| 2  | If you can answer. |
| 3  | A    Yeah.  I don't understand the |
| 4  | question. |
| 5  | Q    Well, it seems like you pick |
| 6  | and choose as to what decisions you call good |
| 7  | business decisions and what decisions you call |
| 8  | bad business decisions, but they're all being |
| 9  | made by the same organization. |
| 10 | A    I think that in Mr. Barger's |
| 11 | case he was hired by Mr. Plumeri.  And my |
| 12 | deposition and Ms. Whalen's deposition, we |
| 13 | believe that he was hired at a rate of pay |
| 14 | that far exceeded the responsibilities of the |
| 15 | job.  And Ms. Whalen, I believe, went on the |
| 16 | record of that.  I support that.  So I believe |
| 17 | that the decision to hire Mr. Barger at that |
| 18 | rate of pay for the job that he was doing was |
| 19 | not a good decision. |
| 20 | Q    Okay.  So Mr. Plumeri made a |
| 21 | bad decision in this case? |
| 22 | A    Correct. |
| 23 | Q    Okay.  In response to that, |
| 24 | later in the morning, Jeff Hack returns an |
| 25 | email back to you, agreeing with your concepts |

|    |                                                          |
|----|----------------------------------------------------------|
| 1  |         CONFIDENTIAL - ANTHONY MARINO                    |
| 2  |         Correct.                                         |
| 3  |    Q    Do you know if he was receiving                  |
| 4  | long-term disability payments from MetLife               |
| 5  | around January 11?                                       |
| 6  |    A    I don't know.                                    |
| 7  |    Q    Do you know if Mr. Barger was                    |
| 8  | on First Data's medical insurance?                       |
| 9  |         MR. EIDELMAN:  Objection.                        |
| 10 |         Asked and answered.                              |
| 11 |         You can answer again.                            |
| 12 |    A    I don't know.                                    |
| 13 |    Q    Okay. That's that. I kind of                     |
| 14 | want to go back to the Joe Pulmeri discussion,           |
| 15 | the hiring discussion. Well, one of the first            |
| 16 | things we talked about this morning in                   |
| 17 | Exhibit 1, the U.S. employee handbook --                 |
| 18 |    A    Uh-huh.                                          |
| 19 |    Q    -- was that the salaries,                        |
| 20 | positions, could be reduced at any time?                 |
| 21 |    A    Uh-huh.                                          |
| 22 |    Q    Why if this was such a -- why                    |
| 23 | if it was such a bad decision did First Data             |
| 24 | not take any action to adjust the salary to              |
| 25 | what would be, in your mind, commensurate with           |

```
 1              CONFIDENTIAL - ANTHONY MARINO
 2     the position?
 3              A     I'll answer it in general, and
 4     then I'll answer it in specific.  It's
 5     uncommon to take an executive and reduce their
 6     pay 50 percent, reduce their title, and then
 7     expect that they'll be motivated to come into
 8     work the next day.
 9                    I've not seen it done a lot.  I
10     suppose that if somebody volunteered that,
11     that would be great, and it would be
12     considered specific to Mr. Barger.  I think
13     that he -- again this is conjecture, but I
14     can't imagine him agreeing that, you know, the
15     next day he'd come into the office, and he'd
16     be a VP, and he'd have his salary reduced 50
17     percent, so it -- it could have happened, but,
18     you know, it's not common.
19              Q     You mentioned that he had been,
20     I would just call it, semi-retired prior to
21     coming into First Data, and it seemed like a
22     formerly semi-retired individual would be a
23     prime candidate for going to and asking will
24     he take a pay cut.
25              A     I think it would have been
```