# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| STEVEN B. BARGER, an individual | **Case No. 1:17-cv-4869-FB-LB** |
| Plaintiff | |
| v. | **(Assigned to the Honorable Frederic Block)** |
| FIRST DATA CORPORATION et al. | |
| Defendants. | |

## PLAINTIFF'S
## RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE*
## AND
## PLAINTIFF'S CROSS-MOTION *IN LIMIINE*

**THE LAW OFFICE OF SHAWN SHEARER, P.C.**
Shawn Shearer (admitted *pro hac vice*)
3839 McKinney Avenue, Suite 155-254
Dallas, Texas 75204
Telephone (972) 803-4499
*shawn@shearerlaw.pro*

**ZEITLIN & ZEITLIN, P.C.**
David A. Zeitlin (Bar No. 2957082)
50 Court Street, Suite 506
Brooklyn, NY 11201
Telephone: (718) 552-5644

Attorneys for Plaintiff
Steven B. Barger

1

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................ 1

II.  ARGUMENTS ............................................................................................................. 2

  1.  **Plaintiff is Entitled to Present Evidence Regarding the Individual
      Defendants' Compensation** ................................................................................ 2

      The "RIF" Defense Asserted by Defendants Makes Compensation of
      the Top 10% Relevant ....................................................................................... 3

      Cross-Motion ....................................................................................................... 8

  2.  **Plaintiff is Entitled to Present Evidence Regarding the Finances Associated
      with the Fiserv/First Data Merger** ................................................................. 8

      Merger Consideration and Valuation is Relevant ............................................ 8

      Cross-Motion ....................................................................................................... 9

  3.  **Evidence of Racial Bias** ...................................................................................... 9

      There are Limited Conditions under which Plaintiff is Entitled to Introduce
      this Evidence ....................................................................................................... 9

      Cross-Motion ..................................................................................................... 11

  4.  **Plaintiff is Entitled to Present Evidence Regarding First Data's Use of Palantir
      and First Data's IT Systems** ............................................................................ 11

      Introduction to the Palantir/Big-Data Issue .................................................. 11

      First Data's Business is Based on Palantir and "Big Data" Collection and
      Analytic Systems ............................................................................................. 13

      Palantir/Big Data Evidence is Relevant to Plaintiff's Case and there is no Evidence
      of Prejudice from Describing First Data's Business ....................................... 14

      There is No Justification under Rule 403 for Excluding Evidence about
      First Data Systems ........................................................................................... 16

  6.  **Evidence of Prior Lawsuits** ............................................................................. 19

  7.  **Plaintiff is Entitled to Present Evidence Regarding Other Reductions-In-Force** ...... 19

III. CONCLUSION .......................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Arista Records LLC v. Lime Grp. LLL*, 2011 WL 1542560, at *1 (SDNY Apr. 21, 2011)............ 3

*Gibson v. Mayor &Council of Wilmington*, 355 F.3d 215, 232 (3d Cir. 2004) ............................. 1

*Honda Motor Co. v. Oberg*, 512 U.S. 415, 432 (1994) ...................................................... 3

*Huddleston v. United States*, 485 U.S. 681, 687 (1988) ..................................................... 1

*United States v. Mills*, 704 F.2d 1553, 1559 (11th Cir. 1983) ........................................... 1

**Regulations**

29 C.F.R. § 825.216 ................................................................................................. 6

**Rules**

Fed. R. Evid. 401, 402, & 403 ............................................................................... Passim

**Other**

E. Castilla (MIT) & S. Benard (Indiana Univ.) *The Paradox of Meritocracy in Organizations*, Administrative Science Quarterly, December 1, 2010

## I.   INTRODUCTION

Plaintiff Steven B. Barger ("Barger" or "Plaintiff") submits this Response in Opposition ("Opposition") to Plaintiff's August 30, 2019 consolidated Motion *In Limine* ("Motion"). The Motion seeks to preclude Plaintiff from presenting evidence at trial in seven categories. Defendants' Motion should be denied. To the extent the Motion is granted as to any category of evidence, then, to the extent a cross-motion in that category is set forth below, Plaintiff requests that such cross-motion be granted to correspondingly limit Defendant's introduction of evidence within that same category as described in each cross-motion below.

In arguing that certain evidence should be excluded at trial as irrelevant or prejudicial, Defendants overlook that "Rules 401 and 402 [of the Federal Rules of Evidence] establish the broad principle that relevant evidence – evidence that makes the existence of any fact [that is of consequence] more or less probable - is admissible *unless the Rules provide otherwise*." *Huddleston v. United States*, 485 U.S. 681, 687 (1988)(emphasis added).

The definition of relevance for purposes of Fed. R. Evid. 401 and 402 is "very broad" and "does not raise a high standard, and those Rules must be liberally construed in favor of admissibility." *Gibson v. Mayor & Council of Wilmington*, 355 F.3d 215, 232 (3d Cir. 2004). Rule 403 favors admissibility and Defendants' arguments regarding prejudice are unfounded.

> Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matters under Rule 403. Unless trials are to be conducted as scenarios, or unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of prejudicial effect.  *United States v. Mills*, 704 F.2d 1553, 1559 (11th Cir. 1983)

The Defendants' Motion looks only at the prejudice side of the equation, without any analysis of the much weightier consideration of the Rules permitting the admission of relevant evidence.

