# EXHIBIT A

1  A    He had requisitions that he had opening a head count he

2  had opened when I assumed the HR role.

3  Q    But then at the -- but then you end up working on the --

4  you didn't work on that.

5           Let's go to the discussion of Mr. Barger's

6  conversations with employees about blatant alcoholism.  Did

7  you write that down anywhere?

8  A    I did not, but I did report that to Karen.

9  Q    So did you report that in an e-mail?

10  A    I don't recall.  I don't believe so.

11  Q    So you just talked to Karen about it?

12  A    And probably his manager, Jeff Hack.

13  Q    Isn't that the type of thing that HR departments should

14  document?

15  A    Well, it is documented.  You can do verbal documentation,

16  you can do written documentation.

17  Q    But there's no way for me to confirm that it even

18  happened, is there?  How can you discipline an employee when

19  there's no written record of his performance problems?

20  A    That would be his manager, Jeff Hack.  Jeff was aware of

21  his performance.

22  Q    And Jeff didn't do anything?

23  A    Steve's an SVP, but at my level I wouldn't have seen

24  Steve's performance review.

25  Q    Now, you testified that there's no need for access

1   A     I'm an assistant professor of Head and Neck Surgery at

2   Emory University.

3   Q     How long have you held this position?

4   A     2000 -- July of 2016.

5   Q     What are your major duties and responsibilities as

6   assistant professor?

7   A     So I do surgery on patients with head and neck cancer,

8   and then their reconstruction if needed.

9            THE COURT:  You sound just like a doctor.

10           MR. ZEITLIN:  Thank you.

11  Q     Do you ever communicate with employers with patients

12  regarding their medical condition and their eligibility to

13  return to work?

14  A     No, ma'am.

15  Q     Do you ever communicate with third-party benefit

16  administrators, such as MetLife, about patient's medical

17  conditions in connection with their return to work?

18  A     No.

19  Q     When was the first time you met Mr. Barger?

20  A     2015.  I believe.

21  Q     How did you meet him?

22  A     He was a referral from an outside ENT provider in Atlanta

23  who contacted me so that we could see him because he had

24  laryngeal cancer treated with radiation and had persisted.  So

25  he was being referred for evaluation for surgical therapy

1           THE COURT:  I do ask questions periodically to get

2     clarity of things.  If I don't understand something, then

3     maybe the jurors do not.  They're not allowed to ask the

4     questions so I have to be their representative, so to speak,

5     okay.

6           So this sales position that Mr. Barger was doing,

7     somebody else is doing to.  I mean, it's not like you're not

8     doing his work anymore, right?

9           THE WITNESS:  We have the sales position.

10          THE COURT:  Yes.  What he was doing, the work he was

11    doing, was necessary for somebody to do at less of a cost.  Is

12    that what you're saying?

13          THE WITNESS:  Yes.  Yes, definitely.

14          THE COURT:  Okay.  So that position still remains,

15    but it was at less of a cost because somebody else was doing

16    it and it was not costing you as much money; correct?

17          THE WITNESS:  Yes.  And Mr. Barger was not actually

18    running the sales organization -- the sales organization was

19    reporting to Mr. Barger.

20          THE COURT:  Now, I guess what I'm a little bit

21    unclear about is could he not be offered to come back to the

22    company maybe at a lesser price?  Was there any conversation

23    about that since the work that he was doing still had to be

24    done; correct?

25          THE WITNESS:  I was not part of that conversation.

1  other?

2          THE WITNESS:  No, your Honor.

3          THE COURT:  I wanted to get clarification about

4  that.

5          Next question.

6  EXAMINATION BY

7  MR. SHEARER:

8  (Continuing.)

9  Q    When we keep referring to the top ten percent -- ten

10  percent of the top 3,000.  Is that ten percent referring to

11  salary or ten percent referring to head count?

12  A    We went head count.

13  Q    Okay.

14          THE COURT:  How would that work out in terms of cost

15  savings?  If it's head count, you really want to know whether

16  or not you can save money, right?

17          THE WITNESS:  Yes, we had ten percent.  If you take

18  the top 3,000 management, right, and not dollar for dollar,

19  you're obviously going to look at the highest expense that you

20  have within your management overhead and see whether or not

21  you needed that same management on a go forward basis.

22          THE COURT:  Right.  The function is still going to

23  be performed.  The company needs people to do what those

24  people were doing, right?

25          THE WITNESS:  The actual trainers, yes, but you may

*D. Charron - Direct/Mr. Shearer*          353

1    not need the management.

2              THE COURT:  Okay.

3              THE WITNESS:  I'm sorry.

4              THE COURT:  You didn't need the management positions

5    anymore?

6              THE WITNESS:  We didn't need the number of managers

7    that we had in the company.

8              THE COURT:  All right.  But you still needed some

9    managers?

10             THE WITNESS:  Yes, sir.

11             THE COURT:  Right.  Who decided which managers would

12   stay and which managers would go?

13             THE WITNESS:  The individuals that each MC member

14   got their list of folks that were in their direct report line

15   and the they make that decision.

16             THE COURT:  What criteria was applied to make that

17   decision?

18             Some managers stayed and some left, right.

19             THE WITNESS:  There was cost, there was performance,

20   there is a lot of different things that each manager looked at

21   as it related to that.

22             THE COURT:  Next question.

23   EXAMINATION BY

24   MR. SHEARER:

25   (Continuing.)

1   Q    When you terminated Mr. Barger as part of this

2   restructuring, did you consider that a savings for First Data

3   in your planning documents for the restructuring?

4   A    Did I as part of the reduction in force?

5   Q    Yes.  Did you say, We got rid of ten percent of our heads

6   and we saved X amount, part of which is attributable to

7   terminating Barger?

8   A    We had the RIF as I went through.  We identified 24

9   different individuals in organizations that weren't necessary

10  from a management perspective on a go forward basis.

11  Q    Okay.  I guess I'll try to ask it this way.

12           Mr. Barger had not asked to come back and it had

13  decided to just sit on his long-term disability.  That

14  wouldn't be a save for your P&L, would it?

15  A    I don't know.  The job was eliminated.  I don't know how

16  to explain this.  We had two different organizations, we

17  brought those organizations together.  We did not need a

18  manager of sales training, a manager of corporate training,

19  and we did not need that job at $700,000.

20           THE COURT:  I think you explained that several

21  times.  The question he's asking, Was it really a cost savings

22  since he was going to get disability, there were other

23  expenses associated with his termination.  I think that's what

24  he's driving at.

25           THE WITNESS:  There's cost savings associated with

*D. Charron - Direct/Mr. Shearer*        355

1  the restructures that we have, absolutely.

2  EXAMINATION BY

3  MR. SHEARER:

4  (Continuing.)

5  Q    Right.  The cost savings for Mr. Barger is only if he

6  comes back and earns a salary, isn't it?  If he comes back and

7  earns a salary --

8              THE COURT:  I that what he's trying to say is why

9  bother to even restructure if people are going to get

10  disability pay or severance pay after that.

11             THE WITNESS:  I did not know Mr. Barger's status.

12  This was purely a business decision that was going on well

13  prior.  We've been talking about what we're doing with the

14  training group for a while.

15             THE COURT:  I take it that whoever make these

16  decisions considers what you have to pay these people in terms

17  of severance pay and looks at the totality of how long these

18  payments will be required and looks at an overall picture to

19  see whether on balance there will be a cost savings.

20             THE WITNESS:  There's definitely a cost savings.

21             THE COURT:  Am I putting words into your mouth here?

22             THE WITNESS:  Excuse me.

23             THE COURT:  Here's what I'm trying to say.

24             THE WITNESS:  Yes.

25             THE COURT:  You're saving money one hand, but you're

1   incurring expenses on the other hand -- severance pay,

2   whatever the insurance is for disability benefits and things

3   of this nature.  So does it balance out so at the end of the

4   line you're not really saving any money if you look at the

5   totality; or if you had any knowledge about that, is there a

6   long term savings that you're looking at?

7           THE WITNESS:  Yes, I see what you're saying.

8           THE COURT:  Is there a short-term savings?  How does

9   it work?

10          THE WITNESS:  Yes.  I mean, you're taking a

11  long-term expense out of the organization because you're doing

12  it with less management overhead with the business.

13          THE COURT:  These other expenses are short term

14  compared to the long term --

15          THE WITNESS:  Yes.

16          THE COURT:  -- savings.

17          THE WITNESS:  Yes.  Our business is much more

18  efficient.  It didn't make any money, so there's a lot of

19  things we've done to increase as it relates to the business

20  and the operation of the business.

21          THE COURT:  You're repeating yourself.  I'm trying

22  to understand whether there really is a total cost savings

23  here.

