# EXHIBIT 1

1          But Mr. Barger wasn't given that chance to continue

2     working.  He was only given forced leave, which really, as it

3     turns out, really wasn't forced leave, it was really a

4     termination.  I mean, he -- yes, he was on leave for 12 weeks,

5     but as soon as he came back, he was fine.  And there's also

6     the failure to accommodate claim, which I've talked to you

7     about, revoking Mr. Barger's remote access.

8          So overall -- the excuses.  I guess I want to cover

9     these excuses you are going to hear real quick.

10          These guys are creative.  They are going to take

11     some tidbits of facts, e-mails here and there, and then

12     they'll weave a story.  One of them I call the time travel

13     excuse, and they're going to try to explain to you that you

14     should not look at really what happened, but you should go

15     back and change the date as to when leave started, even -- and

16     they want leave to have started on the date of surgery, but

17     Mr. Barger was working that whole time.  And they wanted to

18     end the week after he filled out his forms asking for leave.

19          Now how will they do that?  We will see if you

20     believe the facts.  I don't see how the facts work that way.

21          There's the restructuring job elimination defense,

22     and they are going to insist that the plaintiff's job was

23     eliminated as part of a company-wide restructuring involving

24     the termination of three to four hundred people.

25          The evidence will show that this excuse is a

1    subterfuge, a smoke screen, just an excuse for them to -- for

2    First Data not to have to comply with laws like the ADA or the

3    FMLA.

4            Here's why.  First Data has terminated large groups

5    of people every single quarter for 18 to 20 straight quarters.

6    Now, then the way that they account for that is interesting.

7    I hope to try to explain it to you.  What they end up doing is

8    what would have been your bonus expense for that year, they

9    take it and they call it a severance expense or a

10   restructuring charge.  And then for purposes of calculating

11   their net adjusted income and their earnings before interest,

12   taxes, appreciation, amortization, they exclude that.  So all

13   the sudden they are net adjusted earnings go up, even though

14   they have paid severance, simply because they call it

15   severance instead of what would have been your bonus.  And so

16   those concepts, those financial numbers then become part of

17   the formula for determining the amount of bonuses for the rest

18   of the management that remains employed at the company.

19           So it becomes a cycle where they terminate large

20   groups of people every quarter, and -- but the interesting

21   part is, their head count is up.  Their compensation expense

22   is up.  Yet they have terminated large groups of people every

23   single quarter.

24           So even if Mr. Barger was in this reduction of

25   force, and I intend to prove he wasn't, but if he was, their

1  excuse doesn't make any sense.  It is not an elimination of

2  his job.  His job, and they will admit, the job -- his job

3  duties were moved to somebody else while he was gone.  His --

4  on the same day he was hired, Dan Charron, whose group he was

5  in, hired a senior vice president on the exact same day that

6  they terminated Mr. Barger.  This is not a reduction in head

7  count.  And they cannot show you that these reductions in head

8  count have done anything economically because they continue to

9  hire after they fire all these people.  And it is all for

10  accounting manipulation and accounting engineering.  It is not

11  for any real -- for a real purpose, it is just so they can

12  change their financial statements when they talk to Wall

13  Street about their stock, when they talk to their debt holders

14  that they owe money to, to say that they are doing something,

15  but in reality, it is just -- it is like a Ferris wheel.  Some

16  employees get off, some employees get on.

17        And their head count continues to increase, but they

18  are going to try to tell you, these are legitimate

19  terminations as part of a reduction in force, and they are

20  not.  And I will be able to prove that they are not.

21        Remember, and I'll conclude here, the events of only

22  55 days are at issue.  And so trying to keep track of the days

23  is going to be important, and I hope at the end to be able to

24  have a calendar to show when all of these events happened.

25  But it is from November 19, when Mr. Barger was forced on

1  Q    By that point in time Mr. Plumeri, who testified earlier

2  today, had stopped being his supervisor?

3  A    That's correct.

4  Q    Okay.  Were there any discussions in the fall of 2015

5  about Mr. Barger's compensation level?

6  A    Yes.

7  Q    What were those discussions in the fall of 2015?

8  A    That it was difficult to justify a salary or total

9  compensation of $730,000 a year for the head of Sales

10 Training.

11 Q    Did you know anything about Sales Training?

12 A    I do, I actually led Sales Training from 1992 to 2000.

13         THE COURT:  Let me interrupt, I'm a little confused

14 because the jury has seen all sorts of invoices that say

15 $30,000 a month, you just said his compensation was 700, maybe

16 you can clarify why there's a difference.

17         THE WITNESS:  Of course, Your Honor.  His base

18 salary was $480,000 and his incentive or bonus target was

19 another $250,000 for a total of 730.

20         THE COURT:  I thought his base salary was $30,000

21 times 12 which is $360,000.  You said 400 something.  I just

22 want to get clarity.

23         THE WITNESS:  As a consultant he was earning 30,000

24 a month.

25         THE COURT:  And then there was additional

1 | compensation he received?

2 |         THE WITNESS:  When he was hired as a permanent

3 | employee he was brought to a $480,000 base salary level with a

4 | bonus on top of that.

5 |         THE COURT:  When was he hired in that capacity?

6 |         THE WITNESS:  In the summer of 2014.

7 |         THE COURT:  Right.  So, at the time that he got ill

8 | and he left he was making something like 350,000 -- what was

9 | it?

10 |         THE WITNESS:  $730,000 was what he was earning in

11 | 2015.  I'm actually not sure what he was earning when he left.

12 |         THE COURT:  You don't know how much he was earning

13 | when he took his leave?

14 |         THE WITNESS:  Correct.

15 |         THE COURT:  So, what's the last knowledge that you

16 | have of what his salary was?

17 |         THE WITNESS:  I'm thinking back to $730,000.

18 |         THE COURT:  That was what, about a year before he

19 | took his leave or six months before or you don't know?

20 |         THE WITNESS:  That was roughly a year before his

21 | leave.

22 |         THE COURT:  At the time he took his leave, you know

23 | nothing about exactly what his salary was at that time?

24 |         THE WITNESS:  I don't remember.

25 |         THE COURT:  You have no reason to believe that his

1   salary was reduced, that it may have been the same or more but

2   you don't know for sure.

3          THE WITNESS:  He was part of the list where we

4   recommended a compensation reduction.

5          THE COURT:  When was that recommendation to reduce

6   salaries made?

7          THE WITNESS:  January of 2016.

8          THE COURT:  At that time he was earning $750,000?

9          THE WITNESS:  $730,000.

10         THE COURT:  All right.  I just wanted to get that

11  clear because I was a little confused.

12         Anything else?

13         MR. EIDELMAN:  No, that's fine.  Thank you, Your

14  Honor, for that clarity.

15  BY MR. EIDELMAN:

16  Q    So, did you have discussions with Mr. Charron and

17  Mr. Hack about Mr. Barger's compensation adjustment or that

18  there would need to be a compensation adjustment in 2015?

19  A    Yes, we had had brief conversations just that it was very

20  difficult to justify that compensation level for the role.

21  Q    Were there any discussions in the fall of 2015 about

22  Mr. Barger's search for a successor?

23  A    Yes.

24  Q    What were those conversations?

25  A    The view was that Steve was a strong motivational speaker

1  but he wasn't a strong operator of a team so he really wasn't

2  effective at managing a good size team of employees.  There

3  were -- his employees were actually approaching one of the HR

4  folks who worked for me and they were looking for answers,

5  they were having some difficulty getting guidance from Steve,

6  from Mr. Barger at that point in time.

7  Q    Ms. Whalen, in front of you there's a black binder, do

8  you see that --

9  A    I do.

10 Q    -- of the Defendant's Exhibits.

11           Can you turn to Defendant's Exhibit 71 please?

12           THE COURT:  All right.  Did you find it?

13           THE WITNESS:  I have it.

14           THE COURT:  So, you're referring to it now, there's

15 no objection, I assume you want it in evidence, Mr. Eidelman.

16           MR. EIDELMAN:  Yes, Your Honor, thank you.

17           THE COURT:  At this time in evidence.

18           (Defendant's Exhibit 71 received in evidence.)

19 Q    Ms. Whalen, can you identify Defendant's Exhibit 71

20 please?

21 A    Yes, I can, it is an email from Rhonda Johnson who worked

22 for me talking about an upcoming talent review for the Global

23 Business Solutions organization.

24 Q    What is a talent review?

25 A    We sit down and talk about leaders in a very open honest

1    way, their strengths, weaknesses, what we can do to develop

2    them further as leaders.

3    Q    And Ms. Johnson, who is sitting over here in the

4    courtroom today, she's the vice president that worked for you

5    as an SVP?

6    A    She is.

7    Q    And Ms. Johnson is providing some information to you

8    about her conversation with Jeff Hack; is that correct?

9    A    It is.

10   Q    And what is she telling you about the review of

11   Mr. Barger from a talent review perspective for his team?

12   A    That we were working on identifying a successor for that

13   particular role so we weren't actually going to talk about

14   that in the talent review, we were working that item

15   separately.

16   Q    Ms. Johnson also tells you in this email that not only

17   are you working on identifying a successor but you anticipate

18   a short tenure; short tenure for whom?

19   A    For Mr. Barger.

20   Q    And this is in the fall of 2015?

21   A    Correct.

22   Q    Do you know when Mr. Barger was diagnosed with throat

23   cancer?

24   A    Mid-2016 from what I understand.

25   Q    Did the conversation about reducing Mr. Barger's

1  compensation occur prior to or after First Data was notified

2  or that he knew that he had been diagnosed with cancer?

3  A    Prior to.

4  Q    Did the discussions about finding a successor for

5  Mr. Barger occur prior to or after his diagnosis for cancer?

6  A    Prior to.

7  Q    Was Mr. Barger aware of the discussions regarding the

8  need to search for his successor?

9  A    Yes, he was.

10  Q    Could you please turn to Defendant's Exhibit 182.

11          THE COURT:  Do you have it?

12          THE WITNESS:  I do.

13          THE COURT:  You want that in evidence I take it at

14  this time?

15          MR. EIDELMAN:  Yes, Your Honor please.

16          THE COURT:  No objection, in evidence.

17          (Defendant's Exhibit 182 received in evidence.)

18  Q    Ms. Whalen, Mr. Shearer was asking you some questions

19  about a transformation review that you were involved with

20  along with Pat Hadler.  Do you recall that testimony?

21  A    I do.

22  Q    And you said that that process started in mid-November

23  of 2016 and it carried over into 2017; is that correct?

24  A    Correct.

25  Q    And at some point in time there would have been a work

1   product that was prepared as part of that, correct?

2   A    Yes.

3   Q    Is this the work product that was prepared in connection

4   with the review of the Sales Training group?

5   A    This is one of the work product, this is really the

6   entire data set.  So, after we had gathered a whole lot of

7   data, Pat Hadler laid it out in this format so that we could

8   look at it with a completely objective lens and make some

9   assessments and recommendations.

10  Q    Can you turn about halfway, and I apologize they're not

11  page number, about halfway through Defendant's Exhibit 182 to

12  the page that's marked Sales Transformation 2017 Planning

13  December 2016.

14  A    I see that.

15  Q    And do you know when, Ms. Whalen, Mr. Barger went out on

16  leave?

17  A    He went out on leave in November of 2016.

18  Q    And do you know when he submitted his -- and I think

19  Mr. Shearer asked you this, when he submitted his return to

20  work authorization from his physician?

21  A    Yes.

22  Q    When was that?

23  A    January 10th.

24  Q    Of 2000 and?

25  A    17.

1 Q    17.  So, the document I've got you focused on, the sales

2 transformation planning document, this was December 2016, this

3 is while Mr. Barger was on leave but before he had indicated

4 or submitted an authorization to return to work, is that

5 correct?

6 A    Correct.

7 Q    And on the second page of this document, and you'll see

8 to save paper we went front to back, there are some

9 recommendations that are listed there, do you see that under

10 the executive summary?

11 A    Yes, I do.

12 Q    What is the first recommendation in the executive

13 summary?

14 A    Realign resources to better meet business needs and

15 structure, reduce 25 incumbents/open roles for $2.2 million

16 year-over-year save.

17 Q    Okay.  And then if you go to the last page of this

18 document which is:  Sales transformation actions planned total

19 approximate 2.2 million year-over-year save, do you have that?

20 A    The last page -- yes.

21 Q    And what does this table represent?

22 A    These are both actual people impacts, so people that

23 would be notified of a position elimination as well as open

24 roles that we would close.

25 Q    And were these the recommendations that were being

1   discussed in December of 2016 prior to the time that

2   Mr. Barger submitted his authorization to return to work?

3   A    Yes.

4   Q    Was Mr. Barger's name included in the recommendations to

5   achieve those cost savings?

6   A    Yes.

7   Q    And where does his name appear on this document?

8   A    Under open roles.

9   Q    I have it on the screen now, Ms. Whalen, is that where

10  you identified Mr. Barger being on this document?

11  A    Yes.

12  Q    And what is the recommendation in December of 2016 prior

13  to the time Mr. Barger submits his authorization to return to

14  work?

15  A    To eliminate the role.

16  Q    I'd ask you if you would, Ms. Whalen, to turn to

17  Defendant's Exhibit 14 -- D 214?

18       THE COURT:  D 214, there's no objection, that's in

19  evidence at this time.

20       MR. SHEARER:  Thank you, Your Honor.

21       (Defendant's Exhibit D 214 received in evidence.)

22  Q    Ms. Whalen, Mr. Shearer was asking you some questions

23  about the process by which the lists were being created for

24  the elimination of 10 percent of the top 3,000 most highly

25  compensated employees, do you recall that testimony?

 1   A    Yes.

 2   Q    Can you just describe briefly for the jury what

 3   transpired over the course of that weekend in which the

 4   members of GBS who you were responsible for selected their

 5   candidates to be included or their employees or managers to be

 6   included in that reduction in force?

 7   A    Yes, we had provided Dan Charron, Jeff Hack information

 8   about their top 3,000 employees, so there was a portion of the

 9   3,000 that was relevant to that particular business.  We gave

10   them lists.  I walked them through a process and expected

11   timelines and then they in turn submitted back their lists,

12   their recommendations.

13   Q    Did you see a list that included Mr. Barger's name?

14   A    I did.

15   Q    You have D 214 in front of you?

16   A    I do.

17   Q    What day is D 214 dated please?

18   A    January 9th.

19   Q    Who is this document from and who is it to?

20   A    This is from Jeff Hack to Dan Charron and myself listing

21   out who he is recommending or whose positions are recommended

22   for elimination.

23   Q    And is Mr. Barger's name on this list?

24   A    Yes, it is.

25   Q    He's number 2?

1  A    Correct.

2  Q    When you saw this list did you question Mr. Barger's

3  inclusion on the list as a Senior Vice President of Human

4  Resources?

5  A    No, I did not.

6  Q    Why not?

7  A    We ask our leaders to make the difficult decisions to put

8  the list together because it is the right thing to do, it is

9  the right decision to make for the company and my job is

10  really to then put them through our legal team and others to

11  make sure they're fully vetted.

12  Q    Was Exhibit 214, the date of Exhibit 214, is that before

13  or after Mr. Barger submitted his authorization to return to

14  work?

15  A    Before.

16       MR. EIDELMAN:  Your Honor, may I have a minute to

17  consult with my colleague?

18       THE COURT:  You may.

19       (Pause in the proceedings.)

20  Q    Ms. Whalen, how long has it been since you worked at

21  First Data?

22  A    Nineteen months.

23  Q    And why did you leave First Data?

24  A    I was offered a great opportunity to lead HR for an

25  executive whom I'd worked for at First Data actually.

1 Q    You mentioned in your earlier testimony that Robin Ording

2 when Mr. Barger went out took over some of the -- basically

3 managing the Sales Training group?

4 A    Yes.

5 Q    Was Ms. Ording doing this on a full-time basis?

6 A    No, Robin had a full-time day job so she took this on in

7 addition to her day job, as I'll call it.

8 Q    In Mr. Shearer's opening statement he described the RIFs

9 that he asked you about as a Ferris wheel where people just

10 get on and off and then it's just a subterfuge.

11         Is that true, is that what RIFs are used for at

12 First Data?

13 A    Not at all.

14 Q    So, when First Data engages in a restructuring that may

15 involve a reduction in force, what are those monies used for?

16 A    So, the money is really to -- so, in some cases I would

17 say it's really for the benefit of the company's performance

18 overall to flow through to the bottom line, that's really a

19 big benefit but sometimes you cut in some areas to invest in

20 other areas, where in the technologies base, as we all know

21 every day, there are all new skill sets and they continue to

22 evolve.  So, sometimes you'll downsize in one area to be able

23 to invest in other areas.

24 Q    Have you ever seen a RIF -- while you were at First Data

25 had you seen a RIF like this one that was a targeted focus on

1    10 percent of the top 3,000 employees, most highly compensated

2    employees?

3    A    This one was different, I had not seen one like this.

4    Q    Was Mr. Barger included in the 10 percent of the top

5    3,000 reduction in force because he had throat cancer?

6    A    Absolutely not.

7    Q    Was Mr. Barger included in the 10 percent of the top

8    3,000 reduction in force because he had taken leave?

9    A    Absolutely not.

10   Q    Was Mr. Barger included in the 10 percent of the top

11   3,000 reduction in force because he had submitted an

12   authorization to return to work?

13   A    No.

14   Q    In fact, isn't it correct that Mr. Barger's name was

15   included in the elimination before he submitted his

16   authorization to return to work?

17   A    Yes that's correct.

18            MR. EIDELMAN:  I have no further questions.

19            THE COURT:  Any redirect, Mr. Shearer?

20            MR. SHEARER:  Yes.

21   REDIRECT EXAMINATION

22   BY MR. SHEARER:

23   Q    You testified in my last examination that you had been

24   notified on December 22nd and January 7th that Mr. Barger was

25   returning to work by email, is that correct?

1 | supporting Mr. Barger this question of a successor started
2 | coming up; is that correct?
3 | A    Correct.
4 | Q    Why did you recommend that a successor be appointed?
5 | A    There were a lot of organizational gaps that were very
6 | apparent within Steve's organization, his attrition rate was
7 | well over 40 percent and he continued to have positions that
8 | were open for long periods of time.
9 | Q    And this is when, around what time in 2016 were you
10 | recommending this, the new successor?
11 | A    I don't remember the exact time frame but I believe that
12 | was 2015.  Initially it was 2015, late 2015, not long after I
13 | started supporting Steve's group.
14 | Q    And you know that he had assumed Mr. Fricke's Sales
15 | Training group before you became the generalist?
16 | A    To me it was just one organization, it was just the sales
17 | organization group.  There was no other group.  It was one
18 | team.
19 | Q    This is Plaintiff's Exhibit 20, it's an email from --
20 |           THE COURT:  20?
21 |           MR. SHEARER:  -- July 21st.
22 |           THE COURT:  Plaintiff's Exhibit's 20?
23 |           MR. SHEARER:  Yes.
24 |           THE COURT:  In evidence at this time.
25 |           (Plaintiff's Exhibit 20 so marked in evidence.)

1  asking for his permission to force Steve on to a leave of

2  absence, correct?

3  A    No.

4  Q    No.

5  A    I would not say force.

6  Q    Okay.  I'm going to pull up, this is Plaintiff's 28.

7       THE COURT:  28 in evidence now.

8       (Government's Exhibit 28 so marked in evidence.)

9  Q    This is an email from you to Jeff Hack on November 16,

10 2016.  It seems you've gotten Tony's approval and Karen

11 Whalen's approval and you're asking Tony to call Steve up or

12 get a hold of Steve and make him go on leave, is that right?

13 A    I can't make that determination.

14 Q    Well, you wrote this, what were you trying to do?

15 A    So, I was outlining the concerns that we were having with

16 Steve's team, that they continuously came to me about, you

17 know, not having day-to-day management and the concerns that

18 that was causing within the team.

19 Q    So, was Steve supposed to be managing them?

20 A    Yes.

21 Q    And there were concerns about a lack of management, they

22 couldn't get a hold of him; what were their concerns?

23 A    There was a lack of day-to-day management, no decisions,

24 there were frequently emails that would not be answered for

25 quite sometime and then they'd be older emails so situations

1  Q    Who is collecting all that information?

2  A    Collecting or --

3  Q    Let's say it is at a VP level and you are involved, what

4  would your involvement be?  What would your task be?

5  A    To send the leaders a list of their organization, maybe

6  compensation, and, you know, tell them that they needed to

7  review their organization and submit whomever they are

8  selecting.

9  Q    Now, on January 13, you called Mr. Barger and advised him

10 that he was terminated; is that right?

