294

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X
STEVEN B. BARGER,                  : 17-cv-4869(FB)
                                   :
          Plaintiff,               :
                                   :
      -against-                    : United States Courthouse
                                   : Brooklyn, New York
                                   :
                                   :
                                   :
FIRST DATA CORPORATION, et         : Wednesday, September 18, 2019
al.,                               : 10:00 a.m.
                                   :
          Defendants.              :
                                   :
                                   :
- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES SENIOR DISTRICT JUDGE, AND A JURY.

A P P E A R A N C E S:

For the Plaintiff:      THE LAW OFFICE OF SHAWN SHEARER, P.C.
                        Attorney for the Plaintiff -
                        Steven B. Barger
                            3839 McKinney Avenue
                            #155-254
                            Dallas, Texas 75204
                        BY: SHAWN SHEARER, ESQ.

                        ZEITLIN & ZEITLIN, P.C.
                        Attorneys for the Plaintiff -
                        First Data Corporation, et al.
                            50 Court Street
                            Suite 506
                            Brooklyn, New York 11201
                        BY: DAVID A. ZEITLIN, ESQ.

295

```
 For the Defendants:      SAUL EWING ARNSTEIN & LEHR, LLP
                          Attorneys for the Defendants -
                          First Data Corporation, et al.
                            500 E. Pratt Street
                              Baltimore, Maryland 21202
                          BY: GARY B. EIDELMAN, ESQ.
                              GILLIAN A. COOPER, ESQ.
                              MICHAEL CIANFICHI, ESQ.


                          BOND SCHOENECK & KING, PLLC
                          Attorneys for the Defendants -
                          First Data Corporation, et al.
                           330 Madison Avenue
                           39th Floor
                           New York, New York 10017
                          BY: LOUIS P. DILORENZO, ESQ.
```

```
 Court Reporter:  Anthony D. Frisolone, FAPR, RDR, CRR, CRI
                  Official Court Reporter
                  Telephone: (718) 613-2487
                  Facsimile: (718) 613-2694
                  E-mail: Anthony_Frisolone@nyed.uscourts.gov

 Proceedings recorded by computerized stenography.  Transcript
 produced by Computer-aided Transcription.
```

*PROCEEDINGS*                                                296

1           (Open court; no jury present.)

2           (Time noted:  10:03 a.m.)

3           THE COURTROOM DEPUTY:  Civil cause on trial, *Steve*

4  *Barger v. First Data Corp.*  All counsel and parties present.

5           THE COURT:  Good morning.  The jurors are all here,

6  and we would like to bring them in as quickly as possible.

7           Did you work out this exhibit situation when we left

8  yesterday?

9           MR. EIDELMAN:  Mr. Shearer was kind enough last

10 night to send us a revised list.  We are going to confirm this

11 morning, Judge, just to check the dates.  I think it is not

12 going to be all of them, 100 to 110, but we're going to be

13 able to stipulate as to which ones --

14          THE COURT:  Okay.  Work on that.  I'll tell the

15 jurors we will get back to them.  Let's bring the jurors in in

16 the meantime and continue with the trial.

17          (WHEREUPON, at 10:04 a.m., the jury entered the

18 courtroom.)

19          THE COURT:  Folks, when we left off yesterday we had

20 to sort out something in terms of the exhibits that we are

21 going to have in evidence as a result of the deposition

22 testimony of the doctor.  We are still working on that, and we

23 will be able to tell you what's going to happen with respect

24 to that sometime during the course of the morning, perhaps,

25 but in the meantime we are ready for our next witness.

1          MR. SHEARER:  Yes, we are.

2          THE COURT:  Who is that going to be?

3          MR. SHEARER:  The next witness is Grant Barger.

4          THE COURT:  Okay.

5          THE COURTROOM DEPUTY:  Good morning, Mr. Barger, if

6  you can take the witness stand.  I ask you if you can remain

7  standing and raise your right hand.

8          (WHEREUPON, the witness was duly sworn.)

9          THE COURTROOM DEPUTY:  Thank you.  Please have a

10 seat.  And I ask you to please state and spell your name.

11         THE WITNESS:  Grant Barger.  G-r-a-n-t, B-a-r-g-e-r.

12         THE COURTROOM DEPUTY:  Thank you.

13         THE COURT:  Your witness.

14                   GRANT BARGER,

15 called as a witness herein by the Plaintiff, having been first

16 duly sworn, was examined and testified as follows:

17 DIRECT EXAMINATION

18 BY MR. SHEARER:

19 Q    Good morning, Mr. Barger.

20         Can you just state your relationship to the

21 plaintiff, Steve Barger.

22 A    I'm Steve's son, middle child, and we -- I don't know

23 what else you want me to tell you.

24 Q    That's probably it.

25         THE COURT:  You are his son?

1          THE WITNESS:  I am his son, yes.

2          THE COURT:  Simple answer.

3          THE WITNESS:  Yes, I am his son.

4  Q     Right.  And how old are you?

5  A     I am 50.

6  Q     So you have known him -- well, you can remember knowing

7  him 45 years?

8  A     Yes.

9  Q     In your time with him, can you describe what you've

10 observed in terms of his work ethic?

11 A     Oh, it is -- there's no equal to Steve's work ethic.

12 He's -- I mean, when we're talking about somebody who, I

13 guess, you know, when I was growing up, one of the things that

14 I remember the most is it was always most important to get it

15 done right, not just to get it done.  So he's always instilled

16 a pretty stedfast work ethic with us.

17 Q     Okay.  And did you -- we heard about how Steve moved from

18 Iowa to New York.  Did you come to New York with him?

19 A     We did.  We did.  When dad decided to go work with Joe in

20 New York, we uprooted.  I was born and raised in Iowa.  We

21 moved out to New Jersey, and I finished high school in

22 Ridgewood, New Jersey.

23 Q     So you know Joe Plumeri?

24 A     Oh, yeah.

25 Q     Have you spent a lot of time with Joe?

G. BARGER - DIRECT - SHEARER                    299

1  A    I don't know about a lot, but we, you know, because he

2  works so closely with dad, we were around each other a good

3  bit since I was in high school.

4  Q    Now, your dad did all of his work.  Did you kind of --

5  you moved away, right?

6  A    Oh, yeah.  I went to college, yeah.  I went to college

7  while dad was working in New York.

8  Q    We've heard talk of your father's consulting before he

9  took the First Data job.  Were you involved in that business?

10  A    I was.

11  Q    Can you explain what that business was and why it was?

12  A    We started business in about 2010.  It was Called the

13  Barger Group, LLC, and dad was going to teach me the business

14  of consulting financial advisors.  And he did it specifically

15  to help me get my feet wet.  I was previously a financial

16  advisor in 2006, 2007, in that era.  And dad had always been

17  in the business, and it is something that I always wanted to

18  do, I always wanted to work with my dad.

19         So we -- I created an LLC called The Barger Group,

20  because everything was in my name, and then brought him on as

21  a consultant to show me the ropes and to teach me how to coach

22  and teach advisors.

23  Q    So did -- how did the billings work and the revenue work

24  for this LLC?

25  A    As far as the -- how much we charged individuals, things

1    like that?

2    Q    No, no.  I mean, what was your day -- I guess let's start

3    there.  What was your dad's function as part of the business,

4    the --

5    A    He was the rainmaker.  So he was the guy who got the

6    appointments.  He was the guy that knew everybody, you know.

7    If you go to LinkedIn, he knows everybody in the business, and

8    he was setting up the appointments for me.  And we were based

9    out of Birmingham, Alabama.  So we were able to actually, you

10   know, in this time and day and age, you don't have to be on

11   site necessarily to help.  We ended up working long distance

12   with people over the phone.  And so the arrangements, I guess

13   you can say were Steve was the one who set up appointments

14   because he had the preexisting relationships and he knew

15   everybody.  And, again, he was just trying to teach me how to

16   do that.

17   Q    Okay.  And when you did get a client, how -- did you

18   share duties, did you do it, did your dad do it, how did

19   you -- how did you run this?

20   A    He tried to teach me as much as possible.  It just

21   depended on, it was a case by case bases.  If it was something

22   that needed to be done and he knew I could handle, I would do

23   it over the phone with a client, or it was something that he

24   would sit back and listen to me actually take over a

25   conversation or webinar and do what he has done.  It was just

1  a learning experience, step by step experience.

2         THE COURT:  So, Mr. Shearer, you know that I'm going

3  to give you a short --

4         MR. SHEARER:  I know, Your Honor.

5         THE COURT:  Okay.  We got a little background.  I

6  gave a little flexibility.  I want to find out what's relevant

7  here.

8         MR. SHEARER:  Right.

9  Q    How much revenue -- I am going to go to Plaintiff's

10 Exhibit 14.

11        THE COURT:  Is that in evidence yet?

12        MR. SHEARER:  No, it is not, Your Honor.

13        THE COURT:  Okay.  No objection.  That's in

14 evidence.

15        (Plaintiff Exhibit 14 received in evidence.)

16 Q    When you had a client and an invoice went out, did the

17 invoice go out under the name of The Barger Group or did it go

18 out under the name of Steve Barger or Grant Barger?

19 A    It was The Barger Group.

20 Q    What years was this operational?

21 A    2010 to, I don't know, however long it lasted.

22 Q    Do you recognize this document before you?

23 A    Okay.

24 Q    You got it?

25 A    Seems like, yeah.

1  Q    And it says up here at the top, it says, 2001 business?

2  A    Okay.

3  Q    And then it has a column here of dates and then this next

4  column is firm?

5  A    Oh, yeah.

6  Q    Core states?

7  A    Uh-huh.

8  Q    What is this column?

9  A    Those are our clients.

10 Q    Okay.  So UBS and Fifth Third.  And then the amount.  Do

11 you see the --

12         THE COURT:  What's the relevance here, Mr. Shearer?

13 Q    Well, I guess, what was the revenue of The Barger Group

14 in 2011 --

15         MR. SHEARER:  The relevance, Your Honor, is they are

16 trying to say Mr. Barger --

17         THE COURT:  I don't know what they are trying to

18 say.  I don't know what the relevance of this testimony is.

19         MR. SHEARER:  The relevance is the --

20         THE COURT:  Go on to the next question.  I don't get

21 it.

22         MR. DiLORENZO:  Your Honor, we have an objection to

23 this document.

24         THE COURT:  You have an objection to what?

25         MR. DiLORENZO:  To this document.

1        THE COURT:  I don't have it notated as an objection

2   here.  We went over the list, and I don't see any objection on

3   the list we have here.

4        MR. DiLORENZO:  It is in our motion in limine,

5   Your Honor.

6        THE COURT:  Well, it comes as new information to me.

7        Go on to something else.  This is already in

8   evidence.  I don't think it is any harm in having it here.

9        I don't see that it's necessarily relevant.  Go on

10  to something that's relevant.  Why is he testifying here?

11       MR. SHEARER:  He's testifying about the revenue

12  Mr. Barger generated and what -- before he joined First Data.

13       THE COURT:  It goes back three, four, five years

14  ago, he generated revenue into this other business, right?

15       MR. SHEARER:  That's correct.  And more than what

16  the defense --

17       THE COURT:  What else?  What do you want to say?

18       MR. ZEITLIN:  Your Honor, can we have a quick

19  sidebar?

20       THE COURT:  No.

21       What other questions do you want to ask him?

22  Q    Before your dad joined First Data --

23  A    Yes.

24  Q    -- can you tell me about what you were working on right

25  before he joined First Data?

1   A    Oh, yeah.  We were just getting rolling, actually, before

2   he started talking to Joe again, and we were getting ready to

3   work with Lebenthal here.

4           THE COURT:  Make it easy on you.  Before your father

5   joined First Data, he was working with you, correct?

6           THE WITNESS:  Yes, sir.

7           THE COURT:  Just to clarify before the jury.  And

8   you were in business together, right?

9           THE WITNESS:  Yes.

10          THE COURT:  What kind of business were you in?

11          THE WITNESS:  The consulting business.

12          THE COURT:  And you made money?

13          THE WITNESS:  Yes, we did.

14          THE COURT:  And how much money, roughly, did you

15  make?  How much money did your father make?

16          THE WITNESS:  About $30,000 a month.

17          THE COURT:  About $30,000 a month.

18          That's the same amount of money he was being paid

19  when he went with First Data, right?

20          THE WITNESS:  Yes.  I guess so.

21          THE COURT:  Anything else you need to know from him?

22          MR. SHEARER:  Yes.

23  Q    When you structured your consulting deals, did you have a

24  payment for intellectual property that preexisted?

25  A    It just depended, but in some cases I would say yes.

1  Q    What happened when your dad left your business?  In terms

2  of the business, what happened?

3  A    So that was the end of it because we were -- my thing, we

4  were just getting started.

5           THE COURT:  And then you continued to work for that

6  company?

7           THE WITNESS:  I did not.  Just everything --

8           THE COURT:  Your father left, you went on to do

9  something else?

10           THE WITNESS:  I sure did.  Yes, sir.

11           THE COURT:  What did you go on to do?

12           THE WITNESS:  Other various jobs.

13           THE COURT:  So this particular business that you had

14  with your father ended when you went with First Data?

15           THE WITNESS:  It sure did.

16           THE COURT:  Okay.  And you were each making about

17  $30,000 a month when he was working with you or collectively

18  was $30,000?

19           THE WITNESS:  Collectively.

20           THE COURT:  So you got some of that income, too,

21  right?

22           THE WITNESS:  Oh, most of it.

23           THE COURT:  Well, what did your father have?

24           THE WITNESS:  He -- it wasn't necessary for him to

25  have income at the time so he was just helping me and my

1    family get started.

2              THE COURT:  He was helping you?

3              THE WITNESS:  Absolutely.  A hundred percent.

4              THE COURT:  And that business generated $30,000 of

5    income for you and your family at the time?

6              THE WITNESS:  Yes, sir.

7              THE COURT:  And your father was helping out as a

8    good father, and he wouldn't take any of that money at all?

9              THE WITNESS:  Well, no.  That's not true.

10             THE COURT:  Maybe a little bit?

11             THE WITNESS:  Our accountant made sure everything

12   was great.

13             THE COURT:  But not -- he wasn't taking $30,000?

14             THE WITNESS:  No.

15             THE COURT:  He went to work for First Data, then he

16   was getting $30,000 when he went to work for First Data?

17             THE WITNESS:  Initially we both were because it was

18   under The Barger Group.

19             THE COURT:  What?

20             THE WITNESS:  We both were because it was --

21             THE COURT:  You went to work for First Data also?

22             THE WITNESS:  No, he did -- yeah, because it was

23   with The Barger Group, right?  So it was under The Barger

24   Group name, so the $30,000 was coming in to me, initially, to

25   us.

*G. BARGER - DIRECT - SHEARER*                      307

1          THE COURT:  All right.  Do you have any other

2     questions?

3          MR. SHEARER:  Yes.

4     Q    Did you have -- what happened to your clients that you

5     did have when your dad left?

6     A    So we had to reimburse our -- several clients when dad

7     left.

8     Q    Why?  Because --

9     A    Because we were unable to fulfill our obligation with

10    them.

11    Q    Okay.  Were you with your father during his surgery and

12    recovery in Tampa, Florida?

13    A    I was.

14         THE COURT:  Another question:  So your father left

15    his son high and dry?  You were making $30,000, and he skipped

16    ship, and you went down south?

17         THE WITNESS:  Yeah.  You've got to throw the bird

18    out of the nest sometimes, right?

19         THE COURT:  Wow.  So what did you do after that?

20         THE WITNESS:  He was talking about his surgery down

21    in Florida so I went down and took care of him.

22         THE COURT:  So were you earning any income then?

23         THE WITNESS:  At the time, just odd jobs.

24         THE COURT:  Okay.  So your father was critical for

25    you and your family, and then he went with First Data, and you

1   sort of had to adjust to that?

2              THE WITNESS:  Absolutely.

3              THE COURT:  And he went into surgery, at that time

4   you were taking care of him?

5              THE WITNESS:  My mother mostly, yes.

6              THE COURT:  What else?

7   Q    So you were with him in Florida?

8   A    Yes.

9   Q    Okay.  How long were you in Florida with him?

10  A    Two months.

11             THE COURT:  You can take that off the screen right

12  now.

13             MR. SHEARER:  I'm sorry.

14             THE COURT:  I allowed it in, but it doesn't seem

15  like it is terribly relevant, but it is done.

16             MR. SHEARER:  Okay.

17  Q    And can you tell me about what his -- he was working on

18  for First Data?  Not what he was working on, was he working --

19  A    Right.

20  Q    -- on First Data work?

21  A    He's a workaholic, and so the entire time he was down

22  there he was working on the things that he had to do for First

23  Data.  Received several packages from First Data while we were

24  down there.  And never -- aside from the day right after his

25  primary surgery, he was never without his suit, you know, his

1    briefcase, his laptop --

2         THE COURT:  This is before the surgery, he was down

3    in Florida, he was working very hard?

4         THE WITNESS:  During and after.

5         THE COURT:  Before, during, after?

6         THE WITNESS:  Yes, sir.

7         THE COURT:  Okay.  I think we get the sense of it.

8         Anything else?

9         MR. SHEARER:  No, Your Honor.  That's what I just

10   needed to cover.

11        THE COURT:  Okay.  You want to question him at all,

12   Mr. DiLorenzo?

13        MR. DiLORENZO:  Yes, I do, Your Honor.  Thank you.

14   Briefly.

15   CROSS-EXAMINATION

16   BY MR. DiLORENZO:

17   Q    Mr. Barger, my name is Lou DiLorenzo.  I'm just going to

18   ask you some questions.

19   A    Nice to meet you.

20   Q    Nice to meet you, too.

21        So you guys were -- you and your father were in

22   business for about four years together before he became an

23   employee of First Data?

24   A    I think that sounds about right.

25   Q    And during those four years, isn't it true that he

1    generated almost all the business?

2    A    Yes.

3    Q    Really, a hundred percent of it?  You didn't bring any

4    business into the company?

5    A    You know, I think I may have just through virtue of

6    junior partnerships.  When we dealt with father and sons,

7    sometimes on a road tour, I would have conversations with the

8    sons in these father and son teams, but I would never take

9    credit for that, you know, it is -- he was the man.

10   Q    And your testimony is that --

11             THE COURT:  What are you doing today?

12             THE WITNESS:  I am doing a digital version of this

13   to create content for advisors so they can have --

14             THE COURT:  You're working for a company?

15             THE WITNESS:  I'm doing it myself.

16             THE COURT:  Yourself.  You're making a living?

17             THE WITNESS:  Yes, trying to.

18             THE COURT:  Okay.  What else?

19   Q    And the $30,000 that was coming into the business a

20   month, you two split that evenly, 15,000 each?

21   A    No.  It was just a matter of --

22             THE COURT:  I think he said that most of that money

23   went to the son and his family and that his father didn't take

24   very much.

25             THE WITNESS:  That's right.

1  Q    And then when he went to work for First Data, that was

2  the end of the company and he kept all that money as an

3  employee, right?

4  A    No.  He didn't keep it, really any of the money.  It was

5  just part of The Barger Group, so.

6  Q    And not after he became an employee, though?

7  A    Oh, right.  I received nothing from First Data after he

8  became an employee.  Is that the question?

9  Q    Yes.

10 A    Okay.  Thank you.

11 Q    And you said that after the business broke up, then you

12 went down to Florida and helped take care of him; is that

13 right?

14 A    I did, yes, sir.

15 Q    But wasn't his surgery two years after the business broke

16 up?  He worked for First Data for almost three years, I think?

17 A    Yes.  He did.

18 Q    So what did you do between those three years?  I got the

19 understanding as soon as the business broke up, you went to

20 Florida and --

21 A    No, just worked different odd jobs.

22 Q    Not financial consulting?

23 A    No.  Trying to survive.  Well, I had been building the

24 brand, it's called Tangible Alpha, for quite some time now,

25 and I started immediately right after that happened.

1            THE COURT:  So your father went to First Data.  All

2    right.  We get it.  And you were then trying to figure out how

3    to make a living for yourself?

4            THE WITNESS:  Yes, sir.

5            THE COURT:  Were you successful in supporting your

6    family?

7            THE WITNESS:  I would say --

8            THE COURT:  Tough go, right?

9            THE WITNESS:  Yeah, very tough.

10           THE COURT:  Without your father, tough go?

11           THE WITNESS:  Yes.

12           THE COURT:  Anything else?

13           MR. DiLORENZO:  Just a few, Your Honor.

14   Q    You said that sometimes there's an arrangement made with

15   the company that The Barger Group would do work for concerning

16   intellectual property or proprietary information; is that

17   true?

18   A    Yes.

19   Q    Sometimes it would be included in the payments and

20   sometimes it wouldn't be?

21   A    No.  I don't -- I think it was always included.

22   Q    In other words, whatever fee you were charging, it

23   covered the intellectual proprietary?

24   A    It varied, because I can't say that everybody was -- it

25   wasn't necessary for everybody to have the whole stamp of

1   intellectual property, it just depended on -- it was case by

2   case.

3   Q     And without giving away any secrets, what was the nature

4   of the intellectual property?  Like algorithms or source

5   codes?  What was the nature of the intellectual property that

6   was being protected?

7   A     That is a good question.  I think mostly it was the

8   programs that my dad had developed since the late '80s.

9   Q     You mean like a teaching program, like a lesson plan?

10  A     It was like a value development program for -- that you

11  could actually -- that was transferable to a mass market that

12  could be used for as few or as many individuals as you wanted

13  to.

14  Q     So it would teach them, for example, how to sell?

15  A     Oh, no.  Not about selling at all.

16  Q     Oh, it is not about selling?

17  A     It is about creating relationships and earning trust.

18  Q     And so this would be seminar materials as to how to build

19  relationship and establish trust?

20  A     Not necessarily seminar.  Some of it might be a webinar

21  or a seminar, but a lot of it was either face to face or over

22  the phone.  And it would just -- it is just, like I said, it

23  is a case by case basis for someone, who, like, if they want a

24  private coach or private teaching session to improve your

25  life, you would do something similar to what we did.  And we

1    helped individuals improve what they did, you know, in several

2    different ways.  Like, for example, we created a course for

3    Bethel University for their MBA program.

4    Q    But the material, it was really somehow instructional

5    material, course material, is that what we are talking about?

6    A    I don't think that I would put it all in that one

7    category, as instruction or course.  I think it has to do

8    with -- I don't know, maybe I am getting lost in this,

9    Your Honor.  It is just --

10          THE COURT:  I think we are mumbling along here.  Ask

11   another question, all right?

12   Q    During the time -- so did you go down and start staying

13   with him before he had the surgery?

14   A    Yes.

15   Q    And then how long did you stay with him?  If he had the

16   surgery in September, how long did you stay with him?

17   A    It was a couple months.

18   Q    We heard some testimony yesterday about his medical

19   situation.  It sounds like it was a tough road in terms of his

20   wounds and so on.  We got some graphic testimony about it, and

21   is that what you witnessed as well?

22   A    I mean, he had his entire larynx taken out and the doctor

23   actually had to go back in and make some adjustments

24   afterward, but the fact that, you know, he survived the cancer

25   in the first place was a blessing, of course, and then the

1  fact that he was able to live through it.  And those surgeries

2  that are pretty brutal was -- it was pretty traumatic for

3  everybody.

4  Q    And we saw a medical certification yesterday from his

5  doctor indicating he was incapacitated for a large part of

6  that period.  Is it your testimony that he was able to do this

7  job?  I think he was directing a division with 60 people or so

8  and being paid a substantial amount of money to do so.  It is

9  your testimony that from what you saw, he was able to do that

10 job full-time during the time that you were with him in the

11 hospital as well as home?

12 A    It is my testimony that he had all of the things that he

13 needed to do business, he was on the phone constantly

14 afterwards, and either sending e-mails or text messages.  And

15 at one point in time one of the nurses dropped his phone, and

16 I had to go and get it fixed for him so he could catch a

17 meeting.

18            THE COURT:  I'm confused.  Was he able to speak?

19            THE WITNESS:  No.

20            THE COURT:  So how was he on the phone talking?

21            THE WITNESS:  He wasn't talking, he was text

22 messaging on the phone.

23            THE COURT:  So texting?

24            THE WITNESS:  Or sending e-mails, yes, sir, with his

25 phone.

1          THE COURT:  Okay.

2          THE WITNESS:  His iPhone.

3   Q    In terms of the invoices that he sent to First Data

4   during that three and a half months that he was the consultant

5   for them, as I understand it, but he was working for your

6   business, you are the sole owner of the LLC?

7   A    Yes, that's correct.

8   Q    Okay.  You owned 100 percent of it, he didn't own any of

9   it?

10  A    That's right.

11  Q    Okay.  So he's working technically for you, right?

12  A    Yes.

13  Q    Okay.  And he makes a deal with First Data to be a

14  consultant, that lasts for about three and a half months,

15  right, before he becomes an employee?

16  A    I think it started in -- actually, I believe it was

17  earlier than that, when he and Joe started talking because we

18  were going to do Lebenthal, and then that was the end of --

19         THE COURT:  Try to answer the question.

20  A    I think it was longer than that.

21         THE COURT:  Do you understand the question?

22         THE WITNESS:  How long was he working for them?

23         THE COURT:  Right.

24  Q    As a consultant?

25  A    I really don't remember.  I think it was longer than

1    three months.

2            THE COURT:  Best you recall.

3    Q    You had nothing to do with the deal that was made between

4    him and First Data on behalf of Barger and Associates?

5    A    No, that was between Steve and Joe, always.

6    Q    And you didn't know anything about it or have anything to

7    do with it?

8    A    No.  Never.

9    Q    And he sent the invoices to First Data, you didn't have

10   anything to do with that either?

11   A    Sometimes I would print out the invoices, yes.  And

12   that's part back office things, that I was trying to learn the

13   business and trying to, you know.

14   Q    You would print the invoices out, but he would send them

15   to First Data, or he would prepare them?

16   A    Sometimes I would, sometimes he would.  It just depended.

17   Like I said, I was trying to learn the business.

18   Q    You remember being deposed in this case?

19   A    I do.

20   Q    Mr. Eidelman deposed you?

21   A    Yes.

22   Q    I am looking at page 53.

23           THE COURT:  Members of the jury, this is being used

24   for impeachment purposes.  He is not a party.  And the purpose

25   of now having something read from his deposition is to see

*G. BARGER - CROSS - DiLORENZO*                    318

1   whether there's anything that was inconsistent when he gave

2   his deposition from what he said in court now.

3          Let's see if he said anything like that, and then

4   you can assess it all.  Go ahead.

5   Q    Do you recall -- I'm sorry.  Line 10 on page 53.

6   Actually, line 1 on page 53.

7          "QUESTION:  Can you tell me what period of time this

8   invoice was for?

9          "ANSWER:  No, because the date on the invoice

10  doesn't necessarily reflect -- Steve made up all these

11  invoices.  He's the one that did this stuff.

12         "QUESTION:  Oh, so --

13         "ANSWER:  So --

14         "QUESTION:  Let me stop you there.

15         "ANSWER:  Go ahead.

16         "QUESTION:  Your father created these invoices?

17         "ANSWER:  Steve got the business at First Data, he

18  had the relationship with First Data.  I didn't have anything

19  to do with First Data at all."

20         Do you remember those answers?

21         THE COURT:  It is your testimony?

22         THE WITNESS:  Yes.  If I said it, I said it, for

23  sure.

24         THE COURT:  So that's correct?

25         THE WITNESS:  Yes.

1          THE COURT:  That's correct.

2          THE WITNESS:  Yes.  At the time, yes.

3   Q    You entered an engagement letter to have Mr. Shearer

4   represent you in 2014, didn't you?

5   A    I think so, yes.

6   Q    He's the attorney for this Barger --

7          MR. SHEARER:  Objection.

8          MR. ZEITLIN:  Relevance.

9          THE COURT:  Sustained.

10         MR. DiLORENZO:  No more questions, Your Honor.

11         THE COURT:  Any redirect?

12         MR. SHEARER:  No, Your Honor.

13         THE COURT:  You may step down.  Thank you very much.

14         (WHEREUPON, the witness was excused.)

15         THE COURT:  Next witness.  You have somebody else

16  you wish to call?

17         MR. SHEARER:  I am going call Mr. Charron.

18         THE COURTROOM DEPUTY:  Please raise your right hand.

19         (WHEREUPON, the witness was duly sworn.)

20         THE COURTROOM DEPUTY:  Please have a seat.  And I

21  ask you to please state and spell your name.

22         THE WITNESS:  Daniel Joseph Charron.  C-h-a-r-r-o-n.

23         THE COURTROOM DEPUTY:  Thank you.

24         THE COURT:  Your witness, Mr. Shearer.

25         MR. SHEARER:  Thank you, Your Honor.

1              DANIEL J. CHARRON,

2   called as a witness herein by the Plaintiff, having been first

3   duly sworn, was examined and testified as follows:

4   DIRECT EXAMINATION

5   BY MR. SHEARER:

6   Q    Good morning.

7   A    Morning.

8   Q    What was your position with First Data during the time

9   Mr. Barger was employed?

10  A    I was executive vice president of global business

11  solutions.

12  Q    Are you currently the executive vice president of global

13  business solutions?

14  A    I am currently the chairman of global business solutions.

15  Q    You're the chairman?

16  A    Yes.

17  Q    What's the difference between the EVP position and the

18  chairman position?

19  A    We went through a merger with Fiserv.  We were acquired

20  by Fiserv.  So the combined company, Fiserv created different

21  entities that brought together in GBS, and I am managing

22  certain aspects of that.

23          THE COURT:  Excuse me one second.  Mike, can you get

24  this document off the --

25          MR. SHEARER:  Thank you, Judge.

1              THE COURT:  Go ahead.

2    Q    Before the trial, I looked it up, and I saw that you were

3    involved with an Irish bank?  Is that true, or is that not --

4    A    Yes.

5    Q    Is that part of the chairman of global business

6    solutions?

7    A    Yes, it is.

8    Q    Okay.  Can you explain what global business solutions is

9    at First Data?  What does it do?

10   A    At First Data or at Fiserv?

11   Q    Well, during the relevant periods here, 2014 to 2017.

12   A    It was the merchant business.  It resolved around working

13   with different businesses to accept -- allow them to accept

14   credit cards, give them the terminals that they can accept the

15   credit cards, enabling people to actually take the credit

16   cards and get paid for that, the technology and operations

17   around that.

18   Q    So how do you get more merchants to accept terminals?

19   What's the sales process?

20   A    The sales process, it's not -- it is not really a

21   needs-based because you can go to any business today and say,

22   do you need credit cards, you want to accept credit cards,

23   they will say yes.

24              What you do is you go into the customers and talk

25   about your products a little bit and how you differentiate it.

1   There's obviously price, there's service, there's the

2   operations, and a big aspect of that is your brand.  If they

3   know who you are as a company, it helps on the sales process.

4   Q    But what -- you said you tried to distinguish yourself.

5   What's the difference in your card swipe versus somebody

6   else's card swipe machine terminal?

7   A    It depends on what product you're specifically referring

8   to.

9   Q    So you have several products?

10  A    There are multiple products, yes.

11  Q    So do you compete on -- is it basically competing on

12  price?

13  A    No.  Price is a portion of that.  A lot of it is around

14  the brand that you have as a company.  And if you are a

15  recognized brand, they recognized you as a provider.  And

16  that's probably one of the biggest aspects of the sales

17  process is are you represented by a company with the best

18  products, and they look at other businesses that are using

19  that product, and they can see it out there, and so it does

20  help.

21  Q    Okay.  When did you come to First Data?  When did you

22  start there?

23  A    I started at the end of February 2015.

24  Q    So Mr. Barger was already there when you arrived?

25  A    He was.

1   Q    Did you apply for the First Data job or were you

2   recruited?  How did you get this job?

3   A    I was recruited for it.

4   Q    Who recruited you?

5   A    Frank Bisignano.  CEO.

6   Q    Did you come in to replace someone that was previously at

7   First Data?  Was this a new job created for you or --

8   A    I don't know who -- if I came in to replace, I was asked

9   to come in and work on the merchant business.

10  Q    So what were you -- your responsibilities were the

11  merchant business in the United States, or was it global?

12  A    Piece of it, primarily United States.  Global business

13  solutions is a 12,000 person organization.  First Data had

14  three publicly reported segments.  One of them is global

15  business solutions, the other two are called network solutions

16  and global financial solutions.  I was primarily responsible

17  for the merchant business.  I did not have all of the

18  different individuals reporting to me in that business, but I

19  spoke with Investor Day, I spoke to the board, I set the

20  strategy, we talked about the product.  I did have some direct

21  responsibilities for different areas.

22  Q    All right.  Was Steve Barger under your group when you

23  initially came to First Data?

24  A    Was not.

25  Q    Okay.  He was reporting to Joe Plumeri at that time?

1   A    That's my understanding.

2   Q    Okay.  How did Steve Barger end up in global business

3   solutions?

4   A    I think at the time, at the end of it, probably in the

5   end of '15 time frame, Joe was going to be the vice chairman,

6   I think it was after the IPO, vice chairman on our board of

7   directors, and I am not sure, but I think he had training and

8   that got moved to a gentleman named Jeff Hack.

9   Q    Okay.  We've heard about Jeff Hack.  He was an executive

10  vice president of global business solutions, also, right?

11  A    Yes, he was.

12  Q    So you were both executive vice president of global

13  business solutions?

14  A    Yes, we were.

15  Q    But he reported to you; is that right?

16  A    We have a management committee at First Data.  It is

17  headed up by our CEO.  We have 12 to 13 different executive

18  vice presidents that run different aspects of our business.

19  As I mentioned to you earlier, global business solutions is a

20  massive organization with 12,000 different people.  Jeff had

21  unique responsibilities within the merchant business and

22  global business solutions.

23  Q    Mr. Barger reported to Jeff Hack.  Jeff Hack is -- I'm

24  trying to decide who had the ultimate authority to terminate

25  Mr. Barger?

1   A    His direct manager, Jeff Hack.

2   Q    Did you have the authority to terminate Mr. Barger?

3   A    Did I have the authority to terminate Mr. Barger?

4   Q    Yes.

5   A    He didn't report to me directly.

6   Q    But if you decided Steve's gone, could you have fired him

7   without asking Jeff?

8   A    No, Jeff would be involved with that.  I didn't have much

9   dealing with Mr. Barger on a direct relationship training

10  basis and what he did each day.

11  Q    Between you and Jeff Hack, who was responsible for the

12  global business solution segment budget and P&L, profit and

13  loss statements?  Were you responsible?  Was Jeff responsible?

14  A    I was responsible for that on a global basis, yes.

15  Q    So Jeff did not have responsibility for the budget, that

16  was you?

17  A    For the overall P&L reporting, as I mentioned to you, it

18  is a publicly reported segment.  Responsibility for reporting

19  on that, dealing with the board, supporting Investor Day, and

20  running any pieces of that, that was me.  As it relates to the

21  budget associated with the training, if that's the question

22  you're asking, Jeff had responsibility for that.

23  Q    We heard from Karen Whalen and Rhonda Johnson yesterday,

24  both in the human resources department.  What was -- did you

25  have -- did they have a role inside of the GBS organization?

1  What did they do for you?

2  A    Karen Whalen was my HR partner.

3  Q    And they used that term yesterday, and I still don't

4  understand.  What does that mean?  What is an HR partner?

5  A    My definition of HR partner, we had an individual

6  assigned to each executive, assigned to them, and that would

7  handle all of their -- any of their HR needs.  Karen Whalen

8  was mine.

9  Q    Did they report to you in the organization or they

10 reported through HR?

11 A    They reported to HR.

12 Q    Okay.  Could they make decisions for GBS, or did you have

13 to make them?  Could Karen Whalen decide GBS was going to take

14 an action or did you have to make that decision?

15 A    You need to -- what action specifically are you talking

16 about?

17 Q    If you are going to reorganize how the employees are that

18 report to you, could Karen Whalen do that or did you have to

19 make the decision?

20 A    As it relates to the business in the organization, I

21 think we had multiple groups within the company.  We had our

22 HR group, we had our internals consulting group.  We had a lot

23 of people that helped us do analysis and give us guidance and

24 direction on opportunities to increase efficiency, remove

25 spans control.  So they played a role in that, yes.

1  Q    Did you ever do a performance review of -- for

2  Mr. Barger?

3  A    I did not.

4  Q    Do you know if Jeff Hack ever did a performance review

5  for Mr. Barger?

6  A    Do not.

7  Q    Did you do performance reviews for your other employees?

8  A    I did.

9  Q    Where did those reviews -- after you complete the review,

10 where are they housed -- where are they kept?

11 A    They are kept in a system called E-perform, I believe is

12 the name of it.

13 Q    So how many direct reports did you have when you came

14 over to First Data?

15 A    Oh, when I came?

16 Q    Yes.

17 A    I'm not exactly sure.

18 Q    Order of magnitude, 10, 50?

19 A    No, I think it was probably six or seven.

20 Q    And then how many -- then those were senior vice

21 presidents, mainly?

22 A    I don't know exactly what their level was, but it could

23 be.

24 Q    And how many direct reports did Jeff Hack have?

25 A    I'm not sure.

1   Q    Don't know?

2        But you were responsible for the total GBS

3   organization, right?

4   A    Yes.  As I mentioned, and I'll do it again, sir, GBS is a

5   global business, it is 12,000 people in it, multiple

6   countries.  Needed to have an individual that was responsible,

7   as it is a publicly reported segment.  I worked with multiple

8   people in the organization as it relates to anything to do

9   with merchant.

10  Q    Mr. Barger was there when you were hired, but did you

11  ever learn from anyone what purpose Mr. Barger was hired for

12  by Joe Plumeri?

13  A    I had no idea.

14  Q    But yet he was in your organization and you had no idea

15  why he was there?

16  A    He was in global business solutions.

17  Q    But you had no idea what he was there to do?

18  A    My understanding at the time was he was running sales and

19  training.

20  Q    Did you ever talk to him about -- did you only talk to

21  him about the sales training group?  Did you ever talk to him

22  about the other things he was doing?

23  A    I didn't.  I didn't understand what sales transformation

24  is.  I have a better understanding from listening to

25  Mr. Plumeri's testimony yesterday.  But I have been in this

1   industry for 30 years, I have been doing this for a long time.

2   I did not understand what sales transformation was.

3   Q    But yet you managed it for two years?

4   A    I did not manage it for two years.  It was sales

5   training.

6   Q    You thought it was sales training?

7   A    My understanding is, it was sales training.  We're

8   individuals working with our salespeople.  We have a large

9   sales force, they come in, we train them, teach them our

10  products, make sure they know how to use sales force, our CRM

11  tool, teach them how to do different things, and then they go

12  out into the field and sell.

13  Q    Do you agree with the testimony we heard yesterday

14  regarding mismanagement by Mr. Barger?

15  A    I don't understand your question.

16  Q    Well, we heard yesterday he allowed his high attrition

17  rates, he didn't hire enough, he didn't have the right people

18  in the place, he let --

19            THE COURT:  Do you have any knowledge of that at

20  all?

21  A    Yes.  Not at the time.  I mean, we had -- after Robin

22  Ording took over, we had a internal consultant review, which

23  is a bottoms up review, working with all of the different

24  individuals.  That group swelled up to, I think, 60, 70,

25  maybe, folks.  It is about 20 today.  So the net results, I

1    heard about the net results of those, but I wasn't like

2    involved in the day to day analysis.

3    Q    Would that review that was done after Mr. Barger went on

4    leave, how do you know that wouldn't have occurred had

5    Mr. Barger been there?

6    A    I do not know that.

7    Q    So had Mr. Barger not been on leave, it was possible

8    Mr. Barger could have run this review instead of Ms. Ording?

9    A    As I mentioned before, I had very limited interaction as

10   it relates to training.  I did not text with Mr. Barger, did

11   not get e-mails, we did not have calls as it relates to

12   corporate training.  I do know about the results of that

13   internal consulting, but I can't opine on whether or not it

14   would have happened before or after.

15   Q    This is where I am -- Mr. Barger is being criticized for

16   not paying attention to his organization, and you are up here

17   testifying that you don't know what's going on in your

18   organization.  Why is he the one getting fired for that and

19   you're sitting here as an executive vice chairman of GBS and

20   Fiserv.  If that's a real criticism of Mr. Barger, why isn't

21   it a criticism of you, too?

22   A    I can't answer that.  I am not sure what your question

23   is.

24   Q    You have answered three questions saying I didn't pay --

25   I don't know, I don't know.  That was Jeff Hack.  I don't know

1   what Mr. Barger did.  But yet Mr. Barger is terminated

2   according to the testimony yesterday --

3          THE COURT:  It is argumentative.  Why don't you save

4   that for your summation.  You get facts out.  He says he

5   didn't know, he had nothing to do with it.

6   Q    I heard -- we heard testimony that you sat down with

7   Mr. Barger, I've heard, the fall of 2015, I don't think that's

8   the wrong date, to talk to him about taking on additional

9   responsibility; is that correct?

10  A    We had a conversation, and it was really probably the

11  only business conversation.  We did have conversations other

12  than that, but not around business.  We had gone through and

13  done an analysis of different jobs, and what the pay rate was.

14  My understanding at the time, with Mr. Barger running

15  training, he was a senior vice president, he had $480,000 base

16  salary, which was the highest base salary of anybody that was

17  in GBS.  His comp was 700,000.

18         My point of reference is I ran Chase Paymentech's

19  business, a very similar type business.  The individual that I

20  had running that business was making around two, 300,000

21  dollars.

22         So in my conversation with Mr. Barger, and I had a

23  conversation with Jeff, Karen Whalen as well, I sat down with

24  Jeff, with Mr. Barger, and said, he seems a great guy, I

25  like -- I have nothing against Mr. Barger.  I -- he seemed

1  tenured, he had experience.  I said, we need to get you in a

2  role that matches the salary.  We need to put you in an

3  area -- we had P&Ls, we had folks with thousand-person

4  operations running hundreds of millions of dollars of revenue

5  businesses, making less than $480,000 on a base.

6              I said, we need to get you in one of those roles, or

7  we need to expand the role.  Not expand the people, but expand

8  your role.  Get other functions, take on the call center, take

9  on a bunch of different things.  That was my conversation with

10 Mr. Barger.

11 Q    And just to clarify, you said that Paymentech, the person

12 in that role made 230,000?

13 A    Around 300,000.  I don't know the exact number.  But

14 that's my experience of what the job --

15 Q    And what role is that you're talking about?

16 A    The head of sales training.

17 Q    So that's training that -- putting together the training

18 programs for the salespeople?

19 A    That's running the training group.

20 Q    Okay.  But did Paymentech have a similar program like the

21 First Data Way, the cultural transformation that Mr. Plumeri

22 was talking about?

23 A    They had corporate training, we did some of those -- I

24 don't know what sales training -- if you are asking me what's

25 sales transformation, I don't know.  I don't even think there

1  was a group or an organization associated with that.  That was

2  solely associated with Mr. Plumeri and Mr. Barger when they

3  came in prior to my time.  When I got there, it was a sales

4  training group.

5  Q    Okay.  Do you recall at all, when did this conversation

6  with Mr. Barger about taking on additional responsibilities

7  happen?

8  A    Had to happen, I think, the end of '15.

9  Q    And Mr. Barger was diagnosed with cancer in February of

10 '16, right?

11 A    That's my understanding, yes.

12 Q    Did he let you know he was diagnosed promptly?

13 A    I don't think he let me know personally, but I did know

14 about that.

15 Q    What actions did you take to assist Mr. Barger in

16 expanding his role and to taking over these call centers and

17 other responsibilities you just identified?

18 A    No, I didn't identify, I said that's an example.  He

19 worked for Jeff.  I said, you need to spend time with Jeff and

20 work through how you do this.  It was a conversation around

21 making sure that Steve and his compensation matched the job

22 that we had at the company.

23 Q    You said that there was corporate training at Paymentech.

24 What's the different between corporate training and sales

25 training?

1   A    It is really -- they're both training.  We didn't have

2   separate organizations at Paymentech.  It was run training

3   organization.  Corporate training is new employee orientation,

4   teaching them how to sign on, things of that nature.  There

5   were some other things around the overall company.  Sales

6   training is specifically training the sales force on your

7   products and services.  It was one training function.

8   Q    Mr. Bisignano testified in his deposition that First

9   Data's transforming from just simply a processor into an

10  information and technology company.  Do you agree with that?

11  A    I think the whole company's transformed.  First Data has

12  been around for 50 years.  It was a very, very troubled

13  organization.  It was not performing.  So there's been a

14  tremendous amount of transformation as it relates to First

15  Data.

16  Q    So what revenue -- is it a revenue problem, was it

17  expense problem, was it both?

18  A    I think it is all of the above.  It wasn't just

19  financial.  We had a operational problem, we had service

20  issues.  We had product -- there wasn't much product coming

21  out of the business.  Over the past four years, new products

22  had come to bear.  So I would say across the board there was a

23  balance sheet, which is the debt load that you heard about as

24  well was one of the issues that needed to be fixed.  So it was

25  a multi-faceted challenge.

1   Q    So GBS, you are responsible for getting new merchants,

2   creating new revenue, correct?

3   A    The GBS business is around merchants and the revenue

4   that's produced off of businesses, yes.

5   Q    But it's primarily a revenue generator for the company?

6   A    It's a publicly reported segment and it has revenue,

7   expense, and everything else.

8   Q    So it would seem that the sales team should be important

9   to you to make sure that they are out there selling, creating

10  more revenue?

11  A    Yes.

12  Q    So why the -- were you not interested in the sales

13  training group?  You testified you didn't know about it, you

14  don't know the organization.  It seems that would be an

15  important group.  Is it?

16  A    It is an important group, as many others.  I was dealing

17  with people from Asia Pacific, I was dealing with our service

18  centers, I was dealing with a tremendous amount of stuff at

19  the time.  As I mentioned, it's a very, very large

20  organization.  Mr. Hack, who reported to Mr. Hack.  He was

21  oversight of the direct manager of that.  And I totally

22  expected that as it relates to the day-to-day operation of

23  that, that he would be providing oversight to that.

24  Q    Is Mr. Hack still employed by First Data?

25  A    He is not.

1    Q    When did he leave?

2    A    My understanding is the end of February.

3    Q    Of what year?

4    A    2017.

5              (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*D. Charron - Direct/Mr. Shearer*          337

1   EXAMINATION BY

2   MR. SHEARER:

3   (Continuing.)

4   Q    Do you know why Mr. Hack was terminated?

5   A    I wasn't involved in the conversations with Jeff.  I know

6   that Jeff had been having conversations with Frank about his

7   role in the company.

8   Q    Do you know what the criticisms of Mr. Hack were?

9   A    I'm sorry.

10  Q    Well, if he was terminated, what were the criticisms of

11  his work or --

12  A    I wasn't part of that.

13  Q    Did you have criticisms of Mr. Hack's work?

14  A    Did I have criticisms of Mr. Hack?

15  Q    Yes.

16  A    As it relates to what?

17  Q    As it relates to his work performance and running GBS as

18  kind of a cohead?

19  A    Not specifically.

20  Q    And you don't know why he was terminated?

21  A    I wasn't part of that.

22         THE COURT:  Do you know why he was terminated?

23  Q    Do you know?

24         THE COURT:  Do you know why he was terminated?

25         THE WITNESS:  I was not part of --

1           THE COURT:  You were not part of it.

2           THE WITNESS:  I was aware of it, yes.

3           THE COURT:  You were aware that he was terminated.

4    Were you aware of the reasons why he was terminated?

5           THE WITNESS:  I was not aware of the specific

6    reasons.

7           THE COURT:  Okay.

8           THE WITNESS:  I know, you know, a byproduct of that

9    is my conversation, Frank informed me afterwards, and said

10   we're going to bring some more stuff together.  We got an

11   organization trying to streamline it together.  So I had that

12   conversation with Frank but I wasn't specifically on any of

13   the specific details as it relates to Jeff.

14   Q    You keep using this number 12,000 employees in GBS.  How

15   many were in GBS when you arrived in 2015, how many employees?

16   A    Oh, I'm not sure.  In GBS?

17   Q    Yes.

18   A    Or the whole company?

19   Q    GBS.

20   A    I don't know the exact number.

21   Q    In relation to the number that were there when you got

22   there in 2015, look at the GBS organization in 2017, what was

23   the change in the number of employees?

24   A    I don't have that exact number.

25   Q    Does Mr. Bisignano have authority to terminate employees

1    in GBS?

2    A    Mr. Bisignano is the CEO of the company.

3    Q    Right.  And you're saying he terminated Jeff Hack and

4    Jeff Hack reported to you?

5    A    I didn't --

6    Q    Did Mr. Bisignano terminate one of your employees?

7    A    I didn't say he terminated, I said he had conversations.

8    Jeff Hack was on our management committee.  Jeff Hack was an

9    EVP at GBS he was one of 12 people on our management

10   committee, or management committee was managed by the CEO.

11           THE COURT:  He's trying to find out who terminated

12   him, that's it.

13           THE WITNESS:  I was not.  I didn't terminate him, I

14   didn't have conversations as it relates to his exit from the

15   company.

16   Q    But he was terminated, he didn't quit?

17   A    I don't know that either per se.  I know that he was not

18   there.  I had a conversation with Frank.

19           THE COURT:  I think he's answered the question.

20   Move on to something else.

21   Q    We've talked about the restructuring that occurred late

22   2016, beginning of 2017, that involved a cut of 3,000

23   employees at First Data.

24           Are you familiar with that?

25   A    Yes, I am.

1   Q    Were you involved in selecting individuals to be included
2   in that reduction?
3   A    Yes, I was.
4   Q    What criteria were you using to select an individual to
5   be included or excluded from that?
6   A    We've done a lot of different things there.  We had gone
7   through an analysis that spans layers.  We had just closed
8   down multiple facilities, so let me go through spans and
9   layers.
10          If you have two managers, and they each have three
11  people, you can have one leader and have six people.  You
12  don't need two managers managing six people.  We had site
13  closures.  We looked at efficiency where we brought three or
14  four people together.  At the time, we had our management
15  structure that was way larger than what we needed for the
16  organization.
17  Q    You just said if you have two managers, there only needs
18  to be one job.  How do you decide which manager are you going
19  to terminate?
20  A    As it relates to the RIF?
21  Q    Yes.  If you have two, and it's going to become one, how
22  do you pick one over the over?  One to be terminated one to
23  continue.
24  A    There's a direct manager, they look at performance, they
25  look at the cost structure, they look at the expertise.

1    There's multiple factors that go into that.

2    Q    But there's no clear cut, there's no written criteria;

3    look at the last performance review, the one with the worst

4    rank gets fired.  There's no clear criteria?

5    A    As it relates to that, I didn't deal with that directly.

6    Q    In deciding which of the two managers are going to be

7    terminated?

8            THE COURT:  He's trying to find out what process.

9            MR. SHEARER:  I want to find out whether there are

10   objective standards.

11           THE COURT:  Let me ask the question.

12           THE WITNESS:  Okay.

13           THE COURT:  Excuse me.

14           THE WITNESS:  I'll give the example.

15           THE COURT:  Just one.

16           THE WITNESS:  We had two organizations.

17           THE COURT:  You have to listen to me because I try

18   to ask questions to get clarity, all right?

19           There's a little confusion maybe some of the jurors

20   are confused.

21           Was there anything in writing that guided your

22   organization in terms of the determining who shall stay and

23   who shall go?

24           THE WITNESS:  As it relates to written

25   documentation, we did not have specifics as it relates --

1      THE COURT:  You didn't have anything in writing?

2      THE WITNESS:  Did not.

3      THE COURT:  I'm just trying to understand the

4  process, so did you have a group of people that you designated

5  with this responsibility to decide which managers should go

6  and which should stay?  We're just trying to find out exactly

7  how the process unfolded.

8      THE WITNESS:  Okay.  So how the process goes.  We

9  received the initial to go and say we have ten percent of

10 management, we had too large of a management organization.  We

11 needed to look at the management structure that we have.  Can

12 you bring two organizations together and have one manager?  An

13 example of that --

14     THE COURT:  The question is who did this?

15     THE WITNESS:  Huh.

16     THE COURT:  Who did this?  Who made these decisions?

17     THE WITNESS:  The business did.

18     THE COURT:  You had a group of people?

19     THE WITNESS:  Whoever they reported to, your Honor.

20     THE COURT:  Pardon.

21     THE WITNESS:  Whoever they reported to, the business

22 made that decision.

23     THE COURT:  So who were these people?  10 people?

24 20 people?  Do they have a special committee that did this, or

25 was it left to the discretion of a handful of people.  I want

1   to get an understanding of that.  I think the jury wants to

2   know that.

3         THE WITNESS:  Yes, sir.  We received as it relates

4   to that the list of people that were in the direct

5   organization.  Of the top 3,000 managers, we had 240 of those

6   names of the 3,000.  I had a list of people, Mr. Hack had a

7   list of people.  We went through each of those individuals.

8   We've done analysis prior as it relates to individual

9   performance right job, right position.

10         THE COURT:  Who is the we?  You and Mr. Hack?

11         THE WITNESS:  Mr. Hack did his organization, I did

12   mine.  Yes, sir.

13         THE COURT:  Those are the two organizations that

14   were implicated in the reduction in force.

15         THE WITNESS:  They were part of the overall

16   company's reduction.

17         THE COURT:  There were other organizations?

18         THE WITNESS:  Yes, the whole company was going

19   through this.

20         THE COURT:  These were two, Hack had one, you had

21   one.  How about the others?  How many others were there?

22         THE WITNESS:  Oh, the other MC members that went

23   through it, your Honor?

24         THE COURT:  Yes.

25         THE WITNESS:  I wasn't involved.

1           THE COURT:  You and Hack were the ones dealing with

2    these two companies and Mr. Barger was an employee of one of

3    those, right?

4           THE WITNESS:  Yes, sir.

5           THE COURT:  Okay.  Anything else?

6    EXAMINATION BY

7    MR. SHEARER:

8    (Continuing.)

9    Q    When you said you got a list of the 240 people, was it a

10   complete list of all 240?

11   A    I'm not sure if it was the whole list of 240 or whether

12   or not we had individual lists.  We got that in January

13   timeframe.  I'm not sure.

14   Q    The creation of lists is going to be an issue in this

15   case.  So was the list of all of the employees that meet the

16   top ten percent criteria created and given to you?

17   A    Yes, they were.

18   Q    Now, that we're, what, two and a half years since that

19   restructuring that happened in 2017, what evidence is there

20   that it reduced cost or had any effect on the financials of

21   First Data?

22   A    From an overall perspective, we have -- I think we've got

23   multiple thousand less people as it relates to the overall

24   company.  As of this specific, the discussion that we're

25   having here, we have an organization that's probably one-fifth

1   of the size.  We have a couple million dollars less in costs

2   associated with that.  They're performing the same function.

3   Q    But it has the -- you have left costs, but do the costs

4   just get moved to another organization or did other

5   organizations grow while you shrunk?

6   A    Did other organizations grow?

7   Q    You said there were three reporting segments, did the

8   employees in one increase and you decreased?

9   A    During that time, they could.  During that time, we made,

10  I think, on a net basis overall for the company, I think it

11  went down.  We had three major acquisitions and that's

12  including the acquisition.  So my network force, from my

13  understanding, from what I've seen has gone down during that

14  time.

15  Q    And during these restructurings, the employees are given

16  severance payments; is that correct?

17  A    Yes.

18  Q    Okay.  And during the testimony that you gave at

19  deposition, there's a difference in accounting between

20  severance payments and compensation payments; is that correct?

21  A    The accounting you'd probably have to have a conversation

22  with our chief accounting officer.

23  Q    So you're responsible for the P&L for GBS?

24  A    For the public reported segment, yes.

25  Q    Does, for internal purposes, does severance expenses get

1  charged as an expense to the GBS budget?

2  A    From a budget perspective?

3  Q    Yes.

4  A    There was no budget for severance.  Severance payments

5  were handled at the corporate level.

6  Q    If there are a lot of severance payments which would be

7  in your group, are those expenses that you're responsible for?

8  A    The expenses -- severance payments are handled at the

9  corporate level.  Once somebody gets that as part of a

10  restructuring.  Those agreements and things of that nature are

11  handled at the corporate level.

12  Q    So your budget, your P&L, would show less expense.  But

13  the company's P&L would show less salary but increased

14  severance; is that right?

15  A    I'm not sure exactly.

16          THE COURT:  I guess what he's trying to say is you

17  would not have an increase in severance pay if you did not

18  have this restructuring.  There would no people to sever,

19  right?

20          THE WITNESS:  Yes.  We would not have the operating

21  are expense in the business, yes.

22          THE COURT:  So additional costs where you had this

23  restructuring where you have to pay severance pay.

24          THE WITNESS:  Yes.

25          THE COURT:  Since it's not at the corporate level,

1    what does that mean?

2              THE WITNESS:  It's at the First Data level.

3              THE COURT:  Who makes those decisions how much

4    severance pay to give someone.  Is it part of a contract, is

5    it part of a written agreement, or is it just at the

6    discretion of a handful of people?

7              THE WITNESS:  When somebody comes on a

8    restructuring, once we've decided from a business perspective

9    we've made that decision, that is handled by -- we have HR and

10   legal and they handle the actual severance for those

11   individuals.

12             THE COURT:  I don't know how much you determined an

13   increase in cost at least initially when you eliminate a

14   position because you have to pay that person's severance, I

15   take it, right?

16             THE WITNESS:  Yes, if it's done in severance.

17             THE COURT:  An increase in cost in the first

18   instance?

19             THE WITNESS:  Yes.

20   EXAMINATION BY

21   MR. SHEARER:

22   (Continuing.)

23   Q    Now, we heard some -- well, it's been mentioned that

24   Mr. Barger was paid his bonus in 2016, in November of 2016; is

25   that correct?

1  A     He was paid his bonus in November, yes.

2  Q     And normally, that would be paid in February, March?

3  A     Yes.

4  Q     Okay.  Now, the bonus, it accrues, for your P&L purposes,

5  are one-twelfth a month, is that how it's handled?

6  A     We approve for bonuses every quarter, yes.

7  Q     So if somebody is in a restructuring and they're

8  terminated, and they don't get their bonus, so that means all

9  of those one-twelfths go away and your expense decreases by

10  the amount of the accrual for that bonus?

11  A     I don't know exactly how it's treated from the severance

12  on a balance sheet versus how we accrue for bonuses.

13  Q     So Mr. Barger was terminated in January of 2017.  At that

14  point, he'd already received his bonus in 2016.  He wasn't

15  collecting salary because he had been on leaving for 12 weeks.

16  Either on or about to go on long-term disability which is

17  insured.

18        How is terminating Mr. Barger save First Data any

19  money when, First Data, he's zero expense to them at the time

20  of his termination.

21  A     I think you're stretching it from the objective of the

22  top 3,000.  We had an organization with the management

23  overhead of 3,000 people.  We looked at all the functions.

24  The conversations of having an individual running our sales

25  training group making 700-plus thousand dollars did not match

1  the job.

2       So when -- we said -- and at the time, when

3  Mr. Barger went on leave, Robin Ording was running that

4  organization.  Somebody needed to step in the near term.

5       During that time, we had the Internal Consulting

6  Group as they have done with many groups they have done it

7  with our marketing group, they have done it with our telesales

8  group.  There is an organization from the bottoms up looking

9  at that organization.  At that time, there was not a job

10  associated with that.  We brought those organizations

11  together.

12       As it relates to the savings, as part of that, we

13  took an operating expense of management overhead, I don't know

14  the exact number but probably five to six percent of the

15  management overhead for the business.  We can take that same

16  money, invest it back in the company, we can use it in

17  different areas.

18       THE COURT:  So let me ask you a few questions, okay?

19       THE WITNESS:  Yes.

20       THE COURT:  Can you hear me okay, I don't want to

21  yell.

22       THE WITNESS:  I have to watch you, but I appreciate

23  it.  My hearing aids are connected to my phone.

24       THE COURT:  Are you okay?  Can you hear me?

25       THE WITNESS:  Yes, sir.

1    THE COURT:  I do ask questions periodically to get

2    clarity of things.  If I don't understand something, then

3    maybe the jurors do not.  They're not allowed to ask the

4    questions so I have to be their representative, so to speak,

5    okay.

6         So this sales position that Mr. Barger was doing,

7    somebody else is doing to.  I mean, it's not like you're not

8    doing his work anymore, right?

9         THE WITNESS:  We have the sales position.

10        THE COURT:  Yes.  What he was doing, the work he was

11   doing, was necessary for somebody to do at less of a cost.  Is

12   that what you're saying?

13        THE WITNESS:  Yes.  Yes, definitely.

14        THE COURT:  Okay.  So that position still remains,

15   but it was at less of a cost because somebody else was doing

16   it and it was not costing you as much money; correct?

17        THE WITNESS:  Yes.  And Mr. Barger was not actually

18   running the sales organization -- the sales organization was

19   reporting to Mr. Barger.

20        THE COURT:  Now, I guess what I'm a little bit

21   unclear about is could he not be offered to come back to the

22   company maybe at a lesser price?  Was there any conversation

23   about that since the work that he was doing still had to be

24   done; correct?

25        THE WITNESS:  I was not part of that conversation.

*D. Charron - Direct/Mr. Shearer*        351

 1          THE COURT:  You know nothing about that?

 2          THE WITNESS:  No.

 3          THE COURT:  But you certainly are knowledgeable

 4   about the operation of the business and my question, once

 5   again, is that his work was essential.  It was necessary for

 6   somebody to do what he was doing, I assume, am I correct about

 7   that?

 8          THE WITNESS:  You are, yes, sir.

 9          THE COURT:  All right.  But you didn't want to spend

10   $750,000 because he didn't think that was the right dollar for

11   that type of work, right?

12          THE WITNESS:  Yes, that's correct.

13          THE COURT:  So somebody is doing the work?

14          THE WITNESS:  We combined two organizations, your

15   Honor.  So individual -- corporate training and sales training

16   are one organization now.  So there's only an elimination of

17   one.

18          THE COURT:  My question is he was very skilled and

19   very capable but you thought he was making too much money.

20   Was there ever any thought about letting him come back or

21   offering him the right to come back to work but at a lesser

22   salary perhaps?

23          THE WITNESS:  I did not, I wasn't part of that.  I

24   do not know.

25          THE COURT:  You don't know that one way or the

1    other?

2             THE WITNESS:  No, your Honor.

3             THE COURT:  I wanted to get clarification about

4    that.

5             Next question.

6    EXAMINATION BY

7    MR. SHEARER:

8    (Continuing.)

9    Q    When we keep referring to the top ten percent -- ten

10   percent of the top 3,000.  Is that ten percent referring to

11   salary or ten percent referring to head count?

12   A    We went head count.

13   Q    Okay.

14            THE COURT:  How would that work out in terms of cost

15   savings?  If it's head count, you really want to know whether

16   or not you can save money, right?

17            THE WITNESS:  Yes, we had ten percent.  If you take

18   the top 3,000 management, right, and not dollar for dollar,

19   you're obviously going to look at the highest expense that you

20   have within your management overhead and see whether or not

21   you needed that same management on a go forward basis.

22            THE COURT:  Right.  The function is still going to

23   be performed.  The company needs people to do what those

24   people were doing, right?

25            THE WITNESS:  The actual trainers, yes, but you may

1    not need the management.

2                THE COURT:  Okay.

3                THE WITNESS:  I'm sorry.

4                THE COURT:  You didn't need the management positions

5    anymore?

6                THE WITNESS:  We didn't need the number of managers

7    that we had in the company.

8                THE COURT:  All right.  But you still needed some

9    managers?

10               THE WITNESS:  Yes, sir.

11               THE COURT:  Right.  Who decided which managers would

12   stay and which managers would go?

13               THE WITNESS:  The individuals that each MC member

14   got their list of folks that were in their direct report line

15   and the they make that decision.

16               THE COURT:  What criteria was applied to make that

17   decision?

18               Some managers stayed and some left, right.

19               THE WITNESS:  There was cost, there was performance,

20   there is a lot of different things that each manager looked at

21   as it related to that.

22               THE COURT:  Next question.

23   EXAMINATION BY

24   MR. SHEARER:

25   (Continuing.)

*D. Charron - Direct/Mr. Shearer*        **354**

1   Q    When you terminated Mr. Barger as part of this

2   restructuring, did you consider that a savings for First Data

3   in your planning documents for the restructuring?

4   A    Did I as part of the reduction in force?

5   Q    Yes.  Did you say, We got rid of ten percent of our heads

6   and we saved X amount, part of which is attributable to

7   terminating Barger?

8   A    We had the RIF as I went through.  We identified 24

9   different individuals in organizations that weren't necessary

10  from a management perspective on a go forward basis.

11  Q    Okay.  I guess I'll try to ask it this way.

12        Mr. Barger had not asked to come back and it had

13  decided to just sit on his long-term disability.  That

14  wouldn't be a save for your P&L, would it?

15  A    I don't know.  The job was eliminated.  I don't know how

16  to explain this.  We had two different organizations, we

17  brought those organizations together.  We did not need a

18  manager of sales training, a manager of corporate training,

19  and we did not need that job at $700,000.

20        THE COURT:  I think you explained that several

21  times.  The question he's asking, Was it really a cost savings

22  since he was going to get disability, there were other

23  expenses associated with his termination.  I think that's what

24  he's driving at.

25        THE WITNESS:  There's cost savings associated with

1  the restructures that we have, absolutely.

2  EXAMINATION BY

3  MR. SHEARER:

4  (Continuing.)

5  Q    Right.  The cost savings for Mr. Barger is only if he

6  comes back and earns a salary, isn't it?  If he comes back and

7  earns a salary --

8          THE COURT:  I that what he's trying to say is why

9  bother to even restructure if people are going to get

10 disability pay or severance pay after that.

11         THE WITNESS:  I did not know Mr. Barger's status.

12 This was purely a business decision that was going on well

13 prior.  We've been talking about what we're doing with the

14 training group for a while.

15         THE COURT:  I take it that whoever make these

16 decisions considers what you have to pay these people in terms

17 of severance pay and looks at the totality of how long these

18 payments will be required and looks at an overall picture to

19 see whether on balance there will be a cost savings.

20         THE WITNESS:  There's definitely a cost savings.

21         THE COURT:  Am I putting words into your mouth here?

22         THE WITNESS:  Excuse me.

23         THE COURT:  Here's what I'm trying to say.

24         THE WITNESS:  Yes.

25         THE COURT:  You're saving money one hand, but you're

 1  incurring expenses on the other hand -- severance pay,

 2  whatever the insurance is for disability benefits and things

 3  of this nature.  So does it balance out so at the end of the

 4  line you're not really saving any money if you look at the

 5  totality; or if you had any knowledge about that, is there a

 6  long term savings that you're looking at?

 7           THE WITNESS:  Yes, I see what you're saying.

 8           THE COURT:  Is there a short-term savings?  How does

 9  it work?

10           THE WITNESS:  Yes.  I mean, you're taking a

11  long-term expense out of the organization because you're doing

12  it with less management overhead with the business.

13           THE COURT:  These other expenses are short term

14  compared to the long term --

15           THE WITNESS:  Yes.

16           THE COURT:  -- savings.

17           THE WITNESS:  Yes.  Our business is much more

18  efficient.  It didn't make any money, so there's a lot of

19  things we've done to increase as it relates to the business

20  and the operation of the business.

21           THE COURT:  You're repeating yourself.  I'm trying

22  to understand whether there really is a total cost savings

23  here.

24           THE WITNESS:  Oh, yes, there is.

25           THE COURT:  That's what I want you to explain.

1          THE WITNESS:  Okay.

2          THE COURT:  Why is there a total cost savings?

3          THE WITNESS:  Why is there a cost savings?

4          THE COURT:  All the other costs that you have to

5   incur when you terminate somebody, right?  So if you can

6   explain that to the jury, I'll let you have a chance to do

7   that.

8          Go ahead.  Try to keep it --

9          THE WITNESS:  I'm not an expert on the corporate

10  accounting for restructuring.

11         THE COURT:  You're trying to make sense of it.

12         THE WITNESS:  We have an operating P&L, we have an

13  operating expense with direct expense associated with that.

14  One of those line items is compensation which includes

15  compensation, fringe, and benefits that's in.

16         When you restructure and you have less compensation

17  and less people in that organization, there is a profitability

18  associated with that, yes.

19         THE COURT:  Even with all these other expenses that

20  you have will incur --

21         THE WITNESS:  Yes.

22         THE COURT:  -- many employees.

23         THE WITNESS:  Yes, sir.

24         THE COURT:  I want to get a feel for that.

25         THE WITNESS:  Yes, sir.

*D. Charron - Direct/Mr. Shearer*          **358**

1          THE COURT:  Do you have any other questions?

2          MR. SHEARER:  Yes.

3   EXAMINATION BY

4   MR. SHEARER:

5   (Continuing.)

6   Q    The reason there was a savings was because he was coming

7   back; right?

8          THE COURT:  Next question.

9   Q    Last topic here.

10          Did you implement a hiring freeze as part of this

11   restructuring?

12   A    Not a specific hiring freeze that I know of.

13   Q    Mr. Barger was terminated on January 13th -- advised of

14   his termination?

15          MR. EIDELMAN:  Your Honor, I have to object.  It's

16   not been the testimony.  He wasn't terminated on January 13th.

17   He was told on January 13th that his position was being

18   eliminated.

19          THE COURT:  There's an objection that you are

20   mischaracterizing the testimony.  If you want to go on to

21   another question.  I think the jury's heard all about this

22   already.  Let's not be repetitive.

23          What else do you want to know from this witness?

24   EXAMINATION BY

25   MR. SHEARER:

1    (Continuing.)

2    Q    Did you hire another SVP into the GBS organization on

3    January 13, 2017?

4    A    There was a new individual that started, yes.

5    Q    The same day Mr. Barger left?

6              MR. EIDELMAN:  Objection.

7              THE COURT:  Just one second.

8    Q    The same day --

9              THE COURT:  Quiet.  Objection overruled.

10             For clarification, this person was hired, what was

11   Mr. Barger's status at the time that that person was hired?  I

12   think that's the import of the question.

13             THE WITNESS:  I don't know what his status was.  I

14   want tracking his status.

15             THE COURT:  You don't know whether he was there or

16   not there at the time?

17             THE WITNESS:  I knew he was on leave, yes.

18             THE COURT:  You knew he was on leave?

19             THE WITNESS:  Yes, sir.

20             THE COURT:  Did you know anything about whether he

21   was planning to come at the time?

22             THE WITNESS:  I did not.

23             THE COURT:  When you hired that person, you had no

24   personal knowledge of whether Mr. Barger was planning to come

25   back or not?

*D. Charron - Direct/Mr. Shearer*        **360**

1      THE WITNESS:  Did not.

2      THE COURT:  I didn't put words into your mouth.

3      THE WITNESS:  I'm sorry, sorry, sir.

4      THE COURT:  Did I put word into your mouth?

5      THE WITNESS:  No.

6      THE COURT:  Did I put words into your ears?

7      THE WITNESS:  I apologize.

8      THE COURT:  How are you doing?

9      THE WITNESS:  I have hearings aids.

10     THE COURT:  We all have a disability.  That's what

11   this case is about.

12     THE WITNESS:  I understand.

13     THE COURT:  How much longer do you have?

14     MR. SHEARER:  One more question.

15     THE COURT:  One more question.

16   EXAMINATION BY

17   MR. SHEARER:

18   (Continuing.)

19   Q    I'm confused by your answer.

20         You said you didn't know Mr. Barger was coming back.

21   So when you terminated him, how do you save any money if he

22   doesn't come back?

23   A    You keep --

24     THE COURT:  I don't understand the question.

25   Q    If you're not going to pay his salary?

 1              THE COURT:  It's argumentative.

 2              MR. SHEARER:  That's fine.  I'm done.  Thank you.

 3              THE COURT:  We're going to take our morning break at

 4    this particular time.  About 15 minutes.

 5              We'll have some questions, I assume, when we return,

 6    Mr. Eidelman.

 7              MR. EIDELMAN:  I will, your Honor.

 8              THE COURT:  All right.

 9              COURTROOM DEPUTY:  All rise.

10              (Jury exits courtroom at 11:19 a.m.)

11              THE COURT:  The jurors are out.

12              COURTROOM DEPUTY:  Step down.

13              (Witness leaves the witness stand.)

14              (A recess in the proceedings was taken.)

15              (Witness takes the stand.)

16              MR. EIDELMAN:  Judge, can I give you a couple of

17    preliminary things?

18              THE COURT:  Yes.

19              MR. EIDELMAN:  We went through the exhibits that you

20    had asked us about and Mr. Shearer sent me a list.  So the

21    ones that were good on that you had said to us were 101 --

22              THE COURT:  Why don't we do this.  Let me get rid of

23    the jurors.

24              How much is your cross-examination going to be?

25              MR. EIDELMAN:  15, 20 minutes, I think.

1          THE COURT:  We'll take our lunch break after that.

2     We'll have plenty of time to talk about all these things.

3          MR. EIDELMAN:  One other thing, your Honor.

4          THE COURT:  Do we need to do this before the jury

5     comes in?

6          MR. EIDELMAN:  I would.  For one second.

7          THE COURT:  What is it?

8          MR. EIDELMAN:  And I just want to mention it because

9     we didn't want to be rude about it.  Mr. Bisignano, who is

10    able to be here, has to leave for an appointment.  It may be

11    during the course of Mr. Sharon's testimony.  We didn't want

12    to be rude to the jury.

13         THE COURT:  Don't get antsy about it.  Let's bring

14    them in.

15         COURTROOM DEPUTY:  Jury entering.

16         (Jury enters courtroom at 11:51 a.m.)

17         THE COURT:  We're going to have questioning by

18    Mr. Eidelman now.  And my game plan is to finish the testimony

19    of Mr. Charron and then we'll take our lunch break at that

20    time.  Let's see how it goes.

21         So you may see people coming and going here.  It's

22    not they're being rude, it's just that it's okay for people to

23    come and go.  They may have other plans and arrangements.  So

24    don't hold that against anybody.  They all want to stay here

25    if they can, I'm sure.

1           Go ahead, Mr. Eidelman.

2    CROSS-EXAMINATION

3    BY MR. EIDELMAN:

4    Q    Thank you, your Honor.

5           Mr. Charron, can you hear me okay?

6    A    Yes, I can.

7    Q    You do suffer from a disability, do you not?

8    A    I do.

9    Q    What is the nature of your disability?

10   A    I have acute hearing loss and tinnitus.

11   Q    And how did you get that disability?

12   A    Military related from my service.  I spent time in Iraq.

13   Q    Okay.  You mentioned that you were at Payment Tech,

14   Chase Payment Tech prior to joining First Data.

15          What was the business of Chase Payment Tech, and how

16   did you get to Chase Payment Tech?

17   A    Chase Payment Tech is the same business that I'm

18   reasonable for here, global business solutions.  It was around

19   merchant processing and all the technology associated with

20   that.  And I was recruited from Total Systems in another

21   company.  I was doing management consulting and then ended up

22   at Payment Tech, I was there for 14 years.

23   Q    What was your first job following your graduation from

24   college?

25   A    I was in the United States military.

1    Q    Where did you go to school?

2    A    I went to West Point.

3    Q    Then after serving our country, were you discharged?

4    A    I was.

5    Q    And then was Chase Payment Tech your first job in the

6    payments business?

7    A    It was not.  I was at Total Systems Services.

8    Q    Okay.

9    A    It's in the payments business, it's just a different

10   company.

11   Q    Very good.

12         We heard some testimony on your direct examination

13   where Mr. Shearer was asking you questions about the bonus

14   that was paid to Mr. Barger in the fall of 2016.  Were you

15   part of the decision to pay Mr. Barger that bonus of $174,000

16   in cash?

17   A    Mr. Marino came to me and said, hey, we need to look at

18   giving Mr. Barger full compensation for his bonus and I said

19   of course.

20   Q    Now, it would need be to expensed in some fashion, but

21   was the primary consideration at that point in time how First

22   Data was going to expense that, or what was the reason to give

23   Mr. Barger a cash bonus at that time?

24   A    My understanding that conversations Tony had with Steve,

25   things weren't looking good and he wanted to give him his full

1   bonus now versus with everybody else and I said of course.

2   Q    There was also testimony right before the break about the

3   fact that on January 13, 2017, which was the date that

4   Ms. Johnson advised Mr. Barger that his position had been

5   eliminated and that he would be then leaving the company six

6   weeks later; that GBS hired another individual on that day, do

7   you recall that testimony?

8   A    Yes.  I answered yes.

9   Q    Who was the individual that was hired on that day?

10  A    The gentleman's name was E.J. Jackson.

11  Q    What position was Mr. Jackson hired into?

12  A    He was responsible for our Integrated Solutions Group.

13  Q    Can you describe what the Integrated Solutions Group is

14  and how that differs from the Sales Training Group?

15  A    Integrated Solutions Group and E.J. Jackson, we had an

16  investor that we knew that we started to working with software

17  companies big to small.  They call them SaaS companies, if you

18  will.

19        We needed an individual that understood that market

20  it was a very technology heavy job because you had that.

21  Mr. Jackson had started two software companies and sold one to

22  Oracle and the other to People Soft.  He was the senior

23  executive at SAP.

24        He knew the industry, he had a tech background.  And

25  part of that strategic initiative for our company we were

1  behind the industry at that point in time on interacting our

2  systems with software companies.  So we dealt with an a lot of

3  software developers.

4  Q    Based on your knowledge of Mr. Barger's skill set, could

5  he have performed the duties and responsibilities of the job

6  that E.J. Jackson was hired for?

7  A    Based on what I know today, I don't think he was

8  qualified for that job based on his background.

9  Q    Mr. Jackson was qualified for that job; correct?

10  A    Mr. Jackson started two software companies, that's all he

11  did for 30 years.

12  Q    You testified already that GBS is a very large

13  organization, and I believe the testimony was that at least at

14  the time period in question it may have had upwards of 12,000

15  employees?

16  A    Yes, across the globe.  There's different groups, yes,

17  around that.

18  Q    You've also testified as the various roles that you

19  played that ultimately you may have the profit and loss

20  responsibility, but there are other people including Mr. Hack

21  who is an EVP organizations who had segments of GBS; correct?

22  A    Yes, there was a gentleman over at Technology Operations

23  who with another MC member.  There is, you know, legal.  There

24  is a bunch of different pieces that make up GBS from a

25  business perspective, a matrix organization.

1   Q    So in GBS, of the 12,000 employees, how many of them

2   would have been involved in sales?

3   A    Couple thousand maybe.

4   Q    And out of those couple of thousand, how many would be --

5   that you have to hire every year, how many new salespeople

6   would have would you have to hire every year?

7   A    I don't know the exact number, but I bet if you're

8   talking 25, 30 a month, we have a pretty large field sales

9   force.

10  Q    So a couple hundred new salespeople a month, correct?

11       I'm sorry, a couple hundred over the course of the

12  entire year, new salespeople; right?

13  A    Yes, I would say around that.

14  Q    The sales training organization at that point in time

15  which fell under GBS had somewhere between, we heard the

16  testimony, 50 to 70 employees; right?

17  A    Yes, that's my understanding.

18  Q    And those sales trainers would be involved in training

19  these couple of hundred of new salespeople that would come in

20  every year; correct?

21  A    Yes, they would.

22  Q    So, on a percentage basis, out of the 12,000 employees

23  that were in GBS in a given time, approximately what was the

24  percentage of employees that were being impacted by this

25  relatively small sales training organization?

1  A    I'd have to do the math.  You're talking about maybe ten

2  percent.

3  Q    At most, right?

4  A    At most, yes.

5  Q    And your testimony is that Mr. Barger was the highest

6  paid SVP from base salary perspectives of any of the SVPs

7  within the entire sales organization -- within the entire GBS

8  organization; correct?

9  A    At that point in time, yes.

10 Q    You were asked some questions by Mr. Shearer about the

11 process in which you went through analyzing the names that was

12 on your list, and that Mr. Hack analyzed the names that were

13 on his list in the organization.

14        Do you recall that testimony?

15 A    Yes.

16        MR. EIDELMAN:  Your Honor, if I could have the Elmo,

17 please, Defendant's D212.

18 Q    Dan, in front of you, there are several books.  Pull up,

19 if you would, pull up the defendant's exhibits and if you'll

20 turn to D-214?

21        THE COURT:  One second.  You want 214 in the into

22 evidence?

23        MR. EIDELMAN:  Yes.

24        THE COURT:  You don't have to distract him by

25 looking at the book, you're just putting it up on the screen.

1              MR. EIDELMAN:  I just realized I did that.

2              THE WITNESS:  D-212?

3              MR. EIDELMAN:  D-214.

4              THE COURT:  It's already in evidence.  D-214 was in

5    evidence, it was referred to yesterday.

6              MR. EIDELMAN:  Thank you, Judge.

7    EXAMINATION BY

8    MR. EIDELMAN:

9    (Continuing.)

10   Q    Now, Dan, what is Exhibit D-214?

11   A    Looks like the list it's in the January timeframe a list

12   of the individuals that Jeff identified as part of the

13   restructuring.

14   Q    And Jeff is Jeff Hack?

15   A    Yes, my understanding, yes.

16   Q    And he sent this to you, Dan Charron, and to Karen Whalen

17   who we heard testify yesterday; correct?

18   A    Yes.

19   Q    Is Mr. Barger's name on this list?

20   A    Yes.

21   Q    Do you recall receiving this list?

22   A    Yes, I think I received this list because I took this

23   list and then combined it with mine and that's what we submit

24   for GBS North America.

25   Q    At the time that you got this list and you saw

*D. Charron - Cross/Mr. Eidelman*         370

1   Mr. Barger's name on it, did it surprise you, given the

2   criteria that you had all been using within GBS, to select

3   your ten percent of the top 3,000 managers for reduction?

4   A    No, absolutely not.  I know there was conversations, I

5   think, earlier than this that Jeff had had as it relates to

6   that role and individual and even individuals were looking at

7   what we wanted to long term there.  This is not -- I didn't

8   have any questions when I saw this.

9   Q    By this point in time, were you aware of the interim

10  review that had been started by Karen Whalen as she testified

11  yesterday regarding the bottoms up review of the Sales

12  Training Group?

13  A    Yes, absolutely.  She had mentioned that it was going

14  well.  She had said, I think there was savings of a couple

15  million dollars, and I forget the number of people on the

16  restructuring of our training group.

17  Q    Okay.  Mr. Charron, did you hire Steve Barger?

18  A    I did not.

19  Q    Did you supervise or control his activities when he was

20  the SVP of the Sales Training Group?

21  A    Did not.

22  Q    Did you set Mr. Barger's compensation?

23  A    Did not.

24  Q    Did you keep files and records on Mr. Barger?

25  A    I did not.

*D. Charron - Cross/Mr. Eidelman*        371

1   Q    Did you have anything to do with the decision that

2   Mr. Barger would go out on FMLA leave?

3   A    I did not.

4   Q    Did you know at the time that Mr. Barger was going to go

5   out on FMLA leave?

6   A    I knew he was out of the office and on leave.  I didn't

7   know exactly what that was.

8   Q    Did you have anything to do with the paperwork that

9   Mr. Barger would have completed in connection with his

10  application for Family Medical Leave Act that was testified to

11  yesterday?

12  A    No.

13  Q    Did you make the decision to terminate Mr. Barger?

14  A    No.  His direct supervisor manager did, Jeff.

15  Q    Who worked within the GBS organization?

16  A    Yes.  I saw it, I approved it, I understand what was

17  going there, so...

18  Q    Did Mr. Barger -- did the fact that Mr. Steve Barger have

19  throat cancer have anything to do with First Data's decision

20  to include him in and eliminate his position in the ten

21  percent reduction of the top 3,000 highest-compensated

22  employees at First Data?

23  A    Absolutely not.

24  Q    Did the fact that Mr. Barger had taken leave have

25  anything to do with First Data's decision to include him in

*D. Charron - Redirect/Mr. Shearer*          372

1   the reduction in force that eliminated ten percent of the top

2   3,000 highest compensated employees at First Data?

3   A    Absolutely not.

4   Q    Did the fact, to your knowledge that Mr. Barger had

5   indicated that he was interested in returning to work and

6   submitted a doctor's note have anything to do with the

7   decision to include Mr. Barger by First Data in the

8   elimination of ten percent of the top 3,000 employees at First

9   Data.

10  A    I had no knowledge that there ever was that, so no.

11       MR. EIDELMAN:  Your Honor, if I may just consult

12  with my colleagues.

13       THE COURT:  Take your time.

14       MR. EIDELMAN:  Thank you.

15       (A brief pause in the proceedings was held.)

16       MR. EIDELMAN:  Your Honor I have no further

17  questions of Mr. Charron.

18       THE COURT:  Mr. Shearer, do you have any questions?

19       MR. SHEARER:  Just a few.

20  REDIRECT EXAMINATION

21  BY MR. SHEARER:

22  Q    Do you still have Exhibit 214 in front of you?

23       THE COURT:  Ask your question.

24  Q    I want to ask a question about Exhibit 214.  Is that in

25  front of you.  I can put that up on the screen.

1          THE COURT:  Put it back on the screen.

2   Q    I want you to take a look down at the "To Discuss"

3   section.

4          Do you see that?

5   A    Yes.

6   Q    And it's number one talking about Mr. Barger.  And then

7   there's a list of acronyms under that to his head count.

8          You testified that he was only training the sales

9   team, that's what you just said; right?

10  A    Those are all sales teams.

11  Q    So all of these are?  What's EMEA?

12  A    Excuse me what's what.

13  Q    Down here it says 17 EMEA?

14  A    Those are trainers in the EMEA area that are underneath a

15  separate MC member, Mike Neborak.

16  Q    What's EMEA?

17  A    Europe.

18  Q    Okay.  So these are all salespeople?  These are all sales

19  training?

20  A    I'm not exactly sure what the 17 people specifically do

21  in EMEA, one in APAC as I read it here.  SMB has a sales

22  force.  ISO and Ignite has a sales force as well.

23  Q    In your earlier testimony, you said that you were

24  comparing short-term expense versus a long-term save when

25  making -- paying severance instead of salary.  Do you remember

1   that testimony?

2   A    Yes.

3   Q    In order to get the long-term save, doesn't the

4   individual have to be there for that long term?

5            MR. EIDELMAN:  Your Honor, this is beyond the scope

6   of the redirect or my cross.

7            THE COURT:  I'm going to allow it.

8            Do you understand the question?  You can answer it.

9   A    Saying the long-term save that the individual is still

10  there for the long term.

11  Q    Right.

12  A    You're saying that the individual is going to be there

13  for a longer period of time in order to count that long-term

14  savings.  That that expense associated with the organization

15  of the people would be there.

16  Q    Did you ever tell Mr. Barger to take any action regarding

17  reducing the size of his group?

18  A    Not specifically that I remember.

19  Q    Do you know if Mr. Hack ever told him that?

20  A    He may have.  I know that, you know, we're adding head

21  count at that point in time in our company.  That was not

22  something that we did a lot of.  We were looking at resizing

23  and restructuring, so he may have but I don't know firsthand.

24  Q    Jeff Hack was included in the terminations of the top ten

25  percent, ten percent of earners, wasn't he?

*Proceedings*                                              375

1    A     Top ten percent?

2    Q     Yeah, ten percent of the 3,000.  Mr. Hack was one the

3    individuals that was terminated?

4    A     Mr. Hack was part of the restructuring, yes.

5    Q     When was he terminated?

6    A     I don't know the exact date of when, that date.  I know

7    his effective date when he left the company was the end of

8    February.

9    Q     Okay.  But he knew that he was going to be terminated?

10   A     I think so.  I'm not exactly sure of the date.  I didn't

11   talk to Jeff specifically about that.  That he was having

12   those conversations with Frank.  I had a conversation with

13   Frank.  Frank said, I'm talking with Jeff, we're probably

14   going to make some changes here.  I said I understood.  So I

15   knew that it was some time in that but I wasn't party to the

16   actual conversations and dates.

17   Q     That's why you had to approve Jeff Hack's list because

18   you were going to be left with his organization when he was

19   gone, right?

20   A     Portions of his organization but not all of it.  Some of

21   his organization went to different MC members.

22   Q     Okay.

23             MR. SHEARER:  Anything further, your Honor.

24             THE COURT:  Mr. Eidelman, anything else?

25             MR. EIDELMAN:  No, your Honor.

*Proceedings*                                           *376*

1              THE COURT:  Step down.  Thank you very much.

2              (Witness leaves the witness stand.)

3              THE COURT:  Before we adjourn for lunch, you told or

4    you started to tell me that you and Mr. Shearer did go over

5    these exhibits when we left yesterday that were referenced

6    when the deposition of the doctor was read.

7              Tell me what you agreed to so we can mark it now in

8    front of the jury before we go out to lunch.

9              MR. EIDELMAN:  Very good, your Honor.  The parties

10   have agreed that Plaintiff's Exhibiting 101, 104 --

11             THE COURT:  Just one second.  I'm making notes here.

12             MR. EIDELMAN:  Sorry, Judge.

13             THE COURT:  104.

14             MR. EIDELMAN:  101, 104, 106, 107, and 109 are the

15   exhibits to be admitted.

16             THE COURT:  Okay.  So, Mr. Shearer, I thank you four

17   making that effort to save us the time and those are all

18   deemed in evidence at this particular time.

19             (Plaintiff's Exhibits 101, 104, 106, 107, and 109

20   were received in evidence as of this date.)

21             THE COURT:  Anything else?

22             MR. EIDELMAN:  No, Judge.

23             THE COURT:  So we're going to reconvene at 2:00.

24   I'm going to give you a little bit of extra time to enjoy the

25   beautiful weather today.

*Proceedings*                                                377

1          Don't talk about the case we're moving along and

2   when we return, Mr. Shearer, what will we be doing next?  You

3   have another live witness or deposition?

4          MR. SHEARER:  Mr. Tony Marino.

5          THE COURT:  Mr. Marino will be there, so he knows he

6   will be testifying.  So don't talk about the case.  We'll see

7   you at 2:00 o'clock.

8              COURTROOM DEPUTY:  All rise.

9              (Jury exits courtroom at 12:10 p.m.)

10             (Luncheon recess taken; 12:10 p.m.)

11             (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            A F T E R N O O N   S E S S I O N

2

3            (Open court; no jury present.)

4            (Time noted:  2:04 p.m.)

5

6            THE COURT:  Bring in the jury.

7            (WHEREUPON, at 2:04 p.m., the jury re-entered the

8    courtroom.)

9            THE COURT:  All right.  Mr. Shearer, next witness.

10           MR. SHEARER:  The next witness is Anthony Marino.

11           THE COURTROOM DEPUTY:  Good afternoon, Mr. Marino.

12   If you can remain standing and raise your right hand.

13           (WHEREUPON, the witness was duly sworn.)

14           THE COURTROOM DEPUTY:  Thank you.  Please have a

15   seat.  Please state and spell name.

16           THE WITNESS:  Anthony, A-n-t-h-o-n-y, Marino,

17   M-a-r-i-n-o.

18           THE COURT:  Your witness, Mr. Shearer.

19           MR. SHEARER:  Thank you, your Honor.

20                    ANTHONY MARINO,

21   called as a witness herein by the Plaintiff, having been first

22   duly sworn, was examined and testified as follows:

23   DIRECT EXAMINATION

24   BY MR. SHEARER:

25   Q    Hello, Mr. Marino.

1   A    Hello.

2   Q    What is your current position at First Data?

3   A    I am the executive vice president head of HR.

4   Q    How long have you been in the HR field?

5   A    34 years.

6   Q    And how long have you been with First Data?

7   A    Four and a half years.

8   Q    And as I remember from your deposition, you have been a

9   chief human resources officer for three, four companies?

10  A    That's correct.

11  Q    And were those large organizations?

12  A    Yes.

13  Q    How many employees worked at First Data in mid 2018, last

14  year?

15  A    Last year, about 22,000.

16  Q    And how many employees were there in 2016?

17  A    24,000.

18  Q    Okay.  And you use independent contractors as well,

19  correct?

20  A    Correct.

21  Q    Have the contractors changed in numbers between '16 and

22  '18?

23  A    Yes.  They have come down from about 6,000 to 4,000.

24  Q    Okay.  Are you a member of the management committee that

25  we've heard about?

1  A    Yes.

2  Q    How exactly does the management committee work?  You guys

3  vote?  Do you just discuss?

4  A    No, we don't vote.  Frank would chair a meeting every

5  Monday morning, and we would talk about all of the business

6  topics.  The business leaders might give an update on their

7  business' performance, and the rest of us might give a

8  pertinent update or two.

9  Q    And those leaders that are on the committee, are they

10 around the world?

11 A    Correct.

12 Q    So you video conference these, if you are traveling?

13 A    Yes.  Or call in.

14 Q    Okay.  Are there any board resolutions or rules that you

15 follow in terms of spending authority by officers of First

16 Data?

17 A    For purchases, we have a $250,000 limit, whereas the CEO

18 would approve anything above that.

19 Q    So the CEO has to approve any expenditure over $250,000?

20 A    Right.

21 Q    Does that apply to compensation?

22 A    No.

23 Q    What are the rules for compensation?

24 A    Compensation is that, you know, the management committee

25 members could, you know, hire people, if we were going to pay

1  equity to somebody coming in, that would require approval from

2  Frank, who had an authority level to be able to do so.  So I

3  would be able to take those offers to our CEO for his sign

4  off.

5  Q    One more question about the management committee.

6        Are there minutes of these meetings?

7  A    No.

8  Q    No?

9        I am going to go to Plaintiff's Exhibit 3.

10        THE COURT:  That's in evidence at this time.

11        THE COURTROOM DEPUTY:  That's already in evidence.

12  Q    Can you describe what this document is?

13  A    Yes.  The US employee handbook for First Data.

14  Q    Okay.  This is page 7 of that employee handbook.  I want

15  you to look at page 6 -- sorry, page 6.  Page 6 of the

16  employee handbook.  Right here, this section right here.

17  A    Okay.

18  Q    It says:  All employment with First Data is at will, and

19  this means that the employee or the company may terminate

20  employment with or without notice and with or without cause at

21  any time.

22        This is the sentence I am interested in:  In

23  addition, the company has the right to change the terms and

24  conditions of an employee's employment, including an

25  employee's position, title, job responsibilities or

1  compensation level at any time, within its sole discretion and

2  without notice or cause.

3         Does that mean you could have reduced Mr. Barger to

4  a vice president at any time?

5  A    Yes.

6  Q    Could you have reduced his salary at any time?

7  A    Yes.

8  Q    Did you consider reducing his salary or changing his

9  position when he indicated he wanted to return from leave?

10  A    No.

11  Q    You did not consider that option?

12  A    No.

13  Q    But you gave his job responsibilities to Robin Ording,

14  correct?

15  A    Correct.

16  Q    And she's a vice president at a lower salary, correct?

17  A    Correct.

18  Q    Page 8.  We talked about this at your deposition.  It is

19  this exempt employee section.  Was Mr. Barger considered an

20  exempt employee?

21  A    Yes.

22  Q    Down here where it says salary deductions, do you see

23  that?

24  A    Yes.

25  Q    And it says exempt employees must receive their full

1   salary for any workweek in which they perform any work,

2   regardless of the number of days or hours worked in that week.

3   Do you note that part?

4   A    Yes.

5   Q    And down here in the deductions, if they perform no work,

6   they are absent for personal reasons other than sickness or

7   they are absent in accordance with the plan or policy.  I

8   would assume that would be a disability policy.

9            So while Mr. Barger was in the hospital and in

10  Florida and when he was working -- when he was at home, up

11  until from September 6 through November 19, if he worked at

12  all during the week, in any week, he was entitled to his full

13  salary under this policy?

14  A    I don't agree with that.

15  Q    Well, why would you disagree with that?  Isn't that what

16  it says?

17  A    Because I think there's a degree of common sense that

18  goes into the interpretation of any policy.  Let's say that,

19  you know, my job is to be a police officer for the city of New

20  York.  I come to work and I go out on the street and I do my

21  job for eight or ten hours a day.  If another police officer

22  merely looks at his cell phone or sends a text message, but

23  they're doing that from their home, or in this case from their

24  hospital, I don't think you would call that that one person is

25  working and they are both working.  I think you would say that

*MARINO - DIRECT - SHEARER*                                   384

1   there's common sense that goes into the interpretation of

2   policies.

3   Q    But wouldn't that just be a disciplinary action that you

4   would take?  Wouldn't you write up that officer for failing to

5   fulfill his duties?

6   A    You know, in the case of that officer, there -- maybe

7   there's a reason why they are not at work.  But that doesn't

8   mean that because they look at their text messages a couple of

9   times a day or they send a few e-mails that they're at work.

10  It is just common sense.

11  Q    Did anybody write to Mr. Barger in an e-mail or write

12  into the files anywhere that Mr. Barger was failing to perform

13  his duties between September 6 and November 19?

14          MR. DiLORENZO:  Your Honor, I'm going to object to

15  the relevancy.  There's no claim that he wasn't paid his full

16  salary during that entire period, and it is not a wage and

17  hour case.

18          THE COURT:  Do you agree?

19          MR. SHEARER:  That's fine.  Yes.  I agree there's no

20  claim as to the salary.  I think there's going to be a claim

21  as to whether or not he was working.

22          THE COURT:  Go ahead.

23  Q    Now, for reporting time off of work, how is that done at

24  First Data?  If you take a vacation or if you're sick, how do

25  you record that?

1   A    You let your supervisor know and you get approval prior

2   to taking your time off, and then that's recorded into our

3   time and attendance system.

4   Q    Okay.  And for salaried employees, is that system called

5   "OOO," out of office?

6   A    Yes.  But for SVPs, we have an honor system there.  We

7   say that we expect you to work hard, and, you know, you take

8   time off as your family allows.  So we don't track it that

9   way.

10  Q    So who can get into the system to change an employee's

11  recorded out of office time?

12  A    Yeah.  Usually, you know, it is their supervisor that

13  would be the one notating whether they were in or out for that

14  particular time.

15  Q    But who has -- could you change anybody's file at First

16  Data because you are the executive vice --

17  A    No, no.

18  Q    Okay.  So it has to be either yourself or your direct

19  manager?

20  A    That's right.

21  Q    Okay.  So Mr. Barger's case, that would mean, to record

22  him as out of the office, either he had to do it or Jeff Hack

23  had to do it?

24  A    Yes.

25  Q    Okay.  Did either one of them record any time off --

1  A    No, again, because Mr. Barger's an SVP so we didn't

2  require him to track that kind of information.  Because,

3  again, we felt like our senior leaders, they're senior,

4  they're responsible, they should work when they work, and when

5  they can take off, that's great for them.

6  Q    I am going to go to Exhibit 4.

7         THE COURT:  Exhibit 4 is in evidence already.

8  Q    Can you identify this document?

9  A    Yes, sir.

10 Q    What is this?

11 A    The FMLA policy.

12 Q    Mr. Barger qualified for FMLA leave while he was -- in

13 September of 2016, correct?

14        He was qualified to take advantage of this policy?

15 A    That's correct.

16 Q    On page 2, right here, this says:  While on FMLA, an OA's

17 job is protected, however, all pay is based on company policy.

18        This doesn't contain any exceptions for reductions

19 in force or restructurings, does it?

20 A    Yes, it does.  If you go to the bottom of the second page

21 of the FMLA policy, it says that First Data follows all

22 requirements and guidelines of the Family and Medical Leave

23 Act.  So there may be additional guidelines that maybe aren't

24 documented here on the policy, but we would follow all of

25 those guidelines in the case of FMLA.  And there are some

1  exceptions.

2  Q    So you're not intending to provide greater benefits than

3  the FMLA provides?

4  A    I'm not sure I understand the question.

5  Q    Well, the FMLA -- that's all right.  I will talk about it

6  when we get to the closing.

7  A    Okay.

8         MR. SHEARER:  I am going to go to Plaintiff's

9  Exhibit 37, which I believe is already entered.

10        THE COURTROOM DEPUTY:  Yes.

11  Q    Part of that is a document Mr. Barger signed, and this is

12  his rights and responsibilities under the FMLA that he signed

13  on November 21.

14        The second bullet similarly says that if I am on

15  FMLA leave and/or leave under other federal, state, or local

16  law, and I return to work prior to the exhaustion of that

17  time, I will be restored to my same or equivalent position.

18        Again, there are no exceptions in this one either,

19  are there?

20  A    That's generally correct, but there are exceptions under

21  the law, and just because those exceptions aren't listed here

22  doesn't mean that they are not equally relevant.

23  Q    Now, were you involved in the First Data Way program that

24  has been mentioned several times?

25  A    Yes.  I created it at our CEO's suggestion.

1    Q    What exactly was that program?

2    A    Our CEO came to me and said that, you know, we had a very

3    valuable member of our team, or former CEO named Ed Labry.  He

4    said that, you know, Ed Labry is going to be at some point

5    leaving the organization, and that, you know, I should put

6    together a program, whereas Ed Labry would go out to all of

7    our locations in our facilities and talk to our people about

8    products, services, our history.

9         Mr. Labry had spent most of his career, more than 30

10   years, in the industry.  So it was a way of passing on his

11   knowledge and his information to our work force at large.

12   Q    So that wasn't just sales?

13   A    No.  No.

14   Q    Okay.  It was the company as a whole?

15   A    That's correct.  Products, services, our competitors.

16   Q    And what was Mr. Barger's participation in that program?

17   A    Yeah.  So we had a created a terrific one-day program,

18   and Mr. Barger we included in that program to speak to our

19   people about genuine concern, taking care of our clients in a

20   good way.  And, you know, he was -- that's where I got to know

21   Mr. Barger.

22   Q    And you guys spoke a lot during the time off and traveled

23   together?

24   A    Yes, sir.

25   Q    Did you ever ask Mr. Barger for advice as to how you

1  could be more influential on the management committee?

2  A    No.  Mr. Barger and I spent a lot of hours together, so

3  we talked about a lot of things.

4  Q    Did you talk about that?  How to be more influential on

5  the management committee?

6  A    I don't know that I talked about that subject, per se,

7  but we talked about many things.  Many things.

8  Q    Well, is it rewarded in First Data for you to -- the more

9  head count under your organization, the more influential you

10  are in terms of decision making at the management committee

11  level?

12  A    I would never say that, you know, one's influence is a

13  direct proportion of their number of direct reports.  I think

14  it is more what you bring intellectually, what you bring in

15  terms of contribution.

16  Q    So size of staff doesn't necessarily mean more influence?

17  A    No, sir.  But certainly there's a respect that goes with,

18  for instance, our business leaders like Dan Charron, he

19  mentioned he had 12,000 of the 22,000 people that work for our

20  company.  Certainly, there's a degree of respect that goes for

21  our business leaders who have such a responsibility.

22  Q    Now, we had a large -- long discussion about successors

23  yesterday, and I don't want to rehash the whole thing.  But

24  during your deposition, I believe that you were trying to

25  describe that successor meant part of succession planning, not

1    as replacements.  Is that -- explain the succession planning

2    process at First Data.

3    A    I don't think the succession planning process is

4    different at First Data than it is, you know, maybe in the

5    Court system of New York.  At some point, you know, we all

6    have to have a responsibility to think about some day, who's

7    going to take our place.  And I think that's a responsibility

8    that we all have, no matter what job that we do.  So I don't

9    think that's anything magical or different at First Data.

10   Q    Were you involved in the search for one of these

11   successors in December of 2016?

12   A    You know, there was a lot of talk about that, but,

13   Mr. Shearer, we never hired anybody to replace Mr. Barger.  So

14   there never was a successor.  So I agree with you, talking

15   about a successor is kind of wholly irrelevant because we

16   never had a successor.

17   Q    But if you were thinking about it in December of 2016,

18   and then on January 6th or 9th of 2017 you decided to fire 362

19   senior executives, why would you be looking for a successor

20   with such a cut coming right on the heels?

21   A    I didn't say we were looking for a successor.  I said we

22   all had an obligation to find a successor.  But I never

23   developed a, you know, successor, and we never hired a

24   successor.

25   Q    Let's go to your November 3 visit to Mr. Barger's house.

1  A    Yes.

2  Q    You and Mr. Plumeri flew by jet down to Atlanta to see

3  Mr. Barger; is that correct?

4  A    You know, let's be clear that Mr. Plumeri decided that he

5  wanted to go down and see our good friend Mr. Barger.  He

6  chartered a jet, and he asked me if I would like to join on

7  that visit.  So let's be very clear, for the record, I did not

8  initiate that visit.  Mr. Plumeri initiated it.  When he asked

9  me to go, I said, of course.  Of course, I would like to go

10  down and see Steve, with the sole intention of cheering up our

11  good friend.

12  Q    How long were you at his home?

13  A    Several hours.

14  Q    Describe what his condition was that day?

15  A    You know, really, really bad.

16  Q    In what way?  Could he -- he couldn't speak, could he?

17  A    No.  And he could barely walk.  He couldn't walk without

18  help and getting him over to a chair.  And he had a white

19  board, and that's how we spent our time.

20  Q    From that visit until this litigation started, did you

21  see Mr. Barger again in person?

22  A    From that visit to our litigation?  No.  No.  Mr. Barger

23  worked out of Atlanta, I work out of New York.

24  Q    I want to go to Exhibit 35.

25             THE COURT:  35 will be in evidence at this time.

1         (Plaintiff Exhibit 35 received in evidence.)

2   Q    This is a little hard to read so I will try to increase

3   it.

4         Do you recognize this document?

5   A    Yes.  This is a text message exchange between me and

6   Mr. Barger.

7   Q    And that's your phone number there at the top?

8   A    Correct.

9   Q    And by looking at it, you're the blue -- you're blue and

10  Mr. Barger is the gray, correct?

11  A    No.

12  Q    Backwards.  You're gray, Tony Marino is gray, and

13  Mr. Barger is blue?

14  A    Correct.

15  Q    Okay.  I want to go down to November 19, right here.

16  A    Yes.

17  Q    It is at 7:55 a.m. on November 19.

18        Why did you send this text message?

19  A    So, several reasons.  One is that there's an earlier text

20  message on November 8 where -- it is not on the screen here,

21  but on November 8 Mr. Barger sent me a text message saying

22  that he was going to be going into having another surgery for

23  six days, and he was going to need full recovery for four

24  weeks.  So there's a November 8 text message that precedes

25  this that we should show the jury.

1   Q    I don't believe I've seen that.  I think there's a

2   message that comes after November 19 to that effect that I

3   will --

4   A    No.  There was a message after I visited -- after Joe and

5   I visited Steve, and Steve sent a text message saying that,

6   you know, great visit, and, by the way, Tony, I'm going to

7   need another surgery where I need six days of surgery and four

8   full weeks of recovery.

9              MR. ZEITLIN:  Move to strike that answer as

10  nonresponsive.  He's trying to ask him questions about this

11  exhibit.

12             MR. DiLORENZO:  Your Honor, it is the message on the

13  top of the exhibit.

14             THE COURT:  He answered it.

15             Go ahead.  Next question.

16  Q    Who told -- who did you work with to decide to send this

17  message?

18  A    So, again, I am trying to give you the full context.  You

19  are asking me why I would have sent this message, and I am

20  saying that for the full context, you have to understand that

21  Mr. Barger sent me a message saying that he was going to need

22  to be out for four weeks, and on top of that, Mr. Shearer, at

23  the same time we were getting several messages from my team,

24  indicating that Mr. Barger was behaving erratically and they

25  were very concerned.  We had several employees, you know,

1  express concern.  And, you know, it was my best judgment for

2  somebody I cared about dearly, that, you know, given that he's

3  going to need to be on recovery for four straight weeks, that

4  at this point in time, that the best thing for him and his

5  family would be to be on our leave programs.

6  Q    I want to -- you brought up these employees with these

7  complaints.  Let's -- what -- you are the chief human

8  resources officer.  What are the policies and procedures

9  inside of HR for recording and documenting when an employee

10 makes a complaint like that?

11 A    You know, we got to keep in context the fact that Steve

12 was -- is mentioned.  We went to see him on November 8.  He

13 wasn't able to come to work.  He was doing this from his

14 house --

15 Q    That's not what I asked.

16        MR. ZEITLIN:  Move to strike as nonresponsive.  He

17 asked him what the procedure is.

18        MR. DiLORENZO:  Your Honor, first of all, they are

19 talking about two different complaints.

20        THE COURT:  Yeah.  Go ahead.  We will strike that.

21 It is not responsive.

22        MR. DiLORENZO:  He's not talking about --

23        THE COURT:  Ask another question.

24 Q    Are there any written documents showing that those

25 complaints were lodged?

A Yes. I have messages from my team, you know, indicating in e-mails that -- you know, in fact, I think we heard Ms. Rhonda Johnson talk about it yesterday, as well as Karen --

THE COURT: Are there any responsive documents that you have? That's the question.

Q Were those documents produced during discovery?

A I think we had e-mails that are -- were in our documents that show that Rhonda Johnson and Karen Whalen had sent e-mails to me that these things were occurring, and they were very concerned.

Q So describing particular instances, there are e-mails describing particular instances?

A I don't know if they are describing particular instances in the e-mail, but in further follow up with each of them. I'd be happy to go into detail of each and every one of them.

Q No, I just haven't seen documents detailing any of them.

A Okay.

Q Mr. Barger responds fairly promptly to your e-mail telling him -- your text message, telling him that he's being -- he must begin to -- he must begin leave.

He says, you're removing me from my job and I am fired.

And can you read your response back to him?

A I said, no, not fired. Like any employee, required to

1    move to short-term disability until your doctor releases you

2    medically to return to work.  When you return, your full

3    salary is restored and you will be given a comparable job.  We

4    have held off as long as we could.

5    Q    All right.  So at this point you are telling him, get

6    well, come back, and you will be restored?

7    A    That's right.

8    Q    Did that happen?

9    A    No.

10   Q    Then Mr. Barger asks about his salary and bonus, and then

11   there's a discussion of short-term disability and long-term

12   disability.  And short-term disability is paid by First Data,

13   correct?

14   A    Correct.

15   Q    And long-term disability is paid by your insurer MetLife,

16   correct?

17   A    Correct.

18   Q    And then Mr. Barger asks here, the same day, he asks,

19   that means he can't go to work and can't have meetings.

20           And this is where you tell him, no, you must -- this

21   means you should shut down for a little while, you will fully

22   concentrate on getting strong and be back soon, correct?

23   A    Correct.

24   Q    Then you direct that Mr. Barger -- the next day, back at

25   work, because I believe the 19th was a Saturday.  The next

1  day, back at work, you directed that Mr. Barger's access to

2  First Data's systems be cut, his e-mail, his Good app, his

3  access to the intranet; is that right?

4  A    Yes.  Because we wanted to Mr. Barger to concentrate

5  fully on getting better, not worrying about the burdens of

6  First Data or any other company, but spending all of his time

7  with his family and spending all of his time getting better.

8          MR. ZEITLIN:  Move to strike anything after "yes."

9  It was a yes, no question.

10          THE COURT:  Overruled.  He answered the question.

11  Go ahead.  Next question.

12          MR. DiLORENZO:  Your Honor, are there two attorneys

13  handling this witness?  One's questioning him, the other is

14  making objections to his answers.

15          THE COURT:  He can do it.  It is okay.

16          All right.  Next question.

17  Q    Were you thinking, when you placed Robin Ording into --

18  to take the interim position, did you -- did HR begin to take

19  over that role and take it away from Mr. Charron?

20  A    No.  At that point, we just needed to have an interim

21  leader who could attend to the day-to-day needs of the staff

22  while Mr. Barger was recovering.

23  Q    When Mr. Barger asked you this question about having

24  meetings, were you aware that Mr. Barger was communicating

25  with his team during October and November of 2016?

1  A    Yes, I think in general I remember hearing that, you

2  know, he was -- again, not my definition of going to work,

3  but, you know, I believe I heard that he had some e-mails and

4  so forth.

5  Q    And why did you cut off his access?

6  A    So he could concentrate fully on getting better.  So he

7  could take care of himself.  We all have a job that causes all

8  of us, I am sure, a certain degree of stress.  Not having to

9  worry about that, Mr. Shearer, and being able to concentrate

10  fully on our health and our family --

11              THE COURT:  Just answer the question.  You cut off

12  his e-mail for his benefit, is your answer?

13              THE WITNESS:  Correct.

14              THE COURT:  So he can concentrate on getting better

15  and not be distracted by business.  That's your answer?

16              THE WITNESS:  Correct.

17              THE COURT:  Next question.

18  Q    But you said in your deposition that work is Mr. Barger's

19  life, correct?

20  A    I don't know that I said that, but I know that Mr. Barger

21  cared a lot about his work.

22              THE COURT:  All right.  Next question.

23  Q    Exhibit 36.

24              THE COURT:  That's going to be in evidence now.

25              (Plaintiff Exhibit 36 received in evidence.)

1   Q    Can you identify this document?

2   A    Yes.

3   Q    What is this?

4   A    This is the letter that I sent to Mr. Barger, including

5   all of his paperwork, so he could conveniently apply for his

6   leaves, not have to chase down paperwork, send it all to him

7   directly, so he could, you know, expedite his process.

8   Q    Okay.  And you use the words begin to transition to

9   standard leave of absence.  So that implies Mr. Barger was not

10  on leave prior to beginning to transition to leave, correct?

11  A    Well, you know, this is a technical matter, when you say

12  the word "leave."  "Leave" could mean you're on a formal FMLA

13  leave, or "leave" could mean I had a very huge surgery on

14  September 6 and I am working or I'm text messaging and so

15  forth.  So I think in Mr. Barger's own words, his leave

16  started on September 4.

17  Q    Now, what was attached to this letter; do you remember?

18  A    Paperwork to apply for, you know, leave.

19  Q    Okay.  Did you draft this letter or did somebody else

20  draft it?

21  A    No.  I drafted the letter, and then the standard forms we

22  included in the Federal Express package.

23  Q    This is page 2, and I want to say this mark on here was

24  the way that it was when I found it in Mr. Barger's home.

25            And you tell him in this letter that beginning today

1    through 14 calendar days of short-term disability application,

2    First Data will continue to pay your regular salary, correct?

3    A    Correct.

4    Q    Okay.  And First Data did that, paid his salary for

5    another two weeks?

6    A    Yes.

7    Q    Are the processes for FMLA leave and short-term

8    disability insurance, the applications for each of those

9    different or --

10   A    I believe there are some different forms, but, you know,

11   we have a leave department that works in the HR department,

12   you know, couple of layers below me, and we'll process a

13   thousand leaves at any particular time.

14   Q    Okay.  Let me go to Plaintiff's Exhibit 79.

15            THE COURT:  In evidence at this time.

16            (Plaintiff Exhibit 79 received in evidence.)

17   Q    This is a November 22 e-mail from you to Mr. Bisignano,

18   Mr. Charron, and Jeff Hack, advising them that Mr. Barger was

19   to be officially moving -- I think we discussed at your

20   deposition, the word "leave" is missing from that sentence,

21   correct?

22   A    Yes, sir.

23   Q    And Robin Ording.

24            What do you mean in this last sentence here:  As a

25   thought, let's see how Robin does.  It may be possible for me

1    to jigger a few things around to free her up, creating a save,

2    if she does well.

3              What was that about?

4    A    It was, you know, again, always looking for efficiency

5    opportunities.  You know, if Robin does do well in this job,

6    you know, perhaps, you know, that's something she can take on

7    in addition to her current responsibilities.

8              Also, I will say, that on November 21, one day prior

9    to this e-mail, we got a very, very grave -- I got a very

10   grave text message from Mr. Barger, indicating that he may

11   have inoperable cancer, and we needed to immediately work with

12   him to help make sure all of his affairs were in order.

13             So, you know, I was very saddened by that and, you

14   know, not knowing the status of Mr. Barger, I wanted to make

15   sure our management, you know, was aware that Steve was out on

16   leave.

17   Q    So at that point in time you didn't think he was coming

18   back to work, did you?

19   A    You know, when I got that text message from him on the

20   21st of November, I didn't know, but I was very concerned by

21   his message that his doctor felt that his cancer may be

22   inoperable.

23   Q    But you started putting machinations in place to move the

24   training group over to HR, and thinking he wasn't going to

25   come back, and his return is what messed up that plan, isn't

1    it?

2    A    I wouldn't call anything machinations.  I would say that,

3    you know, Mr. Barger was out, we needed to have a place, a

4    person in his department to make sure that the department was

5    running while he was out, and we appointed Robin Ording on a

6    temporary interim basis to do so.

7    Q    Now, I believe it was Plaintiff's Exhibit 62 yesterday.

8              You were informed on December 22 that Mr. Barger was

9    going to return in January, were you?  It is Plaintiff's

10   Exhibit 62.  Let me put it up.

11             You were copied on the top e-mail, and it is down

12   where it says, he looks good, and he's planning on returning

13   in January.

14             So you were informed on December 22 that Mr. Barger

15   was planning to come back in January?

16   A    I consider all of these e-mails to be hearsay,

17   Mr. Shearer.  I have been doing this for 34 years --

18             THE COURT:  You are not answering the question.

19             THE WITNESS:  No.

20             THE COURT:  Did you believe he was going to come

21   back?

22             THE WITNESS:  I don't know.

23             THE COURT:  You don't know.  Nobody knows for sure

24   what's going to happen.

25             THE WITNESS:  That's right, that's right, that's

1   right.

2              THE COURT:  He answered the question.  Go ahead.

3   Next question.

4   Q    And you learned -- somebody else sent you another e-mail

5   on December 28 saying roughly the same thing, correct?

6   A    I am going to give the same answer, or I will elaborate

7   and say --

8              THE COURT:  Which exhibit are you talking about?

9              MR. SHEARER:  I am not sure if it was entered.  If

10  it hasn't been, I will put it in.  It's Plaintiff's Exhibit

11  64.

12             THE COURT:  One second.  64 will be in evidence now.

13             (Plaintiff Exhibit 64 received in evidence.)

14             THE COURT:  It speaks for itself.  Let's move on.

15             MR. SHEARER:  Okay.

16  Q    I did want to ask about one, because it is important for

17  the time.  You also were informed, once again, on January 6,

18  and that's 68.

19             MR. SHEARER:  I don't think this one is in.

20             THE COURT:  68 is in evidence.

21             (Plaintiff Exhibit 68 received in evidence.)

22  A    Just by virtue of all these e-mails, you see why I don't

23  take any of them seriously because until somebody comes

24  back --

25             MR. ZEITLIN:  There's no question posed, your Honor.

1   There's no question posed right now.

2          THE COURT:  So this is just -- would you like to

3   take his place and ask questions?

4          MR. ZEITLIN:  No.

5          THE COURT:  I will let you do it.  It is okay.

6          MR. ZEITLIN:  I will pipe down.

7          THE COURT:  Just let me know if you want to do that,

8   okay?

9          So we have this documentary evidence, the jury sees

10  it.  We don't have to go in with these long explanations.

11         Next question.

12  Q    In this one, you advised your human resources department

13  to be very certain that you get his medical clearance,

14  correct?

15  A    There you go.

16  Q    Now, he delivered his medical clearance on January 10,

17  correct?

18  A    Correct.

19  Q    And he had not been terminated as of January 10, correct?

20  A    Correct.

21  Q    He hadn't been notified of termination as of January 10,

22  correct?

23  A    Correct.

24         THE COURT:  Had anyone been terminated by January

25  10, pursuant to this restructuring?

1          THE WITNESS:  No, we had requested that they provide

2    their list to us on January 13, I believe.

3          THE COURT:  So there was nobody terminated at that

4    time at all?

5          THE WITNESS:  Right.

6          THE COURT:  The terminations happened afterwards,

7    right?

8          Next question.

9          MR. SHEARER:  Well, I would disagree with that, and

10   I will get an exhibit --

11         THE COURT:  Wait a second.  You can do whatever you

12   want to.  I will ask -- this witness testified that nobody was

13   terminated before that date of January 10, I believe.

14         That was your answer, correct?

15         THE WITNESS:  I believe that's correct.

16         THE COURT:  He answered that.  Go ahead.

17   Q    Let's talk about, you paid Mr. Barger's bonus in

18   November, early, correct?

19   A    Correct.

20   Q    And that was because of this message that you are talking

21   about on the 21st?

22   A    Yes, where he asked for us to help him get his financial

23   affairs in order, given that he may have inoperable cancer.

24   Q    And that was paid through regular payroll, or was it part

25   of the bonus pool?

1   A    Paid through regular payroll and pay period after he had

2   text messaged me.

3   Q    On to restructurings.  When did you join First Data?

4   What year?

5   A    March of 2015.

6   Q    So you've been there about 18 quarters at this point, is

7   that right, as of the end of September?  Rough?

8   A    Rough.

9   Q    In all those quarters, how many do you think had

10  restructuring events that involved the termination of

11  employees?

12  A    You know, I look back.  You know, restructuring events,

13  there's many things that would fit under that bucket.  For

14  instance --

15          THE COURT:  You are not being responsive.  Were

16  there people that were terminated before, is what the question

17  is.  I think, right?

18  Q    How often have you had these events in a quarter --

19  A    I am saying, in my entire time at First Data, you know,

20  I'd say maybe ten restructuring events.  But there's a lot of

21  things that would be under the definition of restructuring

22  events.

23          THE COURT:  For any quarter, there were people that

24  were terminated?

25          THE WITNESS:  Not every quarter.

1          THE COURT:  Periodically?

2          THE WITNESS:  Periodically.

3          THE COURT:  Like a rolling type of thing?

4          THE WITNESS:  Yes, because as we mentioned, you

5    know, the company was in horrible financial shape --

6          THE COURT:  I understand that.  You had different

7    stages of terminations, right?

8          THE WITNESS:  That's right.

9          THE COURT:  Okay.

10   Q    You have a team in the human resources department that

11   plans out and projects how these restructuring events are

12   going to save money; is that correct?

13   A    I have a person on my team who runs what we call work

14   force planning and analytics, and she tracks the --

15         THE COURT:  The question is whether you have seen

16   anything.  I think you are not being responsive to the

17   question.

18         Next question.

19   Q    But before you start terminating people, you have

20   projections in your hand as to what economic impact this

21   restructuring is going to have on First Data, correct?

22   A    Yes, there's a list.

23   Q    Do you ever go back and check your actual results against

24   your projected results to see if they match?

25         THE COURT:  Yes or no?

1    A    Sure.

2    Q    Who does that?

3    A    We look at the financials every week.  In our weekly

4    package, we look at -- we have a weekend package, and in the

5    weekend package we have a complete head count for our company,

6    as well as, you know, we have financial information.

7    Q    Is there a way to check whether managers are just

8    backfilling positions after one of these restructurings?

9    A    Yes.  Because you would be able to look at the net head

10   count.  You know, had the net head count for the week gone up

11   or gone down.

12   Q    What criteria do you give to managers for choosing who is

13   in and out of a restructuring?

14   A    Excuse me?  Say that again.

15        THE COURT:  How do you decide who's going to lose

16   their job?

17   A    So let's use the top -- let's use the ten percent of the

18   top 3,000.  We provide each of the management committee

19   members with a list of their individuals that meet that

20   criteria.  We then had the goal.  The goal was they had to

21   come up with ten percent reduction for their list.  They

22   perform all of the due diligence and make the very, very hard

23   and difficult choices of who is going to stay in the company

24   and who's going to go on the reduction in force list.  And

25   they do that, I think we all do that, with a heavy heart, but

1   we all do it based on what can you live with and what can you

2   live without as it relates to the skills that we need.

3            MR. DiLORENZO:  Your Honor, can he finish the

4   question?

5            MR. SHEARER:  He did answer.  I asked what criteria

6   was used.

7   A    That is the criteria.

8            THE COURT:  He was trying to answer the question.

9   We are getting a little repetitious how.  Move on to something

10  else.

11  Q    I would like to go to Plaintiff's Exhibit 84.

12           THE COURT:  84 is in evidence at this time.  Another

13  e-mail exchange.

14           (Plaintiff Exhibit 44 received in evidence.)

15  Q    Yes.  This one is, down here, you write -- this is on

16  January 7, and you talk to Frank, it says, and you -- we still

17  have 635, and it says, open reqs.  What does that mean?

18  A    Yeah.  You know, in a company of 22,000, you are always

19  going to have some positions open, and those 635 reqs would

20  be, you know, mainly for things like answering the phone in

21  the call center, creating plastics, sending out, you know, our

22  terminals.  So those are the, you know, sort of what we would

23  call normal rate of attrition for our, you know, sort of low

24  level jobs.

25  Q    So how many requisitions were open on January 13, 2017?

1  A     I don't have a schedule in front of me.

2  Q     It is going to be around the same number?  It's ten days

3  later.

4  A     Yes.  More or less.

5  Q     All right.  During the deposition, you talked about how

6  some of the problems with the restructuring is if there are

7  hirings by a manager afterwards.  How do you control against

8  that?

9  A     What are you referring to?

10  Q     After you do one of these restructuring events, how do

11  you -- what controls do you put on managers to keep them from

12  backfilling positions?

13  A     We can actually decide not to send out an offer letter.

14  All hiring would come through my office, and we would be able

15  to control it on that basis.

16  Q     Do you know, we were talking about the different

17  accounting treatment for severance versus salary.  Do you know

18  what it takes --

19  A     Go ahead.

20  Q     Do you know what it takes to qualify for restructuring

21  accounting as compared to compensation accounting?

22  A     No, I am not an accountant.

23  Q     Okay.  We've heard about this internal consulting group,

24  Patricia Hadler.  Is that what it's called?

25  A     Yes, sir.

1  Q    Is she in your human resources group?

2  A    No.

3  Q    Who decides what organizations she's going to go to to

4  look at whether they can be restructured?

5  A    At the time it was our chief of operations officer,

6  Christine Larsen.

7  Q    Christine Larsen made the decisions where to send, I

8  guess you call them, IC group, where to send them?

9  A    Yes.  Pat Hadler was a direct report of Ms. Larsen.

10  Q    Okay.  So we've heard about this review of the sales

11  training group by the internal consulting that was run by

12  Ms. Ording soon after Mr. Barger went on leave, right?

13  A    Not run.  She was the interim leader.

14  Q    But soon after Mr. Barger went on leave, the internal

15  consulting group came to look at the sales training group; is

16  that right?

17  A    I don't know the exact time, but, yes, they were doing a

18  review of the sales training group.

19  Q    And that decision would have been made by the COO?

20  A    Right.  Correct.

21  Q    So if Mr. Barger had been at work, the same review would

22  have occurred?

23  A    Correct.

24  Q    Okay.  So Mr. Barger would have gotten the same feedback,

25  that he needed to restructure; is that right?

1   A    Correct.

2   Q    Do you know if Mr. Barger in 2016 assumed additional

3   responsibilities for call centers in Hagerstown, some

4   employees in Europe?

5   A    I am not aware of that.

6   Q    And that could be a reason why his head count grew?  I

7   mean, if he took on new additional groups --

8           THE COURT:  Objection sustained.  It is

9   argumentative.

10  Q    When you were talking about the process for the

11  restructurings, you said each manager would get a list of the

12  employees that met the criteria.  So that would be a list of

13  everybody that met the criteria, right?

14  A    Right.

15  Q    All right.  So there are lists out there which contain

16  3,000 names, and that list doesn't necessarily mean anything

17  as to who got -- who the 300 were that were picked out of

18  those 3,000 names, does it?

19  A    Well, the 3,000 names were given out to the respective

20  leaders, and they would then select their ten percent, and

21  then ultimately there would be one list with 300-plus

22  selections.

23           THE COURT:  You had 3,000 candidates?

24           THE WITNESS:  That's right.

25           THE COURT:  Then I think you described how it was

 1   whittled down to 300.  Do you want to add anything to that at

 2   all?

 3           THE WITNESS:  No, sir.

 4   Q    Do you sign off on all hiring and compensation decisions

 5   for a new SVP?

 6   A    I don't know what you mean by "sign off."  Each business

 7   leader is responsible for, you know, hiring the folks in their

 8   area.  If that person is joining our company and they are

 9   going to have compensation that includes equity, then, you

10   know, that offer would go through myself and Frank.

11   Q    Can another executive vice president hire a senior vice

12   president without your approval?

13   A    I don't approve.  They consult.  So they would consult

14   with me on that offer, but I don't approve, you know, their

15   SVP.  They get my advice.

16   Q    I have one question about another e-mail you sent.  It is

17   Plaintiff's 77.

18           THE COURT:  That's in evidence at this time.

19           (Plaintiff Exhibit 77 received in evidence.)

20   Q    I'm kind of interested in this last sentence here of your

21   e-mail here in the middle, the December 4 sentence.  At the

22   bottom, it says, we need to move as many OAs to the severance

23   pool as possible to relieve pool pressure.

24           What does that mean?

25   A    Yeah.  That means that, you know, if you've got folks

1  that are, you know, leaving the company, that means that you

2  don't have to then expense or you don't have to pay them a

3  bonus.  That's what that means.

4  Q    So does the bonus pool dollar amount remain the same, and

5  is divvied up among less people?  Is that what that means?

6  A    No.  Again, you know, this gets into severance

7  accounting, and I'm not an expert on that.

8  Q    No.  And what I am saying is, if you sever somebody and

9  pay them a severance, all right, and they are no longer going

10 to get a bonus, does that change the amount of funds available

11 to pay bonuses?

12 A    No, because when we sever somebody, we give them a

13 percentage of their bonus in their severance payment, and then

14 the rest, which would be in equity, would be cancelled.

15 Q    And so everybody else that's still at the company splits

16 up what the bonus pool was, so their percentage of the bonus

17 pool goes up because you --

18 A    No, no, I didn't say that.  I just said that when we give

19 somebody severance, we provide them with a severance package

20 that includes a portion of their bonus.  A portion that we

21 don't give them is cancelled.  It is not used for the

22 remaining people who will stay with the company.

23 Q    Okay.  When you -- one last question, and then I will be

24 done.

25           When you heard that Mr. Barger was going to have his

1   surgery at the end of August, we discussed at your deposition

2   that you contacted a Josh King, is that correct, regarding an

3   article -- writing an article for the First Data employee

4   communications?

5   A    I don't recall that.

6   Q    I will have to pull it up.  Plaintiff's Exhibit 98.

7              THE COURT:  98, in evidence at this time.

8              (Plaintiff Exhibit 98 received in evidence.)

9   Q    What did Mr. Barger tell you about retirement being

10  overrated?

11  A    I don't have the -- I don't think I have Exhibit 98.  But

12  I will read it.

13             THE COURT:  One second.  Is that on the screen right

14  now?

15             THE WITNESS:  Yes.

16             THE COURT:  98?  Okay.

17             THE WITNESS:  There's a portion at the bottom right

18  that I don't see.  Okay.

19             THE COURT:  What's the question here?

20             MR. SHEARER:  I asked him what -- the top question,

21  top here, he is asking Josh to ask Mr. Barger about

22  retirement.

23  Q    And I want to know what Mr. Barger told you about his

24  thoughts on retirement.

25  A    Go back down to the bottom.  Let me see what I said to

1  Josh.

2           THE COURT:  You looked at that.  Can you answer that

3  question that was asked of you, or not?  I guess it's what did

4  he say to you, right?

5           MR. SHEARER:  That's correct.

6           THE COURT:  If you recall, if anything.

7  A    You can scroll up.

8           THE COURT:  Anything that refreshes your

9  recollection of what he might have said to you?  Apparently

10 not, right?

11 A    So I say one of your first questions would be to ask him

12 about his first retirement.  He will tell you that retirement

13 is overrated.

14          And, you know, Mr. Barger and I talked about that on

15 the road.  He said, you know, I retired at one time.  I was

16 making toys, you know, for my children, doing woodworking, and

17 you know, I made all the toys that I could possibly make and

18 retirement's overrated.  So that's what I was referring to as

19 that humorous story that Mr. Barger told me.

20          MR. SHEARER:  Okay.  All right.  I am done with this

21 right now.

22          THE COURT:  Any more questions at this time?

23          MR. SHEARER:  No more questions.

24          THE COURT:  Mr. Eidelman?

25          MR. DiLORENZO:  It is actually, Mr. DiLorenzo, your

1   Honor.

2            THE COURT:  Go ahead.

3   CROSS-EXAMINATION

4   BY MR. DiLORENZO:

5   Q    Mr. Marino, did you have anything to do with the hiring

6   of Mr. Barger?

7   A    No, sir.

8   Q    Was he at the company by the time you started?

9   A    Yes, sir.

10  Q    And you didn't have anything to do with -- do you know

11  who hired him?

12  A    Joe Plumeri.

13  Q    And Mr. Plumeri himself approved that and his salary,

14  correct?

15  A    Correct.

16  Q    You mentioned that when people are offered a severance

17  package, when they are part of a RIF, they get a percentage of

18  their bonus.  Mr. Barger was RIF'd in early 2017, correct?

19  A    Correct.

20  Q    And he wouldn't be getting a percentage of his bonus,

21  would he, because you paid him a hundred percent back in

22  November, right?

23  A    That's correct.  All cash.

24  Q    And, now, tell me how that bonus would have worked?  I

25  think you sent an e-mail around to everybody within 24 hours

1   of hearing that he might have inoperable cancer?

2   A    That's right.

3   Q    To give permission to pay him all of the 174,000 now; is

4   that correct?

5   A    That's correct.

6   Q    Did you do that for anybody else?

7   A    No, sir.

8   Q    Now, was he entitled to get a hundred percent of it paid

9   in cash?

10  A    No.

11  Q    How was the bonus paid to people?  First, what time of

12  year was it paid?

13  A    So it would be paid in February or March.  And, you know,

14  in the case of a senior vice president, typically, only 20

15  percent would be paid in cash, the remaining 80 percent would

16  be in equity.  That would vest over a three-year period.

17  Q    So how much would vest the first year?

18  A    So 20 percent.

19  Q    And another 20 percent the second year?

20  A    No, then 40 percent and then another 40 percent.

21  Q    So you accelerated all the vesting, if you will, so he

22  was eligible to receive it in November?

23  A    That's right.

24  Q    Is that right?

25  A    That's right.

MARINO - CROSS - DiLORENZO                           419

1  Q    And he received all cash, no stock?

2  A    Correct.

3  Q    And that was done for his benefit?

4  A    Yes, sir.

5  Q    And you informed him of that?

6  A    Yes.

7  Q    And you've been sued individually in this case, right?

8  A    Yes.  Sadly.

9  Q    Okay.  You talked about a golf trip, I think -- you

10 mentioned the September golf trip?

11 A    Yes.

12 Q    Where Mr. Plumeri chartered a plane?  Was that at his

13 expense?

14 A    The trip for the visit to Mr. Barger was Joe Plumeri

15 chartered a plane.  The golf trip was at Mr. Plumeri's country

16 club in New York.

17 Q    And did that come about because Mr. Barger communicated

18 to you what he really wanted to do before his surgery was play

19 golf with his two friends?  Is that a yes?

20 A    Yes.

21 Q    Is that why you guys invited him up and you played golf

22 with him that day?

23 A    Yes.

24 Q    Was that golf match on a Monday?

25 A    Yes.

1  Q     And what do you usually do on Mondays?

2  A     Management committee meeting.

3  Q     Is that what you did the weekend package for, before the

4  Monday meeting?

5  A     Right.

6  Q     Is that a mandatory meeting as far as the management

7  committee goes?

8  A     Yes.

9  Q     Did you have to get written -- did you make a written

10 request to Mr. Bisignano to miss Monday because you were going

11 to play golf with your friend who was facing a surgery?

12 A     Yes.

13 Q     And did he okay that day at playing golf with Mr. Barger

14 and Mr. Plumeri?

15 A     Yes.

16 Q     And is that a picture of the golf match, the three of

17 you?

18 A     Yes.

19 Q     Is that the day?

20       MR. ZEITLIN:  Your Honor, is this leading somewhere?

21 What's the relevance of this testimony?  He's already stated

22 that he was good friends with the plaintiff.  We know that

23 already.  This is just bolstering that testimony.

24       THE COURT:  Objection overruled.

25 Q     Would you take a look at what's in evidence, I believe,

1    or if it is not, I'm offering it, Defense Exhibit 89.  Can you

2    see it?

3    A    Yes.

4    Q    I think it is an e-mail dated 8 -- August 26, 2016, 6:00

5    at night, from you to Mr. Bisignano, Friday night.  Do you see

6    that?

7    A    Yes.

8    Q    It says:  Frank, not good news from Barger.  Second

9    opinion in Tampa yesterday confirmed return and spread of

10   throat cancer.  Surgery only option, and he will lose entire

11   vocal cords and voice box.  Surgery being scheduled probably

12   for Friday.

13              That was a week --

14              THE COURT:  So 89 now is in evidence.

15              (Defense Exhibit 89 received in evidence.)

16   Q    You said, I would like to miss MC.  That's the management

17   committee?

18   A    Yes.

19   Q    And before accepting, I want to get your okay.  Either

20   way, I am okay with your decision?

21   A    Right.

22   Q    And how does Mr. Bisignano answer you?

23   A    You're good.

24   Q    And what did that mean to you?

25   A    Go enjoy your day.

1  Q    Now, there was some testimony about some text messages

2  between you and Mr. Barger.  Do you remember that testimony?

3  A    Yes.

4  Q    And this is Defendant's Exhibit 115.  I believe it is the

5  same exhibit.  It might have a different number.

6            THE COURT:  115 in evidence now.

7            (Defense Exhibit 115 received in evidence.)

8  Q    Can you read that?

9  A    I have got it in the book.

10  Q    Okay.

11            MR. ZEITLIN:  What exhibit number?

12            THE COURT:  What is it you want to ask this witness?

13            MR. DiLORENZO:  Your Honor, the e-mail he talked

14  about on November 8, where it says, thanks for the wonderful

15  visit.  Personal things are the only ones that count.  Going

16  in for additional repair surgery next week.  Six days in the

17  hospital, four weeks full recovery.  Should be talking around

18  Christmastime.  I could play Santa at office party.  Ha, ha.

19  There it is.  Ha, ha, PC corrected.  Love you, Tony.

20            THE COURT:  So that's what it means.  What's the

21  question?

22  Q    That e-mail was sent to you by Mr. Barger, correct, that

23  text message?

24  A    Yes.

25  Q    And is that the text message that you were talking about

1  that you received after the visit you made to see him?

2  A    Yes.

3  Q    And the last line of the -- two days later you get

4  another voice message -- or another text message.  Last line

5  says:  One more operation soon, and I will have the open

6  internal wounds healed, and we can start eating and drinking

7  again.  Thanks for being in my life, Tony, it means

8  everything.  Love, Steve.

9          He sent you that one two days later?

10 A    Yes.

11 Q    And now on the 19th, you tell him that he's going to get

12 a Federal Express from you, to begin disability claims

13 processing; do you see that?

14 A    Yes.

15 Q    And on your direct testimony, you identified the cover

16 letter that was in the package, right?

17 A    Correct.

18 Q    That he received talking about the transition to

19 disability, right?

20 A    Right.

21 Q    This text message was sent at the same time you sent the

22 Federal Express?

23 A    Yes.

24 Q    Okay.  And this is when he's going to start being on

25 leave, and he's going to lose access to the system, right?

1    A    Correct.

2    Q    Okay.  At that time, was it your understanding that he

3    was capable of working?

4    A    No.

5    Q    And you mentioned that certain things happened between

6    you heard reports of different things that he was involved

7    with with trying to do his job from home and hospital and so

8    on, right?

9    A    Right.

10   Q    And one of them involved e-mails?

11   A    Yes.

12   Q    I would like you to take a look at Defense Exhibit 111.

13            Have you seen this e-mail before?

14   A    Yes.

15            THE COURT:  That's in evidence now.

16            (Defense Exhibit 111 received in evidence.)

17   Q    Was that e-mail sent to you at the time -- around the

18   time it was sent or shown to you?

19   A    It was shown to me.

20   Q    Do you remember who showed it to you?

21   A    I believe Ms. Whalen.

22   Q    So the bottom e-mail appears to be an e-mail from a Wendy

23   Altman to a list of people.  Do you recognize any of the names

24   on that list on the bottom?

25   A    Yes.

1    Q     What kind of positions do those people have?

2    A     Mostly senior vice presidents.

3    Q     And that was dated November 3?

4    A     Correct.

5    Q     And at the top, does that appear to be a "reply all" by

6    Mr. Barger to the group?

7    A     Yes.

8    Q     And what does his note say to all of them?

9    A     I am at okay pain.  Please Cale.

10   Q     Please Cale, with a capital "C," right?

11   A     Right.

12   Q     Now, in light of the e-mail below, and "reply all" he

13   hit, does that make any sense, that exchange?

14   A     No.

15   Q     And did you get contacted by these people to ask what was

16   going on with Mr. Barger?

17   A     Yes.

18   Q     Did you also get reports from people about a meeting that

19   Mr. Barger participated in on the video?

20   A     Yes.

21   Q     And what did you hear?  What was told to you about that

22   meeting?

23              MR. SHEARER:  Objection, your Honor.

24              THE COURT:  Sustained.

25   Q     Your Honor, we're offering if, if it's a hearsay

 1  objection, we're offering it to talk about the actions that he

 2  took as a result of this information --

 3          THE COURT:  You're offering it for a limited

 4  purpose.  Go ahead.

 5          So you received that.  As a result of that, whether

 6  it is true or not, you took certain action?

 7          THE WITNESS:  I had factored that into my head that,

 8  you know, he was showing up on video screen with no shirt.

 9          THE COURT:  Okay.

10  Q    And the action -- that was part of your consideration to

11  take what action?

12  A    To send Mr. Barger paperwork so he could get better.

13  Q    Would you take a look at Defense Exhibit 135.

14          THE COURT:  In evidence at this time.

15          (Defense Exhibit 135 received in evidence.)

16  Q    Mr. Marino, at the bottom of that page there's an e-mail

17  from you to Mr. Charron and Mr. Hack, cc to Karen Whalen and

18  Scott Rodin.  Who's Scott Rodin?

19  A    He's the head of compensation.  He works for me.

20  Q    And Karen Whalen and Daniel Charron are people we saw

21  testify?

22  A    Correct.

23  Q    And Mr. Hack was his supervisor at the time, Mr. Barger's

24  supervisor?

25  A    Yes.

1   Q    And it says:  I'd like to recommend we pay Steve a full

2   bonus at the same number as last year.

3            Did you need these people's permission?

4   A    Yes.

5   Q    And did they grant permission?

6   A    Yes, sir.

7   Q    Now, it says here:  We will pay from normal payroll, not

8   the pool.  E-mail from you to them.  There's something from

9   Mr. Charron, it says, I'm fine with it, question, do we use 95

10  percent so we don't use another person's allocation.

11           What does he mean by that?

12  A    He's saying that we're reducing the pool because we know

13  our performance isn't where it needs to be so we are going to

14  be reducing the bonus pool by 5 percent to 95 percent.

15  Q    I forgot to ask you about that.

16           So the following year, if Mr. -- so you even knew at

17  the time that the bonus pool wasn't going to be a hundred

18  percent of the year before?

19  A    Yes, we knew at least it was going to be down by five

20  percent at that time.

21  Q    And the discussion between the four of you is, we don't

22  want to reduce Mr. Barger's, we are going to give him a

23  hundred percent of all cash, no waiting for the stock to vest

24  or anything else?

25  A    That's my recommendation, which was accepted.

1   Q    Were you concerned -- you were asked a lot of questions

2   about where that money was going to come from and what pocket

3   it was going to be paid from and how much more money people

4   would make or not make because of it.  Was that any

5   consideration that day where you were getting permission to

6   get his bonus paid, a hundred percent?

7   A    No, sir.

8   Q    Now, do you know whether there was -- you gave some

9   testimony and you were asked questions about lists that are

10  prepared for layoffs, and the judge asked you some questions

11  about it, too.  Do you remember that testimony?

12  A    Yes.

13  Q    Was Mr. Barger's -- and you've heard the claims in this

14  case that Mr. Barger was selected for layoff because he tried

15  to return to work with a note on January 10, to come back on

16  January 17.  Do you remember that --

17  A    Yes.

18  Q    -- claim?

19  A    Yes.

20  Q    Do you know whether his name was put on a list before

21  January 10?

22  A    Yes.

23  Q    How many lists do you know of, firsthand knowledge, lists

24  he was put on before January 10?

25  A    At least three.

1   Q    And who's the person that you describe -- one of the

2   people that you describe that works on lists in your office?

3   A    Ms. Kathi Benhardt.

4   Q    Does she actually plan the reductions in force?  What's

5   her role?

6   A    No, she just tallies the information as it comes in from

7   the management committee members.

8   Q    Do you remember, I believe it was today, with

9   Mr. Charron, the judge asking some questions about severance

10  pay versus compensation and savings and those kinds of things?

11  A    Yes, sir.

12  Q    Do you get numbers concerning how much the savings were

13  planned to be from the reduction in force for the top ten

14  percent?

15  A    Yes.

16  Q    Was the judge correct when he talked -- when he was

17  asking questions and making statements about the fact that

18  there's an initial payment for the severance, but then there's

19  a longer term savings?

20  A    Yes.

21  Q    Do you recall what the initial payout on the severance

22  was in early 2017 for the 362 people?

23  A    Yes.  The savings were $43 million in base salary, in

24  fringe, and the severance was 20 million.

25  Q    And the severance was a one-time payment?

1   A    Yes.

2   Q    So stay with me, I am not terrific, even on house budget.

3        But the difference in those two numbers would be how

4   much would be saved the first year?

5   A    Yes.  $23 million would be saved the first year, and the

6   full 43 the second year.

7   Q    And thereafter?

8   A    And thereafter.

9   Q    And there was some claim today I heard for the first time

10  that it didn't make sense for us to claim we'd save any money

11  by laying Mr. Barger off because he wasn't costing us any

12  money.

13       You understand that he's -- we haven't heard a

14  number yet, but you understand he's suing all the individual

15  defendants and First Data for a lot of money, correct?

16  A    Correct.

17  Q    That he's claiming he would have been paid if we hadn't

18  terminated him, right?

19  A    Right.

20  Q    So to say that we weren't really saving any money,

21  because if we terminated them he wasn't costing us any

22  money --

23       MR. ZEITLIN:  Objection.

24  Q    -- is inconsistent with the --

25       MR. ZEITLIN:  He's testifying.

1      MR. DiLORENZO:  Can I finish my question?

2      THE COURT:  One second.

3      I think that it is really more argumentative.  You

4  have the facts.

5      MR. DiLORENZO:  Thank you, your Honor.  I will

6  withdraw.

7      THE COURT:  You can talk about that if you want in

8  your summation.

9      MR. DiLORENZO:  I will withdraw it, your Honor.

10     THE COURT:  I am going to let Mr. Zeitlin

11  participate.  You have a bunch of people helping you out, and

12  I am not a stickler for pinning people down in terms of who's

13  going to question.  He's part of the defense team.  I look at

14  him as if he's the same as Mr. Charron and working in tandem.

15     MR. DiLORENZO:  Oh, yes, your Honor.  My only

16  objection was one lawyer questioning the witness, the other

17  one --

18     THE COURT:  I understand.  If he gets unruly, I will

19  control it.

20     MR. DiLORENZO:  I appreciate it, your Honor.  I

21  don't think he's been unruly yet, in my opinion.

22     THE COURT:  No, he's doing fine.

23     MR. DiLORENZO:  Okay.

24  Q    Mr. Marino, would you take a look at what's Defendant's

25  Exhibit 182.

*MARINO - CROSS - DiLORENZO*                    432

1          THE COURT:  It is in evidence.

2          (Defense Exhibit 182 received in evidence.)

3    Q    I would like you to take a look at -- I think it is

4    marked -- must be double-sided.  It is marked as page 3.

5          Now, just to be clear about a couple of things.  At

6    the point in time when this assignment was made to Robert --

7    sorry, Robin Ording, to -- I think your testimony was that on

8    an interim basis she would manage the sales training group; do

9    you remember that testimony?

10   A    Yes.

11   Q    And there was testimony about, well, why wasn't his --

12   you were asked some questions, why didn't she cut his pay

13   down, because you were going to have somebody else do this

14   work.

15         Was Robin Ording given any more money to run the

16   sales group?

17   A    No.

18   Q    So the cost of us having Robin as an interim manager was

19   zero in terms of compensation and benefits?

20   A    Correct.

21   Q    She had another full-time job as HR director?

22   A    Yes.  No, I'm sorry.  It was vice president of training

23   and development.

24   Q    Vice president of training.

25         And is the box at the top, is this an organizational

1    chart of the sales group?

2    A     Yes.

3    Q     And was this taken from the sales transformation review?

4    A     Yes, sir.

5    Q     And this was the one done by Pat Hadler that we've heard

6    about?

7    A     Yes.

8    Q     So right off the top of her report -- and she did issue a

9    report, right, in January 2017?

10   A     Yes.

11   Q     The top of the report talks about this organizational

12   chart, right?

13   A     Correct.

14   Q     And this is what the structure looked like when Pat

15   Hadler looked at it, right?

16   A     Right.

17   Q     And it shows a VP of sales at the top, do you see that,

18   sales transformation?

19   A     Right.

20   Q     And that's Robin is in that spot as a VP?

21   A     She's in that spot as a VP.

22   Q     It doesn't show a senior vice president on the top, does

23   it?

24   A     No.

25   Q     But that's, at the time, really where it was because

MARINO - CROSS - DiLORENZO                    434

1   Mr. Barger was the senior vice president, right?

2   A    Correct.

3   Q    And across the next layer, right, the layer of

4   management, are five directors, right?

5   A    Right.

6   Q    Justin Stamey?

7   A    Yes.

8   Q    There's an open position, there's Patty Stilwell, Julie

9   Kelly and Lorraine Deschamps, right?

10  A    Right.

11  Q    Five directors.  And then I haven't counted the people,

12  but it's roughly, I think we've heard testimony, somewhere

13  between 50 and 67 or something like that, right?

14  A    Yes.

15  Q    And this group now, the sales training group is now, as

16  part of this reorganization, was put under the training that's

17  in human resources, right?

18  A    Yes.  Corporate training.

19  Q    Corporate training, right?  There was a corporate

20  training group in existence at the time?

21  A    Yes.

22  Q    And that covered training of new employees, developmental

23  training for different jobs, orientation, is that --

24  A    Leadership training, yes.

25  Q    Management training?

1  A    Correct.

2  Q    Sexual harassment training?

3  A    Yes.

4  Q    And in these large organizations that you testified about

5  that you've been in, four or five times you've been chief

6  human resources office?

7  A    Yes.

8  Q    Some of those have been two or three hundred thousand

9  employee organizations?

10 A    Correct.

11 Q    Did you have training, development, management,

12 development and training under the HR functions in those

13 companies?

14 A    For more than 20 years, I have had training and

15 development.

16 Q    Is that a function that's normally under human resources?

17 A    Yes.

18 Q    And after this reorganization, was this combined with

19 corporate training under human resources?

20 A    Yes.

21 Q    Do you know for a fact how the online training -- do you

22 know whether the sales transformation people were working on

23 developing online training under Mr. Barger?

24 A    No.

25 Q    Do you know anything about that?

MARINO - CROSS - DiLORENZO                    436

1    A    No.

2    Q    Do you know what happened after it was moved to HR?

3    A    Yes.

4    Q    What happened after they moved to HR?

5    A    Ms. Ording was assuming those responsibilities and

6    ultimately this group of 60 became 18.

7    Q    The sales training people were reduced down to 18 people?

8    A    Right.

9    Q    And this director, Justin Stamey, is he the one that runs

10   it?

11   A    Yes, sir.

12   Q    And what level is he at?

13   A    Director.

14   Q    And is -- no more questions.

15   A    His comp's at about 150 total, just as an example.

16   Q    That include his bonus?

17   A    Yes.

18   Q    Now, in this report, was there a list on a recommendation

19   as to the changes that should be made in this group?

20   A    Yes.

21   Q    Is this one of the three lists you were saying were

22   developed before January 10?

23   A    Yes.

24   Q    I'd like you to take a look at page 39 of that document.

25            MR. ZEITLIN:   What exhibit number is it?

1           MR. DiLORENZO:  Same one.  I think it is 182.

2    Q    Do you see this list?

3    A    Yes.

4    Q    It says -- the heading says, sales transformation actions

5    plan total approximately 2.2 million.  What's "YOY" stand for?

6    A    Year-over-year savings.

7    Q    Okay.  There's names on this list?

8    A    Correct.

9    Q    And there's estimated savings?

10   A    Right.

11   Q    Mr. Barger show up?

12   A    Yes.

13   Q    Where is he?

14   A    He's the first name in the second row, under open roles.

15   Q    And some of these people have been there 17 years and 13

16   years.  He's been there two years, right?

17   A    Yes.

18   Q    And under recommendation, it says eliminate role; do you

19   see that?

20   A    Yes.

21   Q    Estimated savings, 566400?

22   A    Correct.

23   Q    Do you see that?

24   A    Yes.

25   Q    Now, earlier today I believe we saw a second list, and I

1   want to make sure it is the same one that you are talking

2   about, or one of the three that you're talking about.

3            Defendant's Exhibit 214.  I think Mr. Charron

4   identified this list.  Have you seen this one before?

5   A    Yes.

6   Q    214?

7   A    Yes.

8   Q    This one's dated 1-9-2017; do you see that?

9   A    Yes.

10  Q    The title at the top says, confirmed; you see that?

11  A    Yes.

12  Q    And number 2 on this list is Steve Barger, right?

13  A    Yes.

14  Q    And Mr. Hack developed this list?

15  A    Yes.

16  Q    And --

17           MR. SHEARER:  Your Honor, he's not listed as a

18  recipient or a sender of this e-mail.  Has he testified as

19  to --

20           THE COURT:  You have knowledge of that.

21           THE WITNESS:  Yes.

22           THE COURT:  He has knowledge.

23           MR. DiLORENZO:  I believe he earlier testified, your

24  Honor, there were three lists developed before the 10th.

25           THE COURT:  That's right.  There's no objection here

1  that's being sustained.  Continue with your questioning.

2         MR. DiLORENZO:  Did you say it was sustained?

3         THE COURT:  I said there's no objection that's being

4  sustained.  Continue with your questioning.

5         MR. DiLORENZO:  Thank you.

6  Q    Now, there's a third list.

7         MR. DiLORENZO:  Your Honor, I would like to put this

8  one on the computer because it doesn't --

9         THE COURT:  Is it in evidence?

10        MR. DiLORENZO:  No, your Honor.  We are going to

11 offer it into evidence.  And I believe the placeholder is

12 D-273.

13        THE COURT:  Is this the third list now?  Can you

14 identify that?  I am asking the question.  Look at 273.  Tell

15 us what it is.  Don't show it to the jurors yet.

16        MR. DiLORENZO:  Can I ask some foundation questions,

17 your Honor?

18        THE COURT:  Go ahead.

19 Q    Mr. Marino -- I'm sorry, I keep -- I can't pronounce the

20 name when I see it in writing.  What's the name of the woman

21 that there's been testimony about that keeps the list data

22 analytics?

23 A    Kathi Benhardt.

24 Q    So Kathi Benhardt, what's her title?

25 A    She's vice president of work force data and analytics.

1   Q    And who does she report to?

2   A    Me.

3   Q    And is one of her jobs to -- as reductions in force are

4   done, compile lists of the people that she receives

5   information from, either from you or people in the field,

6   members of the management committee that are looking at people

7   to be selected for the layoffs?

8   A    Yes, sir.

9   Q    And are those maintained in the company's records,

10  computerized records?

11  A    Yes.

12  Q    And is the purpose -- what is the purpose that those

13  lists are maintained for?

14  A    To ensure that, you know, we have one central point of

15  control for understanding, you know, all of that confidential

16  information, and that, you know, we then take those lists and

17  we work with our legal department to ensure that, you know,

18  they're cleared for, you know, in this case, reduction in

19  force.

20          THE COURT:  This is the third list that you referred

21  to, right?

22          THE WITNESS:  That's correct.

23          THE COURT:  So we identified the other two, they are

24  in evidence?

25          THE WITNESS:  That's right.

1              THE COURT:  And you know this is the third list that

2      was generated by this woman, as you have explained the

3      process, right?

4              THE WITNESS:  Correct.

5              THE COURT:  I will allow it in evidence.

6              MR. DiLORENZO:  Thank you, your Honor.

7              (Defense Exhibit D-273 received in evidence.)

8      Q    And, Mr. Marino, do you have -- is one of the entries on

9      these lists the date that the person is put on the list?

10     A    Yes.

11     Q    And can everybody see this?  Can you see the list okay,

12     Mr. Marino?

13     A    Yes.

14     Q    Would you take a look at the 10th.  You see a number of

15     redactions, those are other people's names; is that correct --

16     A    Correct.

17     Q    -- that we have taken off the document?

18     A    Right.

19     Q    Would you take a look at entry number 10?

20     A    Yes.

21     Q    And who's name is there?

22     A    Steve Barger.

23     Q    And the first column says date added to the file; you see

24     that?

25     A    Yes.

1    Q    And what's the date for him being added to the file?

2    A    11-30-16.

3    Q    Are there other people below him that were added on that

4    same day?

5    A    Yes.  Three of them.

6    Q    That says --

7    A    Four.

8    Q    It says submitted by Tony.  Is that you?

9    A    Yes.

10   Q    And you also submitted other people that day?

11   A    Correct.

12   Q    His salary is listed?

13   A    Yes.

14   Q    Notification timeline, it says no date?

15   A    Correct.

16             THE COURT:  So just clarify for me, so I have a

17   clear sense of the timeline, this list was prepared when?

18             THE WITNESS:  This would have been -- information

19   would have been relayed to me on or around 11-30, and then I

20   would have called Ms. Benhardt.  And in this case I remember

21   specifically that Jeff Hack was working on his efficiencies

22   and his reductions, and, you know, he said, you know, we

23   should add Steve to the list.

24             THE COURT:  All right.  So we know what the other

25   time aspects are.  I am not going to comment.  Anything else

1    you wanted --

2            MR. DiLORENZO:   Just a couple more quick, your

3    Honor.

4    Q    So, Mr. Marino, you identified a -- you were asked about

5    a text message you sent to Mr. Barger when he was right in the

6    middle of his medical issues, where you said -- when he asked

7    if this means he's going to be fired, and you said, your

8    salary will be restored after you come back to work, you would

9    be offered another position.  Do you remember that testimony?

10   A    Yes.

11   Q    At that time, did you know that the company was going to

12   engage in a ten percent reduction of the top 3,000 highly

13   compensated individuals?

14   A    I did not.

15   Q    And when did you find that out; do you remember?

16   A    January 2.

17   Q    I want to show you Defense Exhibit 196.

18           THE COURT:   So you didn't know about the spreadsheet

19   until January 2; is that your testimony?

20           THE WITNESS:   That wasn't the question.

21           THE COURT:   When did you know about the spreadsheet?

22           THE WITNESS:   No, he's saying, when did I know about

23   the --

24           THE COURT:   No, but I am asking you, when did you

25   know about the spreadsheet?

*MARINO - CROSS - DiLORENZO*                    444

1            THE WITNESS:  The one --

2            THE COURT:  That he was just --

3            THE WITNESS:  -- that we just saw?

4            THE COURT:  That's the November?

5            THE WITNESS:  Yes.

6            THE COURT:  Did you know it at that time?

7            THE WITNESS:  Yes.

8            THE COURT:  Okay.  Next question.

9   Q    And that text message was much earlier than November,

10  correct?

11  A    Correct.

12  Q    So Defense Exhibit 196, do you see this e-mail chain?  It

13  is double-sided copy.  So down at the bottom is an e-mail from

14  you to a number of people.  Do you see that?

15           THE COURT:  196 is in evidence at this time.

16           (Defense Exhibit 196 received in evidence.)

17  Q    Do you see that e-mail down at the bottom?

18  A    Yes.

19  Q    Okay.  I am going to turn the page over because I believe

20  the body of the e-mail is on this side.

21  A    Right.

22  Q    And this is an e-mail you sent to your team?

23  A    Right.

24  Q    It says:  Today FJB decided to reduce ten percent of the

25  head count in the top 3,000.  Not all MC members have been

*MARINO - CROSS - DiLORENZO* 445

1  notified, but soon will via a file.  I will send the copying

2  yourselves.  The work will be due to Himanshu on Sunday night.

3  I will have Fuji get us time tonight to discuss.  Thanks, all.

4         Now, do you remember what day of the week January

5  2nd was?

6  A    Monday.

7  Q    And that was the day after the new year holiday?

8  A    Yes.

9  Q    Did all the MC members attend that meeting?

10  A    No.

11  Q    Was that what you meant by not all MC members know?

12  A    Yes.

13  Q    And then this -- these other e-mails ensued in terms of

14  timing; is that right?

15  A    That's right.

16  Q    Now, you were asked some questions about the management

17  of this group, the sales training group.  And you were asked

18  some questions about the hires after his arrival and so on.

19         Do you see these attrition rates that were found

20  during the study?  This is already in evidence, I believe,

21  Defense Exhibit 208.

22         THE COURT:  208 is not in evidence.

23         MR. DiLORENZO:  Oh, it's not?  I'm sorry, your

24  Honor.  I am going to offer 208 into evidence.

25         THE COURT:  All right.  In evidence.

1          (Defense Exhibit 208 received in evidence.)

2          THE COURT:  So give me a sense, because I think we

3   are going to be taking a little break.  How much longer do you

4   have on your questioning?

5          MR. DiLORENZO:  You know, your Honor, maybe another

6   20 minutes.

7          THE COURT:  Okay.  We are going to -- look.

8   Obviously, he's a key witness with a lot of information.  We

9   will take our afternoon break.  Don't talk about the case.

10         But let me just tell you folks something here.  You

11  are hearing a lot of e-mails, and you are getting a lot of

12  information.  And the purpose of summation is to let the

13  lawyers have the opportunity to tell you why all of these

14  e-mails are in evidence and to try to argue from the facts in

15  evidence, however they have think is appropriate.

16         So there's a difference between getting the facts

17  out, which is what we're doing, it can be tedious, right, lots

18  of e-mails, but I don't allow the lawyers to argue about it

19  now, all right.  Once in a while they try to do that, but my

20  job is to get the facts out.

21         The lawyers will have the opportunity at their

22  summations to tell you why they have all these e-mails and

23  what they think the significance is, so there's a difference

24  between lawyer argument, which I don't allow now, and just

25  going through the process of getting all the facts and

1    information out to you, which the parties think is relevant to

2    your ultimate consideration.

3          It can be tedious.  There's no question about it,

4    because it comes in piecemeal, not all at once, and some of

5    the relevance to you may or may not be apparent.  But that's

6    what summation is all about, to give the lawyers the

7    opportunity to argue from the facts which are in evidence,

8    what they believe those facts lead to in terms of how they

9    think you should decide the case.

10          So you've got to be patient, I have to be patient,

11    it is all coming in piecemeal.  That's how the process works,

12    all right?  But fear not, because at the end of the line, the

13    lawyers will have the opportunity to tell you why all this

14    information came in and what they make of it, and then you'll

15    decide where the truth lies, okay?

16          So we'll take a 15-minute break at this time.  Don't

17    talk about it.  And I think today we are going to conclude

18    Mr. Marino's testimony.  And I don't know how much you would

19    have in terms of your redirect, a few minutes, I imagine.

20          MR. SHEARER:  Yeah, I got --

21          THE COURT:  All right.  So, obviously, some

22    witnesses, because of their knowledge, they will take longer.

23    We started off with a relatively short witness today, he

24    didn't have lost of knowledge about the business operations.

25    This gentleman does.  So, obviously, not all witnesses are

1    equal in terms of the time it takes.  But we are moving along

2    very nicely, and I'm confident we will be able to finish with

3    the testimony of part in this case, I would imagine Friday.

4    But the predictions we made I think at the beginning that this

5    may overlap into the beginning of next week probably will

6    prove to be true.

7              But I think that we are moving along nicely, and we

8    will see whether or not by the end of Friday all of the

9    testimony is before or whether it is going to overlap until

10   Monday.  We are in that direction, so to speak.  So you have

11   to free yourself up to be here next week.  We don't know how

12   long it is going to take, but for sure it is going to be

13   wrapped up next week, possibly the beginning of week, okay?

14             THE COURTROOM DEPUTY:  All rise.

15             (WHEREUPON, a recess was had at 3:36 p.m.)

16             (Continued on the next page.)

17

18

19

20

21

22

23

24

25

1              (In open court; 3:38 p.m.)

2              (Witness takes the witness stand.)

3              THE COURT:  Bring in the jury.

4              (A brief pause in the proceedings was held.)

5              COURTROOM DEPUTY:  All rise.

6              (Jury enters courtroom at 4:21 p.m.)

7              COURTROOM DEPUTY:  You can all be seated.

8              THE COURT:  All right, folks.  Let's see if we can

9    complete this witness's testimony this afternoon if that's

10   possible.

11             Continue.

12             MR. DILORENZO:  I'll try to hurry here, your Honor,

13   to get these few things.

14   EXAMINATION BY

15   MR. DILORENZO:

16   (Continuing.)

17   Q    Mr. Marino, you mentioned that those companies that you

18   were at you were involved in a number of RIFs?

19   A    Yeah, every company goes through some type of RIF.

20   Q    Was one RIF at a very large company so large that you

21   included yourself in the RIF?

22   A    Yes.

23   Q    When was that?

24   A    It was during the recession of 2007 at a company called

25   Lenna Corporation, the country's largest home builder.

*A. Marino - Cross/Mr. DiLorenzo*                    **450**

1   Q    How many people were RIFed include yourself?

2   A    Two-thirds of the workforce and then I volunteered my

3   position as well.

4   Q    Now, you were asked some questions about employment

5   at-will at First Data Corporation.

6         Do you have a contract protecting your employment at

7   First Data?

8   A    No.

9   Q    Are all the employees at-will?

10  A    Yes.

11  Q    Now, we saw --

12  A    I'm sorry, with the exception of Mr. Bisignano.  He has a

13  contract.

14  Q    We saw a contract that Mr. Barger signed with Mr. Plumeri

15  and so on.

16         That wasn't as an employee was it?

17  A    No, that was as a consultant.

18  Q    And since he became an employee, he was employed at-will;

19  correct?

20  A    Correct, no contract.

21  Q    But you gave testimony that his salary could have been

22  changed, he could have been demoted at any time as an at-will

23  employee, also.  He could have been terminated; correct?

24  A    Correct.

25  Q    Were any of the 362 or other -- is it a total of 362?

1    A    Yes.

2    Q    So the other 361 people that were RIFed at the same time

3    or in that same RIF with Mr. Barger, were any of them offered

4    other positions within the company?

5    A    No.

6    Q    Were any of them offered the opportunity to keep their

7    old job and work at half way?

8    A    No.

9    Q    Did Mr. Barger ever come to you or anyone else and say

10   Oh, geez, Tony, I'm making $800,000 running the sales group,

11   I'd like to keep my job but I think I should make less money

12   because the market doesn't justify paying this much for the

13   job?

14   A    No.

15        THE COURT:  I guess I should be lucky because the

16   constitution says that a judge's salary can't be reduced.

17        THE WITNESS:  You have a contract.

18        THE COURT:  It's in the constitution.

19   Q    Now, you identified, I think, this is 282, Defendant's

20   Exhibit 282, the organizational chart?

21   A    Yes.

22   Q    This Justin Stamey?

23   A    Stamey.

24   Q    He was a director?

25   A    He is a director.

1  Q    And he was a direct shall at the time of this

2  organizational name while Robin was temporarily filling in?

3  A    Yes.

4  Q    And you were asked about, you know, saving money by

5  having him do part-time work.  He was already an existing

6  employee that was a director; right?

7  A    Correct.

8  Q    And in the new reorganization, he's also still a

9  director?

10  A    Yes.

11  Q    So whatever salary he was making as a director here may

12  have increased, stayed the same, or been slightly decreased

13  but he's still a director now running the entire group?

14  A    Correct.

15  Q    Now, you gave testimony about a text message, a text

16  message that you received from Mr. Barger and I frankly

17  couldn't find it, but actually, it's on Plaintiff's

18  Exhibit 35.  You were shown some of these text messages today

19  in your direct examination, do you see the one at the top?

20  A    Yes.

21  Q    I don't think we saw this morning.  But it's on the same

22  document.  "Tony, Rhonda do just take care everything for my

23  STD."

24          Is that Rhonda Johnson?

25  A    Yes.

1   Q    She's the one that helped him fill out the forms and so

2   on?

3   A    Yes.

4   Q    "I appreciate her gentle loving care.  I need to discuss

5   my options with you and Joe."

6         Are those job options, what kind of options are

7   those?

8   A    You know, could be stock options.

9   Q    "They need to be transferred into my wife's name and make

10  certain they are all issued."

11        Do you see that?

12  A    Yes.

13  Q    Does that help you with what the options were referring

14  to?

15  A    I think it was stock options.

16  Q    "All my other accounts will be in here name, also.  I

17  need your help getting my finances together, Dr. Harrison at

18  Moffitt was very concerned about the lymph node cancer being

19  inoperable."

20        Is that's the Dr. Harrison that helped Frank

21  Bisignano and Mr. Plumeri's wife with the throat cancer?

22  A    Yes.

23  Q    The next sentence says, "Don't know length of time, but I

24  need your help for my family security.  Please don't broadcast

25  this."

1          Is that the e-mail that you've been saying changed

2     how you were looking at the situation and decided that you

3     needed to do something?

4     A    In addition to the one on November 8th.

5     Q    This is the one that led you to take care of the bonus

6     and some other things?

7     A    Yes.

8     Q    Now, the judge asked you when we looked at the third list

9     that his name appeared on, I think it was the list indicated

10    that his name was put on November 30th.  The judge asked

11    about, well, if you don't find out until the

12    Management Committee on January 5th that there's going to be a

13    ten percent reduction of the top 3,000, how is there a list on

14    November 30th that much before January 5th?

15         What was the process of that list and what was the

16    origination of that list, if you will, the one in November?

17    A    I think we were working on a view of the top 300.  So we

18    started with a view of the top 300 managers earning wages.  We

19    didn't really find enough savings from that list, so Frank

20    expanded it to the top 3,000.

21    Q    And that was done on January 2nd?

22    A    Correct.

23    Q    Have you ever been sued before in all these HR jobs

24    individually?

25    A    Never.

*A. Marino - Cross/Mr. DiLorenzo*          **455**

1          MR. DILORENZO:  I don't think we put Defendant's

2   Exhibit 283 into evidence, your Honor.  Housekeeping.  We

3   offer 283, the photograph.

4          THE COURT:  283.  283.

5          MR. DILORENZO:  Yes, the photograph.

6          THE COURT:  So that will be in evidence now.

7          MR. DILORENZO:  Thank you.

8          (Defendant's Exhibit 283 was marked in evidence as

9   of this date.)

10  EXAMINATION BY

11  MR. DILORENZO:

12  (Continuing.)

13  Q    In your opinion, with respect to this RIF being involved

14  in it, the reasons for it, how it was done, and why it was

15  done, would Mr. Barger have been treated any differently if he

16  had never gone on leave?

17  A    No.

18  Q    Was he put on the RIF list because he had cancer?

19  A    No.

20  Q    Because he was disabled?

21  A    No.

22  Q    Was he put on it because he had gone out on leave?

23  A    No.

24  Q    Was he put on it because he tried to return to work?

25  A    No.

A. Marino - Cross/Mr. DiLorenzo                456

1   Q    You mentioned that you have a leave department that

2   handles about a thousand leaves at any one time; is that

3   right?

4   A    Correct.

5   Q    And there's a separate department because there's so much

6   paperwork involved, technicality with the dates, and so on --

7   doctor's notes, insurance -- is that why there is a separate

8   department?

9   A    Yes.

10  Q    And how about accommodations?  How many people do we have

11  on accommodations at any time?

12  A    At that time, a hundred.

13  Q    Now, all the text messages, e-mails, conversations you

14  had with Mr. Barger throughout his illness and disability, did

15  he ever once ask you for an accomodation?

16  A    No.

17  Q    There's been some testimony about fraud and falsifying

18  expenses.

19         Do you have any familiarity, in your experience at

20  First Data Corporation, with what happens with an employee who

21  takes money from the company that they're not entitled to?

22  A    We do an investigation and if they're found to have

23  committed those violations they are to be terminated.

24         MR. DILORENZO:  Your Honor, could I have just a

25  second.

1          THE COURT:  Go ahead.

2          (A brief pause in the proceedings was held.)

3          MR. DILORENZO:  No more questions, your Honor.

4    Thank you.

5          THE COURT:  Mr. Shearer, do you have any redirect?

6          MR. SHEARER:  Yes, I do.

7    REDIRECT EXAMINATION

8    BY MR. SHEARER:

9    Q    Mr. Marino, you testified that you and Mr. Barger were

10   good friends.  So if you're such good friends, why didn't you

11   tell him he was having management issues inside his

12   organization?

13   A    We did talk about that.

14   Q    You talked to him about this attrition rate before you

15   got the attrition rate evidence?

16   A    No, not the attrition rate.  Other issues.

17   Q    Now, if you're such good friends, why did you not even

18   consider bringing him back at a lower salary?

19   A    Because we didn't do that for anybody else.

20   Q    But you paid his bonus and you didn't do that for anybody

21   else either; right?

22   A    That's correct.

23   Q    And I'm going to get to that Excel spreadsheet where the

24   list, the third list, but that said, you put him on that on

25   November 30th; right?

1   A    Yeah, Jeff Fiberly called me and said, I'm working on my

2   top 300 and I think we should put Mr. Barger on that list.

3   Q    That's nine days after he received his leave list.  So

4   nine days after you put him on leave, you put him on a

5   termination list?

6   A    It's not me putting him on a termination list, it's

7   Mr. Hack putting on the termination list.  I'm just recording

8   that in our list data process.

9   Q    So you also testified that he received his bonus early

10  and he received a hundred percent while it looked like others

11  were going to be 95 percent.  A hundred percent of what?

12  A    His bonus from the previous year.

13  Q    From the previous year.

14        MR. SHEARER:  Your Honor, this is new, this is

15  Plaintiff's Exhibit 16.

16        THE COURT:  What was that again?

17        MR. SHEARER:  Plaintiff's Exhibit 16.

18        THE COURT:  Just one second.  Okay.

19        It's the first time it's being mentioned.  We'll let

20  it into evidence now.  No objection.

21        (Plaintiff's Exhibit 16 was received in evidence as

22  of this date.)

23  Q    This time Mr. Barger's offer letter.  And Mr. Barger's

24  offer letter said that he was going to start with annual

25  compensation of 730,000 with 480,000 in base and 250 in

*A. Marino - Redirect/Mr. Shearer*            459

1   variable compensation?

2           THE COURT:  You're going so fast I'm not so sure our

3   court reporter can get it.

4           MR. SHEARER:  I'm sorry.

5   Q    You see where that is under "Total Compensation"?

6   A    Yes.

7   Q    So you're saying 174,000 is a hundred percent?

8   A    Of the previous year's bonus.

9   Q    So the previous year's bonus was a reduction in what was

10  in his employment letter then?

11  A    Yes, sir.  All of us had our bonuses reduced based on our

12  performance as a company.

13  Q    What factors go into that company performance

14  calculation?

15  A    Yeah, I think you heard the metrics earlier.  You know

16  our revenue, our earnings, you know, our overall earnings per

17  share, you know, et cetera.

18  Q    Now, this was D-135, it was just put into evidence.

19          Down here, where you recommended the payment of this

20  bonus, you said, "We can include," down the last, very last

21  few words, "Help his morale and get this one off the books."

22          What do you mean by, "Get this one off the books"?

23  A    Yeah, so, you know, there's 174,000 that we'd be able to

24  secure.  So, you know, there would be no further reduction

25  because if we were to have waited until bonus time there would

1  probably be a five percent reduction on the 174 and it

2  wouldn't have been paid all in cash.

3  Q    So you're not saying, If we pay him 174 through payroll

4  that increases the bonus pool by 174,000 for everybody else?

5  A    No.

6  Q    You talked about this text message on 12/9 that you

7  received where Mr. Barger indicated that there was going to be

8  a second surgery.

9         Do you know, did he have that second surgery?

10  A    I believe so.

11  Q    Well.

12  A    I don't know.  I mean, that's what he said.

13  Q    Right here.  Right in the middle here.  December 9th.  So

14  nine days after you put him on the termination list, he, the

15  blue right in the middle, he notifies you that all is good, he

16  doesn't have to have the second surgery?

17  A    Right.

18  Q    Now, the e-mail that you --

19  A    I mean, you're skipping over the e-mail on the 21st.

20  Q    No, I understand the timeline.

21  A    Okay.

22  Q    You put that e-mail up where Mr. Barger hit the "reply to

23  all."  Do you remember that e-mail?

24  A    Yes.

25  Q    Have you ever hit "reply to all" by accident?

1    A    I'm sure.

2    Q    Have you ever sent out an e-mail before you proofread it

3    or included inaccurate information?

4    A    I try not to.

5    Q    Have you ever?

6    A    I'm sure in 34 years we probably all have.

7    Q    My question is, Steve Barger was still included on the

8    initial e-mail on that list, wasn't he?

9    A    That's not the only way he could have replied to all.

10   Q    Right?

11   A    Right.

12   Q    What was the date on that?  There it is.

13            So November 3rd, he's still receiving communications

14   regarding meetings; is that correct?

15   A    Correct.

16   Q    I want to go to that chart.  What was it 270-D.

17   Defendant's 273.  Mr. Barger's, Line 10, here if I highlight

18   it.

19            Can you still read it?

20   A    I can see it.

21   Q    Okay.  And I think you just clarified that.  I was

22   wondering how you could know about this list before the top

23   3,000.  You're saying that there was a top 300, and you said,

24   "We were taking a view of the top 300."

25            What does that mean?

*A. Marino - Redirect/Mr. Shearer*          **462**

1    A    Yeah, we were looking at, you know, if we just looked at

2    the top 300, could we achieve the kind of, you know, cost

3    savings that we were looking to achieve.  And, you know, as

4    mentioned, I remember the discussion with Frank over the

5    holidays that we could not and that's when he communicated on

6    January 2nd the need to expand this to the top 3,000.

7    Q    Okay.  If you look under Mr. Barger's column, Column F at

8    the top says, "Will position be backfilled."

9         Do you see that?

10   A    Yes.

11   Q    And you look down at Mr. Barger's and it says, "Yes."

12        So the plan was to terminate Mr. Barger and hire

13   somebody new?

14   A    No.  The plan was never to hire somebody and we never

15   hired somebody.

16   Q    No but November 30th?

17   A    No.  Backfill could mean that we're going to put somebody

18   in that job on an interim basis.  As you know, we did with

19   Ms. Ording.  So it doesn't necessarily doesn't say will

20   position be hired from the outside replacement.

21   Q    So what does it mean to not have a backfill?

22   A    It means that, you know, that job is either deemed

23   unnecessary or, you know, it would be moved to another

24   department or taken up by another individual.

25   Q    So sounds to me that the backfill, are you saying someone

*A. Marino - Redirect/Mr. Shearer*                463

1  else is going to take it over, that's exactly what happened,

2  that his job wasn't eliminated?

3  A    No, his job was eliminated.  Ms. Ording is a vice

4  president making roughly half of what Mr. Barger was earning.

5  And Ms. Ording had additional responsibilities beyond what,

6  you know, Mr. Barger had.

7  Q    So you were going to transfer this in November.  You're

8  going to transfer it to another senior vice president that was

9  the plan?

10  A    No.  I didn't say that.

11  Q    Well, it says it's going to be backfilled?

12  A    I said that backfill --

13             MR. EIDELMAN:  Your Honor, asked and answered three

14  times.

15             THE COURT:  He answered the question what he meant

16  by backfill.

17             Go on to something else.

18  Q    I'm going to go to Column AB over here.  It's the first

19  blue one.  And the column title is "Severance Weeks."

20             It says the plan was to offer Mr. Barger 20 weeks of

21  severance, is that what that means?

22  A    That's what, you know, the calculation could be correct.

23  Q    When you finally did terminate Mr. Barger, what did you

24  offer in terms of weeks of pay for severance?

25             MR. DILORENZO:  Your Honor, I'm going to object.

1     THE COURT:  I don't know what the relevance of that

2  is.

3     Next question.

4  Q    You stated that you did not believe Mr. Barger would have

5  been treated any differently in the restructuring had he been

6  at work; correct?

7  A    Correct.

8  Q    That was your testimony.  What evidence do you have of

9  that?

10  A    Just in speaking with the Management Committee members,

11  being close to them, understanding how difficult it was to

12  come to the ten percent reduction, understanding from them

13  what jobs they viewed as essential and what jobs that they

14  felt like, hey, you know, it wasn't a function of good people,

15  it was a function of which jobs they could do without.

16     Mr. Barger's job, they felt they could do without

17  and I know that was the discussion going back a while versus,

18  for instance, somebody like Mr. Charron mentioned might be

19  running a division that was bringing in revenue of a billion

20  dollars or running an operation.

21  Q    But if Mr. Barger had been at work and had his e-mail,

22  and he had access to these EC members they could have talked

23  to him about it.  You cut off his communication with them.

24  How do you know that Mr. Barger wouldn't have voluntarily

25  reduced his salary?

1      THE COURT: The question is whether or not some of

2 these folks were willing to have their salaries reduced, would

3 they be able to continue with their employment.

4      THE WITNESS: You know --

5      THE COURT: It's a hypothetical.

6      THE WITNESS: It's hypothetical. It's hypothetical,

7 your Honor. I would say that if Mr. Barger had come to me and

8 said, hey, Tony, look, you know, I really would like to be

9 considered for another job in the future and don't worry about

10 my compensation, you guys pay me what you think the job is

11 worth. Would we have considered that? Absolutely, your

12 Honor.

13      THE COURT: How about if other people came to you?

14      THE WITNESS: Yeah, I think, you know, look, we

15 would consider that if something came up that was appropriate.

16      THE COURT: Has it ever happened to any of these

17 people whose jobs were eliminated when they came to you and

18 said, We want to continue to work. We'll come in at that time

19 a lower salary, whatever. Did that ever happen?

20      THE WITNESS: No.

21      THE COURT: So it wasn't the practice or policy of

22 the organization.

23      THE WITNESS: No. But if somebody would have

24 requested that.

25      THE COURT: Did anybody ever did?

*A. Marino - Redirect/Mr. Shearer*                    **466**

1          THE WITNESS:  They never did.

2          THE COURT:  Happy to leave.  *C'est la vie.*

3          THE WITNESS:  Maybe.

4          THE COURT:  Next question.

5          MR. ZEITLIN:  Your Honor, may I confer with my

6    colleague for one second?

7          THE COURT:  Mr. Zeitlin wants to earn his pay so

8    I'll give him a chance to do that.

9          MR. ZEITLIN:  I have to be productive here.

10          (A brief pause in the proceedings was held.)

11          THE COURT:  Mr. Zeitlin, if you want to ask

12   questions, I'll let you do it.

13          MR. ZEITLIN:  With the same witness?

14          THE COURT:  I'll let you do it.

15   EXAMINATION BY

16   MR. SHEARER:

17   (Continuing.)

18   Q    If you go back to Column F where it's talking about the

19   backfills.  If you look down at 26, that's his position, is

20   yes for the backfill, but downgrade.  What does that mean?

21   A    Yeah.  So that's probably where there was a senior vice

22   president and the position is now becoming a vice president.

23   Q    You don't have that next to Mr. Barger?

24   A    Excuse me.

25   Q    That's not next to Mr. Barger.  His just says yes?

*A. Marino - Redirect/Mr. Shearer*          **467**

1   A    Right.

2   Q    So you weren't planning to downgrade the position in

3   November?

4   A    No, not at that time.

5   Q    Okay.

6   A    We were filling on an interim basis with Ms. Ording.

7   Q    Okay.  I want to go to what was Defendant's 196.  This

8   was the -- I want to go down to this bottom e-mail.  The one

9   down here.  And these are on January 5th, right?  Because I

10  think you kept staying January 2nd?

11  A    Right.

12  Q    So there exhibit is January 5th?

13  A    No, January 2nd is when we had our Management Committee

14  meeting and Mr. Bisignano announced the ten percent reduction

15  of the top 3,000 as Mr. Charron said and then this is now on

16  the 5th.

17  Q    But you write to your team, and down here at the bottom,

18  not all MC members have been modified?

19  A    Right.  Because many of them didn't attend the meeting on

20  2nd.

21  Q    What does this mean, "Next, but soon will be via a file I

22  will send."

23  A    Oh, so I was sending now we were having Ms. Cathy

24  Benhardt full together all the information of the people who

25  would comprise this top 3,000 and then I would send a file to

*A. Marino - Redirect/Mr. Shearer*              **468**

1   the HR person and to the Management Committee member with

2   their individuals.

3   Q    So that would be the entire 3,000 on that list?

4   A    3,000 broken up by each Management Committee member.  I

5   wouldn't give them all the 3,000, they would just get the

6   people in their organizations.

7   Q    This was Defendant's 208 that you testified to.  This is

8   the head count.  Down here, Cathy Benhardt writes you and

9   says, "This one is a little different and not as cut and dry.

10  I'm guessing that there were some sort of business realignment

11  that happened which added to his HC growth," I'm guessing

12  that's head count growth, "in addition to his own hiring."

13            During your investigation and the IC, what

14  businesses were realigned under Mr. Barger?

15  A    You know, I can't really recall.

16  Q    I keep asking everybody if Mr. Barger had assumed larger

17  responsibilities during 2016.  Could that be what is being

18  reflected here?

19  A    I'm not sure.

20  Q    How did you calculate an attrition rate?

21  A    Yeah, that's the rate of voluntary and involuntary

22  attrition.  Does not include promotions or internal mobility

23  or movement.  So these would be people that either left on

24  their own or we would ask them to leave.  So that's the

25  47 percent.  And that was really the concerning, you know,

1  stack that this group was churning at an unusually high rate.

2  Q    But everybody keeps saying this was a small group.  So

3  that means that each involuntary termination is a much bigger

4  percentage, doesn't it?

5  A    That's correct.  If you have a smaller group, if people

6  leave, the math works out that way, that's correct.

7  Q    So if you can you compare Mr. Barger's attrition rates to

8  a group that has 200 people, it's going to make a difference,

9  doesn't it?

10  A    That could very well be, that's right.  You know, he

11  could have some, you know, reasons for that as well.  We're

12  just saying that, gosh, 47 percent seems high when our company

13  average is 24.  So he was more than double the company average

14  that's all we were saying here.

15  Q    Now, you say you talked about there's two separate teams,

16  one for leave management and one for short term disability; is

17  that correct?

18  A    You know, the structure of the Leave Team, yeah, that

19  could be but I'm not sure.

20  Q    Is the Leave Management Team First Data's experts on the

21  FMLA?

22  A    Yes.  Along with our employment attorneys partnered with

23  our Leave Team.

24  Q    You said that you have a policy that you can investigate

25  employees and terminate them for expense reports.  But that

1   policy applies to employees only, it doesn't apply to

2   contractors, does it?

3   A    You know, we have, you know, as we mentioned earlier, we

4   have over 4,000 contract workers.  So if a contract worker

5   were to engage in activity like that, you know, we certainly

6   would investigate and certainly would take action.

7         MR. SHEARER:  Your Honor, I have no further

8   questions.

9         THE COURT:  Anything else.

10        MR. DILORENZO:  Just a couple, your Honor.

11  RECROSS-EXAMINATION

12  BY MR. DILORENZO:

13  Q    Mr. Marino, if you hired a contractor for a few months

14  and he engaged in fraud or theft on his expenses or his

15  invoices, then you hired him as an employee.  And after you

16  hired him as an employee, you found out that he had lied on

17  the invoices or submitted falsifications for expenses, would

18  you continue to employ him because he had done it while he was

19  a contractor?

20  A    No, sir.

21  Q    You were shown Mr. Barger's offer letter.  Thank you.

22        This is the second page of his offer letter.  Do you

23  see the at-will statement?

24  A    Yes, sir.

25  Q    It says, "Please understand this offer does not

*Proceedings*                                              471

1   constitute a contract or a guarantee of continued employment

2   for any period of time."

3   A    Yes.

4   Q    "And your employment maybe terminated by either you or

5   First Data at any time for any reason."

6            Do you see that?

7   A    Yes.

8   Q    As far as you know, that's Mr. Barger's signature down at

9   the bottom?

10  A    Correct.

11           THE COURT:  He can't be terminated for an unlawful

12  reason, obviously, right?  Age or sex or national origin or

13  color, right?

14           THE WITNESS:  That's right.

15           THE COURT:  Maybe even disability?

16           THE WITNESS:  Correct, that's right.

17           MR. DILORENZO:  No more questions, your Honor.

18           THE COURT:  Anything else, Mr. Shearer.

19           MR. SHEARER:  No, your Honor.

20           THE COURT:  Okay.  So we're almost at the witching

21  hour.  Thank you very much.  We are through Mr. Marino's

22  testimony.  It's been a long day.

23           (Witness leaves the witness stand.)

24           THE COURT:  I think we're making a lot of progress

25  because we've had apparently some of the principal parties,

*Proceedings*                                                    **472**

1    witnesses testify already.  I'll speak to the lawyers after

2    you leave to get a realistic sense of where we're at, but it

3    may well be that we can finish the testimony part of the case

4    by the end of Friday.  We're sitting Friday.  I do want to see

5    if we can complete it this week if it's possible.

6              And so, with that, see you tomorrow morning at

7    10:00 o'clock.  You're doing a great job hanging in there

8    today there's a lot of material to absorb.

9              COURTROOM DEPUTY:  All rise.

10             (Jury exits courtroom at 4:52 p.m.)

11             THE COURT:  So the jury is not here.  Let's get a

12   sense of what's going to happen Mr. Shearer.

13             What do you plan on doing?

14             MR. SHEARER:  We have either the witness -- I have

15   two live witnesses tomorrow, Ms. Julie Kelly, who I don't

16   believe should take all that long and then Mr. Bisignano.

17             THE COURT:  You will be a little longer, I guess.

18             MR. SHEARER:  I think so.  But not really all that

19   lengthy, I don't believe.  Then I have -- I'm going to have

20   three depositions to read, read, two of them are quite short.

21   And then Mr. Barger will be next.

22             THE COURT:  Will he be the last witness?

23             MR. SHEARER:  Yes.

24             THE COURT:  All right.

25             MR. SHEARER:  But I think he'll take a while.

*Proceedings*          **473**

1          THE COURT:  We have a sense of things.  You folks

2     are apprised of what to expect tomorrow.

3          MR. EIDELMAN:  We are.  We will have Mr. Bisignano

4     here tomorrow to testify.

5          THE COURT:  Yes.  And so, he'll be here tomorrow.

6     So it looks like we'll have a full day tomorrow and then it

7     may well be that we finish with the evidentiary part of the

8     case by Friday.

9          MR. EIDELMAN:  Well, I think it depends on we

10    will -- first of all, plaintiff needs to rest so we can figure

11    who we want to call.  I think we'll have a better sense of

12    that, judge.  We have some people -- all of the other

13    witnesses for the defense, if we call them, need to fly in.

14    And I don't know how long Mr. Barger is actually going to

15    take, so we will have at least one witness here on Friday.

16    The question is whether or not we have to potentially have all

17    four witnesses.

18          THE COURT:  You do have a sense of where we're

19    going.

20          MR. EIDELMAN:  I do.

21          THE COURT:  Sure.

22          MR. EIDELMAN:  We will work on that, Judge.

23          THE COURT:  If have these people, we'll take them on

24    Friday.  But I think we should try to wrap this up Friday.

25    Looks like we can do that.  I'll try give you a draft of the

*Proceedings*                                    **474**

1    proposed charge tomorrow which we can take a look at.  And it

2    may well be that Friday afternoon we have the luxury of just

3    discussing whatever it is you want to discuss about the charge

4    and I sense that Monday might be the day when you have your

5    concluding remarks and I'll give the jury the charge.  It

6    seems we're tending in that direction.

7              Anything else?  Anybody want to say anything?

8              MR. EIDELMAN:  I would like to, your Honor.  And I

9    wanted until after the close of the evidence today with regard

10   to both Mr. Charron and Mr. Marino.

11             As I did yesterday, with regard to Ms. Johnson, and

12   if you even look at the jury instructions that the plaintiff

13   has put in, I would assert, your Honor, that he has failed to

14   meet his burden of proof.

15             The plaintiff has failed to meet by a preponderance

16   of the evidence of the factors needed to hold somebody

17   individually liable under the FMLA.  I understand the claim

18   against First Data as the employer, but under the *Graziano*

19   test, we would assert, your Honor, they failed to meet that

20   evidence.

21             THE COURT:  It's not a frivolous application that

22   you're making.

23             MR. EIDELMAN:  Thank you.

24             THE COURT:  Yesterday, I gave Mr. Shearer the

25   opportunity to explain why it is that Ms. Johnson should

*Proceedings*                                                    *475*

1   remain as a defendant and I'm not so sure whether I will allow

2   that or not.  But I would kind of err on the side of caution

3   since we're this far along the line.  But I think it's a fair

4   question and maybe you can explain why these folks are named

5   defendant.

6           MR. SHEARER:  I think, well, first, we have to hear

7   the plaintiff's testimony.

8           THE COURT:  Yes.

9           MR. SHEARER:  And there may be testimony coming from

10  the plaintiff that will indicate some facts for Mr. Shearer

11  and Mr. Marino.  Mr. Marino clearly sent the letter forcing

12  him to leave and the standard in Graziano s did you influence

13  the plaintiff's rights under the FMLA?  And I think putting

14  Mr. Barger on leave against his will is influencing his

15  rights.

16          THE COURT:  We'll think about it.  At least you now

17  what the theory is.

18          MR. EIDELMAN:  Your Honor, I do no know his theory.

19          I just point out that Mr. Barger's testimony should

20  have no influence on whether or not these individuals had

21  influence on his FMLA because he wasn't there at the time that

22  he was there.

23          And I would point out under the four factors of

24  *Graziano*, Mr. Barger's testimony is not going to shed light on

25  whether or not any of those three individuals had the power to

*Proceedings*                                                    *476*

1    hire or fire him, supervise control over his work schedule or

2    conditions of employment, determine the rate and methods of

3    his compensation, and maintain his employment records.  Those

4    are the four factors.  We made our proffer, Judge, and thank

5    you for allowing us to do so.

6              THE COURT:  It's not an insubstantial application.

7    And I think what will happen is after I get my head into the

8    actual charge, I'll get a better focussed sense of the

9    elements and I will be able to make a more reasoned decision.

10             What harm is there if they remain in the case?  As a

11   litigation strategy, you made a pretty effective point with

12   the jury that these people are being dragged into this

13   litigation that could possibly boomerang on Mr. Shearer.  What

14   harm is there if we just let the jury to just let come to

15   their --

16             MR. EIDELMAN:  The reason why I think it's

17   significant harm and prejudice is that First Data was

18   Mr. Barger's employer and if you have a situation that anybody

19   who just happens to be involved with somebody's employment

20   could be an employer for the FMLA, the floodgates of

21   litigation to name individuals who, by the way, it's a

22   difference if there is a judgment entered against an

23   individual that carries the rest of their life that they were

24   involved as a --

25             THE COURT:  I can always set it aside, can't I?  If

*Proceedings*                                               477

1    there is no basis for it.  The point is, and it seems that as

2    a matter of litigation strategy, I'm not telling you how to

3    try your case, but I keep them in usually you'll have a field

4    day when you sum up to the jury.  But, you know, it's -- this

5    is why lawyers get paid the big bucks for.

6                From my perspective I always try to make sure that

7    I'm not going to have to try this case a second time.  And

8    that, you know, that's where I come from.  But if there is an

9    absolute drop dead basis for me to have them not go before the

10   jury to determine the liability.  And, of course, I'll

11   seriously consider it.

12               But this is beginning off dialogue and we'll have a

13   better focused view of it all after we hear the testimony and

14   after I get a real good view of the charge.  I have a general

15   sense of what they are but we'll have to down in black and

16   white tomorrow and we'll be able to look at it, okay.

17               MR. EIDELMAN:  Thank you, Judge.

18               THE COURT:  See you tomorrow at 10:00 o'clock.

19               MR. SHEARER:  Thank you.

20               (WHEREUPON, this matter was adjourned to September

21   19, 2019, at 10:00 a.m.)

22

23                          *   *   *

24

25

478

<u>INDEX</u>

<u>WITNESS</u>:                                              <u>PAGE</u>:

        GRANT BARGER............................  297

        DIRECT EXAMINATION

        BY MR. SHEARER..........................  297

        CROSS-EXAMINATION

        BY MR. DiLORENZO........................  309

        DANIEL J. CHARRON.......................  320

        DIRECT EXAMINATION

        BY MR. SHEARER..........................  320

        CROSS-EXAMINATION

        BY MR. EIDELMAN.........................  363

        REDIRECT EXAMINATION

        BY MR. SHEARER..........................  372

479

1          ANTHONY MARINO.........................   378

2          DIRECT EXAMINATION

3          BY MR. SHEARER.........................   378

4          CROSS-EXAMINATION

5          BY MR. DiLORENZO.......................   417

6          REDIRECT EXAMINATION

7          BY MR. SHEARER.........................   457

8          RECROSS-EXAMINATION

9          BY MR. DiLORENZO.......................   470

10                        * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

480

INDEX OF EXHIBITS

FOR THE PLAINTIFF:                                    PAGE:

Plaintiff Exhibit 14 was received in evidence as

of this date ......................................   301

Plaintiff's Exhibits 101, 104, 106, 107, and 109

were received in evidence as of this date..........   376

Plaintiff Exhibit 35 was received in evidence as

of this date ......................................   392

Plaintiff Exhibit 36 was received in evidence as

of this date ......................................   398

Plaintiff Exhibit 79 was received in evidence as

of this date ......................................   400

Plaintiff Exhibit 64 was received in evidence as

of this date ......................................   403

Plaintiff Exhibit 68 was received in evidence as

of this date ......................................   403

Plaintiff Exhibit 44 was received in evidence as

of this date ......................................   409

Plaintiff Exhibit 77 was received in evidence as

of this date ......................................   413

Plaintiff Exhibit 98 was received in evidence as

of this date ......................................   415

481

Plaintiff's Exhibit 16 was received in evidence as

of this date...................................... 458

FOR THE DEFENSE:

Defendant's Exhibit 283 was marked in evidence as

of this date...................................... 455

Defense Exhibit 89 was received in evidence as      421

of this date ....................................

Defense Exhibit 115 was received in evidence as     422

of this date ....................................

Defense Exhibit 111 was received in evidence as     424

of this date ....................................

Defense Exhibit 135 was received in evidence as     426

of this date ....................................

Defense Exhibit 182 was received in evidence as     432

of this date ....................................

Defense Exhibit D-273 was received in evidence      441

as of this date ................................

Defense Exhibit 196 was received in evidence as     444

of this date ....................................

Defense Exhibit 208 was received in evidence as     446

of this date ....................................


                         * * * * *

## #

**#155-254** [1] - 294:16

## $

**$174,000** [1] - 364:15
**$23** [1] - 430:5
**$250,000** [2] - 380:17, 380:19
**$30,000** [10] - 304:16, 304:17, 305:17, 305:18, 306:4, 306:13, 306:16, 306:24, 307:15, 310:19
**$43** [1] - 429:23
**$480,000** [2] - 331:15, 332:5
**$700,000** [1] - 354:19
**$750,000** [1] - 351:10
**$800,000** [1] - 451:10

## '

**'15** [2] - 324:5, 333:8
**'16** [2] - 333:10, 379:21
**'18** [1] - 379:22
**'80s** [1] - 313:8

## 1

**1** [1] - 318:6
**1-9-2017** [1] - 438:8
**10** [14] - 318:5, 327:18, 342:23, 404:16, 404:19, 404:21, 404:25, 405:13, 428:15, 428:21, 428:24, 436:22, 441:19, 461:17
**100** [2] - 296:12, 316:8
**10017** [1] - 295:9
**101** [5] - 361:21, 376:10, 376:14, 376:19, 480:7
**104** [5] - 376:10, 376:13, 376:14, 376:19, 480:7
**106** [3] - 376:14, 376:19, 480:7
**107** [3] - 376:14, 376:19, 480:7
**109** [3] - 376:14, 376:19, 480:7
**10:00** [4] - 294:8, 472:7, 477:18, 477:21
**10:03** [1] - 296:2
**10:04** [1] - 296:17
**10th** [2] - 438:24, 441:14
**11-30** [1] - 442:19
**11-30-16** [1] - 442:2
**110** [1] - 296:12
**111** [3] - 424:12, 424:16, 481:11
**11201** [1] - 294:21
**115** [4] - 422:4, 422:6, 422:7, 481:9
**11:19** [1] - 361:10
**11:51** [1] - 362:16
**12** [3] - 324:17, 339:9, 348:15
**12,000** [8] - 323:13, 324:20, 328:5, 338:14, 366:14, 367:1, 367:22, 389:19
**12/9** [1] - 460:6
**12:10** [2] - 377:9, 377:10
**13** [6] - 324:17, 359:3, 365:3, 405:2, 409:25, 437:15
**135** [3] - 426:13, 426:15, 481:13

**13th** [1] - 358:13, 358:16, 358:17
**14** [5] - 301:10, 301:15, 363:22, 400:1, 480:5
**15** [2] - 361:4, 361:25
**15,000** [1] - 310:20
**15-minute** [1] - 447:16
**150** [1] - 436:15
**16** [4] - 458:15, 458:17, 458:21, 481:1
**17** [4] - 373:13, 373:20, 428:16, 437:15
**17-cv-4869(FB** [1] - 294:3
**174** [2] - 460:1, 460:3
**174,000** [4] - 418:3, 459:7, 459:23, 460:4
**18** [4] - 294:7, 406:6, 436:6, 436:7
**182** [4] - 431:25, 432:2, 437:1, 481:15
**19** [6] - 383:11, 384:13, 392:15, 392:17, 393:2, 477:21
**196** [6] - 443:17, 444:12, 444:15, 444:16, 467:7, 481:19
**19th** [2] - 396:25, 423:11

## 2

**2** [5] - 386:16, 399:23, 438:12, 443:16, 443:19
**2.2** [1] - 437:5
**20** [10] - 329:25, 342:24, 361:25, 418:14, 418:18, 418:19, 429:24, 435:14, 446:6, 463:20
**200** [1] - 469:8
**2001** [1] - 302:1
**2006** [1] - 299:16
**2007** [2] - 299:16, 449:24
**2010** [2] - 299:12, 301:21
**2011** [1] - 302:14
**2014** [2] - 319:4, 321:11
**2015** [5] - 322:23, 331:7, 338:15, 338:22, 406:5
**2016** [13] - 339:22, 347:24, 348:14, 364:14, 379:16, 386:13, 390:11, 390:17, 397:25, 412:2, 421:4, 468:17
**2017** [13] - 321:11, 336:4, 338:22, 339:22, 344:19, 348:13, 359:3, 365:3, 390:18, 409:25, 417:18, 429:22, 433:9
**2018** [1] - 379:13
**2019** [2] - 294:7, 477:21
**208** [6] - 445:21, 445:22, 445:24, 446:1, 468:7, 481:21
**21** [2] - 387:13, 401:8
**21202** [1] - 295:3
**214** [5] - 368:21, 372:22, 372:24, 438:3, 438:6
**21st** [2] - 401:20, 405:21, 460:19
**22** [3] - 400:17, 402:8, 402:14
**22,000** [3] - 379:15, 389:19, 409:18
**230,000** [1] - 332:12
**24** [3] - 354:8, 417:25, 469:13
**24,000** [1] - 379:17
**240** [4] - 343:5, 344:9, 344:10, 344:11
**25** [1] - 367:8
**250** [1] - 458:25
**26** [2] - 421:4, 466:19
**270-D** [1] - 461:16
**273** [2] - 439:14, 461:17
**28** [1] - 403:5

**282** [2] - 451:19, 451:20
**283** [6] - 455:2, 455:3, 455:4, 455:8, 481:5
**297** [2] - 478:5, 478:7
**2:00** [2] - 376:23, 377:7
**2:04** [2] - 378:4, 378:7
**2nd** [6] - 445:5, 454:21, 462:6, 467:10, 467:13, 467:20

## 3

**3** [4] - 381:9, 390:25, 425:3, 432:4
**3,000** [28] - 339:22, 343:5, 343:6, 348:22, 348:23, 352:10, 352:18, 370:3, 371:21, 372:2, 372:8, 375:2, 408:18, 412:16, 412:18, 412:19, 412:23, 443:12, 444:25, 454:13, 454:20, 461:23, 462:6, 467:15, 467:25, 468:3, 468:4, 468:5
**30** [4] - 329:1, 366:11, 367:8, 388:9
**300** [8] - 412:17, 413:1, 454:17, 454:18, 458:2, 461:23, 461:24, 462:2
**300,000** [1] - 331:20, 332:13
**300-plus** [1] - 412:21
**301** [1] - 480:6
**309** [1] - 478:9
**30th** [2] - 454:10, 454:14, 457:25, 462:16
**320** [2] - 478:10, 478:12
**330** [1] - 295:8
**34** [3] - 379:5, 402:17, 461:6
**35** [5] - 391:24, 391:25, 392:1, 452:18, 480:9
**36** [3] - 398:23, 398:25, 480:11
**361** [1] - 451:2
**362** [4] - 390:18, 429:22, 450:25
**363** [1] - 478:14
**37** [1] - 387:9
**372** [1] - 478:16
**376** [1] - 480:8
**378** [2] - 479:1, 479:3
**3839** [1] - 294:16
**39** [1] - 436:24
**392** [1] - 480:10
**398** [1] - 480:12
**39th** [1] - 295:8
**3:36** [1] - 448:15
**3:38** [1] - 449:1
**3rd** [1] - 461:13

## 4

**4** [4] - 386:6, 386:7, 399:16, 413:21
**4,000** [2] - 379:23, 470:4
**40** [2] - 418:20
**400** [1] - 480:14
**403** [2] - 480:16, 480:18
**409** [1] - 480:20
**413** [1] - 480:22
**415** [1] - 480:24
**417** [1] - 479:5
**421** [1] - 481:7
**422** [1] - 481:9
**424** [1] - 481:11

*(426 - answered)*

**426** [1] - 481:13
**43** [1] - 430:6
**432** [1] - 481:15
**44** [2] - 409:14, 480:19
**441** [1] - 481:17
**444** [1] - 481:19
**446** [1] - 481:21
**45** [1] - 298:7
**455** [1] - 481:6
**457** [1] - 479:7
**458** [1] - 481:2
**47** [2] - 468:25, 469:12
**470** [1] - 479:9
**480,000** [1] - 458:25
**4:21** [1] - 449:6
**4:52** [1] - 472:10

---

## 5

**5** [1] - 427:14
**50** [6] - 294:20, 298:5, 327:18, 334:12, 367:16, 434:13
**500** [1] - 295:3
**506** [1] - 294:20
**53** [3] - 317:22, 318:5, 318:6
**566400** [1] - 437:21
**5th** [5] - 454:12, 454:14, 467:9, 467:12, 467:16

---

## 6

**6** [7] - 381:15, 383:11, 384:13, 399:14, 403:17
**6,000** [1] - 379:23
**60** [3] - 315:7, 329:24, 436:6
**613-2487** [1] - 295:21
**613-2694** [1] - 295:22
**62** [2] - 402:7, 402:10
**635** [2] - 409:17, 409:19
**64** [4] - 403:11, 403:12, 403:13, 480:15
**67** [1] - 434:13
**68** [4] - 403:18, 403:20, 403:21, 480:17
**6:00** [1] - 421:4
**6th** [1] - 390:18

---

## 7

**7** [1] - 381:14, 409:16
**70** [2] - 329:24, 367:16
**700,000** [1] - 331:17
**700-plus** [1] - 348:25
**718** [2] - 295:21, 295:22
**730,000** [1] - 458:25
**75204** [1] - 294:17
**77** [3] - 413:17, 413:19, 480:21
**79** [3] - 400:14, 400:16, 480:13
**7:55** [1] - 392:17

---

## 8

**8** [7] - 382:18, 392:20, 392:21, 392:24, 394:12, 421:4, 422:14
**80** [1] - 418:15

---

**84** [2] - 409:11, 409:12
**89** [4] - 421:1, 421:14, 421:15, 481:7
**8th** [1] - 454:4

---

## 9

**95** [3] - 427:9, 427:14, 458:11
**98** [6] - 415:6, 415:7, 415:8, 415:11, 415:16, 480:23
**9th** [1] - 390:18

---

## A

**a.m** [7] - 294:8, 296:2, 296:17, 361:10, 362:16, 392:17, 477:21
**AB** [1] - 463:18
**able** [19] - 296:13, 296:23, 300:9, 315:1, 315:6, 315:9, 315:18, 362:10, 381:2, 381:3, 394:13, 398:9, 408:9, 410:14, 448:2, 459:23, 465:3, 476:9, 477:16
**absence** [1] - 399:9
**absent** [2] - 383:6, 383:7
**absolute** [1] - 477:9
**absolutely** [8] - 306:3, 308:2, 355:1, 370:4, 370:13, 371:23, 372:3, 465:11
**absorb** [1] - 472:8
**accelerated** [1] - 418:21
**accept** [5] - 321:13, 321:14, 321:18, 321:22
**accepted** [1] - 427:25
**accepting** [1] - 421:19
**access** [5] - 397:1, 397:3, 398:5, 423:25, 464:22
**accident** [1] - 460:25
**accommodations** [2] - 456:10, 456:11
**accomodation** [1] - 456:15
**accordance** [1] - 383:7
**according** [1] - 331:2
**accountant** [2] - 306:11, 410:22
**accounting** [8] - 345:19, 345:21, 345:22, 357:10, 410:17, 410:21, 414:7
**accounts** [1] - 453:16
**accrual** [1] - 348:10
**accrue** [1] - 348:12
**accrues** [1] - 348:4
**achieve** [2] - 462:2, 462:3
**acquired** [1] - 320:19
**acquisition** [1] - 345:12
**acquisitions** [1] - 345:11
**acronyms** [1] - 373:7
**Act** [2] - 371:10, 386:23
**action** [8] - 326:14, 326:15, 374:16, 384:3, 426:6, 426:10, 426:11, 470:6
**actions** [2] - 333:15, 426:1, 437:4
**activities** [1] - 370:19
**activity** [1] - 470:5
**actual** [5] - 347:10, 352:25, 375:16, 407:23, 476:8
**acute** [1] - 363:10
**add** [2] - 413:1, 442:23
**added** [4] - 441:23, 442:1, 442:3, 468:11
**adding** [1] - 374:20

---

**addition** [4] - 381:23, 401:7, 454:4, 468:12
**additional** [8] - 331:8, 333:6, 346:22, 386:23, 412:2, 412:7, 422:16, 463:5
**adjourn** [1] - 376:3
**adjourned** [1] - 477:20
**adjust** [1] - 308:1
**adjustments** [1] - 314:23
**admitted** [1] - 376:15
**advantage** [1] - 386:14
**advice** [2] - 388:25, 413:15
**advised** [3] - 358:13, 365:4, 404:12
**advising** [1] - 400:18
**advisor** [1] - 299:16
**advisors** [3] - 299:14, 299:22, 310:13
**affairs** [2] - 401:12, 405:23
**afternoon** [3] - 378:11, 446:9, 449:9, 474:2
**afterwards** [4] - 315:14, 338:9, 405:6, 410:7
**age** [2] - 300:10, 471:12
**ago** [1] - 303:14
**agree** [6] - 329:13, 334:10, 383:14, 384:18, 384:19, 390:14
**agreed** [2] - 376:7, 376:10
**agreement** [1] - 347:5
**agreements** [1] - 346:10
**ahead** [16] - 318:4, 318:15, 321:1, 357:8, 363:1, 384:22, 393:15, 394:20, 397:11, 403:2, 405:16, 410:19, 417:2, 426:4, 439:18, 457:1
**aided** [1] - 295:24
**aids** [2] - 349:23, 360:9
**al** [4] - 294:8, 294:19, 295:2, 295:7
**Alabama** [1] - 300:9
**algorithms** [1] - 313:4
**allocation** [1] - 427:10
**allow** [6] - 321:13, 374:7, 441:5, 446:18, 446:24, 475:1
**allowed** [4] - 308:14, 329:16, 350:3
**allowing** [1] - 476:5
**allows** [1] - 385:8
**almost** [3] - 310:1, 311:16, 471:20
**Alpha** [1] - 311:24
**Altman** [1] - 424:23
**America** [1] - 369:24
**amount** [9] - 302:10, 304:18, 315:8, 334:14, 335:18, 348:10, 354:6, 414:4, 414:10
**analysis** [5] - 326:23, 330:2, 331:13, 340:7, 343:8
**analytics** [3] - 407:14, 439:22, 439:25
**analyzed** [1] - 368:12
**analyzing** [1] - 368:11
**AND** [1] - 294:12
**announced** [1] - 467:14
**annual** [1] - 458:24
**ANSWER** [4] - 318:9, 318:13, 318:15, 318:17
**answer** [15] - 298:2, 316:19, 330:22, 360:19, 374:8, 393:9, 398:11, 398:12, 398:15, 403:6, 405:14, 409:5, 409:8, 416:2, 421:22
**answered** [9] - 330:24, 339:19, 365:8, 393:14, 397:10, 403:2, 405:16, 463:13, 463:15

---

**answering** [2] - 402:18, 409:20
**answers** [2] - 318:20, 397:14
**ANTHONY** [3] - 378:16, 378:20, 479:1
**Anthony** [3] - 295:20, 378:10, 378:16
**antsy** [1] - 362:13
**APAC** [1] - 373:21
**apologize** [1] - 360:7
**app** [1] - 397:2
**apparent** [1] - 447:5
**appear** [1] - 425:5
**appeared** [1] - 454:9
**application** [4] - 371:10, 400:1, 474:21, 476:6
**applications** [1] - 400:8
**applied** [1] - 353:16
**applies** [1] - 470:1
**apply** [5] - 323:1, 380:21, 399:5, 399:18, 470:1
**appointed** [1] - 402:5
**appointment** [1] - 362:10
**appointments** [3] - 300:6, 300:8, 300:13
**appreciate** [3] - 349:22, 431:20, 453:4
**apprised** [1] - 473:2
**appropriate** [2] - 446:15, 465:15
**approval** [3] - 381:1, 385:1, 413:12
**approve** [6] - 348:6, 375:17, 380:18, 380:19, 413:13, 413:14
**approved** [2] - 371:16, 417:13
**area** [3] - 332:3, 373:14, 413:8
**areas** [2] - 323:21, 349:17
**argue** [3] - 446:14, 446:18, 447:7
**argument** [1] - 446:24
**argumentative** [4] - 331:3, 361:1, 412:9, 431:3
**ARNSTEIN** [1] - 295:1
**arrangement** [1] - 312:14
**arrangements** [2] - 300:12, 362:23
**arrival** [1] - 445:18
**arrived** [2] - 322:24, 338:15
**article** [2] - 415:3
**Asia** [1] - 335:17
**aside** [2] - 308:24, 476:25
**aspect** [1] - 322:2
**aspects** [4] - 320:22, 322:16, 324:18, 442:25
**assert** [2] - 474:13, 474:19
**assess** [1] - 318:4
**assigned** [2] - 326:6
**assignment** [1] - 432:6
**assist** [1] - 333:15
**associated** [11] - 325:21, 333:1, 333:2, 345:2, 349:10, 354:23, 354:25, 357:13, 357:18, 363:19, 374:14
**Associates** [1] - 317:4
**assume** [3] - 351:6, 361:5, 383:8
**assumed** [2] - 412:2, 468:16
**assuming** [1] - 436:5
**at-will** [5] - 450:5, 450:9, 450:18, 450:22, 470:23
**Atlanta** [2] - 391:2, 391:23
**attached** [1] - 399:17
**attend** [3] - 397:21, 445:9, 467:19
**attendance** [1] - 385:3
**attention** [1] - 330:16

**attorney** [1] - 319:6
**Attorney** [1] - 294:15
**attorneys** [3] - 295:7, 397:12, 469:22
**Attorneys** [2] - 294:19, 295:2
**attributable** [1] - 354:6
**attrition** [9] - 329:16, 409:23, 445:19, 457:14, 457:15, 457:16, 468:20, 468:22, 469:7
**August** [2] - 415:1, 421:4
**authority** [6] - 324:24, 325:2, 325:3, 338:25, 380:15, 381:2
**available** [1] - 414:10
**Avenue** [2] - 294:16, 295:8
**average** [2] - 469:13
**aware** [8] - 338:2, 338:3, 338:4, 338:5, 370:9, 397:24, 401:15, 412:5

## B

**B-a-r-g-e-r** [1] - 297:11
**backfill** [6] - 462:17, 462:21, 462:25, 463:12, 463:16, 466:20
**backfilled** [2] - 462:8, 463:11
**backfilling** [2] - 408:8, 410:12
**backfills** [1] - 466:19
**background** [3] - 301:5, 365:24, 366:8
**backwards** [1] - 392:12
**bad** [1] - 391:15
**balance** [4] - 334:23, 348:12, 355:19, 356:3
**Baltimore** [1] - 295:3
**bank** [1] - 321:3
**barely** [1] - 391:17
**BARGER** [2] - 294:3, 297:14
**Barger** [189] - 294:15, 296:4, 297:3, 297:5, 297:11, 297:19, 297:21, 299:13, 299:19, 301:17, 301:18, 301:19, 302:13, 302:16, 303:12, 306:18, 306:23, 309:17, 311:5, 312:15, 317:4, 319:6, 320:9, 322:24, 323:22, 324:2, 324:23, 324:25, 325:2, 325:3, 325:9, 327:2, 327:5, 328:10, 328:11, 329:14, 330:3, 330:5, 330:7, 330:8, 330:10, 330:15, 330:20, 331:1, 331:7, 331:14, 331:22, 331:24, 331:25, 332:10, 333:2, 333:6, 333:9, 333:15, 344:2, 347:24, 348:13, 348:18, 349:3, 350:6, 350:17, 350:19, 354:1, 354:7, 354:12, 355:5, 358:13, 359:5, 359:24, 360:20, 364:14, 364:15, 364:18, 364:23, 365:4, 368:5, 370:17, 370:24, 371:2, 371:4, 371:9, 371:13, 371:18, 371:24, 372:4, 372:7, 373:6, 374:16, 382:3, 382:19, 383:9, 384:11, 384:12, 386:12, 387:11, 388:18, 388:21, 388:25, 389:2, 390:13, 391:3, 391:5, 391:21, 391:22, 392:6, 392:10, 392:13, 392:21, 393:21, 393:24, 395:19, 396:10, 396:18, 396:24, 397:4, 397:22, 397:23, 397:24, 398:20, 399:4, 399:9, 400:18, 401:10, 401:14, 402:3, 402:8, 402:14, 411:12, 411:14, 411:21, 411:24, 412:2, 414:25, 415:9, 415:21, 415:23, 416:14, 416:19, 417:6, 417:18, 419:14, 419:17, 420:13, 421:8, 422:2, 422:22, 425:6, 425:16,

**425:19, 426:12, 428:14, 430:11, 434:1, 435:23, 437:11, 438:12, 441:22, 443:5, 450:14, 451:3, 451:9, 452:16, 455:15, 456:14, 457:9, 458:2, 460:7, 460:22, 461:7, 462:12, 463:4, 463:6, 463:20, 463:23, 464:4, 464:21, 464:24, 465:7, 466:23, 466:25, 468:14, 468:16, 472:21, 473:14, 475:14**
**Barger's** [30] - 355:11, 359:11, 366:4, 369:19, 370:1, 370:22, 385:21, 386:1, 388:16, 390:25, 397:1, 398:18, 399:15, 399:24, 405:17, 426:23, 427:22, 428:13, 458:23, 461:17, 462:11, 464:16, 469:7, 470:21, 471:8, 475:19, 475:24, 476:18
**BARGER**............................ [1] - 478:5
**base** [6] - 331:15, 331:16, 332:5, 368:6, 429:23, 458:25
**based** [8] - 300:8, 321:21, 366:4, 366:7, 366:8, 386:17, 409:1, 459:11
**bases** [1] - 300:21
**basis** [14] - 313:23, 325:10, 325:14, 345:10, 352:21, 354:10, 367:22, 402:6, 410:15, 432:8, 462:18, 467:6, 477:1, 477:9
**bear** [1] - 334:22
**beautiful** [1] - 376:25
**became** [5] - 309:22, 311:6, 311:8, 436:6, 450:18
**become** [1] - 340:21
**becomes** [1] - 316:15
**becoming** [1] - 466:22
**BEFORE** [1] - 294:12
**begin** [5] - 395:21, 397:18, 399:8, 423:12
**beginning** [7] - 339:22, 399:10, 399:25, 448:4, 448:5, 448:13, 477:12
**behalf** [1] - 317:4
**behaving** [1] - 393:24
**behind** [1] - 366:1
**below** [3] - 400:12, 425:12, 442:3
**benefit** [2] - 398:12, 419:3
**benefits** [4] - 356:2, 357:15, 387:2, 432:19
**Benhardt** [6] - 429:3, 439:23, 439:24, 442:20, 467:24, 468:8
**best** [4] - 317:2, 322:17, 394:1, 394:4
**bet** [1] - 367:7
**Bethel** [1] - 314:3
**better** [9] - 328:24, 397:5, 397:7, 398:6, 398:14, 426:12, 473:11, 476:8, 477:13
**between** [17] - 311:18, 317:3, 317:5, 320:17, 325:11, 333:24, 345:19, 367:15, 379:21, 384:13, 392:5, 422:2, 424:5, 427:21, 434:13, 446:16, 446:24
**beyond** [2] - 374:5, 463:5
**big** [3] - 322:2, 365:17, 477:5
**bigger** [1] - 469:3
**biggest** [1] - 322:16
**billings** [1] - 299:23
**billion** [1] - 464:19
**bird** [1] - 307:17
**Birmingham** [1] - 300:9
**Bisignano** [15] - 323:5, 334:8, 338:25, 339:2, 339:6, 362:9, 400:17, 420:10,

421:5, 421:22, 450:12, 453:21, 467:14, 472:16, 473:3

**bit** [5] - 299:3, 306:10, 321:25, 350:20, 376:24

**black** [1] - 477:15

**blessing** [1] - 314:25

**BLOCK** [1] - 294:12

**blue** [5] - 392:9, 392:13, 460:15, 463:19

**board** [6] - 323:19, 324:6, 325:19, 334:22, 380:14, 391:19

**body** [1] - 444:20

**bolstering** [1] - 420:23

**BOND** [1] - 295:6

**bonus** [39] - 347:24, 348:1, 348:4, 348:8, 348:10, 348:14, 364:13, 364:15, 364:18, 364:23, 365:1, 396:10, 405:17, 405:25, 414:3, 414:4, 414:10, 414:13, 414:16, 414:20, 417:18, 417:20, 417:24, 418:11, 427:2, 427:14, 427:17, 428:6, 436:16, 454:5, 457:20, 458:9, 458:12, 459:8, 459:9, 459:20, 459:25, 460:4

**bonuses** [4] - 348:6, 348:12, 414:11, 459:11

**book** [2] - 368:25, 422:9

**books** [3] - 368:18, 459:21, 459:22

**boomerang** [1] - 476:13

**born** [1] - 298:20

**bother** [1] - 355:9

**bottom** [12] - 386:20, 413:22, 415:17, 415:25, 424:22, 424:24, 426:16, 444:13, 444:17, 467:8, 467:17, 471:9

**bottoms** [3] - 329:23, 349:8, 370:11

**box** [2] - 421:11, 432:25

**brand** [4] - 311:24, 322:2, 322:14, 322:15

**break** [7] - 361:3, 362:1, 362:19, 365:2, 446:3, 446:9, 447:16

**brief** [4] - 372:15, 449:4, 457:2, 466:10

**briefcase** [1] - 309:1

**briefly** [1] - 309:14

**bring** [10] - 296:6, 296:15, 310:3, 338:10, 342:12, 362:13, 378:6, 389:14, 449:3

**bringing** [2] - 457:18, 464:19

**broadcast** [1] - 453:24

**broke** [3] - 311:11, 311:15, 311:19

**broken** [1] - 468:4

**Brooklyn** [2] - 294:5, 294:21

**brought** [6] - 299:20, 320:21, 340:13, 349:10, 354:17, 394:6

**brutal** [1] - 315:2

**bucket** [1] - 406:13

**bucks** [1] - 477:5

**budget** [8] - 325:12, 325:15, 325:21, 346:1, 346:2, 346:4, 346:12, 430:2

**build** [1] - 313:18

**builder** [1] - 449:25

**building** [1] - 311:23

**bullet** [1] - 387:14

**bunch** [3] - 332:9, 366:24, 431:11

**burden** [1] - 474:14

**burdens** [1] - 397:5

**business** [84] - 299:9, 299:11, 299:12, 299:13, 299:17, 300:3, 300:7, 302:1,

303:14, 304:8, 304:10, 304:11, 305:1, 305:2, 305:13, 306:4, 309:22, 310:1, 310:4, 310:19, 311:11, 311:15, 311:19, 315:13, 316:6, 317:13, 317:17, 318:17, 320:10, 320:13, 320:14, 321:5, 321:8, 321:12, 321:21, 323:9, 323:11, 323:12, 323:15, 323:17, 323:18, 324:2, 324:10, 324:13, 324:18, 324:19, 324:21, 324:22, 325:12, 326:20, 328:5, 328:16, 331:11, 331:12, 331:19, 331:20, 334:21, 335:3, 342:17, 342:21, 346:21, 347:8, 349:15, 351:4, 355:12, 356:12, 356:17, 356:19, 356:20, 363:15, 363:17, 363:18, 364:6, 364:9, 366:25, 380:5, 380:6, 389:18, 389:21, 398:15, 413:6, 447:24, 468:10

**business'** [1] - 380:7

**businesses** [5] - 321:13, 322:18, 332:5, 335:4, 468:14

**byproduct** [1] - 338:8

# C

**c'est** [1] - 466:2

**c-h-a-r-r-o-n** [1] - 319:22

**calculate** [1] - 468:20

**calculation** [2] - 459:14, 463:22

**Cale** [2] - 425:9, 425:10

**calendar** [1] - 400:1

**cancelled** [2] - 414:14, 414:21

**cancer** [11] - 314:24, 333:9, 371:19, 401:11, 401:21, 405:23, 418:1, 421:10, 453:18, 453:21, 455:18

**candidates** [1] - 412:23

**capable** [2] - 351:19, 424:3

**capital** [1] - 425:10

**card** [2] - 322:5, 322:6

**cards** [5] - 321:14, 321:15, 321:16, 321:22

**care** [8] - 307:21, 308:4, 311:12, 388:19, 398:7, 452:22, 453:4, 454:5

**cared** [2] - 394:2, 398:21

**career** [1] - 388:9

**carries** [1] - 476:23

**case** [29] - 300:21, 313:1, 313:2, 313:23, 317:18, 344:15, 360:11, 377:1, 377:6, 383:23, 384:6, 384:17, 385:21, 386:25, 418:14, 419:7, 428:14, 440:18, 442:20, 446:9, 447:9, 448:3, 472:3, 473:8, 476:10, 477:3, 477:7

**cases** [1] - 304:25

**cash** [8] - 364:16, 364:23, 417:23, 418:9, 418:15, 419:1, 427:23, 460:2

**catch** [1] - 315:16

**category** [1] - 314:7

**Cathy** [2] - 467:23, 468:8

**CAUSE** [1] - 294:11

**causes** [1] - 398:7

**caution** [1] - 475:2

**cc** [1] - 426:17

**cell** [1] - 383:22

**center** [2] - 332:8, 409:21

**centers** [3] - 333:16, 335:18, 412:3

**central** [1] - 440:14

**CEO** [9] - 323:5, 324:17, 339:2,

339:10, 380:17, 380:19, 381:3, 388:2, 388:3

**CEO's** [1] - 387:25

**certain** [6] - 320:22, 398:8, 404:13, 424:5, 426:6, 453:10

**certainly** [5] - 351:3, 389:17, 389:20, 470:5, 470:6

**certification** [1] - 315:4

**cetera** [1] - 459:17

**chain** [1] - 444:12

**chair** [2] - 380:4, 391:18

**chairman** [7] - 320:14, 320:15, 320:18, 321:5, 324:5, 324:6, 330:19

**challenge** [1] - 334:25

**chance** [2] - 357:6, 466:8

**change** [5] - 338:23, 381:23, 385:10, 385:15, 414:10

**changed** [3] - 379:21, 450:22, 454:1

**changes** [2] - 375:14, 436:19

**changing** [1] - 382:8

**charge** [5] - 474:1, 474:3, 474:5, 476:8, 477:14

**charged** [2] - 299:25, 346:1

**charging** [1] - 312:22

**Charron** [19] - 319:17, 319:22, 362:19, 363:5, 369:16, 370:17, 372:17, 389:18, 397:19, 400:18, 426:17, 426:20, 427:9, 429:9, 431:14, 438:3, 464:18, 467:15, 474:10

**CHARRON** [1] - 320:1

**CHARRON.....................** [1] - 478:10

**chart** [4] - 433:1, 433:12, 451:20, 461:16

**chartered** [3] - 391:6, 419:12, 419:15

**chase** [1] - 399:6

**Chase** [6] - 331:18, 363:14, 363:15, 363:16, 363:17, 364:5

**check** [3] - 296:11, 407:23, 408:7

**cheering** [1] - 391:10

**chief** [5] - 345:22, 379:9, 394:7, 411:5, 435:5

**child** [1] - 297:22

**children** [1] - 416:16

**choices** [1] - 408:23

**choosing** [1] - 408:12

**Christine** [2] - 411:6, 411:7

**Christmastime** [1] - 422:18

**churning** [1] - 469:1

**CIANFICHI** [1] - 295:5

**city** [1] - 383:19

**CIVIL** [1] - 294:11

**civil** [1] - 296:3

**claim** [7] - 384:15, 384:20, 428:18, 430:9, 430:10, 474:17

**claiming** [1] - 430:17

**claims** [2] - 423:12, 428:13

**clarification** [2] - 352:3, 359:10

**clarified** [1] - 461:21

**clarify** [3] - 304:7, 332:11, 442:16

**clarity** [2] - 341:18, 350:2

**clear** [6] - 341:2, 341:4, 391:4, 391:7, 432:5, 442:17

**clearance** [2] - 404:13, 404:16

**cleared** [1] - 440:18

**clearly** [1] - 475:11

**client** [3] - 300:17, 300:23, 301:16
**clients** [4] - 302:9, 307:4, 307:6, 388:19
**close** [2] - 464:11, 474:9
**closed** [1] - 340:7
**closely** [1] - 299:2
**closing** [1] - 387:6
**closures** [1] - 340:13
**club** [1] - 419:16
**coach** [2] - 299:21, 313:24
**codes** [1] - 313:5
**cohead** [1] - 337:18
**colleague** [1] - 466:6
**colleagues** [1] - 372:12
**collecting** [1] - 348:15
**collectively** [2] - 305:17, 305:19
**college** [3] - 299:6, 363:24
**color** [1] - 471:13
**column** [6] - 302:3, 302:4, 302:8, 441:23, 462:7, 463:19
**Column** [3] - 462:7, 463:18, 466:18
**combined** [4] - 320:20, 351:14, 369:23, 435:18
**coming** [11] - 306:24, 310:19, 334:20, 358:6, 360:20, 362:21, 381:1, 390:20, 401:17, 447:11, 475:9
**comment** [1] - 442:25
**committed** [1] - 456:23
**committee** [19] - 324:16, 339:8, 339:10, 342:24, 379:24, 380:2, 380:9, 380:24, 381:5, 389:1, 389:5, 389:10, 408:18, 420:2, 420:7, 421:17, 429:7, 440:6
**Committee** [5] - 454:12, 464:10, 467:13, 468:1, 468:4
**common** [3] - 383:17, 384:1, 384:10
**communicated** [2] - 419:17, 462:5
**communicating** [1] - 397:24
**communication** [1] - 464:23
**communications** [2] - 415:4, 461:13
**comp** [1] - 331:17
**comp's** [1] - 436:15
**companies** [9] - 344:2, 365:17, 365:21, 366:2, 366:10, 379:9, 435:13, 449:17
**company** [56] - 305:6, 310:4, 310:14, 311:2, 312:15, 320:20, 322:3, 322:14, 322:17, 326:21, 333:22, 334:5, 334:10, 335:5, 337:7, 338:18, 339:2, 339:15, 343:18, 344:24, 345:10, 349:16, 350:22, 352:23, 353:7, 363:21, 364:10, 365:5, 365:25, 374:21, 375:7, 381:19, 381:23, 386:17, 388:14, 389:20, 397:6, 407:5, 408:5, 408:23, 409:18, 413:8, 414:1, 414:15, 414:22, 417:8, 443:11, 449:19, 449:20, 449:24, 451:4, 456:21, 459:12, 459:13, 469:12, 469:13
**company's** [4] - 334:11, 343:16, 346:13, 440:9
**comparable** [1] - 396:3
**compare** [1] - 469:7
**compared** [2] - 356:14, 410:21
**comparing** [1] - 373:24
**compensated** [3] - 371:21, 372:2, 443:13
**Compensation** [1] - 459:5

**compensation** [21] - 333:21, 345:20, 357:14, 357:15, 357:16, 364:18, 370:22, 380:21, 380:23, 380:24, 382:1, 410:21, 413:4, 413:9, 426:19, 429:10, 432:19, 458:25, 459:1, 465:10, 476:3
**compete** [1] - 322:11
**competing** [1] - 322:11
**competitors** [1] - 388:15
**compile** [1] - 440:4
**complaint** [1] - 394:10
**complaints** [3] - 394:7, 394:19, 394:25
**complete** [5] - 327:9, 344:10, 408:5, 449:9, 472:5
**completed** [1] - 371:9
**comprise** [1] - 467:25
**Computer** [1] - 295:24
**computer** [1] - 439:8
**Computer-aided** [1] - 295:24
**computerized** [2] - 295:23, 440:10
**concentrate** [5] - 396:22, 397:4, 398:6, 398:9, 398:14
**concern** [2] - 388:19, 394:1
**concerned** [3] - 393:25, 395:11, 401:20, 428:1, 453:18
**concerning** [3] - 312:15, 429:12, 468:25
**conclude** [1] - 447:17
**concluding** [1] - 474:5
**condition** [1] - 391:14
**conditions** [2] - 381:24, 476:2
**confer** [1] - 466:5
**conference** [1] - 380:12
**confident** [1] - 448:2
**confidential** [1] - 440:15
**confirm** [1] - 296:10
**confirmed** [2] - 421:9, 438:10
**confused** [2] - 315:18, 341:20, 360:19
**confusion** [1] - 341:19
**connected** [1] - 349:23
**connection** [1] - 371:9
**consider** [7] - 354:2, 382:8, 382:11, 402:16, 457:18, 465:15, 477:11
**consideration** [4] - 364:21, 426:10, 428:5, 447:2
**considered** [3] - 382:19, 465:9, 465:11
**considers** [1] - 355:16
**constantly** [1] - 315:13
**constitute** [1] - 471:1
**constitution** [2] - 451:16, 451:18
**consult** [3] - 372:11, 413:13
**consultant** [6] - 299:21, 316:4, 316:14, 316:24, 329:22, 450:17
**consulting** [11] - 299:8, 299:14, 304:11, 304:23, 311:22, 326:22, 330:13, 363:21, 410:23, 411:11, 411:15
**Consulting** [1] - 349:5
**contacted** [2] - 415:2, 425:15
**contain** [2] - 386:18, 412:15
**content** [1] - 310:13
**context** [3] - 393:18, 393:20, 394:11
**continue** [9] - 296:16, 340:23, 400:2, 439:1, 439:4, 449:11, 465:3, 465:18, 470:18
**Continued** [1] - 377:11
**continued** [4] - 305:5, 336:5, 448:16,

471:1
**Continuing** [13] - 337:3, 344:8, 347:22, 352:8, 353:25, 355:4, 358:5, 359:1, 360:18, 369:9, 449:16, 455:12, 466:17
**contract** [9] - 347:4, 450:6, 450:13, 450:14, 450:20, 451:17, 470:4, 471:1
**contractor** [2] - 470:13, 470:19
**contractors** [3] - 379:18, 379:21, 470:2
**contribution** [1] - 389:15
**control** [7] - 326:25, 370:19, 410:7, 410:15, 431:19, 440:15, 476:1
**controls** [1] - 410:11
**conveniently** [1] - 399:5
**conversation** [15] - 300:25, 331:10, 331:11, 331:22, 331:23, 332:9, 333:5, 333:20, 338:9, 338:12, 339:18, 345:21, 350:22, 350:25, 375:12
**conversations** [12] - 310:7, 331:11, 337:5, 337:6, 339:7, 339:14, 348:24, 364:24, 370:4, 375:12, 375:16, 456:13
**COO** [1] - 411:19
**COOPER** [1] - 295:4
**copied** [1] - 402:11
**copy** [1] - 444:13
**copying** [1] - 445:1
**cords** [1] - 421:11
**core** [1] - 302:6
**Corp** [1] - 296:4
**corporate** [16] - 330:12, 332:23, 333:23, 333:24, 334:3, 346:5, 346:9, 346:11, 346:25, 351:15, 354:18, 357:9, 434:18, 434:19, 435:19
**CORPORATION** [1] - 294:7
**Corporation** [6] - 294:19, 295:2, 295:7, 449:25, 450:5, 456:20
**correct** [118] - 303:15, 304:5, 316:7, 318:24, 319:1, 331:9, 335:2, 345:16, 345:20, 347:25, 350:16, 350:24, 351:6, 351:12, 366:9, 366:21, 367:10, 367:20, 368:8, 369:17, 379:10, 379:19, 379:20, 380:11, 382:14, 382:15, 382:16, 382:17, 386:13, 386:15, 387:20, 388:15, 391:3, 392:8, 392:10, 392:14, 396:13, 396:14, 396:16, 396:17, 396:22, 396:23, 398:13, 398:16, 398:19, 399:10, 400:2, 400:3, 400:21, 403:5, 404:14, 404:17, 404:18, 404:19, 404:20, 404:22, 404:23, 405:14, 405:15, 405:18, 405:19, 407:12, 407:21, 411:20, 411:23, 412:1, 415:2, 416:5, 417:14, 417:15, 417:18, 417:19, 417:23, 418:4, 418:5, 419:2, 422:22, 423:17, 424:1, 425:4, 426:22, 429:16, 430:15, 430:16, 432:20, 433:13, 434:2, 435:1, 435:10, 437:8, 437:22, 440:22, 441:4, 441:15, 441:16, 442:11, 442:15, 444:10, 444:11, 450:19, 450:20, 450:23, 450:24, 452:7, 452:14, 454:22, 456:4, 457:22, 461:14, 461:15, 463:22, 464:6, 464:7, 469:5, 469:6, 469:17, 471:10, 471:16
**corrected** [1] - 422:19
**cost** [18] - 340:25, 344:20, 347:13, 347:17, 350:11, 350:15, 352:14,

# D

353:19, 354:21, 354:25, 355:5, 355:19, 355:20, 356:22, 357:2, 357:3, 432:18, 462:2

**costing** [3] - 350:16, 430:11, 430:21
**costs** [5] - 345:1, 345:3, 346:22, 357:4
**counsel** [1] - 296:4
**count** [15] - 352:11, 352:12, 352:15, 373:7, 374:13, 374:21, 389:9, 408:5, 408:10, 412:6, 422:15, 444:25, 468:8, 468:12
**counted** [1] - 434:11
**countries** [1] - 328:6
**country** [2] - 364:3, 419:15
**country's** [1] - 449:25
**couple** [14] - 314:17, 345:1, 361:16, 367:3, 367:4, 367:10, 367:11, 367:19, 370:14, 384:8, 400:12, 432:5, 443:2, 470:10
**course** [12] - 296:24, 314:2, 314:5, 314:7, 314:25, 362:11, 364:19, 365:1, 367:11, 391:9, 477:10
**court** [5] - 296:1, 318:2, 378:3, 449:1, 459:3
**Court** [4] - 294:20, 295:20, 295:21, 390:5
**Courthouse** [1] - 294:5
**courtroom** [7] - 296:18, 361:10, 362:16, 377:9, 378:8, 449:6, 472:10
**COURTROOM** [19] - 296:3, 297:5, 297:9, 297:12, 319:18, 319:20, 319:23, 361:9, 361:12, 362:15, 377:8, 378:11, 378:14, 381:11, 387:10, 448:14, 449:5, 449:7, 472:9
**cover** [2] - 309:10, 423:15
**covered** [2] - 312:23, 434:22
**create** [1] - 310:13
**created** [8] - 299:19, 314:2, 318:16, 320:20, 323:7, 344:16, 387:25, 388:17
**creating** [5] - 313:17, 335:2, 335:9, 401:1, 409:21
**creation** [1] - 344:14
**credit** [6] - 310:9, 321:14, 321:15, 321:22
**CRI** [1] - 295:20
**criteria** [12] - 340:4, 341:2, 341:4, 344:16, 353:16, 370:2, 408:12, 408:20, 409:5, 409:7, 412:12, 412:13
**critical** [1] - 307:24
**criticism** [2] - 330:20, 330:21
**criticisms** [4] - 337:8, 337:10, 337:13, 337:14
**criticized** [1] - 330:15
**CRM** [1] - 329:10
**cross** [2] - 361:24, 374:6
**CROSS** [6] - 309:15, 363:2, 417:3, 478:8, 478:13, 479:4
**cross-examination** [1] - 361:24
**CROSS-EXAMINATION** [6] - 309:15, 363:2, 417:3, 478:8, 478:13, 479:4
**CRR** [1] - 295:20
**cultural** [1] - 332:21
**current** [2] - 379:2, 401:7
**customers** [1] - 321:24
**cut** [9] - 339:22, 341:2, 390:20, 397:2, 398:5, 398:11, 432:12, 464:23, 468:9

**D-135** [1] - 459:18
**d-212** [1] - 369:2
**D-214** [4] - 368:20, 369:3, 369:4, 369:10
**D-273** [3] - 439:12, 441:7, 481:17
**D212** [1] - 368:17
**dad** [13] - 298:19, 299:2, 299:4, 299:7, 299:13, 299:16, 299:18, 300:18, 303:22, 305:1, 307:5, 307:6, 313:8
**dad's** [1] - 300:3
**Dallas** [1] - 294:17
**Dan** [4] - 368:18, 369:10, 369:16, 389:18
**Daniel** [2] - 319:22, 426:20
**DANIEL** [2] - 320:1, 478:10
**data** [3] - 439:21, 439:25, 458:8
**DATA** [1] - 294:7
**Data** [87] - 294:19, 295:2, 295:7, 296:4, 299:9, 303:12, 303:22, 303:25, 304:5, 304:19, 305:14, 306:15, 306:16, 306:21, 307:25, 308:18, 308:20, 308:23, 309:23, 311:1, 311:7, 311:16, 312:1, 316:3, 316:13, 317:4, 317:9, 317:15, 318:17, 318:18, 318:19, 320:8, 321:9, 321:10, 322:21, 323:1, 323:7, 323:13, 323:23, 324:16, 327:14, 332:21, 334:11, 334:15, 335:24, 339:23, 344:21, 347:2, 348:18, 348:19, 354:2, 363:14, 364:22, 371:22, 372:2, 372:7, 372:9, 379:2, 379:6, 379:13, 380:16, 381:13, 381:18, 384:24, 385:16, 386:21, 387:23, 389:8, 390:2, 390:4, 390:9, 396:12, 397:6, 400:2, 400:4, 406:3, 406:19, 407:21, 415:3, 430:15, 450:5, 450:7, 456:20, 471:5, 474:18, 476:17
**Data's** [5] - 334:9, 371:19, 371:25, 397:2, 469:20
**date** [33] - 318:9, 331:8, 365:3, 375:6, 375:7, 375:10, 376:20, 405:13, 441:9, 441:23, 442:1, 442:14, 455:9, 458:22, 461:12, 480:6, 480:10, 480:12, 480:14, 480:16, 480:18, 480:20, 480:22, 480:24, 481:8, 481:10, 481:12, 481:14, 481:16, 481:18, 481:20, 481:22
**date..........** [1] - 480:8
**date.......................................** [2] - 481:2, 481:6
**dated** [3] - 421:4, 425:3, 438:8
**dates** [4] - 296:11, 302:3, 375:16, 456:6
**DAVID** [1] - 294:21
**day-to-day** [2] - 335:22, 397:21
**days** [11] - 383:2, 392:23, 393:7, 400:1, 410:2, 422:16, 423:3, 423:9, 458:3, 458:4, 460:14
**dead** [1] - 477:9
**deal** [3] - 316:13, 317:3, 341:5
**dealing** [6] - 325:9, 325:19, 335:16, 335:17, 335:18, 344:1
**deals** [1] - 304:23
**dealt** [2] - 310:6, 366:2
**dearly** [1] - 394:2

**debt** [1] - 334:23
**December** [6] - 390:11, 390:17, 402:8, 402:14, 403:5, 413:21
**December 9th** [1] - 460:13
**decide** [9] - 324:24, 326:13, 340:18, 342:5, 393:16, 408:15, 410:13, 447:9, 447:15
**decided** [9] - 298:19, 325:6, 347:8, 353:11, 354:13, 390:18, 391:4, 444:24, 454:2
**decides** [1] - 411:3
**deciding** [1] - 341:6
**decision** [17] - 324:14, 326:19, 342:22, 347:9, 353:15, 353:17, 355:12, 364:15, 371:1, 371:13, 371:19, 371:25, 372:7, 389:10, 411:19, 421:20, 476:9
**decisions** [6] - 326:12, 342:16, 347:3, 355:16, 411:7, 413:4
**decreased** [2] - 345:8, 452:12
**decreases** [1] - 348:9
**deductions** [2] - 382:22, 383:5
**deemed** [2] - 376:18, 462:22
**defendant** [2] - 475:1, 475:5
**Defendant's** [3] - 368:17, 461:17, 467:7, 468:7
**Defendant's Exhibit** [7] - 422:4, 431:24, 438:3, 451:19, 455:1, 455:8, 481:5
**defendant's exhibits** [1] - 368:19
**defendants** [2] - 294:9, 430:15
**Defendants** [3] - 295:1, 295:2, 295:7
**DEFENSE** [1] - 481:4
**Defense** [22] - 421:1, 421:15, 422:7, 424:12, 424:16, 426:13, 426:15, 432:2, 441:7, 443:17, 444:12, 444:16, 445:21, 446:1, 481:7, 481:9, 481:11, 481:13, 481:15, 481:17, 481:19, 481:21
**defense** [3] - 303:16, 431:13, 473:13
**definitely** [2] - 350:13, 355:20
**definition** [3] - 326:5, 398:2, 406:12
**degree** [3] - 383:17, 389:20, 398:8
**delivered** [1] - 404:16
**demoted** [1] - 450:22
**department** [12] - 325:24, 400:11, 402:4, 404:12, 407:10, 440:17, 456:1, 456:5, 456:8, 462:24
**depended** [4] - 300:21, 304:25, 313:1, 317:16
**deposed** [2] - 317:18, 317:20
**deposition** [14] - 296:21, 317:25, 318:2, 334:8, 345:19, 376:6, 377:3, 379:8, 382:18, 389:24, 398:18, 400:20, 410:5, 415:1
**depositions** [1] - 472:20
**DEPUTY** [19] - 296:3, 297:5, 297:9, 297:12, 319:18, 319:20, 319:23, 361:9, 361:12, 362:15, 377:8, 378:11, 378:14, 381:11, 387:10, 448:14, 449:5, 449:7, 472:9
**Deschamps** [1] - 434:9
**describe** [7] - 298:9, 365:13, 381:12, 389:25, 391:14, 429:1, 429:2
**described** [1] - 412:25
**describing** [3] - 395:12, 395:13, 395:14
**designated** [1] - 342:4

**detail** [1] - 395:16

**detailing** [1] - 395:17

**details** [1] - 338:13

**determine** [2] - 476:2, 477:10

**determined** [1] - 347:12

**determining** [1] - 341:22

**developed** [5] - 313:8, 390:23, 436:22, 438:14, 438:24

**developers** [1] - 366:3

**developing** [1] - 435:23

**development** [5] - 313:10, 432:23, 435:11, 435:12, 435:15

**developmental** [1] - 434:22

**diagnosed** [2] - 333:9, 333:12

**dialogue** [1] - 477:12

**difference** [8] - 320:17, 322:5, 345:19, 430:3, 446:16, 446:23, 469:8, 476:22

**different** [34] - 311:21, 314:2, 320:20, 321:13, 323:18, 323:21, 324:17, 324:18, 324:20, 329:11, 329:23, 331:13, 332:9, 333:24, 340:6, 349:17, 353:20, 354:9, 354:16, 364:9, 366:16, 366:24, 375:21, 390:4, 390:9, 394:19, 400:9, 400:10, 407:6, 410:16, 422:5, 424:6, 434:23, 468:9

**differentiate** [1] - 321:25

**differently** [2] - 455:15, 464:5

**differs** [1] - 365:14

**difficult** [2] - 408:23, 464:11

**digital** [1] - 310:12

**diligence** [1] - 408:22

**DILORENZO** [13] - 295:9, 449:12, 449:15, 455:1, 455:5, 455:7, 455:11, 456:24, 457:3, 463:25, 470:10, 470:12, 471:17

**DiLorenzo** [36] - 302:22, 302:25, 303:4, 309:12, 309:13, 309:16, 309:17, 312:13, 319:10, 384:14, 393:12, 394:18, 394:22, 397:12, 409:3, 416:25, 417:4, 422:13, 431:1, 431:5, 431:9, 431:15, 431:20, 431:23, 437:1, 438:23, 439:2, 439:5, 439:7, 439:10, 439:16, 441:6, 443:2, 445:23, 446:5

**DiLORENZO** ...................... [2] - 478:9, 479:5

**DILORENZO** ...................... [1] - 479:9

**direct** [20] - 323:20, 325:1, 325:9, 327:13, 327:24, 335:21, 340:24, 343:4, 353:14, 357:13, 364:12, 371:14, 385:18, 389:13, 396:24, 411:9, 423:15, 452:1, 452:19

**DIRECT** [6] - 297:17, 320:4, 378:23, 478:6, 478:11, 479:2

**directed** [1] - 397:1

**directing** [1] - 315:7

**direction** [3] - 326:24, 448:10, 474:6

**directly** [3] - 325:5, 341:5, 399:7

**director** [9] - 432:21, 436:9, 436:13, 451:24, 451:25, 452:6, 452:9, 452:11, 452:13

**directors** [3] - 324:7, 434:4, 434:11

**disability** [22] - 348:16, 354:13, 354:22, 355:10, 356:2, 360:10, 363:7, 363:9, 363:11, 383:8, 396:1, 396:11, 396:12, 396:15, 400:1, 400:8, 423:12, 423:19, 456:14, 469:16, 471:15

**disabled** [1] - 455:20

**disagree** [2] - 383:15, 405:9

**discharged** [1] - 364:3

**disciplinary** [1] - 384:3

**discovery** [1] - 395:7

**discretion** [3] - 342:25, 347:6, 382:1

**Discuss** [1] - 373:2

**discuss** [4] - 380:3, 445:3, 453:4, 474:3

**discussed** [2] - 400:19, 415:1

**discussing** [1] - 474:3

**discussion** [6] - 344:24, 389:22, 396:11, 427:21, 462:4, 464:17

**distance** [1] - 300:11

**distinguish** [1] - 322:4

**distract** [1] - 368:24

**distracted** [1] - 398:15

**DISTRICT** [3] - 294:1, 294:1, 294:12

**division** [2] - 315:7, 464:19

**divvied** [1] - 414:5

**doctor** [6] - 296:22, 314:22, 315:5, 376:6, 396:1, 401:21

**doctor's** [2] - 372:6, 456:7

**document** [12] - 301:22, 302:23, 302:25, 320:24, 381:12, 386:8, 387:11, 392:4, 399:1, 436:24, 441:17, 452:22

**documentary** [1] - 404:9

**documentation** [1] - 341:25

**documented** [1] - 386:24

**documenting** [1] - 394:9

**documents** [6] - 354:3, 394:24, 395:5, 395:7, 395:8, 395:17

**dollar** [4] - 351:10, 352:18, 414:4

**dollars** [6] - 331:21, 332:4, 345:1, 348:25, 370:15, 464:20

**done** [26] - 298:15, 300:22, 300:25, 308:15, 330:3, 331:13, 340:6, 343:8, 347:16, 349:6, 349:7, 350:24, 356:19, 361:2, 384:23, 414:24, 416:20, 419:3, 433:5, 440:4, 454:21, 455:14, 455:15, 470:18

**double** [3] - 432:4, 444:13, 469:13

**double-sided** [2] - 432:4, 444:13

**down** [49] - 307:16, 307:20, 307:21, 308:21, 308:24, 309:2, 311:12, 314:12, 319:13, 331:6, 331:23, 340:8, 345:11, 345:13, 361:12, 373:2, 373:13, 376:1, 379:23, 382:22, 383:5, 391:2, 391:5, 391:10, 392:15, 396:21, 399:6, 402:11, 404:6, 408:11, 409:15, 413:1, 415:25, 427:19, 431:12, 432:13, 436:7, 444:13, 444:17, 459:19, 459:20, 462:11, 466:19, 467:8, 467:9, 467:17, 468:8, 471:8, 477:15

**downgrade** [2] - 466:20, 467:2

**Dr** [2] - 453:17, 453:20

**draft** [3] - 399:19, 399:20, 473:25

**drafted** [1] - 399:21

**dragged** [1] - 476:12

**drinking** [1] - 423:6

**driving** [1] - 354:24

**drop** [1] - 477:9

**dropped** [1] - 315:15

**dry** [2] - 307:15, 468:9

**due** [2] - 408:22, 445:2

**duly** [6] - 297:8, 297:16, 319:19, 320:3,

378:13, 378:22

**during** [28] - 296:24, 307:11, 309:4, 309:5, 309:25, 314:12, 315:10, 316:4, 320:8, 321:11, 345:9, 345:13, 345:15, 345:18, 349:5, 362:11, 383:12, 384:16, 388:22, 389:24, 395:7, 397:25, 410:5, 445:20, 449:24, 468:13, 468:17

**duties** [4] - 300:18, 366:5, 384:5, 384:13

# E

**e-mail** [38] - 384:11, 395:15, 395:19, 397:2, 398:12, 400:17, 401:9, 402:11, 403:4, 409:13, 413:16, 413:21, 417:25, 421:4, 422:13, 422:22, 424:13, 424:17, 424:22, 425:12, 426:16, 427:8, 438:18, 444:12, 444:13, 444:17, 444:20, 444:22, 454:1, 460:18, 460:19, 460:22, 460:23, 461:2, 461:8, 464:21, 467:8

**E-mail** [1] - 295:22

**e-mails** [18] - 315:14, 315:24, 330:11, 384:9, 395:2, 395:8, 395:10, 395:12, 398:3, 402:16, 403:22, 424:10, 445:13, 446:11, 446:14, 446:18, 446:22, 456:13

**E-perform** [1] - 327:11

**E.J** [3] - 365:10, 365:15, 366:6

**early** [4] - 405:18, 417:18, 429:22, 458:9

**earn** [1] - 466:7

**earners** [1] - 374:25

**earning** [4] - 307:22, 313:17, 454:18, 463:4

**earnings** [1] - 459:16

**earns** [2] - 355:6, 355:7

**ears** [1] - 360:6

**EASTERN** [1] - 294:1

**easy** [1] - 304:4

**eating** [1] - 423:6

**EC** [1] - 464:22

**economic** [1] - 407:20

**Ed** [3] - 388:3, 388:4, 388:6

**effect** [2] - 344:20, 393:2

**effective** [2] - 375:7, 476:11

**efficiencies** [1] - 442:21

**efficiency** [3] - 326:24, 340:13, 401:4

**efficient** [1] - 356:18

**effort** [1] - 376:17

**EIDELMAN** [37] - 295:4, 296:9, 358:15, 359:6, 361:7, 361:16, 361:19, 361:25, 362:3, 362:6, 362:8, 363:3, 368:16, 368:23, 369:1, 369:3, 369:6, 369:8, 372:11, 372:14, 372:16, 374:5, 375:25, 376:9, 376:12, 376:14, 376:22, 463:13, 473:3, 473:9, 473:20, 473:22, 474:8, 474:23, 475:18, 476:16, 477:17

**Eidelman** [6] - 317:20, 361:6, 362:18, 363:1, 375:24, 416:24

**EIDELMAN** ...................... [1] - 478:14

**eight** [1] - 383:21

**either** [16] - 313:21, 315:14, 317:10, 339:17, 348:16, 385:18, 385:22, 385:25, 387:18, 421:19, 440:5, 457:21, 462:22, 468:23, 471:4, 472:14

**elaborate** [1] - 403:6

**elements** [1] - 476:9
**eligible** [1] - 418:22
**eliminate** [3] - 347:13, 371:20, 437:18
**eliminated** [7] - 354:15, 358:18, 365:5, 372:1, 463:2, 463:3, 465:17
**elimination** [2] - 351:16, 372:8
**Elmo** [1] - 368:16
**EMEA** [5] - 373:11, 373:13, 373:14, 373:16, 373:21
**employ** [1] - 470:18
**employed** [3] - 320:9, 335:24, 450:18
**employee** [24] - 309:23, 311:3, 311:6, 311:8, 316:15, 334:3, 344:2, 381:13, 381:14, 381:16, 381:19, 382:19, 382:20, 394:9, 395:25, 415:3, 435:9, 450:16, 450:18, 450:23, 452:6, 456:20, 470:15, 470:16
**employee's** [3] - 381:24, 381:25, 385:10
**employees** [33] - 326:17, 327:7, 338:14, 338:15, 338:23, 338:25, 339:6, 339:23, 344:15, 345:8, 345:15, 357:22, 366:15, 367:1, 367:16, 367:22, 367:24, 371:22, 372:2, 372:8, 379:13, 379:16, 382:25, 385:4, 393:25, 394:6, 406:11, 412:4, 412:12, 434:22, 450:9, 469:25, 470:1
**employer** [3] - 474:18, 476:18, 476:20
**employment** [13] - 381:18, 381:20, 381:24, 450:4, 450:6, 459:10, 465:3, 469:22, 471:1, 471:4, 476:2, 476:3, 476:19
**enabling** [1] - 321:15
**end** [16] - 305:3, 311:2, 316:18, 322:23, 324:2, 324:4, 324:5, 333:8, 336:2, 356:3, 375:7, 406:7, 415:1, 447:12, 448:8, 472:4
**ended** [3] - 300:11, 305:14, 363:21
**engage** [2] - 443:12, 470:5
**engaged** [1] - 470:14
**engagement** [1] - 319:3
**enjoy** [2] - 376:24, 421:25
**ensued** [1] - 445:13
**ensure** [2] - 440:14, 440:17
**entered** [6] - 296:17, 319:3, 378:7, 387:9, 403:9, 476:22
**entering** [1] - 362:15
**enters** [2] - 362:16, 449:6
**entire** [10] - 308:21, 314:22, 367:12, 368:7, 384:16, 406:19, 421:10, 452:13, 468:3
**entities** [1] - 320:21
**entitled** [3] - 383:12, 418:8, 456:21
**entries** [1] - 441:8
**entry** [1] - 441:19
**equal** [2] - 298:11, 448:1
**equally** [1] - 387:22
**equity** [4] - 381:1, 413:9, 414:14, 418:16
**equivalent** [1] - 387:17
**era** [1] - 299:16
**err** [1] - 475:2
**erratically** [1] - 393:24
**ESQ** [6] - 294:17, 294:21, 295:4, 295:4, 295:5, 295:9
**essential** [2] - 351:5, 464:13

**establish** [1] - 313:19
**estimated** [2] - 437:9, 437:21
**et** [5] - 294:7, 294:19, 295:2, 295:7, 459:17
**ethic** [3] - 298:10, 298:11, 298:16
**Europe** [2] - 373:17, 412:4
**evenly** [1] - 310:20
**events** [7] - 406:10, 406:12, 406:18, 406:20, 406:22, 407:11, 410:10
**evidence** [88] - 296:21, 301:11, 301:14, 301:15, 303:8, 344:19, 368:22, 369:4, 369:5, 376:18, 376:20, 381:10, 381:11, 386:7, 391:25, 392:1, 398:24, 398:25, 400:15, 400:16, 403:12, 403:13, 403:20, 403:21, 404:9, 409:12, 409:14, 413:18, 413:19, 415:7, 415:8, 420:25, 421:14, 421:15, 422:6, 422:7, 424:15, 424:16, 426:14, 426:15, 432:1, 432:2, 439:9, 439:11, 440:24, 441:5, 441:7, 444:15, 444:16, 445:20, 445:22, 445:24, 445:25, 446:1, 446:14, 446:15, 447:7, 455:2, 455:6, 455:8, 457:15, 458:20, 458:21, 459:18, 464:8, 474:9, 474:16, 474:20, 480:5, 480:8, 480:9, 480:11, 480:13, 480:15, 480:17, 480:19, 480:21, 480:23, 481:1, 481:5, 481:7, 481:9, 481:11, 481:13, 481:15, 481:17, 481:19, 481:21
**evidentiary** [1] - 473:7
**EVP** [3] - 320:17, 339:9, 366:21
**EWING** [1] - 295:1
**exact** [7] - 332:13, 338:20, 338:24, 349:14, 367:7, 375:6, 411:17
**exactly** [11] - 327:17, 327:22, 342:6, 346:15, 348:11, 371:7, 373:20, 375:10, 380:2, 388:1, 463:1
**examination** [3] - 361:24, 364:12, 452:19
**EXAMINATION** [31] - 297:17, 309:15, 320:4, 337:1, 344:6, 347:20, 352:6, 353:23, 355:2, 358:3, 358:24, 360:16, 363:2, 369:7, 372:20, 378:23, 417:3, 449:14, 455:10, 457:7, 466:15, 470:11, 478:6, 478:8, 478:11, 478:13, 478:15, 479:2, 479:4, 479:6, 479:8
**examined** [3] - 297:16, 320:3, 378:22
**example** [6] - 313:14, 314:2, 333:18, 341:14, 342:13, 436:15
**Excel** [1] - 457:23
**exception** [1] - 450:12
**exceptions** [5] - 386:18, 387:1, 387:18, 387:20, 387:21
**exchange** [3] - 392:5, 409:13, 425:13
**excluded** [1] - 340:5
**excuse** [6] - 320:23, 341:13, 355:22, 373:12, 408:14, 466:24
**excused** [1] - 319:14
**executive** [7] - 320:10, 320:12, 324:9, 324:12, 324:17, 326:6, 330:19, 365:23, 379:3, 385:16, 413:11
**executives** [1] - 390:19
**exempt** [3] - 382:19, 382:20, 382:25
**exhaustion** [1] - 387:16
**Exhibit** [30] - 369:10, 372:22, 372:24, 386:6, 386:7, 391:24, 398:23, 415:11, 421:1, 421:15, 422:7, 424:12, 424:16,

426:13, 426:15, 432:2, 441:7, 443:17, 444:12, 444:16, 445:21, 446:1, 481:7, 481:9, 481:11, 481:13, 481:15, 481:17, 481:19, 481:21
**exhibit** [9] - 296:7, 393:11, 393:13, 403:8, 405:10, 422:5, 422:11, 436:25, 467:12
**Exhibiting** [1] - 376:10
**EXHIBITS** [1] - 480:2
**exhibits** [4] - 296:20, 361:19, 376:5, 376:15
**existence** [1] - 434:20
**existing** [1] - 452:5
**exit** [1] - 339:14
**exits** [3] - 361:10, 377:9, 472:10
**expand** [4] - 332:7, 462:6
**expanded** [1] - 454:20
**expanding** [1] - 333:16
**expect** [2] - 385:7, 473:2
**expected** [1] - 335:22
**expedite** [1] - 399:7
**expenditure** [1] - 380:19
**expense** [18] - 334:17, 335:7, 346:1, 346:12, 346:21, 348:9, 348:19, 349:13, 352:19, 356:11, 357:13, 364:22, 373:24, 374:14, 414:2, 419:13, 469:25
**expensed** [1] - 364:20
**expenses** [10] - 345:25, 346:7, 346:8, 354:23, 356:1, 356:13, 357:19, 456:18, 470:14, 470:17
**experience** [5] - 301:1, 332:1, 332:14, 456:19
**expert** [2] - 357:9, 414:7
**expertise** [1] - 340:25
**experts** [1] - 469:20
**explain** [8] - 299:11, 321:8, 354:16, 356:25, 357:6, 390:1, 474:25, 475:4
**explained** [2] - 354:20, 441:2
**explanations** [1] - 404:10
**express** [1] - 394:1
**Express** [3] - 399:22, 423:12, 423:22
**extra** [1] - 376:24

---

# F

**face** [2] - 313:21
**faceted** [1] - 334:25
**facilities** [2] - 340:8, 388:7
**facing** [1] - 420:11
**Facsimile** [1] - 295:22
**fact** [10] - 314:24, 315:1, 365:3, 371:18, 371:24, 372:4, 394:11, 395:2, 429:17, 435:21
**factored** [1] - 426:7
**factors** [5] - 341:1, 459:13, 474:16, 475:23, 476:4
**facts** [9] - 331:4, 431:4, 446:14, 446:16, 446:20, 446:25, 447:7, 447:8, 475:10
**failed** [3] - 474:13, 474:15, 474:19
**failing** [2] - 384:4, 384:12
**fair** [1] - 475:3
**fairly** [1] - 395:19
**fall** [2] - 331:7, 364:14
**falsifications** [1] - 470:17

(falsifying - golf)

**falsifying** [1] - 456:17
**familiar** [1] - 339:24
**familiarity** [1] - 456:19
**family** [10] - 306:1, 306:5, 307:25, 310:23, 312:6, 385:8, 394:5, 397:7, 398:10, 453:24
**Family** [2] - 371:10, 386:22
**FAPR** [1] - 295:20
**far** [4] - 299:25, 420:6, 471:8, 475:3
**fashion** [1] - 364:20
**fast** [1] - 459:2
**father** [17] - 304:4, 304:15, 305:8, 305:14, 305:23, 306:7, 306:8, 307:11, 307:14, 307:24, 309:21, 310:6, 310:8, 310:23, 312:1, 312:10, 318:16
**father's** [1] - 299:8
**fear** [1] - 447:12
**February** [6] - 322:23, 333:9, 336:2, 348:2, 375:8, 418:13
**Federal** [3] - 399:22, 423:12, 423:22
**federal** [1] - 387:15
**fee** [1] - 312:22
**feedback** [1] - 411:24
**feet** [1] - 299:15
**fell** [1] - 367:15
**felt** [4] - 386:3, 401:21, 464:14, 464:16
**few** [10] - 312:13, 313:12, 349:18, 372:19, 384:9, 401:1, 447:19, 449:13, 459:21, 470:13
**Fiberly** [1] - 458:1
**field** [5] - 329:12, 367:8, 379:4, 440:5, 477:3
**Fifth** [1] - 302:10
**fifth** [1] - 344:25
**figure** [2] - 312:2, 473:10
**file** [6] - 385:15, 441:23, 442:1, 445:1, 467:21, 467:25
**files** [2] - 370:24, 384:12
**fill** [1] - 453:1
**filling** [1] - 452:2, 467:6
**finally** [1] - 463:23
**finances** [1] - 453:17
**financial** [8] - 299:14, 299:15, 311:22, 323:16, 334:19, 405:22, 407:5, 408:6
**financials** [2] - 344:20, 408:3
**fine** [4] - 361:2, 384:19, 427:9, 431:22
**finish** [6] - 362:18, 409:3, 431:1, 448:2, 472:3, 473:7
**finished** [1] - 298:21
**fire** [2] - 390:18, 476:1
**fired** [6] - 325:6, 330:18, 341:4, 395:23, 395:25, 443:7
**firm** [1] - 302:4
**FIRST** [1] - 294:7
**first** [21] - 297:15, 314:25, 320:2, 347:17, 363:23, 364:5, 378:21, 394:18, 416:11, 416:12, 418:11, 418:17, 430:4, 430:5, 430:9, 437:14, 441:23, 458:19, 463:18, 473:10, 475:6
**First** [92] - 294:19, 295:2, 295:7, 296:4, 299:9, 303:12, 303:22, 303:25, 304:5, 304:19, 305:14, 306:15, 306:16, 306:21, 307:25, 308:18, 308:20, 308:22, 308:23, 309:23, 311:1, 311:7, 311:16, 312:1, 316:3, 316:13, 317:4, 317:9, 317:15, 318:17, 318:18, 318:19,

320:8, 321:9, 321:10, 322:21, 323:1, 323:7, 323:13, 323:23, 324:16, 327:14, 332:21, 334:8, 334:11, 334:14, 335:24, 339:23, 344:21, 347:2, 348:18, 348:19, 354:2, 363:14, 364:21, 371:19, 371:22, 371:25, 372:2, 372:7, 372:8, 379:2, 379:6, 379:13, 380:15, 381:13, 381:18, 384:24, 385:15, 386:21, 387:23, 389:8, 390:2, 390:4, 390:9, 396:12, 397:2, 397:6, 400:2, 400:4, 406:3, 406:19, 407:21, 415:3, 430:15, 450:5, 450:7, 456:20, 469:20, 471:5, 474:18, 476:17
**firsthand** [2] - 374:23, 428:23
**Fiserv** [5] - 320:19, 320:20, 321:10, 330:20
**fit** [1] - 406:13
**five** [7] - 303:13, 349:14, 427:19, 434:4, 434:11, 435:5, 460:1
**fixed** [2] - 315:16, 334:24
**FJB** [1] - 444:24
**flew** [1] - 391:2
**flexibility** [1] - 301:6
**floodgates** [1] - 476:20
**Floor** [1] - 295:8
**Florida** [8] - 307:12, 307:21, 308:7, 308:9, 309:3, 311:12, 311:20, 383:10
**fly** [1] - 473:13
**FMLA** [18] - 371:2, 371:5, 386:11, 386:12, 386:16, 386:21, 386:25, 387:3, 387:5, 387:12, 387:15, 399:12, 400:7, 469:21, 474:17, 475:13, 475:21, 476:20
**focused** [1] - 477:13
**focussed** [1] - 476:8
**folks** [11] - 296:19, 329:25, 332:3, 353:14, 413:7, 413:25, 446:10, 449:8, 465:2, 473:1, 475:4
**follow** [3] - 380:15, 386:24, 395:15
**following** [3] - 403:23, 427:16
**follows** [4] - 297:16, 320:3, 378:22, 386:21
**FOR** [2] - 294:11, 481:4
**force** [19] - 329:9, 329:10, 334:6, 343:14, 345:12, 354:4, 367:9, 372:1, 373:22, 386:19, 388:11, 407:14, 408:24, 429:4, 429:13, 439:25, 440:3, 440:19
**forcing** [1] - 475:11
**forget** [1] - 370:15
**forgot** [1] - 427:15
**formal** [1] - 399:12
**former** [1] - 388:3
**forms** [3] - 399:21, 400:10, 453:1
**forth** [2] - 398:4, 399:15
**forward** [2] - 352:21, 354:10
**foundation** [1] - 439:16
**four** [9] - 303:13, 309:22, 309:25, 334:21, 340:14, 376:16, 379:7, 379:9, 392:23, 393:7, 393:22, 394:3, 422:17, 427:21, 435:5, 442:7, 473:17, 475:23, 476:4
**frame** [1] - 324:5
**Frank** [15] - 323:5, 337:6, 338:9, 338:12, 339:18, 375:12, 375:13, 381:2, 409:16, 413:10, 421:8, 453:20, 454:19, 462:4
**frank** [1] - 380:4

**frankly** [1] - 452:16
**fraud** [2] - 456:17, 470:14
**FREDERIC** [1] - 294:12
**free** [2] - 401:1, 448:11
**freeze** [2] - 358:10, 358:12
**Friday** [11] - 421:5, 421:12, 448:3, 448:8, 472:4, 473:8, 473:15, 473:24, 474:2
**friend** [3] - 391:5, 391:11, 420:11
**friends** [5] - 419:19, 420:22, 457:10, 457:17
**fringe** [1] - 357:15, 429:24
**Frisolone** [1] - 295:20
**frivolous** [1] - 474:21
**front** [5] - 368:18, 372:22, 372:25, 376:8, 410:1
**Fuji** [1] - 445:3
**fulfill** [2] - 307:9, 384:5
**full** [17] - 315:10, 364:18, 364:25, 382:25, 383:12, 384:15, 392:23, 393:8, 393:18, 393:20, 396:2, 422:17, 427:1, 430:6, 432:21, 467:24, 473:6
**full-time** [2] - 315:10, 432:21
**fully** [4] - 396:21, 397:5, 398:6, 398:10
**function** [7] - 300:3, 334:7, 345:2, 352:22, 435:16, 464:14, 464:15
**functions** [3] - 332:8, 348:23, 435:12
**funds** [1] - 414:10
**future** [1] - 465:9

---

**G**

**game** [1] - 362:18
**GARY** [1] - 295:4
**GBS** [32] - 320:21, 325:25, 326:12, 326:13, 328:2, 328:4, 330:19, 331:17, 335:1, 335:3, 337:17, 338:14, 338:15, 338:16, 338:19, 338:22, 339:1, 339:9, 345:23, 346:1, 359:2, 365:6, 366:12, 366:21, 366:24, 367:1, 367:15, 367:23, 368:7, 369:24, 370:2, 371:15
**geez** [1] - 451:10
**general** [2] - 398:1, 477:14
**generally** [1] - 387:20
**generated** [5] - 303:12, 303:14, 306:4, 310:1, 441:2
**generator** [1] - 335:5
**gentle** [1] - 453:4
**gentleman** [3] - 324:8, 366:22, 447:25
**gentleman's** [1] - 365:10
**genuine** [1] - 388:19
**GILLIAN** [1] - 295:4
**given** [9] - 344:16, 345:15, 367:23, 370:1, 394:2, 396:3, 405:23, 412:19, 432:15
**global** [19] - 320:10, 320:12, 320:14, 321:5, 321:8, 323:11, 323:12, 323:14, 323:16, 324:2, 324:10, 324:12, 324:19, 324:22, 325:12, 325:14, 328:5, 328:16, 363:18
**globe** [1] - 366:16
**goal** [2] - 408:20
**golf** [9] - 419:9, 419:10, 419:15, 419:19, 419:21, 419:24, 420:11, 420:13, 420:16

**gosh** [1] - 469:12
**graduation** [1] - 363:23
**Grant** [2] - 297:3, 301:18
**grant** [2] - 297:11, 427:5
**GRANT** [3] - 297:11, 297:14, 478:5
**graphic** [1] - 314:20
**grave** [2] - 401:9, 401:10
**gray** [3] - 392:10, 392:12
**Graziano** [3] - 474:18, 475:12, 475:24
**great** [5] - 306:12, 331:24, 386:5, 393:6, 472:7
**greater** [1] - 387:2
**grew** [1] - 412:6
**group** [45] - 323:22, 326:22, 328:21, 329:24, 332:19, 333:1, 333:4, 335:13, 335:15, 335:16, 342:4, 342:18, 346:7, 348:25, 349:7, 349:8, 355:14, 370:16, 374:17, 401:24, 410:23, 411:1, 411:8, 411:11, 411:15, 411:18, 425:6, 432:8, 432:16, 433:1, 434:15, 434:20, 436:6, 436:19, 445:17, 451:10, 452:13, 469:1, 469:2, 469:5, 469:8
**Group** [17] - 299:13, 299:19, 301:17, 301:19, 302:13, 306:18, 306:23, 306:24, 311:5, 312:15, 349:6, 365:12, 365:13, 365:14, 365:15, 370:12, 370:20
**groups** [4] - 326:21, 349:6, 366:16, 412:7
**grow** [2] - 345:5, 345:6
**growing** [1] - 298:13
**growth** [2] - 468:11, 468:12
**guarantee** [1] - 471:1
**guess** [12] - 298:13, 300:2, 300:12, 302:13, 304:20, 346:16, 350:20, 354:11, 411:8, 416:3, 451:15, 472:17
**guessing** [2] - 468:10, 468:11
**guidance** [1] - 326:23
**guided** [1] - 341:21
**guidelines** [3] - 386:22, 386:23, 386:25
**guy** [3] - 300:5, 300:6, 331:24
**guys** [5] - 309:21, 380:2, 388:22, 419:21, 465:10

## H

**Hack** [32] - 324:8, 324:9, 324:23, 325:1, 325:11, 327:4, 327:24, 330:25, 337:4, 337:8, 337:14, 339:3, 339:4, 339:8, 343:6, 343:10, 343:11, 343:20, 344:1, 366:20, 368:12, 369:14, 374:19, 374:24, 375:2, 375:4, 385:22, 400:18, 442:21, 458:7
**hack** [6] - 335:20, 335:24, 426:17, 426:23, 438:14
**Hack's** [1] - 375:17
**hack's** [1] - 337:13
**Hadler** [4] - 410:24, 411:9, 433:5, 433:15
**Hagerstown** [1] - 412:3
**half** [6] - 316:4, 316:14, 344:18, 379:7, 451:7, 463:4
**hand** [6] - 297:7, 319:18, 355:25, 356:1, 378:12, 407:20
**handbook** [3] - 381:13, 381:14, 381:16

**handful** [2] - 342:25, 347:6
**handle** [3] - 300:22, 326:7, 347:10
**handled** [5] - 346:5, 346:8, 346:11, 347:9, 348:5
**handles** [1] - 456:2
**handling** [1] - 397:13
**hanging** [1] - 472:7
**happy** [2] - 395:16, 466:2
**harassment** [1] - 435:2
**hard** [4] - 309:3, 385:7, 392:2, 408:22
**harm** [4] - 303:8, 476:10, 476:14, 476:17
**Harrison** [2] - 453:17, 453:20
**HC** [1] - 468:11
**head** [18] - 332:16, 352:11, 352:12, 352:15, 373:7, 374:20, 379:3, 389:9, 408:5, 408:9, 408:10, 412:6, 426:7, 426:19, 444:25, 468:8, 468:12, 476:7
**headed** [1] - 324:17
**heading** [1] - 437:4
**heads** [1] - 354:5
**healed** [1] - 423:6
**health** [1] - 398:10
**hear** [6] - 349:20, 349:24, 363:5, 425:21, 475:6, 477:13
**heard** [30] - 298:17, 299:8, 314:18, 324:9, 325:23, 329:13, 329:16, 330:1, 331:6, 331:7, 334:23, 347:23, 358:21, 364:12, 367:15, 369:17, 379:25, 395:2, 398:3, 410:23, 411:10, 414:25, 424:6, 428:13, 430:9, 430:13, 433:5, 434:12, 459:15
**hearing** [5] - 349:23, 363:10, 398:1, 418:1, 446:11
**hearings** [1] - 360:9
**hearsay** [2] - 402:16, 425:25
**heart** [1] - 408:25
**heavy** [2] - 365:20, 408:25
**heels** [1] - 390:20
**held** [5] - 372:15, 396:4, 449:4, 457:2, 466:10
**hello** [2] - 378:25, 379:1
**Help** [1] - 459:21
**help** [9] - 299:15, 300:11, 322:20, 391:18, 401:12, 405:22, 453:13, 453:17, 453:24
**helped** [5] - 311:12, 314:1, 326:23, 453:1, 453:20
**helping** [4] - 305:25, 306:2, 306:7, 431:11
**helps** [1] - 322:3
**herein** [3] - 297:15, 320:2, 378:21
**high** [4] - 307:15, 329:16, 469:1, 469:12
**high school** [2] - 298:21, 299:3
**highest** [5] - 331:16, 352:19, 368:5, 371:21, 372:2
**highest-compensated** [1] - 371:21
**highlight** [1] - 461:17
**highly** [1] - 443:12
**Himanshu** [1] - 445:2
**himself** [2] - 398:7, 417:13
**hire** [10] - 329:17, 359:2, 367:5, 367:6, 370:17, 380:25, 413:11, 462:12, 462:14, 476:1
**hired** [17] - 328:10, 328:11, 359:10,

359:11, 359:23, 365:6, 365:9, 365:11, 366:6, 390:13, 390:23, 417:11, 462:15, 462:20, 470:13, 470:15, 470:16
**hires** [1] - 445:18
**hiring** [7] - 358:10, 358:12, 410:14, 413:4, 413:7, 417:5, 468:12
**hirings** [1] - 410:7
**history** [1] - 388:8
**hit** [3] - 425:13, 460:22, 460:25
**hold** [2] - 362:24, 474:16
**holiday** [1] - 445:7
**holidays** [1] - 462:5
**home** [7] - 315:11, 383:10, 383:23, 391:12, 399:24, 424:7, 449:25
**Honor** [71] - 301:4, 301:12, 302:15, 302:22, 303:5, 303:18, 309:9, 309:13, 312:13, 314:9, 319:10, 319:12, 319:25, 342:19, 343:23, 351:15, 352:2, 358:15, 361:7, 362:3, 363:4, 368:16, 372:11, 372:16, 374:5, 375:23, 375:25, 376:9, 378:19, 384:14, 393:12, 394:18, 397:12, 403:25, 409:3, 417:1, 420:20, 422:13, 425:23, 425:25, 431:5, 431:9, 431:15, 431:20, 438:17, 438:24, 439:7, 439:10, 439:17, 441:6, 443:3, 445:24, 446:5, 449:12, 455:2, 456:24, 457:3, 458:14, 463:13, 463:25, 465:7, 465:12, 466:5, 470:7, 470:10, 471:17, 471:19, 474:8, 474:13, 474:19, 475:18
**honor** [1] - 385:6
**HONORABLE** [1] - 294:12
**horrible** [1] - 407:5
**hospital** [5] - 315:11, 383:9, 383:24, 422:17, 424:7
**hour** [2] - 384:17, 471:21
**hours** [5] - 383:2, 383:21, 389:2, 391:13, 417:25
**house** [3] - 390:25, 394:14, 430:2
**housed** [1] - 327:10
**housekeeping** [1] - 455:2
**HR** [20] - 326:2, 326:4, 326:5, 326:7, 326:10, 326:11, 326:22, 347:9, 379:3, 379:4, 394:9, 397:18, 400:11, 401:24, 432:21, 435:12, 436:2, 436:4, 454:23, 468:1
**huge** [1] - 399:13
**human** [10] - 325:24, 379:9, 394:7, 404:12, 407:10, 411:1, 434:17, 435:6, 435:16, 435:19
**humorous** [1] - 416:19
**hundred** [15] - 306:3, 310:3, 367:10, 367:11, 367:19, 417:21, 418:8, 427:17, 427:23, 428:6, 435:8, 456:12, 458:10, 458:11, 459:7
**hundreds** [1] - 332:4
**hurry** [1] - 449:12
**hypothetical** [3] - 465:5, 465:6

## I

**IC** [2] - 411:8, 468:13
**idea** [3] - 328:13, 328:14, 328:17
**identified** [8] - 333:17, 354:8, 369:12, 423:15, 438:4, 440:23, 443:4, 451:19
**identify** [4] - 333:18, 386:8, 399:1,

439:14
**Ignite** [1] - 373:22
**illness** [1] - 456:14
**imagine** [2] - 447:19, 448:3
**immediately** [2] - 311:25, 401:11
**impact** [1] - 407:20
**impacted** [1] - 367:24
**impeachment** [1] - 317:24
**implement** [1] - 358:10
**implicated** [1] - 343:14
**implies** [1] - 399:9
**import** [1] - 359:12
**important** [5] - 298:14, 335:8, 335:15, 335:16, 403:16
**improve** [2] - 313:24, 314:1
**inaccurate** [1] - 461:3
**incapacitated** [1] - 315:5
**include** [7] - 371:20, 371:25, 372:7, 436:16, 450:1, 459:20, 468:22
**included** [10] - 312:19, 312:21, 340:1, 340:5, 374:24, 388:18, 399:22, 449:21, 461:3, 461:7
**includes** [3] - 357:14, 413:9, 414:20
**including** [4] - 345:12, 366:20, 381:24, 399:4
**income** [4] - 305:20, 305:25, 306:5, 307:22
**inconsistent** [2] - 318:1, 430:24
**increase** [7] - 326:24, 345:8, 346:17, 347:13, 347:17, 356:19, 392:2
**increased** [2] - 346:13, 452:12
**increases** [1] - 460:4
**incur** [2] - 357:5, 357:20
**incurring** [1] - 356:1
**independent** [1] - 379:18
**INDEX** [1] - 478:1
**iNDEX** [1] - 480:2
**indicate** [1] - 475:10
**indicated** [4] - 372:5, 382:9, 454:9, 460:7
**indicating** [4] - 315:5, 393:24, 395:1, 401:10
**individual** [19] - 326:5, 328:6, 331:19, 340:4, 343:8, 344:12, 348:24, 351:15, 359:4, 365:6, 365:9, 365:19, 370:6, 374:4, 374:9, 374:12, 430:14, 462:24, 476:23
**individually** [3] - 419:7, 454:24, 474:17
**individuals** [20] - 299:25, 313:12, 314:1, 323:18, 329:8, 329:24, 340:1, 343:7, 347:11, 353:13, 354:9, 369:12, 370:6, 375:3, 408:19, 443:13, 468:2, 475:20, 475:25, 476:21
**industry** [4] - 329:1, 365:24, 366:1, 388:10
**influence** [5] - 389:12, 389:16, 475:12, 475:20, 475:21
**influencing** [1] - 475:14
**influential** [3] - 389:1, 389:4, 389:9
**information** [17] - 303:6, 312:16, 334:10, 386:2, 388:11, 408:6, 426:2, 429:6, 440:5, 440:16, 442:18, 446:8, 446:12, 447:1, 447:14, 461:3, 467:24
**informed** [5] - 338:9, 402:8, 402:14, 403:17, 419:5

**initial** [4] - 342:9, 429:18, 429:21, 461:8
**initiate** [1] - 391:8
**initiated** [1] - 391:8
**initiative** [1] - 365:25
**inoperable** [5] - 401:11, 401:22, 405:23, 418:1, 453:19
**inside** [3] - 325:25, 394:9, 457:11
**instance** [4] - 347:18, 389:18, 406:14, 464:18
**instances** [3] - 395:12, 395:13, 395:14
**instead** [2] - 330:8, 373:25
**instilled** [1] - 298:15
**instruction** [1] - 314:7
**instructional** [1] - 314:4
**instructions** [1] - 474:12
**insubstantial** [1] - 476:6
**insurance** [3] - 356:2, 400:8, 456:7
**insured** [1] - 348:17
**insurer** [1] - 396:15
**Integrated** [3] - 365:12, 365:13, 365:15
**intellectual** [6] - 304:24, 312:16, 312:23, 313:1, 313:4, 313:5
**intellectually** [1] - 389:14
**intending** [1] - 387:2
**intention** [1] - 391:10
**interacting** [1] - 366:1
**interaction** [1] - 330:9
**interested** [4] - 335:12, 372:5, 381:22, 413:20
**interim** [9] - 370:9, 397:18, 397:20, 402:6, 411:13, 432:8, 432:18, 462:18, 467:6
**internal** [8] - 329:22, 330:13, 345:25, 410:23, 411:11, 411:14, 423:6, 468:22
**Internal** [1] - 349:5
**internals** [1] - 326:22
**interpretation** [2] - 383:18, 384:1
**intranet** [1] - 397:3
**invest** [1] - 349:16
**investigate** [2] - 469:24, 470:6
**investigation** [2] - 456:22, 468:13
**Investor** [2] - 323:19, 325:19
**investor** [1] - 365:16
**invited** [1] - 419:21
**invoice** [4] - 301:16, 301:17, 318:8, 318:9
**invoices** [8] - 316:3, 317:9, 317:11, 317:14, 318:11, 318:16, 470:15, 470:17
**involuntary** [2] - 468:21, 469:3
**involved** [20] - 299:9, 321:3, 325:8, 330:2, 337:5, 339:22, 340:1, 343:25, 367:2, 367:18, 387:23, 390:10, 406:10, 424:6, 424:10, 449:18, 455:13, 456:6, 476:19, 476:24
**Iowa** [2] - 298:18, 298:20
**iPhone** [1] - 316:2
**IPO** [1] - 324:6
**Iraq** [1] - 363:12
**Irish** [1] - 321:3
**irrelevant** [1] - 390:15
**ISO** [1] - 373:22
**issue** [2] - 344:14, 433:8
**issued** [1] - 453:10
**issues** [5] - 334:20, 334:24, 443:6,

457:11, 457:16
**items** [1] - 357:14
**itself** [1] - 403:14

---

**J**

**Jackson** [3] - 365:10, 365:15, 366:6
**January** [38] - 344:12, 348:13, 358:13, 358:16, 358:17, 359:3, 365:3, 369:11, 390:18, 402:9, 402:13, 402:15, 403:17, 404:16, 404:19, 404:21, 404:24, 405:2, 405:13, 409:16, 409:25, 428:15, 428:16, 428:21, 428:24, 433:9, 436:22, 443:16, 443:19, 445:4, 454:12, 454:14, 454:21, 462:6, 467:9, 467:10, 467:12, 467:13
**Jeff** [39] - 324:8, 324:9, 324:20, 324:23, 325:1, 325:7, 325:8, 325:11, 325:13, 325:15, 325:22, 327:4, 327:24, 330:25, 331:23, 331:24, 333:19, 337:5, 337:6, 338:13, 339:3, 339:4, 339:8, 369:12, 369:14, 370:5, 371:14, 374:24, 375:11, 375:13, 375:17, 385:22, 400:18, 442:21, 458:1
**Jersey** [3] - 298:21, 298:22
**jet** [2] - 391:2, 391:6
**jigger** [1] - 401:1
**job** [46] - 299:9, 315:7, 315:10, 323:1, 323:2, 323:7, 332:14, 333:21, 340:18, 343:9, 349:1, 349:9, 354:15, 354:19, 363:23, 364:5, 365:20, 366:5, 366:8, 366:9, 381:25, 382:13, 383:19, 383:21, 386:17, 390:8, 395:22, 396:3, 398:7, 401:5, 408:16, 424:7, 432:21, 446:20, 451:7, 451:11, 451:13, 453:6, 462:18, 462:22, 463:2, 463:3, 464:16, 465:9, 465:10, 472:7
**jobs** [12] - 305:12, 307:23, 311:21, 331:13, 409:24, 434:23, 440:3, 454:23, 464:13, 464:15, 465:17
**Joe** [13] - 298:19, 298:23, 298:25, 304:2, 316:17, 317:5, 323:25, 324:5, 328:12, 393:4, 417:12, 419:14, 453:5
**Johnson** [7] - 325:23, 365:4, 395:3, 395:9, 452:24, 474:11, 474:25
**join** [2] - 391:6, 406:3
**joined** [4] - 303:12, 303:22, 303:25, 304:5
**joining** [2] - 363:14, 413:8
**Joseph** [1] - 319:22
**Josh** [3] - 415:2, 415:21, 416:1
**JUDGE** [1] - 294:12
**Judge** [8] - 296:11, 320:25, 369:6, 376:12, 376:22, 473:22, 476:4, 477:17
**judge** [7] - 361:16, 428:10, 429:9, 429:16, 454:8, 454:10, 473:12
**judge's** [1] - 451:16
**judgment** [2] - 394:1, 476:22
**Julie** [2] - 434:8, 472:15
**junior** [1] - 310:6
**jurors** [7] - 296:5, 296:15, 341:19, 350:3, 361:11, 361:23, 439:15
**jury** [23] - 296:1, 296:17, 304:7, 317:23, 343:1, 357:6, 362:4, 362:12, 362:15, 376:8, 378:3, 378:6, 378:7,

392:25, 404:9, 449:3, 472:11, 474:5, 474:12, 476:12, 476:14, 477:4, 477:10
**Jury** [5] - 361:10, 362:16, 377:9, 449:6, 472:10
**JURY** [2] - 294:11, 294:12
**jury's** [1] - 358:21
**justify** [1] - 451:12
**Justin** [1] - 434:6, 436:9, 451:22

## K

**Karen** [12] - 325:23, 326:2, 326:7, 326:13, 326:18, 331:23, 369:16, 370:10, 395:4, 395:9, 426:17, 426:20
**Kathi** [3] - 429:3, 439:23, 439:24
**keep** [31] - 314:4, 338:14, 352:9, 357:8, 360:23, 370:24, 394:11, 410:11, 439:19, 451:6, 451:11, 468:16, 477:3
**keeps** [2] - 439:21, 469:2
**Kelly** [2] - 434:9, 472:15
**kept** [4] - 311:2, 327:10, 327:11, 467:10
**key** [1] - 446:8
**kind** [11] - 296:9, 299:4, 304:10, 337:18, 386:2, 390:15, 413:20, 425:1, 453:6, 462:2, 475:2
**kinds** [1] - 429:10
**KING** [1] - 295:6
**King** [1] - 415:2
**knowing** [2] - 298:6, 401:14
**knowledge** [12] - 329:19, 356:5, 359:24, 366:4, 372:4, 372:10, 388:11, 428:23, 438:20, 438:22, 447:22, 447:24
**knowledgeable** [1] - 351:3
**known** [1] - 298:6
**knows** [3] - 300:7, 377:5, 402:23

## L

**Labry** [4] - 388:3, 388:4, 388:6, 388:9
**laptop** [1] - 309:1
**large** [12] - 315:5, 329:8, 335:19, 342:10, 366:12, 367:8, 379:11, 388:11, 389:22, 435:4, 449:20
**larger** [2] - 340:15, 468:16
**largest** [1] - 449:25
**Larsen** [3] - 411:6, 411:7, 411:9
**larynx** [1] - 314:22
**last** [14] - 296:9, 341:3, 358:9, 379:13, 379:15, 400:24, 413:20, 414:23, 423:3, 423:4, 427:2, 459:20, 472:22
**lasted** [1] - 301:21
**lasts** [1] - 316:14
**late** [2] - 313:8, 339:21
**law** [2] - 387:16, 387:21
**LAW** [1] - 294:14
**lawyer** [2] - 431:16, 446:24
**lawyers** [7] - 446:13, 446:18, 446:21, 447:6, 447:13, 472:1, 477:5
**layer** [2] - 434:3
**layers** [3] - 340:7, 340:9, 400:12
**laying** [1] - 430:11
**layoff** [1] - 428:14
**layoffs** [2] - 428:10, 440:7

**lead** [1] - 447:8
**leader** [4] - 340:11, 397:21, 411:13, 413:7
**leaders** [6] - 380:6, 380:9, 386:3, 389:18, 389:21, 412:20
**leadership** [1] - 434:24
**leading** [1] - 420:20
**learn** [3] - 317:12, 317:17, 328:11
**learned** [1] - 403:4
**learning** [1] - 301:1
**least** [6] - 347:13, 366:13, 427:19, 428:25, 473:15, 475:16
**leave** [45] - 330:4, 330:7, 336:1, 349:3, 359:17, 359:18, 362:10, 371:2, 371:5, 371:6, 371:24, 382:9, 386:12, 387:15, 394:5, 395:21, 399:9, 399:10, 399:12, 399:13, 399:15, 399:18, 400:7, 400:11, 400:20, 401:16, 411:12, 411:14, 423:25, 455:16, 455:22, 456:1, 458:3, 458:4, 462:2, 468:24, 469:6, 469:16, 472:2, 475:12, 475:14
**Leave** [5] - 371:10, 386:22, 469:18, 469:20, 469:23
**leaves** [6] - 361:13, 376:2, 399:6, 400:13, 456:2, 471:23
**leaving** [4] - 348:15, 365:5, 388:5, 414:1
**Lebenthal** [2] - 304:3, 316:18
**led** [1] - 454:5
**left** [15] - 296:7, 296:19, 305:1, 305:8, 307:5, 307:7, 307:14, 342:25, 345:3, 353:18, 359:5, 375:7, 375:18, 376:5, 468:23
**legal** [3] - 347:10, 366:23, 440:17
**LEHR** [1] - 295:1
**length** [1] - 453:23
**lengthy** [1] - 472:19
**Lenna** [1] - 449:25
**less** [13] - 332:5, 344:23, 345:1, 346:12, 346:13, 350:11, 350:15, 356:12, 357:16, 357:17, 410:4, 414:5, 451:11
**lesser** [2] - 350:22, 351:21
**lesson** [1] - 313:9
**letter** [14] - 319:3, 399:4, 399:17, 399:19, 399:21, 399:25, 410:13, 423:16, 458:23, 458:24, 459:10, 470:21, 470:22, 475:11
**letting** [1] - 351:20
**level** [11] - 327:22, 346:5, 346:9, 346:11, 346:25, 347:2, 381:2, 382:1, 389:11, 409:24, 436:12
**liability** [1] - 477:10
**liable** [1] - 474:17
**lied** [1] - 470:16
**lies** [1] - 447:15
**life** [4] - 313:25, 398:19, 423:7, 476:23
**light** [2] - 425:12, 475:24
**limine** [1] - 303:4
**limit** [1] - 380:17
**limited** [2] - 330:9, 426:3
**line** [9] - 318:5, 318:6, 353:14, 356:4, 357:14, 423:3, 423:4, 447:12, 475:3
**Line** [1] - 461:17
**LinkedIn** [1] - 300:7
**list** [70] - 296:10, 303:2, 303:3, 343:4,

343:6, 343:7, 344:9, 344:10, 344:11, 344:15, 353:14, 361:20, 368:12, 368:13, 369:11, 369:19, 369:25, 369:22, 369:23, 369:25, 373:7, 375:17, 405:2, 407:22, 408:19, 408:21, 408:24, 412:11, 412:12, 412:16, 412:21, 424:23, 424:24, 428:20, 436:18, 437:2, 437:7, 437:25, 438:4, 438:12, 438:14, 439:6, 439:13, 439:21, 440:20, 441:1, 441:9, 441:11, 442:17, 442:23, 454:8, 454:9, 454:13, 454:15, 454:16, 454:19, 455:18, 457:24, 458:2, 458:3, 458:5, 458:6, 458:7, 458:8, 460:14, 461:8, 461:22, 468:3
**listed** [3] - 387:21, 438:17, 442:12
**listen** [2] - 300:24, 341:17
**listening** [1] - 328:24
**lists** [3] - 344:12, 344:14, 412:15, 428:9, 428:23, 429:2, 436:21, 438:24, 440:4, 440:13, 440:16, 441:9
**litigation** [6] - 391:20, 391:22, 476:11, 476:13, 476:21, 477:2
**live** [5] - 315:1, 377:3, 409:1, 409:2, 472:15
**living** [2] - 310:16, 312:3
**LLC** [4] - 299:13, 299:19, 299:24, 316:6
**LLP** [1] - 295:1
**load** [1] - 334:23
**local** [1] - 387:15
**locations** [1] - 388:7
**lodged** [1] - 394:25
**long-term** [9] - 348:16, 354:13, 356:11, 373:24, 374:3, 374:9, 374:13, 396:11, 396:15
**look** [38] - 322:18, 338:22, 340:24, 340:25, 341:3, 342:11, 352:19, 356:4, 364:17, 373:2, 381:15, 384:8, 406:12, 408:3, 408:4, 408:9, 411:4, 411:15, 420:25, 424:12, 426:13, 431:13, 431:24, 432:3, 436:24, 439:14, 441:14, 441:19, 446:7, 462:7, 462:11, 465:8, 465:14, 466:19, 474:1, 474:12, 477:16
**looked** [10] - 321:2, 340:13, 348:23, 353:20, 416:2, 433:14, 433:15, 454:8, 458:10, 462:1
**looking** [15] - 317:22, 349:8, 356:6, 364:25, 368:25, 370:6, 374:22, 390:19, 390:21, 392:9, 401:4, 440:6, 454:2, 462:1, 462:3
**looks** [7] - 355:17, 355:18, 369:11, 383:22, 402:12, 473:6, 473:25
**Lorraine** [1] - 434:9
**lose** [3] - 408:15, 421:10, 423:25
**loss** [3] - 325:13, 363:10, 366:19
**lost** [2] - 314:8, 447:24
**Lou** [1] - 309:17
**LOUIS** [1] - 295:9
**love** [2] - 422:19, 423:8
**loving** [1] - 453:4
**low** [1] - 409:23
**lower** [3] - 382:16, 457:18, 465:19
**lucky** [1] - 451:15
**lunch** [4] - 362:1, 362:19, 376:3, 376:8
**Luncheon** [1] - 377:10
**luxury** [1] - 474:2

lymph [1] - 453:18

# M

M-a-r-i-n-o [1] - 378:17
machinations [2] - 401:23, 402:2
machine [1] - 322:6
Madison [1] - 295:8
magical [1] - 390:9
magnitude [1] - 327:18
mail [39] - 295:22, 384:11, 395:15, 395:19, 397:2, 398:12, 400:17, 401:9, 402:11, 403:4, 409:13, 413:16, 413:21, 417:25, 421:4, 422:13, 422:22, 424:13, 424:17, 424:22, 425:12, 426:16, 427:8, 438:18, 444:12, 444:13, 444:17, 444:20, 444:22, 454:1, 460:18, 460:19, 460:22, 460:23, 461:2, 461:8, 464:21, 467:8
mails [18] - 315:14, 315:24, 330:11, 384:9, 395:2, 395:8, 395:10, 395:12, 398:3, 402:16, 403:22, 424:10, 445:13, 446:11, 446:14, 446:18, 446:22, 456:13
maintain [1] - 476:3
maintained [2] - 440:9, 440:13
major [1] - 345:11
man [1] - 310:9
manage [2] - 329:4, 432:8
managed [2] - 329:3, 339:10
Management [6] - 454:12, 464:10, 467:13, 468:1, 468:4, 469:20
management [39] - 324:16, 339:8, 339:9, 339:10, 340:14, 342:10, 342:11, 348:22, 349:13, 349:15, 352:18, 352:20, 352:21, 353:1, 353:4, 354:10, 356:12, 363:21, 379:24, 380:2, 380:24, 381:5, 389:1, 389:5, 389:10, 401:15, 408:18, 420:2, 420:6, 421:16, 429:7, 434:4, 434:25, 435:11, 440:6, 445:16, 457:11, 469:16
manager [13] - 325:1, 335:21, 340:18, 340:24, 342:12, 353:20, 354:18, 371:14, 385:19, 410:7, 412:11, 432:18
managers [16] - 340:10, 340:12, 340:17, 341:6, 342:5, 343:5, 353:6, 353:9, 353:11, 353:12, 353:18, 370:3, 408:7, 408:12, 410:11, 454:18
managing [2] - 320:21, 340:12
mandatory [1] - 420:6
March [3] - 348:2, 406:5, 418:13
MARINO [1] - 378:20
Marino [21] - 364:17, 377:4, 377:5, 378:10, 378:11, 378:16, 378:25, 392:12, 417:5, 426:16, 431:24, 439:19, 441:8, 441:12, 443:4, 449:17, 457:9, 470:13, 474:10, 475:11
Marino's [2] - 447:18, 471:21
MARINO......................... [1] - 479:1
mark [2] - 376:7, 399:23
marked [4] - 432:4, 455:8, 481:5
market [3] - 313:11, 365:19, 451:12
marketing [1] - 349:7
Maryland [1] - 295:3
mass [1] - 313:11
massive [1] - 324:20

match [4] - 348:25, 407:24, 419:24, 420:16
matched [1] - 333:21
matches [1] - 332:2
material [4] - 314:4, 314:5, 472:8
materials [1] - 313:18
math [2] - 368:1, 469:6
matrix [1] - 366:25
matter [5] - 310:21, 390:8, 399:11, 477:2, 477:20
MBA [1] - 314:3
MC [10] - 343:22, 353:13, 366:23, 373:15, 375:21, 421:16, 444:25, 445:9, 445:11, 467:18
McKinney [1] - 294:16
mean [32] - 298:12, 300:2, 313:9, 314:22, 326:4, 329:21, 347:1, 350:7, 356:10, 382:3, 384:8, 385:21, 387:22, 389:16, 399:12, 399:13, 400:24, 409:17, 412:7, 412:16, 413:6, 413:24, 421:24, 427:11, 459:22, 460:12, 460:19, 461:25, 462:17, 462:21, 466:20, 467:21
means [14] - 348:8, 381:19, 396:19, 396:21, 413:25, 414:1, 414:3, 414:5, 422:20, 423:7, 443:7, 462:22, 463:21, 469:3
meant [3] - 389:25, 445:11, 463:15
meantime [2] - 296:16, 296:25
Medical [2] - 371:10, 386:22
medical [5] - 314:18, 315:4, 404:13, 404:16, 443:6
medically [1] - 396:2
meet [7] - 309:19, 309:20, 344:15, 408:19, 474:14, 474:15, 474:19
meeting [10] - 315:17, 380:4, 420:2, 420:4, 420:6, 425:18, 425:22, 445:9, 467:14, 467:19
meetings [4] - 381:6, 396:19, 397:24, 461:14
member [7] - 353:13, 366:23, 373:15, 379:24, 388:3, 468:1, 468:4
members [13] - 317:23, 343:22, 375:21, 380:25, 408:19, 429:7, 440:6, 444:25, 445:9, 445:11, 464:10, 464:22, 467:18
mention [1] - 362:8
mentioned [21] - 324:19, 325:17, 328:4, 330:9, 335:19, 347:23, 363:13, 370:13, 387:24, 389:19, 394:12, 407:4, 417:16, 419:10, 424:5, 449:17, 456:1, 458:19, 462:4, 464:18, 470:3
merchant [7] - 321:12, 323:9, 323:11, 323:17, 324:21, 328:9, 363:19
merchants [3] - 321:18, 335:1, 335:3
merely [1] - 383:22
merger [1] - 320:19
message [28] - 383:22, 392:5, 392:18, 392:20, 392:21, 392:24, 393:2, 393:4, 393:5, 393:12, 393:17, 393:19, 393:21, 395:20, 401:10, 401:19, 401:21, 405:20, 422:23, 422:25, 423:4, 423:21, 443:5, 444:9, 452:15, 452:16, 460:6
messaged [1] - 406:2
messages [7] - 315:14, 384:8, 393:23, 395:1, 422:1, 452:18, 456:13

messaging [2] - 315:22, 399:14
messed [1] - 401:25
met [2] - 412:12, 412:13
methods [1] - 476:2
MetLife [1] - 396:15
metrics [1] - 459:15
MICHAEL [1] - 295:5
mid [1] - 379:13
middle [5] - 297:22, 413:21, 443:6, 460:13, 460:15
might [8] - 313:20, 380:6, 380:7, 416:9, 418:1, 422:5, 464:18, 474:4
Mike [2] - 320:23, 373:15
military [2] - 363:12, 363:25
million [6] - 345:1, 370:15, 429:23, 429:24, 430:5, 437:5
millions [1] - 332:4
mine [3] - 326:8, 343:12, 369:23
minutes [5] - 361:4, 361:25, 381:6, 446:6, 447:19
mischaracterizing [1] - 358:20
mismanagement [1] - 329:14
miss [2] - 420:10, 421:16
missing [1] - 400:20
mobility [1] - 468:22
modified [1] - 467:18
Moffitt [1] - 453:18
Monday [7] - 380:5, 419:24, 420:4, 420:10, 445:6, 448:10, 474:4
Mondays [1] - 420:1
money [30] - 304:12, 304:14, 304:15, 304:18, 306:8, 310:22, 311:2, 311:4, 315:8, 348:19, 349:16, 350:16, 351:19, 352:16, 355:25, 356:4, 356:18, 360:21, 407:12, 428:2, 428:3, 430:10, 430:12, 430:15, 430:20, 430:22, 432:15, 451:11, 452:4, 456:21
month [7] - 304:16, 304:17, 305:17, 310:20, 348:5, 367:8, 367:10
months [6] - 308:10, 314:17, 316:4, 316:14, 317:1, 470:13
morale [1] - 459:21
morning [11] - 296:5, 296:11, 296:24, 297:5, 297:19, 320:6, 320:7, 361:3, 380:5, 452:21, 472:6
most [7] - 298:14, 305:22, 310:22, 368:3, 368:4, 388:9
mostly [3] - 308:5, 313:7, 425:2
mother [1] - 308:5
motion [1] - 303:4
mouth [3] - 355:21, 360:2, 360:4
move [9] - 339:20, 393:9, 394:16, 396:1, 397:8, 401:23, 403:14, 409:9, 413:22
moved [8] - 298:17, 298:21, 299:5, 324:8, 345:4, 436:2, 436:4, 462:23
movement [1] - 468:23
moving [4] - 377:1, 400:19, 448:1, 448:7
Mr. Jackson [4] - 365:11, 365:21, 366:9, 366:10
multi [1] - 334:25
multi-faceted [1] - 334:25
multiple [7] - 322:10, 326:21, 328:5, 328:7, 340:8, 341:1, 344:23
mumbling [1] - 314:10

*(must - Oracle)*

**must** [5] - 382:25, 395:21, 396:20, 432:4

## N

**name** [23] - 297:10, 299:20, 301:17, 301:18, 306:24, 309:17, 319:21, 327:12, 365:10, 369:19, 370:1, 378:15, 428:20, 437:14, 439:20, 441:21, 452:2, 453:9, 453:16, 454:9, 454:10, 476:21
**named** [3] - 324:8, 388:3, 475:4
**names** [9] - 343:6, 368:11, 368:12, 412:16, 412:18, 412:19, 424:23, 437:7, 441:15
**national** [1] - 471:12
**nature** [6] - 313:3, 313:5, 334:4, 346:10, 356:3, 363:9
**near** [1] - 349:4
**Neborak** [1] - 373:15
**necessarily** [7] - 300:11, 303:9, 313:20, 318:10, 389:16, 412:16, 462:19
**necessary** [5] - 305:24, 312:25, 350:11, 351:5, 354:9
**need** [31] - 304:21, 321:22, 326:15, 332:1, 332:2, 332:6, 332:7, 333:19, 340:12, 353:1, 353:4, 353:6, 354:17, 354:19, 362:4, 364:17, 364:20, 392:23, 393:7, 393:21, 394:3, 409:2, 413:22, 427:3, 453:4, 453:9, 453:17, 453:24, 462:6, 473:13
**needed** [17] - 300:22, 309:10, 315:13, 328:6, 334:24, 340:15, 342:11, 349:4, 352:21, 353:8, 365:19, 397:20, 401:11, 402:3, 411:25, 454:3, 474:16
**needs** [7] - 321:21, 326:7, 340:17, 352:23, 397:21, 427:13, 473:10
**needs-based** [1] - 321:21
**nest** [1] - 307:18
**net** [5] - 329:25, 330:1, 345:10, 408:9, 408:10
**network** [2] - 323:15, 345:12
**never** [15] - 308:24, 308:25, 310:8, 317:8, 389:12, 390:13, 390:14, 390:16, 390:22, 390:23, 454:25, 455:16, 462:14, 466:1
**new** [18] - 303:6, 323:7, 334:3, 334:21, 335:1, 335:2, 359:4, 367:5, 367:10, 367:12, 367:19, 412:7, 413:5, 434:22, 445:7, 452:8, 458:14, 462:13
**NEW** [1] - 294:1
**New** [14] - 294:5, 294:21, 295:9, 298:18, 298:20, 298:21, 298:22, 299:7, 383:19, 390:5, 391:23, 419:16
**news** [1] - 421:8
**Next** [1] - 467:21
**next** [37] - 296:25, 297:3, 302:3, 302:20, 319:15, 336:5, 352:5, 353:22, 358:8, 377:2, 377:11, 378:9, 378:10, 393:15, 396:24, 396:25, 397:11, 397:16, 398:17, 398:22, 403:3, 404:11, 405:8, 407:18, 422:16, 434:3, 444:8, 448:5, 448:11, 448:13, 448:16, 453:23, 464:3, 466:4, 466:23, 466:25, 472:21
**nice** [2] - 309:19, 309:20
**nicely** [2] - 448:2, 448:7

**night** [4] - 296:10, 421:5, 445:2
**nine** [3] - 458:3, 458:4, 460:14
**nobody** [3] - 402:23, 405:3, 405:12
**node** [1] - 453:18
**nonresponsive** [2] - 393:10, 394:16
**normal** [2] - 409:23, 427:7
**normally** [2] - 348:2, 435:16
**North** [1] - 369:24
**notated** [1] - 303:1
**notating** [1] - 385:13
**note** [4] - 372:6, 383:3, 425:8, 428:15
**noted** [2] - 296:2, 378:4
**notes** [2] - 376:11, 456:7
**nothing** [5] - 311:7, 317:3, 331:5, 331:25, 351:1
**notice** [2] - 381:20, 382:2
**notification** [1] - 442:14
**notified** [2] - 404:21, 445:1
**notifies** [1] - 460:15
**November** [33] - 347:24, 348:1, 383:11, 384:13, 387:13, 390:25, 392:15, 392:17, 392:20, 392:21, 392:24, 393:2, 394:12, 397:25, 400:17, 401:8, 401:20, 405:18, 417:22, 418:22, 422:14, 425:3, 444:4, 444:9, 454:4, 454:10, 454:14, 454:16, 457:25, 461:13, 462:16, 463:7, 467:3
**number** [25] - 332:13, 338:14, 338:20, 338:21, 338:23, 338:24, 349:14, 353:6, 367:7, 370:15, 373:6, 383:2, 389:13, 392:7, 410:2, 422:5, 422:11, 427:2, 430:14, 436:25, 438:12, 441:14, 441:19, 444:14, 449:18
**numbers** [3] - 379:21, 429:12, 430:3
**nurses** [1] - 315:15

## O

**o'clock** [3] - 377:7, 472:7, 477:18
**OA's** [1] - 386:16
**OAs** [1] - 413:22
**object** [3] - 358:15, 384:14, 463:25
**objection** [18] - 301:13, 302:22, 302:24, 303:1, 303:2, 319:7, 358:19, 359:6, 359:9, 412:8, 420:24, 425:23, 426:1, 430:23, 431:16, 438:25, 439:3, 458:20
**objections** [1] - 397:14
**objective** [2] - 341:10, 348:21
**obligation** [2] - 307:9, 390:22
**observed** [1] - 298:10
**obviously** [6] - 322:1, 352:19, 446:8, 447:21, 447:25, 471:12
**occurred** [3] - 330:4, 339:21, 411:22
**occurring** [1] - 395:10
**October** [1] - 397:25
**odd** [2] - 307:23, 311:21
**OF** [4] - 294:1, 294:11, 294:14, 480:2
**offer** [13] - 410:13, 413:10, 413:14, 439:11, 445:24, 455:3, 458:23, 458:24, 463:20, 463:24, 470:21, 470:22, 470:25
**offered** [5] - 350:21, 417:16, 443:9, 451:3, 451:6
**offering** [5] - 351:21, 421:1, 425:25, 426:1, 426:3

**offers** [1] - 381:3
**OFFICE** [1] - 294:14
**office** [9] - 317:12, 371:6, 385:5, 385:11, 385:22, 410:14, 422:18, 429:2, 435:6
**officer** [8] - 345:22, 379:9, 383:19, 383:21, 384:4, 384:6, 394:8, 411:5
**officers** [1] - 380:15
**Official** [1] - 295:21
**officially** [1] - 400:19
**often** [1] - 406:18
**old** [2] - 298:4, 451:7
**once** [7] - 346:9, 347:8, 351:4, 403:17, 446:19, 447:4, 456:15
**one** [107] - 298:13, 300:13, 314:6, 315:15, 318:11, 320:23, 322:16, 323:14, 330:18, 332:6, 334:7, 334:24, 339:6, 339:9, 340:11, 340:18, 340:21, 340:22, 341:3, 341:15, 342:12, 343:20, 343:21, 344:2, 344:25, 345:8, 348:5, 348:9, 351:16, 351:17, 351:25, 355:25, 357:14, 359:7, 360:14, 360:15, 362:3, 362:6, 365:21, 368:21, 373:6, 373:21, 375:2, 376:11, 381:5, 383:24, 385:13, 385:25, 387:18, 388:17, 390:10, 392:19, 395:16, 401:8, 403:12, 403:16, 403:19, 404:12, 408:8, 409:15, 410:10, 412:21, 413:16, 414:23, 415:13, 416:11, 416:15, 423:5, 423:9, 424:10, 429:1, 429:25, 431:2, 431:16, 431:17, 433:5, 436:9, 436:21, 437:1, 438:1, 438:2, 438:4, 439:8, 440:3, 440:14, 441:8, 444:1, 449:20, 452:19, 453:1, 454:4, 454:5, 454:16, 456:2, 458:18, 459:21, 459:22, 463:19, 466:6, 467:8, 468:9, 469:16, 473:15
**one's** [3] - 389:12, 397:13, 438:8
**one-day** [1] - 388:17
**one-fifth** [1] - 344:25
**one-time** [1] - 429:25
**one-twelfth** [1] - 348:5
**one-twelfths** [1] - 348:9
**ones** [4] - 296:13, 344:1, 361:21, 422:15
**online** [2] - 435:21, 435:23
**OOO** [1] - 385:5
**Open** [1] - 378:3
**open** [8] - 296:1, 409:17, 409:19, 409:25, 423:5, 434:8, 437:14, 449:1
**operating** [4] - 346:20, 349:13, 357:12, 357:13
**operation** [5] - 335:22, 351:4, 356:20, 423:5, 464:20
**operational** [2] - 301:20, 334:19
**operations** [5] - 321:16, 322:2, 332:4, 411:5, 447:24
**Operations** [1] - 366:22
**opine** [1] - 330:13
**opinion** [3] - 421:9, 431:21, 455:13
**opportunities** [2] - 326:24, 401:5
**opportunity** [6] - 446:13, 446:21, 447:7, 447:13, 451:6, 474:25
**option** [2] - 382:11, 421:10
**options** [6] - 453:5, 453:6, 453:8, 453:13, 453:15
**Oracle** [1] - 365:22

**order** [5] - 327:18, 374:3, 374:13, 401:12, 405:23
**Ording** [15] - 329:22, 330:8, 349:3, 382:13, 397:17, 400:23, 402:5, 411:12, 432:7, 432:15, 436:5, 462:19, 463:3, 463:5, 467:6
**organization** [50] - 323:13, 324:20, 325:25, 326:9, 326:20, 328:3, 328:8, 328:14, 330:16, 330:18, 333:1, 334:3, 334:13, 335:14, 335:20, 338:11, 338:22, 340:16, 341:22, 342:10, 343:5, 343:11, 344:25, 345:4, 348:22, 349:4, 349:8, 349:9, 350:18, 351:16, 356:11, 357:17, 359:2, 366:13, 366:25, 367:14, 367:25, 368:7, 368:8, 368:13, 371:15, 374:14, 375:18, 375:20, 375:21, 388:5, 389:9, 457:12, 465:22
**organizational** [4] - 432:25, 433:11, 451:20, 452:2
**organizations** [18] - 334:2, 341:16, 342:12, 343:13, 343:17, 345:5, 346:5, 349:10, 351:14, 354:9, 354:16, 354:17, 366:21, 379:11, 411:3, 435:4, 435:9, 468:6
**orientation** [2] - 334:3, 434:23
**origin** [1] - 471:12
**origination** [1] - 454:16
**outside** [1] - 462:20
**overall** [8] - 325:17, 334:5, 343:15, 344:22, 344:23, 345:10, 355:18, 459:16
**overhead** [5] - 348:23, 349:13, 349:15, 352:20, 356:12
**overlap** [2] - 448:5, 448:9
**overrated** [1] - 415:10, 416:13, 416:18
**overruled** [3] - 359:9, 397:10, 420:24
**oversight** [2] - 335:21, 335:23
**own** [4] - 316:8, 399:15, 468:12, 468:24
**owned** [1] - 316:8
**owner** [1] - 316:6

**P**

**P&L** [8] - 325:12, 325:17, 345:23, 346:12, 346:13, 348:4, 354:14, 357:12
**P&Ls** [1] - 332:3
**P.C** [2] - 294:14, 294:18
**p.m** [8] - 377:9, 377:10, 378:4, 378:7, 448:15, 449:1, 449:6, 472:10
**Pacific** [1] - 335:17
**package** [8] - 399:22, 408:4, 408:5, 414:19, 417:17, 420:3, 423:16
**packages** [1] - 308:23
**PAGE** [2] - 478:4, 480:4
**page** [19] - 317:22, 318:5, 318:6, 336:5, 377:11, 381:14, 381:15, 382:18, 386:16, 386:20, 399:23, 426:16, 432:4, 436:24, 444:19, 448:16, 470:22
**paid** [27] - 304:18, 315:8, 321:16, 347:24, 348:1, 348:2, 364:14, 368:6, 384:15, 396:12, 396:15, 400:4, 405:17, 405:24, 406:1, 417:21, 418:8, 418:11, 418:12, 418:13, 418:15, 428:3, 428:6, 430:17, 457:20, 460:2, 477:5
**pain** [1] - 425:9

**paperwork** [6] - 371:8, 399:5, 399:6, 399:18, 426:12, 456:6
**pardon** [1] - 342:20
**part** [36] - 300:3, 311:5, 315:5, 317:12, 321:5, 337:12, 337:21, 337:25, 338:1, 343:15, 346:9, 347:4, 347:5, 349:12, 350:25, 351:23, 354:1, 354:4, 354:6, 358:10, 364:15, 365:25, 369:12, 375:4, 383:3, 387:11, 389:25, 405:24, 417:17, 426:10, 431:13, 434:16, 448:3, 452:5, 472:3, 473:7
**part-time** [1] - 452:5
**participate** [1] - 431:11
**participated** [1] - 425:19
**participation** [1] - 388:16
**particular** [8] - 305:13, 361:4, 376:18, 385:14, 395:12, 395:13, 395:14, 400:13
**parties** [4] - 296:4, 376:9, 447:1, 471:25
**partner** [3] - 326:2, 326:4, 326:5
**partnered** [1] - 469:22
**partnerships** [1] - 310:6
**party** [3] - 317:24, 375:15, 422:18
**passing** [1] - 388:10
**past** [1] - 334:21
**Pat** [2] - 433:5, 433:14
**pat** [1] - 411:9
**patient** [1] - 447:10
**Patricia** [1] - 410:24
**Patty** [1] - 434:8
**pause** [4] - 372:15, 449:4, 457:2, 466:10
**pay** [30] - 330:24, 331:13, 346:17, 346:23, 347:4, 347:14, 355:10, 355:16, 355:17, 356:1, 360:25, 364:15, 380:25, 386:17, 400:2, 406:1, 414:2, 414:9, 414:11, 418:3, 427:1, 427:7, 429:10, 432:12, 460:3, 463:24, 465:10, 466:7
**paying** [3] - 330:16, 373:25, 451:12
**Payment** [7] - 363:13, 363:14, 363:15, 363:16, 363:17, 363:22, 364:5
**payment** [5] - 304:24, 414:13, 429:18, 429:25, 459:19
**Paymentech** [4] - 332:11, 332:20, 333:23, 334:2
**Paymentech's** [1] - 331:18
**payments** [10] - 312:19, 345:16, 345:20, 346:4, 346:6, 346:8, 355:18, 364:6, 364:9
**payout** [1] - 429:21
**payroll** [4] - 405:24, 406:1, 427:7, 460:3
**PC** [1] - 422:19
**People** [1] - 365:22
**people** [86] - 300:12, 315:7, 321:15, 324:20, 326:23, 328:5, 328:8, 329:17, 332:7, 335:17, 339:9, 340:11, 340:12, 340:14, 342:4, 342:18, 342:23, 342:24, 342:25, 343:4, 343:6, 343:7, 344:9, 344:23, 346:18, 347:6, 348:23, 352:23, 352:24, 355:9, 355:16, 357:17, 362:21, 362:22, 366:20, 370:15, 373:20, 374:15, 380:25, 388:7, 388:19, 389:19, 406:16, 406:23, 407:19, 414:5, 414:22, 417:16, 418:11, 424:23, 425:1, 425:15, 425:18, 426:20, 428:3, 429:2, 429:22,

431:11, 431:12, 434:11, 435:22, 436:7, 437:15, 440:4, 440:5, 440:6, 442:3, 442:10, 444:14, 450:1, 451:2, 456:10, 464:14, 465:13, 465:17, 467:24, 468:6, 468:23, 469:5, 469:8, 473:12, 473:23, 476:12
**people's** [2] - 427:3, 441:15
**per** [3] - 339:17, 389:6, 459:16
**percent** [52] - 306:3, 310:3, 316:8, 342:9, 344:16, 349:14, 352:9, 352:10, 352:11, 352:17, 354:5, 368:2, 370:3, 371:21, 372:1, 372:8, 374:25, 375:1, 375:2, 408:17, 408:21, 412:20, 417:21, 418:8, 418:15, 418:18, 418:19, 418:20, 427:10, 427:14, 427:18, 427:20, 427:23, 428:6, 429:14, 443:12, 444:24, 454:13, 458:10, 458:11, 459:7, 460:1, 464:12, 467:14, 468:25, 469:12
**percentage** [7] - 367:22, 367:24, 414:13, 414:16, 417:17, 417:20, 469:4
**perform** [5] - 327:11, 383:1, 383:5, 384:12, 408:22
**performance** [12] - 327:1, 327:4, 327:7, 337:17, 340:24, 341:3, 343:9, 353:19, 380:7, 427:13, 459:12, 459:13
**performed** [2] - 352:23, 366:5
**performing** [2] - 334:13, 345:2
**perhaps** [3] - 296:24, 351:22, 401:6
**period** [8] - 315:6, 318:7, 366:14, 374:13, 384:16, 406:1, 418:16, 471:2
**periodically** [3] - 350:1, 407:1, 407:2
**periods** [1] - 321:11
**permission** [4] - 418:3, 427:3, 427:5, 428:5
**person** [14] - 323:13, 332:3, 332:11, 359:10, 359:11, 359:23, 383:24, 391:21, 402:4, 407:13, 413:8, 429:1, 441:9, 468:1
**person's** [2] - 347:14, 427:10
**personal** [3] - 359:24, 383:6, 422:15
**personally** [1] - 333:13
**perspective** [6] - 344:22, 346:2, 347:8, 354:10, 366:25, 477:6
**perspectives** [1] - 368:6
**pertinent** [1] - 380:8
**phone** [12] - 300:12, 300:23, 313:22, 315:13, 315:15, 315:20, 315:22, 315:25, 349:23, 383:22, 392:7, 409:20
**photograph** [2] - 455:3, 455:5
**pick** [1] - 340:22
**picked** [1] - 412:17
**picture** [2] - 355:18, 420:16
**piece** [1] - 323:12
**piecemeal** [2] - 447:4, 447:11
**pieces** [2] - 325:20, 366:24
**pinning** [1] - 431:12
**pipe** [1] - 404:6
**place** [6] - 314:25, 329:18, 390:7, 401:23, 402:3, 404:3
**placed** [1] - 397:17
**placeholder** [1] - 439:11
**PLAINTIFF** [1] - 480:4
**Plaintiff** [7] - 294:4, 294:14, 294:15, 294:19, 297:15, 320:2, 378:21
**plaintiff** [6] - 297:21, 420:22, 473:10, 474:12, 474:15, 475:10

**Plaintiff Exhibit** [18] - 301:15, 392:1, 398:25, 400:16, 403:13, 403:21, 409:14, 413:19, 415:8, 480:5, 480:9, 480:11, 480:13, 480:15, 480:17, 480:19, 480:21, 480:23

**plaintiff's** [2] - 475:7, 475:13

**Plaintiff's** [2] - 376:10, 413:17

**Plaintiff's Exhibit** [14] - 301:9, 381:9, 387:8, 400:14, 402:7, 402:9, 403:10, 409:11, 415:6, 452:17, 458:15, 458:17, 458:21, 481:1

**Plaintiff's Exhibits** [2] - 376:19, 480:7

**plan** [11] - 313:9, 362:18, 383:7, 401:25, 429:4, 437:5, 462:12, 462:14, 463:9, 463:20, 472:13

**plane** [2] - 419:12, 419:15

**planned** [1] - 429:13

**planning** [10] - 354:3, 359:21, 359:24, 389:25, 390:1, 390:3, 402:12, 402:15, 407:14, 467:2

**plans** [2] - 362:23, 407:11

**plastics** [1] - 409:21

**play** [3] - 419:18, 420:11, 422:18

**played** [3] - 326:25, 366:19, 419:21

**playing** [1] - 420:13

**plenty** [1] - 362:2

**PLLC** [1] - 295:6

**Plumeri** [14] - 298:23, 323:25, 328:12, 332:21, 333:2, 391:2, 391:4, 391:8, 417:12, 417:13, 419:12, 419:14, 420:14, 450:14

**Plumeri's** [3] - 328:25, 419:15, 453:21

**pocket** [1] - 428:2

**point** [22] - 315:15, 331:18, 348:14, 364:21, 366:1, 367:14, 368:9, 370:9, 374:21, 388:4, 390:5, 394:4, 396:5, 397:20, 401:17, 406:6, 432:6, 440:14, 475:19, 475:23, 476:11, 477:1

**police** [2] - 383:19, 383:21

**policies** [2] - 384:2, 394:8

**policy** [12] - 383:7, 383:8, 383:13, 383:18, 386:11, 386:14, 386:17, 386:21, 386:24, 465:21, 469:24, 470:1

**pool** [11] - 405:25, 413:23, 414:4, 414:16, 414:17, 427:8, 427:12, 427:14, 427:17, 460:4

**portion** [4] - 322:13, 414:20, 415:17

**portions** [1] - 375:20

**posed** [2] - 403:25, 404:1

**position** [25] - 320:8, 320:17, 320:18, 343:9, 347:14, 350:6, 350:9, 350:14, 358:17, 365:4, 365:11, 371:20, 379:2, 381:25, 382:9, 387:17, 397:18, 434:8, 443:9, 450:3, 462:8, 462:20, 466:19, 466:22, 467:2

**positions** [6] - 353:4, 408:8, 409:19, 410:12, 425:1, 451:4

**possible** [7] - 296:6, 300:20, 330:7, 400:25, 413:23, 449:10, 472:5

**possibly** [3] - 416:17, 448:13, 476:13

**potentially** [1] - 473:16

**power** [1] - 475:25

**practice** [1] - 465:21

**Pratt** [1] - 295:3

**precedes** [1] - 392:24

**predictions** [1] - 448:4

**preexisted** [1] - 304:24

**preexisting** [1] - 300:14

**prejudice** [1] - 476:17

**preliminary** [1] - 361:17

**prepare** [1] - 317:15

**prepared** [2] - 428:10, 442:17

**preponderance** [1] - 474:15

**present** [3] - 296:1, 296:4, 378:3

**president** [20] - 320:10, 320:12, 324:10, 324:12, 331:15, 379:3, 382:4, 382:16, 413:11, 413:12, 418:14, 432:22, 432:24, 433:22, 434:1, 439:25, 463:4, 463:8, 466:22

**presidents** [3] - 324:18, 327:21, 425:2

**pressure** [1] - 413:23

**pretty** [5] - 298:16, 315:2, 367:8, 476:11

**previous** [4] - 458:12, 458:13, 459:8, 459:9

**previously** [2] - 299:15, 323:6

**price** [4] - 322:1, 322:12, 322:13, 350:22

**primarily** [3] - 323:12, 323:16, 335:5

**primary** [2] - 308:25, 364:21

**principal** [1] - 471:25

**print** [2] - 317:11, 317:14

**private** [1] - 313:24

**problem** [3] - 334:16, 334:17, 334:19

**problems** [1] - 410:6

**procedure** [1] - 394:17

**procedures** [1] - 394:8

**Proceedings** [1] - 295:23

**proceedings** [5] - 361:14, 372:15, 449:4, 457:2, 466:10

**process** [19] - 321:19, 321:20, 322:3, 322:17, 341:8, 342:4, 342:7, 342:8, 368:11, 390:2, 390:3, 399:7, 400:12, 412:10, 441:3, 446:25, 447:11, 454:15, 458:8

**processes** [1] - 400:7

**processing** [2] - 363:19, 423:13

**processor** [1] - 334:9

**produced** [3] - 295:24, 335:4, 395:7

**product** [5] - 322:7, 322:19, 323:20, 334:20

**productive** [1] - 466:9

**products** [9] - 321:25, 322:9, 322:10, 322:18, 329:10, 334:7, 334:21, 388:8, 388:15

**proffer** [1] - 476:4

**profit** [2] - 325:12, 366:19

**profitability** [1] - 357:17

**program** [10] - 313:9, 313:10, 314:3, 332:20, 387:23, 388:1, 388:6, 388:16, 388:17, 388:18

**programs** [3] - 313:8, 332:18, 394:5

**progress** [1] - 471:24

**projected** [1] - 407:24

**projections** [1] - 407:20

**projects** [1] - 407:11

**promotions** [1] - 468:22

**promptly** [2] - 333:12, 395:19

**pronounce** [1] - 439:19

**proof** [1] - 474:14

**proofread** [1] - 461:2

**property** [5] - 304:24, 312:16, 313:1, 313:4, 313:5

**proportion** [1] - 389:13

**proposed** [1] - 474:1

**proprietary** [2] - 312:16, 312:23

**protected** [2] - 313:6, 386:17

**protecting** [1] - 450:6

**prove** [1] - 448:6

**provide** [4] - 387:2, 405:1, 408:18, 414:19

**provider** [1] - 322:15

**provides** [1] - 387:3

**providing** [1] - 335:23

**public** [1] - 345:24

**publicly** [4] - 323:14, 325:18, 328:7, 335:6

**pull** [3] - 368:18, 368:19, 415:6

**purchases** [1] - 380:17

**purely** [1] - 355:12

**purpose** [6] - 317:24, 328:11, 426:4, 440:12, 446:12

**purposes** [3] - 317:24, 345:25, 348:4

**pursuant** [1] - 404:25

**put** [30] - 314:6, 332:2, 360:2, 360:4, 360:6, 372:25, 373:1, 388:5, 402:10, 403:10, 410:11, 428:20, 428:24, 434:16, 439:7, 441:9, 454:10, 455:1, 455:18, 455:22, 455:24, 457:24, 458:2, 458:4, 459:18, 460:14, 460:22, 462:17, 474:13

**putting** [7] - 332:17, 355:21, 368:25, 401:23, 458:6, 458:7, 475:13

## Q

**qualified** [4] - 366:8, 366:9, 386:12, 386:14

**qualify** [1] - 410:20

**quarter** [4] - 348:6, 406:18, 406:23, 406:25

**quarters** [2] - 406:6, 406:9

**QUESTION** [4] - 318:7, 318:12, 318:14, 318:16

**questioning** [6] - 362:17, 397:13, 431:16, 439:1, 439:4, 446:4

**questions** [36] - 303:21, 307:2, 309:18, 319:10, 330:24, 341:18, 349:18, 350:1, 350:4, 358:1, 361:5, 364:13, 368:10, 370:8, 372:17, 372:18, 393:10, 404:3, 416:11, 416:22, 416:23, 428:1, 428:9, 428:10, 429:9, 429:17, 432:12, 436:14, 439:16, 445:16, 445:18, 450:4, 457:3, 466:12, 470:8, 471:17

**quick** [2] - 303:18, 443:2

**quickly** [1] - 296:6

**quiet** [1] - 359:9

**quit** [1] - 339:16

**quite** [2] - 311:24, 472:20

## R

**rainmaker** [1] - 300:5

**raise** [3] - 297:7, 319:18, 378:12

**raised** [1] - 298:20

(ran   restructures)

**ran** [1] - 331:18
**rank** [1] - 341:4
**rate** [9] - 331:13, 409:23, 457:14, 457:15, 457:16, 468:20, 468:21, 469:1, 476:2
**rates** [3] - 329:17, 445:19, 469:7
**RDR** [1] - 295:20
**re** [1] - 378:7
**re-entered** [1] - 378:7
**read** [10] - 317:25, 373:21, 376:6, 392:2, 395:24, 415:12, 422:8, 461:19, 472:20
**ready** [2] - 296:25, 304:2
**real** [2] - 330:20, 477:14
**realigned** [1] - 468:14
**realignment** [1] - 468:10
**realistic** [1] - 472:2
**realized** [1] - 369:1
**really** [22] - 310:3, 311:4, 314:4, 316:25, 321:20, 331:10, 334:1, 352:15, 354:21, 356:4, 356:22, 391:15, 419:18, 430:20, 431:3, 433:25, 454:19, 465:8, 468:15, 468:25, 472:18
**reason** [7] - 358:6, 364:22, 384:7, 412:6, 471:5, 471:12, 476:16
**reasonable** [1] - 363:18
**reasoned** [1] - 476:9
**reasons** [6] - 338:4, 338:6, 383:6, 392:19, 455:14, 469:11
**receive** [2] - 382:25, 418:22
**received** [53] - 301:15, 308:23, 311:7, 342:9, 343:3, 348:14, 369:22, 376:20, 392:1, 398:25, 400:16, 403:13, 403:21, 409:14, 413:19, 415:8, 419:1, 421:15, 422:7, 423:1, 423:18, 424:16, 426:5, 426:15, 432:2, 441:7, 444:16, 446:1, 452:16, 458:3, 458:9, 458:10, 458:21, 460:7, 480:5, 480:8, 480:9, 480:11, 480:13, 480:15, 480:17, 480:19, 480:21, 480:23, 481:1, 481:7, 481:9, 481:11, 481:13, 481:15, 481:17, 481:19, 481:21
**receives** [1] - 440:4
**receiving** [2] - 369:21, 461:13
**recess** [3] - 361:14, 377:10, 448:15
**recession** [1] - 449:24
**recipient** [1] - 438:18
**recognize** [3] - 301:22, 392:4, 424:23
**recognized** [2] - 322:15
**recollection** [1] - 416:9
**recommend** [1] - 427:1
**recommendation** [3] - 427:25, 436:18, 437:18
**recommended** [1] - 459:19
**reconvene** [1] - 376:23
**record** [4] - 384:25, 385:21, 385:25, 391:7
**recorded** [3] - 295:23, 385:2, 385:11
**recording** [2] - 394:9, 458:7
**records** [4] - 370:24, 440:9, 440:10, 476:3
**recovering** [1] - 397:22
**recovery** [5] - 307:12, 392:23, 393:8, 394:3, 422:17
**RECROSS** [2] - 470:11, 479:8
**RECROSS-EXAMINATION** [1] -

470:11, 479:8
**recruited** [4] - 323:2, 323:3, 323:4, 363:20
**redactions** [1] - 441:15
**redirect** [4] - 319:11, 374:6, 447:19, 457:5
**REDIRECT** [4] - 372:20, 457:7, 478:15, 479:6
**reduce** [2] - 427:22, 444:24
**reduced** [8] - 344:20, 382:3, 382:6, 436:7, 451:16, 459:11, 464:25, 465:2
**reducing** [4] - 374:17, 382:8, 427:12, 427:14
**reduction** [18] - 340:2, 343:14, 343:16, 354:4, 370:3, 371:21, 372:1, 408:21, 408:24, 429:13, 440:18, 443:12, 454:13, 459:9, 459:24, 460:1, 464:12, 467:14
**reductions** [4] - 386:18, 429:4, 440:3, 442:22
**reference** [1] - 331:18
**referenced** [1] - 376:5
**referred** [2] - 369:5, 440:20
**referring** [7] - 322:7, 352:9, 352:10, 352:11, 410:9, 416:18, 453:13
**reflect** [1] - 318:10
**reflected** [1] - 468:18
**refreshes** [1] - 416:8
**regard** [2] - 474:9, 474:11
**regarding** [5] - 329:14, 370:11, 374:16, 415:2, 461:14
**regardless** [1] - 383:2
**regular** [3] - 400:2, 405:24, 406:1
**rehash** [1] - 389:23
**reimburse** [1] - 307:6
**related** [2] - 353:21, 363:12
**relates** [22] - 325:20, 326:20, 328:8, 330:10, 330:11, 334:14, 335:22, 337:16, 337:17, 338:13, 339:14, 340:20, 341:5, 341:24, 341:25, 343:3, 343:8, 344:23, 349:12, 356:19, 370:5, 409:2
**relation** [1] - 338:21
**relationship** [4] - 297:20, 313:19, 318:18, 325:9
**relationships** [2] - 300:14, 313:17
**relatively** [1] - 367:25, 447:23
**relayed** [1] - 442:19
**releases** [1] - 396:1
**relevance** [8] - 302:12, 302:15, 302:18, 302:19, 319:8, 420:21, 447:5, 464:1
**relevancy** [1] - 384:15
**relevant** [7] - 301:6, 303:9, 303:10, 308:15, 321:11, 387:22, 447:1
**relieve** [1] - 413:23
**remain** [4] - 297:6, 378:12, 414:4, 475:1, 476:10
**remaining** [2] - 414:22, 418:15
**remains** [1] - 350:14
**remarks** [1] - 474:5
**remember** [22] - 298:6, 298:14, 316:25, 317:18, 318:20, 373:25, 374:18, 379:8, 398:1, 399:17, 422:2, 424:20, 428:11, 428:16, 429:8, 432:9, 442:20, 443:9, 443:15, 445:4, 460:23, 462:4

**remove** [1] - 326:24
**removing** [1] - 395:22
**reorganization** [3] - 434:16, 435:18, 452:8
**reorganize** [1] - 326:17
**repair** [1] - 422:16
**repeating** [1] - 356:21
**repetitious** [2] - 358:22, 409:9
**replace** [3] - 323:6, 323:8, 390:13
**replacement** [1] - 462:20
**replacements** [1] - 390:1
**replied** [1] - 461:9
**reply** [4] - 425:5, 425:12, 460:22, 460:25
**report** [10] - 325:5, 326:9, 326:18, 353:14, 411:9, 433:8, 433:9, 433:11, 436:18, 440:1
**reported** [13] - 323:14, 324:15, 324:23, 325:18, 326:10, 326:11, 328:7, 335:6, 335:20, 339:4, 342:19, 342:21, 345:24
**Reporter** [2] - 295:20, 295:21
**reporter** [1] - 459:3
**reporting** [7] - 323:18, 323:25, 325:17, 325:18, 345:7, 350:19, 384:23
**reports** [6] - 327:13, 327:24, 389:13, 424:6, 425:18, 469:25
**represent** [1] - 319:4
**representative** [1] - 350:4
**represented** [1] - 322:17
**reqs** [2] - 409:17, 409:19
**request** [1] - 420:10
**requested** [2] - 405:1, 465:24
**require** [2] - 381:1, 386:2
**required** [2] - 355:18, 395:25
**requirements** [1] - 386:22
**requisitions** [1] - 409:25
**resizing** [1] - 374:22
**resolutions** [1] - 380:14
**resolved** [1] - 321:12
**resources** [10] - 325:24, 379:9, 394:8, 404:12, 407:10, 411:1, 434:17, 435:6, 435:16, 435:19
**respect** [4] - 296:23, 389:17, 389:20, 455:13
**respective** [1] - 412:19
**responds** [1] - 395:19
**response** [1] - 395:24
**responsibilities** [14] - 323:10, 323:21, 324:21, 333:6, 333:17, 366:5, 381:25, 382:13, 387:12, 401:7, 412:3, 436:5, 463:5, 468:17
**responsibility** [9] - 325:15, 325:18, 325:22, 331:9, 342:5, 366:20, 389:21, 390:6, 390:7
**responsible** [13] - 323:16, 325:11, 325:13, 325:14, 328:2, 328:6, 335:1, 345:23, 346:7, 365:12, 386:4, 413:7
**responsive** [4] - 394:21, 395:5, 406:15, 407:16
**rest** [4] - 380:7, 414:14, 473:10, 476:23
**restored** [4] - 387:17, 396:3, 396:6, 443:8
**restructure** [3] - 355:9, 357:16, 411:25
**restructured** [1] - 411:4
**restructures** [1] - 355:1

**restructuring** [27] - 339:21, 344:19, 346:10, 346:18, 346:23, 347:8, 348:7, 354:2, 354:3, 357:10, 358:11, 369:13, 370:16, 374:23, 375:4, 404:25, 406:10, 406:12, 406:20, 406:21, 407:11, 407:21, 408:13, 410:6, 410:10, 410:20, 464:5

**restructurings** [5] - 345:15, 386:19, 406:3, 408:8, 412:11

**result** [3] - 296:21, 426:2, 426:5

**results** [5] - 329:25, 330:1, 330:12, 407:23, 407:24

**retired** [1] - 416:15

**retirement** [5] - 415:9, 415:22, 415:24, 416:12

**retirement's** [1] - 416:18

**return** [11] - 361:5, 377:2, 382:9, 387:16, 396:2, 401:25, 402:9, 421:9, 428:15, 455:24

**returning** [2] - 372:5, 402:12

**revenue** [15] - 299:23, 301:9, 302:13, 303:11, 303:14, 332:4, 334:16, 335:2, 335:3, 335:5, 335:6, 335:10, 459:16, 464:19

**review** [14] - 327:1, 327:4, 327:9, 329:22, 329:23, 330:3, 330:8, 341:3, 370:10, 370:11, 411:10, 411:18, 411:21, 433:3

**reviews** [2] - 327:7, 327:9

**revised** [1] - 296:10

**rewarded** [1] - 389:8

**Rhonda** [5] - 325:23, 395:3, 395:9, 452:22, 452:24

**rid** [2] - 354:5, 361:22

**Ridgewood** [1] - 298:22

**RIF** [9] - 340:20, 354:8, 417:17, 449:19, 449:20, 449:21, 451:3, 455:13, 455:18

**RIF'd** [1] - 417:18

**RIFed** [2] - 450:1, 451:2

**RIFs** [1] - 449:18

**rights** [3] - 387:12, 475:13, 475:15

**rise** [5] - 361:9, 377:8, 448:14, 449:5, 472:9

**road** [3] - 310:7, 314:19, 416:15

**Robert** [1] - 432:6

**Robin** [13] - 329:21, 349:3, 382:13, 397:17, 400:23, 400:25, 401:5, 402:5, 432:7, 432:15, 432:18, 433:20, 452:2

**Rodin** [2] - 426:18

**role** [13] - 325:25, 326:25, 332:2, 332:7, 332:8, 332:12, 332:15, 333:16, 337:7, 370:6, 397:19, 429:5, 437:18

**roles** [3] - 332:6, 366:18, 437:14

**rolling** [2] - 304:1, 407:3

**ropes** [1] - 299:21

**rough** [2] - 406:7, 406:8

**roughly** [4] - 304:14, 403:5, 434:12, 463:4

**row** [1] - 437:14

**rude** [3] - 362:9, 362:12, 362:22

**rules** [2] - 380:14, 380:23

**run** [7] - 300:19, 324:18, 330:8, 334:2, 411:11, 411:13, 432:15

**running** [15] - 325:20, 328:18, 331:14, 331:20, 332:4, 332:19, 337:17, 348:24,

349:3, 350:18, 402:5, 451:10, 452:13, 464:19, 464:20

**runs** [2] - 407:13, 436:9

## S

**SaaS** [1] - 365:17

**saddened** [1] - 401:13

**sadly** [1] - 419:8

**salaried** [1] - 385:4

**salaries** [1] - 465:2

**salary** [35] - 331:16, 332:2, 346:13, 348:15, 351:22, 352:11, 355:6, 355:7, 360:25, 368:6, 373:25, 382:6, 382:8, 382:16, 382:22, 383:1, 383:13, 384:16, 384:20, 396:3, 396:10, 400:2, 400:4, 410:17, 417:13, 429:23, 442:12, 443:8, 450:21, 451:16, 452:11, 457:18, 464:25, 465:19

**sales** [56] - 321:19, 321:20, 322:3, 322:16, 328:18, 328:21, 328:23, 329:2, 329:4, 329:6, 329:7, 329:9, 329:10, 332:16, 332:24, 332:25, 333:3, 333:24, 334:5, 334:6, 335:8, 335:12, 348:24, 350:6, 350:9, 350:18, 351:15, 354:18, 367:2, 367:8, 367:14, 367:18, 367:25, 368:7, 373:8, 373:10, 373:18, 373:21, 373:22, 388:12, 411:10, 411:15, 411:18, 432:8, 432:16, 433:1, 433:3, 433:17, 433:18, 434:15, 435:22, 436:7, 437:4, 445:17, 451:10

**Sales** [3] - 365:14, 370:11, 370:20

**salespeople** [7] - 329:8, 332:18, 367:5, 367:10, 367:12, 367:19, 373:18

**Santa** [1] - 422:18

**SAP** [1] - 365:23

**sat** [2] - 331:6, 331:23

**Saturday** [1] - 396:25

**SAUL** [1] - 295:1

**save** [12] - 331:3, 348:18, 352:16, 354:14, 360:21, 373:24, 374:3, 374:9, 376:17, 401:1, 407:12, 430:10

**saved** [3] - 354:6, 430:4, 430:5

**saving** [4] - 355:25, 356:4, 430:20, 452:4

**savings** [26] - 349:12, 352:15, 354:2, 354:21, 354:25, 355:5, 355:19, 355:20, 356:6, 356:8, 356:16, 356:22, 357:2, 357:3, 358:6, 370:14, 374:14, 429:10, 429:12, 429:19, 429:23, 437:6, 437:9, 437:21, 454:19, 462:3

**saw** [12] - 315:4, 315:9, 321:2, 369:25, 370:8, 371:16, 426:20, 437:25, 444:3, 450:11, 450:14, 452:21

**schedule** [2] - 410:1, 476:1

**scheduled** [1] - 421:11

**SCHOENECK** [1] - 295:6

**school** [1] - 364:1

**scope** [1] - 374:5

**Scott** [1] - 426:18

**screen** [7] - 308:11, 368:25, 372:25, 373:1, 392:20, 415:13, 426:8

**scroll** [1] - 416:7

**se** [2] - 339:17, 389:6

**search** [1] - 390:10

**seat** [3] - 297:10, 319:20, 378:15

**seated** [1] - 449:7

**second** [24] - 320:23, 359:7, 362:6, 368:21, 376:11, 386:20, 387:14, 403:12, 405:11, 415:13, 418:19, 421:8, 430:6, 431:2, 437:14, 437:25, 456:25, 458:18, 460:8, 460:9, 460:16, 466:6, 470:22, 477:7

**secrets** [1] - 313:3

**section** [3] - 373:3, 381:16, 382:19

**secure** [1] - 459:24

**security** [1] - 453:24

**see** [55] - 302:11, 303:2, 303:9, 317:25, 318:3, 322:19, 352:20, 355:19, 356:7, 362:20, 362:21, 373:4, 377:6, 382:22, 391:2, 391:5, 391:10, 391:21, 394:12, 400:25, 403:22, 407:24, 415:18, 415:25, 421:2, 421:5, 423:1, 423:13, 433:17, 437:2, 437:19, 437:23, 438:8, 438:10, 439:20, 441:11, 441:14, 441:23, 444:12, 444:14, 444:17, 445:19, 448:8, 449:8, 452:19, 453:11, 459:5, 461:20, 462:9, 470:23, 471:6, 472:4, 472:6, 477:18

**seem** [2] - 308:14, 335:8

**sees** [1] - 404:9

**segment** [5] - 325:12, 325:18, 328:7, 335:6, 345:24

**segments** [3] - 323:14, 345:7, 366:21

**select** [3] - 340:4, 370:2, 412:20

**selected** [2] - 428:14, 440:7

**selecting** [1] - 340:1

**selections** [1] - 412:22

**sell** [2] - 313:14, 329:12

**selling** [3] - 313:15, 313:16, 335:9

**seminar** [3] - 313:18, 313:20, 313:21

**send** [13] - 296:10, 317:14, 384:9, 392:18, 393:16, 399:6, 410:13, 411:7, 411:8, 426:12, 445:1, 467:22, 467:25

**sender** [1] - 438:18

**sending** [4] - 315:14, 315:24, 409:21, 467:23

**sends** [1] - 383:22

**senior** [13] - 327:20, 331:15, 365:22, 386:3, 390:19, 413:11, 418:14, 425:2, 433:22, 434:1, 463:8, 466:21

**SENIOR** [1] - 294:12

**sense** [17] - 309:7, 357:11, 383:17, 384:1, 384:10, 425:13, 430:10, 442:17, 446:2, 472:2, 472:12, 473:1, 473:11, 473:18, 474:4, 476:8, 477:15

**sent** [23] - 316:3, 317:9, 361:20, 369:16, 392:21, 393:5, 393:19, 393:21, 395:9, 399:4, 403:4, 413:16, 417:25, 422:22, 423:9, 423:21, 424:17, 424:18, 443:5, 444:22, 461:2, 475:11

**sentence** [6] - 381:22, 400:20, 400:24, 413:20, 413:21, 453:23

**separate** [5] - 334:2, 373:15, 456:5, 456:7, 469:15

**September** [10] - 294:7, 314:16, 383:11, 384:13, 386:13, 399:14, 399:16, 406:7, 419:10, 477:20

**seriously** [2] - 403:23, 477:11

**service** [4] - 322:1, 334:19, 335:17, 363:12

**services** [3] - 334:7, 388:8, 388:15
**Services** [1] - 364:7
**serving** [1] - 364:3
**session** [1] - 313:24
**set** [5] - 300:13, 323:19, 366:4, 370:22, 476:25
**setting** [1] - 300:8
**seven** [1] - 327:19
**sever** [3] - 346:18, 414:8, 414:12
**several** [11] - 307:6, 308:23, 314:1, 322:9, 354:20, 368:18, 387:24, 391:13, 392:19, 393:23, 393:25
**Severance** [1] - 463:19
**severance** [34] - 345:16, 345:20, 345:25, 346:4, 346:6, 346:8, 346:14, 346:17, 346:23, 347:4, 347:10, 347:14, 347:16, 348:11, 350:10, 355:17, 356:1, 373:25, 410:17, 413:22, 414:6, 414:9, 414:13, 414:19, 417:16, 429:9, 429:18, 429:21, 429:24, 429:25, 463:21, 463:24
**sex** [1] - 471:12
**sexual** [1] - 435:2
**shall** [3] - 341:22, 341:23, 452:1
**shape** [1] - 407:5
**share** [2] - 300:18, 459:17
**Sharon's** [1] - 362:11
**SHAWN** [2] - 294:14, 294:17
**Shearer** [24] - 296:9, 301:2, 302:12, 319:3, 319:24, 361:20, 364:13, 368:10, 372:18, 376:4, 376:16, 377:2, 378:9, 378:18, 390:13, 393:22, 398:9, 402:17, 457:5, 471:18, 472:12, 474:24, 475:10, 476:13
**SHEARER** [72] - 294:14, 294:17, 297:1, 297:3, 297:18, 301:4, 301:8, 301:12, 302:15, 302:19, 303:11, 303:15, 304:22, 307:3, 308:13, 308:16, 309:9, 319:7, 319:12, 319:17, 319:25, 320:5, 320:25, 337:2, 341:9, 344:7, 347:21, 352:7, 353:24, 355:3, 358:2, 358:4, 358:25, 360:14, 360:17, 361:2, 372:19, 372:21, 375:23, 377:4, 378:10, 378:19, 378:24, 384:19, 387:8, 403:9, 403:15, 403:19, 405:9, 409:5, 415:20, 416:5, 416:20, 416:23, 425:23, 438:17, 447:20, 457:6, 457:8, 458:14, 458:17, 459:4, 466:16, 470:7, 471:19, 472:14, 472:18, 472:23, 472:25, 475:6, 475:9, 477:19
**SHEARER.......................** [5] - 478:7, 478:12, 478:16, 479:3, 479:7
**shed** [1] - 475:24
**sheet** [2] - 334:23, 348:12
**ship** [1] - 307:16
**shirt** [1] - 426:8
**short** [12] - 301:3, 356:8, 356:13, 373:24, 396:1, 396:11, 396:12, 400:1, 400:7, 447:23, 469:16, 472:20
**short-term** [7] - 356:8, 373:24, 396:1, 396:11, 396:12, 400:1, 400:7
**show** [9] - 299:21, 346:12, 346:13, 392:25, 395:9, 433:22, 437:11, 439:15, 443:17
**showed** [1] - 424:20
**showing** [2] - 394:24, 426:8
**shown** [4] - 424:18, 424:19, 452:18,

470:21
**shows** [1] - 433:17
**shrunk** [1] - 345:5
**shut** [1] - 396:21
**sick** [1] - 384:24
**sickness** [1] - 383:6
**side** [2] - 444:20, 475:2
**sidebar** [1] - 303:19
**sided** [2] - 432:4, 444:13
**sign** [4] - 334:4, 381:3, 413:4, 413:6
**signature** [1] - 471:8
**signed** [3] - 387:11, 387:12, 450:14
**significance** [1] - 446:23
**significant** [1] - 476:17
**similar** [3] - 313:25, 331:19, 332:20
**similarly** [1] - 387:14
**simple** [1] - 298:2
**simply** [1] - 334:9
**sit** [2] - 300:24, 354:13
**site** [2] - 300:11, 340:12
**sitting** [2] - 330:19, 472:4
**situation** [4] - 296:7, 314:19, 454:2, 476:18
**six** [8] - 327:19, 340:11, 340:12, 349:14, 365:5, 392:23, 393:7, 422:16
**size** [3] - 341:3, 374:17, 389:16
**skill** [1] - 366:4
**skilled** [1] - 351:18
**skills** [1] - 409:2
**skipped** [1] - 307:15
**skipping** [1] - 460:19
**slightly** [1] - 452:12
**small** [3] - 365:17, 367:25, 469:2
**smaller** [1] - 469:5
**SMB** [1] - 373:21
**so..** [1] - 371:17
**Soft** [1] - 365:22
**software** [5] - 365:16, 365:21, 366:2, 366:3, 366:10
**sold** [1] - 365:21
**sole** [3] - 316:6, 382:1, 391:10
**solely** [1] - 333:2
**solution** [1] - 325:12
**Solutions** [3] - 365:12, 365:13, 365:15
**solutions** [16] - 320:11, 320:13, 320:14, 321:6, 321:8, 323:13, 323:15, 323:16, 324:3, 324:10, 324:13, 324:19, 324:22, 328:16, 363:18
**someone** [4] - 313:23, 323:6, 347:4, 462:25
**sometime** [1] - 296:24
**sometimes** [8] - 307:18, 310:7, 312:14, 312:19, 312:20, 317:11, 317:16
**somewhere** [3] - 367:15, 420:20, 434:12
**son** [7] - 297:22, 297:25, 298:1, 298:3, 307:15, 310:8, 310:23
**sons** [2] - 310:6, 310:8
**soon** [7] - 311:19, 396:22, 411:12, 411:14, 423:5, 445:1, 467:21
**sorry** [15] - 308:13, 318:5, 337:9, 353:3, 360:3, 367:11, 376:12, 381:15, 432:7, 432:22, 439:19, 445:23, 450:12, 459:4
**sort** [5] - 296:20, 308:1, 409:22,

409:23, 468:10
**sounds** [3] - 309:24, 314:19, 462:25
**source** [1] - 313:4
**south** [1] - 307:16
**spans** [3] - 326:25, 340:7, 340:8
**speaking** [1] - 464:10
**speaks** [1] - 403:14
**special** [1] - 342:24
**specific** [4] - 338:5, 338:13, 344:24, 358:12
**specifically** [10] - 299:14, 322:7, 326:15, 334:6, 337:19, 338:12, 373:20, 374:18, 375:11, 442:21
**specifics** [1] - 341:25
**spell** [3] - 297:10, 319:21, 378:15
**spend** [2] - 333:19, 351:9
**spending** [3] - 380:15, 397:6, 397:7
**spent** [5] - 298:25, 363:12, 388:9, 389:2, 391:19
**split** [1] - 310:20
**splits** [1] - 414:15
**spot** [2] - 433:20, 433:21
**spread** [1] - 421:9
**spreadsheet** [4] - 443:18, 443:21, 443:25, 457:23
**stack** [1] - 469:1
**staff** [2] - 389:16, 397:21
**stages** [1] - 407:7
**Stamey** [4] - 434:6, 436:9, 451:22, 451:23
**stamp** [1] - 312:25
**stand** [7] - 297:6, 361:13, 361:15, 376:2, 437:5, 449:2, 471:23
**standard** [3] - 399:9, 399:21, 475:12
**standards** [1] - 341:10
**standing** [2] - 297:7, 378:12
**start** [7] - 300:2, 314:12, 322:22, 407:19, 423:6, 423:24, 458:24
**started** [20] - 299:12, 304:2, 305:4, 306:1, 311:25, 316:16, 316:17, 322:23, 359:4, 365:16, 365:21, 366:10, 370:10, 376:4, 391:20, 399:16, 401:23, 417:8, 447:23, 454:18
**state** [5] - 297:10, 297:20, 319:21, 378:15, 387:15
**statement** [1] - 470:23
**statements** [2] - 325:13, 429:17
**states** [1] - 302:6
**status** [5] - 355:11, 359:11, 359:13, 359:14, 401:14
**stay** [9] - 314:15, 314:16, 341:22, 342:6, 353:12, 362:24, 408:23, 414:22, 430:2
**stayed** [2] - 353:18, 452:12
**staying** [2] - 314:12, 467:10
**STD** [1] - 452:23
**stedfast** [1] - 298:16
**stenography** [1] - 295:23
**step** [6] - 301:1, 319:13, 349:4, 361:12, 376:1
**Steve** [25] - 296:3, 297:21, 298:17, 300:13, 301:18, 317:5, 318:10, 318:17, 323:22, 324:2, 333:21, 364:24, 370:17, 371:18, 391:10, 393:5, 394:11, 401:15, 423:8, 427:1, 438:12, 441:22, 442:23, 461:7

(Steve's - three)

Steve's [3] - 297:22, 298:11, 325:6
STEVEN [1] - 294:3
Steven [1] - 294:15
stickler [1] - 431:12
still [16] - 296:22, 326:3, 335:24, 350:14, 350:23, 352:22, 353:8, 372:22, 374:9, 409:16, 414:15, 452:8, 452:13, 461:7, 461:13, 461:19
Stilwell [1] - 434:8
stipulate [1] - 296:13
stock [4] - 419:1, 427:23, 453:8, 453:15
stop [1] - 318:14
story [1] - 416:19
straight [1] - 394:3
strategic [1] - 365:25
strategy [3] - 323:20, 476:11, 477:2
streamline [1] - 338:11
Street [2] - 294:20, 295:3
street [1] - 383:20
stress [1] - 398:8
stretching [1] - 348:21
strike [3] - 393:9, 394:16, 394:20, 397:8
strong [1] - 396:22
structure [5] - 340:15, 340:25, 342:11, 433:14, 469:18
structured [1] - 304:23
study [1] - 445:20
stuff [3] - 318:11, 335:18, 338:10
subject [1] - 389:6
submit [1] - 369:23
submitted [4] - 372:6, 442:8, 442:10, 470:17
substantial [1] - 315:8
successful [1] - 312:5
succession [3] - 389:25, 390:1, 390:3
successor [9] - 389:25, 390:14, 390:15, 390:16, 390:19, 390:21, 390:22, 390:23, 390:24
successors [2] - 389:22, 390:11
sued [2] - 419:7, 454:23
suffer [1] - 363:7
suggestion [1] - 387:25
suing [1] - 430:14
suit [1] - 308:25
Suite [1] - 294:20
sum [1] - 477:4
summation [4] - 331:4, 431:8, 446:12, 447:6
summations [1] - 446:22
Sunday [1] - 445:2
supervise [2] - 370:19, 476:1
supervisor [5] - 371:14, 385:1, 385:12, 426:23, 426:24
supporting [2] - 312:5, 325:19
surgeries [1] - 315:1
surgery [21] - 307:11, 307:20, 308:3, 308:25, 309:2, 311:15, 314:13, 314:16, 392:22, 393:7, 399:13, 415:1, 419:18, 420:11, 421:10, 421:11, 422:16, 460:8, 460:9, 460:16
surprise [1] - 370:1
survive [1] - 311:23
survived [1] - 314:24

sustained [6] - 319:9, 412:8, 425:24, 439:1, 439:2, 439:4
SVP [6] - 359:2, 368:6, 370:20, 386:1, 413:5, 413:15
SVPs [2] - 368:6, 385:6
swelled [1] - 329:24
swipe [2] - 322:5, 322:6
sworn [6] - 297:8, 297:16, 319:19, 320:3, 378:13, 378:22
system [7] - 327:11, 385:3, 385:4, 385:6, 385:10, 390:5, 423:25
systems [2] - 366:2, 397:2
Systems [2] - 363:20, 364:7

## T

talks [1] - 433:11
tallies [1] - 429:6
Tampa [2] - 307:12, 421:9
tandem [1] - 431:14
Tangible [1] - 311:24
teach [8] - 299:13, 299:21, 299:22, 300:15, 300:20, 313:14, 329:9, 329:11
teaching [3] - 313:9, 313:24, 334:4
Team [3] - 469:18, 469:20, 469:23
team [11] - 335:8, 373:9, 388:3, 393:23, 395:1, 397:25, 407:10, 407:13, 431:13, 444:22, 467:17
teams [3] - 310:8, 373:10, 469:15
tech [1] - 365:24
Tech [7] - 363:13, 363:14, 363:15, 363:16, 363:17, 363:22, 364:5
technical [1] - 399:11
technicality [1] - 456:6
technically [1] - 316:11
technology [4] - 321:16, 334:10, 363:19, 365:20
Technology [1] - 366:22
tedious [2] - 446:17, 447:3
Telephone [1] - 295:21
telesales [1] - 349:7
temporarily [1] - 452:2
temporary [1] - 402:6
ten [29] - 342:9, 344:16, 352:9, 352:10, 352:11, 352:17, 354:5, 368:1, 370:3, 371:20, 372:1, 372:8, 374:24, 374:25, 375:1, 375:2, 383:21, 406:20, 408:17, 408:21, 410:2, 412:20, 429:13, 443:12, 444:24, 454:13, 464:12, 467:14
tending [1] - 474:6
tenured [1] - 332:1
term [26] - 326:3, 348:16, 349:4, 354:13, 356:6, 356:8, 356:11, 356:13, 356:14, 370:7, 373:24, 374:3, 374:4, 374:9, 374:10, 374:13, 396:1, 396:11, 396:12, 396:15, 400:1, 400:7, 429:19, 469:16
terminal [1] - 322:6
terminals [2] - 314:21, 321:18, 409:22
terminate [13] - 324:24, 325:2, 325:3, 338:25, 339:6, 339:13, 340:19, 357:5, 371:13, 381:19, 462:12, 463:23, 469:25
terminated [35] - 331:1, 337:4, 337:10, 337:20, 337:22, 337:24, 338:3, 338:4, 339:3, 339:7, 339:11, 339:16, 340:22,

341:7, 348:8, 348:13, 354:1, 358:13, 358:16, 360:21, 375:3, 375:5, 375:9, 404:19, 404:24, 405:3, 405:13, 406:16, 406:24, 430:18, 430:21, 450:23, 456:23, 471:4, 471:11
terminating [3] - 348:18, 354:7, 407:19
termination [10] - 348:20, 354:23, 358:14, 404:21, 406:10, 458:5, 458:6, 458:7, 460:14, 469:3
terminations [3] - 374:24, 405:6, 407:7
terms [19] - 296:20, 298:10, 305:1, 314:19, 316:3, 341:22, 352:14, 355:16, 380:15, 381:23, 389:10, 389:15, 431:12, 432:19, 445:13, 447:8, 447:19, 448:1, 463:24
terribly [1] - 308:15
terrific [2] - 388:17, 430:2
test [1] - 474:19
testified [17] - 297:16, 320:3, 334:8, 335:13, 366:12, 366:18, 370:10, 371:10, 373:8, 378:22, 405:12, 435:4, 438:18, 438:23, 457:9, 458:9, 468:7
testify [4] - 369:17, 426:21, 472:1, 473:4
testifying [5] - 303:10, 303:11, 330:17, 377:6, 430:25
testimony [56] - 296:22, 302:18, 310:10, 314:18, 314:20, 315:6, 315:9, 315:12, 318:21, 328:25, 329:13, 331:2, 331:6, 345:18, 358:16, 358:20, 362:11, 362:18, 364:12, 365:2, 365:7, 366:13, 367:16, 368:5, 368:14, 373:23, 374:1, 420:21, 420:23, 422:1, 422:2, 423:15, 428:9, 428:11, 432:7, 432:9, 432:11, 434:12, 439:21, 443:9, 443:19, 447:18, 448:3, 448:9, 449:9, 450:21, 452:15, 456:17, 464:8, 471:22, 472:3, 475:7, 475:9, 475:19, 475:24, 477:13
Texas [1] - 294:17
text [28] - 315:14, 315:21, 330:10, 383:22, 384:8, 392:5, 392:18, 392:19, 392:21, 392:24, 393:5, 395:20, 399:14, 401:10, 401:19, 406:2, 422:1, 422:23, 422:25, 423:4, 423:21, 443:5, 444:9, 452:15, 452:18, 456:13, 460:6
texting [1] - 315:23
theft [1] - 470:14
theory [2] - 475:17, 475:18
thereafter [2] - 430:7, 430:8
thinking [3] - 390:17, 397:17, 401:24
third [6] - 439:6, 439:13, 440:20, 441:1, 454:8, 457:24
Third [1] - 302:10
thirds [1] - 450:2
thoughts [1] - 415:24
thousand [8] - 332:3, 344:23, 348:25, 367:3, 367:4, 400:13, 435:8, 456:2
thousand-person [1] - 332:3
three [24] - 303:13, 311:16, 311:18, 316:4, 316:14, 317:1, 323:14, 330:24, 340:10, 340:13, 345:7, 345:11, 379:9, 418:16, 420:16, 428:25, 435:8, 436:21, 438:2, 438:24, 442:5, 463:13, 472:20, 475:25

(three-year - voice)

**three-year** [1] - 418:16
**throat** [3] - 371:19, 421:10, 453:21
**throughout** [1] - 456:14
**throw** [1] - 307:17
**timeframe** [2] - 344:13, 369:11
**timeline** [3] - 442:14, 442:17, 460:20
**timing** [1] - 445:14
**tinnitus** [1] - 363:10
**title** [4] - 381:25, 438:10, 439:24, 463:19
**today** [15] - 310:11, 321:21, 329:25, 366:7, 376:25, 399:25, 429:8, 430:9, 437:25, 444:24, 447:17, 447:23, 452:18, 472:8, 474:9
**together** [15] - 304:8, 309:22, 320:21, 332:17, 338:10, 338:11, 340:14, 342:12, 349:11, 354:17, 388:6, 388:23, 389:2, 453:17, 467:24
**tomorrow** [9] - 472:6, 472:15, 473:2, 473:4, 473:5, 473:6, 474:1, 477:16, 477:18
**tonight** [1] - 445:3
**Tony** [10] - 364:24, 377:4, 392:12, 393:6, 422:19, 423:7, 442:8, 451:10, 452:22, 465:8
**took** [8] - 299:9, 307:21, 329:22, 349:13, 369:22, 412:7, 426:2, 426:6
**tool** [1] - 329:11
**top** [45] - 302:1, 343:5, 344:16, 348:22, 352:9, 352:10, 352:18, 370:3, 371:21, 372:1, 372:8, 374:24, 375:1, 392:7, 393:13, 393:22, 402:11, 408:17, 408:18, 415:20, 415:21, 425:5, 429:13, 432:25, 433:8, 433:11, 433:17, 433:22, 438:10, 443:12, 444:25, 452:19, 454:13, 454:17, 454:18, 454:20, 458:2, 461:22, 461:23, 461:24, 462:2, 462:6, 462:8, 467:15, 467:25
**topic** [1] - 358:9
**topics** [1] - 380:6
**Total** [3] - 363:20, 364:7, 459:5
**total** [6] - 328:2, 356:22, 357:2, 436:15, 437:5, 450:25
**totality** [2] - 355:17, 356:5
**totally** [1] - 335:21
**tough** [4] - 312:8, 312:9, 312:10, 314:19
**tour** [1] - 310:7
**toys** [2] - 416:16, 416:17
**track** [2] - 385:8, 386:2
**tracking** [1] - 359:14
**tracks** [1] - 407:14
**train** [1] - 329:9
**trainers** [3] - 352:25, 367:18, 373:14
**training** [65] - 324:7, 325:9, 325:21, 328:19, 328:21, 329:5, 329:6, 329:7, 330:10, 330:12, 331:15, 332:16, 332:17, 332:19, 332:23, 332:24, 333:4, 333:23, 333:24, 333:25, 334:1, 334:2, 334:3, 334:6, 334:7, 335:13, 348:25, 351:15, 354:18, 355:14, 367:14, 367:18, 367:25, 370:16, 373:8, 373:19, 401:24, 411:11, 411:15, 411:18, 432:8, 432:22, 432:24, 434:15, 434:16, 434:18, 434:19, 434:20, 434:22, 434:23, 434:24, 434:25, 435:2, 435:11,

435:12, 435:14, 435:19, 435:21, 435:23, 436:7, 445:17
**Training** [3] - 365:14, 370:12, 370:20
**TRANSCRIPT** [1] - 294:11
**Transcript** [1] - 295:23
**Transcription** [1] - 295:24
**transfer** [2] - 463:7, 463:8
**transferable** [1] - 313:11
**transferred** [1] - 453:9
**transformation** [9] - 328:23, 329:2, 332:21, 332:25, 334:14, 433:3, 433:18, 435:22, 437:4
**transformed** [1] - 334:11
**transforming** [1] - 334:9
**transition** [3] - 399:8, 399:10, 423:18
**traumatic** [1] - 315:2
**traveled** [1] - 388:22
**traveling** [1] - 380:12
**treated** [3] - 348:11, 455:15, 464:5
**treatment** [1] - 410:17
**tremendous** [2] - 334:14, 335:18
**trial** [3] - 296:3, 296:16, 321:2
**TRIAL** [1] - 294:11
**tried** [4] - 300:20, 322:4, 428:14, 455:24
**trip** [4] - 419:9, 419:10, 419:14, 419:15
**troubled** [1] - 334:12
**true** [6] - 306:9, 309:25, 312:17, 321:3, 426:6, 448:6
**trust** [2] - 313:17, 313:19
**truth** [1] - 447:15
**try** [14] - 316:19, 341:17, 354:11, 357:8, 392:2, 446:14, 446:19, 449:12, 461:4, 473:24, 473:25, 477:3, 477:6, 477:7
**trying** [25] - 300:15, 302:16, 302:17, 310:17, 311:23, 312:2, 317:12, 317:13, 317:17, 324:24, 338:11, 339:11, 341:8, 342:3, 342:6, 346:16, 355:8, 355:23, 356:21, 357:11, 389:24, 393:10, 393:18, 409:8, 424:7
**turn** [2] - 368:20, 444:19
**twelfth** [1] - 348:5
**twelfths** [1] - 348:9
**two** [37] - 308:10, 310:20, 311:15, 323:15, 329:3, 329:4, 331:20, 340:10, 340:12, 340:17, 340:21, 341:6, 341:16, 342:12, 343:13, 343:20, 344:2, 344:18, 351:14, 354:16, 365:21, 366:10, 380:8, 394:19, 397:12, 400:5, 419:19, 423:3, 423:9, 430:3, 435:8, 437:16, 440:23, 450:2, 469:15, 472:15, 472:20
**two-thirds** [1] - 450:2
**type** [4] - 331:19, 351:11, 407:3, 449:19
**typically** [1] - 418:14

**U**

**UBS** [1] - 302:10
**ultimate** [2] - 324:24, 447:2
**ultimately** [3] - 366:19, 412:21, 436:6
**unable** [1] - 307:9
**unclear** [1] - 350:21
**under** [28] - 301:17, 301:18, 306:18,

306:23, 323:22, 367:15, 373:7, 383:13, 387:12, 387:15, 387:20, 389:9, 406:13, 406:21, 434:16, 435:12, 435:16, 435:19, 435:23, 437:14, 437:18, 459:5, 462:7, 468:14, 474:17, 474:18, 475:13, 475:23
**underneath** [1] - 373:14
**understood** [2] - 365:19, 375:14
**unfolded** [1] - 342:7
**unique** [1] - 324:21
**United States** [6] - 294:1, 294:5, 294:12, 323:11, 323:12, 363:25
**University** [1] - 314:3
**unlawful** [1] - 471:11
**unnecessary** [1] - 462:23
**unruly** [2] - 431:18, 431:21
**unusually** [1] - 469:1
**up** [49] - 298:13, 300:8, 300:11, 300:13, 302:1, 311:11, 311:16, 311:19, 318:10, 321:2, 324:2, 324:17, 329:23, 329:24, 330:16, 349:8, 363:21, 366:24, 368:18, 368:19, 368:25, 370:11, 372:25, 383:10, 384:4, 391:10, 394:6, 395:15, 401:1, 401:25, 402:10, 408:10, 408:21, 414:5, 414:16, 414:17, 415:6, 416:7, 419:21, 426:8, 437:11, 448:11, 448:13, 460:22, 462:24, 465:15, 468:4, 473:24, 477:4
**update** [2] - 380:6, 380:8
**uprooted** [1] - 298:20
**upwards** [1] - 366:14
**US** [1] - 381:13

**V**

**vacation** [1] - 384:24
**valuable** [1] - 388:3
**value** [1] - 313:10
**variable** [1] - 459:1
**varied** [1] - 312:24
**various** [2] - 305:12, 366:18
**version** [1] - 310:12
**versus** [7] - 322:5, 348:12, 365:1, 373:24, 410:17, 429:10, 464:17
**vest** [3] - 418:16, 418:17, 427:23
**vesting** [1] - 418:21
**via** [2] - 445:1, 467:21
**vice** [27] - 320:10, 320:12, 324:5, 324:6, 324:10, 324:12, 324:18, 327:20, 330:19, 331:15, 379:3, 382:4, 382:16, 385:16, 413:11, 418:14, 425:2, 432:22, 432:24, 433:22, 434:1, 439:25, 463:3, 463:8, 466:21, 466:22
**video** [3] - 380:12, 425:19, 426:8
**vie** [1] - 466:2
**view** [5] - 454:17, 454:18, 461:24, 477:13, 477:14
**viewed** [1] - 464:13
**violations** [1] - 456:23
**virtue** [2] - 310:5, 403:22
**visit** [9] - 390:25, 391:7, 391:8, 391:20, 391:22, 393:6, 419:14, 422:15, 423:1
**visited** [2] - 393:4, 393:5
**vocal** [1] - 421:11
**voice** [2] - 421:11, 423:4

*(voluntarily - zero)*

**voluntarily** [1] - 464:24
**voluntary** [1] - 468:21
**volunteered** [1] - 450:2
**vote** [2] - 380:3, 380:4
**VP** [3] - 433:17, 433:20, 433:21

## W

**wage** [1] - 384:16
**wages** [1] - 454:18
**wait** [1] - 405:11
**waited** [1] - 459:25
**waiting** [1] - 427:23
**walk** [2] - 391:17
**wants** [2] - 343:1, 466:7
**watch** [1] - 349:22
**ways** [1] - 314:2
**weather** [1] - 376:25
**webinar** [2] - 300:25, 313:20
**Wednesday** [1] - 294:7
**week** [13] - 383:2, 383:12, 408:3, 408:10, 421:13, 422:16, 445:4, 448:5, 448:11, 448:13, 472:5
**weekend** [3] - 408:4, 408:5, 420:3
**weekly** [1] - 408:3
**Weeks** [1] - 463:19
**weeks** [10] - 348:15, 365:6, 392:24, 393:8, 393:22, 394:3, 400:5, 422:17, 463:20, 463:24
**Wendy** [1] - 424:22
**West Point** [1] - 364:2
**wet** [1] - 299:15
**Whalen** [12] - 325:23, 326:2, 326:7, 326:13, 326:18, 331:23, 369:16, 370:10, 395:9, 424:21, 426:17, 426:20
**whereas** [2] - 380:17, 388:6
**white** [2] - 391:18, 477:16
**whittled** [1] - 413:1
**whole** [7] - 312:25, 334:11, 338:18, 343:18, 344:11, 388:14, 389:23
**wholly** [1] - 390:15
**wife** [1] - 453:21
**wife's** [1] - 453:9
**willing** [1] - 465:2
**wish** [1] - 319:16
**witching** [1] - 471:20
**withdraw** [2] - 431:6, 431:9
**Witness** [5] - 361:13, 361:15, 376:2, 449:2, 471:23
**witness** [32] - 296:25, 297:3, 297:6, 297:8, 297:13, 297:15, 319:14, 319:15, 319:19, 319:24, 320:2, 358:23, 361:13, 376:2, 377:3, 378:9, 378:10, 378:13, 378:18, 378:21, 397:13, 405:12, 422:12, 431:16, 446:8, 447:23, 449:2, 466:13, 471:23, 472:14, 472:22, 473:15
**witness's** [1] - 449:9
**witnessed** [1] - 314:21
**witnesses** [6] - 447:22, 447:25, 472:1, 472:15, 473:13, 473:17
**woman** [2] - 439:20, 441:2
**wonderful** [1] - 422:14
**wondering** [1] - 461:22
**woodworking** [1] - 416:16
**word** [3] - 360:4, 399:12, 400:20

**words** [7] - 312:22, 355:21, 360:2, 360:6, 399:8, 399:15, 459:21
**workaholic** [1] - 308:21
**worker** [1] - 470:4
**workers** [1] - 470:4
**workforce** [1] - 450:2
**works** [6] - 299:2, 400:11, 426:19, 429:2, 447:11, 469:6
**workweek** [1] - 383:1
**world** [1] - 380:10
**worry** [2] - 398:9, 465:9
**worrying** [1] - 397:5
**worst** [1] - 341:3
**worth** [1] - 465:11
**wounds** [2] - 314:20, 423:6
**wow** [1] - 307:19
**wrap** [1] - 473:24
**wrapped** [1] - 448:13
**write** [5] - 384:4, 384:11, 409:15, 467:17
**writes** [1] - 468:8
**writing** [4] - 341:21, 342:1, 415:3, 439:20
**written** [6] - 341:2, 341:24, 347:5, 394:24, 420:9

## Y

**year** [23] - 336:3, 367:5, 367:6, 367:12, 367:20, 379:14, 379:15, 406:4, 418:12, 418:16, 418:17, 418:19, 427:2, 427:16, 427:18, 430:4, 430:5, 430:6, 437:6, 445:7, 458:12, 458:13
**year's** [2] - 459:8, 459:9
**year-over-year** [1] - 437:6
**years** [25] - 298:7, 301:20, 303:13, 309:22, 309:25, 311:15, 311:16, 311:18, 329:1, 329:3, 329:4, 334:12, 334:21, 344:18, 363:22, 366:11, 379:5, 379:7, 388:10, 402:17, 435:14, 437:15, 437:16, 461:6
**yell** [1] - 349:21
**yesterday** [21] - 296:8, 296:19, 314:18, 315:4, 325:23, 326:3, 328:25, 329:13, 329:16, 331:2, 369:5, 369:17, 370:11, 371:11, 376:5, 389:23, 395:3, 402:7, 421:9, 474:11, 474:24
**YORK** [1] - 294:1
**York** [12] - 294:5, 294:21, 295:9, 298:18, 298:20, 299:7, 383:20, 390:5, 391:23, 419:16
**yourself** [8] - 310:16, 312:3, 322:4, 356:21, 385:18, 448:11, 449:21, 450:1
**yourselves** [1] - 445:2
**YOY** [1] - 437:5

## Z

**ZEITLIN** [19] - 294:18, 294:21, 303:18, 319:8, 393:9, 394:16, 397:8, 403:25, 404:4, 404:6, 420:20, 422:11, 430:23, 430:25, 436:25, 466:5, 466:9, 466:13
**Zeitlin** [3] - 431:10, 466:7, 466:11
**zero** [2] - 348:19, 432:19