**482**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X
STEVEN B. BARGER,                : 17-CV-4869(FB)
                                 :
         Plaintiff,              :
                                 :
      -against-                  : United States Courthouse
                                 : Brooklyn, New York
                                 :
                                 :
                                 :
FIRST DATA CORPORATION, et       : Thursday, September 19, 2019
al.,                             : 10:00 a.m.
                                 :
         Defendants.             :
                                 :
                                 :
- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES SENIOR DISTRICT JUDGE, AND A JURY.

A P P E A R A N C E S :

For the Plaintiffs:        THE LAW OFFICE OF SHAWN SHEARER, P.C.
                           Attorney for the Plaintiff -
                           Steven B. Barger
                             3839 McKinney Avenue
                             #155-254
                             Dallas, Texas 75204
                           BY: SHAWN SHEARER, ESQ.

                           ZEITLIN & ZEITLIN, P.C.
                           Attorneys for the Plaintiff -
                           Steven B. Barger
                             50 Court Street
                             Suite 506
                             Brooklyn, New York 11201
                           BY: DAVID A. ZEITLIN, ESQ.

*483*

A P P E A R A N C E S: (Continued.)


 For the Defendants:        SAUL EWING ARNSTEIN & LEHR, LLP
                            Attorneys for the Defendants -
                            First Data Corporation, et al.
                              500 E. Pratt Street
                              Baltimore, Maryland 21202
                            BY: GARY B. EIDELMAN, ESQ.
                              GILLIAN A. COOPER, ESQ.
                              MICHAEL CIANFICHI, ESQ.


                            BOND SCHOENECK & KING, PLLC
                            Attorneys for the Defendants -
                            First Data Corporation, et al.
                             330 Madison Avenue
                             39th Floor
                             New York, New York 10017
                            BY: LOUIS P. DILORENZO, ESQ.

Court Reporter:  Anthony D. Frisolone, FAPR, RDR, CRR, CRI
                 Official Court Reporter
                 Telephone: (718) 613-2487
                 Facsimile: (718) 613-2694
                 E-mail: Anthony_Frisolone@nyed.uscourts.gov


Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

*Proceedings*                                                    **484**

1          (In open court.)

2          THE COURT:  Let's call the case.

3          COURTROOM DEPUTY:  Civil cause on trial, Barger

4    versus First Data Corp., all parties and counsel are present.

5          THE COURT:  Good morning everybody.

6          MR. SHEARER:  Good morning.

7          MR. EIDELMAN:  Good morning.

8          THE COURT:  We have a very good group of jurors, I

9    just go in there to say good morning to them.  I don't think

10   you can do that in the UK.  I think if a judge even said good

11   morning to the jurors, they would be defrocked or something.

12   But we don't follow all their traditions.  And I tell them how

13   proud I am that they're here on time and they're going to get

14   going.

15         So what do we have next now?

16         MR. SHEARER:  We have Ms. Julie Kelly former direct

17   report to Mr. Barger.

18         THE COURT:  Is she here?

19         MR. SHEARER:  Yes, she is.

20         MR. EIDELMAN:  Before we do that, can I raise a

21   couple of preliminary matters that relate to scheduling of

22   witnesses?

23         THE COURT:  Fast.

24         MR. EIDELMAN:  Very, very fast.

25         THE COURT:  The jurors are waiting.

*Proceedings*                                                485

1          MR. EIDELMAN:  I believe after Ms. Kelly,

2    Mr. Shearer has indicated that he wants to read deposition

3    testimony in and that Mr. Barger's -- let me briefly describe

4    this.

5          MR. SHEARER:  By.

6          MR. EIDELMAN:  Mr. Bisignano, thank you.

7    Mr. Bisignano and then deposition testimony.

8          With regard to the deposition testimony, there is

9    four witnesses that I thought I would address with the Court

10   and not waste the jury's time.  The first one is a woman by

11   the name of Amy Steffen last week they designated 57 pages of

12   testimony for Ms. Steffen and most of her answers were that

13   she did not know and that he would need to ask Jennifer

14   Voychevsky who we never deposed.

15         THE COURT:  With all due respect, we're going to

16   bring the witness in.  The first witness is going to testify

17   and I don't know how long she's going to be.  And then after

18   that, you want to read deposition testimony?

19         MR. SHEARER:  Yes, or take Mr. Bisignano while he's

20   here.

21         THE COURT:  Let's get the live witnesses here.  We

22   can talk about your concerns about reading deposition

23   testimony.

24         MR. EIDELMAN:  The amount of time.  We're talking

25   about hours and hours.

*Proceedings*                                                    *486*

1          THE COURT:  We'll talk about it.  In the meantime,

2   we have work to do.

3          MR. EIDELMAN:  Thank you, Judge.  I just wanted to

4   bring it up this morning.

5          MR. SHEARER:  I redesignated Steffen.

6          THE COURT:  Mr. Shearer, when you talk to each

7   other, let me know whether you want it recorded or not.  You

8   must be aware, I don't like to be a martinet to a fault, but

9   we have we have a reporter here, and a terrific reporter, and

10  you notice that Anthony doesn't butt in but he tries to take

11  down everything that happens in court.  So you have cross

12  conversations and it's impossible for him.  You can't do that.

13  Everything you have to say you have to address to me not

14  because I'm an ego maniac but because we have to create

15  structure and discipline, okay?

16         MR. SHEARER:  Yes, Your Honor.

17         THE COURT:  And also, the reporters appreciate it I

18  will say that.

19         COURTROOM DEPUTY:  All rise.

20         (Jury enters courtroom at 10:10 a.m.)

21         COURTROOM DEPUTY:  Please be seated.

22         THE COURT:  We have our next witness available now.

23  Let's call her.

24         MR. SHEARER:  Ms. Julie Kelly.

25         THE COURT:  Come up, ma'am.

1          (Witness takes the witness stand.)

2          COURTROOM DEPUTY:  Ms. Kelly, take the witness

3    stand.  Raise your right hand.

4    **JULIE KELLY**, called by the Plaintiff, having been first duly

5         sworn, was examined and testified as follows:

6          THE WITNESS:  Yes.

7          COURTROOM DEPUTY:  Thank you.  Please have a seat.

8    If you can state and spell your name.

9          THE WITNESS:  Julie Kelly.  J-u-l-i-e K-e-l-l-y.

10          THE COURT:  We can hear you, a little louder,

11   though.

12          Your witness.

13   DIRECT EXAMINATION

14   BY MR. SHEARER:

15   Q    Good morning, Ms. Kelly.

16   A    Good morning.

17   Q    Are you -- were you an employee of First Data in 2014 to

18   2017?

19   A    Yes, I was.

20   Q    How long were you employed at First Data overall?

21   A    I was employed by First Data for yearly 20 years.  I

22   started in 1998.

23   Q    Okay.  What group were you in during that employment?

24   A    I started out at the help desk at a call center and then

25   quickly moved into training positions and then into management

 1  roles and ended up as a director.

 2  Q    Okay.  And did you -- were you in the Sales Training Team

 3  under Mr. Barger?

 4  A    I was.

 5  Q    Okay.  Were you in the Sales Training Team under

 6  Mr. Brian Fricke?

 7  A    I was.

 8  Q    Were you in the Sales Training Team under Ms. Robin

 9  Ording?

10  A    Yes.

11  Q    Did you directly report to all three of those people?

12  A    I reported directly to Brian Fricke, directly to Steve

13  Barger, and directly to Robin Ording.

14  Q    I want to talk through each of those.

15       Can you explain -- were you in the Sales Training

16  Team when Mr. Bisignano became CEO?

17  A    I was, yes.

18  Q    Okay.  When Mr. Bisignano came in as CEO, was there a

19  change to the way the Sales Training Team worked?

20  A    There was.  There was.  That is when we actually came

21  over from the HR-type environment where we serviced all of

22  First Data.  We were split and brought back over to a

23  sales-related umbrella so things did change, yes.

24  Q    So when Mr. Bisignano came in, you moved from

25  Human Resources to -- who became the leader then?

1    A    Of sales?

2    Q    Of your group.  If you were reporting in to HR, who did

3    you start reporting to after that change?

4    A    Immediately it was Karen Whalen.

5    Q    Okay.

6    A    And she was an interim and then Brian Fricke was assigned

7    to that role.

8    Q    So how long did you work for Brian Fricke?

9    A    I worked for him twice in my career.  Once in 2005 for a

10   period of time and then again when Mr. Bisignano took over

11   after Karen Whalen up until Steve Barger took over.

12   Q    Okay.  So we've heard Brian Fricke resigned.  Do you have

13   any insight as to why that was?

14   A    Yes.  During that time, we were under an intense pressure

15   and different leadership.  And Joe Plumeri was Brian's direct

16   boss and had a different idea on how things should be

17   presented and reported which was a change for our organization

18   as we were moving forward in technology.  It was going

19   backwards a little bit and there was a lot of, you know,

20   manual things that had to be done as far as printing and

21   getting reports and making plans and scheduling.

22   Q    And why was that?

23   A    That's the way Joe wanted things done and...

24   Q    Okay.  How was Brian Fricke as a manager?

25   A    He was great.  He was, you know, one the best managers

*J. Kelly - Direct/Mr. Shearer*        **490**

1  I've had.  Never had a problem with him.

2  Q    At some point, did Brian Fricke begin reporting to

3  Mr. Barger?

4  A    I don't believe so.  Mr. Barger came in as a contractor

5  to help with transitioning First Data from, you know, just

6  selling, you know, rates and fees and little credit card boxes

7  to services for merchants.

8  Q    So when did you start working -- did you start working

9  with Mr. Barger before he came your boss?

10  A    I did, yes.

11  Q    How did you work with him before he became your boss?

12  A    We worked on road shows that were big conferences around

13  the country for hundreds and hundreds of employees to go

14  through the program, the genuine concern experience which

15  really dealt with, you know, getting to know people and being

16  passionate about them and being able to deliver results.

17         THE COURT:  So, slow down.  Listen to me.  Try to

18  truncate your answers to be responsive to the question instead

19  of going on and talking about road shows and everything else

20  from the day you were born, okay.

21         THE WITNESS:  Yes, Your Honor.

22         THE COURT:  Be directly responsive to the questions,

23  okay.

24         THE WITNESS:  Yes.

25         THE COURT:  Have you ever testified in court before?

*J. Kelly - Direct/Mr. Shearer*                    **491**

1              THE WITNESS:  No, sir.

2              THE COURT:  I can understand how you might be a

3     little bit nervous.  I'll help you out, though, go ahead.

4              THE WITNESS:  Okay.

5     EXAMINATION BY

6     MR. SHEARER:

7     (Continuing.)

8     Q    So do you have any insight as to why Mr. Fricke resigned?

9              THE COURT:  The question is yes or no.

10    A    Yes.

11    Q    What is that?

12    A    He was overworked.

13    Q    What do you mean by overworked?

14    A    He was working all day, all night, weekends, having to

15    travel at the last minute.  Just too much for a normal person.

16    Q    When did Mr. Fricke resign?

17    A    It was the fall of 2014.

18    Q    And then who became your direct head of the group?

19    A    They brought Steve Barger on because he had been working

20    with us.  And the plan was that they would continue to search

21    for Brian's replacement.  But because Steve was fluent in what

22    we were doing, he could take on that role in addition to his

23    other responsibilities.

24             THE COURT:  Try to go a little slower.

25             Next question.

1  Q    How did Mr. Barger handle the transition to coming in as

2  leader of the sales group, Sales Training Group?

3  A    It was very different from what we were experienced with

4  at First Data.  He came in and one of the first things he did

5  he had each person pull their résumé and put together a list

6  of questions to get to know them.  So their name, where they

7  went to school, where they were located, their birthday, their

8  children.

9              THE COURT:  So he made some changes; right?

10             THE WITNESS:  He made some changes.

11             THE COURT:  Next question.

12 Q    Can you compare Mr. Barger's management style to

13 Mr. Fricke and Ms. Ording's who you've worked for?

14 A    He was filled with that genuine concern he wanted to get

15 to know people and understand what you did and how to impacted

16 First Data and our merchants.

17 Q    Now, when Mr. Barger came in, was the group primarily

18 focused on the salespeople, training salespeople, or did it

19 have a broader scope of work?

20 A    We had other functions like HR.  We did eLearning across

21 the corporation; we did video production, so it was more than

22 just sales.

23 Q    Now, how long did you say you were at First Data,

24 20 years; is that right?

25 A    Nearly 20 years, yes.

1  Q    Have you seen lots of reductions in force or restructures

2  over that time period?

3  A    Yes, sir.

4  Q    What was your -- during -- from -- prior to

5  Mr. Bisignano's takeover as the CEO through Mr. Barger's

6  departure, what was your view on reductions in force?  Did you

7  see a lot of them?

8  A    We did.

9  Q    About how many do you think you saw from 2013 through

10  2018?

11  A    Probably four to five.

12            THE COURT:  How many?

13            THE WITNESS:  Four to five.

14            THE COURT:  Four or five?

15            THE WITNESS:  Mm-hmm.

16            THE COURT:  Okay.

17  Q    Those are the ones that impacted you, or those are the

18  ones that crossed the entire company?

19  A    Across the entire company.  Training as a function is

20  typically targeted as well.  So we were...

21  Q    During Mr. Barger's management of the group, did you take

22  on -- did you just stay with your same responsibilities, did

23  the responsibilities of the group grow, did they shrink.  What

24  is your view of that?

25  A    They would continue to grow as First Data was growing,

1   and with their clover and their software, we continued to take

2   on new applications, work with third-party vendors, we took on

3   bank relationship training, those sorts of things.

4   Q    And during 2016, did Mr. Barger take over

5   responsibilities for call centers, additional responsibilities

6   for European employees?

7   A    Yes.  Because Mr. Barger was more than just sales

8   training, he had insight into different plans that First Data

9   had.  So projections of increasing call centers and we would

10  get call center functions that we had to train as well as

11  international.  One of those was Vision Plus Training.

12          THE COURT:  He took on a lot of new

13  responsibilities, is that basically what you're saying?

14          THE WITNESS:  Yes, sir.

15          THE COURT:  Okay.  Next question.

16  Q    Now, when Mr. Barger was diagnosed with cancer, did he

17  tell the team about it?

18  A    He did.

19  Q    And what was the team's reaction?

20  A    At first very sad, shocked.  And, you know, then

21  accepting and encouraging for him to get well.

22  Q    So before Mr. Barger went on leave, did you think -- did

23  you or did the team think that Mr. Barger was attentive to

24  your needs or aloof, or what did the team think, or you think,

25  of Mr. Barger's management and availability?

1  A    He was very responsive and very available.  Now, of

2  course, if there was the time when he had to go in for surgery

3  and, obviously, you know, he's not going to be responsive at

4  that time.

5  Q    And Mr. Barger went on leave in November of 2016.  What

6  happened when he went on leave and he was no longer available?

7  A    We had Ms. Robin Ording come on as our interim leader of

8  the group.

9  Q    Where did she come in from?  Human Resources?

10  A    Yes.

11  Q    So was she familiar with the group or had you worked with

12  her before?

13  A    I had only attended one training session with her as an

14  observer, so I don't believe so.

15  Q    How did that transition go from Mr. Barger to Ms. Ording

16  as the interim leader?

17  A    She jumped right in and started looking at the group and

18  what they did.  It wasn't...

19  Q    When Mr. Barger was in the hospital after surgery and

20  then at home recovering, before his leave, how did he

21  communicate with you and the other members of the team?

22  A    E-mail and, of course, we have instant messaging at

23  First Data.  We also have a collaboration tool that can be

24  used and the collaboration tool allows you to be in one screen

25  with video if you want, it's optional.  You can share files,

1  you can chat instantly with an entire group, so it makes it

2  very adaptable for someone who has special needs, special

3  accommodations.

4  Q    And so, Steve worked remotely during that period from

5  surgery through his leave?

6  A    From what I recall, yes.

7  Q    There have been issues raised about Steve's management of

8  the group and I would like to show you what was put up

9  yesterday as Defendant's Exhibit D-208.

10           THE COURT:  What's your question?

11  Q    This is a chart that shows in 2016 head count activity.

12  And I know that you weren't involved in this direct e-mail,

13  but I'm looking at Katy Broderick, do you see her, she's the

14  third line down.  She has 14 total involuntary terminations

15  during 2016.

16           Do you know why Ms. Broderick was losing those

17  employees?

18  A    I think it says something to the person hiring.  Perhaps

19  they were not the best judgment and the type of person they

20  were hiring and the demand at that time for these individuals

21  was very great.  We were hiring in tremendous amounts in our

22  business units for our sales represents.

23  Q    So was Ms. Broderick doing these hirings?

24  A    I believe so, yes.

25  Q    And was Ms. Broderick in the Sales Training Group when

1    Mr. Barger took over?

2    A    Yes.

3    Q    I think that's that on that.  We also saw yesterday --

4    this is D-182.  This is the corporate structure when

5    Ms. Ording took over.  It has you the fourth blue box directly

6    under the VP of sales, and it has you listed as a manager of

7    development.

8           Were you a manager of development?  Did you get

9    promoted?

10   A    I was a manager of development.

11   Q    Okay.  And then you did leave First Data; correct?

12   A    I did.

13   Q    Okay.  What was your title when you left?

14   A    I was a director of training.

15   Q    Okay.  And what did your group do?

16   A    In this chart, in this example, my group was responsible

17   for all the design and development of learning materials

18   across First Data.

19   Q    And were those only sales related materials?

20   A    No.  We did other materials for HR, for company policies,

21   different functions.

22   Q    After -- did you know a Pat Hadler?

23   A    I heard of her.

24   Q    Do you know of an Internal Consulting Group at

25   First Data?

*J. Kelly - Direct/Mr. Shearer*          **498**

1   A    Vaguely, yes.

2   Q    Did the Internal Consulting Group do a study of the Sales

3   Training Group in late 2016, early 2017 that you know of?

4   A    I believe it was early 2016.

5   Q    '16 or '17?

6   A    '17.

7   Q    After Mr. Barger was on leave or terminated?

8   A    Yes.

9   Q    And who ran that review?

10  A    We were announced about the review, I believe, by

11  Mr. Marino, Ms. Ording, and Karen Whalen and Pat Hadler were

12  in charge from what I understand.

13  Q    Did they collect any information from you as part of this

14  review process?

15  A    Yes.  My team was also responsible for all the reporting

16  in the group.  So all the projects we have, all of the people

17  who attend training events, the measurement of how the

18  training events took place.

19        THE COURT:  You're not being responsive to the

20  question.  You're not listening to what I'm trying to get you

21  to do.

22        Do you remember what the question was just now?

23        THE WITNESS:  Yes.  We supplied, yes.

24        THE COURT:  A little louder.

25        THE WITNESS:  Yes.

*J. Kelly - Direct/Mr. Shearer*                    **499**

1           THE COURT:  Succinctly.  Keep your voice up and go

2    slower.  When I tell you haven't slowed down one bit.  Okay.

3    Just relax.  Just responsive, not what more that you need to

4    say.

5           Next question.

6    EXAMINATION BY

7    MR. SHEARER:

8    (Continuing.)

9    Q    What type of information did you supply to the Internal

10   Consulting Group?

11   A    Reporting on the types of training programs we have and

12   the numbers of people who attend the classes the amount of

13   knowledge they obtained from taking the classes.

14   Q    Can you tell me what happened to the Sales Training Group

15   in terms of numbers and responsibilities after Ms. Ording took

16   over on a permanent basis?

17   A    They changed and went down.

18   Q    What do you mean by, "They went down"?

19   A    Different groups would go back to the business unit.  So

20   before we were a part of sales training and there were some

21   units that went back.

22   Q    So can you give me an example if you were

23   supporting -- can you use a group as an example and tell me

24   what -- how it changed?

25   A    Oh, yes.  So, for instance, if we still have this on the

1    screen and I can use that.  Patty Stillwell's group went back

2    to report directly to the Direct Portfolio Unit within

3    First Data.

4    Q    So it left the Sales Transformation Group?

5    A    Yes.

6    Q    So that reduced the Sales Transformation Group's

7    responsibilities; is that correct?

8    A    That's correct.

9    Q    Okay.  There some criticisms of Mr. Barger.  Do you

10   remember Mr. Barger discussing his diagnosis and prognosis

11   with the Sales Training Team?

12   A    Yes.

13   Q    Did you hear anything?  Were you offended?

14   A    I was not.

15   Q    Was your belief that the team was offended?

16   A    There was some people, yes.

17   Q    There were.  Do you know who?

18   A    Nick Mantia.

19   Q    Did you ever see Mr. Barger shirtless on a

20   teleconference?

21   A    No.

22   Q    Did you ever hear anything about Mr. Barger talking to an

23   employee about his alcoholism?

24   A    No.

25   Q    Did you know anything about Mr. Barger talking to an

1   employee about her weight?

2   A     No.

3   Q     Tell me about the team that your -- your codirect

4   reports.

5            What do you know about Justin Stamey?

6   A     Justin was a training director over sales trainers within

7   First Data.

8   Q     And what was his responsibility?

9   A     Managing the day-to-day trainers who train new hire

10  programs and there were a couple of other training programs as

11  well.

12  Q     When you became -- when you started working for

13  Ms. Ording, did your responsibilities stay the same, grow,

14  shrink?

15  A     They grew.

16  Q     What kind of other responsibilities were placed on you?

17  A     I took on organizational development activities such as

18  performance cycles within the group.  Succession plans for VPs

19  and above.  Promotion process for the executive team.  Those

20  functions.

21  Q     So there were success plans for VPs and above; is that

22  correct?

23  A     Yes.

24  Q     And those are documented?

25  A     I believe so, yes.

1  Q    Was there a -- what was the attrition rate under

2  Ms. Ording, or did people leave after Ms. Ording took over,

3  did it stay the same?

4  A    We had about 20 percent of our leadership team leave on

5  their own, and then we did have cuts that came a little bit

6  later on.

7  Q    Was there a small reduction in force in the Sales

8  Training Team at the end of January or the beginning of

9  February of 2017?

10 A    Yes.

11 Q    How many people were terminated at that time?

12 A    I believe about 20 to 25.

13 Q    And were you involved in that in any way?

14 A    I was.

15 Q    What was your role?

16 A    Really assisting Ms. Ording with the process and we had

17 HR involved as well.

18 Q    Was that a result of this internal consulting review or

19 separate?

20 A    I believe it was.

21 Q    Did you help Mr. Barger with his technology needs at any

22 time when he was at home?

23 A    I suggested the use of the Adobe Connect collaboration

24 software.

25 Q    And was that implemented?

1    A    It was.

2    Q    How did you accomplish that?

3    A    I took his dial-in conference line number and plugged it

4    into the system and supplied a URL.  I was the administrator

5    of -- my team was the administrator of the software so we

6    would set those up.

7    Q    And who is this individual Nick Mantia was the -- what

8    did you call him -- he was the one that was upset about

9    Mr. Barger speaking about his diagnosis?

10   A    Yes.

11   Q    What was your view of Mr. Mantia?

12   A    He came into the company new.  He didn't know the

13   background of the company right when Mr. Fricke left, and so

14   he had a lack of direction, I believe, throughout his entire

15   period with First Data and really struggled to get that

16   direction and always had kind of a grudge on his shoulder.

17   Q    How long did Mr. Mantia stay at First Data, do you know?

18   A    Perhaps two years.  I'm not sure.

19   Q    Did he leave while Mr. Barger was managing you or when

20   Ms. Ording was?

21   A    I believe under Mr. Barger.

22   Q    Okay.

23            MR. SHEARER:  I think that's everything.

24            Mr. Eidelman.

25            THE COURT:  Are you finished?

*J. Kelly - Cross/Mr. DiLorenzo*                    **504**

1          MR. SHEARER:  Yes, I'm done.  Thank you.

2          THE COURT:  Any questions, Mr. Eidelman?

3          MR. EIDELMAN:  My colleague, Mr. DiLorenzo.

4          THE COURT:  Mr. DiLorenzo will do the questioning?

5          MR. EIDELMAN:  Yes, Your Honor.

6    CROSS-EXAMINATION

7    BY MR. EIDELMAN:

8    Q    My name is Lou DiLorenzo and I represent the defendants

9    in this case.  Do I understand your testimony to be after that

10   after the internal review was done by the Consulting Group

11   that there was -- I thought you called it a small layoff of 20

12   to 25 people in that sales organization?

13   A    I believe so, yes.

14   Q    Wasn't that half of the group?

15   A    I believe we had 70.

16   Q    70?

17   A    Yes.

18   Q    And then 20 to 25?

19   A    And we went down to 50.

20   Q    That was the result of review that was done?

21   A    From my understanding.

22   Q    Now, during the time that Mr. Barger was out, did you

23   meet with Rhonda Johnson and a gentleman by the name of Justin

24   Stamey?

25   A    Yes.

1   Q    Am I saying Justin's last name right?

2   A    Stamey.

3   Q    Stamey?

4   A    Stamey.

5   Q    Thank you.  He was also a director along with you?

6   A    He was a director, I was a manager.

7   Q    Was this meeting in person with Rhonda Johnson?

8   A    It was not.

9   Q    It was on the phone?

10  A    Yes.

11  Q    And did you keep notes of that conversation?

12  A    I wrote down who attended.

13  Q    Did you write anything else done?

14  A    Just that we were discussing having a direct line into

15  the business while Steve was out recovering.  And my

16  suggestion was to have Dawn Stuhr, who was an employee of

17  First Data, very integrated with the company, to help out.

18       MR. DILORENZO:  Your Honor, may I show a document to

19  perhaps refresh the witness's testimony.

20       THE COURT:  About what?

21       MR. DILORENZO:  About the meeting, the notes that

22  she kept from thing meeting.  It's different than what she's

23  remembering right now.

24       THE COURT:  Well, ask her the question first.

25                         ///

1  EXAMINATION BY

2  MR. DILORENZO:

3  (Continuing.)

4  Q    I'm looking at what I think your notes of the meeting on

5  11/10.  You took notes, you listed people that attended?

6  A    Yes.

7  Q    Underneath that you wrote the words:  Embarrassment,

8  pity, frustration.

9          Are those the things you and Justin Stamey went to

10  see Ms. Rhonda Johnson about?

11  A    Those would have been words that were discussed on the

12  call.

13  Q    By you and Justin to Rhonda Johnson who is the HR

14  business partner at the time; correct?

15  A    I don't know who said those words.

16  Q    You don't have any recollection of it.  Do you know why

17  you wrote them down in your notes for that meeting?

18  A    Because I write down what people say.

19  Q    And why was the -- why did you attend with Justin?

20  A    Because we were the leaders of the team.

21  Q    Did he ask for the meeting or did you?

22  A    I don't recall.

23  Q    Now, you're located in Ohio?

24  A    Yes, sir.

25  Q    And were you located in Ohio while you had this job

1    working for Mr. Barger?

2    A    Yes, sir.

3    Q    And Mr. Barger was in Atlanta; is that right?

4    A    Yes.

5    Q    Where was your team located?

6    A    All over the country:  Florida, Maryland, Atlanta.

7    Q    And you would only see Mr. Barger in person a couple

8    times year maybe once or twice?

9    A    Correct.

10   Q    All your work was on the phone or text message or e-mail?

11   Interaction with him, I mean.

12   A    Yes, sir.

13   Q    Have you been subpoenaed to testify here today?

14        THE COURT:  Do you know what that means?  Are you

15   here voluntarily or pursuant to a subpoena telling you to come

16   to court?

17        THE WITNESS:  I'm here voluntarily.

18        THE COURT:  Voluntarily.

19        THE WITNESS:  Mm-hmm.

20   Q    And how did you leave First Data?

21   A    I was in a situation where the job and the requirements

22   of me were affecting my health.

23   Q    This was the 60-mile commute from your home to your place

24   of work?

25   A    And there were other things involved with that, yes, sir.

1  Q    And you have your own lawsuit going against several of

2  these individuals, don't you, in the company?

3  A    I do.

4  Q    You've sued First Data; correct?

5  A    Yes.

6  Q    You sued Frank --

7            MR. ZEITLIN:  I object to the relevance.

8            THE COURT:  Overruled.

9  Q    Frank Bisignano individually as well?

10 A    Yes.

11 Q    Who else at that table have you sued individually?  Oh,

12 you sued you've sued Mr. Eidelman's law firm, haven't you?

13 A    I have.

14 Q    You've also sued this young lady, Gillian Cooper, who is

15 an associate in that law firm.  You sued her individually as

16 well?

17 A    Yes.

18 Q    And your complaint is also for ADA; is that right?

19 A    Some of it, yes.

20 Q    And do you have a belief that by your testimony today if

21 you can help his case that you may help your own case against

22 these same people?

23 A    I do not.

24 Q    You were aware that Justin Stamey is now in charge of

25 that group?

1  A    I was not.

2  Q    You're not aware of that?

3  A    No.

4  Q    Who promoted you from manager to director?

5  A    Robin Ording.

6  Q    And Mr. Fricke, when he ran the group, do you know

7  whether he was a vice president or a senior vice president?

8  A    I do not know.

9  Q    Do you know whether other people complained to Rhonda

10  Johnson about Mr. Barger's management style?

11  A    I do not know.

12  Q    Where were the other directors located while you were

13  working for Mr. Barger?

14        You were in Ohio, where were the other ones?

15  A    We had one in India, over in Europe.  We also had one in

16  India as well as Atlanta.

17  Q    And Justin Stamey was located in Atlanta with Mr. Barger;

18  right?

19  A    Yes.

20  Q    So the two of you were the lead directors, is that what

21  you're saying?

22  A    I was a manager.

23  Q    And Justin was a director?

24  A    He was a director.

25        THE COURT:  Manager is above a director?

J. Kelly - Cross/Mr. DiLorenzo          510

1          THE WITNESS:  Lower.

2          THE COURT:  Lower than a director?

3          THE WITNESS:  Yes.

4   Q    And when you first worked with the Sales Training Group

5   it was under Human Resources; right?

6   A    Yes.

7   Q    And then it was moved over to Mr. Fricke?

8   A    Yes.  We went back and forth quite a bit.

9   Q    And as a result of Robin Ording's recommendations

10  concerning the internal consulting audit that was done, it was

11  moved back to Human Resources, wasn't it?

12  A    No.

13  Q    It wasn't moved back to Human Resources?

14  A    It was moved back to Human Resources shortly after

15  Mr. Bisignano took over and there was a change in HR

16  leadership, and that is when we went back over to sales.

17  Q    I'm sorry.  I thought when Mr. Bisignano took, over a

18  couple of senior vice presidents in HR were let go and it went

19  over to Mr. Fricke?

20  A    Yes, that's what I'm saying.

21  Q    Okay.  Then when Mr. Fricke left, it stayed with

22  Mr. Barger.  But then after Mr. Barger was gone, it came back

23  to Human Resources?

24  A    Correct.

25  Q    As a result of the recommendations made by the

1    Consulting Group that it become part of corporate training,

2    right?

3    A    Yes.

4    Q    Part of HR corporate training?

5    A    Yes.

6    Q    Which existed at the same time there had always been

7    corporate HR training; right?

8    A    Correct.

9    Q    Are you aware that the Sales Training Group in 2016-2017

10   was trying to get a portal and software, online training,

11   going.

12          Do you remember that?

13   A    I do.

14   Q    And a consultant was hired to do that to help with that

15   process outside consultant?

16   A    I'm not sure.  I know the firm and the software was

17   external.

18   Q    I'm sorry.

19   A    I know the software and the hosting platform was

20   external.

21   Q    Are you aware that -- that that was cancelled about

22   halfway through the contract and Robin Ording had it added to

23   the HR portal so there was no reason to duplicate it with a

24   half a million dollar portal?

25   A    Yes.

1    Q    From this vendor?

2    A    Yes.

3    Q    So Robert, as I understand it, had moved over to HR and

4    we cancelled the special efforts that were being made for half

5    a million dollars to create this portal just for sales

6    training.  And we just used the existing portal that was there

7    for corporate Human Resources training; is that right?

8    A    I believe so.

9    Q    Did that happen before you left?

10   A    I believe so.  It was in the works.

11   Q    So that made a lot of sense, didn't it, to save money

12   instead of reinventing the wheel?

13        We already had a partal that corporate training was

14   using so we just went over to that one?

15   A    It did.

16   Q    Do you know how much money was spent before that decision

17   was made?

18   A    I do not know.

19   Q    Do you know if Mr. Barger initiated that initiative to

20   develop the software and create the new portal for the sales

21   training program instead of using the Human Resources one?

22   A    That was an initiative Justin Stamey brought into the

23   team.

24   Q    The initiative of having the portal?

25   A    The portal.

1   Q    And that was under Mr. Barger's management?

2   A    I believe, yes.

3   Q    And so, he would have had to approve that and the hiring

4   of the consultant and the contract and so on?

5   A    I don't know about the consultant.

6   Q    You don't think Justin had the authority to do that on

7   his own, did he?

8   A    I don't know as a director if he would or not.

9   Q    How about you?  Would you have had the authority as a

10  director to enter into a half-a-million-dollar contract to do

11  something like that?

12  A    I was never in a position as a director to do that.

13  Q    You mean you never had the opportunity, or you didn't

14  have the authority?

15  A    Correct, I was the manager.

16  Q    Robin promoted you to director?

17  A    Right.  I was never put in a circumstance where I would

18  have the opportunity to even ask about that.

19  Q    Because you weren't a director?

20  A    I was a director, but that situation was never put upon

21  me.

22  Q    I was a little confused by that testimony concerning the

23  turnover.  You said there was high turnover in a particular

24  group because there was a person who was hiring the wrong

25  people?

*J. Kelly - Cross/Mr. DiLorenzo*                514

1    A    It's common.  That's why we create interview training.

2    Q    Interview training to hire applicants?

3    A    Yes.  To teach our managers and our leaders how to

4    interview properly.

5    Q    So while this -- but I thought you said there was a

6    particular person that wasn't hiring the right people or

7    something, did I miss that?  I didn't catch that.

8    A    That's my observation.

9    Q    What was the name of the person?

10   A    Katy Delaney.

11   Q    What was her job?

12   A    She was the director of training.

13   Q    She was another director along with you and Justin?

14   A    Yes, I was a manager.  But, yes.

15   Q    Did you report to her?

16   A    No, I did not.

17   Q    She reported to Mr. Barger while he was there?

18   A    Correct.

19   Q    So don't you think that ultimately the responsibility for

20   high turnover, if we've got somebody that --

21              MR. DILORENZO:  Withdraw all that.

22   Q    Did you observe this on your own that she was hiring the

23   wrong people and that's why we had such high turnover?

24   A    I saw some of it, yes.

25   Q    So you saw that yourself and she wasn't in Ohio; right?

*J. Kelly - Cross/Mr. DiLorenzo*                515

1    A    No, she was not.

2    Q    And you observed that.  Did you ever have any discussions

3    with Mr. Barger about it?  Did he ever tell you that he

4    noticed it, too?

5    A    I don't know.

6    Q    So do you think that the person responsibile for the area

7    should have identified that there was high turnover and done

8    something to change it?

9    A    I think we did.  I think as a team, we worked to hire the

10   correct people.

11   Q    Who was on that team?

12   A    That would have been Justin Stamey; Katy

13   Delaney-Broderick, I believe she got married; Lorraine; Nick

14   Mantia.  I believe was a part of the team.

15   Q    When did you start to -- when did the team start to

16   correct it so that they --

17   A    We would have, during our meetings, we would discuss

18   things that going on you're team meetings.

19   Q    What time of year, what year?

20   A    Perhaps 2015 into '16.

21   Q    The turnover numbers we're looking at were identified

22   during the 2016-2017 Internal Consultant's Report.  So was

23   that high turnover going on while Mr. Barger was running that

24   group?

25   A    What was the year of the data?  I know you said when the

1   data was --

2   Q    Well, it's in the report.  That annual year's attrition

3   late was, like, 47 percent?

4   A    For 2016?

5   Q    Yes.  It's the whole group.

6   A    Okay.

7   Q    So you guys fixed it.  What did Mr. Barger have to do

8   with fixing it?

9   A    We would just talk as a leadership team.  The correct

10  type of person we want to be training our sales associates.

11  And those are some of the qualities we would put forth.  We

12  also worked with someone in HR to come up with a trainer

13  hiring process.

14  Q    And this was going on 2015, '16, and even into '17?

15  A    I don't know about into '17.

16  Q    Was Robin part of addressing that high turnover?

17  A    No.

18  Q    It was all fixed by the time Robin got there, is that

19  what you're saying?

20  A    I'm not going to say it's fixed, but processes and

21  procedures were put into place to help correct that.

22  Q    Ultimately, that's got to be the responsibility of the

23  person that runs the group; right?

24  A    And everyone who reports up through that group who is a

25  part of hiring.

1   Q    Right.  But you can't blame that on a subordinate if

2   there is a problem with that kind of a problem.  It belongs to

3   the manager, doesn't it?

4   A    To an extent.

5   Q    I mean, you were in leadership, you understand that;

6   right?

7   A    Yes, and I would also take responsibility for something

8   that I'm doing wrong.

9   Q    You would take responsibility for something wrong that

10  your subordinates did as well; right?

11  A    To an extent.

12       MR. DILORENZO:  Your Honor, if I could have a minute

13  with my clients.

14       THE COURT:  Go ahead.

15       (A brief pause in the proceedings was held.)

16  EXAMINATION BY

17  MR. DILORENZO:

18  (Continuing.)

19  Q    Ms. West, when you resigned from the company, did you

20  make a formal request for severance pay?

21  A    I did.

22  Q    And when that was denied, is that when you brought the

23  lawsuit?

24  A    Yes.

25       MR. DILORENZO:  No more questions, your Honor.

*J. Kelly - Redirect/Mr. Shearer*          **518**

1      THE COURT:  Anything further, Mr. Shearer?

2      MR. SHEARER:  Yes, just a few.

3  REDIRECT EXAMINATION

4  BY MR. SHEARER:

5  Q    Do you know how much interaction there was between

6  Mr. Ording and Mr. Barger while Mr. Barger was running the

7  Sales Training Group?

8  A    No only -- very little interaction but it was through a

9  program called The First Data Way that they collaboratively

10  put together.

11  Q    Was Ms. Ording aware of what was going on inside of the

12  Sales Training Group during 2016, 2017?

13      MR. DILORENZO:  I'm going to object, your Honor.  I

14  don't understand --

15      THE COURT:  Sustained.

16  Q    What was your view of Ms. Ording's involvement or

17  collaboration with the Sales Training Group during that time?

18  A    I don't believe she visited many of the sites and learned

19  about what they did.  It was about numbers.

20  Q    Did Ms. Ording ever come to the Sales Training Group and

21  offer the Corporate Training Portal as an option?

22  A    No.

23  Q    Did you ever work with the Corporate Training Portal?

24  A    I knew of it, I didn't work directly with it.

25  Q    Do you know if its capabilities were what you were

*J. Kelly - Redirect/Mr. Shearer*                    **519**

1   looking for in creating your own portal?

2   A    They were different.

3   Q    Now, is it was Ms. Katy Delaney-Broderick was she with

4   the Sales Training Group when it transferred to Mr. Barger at

5   the end of 2014?

6   A    I'm not sure.

7   Q    I guess this is the question.

8           Were the employees with Ms. Broderick inherited by

9   Mr. Barger or were all his employees hired under his

10  leadership?

11  A    I believe most were inherited.

12  Q    How did the hiring process work for if a director needed

13  to hire a subordinate, how would that process work?

14  A    They would first need to justify the position and obtain

15  an approval.  First Data's processes for approval changed

16  quite frequently, but you would need to go up through the

17  chain probably to your senior VP or higher MC member to get

18  approval.  And then we would work with an HR recruiter to get

19  that position listed and they would screen candidates.  And

20  then once the candidates were screened, they would come in to

21  the hiring manager to do their series of interviews.

22  Q    So was the senior VP's role in that approving the posting

23  of the job, or was the senior VP involved in the interviews

24  and the actual hiring decision?

25  A    It could be both.

*J. Kelly - Redirect/Mr. Shearer*          **520**

1  Q    They brought up here your lawsuit.  Were you aware that

2  you were originally listed as a witness for the defendants at

3  the beginning of this casing?

4             MR. DILORENZO:  I object, your Honor.  That's a

5  mischaracterization of what happened.

6             THE COURT:  Sustained.

7             MR. DILORENZO:  Initial disclosures.

8             THE COURT:  Were you listed in terms of this lawsuit

9  any contact with the defendant or contact with the defendant.

10 I think that's what the question is, or any of the defendants.

11            THE WITNESS:  I was subpoenaed by the defendants.

12            THE COURT:  You were subpoenaed by the defendants to

13 come and testify here?

14            THE WITNESS:  For a deposition.

15            THE COURT:  For a deposition?

16            THE WITNESS:  Yes, sir.

17            THE COURT:  And you had your deposition taken by the

18 defendants?

19            THE WITNESS:  Yes.

20            THE COURT:  Okay.  Next question.

21 EXAMINATION BY

22 MR. SHEARER:

23 (Continuing.)

24 Q    Did the defendants ever tell you why they subpoenaed you?

25 A    Yes.

1   Q    What was that reason?

2   A    Because I had filed a complaint against First Data.

3        THE COURT:  Anything else?

4   Q    These notes that you took:  Embarrassment, pity,

5   frustration, were those the words you used on that call?

6   A    I don't believe so.

7   Q    Were those the words that Rhonda used?

8   A    I heard, yes.

9   Q    Did Justin Stamey use those words?

10  A    Perhaps, yes.

11  Q    And they said this call was on November 10th of 2016.

12  What was the purpose of the call, do you remember?

13  A    We had wanted to have someone step in and give us an eye

14  into the business line while Steve was recovering.

15  Q    And what does that mean, "An eye into the business line"?

16  A    Just have some representation where he couldn't be.

17  Q    When you say, "The business," is that trying to see other

18  parts of the company?

19  A    Right.  Steve was so involved with every other aspect of

20  the company and brought projects into us that way, we just

21  wanted someone who could step in at a very senior level.

22  Q    And --

23  A    And communicate with us.

24  Q    You said you had a suggestion?

25  A    I did.

*J. Kelly - Recross/Mr. DiLorenzo*                    **522**

1   Q     What was that suggestion?

2   A     Her name was Dawn Stuhr.  D-a-w-n.  S-t-u-h-r.

3   Q     And who was Dawn Stuhr?

4   A     She was a senior VP located in Atlanta which we thought

5   would be positive with a majority of the staff.

6   Q     What was her responsibilities?

7   A     I believe she was project managing at that time.

8             MR. SHEARER:  Okay.  That's it.  Thank you.

9             MR. DILORENZO:  Just a couple of questions, your

10  Honor.

11            THE COURT:  Go ahead.

12  RECROSS-EXAMINATION

13  BY MR. DILORENZO:

14  Q     Have you hired an attorney with respect to either your

15  claim in Ohio or your involvement in this case, did you retain

16  an attorney?

17  A     I did for my complaint in the State of Ohio.

18  Q     Who is that attorney?

19            MR. SHEARER:  Objection.

20            THE COURT:  Overruled.

21  Q     Who is the attorney that you hired?

22  A     Mr. Shearer.

23  Q     He's in this room, right?  That's him, the one that was

24  just questioning you?

25  A     Yes.

*J. Kelly - Recross/Mr. DiLorenzo*                    **523**

1   Q    He's your attorney in that case in the federal district
2   court in Ohio?
3   A    No, I'm sorry, not the case.
4   Q    Oh, the Ohio --
5   A    My EEOC.
6   Q    -- Human Rights Commission case?
7   A    Yes.
8   Q    The initial filing before the federal court action?
9   A    Yes.
10  Q    And I left off, I'm sorry, I didn't have the caption in
11  front of me in that Southern District of Ohio case.  It's a
12  federal court like this one, right, except in Ohio, right?
13  A    (Nodding).
14  Q    You also sued Robert --
15            THE COURT:  We didn't get an answer.  It was the
16  federal court in Ohio that you brought the lawsuit.
17            THE WITNESS:  Yes, after I followed the protocol of
18  my complaint.
19            THE COURT:  The lawsuit was in Ohio, okay, next
20  question.
21  Q    And you also sued Robin Ording individually, didn't you?
22  A    Yes.
23  Q    The woman that promoted you to director?
24  A    Yes.
25  Q    You also sued Jackson Lewis?

J. Kelly - Recross/Mr. DiLorenzo                524

1    A    Yes.

2    Q    That's another law firm?

3    A    Yes.

4    Q    Now, you gave testimony just now on this redirect that

5    you remembered more about that meeting, I guess, the

6    November 11th meeting/phone call?

7    A    Yes.

8    Q    Okay.  You're starting to remember it?

9    A    Yes.

10   Q    Okay.  Now, you're saying that Justin used those words

11   that are in your notes?

12   A    Typically, yes, it is either Rhonda or Justin.

13   Q    It wasn't you?

14   A    No, I typically do not write down what I say in my notes.

15   Q    Because you'd remember that?

16   A    (Nodding) Yes.

17   Q    Except when it comes time to testify about it then you

18   can't remember that?

19        THE COURT:  Sustained.

20   Q    All right.  So let me ask you this question.

21        You said that you knew the purpose of the meeting

22   before the phone call was to get somebody in to help run the

23   Sales Training Group; right?

24        You needed somebody in the business to help.

25   Something about having an eye into the business, do you

*J. Kelly - Recross/Mr. DiLorenzo*                525

1   remember that testimony?

2   A     Yeah.  Things that were coming up, yes.

3   Q     And you guys needed direction, is that what you're

4   saying?

5   A     No, I did not say direction.  We just wanted to know what

6   projects were coming in, what's happening on the calls.

7   Q     Are you aware that Mr. Barger takes the position that he

8   was working full time and nothing was missing a beat in the

9   sales training, so why do you need somebody to come in and

10  have an eye with respect to his business?

11          MR. ZEITLIN:  Mischaracterizes.

12          THE COURT:  I don't know what the jury knows what

13  the testimony is.  The question is why did you need somebody

14  else to come in to help out?

15          THE WITNESS:  Just to get those updates for our new

16  projects.

17  Q     So there were some things that Mr. Barger wasn't doing,

18  is that what you were saying?

19  A     No, we did not know.

20  Q     You didn't know what?

21  A     It was a suggestion.

22          THE COURT:  Stop it.  Save it for argument.  What's

23  the question?  The question was whether or not you knew that

24  Mr. Barger needed help, is that what you wanted?

25          MR. DILORENZO:  No, she started to say she didn't

1  know and I said what do you mean you didn't know what

2  Mr. Barger was doing.

3          THE COURT:  Sustained.  You're getting repetitious.

4          Do you have anything else to ask her?

5          MR. DILORENZO:  Can I ask her, your Honor, what

6  she's talking about?

7          THE COURT:  I think she's already testified.  Next

8  question.

9          MR. DILORENZO:  No more questions.

10          THE COURT:  All right.  Anything else.

11          MR. SHEARER:  Just one quick one.

12          THE COURT:  You can do it from here.

13  REDIRECT EXAMINATION

14  BY MR. SHEARER:

15  Q    I believe there was confusion as to your lawsuit?

16          THE COURT:  Speak up.

17  Q    Do I represent you in your lawsuit in Ohio?

18  A    No.

19          MR. SHEARER:  Okay.  That's it.  Thank you.

20          THE COURT:  You may step down.

21          (Witness leaves the witness stand.)

22          THE COURT:  Mr. Shearer, do we have another live

23  witness now for you to present?

24          MR. SHEARER:  Yes, I do.

25          THE COURT:  Who is the next witness.

1          MR. SHEARER:  Mr. Bisignano.

2          THE COURT:  Let's take a ten-minute break now before

3    Mr. Bisignano comes in and testifies, okay?

4          Don't talk about the case.  We'll reconvene in about

5    ten minutes.

6          COURTROOM DEPUTY:  All rise.

7          (Jury exits courtroom at 11:01 a.m.)

8          THE COURT:  Bring in the jury.

9          (A brief pause in the proceedings was held.)

10          COURTROOM DEPUTY:  All rise.

11          (Jury enters courtroom at 11:23 a.m.)

12          COURTROOM DEPUTY:  You can be seated.

13          THE COURT:  Next witness.

14          MR. SHEARER:  Mr. Frank Bisignano.

15          THE COURT:  Come on up.

16          (Witness takes the witness stand.)

17          COURTROOM DEPUTY:  Step up and raise your right

18    hand.

19    **FRANK BISIGNANO**, called by the Plaintiff, having been first

20          duly sworn, was examined and testified as follows:

21          THE WITNESS:  I do.

22          COURTROOM DEPUTY:  Thank you.  Please have a seat.

23    And please state and spell your name.

24          THE WITNESS:  Frank Bisignano.  F-r-a-n-k

25    B-i-s-i-g-n-a-n-o.

*F. Bisignano - Direct/Mr. Shearer*          **528**

1          COURTROOM DEPUTY:  Thank you.

2          THE COURT:  So, Mr. Bisignano, you've been here all

3   the time so you understand.  Keep your voice up and speak

4   clearly and your witness at this time, Mr. Shearer.

5          MR. SHEARER:  Thank you.

6   DIRECT EXAMINATION

7   BY MR. SHEARER:

8   Q    Good morning, Mr. Bisignano.

9          I guess we'll start.  What was your role at

10  First Data from 2013 through 2017?

11  A    I was first a CEO and a board of director, a member of

12  the board, and I became chairman of the board and CEO, chief

13  executive officer.

14         THE COURT:  Mr. Plumeri followed you or which --

15         THE WITNESS:  I brought Mr. Plumeri in.  He was vice

16  chairman of the board and he worked for me.  He was a CEO

17  previously.

18         THE COURT:  Before.

19         THE WITNESS:  In a different company.

20         THE COURT:  I thought he was CEO of this company.

21         THE WITNESS:  He was never CEO here.

22         THE COURT:  You're the CEO.

23         THE WITNESS:  I brought him in to work with me.

24         THE COURT:  We have the big cheese here.

25         THE WITNESS:  I worked in the cheese store.

1          THE COURT:  You don't have to get so close to the

2     mic.  Just relax and we can hear you.

3          Go ahead.

4     EXAMINATION BY

5     MR. SHEARER:

6     (Continuing.)

7     Q    How did you come to First Data?  Were you recruited?  How

8     did you become the CEO of First Data?

9     A    I received a phone call from Scott Nuttall, who is the

10    president of KKR today.  KKR is the company that owned

11    First Data.  And him and I talked about it and, ultimately, I

12    took the responsibility.

13         THE COURT:  When does this go back?

14         THE WITNESS:  This goes back to 2013.

15         THE COURT:  So you became the CEO in 2013?

16         THE WITNESS:  April 29, 2013.

17         THE COURT:  So you have a relationship that he

18    thought it would be a good idea if you would be the CEO.

19         THE WITNESS:  Yes.  They've gone through five CEOs

20    in five years.

21         THE COURT:  It doesn't sound as if the term is as

22    long as a federal court judge.

23         THE WITNESS:  It was a low mortality rate job,

24    Judge.

25         THE COURT:  Okay.  Go ahead.

*F. Bisignano - Direct/Mr. Shearer*          **530**

1          How long did you stay a CEO?

2          THE WITNESS:  I stayed in CEO until July 29th when I

3     merged the company.

4          THE COURT:  2013?

5          THE WITNESS:  No this year.  I merged the company

6     this year.

7          THE COURT:  You were CEO of First Data from '13 to

8     just recently?

9          THE WITNESS: To July 29th.  And today, I'm the

10    president and chief operating officer and board member of the

11    new company.

12         THE COURT:  The name of the new company is what?

13         THE WITNESS:  Fiserve.

14         THE COURT:  Fiserv.  First Data is Fiserv?

15         THE WITNESS:  Yes.

16         THE COURT:  Hard to keep track of it.

17         THE WITNESS:  Yes, sir.

18         THE COURT:  You are the CEO now of Fiserv.

19         THE WITNESS:  I am the president and chief operating

20    office and a board member.

21         THE COURT:  So you're not the CEO?

22         THE WITNESS:  That's correct.

23         THE COURT:  Go ahead.

24    EXAMINATION BY

25    MR. SHEARER:

1    (Continuing.)

2    Q    You mentioned you brought in Mr. Plumeri as a board

3    member?

4            Why did you bring Mr. Plumeri in?

5    A    I brought in Joe --

6            THE COURT:  We have a problem.  You have a very good

7    voice.  A CEO would have a live voice, so you don't need the

8    microphone at all.

9            THE WITNESS:  I was listening to everybody else.

10           THE COURT:  You only need a microphone probably, but

11   push it away.

12           THE WITNESS:  Sure.

13           THE COURT:  Push it far away.  Push it away.

14           THE WITNESS:  I knew Mr. Plumeri from the days I

15   worked at Shearson American Express.  He was a very senior

16   executive there and our careers had always crossed.  He was a

17   retired CEO.

18           THE COURT:  So we don't need all of that.

19           THE WITNESS:  Okay.  I was answering his --

20           THE COURT:  You know him, you have a relationship.

21           Ask him questions that are relevant to this case.

22   EXAMINATION BY

23   MR. SHEARER:

24   (Continuing.)

25   Q    We heard about this Management Committee.  Is it you

*F. Bisignano - Direct/Mr. Shearer*　　　532

1   giving directions to the executive vice presidents?  Is the

2   discussion -- what is the role of the Management Committee in

3   your view?

4   A    You know, the role is to oversee the company.  The role

5   is each member, Management Committee member, each

6   Management Committee member has distinct responsibility.  You

7   can kind of think it as --

8             THE COURT:  You answered the questions.

9             THE WITNESS:  Thank you, sir.

10            THE COURT:  They manage people.

11            Go ahead.

12  Q    So do you direct them on specific projects?  Is it a

13  group decision?  What is it?

14  A    It's a team that oversees the company.

15  Q    Is each Management Committee member responsible for their

16  group's budget?

17  A    They're responsible for all the full operation of their

18  group, yes.

19  Q    Now, we heard testimony from, I believe, it was

20  Mr. Charron or maybe Mr. Marino that any expenditure in excess

21  of $250,000 required your approval; is that correct?

22  A    To some degree.

23  Q    What do you mean by, "To some degree"?

24  A    My knowledge of it, maybe.  We'd by buy a computer system

25  for a million dollars and I didn't sign a piece of paper for

*F. Bisignano - Direct/Mr. Shearer*          **533**

1    it.

2    Q    You signed a piece of paper?

3    A    I said I did not.

4    Q    I want to talk about the bonus pool because I think it's

5    important.

6         We heard testimony that the accounting term EBIDTA,

7    Earnings Before Interest Taxes Depreciation Amortization is

8    one of the factors in deciding the bonuses, the amount of

9    funds available for bonuses; is that correct?

10        THE COURT:  You tell the jury you give out bonuses.

11   Do you have any role to play in that and how did you determine

12   whether someone should get a bonus.  I think that's the

13   substance of the question which you can answer quickly, let's

14   do it, let's move on.

15   A    Yes.  Earnings are correlated to incentive compensation.

16        THE COURT:  So how do you determine someone gets a

17   bonus?  Do you have any role to play in that.

18        THE WITNESS:  The line executives oversee how that

19   bonus pool is allocated.

20        THE COURT:  So you leave it up to the line

21   executives to decide who should get a bonus and how much;

22   right?

23        THE WITNESS:  Yes.

24        THE COURT:  Do you have any real to play in that

25   yourself, or are you basically aware of what's going on?

*F. Bisignano - Direct/Mr. Shearer* **534**

1        THE WITNESS:  I'm aware.

2        THE COURT:  Next question.

3        (Continued on the next page.)

1   BY MR. SHEARER:

2   Q    So there's -- so there's no -- can the line managers give

3   out bonuses however they want to?  Is there a limit on the

4   amount that they can give within their group?

5   A    There's an allocation of dollars.

6   Q    And who provides that allocation?

7   A    It is provided through the Human Resources department and

8   we oversee it even as a Management Committee.

9   Q    When we just heard Ms. Kelly testify that when you came

10  in as CEO, the Sales Training Group transferred from the

11  Human Resources department to Mr. Fricke.  Was that -- did you

12  want training outside of HR?  Why did that happen?

13  A    I had nothing to do with that decision.

14          THE COURT:  You don't really know, do you?

15          THE WITNESS:  Right.  Yes, sir.

16          THE COURT:  All right.

17  Q    Did you change the head of HR when you came in?

18  A    At some point in time we -- after I arrived, we had a --

19  we changed the head of HR.  Not when I came in, though.  At

20  some point in time, you evaluate things and look at them.

21  Q    Do you know what measures you've established to comply

22  with the FMLA and ADA inside of First Data?

23  A    We have a legal department, we are general counsel, and

24  we have a Human Resources department, and they oversee those

25  matters.

1  Q    And you mentioned KKR owned First Data.  Did they have a

2  lot of influence on your decisions?

3  A    No.

4  Q    You ran the company independently, didn't need to answer

5  to the masters?

6  A    I had a board of directors, like all companies.

7  Q    During your deposition you said that First Data was at a

8  major pivot point when you came in, transferred from selling

9  terminals to selling technology.  What did that mean?

10 A    Well, we built out a software platform called Clover.  It

11 was eight engineers.  We built it out, and we were going to

12 bring technology.  But I think the real pivot point was it was

13 losing $874 million, and we were there to save jobs.

14 Q    You also said that this new selling technology required

15 different skill sets in a different mind-set.  Was that

16 correct?

17 A    For that aspect of our company, yes.  We have a very

18 large company, and that's one small aspect of it.

19 Q    So what was the different mind-set that was necessary to

20 make this transformation?

21 A    We were no longer just selling a brick terminal as you

22 might see it in a store, and we were selling a software set of

23 services.

24 Q    So the salespeople needed to be aware of what the

25 software services were, how they operated, and what they could

1    offer; is that right?

2    A    They did, yes.

3    Q    Did they have that knowledge when you arrived?

4    A    The product didn't exist when I arrived.

5    Q    They needed -- you needed to train all of your

6    salespeople to understand the new product then; is that right?

7    A    I just want to be clear, the product did not exist when I

8    arrived.  And we didn't need to train all the salespeople.

9    There was a limited amount of salespeople.  This is a company

10   with 25,000 people when I got there.  We have factories, we

11   have mailrooms, we have print shops.  The proponents of people

12   in this company are not salespeople, they are hard working

13   engineers in Omaha, in a print shop.  You know, the

14   representation of sales is the smallest part of the company.

15   Q    But if you looked at any of those other groups you just

16   mentioned and compared them to the rest of the company as a

17   whole, wouldn't you say the exact same thing about them, they

18   are just a small part of the whole?

19   A    I don't think 4,000 people in Omaha in a data center in a

20   print shop is a small part of the whole, I don't think 2,000

21   people answering phone calls.  The fact of the matter is, this

22   company is a company with recurring revenue at 90 percent.

23   Sales is the smallest part of how revenue is generated in this

24   company.  It is the servicing of those clients.

25   Q    So then how is revenue generated, if it is not sales?

1  A     Revenue is generated because we have clients for over 40

2  years that we process their work, we bring to them their

3  statements, how factories create their credit cards.  And when

4  you get down to what the pivot point of the company was, it

5  was saving the pensions of those 40-year employees that have

6  been in this company a long time.

7  Q     So First Data has a pension?

8  A     First Data had a pension plan, yes.

9  Q     Let's talk about restructuring a little bit.

10         How many restructurings involving the termination of

11 employees, and I am using that as -- in terms of -- strike all

12 that.

13         You are familiar with First Data's restructuring

14 accounting policy, are you?

15 A     I would say the chief accounting officer has the best

16 understanding of it.

17 Q     All right.  And so for something to qualify under a

18 restructuring as a restructuring for accounting purposes, as I

19 understand it, there has to be an expenditure of $5 million

20 for it to be treated as a restructuring instead of a normal

21 expense; is that right?

22 A     Okay, yeah.

23 Q     So when I talk about -- when you talk about restructuring

24 accounting as it applies to a reduction in force or -- you

25 need $5 million of severance payments in order to qualify for

1    that accounting treatment, right?

2    A    Okay.

3    Q    Well, is that correct?

4    A    I am not the chief accounting officer, but I am going to

5    say yes.

6    Q    So how many reductions in force or restructurings

7    involving the termination of employees, with more than $5

8    million of severance, have occurred between 2013 and 2018?

9    A    Well, in 2012, the company lost $870 million.  For seven

10   years, it lost about that much money.  And so, you know, one

11   of the things we had to do is get the company right.  And that

12   meant we closed locations and colocated people.  And I would

13   say, during that period of time, you know, from '13 to '17, to

14   get the company from being one of the biggest losing -- money

15   losers in America, to turning around and becoming profitable

16   in '17, probably ten different restructurings, for all

17   different reasons, site closures, vendor contract,

18   renegotiations.  It is not --

19            THE COURT:  You turned the company around.  Sounds

20   like you did a good job.

21            THE WITNESS:  Thank you, sir.

22            THE COURT:  And Fiserv was happy to take you on

23   after that, right?

24            THE WITNESS:  Yes, sir.

25            THE COURT:  I think we have a sense of it.  Let's go

1    on to something a little bit more focussed in terms of this

2    lawsuit.

3    Q    When we were talking about this reduction of the ten

4    percent of the top 3,000, we've seen evidence that indicates

5    that on January 6, 2017, you issued the directive to the -- to

6    Mr. Marino to get ready to execute on that; is that correct?

7              THE COURT:  Were you involved with that?  You knew

8    about that?

9              THE WITNESS:  Yes.  I had thought there was too much

10   management in the company relative to everything else we were

11   doing, and I made a decision that I wanted the high paid

12   people, you know, to be completely looked at, yes.

13             THE COURT:  It was your call, part of the --

14             THE WITNESS:  A hundred percent.

15             THE COURT:  -- saving the company, you felt you

16   needed this restructuring, and it was your decision --

17             THE WITNESS:  Yes, sir.

18             THE COURT:  -- to cut down the staff?

19             THE WITNESS:  Yes, sir.

20             THE COURT:  Okay.  Next question.

21   Q    How many employees were there at First Data at the end of

22   2016, do you know?

23   A    End of -- I don't know, in the -- you know, somewhere

24   between 22 and 25,000.  I don't know.

25   Q    And how many were there --

1  A    I don't remember.  I knew at that time.

2         THE COURT:  You gave --

3         THE WITNESS:  It is no longer relevant.

4         THE COURT:  -- the idea, it's more than two or

5  three, right?

6         THE WITNESS:  Yes, sir.

7         THE COURT:  20,000, 25,000, a big company, a lot of

8  people?

9         THE WITNESS:  Yes.

10         THE COURT:  Next question.

11  Q    Certainly during your tenure, has the head count remained

12  the same?

13  A    Head count ebbs and flows for a whole bunch of reasons.

14  We bought businesses, we sold businesses.  We sold a few

15  thousand people's business in Greece.  So head counts come

16  down a little bit, but we bought businesses and we've hired a

17  lot of people.

18         THE COURT:  So it goes down, it goes up, depends

19  upon whether you own companies, whether you consolidate it,

20  all those business decisions?

21         THE WITNESS:  Yes, sir.

22         THE COURT:  Okay.  Next question.

23  Q    You mentioned in your deposition an internal mobility

24  program.  What is that?

25  A    It is something that I have done my whole career.  You

1   know, it has been around about.  It is about, you know, if

2   you're going to shut down the department, to be able to see,

3   for the work force fundamentally, if you could have other

4   opportunities for them.  So I am a big fan of internal

5   mobility, and I think it's been around about in the Financial

6   Times even, my program.

7   Q    So does that mean that you're trying to promote within?

8   Is that what it means?

9   A    Well, I'm always trying to promote from within.  I mean,

10  I'm always trying to develop people, that talent is darn

11  important, but that's not what it means.  It means if we're

12  going to shut down a job, let's not go hire a person from the

13  outside if we can give a person inside that same opportunity.

14  Q    Now, you just responded to the judge that you were the

15  one that gave the directive on the ten percent of the top

16  3,000.  When you gave that directive, did you establish any

17  criteria for selecting individuals to be included as opposed

18  to excluded from that?

19  A    Well, I didn't have anybody excluded, I would start with

20  that.  And, really, the criteria was the following.  A phrase

21  you may have heard used here, which was spans and layers, but

22  I would like to explain that.  It is how many people does a

23  manager manage, how far is a management from the workers.  And

24  I wanted to move management closer to the workers, and I

25  wanted them to have more responsibility, wider spans.

1          So it was really people who had smaller spans of

2     control, was there a way to consolidate that organization so

3     one leader could lead it, and let's pick the most effective

4     leader for that full job we were talking about.

5          THE COURT:  So those are the marching orders --

6          THE WITNESS:  Yes, sir.

7          THE COURT:  -- you gave to the senior leadership?

8          THE WITNESS:  Yes, sir.

9          THE COURT:  Okay.

10    Q    And it was up to each of the executive vice presidents

11    solely to decide which manager they choose over the other?

12    When they are going to merge something, somebody has to go,

13    that was up to the executive vice presidents to make that

14    decision?

15    A    Yes, sir.

16         THE COURT:  They were to make it in accordance with

17    the instructions you gave them?

18         THE WITNESS:  Exactly.

19    Q    But there was no -- there wasn't take your bottom -- take

20    the -- look at their last performance rankings and we're going

21    to get rid of the lowest ranking performance rankings, that

22    should --

23    A    Well, I mean, there's a natural hierarchy for executive

24    vice presidents who know that, you know, you're not going to

25    get rid of your best performer, right?  So I'm sorry if I

1    didn't make that clear.

2            THE COURT:  Let me ask you this:  Was anything put

3    in writing in terms of the criteria?

4            THE WITNESS:  No.

5            THE COURT:  Or how these people should go about

6    evaluating who should be on this list?

7            THE WITNESS:  No, because we get together every

8    Monday morning.  We talked about this for months leading up to

9    it, this issue of are we top heavy.  We had looked at a bunch

10   of information that's showing these spans and layers, and then

11   an action was taken afterwards.

12           THE COURT:  So this was done at the weekly meetings?

13           THE WITNESS:  Yes.  And it was a collaborative

14   testimony of the team thinking through it.

15           THE COURT:  Go ahead.

16           THE WITNESS:  Thank you, sir.

17           THE COURT:  So your accent doesn't sound like mine,

18   that it comes from Brooklyn.

19           THE WITNESS:  My whole life, East 59th and Avenue N.

20           THE COURT:  Really?

21           THE WITNESS:  Yeah, yeah.  I went to school in

22   Kansas, so.  That was diversity for me.

23           THE COURT:  Kansas is supposed to have the best

24   accents of the country.

25           Okay.  Go ahead.

1              THE WITNESS:  Greatest place in the world, Brooklyn,

2      New York.

3      Q    Now, when you implement one of these restructurings,

4      we've heard that you get projections as to what the savings is

5      going to be.  Do you ever go back and check to make sure that

6      the actual results matched the projections that you were

7      relying on?

8      A    100 percent.

9      Q    And how do you do that?

10     A    I do it by regular performance reporting.  I think the

11     most important thing to think about is, I heard you ask, you

12     know, I've read the testimony -- I read the transcripts, I

13     listened to testimonies, you asked, how do we know these

14     things were effective.  I want to go back to this company was

15     losing $800 million.  That woman testified, there were way

16     more layoffs than the four she talked about during my tenure

17     leading up to it because of the bad condition of the company,

18     had $2 million in interest payments and zero cash.

19             The real issue is, you know, it was making hundreds

20     of millions of dollars, saving jobs, saving pensions.  So, to

21     me, that was the tale of the tape.  It is not one item, it is

22     not about the head count in the company.  It's about the total

23     P&L of the whole -- profit and loss of all the whole company,

24     and that's --

25             THE COURT:  Let me try to get a couple of focused

1   questions.

2           THE WITNESS:  Yes, sir.

3           THE COURT:  You're explaining to the jurors the

4   problems you had and you had all this responsibility with the

5   big company.  But we hear that first there was the 3,000 list,

6   so to speak, right, and then there came a time when it was

7   whittled down to 300, if I recall.

8           THE WITNESS:  362.

9           THE COURT:  So do you know anything about how that

10  happened, where the list came from, 3,000?

11          THE WITNESS:  Well, 3,000, 3,000 were the highly

12  compensated management people in the company.

13          THE COURT:  That was the 3,000.

14          THE WITNESS:  That was the population to look at.

15          THE COURT:  And those were the highest paid --

16          THE WITNESS:  Yes, sir.

17          THE COURT:  -- at the time.

18          And from that there came a point in time when it

19  came to be 300.

20          THE WITNESS:  362.

21          THE COURT:  Can you tell the jury how that happened.

22          THE WITNESS:  That happened through this evaluation

23  of could they consolidate jobs, could they make the decision

24  of the best person to do that job, what those spans, we had a

25  lot of people had one to four direct reports, we had some

1   organizations that had multiple layers.  The organization

2   being discussed about has been consolidated.

3              THE COURT:  You had to get focused --

4              THE WITNESS:  Yes.

5              THE COURT:  -- specifically on who these people

6   were?

7              Now, who made those decisions?  How did that come to

8   pass?

9              THE WITNESS:  Those decisions were made by the

10  executives on the Management Committee who oversaw each one of

11  those operating groups.

12             THE COURT:  Do you have any role to play in that at

13  all?

14             THE WITNESS:  No.  Other than, you know, I would

15  know at the end what the outcome was.

16             THE COURT:  You knew what the outcome was.  And was

17  it successful in reducing costs until you had these other

18  mergers and everything else?

19             THE WITNESS:  A hundred percent very successful.

20             THE COURT:  And you checked on that?

21             THE WITNESS:  A hundred percent, sir.

22             THE COURT:  Do you have any sense of what the

23  difference was between before and after?

24             THE WITNESS:  I think, you know, we had probably --

25  well, I go back to the bigger before and after, because there

1   is a core issue here.  This is about streamlining --

2              THE COURT:  We don't need all that detail.

3              THE WITNESS:  Okay.

4              THE COURT:  We want to get a sense.

5              THE WITNESS:  The core issues is we went from losing

6   hundreds of millions to making them, and part of this

7   management restructure was a large part of that.

8              THE COURT:  That was part of the success that you

9   had?

10             THE WITNESS:  Yes.

11             THE COURT:  All right.  Next question.  Go ahead.

12  Q    Well, is the compensation expense gone up or down since

13  you've taken control?

14             THE COURT:  I don't know why that's relevant.  I

15  mean, if you want to get a focused question about what

16  happened in this particular case, why Mr. Barger was put on

17  the 300 list, I'll listen to that.  But we've heard enough

18  about the general structure, we've gone over this now a couple

19  days.  It is getting a little repetitious.  I think the jury

20  understands the basic dynamics of the structure and the basic

21  overview.  Try to focus on specific questions that you think

22  are relevant in terms of how Mr. Barger was treated.

23  Q    Now, we heard that you had throat cancer; is that

24  correct?

25  A    I had throat cancer, yes, sir.

1  Q    Did you ever talk to Mr. Barger after his diagnosis about

2  it?

3  A    I did, in fact, the doctor, you know, that Joe Plumeri

4  referred him to was the one that I referred to many people who

5  was my oncologist, Lou Harrison.

6  Q    Now, we've heard Jeff Hack's name come up, and I believe

7  Dan Charron indicated that it was your decision to remove Jeff

8  Hack from First Data; is that correct?

9  A    Yes, it was.

10 Q    When did you tell Mr. Hack that he was going to be

11 terminated or exited?

12 A    Mr. Hack and I had multiple discussions about the

13 operating of the company, you know, during the second half of

14 '16.  And Mr. Hack and I concluded he should part ways because

15 his belief of where we could get to wasn't the belief of the

16 rest of the management team.  And that was a decision I made

17 with him in my office, one-on-one.

18 Q    And when did that occur?

19 A    Somewhere late '16-ish.

20 Q    And when did Mr. Hack depart First Data?

21 A    I think end of February in '17.

22 Q    Did he continue working that entire time or was he on

23 what the HR people were calling nonworking status?

24 A    No, I think he was -- I mean, look.  Mr. Hack was a very

25 senior executive who reported to Dan.  He sat at the

1   Management Committee table, and he was a very responsible

2   individual.  This was about a difference in how we needed to

3   run the company.

4   Q    So you didn't have issues with Jeff's management of the

5   people under him, it was more about his vision of what way the

6   company could go, is that what you were saying, about he

7   didn't think we could get where the rest of the committee

8   wanted?

9   A    I am not sure -- I mean, I will tell you what it is.  It

10  is he didn't think we would be in the position we are today,

11  and I believed we could and so did everybody else.  So if

12  that's what you believe, we probably should part ways.  It is

13  not more complicated than that.

14  Q    But you never had discussions with him about poor

15  management of the groups underneath him?

16  A    He reported to Dan Charron.  You know, I didn't have

17  discussions about poor management of groups underneath him.

18  That doesn't mean there wasn't.  That wasn't my responsibility

19  to do that.

20  Q    What other type of cost controls have you put in place

21  besides terminations of heads?

22  A    First week I got to the company, look, we had to save a

23  company.  We had to save a company.  You know, I took this

24  job, I told my wife, I might be presiding over one of the

25  largest bankruptcies, and we agreed we should go do it because

1   this was an operations and technology company.  It wasn't a

2   sales company, right.  That wasn't the main function at all,

3   and it sure wasn't a sales training company as its main

4   function.  And what we did was we called every vendor.  We

5   called every vendor, and we told them we were having a bad

6   time.  We may not be able -- and we met with every one of

7   them, morning, noon, and night on how to restructure every

8   contract we had.  Right?  We looked at every location we had.

9   We looked at every business we had.  And then we needed to put

10  money into technology to fix the company.

11          So that's why I did morning, noon, and night, every

12  day of my life in this job.  And I committed that nobody would

13  outwork this management team because we had a commitment to

14  the 24,000 people to save their jobs.

15          THE COURT:  You know, you are going on and on.

16          THE WITNESS:  Sorry, sir.

17          THE COURT:  We don't need all that information.  I

18  can understand how you wanted to tell everybody how great a

19  job you did.

20          THE WITNESS:  No, no.  I just want to tell them what

21  we were up against.

22          THE COURT:  Clear, focused questions.  Next

23  question.

24          THE WITNESS:  I am looking for one of those.

25  Q     I want to go back to the tracking results against

1   protections real quick.

2          There's -- you say you can look at the numbers, but

3   how do you -- given all of the actions you take, how can you

4   identify what action had what effect at the -- in the end?

5   A    I'm sorry, your Honor, but we are a publicly traded

6   company.  My responsibility was to represent this company to

7   shareholders and the employees.  And our numbers get posted

8   every quarter, publicly, to the Street, and they make their

9   decision whether they want to own our stock.  So I don't know

10  any other way to track it than every number, every day, every

11  way, and I don't understand the question.

12  Q    If you terminate people and they are immediately

13  replaced, do you track that?

14  A    In this 3,000, highly -- highest compensated people,

15  there was a lot less of them than the work force we were

16  adding.  We were adding --

17          THE COURT:  The question is, did you track people --

18  A    -- workers and eliminating --

19          THE COURT:  Listen to me.  We're going to move it

20  along, okay.

21          THE WITNESS:  I agree.

22          THE COURT:  We are getting repetitious and we are

23  wandering.  I am not going to allow that to happen.

24          The question, I think, is, do you know anything

25  about these 300 people who were terminated?  Did you keep

1  track of them?  Did you --

2          THE WITNESS:  A hundred percent.

3          THE COURT:  So give me the general overview --

4          THE WITNESS:  So we look at we have --

5          THE COURT:  Listen to me.

6          THE WITNESS:  Yes.

7          THE COURT:  I am not the CEO, but the judge has

8  certain powers.

9          THE WITNESS:  You are the CEO here.

10          THE COURT:  Here, I am CEO of this room, okay.  I'm

11  just trying to cut to the chase, okay?

12          THE WITNESS:  Yes.

13          THE COURT:  Because we can wander all over the

14  place, we have a lot of information.  It is all interesting,

15  but we are talking about Mr. Barger.

16          Did you have any knowledge of his termination, why

17  he was terminated?  Do you have any knowledge about that whole

18  situation at all?

19          THE WITNESS:  I do.

20          THE COURT:  Yes or no.

21          THE WITNESS:  I have some knowledge.

22          THE COURT:  Okay.  So you can tell the jurors what

23  you know all about that.

24          THE WITNESS:  Yes.  That wasn't the question he was

25  asking, though.

1            THE COURT:  I am going to ask you the question.

2            THE WITNESS:  The conclusion was that by the group,

3    by the person managing Jeff Hack, that the group could be

4    consolidated.

5            THE COURT:  So are you aware that -- did you know

6    that he was one of the people who was going to be terminated?

7            THE WITNESS:  At the end of the process?

8            THE COURT:  Not before.

9            THE WITNESS:  No.

10           THE COURT:  When you say the end of the process,

11   when did you first learn about that?

12           THE WITNESS:  In January sometime.

13           THE COURT:  Was he still recovering from his

14   operation then?

15           THE WITNESS:  I don't -- I wasn't tracking

16   Mr. Barger.

17           THE COURT:  So at the end, you knew he was being

18   terminated?

19           THE WITNESS:  Yes.

20           THE COURT:  And you knew him --

21           THE WITNESS:  Yes.

22           THE COURT:  -- pretty well?

23           THE WITNESS:  Not well.

24           THE COURT:  All right.  And did you review that

25   whole process?  Did you try to understand why he was selected

1    for termination?

2            THE WITNESS:  I didn't.  There were 362 people.  I

3    didn't individually look at --

4            THE COURT:  You just knew it was happening --

5            THE WITNESS:  Yes.

6            THE COURT:  -- and you just let the managers take

7    care of that?

8            THE WITNESS:  Yes.

9            THE COURT:  Do you have any other questions?

10           MR. SHEARER:  Yes.

11   Q    Out of the 362, how many were in the United States, how

12   many were outside of the United States?

13           THE COURT:  I don't know why that's relevant.

14   A    I don't know.

15           THE COURT:  Next question.

16           MR. SHEARER:  I think that will do it.

17           THE COURT:  Okay.  Now, Mr. Eidelman, do you want to

18   question?

19           MR. EIDELMAN:  I do, your Honor.

20           THE COURT:  So it's five to 12:00.  I'm thinking

21   about when we are going to break for lunch.  Possibly, we can

22   complete his testimony before lunch time?

23           MR. EIDELMAN:  Absolutely, Judge.

24           THE COURT:  Let's see what we can do.

25   CROSS-EXAMINATION

1    BY MR. EIDELMAN:

2    Q    Mr. Bisignano, after growing up in Brooklyn, how did you

3    get into business?

4    A    I worked my whole life.  I got summer jobs while I was in

5    college, I worked in the back office of bank --

6            THE COURT:  I don't think we need it.

7            MR. EIDELMAN:  I will move on then, your Honor.

8    Q    When you joined First Data as the CEO in April of 2013,

9    did you do anything with respect to the employees at that

10   point in time?  I've heard -- we've heard testimony about the

11   term "owner associates."  What's an owner associate?

12   A    In the first few months I made the decision to give every

13   person in the company equity in the company so we would all be

14   rowing in the same direction when they understood what we were

15   trying to do to fix the company.

16   Q    You testified that Mr. Plumeri was brought in, Joe

17   Plumeri, who was the first witness who testified here today --

18   at the beginning of the trial on Tuesday, that Joe Plumeri was

19   brought in as a senior advisor to you and worked.

20           Did you know that Mr. Plumeri was hiring Mr. Barger?

21   A    He mentioned he was bringing him on as a consultant.

22   Q    Tell the jury what Mr. Plumeri told you and what was your

23   involvement.

24   A    He said, I'm going to bring Steve Barger on, he's a

25   consultant --

1           MR. SHEARER:  Objection.

2  A    -- and he's going to help me.

3           THE COURT:  Just one second.

4           Well, you know, you are asking him to testify about

5  what somebody else told him, so that normally would not be a

6  proper question, I suspect, right, unless it is a new

7  exception to the hearsay rule.

8  Q    What was your understanding about why Mr. Plumeri was

9  bringing Mr. Barger to work --

10          THE COURT:  Did you have an understanding about

11 that?

12 A    It was --

13          THE COURT:  Do you have any knowledge?

14 A    He was going to help on sales training.

15 Q    Okay.  Did you have a -- did you have contact with

16 Mr. Barger while he was working for Mr. Plumeri?

17 A    I never received a piece of information pertinent to work

18 for Mr. Barger my whole time in the job.

19 Q    After Mr. Plumeri left, what happened with regard to

20 Mr. Barger's position?

21          THE COURT:  Do you know about that?

22 Q    If you know.

23 A    I wasn't -- I honestly didn't know.

24 Q    Okay.

25          THE COURT:  So you have limited knowledge?

1           THE WITNESS:  Yes.

2           THE COURT:  You're the big cheese, and you have --

3    let me ask you this question:  You mentioned something about

4    equity.

5           THE WITNESS:  Yes, sir.

6           THE COURT:  So did these 300 people have equity in

7    the company, stock, meaning stock options, something like

8    that?

9           THE WITNESS:  "Meaning" is always in the eye of the

10   beholder, but the 300 people had equity.  When I got to the

11   company, I said every person.  So 24,000 people had equity in

12   the company.

13          THE COURT:  It means had stock?

14          THE WITNESS:  Yes, sir.

15          THE COURT:  And that would include the 3,000

16   people --

17          THE WITNESS:  Yes.

18          THE COURT:  -- and the 300 people as well.

19          The amount of stock they were given in the company,

20   or equity is what we say, right, who made that determination?

21          THE WITNESS:  We had more of a formula by

22   compensation level of how much equity goes versus cash.

23          THE COURT:  So somebody who was making 700,000 like

24   Mr. Barger, would he have more stock in the company than

25   somebody making 200,000?

1        THE WITNESS:  By all rules, most probably.

2        THE COURT:  So how does it work when somebody is

3   terminated?  Do they keep their stock or do they lose it?

4        THE WITNESS:  Well, they keep all their stock that's

5   vested, and then there's generally, you know, in fact, a way

6   to unwind the rest of it.  In some cases, like in

7   Mr. Barger's, he was given cash in November when he would have

8   received most of that money in stock in February.

9        THE COURT:  I guess what I'm trying to find out,

10  whether or not somebody who's terminated, these people lost

11  their jobs, he was not the only one, right?  Did they have

12  stock in the company when they lost their jobs?

13        THE WITNESS:  Yes.

14        THE COURT:  So if the company was turned around, and

15  then the company became more profitable, they would have

16  benefited by that, I take it?

17        THE WITNESS:  People, thank the Lord, did decent in

18  the turnaround that occurred, sir.

19        THE COURT:  Okay.  Do you have any other questions?

20        MR. EIDELMAN:  Just a few, your Honor.

21  BY MR. EIDELMAN:

22  Q    Did you know that Mr. Barger was on FMLA leave, Family

23  Medical Leave Act leave in November of 2016?

24  A    No.

25  Q    Did you have anything to do with Mr. Barger's taking FMLA

BISIGNANO - CROSS - EIDELMAN                    560

1    leave in 2016?

2    A    No.

3    Q    Did you see any paperwork?  Did you handle any

4    paperwork --

5    A    No.

6    Q    -- for Mr. Barger relating to FMLA?

7    A    No.

8    Q    You didn't hire Mr. Barger, correct?

9    A    Correct.

10   Q    Did you set Mr. Barger's compensation?

11   A    No.

12   Q    Did you supervise Mr. Barger's employment?

13   A    Not at all.

14   Q    Did you keep personnel records or anything like that on

15   Mr. Barger?

16   A    No.

17   Q    Were you surprised that Mr. Barger was included in the

18   ten percent of the top 3,000 reduction in force, the spans and

19   layers exercise that you've testified to?

20   A    No.

21   Q    You're an individual defendant in this case besides

22   having been the CEO of First Data; isn't that right?

23   A    It is.

24   Q    Did Mr. Barger's throat cancer -- and you had throat

25   cancer, too.

1          Did Mr. Barger's throat cancer have anything to do

2     with his inclusion in the ten percent of the top 3,000

3     employees reduction in force?

4     A     No, sir.

5     Q     Did the fact that Mr. Barger had taken leave have

6     anything to do with the fact that he was included in the ten

7     percent of the top 3,000 reduction in force?

8     A     No, sir.

9     Q     Did the fact that Mr. Barger indicated that he wanted to

10    come back to work and submitted a doctor's note that released

11    him have anything to do with his inclusion in the ten percent

12    of the top 3,000 reduction in force?

13    A     No, sir.

14          MR. EIDELMAN:  Your Honor, if I may just consult

15    with my colleagues.

16          THE COURT:  Go ahead.

17          (Short pause.)

18          MR. EIDELMAN:  No further questions, Judge.

19          THE COURT:  Anything else, Mr. Shearer?

20          MR. SHEARER:  Yes, just a few.

21    REDIRECT EXAMINATION

22    BY MR. SHEARER:

23    Q     You mentioned the $250,000, you need to know about it,

24    expenditures?  Do you recall that?

25    A     I recall the conversation.

1   Q    What was Mr. Plumeri's authority?  Was he subject to that

2   $250,000?

3   A    Probably not.

4   Q    Okay.  So if he issued a purchase order for $400,000, he

5   wouldn't have to clear that with you?

6   A    Joe would talk to me about most things.  Just like most

7   people, they would talk to me because it wasn't really about

8   the dollar amount, it was about actually what was going on in

9   the company.

10  Q    When you gave equity to employees, what was the value of

11  the equity you gave them, let's say the manager level of

12  employees?

13  A    I don't relate to that question.

14       THE COURT:  Who decided how much equity somebody

15  would get?  Was that your decision?  Did you leave it to up

16  other people?

17  A    I mean, equity -- I'm sorry to do this, Judge.

18       Equity was generally given in the incentive comp

19  process, and there was a formulaic way it was divided between

20  cash and stock at different levels of management.

21       THE COURT:  All right.  So you had nothing to do

22  with that, you left that up to the managers?

23       THE WITNESS:  Yes.  A hundred percent.

24       THE COURT:  All right.

25       THE WITNESS:  I and the board would only approve my

BISIGNANO - REDIRECT - SHEARER                        563

1    direct reports.

2              THE COURT:  You would approve the general

3    overview --

4              THE WITNESS:  The totality of it.

5              THE COURT:  And you let the managers implement it.

6              THE WITNESS:  Yes, sir.

7    Q    And were any of your cost cutting controls changes to

8    benefits of the employees?

9    A    Could you say that again, please?

10   Q    Benefits.  Employee benefits.

11   A    You said something, top ten.  I didn't know what that

12   was.

13   Q    I'm sorry, no.

14             Did any of your cost reduction measures include

15   cutting benefits, 401(K), medical insurance, that kind of

16   thing?

17   A    I mean, we replaced 401(K) with stock, just for clarity,

18   and then we awarded stock to everyone.  We actually increased

19   severance payments in the company.  We actually kept -- we

20   changed the whole benefits scheme in the company, where the

21   highest paid people paid the most.  And for two years in a row

22   we never raised health benefits for our work force.  So, yes,

23   we changed things.

24   Q    And you approve the corporate-wide amount of bonus pool

25   available, don't you?

1  A    I do.

2  Q    Could you -- can you terminate anybody in the company if

3  you want to?

4  A    I don't really think so.

5  Q    You terminated Jeff Hack, and he reported to Dan.  How

6  did that --

7  A    There was a nuance to this.  He sat at the Monday morning

8  Management Committee.  So many times in companies you have

9  people on a Management Committee but have another member of

10  the Management Committee and their boss.  And Jeff and I had

11  the conversation, and we concluded it was best for him to part

12  ways.

13          THE COURT:  So it was a mutual agreement,

14  apparently, between the two --

15          THE WITNESS:  Yes.  Because if he didn't believe in

16  the mission, he was fundamentally voting himself out.

17          THE COURT:  I think the question is whether you had

18  the power, you were the big cheese, can you fire somebody?

19          THE WITNESS:  Yeah, it is not -- companies don't

20  work like that, that CEOs walk around and fire people.

21          THE COURT:  You may have the power, but you don't

22  implement it, you talk to other people --

23          THE WITNESS:  Yes, of course.

24          MR. SHEARER:  Thank you, your Honor.

25          THE COURT:  Okay.  Anything else, Mr. Eidelman?

1          MR. EIDELMAN:  Yes.  This is one question so I won't

2    walk over.  I think the jury can hear me and see me.

3    RECROSS-EXAMINATION

4    BY MR. EIDELMAN:

5    Q    Mr. Bisignano, if you had learned in June of 2014, that

6    somebody that was working for your company had submitted

7    invoices -- fraudulent invoices for services that they were

8    not entitled to receive, and that came to your attention, what

9    would you have done?

10         THE COURT:  Objection sustained.  We are not dealing

11   with that here.

12         All right.  I don't see that as part of this case.

13         You may step down.

14         THE WITNESS:  Thank you, sir.

15         (WHEREUPON, the witness was excused.)

16         THE COURT:  All right.  So we are going to take our

17   lunch break now, and I'll talk to the lawyers about how we are

18   going to proceed at this time.  And let's come back at a

19   quarter to 2:00, and give me a little chance to talk to the

20   lawyers before we reconvene.  Okay?

21         THE COURTROOM DEPUTY:  All rise.

22         (WHEREUPON, at 12:05 p.m., the jury exited the

23   courtroom.)

24         (Continued on the next page.)

25

*PROCEEDINGS*                                                    566

1   (Open court; no jury present.)

2            THE COURT:  Now, Mr. Shearer, what do we have next?

3            MR. SHEARER:  I have three depositions -- I have cut

4   Ms. Steffen's down --

5            THE COURT:  Talk to me.

6            MR. SHEARER:  Yes.  I cut Ms. Steffen's down.

7            THE COURT:  Do you have any other live witnesses?

8            MR. SHEARER:  Mr. Barger.

9            THE COURT:  All right.  He's the last one?

10           MR. SHEARER:  Yes.

11           THE COURT:  Okay.  You will have no other witnesses

12   after Mr. Barger?

13           MR. SHEARER:  That's correct.

14           THE COURT:  And you have some deposition testimony?

15           MR. SHEARER:  Yes.

16           THE COURT:  Now, as far as deposition testimony,

17   Mr. Eidelman's concerned that it may not be relevant, it may

18   go on and on for no particular reason.  So how long do you

19   think the deposition testimony will be?

20           MR. SHEARER:  Less than an hour, an hour.

21           THE COURT:  Okay.  So --

22           MR. EIDELMAN:  Judge, if I can say something about

23   that.  I think I have counted, from all the deposition

24   testimony that he wants to put in, I think it is close to a

25   hundred pages.  If you do two pages a minute, with

1   breathing --

2              THE COURT:  You are going to talk to each other over

3   lunchtime --

4              MR. EIDELMAN:  I will.

5              THE COURT:  -- and fine tune it.

6              MR. EIDELMAN:  We might be able to stipulate to some

7   of it.

8              THE COURT:  That's why you are going to talk to each

9   other at lunchtime, and when we come back, we will hear from

10  Mr. Barger, and I am sure the deposition situation will be

11  fleshed out properly and you, as officers of the Court, will

12  talk to each other.

13             Now, let's assume we go forward and we complete

14  Mr. Barger's testimony perhaps this afternoon.  What will you

15  folks then have to offer?  I take it you are going to rest

16  after that?

17             MR. SHEARER:  Yes, your Honor.

18             THE COURT:  Okay.

19             MR. EIDELMAN:  So once Mr. Barger rests, we have to

20  evaluate, but we are having witnesses flown in for tomorrow,

21  and I think we could, with the exception of maybe the expert

22  witness, which depends on what Mr. Barger's testimony is, we

23  may need Monday morning, but, Judge, I think we can complete

24  any witnesses we would have, other than our expert, tomorrow

25  morning -- by tomorrow, Friday.

*PROCEEDINGS*                                              568

1          THE COURT:  Well, you let me know who you are going

2   to have as witnesses, we are going to know that at the end of

3   the day.

4          MR. EIDELMAN:  It may depend on whether or not the

5   stipulation --

6          THE COURT:  Well, you are going to know at the end

7   of the day.

8          MR. EIDELMAN:  Certainly.

9          THE COURT:  The expert, you say --

10         MR. EIDELMAN:  We have an expert -- Mr. Barger has

11  no expert.

12         THE COURT:  I understand.  Do you plan to call --

13  this is on the economic aspect of things?

14         MR. EIDELMAN:  It is, your Honor.

15         THE COURT:  You plan to call that person as a

16  witness.  It depends on what Mr. Barger says?

17         MR. EIDELMAN:  Yes, your Honor.

18         THE COURT:  Well, you have a pretty good idea what

19  he's going to say.

20         MR. EIDELMAN:  Yes, and I think --

21         THE COURT:  You are going to let me know at the end

22  of the day.  So I have a sense that maybe tomorrow will be

23  summations, okay?  That's my sense.

24         MR. EIDELMAN:  Summations tomorrow?

25         THE COURT:  Friday.  It looks like we may be able to

*PROCEEDINGS*                                              569

1   finish the testimony today, believe it or not.

2            MR. EIDELMAN:  Well, except -- we likely, your

3   Honor, will have witnesses tomorrow.

4            THE COURT:  You are going to let me know --

5            MR. EIDELMAN:  Yes.

6            THE COURT:  -- who they are --

7            MR. EIDELMAN:  I will.

8            THE COURT:  -- and how long they are going to be.

9            MR. EIDELMAN:  We will converse over lunch with our

10  team and let you know.

11           THE COURT:  You do that.  Because a lot of times

12  cases move along little quicker than you anticipate.  Maybe I

13  have something to do with that process, maybe not.  Let's try

14  to give everybody a fair trial and let's talk about one more

15  thing.

16           You know, I'm not the finder of facts, and I really

17  like to encourage people to settle their difference if they

18  can do that.  And as I mentioned before, it is never too late

19  to settle a case.  You've heard a lot of testimony, you know a

20  lot about what the jury has heard now, and if you think I can

21  be of any help to you folks in terms of seeing whether you can

22  reach an accommodation, I am willing to do that, if I can be

23  of any value to you.  But it is good to see when the cases can

24  be resolved without finding out whether it's going to be a

25  winner or a loser, up or down.  See if you can possibly think

*PROCEEDINGS*                                                570

1    about that.

2          MR. ZEITLIN:  It is worth mentioning that the first

3    offer in several weeks was made today before we commenced, so.

4          THE COURT:  Look.  I am not into the nitty-gritty of

5    it.  I am just offering my services, okay, because I am not

6    going to be in that jury room deciding the facts.  If I can

7    help facilitate a resolution of this matter, I get it,

8    Mr. Barger, I have great empathy for him.  I can understand

9    that.  We all can, all right.  But at the same time, you know,

10   we have a record here that you now have an opportunity to

11   fully assess.  It would be nice if there was some

12   accommodation, if that can be worked out.  I don't think it is

13   going to be in the millions, obviously, but there may be a way

14   of resolving this case in a peaceful way and everybody shake

15   hands and wish everybody good health and happiness, okay?  See

16   whether you can possibly think about that, okay?  And I would

17   like to encourage that.  We will see you at 2:00.

18         MR. EIDELMAN:  Your Honor, before we go off the

19   record, may I just do one thing?  It will take me two seconds,

20   which is, for the reasons that I have previously put on the

21   record with regard to the failure of the plaintiff to prove by

22   a preponderance of the evidence that Ms. Johnson, Mr. Charron,

23   Mr. Marino, and now Mr. Bisignano, should not be individual

24   defendants under the FMLA.

25         THE COURT:  I get it.  You are making your record.

1          MR. EIDELMAN:  Thank you, your Honor.

2          THE COURT:  You'll talk about it all, in view of

3    reaching a settlement, if it can be done.

4          All right.  See you at -- did I say a quarter to

5    2:00, Mike, or 2:00?

6          THE COURTROOM DEPUTY:  Quarter to.

7          THE COURT:  Well, tell the jurors it will be 2:00,

8    okay?

9          THE COURTROOM DEPUTY:  Yes.

10         (WHEREUPON, a recess was had from 12:10 p.m. to 2:11

11   p.m.)

12         (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1            A F T E R N O O N   S E S S I O N

2

3            (Open court; no jury present.)

4            (Time noted:  2:11 p.m.)

5

6            THE COURT:  All right.  Anything you have to report

7    to me, Mr. Shearer?

8            MR. SHEARER:  No.  We have had -- we've talked a

9    little, but it didn't move anywhere.

10           THE COURT:  Let's bring the jurors in.

11           (WHEREUPON, at 2:12 p.m., the jury re-entered the

12   courtroom.)

13           THE COURTROOM DEPUTY:  You can all be seated.

14           THE COURT:  All right.  So I think Mr. Barger is

15   going to now testify.

16           MR. SHEARER:  We have shortened down these

17   depositions.  Would you like the depositions read in first,

18   before Mr. Barger?

19           THE COURT:  I think it would be nice if we can hear

20   his testimony, okay.  Save the deposition for last, if we can.

21   I sense the jury is probably looking forward to hearing from

22   Mr. Barger.

23           MR. SHEARER:  Okay.  Mr. Barger.

24           THE COURTROOM DEPUTY:  Good afternoon, Mr. Barger.

25   I ask if you can remain standing and raise your right hand.

*S. BARGER - DIRECT - SHEARER* 573

1          (WHEREUPON, the witness was duly sworn.)

2          THE COURTROOM DEPUTY:  Please have a seat.

3          THE COURT:  You have been through a lot, I

4   understand that.  So whatever you need, if you need a break or

5   any water, just don't hesitate, and let's hear how you're

6   talking these days.

7          THE WITNESS:  Thank you, your Honor.

8          THE COURT:  Okay.

9          THE WITNESS:  Can you hear me okay?

10         THE COURT:  Jurors, can you hear Mr. Barger, okay?

11         Now, you have to keep that pressed all the time when

12  you talk?

13         THE WITNESS:  Yes.  I am going to explain that in a

14  minute so everybody feels comfortable.  I will just need to

15  gather breath to speak, so.

16         THE COURT:  You take your time.  I am sure everybody

17  here is sympathetic, all the parties in this courtroom.

18         THE WITNESS:  Thank you, sir.

19         THE COURT:  All right.  So your witness.

20                STEVEN B. BARGER,

21  called as a witness herein by the Plaintiff, having been first

22  duly sworn, was examined and testified as follows:

23  DIRECT EXAMINATION

24  BY MR. SHEARER:

25  Q    Hello, Mr. Barger.

1    A    Hello.

2    Q    You conveyed to me that you would like to explain your

3    disability and your speech, and I think -- why don't you take

4    the chance now to --

5              THE COURT:  I don't think he has to do that.  I

6    don't want him to use up more energy than he has to.  We all

7    know he's disabled.  The defendant knows it, everybody in the

8    courtroom knows it.  Everyone is sympathetic, on either side,

9    there's no question about it.

10             Whether or not the defendants wrongfully discharged

11   him or wouldn't let him come back to work and violated the

12   law, that's what we're here to find out.  We know, we all feel

13   sympathetic about it.  But sympathy can't get in the way of

14   your decisions.  It is the evidence and the law.

15   Q    All right.  Mr. Barger, I guess I want to start with your

16   relationship with Mr. Plumeri over the years and how that

17   brought you to First Data.

18             Can you explain that relationship and how -- when

19   you worked together and how that brought you to First Data?

20   A    Certainly.  In 1980, I was fortunate enough to be working

21   for a bank holding company in the Midwest.  And one of my

22   first mentors gave me a charge of developing an investor

23   center and that could provide multiple services to our bank

24   clients.  It was a time in the '80s when Wall Street, the

25   insurance companies, and the banks were trying --

1          THE COURT:  Mr. Barger, I am going to intentionally

2     interrupt, okay.  Because we can be here for a long time

3     talking about your past and Wall Street and banks and all this

4     sort of stuff, but we are not really here for that.

5          THE WITNESS:  This is how Joe found me.

6          THE COURT:  Explain to the jury how you came to meet

7     Mr. Plumeri, how you got this job through him.  He's already

8     testified.  I will let you do that.  But we don't have to go

9     into more detail.

10         THE WITNESS:  Yes.

11    A    So Joe found out what I had been doing, and he called and

12    wanted me to come explain the banking strategy to his top

13    producers at Shearson Lehman Brothers.  So I engaged with him

14    to make the presentations across the firm.  And this was how

15    we first met.

16         THE COURT:  Now, he testified, I just want to get

17    you to conserve your energy, and he testified extensively

18    about how he met you and how he came -- you became close

19    relationships and he offered you the position.  You were in

20    court, you heard him testify, right?

21         THE WITNESS:  Yes, sir.

22         THE COURT:  Was he basically laying it out correctly

23    about the history of how you met and how you came to be --

24         THE WITNESS:  He missed some dates, but yes.

25         THE COURT:  If you want to add anything to it, by

1   all means, but if you agree with what he said --

2            THE WITNESS:  Okay.  Good idea.

3            THE COURT:  -- you had a good relationship, if you

4   want to add anything to it, but go ahead.  But I am really

5   intentionally trying to get you to conserve your energy.

6            THE WITNESS:  Gotcha.  Appreciate you doing that.

7   Q    Now, Mr. Plumeri --

8            THE COURT:  Do you want to say anything else about

9   the relationship between --

10           THE WITNESS:  No, it --

11           THE COURT:  -- you and Mr. Plumeri?

12           THE WITNESS:  No.  It actually started in -- Joe

13  thought it was '84.  It started in 1982.

14           THE COURT:  You agree with everything that he said?

15           THE WITNESS:  Yes.

16           THE COURT:  Okay.  Go ahead.

17  Q    Do you agree that when he made the decision to bring you

18  into First Data -- we had a discussion about a brief

19  presentation that you had given to Lebenthal.  Did he know

20  about the Lebenthal presentation?

21  A    Yes, he did.

22  Q    Okay.  And why did he know about them?

23  A    He served on their board.

24  Q    Okay.

25           MR. SHEARER:  This is going to be Plaintiff's 11.

1            THE WITNESS:  Judge, when I have to cough, I have to

2    turn away, just so you know.

3            THE COURT:  Go ahead.

4            (Short pause.)

5            THE COURT:  You wanted Barger presentation to

6    Lebenthal in evidence?

7            MR. SHEARER:  Yes.

8            THE COURT:  I don't know what the relevancy is, but

9    if you want it, you can have it.

10           (Plaintiff Exhibit 11 received in evidence.)

11           THE COURT:  Do you have to have this shown to the

12   jurors?

13           MR. SHEARER:  I do have one thing on here.

14           THE COURT:  Read what you want the jurors to know

15   about that.  Go ahead.  It is in evidence now.

16   Q    Mr. Barger, can you identify this document?

17           THE COURT:  We know it is identified.  You can

18   identify it, it is in evidence, and you can tell the jurors

19   what you want them to know.

20   Q    Mr. Barger --

21           THE COURT:  I want you to do it.

22   Q    -- page 3, I'm sorry it's sideways, but this was your

23   proposal to Lebenthal that Joe learned about that caused him

24   to talk to you about First Data; is that correct?

25   A    Yes, it is.

S. BARGER - DIRECT - SHEARER                          578

1    Q    Okay.  And can you just describe the financial

2    arrangement you proposed with Lebenthal that Mr. Plumeri knew

3    about?

4                THE COURT:  Sustained.  I don't see where it is

5    relevant.  You want to read anything from the document, I

6    allowed it into evidence, I will let you do.  Let's move on.

7                Look.  There's no question -- listen to me.  Tell me

8    if I am wrong.  You had a good relationship with Joe, right?

9                THE WITNESS:  This is --

10                THE COURT:  Initially, right?

11                THE WITNESS:  This is about the compensation that he

12    replaced when he hired me.

13                THE COURT:  You can speak into the microphone.

14                I am working under the assumption, tell me if I am

15    wrong, that everybody was happy you came to work for them,

16    they were happy to have you, you got along well with them, and

17    then you had these problems when you got sick, right?

18                THE WITNESS:  They are making a contention that I

19    had a false premises for when they hired me, that I was given

20    more money than I should have been when they first hired me.

21    This document shows that my agreement with Lebenthal is kind

22    of what Joe matched when he hired me.

23                THE COURT:  This agreement shows that you were

24    making how much money, is that what you are telling me?

25                THE WITNESS:  Yes.  All collectively, when I was

1   going to go to work for Lebenthal before he asked me to come

2   there, this is about the same numbers that Joe offered --

3              THE COURT:  This is what you were making before you

4   came to work for First Data?

5              THE WITNESS:  That I was about to make, yes.

6              THE COURT:  How much was that?  You can tell the

7   jurors.

8              THE WITNESS:  On a monthly basis it was $20,000,

9   plus they had 12 teams I was going to manage, so it was about

10  30 to $35,000 a month to take care of the responsibilities,

11  and, also, my intellectual property, and the fact I had to

12  give up some other clients that had actually had prepaid me,

13  and I had to pay them back because I wasn't going to work with

14  them.

15             THE COURT:  So I understand, you were making about

16  $30,000 for Lebenthal before you came to First Data?  I'm

17  going to make it easy for you; yes or no?

18             THE WITNESS:  A little more, yes.

19             THE COURT:  A little more?

20             THE WITNESS:  Yes, sir.

21             THE COURT:  And then you came to work for First Data

22  for 30,000, initially; is that correct?

23             THE WITNESS:  Yes.

24             THE COURT:  All right.  And there came a time when

25  you earned more money for First Data?

1              THE WITNESS:  When I went full-time.

2              THE COURT:  And when you went full-time, then what

3    were you earning at First Data?

4              THE WITNESS:  40.

5              THE COURT:  40.

6              And then I think at the time you took leave, it was

7    like 750,000, right?

8              THE WITNESS:  That was still 40,000 a month plus

9    bonus.

10             THE COURT:  Plus the bonus.

11             THE WITNESS:  Yes.

12             THE COURT:  So you got bonuses, also, right?

13             THE WITNESS:  Yes.

14             THE COURT:  And you got bonuses from the inception

15   of just towards the end of the line?

16             THE WITNESS:  No.  When I went full-time, it was

17   part of my agreement.

18             THE COURT:  Right.  So when you went full-time, then

19   it was part of your agreement, you started to get more money,

20   bonuses, and at the time you took your leave --

21             THE WITNESS:  No, I actually got less money on the

22   bonuses.

23             THE COURT:  You got less than 30,000 a year?

24             THE WITNESS:  No, no.  You said bonuses, not salary.

25   I got --

S. BARGER - DIRECT - SHEARER                              581

1          THE COURT:  I was just trying to get a sense, you

2   were working here, you were getting bonuses.  I am giving you

3   a chance to tell the jury how much you were earning.  You

4   started at 30, right?

5          THE WITNESS:  As a consultant.

6          THE COURT:  Well, whatever the label.  As a judge,

7   consultant, whatever, when you started to work, right?

8          THE WITNESS:  Yes, sir.

9          THE COURT:  And then you took on additional duties

10  after that?

11          THE WITNESS:  No.  Then I stopped being a

12  consultant, and I -- they hired me to be an employee.

13          THE COURT:  As an employee?

14          THE WITNESS:  Yes, sir.

15          THE COURT:  Did you continue to make the 30,000?

16          THE WITNESS:  40.

17          THE COURT:  40.  So when you were hired as an

18  employee --

19          THE WITNESS:  They raised me to 40.

20          THE COURT:  You got raised to 40.  And that was

21  Mr. Plumeri who did that?

22          THE WITNESS:  Yes, sir.

23          THE COURT:  Okay.  You had a close relationship with

24  him then?

25          THE WITNESS:  Yes, sir.

S. BARGER - DIRECT - SHEARER                                    582

1          THE COURT:  Okay.  And then there came a time when
2   you made more than as an employee?
3          THE WITNESS:  No.
4          THE COURT:  You stayed at 40?
5          THE WITNESS:  Yes.
6          THE COURT:  But, in addition, as an employee, you
7   got bonuses every year?
8          THE WITNESS:  Originally, it was supposed to be 250,
9   but it was down to 178.
10         THE COURT:  But it was something in --
11         THE WITNESS:  It was --
12         THE COURT:  -- addition to that?
13         THE WITNESS:  Yes.  Absolutely.
14         THE COURT:  Did you take on additional duties and
15  responsibilities?
16         THE WITNESS:  I did.
17         THE COURT:  Okay.  And you were being paid, I think
18  at the time of your leave, 40,000, but there was about 35,000
19  in bonus on top of that?
20         THE WITNESS:  I was being paid 40,000 a month, and
21  if they matched the last year's bonus, about 178,000.
22         THE COURT:  Okay.  So you are doing okay.
23         THE WITNESS:  Yes.
24         THE COURT:  And let's have your next question.
25  Q    When you took the job as an employee, what happened to

1    the consulting business?

2    A    It basically went away, totally went away.  It went away

3    because I was full-time, absolute full-time.

4              THE COURT:  Full-time employee, no longer were doing

5    any consulting?

6              THE WITNESS:  Exactly right.

7              THE COURT:  So I want the record to reflect, because

8    I don't know whether it does, we all know that Mr. Barger is

9    testifying with some degree of difficulty.  You have a voice

10   box and you have to press the button in order to be heard.

11             THE WITNESS:  Actually, I am forcing air into my

12   esophagus and vibrating my esophagus.

13             THE COURT:  So we have this disability, and we

14   really all have our hearts for you.  But it is important for

15   me now to be more aggressive as a judge to try to get to the

16   heart of his testimony and to help him so he doesn't have to

17   really strain his body more than necessary.

18             THE WITNESS:  I'm fine.

19             THE COURT:  So I'm going to be asking a lot of

20   questions to try to get to the heart of things, which I

21   probably would not do if it was not for the disability which

22   Mr. Barger has.  But when I am doing that, I am not suggesting

23   I have a view of the case, I am doing exactly what you see me

24   doing.  Just trying to help him get the information out for

25   you folks, okay?  So we are clear about that, and the record

1    should clearly reflect that the judge is being aggressive in

2    the questioning because of the circumstances that he has to

3    deal with in court.

4            Okay.  Do you have any other questions you want to

5    ask him?

6            MR. SHEARER:  Yes.

7    Q    We heard about how you assumed Mr. Fricke's group in the

8    fall of 2014.

9            Before you got Mr. Fricke's group, what were your

10   duties and responsibilities when you were hired?

11   A    Yes.  So this reflects what Joe and I have always done in

12   the company.  He brings me along, like Batman and Robin, he

13   brings me along to cut across all aspects of the company,

14   talking with all leaders to assess their understanding of the

15   issues of the company, which at that time were severe price

16   compression and the fact that more clients were leaving the

17   back door than coming in the front door.

18           So I was supposed to travel, he wanted me to go to

19   Europe, Asia, South America.  He wanted me to meet with all

20   leaders.  He wanted me to make certain we got the message

21   across of what this cultural change needed to be because it

22   was not just a written document, and my expertise is

23   behavioral change, and how to get people to behave and think

24   differently.  That's what he wanted me to do.

25   Q    Okay.  And in the fall of 2014 when you assumed

1    Mr. Fricke's group, was that in addition to continuing that

2    cultural change?

3    A    Exactly.

4    Q    And you continued that cultural change for the entire

5    time you were at First Data?

6    A    I was supposed to, but I found my time during 2015 being

7    consumed by the training aspect and the fact that the training

8    department, its business purpose was to serve every business

9    in its requests.  And we kept getting multiple, multiple

10   requests, so I had to put more and more time in to the

11   training side and less time in to the cultural change.

12   Q    Okay.  Were you initially supposed to be the interim

13   replacement for Fricke?

14   A    Exactly.  We were supposed to find somebody to come in

15   and oversee all the training issues.

16   Q    I want to talk about 2016.

17            When were you -- you were diagnosed with throat

18   cancer in February of 2016?

19   A    Yes.

20   Q    And your radiation was March to May, is that right, of

21   2016?

22   A    I think April to May.  I took 28 radiation treatments.

23   Q    Sorry I went there.  I do want to go back to your offer

24   letter real quick.  Well, that's all right.  I entered that

25   yesterday.

1          Was your understanding that -- you were given stock

2    options as part of your initial employment; is that correct?

3    A    Yes.

4    Q    And did those vest over a period of time?

5    A    Yeah, I don't know exactly the rate.  I thought maybe it

6    was 20 percent per year, I'm not really certain on that.

7    Q    But you didn't view your First Data time as a short-term

8    gig, did you?

9    A    No.  The times that Joe and I'd been together, we know

10   that culture change is a long-term goal.

11   Q    About how long when you implement these programs does it

12   take to fully implement it through the corporation?

13   A    If you take Primerica where we were, it probably took

14   seven years to make them where they are today as a viable

15   company.

16   Q    Did Joe Plumeri ever complete a performance review for

17   you?

18   A    I've never had a performance review in my entire life.

19   Q    And so Jeff Hack didn't do one either?

20   A    Never.

21   Q    You did what's called a 360 degree performance review?

22   A    I did in 20, I think it was 15, January, yeah.  Yes.

23   Q    So did you voluntarily have yourself reviewed?

24   A    Every year and most of my career I have always wanted to

25   know what my employees thought of me.  I did it as a teacher

S. BARGER - DIRECT - SHEARER                         587

1    and a coach, and I always have, and so this time I requested

2    the HR department actually put -- they have their program

3    called 360 review, where they have your direct reports and

4    your senior manager rates you in several categories, and I

5    asked them to do that for me.

6    Q    And what were the results?

7    A    Better than I rated myself.  I think, I don't know, the

8    average may be, on a scale of 5, was like 4.5.

9            MR. SHEARER:  Okay.  Your Honor, I would like to

10   enter, that's the Plaintiff's Exhibit 23, is the 360 degree

11   review of Mr. Barger.

12           THE COURT:  All right.  23, no objection, is in

13   evidence at this time.

14           (Plaintiff Exhibit 23 received in evidence.)

15   Q    What -- how do you -- what is the process for changing a

16   culture?  What ideas do you have that you implement?

17   A    At the end of the day, in virtually every company I've

18   ever worked with, the same fundamental principles apply.  It

19   is all based on a program I wrote years called, It is Nobody's

20   Business But Yours.  And the concept is very simple for

21   virtually everybody in the company, that you must accept

22   responsibility for your daily actions, what's goes on in your

23   business, you have a lot of different things, and you must be

24   responsible for, especially on the sales side or the servicing

25   side, you must be responsible for the relationship that you

1   manage.  It is not a corporate relationship, it is a personal

2   relationship, and that changes the dynamic of a company when

3   you accept responsibility for taking care of clients.

4        When I got there, there were more clients going out

5   the back door than coming in the front door because we didn't

6   understand we needed to own the concept of taking care of

7   them.

8   Q    All right.  Now, back to after the radiation, what was

9   your physical condition like in -- following those radiation

10  treatments?

11  A    I initially went in because I thought I had laryngitis,

12  and I waited too long.  I went in, and it was cancer.  So the

13  radiation did not work, but the radiation caused my -- my

14  throat was somewhat damaged.  My vocal chords continued to be

15  damaged, and I could -- when I was traveling with Tony, I

16  could whisper, basically.

17  Q    But did you continue to give -- did you continue to work?

18  A    Oh, yes.  Yes.  I went for my half hour treatment, came

19  back.  The hospital was three blocks away.

20  Q    How was your --

21  A    Radiation is not a big deal.

22  Q    What was going -- what was your mental state when you

23  were facing this?

24  A    I thought we would get -- I thought radiation would get

25  it.  The difficult time I had is the day they told me they

1   were taking out my voice box.

2   Q     And what was your emotional reaction to that?

3   A     Because when they tell you that there is no promise you

4   will ever talk again, it is a very difficult day.  And I would

5   admit, I had a pity party for a couple days, thinking about

6   it, poor me.  But as you can see, I can speak just fine, so

7   everything worked out just fine.

8   Q     Have you thought about how you could continue to have

9   done this cultural transformation with, you know, after the

10  surgery?  How -- would you have to change your methods?

11  A     No.  Quite honestly, when I still give some speeches and

12  keynote speeches, people pay really close attention when I

13  speak because their hearing is now challenged and they have to

14  listen very carefully.

15  Q     Now, when you -- you went to Tampa, your surgery was on

16  the 6th; is that correct?

17  A     The initial surgery to take out my voice box and my

18  thyroid and two lymph nodes here in front that had cancer in

19  them.

20  Q     And did you drive to Tampa from Atlanta?

21  A     We did.

22  Q     Did you go into the office over the weekend before that

23  surgery?

24  A     I most likely did try and get enough papers to take with

25  me in my briefcase.

S. BARGER - DIRECT - SHEARER                          590

1   Q    Now, when did you start working on First Data business
2   after your surgery?
3   A    I don't know the date, but within a week, I guess.  I was
4   actually reading e-mails the next day, wanting to see what was
5   going on.  It was a couple days, maybe.
6   Q    All right.  Plaintiff's Exhibit 24.
7           THE COURT:  No objection.  In evidence.
8           (Plaintiff Exhibit 24 received in evidence.)
9   Q    So this is an e-mail that you sent to Gita?  Is it Gita?
10  A    Gita.
11  Q    And this is on the 8th.  And, again, you ask that -- you
12  are now on the Internet.  This was sent to your whole team,
13  telling them you were up and functional?
14  A    Yes.
15  Q    When did you go home from the hospital?
16  A    You know, dates are not the easiest thing for me to
17  remember specifically, but when I left the hospital, I
18  actually had to go to a -- we stayed at a hotel for a couple
19  of weeks in Tampa, and then I had some complications with the
20  way -- what they call fistulas, which were holes in my throat
21  were not healing the right way so I had to have them do an
22  operation where they took skin off of my left shoulder,
23  covered up the fistulas.  I think I was probably down there
24  for five or six weeks.
25  Q    We saw the text messages.  Let's talk about, at home,

1    when you got home, did you have new technological capabilities

2    that you used to work from home?

3    A    Yes.  I asked one of the guys who worked for me, Matt

4    McDonald, to get me set up, and Don Seshlinger helped me.

5    They came over, set up -- I was only four blocks from the

6    office.  They brought my stuff over and set it up for me.

7    Q    Okay.  Did you keep management updated, Mr. Hack,

8    Mr. Marino, Rhonda Johnson, Dan Charron, did you keep them

9    updated as to your work or as to how you were doing?

10   A    Yes.  Rhonda probably knew as much as Anthony because I

11   kind of kept her in the loop of everything.  I would send

12   brief notes or text messages or whatever to whatever members

13   that I thought needed to.  Rhonda and I were probably in the

14   best -- had the best communication going.

15   Q    Now, Mr. Marino --

16   A    Besides that, besides my team.

17   Q    Mr. Marino and Mr. Plumeri came to see you on November 3.

18   What was your view of that get together?

19   A    I agree with Mr. Marino.  I was a mess at that time.  The

20   chemo and the operation had taken me from 222 pounds down to

21   165.  And I was very weak, and I was on a stomach tube and

22   whatever, and I had to talk with a white board.  And I loved

23   seeing them.  I did.  It was very meaningful.  And we spent a

24   couple hours together, they asked me questions, yes or no

25   questions, I'd nod my head or shake my head, and I would write

1    out the questions on a white board to ask them, and they were

2    telling me stories about stuff they were doing and what was

3    going on at the company and how things were going, and kind of

4    brought me up to speed on a lot of things.

5    Q    Yesterday we saw the text message exchange between you

6    and Tony Marino on November 19 through the end of the year.

7    Were you shocked to have gotten that text message from Tony?

8    A    To a degree I was.  I didn't have any add on that, but if

9    we are talking about the ones where I asked if I was being

10   fired, if you are talking about?

11   Q    Yes.

12   A    Yes, that kind of took me askew a little bit.  That's why

13   I asked the question about, does this mean I'm fired.  I

14   didn't quite get the drift of all of it.

15   Q    Did you want to go on leave?

16   A    No.

17   Q    And you let Mr. Marino know that?

18   A    Everybody knew that.

19   Q    And you hadn't asked for leave from the time of your

20   radiation up until November 19?

21   A    I went on leave because Tony says I should go on leave,

22   and I was trusting his judgment.

23   Q    Now, did Rhonda assist you in filling out your paperwork?

24   A    I am sure this was some paperwork I was doing that I

25   didn't understand terminology or timing or whatever, like

1   that, and she was extraordinarily helpful.

2   Q    Okay.  Then all the paperwork went in, and I would like

3   to go to Plaintiff's Exhibit 46.

4           THE COURT:  All right.  That is in evidence, I

5   guess, now.

6           (Plaintiff Exhibit 46 received in evidence.)

7   Q    This is a letter you received on December 15, and it

8   designates the leave start date of 10-24-16, and a return to

9   work date of 1-16-2017.  Did you receive this letter at your

10  home?

11  A    Yes.  It was 95 Tamarisk Drive.

12  Q    Did you receive any other letters from First Data

13  regarding your leave after this?

14  A    I don't -- I don't know.

15  Q    Okay.

16  A    I don't.  I just know that this was the beginning of when

17  Tony told me, corporately, it was -- I needed to do this, so I

18  trusted his judgment.

19  Q    So you understood at this point that you needed to get a

20  doctor's note to First Data prior to January 16, 2017; is that

21  right?

22  A    Somewhere along the line, because, first of all, when he

23  told me, no, I wasn't fired, I was coming back with the same

24  pay and the same position, whatever.  And somewhere along the

25  line I asked, well, how do I reinstate myself.  And somewhere

S. BARGER - DIRECT - SHEARER                    594

1   I was told get a doctor's letter approving you to come back.

2   And I thought that was the green light for my return.

3   Q    So did you use any sick days or vacation days while you

4   were in the hospital or working from home?

5   A    I know that I did.  How that happened, I'm not quite

6   sure.  But somewhere in the mix of all this I think that is

7   what the protocol is before you get placed on short-term, and

8   you use sick days and days of leave and whatever.  There's

9   detail behind that that I'm not quite totally familiar with,

10  but we maximized it, yes.

11  Q    And when you got back to your home, you went to see

12  Dr. Baddour, and he sent you to the hospital, is that correct,

13  for pneumonia?

14  A    This is really -- I'm not too proud of this.  I know that

15  I had pneumonia, and I know I went into the hospital.  And

16  they had me on some medication at that time.  The details

17  around that I don't actually remember, but I had created,

18  because of the fistula problem, some leakage, whatever, and he

19  said I had pneumonia.  So I don't ever remember being in six

20  days, though.  I thought I was in like a day and a half.

21  Q    So when they -- did they tell you they were going to cut

22  off your e-mail, or did it just not work one day?

23  A    I believe either Rhonda or Tony said they were going to

24  discontinue that, you know, with the intent of -- I am sure he

25  was heartfelt about it.  He thought he should.

S. BARGER - DIRECT - SHEARER                              595

1    Q    Did you also apply for short-term disability benefits?

2    A    I did.

3    Q    How long did that process take, do you know?

4    A    Knowing me and my inability to deal with forms, it could

5    have taken some time.  I have never -- no, it took some time.

6    I don't know the amount.

7    Q    When did you start telling people at First Data that you

8    were ready to come -- that you were going to be coming back to

9    work?

10   A    Actually, I had those conversations from day one.  I

11   promised my staff I'd be back to help them.  You mean in a

12   formal way?  I don't know, I mentioned it to several people,

13   and I know I texted it to people and e-mailed people.  And

14   when people would stop by to visit me, and I wasn't talking, I

15   would white board them a message saying, I'd be back, I'm

16   still coming back.  But everybody knew that I was trying to

17   come back, first part of January.

18   Q    You went -- did you go into the office in December?

19   A    Yeah.  The beautiful staff I have, they invited me to

20   their Christmas party, which was all down in the training

21   center on the first floor.  Wonderful day.

22            MR. SHEARER:  I would like to go to Plaintiff's

23   Exhibit 63.

24            THE COURT:  63?

25            MR. SHEARER:  Yes.

S. BARGER - DIRECT - SHEARER                                    596

1          THE COURT:  Okay.  No objection.

2          (Plaintiff Exhibit 63 received in evidence.)

3   Q    These are some e-mails between you and Jeff Hack.  Many

4   of these are -- during your stay in the hospital and at home.

5          I want to go down to, I believe it is 12-28.  I

6   believe you texted Jeff about coming back at the end of

7   December.  There it is.

8          Did you indicate to him in the end of December that

9   you were coming back, to Jeff Hack?

10  A    Oh, I think -- you know, I am under oath.  I don't know

11  how he got the information.  I texted him.  I am just not

12  sure.  But he knew.

13  Q    It is right here?

14  A    He knew.

15  Q    We will be back on January 15.  Can't wait.

16  A    Yes.

17  Q    So you texted Jeff on January -- on December 28 and told

18  him you were coming back on the 15th?

19  A    Yes.

20  Q    On January 5, did you have a conversation -- e-mail

21  exchange with lead management regarding your short-term

22  disability benefits?

23  A    Yes.

24  Q    Yeah.

25         And did you advise lead management on January 5 that

1    you were planning to return on the 17th?

2    A    I told everybody that.

3    Q    Now, then, on January 10, you obtained your return to

4    work authorization from your physician; is that correct?

5    A    Yes.

6            MR. SHEARER:  Plaintiff's Exhibit 101.

7            THE COURT:  Okay.  In evidence.

8            MR. SHEARER:  This is what's titled certification of

9    healthcare provider.

10           THE COURT:  What number is that again?

11           MR. SHEARER:  101.

12           THE COURT:  One second.  101 is in evidence already.

13           MR. SHEARER:  Oh, it is?  That was from the medical

14   depositions.

15   A    Yes.

16   Q    So this is Dr. Baddour.  This is the Dr. Baddour saying

17   you're -- for your leave support.

18           When you gave the return to work authorization to

19   Ms. Johnson, did you have a conversation with her?

20   A    As I recall, I just went into the building, and I caught

21   her in her office, and we smiled at each other, and I handed

22   it to her and said, "Here's what you've been looking for.  I

23   will be back on the 17th."  And I am sure we had a

24   conversation about she and her husband traveling the world,

25   which they always do, and things like that, small talk.

S. BARGER - DIRECT - SHEARER                          598

1  Q    There have been accusations made regarding your behavior

2  that supposedly triggered -- partly triggered the forcing you

3  on leave.

4            Do you recall ever appearing on a video shirtless?

5  A    I send out video updates for people, to say hi to them

6  and to have them tell me what was going on.  And I had a bed

7  gown, hospital bed gown on that as I was moving my arms, it

8  may have fallen down, but they would not allow me to go

9  shirtless in the hospital.  They don't allow that.  So it

10  could have fallen, slipped down, but not shirtless, no.

11  Q    They've also heard allegations that you mismanaged the

12  Sales Training Group, allowed head count to grow, high

13  attrition rates.  What are your thoughts on that?

14  A    When Mr. Fricke left, and Joe asked me to take over

15  training, we did an assessment of -- that's why I ask

16  everybody to give me their resume, their responsibilities,

17  et cetera, so we could kind of find out where we needed to

18  position people.  We defined in the business unit that week,

19  with Joe's approval, of course, that we were in the business

20  of serving all of the business units requiring our services in

21  First Data.  And what that meant was, whatever business unit

22  could find value in what we were doing, we would accept some

23  type of request from them.

24            That kind of opened the floodgate, which was fine,

25  because we wanted to get the message across the entire

1    company.  So as we started to evolve, there was this process

2    of identifying a business need, not a training need, so we

3    served all business units.  So we identified a business need,

4    and we ascertained whether it needed head count to make it

5    happen or not, and if it didn't, we put it under one

6    responsibility.

7              Then if it required additional staff, like the

8    request was so big we had to have a flesh and blood person on

9    site to do it, there was a protocol where you could open a req

10   inside of HR, and it got queued up and in a line, where they

11   would let you know when your req was approved.  And during the

12   first part of that time, I was there, Joe approved them, and

13   during the last part of my time, Dan Charron approved them.

14   And Dan approved them.  It was just a regular part of the

15   weekly meetings.  But the request to increase staff was always

16   an outgrowth of business requests coming in, wanting help.

17   Q    And you mentioned Mr. Charron.  How often did you meet

18   with him and discuss the training group with Dan?

19   A    We had weekly meetings that I attended, and I was always

20   asked on this conference call if I had anything to contribute.

21   And then I think Dan and I had a really nice relationship, and

22   I had incredible respect for him, for him as a leader.

23             We would both be working late at night.  I'd go up

24   and sit down across from him, and we'd start chatting back and

25   forth about a lot of things, so -- including business,

1  including things that are a challenge for him that I could
2  maybe help him with.  So there's a lot of different things we
3  were talking about, scheduled weekly, and his complete staff
4  meeting I attended.
5  Q    There was testimony about a meeting where he asked you to
6  take on more responsibilities, I believe.  Do you remember
7  that meeting?
8  A    Yeah, actually, I believe it was one of those casual
9  meetings that he -- we sat and talked about it.  And I
10  understood his position.  Clearly did.  And at the end of
11  that, he recommended to me that I kind of get my hands around,
12  my head around all of the other training organizations in the
13  company, and to see how they could be consolidated.  And it
14  was my assumption that he meant we could do that and we could
15  consolidate those under his auspices.
16           So and this was late '15, to my recollection, and I
17  started circulating some things in, started asking questions,
18  and immediately got stonewalled by a lady named Christine
19  Larsen, who did not want me talking to her people at all.  And
20  we all had conversations about Christine and her capabilities
21  and that was stonewalled.  So I started having this meeting,
22  these conversations.  Then all of the sudden in February this
23  happens, and I start through the process, and to continue that
24  process, which I thought was a good idea, was stopped, because
25  this was going on.

1    Q     But in 2016, did you also take on additional

2    responsibilities as part of your group?

3    A     There's -- as I said, we responded to the business units.

4    We were starting to have a problem with our bank partners

5    because them understanding the value that we were presenting

6    is not being transferred to the bank clients, and we were

7    invited to go in and save several relationships that were

8    going south.

9          So we created, under Teresa Ward, we created this

10   bank servicing arm.  We started to take on more and more and

11   more banks, where we would send people on site to coach

12   banking people on how to deal with our services when they were

13   making presentations, and that list kept growing and growing

14   and growing.  The last number I remember was 15 banks that we

15   were doing.  As I said, any increase in head count was never

16   randomly chosen, it was always to support a business premise.

17   Q     Now, after you were -- received notice of your

18   termination, what did you do to -- did you seek employment?

19   Did you just start your consulting?  What did you do?

20   A     Once I knew I was not going to be working, I had to get

21   back into my consulting business.  So I started making

22   contacts, always networking.  Always, I got letters of

23   reference from a ton of people that I had been working with

24   that they said I could use in my future going forward.  I had

25   been out of the mainstream for a couple three years, and just

1   now getting around to doing some nice business, and people

2   ended up kind of remembering who I was.

3   Q     Before you took the position with First Data, did you

4   have a pretty healthy Rolodex of clients?

5   A     Everybody on Wall Street knew what I believed in and what

6   I taught.  All the major firms, all the mutual fund companies,

7   everybody.  I did work for all of them.  They understand the

8   message, nobody's business but yours.  Take personal

9   responsibility.  All of that.  That was the standard.  I

10  taught at Wharton Business School, and that was the message.

11  Everybody knew about it.

12  Q     So did you contact your contacts in the inside of the

13  brokerage houses and --

14  A     Yes.  Yes.

15  Q     How many brokerage houses did you call?

16  A     All the big ones.  Some of the regionals.  I know

17  everybody.  I know people in all of them.  Many of them have

18  already signed consulting contracts and were doing business

19  with other people, budgetary issues at that time.  There's a

20  lot of reasons that go on where there's a cycle inside of the

21  business where you have a nice opportunity to reach them.

22  Q     And did you ask about just consulting work, or did you

23  ask about employment?  What were your conversations like?

24  A     So with a couple of my very close friends, and we're

25  still in conversation today, they brought up full-time

1  employment.  And I kind of guided the conversation to give

2  them that direction.  And, in fact, we are still in discussion

3  about some of that.  The answer is, the industry always came

4  to me.  I never applied for a job in my life.  My reputation

5  preceded me.  Therefore, when there was some type of opening,

6  I was usually asked to fill the void.

7  Q    So you didn't apply for the First Data job?

8  A    I have never applied for a job in my entire life.

9  Q    So you have said that -- have you -- how's the consulting

10  business doing?

11  A    It is slow going, but we are making some headway.

12  Q    Okay.  About how much do you think you have been making

13  per month on the consulting business?

14  A    I'm up to maybe now averaging 10, 12.  Somewhere in that

15  neighborhood.

16  Q    And are you talking to potential clients currently?

17  A    I've had three conversations while I've been in New York.

18  Q    Are you charging similar rates as you were prior to

19  joining First Data?

20  A    Of course.

21  Q    And you said you had about a plan of seven years to fully

22  implement this, your program?

23  A    Yes.  The companies that we started and worked on, that

24  was kind of the learning curve, to make certain that they

25  understood what value actually was, so you wouldn't have to

S. BARGER - DIRECT - SHEARER                              604

1    lower the price and you could deliver an ongoing value

2    proposition that made your clients very happy.  It's a culture

3    change.  You can't just send out a memo and say do this, or

4    just give a speech and expect them to behave that way.  It is

5    constant reinforcement.

6    Q     What was your mental state following your termination?

7    Were you immediately energized or were you depressed or what

8    was it like after you were terminated?

9    A     I think it is not exactly comparable to the day they tell

10   you they are taking out your voice box, but it was close.  It

11   was like, wow.  Really.  There is so much potential here,

12   there's so many ways to make this a great company.

13   Q     So you find meaning to working?  You don't like --

14   A     I told you, there's a memo that came up somewhere where I

15   said retirement is overrated.  It is, in my opinion.

16           The critical thing I believe in and I teach is

17   purpose.  That's what drives all of us.  And you have to have

18   a purpose every day.  And my purpose is to help other people

19   maximize their talent.  That's what I do.  I have done it my

20   entire life, coaching high school, college, and all this stuff

21   I have ever done.  And so that continues.  That's never going

22   to go away.  It will be to my last breath, that's what I am

23   going to be doing.

24   Q     I want to go back to the day you were terminated.

25           MR. SHEARER:  This is -- I want to enter Defense

1    Exhibit 310.

2    Q    These are a series of text messages between you and

3    Mr. Plumeri covering a significant amount of time, 2015, and

4    this is a summary.  This isn't all of them.

5         I want to go down to January -- November 19, the day

6    you were notified.  The yellow section here, this first one

7    looks like a copy of Mr. Marino's text message to you; is that

8    correct?

9    A    Yeah.

10   Q    And then the next one is kind of same thing, forwarding

11   Tony's --

12   A    Right.

13   Q    And Mr. Plumeri replied to you, he says:  Big company

14   stuff, I understand.  Look at it from insurance side.  All

15   good.  Love you.

16        What did you take from this "look at it from

17   insurance side" comment?

18   A    Well, I had to think about this because I wasn't quite

19   sure.  My final conclusion was, it may have meant that the

20   cost of carrying a disabled person would be higher.  I don't

21   know.  But that may have been what he is intending to say.  I

22   never clarified it with him.

23        MR. SHEARER:  Okay.  I think I am done with the

24   exhibits, if you want to turn these off.

25   Q    So, Mr. Barger, have you calculated what you think your

S. BARGER - DIRECT - SHEARER                                606

1  termination has cost you in terms of lost salary and bonuses?

2  A    Well, I contacted a friend of mine that I grew up with,

3  and I asked if there was a way I could figure this out, and he

4  pointed me toward, of course, an online calculator.  So I

5  started playing around with it, and now -- my thought process

6  was, if you are trying to calculate backpay, I was making

7  $40,000 a month.  But you have to offset that with my income

8  of my consulting business, to be fair.

9         So month by month I took 40,000, then I calculated

10  the income from it, came up with a number.  And the software

11  had a standard 4 percent interest rate expectation.  On any

12  one of the months between -- this is like March of '17 to

13  September of this year.  On any months that would have

14  included a bonus, did the same thing, there was a total,

15  backed out, subtracted any income I would make, times 4

16  percent.  So that was from March until then.  Came up with the

17  years of compensation, months of compensation, about a million

18  three six, ballpark.

19  Q    And that consists of your wages, had you stayed

20  employed --

21              MR. DiLORENZO:  Can we have him explain what it is.

22              MR. SHEARER:  Sure.

23  Q    Go ahead.

24  A    I didn't hear that.

25  Q    There's no question yet.

S. BARGER - DIRECT - SHEARER                          607

1          And did you think about -- you said you wanted to
2   stay there for seven years.  Did you calculate seven years out
3   in the future, a total of seven years from the time you were
4   terminated?
5   A    Yes.
6   Q    And how did you -- so you calculated the backpay through
7   the end of September, and then that's -- did you go out -- so
8   you went -- at the end of September through February 28 of
9   2024?
10  A    Yes.  That would have been the total of being there seven
11  years.
12  Q    Okay.
13  A    Same calculation of no increase in salary.  Starting with
14  the same bonus number, but this model said it must be
15  discounted into future value.  So I -- and I also took off my
16  projected earning, making from my Consulting Group, I minused
17  all that out, so I wasn't being double paid.  I minused all
18  that out.  And the model said to take that number and discount
19  it.  That number came up to about -- I think about a million
20  four seven, something like that.
21  Q    And then you lost some options in restricted stock that
22  were forfeited?
23  A    Yes.  At the end of the day, if you take options that I
24  was never allowed to exercise, times opening price, about
25  $900,000.

*S. BARGER - DIRECT - SHEARER*                                    608

1   Q    Okay.  And what price did you use, do you remember?

2   A    I think we were at the opening price was 31 and change.

3   Q    And on what day, do you know?  Do you know which day that

4   was?

5   A    I can't remember.

6   Q    Okay.  So it was about 1.3 from the time you were

7   terminated until now, and then about what, 1.4 million?

8   A    Yeah.

9   Q    From now until February 28, 2024, which is seven years

10  from when you were terminated?

11  A    This is all ballpark.  I don't have it in front of me.

12  Q    And then about $900,000 for your lost options and

13  restricted stock?

14  A    Whatever that totals.

15             (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

1

2          MR. SHEARER:  I want to put one more thing in.  You

3   can turn this on, Mr. Innelli.  Thank you.

4   Q    This is Plaintiff's Exhibit 15.  Do you recognize these

5   documents?

6   A    I don't see anything.

7   Q    Do you see them now.  There are several of them?

8   A    There's nothing on my screen.

9   Q    Do you recognize these?

10  A    Yes.

11  Q    What are these?

12  A    Invoices.

13  Q    Okay.  These are invoices from after you issued after you

14  left employment with First Data.  This one's dated

15  December 24, 2017 -- December 4, 2017.

16          So this is your new consulting business, isn't it?

17  A    It is.

18  Q    Okay.  I'd just like to enter those into evidence?

19          THE COURT:  They were in evidence, I think.  That's

20  15?

21          MR. SHEARER:  Yes.

22          THE COURT:  That was placed in evidence yesterday.

23  Let's take a 15-minute break now and we'll continue.

24          COURTROOM DEPUTY:  All rise.

25          (Jury exits courtroom at 3:19 p.m.)

```
 1              COURTROOM DEPUTY:  You can all be seated.  You can
 2     step down if you want.  Width stand.
 3              (A recess in the proceedings was taken.)
 4              THE COURT:  Bring the jury in.
 5              Have a seat.  How much longer is your direct?
 6              MR. SHEARER:  Five minutes maybe.
 7              THE COURT:  Who is going to handle the questioning?
 8              MR. EIDELMAN:  I am, your Honor.
 9              THE COURT:  And you think we can conclude to this
10     afternoon?
11              MR. EIDELMAN:  I don't think so, your Honor.
12              THE COURT:  Let's see how this goes, okay?
13              (A brief pause in the proceedings was held.)
14              COURTROOM DEPUTY:  All rise.
15              (Jury enters courtroom at 3:53 p.m.)
16              THE COURT:  You can all be seated.
17              Mr. Shearer, continue.
18              MR. SHEARER:  Yes, your Honor.  With respect to
19     Mr. Barger's testimony that you just gave as to his
20     calculations, I'd like to enter Plaintiff's Exhibits 96, 97,
21     and 99.  Those are compensation summaries, option summaries,
22     pay stubs?
23              THE COURT:  No objection, I see that.  96, I see
24     that.
25              What was the other one.
```

*S. Barger - Direct/Mr. Shearer*                    611

1          MR. SHEARER:  97.

2          THE COURT:  I don't have a 97 here.  Sorry, I looked

3   at defendant's.  My mistake.  Just bear with me.  So no

4   objection, 96, in evidence.  97 in evidence.  What else.

5          MR. SHEARER:  And 99.

6          THE COURT:  Okay.  No objections to any of that.

7   All in evidence.

8          (Plaintiff's Exhibits 96, 97, and 99 were received

9   in evidence as of this date.)

10  EXAMINATION BY

11  MR. SHEARER:

12  (Continuing.)

13  Q    Mr. Barger, at any time did First Data offer you the

14  opportunity to come back to work ate lower salary or different

15  job?

16  A    No, sir.

17  Q    You know some of your consulting clients, were some of

18  them friends that you've made at First Data?

19  A    No, I have -- absolutely, they left First Data, yeah, I'm

20  consulting with them.

21  Q    Okay.  Have you found -- has your disability hindered

22  your ability to look for work?

23  A    No, the timing has.  My disability is -- I'm not -- it's

24  not a problem whatsoever, I can still communicate and get my

25  point across.

S. Barger - Direct/Mr. Shearer                    612

1    Q    Are you still giving speeches?

2    A    I've given four or five keynote speeches and I've done

3    training classes.  It's just a little bit slower and everybody

4    has to listen a little bit better but it's working out nice.

5    Q    And you're not getting -- seeing rejection simply because

6    of your disability?

7    A    No.  No.  For some reason, people are listening better.

8              MR. SHEARER:  Your Honor, I think that's it.

9              THE COURT:  Okay.  So let's get started,

10   Mr. DiLorenzo, today.  If you can finish today, that would be

11   great.  Let's see how it goes.

12             I just had a thought.  Let's speak to counsel here

13   just about timing and just bear with me when we discuss some

14   matters here at sidebar.  All right.

15             (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

*Sidebar*                                                                    **613**

1          (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4          THE COURT:  So here's my thinking.  So I don't want

5    the jury to come back tomorrow morning if it's only going to

6    be a half hour or an hour, so I'm thinking about maybe

7    adjourning now since you told you have an hour or so to go

8    and, you know, since I left it up in the air as to whether

9    there's going to be any witnesses tomorrow.  If I have you go

10   till 5:00 and come back for an half hour tomorrow we have no

11   other witnesses tomorrow.

12         MR. EIDELMAN:  We do have witnesses tomorrow.

13         THE COURT:  That's what I want you to tell me.

14         MR. EIDELMAN:  Whichever I Jennifer Voycheske on our

15   case once we rest.  Jennifer Voycheske, we have Matthew

16   Cagwin, and we have, I think, Justin Stamey and then there's

17   some deposition testimony.

18         THE COURT:  So you decided you're going to have

19   witnesses testify.

20         MR. EIDELMAN:  We did, yes, your Honor.

21         THE COURT:  So I have an oral argument now on

22   another matter and I'm thinking about not wanting to keep

23   Anthony here too late after 5:00 o'clock because he gets mad

24   at me if I do that.  So I will let them go early, I will take

25   my oral argument, and then discuss some legal matters with you

*Sidebar*                                                                          *614*

1    folks.

2              MR. EIDELMAN:  Certainly.

3              THE COURT:  We can do that.  We will try to prune

4    our charge to get it to you tomorrow.  And I think the way

5    things will shake out probably is that I hear that we'll have

6    a good chunk tomorrow.  We won't be wasting the jurors' time.

7              MR. EIDELMAN:  Yes, sir.

8              THE COURT:  Even if you finish at 1:00 or 2:00, I'm

9    okay with that.  I think the way it will break out is that

10   we'll start Monday with your summations and the charge.  That

11   would work out well, I think.

12             MR. EIDELMAN:  Okay.

13             THE COURT:  Is that agreeable to everybody?

14             MR. DILORENZO:  That's great, your Honor.

15             MR. EIDELMAN:  Thank you, Judge.

16             (Sidebar discussion concludes.)

17             (Continued on the next page.)

18

19

20

21

22

23

24

25

1           (In open court.)

2           THE COURT:  Folks, I spoke with the lawyers about

3    timing.  So I'm going to let you go home early tonight, don't

4    hold to against me.  I will tell you why we have another

5    matter this afternoon.  You're welcome to stay if you want to

6    listen to matter, it has nothing to do with this case, all

7    right?  And the lawyers are waiting here.

8           But the second I was thinking of trying to crunch

9    things if we can get everything to you tomorrow that would be

10   great but I don't think I'm going to be able to do that.  And

11   when I spoke to the lawyers I asked them, you know, do you

12   have any other witnesses?  Does the defendant plan on calling

13   any other witnesses?

14          And I think it's best that we come back tomorrow and

15   finish the testimonial evidentiary part of the case tomorrow

16   which think we can do.

17          So that may take a half a day may take a little more

18   than half a day and then we'll be in a position where Monday

19   morning we'll all be fresh and we'll hear the concluding

20   remarks of the lawyers and my explanation of the law and you

21   can start your deliberations then.  I think that would work

22   out best rather than trying to put a lot of pressure on

23   everybody to finish it today and tomorrow and then the weekend

24   comes and it puts pressure on your deliberations perhaps.

25          So I think that's the executive decision I'm going

Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR
Official Court Reporter

*Proceedings*                                        *616*

1    to make.  But so you can and in all probability anticipate

2    that you're going to start your deliberations on probably

3    Monday afternoon maybe and it's important, though, that you

4    clear your personal agendas so that you don't put any

5    subconscious pressure on you to render a quicker decision than

6    you might if you weren't planning to go away the next day or

7    handling your personal plans and you're responsible people so

8    you understand that when deliberations starts nobody here

9    knows how long it's going to take.  It could be short it could

10   be long it could be in between.  It's not until you hear each

11   other out that you have a sense of how long it's going to take

12   you to do that, all right?

13            So you got to be able to be flexible enough if you

14   have to come back on Tuesday, so be it, Wednesday, whatever.

15   But you know we're going to be giving you the case next week

16   on Monday, all right?

17            So get home.  Don't talk about the case.  I think we

18   made a lot of progress.  I want to thank the lawyers for

19   helping me move the case along and I think in an orderly

20   fashion.  It didn't take two weeks or three weeks.  It took,

21   basically, one week to get the testimony and considering the

22   plethora of the exhibits, the number of exhibits, that we have

23   managed and the details that had to be he addressed with the

24   several witnesses.

25            I think the lawyers have made very good progress and

*Proceedings*                                                           **617**

1    we've been very economical in the usage of our time so I'm

2    happy with the way that worked out.

3            You've been terrific jurors you only have to get

4    here by 10:00 o'clock probably two or days.  And when

5    deliberations start basically I'll be turning over the

6    courtroom to you folks.  So if you want to come at 6:00 in the

7    morning and deliberate you can do that.  Or maybe 10:30 within

8    a reasonable period of time you're going to be controlling the

9    flow of your direct examinations.  And how you want to proceed

10   and do with that, okay, sometimes we've kept the courtroom

11   open late at night.  The jurors wanted to stay here.  And so,

12   we basically try to accommodate the jurors but it's kind of

13   premature to understand how that's all going to play out,

14   right, so for the time being we're giving you an hour off

15   today don't hold it against me.

16           See you tomorrow at 10:00 o'clock.

17           COURTROOM DEPUTY:  All rise.

18           (Jury exits courtroom at 4:03 p.m.)

19           COURTROOM DEPUTY:  You can all be seated.

20           THE COURT:  So let me take a break.  Is the

21   4:00 o'clock conference here.  Everybody?  Okay.  You folks

22   take a little break and we'll come back talk a little bit how

23   to shape up this charge and listen to you folks sort of a

24   rolling type of conference we're going to have in terms of our

25   charging conference.  Okay.  We do this as we go along.  All

*Proceedings*                                              *618*

1    right.  So let's have the 4:00 o'clock.

2             (A recess in the proceedings was taken.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court; 4:27 p.m.)

2           THE COURT:  So let's talk a little about a few

3    things while we have the luxury of time to do so.

4           So what we try to do in preparing the charge is to

5    sort of not to get the jurors to want to commit suicide and

6    bedazzle them with an a lot of language and stuff like that.

7    So we can cut to the chase and present it to the folks in a

8    simple way we try to do that.

9           So at the start of the last thing you have "After

10   Acquired Evidence Defense."  I learned something new, there's

11   such a defense.  I guess you're entitled to assert it.  But I

12   don't see a lot of evidence here and sort of dirties the

13   plaintiff.  Do you really want to do that.

14          MR. EIDELMAN:  Your Honor, with due respect.

15          THE COURT:  You don't have to say "due respect"

16   here.

17          MR. EIDELMAN:  Thank you.  I have not had a case in

18   my entire career where there is such clear-cut evidence that

19   is after acquired evidence.  Ordinarily, the after acquired

20   evidence you see in this case.

21          THE COURT:  What is it here?

22          MR. EIDELMAN:  Here is the following.

23          THE COURT:  Yes, he committed some fraud.

24          MR. EIDELMAN:  His independent contractor agreement

25   provides about how he's permitted to bill and it started on

1   March 17th and it went for three and a half months.  There's

2   an invoice on February 26th for the time period beforehand and

3   we haven't got there yet, but in his deposition testimony he

4   testified that that must have been for the preparation

5   activities that I had before I became a consultant but you

6   need to go Joe Plumeri about that.  Joe Plumeri testified that

7   under oath under no circumstances did he know about it nor

8   would he have approved it and I think he said it's unheard of.

9          THE COURT:  I guess you're entitled to have to, but

10  it's a matter of lawyer strategy and I can't tell you how to

11  practice the profession.  But this guy is a tremendously

12  sympathetic plaintiff, obviously, because of his condition.

13  And now you're going to dirty him by claiming that he's a

14  fraud and doing all sorts of bad things.  If you want to do

15  it, fine.  I don't know that I would like that same decision

16  if you hired me an associate and we were talking about it, but

17  I'll let you do it if you want.

18         That's the first thing I want you to think about.

19  All right.

20         MR. EIDELMAN:  Okay.

21         THE COURT:  I don't know whether if I was part of

22  your firm whether I would be in lock step with you but what do

23  I know.  Okay.  So think about that.  I think you probably

24  have enough here.  I think it's kind of a screwy type

25  affirmative defense.  I didn't write the law, I just apply it.

*Charge Conference*        **621**

1          Now, let's look at what we can do it pare this down.

2    An awful a lot of the jury charge, the length of it and the

3    complexity of it is because you insist, Mr. Shearer, of having

4    all these defendants in the case.  If it was just the ADA

5    claim against the corporation you know it could be a pretty

6    clear cut, you know, type of charge to the jury.

7          So here we have to establish with each one of these

8    people whether they have the requisite type of control and

9    those various factors that we have to consider.  If you want

10   it, I'll do it.  But it's going to make this a more lengthy

11   charge than maybe the jury is going to tolerate in terms of

12   being able to absorb it all and deal with it.

13         So I just wanted to give you some broad strokes here

14   to think about.  And you may want to reconsider whether you

15   want to have these individual defendants in and if so I guess

16   you're entitled to have them I assume.  But let me see whether

17   I have this down right your claims against all the defendants

18   are listed in your FMLA proposed jury instruction No. 5 as

19   follows.  Interfering with his right to reinstatement

20   following his leave and also for retaliating against him for

21   seeking to return to work.

22         So let's break it down.  Where is there evidence of

23   retaliation against him for seeking to return to work based

24   upon these individuals and I know you have that claim under

25   the ADA against the corporation.  But what did these people

*Charge Conference*                                                      **622**

1    do?  How did they retaliate?  Each of them against when he

2    wanted to come back to work?  He got four, five of these

3    individual defendants.

4            MR. SHEARER:  How did they retaliate against him?  I

5    have a lot of the retaliation and pretext is still to be read

6    in the depositions, but the argument is, and I think there is

7    evidence, that while he was out on leave, he was on insurance

8    payments and that he was zero cost.  And it was because he was

9    returning that put him into the RIF because he now was a save

10   when they start calculating the saves in the RIF it's because

11   he now is going to have a salary and they get to claim that

12   because he's now gone he would be.

13           THE COURT:  More costly to have him come back?

14           MR. SHEARER:  Yeah.  If he'd stayed out on leash

15   collecting the long-term disability, he would have been zero

16   cost and they wouldn't have done anything.

17           THE COURT:  You have five defendants.  How were they

18   all implicated in this terrible misdeed?

19           MR. SHEARER:  Well, I think Mr. Bisignano ordered

20   the cutting of the ten percent.  And that he's -- it's not

21   retaliation that's a sign of him being an employer.

22   Mr. Marino made the decision to force him on the leave.

23   Ms. Johnson instigated it.

24           THE COURT:  How is he forced to take the leave?  You

25   have a claim here that he was compelled to take the leave.

*Charge Conference*                                                    **623**

1   Where is that.

2           MR. SHEARER:  I think that, yeah, because Mr. Marino

3   texted him and sent him a letter that says it's time to put

4   you on leave.  Mr. Barger never asked to go on leave

5   Mr. Marino made him.

6           THE COURT:  Well, he was going to continue to work

7   while he had the conscience operation.

8           MR. SHEARER:  Well, yeah, he continued to work while

9   he was in the hospital.  He continued to work at his home.  He

10  worked remotely.  And he was well --

11          THE COURT:  He did go in for his operation.

12          MR. SHEARER:  Yes.

13          THE COURT:  He wasn't forced to do that by any of

14  these people?

15          MR. SHEARER:  No.

16          THE COURT:  All right.

17          MR. SHEARER:  But he received full pay up until

18  November 19th and he was having meetings, he was conducting

19  his business.

20          THE COURT:  From the hospital?

21          MR. SHEARER:  Yes.

22          THE COURT:  Right.

23          MR. SHEARER:  That's what Ms. Kelly talked about

24  today and she talked about his technological set-up and how he

25  was working from his home, how he was participating in

1   meetings, how there were video conferences, how he was

2   texting.

3          THE COURT:  So your theory is that they should not

4   have been anything to interfere with the fact that he was

5   performing his duties albeit under the stressful medical

6   conditions.

7          MR. SHEARER:  Yes, I think if they had a problem

8   with the way he was performing, they should have told him

9   there was no evidence they ever told him.  There was no

10  write-ups there's no performance reports.

11         THE COURT:  I don't know somebody is undergoing this

12  severe type of operation there's a recovery period and you're

13  saying that he should be allowed to continue with his duties

14  under those circumstances.  I don't understand that.

15         MR. SHEARER:  What I'm saying is the right move by

16  an employer would be to talk to him and say, you know, there's

17  some issues, you're not getting work done there are problems,

18  we have the leave program available.  But if you don't take it

19  and you continue like this we're going to have to terminate

20  you because you're not performing your job.  That's the right

21  thing to do instead of taking someone and force the them onto

22  unpaid status.

23         THE COURT:  How did they force him on to be unpaid

24  status?  I guess it's true, they did change his status.  What

25  do you say about that, Mr. Eidelman?

*Charge Conference*                                          **625**

1          MR. EIDELMAN:  I said your Honor he's not unpaid.

2     Plaintiff's Exhibit 99 which he just admitted at the end of

3     his evidence goes to show Mr. Barger has payroll status on the

4     books and records of the company.

5          THE COURT:  Did that change until when?

6          MR. EIDELMAN:  It didn't change.  He got paid his

7     salary through February 28th $20,000 a month.

8          THE COURT:  Yes.  It's in the records.  It's in your

9     records.

10         What happened after that?

11         MR. EIDELMAN:  After that, that was the effective

12    date of his separation, 2/28.

13         THE COURT:  And his separation.

14         MR. DILORENZO:  Is the FMLA.

15         MR. EIDELMAN:  The separation is after February 28th

16    was his last date of employment.  By that point in time,

17    Mr. Barger had already submitted.

18         THE COURT:  Why was that his last date of

19    employment.

20         MR. EIDELMAN:  Because that was the date he was told

21    on January 13th that he would be on working notice until then

22    and that was the separation date.  Remember this was part of

23    the 362 people who were left go.

24         THE COURT:  That was when the so-called

25    reorganization or restructuring was to take place.

1              MR. EIDELMAN:  And that was his last effective date.

2              THE COURT:  So until then he was paid his full

3      salary.

4              MR. EIDELMAN:  He was paid yes, your Honor.

5              THE COURT:  Just one second.

6              MR. EIDELMAN:  Is that not right, Mr. Shearer?

7              THE COURT:  So what you do you say about that.

8              MR. SHEARER:  He's talking from the day he was

9      notified that he was terminated to the date that he was

10     actually no longer an employee, yes, he did get full pay here

11     there.  But from the time he was forced on to leave on

12     November 19th to the time that he was notified, he was on FMLA

13     leave forced to seek short-term disability.

14             THE COURT:  How long a period of time was that?

15             MR. EIDELMAN:  If I may here, Judge, before we get

16     there.  On 11/30, 11/30/2016 which covered the period from

17     11/16 to 11/30 he was paid $20,000.  That was his

18     biweekly -- by monthly salary.  On 12/15 -- on 12/15 excuse me

19     he got the $174,000 bonus.  On 12/15, for the period 12/1

20     through 12/15, it dropped down at that point in time to 10,460

21     because there was an adjustment.  But then for the period

22     12/16 to 12/31 it jumped up to close to 23,000 to take care of

23     that adjustment.  On the next pay period, which was from 1/16

24     to 1/31, it jumped back up to 22,000 to cover that other

25     period.  And then we have the last one from 2/1/2017 to

*Charge Conference*                                          *627*

1   2/15/2017.

2           THE COURT:  They say factually there's no basis for

3   the claim that his salaries were curtailed.

4           MR. EIDELMAN:  Or that he was unpaid.

5           THE COURT:  Okay.  Well, you have a different view

6   of the record.

7           MR. SHEARER:  Yeah, I do.

8           THE COURT:  Why don't we do this.  Okay.  Think

9   about that, okay?  Because I'm trying to present to the jurors

10  what your best arguments are and if, in fact, that is fact

11  actual correct to may not put you in the best right in front

12  of the jury you think about that, okay, let's move on now.

13          You think that there's a claim for interfering with

14  his right to choose when it take leave by force him to take

15  leave against his will but if he was continued his payment

16  continued how then was he forced to take leave against his

17  will.

18          MR. SHEARER:  They cut off his access to work.

19          THE COURT:  Access to work.

20          MR. SHEARER:  He couldn't work.

21          THE COURT:  So there's some testimony with his

22  e-mail account being terminated.  I think somebody testified

23  that they did that out of the kindness or their heart they

24  didn't want to interfere with his ability to recover.  So I

25  guess this is a factual issue.

*Charge Conference*                                            **628**

1               What do you say about that?

2               MR. EIDELMAN:  I say, your Honor, there is no

3      factual issue under the ADA for the following reason.  We were

4      looking at the Court's, your Honor's, ADA instructions which

5      your clerks were kind enough to send to us.  And there's the

6      definition in order to have a claim the ADA, you have to be a

7      qualified individual with a disability.  And actually, and

8      your -- it actually says, it's in your instructions, "The term

9      "qualified individual," as used in these instructions means an

10     individual with a disability, who, with or without reasonable

11     accommodation, can perform the essential functions of the

12     employment position for which the plaintiff applied.  I will

13     now explain to you that's your definition."

14              THE COURT:  But he claims he was able to perform.

15              MR. EIDELMAN:  Exhibit Defendant's Exhibit 154 which

16     is the doctor's certification.

17              THE COURT:  Do you have a chance get sleep at night.

18              MR. EIDELMAN:  I try.

19              THE COURT:  Go ahead.

20              MR. EIDELMAN:  Defendant's Exhibit 154 that was

21     completed by Mr. Barger's doctor, not by First Data, his

22     doctor says he is totally incapacitated and able to work as of

23     October 22nd.  If he's totally incapacitated, unable to work,

24     he can not be a qualified individual under the ADA.

25              THE COURT:  Certain logic to that, Mr. Shearer.

*Charge Conference* 629

1      MR. SHEARER:  Yeah, but it's inconsistent with the

2  facts.  It's a form, MetLife form, signed by a doctor.  He's

3  not totally incapacitated when he's -- he even went to the

4  office and had a meeting.

5      THE COURT:  Okay.  So we have some factual issues.

6  It seems to me there had to be a period of time he was

7  incapacitated I mean my gosh he went he was operated on.

8      MR. SHEARER:  Yeah, he was, and he started texting

9  the next morning.

10      MR. EIDELMAN:  Number one, this is not an MetLife

11  form.  This is the Department of Labor certification of

12  healthcare provider.

13      THE COURT:  Save it for the jury.  I want to get an

14  idea what your issues are, what your facts are, basically, and

15  see what I can pare down be the charge.

16      MR. EIDELMAN:  One more other thing and there will

17  be in evidence.  Mr. Barger received long-term disability

18  payments.

19      THE COURT:  We know that.

20      MR. EIDELMAN:  So how can he be receive long-term

21  disability payments if he was authorized to return to work as

22  well?  He can't be a qualified individual if he submitted a

23  return to work that says you come back with no restrictions

24  and then he got paid long-term disability.  He can't have it

25  both ways.

1          THE COURT:  What was he going to do here?  He's up

2     against it.  He needs the money, I guess.

3          MR. EIDELMAN:  No, I just proved under Defendant's

4     Exhibit 99 that he was paid the whole time.  You can't

5     get -- talk about double dipping, which he said he didn't try

6     to do.  You can't double dip by getting your payments and then

7     receive long-term disability payments.

8          THE COURT:  I just want to see if I can make this

9     charge a little shorter.  So I think I flushed out your

10    claims, right, Mr. Shearer, and I guess if you still want

11    those four or five defendants.

12          MR. SHEARER:  I will talk to my client.

13          THE COURT:  See what you can do about it.

14          So that will help me how the we'll try to get some

15    draft charge to you and anything else you want to say to me.

16          MR. DILORENZO:  Your Honor, we'd --

17          THE COURT:  This is in effect a charging conference.

18          MR. DILORENZO:  Originally, I'm delighted with the

19    schedule we worked out for the week, but originally we were

20    going to submit new jury instructions by tomorrow and a

21    verdict form, a different verdict form, because, frankly,

22    either we didn't understand the claims or they've changed a

23    little bit.

24          THE COURT:  I haven't prepared a verdict form yet.

25          MR. EIDELMAN:  We'd love to be able to do that, give

1   it to you tomorrow morning.

2          THE COURT:  Look, you can submit whatever you want.

3   I don't want to preclude you from giving whatever you want,

4   but I already have a draft of the charge that I put together.

5   And what I'm going to do is I'm going to look at it carefully

6   tonight because my new law clerk has really done a great job

7   after two weeks of being on the job, right?  He's obviously

8   not suffering from any disabilities whatsoever.  So I'm going

9   to take a good look at it tonight.  I may not give it to you

10  tonight.  If I can, I will send you something, it will be a

11  draft for you to chew on.

12         But certainly, by tomorrow, before the end of the

13  week, we'll have something to you.  And I think it will work

14  out time wise okay.  We started to discuss it tonight.  We'll

15  be able to continue our discussion maybe tomorrow afternoon.

16  I'll try to get something to you if not tonight then by

17  tomorrow for you to take a look at and we'll be able to put it

18  all together by Monday morning when you start your argument.

19         How does that work.

20         MR. EIDELMAN:  That's fine, your Honor.  There's a

21  regulation under the FMLA that we're going to propose actually

22  be put in the jury instruction which is that if an employee is

23  laid off during the course of --

24         THE COURT:  Maybe a little louder.

25         MR. DILORENZO:  So 825.216, the limitations on na

1  employees's right to reinstatement states that, "The employee

2  has no greater right to reinstatement or other benefits or

3  conditions of employment if the employee had been

4  conditioned" --

5          THE COURT:  Here's what I want you to do,

6  Mr. DiLorenzo give it to my law clerk.  Who him what we're

7  talking about and we'll take a look at it.

8          MR. SHEARER:  I think we're going to include that

9  there's a regulation I would like to include.

10         THE COURT:  Give me all of your regulations.

11         MR. SHEARER:  Okay.

12         THE COURT:  Whether I put them in or not.

13         MR. EIDELMAN:  Which?

14         MR. SHEARER:  214.

15         THE COURT:  Stop.  We get carried away with

16 ourselves once in a while.  Just let me know what you want.

17 What regulation do you want?

18         MR. SHEARER:  29 CFR 825.214.

19         THE COURT:  Paul, do you have those numbers down?

20         Let me know what else you want me to consider.  You

21 have time to do it all.

22         Anything else you wish to say tonight before we go

23 back and you go to it work again?  How late are you going to

24 keep these poor associates working?

25         MR. EIDELMAN:  They're going to take me to dinner,

*Charge Conference*                                    *633*

1   Judge, so you know.

2           THE COURT:  Were you given a chance to have dinner

3   tonight?

4           MR. EIDELMAN:  Of course.  Of course.

5           THE COURT:  Mr. Shearer, you're okay?

6           MR. SHEARER:  Yeah, I'm not eating a lot of dinner,

7   I guess.

8           (Discussion held off the record.)

9           THE COURT:  See you tomorrow at 10:00 o'clock.

10          MR. SHEARER:  Thank you.

11          MR. EIDELMAN:  Thank you.

12          (WHEREUPON, this matter was adjourned to September

13  20, 2019, at 10:00 a.m.)

14

15                              *   *   *

16

17

18

19

20

21

22

23

24

25

634

1                            INDEX

2

3    WITNESS:                                      PAGE:

4    JULIE KELLY

5            DIRECT EXAMINATION

6            BY MR. SHEARER........................... 487

7            CROSS-EXAMINATION

8            BY MR. EIDELMAN.......................... 504

9            REDIRECT EXAMINATION

10           BY MR. SHEARER........................... 518

11           RECROSS-EXAMINATION

12           BY MR. DILORENZO......................... 522

13           REDIRECT EXAMINATION

14           BY MR. SHEARER........................... 526

15   FRANK BISIGNANO

16           DIRECT EXAMINATION

17           BY MR. SHEARER........................... 528

18           CROSS-EXAMINATION

19           BY MR. EIDELMAN.......................... 555

20           REDIRECT EXAMINATION

21           BY MR. SHEARER........................... 561

22           RECROSS-EXAMINATION

23           BY MR. EIDELMAN.......................... 565

24

25

635

1        STEVEN B. BARGER.........................   573

2        DIRECT EXAMINATION

3        BY MR. SHEARER...........................   573

4

5                              * * * * *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

636

1

2                          INDEX OF EXHIBITS

3

4    FOR THE PLAINTIFF:                              PAGE:

5    Plaintiff Exhibit 11 were received in evidence as

6    of this date ......................................   577

7    Plaintiff Exhibit 23 were received in evidence as

8    of this date ......................................   587

9    Plaintiff Exhibit 24 were received in evidence as

10   of this date ......................................   590

11   Plaintiff Exhibit 46 were received in evidence as

12   of this date ......................................   593

13   Plaintiff Exhibit 63 were received in evidence as

14   of this date ......................................   596

15   Plaintiff's Exhibits 96, 97, and 99 were received

16   in evidence as of this date.........................   611

17

18

19

20                          * * * * *

21

22

23

24

25

# #

**#155-254** [1] - 482:16

# $

**$174,000** [1] - 626:19
**$20,000** [3] - 579:8, 625:7, 626:17
**$250,000** [3] - 532:21, 561:23, 562:2
**$30,000** [1] - 579:16
**$35,000** [1] - 579:10
**$40,000** [1] - 606:7
**$400,000** [1] - 562:4
**$800** [1] - 545:15
**$870** [1] - 539:9
**$874** [1] - 536:13
**$900,000** [2] - 607:25, 608:12

# '

**'13** [2] - 530:7, 539:13
**'15** [1] - 600:16
**'16** [4] - 498:5, 515:20, 516:14, 549:14
**'16-ish** [1] - 549:19
**'17** [8] - 498:5, 498:6, 516:14, 516:15, 539:13, 539:16, 549:21, 606:12
**'80s** [1] - 574:24
**'84** [1] - 576:13

# 1

**1-16-2017** [1] - 593:9
**1.3** [1] - 608:6
**1.4** [1] - 608:7
**1/16** [1] - 626:23
**1/31** [1] - 626:24
**10** [2] - 597:3, 603:14
**10,460** [1] - 626:20
**10-24-16** [1] - 593:8
**100** [1] - 545:8
**10017** [1] - 483:10
**101** [3] - 597:6, 597:11, 597:12
**10:00** [5] - 482:8, 617:4, 617:16, 633:9, 633:13
**10:10** [1] - 486:20
**10:30** [1] - 617:7
**10th** [1] - 521:11
**11** [3] - 576:25, 577:10, 636:5
**11/10** [1] - 506:5
**11/16** [1] - 626:17
**11/30** [2] - 626:16, 626:17
**11/30/2016** [1] - 626:16
**11201** [1] - 482:21
**11:01** [1] - 527:7
**11:23** [1] - 527:11
**11th** [1] - 524:6
**12** [2] - 579:9, 603:14
**12-28** [1] - 596:5
**12/1** [1] - 626:19
**12/15** [4] - 626:18, 626:19, 626:20
**12/16** [1] - 626:22
**12/31** [1] - 626:22
**12:00** [1] - 555:20

**12:05** [1] - 565:22
**12:10** [1] - 571:10
**13th** [1] - 625:21
**14** [1] - 496:14
**15** [6] - 586:22, 593:7, 596:15, 601:14, 609:4, 609:20
**15-minute** [1] - 609:23
**154** [2] - 628:15, 628:20
**15th** [1] - 596:18
**16** [1] - 593:20
**165** [1] - 591:21
**17-CV-4869(FB** [1] - 482:3
**178** [1] - 582:9
**178,000** [1] - 582:21
**17th** [3] - 597:1, 597:23, 620:1
**19** [4] - 482:7, 592:6, 592:20, 605:5
**1980** [1] - 574:20
**1982** [1] - 576:13
**1998** [1] - 487:22
**19th** [2] - 623:18, 626:12
**1:00** [1] - 614:8

# 2

**2** [1] - 545:18
**2,000** [1] - 537:20
**2/1/2017** [1] - 626:25
**2/15/2017** [1] - 627:1
**2/28** [1] - 625:12
**20** [10] - 487:21, 492:24, 492:25, 502:4, 502:12, 504:11, 504:18, 586:6, 586:22, 633:13
**20,000** [1] - 541:7
**200,000** [1] - 558:25
**2005** [1] - 489:9
**2012** [1] - 539:9
**2013** [8] - 493:9, 528:10, 529:14, 529:15, 529:16, 530:4, 539:8, 556:8
**2014** [6] - 487:17, 491:17, 519:5, 565:5, 584:8, 584:25
**2015** [4] - 515:20, 516:14, 585:6, 605:3
**2016** [16] - 494:4, 495:5, 496:11, 496:15, 498:3, 498:4, 516:4, 518:12, 521:11, 540:22, 559:23, 560:1, 585:16, 585:18, 585:21, 601:1
**2016-2017** [2] - 511:9, 515:22
**2017** [9] - 487:18, 498:3, 502:9, 518:12, 528:10, 540:5, 593:20, 609:15
**2018** [2] - 493:10, 539:8
**2019** [2] - 482:7, 633:13
**2024** [2] - 607:9, 608:9
**21202** [1] - 483:5
**214** [1] - 632:14
**22** [1] - 540:24
**22,000** [1] - 626:24
**222** [1] - 591:20
**22nd** [1] - 628:23
**23** [4] - 587:10, 587:12, 587:14, 636:7
**23,000** [1] - 626:22
**24** [4] - 590:6, 590:8, 609:15, 636:9
**24,000** [2] - 551:14, 558:11
**25** [3] - 502:12, 504:12, 504:18
**25,000** [3] - 537:10, 540:24, 541:7
**250** [1] - 582:8
**26th** [1] - 620:2

**28** [4] - 585:22, 596:17, 607:8, 608:9
**28th** [2] - 625:7, 625:15
**29** [2] - 529:16, 632:18
**29th** [2] - 530:2, 530:9
**2:00** [6] - 565:19, 570:17, 571:5, 571:7, 614:8
**2:11** [2] - 571:10, 572:4
**2:12** [1] - 572:11

# 3

**3** [2] - 577:22, 591:17
**3,000** [13] - 540:4, 542:16, 546:5, 546:10, 546:11, 546:13, 552:14, 558:15, 560:18, 561:2, 561:7, 561:12
**30** [2] - 579:10, 581:4
**30,000** [3] - 579:22, 580:23, 581:15
**300** [7] - 546:7, 546:19, 548:17, 552:25, 558:6, 558:10, 558:18
**31** [1] - 608:2
**310** [1] - 605:1
**330** [1] - 483:9
**35,000** [1] - 582:18
**360** [3] - 586:21, 587:3, 587:10
**362** [5] - 546:8, 546:20, 555:2, 555:11, 625:23
**3839** [1] - 482:16
**39th** [1] - 483:10
**3:19** [1] - 609:25
**3:53** [1] - 610:15

# 4

**4** [3] - 606:11, 606:15, 609:15
**4,000** [1] - 537:19
**4.5** [1] - 587:8
**40** [8] - 538:1, 580:4, 580:5, 581:16, 581:17, 581:19, 581:20, 582:4
**40,000** [4] - 580:8, 582:18, 582:20, 606:9
**40-year** [1] - 538:5
**401(K** [2] - 563:15, 563:17
**46** [3] - 593:3, 593:6, 636:11
**47** [1] - 516:3
**487** [1] - 634:6
**4:00** [2] - 617:21, 618:1
**4:03** [1] - 617:18
**4:27** [1] - 619:1

# 5

**5** [7] - 538:19, 538:25, 539:7, 587:8, 596:20, 596:25, 621:18
**50** [2] - 482:20, 504:19
**500** [1] - 483:4
**504** [1] - 634:8
**506** [1] - 482:20
**518** [1] - 634:10
**522** [1] - 634:12
**526** [1] - 634:14
**528** [1] - 634:17
**555** [1] - 634:19
**561** [1] - 634:21
**565** [1] - 634:23

**57** [1] - 485:11
**573** [2] - 635:1, 635:3
**577** [1] - 636:6
**587** [1] - 636:8
**590** [1] - 636:10
**593** [1] - 636:12
**596** [1] - 636:14
**59th** [1] - 544:19
**5:00** [2] - 613:10, 613:23

## 6

**6** [1] - 540:5
**60-mile** [1] - 507:23
**611** [1] - 636:16
**613-2487** [1] - 483:13
**613-2694** [1] - 483:13
**63** [4] - 595:23, 595:24, 596:2, 636:13
**6:00** [1] - 617:6
**6th** [1] - 589:16

## 7

**70** [2] - 504:15, 504:16
**700,000** [1] - 558:23
**718** [2] - 483:13, 483:13
**750,000** [1] - 580:7
**75204** [1] - 482:17

## 8

**825.214** [1] - 632:18
**825.216** [1] - 631:25
**8th** [1] - 590:11

## 9

**90** [1] - 537:22
**95** [1] - 593:11
**96** [5] - 610:20, 610:23, 611:4, 611:8, 636:15
**97** [6] - 610:20, 611:1, 611:2, 611:4, 611:8, 636:15
**99** [6] - 610:21, 611:5, 611:8, 625:2, 630:4, 636:15

## A

**a.m** [5] - 482:8, 486:20, 527:7, 527:11, 633:13
**ability** [2] - 611:22, 627:24
**able** [13] - 490:16, 542:2, 551:6, 567:6, 568:25, 615:10, 616:13, 621:12, 628:14, 628:22, 630:25, 631:15, 631:17
**absolute** [1] - 583:3
**absolutely** [3] - 555:23, 582:13, 611:19
**absorb** [1] - 621:12
**accent** [1] - 544:17
**accents** [1] - 544:24
**accept** [3] - 587:21, 588:3, 598:22
**accepting** [1] - 494:21

**access** [2] - 627:18, 627:19
**accommodate** [1] - 617:12
**accommodation** [3] - 569:22, 570:12, 628:11
**accommodations** [1] - 496:3
**accomplish** [1] - 503:2
**accordance** [1] - 543:16
**account** [1] - 627:22
**accounting** [7] - 533:6, 538:14, 538:15, 538:18, 538:24, 539:1, 539:4
**accusations** [1] - 598:1
**Acquired** [1] - 619:10
**acquired** [2] - 619:19
**Act** [1] - 559:23
**action** [3] - 523:8, 544:11, 552:4
**actions** [2] - 552:3, 587:22
**activities** [2] - 501:17, 620:5
**activity** [1] - 496:11
**actual** [3] - 519:24, 545:6, 627:11
**ADA** [8] - 508:18, 535:22, 621:4, 621:25, 628:3, 628:4, 628:6, 628:24
**adaptable** [1] - 496:2
**add** [3] - 575:25, 576:4, 592:8
**added** [1] - 511:22
**adding** [1] - 552:16
**addition** [4] - 491:22, 582:6, 582:12, 585:1
**additional** [5] - 494:5, 581:9, 582:14, 599:7, 601:1
**address** [2] - 485:9, 486:13
**addressed** [1] - 616:23
**addressing** [1] - 516:16
**adjourned** [1] - 633:12
**adjourning** [1] - 613:7
**adjustment** [2] - 626:21, 626:23
**administrator** [2] - 503:4, 503:5
**admit** [1] - 589:5
**admitted** [1] - 625:2
**Adobe** [1] - 502:23
**advise** [1] - 596:25
**advisor** [1] - 556:19
**affecting** [1] - 507:22
**afternoon** [6] - 567:14, 572:24, 610:10, 615:5, 616:3, 631:15
**afterwards** [1] - 544:11
**agendas** [1] - 616:4
**aggressive** [2] - 583:15, 584:1
**agree** [5] - 552:21, 576:1, 576:14, 576:17, 591:19
**agreeable** [1] - 614:13
**agreed** [1] - 550:25
**agreement** [6] - 564:13, 578:21, 578:23, 580:17, 580:19, 619:24
**ahead** [7] - 491:3, 517:14, 522:11, 529:3, 529:25, 530:23, 532:11, 544:15, 544:25, 548:11, 561:16, 576:4, 576:16, 577:3, 577:15, 606:23, 628:19
**aided** [1] - 483:15
**air** [2] - 583:11, 613:8
**al** [3] - 482:8, 483:4, 483:9
**albeit** [1] - 624:5
**alcoholism** [1] - 500:23
**allegations** [1] - 598:11
**allocated** [1] - 533:19
**allocation** [2] - 535:5, 535:6

**allow** [3] - 552:23, 598:8, 598:9
**allowed** [4] - 578:6, 598:12, 607:24, 624:13
**allows** [1] - 495:24
**aloof** [1] - 494:24
**America** [2] - 539:15, 584:19
**American** [1] - 531:15
**Amortization** [1] - 533:7
**amount** [10] - 485:24, 499:12, 533:8, 535:4, 537:9, 558:19, 562:8, 563:24, 595:6, 605:3
**amounts** [1] - 496:21
**Amy** [1] - 485:11
**AND** [1] - 482:12
**and..** [1] - 489:23
**announced** [1] - 498:10
**annual** [1] - 516:2
**answer** [4] - 523:15, 533:13, 536:4, 603:3
**answered** [1] - 532:8
**answering** [2] - 531:19, 537:21
**answers** [2] - 485:12, 490:18
**Anthony** [4] - 483:12, 486:10, 591:10, 613:23
**anticipate** [2] - 569:12, 616:1
**appearing** [1] - 598:4
**applicants** [1] - 514:2
**applications** [1] - 494:2
**applied** [3] - 603:4, 603:8, 628:12
**applies** [1] - 538:24
**apply** [4] - 587:18, 595:1, 603:7, 620:25
**appreciate** [2] - 486:17, 576:6
**approval** [5] - 519:15, 519:18, 532:21, 598:19
**approve** [4] - 513:3, 562:25, 563:2, 563:24
**approved** [5] - 599:11, 599:12, 599:13, 599:14, 620:8
**approving** [2] - 519:22, 594:1
**April** [3] - 529:16, 556:8, 585:22
**area** [1] - 515:6
**argument** [5] - 525:22, 613:21, 613:25, 622:6, 631:18
**arguments** [1] - 627:10
**arm** [1] - 601:10
**arms** [1] - 598:7
**ARNSTEIN** [1] - 483:3
**arrangement** [1] - 578:2
**arrived** [4] - 535:18, 537:3, 537:4, 537:8
**ascertained** [1] - 599:4
**Asia** [1] - 584:19
**askew** [1] - 592:12
**aspect** [5] - 521:19, 536:17, 536:18, 568:13, 585:7
**aspects** [1] - 584:13
**assert** [1] - 619:11
**assess** [2] - 570:11, 584:14
**assessment** [1] - 598:15
**assigned** [1] - 489:6
**assist** [1] - 592:23
**assisting** [1] - 502:16
**associate** [3] - 508:15, 556:11, 620:16
**associates** [5] - 516:10, 556:11,

632:24
**assume** [2] - 567:13, 621:16
**assumed** [2] - 584:7, 584:25
**assumption** [2] - 578:14, 600:14
**ate** [1] - 611:14
**Atlanta** [6] - 507:3, 507:6, 509:16, 509:17, 522:4, 589:20
**attend** [2] - 498:17, 499:12, 506:19
**attended** [5] - 495:13, 505:12, 506:5, 599:19, 600:4
**attention** [2] - 565:8, 589:12
**attentive** [1] - 494:23
**attorney** [5] - 522:14, 522:16, 522:18, 522:21, 523:1
**Attorney** [1] - 482:15
**attorneys** [1] - 483:8
**Attorneys** [2] - 482:19, 483:3
**attrition** [3] - 502:1, 516:2, 598:13
**audit** [1] - 510:10
**auspices** [1] - 600:15
**authority** [4] - 513:6, 513:9, 513:14, 562:1
**authorization** [2] - 597:4, 597:18
**authorized** [1] - 629:21
**availability** [1] - 494:25
**available** [6] - 486:22, 495:1, 495:6, 533:9, 563:25, 624:18
**Avenue** [3] - 482:16, 483:9, 544:19
**average** [1] - 587:8
**averaging** [1] - 603:14
**awarded** [1] - 563:18
**aware** [12] - 486:8, 508:24, 509:2, 511:9, 511:21, 518:11, 520:1, 525:7, 533:25, 534:1, 536:24, 554:5
**awful** [1] - 621:2

## B

**B-i-s-i-g-n-a-n-o** [1] - 527:25
**backed** [1] - 606:15
**background** [1] - 503:13
**backpay** [2] - 606:6, 607:6
**backwards** [1] - 489:19
**bad** [3] - 545:17, 551:5, 620:14
**Baddour** [3] - 594:12, 597:16
**ballpark** [2] - 606:18, 608:11
**Baltimore** [1] - 483:5
**bank** [7] - 494:3, 556:5, 574:21, 574:23, 601:4, 601:6, 601:10
**banking** [2] - 575:12, 601:12
**bankruptcies** [1] - 550:25
**banks** [4] - 574:25, 575:3, 601:11, 601:14
**BARGER** [2] - 482:3, 573:20
**Barger** [99] - 482:15, 482:19, 484:3, 484:17, 488:3, 488:13, 489:11, 490:3, 490:4, 490:9, 491:19, 492:1, 492:17, 494:4, 494:7, 494:16, 494:22, 494:23, 495:5, 495:15, 495:19, 497:1, 498:7, 500:9, 500:10, 500:19, 500:22, 500:25, 502:21, 503:9, 503:19, 503:21, 504:22, 507:1, 507:3, 507:7, 509:13, 509:17, 510:22, 512:19, 514:17, 515:3, 515:23, 516:7, 518:6, 519:4, 519:9, 525:7, 525:17, 525:24, 526:2, 548:16, 548:22,

549:1, 553:15, 554:16, 556:20, 556:24, 557:9, 557:16, 557:18, 558:24, 559:22, 560:6, 560:8, 560:15, 560:17, 561:5, 561:9, 566:8, 566:12, 567:10, 567:19, 568:10, 568:16, 570:8, 572:14, 572:18, 572:22, 572:23, 572:24, 573:10, 573:25, 574:15, 575:1, 577:5, 577:16, 577:20, 583:8, 583:22, 587:11, 605:25, 611:13, 623:4, 625:3, 625:17, 629:17
**Barger's** [18] - 485:3, 492:12, 493:5, 493:21, 494:25, 509:10, 513:1, 557:20, 559:7, 559:25, 560:10, 560:12, 560:24, 561:1, 567:14, 567:22, 610:19, 628:21
**BARGER**.......................... [1] - 635:1
**based** [2] - 587:19, 621:23
**basic** [2] - 548:20
**basis** [3] - 499:16, 579:8, 627:2
**Batman** [1] - 584:12
**bear** [2] - 611:3, 612:13
**beat** [1] - 525:8
**beautiful** [1] - 595:19
**became** [10] - 488:16, 488:25, 490:11, 491:18, 501:12, 528:12, 529:15, 559:15, 575:18, 620:5
**become** [2] - 511:1, 529:8
**becoming** [1] - 539:15
**bed** [2] - 598:6, 598:7
**bedazzle** [1] - 619:6
**BEFORE** [1] - 482:12
**beforehand** [1] - 620:2
**begin** [1] - 490:2
**beginning** [4] - 502:8, 520:3, 556:18, 593:16
**behave** [2] - 584:23, 604:4
**behavior** [1] - 598:1
**behavioral** [1] - 584:23
**behind** [1] - 594:9
**beholder** [1] - 558:10
**belief** [4] - 500:15, 508:20, 549:15
**belongs** [1] - 517:2
**benefited** [1] - 559:16
**benefits** [9] - 563:8, 563:10, 563:15, 563:20, 563:22, 595:1, 596:22, 632:2
**best** [13] - 489:25, 496:19, 538:15, 543:25, 544:23, 546:24, 564:11, 591:14, 615:14, 615:22, 627:10, 627:11
**better** [3] - 587:7, 612:4, 612:7
**between** [12] - 518:5, 539:8, 540:24, 547:23, 562:19, 564:14, 576:9, 592:5, 596:3, 605:2, 606:12, 616:10
**big** [11] - 490:12, 528:24, 541:7, 542:4, 546:5, 558:2, 564:18, 588:21, 599:8, 602:16, 605:13
**bigger** [1] - 547:25
**biggest** [1] - 539:14
**bill** [1] - 619:25
**birthday** [1] - 492:7
**Bisignano** [20] - 485:6, 485:7, 485:19, 488:16, 488:18, 488:24, 489:10, 508:9, 510:15, 510:17, 527:1, 527:3, 527:14, 527:24, 528:2, 528:8, 556:2, 565:5, 570:23, 622:19
**BISIGNANO** [2] - 527:19, 634:15
**Bisignano's** [1] - 493:5
**bit** [13] - 489:19, 491:3, 499:2, 502:5, 510:8, 538:9, 540:1, 541:16, 592:12,

612:3, 612:4, 617:22, 630:23
**biweekly** [1] - 626:18
**blame** [1] - 517:1
**BLOCK** [1] - 482:12
**blocks** [2] - 588:19, 591:5
**blood** [1] - 599:8
**blue** [1] - 497:5
**board** [13] - 528:11, 528:12, 528:16, 530:10, 530:20, 531:2, 536:6, 562:25, 576:23, 591:22, 592:1, 595:15
**body** [1] - 583:17
**BOND** [1] - 483:8
**bonus** [13] - 533:4, 533:12, 533:17, 533:19, 533:21, 563:24, 580:9, 580:10, 582:19, 582:21, 606:14, 607:14, 626:19
**bonuses** [12] - 533:8, 533:9, 533:10, 535:3, 580:12, 580:14, 580:20, 580:22, 580:24, 581:2, 582:7, 606:1
**books** [1] - 625:4
**born** [1] - 490:20
**boss** [4] - 489:16, 490:9, 490:11, 564:10
**bottom** [1] - 543:19
**bought** [2] - 541:14, 541:16
**box** [5] - 497:5, 583:10, 589:1, 589:17, 604:10
**boxes** [1] - 490:6
**break** [9] - 527:2, 555:21, 565:17, 573:4, 609:23, 614:9, 617:20, 617:22, 621:22
**breath** [2] - 573:15, 604:22
**breathing** [1] - 567:1
**Brian** [7] - 488:6, 488:12, 489:6, 489:8, 489:12, 489:24, 490:2
**Brian's** [2] - 489:15, 491:21
**brick** [1] - 536:21
**brief** [5] - 517:15, 527:9, 576:18, 591:12, 610:13
**briefcase** [1] - 589:25
**briefly** [1] - 485:3
**bring** [10] - 485:16, 486:4, 527:8, 531:4, 536:12, 538:2, 556:24, 572:10, 576:17, 610:4
**bringing** [2] - 556:21, 557:9
**brings** [2] - 584:12, 584:13
**broad** [1] - 621:13
**broader** [1] - 492:19
**Broderick** [7] - 496:13, 496:16, 496:23, 496:25, 515:13, 519:3, 519:8
**brokerage** [2] - 602:13, 602:15
**Brooklyn** [5] - 482:5, 482:21, 544:18, 545:1, 556:2
**Brothers** [1] - 575:13
**brought** [18] - 488:22, 491:19, 512:22, 517:22, 520:1, 521:20, 523:16, 528:15, 528:23, 531:2, 531:5, 556:16, 556:19, 574:17, 574:19, 591:6, 592:4, 602:25
**budget** [1] - 532:16
**budgetary** [1] - 602:19
**building** [1] - 597:20
**built** [2] - 536:10, 536:11
**bunch** [2] - 541:13, 544:9
**Business** [1] - 587:20, 602:10
**business** [40] - 496:22, 499:19, 505:15, 506:14, 521:14, 521:15, 521:17, 524:24, 524:25, 525:10,

541:15, 541:20, 551:9, 556:3, 583:1, 585:8, 587:23, 590:1, 598:18, 598:19, 598:20, 598:21, 599:2, 599:3, 599:16, 599:25, 601:3, 601:16, 601:21, 602:1, 602:8, 602:18, 602:21, 603:10, 603:13, 606:8, 609:16, 623:19
**businesses** [3] - 541:14, 541:16
**butt** [1] - 486:10
**button** [1] - 583:10
**buy** [1] - 532:24

---

## C

**Cagwin** [1] - 613:16
**calculate** [2] - 606:6, 607:2
**calculated** [3] - 605:25, 606:9, 607:6
**calculating** [1] - 622:10
**calculation** [1] - 607:13
**calculations** [1] - 610:20
**calculator** [1] - 606:4
**cancelled** [2] - 511:21, 512:4
**cancer** [9] - 494:16, 548:23, 548:25, 560:24, 560:25, 561:1, 585:18, 588:12, 589:18
**candidates** [2] - 519:19, 519:20
**capabilities** [3] - 518:25, 591:1, 600:20
**caption** [1] - 523:10
**card** [1] - 490:6
**cards** [1] - 538:3
**care** [5] - 555:7, 579:10, 588:3, 588:6, 626:22
**career** [4] - 489:9, 541:25, 586:24, 619:18
**careers** [1] - 531:16
**carefully** [2] - 589:14, 631:5
**carried** [1] - 632:15
**carrying** [1] - 605:20
**case** [26] - 484:2, 504:9, 508:21, 522:15, 523:1, 523:3, 523:6, 523:11, 527:4, 531:21, 548:16, 560:21, 565:12, 569:19, 570:14, 583:23, 613:15, 615:6, 615:15, 616:15, 616:17, 616:19, 619:17, 619:20, 621:4
**cases** [3] - 559:6, 569:12, 569:23
**cash** [4] - 545:18, 558:22, 559:7, 562:20
**casing** [1] - 520:3
**casual** [1] - 600:8
**catch** [1] - 514:7
**categories** [1] - 587:4
**caught** [1] - 597:20
**CAUSE** [1] - 482:11
**caused** [2] - 577:23, 588:13
**center** [5] - 487:24, 494:10, 537:19, 574:23, 595:21
**centers** [2] - 494:5, 494:9
**CEO** [25] - 488:16, 488:18, 493:5, 528:11, 528:12, 528:16, 528:20, 528:21, 528:22, 529:8, 529:15, 529:18, 530:1, 530:2, 530:7, 530:18, 530:21, 531:7, 531:17, 535:10, 553:7, 553:9, 553:10, 556:8, 560:22
**CEOs** [2] - 529:19, 564:20
**certain** [1] - 553:8, 584:20, 586:6,

---

603:24, 628:25
**certainly** [5] - 541:11, 568:8, 574:20, 614:2, 631:12
**certification** [3] - 597:8, 628:16, 629:11
**cetera** [1] - 598:17
**CFR** [1] - 632:18
**chain** [1] - 519:17
**chairman** [2] - 528:12, 528:16
**challenge** [1] - 600:1
**challenged** [1] - 589:13
**chance** [5] - 565:19, 574:4, 581:3, 628:17, 633:2
**change** [19] - 488:19, 488:23, 489:3, 489:17, 510:15, 515:8, 535:17, 584:21, 584:23, 585:2, 585:4, 585:11, 586:10, 589:10, 604:3, 608:2, 624:24, 625:5, 625:6
**changed** [7] - 499:17, 499:24, 519:15, 535:19, 563:20, 563:23, 630:22
**changes** [4] - 492:9, 492:10, 563:7, 588:2
**changing** [1] - 587:15
**charge** [14] - 498:12, 508:24, 574:22, 614:4, 614:10, 617:23, 619:4, 621:2, 621:6, 621:11, 629:15, 630:9, 630:15, 631:4
**charging** [3] - 603:18, 617:25, 630:17
**Charron** [7] - 532:20, 549:7, 550:16, 570:22, 591:8, 599:13, 599:17
**chart** [2] - 496:11, 497:16
**chase** [2] - 553:11, 619:7
**chat** [1] - 496:1
**chatting** [1] - 599:24
**check** [1] - 545:5
**checked** [1] - 547:20
**cheese** [4] - 528:24, 528:25, 558:2, 564:18
**chemo** [1] - 591:20
**chew** [1] - 631:11
**chief** [5] - 528:12, 530:10, 530:19, 538:15, 539:4
**children** [1] - 492:8
**choose** [2] - 543:11, 627:14
**chords** [1] - 588:14
**chosen** [1] - 601:16
**Christine** [2] - 600:18, 600:20
**Christmas** [1] - 595:20
**chunk** [1] - 614:6
**CIANFICHI** [1] - 483:6
**circulating** [1] - 600:17
**circumstance** [1] - 513:17
**circumstances** [3] - 584:2, 620:7, 624:14
**civil** [1] - 484:3
**CIVIL** [1] - 482:11
**claim** [8] - 522:15, 621:5, 621:24, 622:11, 622:25, 627:3, 627:13, 628:6
**claiming** [1] - 620:13
**claims** [4] - 621:17, 628:14, 630:10, 630:22
**clarified** [1] - 605:22
**clarity** [1] - 563:17
**classes** [3] - 499:12, 499:13, 612:3
**clear** [8] - 537:7, 544:1, 551:22, 562:5, 583:25, 616:4, 619:18, 621:6

---

**clear-cut** [1] - 619:18
**clearly** [3] - 528:4, 584:1, 600:10
**clerk** [2] - 631:6, 632:6
**clerks** [1] - 628:5
**client** [1] - 630:12
**clients** [13] - 517:13, 537:24, 538:1, 574:24, 579:12, 584:16, 588:3, 588:4, 601:6, 602:4, 603:16, 604:2, 611:17
**close** [9] - 529:1, 566:24, 575:18, 581:23, 589:12, 602:24, 604:10, 626:22
**closed** [1] - 539:12
**closer** [1] - 542:24
**closures** [1] - 539:17
**Clover** [1] - 536:10
**clover** [1] - 494:1
**coach** [2] - 587:1, 601:11
**coaching** [1] - 604:20
**codirect** [1] - 501:3
**collaboration** [4] - 495:23, 495:24, 502:23, 518:17
**collaborative** [1] - 544:13
**collaboratively** [1] - 518:9
**colleague** [1] - 504:3
**colleagues** [1] - 561:15
**collect** [1] - 498:13
**collecting** [1] - 622:15
**collectively** [1] - 578:25
**college** [2] - 556:5, 604:20
**colocated** [1] - 539:12
**comfortable** [1] - 573:14
**coming** [12] - 492:1, 525:2, 525:6, 584:17, 588:5, 593:23, 595:8, 595:16, 596:6, 596:9, 596:18, 599:16
**commenced** [1] - 570:3
**comment** [1] - 605:17
**Commission** [1] - 523:6
**commit** [1] - 619:5
**commitment** [1] - 551:13
**committed** [2] - 551:12, 619:23
**Committee** [11] - 531:25, 532:2, 532:5, 532:6, 532:15, 535:8, 547:10, 550:1, 564:8, 564:9, 564:10
**committee** [1] - 550:7
**common** [1] - 514:1
**communicate** [3] - 495:21, 521:23, 611:21
**communication** [1] - 591:14
**commute** [1] - 507:23
**comp** [1] - 562:18
**companies** [7] - 536:6, 541:19, 564:8, 564:19, 574:25, 602:6, 603:23
**company** [86] - 493:18, 493:19, 497:20, 503:12, 503:13, 505:17, 508:2, 517:19, 521:18, 521:20, 528:19, 528:20, 529:10, 530:3, 530:5, 530:11, 530:12, 532:4, 532:14, 536:4, 536:17, 536:18, 537:9, 537:12, 537:14, 537:16, 537:22, 537:24, 538:4, 538:6, 539:9, 539:11, 539:14, 539:19, 540:10, 540:15, 541:7, 545:14, 545:17, 545:22, 545:23, 546:5, 546:12, 549:13, 550:3, 550:6, 550:22, 550:23, 551:1, 551:2, 551:3, 551:10, 552:6, 556:13, 556:15, 558:7, 558:11, 558:12, 558:19, 558:24, 559:12, 559:14, 559:15, 562:9, 563:19, 563:20, 564:2, 565:6, 574:21, 584:12,

(comparable - daily)

584:13, 584:15, 586:15, 587:17, 587:21, 588:2, 592:3, 599:1, 600:13, 604:12, 605:13, 625:4
**comparable** [1] - 604:9
**compare** [1] - 492:12
**compared** [1] - 537:16
**compelled** - 622:25
**compensated** [2] - 546:12, 552:14
**compensation** [8] - 533:15, 548:12, 558:22, 560:10, 578:11, 606:17, 610:21
**complained** [1] - 509:9
**complaint** [4] - 508:18, 521:2, 522:17, 523:18
**complete** [5] - 555:22, 567:13, 567:23, 586:16, 600:3
**completed** [1] - 628:21
**completely** [1] - 540:12
**complexity** [1] - 621:3
**complicated** [1] - 550:13
**complications** [1] - 590:19
**comply** [1] - 535:21
**compression** [1] - 584:16
**Computer** [1] - 483:15
**computer** [1] - 532:24
**Computer-aided** [1] - 483:15
**computerized** [1] - 483:15
**concept** [2] - 587:20, 588:6
**concern** [2] - 490:14, 492:14
**concerned** [1] - 566:17
**concerning** [2] - 510:10, 513:22
**concerns** [1] - 485:22
**conclude** [1] - 610:9
**concluded** [2] - 549:14, 564:11
**concludes** [1] - 614:16
**concluding** [1] - 615:19
**conclusion** [2] - 554:2, 605:19
**condition** [3] - 545:17, 588:9, 620:12
**conditioned** [1] - 632:4
**conditions** [2] - 624:6, 632:3
**conducting** [1] - 623:18
**conference** [7] - 503:3, 599:20, 613:1, 617:21, 617:24, 617:25, 630:17
**conferences** [2] - 490:12, 624:1
**confused** [1] - 513:22
**confusion** [1] - 526:15
**Connect** [1] - 502:23
**conscience** [1] - 623:7
**conserve** [2] - 575:17, 576:5
**consider** [2] - 621:9, 632:20
**considering** [1] - 616:21
**consists** [1] - 606:19
**consolidate** [4] - 541:19, 543:2, 546:23, 600:15
**consolidated** [3] - 547:2, 554:4, 600:13
**constant** [1] - 604:5
**consult** [1] - 561:14
**consultant** [10] - 511:14, 511:15, 513:4, 513:5, 556:21, 556:25, 581:5, 581:7, 581:12, 620:5
**Consultant's** [1] - 515:22
**Consulting** [6] - 497:24, 498:2, 499:10, 504:10, 511:1, 607:16
**consulting** [14] - 502:18, 510:10, 583:1, 583:5, 601:19, 601:21, 602:18,

602:22, 603:9, 603:13, 606:8, 609:16, 611:17, 611:20
**consumed** [1] - 585:7
**contact** [4] - 520:9, 557:15, 602:12
**contacted** [1] - 606:2
**contacts** [2] - 601:22, 602:12
**contention** [1] - 578:18
**continue** [14] - 491:20, 493:25, 549:22, 581:15, 588:17, 589:8, 600:23, 609:23, 610:17, 623:6, 624:13, 624:19, 631:15
**Continued** [3] - 483:1, 534:3, 614:17
**continued** [11] - 494:1, 565:24, 571:12, 585:4, 588:14, 608:15, 612:15, 623:8, 623:9, 627:15, 627:16
**continues** [1] - 604:21
**continuing** [1] - 585:1
**Continuing** [9] - 491:7, 499:8, 506:3, 517:18, 520:23, 529:6, 531:1, 531:24, 611:12
**contract** [5] - 511:22, 513:4, 513:10, 539:17, 551:8
**contractor** [2] - 490:4, 619:24
**contracts** [1] - 602:18
**contribute** [1] - 599:20
**control** [3] - 543:2, 548:13, 621:8
**controlling** [1] - 617:8
**controls** [1] - 550:20, 563:7
**conversation** [8] - 505:11, 561:25, 564:11, 596:20, 597:19, 597:24, 602:25, 603:1
**conversations** [6] - 486:12, 595:10, 600:20, 600:22, 602:23, 603:17
**converse** [1] - 569:9
**conveyed** [1] - 574:2
**Cooper** [1] - 508:14
**COOPER** [1] - 483:6
**copy** [1] - 605:7
**core** [2] - 548:1, 548:5
**Corp** [1] - 484:4
**Corporate** [2] - 518:21, 518:23
**corporate** [8] - 497:4, 511:1, 511:4, 511:7, 512:7, 512:13, 563:24, 588:1
**corporate-wide** [1] - 563:24
**corporately** [1] - 593:17
**corporation** [2] - 492:21, 586:12, 621:5, 621:25
**Corporation** [2] - 483:4, 483:9
**CORPORATION** [1] - 482:7
**correct** [34] - 497:11, 500:7, 500:8, 501:22, 506:14, 507:9, 508:4, 510:24, 511:8, 513:15, 514:18, 515:10, 515:16, 516:9, 516:21, 530:22, 532:21, 533:9, 536:16, 539:3, 540:6, 548:24, 549:8, 560:8, 560:9, 566:13, 577:24, 579:22, 586:2, 589:16, 594:12, 597:4, 605:8, 627:11
**correctly** [1] - 575:22
**correlated** [1] - 533:15
**cost** [7] - 550:20, 563:7, 563:14, 605:20, 606:1, 622:8, 622:16
**costly** [1] - 622:13
**costs** [1] - 547:17
**cough** [1] - 577:1
**counsel** [4] - 484:4, 535:23, 612:12, 613:2

**count** [7] - 496:11, 541:11, 541:13, 545:22, 598:12, 599:4, 601:15
**counted** [1] - 566:23
**country** [3] - 490:13, 507:6, 544:24
**counts** [1] - 541:15
**couple** [13] - 484:21, 501:10, 507:7, 510:18, 522:9, 545:25, 548:18, 589:5, 590:5, 590:18, 591:24, 601:25, 602:24
**course** [9] - 495:2, 495:22, 564:23, 598:19, 603:20, 606:4, 631:23, 633:4
**court** [5] - 484:1, 486:11, 490:25, 507:16, 523:2, 523:8, 523:12, 523:16, 529:22, 566:1, 572:3, 575:20, 584:3, 615:1, 619:1
**Court** [6] - 482:20, 483:12, 483:12, 485:9, 567:11, 613:2
**Court's** [1] - 628:4
**Courthouse** [1] - 482:5
**courtroom** [12] - 486:20, 527:7, 527:11, 565:23, 572:12, 573:17, 574:8, 609:25, 610:15, 617:6, 617:10, 617:18
**COURTROOM** [22] - 484:3, 486:19, 486:21, 487:2, 487:7, 527:6, 527:10, 527:12, 527:17, 527:22, 528:1, 565:21, 571:6, 571:9, 572:13, 572:24, 573:2, 609:24, 610:1, 610:14, 617:17, 617:19
**cover** [1] - 626:24
**covered** [2] - 590:23, 626:16
**covering** [1] - 605:3
**create** [5] - 486:14, 512:5, 512:20, 514:1, 538:3
**created** [3] - 594:17, 601:9
**creating** [1] - 519:1
**credit** [2] - 490:6, 538:3
**CRI** [1] - 483:12
**criteria** [3] - 542:17, 542:20, 544:3
**critical** [1] - 604:16
**criticisms** [1] - 500:9
**CROSS** [4] - 504:6, 555:25, 634:7, 634:18
**cross** [1] - 486:11
**CROSS-EXAMINATION** [4] - 504:6, 555:25, 634:7, 634:18
**crossed** [2] - 493:18, 531:16
**CRR** [1] - 483:12
**crunch** [1] - 615:8
**cultural** [5] - 584:21, 585:2, 585:4, 585:11, 589:9
**culture** [3] - 586:10, 587:16, 604:2
**curtailed** [1] - 627:3
**curve** [1] - 603:24
**cut** [10] - 540:18, 553:11, 566:3, 566:6, 584:13, 594:21, 619:7, 619:18, 621:6, 627:18
**cuts** [1] - 502:5
**cutting** [3] - 563:7, 563:15, 622:20
**cycle** [1] - 602:20
**cycles** [1] - 501:18

## D

**D-182** [1] - 497:4
**D-208** [1] - 496:9
**d-a-w-n** [1] - 522:2
**daily** [1] - 587:22

**Dallas** [1] - 482:17
**damaged** [2] - 588:14, 588:15
**Dan** [9] - 549:7, 549:25, 550:16, 564:5, 591:8, 599:13, 599:14, 599:18, 599:21
**darn** [1] - 542:10
**Data** [66] - 483:4, 483:9, 484:4, 487:17, 487:20, 487:21, 488:22, 490:5, 492:4, 492:16, 492:23, 493:25, 494:8, 495:23, 497:11, 497:18, 497:25, 500:3, 501:7, 503:15, 503:17, 505:17, 507:20, 508:4, 518:9, 521:2, 528:10, 529:7, 529:8, 529:11, 530:7, 530:14, 535:22, 536:1, 536:7, 538:7, 538:8, 540:21, 549:8, 549:20, 556:8, 560:22, 574:17, 574:19, 576:18, 577:24, 579:4, 579:16, 579:21, 579:25, 580:3, 585:5, 586:7, 590:1, 593:12, 593:20, 595:7, 598:21, 602:3, 603:7, 603:19, 609:14, 611:13, 611:18, 611:19, 628:21
**DATA** [1] - 482:7
**data** [3] - 515:25, 516:1, 537:19
**Data's** [2] - 519:15, 538:13
**date** [16] - 590:3, 593:8, 593:9, 611:9, 625:12, 625:16, 625:18, 625:20, 625:22, 626:1, 626:9, 636:6, 636:8, 636:10, 636:12, 636:14
**date.......................** [1] - 636:16
**dated** [1] - 609:14
**dates** [2] - 575:24, 590:16
**DAVID** [1] - 482:21
**Dawn** [3] - 505:16, 522:2, 522:3
**day-to-day** [1] - 501:9
**days** [11] - 531:14, 548:19, 573:6, 589:5, 590:5, 594:3, 594:8, 594:20, 617:4
**deal** [5] - 584:3, 588:21, 595:4, 601:12, 621:12
**dealing** [1] - 565:10
**dealt** [1] - 490:15
**December** [7] - 593:7, 595:18, 596:7, 596:8, 596:17, 609:15
**decent** [1] - 559:17
**decide** [2] - 533:21, 543:11
**decided** [2] - 562:14, 613:18
**deciding** [2] - 533:8, 570:6
**decision** [18] - 512:16, 519:24, 532:13, 535:13, 540:11, 540:16, 543:14, 546:23, 549:7, 549:16, 552:9, 556:12, 562:15, 576:17, 615:25, 616:5, 620:15, 622:22
**decisions** [5] - 536:2, 541:20, 547:7, 547:9, 574:14
**defendant** [1] - 560:21
**defendant's** [1] - 611:3
**Defendant's Exhibit** [4] - 496:9, 628:15, 628:20, 630:3
**Defendants** [3] - 483:3, 483:3, 483:8
**defendants** [16] - 482:9, 504:8, 520:2, 520:10, 520:11, 520:12, 520:18, 520:24, 570:24, 574:10, 621:4, 621:15, 621:17, 622:3, 622:17, 630:11
**defense** [2] - 619:11, 620:25
**Defense** [2] - 604:25, 619:10
**defined** [1] - 598:18
**definition** [2] - 628:6, 628:13
**defrocked** [1] - 484:11

**degree** [3] - 532:22, 532:23, 583:9, 586:21, 587:10, 592:8
**Delaney** [3] - 514:10, 515:13, 519:3
**Delaney-Broderick** [2] - 515:13, 519:3
**deliberate** [1] - 617:7
**deliberations** [5] - 615:21, 615:24, 616:2, 616:8, 617:5
**delighted** [1] - 630:18
**deliver** [2] - 490:16, 604:1
**demand** [1] - 496:20
**denied** [1] - 517:22
**depart** [1] - 549:20
**department** [7] - 535:7, 535:11, 535:23, 535:24, 542:2, 585:8, 587:2
**Department** [1] - 629:11
**departure** [1] - 493:6
**deposed** [1] - 485:14
**deposition** [18] - 485:2, 485:7, 485:8, 485:18, 485:22, 520:14, 520:15, 520:17, 536:7, 541:23, 566:14, 566:16, 566:19, 566:23, 567:10, 572:20, 613:17, 620:3
**depositions** [5] - 566:3, 572:17, 597:14, 622:6
**Depreciation** [1] - 533:7
**depressed** [1] - 604:7
**DEPUTY** [22] - 484:3, 486:19, 486:21, 487:2, 487:7, 527:6, 527:10, 527:12, 527:17, 527:22, 528:1, 565:21, 571:6, 571:9, 572:13, 572:24, 573:2, 609:24, 610:1, 610:14, 617:17, 617:19
**describe** [2] - 485:3, 578:1
**design** [1] - 497:17
**designated** [1] - 485:11
**designates** [1] - 593:8
**desk** [1] - 487:24
**detail** [3] - 548:2, 575:9, 594:9
**details** [2] - 594:16, 616:23
**determination** [1] - 558:20
**determine** [2] - 533:11, 533:16
**develop** [2] - 512:20, 542:10
**developing** [1] - 574:22
**development** [5] - 497:7, 497:8, 497:10, 497:17, 501:17
**diagnosed** [2] - 494:16, 585:17
**diagnosis** [3] - 500:10, 503:9, 549:1
**dial** [1] - 503:3
**dial-in** [1] - 503:3
**difference** [3] - 547:23, 550:2, 569:17
**different** [20] - 489:15, 489:16, 492:3, 494:8, 497:21, 499:19, 505:22, 519:2, 528:19, 536:15, 536:19, 539:16, 539:17, 562:20, 587:23, 600:2, 611:14, 627:5, 630:21
**differently** [1] - 584:24
**difficult** [2] - 588:25, 589:4
**difficulty** [1] - 583:9
**DiLorenzo** [6] - 504:3, 504:4, 504:8, 606:21, 612:10, 632:6
**DILORENZO** [21] - 483:11, 505:18, 505:21, 506:2, 514:21, 517:12, 517:17, 517:25, 518:13, 520:4, 520:7, 522:9, 522:13, 525:25, 526:5, 526:9, 614:14, 625:14, 630:16, 630:18, 631:25
**DILORENZO......................** [1] - 634:12

**dinner** [3] - 632:25, 633:2, 633:6
**dip** [1] - 630:6
**dipping** [1] - 630:5
**Direct** [1] - 500:2
**DIRECT** [6] - 487:13, 528:6, 573:23, 634:5, 634:16, 635:2
**direct** [11] - 484:16, 489:15, 491:18, 496:12, 505:14, 532:12, 546:25, 563:1, 587:3, 610:5, 617:9
**direction** [6] - 503:14, 503:16, 525:3, 525:5, 556:14, 603:2
**directions** [1] - 532:1
**directive** [3] - 540:5, 542:15, 542:16
**directly** [8] - 488:11, 488:12, 488:13, 490:22, 497:5, 500:2, 518:24
**director** [21] - 488:1, 497:14, 501:6, 505:5, 505:6, 509:4, 509:23, 509:24, 509:25, 510:2, 513:8, 513:10, 513:12, 513:16, 513:19, 513:20, 514:12, 514:13, 519:12, 523:23, 528:11
**directors** [3] - 509:12, 509:20, 536:6
**dirties** [1] - 619:12
**dirty** [1] - 620:13
**disabilities** [1] - 631:8
**disability** [16] - 574:3, 583:13, 583:21, 595:1, 596:22, 611:21, 611:23, 612:6, 622:15, 626:13, 628:7, 628:10, 629:17, 629:21, 629:24, 630:7
**disabled** [2] - 574:7, 605:20
**discharged** [1] - 574:10
**discipline** [1] - 486:15
**disclosures** [1] - 520:7
**discontinue** [1] - 594:24
**discount** [1] - 607:18
**discounted** [1] - 607:15
**discuss** [5] - 515:17, 599:18, 612:13, 613:25, 631:14
**discussed** [2] - 506:11, 547:2
**discussing** [2] - 500:10, 505:14
**Discussion** [1] - 633:8
**discussion** [5] - 532:2, 576:18, 603:2, 614:16, 631:15
**discussions** [4] - 515:2, 549:12, 550:14, 550:17
**distinct** [1] - 532:6
**DISTRICT** [3] - 482:1, 482:1, 482:12
**district** [1] - 523:1
**District** [1] - 523:11
**diversity** [1] - 544:22
**divided** [1] - 562:19
**doctor** [4] - 549:3, 628:21, 628:22, 629:2
**doctor's** [4] - 561:10, 593:20, 594:1, 628:16
**document** [5] - 505:18, 577:16, 578:5, 578:21, 584:22
**documented** [1] - 501:24
**documents** [1] - 609:5
**dollar** [3] - 511:24, 513:10, 562:8
**dollars** [4] - 512:5, 532:25, 535:5, 545:20
**Don** [1] - 591:4
**done** [21] - 489:20, 489:23, 504:1, 504:10, 504:20, 505:13, 510:10, 515:7, 541:25, 544:12, 565:9, 571:3, 584:11, 589:9, 604:19, 604:21, 605:23, 612:2,

622:16, 624:17, 631:6
**door** [4] - 584:17, 588:5
**double** [3] - 607:17, 630:5, 630:6
**down** [41] - 486:11, 490:17, 496:14, 499:2, 499:17, 499:18, 504:19, 505:12, 506:17, 506:18, 524:14, 526:20, 538:4, 540:18, 541:16, 541:18, 542:2, 542:12, 546:7, 548:12, 565:13, 566:4, 566:6, 569:25, 572:16, 582:9, 590:23, 591:20, 595:20, 596:5, 598:8, 598:10, 599:24, 605:5, 610:2, 621:1, 621:17, 621:22, 626:20, 629:15, 632:19
**Dr** [3] - 594:12, 597:16
**draft** [3] - 630:15, 631:4, 631:11
**drift** [1] - 592:14
**drive** [1] - 589:20
**Drive** [1] - 593:11
**drives** [1] - 604:17
**dropped** [1] - 626:20
**due** [3] - 485:15, 619:14, 619:15
**duly** [4] - 487:4, 527:20, 573:1, 573:22
**duplicate** [1] - 511:23
**during** [22] - 487:23, 489:14, 493:4, 493:21, 494:4, 496:4, 496:15, 504:22, 515:17, 515:22, 518:12, 518:17, 536:7, 539:13, 541:11, 545:16, 549:13, 585:6, 596:4, 599:11, 599:13, 631:23
**duties** [5] - 581:9, 582:14, 584:10, 624:5, 624:13
**dynamic** [1] - 588:2
**dynamics** [1] - 548:20

## E

**E-mail** [1] - 483:14
**e-mail** [7] - 495:22, 496:12, 507:10, 590:9, 594:22, 596:20, 627:22
**e-mailed** [1] - 595:13
**e-mails** [2] - 590:4, 596:3
**early** [4] - 498:3, 498:4, 613:24, 615:3
**earned** [1] - 579:25
**earning** [3] - 580:3, 581:3, 607:16
**Earnings** [1] - 533:7
**earnings** [1] - 533:15
**easiest** [1] - 590:16
**East** [1] - 544:19
**EASTERN** [1] - 482:1
**easy** [1] - 579:17
**eating** [1] - 633:6
**ebbs** [1] - 541:13
**EBIDTA** [1] - 533:6
**economic** [1] - 568:13
**economical** [1] - 617:1
**EEOC** [1] - 523:5
**effect** [2] - 552:4, 630:17
**effective** [4] - 543:3, 545:14, 625:11, 626:1
**efforts** [1] - 512:4
**ego** [1] - 486:14
**Eidelman** [5] - 503:24, 504:2, 555:17, 564:25, 624:25
**EIDELMAN** [76] - 483:5, 484:7, 484:20, 484:24, 485:1, 485:6, 485:24, 486:3, 504:3, 504:5, 504:7, 555:19, 555:23, 556:1, 556:7, 559:20, 559:21, 561:14,

561:18, 565:1, 565:4, 566:22, 567:4, 567:6, 567:19, 568:4, 568:8, 568:10, 568:14, 568:17, 568:20, 568:24, 569:2, 569:5, 569:7, 569:9, 570:18, 571:1, 610:8, 610:11, 613:12, 613:14, 613:20, 614:2, 614:7, 614:12, 614:15, 619:14, 619:17, 619:22, 619:24, 620:20, 625:1, 625:6, 625:11, 625:15, 625:20, 626:1, 626:4, 626:6, 626:15, 627:4, 628:2, 628:15, 628:18, 628:20, 629:10, 629:16, 629:20, 630:3, 630:25, 631:20, 632:13, 632:25, 633:4, 633:11
**Eidelman's** [2] - 508:12, 566:17
**EIDELMAN**.......................... [3] - 634:8, 634:19, 634:23
**eight** [1] - 536:11
**either** [6] - 522:14, 524:12, 574:8, 586:19, 594:23, 630:22
**eLearning** [1] - 492:20
**eliminating** [1] - 552:18
**embarrassment** [2] - 506:7, 521:4
**emotional** [1] - 589:2
**empathy** [1] - 570:8
**employed** [3] - 487:20, 487:21, 606:20
**employee** [16] - 487:17, 500:23, 501:1, 505:16, 563:10, 581:12, 581:13, 581:18, 582:2, 582:6, 582:25, 583:4, 626:10, 631:22, 632:1, 632:3
**employees** [16] - 490:13, 494:6, 496:17, 519:8, 519:9, 538:5, 538:11, 539:7, 540:21, 552:7, 556:9, 561:3, 562:10, 562:12, 563:8, 586:25
**employees's** [1] - 632:1
**employer** [2] - 622:21, 624:16
**employment** [11] - 487:23, 560:12, 586:2, 601:18, 602:23, 603:1, 609:14, 625:16, 625:19, 628:12, 632:3
**encourage** [2] - 569:17, 570:17
**encouraging** [1] - 494:21
**end** [24] - 502:8, 519:5, 540:21, 540:23, 547:15, 549:21, 552:4, 554:7, 554:10, 554:17, 568:2, 568:6, 568:21, 580:15, 587:17, 592:6, 596:6, 596:8, 600:10, 607:7, 607:8, 607:23, 625:2, 631:12
**ended** [2] - 488:1, 602:2
**energized** [1] - 604:7
**energy** [3] - 574:6, 575:17, 576:5
**engaged** [1] - 575:13
**engineers** [2] - 536:11, 537:13
**enter** [5] - 513:10, 587:10, 604:25, 609:18, 610:20
**entered** [2] - 572:11, 585:24
**enters** [3] - 486:20, 527:11, 610:15
**entire** [11] - 493:18, 493:19, 496:1, 503:14, 549:22, 585:4, 586:18, 598:25, 603:8, 604:20, 619:18
**entitled** [4] - 565:8, 619:11, 620:9, 621:16
**environment** [1] - 488:21
**equity** [12] - 556:13, 558:4, 558:6, 558:10, 558:11, 558:20, 558:22, 562:10, 562:11, 562:14, 562:17, 562:18
**esophagus** [1] - 583:12
**especially** [1] - 587:24
**ESQ** [2] - 482:17, 482:21, 483:5,

483:6, 483:6, 483:11
**essential** [1] - 628:11
**establish** [2] - 542:16, 621:7
**established** [1] - 535:21
**et** [4] - 482:7, 483:4, 483:9, 598:17
**Europe** [2] - 509:15, 584:19
**European** [1] - 494:6
**evaluate** [2] - 535:20, 567:20
**evaluating** [1] - 544:6
**evaluation** [1] - 546:22
**events** [2] - 498:17, 498:18
**evidence** [39] - 540:4, 570:22, 574:14, 577:6, 577:10, 577:15, 577:18, 578:6, 587:13, 587:14, 590:7, 590:8, 593:4, 593:6, 596:2, 597:7, 597:12, 609:18, 609:19, 609:22, 611:4, 611:7, 611:9, 619:12, 619:18, 619:19, 619:20, 621:22, 622:7, 624:9, 625:3, 629:17, 636:5, 636:7, 636:9, 636:11, 636:13, 636:16
**Evidence** [1] - 619:10
**evidentiary** [1] - 615:15
**evolve** [1] - 599:1
**EWING** [1] - 483:3
**exact** [1] - 537:17
**exactly** [7] - 543:18, 583:6, 583:23, 585:3, 585:14, 586:5, 604:9
**EXAMINATION** [29] - 487:13, 491:5, 499:6, 504:6, 506:1, 517:16, 518:3, 520:21, 522:12, 526:13, 528:6, 529:4, 530:24, 531:22, 555:25, 561:21, 565:3, 573:23, 611:10, 634:5, 634:7, 634:9, 634:11, 634:13, 634:16, 634:18, 634:20, 634:22, 635:2
**examinations** [1] - 617:9
**examined** [3] - 487:5, 527:20, 573:22
**example** [3] - 497:16, 499:22, 499:23
**except** [3] - 523:12, 524:17, 569:2
**exception** [2] - 557:7, 567:21
**excess** [1] - 532:20
**exchange** [2] - 592:5, 596:21
**excluded** [2] - 542:18, 542:19
**excuse** [1] - 626:18
**excused** [1] - 565:15
**execute** [1] - 540:6
**executive** [9] - 501:19, 528:13, 531:16, 532:1, 543:10, 543:13, 543:23, 549:25, 615:25
**executives** [3] - 533:18, 533:21, 547:10
**exercise** [2] - 560:19, 607:24
**Exhibit** [1] - 605:1
**exhibit** [1] - 628:15
**EXHIBITS** [1] - 636:2
**exhibits** [3] - 605:24, 616:22
**exist** [2] - 537:4, 537:7
**existed** [1] - 511:6
**existing** [1] - 512:6
**exited** [2] - 549:11, 565:22
**exits** [3] - 527:7, 609:25, 617:18
**expect** [1] - 604:4
**expectation** [1] - 606:11
**expenditure** [2] - 532:20, 538:19
**expenditures** [1] - 561:24
**expense** [2] - 538:21, 548:12
**experience** [1] - 490:14

(experienced - future)

**experienced** [1] - 492:3
**expert** [5] - 567:21, 567:24, 568:9, 568:10, 568:11
**expertise** [1] - 584:22
**explain** [9] - 488:15, 542:22, 573:13, 574:2, 574:18, 575:6, 575:12, 606:21, 628:13
**explaining** [1] - 546:3
**explanation** [1] - 615:20
**Express** [1] - 531:15
**extensively** [1] - 575:17
**extent** [2] - 517:4, 517:11
**external** [2] - 511:17, 511:20
**extraordinarily** [1] - 593:1
**eye** [5] - 521:13, 521:15, 524:25, 525:10, 558:9

---

**F**

---

**facilitate** [1] - 570:7
**facing** [1] - 588:23
**Facsimile** [1] - 483:13
**fact** [13] - 537:21, 549:3, 559:5, 561:5, 561:6, 561:9, 579:11, 584:16, 585:7, 603:2, 624:4, 627:10
**factories** [2] - 537:10, 538:3
**factors** [2] - 533:8, 621:9
**facts** [4] - 569:16, 570:6, 629:2, 629:14
**factual** [3] - 627:25, 628:3, 629:5
**factually** [1] - 627:2
**failure** [1] - 570:21
**fair** [2] - 569:14, 606:8
**fall** [3] - 491:17, 584:8, 584:25
**fallen** [2] - 598:8, 598:10
**false** [1] - 578:19
**familiar** [3] - 495:11, 538:13, 594:9
**Family** [1] - 559:22
**fan** [1] - 542:4
**FAPR** [1] - 483:12
**far** [4] - 489:20, 531:13, 542:23, 566:16
**fashion** [1] - 616:20
**fast** [2] - 484:23, 484:24
**fault** [1] - 486:8
**February** [10] - 502:9, 549:21, 559:8, 585:18, 600:22, 607:8, 608:9, 620:2, 625:7, 625:15
**federal** [5] - 523:1, 523:8, 523:12, 523:16, 529:22
**fees** [1] - 490:6
**felt** [1] - 540:15
**few** [6] - 518:2, 541:14, 556:12, 559:20, 561:20, 619:2
**figure** [1] - 606:3
**filed** [1] - 521:2
**files** [1] - 495:25
**filing** [1] - 523:8
**fill** [1] - 603:6
**filled** [1] - 492:14
**filling** [1] - 592:23
**final** [1] - 605:19
**financial** [1] - 578:1
**Financial** [1] - 542:5
**finder** [1] - 569:16
**fine** [7] - 567:5, 583:18, 589:6, 589:7,

598:24, 620:15, 631:20
**finish** [5] - 569:1, 612:10, 614:8, 615:15, 615:23
**finished** [1] - 503:25
**fire** [2] - 564:18, 564:20
**fired** [3] - 592:10, 592:13, 593:23
**firm** [6] - 508:12, 508:15, 511:16, 524:2, 575:14, 620:22
**firms** [1] - 602:6
**FIRST** [1] - 482:7
**first** [27] - 485:10, 485:16, 487:4, 492:4, 494:20, 505:24, 510:4, 519:14, 527:19, 528:11, 546:5, 550:22, 554:11, 556:12, 556:17, 570:2, 572:17, 573:21, 574:22, 575:15, 578:20, 593:22, 595:17, 595:21, 599:12, 605:6, 620:18
**First** [68] - 483:4, 483:9, 484:4, 487:17, 487:20, 487:21, 488:22, 490:5, 492:4, 492:16, 492:23, 493:25, 494:8, 495:23, 497:11, 497:18, 497:25, 500:3, 501:7, 503:15, 503:17, 505:17, 507:20, 508:4, 518:9, 519:15, 521:2, 528:10, 529:7, 529:8, 529:11, 530:7, 530:14, 535:22, 536:1, 536:7, 538:7, 538:8, 538:13, 540:21, 549:8, 549:20, 556:8, 560:22, 574:17, 574:19, 576:18, 577:24, 579:4, 579:16, 579:21, 579:25, 580:3, 585:5, 586:7, 590:1, 593:12, 593:20, 595:7, 598:21, 602:3, 603:7, 603:19, 609:14, 611:13, 611:18, 611:19, 628:21
**Fiserv** [4] - 530:14, 530:18, 539:22
**Fiserve** [1] - 530:13
**fistula** [1] - 594:18
**fistulas** [2] - 590:20, 590:23
**five** [12] - 493:11, 493:13, 493:14, 529:19, 529:20, 555:20, 590:24, 610:6, 612:2, 622:2, 622:17, 630:11
**fix** [2] - 551:10, 556:15
**fixed** [2] - 516:7, 516:18, 516:20
**fixing** [1] - 516:8
**flesh** [1] - 599:8
**fleshed** [1] - 567:11
**flexible** [1] - 616:13
**floodgate** [1] - 598:24
**Floor** [1] - 483:10
**floor** [1] - 595:21
**Florida** [1] - 507:6
**flow** [1] - 617:9
**flown** [1] - 567:20
**flows** [1] - 541:13
**fluent** [1] - 491:21
**flushed** [1] - 630:9
**FMLA** [9] - 535:22, 559:22, 559:25, 560:6, 570:24, 621:18, 625:14, 626:12, 631:21
**focus** [1] - 548:21
**focused** [5] - 492:18, 545:25, 547:3, 548:15, 551:22
**focussed** [1] - 540:1
**folks** [9] - 567:15, 569:21, 583:25, 614:1, 615:2, 617:6, 617:21, 617:23, 619:7
**follow** [1] - 484:12
**followed** [2] - 523:17, 528:14
**following** [6] - 542:20, 588:9, 604:6, 619:22, 621:20, 628:3

**follows** [4] - 487:5, 527:20, 573:22, 621:19
**FOR** [1] - 482:11
**force** [16] - 493:1, 493:6, 502:7, 538:24, 539:6, 542:3, 552:15, 560:18, 561:3, 561:7, 561:12, 563:22, 622:22, 624:21, 624:23, 627:14
**forced** [5] - 622:24, 623:13, 626:11, 626:13, 627:16
**forcing** [2] - 583:11, 598:2
**forfeited** [1] - 557:2
**form** [6] - 629:2, 629:11, 630:21, 630:24
**formal** [2] - 517:20, 595:12
**former** [1] - 484:16
**forms** [1] - 595:4
**formula** [1] - 558:21
**formulaic** [1] - 562:19
**forth** [3] - 510:8, 516:11, 599:25
**fortunate** [1] - 574:20
**forward** [4] - 489:18, 567:13, 572:21, 601:24
**forwarding** [1] - 605:10
**four** [11] - 485:9, 493:11, 493:13, 493:14, 545:16, 546:25, 591:5, 607:20, 612:2, 622:2, 630:11
**fourth** [1] - 497:5
**FRANK** [3] - 527:19, 527:24, 634:15
**Frank** [4] - 508:6, 508:9, 527:14, 527:24
**frankly** [1] - 630:21
**fraud** [2] - 619:23, 620:14
**fraudulent** [1] - 565:7
**FREDERIC** [1] - 482:12
**frequently** [1] - 519:16
**fresh** [1] - 615:19
**Fricke** [18] - 488:6, 488:12, 489:6, 489:8, 489:12, 489:24, 490:2, 491:8, 491:16, 492:13, 503:13, 509:6, 510:7, 510:19, 510:21, 535:11, 585:13, 598:14
**Fricke's** [3] - 584:7, 584:9, 585:1
**Friday** [2] - 567:25, 568:25
**friend** [1] - 606:2
**friends** [2] - 602:24, 611:18
**Frisolone** [1] - 483:12
**front** [6] - 523:11, 584:17, 588:5, 589:18, 608:11, 627:11
**frustration** [2] - 506:8, 521:5
**full** [14] - 525:8, 532:17, 543:4, 580:1, 580:2, 580:16, 580:18, 583:3, 583:4, 602:25, 623:17, 626:2, 626:10
**full-time** [6] - 580:1, 580:2, 580:16, 580:18, 583:3, 583:4, 602:25
**fully** [3] - 570:11, 586:12, 603:21
**function** [3] - 493:19, 551:2, 551:4
**functional** [1] - 590:13
**functions** [5] - 492:20, 494:10, 497:21, 501:20, 628:11
**fund** [1] - 602:6
**fundamental** [1] - 587:18
**fundamentally** [2] - 542:3, 564:16
**funds** [1] - 533:9
**future** [3] - 601:24, 607:3, 607:15

(GARY - Immediately)

## G

**GARY** [1] - 483:5
**gather** [1] - 573:15
**general** [4] - 535:23, 548:18, 553:3, 563:2
**generally** [2] - 559:5, 562:18
**generated** [3] - 537:23, 537:25, 538:1
**gentleman** [1] - 504:23
**genuine** [2] - 490:14, 492:14
**gig** [1] - 586:8
**GILLIAN** [1] - 483:6
**Gillian** [1] - 508:14
**Gita** [3] - 590:9, 590:10
**given** [9] - 552:3, 558:19, 559:7, 562:18, 576:19, 578:19, 586:1, 612:2, 633:2
**goal** [1] - 586:10
**gosh** [1] - 629:7
**gotcha** [1] - 576:6
**gown** [2] - 598:7
**great** [9] - 489:25, 496:21, 551:18, 570:8, 604:12, 612:11, 614:14, 615:10, 631:6
**greater** [1] - 632:2
**greatest** [1] - 545:1
**Greece** [1] - 541:15
**green** [1] - 594:2
**grew** [2] - 501:15, 606:2
**gritty** [1] - 570:4
**Group** [21] - 492:2, 496:25, 497:24, 498:2, 498:3, 499:10, 499:14, 500:4, 504:10, 510:4, 511:1, 511:9, 518:7, 518:12, 518:17, 518:20, 519:4, 524:23, 535:10, 598:12, 607:16
**group** [37] - 484:8, 487:23, 489:2, 491:18, 492:2, 492:17, 493:21, 493:23, 495:8, 495:11, 495:17, 496:1, 496:8, 497:15, 497:16, 498:16, 499:23, 500:1, 501:18, 504:14, 508:25, 509:6, 513:24, 515:24, 516:5, 516:23, 516:24, 532:13, 532:18, 535:4, 554:2, 554:3, 584:7, 584:9, 585:1, 599:18, 601:2
**Group's** [1] - 500:6
**group's** [1] - 532:16
**groups** [5] - 499:19, 537:15, 547:11, 550:15, 550:17
**grow** [4] - 493:23, 493:25, 501:13, 598:12
**growing** [5] - 493:25, 556:2, 601:13, 601:14
**grudge** [1] - 503:16
**guess** [15] - 519:7, 524:5, 528:9, 559:9, 574:15, 590:3, 593:5, 619:11, 620:9, 621:15, 624:24, 627:25, 630:2, 630:10, 633:7
**guided** [1] - 603:1
**guy** [1] - 620:11
**guys** [3] - 516:7, 525:3, 591:3

## H

**Hack** [12] - 549:8, 549:10, 549:12, 549:14, 549:20, 549:24, 554:3, 564:5,

586:19, 591:7, 596:3, 596:9
**Hack's** [1] - 549:6
**Hadler** [2] - 497:22, 498:11
**half** [12] - 504:14, 511:24, 512:4, 513:10, 549:13, 588:18, 594:20, 613:6, 613:10, 615:17, 615:18, 620:1
**half-a-million-dollar** [1] - 513:10
**halfway** [1] - 511:22
**hand** [3] - 487:3, 527:18, 572:25
**handed** [1] - 597:21
**handle** [3] - 492:1, 560:3, 610:7
**handling** [1] - 616:7
**hands** [2] - 570:15, 600:11
**happiness** [1] - 570:15
**happy** [5] - 539:22, 578:15, 578:16, 604:2, 617:2
**hard** [2] - 530:16, 537:12
**Harrison** [1] - 549:5
**head** [14] - 491:18, 496:11, 535:17, 535:19, 541:11, 541:13, 541:15, 545:22, 591:25, 598:12, 599:4, 600:12, 601:15
**heads** [1] - 550:21
**headway** [1] - 603:11
**healing** [1] - 590:21
**health** [3] - 507:22, 563:22, 570:15
**healthcare** [2] - 597:9, 629:12
**healthy** [1] - 602:4
**hear** [15] - 487:10, 500:13, 500:22, 529:2, 546:5, 565:2, 567:9, 572:19, 573:5, 573:9, 573:10, 606:24, 614:5, 615:19, 616:10
**heard** [21] - 489:12, 497:23, 521:8, 531:25, 532:19, 533:6, 535:9, 542:21, 545:4, 545:11, 548:17, 548:23, 549:6, 556:10, 569:19, 569:20, 575:20, 583:10, 584:7, 598:11
**hearing** [3] - 572:21, 589:13, 613:2
**hearsay** [1] - 557:7
**heart** [3] - 583:16, 583:20, 627:23
**heartfelt** [1] - 594:25
**hearts** [1] - 583:14
**heavy** [1] - 544:9
**held** [5] - 517:15, 527:9, 610:13, 613:1, 633:8
**hello** [2] - 573:25, 574:1
**help** [24] - 487:24, 490:5, 491:3, 502:21, 505:17, 508:21, 511:14, 516:21, 524:22, 524:24, 525:14, 525:24, 557:2, 557:14, 569:21, 570:7, 583:16, 583:24, 595:11, 599:16, 600:2, 604:18, 630:14
**helped** [1] - 591:4
**helpful** [1] - 593:1
**helping** [1] - 616:19
**herein** [1] - 573:21
**hesitate** [1] - 573:5
**hi** [1] - 598:5
**hierarchy** [1] - 543:23
**high** [8] - 513:23, 514:20, 514:23, 515:7, 515:23, 516:16, 540:11, 598:12
**high school** [1] - 604:20
**higher** [2] - 519:17, 605:20
**highest** [3] - 546:15, 552:14, 563:21
**highly** [2] - 546:11, 552:14
**himself** [1] - 564:16

**hindered** [1] - 611:21
**hire** [6] - 501:9, 514:2, 515:9, 519:13, 542:12, 560:8
**hired** [13] - 511:14, 519:9, 522:14, 522:21, 541:16, 578:12, 578:19, 578:20, 578:22, 581:12, 581:17, 584:10, 620:16
**hiring** [13] - 496:18, 496:20, 496:21, 513:3, 513:24, 514:6, 514:22, 516:13, 516:25, 519:12, 519:21, 519:24, 556:20
**hirings** [1] - 496:23
**history** [1] - 575:23
**hmm** [2] - 493:15, 507:19
**hold** [2] - 615:4, 617:15
**holding** [1] - 574:21
**holes** [1] - 590:20
**home** [15] - 495:20, 502:22, 507:23, 590:15, 590:25, 591:1, 591:2, 593:10, 594:4, 594:11, 596:4, 615:3, 616:17, 623:9, 623:25
**honestly** [2] - 557:23, 589:11
**Honor** [36] - 486:16, 490:21, 504:5, 505:18, 517:12, 517:25, 518:13, 520:4, 522:10, 526:5, 552:5, 555:19, 556:7, 559:20, 561:14, 564:24, 567:17, 568:14, 568:17, 569:3, 570:18, 571:1, 573:7, 587:9, 610:8, 610:11, 610:18, 612:8, 613:20, 614:14, 619:14, 625:1, 626:4, 628:2, 630:16, 631:20
**Honor's** [1] - 628:4
**HONORABLE** [1] - 482:12
**hospital** [12] - 495:19, 588:19, 590:15, 590:17, 594:4, 594:12, 594:15, 596:4, 598:7, 598:9, 623:9, 623:20
**hosting** [1] - 511:19
**hotel** [1] - 590:18
**hour** [8] - 566:20, 588:18, 613:6, 613:7, 613:10, 617:14
**hours** [3] - 485:25, 591:24
**houses** [2] - 602:13, 602:15
**HR** [20] - 488:21, 489:2, 492:20, 497:20, 502:17, 506:13, 510:15, 510:18, 511:4, 511:7, 511:23, 512:3, 516:12, 519:18, 535:12, 535:17, 535:19, 549:23, 587:2, 599:10
**HR-type** [1] - 488:21
**Human** [3] - 488:25, 495:9, 510:5, 510:11, 510:13, 510:14, 510:23, 512:7, 512:21, 523:6, 535:7, 535:11, 535:24
**hundred** [6] - 540:14, 547:19, 547:21, 553:2, 562:23, 566:25
**hundreds** [4] - 490:13, 545:19, 548:6
**husband** [1] - 597:24

## I

**idea** [7] - 489:16, 529:18, 541:4, 568:18, 576:2, 600:24, 629:14
**ideas** [1] - 587:16
**identified** [4] - 515:7, 515:21, 577:17, 599:3
**identify** [3] - 552:4, 577:16, 577:18
**identifying** [1] - 599:2
**immediately** [4] - 489:4, 552:12, 600:18, 604:7

(Impacted - knowledge)

**impacted** [2] - 492:15, 493:17
**implement** [7] - 545:3, 563:5, 564:22, 586:11, 586:12, 587:16, 603:22
**implemented** [1] - 502:25
**implicated** [1] - 622:18
**important** [5] - 533:5, 542:11, 545:11, 583:14, 616:3
**impossible** [1] - 486:12
**inability** [1] - 595:4
**incapacitated** [4] - 628:22, 628:23, 629:3, 629:7
**incentive** [2] - 533:15, 562:18
**inception** [1] - 580:14
**include** [4] - 558:15, 563:14, 632:8, 632:9
**included** [4] - 542:17, 560:17, 561:6, 606:14
**including** [2] - 599:25, 600:1
**inclusion** [2] - 561:2, 561:11
**income** [3] - 606:7, 606:10, 606:15
**inconsistent** [1] - 629:1
**increase** [3] - 599:15, 601:15, 607:13
**increased** [1] - 563:18
**increasing** [1] - 494:9
**incredible** [1] - 599:22
**independent** [1] - 619:24
**independently** [1] - 536:4
**INDEX** [1] - 634:1
**iINDEX** [1] - 636:2
**India** [2] - 509:15, 509:16
**indicate** [1] - 596:8
**indicated** [3] - 485:2, 549:7, 561:9
**indicates** [1] - 540:4
**individual** [11] - 503:7, 550:2, 560:21, 570:23, 621:15, 622:3, 628:7, 628:9, 628:10, 628:24, 629:22
**individually** [5] - 508:9, 508:11, 508:15, 523:21, 555:3
**individuals** [4] - 496:20, 508:2, 542:17, 621:24
**industry** [1] - 603:3
**influence** [1] - 536:2
**information** [8] - 498:13, 499:9, 544:10, 551:17, 553:14, 557:17, 583:24, 596:11
**inherited** [2] - 519:8, 519:11
**initial** [4] - 520:7, 523:8, 586:2, 589:17
**initiated** [1] - 512:19
**initiative** [3] - 512:19, 512:22, 512:24
**inside** [6] - 518:11, 535:22, 542:13, 599:10, 602:12, 602:20
**insight** [3] - 489:13, 491:8, 494:8
**insist** [1] - 621:3
**instance** [1] - 499:25
**instant** [1] - 495:22
**instantly** [1] - 496:1
**instead** [5] - 490:18, 512:12, 512:21, 538:20, 624:21
**instigated** [1] - 622:23
**instruction** [2] - 621:18, 631:22
**instructions** [5] - 543:17, 628:4, 628:8, 628:9, 630:20
**insurance** [5] - 563:15, 574:25, 605:14, 605:17, 622:7
**integrated** [1] - 505:17

**intellectual** [1] - 579:11
**intending** [1] - 605:21
**intense** [1] - 489:14
**intent** [1] - 594:24
**intentionally** [2] - 575:1, 576:5
**interaction** [3] - 507:11, 518:5, 518:8
**Interest** [1] - 533:7
**interest** [2] - 545:18, 606:11
**interesting** [1] - 553:14
**interfere** [2] - 624:4, 627:24
**interfering** [2] - 621:19, 627:13
**interim** [4] - 489:6, 495:7, 495:16, 585:12
**Internal** [4] - 497:24, 498:2, 499:9, 515:22
**internal** [5] - 502:18, 504:10, 510:10, 541:23, 542:4
**international** [1] - 494:11
**Internet** [1] - 590:12
**interrupt** [1] - 575:2
**interview** [3] - 514:1, 514:2, 514:4
**interviews** [2] - 519:21, 519:23
**investor** [1] - 574:22
**invited** [2] - 595:19, 601:7
**invoice** [1] - 620:2
**invoices** [4] - 565:7, 609:12, 609:13
**involuntary** [1] - 496:14
**involved** [7] - 496:12, 502:13, 502:17, 507:25, 519:23, 521:19, 540:7
**involvement** [3] - 518:16, 522:15, 556:23
**involving** [2] - 538:10, 539:7
**issue** [5] - 544:9, 545:19, 548:1, 627:25, 628:3
**issued** [3] - 540:5, 562:4, 609:13
**issues** [9] - 496:7, 548:5, 550:4, 584:15, 585:15, 602:19, 624:17, 629:5, 629:14
**item** [1] - 545:21

## J

**Jackson** [1] - 523:25
**January** [13] - 502:8, 540:5, 554:12, 586:22, 593:20, 595:17, 596:15, 596:17, 596:20, 596:25, 597:3, 605:5, 625:21
**Jeff** [10] - 549:6, 549:7, 554:3, 564:5, 564:10, 586:19, 596:3, 596:6, 596:9, 596:17
**Jeff's** [1] - 550:4
**Jennifer** [3] - 485:13, 613:14, 613:15
**job** [22] - 506:25, 507:21, 514:11, 519:23, 529:23, 539:20, 542:12, 543:4, 546:24, 550:24, 551:12, 551:19, 557:18, 575:7, 582:25, 603:4, 603:7, 603:8, 611:15, 624:20, 631:6, 631:7
**jobs** [7] - 536:13, 545:20, 546:23, 551:14, 556:4, 559:11, 559:12
**Joe** [21] - 489:15, 489:23, 531:5, 549:3, 556:16, 556:18, 562:6, 575:5, 575:11, 576:12, 577:23, 578:8, 578:22, 579:2, 584:11, 586:9, 586:16, 598:14, 599:12, 620:6
**Joe's** [1] - 598:19

**Johnson** [9] - 504:23, 505:7, 506:10, 506:13, 509:10, 570:22, 591:8, 597:19, 622:23
**joined** [1] - 556:8
**joining** [1] - 603:19
**judge** [7] - 484:10, 529:22, 542:14, 553:7, 581:6, 583:15, 584:1
**Judge** [10] - 486:3, 529:24, 555:23, 561:18, 562:17, 566:22, 567:23, 577:1, 614:15, 626:15, 633:1
**JUDGE** [1] - 482:12
**judgment** [3] - 496:19, 592:22, 593:18
**Julie** [3] - 484:16, 486:24, 487:9
**JULIE** [3] - 487:4, 487:9, 634:4
**July** [2] - 530:2, 530:9
**jumped** [3] - 495:17, 626:22, 626:24
**June** [1] - 565:5
**jurors** [17] - 484:8, 484:11, 484:25, 546:3, 553:22, 571:7, 572:10, 573:10, 577:12, 577:14, 577:18, 579:7, 617:3, 617:11, 617:12, 619:5, 627:9
**jurors'** [1] - 614:6
**JURY** [2] - 482:11, 482:12
**jury** [27] - 525:12, 527:8, 533:10, 546:21, 548:19, 556:22, 565:2, 565:22, 566:1, 569:20, 570:6, 572:3, 572:11, 572:21, 575:6, 581:3, 610:4, 613:3, 613:5, 621:2, 621:6, 621:11, 621:18, 627:12, 629:13, 630:20, 631:22
**Jury** [6] - 486:20, 527:7, 527:11, 609:25, 610:15, 617:18
**jury's** [1] - 485:10
**justify** [1] - 519:14
**Justin** [17] - 501:5, 501:6, 504:23, 506:9, 506:13, 506:19, 508:24, 509:17, 509:23, 512:22, 513:6, 514:13, 515:12, 521:9, 524:10, 524:12, 613:16
**Justin's** [1] - 505:1

## K

**K-e-l-l-y** [1] - 487:9
**Kansas** [2] - 544:22, 544:23
**Karen** [3] - 489:4, 489:11, 498:11
**Katy** [4] - 496:13, 514:10, 515:12, 519:3
**keep** [13] - 499:1, 505:11, 528:3, 530:16, 552:25, 559:3, 559:4, 560:14, 573:11, 591:7, 591:8, 613:22, 632:24
**KELLY** [2] - 487:4, 634:4
**Kelly** [8] - 484:16, 485:1, 486:24, 487:2, 487:9, 487:15, 535:9, 623:23
**kept** [5] - 505:22, 563:19, 585:9, 591:11, 601:13, 617:10
**keynote** [2] - 589:12, 612:2
**kind** [19] - 501:16, 503:16, 517:2, 532:7, 563:15, 578:21, 591:11, 592:3, 592:12, 598:17, 598:24, 600:11, 602:2, 603:1, 603:24, 605:10, 617:12, 620:24, 628:5
**kindness** [1] - 627:23
**KING** [1] - 483:8
**KKR** [3] - 529:10, 536:1
**knowing** [1] - 595:4
**knowledge** [8] - 499:13, 532:24,

537:3, 553:16, 553:17, 553:21, 557:13, 557:25

**knows** [4] - 525:12, 574:7, 574:8, 616:9

## L

**label** [1] - 581:6
**labor** [1] - 629:11
**lack** [1] - 503:14
**lady** [2] - 508:14, 600:18
**laid** [1] - 631:23
**language** [1] - 619:6
**large** [2] - 536:18, 548:7
**largest** [1] - 550:25
**Larsen** [1] - 600:19
**laryngitis** [1] - 588:11
**last** [15] - 485:11, 491:15, 505:1, 543:20, 566:9, 572:20, 582:21, 599:13, 601:14, 604:22, 619:9, 625:16, 625:18, 626:1, 626:25
**late** [9] - 498:3, 516:3, 549:19, 569:18, 599:23, 600:16, 613:23, 617:11, 632:23
**law** [5] - 508:12, 508:15, 524:2, 574:12, 574:14, 615:20, 620:25, 631:6, 632:6
**LAW** [1] - 482:14
**lawsuit** [9] - 508:1, 517:23, 520:1, 520:8, 523:16, 523:19, 526:15, 526:17, 540:2
**lawyer** [1] - 620:10
**lawyers** [8] - 565:17, 565:20, 615:2, 615:7, 615:11, 615:20, 616:18, 616:25
**layers** [4] - 542:21, 544:10, 547:1, 560:19
**laying** [1] - 575:22
**layoff** [1] - 504:11
**layoffs** [1] - 545:16
**lead** [4] - 509:20, 543:3, 596:21, 596:25
**leader** [7] - 488:25, 492:2, 495:7, 495:16, 543:3, 543:4, 599:22
**leaders** [4] - 506:20, 514:3, 584:14, 584:20
**leadership** [7] - 489:15, 502:4, 510:16, 516:9, 517:5, 519:10, 543:7
**leading** [2] - 544:8, 545:17
**leakage** [1] - 594:18
**learn** [1] - 554:11
**learned** [4] - 518:18, 565:5, 577:23, 619:10
**learning** [2] - 497:17, 603:24
**leash** [1] - 622:14
**Leave** [1] - 559:23
**leave** [42] - 494:22, 495:5, 495:6, 495:20, 496:5, 497:11, 498:7, 502:2, 502:4, 503:19, 507:20, 533:20, 559:22, 559:23, 560:1, 561:5, 562:15, 580:6, 580:20, 582:18, 592:15, 592:19, 592:21, 593:8, 593:13, 594:8, 597:17, 598:3, 621:20, 622:7, 622:22, 622:24, 622:25, 623:4, 624:18, 626:11, 626:13, 627:14, 627:15, 627:16
**leaves** [1] - 526:21
**leaving** [1] - 584:16

**Lebenthal** [8] - 576:19, 576:20, 577:6, 577:23, 578:2, 578:21, 579:1, 579:16
**left** [15] - 497:13, 500:4, 503:13, 510:21, 512:9, 523:10, 557:19, 562:22, 590:17, 590:22, 598:14, 609:14, 611:19, 613:8, 625:23
**legal** [2] - 535:23, 613:25
**Lehman** [1] - 575:13
**LEHR** [1] - 483:3
**length** [1] - 621:2
**lengthy** [1] - 621:10
**less** [5] - 552:15, 566:20, 580:21, 580:23, 585:11
**letter** [5] - 585:24, 593:7, 593:9, 594:1, 623:3
**letters** [2] - 593:12, 601:22
**level** [3] - 521:21, 558:22, 562:11
**levels** [1] - 562:20
**Lewis** [1] - 523:25
**life** [7] - 544:19, 551:12, 556:4, 586:18, 603:4, 603:8, 604:20
**light** [1] - 594:2
**likely** [2] - 569:2, 589:24
**limit** [1] - 535:3
**limitations** [1] - 631:25
**limited** [2] - 537:9, 557:25
**line** [12] - 496:14, 503:3, 505:14, 521:14, 521:15, 533:18, 533:20, 535:2, 580:15, 593:22, 593:25, 599:10
**list** [6] - 492:5, 544:6, 546:5, 546:10, 548:17, 601:13
**listed** [6] - 497:6, 506:5, 519:19, 520:2, 520:8, 621:18
**listen** [9] - 490:17, 548:17, 552:19, 553:5, 578:7, 589:14, 612:4, 615:6, 617:23
**listened** [1] - 545:13
**listening** [3] - 498:20, 531:9, 612:7
**live** [4] - 485:21, 526:22, 531:7, 566:7
**LLP** [1] - 483:3
**located** [7] - 492:7, 506:23, 506:25, 507:5, 509:12, 509:17, 522:4
**location** [1] - 551:8
**locations** [1] - 539:12
**lock** [1] - 620:22
**logic** [1] - 628:25
**long-term** [6] - 586:10, 622:15, 629:17, 629:20, 629:24, 630:7
**look** [19] - 525:10, 543:20, 546:14, 549:24, 550:22, 552:2, 553:4, 555:3, 570:4, 578:7, 605:14, 605:11, 622:1, 621:1, 631:2, 631:5, 631:9, 631:17, 632:7
**looked** [6] - 537:15, 540:12, 544:9, 551:8, 551:9, 611:2
**looking** [9] - 495:17, 496:13, 506:4, 515:21, 519:1, 551:24, 572:21, 597:22, 628:4
**looks** [2] - 568:25, 605:7
**loop** [1] - 591:11
**Lord** [1] - 559:17
**Lorraine** [1] - 515:13
**lose** [1] - 559:3
**loser** [1] - 569:25
**losers** [1] - 539:15
**losing** [5] - 496:16, 536:13, 539:14,

545:15, 548:5
**loss** [1] - 545:23
**lost** [7] - 539:9, 539:10, 559:10, 559:12, 606:1, 607:21, 608:12
**Lou** [2] - 504:8, 549:5
**louder** [3] - 487:10, 498:24, 631:24
**LOUIS** [1] - 483:11
**love** [2] - 605:15, 630:25
**loved** [1] - 591:22
**low** [1] - 529:23
**lower** [4] - 510:1, 510:2, 604:1, 611:14
**lowest** [1] - 543:21
**lunch** [4] - 555:21, 555:22, 565:17, 569:9
**lunchtime** [2] - 567:3, 567:9
**luxury** [1] - 619:3
**lymph** [1] - 589:18

## M

**ma'am** [1] - 486:25
**mad** [1] - 613:23
**Madison** [1] - 483:9
**mail** [8] - 483:14, 495:22, 496:12, 507:10, 590:9, 594:22, 596:20, 627:22
**mailed** [1] - 595:13
**mailrooms** [1] - 537:11
**mails** [2] - 590:4, 596:3
**main** [2] - 551:2, 551:3
**mainstream** [1] - 601:25
**major** [2] - 536:8, 602:6
**majority** [1] - 522:5
**manage** [4] - 532:10, 542:23, 579:9, 588:1
**managed** [1] - 616:23
**Management** [11] - 531:25, 532:2, 532:5, 532:6, 532:15, 535:8, 547:10, 550:1, 564:8, 564:9, 564:10
**management** [21] - 487:25, 492:12, 493:21, 494:25, 496:7, 509:10, 513:1, 540:10, 542:23, 542:24, 546:12, 548:7, 549:16, 550:4, 550:15, 550:17, 551:13, 562:20, 591:7, 596:21, 596:25
**manager** [16] - 489:24, 497:6, 497:8, 497:10, 505:6, 509:4, 509:22, 509:25, 513:15, 514:14, 517:3, 519:21, 542:23, 543:11, 562:11, 587:4
**managers** [6] - 489:25, 514:3, 535:2, 555:6, 562:22, 563:5
**managing** [4] - 501:9, 503:19, 522:7, 554:3
**maniac** [1] - 486:14
**Mantia** [5] - 500:18, 503:7, 503:11, 503:17, 515:14
**manual** [1] - 489:20
**March** [4] - 585:20, 606:12, 606:16, 620:1
**marching** [1] - 543:5
**Marino** [13] - 498:11, 532:20, 540:6, 570:23, 591:8, 591:15, 591:17, 591:19, 592:6, 592:17, 622:22, 623:2, 623:5
**Marino's** [1] - 605:7
**married** [1] - 515:13
**martinet** [1] - 486:8
**Maryland** [2] - 483:5, 507:6

masters [1] - 536:5
matched [3] - 545:6, 578:22, 582:21
materials [3] - 497:17, 497:19, 497:20
Matt [1] - 591:3
matter [7] - 537:21, 570:7, 613:22, 615:5, 615:6, 620:10, 633:12
matters [4] - 484:21, 535:25, 612:14, 613:25
Matthew [1] - 613:15
maximize [1] - 604:19
maximized [1] - 594:10
MC [1] - 519:17
McDonald [1] - 591:4
McKinney [1] - 482:16
mean [21] - 491:13, 499:18, 507:11, 513:13, 517:5, 521:15, 526:1, 532:23, 536:9, 542:7, 542:9, 543:23, 548:15, 549:24, 550:9, 550:18, 562:17, 563:17, 592:13, 595:11, 629:7
meaning [3] - 558:7, 558:9, 604:13
meaningful [1] - 591:23
means [7] - 507:14, 542:8, 542:11, 558:13, 576:1, 628:9
meant [4] - 539:12, 598:21, 600:14, 605:19
meantime [1] - 486:1
measurement [1] - 498:17
measures [2] - 535:21, 563:14
medical [3] - 563:15, 597:13, 624:5
Medical [1] - 559:23
medication [1] - 594:16
meet [4] - 504:23, 575:6, 584:19, 599:17
meeting [13] - 505:7, 505:21, 505:22, 506:4, 506:17, 506:21, 524:5, 524:21, 600:4, 600:5, 600:7, 600:21, 629:4
meeting/phone [1] - 524:6
meetings [8] - 515:17, 515:18, 544:12, 599:15, 599:19, 600:9, 623:18, 624:1
member [10] - 519:17, 528:11, 530:10, 530:20, 531:3, 532:5, 532:6, 532:15, 564:9
members [2] - 495:21, 591:12
memo [2] - 604:3, 604:14
mental [2] - 588:22, 604:6
mentioned [10] - 531:2, 536:1, 537:16, 541:23, 556:21, 558:3, 561:23, 569:18, 595:12, 599:17
mentioning [1] - 570:2
mentors [1] - 574:22
merchants [2] - 490:7, 492:16
merge [1] - 543:12
merged [2] - 530:3, 530:5
mergers [1] - 547:18
mess [1] - 591:19
message [9] - 507:10, 584:20, 592:5, 592:7, 595:15, 598:25, 602:8, 602:10, 605:7
messages [3] - 590:25, 591:12, 605:2
messaging [1] - 495:22
met [4] - 551:6, 575:15, 575:18, 575:23
methods [1] - 589:10
MetLife [2] - 629:2, 629:10
mic [1] - 529:2
MICHAEL [1] - 483:6
microphone [3] - 531:8, 531:10,

578:13
Midwest [1] - 574:21
might [5] - 491:2, 536:22, 550:24, 567:6, 616:6
Mike [1] - 571:5
million [14] - 511:24, 512:5, 513:10, 532:25, 536:13, 538:19, 538:25, 539:8, 539:9, 545:15, 545:18, 606:17, 607:19, 608:7
millions [3] - 545:20, 548:6, 570:13
mind [2] - 536:15, 536:19
mind-set [2] - 536:15, 536:19
mine [2] - 544:17, 606:2
minused [2] - 607:16, 607:17
minute [5] - 491:15, 517:12, 527:2, 566:25, 573:14
minutes [2] - 527:5, 610:6
mischaracterization [1] - 520:5
mischaracterizes [1] - 525:11
misdeed [1] - 622:18
mismanaged [1] - 598:11
miss [1] - 514:7
missed [1] - 575:24
missing [1] - 525:8
mission [1] - 564:16
mistake [1] - 611:3
mix [1] - 594:6
mobility [2] - 541:23, 542:5
model [2] - 607:14, 607:18
Monday [8] - 544:8, 564:7, 567:23, 614:10, 615:18, 616:3, 616:16, 631:18
money [12] - 512:11, 512:16, 539:10, 539:14, 551:10, 559:8, 578:20, 578:24, 579:25, 580:19, 580:21, 630:2
month [8] - 579:10, 580:8, 582:20, 603:13, 606:7, 606:9, 625:7
monthly [2] - 579:8, 626:18
months [6] - 544:8, 556:12, 606:12, 606:13, 606:17, 620:11
morning [7] - 484:5, 484:6, 484:7, 484:9, 484:11, 486:4, 487:15, 487:16, 528:8, 544:8, 551:7, 551:11, 564:7, 567:23, 567:25, 613:5, 615:19, 617:7, 629:9, 631:1, 631:18
mortality [1] - 529:23
most [11] - 485:12, 519:11, 543:3, 545:11, 559:1, 559:8, 562:6, 563:21, 586:24, 589:24
move [10] - 533:14, 542:24, 552:19, 556:7, 569:12, 572:9, 578:6, 616:19, 624:15, 627:12
moved [7] - 487:25, 488:24, 510:7, 510:11, 510:13, 510:14, 512:3
moving [2] - 489:18, 598:7
Mr. Innelli [1] - 609:3
multiple [5] - 547:1, 549:12, 574:23, 585:9
must [6] - 486:8, 587:21, 587:23, 587:25, 607:14, 620:4
mutual [2] - 564:13, 602:6

# N

name [1] - 485:11, 487:8, 492:6, 504:8, 504:23, 505:1, 514:9, 522:2,

527:23, 530:12, 549:6
named [1] - 600:18
natural [1] - 543:23
nearly [1] - 492:25
necessary [2] - 536:19, 583:17
need [24] - 485:13, 499:3, 519:14, 519:16, 525:9, 525:13, 531:7, 531:10, 531:18, 536:4, 537:8, 538:25, 548:2, 551:17, 556:6, 561:23, 567:23, 573:4, 573:14, 599:2, 599:3, 620:6
needed [7] - 519:12, 524:24, 525:3, 525:24, 536:24, 537:5, 540:16, 550:2, 551:9, 584:21, 588:6, 591:13, 593:17, 593:19, 598:17, 599:4
needs [4] - 494:24, 496:2, 502:21, 630:2
neighborhood [1] - 603:15
nervous [1] - 491:3
networking [1] - 601:22
never [21] - 485:14, 490:1, 513:12, 513:13, 513:17, 513:20, 528:21, 550:14, 557:17, 563:22, 569:18, 586:18, 586:20, 595:5, 601:15, 603:4, 603:8, 604:21, 605:22, 607:24, 623:4
NEW [1] - 482:1
new [16] - 494:2, 494:12, 501:9, 503:12, 512:20, 525:15, 530:11, 530:12, 536:14, 537:6, 557:6, 591:1, 609:16, 619:10, 630:20, 631:6
New [6] - 482:5, 482:21, 483:10, 545:2, 603:17
next [32] - 484:15, 486:22, 491:25, 492:11, 494:15, 499:5, 520:20, 523:19, 526:7, 526:25, 527:13, 534:2, 534:3, 540:20, 541:10, 541:22, 548:11, 551:22, 555:15, 565:24, 566:2, 571:12, 582:24, 590:4, 605:10, 608:15, 612:15, 614:17, 616:6, 616:15, 626:23, 629:9
nice [6] - 570:11, 572:19, 599:21, 602:1, 602:21, 612:4
Nick [3] - 500:18, 503:7, 515:13
night [6] - 491:14, 551:7, 551:11, 599:23, 617:11, 628:17
nitty [1] - 570:4
nitty-gritty [1] - 570:4
nobody [2] - 551:12, 616:8
Nobody's [1] - 587:19
nobody's [1] - 602:8
Nodding [1] - 523:13
nodes [1] - 589:18
nonworking [1] - 549:23
noon [2] - 551:7, 551:11
normal [2] - 491:15, 538:20
normally [1] - 557:5
note [2] - 561:10, 593:20
noted [1] - 572:4
notes [9] - 505:11, 505:21, 506:4, 506:5, 506:17, 521:4, 524:11, 524:14, 591:12
nothing [5] - 525:8, 535:13, 562:21, 609:8, 615:6
notice [2] - 486:10, 601:17, 625:21
noticed [1] - 515:4
notified [3] - 605:6, 626:9, 626:12
November [11] - 495:5, 521:11, 524:6, 559:7, 559:23, 591:17, 592:6, 592:20,

605:5, 623:18, 626:12
**nuance** [1] - 564:7
**number** [10] - 503:3, 552:10, 597:10,
601:14, 606:10, 607:14, 607:18,
607:19, 616:22, 629:10
**numbers** [8] - 499:12, 499:15, 515:21,
518:19, 552:2, 552:7, 579:2, 632:19
**Nuttall** [1] - 529:9

## O

**o'clock** [6] - 613:23, 617:4, 617:16,
617:21, 618:1, 633:9
**oath** [2] - 596:10, 620:7
**object** [3] - 508:7, 518:13, 520:4
**objection** [8] - 522:19, 557:1, 565:10,
587:12, 590:7, 596:1, 610:23, 611:4
**objections** [1] - 611:6
**observation** [1] - 514:8
**observe** [1] - 514:22
**observed** [1] - 515:2
**observer** [1] - 495:14
**obtain** [1] - 519:14
**obtained** [2] - 499:13, 597:3
**obviously** [4] - 495:3, 570:13, 620:12,
631:7
**occur** [1] - 549:18
**occurred** [2] - 539:8, 559:18
**October** [1] - 628:23
**OF** [4] - 482:1, 482:11, 482:14, 636:2
**offended** [2] - 500:13, 500:15
**offer** [6] - 518:21, 537:1, 567:15,
570:3, 585:23, 611:13
**offered** [2] - 575:19, 579:2
**offering** [1] - 570:5
**office** [8] - 530:20, 549:17, 556:5,
589:22, 591:6, 595:18, 597:21, 629:4
**OFFICE** [1] - 482:14
**officer** [4] - 528:13, 530:10, 538:15,
539:4
**officers** [1] - 567:11
**Official** [1] - 483:12
**offset** [1] - 606:7
**often** [1] - 599:17
**Ohio** [13] - 506:23, 506:25, 509:14,
514:25, 522:15, 522:17, 523:2, 523:4,
523:11, 523:12, 523:16, 523:19, 526:17
**Omaha** [2] - 537:13, 537:19
**once** [7] - 489:9, 507:8, 519:20,
567:19, 601:20, 613:15, 632:16
**oncologist** [1] - 549:5
**one** [59] - 485:10, 489:25, 492:4,
494:11, 495:13, 495:24, 499:2, 503:8,
509:15, 512:14, 512:21, 522:23,
523:12, 526:11, 533:8, 536:18, 539:10,
539:14, 542:15, 543:3, 545:3, 545:21,
546:25, 547:10, 549:4, 549:17, 550:24,
551:6, 551:24, 554:6, 557:3, 559:11,
565:1, 566:9, 569:14, 570:19, 574:21,
577:13, 586:19, 591:3, 594:22, 595:10,
597:12, 599:5, 600:8, 605:6, 605:10,
606:12, 609:2, 610:25, 616:21, 621:7,
626:5, 626:25, 629:10, 629:16
**one's** [1] - 609:14
**one-on-one** [1] - 549:17

**ones** [5] - 493:17, 493:18, 509:14,
592:9, 602:16
**ongoing** [1] - 604:1
**online** [2] - 511:10, 606:4
**Open** [2] - 566:1, 572:3
**open** [5] - 484:1, 599:9, 615:1, 617:11,
619:1
**opened** [1] - 598:24
**opening** [3] - 603:5, 607:24, 608:2
**operated** [2] - 536:25, 629:7
**operating** [4] - 530:10, 530:19, 547:11,
549:13
**operation** [7] - 532:17, 554:14, 590:22,
591:20, 623:7, 623:11, 624:12
**operations** [1] - 551:1
**opinion** [1] - 604:15
**opportunities** [1] - 542:4
**opportunity** [6] - 513:13, 513:18,
542:13, 570:10, 602:21, 611:14
**opposed** [1] - 542:17
**option** [2] - 518:21, 610:21
**optional** [1] - 495:25
**options** [5] - 558:7, 586:2, 607:21,
607:23, 608:12
**oral** [2] - 613:21, 613:25
**order** [4] - 538:25, 562:4, 583:10,
628:6
**ordered** [1] - 622:19
**orderly** [1] - 616:19
**orders** [1] - 543:5
**ordinarily** [1] - 619:19
**Ording** [18] - 488:9, 488:13, 495:7,
495:15, 497:5, 498:11, 499:15, 501:13,
502:2, 502:16, 503:20, 509:5, 511:22,
518:6, 518:11, 518:20, 523:21
**Ording's** [3] - 492:13, 510:9, 518:16
**organization** [4] - 489:17, 504:12,
543:2, 547:1
**organizational** [1] - 501:17
**organizations** [2] - 547:1, 600:12
**originally** [4] - 520:2, 582:8, 630:18,
630:19
**ourselves** [1] - 632:16
**outcome** [2] - 547:15, 547:16
**outgrowth** [1] - 599:16
**outside** [4] - 511:15, 535:12, 542:13,
555:12
**outwork** [1] - 551:13
**overall** [1] - 487:20
**overrated** [1] - 604:15
**Overruled** [2] - 508:8, 522:20
**oversaw** [1] - 547:10
**oversee** [5] - 532:4, 533:18, 535:8,
535:24, 585:15
**oversees** [1] - 532:14
**overview** [3] - 548:21, 553:3, 563:3
**overworked** [2] - 491:12, 491:13
**own** [9] - 502:5, 508:1, 508:21, 513:7,
514:22, 519:1, 541:19, 552:9, 588:6
**owned** [2] - 529:10, 536:1
**owner** [2] - 556:11

## P

**P&L** [1] - 545:23

**P.C** [2] - 482:14, 482:18
**p.m** [9] - 565:22, 571:10, 571:11,
572:4, 572:11, 609:25, 610:15, 617:18,
619:1
**PAGE** [2] - 634:3, 636:4
**page** [7] - 534:3, 565:24, 571:12,
577:22, 608:15, 612:15, 614:17
**pages** [3] - 485:11, 566:25
**paid** [13] - 540:11, 546:15, 563:21,
582:17, 582:20, 607:17, 625:6, 626:2,
626:4, 626:17, 629:24, 630:4
**paper** [2] - 532:25, 533:2
**papers** [1] - 589:24
**paperwork** [5] - 560:3, 560:4, 592:23,
592:24, 593:2
**pare** [2] - 621:1, 629:15
**part** [30] - 498:13, 499:20, 511:1,
511:4, 515:14, 516:16, 516:25, 537:14,
537:18, 537:20, 537:23, 540:13, 548:6,
548:7, 548:8, 549:14, 550:12, 564:11,
565:12, 580:17, 580:19, 586:2, 595:17,
599:12, 599:13, 599:14, 601:2, 615:15,
620:21, 625:22
**partal** [1] - 512:13
**participating** [1] - 623:25
**particular** [4] - 513:23, 514:6, 548:16,
566:18
**parties** [2] - 484:4, 573:17
**partly** [1] - 598:2
**partner** [1] - 506:14
**partners** [1] - 601:4
**parts** [1] - 521:18
**party** [3] - 494:2, 589:5, 595:20
**pass** [1] - 547:8
**passionate** [1] - 490:16
**past** [1] - 575:3
**Pat** [2] - 497:22, 498:11
**Patty** [1] - 500:1
**Paul** [1] - 632:19
**pause** [5] - 517:15, 527:9, 561:17,
577:4, 610:13
**pay** [8] - 517:20, 579:13, 589:12,
593:24, 610:22, 623:17, 626:10, 626:23
**payment** [1] - 627:15
**payments** [8] - 538:25, 545:18,
563:19, 622:8, 629:18, 629:21, 630:6,
630:7
**payroll** [1] - 625:3
**peaceful** [1] - 570:14
**pension** [2] - 538:7, 538:8
**pensions** [2] - 538:5, 545:20
**people** [80] - 488:11, 490:15, 492:15,
498:16, 499:12, 500:16, 502:2, 502:11,
504:12, 506:5, 506:18, 508:22, 509:9,
513:25, 514:6, 514:23, 515:10, 532:10,
537:10, 537:11, 537:19, 537:21,
539:12, 540:12, 541:8, 541:17, 542:10,
542:22, 543:1, 544:5, 546:12, 546:25,
547:5, 549:4, 549:23, 550:5, 551:14,
552:12, 552:14, 552:17, 552:25, 554:6,
555:2, 558:6, 558:10, 558:11, 558:16,
558:18, 559:10, 559:17, 562:7, 562:16,
563:21, 564:9, 564:20, 564:22, 569:17,
584:23, 589:12, 595:7, 595:12, 595:13,
595:14, 598:5, 598:18, 600:19, 601:11,
601:12, 601:23, 602:1, 602:17, 602:19,

604:18, 612:7, 616:7, 621:8, 621:25, 623:14, 625:23

**people's** [1] - 541:15

**per** [2] - 586:6, 603:13

**percent** [19] - 502:4, 516:3, 537:22, 540:4, 540:14, 542:15, 545:8, 547:19, 547:21, 553:2, 560:18, 561:2, 561:7, 561:11, 562:23, 586:6, 606:11, 606:16, 622:20

**perform** [2] - 628:11, 628:14

**performance** [8] - 501:18, 543:20, 543:21, 545:10, 586:16, 586:18, 586:21, 624:10

**performer** [1] - 543:25

**performing** [3] - 624:5, 624:8, 624:20

**perhaps** [7] - 496:18, 503:18, 505:19, 515:20, 521:10, 567:14, 615:24

**period** [16] - 489:10, 493:2, 496:4, 503:15, 539:13, 586:4, 617:8, 620:2, 624:12, 626:14, 626:16, 626:19, 626:21, 626:23, 626:25, 629:6

**permanent** [1] - 499:16

**permitted** [1] - 619:25

**person** [21] - 491:15, 492:5, 496:18, 496:19, 505:7, 507:7, 513:24, 514:6, 514:9, 515:6, 516:10, 516:23, 542:12, 542:13, 546:24, 554:3, 556:13, 558:11, 568:15, 599:8, 605:20

**personal** [4] - 588:1, 602:8, 616:4, 616:7

**personnel** [1] - 560:14

**pertinent** [1] - 557:17

**phone** [5] - 505:9, 507:10, 524:22, 529:9, 537:21

**phrase** [1] - 542:20

**physical** [1] - 588:9

**physician** [1] - 597:4

**pick** [1] - 543:3

**piece** [3] - 532:25, 533:2, 557:17

**pity** [3] - 506:8, 521:4, 589:5

**pivot** [3] - 536:8, 536:12, 538:4

**place** [7] - 498:18, 507:23, 516:21, 545:1, 550:20, 553:14, 625:25

**placed** [3] - 501:16, 594:7, 609:22

**PLAINTIFF** [1] - 636:4

**Plaintiff** [6] - 482:4, 482:15, 482:19, 487:4, 527:19, 573:21

**plaintiff** [4] - 570:21, 619:13, 620:12, 628:12

**Plaintiff Exhibit** [10] - 577:10, 587:14, 590:8, 593:6, 596:2, 636:5, 636:7, 636:9, 636:11, 636:13

**Plaintiff's** [1] - 576:25

**Plaintiff's Exhibit** [7] - 587:10, 590:6, 593:3, 595:22, 597:6, 609:4, 625:2

**Plaintiff's Exhibits** [3] - 610:20, 611:8, 636:15

**Plaintiffs** [1] - 482:14

**plan** [6] - 491:20, 538:8, 568:12, 568:15, 603:21, 615:12

**planning** [2] - 597:1, 616:6

**plans** [5] - 489:21, 494:8, 501:18, 501:21, 616:7

**platform** [2] - 511:19, 536:10

**play** [5] - 533:11, 533:17, 533:24, 547:12, 617:13

**playing** [1] - 606:5

**plethora** [1] - 616:22

**PLLC** [1] - 483:8

**plugged** [1] - 503:3

**Plumeri** [27] - 489:15, 528:14, 528:15, 531:2, 531:4, 531:14, 549:3, 556:16, 556:17, 556:18, 556:20, 556:22, 557:8, 557:16, 557:19, 574:16, 575:7, 576:7, 576:11, 578:2, 581:21, 586:16, 591:17, 605:3, 605:13, 620:6

**Plumeri's** [1] - 562:1

**plus** [3] - 579:9, 580:8, 580:10

**Plus** [1] - 494:11

**pneumonia** [3] - 594:13, 594:15, 594:19

**point** [12] - 490:2, 535:18, 535:20, 536:8, 536:12, 538:4, 546:18, 556:10, 593:19, 611:25, 625:16, 626:20

**pointed** [1] - 606:4

**policies** [1] - 497:20

**policy** [1] - 538:14

**pool** [3] - 533:4, 533:19, 563:24

**poor** [4] - 550:14, 550:17, 589:6, 632:24

**population** [1] - 546:14

**Portal** [2] - 518:21, 518:23

**portal** [9] - 511:10, 511:23, 511:24, 512:5, 512:6, 512:20, 512:24, 512:25, 519:1

**Portfolio** [1] - 500:2

**position** [13] - 513:12, 519:14, 519:19, 525:7, 550:10, 557:20, 575:19, 593:24, 598:18, 600:10, 602:3, 615:18, 628:12

**positions** [1] - 487:25

**positive** [1] - 522:5

**possibly** [3] - 555:21, 569:25, 570:16

**posted** [1] - 552:7

**posting** [1] - 519:22

**potential** [2] - 603:16, 604:11

**pounds** [1] - 591:20

**power** [2] - 564:18, 564:21

**powers** [1] - 553:8

**practice** [1] - 620:11

**Pratt** [1] - 483:4

**preceded** [1] - 603:5

**preclude** [1] - 631:3

**preliminary** [1] - 484:21

**premature** [1] - 617:13

**premise** [1] - 601:16

**premises** [1] - 578:19

**prepaid** [1] - 579:12

**preparation** [1] - 620:4

**prepared** [1] - 630:24

**preparing** [1] - 619:4

**preponderance** [1] - 570:22

**presence** [1] - 613:2

**present** [6] - 484:4, 526:23, 566:1, 572:3, 619:7, 627:9

**presentation** [3] - 576:19, 576:20, 577:5

**presentations** [2] - 575:14, 601:13

**presented** [1] - 489:17

**presenting** [1] - 601:5

**president** [5] - 509:7, 529:10, 530:10, 530:19

**presidents** [5] - 510:18, 532:1, 543:10, 543:13, 543:24

**presiding** [1] - 550:24

**press** [1] - 583:10

**pressed** [1] - 573:11

**pressure** [4] - 489:14, 615:22, 615:24, 616:5

**pretext** [1] - 622:5

**pretty** [4] - 554:22, 568:18, 602:4, 621:5

**previously** [2] - 528:17, 570:20

**price** [5] - 584:15, 604:1, 607:24, 608:1, 608:2

**primarily** [1] - 492:17

**Primerica** [1] - 586:13

**principles** [1] - 587:18

**print** [3] - 537:11, 537:13, 537:20

**printing** [1] - 489:20

**probability** [1] - 616:1

**problem** [8] - 490:1, 517:2, 531:6, 594:18, 601:4, 611:24, 624:7

**problems** [3] - 546:4, 578:17, 624:17

**procedures** [1] - 516:21

**proceed** [2] - 565:18, 617:9

**Proceedings** [1] - 483:15

**proceedings** [5] - 517:15, 527:9, 610:3, 610:13, 618:2

**process** [19] - 498:14, 501:19, 502:16, 511:15, 516:13, 519:12, 519:13, 538:2, 554:7, 554:10, 554:25, 562:19, 569:13, 587:15, 595:3, 599:1, 600:23, 600:24, 606:5

**processes** [2] - 516:20, 519:15

**produced** [1] - 483:15

**producers** [1] - 575:13

**product** [3] - 537:4, 537:6, 537:7

**production** [1] - 492:21

**profession** [1] - 620:11

**profit** [1] - 545:23

**profitable** [2] - 539:15, 559:15

**prognosis** [1] - 500:10

**program** [9] - 490:14, 512:21, 518:9, 541:24, 542:6, 587:2, 587:19, 603:22, 624:18

**programs** [4] - 499:11, 501:10, 586:11

**progress** [2] - 616:18, 616:25

**project** [1] - 522:7

**projected** [1] - 607:16

**projections** [3] - 494:9, 545:4, 545:6

**projects** [5] - 498:16, 521:20, 525:6, 525:16, 532:12

**promise** [1] - 589:3

**promised** [1] - 595:11

**promote** [2] - 542:7, 542:9

**promoted** [4] - 497:9, 509:4, 513:16, 523:23

**promotion** [1] - 501:19

**proper** [1] - 557:6

**properly** [2] - 514:4, 567:11

**property** [1] - 579:11

**proponents** [1] - 537:11

**proposal** [1] - 577:23

**propose** [1] - 631:21

**proposed** [2] - 578:2, 621:18

**proposition** [1] - 604:2

**protections** [1] - 552:1
**protocol** [3] - 523:17, 594:7, 599:9
**proud** [2] - 484:13, 594:14
**prove** [1] - 570:21
**proved** [1] - 630:3
**provide** [1] - 574:23
**provided** [1] - 535:7
**provider** [2] - 597:9, 629:12
**provides** [2] - 535:6, 619:25
**prune** [1] - 614:3
**publicly** [2] - 552:5, 552:8
**pull** [1] - 492:5
**purchase** [1] - 562:4
**purpose** [6] - 521:12, 524:21, 585:8, 604:17, 604:18
**purposes** [1] - 538:18
**pursuant** [1] - 507:15
**push** [3] - 531:11, 531:13
**put** [26] - 492:5, 496:8, 513:17, 513:20, 516:11, 516:21, 518:10, 544:2, 548:16, 550:20, 551:9, 566:24, 570:20, 585:10, 587:2, 599:5, 609:2, 615:22, 616:4, 622:9, 623:3, 627:11, 631:4, 631:17, 631:22, 632:12
**puts** [1] - 615:24

## Q

**qualified** [4] - 628:7, 628:9, 628:24, 629:22
**qualify** [2] - 538:17, 538:25
**qualities** [1] - 516:11
**quarter** [4] - 552:8, 565:19, 571:4, 571:6
**questioning** [4] - 504:4, 522:24, 584:2, 610:7
**questions** [20] - 490:22, 492:6, 504:2, 517:25, 522:9, 526:9, 531:21, 532:8, 546:1, 548:21, 551:22, 555:9, 559:19, 561:18, 583:20, 584:4, 591:24, 591:25, 592:1, 600:17
**queued** [1] - 599:10
**quick** [3] - 526:11, 552:1, 585:24
**quicker** [2] - 569:12, 616:5
**quickly** [2] - 487:25, 533:13
**quite** [7] - 510:8, 519:16, 589:11, 592:14, 594:5, 594:9, 605:18

## R

**radiation** [9] - 585:20, 585:22, 588:8, 588:9, 588:13, 588:21, 588:24, 592:20
**raise** [4] - 484:20, 487:3, 527:17, 572:25
**raised** [4] - 496:7, 563:22, 581:19, 581:20
**ran** [3] - 498:9, 509:6, 536:4
**randomly** [1] - 601:16
**ranking** [1] - 543:21
**rankings** [2] - 543:20, 543:21
**rate** [4] - 502:1, 529:23, 586:5, 606:11
**rated** [1] - 587:7
**rates** [4] - 490:6, 587:4, 598:13, 603:18

**rather** [1] - 615:22
**RDR** [1] - 483:12
**re** [1] - 572:11
**re-entered** [1] - 572:11
**reach** [2] - 569:22, 602:21
**reaching** [1] - 571:3
**reaction** [2] - 494:19, 589:2
**read** [8] - 485:2, 485:18, 545:12, 572:17, 577:14, 578:5, 622:5
**reading** [2] - 485:22, 590:4
**ready** [2] - 540:6, 595:8
**real** [5] - 533:24, 536:12, 545:19, 552:1, 585:24
**really** [21] - 490:15, 502:16, 503:15, 535:14, 542:20, 543:1, 544:20, 562:7, 564:4, 569:16, 575:4, 576:4, 583:14, 583:17, 586:6, 589:12, 594:14, 599:21, 604:11, 619:13, 631:6
**reason** [5] - 511:23, 521:1, 566:18, 612:7, 628:3
**reasonable** [2] - 617:8, 628:10
**reasons** [4] - 539:17, 541:13, 570:20, 602:20
**receive** [5] - 565:8, 593:9, 593:12, 629:20, 630:7
**received** [19] - 529:9, 557:17, 559:8, 577:10, 587:14, 590:8, 593:6, 593:7, 596:2, 601:17, 611:8, 623:17, 629:17, 636:5, 636:7, 636:9, 636:11, 636:13, 636:15
**recently** [1] - 530:8
**recess** [3] - 571:10, 610:3, 618:2
**recognize** [2] - 609:4, 609:9
**recollection** [2] - 506:16, 600:16
**recommendations** [2] - 510:9, 510:25
**recommended** [1] - 600:11
**reconsider** [1] - 621:14
**reconvene** [2] - 527:4, 565:20
**record** [9] - 570:10, 570:19, 570:21, 570:25, 583:7, 583:25, 613:1, 627:6, 633:8
**recorded** [2] - 483:15, 486:7
**records** [4] - 560:14, 625:4, 625:8, 625:9
**recover** [1] - 627:24
**recovering** [4] - 495:20, 505:15, 521:14, 554:13
**recovery** [1] - 624:12
**RECROSS** [4] - 522:12, 565:3, 634:11, 634:22
**RECROSS-EXAMINATION** [4] - 522:12, 565:3, 634:11, 634:22
**recruited** [1] - 529:7
**recruiter** [1] - 519:18
**recurring** [1] - 537:22
**redesignated** [1] - 486:5
**redirect** [1] - 524:4
**REDIRECT** [6] - 518:3, 526:13, 561:21, 634:9, 634:13, 634:20
**reduced** [1] - 500:6
**reducing** [1] - 547:17
**reduction** [8] - 502:7, 538:24, 540:3, 560:18, 561:3, 561:7, 561:12, 563:14
**reductions** [3] - 493:1, 493:6, 539:6
**reference** [1] - 601:23
**referred** [1] - 549:4

**reflect** [2] - 583:7, 584:1
**reflects** [1] - 584:11
**refresh** [1] - 505:19
**regard** [3] - 485:8, 557:19, 570:21
**regarding** [3] - 593:13, 596:21, 598:1
**regionals** [1] - 602:16
**regular** [2] - 545:10, 599:14
**regulation** [3] - 631:21, 632:9, 632:17
**regulations** [1] - 632:10
**reinforcement** [1] - 604:5
**reinstate** [1] - 593:25
**reinstatement** [3] - 621:19, 632:1, 632:2
**reinventing** [1] - 512:12
**rejection** [1] - 612:5
**relate** [2] - 484:21, 562:13
**related** [2] - 488:23, 497:19
**relating** [1] - 560:6
**relationship** [13] - 494:3, 529:17, 531:20, 574:16, 574:18, 576:3, 576:9, 578:8, 581:23, 587:25, 588:1, 588:2, 599:21
**relationships** [2] - 575:19, 601:7
**relative** [1] - 540:10
**relax** [2] - 499:3, 529:2
**released** [1] - 561:10
**relevance** [1] - 508:7
**relevancy** [1] - 577:8
**relevant** [7] - 531:21, 541:3, 548:14, 548:22, 555:13, 566:17, 578:5
**relying** [1] - 545:7
**remain** [1] - 572:25
**remained** [1] - 541:11
**remarks** [1] - 615:20
**remember** [17] - 498:22, 500:10, 511:12, 521:12, 524:8, 524:15, 524:18, 525:1, 541:1, 590:17, 594:17, 594:19, 600:6, 601:14, 608:1, 608:5, 625:22
**remembered** [1] - 524:5
**remembering** [2] - 505:23, 602:2
**remotely** [2] - 496:4, 623:10
**remove** [1] - 549:7
**render** [1] - 616:5
**renegotiations** [1] - 539:18
**reorganization** [1] - 625:25
**repetitious** [3] - 526:3, 548:19, 552:22
**replaced** [3] - 552:13, 563:17, 578:12
**replacement** [2] - 491:21, 585:13
**replied** [1] - 605:13
**Report** [1] - 515:22
**report** [6] - 484:17, 488:11, 500:2, 514:15, 516:2, 572:6
**reported** [6] - 488:12, 489:17, 514:17, 549:25, 550:16, 564:5
**reporter** [2] - 486:9
**Reporter** [2] - 483:12, 483:12
**reporters** [1] - 486:17
**reporting** [6] - 489:2, 489:3, 490:2, 498:15, 499:11, 545:10
**reports** [7] - 489:21, 501:4, 516:24, 546:25, 563:1, 587:3, 624:10
**represent** [3] - 504:8, 526:17, 552:6
**representation** [2] - 521:16, 537:14
**represents** [1] - 496:22
**reputation** [1] - 603:4

**req** [2] - 599:9, 599:11
**request** [4] - 517:20, 598:23, 599:8, 599:15
**requested** [1] - 587:1
**requests** [3] - 585:9, 585:10, 599:16
**required** [4] - 532:21, 536:14, 599:7
**requirements** [1] - 507:21
**requiring** [1] - 598:20
**requisite** [1] - 621:8
**resign** [1] - 491:16
**resigned** [3] - 489:12, 491:8, 517:19
**resolution** [1] - 570:7
**resolved** [1] - 569:24
**resolving** [1] - 570:14
**Resources** [12] - 488:25, 495:9, 510:5, 510:11, 510:13, 510:14, 510:23, 512:7, 512:21, 535:7, 535:11, 535:24
**respect** [8] - 485:15, 522:14, 525:10, 556:9, 599:22, 610:18, 619:14, 619:15
**responded** [2] - 542:14, 601:3
**responsibile** [1] - 515:6
**responsibilities** [17] - 491:23, 493:22, 493:23, 494:5, 494:13, 499:15, 500:7, 501:13, 501:16, 522:6, 579:10, 582:15, 584:10, 598:16, 600:6, 601:2
**responsibility** [15] - 501:8, 514:19, 516:22, 517:7, 517:9, 529:12, 532:6, 542:25, 546:4, 550:18, 552:6, 587:22, 588:3, 599:6, 602:9
**responsible** [8] - 497:16, 498:15, 532:15, 532:17, 550:1, 587:24, 587:25, 616:7
**responsive** [6] - 490:18, 490:22, 495:1, 495:3, 498:19, 499:3
**rest** [6] - 537:16, 549:16, 550:7, 559:6, 567:15, 613:15
**restricted** [2] - 607:21, 608:13
**restrictions** [1] - 629:23
**restructure** [2] - 548:7, 551:7
**restructures** [1] - 493:1
**restructuring** [8] - 538:9, 538:13, 538:18, 538:20, 538:23, 540:16, 625:25
**restructurings** [4] - 538:10, 539:6, 539:16, 545:3
**rests** [1] - 567:19
**result** [4] - 502:18, 504:20, 510:9, 510:25
**results** [4] - 490:16, 545:6, 551:25, 587:6
**resume** [1] - 598:16
**retain** [1] - 522:15
**retaliate** [2] - 622:1, 622:4
**retaliating** [1] - 621:20
**retaliation** [3] - 621:23, 622:5, 622:21
**retired** [1] - 531:17
**retirement** [1] - 604:15
**return** [9] - 593:8, 594:2, 597:1, 597:3, 597:18, 621:21, 621:23, 629:21, 629:23
**returning** [1] - 622:9
**revenue** [4] - 537:22, 537:23, 537:25, 538:1
**review** [12] - 498:9, 498:10, 498:14, 502:18, 504:10, 504:20, 554:24, 586:16, 586:18, 586:21, 587:3, 587:11
**reviewed** [1] - 586:23
**Rhonda** [12] - 504:23, 505:7, 506:10,

506:13, 509:9, 521:7, 524:12, 591:8, 591:10, 591:13, 592:23, 594:23
**rid** [2] - 543:21, 543:25
**RIF** [2] - 622:9, 622:10
**Rights** [1] - 523:6
**rise** [7] - 486:19, 527:6, 527:10, 565:21, 609:24, 610:14, 617:17
**road** [2] - 490:12, 490:19
**Robert** [2] - 512:3, 523:14
**Robin** [11] - 488:8, 488:13, 495:7, 509:5, 510:9, 511:22, 513:16, 516:16, 516:18, 523:21, 584:12
**role** [11] - 489:7, 491:22, 502:15, 519:22, 528:9, 532:2, 532:4, 533:11, 533:17, 547:12
**roles** [1] - 488:1
**rolling** [1] - 617:24
**Rolodex** [1] - 602:4
**room** [3] - 522:23, 553:10, 570:6
**row** [1] - 563:21
**rowing** [1] - 556:14
**rule** [1] - 557:7
**rules** [1] - 559:1
**run** [2] - 524:22, 550:3
**running** [2] - 515:23, 518:6
**runs** [1] - 516:23
**résumé** [1] - 492:5

## S

**S-t-u-h-r** [1] - 522:2
**sad** [1] - 494:20
**salaries** [1] - 627:3
**salary** [8] - 580:24, 606:1, 607:13, 611:14, 622:11, 625:7, 626:3, 626:18
**Sales** [23] - 488:2, 488:5, 488:8, 488:15, 488:19, 492:2, 496:25, 498:2, 499:14, 500:4, 500:6, 500:11, 502:7, 510:4, 511:9, 518:7, 518:12, 518:17, 518:20, 519:4, 524:23, 535:10, 598:12
**sales** [23] - 488:23, 489:1, 492:2, 492:22, 494:7, 496:22, 497:6, 497:19, 499:20, 501:6, 504:12, 510:16, 512:5, 512:20, 516:10, 525:9, 537:14, 537:23, 537:25, 551:2, 551:3, 557:14, 587:24
**sales-related** [1] - 488:23
**salespeople** [7] - 492:18, 536:24, 537:6, 537:8, 537:9, 537:12
**sat** [3] - 549:25, 564:7, 600:9
**SAUL** [1] - 483:3
**save** [10] - 512:11, 525:22, 536:13, 550:22, 550:23, 551:14, 572:20, 601:7, 622:9, 629:13
**saves** [1] - 622:10
**saving** [4] - 538:5, 540:15, 545:20
**savings** [1] - 545:4
**saw** [6] - 493:9, 497:3, 514:24, 514:25, 590:25, 592:5
**scale** [1] - 587:8
**schedule** [1] - 630:19
**scheduled** [1] - 600:3
**scheduling** [2] - 484:21, 489:21
**scheme** [1] - 563:20
**SCHOENECK** [1] - 483:8
**School** [1] - 602:10

**school** [2] - 492:7, 544:21
**scope** [1] - 492:19
**Scott** [1] - 529:9
**screen** [4] - 495:24, 500:1, 519:19, 609:8
**screened** [1] - 519:20
**screwy** [1] - 620:24
**search** [1] - 491:20
**seat** [4] - 487:7, 527:22, 573:2, 610:5
**seated** [6] - 486:21, 527:12, 572:13, 610:1, 610:16, 617:19
**second** [5] - 549:13, 557:3, 597:12, 615:8, 626:5
**seconds** [1] - 570:19
**section** [1] - 605:6
**see** [24] - 493:7, 496:13, 500:19, 506:10, 507:7, 521:17, 536:22, 542:2, 555:24, 560:3, 565:2, 565:12, 569:23, 569:25, 570:15, 570:17, 571:4, 578:4, 583:23, 589:6, 590:4, 591:17, 594:11, 600:13, 609:6, 609:7, 610:12, 610:23, 612:11, 617:16, 619:12, 619:20, 621:16, 629:15, 630:8, 630:13, 633:9
**seeing** [3] - 569:21, 591:23, 612:5
**seek** [2] - 601:18, 626:13
**seeking** [2] - 621:21, 621:23
**selected** [1] - 554:25
**selecting** [1] - 542:17
**selling** [6] - 490:6, 536:8, 536:9, 536:14, 536:21, 536:22
**send** [6] - 591:11, 598:5, 601:11, 604:3, 628:5, 631:10
**SENIOR** [1] - 482:12
**senior** [12] - 509:7, 510:18, 519:17, 519:22, 519:23, 521:21, 522:4, 531:15, 543:7, 549:25, 556:19, 587:4
**sense** [9] - 512:11, 539:25, 547:22, 548:4, 568:22, 568:23, 572:21, 581:1, 616:11
**sent** [4] - 590:9, 590:12, 594:12, 623:3
**separate** [1] - 502:19
**separation** [4] - 625:12, 625:13, 625:15, 625:22
**September** [5] - 482:7, 606:13, 607:7, 607:8, 633:12
**series** [2] - 519:21, 605:2
**serve** [1] - 585:8
**served** [2] - 576:23, 599:3
**serviced** [1] - 488:21
**services** [8] - 490:7, 536:23, 536:25, 565:7, 570:5, 574:23, 598:20, 601:12
**servicing** [3] - 537:24, 587:24, 601:10
**serving** [1] - 598:20
**Seshlinger** [1] - 591:4
**session** [1] - 495:13
**set** [9] - 503:6, 536:15, 536:19, 536:22, 560:10, 591:4, 591:5, 591:6, 623:24
**set-up** [1] - 623:24
**sets** [1] - 536:15
**settle** [2] - 569:17, 569:19
**settlement** [1] - 571:3
**seven** [9] - 539:9, 586:14, 603:21, 607:2, 607:3, 607:10, 607:20, 608:9
**several** [7] - 508:1, 570:3, 587:4, 595:12, 601:7, 609:7, 616:24
**severance** [4] - 517:20, 538:25, 539:8,

563:19

**severe** [2] - 584:15, 624:12

**shake** [3] - 570:14, 591:25, 614:5

**shape** [1] - 617:23

**share** [1] - 495:25

**shareholders** [1] - 552:7

**SHAWN** [2] - 482:14, 482:17

**Shearer** [15] - 485:2, 486:6, 518:1, 522:22, 526:22, 528:4, 561:19, 566:2, 572:7, 610:17, 621:3, 626:6, 628:25, 630:10, 633:5

**SHEARER** [97] - 482:14, 482:17, 484:6, 484:16, 484:19, 485:5, 485:19, 486:5, 486:16, 486:24, 487:14, 491:6, 499:7, 503:23, 504:1, 518:2, 518:4, 520:22, 522:8, 522:19, 526:11, 526:14, 526:19, 526:24, 527:1, 527:14, 528:5, 528:7, 529:5, 530:25, 531:23, 535:1, 555:10, 555:16, 557:1, 561:20, 561:22, 564:24, 566:3, 566:6, 566:8, 566:10, 566:13, 566:15, 566:20, 567:17, 572:8, 572:16, 572:23, 573:24, 576:25, 577:7, 577:13, 584:6, 587:9, 595:22, 595:25, 597:6, 597:8, 597:11, 597:13, 604:25, 605:23, 606:22, 609:2, 609:21, 610:6, 610:18, 611:1, 611:5, 611:11, 612:8, 622:4, 622:14, 622:19, 623:2, 623:8, 623:12, 623:15, 623:17, 623:21, 623:23, 624:7, 624:15, 626:8, 627:7, 627:18, 627:20, 629:1, 629:8, 630:12, 632:8, 632:11, 632:14, 632:18, 633:6, 633:10

**SHEARER.........................** [6] - 634:6, 634:10, 634:14, 634:17, 634:21, 635:3

**Shearson** [2] - 531:15, 575:13

**shirtless** [4] - 500:19, 598:4, 598:9, 598:10

**shocked** [2] - 494:20, 592:7

**shop** [2] - 537:13, 537:20

**shops** [1] - 537:11

**Short** [2] - 561:17, 577:4

**short** [6] - 586:7, 594:7, 595:1, 596:21, 616:9, 626:13

**short-term** [5] - 586:7, 594:7, 595:1, 596:21, 626:13

**shortened** [1] - 572:16

**shorter** [1] - 630:9

**shortly** [1] - 510:14

**shoulder** [2] - 503:16, 590:22

**show** [3] - 496:8, 505:18, 625:3

**showing** [1] - 544:10

**shown** [1] - 577:11

**shows** [5] - 490:12, 490:19, 496:11, 578:21, 578:23

**shrink** [2] - 493:23, 501:14

**shut** [2] - 542:2, 542:12

**sick** [3] - 578:17, 594:3, 594:8

**side** [6] - 574:8, 585:11, 587:24, 587:25, 605:14, 605:17

**sidebar** [3] - 612:14, 613:1, 614:16

**sideways** [1] - 577:22

**sign** [2] - 532:25, 622:21

**signed** [3] - 533:2, 602:18, 629:2

**significant** [1] - 605:3

**similar** [1] - 603:18

**simple** [2] - 587:20, 619:8

**simply** [1] - 612:5

**sit** [1] - 599:24

**site** [3] - 539:17, 599:9, 601:11

**sites** [1] - 518:18

**situation** [4] - 507:21, 513:20, 553:18, 567:10

**six** [3] - 590:24, 594:19, 606:18

**skill** [1] - 536:15

**skin** [1] - 590:22

**sleep** [1] - 628:17

**slipped** [1] - 598:10

**slow** [2] - 490:17, 603:11

**slowed** [1] - 499:2

**slower** [3] - 491:24, 499:2, 612:3

**small** [6] - 502:7, 504:11, 536:18, 537:18, 537:20, 597:25

**smaller** [1] - 543:1

**smallest** [2] - 537:14, 537:23

**smiled** [1] - 597:21

**so-called** [1] - 625:24

**software** [11] - 494:1, 502:24, 503:5, 511:10, 511:16, 511:19, 512:20, 536:10, 536:22, 536:25, 606:10

**sold** [2] - 541:14

**solely** [1] - 543:11

**someone** [7] - 496:2, 516:12, 521:13, 521:21, 533:12, 533:16, 624:21

**sometime** [1] - 554:12

**sometimes** [1] - 617:10

**somewhat** [1] - 588:14

**somewhere** [8] - 540:23, 549:19, 593:22, 593:24, 593:25, 594:6, 603:14, 604:14

**sorry** [12] - 510:17, 511:18, 523:3, 523:10, 543:25, 551:16, 552:5, 562:17, 563:13, 577:22, 585:23, 611:2

**sort** [4] - 575:4, 617:23, 619:5, 619:12

**sorts** [2] - 494:3, 620:14

**sound** [2] - 529:21, 544:17

**sounds** [1] - 539:19

**south** [1] - 601:8

**South** [1] - 584:19

**Southern** [1] - 523:11

**spans** [6] - 542:21, 542:25, 543:1, 544:10, 546:24, 560:18

**speaking** [1] - 503:9

**special** [3] - 496:2, 512:4

**specific** [2] - 532:12, 548:21

**specifically** [2] - 547:5, 590:17

**speech** [2] - 574:3, 604:4

**speeches** [4] - 589:11, 589:12, 612:1, 612:2

**speed** [1] - 592:4

**spell** [2] - 487:8, 527:23

**spent** [2] - 512:16, 591:23

**split** [1] - 488:22

**staff** [7] - 522:5, 540:18, 595:11, 595:19, 599:7, 599:15, 600:3

**Stamey** [12] - 501:5, 504:24, 505:2, 505:3, 505:4, 506:9, 508:24, 509:17, 512:22, 515:12, 521:9, 613:16

**stand** [5] - 487:1, 487:3, 526:21, 527:16, 610:2

**standard** [2] - 602:9, 606:11

**standing** [1] - 572:25

**start** [21] - 489:3, 490:8, 515:15, 528:9, 542:19, 574:15, 590:1, 593:8, 595:7, 599:24, 600:23, 601:19, 614:10, 615:21, 616:2, 617:5, 619:9, 622:10, 631:18

**started** [22] - 487:22, 487:24, 495:17, 501:12, 525:25, 576:12, 576:13, 580:19, 581:4, 581:7, 599:1, 600:17, 600:21, 601:10, 601:21, 603:23, 606:5, 612:9, 619:25, 629:8, 631:14

**starting** [3] - 524:8, 601:4, 607:13

**starts** [1] - 616:8

**state** [4] - 487:8, 527:23, 588:22, 604:6

**State** [1] - 522:17

**statements** [1] - 538:3

**states** [1] - 632:1

**status** [5] - 549:23, 624:22, 624:24, 625:3

**stay** [9] - 493:22, 501:13, 502:3, 503:17, 530:1, 596:4, 607:2, 615:5, 617:11

**stayed** [6] - 510:21, 530:2, 582:4, 590:18, 606:19, 622:14

**Steffen** [3] - 485:11, 485:12, 486:5

**Steffen's** [2] - 566:4, 566:6

**stenography** [1] - 483:15

**step** [7] - 521:13, 521:21, 526:20, 527:17, 565:13, 610:2, 620:22

**Steve** [9] - 488:12, 489:11, 491:19, 491:21, 496:4, 505:15, 521:14, 521:19, 556:24

**Steve's** [1] - 496:7

**STEVEN** [3] - 482:3, 573:20, 635:1

**Steven** [2] - 482:15, 482:19

**still** [11] - 499:25, 554:13, 580:8, 589:11, 595:16, 602:25, 603:2, 611:24, 612:1, 622:5, 630:10

**Stillwell's** [1] - 500:1

**stipulate** [1] - 567:6

**stipulation** [1] - 568:5

**stock** [16] - 552:9, 558:7, 558:13, 558:19, 558:24, 559:3, 559:4, 559:8, 559:12, 562:20, 563:17, 563:18, 586:1, 607:21, 608:13

**stomach** [1] - 591:21

**stonewalled** [2] - 600:18, 600:21

**stop** [3] - 525:22, 595:14, 632:15

**stopped** [2] - 581:11, 600:24

**store** [2] - 528:25, 536:22

**stories** [1] - 592:2

**strain** [1] - 583:17

**strategy** [2] - 575:12, 620:10

**streamlining** [1] - 548:1

**Street** [6] - 482:20, 483:4, 552:8, 574:24, 575:3, 602:5

**stressful** [1] - 624:5

**strike** [1] - 538:11

**strokes** [1] - 621:13

**structure** [4] - 486:15, 497:4, 548:18, 548:20

**struggled** [1] - 503:15

**stubs** [1] - 610:22

**study** [1] - 498:2

**stuff** [6] - 575:4, 591:6, 592:2, 604:20, 605:14, 619:6

**Stuhr** [3] - 505:16, 522:2, 522:3

**style** [2] - 492:12, 509:10

**subconscious** [1] - 616:5

**subject** [1] - 562:1

**submit** [2] - 630:20, 631:2

**submitted** [4] - 561:10, 565:6, 625:17, 629:22

**subordinate** [2] - 517:1, 519:13

**subordinates** [1] - 517:10

**subpoena** [1] - 507:15

**subpoenaed** [4] - 507:13, 520:11, 520:12, 520:24

**substance** [1] - 533:13

**subtracted** [1] - 606:15

**success** [2] - 501:21, 548:8

**successful** [2] - 547:17, 547:19

**succession** [1] - 501:18

**succinctly** [1] - 499:1

**sudden** [1] - 600:22

**sued** [10] - 508:4, 508:6, 508:11, 508:12, 508:14, 508:15, 523:14, 523:21, 523:25

**suffering** [1] - 631:8

**suggested** [1] - 502:23

**suggesting** [1] - 583:22

**suggestion** [4] - 505:16, 521:24, 522:1, 525:19

**suicide** [1] - 619:5

**Suite** [1] - 482:20

**summaries** [2] - 610:21

**summary** [1] - 605:4

**summations** [3] - 568:23, 568:24, 614:10

**summer** [1] - 556:4

**supervise** [1] - 560:12

**supplied** [2] - 498:23, 503:4

**supply** [1] - 499:9

**support** [2] - 597:17, 601:16

**supporting** [1] - 499:23

**supposed** [6] - 544:23, 582:8, 584:18, 585:6, 585:12, 585:14

**supposedly** [1] - 598:2

**surgery** [8] - 495:2, 495:19, 496:5, 589:10, 589:15, 589:17, 589:23, 590:2

**surprised** [1] - 560:17

**suspect** [1] - 557:6

**sustained** [4] - 518:15, 526:3, 565:10, 578:4

**Sustained** [2] - 520:6, 524:19

**sworn** [4] - 487:5, 527:20, 573:1, 573:22

**sympathetic** [1] - 573:17, 574:8, 574:13, 620:12

**sympathy** [1] - 574:13

**system** [2] - 503:4, 532:24

**T**

**table** [2] - 508:11, 550:1

**takeover** [1] - 493:5

**tale** [1] - 545:21

**talent** [2] - 542:10, 604:19

**Tamarisk** [1] - 593:11

**Tampa** [3] - 589:15, 589:20, 590:19

**tape** [1] - 545:21

**targeted** [1] - 493:20

**taught** [2] - 602:6, 602:10

**Taxes** [1] - 533:7

**teach** [2] - 514:3, 604:16

**teacher** [1] - 586:25

**team** [26] - 494:17, 494:23, 494:24, 495:21, 498:15, 500:15, 501:3, 501:19, 502:4, 503:5, 506:20, 507:5, 512:23, 515:9, 515:11, 515:14, 515:15, 515:18, 516:9, 532:14, 544:14, 549:16, 551:13, 569:10, 590:12, 591:16

**Team** [7] - 488:2, 488:5, 488:8, 488:16, 488:19, 500:11, 502:8

**team's** [1] - 494:19

**teams** [1] - 579:9

**technological** [2] - 591:1, 623:24

**technology** [7] - 489:18, 502:21, 536:9, 536:12, 536:14, 551:1, 551:10

**teleconference** [1] - 500:20

**Telephone** [1] - 483:13

**ten** [11] - 527:2, 527:5, 539:16, 540:3, 542:15, 560:18, 561:2, 561:6, 561:11, 563:11, 622:20

**ten-minute** [1] - 527:2

**tenure** [2] - 541:11, 545:16

**Teresa** [1] - 601:9

**term** [15] - 529:21, 533:6, 556:11, 586:7, 586:10, 594:7, 595:1, 596:21, 622:15, 626:13, 628:8, 629:17, 629:20, 629:24, 630:7

**terminal** [1] - 536:21

**terminals** [1] - 536:9

**terminate** [3] - 552:12, 564:2, 624:19

**terminated** [17] - 498:7, 502:11, 549:11, 552:25, 553:17, 554:6, 554:18, 559:3, 559:10, 564:5, 604:8, 604:24, 607:4, 608:7, 608:10, 626:9, 627:22

**termination** [7] - 538:10, 539:7, 553:16, 555:1, 601:18, 604:6, 606:1

**terminations** [2] - 496:14, 550:21

**terminology** [1] - 592:25

**terms** [10] - 499:15, 520:8, 538:11, 540:1, 544:3, 548:22, 569:21, 606:1, 617:24, 621:11

**terrible** [1] - 622:18

**terrific** [2] - 486:9, 617:3

**testified** [15] - 487:5, 490:25, 526:7, 527:20, 545:15, 556:16, 556:17, 560:19, 573:22, 575:8, 575:16, 575:17, 620:4, 620:6, 627:22

**testifies** [1] - 527:3

**testify** [9] - 485:16, 507:13, 520:13, 524:17, 535:9, 557:4, 572:15, 575:20, 613:19

**testifying** [1] - 583:9

**testimonial** [1] - 615:15

**testimonies** [1] - 545:13

**testimony** [35] - 485:3, 485:7, 485:8, 485:12, 485:18, 485:23, 504:9, 505:19, 508:20, 513:22, 524:4, 525:1, 525:13, 532:19, 533:6, 544:14, 545:12, 555:22, 556:10, 566:14, 566:16, 566:19, 566:24, 567:14, 567:22, 569:1, 569:19, 572:20, 583:16, 600:5, 610:19, 613:17, 616:21, 620:3, 627:21

**Texas** [1] - 482:17

**text** [7] - 507:10, 590:25, 591:12, 592:5, 592:7, 605:2, 605:7

**texted** [5] - 595:13, 596:6, 596:11, 596:17, 623:3

**texting** [2] - 624:2, 629:8

**the defendant** [4] - 520:9, 574:7, 615:12

**the times** [1] - 586:9

**theory** [1] - 624:3

**therefore** [1] - 603:5

**they've** [3] - 529:19, 598:11, 630:22

**thinking** [7] - 544:14, 555:20, 589:5, 613:4, 613:6, 613:22, 615:8

**third** [2] - 494:2, 496:14

**third-party** [1] - 494:2

**thoughts** [1] - 598:13

**thousand** [1] - 541:15

**three** [9] - 488:11, 541:5, 566:3, 588:19, 601:25, 603:17, 606:18, 616:20, 620:1

**throat** [3] - 548:23, 548:25, 560:24, 561:1, 585:17, 588:14, 590:20

**throughout** [1] - 503:14

**Thursday** [1] - 482:7

**thyroid** [1] - 589:18

**timing** [4] - 592:25, 611:23, 612:13, 615:3

**title** [1] - 497:13

**titled** [1] - 597:8

**today** [15] - 507:13, 508:20, 529:10, 530:9, 550:10, 556:17, 569:1, 570:3, 586:14, 602:25, 612:10, 615:23, 617:15, 623:24

**together** [9] - 492:5, 518:10, 544:7, 574:19, 586:9, 591:18, 591:24, 631:4, 631:18

**tolerate** [1] - 621:11

**tomorrow** [24] - 567:20, 567:24, 567:25, 568:22, 568:24, 569:3, 613:5, 613:9, 613:10, 613:11, 613:12, 614:4, 614:6, 615:9, 615:14, 615:15, 615:23, 617:16, 630:20, 631:1, 631:12, 631:15, 631:17, 633:9

**ton** [1] - 601:23

**tonight** [8] - 615:3, 631:6, 631:9, 631:10, 631:14, 631:16, 632:22, 633:3

**Tony** [6] - 588:15, 592:6, 592:7, 592:21, 593:17, 594:23

**Tony's** [1] - 605:11

**took** [30] - 489:10, 489:11, 494:2, 494:12, 497:1, 497:5, 498:18, 499:15, 501:17, 502:2, 503:3, 506:5, 510:15, 510:17, 521:4, 529:12, 550:23, 580:6, 580:20, 581:9, 582:25, 585:22, 586:13, 590:22, 592:12, 595:5, 602:3, 606:9, 607:15, 616:20

**tool** [2] - 495:23, 495:24

**top** [10] - 540:4, 542:15, 544:9, 560:18, 561:2, 561:7, 561:12, 563:11, 575:12, 582:19

**total** [5] - 496:14, 545:22, 606:14, 607:3, 607:10

**totality** [1] - 563:4

**totally** [5] - 583:2, 594:9, 628:22, 628:23, 629:3

**totals** [1] - 608:14

**toward** [1] - 606:4

_(towards - west)_

**towards** [1] - 580:15
**track** [5] - 530:16, 552:10, 552:13, 552:17, 553:1
**tracking** [2] - 551:25, 554:15
**traded** [1] - 552:5
**traditions** [1] - 484:12
**train** [4] - 494:10, 501:9, 537:5, 537:8
**trainer** [1] - 516:12
**trainers** [2] - 501:6, 501:9
**training** [39] - 487:25, 492:18, 493:19, 494:3, 494:8, 495:13, 497:14, 498:17, 498:18, 499:11, 499:20, 501:6, 501:10, 511:1, 511:4, 511:7, 511:10, 512:6, 512:7, 512:13, 512:21, 514:1, 514:2, 514:12, 516:10, 525:9, 535:12, 551:3, 557:14, 585:7, 585:11, 585:15, 595:20, 598:15, 599:2, 599:18, 600:12, 612:3
**Training** [24] - 488:2, 488:5, 488:8, 488:15, 488:19, 492:2, 494:11, 496:25, 498:3, 499:14, 500:11, 502:8, 510:4, 511:9, 518:7, 518:12, 518:17, 518:20, 518:21, 518:23, 519:4, 524:23, 535:10, 598:12
**TRANSCRIPT** [1] - 482:11
**Transcript** [1] - 483:15
**Transcription** [1] - 483:15
**transcripts** [1] - 545:12
**transferred** [4] - 519:4, 535:10, 536:8, 601:6
**transformation** [2] - 536:20, 589:9
**Transformation** [2] - 500:4, 500:6
**transition** [2] - 492:1, 495:15
**transitioning** [1] - 490:5
**travel** [2] - 491:15, 584:18
**traveling** [2] - 588:15, 597:24
**treated** [2] - 538:20, 548:22
**treatment** [2] - 539:1, 588:18
**treatments** [2] - 585:22, 588:10
**tremendous** [1] - 496:21
**tremendously** [1] - 620:11
**trial** [3] - 484:3, 556:18, 569:14
**TRIAL** [1] - 482:11
**tries** [1] - 486:10
**triggered** [2] - 598:2
**true** [1] - 624:24
**truncate** [1] - 490:18
**trusted** [1] - 593:18
**trusting** [1] - 592:22
**try** [17] - 490:17, 491:24, 545:25, 548:21, 554:25, 569:13, 583:15, 583:20, 589:24, 614:3, 617:12, 619:4, 619:8, 628:18, 630:5, 630:14, 631:16
**trying** [18] - 498:20, 511:10, 521:17, 542:7, 542:9, 542:10, 553:11, 556:15, 559:9, 574:25, 576:5, 581:1, 583:24, 595:16, 606:6, 615:8, 615:22, 627:9
**tube** [1] - 591:21
**Tuesday** [2] - 556:18, 616:14
**tune** [1] - 567:5
**turn** [3] - 577:2, 605:24, 609:3
**turnaround** [1] - 559:18
**turned** [2] - 539:19, 559:14
**turning** [2] - 539:15, 617:5
**turnover** [8] - 513:23, 514:20, 514:23, 515:7, 515:21, 515:23, 516:16
**twice** [2] - 489:9, 507:8

**two** [11] - 503:18, 509:20, 541:4, 563:21, 564:14, 566:25, 570:19, 589:18, 616:20, 617:4, 631:7
**type** [12] - 488:21, 496:19, 499:9, 516:10, 550:20, 598:23, 603:5, 617:24, 620:24, 621:6, 621:8, 624:12
**types** [1] - 499:11
**typically** [3] - 493:20, 524:12, 524:14

## U

**UK** [1] - 484:10
**ultimately** [3] - 514:19, 516:22, 529:11
**umbrella** [1] - 488:23
**unable** [1] - 628:23
**under** [27] - 488:3, 488:5, 488:8, 489:14, 497:6, 502:1, 503:21, 510:5, 513:1, 519:9, 538:17, 550:5, 570:24, 578:14, 596:10, 599:5, 600:15, 601:9, 620:7, 621:24, 624:5, 624:14, 628:3, 628:24, 630:3, 631:21
**undergoing** [1] - 624:11
**underneath** [3] - 506:7, 550:15, 550:17
**understood** [4] - 556:14, 593:19, 600:10, 603:25
**unheard** [1] - 620:8
**unit** [3] - 499:19, 598:18, 598:21
**Unit** [1] - 500:2
**United States** [5] - 482:1, 482:5, 482:12, 555:11, 555:12
**units** [5] - 496:22, 499:21, 598:20, 599:3, 601:3
**unless** [1] - 557:6
**unpaid** [4] - 624:22, 624:23, 625:1, 627:4
**unwind** [1] - 559:6
**up** [55] - 486:4, 486:25, 488:1, 489:11, 496:8, 499:1, 503:6, 516:12, 516:24, 519:16, 520:1, 525:2, 526:16, 527:15, 527:17, 528:3, 533:20, 541:18, 543:10, 543:13, 544:8, 545:17, 548:12, 549:6, 551:21, 556:2, 562:15, 562:22, 569:25, 574:6, 579:12, 590:13, 590:23, 591:4, 591:5, 591:6, 592:4, 592:20, 599:10, 599:23, 602:2, 602:25, 603:14, 604:14, 606:2, 606:10, 606:16, 607:19, 613:8, 617:23, 623:17, 623:24, 626:22, 626:24, 630:1
**updated** [2] - 591:7, 591:9
**updates** [2] - 525:15, 598:5
**ups** [1] - 624:10
**upset** [1] - 503:8
**URL** [1] - 503:4
**usage** [1] - 617:1

## V

**vacation** [1] - 594:3
**vaguely** [1] - 498:1
**value** [7] - 562:10, 569:23, 598:22, 601:5, 603:25, 604:1, 607:15
**various** [1] - 621:9
**vendor** [4] - 512:1, 539:17, 551:4, 551:5

**vendors** [1] - 494:2
**verdict** [3] - 630:21, 630:24
**versus** [2] - 484:4, 558:22
**vest** [1] - 586:4
**vested** [1] - 559:5
**viable** [1] - 586:14
**vibrating** [1] - 583:12
**vice** [8] - 509:7, 510:18, 528:15, 532:1, 543:10, 543:13, 543:24
**video** [5] - 492:21, 495:25, 598:4, 598:5, 624:1
**view** [10] - 493:6, 493:24, 503:11, 518:16, 532:3, 571:2, 583:23, 586:7, 591:18, 627:5
**violated** [1] - 574:11
**virtually** [2] - 587:17, 587:21
**Vision** [1] - 494:11
**vision** [1] - 550:5
**visit** [1] - 595:14
**visited** [1] - 518:18
**vocal** [1] - 588:14
**voice** [8] - 499:1, 528:3, 531:7, 583:9, 589:1, 589:17, 604:10
**void** [1] - 603:6
**voluntarily** [4] - 507:15, 507:17, 507:18, 586:23
**voting** [1] - 564:16
**Voycheske** [2] - 613:14, 613:15
**Voychevsky** [1] - 485:14
**VP** [4] - 497:6, 519:17, 519:23, 522:4
**VP's** [1] - 519:22
**VPs** [2] - 501:18, 501:21

## W

**wages** [1] - 606:19
**wait** [1] - 596:15
**waited** [1] - 588:12
**waiting** [2] - 484:25, 615:7
**walk** [2] - 564:20, 565:2
**Wall** [3] - 574:24, 575:3, 602:5
**wander** [1] - 553:13
**wandering** [1] - 552:23
**wants** [2] - 485:2, 566:24
**Ward** [1] - 601:9
**wasn't...** [1] - 495:18
**waste** [1] - 485:10
**wasting** [1] - 614:6
**water** [1] - 573:5
**ways** [5] - 549:14, 550:12, 564:12, 604:12, 629:25
**weak** [1] - 591:21
**Wednesday** [1] - 616:14
**week** [8] - 485:11, 550:22, 590:3, 598:18, 616:15, 616:21, 630:19, 631:13
**weekend** [2] - 589:22, 615:23
**weekends** [1] - 491:14
**weekly** [4] - 544:12, 599:15, 599:19, 600:3
**weeks** [6] - 570:3, 590:19, 590:24, 616:20, 631:7
**weight** [1] - 501:1
**welcome** [1] - 615:5
**were.** [1] - 493:20
**west** [1] - 517:19

*(Whalen - zero)*

**Whalen** [3] - 489:4, 489:11, 498:11
**Wharton** [1] - 602:10
**whatsoever** [2] - 611:24, 631:8
**wheel** [1] - 512:12
**whichever** [1] - 613:14
**whisper** [1] - 588:16
**white** [3] - 591:22, 592:1, 595:15
**whittled** [1] - 546:7
**whole** [16] - 516:5, 537:17, 537:18, 537:20, 541:13, 541:25, 544:19, 545:23, 553:17, 554:25, 556:4, 557:18, 563:20, 590:12, 630:4
**wide** [1] - 563:24
**wider** [1] - 542:25
**width** [1] - 610:2
**wife** [1] - 550:24
**willing** [1] - 569:22
**winner** [1] - 569:25
**wise** [1] - 631:14
**wish** [2] - 570:15, 632:22
**withdraw** [1] - 514:21
**witness** [20] - 485:16, 486:22, 487:1, 487:2, 487:12, 520:2, 526:21, 526:23, 526:25, 527:13, 527:16, 528:4, 556:17, 565:15, 567:22, 568:16, 573:1, 573:19, 573:21
**Witness** [3] - 487:1, 526:21, 527:16
**witness's** [1] - 505:19
**witnesses** [16] - 484:22, 485:9, 485:21, 566:7, 566:11, 567:20, 567:24, 568:2, 569:3, 613:9, 613:11, 613:12, 613:19, 615:12, 615:13, 616:24
**woman** [3] - 485:10, 523:23, 545:15
**wonderful** [1] - 595:21
**words** [7] - 506:7, 506:11, 506:15, 521:5, 521:7, 521:9, 524:10
**workers** [3] - 542:23, 542:24, 552:18
**works** [1] - 512:10
**world** [2] - 545:1, 597:24
**worth** [1] - 570:2
**wow** [1] - 604:11
**write** [6] - 505:13, 506:18, 524:14, 591:25, 620:25, 624:10
**write-ups** [1] - 624:10
**writing** [1] - 544:3
**written** [1] - 584:22
**wrongfully** [1] - 574:10
**wrote** [4] - 505:12, 506:7, 506:17, 587:19

## Y

**year** [12] - 507:8, 515:19, 515:25, 530:5, 530:6, 580:23, 582:7, 586:6, 586:24, 592:6, 606:13
**year's** [2] - 516:2, 582:21
**yearly** [1] - 487:21
**years** [19] - 487:21, 492:24, 492:25, 503:18, 529:20, 538:2, 539:10, 563:21, 574:16, 586:14, 587:19, 601:25, 603:21, 606:17, 607:2, 607:3, 607:11, 608:9
**yellow** [1] - 605:6
**yesterday** [5] - 496:9, 497:3, 585:25, 592:5, 609:22

**YORK** [1] - 482:1
**York** [6] - 482:5, 482:21, 483:10, 545:2, 603:17
**young** [1] - 508:14
**yourself** [3] - 514:25, 533:25, 586:23

## Z

**ZEITLIN** [6] - 482:18, 482:21, 508:7, 525:11, 570:2
**zero** [3] - 545:18, 622:8, 622:15