*842*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X
STEVEN B. BARGER,                    :  17-CV-4869(FB)
                                     :
         Plaintiff,                  :
                                     :
         -against-                   :  United States Courthouse
                                     :  Brooklyn, New York
                                     :
                                     :
                                     :
FIRST DATA CORPORATION, et           :  Monday, September 23, 2019
al.,                                 :  10:00 a.m.
                                     :
         Defendants.                 :
                                     :
                                     :
- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE FREDERIC BLOCK
UNITED STATES SENIOR DISTRICT JUDGE, AND A JURY.

A P P E A R A N C E S :

For the Plaintiff:       THE LAW OFFICE OF SHAWN SHEARER, P.C.
                         Attorney for the Plaintiff -
                         Steven B. Barger
                           3839 McKinney Avenue
                           #155-254
                           Dallas, Texas 75204
                         BY: SHAWN SHEARER, ESQ.

                         ZEITLIN & ZEITLIN, P.C.
                         Attorney for the Plaintiff -
                         First Data Corporation, et al.
                           50 Court Street
                           Suite 506
                           Brooklyn, New York 11201
                         BY: DAVID A. ZEITLIN, ESQ.

A P P E A R A N C E S: (Continued.)

                    SAUL EWING ARNSTEIN & LEHR, LLP
                    Attorneys for the Defendants -
                    First Data Corporation, et al.
                        500 E. Pratt Street
                        Baltimore, Maryland 21202
                    BY: GARY B. EIDELMAN, ESQ.
                        GILLIAN A. COOPER, ESQ.
                        MICHAEL CIANFICHI, ESQ.


                    BOND SCHOENECK & KING, PLLC
                    Attorneys for the Defendants -
                    First Data Corporation, et al.
                        330 Madison Avenue
                        39th Floor
                        New York, New York 10017
                    BY: LOUIS P. DILORENZO, ESQ.

Court Reporter:  Anthony D. Frisolone, FAPR, RDR, CRR, CRI
                 Official Court Reporter
                 Telephone: (718) 613-2487
                 Facsimile: (718) 613-2694
                 E-mail: Anthony_Frisolone@nyed.uscourts.gov


Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

*Proceedings*                                                    **844**

1          (In open court.)

2          COURTROOM DEPUTY:  You can be seated.

3          THE COURT:  We have the jurors here.

4          COURTROOM DEPUTY:  Civil cause on trial.  Steven

5    Barger.  Counsel present.

6          THE COURT:  I hope you all had a great weekend.

7          MR. EIDELMAN:  Your Honor, I walked across the

8    Brooklyn bring and then back across it was a lovely day.

9          THE COURT:  The judge had to come here last night to

10   carve out the charge and to deal with your individual

11   liability and you decided to withdraw that, right?

12         MR. SHEARER:  Yes, Your Honor.  We were doing the

13   same thing last night.

14         THE COURT:  Pardon.

15         MR. SHEARER:  Yes, Your Honor.  We just decided when

16   we were working that it just makes too much confusion.

17         THE COURT:  You're entitled to do that.  That's

18   okay.  But you -- probably age discrimination to victimize the

19   judge like that; right?

20         MR. SHEARER:  I apologize.

21         THE COURT:  Okay.  I'm going to give you an

22   opportunity to speak your pieces today.  You got the proposed

23   charge that I had to sit down and draft myself.  And we can

24   talk it over whatever you want to talk about, but first we're

25   going to finish the trial.  And the jurors are waiting for

*Proceedings*                                                       **845**

1    that to happen.  And, Mr. Shearer, you have some deposition

2    testimony you want to read in as the last part of your case.

3           MR. SHEARER:  Yes, Your Honor.  We have two

4    depositions.  One of them is probably less than five minutes.

5    The other one would be 20.

6           THE COURT:  Okay.  But your distinguished

7    adversaries know exactly what you're going to be doing, right?

8           MR. SHEARER:  Yes.

9           THE COURT:  We don't have to fuss about it --

10          MR. EIDELMAN:  Yes, we're fine with that.  He's

11   provide us with our designations.

12          THE COURT:  That's what I expect good lawyers to do.

13   Anything else we have to be concerned about before we bring

14   the jurors in?

15          MR. EIDELMAN:  I would like the record to be clear

16   about something and I'm not sure, Judge, how you deal with

17   this.

18          THE COURT:  Now, we need this before the jurors

19   come?

20          MR. EIDELMAN:  It relates -- I want to make clear

21   that on the record that Mr. Barger is voluntarily dismissing

22   with prejudice the following defendants.

23          THE COURT:  Just one second.  Why don't we just take

24   the jurors and use their time effectively.  And after that,

25   you got the proposed charge, you can make your applications,

*Proceedings*                                                          **846**

1    you can do whatever.  We don't do it --

2              MR. EIDELMAN:  That's fine, Judge.

3              THE COURT:  We don't it on the jurors' time.

4              MR. EIDELMAN:  Absolutely, Judge.  No problem.

5              THE COURT:  I know you're anxious to do it.

6              MR. EIDELMAN:  I just don't want it to change

7    between now and an hour from now.

8              THE COURT:  Bring the jurors in.  You.

9              (A brief pause in the proceedings was held.)

10             COURTROOM DEPUTY:  All rise.

11             (Jury enters courtroom at 10:11 a.m.)

12             THE COURT:  You're great jurors.  You've been so

13   attentive to your obligations to be here at the start and time

14   and we're grateful for that.  Today we're going to complete

15   the evidentiary part of the trial and I'm advised that

16   Mr. Shearer is going to do that by reading some deposition

17   testimony that may take about 20 minutes or 25 minutes and

18   then we'll take a little break I'll talk to the lawyers about

19   a couple of legal matters and then I anticipate right after

20   that we'll have our summations.  This is what I anticipate

21   happening.  I think our timeliness is pretty good.  I would

22   like to be faithful to what I predict initially, but we never

23   can tell when a case is going to end.  We can never tell when

24   your deliberations will take.  But we're pretty much on the

25   money.  But a lot of this was due to the excellent,

*Proceedings*                                                    **847**

1    professional work of the lawyers.

2            Now, they in addition to advocating zealously for

3    their clients, that's their ethical responsibility, and also

4    have an obligation as officers of the court to, you know,

5    cooperate with the judge and with each other when it's not

6    prejudicial to their clients.  But not, you know, objecting to

7    evidence which is going to be admitted anyway and things of

8    that nature.  All the lawyers have really discharged their

9    professional responsibilities in an exemplary fashion here

10   which I'm very grateful for and that's why there case has

11   taken maybe four or five days it try and not four or five

12   weeks.

13           So having said that, Mr. Shearer, you wanted to read

14   some depositions now.  Tell us what it is.

15           MR. SHEARER:  Yes, Your Honor.  The first deposition

16   is going to be of Alicia Parrish, the registered nurse that

17   works with Dr. Badoor.  The second one is Kathi Benhardt.

18           THE COURT:  Make sure you speak clearly so the

19   reporter can hear it as well as I and the jurors can hear it.

20           MR. SHEARER:  David is going to sit at the witness

21   stand.

22           THE COURT:  We're going to have question and answer

23   and Mr. Zeitlin is going to speak.

24           Who is this testimony from?  Who is Mr. Zeitlin

25   going to be?

1          MR. SHEARER:  He is Alicia Parrish, a registered

2    nurse that works with Mr. Barger's physician.

3          THE COURT:  And you are the registered nurse now,

4    okay?

5          MR. ZEITLIN:  Very good.

6          THE COURT:  Go ahead.

7    EXAMINATION BY

8    MR. SHEARER:

9    Q    Ms. Parrish, do you assist where on first page to says

10   that the beginning date for the period of incapacity is

11   October 22, 2016?

12   A    Yes, uh-huh.

13   Q    Do you see where it says that the return to work date is

14   March 1, 2017?

15   A    Yes.

16   Q    Do you know how this March 1, 2017, date was chosen?

17   A    I don't.  And also I know that's not my handwriting.

18   Q    Which part?

19   A    The March.

20   Q    March 1, 2017?

21   A    Uh-huh, yes.

22   Q    Is the right of it your handwriting?

23   A    The approximate date isn't and the return to work date

24   isn't.  Everything else is.

25   Q    So when you say "approximate date," do you mean Line 2

1  where it says, "April 1, 2016," as the approximate date

2  condition commenced.  That's not your handwriting?

3  A    Correct.

4  Q    And the return to work date of March 1, 2017, is not your

5  handwriting?

6  A    Correct.

7  Q    But the rest of the information on the first page of

8  Exhibit 1 is your handwriting?

9  A    Correct.

10  Q    Is any of this Kelly Sommer's handwriting that you're

11  aware of?

12  A    No.

13  Q    So it's fair to say you completed this form minus those

14  two areas we just discussed?

15  A    Yes.

16  Q    Reviewed it with Kelly and then Kelly signed it?

17  A    Yes.

18        MR. SHEARER:  That's discussing Plaintiff's 101

19  which is already in evidence.

20        And then Plaintiff's 109 was handed to Ms. Parrish.

21  Q    Do you recall how you came to choose January 17th as his

22  return to work date?

23  A    I do not.  It sounds like it was a week later.  That can

24  be my only rationale, but I have no idea.

25  Q    This form indicates January 17, 2016.  Did you mean to

1  say 2017?

2  A    No, that's an error.

3  Q    You meant to say 2017?

4  A    Correct.

5          MR. SHEARER:  Then the witness was then handed what

6  is Plaintiff's 110 which is not in evidence yet.

7          THE COURT:  Just one second.  109 is in evidence.

8          MR. SHEARER:  Yes.

9          THE COURT:  Now, 110 is being referenced and there

10  is no objection to it so we'll allow it in evidence.

11          (Plaintiff's Exhibit 110 was received in evidence

12  as of this date.)

13          THE COURT:  Go ahead.

14  Q    This is Emory 0097 through Emory 0102.  I wanted you to

15  take a look at the page that's marked Emory 0101 at the

16  bottom.

17  A    Yes.

18  Q    Do you know whose signature that is?

19  A    Emily Shah.

20  Q    Who is Emily Shah?

21  A    That was Dr. Badoor's nurse practitioner.

22  Q    Does she regularly fill out forms such as this which is a

23  physician's questionnaire from MetLife?

24  A    No.

25  Q    Who usually fills these out?

1  A    I do.  The nurses.

2  Q    Is there any reason why you think she would have filled

3  this one out instead of you?

4  A    She didn't, I did.  She signed it.

5  Q    You did it and then she signed it, okay.  This is

6  consistent in the very first line where it says, "Date the

7  patient was advised to cease work," it's 9/6/16; is that

8  correct?

9  A    Correct.

10  Q    But on 9/6/16, the surgery was performed in Tampa;

11  correct?

12  A    Correct.

13  Q    So it wouldn't have been your office that advised him to

14  is cease work on that date?

15  A    Correct.

16  Q    Right?

17  A    Correct.

18  Q    Because you then note, "Patient had surgery at an outside

19  facility," on 9/6/16; correct?

20  A    Correct.

21  Q    Back on Page 0101, is that your writing in subsection E?

22  A    Approximately nine hours per day?

23  Q    Yes.

24  A    Yes.

25  Q    Can you read that then, E?

1  A    "Patient can work a total of approximately nine hours per

2  day."

3  Q    Then is that your handwriting on the date at the bottom?

4  A    Estimated return, yes.

5  Q    Right next to Dr. Emily Shah's signature, there's a date

6  on this document.  Do you see that?

7  A    Yes.

8  Q    So it says it's dated 1/23/17; correct?

9  A    Correct.

10          MR. SHEARER:  That's it for Ms. Parrish.

11          Next deposition is of Kathi Benhardt of First Data.

12  EXAMINATION BY

13  MR. SHEARER:

14  Q    What have your roles been at First Data over those

15  13 years?

16  A    I started in an HR business partner role.  I moved into

17  our global workforce planning effort.  I led an employee

18  relations function.  I managed our North America HR Generalist

19  Team and I currently lead our global workforce planning and

20  analytics function.

21  Q    What is your definition of a reduction in force as is

22  used inside of First Data?

23  A    It would be a situation where we have identified

24  individuals whose roles and positions are impacted and

25  eliminated.  It may have include a realignment of those

1   positions which results in impact to that abilities or that

2   individual's ability to continue, you know, in their current

3   role so they would ultimately exit the organization.

4   Q    How many reductions in force did you analyze during the

5   period of January of 2016 through January of 2017?

6   A    We ultimately had one large event that kicked off at the

7   end of 2016 and moved into the first quarter of 2017.

8            MR. SHEARER:  I then handed the witness what was

9   Plaintiff's 124.  I offer that in evidence.

10           THE COURT:  124 is the head count report --

11           MR. SHEARER:  Yes, Your Honor.

12           THE COURT:  -- that you talked about?

13           There's no objection to it so we'll have it in

14   evidence now.

15           (Plaintiff's Exhibit 124 was received in evidence

16   as of this date.)

17   Q    I'm going to start on the bottom e-mail which takes up

18   most of this.  Now, the bullet right before, can you read this

19   bullet right before the next chart?

20   A    The note?

21   Q    Yes.

22   A    "Note OAs have grown by 646 which makes us the 15th

23   consecutive work of OA growth."

24   Q    And he's referring to 2016; is that correct?

25   A    Yes.

1    Q    And what's the date of this e-mail?

2    A    December 16th.

3              MR. SHEARER:  I handed the witness what is will

4    Plaintiff's Exhibit 84?

5              THE COURT:  84 is that in evidence yet?

6              MR. SHEARER:  I believe so, your Honor.

7              THE COURT:  84 is in evidence.

8              MR. SHEARER:  Okay.

9    Q    So on Greenwich Mean Time, I don't know it's before noon

10   on Saturday January 7th, I believe.  Can you read the first

11   paragraph?

12   A    "I'm happy to work with finance and build a true and

13   accurate budget which accounts for active head count, name by

14   name at year-end level, number of jobs, and cost.  The budget

15   attached to each leader's plan needs to include each position

16   with the exact expense tied to each and every role.  This is

17   the only way I can see leaders accurately being able to

18   management self-funding -- I guess that was a typo -- for any

19   hires and we use that to make approvals on the job."

20   Q    Then two paragraphs below that, if you could read that

21   the, "I think."

22   A    "I think the reality is even on a one-for-one replacement

23   is people don't care or pay attention that the rehire costs

24   more and, therefore, they need to cut other costs to find that

25   increase."  I guess I meant to write, "fund," that increase

1   and forget that we overhire.

2   Q    So explain what you're trying to get across to you.  What

3   does it mean, "Rehire costs more"?

4   A    I'm trying to explain that you can maintain a flat head

5   count level.  You can start the year with a hundred people and

6   end the year with a hundred people, but if you hire or replace

7   positions with people that make even a penny more you'll blow

8   your expense line.

9              THE COURT:  Go slower.

10  A    So I'm saying that people need to be thoughtful and not

11  only thinking that and stayed at the same head count and

12  retain the same number of jobs but that it was -- but that is

13  at the same cost.

14             MR. SHEARER:  I then gave the witness Plaintiff's

15  Exhibit 87.

16             THE COURT:  We'll have that in evidence at this

17  time.  No objection.

18             (Plaintiff's Exhibit 87 was received in evidence as

19  of this date.)

20  Q    Start at the bottom again and her e-mail is sent

21  Wednesday, January 11th, at 10:11 a.m. Eastern Standard Time

22  to Mr. Marino.  And then it says that she wants to confirm

23  whether Steven should stay below the line and whether there is

24  a special package for him outside of the year-end.  And the

25  subject line is Steve Barger.  So would you agree that the

*Deposition Read-in - K. Bernhardt*                    **856**

1   Steve referenced here is Steve Barger?

2   A    Correct.

3   Q    Okay.  When were you working with Eileen, or was she

4   working with you and putting together all of your numbers for

5   the event and the impact?

6   A    She was not preparing information.  I was sharing

7   information with her because we had people that were being

8   exited in the middle off comp planning cycle.

9   Q    Okay.  And then you forward this on to Karen, Karen

10  Whalen, with a statement, "See below.  Making sure we're in

11  sync."  Why did you go and Karen Whalen need to be in sync on

12  Mr. Barger's compensation?

13  A    I received his name at various points prior to

14  January 11th for the owner associated impact list and wanted

15  to redirect on Karen on status and what the situation was.

16          MR. SHEARER:  I then gave the witness what are

17  Plaintiff's Exhibits 88 and 89 and those are not in evidence

18  yet.

19          THE COURT:  No objection here.  So we have them in

20  evidence at this time.  88 and 89.

21          (Plaintiff's Exhibit 88 and 89 was received in

22  evidence as of this date.)

23  Q    You've got before you what is Exhibit 208 and what was

24  previously marked in prior depositions as Exhibit 57.  They're

25  both labeled "OA Impact Analysis."  Can you basically describe

1    what these documents are?

2    A    These are summaries that I and members of my team prepare

3    to provide an overview of number of people included and the OA

4    action.  The costs, timing, and details associated.

5    Q    Okay.  Now, the Exhibit 208 has a date of January 11,

6    2017.  Would that be the date that it is created?  Would that

7    be the date that it is finalized?  What does that date mean?

8    A    It would likely reference a creation date.

9    Q    Who were these OA impact analyses distributed to when

10   they were completed?

11   A    I would distribute them to Tony Marino and the senior HR

12   business partner team along with Amy Steffen, probably some

13   members of our compensation group, and likely this

14   information, on some occasions, when to Frank Bisignano and

15   from him on to Patel.

16   Q    So the numbers that are included in all these tables

17   would be the best numbers that you would be accurate based on

18   the information you have on January 11th?

19   A    Correct.

20   Q    Okay.  The first page.  Can you describe what

21   these -- what the two tables on Page 2 of Exhibit 208?

22   A    Top chart indicates notification time lines.  So when

23   will employees be notified of a decision related to their role

24   detailed out by the various lines of business across the

25   company.  And the bottom chart is a summary of the same total

*Deposition Read-in - K. Bernhardt*          **858**

1  number of impacted individuals, but it highlights how many

2  people by level would be receiving a termination package

3  versus people who with resignations or exiting the company

4  without any additional payment.

5  Q    On the top chart, which is the timeline, where did you

6  gather the numbers to populate all these columns?

7  A    This is based on a combination of the data that would be

8  submitted to us from the HR generalists as they provided us

9  with names as to when they would be notified and communicated

10  to.  And then the termination or on notice information we

11  carpal the with our HRIS systems against termination details.

12  Q    So on this Exhibit 57 is dated January 19, 2017.  So I

13  want to take a look at, well, I guess on the information

14  timeline, one more question.  It lists week of January

15  incident 9th; week of January 16th; week of January 23rd, and

16  it's weekly through February 27th and then March and April.

17  Who identified which week someone would be notified?

18  A    The HR generalists submitted that information to us and

19  would have been consulting and preparing those dates with

20  managers.

21  Q    Okay.  I want to take a look at the line on this

22  notification timeline on both Exhibits 208 and Exhibit 57.  So

23  on your report for January 11th, Exhibit 208, Global Business

24  Solutions, it says under week of January 9th that there are

25  going to be zero notifications; correct?

1   A    That's correct.

2   Q    Okay.  And then on Exhibit 57, which is on January 19th,

3   it continues to say Global Business Solutions, zero

4   information notifications the week of January 9th; is that

5   correct?

6   A    That's correct.

7   Q    So between January 11th and January 19th, no one was

8   notified to be terminated in Global Business Solutions?

9   A    I didn't have anyone with that date on my list.

10           MR. SHEARER:  Then give the witness what is

11   Plaintiff's Exhibit 92.  I would like to enter that in

12   evidence.

13           THE COURT:  Okay.

14           (Plaintiff's Exhibit 92 was received in evidence as

15   of this date.)

16   Q    So if we look at Steve Barger's line here on

17   Document 48222, it says, "Package, involuntary, not for

18   cause."  What does that mean?

19   A    It means that he received a termination a letter.

20   Q    That he had received a termination agreement or what is

21   it?

22   A    That was the disposition of his situation was he

23   involuntary, not for cause, versus someone who might have been

24   submitted to us who had resigned.

25   Q    Okay.  I guess let's look -- at even though there are a

*Deposition Read-in - K. Bernhardt*          **860**

1   lot of redactions look at the top line over on Columns F and

2   G.  You've got, no, I'm sorry, let's look at F, G, and H,

3   okay, and it says, "Date added to file."  Okay.  So the

4   notification date is 12/16/16 for Row 2, Column F; correct?

5   A    Yes.

6   Q    What does that mean?

7   A    That's the date that they intended to communicate the

8   decision and the information to the owner associate.

9   Q    And then the notice end date what does that mean under

10  Row G?

11  A    The person would be on a notice period and this would be

12  their essential last day working at the company.

13  Q    And then H is date added to file and this one is

14  11/30/16.  What does that mean?

15  A    That's the date that we Would have received the name.

16  Q    So we go then down to Mr. Barger and indicates in Column

17  F his notification date is 1/13/17; correct?

18  A    Yes.

19  Q    And the date added to file Column H is 1/17/17; is that

20  correct?

21  A    Correct.

22  Q    So Mr. Barger was added to this file on January 17, 2017?

23  A    To this file, yes.

24  Q    Now, this does this -- what other -- so on 1/17/17, you

25  added that he had been notified on January 13th?

1    A    Correct.

2    Q    Okay.  If you look down, how many -- if you scroll down

3    here, I can hardly find anywhere where the "added to file"

4    date is after the notification date.  Why would Mr. Barger be

5    added to this file after the notification date when it would

6    represent less than 20 of these where I would represent less

7    than 20 of these.  The added to file is before the

8    notification date?

9    A    On occasion, we do receive names that -- of individuals

10   that have already been communicated to.  We may have

11   individuals in our file that are planning to be notified on a

12   particular day and that notification is adjusted and were

13   communicated that information afterwards.  You might find

14   someone's going to be on vacation and they say, "We're going

15   to, we're going to meet with him a day or two early because we

16   can't meet with him next week."

17   Q    Okay.  I want to look real quick at a few lines here just

18   so you can help me understand.  Row 87 in the notification

19   date Column F it says 5/31/15 and then same with 88 includes

20   9/15/15.  90 says 5/31/15 and then 94 says 5/31/15.  Why are

21   these 2015 notifications included in this event?

22   A    I can't answer that specifically without knowing the

23   names of individuals.

24   Q    But they -- are you trying -- is it an attempt to pull a

25   resignation from two years prior into the event?

1   A    Again, I can't determine that without knowing exactly who

2   it is to evaluate why or what the circumstances are.

3   Q    So who would provide you the notification date

4   information that's included in this chart?

5   A    The HR generalist.

6         MR. SHEARER:  That's it, your Honor.  Your Honor,

7   that completes the reading of the deposition.

8         THE COURT:  Are you finished now?  Okay.  Great.

9   Anything else?

10         MR. SHEARER:  That's it, your Honor.  The plaintiff

11   rests.

12         THE COURT:  Okay.  Fine.  Now, Mr. Eidelman, I know

13   that we had witnesses called out of turn to accommodate them

14   that was part of your case.  Is there anything els you wish to

15   present to the jury before we tell they have now heard all of

16   the evidence in the case.

17         MR. EIDELMAN:  Your Honor, we did take some

18   witnesses out of turn as the Court knows.

19         THE COURT:  Right.

20         MR. EIDELMAN:  Which would constitute the witnesses

21   that we would call in the case on our case.

22         THE COURT:  Right.  We told the jurors that.

23         MR. EIDELMAN:  We told the jurors that.

24   Mr. Shearer, having rested, we do have a Rule 50 motion that

25   we would make outside --

*Proceedings*                                                    *863*

1          THE COURT:  Anybody else you wish to produce as

2    witnesses:  Live testimony, deposition testimony, documents?

3          MR. EIDELMAN:  No.

4          THE COURT:  Okay.  So, members of the jury, you've

5    heard all of the evidence in the case now.  And so, we're

6    going to take an little early break because I have to talk to

7    the lawyers about some legal things we have to deal with at

8    this stage of the proceedings and it shouldn't take too long

9    maybe 15, 20 minutes.  And when we reconvene we'll have our

10   summations.

11         So I told you before but let me tell you again now:

12   Since the plaintiff basically has the burden of proof just

13   like the plaintiff's lawyer went first for the opening

14   statements, the plaintiff's lawyer will also speak first for

15   summations or concluding remarks, however.  And I think I told

16   you, and I caution you again, that what a lawyer says is not

17   facts, you know what the facts are, you have access to them if

18   you don't recall them.  But sometimes the lawyer

19   enthusiastically may possibly misstate a fact.  Sometimes that

20   happens, the other lawyer may get up and say, "I object"

21   because it's not correct.

22         By talking to you like this, I try to minimize those

23   situations by giving you these instructions because,

24   otherwise, I like to have each lawyer have the chance to speak

25   to you without unnecessary interruptions.  If something does

*Proceedings*     **864**

1   have untoward and the lawyer feels very strong about making an

2   okay while his adversary is speaking, well, we'll deal with

3   it.  But by talking to you like this I think it minimizes the

4   chances that that might happen.

5        So, once again, the lawyers are going to be

6   enthusiastically trying to tell you why you should find in

7   their favors, right, their client's favor.  And whatever they

8   say is just lawyer argument.  If it resonates with you, fine.

9   If it doesn't, fine.  It's up to you to assess it all.  And

10  what a lawyer says is not factual, no evidence at all, you

11  understand that the facts are now that you heard the evidence

12  you have.

13       So, with that, we'll take a little break.

14       Now, after the plaintiff, Mr. Shearer, is going to

15  sum up first, Mr. Eidelman, are you going to be summing up

16  four your client for Mr. DiLorenzo?

17       MR. EIDELMAN:  Mr. DiLorenzo.

18       THE COURT:  And then somebody has to get the last

19  word in so that we give the plaintiff, since the plaintiff has

20  the burden of proof, the opportunity to get the last word in

21  and he can have a brief rebuttal.  And a rebuttal is exactly

22  what the word sounds like.  It's to rebut what may have been

23  said in this case by Mr. DiLorenzo during his arguments and

24  it's not to be a repeat of the plaintiff's primary summation.

25  And then you'll have everything that you need to know from the

*Proceedings*                                    **865**

1   lawyers and the evidence.  And the only thing remaining would

2   be for the judge to come down instruct you on the law and to

3   send you off to start your deliberations.

4           I don't know how long the summations are going to

5   take, I don't want to put any time pressure on anybody, but it

6   may not be a bad idea just to give me general sense,

7   Mr. Shearer what you think.

8           MR. SHEARER:  I haven't given it for practice, but I

9   would guess probably an hour.

10          THE COURT:  And Mr. DiLorenzo, an equal amount of

11  time or less?

12          MR. EIDELMAN:  I little bit less I hope, your Honor.

13          THE COURT:  The reason why I say that it would be

14  possibly doable to get the summations in before the lunch

15  break.  And then I imagine that I might be explaining the law

16  to you and it will take about a half hour ether before lunch

17  or after launch depends on how things break.  I'm not putting

18  the lawyers under any time constraints.  We have all the time

19  and it's the way things worked out well.  It's perfect we do

20  this on Monday.

21          And Mr. Innelli, are you there?

22          COURTROOM DEPUTY:  Yes.

23          THE COURT:  I think we should bring lunch in today.

24          COURTROOM DEPUTY:  Okay.

25          THE COURT:  So today the government is feeding you.

1   It's a way of the government thanking you for service, I

2   suspect, and we're not going to be able to give you flaming

3   crepe suzettes but I think we'll have nice food from our

4   commissary downstairs for you.

5          I mentioned this before, probably mention it one

6   more time, that, you know, when you're eating, if the case is

7   all presented to you, and I tell you you can start your

8   deliberations, you don't have to do that until after lunch,

9   you can do it while you're eating.  You have to all be there

10  together when deliberations happen.  But we'll talk a little

11  bit more about that in my concluding remarks.

12         At the present time, just be patient.  There will be

13  little bit of time.  We'll come get you in 15, 20 minutes from

14  now.

15         COURTROOM DEPUTY:  All rise.

16         (Jury exits courtroom at 10:38 a.m.)

17         (A recess in the proceedings was taken.)

18         THE COURT:  Okay, folks.  I have a revised verdict

19  sheet.  I have the revised jury instructions.  I eliminated

20  any reference to the individual defendants.

21         Now, you otherwise it's pretty much what I sent to

22  you with one exception on Page 13.  I have burden of proof

23  that I've eliminated that.  I think the burden rests with the

24  plaintiff all the time.  And otherwise, I'll ask Mr. Shearer

25  first if you have anything of substance or significance that

*Proceedings*                                              867

1   you want to talk about.  This is sort of our charging

2   conference.  I want to make sure that you have everything you

3   need to have so that you can go forward with your summations.

4          MR. SHEARER:  Yes, Your Honor.  I submitted a

5   letter --

6          THE COURT:  You have to speak a little louder for me

7   to understand what you're saying.

8          MR. SHEARER:  I submitted a letter this morning with

9   the comments on one of them.

10         THE COURT:  Just tell me what you have a problem

11  with now.  Let's go right to it, we don't want to keep the

12  jurors waiting longer than necessary.

13         MR. SHEARER:  On Page 15.

14         THE COURT:  Okay.  15.  So, fine, the first 14

15  pages.

16         What is it that you're concerned about on Page 15?

17         MR. SHEARER:  I agree with the first two and a half

18  sentences, but where it starts, "The defendant proved by a

19  preponderance of the evidence."

20         THE COURT:  What is it now?

21         MR. SHEARER:  The portion of that instruction that

22  says, "The defendant proved by a preponderance of the evidence

23  that the termination was due to its reduction in force as I

24  previously explained to you."  I think that's an inaccurate

25  statement of law that 29 CFR --

*Proceedings*                                                         *868*

1          THE COURT:  You don't agree with the statement that

2     the termination, therefore, was unlawful unless the defendant

3     proves by a preponderance of the evidence that it was due to a

4     reduction in force.  So it's not the defendant's burden, I

5     guess.

6          MR. SHEARER:  No, I agree it's the defendant's

7     burden.  But the defendant's burden under the regulation,

8     825.216.

9          THE COURT:  So the burden of proving the

10    determination was due to its reduction in force.  What do you

11    say, Mr. Eidelman?  Is that your burden, or is that not your

12    burden.

13         MR. EIDELMAN:  It is our burden, your Honor.

14         THE COURT:  It is your burden.

15         MR. SHEARER:  It's their burden to show that he

16    would have been terminated prior to requesting a

17    reinstatement, that's what 825.216 is.  Being in the RIF in

18    and of itself --

19         THE COURT:  I think this charge is substantively

20    correct about that.

21         MR. SHEARER:  He was in the RIF after he requested

22    reinstatement.  I don't believe 825.216 applies.

23         MR. EIDELMAN:  We're back to his strict liability

24    argument, your Honor.

25         THE COURT:  I don't understand what you're saying.

*Proceedings* **869**

1    MR. SHEARER:  Then the mitigation instruction.  I

2   just didn't understand why it was in there.  I don't think

3   there is any evidence.

4    THE COURT:  First, you can make whatever claims you

5   think you want to make if you disagreed with anything on the

6   charge, so I don't know whether I'm clear about what you agree

7   with.  I think that is correct to say that termination,

8   therefore, was unlawful unless the defendant proves by a

9   preponderance of the evidence that it was due to its reduction

10  in force.  I think that's exactly what your point is.  Should

11  I say that the termination was lawful?

12    MR. SHEARER:  No.  My point is just the regulation

13  doesn't refer to any particular reason why someone wasn't

14  terminated.  It's their burden to show that he would have been

15  terminated prior to his request for reinstatement had he been

16  employed.

17    THE COURT:  Look, this is a termination here was

18  because of the reduction in force.  That's this case.  No

19  other issue here, okay?  He's not claiming that he would have

20  been terminated for other reasons other than the reduction in

21  force as I understand this case.

22    MR. SHEARER:  Right.  But 825.214 talks about that's

23  not an excuse in the case of a restructuring.  If the event is

24  a restructuring, he's still entitled to the restoration under

25  825.214.

*Proceedings*                                     *870*

1              MR. EIDELMAN:  That is not what that regulation

2    says.

3              THE COURT:  You have your exception.  Next.

4              Anything else?

5              MR. SHEARER:  I don't think there's any evidence

6    that --

7              THE COURT:  I am going to ask counsel -- I hear a

8    lot of evidence about mitigation.  What's your position?  Can

9    he eliminate that?

10             MR. EIDELMAN:  Our position about mitigation is that

11   on cross-examination from Mr. DiLorenzo, Mr. Barger claims

12   that he plugged in all this information to some program that

13   is -- that we don't have and he said he reduced amounts one

14   way or another.  We don't know what numbers were, so I

15   think --

16             THE COURT:  I'm going to leave it.

17             MR. EIDELMAN:  Thank you, Judge.

18             THE COURT:  Now, what is this section that you say

19   makes my charge incorrect?  I don't understand what you're

20   saying.  Section what?

21             MR. SHEARER:  It's the interaction between the

22   regulation 29 CFR 825.214.

23             THE COURT:  29 CFR 825.214.

24             MR. SHEARER:  The last sentence of that regulation.

25             THE COURT:  And what does it say?  Read it.

*Proceedings*                                                          871

1          MR. SHEARER:  It says even if an individual --

2          THE COURT:  Can you please show that to me and to my

3    law clerk.

4          MR. SHEARER:  It says, "An employee is entitled to

5    such reinstatement even if the employee has been replaced or

6    his or her position has been restructured to accommodate the

7    employee's absence."

8          THE COURT:  So your position is that even if there

9    is a reduction in force, and that doesn't make any difference,

10   you would still be entitled to the reinstatement.

11         MR. SHEARER:  If it's considered restructuring, yes.

12         MR. EIDELMAN:  That is not what the regulation says.

13   He's leaving out words.  He's leaving -- it says,

14   "Restructured to accommodate the employee's absence.  There is

15   no evidence in this case that position was restructured to

16   accommodate his absence.'  The evidence actually is in 216.

17   And in 216, Judge, in the instruction that you gave us on

18   Friday, it actually talks, it gives four examples.  And that's

19   why we actually asked that it be put in.  It says in 216, and

20   we had given this to your law clerks previously and that talks

21   about under the FMLA, an employee has no greater right to

22   reinstatement or to other benefits and conditions of

23   employment than if the employee had been continuously employed

24   during the FMLA leave period.  An employer must be able to

25   show and it's our burden that an interview would not otherwise

*Proceedings*                                              872

1   have been employed at the time reinstatement is requested in

2   order to deny restoration of employment.

3           THE COURT:  Stop.  I'm not going to give it.  It's

4   wordy.  We're giving the jury a pristine charge that I spent a

5   lot of time reducing to simple language so the jury can

6   understand it.  This entire case has been litigated on the

7   issue of whether or not there was a lawful termination by

8   reason of a reduction in force.  That's it.  That's what the

9   jury is going to know and that's what this case is about.  I

10  don't think it's about anything else other than that, okay?

11          You have your exception.  We'll take a look at it

12  again.  I just don't see where it relates to this particular

13  case.  What else?  We'll leave in mitigation do you have

14  anything else.

15          MR. SHEARER:  On the jury verdict form.

16          MR. EIDELMAN:  Can we do the instructions first,

17  Judge?

18          THE COURT:  Let's hear the instructions.

19          (Discussion held off the record.)

20          THE COURT:  Okay.

21          MR. EIDELMAN:  Couple things in the charge you

22  provided us on Friday and again.

23          THE COURT:  Forget about that.

24          MR. EIDELMAN:  You're right.  It also showed up last

25  night.  Is that in your charge you have that one of his claims

*Proceedings*                                                    873

1   is that he was discriminated against when it terminated his

2   employment under the ADA.  That is not a claim in this case.

3              THE COURT:  Just one second.

4              MR. EIDELMAN:  Page 11, Judge.

5              THE COURT:  Just one second.  My view is there are

6   two ADA claims.  One is that his e-mail was revoked while he

7   was on medical leave and two he was thereafter terminated.

8              MR. EIDELMAN:  He is not making a claim that he was

9   terminated in violation of the ADA.  His only claim is that he

10  was put on leave and that his ADA access was revoked.  There

11  is no claim.

12             THE COURT:  I don't have that view of this case.  I

13  mean, it's all about termination he was terminated.

14             MR. EIDELMAN:  Your Honor, Mr. Shearer, on behalf of

15  Mr. Barger, has represented to this court in filings that his

16  claim is not that his client was terminated because he was

17  disabled.  I have a bench memo on which cites to -- when he

18  represented to this court on numerous indications.

19             THE COURT:  Let me hear from Mr. Shearer.

20             MR. SHEARER:  I have written that before, yes, I

21  have.

22             THE COURT:  And what do you say about that?

23             MR. SHEARER:  I agree.  I haven't been making that

24  claim up until I've seen the evidence that came in today.

25             THE COURT:  Today?

*Proceedings*                                                    *874*

1              MR. SHEARER:  This week.

2              MR. EIDELMAN:  You saw the jury charge.

3              THE COURT:  Just one second.  I'm not aware that you

4    withdrew that claim, all right?  But if that's what you did,

5    I'll eliminate to it.

6              MR. SHEARER:  Yes, Your Honor.  In the summary

7    judgment motion, I believe is probably what he's referring to.

8              MR. EIDELMAN:  Actually, no.  You did it two weeks

9    ago when you wrote a letter to the judge when you said, I am

10   not making in claim.  That is not Mr. Barger's claim.

11             THE COURT:  So, if that's the case, we're only going

12   to have one ADA claim and that's the e-mail access, right?

13             MR. SHEARER:  Yes.  I think it's two things.  It's

14   the forcing of leave and the simultaneous cutting of access.

15             THE COURT:  It happened at the same time.  It's one

16   event.  He was on leave, he was denied e-mail access; he was

17   on leave.  I think we got it down correctly.  I will eliminate

18   under the ADA any termination claim now that I understand you

19   have made that representation and I will eliminate that.  And

20   the only damages that I can sense, if you're correct on your

21   ADA claim for the denial of e-mail access, is punitive.  I

22   don't see any other damage claim here.  That's what I have

23   here.

24             MR. SHEARER:  The forcing of leave turned out to be

25   a de facto termination.

*Proceedings*                                                    *875*

1          MR. EIDELMAN:  What?

2          THE COURT:  What?  Mr. Shearer, you're all over the

3     place.

4          MR. SHEARER:  He was forced on to leave.

5          THE COURT:  And he was forced on leave and at the

6     same time his e-mail access was denied.  That was your claim.

7     He was not claiming he was wrongfully terminated.

8          MR. SHEARER:  He was terminated while he was on

9     leave.

10         THE COURT:  What are you talking about?

11         MR. SHEARER:  He was terminated while he was on

12    leave.

13         THE COURT:  That's your FMLA claim.

14         MR. SHEARER:  Right.  But, your Honor, when they

15    forced him on to leave and then terminated while he was on

16    leave.  The forcing of leave is the equivalent of the

17    termination.  He wasn't working, he was on short-term

18    disability.

19         THE COURT:  You're claiming now that there is a

20    termination claim here under your ADA?  What are you saying?

21         MR. SHEARER:  I believe the forcing of unpaid leave

22    or leave on disability is then termination of him while he was

23    on leave makes the forcing of the leave the equivalent of a

24    termination.

25         THE COURT:  I'm a little confused.  What do you say

1  about that?

2          MR. EIDELMAN:  I have no idea what he is saying.

3          THE COURT:  Yes.

4          MR. EIDELMAN:  You know, he's -- first of all, it

5  was Mr. Barger who submitted a return to work authorization

6  with no restrictions and then he was then notified, even

7  though the decision had been made previously, he was then

8  notified.  So he couldn't have been on ADA leave.  According

9  to your theory, he couldn't have been on ADA leave at the time

10 he was notified because your client submitted a return to work

11 authorization on January 10th that says he is released with no

12 restrictions.  And then he was notified on the 13th.  He can't

13 be -- your theory doesn't make any sense.  I don't understand

14 it.  I've never understood it from the beginning.

15         THE COURT:  I don't understand it either.  You're

16 all over the place, Mr. Shearer.

17         MR. SHEARER:  No.

18         THE COURT:  You have your exception.  What do you

19 propose I do on the charge?  Do you have language to support

20 your strange theory here?

21         MR. SHEARER:  No, Your Honor, because I was fine

22 with the termination language in there but if it --

23         THE COURT:  Wait a second.

24         MR. SHEARER:  If you want -- if that's coming out

25 because you're correct I wasn't saying he was terminated

1   because of his disability.  I'm saying he was terminated

2   because he was on leave and that he tried to come back.

3          THE COURT:  Mr. Shearer.

4          MR. EIDELMAN:  That is not his claim.

5          THE COURT:  Stop it.  You just agreed that you're

6   withdrawing your termination claim here under the ADA.  You

7   just agreed to that.

8          MR. SHEARER:  I agree, your Honor.

9          THE COURT:  That's the way it is.

10         MR. SHEARER:  Okay.

11         THE COURT:  Okay.  I was willing to give you that.

12  I didn't realize you had withdrawn it, all right?  So that's

13  out.

14         What else do you want to say?

15         MR. SHEARER:  My comments are on the verdict form.

16  If he has more on the instructions.

17         MR. EIDELMAN:  I do have something else on the

18  instruction, Judge.

19         THE COURT:  Let's go.

20         MR. EIDELMAN:  And that is, and we put it in what we

21  sent to the clerk, to your clerks this morning, and I

22  apologize for the timeliness, Judge, is the following.  Is

23  that there no basis nor a punitive damages instruction to the

24  jury in this particular case and if I may be heard on this.

25         THE COURT:  Punitive damage instruction on what

*Proceedings*                                                    *878*

1    issue?

2              MR. EIDELMAN:  The only punitive damages he can get

3    in this case would relate to the ADA because there's no

4    punitive damages under the FMLA.

5              THE COURT:  We're not saying that he is.

6              MR. EIDELMAN:  Here's his ADA claim.  His ADA claim

7    is:  I was put on leave and my access was revoked.  He has it

8    prove by a preponderance of the evidence that the actions of,

9    and now it's only First Data, because it's against -- ADA is

10   only against First Data.  That the actions against First Data

11   were malicious and willful.  The unrefuted testimony in this

12   case is the following and we're not disputing that the -- his

13   theory is it's the act of putting him on but not the reasons

14   behind it.  Mr. Barger testified --

15             THE COURT:  I'm going to stop you now.  Look, I can

16   always throw it out.  All right.

17             Now, if I do agree with you then there's no ADA

18   claim at all because there's no damages, right?

19             MR. EIDELMAN:  I guess.

20             THE COURT:  If there is no damages for denying his

21   e-mail, e-mail that doesn't constitute an ADA claim to the

22   jury.

23             MR. SHEARER:  I guess I'm not understanding why

24   there aren't punitive damages.  There is evidence of that.

25             THE COURT:  I'll let you argue.  But in the absence

*Proceedings*                                                    *879*

1   of punitive damages, you don't have any ADA claim because

2   there's no damages to your client.

3            MR. SHEARER:  Well, we have a violation of the ADA,

4   yes, we do.

5            THE COURT:  And what would be the remedy for that

6   violation?

7            MR. SHEARER:  I think Mr. Barger testified work is

8   his life and forcing him on to leave, taking his work away,

9   that took away his meaning.

10           THE COURT:  What?

11           MR. SHEARER:  His compensatory damages.

12           THE COURT:  You never asked for compensatory

13   damages.  I scrutinized your papers and there is no claim for

14   compensatory damages.  I was thinking whether to give it.

15   You're all over the place here.  You made it very difficult

16   for me to manage this trial.

17           I want to show you last night between 6:00 o'clock

18   and 9:00 o'clock at night, I scrutinized every one of your

19   papers to see whether you made a compensatory damage claim, I

20   didn't see it.  Now, you're telling me for the first time you

21   want it.

22           MR. SHEARER:  I thought I was in the complaint, in

23   the supplemental complaint.

24           MR. EIDELMAN:  Judge, first of all, besides the

25   evidence not supporting it, he had a pity party for two days

*Proceedings*                                          **880**

1    he said.  And then he's been back to work and everything has

2    been great.  There is no evidence of emotional distress and

3    compensatory damages.

4              THE COURT:  Where is the evidence of that?  He said

5    he was fine, he had no problems at all.

6              MR. SHEARER:  He said he was not working, work is

7    his life.  They took that away from him.

8              THE COURT:  Here's what I will do then.  Listen to

9    me.  I have to manage this in a way so I don't have to try

10   this case again.  Sometimes, it's difficult for a judge to do

11   this when you're dealing with counsel that's all over the

12   ballpark.  Let me try the best I can to avoid any problems

13   after the verdict.  I will put under the ADA claim a

14   compensatory damage claim.  I will let it survive or not, it

15   remains to be seen.  It may well be that it's all going to be

16   academic as a practical matter.  But that's why we will

17   reserve on that issue.  If the jury comes in with anything

18   about punitive damages or compensatory damages, I'll have an

19   opportunity thereafter taking a very, very scrutinized look

20   this paperwork to make sure we get it down exactly correct.  I

21   think that's what I should do.

22             MR. EIDELMAN:  Your Honor, for the record, I take an

23   exception to the inclusion of both compensatory damages and

24   the punitive damages instruction.

25             THE COURT:  You have a right to make that exception.

*Proceedings*                                    **881**

1    I'm going to reserve on it.  And if I have to reach that issue

2    and do it I may well agree with you.  What we try to do as you

3    know is to make sure as a trial judge that we have a clear

4    record and that we we'll be able to deal with these issues

5    afterwards.  That's what we do, okay?  So we're going to add a

6    compensatory damage claim and it'll be the regular

7    compensatory damage charge that we normally give, okay?

8            What else, Mr. Eidelman?

9            MR. EIDELMAN:  So, your Honor, we have the jury

10   verdict form which your clerk just gave us that we want to

11   take a look at.

12           THE COURT:  Yes.

13           MR. EIDELMAN:  For the record, Ms. Cooper has a very

14   brief Rule 50 motion that we'd like to make for the record.

15           THE COURT:  Certainly.  But let me just structure

16   this.

17           MR. EIDELMAN:  Okay.

18           THE COURT:  So I'm going to just, you know, edit the

19   verdict sheet by eliminating under the ADA claim the word

20   "remote" because we don't mention remote.  We just say an

21   e-mail access in the charge.  That's just a little bit of a

22   technical change.  And I think that's all I have here.  The

23   important thing that you have the understanding of how you're

24   going to handle your summations.

25           What else?

*Proceedings*                                              *882*

1          MR. EIDELMAN:  On the second page of the verdict

2   form:  Is First Data liable under the ADA for terminating

3   plaintiff's employment?  We agree that should come out that's

4   C.

5          THE COURT:  That has to be changed, right?

6          MR. EIDELMAN:  I right.  I think it -- you said you

7   wanted to put in a compensatory damages --

8          THE COURT:  Wait.  This is the FMLA claim.

9          MR. EIDELMAN:  No, it's the ADA, Judge.  1C is the

10  ADA.

11         THE COURT:  Yes, that has to come out.

12         MR. EIDELMAN:  That has to come out.

13         THE COURT:  We agreed.

14         MR. EIDELMAN:  We agreed.

15         THE COURT:  What else?

16         MR. EIDELMAN:  Then E should come out because that's

17  out now.

18         THE COURT:  It's all out.

19         MR. EIDELMAN:  It's all out.

20         THE COURT:  The termination is out.

21         MR. EIDELMAN:  So, your Honor, we put this in, and I

22  think in the FMLA, it says, "For terminating plaintiff's

23  employment."  The actual language is "failing to restore his

24  position," which ties in with the regulation that says,

25  "Rights to restoration," and the exception to rights to

1    restoration.  I think it's more accurate because I suspect the

2    parties are going to be arguing on both sides that's it's a

3    failure to restore him to his position and then the exception

4    to the failure to restore.  That would be our comment, I

5    think, on that.

6              THE COURT:  Let's stop for a second.

7              My object here is to present to the jury in simple

8    form, okay.  And I spent a lot of time taking 45 pages and

9    reducing it to three or four page.  It's not an easy thing to

10   do.  The jury has heard throughout this whole trial:

11   Termination by reason of reduction in force.  So I would like

12   to give them that consistent language.  If I throw something

13   new to them right now it can confuse them.  I don't see

14   anything substantively of any significance when I talk about

15   was there a lawful reduction in force.  That's what you're

16   talking about.

17             MR. EIDELMAN:  Your Honor, we'll gear our closings

18   to use that language.

19             THE COURT:  Yes.  And if I don't get it then I'll

20   get reversed.  As far as I'm concerned, this case is all about

21   when he was on medical leave.  Maybe he had one more day to go

22   before he was terminated.  Maybe he had three more days to

23   work.  He was medical leave.  He can't be terminated from his

24   employment while he's on medical leave.  And was there a

25   lawful termination or not by reason of the reduction in force?

*Proceedings* **884**

1    That's all I think this case is about.

2         MR. EIDELMAN:  That's fine.

3         One thing, Judge, because I do think it is -- I

4    don't know how the Court will deal with it otherwise is, you

5    have given us the After Required Evidence Instruction.  We've

6    instructed the jury how they are to apply it if they find it.

7    But if they go ahead from a consistency standpoint.  If they

8    go ahead and get to the question of back, and they put it in

9    there, if they answer the question as a legal matter, did you

10   find after acquired evidence, yes or no?  Then I think the

11   Court would be compelled then to use that as a remittitur to

12   get it right because I think it is as a matter of law.  So

13   that's why we just ask yes or no, did we prove after acquired

14   evidence?  Because I think it makes -- what it really does is

15   takes away any uncertainty and gives the Court guidance.

16        THE COURT:  You can say the backpay and what you

17   will not know whether or not it was they considered this after

18   acquired evidence.  I explained it to them in the charge.  So

19   I don't like to carve out separate questions unless there

20   really is a necessity to do that.  If we have sometimes the

21   issue of whether or not the police officer, in the performance

22   of his duties, was objectively reasonable.  Sometimes we have

23   to deal with qualified immunity issues.  There's a real reason

24   to carve out separate questions because the Court has to

25   decide the issue of qualified immunity as a matter of law at

1    least to get the information from the jury so you have

2    separate questions.  This is not that type of case.

3              MR. EIDELMAN:  I actually think, Judge, it would be

4    a matter of law for the Court to ultimately apply after

5    acquired evidence.  If the jury finds it as a matter of fact

6    then it becomes a matter of law for the Court and I'm just

7    suggesting --

8              THE COURT:  If they find that it's after-the-fact

9    evidence, why can't they consider that in deciding?

10             MR. EIDELMAN:  They can.  If going through your

11   instructions.

12             THE COURT:  I'm not going do it to.

13             MR. EIDELMAN:  Okay.  Thank you, Judge.

14             THE COURT:  What I want to do, though, you have --

15   anything else, Mr. Shearer.

16             MR. SHEARER:  One comment on the very first question

17   on point that says revoke e-mail access.  It was more of an

18   edit.  There's video conferencing and a lot of other things

19   besides e-mail were cut.  I would say remote access.

20             THE COURT:  What language do you want?  We put it as

21   the e-mail access I thought that was the primary issue.  You

22   want to expand it to something else?

23             MR. SHEARER:  I would call it "remote access to

24   First Data's systems."

25             THE COURT:  I'm willing to do that.  Revoke

*Proceedings*                                    *886*

1    plaintiff's e-mail access.  What is it that you propose to

2    say?

3              MR. SHEARER:  He also did video conferencing

4    through.

5              THE COURT:  What do you propose in terms of

6    language?

7              MR. SHEARER:  I said, "Plaintiff's remote access to

8    First Data's systems."

9              MR. EIDELMAN:  We're okay with that, Judge.

10             THE COURT:  Let me change it.  Revoke plaintiff's --

11   give me the language again.

12             MR. SHEARER:  Remote access to First Data's systems.

13             THE COURT:  Revoking plaintiff's.

14             MR. SHEARER:  Systems.

15             THE COURT:  Data systems?

16             MR. SHEARER:  Systems.

17             THE COURT:  Plural.  So it would be for revoking

18   plaintiff's access to First Data's systems, plural.

19             MR. SHEARER:  Yes.

20             THE COURT:  Mr. Eidelman, you're satisfied with

21   that?

22             MR. EIDELMAN:  Your Honor, we have no objection to

23   that.

24             THE COURT:  I'm going to change that throughout the

25   charge as well, all right?  As well as on the verdict sheet.

*Proceedings*                                                      *887*

1          All right.  Okay.  Anything else.  Mr. Shearer, you

2     keep tossing things at the 11th hour here.  You're just

3     fumbling all over the place.

4          What else do you want me to consider?

5          MR. SHEARER:  That's it, your Honor.

6          THE COURT:  Now, I want to do one thing here on

7     record now.  And there was an issue here as to whether or not

8     September 4th was the date that he was placed on leave.

9          Mr. Eidelman argued that's the case and I didn't

10    charge that and I'm not using that in this charge.  I want to

11    explain why now on the record and here's my decision in

12    respect to that issue.

13          "As a matter of law, the earliest that the plaintiff

14    could have been on FMLA leave was October 24, 2016.  His

15    doctor said he was unable to work as of October 22nd, a

16    Saturday, and his requested leave began the following Monday.

17    Under the FMLA, once an employer has enough information to

18    know that an employee is eligible for FMLA leave, the employer

19    has five business days to start the clock on an employee's

20    12 weeks of allotted leave time, "Absent extenuating

21    circumstances."

22          And I cite 29 CFR Section 825.300(d)(1).

23          Now, continuing.

24          "First Data does not dispute that it knew Mr. Barger

25    was undergoing surgery on September 4th and it says certainly

*Proceedings*                                                    *888*

1    had knowledge of the serious medical conditions prior to

2    October 22, 2016.  Because First Data failed to designate

3    plaintiff's leave as FMLA leave within five business days, it

4    may not now claim that the leave began on September 4th.

5             Also, First Data cannot retroactively designate that

6    date because that would, "Cause harm of injury to the

7    employer," in violation of 29 CFR Section 825.301(d)."

8             All right.  I wanted to make it clear on the record

9    exactly what my ruling was since the defendant took the

10   position that the leave start on September 4th, okay.  So you

11   have the record on that.

12            MR. EIDELMAN:  Your Honor, if I just may?  Just for

13   the record.

14            We had take exception to that ruling on the grounds

15   we believe it is a question of fact for the jury but we

16   understand the Court's position.

17            THE COURT:  I want the record to be clear.

18            MR. EIDELMAN:  Yes, understood.

19            THE COURT:  Let's take 15 minutes now while I

20   reflect upon these changes that have to be made.  But you

21   understand enough now to go ahead with your summations and

22   I'll make these changes in due course, but the ruling can be

23   in bout 15 minutes.

24            You want to make the Rule 50?

25            MR. EIDELMAN:  We do.

*Proceedings*                                                     *889*

1        THE COURT:  Why don't we do this?  It's indicated on

2   the record that you want to make it at this time.  After the

3   case is presented to the jury, they commence the deliberations

4   you can spread it on the record whatever reasons you want to

5   support that application.

6        MR. EIDELMAN:  That would be fine, Judge.

7        One last thing.  I would like to get on the record

8   before we break that the plaintiff, Steven Barger, is

9   voluntarily dismissing with prejudice Frank Bisignano, Dan

10  Charron, Anthony Marino, Rhonda Johnson, Karen Whalen, and

11  Laurie Graesser.

12       THE COURT:  I think that's appropriate to put that

13  on the record since we were going to allow the jurors to

14  consider whether the individual defendants who were named were

15  liable.  And we carved out a charge to deal with that issue.

16  This morning, I was advised that Mr. Shearer has decided not

17  to seek liability gets any individual party.

18       Is that correct, Mr. Shearer?

19       MR. SHEARER:  That's correct, your Honor.

20       THE COURT:  I think the record is clear about that.

21       MR. EIDELMAN:  Thank you.

22       THE COURT:  That you for bringing that to my

23  attention.

24       MR. EIDELMAN:  Thank you.

25       THE COURT:  Anything else we need to talk about?

*Proceedings*                                    *890*

1        MR. SHEARER:  I will be filing a Rule 50 as well.  I

2   want to preserve and it's going to be on the basis my summary

3   judgment motion as a matter of law.  They can't terminate him

4   once he turned in his doctor's note.

5        MR. EIDELMAN:  Okay.

6        THE COURT:  Even if there is a lawful reduction in

7   force?

8        MR. SHEARER:  Yes, your Honor.  I believe that the

9   handing in of the doctor's note triggers the obligation to

10  reinstate.

11       THE COURT:  You can make whatever arguments you

12  want.  Let's take 15 minutes and we'll reconvene at 11:30.

13  We'll have Mr. Shearer's summation at that time.

14       Mr. Innelli, notify the jurors we'll get together at

15  11:30 at that time.

16       (A recess in the proceedings was taken.)

17       THE COURT:  You have the verdict sheet and the

18  charge is going to be revised in accordance with our

19  conference.  And I think that you know, Mr. Shearer, exactly

20  what it is all about.  So you can start your summations now,

21  take a lunch break after, then see how it goes, okay?

22       MR. SHEARER:  Okay.

23       THE COURT:  Let bring the jurors in.

24       (A brief pause in the proceedings was held.)

25       COURTROOM DEPUTY:  All rise.

1          (Jury enters courtroom at 11:49 a.m.)

2          COURTROOM DEPUTY:  Be seated.

3          THE COURT:  Mr. Shearer, let's have your summation

4    now.

5          MR. SHEARER:  Thank you, guys, for putting in this

6    week.  We appreciate it; Mr. Barger appreciates it.  It takes

7    a lot of work to sit here and listen to this and look at all

8    this evidence.

9          Mr. Barger has been trying to tell his story for

10   over two years now.  He finally got the opportunity to have

11   somebody listen and decide exactly whether he's right and it's

12   a big responsibility.  I think the evidence -- I think we did

13   exactly what I told you I was going to do last Monday.  I told

14   you that there were only two things that are important, and I

15   also told you that once those two things get said, the rest of

16   the trial is going to be about all the excuses and trying to

17   make up a good reason for what is an otherwise an illegal

18   action.

19         There's two things that I mentioned to you.  The

20   first one was they forced him to go on to leave against his

21   will.  I said that that violates the ADA.  The second is they

22   failed to restore him after he produced his doctor's note.

23   You've got to remember That the conditions under which he went

24   on leave was you can go on -- you have to go on leave and you

25   can't come back until you get your doctor's note.  He did

1   exactly that.  He produced his doctor's note on January 10th

2   and he was terminated on Friday, January 13th before he could

3   return to work the Tuesday of the following week which was the

4   first business day of the following week because Monday was

5   Martin Luther King Day.

6           Now, I went through Mr. Barger's background and

7   there's no reason to go over it again, but Mr. Barger has been

8   working his entire life.  He's never taken a vacation day.

9   He's never taken a sick day.  He's always been going to work.

10  Work is his life and to remove him from that, Mr. Barger said,

11  gave him less of a purpose and he didn't have anything to do

12  because he always wanted to be working.  And that is it in and

13  of itself harmed Mr. Barger before we even get to the lost pay

14  and his inability to work.

15          Before getting into the specifics of everything, I

16  just want to give an overview of their excuses.

17          We talked a the about successors.  I still don't

18  understand how that is relevant or what it exactly means.

19  Yes, Mr. Barger was looking for a successor but so is

20  everybody else in the company.  There are succession plans, I

21  don't understand where it's going, I'll be interested to hear

22  from them in their summation as to why they think that should

23  even be considered.

24          Then we hear a lot about a RIF or reduction in

25  force.  When I go through this, I'm going to explain to you

1    that really it's not a reduction in force, it's a rotation in

2    force.  All that occurs at First Data is they terminate large

3    chunks of people just to rehire them, and it's a cute little

4    accounting trick and it's turning into be a nice little

5    attempt to defend a legal argument that they violated the FMLA

6    by going -- having these constant RIFs.

7          Remember Mr. Cagwin?  He said that he'd been there

8    about five years.  He said there'd be a vast majority of the

9    quarters of his five years, there had been a reduction in

10   force or a restructuring involving the termination of enough

11   employees that there is at least $5 million in severance paid

12   that quarter.  That's over and over and over, quarter after

13   quarter, terminating large chunks of people just to turn

14   around, rehire them, or as Mr. Cagwin said, use the savings to

15   go buy another business which has employees so the number of

16   employees stayed pretty constant the entire time, compensation

17   expenses have gone up.  It's just a churn, a churn, a churn

18   and now it's becoming an excuse for not complying with the

19   Family Medical Leave Act and an excuse for not complying with

20   the Americans with Disabilities Act.

21          If you allow a company to do that, they essentially

22   immunize themselves from ever needing to comply with the FMLA

23   or the ADA simply because they're constantly firing large

24   chunks of people and they just say, Well, you were on the

25   list.  And, all of a sudden, they don't have to comply with

1    the FMLA anymore.

2            It's not a real RIF, it's a rotation in force and

3    it's being used for accounting purposes and for legal defense

4    purposes, and it's not for showing up in the financial

5    statements.

6            Now, I just want to when you go back, you're going

7    to be given the exhibits that we've, well, you'll be given an

8    opportunity after the exhibits.  And the way that the

9    defendants and the plaintiffs kind of organization our

10   exhibits a little bit different.  The defendants are more

11   chronological in the way that they are.  Ours are organized a

12   little bit by topic and.  Even though we didn't get all the

13   exhibits in, I just kind of wanted to let you know how our

14   exhibit list works.

15           If you could, Mr. Innelli.

16           These are the topics that we had covered.  The first

17   few exhibits, there are two or three of them in there, are

18   First Data's corporate documents.  Things like the employee

19   handbook, the FMLA policy.  The next section is preemployment

20   documents that's going to be Mr. Barger's consulting business

21   and invoices related to that.  The next category there is what

22   happened when he wasn't ill and before the surgery.  Then the

23   surgery to forced leave, how he was interacting.  E-mails with

24   him interacting with his employees.  The e-mail about cutting

25   off his access and things around the intent to return.  And

1   you can take a look at those if you like.  Like I said, not

2   all of the these are in evidence, but those are the gaps in

3   the numbers if you want to try to find something, that's the

4   way to find it.

5           Now, the story began with the relationship between

6   Joe Plumeri and Mr. Barger over their 30- 40-year career on

7   Wall Street.  When the two -- I think Mr. Barger described

8   them as Batman and Robin.  Wherever Joe went, Steve went along

9   with him.  And so, the two have worked side by side in some

10  gigantic financial institutions, Citigroup, Primerica,

11  Shearson.  They've worked side by side, they know each

12  another.  Joe Plumeri has been his superior at all of those

13  jobs and Joe Plumeri would be approving his compensation at

14  all those jobs.  Joe knows and has paid Mr. Barger before.

15  And for the defense to come in and somehow say that

16  Mr. Plumeri has been tricked by his buddy for the last

17  40 years is ridiculous.  Mr. Barger and Mr. Plumeri have been

18  golf buddies, work buddies and really best friends for decades

19  and decades.  And I don't think there's any evidence to the

20  contrary that's been presented.

21          Both of them testified that they trusted each other

22  and that they worked with each other.  They both had the same

23  comments about what value means, about how to implement

24  cultural, changes across an entire organization not just

25  within a sales department.

*Summation - Mr. Shearer*                           *896*

1        Now, you have to remember that Mr. Plumeri was on
2   the board of directors at Liebenthal.  And we saw that
3   Liebenthal presentation which was Mr. Barger's proposal to
4   consult with Liebenthal at the same time that roughly after
5   that presentation, Mr. Plumeri came to Mr. Barger and asked
6   him to enter into a consulting arrangement with First Data
7   instead of going with Liebenthal.  And the Liebenthal
8   presentation is essentially what Mr. Barger was asking Joe to
9   effectively match and make sure the economics of working for
10  First Data are about the equivalent of the economics for
11  working for Liebenthal and that was done in different ways.
12        But overall, the idea was to make Mr. Barger at
13  least whole to turn down Liebenthal instead of going turn down
14  Liebenthal and go to First Data.  Mr. Barger, also testified
15  that going to First Data to consult full-time was going to
16  cause -- require him to get red rid of his existing clients,
17  and he had a number of clients.  If you saw on that revenue
18  schedule, that Grant briefly looked at, his clients were
19  Merrill-Lynch, UBS, and banks like Fifth Third.
20        These were large institution they had all paid
21  Mr. Barger prepayment possess for consulting services and he
22  was going to have to go and return those funds, cancel the
23  contracts, get out of what he had agreed to do.  And Joe knew
24  that and Joe worked with him on how to figure that out.
25        So Joe effectively matched that Liebenthal offer and

1    agreed to $30,000 a month in consulting fees.  After a few

2    months of Mr. Barger's work as a consultant, Joe Plumeri said

3    he wanted him full-time.  And he talked about how full-time

4    was more important to him.  It was not only full-time, he's

5    also an employee subject to confidentiality, not talking to

6    other clients, his time is focused only on First Data.  And

7    so, after seeing Mr. Barger's work for $30,000 as a

8    consultant, Mr. Plumeri came to Mr. Barger and asked him to be

9    an employee at $40,000 per month plus all the benefits that go

10   with if the and the bonuses and he was trying to get

11   Mr. Barger to leave his consulting business and become an

12   employee of a large company once again.

13          Joe Plumeri knew what value Mr. Barger would bring

14   to First Data and he also knew what value was going to be

15   needed in order to consent Mr. Barger to leave his consulting

16   business.  And that's exactly what's did.  He decided that it

17   was $40,000 per month plus his bonus.  The other thing is Joe

18   Plumeri was a vice chairman of First Data, and there is

19   testimony from both Mr. Marino and Mr. Bisignano regarding the

20   authority of the CEO and the authority of other officers

21   inside of First Data.

22          Mr. Bisignano said anything over 250,000 has to be

23   approved or at least seen by the CEO before it can be done.

24   But he also said that Joe Plumeri wasn't subject to that.

25   That Joe Plumeri could enter into these agreements and he did.

1   Like Mr. Barger testified, Joe and him had oral agreements

2   between the two of them for their entire career.

3          So let's go through the let's start with our claims.

4          They're making a claim under the Americans With

5   Disabilities Act that the forcing of Mr. Barger's leave along

6   with the simultaneous cut-off of Mr. Barger's access to

7   First Data's systems, and his inability to work on First Data

8   business violated the Americans With Disabilities Act.

9          What the Americans with Disabilities Act prohibits

10  is a covered employer, which there's in dispute First Data is,

11  are not allowed to discriminate against an otherwise qualified

12  individual because of a disability with respect to the terms

13  and conditions of employment.

14         And the issues that are going to be coming up, and

15  you will be instructed by Judge Block, so that's a qualified

16  individual because of a disability and regards to the terms

17  and concerns and privileges of employment.

18         The plaintiff's position is that on November 19,

19  2016, when defendant Marino texted plaintiff Barger to inform

20  him he was being required to commence leave that at that time

21  Mr. Barger was a qualified individual, and that by forcing

22  leave and cutting access were adverse actions.

23         And Judge Block will explain that to you.  But we

24  can look at it this way and that is if you negatively impact

25  the terms and conditions of employment.  Things like salary,

*Summation - Mr. Shearer*                                    *899*

1   things like work responsibilities.  If you take an action to

2   diminish those, solely because of a disability, you violated

3   the Americans with Disabilities Act.

4           Now, in Plaintiff's 35, Exhibit 35.  This is those

5   text messages.  It very clearly Mr. Marino very clearly

6   states, Mr. Barger, here, right around here, asks "What will

7   it do to my salary and bonus?"  And Mr. Marino responds,

8   "There's no impact on the bonus.  Salary will be reduced once

9   your paperwork is submitted."

10          So Mr. Marino is telling him, telling him your pay

11  is going down.  He also says above that they held off on this

12  as long as they can.  He's not supposed to work here.  And

13  down here Mr. Barger says, "Does this mean I can't go to

14  meetings?"  And the response back to that is, "Yes, this means

15  you need to shut it down for a little while."

16          I think all of those actions:  The taking away of

17  his responsibilities, the disconnecting him from the

18  First Data systems, and reducing his pay all because of his

19  disability.  And Mr. Marino admitted that.  He said that the

20  reason Mr. Barger was forced on to leave was because of his

21  disability, because of his condition, and they were worried

22  about him wanting to heal himself and take some time to focus

23  on his health.

24          The same witnesses testified that they knew work was

25  Mr. Barger's life and they took away what he enjoyed the most,

1    and that is continuing to work and they took away his pay, and

2    they reduced his pay.  They put him on disability and they

3    also cut him from his ability to communicate with his team at

4    First Data.

5              Is Mr. Barger a qualified individual?

6              Now, you'll be instructed on this, but the first

7    part of it is:  Does Mr. Barger have the education and the

8    skills, the background in order to perform his position?  I

9    think the answer to that, I think, is an absolute yes.  The

10   second question, and I think the defendants are going to

11   contend, that the plaintiff could not perform the essential

12   functions of his job and, therefore, he was not qualified on

13   November 19th.

14             Now, that becomes a difficult one to determine when

15   the essential functions of his job have never been defined.

16   They weren't given to him, there was no written job

17   description we've seen.  I asked the doctor in his deposition

18   when we were reading that whether he knew Mr. Barger's job

19   responsibilities.  He didn't know, First Data never gave him

20   those listings.

21             There's no way for you to determine whether

22   Mr. Barger had essential functions of the job.  What we do

23   know is that Julie Kelly testified that even while in the

24   hospital and while at home, he continued with his

25   responsibilities on team meetings.

1          The evidence has shown, and I'll show you some

2    e-mails, that Mr. Barger continued to make decisions as to his

3    staff, hire, staff structure, all while he was at home or

4    while he was at the hospital.  They haven't indicated anything

5    that Mr. Barger wasn't doing that would be essential.  They've

6    pointed out some undocumented complaints about him, a weight

7    comment, taking one of his employees to rehab, appearing

8    shirtless.  None of those are the essential functions of the

9    job.  Essential functions of the job are managing his team,

10   taking care of the budget, take cake of hires, taking care of

11   the reporting, and there's no evidence that Mr. Barger was

12   failing to do that.

13          Now, maybe they didn't like the way he did it.  They

14   may think he wasn't that great of an employee on that, but

15   that doesn't mean he wasn't doing it or wasn't capable of

16   doing it.  The question isn't his execution, the question is

17   his capability.  And I would submit that Mr. Barger did an

18   excellent job.  That these excuses are being brought up after

19   the events in order to justify or excuse the behavior because

20   if First Data really cared about Mr. Barger's performance,

21   there would be a written performance review.  They would be

22   able to show you documentation of these events.  They can't.

23   We've been here a week and not one single document, not one

24   single e-mail, not one single report indicating any of their

25   allegations about Mr. Barger's performance are true.  It is

1   just these witnesses up here testifying that that's what they

2   heard or that's what somebody reported to them.

3           But this is the HR at a huge company.  Those should

4   be documented those should be in Mr. Barger's personnel file,

5   they're not.  There should be in Rhonda Johnson's outgoing

6   e-mail.  They produced a ton of documents.  60 something

7   thousand pages I went through.  And not one, not one, has

8   Rhonda Johnson discussing Mr. Barger on any of the topics that

9   they brought up.  There's no evidence.

10          (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        MR. SHEARER:  As further example, when you look at

2   what was Plaintiff's Exhibit 24 -- I'll come back to those.

3   Why not just go through those now.  This is back with Joe

4   Plumeri and one of the reasons why I believe Mr. Barger was

5   forced on leave and his access cut, which was why we got into

6   this discussion, was right here, Mr. Barger talked about it.

7   Mr. Plumeri -- Mr. Barger forwarded the text messages from

8   Tony to Joe basically trying to say, what's going on, I

9   can't -- my income can't be cut, I can't take a salary hit.

10  And Mr. Plumeri's answer is:  Big company stuff.  I

11  understand.  We'll get it from the insurance side.

12        Now, Mr. Plumeri, I guess, believed -- just

13  confirmed here -- that First Data was concerned about the

14  possible expense of Mr. Barger remaining working.  Was it

15  going to be they're going to have to insure him?  Was he going

16  to go onto the company medical policy?  When were those

17  expenses going to begin hitting First Data?  And they wanted

18  him out on -- forced him onto leave in an attempt to avoid

19  some of the expenses, at least that's what Mr. Plumeri seems

20  to be saying to me.

21        Now, this is the forced leave letter that also gets

22  us here, and this was signed by Tony and sent on November 18th

23  and this is Plaintiff's Exhibit 36, and this is right here,

24  this is the negative, this is the adverse employment action

25  where he can't work until the doctor comes in and that

1  provides him to focus his time and energy on the recovery.

2           Then in the second paragraph, second page, Mr. --

3  the underlined portion, Mr. Marino indicates that Mr. Barger's

4  pay will stay the same for 14 days, and then after that, he's

5  going -- it's cut and he's going on short-term disability

6  benefits.  That's an adverse employment action, because it

7  says down below down here short-term disability is 66 and

8  two-thirds, and long-term disability is 50 percent, so even if

9  he's receiving benefits under the disability program, it's

10  still a cut in his pay and still an adverse employment action.

11          This has to do with the cutting off of access and

12  it's this email right here from HR Solutions which is inside

13  of the HR department, and the experts on a lot of this, kind

14  of -- Jennifer Voycheske, who was here yesterday, you don't

15  know if she's the one that actually sent this one or someone

16  else on the staff there, but at this point on November 22nd,

17  she still hasn't gotten the paperwork and she says:  Shutting

18  off access -- right here -- is not something we normally do.

19  They retain access but are advised that they can't work.

20          And this is Plaintiff's Exhibit 35:  If that's not

21  the normal practice and it's unique to Mr. Barger and

22  Mr. Barger is being placed on leave and having his access cut

23  because of his disability, First Data is going outside of

24  their normal policies and procedures for the sole purpose of

25  cutting Mr. Barger's access, the practice that they don't do

1    with anybody else.

2           Now, we were talking about whether Mr. Barger was a

3    qualified individual, and as Julie Kelly testified, he

4    continued to work; as Mr. Barger testified, he continued to

5    work; as Mr. -- his son, Grant Barger testified, the plaintiff

6    continued to work the entire time he was in the hospital and

7    at home.  This email right here -- Steve tells his team on

8    September 8th -- and remember the surgery was September 6th --

9    he tells his team on September 8th that he's hooked up to the

10   internet and he's ready to go.

11          Now, I know some people may think that's a little

12   overboard, you just had your larynx removed, but that is

13   exactly the type of person Mr. Barger is.  He immediately, as

14   soon as he woke up and was off the anesthesia, started

15   emailing and texting and started to get back into work.

16          Now, as I said, there's no documentation of the

17   essential functions of Mr. Barger's job; there is no

18   documentation of Mr. Barger failing to perform his job

19   functions.  And you would think if these are truly his

20   friends, as they say they are, if he was having problems with

21   performance or they were having issues with the way he was

22   handling his team, they would have said something, they would

23   have written him an email; there would have been some way that

24   he would know that they had all of these issues with his

25   performance other than to find out in this courtroom that

1    they've created or at least manufactured some concepts in

2    their head as to what he was doing wrong.  Were they essential

3    functions?  I don't think so, because essential functions were

4    being performed in managing this team.

5            Now, the defendants are going to rely on -- solely,

6    their only evidence is going to be either these after-the-fact

7    stories and this document, Exhibit 101 -- it's Plaintiff's

8    101, the defendants have a different number on it -- and this

9    is the doctor certification form that was signed on -- signed

10   down here, we heard Ashley Parrish discussing this in her

11   testimony I read this morning -- signed on December 13th, and

12   Ashley Parrish says that she filled out this form, although

13   she says that she didn't -- is writing about -- right here,

14   that and this (indicating) -- is not her writing, and you can

15   kind of see from the writing of the others that it isn't, and

16   where these numbers came from, I don't know.  But defendants

17   are going to rely here on this -- this definition

18   (indicating).  They say where it says "incapacity" means the

19   inability to perform regular daily activities to attend school

20   or -- or to work because of a condition treatment therefor, or

21   recovery therefrom.  Mr. Eidelman has said before that

22   Mr. Barger was totally incapacitated.  That just simply isn't

23   true.  The evidence is overwhelming Mr. Barger continued to

24   work, he continued to send emails, he was even seen in the

25   office around this time, and we'll get to that.  Mr. Barger

1   was not totally incapacitated.  What he was, if you look down

2   here where they say:  Identify the job functions -- down at

3   the bottom -- identify the job functions the owner associate

4   is unable to perform, and it says patient has limitations with

5   taking -- talking, eating, and other activities of daily life.

6   That means -- the examples Dr. Baddour gave were brushing your

7   teeth, combing your hair, the things that we all do; and he

8   was just saying, and as Dr. Baddour testified, those are

9   just -- when he says a restriction, what he's talking about is

10  it may take him longer to accomplish something than somebody

11  without the disability.  At this point, 10/22, Mr. Barger

12  still did not have his prosthetic device implanted; he still

13  couldn't talk; he was still using the whiteboard, as

14  Mr. Marino testified when he visited on November 3rd.  He also

15  wasn't eating, he had a stomach tube; he was being fed through

16  a tube into his stomach.  So what the doctor is saying is

17  Mr. Barger can't talk and Mr. Barger can't eat, that's what

18  he's talking about, and those are, as you see at the

19  beginning, the inability to perform regular daily activities.

20  That's what Mr. Baddour is saying, that Mr. Barger has

21  limitations on his regular daily activities.  He's not saying

22  he's unable to perform the essential functions of his job.

23  There are ways that Mr. Barger can get around these

24  restrictions on his abilities and as he had been for weeks:

25  Email, text messages, video conferencing.  There are lots of

1  ways he could perform the essential functions and the doctor

2  is not saying he was completely out of it.  He's not saying

3  anything about his mental state, he's not saying anything

4  about his ability to use a computer, his ability to use the

5  whiteboard or his ability to text.  That simply is not what

6  this is, and this is the only piece of evidence that I know of

7  that can go to Mr. Baddour not being a qualified individual

8  and it doesn't prove anything.

9          If you look at this as an example, and even in

10  September of two thousand -- and if you want to look at it,

11  it's Plaintiff's Exhibit 22 -- 27, Steve was involved in

12  hiring and managing decisions, even in September and October,

13  and -- he was performing essential functions job.  I think

14  I've kind of beaten that one to death.

15          The other thing is, and again about this form, it's

16  a form that's just being filled out by a nurse and a nurse

17  practitioner, but Mr. Eidelman and the defense is going to --

18  they believe that these doctors are infallible; that their

19  signing of this form somehow creates a fact that you, as the

20  jury, shouldn't question, and that's simply not true.  We've

21  heard in this trial -- even Dr. Harrison in Tampa thought

22  Mr. Barger had inoperable lymph node cancer.  He turned out to

23  be dead wrong.  It wasn't, the cancer was gone, there was no

24  need to -- he was just wrong.  Dr. Baddour testified that he

25  thought that there was going to need to be a second

1   reconstructive surgery.  Guess what?  He was wrong.  There was

2   no need for a second reconstructive surgery.  Allowing doctors

3   to rely solely upon a doctor's signature on this without

4   looking at other evidence makes no sense in determining

5   Mr. Barger's capabilities when you have evidence completely to

6   the contrary discussing his work -- getting work at the time.

7           The defendants have admitted that plaintiff Barger

8   kept his superiors informed of his activities; that he kept

9   them informed of his condition; and in -- so Mr. Barger was

10  working, performing the essential functions of the job, had

11  communications with his superiors open.  If they had a problem

12  with his management style or his management while he was

13  working at home or the hospital, they would have said

14  something.

15          There really isn't any defense to the allegations

16  that Mr. Barger was forced onto leave because of his medical

17  condition.  I haven't seen any evidence.  In fact, Tony Marino

18  sat up there and said the reason he was put on leave and his

19  access cut was because he needed to focus on his health.

20  Decision made solely based upon Mr. Barger's disability to

21  terminate his access, terminate his work responsibilities, and

22  reduce his pay is a violation of the ADA.

23          You know, it really wasn't their choice.  I mean, if

24  they thought Mr. Barger should take leave, they should have

25  asked him.  It would have been the friendly thing to do, not

1    force him, and if he didn't go on leave and you had

2    performance issues, yeah, then write him up and tell him, if

3    you keep performing like this, you are going to be terminated.

4    They didn't go through that process.  They merely took away

5    what was important to him and that was his job.

6              Now, what were the damages from this?  I'm going to

7    go to -- this might be hard to see, but I will walk you

8    through it.  These are the pay stubs for the last part of the

9    year.

10             I just want to start in, Mr. Barger was forced onto

11   leave in November -- November 19th.  His normal salary was

12   $20,000 per two-week pay period, and you can see the normal

13   paycheck like this one, that's -- normal paycheck shows

14   $20,000 right here at the top -- 20,000, right there.  20,000.

15   That's his normal paycheck.  So then when you get to December,

16   this was his bonus, and you've heard a lot of stories about

17   that bonus being paid early and that's what that pay stub is.

18   This one over here, 12/15/16, it's only $10,460.  That's a

19   difference of $9,540, roughly.

20             Then December 30th, the next page, there must have

21   been an issue in the payroll department, because now all of a

22   sudden he gets paid 22,929, and then he doesn't get paid.  And

23   the interesting thing is he doesn't -- between 12/30 over

24   here -- over here (indicating), 12/30, and then he gets paid

25   on 1/31, so we're missing a pay stub, so there's 20,000

1   missing there.  Now, he gets another 22 at the end of January,

2   and he gets paid 20,000 through February and he gets paid

3   20,000 again.

4          Now, when you add all of this up, it's a loss of

5   about $25,610, and that is comprised of missing a $20,000

6   paycheck, having one paycheck reduced from 20,000 to $10,460,

7   and then he has two paychecks that are above $20,000 and those

8   come out to be $4,930 overpaid.  The net of all that is from

9   the time he went on leave to the time that he was -- his last

10  day of work -- the damages he lost, $25,610 in salary.

11         Now, I would like to move on to the FMLA.

12         Now, the FMLA claim, the FMLA provides the eligible

13  employee up to 12 weeks of unpaid leave to take care of a sick

14  child, to take care of themselves if they have a serious

15  health condition, and that's what the provision applies -- and

16  this is during those 12 weeks, you are unpaid, you don't have

17  job responsibilities, you're on leave, and I think

18  Ms. Voycheske had it right yesterday when she said, Leave is

19  not working.

20         At the end of your leave, the FMLA says that the

21  employee is entitled to be restored to that employee's

22  position or an equivalent position, and that's it.  There are

23  two sides to this:  You are entitled to take leave; you're

24  entitled to be restored.

25         Now, that seems like it should be simple.

1    Mr. Barger was entitled to leave, he took leave.  Mr. Barger

2    got his doctor's note, he delivered his doctor's note.  He

3    should be entitled to be restored.  That's not necessarily

4    always the case, and there have been some exceptions made to

5    the FMLA.  Now, one of them is if they are -- an individual on

6    leave is not entitled to any greater rights and benefits than

7    what that individual would have received had they been at

8    work, because you don't get anything extra because you're on

9    leave.  This is being interpreted by the defense as being that

10   if you were in a reduction in force or a rotation in force, we

11   can terminate you despite not giving you your job back when

12   you gave us your doctor's not.  That's not necessarily I think

13   what the question is.  The question really is:  Would

14   Mr. Barger have been in the RIF had he been at work?  He's not

15   supposed to get anything more, but he's not supposed to get

16   anything less either, and there is no evidence whatsoever that

17   Mr. Barger would have been in this reduction in force had he

18   been at work had he not been on leave.  Had he been there

19   instead of Robin Ording when the internal consulting group

20   came in and did the analysis of his group, which Mr. Marino

21   said would have happened, Mr. Barger would have been doing the

22   restructuring of the sale group, not Ms. Ording.  Mr. Barger

23   would have been taking care of the issues inside of the sales

24   trading group, not Ms. Ording.  Ms. Ording wasn't included in

25   the reduction in force; Ms. Ording continued -- took his job,

1   continued performing the functions.  His functions were still

2   there.  There's absolutely no evidence that Mr. Barger would

3   have been included in the reduction in force.  You have to

4   remember, they stood up and said 362, 362, those are the

5   number of people included in this rotation in force.  You know

6   what the answer is?  The answer is 2,700 -- 2,638, 2,638

7   people out of the top 3,000 were not selected.

8           Now, I will go through this in a moment as to why

9   they selected Mr. Barger.  It's not because of his

10  performance, it's not because of his salary, those are all

11  excuses.  What it is is that Mr. Barger exercised his right to

12  return.  If he had not said, I'm -- had he not said "I'm

13  coming back," he wouldn't have be included in this reduction

14  in force.  It would have done nothing for First Data.

15          Mr. Barger, at that point in time, was on long-term

16  disability.  That's paid fully by MetLife.  First Data had

17  already finished paying the short-term disabilities paid by

18  First Data at 66 and two-thirds, that was over.  First Data

19  had already paid his bonus for 2017 in 2016, so it didn't owe

20  him a bonus in 2017 anymore.

21          So on January 10th when he delivered his

22  return-to-work authorization, he was zero expense to

23  First Data:  No salary, no benefits, no short-term disability,

24  no accrued bonus to be paid, nothing.  Firing him at that

25  moment before he -- the moment before he returned his doctor's

1  note, had you terminated him then, then First Data would have

2  saved zero.  You know how they say that they project the

3  savings of the future cost savings with future salary?  Well,

4  the only way there would be a future salary would be if he

5  returns, and that's exactly what happens, he started telling

6  everyone that he was going to return at the end of December.

7  He told them on the 22nd, he told them on the 28th, he told

8  lead management on January 5th that he was coming back.  It

9  was at that point that Kathi Benhardt could fill out her

10  little chart and call the termination of Mr. Barger a save.

11  If he hadn't have said that, the save would have been zero and

12  there would have been no reason to include it.

13          Now, I will go through it in a little while.  The

14  thing that First Data also seems to ignore, and I think it

15  gets lost in this trial, is that the FMLA requires an employer

16  at the end of an employee's leave to restore that employee to

17  the employee's position or an equivalent position.  There's

18  been no discussion of equivalent positions.  Why wasn't he

19  restored to something else?  There was no discussion.

20  Everybody agreed that they never asked him to take a reduced

21  salary, never asked him to take a vice president position

22  instead of a senior vice president position.  They didn't try

23  anything to restore him, which was their obligation; they

24  simply threw him in the RIF because he was coming back and

25  they now got to say, we're saving $480,000 a year in the

1   future from his salary.  There was no actual cost savings like

2   others that were inside of the RIF.

3          Now, the claim is called FMLA interference.  That's

4   what the lawyers call this claim.  I don't know if you are

5   familiar with American football rules, but it's kind of like a

6   pass interference penalty.  The balance is thrown and if

7   there's contact with the receiver while it's in the air, the

8   penalty is the ball is where the contact happened.  It's kind

9   of -- you don't try to guess what would have happened in the

10  play.  You don't know what would have happened.  It might have

11  been caught for a touchdown, it might have been intercepted,

12  it might have been fumbled, you don't know.  Everybody

13  participating in a game knows what the penalty is for pass

14  interference.  It's the same thing for the FMLA.  We shouldn't

15  speculate as to what would have happened had Mr. Barger come

16  back.  We shouldn't -- maybe he would be in a RIF in a year,

17  maybe he would be in a RIF in two years, maybe he would

18  retire.  Who knows?  Maybe he would go to a different job.

19  Who knows?  That's not the question.  The question of law is

20  did they interfere with his rights?  Did they interfere with

21  his ability to come back to work?  That is it.  The penalty

22  for it is a violation of the FMLA and the penalties that will

23  be described to you are damages such as backpay and it's

24  because they didn't let the play continue.  Had Mr. Barger

25  been at work, he might have been able to talk to Dan and say,

1  you know, I can take a pay cut.  He might have been able to

2  talk to Dan and say I'll restructure my group.  He might have

3  been able to talk to Dan and say I'll take on additional

4  responsibilities, how about merging the training in the other

5  areas with mine, and that -- those options were never, ever

6  discussed.  It was because all they did was interfere with his

7  ability to come back, interfere with his ability to develop

8  his team, interfere with his ability to talk to his management

9  because he couldn't talk to them because they cut off his

10  access.  So it was the actions of the defendants that limited

11  Mr. Barger's ability to resolve any of these concerns that

12  they may point out.

13            Now, the other reason is I think it's going to be

14  nearly impossible for them to tell you the "what if's" and

15  "what could have been's," whether Mr. Barger would have been

16  terminated or not.  This entire RIF that they're talking

17  about -- rotation in force -- commenced on January 5th or 6th,

18  and supposedly Mr. Barger was confirmed on the list on

19  January 9th and then not called until January 13th.  All of

20  that while he was on leave.  How they're going to be able to

21  tell what the analysis of the 3,000 people would have been had

22  Mr. Barger been at work when they were undergoing that, it

23  seems impossible to me, and the burden of proof on this is on

24  them.  The burden of proof is on them that he would have been

25  included in this reduction in force had he been at work,

1   because, remember, it's only he can't get greater benefits on

2   leave than at work.  So they need to show, and the burden is

3   on them by the preponderance of the evidence to show that he

4   would have been terminated as part of this reduction in force;

5   that he would have been part of the 362 -- or if he was there,

6   maybe there would only be 361 or not part of the 2,000 people

7   that weren't selected.  The defendants do not contest that the

8   plaintiff was denied reinstatement.  Everyone admits that he

9   returned, yet he satisfied the condition by providing his

10  doctor's note on January 10th.

11          I want to go to the First Data policy, I think we've

12  looked at this several times -- FMLA policy.

13          First Data's FMLA policy and a couple of things of

14  note, and this is Plaintiff's Exhibit 4, it says, Steps to

15  request leave, and it places the burden right here.  It places

16  the burden on the employee to ask for leave, and it says that

17  the employee is supposed to select start date.  Mr. Barger was

18  forced to fill out his paperwork, it shouldn't have started

19  until at least the 21st of November; however, Ms. Voycheske

20  backdated the approval so that his leave was 10/24 --

21  October 24th through January 16th.  That really doesn't matter

22  because he was on leave, he was on protected FMLA leave when

23  he delivered his position-to-return-to-work authorization.  At

24  that point, in my opinion, they took the note.  Once they take

25  the note, they're supposed to restore him, and Rhonda Johnson

1    in HR and Tony Marino were all involved.  There's emails from

2    January 6th in which Mr. Marino says that -- insisting to his

3    team that Mr. Barger had to have his medical clearance before

4    he could come back -- that's on the January 6th -- and at the

5    same time, Mr. Marino is supposedly planning this reduction

6    and rotation in force of the top 3,000.  At no time did

7    Mr. Marino say, Don't take the note from him, he's going to be

8    in a reduction in force.  That evidence doesn't exist.

9            Rhonda Johnson, as you heard in Kathy Benhardt's

10   testimony this morning, when she was talking about where she

11   collects information as to who has been notified and when

12   they've been notified to create these charts, and we'll look

13   at the charts in a minute, but she's collecting that

14   information from the HR generals.  Ms. Johnson testified that

15   she was the HR generals; she's the one that was helping him

16   out with his forms; she was the one that would be telling

17   Ms. Benhardt when Mr. Barger was notified, and she would

18   certainly believe -- have knowledge that if Mr. Barger was

19   being terminated as part of a reduction in force, she wouldn't

20   have accepted his return-to-work authorization, it would --

21   the notice should have been then.  If he really was terminated

22   on January 9th, it makes no sense if the decision was made why

23   Mr. Marino didn't tell Ms. Johnson to not accept the note.

24   Once he turned in the note, First Data needed to reinstate

25   him, and what happened after that?  We will never know because

1   they interfered with his ability to be restored.  They

2   interfered with our ability to know what would have happened

3   had he gone -- been back at work.  He interfered with -- they

4   interfered with your ability to make a determination as to

5   whether or not there was retaliation because they didn't let

6   him come back.  Had they let him come back and done this

7   analysis again, maybe he would have been fired, maybe not,

8   maybe he would have fixed it, but the fact of the matter is,

9   for this lead, he did exactly as told, he turned in his

10  doctor's note, First Data failed on their part to fulfill the

11  second part of the obligation, which is the entitlement to be

12  restored.  They didn't put him back, they didn't look for an

13  equivalent position, they did none of that.

14          And I had that long conversation, and we've been

15  through that -- this, the direct cause of Mr. Barger's

16  termination and inclusion in the RIF was because Mr. Barger

17  said he was coming back, and if you want to look at the notice

18  to return tax and things, I would point you to Plaintiff's

19  Exhibit 62, which is an email where Mr. Barger tells his --

20  tells Mr. Hack and others that he's planning to return in

21  January.  He says that on December 22nd.  He tells Mr. Hack by

22  text message that on 12/28 that he's returning.  On that same

23  day, Mr. Hack contacts Mr. Marino and -- and Mr. Marino knows

24  about it.

25          And if you look up here at this policy up here real

1    quick, and I pointed this out during my examination, the first

2    bullet under *Pay While on FMLA Leave* says that the job is

3    protected.  It doesn't have any of the exceptions that they're

4    asking you to provide, and the FMLA provides a floor.  That's

5    the minimum benefit an employer can offer.  Here First Data

6    appears to be going above and beyond and saying we are

7    protecting your job, absolutely.

8            And we saw this document numerous times, too.  This

9    is Mr. Barger's signature on the bottom of the *Rights and*

10   *Responsibilities*.  Again, this second bullet, no mention

11   again.  It says your job is protected.  No mention again -- it

12   talks about restored or to an equivalent position.  And if you

13   look at Mr. Marino's text messages, he says the same thing:

14   When you come back, your salary will be restored and you will

15   be given a similar job.  It wasn't until these lawyers got a

16   hold of this case that this defense began to be constructed.

17           If you look at this, this is -- here is 62.  This is

18   an email on the 22nd saying he's got to come back in January.

19   This is 63, this is the text messages between Hack and

20   Mr. Barger right here telling him on December 28th that he'll

21   be back on January 15th and he can't wait.  Here is one

22   between Tony and Jeff Hack and it starts off down at the

23   bottom here and Mr. Hack advises Mr. Marino that he just

24   received that text message saying he would be back.  What's

25   interesting is Mr. Marino then responds, and Mr. Marino

1    responds on December 28th, and he says, yes, we have no choice

2    but to allow him to return, and then it talks about some

3    things that they need to talk to him about such as how his

4    organization has grown through the looking at it that

5    Ms. Ording did.  Mr. Barger never got a chance to come back

6    and resolve those issues.

7            And then Mr. Hack even responds and talks about the

8    successor and the feedback about performance, but none of that

9    had ever occurred to Mr. Barger at this point and no nobody

10   had told him that there were issues but he needed to come back

11   and -- and neither Mr. Hack nor Marino, when you look through

12   this, has ever said, Well, we are going to downsize, we're

13   going to include him in this RIF that's ongoing in November

14   and December.  That conversation never happened.

15           And then Mr. Marino writes back to Mr. Hack, it

16   says:  First he must receive a doctor's clearance to return

17   from short-term disability.  Assuming that happens, he can

18   come back into his old role since we have not filled it at

19   this time and then that is when we talk to him about how he

20   can best help.  We are only doing things in a respectful and

21   dignified way.  That's what Mr. Marino was saying on

22   December 28th.  Has to come back.  His role hasn't been

23   filled, his job is still there, Ording is there on an interim

24   basis.  His job wasn't eliminated; it was given to somebody.

25           Another thing in discussing these reductions in

1   force, and we had three members of this management

2   committee -- Mr. Bisignano, Mr. Charron, and Mr. Marino all

3   testified, and we didn't hear a single one of them say that

4   they also contributed to the cost savings that was needed at

5   First Data by reducing their salaries by them taking less

6   bonuses.  You didn't hear that.  All they did was fire 362

7   people and, as Mr. Cagwin said, turn around and use that

8   savings to buy another company with employees that can -- that

9   random number of -- the head count right back up to where it

10  was.

11          Now, I kind of want to go through -- and I know that

12  was hard when we were reading Kathy Benhardt's deposition this

13  morning because you couldn't see the charts, but I want to

14  show you what she was talking about because Mr. Barger was --

15  Mr. Barger, I believe, was an after-the-fact addition to this

16  reduction in force.  This is the first thing we were talking

17  about.  Now, if you look here -- I've marked it kind of in

18  red, this is one of those spreadsheets, and we'll look at the

19  full one, but it says Steve Barger right here, and if you go

20  across this line, *Date Added to File*, you come down, he was

21  added to this file on January 17th, 2017.  If you look over,

22  too, he was notified on January 13, 2017, so that means

23  Mr. Barger was notified that he was terminated before he was

24  included on the RIF list.

25          Now, if you look through it -- and I will give you

1   the native file list, that is the actual Excel spreadsheet if

2   you want to look at it -- the circumstances in which that

3   happens that where the notification date is earlier than the

4   "added to file," is probably 20 out of the thousands of lines

5   of this.  So how in the world -- and remember, Benhardt says

6   that that information as to -- that she collects comes from

7   the HR general, so in this case it would have come from

8   Ms. Johnson to Kathi Benhardt, and it seems that Kathi

9   Benhardt learned this information on January 17th, that

10  Mr. Barger had been notified on January 13th, but he hadn't

11  prior been on this list of people being considered as part of

12  the reduction.  If he wasn't -- if they didn't consider him

13  part of the reduction before he could -- provided his doctor's

14  note, they should have reinstated him.  Instead they tried to

15  create an excuse for terminating him simply because he was

16  returning, and now all that -- they can count the savings of

17  his salary against the savings of...

18          This is another thing we talked about -- we read

19  today about Ms. Benhardt.  If you look, this is an OA impact

20  analysis dated January 11th, and the testimony we read from

21  Ms. Benhardt was this was created on January 11th, and it is a

22  summary of who has been notified, when are people going to be

23  notified; and if you look at Global Business Solutions, that

24  was Mr. Barger's, Mr. Hack's, and Mr. Charron's group, it says

25  that -- read across -- three have been terminated and nine are

1    on notice.  Up here it says, the week of the 9th --

2    January 9th, and that's the week Mr. Barger was notified,

3    Monday the 9th, and then he was notified on Friday the 13th.

4    On January 11th, this says that nobody in Global Business

5    Solutions had been notified the week of the 9th yet.

6           If you go down to January 19th, that's the next one

7    of these that she prepares, so in the time that the first one,

8    January 11th, has been prepared, Mr. Barger had, the day

9    before, given his doctor's note.  On Friday the 13th, he was

10   notified of his termination.

11          If you go down to -- this is a little bit harder to

12   read because it's a darker color, but this is the same.  The

13   notification time on it, it's the same as the previous table,

14   only this one is as of January 9th.  If you look at Global

15   Business Solutions, it says:  Three terminated, nine complete

16   on notice, which is identical to what was there on

17   January 11th; and it, again, says no GBS employees were

18   notified of termination as part of this reduction in force on

19   January 9th.  Mr. Barger's numbers should be there.  He was

20   terminated the week of the 9th.  If he was really part of this

21   RIF and they were tracking him as part of this RIF and the

22   generalist was providing the information to Kathi Benhardt,

23   there should have been a one in that column, and she says in

24   her testimony, she says -- so I asked her:  Was there anybody

25   in GBS notified of termination as part of this reduction on

1   the week of January 9th?  And she says:  No, not according to

2   my information.

3           Mr. Barger was an afterthought.  It was when -- when

4   you look at these spreadsheets -- and you looked at that one

5   that they had where they said he was on the list

6   November 30th.  You also heard the testimony that the way they

7   started out this reduction was they put together -- the first

8   thing they did was put together a list of all 3,000 names and

9   then they sent those lists out to the various managers.  Being

10  on the list doesn't mean -- didn't mean anything; it just

11  meant you were in the top 3,000.  It's the decision-making as

12  to who from that list gets chosen, and there's no criteria.

13  They have admitted that they handed off to the managers and

14  they just decide who is going to be terminated and who isn't.

15  They just have to get rid of 10 percent.  The problem with

16  that is the statute that talks about an employee on leave not

17  having greater benefits than -- on leave than if he were at

18  work.  It would be easy if you had a plant shutdown and you

19  terminated everyone that worked at the plant, it would be easy

20  to say to somebody on leave, Had you been working, you would

21  have been terminated as part of the shutdown.

22          And, also, if you had a reduction in force or

23  layoffs and you had criteria that said we're going to take

24  everybody -- if it's a one to five ranking of performance, we

25  are going to take anybody with a ranking of two and lower and

1   terminate them, it would be very easy to say to someone on

2   leave, had you been at work, your ranking of two, you would

3   have been included in the reduction.  There's no way to do

4   that here; there is no criteria.

5           Dan and Jeff Hack -- everything seems to be getting

6   blamed on Jeff Hack.  Our understanding when we brought this

7   case was Mr. Hack was terminated before any of that started.

8   Apparently not.  We found out he was still around, but there's

9   no way to know that Jeff Hack would have made the same

10  decision had Mr. Barger been working.  There's no way to know.

11          So it's this lack of criteria that I kept asking

12  them about was designed to elicit exactly that.  Was there

13  anything other than Jeff Hack's win and Dan Charron's win that

14  included Mr. Barger on the list, and the answer is no, that's

15  it, they just picked.

16          And we talked about how when you merge, how did you

17  decide one manager verses another.  Why wasn't Robin Ording --

18  didn't somebody come to Mr. Barger and say, Will you take a

19  vice president position at a lower salary?  That didn't

20  happen.  We don't know -- we don't know why he was chosen and

21  they can't prove it and it's their burden of proof, they have

22  to prove that he would have been in this room.  They have to

23  prove it, I don't, and there's no way that they can.

24          Well, I also talked to Mr. Cagwin and I put up

25  that -- he talked about the speaking schedule, and what he

1    testified to was that all of February was planned for new hire

2    trainings, that they had a complete new hire training program

3    set for the month of February, the exact time.  Right after

4    they're doing all of these supposed reductions in force,

5    they're also continuing to hire and hire.  The end result is

6    that they terminate some, they hire others, the employee

7    population remains the same.

8            And you remember there were 635 requisitions open

9    for open jobs, and Mr. Marino testified to that.  If you look

10   at -- Ms. Benhardt also was testifying as to this chart, and

11   this is Plaintiff's Exhibit 124, and these are -- this is

12   First Data's head count change by month, and you can see in

13   November -- right here, right there (indicating) -- November

14   and December, First Data is on a hiring binge, and then they

15   turn around in January and fire 362 people, and these notes

16   right here that are marked in red, year-to-date increase of

17   471 workers, an increase of 334 employees, and that the OA's

18   employees have grown by 646 people since August, which makes

19   fifteenth consecutive week of employee growth.  They're

20   hiring, hiring, hiring for 15 weeks leading up to this

21   reduction in force, that's why I'm calling it a rotation in

22   force.  It really is a side -- it's just a way for them -- and

23   we'll get to the accounting -- to create a legal defense by

24   saying he was in the RIF, therefore the FMLA does apply, and

25   also is a way for them to get those that survive get greater

1   bonuses.

2          Now the successor, I've mentioned that, I don't

3   understand it, I don't understand.  If everybody has said from

4   the beginning Mr. Barger was supposed to find a replacement

5   for Brian Fricke for his sales training group, somebody was

6   supposed to come in in between Mr. Barger and that training

7   group, that's what they're meaning by "successor," it's not

8   replacement, and they try to spin that.  That's not what

9   Mr. Marino testified to, that's not what Julie Kelly testified

10  to.  Every single one of these management committee members

11  has their own succession plan on who would step in or how they

12  would replace themselves if something happened or if they left

13  and who they are training to take their position.

14         THE COURT:  Mr. Shearer, it's one o'clock, it's up

15  to you, the jurors' lunch is here already.  I don't know how

16  much longer you have --

17         MR. SHEARER:  I've got a little bit more.  I've got

18  to get to --

19         THE COURT:  Let's take a lunch break now.  Let's

20  reconvene.  You are going to be eating in.  Don't talk about

21  the case during your lunch break because I don't want you

22  talking about the case until we are finished with everything,

23  including listening to my instructions on the law, and we'll

24  reconvene at a quarter to two, okay?

25         THE COURTROOM DEPUTY:  All rise.

*Proceedings*                                                929

1          (Jury exits.)

2          THE COURTROOM DEPUTY:  You can all be seated.

3          THE COURT:  And Mr. Shearer, I think the verdict

4   sheet should be changed just to indicate that First Data

5   Corporation is the only defendant.  And I guess I will just

6   tell them not to speculate.  I don't know what else to tell

7   you.  Okay?

8          All right.  So see you at a quarter to two.

9          (Lunch recess.)

10         (Continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                    930

1        A F T E R N O O N    S E S S I O N

2

3                        --oo0oo--

4

5        (In open court; outside the presence of the jury.)

6        THE COURT:  All right.  Let's talk about something

7   Mr. Shearer.  Clear the seat.

8        I'm trying to desperately give your client a fair

9   trial, but I share with you this thought, you're not making

10  it easy for me.  And I don't want to prejudice you, but to

11  say, I have to be fair to both parties.

12       So your whole case, it seems to me, and the

13  verdict sheet was geared to whether or not he was denied

14  access to the remote email, we broadened it to accommodate

15  you to talk about being denied to First Data Corporation's

16  systems, right?

17       MR. SHEARER:  Right.

18       THE COURT:  You tell me that you also are not

19  going to talk about termination by reason of supposed

20  disability, so that's out.  Medical leave is not a

21  termination, yet you tossed that out to me as a concept,

22  which make no sense whatsoever.

23       And then you are now arguing about the fact that

24  he lost income by reason of being on medical leave.  You

25  didn't say anything to me about that as part of your claim

Proceedings                                          931

1    here.  It was all about being denied access to his remote

2    emails.  That was what your thrust was.  That was what we

3    focused on here.

4              And now why are you arguing about loss income.

5    You haven't made that claim.

6              MR. SHEARER:  Yeah.  Because when they forced him

7    on to leaving on the short-term disability, there was

8    adverse employment action because it was a reduction in pay.

9              THE COURT:  But you didn't make that claim in none

10   of your papers, and you didn't say that at all during your

11   discussion about your claims.  It was all about the loss of

12   access to his remote email.  You didn't say, And, Judge, and

13   also, it was an adverse action because he was making less

14   money while on leave.  You never said that to me.

15             MR. SHEARER:  I'm not saying that --

16             THE COURT:  And I looked at your instructions,

17   your instructions for backpay only dealt with termination

18   under the ADA and FMLA.  You didn't say anything in your

19   instructions to me about, you know, the fact that he would

20   be entitled to lost wages under the ADA was well.

21             I'm just trying to understand.  You keep moving

22   around here and it makes it difficult for me to pin you

23   down.  I think what you meant to tell Judge Block is that he

24   was required to against his will to be placed on medical

25   leave, and as a result of that, he suffered two sets of

Proceedings                                                    932

1  adverse actions.  One, he lost money; and two, he couldn't

2  really access his computer, whatever that was.

3          As far as his failure to access his email, there's

4  no compensatory damages that flow from that that I can

5  discern.  You want to argue, I guess, that that would be

6  part of the mix for the jury to consider, if they want to

7  award punitive damages all of these bad things that they did

8  to him?  I guess that could conceptionally flow.  But you

9  have made it very difficult for me to restructure this

10 thing.  I just wanted you to know that.

11         And then this morning after I spent endless hours

12 shaping the charge, you withdrew the claims against the

13 individual defendants?  Mr. Eidelman asked you on three or

14 four or five occasions to do that.  He presented logical

15 reasons for doing that.  He argued for his clients

16 effectively.  I said I'll reserve.  I wanted to give you a

17 fair opportunity to present your case as you saw it to be.

18 I bent over backwards to accommodate you.  I just want to

19 let you know these are difficult cases for a federal judge

20 to handing, when I have those shifting sands for the lawyer.

21         And then I am going to have to consider, I guess,

22 if you get a verdict whether or not -- and you waived any of

23 these various arguments during the course of your pleadings,

24 the instructions or whatever.  It makes it difficult for me

25 to have to really flesh all of that out.

Proceedings                                933

1          Do you understand why it might be frustrating for

2    me to have to deal with this?

3          MR. SHEARER:  Yes, your Honor, I do.  With the

4    instructions as to adverse employment action --

5          THE COURT:  The instruction --

6          MR. SHEARER:  -- that's the point, I went down the

7    route of he got less pay.

8          THE COURT:  I think the instruction as to adverse

9    employment action is correct.  We talked about a bunch of

10   things that could constitute an adverse employment action.

11   We tried out a laundry list, including reduction in

12   compensation, change in conditions, cetera right?

13         MR. SHEARER:  Right.

14         THE COURT:  We did that.

15         But when it comes to the verdict sheet, my focus

16   was only on whether or not the defendant was wrong in

17   denying him access to his -- the systems.  You just kept

18   harping on that and harping on that and harping on that.

19         In fairness to your client, I think I'm going

20   restructure this thing slightly to just put on the verdict

21   sheet, you know, they are liable, you know, under the ADA

22   without putting it in there because of the denial of access

23   to remote email's, whatever that language is, and then let

24   the jury sort out what the adverse actions might be.

25         You're arguing that there's a loss of income.

Proceedings                              934

1          MR. SHEARER:  That's one of them, yeah.

2          THE COURT:  Yeah.  Okay.  Well, that's what you're

3     arguing.

4          You want to argue anything else?  Those are the

5     two things I see now of listening to your arguments.  But

6     you didn't talk to me about this morning or last night or

7     any other time.  You should have said, Judge Block, here's

8     he claim, because he was -- you know, required I think

9     inappropriately to be placed on medical leave, he was denied

10    access to his email account, that's an adverse action.  And

11    it was all lost income.  I understand that.  But it was so

12    hard for me to really grasp that as you went on and on in

13    this case with thousands of exhibits, et cetera, et cetera.

14         So what to do now?  And the defendant, you know,

15    can argue that, you know, if you get a verdict that you

16    waived these issues, I can consider that afterwards.  I have

17    to manage this trial to have a clear record for the Circuit

18    Court of Appeals and that's what I've been trying to do.  So

19    I'm just going to change the verdict sheet.  I don't want to

20    do a lot of damage here.

21         You know, I'm going to put probably in the charge

22    that your contention is -- it's the last time I'm giving you

23    a chance to do this -- that there were adverse employment

24    actions taken in terms of reduction in compensation, and in

25    terms of the denial of the right to have access to the

Proceedings                                                           935

1    remote user, "or systems," as we described it right?

2              Those are it, right?

3              MR. SHEARER:  Yes.

4              THE COURT:  There's nothing else.

5              MR. SHEARER:  No, not on the ADA claim.

6              THE COURT:  You're going to go with that?

7              MR. SHEARER:  Yes.

8              THE COURT:  So there will be a slight adjustment

9    to the charge when I will explain that that's your

10   contentions, right?

11             MR. SHEARER:  Right.

12             THE COURT:  And then on the verdict sheet, I'm

13   just going to simply ask whether or not there was a

14   violation of the ADA.  And I will talk to the jury and

15   explain everything to them that I'm talking to you folks

16   about right now so that it will be really clear about, they

17   have to find an adverse employment action, they have to find

18   him as qualified for that to happening.

19             Right?

20             MR. SHEARER:  Right.

21             THE COURT:  Okay.  So I think I understand it all.

22   When you have hundreds of exhibits and hundreds of trees

23   being tossed out all over the place and all sorts of

24   fanciful theories and claims, it's difficult for me to

25   follow the bouncing ball, but I think we have it now.

Proceedings                                    936

1          Now, as far as the defendant is concerned, they

2   have the right to yell fowl, that we didn't have full

3   knowledge that this was going to be part of your adverse

4   action claim.  I think they probably have knowledge of it.

5   They've been arguing about themselves, right?

6          MR. SHEARER:  Yes.

7          THE COURT:  I'll worry about that later.  They can

8   claim that you waived these claims.  Whatever they want to

9   do, they can do that.  But I'm going to charge the jury on

10  that, the wages, to include under the ADA, that it could

11  include that loss of compensation, and they can make that

12  determination.

13         But it doesn't include anything dealing with the

14  loss of access to the remote emails.  There's nothing I can

15  quantify about that, except that it comes under the broad

16  umbrella of commentary damages whenever it is.  I'm not

17  hearing an awful lot about how he suffered emotionally from

18  this stuff.

19         MR. SHEARER:  Right.

20         THE COURT:  Very thin.

21         And another area where you really were unclear

22  about really what you wanted here.  Now I know you want to

23  have a claim for compensatory damages to include emotional

24  distress, et cetera.  Well, I don't know whether we heard a

25  lot of about it.  So, you know, give it now and I can always

Proceedings                                          937

1   cut it out later, I guess, if you get a verdict.  I'll have

2   to deal with it afterwards.  Once again, that's another

3   example of how you make it difficult for the judge to

4   process a case.

5          And then as far as the punitive damages, we'll put

6   in language that you can consider whatever the content was

7   under the ADA and I will sort that out as well if they do

8   give punitive damages, which I don't thing they will give,

9   but we will see how it happens.

10          Now, I've been speaking a lot.  Mr. Eidelman, you

11  can object all you want to, but I'm just trying to give this

12  gentleman a fair trial under the circumstances.  If you want

13  to say anything on the record now, I will let you do it.

14  But I am telling you what I'm going to do so you understand

15  when it comes time for your summations, I will have the

16  revised charge.  You'll have plenty of time to look at it.

17  But I want you substantively understand what I'm going to be

18  doing here with those little changes.  Okay?  So you are not

19  caught off guard.

20          MR. EIDELMAN:  Okay.  Thank you, your Honor.  And

21  I understand that you are doing everything you can to give

22  Mr. Barger a fair trial.

23          One of the things that I am been concerned about

24  with your revisions to the verdict sheet is the definition

25  of adverse employment action suggests that the jury could at

Proceedings                                    938

1   least consider it, because I don't know what he is going to

2   say.  Now --

3            THE COURT:  I'm sorry.  All due respect, the jury

4   is waiting for me.  Let him finish his oral argument.  He

5   knows what I am going to be doing.  You can put your

6   objections after the jury's not here, but it's not rocket

7   science.  Adverse actions have already been explained to the

8   jury and qualified individual has already been explained to

9   the jury.  Incorporated in my explanation of adverse actions

10  is loss of compensation or other conditions.  His claim here

11  is that he lost compensation and that he had changes in the

12  conditions of his employment.

13           MR. EIDELMAN:  Would you consider, your Honor,

14  just instructing the jury --

15           THE COURT:  What?

16           MR. EIDELMAN:  -- that Mr. Barger is not claiming

17  that an adverse action that occurred to him was that he was

18  terminated in violation of the ADA?  Because that will clear

19  it for the jury that he is not making that claim.

20           THE COURT:  I'm sorry.

21           In order to have a violation of the ADA, you have

22  to show that there's an adverse action and that he was

23  qualified.

24           MR. EIDELMAN:  Right.  But I would like the jury

25  to understand that Mr. Barger is not claiming that his

Proceedings                                     939

1    termination of employment was an adverse action.

2              THE COURT:  Okay.  Yeah, I'll say that.

3              MR. EIDELMAN:  That does it, your Honor, if you

4    instruct the jury that he is not making that claim.

5              THE COURT:  But you waived that?  You waived that?

6              MR. EIDELMAN:  Yeah, that's the one he's waived.

7              THE COURT:  Okay.  I'll say that, not to consider

8    termination, vis-à-vis the adverse employment action.

9              MR. EIDELMAN:  Thank you, Judge.

10             THE COURT:  Okay?  That make -- in fairness to

11   you, your client and everybody else?

12             MR. SHEARER:  Yeah.

13             THE COURT:  All right.  So you know what we're

14   going to be doing.

15             Now, let me just say one thing before the jury

16   comes in.  Judges get a lousy reputation by making life

17   difficult for the lawyers, and I'm not a big fan of doing

18   that.  But sometimes it comes out that way because the

19   judges hear it and it's frustrating to try to get it down.

20   My comments are not intended to denigrate your talents, your

21   ability, or your passion for your client, but it does look

22   as if I'm being critical of you, I get it.  But it is the

23   nature of the trial law.  I know you will understand it and

24   take it completely in that context.

25             MR. SHEARER:  Yes, your Honor.

```
                        Proceedings                        940

 1            THE COURT:  Okay?

 2            MR. SHEARER:  Yes, your Honor.

 3            THE COURT:  All right.  Let's bring in the jury

 4   now.

 5            I think you have an idea of where we're going now.

 6            How much longer do you think you have on your

 7   summations, Mr. Shearer; what would you say?  Just give me

 8   some --

 9            MR. SHEARER:  A half hour.

10            THE COURT:  All right.  Let's try to keep it to

11   that, because I want to get the summations in today for

12   sure.

13            MR. SHEARER:  All right.

14            THE COURT:  And that will include a brief rebuttal

15   that you will have as well?

16            MR. SHEARER:  Yes, your Honor.

17            THE COURTROOM DEPUTY:  All rise.

18            (Jury enters the courtroom.)

19            (Jury present.)

20            THE COURTROOM DEPUTY:  All right.  You can all be

21   seated.

22            THE COURT:  All right.  Mr. Shearer, please

23   continue with your summations.  And you indicated just now

24   that you think you have about 20 minutes to a half hour to

25   go.  Let's see whether you can keep to that, so we can have
```

1    the summations by the defendants' lawyer today.  I was

2    hoping we would be able to get it all done, but I'm not

3    rushing anybody.  But we certainly are going to complete the

4    summations today by all clients, and you will have a brief

5    rebuttal.

6              So let's see if we can move it along now, okay,

7    Mr. Shearer?

8              MR. SHEARER:  All right.

9              I'm going to talk and shift gears.  And now we

10   have talked about the ADA.  We have talked about the FMLA

11   and my assertion that Mr. Barger was terminated because he

12   exercised his right to return in violation of the FMLA.

13             You're going to be asked as part of this to

14   calculate damages.  So assuming there's a violation of the

15   FMLA, you'll need to calculate what award, monetary award

16   should be given to Mr. Barger.  And he testified to it

17   yesterday and you heard the exchange.  I kind of want to

18   explain to you how I view the calculation would go, and to

19   do that I kind of want to start of with -- this is not the

20   calculation of the actual damages, but sort of to show you

21   how this would work.  All right?

22             Mr. Barger was terminated on February 28th, 2017.

23   Today I'm going to be using September 30, 2019, just to make

24   it easy, so next week.  And that's 31 months.  Thirty-one

25   months and Mr. Barger was making $40,000 per month.  So that

Summation by Mr. Shearer                    942

1    equals -- his salary to this point would have been

2    $1.24 million.  He also would have received a $174,000 bonus

3    in 2018 and a $174,000 bonus in 2019.  If you add all of

4    that up, and that comes to $1.588 million.

5             Mr. Barger also had some options that were

6    forfeited when he was terminated.  An option is the right to

7    buy stocks, so it specifies a price at which you could buy

8    stock.  So he had the right to purchase 3,000 -- 31,367

9    shares.

10            MR. DILORENZO:  Your Honor, I have to object.

11   There's no evidence in the record of this.

12            MR. SHEARER:  It's admitted in the --

13            THE COURT:  You can argue to the contrary.

14            Go ahead, sir.

15            MR. SHEARER:  It's admitted in the answer.

16            THE COURT:  Let's not argue amongst yourself.  All

17   right?  They can make the decision.  The juror know that

18   where there's no evidence, you can't consider that.  I can't

19   tell you whether there is or is not.  It's been a long

20   trial.  You will have to sort that out if you think it's

21   relevant.

22            All right.  Go ahead.

23            MR. SHEARER:  So you take the number of shares

24   times -- and we use the price of $31.  It's a recent price.

25   When the buy/serve transaction occurred, it was $31.69.  To

Summation by Mr. Shearer                    943

1   make it's easy, $31 minus the $12.65 first purchase price,

2   and that equals $575,584.

3          And then he had some shares of restricted stock

4   that he lost.  Those you don't have to buy.  They're just

5   given to you when they vest.  And that would be, he had

6   10,330 of those.  Multiply that times $31, and that gets you

7   three, two, zero; two, three, zero.

8          If you add all these up -- add these up, then that

9   would give you the total compensation lost by Mr. Barger

10  over the last 31 months.  And that comes to two, four... --

11  can you see that?  This is salary.  Salary, bonuses, and

12  lost equity comes to that total.

13         Now, yesterday, Mr. Barger -- this doesn't include

14  any interest.  This also doesn't include Mr. Barger's

15  consulting revenue that he has made over those 31 months

16  which would need to be backed out.  What Mr. Barger

17  testified to was that the way he did this -- it was -- if he

18  made $10,000 in March of 2017, the month after, he would

19  have taken -- he would have taken 40,000, his salary, minus

20  the $10,000 that he made consulting, so that -- and then he

21  would -- he multiple that by the number of months.  So at

22  that time -- so at that time there would have been 30 months

23  remaining and so his interest rate calculation, it was

24  4 percent, which was a third of a percent per month.  So it

25  would be .0033, one-third of a percentage, times 30 months.

Summation by Mr. Shearer                    944

1          And that math -- he would do that for every month.

2     He would put -- he's indicated he took 40,000 less what he

3     earned in consulting revenue.  He also did the same thing

4     for when he received his bonus, he multiplied them by

5     however many months were left.  He came up with a number of

6     1.36 million for this (indicating).  It's at 1.36 here.  He

7     said 900,000 here, which is very close, because this -- this

8     actually adds up to 800,950.  This here (indicating).  So

9     that his lost wages and bonus, 1.36 million; lost equity,

10    900,000.  So he came up with a total of 2.26, which is --

11    which is very close.  So that's the damage calculation.

12    That's how you would calculate the -- the backpay.

13          You got invoices and the -- and the exhibits

14    indicating Mr. Barger's consulting revenue.  You've got his

15    pay stubs confirming the 40,000.  You know it's 31 months.

16    And the calculation, it shouldn't -- is -- is not that

17    difficult to do.  You can put interest on it going through

18    this method, and you'll be instructed on that.

19          Now, I suspect that the defense is going to get up

20    here and talk about, That's not all the money Mr. Barger

21    made.  They're going to talk about these long-term

22    disabilities checks.  And I think you saw those, that

23    Mr. Barger received two checks from Met Life, his payment

24    for long-term disability.  Mr. Barger testified that he gave

25    those checks to me, and he did and I deposited them in my

Summation by Mr. Shearer                    945

1  client's trust account.  I'm  still holding that money

2  today.

3          Mr. Barger -- we didn't know whether Mr. Barger

4  was entitled to long-term disability.  We've heard that

5  their witnesses talked about, they didn't know whether

6  short-term disability started on the 6th, but he hadn't

7  applied for it until November.  We didn't know what it was,

8  and the dates were moving.  And so Mr. Barger, instead of

9  taking that, give it to me to hold onto --

10          MR. DILORENZO:  Your Honor, I'm going to object to

11  this testimony by the attorney as to what he did with the

12  checks and what happened.  There's nothing in the record,

13  other than Mr. Barger say he gave them to his lawyer.

14          THE COURT:  Well, I think that's what I remember.

15  He said he got the checks.  He give them to his lawyer.

16          MR. SHEARER:  That's correct.

17          THE COURT:  Yeah.  That's what it was.

18          All right.  So I --

19          MR. DILORENZO:  Well, now he's talking about what

20  he's doing with them, what he hasn't done with them.  So I

21  don't --

22          THE COURT:  Yeah.  I don't think that's part of

23  the case, unless you want to come and open up the case and

24  be a witness, I mean.

25          I think that's an appropriate time to object.  You

Summation by Mr. Shearer                    946

1  know, I'm very, very cautious and instruct the jurors that

2  we don't want to have objections.  But that one's pretty

3  clear to me that gone a little bit above board here.  I do

4  recall him saying that he gave it to the lawyer.  But

5  there's nothing in here about what happened to them

6  afterwards, okay?  So the jury is mindful of that.

7            Continue with you summation.

8            MR. SHEARER:  So in other words, Mr. Barger

9  doesn't have those, the funds in his bank account and never

10  has.

11            They're also going to address, they showed you his

12  tax return in 2017 that included 400-and-some-thousand

13  dollars.  You have to think about that.  They're going to

14  try to -- they're actually double-counting.  As part of

15  Mr. Barger's compensation, he received as part of his

16  bonuses, the cash portion, and a portion in equity.  Those

17  were bonuses back that were paid in 2016 -- 2015 and '16.

18  Those were the options and restricted stock, that was

19  forfeited, the ones that had not yet vested.  Some of his

20  shares, his options and restricted stock that he received as

21  a bonus for his work in 2015 and 2016 had vested and he was

22  able to sell those in 2017.  And, in fact, he had to sell

23  those because he was terminated, and he's not allowed to

24  hold those because he's not an employee.

25            So that $400,000, which is the stock, is really

Summation by Mr. Shearer                947

1    just reflecting his bonus that he received in prior years,

2    2015 and 2016, that is -- because they gave him part cash

3    and part stock for his 2015 bonus.  He didn't get the cash

4    for the stock until 2017.  So it's really not 2017 income,

5    that's 2015 bonus income.

6               I also suspect that you're going to hear about

7    these invoices for Mr. Barger's consulting work.  And when

8    you are looking at this issue, think about a couple of

9    things:  They've got a written consulting agreement, that

10   correct.  But consulting agreements or any other agreements,

11   don't always have to be written.  Mr. Barger and Mr. Plumeri

12   can reach an oral agreement as to consulting.  Mr. Plumeri

13   is authorized to bind First Data.  Mr. Plumeri, according to

14   Mr. Bisignano, has no limits on the amount that he can

15   spend.  So simply because you have a written agreement

16   doesn't mean that you don't have agreements between these

17   two good friends over the last four years.

18              Now, this is going to come up in the context of

19   what's called after-acquired evidence.  And what

20   after-acquired evidence is if during the course of this

21   litigation they discovered that Mr. Barger had done

22   something that had they learned about it while he was

23   employed, he would have been terminated.  The end result of

24   that has to do with how you would calculation damages, and

25   that will be in Judge Block's instructions.

Summation by Mr. Shearer                    948

1          Now, remember, this is not a case -- this is not a

2    contract-dispute case between the

3    Barger Consulting Group, LLC owned by Grant Barger, that was

4    providing the consulting services to First Data, and

5    First Data making a claim against the

6    Barger Consulting Group, LLC, that it had somehow breached

7    their contract.  That's one element you're trying to decide.

8    Mr. Barger testified that those invoices that he says were

9    authorized by Mr. Plumeri directly to him and he sent them

10   through the system.  Mr. Cagwin says that the way the system

11   works, is that if the invoice comes in, it gets paid, and

12   that they were, apparently, comfortable with that.  They

13   changed their procedure since, but then that's what

14   happened.  Mr. Plumeri told Mr. Barger to send the invoices

15   through.  Mr. Barger did.  The other thing you don't have,

16   you don't have any evidence that shows they were actually

17   paid.

18          You know, after the years Mr. Barger has spent

19   working with Joe Plumeri the trust between the two of them,

20   their work in implementing programs, it -- it seemed -- it

21   kind of disgusts me that the defense is actually coming at

22   Mr. Barger calling him a fraudster, calling him -- stealing

23   First Data's money.  And there's no evidence of that.  What

24   Mr. Plumeri did not say that what Mr. Barger did was a

25   problem with him.  He said that if a consultant had sent in

1   an invoice without authority, what would you do?  And he

2   said, Fire him.  But the question has never been asked of

3   Mr. Plumeri, Did you authorize these invoices?  Mr. Barger's

4   testimony is that Mr. Plumeri authorized him to sign these

5   invoices.  And remember, Mr. Plumeri authorized a $400,000

6   purchase order.  First Data was willing to spend $400,000 on

7   Mr. Barger's consulting, and they spent $170,000.

8           So I guess I'm going to wrap it up.  There are two

9   things, like I said at the beginning here today, forced him

10  on leave against his will, caught off his access in

11  violation of the ADA; failed to reinstate him after he

12  returned, his doctor's note saying he could come back to

13  work without any restrictions.  And I don't like to use the

14  word "penalty," but it is sort of a penalty.  First Data has

15  a huge leave management -- it has a leave management

16  department that are experts in the FMLA.  They know what

17  happens if you violate the FMLA.  They know what the penalty

18  is, that is you owe backpay, and there are other remedies

19  within the FMLA, but you owe backpay if you violate it.  And

20  that's designed in part to be a deterrent, to make sure that

21  the whole purpose of the FMLA was to allow people not to be

22  forced to choose between their personal health, or the

23  health of their children, or the health of their spouse and

24  job security at work.

25          Now, before the FMLA, if you needed leave, there

Summation by Mr. Shearer                    950

1   was no protection of your job.  You were at the mercy of

2   your employer.  You were at the mercy of how many vacation

3   days and sick days you had left, and if you were gone for

4   too long, your employer would be perfectly justified in

5   terminating you for a failure to attend.  We changed all of

6   that.  When President Clinton signed the Family Medical

7   Leave Act, the idea was to stop -- to prevent an

8   employee from needing -- helping an employee from needing to

9   make that choice between job security and taking care of

10  themselves or their family, and it was a compromise.  It's

11  not paid leave, it could be.  They decided it's unpaid

12  leave.  They could have said it was 18 weeks.  They chose 12

13  weeks.

14          But what they -- but the offsetting sides are you

15  are entitled to take leave that is unpaid, and you're

16  entitled to have your job protected while you're gone.  And

17  in any leave situation like this, the employer is put into a

18  position where they're going to have to cover the work that

19  that employee out on leave was performing.  They're either

20  going to hire a temp.  They could just reallocate the work

21  among others in the business.  And that's what happened

22  here, they brought in Robin Ording as sort of an interim.

23  And the reason that you needed job protection is that this

24  happened before.  When somebody's gone, you learn maybe we

25  could allocate things.  Maybe we could have someone else

1   come in.  Maybe we could hire someone cheaper, all of those

2   things.  And that's naturally going to happen.  And it's

3   always going to be true that what the person on leave

4   decides to return to work, the expenses of the employer are

5   going to go up, because the employee has been on unpaid or

6   reduced paid leave for the last 12 weeks, and when they

7   return, the costs go up.

8          And for the defendants to take the position that

9   because Mr. Barger was coming back to work and we were going

10   to have to start paying him again, that those are grounds

11   for us to terminate him flies in face of what the statute

12   was designed to do, which was to provide Mr. Barger security

13   to know that when he was done with leave, his job would be

14   there for him.  And an excuse that's being made that when he

15   comes back we have to pay him, therefore, we terminate him

16   puts us right back to where we were before.  Mr. Barger now

17   has to -- does have to make the decision:  Is my job going

18   to be at risk when I take leave?  Is it going to be there

19   when I come back?  And every single employer that gives

20   Family Medical Leave Act is going to face the situation of

21   increased cost when somebody is returning from leave.

22          I think they're kind of -- all of these excuses,

23   none of them were raised with Mr. Barger before when he was

24   employed.  None of these excuses were raised with Mr. Barger

25   when he was on leave.  There's no written evidence that says

Summation by Mr. Shearer                    952

1   that Mr. Barger was running -- wasn't running a proper

2   shift.  Nobody talking to him.  There are no performance

3   reviews.  This is all a concoction that did not exist until

4   they needed to start defending this case.

5           I think with that, there's just to some it up, the

6   forcing of leave violated the ADA.  And as I showed you,

7   there was $20,000 in reduction in pay because he missed that

8   paycheck, and there was short-term disability in there.  Had

9   he not been on leave and earned a full salary, he's short

10  about $2,000 there.  And as I showed you in this math here

11  and as Mr. Barger testified to yesterday, the value of

12  Mr. Barger's lost wages, lost bonus, and lost equity between

13  the date he was terminated calculated through next week, the

14  30th, was $2.48 million.  And that's what I'm going to ask

15  you to award.  I'm going to ask you to award Mr. Barger

16  backpay in the amount of $2.84 million and damages under the

17  ADA in terms of what he was shorted in his salary, that's

18  $20,000.

19          I thank you for taking consideration and looking

20  through all of this.  I know those numbers may sound large,

21  but that's a function of a couple things.  First, it's a

22  function of Mr. Barger's experience, and that's what he

23  commanded from -- to provide his lectures, his experience,

24  and that was his salary.  And that's the way he calculated

25  it.  The other thing that that's part of, it's been a long

Summation by Mr. Shearer                    953

1    time.  I mean, this process has taken a long time from the

2    he was terminated back in 2017 until today.  It's been 31

3    months, and that's part of the reason that that number, when

4    you look back gets bigger, is every month that goes by,

5    another $40,000 gets added to this calculation.  So it's

6    both because the this process took a long time, and it's

7    also because Mr. Barger commanded that salary when he was

8    hired.

9            I thank you for your attention and I think when

10   you look at the evidence, you will agree.

11           THE COURT:  All right, Mr. Shearer.

12           All right.  Now, Mr. DiLorenzo, I understand that

13   you are going to be concluding the summation for the

14   defense?

15           MR. DILORENZO:  Yes, your Honor.

16           THE COURT:  All right.  Now, folks, I just want to

17   let you know something now as Mr. DiLorenzo is walking and

18   heading up to the podium, you heard a lot about individual

19   defendants.  They are no more in this case.  So it will be

20   claims only against the corporation, First Data.

21           Now, speculate as to why the individual defendants

22   are no longer in the case, because the chances are that you

23   will be wrong.  It is important for you just to accept the

24   fact that they are not parties to this litigation anymore.

25   Don't hold that against anybody one way or the other.

Summation by Mr. DiLorenzo                954

1    Things happen for various reasons in the course of a trial.

2    You're only going to consider whether the corporation,

3    First Data, is liable under either or both the ADA and the

4    FMLA, Family Medical Leave Act.

5         Now, if you have any curiosities, that's why I'll

6    come to see you after you render your verdict, and I will

7    explain to you whatever that you are curious about.  But I

8    am going to caution you again when I give you my charge to

9    avoid speculation, because chances you are going to be wrong

10   any and it's not evidence.  So I just want to explain

11   they're not here as well.  All right?

12        There's also not going to be any claim that he

13   was -- under the ADA that he was wrongfully terminated.  So

14   I will explain a little bit more of that to you as well when

15   I explain the law to you, but at least you can follow the

16   bouncing ball now knowing those two things.

17        And at this time, we will be hearing from

18   Mr. DiLorenzo.

19        MR. DILORENZO:  Good afternoon, everyone.

20        Is this working?

21        THE COURT:  There you go.

22        MR. DILORENZO:  Hi, everybody.

23        I, too, want to thank you for all of your

24   attention during this trial.  I noticed how much you've been

25   taking notes, how well you've been paying attention, we

Summation by Mr. DiLorenzo                    955

1   really appreciate it, especially, even though they're out of

2   the case, the four individual defendants, Frank Bisignano,

3   Mr. Charron, Mr. Marino, and Ms. Johnson.  They very much

4   appreciate the attention you've give us and the help,

5   because we need to resolve these two and a half years worth

6   of hanging over everybody's head, especially the individual

7   defendants who were in this case.

8          So I'm going to talk, get right to the heart of

9   the case, basically three claims, two under the ADA, and one

10  under the FMLA.

11         The ADA claims, as you've heard, two parts to the

12  ADA claim.  One is that he was forced -- Mr. Barger was

13  forced onto a leave, disability leave, against his will

14  supposedly in November of -- November 21st of 2016.  And

15  along with being put on that leave, he was denied access to

16  his email and other systems within the company.  And you're

17  going to hear the instructions from the judge on the

18  requirements for the ADA and there are several.  There's the

19  requirement that there be an adverse action.  There's the

20  requirement that the adverse action be the "but-for cause"

21  of the action.  So in other words, his disability has to be

22  the cause of why he was put on leave on November 21st.  His

23  disability had to be the "but-for cause," it wouldn't have

24  happened otherwise.  It has to be the "but-for cause" that

25  caused him to be denied access, had his access revoked.

1        Now, there's several reasons why that can't be
2   proven in this case, not on this record.  First of all, the
3   proof is undisputed that he had this cancer since February
4   of 2016.  So February, March, April, May, June, July,
5   August, September, October go by and nothing's done with his
6   accessed email and nobody's forced him to go on leave.  All
7   that time's gone by.  This isn't like they didn't know about
8   it.  He told everybody that he had the diagnosis in
9   February.  So they knew.  So if they were going to
10  discriminate against him because he had cancer and they were
11  going to put him on a leave because he had cancer, eight
12  months went by they didn't do anything.

13        What happened during the eight months?  He did his
14  speeches with Mr. Marino, Tony Marino.  They did the
15  First Data Way a road trip, and he ran -- by then he was
16  running the sales department, the sales training department.
17  He was doing all of those things.  He testified that he had
18  radiation and chemotherapy during that period.  He clearly
19  had an illness.  He clearly had cancer.  Nothing happened to
20  him.  Nothing made him go on leave.  Nobody took his access
21  off.  So it has to be for some other reason than his
22  cancer -- than his disability.

23        September 6th, as you know, he has surgery, major
24  surgery.  We heard the graphic description from the
25  testimony that they read from the doctor.  So from

1    September 6th he's in the hospital, and he stays in the

2    hospital in that hotel.  I think it was Tampa for a couple

3    of weeks or several week, and then he goes home after that.

4            Now, you've heard some testimony, and we're going

5    to talk about it in a minute, that indicates that he was

6    working during that period.  His son testified that he was

7    with him.  He dropped the phone from the hospital bed, it

8    broke.  He got a couple of Federal Express packages, we

9    heard all of that.  We're going to talk about more of that

10   in a minute.

11           But according to the son's testimony, Mr. Barger's

12   own testimony, nobody put him on leave, even though he had

13   been in a hospital for a serious operation.  He said he

14   wanted to work.  He wanted the chance to work.  I am going

15   to show you some text messages where he said, I need the

16   money.  I can't give up the income, so he was allowed to

17   continue working and he was not put on leave.

18           November 3rd, Tony Marino, one of the former

19   individual defendants, and Mr. Plumeri go down to see him.

20   These are the people -- these are the people that were in

21   the golf picture.  Do you remember the golf picture?  I

22   don't know if -- I guess that wasn't a vacation day for

23   Mr. Barger, but I don't know what he calls it when he plays

24   golf.  But anyway, we had a picture of him, the three of

25   them playing from September.  And then in November, Plumeri

Summation by Mr. DiLorenzo                958

1    and Marino fly down to see him just to see how he's doing,

2    because they hear he's not doing very well.

3            So they go down and see him and Mr. Marino

4    described him as being in very bad shape.  He couldn't walk.

5    He couldn't talk.  He looked very bad.  Mr. Barger on the

6    stand, as part of his direct examination, said, Yes, I did

7    look bad that day.  They caught me on one of my worst days.

8    But on cross-examination, he admitted that he got a lot

9    worse after that day.  He got a lot worse.

10           Now, the claim is -- the claim always has been in

11   this case that with -- and it was made last Monday, last

12   Monday Mr. Barger's attorney said to you that this FMLA

13   problem -- I'm sorry, the mandatory leave problem under the

14   ADA started when Mr. Marino went down and evaluated his

15   condition and came back and put him on leave.  They left

16   everything else out.  So the two events that you --

17   were implied to, was that Mr. Marino saw him on the 3rd, and

18   then right after that because of what he saw, he put him on

19   leave.  Actually that didn't happen.

20           Mr. Marino came back.  Mr. Marino testified what

21   really happened, was this.  He received this text message

22   from Mr. Barger on November 8th, which is five days after

23   the visit to -- to visit him at his home.

24           (Continued on the next page.)

25

*Summation - Mr. DiLorenzo*          959

1          MR. DILORENZO:  Thanks for the wonderful visit.

2   This is from Mr. Barger on November 8th to Mr. Marino.  Thanks

3   for the wonderful visit.  It's Defendant's Exhibit 115.

4   Thanks for the wonderful visit.  Personal things are the only

5   ones that count.  Going in for additional repair surgery next

6   week.  Six weeks in the hospital, four weeks full recovery,

7   should be talking around Christmas time.  I could play Santa

8   at office party ha-ha.  PC corrected.  Love you, Tony.

9          So that's what happened on November 8th.

10          Now, in addition to receiving that text message,

11   Mr. Marino continues to hear reports about the department

12   being neglected.  There is an HR partner, Rhonda Johnson, who

13   you've heard from.  She's giving reports to Mr. Marino and

14   others that that department needs some direction.  It's not

15   operating very well.  That was confirmed by two witnesses that

16   testified in front of you.  Justin Stamey, who is the new

17   director of the group, and Mr. Barger brought a witness in

18   Julie Kelly.

19          Now, you remember Julie Kelly she came in from Ohio

20   voluntarily.  She's a client, or was a client, of

21   Mr. Shearer's represented both of them.  She has an ADA claim

22   against First Data, several of the individual defendants, as

23   well in federal court in Ohio.  She testified that things

24   weren't bad during that period.

25          Justin gave you a clearer picture of the lack of

1   direction while Mr. Barger was out.  Ms. Kelly did admit

2   though that she attended a meeting with Rhonda Johnson on

3   November 11th and she took notes at that meeting.  And the

4   notes had the words:  Embarrassed, frustrated, direction in

5   the notes.  She admitted that she probably took those notes.

6   She wouldn't say that she said it.  Jason testified that they

7   both asked for that meeting with Rhonda Johnson to talk about

8   things going object in the department.

9          So here's what Tony Marino, the HR director, is

10  faced with.  He gets a text message that says I'm going to be

11  out for six weeks.  I got to have more surgery.  He gets

12  reports that the department was not running well and it needs

13  some better direction than just the business HR partner trying

14  to help without when she can.

15         So what he does is he contacts Mr. Barger and he

16  says you're going to be on leave.  He's got to put you on

17  leave and he tells them and Mr. Barger says that he believed

18  it was heartfelt that you've got to get better for yourself

19  and your family.  You got to take the time to get better, stop

20  working, don't worry about this work stuff.  Everything's

21  going to be fine.

22         In the meantime, they put Robin Ording i although

23  she's a VP of HR.  She's going to do both jobs.  Not get paid

24  any more money, she's going to cover as interm director of

25  that Sales Training Group.

*Summation - Mr. DiLorenzo*                961

1          So it wasn't the fact that he was on disability, it

2     was a combination of those things that he received information

3     of the text message that he's going to be out for six weeks.

4     He's not getting better.  He kept saying, Look, I want to keep

5     working, I'm going to get better right away, I'm going to come

6     back.  It didn't happen.  There were complaints he was going

7     to be out for another six weeks and the department needed

8     direction.  That's why Robin went in there.

9          Now, we see a number of other communications that

10    continue.  Here is November 8th where he thanks people.  This

11    is November 8th, he talks about sends it to his group and says

12    please moving forward CC me on all communications.  Too many

13    things are moving through the system without my knowledge.

14    Thanks for protecting me from work.

15         Now, there's a text message, Defendant's

16    Exhibit 310, from him to Mr. Plumeri where he says that I'm

17    working three to four hours a day.  I'm not going to work.

18    I'm not going to work full-time yet but can do three to

19    four hours.  Staying home is killing me.  I need the

20    income -- also, I need the income to continue.

21         When I questioned him on cross-examination, he said

22    during that period, that entire period, he's working ten hours

23    a day.  I don't know if you remember that testimony.  When I

24    confronted him with this note to Mr. Plumeri who he wasn't

25    really involved anymore, we'll talk about that in a minute.

1  He said he lied to Mr. Plumeri, plus Mr. Plumeri was worried

2  about how much he would work or be working.

3          So from September 4th to November 21st when he's put

4  on the leave, it's 88 days.  If he's working ten hours a day,

5  that's about 880 hours.  We put into evidence a couple of

6  e-mails.  One he sent by mistake to a group of people, hit

7  reply all, and it was an incoherent message that went out to

8  about 30 people.  And Mr. Marino commented on that that he was

9  getting reports there was erratic behavior, that he was doing

10 some things that were being questioned by everyone, and then

11 wondering what's going on with him, what's his condition, why

12 is this happening?

13         So Mr. Barger's lawyer kind of poo pooed that hit

14 reply all.  People make mistakes with e-mails once in a while.

15 That wasn't the only point.  The only point is we only have a

16 couple of e-mails.  There's only a couple of e-mails, handful

17 of e-mails or so, that he sent during that period.  It's

18 88 days, he's working ten hours a day.

19         Mr. Shearer told you that just a few minutes ago

20 that he looked at 60,000 records, 60,000 documents in this

21 case, so where is the pile of e-mails that Mr. Barger sent

22 between September 4th and November 21st?  If he's working ten

23 hours a day, what's he doing if he's not sending e-mails.

24 Where are his notes of meetings?  Where are his agendas for

25 meetings that he held with his group.  Where are all the text

1  messages with his group?  The only text messages we have in

2  the record are the ones that he sent back and forth to

3  Mr. Plumeri and the ones he sent back and forth to Mr. Marino.

4  And I've looked at those, I can't see anything in them that

5  deals with business.  And he had no business dealings with

6  either one of them at the time.

7           So where are these things?  Where are -- I get up on

8  a Saturday, even a Saturday, I make a little list of things to

9  do.  He was there 88 days, there aren't any list of things to

10 do?  There aren't any calendars that show his appointments?

11 There aren't any diaries?  What is he doing for ten hours?

12 Where is the projects?  Where is the reports?  Where is the

13 information as to what he Dade.

14          What have we got?  We have a couple of erratic

15 e-mails where he hit reply all and they don't make any sense.

16 And people throughout the company are wondering what a senior

17 vice president is doing sending these kinds of e-mails.

18          So Mr. Marino, heartfelt, puts him on a leave of

19 absence.  And what happens during that leave of absence?  He

20 gets paid about $200,000 from November 21st through to

21 January 10th or, I'm sorry, January 13th when he's released to

22 come back to work he receives disability pay.

23          You heard that there is -- he claims that he's

24 $25,000 short.  There's $47,000 in LTD that he received from

25 MetLife that more than covers the 25,000 he's claiming he was

*Summation - Mr. DiLorenzo*                              964

1    out when he's still making almost $20,000 a month during that

2    time period.

3           As we said before, his condition continues to get

4    worse after Mr. Marino puts him on the leave.  We have an

5    e-mail where he indicates his position has become very

6    serious.  He says, Looks like Rhonda just took care of

7    everything for my STD.  I appreciate her gentle loving care.

8    I need to discuss my options with you and Joe.  I believe

9    those were stock options.  They need to be transferred into my

10   wife's name.  I need to make certain they're all issued.  All

11   my accounts will be in her name.  I also need your help

12   getting my finances together.

13          Dr. Harrison, the one that in opening statement was

14   described as world renowned at Moffitt was very concerned

15   about the lymph node cancer being inoperable.  I don't know

16   length of time but need your help for my family's security.

17   Please don't broadcast this.

18          This is shortly after he's put on the leave.  This

19   reaffirms that this gentleman is sick and can't work.  And the

20   evidence demonstrated that he wasn't working.  As you know,

21   right after Mr. Marino received this text message, he went to

22   work on getting him his bonus paid.  Within 24 hours, he

23   contacts two of the other individual defendants, Frank

24   Bisignano and Mr. Charron, contacts them both and he gets

25   their permission to issue his bonus for the full $174,000,

1  same as last year, no five percent reduction like everybody

2  else.  That bonus isn't supposed to be paid until March, gets

3  paid in the next pay period for him.

4        In addition to that, only 30 percent of it is

5  supposed to be paid in cash, the rest is supposed to be in

6  stock, it will vest.  He gets it all in cash form.  He sends

7  him a nice text message saying, Coach, good news.  We got your

8  bonus paid.  That doesn't sound to me like people that are

9  trying to discriminate against someone by placing them on

10  leave because all of a sudden they got a disability.

11        You heard testimony from our leave service people.

12  Our manager, Jennie Voycheske, she testified at any given time

13  about 1,100 people some leave, military, family medical,

14  Americans With Disabilities Act.  As counsel for the plaintiff

15  told you during his closing, they've devoted an entire

16  department to taking care of leaves for everybody.  We

17  understand the leave process.  We do what's required by the

18  law.  And everything was done for Mr. Barger that should be

19  done.  He wasn't put on the leave discriminatorily or to cause

20  an adverse employment action.  And it wasn't even done -- it

21  wasn't the but for cause.  It was is condition, the concern

22  that he expressed that he was going to have a second

23  operation.  He was going to be out for another six weeks.  It

24  only made sense to put him on leave.  And he was still

25  compensated very well under the disability plan.

1          Last Monday, today their complaining about the

2    $25,000 he's short.  Last Monday, when the opening statements

3    were given, the plaintiff's attorney told you he was placed on

4    unpaid leave; that he was placed on leave of absence,

5    involuntarily and that it was unpaid.  That's not true.  They

6    now figured out from the records that we introduced that he

7    was paid.  And he was paid pretty generously.  Now they're

8    complaining he's $25,000 short.  Now they have the 47,000 from

9    the LTD for that period as well.

10         Now, in addition to what was going on with

11   Mr. Marino, there's even an indication from his own doctor in

12   August, a note from his doctor in August, that indicates, if

13   you look at the highlighted part, it says, talks about a

14   second opinion with cancer.  Finally, to be honest, and Frank,

15   you need to give some real thought about planning retirement.

16   I think whatever comes next will take some steam out of you

17   for a while.  I don't think worrying about a work schedule

18   will help you heal or help you make the best decision.  That's

19   his doctor.

20         When Mr. Marino put him on leave of absence it was

21   for his own good.  It was also for the good of the company.

22   Somebody had to get in there and run that department properly.

23   They had waited as long as they could without doing that.  And

24   he doesn't doubt the good motives of Mr. Marino.

25         You know we can say all you want but this doctor was

1   saying that worrying about work isn't going to help you get

2   better.  He can claim that he was terrific before he put him

3   on leave, but it wasn't until he was put on leave and stopped

4   working and didn't have any e-mail access that he started to

5   get better.  December and January is when he starts to get

6   better and that's after he's put on leave.  I guess we'll

7   never know whether it had anything to do with it, but

8   everybody involved including his own doctors seems to think it

9   was a good idea that he not have work stress while he's trying

10  to recover.

11          Now, with respect to turning off the access.  Again,

12  which went to hand in hand with the leave.  I mean, once

13  you're on leave and you're not going to be working, there is

14  no reason for you to have access to the e-mail system.  There

15  isn't any reason for it.  If he wasn't stopped, he wouldn't

16  have stopped working.  That is really what he was doing was

17  monitoring the e-mail process.  The idea was to focus on

18  getting better.  The only proof we heard of any adverse action

19  you're going to hear the judge in the instructions.

20          The judge will instruct you on what's considered an

21  adverse action under the Americans With Disabilities Act.  You

22  know, it's not a minor inconvenience.  Those things aren't

23  considered adverse employment actions and this particular case

24  with respect to the e-mail address.  The only thing they put

25  in the way of proof was that he didn't get an e-mail that he

*Summation - Mr. DiLorenzo*          968

1   was sent on a Saturday from the leave group concerning his

2   disability papers.  And the testimony was that there was an

3   assistant, his assistant was monitoring his e-mail, and she,

4   on Monday morning, she sent those disability papers to his

5   personal e-mail address.  And that was the only interference

6   or inconvenience that they showed anybody with respect to him

7   not being on e-mail.  There's no proof that anything was lost.

8              In addition, you'll hear the judge's instructions

9   concerning a qualified individual under the Americans With

10  Disabilities Act.  There is a number of definitions.  You have

11  to be qualified, otherwise qualified, disabled person, or

12  person with a disability.  The accommodation requested has to

13  be reasonable.

14             Frankly, he never made any requests.  They put him

15  on leave.  They took away the e-mail access.  We never got a

16  request for reasonable accommodation.  But I'll tell you, and

17  that's one of the requirements that you make a request.  But

18  had he made a request, I got to be honest with you, I'm sure

19  it would have been denied because he's not working.

20             The basis of a reasonable accommodation is you take

21  somebody who is disabled and the question is with a reasonable

22  accommodation can they perform the essential functions the job

23  if they can perform the essential functions of the job and the

24  accommodation requested is reasonable they get it.

25             He had e-mail access from September's operation to

*Summation - Mr. DiLorenzo*                    **969**

1  November 21st.  We say he wasn't doing the work; he wasn't

2  doing the job.  Once he goes on leave, and he's not supposed

3  to be working during the leave, there's no accommodation he

4  needs to be able to do his work.  He's not an otherwise

5  qualified individual.

6          Now, the claim was made that we're going to use the

7  medical record that his doctor's office submitted D-154.  And

8  you heard testimony this morning read about the fact that

9  perhaps this number and this number weren't there when it was

10 signed by the doctor but everything else was.  Everything else

11 was signed and filled in by the doctor's office.

12         Two other things I want to point out to you.  Under

13 yes or now on question three, what location to be

14 incapacitated for a single continuous period of time due to

15 his or medical condition including any time for treatment or

16 recovery the box is checked yes.  Incapacity means inability

17 to perform regular daily activities to attend school or work

18 because of the condition treatment therefore or recovery

19 therefrom.

20         So the plaintiff's right, we're not doctors, but we

21 got to rely on what our associates, doctors, tell us.  This is

22 his doctor telling us that he's totally incapacitated.  He

23 can't work.  If the date of 3/1/17 wasn't filed in then maybe

24 they didn't know when it was going to end.  I don't know who

25 filled it in.  But it just doesn't matter.  When we got it, it

1   was filed, signed by the doctor, and that's the

2   representation.  And you see even the limitations noted down

3   at the bottom.

4          So that's proof from his own doctor that he can't

5   work.  The statement was made these doctors are wrong all the

6   time.  You know what, I wouldn't go starting fires to say

7   doctors are wrong all the time.  But as I told you before, the

8   evidence we had in addition to the certified statement that we

9   got from his doctor that wasn't he was working, he wasn't able

10  to work.  Even the common sense approach of the kinds of

11  illnesses he had, the infections, the complications, the

12  surgeries, those are things where it's going to be difficult

13  for you to work.

14         Now, he gave testimony on the stand that he turned

15  all of the work over to his department.  He had great people.

16  He said, I turned it over to them.  And the judge interrupted

17  him and said, Well, you turned it over to them?  But he said,

18  oh, Well, I mean I delegated things for them to do.  When his

19  son was on the stand, and his son described what he had done,

20  he said he sent some e-mails, sent some text messages, he got

21  a couple of Federal Express packages.  And then he said he was

22  talking on the phone all time.  And the judge, before I could

23  say anything, leaned over and said, Could he talk?  And he

24  said, no.  Well, then how is he using the phone?  Well, he was

25  sending text messages.  As I told you before, the only ones we

1  have record in the record are the ones to Plumeri and the ones

2  to Marino.

3         So our case under the Americans With Disabilities

4  Act, he was probably put on leave for good reasons.  It wasn't

5  because he got a disability that we forced him out on leave.

6  It was because of this entire history of the things that

7  occurred and Mr. Marino's concern of making sure that he was

8  going to be focusing on getting better instead of worrying

9  about these work issues and get somebody into the department

10 that could run it properly.

11        Access.  Just makes common sense from the fact he's

12 put on leave.

13        So those are the two claims under the Americans With

14 Disabilities Act.

15        Talking about the Family Medical Leave Act.  And

16 last Monday, Mr. Barger's attorney got up and said that it's

17 pretty absolute he was telling you about the law under the

18 Family Medical Leave Act and he gave us a similar speech about

19 eight years of legislative history are the statute and so on

20 and compromises that were made.  And he stated that the law is

21 absolute requires reinstatement.  You come off of leave and

22 you can go to work you have to get your job back or you have

23 to get an equivalent position.

24        Mr. Eidelman got up right afterwards and said, you

25 know, we're not supposed to talk about the law, only the judge

*Summation - Mr. DiLorenzo*                    972

1   is supposed to talk about the law.  But since Mr. Barger's

2   attorneys talked about it, I need to clarify some things for

3   the record.  And one was that there's a specific regulation

4   that says you don't get treated any better than the people who

5   were at work and you don't get treated any better as if you

6   were at work and, in fact, one of the exceptions to be

7   reinstated is if you get laid off.  You're not protected from

8   layoff.  You're protected for 12 weeks from the situations

9   that the statute covers.  Your own serious illness, child

10  leave for child rearing, child birth.  Those kinds of things.

11  It couldn't protect you or insulate you from layoff.  If it

12  did, think about what a crazy situation this would be.  361

13  other people besides Mr. Barger were laid off in January and

14  February of 2017.  361 other highest-paid executives in the

15  company.  They were all laid off including his boss.

16          So what are we supposed to do?  Bring Mr. Barger

17  back to his old department and say, well, you don't get laid

18  off because you happen to be gone the day.  We did the layoffs

19  you were out on leave.  It doesn't make any sense.  Would we

20  bring him back to a 70-person department, or would we just

21  bring him back to the one that has 18 in it because all those

22  people got laid off, too.  So what do you do?  Do you bring

23  him back and pay him $720,000 to supervise now 18 people

24  including Jason Stamey who has been running the department

25  since he left?  It doesn't make any sense.  Nobody gets

*Summation - Mr. DiLorenzo*                                973

1    insulated like that not in this day and age.

2          Now, you're going to see the instructions from the

3    judge and I think if you read them carefully or listen to them

4    carefully, you're going to see that Mr. Eidelman was right

5    when he told you there was an exception and one of them is for

6    people to get laid off.  And if they would have been laid off

7    the work.  And the judge is going to tell that you the burden

8    is on us to prove that and I think we've proved that a million

9    times over, way beyond preponderance of the evidence.

10         Probably three days of this week was spent by the

11   plaintiff trying to prove that the layoff is a sham.  That the

12   layoff was a concoction of the lawyers to somehow get rid of

13   Mr. Barger.  It was all dreamed up.  It's the conspiracy

14   theory of the century.  The History Channel wouldn't even run

15   this one because nobody would believe it, it's unbelievable.

16   Here's what it means.

17         It means that everybody at that table had to get on

18   the witness stand and lie.  Mr. Bisignano, Mr. Charron, and

19   Ms. Johnson.  They all would have got up there, all these

20   executives from a publicly traded company, would have had to

21   get up there and lie to you about whether Mr. Barger was going

22   to be laid off for the reasons they gave you:  That he was

23   overpriced, he wasn't that great of a manager, his department

24   was out of control, it needed to be cut down, and it needed to

25   be run by somebody with a more appropriate salary.  Those are

1    the reasons they gave you.  And they told you that they had

2    criteria that he fit perfectly.  He was probably the poster

3    child for that ten percent of the 3,000 highest paid people in

4    the company that should get laid off.

5            In addition to those four people, virtually every

6    other witness we produced.  Everybody.  Jen Voycheske, Karen

7    Whalen, everybody.  Justin Stamey.  Everybody that we produced

8    would have to be lying.  All of the e-mails and text messages

9    we've shown you would you have to be business fraudulent

10   documents.  And we'd have to be the greatest of fortunate

11   tellers that ever existed because we had been writing these

12   things and preparing them knowing that some day we're going to

13   be in a federal courtroom trying to explain this case.  And I

14   got to be honest with you:  If I dreamed it for a year, I

15   couldn't dream up this case that's been presented.

16           There's no way.  You don't see one bad e-mail in

17   here, one bad document that indicates we did anything other

18   than a legitimate layoff for legitimate business reasons and

19   he fit the criteria and he went with a whole bunch of other

20   people including his boss.

21           Let's start with the purpose of the layoff.  Frank

22   Bisignano, the CEO, he told you how he took over this company

23   after five CEOs failed and he told you how the company was

24   losing almost $900 million a year.  He told you how he came in

25   and he brought in a new management team.  They turned the

1    place upside down, they visited every location.  They had

2    24,000 employees, they had $24 billion in debt.  They had

3    $2 billion in interest payments.  I bet there's countries that

4    don't have interest payments that big.  It was a mess.  No

5    cash, no ability to invest in technology, no nothing.  It was

6    headed for bankruptcy which is what he talked to his wife

7    about.

8            Instead of that, they rolled up their sleeves and

9    they decided what do we have to do to save this company.  What

10   did he do?  Yes, he had reductions in force.  He closed

11   locations.  He consolidated areas.  He found efficiencies.

12   What did he do with that money?  And then he renegotiated his

13   contracts with his suppliers.  They addressed every facet of

14   the company in terms of costs.

15           And what did he do with that money?  They reinvested

16   it in the company.  They brought technology.  They bought

17   other companies.  They went on a program of changing the

18   company around financially.

19           Come 2016, the end of 2016, beginning of 2017, he

20   noticed he had done a number cost-cutting measures.  For the

21   first time, he decided we have to cut the management ranks.

22   We're too fat in the management ranks.  And they started the

23   process of looking at numbers, smaller numbers first, and then

24   on January 2nd they have a meeting and he says I want to look

25   at the top 3,000 because.  That's really the size of the

1   management group in the company, 3,000.

2            So they're going to look at 3,000 and he wants to

3   lay off at least ten percent of that.  They ended up laying

4   off more than ten percent, 362.  And paid 54th in that group

5   was Mr. Barger and his boss, Jeff Hack, put him on the list.

6            Now, you heard Mr. Shearer say that Mr. Hack and

7   Mr. Charron put him on list on a whim.  That's not what I

8   heard Mr. Charron say.  When Mr. Charron testified, let's

9   remember who Mr. Charron is, right, he's the West Point grad,

10  the hearing problems from the Gulf War, pretty straightforward

11  guy.  I thought a stand-up guy.  He told you what happened.

12           He said that -- let me go back for a minute.  You

13  know story as well as I do, but I hope that you can see it the

14  way that I see it.  Mr. Barger goes 13 years without

15  contacting Mr. Plumeri, and that's the guy that he he's worked

16  with before.  He's very successful man.  He called him Batman

17  and he was Robin.  In my world, we would have called him the

18  Godfather.  This is somebody that's going to take care of him.

19           He contacts him, he gets him the job at First Data

20  as an consultant.  And we know that history of how he got

21  paid.  He represented that Mr. Plumeri asked him, How much are

22  you making?  Mr. Barger agrees that's what he was told, what

23  he was asked, how much are you making.  He says 20 to 25,000 a

24  month.  So he goes, I'll give you 30.  He needed him.  He was

25  in desperate shape, too, this was this the beginning of trying

1    to save the company.  So he brings him in at $30,000 a month

2    as a consultant and you know about the invoices and the

3    $50,000 for the intellectual property, all those things that

4    happened.  And he did approved the $400,000 purchase order.

5           And just as plaintiff's attorney described it to

6    you, they only used 177 of it because he became an employee in

7    June.  So I guess in his mind -- now, remember, he just split

8    up the business he started with his son to teach him.  He was

9    going to apprentice his son to teach me -- he was going to

10   apprentice his in the business, he was going to teach him to

11   do this work.  He left him high and dry.

12          I think the parting shot for the high-and-dry son

13   was grabbing $50,000 from the money that was left in the

14   400,000 because they didn't use it because before the end of

15   the year he became an employee.  So he grabs 50,000 for his

16   son as a little severance package for the son in the business

17   and off he goes to work for First Data.  And he works for

18   Mr. Plumeri, Batman and Robin, for a good year or so and then

19   Mr. Plumeri goes on to other things and now Robin's alone.

20   Can you imagine Robin without Batman because now that's what

21   we got.  Except Robin is very, very highly paid because his

22   good friend and Godfather Joe Plumeri took care of him he did

23   take care of him very generously.  He's got this high salary

24   now.  High salary like that, you better perform.  I remember

25   win A-Rod came to the Yankees what that was like.  You got to

*Summation - Mr. DiLorenzo*                978

1   perform if you get paid a lot of money because everybody's

2   watch.

3          So what happens?  He's now managed by Jeff Hack and

4   Jeff Hack reports to Dan Charron.  And Dan Charron in the fall

5   of 2015, several months before Mr. Barger gets cancer, he goes

6   to meet with him and Mr. Barger admits they met and what's the

7   conversation about?  You making too much money.  If you're

8   going to justify this salary, you've got you got to do more

9   than have a Sales Training Group that you run.  This isn't

10  going to work, not for $730,000 a year.  It's not going to

11  work.  I got people running businesses that don't make that

12  much money.  So there's the warning.

13         Now, you heard testimony, or not testimony,

14  actually, you hear lawyer argument today about it, geez, if he

15  stayed maybe he would have talked to Dan Charron about cutting

16  his salary.  Seriously?  I don't think Mr. Barger was in the

17  business of talking to people about cutting his salary.  That

18  was a great opportunity he had in the fall 2015 all the way to

19  February when got the cancer, or all the way to September when

20  he went in for the operation.  He never said, you know what,

21  I'm making too much money to be fair to everybody, I should

22  take a pay cut based on what I'm doing compared to the

23  contribution of the other people in the company, I should take

24  less money.  That didn't happen.

25         And you heard Mr. Shearer say that under the FMLA

*Summation - Mr. DiLorenzo*                    979

1   you are to be treated the same as people working.  No better,

2   no worse.  That was a quote.  No better, no worse.  And if he

3   got a pay cut and kept his job, he would have been treated

4   better than the 361 people because Tony Marino testified none

5   of them got a pay cut, they all went.  None of them had their

6   jobs backfilled, they all went.  Nobody got a chance to look

7   work at a lower-level job.  These are very highly compensated

8   managers.  For whatever reason, perhaps that they would be

9   disincentivized if they got their pay cut like that, I don't

10  know what the reasons were.  I only know that he got treated

11  the same as all the other employees.  No better.  Well, I

12  shouldn't say that.  He did get treated a little bit better in

13  some areas that we're going to talk about.  But he certainly

14  didn't get discriminated against.

15        So as soon as Mr. Plumeri left, things changed for

16  him.  In fact, let me show you a set of text messages that

17  Mr. Shearer showed you but he didn't show them all to you.  So

18  these are between Mr. Plumeri and Mr. Barger.  The one that he

19  showed you was this exchange, They trying to get rid of me?

20  And Mr. Plumeri says, Big company stuff.  I understand.  Look

21  at it from the insurance side.  All good.  Love you.  Then he

22  opined what he meant by insurance.  I don't know what he meant

23  he was here nobody asked him what he meant.  I don't know what

24  he's talking about.  So they trying to get rid of me?

25        Now, Mr. Plumeri sends this message on

1    November 19th.  Big company stuff.  I understand.  Look at it

2    from insurance side.  All good.  Love you.  The next day,

3    Mr. Barger writes him saying, They trying to get rid me?  Then

4    he it be sends another message to Mr. Plumeri.  No.  And then

5    on 11/22, two days later, Mr. Plumeri sends this message.  A

6    simple, I love you pal.  Thanks for the incredible friendship

7    would have been nice.  Three exclamation points.

8         This is Batman hearing from Robin a year later when

9    he gets in trouble and is worried about things and he e-mails

10   his Godfather and says, Hey, I might be in trouble here, I'm

11   not sure what's going on.  And Mr. Plumeri's answer is a

12   pretty gentle, Hey, how about a thanks for all the things I've

13   done for you for 30 years including setting you up at

14   First Data?  You got to handle these things yourself.  If

15   you're not going to lose a job, be laid off the job, that's up

16   to you.  Batman's gone, Robin's on his own.

17        And just in case whether there's any question those

18   three exclamation points at of the end the e-mail represent

19   anger.  You can see Mr. Barger interpreted it that way.

20   Thanks.  Thankful for you and Susan just thinking of you have

21   a wonderful day.  I am grateful.  Love, Steve.  So he

22   understood that what Mr. Plumeri was talking about was I don't

23   see the gratitude in all the things I've done for you.  And he

24   did do a lot of thing for him, there's no question about it.

25        But he was gone and now that big salary that he was

1    able to influence Mr. Plumeri to give him, remember the two

2    years of tax returns just before he gets paid the $30,000 a

3    month have negative 16,000.  I got to be honest with you, I

4    didn't know that you could get negative numbers on a tax

5    return.  I don't know if they pay you or what happens when you

6    have negative numbers.  But it's the first time I've ever seen

7    it.  So he has two years of negative numbers, then he reaches

8    out and calls his Godfather, Joe, who he doesn't talk to in

9    13 years and he connects with the First Data package.

10             Now, let's talk a little bit more about that RIF.

11             So we heard from Frank Bisignano who described the

12   purpose of what was going on in the company the things they

13   had to do.  You heard from Tony Marino describe the

14   methodology that was used for this RIF.  It was no different,

15   really, the methodology than the RIFs he's done at other big

16   company where they had to lay people off including himself.

17   During the housing crisis, he worked for a home construction

18   company and they had to lay off, like, 70 or 80 percent of the

19   employees.  It happens.  Unfortunately, it happens.

20             Mr. Barger, in addition to the conversation with

21   Mr. Charron, that same year, the conversations start about

22   successorship.  And you heard some discussion today about, I

23   don't what this successorship is, and maybe it was for

24   Mr. Fricke's job.  Well, remember how that that hierarchy

25   looked?  Mr. Fricke was the vice president and Mr. Barger was

1    a senior vice president, and under Mr. Fricke was the sales

2    group.  Mr. Fricke leaves, Mr. Plumeri is still there, the

3    Godfather, and he says, geez, we can give you an assignment.

4    You can take this sales organization and he steps into that

5    job.  And they don't hire a replacement.  But if you're

6    looking for a successor, Fricke's job has been filled by

7    Mr. Barger.  He's just highly compensated and he still has the

8    title of a senior vice president.

9           But the goal wasn't to hire a successor that would

10   go into Fricke's job and we would move Mr. Barger back up.

11   You heard Mr. Barger testify on cross-examination.  I got to

12   be honest with you, I've had a hard time from the beginning of

13   it case understanding the sales transformation.  What that job

14   is or what that does and he described it, he came in to do it

15   and so on.  I didn't really understand -- I understand that

16   you speak -- he speaks for an hour at the seminar, that

17   there's like 25 or so a year or something like that.

18          I understand speaking at the seminar, but I don't

19   understand how that's the, you know, like sales transformation

20   person that changes the culture over seven years.  I never got

21   that handle.  And you heard him when he was talking about his

22   damages say that it takes about seven years.  He's done at

23   other companies, it takes seven years and he needed five more

24   years here or something.

25          But I never understood it and I asked him question

1   after questioned and my understanding of his answer finally

2   was that whatever sales transformation work he was doing was

3   being done by the sales organization department that he

4   supervised.  So it's one job.

5          So if they find a successor for that sales

6   organization, that person is taking the whole job sales of

7   transformation and sales training.  It's all one job.  So when

8   you're talking about successors, I mean, if people came to me,

9   well, let me say that -- if people come to someone and start

10  talking about we need to find a successor for you, it's

11  usually a pretty good indication somebody's going to be taking

12  a your place.  And there were a ton of those conversations,

13  you saw the e-mails.

14         So my only point is this wasn't a surprise.  We're

15  getting up to the reduction in force in a minute.  But to the

16  extent they're trying to say this reduction in force of 362

17  people was a scam, a scheme, a design to protect us from being

18  sued by Mr. Barger, that's absolutely not true.  Mr. Barger

19  was a target, enough concern, long before January of 2017.  It

20  had been going on for sometime.  He wasn't going to be able to

21  hide anymore, he wasn't going to be able to use his Godfather

22  to protect him.  He was on his own.  Like he says, like he

23  teaches, price becomes an issue when there is no value.  When

24  you're paying too much for something and you're not offering

25  the value, people start to ask questions.

1          You saw Justin Stamey.  Seemed like a sharp person.

2    He's a director of the sales organization, he makes less than

3    $150,000 a year.  So if that's true, Mr. Barger was paid five

4    times the market rate as a t compared to Justin Stamey as he

5    should have been paid for job.  Of course, there's only 18

6    people instead of 70.  And you heard about the 70 and you

7    heard, for example, that one of the reasons this is all a sham

8    is because we talked about what a bad manager Mr. Barger is.

9    I don't think anybody at that table would have ever said

10   anything to anyone about Mr. Barger if he had just been one of

11   the 362, 61 people that was laid offer.  He sued us.  He's

12   challenged the RIF.  He said, I was such a good manager, they

13   should have kept me.  That's the proof that this RIF is

14   invalid because I was so damn good, they shouldn't have let me

15   go.

16        That's why we brought these people in.  My goal is

17   not to throw dirt on Mr. Barger.  One of the worst things that

18   we could do as lawyers is cross-examine a man with a voice

19   prosthetic.  It's not fun.  It's not something we enjoy.  It's

20   not anything that anybody at that table enjoyed watching or

21   have happen.  But it's what we got to do to protect ourselves.

22   We've got to find out what kind of manager he was.

23        He wasn't a bad manager, neither were the 361 other

24   one we laid off.  None of them would have been fired if the

25   company was flush with money.  They probably would still be

*Summation - Mr. DiLorenzo*                    985

1    there.  But when you have to throw people out of the lifeboat

2    and figure out who is going to be available in the boat to row

3    it to shore, you got to pick the best.  You got to figure out

4    what seats do I need to be filled and we dot got to do it.

5    It's not pleasant.  Nobody at that table has enjoyed two

6    things.  One, nobody enjoyed Mr. Barger getting cancer.

7    Number two, nobody enjoys doing any layoffs of anyone.  Of the

8    361 or the 362 including Mr. Barger, none of this was a

9    pleasure trip.  But when they accused and sued individually of

10   things, you're going to hear them say these are the reasons

11   why we did it.  He wasn't that good of a manager.  He did one

12   360 evaluation that you're going heard brag on direct

13   examination.

14        On cross-examination, you heard some of the

15   comments.  These are people that work for him.  These are

16   people around all around him in 360-degree great manager he

17   might have been a great motivational speaker he might still be

18   a great motivational speaker.  That's a totally different

19   skill set than managing a group.  Managing a group, you have

20   to take responsibility and be accountable.  Mr. Barger isn't

21   great on an accountability.

22        I'll give you some examples.  I heard him say, when

23   I asked him why he sued the individual defendants.  He said, I

24   my lawyer told me to do it.  When we -- when I asked him about

25   the attrition in his department where it ballooned up to 70

*Summation - Mr. DiLorenzo*                    986

1    people nobody could figure out what they were doing.  It went

2    down to 18 right after they had the cut.  I asked him, how did

3    so many get hired.  He said, well, it's the business units, we

4    were doing what they asked us to do.  And I go, yeah, but

5    didn't you hire the people?  I just signed the racks, they got

6    approved by people above me.  I asked, how do you have

7    47 percent attrition in your department more than twice the

8    rest of the company?  And what did he say?  Well, that's a

9    director's fault that worked for me.  She worked for me, that

10   was her fault that attrition.  And I asked him in a nice way,

11   I think.  Well, if she works for you, isn't it your

12   responsibility if the department's got bad attrition, those

13   kinds of numbers.

14        Listen, that didn't have anything to do with Robin

15   Ording being the one that was there when they did the audit

16   those numbers are the numbers.  Those numbers would have been

17   the same numbers if he was there not on FMLA leave or Robin

18   Ording was there.  Unless they're suggesting that if he was

19   there, he would have hit some of the numbers or give him false

20   information.  That's an internal audit that's what that

21   consulting groups does.  They found problems.  And those

22   problems were part of what put him on the list.

23        But really probably one of the biggest things was

24   the value problem.  Making that much money for a job that

25   could be done by a director and the whole department could be

*Summation - Mr. DiLorenzo*                    **987**

1    handled by 18 people.

2         So he got the warnings, the RIF was accomplished,

3    we've heard -- you heard a lot of testimony, you heard a lot

4    of testimony that the RIF was improper.  They brought our

5    chief accounting officer in, Matt Cagwin.  He came in on

6    Friday.  He's the one that talked about all the numbers.  This

7    is a publicly traded company.  It's highly regulated.  You

8    know, every day you pick up the newspaper and you see SEC

9    violations and other problems with stock and reporting and so

10   on.  Frankly, when I saw him, I thought he was like a machine

11   in terms of explaining the differences between where this --

12   what bucket this money goes in and how you report to and so on

13   and so.  I still don't understand the theory that's been

14   expressed that somehow this RIF was not legitimate RIF because

15   of the way we directed the money to different accounts.

16        All I know and the thing I remember is that with

17   this RIF we spent about $23 million in severance pay and the

18   first year we saved the difference between 48 million and 23

19   and thereafter we said 48 that I remember.  Now, I think

20   that's legitimate.  It sounds legitimate to me.

21        You're going to hear an instruction from the judge

22   that says, you know, your job as a juror not to second guess

23   the business decisions of the company.  It might be good

24   decisions, bad decisions; you may agree with them, you may not

25   agree with them.  But we get the benefit of those.  We have a

*Summation - Mr. DiLorenzo*                              988

1    right to make mistakes.  And do it but they, their

2    shareholders, their employees, the 22,000 jobs they were

3    trying to save, the thousands of people in pension plans they

4    were they were trying to keep, the shareholder protection they

5    were trying to engage in, and the avoidance of bankruptcy for

6    the good of the people they owed $24 billion to.  That's what

7    they were focused on.

8            So they're looking around the lifeboat and they're

9    trying to figure how the get to shore.  I can't imagine having

10   that job but that's what they did.  And that's the context and

11   that's the heat under which these decisions were made.  And

12   every one of these people that showed up and testified, I saw

13   the difference in people that stand up and be accountable.

14   They looked you all in the eye.  They told you, this is what

15   we did.  This is why we did it.  It wasn't illegal.  We never

16   did anybody intentionally to try to harm Mr. Barger.  We felt

17   bad about him having the cancer.  They did a number of things

18   to try to help him.  They didn't enjoy any of those things.

19   Any of the layoffs or any of the things that happened with

20   Mr. Barger.  But you can't say that that RIF is not

21   legitimate.

22           Matt Cagwin talked about the fact that Ernst & Young

23   did an audit.  There's nothing wrong with how the accounting

24   was handled.  You know some of the proof that just makes it

25   impossible to believe this was a was a fake as part of a grand

1    conspiracy.  Do they think we got Justin Stamey, who is an

2    existing director, to take over the group and reduce the

3    number from 70 to 18 and tell all of them we want you to work

4    three times harder than you've worked until we get rid of this

5    Barger case.  We can't do it.  Right?  Isn't is that, to me,

6    that's the real proof.  If you don't want to hear what people

7    say, you don't want to hear what they write.  Look at what

8    they do.  They laid off 362 people.  Mr. Barger was not the

9    center of the universe.  In fact, in all honesty, the Sales

10   Training Group wasn't the center of the universe in this

11   company.

12           You heard Mr. Bisignano talk about the manufacturing

13   that goes on in this company, the devices that are

14   manufactured, the print shop, the people that send the

15   statements, the people that answer the phones.  That's where

16   the majority of these employees are.  That's where the

17   new -- that's we are talked about some new hires in November

18   and December.  He showed you a chart.  You know, it's a credit

19   card company to sales equipment and sells processes to credit

20   card companies.  The holidays, surprise, the holidays is a big

21   season for credit cards.  So of course they put more people on

22   in November and December.  But this company is not Wall

23   Street.  Mr. Barger maybe Wall Street.  Mr. Plumeri may be

24   Wall Street, but Frank Bisignano from Brooklyn and these

25   people that he's talking about, they're Main Street people and

*Summation - Mr. DiLorenzo*                    990

1   it's a Main Street company.  A lot of technology but it's a

2   Main Street company.

3           Now, let me go through some of the things some of

4   the other things that they talk about the RIF is invalid.  So

5   one of the ones like you know reminds meet conspiracy that we

6   didn't really land people on the moon.

7           The head count didn't go down.  I don't know how

8   many times I heard unrefuted evidence that the head count went

9   from 24,000 to 22,000.  In addition to that, we had three

10  major acquisitions.  So employees got added to the group,

11  okay?  The head count went down.  Whether they liked it or

12  not, the head count went down.

13          Then on the same day Mr. Barger is let go, or given

14  notice that he's going let go January 13th, they hired, this

15  was in the opening statement, they hired another senior vice

16  president.  The same day and he's got to be his replacement.

17  The gentleman's name is E.J. Jackson.  And you heard

18  Mr. Charron testified about E.J. Jackson.  He's hired in

19  San Francisco.  He's a software expert.  He's 30 years in the

20  software business.  He started two software companies that he

21  sold and he got hired to do software work for us.

22          I asked Mr. Barger on the stand; are you qualified

23  to do the work that E.J. Jackson was hired?  No.  He said no.

24  So I don't know I don't know where that went I didn't hear

25  anything about it in the closing statement.  I heard that that

*Summation - Mr. DiLorenzo*                    991

1    just now in the closing statement, I heard that why did they

2    if keep Robin Ording?  He could have had Robin Ording's job.

3    He could have taken a demotion to vice president and had Robin

4    Ording's job.  Robin Ording's job was as a vice president of

5    Human Resources.  Mr. Barger wasn't qualified for that job.

6    She came over to be the interm head of the Sales Training

7    Group and keep her day job in personnel and HR.  So she did

8    them both.  And you know whether you like it or not she didn't

9    get paid any extra money to do it.  She took it on because it

10   needed to be done.  But that wasn't a job she he could have

11   taken.  She was in the business to be in our HR group.

12           Now, you heard some testimony about the time travel

13   excuse last year about fiddling with dates.  All I'm going to

14   say about that is you Jen Voycheske, the manager of that

15   group.  She's no nonsense.  She knows this stuff, she figured

16   it out.  She knows how the FMLA and other leaves work.  She

17   had a justification for every change that she made.  Don't

18   forget, and I forgot to mention it when I was saying Barger

19   worked from September 4th to November 21st when he was put on

20   leave.  She's the one that said in the e-mail saying, When did

21   you stop working?  And he sends an e-mail back that says, I

22   stopped working on the 4th, my operation was on the 6th.  And

23   that's an e-mail I think you've seen.  So out his mouth came

24   those words.

25           Now, there's been some work in this closing

*Summation - Mr. DiLorenzo*                    **992**

1   statement on dates.  The fact that past grand conspiracy we

2   only added him later.  The dates are wrong, all those kinds of

3   things.

4           First, it was that he wasn't put on the list until

5   January 10th and, I'm sorry, January 11th.  I'm sorry.

6   January.  So he brings the return to work notice and the claim

7   he wasn't put on the list until after he brought that return

8   to work slip in.

9           (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Summations by Mr. DiLorenzo                    993

1          MR. DILORENZO (CONTINUED):  We showed you during

2     Mr. Marino's testimony three lists --

3          Let's put them up here now, if we could, Mike?

4          -- three lists all dated before that date.  This

5     first one is a list that was prepared that he was put on

6     November 30th, he was added to that list.  And that's a

7     layoff list.  This is the layoff list that -- and as

8     Mr. Bisignano testified, these things aren't done

9     willy-nilly in terms of layoffs.  They're difficult

10    decisions.  They work them.  They work them.  They work

11    them.

12         Remember, imaging being in an organization like

13    this where you're sitting around a table with a list of

14    3,000 people, and you're trying to decide, Who can we let go

15    from our operation?  Because at that point in time,

16    everybody's working for a reason.  Everybody's got a job,

17    and they're not performing so badly that they should be

18    fired for cause.  So they're all doing at least a meek's, a

19    meek's expectation level, but we got to let people go.

20    They've got to go, they've got to go, and now we've got to

21    decide who.  Those are tough decisions.  But he was put on

22    this list as early as November 30th.

23         And then you remember the sales transformation

24    planning report.  It's dated December of 2016.  And that's

25    the one that has the comprehensive list of all the people.

Summations by Mr. DiLorenzo                    994

1   They're going to save $2.2 million or try to save

2   $2.2 million if they drive into the sales training

3   organization.  You see Mr. Barger's name on it, and you see

4   that it says, Recommendation:  Eliminate role.  And that's

5   in December.  That's before he's come back to work.

6          Now, this theory that he's emailing and texting

7   people about I'm coming back.  I'm doing this.  He's been

8   doing that all year.  He was doing that in September.

9   There's the text messages if you want to read them between

10  him and Plumeri where he's talking about playing golf in

11  October and November.  He's been talking about coming back

12  forever.  We know he wants to come back.  I don't challenge

13  in any way, shape, or form that Mr. Barger didn't want to

14  get laid off, and he wanted to come back to work.  I would

15  bet that almost all of the 361 other people also wanted to

16  come back.  I don't doubt that.  I don't think anybody

17  wanted to be tossed out of the lifeboat.  I think they all

18  wanted to work.  That's not the question.  The question is

19  who's going to go, and what are the reasons for him to go?

20  And it's unrelated to the reasons that he's giving you in

21  terms of it being disability directed.

22          I want to read you and remind you of some

23  testimony that was read to you this morning from Kathi

24  Bernhardt, who is one of the people who keeps lists.  And so

25  on Page 178, Line 18, she was asked about list dated

Summations by Mr. DiLorenzo                    995

1    1/17/17, which is after the day he produced the return to

2    work note.  And it says:  1/17/17; is that correct.

3                Answer:  Yes.

4                Question:  All right.  So Mr. Barger was added to

5    the style on January 17th, 2017?

6                Answer:  To this file, yes.

7                That's because there's other files.  You saw the

8    other files.  And here's an email -- oh, do got it on?  I'm

9    sorry.  You're way ahead of me, Mike.

10               This an email from Kathi Bernhardt -- I'm sorry,

11   from Rhonda Johnson to Kathi Bernhardt, and it's dated the

12   same day as the list, Tuesday, January 17th.  And it says:

13   "Kathi:  Tony/Karen contacted me Friday afternoon and

14   advised me to notice Steven Barger with his SIM pact.  I

15   spoke with Steve Friday evening.  Tony and KW

16   are up-to-date.  Steve will be on nonworking notice until

17   2/18.  Lori G. sent me the agreement.

18               Do you have me to copy?  Contact me directly with

19   any questions."

20               And she got put on the list.  She got put on this

21   list that day.  He was already on three other lists, and we

22   showed you those.

23               Let's put the last one up, Mike, if we could,

24   which is I believe developed by Mr. Hack his boss.

25               So this one's dated 1/9, the day before he brings

1   the return to notice in.  And this is Mr. Hack's email to

2   Mr. Charron and Karen Whalen, to turn to people that he's

3   confirmed, and Number 2 is Steven Barger.  Mr. Shearer

4   talked about Mr. Hack a little bit during his closing.  And

5   he said, you know, Hack and Charron did this on a whim.  I

6   think was the term you used, a "whim."  That's why it's not

7   a legitimate -- one of the reasons it's not a legitimate

8   layout.  Mr. Charron testified it wasn't a whim, and he's

9   the guy that spoke to him in 2015 saying, You better come up

10  with some other job duties.  And I don't mean -- I mean

11  material changes.  I don't mean just adding more trainers,

12  because he had a habit of doing that and building a empire.

13  He could have had 300 trainers some day.  He said not adding

14  more trainers.  Do something in the profit and loss area.

15  Do something for the company.  Do something so we can

16  justify your salary, because they didn't want to cut his

17  salary.

18           Now, let me quickly talk about a couple of things.

19  I am hopeful that you're not going to get to damages in this

20  case, that you can decide this quicker than getting to

21  damages.  But I would be remiss if I didn't say a little

22  something about damages on behalf of my clients.

23           This is a chart that we put together from the

24  evidence in the record.  We call it the Steven Barger value

25  gap, 54,000 highest paid employee.

Summations by Mr. DiLorenzo                    997

1       Barger Consulting before he found Joe Plumeri

2   after 13 years, minus 16,000, minus 15,000.

3   Barger Consulting after he found Joe Plumeri.  These are the

4   invoice from the consulting agreement.

5       And you saw -- you know, the one that -- no matter

6   what question I asked, you saw, Go ask Joe Plumeri.  Just go

7   ask Joe Plumeri.  Well, we asked Joe Plumeri.  Joe Plumeri

8   was here.  You saw us ask him, right?  What did he say when

9   we asked about this stuff?  Unheard of.  You don't send

10  invoices before you do work.

11      And to hear the plaintiff's lawyer say, They had a

12  $400,000 purchase order.  They only had billed $177,000 at

13  that time he became an employee.  It sounded like we could

14  take the rest of the money.  The rest of the money is only

15  to be paid if they do the work.  That's not their money.

16  That's a 400,000 cap on a purchase order that can't be more

17  than that.  That covers the $30,000 a month.

18      And then we heard in the -- let's stay with this.

19      All right.  So we got the -- you got the 30,000 on

20  the top, which is before he's a consultant, and the 50,000

21  on the proprietary information.  Then Barger employment

22  after he finds Joe Plumeri, you'll see when he was 2014, he

23  gets six months' pay.

24      2015, do you how much he was paid, $480,000; 250

25  in bonus.

Summations by Mr. DiLorenzo                998

1        2016, do you see what he was paid?  His bonus, as

2   well as paid from January to August, then September to

3   December was 153,000.  Then another cash bonus of 174, the

4   one that was paid early.  That's the one that was paid

5   early, so he actually got two bonuses that year.

6        2017, he gets paid from January to February,

7   roughly 162,000 because they let him work until

8   February 28th so he could vest in more stock than he

9   otherwise wouldn't gotten if he didn't stay until February.

10       They didn't let him go on January 10th of 2017.

11       So if you flip over to the next page, you'll see

12   the timeline:  Joe Plumeri, senior advisor, 2014; vice chair

13   in 2015; leaves 12/31.  But it was sometime in 2015 or early

14   '16 where he stopped working with Mr. Barger.  And you see

15   Mr. Barger hired in 2014.  He worked for half -- that's when

16   Mr. Plumeri leaves because he go to work Mr. Hack in 2015.

17       By 2016, he's the 54th highest paid employee.

18       And in 2017, he gets caught in the RIF with

19   10 percent of 3,000.

20       And you can see the total amounts that he made

21   from 2014 to 2017.  I didn't add them up.  It looks like

22   about two and a half million dollars.  And we did

23   Mr. Barger's damages claims based on his testimony, which

24   was backpay of 1.3 million, stock of 900,000.  As I

25   understand it, they're not looking for any future damages.

Summations by Mr. DiLorenzo                    999

1    Although we were at a terrible disadvantage because I

2    couldn't understand how they did the calculation, and the

3    calculation I watched on that paper, including stock options

4    and interest rates and so on, it was nothing I'd ever heard

5    before I didn't know where the numbers came from.  There

6    wasn't expert testimony.  You heard me object to it.  I

7    don't think it was proper.

8              So I would like to put up -- let's just put up

9    a -- well, let me just quickly cover a couple of things that

10   were touched on in the plaintiff's motion -- or the closing

11   arguments.

12             So they make a big deal about no discipline in

13   his file.  Where's the documentation of all these things

14   that he did wrong?  We didn't discipline him.  We didn't

15   fire for cause.  We laid him off.  We're defending

16   ourselves, and we are defending the decision we made as to

17   why he was one of the people to go.  That's why we're

18   telling you what happened.  That's why you heard it with

19   live witnesses.  That's why there aren't a lot of documents,

20   but there's several documents.  There's the internal

21   consultant's report.  There's emails back and forth to

22   people.  You saw the note, even Julie -- even Julie Kelly

23   had notes that she didn't want to us give us.

24             I talked to you about the unpaid leave already.  I

25   don't understand the claim that we laid him off because he

1   wouldn't be any cost to us.  We're paying him $750,000 a

2   year.  Might he stayed on -- I mean, he's not disabled.  So

3   I don't know why he's arguing that somehow we wouldn't have

4   paid him, he wouldn't have been a cost.

5          He never requested an accommodation.  They talked

6   about a doctor's note on January 23rd that said he could

7   work nine hours.  He testified he was already working ten

8   hours, so I don't know what the significance of the nine

9   hours is.

10          When he started off explaining to you in closing

11  statements that he was on FMLA leave, he tried to come back,

12  they wouldn't let him.  In quotes, I have it, he said,

13  "that's it."  They wouldn't restore him.  "That's it,"

14  meaning that proves the claim because that's the general

15  rule of FMLA.  And that's the comment that Mr. Marino was

16  making, is that December 28th email where he says he's on

17  leave, he's got to come back, so on and so on.  That's the

18  general rule, unless you're going to be laid off.

19  January 20th -- January 2nd, January 5th they go from a

20  small layoff of management people from 10 percent to 30,000.

21  Mr. Marino's initial reaction is, Yes, he's on leave.  He's

22  coming back.  The law says that if he's on layoff, he loses

23  his job like everybody else does.

24          He argues that he's been speculated that he

25  wouldn't be laid off.  We haven't been speculating.  We told

1   you the reasons.  The reasons are the same.  Every reason

2   was evaluated by every one of those reasons without regard

3   to his position.  He was evaluated based on what he did, the

4   work that his group did, what his salary was, how effective

5   he was as a manager.  Is he someone likely to work for a

6   lean machine going forward?

7           You know, they would expect a manager to come in

8   and say, I've got too many people.  I don't need 70 people.

9   That's an evaluation the manager, himself or herself should

10  make in a company like this, which is looking a every cost,

11  every nickel, every dime, renegotiating every contract they

12  can with vendors, suppliers, and so on.  There was no

13  speculation.  His godfather was gone.  He wouldn't get the

14  protection.  It was over.  And the actual proof, the best

15  proof, even if you don't believe what I'm saying, the best

16  proof is Justin Stamey runs it now and he makes less than

17  $150,000, and he's a director.  And that's what he was

18  before Mr. Barger's position was laid off.

19          As I told you, he doesn't get treated any better

20  or worse.  He said that if he had not been laid off, maybe

21  he would have had time to fix it.  I don't know what he

22  meant, because he didn't explain it, Mr. Shearer didn't

23  explain it.  But I got the sense that he was saying, Okay.

24  There are some problems in the department, but if he was

25  there and he had the chance to talk to Mr. Charron maybe he

1  could fix it.  Probably because, you know, he's a sales guy,

2  and he's good at talking to people and he thinks he might

3  have been able to smooth it over.  I don't think there was

4  any fix of anything when this time came.  And it wasn't

5  matter of firing the bad managers for cost.  It was a

6  question of getting rid of the overpaid managers in areas

7  that could be operated by somebody else with a savings.

8          And the allegation that he wasn't taken back from

9  layoff, only when the lawyers got ahold of it?  Well,

10 listen, he got laid off.  He got laid off.  They didn't need

11 any lawyers to tell them that they could lay him off.  He

12 doesn't have FMLA protection if he would have been laid off

13 anyway, and that's what they did?

14         THE COURT:  Mr. DiLorenzo?

15         MR. DILORENZO:  Yes, your Honor.

16         THE COURT:  It's about a quarter 'til 4:00 now.  I

17 don't want to rush anybody.  As things are working out, I

18 think if we can get in the summations today, we'll have the

19 charge first thing tomorrow morning.  And maybe it was a

20 little overly optimistic, but the lawyers took a little

21 longer than they expected.

22         How much longer do you think you will be?

23         MR. DILORENZO:  Your Honor, I think I can do it by

24 ten 'til 4:00.

25         THE COURT:  All right.  So why don't we just take

Summations by Mr. DiLorenzo                    1003

1  our break now, and then we'll be here at 4:00.  You'll

2  finish your summations by 4:15, and that will leave

3  Mr. Shearer 45 minutes, which is ample time for the

4  rebuttal.  Then we will start with the charge tomorrow

5  morning and let the jury deliberate.

6           How does that sound?  Sound like a plan?

7           MR. DILORENZO:  Sure, your Honor.

8           THE COURT:  Okay.  See you at 4:00 o'clock.

9           THE COURTROOM DEPUTY:  All rise.

10          (The following matters occurred outside the

11  presence of the jury.)

12          THE COURTROOM DEPUTY:  All right.  Please be

13  seated.

14          (Recess taken.)

15          THE COURTROOM DEPUTY:  All rise.

16          (Jury enters the courtroom.)

17          (Jury present.)

18          THE COURTROOM DEPUTY:  All right.  Everyone may be

19  seated.

20          THE COURT:  Mr. DiLorenzo, how long do you think

21  you will be with your summations?

22          MR. DILORENZO:  I don't think I have too much

23  more --

24          THE COURT:  You don't have to if you don't want

25  to --

Summations by Mr. DiLorenzo                    1004

1          MR. DI LORENZO:  Oh, no, I understand.

2          THE COURT:  -- because I'm trying to get all the

3   summations in now.

4          MR. DI LORENZO:  No, I understand, your Honor.

5          THE COURT:  If you need to take more time, by all

6   means, get the flow over tomorrow, get to rethink it, we'll

7   do it.

8          MR. DILORENZO:  I'm not going to do that.  I'm

9   just going to apologize.  I didn't realize I was --

10         THE COURT:  That's okay.

11         MR. DILORENZO:  Most people don't let me talk this

12  long.

13         THE COURT:  I'm going to allow Mr. Shearer a good

14  half hour to 45 minutes for his rebuttal.

15         MR. DILORENZO:  I'll be less than five, Judge.

16         There was talk this morning or this afternoon in

17  closing argument that Mr. Plumeri and Mr. Barger over the

18  years had these little agreement, blah, blah, blah.  They

19  may have, but this place, they had a written contract.  And

20  that written contract as a provision, which you can read,

21  but basically what it says -- and lawyers know better than

22  this, it basically says that it can't be modified by an oral

23  agreement.  Any change to this agreement has to be in

24  writing signed by both parties.  So I don't know what

25  they're talking about with some oral argument.  Mr. Plumeri

Summations by Mr. DiLorenzo                    1005

1   didn't testify about an oral argument.  This was the

2   agreement.  You see the signatures on the contract.

3            Again, I thank you very much on behalf of

4   everybody at our table.  We hope that you will do the right

5   thing and deliver a verdict that First Data deserves.

6            The individual defendants thank you again.

7            I'm going to leave you with some remarks from the

8   trial transcript from Mr. Barger's own words:  I asked him a

9   question about his discrimination claims and he was a little

10  fuzzy.  And then the judge allowed my to read his deposition

11  testimony.

12           "Question:  Okay.  Do you believe that you were

13  terminated because you had cancer?

14           Answer:  All I know is I did not get to come back

15  to work.  That's all I know.

16           Question:  I agree you didn't come back to work.

17  I'm asking you what you believe.  This is your case as a

18  plaintiff.  I wanted to -- if you stand up in front of a

19  jury, are you going to say, I believe I was terminated

20  because I have cancer, because I have cancer?

21           Answer:  Not necessarily because I have cancer.  I

22  don't think it's because I had cancer.

23           Question:  Okay.  Do you believe do you think it

24  was because you went out on leave that you weren't included?

25           Answer:  Say that again.

Summations by Mr. DiLorenzo                    1006

1     Question:  Okay.  You just said that you don't

2  believe it was because you had cancer is the reason why you

3  were terminated.  Do you believe you were terminated because

4  you had taken leave?

5     Answer:  No.  Because the leave was requested,

6  requested by Tony.  I didn't want to go.

7     The Court -- and this is our court in front of

8  you.  The judge said:  That's what you said in your

9  deposition.  If you want to change any of that.

10     You did say that or not?

11     The Witness:  No.  The only think I'll tell you is

12  while I was being deposed, I felt there were lots of

13  disjointed questions that were confusing.  That's the first

14  time I'd ever been deposed in my life.

15     The Court:  Can you tell us now, do you agree with

16  that?  I'll give you a chance to do that.

17     The Witness:  What you read is fine."

18     MR. DI LORENZO:  Thank you.

19     THE COURT:  All right.

20     Mr. Shearer, your rebuttal.  And if you wish to

21  have rebuttal, it's up to you.  You get the last word if you

22  wish to do so.

23     MR. ZEITLIN:  I'll be doing a 10- or 15-minute

24  rebuttal.

25     THE COURT:  Mr. Zeitlin is going to be heard right

Summations by Mr. Zeitlin                    1007

1   now.  Okay.  Thank you.

2          MR. ZEITLIN:  Good afternoon, Ladies and Gentlemen

3   of the Jury.

4          My name is David Zeitlin.  I'm local counsel or

5   second in command on the plaintiff's legal team.  You

6   haven't heard much from me during this trial so far, but I

7   have the privilege of being the very last lawyer you will

8   heard from before you actually go do your jobs.  And

9   hopefully the last lawyer you hear from a while on that.

10         I also want to reiterate what Mr. Shearer and

11  DiLorenzo said to you, your service is greatly appreciated.

12  You guys were a very punctual jury.  You guys were a very

13  attentive jury.  It's part of my job to look over here and

14  see what you guys think of the testimony, and every single

15  time I looked over here, I noticed that everyone was

16  actually paying attention, and that's through now six days

17  of sometimes very tedious testimony.  So your service is

18  greatly appreciated.

19         Now, I've read the jury instructions already, and

20  you're going to get them very shortly.  I've also watched

21  this entire trial just like you have, and what I would like

22  to do, is not take up 30 or 45 minutes of your time right

23  now, but I would like to do is just refute what I believe is

24  a misconception that was presented to you by Mr. DiLorenzo.

25  But I think we can boil your decisions on my client's FMLA

1   case down to its simplest element, and the question is not

2   whether this alleged RIF was proper or improper, whether it

3   is valid or invalid.  It's not whether it was a conspiracy

4   or whether the RIF was fake.  The question is a lot simpler

5   than that.  The question is as follows:  Did Mr. Barger's

6   medical leave contribute or motivate in some way his

7   termination, or did First Data provide you or proof to you

8   that Mr. Barger would have been terminated, even if he never

9   got sick or was never put on leave?  So in other words, you

10  should imagine an alternate world where Mr. Barger never got

11  sick.  He was healthy as a horse all the way through.  You

12  have to determine whether under that set of circumstances

13  would he still be working at First Data today?  We think the

14  answer is quite simply, yes.

15          Now, you guys are probably really sick of the

16  Number 362.  You've heard the Number 362 probably a hundred

17  times in this trial.  I would like to provide for you a

18  framework to think of the Number 362 and how significant

19  that number really is.  This courthouse sits on the edge of

20  a neighborhood called Brooklyn Heights.  Brooklyn Heights

21  covers the area from this courthouse to Atlantic Avenue in

22  one direction and the area from the courthouse to

23  the Promenade or the East River in the other direction.

24  It's a pretty large swath of Brooklyn.  I'm sure you all are

25  familiar with it.  It's considered one of the nicest areas

1   of Brooklyn.  Do you know that the population of

2   Brooklyn Heights is?  The population of Brooklyn Heights is

3   just a hair over 20,000 people.  It's less, significantly

4   less than the number of employees at First Data.

5           If I told you that over the course of a few months

6   362 people that live in Brooklyn Heights decided to move or

7   were told to move, would that strike you as something that's

8   significant in any way?  You would say, No.  It's a big

9   urban area.  It's serviced by some subways.  Some people

10  probably wanted to move.  Some people probably couldn't make

11  rent.  Some want to move in.  And we've shown you in this

12  trial that First Data when it laid off this 362 that they

13  wanted to -- that Defendant's Counsel wants you to focus on,

14  when they laid off these people, they also hired people.

15  They also bought property.  It's just a regular churn of

16  what goes on in a gigantic company of what took place during

17  that time frame.  But nevertheless, like I said earlier,

18  contrary to what Mr. DiLorenzo told you, that's not the

19  question you have to ask.  You have to ask whether, Had he

20  never gotten sick, would he still be there?

21          And I should also mention that would happen to be

22  in the context of an FMLA case, the defendant's burden of

23  proof.  It's their job to prove to you that had this

24  gentleman never had this issue, he would still be employed

25  at First Data.  For instance, and I'm going throw some

Summations by Mr. Zeitlin                1010

1   hypotheticals at you, if you believe that had he never

2   gotten sick, they would have just left Mr. Barger alone,

3   left him to run his department and make some cuts elsewhere

4   in the company, under that set of circumstances, you have to

5   find for the plaintiff.

6           If you believe had he never gotten sick,

7   Mr. Barger would have been asked to take a different role in

8   the company then in that set of circumstance, which is

9   entirely logical, because they -- these defendants want you

10  to know, they've drilled it into your heads, the people at

11  this table are the plaintiff's friends.  He sued his

12  friends.  So we concede that some of those people were good

13  friends of his.  Don't you think that if he was not on leave

14  that these good friends of his would have said, Hey, Steve,

15  Hey, Coach, this isn't working out.  We need you to take a

16  different role in the company?  Or maybe they would have

17  said, Take a little bit less money.  But he wasn't there to

18  have that conversation with them.

19          So in order for them to meet their burden of

20  proof, like I said, those two sets of circumstances that I

21  just described also resulted in findings for the plaintiff

22  in this case.

23          And by the way, -- contrary to what Mr. DiLorenzo

24  just told you, Mr. Barger did, in fact, testify that he has

25  history of taking pay cut at different organizations in the

Summations by Mr. Zeitlin                    1011

1   past.  I think he stated that he did it on one specific

2   occasion, that he cited it was Shearson.

3           How about this set of circumstances?  If you think

4   there never would have been any internal audit of his group

5   because he was still running it, and we learned that one of

6   the people who ran the internal -- or the group was the

7   interim replacement, if you believe that that audit would

8   have never taken place because he wasn't out on leave, under

9   that set of circumstances you have to find for the

10  plaintiff.  Again, you have to think about what would have

11  happened had he stayed there.  Is it indisputable that he

12  would have been included in this layoff?

13          How about this one?  Let's say you think something

14  happened as bad as this:  The company figured out in

15  Mr. Barger's absence, it figured out during that time frame

16  that it could live without him?  You know what?  His team is

17  doing fine without him, let's not have him back.  You know,

18  even under that set of circumstances, you have to find for

19  the plaintiff because he had to be absent from the company

20  in order for the company to reach that determination.  His

21  leave is the but-for cause of his termination under that set

22  of circumstances.

23          Now, they haven't really given you all that much

24  to work with in terms of something you can put your hands on

25  in terms of why this -- why this RIF would definitely had

Summations by Mr. Zeitlin                    1012

1    included him.  And again, it's their burden of proof.

2          They want you to believe that he's the unfortunate

3    victim of this restructuring.  But you guys are smart enough

4    to see the timeline of events.  I think the truth of what

5    took place here is as follows:  I mean, we've been through

6    six days of testimony now, but I think what really happened

7    is the following:  Mr. Barger unfortunately got cancer.  He

8    was put on leave.  He was forced on leave.  It doesn't

9    matter, he was leave.  They took away his ability to

10   communicate with his employees.

11         Then goes on long-term disability, and his salary

12   at that point in time, and I think it's undisputed, is being

13   paid by an insurance company.  It's costing the company

14   nothing.  He's on a list that says LTD, long-term

15   disability.  That particular list is a list of people that

16   are at zero for salary.  Met Life is paying for this.  He's

17   making -- one-half of his salary is paid by an insurance

18   company.

19         Can you put 87 up?

20         THE COURTROOM DEPUTY:  There you go.

21         MR. ZEITLIN:  So anyway, this particular document,

22   this is an email from -- which we read in Kathi Bernhardt's

23   deposition testimony.  Here she is saying, "Hi.  I don't

24   know how to handle this.  I know he's an LTD on your list."

25   That means he's not on a cut list at the time.  This was

Summations by Mr. Zeitlin                    1013

1    sent on Wednesday, January 11th, the day after he sent in

2    his Return-To-Work Form.

3            Now, the response from Mr. Marino, "He's already

4    gotten his bonus, so put a zero in his column, and for

5    severance, put six months' of base."

6            So they're talking about the financial impact of

7    his termination, and they're saying it's -- they're

8    basically telling you in this email that, Ut-oh, he's coming

9    back.  He's going to cost the company something.  Now it's a

10   save to get rid of him.  Before that, it wasn't a save.  You

11   know, it's fair to think that the company presumed that he

12   wasn't going to come back.  That even if he beat the cancer,

13   that he was just going to sail off into the sunset.  But

14   Mr. Barger, you heard testimony from him, that he loves

15   working, and he -- they underestimated him.  He was off the

16   balance sheet and they problem figured, you know, We don't

17   have to do anything with this, guys.  He's a zero.  But then

18   he tells everyone in December, I'm really coming back.  He

19   shows up at the Christmas party healthy as a horse, and then

20   that's when the corporate machination swing into motion.  I

21   want you to look at the dates of all the communications, a

22   flurry of communications that take place after he tells

23   everyone, I'm coming back, and it dawns on them that it's

24   true.

25           I want you to look at all of the communications

Summations by Mr. Zeitlin                    1014

1    that take place in the very earliest part of January 2017

2    between all of these different people in this corporation.

3    You can see the panic.  They have to do something with this

4    guy now.  And that's what really took place here.  He was

5    not going to be part of this RIF if he didn't return -- give

6    them his Return-To-Work Form.

7           Now, I'll just mention a couple of other issues

8    that were mentioned by Mr. DiLorenzo within his summation.

9    One thing that I think -- in the big picture, you should

10   consider the fact that the defense verdict in this case

11   essentially gives this company, this gigantic company, carte

12   blanche to do this with anybody that's coming back from

13   leave.  It's not difficult for this massive company that

14   you've heard has an entire section of it that is devoted to

15   leave management to create a narrative that says, Okay.

16   We've put this person -- this person belongs on the RIF

17   list.  You heard testimony from, I think it was, Mr. Cagwin

18   saying there were almost continuous RIFs going on for all

19   the quarters that he worked at the company.  So it insulates

20   the company for liability under these statutes.  That's not

21   what Congress intended when they pasted these acts.

22          With respect to the after-acquired evidence, so

23   they're trying to limit my client's damages by saying he

24   committed some fraud against his so-called godfather when he

25   was just a consultant to this company.  That doesn't make

Summations by Mr. Zeitlin                    1015

1   any sense.  They just got finished telling you that this was

2   his godfather.  You don't cross the godfather.  This is the

3   guys's meal ticket.  Does that make any sense?  Why would he

4   commit financial fraud against the guy as they just

5   characterized as somebody who is essentially his right-hand

6   man and his whole way to earn money in the world.  Why would

7   you do something like that to that person?  Did Mr. Barger

8   give you the impression in his testimony that he would ever

9   commit some kind of financial crime?  It's such a desperate

10  argument.

11          With respect to Mr. Barger's ADA claims, all I can

12  say is this:  If you're not able to work or perform the

13  functions of your job, why are you getting a text message

14  saying, Hey, stop working.  You need to focus on your

15  health?  We know that he was put on -- we know that he was

16  put on leave via text message from his friend.  Well, why is

17  a text message from his friend even necessary if he's not

18  working?  It doesn't make any logical sense to me.

19          As far as again the after-acquired evidence,

20  you're basically saying this is guy double-crossed his

21  friend.  That's what they're trying to say my client did.

22  And I think his testimony was very clear, that he gave that

23  money to his son.  Or when they were trying to say that he

24  earned negative income in certain years?  I think it was

25  pretty compelling testimony when he said that the LLC is

Proceedings                                    1016

1   owned by my son, and at that point in time in my life, I was

2   giving the money to my son.

3          All right, ladies and gentlemen, you're about to

4   get your jury instructions.  You have finally heard it from

5   all the lawyers.  Congratulations on that.  I think you're

6   going to discover that under the facts of this case, if

7   First Data has violated both the ADA and FMLA, I think you

8   should find for the plaintiff.

9          Thank you for your time.

10          THE COURT:  Thank you, Mr. Zeitlin.

11          Member of the Jury, you have paid played close

12   attention, and it's 20 after 4:00.  I think it would be

13   unkind of me if I were to now burden you with the law at

14   this late hour.  I think you deserve a little bit of a rest.

15   So we're going to do it tomorrow morning.  It all works out

16   just fine.  We'll all be fresh.

17          The charge will not be too long, about 45 minutes

18   or thereabouts, and so you should be able to start your

19   deliberations probably before 11:00 o'clock tomorrow.

20          We will have lunch brought in here again.  I hope

21   you found it to your satisfaction today.  And then I will be

22   turning you over to the courtroom security folks.  Nobody

23   knows how long your deliberations will be, however long,

24   however short it takes to feel everybody out and come to a

25   unanimous verdict on the decisions you are going to have to

Proceedings                                    1017

1   make.  Just make time for that.  So be a little bit caution

2   and make sure you clear the deck so that if it lapses over

3   into Wednesday, you will be able to, you know, not be under

4   any undue pressure.  We want to avoid having anybody make a

5   decision which they might not have otherwise made because

6   they had some pressures, you know, in their personal lives.

7            You folks are very responsibile, and you

8   understand and you have to allow as much time or as little

9   time as it takes to fully deliberate and to come to your

10  unanimous decision on the questions that are in dispute,

11  which will be basically, How do you find liability under the

12  ADA, or do you find liability under the FMLA.  So you'll be

13  able to understand it clearly.  I'm going to come down and

14  explain it to you.  I have it written down.  I will probably

15  give you a copy of it.  I want to make life as easy for you

16  as I can, because there is, you know, a lot of exhibits.

17           You've heard the excellent arguments by all the

18  lawyers.  I think you realize now more than you ever before,

19  why we need a jury in this case to determine the facts.  And

20  that's exactly what we're going to do.

21           I'm going to try to get all of the exhibits bound

22  for you, so we don't give you 300 exhibits in the jury room.

23  We're going to work on that.  We have a very clear record of

24  all the exhibits that were introduced.  I think we're going

25  to get a list for you so that you can then cull them.  And

Proceedings                                    1018

1   I'll talk to the lawyers about how they're going to have

2   these exhibits available for you to look at, whichever ones

3   you may want to see.

4           And as I told you before, you will have the

5   opportunity if you wish to hear back any of the testimony,

6   it has been a number of days, and it may well be that you

7   want to refresh your recollection about testimony that was

8   given two or three days ago.  However it works out, we're

9   here to accommodate you.

10          And so with that, get a good night's sleep, if you

11  can.  See you tomorrow at 10:00 o'clock for the reading of

12  the Court's Charge.  All right?

13              THE COURTROOM DEPUTY:  All rise.

14              (Jury exits the courtroom.)

15              (The following matters occurred outside the

16  presence of the jury.)

17              THE COURTROOM DEPUTY:  You can all be seated.

18              THE COURT:  All right.  The jury is not here.

19  Just a few things I wanted to chat with you folks about, and

20  I think it has worked out well timewise.  I will give you

21  the revised verdict sheet.  I did some nitpicking on the

22  charge.  I am going to be able to give you the final, final

23  one very shortly.

24          I think what I am going to do, though, is make --

25  eliminate any reference to October 24th.  That's on Page 10

1   at the present time, because that can just be more confusing

2   then helpful.  I mean, there's no question but that at the

3   time when the plaintiff was terminated, he was on leave.

4   And I think if I put down no earlier than October 24th,

5   people may want to ask why that date, and it might be more

6   confusing than otherwise.

7          The other thing is on Page 12, I've written down

8   here with respect to the backpay component of compensatory

9   damages for the ADA, that they should calculate the amount

10  that the plaintiff would have earned from between

11  November 19th, 2016 and January 13th, 2017.  I think that's

12  correct.  Or maybe I should explain once again why it's

13  November 19th.

14         I think Mr. Shearer, that's when you claim that

15  their salary was diminished.

16         Right?

17         MR. SHEARER:  November 19th was the point when he

18  was placed under leave.

19         (Continued on the next page.)

20

21

22

23

24

25

*Proceedings*                                                   *1020*

1          MR. SHEARER:  The leaves letters --

2          THE COURT:  So in November 19th when he was on that

3    date when formally placed on leave until the date of determine

4    nation January 13th is that what that is.

5          MR. SHEARER:  More or less.  The actual start date

6    in there is kind of hard to tell I would say yes, the 19th.

7          THE COURT:  Well, I'll let the jury figure it out.

8    But I don't want to tell the start date would be on or about

9    November 19th.

10          MR. SHEARER:  Yes.

11          THE COURT:  Termination date would the date, of

12    course, that he was terminated on gentleman 13 so I'll make

13    that little adjustment, right.  Otherwise, I think it's pretty

14    clean.  And I'll give you the final charge.

15          MR. EIDELMAN:  Your Honor.

16          THE COURT:  Yes.

17          MR. EIDELMAN:  Is the reference to January 13th as

18    date of his termination.  The records and the records that are

19    in evidence indicate that his final date of employment was

20    February 28th and he continued to get paid.  I'm sorry.  I'm

21    not understanding.

22          THE COURT:  We're talking about January 13th as the

23    date that he was the terminated offing the fact he was

24    continued to get bade he was discharged on January 13th from

25    the employment that's the date you always used.  Am I missing

*Proceedings*                                             **1021**

1    something.

2           MR. EIDELMAN:  The date he was notified he continued

3    to be an employee.  He continued to be paid his salary for

4    another six weeks.  So I'm concerned that if maybe I'm

5    misunderstanding.

6           THE COURT:  Why don't we just say from on or about

7    November 19, 2016, when he was formally placed on leave until

8    January 13th when he was notified that he was going to be

9    terminated.  Doesn't that cover the period?  I just want the

10   period of time by which the plaintiff is asking for a backpay

11   for that's what I'm thinking.

12          MR. EIDELMAN:  So this is backpay for the ADA claim.

13          THE COURT:  Yes.

14          MR. EIDELMAN:  Only.

15          THE COURT:  Yes is.

16          MR. EIDELMAN:  Backpay for the ADA claim only.  Now,

17   I think I understand.  I get you now.

18          THE COURT:  I just want to get it down right.  I

19   think your claim is that from on or about November 19th to

20   January 13th he got less pay using short-term disability or

21   something of that nature; is that correct.

22          MR. SHEARER:  That's correct.

23          THE COURT:  After that he got long-term -- he can't

24   claim anything damages for that.

25          MR. SHEARER:  That's correct.

*Proceedings*                                     1022

1      THE COURT:  Do you understand somewhat I'm saying
2  now.
3      MR. EIDELMAN:  I think so.
4      THE COURT:  You stop and make sure you're clear
5  about it.  He's only claiming backpay I think he said 20,000.
6      MR. EIDELMAN:  Right part of the problem is that the
7  record reflects that he received long-term disability payments
8  during that same time period.
9      THE COURT:  Look, the jury has heard the facts.
10  They will sort it out whether or not he had a diminishment in.
11      MR. EIDELMAN:  Compensation for that period.
12      THE COURT:  Compensation during that period.  That's
13  just I just want to fine tune it.  That's what they have to
14  decide whether there was a diminishment in his income during
15  that time period.
16      MR. EIDELMAN:  Understood.  Right.  Okay.
17      THE COURT:  He's not claiming anything beyond
18  January 13th.  So there's no question that he had income
19  coming after that time.  Long-term disability, whatever, right
20  are we clear about that.
21      MR. EIDELMAN:  I am clear about that, yes, your
22  Honor.
23      THE COURT:  That's your claim.  The jury may or may
24  not agree with it that he had a diminishment in his
25  compensation between odd he shall November 19, 2016, and

*Proceedings*                                                    *1023*

1    January 13, 2017.

2              MR. SHEARER:  That's right.

3              THE COURT:  Right.

4              MR. SHEARER:  Yes, your Honor.

5              THE COURT:  That's all that's talking about.  So

6    then everything else is pretty clean.  I'll make these little

7    changes and have them to you probably by 5:00 o'clock if you

8    with an at any time wait it's up to you but I think we can get

9    it to you and the verdict sheet as well.  You can take a look

10   at it I think it's going to be pretty clean and what else do

11   you want to say.

12             Do you want to use a little time now to spread a

13   little Rule 50 motion on the record to.

14             MR. EIDELMAN:  Ms. Cooper will be doing our Rule 50

15   motion.

16             THE COURT:  How much time do you need to protect

17   your record.

18             MS. COOPER:  Less than ten minutes.

19             THE COURT:  Take your time.  But I'm probably going

20   to reserve but you want to make your record.  Your clients are

21   here, you're ready to do a good job.

22             MS. COOPER:  Yes.

23             Pursuant to Rule 50, First Data moves for judgment

24   as a matter of law on plaintiff's claims and damages.

25             Plaintiff's claims are narrow and they are as

*Proceedings*                                                    *1024*

1   follows:

2          One, that First Data violated the ADA by forcing

3   plaintiff on allegedly unmade FMLA leave and by, "Revoking his

4   e-mail and other remote access."

5          His second claim is that First Data interfered with

6   his FMLA rights by not restoring him after he submitted his

7   return to work notice.  Plaintiff incorrectly claims that

8   being forced on unpaid leave and revoking an e-mail is an

9   adverse employment action.  Leave is not an adverse employment

10  action and there is absolutely no case law to support

11  plaintiff's position.

12         Second, plaintiff is not a qualified individual

13  under the ADA and therefore he was not protect by the ADA as

14  of the time that he went on leave.

15         Throughout plaintiff's claim, plaintiff has been

16  arcing that he was on an unpaid leave of absence, but

17  defendants have proven during the course of this trial that

18  that is not true.  Plaintiff was paid his salary in November

19  and December.  There is a question about the one paycheck in

20  January, but that was after plaintiff was on leave and,

21  therefore, he was no longer protected by the ADA.  More

22  importantly, the case law is clear that leave is not an

23  adverse action.

24         Now, we looked throughout the Second Circuit and

25  throughout the country for a similar case where a plaintiff

*Proceedings*                                1025

1   was arguing that putting somebody on an unpaid FMLA leave or

2   just FMLA leave generally would be an adverse action and there

3   is not a single case.  And the reason there is no --

4            THE COURT:  Adverse actions under the ADA.

5            MS. COOPER:  Right.

6            THE COURT:  You said FMLA.

7            MS. COOPER:  So plaintiff's claim is that being put

8   on the FMLA leave violated the ADA.

9            THE COURT:  I think he's claiming he was terminated

10  while he was on leave, okay?  So I don't think you're quite

11  correct but go ahead.

12           MS. COOPER:  I believe this morning, plaintiff

13  abandoned the termination.

14           THE COURT:  On the ADA claim.

15           MS. COOPER:  Right.  I'm talking about the ADA.

16           THE COURT:  He's supposed to prove that.  Under the

17  ADA, he was terminated because he had cancer.

18           MS. COOPER:  Right.  So being put on leave under the

19  ADA is not an adverse employment action.  There is a

20  Second Circuit case, *Joseph v. Levitt*, 465 F.3d 87.  It's a

21  2016 case where the plaintiff was placed on a paid

22  administrative leave and the Second Circuit held that being

23  placed on paid leave is not an adverse employment action.

24           THE COURT:  Well, it's right.  If his salary, in

25  terms of reduction of salary, if it wasn't reduced then that's

*Proceedings*                                                1026

1   not part of an adverse action.  He doesn't have anything

2   adverse if he continues to get paid, I agree with.  That you

3   can continue to get paid and still have an adverse action,

4   right.

5          MS. COOPER:  Correct.  But being placed on a paid

6   leave of absence, which is what we have in this case.  And I

7   note -- so although plaintiff contends that he has a delta of

8   about 25,000 of being unpaid, he actually received the LTD

9   benefit payments which made up that difference.

10         THE COURT:  Don't you think that's for the jury to

11  determine?  Isn't that what they're here for?

12         MS. COOPER:  No, because leave itself is not the

13  adverse action.  There's actually no legal support that leave.

14         THE COURT:  I think you're probably right.

15  Something has to be more involved than just sake that you're

16  on leave.

17         MS. COOPER:  Right.

18         THE COURT:  And the jury is being going to be told

19  that they will have to have two components in order for it to

20  be a violation of the ADA.  There has to be an adverse

21  interaction, it has to be qualified.

22         MS. COOPER:  So that leads me to the fact that he

23  was not at the time he was placed on leave, he was not a

24  qualified individual under the ADA.

25         THE COURT:  You made that argument for sure but

*Proceedings* 1027

1    that's for the jury.  Don't you think?

2         MS. COOPER:  I don't think so.  The case law -- so

3    Cisco, which is the case that we were talking about the other

4    night about forced leave under the FMLA when the

5    Second Circuit found that wasn't a violation of the FMLA, they

6    also analyzed the ADA claim in that case and they found that

7    because the plaintiff at that point was incapacitated, he was

8    not a qualified individual.

9         And here, what we have is we have a doctor

10   certifying that plaintiff is totally incapacitated to allow

11   the jury to substitute their judgment for that of the doctor

12   would essentially mean that any time an employer received

13   medical documentation from a doctor, they would be allowed to

14   also second guess that.

15        THE COURT:  So you're saying that medical evidence

16   as a matter of law should be accepted by the judge and

17   disregard anything else in the case.  Since the doctor said

18   it, it's light out.  That's the end of it, right?

19        MS. COOPER:  When the doctor is filling out a

20   Department of Labor certification of Healthcare Provider to

21   certify that an individual is unable perform the essential

22   functions of the job, I do not think that neither employer nor

23   the Court should be able to substitute their judgment for that

24   of the doctor.

25        THE COURT:  Well, I'm not so sure.  That's not a

*Proceedings*                                                  *1028*

1    factual issue considering the totality circumstances.  We've

2    been here in a number of days we've heard a lot of different

3    testimony.  Surely, you don't say you disregard everything,

4    only focus on what the medical testimony is.

5              MS. COOPER:  No.  But we're evaluating whether

6    First Data's actions by placing him on leave were unlawful.

7    And when they are relying on this medical certification which

8    is how every employer across the country determines whether

9    somebody is going to go out on leave to allow an employer to

10   start being able to second guess that certification that says

11   totally incapacitated, would mean that any employer could say,

12   I don't believe that, I'm going to deny that employer's

13   request.

14             THE COURT:  What else do you want to say to support

15   your motion?

16             MS. COOPER:  So with regards to plaintiff's argument

17   that First Data violated the FMLA by not restoring him to his

18   position, plaintiff relies on this theory that he could have

19   stayed out of work forever and the only reason we terminated

20   him was because he submitted that return to work notice.  But

21   FMLA leave is for 12 weeks to does not allow for an indefinite

22   leave of absence neither does the ADA although leave can be

23   longer under the ADA, it is not permitted to be for an

24   indefinite leave.

25             THE COURT:  Under the ADA, it's not a question of

*Proceedings*                                                      1029

1   leave.  It's a question of whether or not somebody has been

2   terminated because of a disability.

3           MS. COOPER:  Right.  Which is not at issue in this

4   case.  But, more importantly, it wasn't defendant that went

5   out and got the return to work notice that said he could

6   return to work without restrictions, it was plaintiff.

7   Plaintiff went to his doctor and got a note saying he was no

8   longer disabled and, therefore, he was no long eligible for

9   FMLA.

10          THE COURT:  So now you're doing a very good job, but

11  we're going to have to get you to complete your arguments

12  because I think you want me to rule as a matter of law that

13  the plaintiff should not be successful on either the ADA claim

14  or the FMLA claim.

15          So I'm going to reserve decision, and because we

16  have a lot of complexities in this case, a lot of issues.

17  Let's hear what the jury says and then after that, we can

18  discuss further whether there's any basis for me to set aside

19  their verdict should they come in with a verdict.

20          We made a record.  You did a very good job.

21          MS. COOPER:  Thank you, your Honor.

22          THE COURT:  Do you wish to say anything,

23  Mr. Shearer?

24          Let's talk about how we're going to organize the

25  exhibits.  We have to do that and did you put them in a binder

*Proceedings*                                               1030

1   or what exactly have you folks done so that the jurors can

2   have easy access to the exhibits.  I have a suggestion.  I

3   kept a careful list of all the exhibits that have been allowed

4   in evidence and the dates of their admissions.  I can give

5   this to you, Mr. Innelli can supervise it.  You can make up a

6   defendant's list and a plaintiff's list from all of this.

7           COURTROOM DEPUTY:  We already worked on this.

8           THE COURT:  You beat me to the punch.

9           COURTROOM DEPUTY:  We already worked on it.  We're

10   ready to go.

11           THE COURT:  I'm glad you see that do you want my

12   records to double check them.

13           MR. SHEARER:  I would like to trouble check ours.

14           THE COURT:  Just make sure we have a pristine list

15   of exhibits and we can give the jurors tomorrow.  I'm going to

16   give them my instructions it's short, you know, it's right to

17   the point but since we have on this a list of what would

18   constitute adverse actions how they go back to determine

19   whether somebody is a qualified individual I think might be

20   helpful if they had the actual written instructions okay.

21           Any other housekeeping matters we need to discuss

22   today or are we ready to go to war tomorrow?  Okay.

23           So Ty and Paul Gabriel, I want the record reflect

24   you folks did a great job as law clerks.  You can also left

25   the record reflect that Paul Gabriel was with me on Sunday

*Proceedings*                                                    1031

1    night until 8:47.  He had to tell his family and trends that

2    he had to work a little late on Sunday.  But such as the job

3    that he signed up far.  Doesn't happen too often that I'm very

4    grateful to him and also to Ty who was very helpful to

5    notwithstanding the fact that he has a two-year-old daughter

6    to look after and so I want the record to reflect that how

7    much appreciate my clerks.  Let the record reflect that Judge

8    Block was also here Sunday night.  I don't know if that's what

9    I want to do at my age anymore but that's the way it worked

10   out because I wanted the case to be presented seamlessly to

11   the jury so that they're not here for an hour and then come

12   back a date later.  It just worked out that way so we had some

13   weekend work to do.  And unfortunately, I didn't have time to

14   walk the Brooklyn bridge like Mr. Eidelman but obviously I'll

15   be able to make up for that.

16            I want to thank our wonderful court reporters for

17   their usual wonderful work they do.  They very rarely ask a

18   question and have great capacity to make a great record

19   notwithstanding the speed by which people speak.  And so, they

20   should get some he recognition for that as well.

21            And with all of that, I think we'll conclude today

22   at 20 to 5:00.  See you tomorrow at 10:00 o'clock.  Let's get

23   the jury instructions to you guys at some time in a few

24   minutes.

25

*Proceedings* **1032**

1          (WHEREUPON, this matter was adjourned to September

2    24, 2019, at 10:00 a.m.)

1033

1                                INDEX

2

3    <u>WITNESS</u>:                                      <u>PAGE</u>:

4

5    Ashley Parrish - Deposition Read-in by Mr. Shearer

6    Kathi Benhardt deposition read-in by Mr. Shearer

7

8                              * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1034

1

2                          <u>INDEX OF EXHIBITS</u>

3

4    <u>FOR THE PLAINTIFF:</u>                          <u>PAGE:</u>

5    Plaintiff's Exhibit 110 was received in evidence

6    as of this date.................................    850

7    Plaintiff's Exhibit 124 was received in evidence

8    as of this date.................................    853

9    Plaintiff's Exhibit 87 was received in evidence as

10   of this date....................................    855

11   Plaintiff's Exhibit 88 and 89 was received in

12   evidence as of this date........................    856

13   Plaintiff's Exhibit 92 was received in evidence as

14   of this date....................................    859

15

16   <u>SUMMATIONS AND/OR REBUTTAL:</u>

17    Charge Conference..............................    867

18    Summation - Mr. Sheareri.......................    891

19    Summation - Mr. DiLorenzo......................    954

20    Rebuttal - Mr. Zeitlin.........................   1007

21

22                             * * * * *

23

24

25

1035

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# #

**#155-254** [1] - 842:16

# $

**$1.24** [1] - 942:2
**$1.588** [1] - 942:4
**$10,000** [2] - 943:18, 943:20
**$10,460** [2] - 910:18, 911:6
**$12.65** [1] - 943:1
**$150,000** [2] - 984:3, 1001:17
**$170,000** [1] - 949:7
**$174,000** [3] - 942:2, 942:3, 964:25
**$177,000** [1] - 997:12
**$2,000** [1] - 952:10
**$2.48** [1] - 952:14
**$2.84** [1] - 952:16
**$20,000** [7] - 910:12, 910:14, 911:5, 911:7, 952:7, 952:18, 964:1
**$200,000** [1] - 963:20
**$23** [1] - 987:17
**$24** [2] - 975:2, 988:6
**$25,000** [3] - 963:24, 966:2, 966:8
**$25,610** [2] - 911:5, 911:10
**$30,000** [5] - 897:1, 897:7, 977:1, 981:2, 997:17
**$31** [3] - 942:24, 943:1, 943:6
**$31.69** [1] - 942:25
**$4,930** [1] - 911:8
**$40,000** [4] - 897:9, 897:17, 941:25, 953:5
**$400,000** [5] - 946:25, 949:5, 949:6, 977:4, 997:12
**$47,000** [1] - 963:24
**$480,000** [2] - 914:25, 997:24
**$50,000** [2] - 977:3, 977:13
**$575,584** [1] - 943:2
**$720,000** [1] - 972:23
**$730,000** [1] - 978:10
**$750,000** [1] - 1000:1
**$9,540** [1] - 910:19
**$900** [1] - 974:24

# '

**'16** [2] - 946:17, 998:14

# 0

**0033** [1] - 943:25
**0097** [1] - 850:14
**0101** [2] - 850:15, 851:21
**0102** [1] - 850:14
**0A** [1] - 856:25

# 1

**1** [6] - 848:14, 848:16, 848:20, 849:1, 849:4, 849:8
**1,100** [1] - 965:13
**1.3** [1] - 998:24

**1.36** [3] - 944:6, 944:9
**1/13/17** [1] - 860:17
**1/17/17** [4] - 860:19, 860:24, 995:1, 995:2
**1/23/17** [1] - 852:8
**1/31** [1] - 910:25
**1/9** [1] - 995:25
**10** [5] - 925:15, 998:19, 1000:20, 1006:23, 1018:25
**10,330** [1] - 943:6
**10/22** [1] - 907:11
**10/24** [1] - 917:20
**10017** [1] - 843:9
**1007** [1] - 1034:20
**101** [3] - 849:18, 906:7, 906:8
**109** [2] - 849:20, 850:7
**10:00** [4] - 842:8, 1018:11, 1031:22, 1032:2
**10:11** [2] - 846:11, 855:21
**10:38** [1] - 866:16
**10th** [7] - 876:11, 892:1, 913:21, 917:10, 963:21, 992:5, 998:10
**11** [2] - 857:5, 873:4
**11/22** [1] - 980:5
**11/30/16** [1] - 860:14
**110** [4] - 850:6, 850:9, 850:11, 1034:5
**11201** [1] - 842:21
**115** [1] - 959:3
**11:00** [1] - 1016:19
**11:30** [2] - 890:12, 890:15
**11:49** [1] - 891:1
**11th** [14] - 855:21, 856:14, 857:18, 858:23, 859:7, 887:2, 923:20, 923:21, 924:4, 924:8, 924:17, 960:3, 992:5, 1013:1
**12** [8] - 887:20, 911:13, 911:16, 950:12, 951:6, 972:8, 1019:7, 1028:21
**12/15/16** [1] - 910:18
**12/16/16** [1] - 860:4
**12/28** [1] - 919:22
**12/30** [2] - 910:23, 910:24
**12/31** [1] - 998:13
**124** [5] - 853:9, 853:10, 853:15, 927:11, 1034:7
**13** [8] - 852:15, 866:22, 922:22, 976:14, 981:9, 997:2, 1020:12, 1023:1
**13th** [18] - 860:25, 876:12, 892:2, 906:11, 916:19, 923:10, 924:3, 924:9, 963:21, 990:14, 1019:11, 1020:4, 1020:17, 1020:22, 1020:24, 1021:8, 1021:20, 1022:18
**14** [2] - 867:14, 904:4
**15** [9] - 863:9, 866:13, 867:13, 867:14, 867:16, 888:19, 888:23, 890:12, 927:20
**15,000** [1] - 997:2
**15-minute** [1] - 1006:23
**153,000** [1] - 998:3
**15th** [2] - 853:22, 920:21
**16,000** [2] - 981:3, 997:2
**162,000** [1] - 998:7
**16th** [3] - 854:2, 858:15, 917:21
**17** [2] - 849:25, 860:22
**17-CV-4869(FB** [1] - 842:3
**174** [1] - 998:3
**177** [1] - 977:6

**178** [1] - 994:25
**17th** [5] - 849:21, 922:21, 923:9, 995:5, 995:12
**18** [8] - 950:12, 972:21, 972:23, 984:5, 986:2, 987:1, 989:3, 994:25
**18th** [1] - 903:22
**19** [4] - 858:12, 898:18, 1021:7, 1022:25
**19th** [13] - 859:2, 859:7, 900:13, 910:11, 924:6, 980:1, 1019:11, 1019:13, 1019:17, 1020:2, 1020:6, 1020:9, 1021:19
**1C** [1] - 882:9

# 2

**2** [5] - 848:25, 857:21, 860:4, 975:3, 996:3
**2,000** [1] - 917:6
**2,638** [2] - 913:6
**2,700** [1] - 913:6
**2.2** [2] - 994:1, 994:2
**2.26** [1] - 944:10
**2/18** [1] - 995:17
**20** [11] - 845:5, 846:17, 861:6, 861:7, 863:9, 866:13, 923:4, 940:24, 976:23, 1016:12, 1031:22
**20,000** [8] - 910:14, 910:25, 911:2, 911:3, 911:6, 1009:3, 1022:5
**2014** [4] - 997:22, 998:12, 998:15, 998:21
**2015** [13] - 861:21, 946:17, 946:21, 947:2, 947:3, 947:5, 978:5, 978:18, 996:9, 997:24, 998:13, 998:16
**2016** [24] - 848:11, 849:1, 849:25, 853:5, 853:7, 853:24, 887:14, 888:2, 898:19, 913:19, 946:17, 946:21, 947:2, 955:14, 956:4, 975:19, 993:24, 998:1, 998:17, 1019:11, 1021:7, 1022:25, 1025:21
**2017** [33] - 848:14, 848:16, 848:20, 849:4, 850:1, 850:3, 853:5, 853:7, 857:6, 858:12, 860:22, 913:19, 913:20, 922:21, 922:22, 941:22, 943:18, 946:12, 946:22, 947:4, 953:2, 972:14, 975:19, 983:19, 995:5, 998:6, 998:10, 998:18, 998:21, 1014:1, 1019:11, 1023:1
**2018** [1] - 942:3
**2019** [4] - 842:7, 941:23, 942:3, 1032:2
**208** [5] - 856:23, 857:5, 857:21, 858:22, 858:23
**20th** [1] - 1000:19
**21202** [1] - 843:4
**216** [3] - 871:16, 871:17, 871:19
**21st** [7] - 917:19, 955:14, 955:22, 962:3, 962:22, 963:20, 969:1, 991:19
**22** [4] - 848:11, 888:2, 908:11, 911:1
**22,000** [2] - 988:2, 990:9
**22,929** [1] - 910:22
**22nd** [5] - 887:15, 904:16, 914:7, 919:21, 920:18
**23** [2] - 842:7, 987:18
**23rd** [2] - 858:15, 1000:6
**24** [4] - 887:14, 903:2, 964:22, 1032:2

**24,000** [2] - 975:2, 990:9
**24th** [3] - 917:21, 1018:25, 1019:4
**25** [2] - 846:17, 982:17
**25,000** [3] - 963:25, 976:23, 1026:8
**250** [1] - 997:24
**250,000** [1] - 897:22
**27** [1] - 908:11
**27th** [1] - 858:16
**28th** [8] - 914:7, 920:20, 921:1, 921:22, 941:22, 998:8, 1000:16, 1020:20
**29** [5] - 867:25, 870:22, 870:23, 887:22, 888:7
**2nd** [2] - 975:24, 1000:19

## 3

**3,000** [12] - 913:7, 916:21, 918:6, 925:8, 925:11, 942:8, 974:3, 975:25, 976:1, 976:2, 993:14, 998:19
**3/1/17** [1] - 969:23
**30** [10] - 895:6, 941:23, 943:22, 943:25, 962:8, 965:4, 976:24, 980:13, 990:19, 1007:22
**30,000** [2] - 997:19, 1000:20
**300** [2] - 996:13, 1017:22
**30th** [5] - 910:20, 925:6, 952:14, 993:6, 993:22
**31** [5] - 941:24, 943:10, 943:15, 944:15, 953:2
**31,367** [1] - 942:8
**310** [1] - 961:16
**330** [1] - 843:8
**334** [1] - 927:17
**35** [3] - 899:4, 904:20
**36** [1] - 903:23
**360** [1] - 985:12
**360-degree** [1] - 985:16
**361** [7] - 917:6, 972:12, 972:14, 979:4, 984:23, 985:8, 994:15
**362** [15] - 913:4, 917:5, 922:6, 927:15, 976:4, 983:16, 984:11, 985:8, 989:8, 1008:16, 1008:18, 1009:6, 1009:12
**3839** [1] - 842:16
**39th** [1] - 843:9
**3rd** [3] - 907:14, 957:18, 958:17

## 4

**4** [2] - 917:14, 943:24
**40** [1] - 895:17
**40,000** [3] - 943:19, 944:2, 944:15
**40-year** [1] - 895:6
**400,000** [2] - 977:14, 997:16
**400-and-some-thousand** [1] - 946:12
**45** [5] - 883:8, 1003:3, 1004:14, 1007:22, 1016:17
**465** [1] - 1025:20
**47** [1] - 986:7
**47,000** [1] - 966:8
**471** [1] - 927:17
**48** [2] - 987:18, 987:19
**48222** [1] - 859:17
**4:00** [5] - 1002:16, 1002:24, 1003:1, 1003:8, 1016:12

**4:15** [1] - 1003:2
**4th** [8] - 887:8, 887:25, 888:4, 888:10, 962:3, 962:22, 991:19, 991:22

## 5

**5** [1] - 893:11
**5/31/15** [3] - 861:19, 861:20
**50** [9] - 842:20, 862:24, 881:14, 888:24, 890:1, 904:8, 1023:13, 1023:14, 1023:23
**50,000** [2] - 977:15, 997:20
**500** [1] - 843:3
**506** [1] - 842:20
**54,000** [1] - 996:25
**54th** [2] - 976:4, 998:17
**57** [4] - 856:24, 858:12, 858:22, 859:2
**5:00** [2] - 1023:7, 1031:22
**5th** [3] - 914:8, 916:17, 1000:19

## 6

**60** [1] - 902:6
**60,000** [2] - 962:20
**61** [1] - 984:11
**613-2487** [1] - 843:12
**613-2694** [1] - 843:12
**62** [2] - 919:19, 920:17
**63** [1] - 920:19
**635** [1] - 927:8
**646** [2] - 853:22, 927:18
**66** [2] - 904:7, 913:18
**6:00** [1] - 879:17
**6th** [8] - 905:8, 916:17, 918:2, 918:4, 945:6, 956:23, 957:1, 991:22

## 7

**70** [6] - 981:18, 984:6, 985:25, 989:3, 1001:8
**70-person** [1] - 972:20
**718** [2] - 843:12, 843:12
**75204** [1] - 842:17
**7th** [1] - 854:10

## 8

**80** [1] - 981:18
**800,950** [1] - 944:8
**825.214** [4] - 869:22, 869:25, 870:22, 870:23
**825.216** [3] - 868:8, 868:17, 868:22
**825.300(d)(1)** [1] - 887:22
**825.301(d)** [1] - 888:7
**84** [3] - 854:4, 854:5, 854:7
**850** [1] - 1034:6
**853** [1] - 1034:8
**855** [1] - 1034:10
**856** [1] - 1034:12
**859** [1] - 1034:14
**867** [1] - 1034:17
**87** [6] - 855:15, 855:18, 861:18, 1012:19, 1025:20, 1034:9

**88** [1] - 856:17, 856:20, 856:21, 861:19, 962:4, 962:18, 963:9, 1034:11
**880** [1] - 962:5
**89** [4] - 856:17, 856:20, 856:21, 1034:11
**891** [1] - 1034:18
**8:47** [1] - 1031:1
**8th** [7] - 905:8, 905:9, 958:22, 959:2, 959:9, 961:10, 961:11

## 9

**9/15/15** [1] - 861:20
**9/6/16** [3] - 851:7, 851:10, 851:19
**90** [1] - 861:20
**900,000** [1] - 944:7, 944:10, 998:24
**92** [3] - 859:11, 859:14, 1034:13
**94** [1] - 861:20
**954** [1] - 1034:19
**9:00** [1] - 879:18
**9th** [13] - 858:15, 858:24, 859:4, 916:19, 918:22, 924:1, 924:2, 924:3, 924:5, 924:14, 924:19, 924:20, 925:1

## A

**A-Rod** [1] - 977:25
**a.m** [6] - 842:8, 846:11, 855:21, 866:16, 891:1, 1032:2
**abandoned** [1] - 1025:13
**abilities** [2] - 853:1, 907:24
**ability** [16] - 853:2, 900:3, 908:4, 908:5, 915:21, 916:7, 916:8, 916:11, 919:1, 919:2, 919:4, 939:21, 975:5, 1012:9
**able** [25] - 854:17, 866:2, 871:24, 881:4, 901:22, 915:25, 916:1, 916:3, 916:20, 941:2, 946:22, 969:4, 970:9, 981:1, 983:20, 983:21, 1002:3, 1015:12, 1016:18, 1017:3, 1017:13, 1018:22, 1027:23, 1028:10, 1031:15
**absence** [12] - 871:7, 871:14, 871:16, 878:25, 963:19, 966:4, 966:20, 1011:15, 1024:16, 1026:6, 1028:22
**absent** [1] - 1011:19
**Absent** [1] - 887:20
**absolute** [3] - 900:9, 971:17, 971:21
**absolutely** [5] - 846:4, 913:2, 920:7, 983:18, 1024:10
**academic** [1] - 880:16
**accept** [2] - 918:23, 953:23
**accepted** [2] - 918:20, 1027:16
**access** [52] - 863:17, 873:10, 874:12, 874:14, 874:16, 874:21, 875:6, 878:7, 881:21, 885:17, 885:19, 885:21, 885:23, 886:1, 886:7, 886:12, 886:18, 894:25, 898:6, 898:22, 903:5, 904:11, 904:18, 904:19, 904:22, 904:25, 909:19, 909:21, 916:10, 930:14, 931:1, 931:12, 932:2, 932:3, 933:17, 933:22, 934:10, 934:25, 936:14, 949:10, 955:15, 955:25, 956:20, 967:4, 967:11, 967:14, 968:15, 968:25, 971:11, 1024:4, 1030:2
**accessed** [1] - 956:6

**accommodate** [7] - 862:13, 871:6, 871:14, 871:16, 930:14, 932:18, 1018:9

**accommodation** [7] - 968:12, 968:16, 968:20, 968:22, 968:24, 969:3, 1000:5

**accomplish** [1] - 907:10

**accomplished** [1] - 987:2

**accordance** [1] - 890:18

**according** [4] - 876:8, 925:1, 947:13, 957:11

**account** [3] - 934:10, 945:1, 946:9

**accountability** [1] - 985:21

**accountable** [2] - 985:20, 988:13

**accounting** [5] - 893:4, 894:3, 927:23, 987:5, 988:23

**accounts** [3] - 854:13, 964:11, 987:15

**accrued** [1] - 913:24

**accurate** [3] - 854:13, 857:17, 883:1

**accurately** [1] - 854:17

**accused** [1] - 985:9

**acquired** [8] - 884:10, 884:13, 884:18, 885:5, 947:19, 947:20, 1014:22, 1015:19

**acquisitions** [1] - 990:10

**Act** [16] - 893:19, 893:20, 898:5, 898:8, 898:9, 899:3, 950:7, 951:20, 954:4, 965:14, 967:21, 968:10, 971:4, 971:14, 971:15, 971:18

**act** [1] - 878:13

**action** [34] - 857:4, 891:18, 899:1, 903:24, 904:6, 904:10, 931:8, 931:13, 933:4, 933:9, 933:10, 934:10, 935:17, 936:4, 937:25, 938:17, 938:22, 939:1, 939:8, 955:19, 955:20, 955:21, 965:20, 967:18, 967:21, 1024:9, 1024:10, 1024:23, 1025:2, 1025:19, 1025:23, 1026:1, 1026:3, 1026:13

**actions** [14] - 878:8, 878:10, 898:22, 899:16, 916:10, 932:1, 933:24, 934:24, 938:7, 938:9, 967:23, 1025:4, 1028:6, 1030:18

**active** [1] - 854:13

**activities** [6] - 906:19, 907:5, 907:19, 907:21, 909:8, 969:17

**acts** [1] - 1014:21

**actual** [7] - 882:23, 915:1, 923:1, 941:20, 1001:14, 1020:5, 1030:20

**ADA** [71] - 873:2, 873:6, 873:9, 873:10, 874:12, 874:18, 874:21, 875:20, 876:8, 876:9, 877:6, 878:3, 878:6, 878:9, 878:17, 878:21, 879:1, 879:3, 880:13, 881:19, 882:2, 882:9, 882:10, 891:21, 893:23, 909:22, 931:18, 931:20, 933:21, 935:5, 935:14, 936:10, 937:7, 938:18, 938:21, 941:10, 949:11, 952:6, 952:17, 954:3, 954:13, 955:9, 955:11, 955:12, 955:18, 958:14, 959:21, 1015:11, 1016:7, 1017:12, 1019:9, 1021:12, 1021:16, 1024:2, 1024:13, 1024:21, 1025:4, 1025:8, 1025:14, 1025:15, 1025:17, 1025:19, 1026:20, 1026:24, 1027:6, 1028:22, 1028:23, 1028:25, 1029:13

**add** [6] - 881:5, 911:4, 942:3, 943:8, 998:21

**Added** [1] - 922:20

**added** [16] - 860:3, 860:13, 860:19,

860:22, 860:25, 861:3, 861:5, 861:7, 922:21, 923:4, 953:5, 990:10, 992:2, 993:6, 995:4

**adding** [2] - 996:11, 996:13

**addition** [10] - 847:2, 922:15, 959:10, 965:4, 966:10, 968:8, 970:8, 974:5, 981:20, 990:9

**additional** [3] - 858:4, 916:3, 959:5

**address** [3] - 946:11, 967:24, 968:5

**addressed** [1] - 975:13

**adds** [1] - 944:8

**adjourned** [1] - 1032:1

**adjusted** [1] - 861:12

**adjustment** [2] - 935:8, 1020:13

**administrative** [1] - 1025:22

**admissions** [1] - 1030:4

**admit** [1] - 960:1

**admits** [2] - 917:8, 978:6

**admitted** [8] - 847:7, 899:19, 909:7, 925:13, 942:12, 942:15, 958:8, 960:5

**adversaries** [1] - 845:7

**adversary** [1] - 864:2

**adverse** [41] - 898:22, 903:24, 904:6, 904:10, 931:8, 931:13, 932:1, 933:4, 933:8, 933:10, 933:24, 934:10, 934:23, 935:17, 936:3, 937:25, 938:7, 938:9, 938:17, 938:22, 939:1, 939:8, 955:19, 955:20, 965:20, 967:18, 967:21, 967:23, 1024:9, 1024:23, 1025:2, 1025:4, 1025:19, 1025:23, 1026:1, 1026:2, 1026:3, 1026:13, 1026:20, 1030:18

**advised** [6] - 846:15, 851:7, 851:13, 889:16, 904:19, 995:14

**advises** [1] - 920:23

**advisor** [1] - 998:12

**advocating** [1] - 847:2

**after-acquired** [4] - 947:19, 947:20, 1014:22, 1015:19

**after-the-fact** [3] - 885:8, 906:6, 922:15

**afternoon** [4] - 954:19, 995:13, 1004:16, 1007:2

**afterthought** [1] - 925:3

**afterwards** [6] - 861:13, 881:5, 934:16, 937:2, 946:6, 971:24

**age** [3] - 844:18, 973:1, 1031:9

**agendas** [1] - 962:24

**ago** [3] - 874:9, 962:19, 1018:8

**agree** [17] - 855:25, 867:17, 868:1, 868:6, 869:6, 873:23, 877:8, 878:17, 881:2, 882:3, 953:10, 987:24, 987:25, 1005:16, 1006:15, 1022:24, 1026:2

**agreed** [7] - 877:5, 877:7, 882:13, 882:14, 896:23, 897:1, 914:20

**agreement** [11] - 859:20, 947:9, 947:12, 947:15, 995:17, 997:4, 1004:18, 1004:23, 1005:2

**agreements** [5] - 897:25, 898:1, 947:10, 947:16

**agrees** [1] - 976:22

**ahead** [9] - 848:6, 850:13, 884:7, 884:8, 888:21, 942:14, 942:22, 995:9, 1025:11

**ahold** [1] - 1002:9

**aided** [1] - 843:14

**air** [1] - 915:7

**al** [4] - 842:8, 842:19, 843:3, 843:8

**Alicia** [2] - 847:16, 848:1

**allegation** [1] - 1002:8

**allegations** [2] - 901:25, 909:15

**alleged** [1] - 1008:2

**allegedly** [1] - 1024:3

**allocate** [1] - 950:25

**allotted** [1] - 887:20

**allow** [10] - 850:10, 889:13, 893:21, 921:2, 949:21, 1004:13, 1017:8, 1027:10, 1028:9, 1028:21

**allowed** [6] - 898:11, 946:23, 957:16, 1005:10, 1027:13, 1030:3

**allowing** [1] - 909:2

**almost** [4] - 964:1, 974:24, 994:15, 1014:18

**alone** [2] - 977:19, 1010:2

**alternate** [1] - 1008:10

**America** [1] - 852:18

**American** [1] - 915:5

**Americans** [10] - 893:20, 898:4, 898:8, 898:9, 899:3, 965:14, 967:21, 968:9, 971:3, 971:13

**amount** [2] - 865:10, 947:14, 952:16, 1019:9

**amounts** [2] - 870:13, 998:20

**ample** [1] - 1003:3

**Amy** [1] - 857:12

**analyses** [1] - 857:9

**analysis** [4] - 912:20, 916:21, 919:7, 923:20

**Analysis** [1] - 856:25

**analytics** [1] - 852:20

**analyze** [1] - 853:4

**analyzed** [1] - 1027:6

**AND** [1] - 842:12

**AND/OR** [1] - 1034:16

**anesthesia** [1] - 905:14

**anger** [1] - 980:19

**answer** [19] - 847:22, 861:22, 884:9, 900:9, 903:10, 913:6, 926:14, 942:15, 980:11, 983:1, 989:15, 995:3, 995:6, 1005:14, 1005:21, 1005:25, 1006:5, 1008:14

**Anthony** [2] - 843:11, 889:10

**anticipate** [2] - 846:19, 846:20

**anxious** [1] - 846:5

**anyway** [4] - 847:7, 957:24, 1002:13, 1012:21

**apologize** [3] - 844:20, 877:22, 1004:9

**appeals** [1] - 934:18

**appearing** [1] - 901:7

**application** [1] - 889:5

**applications** [1] - 845:25

**applied** [1] - 945:7

**applies** [2] - 868:22, 911:15

**apply** [3] - 884:6, 885:4, 927:24

**appointments** [1] - 963:10

**appreciate** [5] - 891:6, 955:1, 955:4, 964:7, 1031:7

**appreciated** [2] - 1007:11, 1007:18

**appreciates** [1] - 891:6

**apprentice** [2] - 977:9, 977:10

**approach** [1] - 970:10

**appropriate** [3] - 889:12, 945:25, 973:25

**approval** [1] - 917:20

**approvals** [1] - 854:19

**approved** [3] - 897:23, 977:4, 986:6

**approving** [1] - 895:13

**approximate** [3] - 848:23, 848:25, 849:1

**April** [3] - 849:1, 858:16, 956:4

**arcing** [1] - 1024:16

**area** [5] - 936:21, 996:14, 1008:21, 1008:22, 1009:9

**areas** [6] - 849:14, 916:5, 975:11, 979:13, 1002:6, 1008:25

**argue** [6] - 878:25, 932:5, 934:4, 934:15, 942:13, 942:16

**argued** [2] - 887:9, 932:15

**argues** [1] - 1000:24

**arguing** [8] - 883:2, 930:23, 931:4, 933:25, 934:3, 936:5, 1000:3, 1025:1

**argument** [11] - 864:8, 868:24, 893:5, 938:4, 978:14, 1004:17, 1004:25, 1005:1, 1015:10, 1026:25, 1028:16

**arguments** [7] - 864:23, 890:11, 932:23, 934:5, 999:11, 1017:17, 1029:11

**ARNSTEIN** [1] - 843:2

**arrangement** [1] - 896:6

**Ashley** [3] - 906:10, 906:12, 1033:5

**aside** [1] - 1029:18

**assertion** [1] - 941:11

**assess** [1] - 864:9

**assignment** [1] - 982:3

**assist** [1] - 848:9

**assistant** [2] - 968:3

**associate** [2] - 860:8, 907:3

**associated** [2] - 856:14, 857:4

**associates** [1] - 969:21

**assuming** [2] - 921:17, 941:14

**Atlantic** [1] - 1008:21

**attached** [1] - 854:15

**attempt** [3] - 861:24, 893:5, 903:18

**attend** [3] - 906:19, 950:5, 969:17

**attended** [1] - 960:2

**attention** [8] - 854:23, 889:23, 953:9, 954:24, 954:25, 955:4, 1007:16, 1016:12

**attentive** [2] - 846:13, 1007:13

**attorney** [5] - 945:11, 958:12, 966:3, 971:16, 977:5

**Attorney** [2] - 842:15, 842:19

**Attorneys** [1] - 843:2

**attorneys** [2] - 843:7, 972:2

**attrition** [4] - 985:25, 986:7, 986:10, 986:12

**audit** [5] - 986:15, 986:20, 988:23, 1011:4, 1011:7

**August** [5] - 927:18, 956:5, 966:12, 998:2

**authority** [3] - 897:20, 949:1

**authorization** [5] - 876:5, 876:11, 913:22, 917:23, 918:20

**authorize** [1] - 949:3

**authorized** [4] - 947:13, 948:9, 949:4, 949:5

**available** [2] - 985:2, 1018:2

**Avenue** [2] - 842:16, 843:8, 1008:21

**avoid** [4] - 880:12, 903:18, 954:9, 1017:4

**avoidance** [1] - 988:5

**award** [5] - 932:7, 941:15, 952:15

**aware** [2] - 849:11, 874:3

**awful** [1] - 936:17

## B

**backdated** [1] - 917:20

**backed** [1] - 943:16

**backfilled** [1] - 979:6

**background** [2] - 892:6, 900:8

**backpay** [13] - 884:16, 915:23, 931:17, 944:12, 949:18, 949:19, 952:16, 998:24, 1019:8, 1021:10, 1021:12, 1021:16, 1022:5

**backwards** [1] - 932:18

**bad** [15] - 865:6, 932:7, 958:4, 958:5, 958:7, 959:24, 974:16, 974:17, 984:8, 984:23, 986:12, 987:24, 988:17, 1002:5, 1011:14

**Baddour** [5] - 907:6, 907:8, 907:20, 908:7, 908:24

**bade** [1] - 1020:24

**badly** [1] - 993:17

**Badoor** [1] - 847:17

**Badoor's** [1] - 850:21

**balance** [2] - 915:6, 1013:16

**ball** [3] - 915:8, 935:25, 954:16

**ballooned** [1] - 985:25

**ballpark** [1] - 880:12

**Baltimore** [1] - 843:4

**bank** [1] - 946:9

**bankruptcy** [2] - 975:6, 988:5

**banks** [1] - 896:19

**BARGER** [1] - 842:3

**Barger** [216] - 842:15, 844:5, 845:21, 855:25, 856:1, 860:16, 860:22, 861:4, 870:11, 873:15, 876:5, 878:14, 879:7, 887:24, 889:8, 891:6, 891:9, 892:7, 892:10, 892:13, 892:19, 895:6, 895:7, 895:14, 895:17, 896:5, 896:8, 896:12, 896:14, 896:21, 897:8, 897:11, 897:13, 897:15, 898:1, 898:19, 898:21, 899:6, 899:13, 899:20, 900:5, 900:7, 900:22, 901:2, 901:5, 901:11, 901:17, 902:8, 903:4, 903:6, 903:7, 903:14, 904:21, 904:22, 905:2, 905:4, 905:5, 905:13, 905:18, 906:22, 906:23, 906:25, 907:11, 907:17, 907:20, 907:23, 908:22, 909:7, 909:9, 909:16, 909:24, 910:10, 912:1, 912:14, 912:17, 912:21, 912:22, 913:2, 913:9, 913:11, 913:15, 914:10, 915:15, 915:24, 916:15, 916:18, 916:22, 917:17, 918:3, 918:17, 918:18, 919:16, 919:19, 920:20, 921:5, 921:9, 922:14, 922:15, 922:19, 922:23, 923:10, 924:2, 924:8, 925:3, 926:10, 926:14, 926:18, 928:4, 928:6, 937:22, 938:16, 938:25, 941:11, 941:16, 941:22, 941:25, 942:5, 943:9, 943:13, 943:16, 944:20, 944:23, 944:24, 945:3, 945:8, 945:13, 946:8, 947:11, 947:21, 948:3, 948:6, 948:8, 948:14, 948:15, 948:18, 948:22, 948:24, 951:9, 951:12, 951:16, 951:23, 951:24, 952:1, 952:11, 952:15, 953:7, 955:12, 957:23, 958:5, 958:22, 959:2, 959:17, 960:1, 960:15, 960:17, 962:21, 965:18, 972:13, 972:16, 973:13, 973:21, 976:5, 976:14, 976:22, 978:5, 978:6, 978:16, 979:18, 980:3, 980:19, 981:20, 981:25, 982:7, 982:10, 982:11, 983:18, 984:3, 984:8, 984:10, 984:17, 985:6, 985:8, 985:20, 988:16, 988:20, 989:5, 989:8, 989:23, 990:13, 990:22, 991:5, 991:18, 994:13, 995:4, 995:14, 996:3, 996:24, 997:1, 997:3, 997:21, 998:14, 998:15, 1004:17, 1008:8, 1008:10, 1010:2, 1010:7, 1010:24, 1012:7, 1013:14, 1015:7

**Barger's** [46] - 848:2, 856:12, 859:16, 874:10, 892:6, 894:20, 896:3, 897:2, 897:7, 898:5, 898:6, 899:25, 900:18, 901:20, 901:25, 902:4, 904:3, 904:25, 905:17, 909:5, 909:20, 916:11, 919:15, 920:9, 923:24, 924:19, 943:14, 944:14, 946:15, 947:7, 949:3, 949:7, 952:12, 952:22, 957:11, 958:12, 962:13, 971:16, 972:1, 994:3, 998:23, 1001:18, 1005:8, 1008:5, 1011:15, 1015:11

**base** [1] - 1013:5

**based** [6] - 857:17, 858:7, 909:20, 978:22, 998:23, 1001:3

**basis** [5] - 877:23, 890:2, 921:24, 968:20, 1029:18

**Batman** [5] - 895:8, 976:16, 977:18, 977:20, 980:8

**batman's** [1] - 980:16

**beat** [2] - 1013:12, 1030:8

**beaten** [1] - 908:14

**became** [3] - 977:6, 977:15, 997:13

**become** [2] - 897:11, 964:5

**becomes** [3] - 885:6, 900:14, 983:23

**becoming** [1] - 893:18

**bed** [1] - 957:7

**been's** [1] - 916:15

**BEFORE** [1] - 842:12

**began** [4] - 887:16, 888:4, 895:5, 920:16

**begin** [1] - 903:17

**beginning** [8] - 848:10, 876:14, 907:19, 928:4, 949:9, 975:19, 976:25, 982:12

**behalf** [3] - 873:14, 996:22, 1005:3

**behavior** [2] - 901:19, 962:9

**behind** [1] - 878:14

**belongs** [1] - 1014:16

**below** [4] - 854:20, 855:23, 856:10, 904:7

**bench** [1] - 873:17

**benefit** [3] - 920:5, 987:25, 1026:9

**benefits** [6] - 871:22, 897:9, 904:6, 904:9, 912:6, 913:23, 917:1, 925:17

**Benhardt** [12] - 847:17, 852:11, 914:9, 918:17, 923:5, 923:8, 923:9, 923:19, 923:21, 924:22, 927:10, 1033:6

**Benhardt's** [2] - 918:9, 922:12

**bent** [1] - 932:18

**Bernhardt** [3] - 994:24, 995:10, 995:11
**Bernhardt's** [1] - 1012:22
**best** [8] - 857:17, 880:12, 895:18, 921:20, 966:18, 985:3, 1001:14, 1001:15
**bet** [2] - 975:3, 994:15
**better** [21] - 960:13, 960:18, 960:19, 961:4, 961:5, 967:2, 967:5, 967:6, 967:18, 971:8, 972:4, 972:5, 977:24, 979:1, 979:2, 979:4, 979:11, 979:12, 996:9, 1001:19, 1004:21
**between** [24] - 846:7, 859:7, 870:21, 879:17, 895:5, 898:2, 910:23, 920:19, 920:22, 928:6, 947:16, 948:2, 948:19, 949:22, 950:9, 952:12, 962:22, 979:18, 987:11, 987:18, 994:9, 1014:2, 1019:10, 1022:25
**beyond** [3] - 920:6, 973:9, 1022:17
**Big** [1] - 979:20
**big** [11] - 891:12, 903:10, 939:17, 975:4, 980:1, 980:25, 981:15, 989:20, 999:12, 1009:8, 1014:9
**bigger** [1] - 953:4
**biggest** [1] - 986:23
**billed** [1] - 997:12
**billion** [3] - 975:2, 975:3, 988:6
**bind** [1] - 947:13
**binder** [1] - 1029:25
**binge** [1] - 927:14
**birth** [1] - 972:10
**Bisignano** [14] - 857:14, 889:9, 897:19, 897:22, 922:2, 947:14, 955:2, 964:24, 973:18, 974:22, 981:11, 989:12, 989:24, 993:8
**bit** [16] - 865:12, 866:11, 866:13, 881:21, 894:10, 894:12, 924:11, 928:17, 946:3, 954:14, 979:12, 981:10, 996:4, 1010:17, 1016:14, 1017:1
**blah** [1] - 1004:18
**blamed** [1] - 926:6
**blanche** [1] - 1014:12
**Block** [5] - 898:15, 898:23, 931:23, 934:7, 1031:8
**BLOCK** [1] - 842:12
**Block's** [1] - 947:25
**blow** [1] - 855:7
**board** [2] - 896:2, 946:3
**boat** [1] - 985:2
**boil** [1] - 1007:25
**BOND** [1] - 843:7
**bonus** [25] - 897:17, 899:7, 899:8, 910:16, 910:17, 913:19, 913:20, 913:24, 942:2, 942:3, 944:4, 944:9, 946:21, 947:1, 947:3, 947:5, 952:12, 964:22, 964:25, 965:2, 965:8, 997:25, 998:1, 998:3, 1013:4
**bonuses** [7] - 897:10, 922:6, 928:1, 943:11, 946:16, 946:17, 998:5
**boss** [4] - 972:15, 974:20, 976:5, 995:24
**bottom** [9] - 850:16, 852:3, 853:17, 855:20, 857:25, 907:3, 920:9, 920:23, 970:3
**bought** [2] - 975:16, 1009:15
**bouncing** [2] - 935:25, 954:16
**bound** [1] - 1017:21

**bout** [1] - 888:23
**box** [1] - 969:16
**brag** [1] - 985:12
**breached** [1] - 948:6
**break** [10] - 846:18, 863:6, 864:13, 865:15, 865:17, 889:8, 890:21, 928:19, 928:21, 1003:1
**Brian** [1] - 928:5
**bridge** [1] - 1031:14
**brief** [6] - 846:9, 864:21, 881:14, 890:24, 940:14, 941:4
**briefly** [1] - 896:18
**bring** [11] - 844:8, 845:13, 846:8, 865:23, 890:23, 897:13, 940:3, 972:16, 972:20, 972:21, 972:22
**bringing** [1] - 889:22
**brings** [3] - 977:1, 992:6, 995:25
**broad** [1] - 936:15
**broadcast** [1] - 964:17
**broadened** [1] - 930:14
**broke** [1] - 957:8
**Brooklyn** [7] - 842:5, 842:21, 844:8, 989:24, 1008:24, 1009:1, 1031:14
**Brooklyn heights** [5] - 1008:20, 1009:2, 1009:6
**brought** [1] - 901:18, 902:9, 926:6, 950:22, 959:17, 974:25, 975:16, 984:16, 987:4, 992:7, 1016:20
**brushing** [1] - 907:6
**bucket** [1] - 987:12
**buddies** [2] - 895:18
**buddy** [1] - 895:16
**budget** [3] - 854:13, 854:14, 901:10
**build** [1] - 854:12
**building** [1] - 996:12
**bullet** [4] - 853:18, 853:19, 920:2, 920:10
**bunch** [2] - 933:9, 974:19
**burden** [26] - 863:12, 864:20, 866:22, 866:23, 868:4, 868:7, 868:9, 868:11, 868:12, 868:13, 868:14, 868:15, 869:14, 871:25, 916:23, 916:24, 917:2, 917:15, 917:16, 926:21, 973:7, 1009:22, 1010:19, 1012:1, 1016:13
**business** [25] - 852:16, 857:12, 857:24, 887:19, 888:3, 892:4, 893:15, 894:20, 897:11, 897:16, 898:8, 950:21, 960:13, 963:5, 974:9, 974:18, 977:8, 977:10, 977:16, 978:17, 986:3, 987:23, 990:20, 991:11
**Business** [6] - 858:23, 859:3, 859:8, 923:23, 924:4, 924:15
**businesses** [1] - 978:11
**but-for** [4] - 955:20, 955:23, 955:24, 1011:21
**buy** [5] - 893:15, 922:8, 942:7, 943:4
**buy/serve** [1] - 942:25

## C

**Cagwin** [8] - 893:7, 893:14, 922:7, 926:24, 948:10, 987:5, 988:22, 1014:17
**cake** [1] - 901:10
**calculate** [4] - 941:14, 941:15, 944:12, 1019:9

**calculated** [2] - 952:13, 952:24
**calculation** [9] - 941:18, 941:20, 943:23, 944:11, 944:16, 947:24, 953:5, 999:2, 999:3
**calendars** [1] - 963:10
**cancel** [1] - 896:22
**cancer** [22] - 908:22, 908:23, 956:3, 956:10, 956:11, 956:19, 956:22, 964:15, 966:14, 978:5, 978:19, 985:6, 988:17, 1005:13, 1005:20, 1005:21, 1005:22, 1006:2, 1012:7, 1013:12, 1025:17
**cannot** [1] - 888:5
**cap** [1] - 997:16
**capabilities** [1] - 909:5
**capability** [1] - 901:17
**capable** [1] - 901:15
**capacity** [1] - 1031:18
**card** [2] - 989:19, 989:20
**cards** [1] - 989:21
**care** [13] - 854:23, 901:10, 911:13, 911:14, 912:23, 950:9, 964:6, 964:7, 965:16, 976:18, 977:22, 977:23
**cared** [1] - 901:20
**career** [2] - 895:6, 898:2
**careful** [1] - 1030:3
**carefully** [2] - 973:3, 973:4
**carpal** [1] - 858:11
**carte** [1] - 1014:11
**carve** [3] - 844:10, 884:19, 884:24
**carved** [1] - 889:15
**case** [81] - 845:2, 846:23, 847:10, 862:14, 862:16, 862:21, 863:5, 864:23, 866:6, 869:18, 869:21, 869:23, 871:15, 872:6, 872:9, 872:13, 873:2, 873:12, 874:11, 877:24, 878:3, 878:12, 880:10, 883:20, 884:1, 885:2, 887:9, 889:3, 912:4, 920:16, 923:7, 926:7, 928:21, 928:22, 930:12, 932:17, 934:13, 937:4, 945:23, 948:1, 948:2, 952:4, 953:19, 953:22, 955:2, 955:7, 955:9, 956:2, 958:11, 962:21, 967:23, 971:3, 974:13, 974:15, 980:17, 982:13, 989:5, 996:20, 1005:17, 1008:1, 1009:22, 1010:22, 1014:10, 1016:6, 1017:19, 1024:10, 1024:22, 1024:25, 1025:3, 1025:20, 1025:21, 1026:6, 1027:2, 1027:3, 1027:6, 1027:17, 1029:4, 1029:16, 1031:10
**cases** [1] - 932:19
**cash** [7] - 946:16, 947:2, 947:3, 965:5, 965:6, 975:5, 998:3
**category** [1] - 894:21
**caught** [5] - 915:11, 937:19, 949:10, 958:7, 998:18
**CAUSE** [1] - 842:11
**caused** [1] - 955:25
**caution** [3] - 863:16, 954:8, 1017:1
**cautious** [1] - 946:1
**CC** [1] - 961:12
**cease** [2] - 851:7, 851:14
**center** [2] - 989:9, 989:10
**century** [1] - 973:14
**CEO** [3] - 897:20, 897:23, 974:22
**CEOs** [1] - 974:23
**certain** [2] - 964:10, 1015:24

[certainly - complaint]

certainly [5] - 881:15, 887:25, 918:18, 941:3, 979:13
certification [4] - 906:9, 1027:20, 1028:7, 1028:10
certified [1] - 970:8
certify [1] - 1027:21
certifying [1] - 1027:10
cetera [4] - 933:12, 934:13, 936:24
CFR [5] - 867:25, 870:22, 870:23, 887:22, 888:7
chair [1] - 998:12
chairman [1] - 897:18
challenge [1] - 994:12
challenged [1] - 984:12
chance [7] - 863:24, 921:5, 934:23, 957:14, 979:6, 1001:25, 1006:16
chances [3] - 864:4, 953:22, 954:9
change [10] - 846:6, 881:22, 886:10, 886:24, 927:12, 933:12, 934:19, 991:17, 1004:23, 1006:9
changed [5] - 882:5, 929:4, 948:13, 950:5, 979:15
changes [8] - 888:20, 888:22, 895:24, 937:18, 938:11, 982:20, 996:11, 1023:7
changing [1] - 975:17
Channel [1] - 973:14
characterized [1] - 1015:5
charge [30] - 844:10, 844:23, 845:25, 868:19, 869:6, 870:19, 872:4, 872:21, 872:25, 874:2, 876:19, 881:7, 881:21, 884:18, 886:25, 887:10, 889:15, 890:18, 932:12, 934:21, 935:9, 936:9, 937:16, 954:8, 1002:19, 1003:4, 1016:17, 1018:22, 1020:14
Charge [2] - 1018:12, 1034:17
charging [1] - 867:1
Charron [18] - 889:10, 922:2, 955:3, 964:24, 973:18, 976:7, 976:8, 976:9, 978:4, 978:15, 981:21, 990:18, 996:2, 996:5, 996:8, 1001:25
Charron's [2] - 923:24, 926:13
chart [2] - 853:19, 857:22, 857:25, 858:5, 862:4, 914:10, 927:10, 989:18, 996:23
charts [3] - 918:12, 918:13, 922:13
chat [1] - 1018:19
cheaper [1] - 951:1
check [2] - 1030:12, 1030:13
checked [1] - 969:16
checks [5] - 944:22, 944:23, 944:25, 945:12, 945:15
chemotherapy [1] - 956:18
chief [1] - 987:5
child [5] - 911:14, 972:9, 972:10, 974:3
children [1] - 949:23
choice [3] - 909:23, 921:1, 950:9
choose [2] - 849:21, 949:22
chose [1] - 950:12
chosen [3] - 848:16, 925:12, 926:20
Christmas [2] - 959:7, 1013:19
chronological [1] - 894:11
chunks [3] - 893:3, 893:13, 893:24
churn [4] - 893:17, 1009:15
CIANFICHI [1] - 843:5
Circuit [1] - 934:17
circumstance [1] - 1010:8

circumstances [12] - 862:2, 887:21, 923:2, 937:12, 1008:12, 1010:4, 1010:20, 1011:3, 1011:9, 1011:18, 1011:22, 1028:1
Cisco [1] - 1027:3
cite [1] - 887:22
cited [1] - 1011:2
cites [1] - 873:17
Citigroup [1] - 895:10
CIVIL [1] - 842:11
civil [1] - 844:4
claim [70] - 873:2, 873:8, 873:9, 873:11, 873:16, 873:24, 874:4, 874:10, 874:12, 874:18, 874:21, 874:22, 875:6, 875:13, 875:20, 877:4, 877:6, 878:6, 878:18, 878:21, 879:1, 879:13, 879:19, 880:13, 880:14, 881:6, 881:19, 882:8, 888:4, 898:4, 911:12, 915:3, 915:4, 930:25, 931:5, 931:9, 934:8, 935:5, 936:4, 936:8, 936:23, 938:10, 938:19, 939:4, 948:5, 954:12, 955:12, 958:10, 959:21, 967:2, 969:6, 992:6, 999:25, 1000:14, 1019:14, 1021:12, 1021:16, 1021:19, 1021:24, 1022:23, 1024:5, 1024:15, 1025:7, 1025:14, 1027:6, 1029:13, 1029:14
claiming [1] - 869:19, 875:7, 875:19, 938:16, 938:25, 963:25, 1022:5, 1022:17, 1025:9
claims [20] - 869:4, 870:11, 872:25, 873:6, 898:3, 931:11, 932:12, 935:24, 936:8, 953:20, 955:9, 955:11, 963:23, 971:13, 998:23, 1005:9, 1015:11, 1023:24, 1023:25, 1024:7
clarify [1] - 972:2
clean [3] - 1020:14, 1023:6, 1023:10
clear [19] - 845:15, 845:20, 869:6, 881:3, 888:8, 888:17, 889:20, 930:7, 934:17, 935:16, 938:18, 946:3, 1015:22, 1017:2, 1017:23, 1022:4, 1022:20, 1022:21, 1024:22
clearance [2] - 918:3, 921:16
clearer [1] - 959:25
clearly [6] - 847:18, 899:5, 956:18, 956:19, 1017:13
clerk [3] - 871:3, 877:21, 881:10
clerks [4] - 871:20, 877:21, 1030:24, 1031:7
client [11] - 864:16, 873:16, 876:10, 879:2, 930:8, 933:19, 939:11, 939:21, 959:20, 1015:21
client's [4] - 864:7, 945:1, 1007:25, 1014:23
clients [10] - 847:3, 847:6, 896:16, 896:17, 896:18, 897:6, 932:15, 941:4, 996:22, 1023:20
Clinton [1] - 950:6
clock [1] - 887:19
close [3] - 944:7, 944:11, 1016:11
closed [1] - 975:10
closing [8] - 965:15, 990:25, 991:1, 991:25, 996:4, 999:10, 1000:1, 1004:17
closings [1] - 883:17
Coach [1] - 965:7, 1010:15
collecting [1] - 918:13

collects [2] - 918:11, 923:6
color [1] - 924:12
Column [4] - 860:4, 860:16, 860:19, 861:19
column [2] - 924:23, 1013:4
columns [1] - 858:6
Columns [1] - 860:1
combination [2] - 858:7, 961:2
combing [1] - 907:7
comfortable [1] - 948:12
coming [16] - 876:24, 898:14, 913:13, 914:8, 914:24, 919:17, 948:21, 951:9, 994:7, 994:11, 1000:22, 1013:8, 1013:18, 1013:23, 1014:12, 1022:19
command [1] - 1007:5
commanded [2] - 952:23, 953:7
commence [2] - 889:3, 898:20
commenced [2] - 849:2, 916:17
comment [4] - 883:4, 885:16, 901:7, 1000:15
commentary [1] - 936:16
commented [1] - 962:8
comments [5] - 867:9, 877:15, 895:23, 939:20, 985:15
commissary [1] - 866:4
commit [2] - 1015:4, 1015:9
committed [1] - 1014:24
committee [1] - 922:2, 928:10
common [2] - 970:10, 971:11
communicate [3] - 860:7, 900:3, 1012:10
communicated [3] - 858:9, 861:10, 861:13
communications [6] - 909:11, 961:9, 961:12, 1013:21, 1013:22, 1013:25
comp [1] - 856:8
companies [4] - 975:17, 982:23, 989:20, 990:20
company [60] - 857:25, 858:3, 860:12, 892:20, 893:21, 897:12, 902:3, 903:10, 903:16, 922:8, 955:16, 963:16, 966:21, 972:15, 973:20, 974:4, 974:22, 974:23, 975:9, 975:14, 975:16, 975:18, 976:1, 977:1, 978:23, 979:20, 980:1, 981:12, 981:16, 981:18, 984:25, 986:8, 987:7, 987:23, 989:11, 989:13, 989:19, 989:22, 990:1, 990:2, 996:15, 1001:10, 1009:16, 1010:4, 1010:8, 1010:16, 1011:14, 1011:19, 1011:20, 1012:13, 1012:18, 1013:9, 1013:11, 1014:11, 1014:13, 1014:19, 1014:20, 1014:25
compared [2] - 978:22, 984:4
compelled [1] - 884:11
compelling [1] - 1015:25
compensated [3] - 965:25, 979:7, 982:7
compensation [14] - 856:12, 857:13, 893:16, 895:13, 933:12, 934:24, 936:11, 938:10, 938:11, 943:9, 946:15, 1022:11, 1022:12, 1022:25
compensatory [14] - 879:11, 879:12, 879:14, 879:19, 880:3, 880:14, 880:18, 880:23, 881:6, 881:7, 882:7, 932:4, 936:23, 1019:8
complaining [2] - 966:1, 966:8
complaint [2] - 879:22, 879:23

**complaints** [2] - 901:6, 961:6
**complete** [5] - 846:14, 924:15, 927:2, 941:3, 1029:11
**completed** [2] - 849:13, 857:10
**completely** [3] - 908:2, 909:5, 939:24
**completes** [1] - 862:7
**complexities** [1] - 1029:16
**complications** [1] - 970:11
**comply** [2] - 893:22, 893:25
**complying** [2] - 893:18, 893:19
**component** [1] - 1019:8
**components** [1] - 1026:19
**comprehensive** [1] - 993:25
**comprised** [1] - 911:5
**compromise** [1] - 950:10
**compromises** [1] - 971:20
**Computer** [1] - 843:14
**computer** [2] - 908:4, 932:2
**Computer-aided** [1] - 843:14
**computerized** [1] - 843:14
**concede** [1] - 1010:12
**concept** [1] - 930:21
**conceptionally** [1] - 932:8
**concepts** [1] - 906:1
**concern** [3] - 965:21, 971:7, 983:19
**concerned** [8] - 845:13, 867:16, 883:20, 903:13, 936:1, 937:23, 964:14, 1021:4
**concerning** [2] - 968:1, 968:9
**concerns** [2] - 898:17, 916:11
**conclude** [1] - 1031:21
**concluding** [1] - 863:15, 866:11, 953:13
**concoction** [2] - 952:3, 973:12
**condition** [13] - 849:2, 899:21, 906:20, 909:9, 909:17, 911:15, 917:9, 958:15, 962:11, 964:3, 965:21, 969:15, 969:18
**conditions** [8] - 871:22, 888:1, 891:23, 898:13, 898:25, 933:12, 938:10, 938:12
**conference** [2] - 867:2, 890:19
**Conference**................................ [1] - 1034:17
**conferencing** [3] - 885:18, 886:3, 907:25
**confidentiality** [1] - 897:5
**confirm** [1] - 855:22
**confirmed** [4] - 903:13, 916:18, 959:15, 996:3
**confirming** [1] - 944:15
**confronted** [1] - 961:24
**confuse** [1] - 883:13
**confused** [1] - 875:25
**confusing** [3] - 1006:13, 1019:1, 1019:6
**confusion** [1] - 844:16
**congratulations** [1] - 1016:5
**congress** [1] - 1014:21
**connects** [1] - 981:9
**consecutive** [2] - 853:23, 927:19
**consent** [1] - 897:15
**consider** [14] - 885:9, 887:4, 889:14, 923:12, 932:6, 932:21, 934:16, 937:6, 938:1, 938:13, 939:7, 942:18, 954:2, 1014:10
**consideration** [1] - 952:19

**considered** [7] - 871:11, 884:17, 892:23, 923:11, 967:20, 967:23, 1008:25
**considering** [1] - 1028:1
**consistency** [1] - 884:7
**consistent** [2] - 851:6, 883:12
**consolidated** [1] - 975:11
**conspiracy** [5] - 973:13, 989:1, 990:5, 992:1, 1008:3
**constant** [2] - 893:6, 893:16
**constantly** [1] - 893:23
**constitute** [4] - 862:20, 878:21, 933:10, 1030:18
**constraints** [1] - 865:18
**constructed** [1] - 920:16
**construction** [1] - 981:17
**consult** [2] - 896:4, 896:15
**consultant** [7] - 897:2, 897:8, 948:25, 976:20, 977:2, 997:20, 1014:25
**consultant's** [1] - 999:21
**consulting** [20] - 858:19, 894:20, 896:6, 896:21, 897:1, 897:11, 897:15, 912:19, 943:15, 943:20, 944:3, 944:14, 947:7, 947:9, 947:10, 947:12, 948:4, 949:7, 986:21, 997:4
**Consulting** [4] - 948:3, 948:6, 997:1, 997:3
**contact** [3] - 915:7, 915:8, 995:18
**contacted** [1] - 995:13
**contacting** [1] - 976:15
**contacts** [5] - 919:23, 960:15, 964:23, 964:24, 976:19
**contend** [1] - 900:11
**contends** [1] - 1026:7
**content** [1] - 937:6
**contention** [1] - 934:22
**contentions** [1] - 935:10
**contest** [1] - 917:7
**context** [4] - 939:24, 947:18, 988:10, 1009:22
**continue** [8] - 853:2, 915:24, 940:23, 946:7, 957:17, 961:10, 961:20, 1026:3
**CONTINUED** [1] - 993:1
**continued** [13] - 900:24, 901:2, 905:4, 905:6, 906:23, 906:24, 912:25, 913:1, 1020:20, 1020:24, 1021:2, 1021:3
**Continued** [6] - 843:1, 902:10, 929:10, 958:24, 992:9, 1019:19
**continues** [4] - 859:3, 959:11, 964:3, 1026:2
**continuing** [3] - 887:23, 900:1, 927:5
**continuous** [2] - 969:14, 1014:18
**continuously** [1] - 871:23
**contract** [6] - 948:2, 948:7, 1001:11, 1004:19, 1004:20, 1005:2
**contract-dispute** [1] - 948:2
**contracts** [2] - 896:23, 975:13
**contrary** [5] - 895:20, 909:6, 942:13, 1009:18, 1010:23
**contribute** [1] - 1008:6
**contributed** [1] - 922:4
**contribution** [1] - 978:23
**control** [1] - 973:24
**conversation** [5] - 919:14, 921:14, 978:7, 981:20, 1010:18
**conversations** [2] - 981:21, 983:12

**COOPER** [18] - 843:5, 1023:18, 1023:22, 1025:5, 1025:7, 1025:12, 1025:15, 1025:18, 1026:5, 1026:12, 1026:17, 1026:22, 1027:2, 1027:19, 1028:5, 1028:16, 1029:3, 1029:21
**Cooper** [2] - 881:13, 1023:14
**cooperate** [1] - 847:5
**copy** [2] - 995:18, 1017:15
**corporate** [2] - 894:18, 1013:20
**corporation** [3] - 953:20, 954:2, 1014:2
**CORPORATION** [1] - 842:7
**Corporation** [4] - 842:19, 843:3, 843:8, 929:5
**Corporation's** [1] - 930:15
**correct** [44] - 849:3, 849:6, 849:9, 850:4, 851:8, 851:9, 851:11, 851:12, 851:15, 851:17, 851:19, 851:20, 852:8, 852:9, 853:24, 856:2, 857:19, 858:25, 859:1, 859:5, 859:6, 860:4, 860:17, 860:20, 860:21, 861:1, 863:21, 868:20, 869:7, 874:20, 876:25, 880:20, 889:18, 889:19, 933:9, 945:16, 947:10, 995:2, 1019:12, 1021:21, 1021:22, 1021:25, 1025:11, 1026:5
**corrected** [1] - 959:8
**correctly** [1] - 874:17
**cost** [12] - 854:14, 855:13, 914:3, 915:1, 922:4, 951:21, 975:20, 1000:1, 1000:4, 1001:10, 1002:5, 1013:9
**cost-cutting** [1] - 975:20
**costing** [1] - 1012:13
**costs** [6] - 854:23, 854:24, 855:3, 857:4, 951:7, 975:14
**counsel** [6] - 844:5, 870:7, 880:11, 965:14, 1007:4, 1009:13
**count** [12] - 853:10, 854:13, 855:5, 855:11, 922:9, 923:16, 927:12, 959:5, 990:7, 990:8, 990:11, 990:12
**counting** [1] - 946:14
**countries** [1] - 975:3
**country** [2] - 1024:25, 1028:8
**couple** [15] - 846:19, 872:21, 917:13, 947:8, 952:21, 957:2, 957:8, 962:5, 962:16, 963:14, 970:21, 996:18, 999:9, 1014:7
**course** [9] - 888:22, 932:23, 947:20, 954:1, 984:5, 989:21, 1009:5, 1020:12, 1024:17
**court** [9] - 844:1, 847:4, 873:15, 873:18, 930:5, 934:18, 959:23, 1006:7, 1031:16
**Court** [13] - 842:20, 843:11, 843:11, 862:18, 884:4, 884:11, 884:15, 884:24, 885:4, 885:6, 1006:7, 1006:15, 1027:23
**Court's** [2] - 888:16, 1018:12
**courthouse** [3] - 1008:19, 1008:21, 1008:22
**Courthouse** [1] - 842:5
**courtroom** [9] - 846:11, 866:16, 891:1, 905:25, 940:18, 974:13, 1003:16, 1016:22, 1018:14
**COURTROOM** [21] - 844:2, 844:4, 846:10, 865:22, 865:24, 866:15, 890:25, 891:2, 928:25, 929:2, 940:17, 940:20, 1003:9, 1003:12, 1003:15,

1003:18, 1012:20, 1018:13, 1018:17, 1030:7, 1030:9

**cover** [4] - 950:18, 960:24, 999:9, 1021:9

**covered** [2] - 894:16, 898:10

**covers** [4] - 963:25, 972:9, 997:17, 1008:21

**crazy** [1] - 972:12

**create** [4] - 918:12, 923:15, 927:23, 1014:15

**created** [3] - 857:6, 906:1, 923:21

**creates** [1] - 908:19

**creation** [1] - 857:8

**credit** [3] - 989:18, 989:19, 989:21

**crepe** [1] - 866:3

**CRI** [1] - 843:11

**crime** [1] - 1015:9

**crisis** [1] - 981:17

**criteria** [6] - 925:12, 925:23, 926:4, 926:11, 974:2, 974:19

**critical** [1] - 939:22

**cross** [7] - 870:11, 958:8, 961:21, 982:11, 984:18, 985:14, 1015:2

**cross-examination** [5] - 870:11, 958:8, 961:21, 982:11, 985:14

**cross-examine** [1] - 984:18

**crossed** [1] - 1015:20

**CRR** [1] - 843:11

**cull** [1] - 1017:25

**cultural** [1] - 895:24

**culture** [1] - 982:20

**curiosities** [1] - 954:5

**curious** [1] - 954:7

**current** [1] - 853:2

**cut** [23] - 854:24, 885:19, 898:6, 900:3, 903:5, 903:9, 904:5, 904:10, 904:22, 909:19, 916:1, 916:9, 937:1, 973:24, 975:21, 978:22, 979:3, 979:5, 979:9, 986:2, 996:16, 1010:25, 1012:25

**cut-off** [1] - 898:6

**cute** [1] - 893:3

**cuts** [1] - 1010:3

**cutting** [8] - 874:14, 894:24, 898:22, 904:11, 904:25, 975:20, 978:15, 978:17

**cycle** [1] - 856:8

## D

**D-154** [1] - 969:7

**Dade** [1] - 963:13

**daily** [5] - 906:19, 907:5, 907:19, 907:21, 969:17

**Dallas** [1] - 842:17

**damage** [8] - 874:22, 877:25, 879:19, 880:14, 881:6, 881:7, 934:20, 944:11

**damages** [41] - 874:20, 877:23, 878:2, 878:4, 878:18, 878:20, 878:24, 879:1, 879:2, 879:11, 879:13, 879:14, 880:3, 880:18, 880:23, 880:24, 882:7, 910:6, 911:10, 915:23, 932:4, 932:7, 936:16, 936:23, 937:5, 937:8, 941:14, 941:20, 947:24, 952:16, 982:22, 996:19, 996:21, 996:22, 998:23, 998:25, 1014:23, 1019:9, 1021:24, 1023:24

**damn** [1] - 984:14

**Dan** [9] - 889:9, 915:25, 916:2, 916:3, 926:5, 926:13, 978:4, 978:15

**darker** [1] - 924:12

**data** [2] - 858:7, 886:15

**DATA** [1] - 842:7

**Data** [70] - 842:19, 843:3, 843:8, 852:11, 852:14, 852:22, 878:9, 878:10, 882:2, 887:24, 888:2, 888:5, 893:2, 896:6, 896:10, 896:14, 896:15, 897:6, 897:14, 897:18, 897:21, 898:7, 898:10, 899:18, 900:4, 900:19, 901:20, 903:13, 903:17, 904:23, 913:14, 913:16, 913:18, 913:23, 914:1, 914:14, 917:11, 918:24, 919:10, 920:5, 922:5, 927:14, 929:4, 930:15, 947:13, 948:4, 948:5, 949:6, 949:14, 953:20, 954:3, 956:15, 959:22, 976:19, 977:17, 980:14, 981:9, 1005:5, 1008:7, 1008:13, 1009:4, 1009:12, 1009:25, 1016:7, 1023:23, 1024:2, 1024:5, 1028:17

**Data's** [10] - 885:24, 886:8, 886:12, 886:18, 894:18, 898:7, 917:13, 927:12, 948:23, 1028:6

**date** [59] - 848:10, 848:13, 848:16, 848:23, 848:25, 849:1, 849:4, 849:22, 850:12, 851:14, 852:3, 852:5, 853:16, 854:1, 855:19, 856:22, 857:5, 857:6, 857:7, 857:8, 859:9, 859:15, 860:4, 860:7, 860:9, 860:13, 860:15, 860:17, 860:19, 861:4, 861:5, 861:8, 861:19, 862:3, 887:8, 888:6, 917:17, 923:3, 927:16, 952:13, 969:23, 993:4, 995:16, 1019:5, 1020:3, 1020:5, 1020:8, 1020:11, 1020:18, 1020:19, 1020:23, 1020:25, 1021:2, 1031:12

**Date** [3] - 851:6, 860:3, 922:20

**date**.......................... [1] - 1034:12

**date**.................................. [2] - 1034:6, 1034:8

**date**................................. [2] - 1034:10, 1034:14

**dated** [8] - 852:8, 858:12, 923:20, 993:4, 993:24, 994:25, 995:11, 995:25

**dates** [7] - 858:19, 945:8, 991:13, 992:1, 992:2, 1013:21, 1030:4

**daughter** [1] - 1031:5

**DAVID** [1] - 842:21

**David** [2] - 847:20, 1007:4

**dawns** [1] - 1013:23

**days** [20] - 847:11, 879:25, 883:22, 887:19, 888:3, 904:4, 950:3, 958:7, 958:22, 962:4, 962:18, 963:9, 973:10, 980:5, 1007:16, 1012:6, 1018:6, 1018:8, 1028:2

**de** [1] - 874:25

**dead** [1] - 908:23

**deal** [11] - 844:10, 845:16, 863:7, 864:2, 881:4, 884:4, 884:23, 889:15, 933:2, 937:2, 999:12

**dealing** [2] - 880:11, 936:13

**dealings** [1] - 963:5

**deals** [1] - 963:5

**dealt** [1] - 931:17

**death** [1] - 908:14

**debt** [1] - 975:2

**decades** [2] - 895:18, 895:19

**December** [20] - 854:2, 906:11, 910:15, 910:20, 914:6, 919:21, 920:20, 921:1, 921:14, 921:22, 927:14, 967:5, 989:18, 989:22, 993:24, 994:5, 998:3, 1000:16, 1013:18, 1024:19

**decide** [9] - 884:25, 891:11, 925:14, 926:17, 948:7, 993:14, 993:21, 996:20, 1022:14

**decided** [8] - 844:11, 844:15, 889:16, 897:16, 950:11, 975:9, 975:21, 1009:6

**decides** [1] - 951:4

**deciding** [1] - 885:9

**decision** [15] - 857:23, 860:8, 876:7, 887:11, 909:20, 918:22, 925:11, 926:10, 942:17, 951:17, 966:18, 999:16, 1017:5, 1017:10, 1029:15

**decision-making** [1] - 925:11

**decisions** [10] - 901:2, 908:12, 987:23, 987:24, 988:11, 993:10, 993:21, 1007:25, 1016:25

**deck** [1] - 1017:2

**defend** [1] - 893:5

**defendant** [3] - 898:19, 929:5, 1029:4

**defendant's** [6] - 868:4, 868:6, 868:7, 1009:13, 1009:22, 1030:6

**Defendant's Exhibit** [2] - 959:3, 961:15

**defendants** [26] - 842:9, 845:22, 866:20, 889:14, 894:9, 894:10, 900:10, 906:5, 906:8, 906:16, 909:7, 916:10, 917:7, 932:13, 951:8, 953:19, 953:21, 955:2, 955:7, 957:19, 959:22, 964:23, 985:23, 1005:6, 1010:9, 1024:17

**Defendants** [2] - 843:2, 843:7

**defendants'** [1] - 941:1

**defending** [3] - 952:4, 999:15, 999:16

**defense** [11] - 894:3, 895:15, 908:17, 909:15, 912:9, 920:16, 927:23, 944:19, 948:21, 953:14, 1014:10

**defined** [1] - 900:15

**definitely** [1] - 1011:25

**definition** [3] - 852:21, 906:17, 937:24

**definitions** [1] - 968:10

**delegated** [1] - 970:18

**deliberate** [2] - 1003:5, 1017:9

**deliberations** [7] - 846:24, 865:3, 866:8, 866:10, 889:3, 1016:19, 1016:23

**deliver** [1] - 1005:5

**delivered** [3] - 912:2, 913:21, 917:23

**delta** [1] - 1026:7

**demonstrated** [1] - 964:20

**demotion** [1] - 991:3

**denial** [3] - 874:21, 933:22, 934:25

**denied** [10] - 874:16, 875:6, 917:8, 930:13, 930:15, 931:1, 934:9, 955:15, 955:25, 968:19

**denigrate** [1] - 939:20

**deny** [2] - 872:2, 1028:12

**denying** [2] - 878:20, 933:17

**Department** [1] - 1027:20

**department** [25] - 895:25, 904:13, 910:21, 949:16, 956:16, 959:11, 959:14, 960:8, 960:12, 961:7, 965:16, 966:22, 970:15, 971:9, 972:17, 972:20, 972:24, 973:23, 983:3, 985:25, 986:7, 986:25, 1001:24, 1010:3

[department's - during]

**department's** [1] - 986:12
**deposed** [2] - 1006:12, 1006:14
**deposited** [1] - 944:25
**Deposition** [1] - 1033:5
**deposition** [12] - 845:1, 846:16, 847:15, 852:11, 862:7, 863:2, 900:17, 922:12, 1005:10, 1006:9, 1012:23, 1033:6
**depositions** [3] - 845:4, 847:14, 856:24
**DEPUTY** [21] - 844:2, 844:4, 846:10, 865:22, 865:24, 866:15, 890:25, 891:2, 928:25, 929:2, 940:17, 940:20, 1003:9, 1003:12, 1003:15, 1003:18, 1012:20, 1018:13, 1018:17, 1030:7, 1030:9
**describe** [3] - 856:25, 857:20, 981:13
**described** [10] - 895:7, 915:23, 935:1, 958:4, 964:14, 970:19, 977:5, 981:11, 982:14, 1010:21
**description** [2] - 900:17, 956:24
**deserve** [1] - 1016:14
**deserves** [1] - 1005:5
**design** [1] - 983:17
**designate** [2] - 888:2, 888:5
**designations** [1] - 845:11
**designed** [3] - 926:12, 949:20, 951:12
**desperate** [2] - 976:25, 1015:9
**desperately** [1] - 930:8
**despite** [1] - 912:11
**detailed** [1] - 857:24
**details** [2] - 857:4, 858:11
**determination** [4] - 868:10, 919:4, 936:12, 1011:20
**determine** [8] - 862:1, 900:14, 900:21, 1008:12, 1017:19, 1020:3, 1026:11, 1030:18
**determines** [1] - 1028:8
**determining** [1] - 909:4
**deterrent** [1] - 949:20
**develop** [1] - 916:7
**developed** [1] - 995:24
**device** [1] - 907:12
**devices** [1] - 989:13
**devoted** [2] - 965:15, 1014:14
**DI** [3] - 1004:1, 1004:4, 1006:18
**diagnosis** [1] - 956:8
**diaries** [1] - 963:11
**difference** [5] - 871:9, 910:19, 987:18, 988:13, 1026:9
**differences** [1] - 987:11
**different** [12] - 894:10, 896:11, 906:8, 915:18, 981:14, 985:18, 987:15, 1010:7, 1010:16, 1010:25, 1014:2, 1028:2
**difficult** [14] - 879:15, 880:10, 900:14, 931:22, 932:9, 932:19, 932:24, 935:24, 937:3, 939:17, 944:17, 970:12, 993:9, 1014:13
**dignified** [1] - 921:21
**DILORENZO** [16] - 843:10, 942:10, 945:10, 945:19, 953:15, 954:19, 954:22, 959:1, 993:1, 1002:15, 1002:23, 1003:7, 1003:22, 1004:8, 1004:11, 1004:15
**DiLorenzo** [15] - 864:16, 864:17, 864:23, 865:10, 870:11, 953:12,

953:17, 954:18, 1002:14, 1003:20, 1007:11, 1007:24, 1009:18, 1010:23, 1014:8
**DiLorenzo**......................... [1] - 1034:19
**dime** [1] - 1001:11
**diminish** [1] - 899:2
**diminished** [1] - 1019:15
**diminishment** [3] - 1022:10, 1022:14, 1022:24
**direct** [3] - 919:15, 958:6, 985:12
**directed** [2] - 987:15, 994:21
**direction** [7] - 959:14, 960:1, 960:4, 960:13, 961:8, 1008:22, 1008:23
**directly** [2] - 948:9, 995:18
**director** [7] - 959:17, 960:9, 960:24, 984:2, 986:25, 989:2, 1001:17
**director's** [1] - 986:9
**directors** [1] - 896:2
**dirt** [1] - 984:17
**Disabilities** [10] - 893:20, 898:5, 898:8, 898:9, 899:3, 965:14, 967:21, 968:10, 971:3, 971:14
**disabilities** [2] - 913:17, 944:22
**disability** [44] - 875:18, 875:22, 877:1, 898:12, 898:16, 899:2, 899:19, 899:21, 900:2, 904:5, 904:7, 904:8, 904:9, 904:23, 907:11, 909:20, 913:16, 913:23, 921:17, 930:20, 931:7, 944:24, 945:4, 945:6, 952:8, 955:13, 955:21, 955:23, 956:22, 961:1, 963:22, 965:10, 965:25, 968:2, 968:4, 968:12, 971:5, 994:21, 1012:11, 1012:15, 1021:20, 1022:7, 1022:19, 1029:2
**disabled** [5] - 873:17, 968:11, 968:21, 1000:2, 1029:8
**disadvantage** [1] - 999:1
**disagreed** [1] - 869:5
**discern** [1] - 932:5
**discharged** [2] - 847:8, 1020:24
**discipline** [2] - 999:12, 999:14
**disconnecting** [1] - 899:17
**discover** [1] - 1016:6
**discovered** [1] - 947:21
**discriminate** [3] - 898:11, 956:10, 965:9
**discriminated** [2] - 873:1, 979:14
**discrimination** [2] - 844:18, 1005:9
**discriminatorily** [1] - 965:19
**discuss** [3] - 964:8, 1029:18, 1030:21
**discussed** [2] - 849:14, 916:6
**discussing** [5] - 849:18, 902:8, 906:10, 909:6, 921:25
**Discussion** [1] - 872:19
**discussion** [5] - 903:6, 914:18, 914:19, 931:11, 981:22
**disgusts** [1] - 948:21
**disincentivized** [1] - 979:9
**disjointed** [1] - 1006:13
**dismissing** [2] - 845:21, 889:9
**disposition** [1] - 859:22
**dispute** [4] - 887:24, 898:10, 948:2, 1017:10
**disputing** [1] - 878:12
**disregard** [2] - 1027:17, 1028:3
**distinguished** [1] - 845:6
**distress** [2] - 880:2, 936:24

**distribute** [1] - 857:11
**distributed** [1] - 857:9
**DISTRICT** [3] - 842:1, 842:1, 842:12
**doable** [1] - 865:14
**doctor** [23] - 887:15, 900:17, 903:25, 906:9, 907:16, 908:1, 956:25, 966:11, 966:12, 966:19, 966:25, 969:10, 969:22, 970:1, 970:4, 970:9, 1027:9, 1027:11, 1027:13, 1027:17, 1027:19, 1027:24, 1029:7
**doctor's** [19] - 890:4, 890:9, 891:22, 891:25, 892:1, 909:3, 912:2, 912:12, 913:25, 917:10, 919:10, 921:16, 923:13, 924:9, 949:12, 969:7, 969:11, 1000:6
**doctors** [7] - 908:18, 909:2, 967:8, 969:20, 969:21, 970:5, 970:7
**document** [6] - 852:6, 901:23, 906:7, 920:8, 974:17, 1012:21
**Document** [1] - 859:17
**documentation** [2] - 901:22, 905:16, 905:18, 999:13, 1027:13
**documented** [1] - 902:4
**documents** [9] - 857:1, 863:2, 894:18, 894:20, 902:6, 962:20, 974:10, 999:19, 999:20
**dollars** [2] - 946:13, 998:22
**done** [26] - 896:11, 897:23, 913:14, 919:6, 941:2, 945:20, 947:21, 951:13, 956:5, 965:18, 965:19, 965:20, 970:19, 975:20, 980:13, 980:23, 981:15, 982:22, 983:3, 986:25, 991:10, 993:8, 1030:1
**dot** [1] - 985:4
**double** [3] - 946:14, 1015:20, 1030:12
**double-counting** [1] - 946:14
**double-crossed** [1] - 1015:20
**doubt** [2] - 966:24, 994:16
**down** [41] - 844:23, 860:16, 861:2, 865:2, 874:17, 880:20, 896:13, 899:11, 899:13, 899:15, 904:7, 906:10, 907:1, 907:2, 920:22, 922:20, 924:6, 924:11, 931:23, 933:6, 939:19, 957:19, 958:1, 958:3, 958:14, 970:2, 973:24, 975:1, 986:2, 990:7, 990:11, 990:12, 1008:1, 1017:13, 1017:14, 1019:4, 1019:7, 1021:18
**downsize** [1] - 921:12
**downstairs** [1] - 866:4
**Dr** [8] - 847:17, 850:21, 852:5, 907:6, 907:8, 908:21, 908:24, 964:13
**draft** [1] - 844:23
**dream** [1] - 974:15
**dreamed** [2] - 973:13, 974:14
**drilled** [1] - 1010:10
**drive** [1] - 994:2
**dropped** [1] - 957:7
**dry** [2] - 977:11, 977:12
**due** [9] - 846:25, 867:23, 868:3, 868:10, 869:9, 888:22, 938:3, 969:14
**during** [30] - 853:4, 864:23, 871:24, 911:16, 920:1, 928:21, 931:10, 932:23, 947:20, 954:24, 956:13, 956:18, 957:6, 959:24, 961:22, 962:17, 963:19, 964:1, 965:15, 969:3, 981:17, 993:1, 996:4, 1007:6, 1009:16, 1011:15, 1022:8,

*(duties - evidence)* *Page 40*

1022:12, 1022:14, 1024:17
**duties** [2] - 884:22, 996:10

# E

**e-mail** [36] - 853:17, 854:1, 855:20, 873:6, 874:12, 874:16, 874:21, 875:6, 878:21, 881:21, 885:17, 885:19, 885:21, 886:1, 894:24, 901:24, 902:6, 964:5, 967:4, 967:14, 967:17, 967:24, 967:25, 968:3, 968:5, 968:7, 968:15, 968:25, 974:16, 980:18, 990:21, 991:21, 991:23, 1024:4, 1024:8
**E-mail** [1] - 843:13
**e-mails** [15] - 894:23, 901:2, 962:6, 962:14, 962:16, 962:17, 962:21, 962:23, 963:15, 963:17, 970:20, 974:8, 980:9, 983:13
**E.J** [3] - 990:17, 990:18, 990:23
**earliest** [2] - 887:13, 1014:1
**early** [7] - 861:15, 863:6, 910:17, 993:22, 998:4, 998:5, 998:13
**earn** [1] - 1015:6
**earned** [4] - 944:3, 952:9, 1015:24, 1019:10
**East** [1] - 1008:23
**EASTERN** [1] - 842:1
**Eastern** [1] - 855:21
**easy** [9] - 883:9, 925:18, 925:19, 926:1, 930:10, 941:24, 943:1, 1017:15, 1030:2
**eat** [1] - 907:17
**eating** [5] - 866:6, 866:9, 907:5, 907:15, 928:20
**economics** [2] - 896:9, 896:10
**edge** [1] - 1008:19
**edit** [2] - 881:18, 885:18
**education** [1] - 900:7
**effective** [1] - 1001:4
**effectively** [4] - 845:24, 896:9, 896:25, 932:16
**efficiencies** [1] - 975:11
**effort** [1] - 852:17
**Eidelman** [13] - 862:12, 864:15, 868:11, 881:8, 886:20, 887:9, 906:21, 908:17, 932:13, 937:10, 971:24, 973:4, 1031:14
**EIDELMAN** [83] - 843:4, 844:7, 845:10, 845:15, 845:20, 846:2, 846:4, 846:6, 862:17, 862:20, 862:23, 863:3, 864:17, 865:12, 868:13, 868:23, 870:1, 870:10, 870:17, 871:12, 872:16, 872:21, 872:24, 873:4, 873:8, 873:14, 874:2, 874:8, 875:1, 876:2, 876:4, 877:4, 877:17, 877:20, 878:2, 878:6, 878:19, 879:24, 880:22, 881:9, 881:13, 881:17, 882:1, 882:6, 882:9, 882:12, 882:14, 882:16, 882:19, 882:21, 883:17, 884:2, 885:3, 885:10, 885:13, 886:9, 886:22, 888:12, 888:18, 888:25, 889:6, 889:21, 889:24, 890:5, 937:20, 938:13, 938:16, 938:24, 939:3, 939:6, 939:9, 1020:15, 1020:17, 1021:2, 1021:12, 1021:14, 1021:16, 1022:3, 1022:6, 1022:11, 1022:16, 1022:21, 1023:14

**eight** [3] - 956:11, 956:13, 971:19
**Eileen** [1] - 856:3
**either** [7] - 876:15, 906:6, 912:16, 950:19, 954:3, 963:6, 1029:13
**element** [2] - 948:7, 1008:1
**elicit** [1] - 926:12
**eligible** [3] - 887:18, 911:12, 1029:8
**eliminate** [6] - 870:9, 874:5, 874:17, 874:19, 994:4, 1018:25
**eliminated** [4] - 852:25, 866:19, 866:23, 921:24
**eliminating** [1] - 881:19
**els** [1] - 862:14
**elsewhere** [1] - 1010:3
**email** [18] - 904:12, 905:7, 905:23, 907:25, 919:19, 920:18, 930:14, 931:12, 932:3, 934:10, 955:16, 956:6, 995:8, 995:10, 996:1, 1000:16, 1012:22, 1013:8
**email's** [1] - 933:23
**emailing** [2] - 905:15, 994:6
**emails** [5] - 906:24, 918:1, 931:2, 936:14, 999:21
**embarrassed** [1] - 960:4
**Emily** [3] - 850:19, 850:20, 852:5
**Emory** [3] - 850:14, 850:15
**emotional** [2] - 880:2, 936:23
**emotionally** [1] - 936:17
**empire** [1] - 996:12
**employed** [6] - 869:16, 871:23, 872:1, 947:23, 951:24, 1009:24
**employee** [30] - 852:17, 871:4, 871:5, 871:21, 871:23, 887:18, 894:18, 897:5, 897:9, 897:12, 901:14, 911:13, 911:21, 914:16, 917:16, 917:17, 925:16, 927:6, 927:19, 946:24, 950:8, 950:19, 951:5, 977:6, 977:15, 996:25, 997:13, 998:17, 1021:3
**employee's** [6] - 871:7, 871:14, 887:19, 911:21, 914:16, 914:17
**employees** [18] - 857:23, 893:11, 893:15, 893:16, 894:24, 901:7, 922:8, 924:17, 927:17, 927:18, 975:2, 979:11, 981:19, 988:2, 989:16, 990:10, 1009:4, 1012:10
**employer** [17] - 871:24, 887:17, 887:18, 888:7, 898:10, 914:15, 920:5, 950:2, 950:4, 950:17, 951:4, 951:19, 1027:12, 1027:22, 1028:8, 1028:9, 1028:11
**employer's** [1] - 1028:12
**employment** [31] - 871:23, 872:2, 873:2, 882:3, 882:23, 883:24, 898:13, 898:17, 898:25, 903:24, 904:6, 904:10, 931:8, 933:4, 933:9, 933:10, 934:23, 935:17, 937:25, 938:12, 939:1, 939:8, 965:20, 967:23, 997:21, 1020:19, 1020:25, 1024:9, 1025:19, 1025:23
**end** [17] - 846:23, 853:7, 854:14, 855:6, 855:24, 860:9, 911:1, 911:20, 914:6, 914:16, 927:5, 947:23, 969:24, 975:19, 977:14, 980:18, 1027:18
**ended** [1] - 976:3
**endless** [1] - 932:11
**energy** [1] - 904:1
**engage** [1] - 988:5

**enjoy** [2] - 984:19, 988:18
**enjoyed** [4] - 899:25, 984:20, 985:5, 985:6
**enjoys** [1] - 985:7
**enter** [3] - 859:11, 896:6, 897:25
**enters** [4] - 846:11, 891:1, 940:18, 1003:16
**enthusiastically** [2] - 863:19, 864:6
**entire** [12] - 872:6, 892:8, 893:16, 895:24, 898:2, 905:6, 916:16, 961:22, 965:15, 971:6, 1007:21, 1014:14
**entirely** [1] - 1010:9
**entitled** [14] - 844:17, 869:24, 871:4, 871:10, 911:21, 911:23, 911:24, 912:1, 912:3, 912:6, 931:20, 945:4, 950:15, 950:16
**entitlement** [1] - 919:11
**equal** [1] - 865:10
**equals** [2] - 942:1, 943:2
**equipment** [1] - 989:19
**equity** [4] - 943:12, 944:9, 946:16, 952:12
**equivalent** [9] - 875:16, 875:23, 896:10, 911:22, 914:17, 914:18, 919:13, 920:12, 971:23
**Ernst** [1] - 988:22
**erratic** [2] - 962:9, 963:14
**error** [1] - 850:2
**especially** [2] - 955:1, 955:6
**ESQ** [6] - 842:17, 842:21, 843:4, 843:5, 843:5, 843:10
**essential** [17] - 860:12, 900:11, 900:15, 900:22, 901:5, 901:8, 901:9, 905:17, 906:2, 906:3, 907:22, 908:1, 908:13, 909:10, 968:22, 968:23, 1027:21
**essentially** [5] - 893:21, 896:8, 1014:11, 1015:5, 1027:12
**estimated** [1] - 852:4
**et** [7] - 842:7, 842:19, 843:3, 843:8, 934:13, 936:24
**ether** [1] - 865:16
**ethical** [1] - 847:3
**evaluate** [1] - 862:2
**evaluated** [3] - 958:14, 1001:2, 1001:3
**evaluating** [1] - 1028:5
**evaluation** [2] - 985:12, 1001:9
**evening** [1] - 995:15
**event** [6] - 853:6, 856:5, 861:21, 861:25, 869:23, 874:16
**events** [4] - 901:19, 901:22, 958:16, 1012:4
**evidence** [85] - 847:7, 849:19, 850:6, 850:7, 850:10, 850:11, 853:9, 853:14, 853:15, 854:5, 854:7, 855:16, 855:18, 856:17, 856:20, 856:22, 859:12, 859:14, 862:16, 863:5, 864:10, 864:11, 865:1, 867:19, 867:22, 868:3, 869:3, 869:9, 870:5, 870:8, 871:15, 871:16, 873:24, 878:8, 878:24, 879:25, 880:2, 880:4, 884:10, 884:14, 884:18, 885:5, 885:9, 891:8, 891:12, 895:2, 895:19, 901:1, 901:11, 902:9, 906:6, 906:23, 908:6, 909:4, 909:5, 909:17, 912:16, 913:2, 917:3, 918:8, 942:11, 942:18, 947:19, 947:20, 948:16, 948:23,

951:25, 953:10, 954:10, 962:5, 964:20,
970:8, 973:9, 990:8, 996:24, 1014:22,
1015:19, 1020:19, 1027:15, 1030:4,
1034:5, 1034:7, 1034:9, 1034:12,
1034:13
**Evidence** [1] - 884:5
**evidentiary** [1] - 846:15
**EWING** [1] - 843:2
**exact** [2] - 854:16, 927:3
**exactly** [18] - 845:7, 862:1, 864:21,
869:10, 880:20, 888:9, 890:19, 891:11,
891:13, 892:1, 892:18, 897:16, 905:13,
914:5, 919:9, 926:12, 1017:20, 1030:1
**examination** [8] - 870:11, 920:1,
958:6, 958:8, 961:21, 982:11, 985:13,
985:14
**EXAMINATION** [2] - 848:7, 852:12
**examine** [1] - 984:18
**example** [4] - 903:1, 908:9, 937:3,
984:7
**examples** [3] - 871:18, 907:6, 985:22
**Excel** [1] - 923:1
**excellent** [3] - 846:25, 901:18, 1017:17
**except** [2] - 936:15, 977:21
**exception** [10] - 866:22, 870:3, 872:11,
876:18, 880:23, 880:25, 882:25, 883:3,
888:14, 973:5
**exceptions** [3] - 912:4, 920:3, 972:6
**exchange** [2] - 941:17, 979:19
**exclamation** [2] - 980:7, 980:18
**excuse** [7] - 869:23, 893:18, 893:19,
901:19, 923:15, 951:14, 991:13
**excuses** [6] - 891:16, 892:16, 901:18,
913:11, 951:22, 951:24
**execution** [1] - 901:16
**executives** [2] - 972:14, 973:20
**exemplary** [1] - 847:9
**exercised** [2] - 913:11, 941:12
**exhibit** [1] - 894:14
**Exhibit** [11] - 849:8, 856:23, 856:24,
857:5, 857:21, 858:12, 858:22, 858:23,
859:2, 899:4, 906:7
**Exhibits** [1] - 858:22
**EXHIBITS** [1] - 1034:2
**exhibits** [17] - 894:7, 894:8, 894:10,
894:13, 894:17, 934:13, 935:22,
944:13, 1017:16, 1017:21, 1017:22,
1017:24, 1018:2, 1029:25, 1030:2,
1030:3, 1030:15
**exist** [2] - 918:8, 952:3
**existed** [1] - 974:11
**existing** [2] - 896:16, 989:2
**exit** [1] - 853:3
**exited** [1] - 856:8
**exiting** [1] - 858:3
**exits** [3] - 866:16, 929:1, 1018:14
**expand** [1] - 885:22
**expect** [2] - 845:12, 1001:7
**expectation** [1] - 993:19
**expected** [1] - 1002:21
**expense** [4] - 854:16, 855:8, 903:14,
913:22
**expenses** [4] - 893:17, 903:17, 903:19,
951:4
**experience** [2] - 952:22, 952:23
**expert** [2] - 990:19, 999:6

**experts** [2] - 904:13, 949:16
**explain** [17] - 855:2, 855:4, 887:11,
892:25, 898:23, 935:9, 935:15, 941:18,
954:7, 954:10, 954:14, 954:15, 974:13,
1001:22, 1001:23, 1017:14, 1019:12
**explained** [4] - 867:24, 884:18, 938:7,
938:8
**explaining** [3] - 865:15, 987:11,
1000:10
**explanation** [1] - 938:9
**Express** [2] - 957:8, 970:21
**expressed** [2] - 965:22, 987:14
**extent** [1] - 983:16
**extenuating** [1] - 887:20
**extra** [2] - 912:8, 991:9
**eye** [1] - 988:14

---

## F

**F.3d** [1] - 1025:20
**face** [2] - 951:11, 951:20
**faced** [1] - 960:10
**facet** [1] - 975:13
**facility** [1] - 851:19
**Facsimile** [1] - 843:12
**fact** [26] - 863:19, 885:5, 885:8,
888:15, 906:6, 908:19, 909:17, 919:8,
922:15, 930:23, 931:19, 946:22,
953:24, 961:1, 969:8, 971:11, 972:6,
979:16, 988:22, 989:9, 992:1, 1010:24,
1014:10, 1020:23, 1026:22, 1031:5
**facto** [1] - 874:25
**facts** [6] - 863:17, 864:11, 1016:6,
1017:19, 1022:9
**factual** [2] - 864:10, 1028:1
**failed** [5] - 888:2, 891:22, 919:10,
949:11, 974:23
**failing** [3] - 882:23, 901:12, 905:18
**failure** [4] - 883:3, 883:4, 932:3, 950:5
**fair** [8] - 849:13, 930:8, 930:11,
932:17, 937:12, 937:22, 978:21,
1013:11
**fairness** [2] - 933:19, 939:10
**faithful** [1] - 846:22
**fake** [2] - 988:25, 1008:4
**fall** [2] - 978:4, 978:18
**false** [1] - 986:19
**familiar** [2] - 915:5, 1008:25
**Family** [6] - 893:19, 950:6, 951:20,
954:4, 971:15, 971:18
**family** [4] - 950:10, 960:19, 965:13,
1031:1
**family's** [1] - 964:16
**fan** [1] - 939:17
**fanciful** [1] - 935:24
**FAPR** [1] - 843:11
**far** [7] - 883:20, 932:3, 936:1, 937:5,
1007:6, 1015:19, 1031:3
**fashion** [1] - 847:9
**fat** [1] - 975:22
**fault** [2] - 986:9, 986:10
**favor** [1] - 864:7
**favors** [1] - 864:7
**February** [14] - 858:16, 911:2, 927:1,
927:3, 941:22, 956:3, 956:4, 956:9,

972:14, 978:19, 998:6, 998:8, 998:9,
1020:20
**fed** [1] - 907:15
**federal** [3] - 932:19, 959:23, 974:13
**Federal** [2] - 957:8, 970:21
**feedback** [1] - 921:8
**feeding** [1] - 865:25
**fees** [1] - 897:1
**felt** [2] - 988:16, 1006:12
**few** [7] - 861:17, 894:17, 897:1,
962:19, 1009:5, 1018:19, 1031:23
**fiddling** [1] - 991:13
**fifteenth** [1] - 927:19
**Fifth Third** [1] - 896:19
**figure** [6] - 896:24, 985:2, 985:3,
986:1, 988:9, 1020:7
**figured** [5] - 966:6, 991:15, 1011:14,
1011:15, 1013:16
**file** [15] - 860:3, 860:13, 860:19,
860:22, 860:23, 861:3, 861:5, 861:7,
861:11, 902:4, 922:21, 923:1, 923:4,
995:6, 999:13
**File** [1] - 922:20
**filed** [2] - 969:23, 970:1
**files** [2] - 995:7, 995:8
**filing** [1] - 890:1
**filings** [1] - 873:15
**fill** [3] - 850:22, 914:9, 917:18
**filled** [9] - 851:2, 906:12, 908:16,
921:18, 921:23, 969:11, 969:25, 982:6,
985:4
**filling** [1] - 1027:19
**fills** [1] - 850:25
**final** [4] - 1018:22, 1020:14, 1020:19
**finalized** [1] - 857:7
**finally** [4] - 891:10, 966:14, 983:1,
1016:4
**finance** [1] - 854:12
**finances** [1] - 964:12
**financial** [5] - 894:4, 895:10, 1013:6,
1015:4, 1015:9
**financially** [1] - 975:18
**findings** [1] - 1010:21
**fine** [15] - 845:10, 846:2, 862:12,
864:8, 864:9, 867:14, 876:21, 880:5,
884:2, 889:6, 960:21, 1006:17,
1011:17, 1016:16, 1022:13
**finish** [3] - 844:25, 938:4, 1003:2
**finished** [4] - 862:8, 913:17, 928:22,
1015:1
**fire** [4] - 922:6, 927:15, 949:2, 999:15
**fired** [3] - 919:7, 984:24, 993:18
**fires** [1] - 970:6
**firing** [3] - 893:23, 913:24, 1002:5
**FIRST** [1] - 842:7
**first** [40] - 844:24, 847:15, 848:9,
849:7, 851:6, 853:7, 854:10, 857:20,
863:13, 863:14, 864:15, 866:25,
867:14, 867:17, 869:4, 872:16, 876:4,
879:20, 879:24, 885:16, 891:20, 892:4,
894:16, 900:6, 920:1, 921:16, 922:16,
924:7, 925:7, 943:1, 952:21, 956:2,
975:21, 975:23, 981:6, 987:18, 992:4,
993:5, 1002:19, 1006:13
**First** [80] - 842:19, 843:3, 843:8,
852:11, 852:14, 852:22, 878:9, 878:10,

882:2, 885:24, 886:8, 886:12, 886:18, 887:24, 888:2, 888:5, 893:2, 894:18, 896:6, 896:10, 896:14, 896:15, 897:6, 897:14, 897:18, 897:21, 898:7, 898:10, 899:18, 900:4, 900:19, 901:20, 903:13, 903:17, 904:23, 913:14, 913:16, 913:18, 913:23, 914:1, 914:14, 917:11, 917:13, 918:24, 919:10, 920:5, 922:5, 927:12, 927:14, 929:4, 930:15, 947:13, 948:4, 948:5, 948:23, 949:6, 949:14, 953:20, 954:3, 956:15, 959:22, 976:19, 977:17, 980:14, 981:9, 1005:5, 1008:7, 1008:13, 1009:4, 1009:12, 1009:25, 1016:7, 1023:23, 1024:2, 1024:5, 1028:6, 1028:17

**fit** [2] - 974:2, 974:19

**five** [15] - 845:4, 847:11, 887:19, 888:3, 893:8, 893:9, 925:24, 932:14, 958:22, 965:1, 974:23, 982:23, 984:3, 1004:15

**fix** [3] - 1001:21, 1002:1, 1002:4

**fixed** [1] - 919:8

**flaming** [1] - 866:2

**flat** [1] - 855:4

**flesh** [1] - 932:25

**flies** [1] - 951:11

**flip** [1] - 998:11

**Floor** [1] - 843:9

**floor** [1] - 920:4

**flow** [3] - 932:4, 932:8, 1004:6

**flurry** [1] - 1013:22

**flush** [1] - 984:25

**fly** [1] - 958:1

**FMLA** [63] - 871:21, 871:24, 875:13, 878:4, 882:8, 882:22, 887:14, 887:17, 887:18, 888:3, 893:5, 893:22, 894:1, 894:19, 911:11, 911:12, 911:20, 912:5, 914:15, 915:3, 915:14, 915:22, 917:12, 917:13, 917:22, 920:2, 920:4, 927:24, 931:18, 941:10, 941:12, 941:15, 949:16, 949:17, 949:19, 949:21, 949:25, 954:4, 955:10, 958:12, 978:25, 986:17, 991:16, 1000:11, 1000:15, 1002:12, 1007:25, 1009:22, 1016:7, 1017:12, 1024:3, 1024:6, 1025:1, 1025:2, 1025:6, 1025:8, 1027:4, 1027:5, 1028:17, 1028:21, 1029:9, 1029:14

**focus** [8] - 899:22, 904:1, 909:19, 933:15, 967:17, 1009:13, 1015:14, 1028:4

**focused** [3] - 897:6, 931:3, 988:7

**focusing** [1] - 971:8

**folks** [8] - 866:18, 935:15, 953:16, 1016:22, 1017:7, 1018:19, 1030:1, 1030:24

**follow** [2] - 935:25, 954:15

**following** [10] - 845:22, 877:22, 878:12, 887:16, 892:3, 892:4, 929:10, 1003:10, 1012:7, 1018:15

**follows** [3] - 1008:5, 1012:5, 1024:1

**food** [1] - 866:3

**football** [1] - 915:5

**FOR** [1] - 842:11

**force** [43] - 852:21, 853:4, 867:23, 868:4, 868:10, 869:10, 869:18, 869:21,

871:9, 872:8, 883:11, 883:15, 883:25, 890:7, 892:25, 893:1, 893:2, 893:10, 894:2, 910:1, 912:10, 912:17, 912:25, 913:3, 913:5, 913:14, 916:17, 916:25, 917:4, 918:6, 918:8, 918:19, 922:1, 922:16, 924:18, 925:22, 927:4, 927:21, 927:22, 975:10, 983:15, 983:16

**forced** [22] - 875:4, 875:5, 875:15, 891:20, 894:23, 899:20, 903:5, 903:18, 903:21, 909:16, 910:10, 917:18, 931:6, 949:9, 949:22, 955:12, 955:13, 956:6, 971:5, 1012:8, 1024:8, 1027:4

**forcing** [10] - 874:14, 874:24, 875:16, 875:21, 875:23, 879:8, 898:5, 898:21, 952:6, 1024:2

**forever** [2] - 994:12, 1028:19

**forfeited** [2] - 942:6, 946:19

**forget** [3] - 855:1, 872:23, 991:18

**forgot** [1] - 991:18

**Form** [2] - 1013:2, 1014:6

**form** [3] - 849:13, 849:25, 872:15, 877:15, 881:10, 882:2, 883:8, 906:9, 906:12, 908:15, 908:16, 908:19, 965:6, 994:13

**formally** [2] - 1020:3, 1021:7

**former** [1] - 957:18

**forms** [2] - 850:22, 918:16

**forth** [3] - 963:2, 963:3, 999:21

**fortunate** [1] - 974:10

**forward** [4] - 856:9, 867:3, 961:12, 1001:6

**forwarded** [1] - 903:7

**four** [12] - 847:11, 864:16, 871:18, 883:9, 932:14, 947:17, 955:2, 959:6, 961:17, 961:19, 974:5

**four.** [1] - 943:10

**fowl** [1] - 936:2

**frame** [2] - 1009:17, 1011:15

**framework** [1] - 1008:18

**Francisco** [1] - 990:19

**Frank** [8] - 857:14, 889:9, 955:2, 964:23, 966:14, 974:21, 981:11, 989:24

**frankly** [2] - 968:14, 987:10

**fraud** [2] - 1014:24, 1015:4

**fraudster** [1] - 948:22

**fraudulent** [1] - 974:9

**FREDERIC** [1] - 842:12

**fresh** [1] - 1016:16

**Fricke** [4] - 928:5, 981:25, 982:1, 982:2

**Fricke's** [3] - 981:24, 982:6, 982:10

**Friday** [8] - 871:18, 872:22, 892:2, 924:3, 924:9, 987:6, 995:13, 995:15

**friend** [4] - 977:22, 1015:16, 1015:17, 1015:21

**friendly** [1] - 909:25

**friends** [7] - 895:18, 905:20, 947:17, 1010:11, 1010:12, 1010:13, 1010:14

**friendship** [1] - 980:6

**Frisolone** [1] - 843:11

**front** [3] - 959:16, 1005:18, 1006:7

**frustrated** [1] - 960:4

**frustrating** [2] - 933:1, 939:19

**fulfill** [1] - 919:10

**full** [10] - 896:15, 897:3, 897:4, 922:19, 936:2, 952:9, 959:6, 961:18, 964:25

**full-time** [5] - 896:15, 897:3, 897:4, 961:18

**fully** [2] - 913:16, 1017:9

**fumbled** [1] - 915:12

**fumbling** [1] - 887:3

**fun** [1] - 984:19

**function** [4] - 852:18, 852:20, 952:21, 952:22

**functions** [21] - 900:12, 900:15, 900:22, 901:8, 901:9, 905:17, 905:19, 906:3, 907:2, 907:3, 907:22, 908:1, 908:13, 909:10, 913:1, 968:22, 968:23, 1015:13, 1027:22

**fund** [1] - 854:25

**funding** [1] - 854:18

**funds** [2] - 896:22, 946:9

**fuss** [1] - 845:9

**future** [5] - 914:3, 914:4, 915:1, 998:25

**fuzzy** [1] - 1005:10

## G

**Gabriel** [2] - 1030:23, 1030:25

**game** [1] - 915:13

**gap** [1] - 996:25

**gaps** [1] - 895:2

**GARY** [1] - 843:4

**gather** [1] - 858:6

**GBS** [2] - 924:17, 924:25

**gear** [1] - 883:17

**geared** [1] - 930:13

**gears** [1] - 941:9

**geez** [2] - 978:14, 982:3

**general** [4] - 865:6, 923:7, 1000:14, 1000:18

**Generalist** [1] - 852:18

**generalist** [2] - 862:5, 924:22

**generalists** [2] - 858:8, 858:18

**generally** [1] - 1025:2

**generals** [2] - 918:14, 918:15

**generously** [2] - 966:7, 977:23

**gentle** [2] - 964:7, 980:12

**gentleman** [4] - 937:12, 964:19, 1009:24, 1020:12

**gentleman's** [1] - 990:17

**gentlemen** [1] - 1016:3

**Gentlemen** [1] - 1007:2

**gigantic** [3] - 895:10, 1009:16, 1014:11

**GILLIAN** [1] - 843:5

**given** [16] - 865:8, 871:20, 884:5, 894:7, 900:16, 920:15, 921:24, 924:9, 941:16, 943:5, 965:12, 966:3, 990:13, 1011:23, 1018:8

**glad** [1] - 1030:11

**global** [2] - 852:17, 852:19

**Global** [6] - 858:23, 859:3, 859:8, 923:23, 924:4, 924:14

**goal** [2] - 982:9, 984:16

**godfather** [4] - 1001:13, 1014:24, 1015:2

**Godfather** [6] - 976:18, 977:22, 980:10, 981:8, 982:3, 983:21

**golf** [5] - 895:18, 957:21, 957:24, 994:10

**government** [2] - 865:25, 866:1
**grabbing** [1] - 977:13
**grabs** [1] - 977:15
**grad** [1] - 976:9
**Graesser** [1] - 889:11
**grand** [2] - 988:25, 992:1
**Grant** [3] - 896:18, 905:5, 948:3
**graphic** [1] - 956:24
**grasp** [1] - 934:12
**grateful** [4] - 846:14, 847:10, 980:21, 1031:4
**gratitude** [1] - 980:23
**great** [15] - 844:6, 846:12, 862:8, 880:2, 901:14, 970:15, 973:23, 978:18, 985:16, 985:17, 985:18, 985:21, 1030:24, 1031:18
**greater** [5] - 871:21, 912:6, 917:1, 925:17, 927:25
**greatest** [1] - 974:10
**greatly** [2] - 1007:11, 1007:18
**Greenwich** [1] - 854:9
**grounds** [2] - 888:14, 951:10
**Group** [6] - 948:3, 948:6, 960:25, 978:9, 989:10, 991:7
**group** [27] - 857:13, 912:19, 912:20, 912:22, 912:24, 916:2, 923:24, 928:5, 928:7, 959:17, 961:11, 962:6, 962:25, 963:1, 968:1, 976:1, 976:4, 982:2, 985:19, 989:2, 990:10, 991:11, 991:15, 1001:4, 1011:4, 1011:6
**groups** [1] - 986:21
**grown** [3] - 853:22, 921:4, 927:18
**growth** [2] - 853:23, 927:19
**guard** [1] - 937:19
**guess** [23] - 854:18, 854:25, 858:13, 859:25, 865:9, 868:5, 878:19, 878:23, 903:12, 909:1, 915:9, 929:5, 932:5, 932:8, 932:21, 931:7, 949:8, 957:22, 967:6, 977:7, 987:22, 1027:14, 1028:10
**guidance** [1] - 884:15
**Gulf** [1] - 976:10
**guy** [8] - 976:11, 976:15, 996:9, 1002:1, 1014:4, 1015:4, 1015:20
**guys** [8] - 891:5, 1007:12, 1007:14, 1008:15, 1012:3, 1013:17, 1031:23
**guys's** [1] - 1015:3

## H

**ha-ha** [1] - 959:8
**habit** [1] - 996:12
**Hack** [20] - 919:20, 919:21, 919:23, 920:19, 920:22, 920:23, 921:7, 921:11, 921:15, 926:5, 926:6, 926:7, 926:9, 976:5, 976:6, 978:3, 978:4, 996:4, 996:5, 998:16
**hack** [1] - 995:24
**Hack's** [3] - 923:24, 926:13, 996:1
**hair** [2] - 907:7, 1009:3
**half** [9] - 865:16, 867:17, 940:9, 940:24, 955:5, 998:15, 998:22, 1004:14, 1012:17
**hand** [3] - 967:12, 1015:5
**handbook** [1] - 894:19
**handed** [5] - 849:20, 850:5, 853:8,

854:3, 925:13
**handful** [1] - 962:16
**handing** [2] - 890:9, 932:20
**handle** [4] - 881:24, 980:14, 982:21, 1012:24
**handled** [2] - 987:1, 988:24
**handling** [1] - 905:22
**hands** [1] - 1011:24
**handwriting** [7] - 848:17, 848:22, 849:2, 849:5, 849:8, 849:10, 852:3
**hanging** [1] - 955:6
**happy** [1] - 854:12
**hard** [5] - 910:7, 922:12, 934:12, 982:12, 1020:16
**harder** [2] - 924:11, 989:4
**hardly** [1] - 861:3
**harm** [2] - 888:6, 988:16
**harmed** [1] - 892:13
**harping** [1] - 933:18
**Harrison** [2] - 908:21, 964:13
**head** [13] - 853:10, 854:13, 855:4, 855:11, 906:2, 922:9, 927:12, 955:6, 990:7, 990:8, 990:11, 990:12, 991:6
**headed** [1] - 975:6
**heading** [1] - 953:18
**heads** [1] - 1010:10
**heal** [2] - 899:22, 966:18
**health** [7] - 899:23, 909:19, 911:15, 949:22, 949:23, 1015:15
**Healthcare** [1] - 1027:20
**healthy** [2] - 1008:11, 1013:19
**hear** [26] - 847:19, 870:7, 872:18, 873:19, 892:21, 892:24, 922:3, 922:6, 939:19, 947:6, 955:17, 958:2, 959:11, 967:19, 968:8, 978:14, 985:10, 987:21, 989:6, 989:7, 990:24, 997:11, 1007:9, 1018:5, 1029:17
**heard** [62] - 862:15, 863:5, 864:11, 877:24, 883:10, 902:2, 906:10, 908:21, 910:16, 918:9, 925:6, 936:24, 941:17, 945:4, 953:18, 955:11, 956:24, 957:4, 957:9, 959:13, 963:23, 965:11, 967:18, 969:8, 976:6, 978:3, 978:13, 978:25, 981:11, 981:13, 981:22, 982:11, 982:21, 984:6, 984:7, 985:12, 985:14, 985:22, 987:3, 989:12, 990:8, 990:17, 990:25, 991:1, 991:12, 997:18, 999:4, 999:6, 999:18, 1006:25, 1007:6, 1007:8, 1008:16, 1013:14, 1014:14, 1014:17, 1016:4, 1017:17, 1022:9, 1028:2
**hearing** [4] - 936:17, 954:17, 976:10, 980:8
**heart** [1] - 955:8
**heartfelt** [2] - 960:18, 963:18
**heat** [1] - 988:11
**held** [6] - 846:9, 872:19, 890:24, 899:11, 962:25, 1025:22
**help** [10] - 861:18, 921:20, 955:4, 960:14, 964:11, 964:16, 966:18, 967:1, 988:18
**helpful** [3] - 1019:2, 1030:20, 1031:4
**helping** [2] - 918:15, 950:8
**herself** [1] - 1001:9
**hi** [2] - 954:22, 1012:23
**hide** [1] - 983:21

**hierarchy** [1] - 981:24
**high** [4] - 977:11, 977:12, 977:23, 977:24
**high-and-dry** [1] - 977:12
**highest** [4] - 972:14, 974:3, 996:25, 998:17
**highest-paid** [1] - 972:14
**highlighted** [1] - 966:13
**highlights** [1] - 858:1
**highly** [4] - 977:21, 979:7, 982:7, 987:7
**himself** [3] - 899:22, 981:16, 1001:9
**hire** [12] - 855:6, 901:3, 927:1, 927:2, 927:5, 927:6, 950:20, 951:1, 982:5, 982:9, 986:5
**hired** [9] - 953:8, 986:3, 990:14, 990:15, 990:18, 990:21, 990:23, 998:15, 1009:14
**hires** [3] - 854:19, 901:10, 989:17
**hiring** [5] - 908:12, 927:14, 927:20
**history** [4] - 971:6, 971:19, 976:20, 1010:25
**History** [1] - 973:14
**hit** [5] - 903:9, 962:6, 962:13, 963:15, 986:19
**hitting** [1] - 903:17
**hold** [4] - 920:16, 945:9, 946:24, 953:25
**holding** [1] - 945:1
**holidays** [2] - 989:20
**home** [8] - 900:24, 901:3, 905:7, 909:13, 957:3, 958:23, 961:19, 981:17
**honesty** [1] - 989:9
**Honor** [47] - 844:7, 844:12, 844:15, 845:3, 847:15, 853:11, 854:6, 862:6, 862:10, 862:17, 865:12, 867:4, 868:13, 868:24, 873:14, 874:6, 875:14, 876:21, 877:8, 880:22, 881:9, 882:21, 883:17, 886:22, 887:5, 888:12, 889:19, 890:8, 933:3, 937:20, 938:13, 939:3, 939:25, 940:2, 940:16, 942:10, 945:10, 953:15, 1002:15, 1002:23, 1003:7, 1004:4, 1020:15, 1022:22, 1023:4, 1029:21
**HONORABLE** [1] - 842:12
**hooked** [1] - 905:9
**hope** [5] - 844:6, 865:12, 976:13, 1005:4, 1016:20
**hopeful** [1] - 996:19
**hopefully** [1] - 1007:9
**hoping** [1] - 941:2
**horse** [2] - 1008:11, 1013:19
**hospital** [9] - 900:24, 901:4, 905:6, 909:13, 957:1, 957:2, 957:7, 957:13, 959:6
**hotel** [1] - 957:2
**hour** [10] - 846:7, 865:9, 865:16, 887:2, 940:9, 940:24, 982:16, 1004:14, 1016:14, 1031:11
**hours** [15] - 851:22, 852:1, 932:11, 961:17, 961:19, 961:22, 962:4, 962:5, 962:18, 962:23, 963:11, 964:22, 1000:7, 1000:8, 1000:9
**housekeeping** [1] - 1030:21
**housing** [1] - 981:17
**HR** [19] - 852:16, 852:18, 857:11, 858:8, 858:18, 862:5, 902:3, 904:12,

904:13, 918:1, 918:14, 918:15, 923:7, 959:12, 960:9, 960:13, 960:23, 991:7, 991:11

**HRIS** [1] - 858:11
**huge** [2] - 902:3, 949:15
**Human** [1] - 991:5
**hundred** [3] - 855:5, 855:6, 1008:16
**hundreds** [2] - 935:22
**hypotheticals** [1] - 1010:1

## I

**idea** [8] - 849:24, 865:6, 876:2, 896:12, 940:5, 950:7, 967:9, 967:17
**identical** [1] - 924:16
**identified** [2] - 852:23, 858:17
**identify** [2] - 907:2, 907:3
**if's** [1] - 916:14
**ignore** [1] - 914:14
**ill** [1] - 894:22
**illegal** [2] - 891:17, 988:15
**illness** [2] - 956:19, 972:9
**illnesses** [1] - 970:11
**imagine** [4] - 865:15, 977:20, 988:9, 1008:10
**imaging** [1] - 993:12
**immediately** [1] - 905:13
**immunize** [1] - 893:22
**Impact** [1] - 856:25
**impact** [8] - 853:1, 856:5, 856:14, 857:9, 898:24, 899:8, 923:19, 1013:6
**impacted** [2] - 852:24, 858:1
**implanted** [1] - 907:12
**implement** [1] - 895:23
**implementing** [1] - 948:20
**implied** [1] - 958:17
**important** [5] - 881:23, 891:14, 897:4, 910:5, 953:23
**importantly** [2] - 1024:22, 1029:4
**impossible** [3] - 916:14, 916:23, 988:25
**impression** [1] - 1015:8
**improper** [2] - 987:4, 1008:2
**inability** [5] - 892:14, 898:7, 906:19, 907:19, 969:16
**inaccurate** [1] - 867:24
**inappropriately** [1] - 934:9
**incapacitated** [7] - 906:22, 907:1, 969:14, 969:22, 1027:7, 1027:10, 1028:11
**incapacity** [3] - 848:10, 906:18, 969:16
**incident** [1] - 858:15
**include** [11] - 852:25, 854:15, 914:12, 921:13, 936:10, 936:11, 936:13, 936:23, 940:14, 943:13, 943:14
**included** [16] - 857:3, 857:16, 861:21, 862:4, 912:24, 913:3, 913:5, 913:13, 916:25, 922:24, 926:3, 926:14, 946:12, 1005:24, 1011:12, 1012:1
**includes** [1] - 861:19
**including** [11] - 928:23, 933:11, 967:8, 969:15, 972:15, 972:24, 974:20, 980:13, 981:16, 985:8, 999:3
**inclusion** [2] - 880:23, 919:16
**incoherent** [1] - 962:7

**income** [1] - 903:9, 930:24, 931:4, 933:25, 934:11, 947:4, 947:5, 957:16, 961:20, 1015:24, 1022:14, 1022:18
**inconvenience** [2] - 967:22, 968:6
**incorporated** [1] - 938:9
**incorrect** [1] - 870:19
**incorrectly** [1] - 1024:7
**increase** [4] - 854:25, 927:16, 927:17
**increased** [1] - 951:21
**incredible** [1] - 980:6
**indefinite** [2] - 1028:21, 1028:24
**INDEX** [1] - 1033:1
**iNDEX** [1] - 1034:2
**indicate** [2] - 929:4, 1020:19
**indicated** [4] - 889:1, 901:4, 940:23, 944:2
**indicates** [8] - 849:25, 857:22, 860:16, 904:3, 957:5, 964:5, 966:12, 974:17
**indicating** [1] - 901:24, 906:14, 910:24, 927:13, 944:14
**indicating)** [3] - 906:18, 944:6, 944:8
**indication** [2] - 966:11, 983:11
**indications** [1] - 873:18
**indisputable** [1] - 1011:11
**individual** [31] - 844:10, 866:20, 871:1, 889:14, 889:17, 898:12, 898:16, 898:21, 900:5, 905:3, 908:7, 912:5, 912:7, 932:13, 938:8, 953:18, 953:21, 955:2, 955:6, 957:19, 959:22, 964:23, 968:9, 969:5, 985:23, 1005:6, 1024:12, 1026:24, 1027:8, 1027:21, 1030:19
**individual's** [1] - 853:2
**individually** [1] - 985:9
**individuals** [5] - 852:24, 858:1, 861:9, 861:11, 861:23
**infallible** [1] - 908:18
**infections** [1] - 970:11
**influence** [1] - 898:19
**inform** [1] - 898:19
**information** [25] - 849:7, 856:6, 856:7, 857:14, 857:18, 858:10, 858:13, 858:18, 859:4, 860:8, 861:13, 862:4, 870:12, 885:1, 887:17, 918:11, 918:14, 923:6, 923:9, 924:22, 925:2, 961:2, 963:13, 986:20, 997:21
**informed** [2] - 909:8, 909:9
**initial** [1] - 1000:21
**injury** [1] - 888:6
**Innelli** [1] - 1030:5
**inoperable** [2] - 908:22, 964:15
**inside** [5] - 852:22, 897:21, 904:12, 912:23, 915:2
**insisting** [1] - 918:2
**instance** [1] - 1009:25
**instead** [10] - 851:3, 896:7, 896:13, 912:19, 914:22, 923:14, 945:8, 971:8, 975:8, 984:6
**institution** [1] - 896:20
**institutions** [1] - 895:10
**instruct** [4] - 865:2, 939:4, 946:1, 967:20
**instructed** [4] - 884:6, 898:15, 900:6, 944:18
**instructing** [1] - 938:14
**Instruction** [1] - 884:5
**instruction** [1] - 867:21, 869:1,

871:17, 877:18, 877:23, 877:25, 880:24, 933:5, 933:8, 987:21
**instructions** [22] - 863:23, 866:19, 872:16, 872:18, 877:16, 885:11, 928:23, 931:16, 931:17, 931:19, 932:24, 933:4, 947:25, 955:17, 967:19, 968:8, 973:2, 1007:19, 1016:4, 1030:16, 1030:20, 1031:23
**insulate** [1] - 972:11
**insulated** [1] - 973:1
**insulates** [1] - 1014:19
**insurance** [6] - 903:11, 979:21, 979:22, 980:2, 1012:13, 1012:17
**insure** [1] - 903:15
**intellectual** [1] - 977:3
**intended** [3] - 860:7, 939:20, 1014:21
**intent** [1] - 894:25
**intentionally** [1] - 988:16
**interacting** [1] - 894:23, 894:24
**interaction** [2] - 870:21, 1026:21
**intercepted** [1] - 915:11
**interest** [6] - 943:14, 943:23, 944:17, 975:3, 975:4, 999:4
**interested** [1] - 892:21
**interesting** [2] - 910:23, 920:25
**interfere** [3] - 915:20, 916:6, 916:7, 916:8
**interfered** [5] - 919:1, 919:2, 919:3, 919:4, 1024:5
**interference** [4] - 915:3, 915:6, 915:14, 968:5
**interim** [3] - 921:23, 950:22, 1011:7
**interm** [2] - 960:24, 991:6
**internal** [5] - 912:19, 986:20, 999:20, 1011:4, 1011:6
**internet** [1] - 905:10
**interpreted** [2] - 912:9, 980:19
**interrupted** [1] - 970:16
**interruptions** [1] - 863:25
**interview** [1] - 871:25
**introduced** [2] - 966:6, 1017:24
**invalid** [3] - 984:14, 990:4, 1008:3
**invest** [1] - 975:5
**invoice** [3] - 948:11, 949:1, 997:4
**invoices** [9] - 894:21, 944:13, 947:7, 948:8, 948:14, 949:3, 949:5, 977:2, 997:10
**involuntarily** [1] - 966:5
**involuntary** [2] - 859:17, 859:23
**involved** [5] - 908:11, 918:1, 961:25, 967:8, 1026:15
**involving** [1] - 893:10
**issue** [18] - 869:19, 872:7, 878:1, 880:17, 881:1, 884:21, 884:25, 885:21, 887:7, 887:12, 889:15, 910:21, 947:8, 964:25, 983:23, 1009:24, 1028:1, 1029:3
**issued** [1] - 964:10
**issues** [13] - 881:4, 884:23, 898:14, 905:21, 905:24, 910:2, 912:23, 921:6, 921:10, 934:16, 971:9, 1014:7, 1029:16
**it'll** [1] - 881:6
**itself** [3] - 868:18, 892:13, 1026:12

## J

**Jackson** [3] - 990:17, 990:18, 990:23
**January** [84] - 849:21, 849:25, 853:5, 854:10, 855:21, 856:14, 857:5, 857:18, 858:12, 858:14, 858:15, 858:23, 858:24, 859:2, 859:4, 859:7, 860:22, 860:25, 876:11, 892:1, 892:2, 911:1, 913:21, 914:8, 916:17, 916:19, 917:10, 917:21, 918:2, 918:4, 918:22, 919:21, 920:18, 920:21, 922:21, 922:22, 923:9, 923:10, 923:20, 923:21, 924:2, 924:4, 924:6, 924:8, 924:14, 924:17, 924:19, 925:1, 927:15, 963:21, 967:5, 972:13, 975:24, 983:19, 990:14, 992:5, 992:6, 995:5, 995:12, 998:2, 998:6, 998:10, 1000:6, 1000:19, 1013:1, 1014:1, 1019:11, 1020:4, 1020:17, 1020:22, 1020:24, 1021:8, 1021:20, 1022:18, 1023:1, 1024:20
**Jason** [2] - 960:6, 972:24
**Jeff** [8] - 920:22, 926:5, 926:6, 926:9, 926:13, 976:5, 978:3, 978:4
**Jen** [2] - 974:6, 991:14
**Jennie** [1] - 965:12
**Jennifer** [1] - 904:14
**job** [73] - 854:19, 900:12, 900:15, 900:16, 900:18, 900:22, 901:9, 901:18, 905:17, 905:18, 907:2, 907:3, 907:22, 908:13, 909:10, 910:5, 911:17, 912:11, 912:25, 915:18, 920:2, 920:7, 920:11, 920:15, 921:23, 921:24, 949:24, 950:1, 950:9, 950:16, 950:23, 951:13, 951:17, 968:22, 968:23, 969:2, 971:22, 976:19, 979:3, 979:7, 980:15, 981:24, 982:5, 982:6, 982:10, 982:13, 983:4, 983:6, 983:7, 984:5, 986:24, 987:22, 988:10, 991:2, 991:4, 991:5, 991:7, 991:10, 993:16, 996:10, 1000:23, 1007:13, 1009:23, 1015:13, 1023:21, 1027:22, 1029:10, 1029:20, 1030:24, 1031:2
**jobs** [11] - 854:14, 855:12, 895:13, 895:14, 927:9, 960:23, 979:6, 988:2, 1007:8
**Joe** [29] - 895:6, 895:8, 895:12, 895:13, 895:14, 896:8, 896:23, 896:24, 896:25, 897:2, 897:13, 897:17, 897:24, 897:25, 898:1, 903:3, 903:8, 948:19, 964:8, 977:22, 981:8, 997:1, 997:3, 997:6, 997:7, 997:22, 998:12
**Johnson** [13] - 889:10, 902:8, 917:25, 918:9, 918:14, 918:23, 923:8, 955:3, 959:12, 960:2, 960:7, 973:19, 995:11
**Johnson's** [1] - 902:5
**Joseph** [1] - 1025:20
**JUDGE** [1] - 842:12
**judge** [24] - 844:9, 844:19, 847:5, 865:2, 874:9, 879:24, 880:10, 881:3, 931:12, 932:19, 937:3, 955:17, 967:19, 967:20, 970:16, 970:22, 971:25, 973:3, 973:7, 987:21, 1004:15, 1005:10, 1006:8, 1027:16
**Judge** [22] - 845:16, 846:2, 846:4, 870:17, 871:17, 872:17, 873:4, 877:18, 877:22, 882:9, 884:3, 885:3, 885:13, 886:9, 889:6, 898:15, 898:23, 931:23,
934:7, 939:9, 947:25, 1031:7
**judge's** [1] - 968:8
**judges** [2] - 939:16, 939:19
**judgment** [5] - 874:7, 890:3, 1023:23, 1027:11, 1027:23
**Julie** [7] - 900:23, 905:3, 928:9, 959:18, 959:19, 999:22
**July** [1] - 956:4
**June** [2] - 956:4, 977:7
**juror** [2] - 942:17, 987:22
**jurors** [17] - 844:3, 844:25, 845:14, 845:18, 845:24, 846:8, 846:12, 847:19, 862:22, 862:23, 867:12, 889:13, 890:14, 890:23, 946:1, 1030:1, 1030:15
**jurors'** [2] - 846:3, 928:15
**JURY** [2] - 842:11, 842:12
**jury** [58] - 862:15, 863:4, 866:19, 872:4, 872:5, 872:9, 872:15, 874:2, 877:24, 878:22, 880:17, 881:9, 883:7, 883:10, 884:6, 885:1, 885:5, 888:15, 889:3, 908:20, 930:5, 932:6, 933:24, 935:14, 936:9, 937:25, 938:3, 938:8, 938:9, 938:14, 938:19, 938:24, 939:4, 939:15, 940:3, 946:6, 1003:5, 1003:11, 1005:19, 1007:12, 1007:13, 1007:19, 1016:4, 1017:19, 1017:22, 1018:14, 1018:16, 1018:18, 1020:7, 1022:9, 1022:23, 1026:10, 1026:18, 1027:1, 1027:11, 1029:17, 1031:11, 1031:23
**Jury** [10] - 846:11, 866:16, 891:1, 929:1, 940:18, 940:19, 1003:16, 1003:17, 1007:3, 1016:11
**jury's** [1] - 938:6
**justification** [1] - 991:17
**justified** [1] - 950:4
**justify** [3] - 901:19, 978:8, 996:16
**Justin** [7] - 959:16, 959:25, 974:7, 984:1, 984:4, 989:1, 1001:16

## K

**Karen** [7] - 856:9, 856:11, 856:15, 889:10, 974:6, 996:2
**Kathi** [12] - 847:17, 852:11, 914:9, 923:8, 924:22, 994:23, 995:10, 995:11, 995:13, 1012:22, 1033:6
**Kathy** [2] - 918:9, 922:12
**keep** [10] - 867:11, 887:2, 910:3, 931:21, 940:10, 940:25, 961:4, 988:4, 991:2, 991:7
**keeps** [1] - 994:24
**Kelly** [10] - 849:10, 849:16, 900:23, 905:3, 928:9, 959:18, 959:19, 960:1, 999:22
**kept** [8] - 909:8, 926:11, 933:17, 961:4, 979:3, 984:13, 1030:3
**kicked** [1] - 853:6
**killing** [1] - 961:19
**kind** [17] - 894:9, 894:13, 904:13, 906:15, 908:14, 915:5, 915:8, 922:11, 922:17, 941:17, 944:19, 948:21, 951:22, 962:13, 984:22, 1015:9, 1020:6
**kinds** [5] - 963:17, 970:10, 972:10, 986:13, 992:2
**KING** [1] - 843:7
**King** [1] - 892:5
**knowing** [4] - 861:22, 862:1, 954:16, 974:12
**knowledge** [5] - 888:1, 918:18, 936:3, 936:4, 961:13
**knows** [10] - 862:18, 895:14, 915:13, 915:18, 915:19, 919:23, 938:5, 991:15, 991:16, 1016:23
**KW** [1] - 995:15

## L

**labeled** [1] - 856:25
**labor** [1] - 1027:20
**lack** [2] - 926:11, 959:25
**Ladies** [1] - 1007:2
**ladies** [1] - 1016:3
**laid** [25] - 972:7, 972:13, 972:15, 972:17, 972:22, 973:6, 973:22, 974:4, 980:15, 984:11, 984:24, 989:8, 994:14, 999:15, 999:25, 1000:18, 1000:25, 1001:18, 1001:20, 1002:10, 1002:12, 1009:12, 1009:14
**land** [1] - 990:6
**language** [10] - 872:5, 876:19, 876:22, 882:23, 883:12, 883:18, 885:20, 886:6, 886:11, 933:23, 937:6
**lapses** [1] - 1017:2
**large** [8] - 853:6, 893:2, 893:13, 893:23, 896:20, 897:12, 952:20, 1008:24
**larynx** [1] - 905:12
**last** [30] - 844:9, 844:13, 845:2, 860:12, 864:18, 864:20, 870:24, 872:24, 879:17, 889:7, 891:13, 895:16, 910:8, 911:9, 934:6, 934:22, 943:10, 947:17, 951:6, 958:11, 965:1, 966:1, 966:2, 971:16, 991:13, 995:23, 1006:21, 1007:7, 1007:9
**late** [2] - 1016:14, 1031:2
**launch** [1] - 865:17
**laundry** [1] - 933:11
**Laurie** [1] - 889:11
**LAW** [1] - 842:14
**law** [29] - 865:2, 865:15, 867:25, 871:3, 871:20, 884:12, 884:25, 885:4, 885:6, 887:13, 890:3, 915:19, 928:23, 939:23, 954:15, 965:18, 971:17, 971:20, 971:25, 972:1, 1000:22, 1016:13, 1023:24, 1024:10, 1024:22, 1027:2, 1027:16, 1029:12, 1030:24
**lawful** [2] - 869:11, 872:7, 883:15, 883:25, 890:6
**lawyer** [20] - 863:13, 863:14, 863:16, 863:18, 863:20, 863:24, 864:1, 864:8, 864:10, 932:20, 941:1, 945:13, 945:15, 946:4, 962:13, 978:14, 985:24, 997:11, 1007:7, 1007:9
**lawyers** [20] - 845:12, 846:18, 847:1, 847:8, 863:7, 864:5, 865:1, 865:18, 915:4, 920:15, 939:17, 973:12, 984:18, 1002:9, 1002:11, 1002:20, 1004:21, 1016:5, 1017:18, 1018:1
**lay** [4] - 976:3, 981:16, 981:18, 1002:11

**laying** [1] - 976:3
**layoff** [12] - 972:8, 972:11, 973:11, 973:12, 974:18, 974:21, 993:7, 1000:20, 1000:22, 1002:9, 1011:12
**layoffs** [5] - 925:23, 972:18, 985:7, 988:19, 993:9
**layout** [1] - 996:8
**lead** [3] - 852:19, 914:8, 919:9
**leader's** [1] - 854:15
**leaders** [1] - 854:17
**leading** [1] - 927:20
**leads** [1] - 1026:22
**lean** [1] - 1001:6
**leaned** [1] - 970:23
**learn** [1] - 950:24
**learned** [3] - 923:9, 947:22, 1011:5
**least** [11] - 885:1, 893:11, 896:13, 897:23, 903:19, 906:1, 917:19, 938:1, 954:15, 976:3, 993:18
**leave** [196] - 870:16, 871:24, 872:13, 873:7, 873:10, 874:14, 874:16, 874:17, 874:24, 875:4, 875:5, 875:9, 875:12, 875:15, 875:16, 875:21, 875:22, 875:23, 876:8, 876:9, 877:2, 878:7, 879:8, 883:21, 883:23, 883:24, 887:8, 887:14, 887:16, 887:18, 887:20, 888:3, 888:4, 888:10, 891:20, 891:24, 894:23, 897:11, 897:15, 898:5, 898:20, 898:22, 899:20, 903:5, 903:18, 903:21, 904:22, 909:16, 909:18, 909:24, 910:1, 910:11, 911:9, 911:13, 911:17, 911:20, 911:23, 912:1, 912:6, 912:9, 912:18, 914:16, 916:20, 917:2, 917:15, 917:16, 917:20, 917:22, 925:16, 925:17, 925:20, 926:2, 930:20, 930:24, 931:14, 931:25, 934:9, 949:10, 949:15, 949:25, 950:11, 950:12, 950:15, 950:17, 950:19, 951:3, 951:6, 951:13, 951:18, 951:21, 951:25, 952:6, 952:9, 955:13, 955:15, 955:22, 956:6, 956:11, 956:20, 957:12, 957:17, 958:13, 958:15, 958:19, 960:16, 960:17, 962:4, 963:18, 963:19, 964:4, 964:18, 965:10, 965:11, 965:13, 965:17, 965:19, 965:24, 966:4, 966:20, 967:3, 967:6, 967:12, 967:13, 968:1, 968:15, 969:2, 969:3, 971:4, 971:5, 971:12, 971:21, 972:10, 972:19, 986:17, 991:20, 999:24, 1000:11, 1000:17, 1000:21, 1003:2, 1005:7, 1005:24, 1006:4, 1006:5, 1008:6, 1008:9, 1010:13, 1011:8, 1011:21, 1012:8, 1012:9, 1014:13, 1014:15, 1015:16, 1019:3, 1019:18, 1020:3, 1021:7, 1024:3, 1024:8, 1024:9, 1024:14, 1024:16, 1024:20, 1024:22, 1025:1, 1025:2, 1025:8, 1025:10, 1025:18, 1025:22, 1025:23, 1026:6, 1026:12, 1026:13, 1026:16, 1026:23, 1027:4, 1028:6, 1028:9, 1028:21, 1028:22, 1028:24, 1029:1
**Leave** [8] - 893:19, 911:18, 920:2, 950:7, 951:20, 954:4, 971:15, 971:18
**leaves** [6] - 965:16, 982:2, 991:16, 998:13, 998:16, 1020:1
**leaving** [3] - 871:13, 931:7
**lectures** [1] - 952:23

**led** [1] - 852:17
**left** [11] - 928:12, 944:5, 950:3, 958:15, 972:25, 977:11, 977:13, 979:15, 1010:2, 1010:3, 1030:24
**legal** [8] - 846:19, 863:7, 884:9, 893:5, 894:3, 927:23, 1007:5, 1026:13
**legislative** [1] - 971:19
**legitimate** [8] - 974:18, 987:14, 987:20, 988:21, 996:7
**LEHR** [1] - 843:2
**length** [1] - 964:16
**less** [21] - 845:4, 861:6, 865:11, 865:12, 892:11, 912:16, 922:5, 931:13, 933:7, 944:2, 978:24, 984:2, 1001:16, 1004:15, 1009:3, 1009:4, 1010:17, 1020:5, 1021:20, 1023:18
**letter** [5] - 859:19, 867:5, 867:8, 874:9, 903:21
**letters** [1] - 1020:1
**level** [5] - 854:14, 855:5, 858:2, 979:7, 993:19
**Levitt** [1] - 1025:20
**liability** [6] - 844:11, 868:23, 889:17, 1014:20, 1017:11, 1017:12
**liable** [4] - 882:2, 889:15, 933:21, 954:3
**lie** [2] - 973:18, 973:21
**Liebenthal** [9] - 896:2, 896:3, 896:4, 896:7, 896:11, 896:13, 896:14, 896:25
**lied** [1] - 962:1
**Life** [2] - 944:23, 1012:16
**life** [10] - 879:8, 880:7, 892:8, 892:10, 899:25, 907:5, 939:16, 1006:14, 1016:1, 1017:15
**lifeboat** [3] - 985:1, 988:8, 994:17
**light** [1] - 1027:18
**likely** [3] - 857:8, 857:13, 1001:5
**limit** [1] - 1014:23
**limitations** [3] - 907:4, 907:21, 970:2
**limited** [1] - 916:10
**limits** [1] - 947:14
**line** [8] - 851:6, 855:8, 855:23, 855:25, 858:21, 859:16, 860:1, 922:20
**Line** [2] - 848:25, 994:25
**lines** [4] - 857:22, 857:24, 861:17, 923:4
**list** [44] - 856:14, 859:9, 893:25, 894:14, 916:18, 922:24, 923:1, 923:11, 925:5, 925:8, 925:10, 925:12, 926:14, 933:11, 963:8, 963:9, 976:5, 976:7, 986:22, 992:4, 992:7, 993:5, 993:6, 993:7, 993:13, 993:22, 993:25, 994:25, 995:12, 995:20, 995:21, 1012:14, 1012:15, 1012:24, 1012:25, 1014:17, 1017:25, 1030:3, 1030:6, 1030:14, 1030:17
**listen** [6] - 880:8, 891:7, 891:11, 973:3, 986:14, 1002:10
**listening** [2] - 928:23, 934:5
**listings** [1] - 900:20
**lists** [6] - 858:14, 925:9, 993:2, 993:4, 994:24, 995:21
**litigated** [1] - 872:6
**litigation** [2] - 947:21, 953:24
**live** [4] - 863:2, 999:19, 1009:6, 1011:16

**lives** [1] - 1017:6
**LLC** [3] - 948:3, 948:6, 1015:25
**LLP** [1] - 843:2
**local** [1] - 1007:4
**location** [2] - 969:13, 975:1
**locations** [1] - 975:11
**logical** [3] - 932:14, 1010:9, 1015:18
**long-term** [10] - 904:8, 913:15, 944:21, 944:24, 945:4, 1012:11, 1012:14, 1021:23, 1022:7, 1022:19
**Look** [1] - 961:4
**look** [57] - 850:15, 858:13, 858:21, 859:16, 859:25, 860:1, 860:2, 861:2, 861:17, 869:17, 872:11, 878:15, 880:19, 881:11, 891:7, 895:1, 898:24, 903:1, 907:1, 908:9, 908:10, 918:12, 919:12, 919:17, 919:25, 920:13, 920:17, 921:11, 922:17, 922:18, 922:21, 922:25, 923:2, 923:19, 923:23, 924:14, 925:4, 927:9, 937:16, 939:21, 953:4, 953:10, 958:7, 966:13, 975:24, 976:2, 979:6, 979:20, 980:1, 989:7, 1007:13, 1013:21, 1013:25, 1018:2, 1022:9, 1023:9, 1031:6
**looked** [11] - 896:18, 917:12, 925:4, 931:16, 958:5, 962:20, 963:4, 981:25, 988:14, 1007:15, 1024:24
**looking** [10] - 892:19, 909:4, 921:4, 947:8, 952:19, 975:23, 982:6, 988:8, 998:25, 1001:10
**looks** [1] - 998:21
**Looks** [1] - 964:6
**LORENZO** [3] - 1004:1, 1004:4, 1006:18
**Lori** [1] - 995:17
**lose** [1] - 980:15
**loses** [1] - 1000:22
**losing** [1] - 974:24
**loss** [8] - 911:4, 931:4, 931:11, 933:25, 936:11, 936:14, 938:10, 996:14
**lost** [17] - 892:13, 911:10, 914:15, 930:24, 931:20, 932:1, 934:11, 938:11, 943:4, 943:9, 943:12, 944:9, 952:12, 968:7
**louder** [1] - 867:6
**LOUIS** [1] - 843:10
**lousy** [1] - 939:16
**love** [1] - 959:8, 979:21, 980:2, 980:6, 980:21
**lovely** [1] - 844:8
**loves** [1] - 1013:14
**loving** [1] - 964:7
**lower** [3] - 925:25, 926:19, 979:7
**lower-level** [1] - 979:7
**LTD** [5] - 963:24, 966:9, 1012:14, 1012:24, 1026:8
**lunch** [10] - 865:14, 865:16, 865:23, 866:8, 890:21, 928:15, 928:19, 928:21, 929:9, 1016:20
**Luther** [1] - 892:5
**lying** [1] - 974:8
**lymph** [2] - 908:22, 964:15
**Lynch** [1] - 896:19

# M

machination [1] - 1013:20
machine [2] - 987:10, 1001:6
Madison [1] - 843:8
mail [37] - 843:13, 853:17, 854:1, 855:20, 873:6, 874:12, 874:16, 874:21, 875:6, 878:21, 881:21, 885:17, 885:19, 885:21, 886:1, 894:24, 901:24, 902:6, 964:5, 967:4, 967:14, 967:17, 967:24, 967:25, 968:3, 968:5, 968:7, 968:15, 968:25, 974:16, 980:18, 991:20, 991:21, 991:23, 1024:4, 1024:8
mails [15] - 894:23, 901:2, 962:6, 962:14, 962:16, 962:17, 962:21, 962:23, 963:15, 963:17, 970:20, 974:8, 980:9, 983:13
Main Street [3] - 989:25, 990:1, 990:2
maintain [1] - 855:4
major [2] - 956:23, 990:10
majority [2] - 893:8, 989:16
malicious [1] - 878:11
man [3] - 976:16, 984:18, 1015:6
manage [3] - 879:16, 880:9, 934:17
managed [2] - 852:18, 978:3
management [15] - 854:18, 909:12, 914:8, 916:8, 922:1, 928:10, 949:15, 974:25, 975:21, 975:22, 976:1, 1000:20, 1014:15
manager [13] - 926:17, 965:12, 973:23, 984:8, 984:12, 984:22, 984:23, 985:11, 985:16, 991:14, 1001:5, 1001:7, 1001:9
managers [6] - 858:20, 925:9, 925:13, 979:8, 1002:5, 1002:6
managing [5] - 901:9, 906:4, 908:12, 985:19
mandatory [1] - 958:13
manufactured [2] - 906:1, 989:14
manufacturing [1] - 989:12
March [9] - 848:14, 848:16, 848:19, 848:20, 849:4, 858:16, 943:18, 956:4, 965:2
Marino [56] - 855:22, 857:11, 889:10, 897:19, 898:19, 899:5, 899:7, 899:10, 899:19, 904:3, 907:14, 909:17, 912:20, 918:1, 918:2, 918:5, 918:7, 918:23, 919:23, 920:23, 920:25, 921:11, 921:15, 921:21, 922:2, 927:9, 928:9, 955:3, 956:14, 957:18, 958:1, 958:3, 958:14, 958:17, 958:20, 959:2, 959:11, 959:13, 960:9, 962:8, 963:3, 963:18, 964:4, 964:21, 966:11, 966:20, 966:24, 971:2, 979:4, 981:13, 1000:15, 1013:3
Marino's [4] - 920:13, 971:7, 993:2, 1000:21
marked [4] - 850:15, 856:24, 922:17, 927:16
market [1] - 984:4
Martin [1] - 892:5
Maryland [1] - 843:4
massive [1] - 1014:13
match [1] - 896:9
matched [1] - 896:25
material [1] - 996:11
math [2] - 944:1, 952:10

Matt [2] - 987:5, 988:22
matter [19] - 880:16, 884:9, 884:12, 884:25, 885:4, 885:5, 885:6, 887:13, 890:3, 917:21, 919:8, 969:25, 997:5, 1002:5, 1012:9, 1023:24, 1027:16, 1029:12, 1032:1
matters [4] - 846:19, 1003:10, 1018:15, 1030:21
McKinney [1] - 842:16
meal [1] - 1015:3
Mean [1] - 854:9
mean [28] - 848:25, 849:25, 855:3, 857:7, 859:18, 860:6, 860:9, 860:14, 873:13, 899:13, 901:15, 909:23, 925:10, 945:24, 947:16, 953:1, 967:12, 970:18, 983:8, 996:10, 996:11, 1000:2, 1012:5, 1019:2, 1027:12, 1028:11
meaning [3] - 879:9, 928:7, 1000:14
means [12] - 859:19, 892:18, 895:23, 899:14, 906:18, 907:6, 922:22, 969:16, 973:16, 973:17, 1004:6, 1012:25
meant [8] - 850:3, 854:25, 925:11, 931:23, 979:22, 979:23, 1001:22
meantime [1] - 960:22
measures [1] - 975:20
Medical [6] - 893:19, 950:6, 951:20, 954:4, 971:15, 971:18
medical [20] - 873:7, 883:21, 883:23, 883:24, 888:1, 903:16, 909:16, 918:3, 930:20, 930:24, 931:24, 934:9, 965:13, 969:7, 969:15, 1008:6, 1027:13, 1027:15, 1028:4, 1028:7
meek's [2] - 993:18, 993:19
meet [5] - 861:15, 861:16, 978:6, 990:5, 1010:19
meeting [4] - 960:2, 960:3, 960:7, 975:24
meetings [4] - 899:14, 900:25, 962:24, 962:25
member [1] - 1016:11
members [5] - 857:2, 857:13, 863:4, 922:1, 928:10
memo [1] - 873:17
mental [1] - 908:3
mention [7] - 866:5, 881:20, 920:10, 920:11, 991:18, 1009:21, 1014:7
mentioned [4] - 866:5, 891:19, 928:2, 1014:8
mercy [2] - 950:1, 950:2
merely [1] - 910:4
merge [1] - 926:16
merging [1] - 916:4
Merrill [1] - 896:19
Merrill-Lynch [1] - 896:19
mess [1] - 975:4
message [16] - 919:22, 920:24, 958:21, 959:10, 960:10, 961:3, 961:15, 962:7, 964:21, 965:7, 979:25, 980:4, 980:5, 1015:13, 1015:16, 1015:17
messages [13] - 899:5, 903:7, 907:25, 920:13, 920:19, 957:15, 963:1, 970:20, 970:25, 974:8, 979:16, 994:9
met [1] - 978:6
Met [2] - 944:23, 1012:16
method [1] - 944:18
methodology [2] - 981:14, 981:15

MetLife [3] - 850:23, 913:16, 963:25
MICHAEL [1] - 843:5
middle [1] - 856:8
might [22] - 859:23, 861:13, 864:4, 865:15, 910:7, 915:10, 915:11, 915:12, 915:25, 916:1, 916:2, 933:1, 933:24, 980:10, 985:17, 987:23, 1000:2, 1002:2, 1017:5, 1019:5, 1030:19
Mike [3] - 993:3, 995:9, 995:23
military [1] - 965:13
million [15] - 893:11, 942:2, 942:4, 944:6, 944:9, 952:14, 952:16, 973:8, 974:24, 987:17, 987:18, 994:1, 994:2, 998:22, 998:24
mind [1] - 977:7
mindful [1] - 946:6
mine [1] - 916:5
minimize [1] - 863:22
minimizes [1] - 864:3
minimum [1] - 920:5
minor [1] - 967:22
minus [5] - 849:13, 943:1, 943:19, 997:2
minute [6] - 918:13, 957:5, 957:10, 961:25, 976:12, 983:15
minutes [16] - 845:4, 846:17, 863:9, 866:13, 888:19, 888:23, 890:12, 940:24, 962:19, 1003:3, 1004:14, 1007:22, 1016:17, 1023:18, 1031:24
misconception [1] - 1007:24
missed [1] - 952:7
missing [4] - 910:25, 911:1, 911:5, 1020:25
misstate [1] - 863:19
mistake [1] - 962:6
mistakes [2] - 962:14, 988:1
misunderstanding [1] - 1021:5
mitigation [4] - 869:1, 870:8, 870:10, 872:13
mix [1] - 932:6
modified [1] - 1004:22
Moffitt [1] - 964:14
moment [3] - 913:8, 913:25
Monday [12] - 842:7, 865:20, 887:16, 891:13, 892:4, 924:3, 958:11, 958:12, 966:1, 966:2, 968:4, 971:16
monetary [1] - 941:15
money [28] - 846:25, 931:14, 932:1, 944:20, 945:1, 948:23, 957:16, 960:24, 975:12, 975:15, 977:13, 978:1, 978:7, 978:12, 978:21, 978:24, 984:25, 986:24, 987:12, 987:15, 991:9, 997:14, 997:15, 1010:17, 1015:6, 1015:23, 1016:2
monitoring [2] - 967:17, 968:3
month [15] - 897:1, 897:9, 897:17, 927:3, 927:12, 941:25, 943:18, 943:24, 944:1, 953:4, 964:1, 976:24, 977:1, 981:3, 997:17
months [15] - 897:2, 941:24, 941:25, 943:10, 943:15, 943:21, 943:22, 943:25, 944:5, 944:15, 953:3, 956:12, 956:13, 978:5, 1009:5
months' [2] - 997:23, 1013:5
moon [1] - 990:6
morning [1] - 867:8, 877:21, 889:16,

906:11, 918:10, 922:13, 932:11, 934:6, 968:4, 969:8, 994:23, 1002:19, 1003:5, 1004:16, 1016:15, 1025:12

**most** [3] - 853:18, 899:25, 1004:11

**motion** [9] - 862:24, 874:7, 881:14, 890:3, 999:10, 1013:20, 1023:13, 1023:15, 1028:15

**motivate** [1] - 1008:6

**motivational** [2] - 985:17, 985:18

**motives** [1] - 966:24

**mouth** [1] - 991:23

**move** [7] - 911:11, 941:6, 982:10, 1009:6, 1009:7, 1009:10, 1009:11

**moved** [2] - 852:16, 853:7

**moves** [1] - 1023:23

**moving** [4] - 931:21, 945:8, 961:12, 961:13

**Mr. Innelli** [3] - 865:21, 890:14, 894:15

**MS** [17] - 1023:18, 1023:22, 1025:5, 1025:7, 1025:12, 1025:15, 1025:18, 1026:5, 1026:12, 1026:17, 1026:22, 1027:2, 1027:19, 1028:5, 1028:16, 1029:3, 1029:21

**multiple** [1] - 943:21

**multiplied** [1] - 944:4

**multiply** [1] - 943:6

**must** [3] - 871:24, 910:20, 921:16

## N

**name** [9] - 854:13, 854:14, 856:13, 860:15, 964:10, 964:11, 990:17, 994:3, 1007:4

**named** [1] - 889:14

**names** [4] - 858:9, 861:9, 861:23, 925:8

**narrative** [1] - 1014:15

**narrow** [1] - 1023:25

**nation** [1] - 1020:4

**native** [1] - 923:1

**naturally** [1] - 951:2

**nature** [3] - 847:8, 939:23, 1021:21

**nearly** [1] - 916:14

**necessarily** [3] - 912:3, 912:12, 1005:21

**necessary** [2] - 867:12, 1015:17

**necessity** [1] - 884:20

**need** [3] - 845:18, 854:24, 855:10, 856:11, 864:25, 867:3, 889:25, 899:15, 908:24, 908:25, 909:2, 917:2, 921:3, 941:15, 943:16, 955:5, 957:15, 961:19, 961:20, 964:8, 964:9, 964:10, 964:11, 964:16, 966:15, 972:2, 983:10, 985:4, 1001:8, 1002:10, 1004:5, 1010:15, 1015:14, 1017:19, 1023:16, 1030:21

**needed** [14] - 897:15, 909:19, 918:24, 921:10, 922:4, 949:25, 950:23, 952:4, 961:7, 973:24, 976:24, 982:23, 991:10

**needing** [3] - 893:22, 950:8

**needs** [4] - 854:15, 959:14, 960:12, 969:4

**negative** [6] - 903:24, 981:3, 981:4, 981:6, 981:7, 1015:24

**negatively** [1] - 898:24

**neglected** [1] - 959:12

**neighborhood** [1] - 1008:20

**net** [1] - 911:8

**never** [34] - 846:22, 846:23, 876:14, 879:12, 892:8, 892:9, 900:15, 900:19, 914:20, 914:21, 916:5, 918:25, 921:5, 921:14, 931:14, 946:9, 949:2, 967:7, 968:14, 968:15, 978:20, 982:20, 982:25, 988:15, 1000:5, 1008:8, 1008:9, 1008:10, 1009:20, 1009:24, 1010:1, 1010:6, 1011:4, 1011:8

**nevertheless** [1] - 1009:17

**new** [7] - 883:13, 927:1, 927:2, 959:16, 974:25, 989:17

**NEW** [1] - 842:1

**New** [4] - 842:5, 842:21, 843:9

**news** [1] - 965:7

**newspaper** [1] - 987:8

**next** [20] - 852:5, 852:11, 853:19, 861:16, 870:3, 894:19, 894:21, 902:10, 910:20, 924:6, 941:24, 952:13, 958:24, 959:5, 965:3, 966:16, 980:2, 992:9, 998:11, 1019:19

**nice** [5] - 866:3, 893:4, 965:7, 980:7, 986:10

**nicest** [1] - 1008:25

**nickel** [1] - 1001:11

**night** [9] - 844:9, 844:13, 872:25, 879:17, 879:18, 934:6, 1027:4, 1031:1, 1031:8

**night's** [1] - 1018:10

**nilly** [1] - 993:9

**nine** [6] - 851:22, 852:1, 923:25, 924:15, 1000:7, 1000:8

**nitpicking** [1] - 1018:21

**nobody** [14] - 921:9, 924:4, 952:2, 956:20, 957:12, 972:25, 973:15, 979:6, 979:23, 985:5, 985:6, 985:7, 986:1, 1016:22

**nobody's** [1] - 956:6

**node** [2] - 908:22, 964:15

**none** [10] - 901:8, 919:13, 921:8, 931:9, 951:23, 951:24, 979:4, 979:5, 984:24, 985:8

**nonsense** [1] - 991:15

**nonworking** [1] - 995:16

**noon** [1] - 854:9

**normal** [6] - 904:21, 904:24, 910:11, 910:12, 910:13, 910:15

**normally** [2] - 881:7, 904:18

**North** [1] - 852:18

**note** [29] - 851:18, 853:20, 853:22, 890:4, 890:9, 891:22, 891:25, 892:1, 912:2, 914:1, 917:10, 917:14, 917:24, 917:25, 918:7, 918:23, 918:24, 919:10, 923:14, 924:9, 949:12, 961:24, 966:12, 995:2, 999:22, 1000:6, 1026:7, 1029:7

**noted** [1] - 970:2

**notes** [8] - 927:15, 954:25, 960:3, 960:4, 960:5, 962:24, 999:23

**nothing** [12] - 913:14, 913:24, 935:4, 936:14, 945:12, 946:5, 956:19, 956:20, 975:5, 988:23, 999:4, 1012:14

**nothing's** [1] - 956:5

**notice** [15] - 858:10, 860:9, 860:11, 918:21, 919:17, 924:1, 924:16, 990:14, 992:6, 995:14, 995:16, 996:1, 1024:7,

1028:20, 1029:5

**noticed** [3] - 954:24, 975:20, 1007:15

**notification** [12] - 857:22, 858:22, 860:4, 860:17, 861:4, 861:5, 861:8, 861:12, 861:18, 862:3, 923:3, 924:13

**notifications** [3] - 858:25, 859:4, 861:21

**notified** [26] - 857:23, 858:9, 858:17, 859:8, 860:25, 861:11, 876:6, 876:8, 876:10, 876:12, 918:11, 918:12, 918:17, 922:22, 922:23, 923:10, 923:22, 923:23, 924:2, 924:3, 924:5, 924:10, 924:18, 924:25, 1021:2, 1021:8

**notify** [1] - 890:14

**notwithstanding** [2] - 1031:5, 1031:19

**November** [44] - 898:18, 900:13, 903:22, 904:16, 907:14, 910:11, 917:19, 921:13, 925:6, 927:13, 945:7, 955:14, 955:22, 957:18, 957:25, 958:22, 959:2, 959:9, 960:3, 961:10, 961:11, 962:3, 962:22, 963:20, 969:1, 980:1, 989:17, 989:22, 991:19, 993:6, 993:22, 994:11, 1019:11, 1019:13, 1019:17, 1020:2, 1020:9, 1021:7, 1021:19, 1022:25, 1024:18

**number** [25] - 854:14, 855:12, 857:3, 858:1, 893:15, 896:17, 906:8, 913:5, 922:9, 942:23, 943:21, 944:5, 953:3, 961:9, 968:10, 969:9, 975:20, 985:7, 988:17, 989:3, 1008:19, 1009:4, 1018:6, 1028:2

**Number** [4] - 996:3, 1008:16, 1008:18

**numbers** [22] - 856:4, 857:16, 857:17, 858:6, 870:14, 895:3, 906:16, 924:19, 952:20, 975:23, 981:4, 981:6, 981:7, 986:13, 986:16, 986:17, 986:19, 987:6, 999:5

**numerous** [2] - 873:18, 920:8

**nurse** [6] - 847:16, 848:2, 848:3, 850:21, 908:16

**nurses** [1] - 851:1

## O

**o'clock** [8] - 879:17, 879:18, 928:14, 1003:8, 1016:19, 1018:11, 1023:7, 1031:22

**OA** [4] - 853:23, 857:3, 857:9, 923:19

**OA's** [1] - 927:17

**OAs** [1] - 853:22

**object** [8] - 863:20, 883:7, 937:11, 942:10, 945:10, 945:25, 960:8, 999:6

**objecting** [1] - 847:6

**objection** [5] - 850:10, 853:13, 855:17, 856:19, 886:22

**objections** [2] - 938:6, 946:2

**objectively** [1] - 884:22

**obligation** [4] - 847:4, 890:9, 914:23, 919:11

**obligations** [1] - 846:13

**obviously** [1] - 1031:14

**occasion** [2] - 861:9, 1011:2

**occasions** [2] - 857:14, 932:14

**occurred** [6] - 921:9, 938:17, 942:25, 971:7, 1003:10, 1018:15

**occurs** [1] - 893:2
**October** [10] - 848:11, 887:14, 887:15, 888:2, 908:12, 917:21, 956:5, 994:11, 1018:25, 1019:4
**odd** [1] - 1022:25
**OF** [4] - 842:1, 842:11, 842:14, 1034:2
**of..** [1] - 923:17
**offer** [4] - 853:9, 896:25, 920:5, 984:11
**offering** [1] - 983:24
**OFFICE** [1] - 842:14
**office** [5] - 851:13, 906:25, 959:8, 969:7, 969:11
**officer** [2] - 884:21, 987:5
**officers** [2] - 847:4, 897:20
**Official** [1] - 843:11
**offing** [1] - 1020:23
**offsetting** [1] - 950:14
**often** [1] - 1031:3
**Ohio** [2] - 959:19, 959:23
**old** [3] - 921:18, 972:17, 1031:5
**once** [13] - 864:5, 887:17, 890:4, 891:15, 897:12, 899:8, 917:24, 918:24, 937:2, 962:14, 967:12, 969:2, 1019:12
**one** [119] - 845:4, 845:5, 845:23, 847:17, 850:7, 851:3, 853:6, 854:22, 858:14, 859:7, 860:13, 866:5, 866:22, 867:9, 870:13, 872:25, 873:3, 873:5, 873:6, 874:3, 874:12, 874:15, 879:18, 883:21, 884:3, 885:16, 887:6, 889:7, 891:20, 900:14, 901:7, 901:23, 901:24, 902:7, 903:4, 904:15, 908:14, 910:13, 910:18, 911:6, 912:5, 918:15, 918:16, 920:21, 922:3, 922:18, 922:19, 924:6, 924:7, 924:14, 924:23, 925:4, 925:24, 926:17, 928:10, 928:14, 932:1, 934:1, 937:23, 939:6, 939:15, 941:24, 943:25, 948:7, 953:25, 955:9, 955:12, 957:18, 958:7, 962:6, 963:6, 964:13, 968:17, 972:3, 972:6, 972:21, 973:5, 973:15, 974:16, 974:17, 979:18, 983:4, 983:7, 984:7, 984:10, 984:17, 984:24, 985:6, 985:11, 986:15, 986:23, 987:6, 988:12, 990:5, 991:20, 993:5, 993:25, 994:24, 995:23, 996:7, 997:5, 998:4, 999:17, 1001:2, 1008:22, 1008:25, 1011:1, 1011:5, 1011:13, 1012:17, 1014:9, 1018:23, 1024:2, 1024:19
**one's** [2] - 946:2, 995:25
**one-for-one** [1] - 854:22
**one-half** [1] - 1012:17
**one-third** [1] - 943:25
**ones** [9] - 946:19, 959:5, 963:2, 963:3, 970:25, 971:1, 990:5, 1018:2
**ongoing** [1] - 921:13
**oo0oo** [1] - 930:3
**open** [6] - 844:1, 909:11, 927:8, 927:9, 930:5, 945:23
**opening** [4] - 863:13, 964:13, 966:2, 990:15
**operated** [1] - 1002:7
**operating** [1] - 959:15
**operation** [6] - 957:13, 965:23, 968:25, 978:20, 991:22, 993:15
**opined** [1] - 979:22
**opinion** [2] - 917:24, 966:14
**opportunity** [8] - 844:22, 864:20,

880:19, 891:10, 894:8, 932:17, 978:18, 1018:5
**optimistic** [1] - 1002:20
**option** [1] - 942:6
**options** [7] - 916:5, 942:5, 946:18, 946:20, 964:8, 964:9, 999:3
**oral** [6] - 898:1, 938:4, 947:12, 1004:22, 1004:25, 1005:1
**order** [12] - 872:2, 897:15, 900:8, 901:19, 938:21, 949:6, 977:4, 997:12, 997:16, 1010:19, 1011:20, 1026:19
**Ording** [13] - 912:19, 912:22, 912:24, 912:25, 921:5, 921:23, 926:17, 950:22, 960:22, 986:15, 986:18, 991:2
**Ording's** [3] - 991:2, 991:4
**organization** [10] - 853:3, 894:9, 895:24, 921:4, 982:4, 983:3, 983:6, 984:2, 993:12, 994:3
**organizations** [1] - 1010:25
**organize** [1] - 1029:24
**organized** [1] - 894:11
**otherwise** [14] - 863:24, 866:21, 866:24, 871:25, 884:4, 891:17, 898:11, 955:24, 968:11, 969:4, 998:9, 1017:5, 1019:6, 1020:13
**ourselves** [2] - 984:21, 999:16
**outgoing** [1] - 902:5
**outside** [7] - 851:18, 855:24, 862:25, 904:23, 930:5, 1003:10, 1018:15
**overall** [1] - 896:12
**overboard** [1] - 905:12
**overhire** [1] - 855:1
**overly** [1] - 1002:20
**overpaid** [2] - 911:8, 1002:6
**overpriced** [1] - 973:23
**overview** [2] - 857:3, 892:16
**overwhelming** [1] - 906:23
**owe** [3] - 913:19, 949:18, 949:19
**owed** [1] - 988:6
**own** [10] - 928:11, 957:12, 966:11, 966:21, 967:8, 970:4, 972:9, 980:16, 983:22, 1005:8
**owned** [2] - 948:3, 1016:1
**owner** [3] - 856:14, 860:8, 907:3

**P**

**P.C** [2] - 842:14, 842:18
**package** [4] - 855:24, 858:2, 977:16, 981:9
**Package** [1] - 859:17
**packages** [2] - 973:8, 970:21
**pact** [1] - 995:14
**page** [14] - 848:9, 849:7, 850:15, 857:20, 882:1, 883:9, 902:10, 904:2, 910:20, 929:10, 958:24, 992:9, 998:11, 1019:19
**Page** [9] - 851:21, 857:21, 866:22, 867:13, 867:16, 873:4, 994:25, 1018:25, 1019:7
**PAGE** [2] - 1033:3, 1034:4
**pages** [2] - 861:15, 883:8, 902:7
**paid** [58] - 893:11, 895:14, 896:20, 910:17, 910:22, 910:24, 911:2, 913:16, 913:17, 913:19, 913:24, 946:17,

948:11, 948:17, 950:11, 951:6, 960:23, 963:20, 964:22, 965:2, 965:3, 965:5, 965:8, 966:7, 972:14, 974:3, 976:4, 976:21, 977:21, 978:1, 981:2, 984:3, 984:5, 991:9, 996:25, 997:15, 997:24, 998:1, 998:2, 998:4, 998:6, 998:17, 1000:4, 1012:13, 1012:17, 1016:11, 1020:20, 1021:3, 1024:18, 1025:21, 1025:23, 1026:2, 1026:3, 1026:5
**pal** [1] - 980:6
**panic** [1] - 1014:3
**paper** [1] - 999:3
**papers** [5] - 879:13, 879:19, 931:10, 968:2, 968:4
**paperwork** [4] - 880:20, 899:9, 904:17, 917:18
**paragraph** [2] - 854:11, 904:2
**paragraphs** [1] - 854:20
**pardon** [1] - 844:14
**Parrish** [8] - 847:16, 848:1, 848:9, 849:20, 852:10, 906:10, 906:12, 1033:5
**part** [40] - 845:2, 846:15, 848:18, 862:14, 900:7, 910:8, 917:4, 917:5, 917:6, 918:19, 919:10, 919:11, 923:11, 923:13, 924:18, 924:20, 924:21, 924:25, 925:21, 930:25, 932:6, 936:3, 941:13, 945:22, 946:14, 946:15, 947:2, 947:3, 949:20, 952:25, 953:3, 958:6, 966:13, 986:22, 988:25, 1007:13, 1014:1, 1014:5, 1022:6, 1026:1
**participating** [1] - 915:13
**particular** [7] - 861:12, 869:13, 872:12, 877:24, 967:23, 1012:15, 1012:21
**parties** [4] - 883:2, 930:11, 953:24, 1004:24
**parting** [1] - 977:12
**partner** [4] - 852:16, 857:12, 959:12, 960:13
**parts** [1] - 955:11
**party** [4] - 879:25, 889:17, 959:8, 1013:19
**pass** [2] - 915:6, 915:13
**passion** [1] - 939:21
**past** [2] - 992:1, 1011:1
**pasted** [1] - 1014:21
**Patel** [1] - 857:15
**patient** [4] - 851:7, 852:1, 866:12, 907:4
**Patient** [1] - 851:18
**Paul** [2] - 1030:23, 1030:25
**pause** [2] - 846:9, 890:24
**pay** [31] - 854:23, 892:13, 899:10, 899:18, 900:1, 900:2, 904:4, 904:10, 909:22, 910:8, 910:12, 910:17, 910:25, 916:1, 931:8, 933:7, 944:15, 951:15, 952:7, 963:22, 965:3, 972:23, 978:22, 979:3, 979:5, 979:9, 981:5, 987:17, 997:23, 1010:25, 1021:20
**Pay** [1] - 920:2
**paycheck** [7] - 910:13, 910:15, 911:6, 952:8, 1024:19
**paychecks** [1] - 911:7
**paying** [7] - 913:17, 951:10, 954:25, 983:24, 1000:1, 1007:16, 1012:16
**payment** [2] - 858:4, 944:23
**payments** [4] - 975:3, 975:4, 1022:7,

1026:9
**payroll** [1] - 910:21
**PC** [1] - 959:8
**penalties** [1] - 915:22
**penalty** [7] - 915:6, 915:8, 915:13, 915:21, 949:14, 949:17
**penny** [1] - 855:7
**pension** [1] - 988:3
**people** [101] - 854:23, 855:5, 855:6, 855:7, 855:10, 856:7, 857:3, 858:2, 858:3, 893:3, 893:13, 893:24, 905:11, 913:5, 913:7, 916:21, 917:6, 922:7, 923:11, 923:22, 927:15, 927:18, 949:21, 957:20, 961:10, 962:6, 962:8, 962:14, 963:16, 965:8, 965:11, 965:13, 970:15, 972:4, 972:13, 972:22, 972:23, 973:6, 974:3, 974:5, 974:20, 978:11, 978:17, 978:23, 979:1, 979:4, 981:16, 983:8, 983:9, 983:17, 983:25, 984:6, 984:11, 984:16, 985:1, 985:15, 985:16, 986:1, 986:5, 986:6, 987:1, 988:3, 988:6, 988:12, 988:13, 989:6, 989:8, 989:14, 989:15, 989:21, 989:25, 990:6, 993:14, 993:19, 993:25, 994:7, 994:15, 994:24, 996:2, 999:17, 999:22, 1000:20, 1001:8, 1002:2, 1004:11, 1009:3, 1009:6, 1009:9, 1009:10, 1009:14, 1010:10, 1010:12, 1011:6, 1012:15, 1014:2, 1019:5, 1031:19
**per** [7] - 851:22, 852:1, 897:9, 897:17, 910:12, 941:25, 943:24
**percent** [13] - 904:8, 925:15, 943:24, 965:1, 965:4, 974:3, 976:3, 976:4, 981:18, 986:7, 998:19, 1000:20
**percentage** [1] - 943:25
**perfect** [1] - 865:19
**perfectly** [2] - 950:4, 974:2
**perform** [15] - 900:8, 900:11, 905:18, 906:19, 907:4, 907:19, 907:22, 908:1, 968:22, 968:23, 969:17, 977:24, 978:1, 1015:12, 1027:21
**performance** [11] - 884:21, 901:20, 901:21, 901:25, 905:21, 905:25, 910:2, 913:10, 921:8, 925:24, 952:2
**performed** [2] - 851:10, 906:4
**performing** [6] - 908:13, 909:10, 910:3, 913:1, 950:19, 993:17
**perhaps** [2] - 969:9, 979:8
**period** [21] - 848:10, 853:5, 860:11, 871:24, 910:12, 956:18, 957:6, 959:24, 961:22, 962:17, 964:2, 965:3, 966:9, 969:14, 1021:9, 1021:10, 1022:8, 1022:11, 1022:12, 1022:15
**permission** [1] - 964:25
**permitted** [1] - 1028:23
**person** [11] - 860:11, 905:13, 951:3, 968:11, 968:12, 982:20, 983:6, 984:1, 1014:16, 1015:7
**personal** [4] - 949:22, 959:4, 968:5, 1017:6
**personnel** [2] - 902:4, 991:7
**phone** [3] - 957:7, 970:22, 970:24
**phones** [1] - 989:15
**physician** [1] - 848:2
**physician's** [1] - 850:23
**pick** [2] - 985:3, 987:8

**picked** [1] - 926:15
**picture** [5] - 957:21, 957:24, 959:25, 1014:9
**piece** [1] - 908:6
**pieces** [1] - 844:22
**pile** [1] - 962:21
**pin** [1] - 931:22
**pity** [1] - 879:25
**place** [14] - 875:3, 876:16, 879:15, 887:3, 935:23, 975:1, 983:12, 1004:19, 1009:16, 1011:8, 1012:5, 1013:22, 1014:1, 1014:4
**placed** [17] - 887:8, 904:22, 931:24, 934:9, 966:3, 966:4, 1019:18, 1020:3, 1021:7, 1025:21, 1025:23, 1026:5, 1026:23
**places** [2] - 917:15
**placing** [2] - 965:9, 1028:6
**Plaintiff** [1] - 842:4, 842:14, 842:15, 842:19
**plaintiff** [40] - 862:10, 863:12, 864:14, 864:19, 866:24, 887:13, 889:8, 898:19, 900:11, 905:5, 909:7, 917:8, 965:14, 973:11, 1005:18, 1010:5, 1010:21, 1011:10, 1011:19, 1016:8, 1019:3, 1019:10, 1021:10, 1024:3, 1024:7, 1024:12, 1024:15, 1024:18, 1024:20, 1024:25, 1025:12, 1025:21, 1026:7, 1027:7, 1027:10, 1028:18, 1029:6, 1029:7, 1029:13
**PLAINTIFF** [1] - 1034:4
**Plaintiff's** [7] - 849:18, 849:20, 850:6, 853:9, 886:7, 899:4, 906:7
**plaintiff's** [25] - 863:13, 863:14, 864:24, 882:3, 882:22, 886:1, 886:10, 886:13, 886:18, 888:3, 898:18, 966:3, 969:20, 977:5, 997:11, 999:10, 1007:5, 1010:11, 1023:24, 1023:25, 1024:11, 1024:15, 1025:7, 1028:16, 1030:6
**Plaintiff's Exhibit** [20] - 850:11, 853:15, 854:4, 855:14, 855:18, 856:21, 859:11, 859:14, 903:2, 903:23, 904:20, 908:11, 917:14, 919:18, 927:11, 1034:5, 1034:7, 1034:9, 1034:11, 1034:13
**Plaintiff's Exhibits** [1] - 856:17
**plaintiffs** [1] - 894:9
**plan** [2] - 854:15, 928:11, 965:25, 1003:6
**planned** [1] - 927:1
**planning** [8] - 852:17, 852:19, 856:8, 861:11, 918:5, 919:20, 966:15, 993:24
**plans** [2] - 892:20, 988:3
**plant** [2] - 925:18, 925:19
**play** [3] - 915:10, 915:24, 959:7
**played** [1] - 1016:11
**playing** [2] - 957:25, 994:10
**plays** [1] - 957:23
**pleadings** [1] - 932:23
**pleasant** [1] - 985:5
**pleasure** [1] - 985:9
**plenty** [1] - 937:16
**PLLC** [1] - 843:7
**plugged** [1] - 870:12
**Plumeri** [62] - 895:6, 895:12, 895:13, 895:16, 895:17, 896:1, 896:5, 897:2,

897:8, 897:13, 897:18, 897:24, 897:25, 903:4, 903:7, 903:12, 903:19, 947:11, 947:12, 947:13, 948:9, 948:14, 948:19, 948:24, 949:3, 949:4, 949:5, 957:19, 957:25, 961:16, 961:24, 962:1, 963:3, 971:1, 976:15, 976:21, 977:18, 977:19, 977:22, 979:15, 979:18, 979:20, 979:25, 980:4, 980:5, 980:22, 981:1, 982:2, 989:23, 994:10, 997:1, 997:3, 997:6, 997:7, 997:22, 998:12, 998:16, 1004:17, 1004:25
**Plumeri's** [2] - 903:10, 980:11
**plural** [2] - 886:17, 886:18
**plus** [3] - 897:9, 897:17, 962:1
**podium** [1] - 953:18
**point** [23] - 869:10, 869:12, 885:17, 904:16, 907:11, 913:15, 914:9, 916:12, 917:24, 919:18, 921:9, 933:6, 942:1, 962:15, 969:12, 983:14, 993:15, 1012:12, 1016:1, 1019:17, 1027:7, 1030:17
**pointed** [2] - 901:6, 920:1
**points** [3] - 856:13, 980:7, 980:18
**police** [1] - 884:21
**policies** [1] - 904:24
**policy** [6] - 894:19, 903:16, 917:11, 917:12, 917:13, 919:25
**poo** [1] - 962:13
**pooed** [1] - 962:13
**populate** [1] - 858:6
**population** [3] - 927:7, 1009:1, 1009:2
**portion** [4] - 867:21, 904:3, 946:16
**position** [31] - 854:15, 870:8, 870:10, 871:6, 871:8, 871:15, 882:24, 883:3, 888:10, 888:16, 898:18, 900:8, 911:22, 914:17, 914:21, 914:22, 917:23, 919:13, 920:12, 926:19, 928:13, 950:18, 951:8, 964:5, 971:23, 1001:3, 1001:18, 1024:11, 1028:18
**position-to-return-to-work** [1] - 917:23
**positions** [4] - 852:24, 853:1, 855:7, 914:18
**possess** [1] - 896:21
**possible** [1] - 903:14
**possibly** [2] - 863:19, 865:14
**poster** [1] - 974:2
**practical** [1] - 880:16
**practice** [3] - 865:8, 904:21, 904:25
**practitioner** [2] - 850:21, 908:17
**Pratt** [1] - 843:3
**predict** [1] - 846:22
**preemployment** [1] - 894:19
**prejudice** [3] - 845:22, 889:9, 930:10
**prejudicial** [1] - 847:6
**prepare** [1] - 857:2
**prepared** [2] - 924:8, 993:5
**prepares** [1] - 924:7
**preparing** [3] - 856:6, 858:19, 974:12
**prepayment** [1] - 896:21
**preponderance** [7] - 867:19, 867:22, 868:3, 869:9, 878:8, 917:3, 973:9
**presence** [3] - 930:5, 1003:11, 1018:16
**present** [8] - 844:5, 862:15, 866:12, 883:7, 932:17, 940:19, 1003:17, 1019:1

(presentation - reason)                                                                                    Page 21

**presentation** [3] - 896:3, 896:5, 896:8
**presented** [7] - 866:7, 889:3, 895:20, 932:14, 974:15, 1007:24, 1031:10
**preserve** [1] - 890:2
**President** [1] - 950:6
**president** [10] - 914:21, 914:22, 926:19, 963:17, 981:25, 982:1, 982:8, 990:16, 991:3, 991:4
**pressure** [2] - 865:5, 1017:4
**pressures** [1] - 1017:6
**presumed** [1] - 1013:11
**pretty** [15] - 846:21, 846:24, 866:21, 893:16, 946:2, 966:7, 971:17, 976:10, 980:12, 983:11, 1008:24, 1015:25, 1020:13, 1023:6, 1023:10
**prevent** [1] - 950:7
**previous** [1] - 924:13
**previously** [4] - 856:24, 867:24, 871:20, 876:7
**price** [5] - 942:7, 942:24, 943:1, 983:23
**primary** [2] - 864:24, 885:21
**Primerica** [1] - 895:10
**print** [1] - 989:14
**pristine** [2] - 872:4, 1030:14
**privilege** [1] - 1007:7
**privileges** [1] - 898:17
**problem** [10] - 846:4, 867:10, 909:11, 925:15, 948:25, 958:13, 986:24, 1013:16, 1022:6
**problems** [8] - 880:5, 880:12, 905:20, 976:10, 986:21, 986:22, 987:9, 1001:24
**procedure** [1] - 948:13
**procedures** [1] - 904:24
**proceedings** [5] - 846:9, 863:8, 866:17, 890:16, 890:24
**Proceedings** [1] - 843:14
**process** [7] - 910:4, 937:4, 953:1, 953:6, 965:17, 967:17, 975:23
**processes** [1] - 989:19
**produce** [1] - 863:1
**produced** [7] - 843:14, 891:22, 892:1, 902:6, 974:6, 974:7, 995:1
**professional** [2] - 847:1, 847:9
**profit** [1] - 996:14
**program** [4] - 870:12, 904:9, 927:2, 975:17
**programs** [1] - 948:20
**prohibits** [1] - 898:9
**project** [1] - 914:2
**projects** [1] - 963:12
**Promenade** [1] - 1008:23
**proof** [21] - 863:12, 864:20, 866:22, 916:23, 916:24, 926:21, 956:3, 967:18, 967:25, 968:7, 970:4, 984:13, 988:24, 989:6, 1001:14, 1001:15, 1001:16, 1008:7, 1009:23, 1010:20, 1012:1
**proper** [2] - 952:1, 999:7, 1008:2
**properly** [2] - 966:22, 971:10
**property** [2] - 977:3, 1009:15
**proposal** [1] - 896:3
**propose** [3] - 876:19, 886:1, 886:5
**proposed** [2] - 844:22, 845:25
**proprietary** [1] - 997:21
**prosthetic** [2] - 907:12, 984:19
**protect** [6] - 972:11, 983:17, 983:22,

984:21, 1023:16, 1024:13
**protected** [7] - 917:22, 920:3, 920:11, 950:16, 972:7, 972:8, 1024:21
**protecting** [2] - 920:7, 961:14
**protection** [5] - 950:1, 950:23, 988:4, 1001:14, 1002:12
**prove** [10] - 878:8, 884:13, 908:8, 926:21, 926:22, 926:23, 973:8, 973:11, 1009:23, 1025:16
**proved** [3] - 867:18, 867:22, 973:8
**proven** [2] - 956:2, 1024:17
**proves** [3] - 868:3, 869:8, 1000:14
**provide** [8] - 845:11, 857:3, 862:3, 920:4, 951:12, 952:23, 1008:7, 1008:17
**provided** [3] - 858:8, 872:22, 923:13
**Provider** [1] - 1027:20
**provides** [3] - 904:1, 911:12, 920:4
**providing** [3] - 917:9, 924:22, 948:4
**proving** [1] - 868:9
**provision** [2] - 911:15, 1004:20
**publicly** [2] - 973:20, 987:7
**pull** [1] - 861:24
**punch** [1] - 1030:8
**punctual** [1] - 1007:12
**punitive** [12] - 874:21, 877:23, 877:25, 878:2, 878:4, 878:24, 879:1, 880:18, 880:24, 932:7, 937:5, 937:8
**purchase** [6] - 942:8, 943:1, 949:6, 977:4, 997:12, 997:16
**purpose** [5] - 892:11, 904:24, 949:21, 974:21, 981:12
**purposes** [2] - 894:3, 894:4
**pursuant** [1] - 1023:23
**put** [75] - 865:5, 871:19, 873:10, 877:20, 878:7, 880:13, 882:7, 882:21, 884:8, 885:20, 889:12, 900:2, 909:18, 919:12, 925:7, 925:8, 926:24, 933:20, 934:21, 937:5, 938:5, 944:2, 944:17, 950:17, 955:15, 955:22, 956:11, 957:12, 957:17, 958:15, 958:18, 960:16, 960:22, 962:3, 962:5, 964:18, 965:19, 965:24, 966:20, 967:2, 967:3, 967:6, 967:24, 968:14, 971:4, 971:12, 976:5, 976:7, 986:22, 989:21, 991:19, 992:4, 992:7, 993:3, 993:5, 993:21, 995:20, 995:23, 996:23, 999:8, 1008:9, 1011:24, 1012:8, 1012:19, 1013:4, 1013:5, 1014:16, 1015:15, 1015:16, 1019:4, 1025:7, 1025:18, 1029:25
**puts** [3] - 951:16, 963:18, 964:4
**putting** [6] - 856:4, 865:17, 878:13, 891:5, 933:22, 1025:1

## Q

**qualified** [21] - 898:11, 898:15, 898:21, 900:5, 900:12, 905:3, 908:7, 935:18, 938:8, 938:23, 968:9, 968:11, 969:5, 990:22, 991:5, 1024:12, 1026:21, 1026:24, 1027:8, 1030:19
**qualified immunity** [2] - 884:23, 884:25
**quantify** [1] - 936:15
**quarter** [7] - 853:7, 893:12, 893:13, 928:24, 929:8, 1002:16

**quarters** [2] - 893:9, 1014:19
**questioned** [3] - 961:21, 962:10, 983:1
**questionnaire** [1] - 850:23
**questions** [7] - 884:19, 884:24, 885:2, 983:25, 995:19, 1006:13, 1017:10
**quick** [2] - 861:17, 920:1
**quicker** [1] - 996:20
**quickly** [2] - 996:18, 999:9
**quite** [2] - 1008:14, 1025:10
**quote** [1] - 979:2
**quotes** [1] - 1000:12

## R

**racks** [1] - 986:5
**radiation** [1] - 956:18
**raised** [2] - 951:23, 951:24
**ran** [2] - 956:15, 1011:6
**random** [1] - 922:9
**ranking** [3] - 925:24, 925:25, 926:2
**ranks** [2] - 975:21, 975:22
**rarely** [1] - 1031:17
**rate** [2] - 943:23, 984:4
**rates** [1] - 999:4
**rationale** [1] - 849:24
**RDR** [1] - 843:11
**reach** [3] - 881:1, 947:12, 1011:20
**reaches** [1] - 981:7
**reaction** [1] - 1000:21
**Read** [1] - 1033:5
**read** [24] - 845:2, 847:13, 851:25, 853:18, 854:10, 854:20, 870:25, 906:11, 923:18, 923:20, 923:25, 924:12, 956:25, 969:8, 973:3, 994:9, 994:22, 994:23, 1004:20, 1005:10, 1006:17, 1007:19, 1012:22, 1033:6
**Read-in** [1] - 1033:5
**read-in** [1] - 1033:6
**reading** [5] - 846:16, 862:7, 900:18, 922:12, 1018:11
**ready** [4] - 905:10, 1023:21, 1030:10, 1030:22
**reaffirms** [1] - 964:19
**real** [6] - 861:17, 884:23, 894:2, 919:25, 966:15, 989:6
**realignment** [1] - 852:25
**reality** [1] - 854:22
**realize** [3] - 877:12, 1004:9, 1017:18
**reallocate** [1] - 950:20
**really** [36] - 847:8, 884:14, 884:20, 893:1, 895:18, 901:20, 909:15, 909:23, 912:13, 917:21, 918:21, 924:20, 927:22, 932:2, 932:25, 934:12, 935:16, 936:21, 936:22, 946:25, 947:4, 955:1, 956:21, 961:25, 967:16, 975:25, 981:15, 982:15, 986:23, 990:6, 1008:15, 1008:19, 1011:23, 1012:6, 1013:18, 1014:4
**rearing** [1] - 972:10
**reason** [26] - 851:2, 865:13, 869:13, 872:8, 883:11, 883:25, 884:23, 891:17, 892:7, 899:20, 909:18, 914:12, 916:13, 930:19, 930:24, 950:23, 953:3, 956:21, 967:14, 967:15, 979:8, 993:16, 1001:1, 1006:2, 1025:3, 1028:19

Case 1:17-cv-04869-FB-LB   Document 146-2   Filed 03/08/21   Page 216 of 222 PageID #:
8814
*(reasonable - restore)*                                                                          Page 22

**reasonable** [6] - 884:22, 968:13, 968:16, 968:20, 968:21, 968:24

**reasons** [20] - 869:20, 878:13, 889:4, 903:4, 932:15, 954:1, 956:1, 971:4, 973:22, 974:1, 974:18, 979:10, 984:7, 985:10, 994:19, 994:20, 996:7, 1001:1, 1001:2

**rebut** [1] - 864:22

**REBUTTAL** [1] - 1034:16

**rebuttal** [9] - 864:21, 940:14, 941:5, 1003:4, 1004:14, 1006:20, 1006:21, 1006:24

**Rebuttal** [1] - 1034:20

**receive** [2] - 861:9, 921:16

**received** [29] - 850:11, 853:15, 855:18, 856:13, 856:21, 859:14, 859:19, 859:20, 860:15, 912:7, 920:24, 942:2, 944:4, 944:23, 946:15, 946:20, 947:1, 958:21, 961:2, 963:24, 964:21, 1022:7, 1026:8, 1027:12, 1034:5, 1034:7, 1034:9, 1034:11, 1034:13

**receiver** [1] - 915:7

**receives** [1] - 963:22

**receiving** [3] - 858:2, 904:9, 959:10

**recent** [1] - 942:24

**recess** [3] - 866:17, 890:16, 929:9

**Recess** [1] - 1003:14

**recognition** [1] - 1031:20

**recollection** [1] - 1018:7

**recommendation** [1] - 994:4

**reconstructive** [2] - 909:1, 909:2

**reconvene** [4] - 863:9, 890:12, 928:20, 928:24

**record** [40] - 845:15, 845:21, 872:19, 880:22, 881:4, 881:13, 881:14, 887:7, 887:11, 888:8, 888:11, 888:13, 888:17, 889:2, 889:4, 889:7, 889:13, 889:20, 934:17, 937:13, 942:11, 945:12, 956:2, 963:2, 969:7, 971:1, 972:3, 996:24, 1017:23, 1022:7, 1023:13, 1023:17, 1023:20, 1029:20, 1030:23, 1030:25, 1031:6, 1031:7, 1031:18

**recorded** [1] - 843:14

**records** [5] - 962:20, 966:6, 1020:18, 1030:12

**recover** [1] - 967:10

**recovery** [5] - 904:1, 906:21, 959:6, 969:16, 969:18

**red** [3] - 896:16, 922:18, 927:16

**redactions** [1] - 860:1

**redirect** [1] - 856:15

**reduce** [2] - 909:22, 989:2

**reduced** [7] - 870:13, 899:8, 900:2, 911:6, 914:20, 951:6, 1025:25

**reducing** [4] - 872:5, 883:9, 899:18, 922:5

**reduction** [43] - 852:21, 867:23, 868:4, 868:10, 869:9, 869:18, 869:20, 871:9, 872:8, 883:11, 883:15, 883:25, 890:6, 892:24, 893:1, 893:9, 912:10, 912:17, 912:25, 913:3, 913:13, 916:25, 917:4, 918:5, 918:8, 918:19, 922:16, 923:12, 923:13, 924:18, 924:25, 925:7, 925:22, 926:3, 927:21, 931:8, 933:11, 934:24, 952:7, 965:1, 983:15, 983:16, 1025:25

**reductions** [4] - 853:4, 921:25, 927:4,

975:10

**refer** [1] - 869:13

**reference** [4] - 857:8, 866:20, 1018:25, 1020:17

**referenced** [2] - 850:9, 856:1

**referring** [2] - 853:24, 874:7

**reflect** [5] - 888:20, 1030:23, 1030:25, 1031:6, 1031:7

**reflecting** [1] - 947:1

**reflects** [1] - 1022:7

**refresh** [1] - 1018:7

**refute** [1] - 1007:23

**regard** [1] - 1001:2

**regarding** [1] - 897:19

**regards** [2] - 898:16, 1028:16

**registered** [3] - 847:16, 848:1, 848:3

**regular** [6] - 881:6, 906:19, 907:19, 907:21, 969:17, 1009:15

**regularly** [1] - 850:22

**regulated** [1] - 987:7

**regulation** [8] - 868:7, 869:12, 870:1, 870:22, 870:24, 871:12, 882:24, 972:3

**rehab** [1] - 901:7

**rehire** [3] - 854:23, 893:3, 893:14

**Rehire** [1] - 855:3

**reinstate** [3] - 890:10, 918:24, 949:11

**reinstated** [2] - 923:14, 972:7

**reinstatement** [9] - 868:17, 868:22, 869:15, 871:5, 871:10, 871:22, 872:1, 917:8, 971:21

**reinvested** [1] - 975:15

**reiterate** [1] - 1007:10

**relate** [1] - 878:3

**related** [2] - 857:23, 894:21

**relates** [2] - 845:20, 872:12

**relations** [1] - 852:18

**relationship** [1] - 895:5

**released** [2] - 876:11, 963:21

**relevant** [2] - 892:18, 942:21

**relies** [1] - 1028:18

**rely** [4] - 906:5, 906:17, 909:3, 969:21

**relying** [1] - 1028:7

**remaining** [3] - 865:1, 903:14, 943:23

**remains** [2] - 880:15, 927:7

**remarks** [3] - 863:15, 866:11, 1005:7

**remedies** [1] - 949:18

**remedy** [1] - 879:5

**remember** [23] - 891:23, 893:7, 896:1, 905:8, 913:4, 917:1, 923:5, 927:8, 945:14, 948:1, 949:5, 957:21, 959:19, 961:23, 976:9, 977:7, 977:24, 981:1, 981:24, 987:16, 987:19, 993:12, 993:23

**remind** [1] - 994:22

**reminds** [1] - 990:5

**remiss** [1] - 996:21

**remittitur** [1] - 884:11

**remote** [13] - 881:20, 885:19, 885:23, 886:7, 886:12, 930:14, 931:1, 931:12, 933:23, 935:1, 936:14, 1024:4

**remove** [1] - 892:10

**removed** [1] - 905:22

**render** [1] - 954:6

**renegotiated** [1] - 975:12

**renegotiating** [1] - 1001:11

**renowned** [1] - 964:14

**rent** [1] - 1009:11

**repair** [1] - 959:5

**repeat** [1] - 864:24

**replace** [2] - 855:6, 928:12

**replaced** [1] - 871:5

**replacement** [6] - 854:22, 928:4, 928:8, 982:5, 990:16, 1011:7

**reply** [3] - 962:7, 962:14, 963:15

**report** [6] - 853:10, 858:23, 901:24, 987:12, 993:24, 999:21

**reported** [1] - 902:2

**Reporter** [2] - 843:11, 843:11

**reporter** [1] - 847:19

**reporters** [1] - 1031:16

**reporting** [2] - 901:11, 987:9

**reports** [6] - 959:11, 959:13, 960:12, 962:9, 963:12, 978:4

**represent** [2] - 861:6, 980:18

**representation** [2] - 874:19, 970:2

**represented** [4] - 873:15, 873:18, 959:21, 976:21

**reputation** [1] - 939:16

**request** [6] - 869:15, 917:15, 968:16, 968:17, 968:18, 1028:13

**requested** [8] - 868:21, 872:1, 887:16, 968:12, 968:24, 1000:5, 1006:5, 1006:6

**requesting** [1] - 868:16

**requests** [1] - 968:14

**require** [1] - 896:16

**Required** [1] - 884:5

**required** [4] - 898:20, 931:24, 934:8, 965:17

**requirement** [2] - 955:19, 955:20

**requirements** [2] - 955:18, 968:17

**requires** [2] - 914:15, 971:21

**requisitions** [1] - 927:8

**reserve** [5] - 880:17, 881:1, 932:16, 1023:20, 1029:15

**resignation** [1] - 861:25

**resignations** [1] - 858:3

**resigned** [1] - 859:24

**resolve** [3] - 916:11, 921:6, 955:5

**resonates** [1] - 864:8

**Resources** [1] - 991:5

**respect** [9] - 887:12, 898:12, 938:3, 967:11, 967:24, 968:6, 1014:22, 1015:11, 1019:8

**respectful** [1] - 921:20

**responds** [4] - 899:7, 920:25, 921:1, 921:7

**response** [2] - 899:14, 1013:3

**responsibile** [1] - 1017:7

**responsibilities** [8] - 847:9, 899:1, 899:17, 900:19, 900:25, 909:21, 911:17, 916:4

**Responsibilities** [1] - 920:10

**responsibility** [4] - 847:3, 891:12, 985:20, 986:12

**rest** [7] - 849:7, 891:15, 965:5, 986:8, 997:14, 1016:14

**rested** [1] - 862:24

**restoration** [4] - 869:24, 872:2, 882:25, 883:1

**restore** [8] - 882:23, 883:3, 883:4, 891:22, 914:16, 914:23, 917:25, 1000:13

**restored** [8] - 911:21, 911:24, 912:3, 914:19, 919:1, 919:12, 920:12, 920:14
**restoring** [2] - 1024:6, 1028:17
**restricted** [3] - 943:3, 946:18, 946:20
**restriction** [1] - 907:9
**restrictions** [5] - 876:6, 876:12, 907:24, 949:13, 1029:6
**restructure** [2] - 916:2, 932:9, 933:20
**restructured** [2] - 871:6, 871:15
**Restructured** [1] - 871:14
**restructuring** [6] - 869:23, 869:24, 871:11, 893:10, 912:22, 1012:3
**rests** [2] - 862:11, 866:23
**result** [3] - 927:5, 931:25, 947:23
**resulted** [1] - 1010:21
**results** [1] - 853:1
**retain** [2] - 855:12, 904:19
**retaliation** [1] - 919:5
**rethink** [1] - 1004:6
**retire** [1] - 915:18
**retirement** [1] - 966:15
**retroactively** [1] - 888:5
**return** [31] - 848:13, 848:23, 849:4, 849:22, 852:4, 876:5, 876:10, 892:3, 894:25, 896:22, 913:12, 913:22, 914:6, 917:23, 918:20, 919:18, 919:20, 921:2, 921:16, 941:12, 951:4, 951:7, 992:6, 992:7, 995:1, 996:1, 1014:5, 1024:7, 1028:20, 1029:5, 1029:6
**Return** [2] - 1013:2, 1014:6
**return-to-work** [2] - 913:22, 918:20
**Return-To-Work** [2] - 1013:2, 1014:6
**returned** [3] - 913:25, 917:9, 949:12
**returning** [3] - 919:22, 923:16, 951:21
**returns** [1] - 914:5
**revenue** [4] - 896:17, 943:15, 944:3, 944:14
**reversed** [1] - 883:20
**review** [1] - 901:21
**reviewed** [1] - 849:16
**reviews** [1] - 952:3
**revised** [5] - 866:18, 866:19, 890:18, 937:16, 1018:21
**revisions** [1] - 937:24
**revoke** [3] - 885:17, 885:25, 886:10
**revoked** [4] - 873:6, 873:10, 878:7, 955:25
**Revoking** [1] - 1024:3
**revoking** [3] - 886:13, 886:17, 1024:8
**Rhonda** [10] - 889:10, 902:5, 902:8, 917:25, 918:9, 959:12, 960:2, 960:7, 964:6, 995:11
**rid** [9] - 896:16, 925:15, 973:12, 979:19, 979:24, 980:3, 989:4, 1002:6, 1013:10
**ridiculous** [1] - 895:17
**RIF** [33] - 868:17, 868:21, 892:24, 894:2, 912:14, 914:24, 915:2, 915:16, 915:17, 916:16, 919:16, 921:13, 922:24, 924:21, 927:24, 981:10, 981:14, 984:12, 984:13, 987:2, 987:4, 987:14, 987:17, 988:20, 990:4, 998:18, 1008:2, 1008:4, 1011:25, 1014:5, 1014:16
**RIFs** [1] - 893:6, 981:15, 1014:18
**right-hand** [1] - 1015:5

**Rights** [1] - 882:25, 920:9
**rights** [4] - 882:25, 912:6, 915:20, 1024:6
**rise** [8] - 846:10, 866:15, 890:25, 928:25, 940:17, 1003:9, 1003:15, 1018:13
**risk** [1] - 951:18
**River** [1] - 1008:23
**road** [1] - 956:15
**Robin** [17] - 895:8, 912:19, 926:17, 950:22, 960:22, 961:8, 976:17, 977:18, 977:20, 977:21, 980:8, 986:14, 986:17, 991:2, 991:3, 991:4
**Robin's** [2] - 977:19, 980:16
**rocket** [1] - 938:6
**Rod** [1] - 977:25
**role** [9] - 852:16, 853:3, 854:16, 857:23, 921:18, 921:22, 994:4, 1010:7, 1010:16
**roles** [2] - 852:14, 852:24
**rolled** [1] - 975:8
**room** [2] - 926:22, 1017:22
**rotation** [7] - 893:1, 894:2, 912:10, 913:5, 916:17, 918:6, 927:21
**roughly** [3] - 896:4, 910:19, 998:7
**route** [1] - 993:7
**Row** [2] - 860:4, 860:10
**row** [2] - 861:18, 985:2
**rule** [3] - 1000:15, 1000:18, 1029:12
**Rule** [7] - 862:24, 881:14, 888:24, 890:1, 1023:13, 1023:14, 1023:23
**rules** [1] - 915:5
**ruling** [3] - 888:9, 888:14, 888:22
**run** [6] - 966:22, 971:10, 973:14, 973:25, 978:9, 1010:3
**running** [7] - 952:1, 956:16, 960:12, 972:24, 978:11, 1011:5
**runs** [1] - 1001:16
**rush** [1] - 1002:17
**rushing** [1] - 941:3

**S**

**sail** [1] - 1013:13
**sake** [1] - 1026:15
**salaries** [1] - 922:5
**salary** [41] - 898:25, 899:7, 899:8, 903:9, 910:11, 911:10, 913:10, 913:23, 914:3, 914:4, 914:21, 915:1, 920:14, 923:17, 926:19, 942:1, 943:11, 943:19, 952:9, 952:17, 952:24, 953:7, 973:25, 977:23, 977:24, 978:8, 978:16, 978:17, 980:25, 996:16, 996:17, 1001:4, 1012:11, 1012:16, 1012:17, 1019:15, 1021:3, 1024:18, 1025:24, 1025:25
**sale** [1] - 912:22
**sales** [19] - 895:25, 912:23, 928:5, 956:16, 982:1, 982:4, 982:13, 982:19, 983:2, 983:3, 983:5, 983:6, 983:7, 984:2, 989:19, 993:23, 994:2, 1002:1
**Sales** [4] - 960:25, 978:9, 989:9, 991:6
**San** [1] - 990:19
**sands** [1] - 932:20
**Santa** [1] - 959:7
**sat** [1] - 909:18

**satisfaction** [1] - 1016:21
**satisfied** [2] - 886:20, 917:9
**Saturday** [5] - 854:10, 887:16, 963:8, 968:1
**SAUL** [1] - 843:2
**save** [9] - 914:10, 914:11, 975:9, 977:1, 988:3, 994:1, 1013:10
**saved** [2] - 914:2, 987:18
**saving** [1] - 914:25
**savings** [9] - 893:14, 914:3, 915:1, 922:4, 922:8, 923:16, 923:17, 1002:7
**saw** [17] - 874:2, 896:2, 896:17, 920:8, 932:17, 944:22, 958:17, 958:18, 983:13, 984:1, 987:10, 988:12, 995:7, 997:5, 997:6, 997:8, 999:22
**scam** [1] - 983:17
**schedule** [3] - 896:18, 926:25, 966:17
**scheme** [1] - 983:17
**SCHOENECK** [1] - 843:7
**school** [2] - 906:19, 969:17
**science** [1] - 938:7
**scroll** [1] - 861:2
**scrutinized** [3] - 879:13, 879:18, 880:19
**seamlessly** [1] - 1031:10
**season** [1] - 989:21
**seat** [1] - 930:7
**seated** [7] - 844:2, 891:2, 929:2, 940:21, 1003:13, 1003:19, 1018:17
**seats** [1] - 985:4
**SEC** [1] - 987:8
**second** [25] - 845:23, 847:17, 850:7, 873:3, 873:5, 874:3, 876:23, 882:1, 883:6, 891:21, 900:10, 904:2, 908:25, 909:2, 919:11, 920:10, 965:22, 966:14, 987:22, 1007:5, 1024:5, 1024:12, 1027:14, 1028:10
**Second Circuit** [4] - 1024:24, 1025:20, 1025:22, 1027:5
**Section** [2] - 887:22, 888:7
**section** [4] - 870:18, 870:20, 894:19, 1014:14
**security** [7] - 949:24, 950:9, 951:12, 964:16, 1016:22
**see** [53] - 848:13, 852:6, 854:17, 872:12, 874:22, 879:19, 879:20, 883:13, 890:21, 906:15, 907:18, 910:7, 910:12, 922:13, 927:12, 929:8, 934:5, 937:9, 940:25, 941:6, 943:11, 954:6, 957:19, 958:1, 958:3, 961:9, 963:4, 970:2, 973:2, 973:4, 974:16, 976:13, 976:14, 980:19, 980:23, 987:8, 994:3, 997:22, 998:1, 998:11, 998:14, 998:20, 1003:8, 1005:2, 1007:14, 1012:4, 1014:3, 1018:3, 1018:11, 1030:11, 1031:22
**See** [1] - 856:10
**seeing** [1] - 897:7
**seek** [1] - 889:17
**select** [1] - 917:17
**selected** [3] - 913:7, 913:9, 917:7
**self** [1] - 854:18
**self-funding** [1] - 854:18
**sell** [2] - 946:22
**sells** [1] - 989:19
**seminar** [2] - 982:16, 982:18

(send - son's)

**send** [5] - 865:3, 906:24, 948:14, 989:14, 997:9
**sending** [3] - 962:23, 963:17, 970:25
**sends** [6] - 961:11, 965:6, 979:25, 980:4, 980:5, 991:21
**SENIOR** [1] - 842:12
**senior** [7] - 857:11, 914:22, 963:16, 982:1, 982:8, 990:15, 998:12
**sense** [16] - 865:6, 874:20, 876:13, 909:4, 918:22, 930:22, 963:15, 965:24, 970:10, 971:11, 972:19, 972:25, 1001:23, 1015:1, 1015:3, 1015:18
**sent** [20] - 855:20, 866:21, 877:21, 903:22, 904:15, 925:9, 948:9, 948:25, 962:6, 962:17, 962:21, 963:2, 963:3, 968:1, 968:4, 970:20, 995:17, 1013:1
**sentence** [1] - 870:24
**sentences** [1] - 867:18
**separate** [3] - 884:19, 884:24, 885:2
**September** [22] - 842:7, 887:8, 887:25, 888:4, 888:10, 905:8, 905:9, 908:10, 908:12, 941:23, 956:5, 956:23, 957:1, 957:25, 962:3, 962:22, 978:19, 991:19, 994:8, 998:2, 1032:1
**September's** [1] - 968:25
**serious** [5] - 888:1, 911:14, 957:13, 964:6, 972:9
**seriously** [1] - 978:16
**service** [4] - 866:1, 965:11, 1007:11, 1007:17
**serviced** [1] - 1009:9
**services** [2] - 896:21, 948:4
**set** [11] - 927:3, 979:16, 985:19, 1008:12, 1010:4, 1010:8, 1011:3, 1011:9, 1011:18, 1011:21, 1029:18
**sets** [2] - 931:25, 1010:20
**setting** [1] - 980:13
**seven** [3] - 982:20, 982:22, 982:23
**several** [7] - 917:12, 955:18, 956:1, 957:3, 959:22, 978:5, 999:20
**severance** [4] - 893:11, 977:16, 987:17, 1013:5
**Shah** [2] - 850:19, 850:20
**Shah's** [1] - 852:5
**shall** [1] - 1022:25
**sham** [2] - 973:11, 984:7
**shape** [3] - 958:4, 976:25, 994:13
**shaping** [1] - 932:12
**share** [1] - 930:9
**shareholder** [1] - 988:4
**shareholders** [1] - 988:2
**shares** [4] - 942:9, 942:23, 943:3, 946:20
**sharing** [1] - 856:6
**sharp** [1] - 984:1
**SHAWN** [2] - 842:14, 842:17
**Shearer** [39] - 845:1, 846:16, 847:13, 862:24, 864:14, 865:7, 866:24, 873:14, 873:19, 875:2, 876:16, 877:3, 885:15, 887:1, 889:16, 889:18, 890:19, 891:3, 928:14, 929:3, 930:7, 940:7, 940:22, 941:7, 953:11, 962:19, 976:6, 978:25, 979:17, 996:3, 1001:22, 1003:3, 1004:13, 1006:20, 1007:10, 1019:14, 1029:23, 1033:5, 1033:6
**SHEARER** [119] - 842:14, 842:17,

844:12, 844:15, 844:20, 845:3, 845:8, 847:15, 847:20, 848:1, 848:8, 849:18, 850:5, 850:8, 852:10, 852:13, 853:8, 853:11, 854:3, 854:6, 854:8, 855:14, 856:16, 859:10, 862:6, 862:10, 865:8, 867:4, 867:8, 867:13, 867:17, 867:21, 868:6, 868:15, 868:21, 869:1, 869:12, 869:22, 870:5, 870:21, 870:24, 871:1, 871:4, 871:11, 872:15, 873:20, 873:23, 874:1, 874:6, 874:13, 874:24, 875:4, 875:8, 875:11, 875:14, 875:21, 876:17, 876:21, 876:24, 877:8, 877:10, 877:15, 878:23, 879:3, 879:7, 879:11, 879:22, 880:6, 885:16, 885:23, 886:3, 886:7, 886:12, 886:14, 886:16, 886:19, 887:5, 889:19, 890:1, 890:8, 890:22, 891:5, 903:1, 928:17, 930:17, 931:6, 931:15, 933:3, 933:6, 933:13, 934:1, 935:3, 935:5, 935:7, 935:11, 935:20, 936:6, 936:19, 939:12, 939:25, 940:2, 940:9, 940:13, 940:16, 941:8, 942:12, 942:15, 942:23, 945:16, 946:8, 1019:17, 1020:1, 1020:5, 1020:10, 1021:22, 1021:25, 1023:2, 1023:4, 1030:13
**Shearer's** [2] - 890:13, 959:21
**Sheareri.......................** [1] - 1034:18
**Shearson** [2] - 895:11, 1011:2
**sheet** [14] - 866:19, 881:19, 886:25, 890:17, 929:4, 930:13, 933:15, 933:21, 934:19, 935:12, 937:24, 1013:16, 1018:21, 1023:9
**shift** [2] - 941:9, 952:2
**shifting** [1] - 932:20
**shirtless** [1] - 901:8
**shop** [1] - 989:14
**shore** [2] - 985:3, 988:9
**short** [16] - 875:17, 904:5, 904:7, 913:17, 913:23, 921:17, 931:7, 945:6, 952:8, 952:9, 963:24, 966:2, 966:8, 1016:24, 1021:20, 1030:16
**short-term** [10] - 875:17, 904:5, 904:7, 913:17, 913:23, 921:17, 931:7, 945:6, 952:8, 1021:20
**shorted** [1] - 952:17
**shortly** [3] - 964:18, 1007:20, 1018:23
**shot** [1] - 977:12
**show** [16] - 868:15, 869:14, 871:2, 871:25, 879:17, 901:1, 901:22, 917:2, 917:3, 922:14, 938:22, 941:20, 957:15, 963:10, 979:16, 979:17
**showed** [1] - 872:24, 946:11, 952:6, 952:10, 968:6, 979:17, 979:19, 988:12, 989:18, 993:1, 995:22
**showing** [1] - 894:4
**shown** [3] - 901:1, 974:9, 1009:11
**shows** [3] - 910:13, 948:16, 1013:19
**shut** [1] - 899:15
**shutdown** [2] - 925:18, 925:21
**shutting** [1] - 904:17
**sick** [10] - 892:9, 911:13, 950:3, 964:19, 1008:9, 1008:11, 1008:15, 1009:20, 1010:2, 1010:6
**side** [8] - 895:9, 895:11, 903:11, 927:22, 979:21, 980:2
**sides** [3] - 883:2, 911:23, 950:14
**sign** [1] - 949:4

**signature** [4] - 850:18, 852:5, 909:3, 920:9
**signatures** [1] - 1005:2
**signed** [14] - 849:16, 851:4, 851:5, 903:22, 906:9, 906:11, 950:6, 969:10, 969:11, 970:1, 986:5, 1004:24, 1031:3
**significance** [3] - 866:25, 883:14, 1000:8
**significant** [2] - 1008:18, 1009:8
**significantly** [1] - 1009:3
**signing** [1] - 908:19
**SIM** [1] - 995:14
**similar** [3] - 920:15, 971:18, 1024:25
**simple** [4] - 872:5, 883:7, 911:25, 980:6
**simpler** [1] - 1008:4
**simplest** [1] - 1008:1
**simply** [9] - 893:23, 906:22, 908:5, 908:20, 914:24, 923:15, 935:13, 947:15, 1008:14
**simultaneous** [2] - 874:14, 898:6
**single** [9] - 901:23, 901:24, 922:3, 928:10, 951:19, 969:14, 1007:14, 1025:3
**sit** [3] - 844:23, 847:20, 891:7
**site** [1] - 1008:19
**sits** [1] - 993:13
**sitting** [1] - 993:13
**situation** [8] - 852:23, 856:15, 859:22, 950:17, 951:20, 972:12
**situations** [2] - 863:23, 972:8
**six** [10] - 959:6, 960:11, 961:3, 961:7, 965:23, 997:23, 1007:16, 1012:6, 1013:5, 1021:4
**size** [1] - 975:25
**skill** [1] - 985:19
**skills** [1] - 900:8
**sleep** [1] - 1018:10
**sleeves** [1] - 975:8
**slight** [1] - 935:8
**slightly** [1] - 933:20
**slip** [1] - 992:8
**slower** [1] - 855:9
**small** [1] - 1000:20
**smaller** [1] - 975:23
**smart** [1] - 1012:3
**smooth** [1] - 1002:3
**so-called** [1] - 1014:24
**software** [4] - 990:19, 990:20, 990:21
**sold** [1] - 990:21
**sole** [1] - 904:24
**solely** [4] - 899:2, 906:5, 909:3, 909:20
**Solutions** [1] - 858:24, 859:3, 859:8, 904:12, 923:23, 924:5, 924:15
**someone** [10] - 858:17, 859:23, 869:13, 904:15, 926:1, 950:25, 951:1, 965:9, 983:9, 1001:5
**sometime** [2] - 983:20, 998:13
**sometimes** [7] - 863:18, 863:19, 880:10, 884:20, 884:22, 939:18, 1007:17
**somewhat** [1] - 1022:1
**Sommer's** [1] - 849:10
**son** [12] - 905:5, 957:6, 970:19, 977:8, 977:9, 977:12, 977:16, 1015:23, 1016:1, 1016:2
**son's** [1] - 957:11

**soon** [2] - 905:14, 979:15
**sorry** [10] - 860:2, 938:3, 938:20, 958:13, 963:21, 992:5, 995:9, 995:10, 1020:20
**sort** [8] - 867:1, 933:24, 937:7, 941:20, 942:20, 949:14, 950:22, 1022:10
**sorts** [1] - 935:23
**sound** [4] - 952:20, 965:8, 1003:6
**sounded** [1] - 997:13
**sounds** [3] - 849:23, 864:22, 987:20
**speaker** [2] - 985:17, 985:18
**speaking** [4] - 864:2, 926:25, 937:10, 982:18
**speaks** [1] - 982:16
**special** [1] - 855:24
**specific** [2] - 972:3, 1011:1
**specifically** [1] - 861:22
**specifics** [1] - 892:15
**specifies** [1] - 942:7
**speculate** [3] - 915:15, 929:6, 953:21
**speculated** [1] - 1000:24
**speculating** [1] - 1000:25
**speculation** [2] - 954:9, 1001:13
**speech** [1] - 971:18
**speeches** [1] - 956:14
**speed** [1] - 1031:19
**spend** [2] - 947:15, 949:6
**spent** [7] - 872:4, 883:8, 932:11, 948:18, 949:7, 973:10, 987:17
**spin** [1] - 928:8
**split** [1] - 977:7
**spouse** [1] - 949:23
**spread** [2] - 889:4, 1023:12
**spreadsheet** [1] - 923:1
**spreadsheets** [2] - 922:18, 925:4
**staff** [3] - 901:3, 904:16
**stage** [1] - 863:8
**Stamey** [7] - 959:16, 972:24, 974:7, 984:1, 984:4, 989:1, 1001:16
**stand** [9] - 847:21, 958:6, 970:14, 970:19, 973:18, 976:11, 988:13, 990:22, 1005:18
**stand-up** [1] - 976:11
**Standard** [1] - 855:21
**standpoint** [1] - 884:7
**start** [24] - 846:13, 853:17, 855:5, 855:20, 865:3, 866:7, 887:19, 888:10, 890:20, 898:3, 910:10, 917:17, 941:19, 951:10, 952:4, 974:21, 981:21, 983:9, 983:25, 1003:4, 1016:18, 1020:5, 1020:8, 1028:10
**started** [14] - 852:16, 905:14, 905:15, 914:5, 917:18, 925:7, 926:7, 945:6, 958:14, 967:4, 975:22, 977:8, 990:20, 1000:10
**starting** [1] - 970:6
**starts** [3] - 867:18, 920:22, 967:5
**state** [1] - 908:3
**statement** [10] - 856:10, 867:25, 868:1, 964:13, 970:5, 970:8, 990:15, 990:25, 991:1, 992:1
**statements** [5] - 863:14, 894:5, 966:2, 989:15, 1000:11
**states** [1] - 899:6
**status** [1] - 856:15
**statute** [4] - 925:16, 951:11, 971:19, 972:9
**statutes** [1] - 1014:20
**stay** [4] - 855:23, 904:4, 997:18, 998:9
**stayed** [6] - 855:11, 893:16, 978:15, 1000:2, 1011:11, 1028:19
**staying** [1] - 961:19
**stays** [1] - 957:1
**STD** [1] - 964:7
**stealing** [1] - 948:22
**steam** [1] - 966:16
**Steffen** [1] - 857:12
**stenography** [1] - 843:14
**step** [1] - 928:11
**Steps** [1] - 917:14
**steps** [1] - 982:4
**Steve** [12] - 855:25, 856:1, 859:16, 895:8, 905:7, 908:11, 922:19, 980:21, 995:15, 995:16, 1010:14
**STEVEN** [1] - 842:3
**Steven** [7] - 842:15, 844:4, 855:23, 889:8, 995:14, 996:3, 996:24
**still** [25] - 869:24, 871:10, 892:17, 904:10, 904:17, 907:12, 907:13, 913:1, 921:23, 926:8, 945:1, 964:1, 965:24, 982:2, 982:7, 984:25, 985:17, 987:13, 1008:13, 1009:20, 1009:24, 1011:5, 1026:3
**stock** [13] - 942:8, 943:3, 946:18, 946:20, 946:25, 947:3, 947:4, 964:9, 965:6, 987:9, 998:8, 998:24, 999:3
**stocks** [1] - 942:7
**stomach** [2] - 907:15, 907:16
**stood** [1] - 913:4
**stop** [9] - 872:3, 877:5, 878:15, 883:6, 950:7, 960:19, 991:21, 1015:14, 1022:4
**stopped** [5] - 967:3, 967:15, 967:16, 991:22, 998:14
**stories** [2] - 906:7, 910:16
**story** [3] - 891:9, 895:5, 976:13
**straightforward** [1] - 976:10
**strange** [1] - 876:20
**Street** [6] - 842:20, 843:3, 895:7, 989:23, 989:24
**stress** [1] - 967:9
**strict** [1] - 868:23
**strike** [1] - 1009:7
**strong** [1] - 864:1
**structure** [2] - 881:15, 901:3
**stub** [2] - 910:17, 910:25
**stubs** [2] - 910:8, 944:15
**stuff** [7] - 903:10, 936:18, 960:20, 979:20, 980:1, 991:15, 997:9
**style** [2] - 909:12, 995:5
**subject** [3] - 855:25, 897:5, 897:24
**submit** [1] - 901:17
**submitted** [1] - 858:8, 858:18, 859:24, 867:4, 867:8, 876:5, 876:10, 899:9, 969:7, 1024:6, 1028:20
**subsection** [1] - 851:21
**substance** [1] - 866:25
**substantively** [3] - 868:19, 883:14, 937:17
**substitute** [2] - 1027:11, 1027:23
**subways** [1] - 1009:9
**successful** [2] - 976:16, 1029:13
**succession** [2] - 892:20, 928:11
**successor** [8] - 892:19, 921:8, 928:2, 928:7, 982:6, 982:9, 983:5, 983:10
**successors** [2] - 892:17, 983:8
**successorship** [2] - 981:22, 981:23
**sudden** [3] - 893:25, 910:22, 965:10
**sued** [5] - 983:18, 984:11, 985:9, 985:23, 1010:11
**suffered** [2] - 931:25, 936:17
**suggesting** [2] - 885:7, 986:18
**suggestion** [1] - 1030:2
**suggests** [1] - 937:25
**Suite** [1] - 842:20
**sum** [1] - 864:15
**summaries** [1] - 857:2
**summary** [4] - 857:25, 874:6, 890:2, 923:22
**Summation** [2] - 1034:18, 1034:19
**summation** [7] - 864:24, 890:13, 891:3, 892:22, 946:7, 953:13, 1014:8
**summations** [19] - 846:20, 863:10, 863:15, 865:4, 865:14, 867:3, 881:24, 888:21, 890:20, 937:15, 940:7, 940:11, 940:23, 941:1, 941:4, 1002:18, 1003:2, 1003:21, 1004:3
**SUMMATIONS** [1] - 1034:16
**summing** [1] - 864:15
**Sunday** [3] - 1030:25, 1031:2, 1031:8
**sunset** [1] - 1013:13
**superior** [1] - 895:12
**superiors** [2] - 909:8, 909:11
**supervise** [2] - 972:23, 1030:5
**supervised** [1] - 983:4
**supplemental** [1] - 879:23
**suppliers** [2] - 975:13, 1001:12
**support** [5] - 876:19, 889:5, 1024:10, 1026:13, 1028:14
**supporting** [1] - 879:25
**supposed** [17] - 899:12, 912:15, 917:17, 917:25, 927:4, 928:4, 928:6, 930:19, 965:2, 965:5, 969:2, 971:25, 972:1, 972:16, 1025:19
**supposedly** [3] - 916:18, 918:5, 955:14
**surely** [1] - 1028:3
**surgeries** [1] - 970:12
**surgery** [12] - 851:10, 851:18, 887:25, 894:22, 894:23, 905:8, 909:1, 909:2, 956:23, 956:24, 959:5, 960:11
**surprise** [2] - 983:14, 989:20
**survive** [2] - 880:14, 927:25
**Susan** [1] - 980:20
**suspect** [4] - 866:2, 883:1, 944:19, 947:6
**suzettes** [1] - 866:3
**swath** [1] - 1008:24
**swing** [1] - 1013:20
**sync** [2] - 856:11
**system** [4] - 948:10, 961:13, 967:14
**systems** [14] - 858:11, 885:24, 886:8, 886:12, 886:14, 886:15, 886:16, 886:18, 898:7, 899:18, 930:16, 933:17, 935:1, 955:16

**(table - Training)**

# T

**table** [8] - 924:13, 973:17, 984:9, 984:20, 985:5, 993:13, 1005:4, 1010:11
**tables** [2] - 857:16, 857:21
**talents** [1] - 939:20
**talks** [9] - 869:22, 871:18, 871:20, 920:12, 921:2, 921:7, 925:16, 961:11, 966:13
**Tampa** [3] - 851:10, 908:21, 957:2
**target** [1] - 983:19
**tax** [1] - 919:18
**tax return** [2] - 946:12, 981:4
**tax returns** [1] - 981:2
**teach** [3] - 977:8, 977:9, 977:10
**teaches** [1] - 983:23
**Team** [1] - 852:19
**team** [14] - 857:2, 857:12, 900:3, 900:25, 901:9, 905:7, 905:9, 905:22, 906:4, 916:8, 918:3, 974:25, 1007:5, 1011:16
**technical** [1] - 881:22
**technology** [3] - 975:5, 975:16, 990:1
**tedious** [1] - 1007:17
**teeth** [1] - 907:7
**Telephone** [1] - 843:12
**tellers** [1] - 974:11
**temp** [1] - 950:20
**ten** [11] - 961:22, 962:4, 962:18, 962:22, 963:11, 974:3, 976:3, 976:4, 1000:7, 1002:24, 1023:18
**term** [21] - 875:17, 904:5, 904:7, 904:8, 913:15, 913:17, 913:23, 921:17, 931:7, 944:21, 944:24, 945:4, 945:6, 952:8, 996:6, 1012:11, 1012:14, 1021:20, 1021:23, 1022:7, 1022:19
**terminate** [9] - 890:3, 893:2, 909:21, 912:11, 926:1, 927:6, 951:11, 951:15
**terminated** [55] - 859:8, 868:16, 869:14, 869:15, 869:20, 873:1, 873:7, 873:9, 873:13, 873:16, 875:7, 875:8, 875:11, 875:15, 876:25, 877:1, 883:22, 883:23, 892:2, 910:3, 914:1, 916:16, 917:4, 918:19, 918:21, 922:23, 923:25, 924:15, 924:20, 925:14, 925:19, 925:21, 926:7, 938:18, 941:11, 941:22, 942:6, 946:23, 947:23, 952:13, 953:2, 954:13, 1005:13, 1005:19, 1006:3, 1008:8, 1019:3, 1020:12, 1020:23, 1021:9, 1025:9, 1025:17, 1028:19, 1029:2
**terminating** [5] - 882:2, 882:22, 893:13, 923:15, 950:5
**termination** [40] - 858:2, 858:10, 858:11, 859:19, 859:20, 867:23, 868:2, 869:7, 869:11, 869:17, 872:7, 873:13, 874:18, 874:25, 875:17, 875:20, 875:22, 875:24, 876:22, 877:6, 882:20, 883:11, 883:25, 893:10, 914:10, 919:16, 924:10, 924:18, 924:25, 930:19, 930:21, 931:17, 939:1, 939:8, 1008:7, 1011:21, 1013:7, 1020:11, 1020:18, 1025:13
**terms** [14] - 886:5, 898:12, 898:16, 898:25, 934:24, 934:25, 952:17,

975:14, 987:11, 993:9, 994:21, 1011:24, 1011:25, 1025:25
**terrible** [1] - 999:1
**terrific** [1] - 967:2
**testified** [38] - 878:14, 879:7, 895:21, 896:14, 898:1, 899:24, 900:23, 905:3, 905:4, 905:5, 907:8, 907:14, 908:24, 918:14, 922:3, 927:1, 927:9, 928:9, 941:16, 943:17, 944:24, 948:8, 952:11, 956:17, 957:6, 958:20, 959:16, 959:23, 960:6, 965:12, 976:8, 979:4, 988:12, 990:18, 993:8, 996:8, 1000:7
**testify** [3] - 982:11, 1005:1, 1010:24
**testifying** [2] - 902:1, 927:10
**testimony** [46] - 845:2, 846:17, 847:24, 863:2, 878:11, 897:19, 906:11, 918:10, 923:20, 924:24, 925:6, 945:11, 949:4, 956:25, 957:4, 957:11, 957:12, 961:23, 965:11, 968:2, 969:8, 970:14, 978:13, 987:3, 987:4, 991:12, 993:2, 994:23, 998:23, 999:6, 1005:11, 1007:14, 1007:17, 1012:6, 1012:23, 1013:14, 1014:17, 1015:8, 1015:22, 1015:25, 1018:5, 1018:7, 1028:3, 1028:4
**Texas** [1] - 842:17
**text** [26] - 899:5, 903:7, 907:25, 908:5, 919:22, 920:13, 920:19, 920:24, 957:15, 958:21, 959:10, 960:10, 961:3, 961:15, 962:25, 963:1, 964:21, 965:7, 970:20, 970:25, 974:8, 979:16, 994:9, 1015:13, 1015:16, 1015:17
**texted** [1] - 898:19
**texting** [2] - 905:15, 994:6
**thankful** [1] - 980:20
**thanking** [1] - 866:1
**The defendant** [8] - 867:18, 867:22, 868:2, 869:8, 888:9, 933:16, 934:14, 936:1
**themselves** [5] - 893:22, 911:14, 928:12, 936:5, 950:10
**theories** [1] - 935:24
**theory** [8] - 876:9, 876:13, 876:20, 878:13, 973:14, 987:13, 994:6, 1028:18
**there'd** [1] - 893:8
**thereabouts** [1] - 1016:18
**thereafter** [3] - 873:7, 880:19, 987:19
**therefor** [1] - 906:20
**therefore** [10] - 854:24, 868:2, 869:8, 900:12, 927:24, 951:15, 969:18, 1024:13, 1024:21, 1029:8
**therefrom** [2] - 906:21, 969:19
**they've** [10] - 895:11, 901:5, 906:1, 918:12, 936:5, 947:9, 965:15, 993:20, 1010:10
**thin** [1] - 936:20
**thinking** [4] - 855:11, 879:14, 980:20, 1021:11
**thinks** [1] - 1002:2
**third** [2] - 943:24, 943:25
**thirds** [2] - 904:8, 913:18
**thirty** [1] - 941:24
**thirty-one** [1] - 941:24
**thoughtful** [1] - 855:10
**thousand** [2] - 902:7, 908:10
**thousands** [3] - 923:4, 934:13, 988:3
**three** [23] - 883:9, 883:22, 894:17,

922:1, 923:25, 924:15, 932:13, 943:7, 955:9, 957:24, 961:17, 961:18, 969:13, 973:10, 980:7, 980:18, 989:4, 990:9, 993:2, 993:4, 995:21, 1018:8
**threw** [1] - 914:24
**throughout** [6] - 883:10, 886:24, 963:16, 1024:15, 1024:24, 1024:25
**throw** [5] - 878:16, 883:12, 984:17, 985:1, 1009:25
**thrown** [1] - 915:6
**thrust** [1] - 931:2
**ticket** [1] - 1015:3
**tied** [1] - 854:16
**ties** [1] - 882:24
**time's** [1] - 956:7
**timeline** [5] - 858:5, 858:14, 858:22, 998:12, 1012:4
**timeliness** [2] - 846:21, 877:22
**timewise** [1] - 1018:20
**timing** [1] - 857:4
**title** [1] - 982:8
**to be honest** [5] - 966:14, 968:18, 974:14, 981:3, 982:11
**today** [22] - 844:22, 846:14, 865:23, 865:25, 873:24, 873:25, 923:19, 940:11, 941:1, 941:4, 941:23, 945:2, 949:9, 953:2, 966:1, 978:14, 981:22, 1002:18, 1008:13, 1016:21, 1030:22, 1031:21
**together** [7] - 856:4, 866:10, 890:14, 925:7, 925:8, 964:12, 996:23
**tomorrow** [9] - 1002:19, 1003:4, 1004:6, 1016:15, 1016:19, 1018:11, 1030:15, 1030:22, 1031:22
**ton** [2] - 902:6, 983:12
**Tony** [14] - 857:11, 903:8, 903:22, 909:17, 918:1, 920:22, 956:14, 957:18, 959:8, 960:9, 979:4, 981:13, 995:15, 1006:6
**Tony/Karen** [1] - 995:13
**took** [24] - 879:9, 880:7, 888:9, 899:25, 900:1, 910:4, 912:1, 912:25, 917:24, 944:2, 953:6, 956:20, 960:3, 960:5, 964:6, 968:15, 974:22, 977:22, 991:9, 1002:20, 1009:16, 1012:5, 1012:9, 1014:4
**top** [9] - 857:22, 858:5, 860:1, 910:14, 913:7, 918:6, 925:11, 975:25, 997:20
**topic** [1] - 894:12
**topics** [2] - 894:16, 902:8
**tossed** [3] - 930:21, 935:23, 994:17
**tossing** [1] - 887:2
**total** [6] - 852:1, 857:25, 943:9, 943:12, 944:10, 998:20
**totality** [1] - 1028:1
**totally** [6] - 906:22, 907:1, 969:22, 985:18, 1027:10, 1028:11
**touchdown** [1] - 915:11
**touched** [1] - 999:10
**tough** [1] - 993:21
**tracking** [1] - 924:21
**traded** [2] - 973:20, 987:7
**trading** [1] - 912:24
**trainers** [3] - 996:11, 996:13, 996:14
**Training** [4] - 960:25, 978:9, 989:10, 991:6

**training** [8] - 916:4, 927:2, 928:5, 928:6, 928:13, 956:16, 983:7, 994:2
**trainings** [1] - 927:2
**transaction** [1] - 942:25
**TRANSCRIPT** [1] - 842:11
**Transcript** [1] - 843:14
**transcript** [1] - 1005:8
**Transcription** [1] - 843:14
**transferred** [1] - 964:9
**transformation** [5] - 982:13, 982:19, 983:2, 983:7, 993:23
**travel** [1] - 991:12
**treated** [7] - 972:4, 972:5, 979:1, 979:3, 979:10, 979:12, 1001:19
**treatment** [3] - 906:20, 969:15, 969:18
**trees** [1] - 935:22
**trends** [1] - 1031:1
**TRIAL** [1] - 842:11
**trial** [23] - 844:4, 844:25, 846:15, 879:16, 881:3, 883:10, 891:16, 908:21, 914:15, 930:9, 934:17, 937:12, 937:22, 939:23, 942:20, 954:1, 954:24, 1005:8, 1007:6, 1007:21, 1008:17, 1009:12, 1024:17
**trick** [1] - 893:4
**tricked** [1] - 895:16
**tried** [4] - 877:2, 923:14, 933:11, 1000:11
**triggers** [1] - 890:9
**trip** [2] - 956:15, 985:9
**trouble** [3] - 980:9, 980:10, 1030:13
**true** [10] - 854:12, 901:25, 906:23, 908:20, 951:3, 966:5, 983:18, 984:3, 1013:24, 1024:18
**truly** [1] - 905:19
**trust** [2] - 945:1, 948:19
**trusted** [1] - 895:21
**truth** [1] - 1012:4
**try** [16] - 847:11, 863:22, 880:9, 880:12, 881:2, 895:3, 914:22, 915:9, 928:8, 939:19, 940:10, 946:14, 988:16, 988:18, 994:1, 1017:21
**trying** [32] - 855:2, 855:4, 861:24, 864:6, 891:9, 891:16, 897:10, 903:8, 930:8, 931:21, 934:18, 937:11, 948:7, 960:13, 965:9, 967:9, 973:11, 974:13, 976:25, 979:19, 979:24, 980:3, 983:16, 988:3, 988:4, 988:5, 988:9, 993:14, 1004:2, 1014:23, 1015:21, 1015:23
**tube** [2] - 907:15, 907:16
**Tuesday** [2] - 892:3, 995:12
**tune** [1] - 1022:13
**turn** [8] - 862:13, 862:18, 893:13, 896:13, 922:7, 927:15, 996:2
**turned** [9] - 874:24, 890:4, 908:22, 918:24, 919:9, 970:14, 970:16, 970:17, 974:25
**turning** [3] - 893:4, 967:11, 1016:22
**twice** [1] - 986:7
**two** [62] - 845:3, 849:14, 854:20, 857:21, 861:15, 861:25, 867:17, 873:6, 873:7, 874:8, 874:13, 879:25, 891:10, 891:14, 891:15, 891:19, 894:17, 895:7, 895:9, 898:2, 904:8, 908:10, 910:12, 911:7, 911:23, 913:18, 915:17, 925:25, 926:2, 928:24, 929:8, 931:25, 932:1,

934:5, 943:7, 943:10, 944:23, 947:17, 948:19, 949:8, 954:16, 955:5, 955:9, 955:11, 958:16, 959:15, 964:23, 969:12, 971:13, 980:5, 981:1, 981:7, 985:5, 985:7, 990:20, 998:5, 998:22, 1010:20, 1018:8, 1026:19, 1031:5
**two-thirds** [2] - 904:8, 913:18
**two-week** [1] - 910:12
**two-year-old** [1] - 1031:5
**Ty** [2] - 1030:23, 1031:4
**type** [2] - 885:2, 905:13
**typo** [1] - 854:18

## U

**UBS** [1] - 896:19
**ultimately** [3] - 853:3, 853:6, 885:4
**umbrella** [1] - 936:16
**unable** [4] - 887:15, 907:4, 907:22, 1027:21
**unanimous** [2] - 1016:25, 1017:10
**unbelievable** [1] - 973:15
**uncertainty** [1] - 884:15
**unclear** [1] - 936:21
**under** [61] - 858:24, 860:9, 865:18, 868:7, 869:24, 871:21, 873:2, 874:18, 875:20, 877:6, 878:4, 880:13, 881:19, 882:2, 887:17, 891:23, 898:4, 904:9, 920:2, 931:18, 931:20, 933:21, 936:10, 936:15, 937:7, 937:12, 952:16, 954:3, 954:13, 955:9, 955:10, 958:13, 965:25, 967:21, 968:9, 969:12, 971:3, 971:13, 971:17, 978:25, 982:1, 988:11, 1008:12, 1010:4, 1011:8, 1011:18, 1011:21, 1014:20, 1016:6, 1017:3, 1017:11, 1017:12, 1019:18, 1024:13, 1025:4, 1025:16, 1025:18, 1026:24, 1027:4, 1028:23, 1028:25
**underestimated** [1] - 1013:15
**undergoing** [2] - 887:25, 916:22
**underlined** [1] - 904:3
**understood** [5] - 876:14, 888:18, 980:22, 982:25, 1022:16
**undisputed** [2] - 956:3, 1012:12
**undocumented** [1] - 901:6
**undue** [1] - 1017:4
**unfortunate** [1] - 1012:2
**unfortunately** [3] - 981:19, 1012:7, 1031:13
**unheard** [1] - 997:9
**unique** [1] - 904:21
**United States** [3] - 842:1, 842:5, 842:12
**units** [1] - 986:3
**universe** [2] - 989:9, 989:10
**unkind** [1] - 1016:13
**unlawful** [3] - 868:2, 869:8, 1028:6
**unless** [6] - 868:2, 869:8, 884:19, 945:23, 986:18, 1000:18
**unmade** [1] - 1024:3
**unnecessary** [1] - 863:25
**unpaid** [13] - 875:21, 911:13, 911:16, 950:11, 950:15, 951:5, 966:4, 966:5, 999:24, 1024:8, 1024:16, 1025:1, 1026:8

**unrefuted** [2] - 878:11, 990:8
**unrelated** [1] - 994:20
**untoward** [1] - 864:1
**up** [79] - 853:17, 863:20, 864:9, 864:15, 872:24, 873:24, 891:17, 893:17, 894:4, 898:14, 901:18, 902:1, 902:9, 905:9, 905:14, 909:18, 910:2, 911:4, 911:13, 913:4, 919:25, 922:9, 924:1, 926:24, 927:20, 928:14, 942:4, 943:8, 944:5, 944:8, 944:10, 944:19, 945:23, 947:18, 949:8, 951:5, 951:7, 952:5, 953:18, 957:16, 963:7, 971:16, 971:24, 973:13, 973:19, 973:21, 974:15, 975:8, 976:3, 976:11, 977:8, 980:13, 980:15, 982:10, 983:15, 985:25, 987:8, 988:12, 988:13, 993:3, 995:16, 995:23, 996:9, 998:21, 999:8, 1005:18, 1006:21, 1007:22, 1012:19, 1013:19, 1023:8, 1026:9, 1030:5, 1031:3, 1031:15
**up-to-date** [1] - 995:16
**upside** [1] - 975:1
**urban** [1] - 1009:9
**user** [1] - 935:1
**usual** [1] - 1031:17
**Ut** [1] - 1013:8
**Ut-oh** [1] - 1013:8

## V

**vacation** [4] - 861:14, 892:8, 950:2, 957:22
**valid** [1] - 1008:3
**value** [8] - 895:23, 897:13, 897:14, 952:11, 983:23, 983:25, 986:24, 996:24
**various** [5] - 856:13, 857:24, 925:9, 932:23, 954:1
**vast** [1] - 893:8
**vendors** [1] - 1001:12
**verdict** [27] - 866:18, 872:15, 877:15, 880:13, 881:10, 881:19, 882:1, 886:25, 890:17, 929:3, 930:13, 932:22, 933:15, 933:20, 934:15, 934:19, 935:12, 937:1, 937:24, 954:6, 1005:5, 1014:10, 1016:25, 1018:21, 1023:9, 1029:19
**verses** [1] - 926:17
**versus** [2] - 858:3, 859:23
**vest** [3] - 943:5, 965:6, 998:8
**vested** [2] - 946:19, 946:21
**via** [1] - 1015:16
**vice** [12] - 897:18, 914:21, 914:22, 926:19, 963:17, 981:25, 982:1, 982:8, 990:15, 991:3, 991:4, 998:12
**victim** [1] - 1012:3
**victimize** [1] - 844:18
**video** [3] - 885:18, 886:3, 907:25
**view** [3] - 873:5, 873:12, 941:18
**violate** [2] - 949:17, 949:19
**violated** [8] - 893:5, 898:8, 899:2, 952:6, 1016:7, 1024:2, 1025:8, 1028:17
**violates** [1] - 891:21
**violation** [14] - 873:9, 879:3, 879:6, 888:7, 909:22, 915:22, 935:14, 938:18, 938:21, 941:12, 941:14, 949:11, 1026:20, 1027:5

**violations** [1] - 987:9
**virtually** [1] - 974:5
**vis-à-vis** [1] - 939:8
**visit** [5] - 958:23, 959:1, 959:3, 959:4
**visited** [2] - 907:14, 975:1
**voice** [1] - 984:18
**voluntarily** [3] - 845:21, 889:9, 959:20
**Voycheske** [6] - 904:14, 911:18, 917:19, 965:12, 974:6, 991:14
**VP** [1] - 960:23

## W

**wages** [4] - 931:20, 936:10, 944:9, 952:12
**wait** [4] - 876:23, 882:8, 920:21, 1023:8
**waited** [1] - 966:23
**waiting** [3] - 844:25, 867:12, 938:4
**waived** [6] - 932:22, 934:16, 936:8, 939:5, 939:6
**walk** [3] - 910:7, 958:4, 1031:14
**walked** [1] - 844:7
**walking** [1] - 953:17
**Wall** [4] - 895:7, 989:22, 989:23, 989:24
**wants** [4] - 855:22, 976:2, 994:12, 1009:13
**war** [1] - 1030:22
**War** [1] - 976:10
**warning** [1] - 978:12
**warnings** [1] - 987:2
**watch** [1] - 978:2
**watched** [2] - 999:3, 1007:20
**watching** [1] - 984:20
**ways** [3] - 896:11, 907:23, 908:1
**Wednesday** [3] - 855:21, 1013:1, 1017:3
**week** [25] - 849:23, 858:14, 858:15, 858:17, 858:24, 859:4, 861:16, 874:1, 891:6, 892:3, 892:4, 901:23, 910:12, 924:1, 924:2, 924:5, 924:20, 925:1, 927:19, 941:24, 952:13, 957:3, 959:6, 973:10
**weekend** [2] - 844:6, 1031:13
**weekly** [1] - 858:16
**weeks** [20] - 847:12, 874:8, 887:20, 907:24, 911:13, 911:16, 927:20, 950:12, 950:13, 951:6, 957:3, 959:6, 960:11, 961:3, 961:7, 965:23, 972:8, 1021:4, 1028:21
**weight** [1] - 901:6
**West Point** [1] - 976:9
**Whalen** [5] - 856:10, 856:11, 889:10, 974:7, 996:2
**whatsoever** [2] - 912:16, 930:22
**whichever** [1] - 1018:2
**whim** [4] - 976:7, 996:5, 996:6, 996:8
**whiteboard** [2] - 907:13, 908:5
**whole** [8] - 883:10, 896:13, 930:12, 949:21, 974:19, 983:6, 986:25, 1015:6
**wife** [1] - 975:6
**wife's** [1] - 964:10
**willful** [1] - 878:11
**willing** [3] - 877:11, 885:25, 949:6

**willy** [1] - 993:9
**willy-nilly** [1] - 993:9
**win** [3] - 926:13, 977:25
**wish** [6] - 862:14, 863:1, 1006:20, 1006:22, 1018:5, 1029:22
**withdraw** [1] - 844:11
**withdrawing** [1] - 877:6
**withdrawn** [1] - 877:12
**withdrew** [2] - 874:4, 932:12
**witness** [12] - 847:20, 850:5, 853:8, 854:3, 855:14, 856:16, 859:10, 945:24, 959:17, 973:18, 974:6, 1006:11
**Witness** [1] - 1006:17
**witnesses** [9] - 862:13, 862:18, 862:20, 863:2, 899:24, 902:1, 945:5, 959:15, 999:19
**woke** [1] - 905:14
**wonderful** [6] - 959:1, 959:3, 959:4, 980:21, 1031:16, 1031:17
**wondering** [2] - 962:11, 963:16
**word** [6] - 864:19, 864:20, 864:22, 881:19, 949:14, 1006:21
**words** [7] - 871:13, 946:8, 955:21, 960:4, 991:24, 1005:8, 1008:9
**wordy** [1] - 872:4
**workers** [1] - 927:17
**workforce** [2] - 852:17, 852:19
**works** [8] - 847:17, 848:2, 894:14, 948:11, 977:17, 986:11, 1016:15, 1018:8
**world** [6] - 923:5, 964:14, 976:17, 1008:10, 1015:6
**worried** [3] - 899:21, 962:1, 980:9
**worry** [2] - 936:7, 960:20
**worrying** [3] - 966:17, 967:1, 971:8
**worse** [6] - 958:9, 964:4, 979:2, 1001:20
**worst** [2] - 958:7, 984:17
**worth** [1] - 955:5
**wrap** [1] - 949:8
**write** [3] - 854:25, 910:2, 989:7
**writes** [2] - 921:15, 980:3
**writing** [6] - 851:21, 906:13, 906:14, 906:15, 974:11, 1004:24
**written** [13] - 873:20, 900:16, 901:21, 905:23, 947:9, 947:11, 947:15, 951:25, 1004:19, 1004:20, 1017:14, 1019:7, 1030:20
**wrongfully** [2] - 875:7, 954:13
**wrote** [1] - 874:9

## Y

**Yankees** [1] - 977:25
**year** [24] - 854:14, 855:5, 855:6, 855:24, 910:9, 914:25, 915:16, 927:16, 965:1, 974:14, 974:24, 977:15, 977:18, 978:10, 980:8, 981:21, 982:17, 984:3, 987:18, 991:13, 994:8, 998:5, 1000:2, 1031:5
**year-end** [2] - 854:14, 855:24
**year-to-date** [1] - 927:16
**years** [25] - 852:15, 861:25, 891:10, 893:8, 893:9, 895:17, 915:17, 947:1, 947:17, 948:18, 955:5, 971:19, 976:14,

980:13, 981:2, 981:7, 981:9, 982:20, 982:22, 982:23, 982:24, 990:19, 997:2, 1004:18, 1015:24
**yell** [1] - 936:2
**yesterday** [5] - 904:14, 911:18, 941:17, 943:13, 952:11
**YORK** [1] - 842:1
**York** [4] - 842:5, 842:21, 843:9
**Young** [1] - 988:22
**yourself** [3] - 942:16, 960:18, 980:14

## Z

**zealously** [1] - 847:2
**ZEITLIN** [7] - 842:18, 842:21, 848:5, 1006:23, 1007:2, 1012:21
**Zeitlin** [5] - 847:23, 847:24, 1006:25, 1007:4, 1016:10
**Zeitlin..........................** [1] - 1034:20
**zero** [10] - 858:25, 859:3, 913:22, 914:2, 914:11, 943:7, 1012:16, 1013:4, 1013:17