1

<pre>
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF NEW YORK
 2
      - - - - - - - - - - - - - X
 3
        STEVEN B. BARGER,            :    17-CV-4869(FB)
 4                                   :
               Plaintiff,            :    U.S. Courthouse
 5                                   :    Brooklyn, New York
                                     :
 6                                   :    TRANSCRIPT OF
           -against-                 :    JURY TRIAL
 7                                   :
                                     :
 8                                   :    September 16, 2019
                                     :    2:30 p.m.
 9      FIRST DATA CORPORATION,      :
        ET AL                        :
10                                   :
               Defendants.           :
11    - - - - - - - - - - - - - X

12

13   BEFORE:
                      HONORABLE FREDERIC BLOCK, U.S.D.J.,
14                    and a Jury

15

16   APPEARANCES:

17   For the Plaintiff:      THE LAW OFFICE OF SHAWN SHEARER, P.C.
                             3839 McKinney Avenue
18                           #155-254
                             Dallas, TX 75204
19                           BY:  SHAWN SHEARER, ESQ.

20

21
                             Zeitlin & Zeitlin, P.C.
22                           50 Court Street, Suite 506
                             Brooklyn, NY 11201
23                           BY:  DAVID A. ZEITLIN, ESQ.

24

25
</pre>

2

```
 1
    For the Defendants:      SAUL EWING ARNSTEIN & LEHR LLP
 2                           500 E Pratt Street
                             Baltimore, MD 21202
 3                           BY:  GARY B. EIDELMAN, ESQ.
                                  GILLIAN A. COOPER, ESQ.
 4                                MICHAEL CIANFICHI, ESQ.

 5
                             BOND SCHOENECK & KING PLLC
 6                           330 Madison Avenue
                             39th Floor
 7                           New York, NY 10017
                             BY:  LOUIS P. DILORENZO, ESQ.
 8

 9

10  Court Reporter:      Holly Driscoll, CSR, FCRR
                         Chief Court Reporter
11                       225 Cadman Plaza East
                         Brooklyn, New York 11201
12                       (718) 613-2274
                         hdrisc@gmail.com
13

14
    Proceedings recorded by mechanical stenography, transcript
15  produced by Computer-Assisted Transcript.

16

17                         *      *      *

18

19          (The following takes place out of the presence of

20  the jury.)

21          THE COURTROOM DEPUTY:  Civil cause for trial, Steven

22  Barger versus First Data Corp.

23          I ask the parties to state your appearances please.

24          MR. SHEARER:  Shawn Shearer and with me is David

25  Zeitlin for the plaintiff.
```

3

1          MR. ZEITLIN:  Good afternoon, Your Honor.

2          THE COURT:  Good afternoon.

3          And this distinguished gentleman here is?

4          MR. BARGER:  My name is Steve Barger, Your Honor.

5          THE COURT:  You're Mr. Barger.  That's fine, you're

6    welcome to sit there.  Lawyers can sit over there, that's

7    fine.

8          And let's hear from Mr. Eidelman.

9          MR. EIDELMAN:  Good afternoon, Your Honor, Gary

10   Eidelman, Saul Ewing Arnstein & Lehr, along with our

11   colleagues, Gillian Cooper and Michael Cianfichi.

12         Next to me is Louis DiLorenzo.

13         MR. DiLORENZO:  Yes, Your Honor, from Bond,

14   Schoeneck & King.

15         MR. EIDELMAN:  Your Honor, if I can address the rest

16   at counsel table; sitting next to Mr. DiLorenzo is Jill Poole,

17   she's the corporate representative, she is a lawyer and the

18   corporate representative from First Data; sitting next to

19   Ms. Pool is Frank Bisignano, one of the defendants; Dan

20   Charron, the next defendant; Tony Marino, the next defendant;

21   and the last defendant is Rhonda Johnson.

22         THE COURT:  Now, did you introduce everybody this

23   morning when the jury was selected?

24         MR. EIDELMAN:  Yes.

25         THE COURT:  I won't do that again, I'll leave that

4

1  to you who you want at your table and the defendants, of

2  course, are welcome to stay here, they are entitled to do that

3  and I leave that to you as a matter of trial strategy whether

4  you want to overwhelm the jurors with so many people sitting

5  at your defense table, that's a matter for lawyer judgment.

6          MR. EIDELMAN:  Thank you, Judge.

7          THE COURT:  So, we had the jury selected this

8  morning so the first order of business is whether everybody is

9  satisfied with the selection of the jury and whether I should

10  fire my law clerk or not.

11          What do you say, Mr. Shearer?

12          MR. SHEARER:  Your Honor, the plaintiff is fine with

13  the jury.  We're ready to proceed.

14          THE COURT:  And it worked that well, I shouldn't

15  fire my law clerk?

16          MR. SHEARER:  No, I think he did a pretty good job.

17          THE COURT:  Good.

18          MR. EIDELMAN:  He's no longer a rookie.  We're

19  satisfied with the jury, Your Honor.

20          THE COURT:  I say that facetiously, I'm sure he did

21  a good job.  I'm sure he's a little bit nervous which is the

22  way he is supposed to be and I hear that he did splendidly.

23  I'm happy to see that.

24          So, you are satisfied with the jury.  I figure at

25  this time we'll call the jurors in.  What I'd like to do today

5

1    to get started is talk to the jurors 15 minutes or so just to

2    give them a little bit of a sense of how the trial is going to

3    proceed.  I don't know how many of them have been jurors

4    before or not but I go through a little bit of the protocol of

5    what's going to happen and then we'll be finished by 3:00 with

6    that.  Then I think we can have the opening statements today.

7    I don't see any reason why not.

8              Mr. Shearer, how long do you estimate yours will be?

9              MR. SHEARER:  I would guess under a half an hour.

10             THE COURT:  I just want to get a sense whether we

11   can get it done this afternoon.

12             MR. SHEARER:  Yes.

13             THE COURT:  You're going to speak, Mr. Eidelman?

14             MR. EIDELMAN:  I am, Your Honor.  We should

15   absolutely be able to get done this afternoon.

16             THE COURT:  Okay, so we'll try to go in that

17   direction.  We'll have our first witness ready to go tomorrow

18   at 10:00.

19             MR. EIDELMAN:  Judge, if I may, I can mention it in

20   my opening if you like but we did say it is possible that some

21   of the individual defendants may have to be in and out of the

22   courtroom a little bit.

23             THE COURT:  I'm going to mention it to them, I'll

24   talk about that and things will work out just fine.  I'm going

25   to also compliment you on the fact that you worked very hard

1    by meeting with me before the trial starts to work out the

2    exhibit list.  So, the exhibits will be introduced into

3    evidence as you use them.  My guess is that you're not going

4    to use them all because as good lawyers you're not going to

5    overwhelm the jurors with unnecessary paperwork, I'm sure of

6    that.  So, as you use them, they'll be deemed in evidence and

7    we have one or two little things which we will be able to talk

8    about during the course of the trial.

9              So, let's bring the jurors in at this time.

10             (Jury enters courtroom.)

11             THE COURT:  So, Mr. Carr, you happen to be sitting

12   in the first seat not because you're the best looking one or

13   you're the smartest one, though you may be both, it's just

14   that your name came up first, it is strictly by rote.  You're

15   the person who may or may not be the foreperson at the end of

16   the trial.  I will explain that to you a little bit more as we

17   go.  Just relax.

18             In the meantime, all of you relax because my whole

19   purpose in talking to you now is to try to ease you into the

20   trial by telling you about what you can expect, some common

21   sense ABC things and a little bit about how the trial is going

22   to progress, how long it's likely to take, things that your

23   curiosity would want to know about, right.

24             But the first thing I'm curious about is how many of

25   you folks have sat as jurors before?  I wasn't here during the

1    jury selection, it was supervised by my wonderful law clerk.

2         Give me an idea, show of hands.

3         (Pause.)

4         THE COURT:  So, we have three -- four out of eight.

5         Were they criminal or civil cases?  Let's see

6    criminal.

7         A JUROR:  Criminal.

8         A JUROR:  Criminal.

9         THE COURT:  All criminal?

10        A JUROR:  No.

11        THE COURT:  How many were not criminal?

12        Two civil, two criminal, so we have a mixed group

13   here and you know folks are selected for jury service strictly

14   on a random basis and sometimes we get prospective jurors who

15   have been here many times but sometimes not at all, I mean

16   it's just strictly the luck of the draw I guess but I'm very

17   proud to have the privilege of presiding over this trial with

18   you as my jurors.

19        Why do I say that.  By the way, I guess I should

20   introduce myself.  You might know that I'm the judge right now

21   because I'm wearing the black robe and my last name is Block,

22   B-L-O-C-K.

23        At the end of the trial you'll remember this case,

24   it is going to be an interesting trial, we have very good

25   lawyers but hopefully you'll forget the judge because the

1   focus should be on the trial and not the judge.  If you happen

2   to remember me, okay, but the point is to get you to think

3   about the case and about what happens here during the course

4   of the trial but I have to administer the trial, it's my

5   responsibility and we have now eight jurors in this civil

6   case.  This is not a criminal case and it may or may not come

7   as a surprise to you that as far as I know, and I've had my

8   good law clerks research this many times, we are the only

9   country in the world that has jury trials for civil cases.

10  It's incredible.  The last country that had it abandoned it a

11  few years ago, it was England, the UK, which is where we get

12  much of our common law from, traditions from.  They have no

13  civil trials, just the judge decides the case except for one

14  situation, the Queen can sue you for defamation, you can't

15  defame the Queen, you can have a jury trial there.

16          Essentially we're it and you know you can debate

17  whether or not we should impose upon fellow citizens to give

18  up their time, their social life, their economic earnings in

19  many cases to sit as jurors and pass judgment on a fellow

20  citizen or fellow -- it doesn't have to necessarily be a

21  citizen but a person who comes to court, wishes to get his or

22  her rights resolved by his or her peers.

23          At the end of the trial I make it my practice to

24  come and make myself available to you after you've decided the

25  case to answer whatever curiosities you may have about

1    anything that cropped up during the course of the trial that

2    you may be speculating about.  You're not allowed to speculate

3    when you come to your decision but you may want to ask me some

4    questions afterwards, I'll make myself available, we can talk

5    a bit more, I can give you another civic lesson about how we

6    go about our business, what the federal courts are all about,

7    how you become a federal judge.  The public, by and large,

8    doesn't have a lot of knowledge about that.  I personally

9    don't think we do a good job raising our kids and educating

10   them properly about the justice system in our country, that's

11   my personal opinion.  But I find most people, even those with

12   Ph.D. degrees don't even know how you become a federal court

13   judge, what's the difference between the state and federal

14   jurisdiction, why do we have 50 states with separate courts

15   and separate laws, why do we have a federal law, what's that

16   all about.  So, it can be confusing so I try to at least give

17   some light while I'm here and I've got you as captive to get

18   you acclimated to the federal judicial system.

19          This is our federal courthouse.  As you can see, it

20   is a beautiful courthouse and it's the people's courthouse so

21   anybody can come in here and open those doors to join us and

22   listen to the trial.  It's open to everybody.

23          And so, why do we have juries and why do we have a

24   judge.  So, I like to explain basically we're a team, one

25   without the other we cannot have a trial.  We need both.  We

1   need the judge because he went to school for a long time, he's

2   been doing this for a while, he should know a little bit about

3   the law and we need somebody to be in charge of the law

4   department, to explain the law to the jury, to rule on

5   objections, evidentiary issues, things that we're trained to

6   do that you're not trained to do.

7           We need the fact finders, we need the jury.  So, the

8   jury is in charge of the fact department, I'm in charge of the

9   law department.  What does that mean.  That means that the

10  jurors are going to decide where the truth lies.  The jury is

11  going to listen to me explain the law to you at the end of the

12  trial when you hear all the evidence, all the witnesses have

13  testified, all the documents have been offered into evidence

14  that I'll allow into evidence, that's the evidence in the

15  case, and you're going to decide the facts.

16          Obviously there are different versions of facts

17  here, otherwise we would not need a fact finder, then it would

18  be up to the judge just to decide the legal issues in the

19  case.  So, you are in charge of the fact department.  At the

20  end of the trial when I explain the law to you as the person

21  in charge of the law department and give you your marching

22  orders to start your deliberations, I'm not going to be in

23  there with you, I have no place in that jury room with you.

24  Only you eight folks are going to decide the facts and apply

25  them to the law that I give you.

1        So, you may see how this breaks down during the

2   course of the trial; for example, somebody is testifying here

3   and a question is being asked and then the lawyer gets up and

4   says:  Objection, Your Honor, and everyone gets startled by

5   that.  What the lawyer is telling me is that he doesn't think

6   or she doesn't think that that's a proper question to ask the

7   juror and I should not allow the juror to answer that

8   question:  When was the last time you murdered your wife?

9   Well, it has nothing to do with the case, right.  Objection,

10  sustained.  So, I say sustained, it means don't answer the

11  question, okay.  Objection overruled, that means I made a

12  legal decision based upon my knowledge of the law, it's a

13  proper question and the witness can answer it.  So, you'll

14  hear that type of thing happening probably throughout the

15  course of the trial.

16       Now, lawyers should object when they feel inclined

17  to do so because they're not neutrals, they have an ethical

18  responsibility to do the best they can to represent their

19  clients.  The plaintiff is representing Mr. Barger and the

20  defendants are representing First Data Corporation.  You know

21  a little bit about that from what Mr. Morales told you during

22  the openings about the nature of this case a little bit.

23       So, they're not neutrals.  The neutrals are the nine

24  of us, all right.  The judge is a neutral, you folks are

25  neutral, we have no bias, we have no ax to grind.  We're going

1    to call the shots as we see them based solely on the evidence

2    and the testimony that you will hear during the course of the

3    trial.  So, that's the ABC-s of how important we are together

4    to work as a team.

5             I like to also mention historically that we just had

6    another 9/11 holiday or anniversary, not a holiday, this past

7    week and I remember, because I've been here for a while now,

8    that before 9/11 when we went through the jury selection

9    process, you can pick out a bad apple once in a while,

10   unfortunately they were the younger people, not the older

11   people.  You know, they may have said when they came to the

12   court, watch me get out of jury duty, I'll tell the judge I

13   have epilepsy or something like that, who knows why.  We can

14   spot those, we used to get some of that.  After 9/11 I rarely

15   see that anymore.  It's almost as if there's a whole change in

16   attitude about taking our responsibilities as citizens

17   seriously.

18            You cannot be a juror unless you're a citizen.  The

19   founding fathers, and the mothers I'm sure were there

20   whispering in their ear, thought it was so important that we

21   have juries in the United States on civil as well as criminal

22   cases that the one requirement they made is that you have to

23   be a citizen of the United States and the reason why they did

24   that is the same reason why they decided judges should be

25   appointed for life, because they came from a bad place, the UK

1    or Great Britain and England in those days was not a happy

2    place and we all ran from that place to escape persecution,

3    the King was hanging people right and left, right.  And they

4    wanted to make sure that the system of law that they

5    established in the USA was going to be totally independent of

6    politics and that judges can't be removed or hung if the King

7    doesn't like the way the judge handles the case and the

8    citizens know that they're going to get a fair shake when they

9    come to court, there's not going to be any politics, there's

10   not going to be anything at all other than the independence of

11   the federal judiciary, citizens of the United States

12   discharging their responsibility.  So, they thought, the

13   founding fathers, that jury service was so important they put

14   it in the Constitution and that's one of the reasons why

15   because they didn't want the King to decide people's rights,

16   they wanted fellow jurors to decide it.

17        So, I like to give this little civic lesson, make

18   you people feel really important.  You can't serve, I don't

19   think maybe one of you, two of you, you can't go over to

20   Afghanistan and fight for the country but you can give service

21   here as jurors, it's your opportunity to serve.

22        I think you're going to find it to be something

23   that's very special and you're going to remember this for a

24   long time and feel very privileged that you were selected to

25   be jurors in this case.

1        At the end of the trial when I talk to you, I'll ask

2   you do you want me to go to Washington and lobby that we

3   should eliminate jurors in civil cases, what do you think.  I

4   have been asking that question for a long time.  What do you

5   think the answers are.  People say, no, we like it the way it

6   is.  So, we'll see what your answer is at the end of the

7   trial.

8        So, how is this case going to unfold.  So, the

9   plaintiff has brought this lawsuit, you know what it's about,

10  it's a disabilities case claiming he was not reasonably

11  accommodated in his job and you'll hear all about that from

12  the lawyers and the witnesses.  I'm not really a fact witness

13  so I'm not going to tell you anything about the case.  It's

14  not my job, right.  That's what the trial is all about.

15       But the plaintiff, since the plaintiff brought the

16  case, the plaintiff has the burden of proof.  Now, you

17  probably know what the burden of proof is in criminal cases,

18  you all watched the big famous O.J. Simpson trial, right.  In

19  a criminal case it's proof beyond a reasonable doubt, right.

20  But in civil cases it's a lesser burden, it's just a

21  preponderance of the evidence.  Visualize those scales of

22  justice, if they tip ever so much in this direction, then the

23  plaintiff has sustained its burden of proof and I'll tell you

24  more about that at the end of the case when I go through all

25  the law with you that you should be aware of but right now I

1   want to let you know the difference between a civil and a

2   criminal trial.

3            Also, you know in criminal cases, I've told you

4   this, the statutes of Congress that have been enacted to

5   govern our decisions require 12 jurors in a criminal case.  In

6   a civil case we don't need 12 anymore, it used to be 12, and

7   in a criminal case we have alternates and only 12 -- you know

8   12 Angry Men, 12 angry women deliberate, the alternates listen

9   and then they're discharged afterwards if they're not needed.

10           A civil case I like better because everybody picked

11  will deliberate, no alternates.  I like that you're hearing

12  the case and everyone is going to be deliberating and your

13  decisions have to be unanimous, interesting, right.  You'll

14  hear all about that at the end of the day when I tell you my

15  final instructions.  So, why do we have eight, because we must

16  have by statute six so we want to make sure we have a little

17  bit of latitude God forbid if someone gets sick.

18           The case is going to last several days, it's not

19  going to be three months, it's not going to be three weeks, it

20  will be here for a few days, certainly this week and probably

21  lapping over to next week.  We don't know exactly when it's

22  going to end because it is not a scientific laboratory, we

23  don't know how long the cross-examination will be and whatever

24  unfolds but we have a general idea of the nature of the case

25  and the number of witnesses that I'm told will be testifying,

1  we're talking about several days, not several months.  You're

2  going to be here for a little bit of time, it's not going to

3  be too much of an imposition on your time but it is very

4  important that you give it your full attention.

5          So, since the plaintiff has the burden of proof, and

6  when I finish talking, which will be in about ten minutes

7  maybe, then the plaintiff's lawyer will stand up and deliver

8  what we call opening statements.  Then defendants' lawyer who

9  will be speaking on behalf of the defendants will get up and

10  speak to you also.  Those are the opening statements.  We're

11  going to probably get that done this afternoon, should be

12  finished about 4:30.  You'll go home, come back tomorrow

13  morning at 10:00 and we'll start with the first witness.

14          Now, when a lawyer speaks, remember the lawyer is an

15  advocate, the lawyer is not a fact witness so what the lawyer

16  says in his or her opening statements, closing statements or

17  whatever, it's not evidence, it is lawyer argument and the

18  lawyer should make his best efforts to argue on behalf of his

19  client, no question about it.  So, because a lawyer says

20  something, it's not necessarily something that is factually

21  correct.  It's for you to decide what the facts are.

22          So, when the lawyers get up and talk to you, the

23  purpose of opening is to give you a little bit of a road map

24  on what they expect to establish during the course of the

25  trial so you get oriented a little bit.  You see, before the

1    first witness is called you'll have an idea of what the case

2    is all about through the lawyers' perceptions.  They're not

3    testifying as witnesses, they're just advocating and giving

4    you a little bit of a road map.  They're not going to agree

5    with each other.  If they agreed, we wouldn't need you.  We

6    need you because they don't agree with each other.  We're

7    going to find out where the truth lies and who you believe and

8    who you don't believe.

9            And while we talk about the evidence, one of the

10   important functions you have as fact finders is to size up the

11   credibility of a witness, do you believe the witness

12   partially, wholly, not at all.  So, when the witness testifies

13   you know you're going to check the witness out, the verbal as

14   well as nonverbal communication and you be the fact finder on

15   the issue of credibility of the witness, okay, that's part of

16   your fact finding responsibilities.

17           Now, because the case is going to last several days

18   it's okay if any of you want to take notes.  I don't see any

19   of you having paper and pencil with you now but you'll have

20   that available if you want to bring it into the courtroom.

21   You don't have to take notes, you can.  Some people seem to

22   pay better attention when they write things down.  Some people

23   seem to pay better attention to people when they testify when

24   you're looking at them instead of being distracted by writing

25   things down.  Whatever your comfort level is, it's fine with

*Preliminary Remarks of the Court*                          18

 1  me.  This is not trial by who takes the best notes.  If you
 2  take notes, you keep them behind here, they're just for your
 3  own personal use.  You don't have to worry if anybody forgets
 4  what a witness is testifying about, it's going to be several
 5  days later, you don't have to guess because we're blessed in
 6  our courthouse with wonderful court reporters and you can see
 7  Holly is taking down everything that's being spoken by the
 8  judge right now.  So, if during your deliberations you don't
 9  remember what witness X or witness Y said, you think it is
10  relevant, you want to hear it again, it's available for you,
11  we have it in black and white for you to have it read back to
12  you, okay, so you have that comfort level.
13              So, if you want to take notes, it's okay.  You don't
14  have to.  Generally in a long trial people like to take notes
15  just to keep track of events.  In a short trial it's not as
16  important.  Whatever your comfort level is, that's fine but
17  it's personal to you.
18              Now, you're not going to be sitting here 24 hours a
19  day seven days a week so you're going to be able to walk
20  around and you see folks here, you know who they are, they
21  have been introduced to you this morning, the lawyers are
22  there, the lawyers are professionals, they know that if they
23  pass you in the hall or in a restaurant, you never can tell
24  who's going to be sitting next to you, right, they're not
25  going to be talking to you not because they're snobs but

1  because that's the right thing ethically not to do, you don't

2  want to have communication between the witnesses, the lawyers,

3  parties or anybody who's associated with the case.  So, if you

4  see the folks, they'll just nod, they may say hello, that's

5  it, and even if somebody is 50 feet away and you don't know

6  what that person is talking about, we avoid the appearance of

7  impropriety.  So, if you're talking to somebody and somebody

8  sees from 50 feet away that you're talking, they don't know

9  what you're talking about, so we avoid even the appearance of

10  impropriety.  If you exchange common courtesies, good morning,

11  good afternoon, that's it, all right.

12            You're going to be free for lunch, about an hour, an

13  hour and a half, whatever.  We'll probably break about 12:30,

14  it depends upon what's happening in the court.  I'm in charge

15  of the administration of the court.  If a witness has just

16  finished testifying, we'll take a break, otherwise we'll see

17  how it goes.  It probably will be between 12:30 and 1:00

18  usually and then you're going to be going home at night.  We

19  try to run from 10 to 5, all right.  Some of my colleagues

20  start at nine, I'm not such an early bird, but I also find

21  10:00 works fine in New York because you avoid the rush hour.

22  Hopefully none of you are going to drive, I don't know where

23  all of you come from.  I drive and I usually get here okay.

24  Once in a while I'm embarrassed to say I get stuck and I have

25  to apologize but I don't live so far away and I can go right

1   into the courthouse garage.  You may not have that same

2   opportunity.  It is better if you take public transportation.

3   If you drive you really, really have to discount for the fact

4   that you can hit traffic.  We want to start promptly at 10:00.

5   We want to all be here.  Obviously common sense, if one of us

6   is not here, we can't start.  One person may hold up everybody

7   and you don't want to do that.  We all know emergencies

8   happen.  You call Mr. Innelli, you'll have his contact

9   information, if there's an emergency just call and let us know

10  but otherwise we're all trying to be on time and start at

11  10:00.  I'm telling you the person who has the hardest time

12  doing that is the judge.  If I have to rate myself for the

13  quality of being a judge, I'll give myself ten on a scale of

14  one to ten in every category except one, when it comes to

15  tardiness I give myself a four and a half.  For some reason I

16  have a hard time getting up on time but trust me, when it

17  comes to a trial when other people are waiting on me, I bust

18  my gut so I'm here at 10:00 also and if I'm not, boy, am I

19  going to have egg on my face.  So, I think I can do a good job

20  of getting here at ten and so can you folks and you know why

21  it's important, so we can start at 10:00 promptly and not hold

22  the action up.  If I'm not here by ten, I'll apologize

23  profusely, I may even resign as a judge for all I know.  So,

24  we know how important it is.

25          When you get home for sure your loved ones, your

1  significant others, your kids, whoever, are going to pepper

2  you about what kind of case it is and they're going to want

3  all sorts of information from you.  It's natural that people

4  are curious, right, especially people you live with, right,

5  your best friends, and you'll be tempted to talk about the

6  case.  You've got to resist that temptation.  You have to tell

7  these good folks please, at the end of the trial I'll talk to

8  you from here to kingdom come and tell you whatever you want

9  to know.  During the trial don't talk about the case.  Why?

10 Because the only thing that counts is what's happening in the

11 courtroom, what the testimony is.  You don't check the

12 internet out, you don't look at the newspapers, you don't

13 listen to television.  If you hear anything inadvertently, you

14 tell Mr. Innelli about it so we can make sure that nothing

15 happened that would prejudice you to sit objectively as a

16 juror.

17          So, you can only consider what goes on in the

18 courtroom.  So, if your loved one at home says, oh, that's

19 what kind of a case it is, let me tell you about this case.

20 Now you've gotten some information in your head, even if it is

21 going to be subconscious, that could play a devilish role in

22 terms of your ability to sit fairly as a juror based only on

23 what you hear in the courtroom.  So, I think you understand

24 that.

25          So, I use humor to get this point across by telling

1   you the only thing you are allowed to tell the folks back home

2   when they ask you about the case is that Judge Block is a

3   handsome guy, he's 6 feet 4, he's much better looking than

4   Brad Pitt, he's only 34 years old, what a judge we have, okay.

5   Otherwise they'll understand that they have a responsibility

6   as fellow citizens not to try to get into your head.

7            The internet is a dangerous thing because people

8   love to look at the internet, our curiosity, what's this,

9   what's that, okay.  You've got to avoid that.  If you see

10  anything in the paper -- I don't think this is a newspaper

11  case, it's not like the Peter Gotti trial I presided over

12  years ago when it was in the paper every day, but if something

13  comes into the newspaper, because it is a human interest case,

14  try not to read it, try not to do that.  If you see anything,

15  tell Mr. Innelli about it because we can, if necessary, go

16  with seven jurors or even six.  So, if somebody gets sick, we

17  hope that doesn't happen, then we can go with seven or if

18  something happens where one juror is prejudiced, then we'll

19  have to go with that many jurors.  So, you have to really take

20  your responsibility seriously in discharging your obligations

21  fairly and faithfully.

22           So, I've talked a lot and it's about 3:00 now, I

23  think I've covered most of what's going to happen.  We are

24  going to hear all arguments today, then the first witness will

25  come tomorrow and when the lawyer questions that witness, we

1    call that direct examination.  Then after that witness

2    testifies, the other side can question the witness, we call

3    that cross-examination.  There can be redirect, recross and

4    eventually the testimony of that witness will be completed.

5    Then we go on to the next witness.  The plaintiff presents all

6    of its evidence first and the defendant goes after that and

7    after that I'll come down and talk to you.  The lawyers will

8    give their concluding remarks first before that happens in all

9    probability and they'll tell you why you should find in their

10   favor and then I'll explain the law to you and you will be off

11   with your deliberations.

12          I may interrupt from time to time by asking some

13   questions of a witness.  If I do that, it's not because I have

14   an opinion about the case.  Don't think that anything I do or

15   say or whatever is to give you a clue as to what I think of

16   that witness or about the case because that's not what I try

17   to do, but if I feel that the witness is answering a question

18   and it's confusing to me, since you can't ask questions, I

19   would love to have you ask questions but the higher ups say

20   you can't, right, then I'm going to be your surrogate and I'd

21   say if I'm confused, they may be confused and I'll try to ask

22   a question to clarify things.  If the witness is rambling, I

23   may try to get the witness focused.  If they're going too long

24   and I think it is confusing, I'll try to bud in at that

25   particular time to move the trial along in an expeditious

1   proper way and you'll see some of that happening but if that

2   happens, don't think that I'm telling you how the case should

3   be decided, okay.

4          Now, I may have forgotten some things.  I think I've

5   got it down pretty well to my satisfaction.  If I want to say

6   anything else to you, I'm not bashful.

7          One other thing though, we're going to take a

8   mid-morning break and mid-afternoon break.  We're starting

9   today a little bit later so we'll see whether we need a break

10  today but if anybody needs to use the facilities, anybody in

11  the courtroom including the judge, including the court

12  reporter, including Mr. Innelli, my clerk, just don't be

13  bashful and we can take a little break because I want everyone

14  to be comfortable here, all right.  And I think when we go for

15  an hour and a half and take a break, usually that works okay.

