85

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - X
 3
       STEVEN B. BARGER,          :   17-CV-4869(FB)
 4                                :
              Plaintiff,          :   U.S. Courthouse
 5                                :   Brooklyn, New York
                                  :
 6                                :   TRANSCRIPT OF
           -against-             :   JURY TRIAL
 7                                :
                                  :
 8                                :   September 17, 2019
                                  :   10:00 a.m.
 9     FIRST DATA CORPORATION,    :
       ET AL                      :
10                                :
              Defendants.         :
11     - - - - - - - - - - - - - X

12

13   BEFORE:
                   HONORABLE FREDERIC BLOCK, U.S.D.J.,
14                 and a Jury

15

16   APPEARANCES:

17   For the Plaintiff:     THE LAW OFFICE OF SHAWN SHEARER, P.C.
                            3839 McKinney Avenue
18                          #155-254
                            Dallas, TX 75204
19                          BY:  SHAWN SHEARER, ESQ.

20

21                          Zeitlin & Zeitlin, P.C.
                            50 Court Street, Suite 506
22                          Brooklyn, NY 11201
                            BY:  DAVID A. ZEITLIN, ESQ.
23

24

25
```

```
1
2    For the Defendants:        SAUL EWING ARNSTEIN & LEHR LLP
                                500 E Pratt Street
                                Baltimore, MD 21202
3                               BY:  GARY B. EIDELMAN, ESQ.
                                     GILLIAN A. COOPER, ESQ.
4                                    MICHAEL CIANFICHI, ESQ.

5
                                BOND SCHOENECK & KING PLLC
6                               330 Madison Avenue
                                39th Floor
7                               New York, NY 10017
                                BY:  LOUIS P. DILORENZO, ESQ.
8

9

10   Court Reporter:           Holly Driscoll, CSR, FCRR
                                Chief Court Reporter
11                              225 Cadman Plaza East
                                Brooklyn, New York 11201
12                              (718) 613-2274
                                hdrisc@gmail.com
13

14
     Proceedings recorded by mechanical stenography, transcript
15   produced by Computer-Assisted Transcript.

16

17                     *       *       *

18

19

20

21

22

23

24

25
```

1          (Open court; no jury present.)

2          (Time noted:  10:05 a.m.)

3          THE COURTROOM DEPUTY:  Civil cause for trial, *Steven*

4   *Barger v. First Data Corp.*, all parties and counsel present.

5          THE COURT:  So, good morning, everybody.  We're just

6   waiting for one juror, and we will just wait a few minutes.

7   And if need be, we will have seven jurors.  We've got to get

8   the message to them that they've got to be on time.

9          All right.  And while we're talking, you people are

10  professionals, you're very invested in this trial.

11  Mr. Shearer, you've done a very good job for your client.  I

12  know there may be a relationship there, but it's never too

13  late to settle the case, because there's going to be a winner

14  and there's going to be a loser, and there's going to be a big

15  loser here one way or the other.  I don't know what the jury

16  is going to do, but we should always be open-minded to see

17  whether you can walk out of the courtroom shaking hands and

18  settling your case.  Because if you run the risk of not doing

19  that, somebody's going to be very, very, very, very unhappy,

20  and I would like to avoid that if we can.  If we can't, we

21  can't.

22          But sometimes people get so invested in their case

23  because they spent a lot of time on it, and there may be

24  collateral emotionality that's at play as well, but you have

25  to check out very carefully as a professional lawyer and see

1   whether or not that's going to interfere with rational

2   judgment in terms of what the common sense thing is to do.

3           But when I say this, I've been wrong, and I remember

4   just two weeks ago, I told the plaintiff there's no way you

5   are going to get a jury verdict, and when the jury came back

6   with $300,000 of damages, I had to admit I had egg on my face.

7   But nine times out of ten my instincts are correct, and I

8   think it's important for a judge to try to get cases to be

9   resolved, if you can do this in this very contentious world

10  that we live.  If it can't be, you can't do it.

11          But you should always be open-minded, and as the

12  case unfolds, you will be able to have a hands-on view of how

13  it goes in, you will see the jury's reactions.  I am talking

14  to the both of you, but maybe I am focusing a little bit more

15  so on plaintiff's case.  Be open-minded, because I know that

16  the plaintiff has had a tough time of it, and I am sensitive

17  to his rights to come to court, to have the jury determine

18  whether or not he's going to be compensated or not.

19          But I'm just going to comment here because the jury

20  is not here, and it is on the record, and I am not embarrassed

21  to say that on the record because I think the judge should try

22  to encourage all sides to settle the case if they can, at any

23  time during the course of the trial, I am not going to hold it

24  against you if you aren't able to do that.

25          Now, Mr. Innelli just handed me a note, and he says

1    he has info on the juror.

2            THE COURTROOM DEPUTY:  Yes.  It's juror number 6,

3    he's driving, and he's by the Manhattan Bridge, coming up to

4    Adams.

5            THE COURT:  I am willing to go with seven.  What's

6    your pleasure, Mr. Shearer?

7            MR. SHEARER:  It's juror number 8?

8            THE COURTROOM DEPUTY:  I'm sorry, number 8, yes, I'm

9    sorry, 8.

10           MR. SHEARER:  Number 8.  That's fine.  I am fine

11   with that, seven jurors.

12           THE COURT:  Mr. Eidelman, I have to send a message

13   to the jurors.

14           MR. EIDELMAN:  Yes.  Can I just remember, is that

15   Mr. Williams?

16           THE COURTROOM DEPUTY:  Yes.

17           MR. EIDELMAN:  Your Honor, we have no objection.

18           THE COURT:  Okay.  Bring the jurors in.  And when

19   this gentleman comes, you can let him wait for me, I will talk

20   to him.

21           THE COURTROOM DEPUTY CLERK:  Okay.

22           THE COURT:  Actually, we can go with five if there's

23   a problem, but hopefully we won't have to do that.

24           (Continued on the next page.)

25

1          (WHEREUPON, at 10:11 a.m., the jury entered the

2    courtroom.)

3          THE COURT:  We are all here on time.  We are going

4    to go with a jury of seven now.  We can do that, and the other

5    person called and he's stuck in traffic at the Manhattan

6    Bridge.  We just can't wait.

7          And so let's continue with the trial.  And,

8    Mr. Shearer, your first witness.

9          MR. SHEARER:  Thank you, Your Honor.  Our first

10   witness, the plaintiff would like to call Mr. Joseph Plumeri.

11         THE COURTROOM DEPUTY:  Good morning, Mr. Plumeri.

12   I'll ask you to remain standing.  If you can raise your right

13   hand.

14         (WHEREUPON, the witness was duly sworn.)

15         THE COURTROOM DEPUTY:  Please have a seat.  Please

16   state and spell your name.

17         THE WITNESS:  Joseph J. Plumeri.  P-l-u-m-e-r-i.

18         THE COURT:  Your witness.

19         MR. SHEARER:  Thank you, Your Honor.

20                   JOSEPH J. PLUMERI,

21   called as a witness herein by the Plaintiff, having been first

22   duly sworn, was examined and testified as follows:

23   DIRECT EXAMINATION

24   BY MR. SHEARER:

25   Q    Good morning, Mr. Plumeri.

1    A    Good morning.

2    Q    It's an honor to talk to you.  We didn't have a chance to

3    talk during discovery so I'm going to have to ask you some

4    preliminary questions that -- to kind of get a little bit of

5    background, if that's okay?

6    A    Sure.

7    Q    What is your current relationship with respect to the

8    defendant First Data?

9    A    My relationship is nonexistent now.  Since the -- I was

10   on the board of First Data, and when First Data was sold to

11   Fiserv, a new board was formed, and I was not part of that

12   board.  I have no relationship at this moment.

13   Q    What was your relationship with the defendant First Data

14   during the period between 2014 and 2017?

15   A    I was responsible for many things in the company.  I

16   originally got there as a senior advisor to the CEO because of

17   the relationship that I had had with him many years back at

18   Shearson Lehman Brothers and predecessor companies, and I was

19   asked by KKR and him if I would advise him on helping to turn

20   around First Data.  So I got there to help in the sales

21   transformation, but I got involved in almost every aspect of

22   the company.

23   Q    So during your time at First Data, somewhere in that

24   period of 2014 to 2017, you were direct supervisor of

25   Mr. Barger?

1   A      Yes.

2            MR. SHEARER:  Your Honor, can I treat this witness

3   as a 611C2 affiliated with defendant?

4            THE COURT:  I'm sorry, he's affiliated with --

5            MR. SHEARER:  Can I lead this witness --

6            THE COURT:  Well, just ask the questions, and we are

7   going to allow a little flexibility.

8            Members of the jury, even though this gentleman is

9   one of the defendants, I believe, right?

10           MR. SHEARER:  No, he's --

11           THE COURT:  No, he is not, but even though he is on

12  the other side, you might say, you can call anybody as a

13  witness.  You can call adverse parties as witnesses.  There's

14  no rule that says you can't do that.  And you may see that

15  happen here.  And, actually, it is not a bad idea so we don't

16  have to go back and forth and back and forth.  So what

17  Mr. Shearer is asking me to do is because he's not part of the

18  plaintiff's group, that I should give more latitude in the way

19  he questions him by allowing him to ask what we call direct

20  questions.

21           So what I try to do during the course of trial is to

22  explain things to you folks which you may not know about and

23  sort of give you a little tutorial as we go along.  So that's

24  what this is all about.

25           Why don't you start asking him questions and let's

1  see if we need to have any direct questions, okay?

2          MR. SHEARER:  Thank you, Your Honor.

3  Q    Have you spoken to the defense counsel about the issues

4  that are present in this case?

5  A    Yes.

6  Q    And have they advised you that some of your business

7  decisions with regards to Mr. Barger have been raised as to

8  whether they were good or bad business decisions?

9  A    The discussions have not been around whether they were

10  good or bad decisions, the discussions were around the

11  discussions, or the decisions, not whether they were good or

12  bad.

13  Q    Okay.  I kind of want to go through your history, because

14  I think that will be important for them to understand how you

15  make decisions and how you have come to make decisions that

16  you have over the course of your career, because it is a

17  soaring career.

18          Can you explain how you -- what was your -- where

19  did you grow up?

20  A    I grew up in Trenton, New Jersey.

21  Q    In big family, small family?

22  A    Family, two brothers, grandson of immigrants from Sicily.

23  We lived in the same neighborhood, row on row attached houses.

24  I could hear the bathroom next door.  I always knew how the

25  guy felt by the way of the bathroom.  I was a neighborhood

1  kid.  And very close family, very tight, and very much an

2  Italian immigrant family.

3  Q    So you're second-generation American?

4  A    Yes.

5         THE COURT:  What does that have to do with this

6  case?

7         MR. SHEARER:  Your Honor, I think --

8         THE COURT:  Listen to me, okay.  We know he was the

9  CEO, we know he's the big shot, we know he was in charge of

10  your client.  That's what's relevant.  We don't have to know

11  whether he's first general, second generation, fourth

12  generation.  Let's move on.

13         MR. SHEARER:  Okay.

14  Q    When did you first begin working with Mr. Barger?

15  A    I don't remember the exact date.  It was sometime in the

16  mid '80s when I was director of marketing and sales at

17  Shearson Lehman Brothers.

18  Q    And you started your career before Shearson Lehman, or

19  did you?

20  A    Yes.

21  Q    Where did you start?

22  A    I started at Carter, Berlind & Weill in 1968.  I got a

23  part-time job at Carter, Berlind & Weill while I was -- as I

24  was enrolling in law school at New York Law School in 1968,

25  and I went to Wall Street to find a job with a -- part-time

1   with a Wall Street law firm so I thought I could learn the

2   practicalities of the law, and I wound up walking into a

3   brokerage firm because I thought a law firm had three names.

4   It turned out to be a brokerage firm, and Carter, Berlind &

5   Weill turned in to be Shearson Lehman Brothers, which turned

6   out to be Citigroup, and I was there for 32 years.

7   Q    So you're a lawyer?

8   A    I am not.

9   Q    You are not.

10          THE COURT:  So you went to law school.

11          THE WITNESS:  I went to New York Law School for

12  three months, Your Honor, but eventually got re-affiliated

13  with New York Law School, and there's a Plumeri Institute for

14  Social Justice and Economic Opportunity at New York Law School

15  today.  I was given an honorary juris doctorate degree.

16          THE COURT:  It's a good thing you didn't graduate

17  from law school, otherwise you'd be a lowly paid federal court

18  judge.

19          (Laughter.)

20          THE COURT:  Next question.

21  Q    So how did you meet Mr. Barger?

22  A    I met Mr. Barger -- like anything in life, things happen,

23  I guess, accidentally.  In the mid '80s, as part of being a

24  director of marketing and sales, obviously, you always want to

25  know what the competition is going to do.  And in those days

1   the banks were thinking very seriously of getting involved in

2   the securities business.  And I wanted to make sure that our

3   financial consultants, which is what they were called, knew

4   that competition was coming from banks, and banks were very

5   close to clients and their clients, so I was looking for

6   somebody that could speak to them about what the banks were

7   going to be doing so that they understood the competition.

8          I asked one of the people that worked with me if

9   they could find a banker who was very involved in beginning

10  the securities business for a bank.  So he called a banking

11  conference in Boston to see if they could find somebody that

12  was willing to go out and talk to our financial consultants as

13  we had these meetings around the country that were award

14  meetings for the financial consultants, but I wanted a speaker

15  who could speak to the content of what banks were doing.

16         So he calls the bank conference in Boston, and he

17  asked somebody at the desk if there's somebody there who would

18  be willing to talk on behalf of the bank at these meetings.

19  And while that call is going on, Steve Barger is listening to

20  the call.  And the reason he's listening to the call is

21  because the sole of his shoe came loose.  You know when we

22  were kids, the sole flips around sometimes with the shoes.  So

23  he was out there trying to find a staple for his shoes, he

24  listens to the conversation, he says, let me hear what they

25  want, and that's how I turn out to meet Steve Barger.

1  Q    So where was he working at the time?

2  A    He was working at Hawkeye Bank Corporation.

3  Q    In Iowa?

4  A    In Iowa.

5  Q    Okay.  And did you recruit him to come work with you?

6  A    I guess I recruited him.  He went on several of these

7  trips that I made reference to that were in very nice places,

8  and I invited Steve and Marilynn, his wife, to come along on

9  the trips.  And so after four or five, six, seven trips, you

10 get to know somebody, and you get to get a sense of them.  And

11 he was very much aligned with what I wanted to do with the

12 securities business, which is to get our financial consultants

13 closer to the clients and understand their needs.  And Steve

14 believed in that concept.

15          So, I guess, the relationship evolved over those

16 trips, conversations took place.  So I guess I recruited him,

17 but I guess after a while the relationship built, and we kind

18 of said, why don't we do something together and why don't you

19 join me.

20 Q    So what year was it that you hired Mr. Barger --

21 A    Again, it was the mid '80s.  I don't remember exactly the

22 date.

23 Q    Did Mr. Barger fill out an application or did you just --

24 A    Oh, I am sure he did with the Human Resources department,

25 but I don't know that for sure.

1  Q    So what types of programs did you implement with -- did

2  Mr. Barger and with your management implement at Shearson?

3  A    Steve was very good at getting close to financial

4  consultants and helping them grow their business.  He had a

5  concept of it's nobody's business but yours, which meant that

6  you had to take ownership for your business, and taking

7  ownership for your business meant you had to really care about

8  your clients.  And I was a big advocate of caring very much

9  for the client, which was understanding their needs.  He was

10  very aligned with that.  And so it was a perfect fit for Steve

11  to go out and work with our financial consultants and help

12  them build their business.  And that was his main job.  And he

13  met a lot of them on the trips that I made reference to.

14  Q    Now, you mentioned you started with Carter Berlind?

15  A    Berlind & Weill.

16  Q    And that's Sandy Weill?

17  A    Yes, it is.

18  Q    And you worked with Sandy Weill for a lot of your career?

19  A    32 years.

20  Q    32 years.

21       Then Sandy -- looking at this, Sandy Weill bought

22  Shearson back; is that correct?

23  A    In a way.  In 1993, Sandy bought a company called

24  Primerica, and a part of Primerica was a company called Smith

25  Barney.  And after he bought Smith Barney, I had been the CEO

1  of Shearson Lehman Brothers, the Shearson part, and he -- and

2  it was owned by American Express.  And American Express was

3  having problems with cash flow and their balance sheet.  So

4  what they wanted to do was to spin off the Shearson part,

5  which I was responsible for, and leave Lehman by itself.  So

6  what American Express did was spun it off, which means it sold

7  that part to Smith Barney, and became Smith Barney Shearson,

8  and I became the president of Smith Barney Shearson.

9  Q    And did Mr. Barger go with you to Smith Barney --

10  A    Yes, he did.

11  Q    -- Shearson?

12  A    Yes, he did.

13  Q    And that was in 1993?

14  A    That was 1993.

15  Q    And you started working with Mr. Barger in the mid '80s?

16  A    Yes.  I'm sorry, I don't remember the date.

17  Q    You had been working with him seven, eight years at that

18  point?

19  A    Yes.

20  Q    And how long were you the president of Smith Barney?

21  A    Two years.

22  Q    Why did you leave that job?

23  A    I was asked to leave because I did not agree with the

24  person they brought in to the company wanted me to do things

25  that I thought were not in the best interest of our clients or

1   our financial consultants.  The guy's name, who -- they

2   brought a guy in by the name of Bob Greenhill, who became the

3   CEO and man I reported to, who had never run a company before.

4   And he wanted me to convince financial consultants to sell

5   products to our clients that I didn't think was right, and he

6   dismissed me.  But I stayed -- and we were owned at the time

7   by Travelers Group, which was the holding company of Smith

8   Barney Shearson.

9          THE COURT:  Mr. Plumeri, I'm going to interrupt you

10  now, okay, because this is the type of thing that judges do

11  once in a while.

12         THE WITNESS:  Sure.

13         THE COURT:  So I don't know what experience you have

14  had as a witness, but my function is to try to get people to

15  be focused on what the issues are in the trial.  And it's

16  interesting to hear about all these things about Smith Barney

17  and about all this type of stuff, but it is not terribly

18  relevant to what we are here for.  So I am going to interrupt

19  you from time to time to see if I can get you to answer

20  questions directly and as simply as possible.

21         THE WITNESS:  Okay.

22         THE COURT:  If it needs elaboration, we have lawyers

23  here that are not bashful and they will ask you to elaborate,

24  but try to focus on being as direct as you can in response to

25  the questions, okay?

1           Go ahead.

2    Q    When you were advised of your termination, did you go

3    speak with Mr. Barger about being terminated?

4    A    Yes.

5    Q    How did that conversation go?

6    A    I told him that I was just terminated, and I was asked to

7    become director of marketing for Travelers Group, which was

8    the parent.  And when I was terminated, Sandy Weill, who

9    didn't terminate me, the other guy did, asked me -- felt very

10   badly about it because of the reasons I mentioned, and I said

11   to -- he said, who do you want to bring with you, what do you

12   want?  And I said, I just want to bring one person with me.

13   And he said, who, and I said Steve Barger, and he said fine.

14   He asked me what I wanted to get paid, I told him, and I said

15   I want to take care as Steve as well.  And that was basically

16   it.

17   Q    To that point, in '95-ish, you and Steve went to

18   Primerica?

19   A    Yes.

20   Q    Okay.  And what types of programs did you implement at

21   Primerica?

22   A    Well, I became the director of marketing for Travelers

23   Group because the name had changed.  We had bought the

24   remainder of Travelers Insurance.

25               THE COURT:  You became director of marketing.

1          THE WITNESS:  Yes.  For Travelers.

2   A    And I simply brought Steve, and it was our job to create

3   a marketing operation for something that didn't exist at

4   Travelers.

5   Q    Is there something unique about the programs that Steve

6   implements?  You say marketing, and I think of magazines.  Is

7   there -- or billboards.  What is marketing as implemented by

8   Steve Barger and yourself?

9   A    Actually, Steve Barger was not a marketer, he was a

10  salesperson, but I brought him along because I wanted somebody

11  to help me, and somebody that understood how I felt about

12  branding and client affiliation and caring for clients, and he

13  understood that and he was also my friend.  And it was a time

14  in my life where I didn't feel very good being by myself so I

15  brought him with me.

16  Q    But the concept is more of -- the genuine concern, caring

17  about your clients and coaching your sales force, isn't it?

18  A    That's not marketing, that's sales.  I was there to build

19  a marketing operation to brand Travelers Group and its

20  companies.  That didn't last very long because then I became

21  CEO of Primerica Financial Services soon after that, but the

22  intention was to build a brand for Travelers, and that was not

23  Steve's expertise.

24  Q    So you view a change of mind-set of a salesperson from

25  just simply selling a product to caring about the client as

1    sales, as opposed to a cultural or thought transformation?

2    A    It is a part of the sales process, and the sales process

3    is defined by needs-based selling, finding out what the need

4    of the client is.

5    Q    What is needs-based selling?

6    A    Needs-based selling is to ask the client what they need,

7    what's your family, what are your goals, objectives, do you

8    want to finance your child's education, do you want to finance

9    your retirement, ask them a whole bunch of questions so you

10   then know what it is they need to be able to engage with and

11   to buy what products they need, rather than the old Willy

12   Loman approach, this is what I got to sell today whether you

13   need it or not.

14   Q    Well, was that a new concept, needs-based selling, in

15   '95?

16   A    No, it wasn't new in '95, but it was rather new in the

17   early '80s when I adopted it.

18   Q    You adopted it from where?

19   A    Myself.

20   Q    So the idea of -- you created idea of --

21   A    I did.

22   Q    -- needs-based selling?

23        How long were you at Travelers -- Primerica?

24   A    I ran Primerica Financial Services you are referring to?

25   Q    Yes.

1  A    1995 to 2000.

2  Q    And how were your results from implementing the

3  needs-based selling?

4  A    At Primerica.

5  Q    At Primerica, yes.

6  A    The results were good.  It was a multi-level marketing

7  operation where when I got there, they sold on a part-time

8  basis, whole life -- or term life insurance policies.  Did not

9  engage in needs-based selling, simply sold policies to their

10 friends.  And then I created mutual funds and mortgage

11 products and a whole bunch of things and simply created a

12 different way of selling to clients, and it became very

13 successful.  But I would also tell you that the biggest issue

14 they had was governance and compliance because they lacked

15 discipline, and that was totally changed around.

16 Q    And then you moved again after Primerica to Citigroup?

17 A    I did not move, I stayed in the same place.  They gave me

18 an additional job to run Citibank.

19 Q    And did Mr. Barger move with you to Citibank?

20 A    Yes.

21 Q    And how long were you at Citibank?

22 A    Two years.

23 Q    So where are we, 2000?

24 A    2000.  At the end of '99, I left Citigroup.

25 Q    So between 1985 when you met Mr. Barger and when you left

1   Citigroup in 2000, we have 15 years there, how many years did

2   you work together?

3   A    I was -- all the better part of all those years.

4   Wherever I went, I simply brought him with me.  He was my

5   friend and he was good at what he did.

6   Q    So then in 2000, you went to Willis?

7   A    I did.

8   Q    How did you end up in an insurance company?  You had been

9   a banker your entire --

10              THE COURT:  Does it make a difference in this case?

11              MR. SHEARER:  Yes, it does, Your Honor.

12              THE COURT:  Next question.  You have to convince me

13   on a break if it is relevant.

14              MR. SHEARER:  I will.

15              THE COURT:  Go ahead.

16              THE WITNESS:  Do you want me to answer that

17   question, Your Honor?

18              THE COURT:  If I interrupt, don't answer.

19              Go ahead.  Next question.

20   Q    Well, did you take the concepts that you learned in

21   banking and apply them to a new industry?

22   A    In the insurance --

23              THE COURT:  Excuse me one second.  I don't see the

24   relevance.

25              MR. SHEARER:  Because --

1          THE COURT:  Why don't we move on, and when we take a

2     break you can convince me that these questions are relevant.

3     I don't see it.  Let's try to talk about something that's

4     relevant in this case.  Okay?

5          MR. SHEARER:  Okay.

6          THE COURT:  Judges would be bad marketers, I guess,

7     right?

8     Q    You have said that you -- Steve's your friend, that you

9     brought him along with you?

10    A    Yes.

11    Q    But I've seen some quotes from you where you believe in

12    emotional decision making, not necessarily logical decision

13    making; is that right?

14    A    I wouldn't say that, no.

15    Q    What are these -- when you talk about emotional

16    decisions --

17    A    I didn't talk about emotional decisions, you did.

18    Q    No, I have seen quotes from you.

19         THE COURT:  Next question.  I didn't hear a

20    question.

21    Q    How did you end up coming to First Data?

22    A    I had finished my career at Willis Group, which was owned

23    by KKR for the first five years I was there, and when I

24    finished Willis Group, I was looking for what I was going to

25    do next, and just at that time, I had discussions with KKR --

1            THE COURT:  I'm going to interrupt.  Mr. Shearer,

2    look.  I'm not suggesting to the jury I have an opinion on

3    this case, and I caution them not to draw that conclusion, but

4    I am responsible for keeping the trains on the right tracks

5    here.  You want to know why he was discharged, if he was

6    discharged, why he wasn't hired back.  That's what's relevant

7    in this case.  You're not asking any question that relates to

8    that at all.

9            I know this gentleman has a distinguished career, he

10   told this jury a little bit about that.  Ask relevant

11   questions about circumstances that pertain to this trial.

12           Members of the jury, because I say that, do not

13   think I have a negative opinion or a positive opinion or one

14   way or the other.  I am just acting as your surrogate and I'm

15   trying to keep the lawyers focused.  Sometimes they ramble

16   around a little bit, and they try their very best, and I

17   respect that, but my job is to keep the focus on the trial.

18           Questions.  Relevant questions.

19   Q    So you hired Mr. Barger in 2013 as a consultant for First

20   Data?

21   A    Yes.

22   Q    Okay.  Had you made -- I guess you did.  Was this a call

23   out of the blue?  Had you talked to Mr. Barger?

24   A    No.

25   Q    Okay.  So you had been continuing -- and this is 13 years

1  had passed, and they brought this up in their opening

2  statement that you two had --

3          THE COURT:  You can tell the jury why you hired him.

4  Go ahead.

5  A    I had not talked to Steve for the better part of 13

6  years.  When I got to Willis, I had asked him to speak at one

7  of my first conferences in Palm Beach, and after that speech

8  that he gave, to talk about needs-based selling, which really

9  in a lot of cases was not directly applicable to the insurance

10 business.  After that, I did not see or talk to him for 12 to

11 13 years.

12         THE COURT:  How did you -- you spoke to him again,

13 right?

14         THE WITNESS:  I'm sorry, Your Honor?

15         THE COURT:  There came a time when you spoke to him

16 again, obviously, right?

17         THE WITNESS:  After about 12 or 13 years he got in

18 touch with me.

19         THE COURT:  All right.  So what happened then?  You

20 can tell the jury.  Did he come back to work?

21         THE WITNESS:  We had dinner, and he called me about

22 a company I was affiliated with called Lebenthal, that they

23 had called him, because some of the people at Lebenthal worked

24 with us at Shearson, and was asking Steve if he could get

25 involved because they needed to recruit financial consultants

1  and he knew a lot of them.

2          So we had dinner.  I didn't know what the dinner was

3  going to be about.  Turned out to be about Lebenthal, and he

4  asked me what my opinion was.  I was on the board, I put a lot

5  of money into the company, but it wasn't doing really well.

6  So I basically steered Steve away from doing it.

7          THE COURT:  So that's --

8          THE WITNESS:  Even though I was invested in it.

9          THE COURT:  -- how you get reconnected.

10         Do you have another question?  Go ahead,

11  Mr. Shearer.

12         MR. SHEARER:  Yes, I do.

13  Q    Do you know if -- Mr. Barger made a presentation to

14  Lebenthal, didn't he?

15  A    I do not know.

16  Q    Okay.  You didn't know whether he made a proposal to

17  Lebenthal about his compensation as a consultant?

18  A    I knew he had discussions.  Whether he made a proposal or

19  not, I do not know.

20  Q    Okay.  So you then hired him as a consultant.  How did

21  you decide upon how much he was going to be paid in his

22  compensation for consulting at First Data?

23  A    I asked him how much he was making.

24  Q    You asked him how much he was making, as what?

25  A    As a consultant.

1    Q     You didn't ask him what he proposed to Lebenthal?

2    A     No.

3    Q     You were on the board, did you --

4    A     Never got to the board level.

5    Q     It didn't?

6    A     No, it did not.

7    Q     Okay.  What did Mr. Barger tell you about what he was

8    making?

9    A     Making $30,000 a month, approximately.

10   Q     Did he tell you that he had -- he was working for a

11   limited liability company called The Barger Group?

12   A     I didn't know what the name of his consulting company

13   was, but specifically, no.

14   Q     Did you know if there were any owners of The Barger

15   Group?

16   A     No.

17   Q     Were you asking him about his income or what his revenue

18   was as a consultant?

19   A     I asked him how much he was making.

20   Q     Just a general question like that?

21   A     Yes.  How much are you making?  So I could determine what

22   we would pay him as a consultant.  What are you making?

23          THE COURT:  And you eventually hired him as a

24   consultant?

25          THE WITNESS:  Yes.

1        THE COURT:  How much did you hire him for?

2        THE WITNESS:  $30,000 a month.

3        THE COURT:  Okay.  Next question.

4    Q    Is that what you thought he was worth?

5        THE COURT:  What was the question?

6    Q    Is $30,000 a month what you thought he was worth?

7    A    He told me he was making $30,000 a month.  I did not

8    argue.

9    Q    I am asking you, did you think he was worth $30,000 a

10   month?

11   A    I gave him the consulting job so I guess I thought he was

12   worth it.

13   Q    You'd been his superior before.  I guess in those jobs

14   you had approved his compensation before; is that correct?

15   A    I did.

16   Q    Had you paid him $30,000 or more before?

17   A    I don't remember what we -- I paid him at Shearson, I

18   don't remember what I paid him at Citi.  I don't remember, but

19   it was probably in that range.

20   Q    So that experience, put a value on it, not necessarily

21   him saying, "I make $30,000"?

22       THE COURT:  Next question.  Objection sustained.

23       MR. SHEARER:  Well, Your Honor, there is an

24   important concept that Mr. Plumeri teaches, and it is

25   called --

1        THE COURT:  I'm sorry, it is what?

2  Q    What is the -- you teach the concept of a value gap.

3  A    Yes.

4  Q    Can you explain that?

5  A    Value gap is the difference between what a client can do

6  for themselves and what you can do.  And the wider that gap

7  is, the more value you are to the client.  And that was

8  created by Steve Barger.

9  Q    Okay.  And when?

10  A    I don't remember the date when, but I don't know, in the

11  Primerica days, I guess.  I wrote a book and even put it in

12  the book and gave him credit for it.

13  Q    Okay.  And so what I am taking this is, if you see value

14  in something, you are willing to pay for it?

15        THE COURT:  Mr. Plumeri, I'm going to ask you a few

16  questions, okay.  He worked for you when you were at First

17  Data, correct?

18        THE WITNESS:  Yes.

19        MR. SHEARER:  You explained to the jury how he came

20  to work for you already.

21        THE WITNESS:  I did.

22        THE COURT:  So how long were you at First Data while

23  he worked for you?

24        THE WITNESS:  As long as I was there.  I left after

25  being there approximately a little bit more than three years.

1          THE COURT:  All right.  And during the period of

2     time that he was there, what was the overlap between the time

3     that you were there and the time that he was there?

4          THE WITNESS:  I was there for three years, and I

5     left and he stayed.

6          THE COURT:  All right.  So you knew the

7     circumstances of his employment, I assume, right?

8          THE WITNESS:  Yes.

9          THE COURT:  You can tell the jury what he was doing,

10    how much he was getting paid, whether you thought he was a

11    good employee.  I will give you a little opportunity to

12    explain that to the jury, and then we can move on.

13          THE WITNESS:  Okay.

14    A    After about three months or so as a consultant, I asked

15    Mr. Barger if he would come on full-time, and we made a

16    full-time arrangement for his compensation.  And one of the

17    things I needed to do, and it wasn't the only thing I did,

18    Your Honor, was to transform the sales culture to this

19    needs-based culture.  But I got involved in marketing, I got

20    involved in product development.  I raised money to do a

21    pre-IPO, a raise of 3 and a half billion dollars because I had

22    been a public company CEO.  So I did a lot of things, and I

23    think about maybe ten percent of what I did had to do with the

24    sales transformation --

25          THE COURT:  Tell us about Mr. Barger.  You

1   considered him to be a valuable employee?  Were you happy to

2   have him with you?  And did you give him a lot of

3   responsibility?  Generally, I assume that that's the case?

4           THE WITNESS:  Yes.

5           THE COURT:  And you were happy with the services?

6           THE WITNESS:  Yes.

7           THE COURT:  You had a relationship with him, you

8   explained to the jurors?

9           THE WITNESS:  Yes.

10          THE COURT:  Did you increase his salary during the

11  course of the time that you were --

12          THE WITNESS:  I don't remember whether his salary

13  was increased, Your Honor.  I do remember, I gave him more

14  money when he was made a permanent employee, which obviously

15  came with benefits, which he did not get when he was a

16  consultant.  But I don't remember what the raises were.

17          THE COURT:  You were happy with his services, and

18  you were happy to have him as an employee?  Am I putting words

19  in your mouth, or is that --

20          THE WITNESS:  No, he was a fine employee, yes.  I

21  had no problems with him.

22          THE COURT:  What other questions do you want to ask?

23  Q    So you just said you paid him more as an employee than as

24  a consultant?

25  A    Yes.

1   Q    Is that correct?

2   A    Yes.

3   Q    What were you trying to get from him as an employee that

4   you couldn't get from him as a consultant that caused you to

5   pay more?

6   A    Well, first of all, you are full-time, you are engaged,

7   you are invested in the company, you are there all the time,

8   and when you are trying to grow a company of that size, it is

9   better that you're there all the time than you are part-time.

10          As far as the increase in the compensation, it's not

11  unusual to give somebody more so you gross up, so to speak,

12  the compensation, so that what you're netting is the same as

13  you would be netting as a consultant.

14  Q    Did you and Mr. Barger when he became an employee, you

15  began doing these conferences for -- to try to implement this

16  transformation?

17  A    Yes.

18  Q    I want to play -- I have a minute and 30 second video of

19  you introducing Mr. Barger at one of these conferences that

20  First Data held.  I just want to play it real quick.

21  A    I bet you it was a good one.

22          THE COURT:  You propose this as evidence,

23  Mr. Shearer?

24          MR. SHEARER:  Yes.

25          THE COURT:  What exhibit?

1          MR. SHEARER:  It is Exhibit 2, which is the videos,

2    and --

3          THE COURT:  That's a presentation video?  What's the

4    relevance here?  Listen to me carefully, okay.

5          Members of the jury, I met with the lawyers before

6    on several occasions to get a sense of what the exhibits were

7    that they wanted to possibly offer in evidence, and I have to

8    consider whether they are relevant or not, and we have a lot

9    of proposed exhibits that the lawyers were very, very good.

10   They were real officers of the court, very professional, and I

11   was very happy with the way they cooperated with me so this

12   case doesn't have to take seven years to try, okay.  But I am

13   going to really be a little bit of a martinet now to make sure

14   that what is going to be presented to you is relevant.

15         What's the relevancy of this?

16         MR. SHEARER:  This is Mr. Plumeri introducing

17   Mr. Barger talking about how he's the best at what he does and

18   that --

19         THE COURT:  He said he was a great employee.

20         THE WITNESS:  I said that.

21         THE COURT:  Is there anything more we need to know?

22         THE WITNESS:  I admit he's great.  That's why I

23   brought him with me.

24         THE COURT:  What else do you need to know?  Next

25   question.  I'm not going to allow it in evidence, I don't find

1  it be relevant.  Next question.  Go ahead.

2          I know you are not happy with what I'm doing, but

3  I'm the judge, okay.

4          MR. SHEARER:  All right, Your Honor.

5          THE COURT:  And it is a message to everybody.  We're

6  not going to paper this world, we are going to get to the key

7  questions for the jury to resolve.  And it deals with,

8  obviously, when he was discharged, what type of problems he

9  had, how he tried to get back, and what happened as a result

10  of that.  Focus on that.

11 Q    So did you -- at some point you stopped supervising

12 Mr. Barger at First Data; is that correct?

13 A    That's correct.

14 Q    What time frame?

15 A    It was toward the end of my tenure at First Data, which

16 was, I guess, was around 2017.

17 Q    And this name is going to come up, but did you know a

18 name, Brian Fricke?

19 A    Yes.

20 Q    Who was Mr. Fricke at First Data?

21 A    He was the director of training.

22 Q    Did he report to you?

23 A    Yes.

24 Q    The entire time you managed -- you moved Mr. Fricke

25 beneath Mr. Barger as when you were supervising Mr. Barger?

1   A    I don't remember what the hierarchal order was, but

2   because Steve was involved in the training process, I don't

3   remember who reported to who, but Fricke was the head of

4   training.

5   Q    And then Mr. Fricke resigned --

6   A    He did.

7   Q    And then you gave Mr. Fricke's group to Mr. Barger --

8   A    I did.

9   Q    -- to manage?

10  A    I did.

11  Q    Do you remember when that happened?

12  A    No, I don't.

13  Q    So --

14  A    I don't remember the date.

15  Q    So Mr. Fricke's group was in addition to his work he had

16  been doing before?

17  A    Yes.

18  Q    Okay.  How did you -- did you ever do a performance

19  review of Mr. Barger?

20  A    I don't remember.

21       THE COURT:  Mr. Plumeri, were you there when

22  Mr. Barger left and when he became ill and he took a leave of

23  absence to take care of his medical conditions?

24       THE WITNESS:  I was not there.

25       THE COURT:  And do you have any knowledge at all of

1    the circumstances as to why he left his employment?

2             THE WITNESS:  I don't, Your Honor.

3             THE COURT:  You don't.  You weren't there.

4             THE WITNESS:  I wasn't there.

5             THE COURT:  What's your next question?

6    Q    You were there for the hiring, right?

7    A    I was there for the hiring, yes.

8             THE COURT:  He testified about the hiring.  Is there

9    anything else you have that's relevant here?  Otherwise, we

10   move on to the next witness.

11            MR. SHEARER:  I just want to talk real quick about

12   his hiring decisions.

13   Q    Did you hire anybody else while you were at First Data?

14   A    Yes.

15            THE COURT:  Is he the only person you hired, or did

16   you hire other people?

17            THE WITNESS:  No, I hired other people.

18   Q    Okay.  Did you ask them what they made as the reason for

19   your decision?

20   A    Yes.

21   Q    Did you pay them more than what they said they made?

22   A    In most cases I did because you always in a recruiting

23   process ask them what they made at their prior employment, and

24   if they're good, in lots of cases people move and join you

25   because you pay them more and you give them a better

1   opportunity.  Those are the two reasons why people move.

2           MR. SHEARER:  All right, Your Honor.

3           Your witness.

4           THE COURT:  Okay, fine.

5           Do you want to question him or do you want to save

6   him for your case?

7           MR. EIDELMAN:  Your Honor, Mr. Plumeri is leaving

8   the country in a day or so.  I will do it right now and be

9   very quick.

10          THE COURT:  So we allow that.  So the other side has

11  the choice, you can either get questions now and have all the

12  questions posed to him by both counsel or if defense counsel

13  wishes to wait until their case and recall them, we can do

14  that.  So either is okay, and under these circumstances, we

15  are going to allow Mr. Eidelman to question Mr. Plumeri.

16          But you have a word of caution how the judge runs

17  the courtroom.  So be advised.  Relevant questions, relevant

18  evidence.

19          MR. EIDELMAN:  Absolutely, Your Honor.

20  CROSS-EXAMINATION

21  BY MR. EIDELMAN:

22  Q    Good morning, Mr. Plumeri.

23  A    Good morning.

24  Q    Mr. Plumeri, in front of you to your left you have an

25  exhibit book; do you see that?

1  A    I do.

2  Q    Can you please turn to Defendant's Exhibit 311.  And I am

3  also going to put it up here on the Elmo.

4          THE COURT:  Let me catch up to you.  So I have a

5  list of proposed exhibits, and they are very extensive.  Mine

6  ends at 310.  I don't have a 311 on this list.  Do you want to

7  ask another question?  We won't allow that in evidence now.

8          MR. EIDELMAN:  Okay.

9          THE COURT:  Go to something else.

10          MR. EIDELMAN:  I will.

11          THE COURT:  We'll straighten this out, but I am

12  going off the list that we worked hard at putting together.

13          MR. EIDELMAN:  Understood, Your Honor.  There's

14  another exhibit.  If I may, just -- it is already -- we have

15  it.  D-60.

16          If you will go to D-60, please.  It is the

17  independent contractor agreement that Mr. Barger signed with

18  First Data.

19  Q    Do you have that, Mr. Plumeri?

20  A    I do.

21          THE COURT:  Members of the jury, before Mr. Eidelman

22  continues, so I made all the lawyers put all these proposed

23  exhibits in a binder.  They are not all going to be in

24  evidence, but it is good to have them in one spot and

25  facilitate the use of them during the course of the trial.

1            So as I allow them into evidence, they will be

2     deemed in evidence, and you will be able to see them if

3     counsel wants to show them to you, at the end of the trial we

4     will try to put all the exhibits together in a binder to give

5     to you.  In the meantime, let's take it as it comes piecemeal,

6     okay?

7            So D-60, you want that in evidence at this time?

8            MR. EIDELMAN:  Yes, Your Honor.

9            THE COURT:  There's no objection to it.  And it is

10    in evidence now.

11           MR. EIDELMAN:  Thank you.

12           (Defense Exhibit D-60 received in evidence.)

13    Q    Now, Mr. Plumeri, it's common when you hire a consultant

14    that you enter into an agreement, a contract, right?

15    A    Yes, it is.

16    Q    And showing what's been marked, there's going to be two

17    exhibits that you can look at to see this.  It is going to be

18    both D-60 and D-61.  If you can look at that, does this appear

19    to be the independent contractor agreement that Mr. Barger

20    signed and entered into with First Data?

21    A    It appears to be, yes.

22    Q    Okay.  And --

23           THE COURT:  So D-60 and D-61 are deemed in evidence

24    at this time.  They are relevant, they both relate to the

25    contract that was signed.

1          (Defense Exhibit D-61 received in evidence.)

2          THE COURT:  Go ahead.  Next question.

3          MR. EIDELMAN:  Thank you.

4    Q    And, Mr. Plumeri, the contract that's entered into with

5    Mr. Barger is dated the second day of April 2014, correct?

6    A    That's correct.

7    Q    So earlier I think -- I just want to correct something,

8    when Mr. Shearer asked you when Mr. Barger started, you said

9    2013.  It was actually 2014; is that right?

10   A    It was 2014, yes.

11   Q    Correct.

12         THE COURT:  One second, Mr. Eidelman.

13         So I see it is being popped up on the screen, the

14   jury can see it now, right?

15         MR. EIDELMAN:  Yes, sir.

16         THE COURT:  So once something is in evidence, the

17   lawyers can show you any part of it, and, apparently, that's

18   what you are look at right now.

19         Go ahead.

20         MR. EIDELMAN:  Thank you, Judge.

21   Q    Mr. Plumeri, if you turn to the end, it should be there,

22   there is a statement of work, I believe, which is Exhibit A?

23         THE COURT:  We see it, Exhibit A.

24   A    I can see it on the screen.

25   Q    Yes, it's on the screen, correct.

1  A    It's easier for me to see it on the screen.

2  Q    Perfect.  Thank you.  That makes it much easier.  We can

3  go quicker then.

4         And the project duration, am I correct that

5  Mr. Barger was going to start consulting on March 17, 2014 and

6  his consulting period would end December 31, 2014; is that

7  correct?

8  A    That's correct.

9  Q    And that this --

10        MR. SHEARER:  Objection.

11 Q    -- is the amount that you all had agreed to, was $30,000

12 a month?

13        THE COURT:  We have an objection.  Please.

14        MR. EIDELMAN:  I'm sorry.

15        THE COURT:  What's the problem?

16        MR. SHEARER:  This contract is signed by Mr. Kevin

17 Ward, not Mr. Plumeri.

18        THE COURT:  So you're telling me he's

19 misrepresenting what the exhibit is?

20        MR. SHEARER:  I don't know if he has personal

21 knowledge.

22        THE COURT:  Well, follow along --

23        MR. SHEARER:  I don't know if --

24        THE COURT:  -- and if there's anything there that

25 you are not happy with, you can bring it out and question him

1  again, or we take a break, you can try to square these things

2  away.  But he can show this document to the witness, okay.

3  Q    Mr. Plumeri, do you have any reason to believe that this

4  is not the independent contractor agreement that Steve Barger

5  signed with First Data?

6  A    No.

7  Q    All right.  And this is the agreement that you had

8  entered into, correct, that you'd pay him $30,000 a month; is

9  that correct?

10  A    Yes.

11  Q    And if I go back to page 1 of the agreement, let me just

12  see if I can highlight this for you, it says, am I correct,

13  that the contractor, and that's -- the consultant, and that's

14  Mr. Barger, will submit monthly invoices reflecting the amount

15  that's owed to him for the prior month's work; is that

16  correct?

17  A    That's correct.

18  Q    And that's standard as a consultant, correct?

19  A    That's correct.

20        MR. ZEITLIN:  Your Honor, are we allowing leading

21  questions because this is deemed cross?

22        THE COURT:  Absolutely correct.  He is just

23  referring to the exhibit.

24        Okay.  Maybe you can make it sharper.  Mine is a

25  little blurry.

1           MR. EIDELMAN:  I will do that when we get to the

2    next exhibit.

3           THE COURT:  So, you know, you can point out parts of

4    the exhibit and you can ask him questions about that, but you

5    don't have to read the exhibit.  If you want to read part of

6    it, preparatory to asking the question, I will allow you to do

7    that.

8           MR. EIDELMAN:  Thank you, Judge.

9           THE COURT:  But I don't want you to stand there and

10   read everything for no particular reason.

11   Q    Can we turn, Mr. Plumeri to D-62.

12          THE COURT:  62, did you say?

13          MR. EIDELMAN:  62, yes, Judge.  62.

14          THE COURT:  Go ahead.

15   Q    Do you have that in front of you, Mr. Plumeri?

16   A    I do.

17          THE COURT:  You want that in evidence at this time?

18          MR. EIDELMAN:  I do, Your Honor.

19          THE COURT:  No objections to it.  62, deemed in

20   evidence at this time.

21          (Defense Exhibit D-62 received in evidence.)

22          THE COURT:  Next question.

23   Q    So, Mr. Plumeri, can you turn to the second page of D-62.

24   Mr. Plumeri, you will see on the screen, which is the invoice

25   dated April 15, 2014, is that what you have in front of you?

1   A    Yes, I do.

2   Q    Okay.  And would this be an invoice that Mr. Barger would

3   have submitted for his first month of consulting, given the

4   fact that he had started in the middle of March as a

5   consultant?

6   A    Yes.

7   Q    Can you turn to the next page.  Do you have that, sir?

8   Are you looking at an invoice dated March 15 of 2014?

9   A    I have May.

10           THE COURT:  It is May 15.

11  Q    We double-sided.  We double-sided the pages to save a

12  tree.  So if you look on the left side --

13           MR. EIDELMAN:  May I approach him, Your Honor, for

14  just a moment?

15           THE COURT:  Was he getting $30,000 while he was

16  working there every month?

17           THE WITNESS:  Yes.

18           THE COURT:  Next question.

19  Q    All right.

20           THE COURT:  That's the relevancy of all these

21  invoices, right?

22           MR. EIDELMAN:  Yes, Your Honor.

23           THE COURT:  How many invoices were there that you

24  just wanted to put into evidence?

25           MR. EIDELMAN:  So there's an invoice that's dated

1    February --

2              THE COURT:  How many?  10?  15?  20?

3              MR. EIDELMAN:  It is total of, Your Honor, in this

4    particular exhibit, we will admit them all, there are ten

5    invoices, Your Honor.

6              THE COURT:  So be mindful, we don't need to paper

7    this wall, all right?  There's no question, he's getting

8    $30,000 while he was --

9              THE WITNESS:  Yes.

10             MR. EIDELMAN:  Understood.

11             THE COURT:  What else do you need to know?  Go

12   ahead.

13   Q    Mr. Plumeri, we've established that Mr. Barger began his

14   consulting on February 17, 2014.  Can you explain why he

15   submitted an invoice dated February 26, 2014 in the amount of

16   $30,000?

17   A    No.

18   Q    Is it, in your history, your 55 years as a seasoned

19   executive, is it normal to bill a company for the time spent

20   before you become a consultant?

21   A    No.

22   Q    I want to show you, Mr. Plumeri, if you go in your book,

23   you will see, and we did put the pages on both sides of the

24   paper, can you find the invoice which is dated June 20, 2014,

25   invoice 1607?

1          THE COURT:  That's all part of D-62, correct?

2          MR. EIDELMAN:  Yes, Your Honor.

3          THE COURT:  What's your question?

4   Q    Do you have that, Mr. Plumeri?

5   A    I do.

6   Q    There's an invoice dated this date for final fee for

7   business consulting services, 2014, March to June, for

8   $50,000.  Do you know why Mr. Barger billed First Data $50,000

9   for final consulting fees on June 20 of 2014?

10  A    No.

11  Q    At his deposition Mr. Barger told me I needed to ask

12  you --

13         THE COURT:  Just one second.  Ask questions of this

14  witness.  If you want to read from his deposition, is that

15  what you wish to do?

16         MR. EIDELMAN:  From Mr. Barger's deposition?

17         THE COURT:  Yes.  Next question.

18         MR. EIDELMAN:  Thank you, Judge.

19  Q    Mr. Plumeri, if you go back to the independent contractor

20  agreement, which is D-311.

21         THE COURT:  Okay.  So you are saying it is 311, we

22  marked it --

23         MR. EIDELMAN:  D-60.

24         THE COURT:  311 is the same as 60, we've established

25  that.

1       MR. EIDELMAN:  Yes.

2       THE COURT:  Thank you.

3   Q    And I asked you to turn, Mr. Plumeri to section 5 of the

4   independent contractor agreement.  Do you have that, sir?

5   A    The one that says "work product"?

6       THE COURT:  Just put it up.  You want to question

7   him about it, something that's in evidence?  Go ahead.

8   Q    Do you have that, Mr. Plumeri?

9   A    I do.

10  Q    Can you read the part that's been highlighted?

11  A    I can.

12      THE COURT:  Now, the highlighting, I take it, was

13  done by counsel, right?

14      MR. EIDELMAN:  It was, Your Honor.

15      THE COURT:  Go ahead.

16  A    Consultant hereby grants to First Data a nonexclusive,

17  fully paid, worldwide, irrevocable license to make, use, for

18  internal purposes or on behalf of third parties, execute,

19  offer to sell, sell, reproduce, display, perform, and

20  distribute copies and prepare derivative works of the

21  methodologies and any derivative works thereof, and to

22  authorize others to do any or all of the foregoing.

23  Q    And what did you understand that to mean, sir?

24  A    That the company can use whatever Steve had created or

25  had done.  It was the company's ability to use it.

1  Q    Would Mr. Barger have been consulted for -- would

2  Mr. Barger have been compensated for that pursuant to the

3  independent contractor agreement?

4  A    Yes.

5  Q    And how much would he have been compensated for that?

6  A    It was included in the compensation.

7  Q    Okay.  If you had learned in June of 2014 that Mr. Barger

8  submitted an invoice for $50,000 to cover his intellectual

9  property or his proprietary information, what would you have

10  done?

11  A    I would have released him.

12         MR. EIDELMAN:  Your Honor, may I now consult with my

13  colleagues for just one moment.

14         THE COURT:  Go ahead.

15         (Short pause.)

16  Q    Mr. Plumeri, if you had learned in June of 2014 that

17  Mr. Barger had submitted an invoice for $30,000 for the work

18  that he did learning about First Data before he entered into

19  an independent contractor agreement, what would you have done?

20  A    I would have released him then.

21         MR. EIDELMAN:  I have no further questions, Judge.

22         THE COURT:  Mr. Shearer, any redirect?

23  REDIRECT EXAMINATION

24  BY MR. SHEARER:

25  Q    Mr. Plumeri, I want to talk you about I guess this

1   agreement you were just looking at, that you just read from,

2   section 5.

3            MR. SHEARER:  Do you want to put that up, David?

4            THE COURT:  That's from Exhibit D-62, correct?

5            MR. SHEARER:  That's correct.

6            THE COURT:  Go ahead.

7            MR. SHEARER:  Section 5.

8   Q    This is section you just read, correct?

9   A    Yes.

10  Q    And you read the bottom part of the second paragraph,

11  correct, where it says, "consultant hereby"?

12  A    Yes.

13  Q    Can you read the first sentence of the section.

14  A    The one that begins with "work product"?

15  Q    No.  Except as expressly provided below, all materials

16  and copies of the materials developed, generated or produced

17  in connection with consultant's and/or consultant's

18  personnel's provision of services shall be deemed work made

19  for hire, correct?

20           THE COURT:  You just read it.

21  A    You just read it.

22           THE COURT:  What's your question?

23  Q    The question is, the next paragraph defines "work

24  product," correct?

25  A    The paragraph that begins with, "work product shall not

1  include"?

2  Q    Yes.  So isn't this -- wasn't your understanding when you

3  executed this agreement that this license was for things he

4  created while working for First Data, not things he had

5  created before First Data?

6  A    No.  It came with the suit.  I mean, whether you created

7  it before First Data or whether you created it while at First

8  Data, it was part of what Barger brought to the table.

9  Q    So for $30,000 a month you got everything the man had

10  done over a 60 year career?  Everything he did at Smith

11  Barney, everything he did at Shearson, everything he did at

12  Primerica, you bought that for $30,000 a month?

13  A    Apparently.

14  Q    All right.  Did you negotiate this agreement?

15  A    I did not.

16  Q    Who did?

17  A    People in human resources.  All I did was asked him how

18  much he was used to making as a consultant, and he told me

19  $30,000 a month, and that's what I gave him.

20  Q    You have no idea what the negotiations around this

21  provision were, do you?

22  A    I don't get involved in negotiations of this type.

23         THE COURT:  He's the CEO.  He doesn't do that.

24         MR. SHEARER:  He was the vice chairman.

25         THE COURT:  Next question.  I think the jury

1   understands he was hired for $30,000.

2              MR. SHEARER:  I was looking at this --

3              THE COURT:  Listen to me.  The --

4              MR. SHEARER:  The signature page has a --

5              THE COURT:  Mr. Shearer, listen to me.  Let's

6   refocus, all right.  The jury knows he was hired for $30,000.

7   I heard the testimony.  What else do you want to adduce?  Tell

8   me.

9              MR. SHEARER:  Well, I am trying to -- they are going

10  to try to say that these --

11             THE COURT:  They haven't said anything yet.  What

12  else do you want to adduce?

13  Q    Do you know Kevin Ward, the person who signed this?

14  A    Did I know him?

15  Q    Yes.

16  A    Yes, I knew him.

17  Q    Did you give him the terms to put in this contract, the

18  financial terms you had negotiated with Mr. Barger?

19  A    No.  I didn't negotiate the terms with Steve.  I told

20  you, what I did is simply say how much are you making as a

21  consultant, so we can understand, which happens in any

22  conversation when you are hiring somebody, and he said $30,000

23  a month.  So I said, okay, I will give you $30,000 a month.

24             THE COURT:  So there was a question that he

25  submitted an invoice for $30,000 apparently before he started

1    to work.

2              THE WITNESS:  Yes.

3              THE COURT:  And you don't know anything about --

4              THE WITNESS:  I do not.

5              THE COURT:  -- the circumstances of that?

6              THE WITNESS:  No, because it's --

7              THE COURT:  Sorry.  Just one second.

8              (WHEREUPON, there was a short interruption.)

9              THE COURT:  All right.  So you really have no

10   knowledge about what that bill was for?

11             THE WITNESS:  I do not.

12             THE COURT:  Sometimes a baseball player can get a

13   signing bonus, right?  You don't know what the negotiations

14   were.  Somebody else would know about that, right?

15             THE WITNESS:  No, I had no idea that he was --

16             THE COURT:  So then you said if you knew it was

17   going to be done, you would have released him.  Well, that had

18   nothing to do with this case at all.  You didn't know anything

19   about this, did you?

20             THE WITNESS:  No, I did not.  It is inappropriate

21   for somebody --

22             THE COURT:  It may be inappropriate, it may not be.

23   It would depend upon what the negotiations were with the

24   person who entered into this agreement.

25             THE WITNESS:  All I knew is that when he started as

1   a consultant, we were going to pay him $30,000 a month.

2           THE COURT:  Do you know anything about the fact that

3   he was -- you know he became ill, and you know he tried to get

4   his job back, right?  You know about that?

5           THE WITNESS:  A little bit.  I wasn't involved in

6   it.

7           THE COURT:  You know nothing about it, right.

8           THE WITNESS:  Yeah.

9           THE COURT:  But you know of -- have no knowledge

10  about the circumstances about why he wasn't allowed to come

11  back to work, that's nothing you know anything about, right?

12          THE WITNESS:  Nothing.  I wasn't there.

13          THE COURT:  You don't know whether or not he was not

14  allowed to come back because he billed out this $30,000 in the

15  first invoice?  You have no knowledge about that --

16          THE WITNESS:  No, I don't.

17          THE COURT:  -- whatsoever?

18          And you have no knowledge about anything else about

19  the circumstances as to why he wasn't allowed to come back to

20  work after he had his --

21          THE WITNESS:  I do not.  I wasn't there.

22          THE COURT:  Okay.  I think it is clear.  What else

23  you want to ask?

24          MR. SHEARER:  Yes.  One more question.  Few more

25  questions around this.

1  Q    Were you authorized to enter into oral agreements on

2  behalf of First Data?

3  A    Oral agreements?

4  Q    Yes.  Nonwritten agreements.  Could you enter into an

5  oral agreement?

6  A    Give me an example.

7          THE COURT:  No.  Next question.  In other words, was

8  everything reduced to writing?  Could you enter into an oral

9  understanding with someone to come to work?  I guess that's

10 what he wants to know.  I don't know what the relevancy is.

11         THE WITNESS:  That's why I asked for an example,

12 Your Honor.

13         THE COURT:  Next question.

14 Q    Well, you could have orally agreed to pay him for the

15 investigation outside of your experience before?

16 A    I would never do that.  It is unheard of.

17 Q    How long was the investigation period Mr. Barger engaged

18 in --

19         THE COURT:  Next question.  I think we have his

20 relevant testimony.  All right.  Let's move on.

21         MR. SHEARER:  I wanted -- I ordered these invoices

22 in terms of dates.  Can you go to -- which was kind of -- the

23 April 11 invoice.

24         THE COURT:  In D-62?

25         MR. SHEARER:  Yes.

1           THE COURT:  All right.  Tell him what page.  Do you
2  want to question him about that?  You can do that.
3           MR. SHEARER:  I did want to question him about that.
4  Scroll down.
5           THE COURT:  We see it now on the screen.
6           MR. SHEARER:  That's not it.  There's one, April 11.
7           MR. ZEITLIN:  Okay.  Bear with me.  There's multiple
8  invoices on this one.
9           THE COURT:  Okay.  You have it on the screen.
10 What's your question?
11          MR. SHEARER:  Your Honor, it is the -- they are out
12 of order.
13          THE COURT:  I am looking at an April 15, 2014
14 invoice.  Is that the one you want?
15          MR. SHEARER:  I will just use the Elmo.  This is
16 D-62.  April 11.
17          THE COURT:  Okay.  Go ahead.
18 Q    Is that your signature at -- is that your signature on
19 this invoice?
20 A    Yes, it is.
21 Q    So you approved this one?
22 A    Yes, I did.
23 Q    Okay.  And this one is for travel?
24 A    Yes.
25 Q    Okay.  Is this -- this is the June 18 invoice.  Is that

1   your signature there?

2   A    Yes, it is.

3   Q    And then this is the February 26.  Do you know Lisa Lang?

4   A    No, I do not.

5   Q    And then this here, I will pull it down, is this your

6   signature on this, or do you ever do this?

7   A    No.

8   Q    Okay.  Now these refer to, all of them, a PO.  Do you

9   know what that is?

10  A    No, I do not.

11  Q    Okay.  Do you know, was there a purchase that -- purchase

12  order entered with respect to this consulting agreement?

13  A    I don't know.

14  Q    Okay.  That's it.

15              THE COURT:  Anything else, Mr. Eidelman?

16              MR. EIDELMAN:  No, the witness may be excused.

17              THE COURT:  Okay.  Thank you very much.  You are

18  excused.

19              THE WITNESS:  Thank you, Your Honor.

20              (WHEREUPON, the witness was excused.)

21              THE COURT:  Let's take a ten-minute break, and you

22  will have your next witness available when we return,

23  Mr. Shearer.  Have him in the courtroom.  Don't talk about the

24  case.

25              THE COURTROOM DEPUTY:  Should I bring number 8 in

1   when they leave?

2            THE COURT:  Yes.

3            (WHEREUPON, at 11:14 a.m., the jury exited the

4   courtroom.)

5            (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Open court; no jury present.)

2          THE COURTROOM DEPUTY:  All rise.

3          (Juror number 8 enters the courtroom; no other

4    jurors present.)

5          THE COURT:  You can sit down anyplace.

6          So, look.  I know you tried to get here, and I guess

7    when you drive you have problems sometimes.  I understand it.

8    But I have to run a tight ship.

9          And I want to thank you for your service, and I am

10   sure you made the best efforts to get here, but you have to

11   understand, we have to run on time.  All right?

12         So you are free to leave, and I hope you didn't have

13   any real untoward problems getting here today.  But you

14   understand a little bit and hopefully have respect for the way

15   the judicial process works, and it is good to have you as

16   almost a juror in this case.  Thank you very much.

17         THE COURTROOM DEPUTY:  All rise.

18         (WHEREUPON, juror number 8 was excused and exited

19   the courtroom.)

20         THE COURT:  Okay.  So before -- we are still on the

21   record.  We are going to reconvene at 11:30.

22         Look, it is not easy to be a litigator, okay, I get

23   it.  But the first couple of witnesses you get your sea legs

24   about how the Judge runs his courtroom.  We are all a little

25   different.  Just like the lawyers are a little different.

1   And, you know, I am going to be very careful to tell the

2   jurors not to take offense to anything that I may say.  I will

3   be evenhanded.  I am going to push Mr. Eidelman along big time

4   because we are not going to have 700 exhibits to impose upon

5   these jurors, in all probability.

6           So you have a sense of where I am coming from.  You

7   may like it, you may not like it, you may give me bad reviews,

8   you may give me good reviews.  Be my guest.  But it is

9   important that you understand we want to know what happened

10  here, okay?

11          So this witness is relevant because he hired him,

12  and I allowed some questions about what his job was, what his

13  salary was.  Fine.  Let's move on with this case.  Okay.  So

14  you understand where I am coming from, okay?

15          See you at 11:30.

16          (WHEREUPON, a recess was had at 11:30 a.m.)

17          (Continued on the next page.)

18

19

20

21

22

23

24

25

*Proceedings* 143

1          (The following takes place out of the presence of

2     the jury.)

3          MR. EIDELMAN:  Judge, before Michael gets the jury,

4     and I apologize, I think Mike pointed it out to you, 311 was

5     actually --

6          THE COURT:  It's the same as 62.

7          MR. EIDELMAN:  It is actually a better exhibit, Your

8     Honor, because 61 and 62 are sort of combined exhibits.  This

9     is one we stipulated to.

10         THE COURT:  Just tell me is 311 the same as 61?

11         MR. EIDELMAN:  No, it is a combined 61 and 62, it is

12    actually the entire agreement that has the signatures.

13         THE COURT:  It's the same but it's the entire one,

14    we'll let it in evidence.  Be mindful of the fact we're going

15    to pare this down and we don't want to overwhelm the jurors.

16    I'll tell them 311 is in evidence.  I see it is right next to

17    61 on this list.  I assume you did it that way to see whether

18    the judge was suffering from dementia at his age.

19         MR. EIDELMAN:  Actually, Your Honor, I'm worried

20    that I was because when you said it wasn't there, I'm

21    panicking of course.

22         THE COURT:  I appreciate it, I need this little test

23    so I won't have to give up the job.

24         MR. EIDELMAN:  Thank you, Judge.

25         THE COURTROOM DEPUTY:  All rise.

*Proceedings*                                                  144

1           (Jury enters courtroom.)

2           THE COURT:  So, members of the jury, while you were

3    out we cleared up a little housekeeping matter.  This

4    mysterious document 311 is really a combination of 61 and 62.

5    So, we're going to allow that into evidence, it's the same, a

6    little duplicative but no harm, you can just make a notation.

7           (Defendant's Exhibit 311 so marked in evidence.)

8           THE COURT:  The other thing I wanted to mention, I

9    intentionally keep my cell phone here -- I don't have it here

10   right now -- because I have 452 cases to manage at the same

11   time so I try to multi-task.  A lot of times I'm doing work

12   here on that little machine that's relevant to these other

13   cases I have to manage.  So, I'm not a fact finder so I can

14   sort of take the liberty to do that, so if you see that

15   happening -- now, it shouldn't ring, that's something I want

16   to guard against, but you may see me look at some other

17   paperwork and cell phones and stuff like that because I'm

18   trying to also take care of other business while I'm managing

19   this trial so you may notice that and with that, let's have

20   our next witness.

21          MR. SHEARER:  We'd like to call Karen Whalen.

22          (Witness takes the stand and is sworn by the

23   courtroom deputy.)

24   K A R E N   W H A L E N, having been first duly

25   sworn was examined and testified as follows:

1          THE COURT:  Keep your voice up, Ms. Whalen.  Check

2    out the mic, make sure you're comfortable with it.  You don't

3    have to swallow it.

4          Let's hear you say:  Good morning, Judge block.

5          THE WITNESS:  Good morning, Judge block.

6          THE COURT:  Everybody hear Ms. Whalen okay?

7          (Jurors nod.)

8          THE COURT:  Your witness.

9          THE COURTROOM DEPUTY:  I ask you to please state and

10   spell your name.

11         THE WITNESS:  Karen Lorraine Whalen, K A R E N,

12   L O R R A I N E, W H A L E N.

13         THE COURTROOM DEPUTY:  Thank you.

14   DIRECT EXAMINATION

15   BY MR. SHEARER:

16   Q    Good morning, Ms. Whalen.

17   A    Good morning.

18   Q    You worked at First Data for 32 years; is that correct?

19   A    That's correct.

20   Q    And primarily in the human resources and training fields?

21   A    Actually 14 -- 13 years in Human Resources and then

22   19 years in other parts of the organization.

23   Q    Are you still at First Data?

24   A    I am not.

25   Q    What was your last position at First Data?

1   A    Senior Vice President of Human Resources.

2   Q    And I recall from your deposition that prior to that you

3   were co-head of Human Resources at First Data?

4   A    That's correct.

5   Q    In your role as the Senior Vice President, your last role

6   at First Data, what were the responsibilities of your

7   position?

8   A    We're called HR business partners, so we work with the

9   leaders of the organization to provide a host of HR services

10  to the organization, things like recruiting, compensation and

11  benefits, leave management, all of those aspects of HR.

12  Q    First Data has a Leave Management Team, correct?

13  A    Yes.

14  Q    And that team manages requests for leave, returning from

15  leave, doing the paperwork; is that correct?

16  A    That is correct.

17  Q    Did the Leave Management Team report to you during your

18  last position?

19  A    No, they did not.

20  Q    But it did earlier in your career with First Data?

21  A    Yes, it did.

22  Q    So, you're familiar with managing the Leave Management

23  Team?

24  A    Yes.

25  Q    First Data is a worldwide company, do people -- employees

1   work remotely while they're traveling at First Data?

2   A    Yes.

3   Q    So, video conferencing is not an unusual event?

4   A    No, it is not.

5   Q    Were you involved in what we are now calling

6   document 311, the independent -- the consulting agreement that

7   we just looked at; were you in here -- I'm sorry, were you in

8   here for Mr. Plumeri's testimony?

9   A    For a portion of it.

10  Q    Okay.  I'll pull it up.

11       This is 311, D 311.

12  Q    Do you recognize this document?

13  A    I actually don't see it.

14       THE COURTROOM DEPUTY:  It's not up there yet.

15       THE COURT:  You want all 311 on the screen?  It's

16  many pages.

17       MR. SHEARER:  No, just a page.

18       THE COURT:  311 is a document of invoices that were

19  billed by Mr. Barger, okay.

20       Next question.

21  Q    Were you involved in the negotiation of an independent

22  contractor agreement between Mr. Barger and First Data?

23       THE COURT:  See whether we can get the sound a

24  little louder for my ears.  Let's make sure we're okay.

25       What is your question, was she familiar with these

1   invoices?

2           MR. SHEARER:  No.

3   Q    The independent contractor agreement between First Data

4   and Steve Barger, were you involved in the negotiation of that

5   agreement?

6   A    I was not involved in the negotiation, no.

7   Q    That agreement was signed by a Vice President of Human

8   Resources, I believe that's Kevin Ward?

9   A    Yes.

10  Q    Do you know Kevin Ward?

11  A    I do.

12  Q    Was he in your reporting group?

13  A    Yes, at that time I was a co-head of Human Resources and

14  Kevin worked for me and Kevin supported Joe Plumeri.

15  Q    Is it usual for a Human Resources vice president to be

16  signing consulting agreements for the sales training team?

17          THE COURT:  Do you have any knowledge as to why he

18  would sign that document if he's not part of Human Resources I

19  guess?

20          THE WITNESS:  It's really because it is a

21  contracting relationship, it's supplementary staff so that's

22  why the Human Resources leader would be involved.

23  Q    How would Mr. Ward have gotten information from

24  Mr. Plumeri as to how much to charge, how much -- what the

25  terms of the agreement should be?

1  A    They probably had a very brief discussion and then Kevin

2  would have worked with our procurement team to -- it's

3  probably a very standard contract that he used.

4  Q    So, First Data had a form independent consulting

5  agreement, is that what you said, standard that --

6  A    A template that they would work from, yes.

7  Q    Now, when independent contractor agreements like this

8  were entered, were there purchase orders that were issued

9  under the agreement, is that how typically an independent

10 contractor would get paid?

11 A    I believe so, a purchase order would be created that

12 would encompass the anticipated expenses under that contractor

13 agreement and then as the invoices came in, they would be

14 signed and applied --

15         THE COURT:  You answered the question.  I don't know

16 what the relevancy is.  Go on to something else.

17         MR. SHEARER:  Your Honor --

18         THE COURT:  Move on.  Move on.

19 Q    Were you involved in the decision to hire Mr. Barger from

20 being a consultant to becoming an employee?

21 A    I was not.

22         THE COURT:  You were not involved with that or you

23 were?

24         THE WITNESS:  I was not.

25         THE COURT:  Okay.  Keep your voice up a little bit

1   so I can hear up better.

2   Q    When you say you're not, does that mean you didn't have

3   the decision to hire him?

4   A    Correct.

5        THE COURT:  Did you have anything to do with hiring

6   him?

7        THE WITNESS:  Executing Joe Plumeri's wish to bring

8   him on, I was not directly involved, it would have been Kevin.

9   Q    What was your relationship internally with Mr. Plumeri at

10  the time, were you supporting Mr. Plumeri from an HR

11  standpoint?

12  A    At that time, no, I was working directly for Frank

13  Bisignano as a co-head of human resources.

14  Q    Would you consider yourself friends with Mr. Plumeri?

15  A    No, colleagues, former colleagues.

16  Q    Did you give him any advice or recommendations as to the

17  salary that --

18       THE COURT:  What difference does it make?  He was

19  hired for $30,000 a month, we heard this already.  I want to

20  know why he wasn't brought back to work, okay.  Get to it.

21       MR. SHEARER:  All right.

22       THE COURT:  Do you have any knowledge about

23  Mr. Barger's effort to come back to First Data to continue his

24  employment after he was out ill?

25       THE WITNESS:  Yes.

1           THE COURT:  You have some knowledge about that.

2    Tell us about that, do you know the circumstances when he

3    tried to come back to work and what happened as a result of

4    his efforts to come back to work, do you have any knowledge

5    about that?

6           THE WITNESS:  I do.

7           THE COURT:  Hold on.

8           You can ask her questions about that.

9           MR. SHEARER:  About the return?

10          THE COURT:  Yes, that's what we're here for.

11          MR. SHEARER:  I'm going to pull up Exhibit 62.

12          THE COURT:  62?

13          MR. SHEARER:  Yes, Plaintiff's 62.

14          THE COURT:  311 is a consolidated 61 and 62.

15          MR. SHEARER:  Plaintiff's 62.

16          THE COURT:  Plaintiff's 62?

17          MR. SHEARER:  Plaintiff's 62.

18          THE COURT:  I'm sorry, the other one was the

19   Defendant's 62.

20          Let's look at the Plaintiff's 62.  Okay.  So you

21   want that in evidence now, there's no objection to it.  62 is

22   in evidence at this time.

23          Go ahead.

24          (Plaintiff's Exhibit 62 so marked in evidence.)

25   Q    Ms. Whalen, can you -- the top email here is an email

1   from Robin Ording to yourself on December 22nd, 2016, correct?

2   A    Yes.

3   Q    And Ms. Ording is advising you that -- is she advising

4   you regarding Mr. Barger returning?

5   A    She's sharing a message that Steve had texted to her that

6   morning.

7   Q    Why would you be getting this?

8   A    The note from Robin or --

9   Q    Yeah, the note from Robin?

10  A    A colleague of mine had sent me a note saying that he

11  bumped into Steve in the elevator in our Atlanta office, said

12  that he looked good and that Steve was planning to return at

13  the end of January.  I was very surprised by this in a very

14  positive way.

15          THE COURT:  Just answer the question.

16          THE WITNESS:  Sure.

17  Q    That's what I was going to ask, were you surprised by

18  that?

19  A    Yes, yes, in a very good way.

20  Q    Because you thought Steve was very ill at that point?

21  A    I did.

22  Q    How did you come to that information?

23  A    Both Tony and Robin had been doing a lot of work with

24  Steve and were keeping in close contact with him while he was

25  ill and at one point I know we had made the decision to pay

1  out Steve's full bonus early in all cash to make sure he had

2  peace of mind based on what he was dealing with at that time

3  so I thought it was -- I was very concerned, it sounded very

4  dire, so I was very pleasantly surprised to hear he was able

5  to get to the office.

6            THE COURT:  You were happy he was going to be able

7  to come back to work?

8            THE WITNESS:  Absolutely, yes.

9            MR. SHEARER:  And then Plaintiff's Number 65.

10           THE COURT:  You want Plaintiff's Exhibit 65 in

11  evidence at this time, correct?

12           MR. SHEARER:  Yes.

13           THE COURT:  Okay.  That's another email, there's no

14  objections to it, it's in evidence at this time.

15           (Plaintiff's Exhibit 65 so marked in evidence.)

16  Q    This is an email on January 4th from Robin to you saying

17  he again says he's coming back, correct?

18  A    Correct.

19  Q    Did you know what date he was required to come back under

20  his leave?

21  A    I did not.

22  Q    Okay.  At this point in time, as we heard in openings,

23  was there a restructuring being planned at First Data

24  regarding terminating employees during -- around January 4th,

25  2017?

1   A    Yes, there was work we were doing in early January around

2   a reduction of the top 3,000 employees.

3   Q    Had you worked on in November and December a reduction of

4   the top 150?

5   A    I don't remember if it was exactly the top 150 but I know

6   we had been talking about the more highly compensated

7   employees.

8   Q    What was your role in planning and implementing these

9   restructurings?

10  A    We would work with our leaders to give them guidelines to

11  talk through the process, to give them data to help them make

12  decisions.

13  Q    Now, were you involved when Mr. Barger provided his

14  physician's return to work authorization to First Data?

15  A    I honestly don't remember.

16  Q    You don't remember.

17          I think I can refresh your recollection.

18          THE COURTROOM DEPUTY:  This is just for the

19  witness?

20          MR. SHEARER:  Yes, this is Plaintiff's Exhibit 73.

21          THE COURT:  You want 73 in evidence?  There's no

22  objection to it.

23          Mr. Shearer, you want 73 in evidence?

24          MR. SHEARER:  Yes, I do.

25          THE COURT:  It's in evidence at this time, there's

1    no objection to it.

2              (Plaintiff's Exhibit 73 so marked in evidence.)

3    Q    If you've got it there in front of you, it's the

4    second email; it is an email from Rhonda Johnson to you and

5    Mr. Marino on January 10th and it indicates that Mr. Barger

6    had delivered his return to work authorization, correct?

7    A    Correct.

8    Q    Mr. Barger had not been terminated as of January 10th,

9    2017?

10   A    Correct.

11   Q    Who planned -- were you involved in how individuals in

12   this top 3,000 were selected to be included in the

13   restructuring or excluded from the restructuring?

14   A    No.  Again, we would really be focused on process,

15   timelines, providing data but not actually deciding on the

16   individuals.

17   Q    What do you mean by "providing data"?

18   A    Information about how many direct reports they had, how

19   many layers of management in the organization, compensation

20   information, that sort of data.

21   Q    Were you involved in compensation planning at First Data?

22   A    Yes.

23   Q    And deciding how much an employee should make in salary,

24   how much they should make in bonus, ranking those by position

25   and rank?

1  A     I want to be sure about what you're asking here.

2  Q     Were you involved in coming up with the criteria that

3  would be used for employee bonus pools at First Data?

4  A     So, we had a bonus plan and it was based on both how the

5  company performed and how the individual performed.

6          THE COURT:  Were you involved in that?  That was the

7  question, were you involved, you know about it?

8          THE WITNESS:  I know about it.

9          THE COURT:  She knows generally about it.

10          Go ahead.

11  Q     When you say company performance, what factors were

12  considered for company performance?

13  A     Revenue, EBITDA, overall earnings.

14  Q     Was net adjusted income considered?

15  A     I -- that's a very technical term, I don't know that I'd

16  be comfortable answering that.

17  Q     Were you involved in the restructuring of the sales

18  transformation group in January of 2017?

19  A     I was.

20  Q     Who initiated that project?

21  A     I'm not certain but it likely would have come from a

22  conversation between Jeff Hack and Christine Larsen.

23  Christine Larsen managed the internal consulting group and the

24  executive would -- an executive would ask for that group to

25  come in and do a bottoms up data analysis.

1    Q    They did that with Robin Ording who was the interim

2    replacement for Mr. Barger?

3    A    Actually it was Pat -- Patricia Hadler who led the

4    internal consulting group working with me.

5    Q    Okay.  Can you explain how you gathered information about

6    the sales training group that Robin organized, was running on

7    the interim basis for Mr. Barger at this point?

8    A    Yes, we interviewed employees at all levels of the

9    organization.  It started with questions as basic as how do

10   you spend your time every day, how much time do you spend on

11   each, how much time do you spend actually in front of

12   employees training them, what kind of quality scores do you

13   receive on the training that you deliver, so all of these

14   basic data elements, and really Pat had responsibility for

15   laying that out in a format that was easy for people to review

16   and digest.

17   Q    Now, did you complete this study after Mr. Barger was

18   notified of his termination or before?

19   A    We had started before, I want to say around Thanksgiving

20   time, so we had started doing data collection then.

21   Q    Were you familiar with Mr. Barger's organization when you

22   started this project?

23   A    No, it was meant to be objective.

24   Q    Did you study the history of Mr. Barger's organization,

25   how individuals ended up there under his management?

1  A    No, that wasn't really relevant in the work that we were

2  doing.

3  Q    The conclusion was that his head count had grown; is that

4  right?

5  A    It was more about the actual head count versus what was

6  needed, it wasn't about how much it had grown.

7  Q    So, he assumed responsibility for Brian Fricke's group,

8  correct?

9  A    Correct.

10 Q    So, was that taken into account, the growth from assuming

11 Mr. Fricke's when you're looking at how -- percentage wise how

12 much his group has grown?

13 A    It was very point in time, it is here's what the company

14 needs and here's what we have and here are the gaps.

15 Q    Other than Brian Fricke, do you know if Mr. Barger's

16 group had assumed responsibility for any other groups within

17 First Data?

18 A    I don't know.

19 Q    Was one of the purposes when you do a restructuring

20 firing employees, is it designed to reduce head count?

21 A    Not always.

22 Q    What other reasons could there be to terminate 362

23 people?

24 A    Sometimes you have a site closure which would mean you're

25 taking resources from one location and potentially moving them

1   to another location.

2   Q    There wasn't a site closure though in this top 3,000,

3   correct?

4   A    Correct.

5   Q    What other reason would there be to fire 362 people?

6   A    Well, in this instance it was about reducing expenses.

7   Q    As part of this process, is there a model created to

8   project an amount of savings from the terminations?

9   A    If you said 10 percent of the top 3,000 employees, you

10  would probably come up with a number; yes, you could come up

11  with an estimate based on their compensation.

12  Q    But that's only if they're not -- somebody isn't rehired

13  the very next day, correct?

14  A    In the case of position eliminations, by definition you

15  wouldn't be hiring the next day for those same roles.

16  Q    But were there hiring freezes implemented at the same

17  time as these reductions were going on?

18  A    There may have been in some areas but given the nature of

19  what First Data does, it would have been difficult to have a

20  hiring freeze.  We have a lot of call center employees,

21  production employees, we have a fairly high turnover rate so

22  you would not put a hiring freeze in place for those kinds of

23  groups.

24  Q    Is there any way to track whether or not positions are

25  refilled after one of these restructurings?

1   A     If it's an identical position to a position that was

2   eliminated, yes, we would be able to track that.

3   Q     When you say "identical," does that mean same title?

4   A     Same job responsibilities, usually same title, yes.

5   Q     But if the title is different, could you track it; I mean

6   if somebody is director of small business training, I'm just

7   coming up with --

8   A     If there were multiple jobs with the same title, the same

9   responsibilities it's more challenging to track obviously but

10  if it's a single job with -- you would be very much able to

11  track that.

12  Q     What was the total -- do you know the number of employees

13  at First Data in 2014 roughly?

14  A     23, 24,000.

15  Q     And about how many at the end of 2017?

16  A     I don't remember.

17  Q     How many reductions in force or restructurings occurred

18  during 2014, 2015, 2016, 2017, the time Mr. Barger was there?

19  A     Restructuring is a very broad term, it could be one group

20  moving pieces to another part of the organization, another

21  location, so there could be numerous restructurings.

22  Q     How many restructurings involving the termination of

23  employees were during that period from 2014 to 2017?

24  A     I don't have a number that I could give you.  Again, it

25  could be a very small restructuring, it could be very broad

1   restructuring.  It really depends on how you want to define

2   it.

3   Q    I want to show you one more thing, this is Defendant's

4   Exhibit 74.

5              THE COURT:  Defendant's?

6              MR. SHEARER:  Yes.

7              THE COURT:  All right.  That's going to be in

8   evidence with no objection to that.

9              (Defendant's Exhibit 74 received in evidence.)

10  Q    This is an email you sent on January 28, 2016, it's

11  called a re-pricing page.  It's got -- I'll have to zoom in on

12  4 here.

13             There we go.  Can you describe what this is that you

14  were distributing on that date?

15  A    We had looked at some of the most highly compensated

16  employees in the company and were looking at their current

17  compensation levels versus a fair market rate for those

18  positions and then, based on that information, making

19  recommendations about what their new compensation level should

20  be.

21             So, for example, in line 4 it's SVP Mid-Market, if

22  you go to I:  It says in 2015 the plan was to be the $639,000

23  and then the last row says 635, right?

24  A    Can I ask you to scroll up so I can see that.

25  Q    You want me to zoom in or scroll?

1  A    I just wanted to see -- thank you.  I just wanted to see

2  the top.

3           Yes, this is the current comp, the comp that was

4  planned for the role, the market data and the recommendation.

5  Q    So, you were recommending reducing salaries of senior

6  vice presidents in 2016?

7  A    Correct.

8  Q    Did you make that recommendation in 2017?

9  A    It wasn't a formal effort like this was.

10  Q    Were these reductions approved in 2016?

11  A    I'm not sure if all of them were.

12  Q    Okay.  Where would this have gone for approval?

13  A    We would have worked with the senior leaders to make the

14  final determinations.

15           MR. SHEARER:  I think that's what I have, thank you.

16           THE COURT:  Do you wish to question her now,

17  Mr. Eidelman?

18           MR. EIDELMAN:  I do, Your Honor.

19           THE COURT:  All right.  Just give me an idea how

20  long you think your questioning will be.  I want to gauge our

21  lunchtime.

22           MR. EIDELMAN:  I don't have that much for this

23  witness.

24           THE COURT:  Let's go.  Let's try to do this before

25  our lunch break then.

1          MR. EIDELMAN:  I'll try and do that, Judge.

2          THE COURT:  Go ahead, Mr. Eidelman.

3          MR. EIDELMAN:  Thank you, Your Honor.

4   CROSS-EXAMINATION

5   BY MR. EIDELMAN:

6   Q    Good morning, Ms. Whalen.

7   A    Good morning.

8   Q    Ms. Whalen, I want to turn your attention briefly to the

9   fall of 2015.  You were an SVP of Human Resources in the fall

10  of 2015?

11  A    Yes.

12  Q    What organizations were you supporting at that point in

13  time?

14  A    Global Business Solutions, our control organization and

15  our CA or chief administrative organization.

16  Q    In the fall of 2015 who was the leader of Global Business

17  Solutions?

18  A    Dan Charron.

19  Q    Do you know the name Jeff Hack?

20  A    I do.

21  Q    Was Mr. Hack also working in Global Business Solutions?

22  A    He was.

23  Q    Do you know who Mr. Barger's supervisor was in the fall

24  of 2015?

25  A    Jeff Hack.

1   Q    By that point in time Mr. Plumeri, who testified earlier

2   today, had stopped being his supervisor?

3   A    That's correct.

4   Q    Okay.  Were there any discussions in the fall of 2015

5   about Mr. Barger's compensation level?

6   A    Yes.

7   Q    What were those discussions in the fall of 2015?

8   A    That it was difficult to justify a salary or total

9   compensation of $730,000 a year for the head of Sales

10  Training.

11  Q    Did you know anything about Sales Training?

12  A    I do, I actually led Sales Training from 1992 to 2000.

13              THE COURT:  Let me interrupt, I'm a little confused

14  because the jury has seen all sorts of invoices that say

15  $30,000 a month, you just said his compensation was 700, maybe

16  you can clarify why there's a difference.

17              THE WITNESS:  Of course, Your Honor.  His base

18  salary was $480,000 and his incentive or bonus target was

19  another $250,000 for a total of 730.

20              THE COURT:  I thought his base salary was $30,000

21  times 12 which is $360,000.  You said 400 something.  I just

22  want to get clarity.

23              THE WITNESS:  As a consultant he was earning 30,000

24  a month.

25              THE COURT:  And then there was additional

1    compensation he received?

2            THE WITNESS:  When he was hired as a permanent

3    employee he was brought to a $480,000 base salary level with a

4    bonus on top of that.

5            THE COURT:  When was he hired in that capacity?

6            THE WITNESS:  In the summer of 2014.

7            THE COURT:  Right.  So, at the time that he got ill

8    and he left he was making something like 350,000 -- what was

9    it?

10           THE WITNESS:  $730,000 was what he was earning in

11   2015.  I'm actually not sure what he was earning when he left.

12           THE COURT:  You don't know how much he was earning

13   when he took his leave?

14           THE WITNESS:  Correct.

15           THE COURT:  So, what's the last knowledge that you

16   have of what his salary was?

17           THE WITNESS:  I'm thinking back to $730,000.

18           THE COURT:  That was what, about a year before he

19   took his leave or six months before or you don't know?

20           THE WITNESS:  That was roughly a year before his

21   leave.

22           THE COURT:  At the time he took his leave, you know

23   nothing about exactly what his salary was at that time?

24           THE WITNESS:  I don't remember.

25           THE COURT:  You have no reason to believe that his

1   salary was reduced, that it may have been the same or more but

2   you don't know for sure.

3            THE WITNESS:  He was part of the list where we

4   recommended a compensation reduction.

5            THE COURT:  When was that recommendation to reduce

6   salaries made?

7            THE WITNESS:  January of 2016.

8            THE COURT:  At that time he was earning $750,000?

9            THE WITNESS:  $730,000.

10           THE COURT:  All right.  I just wanted to get that

11  clear because I was a little confused.

12           Anything else?

13           MR. EIDELMAN:  No, that's fine.  Thank you, Your

14  Honor, for that clarity.

15  BY MR. EIDELMAN:

16  Q    So, did you have discussions with Mr. Charron and

17  Mr. Hack about Mr. Barger's compensation adjustment or that

18  there would need to be a compensation adjustment in 2015?

19  A    Yes, we had had brief conversations just that it was very

20  difficult to justify that compensation level for the role.

21  Q    Were there any discussions in the fall of 2015 about

22  Mr. Barger's search for a successor?

23  A    Yes.

24  Q    What were those conversations?

25  A    The view was that Steve was a strong motivational speaker

 1   but he wasn't a strong operator of a team so he really wasn't

 2   effective at managing a good size team of employees.  There

 3   were -- his employees were actually approaching one of the HR

 4   folks who worked for me and they were looking for answers,

 5   they were having some difficulty getting guidance from Steve,

 6   from Mr. Barger at that point in time.

 7   Q    Ms. Whalen, in front of you there's a black binder, do

 8   you see that --

 9   A    I do.

10   Q    -- of the Defendant's Exhibits.

11        Can you turn to Defendant's Exhibit 71 please?

12        THE COURT:  All right.  Did you find it?

13        THE WITNESS:  I have it.

14        THE COURT:  So, you're referring to it now, there's

15   no objection, I assume you want it in evidence, Mr. Eidelman.

16        MR. EIDELMAN:  Yes, Your Honor, thank you.

17        THE COURT:  At this time in evidence.

18        (Defendant's Exhibit 71 received in evidence.)

19   Q    Ms. Whalen, can you identify Defendant's Exhibit 71

20   please?

21   A    Yes, I can, it is an email from Rhonda Johnson who worked

22   for me talking about an upcoming talent review for the Global

23   Business Solutions organization.

24   Q    What is a talent review?

25   A    We sit down and talk about leaders in a very open honest

1   way, their strengths, weaknesses, what we can do to develop

2   them further as leaders.

3   Q    And Ms. Johnson, who is sitting over here in the

4   courtroom today, she's the vice president that worked for you

5   as an SVP?

6   A    She is.

7   Q    And Ms. Johnson is providing some information to you

8   about her conversation with Jeff Hack; is that correct?

9   A    It is.

10  Q    And what is she telling you about the review of

11  Mr. Barger from a talent review perspective for his team?

12  A    That we were working on identifying a successor for that

13  particular role so we weren't actually going to talk about

14  that in the talent review, we were working that item

15  separately.

16  Q    Ms. Johnson also tells you in this email that not only

17  are you working on identifying a successor but you anticipate

18  a short tenure; short tenure for whom?

19  A    For Mr. Barger.

20  Q    And this is in the fall of 2015?

21  A    Correct.

22  Q    Do you know when Mr. Barger was diagnosed with throat

23  cancer?

24  A    Mid-2016 from what I understand.

25  Q    Did the conversation about reducing Mr. Barger's

1   compensation occur prior to or after First Data was notified

2   or that he knew that he had been diagnosed with cancer?

3   A    Prior to.

4   Q    Did the discussions about finding a successor for

5   Mr. Barger occur prior to or after his diagnosis for cancer?

6   A    Prior to.

7   Q    Was Mr. Barger aware of the discussions regarding the

8   need to search for his successor?

9   A    Yes, he was.

10  Q    Could you please turn to Defendant's Exhibit 182.

11          THE COURT:  Do you have it?

12          THE WITNESS:  I do.

13          THE COURT:  You want that in evidence I take it at

14  this time?

15          MR. EIDELMAN:  Yes, Your Honor please.

16          THE COURT:  No objection, in evidence.

17          (Defendant's Exhibit 182 received in evidence.)

18  Q    Ms. Whalen, Mr. Shearer was asking you some questions

19  about a transformation review that you were involved with

20  along with Pat Hadler.  Do you recall that testimony?

21  A    I do.

22  Q    And you said that that process started in mid-November

23  of 2016 and it carried over into 2017; is that correct?

24  A    Correct.

25  Q    And at some point in time there would have been a work

1   product that was prepared as part of that, correct?

2   A    Yes.

3   Q    Is this the work product that was prepared in connection

4   with the review of the Sales Training group?

5   A    This is one of the work product, this is really the

6   entire data set.  So, after we had gathered a whole lot of

7   data, Pat Hadler laid it out in this format so that we could

8   look at it with a completely objective lens and make some

9   assessments and recommendations.

10  Q    Can you turn about halfway, and I apologize they're not

11  page number, about halfway through Defendant's Exhibit 182 to

12  the page that's marked Sales Transformation 2017 Planning

13  December 2016.

14  A    I see that.

15  Q    And do you know when, Ms. Whalen, Mr. Barger went out on

16  leave?

17  A    He went out on leave in November of 2016.

18  Q    And do you know when he submitted his -- and I think

19  Mr. Shearer asked you this, when he submitted his return to

20  work authorization from his physician?

21  A    Yes.

22  Q    When was that?

23  A    January 10th.

24  Q    Of 2000 and?

25  A    17.

1  Q    17.  So, the document I've got you focused on, the sales

2  transformation planning document, this was December 2016, this

3  is while Mr. Barger was on leave but before he had indicated

4  or submitted an authorization to return to work, is that

5  correct?

6  A    Correct.

7  Q    And on the second page of this document, and you'll see

8  to save paper we went front to back, there are some

9  recommendations that are listed there, do you see that under

10  the executive summary?

11  A    Yes, I do.

12  Q    What is the first recommendation in the executive

13  summary?

14  A    Realign resources to better meet business needs and

15  structure, reduce 25 incumbents/open roles for $2.2 million

16  year-over-year save.

17  Q    Okay.  And then if you go to the last page of this

18  document which is:  Sales transformation actions planned total

19  approximate 2.2 million year-over-year save, do you have that?

20  A    The last page -- yes.

21  Q    And what does this table represent?

22  A    These are both actual people impacts, so people that

23  would be notified of a position elimination as well as open

24  roles that we would close.

25  Q    And were these the recommendations that were being

1   discussed in December of 2016 prior to the time that

2   Mr. Barger submitted his authorization to return to work?

3   A    Yes.

4   Q    Was Mr. Barger's name included in the recommendations to

5   achieve those cost savings?

6   A    Yes.

7   Q    And where does his name appear on this document?

8   A    Under open roles.

9   Q    I have it on the screen now, Ms. Whalen, is that where

10  you identified Mr. Barger being on this document?

11  A    Yes.

12  Q    And what is the recommendation in December of 2016 prior

13  to the time Mr. Barger submits his authorization to return to

14  work?

15  A    To eliminate the role.

16  Q    I'd ask you if you would, Ms. Whalen, to turn to

17  Defendant's Exhibit 14 -- D 214?

18          THE COURT:  D 214, there's no objection, that's in

19  evidence at this time.

20          MR. SHEARER:  Thank you, Your Honor.

21          (Defendant's Exhibit D 214 received in evidence.)

22  Q    Ms. Whalen, Mr. Shearer was asking you some questions

23  about the process by which the lists were being created for

24  the elimination of 10 percent of the top 3,000 most highly

25  compensated employees, do you recall that testimony?

1   A    Yes.

2   Q    Can you just describe briefly for the jury what

3   transpired over the course of that weekend in which the

4   members of GBS who you were responsible for selected their

5   candidates to be included or their employees or managers to be

6   included in that reduction in force?

7   A    Yes, we had provided Dan Charron, Jeff Hack information

8   about their top 3,000 employees, so there was a portion of the

9   3,000 that was relevant to that particular business.  We gave

10  them lists.  I walked them through a process and expected

11  timelines and then they in turn submitted back their lists,

12  their recommendations.

13  Q    Did you see a list that included Mr. Barger's name?

14  A    I did.

15  Q    You have D 214 in front of you?

16  A    I do.

17  Q    What day is D 214 dated please?

18  A    January 9th.

19  Q    Who is this document from and who is it to?

20  A    This is from Jeff Hack to Dan Charron and myself listing

21  out who he is recommending or whose positions are recommended

22  for elimination.

23  Q    And is Mr. Barger's name on this list?

24  A    Yes, it is.

25  Q    He's number 2?

1    A    Correct.

2    Q    When you saw this list did you question Mr. Barger's

3    inclusion on the list as a Senior Vice President of Human

4    Resources?

5    A    No, I did not.

6    Q    Why not?

7    A    We ask our leaders to make the difficult decisions to put

8    the list together because it is the right thing to do, it is

9    the right decision to make for the company and my job is

10   really to then put them through our legal team and others to

11   make sure they're fully vetted.

12   Q    Was Exhibit 214, the date of Exhibit 214, is that before

13   or after Mr. Barger submitted his authorization to return to

14   work?

15   A    Before.

16          MR. EIDELMAN:  Your Honor, may I have a minute to

17   consult with my colleague?

18          THE COURT:  You may.

19          (Pause in the proceedings.)

20   Q    Ms. Whalen, how long has it been since you worked at

21   First Data?

22   A    Nineteen months.

23   Q    And why did you leave First Data?

24   A    I was offered a great opportunity to lead HR for an

25   executive whom I'd worked for at First Data actually.

1   Q    You mentioned in your earlier testimony that Robin Ording

2   when Mr. Barger went out took over some of the -- basically

3   managing the Sales Training group?

4   A    Yes.

5   Q    Was Ms. Ording doing this on a full-time basis?

6   A    No, Robin had a full-time day job so she took this on in

7   addition to her day job, as I'll call it.

8   Q    In Mr. Shearer's opening statement he described the RIFs

9   that he asked you about as a Ferris wheel where people just

10  get on and off and then it's just a subterfuge.

11          Is that true, is that what RIFs are used for at

12  First Data?

13  A    Not at all.

14  Q    So, when First Data engages in a restructuring that may

15  involve a reduction in force, what are those monies used for?

16  A    So, the money is really to -- so, in some cases I would

17  say it's really for the benefit of the company's performance

18  overall to flow through to the bottom line, that's really a

19  big benefit but sometimes you cut in some areas to invest in

20  other areas, where in the technologies base, as we all know

21  every day, there are all new skill sets and they continue to

22  evolve.  So, sometimes you'll downsize in one area to be able

23  to invest in other areas.

24  Q    Have you ever seen a RIF -- while you were at First Data

25  had you seen a RIF like this one that was a targeted focus on

1   10 percent of the top 3,000 employees, most highly compensated

2   employees?

3   A    This one was different, I had not seen one like this.

4   Q    Was Mr. Barger included in the 10 percent of the top

5   3,000 reduction in force because he had throat cancer?

6   A    Absolutely not.

7   Q    Was Mr. Barger included in the 10 percent of the top

8   3,000 reduction in force because he had taken leave?

9   A    Absolutely not.

10  Q    Was Mr. Barger included in the 10 percent of the top

11  3,000 reduction in force because he had submitted an

12  authorization to return to work?

13  A    No.

14  Q    In fact, isn't it correct that Mr. Barger's name was

15  included in the elimination before he submitted his

16  authorization to return to work?

17  A    Yes that's correct.

18        MR. EIDELMAN:  I have no further questions.

19        THE COURT:  Any redirect, Mr. Shearer?

20        MR. SHEARER:  Yes.

21  REDIRECT EXAMINATION

22  BY MR. SHEARER:

23  Q    You testified in my last examination that you had been

24  notified on December 22nd and January 7th that Mr. Barger was

25  returning to work by email, is that correct?

1   A    That is what people were communicating to me, I had no

2   knowledge of that to be factual.

3   Q    Was Mr. Barger included in this restructuring because he

4   had notified you of his intent to return by January 7th and

5   December 22nd?

6   A    No.

7   Q    No.  Why then was he -- he was included because you did

8   this short-term, the Sales Training group review, is that

9   correct?

10  A    That was one of the factors but that was going on well in

11  advance of knowing whether or not Steve was returning to work.

12  Q    Now, in the fall of 2015 you testified that Mr. Barger

13  needed to take on more responsibilities to justify his salary,

14  correct?

15  A    Correct.

16  Q    Then a year later you're saying that his sales force --

17  that his group is too large and that's the Sales Training

18  group restructuring, correct?

19  A    The reason it was large is because it was inefficient.

20  Q    You also testified that you don't know whether he

21  assumed -- whether he took on additional groups beside Brian

22  Fricke in between being told to take on more responsibilities

23  and being told later that his group was too big, right?

24  A    It's a Sales Training function so even if --

25  Q    But is everybody on that list a Sales Training person?

1   Didn't he take on some call centers in 2016?

2   A    I'm unaware of that.  We had an Operations Training group

3   that was separate.

4   Q    You didn't look to see whether he was taking on

5   additional responsibilities as requested in the fall of 2015

6   before you had decided to criticize the size of his group?

7   A    It would have to be a material increase in the scale and

8   scope of the goal to justify that compensation.  Adding a

9   couple of training groups would not have been material enough

10  to warrant that comp.

11  Q    What would be material?

12  A    Responsibility for a line of business.

13  Q    But you didn't look at reducing his salary either, more

14  commensurate with the responsibility that he had?

15  A    I believe we did look at the salary as part of that

16  January 2016 compensation re-pricing exercise.

17  Q    So, if you do the restructuring that you're going to, as

18  you described it, you cut from one area and you invest in

19  another?

20  A    Uh-huh.

21  Q    When you say invest in another, I think that means hire

22  people in another, is that what it means?

23  A    Probably.

24  Q    So why is it if you're going to fire here and hire here

25  mean that you don't have to restore Mr. Barger to his position

1  or an equivalent position?

2  A    When I talked about de-investing in one area and

3  investing in another, it's about skill sets and capabilities,

4  not -- it's not easy to take an HR -- a Senior Vice President

5  of HR and make me a Senior Vice President of Finance, that

6  just wouldn't work.  So, if you're going to move people

7  around, they have to have the skill sets to be able to do that

8  other job.

9  Q    Why is it limited to that new job?  Why aren't they

10  entitled to their position or an equivalent position?

11       Why couldn't you restore him to a different job when

12  he came back?

13  A    If there wasn't a job that existed at that compensation

14  level for which Mr. Barger had the skill set it wouldn't make

15  any sense.

16  Q    Here is the first page of Plaintiff's Exhibit 4, do you

17  see that?

18       THE COURT:  This is Exhibit 4, just one second.

19  It's the first time it's being mentioned I suspect.  You want

20  that in evidence?

21       MR. SHEARER:  Yes, I do, Your Honor.

22       THE COURT:  Okay.  We'll allow it, no objection.

23       (Plaintiff's Exhibit 4 so marked in evidence.)

24  Q    Ms. Whalen, do you recognize this document?

25  A    I do.

1   Q    Can you tell us what it is?

2   A    It's the U.S. FMLA policy from I believe our employee --

3   the First Data Employee Handbook.

4   Q    Okay.  I'm going to go to page two.  This says, the

5   bullet under Pay While on Leave:  While on leave an OA -- and

6   an OA, can you tell us what that is?

7   A    What specific --

8   Q    What does OA stand for?

9   A    Owner associate.

10  Q    Okay.  And that's what you call an employee?

11  A    At First Data, yes, they refer to employees as owner

12  associates.

13  Q    So:  While on leave an owner associate's job is

14  protected.

15          Is there an exception here for a restructuring?

16  A    I am not an expert on FMLA, I would not pretend to be.

17  There are legitimate exceptions when positions are eliminated.

18  Q    But was his position eliminated or his duties moved?

19  A    Both, so by having another leader absorb that work you're

20  now paying just one leader so you would have --

21  Q    So, while he was out on leave you learned you could get

22  by without him so you just eliminated his position, is that

23  what happened?

24          THE COURT:  If you can answer that?  I don't know

25  whether you can.

1    Q    On --

2              THE COURT:  Just a second.

3              He wants to really flush out the reasons why he was

4    not returned to work.  That's what he's questioning you about.

5              Is there another position he could have been placed

6    into?  Is there something else he could have done to avoid

7    having his position eliminated?  I think that's the thrust of

8    that.  Answer that and then I think we want to take our lunch

9    break.

10             THE WITNESS:  Yes, Your Honor.

11             So, yes, it was a legitimate position elimination

12   based on facts.

13             THE COURT:  That's the best you can do, okay.

14             Now, Mr. Shearer, it's getting close to lunch time.

15             MR. SHEARER:  I just have one more question.

16             THE COURT:  That's all you have, all right.

17   Q    On the issue of the successor, First Data has succession

18   plans for management, right; you try to develop management so

19   that if a manager leaves, there's someone to take their spot,

20   is that correct?

21   A    Yes, I wouldn't say it's formal.

22   Q    But successor doesn't mean replacement, does it?

23   A    It can, yes.

24   Q    I mean Mr. Barger was looking for his replacement, is

25   that what you're saying?

1   A    Initially the -- so, back in 2015, I'm going to say fall

2   of 2015 there were conversations with Steve about finding a

3   successor, the reason being that he was not an effective

4   manager of an organization of that size and I think initially

5   the conversations were about finding Mr. Barger another more

6   sizeable role commensurate with his compensation.

7   Q    But in 2015 he had just assumed Brian Fricke's group and

8   Brian Fricke -- because Brian Fricke resigned, isn't the

9   successor they're talking about in 2015 the replacement for

10  Brian Fricke, not Mr. Barger?

11  A    So, at that point -- I believe Mr. Fricke left either in

12  late 2014 or early 2015, the time that I'm talking about was

13  specifically when Mr. Barger was running the Sales Training

14  organization.

15  Q    Just one more document, this is Plaintiff's Exhibit 19.

16          THE COURT:  In evidence at this time.

17          (Plaintiff's Exhibit 19 so marked in evidence.)

18  Q    Just right here, there in the middle, this is in 2016; so

19  we're back on the successor discussion again in 2016, correct?

20  A    Correct.

21  Q    And you write:  I agree that we should pursue a successor

22  who can serve as Steve's right-hand for an extended period of

23  time.  There's a significant gap between Steve and his current

24  directs.

25          Right?

1   A    Correct.

2   Q    And the reason for the gap is because Fricke is gone,

3   isn't it?

4   A    It's part of the gap but I would say that it was more

5   that Steve was operating more -- he wanted to be out in the

6   field and speaking to large groups and we actually needed a

7   leader to manage the function day-to-day.

8   Q    Brian Fricke's group came into him after he was hired,

9   right?

10  A    Correct.

11  Q    So, he had a job other than the Sales Training group, the

12  Sales Training group was added to his other duties?

13  A    Correct.

14  Q    And so the Sales Training group was added to Robin

15  Ording's duties, is that what happened?

16  A    On an interim basis, yes.

17  Q    Was it then transferred on a permanent basis to Robin

18  Ording?

19  A    Yes.

20  Q    So, the Sales Training group just keeps moving around but

21  somebody is still running it?

22            THE COURT:  Wait a second, this is not summations.

23  This is not the time to argue your case.

24            MR. SHEARER:  No, Your Honor.  I think that's all I

25  need.

*Proceedings*                                        184

1           THE COURT:  All right.

2           Mr. Eidelman, anything else you wish to ask?

3           MR. EIDELMAN:  No, Your Honor, the witness is

4    excused.

5           THE COURT:  You may step down.

6           Thank you very much.

7           THE WITNESS:  Thank you.

8           (Witness steps down.)

9           THE COURT:  This is a good time to break for lunch.

10   We'll reconvene let's say about 2:00.

11          Don't talk about the case and we'll have another

12   witness when we return.

13          (Jury leaves courtroom.)

14          THE COURT:  All right, the jury is out.

15          So, Mr. Shearer, who is your next witness going to

16   be?

17          MR. SHEARER:  I need to talk to you guys -- I need

18   to talk to them, I thought I was going to get through -- I

19   thought it was going to last longer.

20          THE COURT:  You should have known more about how

21   Judge Block conducts his trials.

22          MR. SHEARER:  Yes.

23          THE COURT:  Just one second, Mr. Shearer, please,

24   the reporter is writing everything down, we can't have cross-

25   conversation.

*Proceedings*                                                                    185

1              You want to call somebody else next?

2              MR. SHEARER:  I need to discuss, either Rhonda

3       Johnson or Anthony Marino.

4              THE COURT:  So, we'll have the next person.

5              MR. EIDELMAN:  One more thing I may suggest,

6       Mr. Shearer has deposition testimony that he wants to read

7       into the record at some point in time, in terms of when we

8       should factor that in.

9              THE COURT:  We'll have somebody here, we're going to

10      have a full day to move this trial along.

11             See you at 2:00.

12             (Counsel confer.)

13             (Luncheon recess taken.)

14             (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

*Proceedings*                                                    186

1              (The following takes place out of the presence of

2   the jury.)

3              THE COURT:  Mr. Shearer, do you have your next

4   witness ready?

5              MR. SHEARER:  Yes, I am ready, Your Honor.

6              THE COURT:  Where is he or she?

7              (Witness approaches.)

8              THE COURT:  This is going to be the next witness,

9   come up here.

10             Let her sit up here so we're ready to go.

11             MR. SHEARER:  Rhonda Johnson.

12

13             THE COURTROOM DEPUTY:  All rise.

14             (Jury enters courtroom.)

15             (Witness takes the stand and is sworn by the

16   courtroom deputy.)

17             THE COURTROOM DEPUTY:  Please have a seat.  I ask

18   you to please state and spell your name.

19             THE WITNESS:  Rhonda Johnson, R H O N D A,

20   J O H N S O N.

21             THE COURTROOM DEPUTY:  Thank you.

22             THE COURT:  Your witness, Mr. Shearer.

23             MR. SHEARER:  Thank you.

24   R H O N D A   J O H N S O N, having been first duly

25   sworn was examined and testified as follows:

1   DIRECT EXAMINATION

2   BY MR. SHEARER:

3   Q     Ms. Johnson, what was your position at First Data while

4   Mr. Barger was there, 2014 to 2017?

5   A     HR business partner.

6   Q     Real quickly, can you just explain what an HR business

7   partner does?

8   A     Partner with the leaders around the organization and

9   basically the HR needs for their organization.

10  Q     That's a liaison position between the HR team and the

11  business team?

12  A     Yes.

13  Q     Okay.  When did you start working as Mr. Barger's HR

14  generalist?

15  A     Approximately late summer of 2015.

16  Q     Do you know who his generalist was before you?

17  A     I'm not sure who was just before me.

18  Q     Why did you become his HR generalist?

19  A     He started reporting to Jeff Hack.

20  Q     So, when Mr. Barger started reporting to Jeff Hack you

21  became the generalist because you supported Jeff Hack, is that

22  right?

23  A     Yes, and Jeff had various other SVPs reporting to him so

24  I supported all the SVPs reporting to Jeff.

25  Q     Now, when you got there -- soon after you got to

1   supporting Mr. Barger this question of a successor started

2   coming up; is that correct?

3   A    Correct.

4   Q    Why did you recommend that a successor be appointed?

5   A    There were a lot of organizational gaps that were very

6   apparent within Steve's organization, his attrition rate was

7   well over 40 percent and he continued to have positions that

8   were open for long periods of time.

9   Q    And this is when, around what time in 2016 were you

10  recommending this, the new successor?

11  A    I don't remember the exact time frame but I believe that

12  was 2015.  Initially it was 2015, late 2015, not long after I

13  started supporting Steve's group.

14  Q    And you know that he had assumed Mr. Fricke's Sales

15  Training group before you became the generalist?

16  A    To me it was just one organization, it was just the sales

17  organization group.  There was no other group.  It was one

18  team.

19  Q    This is Plaintiff's Exhibit 20, it's an email from --

20            THE COURT:  20?

21            MR. SHEARER:  -- July 21st.

22            THE COURT:  Plaintiff's Exhibit's 20?

23            MR. SHEARER:  Yes.

24            THE COURT:  In evidence at this time.

25            (Plaintiff's Exhibit 20 so marked in evidence.)

1    Q    In this email --

2              THE COURT:  Mr. Shearer, you have to speak up

3    because we're recording everything we say.

4              MR. SHEARER:  Yes, I'm sorry, Your Honor.

5    Q    In this email you say that you need to have a quick

6    search for Mr. Barger's successor and in it you mention

7    that -- in the part that's hard to read there it says that you

8    need to speak with him over the next two weeks -- he was hired

9    to focus on sales transformation, when Brian Fricke left Steve

10   assumed that role.

11             So, did you know he had assumed Brian Fricke's Sales

12   Training group in July of 2016?

13   A    Yes, I was informed that the sales team moved under

14   Mr. Barger.

15   Q    So, that's the gap, Brian Fricke is gone, that's the gap

16   you're trying to fill?

17   A    No.

18   Q    Then what are you trying to --

19   A    There was no other employees.  It's one role.  There's

20   no -- there's not two divisions of work, it was just one group

21   of work.  It was a Sales Training team.

22   Q    Both Mr. Barger and Brian Fricke were employed at the

23   same time, correct?

24   A    My understanding is yes.

25   Q    And they each had different jobs?

1   A    I'm not familiar with what Steve's job was before but --

2   other than what I've heard here, yes.

3   Q    Now, Mr. Barger had surgery on September 6th.  Did you

4   work -- then he recovered in the hospital and then he came

5   home.

6             Did you work with him while he was in the hospital?

7   A    Steve reached out to me frequently.

8   Q    Did he participate in hiring and firing decisions for the

9   Sales Training group while he was in the hospital?

10  A    I would say that -- well, by participate, he didn't make

11  decisions necessarily one-on-one, he would -- we had to look

12  at some of the group and make recommendations so we'd send

13  those over to Steve, you know, so he'd be aware.

14  Q    But were those recommendations for Steve to approve?

15  A    I don't recall if Mr. Hack or if Barger.

16  Q    This is Plaintiff's Exhibit 27, Plaintiff's Number 27, an

17  email of October 12th.

18            THE COURT:  Which exhibit now?

19            MR. SHEARER:  27, Plaintiff's 27.

20            THE COURT:  27.

21            MR. SHEARER:  Yes.

22            THE COURT:  In evidence at this time.

23            (Plaintiff's Exhibit 27 so marked in evidence.)

24  Q    And in this, this one I'm showing you here from James

25  Brit to you.

1    A    Yes.

2    Q    There's a call scheduled today with Steve to hear what he

3    has to say and that's on a hiring decision inside of his

4    group, isn't it?

5          Down at the bottom email, you're not on but it is a

6    description of all the possibilities to fill a role within

7    Mr. Barger's organization?

8    A    Yes, I see various positions outlined below.

9    Q    And you're seeking Steve's input while he's in the

10   hospital?

11   A    I said that it looks like there is a call with Steve

12   today, that I will join, I wasn't his HR partner at this time,

13   this had transferred to Ed Stutz.

14   Q    Well, then Mr. Barger comes back from the hospital; did

15   you work with him at all when he was at home recovering?

16   A    Steve would text me and write to me frequently.

17   Q    I don't know what that means.  What do you mean, he would

18   text you about what?

19   A    Various things.  Sometimes he'd give me an update on how

20   he was doing, other times he would text me questions that he

21   may have around paperwork or other questions.

22   Q    And this is before he was on leave he was contacting

23   you?

24   A    Yes.

25   Q    Now, around November 16th of 2016 you emailed Jeff Hack

1   asking for his permission to force Steve on to a leave of

2   absence, correct?

3   A    No.

4   Q    No.

5   A    I would not say force.

6   Q    Okay.  I'm going to pull up, this is Plaintiff's 28.

7             THE COURT:  28 in evidence now.

8             (Government's Exhibit 28 so marked in evidence.)

9   Q    This is an email from you to Jeff Hack on November 16,

10  2016.  It seems you've gotten Tony's approval and Karen

11  Whalen's approval and you're asking Tony to call Steve up or

12  get a hold of Steve and make him go on leave, is that right?

13  A    I can't make that determination.

14  Q    Well, you wrote this, what were you trying to do?

15  A    So, I was outlining the concerns that we were having with

16  Steve's team, that they continuously came to me about, you

17  know, not having day-to-day management and the concerns that

18  that was causing within the team.

19  Q    So, was Steve supposed to be managing them?

20  A    Yes.

21  Q    And there were concerns about a lack of management, they

22  couldn't get a hold of him; what were their concerns?

23  A    There was a lack of day-to-day management, no decisions,

24  there were frequently emails that would not be answered for

25  quite sometime and then they'd be older emails so situations

1   had already been resolved.

2   Q    Are there any written documents in Mr. Barger's personnel

3   file to reflect that?

4   A    I wouldn't know, I didn't manage Mr. Barger.

5   Q    Okay.  Who would have had those documents?

6   A    Jeff Hack managed Mr. Barger.

7   Q    Who kept his personnel records?

8   A    If the manager had anything they would put it in the

9   personnel records.

10  Q    But doesn't HR maintain personnel records?

11  A    Everything doesn't come through myself, we have an

12  HR Service Center.

13  Q    And that's part of the Human Resources Team, correct?

14  A    Correct.

15  Q    Now, in this email you also say at the end, the last two

16  lines of that first paragraph you say that Steve is able to

17  set up a video chat, he likes to work using video chats,

18  right?

19  A    Yes.

20  Q    Had you spoken to him using a video text chat?

21  A    He had reached out to me, I was no longer his HR partner

22  but he reached out to me for a finance issue and said that the

23  issue would not have occurred when I was his HR partner and

24  asked that I help resolve the finance issue with his finance

25  partner.

1  Q    And then Tony did contact Mr. Barger and provide him

2  leave of absence forms to complete, is that correct?

3  A    I don't know if Tony provided the forms.  I believe the

4  HR Service Center sent the forms over but, yes, Tony reached

5  out to him is my understanding.

6  Q    And then -- that was on -- do you know the date?

7  A    I do not.

8  Q    But on November 21st you offered to help Mr. Barger fill

9  out his leave of absence forms, correct?

10 A    Mr. Barger reached out and asked if I would help him fill

11 out the forms, he said he had a lot of questions and needed

12 some help.

13 Q    I'm just pointing to Exhibit 30, I think that is correct,

14 he asked you owe -- this is the email that you're talking

15 about, correct?

16 A    Yes, he said:  Will you help me with these papers today?

17 Q    Okay.  Did you help him?

18 A    I did.

19 Q    Were the papers complicated?

20 A    No.

21 Q    What were the papers, do you remember?

22 A    I think, you know, other than your name, maybe your

23 doctor's name and contact information might have been on it.

24 I am not familiar with the leave paperwork, I generally don't

25 handle that.

1  Q    This is Plaintiff's Exhibit 37.

2         THE COURT:  In evidence.

3         (Plaintiff's Exhibit 37 so marked in evidence.)

4  Q    This is an email from you to Jennifer Voycheske on

5  November 23rd.

6         Who is Jennifer Voycheske?

7  A    She was the manager of the HR Service Center, they

8  handled our leave and our benefits.

9  Q    You say:  Attached are the forms Steve signed on Monday.

10        Are those the forms that you helped fill out?

11 A    Yes, it says:  I sent the certification paperwork to his

12 doctor.

13 Q    Okay.  Attached to that is this form, it's a Met Life

14 form?

15 A    Yes.

16 Q    Do you know what this form was for?

17 A    So, it's I assume one of the paperworks he needed to fill

18 out for his leave.

19 Q    And then the next one that his signature is down here on

20 November 21st, do you know what this document is?

21 A    Again it looks like the same document.

22 Q    Okay.  What's the second bullet, see the second bullet

23 there?

24 A    Uh-huh.

25 Q    It says:  The eligibility for job restoration.  It says:

 1    If I'm on FMLA leave and/or leave under any other federal,

 2    state or local law and I return to work prior to the

 3    exhaustion of that approved leave, I will be restored to my

 4    same or equivalent position, correct?

 5    A    Correct.

 6    Q    And this is the form that you asked Mr. Barger to sign?

 7    A    No, this is the standard form for leave.  I didn't ask

 8    him to sign it.  It was sent to him just like anyone else who

 9    applies for leave and he asked me to help him with the

10    paperwork.  The only thing I filled out was the top for his

11    employee ID number, that information at the top.  I told him I

12    cannot sign this paperwork, he would have to sign the

13    paperwork but this is the standard paperwork that is sent to

14    all employees.

15    Q    Did you and Jennifer Voycheske work back and forth trying

16    to get the forms done and trying to get the leave approved?

17    A    I wouldn't say get the leave approved.  Steve

18    continuously texted me and asked for help with the information

19    so I reached out to Jennifer because, again, I don't handle

20    the benefits so I asked Jennifer if she would help Mr. Barger.

21    Q    Now, on December 15th, so this is several weeks later,

22    Mr. Barger's leave was approved, do you remember that?

23    A    I do.

24    Q    And the LOA, the leave of absence, called the LOA system

25    at First Data, correct; it sent a note to Jeff Hack that said

1  the leave is approved, do you remember?

2  A    I believe so.  Again, I don't generally handle the

3  leaves, that's all centralized with our benefits.  I only

4  helped Steve because he asked --

5           THE COURT:  The question is was the leave approved,

6  yes or no?

7           THE WITNESS:  Oh, yes.

8  Q    I want to go to Plaintiff's 44.

9           THE COURT:  Plaintiff 44 you want?

10          MR. SHEARER:  Yes.

11          THE COURT:  Okay, in evidence, no objections.

12          (Plaintiff's Exhibit 44 so marked in evidence.)

13 Q    So, this is on December 15th and Voycheske informs you

14 that they're still working on short-term disability but it's

15 been approved and an email has gone to his manager upon the

16 approval and why is she informing you if you are not his HR

17 person?

18 A    Because Steve asked if I would make sure that his

19 paperwork was done and what was the next steps and where they

20 were, he constantly had questions so he'd text me, so I

21 replied to Steve so he would be kept up to date.

22 Q    Okay.  Then on the 21st you directed Jennifer Voycheske

23 to cut off Mr. Barger's access to the First Data systems, is

24 that right?

25 A    I don't remember the date but yes.

1    Q    Okay.  This is Plaintiff's 60.

2            THE COURT:  6-O?

3            MR. SHEARER:  6-O.

4            THE COURT:  In evidence.

5            (Plaintiff's Exhibit 60 so marked in evidence.)

6    Q    I'm going to start at the bottom here.  This email at the

7    bottom is from Jean, J E A N, Wyatt, W Y A T T, you're cc-d on

8    this and this is -- who is Jean Wyatt?

9    A    She was one of the admins in Human Resources.

10   Q    This is when she said you've given the direction to cut

11   prove Barger's access, correct?

12   A    Correct.

13   Q    In response, HR Solutions -- what's HR Solutions?

14   A    It's the same as HR Service Center.

15   Q    Okay.  And could that be Jennifer Voycheske, could that

16   be?

17   A    Could be, it could be anyone in the HR Service Center but

18   there are names attached here.

19   Q    And they say:  Shutting off access for someone on a leave

20   of absence is not something we normally do.

21           Correct?

22   A    I was not aware of that, yes.  I thought it was a

23   standard protocol that you shut off access when someone was on

24   a leave.

25   Q    Then you responded that you'll get back to them and you

1    said it was a sensitive issue.

2            What was sensitive?

3    A    You know, I didn't want to talk about the medical

4    condition.  I know Steve had texted me numerous times because

5    he couldn't speak so that's why he asked me to often follow up

6    with things and help him with assistance.

7    Q    Why would you need to talk about his health when you're

8    asking for access to be cut?

9    A    Oh, I didn't, this was just to -- the access to be

10   removed.

11   Q    Okay.  Then Mr. Barger is on leave from January 20th --

12   it's been approved through the 16th of January, correct?

13   A    I don't remember the dates.

14   Q    When did you start hearing that Mr. Barger was planning

15   to return to work?

16   A    Steve had reached out, he often included me in emails

17   that he sent to his team about when he would return and I

18   believe he had stated he would return in March is when his

19   doctor planned to release him.

20   Q    But did you see him in the office at the end of December?

21   A    He came into the office a few times, I did see him.  I

22   don't remember what day it is.

23   Q    Okay.  Plaintiff's 65.

24            THE COURT:  In evidence.

25            THE COURTROOM DEPUTY:  Already in evidence.

1    THE COURT:  65 is in evidence already.

2  Q    This is on January 4th, you're informed that Steve was in

3  the office, sounds great and that's on the 4th.  And then on

4  the 6th you're informed again --

5         That's Plaintiff's 68?

6         THE COURT:  You want 68 in evidence?

7         MR. SHEARER:  Plaintiff's 68.

8         THE COURT:  Plaintiff's 68 in evidence now, no

9  objection.

10        (Plaintiff's Exhibit 68 so marked in evidence.)

11 Q    And in this one it's an email exchange involving Robin

12 Ording who we've heard about, Steve's interim replacement, and

13 Amy Stefan; we haven't seen that name, who was Amy Stefan?

14 A    She was the senior leader over at the HR Service Center.

15 Q    And in this Mr. Marino says he has to have his

16 physician's note before he can return, correct?

17 A    That's standard, yes.

18 Q    Okay.

19        Now, that is on the 6th but on the 5th Jennifer

20 Voycheske had gotten a hold of you and wanted to change Mr.

21 Barger's leave dates, is that correct?

22 A    Again, I don't remember the dates.

23 Q    Okay.

24 A    But I believe there was some question around what the

25 dates were from his doctor.

1    Q    I guess we're going to go to Plaintiff's 52.

2              THE COURT:  52 in evidence.

3              (Plaintiff's Exhibit 52 so marked in evidence.)

4    Q    What is this document?

5    A    It's from the Leave of Absence Help Desk.

6    Q    Right.  Why is this coming to you, you're not

7    Mr. Barger's manager, you're not his HR generalist, why are

8    you being informed of his revised leave dates?

9    A    Steve continuously texted me on my personal cell, would

10   ask for help and assistance and have questions.  He didn't

11   work with any of the other HR partners because he knew me and

12   he had worked with me very closely.

13   Q    But then let's look at Plaintiff's 40, and this is

14   earlier, this is when the leave application originally went

15   in, it went in on November 23rd and the initial leave request

16   was sent on 11/23 and this goes to Jeff Hack; why is Jeff Hack

17   getting these emails from LOA Help in November and you're

18   suddenly getting them in January when Jeff is still his

19   manager?

20   A    My understanding is these only go to the manager when

21   individuals are out on leave.

22   Q    But this is the approval form, this is saying we got

23   it -- the system is telling Jeff Hack that --

24   A    Yeah.

25   Q    -- that he applied for leave.

*Johnson - direct - Shearer*                                    202

1   A    That his employee applied for leave.

2   Q    Did Jeff Hack get notified on December 15th when the

3   leave was approved or did you?

4   A    I'm not sure.

5   Q    Moving to Plaintiff's 45.

6            THE COURT:  In evidence.

7            (Plaintiff's Exhibit 45 so marked in evidence.)

8   Q    This is Plaintiff's 45 on December 15th which was the

9   original approval date and this goes from LOA Help, which is

10  Leave of Absence Help, to Jeff Hack and it's saying the leave

11  is approved for the period 10/24 to 1/16.

12           So, I guess -- who could -- these were going to Jeff

13  Hack as Steve's manager in December.  All of a sudden on

14  January 5th, twenty days later, they're all coming to you.

15  What changed, why are these notices coming to you and not Jeff

16  Hack?

17  A    I don't know.

18           (Continued on next page.)

19

20

21

22

23

24

25

1    BY MR. SHEARER:

2    Q    Did Jeff Hack get notice in January of that leave -- the

3    leave change?

4    A    I wouldn't know.  I generally don't deal with the leave

5    of absence.

6    Q    Well, in another conversation you had on January 5 with

7    Jennifer Voycheske by e-mail, in response to the change of

8    leave date, you sent this e-mail, and this is Plaintiff's 82.

9              THE COURT:  What exhibit now?

10             MR. SHEARER:  Plaintiff's 82.

11             THE COURT:  82 in evidence.

12             (Plaintiff Exhibit 82 received in evidence.)

13   Q    On January 5, the middle e-mail here, it says:  To my

14   knowledge he has not been terminated, correct?

15   A    Correct.

16   Q    All right.  Were you involved in this restructuring that

17   was being planned in November, December, January of --

18   November, December of 2016, January of 2017?

19   A    Are you speaking of the SVPs and above?

20   Q    Yes.

21   A    I was aware that we were restructuring, but I was not

22   involved in it.

23   Q    Are the generalists not involved in the planning and

24   executions of a restructuring like that?

25   A    Not at the SVP and above level.

1    Q    Who is collecting all that information?

2    A    Collecting or --

3    Q    Let's say it is at a VP level and you are involved, what

4    would your involvement be?  What would your task be?

5    A    To send the leaders a list of their organization, maybe

6    compensation, and, you know, tell them that they needed to

7    review their organization and submit whomever they are

8    selecting.

9    Q    Now, on January 13, you called Mr. Barger and advised him

10   that he was terminated; is that right?

11   A    I notified Mr. Barger that his position was eliminated,

12   and I also notified him of the compensation amount for the

13   severance agreement.

14   Q    Why did you do that, since this is an SVP termination?

15   A    I was asked to reach out to Mr. Barger because Mr. Barger

16   had worked with me closely and said that he really appreciated

17   me and would partner with me through these other situations,

18   so I was asked to reach out to Mr. Barger.

19   Q    Who asked you to do that?

20   A    Tony Marino.

21   Q    Tony Marino?

22   A    Yes.

23   Q    Did you speak with -- did you have to call Mr. Barger

24   more than once?

25   A    Yes.

1   Q    When did you finally speak to him on that day, the 13th?

2   A    I was -- I believe it was around after 5:00, was the

3   first time.  Mr. Barger advised he was on a plane and to call

4   back later.  So I called back later that evening.

5   Q    Do you know what was Mr. Barger's last day of work in the

6   systems at First Data?

7   A    I don't recall the exact date.

8   Q    I asked you that same question during your deposition,

9   and your response was, well, that depends on what you mean by

10  work.  Do you mean the last day on the premises?

11           Was that answer at the deposition correct?

12  A    I mean, it could be -- are you talking about physically

13  at work, or --

14  Q    Right.  That question is kind of vague, isn't it?

15  A    Yes.

16  Q    Okay.

17           MR. SHEARER:  Your witness.

18           THE COURT:  Mr. Eidelman, any questions?

19           MR. EIDELMAN:  Yes, Judge.  Can I have just a

20  moment, Judge, to get may papers, please.

21           (Short pause.)

22  CROSS-EXAMINATION

23  BY MR. EIDELMAN:

24  Q    Good afternoon, Ms. Johnson.  How are you?

25  A    Good.

1    Q    Do you still work for First Data?

2    A    I do not.

3    Q    When did you leave First Data?

4    A    December of last year.

5    Q    And why did you leave First Data?

6    A    I had a very good opportunity with another company as

7    leading HR.

8    Q    Mr. Shearer asked you some questions about Brian Fricke

9    and more than one person in the organization.  When did you

10   become Mr. Barger's HR business partner, approximately?

11   A    Approximately August -- July, August of 2015.

12   Q    And you remained his HR business partner until he was

13   selected for elimination or, no, did you stop being his HR

14   partner prior to that that time?

15   A    He was moved under another group.

16   Q    At the time that you became his HR business partner, was

17   Brian Fricke employed at First Data?

18   A    No.

19   Q    So the organization -- tell me just briefly, what was the

20   organization that you became the HR business partner for?

21   A    It was the sales organization, so there were a few

22   directors, managers, sales training organizations.

23   Q    And who led -- who was the manager of that organization?

24   A    Steve.

25   Q    Okay.  Did you have other organizations that you were

1  responsible for as an HR business partner at First Data?

2  A    Yes.

3  Q    At that time?

4  A    Yes.

5  Q    How many?

6  A    Approximately four other SVPs.

7  Q    Approximately how many employees with those four SVPs

8  were you responsible for ultimately as being the HR business

9  partner?

10  A    Total?

11  Q    Yes.

12  A    Could range generally between 7 and 900 people.

13  Q    And at that point in time, approximately how many people

14  were in the sales training group that was led by Mr. Barger?

15  A    I believe around upper 40s, like maybe 48, maybe to 52.

16  Q    Okay.  What was your role as the HR business partner?

17  What were your job duties and responsibilities with respect to

18  assisting Mr. Barger as -- in managing that group?

19  A    Steve's group or in general what was my responsibilities?

20  Because they varied a little.

21  Q    What was the difference between what you would do with

22  the other groups that you were managing and what you were

23  doing with Mr. Barger's group?

24  A    So, generally, we provide high level assistance to the

25  SVPs for their organization, maybe org design, what are their

1   needs, recruiting responsibilities, not actually recruiting,

2   but making sure, you know, what job openings, et cetera.  For

3   Steve's group, it was a lot more.  And, you know, it was some

4   of the day-to-day management of the team, they needed

5   direction.  There were directors that were looking to redesign

6   their organization, and normally they would partner with a

7   leader to decide what that organization would look like and

8   what their needs were.  And in one instance, one of the

9   directors partnered with me to determine what that

10  organization should look like, and to really present that to a

11  leader of a country that was over that area.

12  Q    And is that a role that you would ordinarily assume as

13  being an HR business partner?

14  A    No.

15  Q    So who was supposed to be doing those duties and

16  responsibilities?

17  A    Steve would have presented it to the head of the country

18  that we were partnering with.

19  Q    Did you have conversations with Mr. Barger about the

20  concerns that you had that there was a lack of leadership in

21  the sales training organization?

22  A    Yes.

23  Q    And tell us about those conversations.

24  A    We talked about a successor and the gap between, you

25  know, Steve and the next level, which was a director, so there

1   was no VP.  There was a -- Steve was very focused on the sales

2   transformation, is what he called it, but it was the First

3   Data Way.  So he traveled around a lot and, you know, very

4   wonderful motivational speaker.  But there were day-to-day

5   management needs, so our sales organization really needed to

6   be built up, and in order to do that, you had to have the

7   right training individuals.  So we really needed to define --

8   again, there was an over 40 percent attrition rate, and we

9   needed really to find what talent we were hiring, who was

10  filling those roles, and, really, a shift in who we were

11  hiring because you had so much attrition and we weren't able

12  to really meet the organizational needs.

13  Q    Now, we've heard testimony about a sales training group

14  and a sales transformation group.  Was there a difference?

15  A    No.  It was just one role.  There was no group.  The only

16  group was the sales training group.  So everyone was in the

17  sales training group.

18  Q    And that's the group that about that point in time when

19  you came on board in 2015, had approximately 50 employees or

20  so?

21  A    Correct.

22  Q    Okay.  Did you -- did you have conversations with any

23  employees who came to you to talk with frustrations that they

24  had about Mr. Barger?

25  A    Yes.

1  Q    Tell the jury about some of those conversations that you

2  had with employees.

3           MR. SHEARER:  Objection, Your Honor.  Objection.

4           MR. EIDELMAN:  There's an objection.

5           THE COURT:  Sustained.  Go ahead.

6           MR. EIDELMAN:  Sustained or --

7           THE COURT:  Rephrase it.  Let's hear about what

8  specific employees you were talking about.

9           MR. EIDELMAN:  That's what I was going to ask.

10 Q    What employees came to you to talk with you about

11 circumstances regarding Mr. Barger's leadership of the sales

12 training organization?

13 A    So Justin Stamey, Paula, I apologize, I cannot remember

14 her name, she was a project manager in a team.  I believe

15 Teresa.  I can't remember her last name.  I apologize.  It has

16 been a couple of years.  As well as Nick Mantia.  So those

17 were the couple of the individuals.

18 Q    And can you tell us what those conversations were with

19 those employees, those specific employees?

20 A    Nick's were a little different, but the others were

21 day-to-day management.  Again, just, they really needed

22 oversight.  So, for example, one situation, Justin had come

23 and said he was being put in a position with one of the other

24 SVPs was asking him questions around budget and around

25 structuring and really pressuring him around some of the needs

 1   and some of the deliverables that were due from the sales

 2   training team, and Justin, being a director, didn't really

 3   feel like he could push back on the SVP that was approaching

 4   him, and really said that, you know, he really needed Steve's

 5   level to push back on the other SVP because Justin was a

 6   director.

 7          THE COURT:  So this is what they told you?

 8          THE WITNESS:  Yes.

 9          THE COURT:  So I don't know whether it is true or

10   not, they are not here to testify.  So you can accept this

11   just for what it is, that this is the information that

12   Ms. Johnson had.  We don't know if it's true or not, but you

13   had that information from them.

14          And did you take any action as a result of that?

15          THE WITNESS:  I did reach out to Steve and said, you

16   know, you really need not only a successor, but you need to

17   involve your team on the organization and design on where the

18   gaps are and what their needs are so you can make sure your

19   team is getting what they need, the development, and the

20   support.

21          THE COURT:  So that's what led you into having that

22   conversation with Mr. Barger, right?

23          THE WITNESS:  Yes, Your Honor.

24          THE COURT:  Okay.  Next question.

25          MR. EIDELMAN:  Thank you.

1  Q    And, Ms. Johnson, if you will turn to Defendant's 77, the

2  binder in front of you.

3           THE COURT:  That's in evidence.

4           (Defense Exhibit 77 received in evidence.)

5           MR. EIDELMAN:  Thank you.

6  Q    Is this -- when was this e-mail from?  This is an

7  e-mail -- I'm sorry.

8           This is an e-mail from you to Karen Whalen, SVP, who

9  was your supervisor at the time?

10 A    Correct.

11 Q    And when is this dated?

12 A    July 8, 2016.

13 Q    And what was the purpose of this particular e-mail?

14 A    So we were -- one of my roles, as I said, was

15 organizational design.  And I was outlining my client, some of

16 my clients, Pam Parker and Steve Barger, their organization.

17 Q    And there's -- is there a discussion in this e-mail

18 about, I think you just testified a little while ago, about

19 your conversations with Mr. Barger about the need for a

20 successor?

21 A    Correct.

22 Q    And what were you advising Ms. Whalen?

23 A    That we needed to move forward with a successor for

24 Steve.  I said that Steve and I had also been discussing the

25 need for a successor, and we held a few follow-up discussions

1    during our one-on-ones on June 27, which was of 2016.  And I

2    approached Steve again, providing examples of how the gap

3    between his experience and his direction is impacting morale,

4    attrition, and slowing down his team's ability to move quickly

5    in several key areas.

6    Q    Now, prior to that, you say that your conversation with

7    Mr. Barger about the need to find a successor, and I think you

8    wrote, seemed to shock Steve, meaning Mr. Barger.

9         Were you referring to the conversation that you had

10   with him on June 27 or some other time?

11   A    Sorry, just want to read hits.

12   Q    I'm sorry.  It begins, "my first mention of this topic,

13   late 2015, seemed to shock Steve."

14   A    Yes.  So a previous conversation, not this conversation.

15   Q    Okay.  So by the time you had had this conversation, you

16   had already spoken to Mr. Barger some six or seven months

17   earlier about the need to find a successor?

18   A    Correct.

19   Q    What does it mean to have a successor?

20   A    It means that someone that, you know, you would mentor

21   and you would train on your responsibilities.  They'd

22   eventually move into that role, take over the group, is

23   generally what a successor is.

24   Q    And your understanding was that Mr. Barger would bring in

25   a successor, that person would work with him for some time

1  period, and then Mr. Barger would depart the organization?

2  A     Yes.

3  Q     At the bottom of this e-mail, where you're also advising,

4  Ms. Johnson, on the situation regarding organizational

5  strategy, you discuss a conversation that you had with Tony.

6  Is that Tony Marino that is in the courtroom today?

7  A     Correct.

8  Q     What was the conversation that you had with Mr. Marino?

9  A     So Tony came by my office and said that he agreed we

10 needed to identify a successor for Steve.

11 Q     Did Mr. Marino share with you other -- any other

12 information about his conversations with Mr. Barger?

13 A     He did not.  But Mr. Barger came to my office later.

14 Q     And what did Mr. Barger tell you?

15 A     His specific words were, "I confessed my HR -- all of my

16 HR sins to Tony."

17 Q     And did he elaborate?

18 A     I knew what Steve was referring to.

19 Q     What was Steve referring to?

20 A     So Steve had had conversations with -- so I was in

21 Steve's office one day, and there was an individual on his

22 team who was looking to move into the sales organization and

23 become a sales trainer, and Steve said, you know, I've been

24 talking to her, and told her that her weight was part of the

25 problem.  And so I told Steve that we really -- you know, I

1   said, "You said that?"  And he said, "Yes, it is okay, you

2   know, we have had this conversation on several occasions."

3   And he wanted to help her with how she dressed, and he said he

4   had talked to her about her weight being part of the problem

5   and why she had not been selected.  So I coached Mr. Barger

6   that not only as, you know, an HR representative, that was an

7   inappropriate conversation.

8   Q    Were there any other conversations that you had where you

9   counselled Mr. Barger from an HR perspective in terms of his

10  management of the sales training group?

11  A    Yes.

12  Q    What conversation -- what other conversations did you

13  have with him?

14  A    So Steve had had a conversation with one of the gentleman

15  on his team about his alcoholism and stating that he was an

16  alcoholic.  Steve had said that he really encouraged him to

17  get help on several occasions, and I believe he said that he

18  called the gentleman's partner and said, you know, he's an

19  alcoholic, and encouraged him to get help or took him to the

20  rehab center.  I really couldn't tell from what the outcome

21  was of that situation.  It sounded like Steve had taken him to

22  the rehab center or maybe called his partner to come get him.

23  Q    And why would you counsel Mr. Barger about something like

24  that?  It sounds like he's trying to do something for an

25  employee?

1  A    Yes.  And I could understand that, but I'd ask if the

2  gentleman had, you know, any cause to see like was he drinking

3  at work?  Did he smell of alcohol?  Was there, you know, a

4  work issue?  And those -- he said, no, there wasn't any of

5  those.

6  Q    Do you believe that these were the HR sins that

7  Mr. Marino mentioned when he referenced that Mr. Barger had

8  come and talked to him?

9  A    Yes.

10 Q    Did Mr. Marino advise you in the fall of 2016 as to the

11 reason why Mr. Barger needed -- that the company wanted to put

12 Mr. Barger out on leave?

13 A    He said to focus on his health and really getting better.

14 Q    Okay.  Had anything happened that led, to your knowledge,

15 that led Mr. Marino to -- and the company to make that

16 decision?

17 A    I was aware that we were paying out Mr. Barger's bonus

18 early, in all cash, and that was approximately four months

19 earlier.  Bonuses had not even been determined nor the budget.

20            MR. EIDELMAN:  I believe this might -- D-117.

21            THE COURT:  In evidence.

22            (Defense Exhibit D-117 received in evidence.)

23 Q    Showing you what's been marked, Ms. Johnson, I think you

24 should have it there in front of you, D-117, can you tell me

25 what this e-mail is, the lower part of the e-mail?

1    A     The highlighted portion?

2    Q     Yes, ma'am.

3    A     "I advised that Steve is able to set up video chat with

4    Tony, if Tony finds that approach best."

5    Q     Right.  But go above that to the top part, where it

6    says -- under "Jeff."  And "Jeff" is Jeff Hack?

7    A     Yes.  Jeff Hack.

8    Q     All right.  And what are you telling Mr. Hack?

9    A     That some of the concerns with Steve has escalated, we

10   really needed to implement a leave of absence for him to focus

11   on his health.  We wanted to ensure his dignity is maintained,

12   but several incidents are concerning.

13   Q     Was it your understanding that what the company was doing

14   was to -- that Mr. Barger was going to be put on a leave of

15   absence, and the reason why the company made that decision was

16   not because he was working, but they wanted him to focus on

17   his health?  Was that your understanding?

18   A     Yes.

19   Q     And Mr. Shearer asked you some questions about removing

20   access.  What does that mean to remove access?

21   A     It means you can't get on e-mail, and you can't come into

22   the building, so you can't come into the workplace unless

23   someone comes and greets you, signs you in.  So you couldn't

24   use your badge, it no longer accesses the building.

25   Q     And if Mr. Barger -- if the company was putting

1  Mr. Barger on leave so that he would not be focused on work,

2  would there be any reason for him to need e-mail access?

3  A    No.

4  Q    You testified that you helped Mr. Barger and you provided

5  assistance with Mr. Barger securing some paperwork.  Do you

6  remember that testimony?

7  A    Yes.

8              MR. EIDELMAN:  D-154, Your Honor.

9              THE COURT:  In evidence at this time.

10             (Defense Exhibit D-154 received in evidence.)

11  Q    Ms. Johnson, I know you are not familiar or you don't

12  handle the paperwork that much, but have you seen before a

13  certification of health care provider?  Do you see that?

14  A    Yes.

15  Q    Do you know what that form is used for?

16  A    My understanding is, again, since it is the health care

17  provider, the doctor would complete this form to put someone

18  out on a leave of absence.

19  Q    Did you complete this form?

20  A    No.

21  Q    Is your signature on this form at all?

22  A    None of the handwriting on this form is mine.

23  Q    At any point in time did you see a copy of the

24  certification of health care provider, that is D-154, that

25  came in from Mr. Barger's doctor regarding the certification

1   of health care provider?

2   A    I believe they may have sent this over and I sent it to

3   the service center.

4   Q    Okay.  And turning your attention to number 4 on the

5   form, now, again, this is not a form that you completed, this

6   is Mr. Barger's doctor completing this form?

7   A    Correct.

8   Q    And can you read what the question in number 4 is?

9              THE COURT:  The yellow highlights are those that you

10  put on?

11             MR. EIDELMAN:  Yes, they are, Your Honor.

12             THE COURT:  When you see yellow highlights, they

13  were added by counsel.

14             MR. EIDELMAN:  They were added by counsel to make it

15  easier for the witness.  Thank you, Your Honor, for that

16  clarification.

17  Q    That is my highlighting, Ms. Johnson.

18             So can you just read what that highlighting is.

19  A    Was the patient admitted for an overnight stay in a

20  hospital, hospice, or residential medical care facility.  If

21  yes, dates of admission.  10-22-16 to 10-26-16 are the dates

22  that are entered in that slot.

23  Q    Right.

24             Now above that, though, in number 3, which I did not

25  highlight, what is Mr. Barger's doctor indicating there in

1   number 3?

2   A    It is marked yes, and the question is:  Will the patient

3   be incapacitated for a single continuous period of time due to

4   his, her, medical condition, including any time for treatment

5   and recovery.

6   Q    And is there a beginning date that the doctor puts on the

7   form as to when Mr. Barger's period of incapacity is going to

8   begin?

9   A    Yes, it says begin date is 10-22-16.

10  Q    And his return to work date?

11  A    3-1-17.

12  Q    Right.

13        And then there's also a definition of what

14  incapacity means, correct?

15  A    Yes.  Incapacity means an ability to perform regular

16  daily activities, to attend school or work because of the

17  condition, treatment therefor or recovery therefrom.

18  Q    So if Mr. Barger, as you understand it, because you were

19  the person who arranged for access to the e-mail systems to be

20  revoked, if he was incapacitated, there would be no reason for

21  him to need e-mail access to the company, correct?

22  A    Correct.

23  Q    Will you please turn to D-232.

24        THE COURT:  In evidence now.

25        (Defense Exhibit D-232 received in evidence.)

1   Q    Mr. Shearer asked you some questions about your

2   communications with Mr. Barger about notifying that his

3   position had been eliminated.

4            Can you just -- did you tell Mr. Barger on that call

5   that he had been terminated from employment, or what did you

6   actually tell him?

7   A    I said that your position has been eliminated.  So while

8   I had not had conversations with SVP before, we do have a

9   standard that we inform employees that their position has been

10  eliminated.  So I used that same context.

11  Q    Did you share that information with anyone about your

12  conversation with Mr. Barger?

13  A    Afterwards, yes.

14  Q    Okay.  And who was that?

15  A    Tony Marino.  Tony had asked me to follow up and let him

16  know once I notified Steve.  Karen Whalen.  Kathi Benhardt,

17  who was also in human resources.  She kept the master

18  information.

19  Q    And did you speak to -- did you send an e-mail to

20  Jennifer Voycheske?

21  A    I sent an e-mail, I believe, to Jennifer Voycheske and

22  Amy Steffen, because they were in the HR service center.

23  Q    Okay.  Showing you what's been marked as Defense Exhibit

24  232, again, the highlights are mine, is this the e-mail that

25  you sent to Jennifer Voycheske notifying her that you had

1  advised Mr. Barger that his position was being eliminated?

2  A    Yes.

3            THE COURT:  232, right?

4            MR. EIDELMAN:  232.  Yes, Your Honor.  Thank you.

5            THE COURT:  It is in evidence.

6  Q    Was Mr. Barger's employment terminated on January 13 when

7  you spoke to him?

8  A    No.

9  Q    How long did he continue to be employed?

10 A    Generally you're given a two-week nonworking notice.

11 Q    Did Mr. Barger's employment continue to that point, or

12 you just don't know the date when his employment finally

13 ended?

14 A    My understanding was his employment was extended.

15 Q    And, actually, if I go back to 232 --

16           THE COURT:  You are on 232 now, right?

17           MR. EIDELMAN:  Yes.  I'm back to 232.  Thank you.

18           THE COURT:  You have been on 232 all this time?

19           MR. EIDELMAN:  Yes, Your Honor.  I put it back up on

20 the Elmo.

21 Q    For D-232, you're also sharing with Mr. Voycheske, as you

22 understand it, as to the dates that he would be on nonworking

23 notice?

24 A    Correct.  Through 2-25.  I'm not sure if 2-24 or 2-25

25 would be considered his last day of employment.

1   Q    And do you know whether or not his last date of

2   employment was extended to the end of February?

3   A    I don't recall the dates, I wasn't involved in the

4   decision.

5   Q    Showing you what's marked as D-235.

6            THE COURT:  In evidence at this time.

7            (Defense Exhibit D-235 received in evidence.)

8   Q    Does this help refresh your recollection, Ms. Johnson, as

9   to whether or not there was a different date for Mr. Barger's

10  final date of employment?

11  A    Yes.

12  Q    And when was it?

13  A    Steve, be on nonworking notice until 2-28.

14  Q    Thank you.

15            When Tony Marino contacted you on January 13, 2017

16  and asked you to call Mr. Barger, prior to that time, had you

17  been aware that he had been selected for inclusion in the

18  reduction in force?

19  A    No.

20  Q    That was the first time you learned that?

21  A    Correct.

22  Q    Did anybody at First Data tell you that the reason why

23  Mr. Barger had been included in the reduction in force was

24  because he had cancer?

25  A    No.

1    Q    Did anybody tell you at First Data that Mr. Barger had

2    been included in the reduction in force because he had taken

3    leave?

4    A    No.

5    Q    Did anybody at First Data tell you that Mr. Barger had

6    been included in the reduction in force because he had

7    submitted a returned to work note?

8    A    No.

9    Q    Now, you were very close to Mr. Barger while he was

10   employed there, right?

11   A    Yes.

12   Q    Did he ever share with you how he felt about you

13   personally?

14   A    Yes.

15   Q    What did he tell you?

16   A    Sorry.  It's hard.

17        Just that I was very helpful and that he couldn't do

18   without me.  He said I was the best HR person he ever had.

19   Q    Ms. Johnson, did you hire Steve Barger?

20   A    No.

21   Q    Did you set Mr. Barger's compensation?

22   A    No.

23   Q    Did you make the determination that he should go on FMLA

24   leave?

25   A    No.

1   Q    Did you make the determination that his employment should
2   be terminated?

3   A    No.

4   Q    When was the last time you spoke to Mr. Barger?

5   A    The last time, like the very last time I spoke with him?

6   Q    The last time you spoke to Mr. Barger.

7   A    I saw Steve when I came in the courtroom the other day.

8   Q    Did you speak?

9   A    Yes.

10  Q    What was that conversation?

11  A    He asked me about my husband, and he said he was sorry I
12  was going through this, and that he was consulting and he
13  would be okay.  And he said thanks for helping him.

14          MR. EIDELMAN:  Your Honor, may I have just a moment
15  to consult with my colleagues.

16          THE COURT:  You may.

17          MR. EIDELMAN:  Thank you.

18          (Short pause.)

19  Q    Ms. Johnson, remind me again when you left First Data?

20  A    The end of December last year, so 2018.

21  Q    Had you been a defendant in this case from the entire
22  time when it was filed two and a half years ago?

23  A    Yes.

24  Q    Do you know why you were named as a defendant in this
25  case?

1    A    No.

2           MR. ZEITLIN:  I'm going to object.  I think this is

3    more prejudicial than it is probative.

4           THE COURT:  Sustained.

5           MR. EIDELMAN:  No further questions, Judge.

6           THE COURT:  Any redirect, Mr. Shearer?

7    REDIRECT EXAMINATION

8    BY MR. SHEARER:

9    Q    Ms. Johnson, you testified that you had several

10   conversations with Mr. Barger regarding a lack of leadership

11   in the group.  Are there any written documents to show that

12   those conversations occurred?

13   A    Other than e-mails I may have sent to Karen or Jeff Hack,

14   no.  I was not his manager.

15   Q    So there wouldn't be performance reports or performance

16   improvement plans, or any other documents to indicate you were

17   having performance issues with Mr. Barger?

18   A    So that would have to be his manager.  So I would inform

19   Jeff Hack, but I did not have the authority to write

20   performance plans for Steve.

21   Q    Did Jeff Hack ever -- to your knowledge, did Jeff Hack

22   ever write a performance review?

23   A    Again, since Steve was an SVP, I necessarily would not

24   have seen those.

25   Q    Now, you were talking about hiring a successor.  And you

1    were saying that that -- you said that a successor would come

2    in so that Steve would leave shortly thereafter.  Is that what

3    you said?

4    A    I said a successor would generally -- you train the

5    successor, and they'd learn and eventually take over the role.

6    I don't think I defined a time frame.

7    Q    What time frame were you thinking when you were talking

8    about a successor was Steve to soon exit?

9    A    That could vary.

10   Q    What is vary -- five years?  Two years?  Six months?  Two

11   weeks?

12   A    It could vary.  So when you hire a successor, depends on

13   the skill gap between, you know, the senior leader or the

14   person, you know, it could be any level.  Depends on the skill

15   gap between that person and whom you hire.  So depending on

16   the skill gap between the two, the time frame could vary from,

17   you know, several months to longer.

18   Q    I asked you specifically in your deposition.  I said, why

19   was July 26 the time you started looking for a successor.  To

20   me, that means a replacement, that Steve is leaving.  And your

21   answer was no.

22          So a successor doesn't mean replacement, does it?

23   A    It can mean eventually a successor generally does fill

24   the role --

25          MR. DiLORENZO:  Your Honor, can we have a reference

1   to that page and line in the deposition so we can see what it

2   actually says.

3           THE COURT:  Yes.  Just tell us where we are talking.

4           MR. SHEARER:  Page 42, line 24 through line 2 of 43.

5           MR. DiLORENZO:  Mr. Shearer, can you give us the

6   page and line again.

7           MR. SHEARER:  Page 42, line 24.

8           THE COURT:  Let's go forward.  You want to ask a

9   question from the deposition?

10          MR. SHEARER:  No.  I just -- her story that she told

11  me in the deposition is different than what she said here.

12          THE COURT:  What is it that you want to ask now?

13          MR. EIDELMAN:  Your Honor --

14          THE COURT:  Just one second.  You have a question to

15  pose to this witness, go ahead.

16          MR. SHEARER:  Yes, I do.

17          THE COURT:  What is it?

18  Q    To you, then, what is a successor, if it is not Steve

19  leaving?

20          THE COURT:  Can you tell the jurors what you mean by

21  successor?  I think that's the question.

22  A    Yes.  It is generally someone you'd bring in, and they

23  weren't quite at your level of performance, didn't quite have,

24  you know, ready to fill your role, but you train them, you

25  bring them along, you mentor them, so, eventually, if your

1   role was to be vacated, then, you know, you'd have an event

2   string, so that person would eventually fill your role.

3   Q    Didn't you have conversations with Mr. Barger about

4   trying to groom Justin Stamey as the leader of that group?

5   A    Yes.

6   Q    When -- those conversations were in 2016?

7   A    I can't remember the dates, but, yes, we talked about

8   Justin.

9   Q    And how is that Steve not looking for a successor?

10  A    There was a large skill gap between Justin as a director

11  and Steve as an SVP.  It was a very big skill gap between the

12  two.

13  Q    But I thought you were supposed to be grooming somebody

14  to improve to become -- that's what the successor was, someone

15  that you are grooming?

16  A    It is.  It can be various levels.  Again, you can hire

17  someone that's very close to your skill and knowledge, you can

18  hire someone who has a bigger gap.  But, again, just on the

19  day-to-day management needs that the team wasn't getting as

20  well, it was really needed for that team.

21  Q    So you didn't think Justin Stamey could perform the role

22  of being groomed for Mr. Barger's job eventually?

23  A    He may be able to.

24  Q    I guess, were you helping Mr. Barger to groom Justin for

25  that position?

1   A    We'd not -- he'd not identified Justin as a successor.

2   Q    He didn't?

3   A    No.

4   Q    Well, how do you designate someone as a successor?

5   A    You -- we were talking about a successor, and he agreed

6   that Justin -- you know, he'd helped mentor Justin, but that

7   there was a big skill gap in between, even Steve said, you

8   know, between his knowledge and his wealth of experience and

9   Justin's.

10  Q    But how do you designate a successor?

11  A    Could be a variety.  It could be informal, formally.

12  Q    So how is what Mr. Barger did trying to train Justin not

13  informally designating him his successor?

14  A    I didn't see any plan or details around training Justin.

15  Q    Now, all this successor talk we've had, and it's been

16  around July, August of 2016, correct?

17  A    I believe so.

18  Q    The exhibits that have come in.

19       Mr. Barger finished his radiation treatments in May

20  of 2016 and had surgery on -- in September of 20- --

21  September 6, 2016.

22       Were you focusing on his successor because

23  Mr. Barger had cancer?

24  A    No.

25  Q    Well, why was this time period so essential?

1  A    There was looking for one in February as well, and even

2  after I took over the HR role as Mr. Barger's HR partner,

3  prior before that, prior before he knew he had cancer.

4  Q    Now, did Mr. Barger take on any additional management

5  roles during 2016, besides the sales training group and his

6  work on First Data Way?

7  A    Not to my -- not to my recollection, no.

8  Q    Did he assume call center responsibilities for Karen

9  Beck?

10  A    I'm not familiar with that, no.

11  Q    Did he assume management responsibilities for any people

12  underneath Amy Steffen?

13  A    Not to my knowledge.

14  Q    Did he assume any responsibilities for individuals under

15  Ed Stutz during 2016?

16  A    Not to my knowledge, but when you say under Ed Stutz,

17  he's in -- Ed was in HR.

18  Q    Right.  And did he have responsibilities for individuals

19  out in call centers in Hagerstown?

20  A    I didn't have the team at that time.

21  Q    Did Mr. Barger assume any responsibilities for managing

22  individuals in the -- in Europe during 2016?

23  A    In addition to what he had when I was the HR partner?

24  Q    Yes.  In 2016, did he grow the number of people that he

25  was responsible for, including some people in Europe?

1  A    He had requisitions that he had opening a head count he

2  had opened when I assumed the HR role.

3  Q    But then at the -- but then you end up working on the --

4  you didn't work on that.

5         Let's go to the discussion of Mr. Barger's

6  conversations with employees about blatant alcoholism.  Did

7  you write that down anywhere?

8  A    I did not, but I did report that to Karen.

9  Q    So did you report that in an e-mail?

10  A    I don't recall.  I don't believe so.

11  Q    So you just talked to Karen about it?

12  A    And probably his manager, Jeff Hack.

13  Q    Isn't that the type of thing that HR departments should

14  document?

15  A    Well, it is documented.  You can do verbal documentation,

16  you can do written documentation.

17  Q    But there's no way for me to confirm that it even

18  happened, is there?  How can you discipline an employee when

19  there's no written record of his performance problems?

20  A    That would be his manager, Jeff Hack.  Jeff was aware of

21  his performance.

22  Q    And Jeff didn't do anything?

23  A    Steve's an SVP, but at my level I wouldn't have seen

24  Steve's performance review.

25  Q    Now, you testified that there's no need for access

 1   because -- when you're on leave, correct?

 2   A    If you are on a leave of absence?

 3   Q    Yes.

 4        MR. EIDELMAN:  Objection.  That mischaracterizes the

 5   testimony, Judge.

 6        THE COURT:  Well, all right.  So next question then.

 7   Q    I am going to go to Plaintiff's 42 here in a minute.

 8        THE COURT:  You want Plaintiff's 42 in evidence?

 9        MR. SHEARER:  Plaintiff's 42 in evidence.

10        THE COURT:  It is in evidence already.

11        THE COURTROOM DEPUTY:  Would you like it published?

12        MR. SHEARER:  Just a second.

13        THE COURTROOM DEPUTY:  Sure.

14        THE COURT:  42 is in evidence now.

15        (Plaintiff Exhibit 42 received in evidence.)

16   Q    If you want to take a look at that bottom e-mail, and I

17   will scroll down for you.

18        This is an e-mail from LOA Help to Steve Barger,

19   telling him he has some forms that still need to be completed,

20   and it's dated December 5, right?

21   A    December 3.

22   Q    December 3.  My eyes are going bad.

23        Now, this is sent -- somebody then turns around and

24   sends an e-mail from Steve.Barger@FirstData.com to

25   Steve@TheBargerGroup.com; do you see that?

1   A    Yes.

2   Q    Now, on December 5, Steve did not have e-mail access; is

3   that right?  His e-mail access was cut off November 21, right?

4   A    I don't recall the date.

5   Q    Okay.  So somebody -- Mr. Barger got an e-mail to his

6   First Data e-mail on December 5, giving him a deadline for

7   forms, from the leave of absence group.  That's Jennifer

8   Voycheske, right?

9        Why would Jennifer Voycheske send an e-mail to an

10  e-mail address that she's cut off access to?

11       And isn't this a reason why Mr. Barger would need

12  access, because they're -- a leave of absence team is

13  communicating to his First Data e-mail address, telling him to

14  get his forms, and he can't get the forms?  And so he

15  responds.  So there is a reason to have access to your work

16  e-mail while you're on leave, isn't there?

17  A    No.  Steve had also provided his other information so

18  they could follow up with him via his either personal e-mail

19  or his phone number.

20  Q    Now, you -- Mr. Eidelman had you read from the

21  physician's record that indicated October 24 was the date of

22  incapacitation; do you recall that testimony?

23  A    Yes.

24  Q    Do you know what occurred on October 24, with regards to

25  Mr. Barger's health?

1  A    I don't know the exact dates as to what occurred.  Steve

2  shared a lot about what happened, but I don't recall the exact

3  dates of all the events.

4  Q    So you don't know what it was that would have

5  incapacitated him?

6  A    His surgery.

7  Q    Well, he had surgery September 6, so that's not what the

8  doctor's talking about.  Do you know -- you don't know what it

9  is?

10  A    No.

11  Q    All right.  When we discussed -- when I was last up here,

12  we discussed you're seeking his -- Steve's input on employee

13  hirings and having meetings with Steve, or getting his input

14  on the organizational structure; do you remember that?

15        That e-mail, which was Plaintiff's 27, was dated on

16  October 12.  Did Mr. Barger seem incapacitated while you were

17  working on the organization structure?

18  A    Let me look at that one.  You said 27?

19  Q    27.

20        THE COURT:  What document are you referring to now,

21  Mr. Shearer?

22        MR. SHEARER:  Plaintiff's 27.  We had -- we entered

23  it last time.

24        THE COURT:  What's your question?

25  Q    Did Mr. Barger seem incapacitated when you were working

1   with him on October 12?

2   A    I wasn't his HR partner.  This was the other HR partner.

3            THE COURT:  Can you answer the question.  Do you

4   have any knowledge as to whether he seemed incapacitated?  Did

5   you see him at that time?  Did you speak to him at that time?

6   Do you know anything about that?

7            THE WITNESS:  I don't.  I did not see him, I don't

8   recall seeing him at that time.

9            THE COURT:  So you don't knowing anything about it.

10           Next question.

11  Q    You mentioned that when you looked at Steve's group,

12  there was a high rate of attrition.  What does that -- what is

13  a high rate of attrition?

14  A    So attrition is individuals who are quitting and leaving

15  the organization.  So we had a high rate of trainers when I

16  assumed the HR role for the group, and that continued for a

17  while so we talked about the type of individuals he was

18  hiring.

19  Q    Now, can attrition -- when you look at attrition, are you

20  looking only at the people that are in his group today, and

21  then if you lose some, who's in his group in six months, and

22  if it's changed that that's attrition?

23  A    You can look at that, yes, and you break it out by

24  voluntary attrition, was really what you are focused on,

25  because voluntary means that the individual chose to leave.

1  Q    What about promotions?  What if someone is promoted and

2  is no longer under Mr. Barger, would that show as somebody

3  leaving the organization?

4  A    It may show that we would only look at the terminations.

5  Q    And the same with a lateral move, if they decide to apply

6  for an open position, it --

7  A    That would not count against attrition.

8  Q    That wouldn't count against it.  How do you designate the

9  difference?

10 A    You can look at transfers in and out, you can look at

11 promotions, you can look at voluntary attrition, and you can

12 look at involuntary attrition.

13 Q    And who keeps track of that information?

14 A    It is put in the HRIS system.

15 Q    And do you do that for the groups you support?

16 A    No.

17 Q    No?

18 A    The manager puts it in.

19 Q    Now, you also testified that there's no difference

20 between sales training and sales transformation; do you recall

21 that testimony?

22       So do you consider what Mr. Barger was doing on the

23 First Data Way presentations to be sales training?

24 A    I only considered the group.  It was one group when it

25 came to me.  It just seemed like one function.  It was all the

JOHNSON - REDIRECT - SHEARER                      238

1  sales, dealing with the sales organization.

2  Q    Okay.  So what does it mean to have a position

3  eliminated?  Does that mean nobody's managing the sales

4  training group anymore?

5  A    It could mean a number of things.  It could mean that you

6  moved the entire group under, you know, a different position.

7  So, for example, maybe you don't need a manager, you need a

8  supervisor.  Maybe you don't need a director, you need a

9  manager.  Vice versa.

10 Q    Doesn't seem like elimination to me, sounds like you are

11 just moving management responsibility to somebody else.

12 A    You remove the head count.

13 Q    But the same number of people are there, except for

14 Mr. Barger, right?

15 A    Depending on what position you're eliminating, that

16 position is eliminated.  So the head count goes away.

17 Q    But the functions of managing the sales training group

18 didn't go away, did they?

19         THE COURT:  You still needed somebody to do that, I

20 think is his question.

21 A    You still need someone to look at it, over the group.

22 Q    So I am not understanding what the position is that

23 you're saying is eliminated.  If somebody is going to continue

24 to manage the sales training group, what is the position that

25 was eliminated?

1  A     You can look at a lower level position to take on more

2  responsibility.  Again, the task at hand was spans and layers,

3  how many people reported, how many managers you had.  We'd

4  already reduced individuals at a lower level, so you don't

5  need as many leaders.

6              THE COURT:  Is that what happened?

7              THE WITNESS:  Yes, Your Honor.

8              THE COURT:  You know that of your own knowledge?

9              THE WITNESS:  Yes.

10             THE COURT:  So, basically, you take these positions

11 and you send them to people who are lesser employees, not -- I

12 don't mean lesser in terms of their quality, but less costly

13 employees?

14             THE WITNESS:  Generally, yes.  Or, you know, someone

15 would take on more responsibility --

16             THE COURT:  Right.

17             THE WITNESS:  -- and use less people.

18             THE COURT:  The position doesn't have to be

19 involved, right?

20             THE WITNESS:  Correct.

21             THE COURT:  I think she's answered question.

22 Q     Did anyone tell you that Mr. Barger was terminated

23 because he had announced at the end of December, beginning of

24 January, that he was planning to return from his leave?

25 A     No.

1   Q    Did you try to influence Anthony Marino and Karen Whalen

2   to place Steve Barger on leave of absence on December 16?

3              THE COURT:  Did you have any conversation with them

4   about that subject matter, as to whether he should be placed

5   on leave of absence on or about that date?

6              THE WITNESS:  Yes.

7              MR. SHEARER:  All right.  Thank you.

8              MR. ZEITLIN:  Before he determines he's finished

9   with redirect, I would like to conference with him for just a

10  couple of seconds.

11             THE COURT:  Go ahead.  We will try to finish this

12  witness before we take our afternoon break.

13             (Short pause.)

14             MR. SHEARER:  We're done.  Thank you.

15             THE COURT:  Anything further, Mr. Eidelman?

16             MR. EIDELMAN:  Yes, Your Honor.  Just one moment.

17             (Short pause.)

18             MR. EIDELMAN:  Your Honor, Mr. Shearer tried to

19  impeach Ms. Johnson's testimony here with testimony from her

20  deposition.  We don't believe it accurately depicted that

21  deposition --

22             THE COURT:  You want to read from her deposition?

23             MR. EIDELMAN:  It's a half a page.

24             THE COURT:  Go ahead.

25             MR. EIDELMAN:  Okay.

1  RECROSS-EXAMINATION

2  BY MR. EIDELMAN:

3  Q    Ms. Johnson, can you turn to page 42 of your deposition.

4  Page 42, line 19.  And I am going to ask you to read the

5  questions from line 19 all the way to page 43, line 15, okay.

6           THE COURT:  You can do that, but you can also do it

7  yourself, if you would like.

8           MR. EIDELMAN:  I could ask her the question, right?

9  Thank you, Your Honor.

10          THE COURT:  You ask her the questions, she can

11  answer.

12          MR. EIDELMAN:  Thank you, Your Honor.

13 Q    The question:  And then you conclude that we need to

14 identify a successor for Steve.

15          And you don't do what witness are supposed to do,

16 you don't give a verbal, you go, "um, um;" do you see that?

17 A    Yes.

18 Q    And then I say, and then the question is:  It is in the

19 second to last sentence, um, um, and then I ask -- there are

20 questions asked by Mr. Shearer.  Why was July 2016 the time to

21 start looking for a successor.  To me that means a replacement

22 that Steve is leaving.

23          What is your answer?  Page 43, line 2.

24 A    No.

25 Q    So what do you mean by a successor?

1  A    A successor is someone you can grow into a role.  Someone

2  who would take on your responsibilities, for example.  There

3  were many things -- as I mentioned before, Steve was not --

4  there were basic responsibilities of a manager that Steve was

5  not performing in late 2015, and at this time, it had been

6  approximately a year, and Steve was still not managing his

7  team.

8           THE COURT:  You may want to go a little slower

9  because we are trying to get down all your words.

10          If Mr. Eidelman would have read this, you wouldn't

11  have had this problem, but he wants --

12          THE WITNESS:  I apologize, Your Honor.

13          THE COURT:  Go ahead.  What else?

14  A    A successor is someone you can grow into a role --

15  Q    Slow, please.

16          THE COURT:  Mr. Eidelman, why don't you read it.

17          MR. EIDELMAN:  Yes, I will ready it.

18          THE COURT:  So, members of the jury, while

19  Mr. Eidelman is going to do that, what we are talking about,

20  you have heard the word "deposition" before.  Before a case

21  comes before me, or in court, the lawyers have the right to

22  ask questions of the parties, of key witnesses, not in the

23  court, but it is part of the trial preparation.  And we call

24  this depositions.  So they are sworn under oath.  It can be in

25  the courthouse, it can be in Mr. Eidelman's office, it can be

1    in Mr. Shearer's office, whatever.  But the importance of it

2    for your knowledge is that at the trial, if there's anything

3    in the prior testimony that the lawyers think may be

4    inconsistent with what the witness is testifying in court,

5    they can bring that out, and then it is up to you as the trier

6    of the facts to determine if there's anything inconsistent,

7    the importance of the testimony, and it is part of your fact

8    finding responsibility.

9           Now, a deposition can also be used for another

10   purpose.  It can be used for cross-examination to impeach what

11   a witness may be testifying to under oath at trial, or if the

12   deposition is of a party, it can also be read as substantive

13   evidence as if that person is actually testifying in court.

14   Even if the witness is available to testify, if he or she is a

15   party, deposition testimony can be read, you can consider that

16   as substantive evidence.

17          So it can be used for two purposes.  If it is a

18   witness or nonwitness, it can be used for impeachment purposes

19   or it can be used for substantive evidence, and I just want to

20   give you a little thumbnail sketch about what deposition

21   testimony is all about.

22          And when it is read back, the lawyers sometimes read

23   the question and have the witness answer it, like it is Perry

24   Mason, or they can read it themselves and give the answer.

25   The important thing is to get the information out, regardless

1    of how it is presented.

2            Go ahead.

3            MR. EIDELMAN:  Thank you, Judge.  I will come close

4    to the court reporter and I will talk slow.

5    Q    And, Rhonda, if you would follow along to make sure I

6    have accurately read the question and the answer.

7            "QUESTION:  So what do you mean by a successor?

8            "ANSWER:  Successor is someone you can grow into a

9    role, someone who would take on the responsibilities.  For

10   example, there are many things.  As I mentioned before, Steve

11   was not -- there were basic responsibilities of a manager that

12   Steve was not performing in late 2015.  And at this time, it

13   had been approximately a year, and Steve was still not

14   managing his team.  His team continued to come to me and ask,

15   you know, for direction.  They needed, you know, more support,

16   they needed guidance.  They needed someone to really have

17   these conversations with senior leaders."

18           Did I read that accurately, Ms. Johnson?

19   A    Yes.

20           THE COURT:  All right.  So you heard a lot about

21   successor.  It is part of your fact finding responsibility.

22   You heard explanations, you heard deposition testimony read

23   back, you heard cross-examination, you heard direct.  It is up

24   to you to sort it all out, you know, if it's relevant to you,

25   you know what it is all about.

1          MR. EIDELMAN:  Can I have the Elmo back?

2          THE COURTROOM DEPUTY:  Sure.

3   Q    I want to show you, Ms. Johnson, Plaintiff's Exhibit 42.

4   The highlights are mine.  And is this a question that

5   Mr. Shearer asked you about, about access to e-mail.  And the

6   lower e-mail is from Steve Barger to Steve Barger.  Did you

7   understand that someone at First Data was monitoring

8   Mr. Barger's e-mail?

9   A    Yes.

10  Q    Who was that?

11  A    His assistant, Gita.

12  Q    And then this e-mail comes -- it gets sent to Mr. Barger

13  on -- but it looks to me like he is sending you an e-mail on

14  December 5, 2016.  And is that from his work e-mail or his

15  personal e-mail?

16  A    His personal e-mail.

17  Q    And he is sending that to you.  And what is he asking you

18  about, do you know?

19  A    It says, the leave of absence forms, don't have access to

20  these forms, thought you filled them out, what do I do.

21  Q    Okay.  Plaintiff's Exhibit 37, Ms. Johnson.

22          THE COURT:  That's in evidence.

23          (Plaintiff Exhibit 37 received in evidence.)

24  Q    37.  Ms. Johnson, this is the cover e-mail from you to

25  Jennifer Voycheske, on November 23, 2016, and it says Steve

1    Barger forms; do you see that?

2    A    Yes.

3    Q    And then Mr. Shearer asked you something about these

4    forms, and one of the forms is this form that was signed by

5    Mr. Barger on, it looks like, November 21, 2016; is that

6    right?

7    A    Yes.

8    Q    And then you sent this form to -- and I asked you about

9    these previously, I believe, that this is the second form that

10   Mr. Barger signed, I think Mr. Shearer asked you about, that

11   was also on 11-16 -- 21, 2016, correct?

12   A    Correct.

13   Q    Now, in addition to these forms, I think the only other

14   form that you have testified to is the certification of health

15   care provider that Mr. Barger's doctor completed, correct?

16   A    I believe so, yes.

17   Q    Did you have -- were you responsible -- you didn't work

18   at the -- strike that.

19         You didn't work at the doctor's office, right?

20   A    No.

21   Q    You didn't control his doctors filling out that form,

22   right?

23   A    No.

24   Q    And I showed you this form before, do you remember that?

25         MR. ZEITLIN:  Objection.  This is beyond the scope

1   of the redirect.

2              THE COURT:  Which form is this now?

3              MR. EIDELMAN:  Your Honor, this is D-154.

4              MR. ZEITLIN:  There was no redirect about this.

5              THE COURT:  That's in evidence.

6              MR. EIDELMAN:  Yes, it is in evidence, Your Honor.

7              THE COURT:  I am going to allow it.  I mean, we are

8   not really holding strict to the structure of having direct

9   and redirect to each person calling their witnesses in turn.

10  I'll allow it.

11             MR. EIDELMAN:  Thank you.

12             THE COURT:  This is D what?

13             MR. EIDELMAN:  This is D-154.

14             THE COURT:  Let me find it.  D-154 is in evidence

15  already.

16             MR. EIDELMAN:  Yes, it is, Your Honor.

17             THE COURT:  Go ahead.

18  Q    So, Ms. Johnson, up at the top of D-154, there's a fax

19  date that this form is being sent, and it appears to be from

20  the doctor's office, right?  Do you see that up at the very

21  top?

22  A    I see the date.

23  Q    And what date is that?

24  A    December 14.

25  Q    Of 2016?

1    A    2016, yes.

2    Q    And the form from the doctor, that is December 14, 2016,

3    that you couldn't control because you didn't work at the

4    doctor's office, that was after this e-mail that Mr. Barger

5    sent you on November -- on December 5, 2016, indicating that

6    certain forms hadn't come in yet, correct?

7                 THE COURT:  It speaks for itself.

8                 MR. EIDELMAN:  It does.  Thank you, Your Honor.  I

9    was just trying to tie the two together.

10   Q    Ms. Johnson, on redirect Mr. Shearer asked you some

11   questions about conversations that you had with Tony Marino

12   and Karen Whalen about concerns -- about putting Mr. Barger on

13   leave in November of 2016; do you recall that?

14   A    Yes.

15   Q    Had you been aware of any circumstances that had occurred

16   prior to November of 2016 that led to your suggestion to

17   Mr. Marino and Ms. Whalen that Mr. Barger needed to go out on

18   leave?

19   A    Yes.

20   Q    And what were those?

21   A    There were several.  One was Steve had called one of his

22   employees to his home to try to recall an e-mail he said he

23   sent that he was embarrassed to have sent out, and trying to

24   get them to help him recall that message.

25                 Another one was three of the employees, Justin,

1  Paula, and, I apologize, I can't remember the other lady's

2  name, that came to my office, just they were very upset.

3  Steve often was very open about his condition, and, you know,

4  would share that with myself and others, but he showed up on a

5  video and he didn't have on a shirt.  They were -- they said

6  it was just very upsetting to continuously see Steve and for

7  him to continue to send e-mails about his situation.  But that

8  really wasn't everything, it was they still were having

9  trouble with the day-to-day management and really needed

10  direction.

11  Q    And these day-to-day management problems didn't just

12  start when Mr. Barger went out on leave, right?

13  A    No, they had been ongoing pretty much.  I noticed them a

14  couple months after I became the HR business partner, which is

15  why the team took up most of my time out of the -- of all the

16  SVPs that I supported.

17              MR. SHEARER:  Just one moment, Your Honor.

18              No further questions.

19              THE COURT:  Anything further, Mr. Shearer?

20              MR. SHEARER:  Just two questions, real quick.

21  FURTHER REDIRECT EXAMINATION

22  BY MR. SHEARER:

23  Q    You just testified about some -- an e-mail being sought

24  to be recalled, some employees come in, into your office, and

25  you named -- concerned about Mr. Barger.  Again, were there --

1  is there any written documentation of these complaints about

2  Mr. Barger?

3  A    The employees came to me personally because I had

4  partnered so much with Steve.  They --

5          THE COURT:  The question is, is there any

6  documentation, any written documentation?  Or is it just oral

7  communication?

8          THE WITNESS:  I believe it was all verbal

9  communication.

10          THE COURT:  All oral.  Next question.

11  Q    And you said Justin, Paula, and another lady you couldn't

12  remember.  Was it Julie Kelly, the third one?

13  A    I would have to check.

14  Q    And just help me clarify this, because these two ideas

15  seem incongruent.

16          In July and August of 2016, you are telling Steve to

17  find a successor, but then on January 13 of 2017, his position

18  is eliminated.  So how can --

19          THE COURT:  Ask the question.

20  Q    My question is, why are you looking for a successor to a

21  position soon to be eliminated?

22          THE COURT:  You understand the question?  He's

23  trying to find out, if the position was going to be

24  eliminated, why are you looking for a successor.

25          THE WITNESS:  Exactly.

 1             THE COURT:  And it seems to be inconsistent.

 2             THE WITNESS:  Exactly.

 3             THE COURT:  You will answer that, explain it, and we

 4    will move on.

 5    A    At that time, the spans and layers for that level had not

 6    been identified, so that exercise came later.

 7             THE COURT:  That's your answer.  Next question.

 8             MR. SHEARER:  That's it.  Thank you.

 9             THE COURT:  All right.

10             MR. EIDELMAN:  Nothing further, Judge.

11             THE COURT:  All right.  Thank you very much.  You

12    can step down.

13             (WHEREUPON, the witness was excused.)

14             THE COURT:  So we kept you a little bit later today

15    than we normally would for our afternoon break.  We will take

16    15 minutes, and we will have the next witness when you return.

17    Don't talk about the case.

18             THE COURTROOM DEPUTY:  All rise.

19             (WHEREUPON, at 3:54 p.m., the jury exited the

20    courtroom.)

21             (Continued on the next page.)

22

23

24

25

1           (Open court; no jury present.)

2           THE COURT:  Who's the next witness?

3           MR. SHEARER:  Your Honor, we need to read in some

4    depositions from the doctor and the nurse.

5           THE COURT:  You want to read deposition

6    testimony?

7           MR. SHEARER:  Yes.

8           The doctor and the nurse.

9           THE COURT:  Any problem with that?

10          MR. EIDELMAN:  I have no problem with that,

11   Your Honor.

12          Just sort of a procedural matter actually, which is,

13   I believe don't believe there's going to be any other

14   witnesses that can testify about Ms. Johnson's role in this

15   case, and she's named as an individual defendant on the FMLA.

16   And --

17          THE COURT:  You want to move to dismiss her as a

18   party?

19          MR. EIDELMAN:  Yes, Your Honor, I would.

20          THE COURT:  We will talk about it after the jury

21   leaves today.

22          MR. EIDELMAN:  Very good.

23          Thank you, Your Honor.

24          THE COURT:  We will talk about a few things.  But in

25   the meantime, we will have deposition testimony.  Will that

*PROCEEDINGS*                                                    253

1    take up the rest of the day?

2              MR. SHEARER:  Yes.

3              THE COURT:  Okay, fine.

4              (WHEREUPON, a recess was had at 3:55 p.m.)

5              (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

254

1          THE COURT:  So, folks, at this time I am told that

2   Mr. Shearer would like to read in some deposition testimony,

3   so I told you before about deposition testimony and this is

4   going to be the testimony of who?

5          MR. SHEARER:  Dr. Harry Baddour and, if there's

6   time, his registered nurse, Ms. Parrish, Ashley Parrish.

7          THE COURT:  First it is going to be a doctor, right?

8          MR. SHEARER:  Yes.

9          THE COURT:  So, we have doctors who testify,

10  sometimes they're not available, they are busy operating on

11  people, whatever, so their deposition testimony will be

12  allowed to be read as substantive evidence just as if they

13  were here and testified in front of you as a live witness,

14  okay.

15         So, how much time will that be?

16         MR. SHEARER:  I think we can get the doctor in, I

17  don't know that we can get them both in, in half an hour.

18         THE COURT:  I just asked you a question, how much

19  time do you anticipate the doctor's deposition testimony will

20  be?

21         MR. SHEARER:  20, 25 minutes.

22         THE COURT:  Let's do that, that will end the

23  festivities for the day, we'll pick up tomorrow.

24         Let's go.  Nice and slow and loud and clear.

25         So, how this is to happen, pretend it is like Perry

*Deposition - Harry M. Baddour, MD*                    255

1   Mason, so the question is going to be asked.  Who is going to

2   pretend to be the doctor?

3          MR. ZEITLIN:  I'll be playing the doctor.

4          THE COURT:  Why don't you sit up here as if you're

5   testifying.

6          MR. SHEARER:  We're going to stumble over some

7   medical terms I assure you.

8          THE COURT:  Speak clearly, question and answer.

9          MR. SHEARER:  Do you want us to say question or just

10  read the question, Your Honor?

11         THE COURT:  You read the question that was asked of

12  the doctor.

13         And this is going to be doctor whom?

14         MR. SHEARER:  Dr. Harry Baddour.

15         MR. ZEITLIN:  Harry Baddour, Your Honor.

16         THE COURT:  All right, we have that.  And pretend

17  that this is the doctor, okay.

18         MR. ZEITLIN:  These are excerpts from a deposition

19  dated Monday, June 25th, 2018.

20         MR. SHEARER:  The questions were being asked by

21  Lindsey Kennedy and subsequent questions were asked by myself.

22         So, initially this is Ms. Lindsey Kennedy of Saul

23  Ewing asking questions.

24

25  "Q    So, what is your current position?

1  A    I'm an assistant professor of Head and Neck Surgery at

2  Emory University.

3  Q    How long have you held this position?

4  A    2000 -- July of 2016.

5  Q    What are your major duties and responsibilities as

6  assistant professor?

7  A    So I do surgery on patients with head and neck cancer,

8  and then their reconstruction if needed.

9            THE COURT:  You sound just like a doctor.

10           MR. ZEITLIN:  Thank you.

11 Q    Do you ever communicate with employers with patients

12 regarding their medical condition and their eligibility to

13 return to work?

14 A    No, ma'am.

15 Q    Do you ever communicate with third-party benefit

16 administrators, such as MetLife, about patient's medical

17 conditions in connection with their return to work?

18 A    No.

19 Q    When was the first time you met Mr. Barger?

20 A    2015.  I believe.

21 Q    How did you meet him?

22 A    He was a referral from an outside ENT provider in Atlanta

23 who contacted me so that we could see him because he had

24 laryngeal cancer treated with radiation and had persisted.  So

25 he was being referred for evaluation for surgical therapy

1   because the outside ENT provider didn't do that procedure

2   anymore.  That was beyond the scope of what he normally does.

3   Q    Okay.  Were you aware that Mr. Barger was employed by

4   First Data Corporation?

5            MR. SHEARER:  Oops, did I skip?

6            MR. ZEITLIN:  What page are we on?

7            MR. SHEARER:  Page nine.

8            MR. ZEITLIN:  Repeat the question please.

9            MR. SHEARER:  Yes.

10  Q    Okay.  Were you aware that Mr. Barger was employed by

11  First Data Corporation?

12  A    Not prior to this deposition.

13  Q    When did you learn that he had been employed by First

14  Data?

15  A    When I received the deposition.

16  Q    Did you ever speak with Mr. Barger about his employment

17  situation while you were treating him?

18  A    Not that I remember.  In general I don't have that

19  conversation with my patients.

20  Q    Can you describe the medical condition for which you

21  treated Mr. Barger?

22  A    He had a recurrent cancer of his voice box that required

23  removal of his voice box and then reconstruction following it.

24  Q    Did you perform either of these procedures?

25  A    I did not.

1  Q    So the removal of the voice box is one procedure and then

2  the reconstruction is a totally separate one; is that right?

3  A    It's usually done at the same time, same day.

4  Q    Did he also have something -- and I'm going to butcher

5  the pronunciation -- called a pharyngocutaneous fistula?

6  A    He did.

7  Q    How do you say that, by the way?

8  A    Pharyngocutaneous.

9  Q    I told you I'd butcher it.  Is it okay if I refer to that

10 as a fistula for this deposition?

11 A    That's what we call it anyway.

12 Q    Did you treat him for that condition?

13 A    Correct.

14 Q    What is that?  What is it a pharyngocutaneous fistula?

15 A    So when you take the voice box out, the pharynx or the

16 throat has an opening in the front that was closed off by the

17 larynx, so the voice box, but since it's gone, it's basically

18 an open tube.  So you close it back on itself and you bring

19 the two edges of the throat back together.  However, if

20 there's a leak of spit from the new closure incision line,

21 then you develop a fistula where spit leaks out in your neck.

22 Q    So you treated him for the fistula and recurrent cancer;

23 is that accurate?

24 A    Correct.  Well, I did not perform the surgery but treated

25 him for the fistula following.

Deposition - Harry M. Baddour, MD                    259

1  Q    So did you not perform any surgical procedures on him?

2  A    No.

3  Q    Do you know if Mr. Barger ever got any follow-up

4  surgeries or procedures other than the removal of his voice

5  box and the reconstruction.

6  A    He had his voice box prosthesis placed at the same time

7  as the original surgery.  So following that he didn't have

8  any, since I've taken care of him, any other head or neck

9  procedures.  So the resection reconstruction and the voice

10 prosthesis were all one surgery.

11 Q    How often do you care for patients who have undergone

12 this tripartite surgery that you just be described?

13 A    That exact surgery?

14 Q    Yes.

15 A    No.  Probably see one or two every week in my clinic and

16 I only have clinic one day a week.  No.

17 Q    Did you see Mr. Barger in the clinic?

18 A    Correct, after he saw Dr. Rogers, I saw him.  Then he had

19 a surgery performed elsewhere and then he came back and that's

20 when I picked up his care again.

21 Q    So if you're in the clinic one day a week, what are you

22 doing the other days of the week?

23 A    I have cases three days a week and then administrative

24 day.

25 Q    When up say cases, do you mean surgeries?

1  A    Yes.  Just like his.

2  Q    How often do you perform voice box removal and

3  reconstruction surgery?

4  A    Probably one to two a month.  That case takes about eight

5  hours.

6  Q    What's the recovery process typically like for this kind

7  of surgery?

8  A    Their throat.  So after they've been radiated it takes

9  longer for their wounds to heal.  So we usually tell them, you

10  know, to prepare for four to six weeks of recovery, longer if

11  you've been radiated or you have a complication, such as a

12  fistula or your other wounds don't heal in your neck.

13  Q    For somebody that did undergo radiation and also

14  developed a fistula, what would you say is the average

15  recovery time?

16  A    So if it's a small fistula that can be packed with

17  packing changes in the neck if it's small, then the recovery

18  is going to be probably in total around two -- two to -- two

19  months, two to three months, something like that.

20        Because it will delay -- it's going to delay his

21  recovery if he's still got an open drain wound in his neck.

22  It will take him longer to be strength-wise back where he was

23  preoperatively.

24  Q    Would you consider Mr. Barger's fistula to be a small

25  fistula like you described or something bigger?

1  A    No, it was a pretty sizeable fistula and he had an

2  additional problem of the spit kind of leaking down into his

3  airway.  So he came back from a complication of his

4  complication with shortness of breath, coughing, and had

5  developed pneumonia postoperatively, even after I saw him for

6  the original complication of the fistula.  Or it might have

7  been the same visit.  I can't remember but he came back and he

8  was -- he did he not look well.

9  Q    Given what you've just described to me, this complication

10 of a complication, and I think you described Mr. Barger's

11 fistula as being sizeable, what would you say was his overall

12 recovery time?

13 A    So when he came originally, I initially thought that his

14 fistula was large enough that we were going to have to take

15 him back to actually do a revision reconstruction, which I've

16 never had to do, and most of the them close on their own but

17 his was big enough to where I didn't think it was going to

18 close on its own, but we gave it the benefit of the doubt,

19 starting packing it.

20        It started getting smaller.  The output started

21 decreasing.  He started looking better but his recovery -- I

22 mean from what I -- from start to finish he had at least three

23 months of pretty hard recovery because the fistula took a long

24 time to close because it was big, a big hole.

25        He also had some -- had external -- had an ex -- his

1   muscle from his chest that used to close the reconstruction

2   was exposed.  So he actual had an open wound on the other side

3   that was not -- it didn't have anything to do with his fistula

4   but it still had to heal because it was just exposed.  So that

5   took an additional -- took time for new skin to grow over

6   that.

7   Q    How long are individuals who undergo this type of surgery

8   and these complications you've been describing typically out

9   of work?  And let me clarify.  I'm assuming they have an

10  office job, they're not doing hard labor or something.

11  A    Right.  I usually tell them -- or for this case, I knew

12  he was going to be out at least three months, because I didn't

13  think it was going to heal very quickly because radiation

14  stunts healing.  I mean a lot.  It really slows things down.

15  So we give it a lot of extra time for healing because it just

16  doesn't seem to make much progress week to -- sometimes it

17  takes -- you can't even look at it week-to-week.  You have to

18  look at it every two weeks, because you can't really tell if

19  it made any progress within the week or not.  So it's kind of

20  slow.

21  Q    When you say three months, do you mean three months from

22  the time he developed the fistula or three months --

23  A    So from the time that he started -- so when he presented,

24  I didn't know if he was ever going to heal the fistula, and

25  that I thought we might need to do another surgery to close

1    the hole.  So that's the first visit.  Then I think I saw him

2    a couple of weeks after that, after his lung issue cleared up,

3    because he came in really short of breath and had pneumonia,

4    from what I remember, and he then -- from that point where he

5    kind of turned the corner and was stabilized, I expected him

6    to be not -- that fistula was probably not going to be closed

7    for around three months.

8    Q    Do you recall --

9    A    Because I really didn't think it was going to but it

10   surprised me that it did.  It just took a long time.

11   Q    Three months from the time you got him stabilized?

12   A    Yeah.

13   Q    Just to clarify, the time he was stabilized was when his

14   fistula started healing?  I'm still trying to understand --

15   A    Right.  So he came in -- so his fistula wasn't so much an

16   imminent threat to his health as it was -- as was his lung

17   issue that had developed as a result of his fistula, because

18   he came in and he was very uncomfortable.  He was coughing up

19   a lot of mucous.  He was very short of breath.  I think I sent

20   him to the ER from our clinic to get a chest X-ray and a

21   workup.

22   Q    Do you recall when that was?

23   A    That was -- I want to say that was three weeks -- or

24   maybe -- no, it wasn't that long.  Maybe two weeks after his

25   surgery in Tampa.  Because he came back and he was in bad

1    shape when we originally saw him, when we initially saw him.

2    Q    When individuals who have undergone such surgery and such

3    complications return to their jobs, do they typically return

4    with restrictions or limitations?

5    A    Well, his case is unique in that the --

6         You know, we didn't really know how his whole -- he

7    lost his voice box, so I guess depending on his scope of work,

8    it was going to affect what he could do and communicate.  But

9    his prosthesis that he had placed during the initial surgery

10   ended up working extremely well for him, but I had -- we don't

11   typically put the prosthesis in at the time of the resection

12   and reconstruction.  We never do that.  So I didn't know the

13   outcome of what his voice was going to be like or if that

14   prosthesis was going to work, considering he had already had

15   wound complication with the fistula healing.

16        So basically the prosthesis is a valve that sits in

17   his new airway here, in his neck, and it allows -- it's a

18   one-way valve that allows air in and allows him to speak out

19   of his mouth without a voice box.  So I didn't know how well

20   he was going to function at work because I don't know his

21   duties, whether he would have to write or whether he would

22   have to use electrolarynx, which is a robotic type of speaking

23   apparatus, or like an iPad and then voice -- you type it --

24   you can type it in and then it says it out loud for you.

25   Those are all other manners we have people use but it adds

*Deposition - Harry M. Baddour, MD*                                265

1   significant time to their communication.

2            You know, it takes a lot just to get a sentence out

3   sometimes.  So I didn't know how that would impact, nor I

4   wasn't aware of what he did."

5            MR. SHEARER:  They then displayed Defendant's

6   Exhibit number one.

7   Q    Do you know what this document is generally?

8   A    Yes.

9   Q    Do you complete these regularly for patients?

10  A    Correct.

11  Q    Whose signature is that at the bottom of the second page?

12  A    I don't know.

13  Q    Do you believe that it's someone who worked with you

14  given your name is listed in the provider's name section?

15  A    Correct.

16  Q    This person's, whoever it is, the signature appears to be

17  dated December 13, 2016?

18  A    Correct.

19  Q    Would you agree with me that this form indicates that the

20  beginning date of Mr. Barger's period of incapacity for

21  purposes of this form was October 22nd, 2016?

22  A    Correct.

23  Q    Would you agree with me that this form indicates that his

24  return to work date is March 1st, 2017?

25  A    Correct.

*Deposition - Harry M. Baddour, MD*                                    266

1   Q    Do you know how this date was chosen, the March 1st date?

2   A    I do not.

3   Q    Do you recall having any discussions with Mr. Barger

4   about this March 1st return to work date?

5   A    I do not remember any of those discussions.

6   Q    Do you recall having discussions with anyone else in your

7   practice about the March 1st return to work date for Mr.

8   Barger?

9   A    I don't remember any specific conversations."

10            MR. SHEARER:  Then they displayed Defendant's

11  Exhibit 2.

12  Q    What are these documents?

13  A    So these are ENT clinic notes for our head/neck clinic.

14  A lot of these look like they're speech language pathology

15  notes from our speech pathologists who work in our clinic, who

16  see all of our laryngectomy patients and then care for them

17  postoperatively from a swallowing and a voice rehabilitation

18  standpoint, particularly if they have a TEP.

19            Then some of these, some of these notes are from the

20  provider.  So either myself, our nurse practitioners, who are

21  looking more at their clinical progress and surveillance from

22  a cancer recurrent standpoint.

23  Q    What does TEP stand for?

24  A    So tracheoesophageal prosthesis.

25  Q    And ENT stands for ear, nose and throat?

1   A    Correct.

2   Q    What does NTE stand for?  I see that at the top of a lot

3   of these pages.

4   A    A note.  Our speech language pathology evaluations,

5   they're different templates than our clinical notes, but they

6   all follow under the ENT note.

7   Q    What does it mean when it says, "Final Report"?

8   A    That's if the -- that's once the final provider signs off

9   on the document.

10  Q    And that final provider can be the speech language

11  pathologist or you?

12  A    Or the nurse practitioner, uh-hum.

13  Q    I'd like to draw your attention to a page 17 about

14  halfway through that has Emory 0048 at the bottom right-hand

15  corner.

16  A    Okay.

17  Q    The date on it above the documented date is December 9,

18  2016.  Do you see that?

19  A    I do.

20  Q    If you look at Page 3 of 3 of this, which ends in Emory

21  0050, it says it was co-signed by you.  Is that correct?

22  A    Yes.

23  Q    Can you read for me the last sentence on the first page

24  underneath "History of Present Illness," the last sentence of

25  that second paragraph?

*Deposition - Harry M. Baddour, MD*          268

1    A     Which page?

2    Q     Page 1 under History of Present Illness?

3    A     Starting with Interim History?

4    Q     Above that.

5          Yes, I'm sorry.  Both paragraphs start 18 with

6    Interim History.

7          The one that says "his postop course."  Can you read

8    that?

9    A     "His postop course was complicated by a pharyngocutaneous

10   fistula and therefore underwent left pec muscle flap and

11   AlloDerm closure but unfortunately he continued to have a

12   PCF," pharyngocutaneous fistula, "draining to the right

13   neck."

14   Q     Thank you.  You answered one of my questions already.

15   What is left pec muscle flap and AlloDerm closure?

16   A     So he developed a fistula while he was postoperatively

17   recovering at the other institution, and they decided to close

18   over the fistula with a muscle flap from his left chest.  I

19   believe it was his left chest.  His pectoralis muscle.

20   Q     Let's look at the next page, Page 2 of 3.  I'm looking

21   underneath the heading of Assessment/Plan.

22          Can you read No. 3 for me underneath that?

23   A     Yes.  "Will cancel planned pharyngeal reconstruction

24   given pharyngeal defect is near closed."

25   Q     And what does that mean?

*Deposition - Harry M. Baddour, MD*                    269

1   A    That means that he, in our words, had kind of turned the

2   corner and his fistula output had decreased.  His fistula size

3   of the wound in his neck had decreased.  So the plan for

4   further reconstruction looked like it would not be indicated.

5   Q    Did you decide on December 9th, 2016, that 21 the

6   reconstruction surgery would not be necessary for Mr. Barger?

7   A    Correct.

8   Q    Let's now look at the document which begins with Emory

9   0039, just a few pages ahead?

10  A    Okay.

11  Q    This appears to be another speech language pathology

12  progress note, this time dated January 10, 2017.  Is that

13  correct?

14  A    Correct.

15  Q    This one seems to be signed by rehab therapist Merrill

16  Kaufman; is that right?

17  A    Correct.

18  Q    Did you see Mr. Barger on January 10, 2017?

19  A    I do not know.

20  Q    But this document does not indicate that you did, right?

21  A    I know that the speech pathologist who saw him in this

22  visit, and I never overlapped on days in the clinic so I don't

23  believe I saw him with her.

24  Q    On the first page, underneath the Basic Information

25  heading, the last two sentences there, which starts with

1   "patient now taking," can you read those for me, please?

2   A    "Patient now taking normal diet PO," or by mouth, "and

3   using TEP," or tracheoesophageal prosthesis, "for

4   communication.  Patient reports he has not used PEG in one

5   month and had it removed in clinic by Ashley Parrish, RN

6   today."

7   Q    And remind me what PEG is?

8   A    Percutaneous endoscopic gastrostomy.  It's a stomach

9   tube, a tube in his stomach to feed him.  A gastrostomy tube

10  is a stomach tube.

11  Q    And what's the procedure like to remove that?

12  A    Usually you deflate the balloon that's keeping the tube

13  in the stomach, in the stomach wall, and then you just pull it

14  out and the hole closes on its own, after you put a dressing

15  over it.

16  Q    Is it something that a patient typically has to make an

17  appointment for or is it something that can just be done --

18  A    While they're there?

19  Q    -- while they're there?

20  A    While they're there, yes.

21  Q    At this time, when you saw him on January 16 20th, 2017,

22  were you concerned that Mr. Barger was continuing to suffer

23  from his complications following the surgery?

24  A    At that point I thought that he was -- had started on a

25  path, positive progress.

*Deposition - Harry M. Baddour, MD*                    271

1  Q    As of January 20, 2017, did you think that he would be

2  able to be working without any restrictions or limitations in

3  an office-style setting?

4  A    It would depend on what his requirements were at his job

5  and if his -- just because he has the prosthesis, if he

6  doesn't know how to use it, then his communication can still

7  suffer significantly from that, because they have to learn how

8  to use it.

9        And I think at this point his -- he was taking

10 everything by mouth and was not using his feeding tube because

11 I think his feeding tube had been pulled at the prior visit

12 with Meryl Kaufman.

13       So wound care wise, he would have had the 11 left

14 pec closure was healing.  So at this point it would be mostly

15 a communication issue for him in terms of restrictions."

16       MR. SHEARER:  Then they displayed Defendant's

17 Exhibit 3.

18 Q    I'm handing you what has been marked as Exhibit Number 3.

19 A    Okay."

20       THE COURT:  Is that Exhibit 3 that now you want in

21 evidence here?

22       MR. SHEARER:  At the end of this I will give you the

23 list of the documents.

24       THE COURT:  These are all documents that you have on

25 your list here?

*Deposition - Harry M. Baddour, MD*                    272

1        MR. SHEARER:  They're 101 to 110.

2        THE COURT:  Well, no, I just want to make sure that

3   there's not going to be a problem in admitting them into

4   evidence.  You want them in evidence in coordination with the

5   doctor's testimony, right?

6        MR. SHEARER:  Yes, I do.

7        THE COURT:  Just make sure we have a clear record

8   when the jurors leave or even before they leave what you want

9   in evidence.

10

11       MR. SHEARER:  Okay.  I was going to do that at the

12  end.

13       THE COURT:  Go ahead.  How much more do you have?

14  I'm not rushing you.

15       MR. SHEARER:  Three, four more pages.

16       THE COURT:  Let's see whether you can finish it

17  today.

18  Q    I'm handing you what has been marked as Exhibit Number 3.

19  A    Okay.

20  Q    This is a document that has Emory 0093 on the bottom

21  right-hand corner.

22       Have you ever seen this document before,

23  Dr. Baddour?

24  A    Not that I recall.

25  Q    Can you read for me what it says in the mainline of the

*Deposition - Harry M. Baddour, MD*                    273

1  document?

2  A    "Steve even Barger is a patient of Dr. Harry Baddour.  He

3  is cleared to return to work on January 17th, 2016."  which I

4  think that should read 2017, "without any restrictions."

5  Q    Do you know why his return to work date was moved up

6  significantly from March 1st to January 17?

7  A    I suspect his progress with his fistula closure, his

8  medical -- his lung, his pulmonary or lung status, being able

9  to breathe more comfortably, and then his wounds healing.

10  Q    You're saying you suspect but you don't as you sit here

11  today have specific knowledge of that having happened,

12  correct?

13  A    I don't remember his status.  I mean based on the

14  previous exhibit, my note from January --

15  Q    Feel free to look.

16  A    January 20th.  Yes, January 20th, it appeared that he had

17  made significant progress in terms of his fistula being

18  closed, learning to speak again with his prosthesis.

19         MR. SHEARER:  Then Exhibit 4.

20  Q    Would you agree as of January 10, 2017, Mr. Barger has a

21  fistula and has to change dressings periodically and he's

22  trying to get the fistula to close?

23  A    Do I agree?

24  Q    Correct.

25  A    No.

1    Q    And why not?

2    A    His fistula had closed by then.

3    Q    How do you know that?

4    A    From our previous clinic documents.

5    Q    The January --

6    A    The 20th.

7    Q    -- 20th one?

8    A    Correct.

9    Q    Where in this January 20th document does it say that his

10   fistula has closed and that he does not have those

11   restrictions listed in this exhibit?

12   A    "Excision is well healed," under the neck subheading

13   under the physical exam.

14   Q    Does it say anywhere in this document about his

15   restrictions or lack thereof?

16   A    In this same -- January 20th?

17   Q    Correct.

18   A    I do not see any documentation of that that I entered on

19   his restriction.

20   Q    I think you said earlier that you did not agree that as

21   of January 10th that he had lifting restriction, eating

22   restrictions and talking restrictions.  So I'm trying to

23   understand the basis for your knowledge of that.

24   A    Well, we -- so eating restrictions he did not have

25   because on January 10th, in the note by Meryl Kaufman, he got

1   his stomach tube removed.  So he was taking -- and she noted

2   that he was taking a normal diet by mouth.

3            So he no longer had eating restrictions as of

4   January 10th.

5            This one.

6   Q    Correct, yes?

7            Then talking restrictions --

8            MR. ZEITLIN:  That's me.

9   A    Then taking restrictions he was as of January 10th doing

10   fairly well with his prosthesis and had learned how to use it.

11   So he did not have talking restrictions in that he was still

12   learning how to speak again but he was coming along well."

13            MR. DILORENZO:  Your Honor, there's two errors.

14   First, it is talking, not taking.

15            THE COURT:  He read it incorrectly?

16            MR. DILORENZO:  Yes.

17            THE COURT:  You read it correctly.

18            MR. DILORENZO:  Then talking restrictions he was as

19   of January 10th doing fairly well with his prosthesis and had

20   learned how to use it.  So he did have talking restrictions.

21   I think the witness said, "he did not have talking

22   restrictions."

23            THE COURT:  Well, did he have --

24            MR. DILORENZO:  I apologize, it says --

25            THE COURT:  Doctors get a little confused.

1          Anything else?

2  A    He did have talking restrictions in that he was still

3  learning how to speak again but he was coming along well.  And

4  then lifting restrictions, he at that point did not have any

5  lifting restrictions."

6          THE COURT:  We've got it down right, Mr. DiLorenzo,

7  everybody satisfied now?

8          MR. DILORENZO:  Yes, Your Honor.

9          THE COURT:  Continue.

10 Q    So, is it fair to say that sometime between December 13,

11 2016 and January 10, 2017, Mr. Barger had healed substantially

12 such that he was able to return to work without any

13 restrictions whatsoever?

14 A    At what time point?

15 Q    As of January 17th, the date that he was cleared to

16 return to work?

17 A    His only restriction after looking at this would be his

18 speech, talking.

19 Q    What kind of restriction?  What does that mean?

20 A    Learning how to communicate with his prosthesis.  Because

21 that would -- relaying information was going to take him a lot

22 longer than it would someone that had their voice box.

23 Q    And you're telling me that as of January 10, 2017, as far

24 as you were aware, he could return to work, able to perform

25 his job without any of these limitations or restrictions; is

1   that right?

2   A    No.  He would still have the talking restriction.

3   Q    I'm sorry, did you say that?

4   A    Yes.

5   Q    So he would have the talking restriction?

6   A    But the eating no.  Walking no.  Lifting, no.  But

7   communicating, yes.

8   Q    So aside from the specific restrictions and limitations,

9   how is it that on December 13th he could not do his job and

10  had to be out of work, and then January 10th he could go to

11  work without any restrictions or limitations?

12         What happened in that month-long period?  Because to

13  me it seems like some sort of miraculous recovery.  So, in

14  your words, what happened?

15  A    So once his fistula healed, that allowed his voice -- so

16  that means that his throat is closed.  So once his throat, his

17  new throat is closed, then he can take things by mouth, so he

18  can eat again and not use the feeding tube.  And then he can

19  use his prosthesis at that point because prior he could not.

20  If you have a fistula, you cannot use your prosthesis because

21  your fistula is reliant on your throat being completely closed

22  to generate and hold sound, you know, the breath that you

23  breathe 21 in.

24         So he didn't -- until that fistula closed, he was

25  never going to make any progress with eating or speech.  But

1    once it closed over that four-week period of time, then he can

2    make progress with those two functions.

3    Q    As you sit here today, and you see that his return to

4    work date was initially March 1st, 2017, and then you see that

5    he was cleared to return to work on January 17th, are you

6    surprised by that?

7    A    No, because he made progress that I was unsure he was

8    going to make, given his significant problem in, you know --

9    December 13th.

10   Q    Would you consider that unusually good progress or

11   remarkable progress, or is that just kind of par for the

12   course, that you don't know when these fistulas are going to

13   heal?

14        Were you pleasantly surprised --

15   A    Yes.

16   Q    -- by that progress?

17   A    Yes.

18   Q    Is it unusual, given the rest of his medical situation?

19   A    I wasn't surprised that his fistula closed, but I was

20   surprised that he swallowed very well with his new throat.

21   Because some people need their feeding tube in addition to

22   taking things by mouth, because they still have trouble

23   swallowing through their new throat, because the mechanism is

24   completely different now for them.

25        And then I was surprised at how quickly -- not how

1   quickly but how his prosthesis actually worked well

2   considering how big his fistula was upon presentation."

3           MR. SHEARER:   Exhibit Number 5 now.

4   Q    So I'm handing you what has been marked as Defendant's

5   Exhibit No. 5.  This is a document that goes from range

6   MetLife 0035 through MetLife 0040.

7           Is that the document that you have in front of you?

8   A    Correct.

9   Q    Have you ever seen this document before?

10  A    No.

11  Q    I'd like to ask you about a particular row in this

12  document and unfortunately it breaks across a couple of pages

13  but it begins on page -- where it says at the top 3 of 84 and

14  at the bottom it's MetLife 0037.

15  A    Okay.

16  Q    So I'd like to ask you have a few questions about this

17  row.  You're welcome to read all the information at the top if

18  you'd like but I really would like to ask you about the

19  information that appears at MetLife 0039, just a few pages

20  later.

21  A    Okay.

22  Q    Second full sentence, the Comment field, can you please

23  read that for me, that begins with per Dr. Baddour's office?

24  A    "Per Dr. Baddour's office as of 1/10/17 EE has lifting

25  restrictions, eating restrictions, talking restrictions

1  currently.  Treatment plan EE has a fistula and has to change

2  dressings periodically.  Trying to get fistula to close."

3  Q    Is that in and of itself an accurate statement?

4  A    As of 1/10/2017?

5  Q    Correct.  Based on your knowledge?

6  A    No.

7  Q    And why not?

8  A    Because -- well, I didn't see him until 1/20, and

9  everything had healed.

10         I'm not sure if 1/10 it was any different than it

11  was 10 days later, when I saw him.  But on -- where is Meryl

12  Kaufman's?

13         Okay.  So on 1/10/20 through 17, per Meryl Kaufman's

14  note, he had normal diet by mouth and his feeding tube was

15  removed.  So eating restrictions, not accurate.

16         And he had not any -- not any lifting restrictions

17  that I would be aware of at that point.

18         And the talking restriction is the learning how to

19  use his prosthesis.

20         But not the last sentence talking about fistula,

21  having to change dressings periodically, trying to get it to

22  close."

23         MR. SHEARER:  Then Shawn Shearer begins questioning.

24  Q    Then Exhibit 2 that says Emory 49 at the bottom.

25  A    Okay.

1  Q    This is where you read No. 3 under the Assessment Plan.

2  So this one is dated -- so December 9, 2016, you said you're

3  cancelling the plan for reconstruction given pharyngeal defect

4  is near closed.

5          So correct me if I'm wrong, but was it December 9

6  that you decided the fistula was sufficiently closed that

7  surgery was not needed?

8  A    Correct.

9  Q    Then on 12/13, December 13th, back to Exhibit 1, that's

10  when the medical information was given to MetLife; is that

11  correct?

12  A    It doesn't have that on Exhibit 1 to MetLife, but I

13  assume that's what this is.  Am I to assume that's what this

14  is?

15  Q    Defendant's 1 was signed on December 13th.

16  A    Correct.

17  Q    Throughout your testimony there was a lot 25 of talk

18  about restrictions, and I'm a little unsure as to whether what

19  everyone thinks the term "restrictions" means.

20          When you say he has a restriction, what does that

21  mean to you?

22  A    That he cannot complete his job duties and functions as

23  easily as he could prior to his surgery.  He can't execute

24  them as easily.  Though he may be able to get them done, it

25  will give him -- it will require additional time for him.

*Deposition - Harry M. Baddour, MD*                    282

1   Q    So it does not mean that is an order from you not to

2   work?

3   A    Correct.  Because we frequently have people go back to

4   work with restrictions, meaning they can go to work but we

5   don't want them -- if they're having wound care on their left

6   leg from something we took from their left leg to put in their

7   face, then we don't want them walking a lot on that leg, or

8   sweating, and things like that.

9           So we do put restrictions for certain things.

10  Q    Back when you were describing what ADL is on here, was it

11  daily living --

12  A    Activities of daily living.

13  Q    And you gave examples of you can't brush your teeth, make

14  your own food.  You gave a list of examples.

15          My question is, were those examples or were those,

16  of ADL, or were those what Mr. Barger experiencing at the

17  time?

18  A    Those were examples.

19  Q    Do you recall if Mr. Barger -- if can you look at

20  Emory -- it's Exhibit 2, what's marked as Emory 0042 and it's

21  under Speech Therapy Evaluation.

22  A    Okay.

23  Q    It's about a third.  We talked about the Dale collar.

24  You see where the Dale collar is?

25  A    Correct.

1   Q    The sentence before that, can you read that?

2   A    Patient speaking?

3   Q    Yes.

4   A    "Patient speaking with TE speech to communicate with

5   excellent Intel ability."

6           MR. SHEARER:  And Ms. Kennedy, follow-up.

7   Q    You described for Mr. Shearer what ADL is, activities of

8   daily living --

9           THE COURT:  Mr. Shearer, you've got to go slower.

10  We are at five o'clock, I thought you would be finished.  How

11  much more?

12          MR. ZEITLIN:  Literally one more page.

13  Q    You described for Mr. Shearer what ADL is, activities of

14  daily living.  Examples you gave earlier were general

15  examples?"

16          THE COURT:  Go slower, we have a reporter that has

17  to take your words down.

18  Q    Examples you gave earlier were general examples of ADLs,

19  correct?

20  A    Correct.

21  Q    What was Mr. Barger himself experiencing in terms of his

22  restrictions on ADLs as of the date of this document,

23  December 13, 2016?

24  A    At that point -- well, he couldn't -- I think his wife

25  was helping him feed himself with the feeding tube in his

1   stomach, to assist him with that and prepare the -- I'm not

2   sure what nutrition he was on at that point, if he was just on

3   like Boost and Ensure, or he was supplementing that with other

4   blended food.  So I know eating was something that he was

5   probably needing assistance with.

6           Dressing changes at that point, from his wife as

7   well, because it's really kind of hard to do by yourself.

8           But as far as walking, brushing teeth, combing hair,

9   showering, I don't know what restrictions he would have had at

10  that point, except not getting his wound wet.

11          But other than that, I'm not aware of specific ones

12  he had."

13          MR. SHEARER:  That's it.

14          THE COURT:  Okay, fine.

15          MR. SHEARER:  Your Honor, I would like to move to

16  have those exhibits that are referenced in here --

17          THE COURT:  All these have been referenced, there's

18  been no objections to any of them I take it.

19          MR. EIDELMAN:  There actually is an objection on

20  page --

21          THE COURT:  Well, let me just send the jurors home.

22  Which ones do you have an objection to?

23          MR. EIDELMAN:  I have an objection to the

24  reference --

25          THE COURT:  Do you have an objection to one of those

*Proceedings*                                                      285

1    exhibits?

2              MR. EIDELMAN:  Yes, because it is not in evidence,

3    Defendant's Exhibit 5.

4              THE COURT:  We want to send the jurors home.

5              MR. EIDELMAN:  Yes, Your Honor.

6              THE COURT:  We'll talk about all of the exhibits

7    that have been referenced will be allowed in evidence except

8    which one?

9              MR. EIDELMAN:  It would be Defendant's Exhibit 5

10   which is Met Life document --

11             THE COURT:  We'll talk about that.  All the others

12   that there are no objections to them, we'll identify them on

13   the record promptly.  The one Mr. Eidelman is concerned about,

14   we'll talk about it without burdening you with having to be

15   here.

16             We'll see you tomorrow 10:00 promptly.  We're moving

17   along well.  The evidence doesn't come in like on television

18   all within a half hour.  So, we've had four witnesses

19   including the doctor's testimony and they have been principal

20   witnesses so I think we're moving along nicely and I'll talk

21   to the lawyers and see whether I can get a realistic sense

22   about how much longer the case will take and we'll chat about

23   that after you leave.

24             Don't talk about the case.  See you tomorrow at

25   10:00.

*Proceedings*                                                    286

1         THE COURTROOM DEPUTY:  All rise.

2         (Jury leaves courtroom.)

3         THE COURT:  All right.

4         So, now as far as the case on trial is concerned,

5    you will let me know all the exhibit numbers with the

6    exception of that number 5 so we can mark them into evidence.

7    That won't take too long I take it or do you want to do that

8    tomorrow morning?

9         MR. SHEARER:  No, I can do it now.

10        THE COURT:  Go slow --

11        MR. SHEARER:  Plaintiff's Exhibits --

12        THE COURT:  -- so I can mark them down.  We're

13   talking about Plaintiff's Exhibits, we try our best to keep a

14   careful record.  What's the first Plaintiff's Exhibit?

15        MR. SHEARER:  101.

16        THE COURT:  Just one second.

17        It's in evidence.  Go ahead.

18        MR. SHEARER:  All the way through 110.

19        THE COURT:  101 to 110 all in evidence, right?

20        MR. EIDELMAN:  So, Judge, I just have a problem

21   understanding this because in the table of exhibits from

22   Dr. Baddour's deposition there are only five exhibits I

23   believe it says in the index of exhibits --

24        THE COURT:  I didn't think this was going to be a

25   problem --

1          MR. EIDELMAN:  -- so how can there be ten.

2          THE COURT:  Stop.  You will talk to each other after

3   we let our court reporter go home and you will discuss this

4   with yourselves as officers of the court and you'll report to

5   me after you've had that conversation and you'll stay a little

6   late today.  I have another matter to take care of.  You try

7   to work it out so we don't have to have unnecessary colloquy

8   over managerial issues, okay.

9          If there's any real problem with any of these

10  documents in evidence, you let me know today, I'll be here as

11  long as you need me to be here so we can talk to each other

12  while I go on and handle some other business today before we

13  adjourn.

14         Give me a heads up what we can expect tomorrow.

15         MR. SHEARER:  Tomorrow we're going to have Grant

16  Barger, Dan Charron and Tony Marino and if there's some spare

17  time, we need to get the nurse's deposition in as well.

18         THE COURT:  Speak a little louder and clearer.  It's

19  my problem, I don't hear as well as I used to when I was your

20  age.

21         MR. SHEARER:  If there's extra time we have the

22  nurse's deposition.

23         THE COURT:  Mr. Eidelman is aware of what to expect

24  tomorrow, that's the important thing, all right.  And it seems

25  like we're moving along nicely and tomorrow I think is going

*Proceedings*                                                    288

1   to be Wednesday, my guess is that by the end of Thursday you

2   will have completed your case, am I being too ambitious?

3          MR. SHEARER:  No, we have Mr. Bisignano, Ms. Julie

4   Kelly and Mr. Barger.  I think Mr. Barger will take --

5          THE COURT:  Whatever, certainly by the end of this

6   week we'll have the case done.

7          MR. SHEARER:  Yes.

8          THE COURT:  Thursday, listen to me, or Friday.

9   Then, of course, the defendant has done a lot in terms of

10  questioning of witnesses that you would have called otherwise,

11  so I have a sense that we'll probably be finished with the

12  evidentiary part of this case maybe Monday or thereabouts

13  roughly and the reason why I say that is so that we can make

14  sure that we're going to be able to have a smooth transition

15  with your concluding remarks and with the preparation of the

16  charge and we'll get that to you before the end of the week

17  for sure.

18         Now, let me ask you this, Mr. Shearer, the question

19  was raised quickly by Mr. Eidelman as to why we have

20  Ms. Johnson as a defendant in this case, so I want to

21  understand, I don't see where she's relevant.  Now, am I

22  missing something?  Here is your opportunity to tell me why I

23  should not dismiss her.

24         MR. SHEARER:  I think it is exactly the situation

25  that's in Graziadio, she is an HR professional that is

*Proceedings*                                            289

1   influencing a business decision maker on what action to take,

2   what adverse employment action to take to an employee on leave

3   and she clearly influenced the decision to force Mr. Barger on

4   to leave.  She went and got Mr. Marino and Mr. Hack to sign

5   off and -- Ms. Whalen to sign off and then got Mr. Hack to

6   sign off.

7           THE COURT:  So, you explained yourself so

8   Mr. Eidelman will understand what your theory is in that

9   respect.  We'll talk about it later on.  I'm not going to

10  dismiss her tonight.

11          The other thing I want to ask, we do have a lot of

12  documentary evidence that shows there's been a legitimate

13  reduction in force.  Faced with that documentary evidence,

14  give me your sense of why you think that is pretext.

15          MR. SHEARER:  I think if we get to Kathi Benhardt

16  who plans the reductions in force, there's testimony from her

17  that Mr. Barger wasn't added to that RIF until after the 10th.

18  There also will be some evidence that Mr. Barger was not going

19  to be in the RIF until he told them that he was going to come

20  back and that --

21          THE COURT:  That's sufficient.  If you have stuff

22  like that, I can get it, okay.  So, it's good to really get a

23  sense so the judge has a good feeling as to the issues in the

24  case, okay.

25          And you have retaliation claims here, I'm not so

1   sure I understand what the basis is but we'll talk about it in

2   due course.

3            Anything else anybody wants to say before we adjourn

4   for the day?

5            (No response.)

6            THE COURT:  Okay.  Talk about these exhibits so we

7   don't have to fuss over it right now while I handle another

8   matter, then hopefully you will come to a collective

9   understanding as to what I mark into this trial as evidence,

10  okay.  All right.

11           (Proceedings adjourned as above set forth.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

291

1                        I  N  D  E  X

2    WITNESS                                    PAGE

3

4

5        J O S E P H   J.   P L U M E R I

6        DIRECT EXAMINATION                      90

7        BY MR. SHEARER

8        CROSS-EXAMINATION                      120

9        BY MR. EIDELMAN

10       REDIRECT EXAMINATION                   131

11       BY MR. SHEARER

12

13       K A R E N    W H A L E N

14       DIRECT EXAMINATION                     145

15       BY MR. SHEARER

16       CROSS-EXAMINATION                      163

17       BY MR. EIDELMAN

18       REDIRECT EXAMINATION                   176

19       BY MR. SHEARER

20

21       R H O N D A    J O H N S O N

22       DIRECT EXAMINATION                     187

23       BY MR. SHEARER

24       CROSS-EXAMINATION                      205

25       BY MR. EIDELMAN

292

1        REDIRECT EXAMINATION                    226

2        BY MR. SHEARER

3        RECROSS-EXAMINATION                     241

4        BY MR. EIDELMAN

5        FURTHER REDIRECT EXAMINATION            249

6        BY MR. SHEARER

7                    E  X  H  I  B  I  T  S

8                                               PAGE

9

10       Plaintiff's Exhibit 62                 151

11       Plaintiff's Exhibit 65                 153

12       Plaintiff's Exhibit 73                 155

13       Plaintiff's Exhibit 4                  179

14       Plaintiff's Exhibit 19                 182

15       Plaintiff's Exhibit 20                 188

16       Plaintiff's Exhibit 27                 190

17       Plaintiff's Exhibit 28                 192

18       Plaintiff's Exhibit 37                 195

19       Plaintiff's Exhibit 44                 197

20       Plaintiff's Exhibit 60                 198

21       Plaintiff's Exhibit 68                 200

22       Plaintiff's Exhibit 52                 201

23       Plaintiff's Exhibit 45                 202

24       Defense Exhibit D-60                   122

25       Defense Exhibit D-61                   123

293

| | | |
|---|---|---|
| 1 | Defense Exhibit D-62 | 126 |
| 2 | Defendant's Exhibit 311 | 144 |
| 3 | Defendant's Exhibit 74 | 161 |
| 4 | Defendant's Exhibit 71 | 167 |
| 5 | Defendant's Exhibit 182 | 169 |
| 6 | Defendant's Exhibit D 214 | 172 |
| 7 | Defense Exhibit 77 | 212 |
| 8 | Defense Exhibit D-117 | 216 |
| 9 | Defense Exhibit D-154 | 218 |
| 10 | Defense Exhibit D-232 | 220 |
| 11 | Defense Exhibit D-235 | 223 |
| 12 | Plaintiff Exhibit 82 | 203 |
| 13 | Plaintiff Exhibit 42 | 233 |
| 14 | Plaintiff Exhibit 37 | 245 |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

**#**

**#155-254** [1] - 85:18

**$**

**$250,000** [1] - 164:19
**$30,000** [26] - 110:9, 111:2, 111:6, 111:7, 111:9, 111:16, 111:21, 124:11, 125:8, 127:15, 128:8, 128:16, 131:17, 133:9, 133:12, 133:19, 134:1, 134:6, 134:22, 134:23, 134:25, 136:1, 136:14, 150:19, 164:15, 164:20
**$300,000** [1] - 88:6
**$360,000** [1] - 164:21
**$480,000** [2] - 164:18, 165:3
**$50,000** [3] - 129:8, 131:8
**$639,000** [1] - 161:22
**$730,000** [4] - 164:9, 165:10, 165:17, 166:9
**$750,000** [1] - 166:8

**'**

**'80s** [5] - 94:16, 95:23, 97:21, 99:15, 103:17
**'95** [2] - 103:15, 103:16
**'95-ish** [1] - 101:17
**'99** [1] - 104:24

**0**

**0035** [1] - 279:6
**0037** [1] - 279:14
**0039** [2] - 269:9, 279:19
**0040** [1] - 279:6
**0042** [1] - 282:20
**0048** [1] - 267:14
**0050** [1] - 267:21
**0093** [1] - 272:20

**1**

**1** [5] - 125:11, 268:2, 281:9, 281:12, 281:15
**1/10** [1] - 280:10
**1/10/17** [1] - 279:24

**1/10/20** [1] - 280:13
**1/10/2017** [1] - 280:4
**1/16** [1] - 202:11
**1/20** [1] - 280:8
**10** [13] - 128:2, 159:9, 172:24, 176:1, 176:4, 176:7, 176:10, 269:12, 269:18, 273:20, 276:11, 276:23, 280:11
**10-22-16** [2] - 219:21, 220:9
**10-26-16** [1] - 219:21
**10/24** [1] - 202:11
**10017** [1] - 86:7
**101** [3] - 272:1, 286:15, 286:19
**10:00** [3] - 85:8, 285:16, 285:25
**10:05** [1] - 87:2
**10:11** [1] - 90:1
**10th** [10] - 155:5, 155:8, 170:23, 274:21, 274:25, 275:4, 275:9, 275:19, 277:10, 289:17
**11** [4] - 137:23, 138:6, 138:16, 271:13
**11-16** [1] - 246:11
**11/23** [1] - 201:16
**110** [3] - 272:1, 286:18, 286:19
**11201** [2] - 85:22, 86:11
**11:14** [1] - 140:3
**11:30** [3] - 141:21, 142:15, 142:16
**12** [5] - 108:10, 108:17, 164:21, 235:16, 236:1
**12/13** [1] - 281:9
**120** [1] - 291:8
**122** [1] - 292:24
**123** [1] - 292:25
**126** [1] - 293:1
**12th** [1] - 190:17
**13** [12] - 107:25, 108:5, 108:11, 108:17, 145:21, 204:9, 222:6, 223:15, 250:17, 265:17, 276:10, 283:23
**131** [1] - 291:10
**13th** [5] - 205:1, 277:9, 278:9, 281:9, 281:15
**14** [1] - 145:21, 172:17, 247:24, 248:2

**144** [1] - 293:2
**145** [1] - 291:14
**15** [8] - 105:1, 126:25, 127:8, 127:10, 128:2, 138:13, 241:5, 251:16
**150** [2] - 154:4, 154:5
**151** [1] - 292:10
**153** [1] - 292:11
**155** [1] - 292:12
**15th** [4] - 196:21, 197:13, 202:2, 202:8
**16** [3] - 192:9, 240:2, 270:21
**1607** [1] - 128:25
**161** [1] - 293:3
**163** [1] - 291:16
**167** [1] - 293:4
**169** [1] - 293:5
**16th** [2] - 191:25, 199:12
**17** [8] - 85:8, 124:5, 128:14, 170:25, 171:1, 267:13, 273:6, 280:13
**17-CV-4869(FB** [1] - 85:3
**172** [1] - 293:6
**176** [1] - 291:18
**179** [1] - 292:13
**17th** [3] - 273:3, 276:15, 278:5
**18** [2] - 138:25, 268:5
**182** [5] - 169:10, 169:17, 170:11, 292:14, 293:5
**187** [1] - 291:22
**188** [1] - 292:15
**19** [6] - 145:22, 182:15, 182:17, 241:4, 241:5, 292:14
**190** [1] - 292:16
**192** [1] - 292:17
**195** [1] - 292:18
**1968** [2] - 94:22, 94:24
**197** [1] - 292:19
**198** [1] - 292:20
**1985** [1] - 104:25
**1992** [1] - 164:12
**1993** [3] - 98:23, 99:13, 99:14
**1995** [1] - 104:1
**1st** [6] - 265:24, 266:1, 266:4, 266:7, 273:6, 278:4

**2**

**2** [8] - 116:1, 173:25, 228:4, 241:23,

266:11, 268:20, 280:24, 282:20
**2-24** [1] - 222:24
**2-25** [2] - 222:24
**2-28** [1] - 223:13
**2.2** [2] - 171:15, 171:19
**20** [11] - 128:2, 128:24, 129:9, 188:19, 188:20, 188:22, 188:25, 230:20, 254:21, 271:1, 292:15
**200** [1] - 292:21
**2000** [8] - 104:1, 104:23, 104:24, 105:1, 105:6, 164:12, 170:24, 256:4
**201** [1] - 292:22
**2013** [2] - 107:19, 123:9
**2014** [23] - 91:14, 91:24, 123:5, 123:9, 123:10, 124:5, 124:6, 126:25, 127:8, 128:14, 128:15, 128:24, 129:7, 129:9, 131:7, 131:16, 138:13, 160:13, 160:18, 160:23, 165:6, 182:12, 187:4
**2015** [29] - 160:18, 161:22, 163:9, 163:10, 163:16, 163:24, 164:4, 164:7, 165:11, 166:18, 166:21, 168:20, 177:12, 178:5, 182:1, 182:2, 182:7, 182:9, 182:12, 187:15, 188:12, 206:11, 209:19, 213:13, 242:5, 244:12, 256:20
**2016** [53] - 152:1, 160:18, 161:10, 162:6, 162:10, 166:7, 169:23, 170:13, 170:17, 171:2, 172:1, 172:12, 178:1, 178:16, 182:18, 182:19, 188:9, 189:12, 191:25, 192:10, 203:18, 212:12, 213:1, 216:10, 229:6,

230:16, 230:20, 230:21, 231:5, 231:15, 231:22, 231:24, 241:20, 245:14, 245:25, 246:5, 246:11, 247:25, 248:1, 248:2, 248:5, 248:13, 248:16, 250:16, 256:4, 265:17, 265:21, 267:18, 269:5, 273:3, 276:11, 281:2, 283:23
**2017** [26] - 91:14, 91:24, 117:16, 153:25, 155:9, 156:18, 160:15, 160:18, 160:23, 162:8, 169:23, 170:12, 187:4, 203:18, 223:15, 250:17, 265:24, 269:12, 269:18, 270:21, 271:1, 273:4, 273:20, 276:11, 276:23, 278:4
**2018** [2] - 225:20, 255:19
**2019** [1] - 85:8
**202** [1] - 292:23
**203** [1] - 293:12
**205** [1] - 291:24
**20th** [8] - 199:11, 270:21, 273:16, 274:6, 274:7, 274:9, 274:16
**21** [5] - 234:3, 246:5, 246:11, 269:5, 277:23
**212** [1] - 293:7
**21202** [1] - 86:2
**214** [8] - 172:17, 172:18, 172:21, 173:15, 173:17, 174:12, 293:6
**216** [1] - 293:8
**218** [1] - 293:9
**21st** [4] - 188:21, 194:8, 195:20, 197:22
**220** [1] - 293:10
**223** [1] - 293:11
**225** [1] - 86:11
**226** [1] - 292:1
**22nd** [4] - 152:1, 176:24, 177:5, 265:21
**23** [2] - 160:14, 245:25

**232** [7] - 221:24, 222:3, 222:4, 222:15, 222:16, 222:17, 222:18
**233** [1] - 293:13
**23rd** [2] - 195:5, 201:15
**24** [4] - 228:4, 228:7, 234:21, 234:24
**24,000** [1] - 160:14
**241** [1] - 292:3
**245** [1] - 293:14
**249** [1] - 292:5
**25** [3] - 171:15, 254:21, 281:17
**25th** [1] - 255:19
**26** [3] - 128:15, 139:3, 227:19
**27** [13] - 190:16, 190:19, 190:20, 190:23, 213:1, 213:10, 235:15, 235:18, 235:19, 235:22, 292:16
**28** [5] - 161:10, 192:6, 192:7, 192:8, 292:17
**2:00** [2] - 184:10, 185:11

## 3

**3** [15] - 113:21, 219:24, 220:1, 233:21, 233:22, 267:20, 268:20, 268:22, 271:17, 271:18, 271:20, 272:18, 279:13, 281:1
**3,000** [11] - 154:2, 155:12, 159:2, 159:9, 172:24, 173:8, 173:9, 176:1, 176:5, 176:8, 176:11
**3-1-17** [1] - 220:11
**30** [2] - 115:18, 194:13
**30,000** [1] - 164:23
**31** [1] - 124:6
**310** [1] - 121:6
**311** [16] - 121:2, 121:6, 129:21, 129:24, 143:4, 143:10, 143:16, 144:4, 144:7, 147:6, 147:11, 147:15, 147:18, 151:14, 293:2
**32** [4] - 95:6, 98:19, 98:20, 145:18
**330** [1] - 86:6
**350,000** [1] - 165:8

**362** [2] - 158:22, 159:5
**37** [7] - 195:1, 195:3, 245:21, 245:23, 245:24, 292:18, 293:14
**3839** [1] - 85:17
**39th** [1] - 86:6
**3:54** [1] - 251:19
**3:55** [1] - 253:4

## 4

**4** [9] - 161:12, 161:21, 179:16, 179:18, 179:23, 219:4, 219:8, 273:19, 292:13
**40** [3] - 188:7, 201:13, 209:8
**400** [1] - 164:21
**40s** [1] - 207:15
**42** [11] - 228:4, 228:7, 233:7, 233:8, 233:9, 233:14, 233:15, 241:3, 241:4, 245:3, 245:14, 292:10
**43** [3] - 228:4, 241:5, 241:23
**44** [4] - 197:8, 197:9, 197:12, 292:19
**45** [4] - 202:5, 202:7, 202:8, 292:23
**452** [1] - 144:10
**48** [1] - 207:15
**49** [1] - 280:24
**4th** [4] - 153:16, 153:24, 200:2, 200:3

## 5

**5** [15] - 130:3, 132:2, 132:7, 203:6, 203:13, 233:20, 234:2, 234:6, 245:14, 248:5, 279:3, 279:5, 285:3, 285:9, 286:6
**50** [2] - 85:22, 209:19
**500** [1] - 86:2
**506** [1] - 85:22
**52** [5] - 201:1, 201:2, 201:3, 207:15, 292:22
**55** [1] - 128:18
**5:00** [1] - 205:2
**5th** [2] - 200:19, 202:14

## 6

**6**
**6** [1] - 89:2, 230:21, 235:7
**6-0** [2] - 198:2, 198:3
**60** [5] - 129:24, 133:10, 198:1, 198:5, 292:20
**61** [6] - 143:8, 143:10, 143:11, 143:17, 144:4, 151:14
**611C2** [1] - 92:3
**613-2274** [5] - 86:12
**62** [20] - 126:12, 126:13, 126:19, 143:6, 143:8, 143:11, 144:4, 151:11, 151:12, 151:13, 151:14, 151:15, 151:16, 151:17, 151:19, 151:20, 151:21, 151:24, 292:10
**635** [1] - 161:23
**65** [6] - 153:9, 153:10, 153:15, 199:23, 200:1, 292:11
**68** [6] - 200:5, 200:6, 200:7, 200:8, 200:10, 292:21
**6th** [3] - 190:3, 200:4, 200:19

## 7

**7** [1] - 207:12
**700** [2] - 142:4, 164:15
**71** [4] - 167:11, 167:18, 167:19, 293:4
**718** [1] - 86:12
**73** [5] - 154:20, 154:21, 154:23, 155:2, 292:12
**730** [1] - 164:19
**74** [3] - 161:4, 161:9, 293:3
**75204** [1] - 85:18
**77** [3] - 212:1, 212:4, 293:7
**7th** [2] - 176:24, 177:4

## 8

**8** [8] - 89:7, 89:8, 89:9, 89:10, 139:25, 141:3, 141:18, 212:12
**82** [5] - 203:8, 203:10, 203:11, 203:12,

293:12
**84** [1] - 279:13

## 9

**9** [3] - 267:17, 281:2, 281:5
**90** [1] - 291:6
**900** [1] - 207:12
**9th** [2] - 173:18, 269:5

## A

**a.m** [5] - 85:8, 87:2, 90:1, 140:3, 142:16
**ability** [4] - 130:25, 213:4, 220:15, 283:5
**able** [20] - 88:12, 88:24, 103:10, 122:2, 153:4, 153:6, 160:2, 160:10, 175:22, 179:7, 193:16, 209:11, 217:3, 229:23, 271:2, 273:8, 276:12, 276:24, 281:24, 288:14
**absence** [16] - 118:23, 192:2, 194:2, 194:9, 196:24, 198:20, 203:5, 217:10, 217:15, 218:18, 233:2, 234:7, 234:12, 240:2, 240:5, 245:19
**Absence** [2] - 201:5, 202:10
**absolutely** [5] - 120:19, 125:22, 153:8, 176:6, 176:9
**absorb** [1] - 180:19
**accept** [1] - 211:10
**access** [19] - 197:23, 198:11, 198:19, 198:23, 199:8, 199:9, 217:20, 218:2, 220:19, 220:21, 232:25, 234:2, 234:3, 234:10, 234:12, 234:15, 245:5, 245:19
**accesses** [1] - 217:24
**accidentally** [1] - 95:23
**account** [1] - 158:10
**accurate** [3] - 258:23, 280:3, 280:15
**accurately** [2] - 240:20, 244:6,

244:18
**achieve** [1] - 172:5
**acting** [1] - 107:14
**action** [3] - 211:14, 289:1, 289:2
**actions** [1] - 171:18
**Activities** [1] - 282:12
**activities** [3] - 220:16, 283:7, 283:13
**actual** [3] - 158:5, 171:22, 262:2
**Adams** [1] - 89:4
**added** [6] - 183:12, 183:14, 219:13, 219:14, 289:17
**adding** [1] - 178:8
**addition** [5] - 118:15, 175:7, 231:23, 246:13, 278:21
**additional** [8] - 104:18, 164:25, 177:21, 178:5, 231:4, 261:2, 262:5, 281:25
**address** [2] - 234:10, 234:13
**adds** [1] - 264:25
**adduce** [2] - 134:7, 134:12
**adjourn** [2] - 287:13, 290:3
**adjourned** [1] - 290:11
**adjusted** [1] - 156:14
**adjustment** [2] - 166:17, 166:18
**ADL** [4] - 282:10, 282:16, 283:7, 283:13
**ADLs** [2] - 283:18, 283:22
**administrative** [2] - 163:15, 259:23
**administrators** [1] - 256:16
**admins** [1] - 198:9
**admission** [1] - 219:21
**admit** [3] - 88:6, 116:22, 128:4
**admitted** [1] - 219:19
**admitting** [1] - 272:3
**adopted** [2] - 103:17, 103:18
**advance** [1] - 177:11
**adverse** [2] - 92:13, 289:2
**advice** [1] - 150:16
**advise** [2] - 91:19, 216:10
**advised** [7] - 93:6,

101:2, 120:17, 204:9, 205:3, 217:3, 222:1

**advising** [4] - 152:3, 212:22, 214:3

**advisor** [1] - 91:16

**advocate** [1] - 98:8

**affect** [1] - 264:8

**affiliated** [4] - 92:3, 92:4, 95:12, 108:22

**affiliation** [1] - 102:12

**afternoon** [3] - 205:24, 240:12, 251:15

**afterwards** [1] - 221:13

**age** [2] - 143:18, 287:20

**ago** [3] - 88:4, 212:18, 225:22

**agree** [7] - 99:23, 182:21, 265:19, 265:23, 273:20, 273:23, 274:20

**agreed** [4] - 124:11, 137:14, 214:9, 230:5

**agreement** [27] - 121:17, 122:14, 122:19, 125:4, 125:7, 125:11, 129:20, 130:4, 131:3, 131:19, 132:1, 133:3, 133:14, 135:24, 137:5, 139:12, 143:12, 147:6, 147:22, 148:3, 148:5, 148:7, 148:25, 149:5, 149:9, 149:13, 204:13

**agreements** [5] - 137:1, 137:3, 137:4, 148:16, 149:7

**ahead** [28] - 101:1, 105:15, 105:19, 108:4, 109:10, 117:1, 123:2, 123:19, 126:14, 128:12, 130:7, 130:15, 131:14, 132:6, 138:17, 151:23, 156:10, 163:2, 210:5, 228:15, 240:11, 240:24, 242:13, 244:2, 247:17, 269:9, 272:13, 286:17

**air** [1] - 264:18

**airway** [2] - 261:3, 264:17

**AL** [1] - 85:9

**alcohol** [1] - 216:3

**alcoholic** [2] - 215:16, 215:19

**alcoholism** [2] - 215:15, 232:6

**aligned** [2] - 97:11, 98:10

**AlloDerm** [2] - 268:11, 268:15

**allow** [11] - 92:7, 116:25, 120:10, 120:15, 121:7, 122:1, 126:6, 144:5, 179:22, 247:7, 247:10

**allowed** [7] - 136:10, 136:14, 136:19, 142:12, 254:12, 277:15, 285:7

**allowing** [2] - 92:19, 125:20

**allows** [3] - 264:17, 264:18

**almost** [2] - 91:21, 141:16

**ambitious** [1] - 288:2

**American** [4] - 94:3, 99:2, 99:6

**amount** [2] - 124:11, 125:14, 128:15, 159:8, 204:12

**Amy** [4] - 200:13, 221:22, 231:12

**analysis** [1] - 156:25

**announced** [1] - 239:23

**ANSWER** [1] - 244:8

**answer** [17] - 100:19, 105:16, 105:18, 152:15, 180:24, 181:8, 205:11, 227:21, 236:3, 241:11, 241:23, 243:23, 243:24, 244:6, 251:3, 251:7, 255:8

**answered** [4] - 149:15, 192:24, 239:21, 268:14

**answering** [1] - 156:16

**answers** [1] - 167:4

**Anthony** [2] - 185:3, 240:1

**anticipate** [2] - 168:17, 254:19

**anticipated** [1] -

149:12

**anyplace** [1] - 141:5

**anyway** [1] - 258:11

**apologize** [7] - 143:4, 170:10, 210:13, 210:15, 242:12, 249:1, 275:24

**apparatus** [1] - 264:23

**apparent** [1] - 188:6

**appear** [2] - 122:18, 127:7

**APPEARANCES** [1] - 85:16

**appeared** [1] - 273:16

**applicable** [1] - 108:9

**application** [2] - 97:23, 201:14

**applied** [3] - 149:14, 201:25, 202:1

**applies** [1] - 196:9

**apply** [2] - 105:21, 237:5

**appointed** [1] - 188:4

**appointment** [1] - 270:17

**appreciate** [1] - 143:22

**appreciated** [1] - 204:16

**approach** [3] - 103:12, 127:13, 217:4

**approached** [1] - 213:2

**approaches** [1] - 186:7

**approaching** [2] - 167:3, 211:3

**approval** [6] - 162:12, 192:10, 192:11, 197:16, 201:22, 202:9

**approve** [1] - 190:14

**approved** [13] - 111:14, 138:21, 162:10, 196:3, 196:16, 196:17, 196:22, 197:1, 197:5, 197:15, 199:12, 202:3, 202:11

**approximate** [1] - 171:19

**April** [6] - 123:5, 126:25, 137:23, 138:6, 138:13, 138:16

**area** [4] - 175:22, 178:18, 179:2, 208:11

**areas** [5] - 159:18,

175:19, 175:20, 175:23, 213:5

**argue** [2] - 111:8, 183:23

**ARNSTEIN** [1] - 86:1

**arranged** [1] - 220:19

**arrangement** [1] - 113:16

**Ashley** [2] - 254:6, 270:5

**aside** [1] - 277:8

**aspect** [1] - 91:21

**aspects** [1] - 146:11

**Assessment** [1] - 281:1

**Assessment/Plan** [1] - 268:21

**assessments** [1] - 170:9

**assist** [1] - 284:1

**assistance** [5] - 199:6, 201:10, 207:24, 218:5, 284:5

**assistant** [3] - 245:11, 256:1, 256:6

**Assisted** [1] - 86:15

**assisting** [1] - 207:18

**associate** [1] - 180:9

**associate's** [1] - 180:13

**associates** [1] - 180:12

**assume** [12] - 113:7, 114:3, 143:17, 167:15, 195:17, 208:12, 231:8, 231:11, 231:14, 231:21, 281:13

**assumed** [9] - 158:7, 158:16, 177:21, 182:7, 188:14, 189:10, 189:11, 232:2, 236:16

**assuming** [2] - 158:10, 262:9

**assure** [1] - 255:7

**Atlanta** [2] - 152:11, 256:22

**attached** [4] - 93:23, 195:9, 195:13, 198:18

**attend** [1] - 220:16

**attention** [3] - 163:8, 219:4, 267:13

**attrition** [14] - 188:6, 209:8, 209:11, 213:4, 236:12, 236:13, 236:14, 236:19, 236:22, 236:24, 237:7,

237:11, 237:12

**August** [4] - 206:11, 230:16, 250:16

**authority** [1] - 226:19

**authorization** [9] - 154:14, 155:6, 170:20, 171:4, 172:2, 172:13, 174:13, 176:12, 176:16

**authorize** [1] - 130:22

**authorized** [1] - 137:1

**available** [3] - 139:22, 243:14, 254:10

**Avenue** [2] - 85:17, 86:6

**average** [1] - 260:14

**avoid** [2] - 87:20, 181:6

**award** [1] - 96:13

**aware** [15] - 169:7, 190:13, 198:22, 203:21, 216:17, 223:17, 232:20, 248:15, 257:3, 257:10, 265:4, 276:24, 280:17, 284:11, 287:23

## B

**background** [1] - 91:5

**bad** [8] - 92:15, 93:8, 93:10, 93:12, 106:6, 142:7, 233:22, 263:25

**Baddour** [5] - 254:5, 255:14, 255:15, 272:23, 273:2

**Baddour's** [3] - 279:23, 279:24, 286:22

**badge** [1] - 217:24

**badly** [1] - 101:10

**balance** [1] - 99:3

**balloon** [1] - 270:12

**Baltimore** [1] - 86:2

**bank** [3] - 96:10, 96:16, 96:18

**Bank** [1] - 97:2

**banker** [2] - 96:9, 105:9

**banking** [2] - 96:10, 105:21

**banks** [5] - 96:1, 96:4, 96:6, 96:15

**barger** [1] - 193:4

**Barger** [209] - 87:4, 91:25, 93:7, 94:14, 95:21, 95:22, 96:19,

96:25, 97:20, 97:23,
98:2, 99:9, 99:15,
101:3, 101:13,
102:8, 102:9,
104:19, 104:25,
107:19, 107:23,
109:13, 110:7,
110:11, 110:14,
112:8, 113:15,
113:25, 115:14,
115:19, 116:17,
117:12, 117:25,
118:7, 118:19,
118:22, 121:17,
122:19, 123:5,
123:8, 124:5, 125:4,
125:14, 127:2,
128:13, 129:8,
129:11, 131:1,
131:2, 131:7,
131:17, 133:8,
134:18, 137:17,
147:19, 147:22,
148:4, 149:19,
152:4, 154:13,
155:5, 155:8, 157:2,
157:7, 157:17,
160:18, 167:6,
168:11, 168:19,
168:22, 169:5,
169:7, 170:15,
171:3, 172:2,
172:10, 172:13,
174:13, 175:2,
176:4, 176:7,
176:10, 176:24,
177:3, 177:12,
178:25, 179:14,
181:24, 182:5,
182:10, 182:13,
187:4, 187:20,
188:1, 189:14,
189:22, 190:3,
190:15, 191:14,
193:6, 194:1, 194:8,
194:10, 196:6,
196:20, 199:11,
199:14, 204:9,
204:11, 204:15,
204:18, 204:23,
205:3, 207:14,
207:18, 208:19,
209:24, 211:22,
212:16, 212:19,
213:7, 213:8,
213:16, 213:24,
214:1, 214:12,
214:13, 214:14,
215:5, 215:9,
215:23, 216:7,
216:11, 216:12,

217:14, 217:25,
218:1, 218:4, 218:5,
220:18, 221:2,
221:4, 221:12,
222:1, 223:16,
223:23, 224:1,
224:5, 224:9,
224:19, 225:4,
225:6, 226:10,
226:17, 229:3,
229:24, 230:12,
230:19, 230:23,
231:4, 231:21,
233:18, 234:5,
234:11, 235:16,
235:25, 237:2,
237:22, 238:14,
239:22, 240:2,
245:6, 245:12,
246:1, 246:5,
246:10, 248:4,
248:12, 248:17,
249:12, 249:25,
250:2, 256:19,
257:3, 257:10,
257:16, 257:21,
259:3, 259:17,
266:3, 266:8, 269:6,
269:18, 270:22,
273:2, 273:20,
276:11, 282:16,
282:19, 283:21,
287:16, 288:4,
289:3, 289:17,
289:18
**BARGER** [1] - 85:3
**Barger's** [46] - 129:16,
150:23, 157:21,
157:24, 158:15,
163:23, 164:5,
166:17, 166:22,
168:25, 172:4,
173:13, 173:23,
174:2, 176:14,
187:13, 189:6,
191:7, 193:2,
196:22, 197:23,
198:11, 200:21,
201:7, 205:5,
206:10, 207:23,
210:11, 216:17,
218:25, 219:6,
219:25, 220:7,
222:6, 222:11,
223:9, 224:21,
229:22, 231:2,
232:5, 234:25,
245:8, 246:15,
260:24, 261:10,
265:20
**Barney** [10] - 98:25,

99:7, 99:8, 99:9,
99:20, 100:8,
100:16, 133:11
**base** [4] - 164:17,
164:20, 165:3,
175:20
**baseball** [1] - 135:12
**Based** [1] - 280:5
**based** [15] - 103:3,
103:5, 103:6,
103:14, 103:22,
104:3, 104:9, 108:8,
113:19, 153:2,
156:4, 159:11,
161:18, 181:12,
273:13
**bashful** [1] - 100:23
**Basic** [1] - 269:24
**basic** [4] - 157:9,
157:14, 242:4,
244:11
**basis** [7] - 104:8,
157:7, 175:5,
183:16, 183:17,
274:23, 290:1
**bathroom** [2] - 93:24,
93:25
**Beach** [1] - 108:7
**bear** [1] - 138:7
**became** [15] - 99:7,
99:8, 100:2, 101:22,
101:25, 102:20,
104:12, 115:14,
118:22, 136:3,
187:21, 188:15,
206:16, 206:20,
249:14
**Beck** [1] - 231:9
**become** [6] - 101:7,
128:20, 187:18,
206:10, 214:23,
229:14
**becoming** [1] - 149:20
**BEFORE** [1] - 85:13
**began** [2] - 115:15,
128:13
**begin** [3] - 94:14,
220:8, 220:9
**beginning** [4] - 96:9,
220:6, 239:23,
265:20
**begins** [7] - 132:14,
132:25, 213:12,
269:8, 279:13,
279:23, 280:23
**behalf** [3] - 96:18,
130:18, 137:2
**below** [2] - 132:15,
191:8
**beneath** [1] - 117:25

benefit [4] - 175:17,
175:19, 256:15,
261:18
**benefits** [5] - 114:15,
146:11, 195:8,
196:20, 197:3
**Benhardt** [2] - 221:16,
289:15
**Berlind** [5] - 94:22,
94:23, 95:4, 98:14,
98:15
**beside** [1] - 177:21
**best** [8] - 99:25,
107:16, 116:17,
141:10, 181:13,
217:4, 224:18,
286:13
**bet** [1] - 115:21
**better** [9] - 105:3,
108:5, 115:9,
119:25, 143:7,
150:1, 171:14,
216:13, 261:21
**between** [23] - 91:14,
104:25, 112:5,
113:2, 147:22,
148:3, 156:22,
177:22, 182:23,
187:10, 207:12,
207:21, 208:24,
213:3, 227:13,
227:15, 227:16,
229:10, 229:11,
230:7, 230:8,
237:20, 276:10
**beyond** [2] - 246:25,
257:2
**big** [13] - 87:14, 93:21,
94:9, 98:8, 142:3,
175:19, 177:23,
229:11, 230:7,
261:17, 261:24,
279:2
**bigger** [2] - 229:18,
260:25
**biggest** [1] - 104:13
**bill** [2] - 128:19,
135:10
**billboards** [1] - 102:7
**billed** [3] - 129:8,
136:14, 147:19
**billion** [1] - 113:21
**binder** [4] - 121:23,
122:4, 167:7, 212:2
**Bisignano** [2] -
150:13, 288:3
**bit** [10] - 88:14, 91:4,
107:10, 107:16,
112:25, 116:13,
136:5, 141:14,

149:25, 251:14
**black** [1] - 167:7
**blatant** [1] - 232:6
**blended** [1] - 284:4
**Block** [1] - 184:21
**block** [2] - 145:4,
145:5
**BLOCK** [1] - 85:13
**blue** [1] - 107:23
**blurry** [1] - 125:25
**board** [7] - 91:10,
91:11, 91:12, 109:4,
110:3, 110:4, 209:19
**Bob** [1] - 100:2
**BOND** [1] - 86:5
**bonus** [8] - 135:13,
153:1, 155:24,
156:3, 156:4,
164:18, 165:4,
216:17
**bonuses** [1] - 216:19
**book** [4] - 112:11,
112:12, 120:25,
128:22
**Boost** [1] - 284:3
**Boston** [2] - 96:11,
96:16
**bottom** [12] - 132:10,
175:18, 191:5,
198:6, 198:7, 214:3,
233:16, 265:11,
267:14, 272:20,
279:14, 280:24
**bottoms** [1] - 156:25
**bought** [5] - 98:21,
98:23, 98:25,
101:23, 133:12
**box** [11] - 257:22,
257:23, 258:1,
258:15, 258:17,
259:5, 259:6, 260:2,
264:7, 264:19,
276:22
**brand** [2] - 102:19,
102:22
**branding** [1] - 102:12
**break** [10] - 105:13,
106:2, 125:1,
139:21, 162:25,
181:9, 184:9,
236:23, 240:12,
251:15
**breaks** [1] - 279:12
**breath** [4] - 261:4,
263:3, 263:19,
277:22
**breathe** [2] - 273:9,
277:23
**Brian** [15] - 117:18,
158:7, 158:15,

177:21, 182:7,
182:8, 182:10,
183:8, 189:9,
189:11, 189:15,
189:22, 206:8,
206:17
**Bridge** [2] - 89:3, 90:6
**brief** [2] - 149:1,
166:19
**briefly** [3] - 163:8,
173:2, 206:19
**bring** [11] - 89:18,
101:11, 101:12,
124:25, 139:25,
150:7, 213:24,
228:22, 228:25,
243:5, 258:18
**Brit** [1] - 190:25
**broad** [2] - 160:19,
160:25
**brokerage** [2] - 95:3,
95:4
**Brooklyn** [3] - 85:5,
85:22, 86:11
**Brothers** [4] - 91:18,
94:17, 95:5, 99:1
**brothers** [1] - 93:22
**brought** [7] - 99:24,
100:2, 100:2,
102:10, 102:15,
105:4, 106:9, 108:1,
116:23, 133:8,
150:20, 165:3
**brush** [1] - 282:13
**brushing** [1] - 284:8
**budget** [2] - 210:24,
216:19
**build** [3] - 98:12,
102:18, 102:22
**building** [2] - 217:22,
217:24
**built** [2] - 97:17, 209:6
**bullet** [3] - 180:5,
195:22
**bumped** [1] - 152:11
**bunch** [2] - 103:9,
104:11
**burdening** [1] -
285:14
**business** [32] - 93:6,
93:8, 96:2, 96:10,
97:12, 98:4, 98:5,
98:6, 98:7, 98:12,
108:10, 129:7,
144:18, 146:8,
160:6, 171:14,
173:9, 178:12,
187:5, 187:6,
187:11, 206:10,
206:12, 206:16,

206:20, 207:1,
207:8, 207:16,
208:13, 249:14,
287:12, 289:1
**Business** [4] - 163:14,
163:16, 163:21,
167:23
**busy** [1] - 254:10
**butcher** [2] - 258:4,
258:9
**buy** [1] - 103:11
**BY** [28] - 85:19, 85:23,
86:3, 86:7, 90:24,
120:21, 131:24,
145:15, 163:5,
166:15, 176:22,
187:2, 203:1,
205:23, 226:8,
241:2, 249:22,
291:7, 291:9,
291:11, 291:15,
291:17, 291:19,
291:23, 291:25,
292:2, 292:4, 292:6

## C

**CA** [1] - 163:15
**Cadman** [1] - 86:11
**cancel** [1] - 268:23
**cancelling** [1] - 281:3
**cancer** [12] - 168:23,
169:2, 169:5, 176:5,
223:24, 230:23,
231:3, 256:7,
256:24, 257:22,
258:22, 266:22
**candidates** [1] - 173:5
**cannot** [4] - 196:12,
210:13, 277:20,
281:22
**capabilities** [1] -
179:3
**capacity** [1] - 165:5
**care** [17] - 98:7,
101:15, 118:23,
144:18, 218:13,
218:16, 218:24,
219:1, 219:20,
246:15, 259:8,
259:11, 259:20,
266:16, 271:13,
282:5, 287:6
**career** [8] - 93:16,
93:17, 94:18, 98:18,
106:22, 107:9,
133:10, 146:20
**careful** [2] - 142:1,
286:14
**carefully** [2] - 87:25,

116:4
**caring** [4] - 98:8,
102:12, 102:16,
102:25
**carried** [1] - 169:23
**Carter** [4] - 94:22,
94:23, 95:4, 98:14
**case** [39] - 87:13,
87:18, 87:22, 88:12,
88:15, 88:22, 93:4,
94:6, 105:10, 106:4,
107:3, 107:7, 114:3,
116:12, 120:6,
120:13, 135:18,
139:24, 141:16,
142:13, 159:14,
183:23, 184:11,
225:21, 225:25,
242:20, 251:17,
252:15, 260:4,
262:11, 264:5,
285:22, 285:24,
286:4, 288:2, 288:6,
288:12, 288:20,
289:24
**cases** [9] - 88:8,
108:9, 119:22,
119:24, 144:10,
144:13, 175:16,
259:23, 259:25
**cash** [3] - 99:3, 153:1,
216:18
**catch** [1] - 121:4
**caused** [1] - 115:4
**causing** [1] - 192:18
**caution** [2] - 107:3,
120:16
**cc** [1] - 198:7
**cc-d** [1] - 198:7
**cell** [3] - 144:9,
144:17, 201:9
**Center** [6] - 193:12,
194:4, 195:7,
198:14, 198:17,
200:14
**center** [6] - 159:20,
215:20, 215:22,
219:3, 221:22, 231:8
**centers** [2] - 178:1,
231:19
**centralized** [1] - 197:3
**CEO** [7] - 91:16, 94:9,
98:25, 100:3,
102:21, 113:22,
133:23
**certain** [3] - 156:21,
248:6, 282:9
**certainly** [1] - 288:5
**certification** [5] -
195:11, 218:13,

218:24, 218:25,
246:14
**cetera** [1] - 208:2
**chairman** [1] - 133:24
**challenging** [1] -
160:9
**chance** [1] - 91:2
**change** [7] - 102:24,
200:20, 203:3,
203:7, 273:21,
280:1, 280:21
**changed** [4] - 101:23,
104:15, 202:15,
236:22
**changes** [2] - 260:17,
284:6
**charge** [3] - 94:9,
148:24, 288:16
**Charron** [5] - 163:18,
166:16, 173:7,
173:20, 287:16
**chat** [4] - 193:17,
193:20, 217:3,
285:22
**chats** [1] - 193:17
**check** [3] - 87:25,
145:1, 250:13
**chest** [4] - 262:1,
263:20, 268:18,
268:19
**Chief** [1] - 86:10
**chief** [1] - 163:15
**child's** [1] - 103:8
**choice** [1] - 120:11
**chose** [1] - 236:25
**chosen** [1] - 266:1
**Christine** [2] - 156:22,
156:23
**CIANFICHI** [1] - 86:4
**circumstances** [10] -
107:11, 113:7,
119:1, 120:14,
135:5, 136:10,
136:19, 151:2,
210:11, 248:15
**Citi** [1] - 111:18
**Citibank** [3] - 104:18,
104:19, 104:21
**Citigroup** [4] - 95:6,
104:16, 104:24,
105:1
**civil** [1] - 87:3
**claims** [1] - 289:25
**clarification** [1] -
219:16
**clarify** [4] - 164:16,
250:14, 262:9,
263:13
**clarity** [2] - 164:22,
166:14

**clear** [4] - 136:22,
166:11, 254:24,
272:7
**cleared** [5] - 144:3,
263:2, 273:3,
276:15, 278:5
**clearer** [1] - 287:18
**clearly** [2] - 255:8,
289:3
**CLERK** [1] - 89:21
**client** [10] - 87:11,
94:10, 98:9, 102:12,
102:25, 103:4,
103:6, 112:5, 112:7,
212:15
**clients** [10] - 96:5,
97:13, 98:8, 99:25,
100:5, 102:12,
102:17, 104:12,
212:16
**clinic** [11] - 259:15,
259:16, 259:17,
259:21, 263:20,
266:13, 266:15,
269:22, 270:5, 274:4
**clinical** [2] - 266:21,
267:5
**close** [19] - 94:1, 96:5,
98:3, 152:24,
171:24, 181:14,
224:9, 229:17,
244:3, 258:18,
261:16, 261:18,
261:24, 262:1,
262:25, 268:17,
273:22, 280:2,
280:22
**closed** [14] - 258:16,
263:6, 268:24,
273:18, 274:2,
274:10, 277:16,
277:17, 277:21,
277:24, 278:1,
278:19, 281:4, 281:6
**closely** [2] - 201:12,
204:16
**closer** [1] - 97:13
**closes** [1] - 270:14
**closure** [7] - 158:24,
159:2, 258:20,
268:11, 268:15,
271:14, 273:7
**co** [4] - 146:3, 148:13,
150:13, 267:21
**co-head** [3] - 146:3,
148:13, 150:13
**co-signed** [1] - 267:21
**coached** [1] - 215:5
**coaching** [1] - 102:17
**collar** [2] - 282:23,

282:24
**collateral** [1] - 87:24
**colleague** [2] -
152:10, 174:17
**colleagues** [4] -
131:13, 150:15,
225:15
**collecting** [2] - 204:1,
204:2
**collection** [1] - 157:20
**collective** [1] - 290:8
**colloquy** [1] - 287:7
**combination** [1] -
144:4
**combined** [2] - 143:8,
143:11
**combing** [1] - 284:8
**comfortable** [2] -
145:2, 156:16
**comfortably** [1] -
273:9
**coming** [14] - 89:3,
96:4, 106:21, 142:6,
142:14, 153:17,
156:2, 160:7, 188:2,
201:6, 202:14,
202:15, 275:12,
276:3
**commensurate** [2] -
178:14, 182:6
**Comment** [1] - 279:22
**comment** [1] - 88:19
**common** [2] - 88:2,
122:13
**communicate** [5] -
256:11, 256:15,
264:8, 276:20, 283:4
**communicating** [3] -
177:1, 234:13, 277:7
**communication** [6] -
250:7, 250:9, 265:1,
270:4, 271:6, 271:15
**communications** [1] -
221:2
**comp** [3] - 162:3,
178:10
**companies** [2] -
91:18, 102:20
**company** [31] - 91:15,
91:22, 98:23, 98:24,
99:24, 100:3, 100:7,
105:8, 108:22,
109:5, 110:11,
110:12, 113:22,
115:7, 115:8,
128:19, 130:24,
146:25, 156:5,
156:11, 156:12,
158:13, 161:16,
174:9, 206:6,

216:11, 216:15,
217:13, 217:15,
217:25, 220:21
**company's** [2] -
130:25, 175:17
**compensated** [7] -
88:18, 131:2, 131:5,
154:6, 161:15,
172:25, 176:1
**compensation** [29] -
109:17, 109:22,
111:14, 113:16,
115:10, 115:12,
131:6, 146:10,
155:19, 155:21,
159:11, 161:17,
161:19, 164:5,
164:9, 164:15,
165:1, 166:4,
166:17, 166:18,
166:20, 169:1,
178:8, 178:16,
179:13, 182:6,
204:6, 204:12,
224:21
**competition** [3] -
95:25, 96:4, 96:7
**complaints** [1] - 250:1
**complete** [6] - 157:17,
194:2, 218:17,
218:19, 265:9,
281:22
**completed** [4] - 219:5,
233:19, 246:15,
288:2
**completely** [3] -
170:8, 277:21,
278:24
**completing** [1] - 219:6
**compliance** [1] -
104:14
**complicated** [2] -
194:19, 268:9
**complication** [7] -
260:11, 261:3,
261:4, 261:6, 261:9,
261:10, 264:15
**complications** [3] -
262:8, 264:3, 270:23
**Computer** [1] - 86:15
**Computer-Assisted**
[1] - 86:15
**concept** [6] - 97:14,
98:5, 102:16,
103:14, 111:24,
112:2
**concepts** [1] - 105:20
**concern** [1] - 102:16
**concerned** [5] - 153:3,
249:25, 270:22,

285:13, 286:4
**concerning** [1] -
217:12
**concerns** [7] - 192:15,
192:17, 192:21,
192:22, 208:20,
217:9, 248:12
**conclude** [1] - 241:13
**concluding** [1] -
288:15
**conclusion** [2] -
107:3, 158:3
**condition** [7] - 199:4,
220:4, 220:17,
249:3, 256:12,
257:20, 258:12
**conditions** [2] -
118:23, 256:17
**conducts** [1] - 184:21
**confer** [1] - 185:12
**conference** [3] -
96:11, 96:16, 240:9
**conferences** [3] -
108:7, 115:15,
115:19
**conferencing** [1] -
147:3
**confessed** [1] -
214:15
**confirm** [1] - 232:17
**confused** [3] - 164:13,
166:11, 275:25
**connection** [3] -
132:17, 170:3,
256:17
**consider** [6] - 116:8,
150:14, 237:22,
243:15, 260:24,
278:10
**considered** [5] -
114:1, 156:12,
156:14, 222:25,
237:24
**considering** [2] -
264:14, 279:2
**consolidated** [1] -
151:14
**constantly** [1] -
197:20
**consult** [3] - 131:12,
174:17, 225:15
**consultant** [24] -
107:19, 109:17,
109:20, 109:25,
110:18, 110:22,
110:24, 113:14,
114:16, 114:24,
115:4, 115:13,
122:13, 125:13,
125:18, 127:5,

128:20, 130:16,
132:11, 133:18,
134:21, 136:1,
149:20, 164:23
**consultant's** [2] -
132:17
**consultants** [9] - 96:3,
96:12, 96:14, 97:12,
98:4, 98:11, 100:1,
100:4, 108:25
**consulted** [1] - 131:1
**consulting** [16] -
109:22, 110:12,
111:11, 124:5,
124:6, 127:3,
128:14, 129:7,
129:9, 139:12,
147:6, 148:16,
149:4, 156:23,
157:4, 225:12
**contact** [3] - 152:24,
194:1, 194:23
**contacted** [2] -
223:15, 256:23
**contacting** [1] -
191:22
**content** [1] - 96:15
**contentious** [1] - 88:9
**context** [1] - 221:10
**continue** [8] - 90:7,
150:23, 175:21,
222:9, 222:11,
238:23, 249:7, 276:9
**continued** [11] -
89:24, 140:5,
142:17, 185:14,
188:7, 202:18,
236:16, 244:14,
251:21, 253:5,
268:11
**continues** [1] - 121:22
**continuing** [2] -
107:25, 270:22
**continuous** [1] - 220:3
**continuously** [4] -
192:16, 196:18,
201:9, 249:6
**contract** [6] - 122:14,
122:25, 123:4,
124:16, 134:17,
149:3
**contracting** [1] -
148:21
**contractor** [13] -
121:17, 122:19,
125:4, 125:13,
129:19, 130:4,
131:3, 131:19,
147:22, 148:3,
149:7, 149:10,

149:12
**control** [3] - 163:14,
246:21, 248:3
**conversation** [25] -
96:24, 101:5,
134:22, 156:22,
168:8, 168:25,
184:25, 203:6,
211:22, 213:6,
213:9, 213:14,
213:15, 214:5,
214:8, 215:2, 215:7,
215:12, 215:14,
221:12, 225:10,
240:3, 257:19, 287:5
**conversations** [24] -
97:16, 166:19,
166:24, 182:2,
182:5, 208:19,
208:23, 209:22,
210:1, 210:18,
212:19, 214:12,
214:20, 215:8,
215:12, 221:8,
226:10, 226:12,
229:3, 229:6, 232:6,
244:17, 248:11,
266:9
**convince** [3] - 100:4,
105:12, 106:2
**COOPER** [1] - 86:3
**cooperated** [1] -
116:11
**coordination** [1] -
272:4
**copies** [2] - 130:20,
132:16
**copy** [1] - 218:23
**corner** [4] - 263:5,
267:15, 269:2,
272:21
**Corp** [1] - 87:4
**CORPORATION** [1] -
85:9
**Corporation** [3] -
97:2, 257:4, 257:11
**correct** [134] - 88:7,
98:22, 111:14,
112:17, 115:1,
117:12, 117:13,
123:5, 123:6, 123:7,
123:11, 123:25,
124:4, 124:7, 124:8,
125:8, 125:9,
125:12, 125:16,
125:17, 125:18,
125:19, 125:22,
129:1, 132:4, 132:5,
132:8, 132:11,
132:19, 132:24,

145:18, 145:19,
146:4, 146:12,
146:15, 146:16,
150:4, 152:1,
153:11, 153:17,
153:18, 155:6,
155:7, 155:10,
158:8, 158:9, 159:3,
159:4, 159:13,
162:7, 164:3,
165:14, 168:8,
168:21, 169:23,
169:24, 170:1,
171:5, 171:6, 174:1,
176:14, 176:17,
176:25, 177:9,
177:14, 177:15,
177:18, 181:20,
182:19, 182:20,
183:1, 183:10,
183:13, 188:2,
188:3, 189:23,
192:2, 193:13,
193:14, 194:2,
194:9, 194:13,
194:15, 196:4,
196:5, 196:25,
198:11, 198:12,
198:21, 199:12,
200:16, 200:21,
203:14, 203:15,
205:11, 209:21,
212:10, 212:21,
213:18, 214:7,
219:7, 220:14,
220:21, 220:22,
222:24, 223:21,
230:16, 233:1,
239:20, 246:11,
246:12, 246:15,
248:6, 258:13,
258:24, 259:18,
265:10, 265:15,
265:18, 265:22,
265:25, 267:21,
269:13, 269:14,
273:12, 273:24,
274:8, 275:6, 279:8,
281:5, 281:11,
282:25, 283:19,
283:20
**Correct** [8] - 267:1,
269:7, 269:17,
274:17, 280:5,
281:8, 281:16, 282:3
**correctly** [1] - 275:17
**cost** [1] - 172:5
**costly** [1] - 239:12
**coughing** [2] - 261:4,
263:18

**counsel** [10] - 87:4,
93:3, 120:12, 122:3,
130:13, 185:12,
215:23, 219:13,
219:14
**counselled** [1] - 215:9
**count** [8] - 158:3,
158:5, 158:20,
232:1, 237:7, 237:8,
238:12, 238:16
**country** [4] - 96:13,
120:8, 208:11,
208:17
**couple** [8] - 141:23,
178:9, 210:16,
210:17, 240:10,
249:14, 263:2,
279:12
**course** [13] - 88:23,
92:21, 93:16,
114:11, 121:25,
143:21, 164:17,
173:3, 268:7, 268:9,
278:12, 288:9, 290:2
**COURT** [378] - 85:1,
87:5, 89:5, 89:12,
89:18, 89:22, 90:3,
90:18, 92:4, 92:6,
92:11, 94:5, 94:8,
95:10, 95:16, 95:20,
100:9, 100:13,
100:22, 101:25,
105:10, 105:12,
105:15, 105:18,
105:23, 106:1,
106:6, 106:19,
107:1, 108:3,
108:12, 108:15,
108:19, 109:7,
109:9, 110:23,
111:1, 111:3, 111:5,
111:22, 112:1,
112:15, 112:22,
113:1, 113:6, 113:9,
113:25, 114:5,
114:7, 114:10,
114:17, 114:22,
115:22, 115:25,
116:3, 116:19,
116:21, 116:24,
117:5, 118:21,
118:25, 119:3,
119:5, 119:8,
119:15, 120:4,
120:10, 121:4,
121:9, 121:11,
121:21, 122:9,
122:23, 123:2,
123:12, 123:16,
123:23, 124:13,

124:15, 124:18,
124:22, 124:24,
125:22, 126:3,
126:9, 126:12,
126:14, 126:17,
126:19, 126:22,
127:10, 127:15,
127:18, 127:20,
127:23, 128:2,
128:6, 128:11,
129:1, 129:3,
129:13, 129:17,
129:21, 129:24,
130:2, 130:6,
130:12, 130:15,
131:14, 131:22,
132:4, 132:6,
132:20, 132:22,
133:23, 133:25,
134:3, 134:5,
134:11, 134:24,
135:3, 135:5, 135:7,
135:9, 135:12,
135:16, 135:22,
136:2, 136:7, 136:9,
136:13, 136:17,
136:22, 137:7,
137:13, 137:19,
137:24, 138:1,
138:5, 138:9,
138:13, 138:17,
139:15, 139:17,
139:21, 140:2,
141:5, 141:20,
143:6, 143:10,
143:13, 143:22,
144:2, 144:8, 145:1,
145:6, 145:8,
147:15, 147:18,
147:23, 148:17,
149:15, 149:18,
149:22, 149:25,
150:5, 150:18,
150:22, 151:1,
151:7, 151:10,
151:12, 151:14,
151:16, 151:18,
152:15, 153:6,
153:10, 153:13,
154:21, 154:25,
156:6, 156:9, 161:5,
161:7, 162:16,
162:19, 162:24,
163:2, 164:13,
164:20, 164:25,
165:5, 165:7,
165:12, 165:15,
165:18, 165:22,
165:25, 166:5,
166:8, 166:10,
167:12, 167:14,

167:17, 169:11,
169:13, 169:16,
172:18, 174:18,
176:19, 179:18,
179:22, 180:24,
181:2, 181:13,
181:16, 182:16,
183:22, 184:1,
184:5, 184:9,
184:14, 184:20,
184:23, 185:4,
185:9, 186:3, 186:6,
186:8, 186:22,
188:20, 188:22,
188:24, 189:2,
190:18, 190:20,
190:22, 192:7,
195:2, 197:5, 197:9,
197:11, 198:2,
198:4, 199:24,
200:1, 200:6, 200:8,
201:2, 202:6, 203:9,
203:11, 205:18,
210:5, 210:7, 211:7,
211:9, 211:21,
211:24, 212:3,
216:21, 218:9,
219:9, 219:12,
220:24, 222:3,
222:5, 222:16,
222:18, 223:6,
225:16, 226:4,
226:6, 228:3, 228:8,
228:12, 228:14,
228:17, 228:20,
233:6, 233:8,
233:10, 233:14,
235:20, 235:24,
236:3, 236:9,
238:19, 239:6,
239:8, 239:10,
239:16, 239:18,
239:21, 240:3,
240:11, 240:15,
240:22, 240:24,
241:6, 241:10,
242:8, 242:13,
242:16, 242:18,
244:20, 245:22,
247:2, 247:5, 247:7,
247:12, 247:14,
247:17, 248:7,
249:19, 250:5,
250:10, 250:19,
250:22, 251:1,
251:3, 251:7, 251:9,
251:11, 251:14,
252:2, 252:5, 252:9,
252:17, 252:20,
252:24, 253:3,
254:1, 254:7, 254:9,

254:18, 254:22,
255:4, 255:8,
255:11, 255:16,
256:9, 271:20,
271:24, 272:2,
272:7, 272:13,
272:16, 275:15,
275:17, 275:23,
275:25, 276:6,
276:9, 283:9,
283:16, 284:14,
284:17, 284:21,
284:25, 285:4,
285:6, 285:11,
286:3, 286:10,
286:12, 286:16,
286:19, 286:24,
287:2, 287:18,
287:23, 288:5,
288:8, 289:7,
289:21, 290:6
**court** [13] - 87:1,
88:17, 95:17,
116:10, 141:1,
242:21, 242:23,
243:4, 243:13,
244:4, 252:1, 287:3,
287:4
**Court** [3] - 85:22,
86:10, 86:10
**courthouse** [1] -
242:25
**Courthouse** [1] - 85:4
**courtroom** [18] -
87:17, 90:2, 120:17,
139:23, 140:4,
141:3, 141:19,
141:24, 144:1,
144:23, 168:4,
184:13, 186:14,
186:16, 214:6,
225:7, 251:20, 286:2
**COURTROOM** [24] -
87:3, 89:2, 89:8,
89:16, 89:21, 90:11,
90:15, 139:25,
141:2, 141:17,
143:25, 145:9,
145:13, 147:14,
154:18, 186:13,
186:17, 186:21,
199:25, 233:11,
233:13, 245:2,
251:18, 286:1
**cover** [2] - 131:8,
245:24
**create** [1] - 102:2
**created** [12] - 103:20,
104:10, 104:11,
112:8, 130:24,

133:4, 133:5, 133:6,
133:7, 149:11,
159:7, 172:23
**credit** [1] - 112:12
**criteria** [1] - 156:2
**criticize** [1] - 178:6
**CROSS** [6] - 120:20,
163:4, 205:22,
291:8, 291:16,
291:24
**cross** [4] - 125:21,
184:24, 243:10,
244:23
**CROSS-
EXAMINATION** [6] -
120:20, 163:4,
205:22, 291:8,
291:16, 291:24
**cross-examination** [2]
- 243:10, 244:23
**CSR** [1] - 86:10
**cultural** [1] - 103:1
**culture** [2] - 113:18,
113:19
**current** [5] - 91:7,
161:16, 162:3,
182:23, 255:25
**cut** [7] - 175:19,
178:18, 197:23,
198:10, 199:8,
234:3, 234:10

**D**

**D-117** [4] - 216:20,
216:22, 216:24,
293:8
**D-154** [8] - 218:8,
218:10, 218:24,
247:3, 247:13,
247:14, 247:18,
293:9
**D-232** [4] - 220:23,
220:25, 222:21,
293:10
**D-235** [3] - 223:5,
223:7, 293:11
**D-311** [1] - 129:20
**D-60** [8] - 121:15,
121:16, 122:7,
122:12, 122:18,
122:23, 129:23,
292:24
**D-61** [4] - 122:18,
122:23, 123:1,
292:25
**D-62** [8] - 126:11,
126:21, 126:23,
129:1, 132:4,
137:24, 138:16,

293:1
**daily** [5] - 220:16,
282:11, 282:12,
283:8, 283:14
**Dale** [2] - 282:23,
282:24
**Dallas** [1] - 85:18
**damages** [1] - 88:6
**Dan** [1] - 163:18,
173:7, 173:20,
287:16
**Data** [80] - 87:4, 91:8,
91:10, 91:13, 91:20,
91:23, 106:21,
107:20, 109:22,
112:17, 112:22,
115:20, 117:12,
117:15, 117:20,
119:13, 121:18,
122:20, 125:5,
129:8, 130:16,
131:18, 133:4,
133:5, 133:7, 133:8,
137:2, 145:18,
145:23, 145:25,
146:3, 146:6,
146:12, 146:20,
146:25, 147:1,
147:22, 148:3,
149:4, 150:23,
153:23, 154:14,
155:21, 156:3,
158:17, 159:19,
160:13, 169:1,
174:21, 174:23,
174:25, 175:12,
175:14, 175:24,
180:3, 180:11,
181:17, 187:3,
196:25, 197:23,
205:6, 206:1, 206:3,
206:5, 206:17,
207:1, 209:3,
223:22, 224:1,
224:5, 225:19,
231:6, 234:6,
234:13, 237:23,
245:7, 257:4,
257:11, 257:14
**data** [10] - 154:11,
155:15, 155:17,
155:20, 156:25,
157:14, 157:20,
162:4, 170:6, 170:7
**DATA** [1] - 85:9
**date** [40] - 94:15,
97:22, 99:16,
112:10, 118:14,
129:6, 153:19,
161:14, 174:12,

194:6, 197:21,
197:25, 202:9,
203:8, 205:7, 220:6,
220:9, 220:10,
222:12, 223:1,
223:9, 223:10,
234:4, 234:21,
240:5, 247:19,
247:22, 247:23,
265:20, 265:24,
266:1, 266:4, 266:7,
267:17, 273:5,
276:15, 278:4,
283:22
**dated** [15] - 123:5,
126:25, 127:8,
127:25, 128:15,
128:24, 129:6,
173:17, 212:11,
233:20, 235:15,
255:19, 265:17,
269:12, 281:2
**dates** [13] - 137:22,
199:13, 200:21,
200:22, 200:25,
201:8, 219:21,
222:22, 223:3,
229:7, 235:1, 235:3
**DAVID** [1] - 85:23
**David** [1] - 132:3
**day-to-day** [9] - 183:7,
192:17, 192:23,
208:4, 209:4,
210:21, 229:19,
249:9, 249:11
**days** [7] - 95:25,
112:11, 202:14,
259:22, 259:23,
269:22, 280:11
**de** [1] - 179:2
**de-investing** [1] -
179:2
**deadline** [1] - 234:6
**deal** [1] - 203:4
**dealing** [2] - 153:2,
238:1
**deals** [1] - 117:7
**December** [41] -
124:6, 152:1, 154:3,
170:13, 171:2,
172:1, 172:12,
176:24, 177:5,
196:21, 197:13,
199:20, 202:2,
202:8, 202:13,
203:17, 203:18,
206:4, 225:20,
233:20, 233:21,
233:22, 234:2,
234:6, 239:23,

240:2, 245:14,
247:24, 248:2,
248:5, 265:17,
267:17, 269:5,
276:10, 277:9,
278:9, 281:2, 281:5,
281:9, 281:15,
283:23
**decide** [4] - 109:21,
208:7, 237:5, 269:5
**decided** [3] - 178:6,
268:17, 281:6
**deciding** [2] - 155:15,
155:23
**decision** [13] - 106:12,
119:19, 149:19,
150:3, 152:25,
174:9, 191:3,
216:16, 217:15,
223:4, 289:1, 289:3
**decisions** [14] - 93:7,
93:8, 93:10, 93:11,
93:15, 106:16,
106:17, 119:12,
154:12, 174:7,
190:8, 190:11,
192:23
**decreased** [2] - 269:2,
269:3
**decreasing** [1] -
261:21
**deemed** [5] - 122:2,
122:23, 125:21,
126:19, 132:18
**defect** [2] - 268:24,
281:3
**defendant** [8] - 91:8,
91:13, 92:3, 225:21,
225:24, 252:15,
288:9, 288:20
**Defendant's** [27] -
121:2, 144:7,
151:19, 161:3,
161:9, 167:10,
167:11, 167:18,
167:19, 169:10,
169:17, 170:11,
172:17, 172:21,
212:1, 265:5,
266:10, 271:16,
279:4, 281:15,
285:3, 285:9, 293:2,
293:3, 293:4, 293:5,
293:6
**defendant's** [1] -
161:5
**defendants** [2] -
85:10, 92:9
**Defendants** [1] - 86:1
**Defense** [17] - 122:12,

123:1, 126:21,
212:4, 216:22,
218:10, 220:25,
221:23, 223:7,
292:24, 292:25,
293:1, 293:7, 293:8,
293:9, 293:10,
293:11
**defense** [2] - 93:3,
120:12
**define** [2] - 161:1,
209:7
**defined** [1] - 103:3,
227:6
**defines** [1] - 132:23
**definition** [2] - 159:14,
220:13
**deflate** [1] - 270:12
**degree** [1] - 95:15
**delay** [2] - 260:20
**deliver** [1] - 157:13
**deliverables** [1] -
211:1
**delivered** [1] - 155:6
**dementia** [1] - 143:18
**depart** [1] - 214:1
**department** [1] - 97:24
**departments** [1] -
232:13
**depicted** [1] - 240:20
**deposition** [34] -
129:11, 129:14,
129:16, 146:2,
185:6, 205:8,
205:11, 227:18,
228:1, 228:9,
228:11, 240:20,
240:21, 240:22,
241:3, 242:20,
243:9, 243:12,
243:15, 243:20,
244:22, 252:5,
252:25, 254:2,
254:3, 254:11,
254:19, 255:18,
257:12, 257:15,
258:10, 286:22,
287:17, 287:22
**depositions** [2] -
242:24, 252:4
**deputy** [2] - 144:23,
186:16
**DEPUTY** [24] - 87:3,
89:2, 89:8, 89:16,
89:21, 90:11, 90:15,
139:25, 141:2,
141:17, 143:25,
145:9, 145:13,
147:14, 154:18,
186:13, 186:17,

186:21, 199:25,
233:11, 233:13,
245:2, 251:18, 286:1
**derivative** [2] -
130:20, 130:21
**describe** [3] - 161:13,
173:2, 257:20
**described** [8] - 175:8,
178:18, 259:12,
260:25, 261:9,
261:10, 283:7,
283:13
**describing** [2] - 262:8,
282:10
**description** [1] - 191:6
**design** [3] - 207:25,
211:17, 212:15
**designate** [3] - 230:4,
230:10, 237:8
**designating** [1] -
230:13
**designed** [1] - 158:20
**Desk** [1] - 201:5
**desk** [1] - 96:17
**details** [1] - 230:14
**determination** [3] -
192:13, 224:23,
225:1
**determinations** [1] -
162:14
**determine** [4] - 88:17,
110:21, 208:9, 243:6
**determined** [1] -
216:19
**determines** [1] - 240:8
**develop** [3] - 168:1,
181:18, 258:21
**developed** [6] -
132:16, 260:14,
261:5, 262:22,
263:17, 268:16
**development** [2] -
113:20, 211:19
**diagnosed** [2] -
168:22, 169:2
**diagnosis** [1] - 169:5
**diet** [3] - 270:2, 275:2,
280:14
**difference** [8] -
105:10, 112:5,
150:18, 164:16,
207:21, 209:14,
237:9, 237:19
**different** [14] - 104:12,
141:25, 160:5,
176:3, 179:11,
189:25, 210:20,
223:9, 228:11,
238:6, 267:5,
278:24, 280:10

**difficult** [4] - 159:19,
164:8, 166:20, 174:7
**difficulty** [1] - 167:5
**digest** [1] - 157:16
**dignity** [1] - 217:11
**DILORENZO** [6] -
86:7, 275:13,
275:16, 275:18,
275:24, 276:8
**DiLorenzo** [3] -
227:25, 228:5, 276:6
**dinner** [3] - 108:21,
109:2
**dire** [1] - 153:4
**DIRECT** [6] - 90:23,
145:14, 187:1,
291:6, 291:14,
291:22
**direct** [7] - 91:24,
92:19, 93:1, 100:24,
155:18, 244:23,
247:8
**directed** [1] - 197:22
**direction** [5] - 198:10,
208:5, 213:3,
244:15, 249:10
**directly** [4] - 100:20,
108:9, 150:8, 150:12
**director** [12] - 94:16,
95:24, 101:7,
101:22, 101:25,
117:21, 160:6,
208:25, 211:2,
211:6, 229:10, 238:8
**directors** [3] - 206:22,
208:5, 208:9
**directs** [1] - 182:24
**disability** [5] - 197:14
**discharged** [3] -
107:5, 107:6, 117:8
**discipline** [2] -
104:15, 232:18
**discovery** [1] - 91:3
**discuss** [3] - 185:2,
214:5, 287:3
**discussed** [3] - 172:1,
235:11, 235:12
**discussing** [1] -
212:24
**discussion** [4] -
149:1, 182:19,
212:17, 232:5
**discussions** [15] -
93:9, 93:10, 93:11,
106:25, 109:18,
164:4, 164:7,
166:16, 166:21,
169:4, 169:7,
212:25, 266:3,
266:5, 266:6

**dismiss** [3] - 252:17,
288:23, 289:10
**dismissed** [1] - 100:6
**display** [1] - 130:19
**displayed** [3] - 265:5,
266:10, 271:16
**distinguished** [1] -
107:9
**distribute** [1] - 130:20
**distributing** [1] -
161:14
**DISTRICT** [2] - 85:1,
85:1
**divisions** [1] - 189:20
**doctor** [20] - 195:12,
199:19, 200:25,
218:17, 218:25,
219:6, 219:25,
220:6, 246:15,
248:2, 252:4, 252:8,
254:7, 254:16,
255:2, 255:3,
255:12, 255:13,
255:17, 256:9
**doctor's** [8] - 194:23,
235:8, 246:19,
247:20, 248:4,
254:19, 272:5,
285:19
**doctorate** [1] - 95:15
**doctors** [3] - 246:21,
254:9, 275:25
**document** [35] -
125:2, 144:4, 147:6,
147:12, 147:18,
148:18, 171:1,
171:2, 171:7,
171:18, 172:7,
172:10, 173:19,
179:24, 182:15,
195:20, 195:21,
201:4, 232:14,
235:20, 265:7,
267:9, 269:8,
269:20, 272:20,
272:22, 273:1,
274:9, 274:14,
279:5, 279:7, 279:9,
279:12, 283:22,
285:10
**documentary** [2] -
289:12, 289:13
**documentation** [6] -
232:15, 232:16,
250:1, 250:6, 274:18
**documented** [2] -
232:15, 267:17
**documents** [5] -
193:2, 193:5,
226:11, 226:16,

266:12, 271:23,
271:24, 274:4,
287:10
**dollars** [1] - 113:21
**done** [16] - 87:11,
130:13, 130:25,
131:10, 131:19,
133:10, 135:17,
181:6, 196:16,
197:19, 240:14,
258:3, 270:17,
281:24, 288:6, 288:9
**door** [1] - 93:24
**double** [2] - 127:11
**double-sided** [2] -
127:11
**doubt** [1] - 261:18
**down** [20] - 138:4,
139:5, 141:5,
143:15, 167:25,
184:5, 184:8,
184:24, 191:5,
195:19, 213:4,
232:7, 233:17,
242:9, 251:12,
261:2, 262:14,
276:6, 283:17,
286:12
**downsize** [1] - 175:22
**Dr** [8] - 254:5, 255:14,
259:18, 272:23,
273:2, 279:23,
279:24, 286:22
**drain** [1] - 260:21
**draining** [1] - 268:12
**draw** [2] - 107:3,
267:13
**dressed** [1] - 215:3
**dressing** [2] - 270:14,
284:6
**dressings** [3] -
273:21, 280:2,
280:21
**drinking** [1] - 216:2
**Driscoll** [1] - 86:10
**drive** [1] - 141:7
**driving** [1] - 89:3
**due** [3] - 211:1, 220:3,
290:2
**duly** [4] - 90:14, 90:22,
144:24, 186:24
**duplicative** [1] - 144:6
**duration** [1] - 124:4
**during** [18] - 88:23,
91:3, 91:14, 91:23,
92:21, 113:1,
114:10, 121:25,
146:17, 153:24,
160:18, 160:23,
205:8, 213:1, 231:5,

231:15, 231:22,
264:9
**duties** [8] - 180:18,
183:12, 183:15,
207:17, 208:15,
256:5, 264:21,
281:22

---

## E

**e-mail** [44] - 203:7,
203:8, 203:13,
212:6, 212:7, 212:8,
212:13, 212:17,
214:3, 216:25,
217:21, 218:2,
220:19, 220:21,
221:19, 221:21,
221:24, 232:9,
233:16, 233:18,
233:24, 234:2,
234:3, 234:5, 234:6,
234:9, 234:10,
234:13, 234:16,
234:18, 235:15,
245:5, 245:6, 245:8,
245:12, 245:13,
245:14, 245:15,
245:16, 245:24,
248:4, 248:22,
249:23
**e-mails** [2] - 226:13,
249:7
**ear** [1] - 266:25
**early** [5] - 103:17,
153:1, 154:1,
182:12, 216:18
**earning** [4] - 164:23,
165:10, 165:11,
165:12, 166:8
**earnings** [1] - 156:13
**ears** [1] - 147:24
**easier** [3] - 124:1,
124:2, 219:15
**easily** [2] - 281:23,
281:24
**East** [1] - 86:11
**EASTERN** [1] - 85:1
**easy** [3] - 141:22,
157:15, 179:4
**eat** [1] - 277:18
**eating** [8] - 274:21,
274:24, 275:3,
277:6, 277:25,
279:25, 280:15,
284:4
**EBITDA** [1] - 156:13
**Economic** [1] - 95:14
**Ed** [4] - 191:13,
231:15, 231:16,

231:17
**edges** [1] - 258:19
**education** [1] - 103:8
**EE** [2] - 279:24, 280:1
**effective** [2] - 167:2, 182:3
**effort** [2] - 150:23, 162:9
**efforts** [2] - 141:10, 151:4
**egg** [1] - 88:6
**EIDELMAN** [101] - 86:3, 89:14, 89:17, 120:7, 120:19, 120:21, 121:8, 121:10, 121:13, 122:8, 122:11, 123:3, 123:15, 123:20, 124:14, 126:1, 126:8, 126:13, 126:18, 127:13, 127:22, 127:25, 128:3, 128:10, 129:2, 129:16, 129:18, 129:23, 130:1, 130:14, 131:12, 131:21, 139:16, 143:3, 143:7, 143:11, 143:19, 143:24, 162:18, 162:22, 163:1, 163:3, 163:5, 166:13, 166:15, 167:16, 169:15, 174:16, 176:18, 184:3, 185:5, 205:19, 205:23, 210:4, 210:6, 210:9, 211:25, 212:5, 216:20, 218:8, 219:11, 219:14, 222:4, 222:17, 222:19, 225:14, 225:17, 226:5, 228:13, 233:4, 240:16, 240:18, 240:23, 240:25, 241:2, 241:8, 241:12, 242:17, 244:3, 245:1, 247:3, 247:6, 247:11, 247:13, 247:16, 248:8, 251:10, 252:10, 252:19, 252:22, 284:19, 284:23, 285:2, 285:5, 285:9, 286:20, 287:1, 291:9, 291:17,

291:25, 292:4
**Eidelman** [20] - 89:12, 120:15, 121:21, 123:12, 139:15, 142:3, 162:17, 163:2, 167:15, 184:2, 205:18, 234:20, 240:15, 242:10, 242:16, 242:19, 285:13, 287:23, 288:19, 289:8
**Eidelman's** [1] - 242:25
**eight** [2] - 99:17, 260:4
**either** [8] - 120:11, 120:14, 178:13, 182:11, 185:2, 234:18, 257:24, 266:20
**elaborate** [2] - 100:23, 214:17
**elaboration** [1] - 100:22
**electrolarynx** [1] - 264:22
**elements** [1] - 157:14
**elevator** [1] - 152:11
**eligibility** [2] - 195:25, 256:12
**eliminate** [1] - 172:15
**eliminated** [17] - 160:2, 180:17, 180:18, 180:22, 181:7, 204:11, 221:3, 221:7, 221:10, 222:1, 238:3, 238:16, 238:23, 238:25, 250:18, 250:21, 250:24
**eliminating** [1] - 238:15
**elimination** [7] - 171:23, 172:24, 173:22, 176:15, 181:11, 206:13, 238:10
**eliminations** [1] - 159:14
**Elmo** [4] - 121:3, 138:15, 222:20, 245:1
**elsewhere** [1] - 259:19
**email** [22] - 151:25, 153:13, 153:16, 155:4, 161:10, 167:21, 168:16, 176:25, 188:19,

189:1, 189:5, 190:17, 191:5, 192:9, 193:15, 194:14, 195:4, 197:15, 198:6, 200:11
**emailed** [1] - 191:25
**emails** [4] - 192:24, 192:25, 199:16, 201:17
**embarrassed** [2] - 88:20, 248:23
**Emory** [8] - 256:2, 267:14, 267:20, 269:8, 272:20, 280:24, 282:20
**emotional** [3] - 106:12, 106:15, 106:17
**emotionality** [1] - 87:24
**employed** [7] - 189:22, 206:17, 222:9, 224:10, 257:3, 257:10, 257:13
**Employee** [1] - 180:3
**employee** [21] - 113:11, 114:1, 114:14, 114:18, 114:20, 114:23, 115:3, 115:14, 116:19, 149:20, 155:23, 156:3, 165:3, 180:2, 180:10, 196:11, 202:1, 215:25, 232:18, 235:12, 289:2
**employees** [39] - 146:25, 153:24, 154:2, 154:7, 157:8, 157:12, 158:20, 159:9, 159:20, 159:21, 160:12, 160:23, 161:16, 167:2, 167:3, 172:25, 173:5, 173:8, 176:1, 176:2, 180:11, 189:19, 196:14, 207:7, 209:19, 209:23, 210:2, 210:8, 210:10, 210:19, 221:9, 232:6, 239:11, 239:13, 248:22, 248:25, 249:24, 250:3
**employers** [1] - 256:11

**employment** [15] - 113:7, 119:1, 119:23, 150:24, 221:5, 222:6, 222:11, 222:12, 222:14, 222:25, 223:2, 223:10, 225:1, 257:16, 289:2
**encompass** [1] - 149:12
**encourage** [1] - 88:22
**encouraged** [2] - 215:16, 215:19
**end** [21] - 104:24, 105:8, 106:21, 117:15, 122:3, 123:21, 124:6, 152:13, 160:15, 193:15, 199:20, 223:2, 225:20, 232:3, 239:23, 254:22, 271:22, 272:12, 288:1, 288:5, 288:16
**ended** [3] - 157:25, 222:13, 264:10
**endoscopic** [1] - 270:8
**ends** [2] - 121:6, 267:20
**engage** [2] - 103:10, 104:9
**engaged** [2] - 115:6, 137:17
**engages** [1] - 175:14
**enrolling** [1] - 94:24
**ensure** [1] - 217:11
**Ensure** [1] - 284:3
**ENT** [5] - 256:22, 257:1, 266:13, 266:25, 267:6
**enter** [4] - 122:14, 137:1, 137:4, 137:8
**entered** [11] - 90:1, 122:20, 123:4, 125:8, 131:18, 135:24, 139:12, 149:8, 219:22, 235:22, 274:18
**enters** [3] - 141:3, 144:1, 186:14
**entire** [7] - 105:9, 117:24, 143:12, 143:13, 170:6, 225:21, 238:6
**entitled** [1] - 179:10
**equivalent** [3] - 179:1, 179:10, 196:4
**ER** [1] - 263:20
**errors** [1] - 275:13

**escalated** [1] - 217:9
**ESQ** [6] - 85:19, 85:23, 86:3, 86:3, 86:4, 86:7
**essential** [1] - 230:25
**established** [2] - 128:13, 129:24
**estimate** [1] - 159:11
**et** [1] - 208:2
**ET** [1] - 85:9
**Europe** [2] - 231:22, 231:25
**evaluation** [1] - 256:25
**Evaluation** [1] - 282:21
**evaluations** [1] - 267:4
**evenhanded** [1] - 142:3
**evening** [1] - 205:4
**event** [2] - 147:3, 229:1
**events** [1] - 235:3
**eventually** [8] - 95:12, 110:23, 213:22, 227:5, 227:23, 228:25, 229:2, 229:22
**evidence** [111] - 115:22, 116:7, 116:25, 120:18, 121:7, 121:24, 122:1, 122:2, 122:7, 122:10, 122:12, 122:23, 123:1, 123:16, 126:17, 126:20, 126:21, 127:24, 130:7, 143:14, 143:16, 144:5, 144:7, 151:21, 151:22, 151:24, 153:11, 153:14, 153:15, 154:21, 154:23, 154:25, 155:2, 161:8, 161:9, 167:15, 167:17, 167:18, 169:13, 169:16, 169:17, 172:19, 172:21, 179:20, 179:23, 182:16, 182:17, 188:24, 188:25, 190:22, 190:23, 192:7, 192:8, 195:2, 195:3, 197:11, 197:12, 198:4, 198:5, 199:24, 199:25, 200:1,

200:6, 200:8,
200:10, 201:2,
201:3, 202:6, 202:7,
203:11, 203:12,
212:3, 212:4,
216:21, 216:22,
218:9, 218:10,
220:24, 220:25,
222:5, 223:6, 223:7,
233:8, 233:9,
233:10, 233:14,
233:15, 243:13,
243:16, 243:19,
245:22, 245:23,
247:5, 247:6,
247:14, 254:12,
271:21, 272:4,
272:9, 285:2, 285:7,
285:17, 286:6,
286:17, 286:19,
287:10, 289:12,
289:13, 289:18,
290:9
**evidentiary** [1] -
288:12
**evolve** [1] - 175:22
**evolved** [1] - 97:15
**EWING** [1] - 86:1
**Ewing** [1] - 255:23
**ex** [1] - 261:25
**exact** [6] - 94:15,
188:11, 205:7,
235:1, 235:2, 259:13
**exactly** [6] - 97:21,
154:5, 165:23,
250:25, 251:2,
288:24
**exam** [1] - 274:13
**examination** [3] -
176:23, 243:10,
244:23
**EXAMINATION** [22] -
90:23, 120:20,
131:23, 145:14,
163:4, 176:21,
187:1, 205:22,
226:7, 241:1,
249:21, 291:6,
291:8, 291:10,
291:14, 291:16,
291:18, 291:22,
291:24, 292:1,
292:3, 292:5
**examined** [3] - 90:22,
144:25, 186:25
**example** [7] - 137:6,
137:11, 161:21,
210:22, 238:7,
242:2, 244:10
**examples** [9] - 213:2,

282:13, 282:14,
282:15, 282:18,
283:14, 283:15,
283:18
**excellent** [1] - 283:5
**except** [4] - 132:15,
238:13, 284:10,
285:7
**exception** [2] -
180:15, 286:6
**exceptions** [1] -
180:17
**excerpts** [1] - 255:18
**exchange** [1] - 200:11
**Excision** [1] - 274:12
**excluded** [1] - 115:23
**excuse** [1] - 105:23
**excused** [6] - 139:16,
139:18, 139:20,
141:18, 184:4,
251:13
**execute** [2] - 130:18,
281:23
**executed** [1] - 133:3
**executing** [1] - 150:7
**executions** [1] -
203:24
**executive** [6] - 128:19,
156:24, 171:10,
171:12, 174:25
**exercise** [2] - 178:16,
251:6
**exhaustion** [1] - 196:3
**exhibit** [15] - 115:25,
120:25, 121:14,
124:19, 125:23,
126:2, 126:4, 126:5,
128:4, 143:7,
190:18, 203:9,
273:14, 274:11,
286:5
**Exhibit** [102] - 116:1,
121:2, 122:12,
123:1, 123:22,
123:23, 126:21,
132:4, 144:7,
151:11, 151:24,
153:10, 153:15,
154:20, 155:2,
161:4, 161:9,
167:11, 167:18,
167:19, 169:10,
169:17, 170:11,
172:17, 172:21,
174:12, 179:16,
179:18, 179:23,
182:15, 182:17,
188:19, 188:25,
190:16, 190:23,
192:8, 194:13,

195:1, 195:3,
197:12, 198:5,
200:10, 201:3,
202:7, 203:12,
212:4, 216:22,
218:10, 220:25,
221:23, 223:7,
233:15, 245:3,
245:21, 245:23,
265:6, 266:11,
271:17, 271:18,
271:20, 272:18,
273:19, 279:3,
279:5, 280:24,
281:9, 281:12,
282:20, 285:3,
285:9, 286:14,
292:10, 292:11,
292:12, 292:13,
292:14, 292:15,
292:16, 292:17,
292:18, 292:19,
292:20, 292:21,
292:22, 292:23,
292:24, 292:25,
293:1, 293:2, 293:3,
293:4, 293:5, 293:6,
293:7, 293:8, 293:9,
293:10, 293:11,
293:12, 293:13,
293:14
**Exhibit's** [1] - 188:22
**exhibits** [16] - 116:6,
116:9, 121:5,
121:23, 122:4,
122:17, 142:4,
143:8, 230:18,
284:16, 285:1,
285:6, 286:21,
286:22, 286:23,
290:6
**Exhibits** [3] - 167:10,
286:11, 286:13
**exist** [1] - 102:3
**existed** [1] - 179:13
**exit** [1] - 227:8
**exited** [3] - 140:3,
141:18, 251:19
**expect** [2] - 287:14,
287:23
**expected** [2] - 173:10,
263:5
**expenses** [2] - 149:12,
159:6
**experience** [5] -
100:13, 111:20,
137:15, 213:3, 230:8
**experiencing** [2] -
282:16, 283:21
**expert** [1] - 180:16

**expertise** [1] - 102:23
**explain** [8] - 92:22,
93:18, 112:4,
113:12, 128:14,
157:5, 187:6, 251:3
**explained** [3] -
112:19, 114:8, 289:7
**explanations** [1] -
244:22
**exposed** [2] - 262:2,
262:4
**Express** [2] - 99:2,
99:6
**expressly** [1] - 132:15
**extended** [3] - 182:22,
222:14, 223:22
**extensive** [1] - 121:5
**external** [1] - 261:25
**extra** [2] - 262:15,
287:21
**extremely** [1] - 264:10
**eyes** [1] - 233:22

# F

**face** [2] - 88:6, 282:7
**faced** [1] - 289:13
**facilitate** [1] - 121:25
**facility** [1] - 219:20
**fact** [7] - 127:4, 136:2,
143:14, 144:13,
176:14, 243:7,
244:21
**factor** [1] - 185:8
**factors** [2] - 156:11,
177:10
**facts** [2] - 181:12,
243:6
**factual** [1] - 177:2
**fair** [2] - 161:17,
276:10
**fairly** [3] - 159:21,
275:10, 275:19
**fall** [12] - 163:9,
163:16, 163:23,
164:4, 164:7,
166:21, 168:20,
177:12, 178:5,
182:1, 216:10
**familiar** [7] - 146:22,
147:25, 157:21,
190:1, 194:24,
218:11, 231:10
**family** [6] - 93:21,
93:22, 94:1, 94:2,
103:7
**far** [4] - 115:10,
276:23, 284:8, 286:4
**fax** [1] - 247:18
**FCRR** [1] - 86:10

**February** [6] - 128:1,
128:14, 128:15,
139:3, 223:2, 231:1
**federal** [2] - 95:17,
196:1
**fee** [1] - 129:6
**feed** [2] - 270:9,
283:25
**feeding** [6] - 271:10,
271:11, 277:18,
278:21, 280:14,
283:25
**fees** [1] - 129:9
**felt** [4] - 93:25, 101:9,
102:11, 224:12
**Ferris** [1] - 175:9
**festivities** [1] - 254:23
**few** [10] - 87:6, 112:15,
136:24, 199:21,
206:21, 212:25,
252:24, 269:9,
279:16, 279:19
**field** [2] - 183:6,
279:22
**fields** [1] - 145:20
**file** [1] - 193:3
**filed** [1] - 225:22
**fill** [10] - 97:23,
189:16, 191:6,
194:8, 194:10,
195:10, 195:17,
227:23, 228:24,
229:2
**filled** [2] - 196:10,
245:20
**filling** [2] - 209:10,
246:21
**final** [6] - 129:6, 129:9,
162:14, 223:10,
267:8, 267:10
**Final** [1] - 267:7
**finally** [2] - 205:1,
222:12
**finance** [5] - 103:8,
193:22, 193:24
**Finance** [1] - 179:5
**financial** [10] - 96:3,
96:12, 96:14, 97:12,
98:3, 98:11, 100:1,
100:4, 108:25,
134:18
**Financial** [2] - 102:21,
103:24
**finder** [1] - 144:13
**fine** [9] - 89:10,
101:13, 114:20,
120:4, 142:13,
166:13, 253:3,
284:14
**finish** [3] - 240:11,

Case 1:17-cv-04869-FB-LB   Document 148   Filed 03/09/21   Page 220 of 239 PageID #: 9202

261:22, 272:16
**finished** [6] - 106:22,
106:24, 230:19,
240:8, 283:10,
288:11
**fire** [2] - 159:5, 178:24
**firing** [2] - 158:20,
190:8
**firm** [4] - 95:1, 95:3,
95:4
**first** [28] - 90:8, 90:9,
90:21, 94:11, 94:14,
106:23, 108:7,
115:6, 127:3,
132:13, 136:15,
141:23, 144:24,
171:12, 179:16,
179:19, 186:24,
193:16, 205:3,
213:12, 223:20,
254:7, 256:19,
263:1, 267:23,
269:24, 275:14,
286:14
**First** [80] - 87:4, 91:8,
91:10, 91:13, 91:20,
91:23, 106:21,
107:19, 109:22,
112:16, 112:22,
115:20, 117:12,
117:15, 117:20,
119:13, 121:18,
122:20, 125:5,
129:8, 130:16,
131:18, 133:4,
133:5, 133:7, 137:2,
145:18, 145:23,
145:25, 146:3,
146:6, 146:12,
146:20, 146:25,
147:1, 147:22,
148:3, 149:4,
150:23, 153:23,
154:14, 155:21,
156:3, 158:17,
159:19, 160:13,
169:1, 174:21,
174:23, 174:25,
175:12, 175:14,
175:24, 180:3,
180:11, 181:17,
187:3, 196:25,
197:23, 205:6,
206:1, 206:3, 206:5,
206:17, 207:1,
209:2, 223:22,
224:1, 224:5,
225:19, 231:6,
234:6, 234:13,
237:23, 245:7,

257:4, 257:11,
257:13
**FIRST** [1] - 85:9
**Fiserv** [1] - 91:11
**fistula** [46] - 258:5,
258:10, 258:14,
258:21, 258:22,
258:25, 260:12,
260:14, 260:16,
260:24, 260:25,
261:1, 261:6,
261:11, 261:14,
261:23, 262:3,
262:22, 262:24,
263:6, 263:14,
263:15, 263:17,
264:15, 268:10,
268:12, 268:16,
268:18, 269:2,
273:7, 273:17,
273:21, 273:22,
274:2, 274:10,
277:15, 277:20,
277:21, 277:24,
278:19, 279:2,
280:1, 280:2,
280:20, 281:6
**fistulas** [1] - 278:12
**fit** [1] - 98:10
**five** [6] - 89:22, 97:9,
106:23, 227:10,
283:10, 286:22
**flap** [3] - 268:10,
268:15, 268:18
**flexibility** [1] - 92:7
**flips** [1] - 96:22
**Floor** [1] - 86:6
**flow** [2] - 99:3, 175:18
**flush** [1] - 181:3
**FMLA** [5] - 180:2,
180:16, 196:1,
224:23, 252:15
**focus** [8] - 100:24,
107:17, 117:10,
175:25, 189:9,
216:13, 217:10,
217:16
**focused** [7] - 100:15,
107:15, 155:14,
171:1, 209:1, 218:1,
236:24
**focusing** [2] - 88:14,
230:22
**folks** [3] - 92:22,
167:4, 254:1
**follow** [9] - 124:22,
199:5, 212:25,
221:15, 234:18,
244:5, 259:3, 267:6,
283:6

follow-up [3] - 212:25,
259:3, 283:6
**following** [6] - 143:1,
186:1, 257:23,
258:25, 259:7,
270:23
**follows** [3] - 90:22,
144:25, 186:25
**food** [2] - 282:14,
284:4
**force** [17] - 102:17,
160:17, 173:6,
175:15, 176:5,
176:8, 176:11,
177:16, 192:1,
192:5, 223:18,
223:23, 224:2,
224:6, 289:3,
289:13, 289:16
**foregoing** [1] - 130:22
**form** [28] - 149:4,
195:13, 195:14,
195:16, 196:6,
196:7, 201:22,
218:15, 218:17,
218:19, 218:21,
218:22, 219:5,
219:6, 220:7, 246:4,
246:8, 246:9,
246:14, 246:21,
246:24, 247:2,
247:19, 248:2,
265:19, 265:21,
265:23
**formal** [2] - 162:9,
181:21
**formally** [1] - 230:11
**format** [2] - 157:15,
170:7
**formed** [1] - 91:11
**former** [1] - 150:15
**forms** [19] - 194:2,
194:3, 194:4, 194:9,
194:11, 195:9,
195:10, 196:16,
233:19, 234:7,
234:14, 245:19,
245:20, 246:1,
246:4, 246:13, 248:6
**forth** [4] - 92:16,
196:15, 290:11
**forward** [2] - 212:23,
228:8
**four** [8] - 97:9, 207:6,
207:7, 216:18,
260:10, 272:15,
278:1, 285:18
**four-week** [1] - 278:1
**fourth** [1] - 94:11
**frame** [5] - 117:14,

188:11, 227:6,
227:7, 227:16
**Frank** [1] - 150:12
**FREDERIC** [1] - 85:13
**free** [2] - 141:12,
273:15
**freeze** [2] - 159:20,
159:22
**freezes** [1] - 159:16
**frequently** [4] - 190:7,
191:16, 192:24,
282:3
**Fricke** [17] - 117:18,
117:20, 117:24,
118:3, 118:5,
158:15, 177:22,
182:8, 182:10,
182:11, 183:2,
189:9, 189:15,
189:22, 206:8,
206:17
**Fricke's** [8] - 118:7,
118:15, 158:7,
158:11, 182:7,
183:8, 188:14,
189:11
**Friday** [1] - 288:8
**friend** [2] - 102:13,
105:5, 106:8
**friends** [2] - 104:10,
150:14
**front** [13] - 120:24,
126:15, 126:25,
155:3, 157:11,
167:7, 171:8,
173:15, 212:2,
216:24, 254:13,
258:16, 279:7
**frustrations** [1] -
209:23
**full** [8] - 113:15,
113:16, 115:6,
153:1, 175:5, 175:6,
185:10, 279:22
**full-time** [5] - 113:15,
113:16, 115:6,
175:5, 175:6
**fully** [2] - 130:17,
174:11
**function** [5] - 100:14,
177:24, 183:7,
237:25, 264:20
**functions** [3] - 238:17,
278:2, 281:22
**funds** [1] - 104:10
**FURTHER** [1] -
249:21, 292:5
**fuss** [1] - 290:7

# G

**gap** [17] - 112:2,
112:5, 112:6,
182:23, 183:2,
183:4, 189:15,
208:24, 213:2,
227:13, 227:15,
227:16, 229:10,
229:11, 229:18,
230:7
**gaps** [3] - 158:14,
188:5, 211:18
**GARY** [1] - 86:3
**gastrostomy** [2] -
270:8, 270:9
**gathered** [2] - 157:5,
170:6
**gauge** [1] - 162:20
**GBS** [1] - 173:4
**general** [6] - 94:11,
110:20, 207:19,
257:18, 283:14,
283:18
**generalist** [6] -
187:14, 187:16,
187:18, 187:21,
188:15, 201:7
**generalists** [1] -
203:23
**generally** [14] - 114:3,
156:9, 194:24,
197:2, 203:4,
207:12, 207:24,
213:23, 222:10,
227:4, 227:23,
228:22, 239:14,
265:7
**generate** [1] - 277:22
**generated** [1] - 132:16
**generation** [3] - 94:3,
94:11, 94:12
**gentleman** [5] - 89:19,
92:8, 107:9, 215:14,
216:2
**gentleman's** [1] -
215:18
**genuine** [1] - 102:16
**GILLIAN** [1] - 86:3
**Gita** [1] - 245:11
**given** [12] - 95:15,
127:3, 159:18,
198:10, 222:10,
261:9, 265:14,
268:24, 278:8,
278:18, 281:3,
281:10
**global** [1] - 163:14
**Global** [3] - 163:16,
163:21, 167:22

**goal** [1] - 178:8
**goals** [1] - 103:7
**governance** [1] - 104:14
**Government's** [1] - 192:8
**graduate** [1] - 95:16
**grandson** [1] - 93:22
**Grant** [1] - 287:15
**grants** [1] - 130:16
**Graziadio** [1] - 288:25
**great** [4] - 116:19, 116:22, 174:24, 200:3
**Greenhill** [1] - 100:2
**greets** [1] - 217:23
**grew** [1] - 93:20
**groom** [2] - 229:4, 229:24
**groomed** [1] - 229:22
**grooming** [2] - 229:13, 229:15
**gross** [1] - 115:11
**group** [66] - 92:18, 118:7, 118:15, 148:12, 156:18, 156:23, 156:24, 157:4, 157:6, 158:7, 158:12, 158:16, 160:19, 170:4, 175:3, 177:8, 177:17, 177:18, 177:23, 178:2, 178:6, 182:7, 183:8, 183:11, 183:12, 183:14, 183:20, 188:13, 188:15, 188:17, 189:12, 189:20, 190:9, 190:12, 191:4, 206:15, 207:14, 207:18, 207:19, 207:23, 208:3, 209:13, 209:14, 209:15, 209:16, 209:17, 209:18, 213:22, 215:10, 226:11, 229:4, 231:5, 234:7, 236:11, 236:16, 236:20, 236:21, 237:24, 238:4, 238:6, 238:17, 238:21, 238:24
**Group** [8] - 100:7, 101:7, 101:23, 102:19, 106:22, 106:24, 110:11, 110:15
**groups** [7] - 158:16,

159:23, 177:21, 178:9, 183:6, 207:22, 237:15
**grow** [8] - 93:19, 98:4, 115:8, 231:24, 242:1, 242:14, 244:8, 262:5
**grown** [3] - 158:3, 158:6, 158:12
**growth** [1] - 158:10
**guard** [1] - 144:16
**guess** [20] - 95:23, 97:6, 97:15, 97:16, 97:17, 106:6, 107:22, 111:11, 111:13, 112:11, 117:16, 131:25, 137:9, 141:6, 148:19, 201:1, 202:12, 229:24, 264:7, 288:1
**guest** [1] - 142:8
**guidance** [2] - 167:5, 244:16
**guidelines** [1] - 154:10
**guy** [3] - 93:25, 100:2, 101:9
**guys** [1] - 184:17

**H**

**Hack** [29] - 156:22, 163:19, 163:25, 168:8, 173:7, 173:20, 187:19, 187:20, 187:21, 191:25, 192:9, 193:6, 196:25, 201:16, 201:23, 202:2, 202:10, 202:13, 202:16, 203:2, 217:6, 217:7, 226:13, 226:19, 226:21, 232:12, 232:20
**hack** [6] - 163:21, 166:17, 190:15, 217:8, 289:4, 289:5
**Hadler** [3] - 157:3, 169:20, 170:7
**Hagerstown** [1] - 231:19
**hair** [1] - 284:8
**half** [5] - 113:21, 225:22, 240:23, 254:17, 285:18
**halfway** [3] - 170:10, 170:11, 267:14
**hand** [5] - 90:13,

182:22, 239:2, 267:14, 272:21
**Handbook** [1] - 180:3
**handed** [1] - 88:25
**handing** [3] - 271:18, 272:18, 279:4
**handle** [6] - 194:25, 196:19, 197:2, 218:12, 287:12, 290:7
**handled** [1] - 195:8
**hands** [2] - 87:17, 88:12
**hands-on** [1] - 88:12
**handwriting** [1] - 218:22
**happy** [8] - 114:1, 114:5, 114:17, 114:18, 116:11, 117:2, 124:25, 153:6
**hard** [6] - 121:12, 189:7, 224:16, 261:23, 262:10, 284:7
**harm** [1] - 144:6
**Harry** [3] - 254:5, 255:14, 273:2
**harry** [1] - 255:15
**Hawkeye** [1] - 97:2
**hdrisc@gmail.com** [1] - 86:12
**head** [14] - 118:3, 146:3, 148:13, 150:13, 158:3, 158:5, 158:20, 164:9, 208:17, 232:1, 238:12, 238:16, 256:7, 259:8
**Head** [1] - 256:1
**head/neck** [1] - 266:13
**heading** [2] - 268:21, 269:25
**heads** [1] - 287:14
**heal** [6] - 260:9, 260:12, 262:4, 262:13, 262:24, 278:13
**healed** [4] - 274:12, 276:11, 277:15, 280:9
**healing** [6] - 262:14, 262:15, 263:14, 264:15, 271:14, 273:9
**health** [11] - 199:7, 216:13, 217:11, 217:17, 218:13, 218:16, 218:24, 219:1, 234:25,

246:14, 263:16
**hear** [11] - 93:24, 96:24, 100:16, 106:19, 145:4, 145:6, 150:1, 153:4, 191:2, 210:7, 287:19
**heard** [12] - 134:7, 150:19, 153:22, 190:2, 200:12, 209:13, 242:20, 244:20, 244:22, 244:23
**hearing** [1] - 199:14
**held** [3] - 115:20, 212:25, 256:3
**Help** [5] - 201:5, 201:17, 202:9, 202:10, 233:18
**help** [21] - 91:20, 98:11, 102:11, 154:11, 193:24, 194:8, 194:10, 194:12, 194:16, 194:17, 196:9, 196:18, 196:20, 199:6, 201:10, 215:3, 215:17, 215:19, 223:8, 248:24, 250:14
**helped** [4] - 195:10, 197:4, 218:4, 230:6
**helpful** [1] - 224:17
**helping** [5] - 91:19, 98:4, 225:13, 229:24, 283:25
**hereby** [2] - 130:16, 132:11
**herein** [1] - 90:21
**hierarchal** [1] - 118:1
**high** [5] - 159:21, 207:24, 236:12, 236:13, 236:15
**highlight** [2] - 125:12, 219:25
**highlighted** [2] - 130:10, 217:1
**highlighting** [3] - 130:12, 219:17, 219:18
**highlights** [4] - 219:9, 219:12, 221:24, 245:4
**highly** [4] - 154:6, 161:15, 172:24, 176:1
**himself** [2] - 283:21, 283:25
**hire** [14] - 111:1, 119:13, 119:16, 122:13, 132:19,

149:19, 150:3, 178:21, 178:24, 224:19, 227:12, 227:15, 229:16, 229:18
**hired** [16] - 97:20, 107:6, 107:19, 108:3, 109:20, 110:23, 119:15, 119:17, 134:1, 134:6, 142:11, 150:19, 165:2, 165:5, 183:8, 189:8
**hiring** [16] - 119:6, 119:7, 119:8, 119:12, 134:22, 150:5, 159:15, 159:16, 159:20, 159:22, 190:8, 191:3, 209:9, 209:11, 226:25, 236:18
**hirings** [1] - 235:13
**History** [4] - 267:24, 268:2, 268:3, 268:6
**history** [3] - 93:13, 128:18, 157:24
**hits** [1] - 213:11
**hold** [6] - 88:23, 151:7, 192:12, 192:22, 200:20, 277:22
**holding** [2] - 100:7, 247:8
**hole** [3] - 261:24, 263:1, 270:14
**Holly** [1] - 86:10
**home** [6] - 190:5, 191:15, 248:22, 284:21, 285:4, 287:3
**honest** [1] - 167:25
**honestly** [1] - 154:15
**honor** [1] - 91:2
**Honor** [80] - 89:17, 90:9, 90:19, 92:2, 93:2, 94:7, 95:12, 105:11, 105:17, 108:14, 111:23, 113:18, 114:13, 117:4, 119:2, 120:2, 120:7, 120:19, 121:13, 122:8, 125:20, 126:18, 127:13, 127:22, 128:3, 128:5, 129:2, 130:14, 131:12, 137:12, 138:11, 139:19, 143:8, 143:19, 149:17, 162:18, 163:3,

164:17, 166:14,
167:16, 169:15,
172:20, 174:16,
179:21, 181:10,
183:24, 184:3,
186:5, 189:4, 210:3,
211:23, 218:8,
219:11, 219:15,
222:4, 222:19,
225:14, 227:25,
228:13, 239:7,
240:16, 240:18,
241:9, 241:12,
242:12, 247:3,
247:6, 247:16,
248:8, 249:17,
252:3, 252:11,
252:19, 252:23,
255:10, 255:15,
275:13, 276:8,
284:15, 285:5
**HONORABLE** [1] -
85:13
**honorary** [1] - 95:15
**hope** [1] - 141:12
**hopefully** [3] - 89:23,
141:14, 290:8
**hospice** [1] - 219:20
**hospital** [6] - 190:4,
190:6, 190:9,
191:10, 191:14,
219:20
**host** [1] - 146:9
**hour** [2] - 254:17,
285:18
**hours** [1] - 260:5
**housekeeping** [1] -
144:3
**houses** [1] - 93:23
**HR** [57] - 146:8, 146:9,
146:11, 150:10,
167:3, 174:24,
179:4, 179:5, 187:5,
187:6, 187:9,
187:10, 187:13,
187:18, 191:12,
193:10, 193:12,
193:21, 193:23,
194:4, 195:7,
197:16, 198:13,
198:14, 198:17,
200:14, 201:7,
201:11, 206:7,
206:10, 206:12,
206:13, 206:16,
206:20, 207:1,
207:8, 207:16,
208:13, 214:15,
214:16, 215:6,
215:9, 216:6,

221:22, 224:18,
231:2, 231:17,
231:23, 232:2,
232:13, 236:2,
236:16, 249:14,
288:25
**HRIS** [1] - 237:14
**hum** [1] - 267:12
**Human** [13] - 97:24,
145:21, 146:1,
146:3, 148:7,
148:13, 148:15,
148:18, 148:22,
163:9, 174:3,
193:13, 198:9
**human** [4] - 133:17,
145:20, 150:13,
221:17
**husband** [1] - 225:11

## I

**ID** [1] - 196:11
**idea** [6] - 92:15,
103:20, 133:20,
135:15, 162:19
**ideas** [1] - 250:14
**identical** [2] - 160:1,
160:3
**identified** [3] - 172:10,
230:1, 251:6
**identify** [4] - 167:19,
214:10, 241:14,
285:12
**identifying** [2] -
168:12, 168:17
**ill** [6] - 118:22, 136:3,
150:24, 152:20,
152:25, 165:7
**Illness** [2] - 267:24,
268:2
**immigrant** [1] - 94:2
**immigrants** [1] - 93:22
**imminent** [1] - 263:16
**impact** [1] - 265:3
**impacting** [1] - 213:3
**impacts** [1] - 171:22
**impeach** [2] - 240:19,
243:10
**impeachment** [1] -
243:18
**implement** [5] - 98:1,
98:2, 101:20,
115:15, 217:10
**implemented** [2] -
102:7, 159:16
**implementing** [2] -
104:2, 154:8
**implements** [1] -
102:6

**importance** [2] -
243:1, 243:7
**important** [6] - 88:8,
93:14, 111:24,
142:9, 243:25,
287:24
**impose** [1] - 142:4
**improve** [1] - 229:14
**improvement** [1] -
226:16
**inappropriate** [3] -
135:20, 135:22,
215:7
**incapacitated** [6] -
220:3, 220:20,
235:5, 235:16,
235:25, 236:4
**incapacitation** [1] -
234:22
**incapacity** [4] - 220:7,
220:14, 220:15,
265:20
**incentive** [1] - 164:18
**incidents** [1] - 217:12
**incision** [1] - 258:20
**include** [1] - 133:1
**included** [16] - 131:6,
155:12, 172:4,
173:5, 173:6,
173:13, 176:4,
176:7, 176:10,
176:15, 177:3,
177:7, 199:16,
223:23, 224:2, 224:6
**including** [3] - 220:4,
231:25, 285:19
**inclusion** [2] - 174:3,
223:17
**income** [2] - 110:17,
156:14
**incongruent** [1] -
250:15
**inconsistent** [3] -
243:4, 243:6, 251:1
**incorrectly** [1] -
275:15
**increase** [3] - 114:10,
115:10, 178:7
**increased** [1] - 114:13
**incumbents/open** [1]
- 171:15
**independent** [13] -
121:17, 122:19,
125:4, 129:19,
130:4, 131:3,
131:19, 147:6,
147:21, 148:3,
149:4, 149:7, 149:9
**index** [1] - 286:23
**indicate** [2] - 226:16,

269:20
**indicated** [3] - 171:3,
234:21, 269:4
**indicates** [3] - 155:5,
265:19, 265:23
**indicating** [2] -
219:25, 248:5
**individual** [4] - 156:5,
214:21, 236:25,
252:15
**individuals** [14] -
155:11, 155:16,
157:25, 201:21,
209:7, 210:17,
231:14, 231:18,
231:22, 236:14,
236:17, 239:4,
262:7, 264:2
**industry** [1] - 105:21
**inefficient** [1] - 177:19
**influence** [1] - 240:1
**influenced** [1] - 289:3
**influencing** [1] - 289:1
**info** [1] - 89:1
**inform** [2] - 221:9,
226:18
**informal** [1] - 230:11
**informally** [1] - 230:13
**Information** [1] -
269:24
**information** [25] -
131:9, 148:23,
152:22, 155:18,
155:20, 157:5,
161:18, 168:7,
173:7, 194:23,
196:11, 196:18,
204:1, 211:11,
211:13, 214:12,
221:11, 221:18,
234:17, 237:13,
243:25, 276:21,
279:17, 279:19,
281:10
**informed** [4] - 189:13,
200:2, 200:4, 201:8
**informing** [1] - 197:16
**informs** [1] - 197:13
**initial** [2] - 201:15,
264:9
**initiated** [1] - 156:20
**Innelli** [1] - 88:25
**input** [3] - 191:9,
235:12, 235:13
**inside** [1] - 191:3
**instance** [2] - 159:6,
208:8
**instincts** [1] - 88:7
**Institute** [1] - 95:13
**institution** [1] - 268:17

**insurance** [4] - 104:8,
105:8, 105:22, 108:9
**Insurance** [1] - 101:24
**Intel** [1] - 283:5
**intellectual** [1] - 131:8
**intent** [1] - 177:4
**intention** [1] - 102:22
**intentionally** [1] -
144:9
**interest** [1] - 99:25
**interesting** [1] -
100:16
**interfere** [1] - 88:1
**Interim** [2] - 268:3,
268:6
**interim** [4] - 157:1,
157:7, 183:16,
200:12
**internal** [3] - 130:18,
156:23, 157:4
**internally** [1] - 150:9
**interrupt** [5] - 100:9,
100:18, 105:18,
107:1, 164:13
**interruption** [1] -
135:8
**interviewed** [1] -
157:8
**introducing** [2] -
115:19, 116:16
**invest** [4] - 175:19,
175:23, 178:18,
178:21
**invested** [4] - 87:10,
87:22, 109:8, 115:7
**investigation** [2] -
137:15, 137:17
**investing** [2] - 179:2,
179:3
**invited** [1] - 97:8
**invoice** [16] - 126:24,
127:2, 127:8,
127:25, 128:15,
128:24, 128:25,
129:6, 131:8,
131:17, 134:25,
136:15, 137:23,
138:14, 138:19,
138:25
**invoices** [10] - 125:14,
127:21, 127:23,
128:5, 137:21,
138:8, 147:18,
148:1, 149:13,
164:14
**involuntary** [1] -
237:12
**involve** [2] - 175:15,
211:17
**involved** [31] - 91:21,

96:1, 96:9, 108:25, 113:19, 113:20, 118:2, 133:22, 136:5, 147:5, 147:21, 148:4, 148:6, 148:22, 149:19, 149:22, 150:8, 154:13, 155:11, 155:21, 156:2, 156:6, 156:7, 156:17, 169:19, 203:16, 203:22, 203:23, 204:3, 223:3, 239:19
**involvement** [1] - 204:4
**involving** [2] - 160:22, 200:11
**Iowa** [2] - 97:3, 97:4
**iPad** [1] - 264:23
**IPO** [1] - 113:21
**irrevocable** [1] - 130:17
**issue** [10] - 104:13, 181:17, 193:22, 193:23, 193:24, 199:1, 216:4, 263:2, 263:17, 271:15
**issued** [1] - 149:8
**issues** [5] - 93:3, 100:15, 226:17, 287:8, 289:23
**Italian** [1] - 94:2
**item** [1] - 168:14
**itself** [4] - 99:5, 248:7, 258:18, 280:3

## J

**James** [1] - 190:24
**January** [52] - 152:13, 153:16, 153:24, 154:1, 155:5, 155:8, 156:18, 161:10, 166:7, 170:23, 173:18, 176:24, 177:4, 178:16, 199:11, 199:12, 200:2, 201:18, 202:14, 203:2, 203:6, 203:13, 203:17, 203:18, 204:9, 222:6, 223:15, 239:24, 250:17, 269:12, 269:18, 270:21, 271:1, 273:3, 273:6, 273:14, 273:16, 273:20, 274:5, 274:9, 274:16,

274:21, 274:25, 275:4, 275:9, 275:19, 276:11, 276:15, 276:23, 277:10, 278:5
**Jean** [2] - 198:7, 198:8
**Jeff** [36] - 156:22, 163:19, 163:25, 168:8, 173:7, 173:20, 187:19, 187:20, 187:21, 187:23, 187:24, 191:25, 192:9, 193:6, 196:25, 201:16, 201:18, 201:23, 202:2, 202:10, 202:12, 202:15, 203:2, 217:6, 217:7, 226:13, 226:19, 226:21, 232:12, 232:20, 232:22
**Jennifer** [15] - 195:4, 195:6, 196:15, 196:19, 196:20, 197:22, 198:15, 200:19, 203:7, 221:20, 221:21, 221:25, 234:7, 234:9, 245:25
**Jersey** [1] - 93:20
**job** [33] - 87:11, 94:23, 94:25, 98:12, 99:22, 102:2, 104:18, 107:17, 111:11, 136:4, 142:12, 143:23, 160:4, 160:10, 174:9, 175:6, 175:7, 179:8, 179:9, 179:11, 179:13, 180:13, 183:11, 190:1, 195:25, 207:17, 208:2, 229:22, 262:10, 271:4, 276:25, 277:9, 281:22
**jobs** [4] - 111:13, 160:8, 189:25, 264:3
**Joe** [2] - 148:14, 150:7
**Johnson** [28] - 155:4, 167:21, 168:3, 168:7, 168:16, 185:3, 186:11, 186:19, 187:3, 205:24, 211:12, 212:1, 214:4, 216:23, 218:11, 219:17, 223:8, 224:19, 225:19,

226:9, 241:3, 244:18, 245:3, 245:21, 245:24, 247:18, 248:10, 288:20
**Johnson's** [2] - 240:19, 252:14
**join** [3] - 97:19, 119:24, 191:12
**Joseph** [2] - 90:10, 90:17
**JOSEPH** [1] - 90:20
**judge** [8] - 88:8, 88:21, 95:18, 117:3, 120:16, 143:3, 143:18, 289:23
**Judge** [18] - 123:20, 126:8, 126:13, 129:18, 131:21, 141:24, 143:24, 145:4, 145:5, 163:1, 184:21, 205:19, 205:20, 226:5, 233:5, 244:3, 251:10, 286:20
**judges** [2] - 100:10, 106:6
**judgment** [1] - 88:2
**judicial** [1] - 141:15
**Julie** [2] - 250:12, 288:3
**July** [9] - 188:21, 189:12, 206:11, 212:12, 227:19, 230:16, 241:20, 250:16, 256:4
**June** [9] - 128:24, 129:7, 129:9, 131:7, 131:16, 138:25, 213:1, 213:10, 255:19
**juris** [1] - 95:15
**Juror** [1] - 141:3
**juror** [6] - 87:6, 89:1, 89:2, 89:7, 141:16, 141:18
**Jurors** [1] - 145:7
**jurors** [13] - 87:7, 89:11, 89:13, 89:18, 114:8, 141:4, 142:2, 142:5, 143:15, 228:20, 272:8, 284:21, 285:4
**jury** [39] - 87:1, 87:15, 88:5, 88:17, 88:19, 90:1, 90:4, 92:8, 107:2, 107:10, 107:12, 108:3, 108:20, 112:19, 113:9, 113:12,

116:5, 117:7, 121:21, 123:14, 133:25, 134:6, 140:3, 141:1, 143:2, 143:3, 144:1, 144:2, 164:14, 173:2, 184:13, 184:14, 186:2, 210:1, 242:18, 251:19, 252:1, 252:20
**JURY** [1] - 85:6
**Jury** [3] - 85:14, 186:14, 286:2
**jury's** [1] - 88:13
**Justice** [1] - 95:14
**justify** [4] - 164:8, 166:20, 177:13, 178:8
**Justin** [16] - 210:13, 210:22, 211:2, 211:5, 229:4, 229:8, 229:10, 229:21, 229:24, 230:1, 230:6, 230:12, 230:14, 248:25, 250:11
**Justin's** [1] - 230:9

## K

**Karen** [11] - 144:21, 145:11, 192:10, 212:8, 221:16, 226:13, 231:8, 232:8, 232:11, 240:1, 248:12
**Kathi** [2] - 221:16, 289:15
**Kaufman** [3] - 269:16, 271:12, 274:25
**Kaufman's** [2] - 280:12, 280:13
**keep** [6] - 107:15, 107:17, 144:9, 145:1, 149:25, 286:13
**keeping** [3] - 107:4, 152:24, 270:12
**keeps** [2] - 183:20, 237:13
**Kelly** [2] - 250:12, 288:4
**Kennedy** [3] - 255:21, 255:22, 283:6
**kept** [4] - 193:7, 197:21, 221:17, 251:14
**Kevin** [8] - 124:16, 134:13, 148:8, 148:10, 148:14,

149:1, 150:8
**key** [3] - 117:6, 213:5, 242:22
**kid** [1] - 94:1
**kids** [1] - 96:22
**kind** [14] - 91:4, 93:13, 97:17, 137:22, 157:12, 205:14, 260:6, 261:2, 262:19, 263:5, 269:1, 276:19, 278:11, 284:7
**kinds** [1] - 159:22
**KING** [1] - 86:5
**KKR** [3] - 91:19, 106:23, 106:25
**knowing** [2] - 177:11, 236:9
**knowledge** [25] - 118:25, 124:21, 135:10, 136:9, 136:15, 136:18, 148:17, 150:22, 151:1, 151:4, 165:15, 177:2, 203:14, 216:14, 226:21, 229:17, 230:8, 231:13, 231:16, 236:4, 239:8, 243:2, 273:11, 274:23, 280:5
**known** [1] - 184:20
**knows** [2] - 134:6, 156:9

## L

**labor** [1] - 262:10
**lack** [5] - 192:21, 192:23, 208:20, 226:10, 274:15
**lacked** [1] - 104:14
**lady** [1] - 250:11
**lady's** [1] - 249:1
**laid** [1] - 170:7
**Lang** [1] - 139:3
**language** [4] - 266:14, 267:4, 267:10, 269:11
**large** [5] - 177:17, 177:19, 183:6, 229:10, 261:14
**Larsen** [2] - 156:22, 156:23
**laryngeal** [1] - 256:24
**laryngectomy** [1] - 266:16
**larynx** [1] - 258:17
**last** [29] - 102:20,

145:25, 146:5,
146:18, 161:23,
165:15, 171:17,
171:20, 176:23,
184:19, 193:15,
205:5, 205:10,
206:4, 210:15,
222:25, 223:1,
225:4, 225:5, 225:6,
225:20, 235:11,
235:23, 241:19,
267:23, 267:24,
269:25, 280:20
**late** [8] - 87:13,
182:12, 187:15,
188:12, 213:13,
242:5, 244:12, 287:6
**lateral** [1] - 237:5
**latitude** [1] - 92:18
**laughter** [1] - 95:19
**LAW** [1] - 85:17
**law** [7] - 94:24, 95:1,
95:2, 95:3, 95:10,
95:17, 196:2
**Law** [4] - 94:24, 95:11,
95:13, 95:14
**lawyer** [2] - 87:25,
95:7
**lawyers** [11] - 100:22,
107:15, 116:5,
116:9, 121:22,
123:17, 141:25,
242:21, 243:3,
243:22, 285:21
**layers** [3] - 155:19,
239:2, 251:5
**laying** [1] - 157:15
**lead** [2] - 92:5, 174:24
**leader** [10] - 148:22,
163:16, 180:19,
180:20, 183:7,
200:14, 208:7,
208:11, 227:13,
229:4
**leaders** [10] - 146:9,
154:10, 162:13,
167:25, 168:2,
174:7, 187:8, 204:5,
239:5, 244:17
**leadership** [3] -
208:20, 210:11,
226:10
**leading** [2] - 125:20,
206:7
**leak** [1] - 258:20
**leaking** [1] - 261:2
**leaks** [1] - 258:21
**learn** [4] - 95:1, 227:5,
257:13, 271:7
**learned** [7] - 105:20,

131:7, 131:16,
180:21, 223:20,
275:10, 275:20
**learning** [6] - 131:18,
273:18, 275:12,
276:3, 276:20,
280:18
**least** [2] - 261:22,
262:12
**Leave** [6] - 146:12,
146:17, 146:22,
180:5, 201:5, 202:10
**leave** [85] - 99:5,
99:22, 99:23,
118:22, 140:1,
141:12, 146:11,
146:14, 146:15,
153:20, 165:13,
165:19, 165:21,
165:22, 170:16,
170:17, 171:3,
174:23, 176:8,
180:5, 180:13,
180:21, 191:22,
192:1, 192:12,
194:2, 194:9,
194:24, 195:8,
195:18, 196:1,
196:3, 196:7, 196:9,
196:16, 196:17,
196:22, 196:24,
197:1, 197:5,
198:19, 198:24,
199:11, 200:21,
201:8, 201:14,
201:15, 201:21,
201:25, 202:1,
202:3, 202:10,
203:2, 203:3, 203:4,
203:8, 206:3, 206:5,
216:12, 217:10,
217:14, 218:1,
218:18, 224:3,
224:24, 227:2,
233:1, 233:2, 234:7,
234:12, 234:16,
236:25, 239:24,
240:2, 240:5,
245:19, 248:13,
248:18, 249:12,
272:8, 285:23,
289:2, 289:4
**leaves** [5] - 181:19,
184:13, 197:3,
252:21, 286:2
**leaving** [6] - 120:7,
227:20, 228:19,
236:14, 237:3,
241:22
**Lebenthal** [6] -

108:22, 108:23,
109:3, 109:14,
109:17, 110:1
**led** [8] - 157:3, 164:12,
206:23, 207:14,
211:21, 216:14,
216:15, 248:16
**left** [20] - 104:24,
104:25, 112:24,
113:5, 118:22,
119:1, 120:24,
127:12, 165:8,
165:11, 182:11,
189:9, 225:19,
268:10, 268:15,
268:18, 268:19,
271:13, 282:5, 282:6
**leg** [3] - 282:6, 282:7
**legal** [1] - 174:10
**legitimate** [3] -
180:17, 181:11,
289:12
**legs** [1] - 141:23
**Lehman** [6] - 91:18,
94:17, 94:18, 95:5,
99:1, 99:5
**LEHR** [1] - 86:1
**lens** [1] - 170:8
**less** [2] - 239:12,
239:17
**lesser** [2] - 239:11,
239:12
**level** [18] - 104:6,
110:4, 161:19,
164:5, 165:3,
166:20, 179:14,
203:25, 204:3,
207:24, 208:25,
211:5, 227:14,
228:23, 232:23,
239:1, 239:4, 251:5
**levels** [3] - 157:8,
161:17, 229:16
**liability** [1] - 110:11
**liaison** [1] - 187:10
**liberty** [1] - 144:14
**license** [2] - 130:17,
133:3
**Life** [2] - 195:13,
285:10
**life** [4] - 95:22, 102:14,
104:8
**lifting** [6] - 274:21,
276:4, 276:5, 277:6,
279:24, 280:16
**likely** [1] - 156:21
**limitations** [5] - 264:4,
271:2, 276:25,
277:8, 277:11
**limited** [2] - 110:11,

179:9
**Lindsey** [2] - 255:21,
255:22
**line** [13] - 161:21,
175:18, 178:12,
228:1, 228:4, 228:6,
228:7, 241:4, 241:5,
241:23, 258:20
**lines** [1] - 193:16
**Lisa** [1] - 139:3
**list** [15] - 121:5, 121:6,
121:12, 143:17,
166:3, 173:13,
173:23, 174:2,
174:3, 174:8,
177:25, 204:5,
271:23, 271:25,
282:14
**listed** [1] - 171:9,
265:14, 274:11
**listen** [5] - 94:8, 116:4,
134:3, 134:5, 288:8
**listening** [2] - 96:19,
96:20
**listens** [1] - 96:24
**listing** [1] - 173:20
**lists** [3] - 172:23,
173:10, 173:11
**literally** [1] - 283:12
**litigator** [1] - 141:22
**live** [2] - 88:10, 254:13
**lived** [1] - 93:23
**living** [4] - 282:11,
282:12, 283:8,
283:14
**LLP** [1] - 86:1
**LOA** [5] - 196:24,
201:17, 202:9,
233:18
**local** [1] - 196:2
**location** [3] - 158:25,
159:1, 160:21
**logical** [1] - 106:12
**Loman** [1] - 103:12
**look** [37] - 107:2,
122:17, 122:18,
123:18, 127:12,
141:6, 141:22,
144:16, 151:20,
170:8, 178:4,
178:13, 178:15,
190:11, 201:13,
208:7, 208:10,
233:16, 235:18,
236:19, 236:23,
237:4, 237:10,
237:11, 237:12,
238:21, 239:1,
261:8, 262:17,
262:18, 266:14,

267:20, 268:20,
269:8, 273:15,
282:19
**looked** [5] - 147:7,
152:12, 161:15,
236:11, 269:4
**looking** [24] - 96:5,
98:21, 106:24,
127:8, 132:1, 134:2,
138:13, 158:11,
161:16, 167:4,
181:24, 208:5,
214:22, 227:19,
229:9, 231:1,
236:20, 241:21,
250:20, 250:24,
261:21, 266:21,
268:20, 276:17
**looks** [4] - 191:11,
195:21, 245:13,
246:5
**loose** [1] - 96:21
**Lorraine** [1] - 145:11
**lose** [1] - 236:21
**loser** [2] - 87:14,
87:15
**lost** [1] - 264:7
**loud** [2] - 254:24,
264:24
**louder** [2] - 147:24,
287:18
**LOUIS** [1] - 86:7
**lower** [4] - 216:25,
239:1, 239:4, 245:6
**lowly** [1] - 95:17
**lunch** [4] - 162:25,
181:8, 181:14, 184:9
**luncheon** [1] - 185:13
**lunchtime** [1] - 162:21
**lung** [4] - 263:2,
263:16, 273:8

**M**

**ma'am** [2] - 217:2,
256:14
**machine** [1] - 144:12
**Madison** [1] - 86:6
**magazines** [1] - 102:6
**mail** [44] - 203:7,
203:8, 203:13,
212:6, 212:7, 212:8,
212:13, 212:17,
214:3, 216:25,
217:21, 218:2,
220:19, 220:21,
221:19, 221:21,
221:24, 232:9,
233:16, 233:18,
233:24, 234:2,

234:3, 234:5, 234:6, 234:9, 234:10, 234:13, 234:16, 234:18, 235:15, 245:5, 245:6, 245:8, 245:12, 245:13, 245:14, 245:15, 245:16, 245:24, 248:4, 248:22, 249:23

**mails** [2] - 226:13, 249:7

**main** [1] - 98:12

**mainline** [1] - 272:25

**maintain** [1] - 193:10

**maintained** [1] - 217:11

**major** [1] - 256:5

**maker** [1] - 289:1

**man** [2] - 100:3, 133:9

**manage** [6] - 118:9, 144:10, 144:13, 183:7, 193:4, 238:24

**managed** [3] - 117:24, 156:23, 193:6

**management** [19] - 98:2, 146:11, 155:19, 157:25, 181:18, 192:17, 192:21, 192:23, 208:4, 209:5, 210:21, 215:10, 229:19, 231:4, 231:11, 238:11, 249:9, 249:11

**Management** [3] - 146:12, 146:17, 146:22

**manager** [20] - 181:19, 182:4, 193:8, 195:7, 197:15, 201:7, 201:19, 201:20, 202:13, 206:23, 210:14, 226:14, 226:18, 232:12, 232:20, 237:18, 238:7, 238:9, 242:4, 244:11

**managerial** [1] - 287:8

**managers** [3] - 173:5, 206:22, 239:3

**manages** [1] - 146:14

**managing** [12] - 144:18, 146:22, 167:2, 175:3, 192:19, 207:18, 207:22, 231:21, 238:3, 238:17, 242:6, 244:14

**Manhattan** [2] - 89:3,

90:5

**manners** [1] - 264:25

**Mantia** [1] - 210:16

**March** [11] - 124:5, 127:4, 127:8, 129:7, 199:18, 265:24, 266:1, 266:4, 266:7, 273:6, 278:4

**Marilynn** [1] - 97:8

**Marino** [18] - 155:5, 185:3, 200:15, 204:20, 204:21, 214:6, 214:8, 214:11, 216:7, 216:10, 216:15, 221:15, 223:15, 240:1, 248:11, 248:17, 287:16, 289:4

**mark** [3] - 286:6, 286:12, 290:9

**marked** [26] - 122:16, 129:22, 144:7, 151:24, 153:15, 155:2, 170:12, 179:23, 182:17, 188:25, 190:23, 192:8, 195:3, 197:12, 198:5, 200:10, 201:3, 202:7, 216:23, 220:2, 221:23, 223:5, 271:18, 272:18, 279:4, 282:20

**market** [2] - 161:17, 162:4

**Market** [1] - 161:21

**marketer** [1] - 102:9

**marketers** [1] - 106:6

**marketing** [12] - 94:16, 95:24, 101:7, 101:22, 101:25, 102:3, 102:6, 102:7, 102:18, 102:19, 104:6, 113:19

**martinet** [1] - 116:13

**Mason** [2] - 243:24, 255:1

**master** [1] - 221:17

**material** [3] - 178:7, 178:9, 178:11

**materials** [2] - 132:15, 132:16

**matter** [5] - 144:3, 240:4, 252:12, 287:6, 290:8

**McKinney** [1] - 85:17

**MD** [1] - 86:2

**mean** [37] - 130:23,

133:6, 150:2, 155:17, 158:24, 160:3, 160:5, 178:25, 181:22, 181:24, 191:17, 205:9, 205:10, 205:12, 213:19, 217:20, 227:22, 227:23, 228:20, 238:2, 238:3, 238:5, 239:12, 241:25, 244:7, 247:7, 259:25, 261:22, 262:14, 262:21, 267:7, 268:25, 273:13, 276:19, 281:21, 282:1

**meaning** [2] - 213:8, 282:4

**means** [14] - 99:6, 178:21, 178:22, 191:17, 213:20, 217:21, 220:14, 220:15, 227:20, 236:25, 241:21, 269:1, 277:16, 281:19

**meant** [3] - 98:5, 98:7, 157:23

**meantime** [2] - 122:5, 252:25

**mechanical** [1] - 86:14

**mechanism** [1] - 278:23

**medical** [11] - 118:23, 199:3, 219:20, 220:4, 255:7, 256:12, 256:16, 257:20, 273:8, 278:18, 281:10

**meet** [5] - 95:21, 96:25, 171:14, 209:12, 256:21

**meetings** [4] - 96:13, 96:14, 96:18, 235:13

**members** [7] - 92:8, 107:12, 116:5, 121:21, 144:2, 173:4, 242:18

**mention** [3] - 144:8, 189:6, 213:12

**mentioned** [8] - 98:14, 101:10, 175:1, 179:19, 216:7, 236:11, 242:3, 244:10

**mentor** [3] - 213:20, 228:25, 230:6

**Merrill** [1] - 269:15

**Meryl** [4] - 271:12, 274:25, 280:11, 280:13

**message** [5] - 87:8, 89:12, 117:5, 152:5, 248:24

**Met** [2] - 195:13, 285:10

**met** [5] - 95:22, 98:13, 104:25, 116:5, 256:19

**methodologies** [1] - 130:21

**MetLife** [7] - 256:16, 279:6, 279:14, 279:19, 281:10, 281:12

**mic** [1] - 145:2

**Michael** [3] - 143:3

**MICHAEL** [1] - 86:4

**mid** [5] - 94:16, 95:23, 97:21, 99:15, 169:22

**Mid** [1] - 161:21

**mid-2016** [1] - 168:24

**Mid-Market** [1] - 161:21

**mid-November** [1] - 169:22

**middle** [3] - 127:4, 182:18, 203:13

**might** [5] - 92:12, 194:23, 216:20, 261:6, 262:25

**Mike** [1] - 143:4

**million** [2] - 171:15, 171:19

**mind** [1] - 102:24, 153:2

**mind-set** [1] - 102:24

**minded** [3] - 87:16, 88:11, 88:15

**mindful** [2] - 128:6, 143:14

**Mine** [1] - 121:5

**mine** [5] - 125:24, 152:10, 218:22, 221:24, 245:4

**minute** [4] - 115:18, 139:21, 174:16, 233:7

**minutes** [3] - 87:6, 251:16, 254:21

**miraculous** [1] - 277:13

**mischaracterizes** [1] - 233:4

**misrepresenting** [1] - 124:19

**missing** [1] - 288:22

**model** [1] - 159:7

**moment** [7] - 91:12, 127:14, 131:13, 205:20, 225:14, 240:16, 249:17

**Monday** [3] - 195:9, 255:19, 288:12

**money** [4] - 109:5, 113:20, 114:14, 175:16

**monies** [1] - 175:15

**monitoring** [1] - 245:7

**month** [21] - 110:9, 111:2, 111:6, 111:7, 111:10, 124:12, 125:8, 127:3, 127:16, 133:9, 133:12, 133:19, 134:23, 136:1, 150:19, 164:15, 164:24, 260:4, 270:5, 277:12

**month's** [1] - 125:15

**month-long** [1] - 277:12

**monthly** [1] - 125:14

**months** [19] - 95:12, 113:14, 165:19, 174:22, 213:16, 216:18, 227:10, 227:17, 236:21, 249:14, 260:19, 261:23, 262:12, 262:21, 262:22, 263:7, 263:11

**morale** [1] - 213:3

**morning** [14] - 87:5, 90:11, 90:25, 91:1, 120:22, 120:23, 145:4, 145:5, 145:16, 145:17, 152:6, 163:6, 163:7, 286:8

**mortgage** [1] - 104:10

**most** [6] - 119:22, 161:15, 172:24, 176:1, 249:15, 261:16

**mostly** [1] - 271:14

**motivational** [2] - 166:25, 209:4

**mouth** [8] - 114:19, 264:19, 270:2, 271:10, 275:2, 277:17, 278:22, 280:14

**move** [22] - 94:12, 104:17, 104:19, 106:1, 113:12, 119:10, 119:24, 120:1, 137:20,

142:13, 149:18,
179:6, 185:10,
212:23, 213:4,
213:22, 214:22,
237:5, 251:4,
252:17, 284:15
**moved** [7] - 104:16,
117:24, 180:18,
189:13, 206:15,
238:6, 273:5
**moving** [8] - 158:25,
160:20, 183:20,
202:5, 238:11,
285:16, 285:20,
287:25
**MR** [265] - 89:7, 89:10,
89:14, 89:17, 90:9,
90:19, 90:24, 92:2,
92:5, 92:10, 93:2,
94:7, 94:13, 105:11,
105:14, 105:25,
106:5, 109:12,
111:23, 112:19,
115:24, 116:1,
116:16, 117:4,
119:11, 120:2,
120:7, 120:19,
120:21, 121:8,
121:10, 121:13,
122:8, 122:11,
123:3, 123:15,
123:20, 124:10,
124:14, 124:16,
124:20, 124:23,
125:20, 126:1,
126:8, 126:13,
126:18, 127:13,
127:22, 127:25,
128:3, 128:10,
129:2, 129:16,
129:18, 129:23,
130:1, 130:14,
131:12, 131:21,
131:24, 132:3,
132:5, 132:7,
133:24, 134:2,
134:4, 134:9,
136:24, 137:21,
137:25, 138:3,
138:6, 138:7,
138:11, 138:15,
139:16, 143:3,
143:7, 143:11,
143:19, 143:24,
144:21, 145:15,
147:17, 148:2,
149:17, 150:21,
151:9, 151:11,
151:13, 151:15,
151:17, 153:9,
153:12, 154:20,

154:24, 161:6,
162:15, 162:18,
162:22, 163:1,
163:3, 163:5,
166:13, 166:15,
167:16, 169:15,
172:20, 174:16,
176:18, 176:20,
176:22, 179:21,
181:15, 183:24,
184:3, 184:17,
184:22, 185:2,
185:5, 186:5,
186:11, 186:23,
187:2, 188:21,
188:23, 189:4,
190:19, 190:21,
197:10, 198:3,
200:7, 203:1,
203:10, 205:17,
205:19, 205:23,
210:3, 210:4, 210:6,
210:9, 211:25,
212:5, 216:20,
218:8, 219:11,
219:14, 222:4,
222:17, 222:19,
225:14, 225:17,
226:2, 226:5, 226:8,
227:25, 228:4,
228:5, 228:7,
228:10, 228:13,
228:16, 233:4,
233:9, 233:12,
235:22, 240:7,
240:8, 240:14,
240:16, 240:18,
240:23, 240:25,
241:2, 241:8,
241:12, 242:17,
244:3, 245:1,
246:25, 247:3,
247:4, 247:6,
247:11, 247:13,
247:16, 248:8,
249:17, 249:20,
249:22, 251:8,
251:10, 252:3,
252:7, 252:10,
252:19, 252:22,
253:2, 254:5, 254:8,
254:16, 254:21,
255:3, 255:6, 255:9,
255:14, 255:15,
255:18, 255:20,
256:10, 257:5,
257:6, 257:7, 257:8,
257:9, 265:5,
266:10, 271:16,
271:22, 272:1,
272:6, 272:11,

272:15, 273:19,
275:8, 275:13,
275:16, 275:18,
275:24, 276:8,
279:3, 280:23,
283:6, 283:12,
284:13, 284:15,
284:19, 284:23,
285:2, 285:5, 285:9,
286:9, 286:11,
286:15, 286:18,
286:20, 287:1,
287:15, 287:21,
288:3, 288:7,
288:24, 289:15,
291:7, 291:9,
291:11, 291:15,
291:17, 291:19,
291:23, 291:25,
292:2, 292:4, 292:6
**mucous** [1] - 263:19
**multi** [2] - 104:6,
144:11
**multi-level** [1] - 104:6
**multi-task** [1] - 144:11
**multiple** [2] - 138:7,
160:8
**muscle** [5] - 262:1,
268:10, 268:15,
268:18, 268:19
**mutual** [1] - 104:10
**mysterious** [1] - 144:4

# N

**name** [23] - 90:16,
100:1, 100:2,
101:23, 110:12,
117:17, 117:18,
145:10, 163:19,
172:4, 172:7,
173:13, 173:23,
176:14, 186:18,
194:22, 194:23,
200:13, 210:14,
210:15, 249:2,
265:14
**named** [3] - 225:24,
249:25, 252:15
**names** [2] - 95:3,
198:18
**nature** [1] - 159:18
**near** [2] - 268:24,
281:4
**necessarily** [4] -
106:12, 111:20,
190:11, 226:23
**necessary** [1] - 269:6
**Neck** [1] - 256:1
**neck** [10] - 256:7,

258:21, 259:8,
260:12, 260:17,
260:21, 264:17,
268:13, 269:3,
274:12
**need** [45] - 87:7, 93:1,
103:3, 103:6,
103:10, 103:11,
103:13, 116:21,
116:24, 128:6,
128:11, 143:22,
166:18, 169:8,
183:25, 184:17,
185:2, 189:5, 189:8,
199:7, 211:16,
211:19, 212:19,
212:25, 213:7,
213:17, 218:2,
220:21, 232:25,
233:19, 234:11,
238:7, 238:8,
238:21, 239:5,
241:13, 252:3,
262:25, 278:21,
287:11, 287:17
**needed** [28] - 108:25,
113:17, 129:11,
158:6, 177:13,
183:6, 194:11,
195:17, 204:6,
208:4, 209:5, 209:7,
209:9, 210:21,
211:4, 212:23,
214:10, 216:11,
217:10, 229:20,
238:19, 244:15,
244:16, 248:17,
249:9, 256:8, 281:7
**needing** [1] - 284:5
**needs** [22] - 97:13,
98:9, 100:22, 103:3,
103:5, 103:6,
103:14, 103:22,
104:3, 104:9, 108:8,
113:19, 158:14,
171:14, 187:9,
208:1, 208:8, 209:5,
209:12, 210:25,
211:18, 229:19
**needs-based** [9] -
103:3, 103:5, 103:6,
103:14, 103:22,
104:3, 104:9, 108:8,
113:19
**negative** [1] - 107:13
**negotiate** [2] - 133:14,
134:19
**negotiated** [1] -
134:18
**negotiation** [3] -

147:21, 148:4, 148:6
**negotiations** [4] -
133:20, 133:22,
135:13, 135:23
**neighborhood** [2] -
93:23, 93:25
**net** [1] - 156:14
**netting** [2] - 115:12,
115:13
**never** [8] - 87:12,
100:3, 110:4,
137:16, 261:16,
264:12, 269:22,
277:25
**NEW** [1] - 85:1
**new** [15] - 91:11,
103:14, 103:16,
105:21, 161:19,
175:21, 179:9,
188:10, 258:20,
262:5, 264:17,
277:17, 278:20,
278:23
**New** [8] - 85:5, 86:7,
86:11, 93:20, 94:24,
95:11, 95:13, 95:14
**next** [53] - 89:24,
93:24, 95:20,
105:12, 105:19,
106:19, 106:25,
111:3, 111:22,
116:24, 117:1,
119:5, 119:10,
123:2, 126:2,
126:22, 127:7,
127:18, 129:17,
132:23, 133:25,
137:7, 137:13,
137:19, 139:22,
140:5, 142:17,
143:16, 144:20,
147:20, 159:13,
159:15, 184:15,
185:1, 185:4,
185:14, 186:3,
186:8, 189:8,
195:19, 197:19,
202:18, 208:25,
211:24, 233:6,
236:10, 250:10,
251:7, 251:16,
251:21, 252:2,
253:5, 268:20
**nice** [2] - 97:7, 254:24
**nicely** [2] - 285:20,
287:25
**Nick** [1] - 210:16
**nick's** [1] - 210:20
**nine** [2] - 88:7, 257:7
**nineteen** [1] - 174:22

**nobody's** [2] - 98:5, 238:3
**none** [1] - 218:22
**nonexclusive** [1] - 130:16
**nonexistent** [1] - 91:9
**nonwitness** [1] - 243:18
**nonworking** [3] - 222:10, 222:22, 223:13
**nonwritten** [1] - 137:4
**normal** [4] - 128:19, 270:2, 275:2, 280:14
**normally** [4] - 198:20, 208:6, 251:15, 257:2
**nose** [1] - 266:25
**notation** [1] - 144:6
**note** [13] - 88:25, 152:8, 152:9, 152:10, 196:25, 200:16, 224:7, 267:4, 267:6, 269:12, 273:14, 274:25, 280:14
**noted** [2] - 87:2, 275:1
**notes** [4] - 266:13, 266:15, 266:19, 267:5
**nothing** [6] - 135:18, 136:7, 136:11, 136:12, 165:23, 251:10
**notice** [5] - 144:19, 203:2, 222:10, 222:23, 223:13
**noticed** [1] - 249:13
**notices** [1] - 202:15
**notified** [9] - 157:18, 169:1, 171:23, 176:24, 177:4, 202:2, 204:11, 204:12, 221:16
**notifying** [2] - 221:2, 221:25
**November** [18] - 154:3, 169:22, 170:17, 191:25, 192:9, 194:8, 195:5, 195:20, 201:15, 201:17, 203:17, 203:18, 234:3, 245:25, 246:5, 248:5, 248:13, 248:16
**NTE** [1] - 267:2
**number** [23] - 89:2, 89:7, 89:8, 89:10, 139:25, 141:3, 141:18, 159:10,

160:12, 160:24, 170:11, 173:25, 196:11, 219:4, 219:8, 219:24, 220:1, 231:24, 234:19, 238:5, 238:13, 265:6, 286:6
**Number** [5] - 153:9, 190:16, 271:18, 272:18, 279:3
**numbers** [1] - 286:5
**numerous** [2] - 160:21, 199:4
**nurse** [5] - 252:4, 252:8, 254:6, 266:20, 267:12
**nurse's** [2] - 287:17, 287:22
**nutrition** [1] - 284:2
**NY** [2] - 85:22, 86:7

## O

**o'clock** [1] - 283:10
**OA** [3] - 180:5, 180:6, 180:8
**oath** [2] - 242:24, 243:11
**object** [1] - 226:2
**objection** [23] - 89:17, 111:22, 122:9, 124:10, 124:13, 151:21, 154:22, 155:1, 161:8, 167:15, 169:16, 172:18, 179:22, 200:9, 210:3, 210:4, 233:4, 246:25, 284:19, 284:22, 284:23, 284:25
**objections** [5] - 126:19, 153:14, 197:11, 284:18, 285:12
**objective** [2] - 157:23, 170:8
**objectives** [1] - 103:7
**obviously** [5] - 95:24, 108:16, 114:14, 117:8, 160:9
**occasions** [3] - 116:6, 215:2, 215:17
**occur** [2] - 169:1, 169:5
**occurred** [6] - 160:17, 193:23, 226:12, 234:24, 235:1, 248:15
**October** [6] - 190:17, 234:21, 234:24,

235:16, 236:1, 265:21
**OF** [3] - 85:1, 85:6, 85:17
**offense** [1] - 142:2
**offer** [2] - 116:7, 130:19
**offered** [2] - 174:24, 194:8
**office** [19] - 152:11, 153:5, 199:20, 199:21, 200:3, 214:9, 214:13, 214:21, 242:25, 243:1, 246:19, 247:20, 248:4, 249:2, 249:24, 262:10, 271:3, 279:23, 279:24
**OFFICE** [1] - 85:17
**office-style** [1] - 271:3
**officers** [2] - 116:10, 287:4
**often** [5] - 199:5, 199:16, 249:3, 259:11, 260:2
**old** [1] - 103:11
**older** [1] - 192:25
**once** [8] - 100:11, 123:16, 204:24, 221:16, 267:8, 277:15, 277:16, 278:1
**one** [102] - 87:6, 87:15, 92:9, 96:8, 101:12, 105:23, 107:13, 108:6, 113:16, 115:19, 115:21, 121:24, 123:12, 129:13, 130:5, 131:13, 132:14, 135:7, 136:24, 138:6, 138:8, 138:14, 138:21, 138:23, 143:9, 143:13, 151:18, 152:25, 158:19, 158:25, 159:25, 160:19, 161:3, 167:3, 170:5, 175:22, 175:25, 176:3, 177:10, 178:18, 179:2, 179:18, 180:20, 181:15, 182:15, 184:23, 185:5, 186:16, 188:17, 189:19, 189:20, 190:11, 190:24, 195:17, 195:19,

198:9, 200:11, 206:9, 208:8, 209:15, 210:22, 210:23, 212:14, 213:1, 214:21, 215:14, 228:14, 231:1, 235:18, 237:24, 237:25, 240:16, 246:4, 248:21, 248:25, 249:17, 250:12, 258:1, 258:2, 259:10, 259:15, 259:16, 259:21, 260:4, 264:18, 265:6, 268:7, 268:14, 269:15, 270:4, 274:7, 275:5, 281:2, 283:12, 284:25, 285:8, 285:13, 286:16
**one-on-one** [1] - 190:11
**one-on-ones** [1] - 213:1
**one-way** [1] - 264:18
**ones** [3] - 213:1, 284:11, 284:22
**ongoing** [1] - 249:13
**oops** [1] - 257:5
**Open** [3] - 87:1, 141:1, 252:1
**open** [12] - 87:16, 88:11, 88:15, 167:25, 171:23, 172:8, 188:8, 237:6, 249:3, 258:18, 260:21, 262:2
**open-minded** [3] - 87:16, 88:11, 88:15
**opened** [1] - 232:2
**opening** [4] - 108:1, 175:8, 232:1, 258:16
**openings** [2] - 153:22, 208:2
**operating** [2] - 183:5, 254:10
**operation** [3] - 102:3, 102:19, 104:7
**Operations** [1] - 178:2
**operator** [1] - 167:1
**opinion** [4] - 107:2, 107:13, 109:4
**Opportunity** [1] - 95:14
**opportunity** [5] - 113:11, 120:1, 174:24, 206:6, 288:22
**opposed** [1] - 103:1

**oral** [6] - 137:1, 137:3, 137:5, 137:8, 250:6, 250:10
**orally** [1] - 137:14
**order** [6] - 118:1, 138:12, 139:12, 149:11, 209:6, 282:1
**ordered** [1] - 137:21
**orders** [1] - 149:8
**ordinarily** [1] - 208:12
**Ording** [7] - 152:1, 152:3, 157:1, 175:1, 175:5, 183:18, 200:12
**Ording's** [1] - 183:15
**org** [1] - 207:25
**organization** [41] - 145:22, 146:9, 146:10, 155:19, 157:9, 157:21, 157:24, 160:20, 163:14, 163:15, 167:23, 182:4, 182:14, 187:8, 187:9, 188:6, 188:16, 188:17, 191:7, 204:5, 204:7, 206:9, 206:19, 206:20, 206:21, 206:23, 207:25, 208:6, 208:7, 208:10, 208:21, 209:5, 210:12, 211:17, 212:16, 214:1, 214:22, 235:17, 236:15, 237:3, 238:1
**organizational** [5] - 188:5, 209:12, 212:15, 214:4, 235:14
**organizations** [3] - 163:12, 206:22, 206:25
**organized** [1] - 157:6
**original** [3] - 202:9, 259:7, 261:6
**originally** [4] - 91:16, 201:14, 261:13, 264:1
**otherwise** [3] - 95:17, 119:9, 288:10
**outcome** [2] - 215:20, 264:13
**outlined** [1] - 191:8
**outlining** [2] - 192:15, 212:15
**output** [2] - 261:20, 269:2
**outside** [3] - 137:15,

256:22, 257:1
**overall** [3] - 156:13, 175:18, 261:11
**overlap** [1] - 113:2
**overlapped** [1] - 269:22
**overnight** [1] - 219:19
**oversight** [1] - 210:22
**overwhelm** [1] - 143:15
**owe** [1] - 194:14
**owed** [1] - 125:15
**own** [3] - 239:8, 261:16, 261:18, 270:14, 282:14
**owned** [3] - 99:2, 100:6, 106:22
**owner** [3] - 180:9, 180:11, 180:13
**owners** [1] - 110:14
**ownership** [2] - 98:6, 98:7

**P**

**p-l-u-m-e-r-i** [1] - 90:17
**P.C** [2] - 85:17, 85:21
**p.m** [2] - 251:19, 253:4
**packed** [1] - 260:16
**packing** [2] - 260:17, 261:19
**Page** [3] - 267:20, 268:2, 268:20
**page** [41] - 89:24, 125:11, 126:23, 127:7, 134:4, 138:1, 140:5, 142:17, 147:17, 161:11, 170:11, 170:12, 171:7, 171:17, 171:20, 179:16, 180:4, 185:14, 202:18, 228:1, 228:4, 228:6, 228:7, 240:23, 241:3, 241:4, 241:5, 241:23, 251:21, 253:5, 257:6, 257:7, 265:11, 267:13, 267:23, 268:1, 268:20, 269:24, 279:13, 283:12, 284:20
**PAGE** [2] - 291:2, 292:8
**pages** [8] - 127:11, 128:23, 147:16, 267:3, 269:9, 272:15, 279:12,

279:19
**paid** [10] - 95:17, 101:14, 109:21, 111:16, 111:17, 111:18, 113:10, 114:23, 130:17, 149:10
**Palm** [1] - 108:7
**Pam** [1] - 212:16
**panicking** [1] - 143:21
**paper** [4] - 117:6, 128:6, 128:24, 171:8
**papers** [4] - 194:16, 194:19, 194:21, 205:20
**paperwork** [12] - 144:17, 146:15, 191:21, 194:24, 195:11, 196:10, 196:12, 196:13, 197:19, 218:5, 218:12
**paperworks** [1] - 195:17
**par** [1] - 278:11
**paragraph** [5] - 132:10, 132:23, 132:25, 193:16, 267:25
**paragraphs** [1] - 268:5
**pare** [1] - 143:15
**parent** [1] - 101:8
**Parker** [1] - 212:16
**Parrish** [3] - 254:6, 270:5
**part** [37] - 91:11, 92:17, 94:23, 94:25, 95:23, 98:24, 99:1, 99:4, 99:7, 103:2, 104:7, 105:3, 108:5, 115:9, 123:17, 126:5, 129:1, 130:10, 132:10, 133:8, 148:18, 159:7, 160:20, 166:3, 170:1, 178:15, 183:4, 189:7, 193:13, 214:24, 215:4, 216:25, 217:5, 242:23, 243:7, 244:21, 288:12
**part-time** [4] - 94:23, 94:25, 104:7, 115:9
**participate** [2] - 190:8, 190:10
**particular** [6] - 126:10, 128:4, 168:13, 173:9, 212:13, 279:11
**pay** [9] - 110:22,

**particularly** [1] - 266:18
**parties** [4] - 87:4, 92:13, 130:18, 242:22
**partner** [25] - 187:5, 187:7, 187:8, 191:12, 193:21, 193:23, 193:25, 204:17, 206:10, 206:12, 206:14, 206:16, 206:20, 207:1, 207:9, 207:16, 208:6, 208:13, 215:18, 215:22, 231:2, 231:23, 236:2, 249:14
**partnered** [2] - 208:9, 250:4
**partnering** [1] - 208:18
**partners** [2] - 146:8, 201:11
**parts** [2] - 126:3, 145:22
**party** [4] - 243:12, 243:15, 252:18, 256:15
**passed** [1] - 108:1
**Pat** [4] - 157:3, 157:14, 169:20, 170:7
**path** [1] - 270:25
**pathologist** [2] - 267:11, 269:21
**pathologists** [1] - 266:15
**pathology** [3] - 266:14, 267:4, 269:11
**patient** [7] - 219:19, 220:2, 270:1, 270:16, 273:2, 283:2, 283:4
**Patient** [2] - 270:2, 270:4
**patient's** [1] - 256:16
**patients** [6] - 256:7, 256:11, 257:19, 259:11, 265:9, 266:16
**Patricia** [1] - 157:3
**Paula** [3] - 210:13, 249:1, 250:11
**pause** [6] - 131:15, 174:19, 205:21, 225:18, 240:13, 240:17
**pay** [9] - 110:22,

112:14, 115:5, 119:21, 119:25, 125:8, 136:1, 137:14, 152:25
**Pay** [1] - 180:5
**paying** [2] - 180:20, 216:17
**PCF** [1] - 268:12
**peace** [1] - 153:2
**pec** [3] - 268:10, 268:15, 271:14
**pectoralis** [1] - 268:19
**PEG** [5] - 270:4, 270:7, 270:24, 270:25, 277:12, 278:1
**people** [34] - 87:9, 87:22, 96:8, 100:14, 108:23, 119:16, 119:17, 119:24, 120:1, 133:17, 146:25, 157:15, 158:23, 159:5, 171:22, 175:9, 177:1, 178:22, 179:6, 207:12, 207:13, 231:11, 231:24, 231:25, 236:20, 238:13, 239:3, 239:11, 239:17, 254:11, 264:25, 278:21, 282:3
**per** [2] - 279:23, 280:13
**Per** [1] - 279:24
**percent** [9] - 113:23, 159:9, 172:24, 176:1, 176:4, 176:7, 176:10, 188:7, 209:8
**percentage** [1] - 158:11
**Percutaneous** [1] - 270:8
**perfect** [2] - 98:10, 124:2
**perform** [8] - 130:19, 220:15, 229:21, 257:24, 258:24, 259:1, 260:2, 276:24
**performance** [13] - 118:18, 156:11, 156:12, 175:17, 226:15, 226:17, 226:20, 226:22, 228:23, 232:19, 232:21, 232:24
**performed** [3] - 156:5, 259:19
**performing** [2] - 242:5, 244:12
**period** [15] - 91:14, 91:24, 113:1, 124:6,

137:17, 160:23, 182:22, 202:11, 214:1, 220:3, 220:7, 230:25, 265:20, 277:12, 278:1
**periodically** [3] - 273:21, 280:2, 280:21
**periods** [1] - 188:8
**permanent** [3] - 114:14, 165:2, 183:17
**permission** [1] - 192:1
**Perry** [2] - 243:23, 254:25
**persisted** [1] - 256:24
**person** [18] - 90:5, 99:24, 101:12, 119:15, 134:13, 135:24, 177:25, 185:4, 197:17, 206:9, 213:25, 220:19, 224:18, 227:14, 227:15, 229:2, 243:13, 247:9
**person's** [1] - 265:16
**personal** [5] - 124:20, 201:9, 234:18, 245:15, 245:16
**personally** [2] - 224:13, 250:3
**personnel** [4] - 193:2, 193:7, 193:9, 193:10
**personnel's** [1] - 132:18
**perspective** [2] - 168:11, 215:9
**pertain** [1] - 107:11
**pharyngeal** [3] - 268:23, 268:24, 281:3
**pharyngocutaneous** [5] - 258:5, 258:8, 258:14, 268:9, 268:12
**pharynx** [1] - 258:15
**phone** [2] - 144:9, 234:19
**phones** [1] - 144:17
**physical** [1] - 274:13
**physically** [1] - 205:12
**physician** [1] - 170:20
**physician's** [3] - 154:14, 200:16, 234:21
**pick** [1] - 254:23
**picked** [1] - 259:20
**piecemeal** [1] - 122:5
**pieces** [1] - 160:20
**place** [6] - 97:16,

104:17, 143:1,
159:22, 186:1, 240:2
**placed** [4] - 181:5,
240:4, 259:6, 264:9
**places** [1] - 97:7
**Plaintiff** [9] - 85:4,
85:17, 90:21,
203:12, 233:15,
245:23, 293:12,
293:13, 293:14
**plaintiff** [4] - 88:4,
88:16, 90:10, 197:9
**Plaintiff's** [63] -
151:13, 151:15,
151:16, 151:17,
151:20, 151:24,
153:9, 153:10,
153:15, 154:20,
155:2, 179:16,
179:23, 182:15,
182:17, 188:19,
188:22, 188:25,
190:16, 190:19,
190:23, 192:6,
195:1, 195:3, 197:8,
197:12, 198:1,
198:5, 199:23,
200:5, 200:7, 200:8,
200:10, 201:1,
201:3, 201:13,
202:5, 202:7, 202:8,
203:8, 233:7, 233:8,
235:15, 245:3,
245:21, 286:11,
286:13, 286:14,
292:10, 292:11,
292:12, 292:13,
292:14, 292:15,
292:16, 292:17,
292:18, 292:19,
292:20, 292:21,
292:22, 292:23
**plaintiff's** [5] - 88:15,
92:18, 203:10,
233:9, 235:22
**plan** [6] - 156:4,
161:22, 230:14,
269:3, 280:1, 281:3
**Plan** [1] - 281:1
**plane** [1] - 205:3
**planned** [7] - 153:23,
155:11, 162:4,
171:18, 199:19,
203:17, 268:23
**Planning** [1] - 170:12
**planning** [7] - 152:12,
154:8, 155:21,
171:2, 199:14,
203:23, 239:24
**plans** [4] - 181:18,

226:16, 226:20,
289:16
**play** [3] - 87:24,
115:18, 115:20
**player** [1] - 135:12
**playing** [1] - 255:3
**Plaza** [1] - 86:11
**pleasantly** [2] - 153:4,
278:14
**pleasure** [1] - 89:6
**PLLC** [1] - 86:5
**Plumeri** [38] - 90:10,
90:11, 90:17, 90:25,
95:13, 100:9,
111:24, 112:15,
116:16, 118:21,
120:7, 120:15,
120:22, 120:24,
121:19, 122:13,
123:4, 123:21,
124:17, 125:3,
126:11, 126:15,
126:23, 126:24,
128:13, 128:22,
129:4, 129:19,
130:3, 130:8,
131:16, 131:25,
148:14, 148:24,
150:9, 150:10,
150:14, 164:1
**PLUMERI** [1] - 90:20
**Plumeri's** [2] - 147:8,
150:7
**pneumonia** [2] -
261:5, 263:3
**PO** [2] - 139:8, 270:2
**point** [31] - 99:18,
101:17, 117:11,
126:3, 152:20,
152:25, 153:22,
157:7, 158:13,
163:12, 164:1,
167:6, 169:25,
182:11, 185:7,
207:13, 209:18,
218:23, 222:11,
263:4, 270:24,
271:9, 271:14,
276:4, 276:14,
277:19, 280:17,
283:24, 284:2,
284:6, 284:10
**pointed** [1] - 143:4
**pointing** [1] - 194:13
**policies** [2] - 104:8,
104:9
**policy** [1] - 180:2
**pools** [1] - 156:3
**popped** [1] - 123:13
**portion** [3] - 147:9,

173:8, 217:1
**pose** [1] - 228:15
**posed** [1] - 120:12
**position** [41] - 145:25,
146:7, 146:18,
155:24, 159:14,
160:1, 171:23,
178:25, 179:1,
179:10, 180:18,
180:22, 181:5,
181:7, 181:11,
187:3, 187:10,
196:4, 204:11,
210:23, 221:3,
221:7, 221:9, 222:1,
229:25, 237:6,
238:2, 238:6,
238:15, 238:16,
238:22, 238:24,
239:1, 239:18,
250:17, 250:21,
250:23, 255:25,
256:3
**positions** [7] - 159:24,
161:18, 173:21,
180:17, 188:7,
191:8, 239:10
**positive** [3] - 107:13,
152:14, 270:25
**possibilities** [1] -
191:6
**possible** [1] - 100:20
**possibly** [1] - 116:7
**postop** [2] - 268:7,
268:9
**postoperatively** [3] -
261:5, 266:17,
268:16
**potentially** [1] -
158:25
**practicalities** [1] -
95:2
**practice** [1] - 266:7
**practitioner** [1] -
267:12
**practitioners** [1] -
266:20
**Pratt** [1] - 86:2
**pre** [1] - 113:21
**pre-IPO** [1] - 113:21
**predecessor** [1] -
91:18
**prejudicial** [1] - 226:3
**preliminary** [1] - 91:4
**premises** [1] - 205:10
**preoperatively** [1] -
260:23
**preparation** [2] -
242:23, 288:15
**preparatory** [1] -

126:6
**prepare** [3] - 130:20,
260:10, 284:1
**prepared** [2] - 170:1,
170:3
**presence** [2] - 143:1,
186:1
**Present** [2] - 267:24,
268:2
**present** [7] - 87:1,
87:4, 93:4, 141:1,
141:4, 208:10, 252:1
**presentation** [3] -
109:13, 116:3, 279:2
**presentations** [1] -
237:23
**presented** [4] -
116:14, 208:17,
244:1, 262:23
**President** [6] - 146:1,
146:5, 148:7, 174:3,
179:4, 179:5
**president** [4] - 99:8,
99:20, 148:15, 168:4
**presidents** [1] - 162:6
**pressuring** [1] -
210:25
**pretend** [4] - 180:16,
254:25, 255:2,
255:16
**pretext** [1] - 289:14
**pretty** [3] - 249:13,
261:1, 261:23
**previous** [3] - 213:14,
273:14, 274:4
**previously** [1] - 246:9
**pricing** [2] - 161:11,
178:16
**primarily** [1] - 145:20
**Primerica** [12] - 98:24,
101:18, 101:21,
102:21, 103:23,
103:24, 104:4,
104:5, 104:16,
112:11, 133:12
**principal** [1] - 285:19
**probability** [1] - 142:5
**probative** [1] - 226:3
**problem** [14] - 89:23,
124:15, 214:25,
215:4, 242:11,
252:9, 252:10,
261:2, 272:3, 278:8,
286:20, 286:25,
287:9, 287:19
**problems** [7] - 99:3,
114:21, 117:8,
141:7, 141:13,
232:19, 249:11
**procedural** [1] -

252:12
**procedure** [3] - 257:1,
258:1, 270:11
**procedures** [4] -
257:24, 259:1,
259:4, 259:9
**proceedings** [1] -
174:19
**Proceedings** [2] -
86:14, 290:11
**process** [10] - 103:2,
118:2, 119:23,
141:15, 154:11,
155:14, 159:7,
169:22, 172:23,
173:10, 260:6
**procurement** [1] -
149:2
**produced** [2] - 86:15,
132:16
**product** [9] - 102:25,
113:20, 130:5,
132:14, 132:24,
132:25, 170:1,
170:3, 170:5
**production** [1] -
159:21
**products** [3] - 100:5,
103:11, 104:11
**professional** [3] -
87:25, 116:10,
288:25
**professionals** [1] -
87:10
**professor** [2] - 256:1,
256:6
**programs** [3] - 98:1,
101:20, 102:5
**progress** [5] -
262:16, 262:19,
266:21, 269:12,
270:25, 273:7,
273:17, 277:25,
278:2, 278:7,
278:10, 278:11,
278:16
**project** [5] - 124:4,
156:20, 157:22,
159:8, 210:14
**promoted** [1] - 237:1
**promotions** [2] -
237:1, 237:11
**promptly** [2] - 285:13,
285:16
**pronunciation** [1] -
258:5
**property** [1] - 131:9
**proposal** [2] - 109:16,
109:18
**propose** [1] - 115:22

**proposed** [4] - 110:1, 116:9, 121:5, 121:22
**proprietary** [1] - 131:9
**prosthesis** [17] - 259:6, 259:10, 264:9, 264:11, 264:14, 264:16, 266:24, 270:3, 271:5, 273:18, 275:10, 275:19, 276:20, 277:19, 277:20, 279:1, 280:19
**protected** [1] - 180:14
**protocol** [1] - 198:23
**prove** [1] - 198:11
**provide** [3] - 146:9, 194:1, 207:24
**provided** [6] - 132:15, 154:13, 173:7, 194:3, 218:4, 234:17
**provider** [10] - 218:13, 218:17, 218:24, 219:1, 246:15, 256:22, 257:1, 266:20, 267:8, 267:10
**provider's** [1] - 265:14
**providing** [4] - 155:15, 155:17, 168:7, 213:2
**provision** [2] - 132:18, 133:21
**public** [1] - 113:22
**published** [1] - 233:11
**pull** [5] - 139:5, 147:10, 151:11, 192:6, 270:13
**pulled** [1] - 271:11
**pulmonary** [1] - 273:8
**purchase** [4] - 139:11, 149:8, 149:11
**purpose** [2] - 212:13, 243:10
**purposes** [5] - 130:18, 158:19, 243:17, 243:18, 265:21
**pursuant** [1] - 131:2
**pursue** [1] - 182:21
**push** [3] - 142:3, 211:3, 211:5
**put** [26] - 109:4, 111:20, 112:11, 121:3, 121:22, 122:4, 127:24, 128:23, 130:6, 132:3, 134:17, 159:22, 174:7, 174:10, 193:8, 210:23, 216:11, 217:14, 218:17,

219:10, 222:19, 237:14, 264:11, 270:14, 282:6, 282:9
**puts** [2] - 220:6, 237:18
**putting** [4] - 114:18, 121:12, 217:25, 248:12

**Q**

**quality** [2] - 157:12, 239:12
**QUESTION** [1] - 244:7
**questioning** [4] - 162:20, 181:4, 280:23, 288:10
**questions** [53] - 91:4, 92:6, 92:19, 92:20, 92:25, 93:1, 100:20, 100:25, 103:9, 106:2, 107:11, 107:18, 112:16, 114:22, 117:7, 120:11, 120:12, 120:17, 125:21, 126:4, 129:13, 131:21, 136:25, 142:12, 151:8, 157:9, 169:18, 172:22, 176:18, 191:20, 191:21, 194:11, 197:20, 201:10, 205:18, 206:8, 210:24, 217:19, 221:1, 226:5, 241:5, 241:10, 241:20, 242:22, 248:11, 249:18, 249:20, 255:20, 255:21, 255:23, 268:14, 279:16
**quick** [5] - 115:20, 119:11, 120:9, 189:5, 249:20
**quicker** [1] - 124:3
**quickly** [6] - 187:6, 213:4, 262:13, 278:25, 279:1, 288:19
**quite** [3] - 192:25, 228:23
**quitting** [1] - 236:14
**quotes** [2] - 106:11, 106:18

**R**

**radiated** [2] - 260:8,

260:11
**radiation** [4] - 230:19, 256:24, 260:13, 262:13
**raise** [2] - 90:12, 113:21
**raised** [3] - 93:7, 113:20, 288:19
**raises** [1] - 114:16
**ramble** [1] - 107:15
**ran** [1] - 103:24
**range** [3] - 111:19, 207:12, 279:5
**rank** [1] - 155:25
**ranking** [1] - 155:24
**rate** [7] - 159:21, 161:17, 188:6, 209:8, 236:12, 236:13, 236:15
**rather** [2] - 103:11, 103:16
**rational** [1] - 88:1
**ray** [1] - 263:20
**re** [3] - 95:12, 161:11, 178:16
**re-affiliated** [1] - 95:12
**re-pricing** [2] - 161:11, 178:16
**reach** [3] - 204:15, 204:18, 211:15
**reached** [7] - 190:7, 193:21, 193:22, 194:4, 194:10, 196:19, 199:16
**reactions** [1] - 88:13
**read** [47] - 126:5, 126:10, 129:14, 130:10, 132:1, 132:8, 132:10, 132:13, 132:20, 132:21, 185:6, 189:7, 213:11, 219:8, 219:18, 234:20, 240:22, 241:4, 242:10, 242:16, 243:12, 243:15, 243:22, 243:24, 244:6, 244:18, 244:22, 252:3, 252:5, 254:2, 254:12, 255:10, 255:11, 267:23, 268:7, 268:22, 270:1, 272:25, 273:4, 275:15, 275:17, 279:17, 279:23, 281:1, 283:1
**ready** [5] - 186:4, 186:5, 186:10, 228:24, 242:17

**real** [7] - 115:20, 116:10, 119:11, 141:13, 187:6, 249:20, 287:9
**realign** [1] - 171:14
**realistic** [1] - 285:21
**really** [50] - 98:7, 108:8, 109:5, 116:13, 135:9, 144:4, 148:20, 155:14, 157:14, 158:1, 161:1, 167:1, 170:5, 174:10, 175:16, 175:17, 175:18, 181:3, 204:16, 208:10, 209:5, 209:7, 209:9, 209:10, 209:12, 210:21, 210:25, 211:2, 211:4, 211:16, 214:25, 215:16, 215:20, 216:13, 217:10, 229:20, 236:24, 244:16, 247:8, 249:8, 249:9, 262:14, 262:18, 263:3, 263:9, 264:6, 279:18, 284:7, 289:22
**reason** [17] - 96:20, 119:18, 125:3, 126:10, 159:5, 165:25, 177:19, 182:3, 183:2, 216:11, 217:15, 218:2, 220:20, 223:22, 234:11, 234:15, 288:13
**reasons** [4] - 101:10, 120:1, 158:22, 181:3
**recalled** [1] - 249:24
**receive** [1] - 157:13
**received** [17] - 122:12, 123:1, 126:21, 161:9, 165:1, 167:18, 169:17, 172:21, 203:12, 212:4, 216:22, 218:10, 220:25, 223:7, 233:15, 245:23, 257:15
**recess** [3] - 142:16, 185:13, 253:4
**recognize** [2] - 147:12, 179:24
**recollection** [3] - 154:17, 223:8, 231:7
**recommend** [1] - 188:4

**recommendation** [5] - 162:4, 162:8, 166:5, 171:12, 172:12
**recommendations** [9] - 150:16, 161:19, 170:9, 171:9, 171:25, 172:4, 173:12, 190:12, 190:14
**recommended** [2] - 166:4, 173:21
**recommending** [3] - 162:5, 173:21, 188:10
**reconnected** [1] - 109:9
**reconstruction** [13] - 256:8, 257:23, 258:2, 259:5, 259:9, 260:3, 261:15, 262:1, 264:12, 268:23, 269:4, 269:6, 281:3
**reconvene** [2] - 141:21, 184:10
**record** [9] - 88:20, 88:21, 141:21, 185:7, 232:19, 234:21, 272:7, 285:13, 286:14
**recorded** [1] - 86:14
**recording** [1] - 189:3
**records** [3] - 193:7, 193:9, 193:10
**recovered** [1] - 190:4
**recovering** [2] - 191:15, 268:17
**recovery** [11] - 220:5, 220:17, 260:6, 260:10, 260:15, 260:17, 260:21, 261:12, 261:21, 261:23, 277:13
**RECROSS** [2] - 241:1, 292:3
**RECROSS-EXAMINATION** [2] - 241:1, 292:3
**recruit** [2] - 97:5, 108:25
**recruited** [2] - 97:6, 97:16
**recruiting** [4] - 119:22, 146:10, 208:1
**recurrent** [3] - 257:22, 258:22, 266:22
**redesign** [1] - 208:5
**redirect** [8] - 131:22, 176:19, 226:6,

240:9, 247:1, 247:4, 247:9, 248:10

**REDIRECT** [8] - 131:23, 176:21, 226:7, 249:21, 291:10, 291:18, 292:1, 292:5

**reduce** [3] - 158:20, 166:5, 171:15

**reduced** [3] - 137:8, 166:1, 239:4

**reducing** [4] - 159:6, 162:5, 168:25, 178:13

**reduction** [13] - 154:2, 154:3, 166:4, 173:6, 175:15, 176:5, 176:8, 176:11, 223:18, 223:23, 224:2, 224:6, 289:13

**reductions** [4] - 159:17, 160:17, 162:10, 289:16

**refer** [3] - 139:8, 180:11, 258:9

**reference** [4] - 97:7, 98:13, 227:25, 284:24

**referenced** [4] - 216:7, 284:16, 284:17, 285:7

**referral** [1] - 256:22

**referred** [1] - 256:25

**referring** [7] - 103:24, 125:23, 167:14, 213:9, 214:18, 214:19, 235:20

**refilled** [1] - 159:25

**reflect** [1] - 193:3

**reflecting** [1] - 125:14

**refocus** [1] - 134:6

**refresh** [2] - 154:17, 223:8

**regarding** [8] - 152:4, 153:24, 169:7, 210:11, 214:4, 218:25, 226:10, 256:12

**regardless** [1] - 243:25

**regards** [2] - 93:7, 234:24

**registered** [1] - 254:6

**regular** [1] - 220:15

**regularly** [1] - 265:9

**rehab** [3] - 215:20, 215:22, 269:15

**rehabilitation** [1] - 266:17

**rehired** [1] - 159:12

**relate** [1] - 122:24

**relates** [1] - 107:7

**relationship** [11] - 87:12, 91:7, 91:9, 91:12, 91:13, 91:17, 97:15, 97:17, 114:7, 148:21, 150:9

**relaying** [1] - 276:21

**release** [1] - 199:19

**released** [3] - 131:11, 131:20, 135:17

**relevance** [2] - 105:24, 116:4

**relevancy** [4] - 116:15, 127:20, 137:10, 149:16

**relevant** [22] - 94:10, 100:18, 105:13, 106:2, 106:4, 107:6, 107:10, 107:18, 116:8, 116:14, 117:1, 119:9, 120:17, 122:24, 137:20, 142:11, 144:12, 158:1, 173:9, 244:24, 288:21

**reliant** [1] - 277:21

**remain** [1] - 90:12

**remainder** [1] - 101:24

**remained** [1] - 206:12

**remarkable** [1] - 278:11

**remarks** [1] - 288:15

**remember** [44] - 88:3, 89:14, 94:15, 97:21, 99:16, 111:17, 111:18, 112:10, 114:12, 114:13, 114:16, 118:1, 118:3, 118:11, 118:14, 118:20, 154:5, 154:15, 154:16, 160:16, 165:24, 188:11, 194:21, 196:22, 197:1, 197:25, 199:13, 199:22, 200:22, 210:13, 210:15, 218:6, 229:7, 235:14, 246:24, 249:1, 250:12, 257:18, 261:7, 263:4, 266:5, 266:9, 273:13

**remind** [2] - 225:19, 270:7

**remotely** [1] - 147:1

**removal** [4] - 257:23, 258:1, 259:4, 260:2

**remove** [3] - 217:20, 238:12, 270:11

**removed** [4] - 199:10, 270:5, 275:1, 280:15

**removing** [1] - 217:19

**repeat** [1] - 257:8

**rephrase** [1] - 210:7

**replacement** [8] - 157:2, 181:22, 181:24, 182:9, 200:12, 227:20, 227:22, 241:21

**replied** [1] - 197:21

**Report** [1] - 267:7

**report** [5] - 117:22, 146:17, 232:8, 232:9, 287:4

**reported** [3] - 100:3, 118:3, 239:3

**Reporter** [2] - 86:10, 86:10

**reporter** [4] - 184:24, 244:4, 283:16, 287:3

**reporting** [5] - 148:12, 187:19, 187:20, 187:23, 187:24

**reports** [3] - 155:18, 226:15, 270:4

**represent** [1] - 171:21

**representative** [1] - 215:6

**reproduce** [1] - 130:19

**request** [1] - 201:15

**requested** [1] - 178:5

**requests** [1] - 146:14

**require** [1] - 281:25

**required** [2] - 153:19, 257:22

**requirements** [1] - 271:4

**requisitions** [1] - 232:1

**resection** [2] - 259:9, 264:11

**residential** [1] - 219:20

**resigned** [2] - 118:5, 182:8

**resolve** [2] - 117:7, 193:24

**resolved** [2] - 88:9, 193:1

**Resources** [13] - 97:24, 145:21, 146:1, 146:3, 148:8, 148:13, 148:15, 148:18, 148:22, 163:9, 174:4, 193:13, 198:9

**resources** [6] -

133:17, 145:20, 150:13, 158:25, 171:14, 221:17

**respect** [6] - 91:7, 107:17, 139:12, 141:14, 207:17, 289:9

**responded** [1] - 198:25

**responds** [1] - 234:15

**response** [5] - 100:24, 198:13, 203:7, 205:9, 290:5

**responsibilities** [21] - 146:6, 160:4, 160:9, 177:13, 177:22, 178:5, 207:17, 207:19, 208:1, 208:16, 213:21, 231:8, 231:11, 231:14, 231:18, 231:21, 242:2, 242:4, 244:9, 244:11, 256:5

**responsibility** [11] - 114:3, 157:14, 158:7, 158:16, 178:12, 178:14, 238:11, 239:2, 239:15, 243:8, 244:21

**responsible** [8] - 91:15, 99:5, 107:4, 173:4, 207:1, 207:8, 231:25, 246:17

**rest** [2] - 253:1, 278:18

**restoration** [1] - 195:25

**restore** [2] - 178:25, 179:11

**restored** [1] - 196:3

**restriction** [8] - 274:19, 274:21, 276:17, 276:19, 277:2, 277:5, 280:18, 281:20

**restrictions** [34] - 264:4, 271:2, 271:15, 273:4, 274:11, 274:15, 274:22, 274:24, 275:3, 275:7, 275:9, 275:11, 275:18, 275:20, 275:22, 276:2, 276:4, 276:5, 276:13, 276:25, 277:8, 277:11, 279:25, 280:15, 280:16, 281:18, 281:19, 282:4,

282:9, 283:22, 284:9

**restructuring** [16] - 153:23, 155:13, 156:17, 158:19, 160:19, 160:25, 161:1, 175:14, 177:3, 177:18, 178:17, 180:15, 203:16, 203:21, 203:24

**restructurings** [5] - 154:9, 159:25, 160:17, 160:21, 160:22

**result** [4] - 117:9, 151:3, 211:14, 263:17

**results** [2] - 104:2, 104:6

**retaliation** [1] - 289:25

**retirement** [1] - 103:9

**return** [36] - 139:22, 151:9, 152:12, 154:14, 155:6, 170:19, 171:4, 172:2, 172:13, 174:13, 176:12, 176:16, 177:4, 184:12, 196:2, 199:15, 199:17, 199:18, 200:16, 220:10, 239:24, 251:16, 256:13, 256:17, 264:3, 265:24, 266:4, 266:7, 273:3, 273:5, 276:12, 276:16, 276:24, 278:3, 278:5

**returned** [2] - 181:4, 224:7

**returning** [4] - 146:14, 152:4, 176:25, 177:11

**revenue** [2] - 110:17, 156:13

**review** [13] - 118:19, 157:15, 167:22, 167:24, 168:10, 168:11, 168:14, 169:19, 170:4, 177:8, 204:7, 226:22, 232:24

**reviews** [2] - 142:7, 142:8

**revised** [1] - 201:8

**revision** [1] - 261:15

**revoked** [1] - 220:20

**Rhonda** [6] - 155:4, 167:21, 185:2, 186:11, 186:19,

244:5
**RIF** [4] - 175:24,
175:25, 289:17,
289:19
**RIFs** [2] - 175:8,
175:11
**right-hand** [3] -
182:22, 267:14,
272:21
**rights** [1] - 88:17
**ring** [1] - 144:15
**rise** [6] - 141:2,
141:17, 143:25,
186:13, 251:18,
286:1
**risk** [1] - 87:18
**RN** [1] - 270:5
**Robin** [12] - 152:1,
152:8, 152:9,
152:23, 153:16,
157:1, 157:6, 175:1,
175:6, 183:14,
183:17, 200:11
**robotic** [1] - 264:22
**Rogers** [1] - 259:18
**role** [28] - 146:5,
154:8, 162:4,
166:20, 168:13,
172:15, 182:6,
189:10, 189:19,
191:6, 207:16,
208:12, 209:15,
213:22, 227:5,
227:24, 228:24,
229:1, 229:2,
229:21, 231:2,
232:2, 236:16,
242:1, 242:14,
244:9, 252:14
**roles** [7] - 159:15,
171:15, 171:24,
172:8, 209:10,
212:14, 231:5
**roughly** [3] - 160:13,
165:20, 288:13
**row** [5] - 93:23,
161:23, 279:11,
279:17
**rule** [1] - 92:14
**run** [5] - 87:18, 100:3,
104:18, 141:8,
141:11
**running** [3] - 157:6,
182:13, 183:21
**runs** [2] - 120:16,
141:24
**rushing** [1] - 272:14

## S

**salaries** [2] - 162:5,
166:6
**salary** [15] - 114:10,
114:12, 142:13,
150:17, 155:23,
164:8, 164:18,
164:20, 165:3,
165:16, 165:23,
166:1, 177:13,
178:13, 178:15
**sales** [43] - 91:20,
94:16, 95:24,
102:17, 102:18,
103:1, 103:2,
113:18, 113:24,
148:16, 156:17,
157:6, 171:1,
171:18, 177:16,
188:16, 189:9,
189:13, 206:21,
206:22, 207:14,
208:21, 209:1,
209:5, 209:13,
209:14, 209:16,
209:17, 210:11,
211:1, 214:22,
214:23, 215:10,
231:5, 237:20,
237:23, 238:1,
238:3, 238:17,
238:24
**Sales** [19] - 164:9,
164:11, 164:12,
170:4, 170:12,
175:3, 177:8,
177:17, 177:24,
177:25, 182:13,
183:11, 183:12,
183:14, 183:20,
188:14, 189:11,
189:21, 190:9
**salesperson** [2] -
102:10, 102:24
**Sandy** [6] - 98:16,
98:18, 98:21, 98:23,
101:8
**satisfied** [1] - 276:7
**Saul** [1] - 255:22
**SAUL** [1] - 86:1
**save** [5] - 120:5,
127:11, 171:8,
171:16, 171:19
**savings** [2] - 159:8,
172:5
**saw** [12] - 174:2,
225:7, 259:18,
261:5, 263:1, 264:1,
269:21, 269:23,

270:21, 280:11
**scale** [1] - 178:7
**scheduled** [1] - 191:2
**SCHOENECK** [1] -
86:5
**school** [4] - 94:24,
95:10, 95:17, 220:16
**School** [4] - 94:24,
95:11, 95:13, 95:14
**scope** [4] - 178:8,
246:25, 257:2, 264:7
**scores** [1] - 157:12
**screen** [9] - 123:13,
123:24, 123:25,
124:1, 126:24,
138:5, 138:9,
147:15, 172:9
**scroll** [4] - 138:4,
161:24, 161:25,
233:17
**sea** [1] - 141:23
**search** [3] - 166:22,
169:8, 189:6
**seasoned** [1] - 128:18
**seat** [2] - 90:15,
186:17
**Second** [1] - 279:22
**second** [25] - 94:3,
94:11, 105:23,
115:18, 123:5,
123:12, 126:23,
129:13, 132:10,
135:7, 155:4, 171:7,
179:18, 181:2,
183:22, 184:23,
195:22, 228:14,
233:12, 241:19,
246:9, 265:11,
267:25, 286:16
**second-generation**
[1] - 94:3
**seconds** [1] - 240:10
**section** [6] - 130:3,
132:2, 132:7, 132:8,
132:13, 265:14
**securing** [1] - 218:5
**securities** [3] - 96:2,
96:10, 97:12
**see** [76] - 87:16, 87:25,
88:13, 92:14, 93:1,
96:11, 100:19,
105:23, 106:3,
108:10, 112:13,
120:25, 122:2,
122:17, 123:13,
123:14, 123:23,
123:24, 124:1,
125:12, 126:24,
128:23, 138:5,
142:15, 143:16,

143:17, 144:14,
144:16, 147:13,
147:23, 161:24,
162:1, 167:8,
170:14, 171:7,
171:9, 173:13,
178:4, 179:17,
185:11, 191:8,
195:22, 199:20,
199:21, 216:2,
218:13, 218:23,
219:12, 228:1,
230:14, 233:25,
236:5, 236:7,
241:16, 246:1,
247:20, 247:22,
249:6, 256:23,
259:15, 259:17,
266:16, 267:2,
267:18, 269:18,
272:16, 274:18,
278:3, 278:4, 280:8,
282:24, 285:16,
285:21, 285:24,
288:21
**seeing** [1] - 236:8
**seeking** [2] - 191:9,
235:12
**seem** [5] - 235:16,
235:25, 238:10,
250:15, 262:16
**selected** [5] - 155:12,
173:4, 206:13,
215:5, 223:17
**selecting** [1] - 204:8
**sell** [4] - 100:4,
103:12, 130:19
**selling** [10] - 102:25,
103:3, 103:5, 103:6,
103:14, 103:22,
104:3, 104:9,
104:12, 108:8
**send** [9] - 89:12,
190:12, 204:5,
221:19, 234:9,
239:11, 249:7,
284:21, 285:4
**sending** [2] - 245:13,
245:17
**sends** [1] - 233:24
**senior** [7] - 91:16,
146:1, 162:5,
162:13, 200:14,
227:13, 244:17
**Senior** [4] - 146:5,
174:3, 179:4, 179:5
**sense** [9] - 88:2,
97:10, 116:6, 142:6,
179:15, 285:21,
288:11, 289:14,

289:23
**sensitive** [3] - 88:16,
199:1, 199:2
**sent** [23] - 152:10,
161:10, 194:4,
195:11, 196:8,
196:13, 196:25,
199:17, 201:16,
203:8, 219:2,
221:21, 221:25,
226:13, 233:23,
245:12, 246:8,
247:19, 248:5,
248:23, 263:19
**sentence** [8] - 132:13,
241:19, 265:2,
267:23, 267:24,
279:22, 280:20,
283:1
**sentences** [1] - 269:25
**separate** [2] - 178:3,
258:2
**separately** [1] -
168:15
**September** [5] - 85:8,
190:3, 230:20,
230:21, 235:7
**seriously** [1] - 96:1
**serve** [1] - 182:22
**service** [3] - 141:9,
219:3, 221:22
**Service** [6] - 193:12,
194:4, 195:7,
198:14, 198:17,
200:14
**services** [5] - 114:5,
114:17, 129:7,
132:18, 146:9
**Services** [2] - 102:21,
103:24
**set** [7] - 102:24, 170:6,
179:14, 193:17,
217:3, 224:21,
290:11
**sets** [3] - 175:21,
179:3, 179:7
**setting** [1] - 271:3
**settle** [2] - 87:13,
88:22
**settling** [1] - 87:18
**seven** [8] - 87:7, 89:5,
89:11, 90:4, 97:9,
99:17, 116:12,
213:16
**several** [10] - 97:6,
116:6, 196:21,
213:5, 215:2,
215:17, 217:12,
226:9, 227:17,
248:21

**severance** [1] - 204:13
**shaking** [1] - 87:17
**shall** [2] - 132:18, 132:25
**shape** [1] - 264:1
**share** [4] - 214:11, 221:11, 224:12, 249:4
**shared** [1] - 235:2
**sharing** [2] - 152:5, 222:21
**sharper** [1] - 125:24
**Shawn** [1] - 280:23
**SHAWN** [2] - 85:17, 85:19
**shearer** [1] - 109:11
**SHEARER** [146] - 85:17, 85:19, 89:7, 89:10, 90:9, 90:19, 90:24, 92:2, 92:5, 92:10, 93:2, 94:7, 94:13, 105:11, 105:14, 105:25, 106:5, 109:12, 111:23, 112:19, 115:24, 116:1, 116:16, 117:4, 119:11, 120:2, 124:10, 124:16, 124:20, 124:23, 131:24, 132:3, 132:5, 132:7, 133:24, 134:2, 134:4, 134:9, 136:24, 137:21, 137:25, 138:3, 138:6, 138:11, 138:15, 144:21, 145:15, 147:17, 148:2, 149:17, 150:21, 151:9, 151:11, 151:13, 151:15, 151:17, 153:9, 153:12, 154:20, 154:24, 161:6, 162:15, 172:20, 176:20, 176:22, 179:21, 181:15, 183:24, 184:17, 184:22, 185:2, 186:5, 186:11, 186:23, 187:2, 188:21, 188:23, 189:4, 190:19, 190:21, 197:10, 198:3, 200:7, 203:1, 203:10, 205:17, 210:3, 226:8, 228:4, 228:7, 228:10,
228:16, 233:9, 233:12, 235:22, 240:7, 240:14, 249:17, 249:20, 249:22, 251:8, 252:3, 252:7, 253:2, 254:5, 254:8, 254:16, 254:21, 255:6, 255:9, 255:14, 255:20, 257:5, 257:7, 257:9, 265:5, 266:10, 271:16, 271:22, 272:1, 272:6, 272:11, 272:15, 273:19, 279:3, 280:23, 283:6, 284:13, 284:15, 286:9, 286:11, 286:15, 286:18, 287:15, 287:21, 288:3, 288:7, 288:24, 289:15, 291:7, 291:11, 291:15, 291:19, 291:23, 292:2, 292:6
**Shearer** [41] - 87:11, 89:6, 90:8, 92:17, 107:1, 115:23, 123:8, 131:22, 134:5, 139:23, 154:23, 169:18, 170:19, 172:22, 176:19, 181:14, 184:15, 184:23, 185:6, 186:3, 186:22, 189:2, 206:8, 217:19, 221:1, 226:6, 228:5, 235:21, 240:18, 241:20, 245:5, 246:3, 246:10, 248:10, 249:19, 254:2, 280:23, 283:7, 283:9, 283:13, 288:18
**Shearer's** [2] - 175:8, 243:1
**Shearson** [16] - 91:18, 94:17, 94:18, 95:5, 98:2, 98:22, 99:1, 99:4, 99:7, 99:8, 99:11, 100:8, 108:24, 111:17, 133:11
**sheet** [1] - 99:3
**shift** [1] - 209:10
**ship** [1] - 141:8
**shirt** [1] - 249:5
**shock** [2] - 213:8,

213:13
**shoe** [1] - 96:21
**shoes** [2] - 96:22, 96:23
**short** [7] - 135:8, 168:18, 177:8, 197:14, 263:3, 263:19
**Short** [5] - 131:15, 205:21, 225:18, 240:13, 240:17
**short-term** [2] - 177:8, 197:14
**shortly** [1] - 227:2
**shortness** [1] - 261:4
**shot** [1] - 94:9
**show** [9] - 122:3, 123:17, 125:2, 128:22, 161:3, 226:11, 237:2, 237:4, 245:3
**showed** [2] - 246:24, 249:4
**showering** [1] - 284:9
**showing** [5] - 122:16, 190:24, 216:23, 221:23, 223:5
**shows** [1] - 289:12
**shut** [1] - 198:23
**shutting** [1] - 198:19
**Sicily** [1] - 93:22
**side** [4] - 92:12, 120:10, 127:12, 262:2
**sided** [2] - 127:11
**sides** [2] - 88:22, 128:23
**sign** [8] - 148:18, 196:6, 196:8, 196:12, 289:4, 289:5, 289:6
**signature** [9] - 134:4, 138:18, 139:1, 139:6, 195:19, 218:21, 265:11, 265:16
**signatures** [1] - 143:12
**signed** [14] - 121:17, 122:20, 122:25, 124:16, 125:5, 134:13, 148:7, 149:14, 195:9, 246:4, 246:10, 267:21, 269:15, 281:15
**significant** [4] - 182:23, 265:1, 273:17, 278:8
**significantly** [2] -

271:7, 273:6
**signing** [2] - 135:13, 148:16
**signs** [2] - 217:23, 267:8
**simply** [7] - 100:20, 102:2, 102:25, 104:9, 104:11, 105:4, 134:20
**single** [2] - 160:10, 220:3
**sins** [2] - 214:16, 216:6
**sit** [6] - 141:5, 167:25, 186:10, 255:4, 273:10, 278:3
**site** [2] - 158:24, 159:2
**sits** [1] - 264:16
**sitting** [1] - 168:3
**situation** [7] - 210:22, 214:4, 215:21, 249:7, 257:17, 278:18, 288:24
**situations** [2] - 192:25, 204:17
**six** [6] - 97:9, 165:19, 213:16, 227:10, 236:21, 260:10
**size** [5] - 115:8, 167:2, 178:6, 182:4, 269:2
**sizeable** [2] - 182:6, 261:1, 261:11
**sketch** [1] - 243:20
**skill** [11] - 175:21, 179:3, 179:7, 179:14, 227:13, 227:14, 227:16, 229:10, 229:11, 229:17, 230:7
**skin** [1] - 262:5
**skip** [1] - 257:5
**slot** [1] - 219:22
**slow** [5] - 242:15, 244:4, 254:24, 262:20, 286:10
**slower** [3] - 242:8, 283:9, 283:16
**slowing** [1] - 213:4
**slows** [1] - 262:14
**small** [6] - 93:21, 160:6, 160:25, 260:16, 260:17, 260:24
**smaller** [1] - 261:20
**smell** [1] - 216:3
**Smith** [10] - 98:24, 98:25, 99:7, 99:8, 99:9, 99:20, 100:7, 100:16, 133:10
**smooth** [1] - 288:14

**soaring** [1] - 93:17
**Social** [1] - 95:14
**sold** [4] - 91:10, 99:6, 104:7, 104:9
**sole** [2] - 96:21, 96:22
**Solutions** [6] - 163:14, 163:17, 163:21, 167:23, 198:13
**someone** [24] - 137:9, 181:19, 198:19, 198:23, 213:20, 217:23, 218:17, 228:22, 229:14, 229:17, 229:18, 230:4, 237:1, 238:21, 239:14, 242:1, 242:14, 244:8, 244:9, 244:16, 245:7, 265:13, 276:22
**sometime** [3] - 94:15, 192:25, 276:10
**sometimes** [13] - 87:22, 96:22, 107:15, 135:12, 141:7, 158:24, 175:19, 175:22, 191:19, 243:22, 254:10, 262:16, 265:3
**somewhere** [1] - 91:23
**soon** [4] - 102:21, 187:25, 227:8, 250:21
**sorry** [18] - 89:8, 89:9, 92:4, 99:16, 108:14, 112:1, 124:14, 135:7, 147:7, 151:18, 189:4, 212:7, 213:11, 213:12, 224:16, 225:11, 268:5, 277:3
**sort** [7] - 92:23, 143:8, 144:14, 155:20, 244:24, 252:12, 277:13
**sorts** [1] - 164:14
**sought** [1] - 249:23
**sound** [3] - 147:23, 256:9, 277:22
**sounded** [2] - 153:3, 215:21
**sounds** [3] - 200:3, 215:24, 238:10
**spans** [2] - 239:2, 251:5
**spare** [1] - 287:16
**speaker** [3] - 96:14, 166:25, 209:4

**speaking** [5] - 183:6, 203:19, 264:22, 283:2, 283:4
**speaks** [1] - 248:7
**specific** [8] - 180:7, 210:8, 210:19, 214:15, 266:9, 273:11, 277:8, 284:11
**specifically** [3] - 110:13, 182:13, 227:18
**Speech** [1] - 282:21
**speech** [10] - 108:7, 266:14, 266:15, 267:4, 267:10, 269:11, 269:21, 276:18, 277:25, 283:4
**spell** [3] - 90:16, 145:10, 186:18
**spend** [3] - 157:10, 157:11
**spent** [2] - 87:23, 128:19
**spin** [1] - 99:4
**spit** [3] - 258:20, 258:21, 261:2
**spoken** [3] - 93:3, 193:20, 213:16
**spot** [2] - 121:24, 181:19
**spun** [1] - 99:6
**square** [1] - 125:1
**stabilized** [3] - 263:5, 263:11, 263:13
**staff** [1] - 148:21
**Stamey** [3] - 210:13, 229:4, 229:21
**stand** [6] - 126:9, 144:22, 180:8, 186:15, 266:23, 267:2
**standard** [8] - 125:18, 149:3, 149:5, 196:7, 196:13, 198:23, 200:17, 221:9
**standing** [1] - 90:12
**standpoint** [3] - 150:11, 266:18, 266:22
**stands** [1] - 266:25
**staple** [1] - 96:23
**start** [10] - 92:25, 94:21, 124:5, 187:13, 198:6, 199:14, 241:21, 249:12, 261:22, 268:5
**started** [24] - 94:18,

94:22, 98:14, 99:15, 123:8, 127:4, 134:25, 135:25, 157:9, 157:19, 157:20, 157:22, 169:22, 187:19, 187:20, 188:1, 188:13, 227:19, 261:20, 261:21, 262:23, 263:14, 270:24
**starting** [1] - 261:19
**Starting** [1] - 268:3
**starts** [1] - 269:25
**state** [4] - 90:16, 145:9, 186:18, 196:2
**statement** [4] - 108:2, 123:22, 175:8, 280:3
**STATES** [1] - 85:1
**stating** [1] - 215:15
**status** [2] - 273:8, 273:13
**stay** [2] - 219:19, 287:5
**stayed** [3] - 100:6, 104:17, 113:5
**steered** [1] - 109:6
**Stefan** [2] - 200:13
**Steffen** [2] - 221:22, 231:12
**stenography** [1] - 86:14
**step** [2] - 184:5, 251:12
**steps** [2] - 184:8, 197:19
**Steve** [112] - 96:19, 96:25, 97:8, 97:13, 98:3, 98:10, 101:13, 101:15, 101:17, 102:2, 102:5, 102:8, 102:9, 108:5, 108:24, 109:6, 112:8, 118:2, 125:4, 130:24, 134:19, 148:4, 152:5, 152:11, 152:12, 152:20, 152:24, 166:25, 167:5, 177:11, 182:2, 182:23, 183:5, 189:9, 190:7, 190:13, 190:14, 191:2, 191:11, 191:16, 192:1, 192:11, 192:12, 192:19, 193:16, 195:9, 196:17, 197:4, 197:18, 197:21, 199:4,

199:16, 200:2, 201:9, 206:24, 208:17, 208:25, 209:1, 211:15, 212:16, 212:24, 213:2, 213:8, 213:13, 214:10, 214:18, 214:19, 214:20, 214:23, 214:25, 215:14, 215:16, 215:21, 217:3, 217:9, 221:16, 223:13, 224:19, 225:7, 226:20, 226:23, 227:2, 227:8, 227:20, 228:18, 229:9, 229:11, 230:7, 233:18, 234:2, 234:17, 235:1, 235:13, 240:2, 241:14, 241:22, 242:3, 242:4, 242:6, 244:10, 244:12, 244:13, 245:6, 245:25, 248:21, 249:3, 249:6, 250:4, 250:16, 273:2
**Steve's** [19] - 102:23, 106:8, 153:1, 182:22, 188:6, 188:13, 190:1, 191:9, 192:16, 200:12, 202:13, 207:19, 208:3, 211:4, 214:21, 232:23, 232:24, 235:12, 236:11
**Steve.Barger@ FirstData.com** [1] - 233:24
**Steve@ TheBargerGroup. com** [1] - 233:25
**STEVEN** [1] - 85:3
**Steven** [1] - 87:3
**still** [20] - 141:20, 145:23, 183:21, 197:14, 201:18, 206:1, 233:19, 238:19, 238:21, 242:6, 244:13, 249:8, 260:21, 262:4, 263:14, 271:6, 275:11, 276:2, 277:2, 278:22
**stipulated** [1] - 143:9
**stomach** [7] - 270:8, 270:9, 270:10,

270:13, 275:1, 284:1
**stop** [2] - 206:13, 287:2
**stopped** [2] - 117:11, 164:2
**story** [1] - 228:10
**straighten** [1] - 121:11
**strategy** [1] - 214:5
**Street** [4] - 85:22, 86:2, 94:25, 95:1
**strength** [1] - 260:22
**strength-wise** [1] - 260:22
**strengths** [1] - 168:1
**strict** [1] - 247:8
**strike** [1] - 246:18
**string** [1] - 229:2
**strong** [2] - 166:25, 167:1
**structure** [4] - 171:15, 235:14, 235:17, 247:8
**structuring** [1] - 210:25
**stuck** [1] - 90:5
**study** [2] - 157:17, 157:24
**stuff** [3] - 100:17, 144:17, 289:21
**stumble** [1] - 255:6
**stunts** [1] - 262:14
**Stutz** [3] - 191:13, 231:15, 231:16
**style** [1] - 271:3
**subheading** [1] - 274:12
**subject** [1] - 240:4
**submit** [2] - 125:14, 204:7
**submits** [1] - 172:13
**submitted** [14] - 127:3, 128:15, 131:8, 131:17, 134:25, 170:18, 170:19, 171:4, 172:2, 173:11, 174:13, 176:11, 176:15, 224:7
**subsequent** [1] - 255:21
**substantially** [1] - 276:11
**substantive** [4] - 243:12, 243:16, 243:19, 254:12
**subterfuge** [1] - 175:10
**successful** [1] - 104:13
**succession** [1] -

181:17
**successor** [57] - 166:22, 168:12, 168:17, 169:4, 169:8, 181:17, 181:22, 182:3, 182:9, 182:19, 182:21, 188:1, 188:4, 188:10, 189:6, 208:24, 211:16, 212:20, 212:23, 212:25, 213:7, 213:17, 213:19, 213:23, 213:25, 214:10, 226:25, 227:1, 227:4, 227:5, 227:8, 227:12, 227:19, 227:22, 227:23, 228:18, 228:21, 229:9, 229:14, 230:1, 230:4, 230:5, 230:10, 230:13, 230:15, 230:22, 241:14, 241:21, 241:25, 242:1, 242:14, 244:7, 244:8, 244:21, 250:17, 250:20, 250:24
**sudden** [1] - 202:13
**suddenly** [1] - 201:18
**suffer** [2] - 270:22, 271:7
**suffering** [1] - 143:18
**sufficient** [1] - 289:21
**sufficiently** [1] - 281:6
**suggest** [1] - 185:5
**suggesting** [1] - 107:2
**suggestion** [1] - 248:16
**suit** [1] - 133:6
**Suite** [1] - 85:22
**summary** [2] - 171:10, 171:13
**summations** [1] - 183:22
**summer** [2] - 165:6, 187:15
**superior** [1] - 111:13
**supervising** [2] - 117:11, 117:25
**supervisor** [5] - 91:24, 163:23, 164:2, 212:9, 238:8
**supplementary** [1] - 148:21
**supplementing** [1] - 284:3
**support** [3] - 211:20,

237:15, 244:15
**supported** [4] -
148:14, 187:21,
187:24, 249:16
**supporting** [4] -
150:10, 163:12,
188:1, 188:13
**supposed** [4] -
192:19, 208:15,
229:13, 241:15
**surgeries** [2] - 259:4,
259:25
**Surgery** [1] - 256:1
**surgery** [22] - 190:3,
230:20, 235:6,
235:7, 256:7,
258:24, 259:7,
259:10, 259:12,
259:13, 259:19,
260:3, 260:7, 262:7,
262:25, 263:25,
264:2, 264:9, 269:6,
270:23, 281:7,
281:23
**surgical** [2] - 256:25,
259:1
**surprised** [9] - 152:13,
152:17, 153:4,
263:10, 278:6,
278:14, 278:19,
278:20, 278:25
**surrogate** [1] - 107:14
**surveillance** [1] -
266:21
**suspect** [3] - 179:19,
273:7, 273:10
**sustained** [4] -
111:22, 210:5,
210:6, 226:4
**SVP** [12] - 161:21,
163:9, 168:5,
203:25, 204:14,
211:3, 211:5, 212:8,
221:8, 226:23,
229:11, 232:23
**SVPs** [8] - 187:23,
187:24, 203:19,
207:6, 207:7,
207:25, 210:24,
249:16
**swallow** [1] - 145:3
**swallowed** [1] -
278:20
**swallowing** [2] -
266:17, 278:23
**sweating** [1] - 282:8
**sworn** [7] - 90:14,
90:22, 144:22,
144:25, 186:15,
186:25, 242:24

**system** [3] - 196:24,
201:23, 237:14
**systems** [3] - 197:23,
205:6, 220:19

**T**

**table** [1] - 133:8,
171:21, 286:21
**talent** [5] - 167:22,
167:24, 168:11,
168:14, 209:9
**Tampa** [1] - 263:25
**target** [1] - 164:18
**targeted** [1] - 175:25
**task** [3] - 144:11,
204:4, 239:2
**TE** [1] - 283:4
**teach** [1] - 112:2
**teaches** [1] - 111:24
**Team** [4] - 146:12,
146:17, 146:23,
193:13
**team** [30] - 146:14,
148:16, 149:2,
167:1, 167:2,
168:11, 174:10,
187:10, 187:11,
188:18, 189:13,
189:21, 192:16,
192:18, 199:17,
208:4, 210:14,
211:2, 211:17,
211:19, 214:22,
215:15, 229:19,
229:20, 231:20,
234:12, 242:7,
244:14, 249:15
**team's** [1] - 213:4
**technical** [1] - 156:15
**technologies** [1] -
175:20
**teeth** [2] - 282:13,
284:8
**television** [1] - 285:17
**template** [1] - 149:6
**templates** [1] - 267:5
**ten** [5] - 88:7, 113:23,
128:4, 139:21, 287:1
**ten-minute** [1] -
139:21
**tenure** [3] - 117:15,
168:18
**TEP** [3] - 266:18,
266:23, 270:3
**Teresa** [1] - 210:15
**term** [6] - 104:8,
156:15, 160:19,
177:8, 197:14,
281:19

157:19
**terminate** [2] - 101:9,
158:22
**terminated** [10] -
101:3, 101:6, 101:8,
155:8, 203:14,
204:10, 221:5,
222:6, 225:2, 239:22
**terminating** [1] -
153:24
**termination** [4] -
101:2, 157:18,
160:22, 204:14
**terminations** [2] -
159:8, 237:4
**terms** [14] - 88:2,
134:17, 134:18,
134:19, 137:22,
148:25, 185:7,
215:9, 239:12,
255:7, 271:15,
273:17, 283:21,
288:9
**terribly** [1] - 100:17
**test** [1] - 143:22
**testified** [16] - 90:22,
119:8, 144:25,
164:1, 176:23,
177:12, 177:20,
186:25, 212:18,
218:4, 226:9,
232:25, 237:19,
246:14, 249:23,
254:13
**testify** [4] - 211:10,
243:14, 252:14,
254:9
**testifying** [4] - 243:4,
243:11, 243:13,
255:5
**testimony** [30] - 134:7,
137:20, 147:8,
169:20, 172:25,
175:1, 185:6,
209:13, 218:6,
233:5, 234:22,
237:21, 240:19,
243:3, 243:7,
243:15, 243:21,
244:22, 252:6,
252:25, 254:2,
254:3, 254:4,
254:11, 254:19,
272:5, 281:17,
285:19, 289:16
**text** [5] - 191:16,
191:18, 191:20,
193:20, 197:20
**texted** [4] - 152:5,
196:18, 199:4, 201:9
**Thanksgiving** [1] -

128:2, 128:6, 128:9,
128:11, 129:1,
129:3, 129:13,
129:17, 129:21,
129:24, 130:2,
130:6, 130:12,
130:15, 131:14,
131:22, 132:4,
132:6, 132:20,
132:22, 133:23,
133:25, 134:3,
134:5, 134:11,
134:24, 135:2,
135:3, 135:4, 135:5,
135:6, 135:7, 135:9,
135:11, 135:12,
135:15, 135:16,
135:20, 135:22,
135:25, 136:2,
136:5, 136:7, 136:8,
136:9, 136:12,
136:13, 136:16,
136:17, 136:21,
136:22, 137:7,
137:11, 137:13,
137:19, 137:24,
138:1, 138:5, 138:9,
138:13, 138:17,
139:15, 139:17,
139:19, 139:21,
139:25, 140:2,
141:2, 141:5,
141:17, 141:20,
143:6, 143:10,
143:13, 143:22,
143:25, 144:2,
144:8, 145:1, 145:5,
145:6, 145:8, 145:9,
145:11, 145:13,
147:14, 147:15,
147:18, 147:23,
148:17, 148:20,
149:15, 149:18,
149:22, 149:24,
149:25, 150:5,
150:7, 150:18,
150:22, 150:25,
151:1, 151:6, 151:7,
151:10, 151:12,
151:14, 151:16,
151:18, 152:15,
152:16, 153:6,
153:8, 153:10,
153:13, 154:18,
154:21, 154:25,
156:6, 156:8, 156:9,
161:5, 161:7,
162:16, 162:19,
162:24, 163:2,
164:13, 164:17,
164:20, 164:23,

**THE** [488] - 85:17,
87:3, 87:5, 89:2,
89:5, 89:8, 89:12,
89:16, 89:18, 89:21,
89:22, 90:3, 90:11,
90:15, 90:17, 90:18,
92:4, 92:6, 92:11,
94:5, 94:8, 95:10,
95:11, 95:16, 95:20,
100:9, 100:12,
100:13, 100:21,
100:22, 101:25,
102:1, 105:10,
105:12, 105:15,
105:16, 105:18,
105:23, 106:1,
106:6, 106:19,
107:1, 108:3,
108:12, 108:14,
108:15, 108:17,
108:19, 108:21,
109:7, 109:8, 109:9,
110:23, 110:25,
111:1, 111:2, 111:3,
111:5, 111:22,
112:1, 112:15,
112:18, 112:21,
112:22, 112:24,
113:1, 113:4, 113:6,
113:8, 113:9,
113:13, 113:25,
114:4, 114:5, 114:6,
114:7, 114:9,
114:10, 114:12,
114:17, 114:20,
114:22, 115:22,
115:25, 116:3,
116:19, 116:20,
116:21, 116:22,
116:24, 117:5,
118:21, 118:24,
118:25, 119:2,
119:3, 119:4, 119:5,
119:8, 119:15,
119:17, 120:4,
120:10, 121:4,
121:9, 121:11,
121:21, 122:9,
122:23, 123:2,
123:12, 123:16,
123:23, 124:13,
124:15, 124:18,
124:22, 124:24,
125:22, 126:3,
126:9, 126:12,
126:14, 126:17,
126:19, 126:22,
127:10, 127:15,
127:17, 127:18,
127:20, 127:23,

164:25, 165:2,
165:5, 165:6, 165:7,
165:10, 165:12,
165:14, 165:15,
165:17, 165:18,
165:20, 165:22,
165:24, 165:25,
166:3, 166:5, 166:7,
166:8, 166:9,
166:10, 167:12,
167:13, 167:14,
167:17, 169:11,
169:12, 169:13,
169:16, 172:18,
174:18, 176:19,
179:18, 179:22,
180:24, 181:2,
181:10, 181:13,
181:16, 182:16,
183:22, 184:1,
184:5, 184:7, 184:9,
184:14, 184:20,
184:23, 185:4,
185:9, 186:6, 186:8,
186:13, 186:17,
186:19, 186:21,
186:22, 188:20,
188:22, 188:24,
189:2, 190:18,
190:20, 190:22,
192:7, 195:2, 197:5,
197:7, 197:9,
197:11, 198:2,
198:4, 199:24,
199:25, 200:1,
200:6, 200:8, 201:2,
202:6, 203:9,
203:11, 205:18,
210:5, 210:7, 211:7,
211:8, 211:9,
211:15, 211:21,
211:23, 211:24,
212:3, 216:21,
218:9, 219:9,
219:12, 220:24,
222:3, 222:5,
222:16, 222:18,
223:6, 225:16,
226:4, 226:6, 228:3,
228:8, 228:12,
228:14, 228:17,
228:20, 233:6,
233:8, 233:10,
233:11, 233:13,
233:14, 235:20,
235:24, 236:3,
236:7, 236:9,
238:19, 239:6,
239:7, 239:8, 239:9,
239:10, 239:14,
239:16, 239:17,

239:18, 239:20,
239:21, 240:3,
240:6, 240:11,
240:15, 240:22,
240:24, 241:6,
241:10, 242:8,
242:12, 242:13,
242:16, 242:18,
244:20, 245:2,
245:22, 247:2,
247:5, 247:7,
247:12, 247:14,
247:17, 248:7,
249:19, 250:5,
250:8, 250:10,
250:19, 250:22,
250:25, 251:1,
251:2, 251:3, 251:7,
251:9, 251:11,
251:14, 251:18,
252:2, 252:5, 252:9,
252:17, 252:20,
252:24, 253:3,
254:1, 254:7, 254:9,
254:18, 254:22,
255:4, 255:8,
255:11, 255:16,
256:9, 271:20,
271:24, 272:2,
272:7, 272:13,
272:16, 275:15,
275:17, 275:23,
275:25, 276:6,
276:9, 283:9,
283:16, 284:14,
284:17, 284:21,
284:25, 285:4,
285:6, 285:11,
286:1, 286:3,
286:10, 286:12,
286:16, 286:19,
286:24, 287:2,
287:18, 287:23,
288:5, 288:8, 289:7,
289:21, 290:6
**themselves** [2] -
112:6, 243:24
**theory** [1] - 289:8
**therapist** [1] - 269:15
**therapy** [1] - 256:25
**Therapy** [1] - 282:21
**thereabouts** [1] -
288:12
**thereafter** [1] - 227:2
**therefor** [1] - 220:17
**therefore** [1] - 268:10
**therefrom** [1] - 220:17
**thereof** [2] - 130:21,
274:15
**they've** [2] - 87:8,

260:8
**thinking** [3] - 96:1,
165:17, 227:7
**thinks** [1] - 281:19
**third** [4] - 130:18,
250:12, 256:15,
282:23
**third-party** [1] -
256:15
**threat** [1] - 263:16
**three** [16] - 95:3,
95:12, 112:25,
113:4, 113:14,
248:25, 259:23,
260:19, 261:22,
262:12, 262:21,
262:22, 263:7,
263:23, 272:15
**Three** [1] - 263:11
**throat** [12] - 168:22,
176:5, 258:16,
258:19, 260:8,
266:25, 277:16,
277:17, 277:21,
278:20, 278:23
**Throughout** [1] -
281:17
**thrust** [1] - 181:7
**thumbnail** [1] - 243:20
**Thursday** [2] - 288:1,
288:8
**tie** [1] - 248:9
**tight** [2] - 94:1, 141:8
**timelines** [2] - 155:15,
173:11
**title** [4] - 160:3, 160:4,
160:5, 160:8
**today** [19] - 95:15,
103:12, 141:13,
164:2, 168:4, 191:2,
191:12, 194:16,
214:6, 236:20,
251:14, 252:21,
270:6, 272:17,
273:11, 278:3,
287:6, 287:10,
287:12
**together** [7] - 97:18,
105:2, 121:12,
122:4, 174:8, 248:9,
258:19
**tomorrow** [8] -
254:23, 285:16,
285:24, 286:8,
287:14, 287:15,
287:24, 287:25
**tonight** [1] - 289:10
**Tony** [18] - 152:23,
192:11, 194:1,
194:3, 194:4,

204:20, 204:21,
214:5, 214:6, 214:9,
214:16, 217:4,
221:15, 223:15,
248:11, 287:16
**Tony's** [1] - 192:10
**took** [16] - 97:16,
118:22, 165:13,
165:19, 165:22,
175:2, 175:6,
177:21, 215:19,
231:2, 249:15,
261:23, 262:5,
263:10, 282:6
**top** [23] - 151:25,
154:2, 154:4, 154:5,
155:12, 159:2,
159:9, 162:2, 165:4,
172:24, 173:8,
176:1, 176:4, 176:7,
176:10, 196:10,
196:11, 217:5,
247:18, 247:21,
267:2, 279:13,
279:17
**topic** [1] - 213:12
**total** [7] - 128:3,
160:12, 164:8,
164:19, 171:18,
207:10, 260:18
**totally** [2] - 104:15,
258:2
**touch** [1] - 108:18
**tough** [1] - 88:16
**toward** [1] - 117:15
**tracheoesophageal**
[2] - 266:24, 270:3
**track** [6] - 159:24,
160:2, 160:5, 160:9,
160:11, 237:13
**tracks** [1] - 107:4
**traffic** [1] - 90:5
**train** [4] - 213:21,
227:4, 228:24,
230:12
**trainer** [1] - 214:23
**trainers** [1] - 236:15
**training** [27] - 117:21,
118:2, 118:4,
145:20, 148:16,
157:6, 157:12,
157:13, 160:6,
178:9, 206:22,
207:14, 208:21,
209:7, 209:13,
209:16, 209:17,
210:12, 211:2,
215:10, 230:14,
231:5, 237:20,
237:23, 238:4,

238:17, 238:24
**Training** [19] - 164:10,
164:11, 164:12,
170:4, 175:3, 177:8,
177:17, 177:24,
177:25, 178:2,
182:13, 183:11,
183:12, 183:14,
183:20, 188:15,
189:12, 189:21,
190:9
**trains** [1] - 107:4
**TRANSCRIPT** [1] -
85:6
**transcript** [1] - 86:14
**Transcript** [1] - 86:15
**transferred** [2] -
183:17, 191:13
**transfers** [1] - 237:10
**transform** [1] - 113:18
**Transformation** [1] -
170:12
**transformation** [12] -
91:21, 103:1,
113:24, 115:16,
156:18, 169:19,
171:2, 171:18,
189:9, 209:2,
209:14, 237:20
**transition** [1] - 288:14
**transpired** [1] - 173:3
**travel** [1] - 138:23
**traveled** [1] - 209:3
**Travelers** [9] - 100:7,
101:7, 101:22,
101:24, 102:1,
102:4, 102:19,
102:22, 103:23
**traveling** [1] - 147:1
**treat** [2] - 92:2, 258:12
**treated** [4] - 256:24,
257:21, 258:22,
258:24
**treating** [1] - 257:17
**Treatment** [1] - 280:1
**treatment** [2] - 220:4,
220:17
**treatments** [1] -
230:19
**tree** [1] - 127:12
**Trenton** [1] - 93:20
**trial** [17] - 87:3, 87:10,
88:23, 90:7, 92:21,
100:15, 107:11,
107:17, 121:25,
122:3, 144:19,
185:10, 242:23,
243:2, 243:11,
286:4, 290:9
**TRIAL** [1] - 85:6

**trials** [1] - 184:21
**tried** [5] - 117:9, 136:3, 141:6, 151:3, 240:18
**trier** [1] - 243:5
**tripartite** [1] - 259:12
**trips** [5] - 97:7, 97:9, 97:16, 98:13
**trouble** [2] - 249:9, 278:22
**true** [3] - 175:11, 211:9, 211:12
**try** [21] - 88:8, 88:21, 92:21, 100:14, 100:24, 106:3, 107:16, 115:15, 116:12, 122:4, 125:1, 134:10, 144:11, 162:24, 163:1, 181:18, 240:1, 240:11, 248:22, 286:13, 287:6
**trying** [22] - 96:23, 107:15, 115:3, 115:8, 134:9, 144:18, 189:16, 189:18, 192:14, 196:15, 196:16, 215:24, 229:4, 230:12, 242:9, 248:9, 248:23, 250:23, 263:14, 273:22, 274:22, 280:21
**Trying** [1] - 280:2
**tube** [13] - 258:18, 270:9, 270:10, 270:12, 271:10, 271:11, 275:1, 277:18, 278:21, 280:14, 283:25
**turn** [18] - 91:19, 96:25, 121:2, 123:21, 126:11, 126:23, 127:7, 130:3, 163:8, 167:11, 169:10, 170:10, 172:16, 173:11, 212:1, 220:23, 241:3, 247:9
**turned** [6] - 95:4, 95:5, 109:3, 263:5, 269:1
**turning** [1] - 219:4
**turnover** [1] - 159:21
**turns** [1] - 233:23
**tutorial** [1] - 92:23
**twenty** [1] - 202:14
**two** [33] - 88:4, 93:22, 99:21, 104:22,

108:2, 120:1, 122:16, 180:4, 189:8, 189:20, 193:15, 222:10, 225:22, 227:10, 227:16, 229:12, 243:17, 248:9, 249:20, 250:14, 258:19, 259:15, 260:4, 260:18, 260:19, 262:18, 263:24, 269:25, 275:13, 278:2
**two-week** [1] - 222:10
**TX** [1] - 85:18
**type** [10] - 100:10, 100:17, 117:8, 133:22, 232:13, 236:17, 262:7, 264:22, 264:23, 264:24
**types** [2] - 98:1, 101:20
**typically** [6] - 149:9, 260:6, 262:8, 264:3, 264:11, 270:16

## U

**U.S** [2] - 85:4, 180:2
**U.S.D.J** [1] - 85:13
**uh-hum** [1] - 267:12
**ultimately** [1] - 207:8
**unaware** [1] - 178:2
**uncomfortable** [1] - 263:18
**under** [24] - 120:14, 149:9, 149:12, 153:19, 157:25, 171:9, 172:8, 180:5, 189:13, 196:1, 206:15, 217:6, 231:14, 231:16, 237:2, 238:6, 242:24, 243:11, 267:6, 268:2, 274:12, 274:13, 281:1, 282:21
**undergo** [2] - 260:13, 262:7
**undergone** [2] - 259:11, 264:2
**underneath** [5] - 231:12, 267:24, 268:21, 268:22, 269:24
**understood** [5] - 96:7, 102:11, 102:13, 121:13, 128:10
**underwent** [1] -

268:10
**unfolds** [1] - 88:12
**unfortunately** [2] - 268:11, 279:12
**unhappy** [1] - 87:19
**unheard** [1] - 137:16
**unique** [2] - 102:5, 264:5
**UNITED** [1] - 85:1
**University** [1] - 256:2
**unless** [1] - 217:22
**unnecessary** [1] - 287:7
**unsure** [2] - 278:7, 281:18
**untoward** [1] - 141:13
**unusual** [3] - 115:11, 147:3, 278:18
**unusually** [1] - 278:10
**up** [64] - 89:3, 93:19, 93:20, 95:2, 105:8, 106:21, 108:1, 115:11, 117:17, 121:3, 121:4, 123:13, 130:6, 132:3, 143:23, 144:3, 145:1, 147:10, 147:14, 149:25, 150:1, 151:11, 156:2, 156:25, 157:25, 159:10, 160:7, 161:24, 186:9, 186:10, 188:2, 189:2, 192:6, 192:11, 193:17, 197:21, 199:5, 209:6, 212:25, 217:3, 221:15, 222:19, 232:3, 234:18, 235:11, 243:5, 244:23, 247:18, 247:20, 249:4, 249:15, 253:1, 254:23, 255:4, 259:3, 259:20, 259:25, 263:2, 263:18, 264:10, 273:5, 283:6, 287:14
**upcoming** [1] - 167:22
**update** [1] - 191:19
**upper** [1] - 207:15
**upset** [1] - 249:2
**upsetting** [1] - 249:6
**usual** [1] - 148:15

## V

**vacated** [1] - 229:1

**vague** [1] - 205:14
**valuable** [1] - 114:1
**value** [5] - 111:20, 112:2, 112:5, 112:7, 112:13
**valve** [2] - 264:16, 264:18
**varied** [1] - 207:20
**variety** [1] - 230:11
**various** [4] - 187:23, 191:8, 191:19, 229:16
**vary** [4] - 227:9, 227:10, 227:12, 227:16
**verbal** [3] - 232:15, 241:16, 250:8
**verdict** [1] - 88:5
**versa** [1] - 238:9
**versus** [2] - 158:5, 161:17
**vetted** [1] - 174:11
**via** [1] - 234:18
**Vice** [6] - 146:1, 146:5, 148:7, 174:3, 179:4, 179:5
**vice** [5] - 133:24, 148:15, 162:6, 168:4, 238:9
**video** [8] - 115:18, 116:3, 147:3, 193:17, 193:20, 217:3, 249:5
**videos** [1] - 116:1
**view** [3] - 88:12, 102:24, 166:25
**visit** [4] - 261:7, 263:1, 269:22, 271:11
**voice** [18] - 145:1, 149:25, 257:22, 257:23, 258:1, 258:15, 258:17, 259:4, 259:6, 259:9, 260:2, 264:7, 264:13, 264:19, 264:23, 266:17, 276:22, 277:15
**voluntary** [3] - 236:24, 236:25, 237:11
**Voycheske** [15] - 195:4, 195:6, 196:15, 197:13, 197:22, 198:15, 200:20, 203:7, 221:20, 221:21, 221:25, 222:21, 234:8, 234:9, 245:25
**VP** [2] - 204:3, 209:1

## W

**wait** [5] - 87:6, 89:19, 90:6, 120:13, 183:22
**waiting** [1] - 87:6
**walk** [1] - 87:17
**walked** [1] - 173:10
**walking** [4] - 95:2, 277:6, 282:7, 284:8
**wall** [2] - 128:7, 270:13
**Wall** [2] - 94:25, 95:1
**wants** [6] - 122:3, 137:10, 181:3, 185:6, 242:11, 290:3
**Ward** [5] - 124:17, 134:13, 148:8, 148:10, 148:23
**warrant** [1] - 178:10
**weaknesses** [1] - 168:1
**wealth** [1] - 230:8
**Wednesday** [1] - 288:1
**week** [13] - 222:10, 259:15, 259:16, 259:21, 259:22, 259:23, 262:16, 262:17, 262:19, 278:1, 288:6, 288:16
**week-to-week** [1] - 262:17
**weekend** [1] - 173:3
**weeks** [9] - 88:4, 189:8, 196:21, 227:11, 260:10, 262:18, 263:2, 263:23, 263:24
**weight** [2] - 214:24, 215:4
**Weill** [8] - 94:22, 94:23, 95:5, 98:15, 98:16, 98:18, 98:21, 101:8
**welcome** [1] - 279:17
**wet** [1] - 284:10
**Whalen** [24] - 144:21, 145:1, 145:6, 145:11, 145:16, 151:25, 163:6, 163:8, 167:7, 167:19, 169:18, 170:15, 172:9, 172:16, 172:22, 174:20, 179:24, 212:8, 212:22, 221:16, 240:1, 248:12, 248:17, 289:5
**Whalen's** [1] - 192:11

**whatsoever** [2] - 136:17, 276:13
**wheel** [1] - 175:9
**WHEREUPON** [10] - 90:1, 90:14, 135:8, 139:20, 140:3, 141:18, 142:16, 251:13, 251:19, 253:4
**whole** [5] - 103:9, 104:8, 104:11, 170:6, 264:6
**wider** [1] - 112:6
**wife** [3] - 97:8, 283:24, 284:6
**Williams** [1] - 89:15
**willing** [4] - 89:5, 96:12, 96:18, 112:14
**Willis** [4] - 105:6, 106:22, 106:24, 108:6
**Willy** [1] - 103:11
**winner** [1] - 87:13
**wise** [3] - 158:11, 260:22, 271:13
**wish** [4] - 129:15, 150:7, 162:16, 184:2
**wishes** [1] - 120:13
**Witness** [2] - 184:8, 186:7
**witness** [44] - 90:8, 90:10, 90:14, 90:18, 90:21, 92:2, 92:5, 92:13, 100:14, 119:10, 120:3, 125:2, 129:14, 139:16, 139:20, 139:22, 142:11, 144:20, 144:22, 145:8, 154:19, 162:23, 184:3, 184:12, 184:15, 186:4, 186:8, 186:15, 186:22, 205:17, 219:15, 228:15, 240:12, 241:15, 243:4, 243:11, 243:14, 243:18, 243:23, 251:13, 251:16, 252:2, 254:13, 275:21
**WITNESS** [88] - 90:17, 95:11, 100:12, 100:21, 102:1, 105:16, 108:14, 108:17, 108:21, 109:8, 110:25, 111:2, 112:18, 112:21, 112:24,

113:4, 113:8, 113:13, 114:4, 114:6, 114:9, 114:12, 114:20, 116:20, 116:22, 118:24, 119:2, 119:4, 119:17, 127:17, 128:9, 135:2, 135:4, 135:6, 135:11, 135:15, 135:20, 135:25, 136:5, 136:8, 136:12, 136:16, 136:21, 137:11, 139:19, 145:5, 145:11, 148:20, 149:24, 150:7, 150:25, 151:6, 152:16, 153:8, 156:8, 164:17, 164:23, 165:2, 165:6, 165:10, 165:14, 165:17, 165:20, 165:24, 166:3, 166:7, 166:9, 167:13, 169:12, 181:10, 184:7, 186:19, 197:7, 211:8, 211:15, 211:23, 236:7, 239:7, 239:9, 239:14, 239:17, 239:20, 240:6, 242:12, 250:8, 250:25, 251:2, 291:2
**witnesses** [8] - 92:13, 141:23, 242:22, 247:9, 252:14, 285:18, 285:20, 288:10
**wonderful** [1] - 209:4
**word** [2] - 120:16, 242:20
**words** [7] - 114:18, 137:7, 214:15, 242:9, 269:1, 277:14, 283:17
**workplace** [1] - 217:22
**works** [3] - 130:20, 130:21, 141:15
**workup** [1] - 263:21
**world** [2] - 88:9, 117:6
**worldwide** [2] - 130:17, 146:25
**worried** [1] - 143:19
**worth** [4] - 111:4, 111:6, 111:9, 111:12
**wound** [8] - 95:2, 260:21, 262:2,

264:15, 269:3, 271:13, 282:5, 284:10
**wounds** [3] - 260:9, 260:12, 273:9
**write** [6] - 182:21, 191:16, 226:19, 226:22, 232:7, 264:21
**writing** [2] - 137:8, 184:24
**written** [6] - 193:2, 226:11, 232:16, 232:19, 250:1, 250:6
**wrote** [3] - 112:11, 192:14, 213:8
**Wyatt** [2] - 198:7, 198:8

## X

**X-ray** [1] - 263:20

## Y

**year** [14] - 97:20, 133:10, 164:9, 165:18, 165:20, 171:16, 171:19, 177:16, 206:4, 225:20, 242:6, 244:13
**year-over-year** [2] - 171:16, 171:19
**years** [26] - 91:17, 95:6, 98:19, 98:20, 99:17, 99:21, 104:22, 105:1, 105:3, 106:23, 107:25, 108:6, 108:11, 108:17, 112:25, 113:4, 116:12, 128:18, 145:18, 145:21, 145:22, 210:16, 225:22, 227:10
**yellow** [2] - 219:9, 219:12
**YORK** [1] - 85:1
**York** [7] - 85:5, 86:7, 86:11, 94:24, 95:11, 95:13, 95:14
**yourself** [6] - 102:8, 150:14, 152:1, 241:7, 284:7, 289:7
**yourselves** [1] - 287:4

## Z

**Zeitlin** [2] - 85:21

**ZEITLIN** [15] - 85:23, 125:20, 138:7, 226:2, 240:8, 246:25, 247:4, 255:3, 255:15, 255:18, 256:10, 257:6, 257:8, 275:8, 283:12
**zoom** [2] - 161:11, 161:25