None of the evidence identified by Defendants in the Motion rises to the level of *unfairly* prejudicial when compared to the broad and liberal standard of relevance. Rule 403 does not bar Plaintiff from using any evidence within any of the categories discussed below.

For practical purposes, until the evidence is clearly offered and the court is aware of its relevance (in context), its probative value, and its potential for prejudice, the court cannot intelligently rule on admissibility at this stage. Each of the categories of evidence Defendants seek to bar are, or may become, relevant to a key element of proof in the case and should not be excluded before trial and the context in which the evidence is being offered is known.

## II.   ARGUMENTS

### 1.   Plaintiff is Entitled to Present Evidence Regarding the Individual Defendants' Compensation

The Motion seeks to prohibit the Plaintiff from submitting evidence regarding the individual Defendant's "compensation, financial conditions, and net worth." The Plaintiff does not intend to seek to introduce evidence on any of the individual Defendant's net worth. The term financial condition is vague and an order to exclude references to this category would be fraught with disaster (e.g. does asking a witness where they live become a question implying financial condition) and the Motion should not be granted as to "financial condition" due to this vagueness. The Plaintiff does seek to offer evidence regarding the compensation paid to the individual defendants, as such compensation is relevant and probative on the matters of the bona fides of the "RIF," the legitimacy and business purpose of the RIF, and the individual defendants' motives for engaging in repeated RIFs and selecting individuals for termination.[1]

---

[1] None of the cases cited by the Plaintiff's in support of this proposition in Item 1 of the Motion at page 4 apply and do not stand for the proposition for which they are cited. The cases cited all involve corporations and the prejudicial effect of the big guy versus the little guy. None of them discuss an individual vs. an individual. Moreover, the cases support admission of the evidence in cases where punitive damages, such as those in the Supplemental Complaint for ADA violations, are alleged. In fact, the quote on page 3 of the motion from *Honda Motor Co. v. Oberg*, 512

<u>The "RIF" Defense Asserted by Defendants Makes Compensation of the Top 10% Relevant</u>

Defendants assert that a "RIF" (never defined by Defendants) is a "legitimate, non-discriminatory business justification" for the otherwise unlawful termination of Plaintiff. The Defendants seem to believe that simply stating "RIF" is all that is necessary to avoid compliance with the law. There is more to it than that, and Plaintiff is entitled to present evidence disproving the bona fides, legitimacy and business justification of the implementation of a termination under the guise of the undefined term "RIF" that is nowhere to be seen in the statutory text of the ADA or FMLA. [2]

The "RIF" defense makes all evidence as to each individual defendant's contribution to First Data's overall compensation expense relevant, as the asserted justification for a RIF is a projected reduction in compensation expense. The RIF defense also puts First Data's executive compensation policies, compensation expenses, and compensation practices at issue.

First Data is a constant Ferris wheel with employees onboarding taking a ride and then debarking while others take their seat and there is no change, or possibly an increase, in the number riding at any point in time. At First Data, there is no "reduction" in "reduction-in-force". There are "RIFs" every quarter, but both headcount and compensation and contractor expense

---

U.S. 415, 432 (1994) is taken completely out of context. In that portion of the decision, the Court stated that because financial information that is admissible as relevant for punitive damages may result emotional jury awards, the system's judicial review of those large awards protects check against any negative implications from the admission of emotional evidence. The same concept applies to liquidated and punitive damages under the FMLA and ADA. The *Arista Records LLC v. Lime Grp. LLL*, 2011 WL 1542560, at *1 (SDNY Apr. 21, 2011) cited similarly is taken out of context. In that case, the court had already ruled on liability for the plaintiff a corporation.

[2] As set forth in Plaintiff's Rule 56 briefings [ECF Nos. 94-5, 94-12, 94-17] FMLA interference claims are not discrimination claims and, therefore, the "RIF" is not a defense unless the Defendants meet their burden of proof under 29 C.F.R. § 825.216. The RIF also is not a defense at all to Plaintiff's claim that forcing unpaid leave based on Plaintiff's disability is a per se adverse employment action based on a disability in violation of the ADA. Even if the Defense is correct that leave was an accommodation, the forcing of an accommodation against the Plaintiff's wishes is also a violation of the ADA. By addressing the "legitimate, non-discriminatory business justification defense", Plaintiff is not conceding that such a defense is available. FMLA interference is not about discrimination. Plaintiff's entitlements under the act were either deprived or they were not. Further, there is no legitimate non-discriminatory business justification for forcing leave based solely upon Plaintiff's disability. There may be a business justification, but on its face that act is discriminatory.

continues to increase. The "RIF" is a façade designed to avoid legal liability and garner preferred accounting treatment, it is not legitimate as practiced by First Data.

The Defendants are alleging the Plaintiff was included in a supposed "RIF" involving the termination of a portion of the top 10% of wage earners at First Data. Defendants Bisignano, Marino, and Charron, as well as the Plaintiff, were in that top 10% pool subject to potential termination if the RIF was real. These individual Defendants survived this supposed culling process (probably because all of them were involved in the process, which is why they are here as "employers" under the FMLA).

The Defendants have asserted that the business justification for these "RIFs" is control of compensation expense (salary, bonus, etc.). The Defendants have asserted that it was Plaintiff's salary that caused him to be selected for inclusion for termination. Yet, each of the Defendant's salaries also contributed to First Data's aggregate compensation expense. Therefore, the reasons for the Defendants' exclusion from the RIF and their salary, compensation and job duties in comparison to Plaintiff's should be examined to determine the bona fides of this "RIF."