24          THE WITNESS:  Oh, yes, there is.

25          THE COURT:  That's what I want you to explain.

1　　　　THE WITNESS:  Okay.

2　　　　THE COURT:  Why is there a total cost savings?

3　　　　THE WITNESS:  Why is there a cost savings?

4　　　　THE COURT:  All the other costs that you have to

5　incur when you terminate somebody, right?  So if you can

6　explain that to the jury, I'll let you have a chance to do

7　that.

8　　　　Go ahead.  Try to keep it --

9　　　　THE WITNESS:  I'm not an expert on the corporate

10　accounting for restructuring.

11　　　　THE COURT:  You're trying to make sense of it.

12　　　　THE WITNESS:  We have an operating P&L, we have an

13　operating expense with direct expense associated with that.

14　One of those line items is compensation which includes

15　compensation, fringe, and benefits that's in.

16　　　　When you restructure and you have less compensation

17　and less people in that organization, there is a profitability

18　associated with that, yes.

19　　　　THE COURT:  Even with all these other expenses that

20　you have will incur --

21　　　　THE WITNESS:  Yes.

22　　　　THE COURT:  -- many employees.

23　　　　THE WITNESS:  Yes, sir.

24　　　　THE COURT:  I want to get a feel for that.

25　　　　THE WITNESS:  Yes, sir.

1           THE COURT:  Do you have any other questions?

2           MR. SHEARER:  Yes.

3    EXAMINATION BY

4    MR. SHEARER:

5    (Continuing.)

6    Q    The reason there was a savings was because he was coming

7    back; right?

8           THE COURT:  Next question.

9    Q    Last topic here.

10          Did you implement a hiring freeze as part of this

11   restructuring?

12   A    Not a specific hiring freeze that I know of.

13   Q    Mr. Barger was terminated on January 13th -- advised of

14   his termination?

15          MR. EIDELMAN:  Your Honor, I have to object.  It's

16   not been the testimony.  He wasn't terminated on January 13th.

17   He was told on January 13th that his position was being

18   eliminated.

19          THE COURT:  There's an objection that you are

20   mischaracterizing the testimony.  If you want to go on to

21   another question.  I think the jury's heard all about this

22   already.  Let's not be repetitious.

23          What else do you want to know from this witness?

24   EXAMINATION BY

25   MR. SHEARER:

1          THE WITNESS:  No, sir.

2          THE COURT:  I can understand how you might be a

3    little bit nervous.  I'll help you out, though, go ahead.

4          THE WITNESS:  Okay.

5    EXAMINATION BY

6    MR. SHEARER:

7    (Continuing.)

8    Q    So do you have any insight as to why Mr. Fricke resigned?

9          THE COURT:  The question is yes or no.

10   A    Yes.

11   Q    What is that?

12   A    He was overworked.

13   Q    What do you mean by overworked?

14   A    He was working all day, all night, weekends, having to

15   travel at the last minute.  Just too much for a normal person.

16   Q    When did Mr. Fricke resign?

17   A    It was the fall of 2014.

18   Q    And then who became your direct head of the group?

19   A    They brought Steve Barger on because he had been working

20   with us.  And the plan was that they would continue to search

21   for Brian's replacement.  But because Steve was fluent in what

22   we were doing, he could take on that role in addition to his

23   other responsibilities.

24          THE COURT:  Try to go a little slower.

25          Next question.

1  should clearly reflect that the judge is being aggressive in

2  the questioning because of the circumstances that he has to

3  deal with in court.

4         Okay.  Do you have any other questions you want to

5  ask him?

6         MR. SHEARER:  Yes.

7  Q   We heard about how you assumed Mr. Fricke's group in the

8  fall of 2014.

9         Before you got Mr. Fricke's group, what were your

10  duties and responsibilities when you were hired?

11  A   Yes.  So this reflects what Joe and I have always done in

12  the company.  He brings me along, like Batman and Robin, he

13  brings me along to cut across all aspects of the company,

14  talking with all leaders to assess their understanding of the

15  issues of the company, which at that time were severe price

16  compression and the fact that more clients were leaving the

17  back door than coming in the front door.

18         So I was supposed to travel, he wanted me to go to

19  Europe, Asia, South America.  He wanted me to meet with all

20  leaders.  He wanted me to make certain we got the message

21  across of what this cultural change needed to be because it

22  was not just a written document, and my expertise is

23  behavioral change, and how to get people to behave and think

24  differently.  That's what he wanted me to do.

25  Q   Okay.  And in the fall of 2014 when you assumed

1 Mr. Fricke's group, was that in addition to continuing that

2 cultural change?

3 A    Exactly.

4 Q    And you continued that cultural change for the entire

5 time you were at First Data?

6 A    I was supposed to, but I found my time during 2015 being

7 consumed by the training aspect and the fact that the training

8 department, its business purpose was to serve every business

9 in its requests.  And we kept getting multiple, multiple

10 requests, so I had to put more and more time in to the

11 training side and less time in to the cultural change.

12 Q    Okay.  Were you initially supposed to be the interim

13 replacement for Fricke?

14 A    Exactly.  We were supposed to find somebody to come in

15 and oversee all the training issues.

16 Q    I want to talk about 2016.

17         When were you -- you were diagnosed with throat

18 cancer in February of 2016?

19 A    Yes.

20 Q    And your radiation was March to May, is that right, of

21 2016?

22 A    I think April to May.  I took 28 radiation treatments.

23 Q    Sorry I went there.  I do want to go back to your offer

24 letter real quick.  Well, that's all right.  I entered that

25 yesterday.

*Charge Conference*                                   **631**

1   it to you tomorrow morning.

2            THE COURT:  Look, you can submit whatever you want.

3   I don't want to preclude you from giving whatever you want,

4   but I already have a draft of the charge that I put together.

5   And what I'm going to do is I'm going to look at it carefully

6   tonight because my new law clerk has really done a great job

7   after two weeks of being on the job, right?  He's obviously

8   not suffering from any disabilities whatsoever.  So I'm going

9   to take a good look at it tonight.  I may not give it to you

10  tonight.  If I can, I will send you something, it will be a

11  draft for you to chew on.

12           But certainly, by tomorrow, before the end of the

13  week, we'll have something to you.  And I think it will work

14  out time wise okay.  We started to discuss it tonight.  We'll

15  be able to continue our discussion maybe tomorrow afternoon.

16  I'll try to get something to you if not tonight then by

17  tomorrow for you to take a look at and we'll be able to put it

18  all together by Monday morning when you start your argument.

19           How does that work.

20           MR. EIDELMAN:  That's fine, your Honor.  There's a

21  regulation under the FMLA that we're going to propose actually

22  be put in the jury instruction which is that if an employee is

23  laid off during the course of --

24           THE COURT:  Maybe a little louder.

25           MR. DILORENZO:  So 825.216, the limitations on na

1   employees's right to reinstatement states that, "The employee

2   has no greater right to reinstatement or other benefits or

3   conditions of employment if the employee had been

4   conditioned" --

5          THE COURT:  Here's what I want you to do,

6   Mr. DiLorenzo give it to my law clerk.  Who him what we're

7   talking about and we'll take a look at it.

8          MR. SHEARER:  I think we're going to include that

9   there's a regulation I would like to include.

10          THE COURT:  Give me all of your regulations.

11          MR. SHEARER:  Okay.

12          THE COURT:  Whether I put them in or not.

13          MR. EIDELMAN:  Which?

14          MR. SHEARER:  214.

15          THE COURT:  Stop.  We get carried away with

16   ourselves once in a while.  Just let me know what you want.

17   What regulation do you want?

18          MR. SHEARER:  29 CFR 825.214.

19          THE COURT:  Paul, do you have those numbers down?

20          Let me know what else you want me to consider.  You

21   have time to do it all.

22          Anything else you wish to say tonight before we go

23   back and you go to it work again?  How late are you going to

24   keep these poor associates working?

25          MR. EIDELMAN:  They're going to take me to dinner,

1  provider that we had seen earlier, correct?

2  A    Correct.

3  Q    'When did you start missing work,' that's the question

4  that you asked him, those words, 'When did you start missing

5  work,' correct?

6  A    Yes.

7  Q    Now he responds back to you, but he really doesn't

8  answer the question, right?

9  A    Right.

10 Q    So then you ask him again.  'Thanks, Steve.  Can you

11 clarify when you stopped working?  Was it on 9/4/16 or

12 10/22/16?'  And how does he respond?

13 A    He responds by saying '9/4, my operation was 9/6.'

14 Q    You understood that to mean that Mr. Barger telling you

15 in response to your question when did he stop working that

16 he had stopped working on 9/4?

17 A    Correct.

18 Q    Did you take any action after Mr. Barger advised you

19 that he had stopped working on 9/4?