11 A    I notified Mr. Barger that his position was eliminated,

12 and I also notified him of the compensation amount for the

13 severance agreement.

14 Q    Why did you do that, since this is an SVP termination?

15 A    I was asked to reach out to Mr. Barger because Mr. Barger

16 had worked with me closely and said that he really appreciated

17 me and would partner with me through these other situations,

18 so I was asked to reach out to Mr. Barger.

19 Q    Who asked you to do that?

20 A    Tony Marino.

21 Q    Tony Marino?

22 A    Yes.

23 Q    Did you speak with -- did you have to call Mr. Barger

24 more than once?

25 A    Yes.

1   said, "You said that?"  And he said, "Yes, it is okay, you

2   know, we have had this conversation on several occasions."

3   And he wanted to help her with how she dressed, and he said he

4   had talked to her about her weight being part of the problem

5   and why she had not been selected.  So I coached Mr. Barger

6   that not only as, you know, an HR representative, that was an

7   inappropriate conversation.

8   Q     Were there any other conversations that you had where you

9   counselled Mr. Barger from an HR perspective in terms of his

10  management of the sales training group?

11  A     Yes.

12  Q     What conversation -- what other conversations did you

13  have with him?

14  A     So Steve had had a conversation with one of the gentleman

15  on his team about his alcoholism and stating that he was an

16  alcoholic.  Steve had said that he really encouraged him to

17  get help on several occasions, and I believe he said that he

18  called the gentleman's partner and said, you know, he's an

19  alcoholic, and encouraged him to get help or took him to the

20  rehab center.  I really couldn't tell from what the outcome

21  was of that situation.  It sounded like Steve had taken him to

22  the rehab center or maybe called his partner to come get him.

23  Q     And why would you counsel Mr. Barger about something like

24  that?  It sounds like he's trying to do something for an

25  employee?

1  A    Yes.  And I could understand that, but I'd ask if the
2  gentleman had, you know, any cause to see like was he drinking
3  at work?  Did he smell of alcohol?  Was there, you know, a
4  work issue?  And those -- he said, no, there wasn't any of
5  those.
6  Q    Do you believe that these were the HR sins that
7  Mr. Marino mentioned when he referenced that Mr. Barger had
8  come and talked to him?
9  A    Yes.
10 Q    Did Mr. Marino advise you in the fall of 2016 as to the
11 reason why Mr. Barger needed -- that the company wanted to put
12 Mr. Barger out on leave?
13 A    He said to focus on his health and really getting better.
14 Q    Okay.  Had anything happened that led, to your knowledge,
15 that led Mr. Marino to -- and the company to make that
16 decision?
17 A    I was aware that we were paying out Mr. Barger's bonus
18 early, in all cash, and that was approximately four months
19 earlier.  Bonuses had not even been determined nor the budget.
20           MR. EIDELMAN:  I believe this might -- D-117.
21           THE COURT:  In evidence.
22           (Defense Exhibit D-117 received in evidence.)
23 Q    Showing you what's been marked, Ms. Johnson, I think you
24 should have it there in front of you, D-117, can you tell me
25 what this e-mail is, the lower part of the e-mail?

1   A     The highlighted portion?

2   Q     Yes, ma'am.

3   A     "I advised that Steve is able to set up video chat with

4   Tony, if Tony finds that approach best."

5   Q     Right.  But go above that to the top part, where it

6   says -- under "Jeff."  And "Jeff" is Jeff Hack?

7   A     Yes.  Jeff Hack.

8   Q     All right.  And what are you telling Mr. Hack?

9   A     That some of the concerns with Steve has escalated, we

10  really needed to implement a leave of absence for him to focus

11  on his health.  We wanted to ensure his dignity is maintained,

12  but several incidents are concerning.

13  Q     Was it your understanding that what the company was doing

14  was to -- that Mr. Barger was going to be put on a leave of

15  absence, and the reason why the company made that decision was

16  not because he was working, but they wanted him to focus on

17  his health?  Was that your understanding?

18  A     Yes.

19  Q     And Mr. Shearer asked you some questions about removing

20  access.  What does that mean to remove access?

21  A     It means you can't get on e-mail, and you can't come into

22  the building, so you can't come into the workplace unless

23  someone comes and greets you, signs you in.  So you couldn't

24  use your badge, it no longer accesses the building.

25  Q     And if Mr. Barger -- if the company was putting

1  Mr. Barger on leave so that he would not be focused on work,

2  would there be any reason for him to need e-mail access?

3  A    No.

4  Q    You testified that you helped Mr. Barger and you provided

5  assistance with Mr. Barger securing some paperwork.  Do you

6  remember that testimony?

7  A    Yes.

8           MR. EIDELMAN:  D-154, Your Honor.

9           THE COURT:  In evidence at this time.

10          (Defense Exhibit D-154 received in evidence.)

11  Q    Ms. Johnson, I know you are not familiar or you don't

12  handle the paperwork that much, but have you seen before a

13  certification of health care provider?  Do you see that?

14  A    Yes.

15  Q    Do you know what that form is used for?

16  A    My understanding is, again, since it is the health care

17  provider, the doctor would complete this form to put someone

18  out on a leave of absence.

19  Q    Did you complete this form?

20  A    No.

21  Q    Is your signature on this form at all?

22  A    None of the handwriting on this form is mine.

23  Q    At any point in time did you see a copy of the

24  certification of health care provider, that is D-154, that

25  came in from Mr. Barger's doctor regarding the certification

1  of health care provider?

2  A    I believe they may have sent this over and I sent it to

3  the service center.

4  Q    Okay.  And turning your attention to number 4 on the

5  form, now, again, this is not a form that you completed, this

6  is Mr. Barger's doctor completing this form?

7  A    Correct.

8  Q    And can you read what the question in number 4 is?

9        THE COURT:  The yellow highlights are those that you

10  put on?

11        MR. EIDELMAN:  Yes, they are, Your Honor.

12        THE COURT:  When you see yellow highlights, they

13  were added by counsel.

14        MR. EIDELMAN:  They were added by counsel to make it

15  easier for the witness.  Thank you, Your Honor, for that

16  clarification.

17  Q    That is my highlighting, Ms. Johnson.

18        So can you just read what that highlighting is.

19  A    Was the patient admitted for an overnight stay in a

20  hospital, hospice, or residential medical care facility.  If

21  yes, dates of admission.  10-22-16 to 10-26-16 are the dates

22  that are entered in that slot.

23  Q    Right.

24        Now above that, though, in number 3, which I did not

25  highlight, what is Mr. Barger's doctor indicating there in

1    number 3?

2    A    It is marked yes, and the question is:  Will the patient

3    be incapacitated for a single continuous period of time due to

4    his, her, medical condition, including any time for treatment

5    and recovery.

6    Q    And is there a beginning date that the doctor puts on the

7    form as to when Mr. Barger's period of incapacity is going to

8    begin?

9    A    Yes, it says begin date is 10-22-16.

10   Q    And his return to work date?

11   A    3-1-17.

12   Q    Right.

13        And then there's also a definition of what

14   incapacity means, correct?

15   A    Yes.  Incapacity means an ability to perform regular

16   daily activities, to attend school or work because of the

17   condition, treatment therefor or recovery therefrom.

18   Q    So if Mr. Barger, as you understand it, because you were

19   the person who arranged for access to the e-mail systems to be

20   revoked, if he was incapacitated, there would be no reason for

21   him to need e-mail access to the company, correct?

22   A    Correct.

23   Q    Will you please turn to D-232.

24        THE COURT:  In evidence now.

25        (Defense Exhibit D-232 received in evidence.)

1  Mason, so the question is going to be asked.  Who is going to

2  pretend to be the doctor?

3        MR. ZEITLIN:  I'll be playing the doctor.

4        THE COURT:  Why don't you sit up here as if you're

5  testifying.

6        MR. SHEARER:  We're going to stumble over some

7  medical terms I assure you.

8        THE COURT:  Speak clearly, question and answer.

9        MR. SHEARER:  Do you want us to say question or just

10  read the question, Your Honor?

11        THE COURT:  You read the question that was asked of

12  the doctor.

13        And this is going to be doctor whom?

14        MR. SHEARER:  Dr. Harry Baddour.

15        MR. ZEITLIN:  Harry Baddour, Your Honor.

16        THE COURT:  All right, we have that.  And pretend

17  that this is the doctor, okay.

18        MR. ZEITLIN:  These are excerpts from a deposition

19  dated Monday, June 25th, 2018.

20        MR. SHEARER:  The questions were being asked by

21  Lindsey Kennedy and subsequent questions were asked by myself.

22        So, initially this is Ms. Lindsey Kennedy of Saul

23  Ewing asking questions.

24

25  "Q    So, what is your current position?

1   A     I'm an assistant professor of Head and Neck Surgery at

2   Emory University.

3   Q     How long have you held this position?

4   A     2000 -- July of 2016.

5   Q     What are your major duties and responsibilities as

6   assistant professor?

7   A     So I do surgery on patients with head and neck cancer,

8   and then their reconstruction if needed.

9          THE COURT:  You sound just like a doctor.

10         MR. ZEITLIN:  Thank you.

11  Q     Do you ever communicate with employers with patients

12  regarding their medical condition and their eligibility to

13  return to work?

14  A     No, ma'am.

15  Q     Do you ever communicate with third-party benefit

16  administrators, such as MetLife, about patient's medical

17  conditions in connection with their return to work?

18  A     No.

19  Q     When was the first time you met Mr. Barger?

20  A     2015.  I believe.

21  Q     How did you meet him?

22  A     He was a referral from an outside ENT provider in Atlanta

23  who contacted me so that we could see him because he had

24  laryngeal cancer treated with radiation and had persisted.  So

25  he was being referred for evaluation for surgical therapy

1  because the outside ENT provider didn't do that procedure

2  anymore.  That was beyond the scope of what he normally does.

3  Q    Okay.  Were you aware that Mr. Barger was employed by

4  First Data Corporation?

5           MR. SHEARER:  Oops, did I skip?

6           MR. ZEITLIN:  What page are we on?

7           MR. SHEARER:  Page nine.

8           MR. ZEITLIN:  Repeat the question please.

9           MR. SHEARER:  Yes.

10  Q    Okay.  Were you aware that Mr. Barger was employed by

11  First Data Corporation?

12  A    Not prior to this deposition.

13  Q    When did you learn that he had been employed by First

14  Data?

15  A    When I received the deposition.

16  Q    Did you ever speak with Mr. Barger about his employment

17  situation while you were treating him?

18  A    Not that I remember.  In general I don't have that

19  conversation with my patients.

20  Q    Can you describe the medical condition for which you

21  treated Mr. Barger?

22  A    He had a recurrent cancer of his voice box that required

23  removal of his voice box and then reconstruction following it.

24  Q    Did you perform either of these procedures?

25  A    I did not.

1  Q    So the removal of the voice box is one procedure and then

2  the reconstruction is a totally separate one; is that right?

3  A    It's usually done at the same time, same day.

4  Q    Did he also have something -- and I'm going to butcher

5  the pronunciation -- called a pharyngocutaneous fistula?

6  A    He did.

7  Q    How do you say that, by the way?

8  A    Pharyngocutaneous.

9  Q    I told you I'd butcher it.  Is it okay if I refer to that

10  as a fistula for this deposition?

11  A    That's what we call it anyway.

12  Q    Did you treat him for that condition?

13  A    Correct.

14  Q    What is that?  What is it a pharyngocutaneous fistula?

15  A    So when you take the voice box out, the pharynx or the

16  throat has an opening in the front that was closed off by the

17  larynx, so the voice box, but since it's gone, it's basically

18  an open tube.  So you close it back on itself and you bring

19  the two edges of the throat back together.  However, if

20  there's a leak of spit from the new closure incision line,

21  then you develop a fistula where spit leaks out in your neck.

22  Q    So you treated him for the fistula and recurrent cancer;

23  is that accurate?

24  A    Correct.  Well, I did not perform the surgery but treated

25  him for the fistula following.

1  Q    So did you not perform any surgical procedures on him?

2  A    No.

3  Q    Do you know if Mr. Barger ever got any follow-up

4  surgeries or procedures other than the removal of his voice

5  box and the reconstruction.

6  A    He had his voice box prosthesis placed at the same time

7  as the original surgery.  So following that he didn't have

8  any, since I've taken care of him, any other head or neck

9  procedures.  So the resection reconstruction and the voice

10  prosthesis were all one surgery.

11  Q    How often do you care for patients who have undergone

12  this tripartite surgery that you just be described?

13  A    That exact surgery?

14  Q    Yes.

15  A    No.  Probably see one or two every week in my clinic and

16  I only have clinic one day a week.  No.

17  Q    Did you see Mr. Barger in the clinic?

18  A    Correct, after he saw Dr. Rogers, I saw him.  Then he had

19  a surgery performed elsewhere and then he came back and that's

20  when I picked up his care again.

21  Q    So if you're in the clinic one day a week, what are you

22  doing the other days of the week?

23  A    I have cases three days a week and then administrative

24  day.

25  Q    When up say cases, do you mean surgeries?

1  A    Yes.  Just like his.

2  Q    How often do you perform voice box removal and

3  reconstruction surgery?

4  A    Probably one to two a month.  That case takes about eight

5  hours.

6  Q    What's the recovery process typically like for this kind

7  of surgery?

8  A    Their throat.  So after they've been radiated it takes

9  longer for their wounds to heal.  So we usually tell them, you

10 know, to prepare for four to six weeks of recovery, longer if

11 you've been radiated or you have a complication, such as a

12 fistula or your other wounds don't heal in your neck.

13 Q    For somebody that did undergo radiation and also

14 developed a fistula, what would you say is the average

15 recovery time?

16 A    So if it's a small fistula that can be packed with

17 packing changes in the neck if it's small, then the recovery

18 is going to be probably in total around two -- two to -- two

19 months, two to three months, something like that.

20          Because it will delay -- it's going to delay his

21 recovery if he's still got an open drain wound in his neck.

22 It will take him longer to be strength-wise back where he was

23 preoperatively.

24 Q    Would you consider Mr. Barger's fistula to be a small

25 fistula like you described or something bigger?

1  A    No, it was a pretty sizeable fistula and he had an

2  additional problem of the spit kind of leaking down into his

3  airway.  So he came back from a complication of his

4  complication with shortness of breath, coughing, and had

5  developed pneumonia postoperatively, even after I saw him for

6  the original complication of the fistula.  Or it might have

7  been the same visit.  I can't remember but he came back and he

8  was -- he did he not look well.

9  Q    Given what you've just described to me, this complication

10  of a complication, and I think you described Mr. Barger's

11  fistula as being sizeable, what would you say was his overall

12  recovery time?

13  A    So when he came originally, I initially thought that his

14  fistula was large enough that we were going to have to take

15  him back to actually do a revision reconstruction, which I've

16  never had to do, and most of the them close on their own but

17  his was big enough to where I didn't think it was going to

18  close on its own, but we gave it the benefit of the doubt,

19  starting packing it.

20         It started getting smaller.  The output started

21  decreasing.  He started looking better but his recovery -- I

22  mean from what I -- from start to finish he had at least three

23  months of pretty hard recovery because the fistula took a long

24  time to close because it was big, a big hole.

25         He also had some -- had external -- had an ex -- his

1    muscle from his chest that used to close the reconstruction

2    was exposed.  So he actual had an open wound on the other side

3    that was not -- it didn't have anything to do with his fistula

4    but it still had to heal because it was just exposed.  So that

5    took an additional -- took time for new skin to grow over

6    that.

7    Q    How long are individuals who undergo this type of surgery

8    and these complications you've been describing typically out

9    of work?  And let me clarify.  I'm assuming they have an

10   office job, they're not doing hard labor or something.

11   A    Right.  I usually tell them -- or for this case, I knew

12   he was going to be out at least three months, because I didn't

13   think it was going to heal very quickly because radiation

14   stunts healing.  I mean a lot.  It really slows things down.

15   So we give it a lot of extra time for healing because it just

16   doesn't seem to make much progress week to -- sometimes it

17   takes -- you can't even look at it week-to-week.  You have to

18   look at it every two weeks, because you can't really tell if

19   it made any progress within the week or not.  So it's kind of

20   slow.

21   Q    When you say three months, do you mean three months from

22   the time he developed the fistula or three months --

23   A    So from the time that he started -- so when he presented,

24   I didn't know if he was ever going to heal the fistula, and

25   that I thought we might need to do another surgery to close

1  the hole.  So that's the first visit.  Then I think I saw him

2  a couple of weeks after that, after his lung issue cleared up,

3  because he came in really short of breath and had pneumonia,

4  from what I remember, and he then -- from that point where he

5  kind of turned the corner and was stabilized, I expected him

6  to be not -- that fistula was probably not going to be closed

7  for around three months.

8  Q    Do you recall --

9  A    Because I really didn't think it was going to but it

10 surprised me that it did.  It just took a long time.

11 Q    Three months from the time you got him stabilized?

12 A    Yeah.

13 Q    Just to clarify, the time he was stabilized was when his

14 fistula started healing?  I'm still trying to understand --

15 A    Right.  So he came in -- so his fistula wasn't so much an

16 imminent threat to his health as it was -- as was his lung

17 issue that had developed as a result of his fistula, because

18 he came in and he was very uncomfortable.  He was coughing up

19 a lot of mucous.  He was very short of breath.  I think I sent

20 him to the ER from our clinic to get a chest X-ray and a

21 workup.

22 Q    Do you recall when that was?

23 A    That was -- I want to say that was three weeks -- or

24 maybe -- no, it wasn't that long.  Maybe two weeks after his

25 surgery in Tampa.  Because he came back and he was in bad

1  shape when we originally saw him, when we initially saw him.

2  Q      When individuals who have undergone such surgery and such

3  complications return to their jobs, do they typically return

4  with restrictions or limitations?

5  A      Well, his case is unique in that the --

6         You know, we didn't really know how his whole -- he

7  lost his voice box, so I guess depending on his scope of work,

8  it was going to affect what he could do and communicate.  But

9  his prosthesis that he had placed during the initial surgery

10 ended up working extremely well for him, but I had -- we don't

11 typically put the prosthesis in at the time of the resection

12 and reconstruction.  We never do that.  So I didn't know the

13 outcome of what his voice was going to be like or if that

14 prosthesis was going to work, considering he had already had

15 wound complication with the fistula healing.

16        So basically the prosthesis is a valve that sits in

17 his new airway here, in his neck, and it allows -- it's a

18 one-way valve that allows air in and allows him to speak out

19 of his mouth without a voice box.  So I didn't know how well

20 he was going to function at work because I don't know his

21 duties, whether he would have to write or whether he would

22 have to use electrolarynx, which is a robotic type of speaking

23 apparatus, or like an iPad and then voice -- you type it --

24 you can type it in and then it says it out loud for you.

25 Those are all other manners we have people use but it adds

1  significant time to their communication.

2          You know, it takes a lot just to get a sentence out

3  sometimes.  So I didn't know how that would impact, nor I

4  wasn't aware of what he did."

5          MR. SHEARER:  They then displayed Defendant's

6  Exhibit number one.

7  Q    Do you know what this document is generally?

8  A    Yes.

9  Q    Do you complete these regularly for patients?

10 A    Correct.

11 Q    Whose signature is that at the bottom of the second page?

12 A    I don't know.

13 Q    Do you believe that it's someone who worked with you

14 given your name is listed in the provider's name section?

15 A    Correct.

16 Q    This person's, whoever it is, the signature appears to be

17 dated December 13, 2016?

18 A    Correct.

19 Q    Would you agree with me that this form indicates that the

20 beginning date of Mr. Barger's period of incapacity for

21 purposes of this form was October 22nd, 2016?

22 A    Correct.

23 Q    Would you agree with me that this form indicates that his

24 return to work date is March 1st, 2017?

25 A    Correct.

1    Q    Do you know how this date was chosen, the March 1st date?

2    A    I do not.

3    Q    Do you recall having any discussions with Mr. Barger

4    about this March 1st return to work date?

5    A    I do not remember any of those discussions.

6    Q    Do you recall having discussions with anyone else in your

7    practice about the March 1st return to work date for Mr.

8    Barger?

9    A    I don't remember any specific conversations."

10         MR. SHEARER:  Then they displayed Defendant's

11   Exhibit 2.

12   Q    What are these documents?

13   A    So these are ENT clinic notes for our head/neck clinic.

14   A lot of these look like they're speech language pathology

15   notes from our speech pathologists who work in our clinic, who

16   see all of our laryngectomy patients and then care for them

17   postoperatively from a swallowing and a voice rehabilitation

18   standpoint, particularly if they have a TEP.