16  I may take a shorter break.  We're human, don't be bashful

17  about it.  Pretend we're in kindergarten class, raise your

18  hand, teacher, I have to go to the bathroom.

19          I think Mr. Shearer is going to make the opening

20  statement.

21          Before we do that, Mr. Innelli always reminds me, we

22  have to give you another oath.  You may recall you took an

23  oath, everybody was out there, and that was to guide your

24  answers in terms of what we call the voir dire process, the

25  selection of the jury, can you answer these questions

1    truthfully and honestly, etc.

2          Now that you've been selected as jurors, we give you

3    a different oath and it goes by like a bullet but it is so

4    important we start the trial that way, we end it that way.

5    Listen to it carefully.  Mr. Innelli at this time will

6    administer it.

7          THE COURTROOM DEPUTY:  Good afternoon.  If you could

8    all please stand and raise your right hands.

9          (Jury sworn by the courtroom deputy.)

10         THE COURT:  Can you hear it all?

11         Mike, do you want to say it again.  It's so

12   important.  Slow it, say it again.

13         (Whereupon, the courtroom deputy repeats the oath.)

14         THE COURT:  Without fear, without favor.  We don't

15   care whether it is a corporation, what color the parties are,

16   whether they blue, purple, whatever, their national origin,

17   anything about that; without fear or favor, just based upon

18   the evidence, a true verdict based upon the evidence which is

19   going to unfold starting tomorrow morning when the plaintiff

20   calls the first witness but first Mr. Shearer is going to give

21   you his opening statements.

22         Go ahead.

23         MR. SHEARER:  Thank you, Your Honor.

24         Good afternoon.  We're here today because First Data

25   Corporation and the four individual defendants over here,

1   Mr. Bisignano, Mr. Charron, Mr. Marino and Ms. Johnson,

2   violated plaintiff's rights under the Family and Medical Leave

3   Act and the Americans with Disabilities Act.

4           They did this in two ways, they took two actions;

5   first, the plaintiff has recovered from cancer surgery, he had

6   his larynx removed.  He was at home working from home remotely

7   using computers, video-conferencing, texting and working on

8   his company business while he was recovering at home.

9           First Data, for reasons that you'll have to decide,

10  came and visited Mr. Barger, saw his condition, decided that

11  he should be on leave of absence and forced him to quit

12  working, to go on unpaid leave of absence against his will.

13  He asked to stay working but they told him for his own health

14  he needed to stop working.  That violates the Americans with

15  Disabilities Act.  That is making a decision based solely upon

16  the plaintiff's physical condition and illness to take an

17  action against him by making him stop work and go on unpaid

18  leave, stopped his salary and told him to stop working.

19          The second way they violated the law was under the

20  Family and Medical Leave Act.  At the end of this forced leave

21  Mr. Barger was required to present to First Data a physician's

22  note that said that he could return to work and that the

23  doctor had okayed his return.  Mr. Barger delivered that note

24  and he delivered it timely within the twelve weeks.  First

25  Data accepted the doctor's note.  Three days later they called

1    him up and told him that he was fired and that he didn't need

2    to come into work as scheduled the following business day

3    after the weekend.  That violated the Family and Medical Leave

4    Act because you're entitled to take twelve weeks with pay and

5    the statute says you're entitled to be restored to your

6    position or an equivalent position at the end of your leave.

7    First Data violated it by not bringing him back after he had

8    satisfied every condition which was to have his doctor certify

9    his right to return and his ability to return at that time.

10          Now, when I first heard Mr. Barger's story I

11   couldn't believe it because First Data is a large corporation,

12   they have 22,000 employees worldwide, they have 6,000

13   independent contractors and they have a management team that

14   is excellent, a very experienced CEO, an Executive Vice

15   President of Human Resources that's been around for decades

16   and it's a well managed company and they've got a special

17   leave management team.

18          Somebody screwed up and ever since then First Data

19   has been making excuses and you're going to hear their excuses

20   and I hope that the presentation of evidence that I will have

21   for you will show you for what they are, they are after the

22   fact, lawyer manufactured excuses for what was otherwise

23   illegal conduct, forcing leave against Mr. Barger's will and

24   failing to reinstate him when he satisfied the condition of

25   providing a doctor's note.

1          Now, the purpose of this opening is to kind of give

2     you not only that background but background as to the facts

3     you're going to hear and what I think I can prove and I'm

4     going to anticipate what I think the defendants are going to

5     say, I've been -- this case has been going on for two and a

6     half years, almost, if you add all of it together, the pre-

7     filing of the suit, almost three years at this point.  So,

8     I've heard their arguments so I'm going to anticipate those

9     for you a little bit.

10          Now, this is going to be an interesting trial,

11    you're going to hear from Wall Street CEO-s, you are going to

12    hear from physicians about the surgery that occurred, the

13    recovery, how long it takes.  You're going to hear about First

14    Data's business, what they do, how they process payments, the

15    type of technology that they use because Mr. Barger's job at

16    First Data, he was the Senior Vice President of Sales

17    Transformation and Training.  He designed the training

18    programs around lots of things, the corporate -- the

19    transformation of First Data from a corporation that merely

20    provided PIN pads and credit card swipes to a merchant and

21    then processed those transactions to a company that's now

22    transforming with new modern technology into the ability to

23    collect information, provide their customers additional

24    information about the market, about the economy, about their

25    specific business.  So, they're moving to more of an

1    information type company and Mr. Barger was hired to help.

2            Now, I'll get into the details of all of that but I

3    want to echo what the judge just said about what the lawyers

4    are talking about, what the lawyers say is not evidence.  So,

5    remember that.  Mr. Eidelman and Mr. DiLorenzo are very

6    experienced attorneys and can tell a good story and just

7    remember what they say is not the evidence.  You're going to

8    need to listen to the witnesses, you need to listen to -- look

9    at the documents and make your decision based upon that.

10           I'd like to introduce Mr. Barger right here.  Wish

11   him happy birthday, he turned 75 just Saturday.  This is my

12   co-counsel, Mr. David Zeitlin, who's from here in Brooklyn and

13   is helping me out with this case.

14           Now, this case is not like most ADA and FMLA cases.

15   In this case in every instance you'll hear, you'll hear

16   Mr. Barger through emails and through testimony saying he

17   wants to work, work is the man's life, he loves it, he's been

18   working since he was 15, 16 years old every single day.

19   Taking the work away from him is what really harmed him.

20   That's what he did, he worked and he wanted to continue

21   working.

22           You will hear that the day after his larynx was

23   removed he was up the next morning checking on his team that

24   was at work, asking them how they were doing, following emails

25   while he was laying in bed 24 hours after surgery.  The man

1    wanted to work, and a lot of cases that you'll hear under the

2    FMLA or ADA is people wanting to leave, fighting over whether

3    or not they stayed on leave too long, whether they've taken

4    leave too much but that's not the case here, Mr. Barger didn't

5    want leave and so it's a little bit different in that way from

6    what you may have read about in terms of leave cases.

7            Now, like I said, the plaintiff is making claims

8    under both the ADA, the Americans with Disabilities Act, and

9    the FMLA, the Family and Medical Leave Act.  We're not trying

10   to get double count, we're not trying to recover twice.  The

11   law requires that when you bring a case, you need to bring all

12   of the claims that you may have that arise out of the same set

13   of facts and out of the same set of circumstances at the same

14   time.  So, these all arise out of the same set of facts,

15   they're brought together, we're not double counting, we'll

16   only get the damages that you can get under both statutes, you

17   can get them once, so don't take it like this is a pile on.

18           (Continued on next page.)

19

20

21

22

23

24

25

1          MR. SHEARER:  The case is simple, like I said.

2          Two things to remember.  They forced him on leave

3    when he didn't want it because he was ill, because of their

4    determination that he was ill.  And, second, when he satisfied

5    the criterion, brought his doctor's note back, they wouldn't

6    let him come back to work, and violated the Family Medical

7    Leave Act.

8          Now, Mr. Barger, I want to tell you a little bit

9    about Mr. Barger so you can kind of understand where this work

10   ethic came from.

11         Mr. Barger was born in Boone, Iowa.  It is a farming

12   community kind of north of Des Moines, and then he lived in

13   Hammond, Illinois, he lived in LaSalle, Illinois -- Hammond,

14   Indiana, I'm sorry.  But he did most of his growing up in

15   Dixon, Illinois.  So Mr. Barger is from small Midwestern,

16   small towns, Iowa, Illinois, farm areas.  And, you know, from

17   the time he was little, he was mowing, raking leaves, baling

18   hay, doing all the things that kids in the small town Midwest

19   do.

20         He then graduated from Dixon high school and went to

21   Iowa State University for a year, played freshman basketball,

22   but then decided college wasn't really his thing and dropped

23   out to go get a job.  Then he decided, well, maybe I should go

24   back to school.  And so he ended up at what's now Truman

25   State.  It was Northeast Missouri state at the time.  And he

1    graduated with a BS in education.

2            And he got a job coaching basketball and teaching

3    history in another small town in Gilbert, Iowa.  So he did

4    not -- you hear this case, we are going to be talking a lot of

5    Wall Street.  Mr. Barger is from the Midwest and was a high

6    school teacher and a high school coach.  Painted houses in the

7    summer, and every few years he decided that he was making more

8    money painting houses than what he was teaching school, and so

9    he stopped teaching and painted houses full-time.

10           And he moved to another small town in Iowa,

11   Chariton, Iowa.  And there he decided to sell some real estate

12   and painted some houses, and he owned a bowling alley.

13   Chariton, Iowa is, I believe, about 4,000 people, and

14   Mr. Barger was elected to the city council.  But while he was

15   there, he met a guy that ran a bank, and he became -- he sold

16   off his businesses and started his career with a bank.  He did

17   fabulous, and after a few years, the bank moved into their

18   main office in Des Moines, Iowa, and he worked there for quite

19   a while and developed some innovative products.

20           Up until that point banks only could be banks, they

21   couldn't sell securities, they couldn't have insurance, and

22   now you have these mega banks, Citibank, you know, Chase,

23   where they can sell everything.

24           What Mr. Barger developed, as that was changing, he

25   developed the first investor center, he served on the American

1  Bankers Association advisory board, and he created some new

2  marketing ideas, and he was recruited to Wall Street because

3  of it, and he was hired at Shearson Lehman, and he moved to

4  New York.  Had to have been a brave move, from those

5  4,000-people towns to the area.  His first office was on the

6  106th floor of Tower 2.  That's quite a move from small town

7  Iowa.

8              And he worked, he was a director of sales and

9  training there.  He created several new programs for training

10 the employees at Shearson, and worked very closely with the

11 man you will hear from tomorrow, Mr. Joseph Plumeri, who is

12 one of the stars of -- been a star of Wall Street for a long

13 time.  And he then left, started consulting, and then he got

14 recruited back by Mr. Plumeri again, and he was senior

15 executive training and business development at Smith Barney.

16 And, again, he just continued developing his training classes,

17 and the training classes focused on the sales force, on how

18 you get people to buy.  And it is not marketing, he has some

19 really interesting ideas on how you train.

20             And you will get to hear from him probably near the

21 end of our case, because we have to get some witnesses through

22 that need to travel in, fly in, and so Mr. Barger will

23 probably be near the end.  And you will hear from him.  And

24 he's great, and his ideas are great.  And he's a teacher.

25             Then after he kind of retired again, came back to

1    Primerica, he was at Citigroup, and he kind of retired again.

2    I wouldn't call it really retirement.  He calls it retirement,

3    but he continued working.  It more or less means he's not on

4    Wall Street anymore.

5           Then he got recruited.  He was working his

6    consulting business, and this is where the story for this case

7    really starts.  The end of 2013, the beginning of 2014,

8    Mr. Barger was working his consulting business, and

9    Mr. Plumeri calls him up again, and said, you know, I'm now

10   vice chairman of First Data Corporation.  They're doing this

11   transformation from starting to sell technology and

12   information, and your programs that you use for the brokers at

13   the banks on how they have the information advantage and how

14   they use that to sell securities or other financial products,

15   would be a good fit at First Data.

16          Now, I don't know if you know who First Data is.

17   Big company.  You probably interacted with First Data every

18   day, or at least once a week and don't even know it.  Their

19   business involves almost every aspect of the electronic

20   payments transactions.  They have agreements with the banks to

21   print and issue credit cards.  They have agreements with your

22   local pizza shop where they will process the credit cards for

23   the pizza shop.  They run an ATM network, and they process all

24   of this information and make sure the cash moves from -- your

25   debit transaction moves from your bank to the pizza shop's

1    bank, and it all runs through their system.  They estimate

2    that 40 percent of all electronic payments in the United

3    States pass through their systems at some point during that

4    whole process, whether it is from your bank to their bank or

5    it is between you and the merchant, whether it is the card

6    that's been issued, and they are a part of the American

7    economy.  They process 3,000 transactions a second.  And some

8    people probably haven't even heard of them, but they are a

9    critical component to how payments work inside the United

10   States and in the world.

11           Like I said, up until the last five to ten years,

12   what they probably did with merchants was give them PIN pads

13   and swipers.  That's changing.  And Mr. Barger was coming in.

14           Like I said, he spent 30-plus years on Wall Street,

15   and he -- Mr. Plumeri, his friend, for all those 30 years, a

16   man he worked with at all those companies, Shearson,

17   Primerica, Citigroup, recruited him.

18           Mr. Barger began working with First Data in January

19   of 2014 simply as a consultant.  He was working when he could,

20   but he came in, started to evaluate the company, whether he

21   thought that his trading programs would work there, whether

22   they could be modified to work in a different industry other

23   than where they had been used before, and he found First Data

24   interesting and thought that his program would work.  And so

25   he continued to consult, but in April of 2014, Mr. Plumeri

1    came to him and said that he wanted him to shut down his

2    consulting with other clients.  He was consulting with other

3    banks, he was consulting with other brokerage houses, and

4    Mr. Plumeri wanted him to only work for First Data.  So he

5    gave him extra money a month and said come to First Data as an

6    employee, and that's what he did.  Mr. Barger began as an

7    employee of First Data on June 30, 2014.

8            Now, the first few years he reported to Mr. Plumeri.

9    Mr. Plumeri then decided to just be a member of the board and

10   not be involved in the day-to-day operations of First Data

11   anymore.  And Mr. Barger began reporting to a man named Jeff

12   Hack, who is not here, and I don't believe you are going to

13   see him, but you will be hearing his name a lot.  And Mr. Hack

14   was an executive vice president of sales and training at First

15   Data.  And Mr. Hack reported to defendant Charron that -- and

16   in what's called the global business solutions group within

17   First Data.  And so Mr. Barger became within defendant

18   Charron's group.  Defendant Charron reports to defendant CEO

19   Frank Bisignano.  And so that structure was there for a while.

20           Now, Mr. Barger continued to work on the sales

21   training programs, he developed programs called the First Data

22   Way, which was a traveling road show that First Data did to

23   their employees, to teach them about the new mentality about

24   the company on how you begin to think, how you become a

25   business consultant for the merchant, tell them what

1   information First Data could supply them about their

2   competitors, about their market, about their customers, about

3   the economy.  And it collects some data.  It collected from

4   public sources, from transactions, it puts together a package

5   and First Data sells it.  Mr. Barger was trying to teach the

6   company that we are different now, we are selling information,

7   not just PIN pads.

8           In February 2016, Mr. Barger was diagnosed with

9   spindle cell carcinoma of the larynx, in other words, throat

10  cancer.  From March until May of 2016, Mr. Barger underwent 30

11  radiation treatments, and that's a lot, inside of two months,

12  from the end of March to May, the beginning of May.

13          But the whole time, he did not miss work.  He went

14  into work every single week, every single day.  He was in

15  work, he had his radiation treatments over lunch, he would

16  have his -- whenever he had them, he would be back in the

17  office right afterwards, and he was there every day.  He never

18  called in sick, didn't take vacation, didn't take leave, just

19  continued to keep working, traveling, and continued speaking

20  on behalf of First Data at these gatherings.

21          In August of 2016, he went back into the doctor and

22  got the bad news that the radiation hadn't worked and that

23  they were going to have to do total laryngectomy, remove his

24  voice box.  He went and got a second opinion, and they

25  concurred.  And on September 6, Mr. Barger traveled to Tampa,

1   Florida, where one of the very great otolaryngologists and

2   throat cancer doctors works, and who was recommended to him by

3   CEO Bisignano, he was a friend of Mr. Bisignano, and suggested

4   that Mr. Barger go see him.  So Mr. Barger had his larynx

5   removed in Tampa, Florida, September 6, 2016.

6            Like I said, the next morning he was up working

7   again on the e-mails, on the text messages.  Couldn't speak,

8   but the time we're on there, they figured out ways to have

9   video conferencing where he could text his questions onto the

10  screen so that the team he was working with was able to see

11  what his thoughts were and he could submit questions to his

12  team.  He had e-mail, he could text people in the meetings, so

13  he could continue to communicate while his throat was healing

14  and he was unable to speak.

15           He had some complications, and you will hear about

16  that, and ended up staying in the hospital for three weeks

17  longer than what he suspected, but like I said, he was

18  continuing to work the whole time.

19           Middle of October, so about six weeks after his

20  surgery, he went back home, and his home was in Atlanta.  So

21  he went back home to Atlanta, and he stayed there.  He was

22  back on his home computer in his home office, had -- First

23  Data was right down -- their office in Atlanta was right down

24  the road.  It came and set up all the electronics he needed,

25  video conferencing, gave him his laptop so he would be more

1   efficient, and set up an Adobe meeting system.  And I will

2   have somebody explain that to you about how -- it was real

3   time.  They had -- you know, they're in a meeting room, in an

4   office somewhere they had cameras up, and Mr. Barger could see

5   them, Mr. Barger could communicate with them, he could type.

6   But his throat was still healing.  Couldn't speak yet, and he

7   can now, it's great.  He's getting -- it is amazing technology

8   that they now have.  It is not this little electronic thing

9   that's on your throat.  It is actually a device that connects

10  your trachea to your esophagus and then pushes on this button,

11  the air comes up, out -- no, it comes up out of our mouths,

12  that doesn't work anymore.  His air comes up and comes out

13  this hole.  When he pushes that button, it forces the air to

14  go into his esophagus and vibrates the back of his mouth.  And

15  so it pushes the button and vibrates the back of his mouth,

16  and he can speak, just like when we talk, the air comes up and

17  out, but instead it comes and vibrates our vocal cords, and

18  now it is just vibrating the back of his throat.

19          So on November 3 -- so he came home mid October.  On

20  November 3 of 2016, Mr. Plumeri and defendant Marino flew from

21  New York and -- New York on private jet down to Atlanta to see

22  Mr. Barger.  Mr. Barger was not in good shape.  There was

23  still some complications, not only with the healing, but, you

24  know, there was drainage issues that gave him pneumonia for a

25  night --

1          THE COURT:  Sorry.

2          (WHEREUPON, there was a short interruption.)

3          MR. SHEARER:  So Mr. Marino and Mr. Plumeri came

4   November 3.  And Mr. Barger was still raw, recovering, had

5   just come out of the hospital for an overnight stay because of

6   pneumonia, and Mr. Marino observed him.  He was there for

7   about two hours, and then he left.

8          Well, about two weeks later, Mr. Marino, who's good

9   friends with Mr. Barger, they worked together a lot, they

10  traveled together, sent Mr. Barger a text message, that

11  November 19th.  It was a Saturday.  Sent him a text message

12  and told him that First Data was requiring him to take leave

13  and apply for short-term disability because Mr. Barger had

14  been being paid on regular payroll all the way through, from

15  the day of surgery through November 19.

16          Short-term disability is 66 and two-thirds, so

17  two-thirds of salary, you get that for 90 days.  Then you

18  would move on to long-term disability, which is 50 percent of

19  your pay.  The distinction between short-term disability and

20  long-term disability is going to be important.  The parties

21  have agreed that the way that the short-term disability works

22  is First Data pays for the short -- makes short-term

23  disability payments, and it comes out of First Data's bank

24  accounts, the 66 and two-thirds percent of his salary.  If you

25  get to long-term disability, they bought an insurance policy

1   through MetLife, and once you hit long-term disability, First

2   Data doesn't make those 50 percent payments, MetLife does as

3   part of the insurance policy.  It is an insured product.  So

4   when he's on short-term disability, it is First Data's

5   expense, when he's on long-term disability, First Data's

6   expense is zero.

7           So Mr. Barger responds to Mr. Marino's text, and he

8   says, "What?  I'm fired?  You are removing me from my job?"

9   And Mr. Marino texts back, "No, no, not fired, just like

10  anybody on short-term disability or leave, your salary will be

11  restored when you are well, and you need to take time to get

12  well and focus on your health."

13          And that's where the ADA problem is.  Mr. Marino saw

14  him on November 3, evaluated the medical condition, and told

15  him that he had to go on leave without -- against Mr. Barger's

16  wishes.  And that would be short-term disability for 90 days,

17  and then long-term disability simply because that's a benefit.

18  Under the FMLA, it can be unpaid leave completely.

19          So Mr. Barger continued -- well, one other thing.

20  When they forced him onto leave, they also cut his access to

21  the First Data systems.  I mean, he could no longer get

22  e-mail, he could no longer do his video conferences.  He could

23  not access the First Data.  They had a web site for employees

24  where they can get forms and get information about their HR

25  benefits.  He could no longer access any of that.  He couldn't

1   use a cell phone to e-mail from his First Data e-mail address.

2   So he basically was forced to completely cut communication

3   with First Data.

4          Now, that's the other violation of the ADA.  Up

5   until that point, a company has an obligation to provide a

6   reasonable accomodation to someone who has disability, if they

7   can perform the essential functions of their job, which is

8   exactly what there was.  First Data had given him all the

9   technology to perform his job from his home while he was in

10  recovery, and then First Data, on their own, took it away from

11  him and told him, "We are not paying you on payroll anymore,

12  and you can't work on work anymore."

13         Mr. Barger then received -- took all the way until

14  December 15.  So November 19, he was told he was going to

15  leave.  There was a mess involving how the forms got sent.

16  But Mr. Barger filled out his forms on the 21st and gave them

17  to the HR department, but it took until December 15 for him

18  finally to get a letter that declared his leave to be from

19  October 24 to January 16, '17.  So 10-24 of 16 to 1-16 of 17.

20         Now, I could have an argument about the start date

21  because he wasn't -- how his leave could have started before

22  he even got the forms, I am not quite sure, but for purposes

23  of this case it doesn't really matter because on -- because he

24  delivered his physicians note before his leave expired.  But

25  he was told when he -- even though they declared his leave,

1   October 24, January 16, he was told he couldn't come back

2   until he had a physician's letter.  And if he didn't get the

3   physician's letter, when leave expired, at that point he was

4   no longer on protected leave and his job could be filled, he

5   could be terminated, so he needed to get back by that date or

6   ask for additional leave, but not under the FMLA.

7           Just a few weeks after he got that, at the end of

8   December, he went into the office for the holiday party.  On

9   December 22, he went into the office, you know, Merry

10  Christmas, happy holidays to his team, and at that point he

11  told members of First Data's management his plan was to return

12  in January.  That was the first time he told them he was

13  coming back.

14          On December 28, he told Jeff Hack that he was coming

15  back on January 16.  Jeff Hack then told Mr. Marino that

16  Mr. Barger was coming back on January 16.  He then on January

17  5, he informed lead management that he was coming back on

18  January 16, and he told them that he would get his doctor's

19  note on January 10.

20          Now, remember, he was forced on leave November 19,

21  and here we are just January, six weeks later, and he's

22  already coming back.

23          So Mr. Barger did exactly as he said.  Went to his

24  doctor on January 10.  Doctor says, you're good to go.  He

25  immediately drove from the doctors to the First Data office,

1    and handed his return to work authorization, signed by his

2    doctor to defendant Johnson, and they scheduled him to come

3    back a week later.

4             A week sounds like a lot, but it's really not.

5    January 10 was a Tuesday.  And January 17 then is a Tuesday,

6    but the 16th was Martin Luther King holiday.  So it was really

7    only three business days for him to get ready to come back,

8    for the company to get ready for him to come back.

9             Then he got told on January 13.  So the business day

10   before he was supposed to go back to work, 6:00 p.m.,

11   Mr. Johnson called him up and told him that he was terminated

12   and that there was no need for him to come into the office the

13   following day, following business day.

14            That violates the FMLA.  It says you need to restore

15   someone to their position or to an equivalent position.  You

16   are going to hear some stories of a company-wide

17   restructuring, you're going to hear some stories about how we

18   should recount dates.  You are going to hear some stories

19   about how Mr. Barger may have not -- may have tricked his

20   friend of 30 years.  That's all lawyer speak.  That's not what

21   happened.  What happened was Mr. Barger turned in his note on

22   January 10, said his return to work date, and was fired and

23   wasn't restored.

24            Now, I also think I'm going to be able to prove to

25   you that Mr. Barger was fired only because he decided to come

1    back.  Because when he's on long-term disability, he's zero

2    cost to First data.  That's being paid by the insurance

3    company.  But when he decides to come back to work, First Data

4    has to start paying his salary again.  And First Data would

5    have been just fine letting him continue on long-term

6    disability for as long as he could, and they would just go on

7    their merry way, taking his responsibilities, giving them to

8    someone else, hiring someone else, restructuring it.  And

9    that's what they thought he was going to do.  They thought he

10   was going to go out to pasture.  And, instead, consistent with

11   what everyone will testify to, he decided he wanted to go back

12   to work.  And it was him wanting to go back to work, I think

13   the evidence will show, for economic reasons, that First Data

14   terminated him because they didn't want to take his salary

15   back.

16           Well, that's exactly what the FMLA was designed for.

17   Before the FMLA, there were no protections for leave.  If you

18   were ill in such a situation, you had to rely upon the

19   kindness of your employer to keep your job, not fire you for

20   being absent.  Once you were down on sick days and you were

21   out of vacation days, that was it.  You didn't have any job

22   protection at all.  And the argument made by the employers on

23   why they didn't want the FMLA was we can't -- we have a

24   business to run here.  We can't have employees out.  And so

25   there were negotiations for eight years in Congress, trying to

1   figure out how to balance what the employers need and that the

2   employees need to have a protected job.  You need cancer

3   surgery.  And the balance is, what was struck, was 12 weeks of

4   unpaid leave.  But on the other side of it, there's unpaid,

5   but the employee's job was protected.

6          So you could leave, not get paid, but your job is

7   still there.  The First Data forgot the second part.  We got

8   the leave, Mr. Barger got the leave, he got forced on

9   short-term disability, he got long-term disability, but the

10  second half that comes with that wasn't there.

11         The Americans With Disabilities Act, I have alluded

12  to that, it was -- that statute was adopted back in 1991,

13  based on the idea that physical disabilities don't diminish a

14  person's right to participate in society and that because

15  society had historically shunned or segregated disabled

16  individuals, that a law was needed to remedy that situation to

17  make companies be careful in the way that they're thinking.

18  Make sure they don't discriminate against the disabled in

19  their hiring decision and in their pay decision and in their

20  termination decisions.

21         Both -- all the defendants and the plaintiffs, that

22  we all agree, that cancer is a disability under the terms of

23  the Americans With Disabilities Act.  In addition, once

24  Mr. Barger's voice box was removed and he's using a prosthetic

25  device to speak, that change in his speaking is also a

1    disability for purposes of the ADA, and there's no dispute

2    about that between the parties.

3           The ADA prohibits First Data from discriminating

4    against the plaintiff on the basis of his disability in

5    regards to his discharge or any other terms and conditions of

6    employment, and First Data violates that provision, and I

7    think it is not necessarily going to be obvious, they forced

8    Mr. Barger onto leave because they told him that he needed to

9    work on his health.  And what his health problem -- was the

10   cancer and recovery from the removal of his voice box, both of

11   which are disabilities.  So the decision to put him onto leave

12   was solely motivated by First Data's observation of his health

13   condition, and in telling him to go on leave and take of

14   himself.

15          It may sound like a noble act for First Data to be

16   concerned about Mr. Barger's health and Mr. Barger's

17   condition.  But Mr. Barger didn't want that.  He wanted to

18   continue to work.  And you can't force someone who's disabled

19   to take an accommodation if they don't want it.  And, in fact,

20   that becomes a violation of the ADA itself.  You can't tell

21   someone you are so disabled, let me give you this aid for your

22   job.  If you say no, I can't force you to, but if you can't

23   perform, then I can discipline you however's necessary.

24   Failure to do your job, write you up at work, terminate you if

25   you can't do your job.

1        But Mr. Barger wasn't given that chance to continue

2   working.  He was only given forced leave, which really, as it

3   turns out, really wasn't forced leave, it was really a

4   termination.  I mean, he -- yes, he was on leave for 12 weeks,

5   but as soon as he came back, he was fine.  And there's also

6   the failure to accommodate claim, which I've talked to you

7   about, revoking Mr. Barger's remote access.

8        So overall -- the excuses.  I guess I want to cover

9   these excuses you are going to hear real quick.

10       These guys are creative.  They are going to take

11  some tidbits of facts, e-mails here and there, and then

12  they'll weave a story.  One of them I call the time travel

13  excuse, and they're going to try to explain to you that you

14  should not look at really what happened, but you should go

15  back and change the date as to when leave started, even -- and

16  they want leave to have started on the date of surgery, but

17  Mr. Barger was working that whole time.  And they wanted to

18  end the week after he filled out his forms asking for leave.