First Data's accounting for these RIFs also requires an examination of individual compensation. The Plaintiff will present evidence that RIFs are used to manipulate the bonus pools available. RIFs are used as a method to increase compensation to senior managers or increasing each individual's share of bonus pools. Then, once the compensation is divided-up, First Data starts hiring again and headcount increases. First Data's compensation methods, the beneficiaries of this shell game, and the amounts received all motivate the decision-makers (i.e. the Defendants) and the evidence of that motivation is inside of each of their compensation packages. The evidence is relevant.

The only documentary evidence Plaintiff intends present is the compensation information

included in First Data's filings with the Securities and Exchange Commission. While the Motion attempts to pre-empt this argument, the Defense's position is not persuasive. Compensation information for the top five highly compensated officers is required by law to be publically disclosed because that information has been deemed relevant for the market to make investment decisions. The Plaintiff's presentation of that exact same information to the jury does not have any further *unfair* prejudicial effect. By placing that information into the public sphere, the individuals have already answered questions about their compensation and they should be able to do so before the jury as well. This evidence, when viewed in context with the accounting and compensation policies of First Data, is probative as to the motivations of management for making decisions, and as to the legitimacy and business purpose of those decision.

The cases cited by the Defendants do not support the proposition that knowing an individual defendant's annual compensation will lead to *unfair* prejudice against that individual defendant. The cases cited by Defendants all address situations with a corporation or entity and its net worth for paying damages. The Motion only requests limits on evidence regarding the individual defendants in this category. There is no evidence that a jury would be prejudiced against any defendant that is an individual because of the salary they earn. The Plaintiff himself was a Senior Vice President and is requesting that damages be based upon his compensation package at First Data. There is little relative differences between the Plaintiff's former compensation at First Data and that of most of the individual defendants and that difference should not create *unfair* prejudice in either direction.

Finally, this is an employment lawsuit. Plaintiff's salary, bonus, equity awards, and consulting income before, during, and projected after, this lawsuit will be discussed at length during all phases of the trial. The salary, bonuses, and equity awards conferred on the individual

defendants implementing these RIFs is probative as to their motivations for making RIF decisions and selections for termination – decisions and selection the Plaintiff alleges were illegal. Evidence as to motive and incentive is relevant to pretext, legitimacy, and the purported "business" justification for decisions.

After-Acquired Evidence Defense Does Not Justify Exclusion of Compensation Evidence[3]

      The Plaintiff truly does not understand Defendants' argument as to why the after-acquired evidence defense (attempting to limit the amount of damages owed by a liable party) has anything to do with the probative value of the Defendants' compensation on motive, legitimacy, and business justification on the liability issues. Defendant's argument makes so little sense in this context, it must have been included solely to unfairly prejudice the Court on the eve of trial by impugning the character of the Plaintiff.

      After-acquired evidence is evidence discovered after the case commenced. After-acquired evidence is by definition unrelated to evidence relevant to the question of the legitimacy of the business decisions made by the Defendants from November 2016 (forced leave) to January 2017 (termination).

      The Defendants obtained an extension of discovery based upon this "after-acquired" evidence theory. In Plaintiff's Rule 11 Motion seeking sanctions, including prohibition of this defense [ECF No. 111], the Plaintiff outlined the facts on the record contrary to Defendants' assertions. After receiving months of additional discovery time based on an alleged need to prove this after-acquired evidence defense, engaging in litigation both in the Southern District of Ohio and the Northern District of Alabama against third-parties, and then taking three third-party

---

[3] See Plaintiff's Motion for Sanctions [ECF No. 111] requesting sanctions, including prohibition of this defense, because of Defendants' misrepresentations to this Court when Defendants sought an extension of discovery to pursue this exact "after-acquired evidence" defense

depositions and obtaining document production from those third-parties, there was not one single reference to those depositions or documents, or even to the after-acquired evidence defense, in the Defendants' Rule 56 filings.

This entire third-party discovery process chasing the non-existent after-acquired evidence was a farce and produced nothing. The continued advocacy of this knowingly baseless after-acquired evidence defense in the Motion is a further violation of Rule 11 for the same reasons set forth in ECF No. 111.

The Defendants' assert that their "after-acquired evidence" (i.e. the Plaintiff's earnings before he was employed by First Data) is admissible. Defendants' asserted relevance of Plaintiff's pre-employment income concedes that compensation evidence is relevant for a jury to make judgments as to the character and motives of individuals. The Defendants all are motivated monetarily as well and, therefore, their compensation is relevant as to their motives and decisions. The Defendants advocacy of this "after-acquired" defense proves that this Motion must be denied. The jury is entitled to decide whether a termination motivated by self-gain through increased compensation for senior executives is, or is not, a "legitimate business reason" justifying an otherwise illegal termination.

Evidence as to the salary and compensation of each of the individual Defendants is relevant to the issues of motive, pretext, and the legitimacy and business nature of decisions. This probative value is not outweighed by an unspecified prejudicial effect relying on cases that are inapplicable to the facts before this Court.[4]

---

[4] The after-acquired evidence defense in intimately intertwined with the Palantir/big data issues discussed below. Because of the sensitive nature of Palantir and First Data's data capture, aggregation and analysis capabilities, First Data and Joe Plumeri sought the Plaintiff's exclusive attention and were willing to pay the Plaintiff a sufficient incentive to cause him to stop working for other clients in his consulting business. The Plaintiff's response to the after-acquired evidence allegations will require a discussion of the proprietary nature of First Data's Palantir and big data capabilities for which Plaintiff was tasked to develop the sales force. Evidence as to Palantir/big data  not only is relevant to Plaintiff's response to this after-acquired evidence defense, but it also is essential to determine

<u>Cross-Motion</u>

To the extent the Defendants' Motion on this category is granted, the Plaintiff cross-moves for a corresponding prohibition on the presentation of any evidence as to Plaintiff's income, compensation, net worth or financial condition.