20 A    I did.  I went to the MetLife disability site, based on

21 his statement that they had approved him beginning that

22 date.  We have access to Met Links portal that shows all

23 approvals of disability claims.  I looked at Mr. Barger's

24 claim and confirmed they did indeed approve it for a date of

25 disability of 9/4.

1  Q    I want to show you Defendant's exhibit 191, the second

2  page of it, do you see that?

3  A    Yes.

4  Q    Is this the MetLife portal that you looked at?

5  A    Yes.

6  Q    This is the MetLife portal that you looked at after

7  Mr. Barger told that you he stopped working on 9/4?

8  A    Yes.

9  Q    What did the MetLife portal tell you?

10 A    The MetLife portal told me that his date of disability

11 had been determined to be September 4, that what his

12 benefits start date was, what had been approved through, and

13 what his maximum duration was.

14 Q    I see there is a circle around 9/4/2016.  Was that on

15 the MetLife portal?

16 A    I circled that as part of preparation for this trial.

17 Q    After confirming that what Mr. Barger had told you was

18 accurate, that MetLife had confirmed that his date of

19 disability for short-term disability purposes was 9/4, what

20 actions did you take?

21 A    Based on the fact that MetLife does extensive medical

22 research, we rely on their dates if we're unable to obtain

23 additional data through our own means.  I took that 9/4 date

24 as a medically informed begin date, and I retroactively

25 approved his FMLA to that date.

VOYCHESKE - DIRECT - EIDELMAN          791

1   Q    Do the FMLA regulations allow an employer to do that

2   when it receives new information about an employee's

3   beginning of their start date under the FMLA?

4   A    Absolutely.

5            MR. SHEARER:  Objection.

6            THE COURT:  You had knowledge.

7   Q    After confirming with MetLife the information that

8   Mr. Barger told you was accurate, what steps did you take?

9   Did you notify Mr. Barger?

10  A    I retroactively approved his leave to the 9/4 date.  I

11  mailed him a letter, as I had previously, this was

12  readvised.

13  Q    This is Defendant's exhibit 188.  Is this the revised

14  FMLA date letter that you sent Mr. Barger on January 5,

15  2017?

16  A    Yes, it is.

17  Q    What was the purpose of sending Mr. Barger this letter?

18  A    To let him know that his approval for FMLA had been

19  pushed backwards to be effective beginning 9/5.  And that

20  his exhaustion of FMLA had changed to November 28.  But we

21  were continuing evaluation of his leave of absence.  And we

22  were requesting the additional time under the business unit

23  under the ADA.

24  Q    So after the FMLA would be expired, Mr. Barger would

25  then have eligibility to be covered by First Data's policy

1    stay here until Monday.

2           MR. EIDELMAN:  Your Honor, it is going to be very,

3    very brief.

4           THE COURT:  I am not going to truncate Mr. Shearer's

5    questioning.

6           MR. EIDELMAN:  I am not trying to, Judge.

7           THE COURT:  I am telling you right now.

8           MR. EIDELMAN:  Okay.  If I may then.

9           THE COURT:  This is not the heart of your case.

10          MR. EIDELMAN:  Can I ask him what his current

11   position is, please.

12          THE COURT:  Go ahead.

13   Q    What is your current position?

14   A    I'm director of training.

15   Q    And who leads the sales training group at First Data now,

16   Fiserv?

17   A    I do.

18          THE COURT:  You were working -- you were not -- you

19   were working underneath Mr. Barger's supervision, weren't you?

20          THE WITNESS:  Yes, Your Honor.

21          THE COURT:  Do you have any problems with the way he

22   did his job?  You had a close relationship?

23          THE WITNESS:  We had a close relationship.

24          THE COURT:  Came to work every day, worked really

25   hard?

1           THE WITNESS:  Yes.

2           THE COURT:  You were all trying to do the best you

3    can to make a lot of money for First Data, right?

4           THE WITNESS:  Yes, sir.

5           THE COURT:  Do you have any other questions?

6           MR. EIDELMAN:  I do.

7    Q    Were you employed by First Data when Robin Ording took

8    over as interim lead -- interim manager or lead of the sales

9    training group?

10   A    Yes.

11   Q    When did that occur?

12   A    Early 2017.

13   Q    What was the difference between Mr. Barger's management

14   style and Ms. Ording's management style --

15          THE COURT:  Objection sustained.  I don't think

16   it's -- I think we're getting a little far afield.  Maybe it's

17   tangentially relevant on some theory, but let's move on.

18          MR. EIDELMAN:  I will move on.

19          Can I have the Elmo, please.

20   Q    Mr. Stamey, are you familiar with this organizational

21   chart?

22   A    Yes.

23   Q    This is Defense Exhibit 182.

24          Is this the organizational chart that existed at the

25   time that Steve Barger went out on leave and Ms. Ording took

1    over?

2              THE COURT:  There was already testimony about this.

3              MR. EIDELMAN:  I know.

4              THE COURT:  We don't need it.  It is duplicative.

5    It is getting cumulative.  We have tons of exhibits.

6              MR. EIDELMAN:  Can I just ask him a question, Judge?

7              THE COURT:  One last question.

8              MR. EIDELMAN:  One last question.

9              THE COURT:  Go ahead.

10   Q    Mr. Stamey, at my request, did you mark the -- let me ask

11   this question.

12             How many employees are currently in the sales

13   training group, including yourself?

14             THE COURT:  I don't think we need it.  Next

15   question.

16   Q    Mr. Stamey, at my request, did you mark the sales -- the

17   organizational chart to indicate what the sales training group

18   looked like now versus what it looked like at the time that

19   the company determined --

20             THE COURT:  I think we're getting a little bit

21   collateral, tangential, and I think it's getting a little bit

22   confusing and prolix.  We don't need it.

23             Do you have any other questions of this witness?

24             MR. DiLORENZO:  Your Honor, can we make an offer of

25   proof?

1   You got the notice on the 7th saying he could return on the

2   17th.

3           MR. SHEARER:  Right.

4           THE COURT:  He was terminated, notice of termination

5   on January 13, unless I have it wrong.

6           MR. EIDELMAN:  That was not notice -- that was -- he

7   was advised at that point in time that his employment would

8   end, effective at the end -- he stayed employed for another

9   six weeks.  His last date of employment was the 28th.

10          THE COURT:  Was February 28 --

11          MR. EIDELMAN:  That's the last date of his

12  employment.

13          THE COURT:  -- 2017.

14          MR. EIDELMAN:  That is correct.

15          THE COURT:  But somebody can be told he's terminated

16  effective three weeks later or four weeks later.  But the

17  official notice that he's going to be not be employed was

18  when?  January 13, wasn't it?

19          MR. EIDELMAN:  Yes.  But he -- yes, that is right,

20  Your Honor --

21          THE COURT:  Get the dates down.

22          MR. EIDELMAN:  I'm sorry?

23          THE COURT:  On January 13, he was told he's not

24  going to have a job anymore.

25          MR. EIDELMAN:  As of February --

1    And I think you understand where I am coming from,

2    Mr. Eidelman, and we will think about whether that provision

3    of the labor law, as a matter of law, precludes you from

4    arguing that September 4 was the date or not.  We will talk

5    about it later, okay?  But you know where I am coming from at

6    least.  That's the important thing, all right?

7            Now, having said everything I've said, I have great

8    respect for the lawyering.  You people worked very hard.  Your

9    clients should be most grateful, the efforts you put in.

10   High-end lawyering.  I am not willing to have you walk out of

11   this courtroom thinking that I am denigrating your talents.  I

12   have my own style, you have your own style, whatever it is.  I

13   respect the fact that you tried so hard.

14           Would I have put in 700 exhibits when I was

15   practicing law in Suffolk County?  I don't know.  We couldn't

16   count that high in those days, right?  But that's what you

17   decided to do and you spent a lot of time doing it, and maybe

18   it was appropriate.  But I think we have enough, okay.

19           And we will look forward to your deposition.  Do you

20   think it is going to really be necessary?  Is this something

21   you have spoken about today?

22           MR. SHEARER:  One of them, yes.  There's some

23   pretext towards the RIF or whether he was in it.

24           THE COURT:  Well, it is all pretext.  Ultimately, I

25   think it is going to come down to whether the jury believes

1   there was a legitimate reduction in force here.  I think

2   that's what it's going to come down to.

3            MR. SHEARER:  And that's what this -- one of these

4   depositions is going to say.

5            THE COURT:  I don't know what spreadsheets have to

6   do with it all.  Maybe it's somewhat relevant, but it seems to

7   be marching far afield here.

8            Okay.  Anything you want to say before we leave?

9            MR. DiLORENZO:  Your Honor, one thing.

10           THE COURT:  Yes.

11           MR. DiLORENZO:  This damage testimony that went in

12   from the plaintiff.