19         Then some of these, some of these notes are from the

20   provider.  So either myself, our nurse practitioners, who are

21   looking more at their clinical progress and surveillance from

22   a cancer recurrent standpoint.

23   Q    What does TEP stand for?

24   A    So tracheoesophageal prosthesis.

25   Q    And ENT stands for ear, nose and throat?

1   A    Correct.

2   Q    What does NTE stand for?  I see that at the top of a lot

3   of these pages.

4   A    A note.  Our speech language pathology evaluations,

5   they're different templates than our clinical notes, but they

6   all follow under the ENT note.

7   Q    What does it mean when it says, "Final Report"?

8   A    That's if the -- that's once the final provider signs off

9   on the document.

10  Q    And that final provider can be the speech language

11  pathologist or you?

12  A    Or the nurse practitioner, uh-hum.

13  Q    I'd like to draw your attention to a page 17 about

14  halfway through that has Emory 0048 at the bottom right-hand

15  corner.

16  A    Okay.

17  Q    The date on it above the documented date is December 9,

18  2016.  Do you see that?

19  A    I do.

20  Q    If you look at Page 3 of 3 of this, which ends in Emory

21  0050, it says it was co-signed by you.  Is that correct?

22  A    Yes.

23  Q    Can you read for me the last sentence on the first page

24  underneath "History of Present Illness," the last sentence of

25  that second paragraph?

1  A    Which page?

2  Q    Page 1 under History of Present Illness?

3  A    Starting with Interim History?

4  Q    Above that.

5         Yes, I'm sorry.  Both paragraphs start 18 with

6  Interim History.

7         The one that says "his postop course."  Can you read

8  that?

9  A    "His postop course was complicated by a pharyngocutaneous

10 fistula and therefore underwent left pec muscle flap and

11 AlloDerm closure but unfortunately he continued to have a

12 PCF," pharyngocutaneous fistula, "draining to the right

13 neck."

14 Q    Thank you.  You answered one of my questions already.

15 What is left pec muscle flap and AlloDerm closure?

16 A    So he developed a fistula while he was postoperatively

17 recovering at the other institution, and they decided to close

18 over the fistula with a muscle flap from his left chest.  I

19 believe it was his left chest.  His pectoralis muscle.

20 Q    Let's look at the next page, Page 2 of 3.  I'm looking

21 underneath the heading of Assessment/Plan.

22         Can you read No. 3 for me underneath that?

23 A    Yes.  "Will cancel planned pharyngeal reconstruction

24 given pharyngeal defect is near closed."

25 Q    And what does that mean?

1  A    That means that he, in our words, had kind of turned the

2  corner and his fistula output had decreased.  His fistula size

3  of the wound in his neck had decreased.  So the plan for

4  further reconstruction looked like it would not be indicated.

5  Q    Did you decide on December 9th, 2016, that 21 the

6  reconstruction surgery would not be necessary for Mr. Barger?

7  A    Correct.

8  Q    Let's now look at the document which begins with Emory

9  0039, just a few pages ahead?

10 A    Okay.

11 Q    This appears to be another speech language pathology

12 progress note, this time dated January 10, 2017.  Is that

13 correct?

14 A    Correct.

15 Q    This one seems to be signed by rehab therapist Merrill

16 Kaufman; is that right?

17 A    Correct.

18 Q    Did you see Mr. Barger on January 10, 2017?

19 A    I do not know.

20 Q    But this document does not indicate that you did, right?

21 A    I know that the speech pathologist who saw him in this

22 visit, and I never overlapped on days in the clinic so I don't

23 believe I saw him with her.

24 Q    On the first page, underneath the Basic Information

25 heading, the last two sentences there, which starts with

1  "patient now taking," can you read those for me, please?

2  A    "Patient now taking normal diet PO," or by mouth, "and

3  using TEP," or tracheoesophageal prosthesis, "for

4  communication.  Patient reports he has not used PEG in one

5  month and had it removed in clinic by Ashley Parrish, RN

6  today."

7  Q    And remind me what PEG is?

8  A    Percutaneous endoscopic gastrostomy.  It's a stomach

9  tube, a tube in his stomach to feed him.  A gastrostomy tube

10  is a stomach tube.

11  Q    And what's the procedure like to remove that?

12  A    Usually you deflate the balloon that's keeping the tube

13  in the stomach, in the stomach wall, and then you just pull it

14  out and the hole closes on its own, after you put a dressing

15  over it.

16  Q    Is it something that a patient typically has to make an

17  appointment for or is it something that can just be done --

18  A    While they're there?

19  Q    -- while they're there?

20  A    While they're there, yes.

21  Q    At this time, when you saw him on January 16 20th, 2017,

22  were you concerned that Mr. Barger was continuing to suffer

23  from his complications following the surgery?

24  A    At that point I thought that he was -- had started on a

25  path, positive progress.

1  Q    As of January 20, 2017, did you think that he would be

2  able to be working without any restrictions or limitations in

3  an office-style setting?

4  A    It would depend on what his requirements were at his job

5  and if his -- just because he has the prosthesis, if he

6  doesn't know how to use it, then his communication can still

7  suffer significantly from that, because they have to learn how

8  to use it.

9         And I think at this point his -- he was taking

10 everything by mouth and was not using his feeding tube because

11 I think his feeding tube had been pulled at the prior visit

12 with Meryl Kaufman.

13        So wound care wise, he would have had the 11 left

14 pec closure was healing.  So at this point it would be mostly

15 a communication issue for him in terms of restrictions."

16        MR. SHEARER:  Then they displayed Defendant's

17 Exhibit 3.

18 Q    I'm handing you what has been marked as Exhibit Number 3.

19 A    Okay."

20        THE COURT:  Is that Exhibit 3 that now you want in

21 evidence here?

22        MR. SHEARER:  At the end of this I will give you the

23 list of the documents.

24        THE COURT:  These are all documents that you have on

25 your list here?

1      MR. SHEARER:  They're 101 to 110.

2      THE COURT:  Well, no, I just want to make sure that

3  there's not going to be a problem in admitting them into

4  evidence.  You want them in evidence in coordination with the

5  doctor's testimony, right?

6      MR. SHEARER:  Yes, I do.

7      THE COURT:  Just make sure we have a clear record

8  when the jurors leave or even before they leave what you want

9  in evidence.

10

11      MR. SHEARER:  Okay.  I was going to do that at the

12  end.

13      THE COURT:  Go ahead.  How much more do you have?

14  I'm not rushing you.

15      MR. SHEARER:  Three, four more pages.

16      THE COURT:  Let's see whether you can finish it

17  today.

18  Q    I'm handing you what has been marked as Exhibit Number 3.

19  A    Okay.

20  Q    This is a document that has Emory 0093 on the bottom

21  right-hand corner.

22      Have you ever seen this document before,

23  Dr. Baddour?

24  A    Not that I recall.

25  Q    Can you read for me what it says in the mainline of the

1  document?

2  A    "Steve even Barger is a patient of Dr. Harry Baddour.  He

3  is cleared to return to work on January 17th, 2016."  which I

4  think that should read 2017, "without any restrictions."

5  Q    Do you know why his return to work date was moved up

6  significantly from March 1st to January 17?

7  A    I suspect his progress with his fistula closure, his

8  medical -- his lung, his pulmonary or lung status, being able

9  to breathe more comfortably, and then his wounds healing.

10  Q    You're saying you suspect but you don't as you sit here

11  today have specific knowledge of that having happened,

12  correct?

13  A    I don't remember his status.  I mean based on the

14  previous exhibit, my note from January --

15  Q    Feel free to look.

16  A    January 20th.  Yes, January 20th, it appeared that he had

17  made significant progress in terms of his fistula being

18  closed, learning to speak again with his prosthesis.

19            MR. SHEARER:  Then Exhibit 4.

20  Q    Would you agree as of January 10, 2017, Mr. Barger has a

21  fistula and has to change dressings periodically and he's

22  trying to get the fistula to close?

23  A    Do I agree?

24  Q    Correct.

25  A    No.

1    Q    And why not?

2    A    His fistula had closed by then.

3    Q    How do you know that?

4    A    From our previous clinic documents.

5    Q    The January --

6    A    The 20th.

7    Q    -- 20th one?

8    A    Correct.

9    Q    Where in this January 20th document does it say that his

10   fistula has closed and that he does not have those

11   restrictions listed in this exhibit?

12   A    "Excision is well healed," under the neck subheading

13   under the physical exam.

14   Q    Does it say anywhere in this document about his

15   restrictions or lack thereof?

16   A    In this same -- January 20th?

17   Q    Correct.

18   A    I do not see any documentation of that that I entered on

19   his restriction.

20   Q    I think you said earlier that you did not agree that as

21   of January 10th that he had lifting restriction, eating

22   restrictions and talking restrictions.  So I'm trying to

23   understand the basis for your knowledge of that.

24   A    Well, we -- so eating restrictions he did not have

25   because on January 10th, in the note by Meryl Kaufman, he got

1   his stomach tube removed.  So he was taking -- and she noted

2   that he was taking a normal diet by mouth.

3           So he no longer had eating restrictions as of

4   January 10th.

5           This one.

6   Q    Correct, yes?

7           Then talking restrictions --

8           MR. ZEITLIN:  That's me.

9   A    Then taking restrictions he was as of January 10th doing

10  fairly well with his prosthesis and had learned how to use it.

11  So he did not have talking restrictions in that he was still

12  learning how to speak again but he was coming along well."

13          MR. DILORENZO:  Your Honor, there's two errors.

14  First, it is talking, not taking.

15          THE COURT:  He read it incorrectly?

16          MR. DILORENZO:  Yes.

17          THE COURT:  You read it correctly.

18          MR. DILORENZO:  Then talking restrictions he was as

19  of January 10th doing fairly well with his prosthesis and had

20  learned how to use it.  So he did have talking restrictions.

21  I think the witness said, "he did not have talking

22  restrictions."

23          THE COURT:  Well, did he have --

24          MR. DILORENZO:  I apologize, it says --

25          THE COURT:  Doctors get a little confused.

1    Anything else?

2    A    He did have talking restrictions in that he was still

3    learning how to speak again but he was coming along well.  And

4    then lifting restrictions, he at that point did not have any

5    lifting restrictions."

6        THE COURT:  We've got it down right, Mr. DiLorenzo,

7    everybody satisfied now?

8        MR. DILORENZO:  Yes, Your Honor.

9        THE COURT:  Continue.

10   Q    So, is it fair to say that sometime between December 13,

11   2016 and January 10, 2017, Mr. Barger had healed substantially

12   such that he was able to return to work without any

13   restrictions whatsoever?

14   A    At what time point?

15   Q    As of January 17th, the date that he was cleared to

16   return to work?

17   A    His only restriction after looking at this would be his

18   speech, talking.

19   Q    What kind of restriction?  What does that mean?

20   A    Learning how to communicate with his prosthesis.  Because

21   that would -- relaying information was going to take him a lot

22   longer than it would someone that had their voice box.

23   Q    And you're telling me that as of January 10, 2017, as far

24   as you were aware, he could return to work, able to perform

25   his job without any of these limitations or restrictions; is

1   that right?

2   A    No.  He would still have the talking restriction.

3   Q    I'm sorry, did you say that?

4   A    Yes.

5   Q    So he would have the talking restriction?

6   A    But the eating no.  Walking no.  Lifting, no.  But

7   communicating, yes.

8   Q    So aside from the specific restrictions and limitations,

9   how is it that on December 13th he could not do his job and

10  had to be out of work, and then January 10th he could go to

11  work without any restrictions or limitations?

12         What happened in that month-long period?  Because to

13  me it seems like some sort of miraculous recovery.  So, in

14  your words, what happened?

15  A    So once his fistula healed, that allowed his voice -- so

16  that means that his throat is closed.  So once his throat, his

17  new throat is closed, then he can take things by mouth, so he

18  can eat again and not use the feeding tube.  And then he can

19  use his prosthesis at that point because prior he could not.

20  If you have a fistula, you cannot use your prosthesis because

21  your fistula is reliant on your throat being completely closed

22  to generate and hold sound, you know, the breath that you

23  breathe 21 in.

24         So he didn't -- until that fistula closed, he was

25  never going to make any progress with eating or speech.  But

1  once it closed over that four-week period of time, then he can

2  make progress with those two functions.

3  Q    As you sit here today, and you see that his return to

4  work date was initially March 1st, 2017, and then you see that

5  he was cleared to return to work on January 17th, are you

6  surprised by that?

7  A    No, because he made progress that I was unsure he was

8  going to make, given his significant problem in, you know --

9  December 13th.

10 Q    Would you consider that unusually good progress or

11 remarkable progress, or is that just kind of par for the

12 course, that you don't know when these fistulas are going to

13 heal?

14        Were you pleasantly surprised --

15 A    Yes.

16 Q    -- by that progress?

17 A    Yes.

18 Q    Is it unusual, given the rest of his medical situation?

19 A    I wasn't surprised that his fistula closed, but I was

20 surprised that he swallowed very well with his new throat.

21 Because some people need their feeding tube in addition to

22 taking things by mouth, because they still have trouble

23 swallowing through their new throat, because the mechanism is

24 completely different now for them.

25        And then I was surprised at how quickly -- not how

1  quickly but how his prosthesis actually worked well

2  considering how big his fistula was upon presentation."

3         MR. SHEARER:  Exhibit Number 5 now.

4  Q    So I'm handing you what has been marked as Defendant's

5  Exhibit No. 5.  This is a document that goes from range

6  MetLife 0035 through MetLife 0040.

7         Is that the document that you have in front of you?

8  A    Correct.

9  Q    Have you ever seen this document before?

10 A    No.

11 Q    I'd like to ask you about a particular row in this

12 document and unfortunately it breaks across a couple of pages

13 but it begins on page -- where it says at the top 3 of 84 and

14 at the bottom it's MetLife 0037.

15 A    Okay.

16 Q    So I'd like to ask you have a few questions about this

17 row.  You're welcome to read all the information at the top if

18 you'd like but I really would like to ask you about the

19 information that appears at MetLife 0039, just a few pages

20 later.

21 A    Okay.

22 Q    Second full sentence, the Comment field, can you please

23 read that for me, that begins with per Dr. Baddour's office?

24 A    "Per Dr. Baddour's office as of 1/10/17 EE has lifting

25 restrictions, eating restrictions, talking restrictions

1   currently.  Treatment plan EE has a fistula and has to change

2   dressings periodically.  Trying to get fistula to close."

3   Q    Is that in and of itself an accurate statement?

4   A    As of 1/10/2017?

5   Q    Correct.  Based on your knowledge?

6   A    No.

7   Q    And why not?

8   A    Because -- well, I didn't see him until 1/20, and

9   everything had healed.

10          I'm not sure if 1/10 it was any different than it

11  was 10 days later, when I saw him.  But on -- where is Meryl

12  Kaufman's?

13          Okay.  So on 1/10/20 through 17, per Meryl Kaufman's

14  note, he had normal diet by mouth and his feeding tube was

15  removed.  So eating restrictions, not accurate.

16          And he had not any -- not any lifting restrictions

17  that I would be aware of at that point.

18          And the talking restriction is the learning how to

19  use his prosthesis.

20          But not the last sentence talking about fistula,

21  having to change dressings periodically, trying to get it to

22  close."

23          MR. SHEARER:  Then Shawn Shearer begins questioning.

24  Q    Then Exhibit 2 that says Emory 49 at the bottom.

25  A    Okay.

1    Q    This is where you read No. 3 under the Assessment Plan.

2    So this one is dated -- so December 9, 2016, you said you're

3    cancelling the plan for reconstruction given pharyngeal defect

4    is near closed.

5            So correct me if I'm wrong, but was it December 9

6    that you decided the fistula was sufficiently closed that

7    surgery was not needed?

8    A    Correct.

9    Q    Then on 12/13, December 13th, back to Exhibit 1, that's

10   when the medical information was given to MetLife; is that

11   correct?

12   A    It doesn't have that on Exhibit 1 to MetLife, but I

13   assume that's what this is.  Am I to assume that's what this

14   is?

15   Q    Defendant's 1 was signed on December 13th.

16   A    Correct.

17   Q    Throughout your testimony there was a lot 25 of talk

18   about restrictions, and I'm a little unsure as to whether what

19   everyone thinks the term "restrictions" means.

20            When you say he has a restriction, what does that

21   mean to you?

22   A    That he cannot complete his job duties and functions as

23   easily as he could prior to his surgery.  He can't execute

24   them as easily.  Though he may be able to get them done, it

25   will give him -- it will require additional time for him.

1  Q    So it does not mean that is an order from you not to
2  work?
3  A    Correct.  Because we frequently have people go back to
4  work with restrictions, meaning they can go to work but we
5  don't want them -- if they're having wound care on their left
6  leg from something we took from their left leg to put in their
7  face, then we don't want them walking a lot on that leg, or
8  sweating, and things like that.
9         So we do put restrictions for certain things.
10 Q    Back when you were describing what ADL is on here, was it
11 daily living --
12 A    Activities of daily living.
13 Q    And you gave examples of you can't brush your teeth, make
14 your own food.  You gave a list of examples.
15        My question is, were those examples or were those,
16 of ADL, or were those what Mr. Barger experiencing at the
17 time?
18 A    Those were examples.
19 Q    Do you recall if Mr. Barger -- if can you look at
20 Emory -- it's Exhibit 2, what's marked as Emory 0042 and it's
21 under Speech Therapy Evaluation.
22 A    Okay.
23 Q    It's about a third.  We talked about the Dale collar.
24 You see where the Dale collar is?
25 A    Correct.

1    Q    The sentence before that, can you read that?

2    A    Patient speaking?

3    Q    Yes.

4    A    "Patient speaking with TE speech to communicate with

5    excellent Intel ability."

6             MR. SHEARER:  And Ms. Kennedy, follow-up.

7    Q    You described for Mr. Shearer what ADL is, activities of

8    daily living --

9             THE COURT:  Mr. Shearer, you've got to go slower.

10   We are at five o'clock, I thought you would be finished.  How

11   much more?

12            MR. ZEITLIN:  Literally one more page.

13   Q    You described for Mr. Shearer what ADL is, activities of

14   daily living.  Examples you gave earlier were general

15   examples?"

16            THE COURT:  Go slower, we have a reporter that has

17   to take your words down.

18   Q    Examples you gave earlier were general examples of ADLs,

19   correct?

20   A    Correct.

21   Q    What was Mr. Barger himself experiencing in terms of his

22   restrictions on ADLs as of the date of this document,

23   December 13, 2016?

24   A    At that point -- well, he couldn't -- I think his wife

25   was helping him feed himself with the feeding tube in his

1  stomach, to assist him with that and prepare the -- I'm not

2  sure what nutrition he was on at that point, if he was just on

3  like Boost and Ensure, or he was supplementing that with other

4  blended food.  So I know eating was something that he was

5  probably needing assistance with.

6        Dressing changes at that point, from his wife as

7  well, because it's really kind of hard to do by yourself.

8        But as far as walking, brushing teeth, combing hair,

9  showering, I don't know what restrictions he would have had at

10  that point, except not getting his wound wet.

11        But other than that, I'm not aware of specific ones

12  he had."

13        MR. SHEARER:  That's it.

14        THE COURT:  Okay, fine.

15        MR. SHEARER:  Your Honor, I would like to move to

16  have those exhibits that are referenced in here --

17        THE COURT:  All these have been referenced, there's

18  been no objections to any of them I take it.

19        MR. EIDELMAN:  There actually is an objection on

20  page --

21        THE COURT:  Well, let me just send the jurors home.

22  Which ones do you have an objection to?

23        MR. EIDELMAN:  I have an objection to the

24  reference --

25        THE COURT:  Do you have an objection to one of those

1  industry for 30 years, I have been doing this for a long time.

2  I did not understand what sales transformation was.

3  Q    But yet you managed it for two years?

4  A    I did not manage it for two years.  It was sales

5  training.

6  Q    You thought it was sales training?

7  A    My understanding is, it was sales training.  We're

8  individuals working with our salespeople.  We have a large

9  sales force, they come in, we train them, teach them our

10 products, make sure they know how to use sales force, our CRM

11 tool, teach them how to do different things, and then they go

12 out into the field and sell.

13 Q    Do you agree with the testimony we heard yesterday

14 regarding mismanagement by Mr. Barger?

15 A    I don't understand your question.

16 Q    Well, we heard yesterday he allowed his high attrition

17 rates, he didn't hire enough, he didn't have the right people

18 in the place, he let --

19          THE COURT:  Do you have any knowledge of that at

20 all?