19       Now how will they do that?  We will see if you

20  believe the facts.  I don't see how the facts work that way.

21       There's the restructuring job elimination defense,

22  and they are going to insist that the plaintiff's job was

23  eliminated as part of a company-wide restructuring involving

24  the termination of three to four hundred people.

25       The evidence will show that this excuse is a

1    subterfuge, a smoke screen, just an excuse for them to -- for

2    First Data not to have to comply with laws like the ADA or the

3    FMLA.

4         Here's why.  First Data has terminated large groups

5    of people every single quarter for 18 to 20 straight quarters.

6    Now, then the way that they account for that is interesting.

7    I hope to try to explain it to you.  What they end up doing is

8    what would have been your bonus expense for that year, they

9    take it and they call it a severance expense or a

10   restructuring charge.  And then for purposes of calculating

11   their net adjusted income and their earnings before interest,

12   taxes, appreciation, amortization, they exclude that.  So all

13   the sudden they are net adjusted earnings go up, even though

14   they have paid severance, simply because they call it

15   severance instead of what would have been your bonus.  And so

16   those concepts, those financial numbers then become part of

17   the formula for determining the amount of bonuses for the rest

18   of the management that remains employed at the company.

19        So it becomes a cycle where they terminate large

20   groups of people every quarter, and -- but the interesting

21   part is, their head count is up.  Their compensation expense

22   is up.  Yet they have terminated large groups of people every

23   single quarter.

24        So even if Mr. Barger was in this reduction of

25   force, and I intend to prove he wasn't, but if he was, their

1  excuse doesn't make any sense.  It is not an elimination of

2  his job.  His job, and they will admit, the job -- his job

3  duties were moved to somebody else while he was gone.  His --

4  on the same day he was hired, Dan Charron, whose group he was

5  in, hired a senior vice president on the exact same day that

6  they terminated Mr. Barger.  This is not a reduction in head

7  count.  And they cannot show you that these reductions in head

8  count have done anything economically because they continue to

9  hire after they fire all these people.  And it is all for

10 accounting manipulation and accounting engineering.  It is not

11 for any real -- for a real purpose, it is just so they can

12 change their financial statements when they talk to Wall

13 Street about their stock, when they talk to their debt holders

14 that they owe money to, to say that they are doing something,

15 but in reality, it is just -- it is like a Ferris wheel.  Some

16 employees get off, some employees get on.

17         And their head count continues to increase, but they

18 are going to try to tell you, these are legitimate

19 terminations as part of a reduction in force, and they are

20 not.  And I will be able to prove that they are not.

21         Remember, and I'll conclude here, the events of only

22 55 days are at issue.  And so trying to keep track of the days

23 is going to be important, and I hope at the end to be able to

24 have a calendar to show when all of these events happened.

25 But it is from November 19, when Mr. Barger was forced on

1  leave, to January 13, when he was notified of his termination.

2  And a lot of things happened in there, but the whole time

3  Mr. Barger was on leave, and wasn't -- didn't have access.

4          So I am going to have to prove what happened during

5  that time period, using the e-mails that they have produced

6  during discovery, and using their witnesses that were there,

7  to try to get them to tell you what happened.  Remember, their

8  incentive, especially the defendants, is to tell their story,

9  and I will point that out while they are being examined.

10         Well, the trial -- in thinking about this, I am

11  going to try to organize things into sort of five time frames.

12  There's the -- the first time frame is before Mr. Barger was

13  hired, so his relationship with Joe Plumeri, who hired him at

14  First Data.  We are going to talk about that.  Then we are

15  going to talk about the time between his hiring and his

16  surgery, which are the programs and training programs and what

17  Mr. Barger did when he was working at his job full-time in the

18  office before his diagnosis.

19         Then from the surgery to the time of forced leave,

20  how Mr. Barger was working in the hospital and was working at

21  home.  And then from the time of forced leave to the time he

22  turns in his doctor's note and is terminated.  And then,

23  finally, there's going to be some relevant evidence related to

24  the period of time from the time he was terminated until we

25  are here today.

1        So you're about to watch a major company, a very big

2   company, try to cover for what is a mistake.  They should have

3   brought him back.  They should have brought him back.  Had

4   they brought him back to a position or even equivalent

5   position, they always forget that one, even if his job was

6   given to someone else, that doesn't mean that they couldn't

7   have provided him an equivalent position.

8        They are going to ask you to ignore time and

9   recreate events, and they are going to attack Mr. Barger's

10   credibility and mischaracterize his job.

11        What they are trying to tell you is, because we fire

12   lots of people every quarter, we don't have to comply with the

13   FMLA.  If that person is one of them, we don't have to comply

14   with anybody in this group that's being fired.  This quarter,

15   your FMLA rights don't matter.  That's what they are going to

16   try to tell you.  They will tell you that officers with

17   multiple decades, like Mr. Plumeri or Mr. Bisignano, somehow

18   were tricked or made a mistake in their hiring of Mr. Barger.

19   And the evidence will show that that simply cannot be true.

20        And the evidence will be contrary on both the time

21   counting, on the trickery of Wall Street executives, and onto

22   this restructuring, and it is all designed to force you to

23   take into account and ignore that they forced him on leave in

24   violation of the ADA, that they didn't reinstate him when he

25   brought back his doctor's note.  Those are the only two things

1  you need to remember, and I look forward to presenting this

2  evidence to you, and I am confident you will agree with me and

3  the plaintiff that Mr. Barger deserves justice, and I am going

4  to place this decision in your hands in a few days, and I hope

5  you see it the way I do, which is you can't force somebody on

6  to leave because they are disabled, and when they do come back

7  from leave and they give you a doctor's note, you've got to

8  give them their job back.

9            Thank you.

10           THE COURT:  Thank you, Mr. Shearer.

11           Mr. Eidelman.

12           MR. EIDELMAN:  Thank you, Your Honor.

13            OPENING STATEMENT ON BEHALF OF DEFENDANTS

14           MR. EIDELMAN:  Good afternoon, Ladies and Gentlemen.

15           Your Honor, thank you.

16           362.  362 is the total number of employees who had

17  their jobs eliminated as part of a restructuring, a reduction

18  in force, that occurred in late 2016 and 2017, that included

19  the plaintiff, Mr. Barger.  And Mr. Barger was included

20  because at that time he was the 54th highest paid employee in

21  the company, earning -- out of 22,000 employees.  And the

22  company determined that it did not need somebody earning close

23  to $70,000 running a sales training group.  That's the

24  evidence -- close to $700,000.  That's the evidence, ladies

25  and gentlemen.  And we are going to talk about the evidence.

1          Before I begin, I just want to say one thing.  I did

2   not interrupt Mr. Shearer when he tried to give you a lesson

3   and instruct you on what the law is regarding the FMLA and the

4   Americans With Disabilities Act, the ADA.

5          You heard Judge Block tell you at the beginning that

6   it is the judge's responsibility to tell you what the law is,

7   and the lawyers are here to argue or to present evidence, and

8   opening statement is where I am going to present evidence to

9   you.  I am not going to argue the case right now.

10         But because Mr. Shearer did tell you what the law

11  was under the FMLA, he left one piece out, and the piece that

12  he left out is that there's an exception to bringing somebody

13  back at the end of FMLA leave, and it is called in the

14  regulation limitations, the right to restoration.  And the

15  limitation that is issued in this case -- that is at issue in

16  this case is that you would otherwise have been laid off,

17  regardless of whether or not you were at work or not, it is

18  not a violation of the ADA to include somebody in a

19  restructure in force.  And that's what happened in this

20  particular case.

21         Mr. Barger would have been included in this

22  reduction in force regardless if he was at leave or regardless

23  if he was at work, and that's why he was included, along with

24  362 other people who were let go.  And they were let go

25  because at that point in time, management decided that there

1    was -- that management had become top heavy.  And you are

2    going to hear something called the reduction in force of ten

3    percent of the top 3,000 highest compensated employees of

4    First Data.  They were the managers of First Data, and

5    Mr. Barger was one of them.

6             Mr. Barger was hired in 2014 first as a consultant,

7    and then as an employee by Joseph Plumeri.  Mr. Barger and Joe

8    Plumeri go back many, many years.  30 years together.  They

9    were friends.  Mr. Plumeri went from company to company, and

10   he brought Mr. Barger with him along the way.  And,

11   ultimately, they get to First Data.  And you've heard a little

12   bit about what First Data does today, and you are going to

13   hear a lot more about it during the trial.  But what it does

14   is exactly that, from that standpoint, which is, you go to the

15   credit card, you go to the cash register, you pull out your

16   credit or your debit card.  You ever wonder how that

17   transaction is completed so quickly?  Well, that's what First

18   Data's business was, where you swipe your card, and the

19   machine talks to your bank, and the bank talks to the

20   merchant.  That's what the business is, and you are going to

21   hear a lot more about that.

22            This case is a little bit different than a lot of

23   employment cases that are presented.  You're not going to hear

24   witness after witness come up and testify in this particular

25   case that we had -- that we were looking for cause to

1    terminate Mr. Barger.  That's not what this case is about.

2    This case is about whether or not it was justifiable to

3    include him with 361 other people in this reduction in force.

4         Mr. Barger decided when his employment was

5    terminated to sue First Data, and he also decided to sue four

6    individuals that had been identified.  If you will just

7    indulge me for a moment, I want to go back to counsel table so

8    that I can introduce them to you, if I may.

9         This is Frank Bisignano.  Frank Bisignano was the

10   CEO of First Data.  And it was Mr. Bisignano who made the

11   decision in 2016 or 2017 that the company had become too top

12   pay with management, so they needed to look at eliminating,

13   and you will hear these terms, spans and layers of management,

14   to bring the managers closer to the workers, and also to give

15   the managers more increased responsibility.

16        Mr. Barger himself had throat cancer, and it was

17   Mr. Bisignano, along with Joe Plumeri, who referred Mr. Barger

18   to Dr. Lou Harrison, as soon as they found out that Mr. Barger

19   had been unfortunately diagnosed with throat cancer.  And

20   Frank joined the company in 2013 to help turn that company

21   around.

22        This is Dan Charron.  Dan Charron joined the company

23   sometime in 2015 to lead GBS, global business solutions, the

24   largest division in the company.  And it was Dan Charron, who

25   in the fall of 2015 talked to Mr. Barger about the fact that

1    the company could not have somebody earning $700,000 a year

2    running a sales training group, that he needed to get with his

3    manager Jeff Hack to come up with a plan to increase the scope

4    of Mr. Barger's responsibilities.  That happened in 2015,

5    prior to the time that Mr. Barger had been diagnosed with

6    throat cancer.  And you heard testimony that Mr. Charron never

7    got that plan.

8         This is Tony Marino.  Tony Marino was an executive

9    vice president of human resources.  He's also a defendant

10   here.  Tony Marino and Steve Barger were very close friends.

11   They traveled a great deal together.  They worked together

12   closely.  And it was Mr. Marino who did everything he could,

13   financially and otherwise, to support Mr. Barger when he first

14   became sick, and then when he had to go out for additional

15   surgery.  And he did this for the person that he called

16   "coach."  That's Mr. Marino.

17        This is Rhonda Johnson.  Rhonda Johnson was

18   Mr. Barger's HR business partner when he was at First Data.

19   She also helped him manage the sales training group over those

20   years.  It was Ms. Johnson who when Mr. Barger needed to fill

21   out forms for FMLA and short-term disability and long-term

22   disability so that payment plans could continue once he

23   stopped being paid, at some time in the future or whenever it

24   may be, it was Ms. Johnson who did that.  Mr. Barber describes

25   Ms. Johnson as indispensable and someone who he cares very

1   much about.

2          These four individual defendants seem to suggest

3   that the adage comes true, that no good deed goes unpunished.

4   And what's happened here, in addition to suing First Data, his

5   employer, Mr. Barger has sued Frank Bisignano individually.

6   He has sued Dan Charron individually.  He has sued Tony Marino

7   individually.  And he has sued Rhonda Johnson individually.

8          Now, you have heard what Mr. Barger's claims are in

9   this case.  Well, let me tell you what his claims are not.

10  Mr. Barger testified at his deposition that he was not -- that

11  he does not believe that he was terminated because he has

12  cancer.  Mr. Barger testified at his deposition that he does

13  not believe that he was terminated because he took leave.

14  Mr. Barger testified at his deposition that he did believe

15  that the reason why Tony Marino insisted that he go out on

16  leave in November of 2016 was to take care of himself, not

17  worry about work, so that he could get better.

18          You are going to hear the First Data witnesses

19  testify that the hardest thing that they do, and they have

20  done in the past, is to let people know that they've been

21  terminated or separated from employment.  It is a very

22  difficult thing for them to do.  But First Data doesn't just

23  throw people out on the street.  First Data offers employees

24  generous packages to ease their transition into the next

25  phase, whatever it may be.  Mr. Barger chose not to accept

1  his, and he decided to sue.

2          We are going to talk a lot about what happened in

3  2016 and 2017, but I think it is very important that we first

4  go back to 2013.  It's a critical time period, and I will tell

5  you why.

6          In 2013, early 2013, Mr. Bisignano, Frank Bisignano,

7  gets a telephone call from KKR.  KKR is a company that happens

8  to own First Data.  It was a private company at that point in

9  time.

10         Mr. Bisignano, Frank, is asked whether or not he

11 wants to consider becoming the CEO, the chief executive

12 officer, of First Data.  You see, in the seven years prior to

13 that, First Data had five CEOs come and go.  Why?  The company

14 was on the verge of bankruptcy.  The company -- this number,

15 it's a big number, it is hard to understand.  The company had

16 $24 billion in debt that had been taken over years and years

17 and years.  The company had $2 billion in interest that it had

18 to pay every year.  So it had no money to invest in anything

19 because any money that came in went to pay for that interest.

20 This happened long before any of those individuals worked at

21 First Data, including Mr. Barger.

22         The company was in shambles, and it was in trouble,

23 and they were calling Frank to see if he was interested in

24 coming to help save up to 24 or 25,000 people's jobs because

25 that's the other thing First Data had.  First Data was

1   employing close to 25,000 people whose livelihoods depended on

2   First Data.  But this company was either going to get rescued

3   or it was going to go out of business, and ten of thousands of

4   people would lose their job.

5        It was a tough time, but, you know, First Data had

6   something else.  It had the name.  It had been in the payments

7   industry and, therefore, it knew what it was doing so it had a

8   good reputation, from that perspective.

9        So Frank decides, he speaks to his wife.  They talk

10  about he knows it is going to be a challenge.  He's had

11  experience doing these kinds of things, so he decides to take

12  on the job.  He arrives.  He knows he can't do it alone, so he

13  brings in a team with him.  He starts to hire people to come

14  on board and help him turn around the company, and he does

15  that.  He hires people like Dan Charron, who I have introduced

16  you to, who has had a lot of experience in the payments

17  industry.  He also brings on Tony Marino, and he brings on

18  Tony Marino's support.  Tony has worked at big companies, but,

19  more importantly, he's also worked at big companies that have

20  been in trouble and what needed to be done to help turn it

21  around.

22        The team starts to get to work.  They work 24/7.

23  They leave no stone unturned.  They are looking at everybody's

24  job, they are look at technology, they are looking at what can

25  we do to turn this around.  They convince KKR, the owner of

1    First Data, not to sell off pieces of the company.  Because

2    this would have been disastrous.  People would have lost their

3    jobs, and they didn't want to do that.  They wanted to try and

4    make a go of it.

5              In 2013, when Mr. Bisignano, when Frank joins the

6    company, he also brings on board Joe Plumeri, whose name you

7    have heard today already.  Joe was brought on as a senior

8    advisor, and he had many duties and responsibilities, one of

9    which was to help turn around the sales culture at First Data.

10             (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court.)

2          MR. EIDELMAN:  (Cont'g.)  Mr. Plumeri happens to

3    reconnect with Mr. Barger after 13 years.  They had been

4    friends and worked together for 30 years.  They had

5    disconnected for 13 years.  They got reconnected, and Joe

6    said, you know what, we really need help.  It's a desperate

7    time.  We really need to turn this around.

8          He turned to his friend Steve Barger, and he said, I

9    want you to come join me; and that's what happened.  And the

10   two of them started to go out on what are called road shows.

11   They started to go out, train salespeople how they wanted to

12   do these new things; and that went on for a while.  That's

13   what they were doing.  That's what Mr. Barger was really good.

14   First Data admits that he was really good at this motivational

15   sales transformation type of thing.

16         That was in the beginning of 2014, and then in

17   August of 2014 Mr. Barger is asked by Joe Plumeri to take on

18   the role of managing the sales training group.  The sales

19   training group at that point in time was probably around 50

20   employees or so, and they were the ones who designed the

21   training that then -- that the salespeople would ultimately

22   use.

23         Mr. Barger himself was not in sales.  He didn't

24   sell.  That's not what he went to do.

25         So then we fast forward a little bit, to the fall of

1    2015.  A lot of things happen in the fall of 2015.

2    Mr. Plumeri stops being involved on a day-to-day basis.  He

3    has now done this for a few years or so.  He can't -- he's got

4    other things to do.  So he steps out and he stops being

5    Mr. Barger's supervisor.  That becomes Jeff Hack.  You have

6    heard that already from Mr. Shearer; and ultimately Mr. Hack

7    and Dan Charron worked together in GBS.

8              At this point in time Rhonda Johnson also comes into

9    the picture.  Rhonda Johnson becomes this HR business partner,

10   and during the course of that she is helping him do everything

11   that she can.  So she is working in sales training.

12             I mentioned already that Mr. Charron in the fall of

13   2015 has a conversation with Mr. Barger about his compensation

14   and says we can't have somebody -- you are the highest-paid

15   senior vice president in GBS at this time who doesn't have any

16   revenue responsibilities.  Accountants might call what sales

17   training was as overhead of some sort, and you are making

18   close to $700,000.  You need to come up with a plan with Jeff

19   Hack.  Tell me what you are going to do to try and justify

20   this money.  Never heard from Mr. Hack about it and never

21   heard from Mr. Barger about it either.

22             Something else important happened during this time

23   period.  Rhonda Johnson started to talk to Mr. Barger about

24   the need to hire his successor, the person who was going to

25   take over his job.  Now, Ms. Johnson knew that a year earlier,

*Opening - Eidelman*                                    64

1   six months after Mr. Barger got to First Data, he was working

2   on hiring his successor.  The company went out and started

3   that process of doing that, but because of budgetary

4   constraints it got put on hold.

5        Remember, I told you this company was in dire

6   financial straits.  So that got put on hold.

7        A year later Ms. Johnson raises it with Mr. Barger

8   and discusses it with him.  She also discusses it with Dan

9   Charron, and she discuss it is with Jeff Hack.

10       Moving forward with the successor takes a pause

11  when, unfortunately, in February of 2016 Mr. Barger is

12  diagnosed with throat cancer.  Mr. Barger tells Joe Plumeri at

13  a meeting in Florida that he has been diagnosed.  Mr. Plumeri

14  immediately picks up his telephone and calls Dr. Lou Harrison,

15  whose name you have heard here today.  He called Lou Harrison.

16  He said, Lou, Dr. Harrison, there is a colleague of ours here

17  at First Data, somebody I have known for a long time, you need

18  to see him.  This is a renowned oncologist, very busy

19  practice.  He is seen almost the next day.

20       How does Joe Plumeri know Dr. Lou Harrison?  Because

21  he was Frank Bisignano's doctor when Frank had cancer in 2010;

22  and, when it came to the time that Joe's wife had cancer,

23  Frank Bisignano immediately referred Joe to Lou Harrison.  At

24  that same meeting, Mr. Bisignano learned from Mr. Barger that

25  he had been diagnosed, unfortunately, with throat cancer.  The

1   first thing Mr. Bisignano, Frank, did was to get in touch with

2   Joe and said have we gotten Mr. Barger in, have we gotten

3   Steve in to see Dr. Harrison; and Joe assured him that he did.

4          During the course -- and you heard it -- he

5   underwent radiation, and he continued to first on First

6   Data OA.  Now, I thought I heard in the opening that it was

7   Mr. Barger who developed First Data OA.  That's not what the

8   evidence is going to show.  The evidence is going to show that

9   Mr. Marino, who joined the company in March of 2015, in the

10  fall of 2015 Mr. Marino decided that First Data OA should roll

11  out because they were no longer doing the road shows with Joe

12  Plumeri any more.  He was going upstairs.

13         And Mr. Marino put together a program that brought

14  together some senior leaders in the company, and they went out

15  and did a day or a day and a half seminar where they talked

16  about the history of the company, payments in the company.

17  The former CEO spoke for three hours in the morning about it,

18  and then you had other people come in to talk about how you do

19  a deal, how you do this.

20         Mr. Barger's presentation in First Data OA was 45

21  minutes in the afternoon, and he talked about things like

22  sales enterprise selling, the things that Mr. Shearer was

23  telling you about.  That's when Mr. Shearer -- excuse me, when

24  Mr. Barger and Tony Marino became good friends, because they

25  started traveling together.  But it wasn't Mr. Barger who put

1   together First Data OA; it was Tony Marino.

2         But during the time after he had his radiation and

3   it was difficult for Mr. Barger to speak, the company didn't

4   say you can't do First Data OA anymore, even though it's

5   difficult.  He continued to participate in First Data OA,

6   because that was the right thing to do, and that's what

7   happened.

8         But during the time that he is undergoing radiation,

9   there is a pause put on the search for his successor.  The

10  company said let's hold off.  But after the radiation was

11  done, Rhonda Johnson will testify -- and there is evidence to

12  this -- that she spoke to Mr. Barger again about the need for

13  a successor; that the sales training group was in shambles at

14  the time.  There was no leadership; there was no direction.

15        You see, Mr. Barger was the senior vice president up

16  here of sales training, and the workers were down here at

17  director level.  There was nobody in between.  Ms. Johnson was

18  trying to fill that role, but she is in human resources.  She

19  is not in GBS.  That's not where she belongs.

20        And she talked to him over the years and counseled

21  him about what he needed to do to improve his leadership and

22  his training and his management of that group; and he agreed

23  that they needed to look for a successor, and the company

24  started to do that.  The company started to do that, and

25  ultimately determined at the end of the day that there wasn't

1    a need for a successor, because we will get to the 362 again.

2           Mr. Barger was supposed to go out on surgery and did

3    have surgery at the beginning of 20 -- excuse me, in September

4    of 2016.  Right before he went out on surgery, Joe Plumeri

5    asked him and Tony Marino to come play golf.  You know what,

6    sometimes they say that a picture speaks a thousand words; and

7    I know this was important to Mr. Barger.  There is no question

8    about it.

9           But this is the picture that was taken like three

10   days before they went to play golf.  This is Mr. Barger.  This

11   is Joe Plumeri, who you are going to meet tomorrow.  And this

12   is Tony Marino.  Tony Marino, the same defendant that's

13   sitting over there, who has been sued under the FMLA.

14          Mr. Barger goes out on surgery in early September.

15   And you are right, the company does not require him to go out

16   on leave at that time.  He says he wants to keep working.  He

17   is a senior vice president; and the company says, okay, you

18   can work, and they continue to pay his salary throughout that

19   entire time.

20          In early November, Joe Plumeri and Tony Marino fly

21   down to Atlanta to go visit Mr. Barger.  During this time

22   period, Joe Plumeri is texting with Mr. Barger, seeing how he

23   is; and Mr. Barger doesn't want him to come visit.  He says he

24   is too ill to see people yet, he is not ready; but, finally,

25   he relents, and in November his friends fly down to see him.

1   They spend time together.  It was a good visit.  The visit was

2   so good that Mr. Barger describes the time they spent together

3   as priceless.

4           Mr. Plumeri and Mr. Marino are going to testify

5   under oath that the reason for that visit was not to spy on

6   Mr. Barger, not to find out what was, you know, whether or not

7   he could work or not.  It was to go visit and cheer up their

8   friend.

9           Now, you have heard something about a story, the

10  stories we are going to tell.  We are not telling stories.  We

11  are presenting evidence.  There is a reason why Mr. Marino and

12  the company told Mr. Barger that he had to go out on a leave,

13  and this got left out.  If you listening carefully in the

14  opening, there is a piece that got left out, because about a

15  week and a half after that visit Mr. Barger sends Tony Marino

16  a text message; and you will see those text messages about a

17  week and a half later, and it says, doctor found some more

18  cancer, I need to go in for another operation, I'm going to be

19  in the hospital for six days, and I'm going to have another

20  four weeks of recovery.  This is what he texted to Tony

21  Marino.  He didn't tell him when they were there.  He texted

22  them a week later, a week and a half later.

23          Now, by this point in time Mr. Marino was aware of

24  some strange behaviors that had occurred while Mr. Barger was

25  recovering from leave.  He had showed up on a couple of video

1    calls with his team not wearing a shirt.  He had sent a couple

2    of e-mails that were incoherent, including to senior managers

3    of the company, that suggested to the company that he was

4    heavily medicated at the time that he was sending these text

5    messages.  And now here Mr. Marino gets an e-mail that says, I

6    need more surgery and I'm going to be out another four weeks.

7           So the company decides at that point in time, we

8    need to shut Mr. Barger down, we need to let him concentrate

9    on getting better.  Not worrying about things at the company,

10   but getting better.  And as I testified -- as I said, not

11   testified -- Mr. Barger testified at his deposition that he

12   believed that the reason why Tony Marino did that, the reason

13   Tony Marino did that and the company did that was because they

14   truly wanted him to get better; and that was the reason.

15          And it's true, his access was turned off, and you

16   heard talk about what the ADA requires one way or another.

17   The reason why the company turned off Mr. Barger's access is

18   because if he wasn't going to be working there is no need for

19   him to have access to the company's systems.  So there is no

20   reason for an accommodation.

21          What happens then is Mr. Barger is sent paperwork.

22   This wasn't going to be unpaid leave.  Mr. Barger continued to

23   get paid, and you are going to see the paychecks that went all

24   the way through his entire employment.  But Rhonda Johnson

25   gets involved and offers to help him with his paperwork.  She

1   helps him get his paperwork sent out; and, finally, his

2   doctor -- not our doctor but his doctor -- sends in the FMLA

3   certification form, and this doctor sends it in in

4   mid-December, and his doctor said that Mr. Barger is

5   incomplete incapacitated starting in October.

6          We didn't fill out the form.  The doctor filled out

7   the form.  The doctor said he is completely incapacitated

8   beginning in October and that he can't work.  He then does get

9   notification from the company, and that's fine.  Later on you

10  are going to hear that there was some questions about whether

11  or not he had filled out enough paperwork for his STD and LTD.

12         The company reached out to him in the beginning of

13  January because there was now a question as to when did his

14  leave start, and in response to an e-mail that he was sent,

15  that he was sent by somebody in leave management, here was the

16  question, when did you stop working.  An e-mail said, and

17  Mr. Barger's response was, 9/4, my surgery was 9/6.  As a

18  result of what Mr. Barger told the company, they went and

19  looked at the MetLife portal; and they showed that, sure

20  enough, MetLife had been working with the doctors and

21  Mr. Barger and determined that his work had stopped on 9/4

22  when he had surgery.

23         So he was sent the second FMLA notice; and it's our

24  position, ladies and gentlemen, that at that point in time he

25  went on a different form of leave.  So at the time he wanted

*Opening - Eidelman*                                    71

1   to return to work he, was no longer covered by the FMLA; and

2   you will hear more about that.

3          While Mr. Barger is out they do an internal review

4   of his department, of the sales training.  A woman by the name

5   of Robin Ording is appointed on an interim basis to take over

6   his job duties.  Robin worked in HR, and her skill set was

7   training.  She didn't do this full-time.  She just bolted it

8   onto her other duties and activities.

9          They looked and they did a review from the bottom

10  up.  They went in and they started talking to the workers, the

11  people that worked there; and what did they find?  They find

12  that during a time when the company was still looking to turn

13  itself around, that this group was projected to not only stay

14  the same and not go down but they were going to be seven more

15  hirings.

16         But it was a mess.  It wasn't well organized.  It

17  wasn't well managed by the person who was leading it.  So the

18  determination was made, by the way, at that point in time that

19  there was a recommendation that the company did not need

20  somebody earning $700,000 or so to run a sales training group

21  that could even be shrunk further; and it would be shrunk

22  further, and you are going to hear about that.

23         Mr. Charron, who is the head of GBS -- and, as I

24  said, sales training is in GBS -- Mr. Charron was told orally

25  or verbally these are the results, this organization is much

1   too big, it can become a lot smaller, and we don't need

2   somebody at an SVP level running that department.

3          Later that month Tony Marino and Jeff Hack share an

4   e-mail exchange where they say Mr. Barger can't come back into

5   that job and he doesn't have a choice and that organization is

6   in shambles.  It's at this point in time that Mr. Bisignano,

7   that Frank, has decided there is too many layers of

8   management; and they start looking at how can we cut

9   10 percent of the top 300 highest-compensated people, and they

10  looked at it, and it wasn't enough.  It wasn't going to

11  achieve the objectives.