**2. Plaintiff is Entitled to Present Evidence Regarding the Finances Associated with the Fiserv/First Data Merger**

<u>Merger Consideration and Valuation is Relevant</u>

Fiserv acquired First Data on July 29, 2019. First Data's equity was valued at approximately $22 billion. This purchase price for First Data is relevant. Plaintiff forfeited First Data stock options and restricted stock when he was wrongfully terminated, and, therefore, the merger transaction that occurred 45 days before the scheduled trial is extremely probative as to the calculation of damages (i.e. the value of Plaintiff's forfeited equity as of the judgment date).

The Fiserv/First Data merger has been publically announced, and covered by news outlets. The fact the merger occurred is not prejudicial. The value of the merger transaction is not prejudicial. The equity valuation of only one of the merging entities is not a measure of the consolidated entity's net worth. The merger and its valuation is admissible as evidence of Plaintiff's back-pay award, and as evidence probative on the questions of motive, pretext, legitimacy, business justification, etc.

Evidence as to this $22 billion merger also is probative as to the legitimacy of the RIF. First Data was not a financially distressed company in 2017 when Plaintiff was terminated (a $22 billion valuation did not suddenly appear over a two year period). There were no written criteria for selection of individuals to be included in the "RIF." First Data has had "RIFs" for each of nearly 20 consecutive quarters. A financially sound company's quarterly "RIFs" cannot be used

---

Plaintiff's job functions and to explain Plaintiff's consulting fees and starting salary.

to immunize the company for violations of worker protection laws (such as the FMLA and ADA). The merger and its valuation goes directly to the question of whether the RIFs actually were business decisions or whether they were decisions motivated by individual monetary rewards that may cloud and influence decisions as to whether or not to comply with the law.

The supposed legitimate, non-discriminatory business justification for these repeated and continuous "RIFs" is that they are designed to reduce costs. A possible ultimate result from cost-cutting/efficiency measures would be an acquisition. The fact that the Defendants are asking to exclude evidence of the value of the merger from the trial is proof, in-and-of-itself, that the real reason for the "RIF" was not to increase the value of the company (i.e. no business justification), otherwise First Data would be singing the praises of the merger value achieved through RIFs. The merger and its valuation goes to damages and the legitimacy and bona fides of the RIF, and there is no prejudicial effect to justify exclusion under Rule 403.

Cross-Motion

To the extent that Defendants' Motion on this category is granted, the Plaintiff cross-moves for a corresponding prohibition of the presentation of any evidence by the Defendants alluding to the merger, or its valuation, as proof that the "RIFs" during 2015 to 2018 were successful in obtaining this valuation and were legitimate business justifications for terminating the Plaintiff.

**3. Evidence of Racial Bias**

There are Limited Conditions under which Plaintiff is Entitled to Introduce this Evidence

The Plaintiff has no intention of initiating any discussion of the racial bias that exists within First Data (i.e. as of mid-2018, there were no African-American senior executives, and Bisignano testified that Atlanta - home of the civil rights movement - was First Data's headquarters – that means, First Data is a company based in Atlanta with 22,000 employees and

9

no African American senior executives).

   First Data, somehow, has done well in the press and received public kudos for its commitment to "diversity." These awards are in the nature of typical industry back-scratching without any underlying investigation or method for determining the winners (other than possibly advertisers or contributors have a better chance), and are handed-out for marketing purposes. If First Data is to use those awards and accolades for diversity as evidence of First Data's wholesome intentions and motivations as to the Plaintiff, then First Data also should answer for using a character named "Ken Kong" as being the fictional "Vice President of Disruption Services" and for distributing to its employees, in a glossy magazine, pictures of a gorilla in a suit chasing workers out of their office.[5] That magazine also is available to be viewed by the public on First Data's web site even today. This publication is not sensitive, or even aware, behavior by this supposed beacon of diversity. This publication demonstrates a complete insensitivity to diversity issues[6] and demonstrates an underlying unconscious bias within the company.[7]

   Plaintiff agrees that racial issues are highly charged and to be avoided in this trial. However, the highly charged nature of the topic should not allow First Data to then trot-out,

---

[5] Clearly, Mr. Eidelman, nor any associates at Saul Ewing have read the article in which Ken Kong Vice President of Disruption Services appears. The 800-pound gorilla in the article is not First Data as stated by Bisignano and in the Motion. The 800-pound gorilla is the massive changes ongoing in the area of payments driven by changing consumer choices. The metaphor was that there are changes ongoing in the market and First Data needed to adapt and not run from the 800-pound gorilla disrupting the consumer market.

[6] If First Data truly believed that this magazine issue did not have racial undertones and meaning, and if First Data truly was diverse and executed on its espoused values, First Data would not need to request exclusion of this evidence and would simply defend their actions.