13           THE COURT:  Damage testimony?

14           MR. DiLORENZO:  I don't know how he did it, what he

15   did.  We don't have the program.

16           THE COURT:  Well, you know, look.  I think it is --

17   I didn't pay a lot of attention to it.  He tossed out some

18   numbers.  Let the jury wrestle with that.  I can always set it

19   aside afterwards.  I would rather get everything we can from

20   the jury, and I can always deal with it afterwards, I think.

21   I think I am more comfortable doing that, than knocking it out

22   of the box.

23           What do you say?

24           MR. SHEARER:  I agree.

25           THE COURT:  I think there's -- Mr. DiLorenzo has a

*Proceedings*                                                      866

1    It's a way of the government thanking you for service, I

2    suspect, and we're not going to be able to give you flaming

3    crepe suzettes but I think we'll have nice food from our

4    commissary downstairs for you.

5              I mentioned this before, probably mention it one

6    more time, that, you know, when you're eating, if the case is

7    all presented to you, and I tell you you can start your

8    deliberations, you don't have to do that until after lunch,

9    you can do it while you're eating.  You have to all be there

10   together when deliberations happen.  But we'll talk a little

11   bit more about that in my concluding remarks.

12             At the present time, just be patient.  There will be

13   little bit of time.  We'll come get you in 15, 20 minutes from

14   now.

15             COURTROOM DEPUTY:  All rise.

16             (Jury exits courtroom at 10:38 a.m.)

17             (A recess in the proceedings was taken.)

18             THE COURT:  Okay, folks.  I have a revised verdict

19   sheet.  I have the revised jury instructions.  I eliminated

20   any reference to the individual defendants.

21             Now, you otherwise it's pretty much what I sent to

22   you with one exception on Page 13.  I have burden of proof

23   that I've eliminated that.  I think the burden rests with the

24   plaintiff all the time.  And otherwise, I'll ask Mr. Shearer

25   first if you have anything of substance or significance that

*Proceedings*                                                867

1   you want to talk about.  This is sort of our charging

2   conference.  I want to make sure that you have everything you

3   need to have so that you can go forward with your summations.

4          MR. SHEARER:  Yes, Your Honor.  I submitted a

5   letter --

6          THE COURT:  You have to speak a little louder for me

7   to understand what you're saying.

8          MR. SHEARER:  I submitted a letter this morning with

9   the comments on one of them.

10          THE COURT:  Just tell me what you have a problem

11   with now.  Let's go right to it, we don't want to keep the

12   jurors waiting longer than necessary.

13          MR. SHEARER:  On Page 15.

14          THE COURT:  Okay.  15.  So, fine, the first 14

15   pages.

16          What is it that you're concerned about on Page 15?

17          MR. SHEARER:  I agree with the first two and a half

18   sentences, but where it starts, "The defendant proved by a

19   preponderance of the evidence."

20          THE COURT:  What is it now?

21          MR. SHEARER:  The portion of that instruction that

22   says, "The defendant proved by a preponderance of the evidence

23   that the termination was due to its reduction in force as I

24   previously explained to you."  I think that's an inaccurate

25   statement of law that 29 CFR --

*Proceedings* 868

1    THE COURT:  You don't agree with the statement that

2  the termination, therefore, was unlawful unless the defendant

3  proves by a preponderance of the evidence that it was due to a

4  reduction in force.  So it's not the defendant's burden, I

5  guess.

6    MR. SHEARER:  No, I agree it's the defendant's

7  burden.  But the defendant's burden under the regulation,

8  825.216.

9    THE COURT:  So the burden of proving the

10  determination was due to its reduction in force.  What do you

11  say, Mr. Eidelman?  Is that your burden, or is that not your

12  burden.

13    MR. EIDELMAN:  It is our burden, your Honor.

14    THE COURT:  It is your burden.

15    MR. SHEARER:  It's their burden to show that he

16  would have been terminated prior to requesting a

17  reinstatement, that's what 825.216 is.  Being in the RIF in

18  and of itself --

19    THE COURT:  I think this charge is substantively

20  correct about that.

21    MR. SHEARER:  He was in the RIF after he requested

22  reinstatement.  I don't believe 825.216 applies.

23    MR. EIDELMAN:  We're back to his strict liability

24  argument, your Honor.

25    THE COURT:  I don't understand what you're saying.

*Proceedings*                                                        869

1          MR. SHEARER:  Then the mitigation instruction.  I

2    just didn't understand why it was in there.  I don't think

3    there is any evidence.

4          THE COURT:  First, you can make whatever claims you

5    think you want to make if you disagreed with anything on the

6    charge, so I don't know whether I'm clear about what you agree

7    with.  I think that is correct to say that termination,

8    therefore, was unlawful unless the defendant proves by a

9    preponderance of the evidence that it was due to its reduction

10   in force.  I think that's exactly what your point is.  Should

11   I say that the termination was lawful?

12         MR. SHEARER:  No.  My point is just the regulation

13   doesn't refer to any particular reason why someone wasn't

14   terminated.  It's their burden to show that he would have been

15   terminated prior to his request for reinstatement had he been

16   employed.

17         THE COURT:  Look, this is a termination here was

18   because of the reduction in force.  That's this case.  No

19   other issue here, okay?  He's not claiming that he would have

20   been terminated for other reasons other than the reduction in

21   force as I understand this case.

22         MR. SHEARER:  Right.  But 825.214 talks about that's

23   not an excuse in the case of a restructuring.  If the event is

24   a restructuring, he's still entitled to the restoration under

25   825.214.

1          MR. EIDELMAN:  That is not what that regulation

2  says.

3          THE COURT:  You have your exception.  Next.

4          Anything else?

5          MR. SHEARER:  I don't think there's any evidence

6  that --

7          THE COURT:  I am going to ask counsel -- I hear a

8  lot of evidence about mitigation.  What's your position?  Can

9  he eliminate that?

10          MR. EIDELMAN:  Our position about mitigation is that

11  on cross-examination from Mr. DiLorenzo, Mr. Barger claims

12  that he plugged in all this information to some program that

13  is -- that we don't have and he said he reduced amounts one

14  way or another.  We don't know what numbers were, so I

15  think --

16          THE COURT:  I'm going to leave it.

17          MR. EIDELMAN:  Thank you, Judge.

18          THE COURT:  Now, what is this section that you say

19  makes my charge incorrect?  I don't understand what you're

20  saying.  Section what?

21          MR. SHEARER:  It's the interaction between the

22  regulation 29 CFR 825.214.

23          THE COURT:  29 CFR 825.214.

24          MR. SHEARER:  The last sentence of that regulation.

25          THE COURT:  And what does it say?  Read it.

*Proceedings*                                                871

1           MR. SHEARER:  It says even if an individual --

2           THE COURT:  Can you please show that to me and to my

3    law clerk.

4           MR. SHEARER:  It says, "An employee is entitled to

5    such reinstatement even if the employee has been replaced or

6    his or her position has been restructured to accommodate the

7    employee's absence."

8           THE COURT:  So your position is that even if there

9    is a reduction in force, and that doesn't make any difference,

10   you would still be entitled to the reinstatement.

11          MR. SHEARER:  If it's considered restructuring, yes.

12          MR. EIDELMAN:  That is not what the regulation says.

13   He's leaving out words.  He's leaving -- it says,

14   "Restructured to accommodate the employee's absence.  There is

15   no evidence in this case that position was restructured to

16   accommodate his absence.'  The evidence actually is in 216.

17   And in 216, Judge, in the instruction that you gave us on

18   Friday, it actually talks, it gives four examples.  And that's

19   why we actually asked that it be put in.  It says in 216, and

20   we had given this to your law clerks previously and that talks

21   about under the FMLA, an employee has no greater right to

22   reinstatement or to other benefits and conditions of

23   employment than if the employee had been continuously employed

24   during the FMLA leave period.  An employer must be able to

25   show and it's our burden that an interview would not otherwise

*Proceedings*                                                              *872*

1   have been employed at the time reinstatement is requested in

2   order to deny restoration of employment.

3          THE COURT:  Stop.  I'm not going to give it.  It's

4   wordy.  We're giving the jury a pristine charge that I spent a

5   lot of time reducing to simple language so the jury can

6   understand it.  This entire case has been litigated on the

7   issue of whether or not there was a lawful termination by

8   reason of a reduction in force.  That's it.  That's what the

9   jury is going to know and that's what this case is about.  I

10  don't think it's about anything else other than that, okay?

11         You have your exception.  We'll take a look at it

12  again.  I just don't see where it relates to this particular

13  case.  What else?  We'll leave in mitigation do you have

14  anything else.