21 A    Yes.  Not at the time.  I mean, we had -- after Robin

22 Ording took over, we had a internal consultant review, which

23 is a bottoms up review, working with all of the different

24 individuals.  That group swelled up to, I think, 60, 70,

25 maybe, folks.  It is about 20 today.  So the net results, I

1    heard about the net results of those, but I wasn't like

2    involved in the day to day analysis.

3    Q    Would that review that was done after Mr. Barger went on

4    leave, how do you know that wouldn't have occurred had

5    Mr. Barger been there?

6    A    I do not know that.

7    Q    So had Mr. Barger not been on leave, it was possible

8    Mr. Barger could have run this review instead of Ms. Ording?

9    A    As I mentioned before, I had very limited interaction as

10   it relates to training.  I did not text with Mr. Barger, did

11   not get e-mails, we did not have calls as it relates to

12   corporate training.  I do know about the results of that

13   internal consulting, but I can't opine on whether or not it

14   would have happened before or after.

15   Q    This is where I am -- Mr. Barger is being criticized for

16   not paying attention to his organization, and you are up here

17   testifying that you don't know what's going on in your

18   organization.  Why is he the one getting fired for that and

19   you're sitting here as an executive vice chairman of GBS and

20   Fiserv.  If that's a real criticism of Mr. Barger, why isn't

21   it a criticism of you, too?

22   A    I can't answer that.  I am not sure what your question

23   is.

24   Q    You have answered three questions saying I didn't pay --

25   I don't know, I don't know.  That was Jeff Hack.  I don't know

1    what Mr. Barger did.  But yet Mr. Barger is terminated

2    according to the testimony yesterday --

3            THE COURT:  It is argumentative.  Why don't you save

4    that for your summation.  You get facts out.  He says he

5    didn't know, he had nothing to do with it.

6    Q    I heard -- we heard testimony that you sat down with

7    Mr. Barger, I've heard, the fall of 2015, I don't think that's

8    the wrong date, to talk to him about taking on additional

9    responsibility; is that correct?

10   A    We had a conversation, and it was really probably the

11   only business conversation.  We did have conversations other

12   than that, but not around business.  We had gone through and

13   done an analysis of different jobs, and what the pay rate was.

14   My understanding at the time, with Mr. Barger running

15   training, he was a senior vice president, he had $480,000 base

16   salary, which was the highest base salary of anybody that was

17   in GBS.  His comp was 700,000.

18           My point of reference is I ran Chase Paymentech's

19   business, a very similar type business.  The individual that I

20   had running that business was making around two, 300,000

21   dollars.

22           So in my conversation with Mr. Barger, and I had a

23   conversation with Jeff, Karen Whalen as well, I sat down with

24   Jeff, with Mr. Barger, and said, he seems a great guy, I

25   like -- I have nothing against Mr. Barger.  I -- he seemed

1   tenured, he had experience.  I said, we need to get you in a

2   role that matches the salary.  We need to put you in an

3   area -- we had P&Ls, we had folks with thousand-person

4   operations running hundreds of millions of dollars of revenue

5   businesses, making less than $480,000 on a base.

6            I said, we need to get you in one of those roles, or

7   we need to expand the role.  Not expand the people, but expand

8   your role.  Get other functions, take on the call center, take

9   on a bunch of different things.  That was my conversation with

10  Mr. Barger.

11  Q    And just to clarify, you said that Paymentech, the person

12  in that role made 230,000?

13  A    Around 300,000.  I don't know the exact number.  But

14  that's my experience of what the job --

15  Q    And what role is that you're talking about?

16  A    The head of sales training.

17  Q    So that's training that -- putting together the training

18  programs for the salespeople?

19  A    That's running the training group.

20  Q    Okay.  But did Paymentech have a similar program like the

21  First Data Way, the cultural transformation that Mr. Plumeri

22  was talking about?

23  A    They had corporate training, we did some of those -- I

24  don't know what sales training -- if you are asking me what's

25  sales transformation, I don't know.  I don't even think there

1  was a group or an organization associated with that.  That was

2  solely associated with Mr. Plumeri and Mr. Barger when they

3  came in prior to my time.  When I got there, it was a sales

4  training group.

5  Q    Okay.  Do you recall at all, when did this conversation

6  with Mr. Barger about taking on additional responsibilities

7  happen?

8  A    Had to happen, I think, the end of '15.

9  Q    And Mr. Barger was diagnosed with cancer in February of

10 '16, right?

11 A    That's my understanding, yes.

12 Q    Did he let you know he was diagnosed promptly?

13 A    I don't think he let me know personally, but I did know

14 about that.

15 Q    What actions did you take to assist Mr. Barger in

16 expanding his role and to taking over these call centers and

17 other responsibilities you just identified?

18 A    No, I didn't identify, I said that's an example.  He

19 worked for Jeff.  I said, you need to spend time with Jeff and

20 work through how you do this.  It was a conversation around

21 making sure that Steve and his compensation matched the job

22 that we had at the company.

23 Q    You said that there was corporate training at Paymentech.

24 What's the different between corporate training and sales

25 training?

1          THE COURT:  You know nothing about that?

2          THE WITNESS:  No.

3          THE COURT:  But you certainly are knowledgeable

4    about the operation of the business and my question, once

5    again, is that his work was essential.  It was necessary for

6    somebody to do what he was doing, I assume, am I correct about

7    that?

8          THE WITNESS:  You are, yes, sir.

9          THE COURT:  All right.  But you didn't want to spend

10   $750,000 because he didn't think that was the right dollar for

11   that type of work, right?

12         THE WITNESS:  Yes, that's correct.

13         THE COURT:  So somebody is doing the work?

14         THE WITNESS:  We combined two organizations, your

15   Honor.  So individual -- corporate training and sales training

16   are one organization now.  So there's only an elimination of

17   one.

18         THE COURT:  My question is he was very skilled and

19   very capable but you thought he was making too much money.

20   Was there ever any thought about letting him come back or

21   offering him the right to come back to work but at a lesser

22   salary perhaps?

23         THE WITNESS:  I did not, I wasn't part of that.  I

24   do not know.

25         THE COURT:  You don't know that one way or the

1          MR. EIDELMAN:  I just realized I did that.

2          THE WITNESS:  D-212?

3          MR. EIDELMAN:  D-214.

4          THE COURT:  It's already in evidence.  D-214 was in

5     evidence, it was referred to yesterday.

6          MR. EIDELMAN:  Thank you, Judge.

7     EXAMINATION BY

8     MR. EIDELMAN:

9     (Continuing.)

10    Q    Now, Dan, what is Exhibit D-214?

11    A    Looks like the list it's in the January timeframe a list

12    of the individuals that Jeff identified as part of the

13    restructuring.

14    Q    And Jeff is Jeff Hack?

15    A    Yes, my understanding, yes.

16    Q    And he sent this to you, Dan Charron, and to Karen Whalen

17    who we heard testify yesterday; correct?

18    A    Yes.

19    Q    Is Mr. Barger's name on this list?

20    A    Yes.

21    Q    Do you recall receiving this list?

22    A    Yes, I think I received this list because I took this

23    list and then combined it with mine and that's what we submit

24    for GBS North America.

25    Q    At the time that you got this list and you saw

1  Mr. Barger's name on it, did it surprise you, given the

2  criteria that you had all been using within GBS, to select

3  your ten percent of the top 3,000 managers for reduction?

4  A    No, absolutely not.  I know there was conversations, I

5  think, earlier than this that Jeff had had as it relates to

6  that role and individual and even individuals were looking at

7  what we wanted to long term there.  This is not -- I didn't

8  have any questions when I saw this.

9  Q    By this point in time, were you aware of the interim

10 review that had been started by Karen Whalen as she testified

11 yesterday regarding the bottoms up review of the Sales

12 Training Group?

13 A    Yes, absolutely.  She had mentioned that it was going

14 well.  She had said, I think there was savings of a couple

15 million dollars, and I forget the number of people on the

16 restructuring of our training group.

17 Q    Okay.  Mr. Charron, did you hire Steve Barger?

18 A    I did not.

19 Q    Did you supervise or control his activities when he was

20 the SVP of the Sales Training Group?

21 A    Did not.

22 Q    Did you set Mr. Barger's compensation?

23 A    Did not.

24 Q    Did you keep files and records on Mr. Barger?

25 A    I did not.

1    Q    What exactly was that program?

2    A    Our CEO came to me and said that, you know, we had a very

3    valuable member of our team, or former CEO named Ed Labry.  He

4    said that, you know, Ed Labry is going to be at some point

5    leaving the organization, and that, you know, I should put

6    together a program, whereas Ed Labry would go out to all of

7    our locations in our facilities and talk to our people about

8    products, services, our history.

9          Mr. Labry had spent most of his career, more than 30

10   years, in the industry.  So it was a way of passing on his

11   knowledge and his information to our work force at large.

12   Q    So that wasn't just sales?

13   A    No.  No.

14   Q    Okay.  It was the company as a whole?

15   A    That's correct.  Products, services, our competitors.

16   Q    And what was Mr. Barger's participation in that program?

17   A    Yeah.  So we had a created a terrific one-day program,

18   and Mr. Barger we included in that program to speak to our

19   people about genuine concern, taking care of our clients in a

20   good way.  And, you know, he was -- that's where I got to know

21   Mr. Barger.

22   Q    And you guys spoke a lot during the time off and traveled

23   together?

24   A    Yes, sir.

25   Q    Did you ever ask Mr. Barger for advice as to how you

1  A    Yes.

2  Q    You and Mr. Plumeri flew by jet down to Atlanta to see

3  Mr. Barger; is that correct?

4  A    You know, let's be clear that Mr. Plumeri decided that he

5  wanted to go down and see our good friend Mr. Barger.  He

6  chartered a jet, and he asked me if I would like to join on

7  that visit.  So let's be very clear, for the record, I did not

8  initiate that visit.  Mr. Plumeri initiated it.  When he asked

9  me to go, I said, of course.  Of course, I would like to go

10  down and see Steve, with the sole intention of cheering up our

11  good friend.

12  Q    How long were you at his home?

13  A    Several hours.

14  Q    Describe what his condition was that day?

15  A    You know, really, really bad.

16  Q    In what way?  Could he -- he couldn't speak, could he?

17  A    No.  And he could barely walk.  He couldn't walk without

18  help and getting him over to a chair.  And he had a white

19  board, and that's how we spent our time.

20  Q    From that visit until this litigation started, did you

21  see Mr. Barger again in person?

22  A    From that visit to our litigation?  No.  No.  Mr. Barger

23  worked out of Atlanta, I work out of New York.

24  Q    I want to go to Exhibit 35.

25          THE COURT:  35 will be in evidence at this time.

1          (Plaintiff Exhibit 35 received in evidence.)

2   Q    This is a little hard to read so I will try to increase

3   it.

4          Do you recognize this document?

5   A    Yes.  This is a text message exchange between me and

6   Mr. Barger.

7   Q    And that's your phone number there at the top?

8   A    Correct.

9   Q    And by looking at it, you're the blue -- you're blue and

10  Mr. Barger is the gray, correct?

11  A    No.

12  Q    Backwards.  You're gray, Tony Marino is gray, and

13  Mr. Barger is blue?

14  A    Correct.

15  Q    Okay.  I want to go down to November 19, right here.

16  A    Yes.

17  Q    It is at 7:55 a.m. on November 19.

18          Why did you send this text message?

19  A    So, several reasons.  One is that there's an earlier text

20  message on November 8 where -- it is not on the screen here,

21  but on November 8 Mr. Barger sent me a text message saying

22  that he was going to be going into having another surgery for

23  six days, and he was going to need full recovery for four

24  weeks.  So there's a November 8 text message that precedes

25  this that we should show the jury.

1  Q    I don't believe I've seen that.  I think there's a

2  message that comes after November 19 to that effect that I

3  will --

4  A    No.  There was a message after I visited -- after Joe and

5  I visited Steve, and Steve sent a text message saying that,

6  you know, great visit, and, by the way, Tony, I'm going to

7  need another surgery where I need six days of surgery and four

8  full weeks of recovery.

9         MR. ZEITLIN:  Move to strike that answer as

10 nonresponsive.  He's trying to ask him questions about this

11 exhibit.

12        MR. DiLORENZO:  Your Honor, it is the message on the

13 top of the exhibit.

14        THE COURT:  He answered it.

15        Go ahead.  Next question.

16 Q    Who told -- who did you work with to decide to send this

17 message?

18 A    So, again, I am trying to give you the full context.  You

19 are asking me why I would have sent this message, and I am

20 saying that for the full context, you have to understand that

21 Mr. Barger sent me a message saying that he was going to need

22 to be out for four weeks, and on top of that, Mr. Shearer, at

23 the same time we were getting several messages from my team,

24 indicating that Mr. Barger was behaving erratically and they

25 were very concerned.  We had several employees, you know,

1  express concern.  And, you know, it was my best judgment for

2  somebody I cared about dearly, that, you know, given that he's

3  going to need to be on recovery for four straight weeks, that

4  at this point in time, that the best thing for him and his

5  family would be to be on our leave programs.

6  Q    I want to -- you brought up these employees with these

7  complaints.  Let's -- what -- you are the chief human

8  resources officer.  What are the policies and procedures

9  inside of HR for recording and documenting when an employee

10 makes a complaint like that?

11 A    You know, we got to keep in context the fact that Steve

12 was -- is mentioned.  We went to see him on November 8.  He

13 wasn't able to come to work.  He was doing this from his

14 house --

15 Q    That's not what I asked.

16       MR. ZEITLIN:  Move to strike as nonresponsive.  He

17 asked him what the procedure is.

18       MR. DiLORENZO:  Your Honor, first of all, they are

19 talking about two different complaints.

20       THE COURT:  Yeah.  Go ahead.  We will strike that.

21 It is not responsive.

22       MR. DiLORENZO:  He's not talking about --

23       THE COURT:  Ask another question.

24 Q    Are there any written documents showing that those

25 complaints were lodged?

1  A    Yes.  I have messages from my team, you know, indicating

2  in e-mails that -- you know, in fact, I think we heard

3  Ms. Rhonda Johnson talk about it yesterday, as well as

4  Karen --

5          THE COURT:  Are there any responsive documents that

6  you have?  That's the question.

7  Q    Were those documents produced during discovery?

8  A    I think we had e-mails that are -- were in our documents

9  that show that Rhonda Johnson and Karen Whalen had sent

10 e-mails to me that these things were occurring, and they were

11 very concerned.

12 Q    So describing particular instances, there are e-mails

13 describing particular instances?

14 A    I don't know if they are describing particular instances

15 in the e-mail, but in further follow up with each of them.

16 I'd be happy to go into detail of each and every one of them.

17 Q    No, I just haven't seen documents detailing any of them.

18 A    Okay.

19 Q    Mr. Barger responds fairly promptly to your e-mail

20 telling him -- your text message, telling him that he's

21 being -- he must begin to -- he must begin leave.

22          He says, you're removing me from my job and I am

23 fired.

24          And can you read your response back to him?

25 A    I said, no, not fired.  Like any employee, required to

1    move to short-term disability until your doctor releases you

2    medically to return to work.  When you return, your full

3    salary is restored and you will be given a comparable job.  We

4    have held off as long as we could.

5    Q    All right.  So at this point you are telling him, get

6    well, come back, and you will be restored?

7    A    That's right.

8    Q    Did that happen?

9    A    No.

10   Q    Then Mr. Barger asks about his salary and bonus, and then

11   there's a discussion of short-term disability and long-term

12   disability.  And short-term disability is paid by First Data,

13   correct?

14   A    Correct.

15   Q    And long-term disability is paid by your insurer MetLife,

16   correct?

17   A    Correct.

18   Q    And then Mr. Barger asks here, the same day, he asks,

19   that means he can't go to work and can't have meetings.

20        And this is where you tell him, no, you must -- this

21   means you should shut down for a little while, you will fully

22   concentrate on getting strong and be back soon, correct?

23   A    Correct.

24   Q    Then you direct that Mr. Barger -- the next day, back at

25   work, because I believe the 19th was a Saturday.  The next

1  day, back at work, you directed that Mr. Barger's access to

2  First Data's systems be cut, his e-mail, his Good app, his

3  access to the intranet; is that right?

4  A    Yes.  Because we wanted to Mr. Barger to concentrate

5  fully on getting better, not worrying about the burdens of

6  First Data or any other company, but spending all of his time

7  with his family and spending all of his time getting better.

8          MR. ZEITLIN:  Move to strike anything after "yes."

9  It was a yes, no question.

10         THE COURT:  Overruled.  He answered the question.

11  Go ahead.  Next question.

12         MR. DiLORENZO:  Your Honor, are there two attorneys

13  handling this witness?  One's questioning him, the other is

14  making objections to his answers.

15         THE COURT:  He can do it.  It is okay.

16         All right.  Next question.

17  Q    Were you thinking, when you placed Robin Ording into --

18  to take the interim position, did you -- did HR begin to take

19  over that role and take it away from Mr. Charron?

20  A    No.  At that point, we just needed to have an interim

21  leader who could attend to the day-to-day needs of the staff

22  while Mr. Barger was recovering.

23  Q    When Mr. Barger asked you this question about having

24  meetings, were you aware that Mr. Barger was communicating

25  with his team during October and November of 2016?

1  A    Yes, I think in general I remember hearing that, you

2  know, he was -- again, not my definition of going to work,

3  but, you know, I believe I heard that he had some e-mails and

4  so forth.

5  Q    And why did you cut off his access?

6  A    So he could concentrate fully on getting better.  So he

7  could take care of himself.  We all have a job that causes all

8  of us, I am sure, a certain degree of stress.  Not having to

9  worry about that, Mr. Shearer, and being able to concentrate

10 fully on our health and our family --

11          THE COURT:  Just answer the question.  You cut off

12 his e-mail for his benefit, is your answer?

13          THE WITNESS:  Correct.

14          THE COURT:  So he can concentrate on getting better

15 and not be distracted by business.  That's your answer?

16          THE WITNESS:  Correct.

17          THE COURT:  Next question.

18 Q    But you said in your deposition that work is Mr. Barger's

19 life, correct?

20 A    I don't know that I said that, but I know that Mr. Barger

21 cared a lot about his work.

22          THE COURT:  All right.  Next question.

23 Q    Exhibit 36.

24          THE COURT:  That's going to be in evidence now.

25          (Plaintiff Exhibit 36 received in evidence.)

1          THE COURT:  It is in evidence.

2          (Defense Exhibit 182 received in evidence.)

3   Q    I would like you to take a look at -- I think it is

4   marked -- must be double-sided.  It is marked as page 3.

5          Now, just to be clear about a couple of things.  At

6   the point in time when this assignment was made to Robert --

7   sorry, Robin Ording, to -- I think your testimony was that on

8   an interim basis she would manage the sales training group; do

9   you remember that testimony?

10  A    Yes.

11  Q    And there was testimony about, well, why wasn't his --

12  you were asked some questions, why didn't she cut his pay

13  down, because you were going to have somebody else do this

14  work.

15         Was Robin Ording given any more money to run the

16  sales group?

17  A    No.

18  Q    So the cost of us having Robin as an interim manager was

19  zero in terms of compensation and benefits?

20  A    Correct.

21  Q    She had another full-time job as HR director?

22  A    Yes.  No, I'm sorry.  It was vice president of training

23  and development.

24  Q    Vice president of training.

25         And is the box at the top, is this an organizational

1  chart of the sales group?

2  A    Yes.

3  Q    And was this taken from the sales transformation review?

4  A    Yes, sir.

5  Q    And this was the one done by Pat Hadler that we've heard

6  about?

7  A    Yes.

8  Q    So right off the top of her report -- and she did issue a

9  report, right, in January 2017?

10  A    Yes.

11  Q    The top of the report talks about this organizational

12  chart, right?

13  A    Correct.

14  Q    And this is what the structure looked like when Pat

15  Hadler looked at it, right?

16  A    Right.

17  Q    And it shows a VP of sales at the top, do you see that,

18  sales transformation?

19  A    Right.

20  Q    And that's Robin is in that spot as a VP?

21  A    She's in that spot as a VP.

22  Q    It doesn't show a senior vice president on the top, does

23  it?

24  A    No.

25  Q    But that's, at the time, really where it was because

1  Mr. Barger was the senior vice president, right?

2  A    Correct.

3  Q    And across the next layer, right, the layer of

4  management, are five directors, right?

5  A    Right.

6  Q    Justin Stamey?

7  A    Yes.

8  Q    There's an open position, there's Patty Stilwell, Julie

9  Kelly and Lorraine Deschamps, right?

10  A    Right.

11  Q    Five directors.  And then I haven't counted the people,

12  but it's roughly, I think we've heard testimony, somewhere

13  between 50 and 67 or something like that, right?