12         The company is still in trouble at this point in

13  time.  It's gone public, and the price of the shares was

14  actually lower than it was at the time that it went public.

15  They are still in this recovery mode, this restructuring mode.

16  And they make a decision that they are going to focus now on a

17  larger subset.  They are going to go to 3,000.

18         Now, Mr. Barger's name started appearing on some

19  lists as early as mid-November as being eligible and maybe on

20  that list for reduction in force because of his salary and

21  what he was doing.  And you will see these e-mails and you

22  will see the RIF list that continued throughout November into

23  December and ultimately into January.

24         Then in early January, that is when on January 5 --

25  and you hear a lot of dates in this case, and please try not

1    to get confused.  There are so many dates, and we are going to

2    try and get them for you, but what's important to know that in

3    early January that's when the company decided to expand; and

4    over the course of that weekend Mr. Charron, along with Jeff

5    Hack, got their list of their top 10 percent of that 3,000,

6    and they had to make decisions over the weekend who was going

7    to be selected.

8            Mr. Barger reported to Mr. Hack.  It was Mr. Hack

9    who determined and put Mr. Barger on the list saying he should

10   be included in the 10 percent of the top 3,000 reduction in

11   force.  Mr. Hack gave his list to Mr. Charron, who combined it

12   with the list of people that Mr. Charron was responsible for;

13   and, together, a list of 24 names was submitted.  That's how

14   Mr. Barger ended up being part of this reduction; and you are

15   going to hear about the reasons why the company selected him

16   or why he was selected for inclusion.  That will be part of

17   the evidence.  There was a final RIF.

18           The day after those decisions were made, Mr. Barger

19   shows up at work, meets with Rhonda Johnson; and at this point

20   in time -- and I meant to tell you this -- when the doctor

21   submitted that note that said he was incapacitated, the doctor

22   projected that he was going to be out until March, given what

23   his condition was.  He comes back with a note on the 10th and

24   he says, I'm ready to come back to work in a week without any

25   restrictions whatsoever.

1          Rhonda lets the people in management know about

2     this.  Rhonda does not know at that time that Mr. Barger has

3     been selected for inclusion in the RIF and he had already been

4     selected for inclusion in the RIF.  So two, three days later

5     Mr. Marino asked Ms. Johnson to call Mr. Barger because she

6     has supported him well; and she told him on Friday the 13th

7     that his job position had been eliminated and there would be a

8     package for him.

9          The next day Mr. Marino calls him and tells him the

10    same thing, that his job has been eliminated; and they talked

11    about what his package would look like and things that the

12    company was going to do for him over and above.  By the way,

13    there is something else that the company did for Mr. Barger

14    over and above that they did for somebody else.

15         Remember when I told you that Mr. Marino and the

16    company told Mr. Barger that he needed to go out on leave?

17    This was back in November.  Well, something else happened two

18    days later.  Mr. Barger sent Mr. -- Mr. Barger sent Tony

19    another text message, and that text message said the doctor

20    thinks my cancer might be inoperable.  You need to get my

21    family's finances in order, you need to take care of my wife,

22    you need to have my stock transferred to my wife.

23         And here is what the company did, something that

24    they just don't do for other people.  This idea that we

25    discriminated and tried to treat him badly.  Tony Marino,

1    within 24 hours, went to Frank Bisignano and went to Dan

2    Charron and said I want to pay Mr. Barger his bonus right now.

3    I have just gotten this e-mail from him.  He says he might

4    have inoperable cancer.

5            Bonuses aren't normally paid until the next year at

6    a company like First Data.  They wait for the year to be done

7    and then they pay it.  This is in November.

8            Mr. Marino sent Mr. Barger and e-mail the next day

9    that says we are going to pay your bonus now, we are going to

10   pay it all in cash, $174,000.  Everybody else's bonus was

11   going to be in some cash and some equity in the company.  Not

12   for Mr. Barger.  And everybody else's bonuses were supposed to

13   be 5 percent less.  There was no 5 percent reduction.  And

14   Mr. Barger got paid that bonus, something that was done for

15   him, that wasn't done for others.

16           And this is -- when Tony talked to him about the

17   fact that his job was going to be eliminated, Tony said

18   whatever equity in the company, stock in the company you might

19   lose because your job has been eliminated, we are going to

20   write a check to you for that as well.

21           Mr. Barger's employment didn't end on January 13

22   when Ms. Johnson told him his job had been eliminated.  The

23   company put him on nonworking notice, and he kept on the

24   payroll for another six weeks at his full salary, for a total

25   of another $60,000; and they extended the date of his

1  separation until February 28 so that he would vest in another

2  portion of his stock.  These are the things that the company

3  did for him in recognition of the service that he had

4  provided, and the kind of thing that the company would try to

5  do for people all along; and you are going to hear testimony

6  on that.

7         Now, Mr. Barger ultimately decides to sue First Data

8  and these four individuals, and normally that's when the story

9  would end.  We would be done, and we would then go and start

10  presenting evidence, and that's what would happen; but it's

11  not the end because this case has a twist.

12         Now, when parties sue each other in court, you then

13  engage in something called discovery.  What discovery is is

14  that the parties exchange documents back and forth so you can

15  see what each other has, and then parties also take what are

16  known as depositions.

17         And we took Mr. Barger's deposition in my office on

18  August 10 of 2018.  He came in, and there was a court reporter

19  just like the court reporter here, and he swore to tell the

20  truth, just like the witnesses will do here; and Mr. Shearer

21  was there at his deposition.  And we asked him some questions

22  about his case during that period of time.

23         During that period of time we discovered some

24  evidence that was not known by the company at the time that it

25  happened, and that's why this evidence is called

1    after-acquired evidence, because it was acquired after the

2    time period that it happened.  So I asked Mr. Barger, how did

3    it come about that Joe Plumeri and First Data decided to pay

4    you $30,000 a month to be a consultant.

5              Now, you heard in the opening that Mr. Barger

6    started being a consultant in January of 2017.  His consulting

7    agreement is dated -- it's dated in April, but the first date

8    of his consulting is the middle of March of 20 -- not the

9    beginning, the middle of March.  March 17 to be exact.

10             I asked him, how did you and Mr. Plumeri agree on

11   $30,000.  He said, I told Mr. Plumeri, I told Joe that I was

12   making 20 to $25,000 a month.  And that's why Joe agreed to

13   pay you 30?  He said, yes, that's why Joe did, because I told

14   him what I was making.  Mr. Plumeri had no reason to question

15   what Mr. Barger was telling him.  They had known each other

16   for 30 years.  They were friends.  Joe had reached out to him

17   for help.

18             Mr. Barger wasn't making 20 to $25,000 as a

19   consultant at that time.  He wasn't making 20 to $25,000 a

20   year at that time.  In 2013, the year immediately prior to

21   that conversation that he had with Joe Plumeri, he made less

22   than $20,000 as a consultant in 2013, and he made less than

23   $20,000 as a consultant in 2012.  That was the first

24   after-acquired fact that we learned at the deposition, at that

25   deposition.

1           But then we learned a couple of other ones.  You

2     see, as I told you, he became a consultant effective March 17.

3     And they entered into a consulting agreement.  It's a standard

4     kind of agreement.  If you are going to be a consultant, you

5     enter into one of these agreements, and these agreements tell

6     you what the terms are going to be.

7           And you know what was in there?  It said this is the

8     date your consulting is going to start, March 17.  It had the

9     $30,000 number in there, and it also had how he was going to

10    bill, that at the end of the month he would send a bill for

11    the prior month.  And there were some other things that were

12    in the standard independent contractor agreement.

13          I asked him in particular about two invoices.  The

14    first invoice was dated February 26, 2007 -- 2014.  And I

15    asked him what that was for, considering that his consulting

16    hadn't started until three weeks later.  And Mr. Barger's

17    response was, well, that must have been for the time that I

18    spent learning about First Data before I became a consultant.

19    There will be testimony that consultants don't bill you for

20    the time that's spent before you become a consultant.

21          But there was another invoice.  There was another

22    invoice that was dated June 20 of 2014, and that one was for

23    $50,000.  For $50,000.

24          Now, you have heard and it is correct that

25    Mr. Barger became a full-time First Data employee and

1   Mr. Plumeri agreed on behalf of the company to pay him,

2   starting in July of 2014, $480,000 a year, 250,000 cash bonus,

3   and equity.  So he was a consultant for three and a half

4   months.  And you will see the invoices that he was paid for

5   three and a half months.

6             But this $50,000 invoice, I didn't know what it was

7   for.  It said it was for final services rendered as a

8   consultant, $50,000.  I looked in the employment agreement,

9   and I went through with him the independent contractor

10  agreement, and said where is it provided here that you are

11  able to bill for final consulting services; and he couldn't

12  find the provision.  It's not there.

13            And I asked him what the $50,000 was for.  He said

14  it was for his proprietary information, his intellectual

15  property basically.  And then I went and pointed out to him

16  that in the independent contractor agreement it provides that

17  he gave First Data a prepaid license to use his information in

18  exchange for the $30,000 he had already been paid for; and he

19  went and billed the company $50,000 that got paid.

20            You are going to hear testimony from First Data

21  witnesses that First Data has terminated employees for

22  dishonesty.  You are going to hear testimony from First Data

23  witnesses that employees have been terminated for falsifying

24  expense reports.  You are going to hear testimony from First

25  Data witnesses that had they known in June of 2014 that

1   Mr. Barger had submitted an invoice for services allegedly

2   rendered before he became a consultant but, more importantly,

3   that he had billed the company $50,000 for intellectual

4   property that was already covered by the $30,000 a month fee,

5   his employment would have been terminated at that time.

6           And the judge will instruct you at the end of the

7   case on the law regarding after-acquired evidence, just as

8   Judge Block will instruct you on the law regarding the

9   Americans with Disabilities Act, and the Family Medical Leave

10  Act.

11          Defendants in this case are going to prove at least

12  five things that will prevent Mr. Barger from prevailing on

13  either liability or damages.

14          One:  That starting in 2013 that management did what

15  it had to do to try and save 22,000 jobs over time, which

16  included a variety of restructuring, closing locations,

17  investing in technology, and it included at times the need to

18  eliminate jobs like Mr. Barger's.

19          Two:  First Data will prove that Dan Charron talked

20  to Mr. Barger and others about his high compensation and that

21  Rhonda Johnson and others talked to Mr. Barger about the need

22  for his replacement; and both of those things happened prior

23  to him being diagnosed with cancer.

24          Three:  That First Data placed Mr. Barger on leave

25  in order for him to get better and that they treated him

1    better in a number of ways, including that payment of an

2    all-cash bonus after he told Tony Marino that things were

3    dire.

4            Four:  That Mr. Barger's names started appearing on

5    reduction in force lists as early as November of 2016, long

6    before he submitted any request to return to work, and it was

7    done at a time when there had been a review of the sales

8    training group and a determination that the company did not

9    need somebody earning close to $700,000 running a training

10   group of about 70 people at that time, which had become

11   bloated and was also ineffective.

12           Five:  First Data will also prove that Mr. Barger

13   was one of the highest-paid employees and that his inclusion

14   was not improper.  There were 361 other individuals who were

15   affected the same way he was, and the evidence will show that

16   he was included not because he had cancer and not because he

17   was on leave and not because he failed -- that he requested

18   the right to return to leave; and also that First Data, the

19   evidence will show, they did not fail to accommodate

20   Mr. Barger's condition.

21           At the end of the day, ladies and gentlemen, we are

22   confident that you will find that the evidence will

23   demonstrate that Mr. Barger cannot prevail on liability

24   against First Data, Frank Bisignano, Dan Charron, Tony Marino,

25   and Rhonda Johnson.

1           We want to thank you for your time and your service.

2   And I will just ask you to remember, 362, 362 are the total

3   number of employees who were impacted along with Mr. Barger at

4   the reduction in force that impacted 10 percent of the top

5   3,000 highest-compensated employees at First Data.  Thank you.

6           THE COURT:  Thank you, Mr. Eidelman.

7           So, folks, you have a good idea now of what you can

8   expect, and I think you also realize why we need you as jurors

9   to decide this case.

10          You know, I find that I'm blessed with having the

11  privilege of being a judge in the federal courthouse; but

12  every day I come to work I learn something new.  And you are

13  going to be exposed to learning something probably that you

14  didn't know before as well.  So it's always fascinating.

15          And I can tell by the way that you all are listening

16  very carefully that you are going to become experts in this

17  credit card business of ours and learn an awful lot about how

18  credit cards get processed.  How interesting.

19          So I have no opinion of the case, and you have no

20  opinion of the case right now.  It's a blank slate after the

21  lawyers arguments.  Tomorrow, as the saying, goes we start to

22  put meat on the bones, I guess.

23          At 10 o'clock we will have our first witness.

24          And who will be it, Mr. Shearer.

25          MR. SHEARER:  I'm going to call Mr. Joe Plumeri

*Proceedings*                                                                83

1    first.

2              THE COURT:  So be ready at 10:00 o'clock.  Get a

3    good night's sleep.

4              Remember just to tell your folks back home about the

5    fact that Judge Block looks like -- I guess it was Brad Pitt I

6    said -- and keep the peace.  There is certainly a lot of

7    obviously temptation to talk to people about this case.  Maybe

8    people know about this business.  I don't know.

9              The Internet obviously has a lot of information.

10   You don't want to check it out.  You really have to be like

11   Caesar's wife.  Nobody is going to be there to supervise you.

12   We are not going to have marshals standing over you.  We are

13   not going to have marshals living with you.  So if you really

14   want to find out about things, you obviously can; but you will

15   know the difference and you will realize how important it is

16   for us to really not let the outside influences intrude upon

17   you during the course of this trial.

18             We will see you at 10 o'clock.  Let's all be here

19   promptly, and we will see you then.

20             THE CLERK:  All rise.

21             (Jury exits.)

22

23

24             THE COURT:  Okay.  The jury is not here and I signed

25   this request to allow Mr. Jarred to be accommodated, and if

*Proceedings*                                        84

1  anybody needs any accommodations.  I don't know whether the

2  federal court comes under the Disabilities Act.  I guess it

3  does, but we will certainly try to help anybody who needs

4  help.

5          We will see you folks tomorrow.  Does anybody want

6  to put anything on the record before we adjourn for the day?

7  I do.  I want to thank all of you for the hard work you did in

8  working out the exhibit list.  I think you will find that the

9  effort that was made especially, with the aid of my wonderful

10  law clerk Ty Cohn, is going to pay off in spades because we

11  will be able to move smoothly and efficiently and

12  substantively in the process of this case.  We have a few

13  things we will have to sort out during the course of this

14  trial, but we will manage it; and we have come a long way from

15  the time we first met and that blunderbuss exhibit list.

16          So I thank you for your professional cooperation as

17  well because this is a court.  See you tomorrow at 10 o'clock,

18  unless anybody wants to say anything.  Mr. Shearer?

19          MR. SHEARER:  No, Your Honor.

20          THE COURT:  Mr. Eidelman?

21          MR. EIDELMAN:  No, Your Honor.  Thank you.

22          (Trial adjourned to Tuesday, September 17, 2019, at

23  10:00 a.m.)

24

25

## #

**#155-254** [1] - 1:18

## $

**$174,000** [1] - 75:10
**$20,000** [2] - 77:22, 77:23
**$24** [1] - 59:16
**$25,000** [3] - 77:12, 77:18, 77:19
**$30,000** [5] - 77:4, 77:11, 78:9, 79:18, 80:4
**$480,000** [1] - 79:2
**$50,000** [7] - 78:23, 79:6, 79:8, 79:13, 79:19, 80:3
**$60,000** [1] - 75:25
**$70,000** [1] - 53:23
**$700,000** [5] - 53:24, 57:1, 63:18, 71:20, 81:9

## '

**'17** [1] - 42:19

## 1

**1-16** [1] - 42:19
**10** [13] - 19:19, 43:19, 43:24, 44:5, 44:22, 72:9, 73:5, 73:10, 76:18, 82:4, 82:23, 83:18, 84:17
**10-24** [1] - 42:19
**10017** [1] - 2:7
**106th** [1] - 33:6
**10:00** [9] - 5:18, 16:13, 19:21, 20:4, 20:11, 20:18, 20:21, 83:2, 84:23
**10th** [1] - 73:23
**11201** [2] - 1:22, 2:11
**12** [8] - 15:5, 15:6, 15:7, 15:8, 46:3, 48:4
**12:30** [2] - 19:13, 19:17
**13** [5] - 44:9, 51:1, 62:3, 62:5, 75:21
**13th** [1] - 74:6
**15** [4] - 5:1, 29:18, 42:14, 42:17
**16** [8] - 1:8, 29:18, 42:19, 43:1, 43:15, 43:16, 43:18
**16th** [1] - 44:6

## 2

**2** [2] - 33:6, 59:17
**20** [7] - 49:5, 67:3, 77:8, 77:12, 77:18, 77:19, 78:22
**2007** [1] - 78:14
**2010** [1] - 64:21
**2012** [1] - 77:23
**2013** [9] - 34:7, 56:20, 59:4, 59:6, 61:5, 77:20, 77:22, 80:14
**2014** [11] - 34:7, 35:19, 35:25, 36:7, 55:6, 62:16, 62:17, 78:14, 78:22, 79:2, 79:25
**2015** [8] - 56:23, 56:25, 57:4, 63:1, 63:13, 65:9, 65:10
**2016** [12] - 37:8, 37:10, 37:21, 38:5, 39:20, 53:18, 56:11, 58:16, 59:3, 64:11, 67:4, 81:5
**2017** [4] - 53:18, 56:11, 59:3, 77:6
**2018** [1] - 76:18
**2019** [2] - 1:8, 84:22
**21202** [1] - 2:2
**21st** [1] - 42:16
**22** [1] - 43:9
**22,000** [3] - 27:12, 53:21, 80:15
**225** [1] - 2:11
**24** [7] - 18:18, 29:25, 42:19, 43:1, 59:24, 73:13, 75:1
**24/7** [1] - 60:22
**25,000** [2] - 59:24, 60:1
**250,000** [1] - 79:2
**26** [1] - 78:14
**28** [2] - 43:14, 76:1
**2:30** [1] - 1:8

## 3

**3** [4] - 39:19, 39:20,

---

40:4, 41:14
**3,000** [6] - 35:7, 55:3, 72:17, 73:5, 73:10, 82:5
**30** [8] - 35:15, 36:7, 37:10, 44:20, 55:8, 62:4, 77:13, 77:16
**30-plus** [1] - 35:14
**300** [1] - 72:9
**330** [1] - 2:6
**34** [1] - 22:4
**361** [2] - 56:3, 81:14
**362** [6] - 53:16, 54:24, 67:1, 82:2
**3839** [1] - 1:17
**39th** [1] - 2:6
**3:00** [2] - 5:5, 22:22

## 4

**4** [1] - 22:3
**4,000** [1] - 32:13
**4,000-people** [1] - 33:5
**40** [1] - 35:2
**45** [1] - 65:20
**4:30** [1] - 16:12

## 5

**5** [5] - 19:19, 43:17, 72:24, 75:13
**50** [7] - 1:22, 9:14, 19:5, 19:8, 40:18, 41:2, 62:19
**500** [1] - 2:2
**506** [1] - 1:22
**54th** [1] - 53:20
**55** [1] - 50:22

## 6

**6** [3] - 22:3, 37:25, 38:5
**6,000** [1] - 27:12
**613-2274** [1] - 2:12
**66** [2] - 40:16, 40:24
**6:00** [1] - 44:10

## 7

**70** [1] - 81:10
**718** [1] - 2:12
**75** [1] - 29:11
**75204** [1] - 1:18

## 9

**9/11** [3] - 12:6, 12:8, 12:14

---

**9/4** [2] - 70:17, 70:21
**9/6** [1] - 70:17
**90** [2] - 40:17, 41:16

## A

**a.m** [1] - 84:23
**abandoned** [1] - 8:10
**ABC** [2] - 6:21, 12:3
**ABC-s** [1] - 12:3
**ability** [3] - 21:22, 27:9, 28:22
**able** [9] - 5:15, 6:7, 18:19, 38:10, 44:24, 50:20, 50:23, 79:11, 84:11
**absence** [2] - 26:11, 26:12
**absent** [1] - 45:20
**absolutely** [1] - 5:15
**accept** [1] - 58:25
**accepted** [1] - 26:25
**access** [8] - 41:20, 41:23, 41:25, 48:7, 51:3, 69:15, 69:17, 69:19
**acclimated** [1] - 9:18
**accommodate** [2] - 48:6, 81:19
**accommodated** [2] - 14:11, 83:25
**accommodation** [2] - 47:19, 69:20
**accommodations** [1] - 84:1
**accomodation** [1] - 42:6
**account** [2] - 49:6, 52:23
**Accountants** [1] - 63:16
**accounting** [2] - 50:10
**accounts** [1] - 40:24
**achieve** [1] - 72:11
**acquired** [4] - 77:1, 77:24, 80:7
**Act** [14] - 26:3, 26:15, 26:20, 27:4, 30:8, 30:9, 31:7, 46:11, 46:23, 54:4, 80:9, 80:10, 84:2
**act** [1] - 47:15
**action** [2] - 20:22, 26:17
**actions** [1] - 26:4
**activities** [1] - 71:8
**ADA** [13] - 29:14, 30:2, 30:8, 41:13, 42:4, 47:1, 47:3, 47:20, 49:2, 52:24, 54:4,

---

54:18, 69:16
**adage** [1] - 58:3
**add** [1] - 28:6
**addition** [2] - 46:23, 58:4
**additional** [3] - 28:23, 43:6, 57:14
**address** [2] - 3:15, 42:1
**adjourn** [1] - 84:6
**adjourned** [1] - 84:22
**adjusted** [2] - 49:11, 49:13
**administer** [2] - 8:4, 25:6
**administration** [1] - 19:15
**admit** [1] - 50:2
**admits** [1] - 62:14
**Adobe** [1] - 39:1
**adopted** [1] - 46:12
**advantage** [1] - 34:13
**advisor** [1] - 61:8
**advisory** [1] - 33:1
**advocate** [1] - 16:15
**advocating** [1] - 17:3
**affected** [1] - 81:15
**Afghanistan** [1] - 13:20
**after-acquired** [3] - 77:1, 77:24, 80:7
**afternoon** [12] - 3:1, 3:2, 3:9, 5:11, 5:15, 16:11, 19:11, 24:8, 25:7, 25:24, 53:14, 65:21
**afterwards** [3] - 9:4, 15:9, 37:17
**ago** [2] - 8:11, 22:12
**agree** [5] - 17:4, 17:6, 46:22, 53:2, 77:10
**agreed** [5] - 17:5, 40:21, 66:22, 77:12, 79:1
**agreement** [7] - 77:7, 78:3, 78:4, 78:12, 79:8, 79:10, 79:16
**agreements** [4] - 34:20, 34:21, 78:5
**ahead** [1] - 25:22
**aid** [2] - 47:21, 84:9
**air** [4] - 39:11, 39:12, 39:13, 39:16
**AL** [1] - 1:9
**all-cash** [1] - 81:2
**allegedly** [1] - 80:1
**alley** [1] - 32:12
**allow** [3] - 10:14, 11:7, 83:25
**allowed** [2] - 9:2, 22:1

**alluded** [1] - 46:11
**almost** [5] - 12:15, 28:6, 28:7, 34:19, 64:19
**alone** [1] - 60:12
**alternates** [3] - 15:7, 15:8, 15:11
**amazing** [1] - 39:7
**American** [2] - 32:25, 35:6
**Americans** [7] - 26:3, 26:14, 30:8, 46:11, 46:23, 54:4, 80:9
**amortization** [1] - 49:12
**amount** [1] - 49:17
**Angry** [1] - 15:8
**angry** [1] - 15:8
**anniversary** [1] - 12:6
**answer** [6] - 8:25, 11:7, 11:10, 11:13, 14:6, 24:25
**answering** [1] - 23:17
**answers** [2] - 14:5, 24:24
**anticipate** [2] - 28:4, 28:8
**apologize** [2] - 19:25, 20:22
**appearance** [2] - 19:6, 19:9
**APPEARANCES** [1] - 1:16
**appearances** [1] - 2:23
**appearing** [2] - 72:18, 81:4
**apple** [1] - 12:9
**apply** [2] - 10:24, 40:13
**appointed** [2] - 12:25, 71:5
**appreciation** [1] - 49:12
**April** [2] - 35:25, 77:7
**area** [1] - 33:5
**areas** [1] - 31:16
**argue** [3] - 16:18, 54:7, 54:9
**argument** [3] - 16:17, 42:20, 45:22
**arguments** [3] - 22:24, 28:8, 82:21
**arise** [2] - 30:12, 30:14
**ARNSTEIN** [1] - 2:1
**Arnstein** [1] - 3:10
**arrives** [1] - 60:12
**aspect** [1] - 34:19
**Assisted** [1] - 2:15
**associated** [1] - 19:3

**Association** [1] - 33:1
**assured** [1] - 65:3
**Atlanta** [5] - 38:20, 38:21, 38:23, 39:21, 67:21
**ATM** [1] - 34:23
**attack** [1] - 52:9
**attention** [3] - 16:4, 17:22, 17:23
**attitude** [1] - 12:16
**attorneys** [1] - 29:6
**August** [3] - 37:21, 62:17, 76:18
**authorization** [1] - 44:1
**available** [4] - 8:24, 9:4, 17:20, 18:10
**Avenue** [2] - 1:17, 2:6
**avoid** [4] - 19:6, 19:9, 19:21, 22:9
**aware** [2] - 14:25, 68:23
**awful** [1] - 82:17
**ax** [1] - 11:25

**B**

**B-L-O-C-K** [1] - 7:22
**background** [2] - 28:2
**bad** [3] - 12:9, 12:25, 37:22
**badly** [1] - 74:25
**balance** [2] - 46:1, 46:3
**baling** [1] - 31:17
**Baltimore** [1] - 2:2
**bank** [10] - 32:15, 32:16, 32:17, 34:25, 35:1, 35:4, 40:23, 55:19
**Bankers** [1] - 33:1
**bankruptcy** [1] - 59:14
**banks** [6] - 32:20, 32:22, 34:13, 34:20, 36:3
**barber** [1] - 57:24
**Barger** [155] - 2:22, 3:4, 3:5, 11:19, 26:10, 26:21, 26:23, 29:1, 29:10, 29:16, 30:4, 31:8, 31:9, 31:11, 31:15, 32:5, 32:14, 32:24, 33:22, 34:8, 35:13, 35:18, 36:6, 36:11, 36:17, 36:20, 37:5, 37:8, 37:10, 37:25, 38:4, 39:4, 39:5, 39:22, 40:4, 40:9, 40:10, 40:13, 41:7, 41:19,

42:13, 42:16, 43:16, 43:23, 44:19, 44:21, 44:25, 46:8, 47:8, 47:17, 48:1, 48:17, 49:24, 50:6, 50:25, 51:3, 51:12, 51:17, 51:20, 52:18, 53:3, 53:19, 54:21, 55:5, 55:6, 55:7, 55:10, 56:1, 56:4, 56:16, 56:17, 56:18, 56:25, 57:5, 57:10, 57:13, 57:20, 58:5, 58:10, 58:12, 58:14, 58:25, 59:21, 62:3, 62:8, 62:13, 62:17, 62:23, 63:13, 63:21, 63:23, 64:1, 64:7, 64:11, 64:12, 64:24, 65:2, 65:7, 65:24, 65:25, 66:3, 66:12, 66:15, 67:2, 67:7, 67:10, 67:14, 67:21, 67:22, 67:23, 68:2, 68:6, 68:12, 68:15, 68:24, 69:8, 69:11, 69:21, 69:22, 70:4, 70:18, 70:21, 71:3, 72:4, 73:8, 73:9, 73:14, 73:18, 74:2, 74:5, 74:13, 74:16, 74:18, 75:2, 75:8, 75:12, 75:14, 76:7, 77:2, 77:5, 77:15, 77:18, 78:25, 80:1, 80:12, 80:20, 80:21, 80:24, 81:12, 81:23, 82:3
**BARGER** [2] - 1:3, 3:4
**Barger's** [23] - 27:10, 27:23, 28:15, 41:15, 46:24, 47:16, 48:7, 52:9, 57:4, 57:18, 58:8, 63:5, 65:20, 69:17, 70:17, 72:18, 75:21, 76:17, 78:16, 80:18, 81:4, 81:20
**Barney** [1] - 33:15
**based** [8] - 11:12, 12:1, 21:22, 25:17, 25:18, 26:15, 29:9, 46:13
**bashful** [3] - 24:6, 24:13, 24:16
**basis** [4] - 7:14, 47:4, 63:2, 71:5
**basketball** [2] - 31:21, 32:2
**bathroom** [1] - 24:18
**beautiful** [1] - 9:20
**became** [8] - 32:15,