[7] During his deposition, Defendant Bisignano repeatedly espoused his belief in implementing a meritocracy five different times, and his belief that his meritocracy thought process leads to a diverse work place. The scholarly work indicates that attempts to implement a "meritocracy," despite its espoused noble ends, results in a demonstrable bias against the groups outside of that of the decision-maker. See e.g. E. Castilla (MIT) & S. Benard (Indiana Univ.) *The Paradox of Meritocracy in Organizations*, Administrative Science Quarterly, December 1, 2010. A mere perusal of the race of the management committee members bears this conclusion out.

unchallenged, its "awards" for its commitments to "diversity" as a positive, without then opening

the door for Plaintiff to discuss the reality of First Data's lack of diversity, insensitivity, and bias,

whether conscious or unconscious.  If First Data does not submit evidence to brag about its

commitment to "diversity" there will be no reason for the Plaintiff to broach this topic.  On the

other hand, if First Data wishes to persuade the jury that it's stated commitment to "diversity" is

evidence to prove its pure motives in this case, the Plaintiff must be able test that assertion by

showing First Data's lack of adherence to its self-proclaimed standards.

Cross-Motion

To the extent Defendants' Motion on this category is granted, the Plaintiff cross-moves

for a corresponding prohibition on the presentation of any evidence by the Defendants alluding

to First Data's "commitment" or "awards" or similar praises for diversity in the workplace.

**4. Plaintiff is Entitled to Present Evidence Regarding First Data's Use of Palantir and First Data's IT Systems**

Introduction to the Palantir/Big-Data Issue

The Motion's factual allegations and conjectures as to the Plaintiff's planned evidence on

the Palantir topics are way off-base, inaccurate, and simply wrong. The Defendants once again

create a strawman and do not address the real issues at hand. This repeated tactic is either an

intentional diversion away from the topic, or Defense counsel does not understand their own

client's business.[8]  The Plaintiff is not intending, nor has it ever intended, to introduce evidence

that First Data is "spying" on its employees using Palantir or other technology. The employees

---

[8] There may be a good reason that counsel does not understand its client's business.  First Data's big data capabilities are somewhat controversial as people may not like the concept of their information being captured and sold by First Data. It was, in part, this issue that led to Mr. Plumeri seeking to hire Barger so that Barger was working on an exclusive basis for First Data and not working as a consultant with other financial industry clients or potential competitors while Barger possessed knowledge of First Data's information capture and analytics capabilities. Plumeri's compensation package for Barger was designed to incent Barger to do so, and was a package deigned to gain Barger's exclusive attention and services to First Data.

and Plaintiff know employee monitoring at First Data is on-going. There is no reason for Plaintiff to introduce such evidence in this case.

The Plaintiff's requests for 30(b)(6) depositions on IT issues were driven, at the time, to conduct discovery related to the human resources department's systems for leave, payroll, disability benefits, and integration with service providers such as MetLife. This focus was directly due to the two questionable affidavits submitted by Ms. Voycheske, and Plaintiff's quest to obtain an IT deposition had little if anything to do with "Palantir" or more generally "big data" capabilities of First Data. Compulsion of the Rule 30(b)(6) IT deposition was denied and that ruling upheld on a Rule 72(a) appeal of that decision. [ECF No. 86] The prejudice, if any, to Plaintiff's case from this lack of discovery is yet to be seen.

The Court has not heard any argument as to Palantir/big data in this case. Evidence regarding First Data's Palantir and "big data"[9] capabilities is relevant to the scope of Plaintiff Barger's job. The nature of the FMLA and the ADA place Plaintiff's job functions (essential or otherwise) directly at issue and they are subject to the Plaintiff's burden of proof.  Plaintiff pled in the Complaint that his job was to transform the sales culture and prepare the sales force for selling and distributing First Data's new product – aggregated information.

The Motion possibly could be read to be a request for the exclusion of evidence regarding Palantir and other big data capabilities at First Data. Such an exclusion  would be the equivalent of prohibiting the terminated SVP of sales training at Porsche from discussing her duties in preparing marketing materials and training for selling the Porsche 911 while excluding any discussion of its engine and engineering specifications. To understand Plaintiff's job function,

---

[9] "Big data" refers to the field that develops ways to systematically extract information from, or otherwise deal with, data sets that are too large or complex to be dealt with by traditional methods. The term refers to the handling of large, diverse sets of information that grows at increasing rates, encompasses the handling of the volume of data, the velocity with which it is created and collected, and the variety or scope of the data points being covered.

the jury needs to understand First Data's products, and to do so the jury needs to understand the

Palantir/big-data collection and aggregation systems around which Barger was hired to build a

sales force and sales culture. The relevant Palantir evidence goes directly to that question - the

scope and responsibilities of the Plaintiff's position at First Data.

First Data's Business is Based on Palantir and "Big Data" Collection and Analytic Systems

    According to First Data's 2017 10-K:

> First Data Corporation sits at the center of global electronic commerce. . . . We
> serve our clients in over 100 countries, reaching over 6 million business locations
> and over 4,000 financial institutions. . . We are the largest merchant acquirer,
> issuer processor, and independent network provider in the world, enabling
> business to accept electronic payments, helping financial institutions issue credit,
> debit, and prepaid cards, and routing secure transactions between them. In 2017,
> we processed 93 billion transactions globally, or approximately 3,000 per second.
> In our largest market, the United States, we processed approximately $2.1 trillion
> of payment volume, which represents over 10% of the United States gross
> domestic product (GDP) last year.