15         MR. SHEARER:  On the jury verdict form.

16         MR. EIDELMAN:  Can we do the instructions first,

17  Judge?

18         THE COURT:  Let's hear the instructions.

19         (Discussion held off the record.)

20         THE COURT:  Okay.

21         MR. EIDELMAN:  Couple things in the charge you

22  provided us on Friday and again.

23         THE COURT:  Forget about that.

24         MR. EIDELMAN:  You're right.  It also showed up last

25  night.  Is that in your charge you have that one of his claims

*Proceedings*                                                          873

1   is that he was discriminated against when it terminated his

2   employment under the ADA.  That is not a claim in this case.

3            THE COURT:  Just one second.

4            MR. EIDELMAN:  Page 11, Judge.

5            THE COURT:  Just one second.  My view is there are

6   two ADA claims.  One is that his e-mail was revoked while he

7   was on medical leave and two he was thereafter terminated.

8            MR. EIDELMAN:  He is not making a claim that he was

9   terminated in violation of the ADA.  His only claim is that he

10  was put on leave and that his ADA access was revoked.  There

11  is no claim.

12           THE COURT:  I don't have that view of this case.  I

13  mean, it's all about termination he was terminated.

14           MR. EIDELMAN:  Your Honor, Mr. Shearer, on behalf of

15  Mr. Barger, has represented to this court in filings that his

16  claim is not that his client was terminated because he was

17  disabled.  I have a bench memo on which cites to -- when he

18  represented to this court on numerous indications.

19           THE COURT:  Let me hear from Mr. Shearer.

20           MR. SHEARER:  I have written that before, yes, I

21  have.

22           THE COURT:  And what do you say about that?

23           MR. SHEARER:  I agree.  I haven't been making that

24  claim up until I've seen the evidence that came in today.

25           THE COURT:  Today?

*Proceedings* 874

1      MR. SHEARER:  This week.

2      MR. EIDELMAN:  You saw the jury charge.

3      THE COURT:  Just one second.  I'm not aware that you

4  withdrew that claim, all right?  But if that's what you did,

5  I'll eliminate to it.

6      MR. SHEARER:  Yes, Your Honor.  In the summary

7  judgment motion, I believe is probably what he's referring to.

8      MR. EIDELMAN:  Actually, no.  You did it two weeks

9  ago when you wrote a letter to the judge when you said, I am

10 not making in claim.  That is not Mr. Barger's claim.

11     THE COURT:  So, if that's the case, we're only going

12 to have one ADA claim and that's the e-mail access, right?

13     MR. SHEARER:  Yes.  I think it's two things.  It's

14 the forcing of leave and the simultaneous cutting of access.

15     THE COURT:  It happened at the same time.  It's one

16 event.  He was on leave, he was denied e-mail access; he was

17 on leave.  I think we got it down correctly.  I will eliminate

18 under the ADA any termination claim now that I understand you

19 have made that representation and I will eliminate that.  And

20 the only damages that I can sense, if you're correct on your

21 ADA claim for the denial of e-mail access, is punitive.  I

22 don't see any other damage claim here.  That's what I have

23 here.

24     MR. SHEARER:  The forcing of leave turned out to be

25 a de facto termination.

*Proceedings*                                                875

1          MR. EIDELMAN:  What?

2          THE COURT:  What?  Mr. Shearer, you're all over the

3    place.

4          MR. SHEARER:  He was forced on to leave.

5          THE COURT:  And he was forced on leave and at the

6    same time his e-mail access was denied.  That was your claim.

7    He was not claiming he was wrongfully terminated.

8          MR. SHEARER:  He was terminated while he was on

9    leave.

10         THE COURT:  What are you talking about?

11         MR. SHEARER:  He was terminated while he was on

12   leave.

13         THE COURT:  That's your FMLA claim.

14         MR. SHEARER:  Right.  But, your Honor, when they

15   forced him on to leave and then terminated while he was on

16   leave.  The forcing of leave is the equivalent of the

17   termination.  He wasn't working, he was on short-term

18   disability.

19         THE COURT:  You're claiming now that there is a

20   termination claim here under your ADA?  What are you saying?

21         MR. SHEARER:  I believe the forcing of unpaid leave

22   or leave on disability is then termination of him while he was

23   on leave makes the forcing of the leave the equivalent of a

24   termination.

25         THE COURT:  I'm a little confused.  What do you say

*Proceedings*                                                                   *882*

 1              MR. EIDELMAN:  On the second page of the verdict

 2    form:  Is First Data liable under the ADA for terminating

 3    plaintiff's employment?  We agree that should come out that's

 4    C.

 5              THE COURT:  That has to be changed, right?

 6              MR. EIDELMAN:  I right.  I think it -- you said you

 7    wanted to put in a compensatory damages --

 8              THE COURT:  Wait.  This is the FMLA claim.

 9              MR. EIDELMAN:  No, it's the ADA, Judge.  1C is the

10    ADA.

11              THE COURT:  Yes, that has to come out.

12              MR. EIDELMAN:  That has to come out.

13              THE COURT:  We agreed.

14              MR. EIDELMAN:  We agreed.

15              THE COURT:  What else?

16              MR. EIDELMAN:  Then E should come out because that's

17    out now.

18              THE COURT:  It's all out.

19              MR. EIDELMAN:  It's all out.

20              THE COURT:  The termination is out.

21              MR. EIDELMAN:  So, your Honor, we put this in, and I

22    think in the FMLA, it says, "For terminating plaintiff's

23    employment."  The actual language is "failing to restore his

24    position," which ties in with the regulation that says,

25    "Rights to restoration," and the exception to rights to

*Proceedings*                                                    883

1   restoration.  I think it's more accurate because I suspect the

2   parties are going to be arguing on both sides that's it's a

3   failure to restore him to his position and then the exception

4   to the failure to restore.  That would be our comment, I

5   think, on that.

6           THE COURT:  Let's stop for a second.

7           My object here is to present to the jury in simple

8   form, okay.  And I spent a lot of time taking 45 pages and

9   reducing it to three or four page.  It's not an easy thing to

10  do.  The jury has heard throughout this whole trial:

11  Termination by reason of reduction in force.  So I would like

12  to give them that consistent language.  If I throw something

13  new to them right now it can confuse them.  I don't see

14  anything substantively of any significance when I talk about

15  was there a lawful reduction in force.  That's what you're

16  talking about.

17          MR. EIDELMAN:  Your Honor, we'll gear our closings

18  to use that language.

19          THE COURT:  Yes.  And if I don't get it then I'll

20  get reversed.  As far as I'm concerned, this case is all about

21  when he was on medical leave.  Maybe he had one more day to go

22  before he was terminated.  Maybe he had three more days to

23  work.  He was medical leave.  He can't be terminated from his

24  employment while he's on medical leave.  And was there a

25  lawful termination or not by reason of the reduction in force?

*Proceedings*                                                    887

1          All right.  Okay.  Anything else.  Mr. Shearer, you

2     keep tossing things at the 11th hour here.  You're just

3     fumbling all over the place.

4          What else do you want me to consider?

5          MR. SHEARER:  That's it, your Honor.

6          THE COURT:  Now, I want to do one thing here on

7     record now.  And there was an issue here as to whether or not

8     September 4th was the date that he was placed on leave.

9          Mr. Eidelman argued that's the case and I didn't

10    charge that and I'm not using that in this charge.  I want to

11    explain why now on the record and here's my decision in

12    respect to that issue.

13         "As a matter of law, the earliest that the plaintiff

14    could have been on FMLA leave was October 24, 2016.  His

15    doctor said he was unable to work as of October 22nd, a

16    Saturday, and his requested leave began the following Monday.

17    Under the FMLA, once an employer has enough information to

18    know that an employee is eligible for FMLA leave, the employer

19    has five business days to start the clock on an employee's

20    12 weeks of allotted leave time, "Absent extenuating

21    circumstances."

22         And I cite 29 CFR Section 825.300(d)(1).

23         Now, continuing.

24         "First Data does not dispute that it knew Mr. Barger

25    was undergoing surgery on September 4th and it says certainly

*Proceedings*                                                    888

1  had knowledge of the serious medical conditions prior to

2  October 22, 2016.  Because First Data failed to designate

3  plaintiff's leave as FMLA leave within five business days, it

4  may not now claim that the leave began on September 4th.

5           Also, First Data cannot retroactively designate that

6  date because that would, "Cause harm of injury to the

7  employer," in violation of 29 CFR Section 825.301(d)."

8           All right.  I wanted to make it clear on the record

9  exactly what my ruling was since the defendant took the

10  position that the leave start on September 4th, okay.  So you

11  have the record on that.

12           MR. EIDELMAN:  Your Honor, if I just may?  Just for

13  the record.