14  A    Yes.

15  Q    And this group now, the sales training group is now, as

16  part of this reorganization, was put under the training that's

17  in human resources, right?

18  A    Yes.  Corporate training.

19  Q    Corporate training, right?  There was a corporate

20  training group in existence at the time?

21  A    Yes.

22  Q    And that covered training of new employees, developmental

23  training for different jobs, orientation, is that --

24  A    Leadership training, yes.

25  Q    Management training?

1    A    Correct.

2    Q    Sexual harassment training?

3    A    Yes.

4    Q    And in these large organizations that you testified about

5    that you've been in, four or five times you've been chief

6    human resources office?

7    A    Yes.

8    Q    Some of those have been two or three hundred thousand

9    employee organizations?

10   A    Correct.

11   Q    Did you have training, development, management,

12   development and training under the HR functions in those

13   companies?

14   A    For more than 20 years, I have had training and

15   development.

16   Q    Is that a function that's normally under human resources?

17   A    Yes.

18   Q    And after this reorganization, was this combined with

19   corporate training under human resources?

20   A    Yes.

21   Q    Do you know for a fact how the online training -- do you

22   know whether the sales transformation people were working on

23   developing online training under Mr. Barger?

24   A    No.

25   Q    Do you know anything about that?

1  A    No.

2  Q    Do you know what happened after it was moved to HR?

3  A    Yes.

4  Q    What happened after they moved to HR?

5  A    Ms. Ording was assuming those responsibilities and

6  ultimately this group of 60 became 18.

7  Q    The sales training people were reduced down to 18 people?

8  A    Right.

9  Q    And this director, Justin Stamey, is he the one that runs

10 it?

11 A    Yes, sir.

12 Q    And what level is he at?

13 A    Director.

14 Q    And is -- no more questions.

15 A    His comp's at about 150 total, just as an example.

16 Q    That include his bonus?

17 A    Yes.

18 Q    Now, in this report, was there a list on a recommendation

19 as to the changes that should be made in this group?

20 A    Yes.

21 Q    Is this one of the three lists you were saying were

22 developed before January 10?

23 A    Yes.

24 Q    I'd like you to take a look at page 39 of that document.

25           MR. ZEITLIN:  What exhibit number is it?

1          THE COURT:  And you know this is the third list that
2     was generated by this woman, as you have explained the
3     process, right?
4          THE WITNESS:  Correct.
5          THE COURT:  I will allow it in evidence.
6          MR. DiLORENZO:  Thank you, your Honor.
7          (Defense Exhibit D-273 received in evidence.)
8     Q    And, Mr. Marino, do you have -- is one of the entries on
9     these lists the date that the person is put on the list?
10    A    Yes.
11    Q    And can everybody see this?  Can you see the list okay,
12    Mr. Marino?
13    A    Yes.
14    Q    Would you take a look at the 10th.  You see a number of
15    redactions, those are other people's names; is that correct --
16    A    Correct.
17    Q    -- that we have taken off the document?
18    A    Right.
19    Q    Would you take a look at entry number 10?
20    A    Yes.
21    Q    And who's name is there?
22    A    Steve Barger.
23    Q    And the first column says date added to the file; you see
24    that?
25    A    Yes.

1  Q    And what's the date for him being added to the file?

2  A    11-30-16.

3  Q    Are there other people below him that were added on that

4  same day?

5  A    Yes.  Three of them.

6  Q    That says --

7  A    Four.

8  Q    It says submitted by Tony.  Is that you?

9  A    Yes.

10 Q    And you also submitted other people that day?

11 A    Correct.

12 Q    His salary is listed?

13 A    Yes.

14 Q    Notification timeline, it says no date?

15 A    Correct.

16          THE COURT:  So just clarify for me, so I have a

17 clear sense of the timeline, this list was prepared when?

18          THE WITNESS:  This would have been -- information

19 would have been relayed to me on or around 11-30, and then I

20 would have called Ms. Benhardt.  And in this case I remember

21 specifically that Jeff Hack was working on his efficiencies

22 and his reductions, and, you know, he said, you know, we

23 should add Steve to the list.

24          THE COURT:  All right.  So we know what the other

25 time aspects are.  I am not going to comment.  Anything else

1   you wanted --

2          MR. DiLORENZO:  Just a couple more quick, your

3   Honor.

4   Q    So, Mr. Marino, you identified a -- you were asked about

5   a text message you sent to Mr. Barger when he was right in the

6   middle of his medical issues, where you said -- when he asked

7   if this means he's going to be fired, and you said, your

8   salary will be restored after you come back to work, you would

9   be offered another position.  Do you remember that testimony?

10  A    Yes.

11  Q    At that time, did you know that the company was going to

12  engage in a ten percent reduction of the top 3,000 highly

13  compensated individuals?

14  A    I did not.

15  Q    And when did you find that out; do you remember?

16  A    January 2.

17  Q    I want to show you Defense Exhibit 196.

18         THE COURT:  So you didn't know about the spreadsheet

19  until January 2; is that your testimony?

20         THE WITNESS:  That wasn't the question.

21         THE COURT:  When did you know about the spreadsheet?

22         THE WITNESS:  No, he's saying, when did I know about

23  the --

24         THE COURT:  No, but I am asking you, when did you

25  know about the spreadsheet?

1    THE WITNESS:  The one --

2    THE COURT:  That he was just --

3    THE WITNESS:  -- that we just saw?

4    THE COURT:  That's the November?

5    THE WITNESS:  Yes.

6    THE COURT:  Did you know it at that time?

7    THE WITNESS:  Yes.

8    THE COURT:  Okay.  Next question.

9 Q   And that text message was much earlier than November,

10 correct?

11 A   Correct.

12 Q   So Defense Exhibit 196, do you see this e-mail chain?  It

13 is double-sided copy.  So down at the bottom is an e-mail from

14 you to a number of people.  Do you see that?

15    THE COURT:  196 is in evidence at this time.

16    (Defense Exhibit 196 received in evidence.)

17 Q   Do you see that e-mail down at the bottom?

18 A   Yes.

19 Q   Okay.  I am going to turn the page over because I believe

20 the body of the e-mail is on this side.

21 A   Right.

22 Q   And this is an e-mail you sent to your team?

23 A   Right.

24 Q   It says:  Today FJB decided to reduce ten percent of the

25 head count in the top 3,000.  Not all MC members have been

1   notified, but soon will via a file.  I will send the copying

2   yourselves.  The work will be due to Himanshu on Sunday night.

3   I will have Fuji get us time tonight to discuss.  Thanks, all.

4           Now, do you remember what day of the week January

5   2nd was?

6   A    Monday.

7   Q    And that was the day after the new year holiday?

8   A    Yes.

9   Q    Did all the MC members attend that meeting?

10  A    No.

11  Q    Was that what you meant by not all MC members know?

12  A    Yes.

13  Q    And then this -- these other e-mails ensued in terms of

14  timing; is that right?

15  A    That's right.

16  Q    Now, you were asked some questions about the management

17  of this group, the sales training group.  And you were asked

18  some questions about the hires after his arrival and so on.

19          Do you see these attrition rates that were found

20  during the study?  This is already in evidence, I believe,

21  Defense Exhibit 208.

22          THE COURT:  208 is not in evidence.

23          MR. DiLORENZO:  Oh, it's not?  I'm sorry, your

24  Honor.  I am going to offer 208 into evidence.

25          THE COURT:  All right.  In evidence.

1      MR. DILORENZO:  I don't think we put Defendant's

2  Exhibit 283 into evidence, your Honor.  Housekeeping.  We

3  offer 283, the photograph.

4      THE COURT:  283.  283.

5      MR. DILORENZO:  Yes, the photograph.

6      THE COURT:  So that will be in evidence now.

7      MR. DILORENZO:  Thank you.

8      (Defendant's Exhibit 283 was marked in evidence as

9  of this date.)

10  EXAMINATION BY

11  MR. DILORENZO:

12  (Continuing.)

13  Q    In your opinion, with respect to this RIF being involved

14  in it, the reasons for it, how it was done, and why it was

15  done, would Mr. Barger have been treated any differently if he

16  had never gone on leave?

17  A    No.

18  Q    Was he put on the RIF list because he had cancer?

19  A    No.

20  Q    Because he was disabled?

21  A    No.

22  Q    Was he put on it because he had gone out on leave?

23  A    No.

24  Q    Was he put on it because he tried to return to work?

25  A    No.

1   Q    You mentioned that you have a leave department that

2   handles about a thousand leaves at any one time; is that

3   right?

4   A    Correct.

5   Q    And there's a separate department because there's so much

6   paperwork involved, technicality with the dates, and so on --

7   doctor's notes, insurance -- is that why there is a separate

8   department?

9   A    Yes.

10  Q    And how about accommodations?  How many people do we have

11  on accommodations at any time?

12  A    At that time, a hundred.

13  Q    Now, all the text messages, e-mails, conversations you

14  had with Mr. Barger throughout his illness and disability, did

15  he ever once ask you for an accomodation?

16  A    No.

17  Q    There's been some testimony about fraud and falsifying

18  expenses.

19        Do you have any familiarity, in your experience at

20  First Data Corporation, with what happens with an employee who

21  takes money from the company that they're not entitled to?

22  A    We do an investigation and if they're found to have

23  committed those violations they are to be terminated.

24        MR. DILORENZO:  Your Honor, could I have just a

25  second.

1    else is going to take it over, that's exactly what happened,

2    that his job wasn't eliminated?

3    A    No, his job was eliminated.  Ms. Ording is a vice

4    president making roughly half of what Mr. Barger was earning.

5    And Ms. Ording had additional responsibilities beyond what,

6    you know, Mr. Barger had.

7    Q    So you were going to transfer this in November.  You're

8    going to transfer it to another senior vice president that was

9    the plan?

10   A    No.  I didn't say that.

11   Q    Well, it says it's going to be backfilled?

12   A    I said that backfill --

13          MR. EIDELMAN:  Your Honor, asked and answered three

14   times.

15          THE COURT:  He answered the question what he meant

16   by backfill.

17          Go on to something else.

18   Q    I'm going to go to Column AB over here.  It's the first

19   blue one.  And the column title is "Severance Weeks."

20          It says the plan was to offer Mr. Barger 20 weeks of

21   severance, is that what that means?

22   A    That's what, you know, the calculation could be correct.

23   Q    When you finally did terminate Mr. Barger, what did you

24   offer in terms of weeks of pay for severance?

25          MR. DILORENZO:  Your Honor, I'm going to object.

1      COURTROOM DEPUTY:  Thank you.

2      THE COURT:  So, Mr. Bisignano, you've been here all

3   the time so you understand.  Keep your voice up and speak

4   clearly and your witness at this time, Mr. Shearer.

5      MR. SHEARER:  Thank you.

6   DIRECT EXAMINATION

7   BY MR. SHEARER:

8   Q    Good morning, Mr. Bisignano.

9      I guess we'll start.  What was your role at

10  First Data from 2013 through 2017?

11  A    I was first a CEO and a board of director, a member of

12  the board, and I became chairman of the board and CEO, chief

13  executive officer.

14      THE COURT:  Mr. Plumeri followed you or which --

15      THE WITNESS:  I brought Mr. Plumeri in.  He was vice

16  chairman of the board and he worked for me.  He was a CEO

17  previously.

18      THE COURT:  Before.

19      THE WITNESS:  In a different company.

20      THE COURT:  I thought he was CEO of this company.

21      THE WITNESS:  He was never CEO here.

22      THE COURT:  You're the CEO.

23      THE WITNESS:  I brought him in to work with me.

24      THE COURT:  We have the big cheese here.

25      THE WITNESS:  I worked in the cheese store.

1    on to something a little bit more focussed in terms of this

2    lawsuit.

3    Q    When we were talking about this reduction of the ten

4    percent of the top 3,000, we've seen evidence that indicates

5    that on January 6, 2017, you issued the directive to the -- to

6    Mr. Marino to get ready to execute on that; is that correct?

7              THE COURT:  Were you involved with that?  You knew

8    about that?

9              THE WITNESS:  Yes.  I had thought there was too much

10   management in the company relative to everything else we were

11   doing, and I made a decision that I wanted the high paid

12   people, you know, to be completely looked at, yes.

13             THE COURT:  It was your call, part of the --

14             THE WITNESS:  A hundred percent.

15             THE COURT:  -- saving the company, you felt you

16   needed this restructuring, and it was your decision --

17             THE WITNESS:  Yes, sir.

18             THE COURT:  -- to cut down the staff?

19             THE WITNESS:  Yes, sir.

20             THE COURT:  Okay.  Next question.

21   Q    How many employees were there at First Data at the end of

22   2016, do you know?

23   A    End of -- I don't know, in the -- you know, somewhere

24   between 22 and 25,000.  I don't know.

25   Q    And how many were there --

1          Was your understanding that -- you were given stock
2  options as part of your initial employment; is that correct?
3  A    Yes.
4  Q    And did those vest over a period of time?
5  A    Yeah, I don't know exactly the rate.  I thought maybe it
6  was 20 percent per year, I'm not really certain on that.
7  Q    But you didn't view your First Data time as a short-term
8  gig, did you?
9  A    No.  The times that Joe and I'd been together, we know
10 that culture change is a long-term goal.
11 Q    About how long when you implement these programs does it
12 take to fully implement it through the corporation?
13 A    If you take Primerica where we were, it probably took
14 seven years to make them where they are today as a viable
15 company.
16 Q    Did Joe Plumeri ever complete a performance review for
17 you?
18 A    I've never had a performance review in my entire life.
19 Q    And so Jeff Hack didn't do one either?
20 A    Never.
21 Q    You did what's called a 360 degree performance review?
22 A    I did in 20, I think it was 15, January, yeah.  Yes.
23 Q    So did you voluntarily have yourself reviewed?
24 A    Every year and most of my career I have always wanted to
25 know what my employees thought of me.  I did it as a teacher

1  and a coach, and I always have, and so this time I requested

2  the HR department actually put -- they have their program

3  called 360 review, where they have your direct reports and

4  your senior manager rates you in several categories, and I

5  asked them to do that for me.

6  Q    And what were the results?

7  A    Better than I rated myself.  I think, I don't know, the

8  average may be, on a scale of 5, was like 4.5.

9         MR. SHEARER:  Okay.  Your Honor, I would like to

10  enter, that's the Plaintiff's Exhibit 23, is the 360 degree

11  review of Mr. Barger.

12         THE COURT:  All right.  23, no objection, is in

13  evidence at this time.

14         (Plaintiff Exhibit 23 received in evidence.)

15  Q    What -- how do you -- what is the process for changing a

16  culture?  What ideas do you have that you implement?

17  A    At the end of the day, in virtually every company I've

18  ever worked with, the same fundamental principles apply.  It

19  is all based on a program I wrote years called, It is Nobody's

20  Business But Yours.  And the concept is very simple for

21  virtually everybody in the company, that you must accept

22  responsibility for your daily actions, what's goes on in your

23  business, you have a lot of different things, and you must be

24  responsible for, especially on the sales side or the servicing

25  side, you must be responsible for the relationship that you

1   I was told get a doctor's letter approving you to come back.

2   And I thought that was the green light for my return.

3   Q    So did you use any sick days or vacation days while you

4   were in the hospital or working from home?

5   A    I know that I did.  How that happened, I'm not quite

6   sure.  But somewhere in the mix of all this I think that is

7   what the protocol is before you get placed on short-term, and

8   you use sick days and days of leave and whatever.  There's

9   detail behind that that I'm not quite totally familiar with,

10  but we maximized it, yes.

11  Q    And when you got back to your home, you went to see

12  Dr. Baddour, and he sent you to the hospital, is that correct,

13  for pneumonia?

14  A    This is really -- I'm not too proud of this.  I know that

15  I had pneumonia, and I know I went into the hospital.  And

16  they had me on some medication at that time.  The details

17  around that I don't actually remember, but I had created,

18  because of the fistula problem, some leakage, whatever, and he

19  said I had pneumonia.  So I don't ever remember being in six

20  days, though.  I thought I was in like a day and a half.

21  Q    So when they -- did they tell you they were going to cut

22  off your e-mail, or did it just not work one day?

23  A    I believe either Rhonda or Tony said they were going to

24  discontinue that, you know, with the intent of -- I am sure he

25  was heartfelt about it.  He thought he should.

1      (In open court; 4:27 p.m.)

2      THE COURT:  So let's talk a little about a few

3  things while we have the luxury of time to do so.

4      So what we try to do in preparing the charge is to

5  sort of not to get the jurors to want to commit suicide and

6  bedazzle them with an a lot of language and stuff like that.

7  So we can cut to the chase and present it to the folks in a

8  simple way we try to do that.

9      So at the start of the last thing you have "After

10  Acquired Evidence Defense."  I learned something new, there's

11  such a defense.  I guess you're entitled to assert it.  But I

12  don't see a lot of evidence here and sort of dirties the

13  plaintiff.  Do you really want to do that.

14      MR. EIDELMAN:  Your Honor, with due respect.

15      THE COURT:  You don't have to say "due respect"

16  here.

17      MR. EIDELMAN:  Thank you.  I have not had a case in

18  my entire career where there is such clear-cut evidence that

19  is after acquired evidence.  Ordinarily, the after acquired

20  evidence you see in this case.

21      THE COURT:  What is it here?

22      MR. EIDELMAN:  Here is the following.

23      THE COURT:  Yes, he committed some fraud.

24      MR. EIDELMAN:  His independent contractor agreement

25  provides about how he's permitted to bill and it started on

1 March 17th and it went for three and a half months.  There's

2 an invoice on February 26th for the time period beforehand and

3 we haven't got there yet, but in his deposition testimony he

4 testified that that must have been for the preparation

5 activities that I had before I became a consultant but you

6 need to go Joe Plumeri about that.  Joe Plumeri testified that

7 under oath under no circumstances did he know about it nor

8 would he have approved it and I think he said it's unheard of.

9      THE COURT:  I guess you're entitled to have to, but

10 it's a matter of lawyer strategy and I can't tell you how to

11 practice the profession.  But this guy is a tremendously

12 sympathetic plaintiff, obviously, because of his condition.

13 And now you're going to dirty him by claiming that he's a

14 fraud and doing all sorts of bad things.  If you want to do

15 it, fine.  I don't know that I would like that same decision

16 if you hired me an associate and we were talking about it, but

17 I'll let you do it if you want.

18      That's the first thing I want you to think about.

19 All right.

20      MR. EIDELMAN:  Okay.

21      THE COURT:  I don't know whether if I was part of

22 your firm whether I would be in lock step with you but what do

23 I know.  Okay.  So think about that.  I think you probably

24 have enough here.  I think it's kind of a screwy type

25 affirmative defense.  I didn't write the law, I just apply it.

1          Now, let's look at what we can do it pare this down.

2   An awful a lot of the jury charge, the length of it and the

3   complexity of it is because you insist, Mr. Shearer, of having

4   all these defendants in the case.  If it was just the ADA

5   claim against the corporation you know it could be a pretty

6   clear cut, you know, type of charge to the jury.

7          So here we have to establish with each one of these

8   people whether they have the requisite type of control and

9   those various factors that we have to consider.  If you want

10  it, I'll do it.  But it's going to make this a more lengthy

11  charge than maybe the jury is going to tolerate in terms of

12  being able to absorb it all and deal with it.

13         So I just wanted to give you some broad strokes here

14  to think about.  And you may want to reconsider whether you

15  want to have these individual defendants in and if so I guess

16  you're entitled to have them I assume.  But let me see whether

17  I have this down right your claims against all the defendants

18  are listed in your FMLA proposed jury instruction No. 5 as

19  follows.  Interfering with his right to reinstatement

20  following his leave and also for retaliating against him for

21  seeking to return to work.

22         So let's break it down.  Where is there evidence of

23  retaliation against him for seeking to return to work based

24  upon these individuals and I know you have that claim under

25  the ADA against the corporation.  But what did these people

1    do?  How did they retaliate?  Each of them against when he

2    wanted to come back to work?  He got four, five of these

3    individual defendants.

4            MR. SHEARER:  How did they retaliate against him?  I

5    have a lot of the retaliation and pretext is still to be read

6    in the depositions, but the argument is, and I think there is

7    evidence, that while he was out on leave, he was on insurance

8    payments and that he was zero cost.  And it was because he was

9    returning that put him into the RIF because he now was a save

10   when they start calculating the saves in the RIF it's because

11   he now is going to have a salary and they get to claim that

12   because he's now gone he would be.

13           THE COURT:  More costly to have him come back?

14           MR. SHEARER:  Yeah.  If he'd stayed out on leash

15   collecting the long-term disability, he would have been zero

16   cost and they wouldn't have done anything.