36:17, 57:14, 65:24, 78:2, 78:18, 78:25, 80:2
**become** [10] - 9:7, 9:12, 36:24, 49:16, 55:1, 56:11, 72:1, 78:20, 81:10, 82:16
**becomes** [4] - 47:20, 49:19, 63:5, 63:9
**becoming** [1] - 59:11
**bed** [1] - 29:25
**BEFORE** [1] - 1:13
**began** [3] - 35:18, 36:6, 36:11
**begin** [2] - 36:24, 54:1
**beginning** [8] - 34:7, 37:12, 54:5, 62:16, 67:3, 70:8, 70:12, 77:9
**BEHALF** [1] - 53:13
**behalf** [4] - 16:9, 16:18, 37:20, 79:1
**behaviors** [1] - 68:24
**behind** [1] - 18:2
**belongs** [1] - 66:19
**benefit** [1] - 41:17
**benefits** [1] - 41:25
**best** [5] - 6:12, 11:18, 16:18, 18:1, 21:5
**better** [11] - 15:10, 17:22, 17:23, 20:2, 22:3, 58:17, 69:9, 69:10, 69:14, 80:25, 81:1
**between** [9] - 9:13, 15:1, 19:2, 19:17, 35:5, 40:19, 47:2, 51:15, 66:17
**beyond** [1] - 14:19
**bias** [1] - 11:25
**big** [7] - 14:18, 34:17, 52:1, 59:15, 60:18, 60:19, 72:1
**bill** [4] - 78:10, 78:19, 79:11
**billed** [2] - 79:19, 80:3
**billion** [2] - 59:16, 59:17
**bird** [1] - 19:20
**birthday** [1] - 29:11
**Bisignano** [21] - 3:19, 26:1, 36:19, 38:3, 52:17, 56:9, 56:10, 56:17, 58:5, 59:6, 59:10, 61:5, 64:23, 64:24, 65:1, 72:6, 75:1, 81:24
**Bisignano's** [1] - 64:21
**bit** [22] - 4:21, 5:2, 5:4,

36:17, 57:14, 65:24, 78:2, 78:18, 78:25, 80:2
**become** [10] - 9:7, 9:12, 36:24, 49:16, 55:1, 56:11, 72:1, 78:20, 81:10, 82:16
**becomes** [4] - 47:20, 49:19, 63:5, 63:9
**becoming** [1] - 59:11
**bed** [1] - 29:25

5:22, 6:16, 6:21, 9:5, 10:2, 11:21, 11:22, 15:17, 16:2, 16:23, 16:25, 17:4, 24:9, 28:9, 30:5, 31:8, 55:12, 55:22, 62:25
**black** [2] - 7:21, 18:11
**blank** [1] - 82:20
**blessed** [2] - 18:5, 82:10
**bloated** [1] - 81:11
**BLOCK** [1] - 1:13
**Block** [5] - 7:21, 22:2, 54:5, 80:8, 83:5
**blue** [1] - 25:16
**blunderbuss** [1] - 84:15
**board** [4] - 33:1, 36:9, 60:14, 61:6
**bolted** [1] - 71:7
**Bond** [1] - 3:13
**BOND** [1] - 2:5
**bones** [1] - 82:22
**bonus** [8] - 49:8, 49:15, 75:2, 75:9, 75:10, 75:14, 79:2, 81:2
**Bonuses** [1] - 75:5
**bonuses** [2] - 49:17, 75:12
**Boone** [1] - 31:11
**born** [1] - 31:11
**bottom** [1] - 71:9
**bought** [1] - 40:25
**bowling** [1] - 32:12
**box** [3] - 37:24, 46:24, 47:10
**boy** [1] - 20:18
**Brad** [2] - 22:4, 83:5
**brave** [1] - 33:4
**break** [8] - 19:13, 19:16, 24:8, 24:9, 24:13, 24:15, 24:16
**breaks** [1] - 11:1
**bring** [5] - 6:9, 17:20, 30:11, 56:14
**bringing** [2] - 27:7, 54:12
**brings** [4] - 60:13, 60:17, 61:6
**Britain** [1] - 13:1
**brokerage** [1] - 36:3
**brokers** [1] - 34:12
**Brooklyn** [4] - 1:5, 1:22, 2:11, 29:12
**brought** [11] - 14:9, 14:15, 30:15, 31:5, 52:3, 52:4, 52:25, 55:10, 61:7, 65:13
**BS** [1] - 32:1

**bud** [1] - 23:24
**budgetary** [1] - 64:3
**bullet** [1] - 25:3
**burden** [5] - 14:16, 14:17, 14:20, 14:23, 16:5
**business** [24] - 4:8, 9:6, 26:8, 27:2, 28:14, 28:25, 33:15, 34:6, 34:8, 34:19, 36:16, 36:25, 44:7, 44:9, 44:13, 45:24, 55:18, 55:20, 56:23, 57:18, 60:3, 63:9, 82:17, 83:8
**businesses** [1] - 32:16
**bust** [1] - 20:17
**busy** [1] - 64:18
**button** [3] - 39:10, 39:13, 39:15
**buy** [1] - 33:18
**BY** [4] - 1:19, 1:23, 2:3, 2:7

## C

**Cadman** [1] - 2:11
**Caesar's** [1] - 83:11
**calculating** [1] - 49:10
**calendar** [1] - 50:24
**cameras** [1] - 39:4
**cancer** [19] - 26:5, 37:10, 38:2, 46:2, 46:22, 47:10, 56:16, 56:19, 57:6, 58:12, 64:12, 64:21, 64:22, 64:25, 68:18, 74:20, 75:4, 80:23, 81:16
**cannot** [5] - 9:25, 12:18, 50:7, 52:19, 81:23
**captive** [1] - 9:17
**carcinoma** [1] - 37:9
**card** [6] - 28:20, 35:5, 55:15, 55:16, 55:18, 82:17
**cards** [3] - 34:21, 34:22, 82:18
**care** [3] - 25:15, 58:16, 74:21
**career** [1] - 32:16
**careful** [1] - 46:17
**carefully** [3] - 25:5, 68:13, 82:16
**cares** [1] - 57:25
**carr** [1] - 6:11
**case** [69] - 7:23, 8:3, 8:6, 8:13, 8:25, 10:15, 10:19, 11:9,

11:22, 13:7, 13:25, 14:8, 14:10, 14:13, 14:16, 14:19, 14:24, 15:5, 15:6, 15:7, 15:10, 15:12, 15:18, 15:24, 17:1, 17:17, 19:3, 21:2, 21:6, 21:9, 21:19, 22:2, 22:11, 22:13, 23:14, 23:16, 24:2, 28:5, 29:13, 29:14, 29:15, 30:4, 30:11, 31:1, 32:4, 33:21, 34:6, 42:23, 54:9, 54:15, 54:16, 54:20, 55:22, 55:25, 56:1, 56:2, 58:9, 72:25, 76:11, 76:22, 80:7, 80:11, 82:9, 82:19, 82:20, 83:7, 84:12
**cases** [12] - 7:5, 8:9, 8:19, 12:22, 14:3, 14:17, 14:20, 15:3, 29:14, 30:1, 30:6, 55:23
**cash** [6] - 34:24, 55:15, 75:10, 75:11, 79:2, 81:2
**category** [1] - 20:14
**cell** [2] - 37:9, 42:1
**center** [1] - 32:25
**CEO** [7] - 27:14, 28:11, 36:18, 38:3, 56:10, 59:11, 65:17
**CEO-s** [1] - 28:11
**CEOs** [1] - 59:13
**certainly** [3] - 15:20, 83:6, 84:3
**certification** [1] - 70:3
**certify** [1] - 27:8
**chairman** [1] - 34:10
**challenge** [1] - 60:10
**chance** [1] - 48:1
**change** [4] - 12:15, 46:25, 48:15, 50:12
**changing** [2] - 32:24, 35:13
**charge** [7] - 10:3, 10:8, 10:19, 10:21, 19:14, 49:10
**Chariton** [2] - 32:11, 32:13
**Charron** [22] - 3:20, 26:1, 36:15, 36:18, 50:4, 56:22, 56:24, 57:6, 58:6, 60:15, 63:7, 63:12, 64:9, 71:23, 71:24, 73:4, 73:11, 73:12, 75:2, 80:19, 81:24

**Charron's** [1] - 36:18
**Chase** [1] - 32:22
**check** [4] - 17:13, 21:11, 75:20, 83:10
**checking** [1] - 29:23
**cheer** [1] - 68:7
**chief** [1] - 59:11
**Chief** [1] - 2:10
**choice** [1] - 72:5
**chose** [1] - 58:25
**Christmas** [1] - 43:10
**Cianfichi** [1] - 3:11
**CIANFICHI** [1] - 2:4
**circumstances** [1] - 30:13
**Citibank** [1] - 32:22
**Citigroup** [2] - 34:1, 35:17
**citizen** [4] - 8:20, 8:21, 12:18, 12:23
**citizens** [5] - 8:17, 12:16, 13:8, 13:11, 22:6
**city** [1] - 32:14
**civic** [2] - 9:5, 13:17
**civil** [12] - 2:21, 7:5, 7:12, 8:5, 8:9, 8:13, 12:21, 14:3, 14:20, 15:1, 15:6, 15:10
**claim** [1] - 48:6
**claiming** [1] - 14:10
**claims** [4] - 30:7, 30:12, 58:8, 58:9
**clarify** [1] - 23:22
**class** [1] - 24:17
**classes** [2] - 33:16, 33:17
**clerk** [5] - 4:10, 4:15, 7:1, 24:12, 84:10
**CLERK** [1] - 83:20
**clerks** [1] - 8:8
**client** [1] - 16:19
**clients** [2] - 11:19, 36:2
**close** [6] - 53:22, 53:24, 57:10, 60:1, 63:18, 81:9
**closely** [2] - 33:10, 57:12
**closer** [1] - 56:14
**closing** [2] - 16:16, 80:16
**clue** [1] - 23:15
**co** [1] - 29:12
**co-counsel** [1] - 29:12
**coach** [2] - 32:6, 57:16
**coaching** [1] - 32:2
**Cohn** [1] - 84:10
**colleague** [1] - 64:16

**colleagues** [2] - 3:11, 19:19
**collect** [1] - 28:23
**collected** [1] - 37:3
**collects** [1] - 37:3
**college** [1] - 31:22
**color** [1] - 25:15
**combined** [1] - 73:11
**comfort** [3] - 17:25, 18:12, 18:16
**comfortable** [1] - 24:14
**coming** [7] - 35:13, 43:13, 43:14, 43:16, 43:17, 43:22, 59:24
**common** [4] - 6:20, 8:12, 19:10, 20:5
**communicate** [2] - 38:13, 39:5
**communication** [3] - 17:14, 19:2, 42:2
**community** [1] - 31:12
**companies** [4] - 35:16, 46:17, 60:18, 60:19
**company** [80] - 26:8, 27:16, 28:21, 29:1, 34:17, 35:20, 36:24, 37:6, 42:5, 44:8, 44:16, 45:3, 48:23, 49:18, 52:1, 52:2, 53:21, 53:22, 55:9, 56:11, 56:20, 56:22, 56:24, 57:1, 59:7, 59:8, 59:13, 59:14, 59:15, 59:17, 59:22, 60:2, 60:14, 61:1, 61:6, 64:2, 64:5, 65:9, 65:14, 65:16, 66:3, 66:10, 66:23, 66:24, 67:15, 67:17, 68:12, 69:3, 69:7, 69:9, 69:13, 69:17, 70:9, 70:12, 70:18, 71:12, 71:19, 72:12, 73:3, 73:15, 74:12, 74:13, 74:16, 74:23, 75:6, 75:11, 75:18, 75:23, 76:2, 76:4, 76:24, 79:1, 79:19, 80:3, 81:8
**company's** [1] - 69:19
**company-wide** [2] - 44:16, 48:23
**compensated** [3] - 55:3, 72:9, 82:5
**compensation** [3] - 49:21, 63:13, 80:20
**competitors** [1] - 37:2
**completed** [2] - 23:4,

55:17
**completely** [3] - 41:18, 42:2, 70:7
**complications** [2] - 38:15, 39:23
**compliment** [1] - 5:25
**comply** [3] - 49:2, 52:12, 52:13
**component** [1] - 35:9
**Computer** [1] - 2:15
**computer** [1] - 38:22
**Computer-Assisted** [1] - 2:15
**computers** [1] - 26:7
**concentrate** [1] - 69:8
**concepts** [1] - 49:16
**concerned** [1] - 47:16
**conclude** [1] - 50:21
**concluding** [1] - 23:8
**concurred** [1] - 37:25
**condition** [9] - 26:10, 26:16, 27:8, 27:24, 41:14, 47:13, 47:17, 73:23, 81:20
**conditions** [1] - 47:5
**conduct** [1] - 27:23
**conferences** [1] - 41:22
**conferencing** [3] - 26:7, 38:9, 38:25
**confident** [2] - 53:2, 81:22
**confused** [3] - 23:21, 73:1
**confusing** [3] - 9:16, 23:18, 23:24
**Congress** [2] - 15:4, 45:25
**connects** [1] - 39:9
**consider** [2] - 21:17, 59:11
**considering** [1] - 78:15
**consistent** [1] - 45:10
**Constitution** [1] - 13:14
**constraints** [1] - 64:4
**consult** [1] - 35:25
**consultant** [15] - 35:19, 36:25, 55:6, 77:4, 77:6, 77:19, 77:22, 77:23, 78:2, 78:4, 78:18, 78:20, 79:3, 79:8, 80:2
**consultants** [1] - 78:19
**consulting** [12] - 33:13, 34:6, 34:8, 36:2, 36:3, 77:6, 77:8, 78:3, 78:8,

78:15, 79:11
**Cont'g** [1] - 62:2
**contact** [1] - 20:8
**continue** [8] - 29:20, 38:13, 45:5, 47:18, 48:1, 50:8, 57:22, 67:18
**continued** [12] - 33:16, 34:3, 35:25, 36:20, 37:19, 41:19, 61:10, 65:5, 66:5, 69:22, 72:22
**Continued** [1] - 30:18
**continues** [1] - 50:17
**continuing** [1] - 38:18
**contractor** [3] - 78:12, 79:9, 79:16
**contractors** [1] - 27:13
**contrary** [1] - 52:20
**conversation** [2] - 63:13, 77:21
**convince** [1] - 60:25
**Cooper** [1] - 3:11
**COOPER** [1] - 2:3
**cooperation** [1] - 84:16
**cords** [1] - 39:17
**Corp** [1] - 2:22
**corporate** [3] - 3:17, 3:18, 28:18
**corporation** [3] - 25:15, 27:11, 28:19
**Corporation** [3] - 11:20, 25:25, 34:10
**CORPORATION** [1] - 1:9
**correct** [2] - 16:21, 78:24
**cost** [1] - 45:2
**council** [1] - 32:14
**counsel** [3] - 3:16, 29:12, 56:7
**counseled** [1] - 66:20
**count** [5] - 30:10, 49:21, 50:7, 50:8, 50:17
**counting** [2] - 30:15, 52:21
**country** [4] - 8:9, 8:10, 9:10, 13:20
**counts** [1] - 21:10
**couple** [3] - 68:25, 69:1, 78:1
**course** [13] - 4:2, 6:8, 8:3, 9:1, 11:2, 11:15, 12:2, 16:24, 63:10, 65:4, 73:4, 83:17, 84:13
**court** [14] - 8:21, 9:12,

12:12, 13:9, 18:6, 19:14, 19:15, 24:11, 62:1, 76:12, 76:18, 76:19, 84:2, 84:17
**COURT** [25] - 1:1, 3:2, 3:5, 3:22, 3:25, 4:7, 4:14, 4:17, 4:20, 5:10, 5:13, 5:16, 5:23, 6:11, 7:4, 7:9, 7:11, 25:10, 25:14, 40:1, 53:10, 82:6, 83:2, 83:24, 84:20
**Court** [3] - 1:22, 2:10, 2:10
**courtesies** [1] - 19:10
**courthouse** [6] - 9:19, 9:20, 18:6, 20:1, 82:11
**Courthouse** [1] - 1:4
**COURTROOM** [2] - 2:21, 25:7
**courtroom** [9] - 5:22, 6:10, 17:20, 21:11, 21:18, 21:23, 24:11, 25:9, 25:13
**courts** [2] - 9:6, 9:14
**cover** [2] - 48:8, 52:2
**covered** [3] - 22:23, 71:1, 80:4
**created** [2] - 33:1, 33:9
**creative** [1] - 48:10
**credibility** [3] - 17:11, 17:15, 52:10
**credit** [7] - 28:20, 34:21, 34:22, 55:15, 55:16, 82:17, 82:18
**criminal** [15] - 7:5, 7:6, 7:7, 7:8, 7:9, 7:11, 7:12, 8:6, 12:21, 14:17, 14:19, 15:2, 15:3, 15:5, 15:7
**criterion** [1] - 31:5
**critical** [2] - 35:9, 59:4
**cropped** [1] - 9:1
**cross** [2] - 15:23, 23:3
**cross-examination** [2] - 15:23, 23:3
**CSR** [1] - 2:10
**culture** [1] - 61:9
**curiosities** [1] - 8:25
**curiosity** [2] - 6:23, 22:8
**curious** [2] - 6:24, 21:4
**customers** [2] - 28:23, 37:2
**cut** [3] - 41:20, 42:2, 72:8
**cycle** [1] - 49:19

**D**

**Dallas** [1] - 1:18
**damages** [2] - 30:16, 80:13
**Dan** [12] - 3:19, 50:4, 56:22, 56:24, 58:6, 60:15, 63:7, 64:8, 75:1, 80:19, 81:24
**dangerous** [1] - 22:7
**Data** [97] - 2:22, 3:18, 11:20, 25:24, 26:9, 26:21, 26:25, 27:7, 27:11, 27:18, 28:16, 28:19, 34:10, 34:15, 34:16, 34:17, 35:18, 35:23, 36:4, 36:5, 36:7, 36:10, 36:15, 36:17, 36:21, 36:22, 37:1, 37:5, 37:20, 38:23, 40:12, 40:22, 41:2, 41:21, 41:23, 42:1, 42:3, 42:8, 42:10, 43:25, 45:3, 45:4, 45:13, 46:7, 47:3, 47:6, 47:15, 49:2, 49:4, 51:14, 55:4, 55:11, 55:12, 56:5, 56:10, 57:18, 58:4, 58:18, 58:22, 58:23, 59:8, 59:12, 59:13, 59:21, 59:25, 60:2, 60:5, 61:1, 61:9, 62:14, 64:1, 64:17, 65:6, 65:7, 65:10, 65:20, 66:1, 66:4, 66:5, 75:6, 76:7, 77:3, 78:18, 78:25, 79:17, 79:20, 79:21, 79:22, 79:25, 80:19, 80:24, 81:12, 81:18, 81:24, 82:5
**DATA** [1] - 1:9
**Data's** [7] - 28:14, 40:23, 41:4, 41:5, 43:11, 47:12, 55:18
**date** [8] - 42:20, 43:5, 44:22, 48:15, 48:16, 75:25, 77:7, 78:8
**dated** [4] - 77:7, 78:14, 78:22
**dates** [3] - 44:18, 72:25, 73:1
**David** [2] - 2:24, 29:12
**DAVID** [1] - 1:23
**day-to-day** [2] - 36:10, 63:2
**days** [20] - 13:1, 15:18, 15:20, 16:1,

17:17, 18:5, 18:19, 26:25, 40:17, 41:16, 44:7, 45:20, 45:21, 50:22, 53:4, 67:10, 68:19, 74:4, 74:18
**deal** [2] - 57:11, 65:19
**debate** [1] - 8:16
**debit** [2] - 34:25, 55:16
**debt** [2] - 50:13, 59:16
**decades** [2] - 27:15, 52:17
**December** [7] - 42:14, 42:17, 43:8, 43:9, 43:14, 70:4, 72:23
**decide** [9] - 10:10, 10:15, 10:18, 10:24, 13:15, 13:16, 16:21, 26:9, 82:9
**decided** [19] - 8:24, 12:24, 24:3, 26:10, 31:22, 31:23, 32:7, 32:11, 36:9, 44:25, 45:11, 54:25, 56:4, 56:5, 59:1, 65:10, 72:7, 73:3, 77:3
**decides** [6] - 8:13, 45:3, 60:9, 60:11, 69:7, 76:7
**decision** [10] - 9:3, 11:12, 26:15, 29:9, 46:19, 47:11, 53:4, 56:11, 72:16
**decisions** [5] - 15:5, 15:13, 46:20, 73:6, 73:18
**declared** [2] - 42:18, 42:25
**deed** [1] - 58:3
**deemed** [1] - 6:6
**defamation** [1] - 8:14
**defame** [1] - 8:15
**defendant** [12] - 3:20, 3:21, 23:6, 36:15, 36:17, 36:18, 39:20, 44:2, 57:9, 67:12
**DEFENDANTS** [1] - 53:13
**defendants** [11] - 1:10, 3:19, 4:1, 5:21, 11:20, 16:9, 25:25, 28:4, 46:21, 51:8, 58:2
**Defendants** [2] - 2:1, 80:11
**defendants'** [1] - 16:8
**defense** [2] - 4:5, 48:21
**degrees** [1] - 9:12
**deliberate** [2] - 15:8,

15:11
**deliberating** [1] - 15:12
**deliberations** [3] - 10:22, 18:8, 23:11
**deliver** [1] - 16:7
**delivered** [2] - 26:23, 26:24, 42:24
**demonstrate** [1] - 81:23
**department** [8] - 10:4, 10:8, 10:9, 10:19, 10:21, 42:17, 71:4, 72:2
**depended** [1] - 60:1
**deposition** [6] - 58:10, 58:12, 58:14, 69:11, 76:17, 76:21, 77:24, 77:25
**depositions** [1] - 76:16
**DEPUTY** [2] - 2:21, 25:7
**deputy** [2] - 25:9, 25:13
**Des** [2] - 31:12, 32:18
**describes** [1] - 57:24, 68:2
**deserves** [1] - 53:3
**designed** [4] - 28:17, 45:16, 52:22, 62:20
**desperate** [1] - 62:6
**details** [1] - 29:2
**determination** [3] - 31:4, 71:18, 81:8
**determined** [4] - 53:22, 66:25, 70:21, 73:9
**determining** [1] - 49:17
**developed** [5] - 32:19, 32:24, 32:25, 36:21, 65:7
**developing** [1] - 33:16
**development** [1] - 33:15
**device** [2] - 39:9, 46:25
**devilish** [1] - 21:21
**diagnosed** [7] - 37:8, 56:19, 57:5, 64:12, 64:13, 64:25, 80:23
**diagnosis** [1] - 51:18
**difference** [3] - 9:13, 15:1, 83:15
**different** [7] - 10:16, 25:3, 30:5, 35:22, 37:6, 55:22, 70:25
**difficult** [3] - 58:22, 66:3, 66:5

**DiLorenzo** [4] - 3:12, 3:13, 3:16, 29:5
**DILORENZO** [1] - 2:7
**diminish** [1] - 46:13
**dire** [3] - 24:24, 64:5, 81:3
**direct** [1] - 23:1
**direction** [3] - 5:17, 14:22, 66:14
**director** [2] - 33:8, 66:17
**disabilities** [3] - 14:10, 46:13, 47:11
**Disabilities** [8] - 26:3, 26:15, 30:8, 46:11, 46:23, 54:4, 80:9, 84:2
**disability** [24] - 40:13, 40:16, 40:18, 40:19, 40:20, 40:21, 40:23, 40:25, 41:1, 41:4, 41:5, 41:10, 41:16, 41:17, 42:6, 45:1, 45:6, 46:9, 46:22, 47:1, 47:4, 57:21, 57:22
**disabled** [5] - 46:15, 46:18, 47:18, 47:21, 53:6
**disastrous** [1] - 61:2
**discharge** [1] - 47:5
**discharged** [1] - 15:9
**discharging** [2] - 13:12, 22:20
**discipline** [1] - 47:23
**disconnected** [1] - 62:5
**discount** [1] - 20:3
**discovered** [1] - 76:23
**discovery** [3] - 51:6, 76:13
**discriminate** [1] - 46:18
**discriminated** [1] - 74:25
**discriminating** [1] - 47:3
**discuss** [1] - 64:9
**discusses** [2] - 64:8
**dishonesty** [1] - 79:22
**dispute** [1] - 47:1
**distinction** [1] - 40:19
**distinguished** [1] - 3:3
**distracted** [1] - 17:24
**DISTRICT** [2] - 1:1, 1:1
**division** [1] - 56:24
**Dixon** [2] - 31:15, 31:20
**doctor** [18] - 26:23, 27:8, 37:21, 43:24,

44:2, 64:21, 68:17, 70:2, 70:3, 70:4, 70:6, 70:7, 73:20, 73:21, 74:19
**doctor's** [7] - 26:25, 27:25, 31:5, 43:18, 51:22, 52:25, 53:7
**doctors** [3] - 38:2, 43:25, 70:20
**documents** [3] - 10:13, 29:9, 76:14
**done** [13] - 5:11, 5:15, 16:11, 50:8, 58:20, 60:20, 63:3, 66:11, 75:6, 75:14, 75:15, 76:9, 81:7
**doors** [1] - 9:21
**double** [2] - 30:10, 30:15
**doubt** [1] - 14:19
**down** [16] - 11:1, 17:22, 17:25, 18:7, 23:7, 24:5, 36:1, 38:23, 39:21, 45:20, 66:16, 67:21, 67:25, 69:8, 71:14
**Dr** [5] - 56:18, 64:14, 64:16, 64:20, 65:3
**drainage** [1] - 39:24
**draw** [1] - 7:16
**Driscoll** [1] - 2:10
**drive** [3] - 19:22, 19:23, 20:3
**dropped** [1] - 31:22
**drove** [1] - 43:25
**During** [3] - 65:4, 67:21, 76:23
**during** [22] - 6:8, 6:25, 8:3, 9:1, 11:1, 11:21, 12:2, 16:24, 18:8, 21:9, 35:3, 51:4, 51:6, 55:13, 63:10, 63:22, 66:2, 66:8, 71:12, 76:22, 83:17, 84:13
**duties** [4] - 50:3, 61:8, 71:6, 71:8
**duty** [1] - 12:12

---

**E**

**e-mail** [10] - 38:12, 41:22, 42:1, 69:5, 70:14, 70:16, 72:4, 75:3, 75:8
**e-mails** [5] - 38:7, 48:11, 51:5, 69:2, 72:21
**ear** [1] - 12:20
**early** [8] - 19:20, 59:6,

67:14, 67:20, 72:19, 72:24, 73:3, 81:5
**earning** [5] - 53:21, 53:22, 57:1, 71:20, 81:9
**earnings** [3] - 8:18, 49:11, 49:13
**ease** [2] - 6:19, 58:24
**East** [1] - 2:11
**EASTERN** [1] - 1:1
**echo** [1] - 29:3
**economic** [2] - 8:18, 45:13
**economically** [1] - 50:8
**economy** [3] - 28:24, 35:7, 37:3
**educating** [1] - 9:9
**education** [1] - 32:1
**effective** [1] - 78:2
**efficient** [1] - 39:1
**efficiently** [1] - 84:11
**effort** [1] - 84:9
**efforts** [1] - 16:18
**egg** [1] - 20:19
**Eidelman** [7] - 3:8, 3:10, 5:13, 29:5, 53:11, 82:6, 84:20
**EIDELMAN** [12] - 2:3, 3:9, 3:15, 3:24, 4:6, 4:18, 5:14, 5:19, 53:12, 53:14, 62:2, 84:21
**eight** [5] - 7:4, 8:5, 10:24, 15:15, 45:25
**either** [3] - 60:2, 63:21, 80:13
**elected** [1] - 32:14
**electronic** [3] - 34:19, 35:2, 39:8
**electronics** [1] - 38:24
**eligible** [1] - 72:19
**eliminate** [2] - 14:3, 80:18
**eliminated** [7] - 48:23, 53:17, 74:7, 74:10, 75:17, 75:19, 75:22
**eliminating** [1] - 56:12
**elimination** [2] - 48:21, 50:1
**emails** [2] - 29:16, 29:24
**embarrassed** [1] - 19:24
**emergencies** [1] - 20:7
**emergency** [1] - 20:9
**employed** [1] - 49:18
**employee** [3] - 36:6, 36:7, 53:20, 55:7,

78:25
**employee's** [1] - 46:5
**employees** [18] - 27:12, 33:10, 36:23, 41:23, 45:24, 46:2, 50:16, 53:16, 53:21, 55:3, 58:23, 62:20, 79:21, 79:23, 81:13, 82:3, 82:5
**employer** [2] - 45:19, 58:5
**employers** [2] - 45:22, 46:1
**employing** [1] - 60:1
**employment** [8] - 47:6, 55:23, 56:4, 58:21, 69:24, 75:21, 79:8, 80:5
**enacted** [1] - 15:4
**end** [30] - 6:15, 7:23, 8:23, 10:11, 10:20, 14:1, 14:6, 14:24, 15:14, 15:22, 21:7, 25:4, 26:20, 27:6, 33:21, 33:23, 34:7, 37:12, 43:7, 48:18, 49:7, 50:23, 54:13, 66:25, 75:21, 76:9, 76:11, 78:10, 80:6, 81:21
**ended** [3] - 31:24, 38:16, 73:14
**engage** [1] - 76:13
**engineering** [1] - 50:10
**England** [2] - 8:11, 13:1
**enter** [1] - 78:5
**entered** [1] - 78:3
**enterprise** [1] - 65:22
**enters** [1] - 6:10
**entire** [2] - 67:19, 69:24
**entitled** [3] - 4:2, 27:4, 27:5
**epilepsy** [1] - 12:13
**equity** [3] - 75:11, 75:18, 79:3
**equivalent** [4] - 27:6, 44:15, 52:4, 52:7
**escape** [1] - 13:2
**esophagus** [2] - 39:10, 39:14
**especially** [3] - 21:4, 51:8, 84:9
**ESQ** [6] - 1:19, 1:23, 2:3, 2:3, 2:4, 2:7
**essential** [1] - 42:7
**essentially** [1] - 8:16
**establish** [1] - 16:24