    During his deposition, Defendant Bisignano testified at length as to First Data's

involvement in every aspect of an electronic payments transaction. A diagram of this

involvement taken from First Data's 2017 10-K is attached as Exhibit A with First Data's

appearance throughout that payment process highlighted by Plaintiff. At all points during these

payment transactions, currency and information regarding consumers, businesses, and banks,

pass through First Data's systems. Under Mr. Bisignano's leadership, this information is

gathered, packaged and then sold by First Data as its own information product. Mr. Bisignano

testified that before he arrived as CEO, First Data did not have the big data capability to capture,

analyze and aggregate this huge amount of data passing through First Data's systems.

    First Data's legacy products were almost a utility in nature. First Data provided a network

over which transactions occurred. In simplest terms, First Data collected a per-transaction fee

and collected fees and lease payments for the equipment a merchant needed to access the

network (i.e. PIN pads and card readers). First Data's transition from simply selling equipment, network access, and payment processing to a company adding the more lucrative product of selling information collected through aggregation of large amounts of disparate data requires a sales force focused on different goals and a system that is able to cross-apply data points to create a bigger picture of movements of people, products, services, and money in the marketplace.

Palantir/Big Data Evidence is Relevant to Plaintiff's Case and there is no Evidence of Prejudice from Describing First Data's Business

Throughout Plaintiff's entire health crisis and then this litigation process (from the date of Mr. Barger's surgery until today) it has been stunning that no one (doctors, insurers, defense counsel) has ever asked Mr. Barger what his job duties were or why he was hired. Everyone in this case keeps wrongly assuming he was hired to run the sales training group.  This is not the case. Barger assumed the additional responsibility for the sales training group only when the leader of that group abruptly resigned in the fall of 2014.

The Defendants admitted in their Answer to the Complaint [ECF No. 1 and 19 at ¶ 32] that Barger accepted a position as "Senior Vice President – Sales Force Effectiveness", not sales force training. The Defendants admitted in ¶55 of the Answer that from his hiring in June 2014 until August 2014 Barger did not have any direct reports and was working across the company to creating the new sales culture around the selling of aggregated information. In ¶ 37 of the Complaint, the Plaintiff alleged that Plaintiff "was hired to drive the transformation of First Data's sales from selling a 'utility' merely processing services into a sales force selling value-added business consulting services in addition to transaction processing."

In ¶17 of Plaintiff Barger's Affidavit in Support of Plaintiff's Rule 56 Motion [ECF 94-7 at ¶17] Plaintiff Barger stated:

> The basic concept for beginning the implementation of the sales culture transformation involved expanding deployment of First Data's recently acquired "Clover" system and First Data's then "Insighics" and internal data capabilities. The concept being that these systems, if deployed properly, and the sales staff (and all supporting functions) educated, First Data could become a business consultant to merchants of all sizes, not just a transaction processing company. This planned transformation would be based on the information gathering capabilities of First Data and Clover, and the subsequent transformation of that collected data into a saleable product for use by merchants in operating, planning and conducting their business. The product would include applications running on the Clover cloud-based infrastructure gathering data from all transactions in which First Data was involved and then "anonomizing" that information and reselling it to merchants as a business and market analysis tool.

This is not the work of a mere sales force trainer.

Mr. Bisignano testified similarly in his deposition. Mr. Bisignano testified that First Data is involved in 40% of the card swipes in America, and by First Data collecting, aggregating and "anonomizing" that data, a merchant, by purchasing information from First Data can gain significant insights into the market and potential customers in the area. [Exhibit 3 to ECF No. 95, Bisignano Depo at 82:8-14]

When asked at his deposition "Does First Data use Palantir?" Defendant Bisignano (after an objection from defense counsel for which there is no basis given such a simple question at a deposition) answered in the affirmative "Yes we do." Defendant Bisignano further admitted in his testimony that First Data uses Palantir technology for building data analytics from the information it collects during the payment processing cycle. Mr. Bisignano also testified that First Data has scaled-back its use of Palantir developers in favor of hiring and deploying its own in-house developers for building-out First Data's own data collection and aggregation systems. [Exhibit 3 to ECF No. 95, Bisignano Depo 245:8-246:20].

Mr. Barger was hired at First Data by the Vice Chairman of the Board, Joe Plumeri, who Mr. Bisignano called one of his important mentors [Exhibit 3 to ECF No. 95, Bisignano Dep at

34:7-8]. Mr. Plumeri and Plaintiff Barger had worked closely together for years on sales culture transformations for several major Wall Street financial institutions. Plaintiff Barger was brought to First Data by Mr. Plumeri for purposes of redesigning the First Data sales force, and entire corporate culture, to become an information collection and distribution company that assists business owners rather than simply selling transaction processing. Palantir and "big data" systems were the backbone and core of the new product.

Evidence as to "Palantir" or "big data" or systems for collection, aggregation and analysis of information passing through First Data's systems at the rate of 3,000 card transactions per second, is extremely relevant to Plaintiff Barger's job duties upon hire. That evidence is fundamental to defining whether or not Mr. Barger was capable of performing the functions of his job, essential or otherwise, for purposes of the ADA and FMLA. Without knowing what Plaintiff Barger's job was, the jury cannot be informed as to whether or not he could perform those functions while sick or recovering, while working remotely, or after his physician's authorization was provided. First Data's systems not only are relevant, but are fundamental to understanding this case and Plaintiff's job function and duties.