14           We had take exception to that ruling on the grounds

15  we believe it is a question of fact for the jury but we

16  understand the Court's position.

17           THE COURT:  I want the record to be clear.

18           MR. EIDELMAN:  Yes, understood.

19           THE COURT:  Let's take 15 minutes now while I

20  reflect upon these changes that have to be made.  But you

21  understand enough now to go ahead with your summations and

22  I'll make these changes in due course, but the ruling can be

23  in bout 15 minutes.

24           You want to make the Rule 50?

25           MR. EIDELMAN:  We do.

*Proceedings*                                                    *890*

1        MR. SHEARER:  I will be filing a Rule 50 as well.  I

2   want to preserve and it's going to be on the basis my summary

3   judgment motion as a matter of law.  They can't terminate him

4   once he turned in his doctor's note.

5        MR. EIDELMAN:  Okay.

6        THE COURT:  Even if there is a lawful reduction in

7   force?

8        MR. SHEARER:  Yes, your Honor.  I believe that the

9   handing in of the doctor's note triggers the obligation to

10  reinstate.

11       THE COURT:  You can make whatever arguments you

12  want.  Let's take 15 minutes and we'll reconvene at 11:30.

13  We'll have Mr. Shearer's summation at that time.

14       Mr. Innelli, notify the jurors we'll get together at

15  11:30 at that time.

16       (A recess in the proceedings was taken.)

17       THE COURT:  You have the verdict sheet and the

18  charge is going to be revised in accordance with our

19  conference.  And I think that you know, Mr. Shearer, exactly

20  what it is all about.  So you can start your summations now,

21  take a lunch break after, then see how it goes, okay?

22       MR. SHEARER:  Okay.

23       THE COURT:  Let bring the jurors in.

24       (A brief pause in the proceedings was held.)

25       COURTROOM DEPUTY:  All rise.

1   direction while Mr. Barger was out.  Ms. Kelly did admit

2   though that she attended a meeting with Rhonda Johnson on

3   November 11th and she took notes at that meeting.  And the

4   notes had the words:  Embarrassed, frustrated, direction in

5   the notes.  She admitted that she probably took those notes.

6   She wouldn't say that she said it.  Jason testified that they

7   both asked for that meeting with Rhonda Johnson to talk about

8   things going object in the department.

9          So here's what Tony Marino, the HR director, is

10  faced with.  He gets a text message that says I'm going to be

11  out for six weeks.  I got to have more surgery.  He gets

12  reports that the department was not running well and it needs

13  some better direction than just the business HR partner trying

14  to help without when she can.

15         So what he does is he contacts Mr. Barger and he

16  says you're going to be on leave.  He's got to put you on

17  leave and he tells them and Mr. Barger says that he believed

18  it was heartfelt that you've got to get better for yourself

19  and your family.  You got to take the time to get better, stop

20  working, don't worry about this work stuff.  Everything's

21  going to be fine.

22         In the meantime, they put Robin Ording i although

23  she's a VP of HR.  She's going to do both jobs.  Not get paid

24  any more money, she's going to cover as interm director of

25  that Sales Training Group.

*Summation - Mr. DiLorenzo*                    **961**

1    So it wasn't the fact that he was on disability, it

2   was a combination of those things that he received information

3   of the text message that he's going to be out for six weeks.

4   He's not getting better.  He kept saying, Look, I want to keep

5   working, I'm going to get better right away, I'm going to come

6   back.  It didn't happen.  There were complaints he was going

7   to be out for another six weeks and the department needed

8   direction.  That's why Robin went in there.

9    Now, we see a number of other communications that

10  continue.  Here is November 8th where he thanks people.  This

11  is November 8th, he talks about sends it to his group and says

12  please moving forward CC me on all communications.  Too many

13  things are moving through the system without my knowledge.

14  Thanks for protecting me from work.

15    Now, there's a text message, Defendant's

16  Exhibit 310, from him to Mr. Plumeri where he says that I'm

17  working three to four hours a day.  I'm not going to work.

18  I'm not going to work full-time yet but can do three to

19  four hours.  Staying home is killing me.  I need the

20  income -- also, I need the income to continue.

21    When I questioned him on cross-examination, he said

22  during that period, that entire period, he's working ten hours

23  a day.  I don't know if you remember that testimony.  When I

24  confronted him with this note to Mr. Plumeri who he wasn't

25  really involved anymore, we'll talk about that in a minute.

1    He said he lied to Mr. Plumeri, plus Mr. Plumeri was worried

2    about how much he would work or be working.

3            So from September 4th to November 21st when he's put

4    on the leave, it's 88 days.  If he's working ten hours a day,

5    that's about 880 hours.  We put into evidence a couple of

6    e-mails.  One he sent by mistake to a group of people, hit

7    reply all, and it was an incoherent message that went out to

8    about 30 people.  And Mr. Marino commented on that that he was

9    getting reports there was erratic behavior, that he was doing

10   some things that were being questioned by everyone, and then

11   wondering what's going on with him, what's his condition, why

12   is this happening?

13           So Mr. Barger's lawyer kind of poo pooed that hit

14   reply all.  People make mistakes with e-mails once in a while.

15   That wasn't the only point.  The only point is we only have a

16   couple of e-mails.  There's only a couple of e-mails, handful

17   of e-mails or so, that he sent during that period.  It's

18   88 days, he's working ten hours a day.

19           Mr. Shearer told you that just a few minutes ago

20   that he looked at 60,000 records, 60,000 documents in this

21   case, so where is the pile of e-mails that Mr. Barger sent

22   between September 4th and November 21st?  If he's working ten

23   hours a day, what's he doing if he's not sending e-mails.

24   Where are his notes of meetings?  Where are his agendas for

25   meetings that he held with his group.  Where are all the text

1  messages with his group?  The only text messages we have in

2  the record are the ones that he sent back and forth to

3  Mr. Plumeri and the ones he sent back and forth to Mr. Marino.

4  And I've looked at those, I can't see anything in them that

5  deals with business.  And he had no business dealings with

6  either one of them at the time.

7          So where are these things?  Where are -- I get up on

8  a Saturday, even a Saturday, I make a little list of things to

9  do.  He was there 88 days, there aren't any list of things to

10 do?  There aren't any calendars that show his appointments?

11 There aren't any diaries?  What is he doing for ten hours?

12 Where is the projects?  Where is the reports?  Where is the

13 information as to what he Dade.

14         What have we got?  We have a couple of erratic

15 e-mails where he hit reply all and they don't make any sense.

16 And people throughout the company are wondering what a senior

17 vice president is doing sending these kinds of e-mails.

18         So Mr. Marino, heartfelt, puts him on a leave of

19 absence.  And what happens during that leave of absence?  He

20 gets paid about $200,000 from November 21st through to

21 January 10th or, I'm sorry, January 13th when he's released to

22 come back to work he receives disability pay.

23         You heard that there is -- he claims that he's

24 $25,000 short.  There's $47,000 in LTD that he received from

25 MetLife that more than covers the 25,000 he's claiming he was

*Summation - Mr. DiLorenzo*                    **976**

1   management group in the company, 3,000.

2          So they're going to look at 3,000 and he wants to

3   lay off at least ten percent of that.  They ended up laying

4   off more than ten percent, 362.  And paid 54th in that group

5   was Mr. Barger and his boss, Jeff Hack, put him on the list.

6          Now, you heard Mr. Shearer say that Mr. Hack and

7   Mr. Charron put him on list on a whim.  That's not what I

8   heard Mr. Charron say.  When Mr. Charron testified, let's

9   remember who Mr. Charron is, right, he's the West Point grad,

10  the hearing problems from the Gulf War, pretty straightforward

11  guy.  I thought a stand-up guy.  He told you what happened.

12         He said that -- let me go back for a minute.  You

13  know story as well as I do, but I hope that you can see it the

14  way that I see it.  Mr. Barger goes 13 years without

15  contacting Mr. Plumeri, and that's the guy that he he's worked

16  with before.  He's very successful man.  He called him Batman

17  and he was Robin.  In my world, we would have called him the

18  Godfather.  This is somebody that's going to take care of him.

19         He contacts him, he gets him the job at First Data

20  as an consultant.  And we know that history of how he got

21  paid.  He represented that Mr. Plumeri asked him, How much are

22  you making?  Mr. Barger agrees that's what he was told, what

23  he was asked, how much are you making.  He says 20 to 25,000 a

24  month.  So he goes, I'll give you 30.  He needed him.  He was

25  in desperate shape, too, this was this the beginning of trying

*Summation - Mr. DiLorenzo*                          977

1    to save the company.  So he brings him in at $30,000 a month

2    as a consultant and you know about the invoices and the

3    $50,000 for the intellectual property, all those things that

4    happened.  And he did approved the $400,000 purchase order.