17           THE COURT:  You have five defendants.  How were they

18   all implicated in this terrible misdeed?

19           MR. SHEARER:  Well, I think Mr. Bisignano ordered

20   the cutting of the ten percent.  And that he's -- it's not

21   retaliation that's a sign of him being an employer.

22   Mr. Marino made the decision to force him on the leave.

23   Ms. Johnson instigated it.

24           THE COURT:  How is he forced to take the leave?  You

25   have a claim here that he was compelled to take the leave.

1   Where is that.

2        MR. SHEARER:  I think that, yeah, because Mr. Marino

3   texted him and sent him a letter that says it's time to put

4   you on leave.  Mr. Barger never asked to go on leave

5   Mr. Marino made him.

6        THE COURT:  Well, he was going to continue to work

7   while he had the conscience operation.

8        MR. SHEARER:  Well, yeah, he continued to work while

9   he was in the hospital.  He continued to work at his home.  He

10  worked remotely.  And he was well --

11       THE COURT:  He did go in for his operation.

12       MR. SHEARER:  Yes.

13       THE COURT:  He wasn't forced to do that by any of

14  these people?

15       MR. SHEARER:  No.

16       THE COURT:  All right.

17       MR. SHEARER:  But he received full pay up until

18  November 19th and he was having meetings, he was conducting

19  his business.

20       THE COURT:  From the hospital?

21       MR. SHEARER:  Yes.

22       THE COURT:  Right.

23       MR. SHEARER:  That's what Ms. Kelly talked about

24  today and she talked about his technological set-up and how he

25  was working from his home, how he was participating in

1  meetings, how there were video conferences, how he was

2  texting.

3        THE COURT:  So your theory is that they should not

4  have been anything to interfere with the fact that he was

5  performing his duties albeit under the stressful medical

6  conditions.

7        MR. SHEARER:  Yes, I think if they had a problem

8  with the way he was performing, they should have told him

9  there was no evidence they ever told him.  There was no

10  write-ups there's no performance reports.

11        THE COURT:  I don't know somebody is undergoing this

12  severe type of operation there's a recovery period and you're

13  saying that he should be allowed to continue with his duties

14  under those circumstances.  I don't understand that.

15        MR. SHEARER:  What I'm saying is the right move by

16  an employer would be to talk to him and say, you know, there's

17  some issues, you're not getting work done there are problems,

18  we have the leave program available.  But if you don't take it

19  and you continue like this we're going to have to terminate

20  you because you're not performing your job.  That's the right

21  thing to do instead of taking someone and force the them onto

22  unpaid status.

23        THE COURT:  How did they force him on to be unpaid

24  status?  I guess it's true, they did change his status.  What

25  do you say about that, Mr. Eidelman?

1  MR. EIDELMAN:  I said your Honor he's not unpaid.

2  Plaintiff's Exhibit 99 which he just admitted at the end of

3  his evidence goes to show Mr. Barger has payroll status on the

4  books and records of the company.

5  THE COURT:  Did that change until when?

6  MR. EIDELMAN:  It didn't change.  He got paid his

7  salary through February 28th $20,000 a month.

8  THE COURT:  Yes.  It's in the records.  It's in your

9  records.

10  What happened after that?

11  MR. EIDELMAN:  After that, that was the effective

12  date of his separation, 2/28.

13  THE COURT:  And his separation.

14  MR. DILORENZO:  Is the FMLA.

15  MR. EIDELMAN:  The separation is after February 28th

16  was his last date of employment.  By that point in time,

17  Mr. Barger had already submitted.

18  THE COURT:  Why was that his last date of

19  employment.

20  MR. EIDELMAN:  Because that was the date he was told

21  on January 13th that he would be on working notice until then

22  and that was the separation date.  Remember this was part of

23  the 362 people who were left go.

24  THE COURT:  That was when the so-called

25  reorganization or restructuring was to take place.

1        MR. EIDELMAN:  And that was his last effective date.

2        THE COURT:  So until then he was paid his full

3    salary.

4        MR. EIDELMAN:  He was paid yes, your Honor.

5        THE COURT:  Just one second.

6        MR. EIDELMAN:  Is that not right, Mr. Shearer?

7        THE COURT:  So what you do you say about that.

8        MR. SHEARER:  He's talking from the day he was

9    notified that he was terminated to the date that he was

10   actually no longer an employee, yes, he did get full pay here

11   there.  But from the time he was forced on to leave on

12   November 19th to the time that he was notified, he was on FMLA

13   leave forced to seek short-term disability.

14       THE COURT:  How long a period of time was that?

15       MR. EIDELMAN:  If I may here, Judge, before we get

16   there.  On 11/30, 11/30/2016 which covered the period from

17   11/16 to 11/30 he was paid $20,000.  That was his

18   biweekly -- by monthly salary.  On 12/15 -- on 12/15 excuse me

19   he got the $174,000 bonus.  On 12/15, for the period 12/1

20   through 12/15, it dropped down at that point in time to 10,460

21   because there was an adjustment.  But then for the period

22   12/16 to 12/31 it jumped up to close to 23,000 to take care of

23   that adjustment.  On the next pay period, which was from 1/16

24   to 1/31, it jumped back up to 22,000 to cover that other

25   period.  And then we have the last one from 2/1/2017 to

1  2/15/2017.

2  THE COURT:  They say factually there's no basis for

3  the claim that his salaries were curtailed.

4  MR. EIDELMAN:  Or that he was unpaid.

5  THE COURT:  Okay.  Well, you have a different view

6  of the record.

7  MR. SHEARER:  Yeah, I do.

8  THE COURT:  Why don't we do this.  Okay.  Think

9  about that, okay?  Because I'm trying to present to the jurors

10  what your best arguments are and if, in fact, that is fact

11  actual correct to may not put you in the best right in front

12  of the jury you think about that, okay, let's move on now.

13  You think that there's a claim for interfering with

14  his right to choose when it take leave by force him to take

15  leave against his will but if he was continued his payment

16  continued how then was he forced to take leave against his

17  will.

18  MR. SHEARER:  They cut off his access to work.

19  THE COURT:  Access to work.

20  MR. SHEARER:  He couldn't work.

21  THE COURT:  So there's some testimony with his

22  e-mail account being terminated.  I think somebody testified

23  that they did that out of the kindness or their heart they

24  didn't want to interfere with his ability to recover.  So I

25  guess this is a factual issue.

1      What do you say about that?

2      MR. EIDELMAN:  I say, your Honor, there is no

3  factual issue under the ADA for the following reason.  We were

4  looking at the Court's, your Honor's, ADA instructions which

5  your clerks were kind enough to send to us.  And there's the

6  definition in order to have a claim the ADA, you have to be a

7  qualified individual with a disability.  And actually, and

8  your -- it actually says, it's in your instructions, "The term

9  "qualified individual," as used in these instructions means an

10  individual with a disability, who, with or without reasonable

11  accommodation, can perform the essential functions of the

12  employment position for which the plaintiff applied.  I will

13  now explain to you that's your definition."

14      THE COURT:  But he claims he was able to perform.

15      MR. EIDELMAN:  Exhibit Defendant's Exhibit 154 which

16  is the doctor's certification.

17      THE COURT:  Do you have a chance get sleep at night.

18      MR. EIDELMAN:  I try.

19      THE COURT:  Go ahead.

20      MR. EIDELMAN:  Defendant's Exhibit 154 that was

21  completed by Mr. Barger's doctor, not by First Data, his

22  doctor says he is totally incapacitated and able to work as of

23  October 22nd.  If he's totally incapacitated, unable to work,

24  he can not be a qualified individual under the ADA.

25      THE COURT:  Certain logic to that, Mr. Shearer.

1          MR. SHEARER:  Yeah, but it's inconsistent with the

2    facts.  It's a form, MetLife form, signed by a doctor.  He's

3    not totally incapacitated when he's -- he even went to the

4    office and had a meeting.

5          THE COURT:  Okay.  So we have some factual issues.

6    It seems to me there had to be a period of time he was

7    incapacitated I mean my gosh he went he was operated on.

8          MR. SHEARER:  Yeah, he was, and he started texting

9    the next morning.

10         MR. EIDELMAN:  Number one, this is not an MetLife

11   form.  This is the Department of Labor certification of

12   healthcare provider.

13         THE COURT:  Save it for the jury.  I want to get an

14   idea what your issues are, what your facts are, basically, and

15   see what I can pare down be the charge.

16         MR. EIDELMAN:  One more other thing and there will

17   be in evidence.  Mr. Barger received long-term disability

18   payments.

19         THE COURT:  We know that.

20         MR. EIDELMAN:  So how can he be receive long-term

21   disability payments if he was authorized to return to work as

22   well?  He can't be a qualified individual if he submitted a

23   return to work that says you come back with no restrictions

24   and then he got paid long-term disability.  He can't have it

25   both ways.

1          THE COURT:  What was he going to do here?  He's up

2   against it.  He needs the money, I guess.

3          MR. EIDELMAN:  No, I just proved under Defendant's

4   Exhibit 99 that he was paid the whole time.  You can't

5   get -- talk about double dipping, which he said he didn't try

6   to do.  You can't double dip by getting your payments and then

7   receive long-term disability payments.

8          THE COURT:  I just want to see if I can make this

9   charge a little shorter.  So I think I flushed out your

10  claims, right, Mr. Shearer, and I guess if you still want

11  those four or five defendants.

12         MR. SHEARER:  I will talk to my client.

13         THE COURT:  See what you can do about it.

14         So that will help me how the we'll try to get some

15  draft charge to you and anything else you want to say to me.

16         MR. DILORENZO:  Your Honor, we'd --

17         THE COURT:  This is in effect a charging conference.

18         MR. DILORENZO:  Originally, I'm delighted with the

19  schedule we worked out for the week, but originally we were

20  going to submit new jury instructions by tomorrow and a

21  verdict form, a different verdict form, because, frankly,

22  either we didn't understand the claims or they've changed a

23  little bit.

24         THE COURT:  I haven't prepared a verdict form yet.

25         MR. EIDELMAN:  We'd love to be able to do that, give

1    it to you tomorrow morning.

2          THE COURT:  Look, you can submit whatever you want.

3    I don't want to preclude you from giving whatever you want,

4    but I already have a draft of the charge that I put together.

5    And what I'm going to do is I'm going to look at it carefully

6    tonight because my new law clerk has really done a great job

7    after two weeks of being on the job, right?  He's obviously

8    not suffering from any disabilities whatsoever.  So I'm going

9    to take a good look at it tonight.  I may not give it to you

10   tonight.  If I can, I will send you something, it will be a

11   draft for you to chew on.

12         But certainly, by tomorrow, before the end of the

13   week, we'll have something to you.  And I think it will work

14   out time wise okay.  We started to discuss it tonight.  We'll

15   be able to continue our discussion maybe tomorrow afternoon.

16   I'll try to get something to you if not tonight then by

17   tomorrow for you to take a look at and we'll be able to put it

18   all together by Monday morning when you start your argument.

19         How does that work.

20         MR. EIDELMAN:  That's fine, your Honor.  There's a

21   regulation under the FMLA that we're going to propose actually

22   be put in the jury instruction which is that if an employee is

23   laid off during the course of --

24         THE COURT:  Maybe a little louder.

25         MR. DILORENZO:  So 825.216, the limitations on na

1  employees's right to reinstatement states that, "The employee

2  has no greater right to reinstatement or other benefits or

3  conditions of employment if the employee had been

4  conditioned" --

5          THE COURT:  Here's what I want you to do,

6  Mr. DiLorenzo give it to my law clerk.  Who him what we're

7  talking about and we'll take a look at it.

8          MR. SHEARER:  I think we're going to include that

9  there's a regulation I would like to include.

10          THE COURT:  Give me all of your regulations.

11          MR. SHEARER:  Okay.

12          THE COURT:  Whether I put them in or not.

13          MR. EIDELMAN:  Which?

14          MR. SHEARER:  214.

15          THE COURT:  Stop.  We get carried away with

16  ourselves once in a while.  Just let me know what you want.

17  What regulation do you want?

18          MR. SHEARER:  29 CFR 825.214.

19          THE COURT:  Paul, do you have those numbers down?

20          Let me know what else you want me to consider.  You

21  have time to do it all.

22          Anything else you wish to say tonight before we go

23  back and you go to it work again?  How late are you going to

24  keep these poor associates working?

25          MR. EIDELMAN:  They're going to take me to dinner,

1    Judge, so you know.

2            THE COURT:  Were you given a chance to have dinner

3    tonight?

4            MR. EIDELMAN:  Of course.  Of course.

5            THE COURT:  Mr. Shearer, you're okay?

6            MR. SHEARER:  Yeah, I'm not eating a lot of dinner,

7    I guess.

8            (Discussion held off the record.)

9            THE COURT:  See you tomorrow at 10:00 o'clock.

10           MR. SHEARER:  Thank you.

11           MR. EIDELMAN:  Thank you.

12           (WHEREUPON, this matter was adjourned to September

13   20, 2019, at 10:00 a.m.)

14

15                              *   *   *

16

17

18

19

20

21

22

23

24

25

1    Question:  Let me make sure I get my questions right.

2  My question to you is, has anyone ever told that you were in

3  included in the reduction in force where you were terminated

4  in January of 2017 because you had taken FMLA leave?  Has

5  anyone ever told you that?

6  A    No.

7  Q    There was an objection.

8    Answer:  No, I never had conversation with anyone.  How

9  could they?

10    Question:  That's right.  Has anybody ever told you you

11  were included in the reduction in force and terminated in

12  2007 because you had cancer?

13    Objection.

14    Answer:  Nobody ever talked to me.

15    Question:  Okay.  Do you believe that you were

16  terminated because you had cancer?

17    Answer:  All I know is I did not get to come back to

18  work, that's all I know.

19    Question:  I agree that you didn't come back to work.

20  I'm asking what you believe.  This is your case as a

21  plaintiff.  And I wanted to, if you stand up in front of a

22  jury are you going to say I believe I was terminated because

23  I have cancer, because I have cancer?

24    Answer:  Not necessarily because I have cancer.

25    Question:  I'm asking you, you did --

1      Answer:  I don't think it's because I had cancer.

2      Question:  Okay.  Do you believe -- do you think it was

3 because you went out on leave that you were included?

4      Answer:  Say that again?

5      Question:  Okay.  You just said that you don't believe

6 it was because you had cancer is the reason why you were

7 terminated.  Do you believe you were terminated because you

8 had taken leave?

9      Answer:  No, because the leave was requested by Tony.

10 I didn't want to go on leave.

11           THE COURT:  That's what you said in your

12 deposition.  Do you want to change any of that now?  You did

13 say that or not?

14           THE WITNESS:  No.  The only thing I will tell you

15 is while I was being deposed I felt there were lots of

16 disjointed questions that were confusing.  That's the first

17 time I had ever been deposed my your life.

18           THE COURT:  You can tell us now, do you disagree

19 with that, I'll give you a chance to do that.

20           THE WITNESS:  What you read is fine.

21 BY MR. DiLORENZO:

22 Q    You said when you were describing the law to the judge,

23 which was a little unusual, you were explaining you should

24 get an equivalent position if you don't get your position

25 back.  You're not claiming that you should have gotten Robin

1  and his expertise was the esophagus, and he was concerned I

2  was not going to heal rapidly.

3  Q    And this advice that he gave you with e-mail, it was

4  similar, very similar, wasn't it, to what Tony Marino told you

5  as to why he wanted to put you on -- have you apply for leave

6  and receive leave of absence?

7  A    I didn't apply for it.

8  Q    Well, you signed the papers --

9  A    I did.

10 Q    -- requesting it?

11 A    Because he asked me to.

12 Q    Okay.  But you still had to sign -- if you didn't sign

13 them, you wouldn't have got it, right?  You almost didn't make

14 the deadline as it was, right?

15 A    He asked me to.  That's why I -- if he had not asked me

16 that, I wouldn't have.

17 Q    Then you got help from Rhonda to fill them out, right?

18 A    After Tony asked me to, I said I would do it.

19 Q    And my only question was, isn't that similar, almost

20 identical to what Mr. Marino was telling you at the time, as

21 to why he wanted you to focus on getting better?

22 A    Yes.

23 Q    Work stress -- I mean, is it your understanding that work

24 stress helps people get better from medical issues?

25 A    It sure helped me.  I got better faster than this doctor

1    MR. SHEARER:  He is Alicia Parrish, a registered

2  nurse that works with Mr. Barger's physician.

3    THE COURT:  And you are the registered nurse now,

4  okay?

5    MR. ZEITLIN:  Very good.

6    THE COURT:  Go ahead.

7  EXAMINATION BY

8  MR. SHEARER:

9  Q    Ms. Parrish, do you assist where on first page to says

10  that the beginning date for the period of incapacity is

11  October 22, 2016?

12  A    Yes, uh-huh.

13  Q    Do you see where it says that the return to work date is

14  March 1, 2017?

15  A    Yes.

16  Q    Do you know how this March 1, 2017, date was chosen?

17  A    I don't.  And also I know that's not my handwriting.

18  Q    Which part?

19  A    The March.

20  Q    March 1, 2017?

21  A    Uh-huh, yes.

22  Q    Is the right of it your handwriting?

23  A    The approximate date isn't and the return to work date

24  isn't.  Everything else is.

25  Q    So when you say "approximate date," do you mean Line 2

1  where it says, "April 1, 2016," as the approximate date

2  condition commenced.  That's not your handwriting?

3  A    Correct.

4  Q    And the return to work date of March 1, 2017, is not your

5  handwriting?

6  A    Correct.

7  Q    But the rest of the information on the first page of

8  Exhibit 1 is your handwriting?

9  A    Correct.

10 Q    Is any of this Kelly Sommer's handwriting that you're

11 aware of?

12 A    No.

13 Q    So it's fair to say you completed this form minus those

14 two areas we just discussed?

15 A    Yes.

16 Q    Reviewed it with Kelly and then Kelly signed it?

17 A    Yes.

18      MR. SHEARER:  That's discussing Plaintiff's 101

19 which is already in evidence.

20      And then Plaintiff's 109 was handed to Ms. Parrish.

21 Q    Do you recall how you came to choose January 17th as his

22 return to work date?

23 A    I do not.  It sounds like it was a week later.  That can

24 be my only rationale, but I have no idea.

25 Q    This form indicates January 17, 2016.  Did you mean to

1   say 2017?

2   A    No, that's an error.

3   Q    You meant to say 2017?

4   A    Correct.

5        MR. SHEARER:  Then the witness was then handed what

6   is Plaintiff's 110 which is not in evidence yet.

7        THE COURT:  Just one second.  109 is in evidence.

8        MR. SHEARER:  Yes.

9        THE COURT:  Now, 110 is being referenced and there

10  is no objection to it so we'll allow it in evidence.

11       (Plaintiff's Exhibit 110 was received in evidence

12  as of this date.)

13       THE COURT:  Go ahead.

14  Q    This is Emory 0097 through Emory 0102.  I wanted you to

15  take a look at the page that's marked Emory 0101 at the

16  bottom.

17  A    Yes.

18  Q    Do you know whose signature that is?

19  A    Emily Shah.

20  Q    Who is Emily Shah?

21  A    That was Dr. Badoor's nurse practitioner.

22  Q    Does she regularly fill out forms such as this which is a

23  physician's questionnaire from MetLife?

24  A    No.

25  Q    Who usually fills these out?

1   A    I do.  The nurses.

2   Q    Is there any reason why you think she would have filled

3   this one out instead of you?

4   A    She didn't, I did.  She signed it.

5   Q    You did it and then she signed it, okay.  This is

6   consistent in the very first line where it says, "Date the

7   patient was advised to cease work," it's 9/6/16; is that

8   correct?

9   A    Correct.

10  Q    But on 9/6/16, the surgery was performed in Tampa;

11  correct?

12  A    Correct.

13  Q    So it wouldn't have been your office that advised him to

14  is cease work on that date?

15  A    Correct.

16  Q    Right?

17  A    Correct.

18  Q    Because you then note, "Patient had surgery at an outside

19  facility," on 9/6/16; correct?

20  A    Correct.

21  Q    Back on Page 0101, is that your writing in subsection E?

22  A    Approximately nine hours per day?

23  Q    Yes.

24  A    Yes.

25  Q    Can you read that then, E?

1  A    "Patient can work a total of approximately nine hours per

2  day."

3  Q    Then is that your handwriting on the date at the bottom?

4  A    Estimated return, yes.

5  Q    Right next to Dr. Emily Shah's signature, there's a date

6  on this document.  Do you see that?