**established** [1] - 13:5
**estate** [1] - 32:11
**estimate** [2] - 5:8, 23:25
**ET** [1] - 1:9
**etc** [1] - 25:1
**ethic** [1] - 31:10
**ethical** [1] - 11:17
**ethically** [1] - 19:1
**evaluate** [1] - 35:20
**evaluated** [1] - 41:14
**events** [4] - 18:15, 50:21, 50:24, 52:9
**eventually** [1] - 23:4
**evidence** [40] - 6:3, 6:6, 10:12, 10:13, 10:14, 12:1, 14:21, 16:17, 17:9, 23:6, 25:18, 27:20, 29:4, 29:7, 45:13, 48:25, 51:23, 52:19, 52:20, 53:2, 53:24, 53:25, 54:7, 54:8, 65:8, 66:11, 68:11, 73:17, 76:10, 76:24, 76:25, 77:1, 80:7, 81:15, 81:19, 81:22
**evidentiary** [1] - 10:5
**Ewing** [1] - 3:10
**EWING** [1] - 2:1
**exact** [2] - 50:5, 77:9
**exactly** [5] - 15:21, 42:8, 43:23, 45:16, 55:14
**examination** [3] - 15:23, 23:1, 23:3
**examined** [1] - 51:9
**example** [1] - 11:2
**excellent** [1] - 27:14
**except** [2] - 8:13, 20:14
**exception** [1] - 54:12
**exchange** [4] - 19:10, 72:4, 76:14, 79:18
**exclude** [1] - 49:12
**excuse** [6] - 48:13, 48:25, 49:1, 50:1, 65:23, 67:3
**excuses** [5] - 27:19, 27:22, 48:8, 48:9
**executive** [4] - 33:15, 36:14, 57:8, 59:11
**Executive** [1] - 27:14
**executives** [1] - 52:21
**exhibit** [3] - 6:2, 84:8, 84:15
**exhibits** [1] - 6:2
**exits** [1] - 83:21
**expand** [1] - 73:3
**expect** [3] - 6:20,

16:24, 82:8
**expeditious** [1] -
 23:25
**expense** [6] - 41:5,
 41:6, 49:8, 49:9,
 49:21, 79:24
**experience** [2] -
 60:11, 60:16
**experienced** [2] -
 27:14, 29:6
**experts** [1] - 82:16
**expired** [2] - 42:24,
 43:3
**explain** [9] - 6:16,
 9:24, 10:4, 10:11,
 10:20, 23:10, 39:2,
 48:13, 49:7
**exposed** [1] - 82:13
**extended** [1] - 75:25
**extra** [1] - 36:5

**F**

**fabulous** [1] - 32:17
**face** [1] - 20:19
**facetiously** [1] - 4:20
**facilities** [1] - 24:10
**fact** [17] - 5:25, 10:7,
 10:8, 10:17, 10:19,
 14:12, 16:15, 17:10,
 17:14, 17:16, 20:3,
 27:22, 47:19, 56:25,
 75:17, 77:24, 83:5
**facts** [10] - 10:15,
 10:16, 10:24, 16:21,
 28:2, 30:13, 30:14,
 48:11, 48:20
**factually** [1] - 16:20
**fail** [1] - 81:19
**failed** [1] - 81:17
**failing** [1] - 27:24
**failure** [2] - 47:24,
 48:6
**fair** [1] - 13:8
**fairly** [2] - 21:22, 22:21
**faithfully** [1] - 22:21
**fall** [5] - 56:25, 62:25,
 63:1, 63:12, 65:10
**falsifying** [1] - 79:23
**Family** [6] - 26:2,
 26:20, 27:3, 30:9,
 31:6, 80:9
**family's** [1] - 74:21
**famous** [1] - 14:18
**far** [2] - 8:7, 19:25
**farm** [1] - 31:16
**farming** [1] - 31:11
**fascinating** [1] - 82:14
**fast** [1] - 62:25
**fathers** [2] - 12:19,

13:13
**favor** [3] - 23:10,
 25:14, 25:17
**FCRR** [1] - 2:10
**fear** [2] - 25:14, 25:17
**February** [4] - 37:8,
 64:11, 76:1, 78:14
**federal** [10] - 9:6, 9:7,
 9:12, 9:13, 9:15,
 9:18, 9:19, 13:11,
 82:11, 84:2
**fee** [1] - 80:4
**feet** [3] - 19:5, 19:8,
 22:3
**fellow** [5] - 8:17, 8:19,
 8:20, 13:16, 22:6
**Ferris** [1] - 50:15
**few** [9] - 8:11, 15:20,
 32:7, 32:17, 36:8,
 43:7, 53:4, 63:3,
 84:12
**fight** [1] - 13:20
**fighting** [1] - 30:2
**figure** [2] - 4:24, 46:1
**figured** [1] - 38:8
**filing** [1] - 28:7
**fill** [3] - 57:20, 66:18,
 70:6
**filled** [5] - 42:16, 43:4,
 48:18, 70:6, 70:11
**final** [4] - 15:15, 73:17,
 79:7, 79:11
**finally** [4] - 42:18,
 51:23, 67:24, 70:1
**finances** [1] - 74:21
**financial** [4] - 34:14,
 49:16, 50:12, 64:6
**financially** [1] - 57:13
**finder** [2] - 10:17,
 17:14
**finders** [2] - 10:7,
 17:10
**fine** [10] - 3:5, 3:7,
 4:12, 5:24, 17:25,
 18:16, 19:21, 45:5,
 48:5, 70:9
**finish** [1] - 16:6
**finished** [3] - 5:5,
 16:12, 19:16
**fire** [5] - 4:10, 4:15,
 45:19, 50:9, 52:11
**fired** [6] - 27:1, 41:8,
 41:9, 44:22, 44:25,
 52:14
**First** [105] - 2:22, 3:18,
 11:20, 25:24, 26:9,
 26:21, 26:24, 27:7,
 27:11, 27:18, 28:13,
 28:16, 28:19, 34:10,
 34:15, 34:16, 34:17,

35:18, 35:23, 36:4,
 36:5, 36:7, 36:10,
 36:14, 36:17, 36:21,
 36:22, 37:1, 37:5,
 37:20, 38:22, 40:12,
 40:22, 40:23, 41:1,
 41:4, 41:5, 41:21,
 41:23, 42:1, 42:3,
 42:8, 42:10, 43:11,
 43:25, 45:2, 45:3,
 45:4, 45:13, 46:7,
 47:3, 47:6, 47:12,
 47:15, 49:2, 49:4,
 51:14, 55:4, 55:11,
 55:12, 55:17, 56:5,
 56:10, 57:18, 58:4,
 58:18, 58:22, 58:23,
 59:8, 59:12, 59:13,
 59:21, 59:25, 60:2,
 60:5, 61:1, 61:9,
 62:14, 64:1, 64:17,
 65:5, 65:7, 65:10,
 65:20, 66:1, 66:4,
 66:5, 75:6, 76:7,
 77:3, 78:18, 78:25,
 79:17, 79:20, 79:21,
 79:22, 79:24, 80:19,
 80:24, 81:12, 81:18,
 81:24, 82:5
**first** [30] - 4:8, 5:17,
 6:12, 6:14, 6:24,
 16:13, 17:1, 22:24,
 23:6, 23:8, 25:20,
 26:5, 27:10, 32:25,
 33:5, 36:8, 43:12,
 51:12, 55:6, 57:13,
 59:3, 65:1, 65:5,
 77:7, 77:23, 78:14,
 82:23, 83:1, 84:15
**FIRST** [1] - 1:9
**fit** [1] - 34:15
**Five** [1] - 81:12
**five** [9] - 35:11, 51:11,
 59:13, 80:12
**flew** [1] - 39:20
**floor** [1] - 33:6
**Floor** [1] - 2:6
**Florida** [3] - 38:1,
 38:5, 64:13
**fly** [3] - 33:22, 67:20,
 67:25
**FMLA** [20] - 29:14,
 30:2, 30:9, 41:18,
 43:6, 44:14, 45:16,
 45:17, 45:23, 49:3,
 52:13, 52:15, 54:3,
 54:11, 54:13, 57:21,
 67:13, 70:2, 70:23,
 71:1
**focus** [3] - 8:1, 41:12,

72:16
**focused** [2] - 23:23,
 33:17
**folks** [12] - 6:25, 7:13,
 10:24, 11:24, 18:20,
 19:4, 20:20, 21:7,
 22:1, 82:7, 83:4,
 84:5
**following** [5] - 2:19,
 27:2, 29:24, 44:13
**forbid** [1] - 15:17
**force** [16] - 33:17,
 47:18, 47:22, 49:25,
 50:19, 52:22, 53:5,
 53:18, 54:19, 54:22,
 55:2, 56:3, 72:20,
 73:11, 81:5, 82:4
**forced** [14] - 26:11,
 26:20, 31:2, 41:20,
 42:2, 43:20, 46:8,
 47:7, 48:2, 48:3,
 50:25, 51:19, 51:21,
 52:23
**forces** [1] - 39:13
**forcing** [1] - 27:23
**foreperson** [1] - 6:15
**forget** [2] - 7:25, 52:5
**forgets** [1] - 18:3
**forgot** [1] - 46:7
**forgotten** [1] - 24:4
**form** [4] - 70:3, 70:6,
 70:7, 70:25
**former** [1] - 65:17
**forms** [6] - 41:24,
 42:15, 42:16, 42:22,
 48:18, 57:21
**formula** [1] - 49:17
**forth** [1] - 76:14
**forward** [3] - 53:1,
 62:25, 64:10
**founding** [2] - 12:19,
 13:13
**four** [9] - 7:4, 20:15,
 25:25, 48:24, 56:5,
 58:2, 68:20, 69:6,
 76:8
**Four** [1] - 81:4
**frame** [1] - 51:12
**frames** [1] - 51:11
**Frank** [18] - 3:19,
 36:19, 56:9, 56:20,
 58:5, 59:6, 59:10,
 59:23, 60:9, 61:5,
 64:21, 64:23, 65:1,
 72:7, 75:1, 81:24
**FREDERIC** [1] - 1:13
**free** [1] - 19:12
**freshman** [1] - 31:21
**Friday** [1] - 74:6
**friend** [5] - 35:15,

38:3, 44:20, 62:8,
 68:8
**friends** [8] - 21:5,
 40:9, 55:9, 57:10,
 62:4, 65:24, 67:25,
 77:16
**full** [6] - 16:4, 32:9,
 51:17, 71:7, 75:24,
 78:25
**full-time** [4] - 32:9,
 51:17, 71:7, 78:25
**functions** [2] - 17:10,
 42:7
**future** [1] - 57:23

**G**

**garage** [1] - 20:1
**Gary** [1] - 3:9
**GARY** [1] - 2:3
**gatherings** [1] - 37:20
**GBS** [6] - 56:23, 63:7,
 63:15, 66:19, 71:23,
 71:24
**general** [1] - 15:24
**generally** [1] - 18:14
**generous** [1] - 58:24
**gentleman** [1] - 3:3
**Gentlemen** [1] - 53:14
**gentlemen** [3] - 53:25,
 70:24, 81:21
**Gilbert** [1] - 32:3
**Gillian** [1] - 3:11
**GILLIAN** [1] - 2:3
**given** [5] - 42:8, 48:1,
 48:2, 52:6, 73:22
**global** [2] - 36:16,
 56:23
**God** [1] - 15:17
**golf** [2] - 67:5, 67:10
**Gotti** [1] - 22:11
**govern** [1] - 15:5
**graduated** [2] - 31:20,
 32:1
**great** [5] - 33:24, 38:1,
 39:7, 57:11
**Great** [1] - 13:1
**grind** [1] - 11:25
**group** [16] - 7:12,
 36:16, 36:18, 50:4,
 52:14, 53:23, 57:2,
 57:19, 62:18, 62:19,
 66:13, 66:22, 71:13,
 71:20, 81:8, 81:10
**groups** [3] - 49:4,
 49:20, 49:22
**growing** [1] - 31:14
**guess** [9] - 5:9, 6:3,
 7:16, 7:19, 18:5,
 48:8, 82:22, 83:5,

84:2
**guide** [1] - 24:23
**gut** [1] - 20:18
**guy** [2] - 22:3, 32:15
**guys** [1] - 48:10

# H

**Hack** [14] - 36:12,
43:14, 43:15, 57:3,
63:5, 63:6, 63:19,
63:20, 64:9, 72:3,
73:5, 73:8, 73:11
**hack** [2] - 36:13, 36:15
**half** [12] - 5:9, 19:13,
20:15, 24:15, 28:6,
46:10, 65:15, 68:15,
68:17, 68:22, 79:3,
79:5
**hall** [1] - 18:23
**Hammond** [2] - 31:13
**hand** [1] - 24:18
**handed** [1] - 44:1
**handles** [1] - 13:7
**hands** [3] - 7:2, 25:8,
53:4
**handsome** [1] - 22:3
**hanging** [1] - 13:3
**happy** [4] - 4:23, 13:1,
29:11, 43:10
**hard** [4] - 5:25, 20:16,
59:15, 84:7
**hardest** [2] - 20:11,
58:19
**harmed** [1] - 29:19
**Harrison** [7] - 56:18,
64:14, 64:15, 64:16,
64:20, 64:23, 65:3
**hay** [1] - 31:18
**hdrisc@gmail.com**
[1] - 2:12
**head** [7] - 21:20, 22:6,
49:21, 50:6, 50:7,
50:17, 71:23
**healing** [3] - 38:13,
39:6, 39:23
**health** [6] - 26:13,
41:12, 47:9, 47:12,
47:16
**hear** [45] - 3:8, 4:22,
10:12, 11:14, 12:2,
14:11, 15:14, 18:10,
21:13, 21:23, 22:24,
25:10, 27:19, 28:3,
28:11, 28:12, 28:13,
29:15, 29:22, 30:1,
32:4, 33:11, 33:20,
33:23, 38:15, 44:16,
44:17, 44:18, 48:9,
55:2, 55:13, 55:21,

55:23, 56:13, 58:18,
70:10, 71:2, 71:22,
72:25, 73:15, 76:5,
79:20, 79:22, 79:24
**heard** [18] - 27:10,
28:8, 35:8, 54:5,
55:11, 57:6, 58:8,
61:7, 63:6, 63:20,
63:21, 64:15, 65:4,
65:6, 68:9, 69:16,
77:5, 78:24
**hearing** [2] - 15:11,
36:13
**heavily** [1] - 69:4
**heavy** [1] - 55:1
**hello** [1] - 19:4
**help** [11] - 29:1, 56:20,
59:24, 60:14, 60:20,
61:9, 62:6, 69:25,
77:17, 84:3, 84:4
**helped** [1] - 57:19
**helping** [2] - 29:13,
63:10
**helps** [1] - 70:1
**high** [4] - 31:20, 32:5,
32:6, 80:20
**higher** [1] - 23:19
**highest** [6] - 53:20,
55:3, 63:14, 72:9,
81:13, 82:5
**highest-**
**compensated** [2] -
72:9, 82:5
**highest-paid** [1] -
63:14, 81:13
**himself** [4] - 47:14,
56:16, 58:16, 62:23
**hire** [3] - 50:9, 60:13,
63:24
**hired** [7] - 29:1, 33:3,
50:4, 50:5, 51:13,
55:6
**hires** [1] - 60:15
**hiring** [5] - 45:8,
46:19, 51:15, 52:18,
64:2
**hirings** [1] - 71:15
**historically** [2] - 12:5,
46:15
**history** [2] - 32:3,
65:16
**hit** [2] - 20:4, 41:1
**hold** [5] - 20:6, 20:21,
64:4, 64:6, 66:10
**holders** [1] - 50:13
**hole** [1] - 39:13
**holiday** [4] - 12:6,
43:8, 44:6
**holidays** [1] - 43:10
**Holly** [2] - 2:10, 18:7

**home** [17] - 16:12,
19:18, 20:25, 21:18,
22:1, 26:6, 26:8,
38:20, 38:21, 38:22,
39:19, 42:9, 51:21,
83:4
**honestly** [1] - 25:1
**Honor** [14] - 3:1, 3:4,
3:9, 3:13, 3:15, 4:12,
4:19, 5:14, 11:4,
25:23, 53:12, 53:15,
84:19, 84:21
**HONORABLE** [1] -
1:13
**hope** [5] - 22:17,
27:20, 49:7, 50:23,
53:4
**hopefully** [1] - 7:25,
19:22
**hospital** [4] - 38:16,
40:5, 51:20, 68:19
**hour** [5] - 5:9, 19:12,
19:13, 19:21, 24:15
**hours** [5] - 18:18,
29:25, 40:7, 65:17,
75:1
**houses** [5] - 32:6,
32:8, 32:9, 32:12,
36:3
**however's** [1] - 47:23
**HR** [5] - 41:24, 42:17,
57:18, 63:9, 71:6
**Human** [1] - 27:15
**human** [4] - 22:13,
24:16, 57:9, 66:18
**humor** [1] - 21:25
**hundred** [1] - 48:24
**hung** [1] - 13:6

# I

**idea** [6] - 7:2, 15:24,
17:1, 46:13, 74:24,
82:7
**ideas** [3] - 33:2, 33:19,
33:24
**identified** [1] - 56:6
**ignore** [2] - 52:8,
52:23
**ill** [4] - 31:3, 31:4,
45:18, 67:24
**illegal** [1] - 27:23
**Illinois** [3] - 31:13,
31:15, 31:16
**illness** [1] - 26:16
**immediately** [4] -
43:25, 64:14, 64:23,
77:20
**impacted** [2] - 82:3,
82:4

**important** [18] - 12:3,
12:20, 13:13, 13:18,
16:4, 17:10, 18:16,
20:21, 20:24, 25:4,
25:12, 40:20, 50:23,
59:3, 63:22, 67:7,
73:2, 83:15
**importantly** [2] -
60:19, 80:2
**impose** [1] - 8:17
**imposition** [1] - 16:3
**improper** [1] - 81:14
**impropriety** [2] - 19:7,
19:10
**improve** [1] - 66:21
**inadvertently** [1] -
21:13
**incapacitated** [3] -
70:5, 70:7, 73:21
**incentive** [1] - 51:8
**inclined** [1] - 11:16
**include** [3] - 54:18,
56:3
**included** [8] - 53:18,
53:19, 54:21, 54:23,
73:10, 80:16, 80:17,
81:16
**including** [6] - 24:11,
24:12, 59:21, 69:2,
81:1
**inclusion** [4] - 73:16,
74:3, 74:4, 81:13
**incoherent** [1] - 69:2
**income** [1] - 49:11
**incomplete** [1] - 70:5
**increase** [2] - 50:17,
57:3
**increased** [1] - 56:15
**incredible** [1] - 8:10
**independence** [1] -
13:10
**independent** [5] -
13:5, 27:13, 78:12,
79:9, 79:16
**Indiana** [1] - 31:14
**indispensable** [1] -
57:25
**individual** [5] - 5:21,
25:25, 58:2
**individually** [4] - 58:5,
58:6, 58:7
**individuals** [5] -
46:16, 56:6, 59:20,
76:8, 81:14
**indulge** [1] - 56:7
**industry** [3] - 35:22,
60:7, 60:17
**ineffective** [1] - 81:11
**influences** [1] - 83:16
**information** [15] -

20:9, 21:3, 21:20,
28:23, 28:24, 29:1,
34:12, 34:13, 34:24,
37:1, 37:6, 41:24,
79:14, 79:17, 83:9
**informed** [1] - 43:17
**Innelli** [6] - 20:8,
21:14, 22:15, 24:12,
24:21, 25:5
**innovative** [1] - 32:19
**inoperable** [2] - 74:20,
75:4
**inside** [2] - 35:9, 37:11
**insist** [1] - 48:22
**insisted** [1] - 58:15
**instance** [1] - 29:15
**instead** [4] - 17:24,
39:17, 45:10, 49:15
**instruct** [3] - 54:3,
80:6, 80:8
**instructions** [1] -
15:15
**insurance** [4] - 32:21,
40:25, 41:3, 45:2
**insured** [1] - 41:3
**intellectual** [2] -
79:14, 80:3
**intend** [1] - 49:25
**interacted** [1] - 34:17
**interest** [4] - 22:13,
49:11, 59:17, 59:19
**interested** [1] - 59:23
**interesting** [8] - 7:24,
15:13, 28:10, 33:19,
35:24, 49:6, 49:20,
82:18
**interim** [1] - 71:5
**internal** [1] - 71:3
**Internet** [1] - 83:9
**internet** [3] - 21:12,
22:7, 22:8
**interrupt** [2] - 23:12,
54:2
**interruption** [1] - 40:2
**introduce** [4] - 3:22,
7:20, 29:10, 56:8
**introduced** [3] - 6:2,
18:21, 60:15
**intrude** [1] - 83:16
**invest** [1] - 59:18
**investing** [1] - 80:17
**investor** [1] - 32:25
**invoice** [5] - 78:14,
78:21, 78:22, 79:6,
80:1
**invoices** [2] - 78:13,
79:4
**involved** [3] - 36:10,
63:2, 69:25
**involves** [1] - 34:19

**involving** [2] - 42:15, 48:23
**Iowa** [9] - 31:11, 31:16, 31:21, 32:3, 32:10, 32:11, 32:13, 32:18, 33:7
**issue** [4] - 17:15, 34:21, 50:22, 54:15
**issued** [2] - 35:6, 54:15
**issues** [3] - 10:5, 10:18, 39:24
**itself** [2] - 47:20, 71:13

## J

**January** [23] - 35:18, 42:19, 43:1, 43:12, 43:15, 43:16, 43:18, 43:19, 43:21, 43:24, 44:5, 44:9, 44:22, 51:1, 70:13, 72:23, 72:24, 73:3, 75:21, 77:6
**Jarred** [1] - 83:25
**Jeff** [9] - 36:11, 43:14, 43:15, 57:3, 63:5, 63:18, 64:9, 72:3, 73:4
**jet** [1] - 39:21
**Jill** [1] - 3:16
**job** [42] - 4:16, 4:21, 9:9, 14:11, 14:14, 20:19, 28:15, 31:23, 32:2, 41:8, 42:7, 42:9, 43:4, 45:19, 45:21, 46:2, 46:5, 46:6, 47:22, 47:24, 47:25, 48:21, 48:22, 50:2, 51:17, 52:5, 52:10, 53:8, 60:4, 60:12, 60:24, 63:25, 71:6, 72:5, 74:7, 74:10, 75:17, 75:19, 75:22
**jobs** [5] - 53:17, 59:24, 61:3, 80:15, 80:18
**Joe** [24] - 51:13, 55:7, 56:17, 61:6, 61:7, 62:5, 62:17, 64:12, 64:20, 64:23, 65:2, 65:3, 65:11, 67:4, 67:11, 67:20, 67:22, 77:3, 77:11, 77:12, 77:13, 77:16, 77:21, 82:25
**Joe's** [1] - 64:22
**Johnson** [23] - 3:21, 26:1, 44:2, 44:11, 57:17, 57:20, 57:24, 57:25, 58:7, 63:8, 63:9, 63:23, 63:25, 64:7, 66:11, 66:17, 69:24, 73:19, 74:5, 75:22, 80:21, 81:25
**join** [2] - 9:21, 62:9
**joined** [2] - 56:20, 56:22, 65:9
**joins** [1] - 61:5
**Joseph** [2] - 33:11, 55:7
**Judge** [5] - 4:6, 22:2, 54:5, 80:8, 83:5
**judge** [22] - 5:19, 7:20, 7:25, 8:1, 8:13, 9:7, 9:13, 9:24, 10:1, 10:18, 11:24, 12:12, 13:7, 18:8, 20:12, 20:13, 20:23, 22:4, 24:11, 29:3, 80:6, 82:11
**judge's** [1] - 54:6
**judges** [2] - 12:24, 13:6
**judgment** [2] - 4:5, 8:19
**judicial** [1] - 9:18
**judiciary** [1] - 13:11
**July** [1] - 79:2
**June** [3] - 36:7, 78:22, 79:25
**juries** [2] - 9:23, 12:21
**jurisdiction** [1] - 9:14
**JUROR** [3] - 7:7, 7:8, 7:10
**juror** [6] - 11:7, 12:18, 21:16, 21:22, 22:18
**jurors** [21] - 4:4, 4:25, 5:1, 5:3, 6:5, 6:9, 6:25, 7:14, 7:18, 8:5, 8:19, 10:10, 13:16, 13:21, 13:25, 14:3, 15:5, 22:16, 22:19, 25:2, 82:8
**jury** [22] - 2:20, 3:23, 4:7, 4:9, 4:13, 4:19, 4:24, 7:1, 7:13, 8:9, 8:15, 10:4, 10:7, 10:8, 10:10, 10:23, 12:8, 12:12, 13:13, 24:25, 25:9, 83:24
**JURY** [1] - 1:6
**Jury** [3] - 1:14, 6:10, 83:21
**justice** [3] - 9:10, 14:22, 53:3
**justifiable** [1] - 56:2
**justify** [1] - 63:19

## K

**keep** [7] - 18:2, 18:15, 37:19, 45:19, 50:22, 67:16, 83:6
**kept** [1] - 75:23
**kids** [3] - 9:9, 21:1, 31:18
**kind** [9] - 21:2, 21:19, 28:1, 31:9, 31:12, 33:25, 34:1, 76:4, 78:4
**kindergarten** [1] - 24:17
**kindness** [1] - 45:19
**kinds** [1] - 60:11
**King** [5] - 3:14, 13:3, 13:6, 13:15, 44:6
**KING** [1] - 2:5
**kingdom** [1] - 21:8
**KKR** [3] - 59:7, 60:25
**knowledge** [2] - 9:8, 11:12
**known** [5] - 64:17, 76:16, 76:24, 77:15, 79:25
**knows** [3] - 12:13, 60:10, 60:12

## L

**laboratory** [1] - 15:22
**Ladies** [1] - 53:14
**ladies** [3] - 53:24, 70:24, 81:21
**laid** [1] - 54:16
**lapping** [1] - 15:21
**laptop** [1] - 38:25
**large** [5] - 9:7, 27:11, 49:4, 49:19, 49:22
**larger** [1] - 72:17
**largest** [1] - 56:24
**laryngectomy** [1] - 37:23
**larynx** [4] - 26:6, 29:22, 37:9, 38:4
**LaSalle** [1] - 31:13
**last** [7] - 3:21, 7:21, 8:10, 11:8, 15:18, 17:17, 35:11
**late** [1] - 53:18
**latitude** [1] - 15:17
**law** [27] - 4:10, 4:15, 7:1, 8:8, 8:12, 9:15, 10:3, 10:4, 10:9, 10:11, 10:20, 10:21, 10:25, 11:12, 13:4, 14:25, 23:10, 26:19, 30:11, 46:16, 54:3, 54:6, 54:10, 80:7,
**Leave** [6] - 26:2, 26:20, 27:3, 30:9, 31:7, 80:9
**leaves** [1] - 31:17
**left** [7] - 13:3, 33:13, 40:7, 54:11, 54:12,

80:8, 84:10
**LAW** [1] - 1:17
**laws** [2] - 9:15, 49:2
**lawsuit** [1] - 14:9
**lawyer** [16] - 3:17, 4:5, 11:3, 11:5, 16:7, 16:8, 16:14, 16:15, 16:17, 16:18, 16:19, 22:25, 27:22, 44:20
**lawyers** [13] - 6:4, 7:25, 11:16, 14:12, 16:22, 18:21, 18:22, 19:2, 23:7, 29:3, 29:4, 54:7, 82:21
**Lawyers** [1] - 3:6
**lawyers'** [1] - 17:2
**layers** [2] - 56:13, 72:7
**laying** [1] - 29:25
**lead** [2] - 43:17, 56:23
**leaders** [1] - 65:14
**leadership** [2] - 66:14, 66:21
**leading** [1] - 71:17
**learn** [2] - 82:12, 82:17
**learned** [2] - 64:24, 77:24, 78:1
**learning** [2] - 78:18, 82:13
**least** [3] - 9:16, 34:18, 80:11
**leave** [67] - 3:25, 4:3, 26:11, 26:12, 26:18, 26:20, 27:6, 27:17, 27:23, 30:2, 30:3, 30:4, 30:5, 30:6, 31:2, 37:18, 40:12, 41:10, 41:15, 41:18, 41:20, 42:15, 42:18, 42:21, 42:24, 42:25, 43:3, 43:4, 43:6, 43:20, 45:17, 46:4, 46:6, 46:8, 47:8, 47:11, 47:13, 48:2, 48:3, 48:4, 48:15, 48:16, 48:18, 51:1, 51:3, 51:19, 51:21, 52:23, 53:6, 53:7, 54:13, 54:22, 58:13, 58:16, 60:23, 67:16, 68:12, 68:25, 69:22, 70:14, 70:15, 70:25, 74:16, 80:24, 81:17, 81:18