There is No Justification under Rule 403 for Excluding Evidence about First Data Systems

The Plaintiff is not intending to produce evidence that First Data is using Palantir products to "monitor employee communications." Plaintiff must present evidence as to the job duties and functions Plaintiff was hired to perform. Plaintiff was hired to implement the sales culture of providing value-added services (i.e. relevant business information and intelligence) to First Data's client's by selling aggregated information collected by First Data, and then by selling additional Clover terminals to expand the number of data sources and outlets, the same way he had developed that culture earlier in his career with Mr. Plumeri at Primerica, Shearson, and Citi. The Motion provides absolutely no justification as to why this clearly relevant evidence

16

regarding the Palantir technology and First Data's own big data processing capabilities is prejudicial at all. It is First Data's actual business. First Data's data collection, analyzation, and aggregation capabilities are relevant and probative, and there is absolutely no prejudice to consider as a counter balance from the presentation of this evidence. This evidence cannot be excluded under Rule 403.

### 5. Plaintiff is Entitled to Present Evidence Regarding First Data's Hiring of E.J. Jackson

Plaintiff's argument is that First Data's hiring of E.J. Jackson as a Senior Vice President, on the exact same day Plaintiff was terminated, at comparable compensation to Plaintiff and reporting to the same Executive Vice President as Plaintiff, is probative evidence that there was no "reduction-in-force" at all (i.e. the RIF is not legitimate) or that the "RIF" nomenclature merely serves as a pretextual cover for otherwise illegal terminations (i.e. no business justification and pretext). RIFs occur so frequently at First Data that if an executive did want to fire an employee for an illegal reason, that executive need only wait for the next announced reduction and place that employee into the termination pool and then when a lawsuit is filed, once again state a RIF defense.[10]

The Motion completely misstates Plaintiff's position regarding the relevance of E.J. Jackson's hiring. It is the way Defense counsel works, set up a strawman and divert. Defense

---

[10] The jury should decide whether these serial RIFs are legitimate because if they are, the employment laws have now been interpreted to meaninglessness as long as a number of people are fired at the same time. This case does not involve a plant closing, an office closing, or the elimination of a division, or an elimination of a shift. This case does not involve a financially distressed company. This case involves executives selecting 300 people out of 22,000 to terminate with no criteria for choosing who is terminated. Bisignano testified that the combined employee/independent contractor headcount and compensation expense continued to increase. These are not the circumstances of a legitimate RIF for legal purposes. The RIFs are merely accounting hocus pocus related to the proper allocation of expenses that attorneys have latched onto for purposes of defending wrongful termination lawsuits. A true RIF is not a quarterly event, every quarter for five years. RIFs are unfortunate one-time or rare events. First Data's "RIFs" are restructurings and reinstatement is required under 29 C.F.R. §825.216.

counsel is intentionally trying to create confusion to trigger thoughts that the identity of the replacement employee is important, such as in an ADEA or Title VII case where Plaintiff must put-on evidence as to whether his replacement was outside of a protected class. These concepts do not apply to Plaintiff's arguments that failure to reinstate violated the FMLA and forcing leave violated the ADA.[11]

The Plaintiff reported up through the organization run by Executive Vice President Dan Charron. The evidence will show that First Data's management committee primarily is comprised of Mr. Bisignano and the Executive Vice Presidents. The evidence will also show that First Data operates its business through the management committee, with each Executive Vice President responsible for implementing the committee's plans and decisions through that executive's organization.

On the day Plaintiff was terminated, (i) his duties for leading the sales training team were assumed by Robin Ording, and (ii) Dan Charron announced the hiring of a new SVP in his group, E.J. Jackson. E.J. Jackson has the skill set to fulfill Plaintiff's role in transmitting and educating the sales force organizations on the capabilities and products created through the Palantir/big data system at First Data. This is not a reduction in force. One SVP added into Charron's organization and one SVP terminated from Charron's group. Plaintiff's job functions did not disappear, they were merely assigned to different people. Mr. Barger's salary expense did not disappear, it was merely given to the new SVP within Charron's organizational budget. This is a perfect example of the First Data Ferris wheel. There is no exception in the FMLA for failing to reinstate Plaintiff under these facts if proven. Therefore, the evidence regarding Jackson is

---

[11] On September 4, 2018, Judge Bloom found information as to E.J. Jackson's starting salary relevant for discovery and compelled Defendant First Data to answer requests for admission propounded by Plaintiff to First Data regarding the initial salary of E.J. Jackson.

18

extremely relevant.

The "RIF" is a façade and the hiring of E.J. Jackson the same day as the termination of Plaintiff is probative as to the legitimacy and business justification of the "RIF." The evidence regarding Jackson is extremely relevant.

The Defendants have placed the legitimacy and business justification of the RIF at issue. The evidence regarding the hiring of Mr. Jackson is probative as to both of those issues. The Motion does not make any arguments that such evidence is unfairly prejudicial. Therefore, there is no basis upon which to exclude this evidence under Rule 403.

**6.   Evidence of Prior Lawsuits**

The Plaintiff does not intend to introduce evidence with respect to the *Fountain, Golbin*, and *Merchant Link* cases for which exclusion is sought in the Motion. However, any sworn testimony in those prior cases (either at trial or in depositions) by a witness that is also presented at this trial should be allowed for use in impeachment of the witness in this trial, and to the extent Defendants for any reason raise those cases during trial, Plaintiff should be entitled to respond.