5          And just as plaintiff's attorney described it to

6    you, they only used 177 of it because he became an employee in

7    June.  So I guess in his mind -- now, remember, he just split

8    up the business he started with his son to teach him.  He was

9    going to apprentice his son to teach me -- he was going to

10   apprentice his in the business, he was going to teach him to

11   do this work.  He left him high and dry.

12         I think the parting shot for the high-and-dry son

13   was grabbing $50,000 from the money that was left in the

14   400,000 because they didn't use it because before the end of

15   the year he became an employee.  So he grabs 50,000 for his

16   son as a little severance package for the son in the business

17   and off he goes to work for First Data.  And he works for

18   Mr. Plumeri, Batman and Robin, for a good year or so and then

19   Mr. Plumeri goes on to other things and now Robin's alone.

20   Can you imagine Robin without Batman because now that's what

21   we got.  Except Robin is very, very highly paid because his

22   good friend and Godfather Joe Plumeri took care of him he did

23   take care of him very generously.  He's got this high salary

24   now.  High salary like that, you better perform.  I remember

25   win A-Rod came to the Yankees what that was like.  You got to

1    November 19th.  Big company stuff.  I understand.  Look at it

2    from insurance side.  All good.  Love you.  The next day,

3    Mr. Barger writes him saying, They trying to get rid me?  Then

4    he it be sends another message to Mr. Plumeri.  No.  And then

5    on 11/22, two days later, Mr. Plumeri sends this message.  A

6    simple, I love you pal.  Thanks for the incredible friendship

7    would have been nice.  Three exclamation points.

8         This is Batman hearing from Robin a year later when

9    he gets in trouble and is worried about things and he e-mails

10   his Godfather and says, Hey, I might be in trouble here, I'm

11   not sure what's going on.  And Mr. Plumeri's answer is a

12   pretty gentle, Hey, how about a thanks for all the things I've

13   done for you for 30 years including setting you up at

14   First Data?  You got to handle these things yourself.  If

15   you're not going to lose a job, be laid off the job, that's up

16   to you.  Batman's gone, Robin's on his own.

17        And just in case whether there's any question those

18   three exclamation points at of the end the e-mail represent

19   anger.  You can see Mr. Barger interpreted it that way.

20   Thanks.  Thankful for you and Susan just thinking of you have

21   a wonderful day.  I am grateful.  Love, Steve.  So he

22   understood that what Mr. Plumeri was talking about was I don't

23   see the gratitude in all the things I've done for you.  And he

24   did do a lot of thing for him, there's no question about it.

25        But he was gone and now that big salary that he was

1  after questioned and my understanding of his answer finally

2  was that whatever sales transformation work he was doing was

3  being done by the sales organization department that he

4  supervised. So it's one job.

5         So if they find a successor for that sales

6  organization, that person is taking the whole job sales of

7  transformation and sales training. It's all one job. So when

8  you're talking about successors, I mean, if people came to me,

9  well, let me say that -- if people come to someone and start

10  talking about we need to find a successor for you, it's

11  usually a pretty good indication somebody's going to be taking

12  a your place. And there were a ton of those conversations,

13  you saw the e-mails.

14         So my only point is this wasn't a surprise. We're

15  getting up to the reduction in force in a minute. But to the

16  extent they're trying to say this reduction in force of 362

17  people was a scam, a scheme, a design to protect us from being

18  sued by Mr. Barger, that's absolutely not true. Mr. Barger

19  was a target, enough concern, long before January of 2017. It

20  had been going on for sometime. He wasn't going to be able to

21  hide anymore, he wasn't going to be able to use his Godfather

22  to protect him. He was on his own. Like he says, like he

23  teaches, price becomes an issue when there is no value. When

24  you're paying too much for something and you're not offering

25  the value, people start to ask questions.

*Proceedings*                                                1020

1          MR. SHEARER:  The leaves letters --

2          THE COURT:  So in November 19th when he was on that

3    date when formally placed on leave until the date of determine

4    nation January 13th is that what that is.

5          MR. SHEARER:  More or less.  The actual start date

6    in there is kind of hard to tell I would say yes, the 19th.

7          THE COURT:  Well, I'll let the jury figure it out.

8    But I don't want to tell the start date would be on or about

9    November 19th.

10         MR. SHEARER:  Yes.

11         THE COURT:  Termination date would the date, of

12   course, that he was terminated on gentleman 13 so I'll make

13   that little adjustment, right.  Otherwise, I think it's pretty

14   clean.  And I'll give you the final charge.

15         MR. EIDELMAN:  Your Honor.

16         THE COURT:  Yes.

17         MR. EIDELMAN:  Is the reference to January 13th as

18   date of his termination.  The records and the records that are

19   in evidence indicate that his final date of employment was

20   February 28th and he continued to get paid.  I'm sorry.  I'm

21   not understanding.

22         THE COURT:  We're talking about January 13th as the

23   date that he was the terminated offing the fact he was

24   continued to get bade he was discharged on January 13th from

25   the employment that's the date you always used.  Am I missing

*Proceedings*                                                    1021

1    something.

2           MR. EIDELMAN:  The date he was notified he continued

3    to be an employee.  He continued to be paid his salary for

4    another six weeks.  So I'm concerned that if maybe I'm

5    misunderstanding.

6           THE COURT:  Why don't we just say from on or about

7    November 19, 2016, when he was formally placed on leave until

8    January 13th when he was notified that he was going to be

9    terminated.  Doesn't that cover the period?  I just want the

10   period of time by which the plaintiff is asking for a backpay

11   for that's what I'm thinking.

12          MR. EIDELMAN:  So this is backpay for the ADA claim.

13          THE COURT:  Yes.

14          MR. EIDELMAN:  Only.

15          THE COURT:  Yes is.

16          MR. EIDELMAN:  Backpay for the ADA claim only.  Now,

17   I think I understand.  I get you now.

18          THE COURT:  I just want to get it down right.  I

19   think your claim is that from on or about November 19th to

20   January 13th he got less pay using short-term disability or

21   something of that nature; is that correct.

22          MR. SHEARER:  That's correct.

23          THE COURT:  After that he got long-term -- he can't

24   claim anything damages for that.

25          MR. SHEARER:  That's correct.

*Jury Charge* 1054

1   employees available who can perform that function; and,

2         Three:  Whether the function is highly specialized

3   so if the plaintiff was hired for his ability to perform those

4   functions.

5         If you decide the plaintiff could perform the

6   essential functions of his job, even if he was on medical

7   leave, regardless of his disability, then he is a qualified

8   individual.  You must, therefore, find that First Data

9   unlawfully discriminated against him.  He could perform it

10  then, you know, you can't find discrimination if you can do

11  the job.  So you heard a lot of argument about whether he

12  could or could not.  It's a large part of his case and you

13  have to determine two things in order to find liability under

14  the Americans with Disabilities Act that when he was placed on

15  medical leave he suffered an adverse employment action.  And

16  (2), that he was qualified to do his job.

17        So I think you can understand that it's not that

18  complicated.  The case is complicated because of hundreds of

19  exhibits and lots of testimony back and forth.  But the law is

20  pretty clear and I think you will be able to figure out to

21  decide this case.

22        Now, the plaintiff also make a case claim against

23  FMLA against First Data.  The Family Medical Leave Act is a

24  little bit different than the Americans with Disabilities Act.

25        The FMLA requires that employers allow eligible

*Jury Charge*                                                1055

1   employees to take up to 12 weeks of unpaid medical leave each

2   year.  An eligible employee may take this leave if he or she

3   is unable would work due to a serious health condition.

4        Now, everyone agrees that the plaintiff was an

5   eligible employee; that his cancer was obviously a serious

6   health condition.  So you have this nice law that gives you

7   12 weeks, everybody, Congress passed that law.  And when that

8   12-weeks you're entitled to medical leave, you can't be fired

9   or discharged unless it was for a legitimate reason.  That's

10  what this case is basically about.

11       The plaintiff had not exhausted his 12-week

12  entitlement to leave time before he was terminated on

13  January 13, 2017.  That's when he got the notice saying he was

14  going to be terminated effective whatever date, okay?  That

15  termination, therefore, was unlawful unless First Data proves

16  by the preponderance of the evidence that the plaintiff would

17  have been terminated even if he had not been on leave.

18       In that respect, First Data argues that the decision

19  to terminate plaintiff was part of a reduction in force.