7  A    Yes.

8  Q    So it says it's dated 1/23/17; correct?

9  A    Correct.

10         MR. SHEARER:  That's it for Ms. Parrish.

11         Next deposition is of Kathi Benhardt of First Data.

12 EXAMINATION BY

13 MR. SHEARER:

14 Q    What have your roles been at First Data over those

15 13 years?

16 A    I started in an HR business partner role.  I moved into

17 our global workforce planning effort.  I led an employee

18 relations function.  I managed our North America HR Generalist

19 Team and I currently lead our global workforce planning and

20 analytics function.

21 Q    What is your definition of a reduction in force as is

22 used inside of First Data?

23 A    It would be a situation where we have identified

24 individuals whose roles and positions are impacted and

25 eliminated.  It may have include a realignment of those

1  It's a way of the government thanking you for service, I

2  suspect, and we're not going to be able to give you flaming

3  crepe suzettes but I think we'll have nice food from our

4  commissary downstairs for you.

5          I mentioned this before, probably mention it one

6  more time, that, you know, when you're eating, if the case is

7  all presented to you, and I tell you you can start your

8  deliberations, you don't have to do that until after lunch,

9  you can do it while you're eating.  You have to all be there

10 together when deliberations happen.  But we'll talk a little

11 bit more about that in my concluding remarks.

12         At the present time, just be patient.  There will be

13 little bit of time.  We'll come get you in 15, 20 minutes from

14 now.

15         COURTROOM DEPUTY:  All rise.

16         (Jury exits courtroom at 10:38 a.m.)

17         (A recess in the proceedings was taken.)

18         THE COURT:  Okay, folks.  I have a revised verdict

19 sheet.  I have the revised jury instructions.  I eliminated

20 any reference to the individual defendants.

21         Now, you otherwise it's pretty much what I sent to

22 you with one exception on Page 13.  I have burden of proof

23 that I've eliminated that.  I think the burden rests with the

24 plaintiff all the time.  And otherwise, I'll ask Mr. Shearer

25 first if you have anything of substance or significance that

1   you want to talk about.  This is sort of our charging

2   conference.  I want to make sure that you have everything you

3   need to have so that you can go forward with your summations.

4          MR. SHEARER:  Yes, Your Honor.  I submitted a

5   letter --

6          THE COURT:  You have to speak a little louder for me

7   to understand what you're saying.

8          MR. SHEARER:  I submitted a letter this morning with

9   the comments on one of them.

10          THE COURT:  Just tell me what you have a problem

11   with now.  Let's go right to it, we don't want to keep the

12   jurors waiting longer than necessary.

13          MR. SHEARER:  On Page 15.

14          THE COURT:  Okay.  15.  So, fine, the first 14

15   pages.

16          What is it that you're concerned about on Page 15?

17          MR. SHEARER:  I agree with the first two and a half

18   sentences, but where it starts, "The defendant proved by a

19   preponderance of the evidence."

20          THE COURT:  What is it now?

21          MR. SHEARER:  The portion of that instruction that

22   says, "The defendant proved by a preponderance of the evidence

23   that the termination was due to its reduction in force as I

24   previously explained to you."  I think that's an inaccurate

25   statement of law that 29 CFR --

1          THE COURT:  You don't agree with the statement that

2     the termination, therefore, was unlawful unless the defendant

3     proves by a preponderance of the evidence that it was due to a

4     reduction in force.  So it's not the defendant's burden, I

5     guess.

6          MR. SHEARER:  No, I agree it's the defendant's

7     burden.  But the defendant's burden under the regulation,

8     825.216.

9          THE COURT:  So the burden of proving the

10    determination was due to its reduction in force.  What do you

11    say, Mr. Eidelman?  Is that your burden, or is that not your

12    burden.

13         MR. EIDELMAN:  It is our burden, your Honor.

14         THE COURT:  It is your burden.

15         MR. SHEARER:  It's their burden to show that he

16    would have been terminated prior to requesting a

17    reinstatement, that's what 825.216 is.  Being in the RIF in

18    and of itself --

19         THE COURT:  I think this charge is substantively

20    correct about that.

21         MR. SHEARER:  He was in the RIF after he requested

22    reinstatement.  I don't believe 825.216 applies.

23         MR. EIDELMAN:  We're back to his strict liability

24    argument, your Honor.

25         THE COURT:  I don't understand what you're saying.

1          MR. SHEARER:  Then the mitigation instruction.  I

2    just didn't understand why it was in there.  I don't think

3    there is any evidence.

4          THE COURT:  First, you can make whatever claims you

5    think you want to make if you disagreed with anything on the

6    charge, so I don't know whether I'm clear about what you agree

7    with.  I think that is correct to say that termination,

8    therefore, was unlawful unless the defendant proves by a

9    preponderance of the evidence that it was due to its reduction

10   in force.  I think that's exactly what your point is.  Should

11   I say that the termination was lawful?

12         MR. SHEARER:  No.  My point is just the regulation

13   doesn't refer to any particular reason why someone wasn't

14   terminated.  It's their burden to show that he would have been

15   terminated prior to his request for reinstatement had he been

16   employed.

17         THE COURT:  Look, this is a termination here was

18   because of the reduction in force.  That's this case.  No

19   other issue here, okay?  He's not claiming that he would have

20   been terminated for other reasons other than the reduction in

21   force as I understand this case.

22         MR. SHEARER:  Right.  But 825.214 talks about that's

23   not an excuse in the case of a restructuring.  If the event is

24   a restructuring, he's still entitled to the restoration under

25   825.214.

1          MR. EIDELMAN:  That is not what that regulation

2     says.

3          THE COURT:  You have your exception.  Next.

4          Anything else?

5          MR. SHEARER:  I don't think there's any evidence

6     that --

7          THE COURT:  I am going to ask counsel -- I hear a

8     lot of evidence about mitigation.  What's your position?  Can

9     he eliminate that?

10         MR. EIDELMAN:  Our position about mitigation is that

11    on cross-examination from Mr. DiLorenzo, Mr. Barger claims

12    that he plugged in all this information to some program that

13    is -- that we don't have and he said he reduced amounts one

14    way or another.  We don't know what numbers were, so I

15    think --

16         THE COURT:  I'm going to leave it.

17         MR. EIDELMAN:  Thank you, Judge.

18         THE COURT:  Now, what is this section that you say

19    makes my charge incorrect?  I don't understand what you're

20    saying.  Section what?

21         MR. SHEARER:  It's the interaction between the

22    regulation 29 CFR 825.214.

23         THE COURT:  29 CFR 825.214.

24         MR. SHEARER:  The last sentence of that regulation.

25         THE COURT:  And what does it say?  Read it.

1          MR. SHEARER:  It says even if an individual --

2          THE COURT:  Can you please show that to me and to my

3    law clerk.

4          MR. SHEARER:  It says, "An employee is entitled to

5    such reinstatement even if the employee has been replaced or

6    his or her position has been restructured to accommodate the

7    employee's absence."

8          THE COURT:  So your position is that even if there

9    is a reduction in force, and that doesn't make any difference,

10   you would still be entitled to the reinstatement.

11         MR. SHEARER:  If it's considered restructuring, yes.

12         MR. EIDELMAN:  That is not what the regulation says.

13   He's leaving out words.  He's leaving -- it says,

14   "Restructured to accommodate the employee's absence.  There is

15   no evidence in this case that position was restructured to

16   accommodate his absence.'  The evidence actually is in 216.

17   And in 216, Judge, in the instruction that you gave us on

18   Friday, it actually talks, it gives four examples.  And that's

19   why we actually asked that it be put in.  It says in 216, and

20   we had given this to your law clerks previously and that talks

21   about under the FMLA, an employee has no greater right to

22   reinstatement or to other benefits and conditions of

23   employment than if the employee had been continuously employed

24   during the FMLA leave period.  An employer must be able to

25   show and it's our burden that an interview would not otherwise

1  have been employed at the time reinstatement is requested in

2  order to deny restoration of employment.

3            THE COURT:  Stop.  I'm not going to give it.  It's

4  wordy.  We're giving the jury a pristine charge that I spent a

5  lot of time reducing to simple language so the jury can

6  understand it.  This entire case has been litigated on the

7  issue of whether or not there was a lawful termination by

8  reason of a reduction in force.  That's it.  That's what the

9  jury is going to know and that's what this case is about.  I

10 don't think it's about anything else other than that, okay?

11           You have your exception.  We'll take a look at it

12 again.  I just don't see where it relates to this particular

13 case.  What else?  We'll leave in mitigation do you have

14 anything else.

15           MR. SHEARER:  On the jury verdict form.

16           MR. EIDELMAN:  Can we do the instructions first,

17 Judge?

18           THE COURT:  Let's hear the instructions.

19           (Discussion held off the record.)

20           THE COURT:  Okay.

21           MR. EIDELMAN:  Couple things in the charge you

22 provided us on Friday and again.

23           THE COURT:  Forget about that.

24           MR. EIDELMAN:  You're right.  It also showed up last

25 night.  Is that in your charge you have that one of his claims

 1  is that he was discriminated against when it terminated his

 2  employment under the ADA.  That is not a claim in this case.

 3          THE COURT:  Just one second.

 4          MR. EIDELMAN:  Page 11, Judge.

 5          THE COURT:  Just one second.  My view is there are

 6  two ADA claims.  One is that his e-mail was revoked while he

 7  was on medical leave and two he was thereafter terminated.

 8          MR. EIDELMAN:  He is not making a claim that he was

 9  terminated in violation of the ADA.  His only claim is that he

10  was put on leave and that his ADA access was revoked.  There

11  is no claim.

12          THE COURT:  I don't have that view of this case.  I

13  mean, it's all about termination he was terminated.

14          MR. EIDELMAN:  Your Honor, Mr. Shearer, on behalf of

15  Mr. Barger, has represented to this court in filings that his

16  claim is not that his client was terminated because he was

17  disabled.  I have a bench memo on which cites to -- when he

18  represented to this court on numerous indications.

19          THE COURT:  Let me hear from Mr. Shearer.

20          MR. SHEARER:  I have written that before, yes, I

21  have.

22          THE COURT:  And what do you say about that?

23          MR. SHEARER:  I agree.  I haven't been making that

24  claim up until I've seen the evidence that came in today.

25          THE COURT:  Today?

1      MR. SHEARER:  This week.

2      MR. EIDELMAN:  You saw the jury charge.

3      THE COURT:  Just one second.  I'm not aware that you

4  withdrew that claim, all right?  But if that's what you did,

5  I'll eliminate to it.

6      MR. SHEARER:  Yes, Your Honor.  In the summary

7  judgment motion, I believe is probably what he's referring to.

8      MR. EIDELMAN:  Actually, no.  You did it two weeks

9  ago when you wrote a letter to the judge when you said, I am

10  not making in claim.  That is not Mr. Barger's claim.

11      THE COURT:  So, if that's the case, we're only going

12  to have one ADA claim and that's the e-mail access, right?

13      MR. SHEARER:  Yes.  I think it's two things.  It's

14  the forcing of leave and the simultaneous cutting of access.

15      THE COURT:  It happened at the same time.  It's one

16  event.  He was on leave, he was denied e-mail access; he was

17  on leave.  I think we got it down correctly.  I will eliminate

18  under the ADA any termination claim now that I understand you

19  have made that representation and I will eliminate that.  And

20  the only damages that I can sense, if you're correct on your

21  ADA claim for the denial of e-mail access, is punitive.  I

22  don't see any other damage claim here.  That's what I have

23  here.

24      MR. SHEARER:  The forcing of leave turned out to be

25  a de facto termination.

1          MR. EIDELMAN:  What?

2          THE COURT:  What?  Mr. Shearer, you're all over the

3     place.

4          MR. SHEARER:  He was forced on to leave.

5          THE COURT:  And he was forced on leave and at the

6     same time his e-mail access was denied.  That was your claim.

7     He was not claiming he was wrongfully terminated.

8          MR. SHEARER:  He was terminated while he was on

9     leave.

10         THE COURT:  What are you talking about?

11         MR. SHEARER:  He was terminated while he was on

12    leave.

13         THE COURT:  That's your FMLA claim.

14         MR. SHEARER:  Right.  But, your Honor, when they

15    forced him on to leave and then terminated while he was on

16    leave.  The forcing of leave is the equivalent of the

17    termination.  He wasn't working, he was on short-term

18    disability.

19         THE COURT:  You're claiming now that there is a

20    termination claim here under your ADA?  What are you saying?

21         MR. SHEARER:  I believe the forcing of unpaid leave

22    or leave on disability is then termination of him while he was

23    on leave makes the forcing of the leave the equivalent of a

24    termination.

25         THE COURT:  I'm a little confused.  What do you say

1   about that?

2        MR. EIDELMAN:  I have no idea what he is saying.

3        THE COURT:  Yes.

4        MR. EIDELMAN:  You know, he's -- first of all, it

5   was Mr. Barger who submitted a return to work authorization

6   with no restrictions and then he was then notified, even

7   though the decision had been made previously, he was then

8   notified.  So he couldn't have been on ADA leave.  According

9   to your theory, he couldn't have been on ADA leave at the time

10  he was notified because your client submitted a return to work

11  authorization on January 10th that says he is released with no

12  restrictions.  And then he was notified on the 13th.  He can't

13  be -- your theory doesn't make any sense.  I don't understand

14  it.  I've never understood it from the beginning.

15       THE COURT:  I don't understand it either.  You're

16  all over the place, Mr. Shearer.

17       MR. SHEARER:  No.

18       THE COURT:  You have your exception.  What do you

19  propose I do on the charge?  Do you have language to support

20  your strange theory here?

21       MR. SHEARER:  No, Your Honor, because I was fine

22  with the termination language in there but if it --

23       THE COURT:  Wait a second.

24       MR. SHEARER:  If you want -- if that's coming out

25  because you're correct I wasn't saying he was terminated

1    because of his disability.  I'm saying he was terminated

2    because he was on leave and that he tried to come back.

3           THE COURT:  Mr. Shearer.

4           MR. EIDELMAN:  That is not his claim.

5           THE COURT:  Stop it.  You just agreed that you're

6    withdrawing your termination claim here under the ADA.  You

7    just agreed to that.

8           MR. SHEARER:  I agree, your Honor.

9           THE COURT:  That's the way it is.

10          MR. SHEARER:  Okay.

11          THE COURT:  Okay.  I was willing to give you that.

12    I didn't realize you had withdrawn it, all right?  So that's

13    out.

14          What else do you want to say?

15          MR. SHEARER:  My comments are on the verdict form.

16    If he has more on the instructions.

17          MR. EIDELMAN:  I do have something else on the

18    instruction, Judge.

19          THE COURT:  Let's go.

20          MR. EIDELMAN:  And that is, and we put it in what we

21    sent to the clerk, to your clerks this morning, and I

22    apologize for the timeliness, Judge, is the following.  Is

23    that there no basis nor a punitive damages instruction to the

24    jury in this particular case and if I may be heard on this.

25          THE COURT:  Punitive damage instruction on what

1    issue?

2            MR. EIDELMAN:  The only punitive damages he can get

3    in this case would relate to the ADA because there's no

4    punitive damages under the FMLA.

5            THE COURT:  We're not saying that he is.

6            MR. EIDELMAN:  Here's his ADA claim.  His ADA claim

7    is:  I was put on leave and my access was revoked.  He has it

8    prove by a preponderance of the evidence that the actions of,

9    and now it's only First Data, because it's against -- ADA is

10   only against First Data.  That the actions against First Data

11   were malicious and willful.  The unrefuted testimony in this

12   case is the following and we're not disputing that the -- his

13   theory is it's the act of putting him on but not the reasons

14   behind it.  Mr. Barger testified --

15           THE COURT:  I'm going to stop you now.  Look, I can

16   always throw it out.  All right.

17           Now, if I do agree with you then there's no ADA

18   claim at all because there's no damages, right?

19           MR. EIDELMAN:  I guess.

20           THE COURT:  If there is no damages for denying his

21   e-mail, e-mail that doesn't constitute an ADA claim to the

22   jury.

23           MR. SHEARER:  I guess I'm not understanding why

24   there aren't punitive damages.  There is evidence of that.

25           THE COURT:  I'll let you argue.  But in the absence

1  of punitive damages, you don't have any ADA claim because

2  there's no damages to your client.

3         MR. SHEARER:  Well, we have a violation of the ADA,

4  yes, we do.

5         THE COURT:  And what would be the remedy for that

6  violation?

7         MR. SHEARER:  I think Mr. Barger testified work is

8  his life and forcing him on to leave, taking his work away,

9  that took away his meaning.

10        THE COURT:  What?

11        MR. SHEARER:  His compensatory damages.

12        THE COURT:  You never asked for compensatory

13  damages.  I scrutinized your papers and there is no claim for

14  compensatory damages.  I was thinking whether to give it.

15  You're all over the place here.  You made it very difficult

16  for me to manage this trial.

17        I want to show you last night between 6:00 o'clock

18  and 9:00 o'clock at night, I scrutinized every one of your

19  papers to see whether you made a compensatory damage claim, I

20  didn't see it.  Now, you're telling me for the first time you

21  want it.

22        MR. SHEARER:  I thought I was in the complaint, in

23  the supplemental complaint.

24        MR. EIDELMAN:  Judge, first of all, besides the

25  evidence not supporting it, he had a pity party for two days

1  he said.  And then he's been back to work and everything has

2  been great.  There is no evidence of emotional distress and

3  compensatory damages.

4        THE COURT:  Where is the evidence of that?  He said

5  he was fine, he had no problems at all.

6        MR. SHEARER:  He said he was not working, work is

7  his life.  They took that away from him.

8        THE COURT:  Here's what I will do then.  Listen to

9  me.  I have to manage this in a way so I don't have to try

10  this case again.  Sometimes, it's difficult for a judge to do

11  this when you're dealing with counsel that's all over the

12  ballpark.  Let me try the best I can to avoid any problems

13  after the verdict.  I will put under the ADA claim a

14  compensatory damage claim.  I will let it survive or not, it

15  remains to be seen.  It may well be that it's all going to be

16  academic as a practical matter.  But that's why we will

17  reserve on that issue.  If the jury comes in with anything

18  about punitive damages or compensatory damages, I'll have an

19  opportunity thereafter taking a very, very scrutinized look

20  this paperwork to make sure we get it down exactly correct.  I

21  think that's what I should do.

22        MR. EIDELMAN:  Your Honor, for the record, I take an

23  exception to the inclusion of both compensatory damages and

24  the punitive damages instruction.

25        THE COURT:  You have a right to make that exception.

1   I'm going to reserve on it.  And if I have to reach that issue

2   and do it I may well agree with you.  What we try to do as you

3   know is to make sure as a trial judge that we have a clear

4   record and that we we'll be able to deal with these issues

5   afterwards.  That's what we do, okay?  So we're going to add a

6   compensatory damage claim and it'll be the regular

7   compensatory damage charge that we normally give, okay?

8           What else, Mr. Eidelman?

9           MR. EIDELMAN:  So, your Honor, we have the jury

10  verdict form which your clerk just gave us that we want to

11  take a look at.

12          THE COURT:  Yes.

13          MR. EIDELMAN:  For the record, Ms. Cooper has a very

14  brief Rule 50 motion that we'd like to make for the record.

15          THE COURT:  Certainly.  But let me just structure

16  this.

17          MR. EIDELMAN:  Okay.

18          THE COURT:  So I'm going to just, you know, edit the

19  verdict sheet by eliminating under the ADA claim the word

20  "remote" because we don't mention remote.  We just say an

21  e-mail access in the charge.  That's just a little bit of a

22  technical change.  And I think that's all I have here.  The

23  important thing that you have the understanding of how you're

24  going to handle your summations.

25          What else?

1        MR. EIDELMAN:  On the second page of the verdict

2   form:  Is First Data liable under the ADA for terminating

3   plaintiff's employment?  We agree that should come out that's

4   C.

5        THE COURT:  That has to be changed, right?

6        MR. EIDELMAN:  I right.  I think it -- you said you

7   wanted to put in a compensatory damages --

8        THE COURT:  Wait.  This is the FMLA claim.

9        MR. EIDELMAN:  No, it's the ADA, Judge.  1C is the

10  ADA.

11       THE COURT:  Yes, that has to come out.

12       MR. EIDELMAN:  That has to come out.

13       THE COURT:  We agreed.

14       MR. EIDELMAN:  We agreed.

15       THE COURT:  What else?

16       MR. EIDELMAN:  Then E should come out because that's

17  out now.