68:13, 68:14
**legal** [2] - 10:18, 11:12
**legitimate** [1] - 50:18
**Lehman** [1] - 33:3
**Lehr** [1] - 3:10
**LEHR** [1] - 2:1
**less** [4] - 34:3, 75:13, 77:21, 77:22
**lesser** [1] - 14:20
**lesson** [3] - 9:5, 13:17, 54:2
**letter** [3] - 42:18, 43:2, 43:3
**letting** [1] - 45:5
**level** [5] - 17:25, 18:12, 18:16, 66:17, 72:2
**liability** [2] - 80:13, 81:23
**license** [1] - 79:17
**lies** [2] - 10:10, 17:7
**life** [3] - 8:18, 12:25, 29:17
**light** [1] - 9:17
**likely** [1] - 6:22
**limitation** [1] - 54:15
**limitations** [1] - 54:14
**list** [10] - 6:2, 72:20, 72:22, 73:5, 73:9, 73:11, 73:12, 73:13, 84:8, 84:15
**listen** [7] - 9:22, 10:11, 15:8, 21:13, 25:5, 29:8
**listening** [2] - 68:13, 82:15
**lists** [2] - 72:19, 81:5
**live** [2] - 19:25, 21:4
**lived** [2] - 31:12, 31:13
**livelihoods** [1] - 60:1
**living** [1] - 83:13
**LLP** [1] - 2:1
**lobby** [1] - 14:2
**local** [1] - 34:22
**locations** [1] - 80:16
**long-term** [10] - 40:18, 40:20, 40:25, 41:1, 41:5, 41:17, 45:1, 45:5, 46:9, 57:21
**look** [9] - 21:12, 22:8, 29:8, 48:14, 53:1, 56:12, 60:24, 66:23, 74:11
**looked** [4] - 70:19, 71:9, 72:10, 79:8
**looking** [6] - 6:12, 17:24, 22:3, 55:25, 60:23, 60:24, 71:12, 72:8
**looks** [1] - 83:5

**lose** [2] - 60:4, 75:19
**lost** [1] - 61:2
**Lou** [6] - 56:18, 64:14, 64:15, 64:16, 64:20, 64:23
**LOUIS** [1] - 2:7
**Louis** [1] - 3:12
**love** [2] - 22:8, 23:19
**loved** [2] - 20:25, 21:18
**loves** [1] - 29:17
**lower** [1] - 72:14
**LTD** [1] - 70:11
**luck** [1] - 7:16
**lunch** [2] - 19:12, 37:15
**Luther** [1] - 44:6

## M

**machine** [1] - 55:19
**Madison** [1] - 2:6
**mail** [10] - 38:12, 41:22, 42:1, 69:5, 70:14, 70:16, 72:4, 75:3, 75:8
**mails** [5] - 38:7, 48:11, 51:5, 69:2, 72:21
**main** [1] - 32:18
**major** [1] - 52:1
**man** [4] - 29:25, 33:11, 35:16, 36:11
**man's** [1] - 29:17
**manage** [2] - 57:19, 84:14
**managed** [2] - 27:16, 71:17
**management** [14] - 27:13, 27:17, 43:11, 43:17, 49:18, 54:25, 55:1, 56:12, 56:13, 66:22, 70:15, 72:8, 74:1, 80:14
**manager** [1] - 57:3
**managers** [4] - 55:4, 56:14, 56:15, 69:2
**managing** [1] - 62:18
**manipulation** [1] - 50:10
**manufactured** [1] - 27:22
**map** [2] - 16:23, 17:4
**March** [9] - 37:10, 37:12, 65:9, 73:22, 77:8, 77:9, 78:2, 78:8
**marching** [1] - 10:21
**Marino** [42] - 3:20, 26:1, 39:20, 40:3, 40:6, 40:8, 41:9,

41:13, 43:15, 57:8, 57:10, 57:12, 57:16, 58:6, 58:15, 60:17, 65:9, 65:10, 65:13, 65:24, 66:1, 67:5, 67:12, 67:20, 68:4, 68:11, 68:15, 68:21, 68:23, 69:5, 69:12, 69:13, 72:3, 74:5, 74:9, 74:15, 74:25, 75:8, 81:2, 81:24
**Marino's** [2] - 41:7, 60:18
**market** [2] - 28:24, 37:2
**marketing** [2] - 33:2, 33:18
**marshals** [2] - 83:12, 83:13
**Martin** [1] - 44:6
**matter** [4] - 4:3, 4:5, 42:23, 52:15
**McKinney** [1] - 1:17
**MD** [1] - 2:2
**mean** [5] - 7:15, 10:9, 41:21, 48:4, 52:6
**means** [4] - 10:9, 11:10, 11:11, 34:3
**meant** [1] - 73:20
**meantime** [1] - 6:18
**meat** [1] - 82:22
**mechanical** [1] - 2:14
**Medical** [4] - 26:2, 26:20, 27:3, 30:9, 31:6, 80:9
**medical** [1] - 41:14
**medicated** [1] - 69:4
**meet** [1] - 67:11
**meeting** [5] - 6:1, 39:1, 39:3, 64:13, 64:24
**meetings** [1] - 38:12
**meets** [1] - 73:19
**mega** [1] - 32:22
**member** [1] - 36:9
**members** [1] - 43:11
**Men** [1] - 15:8
**mentality** [1] - 36:23
**mention** [3] - 5:19, 5:23, 12:5
**mentioned** [1] - 63:12
**merchant** [4] - 28:20, 35:5, 36:25, 55:20
**merchants** [1] - 35:12
**merely** [1] - 28:19
**merry** [1] - 45:7
**Merry** [1] - 43:9
**mess** [2] - 42:15, 71:16
**message** [5] - 40:10,

40:11, 68:16, 74:19
**messages** [3] - 38:7, 68:16, 69:5
**met** [2] - 32:15, 84:15
**MetLife** [4] - 41:1, 41:2, 70:19, 70:20
**Michael** [1] - 3:11
**MICHAEL** [1] - 2:4
**mid** [5] - 24:8, 39:19, 70:4, 72:19
**mid-afternoon** [1] - 24:8
**mid-December** [1] - 70:4
**mid-morning** [1] - 24:8
**mid-November** [1] - 72:19
**middle** [3] - 38:19, 77:8, 77:9
**Midwest** [2] - 31:18, 32:5
**Midwestern** [1] - 31:15
**might** [5] - 7:20, 63:16, 74:20, 75:3, 75:18
**mike** [1] - 25:11
**minutes** [3] - 5:1, 16:6, 65:21
**mischaracterize** [1] - 52:10
**miss** [1] - 37:13
**Missouri** [1] - 31:25
**mistake** [2] - 52:2, 52:18
**mixed** [1] - 7:12
**mode** [2] - 72:15
**modern** [1] - 28:22
**modified** [1] - 35:22
**Moines** [2] - 31:12, 32:18
**moment** [1] - 56:7
**money** [6] - 32:8, 36:5, 50:14, 59:18, 59:19, 63:20
**month** [7] - 36:5, 72:3, 77:4, 77:12, 78:10, 78:11, 80:4
**months** [6] - 15:19, 16:1, 37:11, 64:1, 79:4, 79:5
**Morales** [1] - 11:21
**morning** [10] - 3:23, 4:8, 16:13, 18:21, 19:10, 24:8, 25:19, 29:23, 38:6, 65:17
**most** [4] - 9:11, 22:23, 29:14, 31:14
**mothers** [1] - 12:19

**motivated** [1] - 47:12
**motivational** [1] - 62:14
**mouth** [2] - 39:14, 39:15
**mouths** [1] - 39:11
**move** [5] - 23:25, 33:4, 33:6, 40:18, 84:11
**moved** [4] - 32:10, 32:17, 33:3, 50:3
**moves** [2] - 34:24, 34:25
**Moving** [1] - 64:10
**moving** [1] - 28:25
**mowing** [1] - 31:17
**MR** [24] - 2:24, 3:1, 3:4, 3:9, 3:13, 3:15, 3:24, 4:6, 4:12, 4:16, 4:18, 5:9, 5:12, 5:14, 5:19, 25:23, 31:1, 40:3, 53:12, 53:14, 62:2, 82:25, 84:19, 84:21
**multiple** [1] - 52:17
**murdered** [1] - 11:8
**must** [2] - 15:15, 78:17

## N

**name** [9] - 3:4, 6:14, 7:21, 36:13, 60:6, 61:6, 64:15, 71:4, 72:18
**named** [1] - 36:11
**names** [2] - 73:13, 81:4
**national** [1] - 25:16
**natural** [1] - 21:3
**nature** [2] - 11:22, 15:24
**near** [2] - 33:20, 33:23
**necessarily** [3] - 8:20, 16:20, 47:7
**necessary** [2] - 22:15, 47:23
**need** [44] - 9:25, 10:1, 10:3, 10:7, 10:17, 15:6, 17:5, 17:6, 24:9, 27:1, 29:8, 30:11, 33:22, 41:11, 44:12, 44:14, 46:1, 46:2, 53:1, 53:22, 62:6, 62:7, 63:18, 63:24, 64:17, 66:12, 67:1, 68:18, 69:6, 69:8, 69:18, 71:19, 72:1, 74:20, 74:21, 74:22, 80:17, 80:21, 81:9, 82:8

**needed** [13] - 15:9, 26:14, 38:24, 43:5, 46:16, 47:8, 56:12, 57:2, 57:20, 60:20, 66:21, 66:23, 74:16
**needs** [3] - 24:10, 84:1, 84:3
**negotiations** [1] - 45:25
**nervous** [1] - 4:21
**net** [2] - 49:11, 49:13
**network** [1] - 34:23
**neutral** [2] - 11:24, 11:25
**neutrals** [2] - 11:17, 11:23
**Never** [1] - 63:20
**never** [4] - 18:23, 37:17, 57:6, 63:20
**NEW** [1] - 1:1
**new** [6] - 28:22, 33:1, 33:9, 36:23, 62:12, 82:12
**New** [7] - 1:5, 2:7, 2:11, 19:21, 33:4, 39:21
**news** [1] - 37:22
**newspaper** [2] - 22:10, 22:13
**newspapers** [1] - 21:12
**next** [17] - 3:12, 3:16, 3:18, 3:20, 15:21, 18:24, 23:5, 29:23, 30:18, 38:6, 58:24, 61:10, 64:19, 74:9, 75:5, 75:8
**night** [2] - 19:18, 39:25
**night's** [1] - 83:3
**nine** [2] - 11:23, 19:20
**noble** [1] - 47:15
**Nobody** [1] - 83:11
**nobody** [1] - 66:17
**none** [1] - 19:22
**nonverbal** [1] - 17:14
**nonworking** [1] - 75:23
**normally** [2] - 75:5, 76:8
**north** [1] - 31:12
**Northeast** [1] - 31:25
**note** [13] - 26:22, 26:23, 26:25, 27:25, 31:5, 42:24, 43:19, 44:21, 51:22, 52:25, 53:7, 73:21, 73:23
**notes** [6] - 17:18, 17:21, 18:1, 18:2, 18:13, 18:14

**nothing** [2] - 11:9, 21:14
**notice** [2] - 70:23, 75:23
**notification** [1] - 70:9
**notified** [1] - 51:1
**November** [17] - 39:19, 39:20, 40:4, 40:11, 40:15, 41:14, 42:14, 43:20, 50:25, 58:16, 67:20, 67:25, 72:19, 72:22, 74:17, 75:7, 81:5
**number** [7] - 15:25, 53:16, 59:14, 59:15, 78:9, 81:1, 82:3
**numbers** [1] - 49:16
**NY** [2] - 1:22, 2:7

## O

**o'clock** [4] - 82:23, 83:2, 83:18, 84:17
**O.J** [1] - 14:18
**OA** [7] - 65:6, 65:7, 65:10, 65:20, 66:1, 66:4, 66:5
**oath** [5] - 24:22, 24:23, 25:3, 25:13, 68:5
**object** [1] - 11:16
**objection** [3] - 11:4, 11:9, 11:11
**objections** [1] - 10:5
**objectively** [1] - 21:15
**objectives** [1] - 72:11
**obligation** [1] - 42:5
**obligations** [1] - 22:20
**observation** [1] - 47:12
**observed** [1] - 40:6
**obvious** [1] - 47:7
**obviously** [5] - 10:16, 20:5, 83:7, 83:9, 83:14
**occurred** [3] - 28:12, 53:18, 68:24
**October** [6] - 38:19, 39:19, 42:19, 43:1, 70:5, 70:8
**OF** [4] - 1:1, 1:6, 1:17, 53:13
**offered** [1] - 10:13
**offers** [2] - 58:23, 69:25
**OFFICE** [1] - 1:17
**office** [12] - 32:18, 33:5, 37:17, 38:22, 38:23, 39:4, 43:8, 43:9, 43:25, 44:12,

**51**:18, 76:17
**officer** [1] - 59:12
**officers** [1] - 52:16
**okayed** [1] - 26:23
**old** [2] - 22:4, 29:18
**older** [1] - 12:10
**ON** [1] - 53:13
**once** [8] - 12:9, 19:24, 30:17, 34:18, 41:1, 45:20, 46:23, 57:22
**oncologist** [1] - 64:18
**one** [31] - 3:19, 6:7, 6:12, 6:13, 8:13, 9:24, 12:22, 13:14, 13:19, 17:9, 20:5, 20:6, 20:14, 21:18, 22:18, 24:7, 33:12, 38:1, 41:19, 48:12, 52:5, 52:13, 54:1, 54:11, 55:5, 61:8, 69:16, 78:5, 78:22, 81:13
**One** [1] - 80:14
**ones** [3] - 20:25, 62:20, 78:1
**open** [3] - 9:21, 9:22, 62:1
**OPENING** [1] - 53:13
**opening** [13] - 5:6, 5:20, 16:8, 16:10, 16:16, 16:23, 24:19, 25:21, 28:1, 54:8, 65:6, 68:14, 77:5
**openings** [1] - 11:22
**operation** [1] - 68:18
**operations** [1] - 36:10
**opinion** [5] - 9:11, 23:14, 37:24, 82:19, 82:20
**opportunity** [2] - 13:21, 20:2
**orally** [1] - 71:24
**order** [3] - 4:8, 74:21, 80:25
**orders** [1] - 10:22
**Ording** [1] - 71:5
**organization** [2] - 71:25, 72:5
**organize** [1] - 51:11
**organized** [1] - 71:16
**oriented** [1] - 16:25
**origin** [1] - 25:16
**otherwise** [7] - 10:17, 19:16, 20:10, 22:5, 27:22, 54:16, 57:13
**otolaryngologists** [1] - 38:1
**outside** [1] - 83:16
**overall** [1] - 48:8
**overhead** [1] - 63:17

**overnight** [1] - 40:5
**overruled** [1] - 11:11
**overwhelm** [2] - 4:4, 6:5
**owe** [1] - 50:14
**own** [4] - 18:3, 26:13, 42:10, 59:8
**owned** [1] - 32:12
**owner** [1] - 60:25

## P

**P.C** [2] - 1:17, 1:21
**p.m** [2] - 1:8, 44:10
**package** [3] - 37:4, 74:8, 74:11
**packages** [1] - 58:24
**pads** [3] - 28:20, 35:12, 37:7
**page** [2] - 30:18, 61:10
**paid** [14] - 40:14, 45:2, 46:6, 49:14, 53:20, 57:23, 63:14, 69:23, 75:5, 75:14, 79:4, 79:18, 79:19, 81:13
**painted** [2] - 32:6, 32:9, 32:12
**painting** [1] - 32:8
**paper** [3] - 17:19, 22:10, 22:12
**paperwork** [5] - 6:5, 69:21, 69:25, 70:1, 70:11
**part** [11] - 17:15, 35:6, 41:3, 46:7, 48:23, 49:16, 49:21, 50:19, 53:17, 73:14, 73:16
**partially** [1] - 17:12
**participate** [2] - 46:14, 66:5
**particular** [4] - 23:25, 54:20, 55:24, 78:13
**parties** [8] - 2:23, 19:3, 25:15, 40:20, 47:2, 76:12, 76:14, 76:15
**partner** [2] - 57:18, 63:9
**party** [1] - 43:8
**pass** [3] - 8:19, 18:23, 35:3
**past** [2] - 12:6, 58:20
**pasture** [1] - 45:10
**pause** [2] - 64:10, 66:9
**Pause** [1] - 7:3
**pay** [17] - 17:22, 17:23, 27:4, 40:19, 46:19, 56:12, 59:18, 59:19, 67:18, 75:2, 75:7, 75:9, 75:10,

**77**:3, 77:13, 79:1, 84:10
**paychecks** [1] - 69:23
**paying** [2] - 42:11, 45:4
**payment** [2] - 57:22, 81:1
**payments** [9] - 28:14, 34:20, 35:2, 35:9, 40:23, 41:2, 60:6, 60:16, 65:16
**payroll** [2] - 40:14, 42:11, 75:24
**pays** [1] - 40:22
**peace** [1] - 83:6
**peers** [1] - 8:22
**pencil** [1] - 17:19
**people** [46] - 4:4, 9:11, 12:10, 12:11, 13:3, 13:18, 14:5, 17:21, 17:22, 17:23, 18:14, 20:17, 21:3, 21:4, 22:7, 30:2, 32:13, 33:18, 35:8, 38:12, 48:24, 49:5, 49:20, 49:22, 50:9, 52:12, 54:24, 56:3, 58:20, 58:23, 60:1, 60:4, 60:13, 60:15, 61:2, 65:18, 67:24, 71:11, 72:9, 73:12, 74:1, 74:24, 76:5, 81:10, 83:7, 83:8
**people's** [3] - 9:20, 13:15, 59:24
**pepper** [1] - 21:1
**percent** [7] - 35:2, 40:18, 40:24, 41:2, 55:3, 72:9, 73:5, 73:10, 75:13, 82:4
**perceptions** [1] - 17:2
**perform** [3] - 42:7, 42:9, 47:23
**period** [8] - 51:5, 51:24, 59:4, 63:23, 67:22, 76:22, 76:23, 77:2
**persecution** [1] - 13:2
**person** [10] - 6:15, 8:21, 10:20, 19:6, 20:6, 20:11, 52:13, 57:15, 63:24, 71:17
**person's** [1] - 46:14
**personal** [3] - 9:11, 18:3, 18:17
**personally** [1] - 9:8
**perspective** [1] - 60:8
**Peter** [1] - 22:11
**Ph.D** [1] - 9:12
**phase** [1] - 58:25

**phone** [1] - 42:1
**physical** [2] - 26:16, 46:13
**physician's** [3] - 26:21, 43:2, 43:3
**physicians** [2] - 28:12, 42:24
**pick** [1] - 12:9
**picked** [1] - 15:10
**picks** [1] - 64:14
**picture** [3] - 63:9, 67:6, 67:9
**piece** [3] - 54:11, 68:14
**pieces** [1] - 61:1
**pile** [1] - 30:17
**PIN** [3] - 28:20, 35:12, 37:7
**Pitt** [2] - 22:4, 83:5
**pizza** [3] - 34:22, 34:23, 34:25
**place** [6] - 2:19, 10:23, 12:25, 13:2, 53:4
**placed** [1] - 80:24
**Plaintiff** [2] - 1:4, 1:17
**plaintiff** [16] - 2:25, 4:12, 11:19, 14:9, 14:15, 14:16, 14:23, 16:5, 23:5, 25:19, 26:5, 30:7, 47:4, 53:3, 53:19
**plaintiff's** [4] - 16:7, 26:2, 26:16, 48:22
**plaintiffs** [1] - 46:21
**plan** [4] - 43:11, 57:3, 57:7, 63:18
**plans** [1] - 57:22
**play** [3] - 21:21, 67:5, 67:10
**played** [1] - 31:21
**Plaza** [1] - 2:11
**PLLC** [1] - 2:5
**Plumeri** [36] - 33:11, 33:14, 34:9, 35:15, 35:25, 36:4, 36:8, 36:9, 39:20, 40:3, 51:13, 52:17, 55:7, 55:8, 55:9, 56:17, 61:6, 62:2, 62:17, 63:2, 64:12, 64:13, 64:20, 65:12, 67:4, 67:11, 67:20, 67:22, 68:4, 77:3, 77:10, 77:11, 77:14, 77:21, 79:1, 82:25
**pneumonia** [2] - 39:24, 40:6
**point** [20] - 8:2, 21:25, 28:7, 32:20, 35:3, 42:5, 43:3, 43:10,

51:9, 54:25, 59:8,
62:19, 63:8, 68:23,
69:7, 70:24, 71:18,
72:6, 72:12, 73:19
**pointed** [1] - 79:15
**policy** [2] - 40:25, 41:3
**politics** [2] - 13:6,
13:9
**Pool** [1] - 3:19
**Poole** [1] - 3:16
**portal** [1] - 70:19
**portion** [1] - 76:2
**position** [9] - 27:6,
44:15, 52:4, 52:5,
52:7, 70:24, 74:7
**possible** [1] - 5:20
**practice** [2] - 8:23,
64:19
**Pratt** [1] - 2:2
**pre** [1] - 28:6
**prejudice** [1] - 21:15
**prejudiced** [1] - 22:18
**prepaid** [1] - 79:17
**preponderance** [1] -
14:21
**presence** [1] - 2:19
**present** [3] - 26:21,
54:7, 54:8
**presentation** [2] -
27:20, 65:20
**presented** [1] - 55:23
**presenting** [3] - 53:1,
68:11, 76:10
**presents** [1] - 23:5
**presided** [1] - 22:11
**president** [6] - 36:14,
50:5, 57:9, 63:15,
66:15, 67:17
**President** [2] - 27:15,
28:16
**presiding** [1] - 7:17
**pretend** [1] - 24:17
**pretty** [2] - 4:16, 24:5
**prevail** [1] - 81:23
**prevailing** [1] - 80:12
**prevent** [1] - 80:12
**price** [1] - 72:13
**priceless** [1] - 68:3
**Primerica** [2] - 34:1,
35:17
**print** [1] - 34:21
**private** [2] - 39:21,
59:8
**privilege** [2] - 7:17,
82:11
**privileged** [1] - 13:24
**probability** [1] - 23:9
**problem** [2] - 41:13,
47:9

**proceed** [2] - 4:13, 5:3
**Proceedings** [1] -
2:14
**process** [9] - 12:9,
24:24, 28:14, 34:22,
34:23, 35:4, 35:7,
64:3, 84:12
**processed** [2] - 28:21,
82:18
**produced** [2] - 2:15,
51:5
**product** [1] - 41:3
**products** [2] - 32:19,
34:14
**professional** [1] -
84:16
**professionals** [1] -
18:22
**profusely** [1] - 20:23
**program** [2] - 35:24,
65:13
**programs** [8] - 28:18,
33:9, 34:12, 35:21,
36:21, 51:16
**progress** [1] - 6:22
**prohibits** [1] - 47:3
**projected** [2] - 71:13,
73:22
**promptly** [3] - 20:4,
20:21, 83:19
**proof** [5] - 14:16,
14:17, 14:19, 14:23,
16:5
**proper** [3] - 11:6,
11:13, 24:1
**properly** [1] - 9:10
**property** [2] - 79:15,
80:4
**proprietary** [1] - 79:14
**prospective** [1] - 7:14
**prosthetic** [1] - 46:24
**protected** [3] - 43:4,
46:2, 46:5
**protection** [1] - 45:22
**protections** [1] -
45:17
**protocol** [1] - 5:4
**proud** [1] - 7:17
**prove** [8] - 28:3,
44:24, 49:25, 50:20,
51:4, 80:11, 80:19,
81:12
**provide** [2] - 28:23,
42:5
**provided** [4] - 28:20,
52:7, 76:4, 79:10
**provides** [1] - 79:16
**providing** [1] - 27:25
**provision** [2] - 47:6,
79:12

**public** [5] - 9:7, 20:2,
37:4, 72:13, 72:14
**pull** [1] - 55:15
**purple** [1] - 25:16
**purpose** [4] - 6:19,
16:23, 28:1, 50:11
**purposes** [3] - 42:22,
47:1, 49:10
**pushes** [3] - 39:10,
39:13, 39:15
**put** [11] - 13:13, 47:11,
64:4, 64:6, 65:13,
65:25, 66:9, 73:9,
75:23, 82:22, 84:6
**puts** [1] - 37:4

## Q

**quality** [1] - 20:13
**quarter** [5] - 49:5,
49:20, 49:23, 52:12,
52:14
**quarters** [1] - 49:5
**Queen** [2] - 8:14, 8:15
**questions** [10] - 9:4,
22:25, 23:13, 23:18,
23:19, 24:25, 38:9,
38:11, 70:10, 76:21
**quick** [1] - 48:9
**quickly** [1] - 55:17
**quit** [1] - 26:11
**quite** [3] - 32:18, 33:6,
42:22

## R

**radiation** [7] - 37:11,
37:15, 37:22, 65:5,
66:2, 66:8, 66:10
**raise** [2] - 24:17, 25:8
**raises** [1] - 64:7
**raising** [1] - 9:9
**raking** [1] - 31:17
**rambling** [1] - 23:22
**ran** [2] - 13:2, 32:15
**random** [1] - 7:14
**rarely** [1] - 12:14
**rate** [1] - 20:12
**raw** [1] - 40:4
**reached** [2] - 70:12,
77:16
**read** [3] - 18:11,
22:14, 30:6
**ready** [7] - 4:13, 5:17,
44:7, 44:8, 67:24,
73:24, 83:2
**real** [5] - 32:11, 39:2,
48:9, 50:11
**reality** [1] - 50:15
**realize** [2] - 82:8,

83:15
**really** [24] - 13:18,
14:12, 20:3, 22:19,
29:19, 31:22, 33:19,
34:2, 34:7, 42:23,
44:4, 44:6, 48:2,
48:3, 48:14, 62:6,
62:7, 62:13, 62:14,
83:10, 83:13, 83:16
**reason** [13] - 5:7,
12:23, 12:24, 20:15,
58:15, 68:5, 68:11,
69:12, 69:14, 69:17,
69:20, 77:14
**reasonable** [2] -
14:19, 42:6
**reasonably** [1] - 14:10
**reasons** [4] - 13:14,
26:9, 45:13, 73:15
**received** [1] - 42:13
**recognition** [1] - 76:3
**recommendation** [1] -
71:19
**recommended** [1] -
38:2
**reconnect** [1] - 62:3
**reconnected** [1] - 62:5
**record** [1] - 84:6
**recorded** [1] - 2:14
**recount** [1] - 44:18
**recover** [1] - 30:10
**recovered** [1] - 26:5
**recovering** [2] - 26:8,
40:4, 68:25
**recovery** [5] - 28:13,
42:10, 47:10, 68:20,
72:15
**recreate** [1] - 52:9
**recross** [1] - 23:3
**recruited** [4] - 33:2,
33:14, 34:5, 35:17
**redirect** [1] - 23:3
**reduction** [13] - 49:24,
50:6, 50:19, 53:17,
54:22, 55:2, 56:3,
72:20, 73:10, 73:14,
75:13, 81:5, 82:4
**reductions** [1] - 50:7
**referred** [2] - 56:17,
64:23
**regarding** [3] - 54:3,
80:7, 80:8
**regardless** [3] - 54:17,
54:22
**regards** [1] - 47:5
**register** [1] - 55:15
**regular** [1] - 40:14
**regulation** [1] - 54:14
**reinstate** [2] - 27:24,
52:24

**related** [1] - 51:23
**relationship** [1] -
51:13
**relax** [2] - 6:17, 6:18
**relents** [1] - 67:25
**relevant** [2] - 18:10,
51:23
**rely** [1] - 45:18
**remains** [1] - 49:18
**remarks** [1] - 23:8
**remedy** [1] - 46:16
**Remember** [3] - 64:5,
74:15, 83:4
**remember** [14] - 7:23,
8:2, 12:7, 13:23,
16:14, 18:9, 29:5,
29:7, 31:2, 43:20,
50:21, 51:7, 53:1,
82:2
**reminds** [1] - 24:21
**remote** [1] - 48:7
**remotely** [1] - 26:6
**removal** [1] - 47:10
**remove** [1] - 37:23
**removed** [5] - 13:6,
26:6, 29:23, 38:5,
46:24
**removing** [1] - 41:8
**rendered** [2] - 79:7,
80:2
**renowned** [1] - 64:18
**repeats** [1] - 25:13
**replacement** [1] -
80:22
**reported** [3] - 36:8,
36:15, 73:8
**reporter** [3] - 24:12,
76:18, 76:19
**Reporter** [2] - 2:10,
2:10
**reporters** [1] - 18:6
**reporting** [1] - 36:11
**reports** [2] - 36:18,
79:24
**represent** [1] - 11:18
**representative** [2] -
3:17, 3:18
**representing** [2] -
11:19, 11:20
**reputation** [1] - 60:8
**request** [2] - 81:6,
83:25
**requested** [1] - 81:17
**require** [2] - 15:5,
67:15
**required** [1] - 26:21
**requirement** [1] -
12:22
**requires** [2] - 30:11,
69:16