**7.   Plaintiff is Entitled to Present Evidence Regarding Other Reductions-In-Force**

The scope of the exclusion being sought in the Motion as to information regarding prior "RIFs" is not clear. Without specificity as to the evidence that is excluded, Plaintiff will be prejudiced with a constant concern that evidence being presented could be construed as a violation of an order granting the Motion as written for this category of evidence. Therefore, this request must be denied on its face.[12]

---

[12] To add further confusion, both Matt Cagwin (30(b)(6) designee on accounting issues) and Kathi Benhardt who is responsible for the data and analytics of First Data's RIFs (yes, First Data has a department dedicated to keeping up with all of the RIFS), testified that depending upon the length of what they call an "event" (or RIF), one event may bleed over into the other or one event may be merged into the next event. So, in other words, there is absolutely no way to tell one RIF from another. Once again proving the mirage of this RIF defense, but also making a ruling on this request for exclusion impossible.

The Plaintiff does not intend to present evidence creating mini-trials as to whether or not individuals included in prior RIFs at First Data were subjected to illegal treatment as proof of illegal treatment in this case.

However, certain evidence regarding RIFs conducted by First Data in the two years prior to Plaintiff's termination, and even those that occurred during the course of this litigation, are relevant and probative on a number of issues.

The accounting for RIFs at First Data is an important factor in addressing the legitimacy and business justification for First Data's decisions. First Data has conducted RIFs every quarter for nearly 20 consecutive quarters, yet headcount and compensation expense has remained the same and increased. There must be a reason why repeated reductions-in-force actually do not reduce the force and compensation increases.

The first answer is that following a mass termination, First Data simply backfills positions and the headcount goes up, but the senior executives tout their head-cutting as a cost cutting measure and are awarded larger bonuses and compensation for the effort.

The answer also lies in First Data's methods for accounting for compensation vs. severance expenses. A comparison of this treatment across different fiscal periods is necessary to determine that First Data must engage in mass firings every quarter so that its financial performance for the period is comparable to prior periods where a RIF occurred because of the manner in which First Data calculates Net Adjusted Income (NAI) and EBITDA, two factors that are included in bonus and other compensation decisions.

If First Data would cease the quarterly firings and severance payments, the year to year comparison of quarterly NAI and EBITDA would show a drop, or at least much less than the projected increase, in NAI and EBITDA. A drop in NAI and EBITDA would impact executive

bonuses. Therefore, the quarterly RIF machine must keep going, not because of cost control (the total cost remains the same or is greater, but that cost is either included or excluded from NAI and EBITDA). When RIFs for this reason are combined with no definitive selection criteria for inclusion, it becomes easy to hide illegal terminations within this rolling system that can be defended by simply stating "RIF" as in this case.

In addition, the processes and procedures used in Plaintiff's supposed "RIF," must be compared to the processes and procedures used by First Data in prior and subsequent RIFs. If those process and procedures differ, the issue as to why those differences exist will be probative and relevant to the legitimacy and justification for this particular RIF.

Plaintiff does not seek to introduce evidence as to any particular person or group of persons included in prior RIFs to demonstrate a pattern of violations of the FMLA or ADA. Plaintiff's proof will only be as to the historical accounting treatment of severance payments, bonus payments, projections v. actuals, tracking of "RIF" results, and other financial measures for purposes of proving motive, lack of legitimacy and business justifications of First Data's quarterly restructurings.

The Plaintiff also will introduce evidence that First Data's procedures in the Plaintiff's supposed "RIF" were not consistent with its practices in other similar termination events, which is probative again as to the legitimacy and business justification for this particular RIF.

It is the pattern of repeated RIFs, not the individuals included in the RIFs, that is probative. Quarterly "RIFs," including the one at issue, cannot be truly legitimate because they are consistently reoccurring events, and they are merely a vehicle for obtaining preferable accounting treatment, nothing more, for purposes of increasing executive compensation.

As a more practical point, when examining First Data's annual financial statements, the

"restructuring expense" (i.e. severance payments) are obviously the aggregate of events over the four quarters in the fiscal year. Therefore, by simply introducing evidence as to the annual audited financials, the Plaintiff by definition must introduce evidence as to the RIFS/restructurings that occurred in the quarters, prior or subsequent, within the same fiscal year. First Data "RIFs" every quarter. The prejudice to Plaintiff from exclusion of First Data's annual audited financial information would exclude relevant evidence regarding past and/or subsequent RIFs, and prejudice Plaintiff without providing any protection for the Defendants under the justifications in Rule 403.

There is no basis under Rule 401, 402 or 403 for exclusion of the relevant evidence as to First Data's historical RIF practices, process, procedures, and accounting.

## III.   CONCLUSION

For the reasons set forth above, the Defendants requests in the Motion *In Limine* should be denied. If Defendants' Motion is granted for any evidence category above as to which Plaintiff identified a cross-motion *in limine,* Plaintiff's cross-motion as to that same category should then be granted as well.

Respectfully submitted,

**THE LAW OFFICE OF SHAWN SHEARER, P.C.**

/s/ Shawn Shearer
Shawn Shearer (admitted *pro hac vice*)
3839 McKinney Avenue, Suite 155-254
Dallas, Texas 75204
Telephone (972) 803-4499
*shawn@shearerlaw.pro*

**ZEITLIN & ZEITLIN, P.C.**
David A. Zeitlin (Bar No. 2957082)
50 Court Street, Suite 506
Brooklyn, NY 11201
Telephone: (718) 552-5644

22

Attorneys for Plaintiff
Steven B. Barger