20  Therefore, if you find that the termination of plaintiff's

21  employment with First Data would have occurred because of

22  First Data's reduction in force, it was not merely a coverup

23  for a decision to terminate the plaintiff because he had taken

24  FMLA leave, then you must find for the defendant.

25       In determining whether you believe First Data's

1    stated reason for terminating the plaintiff, that is, the

2    reduction in force, you may not question First Data's business

3    judgment, that is, you cannot find an FMLA violation simply

4    because you disagree with the business sense of First Data or

5    believe its decision was harsh or unreasonable.  In other

6    words, you are not to consider First Data's wisdom.  You have

7    to determine whether there was a true reduction in force or

8    whether you thought a good idea or bad idea.

9              Now, I'm going to talk to you about damages.

10             If you find liability on either of the ADA claim or

11   the FMLA claim, then you consider what damages, if any, to

12   ward the plaintiff.  If you do not find liability, then you

13   don't have to consider damages, obviously.  But I've got to

14   tell you about the damages.  The fact I'm instructing you

15   about damages doesn't mean I'm telling you what to do.  But

16   you have to have the law in front of you in case you reach

17   damages you have to know what the law is.

18             The fact that I am giving you this instruction does

19   not mean, therefore, that I have any view as to whether

20   plaintiff is entitled to a verdict against defendant with

21   respect to any of his claims.  Instructions as to the measure

22   of damages are given only for your guidance.

23             In the event that you find in favor of plaintiff on

24   the question of liability as to any of his claims by a

25   preponderance of the evidence in accordance with the other

*Proceedings*                                                    1078

1          (In open court; 2:20 p.m.)

2          (Court's Exhibit 4 was marked in evidence as of this

3    date.)

4          THE COURT:  So we have a note that we marked Court

5    Exhibit No. 4.  And it says, Page 10, 1st sentence, of the

6    charge, 2nd paragraph under FMLA claim.  Question:  Is this a

7    statement of fact or opinion?

8          So I don't have to call them in I can just write

9    back it's a statement of fact.

10         What's the problem.

11         MR. ZEITLIN:  We agree.  It should be deemed a

12   statement of fact.

13         THE COURT:  What is it that you're saying?

14         MR. ZEITLIN:  Only agree with your Honor whether

15   it's a statement of fact.  The question is whether it's the

16   second or third paragraph and I want to be very precise.

17         THE COURT:  Let's see what we're talking about.

18   Second paragraph under the FMLA claim.

19         MR. ZEITLIN:  Technically, it's the third paragraph.

20         THE COURT:  Pardon.

21         MR. ZEITLIN:  The only issue, it's technically the

22   third paragraph and I want to be very precise about this.

23         THE COURT:  Under FMLA claim, first sentence of the

24   second paragraph it says, "The FMLA requires that employers

25   allow eligible employees to take up to 12 weeks of unpaid

*Proceedings*                                            *1079*

1   medical leave each year."

2        MR. ZEITLIN:  Here's the issue, your Honor.  When we

3   received this -- first what's marked as Court's Exhibit No. 3

4   requesting certain documents, seven or eight different

5   documents.

6        THE COURT:  Look, let's what are you trying to say?

7   Do you want to know whether or not what is a statement of fact

8   that the plaintiff was exhausted his 12-week entitlement?

9        MR. ZEITLIN:  We believe that's what the jury wants

10  to know.

11       THE COURT:  Stop it.  I think that's what they are

12  asking.

13       MR. ZEITLIN:  We agree.

14       THE COURT:  Okay.  Bring them in.  We'll clarify

15  that.  The we're going to find out.

16       MR. EIDELMAN:  That's a good way to do it.

17       (A brief pause in the proceedings was held.)

18       THE COURT:  I think they want to know whether the

19  plaintiff has exhausted his 12 weeks of entitlement before he

20  was terminated I think that's what they're looking at.

21       MR. EIDELMAN:  Because also, your Honor, looking at

22  the first one, of course, is under the FMLA it's a 12-week

23  period, to doesn't necessarily have to be a calendar year.

24       THE COURT:  I'm going to ask them, Mr. Eidelman what

25  exactly is it that they want to know.

*Proceedings*                                        **1080**

1           MR. EIDELMAN:  Good.  Thank you, Judge.

2           THE COURT:  Very simple.

3           MR. EIDELMAN:  Agreed.

4           THE COURT:  Everyone gets antsy at this time.

5           MR. EIDELMAN:  It's very true, it's very true.

6           THE COURT:  After we.

7           COURTROOM DEPUTY:  All rise.

8           (Jury enters courtroom at 2:40 p.m.)

9           THE COURT:  Okay.  Madam foreperson, you are the

10   spokesperson for the jurors.  I just want to make sure I have

11   this down correctly.  You told me Page 10 of the charge, first

12   sentence, second paragraph, under FMLA claim, is this a

13   statement of fact or opinion?  I think you're referring to

14   what technically is the third paragraph.  I may be wrong about

15   that.

16           JUROR:  Oh, yeah.

17           THE COURT:  First, plaintiff also makes a claim

18   under the FMLA against First Data.  The second paragraph that

19   says the plaintiff had not exhausted his 12-week entitlement

20   to leave time before he was terminated on January 13, 2017.  I

21   think that's what you are referring to, am I right?

22           JUROR:  Yes.

23           THE COURT:  So that's a statement of fact, okay?

24   That answers your question.  I was going to write it down

25   here, but since we're not technically counted on this thing it

| | |
|---|---|
| *Proceedings* | *1081* |

1  looks like it could be the third paragraph.  So we want it be

2  certain we know exactly what's on your mind.

3          Does that answer your question?

4          JUROR:  We're referring to this right here.

5          THE COURT:  Are you referring to this?  Listen to me

6  carefully.  The plaintiff had not exhausted his 12-week

7  entitlement to leave time before he was terminated on

8  January 13, 2017.

9          Is that what you want to know?

10          JUROR:  Yes.

11          THE COURT:  It's a statement of fact or opinion.

12          JUROR:  Yes.

13          THE COURT:  That's your question?  Do you want to

14  talk to each other?  Is there some confusion about it?

15          JUROR:  There is.

16          THE COURT:  You're talking to each other.  Why don't

17  you go back to the jury room and let me know whether you want

18  to know whether that statement is a statement of fact or an

19  opinion, is that your question?  I'll answer it.

20          When I see two of your colleagues whisper to each

21  other it makes me insecure.  Go back to the jury room.  Come

22  back and let me know in a written statement what exactly --

23  write it out what the statement is that you want me to tell

24  you about whether it's a statement of fact or opinion.  Just

25  write it down on your note.  That will be the easiest way I

*Proceedings*                                        *1082*

1    think, right?

2                    JUROR:  Yes.

3                    THE COURT:  So do that.  Go ahead and I'll wait for

4    you.

5                    COURTROOM DEPUTY:  All rise.

6                    (Jury exits courtroom at 2:42 p.m.)

7                    COURTROOM DEPUTY:  You can all be seated.

8                    THE COURT:  It's not easy.  Sometimes things seem

9    very simple and you have to be really, really careful to just

10   get it down right.

11                   Off the record.

12                   (Discussion held off the record.)

13                   COURTROOM DEPUTY:  All rise.

14                   (Jury enters courtroom at 3:45 p.m.)

15                   COURTROOM DEPUTY:  You can all be.

16                   (Court's Exhibit 5 was marked in evidence as of this

17   date.)  Seated.

18                   THE COURT:  All right, folks.  We have the note

19   which I marked as Exhibit No. 5 that you have reached a

20   verdict.  And I guess you didn't need any further

21   clarification from me on the other thing, right?

22                   So at this time, Ms. Antigua.

23                   THE FOREPERSON:  Yes.

24                   THE COURT:  So you're going to stand and Mr. Innelli

25   is going to ask you for the verdict.  Listen carefully.

*Proceedings*                                              *1083*

1              COURTROOM DEPUTY:  Has the jury reached a unanimous

2     verdict?

3              THE FOREPERSON:  Yes.

4              COURTROOM DEPUTY:  1:  ADA.  1-A:  Is First Data

5     liable under the ADA for requiring plaintiff to take medical

6     leave, yes or no?

7              THE FOREPERSON:  No.

8              COURTROOM DEPUTY:  No.  So you went on to

9     Question No.  2, correct?

10             THE FOREPERSON:  Yes.

11             COURTROOM DEPUTY:  2:  FMLA.  2-A:  Is First Data

12    liable under the FMLA for terminating plaintiff's employment,

13    yes or no?

14             THE FOREPERSON:  No.

15             COURTROOM DEPUTY:  And you've answered no further

16    questions, correct?

17             THE FOREPERSON:  Correct.

18             THE COURT:  You may be seated.

19             COURTROOM DEPUTY:  Juror No. 1, is that your

20    verdict?

21             JUROR NO. 1:  Yes.

22             COURTROOM DEPUTY:  Juror No. 2, is that your

23    verdict?

24             JUROR NO. 2:  Yes.

25             COURTROOM DEPUTY:  Juror No. 3, is that your