18       THE COURT:  It's all out.

19       MR. EIDELMAN:  It's all out.

20       THE COURT:  The termination is out.

21       MR. EIDELMAN:  So, your Honor, we put this in, and I

22  think in the FMLA, it says, "For terminating plaintiff's

23  employment."  The actual language is "failing to restore his

24  position," which ties in with the regulation that says,

25  "Rights to restoration," and the exception to rights to

1   restoration.  I think it's more accurate because I suspect the

2   parties are going to be arguing on both sides that's it's a

3   failure to restore him to his position and then the exception

4   to the failure to restore.  That would be our comment, I

5   think, on that.

6           THE COURT:  Let's stop for a second.

7           My object here is to present to the jury in simple

8   form, okay.  And I spent a lot of time taking 45 pages and

9   reducing it to three or four page.  It's not an easy thing to

10  do.  The jury has heard throughout this whole trial:

11  Termination by reason of reduction in force.  So I would like

12  to give them that consistent language.  If I throw something

13  new to them right now it can confuse them.  I don't see

14  anything substantively of any significance when I talk about

15  was there a lawful reduction in force.  That's what you're

16  talking about.

17          MR. EIDELMAN:  Your Honor, we'll gear our closings

18  to use that language.

19          THE COURT:  Yes.  And if I don't get it then I'll

20  get reversed.  As far as I'm concerned, this case is all about

21  when he was on medical leave.  Maybe he had one more day to go

22  before he was terminated.  Maybe he had three more days to

23  work.  He was medical leave.  He can't be terminated from his

24  employment while he's on medical leave.  And was there a

25  lawful termination or not by reason of the reduction in force?

1   That's all I think this case is about.

2           MR. EIDELMAN:  That's fine.

3           One thing, Judge, because I do think it is -- I

4   don't know how the Court will deal with it otherwise is, you

5   have given us the After Required Evidence Instruction.  We've

6   instructed the jury how they are to apply it if they find it.

7   But if they go ahead from a consistency standpoint.  If they

8   go ahead and get to the question of back, and they put it in

9   there, if they answer the question as a legal matter, did you

10  find after acquired evidence, yes or no?  Then I think the

11  Court would be compelled then to use that as a remittitur to

12  get it right because I think it is as a matter of law.  So

13  that's why we just ask yes or no, did we prove after acquired

14  evidence?  Because I think it makes -- what it really does is

15  takes away any uncertainty and gives the Court guidance.

16          THE COURT:  You can say the backpay and what you

17  will not know whether or not it was they considered this after

18  acquired evidence.  I explained it to them in the charge.  So

19  I don't like to carve out separate questions unless there

20  really is a necessity to do that.  If we have sometimes the

21  issue of whether or not the police officer, in the performance

22  of his duties, was objectively reasonable.  Sometimes we have

23  to deal with qualified immunity issues.  There's a real reason

24  to carve out separate questions because the Court has to

25  decide the issue of qualified immunity as a matter of law at

1  least to get the information from the jury so you have

2  separate questions.  This is not that type of case.

3          MR. EIDELMAN:  I actually think, Judge, it would be

4  a matter of law for the Court to ultimately apply after

5  acquired evidence.  If the jury finds it as a matter of fact

6  then it becomes a matter of law for the Court and I'm just

7  suggesting --

8          THE COURT:  If they find that it's after-the-fact

9  evidence, why can't they consider that in deciding?

10         MR. EIDELMAN:  They can.  If going through your

11 instructions.

12         THE COURT:  I'm not going do it to.

13         MR. EIDELMAN:  Okay.  Thank you, Judge.

14         THE COURT:  What I want to do, though, you have --

15 anything else, Mr. Shearer.

16         MR. SHEARER:  One comment on the very first question

17 on point that says revoke e-mail access.  It was more of an

18 edit.  There's video conferencing and a lot of other things

19 besides e-mail were cut.  I would say remote access.

20         THE COURT:  What language do you want?  We put it as

21 the e-mail access I thought that was the primary issue.  You

22 want to expand it to something else?

23         MR. SHEARER:  I would call it "remote access to

24 First Data's systems."

25         THE COURT:  I'm willing to do that.  Revoke

1 plaintiff's e-mail access. What is it that you propose to

2 say?

3        MR. SHEARER: He also did video conferencing

4 through.

5        THE COURT: What do you propose in terms of

6 language?

7        MR. SHEARER: I said, "Plaintiff's remote access to

8 First Data's systems."

9        MR. EIDELMAN: We're okay with that, Judge.

10        THE COURT: Let me change it. Revoke plaintiff's --

11 give me the language again.

12        MR. SHEARER: Remote access to First Data's systems.

13        THE COURT: Revoking plaintiff's.

14        MR. SHEARER: Systems.

15        THE COURT: Data systems?

16        MR. SHEARER: Systems.

17        THE COURT: Plural. So it would be for revoking

18 plaintiff's access to First Data's systems, plural.

19        MR. SHEARER: Yes.

20        THE COURT: Mr. Eidelman, you're satisfied with

21 that?

22        MR. EIDELMAN: Your Honor, we have no objection to

23 that.

24        THE COURT: I'm going to change that throughout the

25 charge as well, all right? As well as on the verdict sheet.

1          All right.  Okay.  Anything else.  Mr. Shearer, you

2    keep tossing things at the 11th hour here.  You're just

3    fumbling all over the place.

4          What else do you want me to consider?

5          MR. SHEARER:  That's it, your Honor.

6          THE COURT:  Now, I want to do one thing here on

7    record now.  And there was an issue here as to whether or not

8    September 4th was the date that he was placed on leave.

9          Mr. Eidelman argued that's the case and I didn't

10   charge that and I'm not using that in this charge.  I want to

11   explain why now on the record and here's my decision in

12   respect to that issue.

13          "As a matter of law, the earliest that the plaintiff

14   could have been on FMLA leave was October 24, 2016.  His

15   doctor said he was unable to work as of October 22nd, a

16   Saturday, and his requested leave began the following Monday.

17   Under the FMLA, once an employer has enough information to

18   know that an employee is eligible for FMLA leave, the employer

19   has five business days to start the clock on an employee's

20   12 weeks of allotted leave time, "Absent extenuating

21   circumstances."

22          And I cite 29 CFR Section 825.300(d)(1).

23          Now, continuing.

24          "First Data does not dispute that it knew Mr. Barger

25   was undergoing surgery on September 4th and it says certainly

1  had knowledge of the serious medical conditions prior to

2  October 22, 2016.  Because First Data failed to designate

3  plaintiff's leave as FMLA leave within five business days, it

4  may not now claim that the leave began on September 4th.

5          Also, First Data cannot retroactively designate that

6  date because that would, "Cause harm of injury to the

7  employer," in violation of 29 CFR Section 825.301(d)."

8          All right.  I wanted to make it clear on the record

9  exactly what my ruling was since the defendant took the

10  position that the leave start on September 4th, okay.  So you

11  have the record on that.

12          MR. EIDELMAN:  Your Honor, if I just may?  Just for

13  the record.

14          We had take exception to that ruling on the grounds

15  we believe it is a question of fact for the jury but we

16  understand the Court's position.

17          THE COURT:  I want the record to be clear.

18          MR. EIDELMAN:  Yes, understood.

19          THE COURT:  Let's take 15 minutes now while I

20  reflect upon these changes that have to be made.  But you

21  understand enough now to go ahead with your summations and

22  I'll make these changes in due course, but the ruling can be

23  in bout 15 minutes.

24          You want to make the Rule 50?

25          MR. EIDELMAN:  We do.

1      THE COURT:  Why don't we do this?  It's indicated on

2 the record that you want to make it at this time.  After the

3 case is presented to the jury, they commence the deliberations

4 you can spread it on the record whatever reasons you want to

5 support that application.

6      MR. EIDELMAN:  That would be fine, Judge.

7      One last thing.  I would like to get on the record

8 before we break that the plaintiff, Steven Barger, is

9 voluntarily dismissing with prejudice Frank Bisignano, Dan

10 Charron, Anthony Marino, Rhonda Johnson, Karen Whalen, and

11 Laurie Graesser.

12      THE COURT:  I think that's appropriate to put that

13 on the record since we were going to allow the jurors to

14 consider whether the individual defendants who were named were

15 liable.  And we carved out a charge to deal with that issue.

16 This morning, I was advised that Mr. Shearer has decided not

17 to seek liability gets any individual party.

18      Is that correct, Mr. Shearer?

19      MR. SHEARER:  That's correct, your Honor.

20      THE COURT:  I think the record is clear about that.

21      MR. EIDELMAN:  Thank you.

22      THE COURT:  That you for bringing that to my

23 attention.

24      MR. EIDELMAN:  Thank you.

25      THE COURT:  Anything else we need to talk about?

1      MR. SHEARER:  I will be filing a Rule 50 as well.  I

2  want to preserve and it's going to be on the basis my summary

3  judgment motion as a matter of law.  They can't terminate him

4  once he turned in his doctor's note.

5      MR. EIDELMAN:  Okay.

6      THE COURT:  Even if there is a lawful reduction in

7  force?

8      MR. SHEARER:  Yes, your Honor.  I believe that the

9  handing in of the doctor's note triggers the obligation to

10  reinstate.

11      THE COURT:  You can make whatever arguments you

12  want.  Let's take 15 minutes and we'll reconvene at 11:30.

13  We'll have Mr. Shearer's summation at that time.

14      Mr. Innelli, notify the jurors we'll get together at

15  11:30 at that time.

16      (A recess in the proceedings was taken.)

17      THE COURT:  You have the verdict sheet and the

18  charge is going to be revised in accordance with our

19  conference.  And I think that you know, Mr. Shearer, exactly

20  what it is all about.  So you can start your summations now,

21  take a lunch break after, then see how it goes, okay?

22      MR. SHEARER:  Okay.

23      THE COURT:  Let bring the jurors in.

24      (A brief pause in the proceedings was held.)

25      COURTROOM DEPUTY:  All rise.

1  exactly that.  He produced his doctor's note on January 10th

2  and he was terminated on Friday, January 13th before he could

3  return to work the Tuesday of the following week which was the

4  first business day of the following week because Monday was

5  Martin Luther King Day.

6          Now, I went through Mr. Barger's background and

7  there's no reason to go over it again, but Mr. Barger has been

8  working his entire life.  He's never taken a vacation day.

9  He's never taken a sick day.  He's always been going to work.

10  Work is his life and to remove him from that, Mr. Barger said,

11  gave him less of a purpose and he didn't have anything to do

12  because he always wanted to be working.  And that is it in and

13  of itself harmed Mr. Barger before we even get to the lost pay

14  and his inability to work.

15          Before getting into the specifics of everything, I

16  just want to give an overview of their excuses.

17          We talked a the about successors.  I still don't

18  understand how that is relevant or what it exactly means.

19  Yes, Mr. Barger was looking for a successor but so is

20  everybody else in the company.  There are succession plans, I

21  don't understand where it's going, I'll be interested to hear

22  from them in their summation as to why they think that should

23  even be considered.

24          Then we hear a lot about a RIF or reduction in

25  force.  When I go through this, I'm going to explain to you

1    that really it's not a reduction in force, it's a rotation in

2    force.  All that occurs at First Data is they terminate large

3    chunks of people just to rehire them, and it's a cute little

4    accounting trick and it's turning into be a nice little

5    attempt to defend a legal argument that they violated the FMLA

6    by going -- having these constant RIFs.

7         Remember Mr. Cagwin?  He said that he'd been there

8    about five years.  He said there'd be a vast majority of the

9    quarters of his five years, there had been a reduction in

10   force or a restructuring involving the termination of enough

11   employees that there is at least $5 million in severance paid

12   that quarter.  That's over and over and over, quarter after

13   quarter, terminating large chunks of people just to turn

14   around, rehire them, or as Mr. Cagwin said, use the savings to

15   go buy another business which has employees so the number of

16   employees stayed pretty constant the entire time, compensation

17   expenses have gone up.  It's just a churn, a churn, a churn

18   and now it's becoming an excuse for not complying with the

19   Family Medical Leave Act and an excuse for not complying with

20   the Americans with Disabilities Act.

21        If you allow a company to do that, they essentially

22   immunize themselves from ever needing to comply with the FMLA

23   or the ADA simply because they're constantly firing large

24   chunks of people and they just say, Well, you were on the

25   list.  And, all of a sudden, they don't have to comply with

1   the FMLA anymore.

2          It's not a real RIF, it's a rotation in force and

3   it's being used for accounting purposes and for legal defense

4   purposes, and it's not for showing up in the financial

5   statements.

6          Now, I just want to when you go back, you're going

7   to be given the exhibits that we've, well, you'll be given an

8   opportunity after the exhibits.  And the way that the

9   defendants and the plaintiffs kind of organization our

10  exhibits a little bit different.  The defendants are more

11  chronological in the way that they are.  Ours are organized a

12  little bit by topic and.  Even though we didn't get all the

13  exhibits in, I just kind of wanted to let you know how our

14  exhibit list works.

15         If you could, Mr. Innelli.

16         These are the topics that we had covered.  The first

17  few exhibits, there are two or three of them in there, are

18  First Data's corporate documents.  Things like the employee

19  handbook, the FMLA policy.  The next section is preemployment

20  documents that's going to be Mr. Barger's consulting business

21  and invoices related to that.  The next category there is what

22  happened when he wasn't ill and before the surgery.  Then the

23  surgery to forced leave, how he was interacting.  E-mails with

24  him interacting with his employees.  The e-mail about cutting

25  off his access and things around the intent to return.  And

1   management group in the company, 3,000.

2          So they're going to look at 3,000 and he wants to

3   lay off at least ten percent of that.  They ended up laying

4   off more than ten percent, 362.  And paid 54th in that group

5   was Mr. Barger and his boss, Jeff Hack, put him on the list.

6          Now, you heard Mr. Shearer say that Mr. Hack and

7   Mr. Charron put him on list on a whim.  That's not what I

8   heard Mr. Charron say.  When Mr. Charron testified, let's

9   remember who Mr. Charron is, right, he's the West Point grad,

10  the hearing problems from the Gulf War, pretty straightforward

11  guy.  I thought a stand-up guy.  He told you what happened.

12         He said that -- let me go back for a minute.  You

13  know story as well as I do, but I hope that you can see it the

14  way that I see it.  Mr. Barger goes 13 years without

15  contacting Mr. Plumeri, and that's the guy that he he's worked

16  with before.  He's very successful man.  He called him Batman

17  and he was Robin.  In my world, we would have called him the

18  Godfather.  This is somebody that's going to take care of him.

19         He contacts him, he gets him the job at First Data

20  as an consultant.  And we know that history of how he got

21  paid.  He represented that Mr. Plumeri asked him, How much are

22  you making?  Mr. Barger agrees that's what he was told, what

23  he was asked, how much are you making.  He says 20 to 25,000 a

24  month.  So he goes, I'll give you 30.  He needed him.  He was

25  in desperate shape, too, this was this the beginning of trying

1    to save the company.  So he brings him in at $30,000 a month

2    as a consultant and you know about the invoices and the

3    $50,000 for the intellectual property, all those things that

4    happened.  And he did approved the $400,000 purchase order.

5          And just as plaintiff's attorney described it to

6    you, they only used 177 of it because he became an employee in

7    June.  So I guess in his mind -- now, remember, he just split

8    up the business he started with his son to teach him.  He was

9    going to apprentice his son to teach me -- he was going to

10   apprentice his in the business, he was going to teach him to

11   do this work.  He left him high and dry.

12         I think the parting shot for the high-and-dry son

13   was grabbing $50,000 from the money that was left in the

14   400,000 because they didn't use it because before the end of

15   the year he became an employee.  So he grabs 50,000 for his

16   son as a little severance package for the son in the business

17   and off he goes to work for First Data.  And he works for

18   Mr. Plumeri, Batman and Robin, for a good year or so and then

19   Mr. Plumeri goes on to other things and now Robin's alone.

20   Can you imagine Robin without Batman because now that's what

21   we got.  Except Robin is very, very highly paid because his

22   good friend and Godfather Joe Plumeri took care of him he did

23   take care of him very generously.  He's got this high salary

24   now.  High salary like that, you better perform.  I remember

25   win A-Rod came to the Yankees what that was like.  You got to

1          (In open court; 2:20 p.m.)

2          (Court's Exhibit 4 was marked in evidence as of this

3     date.)

4          THE COURT:  So we have a note that we marked Court

5     Exhibit No. 4.  And it says, Page 10, 1st sentence, of the

6     charge, 2nd paragraph under FMLA claim.  Question:  Is this a

7     statement of fact or opinion?

8          So I don't have to call them in I can just write

9     back it's a statement of fact.

10         What's the problem.

11         MR. ZEITLIN:  We agree.  It should be deemed a

12    statement of fact.

13         THE COURT:  What is it that you're saying?

14         MR. ZEITLIN:  Only agree with your Honor whether

15    it's a statement of fact.  The question is whether it's the

16    second or third paragraph and I want to be very precise.

17         THE COURT:  Let's see what we're talking about.

18    Second paragraph under the FMLA claim.

19         MR. ZEITLIN:  Technically, it's the third paragraph.

20         THE COURT:  Pardon.

21         MR. ZEITLIN:  The only issue, it's technically the

22    third paragraph and I want to be very precise about this.

23         THE COURT:  Under FMLA claim, first sentence of the

24    second paragraph it says, "The FMLA requires that employers

25    allow eligible employees to take up to 12 weeks of unpaid

1      MR. EIDELMAN:  Good.  Thank you, Judge.

2      THE COURT:  Very simple.

3      MR. EIDELMAN:  Agreed.

4      THE COURT:  Everyone gets antsy at this time.

5      MR. EIDELMAN:  It's very true, it's very true.

6      THE COURT:  After we.

7      COURTROOM DEPUTY:  All rise.

8      (Jury enters courtroom at 2:40 p.m.)

9      THE COURT:  Okay.  Madam foreperson, you are the

10  spokesperson for the jurors.  I just want to make sure I have

11  this down correctly.  You told me Page 10 of the charge, first

12  sentence, second paragraph, under FMLA claim, is this a

13  statement of fact or opinion?  I think you're referring to

14  what technically is the third paragraph.  I may be wrong about

15  that.

16      JUROR:  Oh, yeah.

17      THE COURT:  First, plaintiff also makes a claim

18  under the FMLA against First Data.  The second paragraph that

19  says the plaintiff had not exhausted his 12-week entitlement

20  to leave time before he was terminated on January 13, 2017.  I

21  think that's what you are referring to, am I right?

22      JUROR:  Yes.

23      THE COURT:  So that's a statement of fact, okay?

24  That answers your question.  I was going to write it down

25  here, but since we're not technically counted on this thing it

1    looks like it could be the third paragraph.  So we want it be

2    certain we know exactly what's on your mind.

3             Does that answer your question?

4             JUROR:  We're referring to this right here.

5             THE COURT:  Are you referring to this?  Listen to me

6    carefully.  The plaintiff had not exhausted his 12-week

7    entitlement to leave time before he was terminated on

8    January 13, 2017.

9             Is that what you want to know?

10            JUROR:  Yes.

11            THE COURT:  It's a statement of fact or opinion.

12            JUROR:  Yes.

13            THE COURT:  That's your question?  Do you want to

14   talk to each other?  Is there some confusion about it?

15            JUROR:  There is.

16            THE COURT:  You're talking to each other.  Why don't

17   you go back to the jury room and let me know whether you want

18   to know whether that statement is a statement of fact or an

19   opinion, is that your question?  I'll answer it.

20            When I see two of your colleagues whisper to each

21   other it makes me insecure.  Go back to the jury room.  Come

22   back and let me know in a written statement what exactly --

23   write it out what the statement is that you want me to tell

24   you about whether it's a statement of fact or opinion.  Just

25   write it down on your note.  That will be the easiest way I

1  think, right?

2          JUROR:  Yes.

3          THE COURT:  So do that.  Go ahead and I'll wait for

4  you.

5          COURTROOM DEPUTY:  All rise.

6          (Jury exits courtroom at 2:42 p.m.)

7          COURTROOM DEPUTY:  You can all be seated.

8          THE COURT:  It's not easy.  Sometimes things seem

9  very simple and you have to be really, really careful to just

10  get it down right.

11          Off the record.

12          (Discussion held off the record.)

13          COURTROOM DEPUTY:  All rise.

14          (Jury enters courtroom at 3:45 p.m.)

15          COURTROOM DEPUTY:  You can all be.

16          (Court's Exhibit 5 was marked in evidence as of this

17  date.)  Seated.

18          THE COURT:  All right, folks.  We have the note

19  which I marked as Exhibit No. 5 that you have reached a

20  verdict.  And I guess you didn't need any further

21  clarification from me on the other thing, right?

22          So at this time, Ms. Antigua.

23          THE FOREPERSON:  Yes.

24          THE COURT:  So you're going to stand and Mr. Innelli

25  is going to ask you for the verdict.  Listen carefully.