**requiring** [1] - 40:12
**rescued** [1] - 60:2
**research** [1] - 8:8
**resign** [1] - 20:23
**resist** [1] - 21:6
**resolved** [1] - 8:22
**Resources** [1] - 27:15
**resources** [2] - 57:9, 66:18
**responds** [1] - 41:7
**response** [3] - 70:14, 70:17, 78:17
**responsibilities** [6] - 12:16, 17:16, 45:7, 57:4, 61:8, 63:16
**responsibility** [7] - 8:5, 11:18, 13:12, 22:5, 22:20, 54:6, 56:15
**responsible** [1] - 73:12
**rest** [2] - 3:15, 49:17
**restaurant** [1] - 18:23
**restoration** [1] - 54:14
**restore** [1] - 44:14
**restored** [3] - 27:5, 41:11, 44:23
**restrictions** [1] - 73:25
**restructure** [1] - 54:19
**restructuring** [9] - 44:17, 45:8, 48:21, 48:23, 49:10, 52:22, 53:17, 72:15, 80:16
**result** [1] - 70:18
**results** [1] - 71:25
**retired** [2] - 33:25, 34:1
**retirement** [2] - 34:2
**return** [10] - 26:22, 26:23, 27:9, 43:11, 44:1, 44:22, 71:1, 81:6, 81:18
**revenue** [1] - 63:16
**review** [3] - 71:3, 71:9, 81:7
**revoking** [1] - 48:7
**Rhonda** [14] - 3:21, 57:17, 58:7, 63:8, 63:9, 63:23, 66:11, 69:24, 73:19, 74:1, 74:2, 80:21, 81:25
**RIF** [4] - 72:22, 73:17, 74:3, 74:4
**rights** [4] - 8:22, 13:15, 26:2, 52:15
**rise** [1] - 83:20
**road** [6] - 16:23, 17:4, 36:22, 38:24, 62:10, 65:11
**robe** [1] - 7:21

**Robin** [2] - 71:5, 71:6
**role** [3] - 21:21, 62:18, 66:18
**roll** [1] - 65:10
**rookie** [1] - 4:18
**room** [2] - 10:23, 39:3
**rote** [1] - 6:14
**rule** [1] - 10:4
**run** [4] - 19:19, 34:23, 45:24, 71:20
**running** [4] - 53:23, 57:2, 72:2, 81:9
**runs** [1] - 35:1
**rush** [1] - 19:21

## S

**salary** [9] - 26:18, 40:17, 40:24, 41:10, 45:4, 45:14, 67:18, 72:20, 75:24
**sales** [21] - 33:8, 33:17, 36:14, 36:20, 53:23, 57:2, 57:19, 61:9, 62:15, 62:18, 62:23, 63:11, 63:16, 65:22, 66:13, 66:16, 71:4, 71:20, 71:24, 81:7
**Sales** [1] - 28:16
**salespeople** [2] - 62:11, 62:21
**sat** [1] - 6:25
**satisfaction** [1] - 24:5
**satisfied** [6] - 4:9, 4:19, 4:24, 27:8, 27:24, 31:4
**Saturday** [2] - 29:11, 40:11
**Saul** [1] - 3:10
**SAUL** [1] - 2:1
**save** [2] - 59:24, 80:15
**saw** [2] - 26:10, 41:13
**scale** [1] - 20:13
**scales** [1] - 14:21
**scheduled** [2] - 27:2, 44:2
**SCHOENECK** [1] - 2:5
**Schoeneck** [1] - 3:14
**school** [6] - 10:1, 31:20, 31:24, 32:6, 32:8
**scientific** [1] - 15:22
**scope** [1] - 57:3
**screen** [2] - 38:10, 49:1
**screwed** [1] - 27:18
**search** [1] - 66:9
**seat** [1] - 6:12
**second** [7] - 26:19,

31:4, 35:7, 37:24, 46:7, 46:10, 70:23
**securities** [2] - 32:21, 34:14
**See** [1] - 84:17
**see** [43] - 4:23, 5:7, 7:5, 9:19, 11:1, 12:1, 12:15, 14:6, 16:25, 17:18, 18:6, 18:20, 19:4, 19:16, 22:9, 22:14, 24:1, 24:9, 36:13, 38:4, 38:10, 39:4, 39:21, 48:19, 48:20, 53:5, 59:12, 59:23, 64:18, 65:3, 66:15, 67:24, 67:25, 68:16, 69:23, 72:21, 72:22, 76:15, 78:2, 79:4, 83:18, 83:19, 84:5
**seeing** [1] - 67:22
**seem** [3] - 17:21, 17:23, 58:2
**sees** [1] - 19:8
**segregated** [1] - 46:15
**selected** [10] - 3:23, 4:7, 7:13, 13:24, 25:2, 73:7, 73:15, 73:16, 74:3, 74:4
**selection** [4] - 4:9, 7:1, 12:8, 24:25
**sell** [7] - 32:11, 32:21, 32:23, 34:11, 34:14, 61:1, 62:24
**selling** [2] - 37:6, 65:22
**sells** [1] - 37:5
**seminar** [1] - 65:15
**send** [1] - 78:10
**sending** [1] - 69:4
**sends** [3] - 68:15, 70:2, 70:3
**senior** [8] - 33:14, 50:5, 61:7, 63:15, 65:14, 66:15, 67:17, 69:2
**Senior** [1] - 28:16
**sense** [5] - 5:2, 5:10, 6:21, 20:5, 50:1
**sent** [12] - 40:10, 40:11, 42:15, 69:1, 69:21, 70:1, 70:14, 70:15, 70:23, 74:18, 75:8
**separate** [2] - 9:14, 9:15
**separated** [1] - 58:21
**separation** [1] - 76:1
**September** [6] - 1:8, 37:25, 38:5, 67:3,

67:14, 84:22
**seriously** [2] - 12:17, 22:20
**serve** [2] - 13:18, 13:21
**served** [1] - 32:25
**service** [5] - 7:13, 13:13, 13:20, 76:3, 82:1
**services** [3] - 79:7, 79:11, 80:1
**set** [6] - 30:12, 30:13, 30:14, 38:24, 39:1, 71:6
**seven** [5] - 18:19, 22:16, 22:17, 59:12, 71:14
**several** [6] - 15:18, 16:1, 17:17, 18:4, 33:9
**severance** [3] - 49:9, 49:14, 49:15
**shake** [1] - 13:8
**shambles** [3] - 59:22, 66:13, 72:6
**shape** [1] - 39:22
**share** [1] - 72:3
**shares** [1] - 72:13
**SHAWN** [1] - 1:17, 1:19
**Shawn** [1] - 2:24
**SHEARER** [12] - 1:17, 1:19, 2:24, 4:12, 4:16, 5:9, 5:12, 25:23, 31:1, 40:3, 82:25, 84:19
**Shearer** [14] - 2:24, 4:11, 5:8, 24:19, 25:20, 53:10, 54:2, 54:10, 63:6, 65:22, 65:23, 76:20, 82:24, 84:18
**Shearson** [3] - 33:3, 33:10, 35:16
**shirt** [1] - 69:1
**shop** [2] - 34:22, 34:23
**shop's** [1] - 34:25
**short** [13] - 18:15, 40:2, 40:13, 40:16, 40:19, 40:21, 40:22, 41:4, 41:10, 41:16, 46:9, 57:21
**short-term** [10] - 40:13, 40:16, 40:19, 40:21, 40:22, 41:4, 41:10, 41:16, 46:9, 57:21
**shorter** [1] - 24:16
**shots** [1] - 12:1

**show** [12] - 7:2, 27:21, 36:22, 45:13, 48:25, 50:7, 50:24, 52:19, 65:8, 81:15, 81:19
**showed** [2] - 68:25, 70:19
**shows** [3] - 62:10, 65:11, 73:19
**shrunk** [2] - 71:21
**shunned** [1] - 46:15
**shut** [2] - 36:1, 69:8
**sick** [5] - 15:17, 22:16, 37:18, 45:20, 57:14
**side** [2] - 23:2, 46:4
**signed** [2] - 44:1, 83:24
**significant** [1] - 21:1
**simple** [1] - 31:1
**simply** [4] - 35:19, 41:17, 49:14, 52:19
**Simpson** [1] - 14:18
**single** [2] - 29:18, 37:14, 49:5, 49:23
**sit** [5] - 3:6, 8:19, 21:15, 21:22
**site** [1] - 41:23
**sitting** [7] - 3:16, 3:18, 4:4, 6:11, 18:18, 18:24, 67:13
**situation** [3] - 8:14, 45:18, 46:16
**six** [7] - 15:16, 22:16, 38:19, 43:21, 64:1, 68:19, 75:24
**size** [1] - 17:10
**skill** [1] - 71:6
**slate** [1] - 82:20
**sleep** [1] - 83:3
**slow** [1] - 25:12
**small** [6] - 31:15, 31:16, 31:18, 32:3, 32:10, 33:6
**smaller** [1] - 72:1
**smartest** [1] - 6:13
**Smith** [1] - 33:15
**smoke** [1] - 49:1
**smoothly** [1] - 84:11
**snobs** [1] - 18:25
**social** [1] - 8:18
**society** [2] - 46:14, 46:15
**sold** [1] - 32:15
**solely** [3] - 12:1, 26:15, 47:12
**solutions** [2] - 36:16, 56:23
**someone** [9] - 15:17, 42:6, 44:15, 45:8, 47:18, 47:21, 52:6, 57:25

sometime [1] - 56:23
sometimes [3] - 7:14, 7:15, 67:6
somewhere [1] - 39:4
soon [2] - 48:5, 56:18
sorry [2] - 31:14, 40:1
sort [3] - 51:11, 63:17, 84:13
sorts [1] - 21:3
sound [1] - 47:15
sounds [1] - 44:4
sources [1] - 37:4
spades [1] - 84:10
spans [1] - 56:13
speaking [3] - 16:9, 37:19, 46:25
speaks [3] - 16:14, 60:9, 67:6
special [2] - 13:23, 27:16
specific [1] - 28:25
speculate [1] - 9:2
speculating [1] - 9:2
spend [1] - 68:1
spent [4] - 35:14, 68:2, 78:18, 78:20
spindle [1] - 37:9
splendidly [1] - 4:22
spoken [1] - 18:7
spot [1] - 12:14
spy [1] - 68:5
stand [2] - 16:7, 25:8
standard [2] - 78:3, 78:12
standing [1] - 83:12
standpoint [1] - 55:14
star [1] - 33:12
stars [1] - 33:12
start [15] - 10:22, 16:13, 19:20, 20:4, 20:6, 20:10, 20:21, 25:4, 42:20, 45:4, 70:14, 72:8, 76:9, 78:8, 82:21
started [19] - 5:1, 32:16, 33:13, 35:20, 42:21, 48:15, 48:16, 62:10, 62:11, 63:23, 64:2, 65:25, 66:24, 71:10, 72:18, 77:6, 78:16, 81:4
starting [6] - 24:8, 25:19, 34:11, 70:5, 79:2, 80:14
startled [1] - 11:4
starts [4] - 6:1, 34:7, 60:13, 60:22
state [3] - 2:23, 9:13, 31:25
State [2] - 31:21,

31:25
STATEMENT[1] - 53:13
statement [2] - 24:20, 54:8
statements [7] - 5:6, 16:8, 16:10, 16:16, 25:21, 50:12
States [5] - 12:21, 12:23, 13:11, 35:3, 35:10
states [1] - 9:14
STATES [1] - 1:1
statute [3] - 15:16, 27:5, 46:12
statutes [2] - 15:4, 30:16
stay [4] - 4:2, 26:13, 40:5, 71:13
stayed [2] - 30:3, 38:21
staying [1] - 38:16
STD [1] - 70:11
stenography [1] - 2:14
steps [1] - 63:4
Steve [4] - 3:4, 57:10, 62:8, 65:3
STEVEN [1] - 1:3
Steven [1] - 2:21
still [7] - 39:6, 39:23, 40:4, 46:7, 71:12, 72:12, 72:15
stock [4] - 50:13, 74:22, 75:18, 76:2
stone [1] - 60:23
stop [6] - 26:14, 26:17, 26:18, 70:16
stopped [4] - 26:18, 32:9, 57:23, 70:21
stops [2] - 63:2, 63:4
stories [5] - 44:16, 44:17, 44:18, 68:10
story [7] - 27:10, 29:6, 34:6, 48:12, 51:8, 68:9, 76:8
straight [1] - 49:5
straits [1] - 64:6
strange [1] - 68:24
strategy [1] - 4:3
Street [10] - 1:22, 2:2, 28:11, 32:5, 33:2, 33:12, 34:4, 35:14, 50:13, 52:21
street [1] - 58:23
strictly [3] - 6:14, 7:13, 7:16
struck [1] - 46:3
structure [1] - 36:19
stuck [1] - 19:24
subconscious [1] -

21:21
submit [1] - 38:11
submitted [4] - 73:13, 73:21, 80:1, 81:6
subset [1] - 72:17
substantively [1] - 84:12
subterfuge [1] - 49:1
successor [7] - 63:24, 64:2, 64:10, 66:9, 66:13, 66:23, 67:1
sudden [1] - 49:13
sue [6] - 8:14, 56:5, 59:1, 76:7, 76:12
sued [5] - 58:5, 58:6, 58:7, 67:13
suggest [1] - 58:2
suggested [3] - 38:3, 69:3
suing [1] - 58:4
suit [1] - 28:7
Suite [1] - 1:22
summer [1] - 32:7
supervise [1] - 83:11
supervised [1] - 7:1
supervisor [1] - 63:5
supply [1] - 37:1
support [2] - 57:13, 60:18
supported [1] - 74:6
supposed [4] - 4:22, 44:10, 67:2, 75:12
surgery [17] - 26:5, 28:12, 29:25, 38:20, 40:15, 46:3, 48:16, 51:16, 51:19, 57:15, 67:2, 67:3, 67:4, 67:14, 69:6, 70:17, 70:22
surprise [1] - 8:7
surrogate [1] - 23:20
suspected [1] - 38:17
sustained [3] - 11:10, 14:23
SVP [1] - 72:2
swipe [1] - 55:18
swipers [1] - 35:13
swipes [1] - 28:20
swore [1] - 76:19
sworn [1] - 25:9
system [5] - 9:10, 9:18, 13:4, 35:1, 39:1
systems [3] - 35:3, 41:21, 69:19

**T**

table [4] - 3:16, 4:1, 4:5, 56:7

talks [2] - 55:19
Tampa [2] - 37:25, 38:5
tardiness [1] - 20:15
taxes [1] - 49:12
teach [2] - 36:23, 37:5
teacher [3] - 24:18, 32:6, 33:24
teaching [3] - 32:2, 32:8, 32:9
team [19] - 9:24, 12:4, 27:13, 27:17, 29:23, 38:10, 38:12, 43:10, 60:13, 60:22, 69:1
technology [7] - 28:15, 28:22, 34:11, 39:7, 42:9, 60:24, 80:17
telephone [2] - 59:7, 64:14
television [1] - 21:13
temptation [2] - 21:6, 83:7
tempted [1] - 21:5
ten [8] - 16:6, 20:13, 20:14, 20:20, 20:22, 35:11, 55:2, 60:3
term [20] - 40:13, 40:16, 40:18, 40:19, 40:20, 40:21, 40:22, 40:25, 41:1, 41:4, 41:5, 41:10, 41:16, 41:17, 45:1, 45:5, 46:9, 57:21
terminate [3] - 47:24, 49:19, 56:1
terminated [15] - 43:5, 44:11, 45:14, 49:4, 49:22, 50:6, 51:22, 51:24, 56:5, 58:11, 58:13, 58:21, 79:21, 79:23, 80:5
termination [4] - 46:20, 48:4, 48:24, 51:1
terminations [1] - 50:19
terms [7] - 21:22, 24:24, 30:6, 46:22, 47:5, 56:13, 78:6
testified [7] - 10:13, 58:10, 58:12, 58:14, 69:10, 69:11
testifies [2] - 17:12, 23:2
testify [6] - 17:23, 45:11, 55:24, 58:19, 66:11, 68:4
testifying [5] - 11:2, 15:25, 17:3, 18:4,

19:16
testimony [10] - 12:2, 21:11, 23:4, 29:16, 57:6, 76:5, 78:19, 79:20, 79:22, 79:24
text [11] - 38:7, 38:9, 38:12, 40:10, 40:11, 41:7, 68:16, 69:4, 74:19
texted [2] - 68:20, 68:21
texting [1] - 26:7, 67:22
texts [1] - 41:9
THE [28] - 1:17, 2:21, 3:2, 3:5, 3:22, 3:25, 4:7, 4:14, 4:17, 4:20, 5:10, 5:13, 5:16, 5:23, 6:11, 7:4, 7:9, 7:11, 25:7, 25:10, 25:14, 40:1, 53:10, 82:6, 83:2, 83:20, 83:24, 84:20
therefore [1] - 60:7
they've [3] - 27:16, 30:3, 58:20
thinking [2] - 46:17, 51:10
thinks [1] - 74:20
thirds [3] - 40:16, 40:17, 40:24
thoughts [1] - 38:11
thousand [1] - 67:6
thousands [1] - 60:3
Three [1] - 80:24
three [14] - 7:4, 15:19, 26:25, 28:7, 38:16, 44:7, 48:24, 65:17, 67:9, 74:4, 78:16, 79:3, 79:5
throat [1] - 37:9, 38:2, 38:13, 39:6, 39:9, 39:18, 56:16, 56:19, 57:6, 64:12, 64:25
throughout [3] - 11:14, 67:18, 72:22
throw [1] - 58:23
tidbits [1] - 48:11
timely [1] - 26:24
tip [1] - 14:22
today [4] - 4:25, 5:6, 22:24, 24:9, 24:10, 25:24, 51:25, 55:12, 61:7, 64:15
together [18] - 12:3, 28:6, 30:15, 37:4, 40:9, 40:10, 55:8, 57:11, 62:4, 63:7, 65:13, 65:14, 65:25,

66:1, 68:1, 68:2, 73:13
**Tomorrow** [1] - 82:21
**tomorrow** [8] - 5:17, 16:12, 22:25, 25:19, 33:11, 67:11, 84:5, 84:17
**Tony** [26] - 3:20, 57:8, 57:10, 58:6, 58:15, 60:17, 60:18, 65:24, 66:1, 67:5, 67:12, 67:20, 68:15, 68:20, 69:12, 69:13, 72:3, 74:18, 74:25, 75:16, 75:17, 81:2, 81:24
**took** [7] - 24:22, 26:4, 42:10, 42:13, 42:17, 58:13, 76:17
**top** [7] - 55:1, 55:3, 56:11, 72:9, 73:5, 73:10, 82:4
**total** [4] - 37:23, 53:16, 75:24, 82:2
**totally** [1] - 13:5
**touch** [1] - 65:1
**tough** [1] - 60:5
**Tower** [1] - 33:6
**town** [4] - 31:18, 32:3, 32:10, 33:6
**towns** [2] - 31:16, 33:5
**trachea** [1] - 39:10
**track** [2] - 18:15, 50:22
**trading** [1] - 35:21
**traditions** [1] - 8:12
**traffic** [1] - 20:4
**train** [2] - 33:19, 62:11
**trained** [2] - 10:5, 10:6
**Training** [1] - 28:17
**training** [26] - 28:17, 33:9, 33:15, 33:16, 33:17, 36:14, 36:21, 51:16, 53:23, 57:2, 57:19, 62:18, 62:19, 62:21, 63:11, 63:17, 66:13, 66:16, 66:22, 71:4, 71:7, 71:20, 71:24, 81:8, 81:9
**transaction** [2] - 34:25, 55:17
**transactions** [4] - 28:21, 34:20, 35:7, 37:4
**transcript** [1] - 2:14
**TRANSCRIPT** [1] - 1:6
**Transcript** [1] - 2:15
**transferred** [1] - 74:22
**Transformation** [1] - 28:17
**transformation** [3] - 28:19, 34:11, 62:15

**transforming** [1] - 28:22
**transition** [1] - 58:24
**transportation** [1] - 20:2
**travel** [2] - 33:22, 48:12
**traveled** [1] - 37:25, 40:10, 57:11
**traveling** [3] - 36:22, 37:19, 65:25
**treat** [1] - 74:25
**treated** [1] - 80:25
**treatments** [2] - 37:11, 37:15
**Trial** [1] - 84:22
**trial** [44] - 2:21, 4:3, 5:2, 6:1, 6:8, 6:16, 6:20, 6:21, 7:17, 7:23, 7:24, 8:1, 8:4, 8:15, 8:23, 9:1, 9:22, 9:25, 10:12, 10:20, 11:2, 11:15, 12:3, 14:1, 14:7, 14:14, 14:18, 15:2, 16:25, 18:1, 18:14, 18:15, 20:17, 21:7, 21:9, 22:11, 23:25, 25:4, 28:10, 51:10, 55:13, 83:17, 84:14
**TRIAL** [1] - 1:6
**trials** [2] - 8:9, 8:13
**tricked** [2] - 44:19, 52:18
**trickery** [1] - 52:21
**tried** [2] - 54:2, 74:25
**trouble** [3] - 59:22, 60:20, 72:12
**true** [4] - 25:18, 52:19, 58:3, 69:15
**truly** [1] - 69:14
**Truman** [1] - 31:24
**trust** [1] - 20:16
**truth** [3] - 10:10, 17:7, 76:20
**truthfully** [1] - 25:1
**try** [25] - 5:16, 6:19, 9:16, 19:19, 22:6, 22:14, 23:16, 23:21, 23:23, 23:24, 48:13, 49:7, 50:18, 51:7, 51:11, 52:2, 52:16, 61:3, 63:19, 72:25, 73:2, 76:4, 80:15, 84:3
**trying** [8] - 20:10, 30:9, 30:10, 37:5, 45:25, 50:22, 52:11, 66:18
**Tuesday** [3] - 44:5,

84:22
**turn** [7] - 56:20, 60:14, 60:20, 60:25, 61:9, 62:7, 71:12
**turned** [5] - 29:11, 44:21, 62:8, 69:15, 69:17
**turns** [2] - 48:3, 51:22
**twelve** [2] - 26:24, 27:4
**twice** [1] - 30:10
**twist** [1] - 76:11
**Two** [1] - 80:19
**two** [19] - 6:7, 7:12, 13:19, 26:4, 28:5, 31:2, 37:11, 40:7, 40:8, 40:16, 40:17, 40:24, 52:25, 62:10, 74:4, 74:17, 78:13
**two-thirds** [3] - 40:16, 40:17, 40:24
**TX** [1] - 1:18
**Ty** [1] - 84:10
**type** [5] - 11:14, 28:15, 29:1, 39:5, 62:15

## U

**U.S** [1] - 1:4
**U.S.D.J** [1] - 1:13
**UK** [2] - 8:11, 12:25
**ultimately** [6] - 55:11, 62:21, 63:6, 66:25, 72:23, 76:7
**unable** [1] - 38:14
**unanimous** [1] - 15:13
**under** [13] - 5:9, 26:2, 26:19, 30:1, 30:8, 30:16, 41:18, 43:6, 46:22, 54:11, 67:13, 68:5, 84:2
**undergoing** [1] - 66:8
**underwent** [2] - 37:10, 65:5
**unfold** [2] - 14:8, 25:19
**unfolds** [1] - 15:24
**unfortunately** [4] - 12:10, 56:19, 64:11, 64:25
**United** [5] - 12:21, 12:23, 13:11, 35:2, 35:9
**UNITED** [1] - 1:1
**University** [1] - 31:21
**unless** [2] - 12:18, 84:18
**unnecessary** [1] - 6:5
**unpaid** [6] - 26:12, 26:17, 41:18, 46:4,

69:22
**unpunished** [1] - 58:3
**unturned** [1] - 60:23
**up** [47] - 6:14, 8:18, 9:1, 10:18, 11:3, 16:7, 16:9, 16:22, 17:10, 20:6, 20:16, 20:22, 27:1, 27:18, 29:23, 31:14, 31:24, 32:20, 34:9, 35:11, 38:6, 38:16, 38:24, 39:1, 39:4, 39:11, 39:12, 39:16, 42:4, 44:11, 47:24, 49:7, 49:13, 49:21, 49:22, 55:24, 57:3, 59:24, 63:18, 64:14, 66:15, 68:7, 68:25, 71:10, 73:14, 73:19
**ups** [1] - 23:19
**upstairs** [1] - 65:12
**USA** [1] - 13:5

## V

**vacation** [2] - 37:18, 45:21
**variety** [1] - 80:16
**verbal** [1] - 17:13
**verbally** [1] - 71:25
**verdict** [1] - 25:18
**verge** [1] - 59:14
**versions** [1] - 10:16
**versus** [1] - 2:22
**vest** [1] - 76:1
**vibrates** [3] - 39:14, 39:15, 39:17
**vibrating** [1] - 39:18
**vice** [7] - 34:10, 36:14, 50:5, 57:9, 63:15, 66:15, 67:17
**Vice** [2] - 27:14, 28:16
**video** [5] - 26:7, 38:9, 38:25, 41:22, 68:25
**video-conferencing** [1] - 26:7
**violated** [5] - 26:2, 26:19, 27:3, 27:7, 31:6
**violates** [3] - 26:14, 44:14, 47:6
**violation** [4] - 42:4, 47:20, 52:24, 54:18
**visit** [7] - 67:21, 67:23, 68:1, 68:5, 68:7, 68:15
**visited** [1] - 26:10
**visualize** [1] - 14:21
**vocal** [1] - 39:17
**voice** [3] - 37:24,

46:24, 47:10
**voir** [1] - 24:24

## W

**wait** [1] - 75:6
**waiting** [1] - 20:17
**walk** [1] - 18:19
**Wall** [8] - 28:11, 32:5, 33:2, 33:12, 34:4, 35:14, 50:12, 52:21
**wants** [4] - 29:17, 59:11, 67:16, 84:18
**Washington** [1] - 14:2
**watch** [2] - 12:12, 52:1
**watched** [1] - 14:18
**ways** [3] - 26:4, 38:8, 81:1
**wearing** [2] - 7:21, 69:1
**weave** [1] - 48:12
**web** [1] - 41:23
**week** [14] - 12:7, 15:20, 15:21, 18:19, 34:18, 37:14, 44:3, 44:4, 48:18, 68:15, 68:17, 68:22, 73:24
**weekend** [4] - 27:3, 73:4, 73:6
**weeks** [14] - 15:19, 26:24, 27:4, 38:16, 38:19, 40:8, 43:7, 43:21, 46:3, 48:4, 68:20, 69:6, 75:24, 78:16
**welcome** [2] - 3:6, 4:2
**whatsoever** [1] - 73:25
**wheel** [1] - 50:15
**WHEREUPON** [1] - 40:2
**whispering** [1] - 12:20
**white** [1] - 18:11
**whole** [7] - 6:18, 12:15, 35:4, 37:13, 38:18, 48:17, 51:2
**wholly** [1] - 17:12
**wide** [2] - 44:16, 48:23
**wife** [6] - 11:8, 60:9, 64:22, 74:21, 74:22, 83:11
**wish** [1] - 29:10
**wishes** [2] - 8:21, 41:16
**witness** [30] - 5:17, 11:13, 14:12, 16:13, 16:15, 17:1, 17:11, 17:12, 17:13, 17:15, 18:4, 18:9, 19:15, 22:24, 22:25, 23:1,

23:2, 23:4, 23:5,
23:13, 23:16, 23:17,
23:22, 23:23, 25:20,
55:24, 82:23
**witnesses** [13] -
10:12, 14:12, 15:25,
17:3, 19:2, 29:8,
33:21, 51:6, 58:18,
76:20, 79:21, 79:23,
79:25
**woman** [1] - 71:4
**women** [1] - 15:8
**wonder** [1] - 55:16
**wonderful** [3] - 7:1,
18:6, 84:9
**words** [2] - 37:9, 67:6
**workers** [3] - 56:14,
66:16, 71:10
**works** [4] - 19:21,
24:15, 38:2, 40:21
**world** [2] - 8:9, 35:10
**worldwide** [1] - 27:12
**worry** [2] - 18:3, 58:17
**worrying** [1] - 69:9
**write** [3] - 17:22,
47:24, 75:20
**writing** [1] - 17:24

## Y

**year** [11] - 31:21, 49:8,
57:1, 59:18, 63:25,
64:7, 75:5, 75:6,
77:20, 79:2
**years** [27] - 8:11, 22:4,
22:12, 28:6, 28:7,
29:18, 32:7, 32:17,
35:11, 35:14, 35:15,
36:8, 44:20, 45:25,
55:8, 57:20, 59:12,
59:16, 59:17, 62:3,
62:4, 62:5, 63:3,
66:20, 77:16
**YORK** [1] - 1:1
**York** [7] - 1:5, 2:7,
2:11, 19:21, 33:4,
39:21
**younger** [1] - 12:10

## Z

**Zeitlin** [4] - 1:21, 2:25,
29:12
**ZEITLIN** [2] - 1:23, 3:1
**zero** [2] - 41:6, 45:1