637

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - - - - X
3   STEVEN B. BARGER,             :  17-CV-4869(FB)
                                  :
4          Plaintiff,             :
                                  :
5      -against-                  :  United States Courthouse
                                  :  Brooklyn, New York
6                                 :
                                  :
7                                 :
   FIRST DATA CORPORATION, et     :  Friday, September 20, 2019
8   al.,                          :  10:00 a.m.
                                  :
9          Defendants.            :
                                  :
10                                :
   - - - - - - - - - - - - - - - - X
11
               TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
12             BEFORE THE HONORABLE FREDERIC BLOCK
       UNITED STATES SENIOR DISTRICT JUDGE, AND A JURY.
13
                   A P P E A R A N C E S:
14
   For the Plaintiffs:    THE LAW OFFICE OF SHAWN SHEARER, P.C.
15                         Attorney for the Plaintiff -
                           Steven B. Barger
16                            3839 McKinney Avenue
                              #155-254
17                            Dallas, Texas 75204
                           BY: SHAWN SHEARER, ESQ.
18
                           ZEITLIN & ZEITLIN, P.C.
19                         Attorneys for the Plaintiff -
                           Steven B. Barger
20                            50 Court Street
                              Suite 506
21                            Brooklyn, New York 11201
                           BY: DAVID A. ZEITLIN, ESQ.
22

23

24

25

*638*

```
 1              A P P E A R A N C E S: (Continued.)
 2

 3   For the Defendants:        SAUL EWING ARNSTEIN & LEHR, LLP
                                Attorneys for the Defendants -
 4                              First Data Corporation, et al.
                                  500 E. Pratt Street
 5                                Baltimore, Maryland 21202
                                BY: GARY B. EIDELMAN, ESQ.
 6                                  GILLIAN A. COOPER, ESQ.
                                    MICHAEL CIANFICHI, ESQ.
 7

 8                              BOND SCHOENECK & KING, PLLC
                                Attorneys for the Defendants -
 9                              First Data Corporation, et al.
                                 330 Madison Avenue
10                               39th Floor
                                 New York, New York 10017
11                              BY: LOUIS P. DILORENZO, ESQ.

12

13

14   Court Reporter:   Rivka Teich
                        Official Court Reporter
15                      Telephone: 718-613-2268
                        E-mail: RivkaTeich@gmail.com
16
     Proceedings recorded by computerized stenography.  Transcript
17   produced by Computer-aided Transcription.

18

19

20

21

22

23

24

25
```

PROCEEDINGS                      639

1          (Open court; no jury present.)

2          (Time noted:  10:03 a.m.)

3

4          THE COURTROOM DEPUTY:  All Rise.  Civil cause on

5    trial, *Barger v. First Data.*  All parties and counsel are

6    present.

7          THE COURT:  So the jurors are all here.  And

8    they've been very responsive, so that's good to know.  And

9    we're going to try to wrestle down the charge, give you

10   something at lunch time.  We're okay time-wise, we have the

11   whole weekend.  I'm sorry we have the whole weekend, it

12   would be better for you to get the case done today and go

13   out for the weekend.  Such is the lot of the litigator,

14   right?

15         MR. EIDELMAN:  That's just the life, Judge.

16         THE COURT:  Mr. DiLorenzo.

17         MR. DiLORENZO:  The Labor Section is meeting at

18   Cornell, I canceled that meeting.

19         THE COURT:  You can watch another one of my

20   podcasts in your free time.  I'm going to try to drink some

21   coffee while you continue the trial.  Let's bring the jurors

22   in.

23         COURTROOM DEPUTY:  Mr. Barger, you can take the

24   witness stand.

25         (Whereupon, the witness resumes the stand.)

S. BARGER - CROSS - DiLORENZO                640

1        COURTROOM DEPUTY:  We're still waiting for juror
2   number seven.
3        (Jury enters the courtroom.)
4        COURTROOM DEPUTY:  I remind the witness you are
5   still under oath.
6        THE WITNESS:  Thank you.
7        THE COURT:  Let's continue with the -- or start
8   with cross examination.
9        So actually, this witness can be called by either
10  side, like all witnesses, right.  He was called by the
11  plaintiff and this is the plaintiff.  Now we have
12  cross-examination by defense counsel.  Go ahead,
13  Mr. DiLorenzo.
14       MR. DiLORENZO:  Thank you, your Honor.
15                STEVEN B. BARGER,
16  called as a witness herein by the Plaintiff, having been
17  previously duly sworn and having testified, was examined and
18  testified further as follows:
19  CROSS-EXAMINATION
20  BY MR. DiLORENZO:
21  Q    Hello, Mr. Barger.
22  A    Good morning.
23  Q    As the Judge said to you yesterday, if you need a
24  break, have some time, whatever you need, just tell me and
25  I'll stop.

1   A    Everything will be okay.

2   Q    At the end of your testimony yesterday you talked, I

3   think it was at the end, you talked about the Lebenthal

4   proposal.  Do you remember that testimony?

5   A    Yes, sir.

6   Q    And the Lebenthal situation was not an actual contract,

7   correct, it was just a proposal to charge 20,000 a month and

8   a $50,000 fee for intellectual property?

9   A    It was one being presented to the board.  I was told it

10  was a formality.  We were just getting started.

11  Q    You heard Mr. Plumeri said it never made it to the

12  board.  Did you hear him say that?

13  A    It's possible.  I don't know that.  All I know is I

14  gave it and was told that it was going to be presented to

15  the board.  It was just a formality, that's all I know.

16  Q    At the time, Mr. Plumeri was actually on the board,

17  correct?

18  A    He was.

19  Q    And in fact, in your research for the Lebenthal

20  proposal you found he was on the board, that's when you

21  reached out to him, correct?

22  A    I don't remember if he reached out to me or I reached

23  out to him.  I know that --

24          THE COURT:  He's on the board.  We know that.  You

25  don't have to answer.

S. BARGER - CROSS - DiLORENZO                642

1   Q    You hadn't connected with him for some 13 years at that

2   point?

3   A    I tried, I tried e-mail -- I mean text.  But I did not

4   have his e-mail address so, no, we didn't talk.

5   Q    I believe you indicated earlier that when he set the

6   price that he would pay you at First Data he asked you what

7   you were making, you said I'm making 20 to 25,000 a month?

8   A    I believe that's right.

9   Q    And you submitted -- do you recall submitting an

10  invoice -- there were dates when that invoice, when the

11  purchase order would take effect I believe March 17, the

12  first date?

13  A    I don't remember dates or I do not remember dates.  I'm

14  sorry.

15  Q    Do you remember submitting a $30,000 proposal for

16  February when you went down to Atlanta to check the company

17  out?

18  A    I know there were a series of them.  I can't testify to

19  dates.  I'm sorry.

20  Q    That's okay.  Do you remember submitting an invoice

21  that you talked about at your deposition that was for your

22  expiration to see if you wanted to undertake the assignment?

23  A    I'm sorry, I don't know what that means "expiration."

24  Q    Expiration, investigation, you were going to take a

25  look.  You said you went down to the company before the time

1   period started, spent a week or so in Atlanta.  You don't

2   remember that testimony?

3   A    Those were not the circumstances, no.

4   Q    What were the circumstances of the first invoice?

5   A    All the 30 years, every time Joe engaged me there was

6   verbal contracts as to what was going to be needed to make

7   it happen economically.  And whatever that was, after 30

8   years he trusted me in the nth degree.  He just said,

9   whatever it's going to take we'll approve.  And that was, it

10  was always that way for 30 years.

11  Q    In this particular case, though, there was a written

12  agreement, wasn't there?

13  A    A written consulting agreement, is that what you're

14  asking me?

15  Q    Yes.

16  A    Yes.

17  Q    That was different than all the 30 years previous worth

18  of arrangements?

19  A    Usually in the other 30 years of all the places that we

20  fixed, it was short time of just come in and do it, we'll

21  pay you, no contract.  Then he would just bring me on

22  full-time.  He wanted me to get a sense of the company

23  before I said yes.

24  Q    You mentioned in your testimony yesterday that the

25  Lebenthal proposal had a specific provision that provided

S. BARGER - CROSS - DiLORENZO                644

1    for $50,000 for intellectual property?

2    A    It was for that and for offsetting other things that I

3    would have to refund money to existing relationships.  So it

4    was a combination of things.  And I believe it was 60,000 in

5    Lebenthal.

6    Q    And as I understood your testimony, I thought that you

7    were using that Lebenthal proposal to show that sometimes

8    intellectual properties paid separately and sometimes it's

9    included in your agreement, as your son testified.

10   Sometimes it's in and sometimes it's not included in the

11   fee.  And Lebenthal was an example of it not being included;

12   is that correct, not included in the monthly fee?

13   A    It was going to be a payment, yes.

14   Q    Was that to show that you could have mixed up these two

15   contracts and thought there was a special payment provision

16   for the intellectual property at the end of the contract and

17   that's why the final invoice was the 50,000 for intellectual

18   property?

19   A    Once again, Joe and I our conversation was trying to in

20   someway match up what the Lebenthal offer was.  He would

21   make certain that I was coming aboard at the end.  Joe has

22   always been fair with me, always.  We've been friends for 30

23   years.  So when he -- my relationship with Joe is probably

24   different than anybody else that he's been associated with

25   in the company.  He trusted my judgment.  And he said

S. BARGER - CROSS - DiLORENZO                    645

1   whatever it's going to take, figure it out, invoice it,

2   let's go and get this started.  We did that forever.

3   Q    So the Lebenthal, you're saying the Lebenthal proposal

4   was to say that he was going to match the Lebenthal

5   proposal?

6   A    Joe knew what it was.  And we all -- there was nothing

7   that formal with Joe.  It was never that way.

8        When he recruited me he knew that I could be somebody

9   that he could trust with all of his private information,

10  everything that was going on at the company.  And he knew

11  that whenever I made some type of proposal, it was going to

12  be justified all the time.  It was never ever any question

13  through our 30 years.

14  Q    You at the time that final invoice was submitted for

15  the 50,000, you had decided to become an employee.  And you

16  knew, as your son testified, that you were going to breakup

17  the consulting arrangement with your son?

18  A    We were throwing everything up, it was part of the

19  entire process.  That's just Joe and me.  There is no -- it

20  was never formal, it just wasn't.  We shook hands.  We loved

21  each other.  We protected each other's back.  I saved him.

22        THE COURT:  I think he explained himself.  I don't

23  know that this case is about Lebenthal.  I think the case is

24  about the ADA and about the FMLA.

25        MR. DiLORENZO:  Your Honor, we also --

S. BARGER - CROSS - DiLORENZO                646

1          THE COURT:  I'll let you have the opportunity to

2     question him.  He answered it.  We heard enough about

3     Lebenthal.  Go on to something else.

4          MR. DiLORENZO:  Okay, your Honor.

5     BY MR. DiLORENZO:

6     Q    Let's talk about the position that you had when you

7     were hired after the agreement was signed.  You were hired

8     for the sales transformation, the culture change, that you

9     said would take about seven years, is that what you were

10    hired for?

11    A    Yes.  Once again --

12         THE COURT:  You answered yes.

13         THE WITNESS:  Yes.

14         THE COURT:  I know you're attempting to explain

15    everything, I'm not going to allow that to happen.  Let's

16    move on what to what is essential here.  Yes or no answer.

17    If you need an explanation, your lawyer can ask you a follow

18    up question.  I'm really trying to get to the essence of

19    things.

20         THE WITNESS:  Thank you.  You're good.

21    BY MR. DiLORENZO:

22    Q    You didn't have the sales training group yet,

23    Mr. Fricke was still there when you got hired?

24    A    Yes.

25    Q    What was it that you were hired to do with Joe Plumeri

S. BARGER - CROSS - DiLORENZO                647

1    initially?

2    A    When Joe and I would start with any company, one of the

3    first things he would do is he wanted me to do because

4    enormous responsibilities was he wanted me to go across the

5    entire company because he knew what our message was.  And he

6    wanted me to introduce myself and meet with all of the

7    senior executives all of the department heads, globally,

8    everywhere.  Get a sense of how they were operating.  Get a

9    sense of their challenges from day to day.  And just to

10   start to have a conversation about down streaming the

11   message that Joe wanted everybody to understand.

12        And that is based on the concept that price becomes an

13   issue in the absence of value.  So our charge was to make

14   certain that everyone, at every level in the company, senior

15   management, understood it, could in essence restate it so

16   it's accurate.  So they owned the words and passed it on

17   down through their management, so that department owned the

18   concepts.

19        So I was on my way of traveling the world to meet

20   everybody.

21   Q    That was about 750 people, is that what you said?

22   A    No, I didn't say 750.

23   Q    I read, I think in your deposition, that you and

24   Mr. Plumeri were going to around these shows and talk --

25   A    That was with --

1    Q    The top 750 people were the First Data Way?

2    A    That was when --

3    Q    How long did it take you to accomplish?

4    A    I just got started and I was given -- I did Omaha, some

5    people in New York, some people in Atlanta.  And I was

6    spending a week different places.  And then all of a sudden

7    when Fricke left I took on other responsibilities and that

8    kind of slowed down.

9    Q    What percentage of your job would you say was managing

10   the sales training group compared to this other

11   responsibility?

12   A    I would say probably 70/30.

13   Q    Seventy the training group, 30 being?

14   A    Yes, being that way.  I couldn't make 100 percent the

15   original job.

16   Q    Did you have the sales training group before

17   Mr. Plumeri left this area and didn't supervise you any

18   longer?

19   A    Yes.

20   Q    It was 70/30 both while he was there as well as after

21   he left?

22   A    There was still this corporate messaging that I was

23   involved in with Tony.  So there were other things going on

24   besides just training, yes.

25   Q    You weren't doing the road shows anymore, obviously

1   with Plumeri.  And you were not doing the shows with Tony.

2   Were you doing some shows on your own in addition to the

3   ones with Tony?

4   A    We would have chairman councils or we would have some

5   type of regional meetings I would also be addressing.  We

6   had a program where we had -- I can't remember the name,

7   interns I think it was -- and people who were potentially

8   new hires that I also did presentations for.  There were

9   multiple things going on, as everybody has testified, I gave

10  a lot of speeches.

11  Q    You spoke at -- Tony's program was the First Data Way,

12  right?

13  A    I helped Tony put it together.

14  Q    He said he put to together.  Did you do a lot of the

15  work on it?

16  A    We all sat and decided what was going to happen.  And I

17  ended up introducing everybody, and kind of emceeing it, and

18  making key comments during the presentation.  So relate back

19  to the concept that Tony wanted to put in place.  It was all

20  his idea.  It was an opportunity for us to talk to 750

21  people who were feeling disenfranchised.

22  Q    You would speak for about an hour in that program?

23  A    I had a presentation for about an hour, but I spoke

24  frequently during the day based on what each speaker would

25  say.  I would add things and add color to everybody's

1    presentations.  Then in the evenings we had a dinner that I

2    emceed the dinner.  And we had everybody who attended stand

3    up and tell us two things that they --

4            THE COURT:  I don't think we need all of this.  I

5    don't want to know what you ate for dinner.

6            Next question.  Let's get on to something

7    relevant.

8            MR. DiLORENZO:  The relevancy here relates to

9    their claims concerning whether replacements, who was doing

10   the work --

11           THE COURT:  You asked enough questions.  I gave

12   you latitude.  Let's move on.

13   BY MR. DiLORENZO:

14   Q    Would you take a look at Defendant's exhibit 307, is

15   this one of the agendas?

16   A    Yes.

17   Q    You're speaking at Enterprise Solutions Selling, is

18   that typically what you spoke at?

19   A    Among other things, yes.

20   Q    The introduction is by Tony Marino, is that the

21   emceeing that you were talking about that you did?

22   A    No.

23   Q    You don't show up here as doing anything in the

24   beginning.

25   A    It was just part of the flow of the 20 meetings.  We

1    were a team doing this.

2          THE COURT:  You don't have to answer that.

3    Q    You talked about the theme that you were trying to

4    develop and teach everybody was price becomes an issue in

5    the absence of value, can you tell me what that means?

6    A    Well, we always thought it was self-explanatory.  But,

7    no matter in of our lives, whatever we are spending our time

8    or spending or money, whatever we're spending, must equate

9    to the value we receive.  So the only time that value is

10   ever questioned in any, in a relationship, in service, in

11   sales, in product, is when the price exceeds the value.

12   Q    Now you heard testimony the last couple of days that

13   the time that you were put on the reduction of force you

14   were the 54th highest paid employee out of 23 or 24,000

15   employees, do you remember that testimony?

16   A    I do.

17   Q    That would be your price to the corporation, right?

18   That's the price of what we're paying for your services,

19   right, your salary compensation?

20   A    That was the agreed-upon price.

21   Q    And early on after Mr. Plumeri left, he left in 2015,

22   right?

23   A    I don't remember date.  He did leave.

24   Q    You had a conversation with Mr. Charron.  At that time

25   Mr. Plumeri was gone, when Mr. Charron had this conversation

S. BARGER - CROSS - DiLORENZO                    652

1   with you?

2   A    Time-wise I don't know.

3   Q    Weren't you working for Mr. Hack at the time.  And

4   Mr. Hack reported to Mr. Charron, and that's why Mr. Charron

5   was talking to you?

6            THE COURT:  Whatever it was, you talked to people.

7   Listen, you were there for a number of years.  Counsel is

8   trying to pick and choose a couple of conferences you had, a

9   couple of discussions you had.  You answered the question.

10           Move on.

11  BY MR. DiLORENZO:

12  Q    You were only there about two-and-a-half years, right?

13  A    Yes.

14  Q    You agree with me, Mr. Charron talked to you based on

15  how high your salary was, you would have to do more things

16  of value to the company to justify that salary?

17           THE COURT:  Do you remember that?

18           THE WITNESS:  Yes.

19  Q    That was long before you were diagnosed with cancer,

20  correct?

21  A    I don't think it was long before, no, maybe a couple of

22  months.

23           THE COURT:  It was before.  You were working

24  there, you had this conversation, and then maybe you could

25  do more for the company.  Is that basically the essence of

S. BARGER - CROSS - DiLORENZO                653

1   what it was?

2            THE WITNESS:  Yes.

3   BY MR. DiLORENZO:

4   Q    Isn't it that situation exactly the one we're talking

5   about when we said price becomes an issue when there is no

6   value or not the same value that somebody --

7            THE COURT:  Save that for summation.  Next

8   question.

9   BY MR. DiLORENZO:

10  Q    You described the way you felt after that conversation

11  as getting pressured because you weren't meeting the

12  revenue, the company wasn't meeting its revenue

13  expectations, and you were a fixed expense.  Do you remember

14  that testimony?

15  A    I don't.

16  Q    You would agree with me that the training function that

17  you were heading was an overhead to the corporation?

18  A    Everybody's salary is an overhead.

19  Q    But this was --

20           THE COURT:  Don't argue.  Next question.

21  BY MR. DiLORENZO:

22  Q    Are you saying that it wouldn't have been considered a

23  fixed expense?

24           THE COURT:  Sustained.  Next question.

25  BY MR. DiLORENZO:

S. BARGER - CROSS - DiLORENZO                654

1  Q    Did you believe that Mr. Charron and the corporation

2  had a different view of the value that you rendered to the

3  company versus what you thought the value was worth?

4           THE COURT:  Did you have any discussions with

5  Mr. Charron about whether you were doing the right job,

6  whether you were value to the company?

7           THE WITNESS:  No.  Our discussions were taking on

8  more responsibility.

9           THE COURT:  He wanted you to take on more

10  responsibility.

11           THE WITNESS:  Yes.

12           THE COURT:  Did you agree to do that?

13           THE WITNESS:  I did.

14           THE COURT:  You did take on more responsibility?

15           THE WITNESS:  I was researching a way to get that

16  done.

17           THE COURT:  Next question.

18           You're getting a salary, they wanted to get more

19  bang for the buck, that's basically what happened.

20           THE WITNESS:  Yes.

21           THE COURT:  Did anyone ever complain about the job

22  you were doing or discharge you if you didn't do anything

23  better, conversations like that?

24           THE WITNESS:  Never.

25           THE COURT:  They wanted to get more productivity

S. BARGER - CROSS - DiLORENZO                 655

1   out of you for the money you were making.

2              THE WITNESS:  Yes.

3              THE COURT:  Is that the essence of your testimony?

4              THE WITNESS:  Yes.

5              THE COURT:  You agree with that?

6              THE WITNESS:  Yes.

7              THE COURT:  After that, you tried to do something

8   different; yes or no, I don't know.

9              THE WITNESS:  Yes.

10             THE COURT:  What did you do after that

11  conversation?

12             THE WITNESS:  I began having conversations with

13  the other training departments in the company to see if we

14  could bring them on board underneath.

15             THE COURT:  So you took the advice seriously.  You

16  tried to do something about it.

17             THE WITNESS:  Yes, sir.

18  BY MR. DiLORENZO:

19  Q    As a result of that conversation, did you have an

20  understanding that the company did not appreciate the value

21  that you rendered to the company?

22  A    No.

23             THE COURT:  Sustained.  He testified.  He

24  explained himself.

25             MR. DiLORENZO:  Your Honor, he gave

S. BARGER - CROSS - DiLORENZO                    656

1    inconsistent --

2              THE COURT:  You can argue at your summations.

3              MR. DiLORENZO:  I understand that, your Honor.

4              THE COURT:  A fact adduced in evidence.

5              MR. DiLORENZO:  Your Honor, at his deposition he

6    gave contrary --

7              THE COURT:  Do you have his deposition?

8              MR. DiLORENZO:  That's what I want to do.

9              THE COURT:  Go ahead.

10   BY MR. DiLORENZO:

11   Q    Page 124 of your deposition.  Do you recall being asked

12   this question and giving this answer, page 24 line 21.

13        Question:  And going back to what you said that you

14   expected that would continue in the role that you were

15   doing, and sales training would go to somebody else when

16   they found your successor for it.  Isn't it true that Dan

17   Charron came and talked to you in 2015 and said, 'Steve, if

18   you're going to make $408,000 a year you've got to do other

19   stuff around here.'

20        And you gave this.

21        Answer:  Yeah, he did.  We had the conversation,

22   absolutely did.  And that point, at that point, I told him I

23   would start just go about --

24        Question:  What is the date again that he said that, in

25   the fall 2015?

1      Answer:  Yes, I think that's about right.  I don't

2    remember the date exactly.  Dan said we've got to, and

3    that's reflection of a couple of things.  That's a

4    reflection of Dan not understanding the value that I did

5    bring, that's one challenge.

6         So that was your understanding?

7              THE COURT:  You read the deposition, it's fine.

8    And can you consider that, folks, for impeachment purposes

9    or if you think it's inconsistent of whatever he said or

10   substantive evidence.

11             Go ahead.

12   BY MR. DiLORENZO:

13   Q    Mr. Barger, yesterday you talked to us a little about

14   the 360 review that you had done?

15   A    Yes.

16   Q    And that's not just subordinates, that's people all

17   around you, 360 degrees, right, including your manager?

18   A    Yes -- I think there was a lady named Stasha.

19             THE COURT:  You don't have to answer that

20   question.  He's making statement.  You don't have to answer.

21             THE WITNESS:  I'm sorry.

22             THE COURT:  Listen to me, we're not going to stay

23   here all day with this.  If you makes a statement you don't

24   have to comment.  Next question.

25   BY MR. DiLORENZO:

S. BARGER - CROSS - DiLORENZO                    658

1    Q    I'd like to show you a page from that review.  There is

2    comments, right, people submit comments?

3    A    I don't know.

4         THE COURT:  You have comments.  What do you want

5    to show him?

6         MR. DiLORENZO:  Plaintiff's Exhibit 23.

7         THE COURT:  Is that in evidence?

8         MR. DiLORENZO:  It was referenced yesterday.  I

9    don't think the document is in evidence.

10        COURTROOM DEPUTY:  What is the number?

11        MR. DiLORENZO:  Plaintiff's Exhibit 23.

12        THE COURT:  Let me find it.

13        COURTROOM DEPUTY:  In evidence.

14        THE COURT:  In evidence.

15        MR. DiLORENZO:  Okay.

16        THE COURT:  This is the performance review.

17        (Plaintiff Exhibit 23 received in evidence.)

18   BY MR. DiLORENZO:

19   Q    You see this box on the right-hand side, these are the

20   people that submitted comments, right?

21   A    It looks like they are, yes.

22   Q    So manager one is Jeff Hack, that's who you reported to

23   at the time?

24   A    Yes.

25   Q    And the first direct report is Justin Stamey?

1    A    Yes.

2    Q    And Julie Kelly is on here?

3    A    Yes.

4    Q    Third direct report.  You see that?

5    A    I see all those.  I know all those people.

6    Q    Here are the comments on the back page I've highlighted

7    them.  Can you see some comments, the first highlighted

8    comments:  Steve's fatal flaws as manager of people he

9    doesn't hold his team to the same standards.  He also fails

10   to coach his people when things weren't going well, and

11   instead makes is a change to fix it.  This tends to divide

12   the team.  While Steve is a great leader he struggles to be

13   a day to day manager, because he's often involved in

14   projects that have little impact on the sales transformation

15   and overall strategy, for example, attending every FD Way

16   training.

17        That's First Data Way training that you did with Tony?

18   Is that a yes?

19   A    Yes, sir.

20   Q    Next one is:  Perhaps not to be considered a fatal flaw

21   or weakness is lack of documentation of underperforming team

22   members.  Steve doesn't handle conflict well.  Sometimes he

23   doesn't communicate, sometimes he makes decisions or doesn't

24   include his reps in the process.  Steve makes moves, even

25   demotions and scope, while talking about a great job the

1   person isn't doing which isn't true.

2           THE COURT:  What question do you want to ask him?

3   Do you want to read the deposition?  Ask him a question.

4   BY MR. DiLORENZO:

5   Q    Were these legitimate criticisms in these comments?

6           THE COURT:  Yes or no.

7   A    They came from somebody.

8   Q    So they were legitimate or not legitimate?

9   A    I don't know what legitimate means.

10          THE COURT:  They were comments that were made.

11          THE WITNESS:  Yes.

12          THE COURT:  Do you agree with them, disagree, or

13  whatever?

14          THE WITNESS:  I don't know that I agree with all

15  of them.  I think some of them are probably accurate.

16          THE COURT:  You took them constructively as

17  possible?

18          THE WITNESS:  That's why I did it, so I can

19  improve.

20  BY MR. DiLORENZO:

21  Q    Yesterday when you described the review you said they

22  rated you better than you would have yourself, those are

23  some of the criticisms you would have given yourself.

24  A    Yes, and there are a lot more that I would have given

25  myself.

1   Q    A number of those relate to the managing of the day to

2   day of the sales training group, right?

3   A    I assume they do, yes.

4   Q    Did you have much management experience before you got

5   this sales training group?

6   A    Most of my life.  I've had at Barney, Shearson.  I had

7   training departments reporting to me.

8   Q    This large?

9   A    Larger.

10  Q    Did you get laid off from any of those jobs?

11  A    I've never been.

12  Q    You testified at your deposition you were very familiar

13  with the process of reductions and force on Wall Street, a

14  short-term cost-saving, do you remember that testimony?

15  A    Yes.

16  Q    You disagreed with the philosophy of it; is that right?

17  A    No.  But what I disagree is the premise by which it's

18  presented to the public.  It is usually done so that

19  quarterly reports look good to the analysts.  I've seen that

20  happen through all of the companies I've worked for.  And

21  I've watched the masters of what I call financial

22  engineering make quarterly reports look really good.

23  Q    You heard Mr. Bisignano's testimony yesterday.  Did you

24  agree with the way he described the financial difficulties

25  that he faced when he came into the company?

S. BARGER - CROSS - DiLORENZO                    662

1   A    They had a terrible debt load.

2   Q    You mentioned the transformation of the culture that

3   you worked on at another location when you talked about your

4   damages.  You said that you estimated seven years' worth of

5   future employment because it has taken in the past that long

6   to change a culture?

7   A    Right.

8   Q    What was the name of the other company where it took

9   seven years?

10  A    Shearson and Smith Barney is one example.

11  Q    That took seven years?

12  A    The final result of it took hold seven years after I

13  started it.

14  Q    There is no way to tell how long that's going to take

15  in a company, every company is different?

16  A    It is different, yes, sir.  Simple answer is it's

17  different.

18  Q    Frankly to turnaround First Data didn't take seven

19  years even after you left?

20  A    Well, the turnaround has to do with its financial

21  reporting, not its behavior.

22  Q    So you have no idea whether its behavior turned around.

23  By the time this financial transformation had turned around

24  you were gone, right?

25  A    I was gone, yes.

1  Q    Do you have any information that supports your belief

2  that you would have worked seven years changing that

3  culture?  Do you have any proof that it would have taken

4  seven years at First Data?

5  A    Just my past experience is all.

6  Q    That was with one other company?

7  A    Multiple companies.  I did the same thing, consulting,

8  with UBS.  It took them about five years to make the

9  transition.  I was consulting for them.

10 Q    For UPS?

11 A    UBS, I was in the financial world.  When I stopped

12 consulting people continued the process that I put in place.

13 And the people that I trained became the leaders of those

14 companies.  And they took all of the concepts and drove them

15 forward.

16 Q    When Robin Ording became the interim vice president of

17 the sales group when you went out on leave, she assumed the

18 entire job, didn't she, that you had?

19 A    That's what I heard today, this week.

20 Q    What was going on?  What was part of the job besides

21 managing the sales training force at that time?

22 A    Sales training was a portion of where we would want to

23 train our sales people who were being hired to come in and

24 sell the bell and tear product that we had.  It was the

25 inside made to sell clover, to sell the fact that we could

1   ask a series of questions and get people to understand more

2   about what we do.

3       But we also, there was a fairly small part, we also did

4   was we had bank partners and we had other delivery systems

5   other than our direct sales force.  And we had servicing

6   people and call centers.

7       The goal was to get and keep.  When I got there the

8   getting was happening; the keeping was terrible.  They were

9   flying out the back door.  So we needed to get the culture

10  in place to understand how to keep them, that's one of the

11  reasons they weren't making any money.  So it cut across the

12  large swath.

13      And on top of that, our charge was to answer the bell

14  any time that a business unit wanted our help.  So on a

15  weekly basis we had a status report of a spreadsheet with

16  300 different ongoing projects to service all of the company

17  that requested help.

18  Q   So the agenda, the projects, as well as the staffing of

19  your group was being driven by the other units because they

20  make requests and you would have to be able to respond to

21  those and fit the needs, whether to hire a number of people,

22  or develop a new program, or whatever you had to do?

23  A   That's not exactly true.  Would you like me to explain

24  it to you?

25  Q   Sure.

S. BARGER - CROSS - DiLORENZO                665

1    A    When a business unit would request help, either one of

2    their partners in bank training we were about to lose a

3    relationship with a bank, we would send people on site

4    immediately.  The more banks that were requesting, we didn't

5    have enough people to do it.

6         So the process would be, we would open a req, a

7    requirement for a position.  We would get the req approved

8    by senior management.  And we would be cued up in a line of

9    priorities.  And once we were the next priority we would go

10   out and try to hire somebody to fill it.  All of the hiring

11   requests were controlled by senior management.  All I did

12   was put the request in for the business unit.

13   Q    When Robin, so are you saying -- I'm not sure I got an

14   answer to the real question, which is the sales

15   transformation versus the training.  The time you went on

16   leave was all the sales transformation work in your job

17   being done through the sales training organization, one

18   director or another, or one division or another, it was all

19   coming through that?

20   A    I've got to clarify if you're asking did all my direct

21   reports cross the entire spectrum?

22   Q    No.  I heard a lot of testimony about you had a sales

23   transformation piece of your responsibility and managing the

24   sales training group, which came later.  I haven't been able

25   to understand after Mr. Plumeri left what it was that you

S. BARGER - CROSS - DiLORENZO                    666

1   were doing on sales transformation with the culture, the
2   seven years the things were going to take, unless it's doing
3   that transformation through the people in the sales training
4   organization?
5           THE COURT:  Do you understand the question?  Let's
6   get a quick answer and move on to something else.
7   A    Yes.
8           THE COURT:  The answer is yes.
9   Q    It is yes, all done through the people that work for
10  you?
11          MR. ZEITLIN:  Asked and answered.
12  A    No.  We had sales responsibilities and but those
13  included service and other things besides sales.
14  Q    I understand that.
15  A    That's one group.  I still was, as everybody has
16  testified, the spokesperson for the messaging of how we're
17  going to make this work.  And that was embedded inside of
18  the sales and all the other training that I was doing.
19  Q    Okay.  So really it was integrated with the sales
20  training organization, right?
21  A    Yes, sir.
22  Q    You were the sole contributor on giving the speeches
23  once in a while going to the First Data Way?
24  A    There were several people who worked for me who got
25  developed over the course of several months who, I would

S. BARGER - CROSS - DiLORENZO                667

1  say, I would be really proud of could give the same

2  presentation --

3  Q    And you heard testimony --

4  A    -- including Tony.

5  Q    -- you heard testimony that Justin, I believe it's

6  Stamey, took over the group after you left?

7  A    I heard him, yes.

8  Q    He was a director under you?

9  A    Yes.

10  Q    Did it surprise you, even hearing Ms. Kelly's testimony

11  yesterday, that that group went down to 20 people or 25

12  people or so from 50, 60, 70 whatever it was?

13  A    Yes.  The group was disbanded, it didn't necessarily

14  reduce in size.  It was passed back to different business

15  units.  That's part of the financial engineering that goes

16  on.

17  Q    But there were, she testified there were 20 to 25

18  people who lost those jobs.  Those people didn't get passed

19  on to different business units?

20  A    No.

21  Q    So there --

22  A    There is a large group that went back to others, to the

23  banking side.  They were transferred out.  So it's a

24  combination of the two.

25            THE COURT:  Let me try to get clarification.  I

S. BARGER - CROSS - DiLORENZO                 668

1   may be wrong, and the jury is not going to draw any

2   inferences from my questions, I warned them.  I want to try

3   to get focused what I think may be the more significant

4   issues.  I may be right, I may be wrong.  Let's cut to the

5   chase.

6              There was a reduction in force, all right.  Do you

7   think that you were erroneously included in that group of

8   300 or do you think it was okay to be included with the

9   others?

10             THE WITNESS:  No.

11             THE COURT:  No what?

12             THE WITNESS:  I think --

13             THE COURT:  You should not have been included,

14  your salary should have stayed the same, you should not have

15  been one of the 300.

16             THE WITNESS:  That's what the law says.  That's

17  what I was told the law says.

18             THE COURT:  I didn't hear you.  Do you agree or

19  disagree they had the right to reduce the forces?

20             THE WITNESS:  They always do.

21             THE COURT:  Always do that, right?

22             THE WITNESS:  Yes.

23             THE COURT:  You know that.

24             THE WITNESS:  Yes, sir.

25             THE COURT:  Your number came up here, and you're

S. BARGER - CROSS - DiLORENZO                 669

1    taking issue with that, right.  Why do you think that you

2    should not have been on that list?  And why you should have

3    been kept on as a high-end employee for collectively

4    750,000?  Explain to the jury and let's move on.

5              THE WITNESS:  Okay.  I was being dismissed.  All

6    of the things that have happened basically happened after I

7    said I was returning to work.  And everything that took

8    place where I did follow all of the rules the way, I

9    understand or FMLA and other laws, is a requirement for me

10   to be brought back from a disability.  And that I could

11   either have the same job or a similar job.

12             THE COURT:  So you believe that if you never had a

13   disability and you stayed in that position, that the company

14   could not reduce your salary or include you in part of the

15   restructure of the organization.  Is that your position?  If

16   you never had disability and the company did the same thing,

17   you would say they were acting improperly?

18             THE WITNESS:  I don't know.

19             THE COURT:  I want to know.  If you didn't have

20   disability, you stayed on, is it your position that your

21   position was frozen at 750,000 and you could not be part of

22   the group of 300?  I want to understand what your position

23   is?

24             THE WITNESS:  I think that I would have continued

25   to find more responsibilities, as Dan asked me to do.

S. BARGER - CROSS - DiLORENZO          670

1        THE COURT:  It's your position that you should not

2   have been part of -- regardless of you taking disability or

3   not, you explain why.  You want to tell the jury again why

4   you should not have been part of the part of the 300, with

5   or without disability.

6        THE WITNESS:  My conversations before I went out

7   on leave or with Mr. Charron, we had discussions about where

8   some of the servicing training should take place.  Because

9   he was well aware that the servicing side was

10  non-functional.  And when he asked me to start looking at

11  fixing that, I took that as a wonderful decision, because

12  we're talking about getting and keeping.  The keeping was

13  killing us.  He saw that, he wanted that to be fixed.  He's

14  the only man that saw it.  And I wanted to say, yeah, let's

15  go get it.

16       THE COURT:  So then it doesn't matter whether you

17  were disabled or not, you should not have had your position

18  reduced, you should not have been one of the 300.  That's

19  your position.

20       THE WITNESS:  No.

21       THE COURT:  And you explained why.  Let's get

22  going.

23  BY MR. DiLORENZO:

24  Q    You never testified at your deposition Mr. Charron

25  asked you to look at that and take it over.  He told you you

1    better find something to do, right?

2    A    No.

3    Q    Is it he told you that he wanted --

4         THE COURT:  Wait a second.  Who is testifying now?

5    He said no.  Do you have something there you want to read?

6    You can read it.  I think the jury understands this case.

7    BY MR. DiLORENZO:

8    Q    You testified at your deposition you don't believe you

9    got fired because you took leave.  Do you remember that

10   testimony?

11   A    If you say it's in there.

12        THE COURT:  Don't question his memory.  Is there a

13   question you want to read something?

14        Did you believe you were terminated because you

15   took disability?  Yes or no.  Counsel said that you said no

16   at your deposition.  Is that true or not?

17        THE WITNESS:  I --

18        THE COURT:  So read from the deposition.

19        THE WITNESS:  I don't know when I first noticed --

20   it was the first deposition I've ever taken in my life.

21   There is a lot of stuff that I do not remember.

22        THE COURT:  Stop, stop.  If you have something,

23   I'll let you read it.

24        MR. DiLORENZO:  Thank you, your Honor.

25   Q    Page 159 and 160.

S. BARGER - CROSS - DiLORENZO                672

1    Question:  Let me make sure I get my questions right.

2 My question to you is, has anyone ever told that you were in

3 included in the reduction in force where you were terminated

4 in January of 2017 because you had taken FMLA leave?  Has

5 anyone ever told you that?

6 A    No.

7 Q    There was an objection.

8    Answer:  No, I never had conversation with anyone.  How

9 could they?

10    Question:  That's right.  Has anybody ever told you you

11 were included in the reduction in force and terminated in

12 2007 because you had cancer?

13    Objection.

14    Answer:  Nobody ever talked to me.

15    Question:  Okay.  Do you believe that you were

16 terminated because you had cancer?

17    Answer:  All I know is I did not get to come back to

18 work, that's all I know.

19    Question:  I agree that you didn't come back to work.

20 I'm asking what you believe.  This is your case as a

21 plaintiff.  And I wanted to, if you stand up in front of a

22 jury are you going to say I believe I was terminated because

23 I have cancer, because I have cancer?

24    Answer:  Not necessarily because I have cancer.

25    Question:  I'm asking you, you did --

S. BARGER - CROSS - DiLORENZO                673

1      Answer:  I don't think it's because I had cancer.

2      Question:  Okay.  Do you believe -- do you think it was

3  because you went out on leave that you were included?

4      Answer:  Say that again?

5      Question:  Okay.  You just said that you don't believe

6  it was because you had cancer is the reason why you were

7  terminated.  Do you believe you were terminated because you

8  had taken leave?

9      Answer:  No, because the leave was requested by Tony.

10 I didn't want to go on leave.

11          THE COURT:  That's what you said in your

12 deposition.  Do you want to change any of that now?  You did

13 say that or not?

14          THE WITNESS:  No.  The only thing I will tell you

15 is while I was being deposed I felt there were lots of

16 disjointed questions that were confusing.  That's the first

17 time I had ever been deposed my your life.

18          THE COURT:  You can tell us now, do you disagree

19 with that, I'll give you a chance to do that.

20          THE WITNESS:  What you read is fine.

21 BY MR. DiLORENZO:

22 Q    You said when you were describing the law to the judge,

23 which was a little unusual, you were explaining you should

24 get an equivalent position if you don't get your position

25 back.  You're not claiming that you should have gotten Robin

1    Ording job, she was an HR person?

2    A    I have no idea what that means in the law.

3    Q    Are there any positions that you were entitled to that

4    you should have been offered?

5    A    I have no idea.

6    Q    Do you know whether the 362 people, any of them were

7    offered positions?

8    A    I have no idea.

9    Q    What about this EJ Jackson, you heard testimony about

10   his job from I think Mr. Charron?

11   A    Software guy.

12   Q    Yes.  You don't believe you were qualified for that

13   position, do you?

14   A    No.

15            THE COURT:  You were not qualified.

16            THE WITNESS:  No, he's a software expert.

17            THE COURT:  You're not a software guy.

18            THE WITNESS:  No.

19   BY MR. DiLORENZO:

20   Q    You said earlier, maybe my question or the Judge's

21   question, that the reason you think things were done wrong

22   here is because you weren't selected for layoff until after

23   you tried to come back to work.  Were you here yesterday for

24   the three lists we showed that were compiled with your name

25   on it a large part of your department $2.2 million in

1  savings including your salary --

2        THE COURT:  Mr. DiLorenzo, save it for argument.

3        MR. DiLORENZO:  Sorry, your Honor.

4        THE COURT:  We want to get the facts out.  The

5  facts.  Whatever happened yesterday they are facts, you can

6  recall them to the jury, you can look at many documents we

7  have, you can look at it from the summation and argue from

8  the facts.

9  BY MR. DiLORENZO:

10 Q    Were you here for the testimony?

11       THE COURT:  He was here all the time.

12 BY MR. DiLORENZO:

13 Q    Did you hear the testimony?

14       THE COURT:  He heard the testimony.  Next

15 question.  Nothing wrong with his ears.

16 BY MR. DiLORENZO:

17 Q    Do you allege that any of those lists were developed in

18 bad faith or improperly by the people that testified

19 concerning them?

20 A    That's up to my attorneys, I have no idea.

21 Q    You don't have any information that indicates they

22 aren't legitimate lists or legitimate communications?

23       THE COURT:  They are the lists.

24 A    They are the lists.  I couldn't prove if they are right

25 or wrong.

1          THE COURT:  If they are correct or not you're not

2    dealing with that.  They are the list.

3    BY MR. DiLORENZO:

4    Q    There has been some testimony -- can you describe for

5    us the work that you were doing from September 4 or 6 when

6    you had the operation, until the doctor gave you the return

7    to work on January 10.  You said that you were -- people

8    have said you did some work from hospital beds?

9    A    I can't -- so I always wanted to know what the team was

10   doing.  So as I mentioned before, we had a weekly team

11   meeting.  We had a status report of everybody's

12   responsibility throughout the entire team worldwide, three

13   different projects at any point in time.  That was sent to

14   me or I got it electronically.  And I just wanted to make

15   certain we were staying focused and that we were going

16   ahead.  And making sure certain things were getting done.

17         And then I wanted to know, I gave them permission to

18   have their staff meetings and I would listen in.  In the

19   early days before I could talk and I would text things back

20   and forth with any questions I wanted to ask.

21         That process in my opinion really helped me heal

22   faster, because I thought I was being a contributing human

23   being and not a drag on society.  So that was a big deal for

24   me.  I got constant e-mails back and forth, not just from my

25   team but from senior management telling me things, asking me

1  questions, wanting to know if I want to do certain things.

2  And I would e-mail them back.

3      There is just a bunch of stuff going on at that time.

4  And when the doctor in Atlanta thought I had pneumonia, I

5  was healed in about six days, which is normal for me.  Every

6  one of my doctors said I heal rapidly.  They are surprised.

7      So I wanted to continue to have the conversation, see

8  where they were, and make certain that the projects were

9  being completed.  And I spent as much, as much time as

10  possible doing that on a daily basis.

11      Because I have a reading disability it takes me quite a

12  while to read through several papers.  I would spend my off

13  time reading documents, et cetera, that they send me wanting

14  to make certain that everything was going the right

15  direction.  And trusting my direct reports to take care of

16  the responsibilities.

17          (Continued on next page.)

18

19

20

21

22

23

24

25

*S. BARGER - CROSS - DiLORENZO*                               678

1  BY MR. DiLORENZO:

2  Q    Roughly, how many hours a day do you think you worked

3  during that period?

4  A    On and off, probably -- I'd wake up in the middle of the

5  night.  Ten hours.

6  Q    Ten hours a day?

7  A    Oh, yeah.

8  Q    September, October, November?

9  A    I started two days after my operation.  Remember, I had

10 paperwork I was looking at.  When you have 300 different

11 projects going on, and the only way you are finding out about

12 it is to read about it, you've got to go through that and take

13 serious notes to get back to people.

14 Q    Now, you were text messaging --

15           THE WITNESS:  Your Honor --

16           THE COURT:  You need some time?  Take some time.  If

17 you want to take a break, let me know.

18           THE WITNESS:  Don't worry about this.  This is

19 normal.  It is no big deal.

20 A    Okay.  Yes, sir.

21 Q    So during this time -- just a second.

22           During this time, you engaged in a number of text

23 messages with Mr. Plumeri; do you remember that?

24 A    I'm sure I was.

25 Q    And discussing a number of things.  You weren't working

1  for him at the time, but the two of you --

2  A    At the end, he was gone then.

3  Q    Right.

4  A    Actually, he was vice chairman, and then he was still

5  with the firm, so.

6  Q    Defense Exhibit 310.  Page 16.  I believe the neutral

7  boxes are your text messages, and the ones that are shaded in

8  a bit are Mr. Plumeri's.  On October 26 --

9  A    I see it.

10  Q    -- 3:36 in the afternoon, there's one from you to him.

11  And you say:  I'm not going to work full-time yet, but can do

12  three to four hours.  Staying at home is --

13          THE COURTROOM DEPUTY:  Mr. DiLorenzo --

14  Q    -- killing me?

15          THE COURTROOM DEPUTY:  -- it is not in evidence.

16  310 isn't in evidence.

17          MR. DiLORENZO:  I'm sorry.

18          THE COURT:  Which one is this now?

19          MR. DiLORENZO:  I offer 310 into evidence, which are

20  the -- sorry, which are the Plumeri text messages.

21          THE COURT:  Defense Exhibit 310.

22          MR. DiLORENZO:  I don't think there's any objection.

23          THE COURT:  One second.  Which one?

24          THE COURTROOM DEPUTY:  310.  Defense Exhibit 310.

25          THE COURT:  I think that's already in evidence.

1      MR. DiLORENZO:  I think 311 you --

2      THE COURT:  Put it in evidence now, no objection.

3      (Defense Exhibit 310 received in evidence.)

4      MR. DiLORENZO:  Sorry, Your Honor.

5  Q    So you see, August --

6  A    I do.

7  Q    -- October 26 --

8  A    Yes, sir.

9  Q    -- the e-mail from you to Mr. Plumeri, who's not your

10 boss, and you say:  I am not going to work full-time yet, but

11 can go three to four hours.  Staying at home is killing me.

12 Do you see that?

13 A    I do.

14 Q    And the next message you sent him on the same day, about

15 three minutes later, is:  Also, I need the income to continue.

16 Do you see that?

17 A    Right.  Yes.

18 Q    And that was your full income, right?  That was --

19 A    I don't know what that means.

20 Q    You don't know what it means, it says:  I also need the

21 income to continue?

22 A    Yeah.  No, I mean, whatever the context, I don't know.

23 You mean, if that means needing money, that would be accurate.

24 Q    At the time -- well, so is this an accurate description

25 of how much you are able to work at the time, instead of ten

1   hours, three to four hours?

2   A     No.

3   Q     You weren't thinking at the time you were sending these

4   text messages that there would be litigation in this case, did

5   you?

6   A     This Joe was always concerned about me working the hours

7   that I worked.  And I was trying to make certain, I said,

8   look, I am taking your advice, I am taking it easy.  The same

9   thing I told Tony, I would take it easy, because they were

10  concerned about me.  And the fact is, that my son testified, I

11  can't do nothing.  It is impossible for me.  So I work, and I

12  work, and I work.  That's my sense of being.  So it may be a

13  flaw, but that's me.

14  Q     But the only other reason you do it is for the money,

15  right?

16  A     I've got to make a living.

17  Q     But this is the full pay while you're out on -- while

18  you're recovering from serious surgery, right?  With

19  complications, right?

20  A     Income to me means I just need money to live.  That's

21  what that means.  I don't know if it has a definition greater

22  than that.

23  Q     So your testimony is -- I thought first you didn't know

24  what the context was, but your testimony is that you told

25  Mr. Plumeri something that wasn't true so that he wouldn't

1   worry about how much you were working?

2           MR. ZEITLIN:  Objection.

3           MR. DiLORENZO:  Is that a fair statement?

4   A    No.  I was making Joe feel better about my decisions.

5   Joe always worried about how many hours I worked.  And I'm

6   just trying to soothe him, saying, okay, I'm listening to you.

7   Joe always wanted his advice that he gave me.  He wanted to

8   give me advice, which he did, he was my mentor.  So at the end

9   of the day, oh, yeah, I am doing some work.

10  Q    And he would always -- he always worried about how hard

11  you were working, even when you were healthy and not that you

12  had -- always, all 30 years?

13  A    Always.

14  Q    But must have been one of the reasons he brought you

15  along was you were such a dedicated, hard worker, right?

16  A    Yeah.

17  Q    I mean, at the end of 30 years, if you haven't taken his

18  advice about not working hard, why would you send him this

19  text message 30 years later?  He knows you are not telling him

20  the truth, right?

21  A    Listen.  It is just a way for when we communicate, Joe

22  and I relationship, it was not formal.  It was totally

23  informal.

24  Q    You'd agree with me, wouldn't you, that you had a heck of

25  a time, you went through a heck of a medical test of your

1  mental and physical abilities during those months of

2  September, October, November, December?  I mean, we heard the

3  doctor testimony about the holes not healing and the

4  complications and the drainage, and so on?  Wasn't difficult?

5  A    Can I respond?

6  Q    Yes.  I thought -- it sounded difficult to me.

7  A    When they first told me they were taking out my voice

8  box, it was extremely difficult.  I had three days of a pity

9  party where I just wondered if I'd ever be able to talk again.

10  So it's pretty emotionally distressing.

11         I got three days sitting in the cancer ward watching

12  everybody else's problem and figured out mine was no big deal.

13  And from that time going forward, I actually felt that I was

14  blessed.  I had some things I had to do.  I had some fissures

15  that had to be fixed, but to say that I was distraught or

16  whatever you said about it, some people might take it as being

17  really serious.  I knew I was alive, and it was a possibility

18  that I could talk again.  And I got to participate in talking

19  with my -- or communicating with my staff.  How could things

20  be any better.  So other than those three days of a pity

21  party, I have never ever thought I was distressed, no.

22  Q    And I wasn't talking just about mental, I was talking

23  about the physical.

24  A    Yes.  I do -- one of the things every doctor said is it

25  is remarkable how fast my body recovered.  It was months and

1   months ahead of time.  Including my speech therapist, who

2   cried the first time I spoke.  She's never heard it before.

3   So all that fell into place.  I was a blessed man.  I was

4   lucky.  A lot of people don't get what I got.

5   Q    Do you think that going -- actually going out on

6   disability leave and not having access to the e-mail and so on

7   actually helped you recuperate faster?

8   A    I'd say, I understood Mr. Marino's concern, but that was

9   in November.  In December I went to the Christmas party, and I

10  could walk.  I started working out.  Because he saw me at the

11  very worst part of my -- I was down to 165.  They hadn't put

12  the TEP yet in for me to talk.  I got it put in, I went over

13  there, and I actually went to the Christmas party with my

14  staff and had conversations.  That was 30 days later.  So I

15  just keep thinking, I am a very, very lucky man.

16  Q    Well, you said he saw you at your worst.  That was

17  November 3, right?  That was around November 3?  But didn't

18  you get worse than that, and didn't you send him some text

19  messages after that, indicating you were even worse than that?

20  You thought you had inoperable cancer and it spread to your

21  lymph nodes, and you wanted your personal affairs put in order

22  for your wife?

23  A    Yes.

24  Q    You weren't that bad when he saw you with Mr. Plumeri at

25  your home on the 3rd?

1  A    No, I later found out that they weren't sure about the

2  lymph nodes, but that only lasted a short period of time with

3  the doctor, and I found out I did not have recurring cancer,

4  and I was going to be fine.

5  Q    So I show you Defense Exhibit 115, which I believe is in

6  evidence during Mr. Marino's testimony.

7          MR. DiLORENZO:  Am I right?

8          THE COURTROOM DEPUTY:  Yes.

9  Q    Take a look at the message you sent at the top, which is:

10  Thanks for the wonderful visit.  Personal things are the only

11  ones that count.  Going in for additional repair surgery next

12  weeks.  Six days in the hospital, four weeks full recovery.

13  Should be talking around Christmastime.  I can play Santa.  I

14  love you, Tony.  Or love you, Tony.

15  A    Yes.

16  Q    And then the next one talks about the -- one more

17  operation, and then there's the one, on the 21st, that

18  Mr. Marino testified to.  This is the one where you say:  I

19  need to discuss my options with you and Joe.  They need to be

20  transferred in my wife's name.  Make certain they are all

21  issued.  All my other accounts will be in her name, also?

22  A    Yes, sir.

23  Q    I need your help getting my finances together.

24  Dr. Harrison at Moffitt was very concerned about the lymph

25  node cancer being inoperable.  Don't know length of time.  But

1    need your help for my family's security.  Please don't

2    broadcast this.

3    A    Yes.

4    Q    You sent him that on the 21st, right?

5    A    Yes.

6    Q    So that was a darker day than November 3, right?

7            And this is three months after you've had the

8    surgery, right?

9    A    It was.

10   Q    And Tony -- were you pleased with the way Tony reacted to

11   these text messages that you sent, in terms of getting you

12   your bonus vested, $174,000, all ahead of time, no reduction

13   and no stock and no waiting for cliff vesting for three years?

14   A    Yes.

15   Q    You had to be happy with that, right?

16   A    Sure.

17   Q    I mean, on a dime, he got it done in about 24 hours,

18   right?

19   A    He's a good man.

20   Q    He is a good man?

21   A    Of course he is.

22   Q    Why did you sue him in this case?  What do you allege

23   that he did wrong in this case with respect to your Family

24   Medical Leave Act and ADA claims?

25   A    Was not my choice.  I took advice of my counsel.  My

1  counsel constructed the case, and I followed what he said I

2  must do.

3  Q    Is that the same with all the other individual

4  defendants, Rhonda Johnson?

5  A    Yes, sir.  The strategy was -- yes, sir.

6  Q    The same thing with Mr. Dan Charron?

7  A    Yes, sir.

8  Q    Same thing with Mr. Bisignano?

9  A    Yes, sir.

10 Q    So when I asked you what evidence you have that indicates

11 they have violated these statutes, the Family Medical Leave --

12         MR. ZEITLIN:  Objection.  He's a lay witness.

13         THE COURT:  Sustained.

14         MR. DiLORENZO:  I am asking for facts, Your Honor,

15 that support the claim.

16         THE COURT:  What is the question you are going to

17 ask?

18         MR. DiLORENZO:  I'm sorry, Your Honor?

19         THE COURT:  Let me hear the question.

20 Q    What facts do you have that indicate they treated you

21 improperly under these two statutes?

22         THE COURT:  Why do you believe that you were treated

23 improperly under these statutes?  Or do you want to say you

24 don't have any belief, you leave it up to your lawyer,

25 whatever they think is okay?

1              THE WITNESS:  I am not a legal expert.  So --

2              THE COURT:  You left it up to your lawyer?

3              THE WITNESS:  Everything.

4              THE COURT:  You have no way of knowing under the

5    law --

6              THE WITNESS:  I do not.

7              THE COURT:  -- whether they treated you properly or

8    improperly?

9              THE WITNESS:  I do not.

10             THE COURT:  You explained the facts here, and then

11   the lawyer advised you on the law, and you followed the --

12             THE WITNESS:  Yes, sir.

13             THE COURT:  -- lawyers advice?

14             That's his answer.

15   Q    I want to ask you about a plaintiff's exhibit that was

16   put in evidence yesterday.  I believe it was Plaintiff's

17   Exhibit 99, which is the First Data payments.  But I am going

18   to use the defendant's exhibit, which is the same one.  I

19   can't put my hands quickly on it.

20             THE COURT:  So, Mr. DiLorenzo, when you mumble, the

21   poor --

22             MR. DiLORENZO:  I'm sorry, Your Honor.

23             THE COURT:  Listen to me.  The poor reporter doesn't

24   know whether to take your mumbles down or not.  Let me know

25   when you want your mumbles reduced to writing.

1           MR. DiLORENZO:  I don't, Your Honor.

2           THE COURT:  Okay.

3           MR DiLORENZO:  I'd like to introduce, if it is not

4    in evidence, Defense Exhibit 268.

5           THE COURT:  One second.

6           THE COURTROOM DEPUTY:  It is not.

7           MR. ZEITLIN:  What exhibit number?

8           THE COURTROOM DEPUTY:  268.

9           THE COURT:  Defense Exhibit 268.  Let me take a look

10   at it and find it.

11          MR. DiLORENZO:  Can I show it to the jury,

12   Your Honor.

13          THE COURT:  Just one second.  So --

14          MR. DiLORENZO:  You know what, Your Honor?  I'm

15   sorry, Plaintiff's Exhibit 99 is already in evidence.  I will

16   use that one.

17          THE COURT:  Plaintiff's Exhibit 99.

18          MR. DiLORENZO:  Although I would like to offer 268

19   in evidence.

20          THE COURT:  You want 268 in?  It may be duplicative,

21   is what you are saying?

22          MR. DiLORENZO:  It may be.

23          THE COURT:  No harm.  There's no objection.  Defense

24   Exhibit 268 in evidence at this time.

25          (Defense Exhibit 268 received in evidence.)

*S. BARGER - CROSS - DiLORENZO*                                    690

1    Q     Mr. Barger, we heard a claim in the opening statement

2    that one of the things you claim that was done improperly was

3    you were forced to go on Family Medical Leave Act when you

4    didn't want to; is that correct?  You wanted to keep working,

5    right?

6    A     Yes.  I wanted -- I have always wanted to work.

7    Absolutely.

8    Q     Right.

9          And you wanted to be paid full-time for working,

10   right, full-time pay?

11   A     Yes.

12   Q     Okay.  And in the opening statement it was stated that

13   you were put on unpaid leave against your will.  I'd like you

14   to take a look at these payroll documents that your attorneys

15   put into evidence.  The first one deals with the payday of --

16   I think it is 8-15-2016; do you see that?

17   A     Yes, sir.

18   Q     And this is before you went on leave, right?

19   A     I don't remember the dates, but I will stipulate --

20   Q     So this one looks like you got $20,000, the top number at

21   the top under current, it has year to date and current, do you

22   see $20,000 --

23   A     I do.

24   Q     -- and 334,000.

25          And down at bottom there's a current distribution,

1   which I believe is your net pay for the two-week period?

2   A    Okay.

3   Q    12,076?

4   A    Yes.

5   Q    And so is the next document, which is across from it,

6   which is for 8-31; do you see that?

7   A    Yes, sir.

8   Q    And I think these two, which is the next page of that

9   exhibit, shows the same payment numbers through to 9-30 --

10  A    I do.

11  Q    -- 2016.

12       So this is after you had the surgery, still full

13  pay, right?

14  A    Yes, sir.

15  Q    The next one -- the next two are for the period 10-14 and

16  10-31, and the numbers are all the same; do you see that?

17  A    Yes, sir.

18  Q    Now we're coming up to the time where you get put on the

19  leave, right?  The first one, which is November 5 -- I'm

20  sorry, November 15, 20,000 and 12,000; do you see that?

21  A    Yes, sir.

22  Q    And then the end of November is 20,000 and 12,000; do you

23  see that?

24  A    Yes, sir.

25  Q    The next one has a gross pay of 174,000 on 12-15; do you

1    see that?

2    A    That was my bonus.

3    Q    That's your bonus, right?  And the distribution was

4    115,000?

5    A    Yes, sir.

6    Q    And then for December 15, the same date, same pay date in

7    the two documents, this one says 10,000 and the current is

8    7,200?

9    A    I see that.

10   Q    So that's what you got paid, and that's the first time

11   you have had a payment below those regular numbers while you

12   were on disability, right?  While you were on leave?

13   A    It appears that way, yes.

14   Q    And was there a mistake in that pay that it was too low?

15   You don't know?

16   A    I have no idea.

17   Q    The next page, which covers the period of 12-30, is the

18   pay date.  Do you see the current payment is 22,000 --

19   A    Yes.

20   Q    -- 929?

21   A    Yes.

22   Q    And the distribution is 15,000?

23   A    Yes.

24   Q    So it is actually higher than your regular pay was,

25   before you went on leave?

1  A    Looks like it.

2  Q    And it looks like it is making up for a mistake in a

3  deduction that was made in the earlier one.

4        The next payment, which is for 1-31?

5  A    Yes.

6  Q    That's got 22,000 and 11,000, which is also higher than

7  your regular pay, right?

8  A    Yes.

9  Q    And then the 2-15, you produced a return to work notice

10 that was effective 1-17; do you remember that?  You could come

11 back to work with no restrictions on 1-17?

12 A    Yes.

13 Q    And this pay date is -- and you got paid through the end

14 of February, right?  You were put back on the payroll from the

15 17th of January through the end of February?

16 A    Yes.

17 Q    Because you had been returned -- you had the return to

18 work notice with no restrictions?

19 A    Tony mentioned to me that they were going to continue to

20 pay me until, I believe, February.  I don't remember the date,

21 but --

22 Q    So this is back to your regular pay of 20,000, 11,110?

23 A    Right.

24 Q    Now, these are the documents your lawyers put in

25 yesterday --

1    A    Right.

2    Q    -- that show your pay for that period?

3    A    Yes.

4    Q    Do you agree with me that you were not put on an unpaid

5    leave during that time period?

6    A    I don't know what the ramifications of saying unpaid are,

7    or if this was something that was agreed to because I had not

8    signed an agreement.  So that they pay -- I will say this,

9    they paid me during that time.  That's what I will say.

10   Q    Well, you became eligible for disability pay during that

11   time, didn't you?

12        MR. ZEITLIN:  Your Honor, I think these documents

13   speak for themselves.  It's just bolstering --

14        THE COURT:  Look.  I am being a little distracted

15   because I am going over the charge now.  But we are about

16   ready to take a little bit of a 15-minute break, I suspect.

17   Do you want to ask one or two more questions?

18        MR. DiLORENZO:  I can just finish these documents.

19   They are the same exhibit.

20        THE COURT:  Same exhibit.

21        MR. DiLORENZO:  Part of the same exhibit.

22        THE COURT:  Ask one or two more questions, and we

23   will take a break.

24   Q    I forgot to show you February 28, the last payment.  Do

25   you see that?

S. BARGER - CROSS - DiLORENZO                    695

1   A    Yes.

2   Q    And it is the same 20,000 as your pay before you were put

3   on leave and after?

4   A    Yes, sir.

5         MR. DiLORENZO:  And the last checks I have are

6   Defendant Exhibit 249, Your Honor.

7         THE COURT:  Are they in evidence?

8         MR. DiLORENZO:  Not yet, I don't think.

9         THE COURTROOM DEPUTY:  No.

10        THE COURT:  In evidence now.

11        (Defense Exhibit 249 received in evidence.)

12  Q    Do you recognize these MetLife long-term disability

13  checks that you received?

14  A    I do.

15  Q    One is for $13,852?

16  A    Yes.

17  Q    And one is for $27,705 --

18  A    I do.

19  Q    -- right?

20        And those were LTD that was paid retroactively for

21  some of this time period?

22  A    When I got these, I gave them to my attorney because I

23  had no idea.  I had not agreed to go on long-term disability,

24  and I got these checks.  I gave them to my attorney, and they

25  are in an escrow account.  I never --

1          THE COURT:  Did you deposit those checks?

2          THE WITNESS:  No.

3          THE COURT:  Those checks have not been used by you?

4          THE WITNESS:  No.

5          THE COURT:  You gave them to the attorneys?

6          THE WITNESS:  Yes.

7          THE COURT:  That is his answer.

8   Q     But you weren't disabled you, you had a return to work

9   from the doctor that you have no restrictions?

10  A     I didn't know the intention of these.  With all of these

11  things going on, I am not an attorney, I knew that I was not

12  on long-term disability, and that's why I gave them to my

13  attorney.  I wasn't going to cash them.

14         THE COURT:  You didn't cash the checks because you

15  didn't believe you were on long-term disability?

16         THE WITNESS:  Exactly.

17         THE COURT:  That's his answer.

18  Q     How about that $50,000 for the intellectual property?

19  Have you returned that to the company after you discovered it

20  wasn't included in the contract?

21  A     That was an agreement between Joe and myself.  I told you

22  that.  It's already been answered.

23         THE COURT:  Explain what that's all about.  You kept

24  that money, right?

25         THE WITNESS:  Yes.

1        THE COURT:  He explained that.  Why don't we take --

2        MR. DiLORENZO:  Stop here, Your Honor?

3        THE COURT:  -- a break now, unless -- let me ask you

4   this, so I have a sense, Mr. DiLorenzo.  How much more

5   questioning do you have?

6        MR. DiLORENZO:  I think I am going to be able to

7   wrap up fairly quickly, Your Honor.  Maybe 20 minutes, 25

8   minutes.

9        THE COURT:  Okay.  We are going to try to do that,

10  and we are going to try to complete his testimony, if we can,

11  before lunch break.

12        Let's take a 15-minute recess, but before we do,

13  Mr. Innelli told me that juror number 6 would like to leave by

14  4:30 for sufficient reasons.  I think that's a reasonable

15  accomodation, using the ADA law, right?  So we are going to

16  grant that accommodation.  No problem.  We may even leave a

17  little earlier.  We will see how it goes.  But you don't have

18  to worry about that, okay?

19        THE COURTROOM DEPUTY:  All rise.

20        (WHEREUPON, at 11:29 a.m., the jury exited the

21  courtroom and a recess was had from 11:29 a.m. to 12:00 p.m.)

22        (Continued on the next page.)

23

24

25

1    (Open court; no jury present.)

2         THE COURT:  While Mr. Innelli is getting the jury,

3    it will be good if we can complete at least his testimony

4    before lunch, and then we will talk about a lot of these

5    issues that are bedazzling the judge.  I am not so sure I'm

6    smart enough to sort out all these complex issues that you are

7    throwing at me.  We'll talk about it, though, right?  I see a

8    bunch of inconsistencies which we will talk about.

9         Mr. Shearer, you are trying to challenge me as to

10   whether I should take senior status again, or whether I am

11   still able to do this job.

12        We will do the best we can, but there are a bunch of

13   things to talk about.  This is kind of a commingled complex

14   couple of tea which you are presenting to me to try to sort

15   out in my old age, okay?

16        (Continued on the next page.)

17

18

19

20

21

22

23

24

25

1           (WHEREUPON, at 12:13 p.m., the jury re-entered the

2   courtroom.)

3           THE COURT:  All right.  Folks, the game plan is to

4   see if we can complete Mr. Barger's before lunch break.  Let's

5   see if we can do that.

6           And during the course of the day, there are a number

7   of legal matters which I have to talk to counsel about at the

8   stage of the trial.  This is the type of thing that happens.

9   We have to make sure we have a charge that we can present to

10  you.  And so those are legal matters which I am not going to

11  burden you with, but I think we still can make good use of

12  your time today, and maybe we can finish the testimonial part

13  of the trial.  Let's see what we can do now.

14          Mr. DiLorenzo, let's see if you can wrap it up.

15          MR. DiLORENZO:  I will do the best I can,

16  Your Honor.

17          THE COURT:  All right.  Let us know when you are

18  okay.  Okay, Mr. Barger?

19          THE WITNESS:  Yes, sir.

20          THE COURT:  Are you okay?

21          THE WITNESS:  Yes.  Sorry.

22          THE COURT:  Okay.  Good.

23  CROSS-EXAMINATION

24  BY MR. DiLORENZO:  (Continued)

25  Q    Mr. Barger, yesterday you testified to what this

1   termination cost you, which is what I understand you are

2   asking for in damages; am I correct?

3           THE COURT:  What was the question?

4           MR. DiLORENZO:  The testimony he gave yesterday was

5   this is what this termination cost me.  I am asking if

6   those --

7           THE COURT:  Okay.  So he gave that testimony.  So

8   what's your question?

9           MR. DiLORENZO:  My question is, is that what he's

10  asking for in damages.  Do we have his request for damages?

11          MR. ZEITLIN:  Again, it is a lay witness.

12          MR. DiLORENZO:  Yes, but there's no expert.  I still

13  haven't heard --

14          THE COURT:  It is okay.  What's your request for

15  damages?  Let's hear it again.  You gave testimony that you're

16  entitled to a lot of money, right?

17          THE WITNESS:  Yes.

18          THE COURT:  And now Mr. DiLorenzo wants to find out

19  why.  You need to get to the nitty gritty of why you think you

20  are entitled to that money.

21          Is that basically what you want to do?

22          MR. DiLORENZO:  Yes, Your Honor.

23  Q    And the amounts in light of these payments you received

24  during the disability payments.

25          THE COURT:  Yes.  So you got some payments during

1   your disability.  We know that, right?

2           THE WITNESS:  Yes.

3           THE COURT:  And you still think you are entitled to

4   money by reason of this lawsuit --

5           THE WITNESS:  The answer is yes.

6           THE COURT:  Explain why in addition to the -- why

7   you are entitled to money.

8           He said he didn't cash the disability check.

9           MR. DiLORENZO:  Well, yeah, but the other payments

10  the 20,000 a month --

11          THE COURT:  You had some other payments.

12          MR. DiLORENZO:  I don't think those were included --

13          THE COURT:  Explain again why you think --

14          MR. DiLORENZO:  In fact, Your Honor, if it is easier

15  for him, I can just see if I got it right from my notes from

16  yesterday.

17          THE COURT:  All right.  So you read it, and tell me

18  whether you agree.

19  Q    And if you disagree with me, you tell me.

20          What I understood you to say was you used some kind

21  of a software package for the period of March 2017 to

22  September of 2019, which was the backpay claim?  And you

23  applied a 4.5 percent.  I don't know if that was a present

24  discounted value.  4 percent?  Discounted present value?  4

25  percent on top of it?

S. BARGER - CROSS - DiLORENZO                702

1  A    Since you are talking from March to September, it was the

2  pay I would have received, plus bonuses, less the amount of

3  consulting fees that I was paid in this software, setting

4  interest rate should be around 4 percent.  So that's what I

5  put in.

6  Q    So you gave us the bottom line, which is 1.36 --

7  1,360,000.  But I don't know what --

8  A    I don't have the paper in front of me.  Something close

9  to that.

10 Q    So I don't know what number you used for income, I don't

11 know what number you used for bonus, and I don't know what

12 number you used for an offset.  Your tax return for that year

13 shows 450,000 or something like that?

14 A    I'm sorry, I do not remember.  I am just giving you the

15 30,000 foot level.  I'm sorry.  The individual numbers are

16 what to end up -- what the software calculated it to be, and

17 that's the numbers.  I'm sorry if I don't have the month by

18 month numbers.

19 Q    Well, the problem is, I can't tell how you did it, I

20 don't know what the software says, I don't know if the

21 methodology is correct, I don't know if the numbers are right.

22 There's no basis for me to attack this summary or question.

23 Maybe it is the right number, but I have no basis

24 whatsoever --

25           THE COURT:  This is your summary, this is what you

1    think you are entitled to.  He wants to know specifically the

2    breakdown, how you came to that calculation.

3              THE WITNESS:  I testified about that yesterday.

4              THE COURT:  You explained it all yesterday?

5              THE WITNESS:  Yes.

6              MR. DiLORENZO:  This is the same explanation we got

7    today.  This is the exact same one we got today as the one

8    yesterday.  It doesn't have any details.

9              THE COURT:  We can argue what that means in terms of

10   the law, but he gave the testimony --

11             MR. DiLORENZO:  Okay.

12             THE COURT:  -- that's what he relied on.  There's

13   nothing else you wish to offer?

14             THE WITNESS:  No.

15   Q    So can you give me the second -- so one piece is

16   1,360,000, the second piece is 1,470,000, that's the seven

17   years?

18   A    It's exactly what I said yesterday.

19   Q    You can't remember what it is now?  There's a discounted

20   projected earnings based on seven years to change the culture?

21   A    It started.  So it started.  The projections going

22   forward from September until about 53 months, with the

23   assumption of the same salary and bonus, and the assumption of

24   the consultant fees that were subtracted from that.  And the

25   software said it had to be discounted by 4 percent.

1   Q     Did you project consultant fees increasing every year?

2   A     You know what?  I do not -- I plugged in 53 different

3   months.  I cannot remember the detail, and I'm sorry.  You are

4   asking me specific -- whatever I said yesterday is what I say

5   today.

6   Q     Well, yesterday with respect to this issue, you said, "I

7   projected earnings I would have as a consultant."  You didn't

8   tell us what they were.  So I am asking if they went up, down,

9   stayed the same?  Because that's an offset for us in your

10  calculation.

11  A     Yeah.  They were the same rate.  I don't remember what

12  that was.  I'm sorry, Counselor.

13  Q     And you have 900,000 in for stock options?

14  A     Yeah.  That was a calculation of the unvested stock

15  options that I believe the price when it went public, when

16  they, First Data, went public.

17  Q     So it is these three numbers combined, 1.360, 1.47

18  million, and 900,000?

19  A     Yes, that's what I testified yesterday.

20  Q     Did you ever ask for a reasonable accommodation under the

21  Americans With Disabilities Act while you worked at First

22  Data?

23  A     I don't know what that means.  Would you explain that in

24  laymen's terms?

25  Q     Did you ever ask, based on your disability, that you

1    needed something to be able to do the essential functions of

2    your job?

3    A    I just wanted access to my technology.

4    Q    And other than what we heard on -- from other witnesses

5    that -- other witnesses that you were deprived -- there was an

6    e-mail I think that was sent to your address on a Saturday

7    concerning some disability forms, your assistant was

8    monitoring your e-mail, she forwarded it to your personal

9    e-mail the following Monday.  Other than that, was there

10   anything that you claim you suffered or lost because you were

11   not on e-mail access?

12   A    Are you asking me, at that -- on that particular date?

13   Q    No, I am asking the entire time you were denied access to

14   the e-mail system, what harm did it cause you?

15   A    Other than the fact that I just wanted to stay abreast of

16   what was going on, I -- we had a program called the Good

17   system that allowed me to go in and communicate with virtually

18   everybody.  I don't know the technical terms, but I could hook

19   up with everybody, and I could still go on, if I wanted to.

20   If they wanted to have a videoconference, I could see them,

21   just technology stuff.

22   Q    But after you filled out all the paperwork for

23   disability, you understood you weren't supposed to be working

24   anymore, you had received those payments because you weren't

25   to work?  You were on disability?

1  A    I don't know if I understand.  That may be the technical

2  definition of it.  I still felt a personal responsibility to

3  check in every once in a while.  That's why I wanted it.  I

4  cared about the employees I was working with.

5           MR. DiLORENZO:  Your Honor, I would like to offer

6  Defense Exhibit 85 into evidence.

7           THE COURT:  Defense Exhibit 85?

8           MR. DiLORENZO:  Yes, Your Honor.

9           THE COURT:  Let's take a look.  Defense Exhibit 85.

10  Okay.  I see it.  No objection.  We will allow it.

11           (Defense Exhibit 85 received in evidence.)

12  Q    Mr. Barger, this is an e-mail, I am not sure if I am

13  pronouncing the name right, Gita Patel?

14  A    Gita Patel.

15  Q    She's your administrative assistant?

16  A    Yes, sir.

17  Q    This is an e-mail that -- I'm not sure, to be honest with

18  you, who it is from.  Your name is on here.  But it summarizes

19  a discussion with Michael Baddour at Emory.

20           And down at the bottom it says:  Finally, to be

21  honest and frank, you need to give some real thought to

22  planning retirement; do you see that?

23           MR. SHEARER:  Objection, Your Honor.

24           THE COURT:  Overruled.

25  Q    Do you see that?

1              THE COURT:  The question is, do you see that?

2    That's the question.

3    Q    I don't want to make you read it.

4              THE COURT:  Listen to me.

5    A    I see it.

6              THE COURT:  The question is whether you see that.

7              THE WITNESS:  Yes, sir.

8              THE COURT:  Yes or no; you see it?

9              THE WITNESS:  I do.

10             THE COURT:  He sees it.

11   Q    Okay.  I am going to read it because I don't want to make

12   you read it.  Finally, to be honest and frank, you need to

13   give some real thought to planning retirement.  I think

14   whatever comes next will take some steam out of you for a

15   while.  I don't think worrying about a work schedule will help

16   you heal or help you make the best decisions.  We'll be in

17   touch.

18             And that's from Aaron Rogers?

19   A    Yes.

20   Q    Who is Aaron Rogers?

21   A    Dr. Rogers.

22   Q    He's a doctor as well?

23   A    Yes.

24   Q    Your doctor?

25   A    He was someone that when I had the fissures in my throat,

1    and his expertise was the esophagus, and he was concerned I

2    was not going to heal rapidly.

3    Q    And this advice that he gave you with e-mail, it was

4    similar, very similar, wasn't it, to what Tony Marino told you

5    as to why he wanted to put you on -- have you apply for leave

6    and receive leave of absence?

7    A    I didn't apply for it.

8    Q    Well, you signed the papers --

9    A    I did.

10   Q    -- requesting it?

11   A    Because he asked me to.

12   Q    Okay.  But you still had to sign -- if you didn't sign

13   them, you wouldn't have got it, right?  You almost didn't make

14   the deadline as it was, right?

15   A    He asked me to.  That's why I -- if he had not asked me

16   that, I wouldn't have.

17   Q    Then you got help from Rhonda to fill them out, right?

18   A    After Tony asked me to, I said I would do it.

19   Q    And my only question was, isn't that similar, almost

20   identical to what Mr. Marino was telling you at the time, as

21   to why he wanted you to focus on getting better?

22   A    Yes.

23   Q    Work stress -- I mean, is it your understanding that work

24   stress helps people get better from medical issues?

25   A    It sure helped me.  I got better faster than this doctor

1    expected.

2    Q    And it helped you by not having access to work?

3    A    No.  Every time I -- every doctor I saw was amazed that I

4    healed so much faster than they'd ever seen before.  So I

5    was -- when he mentioned about retirement, that was a joke to

6    me.

7    Q    But the speed with which you started to heal ahead of

8    schedule started in November and December --

9    A    It was through every operation.

10   Q    -- and early January?

11   A    Everything that I went through, every doctor at every

12   juncture, every speech therapist, everyone said they've never

13   had anybody heal faster than I have.

14           THE COURT:  He wanted to work until he was 300 years

15   old, and all the stress turns him on.  Okay.  Next question.

16           MR. DiLORENZO:  We only have a few things to cover

17   here.

18           We offer into evidence Defense Exhibit 113.

19           THE COURT:  113.  Okay.  In evidence now.

20           (Defense Exhibit 113 received in evidence.)

21   Q    Mr. Barger, this is another e-mail while you were out, it

22   is November 8, from you to a number of people I assume that

23   were on your team?

24   A    Yes.

25   Q    Justin Stamey is on here, for example, Julie Kelly?

1   A     Great people.

2   Q     And this says:  Moving forward, please cc me on all

3   communication.  Too many things are moving through the system

4   without my knowledge?

5   A     Yes.

6   Q     And this was because you weren't working full-time,

7   right?

8   A     Not necessarily.  It may have been that all of the things

9   that were moving rapidly, I was not getting reports on,

10  possibly.

11  Q     And it says:  Thanks for protecting me from working.

12        Is that what was going on?

13  A     My charge for them was you take over while I'm gone.  You

14  guys know how to run the business.

15        THE COURT:  Well, wait a second.  You said they took

16  over while you were gone?

17        THE WITNESS:  I gave them responsibilities and

18  that's why I checked in.

19        THE COURT:  You were gone so somebody else had to do

20  what you were doing, is that what you're saying?

21        THE WITNESS:  No.  Their own responsibilities.

22        THE COURT:  You were still issuing orders like you

23  were working full-time, right?

24        THE WITNESS:  Absolutely.

25        THE COURT:  Never missed a beat?

1           THE WITNESS:  Didn't.

2           THE COURT:  Next question.

3    Q    So why do you thank them for protecting you from work?

4    A    They were basically working hard for me.  That was the

5    compliment to them because they were all very caring people.

6    Q    And they weren't copying you on the things that they

7    would normally copy you on?

8    A    Some would.

9           MR. DiLORENZO:  Defense Exhibit 110.

10          THE COURT:  In evidence.

11          (Defense Exhibit 110 received in evidence.)

12   Q    Can you take a look at Defense Exhibit 110.  This is an

13   e-mail from you to Rhonda Johnson.  Do you see that?

14   A    I do.

15   Q    One of the individual defendants.  And you are thanking

16   her for proactively taking care of business in my absence; do

17   you see that?

18   A    Yeah.  She actually helped me --

19   Q    No question.

20   A    Okay.

21          THE COURT:  She was taking care of business in your

22   absence?

23          THE WITNESS:  She helped me, yes, she did.

24          THE COURT:  Okay.  Next question.

25   Q    I'm sorry, she what?

1    THE COURT:  She helped him.

2  A    She helped me, yes.

3    MR. DiLORENZO:  Defense Exhibit 104.

4    THE COURT:  In evidence.

5    (Defense Exhibit 104 received in evidence.)

6  Q    Would you take a look at what's in evidence as Defense

7  Exhibit 104.  This is another e-mail from you to Ms. Johnson,

8  dated October 12.  It says:  You are the best that ever was.

9  I'm on too many meds.

10    Do you mean too many medications?

11  A    On that current day, I probably was.

12    MR. DiLORENZO:  We offer Defense Exhibit D-127 into

13  evidence.

14    THE COURT:  In evidence.

15    (Defense Exhibit 127 received in evidence.)

16  Q    This is another e-mail from Rhonda Johnson to you.

17  There's a chain of them that you send her, and one on the 21st

18  saying will you help me with these papers today.

19  A    Yes, I had --

20  Q    She writes back:  Absolutely.  Do you want me to come by

21  your home this afternoon or prefer I speak with your wife

22  directly.

23    These are the disability papers that everybody fills

24  out for disability?

25  A    Yes.  I was confused on some things.

S. BARGER - CROSS - DiLORENZO                    713

1   Q    You weren't able to do it by yourself without her help?

2   A    Yes.  She's the expert.  That's why I asked her.

3   Q    No, but these are same disability papers that anybody

4   fills out, right?

5   A    I don't know if they are disability.  They were papers.

6   I don't know what they were about.  But I needed some help.

7   Thank you.

8              MR. DiLORENZO:  This might be in evidence already.

9   It is Defense Exhibit 108 and Plaintiff's 81, I think.

10             THE COURT:  108.  Not in evidence yet.

11             MR. DiLORENZO:  Maybe that's a deposition number.

12  108 is definitely defendant's.

13             THE COURT:  Excuse me, you want Defense Exhibit 108

14  in evidence?

15             MR. DiLORENZO:  Yes, Your Honor.

16             THE COURT:  You want that in evidence?

17             MR. DiLORENZO:  Yes.

18             THE COURT:  No objection.  It is in evidence.

19             (Defense Exhibit 108 received in evidence.)

20  Q    This one's from Rhonda Johnson to you and Justin Stamey

21  and Paula Lessen.  Is she a director -- was she a director in

22  your sales organization, sales training organization?

23  A    Yes.  Both Justin and Paula worked for me, absolutely.

24  Q    And if you go down further in the e-mail, there's a

25  discussion of -- there's a reference to in your e-mail a level

1   of confusion here that didn't exist under Rhonda's leadership?

2   A    Right.

3   Q    You can't take a step backward when it comes to covering

4   up our partner growth plans.  Rhonda, please make me feel

5   better about this head count challenge that affects our

6   partners.  What is that in reference to?

7   A    I don't remember the intent of -- if it was about

8   Rhonda's help deciphering challenges in the HR side and

9   somehow I did not have her input.  I was probably looking for

10  it.

11  Q    And there's a second page to the e-mail, which is a list

12  of people, including you.  Is that a list of head counts in

13  the department?

14  A    It looks like that.

15  Q    And on the flip side of the first page, it says Andy

16  plans to load all 68 for the Wednesday load unless we tell him

17  differently.

18        Who is Andy?

19  A    It may -- I don't remember.  It may have been someone

20  that everybody communicated with that would make certain a

21  head count was put into the system at a certain time.

22  Q    There's a note that says:  Let Justin and I know how you

23  want to proceed with the socialization exercise with Jeff

24  Hack.

25        Do you know what that reference is to?

*S. BARGER - CROSS - DiLORENZO*                                    715

1   A    It is probably about our businesses that required us to

2   hire more people, and we need to socialize the open reqs,

3   would be my guess.

4   Q    Socialize them?

5   A    That's a term I learned in First Data.  That means you

6   talk about them.

7            MR. DiLORENZO:  Okay.  I offer Defendant's Exhibit

8   066 in evidence.

9            THE COURT:  Just one second.  066.  In evidence now,

10  Defense Exhibit 66.

11           (Defense Exhibit 66 received in evidence.)

12  Q    This is an e-mail from a David Short.  It looks like he

13  received an e-mail from you on the 28th, and he writes to --

14  David Short writes to Kathleen Short on the 2nd, saying:  This

15  is from the guy who never responds to me, Steve Barger, the

16  interim boss.

17           Do you know this David Short?

18  A    Yes.  I promoted David Short to run Omaha from just being

19  a training specialist.

20  Q    When you first came in with -- when you first came in and

21  took over this group, was it indicated that it would be on an

22  interim basis or short-term?

23  A    We weren't sure that we knew that we were eventually

24  going to have to find somebody to take over the training side,

25  because I was doing other things.

1  Q     Now, there was a lot of testimony yesterday about

2  successorship.  You were involved in conversations to find a

3  successor for you, weren't you?

4  A     A successor for the training responsibilities.

5  Q     Right.  I thought we established earlier with your

6  testimony that that's all the responsibilities there were,

7  were the training through the sales organization.  And once in

8  a while you would talk to some groups about the

9  transformation?

10  A     The intent, and it is one of the reasons that I hired

11  Justin, was to come in and learn and try to accept some

12  responsibility for the overall organization so that he could

13  take over some of the responsibilities and I could go back to

14  my original thoughts.

15          MR. DiLORENZO:  Your Honor, we offer Defense Exhibit

16  70 into evidence.

17          THE COURT:  70?

18          MR. DiLORENZO:  Yes.

19          THE COURT:  In evidence at this time.

20          (Defense Exhibit 70 received in evidence.)

21  Q     So, Mr. Barger, this is a chain of e-mails that you are

22  involved in.  Talk about some things on the front page, but I

23  want to ask you about what's on the back.

24  A     Yes.

25  Q     On the back it says, it is from -- you are cc'd on it.

1  It is to Kim Hoefer.  It says:  Kim, due to budget restraints,

2  the search for Steve's replacement has to be postponed for the

3  interim.

4  A    Yes.

5  Q    And that's dated March 17, 2015.

6  A    Yes.

7  Q    Almost a year before you're diagnosed with cancer,

8  correct?

9  A    Yeah.

10 Q    You testified earlier when the judge asked you why you

11 think, had you not gotten cancer on gone out on leave, you

12 would not have been laid off in that group of ten percent of

13 the top 3,000 highest paid managers; do you remember that

14 testimony?

15 A    Yes.

16 Q    And the reason I think you gave was you thought that

17 Dan -- the conversation with Dan Charron, you would have got

18 to work on getting some of these other groups and trying to

19 get more responsibility for them; is that your testimony?

20 A    Among other things.

21 Q    What are the other things?  I didn't hear you say

22 anything else.

23 A    During all this transition when Joe left and Mr. Charron

24 came in, there was a lot of stuff going on in terms of who was

25 going to report to who, et cetera, et cetera.

1          I took my conversations with Dan to be, you know, we

2   get this training thing, training thing, meaning if we expand

3   the amount of responsibility that you have, because of your

4   $40,000 a month, that it will justify it in his mind what I

5   should be making.  And I agreed to expanding it and putting it

6   all under one leadership made all the sense in the world so

7   that we had consistent messaging.

8          So as I was starting to go through that, trying to

9   make connections to make that happen, and then this occurred,

10  I felt like it was probably -- I thought it was a brilliant

11  idea that we continue that process and consolidate all of that

12  so the messaging should be consistent throughout the company.

13  And the biggest challenge was on the servicing side.  And all

14  of the people and all the head counts exiting the company, and

15  that became a bastion for me to fix that, and that's why I

16  agreed with Dan, and thought we should -- thought I was going

17  to come back and fix that.  That was my mind-set.

18  Q    And there were other training groups in the organization,

19  right?

20  A    Oh, yeah.

21  Q    Including human resources, did that have the largest

22  training group?

23  A    You know, I don't know, Omaha, Hagerstown, the call

24  centers, the servicing part under Christine Larsen, those were

25  in complete shambles, and he knew it.  We talked about it.

1  Q    Did they have worse turnover than your group?

2  A    There was a time when the turnover in the company was

3  pretty significant.  Mine was trying to clean some things up

4  and then ensure the year that I was there to find the right

5  people.

6  Q    You don't know if theirs was worse than yours?

7  A    It was bad.

8  Q    You don't know if theirs was worse than yours?

9  A    I don't know the number, but in our conversations, we

10  both agreed, it had to be fixed.  So that became a brilliant

11  strategy.

12  Q    Your salary was in like the top 1 or 2 percent, right, of

13  the company, at 54?

14  A    I don't do the math.  If you say it is 1 percent, that's

15  fine.

16  Q    I don't think it is 1 percent --

17  A    Okay.

18  Q    -- I think it is a little bit higher, like 1.5 --

19  A    Okay.

20  Q    -- or something like that, 1.25?

21  A    Okay.

22  Q    So that would have put you on a high target level for

23  this reduction in force, right?

24  A    Apparently.

25  Q    Now, when you did your calculation of damages, did you

1   take into account your earnings -- your income in 2017 for the

2   entire year?  You left us in -- you left First Data, I think,

3   at the end of February; do you remember that?

4   A    My calculations started March of '17.

5   Q    Yes.  Did you include the money you earned from March

6   until December?  Because according to your tax returns, you

7   have about $470,000 in earnings that year, and only 62 or 61

8   of it came from First Data?

9   A    I do not remember.  I'm sorry.

10             MR. DiLORENZO:  Your Honor, I would like to

11   introduce Defense Exhibit 43.  And I'm not trying to violate

12   privacy here.  We can probably just do the first page.

13             THE COURT:  Yes.  We will allow the first page.  I

14   am not going to allow all of it.

15             (Defense Exhibit 43, first page only, received in

16   evidence.)

17   Q    See if this refreshes your recollection, Mr. Barger.

18   Where it says income, wages, salary, tips, et cetera, attach

19   W-2s, it has 478,427; do you see that?

20   A    I do.

21             (Continued on the next page.)

22

23

24

25

S. BARGER - CROSS - DiLORENZO                721

BY MR. DiLORENZO:

Q    And earlier you told me what you wanted to see.  This
is the earlier page from Defendant's exhibit 268, which is
in evidence.  It shows the $20,000 for the month through
February 28 pay period ending.  There is the 20,000 but it's
got year to date, which is the last payment you got for that
year, which is 62,000 from us.  So there is another 420,000
or so on this tax return for 2017?

A    I'm assuming those were stock.

Q    Stock from where?

A    Options invested, would be my guess.

Q    First Data stock?

A    Yes.

Q    Do you know that or?

A    My accountant does all of this.  I'm guessing that's
what it was.

Q    Are you making a lot more now -- in -- we did 2017 --
2018, which is also included in your years, as well as 2019
going forward, are you making a great deal more money than
you did in the consulting firm of your sons back in 2012 and
2013?

A    I'm slowly working my way up.  I'm into ten to 15,000,
trying to get 20.  It fluctuates, yes.

Q    Ten to 15 for the year?

A    No, per month.  That's what I told you that I ended up

S. BARGER - CROSS - DiLORENZO                722

1   deducting from my projections.

2         MR. DiLORENZO:  Your Honor, I'd like to offer

3   Defendant's exhibit 44 and Defendant's exhibit 41, which are

4   tax returns, at least the front page, for 2013 and 2014,

5   which are the two years immediately before he came to First

6   Data.

7         THE COURT:  I'll allow the first page.  44 and 41?

8         MR. DiLORENZO:  Yes, your Honor.

9         THE COURT:  That's sufficient.

10        MR. DiLORENZO:  I'm sorry, your Honor, I made a

11  mistake.

12        THE COURT:  44, the first page.

13        MR. DiLORENZO:  Definitely 41.

14        THE COURT:  One second, 44 is in evidence, 2014,

15  first page.

16        And 41 first page as well?

17        MR. DiLORENZO:  41 is definitely the first page.

18        I'm sorry, your Honor.  The years are 2012 and

19  2013.  They are 40 and 41.

20        THE COURT:  First page, we'll allow those in.

21        (Defense Exhibit 40 and 41 received in evidence.)

22  BY MR. DiLORENZO:

23  Q   Mr. Barger, this is a tax return for 2012, the combined

24  adjusted gross income I think is a negative number, 17,000.

25  Do you see that?

S. BARGER - CROSS - DiLORENZO          723

1  A    Yes.

2  Q    So 2012 is a negative number, that's Exhibit 40.

3       And Exhibit 41, which is 2013, is immediately before

4  you came to First Data, it's another negative number?

5  A    Yes.

6  Q    Minus 14,000?

7  A    Yes.

8  Q    That's for the year, right, those are for both years,

9  right?

10 A    Yes.

11 Q    You received correspondence from MetLife concerning

12 your disability claims --

13          THE COURT:  We're going to take a lunch break by

14 one, how much longer do you have?

15          MR. DiLORENZO:  Five minutes, your Honor.

16          THE COURT:  Let's try to finish with the

17 cross-examination at this time.

18          THE WITNESS:  I'm ready.

19          MR. DiLORENZO:  Your Honor, we offer into evidence

20 Defendant's exhibit 201.

21          THE COURT:  Okay.  No objection.  We'll allow

22 that.

23          (Defense Exhibit 201 received in evidence.)

24 BY MR. DiLORENZO:

25 Q    Mr. Barger, you see this letter from MetLife?

S. BARGER - CROSS - DiLORENZO                724

1    A    I do.

2    Q    Underneath 'What you need to know,' this is addressed

3    to you, right, at 95 Tamarisk Drive in Georgia?

4    A    Yes.

5    Q    That was your address at the time?

6    A    Yes.

7    Q    'What you need to know.  Our records show that you last

8    worked on September 1, 2016.  As a result we have approved

9    your disability claim starting September 4, 2016 through

10   October 15.'

11        Do you see that?

12   A    Yes.  I don't remember this, but I see that it's

13   addressed to me.

14        MR. DiLORENZO:  Your Honor, we also would like to

15   offer into evidence Defendant's exhibit 267, three-page

16   document.

17        THE COURT:  No objection to that.  We'll allow it

18   in.

19        (Defense Exhibit 267 received in evidence.)

20   BY MR. DiLORENZO:

21   Q    Mr. Barger, this looks like another letter from MetLife

22   addressed to you at the same location.  This one also

23   says -- this one is dated February 3rd; Defendant's exhibit

24   201 is dated January 6.  Do you see that?

25   A    Yes.  I don't remember these, but there is an address

S. BARGER - CROSS - DiLORENZO                725

1   to me, I must have gotten them.

2   Q    This one says under, 'What you need to know,' same

3   thing, last worked on September 1st, approved your

4   disability claim starting on September 4.  Do you see that?

5   A    I do.

6   Q    At some point in time, your leave, your FMLA leave

7   notification, was like October 22 or something like that

8   originally?

9   A    I thought it was November or something, but I don't

10  know, somewhere in that neighborhood.

11  Q    At some point you got notification of a change?

12  A    I did.

13  Q    Do you recall sending an e-mail being asked when you

14  stopped working?  Do you recall that e-mail, Ms. Jennifer

15  Voycheske?

16       MR. DiLORENZO:  Your Honor, we offer into evidence

17  Defendant's exhibit 193.

18  A    The discrepancy see was the definition of whether I was

19  going into work --

20       THE COURT:  There is no question before you.

21       MR. ZEITLIN:  He did ask a question, then

22  proceeded to --

23       THE COURT:  193 is offered into evidence.  There

24  is no objection.  That's in evidence at this time.

25       What is the question you want to ask?

S. BARGER - CROSS - DiLORENZO                726

1          MR. DiLORENZO:  I want to offer it into evidence,

2    your Honor.  I'm trying to move it along.

3          MR. ZEITLIN:  He actually posed a question and my

4    client was trying to answer it.  Then he proceeded to go to

5    a document.  I would ask the Court permit him to answer the

6    question.

7          THE COURT:  You can ask a follow up question.

8          MR. ZEITLIN:  Can the reporter read it back?

9          THE COURT:  Pardon?

10         MR. ZEITLIN:  If the court reporter could read the

11   question back.

12         MR. DiLORENZO:  The question was asked by me

13   showing him the document.  I asked him, when he hesitated, I

14   said --

15         THE COURT:  I wasn't paying attention.  Let's hear

16   the question or we'll take an hour to decide what this is

17   about.

18         Can the court reporter read back the question that

19   Mr. DiLorenzo asked before the document was produced?

20         (Whereupon, the record was read.)

21         THE COURT:  The question is:  Do you recall the

22   e-mail?

23         THE WITNESS:  No.

24         THE COURT:  He doesn't recall the e-mail.  Then

25   you put it into evidence.

1           MR. DiLORENZO:  May I put it in?

2           THE COURT:  It's in evidence.  No on objected to

3     it.

4     BY MR. DiLORENZO:

5     Q    Mr. Barger, this e-mail appears to be from

6     Ms. Voycheske to you.  Do you see that?

7           THE COURT:  You don't have to ask him if he sees

8     it.  What do you want to read from that e-mail?

9     BY MR. DiLORENZO:

10    Q    Did you send her an e-mail telling her in response to

11    her question, 'Can you clarify when you stopped working?

12    Was it 9/4/16 or 10/22/16?'  And did you write her back,

13    '9/4, my operation was 9/6'?

14    A    That's when I stopped going into work, was my take on

15    that.  I had no idea that it meant actually not working.  My

16    interpretation --

17    Q    That's a yes, though, you send her an e-mail?

18          THE COURT:  The question is, that e-mail was sent?

19          THE WITNESS:  I don't know.

20          THE COURT:  You don't know.  The e-mail is in

21    evidence.  It reads what it reads.

22          Go ahead, next question.

23          MR. DiLORENZO:  Your Honor, we offer Defendant's

24    exhibit 188 into evidence.

25          THE COURT:  Defendant's exhibit 188.  How many

S. BARGER - CROSS - DiLORENZO                728

1    more do you want to put in evidence?  The jury has tons of

2    exhibits.  If you want them to read it all, we'll be here

3    for a year.

4           MR. DiLORENZO:  Our hope is to get them in

5    evidence and simplify --

6           THE COURT:  What else do you want in evidence?

7           MR. DiLORENZO:  This is the last one, Defendant's

8    exhibit 188.

9           THE COURT:  In evidence.

10          (Defense Exhibit 188 received in evidence.)

11          THE COURT:  What else?  Do you have any other

12   questions of this witness?

13   BY MR. DiLORENZO:

14   Q    Mr. Barger, did you receive this letter?

15   A    No, I did not.

16          THE COURT:  You didn't receive the letter.  Okay.

17          MR. DiLORENZO:  No more questions, your Honor.

18          THE COURT:  Mr. Shearer, let's see whether you can

19   ask him, how many questions do you have before we adjourn?

20   If you can do it now, I'd like to do that.

21          MR. SHEARER:  Your Honor, there is pretty long

22   cross.

23          THE COURT:  Do you have many questions?

24          MR. SHEARER:  More than five minutes.

25          THE COURT:  We'll take our lunch break, jurors.

1   We'll meet back at 2:15.  I have some things to talk to the

2   lawyers about.  Don't talk about the case.

3               (Jury exits the courtroom.)

4               COURTROOM DEPUTY:  You can be seated.

5               You can step down, Mr. Barger.

6               (Whereupon, the witness steps down.)

7               THE COURT:  Let me talk a little about some of

8   your legal claims here.

9               Mr. Shearer, I may not be smart enough to figure

10  out your complex claims here.  You're claiming under the ADA

11  that he was or was not placed on medical leave.  I think

12  your claim is that he was not put on medical leave, that he

13  was never on medical leave.  Am I correct or not?

14              MR. SHEARER:  No.

15              THE COURT:  Not correct?

16              MR. SHEARER:  No.

17              THE COURT:  I thought you said that he was never

18  was on medical leave because he continued to do his work,

19  even though he was in the hospital, so he was not on medical

20  leave, that's your position.

21              MR. SHEARER:  Right.

22              THE COURT:  So if he was not on medical leave,

23  then the discrimination was based upon the fact that he was

24  terminated because of his medical disabilities, I guess,

25  right?

PROCEEDINGS                    730

1          MR. SHEARER:  No.  From September 6, the date of

2    the surgery there is November 19, the date that Tony sent

3    him the letter and said you're going on leave during that

4    period.  Mr. Barger continued to work and was not on leave.

5          THE COURT:  He was not on medical leave.

6          MR. SHEARER:  November 19 when he was forced on to

7    leave --

8          THE COURT:  There is no, under the ADA, there is

9    no cause of action to be forced to take medical leave.

10          MR. SHEARER:  I think the decision is the change

11    of his terms of his employment based upon his illness.  He

12    had to go -- he had to stop working.  The terms of --

13          THE COURT:  Your position is that he was on

14    medical leave starting in December.

15          MR. SHEARER:  November 19.

16          THE COURT:  November 19 he was on medical leave.

17          MR. SHEARER:  Yes.

18          THE COURT:  Before then he was not on medical

19    leave, is your position?

20          MR. SHEARER:  Yes.

21          THE COURT:  I'm curious as to whether or not the

22    defendant agrees that he was not on medical leave until

23    November -- what date?

24          MR. SHEARER:  November 19, is when he got the

25    notice; the paperwork got done the 21st.

PROCEEDINGS                          731

1          MR. EIDELMAN:  That's not the defendant's

2     position.  One only needs to look at D154 --

3          THE COURT:  No numbers.  You're claiming he's on

4     medical leave from the date he went into the hospital,

5     right?

6          MR. EIDELMAN:  Yes, your Honor that's our

7     position.

8          MR. DiLORENZO:  Yes, that's right.

9          THE COURT:  So maybe the jury has to decide

10    whether he was or was not on medical leave.

11         MR. EIDELMAN:  Except for one fact, Judge.  There

12    is a certification from a health care provider that makes

13    him incapacitated by his own doctor on the 22nd.

14         THE COURT:  You can argue before the jury.

15         The question of law, though, is whether he was --

16    I understand your position -- you said he was on medical

17    leave from September --

18         MR. EIDELMAN:  It is September, Judge, but as the

19    doctor's certification --

20         THE COURT:  Because the doctor certified he's on

21    medical leave --

22         MR. EIDELMAN:  He can't be disabled under the ADA.

23         THE COURT:  One second, calm down.  Your position

24    is he was on medical leave starting in September.

25         MR. EIDELMAN:  Yes.

PROCEEDINGS                          732

1              MR. ZEITLIN:  Your Honor, is it appropriate for
2      the defendant --
3              THE COURT:  Sit down.
4              MR. ZEITLIN:  -- the defendant's witnesses are in
5      the room.
6              THE COURT:  What is wrong with that?
7              MR. ZEITLIN:  If the jury can't hear this, why can
8      the witnesses hear this?
9              THE COURT:  The defendants are entitled to have
10     their parties in the room, just like you're entitled to have
11     Mr. Barger in the room.
12             MR. ZEITLIN:  I'm not talking about the named
13     defendants.
14             THE COURT:  Other witnesses are here?
15             MR. ZEITLIN:  Correct.
16             MR. DiLORENZO:  There was no sequestration, your
17     Honor.
18             THE COURT:  There was no request to sequester
19     them.  I wasn't aware.  We're talking about the legal
20     matters not the testimony of the witnesses.
21             MR. ZEITLIN:  I was just making the point.
22             THE COURT:  Do you want them to leave the room
23     when we talk about legal matters?
24             MR. ZEITLIN:  I think it could influence their
25     testimony.

PROCEEDINGS                    733

1          MR. EIDELMAN:  No objection.

2          I don't know how much longer, we have these three

3    witnesses who flew in from out of town to testify today.

4          THE COURT:  We will try to accommodate that.

5          We have to continue our discussion.  We have lots

6    of inconsistencies and confusion to be sorted out.

7          You now claim that he was not on medical leave

8    until November.  You claim he was on medical leave to begin

9    with.

10         Okay, I have to understand your contentions.

11   Don't give me exhibit numbers.  Don't give me doctor's

12   testimony.  Let's try to sort out what we have to have the

13   jury decide.

14         So does the jury have to decide whether or not he

15   was on medical leave starting in September?  What do you

16   think?

17         MR. SHEARER:  Yes, whether his leave started in

18   September or November is going be an issue to be decided.

19         THE COURT:  It could make a difference when he was

20   on medical leave, right?

21         MR. SHEARER:  Yes, it makes a difference.

22         THE COURT:  I want to get your positions clear.

23         What difference does it make?  Let's take a

24   assumption he was on medical leave starting in September.

25   So if he was on medical leave then, they don't have to

PROCEEDINGS                    734

1   accommodate time, he's not able to work.

2          MR. SHEARER:  The 12 weeks would end, under the

3   FMLA would end --

4          THE COURT:  When?  So he's entitled to take

5   medical leave under the law for 12 weeks.

6          MR. SHEARER:  Right.  It would have ended at the

7   12 weeks ending near Thanksgiving.

8          THE COURT:  What?

9          MR. SHEARER:  Around the end of November.

10          THE COURT:  Right.  So until then he was entitled

11   to take medical leave, right?

12          MR. SHEARER:  If the leave started on the 5th/6th

13   of September it would have ended the end of November.  If

14   the leave ended the middle of November, it would have ended

15   the middle of January.

16          THE COURT:  So if he was entitled to take medical

17   leave in September and it ended in November, there is no

18   claim here under the ADA because he was entitled to take

19   that leave, right?

20          MR. SHEARER:  No.  The claim under the ADA is that

21   he was forced to take leave.

22          THE COURT:  There is no such theory under the ADA.

23          MR. SHEARER:  I know but --

24          THE COURT:  The Second Circuit made it very clear,

25   to be forced to take leave is not a viable claim under the

PROCEEDINGS                    735

1    ADA.  It has to be adverse action that was taken.  That's

2    not it.

3            MR. SHEARER:  I think forcing leave is adverse

4    action.

5            THE COURT:  Not according to the Second Circuit.

6    You want to read the law?

7            MR. SHEARER:  I'll take a look at it.

8            THE COURT:  My clerk will give you the case.

9            Mr. DiLorenzo?

10           MR. DiLORENZO:  Part of the confusion is how we

11   start with the claims.  ADA claim in this case, one, which

12   your Honor correctly points out, isn't covered to force him

13   on leave.

14           The second one is denying him access, those are

15   the ADA.

16           The dates relate only to the FMLA.  They don't

17   relate to anything except denying him the right to come

18   back, that's all that's left under the FMLA.  Shawn is

19   right, Mr. Shearer is right, that the dates do effect

20   whether there is even coverage.

21           THE COURT:  If he was on medical leave then there

22   is no need to be worried about the e-mail issue because he

23   was on leave.  So if he's on leave he doesn't have to be

24   given the right to continue to work because he's on medical

25   leave okay.

PROCEEDINGS                    736

1          MR. SHEARER:  Okay.

2          THE COURT:  So if he was not on medical leave,

3    which is what you claim, right, and then he was

4    discriminated against because he was not on leave.

5    Theoretically, I guess that would be some sort of a claim,

6    if his work was diminished or pay was diminished and he was

7    still working and not on medical leave, then we have a claim

8    for discrimination, right?

9          MR. SHEARER:  Yes.

10          MR. DiLORENZO:  I don't think he is claiming that

11   we denied him access until he went on leave, those things

12   happened simultaneously.  Because he went on leave in

13   November that's when he was taken off of access.

14          THE COURT:  When is the big deal about the e-mail?

15   When did that happen?

16          MR. DiLORENZO:  When he was put on leave.

17          THE COURT:  You agree he was on leave as of

18   December, whatever the date was, right?

19          MR. SHEARER:  Yes, he was on leave.

20          THE COURT:  How can you have a claim for being

21   denied e-mail access if he was on leave at that --

22          MR. SHEARER:  It's the act of taking away, that's

23   a change of terms of conditions, the taking away of that

24   access.

25          THE COURT:  If he's on leave then he's not

PROCEEDINGS                737

1   working, he's on leave.  So it doesn't matter whether he has

2   access or not, he's not working.

3           MR. SHEARER:  It's the simultaneous action of

4   against his will taking away his work and his access.

5           THE COURT:  If he was on leave, he's not working.

6   That's what medical leave is, he's not working.

7           MR. SHEARER:  Correct.

8           THE COURT:  If he was not on leave, and then they

9   did things too, and that was an adverse type of action, gave

10  him less money, took away work responsibilities, cut off

11  e-mail account, that theoretically is something that could

12  be compensable if in fact he was not on leave.

13          MR. SHEARER:  Right.

14          THE COURT:  What adverse action was taken?  Let's

15  assume that he was not on leave until November 19.  The fact

16  that after that he was denied e-mail access doesn't give you

17  anything because he was on leave.  You agree?

18          MR. SHEARER:  Doesn't give me anything as to?

19          THE COURT:  After he was on leave, you agree, you

20  just told me that November 19 was the day, he was on leave.

21          MR. SHEARER:  Yes.

22          THE COURT:  So after that he doesn't get anything,

23  he's on leave.

24          MR. SHEARER:  Right.

25          THE COURT:  They can take away his access, whether

1  he gets paid or not is a separate issue, whether he's on

2  leave or not, okay, let's put that aside.

3          So let's look at the period of time when you claim

4  he was not on leave.  He was operated on.  He was fully

5  functional, he didn't miss a beat, he's one of those

6  Herculean people.  He's not on leave, that's your position.

7          MR. SHEARER:  That's correct.

8          THE COURT:  If in fact he was not on leave and he

9  did have a diminishment in his employment responsibilities

10 or his income, I guess that could be cognizable,

11 theoretically.

12         Tell me what happened when he was arguably not on

13 leave from September through November 19, what did he

14 suffer, what adverse consequences?

15         MR. SHEARER:  I don't think that we've alleged

16 anything.  The very first in the timeline, the first thing

17 we're alleging, was that the forcing of leave violated the

18 ADA.

19         THE COURT:  I'm telling you that there is no such

20 claim under the ADA for forcing somebody to take a leave.

21 He was on leave, by your own admission, starting in

22 November 19 I get it, okay.  I just want to get your theory.

23         And you are not claiming that when he was not on

24 leave, because he was working even though he's operated on,

25 that he suffered any adverse consequences.

PROCEEDINGS                              739

1              MR. SHEARER:  No.

2              THE COURT:  So I don't see the claim that you have

3    here.

4              MR. SHEARER:  I guess it is the forcing of leave

5    that I thought was the claim under the ADA.

6              THE COURT:  So I'm not so sure that you're correct

7    legally.  I think the Second Circuit has said there is no

8    claim under the ADA for forcing somebody to take a leave.

9              Paul, you have that decision?

10             THE LAW CLERK:  That applies to the FMLA, Judge.

11             MR. SHEARER:  There are cases that say that under

12   the FMLA.

13             THE COURT:  But under the ADA if he was forced to

14   take a leave and didn't want to, that would be cognizable?

15             MR. SHEARER:  It changes the terms and conditions

16   of his work on the basis of his disability.

17             THE COURT:  Okay, so I get a sense.  You're

18   claiming here that as of November 19 he was forced to take a

19   leave.  And that is the basis of your claim that he should

20   not have been required to take a leave under the --

21             MR. SHEARER:  The basis for forcing him to leave

22   was his disability.  They've all testified that --

23             THE COURT:  Save it for the jury.  He was forced

24   to take the leave on the 19th of November and that's your

25   ADA claim.

1              MR. SHEARER:  Yes.

2              THE COURT:  That's his claim, what do you say?

3              MR. DiLORENZO:  Your Honor, his doctor certified

4     him --

5              THE COURT:  I don't care about the evidence.

6     Theoretically, is that a viable claim?

7              MR. DiLORENZO:  No.  Because he's not an otherwise

8     qualified individual because his doctor says he's

9     incapacitated.  He's not protected under the statute.

10             THE COURT:  That's an argument to the jury.

11             MR. DiLORENZO:  That's not an argument.

12             THE COURT:  He was qualified and forced to take a

13    leave.

14             MR. DiLORENZO:  His doctor certified.

15             THE COURT:  Argue that to the jury.

16             MR. DiLORENZO:  I think it's a legal question,

17    your Honor.

18             THE COURT:  The legal question is because the

19    doctor certified him as a matter of law he was not

20    qualified?

21             MR. DiLORENZO:  As a matter of medicine he's

22    not --

23             THE COURT:  I want to get in my head the legal

24    theory.

25             Your position under the ADA is because November 19

PROCEEDINGS                    741

1    he was forced to take a leave, regardless if he's paid or

2    not, that in itself is the violation of the ADA.

3              MR. SHEARER:  That's a change.

4              THE COURT:  He wasn't allowed to work.

5              As far as the other is concerned, I don't want to

6    deal with that right now.  Just one at a time.

7              I think I have your ADA claim down now, and we'll

8    talk about the other one later on.

9              We'll reconvene at 2:15 after lunch.

10             (Lunch recess taken at 1:10 p.m.)

11             (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     AFTERNOON SESSION

 2

 3           (In open court.)

 4           (Parties present.)

 5           THE COURT:  Bring the jurors in.

 6           You were very helpful, Mr. Shearer, both of you in

 7   helping me focus on how to shape the charge.  I will have

 8   something to you for sure in the not too distant future.  I

 9   think I got to now, it's not a simple cup of tea, and we'll

10   have something to talk about and I'm sure we'll be able to put

11   it all together.

12           COURTROOM DEPUTY:  Jury entering.  All rise.

13           (Jury enters courtroom at 2:28 p.m.)

14           COURTROOM DEPUTY:  You can all be seated.

15           THE COURT:  Go ahead.  Redirect, Mr. Shearer.

16   REDIRECT EXAMINATION

17   BY MR. SHEARER:

18   Q    Mr. Barger.

19           MR. SHEARER:  And, your Honor, I want to clear up a

20   housekeeping matter.

21   Q    Mr. Barger, do you know this document which is

22   Plaintiff's Exhibit 13?

23           THE COURT:  Is it in evidence?

24           MR. SHEARER:  Yes.

25           THE COURT:  Don't ask him.
```

1      MR. SHEARER:  No, it's not in evidence yet.

2      THE COURT:  It's in evidence now because there's no

3  objection to it.  Don't ask him if he knows it, it just wastes

4  our time.  It's in evidence.  If you want to read from it go

5  ahead.

6      (Plaintiff's Exhibit 13 was received in evidence as

7  of this date.)

8  Q    In your --

9      Can you comment on how you believe Joe Plumeri makes

10 decisions on hiring and firing?

11     MR. DILORENZO:  Objection.

12     THE COURT:  Repetitious.  We don't need it.  Next

13 question.  We heard so much about it.  He's testified,

14 everyone has testified, the jury understands all that.

15     Get to the points.

16 Q    In your career, did you ever take a reduction of salary

17 voluntarily?

18     THE COURT:  You can answer that question.

19 A    Yes, sir.

20 Q    When was that and why?

21 A    When Joe and I were at Primerica, they had an amount of

22 money that he needed to give some other people in the company

23 that he promoted and I took a reduction in salary and in bonus

24 so that they could be included.

25     THE COURT:  You've been a good team player.  You and

1   Joe cooperated with each other.  You know each other a long

2   time.  I think the jury understands the nature of your

3   relationship.

4         Next question.

5   Q    They briefly brought up Justin Stamey.  Can you tell me

6   why you hired Justin Stamey?

7   A    Yes.  I needed some help in our training area and Justin

8   had been a trainer and then went to the field as in sales.

9   And, just a minute, and then I had conversations and the best

10  choice for him and for me was to have him come help us on the

11  sales side.

12        THE COURT:  You knew he was a company guy who could

13  help out?

14        THE WITNESS:  Absolutely, Judge.

15        THE COURT:  Next question.

16  Q    I wanted to talk about your tax returns quickly.

17        They presented you the 2012-2013 tax returns which

18  were small numbers in terms of income?

19  A    Yes.

20  Q    Why was your income at that amount?

21  A    All the income that was generated I actually gave to my

22  son and his family.

23        THE COURT:  I'm sorry.  Why was it so low during

24  those years?

25        THE WITNESS:  All the income was given to my son.

1        THE COURT:  It was all given to your son?

2        THE WITNESS:  Yes.

3        THE COURT:  You're a good father.  You gave the

4   money to your son.

5        THE WITNESS:  Yes, sir.

6   EXAMINATION BY

7   MR. SHEARER:

8   (Continuing.)

9   Q    That was inside of that consulting LLC?

10  A    Yes.

11  Q    That you talked about yesterday?

12  A    Yes.

13  Q    And in 2017, the numbers 400,000 and some, do you know

14  what those -- why it was so high that year?

15  A    Yes.  That was bonuses I had been paid in prior years in

16  stock that I exercised.

17        THE COURT:  You didn't give those to your son.

18        THE WITNESS:  No, sir.

19  Q    So those were stock awards that you were given for your

20  work for First Data?

21  A    Yes in prior years.

22  Q    Okay.  In Defendant's Exhibit 193, if you remember that

23  e-mail, it's the one that when did I stop working the 9/4,

24  surgery 9/6 e-mail.  Do you recall that one?

25        What did you think the question was of you when she

*S. Barger - Redirect/Mr. Shearer*                    **746**

1   asked you?

2            THE COURT:  That's not a good question.  Try a

3   different way.

4            This is September 4th or September 6th, is that what

5   you're talking about in this e-mail?

6            MR. SHEARER:  Yes.

7            THE COURT:  So do want to read those e-mails to the

8   jurors and to the plaintiff you can do that.

9   Q    Do you recall this one?

10           THE COURT:  Don't ask him if he recalls that, we'll

11  be here forever.

12           THE WITNESS:  Yes.

13           THE COURT:  Do you want to read it.

14           MR. SHEARER:  And the date on this is January 5th.

15  I'd like to go to Plaintiff's 47?

16           THE COURT:  It's in evidence, right?

17           MR. SHEARER:  Yes.

18           THE COURT:  What do you want to bring out?

19           COURTROOM DEPUTY:  No, it's not.  Not yet.

20           THE COURT:  47?

21           MR. SHEARER:  Plaintiff's 47.

22           THE COURT:  It's not in evidence yet.  Do you want

23  that in evidence?  There's no objection to it.

24           MR. SHEARER:  Yes.

25           THE COURT:  In evidence.

1          (Plaintiff's Exhibit 47 was received in evidence as

2   of this date.)

3          THE COURT:  What's your question?

4   EXAMINATION BY

5   MR. SHEARER:

6   (Continuing.)

7   Q    This is an e-mail that you sent to Rhonda Johnson on

8   December 16th asking what your last day worked was.  Did you

9   ever get an answer to that question?

10         THE WITNESS:  I think I may have to read this, your

11  Honor.

12         THE COURT:  Read it.  There's an e-mail you sent to

13  Rhonda Johnson.  You got a response from her.

14         THE WITNESS:  It's from her I, have to see what she

15  said.

16         THE COURT:  You want to read that e-mail now?

17         THE WITNESS:  I got it.

18  Q    I want to know whether you received an answer to his

19  question from Rhonda?

20  A    I don't remember.

21         THE COURT:  You don't remember.  Next question.

22         MR. SHEARER:  Then Plaintiff's No. 48.

23         THE COURT:  48.  You want that in evidence now?

24         MR. SHEARER:  Yes.

25         THE COURT:  Okay, that's in evidence.

1          (Plaintiff's Exhibit 48 was received in evidence as

2   of this date.)

3   EXAMINATION BY

4   MR. SHEARER:

5   (Continuing.)

6   Q    This bottom e-mail that you were copied on.  This is a

7   Rhonda turnaround and forwarded this on to ask

8   Leave Management, right?

9          Did Leave Management get back to you with your last

10  day worked?

11         THE COURT:  What was the question?

12  Q    Did Leave Management, after Rhonda asked Leave Management

13  what your last day worked was, did Leave Management get back

14  to you?

15  A    They have.

16  Q    One more up here real quick.

17         MR. SHEARER:  Plaintiff's 49.

18         THE COURT:  49.  You want that in evidence?

19         MR. SHEARER:  Yes, Your Honor.

20         THE COURT:  No objection.  In evidence.

21         (Plaintiff's Exhibit 49 was received in evidence as

22  of this date.)

23  Q    And this is an e-mail from -- that you were copied on or

24  Leave Management says that your manager would need to verify

25  your last day worked.

1          Did your manager, at this time, was that Jeff Hack?

2    A    I believe it was on 12/16, I believe it was Jeffrey Trudy

3    and Sharon.

4    Q    Did Jeff Hack tell you when your last day of work was?

5    A    Never.

6    Q    They went through your all those pay stubs --

7    A    Yes.

8    Q    -- showing your pay?

9    A    Yes, sir.

10   Q    And your full pay went through the end of November as I

11   remember.  That is how you recall it?

12   A    If that's what's entered.  My recall.

13   Q    Okay.  I'd like to go to --

14          Do you remember when you first received your FMLA

15   paperwork to complete?

16   A    Actual day, no.  I'm going to say it was fourth quarter

17   of '16.  I don't know a date, I'm sorry.

18          THE COURT:  Fourth quarter, meaning what?  November,

19   December?  Somewhere around that, 2016?

20          THE WITNESS:  Yes, sir.

21          THE COURT:  Next question.

22   Q    Now, when you were discussing your damages, I believe you

23   made a mistake.  Did you mean to say you did your stock

24   options calculation based on price at the IPO?

25   A    The stock options as to what the conversion price was.

1  Q    This 900,000 is calculated as of the IPO?

2  A    It was based on -- I know this.  It was based on a $31

3  valuation, which probably was the IPO when they first went

4  public.  I'm sure of that because the stock initially was

5  worth less than that.

6           THE COURT:  We don't need that.  You answered the

7  question.

8  Q    Just a couple more questions.

9           The defendant showed you the MetLife letters that

10 were approving your short-term disability and your long-term

11 disability.  Did MetLife ever talk to you?  Did they call you

12 on the phone?  Did they write to you?  How did you get

13 information to MetLife?

14 A    I don't recall talking to anyone.  Documents came,

15 various documents came, and some I've never seen before so I

16 cannot answer that question.

17          THE COURT:  You don't know how they came to you

18 particularly?

19          THE WITNESS:  No.

20          THE COURT:  Next question.

21 Q    Do you recall ever telling MetLife that you stopped

22 working on September 6th?

23 A    No.  I worked from September 6th all the way through I

24 was told not to work and then I didn't go in the office but I

25 did work.

1           MR. SHEARER:  That's it, your Honor.

2           THE COURT:  Anything further, Mr. DiLorenzo?

3           MR. DILORENZO:  One question.

4   RECROSS EXAMINATION

5   BY MR. DILORENZO:

6   Q    You came up with the 900,000, did that number come out

7   evenly, $900,000?

8   A    It's rounded.  I'm sure it's rounded.  I don't know if

9   that accurate or not, it's a rounding.

10          MR. DILORENZO:  At some point, I have a motion on

11  that testimony.

12          THE COURT:  He said he rounded it out.  It's your

13  answer.

14          MR. DILORENZO:  All the damages testimony.

15          THE COURT:  Anything else.  You want to ask him?

16          MR. DILORENZO:  No, Your Honor.

17          THE COURT:  Anything else, Mr. Shearer.

18          MR. SHEARER:  No, Your Honor.

19          THE COURT:  You may step down.  Take a glass of

20  water just relax.

21          (Witness leaves the witness stand.)

22          THE COURT:  What do we have next, Mr. Shearer?  Do

23  we have any more live witnesses?

24          MR. SHEARER:  Well, your Honor, we were going to

25  read in some depositions.

*Proceedings*                                            **752**

```
 1          THE COURT:  No, it's still your case.  Does this
 2   complete your live testimony?  We're not talking about the
 3   defendant's case, we're talking about yours.
 4          MR. SHEARER:  I was going to read in a deposition of
 5   a witness that is present, so I don't know.
 6          MR. EIDELMAN:  Your Honor.
 7          THE COURT:  Do you have any problem with reading in
 8   the deposition?  Do you know what he's talking about?
 9          MR. EIDELMAN:  I made a recommendation.  I said to
10   Mr. Zeitlin and Mr. Shearer, and you have to explain it to the
11   jury, that we brought these witnesses in from out of town.  We
12   can take them out of turn where we would do the direct, which
13   would be very short.  He can then cross them.  One of those
14   witnesses, he would not need their deposition testimony then.
15          THE COURT:  What do you say, Mr. Shearer?  We don't
16   want to have a long colloquy here while the jury is watching
17   us.
18          Do you have any other people that you want to call
19   as a witness?
20          MR. SHEARER:  Yes, I do, I guess.
21          THE COURT:  Call them.
22          MR. SHEARER:  Okay.
23          THE COURT:  Who do we have now?
24          MR. SHEARER:  This is Matt Cagwin.
25          (Witness takes the witness stand.)
```

1         COURTROOM DEPUTY:  Good afternoon, Mr. Cagwin.  Take

2    the witness stand.  If you can remain standing and raise your

3    right hand.

4    **MATT CAGWIN**, called by the Plaintiff, having been first duly

5         sworn, was examined and testified as follows:

6         THE WITNESS:  Yes.

7         COURTROOM DEPUTY:  Thank you.  Please have a seat.

8    State and spell your name for the record.

9         THE WITNESS:  Matt Cagwin.  C-a-g-w-i-n.

10        COURTROOM DEPUTY:  Thank you.

11        THE COURT:  Your witness, Mr. Shearer.

12        MR. SHEARER:  Thank you, your Honor.

13   DIRECT EXAMINATION

14   BY MR. SHEARER:

15   Q    Hi, Mr. Cagwin.  You're an employee of First Data; is

16   that correct?

17   A    That's correct.

18   Q    What is your title and -- what are your title and

19   responsibilities?

20   A    My title is GBS CFO.  I'm responsible for the finance

21   function of the GBS segment.

22   Q    Okay.  And have you held other titles in the last two

23   years?

24   A    Yes.  Prior to that, I was our accounting officer.

25   Q    How long were you the chief accounting officer?

1  A    About four years.

2  Q    Okay.  And what years were those?

3  A    The end of '14 through the end of last year.

4           THE COURT:  First Data has merged now with Fiserv;

5  right?

6           THE WITNESS:  They have.

7           THE COURT:  You said you worked for First Data?

8           THE WITNESS:  I work for Fiserv, thank you.

9  Q    We had a deposition, I asked you about the 10K and --

10          THE COURT:  Stop mumbling.

11          MR. SHEARER:  I'm going to bring up the 10K.

12          THE COURT:  Stop.  It's hard for me to understand

13  you when you mumble like that.  Ask him a question, that's why

14  he's a witness.

15          MR. SHEARER:  I'm going to go to Plaintiff's Exhibit

16  No. 10.

17          THE COURT:  You want to show him Plaintiff's

18  Exhibit 10?

19          MR. SHEARER:  Yes.

20          THE COURT:  Is that in evidence?

21          MR. SHEARER:  No.

22          THE COURT:  All right.  Let's see whether or not

23  there's any objection.

24          All right.  There's no objection to Exhibit No. 10.

25  It's in evidence.

1          (Plaintiff's Exhibit 10 was received in evidence as

2     of this date.)

3          THE COURT:  Now do you have a question to ask him?

4     Ask him.

5     EXAMINATION BY

6     MR. SHEARER:

7     (Continuing.)

8     Q    This is First Data's 2017 Form 10K.  There's a section in

9     here on Page 36 that's entitled "Restructuring and Cost

10    Management Initiatives."

11         Would you like me to pull that up for you?

12    A    Please.

13         THE COURT:  He doesn't care what you pull up.  Ask

14    him a question.

15    Q    Restructuring and cost management, it's the second title

16    down on the right-hand side.

17         Do you see that?

18    A    I do.

19         THE COURT:  He sees it.

20         Next question.

21    Q    Can you tell me what it means when it says, "We

22    continually evaluate our cost basis and over the past three

23    years have executed a number of restructuring initiatives

24    which has allowed us to streamline management, eliminate

25    excess facilities, and work with our suppliers."

1        Can you tell me what that means?

2        THE COURT:  You just read it.

3        MR. SHEARER:  I'm trying to ask him what it means.

4        THE COURT:  Do you have anything to add to that?

5        THE WITNESS:  I think it means what it says.

6    Q    What does "cost basis" mean "cost base"?

7    A    Our total expenses.  The expense to run the company.

8    Q    So this is you're constantly evaluating expenses and

9    taking it, restructuring initiatives; right?

10   A    We're constantly looking at ways to streamline our cost

11   structure including restructuring activities.

12   Q    So how many restructuring events occurred at First Data

13   over 2014 to 2017?

14   A    Approximately ten plus.

15       THE COURT:  About ten?

16       THE WITNESS:  About ten.

17   Q    How many of those included terminations of employees?

18   A    Virtually all.

19       THE COURT:  About how many?

20       THE WITNESS:  Almost all.

21       THE COURT:  Almost all.

22   Q    And that's 2014 to 2017?

23   A    Correct.

24   Q    What was the rough operating expense of First Data in

25   2017?

1   A    In 2017, it's a couple pages later on, but it's roughly

2   $4 or $5 billion.

3   Q    The operating expense?

4   A    Correct.

5   Q    And is it -- there was a category within that, are you

6   familiar with the Other Operating Expense?

7   A    I am.

8   Q    And what is included in Other Operating Expense?

9   A    Our other operating expenses are any of our expenses that

10  are of an abnormal thing of nature:  Restructuring,

11  litigation, settlements, things of that nature greater than

12  $5 million.

13  Q    Were the 2017 Other Operating expenses 143 million?

14  A    That sounds correct.

15  Q    So out of that 143 million, how much was restructuring

16  costs?

17  A    A little more than 80 million.

18  Q    So 80 million, that means that 80 million in severance

19  payments in 2017, is that what that means?

20  A    Correct.

21  Q    And out of the 143 million of Other Operating Expense, of

22  which 83 million --

23         MR. SHEARER:  Strike that.

24  Q    So $83 million in cost due to terminations in 2017?

25  A    Correct.

1   Q    Do you know why management chooses to incur $83 million

2   of restructuring expense?  Why does it incur up front

3   $83 million of expenses to terminate people?

4   A    To treat our employees fairly when we're taking an action

5   to restructure our company.  So we're providing them

6   compensation to help them bridge between jobs while we get our

7   company or expense base to the right levels and invest our

8   money where we can add value and grow the company.

9   Q    When I deposed you, you said you'd been with First Data

10  approximately 18 quarterly periods.  I guess it's been three

11  more since then.  So out of those 21 quarterly periods, how

12  many quarters had restructuring expenses related to the

13  termination of employees?

14  A    I believe my answer originally was most of the quarters.

15  And since then, the answer probably would be the same.  It

16  would be the same.

17  Q    So most of those 21 quarters they were restructures?

18  A    They were expenses related to the restructuring

19  initiative.

20  Q    That involved the termination of employees?

21  A    Correct.

22  Q    Out of the -- did that pattern continue where the

23  restructuring expense was a large, significantly large,

24  portion of the Other Operating Expense for 2018?

25  A    No.  During '18, the percentage probably declined a

1   little bit because we had some deal and deal integration costs

2   which is related to our merger with Fiserv.  Still a large

3   portion of it but not the same percentage.

4          MR. SHEARER:  I would like to go to Plaintiff's

5   Exhibit 6?

6          THE COURT:  That's in evidence now; right?

7          COURTROOM DEPUTY:  It is now.

8          THE COURT:  Plaintiff's Exhibit 6 in evidence.  No

9   objection.

10          (Plaintiff's Exhibit 6 was received in evidence as

11   of this date.)

12          MR. EIDELMAN:  Your Honor, in our book Exhibit 6

13   says "reserved."

14          MR. SHEARER:  We gave you a copy of it the other

15   day.

16          MR. EIDELMAN:  It's the restructuring policy, okay.

17          MR. SHEARER:  Yes.

18   EXAMINATION BY

19   MR. SHEARER:

20   (Continuing.)

21   Q    First Data, has what's called a Restructuring Accounting

22   Policy; correct?

23   A    That's correct.

24   Q    And what's the purpose of that policy?

25   A    To ensure that we account for our restructuring properly

1    under the accounting rules.

2    Q    So what's the difference between the accounting treatment

3    of termination expenses if they are a restructuring versus a

4    normal expense?

5    A    The accounting rules require for a restructuring

6    initiative to disclose data about that information in your SEC

7    filings.

8    Q    Does it impact any other if it's categorized as a

9    restructuring instead of normal expense?  Does it affect any

10   other numbers that the finance department calculates?

11   A    Yes, it does.  We also, this is our choice, but we

12   defined our definitions of our non-GAAP measures.  These are

13   measures we use with the investor community.  Things like

14   adjusted net income and adjusted EBITDA.  We would exclude

15   restructuring initiatives where we would not exclude normal

16   day-to-day severance expense.

17   Q    So EBITDA is Earnings Before Interest --

18   A    Taxes Depreciation.

19   Q    -- and Amortization?

20   A    Correct.

21   Q    So if it's a normal expense, it reduce us your earnings.

22   And if it's a normal expense, it has no change to EBITDA; is

23   that correct?

24   A    If it's a normal expense, it would reduce the EBITDA.  If

25   it was a restructuring, it would not.

Case 1:17-cv-04869-FB-LB   Document 149   Filed 03/09/21   Page 125 of 234 PageID #: 9346

1    Q    Okay.  And so, categorizing -- it's a benefit to your

2    EBITDA number if it's categorized as a restructuring?

3    A    Correct.

4    Q    And it's a benefit to your net adjusted income number if

5    it's a restructuring?

6    A    That's correct.

7    Q    And those numbers, are they use inside of First Data's

8    bonus plans?

9    A    No.

10   Q    Neither net adjusted income or EBITDA are used inside

11   of --

12   A    Overall performance is used to determine the bonus plan.

13   Those are measures that might be considered but there's not a

14   defined plan with those measures in it.

15   Q    Did you track the savings, projected savings, from a

16   restructuring?  Did the finance department track to see the

17   actuals matched the projections after a restructuring, the

18   terminating, of employees happened?

19   A    We talked about it before.  We have different kinds of

20   restructurings.  Our level of tracking for a RIF, when you're

21   doing a reduction in force, you basically track to see the

22   employee leave and you know you'll get the savings from it

23   because there is no ongoing cost.

24         There is a separate kind of program where we might

25   be shutting down a facility or a location.  In those

1  situations, we have business case where we monitor all the

2  through fruitions to make sure that the new cost of the new

3  employees you hire and the new location relative to the old

4  has a return to respecting.

5  Q    So you don't check to make sure the position, in a RIF

6  situation, that the position eliminated not subsequently

7  refilled and the cost returns?

8  A    I do not do that.

9  Q    Are restructuring events such as RIFs and other

10  termination events, are they -- are you able to tell one from

11  the other if they cross accounting periods?

12  A    Generally, yes.

13  Q    Okay.  And you can run those as separate projects they

14  don't blur together?

15  A    It depends on how close they are done together.

16  Sometimes we start an initiative, don't accomplish the goals

17  we're trying to do, and we may add another one on.  In those

18  situations, we combine them together.  But if there is a

19  lengthy period of time between the two, we would track them as

20  separate initiatives.

21  Q    Okay.  One more exhibit.  Plaintiff's 81.

22         THE COURT:  All right.  There's no objection that's

23  in evidence now.

24  Q    We talked about this at your deposition.  This is a new

25  hire orientation master schedule for, I believe, February.

1   You're listed as speaker in February, the end of January.

2            Can you tell me what this new hire orientation is?

3   A    This is a new hire orientation we do for all the

4   employees in the Atlanta office and we rotate leaders through

5   that to present.  The column I'm in is to do a business

6   overview for the new hires so they get an understanding of

7   First Data at the time.

8            At the same time, at that meeting, there would also

9   be HR present before and they'd give an update on the HR

10  policies, benefits, and things of that nature.

11  Q    So First Data, at this point, is a complete schedule for

12  all the new hires that are coming in in 2017?

13  A    No, this is a schedule of -- the training sessions are

14  schedule every two weeks throughout the year because most of

15  our senior leaders are very busy people and travel a fair bit.

16  They came some out when we would be bringing on new employees.

17  Q    First Data schedules these new hire orientations every

18  two weeks, they were scheduling them every two weeks in 2017?

19  A    Correct.

20            MR. SHEARER:  No further questions.

21            THE COURT:  Any questions.

22            MR. EIDELMAN:  Very briefly.

23  CROSS-EXAMINATION

24  BY MR. EIDELMAN:

25  Q    Good afternoon, Mr. Cagwin.

1    A    Good afternoon.

2    Q    You said, I believe, correctly that you were the chief

3    accounting officer of First Data for 2014 to 2017; is that

4    correct?

5    A    Actually to the end of '18.

6    Q    It the end of '18, I apologize.

7         Are you a certified public accountant, a CPA?

8    A    I am.

9    Q    As part of your duties and responsibilities as the chief

10   accounting officer of First Data, were you responsible for the

11   public filings, the one that Mr. Shearer just showed you, the

12   10K, was that apart of your duties and responsibilities?

13   A    It was.

14   Q    Mr. Shearer showed you, and I'll actually mark it into

15   evidence, your Honor, on D-36, please.

16        THE COURT:  Okay.

17        (Defendant's Exhibit D-36 was marked in evidence as

18   of this date.)

19   Q    You're familiar with First Data's Restructuring

20   Accounting Policy, Mr. Cagwin?

21   A    I am.

22   Q    And what was your role in connection with the

23   Restructuring Accounting Policy?

24   A    So, as the chief accounting officer, I am responsible for

25   all accounting policies including this one.

1  Q    Did you create this policy?

2  A    I did.

3  Q    Mr. Shearer asked you some questions about the reduction

4  in force that occurred in 2016-2017, the spans and layers

5  reduction in force that affected 362 employees.

6          Are you familiar with that restructuring?

7  A    I am.

8  Q    Did First Data apply the restructuring policy, D-36, in

9  connection with that restructuring?

10 A    We did.

11 Q    And were the results of that pursuant to the

12 restructuring included with the public filings?

13 A    It was.

14 Q    We had some testimony yesterday from Mr. Marino, the

15 human resources officer, that the salary expense savings from

16 the 2016-2017 reduction in force of the top 3,000 managers was

17 about $44 million in base salary.

18          Were there additional projected savings from that

19 reduction in force?

20 A    Yes, there was.  There were also other benefits.  The

21 total savings from that initiative was about $53 million.

22 Q    $53 million total for that particular restructuring

23 event?

24 A    That's correct.

25 Q    What was the savings -- what was the severance expense

1   that the company allocated to, as you say, take care of those

2   employees who were going to be impacted by that reduction in

3   force?

4   A    Approximately $22 million.

5   Q    D-63, Judge, please.

6            THE COURT:  D-63.

7            (Defendant's Exhibit D-63 was marked in evidence as

8   of this date.)

9   Q    Mr. Cagwin, showing you what's been marked as D-63, can

10  you identify that, please?

11  A    This is a purchase order between First Data and

12  Barger Group.

13  Q    And you understand, do you not, Mr. Cagwin that this was

14  the purchase order that was put into place when Mr. Barger

15  became a consultant for First Data on or about March 17th of

16  2014?

17  A    That's correct.

18  Q    And there's a number here that says that the total number

19  is $400,000.

20            What does that indicate?

21  A    So that's the amount that has been approved to spend up

22  to.  So his future services provided under the contract we had

23  with Barger Group, we would then apply those invoices against

24  this $400,000 in an amount to be authorized and paid up to

25  that amount.

1    Q    Does this mean that $400,000 is automatically going to be

2    spent?

3    A    No, only for services provided.

4    Q    What was the process in 2014 if an invoice came in with

5    respect to getting it approved to be paid pursuant to the

6    purchase order?

7    A    The vendor would send the invoice into the Accounts

8    Payable Department, the P.O. number would be applied to that

9    and automatically paid.

10   Q    If there was just a purchase order number, it didn't need

11   a signature, it would just get paid so long as it didn't come

12   up against the ceiling of $400,000?

13   A    That's correct.

14   Q    Does First Data, at the time that you were the chief

15   accounting officer, have an outside auditing accounting and

16   firm?

17   A    We did.  We used Ernst & Young.

18   Q    Did Ernst & Young audit the financial statements

19   including the 10K that was referred to in which the

20   restructuring event that occurred in 2016-2017 involved the

21   top $3,000 employees.  Did they review those and audit those

22   financial statements?

23   A    They did.

24   Q    Did First Data receive a clean audit as a result of that

25   audit by Ernst & Young, your outside accounting firm?

*M. Cagwin - Redirect/Mr. Shearer*                    768

1   A    We received a clean opinion.

2          MR. EIDELMAN:  If I may confer with my colleagues

3   just one second.

4          THE COURT:  Go ahead.

5          (A brief pause in the proceedings was held.)

6          MR. EIDELMAN:  Your Honor, I have no further

7   questions for Mr. Cagwin.

8          THE COURT:  Anything else, Mr. Shearer.

9          MR. SHEARER:  A couple.

10  REDIRECT EXAMINATION

11  BY MR. SHEARER:

12  Q    Mr. Cagwin, you said the 2016-2017 event saved 53 million

13  in salary, is that what the number was?

14  A    No, salaries and benefits.

15  Q    And that's simply just calculating what the salary and

16  benefits of the people that were terminated were, is that how

17  you come up with that number?

18  A    That's correct.

19  Q    That only, that's a savings that you get over time, isn't

20  that right?  It's not 53 million right away?

21  A    No, it's the next 12 months after they exit the company.

22  Q    And that's why I was asking the question whether you

23  monitor whether there were backfills.  How do you know that

24  that 53 million is actually saved and you're not just rehiring

25  someone else and paying them?

1    A    I think we talked about it before.  We actually monitor

2    our overall head count.  And during this period of time, our

3    head count declined about 2,000 heads while we acquired three

4    large companies adding about 500 heads to our company.  So

5    that's how we know we didn't add back more.  Some were not

6    relevant.  It's more about we terminate these individuals,

7    save some money, but we also reinvest so we can grow our

8    company to make sure we're a profitable enterprise.

9                  (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. SHEARER:

2   Q    So you use the savings from terminations to buy other

3   companies?

4   A    We use savings and invest in growth opportunities,

5   including buying other companies.

6   Q    And you use savings from terminated employees to make

7   other investments; is that correct?

8   A    That's correct.

9   Q    In 2016/2017 was First Data in any way close or on the

10  verge of a bankruptcy?

11  A    So five years ago when Frank joined, we were in

12  desperate times.  We had lost money for many years before

13  that.  The first three years with us we were losing money as

14  well.  It started to turn about 2016/2017 and continued to

15  improve since then.

16  Q    It was profitable though in 2016, wasn't it?

17  A    It was.

18  Q    In 2017?

19  A    Correct.

20  Q    Also in 2018?

21  A    Correct.  Because the initiative we've taken over that

22  five-year period.

23  Q    You're talking about the payment of these purchase

24  orders.  If someone has got an agreement in a purchase order

25  number and that comes into accounts payable, they

CAGWIN - REDIRECT - SHEARER                771

1    automatically just pay it?

2    A    During the time of that invoice, yes.

3    Q    There were no internal controls inside of accounts

4    payable to check to make sure that the invoice was correct?

5    A    There were no controls to validate the service

6    provided.

7    Q    And no requirement that any management sign and approve

8    the invoice?

9    A    No.

10   Q    You think that's standard internal procedure for a

11   public company?

12   A    There are other companies I've worked with that have

13   similar controls; we have tightened the controls up since.

14   Q    What have you done?

15   A    Now our --

16        MR. EIDELMAN:  Your Honor --

17        THE COURT:  Sustained.

18        MR. SHEARER:  That's it.  Thank you.

19        MR. EIDELMAN:  I have no further questions for

20   Mr. Cagwin.

21        THE COURT:  You may step down.

22        (Whereupon, the witness was excused.)

23        THE COURT:  Listen to me, I want to know if you

24   have anymore live witnesses you wish to call as part of

25   plaintiff's case?

PROCEEDINGS                    772

1            MR. SHEARER:  No.

2            MR. EIDELMAN:  Your Honor, I brought two

3    witnesses --

4            THE COURT:  One second.

5            MR. EIDELMAN:  If he wants to call them, he can.

6            THE COURT:  I'm asking him, are there other

7    people, it's you're choice, you don't have to call them.

8            You're finished with your live witnesses?

9            MR. SHEARER:  Yes.

10           THE COURT:  Okay.  Do you have anything else you

11   wish to present as part of your case?

12           MR. SHEARER:  I have two short depositions to read

13   and one that is longer.

14           THE COURT:  How long?

15           MR. SHEARER:  One of them is -- two of them are

16   probably ten minutes.

17           THE COURT:  Collectively?

18           MR. SHEARER:  Ten minutes each, one of them about

19   half an hour.

20           THE COURT:  Mr. Eidelman, you have people who came

21   here from long distance?

22           MR. EIDELMAN:  Yes.

23           THE COURT:  I will let you take them out of turn

24   if you would like to do.

25           MR. EIDELMAN:  I will do that.

PROCEEDINGS                 773

1          THE COURT:  We want to accommodate them if we can.

2    We won't go past 4:30.  Do you think that your witnesses

3    will be finished by then.

4          MR. EIDELMAN:  From my perspective, certainly.

5          THE COURT:  Let's have it.

6          We're potentially truncating the plaintiff's case

7    a little bit.  He wants to read some deposition testimony,

8    he can do that.  We're taking the witnesses out of turn,

9    part of the defendant's case, which technically hasn't

10   happened yet because the plaintiff hasn't completed with his

11   case, which he will be the reading of deposition testimony.

12         MR. EIDELMAN:  Your Honor, we call Jennifer

13   Voycheske.

14         (Witness takes the witness stand.)

15           JENNIFER VOYCHESKE, called as a witness,

16   having been first duly sworn/affirmed, was examined and

17   testified as follows:

18         COURTROOM DEPUTY:  Remain standing raise your

19   right hand.

20         THE WITNESS:  I do.

21         COURTROOM DEPUTY:  Have a seat.  Keep your voice

22   up, and state and spell your name.

23         THE WITNESS:  Jennifer, J-E-N-N-I-F-E-R,

24   Voycheske, V-O-Y-C-H-E-S-K-E.

25         THE COURT:  You may not have to get that close to

VOYCHESKE - DIRECT - EIDELMAN                    774

1    the microphone.  We'll see how it goes.

2    DIRECT EXAMINATION

3    BY MR. EIDELMAN:

4    Q    Good afternoon, Ms. Voycheske.

5    A    Hello.

6    Q    What is your current title?

7    A    Manager of HR Operations.

8    Q    Are you involved with something called the HR Service

9    Center at First Data?

10   A    I am a manager in that department.

11            THE COURT:  First Data now is Fiserv.

12            MR. EIDELMAN:  Yes, thank you for the

13   clarification, Judge.  Thank you.

14   Q    How long have you been employed at First Data/Fiserv?

15   A    Since 2002.

16   Q    How long have you been the manager of the HRSC?

17   A    May 2015.

18   Q    What are your duties and responsibilities as the

19   manager?

20   A    I manage the administrative process related to leave of

21   absence within the organization.

22   Q    Why does First Data have a human resources services

23   there, what is the function?

24   A    It serves as a first level of support for a multiple HR

25   functions, leave of absence, payroll, employment,

VOYCHESKE - DIRECT - EIDELMAN                775

1    unemployment claims, those types of things.

2           THE COURT:  Where is it located?

3           THE WITNESS:  Omaha, Nebraska.

4           THE COURT:  Is that where you're from?

5           THE WITNESS:  Yes.

6    BY MR. EIDELMAN:

7    Q    Approximately how many people out of 22,000 people

8    pre-Fiserv, the 22,000 that work First Data, at any given

9    time how many people make a leave of absence, which requires

10   the assistance from the human services center?

11   A    Approximately 1100 per month.

12   Q    What types of leaves might that be?

13   A    They can include the leaves under the Family Medical

14   Leave Act, FMLA, Americans with Disability Act, ADA, also a

15   military leave policy, a paid parental leave policy, as well

16   as worker's compensation.

17   Q    Does your department also handle accommodations under

18   the Americans with Disabilities Act?

19   A    We do.

20   Q    At any given time how many people would be on an

21   accommodation?

22   A    Between one to 200.

23          MR. EIDELMAN:  Defendants 30, Judge, move the

24   admission.

25          THE COURT:  Let see, that's not in evidence yet.

VOYCHESKE - DIRECT - EIDELMAN                776

1          MR. EIDELMAN:  It is not, Judge.

2          THE COURT:  Let me find it.  No objection,

3    Defendant's exhibit 30 is in.

4          (Defense Exhibit 30 received in evidence.)

5    Q    Are you familiar with the Equal Employment Opportunity

6    policy that is on your screen?

7    A    Yes, I am.

8    Q    What is the basis, what is the need or what is the

9    Equal Employment Opportunity policy at First Data?

10   A    Essentially that First Data won't discriminate on a

11   number of things in relation of employment.

12   Q    Is there a reference to the Americans with Disabilities

13   Act in the EEO policy?

14   A    It does state we will make reasonable accommodations to

15   qualified individuals with known disabilities.

16   Q    What is a qualified individual?

17   A    It's an individual that has certain acts of daily

18   living that they are unable to perform, that are stated by

19   the physician that would impact their ability to do their

20   job.

21   Q    Unless they have an accommodation to be able to do?

22   A    Correct, they need an accommodation to do that job at

23   100 percent.

24          MR. EIDELMAN:  Your Honor, I think these are in

25   evidence already.  I want to make sure that Ms. Voycheske

1    has a chance to see them.  Defendant's exhibit 31?

2             THE COURT:  Not in evidence yet.

3             MR. EIDELMAN:  I will move its admission.

4             (Defense Exhibit 31 received in evidence.)

5    Q    Are you familiar with Defendant's exhibit 31, the U.S.

6    Americans with Disabilities Act policy of First Data?

7    A    Yes, I am.

8    Q    What is the reason for this policy?

9    A    It is to provide reasonable accommodations to qualified

10   but disabled associates who need an accommodation to perform

11   their essential functions.

12   Q    This policy is similar to the one that I showed you

13   before, Defendant's 30, but more specific to the Americans

14   with Disabilities Act?

15   A    It's more elaborate, yes.

16   Q    Showing you what is marked Defendant's exhibit 32,

17   which I believe this one is in evidence -- it is not in

18   evidence.  I will move this one into evidence, judge.

19            THE COURT:  Exhibit 32?

20            MR. EIDELMAN:  Yes, sir.

21            THE COURT:  Go ahead.

22            (Defense Exhibit 32 received in evidence.)

23   Q    Defendant's exhibit 32, Ms. Voycheske, are you familiar

24   with the U.S. Family and Medical Leave Act policy?

25   A    I am.

VOYCHESKE - DIRECT - EIDELMAN                778

1   Q    Is this a policy that you're responsible for
2   administering?
3   A    Yes.
4   Q    And what is your understanding, I know you're not a
5   lawyer, what is your understanding of the Family Medical
6   Leave Act and what it provides?
7   A    It provides job protection to qualified individuals
8   with a serious health condition.
9   Q    When an individual goes out on leave, what is the
10  process that the human resources services center is involved
11  in, in terms of providing assistance to individuals on
12  leave?  What do you do?
13  A    We collect necessary information to initiate the claim.
14  Then we mail them the necessary paperwork that them and the
15  treating physician needs to fill out.  Give them a due date
16  to return it back to us.  Once we have that information, we
17  evaluate to make ensure it meets the criteria for a leave of
18  absence.  If it does, we issue them an approval.  Let the
19  manager know of the approval.  And they are protected to be
20  out on leave for that duration of time.
21            MR. EIDELMAN:  Your Honor, move the admission of
22  D123.
23            THE COURT:  D123?
24            MR. EIDELMAN:  Yes.
25            THE COURT:  How many more exhibits do you want to

VOYCHESKE - DIRECT - EIDELMAN                779

1    put into evidence?

2              MR. EIDELMAN:  Just a couple after this, Judge,

3    very fast.

4              THE COURT:  Why don't you put them in now?

5              MR. EIDELMAN:  D123.

6              THE COURT:  What else?

7              (Defense Exhibit 123 received in evidence.)

8              MR. EIDELMAN:  D154 is in evidence already, I

9    believe.

10             THE COURT:  Yes, go ahead.

11             MR. EIDELMAN:  D157 is in evidence.

12             THE COURT:  D157 is not in evidence.  You want to

13   put it in evidence?

14             MR. EIDELMAN:  D157 into evidence, please.

15             THE COURT:  No objection.  So I'll allow it.  Go

16   ahead.

17             (Defense Exhibit 157 received in evidence.)

18             MR. EIDELMAN:  D193 I believe is in evidence.

19             THE COURT:  Yes, it is.

20             MR. EIDELMAN:  D191.

21             THE COURT:  You want that in evidence?

22             MR. EIDELMAN:  Yes, please.  Then D188.

23             (Defense Exhibit 191 received in evidence.)

24             (Defense Exhibit 188 received in evidence.)

25             THE COURT:  That's in evidence.

1        MR. EIDELMAN:  Thank you, Judge.

2   BY MR. EIDELMAN:

3   Q    Ms. Voycheske, I want to turn back to D123, which has

4   an unsigned cover letter from Mr. Marino, that's not what I

5   want to ask you about.  You testified that there is a

6   package of information that individuals who are going to go

7   out on leave receive.  Can you identify, I know it's not the

8   full screen -- let me do this for everybody, if I can.  Is

9   this a one of the blank forms that is sent to individuals,

10  one of the forms that your team will send out as part of

11  leave administration?

12  A    Yes, it is.

13  Q    That's a form, a blank form, from MetLife for what

14  purpose?

15  A    A medical release.  The associate signs it to release

16  MetLife to reach out to their physician to get medical

17  information.

18  Q    We've seen the completed one of these already, D154.

19  Is this the blank certification of health care provider for

20  Family Medical Leave Act that complies with the Department

21  of Labor regulations?

22  A    Yes, it is.

23  Q    What is this form, Ms. Voycheske?

24  A    This is our associate's responsibility as well as leave

25  of absence.  They complete this to declare what type of

VOYCHESKE - DIRECT - EIDELMAN              781

1   leave they are requesting, that they do plan to return to

2   work upon completion.  And there is some basic provisions

3   and terms of conditions that they need to read and agree to

4   and sign.

5   Q    And this is a blank form?

6   A    This is page two of the same document that requires the

7   signature.

8   Q    And this document, Ms. Voycheske?

9   A    This is a release to return to work for those that are

10  out for their own medical condition.  We require a

11  physician's release to allow them to return to work.  This

12  just gives them a sample form to use.

13  Q    Last but not least, what is this document?

14  A    This is rights and responsibilities under the FMLA.  So

15  it's overview of the entitlements that employees receive

16  under FMLA.

17  Q    Defendant's exhibit 123, is that the standard packet of

18  forms that is sent to employees who go out on leave as

19  employees of First Data?

20  A    For their own medical condition, yes.

21  Q    Were you involved at all in processing the leave for

22  Steven Barger, the plaintiff if this matter?

23  A    I was.

24  Q    What was your role?

25  A    I oversaw the leave from the time I became aware of it

1   to its conclusion.

2   Q    Showing you D154.  Would that be standard for you to be

3   involved in a leave administration for an employee like

4   Mr. Barger?

5   A    As a manager I don't typically handle them.  But when

6   we wanted to give special attention to say a executive or a

7   higher level employee, then I will handle them, yes.

8   Q    Were you working with anybody in HR in Atlanta,

9   Georgia, where Mr. Barger, where his office was, in

10  connection with the administration of his leave paperwork?

11  A    I corresponded regularly with Rhonda Johnson.

12  Q    Would it be unusual for you to work with a vice

13  president of human resources on leave administration?

14  A    It's not something we do every day.  We do it when we

15  want to ensure white-glove treatment for an employee.

16  Q    Did you receive Defendant's exhibit 154, which was the

17  certification of health care provider filled out by

18  Dr. Baddour, Mr. Barger's doctor?

19  A    I did.

20  Q    The information that's on this form is completed by

21  Dr. Baddour or his office and not by people at First Data,

22  correct?

23  A    Correct.

24  Q    When you received this certification of health care

25  provider, Defendant's exhibit 154, what actions did you

VOYCHESKE - DIRECT - EIDELMAN                783

1   take?

2   A    I reviewed the details within the form, medical facts,

3   how the questions are answered, to determine if it qualifies

4   as a leave of absence under the Family Medical Leave Act,

5   which this did.  So I provided approval for the leave of

6   absence for the dates that the doctor indicated the

7   associate needed.

8            THE COURT:  What date was that, September 2?

9            THE WITNESS:  At this time what we had been

10  provided was October 22 as the first day of leave.

11           THE COURT:  October 22?

12           THE WITNESS:  Yes.

13  BY MR. EIDELMAN:

14  Q    Was that the ordinary course of your job duties as the

15  manager of the human resources services center to receive

16  information like this, a certification of health care

17  provider, and make a determination whether or not somebody

18  was qualified to be on Family Medical Leave Act?

19  A    Yes.

20  Q    You do this every day and you've done this every day

21  for the last five, six, seven years, correct?

22  A    Absolutely, yes.

23  Q    As a result of -- what was the determination -- what

24  was the reason why you determined that Mr. Barger had

25  qualified with a serious health condition, that you just

VOYCHESKE - DIRECT - EIDELMAN                    784

1    told the Judge, as of October 22?

2    A    The physician is asked for the beginning and end dates

3    of patient incapacity, and the physician indicated 10/22 as

4    the first date of incapacity.

5    Q    Does the document that you have presented to the

6    physician that the physician fills out, indicate what it

7    means to be incapacitated on the certification form that was

8    completed by Mr. Barger's doctor?

9    A    Are you asking if incapacity is defined?

10   Q    Yes.  Is it?

11   A    Yes, it is defined directly underneath in italics.

12   Q    The jury can see that; you don't have to read that.

13            THE COURT:  So the first day of his leave,

14   according to the doctor, is October 22.

15            THE WITNESS:  At this time according to what we

16   knew it was 10/22 of '16.

17            THE COURT:  He was not on leave before, was he?

18            THE WITNESS:  At this time I was not aware that he

19   was.

20   BY MR. EIDELMAN:

21   Q    Speaking of that, did you know Mr. Barger before Rhonda

22   Johnson contacted you to assist with the paperwork for him?

23   A    No, I did not.

24   Q    Did you know that Mr. Barger had surgery in September?

25   A    No.

VOYCHESKE - DIRECT - EIDELMAN                785

1  Q    After receiving the certification of health care

2  provider from Dr. Baddour for Mr. Barger, what was the next

3  step that you took in connection with the administration of

4  Mr. Barger's leave?

5  A    I issued him an approval letter for the leave of

6  absence.

7  Q    D157, this is the approval letter that you issued to

8  Mr. Barger?

9  A    Yes.

10 Q    It indicates, it says, it indicates, that the leave

11 start date is 10/24/2016, why would it be that date?

12 A    That was a Monday.  I believe 10/22 and 23 were

13 Saturday and Sunday.

14 Q    Did you send this to Mr. Barger?

15 A    I did.

16 Q    How did you send it to him?

17 A    Postal mail.

18         THE COURT:  Let me ask you this question.  So the

19 first official date of his leave was October 22 or was it

20 October 24?

21         THE WITNESS:  His date of incapacity was 10/22.

22 His day of actual work was, actual work, was 10/24.  We

23 approved October 24.

24         THE COURT:  Under the Family Medical Leave Act

25 when would the 90 days expire?

1          THE WITNESS:  I indicated in this letter, expires

2     on 1/16 the following year.

3          THE COURT:  January 16.

4          THE WITNESS:  Yes.

5     BY MR. EIDELMAN:

6     Q    At some point in time, Ms. Voycheske, was an adjustment

7     made to the period of it Mr. Barger's FLA leave?

8     A    Yes.

9     Q    How did that come about?

10    A    In an e-mail exchange with Mr. Barger.  He indicated

11    that he went stopped working approximately 9/4.

12    Q    What how did you get that information from Mr. Barger?

13    A    I asked him when did he stop working.

14    Q    Let me show you Defendant's exhibit 193.  And let me

15    start at the bottom, can you see that, Ms. Voycheske?

16    A    Yes.

17    Q    And there is an e-mail from you to Mr. Barger on

18    January 5, 2017, so this is after New Years?

19    A    Yes.

20    Q    And it says, 'Our records from your physician indicate

21    you didn't start missing work until 10/22/2016.  When did

22    you start missing work?'

23         Before I do that, let me turn back over, I apologize I

24    jumped ahead.

25         Earlier on the 5th you wrote an e-mail to Marilyn and

VOYCHESKE - DIRECT - EIDELMAN                787

1   Steve.  Do you know who Marilyn was?

2   A    Yes.

3   Q    What was Marilyn?

4   A    It was Steve's spouse.

5   Q    Had you been communicating with Mr. And Mrs. Barger in

6   connection with trying to assist them with their leave

7   paperwork?

8   A    I had.

9   Q    On January 5 why did you reach out to them?

10  A    I reached out to them as a courtesy because we had not

11  yet received short-term disability approval.  I wanted to

12  make him aware that if we didn't receive that, he would have

13  pay impact.

14  Q    You were here in the courtroom a little while ago when

15  Mr. Barger said he doesn't whether or not he spoke to anyone

16  to MetLife about the leave date.

17       If you go up above the line where you just read from

18  your e-mail, it appears to me there is an e-mail from Steven

19  Barger to you, Jennifer Voycheske, copying what I think

20  might be his wife's e-mail.  And it says, this is from

21  Mr. Barger to you, 'Ruth called and said she approved pay

22  from 9/4 until 10/15.  She's awaiting for additional info

23  from doctor to extend payment to 12/13.'

24       Do you see that?

25  A    Yes.

VOYCHESKE - DIRECT - EIDELMAN          788

1   Q    Do you know who Ruth is?

2   A    I believe the claim manager at MetLife.

3   Q    In response to this e-mail from Mr. Barger where he

4   tells you that MetLife who administers short-term disability

5   had indicated they approved shorts term disability from 9/4,

6   what steps did you take -- or did this surprise you?

7   A    It caught me off guard, yes.

8   Q    Why?

9   A    Because from everything that we received up to this

10  point we believed he had not stopped missing work prior to

11  10/22.

12  Q    What is -- I know that -- does First Data administer

13  its own short- and long-term disability programs?

14  A    All we do is pay it.  MetLife evaluates and approves

15  it.

16  Q    What does it mean to be approved on short term or long

17  term disability?  Does it mean that according to the terms

18  of plan, MetLife has determined that you're disabled as of

19  that point in time?

20  A    Yes.

21  Q    In response to Mr. Barger telling you that MetLife had

22  approved his leave as of 9/4, this is when you sent to him,

23  that same day on January 5, 'Our records from your physician

24  indicate you didn't start missing work until 10/22/2016.'

25  That's referring to the certification of health care

VOYCHESKE - DIRECT - EIDELMAN                    789

1   provider that we had seen earlier, correct?

2   A    Correct.

3   Q    'When did you start missing work,' that's the question

4   that you asked him, those words, 'When did you start missing

5   work,' correct?

6   A    Yes.

7   Q    Now he responds back to you, but he really doesn't

8   answer the question, right?

9   A    Right.

10  Q    So then you ask him again.  'Thanks, Steve.  Can you

11  clarify when you stopped working?  Was it on 9/4/16 or

12  10/22/16?'  And how does he respond?

13  A    He responds by saying '9/4, my operation was 9/6.'

14  Q    You understood that to mean that Mr. Barger telling you

15  in response to your question when did he stop working that

16  he had stopped working on 9/4?

17  A    Correct.

18  Q    Did you take any action after Mr. Barger advised you

19  that he had stopped working on 9/4?

20  A    I did.  I went to the MetLife disability site, based on

21  his statement that they had approved him beginning that

22  date.  We have access to Met Links portal that shows all

23  approvals of disability claims.  I looked at Mr. Barger's

24  claim and confirmed they did indeed approve it for a date of

25  disability of 9/4.

VOYCHESKE - DIRECT - EIDELMAN                790

1   Q    I want to show you Defendant's exhibit 191, the second

2   page of it, do you see that?

3   A    Yes.

4   Q    Is this the MetLife portal that you looked at?

5   A    Yes.

6   Q    This is the MetLife portal that you looked at after

7   Mr. Barger told that you he stopped working on 9/4?

8   A    Yes.

9   Q    What did the MetLife portal tell you?

10  A    The MetLife portal told me that his date of disability

11  had been determined to be September 4, that what his

12  benefits start date was, what had been approved through, and

13  what his maximum duration was.

14  Q    I see there is a circle around 9/4/2016.  Was that on

15  the MetLife portal?

16  A    I circled that as part of preparation for this trial.

17  Q    After confirming that what Mr. Barger had told you was

18  accurate, that MetLife had confirmed that his date of

19  disability for short-term disability purposes was 9/4, what

20  actions did you take?

21  A    Based on the fact that MetLife does extensive medical

22  research, we rely on their dates if we're unable to obtain

23  additional data through our own means.  I took that 9/4 date

24  as a medically informed begin date, and I retroactively

25  approved his FMLA to that date.

VOYCHESKE - DIRECT - EIDELMAN            791

1   Q    Do the FMLA regulations allow an employer to do that

2   when it receives new information about an employee's

3   beginning of their start date under the FMLA?

4   A    Absolutely.

5            MR. SHEARER:  Objection.

6            THE COURT:  You had knowledge.

7   Q    After confirming with MetLife the information that

8   Mr. Barger told you was accurate, what steps did you take?

9   Did you notify Mr. Barger?

10  A    I retroactively approved his leave to the 9/4 date.  I

11  mailed him a letter, as I had previously, this was

12  readvised.

13  Q    This is Defendant's exhibit 188.  Is this the revised

14  FMLA date letter that you sent Mr. Barger on January 5,

15  2017?

16  A    Yes, it is.

17  Q    What was the purpose of sending Mr. Barger this letter?

18  A    To let him know that his approval for FMLA had been

19  pushed backwards to be effective beginning 9/5.  And that

20  his exhaustion of FMLA had changed to November 28.  But we

21  were continuing evaluation of his leave of absence.  And we

22  were requesting the additional time under the business unit

23  under the ADA.

24  Q    So after the FMLA would be expired, Mr. Barger would

25  then have eligibility to be covered by First Data's policy

VOYCHESKE - DIRECT - EIDELMAN                792

1   with respect to allowing employees to stay out on additional

2   leave under the Americans with Disabilities Act?

3   A    Yes.

4   Q    Is that standard practice and procedure for First Data?

5   A    We do it for every employee out on medically leave who

6   is unable to return on the conclusion of FMLA.  We consider

7   their additional time under the ADA, yes.

8              MR. EIDELMAN:  If I may consult with my

9   colleagues?

10             THE COURT:  Go ahead.

11             MR. EIDELMAN:  No further questions of

12  Ms. Voycheske.

13             THE COURT:  Anything else, Ms. Shearer?

14             MR. SHEARER:  Yes, I have quite a bit.

15             THE COURT:  Let me ask a question.  The FMLA

16  expired November 28, you continued it for two weeks after

17  that?

18             THE WITNESS:  We continued it.  We were prepared

19  to continue it for the long as business was able to

20  accommodate him being out.

21             THE COURT:  About how long is that?

22             THE WITNESS:  Well --

23             THE COURT:  It's an indefinite period of time?

24             THE WITNESS:  It can go on for quite a while.

25             THE COURT:  I'm confused about that.  A person can

 1   be considered to be on leave for an indeterminate period of

 2   time not just --

 3            THE WITNESS:  There is generally a time period

 4   where it would be an undue hardship to the business.

 5            THE COURT:  That's just your practice.  Under the

 6   Act, November 28 was the date of the end of the entitlement.

 7            THE WITNESS:  Under the FMLA.

 8            THE COURT:  What was the date of his termination

 9   from employment, do you know?

10            THE WITNESS:  I don't remember offhand.  I know he

11   provided a release to return on the tenth.  I'm not quite

12   sure.  I wasn't involved in the termination.

13            THE COURT:  What was the date of termination?

14            MR. SHEARER:  Notified on January 13.

15            THE COURT:  January 13 he was notified.

16            MR. SHEARER:  It was --

17            MR. EIDELMAN:  It was effective through

18   February 28, 2017.

19            THE COURT:  The notification was January 13 that

20   he was not welcomed to come back, I guess, right, and

21   effective February?

22            MR. EIDELMAN:  Twenty-eight.

23            THE COURT:  So February 28 is the actual official

24   termination date I take it.

25            MR. EIDELMAN:  His last date of employment, yes,

1    sir.

2    CROSS-EXAMINATION

3    BY MR. SHEARER:

4    Q    Ms. Voycheske, what do you define as a leave?  What is

5    leave?

6    A    I define leave is what is designated under the Family

7    Medical Leave Act, which basically states an employee or

8    qualifying family member must have a serious health

9    condition in which the associate, if it's our employee, is

10   unable to work, or that qualifying family member is unable

11   to work, thus our associate needs to care for them.

12   Q    So somebody has to be not working in order to be on

13   leave?

14   A    That's the understanding, yes.

15   Q    So if somebody is working, then they are not on leave;

16   is that correct?

17   A    They are violating FMLA.

18   Q    If somebody is going to work, they are not on leave?

19   A    Correct.

20   Q    I'm going to go to the last -- you went to the MetLife

21   portal, this Defendant's exhibit 193, I believe --

22   Defendant's exhibit 191.  You just testified as to document.

23        When did you say you went and looked at this on the

24   MetLife portal?

25   A    Immediately after I read Mr. Barger's e-mail that he

1  stopped working on 9/4.

2  Q    And so that was on January 5, correct?

3  A    Yes.

4  Q    Can you answer this question for me, right here it says

5  claim status closed January 18.

6  A    Uh-huh.

7  Q    How could you look at something with a closed status of

8  January 18 on January 5?

9  A    This is a print screen that was pulled later.  This a

10 print screen of the Met Link portal after the date that I

11 looked at it this.  This is representing what the approval

12 was on the day I looked at.  I didn't think to take a print

13 screen that day; we pulled it a few weeks later.

14 Q    That closed status, I see some of these areas like this

15 one here edit, edit, but this one doesn't have that.  These

16 are edits, does give First Data the ability to change the

17 information there?

18 A    No.  We have no -- we have view-only access to this

19 portal.

20 Q    Has anyone ever asked the doctors if the employee has

21 been at work?

22 A    We rely on the certification that says what the dates

23 of incapacity are.  We don't call the doctors and verify

24 that they are not at work.

25 Q    Do you have to be incapacitated to go on Family Medical

VOYCHESKE - CROSS - SHEARER                796

1   Leave Act?

2   A    Continuously, yes.

3   Q    So a serious health condition is defined as an

4   incapacity, unable to work, normal conduct, unable to go to

5   school.  You have to be -- that's a serious health

6   condition, only incapacities are serious health conditions?

7   A    No, the form itself requires several questions to be

8   answered a certain way.  It requires a medical diagnosis,

9   you have to evaluate the entire form to determine whether it

10  meets the criteria for a serious health condition, which is

11  what I did.

12       For example, prescription medication, overnight stay at

13  hospital, the condition itself would render you

14  incapacitated, multiple treatments, various things that need

15  to be considered and analyzed to consider the FMLA

16  designation.

17  Q    So when did Mr. Barger sign his documents initially.

18  A    I believe he signed his employee documents shortly

19  after he got them in November.

20  Q    So if Mr. Barger was totally incapacitated on 10/24,

21  and his signatures are on 11/21.  How you're asking him to

22  do that?  He's capable of doing that.

23  A    We ask all employees to do that?

24  Q    I thought you were saying he's totally incapacitated?

25  A    That doesn't necessarily mean he can't sign his name.

VOYCHESKE - CROSS - SHEARER                    797

1   Q    Does that mean he can understand that documents?

2   A    He shouldn't have signed them if he didn't understand

3   them.

4   Q    When is the first time that you gave Mr. Barger his

5   notification of eligibility under the FMLA?

6   A    Are you talking approval or his eligibility to apply?

7   Q    Eligibility notice?

8   A    I believe that packet was sent to him on November 17.

9   Q    That's when you sent the rights and responsibilities

10  form as well?

11  A    That's when that was sent to him, yes.

12  Q    You have his leave ending seven days after he received

13  his notice of eligibility and notice of rights and

14  responsibilities?

15  A    Retroactively that's how it ended up, yes.

16  Q    How can -- you know the FMLA --

17  A    I can explain it.

18  Q    How can his leave be before the rights were

19  responsibilities were given to him?

20  A    It wasn't.  I can explain it if you like, it happens

21  every day.

22  Q    No.  Did anybody at First Data provide Mr. Barger's

23  doctor a description of his job?

24  A    It's up to -- unless you are --

25           THE COURT:  The question is whether anyone did?

VOYCHESKE - CROSS - SHEARER                798

1          THE WITNESS:  No, I do not.

2    Q    How does the doctor know --

3          THE COURT:  That's argument.

4    Q    In the MetLife form that was shown, I believe I can put

5    it up here, the very first line under authorization to

6    disclose information about me.  It says, MetLife integrate

7    the claim services for disability benefits and request under

8    the Family Medical Leave Act.

9          What does MetLife do under First Data's Family Medical

10   Leave Act practices?

11   A    They do nothing.  This is a template that they send to

12   all of their clients, which some they do manage FMLA.  This

13   is a general form.

14   Q    MetLife isn't involved in the FMLA process?

15   A    Not for First Data, no.

16   Q    Can you be on FMLA leave and not receive short-term

17   disability?

18   A    Yes, you can.

19   Q    Can you receive short-term and not be on FMLA leave?

20   A    We try not to let that happen.

21   Q    Why does the short-term disability date and the leave

22   date have to match?

23   A    Because if the doctor is consistent in what he provides

24   to our organization and what he provides to MetLife, they

25   should be the same.  The patient should be incapacitated on

1    beginning and end date for both disability and leave of

2    absence.

3    Q    But when did Mr. Barger apply for disability benefits?

4    A    I believe it was a bit late in the process.

5    Q    When was he approved for disability benefits?

6    A    I don't believe until January.

7    Q    But yet the short-term disability benefits were applied

8    all the way back to September 4?

9    A    No.  This is FMLA only, I'm not talking about

10   disability.

11   Q    But you relied on MetLife's determination of when the

12   short-term disability started in order to make your

13   determination as to when the FMLA leave started?

14   A    Yes.

15   Q    Why does one have anything to do --

16            MR. EIDELMAN:  Your Honor --

17            THE COURT:  Sustained.

18   Q    What does it take --

19            THE COURT:  Sustained.  You're argumentative.

20            Let me clarify, if the first day of his FMLA leave

21   started on September 4, assuming that's the case, then his

22   FMLA entitlements would end on November 28.

23            THE WITNESS:  Right.

24            THE COURT:  If it started on October 22 or

25   October 24, let's say October 22, then I think the last day

1    was January 16.

2              THE WITNESS:  Correct.

3              THE COURT:  2017.

4              THE WITNESS:  Uh-huh.

5              THE COURT:  And his termination data apparently is

6    February 28 and the notification indication of termination

7    was on January 13, right?

8              THE WITNESS:  Uh-huh.

9              THE COURT:  So am I correct that whether or not

10   the first day of leave started on October 22 or September 4,

11   his FMLA claims would have expired by at the outset

12   January 16.

13             THE WITNESS:  Correct, yes.

14             THE COURT:  So he would not be entitled to leave

15   under the FMLA after January 16.

16             THE WITNESS:  Yes.  He would have exhausted his 12

17   weeks.  It's complex, yes, you're right, his 12 weeks have

18   exhausted.

19             THE COURT:  You talk about the ADA, you continued

20   to provide benefits subsequent to the FMLA expiration date

21   as a matter of policy by your organization?

22             THE WITNESS:  Yes.

23             THE COURT:  That's not for FMLA purposes, that's

24   for ADA purposes.

25             THE WITNESS:  Under the ADA.

 1          THE COURT:  Which means, you would not terminate

 2     somebody unless there is some lawful reason to do so.

 3          THE WITNESS:  Correct.

 4          THE COURT:  The job would be kept open, he could

 5     come back under the ADA?

 6          THE WITNESS:  Yes.

 7          THE COURT:  Unless he was terminated for some

 8     lawful reason.

 9          THE WITNESS:  Yes, for a reason that was --

10          THE COURT:  It's confusing for me, maybe it's not

11     confusing for the jury, to understand the difference between

12     entitled to leave under the FMLA on the one hand and what

13     the policy is under the ADA.

14          THE WITNESS:  The ADA isn't quite as black and

15     white as the FMLA.

16          THE COURT:  The person would be entitled under the

17     ADA, he cannot be discharged unless for disability.

18          THE WITNESS:  Not for his disability.

19          THE COURT:  It would be have for a lawful reason.

20          THE WITNESS:  Correct.

21          THE COURT:  I think I'm beginning to understand

22     it.  I don't know whether you folks are beginning to lift

23     the clouds or not.  I'm not telling you anything about how

24     the case should be decided, just trying to understand it in

25     terms of the dates and the FMLA.  We'll be talking more

1    about this when I give you the instructions on the law,

2    that's why it's taking me a little bit of time to get it all

3    together.  You can see it's not so black and white.  It's

4    not so easy to understand this.  Hopefully you do have an

5    understanding now.

6              Anything else?

7    BY MR. SHEARER:

8    Q    When the doctor's certification, the original one that

9    you looked at said 10/22, where does the doctor send that

10   form?

11   A    To my leave management department.

12   Q    To leave management department, that doesn't go to

13   MetLife?

14   A    They may send it to MetLife.  We're not privy to what

15   MetLife receives.  I can't say if it was or wasn't.

16   Q    Going to Plaintiff's Exhibit 48, this is already

17   entered.  This bottom e-mail here, it's an e-mail, it says

18   to HR help desk and service center, is that for you?

19   A    Neither of those are leave management.  They are within

20   our department, but not to my team.

21   Q    Mr. Barger asked what his last day of work was, this is

22   in December.  And then --

23             THE COURT:  Is there anything?  Mr. Shearer, you

24   have thousands of documents in evidence here the jury can

25   paper the walls with.

1          Aside from that, are there any other facts?

2          MR. SHEARER:  Yes.

3          THE COURT:  Do it now.  I promised the jurors 4:30

4   and we have somebody else that is here.  How long will that

5   witness take?

6          MR. EIDELMAN:  Your Honor, I'll do it as quickly

7   as Ms. Voycheske, I think about ten minutes.

8          THE COURT:  Ask one or two more questions,

9   Mr. Shearer.  I think you exhausted her testimony.

10  BY MR. SHEARER:

11  Q    So this exhibit Plaintiff's Exhibit 49 I don't think --

12  the manager has to verify an employee's last day of work; is

13  that correct?

14  A    Generally the employee should verify their last day of

15  work.  It's odd that they wouldn't know what their last day

16  of work is; if they do not, we rely on the manager to do

17  that.

18  Q    Why did you -- but the doctor provided it to you, is

19  that what you're saying?

20  A    Well, MetLife is who reached to Steve, not our team.

21  Q    You relied on --

22          THE COURT:  We have the facts.  Any other

23  questions?  Save your argument for summations.

24          MR. SHEARER:  Yes, I do.

25          THE COURT:  What else do you need to know from

VOYCHESKE - CROSS - SHEARER                    804

1   this witness, factually?

2   Q    Could it have been construed when you asked Mr. Barger

3   what his last day working was that he thought that was the

4   last day he was in the office?

5              THE COURT:  Anything is possible.  Next question.

6              MR. SHEARER:  Your Honor, I would like to enter

7   some documents.  I don't necessarily need to talk about

8   them, but are related to --

9              THE COURT:  Do you think you need more documents?

10             MR. SHEARER:  I think they are important.

11             THE COURT:  You want more documents?  You have

12  more questions of this witness?

13             MR. SHEARER:  I need Exhibit 40, 45 and 52, 53.

14             THE COURT:  Fifty-two is in evidence already.

15             Let's take care of that after Ms. Voycheske

16  leaves.

17             We want to accommodate this person they came a

18  long distance to testify.  We have 45 minutes left to do

19  that.  Thank you very much.  Next witness.

20             (Whereupon, the witness was excused.)

21             MR. EIDELMAN:  We call Justin Stamey.

22             COURTROOM DEPUTY:  Take the witness stand.  Remain

23  standing assistant raise your right hand.

24             (Witness takes the witness stand.)

25                  JUSTIN STAMEY, called as a witness, having

1  been first duly sworn/affirmed, was examined and testified as

2  follows:

3            THE WITNESS:  Yes.

4            COURTROOM DEPUTY:  Have a seat.  State your name

5  for the record.

6            THE WITNESS:  Justin, J-U-S-T-I-N, Stamey,

7  S-T-A-M-E-Y.

8            COURTROOM DEPUTY:  Thank you.

9  DIRECT EXAMINATION

10 BY MR. EIDELMAN:

11 Q    Good afternoon, Mr. Stamey.  Thank you for coming from

12 Atlanta today to join us here.  By whom are you employed?

13 A    Fiserv.

14 Q    You got it, right.  What is your title?

15 A    Director of training.

16 Q    When did you start working at First Data or Fiserv?

17 A    July 2009.

18 Q    Were you hired by Steven Barger?

19 A    No.

20 Q    Quickly, just get to what you were hired at and how you

21 got to the sales training group?

22 A    Sure.  Spent a couple of years in sales, then moved to

23 training role for about a year.  Then I moved into a sales

24 manager role for two years.  And then into my current

25 position, which was under Steven Barger at July 2015.

STAMEY - DIRECT - EIDELMAN                806

1   Q     So you've been a director at First Data since July 2015

2   to present?

3   A     Yes.

4             (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. EIDELMAN:

2  Q    You just said you came to work under Steve Barger.  Was

3  he already the senior vice president in charge of sales

4  training at the time you joined that organization?

5  A    Yes, he was.

6  Q    As a director, what were your duties and responsibilities

7  then?

8  A    To take in requests from business leaders, analyze the

9  request, design, develop, and then deliver training.

10  Q    We heard testimony yesterday from Julie Kelly that while

11  Mr. Barger was the manager of the sales training department,

12  that he was responsive, effective, and available, as the

13  manager of that group.  Do you agree with that testimony?

14  A    When I was first hired, yes.

15  Q    Did that change?

16  A    It did change over time.

17  Q    What happened?

18  A    I think in the middle of 2016, you know, somewhere in

19  July, somewhere around that time, it was harder to reach

20  Steve.  After the surgery, I think that was the hardest part.

21  Q    The surgery that took place in September?

22  A    September, yes.

23  Q    Okay.  Did you have an opportunity to interact with

24  Mr. Barger while he was on leave following his surgery?

25  A    I did.

1    Q    What was the nature of those interactions?

2    A    Really just -- number one, to check on him personally,

3    because we had a personal relationship.  He was my boss.  I

4    wanted to make sure he was doing okay.  And, you know, we

5    wanted to stay connected.  I testified, like you heard

6    earlier, so we would try and make sure that he had, a laptop

7    or something set up so that he could stay connected.

8    Q    Did you consider him to be working during that time

9    period?

10   A    Not to the degree that he was before the surgery.

11   Q    Right.

12        So how often did you interact with him while he

13   was -- prior to his surgery?

14   A    Prior to the surgery, probably, you know, once a day.  He

15   was in the office, you know, we'd stop by in the morning,

16   talk.

17   Q    Prior to the surgery, was there anyone else involved in

18   running the leave group besides Mr. Barger?

19   A    Prior to the surgery?

20   Q    The sales training group.  Was Rhonda Johnson involved?

21   Was she somebody that you worked with in terms of when you

22   were an employee of the leave -- not the leave group.  Excuse

23   me, in the sales training group?

24   A    Yes.  She was our HR partner, so we would go to Rhonda if

25   we needed help around a sensitive situation.  That's typically

1   what the HR people do.

2   Q    Do you also talk to Rhonda Johnson about difficulties

3   that were being encountered because Mr. Barger was unavailable

4   to help lead the group?

5   A    Yes.

6   Q    Okay.  And that happened quite often?

7   A    Yes.

8   Q    And that happened prior to the time that Mr. Barger had

9   surgery?

10  A    Again, not as frequently before he had surgery, it was

11  more after the surgery.

12  Q    Okay.  There was testimony yesterday about a conversation

13  between you, Rhonda Johnson, and Julie Kelly that was on or

14  about November 10 of 2017 -- '16, excuse me, because there

15  were concerns about Mr. Barger and his accessibility and

16  availability.  Are you familiar with that conversation?

17  A    It sounds familiar.  We had a conversation with Rhonda

18  around that time, so, yes.

19  Q    What were those conversations with Rhonda at that time?

20  A    Well, at that time of year, it's typically budget

21  planning, there's head count considerations, there are

22  planning for the next year.  So we were trying to essentially

23  package information that could be put in front of Steve or

24  Jeff Hack or someone that can make a decision on what we

25  needed to do with our strategy going forward.

1  Q    Were you having trouble connecting with Mr. Barger during
2  that time period?
3  A    Yes.
4  Q    Okay.  And that's why you -- was it just you that went to
5  Ms. Johnson or were there other people as well?
6  A    There were others.  Theresa Ward, I know -- well, Julie,
7  as well, Julie Kelly.
8  Q    Okay.  While you were -- while Mr. Barger was managing
9  the department, there were a number of products, I think, that
10  were brought in to be used for working with the sales training
11  group; is that right?
12  A    When you say products?
13  Q    Products.  Have you heard of something called a business
14  needs analysis?
15  A    Yes.
16  Q    What was the business needs analysis?
17  A    So, in short, it was essentially a software program,
18  essentially ten questions -- let me ask you ten questions
19  about your business, and then it would provide a
20  recommendation with a bundled solution that you could then
21  present to that client.
22  Q    Is First Data using business needs analysis now?
23  A    No.
24  Q    When did it stop using it?
25  A    Probably late 2017, early 2018.

1   Q    Why did it stop using it?

2   A    Mainly low utilization.  It was costly to deploy and

3   then, of course, costly to maintain.  You had to update the

4   recommendations based on the products that were changing, and

5   it wasn't being used as much in the field.

6   Q    When you say it was costly, do you have a sense of the

7   cost for the business needs analysis software that Mr. Barger

8   brought to the company?

9   A    Based on all of the development that was done with the

10  external vendor, it had to be north of 2 million.

11  Q    And this was done at First Data, right?  This is First

12  Data developed the business needs analysis, correct?

13  A    So First Data developed the connections on the back end.

14  It is based out of the CRM tool, but then there was another

15  company that was writing some of the app architecture and what

16  it needed to essentially function on the iPad.

17  Q    Right.

18       During his employment as the manager of that group,

19  did you also turn to an external learning company to help the

20  sales training group deliver sales training to employees?

21  A    To employees?

22  Q    Or to sales folks, something called the Richardson?

23  A    Oh, yes.  So Richardson was a sales skills methodology

24  company.  They were a vendor, companies will bring them in to

25  look -- rolling out new sales skills training.  So we did work

1    with the Richardson, yes.

2    Q    Does First Data still work with Richardson?

3    A    No.

4    Q    When did it stop working with Richardson?

5    A    We were able to get rid of that contract in March of

6    2018.

7    Q    March of 2018?

8    A    Uh-huh.

9    Q    What was -- how much was that contract costing First

10   Data?

11   A    Total, 1.3 million over three years.

12   Q    Why did First Data cancel the contract with Richardson?

13   A    Mostly the cost initiative.

14   Q    Did you need the services that were provided by

15   Richardson or these things that you could do internally at

16   First Data?

17   A    We could do it internally.

18              THE COURT:  But you were there while this was

19   happening, right?

20              THE WITNESS:  The agreement preceded me.

21              THE COURT:  This is afterwards, you came, and you

22   cut costs, and you didn't need it anymore?

23              THE WITNESS:  Correct.

24              THE COURT:  We are getting a little tangential.

25   Let's go on.  Do you need him anymore?  Because he may have to

 1   stay here until Monday.

 2          MR. EIDELMAN:  Your Honor, it is going to be very,

 3   very brief.

 4          THE COURT:  I am not going to truncate Mr. Shearer's

 5   questioning.

 6          MR. EIDELMAN:  I am not trying to, Judge.

 7          THE COURT:  I am telling you right now.

 8          MR. EIDELMAN:  Okay.  If I may then.

 9          THE COURT:  This is not the heart of your case.

10          MR. EIDELMAN:  Can I ask him what his current

11   position is, please.

12          THE COURT:  Go ahead.

13   Q    What is your current position?

14   A    I'm director of training.

15   Q    And who leads the sales training group at First Data now,

16   Fiserv?

17   A    I do.

18          THE COURT:  You were working -- you were not -- you

19   were working underneath Mr. Barger's supervision, weren't you?

20          THE WITNESS:  Yes, Your Honor.

21          THE COURT:  Do you have any problems with the way he

22   did his job?  You had a close relationship?

23          THE WITNESS:  We had a close relationship.

24          THE COURT:  Came to work every day, worked really

25   hard?

1           THE WITNESS:  Yes.

2           THE COURT:  You were all trying to do the best you

3    can to make a lot of money for First Data, right?

4           THE WITNESS:  Yes, sir.

5           THE COURT:  Do you have any other questions?

6           MR. EIDELMAN:  I do.

7    Q    Were you employed by First Data when Robin Ording took

8    over as interim lead -- interim manager or lead of the sales

9    training group?

10   A    Yes.

11   Q    When did that occur?

12   A    Early 2017.

13   Q    What was the difference between Mr. Barger's management

14   style and Ms. Ording's management style --

15          THE COURT:  Objection sustained.  I don't think

16   it's -- I think we're getting a little far afield.  Maybe it's

17   tangentially relevant on some theory, but let's move on.

18          MR. EIDELMAN:  I will move on.

19          Can I have the Elmo, please.

20   Q    Mr. Stamey, are you familiar with this organizational

21   chart?

22   A    Yes.

23   Q    This is Defense Exhibit 182.

24          Is this the organizational chart that existed at the

25   time that Steve Barger went out on leave and Ms. Ording took

1  over?

2          THE COURT:  There was already testimony about this.

3          MR. EIDELMAN:  I know.

4          THE COURT:  We don't need it.  It is duplicative.

5  It is getting cumulative.  We have tons of exhibits.

6          MR. EIDELMAN:  Can I just ask him a question, Judge?

7          THE COURT:  One last question.

8          MR. EIDELMAN:  One last question.

9          THE COURT:  Go ahead.

10 Q   Mr. Stamey, at my request, did you mark the -- let me ask

11 this question.

12         How many employees are currently in the sales

13 training group, including yourself?

14         THE COURT:  I don't think we need it.  Next

15 question.

16 Q   Mr. Stamey, at my request, did you mark the sales -- the

17 organizational chart to indicate what the sales training group

18 looked like now versus what it looked like at the time that

19 the company determined --

20         THE COURT:  I think we're getting a little bit

21 collateral, tangential, and I think it's getting a little bit

22 confusing and prolix.  We don't need it.

23         Do you have any other questions of this witness?

24         MR. DiLORENZO:  Your Honor, can we make an offer of

25 proof?

1          THE COURT:  No, you can take it up to the Circuit

2     Court.

3          Do you have anything else?

4          MR. DiLORENZO:  Your Honor, can I be heard on this

5     objection, please.

6          THE COURT:  No.

7          You have any other questions of this witness?

8          MR. EIDELMAN:  May I just consult with my colleague

9     for one second, Your Honor?

10         THE COURT:  You can ask one or two more questions,

11    and then we're going to move on.

12         MR. EIDELMAN:  Well, the only last question I have

13    would be, what does the organizational chart look like now.

14    And I asked him to mark it, what it looked like now versus

15    what it looked like then.

16         THE COURT:  You know, look.  It may be on some sort

17    of theory relevant to your case.  You have 700 exhibits in

18    evidence already.  You are overwhelming the jurors.  There

19    comes a time when I think as the judge that it is getting a

20    little bit too complicated and prolix, and I think we have had

21    enough, okay?  That's my ruling.  You can step down.

22         Do you have any questions to ask of him?

23         MR. SHEARER:  Just one.

24         THE COURT:  You can stay, if you need to have him

25    come back on Monday, I am going to tell the jury you are

STAMEY - CROSS - SHEARER                          817

1   perfectly entitled to do that.

2           MR. SHEARER:  No, no.  I just have one question.

3   CROSS-EXAMINATION

4   BY MR. SHEARER:

5   Q    You talked about the business needs analysis and the

6   external learning company.

7           Do you have any personal knowledge that Mr. Barger

8   was the one that implemented these?

9   A    Yes.

10  Q    Do you have any personal knowledge that Mr. Plumeri

11  implemented these?

12  A    No.

13          MR. SHEARER:  That's it.

14          THE COURT:  You may step down.

15          (WHEREUPON, the witness was excused.)

16          THE COURT:  All right.  Now, it is 4:00.  We have

17  any more live witnesses today?

18          MR. SHEARER:  No, Your Honor.

19          THE COURT:  Does the defendant have any live

20  witnesses today to present?

21          MR. EIDELMAN:  We let Mr. Shearer put them on.

22          THE COURT:  Okay.  I'm just asking.

23          What I am trying to do, I'm not trying to play games

24  with you folks, okay.  You've got this thing litigated up to

25  the eyeballs.  We understand it.  But there comes a point in

1    time when I think it's getting a little prolix and I have to

2    control the case, all right?

3              You have some deposition testimony you want to read

4    in yet?

5              MR. SHEARER:  Yes, I do.

6              THE COURT:  All right.  And I think if you do that,

7    how long will it be?  Because we are going to leave at 4:30.

8    Can you do it by 4:30?

9              MR. SHEARER:  I think so.  I hope so.

10             THE COURT:  If it is not terribly relevant, I am

11   going to make the same rulings with respect to your offerings

12   as I did with the defendants.

13             What is it all about?

14             MR. SHEARER:  The first one I want to do is Kathi

15   Benhardt, who is the head of the spreadsheets that we were

16   looking at on Mr. Barger being added.  She's the one that

17   plans the reductions in force.

18             THE COURT:  How long will that take?

19             MR. EIDELMAN:  Your Honor, that's a

20   mischaracterization.  She does not plan the reductions in

21   force.

22             THE COURT:  I don't know.  I haven't heard a thing.

23             MR. EIDELMAN:  She does the reporting.

24             THE COURT:  I just want to know how long will that

25   deposition testimony be?  I'm trying to conclude this trial

1    today.  If I can't do it, I can't do it.

2          MR. SHEARER:  Can I get it into a half hour?  I

3    don't know.

4          THE COURT:  Here's what we are going to do.  Members

5    of the jury, we have had a long week.  You are free to go home

6    now.  Don't talk about the case.

7          We are going to have to talk to the lawyers about a

8    few things in your absence, sort of get the real issues

9    refined so we can present it to you in a way that you

10   understand, hopefully.  That's my job.  We have had a lot of

11   exhibits, we have had a lot of testimony, about a lot of

12   operations of First Data.  It has been all very educational.

13   I'll pull it all together for you in my charge.  In the

14   meantime, maybe Monday morning, there may be another hour of

15   depositions or whatever else, all right?  But for sure, after

16   that, we will have probably summations, and we will see how we

17   go.

18         But rather than put everybody under undue pressure

19   today, now, I think it is a good time for us to end our

20   proceedings for the week.

21         Juror number 6, drive carefully to where you are

22   going, okay.

23         And we will see you all on Monday morning at 10:00.

24         THE COURTROOM DEPUTY:  All rise.

25         (WHEREUPON, at 4:01 p.m., the jury exited the

1    courtroom.)

2         (Proceedings continue in open court; no jury

3    present.)

4         THE COURT:  All right.  The jurors are not here.  We

5    are going to take a 15-minute break and then continue.

6         But I want to ask once again, Mr. Shearer, I think

7    you said the first day of leave was when?  November?  You gave

8    me a date before?

9         MR. SHEARER:  They came in --

10        THE COURT:  When do you claim he was on leave, if at

11   all?

12        MR. SHEARER:  He started leave, November 21.

13        THE COURT:  That's the date that you claim leave

14   started?

15        MR. SHEARER:  Right.

16        THE COURT:  You concede he was on leave November 21?

17        MR. SHEARER:  Yes, he was.  I am not contesting that

18   October 24 start date that was in the designation letter,

19   because it doesn't affect Mr. Barger's rights at the end of

20   leave.  Because he would -- he asked to be returned.  So I am

21   not contesting --

22        THE COURT:  Just one second.

23        So you claim that -- I have to give the jury some

24   dates here, that we agreed to.  November 21 is when you claim

25   that he was lawfully on leave, right?

*PROCEEDINGS*                                                    821

1          MR. SHEARER:  Yes.

2          THE COURT:  Okay.

3          MR. SHEARER:  And like I am saying, Your Honor, you

4   can use the October 24 date --

5          THE COURT:  Just one second.

6          So October 24 or 22 is the day of first leave,

7   according to what we just heard, right?  And you say it is

8   okay whether it's October 24 or 22 or November 1.

9          MR. SHEARER:  Right.

10         THE COURT:  So if it is October 22, the -- his FMLA

11  date ended on January 16.

12         MR. SHEARER:  Correct.

13         THE COURT:  Now, your position is that he wanted to

14  come back to work before that, right?

15         MR. SHEARER:  He scheduled January 17 to come back

16  to work.

17         THE COURT:  Right.

18         So on January 7, he wanted to come back.  He still

19  had some time left on his leave, right?

20         MR. SHEARER:  Correct.

21         THE COURT:  And that's what you say is the basis for

22  your claim, I guess, under the FMLA?

23         MR. SHEARER:  Right.

24         THE COURT:  Okay.  So I just want to get it

25  straight.  It is not easy for me, you know.  You've got so

1   many exhibits.  And it is fun, you can try the case whatever

2   way you want, but if you want to give this jury 340 exhibits,

3   good luck.  But you got them all in evidence.  The defendant

4   as well.  Sometimes cases are overtried.

5            MR. SHEARER:  It's hard to prove when you are on

6   leave and not there.  That's --

7            THE COURT:  All right.  4:15, we will continue our

8   conversation.

9            (WHEREUPON, a recess was had from 4:03 p.m. to 4:21

10  p.m.)

11           THE COURT:  Let's go back on the record.

12           So, Mr. Eidelman, the defendant's position is that

13  there's no FMLA problem because his leave started on September

14  4.  Is that your position?

15           MR. EIDELMAN:  One of them, Judge.

16           THE COURT:  Well, that is our principal one, to

17  start.

18           October 22, I think you said, is the first day of

19  his leave, right?

20           MR. EIDELMAN:  No, we said, actually, Your Honor,

21  the earlier, when we were here earlier, before lunch, we said

22  the first day of the leave was in September.  And that's --

23           THE COURT:  Fine.

24           MR. EIDELMAN:  And that's what we said.

25           THE COURT:  And that's your position.

*PROCEEDINGS* 823

1          Now, October 22, what happened then?

2          MR. EIDELMAN:  On October 22, that was the first --

3   that was the initial time that we got the doctor's

4   certification saying -- and then, based on additional

5   information that came from the plaintiff, the leave management

6   office, Ms. Voycheske testified --

7          THE COURT:  You don't have to do that.  Your

8   position is that he was lawfully on leave as of October 22,

9   one way or the other?  Yes or no?

10         MR. EIDELMAN:  Yes.

11         THE COURT:  Okay.  So if he was lawfully on leave on

12  October 22, that means his leave, 12 weeks period under the

13  FMLA, expired January 16, correct?

14         MR. EIDELMAN:  No.  No.

15         THE COURT:  Well, I count 12 weeks.

16         MR. EIDELMAN:  But because if we say it started on

17  September 1 --

18         THE COURT:  No.  I am talking about if it started

19  October 22.

20         MR. EIDELMAN:  Yes.

21         THE COURT:  For sure, you've got a good argument

22  that as of October 22 --

23         MR. EIDELMAN:  If it started on October 22,

24  Your Honor, I would agree, if that's the date that it started,

25  then it would have expired on --

1          THE COURT:  January 16.  I wrote it down.

2          MR. EIDELMAN:  Yes.  Correct.

3          THE COURT:  And then he was -- wrote the letter he

4    was willing to come back on January 7, whenever it was.

5          MR. EIDELMAN:  17.

6          THE COURT:  And he was terminated on the 13th -- the

7    17th --

8          MR. EIDELMAN:  No, he was not -- no --

9          THE COURT:  Wait a second.

10         The letter that said he was ready to come back, I

11   thought it was January 2?

12         MR. SHEARER:  He delivered his positions return to

13   work authorization on January 10.

14         THE COURT:  January 10.  So your position is that as

15   of January 10, he was ready to come back to work.

16         MR. EIDELMAN:  No.

17         MR. DiLORENZO:  No.

18         THE COURT:  I will ask the plaintiff.

19         MR. EIDELMAN:  Sorry.

20         THE COURT:  Your position is -- we have to find out

21   whether he was terminated before or after his FMLA rights

22   expired.  That's all I am trying to do.

23         MR. SHEARER:  His doctor's note said that -- turned

24   in on the 10th, said he could return on the 17th.

25         THE COURT:  Okay.  So now let's talk about that.

1    You got the notice on the 7th saying he could return on the

2    17th.

3              MR. SHEARER:  Right.

4              THE COURT:  He was terminated, notice of termination

5    on January 13, unless I have it wrong.

6              MR. EIDELMAN:  That was not notice -- that was -- he

7    was advised at that point in time that his employment would

8    end, effective at the end -- he stayed employed for another

9    six weeks.  His last date of employment was the 28th.

10             THE COURT:  Was February 28 --

11             MR. EIDELMAN:  That's the last date of his

12   employment.

13             THE COURT:  -- 2017.

14             MR. EIDELMAN:  That is correct.

15             THE COURT:  But somebody can be told he's terminated

16   effective three weeks later or four weeks later.  But the

17   official notice that he's going to be not be employed was

18   when?  January 13, wasn't it?

19             MR. EIDELMAN:  Yes.  But he -- yes, that is right,

20   Your Honor --

21             THE COURT:  Get the dates down.

22             MR. EIDELMAN:  I'm sorry?

23             THE COURT:  On January 13, he was told he's not

24   going to have a job anymore.

25             MR. EIDELMAN:  As of February --

*PROCEEDINGS*                                                     826

1          THE COURT:  I understand that.  But as of January

2    13, he was told he's not going to have a job anymore.

3          MR. EIDELMAN:  Yes, Your Honor.

4          THE COURT:  All right.  So you had the doctor's

5    letter saying he could come back to work on the 17th, right?

6          MR. SHEARER:  Right.

7          THE COURT:  Okay.  And you think that he still was

8    in the FMLA time frame under those circumstances.

9          MR. SHEARER:  Yes.  Right.  His leave expired on --

10   I believe his leave expired on the 16th.

11         THE COURT:  What?

12         MR. SHEARER:  I believe his leave expired on the

13   16th and he was coming to work on the 17th.

14         THE COURT:  Okay.  So, look.  We are dealing with a

15   day here and a day here.  That's okay.  I want to get it down

16   right.

17         So we have the facts now in terms of the timelines,

18   right?  Okay.  Notice of the termination, January 13, 2017.

19   Clear, right?  Effective as of February 28, 2017, okay.

20         MR. EIDELMAN:  Yes, Your Honor.

21         THE COURT:  And if, in fact, he was definitely on

22   leave as of October 22, that his leave expired on January 16.

23   The doctor wrote on January 7 he could come back on January

24   17, right?

25         MR. SHEARER:  January 10.  He said come back --

1          THE COURT:  January 10 he wrote.

2          MR. SHEARER:  Yes.

3          THE COURT:  Said he can come back on the 17th.

4          All right.  Now, you would rather have his leave

5    start on September 4, right?  Because if it started on

6    September 24, then his FMLA rights expired way in advance of

7    their notice of termination.

8          MR. EIDELMAN:  That is correct, Your Honor.

9          THE COURT:  Okay.  Now, there's a regulation -- so

10   it is a fact issue maybe as to whether or not he really

11   started his leave on September 4 or October 22 or whatever.

12   But we have a regulation now that my attention was called to.

13   29 CFR 825.301, subdivision B, called retroactive designation.

14   Are you familiar with that?

15         MR. DiLORENZO:  We are, Your Honor.

16         MR. EIDELMAN:  We are, Your Honor.

17         MR. SHEARER:  Yes, Your Honor.

18         THE COURT:  It says:  If an employer does not

19   designate leave, as required by 825.300, the employer may

20   retroactively designate leave as FMLA leave, with appropriate

21   notice to the employee.

22         So am I right that you did not designate the leave

23   under 825.300?

24         MR. EIDELMAN:  We designated it the very day that we

25   found out that his leave had started earlier.

```
 1              THE COURT:  Okay.  You designated it on what date?
 2              MR. EIDELMAN:  On January 5, the same day that
 3    Mr. Barger confirmed that his leave had started and he stopped
 4    working.
 5              THE COURT:  But before then you did not designate
 6    it, for whatever reason?
 7              MR. EIDELMAN:  Not at that date.  We had designated
 8    previously.
 9              MR. SHEARER:  They did designate previously.
10              THE COURT:  When did they designate it?
11              MR. SHEARER:  On December 15, they designated the
12    October 24 through January 16.
13              MR. EIDELMAN:  It was -- Your Honor, it was the same
14    protocol, meaning --
15              THE COURT:  Stop.
16              MR. EIDELMAN:  Sorry.
17              THE COURT:  So the designation under the regulation
18    here happened in December, and they designated it as of
19    October 22, is your position, right?
20              MR. SHEARER:  That's right.  December 15 -- the
21    letter actually says the 24th.  That was the weekend --
22              THE COURT:  Say the 24th.  They designated it.
23              MR. SHEARER:  Yes.
24              THE COURT:  But they didn't designate it back to
25    September 4, didn't they?
```

1          MR. SHEARER:  No.

2          THE COURT:  And?

3          MR. EIDELMAN:  And the reason is, Your Honor, we did

4   the same process that we did with the December date.  On

5   December 15, I think it was, we were notified that his leave

6   had started previously, and pursuant to the regulation, we

7   sent the letter on that date advising that his leave started

8   on the 24th.  Retroactive, because that's when we got the

9   information.

10          On January 5, when Mr. Barger confirmed that his

11   first date of work -- stopping work was on September 4, they

12   did the exact same thing.  They used the regulation, they

13   retroactively designated his leave.

14          THE COURT:  So here's what it says.  If an employer

15   does not designate leave as required by 825.30, I have to look

16   at that again, the employee may retroactively designate leave

17   with appropriate notice to the employee, as provided by that

18   section, provided that the employer's failure to timely

19   designate leave does not cause harm or injury to the employee.

20   In all cases where leave would qualify for FMLA protections,

21   an employer and an employee can mutually agree that leave be

22   retroactively designated as FMLA leave.

23          I don't think that happened here, right?  So we have

24   to consider the application of that provision of the code,

25   okay?

1        You have your reasons why it never happened, but the

2   truth of the matter is they say it wasn't designated.  You

3   knew he was in the hospital and you didn't designate it,

4   right?

5        MR. EIDELMAN:  Well, no, no, no.  No.  What the

6   testimony has been is that the company allowed Mr. Barger to

7   stay on the payroll starting on September 4 at full leave.

8   And then we know what happened with the company determining,

9   in November, after Mr. Barger came forward and said "I need to

10  have more surgery," et cetera, that that was the time to go

11  out on leave.  He gets his paperwork.  His doctor -- it was

12  his responsibility to get his paperwork in.  And, in fact,

13  what the regulations say, that you normally get 15 days to get

14  in your paperwork, and then you cannot even be eligible for

15  FMLA.  They let it go a lot longer.  On December 15, almost

16  three weeks later, his doctor --

17       THE COURT:  I know you are on top of the 742

18  exhibits, okay.  I get it.

19       Let me ask you a couple of questions.

20       MR. EIDELMAN:  Certainly.

21       THE COURT:  It seems to me that you knew he was in

22  the hospital on September 4.

23       MR. EIDELMAN:  We did.

24       THE COURT:  Just one second.  I mean, I don't have

25  as complicated a mind as you have.

*PROCEEDINGS*                                                    831

1          You knew he was in the hospital on September 4,

2    right?  All sorts of testimony that he was being operated on

3    and that he was being visited and you cared about him,

4    et cetera, et cetera, right?  But for whatever reason, you

5    never designated September 4 as the time that his leave would

6    start, even though you knew that he was hospitalized, even

7    though you knew he was undergoing serious surgery, right?  So

8    you had knowledge of that.

9          MR. EIDELMAN:  Correct.  Yes.

10         THE COURT:  I understand later on all these letters

11   came, and I get it.  Right?

12         So one of the ways I can present this case to the

13   jury is to let them decide, I guess, is the factual matter

14   whether September 24 was the date of the leave, and I can

15   decide the leave issue later on, I imagine.

16         My initial reaction is that legally you were out to

17   lunch here on this case because you had all sorts of knowledge

18   of the circumstances and you never designated him, okay.  But

19   I don't think I have to make that determination.  Maybe the

20   jury will spare us of that, right?

21         So that's what I am thinking of right now.  Now, you

22   can go back to your 742 exhibits if you want to.  I am just

23   trying to logically explain this to the best of my ability,

24   okay.

25         I think you've got a problem there under that

1    section, is my general sense.  So I understand you have all

2    these events and all these letters and all these doctors, but

3    it doesn't seem to me as if you could not have designated him,

4    according to the labor law provisions, back to September 4.

5                   MR. EIDELMAN:  Under --

6                   THE COURT:  In October, the end of September?  I

7    mean, you knew this guy was in the hospital.

8                   MR. EIDELMAN:  Your Honor, I understand the Court's

9    position.  We actually -- I mean --

10                   THE COURT:  It is a matter of law, I am talking

11   about.  It is an issue of law.

12                   MR. EIDELMAN:  It is an issue of law as to -- well,

13   if it is an issue of law, then it would appear to me that the

14   facts are undisputed that based on what Mr. Barger then

15   told -- I understand the point that we did not designate it on

16   September 4.  And there was testimony from our witnesses as to

17   why we didn't do it that way at that time.

18                   THE COURT:  Well, you designated on September 10.

19   You didn't designate on September 20, you didn't designate it

20   on October 1.  And your position is this guy was not able to

21   return to work.

22                   MR. EIDELMAN:  But I am not sure, Your Honor, from a

23   logical perspective, what is the difference between it being

24   designated on December 22, when we get the note from his

25   doctor.  We didn't designate it on September 22 until we got

1    the note from the doctor.

2          THE COURT:  I don't think you needed a note from the

3    doctor to designate here.

4          Look.  We will see how it all fleshes out.  I am not

5    so sure that this is not an issue of law that September 4 is

6    not the trigger date.  But we're going to let the jury decide

7    it, perhaps, factually, right?  And, in any event, if they do

8    decide that September 24 was the date, and if the law, you

9    know, does not foreclose you from arguing this, then I guess

10   his leave rights expired well in advance of the time he was

11   discharged, right?  Yeah.

12         MR. EIDELMAN:  We would think it would be a factual

13   question under that scenario, Judge.

14         THE COURT:  I am going to think about it.  But we

15   have to have an open discussion, okay?  So I think we are

16   getting close to crunching here.

17         Now, what we are going to do here is that you be a

18   little patient, and we are going to get a proposed charge to

19   you before the weekend so you can have a nice weekend, and it

20   is going to be a draft.  It will be a track -- a lot of what

21   we have been speaking about over the last day or so, okay.

22         And then you will have an opportunity to look at it

23   and memorize it over the weekend, and we can talk more about

24   it.  But at least you will have a pretty good idea about how

25   you are going to argue your case to the jury.  And I want you

1    to make sure that you have enough information so we can have

2    an intelligent argument.  Fine tuning the charge we will do,

3    all right.

4            And I am willing to listen to whatever substantive

5    things you want me to consider.  But my game plan is to have

6    you, Mr. Shearer, finish up your deposition testimony,

7    whatever.

8            As far as I am concerned, we have gone way off the

9    rails here.  I've allowed you to do it.  Good law firms do

10   that.  And I sort of was a little bit permissive here, but we

11   are where we are anyway, right?  We didn't handle such

12   complicated cases in Suffolk County.  It's taken me 24 years

13   to get in touch with how you do it in New York City, okay?

14   But I am still trying to learn.

15           So you will have the proposed charge.  You can look

16   at it and we can talk about it.  I think that the guts of what

17   we're talking about will be in it, and we can talk more on

18   Monday morning.  But, hopefully, you will be able to sum up on

19   Monday, okay?  That's what I want you to be able to do.

20   That's why I want you to see the draft of the charge before

21   you leave today, okay?  Because I don't want the jury to come

22   back for a half hour and then have to come back again on

23   Tuesday, okay?

24           So be prepared to sum up.  You understand where you

25   are going.  I think I know where you are going now, right?

*PROCEEDINGS*                                                     835

1   And I think you understand where I am coming from,

2   Mr. Eidelman, and we will think about whether that provision

3   of the labor law, as a matter of law, precludes you from

4   arguing that September 4 was the date or not.  We will talk

5   about it later, okay?  But you know where I am coming from at

6   least.  That's the important thing, all right?

7            Now, having said everything I've said, I have great

8   respect for the lawyering.  You people worked very hard.  Your

9   clients should be most grateful, the efforts you put in.

10  High-end lawyering.  I am not willing to have you walk out of

11  this courtroom thinking that I am denigrating your talents.  I

12  have my own style, you have your own style, whatever it is.  I

13  respect the fact that you tried so hard.

14           Would I have put in 700 exhibits when I was

15  practicing law in Suffolk County?  I don't know.  We couldn't

16  count that high in those days, right?  But that's what you

17  decided to do and you spent a lot of time doing it, and maybe

18  it was appropriate.  But I think we have enough, okay.

19           And we will look forward to your deposition.  Do you

20  think it is going to really be necessary?  Is this something

21  you have spoken about today?

22           MR. SHEARER:  One of them, yes.  There's some

23  pretext towards the RIF or whether he was in it.

24           THE COURT:  Well, it is all pretext.  Ultimately, I

25  think it is going to come down to whether the jury believes

1   there was a legitimate reduction in force here.  I think

2   that's what it's going to come down to.

3            MR. SHEARER:  And that's what this -- one of these

4   depositions is going to say.

5            THE COURT:  I don't know what spreadsheets have to

6   do with it all.  Maybe it's somewhat relevant, but it seems to

7   be marching far afield here.

8            Okay.  Anything you want to say before we leave?

9            MR. DiLORENZO:  Your Honor, one thing.

10            THE COURT:  Yes.

11            MR. DiLORENZO:  This damage testimony that went in

12   from the plaintiff.

13            THE COURT:  Damage testimony?

14            MR. DiLORENZO:  I don't know how he did it, what he

15   did.  We don't have the program.

16            THE COURT:  Well, you know, look.  I think it is --

17   I didn't pay a lot of attention to it.  He tossed out some

18   numbers.  Let the jury wrestle with that.  I can always set it

19   aside afterwards.  I would rather get everything we can from

20   the jury, and I can always deal with it afterwards, I think.

21   I think I am more comfortable doing that, than knocking it out

22   of the box.

23            What do you say?

24            MR. SHEARER:  I agree.

25            THE COURT:  I think there's -- Mr. DiLorenzo has a

1    lot here that I tend to agree with.  I mean, it seems

2    speculative, a little fuzzy.  Not so sure you really -- you

3    know, you didn't have an expert testify.  I'm not so sure I

4    was impressed with that whole dynamic, but I don't know.  You

5    want to tell me specifically why you don't think we should let

6    the jury decide damages?

7              MR. SHEARER:  Yes.  I think he's a 30-year veteran

8    of Wall Street that can calculate interest and what he made.

9              MR. DiLORENZO:  That's not what I am arguing.

10             THE COURT:  What are you --

11             MR. DiLORENZO:  What I'm arguing is that he gave

12   testimony that hit the ball.  He told me he didn't know how he

13   calculated the 900,000, he didn't know what the offset was.

14   His projection of seven years was incredibly speculative,

15   based on changing the culture at another company.  I mean, I

16   want on the record a motion to strike all of his testimony on

17   damages.

18             THE COURT:  I am not going to do that.

19             MR. DiLORENZO:  I will do it however you want.

20             THE COURT:  Let's see what the jury says, because I

21   may agree with you eventually.  It is great when you have a

22   verdict to look at and we have the record and I can toss it

23   out afterwards.  I have done that type of thing before.  But I

24   just want to get a complete record here.  Anything else?

25             MR. DiLORENZO:  No.

*PROCEEDINGS*                                                          838

1          MR. SHEARER:  No.

2          MR. DiLORENZO:  Your Honor, we just still have the

3    individual defendants.

4          THE COURT:  To do -- they are in the case.

5          MR. DiLORENZO:  Yes.

6          THE COURT:  I am not --

7          MR. DiLORENZO:  Our position is no reasonable jury

8    based on this record could --

9          THE COURT:  We are going to let the jury decide

10   that.  They are going to decide whether they were in control

11   of Mr. Barger under that multi-factor test, you know, as to

12   whether there's control or not.  Let them wrestle with it.  We

13   will see what happens after that.  Anything else?

14         MR. SHEARER:  No, Your Honor.

15         THE COURT:  All right.  So just wait.  I should have

16   a draft charge to you within the hour, all right.  And I want

17   you to have it before you leave.

18              (WHEREUPON, at 4:39 p.m., the proceedings were

19   adjourned until 10:00 a.m., September 23, 2019.)

20

21

22

23

24

25

839

1                              INDEX

2

3     WITNESS                                    PAGE

4

5     STEVEN B. BARGER                            640

6     CROSS-EXAMINATION BY MR. DiLORENZO          640

7     REDIRECT EXAMINATION BY MR. SHEARER         742

8     RECROSS EXAMINATION BY MR. DILORENZO        751

9

10    MATT CAGWIN                                 753

11    DIRECT EXAMINATION BY MR. SHEARER           753

12    CROSS-EXAMINATION BY MR. EIDELMAN           763

13    REDIRECT EXAMINATION BY MR. SHEARER         768

14

15    JENNIFER VOYCHESKE                          773

16    DIRECT EXAMINATION BY MR. EIDELMAN          774

17    CROSS-EXAMINATION BY MR. SHEARER            794

18

19    JUSTIN STAMEY                               804

20    DIRECT EXAMINATION BY MR. EIDELMAN          805

21    CROSS-EXAMINATION BY MR. SHEARER            817

22

23

24

25

840

1    INDEX:   (Continued)

2

3    EXHIBIT                                    RECEIVED

4

5    Plaintiff Exhibit 23                        658

6    Plaintiff's Exhibit 13                      743

7    Plaintiff's Exhibit 47                      747

8    Plaintiff's Exhibit 48                      748

9    Plaintiff's Exhibit 49                      748

10    Plaintiff's Exhibit 10                      755

11    Plaintiff's Exhibit 6                       759

12

13

14

15    Defendant's Exhibit D-36                    764

16    Defendant's Exhibit D-63                    766

17

18    Defense Exhibit 310                         680

19    Defense Exhibit 268                         689

20    Defense Exhibit 249                         695

21    Defense Exhibit 85                          706

22    Defense Exhibit 113                         709

23    Defense Exhibit 110                         711

24    Defense Exhibit 104                         712

25    Defense Exhibit 127                         712

841

| | | |
|---|---|---|
| 1 | Defense Exhibit 108 | 713 |
| 2 | Defense Exhibit 66 | 715 |
| 3 | Defense Exhibit 70 | 716 |
| 4 | Defense Exhibit 43, first page only | 720 |
| 5 | Defense Exhibit 40 and 41 | 722 |
| 6 | Defense Exhibit 201 | 723 |
| 7 | Defense Exhibit 267 | 724 |
| 8 | Defense Exhibit 188 | 728 |
| 9 | Defense Exhibit 30 | 776 |
| 10 | Defense Exhibit 31 | 777 |
| 11 | Defense Exhibit 32 | 777 |
| 12 | Defense Exhibit 123 | 779 |
| 13 | Defense Exhibit 157 | 779 |
| 14 | Defense Exhibit 191 | 779 |
| 15 | Defense Exhibit 188 | 779 |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

1

# #

**#155-254** [1] - 637:16

# $

**$13,852** [1] - 695:15
**$174,000** [1] - 686:12
**$20,000** [3] - 690:20, 690:22, 721:4
**$22** [1] - 766:4
**$27,705** [1] - 695:17
**$3,000** [1] - 767:21
**$30,000** [1] - 642:15
**$31** [1] - 750:2
**$40,000** [1] - 718:4
**$400,000** [4] - 766:19, 766:24, 767:1, 767:12
**$408,000** [1] - 656:18
**$44** [1] - 765:17
**$470,000** [1] - 720:7
**$50,000** [3] - 641:8, 644:1, 696:18
**$53** [2] - 765:21, 765:22
**$83** [3] - 757:24, 758:1, 758:3
**$900,000** [1] - 751:7

# '

**'14** [1] - 754:3
**'16** [3] - 749:17, 784:16, 809:14
**'17** [1] - 720:4
**'18** [3] - 758:25, 764:5, 764:6
**'Can** [1] - 727:11
**'Our** [2] - 786:20, 788:23
**'Ruth** [1] - 787:21
**'Steve** [1] - 656:17
**'Thanks** [1] - 789:10
**'What** [3] - 724:2, 724:7, 725:2
**'when** [2] - 789:3, 789:4

# 0

**066** [2] - 715:8, 715:9

# 1

**1** [7] - 719:12, 719:14, 719:16, 724:8, 821:8, 823:17, 832:20
**1,360,000** [2] - 702:7, 703:16
**1,470,000** [1] - 703:16
**1-17** [2] - 693:10, 693:11
**1-31** [1] - 693:4
**1.25** [1] - 719:20
**1.3** [1] - 812:11
**1.36** [1] - 702:6
**1.360** [1] - 704:17
**1.47** [1] - 704:17
**1.5** [1] - 719:18
**1/16** [1] - 786:2
**10** [13] - 676:7, 754:16, 754:18, 754:24, 755:1, 809:14, 824:13, 824:14,

824:15, 826:25, 827:1, 832:18, 840:10
**10,000** [1] - 692:7
**10-14** [1] - 691:15
**10-31** [1] - 691:16
**10/15** [1] - 787:22
**10/22** [6] - 784:3, 784:16, 785:12, 785:21, 788:11, 802:9
**10/22/16** [2] - 727:12, 789:12
**10/22/2016** [2] - 786:21, 788:24
**10/24** [2] - 785:22, 796:20
**10/24/2016** [1] - 785:11
**100** [2] - 648:14, 776:23
**10017** [1] - 638:10
**104** [4] - 712:3, 712:5, 712:7, 840:24
**108** [6] - 713:9, 713:10, 713:12, 713:13, 713:19, 841:1
**10:00** [3] - 637:8, 819:23, 838:19
**10:03** [1] - 639:2
**10K** [5] - 754:9, 754:11, 755:8, 764:12, 767:19
**10th** [1] - 824:24
**11,000** [1] - 693:6
**11,110** [1] - 693:22
**11/21** [1] - 796:24
**110** [4] - 711:9, 711:11, 711:12, 840:23
**1100** [1] - 775:11
**11201** [1] - 637:21
**113** [4] - 709:18, 709:19, 709:20, 840:22
**115** [1] - 685:5
**115,000** [1] - 692:4
**11:29** [2] - 697:20, 697:21
**12** [9] - 712:8, 734:2, 734:5, 734:7, 768:21, 800:16, 800:17, 823:12, 823:15
**12,000** [2] - 691:20, 691:22
**12,076** [1] - 691:3
**12-15** [1] - 691:25
**12-30** [1] - 692:17
**12/13** [1] - 787:23
**12/16** [1] - 749:2
**123** [3] - 779:7, 781:17, 841:12
**124** [1] - 656:11
**127** [2] - 712:15, 840:25
**12:00** [1] - 697:21
**12:13** [1] - 699:1
**13** [13] - 642:1, 742:22, 743:6, 793:14, 793:15, 793:19, 800:7, 825:5, 825:18, 825:23, 826:2, 826:18, 840:6
**13th** [1] - 824:6
**14,000** [1] - 723:6
**143** [3] - 757:13, 757:15, 757:21
**15** [9] - 691:20, 692:6, 721:24, 724:10, 828:11, 828:20, 829:5, 830:13, 830:15
**15,000** [2] - 692:22, 721:22
**15-minute** [3] - 694:16, 697:12, 820:5
**154** [2] - 782:16, 782:25
**157** [2] - 779:17, 841:13
**159** [1] - 671:25
**16** [10] - 679:6, 786:3, 800:1, 800:12,

800:15, 821:11, 823:13, 824:1, 826:22, 828:12
**160** [1] - 671:25
**165** [1] - 684:11
**16th** [3] - 747:8, 826:10, 826:13
**17** [6] - 642:11, 717:5, 797:8, 821:15, 824:5, 826:24
**17,000** [1] - 722:24
**17-CV-4869(FB** [1] - 637:3
**174,000** [1] - 691:25
**17th** [8] - 693:15, 766:15, 824:7, 824:24, 825:2, 826:5, 826:13, 827:3
**18** [3] - 758:10, 795:5, 795:8
**182** [1] - 814:23
**188** [8] - 727:24, 727:25, 728:8, 728:10, 779:24, 791:13, 841:8, 841:15
**19** [11] - 730:2, 730:6, 730:15, 730:16, 730:24, 737:15, 737:20, 738:13, 738:22, 739:18, 740:25
**191** [4] - 779:23, 790:1, 794:22, 841:14
**193** [5] - 725:17, 725:23, 745:22, 786:14, 794:21
**19th** [1] - 739:24
**1:10** [1] - 741:10
**1st** [1] - 725:3

# 2

**2** [4] - 719:12, 783:8, 811:10, 824:11
**2,000** [1] - 769:3
**2-15** [1] - 693:9
**2.2** [1] - 674:25
**20** [8] - 637:7, 642:7, 650:25, 667:11, 667:17, 697:7, 721:23, 832:19
**20,000** [7] - 641:7, 691:20, 691:22, 693:22, 695:2, 701:10, 721:5
**200** [1] - 775:22
**2002** [1] - 774:15
**2007** [1] - 672:12
**2009** [1] - 805:17
**201** [4] - 723:20, 723:23, 724:24, 841:6
**2012** [4] - 721:20, 722:18, 722:23, 723:2
**2012-2013** [1] - 744:17
**2013** [4] - 721:21, 722:4, 722:19, 723:3
**2014** [7] - 722:4, 722:14, 756:13, 756:22, 764:3, 766:16, 767:4
**2015** [7] - 651:21, 656:17, 656:25, 717:5, 774:17, 805:25, 806:1
**2016** [6] - 691:11, 724:8, 724:9, 749:19, 770:16, 807:18
**2016-2017** [4] - 765:4, 765:16, 767:20, 768:12
**2016/2017** [2] - 770:9, 770:14
**2017** [28] - 672:4, 701:21, 720:1, 721:8, 721:17, 745:13, 755:8, 756:13, 756:22, 756:25, 757:1, 757:13, 757:19, 757:24, 763:12, 763:18, 764:3, 770:18, 786:18, 791:15, 793:18, 800:3, 809:14, 810:25, 814:12, 825:13, 826:18, 826:19

**2018** [6] - 721:18, 758:24, 770:20, 810:25, 812:6, 812:7
**2019** [4] - 637:7, 701:22, 721:18, 838:19
**21** [6] - 656:12, 758:11, 758:17, 820:12, 820:16, 820:24
**21202** [1] - 638:5
**21st** [4] - 685:17, 686:4, 712:17, 730:25
**22** [25] - 725:7, 783:10, 783:11, 784:1, 784:14, 785:19, 799:24, 799:25, 800:10, 821:6, 821:8, 821:10, 822:18, 823:1, 823:2, 823:8, 823:12, 823:19, 823:22, 823:23, 826:22, 827:11, 828:19, 832:24, 832:25
**22,000** [4] - 692:18, 693:6, 775:7, 775:8
**22nd** [1] - 731:13
**23** [7] - 651:14, 658:6, 658:11, 658:17, 785:12, 838:19, 840:5
**24** [14] - 656:12, 686:17, 785:20, 785:23, 799:25, 820:18, 821:4, 821:6, 821:8, 827:6, 828:12, 831:14, 833:8, 834:12
**24,000** [1] - 651:14
**249** [3] - 695:6, 695:11, 840:20
**24th** [3] - 828:21, 828:22, 829:8
**25** [3] - 667:11, 667:17, 697:7
**25,000** [1] - 642:7
**26** [2] - 679:8, 680:7
**267** [3] - 724:15, 724:19, 841:7
**268** [9] - 689:4, 689:8, 689:9, 689:18, 689:20, 689:24, 689:25, 721:3, 840:19
**28** [11] - 694:24, 721:5, 791:20, 792:16, 793:6, 793:18, 793:23, 799:22, 800:6, 825:10, 826:19
**28th** [2] - 715:13, 825:9
**29** [1] - 827:13
**2:15** [2] - 729:1, 741:9
**2:28** [1] - 742:13
**2nd** [1] - 715:14

---

### 3

**3** [3] - 684:17, 686:6
**3,000** [2] - 717:13, 765:16
**30** [17] - 643:5, 643:7, 643:10, 643:17, 643:19, 644:22, 645:13, 648:13, 682:12, 682:17, 682:19, 684:14, 775:23, 776:3, 776:4, 777:13, 841:9
**30,000** [1] - 702:15
**30-year** [1] - 837:7
**300** [8] - 664:16, 668:8, 668:15, 669:22, 670:4, 670:18, 678:10, 709:14
**307** [1] - 650:14
**31** [4] - 777:1, 777:4, 777:5, 841:10
**310** [8] - 679:6, 679:16, 679:19, 679:21, 679:24, 680:3, 840:18
**311** [1] - 680:1
**32** [5] - 777:16, 777:19, 777:22, 777:23, 841:11
**330** [1] - 638:9
**334,000** [1] - 690:24
**340** [1] - 822:2

---

**36** [1] - 755:9
**360** [2] - 657:14, 657:17
**362** [2] - 674:6, 765:5
**3839** [1] - 637:16
**39th** [1] - 638:10
**3:36** [1] - 679:10
**3rd** [2] - 684:25, 724:23

---

### 4

**4** [25] - 676:5, 701:24, 702:4, 703:25, 724:9, 725:4, 757:2, 790:11, 799:8, 799:21, 800:10, 822:14, 827:5, 827:11, 828:25, 829:11, 830:7, 830:22, 831:1, 831:5, 832:4, 832:16, 833:5, 835:4
**4.5** [1] - 701:23
**40** [5] - 722:19, 722:21, 723:2, 804:13, 841:5
**400,000** [1] - 745:13
**41** [9] - 722:3, 722:7, 722:13, 722:16, 722:17, 722:19, 722:21, 723:3, 841:5
**420,000** [1] - 721:7
**43** [3] - 720:11, 720:15, 841:4
**44** [4] - 722:3, 722:7, 722:12, 722:14
**45** [2] - 804:13, 804:18
**450,000** [1] - 702:13
**47** [5] - 746:15, 746:20, 746:21, 747:1, 840:7
**478,427** [1] - 720:19
**48** [5] - 747:22, 747:23, 748:1, 802:16, 840:8
**49** [5] - 748:17, 748:18, 748:21, 803:11, 840:9
**4:00** [1] - 817:16
**4:01** [1] - 819:25
**4:03** [1] - 822:9
**4:15** [1] - 822:7
**4:21** [1] - 822:9
**4:30** [5] - 697:14, 773:2, 803:3, 818:7, 818:8
**4:39** [1] - 838:18
**4th** [1] - 746:4

---

### 5

**5** [11] - 691:19, 757:2, 757:12, 786:18, 787:9, 788:23, 791:14, 795:2, 795:8, 828:2, 829:10
**50** [2] - 637:20, 667:12
**50,000** [2] - 644:17, 645:15
**500** [2] - 638:4, 769:4
**506** [1] - 637:20
**52** [1] - 804:13
**53** [6] - 703:22, 704:2, 768:12, 768:20, 768:24, 804:13
**54** [1] - 719:13
**54th** [1] - 651:14
**5th** [2] - 746:14, 786:25
**5th/6th** [1] - 734:12

---

### 6

**6** [10] - 676:5, 697:13, 724:24, 730:1, 759:5, 759:8, 759:10, 759:12, 819:21, 840:11
**60** [1] - 667:12
**60,000** [1] - 644:4
**61** [1] - 720:7
**62** [1] - 720:7
**62,000** [1] - 721:7
**640** [2] - 839:5, 839:6
**658** [1] - 840:5
**66** [3] - 715:10, 715:11, 841:2
**68** [1] - 714:16
**680** [1] - 840:18
**689** [1] - 840:19
**695** [1] - 840:20
**6th** [3] - 746:4, 750:22, 750:23

---

### 7

**7** [3] - 821:18, 824:4, 826:23
**7,200** [1] - 692:8
**70** [5] - 667:12, 716:16, 716:17, 716:20, 841:3
**70/30** [2] - 648:12, 648:20
**700** [2] - 816:17, 835:14
**706** [1] - 840:21
**709** [1] - 840:22
**711** [1] - 840:23
**712** [2] - 840:24, 840:25
**713** [1] - 841:1
**715** [1] - 841:2
**716** [1] - 841:3
**718-613-2268** [1] - 638:15
**720** [1] - 841:4
**722** [1] - 841:5
**723** [1] - 841:6
**724** [1] - 841:7
**728** [1] - 841:8
**742** [3] - 830:17, 831:22, 839:7
**743** [1] - 840:6
**747** [1] - 840:7
**748** [2] - 840:8, 840:9
**750** [4] - 647:21, 647:22, 648:1, 649:20
**750,000** [2] - 669:4, 669:21
**751** [1] - 839:8
**75204** [1] - 637:17
**753** [2] - 839:10, 839:11
**755** [1] - 840:10
**759** [1] - 840:11
**763** [1] - 839:12
**764** [1] - 840:15
**766** [1] - 840:16
**768** [1] - 839:13
**773** [1] - 839:15
**774** [1] - 839:16
**776** [1] - 841:9
**777** [2] - 841:10, 841:11

**779** [4] - 841:12, 841:13, 841:14, 841:15
**794** [1] - 839:17
**7th** [1] - 825:1

## 8

**8** [1] - 709:22
**8-15-2016** [1] - 690:16
**8-31** [1] - 691:6
**80** [3] - 757:17, 757:18
**804** [1] - 839:19
**805** [1] - 839:20
**81** [2] - 713:9, 762:21
**817** [1] - 839:21
**825.30** [1] - 829:15
**825.300** [2] - 827:19, 827:23
**825.301** [1] - 827:13
**83** [1] - 757:22
**85** [5] - 706:6, 706:7, 706:9, 706:11, 840:21

## 9

**9-30** [1] - 691:9
**9/4** [15] - 727:13, 745:23, 786:11, 787:22, 788:5, 788:22, 789:13, 789:16, 789:19, 789:25, 790:7, 790:19, 790:23, 791:10, 795:1
**9/4/16** [2] - 727:12, 789:11
**9/4/2016** [1] - 790:14
**9/5** [1] - 791:19
**9/6** [3] - 727:13, 745:24, 789:13
**90** [1] - 785:25
**900,000** [5] - 704:13, 704:18, 750:1, 751:6, 837:13
**929** [1] - 692:20
**95** [1] - 724:3
**99** [3] - 688:17, 689:15, 689:17

## A

**a.m** [5] - 637:8, 639:2, 697:20, 697:21, 838:19
**Aaron** [2] - 707:18, 707:20
**abilities** [1] - 683:1
**ability** [3] - 776:19, 795:16, 831:23
**able** [17] - 664:20, 665:24, 680:25, 683:9, 697:6, 698:11, 705:1, 713:1, 734:1, 742:10, 762:10, 776:21, 792:19, 812:5, 832:20, 834:18, 834:19
**abnormal** [1] - 757:10
**aboard** [1] - 644:21
**abreast** [1] - 705:15
**absence** [16] - 647:13, 651:5, 708:6, 711:16, 711:22, 774:21, 774:25, 775:9, 778:18, 780:25, 783:4, 783:6, 785:6, 791:21, 799:2, 819:8
**absolutely** [6] - 656:22, 690:7, 710:24, 712:20, 713:23, 744:14
**Absolutely** [2] - 783:22, 791:4

**accept** [1] - 716:11
**access** [16] - 684:6, 705:3, 705:11, 705:13, 709:2, 735:14, 736:11, 736:13, 736:21, 736:24, 737:2, 737:4, 737:16, 737:25, 789:22, 795:18
**accessibility** [1] - 809:15
**accommodate** [5] - 733:4, 734:1, 773:1, 792:20, 804:17
**accommodation** [6] - 697:16, 704:20, 775:21, 776:21, 776:22, 777:10
**accommodations** [3] - 775:17, 776:14, 777:9
**accomodation** [1] - 697:15
**accomplish** [2] - 648:3, 762:16
**according** [7] - 720:6, 735:5, 784:14, 784:15, 788:17, 821:7, 832:4
**account** [4] - 695:25, 720:1, 737:11, 759:25
**accountant** [2] - 721:15, 764:7
**Accounting** [3] - 759:21, 764:20, 764:23
**accounting** [13] - 753:24, 753:25, 760:1, 760:2, 760:5, 762:11, 764:3, 764:10, 764:24, 764:25, 767:15, 767:25
**Accounts** [1] - 767:7
**accounts** [3] - 685:21, 770:25, 771:3
**accurate** [7] - 647:16, 660:15, 680:23, 680:24, 751:9, 790:18, 791:8
**acquired** [1] - 769:3
**Act** [21] - 686:24, 690:3, 704:21, 775:14, 775:18, 776:13, 777:6, 777:14, 777:24, 778:6, 780:20, 783:4, 783:18, 785:24, 792:2, 793:6, 794:7, 796:1, 798:8, 798:10
**act** [1] - 736:22
**acting** [1] - 669:17
**action** [9] - 709:3, 735:1, 735:4, 737:3, 737:9, 737:14, 758:4, 789:18
**actions** [2] - 782:25, 790:20
**activities** [1] - 756:11
**acts** [1] - 776:17
**actual** [5] - 641:6, 749:16, 785:22, 793:23
**actuals** [1] - 761:17
**ADA** [31] - 645:24, 686:24, 697:15, 729:10, 730:8, 731:22, 734:18, 734:20, 734:22, 735:1, 735:11, 735:15, 738:18, 738:20, 739:5, 739:8, 739:13, 739:25, 740:25, 741:2, 741:7, 775:14, 791:23, 792:7, 800:19, 800:24, 800:25, 801:5, 801:13, 801:14, 801:17
**add** [6] - 649:25, 756:4, 758:8, 762:17, 769:5
**added** [1] - 818:16
**adding** [1] - 769:4
**addition** [2] - 649:2, 701:6
**additional** [8] - 685:11, 765:18, 787:22, 790:23, 791:22, 792:1, 792:7, 823:4
**address** [4] - 642:4, 705:6, 724:5, 724:25

**addressed** [3] - 724:2, 724:13, 724:22
**addressing** [1] - 649:5
**adduced** [1] - 656:4
**adjourn** [1] - 728:19
**adjourned** [1] - 838:19
**adjusted** [3] - 722:24, 760:14, 761:4, 761:10
**adjustment** [1] - 786:6
**administer** [1] - 788:12
**administering** [1] - 778:2
**administers** [1] - 788:4
**administration** [5] - 780:11, 782:3, 782:10, 782:13, 785:3
**administrative** [2] - 706:15, 774:20
**admission** [4] - 738:21, 775:24, 777:3, 778:21
**advance** [2] - 827:6, 833:10
**adverse** [6] - 735:1, 735:3, 737:9, 737:14, 738:14, 738:25
**advice** [8] - 655:15, 681:8, 682:7, 682:8, 682:18, 686:25, 688:13, 708:3
**advised** [3] - 688:11, 789:18, 825:7
**advising** [1] - 829:7
**affairs** [1] - 684:21
**affect** [2] - 760:9, 820:19
**affected** [1] - 765:5
**affects** [1] - 714:5
**afield** [2] - 814:16, 836:7
**AFTERNOON** [1] - 742:1
**afternoon** [7] - 679:10, 712:21, 753:1, 763:25, 764:1, 774:4, 805:11
**afterwards** [4] - 812:21, 836:19, 836:20, 837:23
**age** [1] - 698:15
**agenda** [1] - 664:18
**agendas** [1] - 650:15
**ago** [2] - 770:11, 787:14
**agree** [22] - 652:14, 653:16, 654:12, 655:5, 660:12, 660:14, 661:24, 668:18, 672:19, 682:24, 694:4, 701:18, 736:17, 737:17, 737:19, 781:3, 807:13, 823:24, 829:21, 836:24, 837:1, 837:21
**agreed** [7] - 651:20, 694:7, 695:23, 718:5, 718:16, 719:10, 820:24
**agreed-upon** [1] - 651:20
**agreement** [8] - 643:12, 643:13, 644:9, 646:7, 694:8, 696:21, 770:24, 812:20
**agrees** [1] - 730:22
**ahead** [18] - 640:12, 656:9, 657:11, 676:16, 684:1, 686:12, 709:7, 727:22, 742:15, 743:5, 768:4, 777:21, 779:10, 779:16, 786:24, 792:10, 813:12, 815:9
**aided** [1] - 638:17
**al** [3] - 637:8, 638:4, 638:9
**alive** [1] - 683:17
**allege** [2] - 675:17, 686:22
**alleged** [1] - 738:15
**alleging** [1] - 738:17

**allocated** [1] - 766:1
**allow** [11] - 646:15, 706:10, 720:13, 720:14, 722:7, 722:20, 723:21, 724:17, 779:15, 781:11, 791:1
**allowed** [5] - 705:17, 741:4, 755:24, 830:6, 834:9
**allowing** [1] - 792:1
**almost** [6] - 708:13, 708:19, 717:7, 756:20, 756:21, 830:15
**amazed** [1] - 709:3
**Americans** [7] - 704:21, 775:14, 775:18, 776:12, 777:6, 777:13, 792:2
**Amortization** [1] - 760:19
**amount** [7] - 702:2, 718:3, 743:21, 744:20, 766:21, 766:24, 766:25
**amounts** [1] - 700:23
**analysis** [6] - 810:14, 810:16, 810:22, 811:7, 811:12, 817:5
**analysts** [1] - 661:19
**analyze** [1] - 807:8
**analyzed** [1] - 796:15
**AND** [1] - 637:12
**Andy** [2] - 714:15, 714:18
**answer** [26] - 641:25, 646:16, 651:2, 656:12, 657:19, 657:20, 662:16, 664:13, 665:14, 666:6, 666:8, 688:14, 696:7, 696:17, 701:5, 726:4, 726:5, 743:18, 747:9, 747:18, 750:16, 751:13, 758:14, 758:15, 789:8, 795:4
**Answer** [9] - 656:21, 657:1, 672:8, 672:14, 672:17, 672:24, 673:1, 673:4, 673:9
**answered** [8] - 646:2, 646:12, 652:9, 666:11, 696:22, 750:6, 783:3, 796:8
**anyway** [1] - 834:11
**apart** [1] - 764:12
**apologize** [2] - 764:6, 786:23
**app** [1] - 811:15
**appear** [1] - 832:13
**application** [1] - 829:24
**applied** [3] - 701:23, 767:8, 799:7
**applies** [1] - 739:10
**apply** [6] - 708:5, 708:7, 765:8, 766:23, 797:6, 799:3
**appreciate** [1] - 655:20
**appropriate** [4] - 732:1, 827:20, 829:17, 835:18
**approval** [9] - 778:18, 778:19, 783:5, 785:5, 785:7, 787:11, 791:18, 795:11, 797:6
**approvals** [1] - 789:23
**approve** [3] - 643:9, 771:7, 789:24
**approved** [15] - 665:7, 724:8, 725:3, 766:21, 767:5, 785:23, 787:21, 788:5, 788:16, 788:22, 789:21, 790:12, 790:25, 791:10, 799:5
**approves** [1] - 788:14
**approving** [1] - 750:10
**architecture** [1] - 811:15
**area** [2] - 648:17, 744:7

**areas** [1] - 795:14
**arguably** [1] - 738:12
**argue** [6] - 653:20, 656:2, 675:7, 703:9, 731:14, 833:25
**Argue** [1] - 740:15
**arguing** [4] - 833:9, 835:4, 837:9, 837:11
**argument** [7] - 675:2, 740:10, 740:11, 798:3, 803:23, 823:21, 834:2
**argumentative** [1] - 799:19
**ARNSTEIN** [1] - 638:3
**arrangement** [1] - 645:17
**arrangements** [1] - 643:18
**aside** [2] - 738:2, 836:19
**Aside** [1] - 803:1
**assignment** [1] - 642:22
**assist** [2] - 784:22, 787:6
**assistance** [2] - 775:10, 778:11
**assistant** [3] - 705:7, 706:15, 804:23
**associate** [4] - 780:15, 783:7, 794:9, 794:11
**associate's** [1] - 780:24
**associated** [1] - 644:24
**associates** [1] - 777:10
**assume** [3] - 661:3, 709:22, 737:15
**assumed** [1] - 663:17
**assuming** [2] - 721:9, 799:21
**assumption** [3] - 703:23, 733:24
**ate** [1] - 650:5
**Atlanta** [7] - 642:16, 643:1, 648:5, 677:4, 763:4, 782:8, 805:12
**attach** [1] - 720:18
**attack** [1] - 702:22
**attempting** [1] - 646:14
**attended** [1] - 650:2
**attending** [1] - 659:15
**attention** [4] - 726:15, 782:6, 827:12, 836:17
**attorney** [4] - 695:22, 695:24, 696:11, 696:13
**Attorney** [1] - 637:15
**attorneys** [4] - 638:8, 675:20, 690:14, 696:5
**Attorneys** [2] - 637:19, 638:3
**audit** [4] - 767:18, 767:21, 767:24, 767:25
**auditing** [1] - 767:15
**August** [1] - 680:5
**authorization** [2] - 798:5, 824:13
**authorized** [1] - 766:24
**automatically** [3] - 767:1, 767:9, 771:1
**availability** [1] - 809:16
**available** [1] - 807:12
**Avenue** [2] - 637:16, 638:9
**awaiting** [1] - 787:22
**awards** [1] - 745:19
**aware** [5] - 670:9, 732:19, 781:25, 784:18, 787:12

# B

**backfills** [1] - 768:23
**backpay** [1] - 701:22
**backward** [1] - 714:3
**backwards** [1] - 791:19
**bad** [3] - 675:18, 684:24, 719:7
**Baddour** [4] - 706:19, 782:18, 782:21, 785:2
**ball** [1] - 837:12
**Baltimore** [1] - 638:5
**bang** [1] - 654:19
**bank** [3] - 664:4, 665:2, 665:3
**banking** [1] - 667:23
**bankruptcy** [1] - 770:10
**banks** [1] - 665:4
**BARGER** [3] - 637:3, 640:15, 839:5
**Barger** [81] - 637:15, 637:19, 639:5, 639:23, 640:21, 657:13, 690:1, 699:18, 699:25, 706:12, 709:21, 715:15, 716:21, 720:17, 722:23, 723:25, 724:21, 727:5, 728:14, 729:5, 730:4, 732:11, 742:18, 742:21, 766:12, 766:14, 766:23, 781:22, 782:4, 782:9, 783:24, 784:21, 784:24, 785:2, 785:8, 785:14, 786:10, 786:12, 786:17, 787:5, 787:15, 787:19, 787:21, 788:3, 788:21, 789:14, 789:18, 790:7, 790:17, 791:8, 791:9, 791:14, 791:17, 791:24, 796:17, 796:20, 797:4, 799:3, 802:21, 804:2, 805:18, 805:25, 807:2, 807:11, 807:24, 808:18, 809:3, 809:8, 809:15, 810:1, 810:8, 811:7, 814:25, 817:7, 818:16, 828:3, 829:10, 830:6, 830:9, 832:14, 838:11
**Barger's** [11] - 699:4, 782:18, 784:8, 785:4, 786:7, 789:23, 794:25, 797:22, 813:19, 814:13, 820:19
**Barney** [2] - 661:6, 662:10
**base** [3] - 756:6, 758:7, 765:17
**based** [18] - 647:12, 649:24, 652:14, 703:20, 704:25, 729:23, 730:11, 749:24, 750:2, 789:20, 811:4, 811:9, 811:14, 823:4, 832:14, 837:15, 838:8
**Based** [1] - 790:21
**basic** [1] - 781:2
**basis** [12] - 664:15, 677:10, 702:22, 702:23, 715:22, 739:16, 739:19, 739:21, 755:22, 756:6, 776:8, 821:21
**bastion** [1] - 718:15
**beat** [2] - 710:25, 738:5
**became** [7] - 663:13, 663:16, 694:10, 718:15, 719:10, 766:15, 781:25
**become** [1] - 645:15
**becomes** [3] - 647:12, 651:4, 653:5
**bedazzling** [1] - 698:5
**beds** [1] - 676:8
**BEFORE** [1] - 637:12
**began** [1] - 655:12

**begin** [2] - 733:8, 790:24
**beginning** [8] - 650:24, 784:2, 789:21, 791:3, 791:19, 799:1, 801:21, 801:22
**behavior** [2] - 662:21, 662:22
**belief** [2] - 663:1, 687:24
**believes** [1] - 835:25
**bell** [2] - 663:24, 664:13
**below** [1] - 692:11
**benefit** [2] - 761:1, 761:4
**benefits** [10] - 763:10, 765:20, 768:14, 768:16, 790:12, 798:7, 799:3, 799:5, 799:7, 800:20
**Benhardt** [1] - 818:15
**best** [7] - 698:12, 699:15, 707:16, 712:8, 744:9, 814:2, 831:23
**better** [10] - 639:12, 654:23, 660:22, 671:1, 682:4, 683:20, 708:21, 708:24, 708:25, 714:5
**between** [9] - 696:21, 758:6, 760:2, 762:19, 766:11, 801:11, 809:13, 814:13, 832:23
**Between** [1] - 775:22
**big** [4] - 676:23, 678:19, 683:12, 736:14
**biggest** [1] - 718:13
**billion** [1] - 757:2
**Bisignano** [1] - 687:8
**Bisignano's** [1] - 661:23
**bit** [13] - 679:8, 694:16, 719:18, 759:1, 763:15, 773:7, 792:14, 799:4, 802:2, 815:20, 815:21, 816:20, 834:10
**black** [2] - 801:14, 802:3
**blank** [4] - 780:9, 780:13, 780:19, 781:5
**blessed** [2] - 683:14, 684:3
**BLOCK** [1] - 637:12
**blur** [1] - 762:14
**board** [7] - 641:9, 641:12, 641:15, 641:16, 641:20, 641:24, 655:14
**body** [1] - 683:25
**bolstering** [1] - 694:13
**BOND** [1] - 638:8
**bonus** [8] - 686:12, 692:2, 692:3, 702:11, 703:23, 743:23, 761:8, 761:12
**bonuses** [2] - 702:2, 745:15
**book** [1] - 759:12
**boss** [3] - 680:10, 715:16, 808:3
**bottom** [6] - 690:25, 702:6, 706:20, 748:6, 786:15, 802:17
**box** [3] - 658:19, 683:8, 836:22
**boxes** [1] - 679:7
**break** [10] - 640:24, 678:17, 694:16, 694:23, 697:3, 697:11, 699:4, 723:13, 728:25, 820:5
**breakdown** [1] - 703:2
**breakup** [1] - 645:16
**bridge** [1] - 758:6
**brief** [2] - 768:5, 813:3
**briefly** [2] - 744:5, 763:22
**brilliant** [2] - 718:10, 719:10
**bring** [8] - 639:21, 643:21, 655:14,

657:5, 742:5, 746:18, 754:11, 811:24
**bringing** [1] - 763:16
**broadcast** [1] - 686:2
**Brooklyn** [2] - 637:5, 637:21
**brought** [7] - 669:10, 682:14, 744:5, 752:11, 772:2, 810:10, 811:8
**buck** [1] - 654:19
**budget** [2] - 717:1, 809:20
**bunch** [3] - 677:3, 698:8, 698:12
**bundled** [1] - 810:20
**burden** [1] - 763:10
**business** [21] - 664:14, 665:1, 665:12, 667:14, 667:19, 710:14, 711:16, 711:21, 762:1, 763:5, 791:22, 792:19, 793:4, 807:8, 810:13, 810:16, 810:19, 810:22, 811:7, 811:12, 817:5
**businesses** [1] - 715:1
**busy** [1] - 763:15
**buy** [1] - 770:2
**buying** [1] - 770:5
**BY** [70] - 637:17, 637:21, 638:5, 638:11, 640:20, 646:5, 646:21, 650:13, 652:11, 653:3, 653:9, 653:21, 653:25, 655:18, 656:10, 657:12, 657:25, 658:18, 660:4, 660:20, 670:23, 671:7, 673:21, 674:19, 675:9, 675:12, 675:16, 676:3, 678:1, 699:24, 721:1, 722:22, 723:24, 724:20, 727:4, 727:9, 728:13, 742:17, 745:6, 747:4, 748:3, 751:5, 753:14, 755:5, 759:18, 763:24, 768:11, 770:1, 774:3, 775:6, 780:2, 783:13, 784:20, 786:5, 794:3, 802:7, 803:10, 805:10, 807:1, 817:4, 839:6, 839:7, 839:8, 839:11, 839:12, 839:13, 839:16, 839:17, 839:20, 839:21

# C

**C-a-g-w-i-n** [1] - 753:9
**Cagwin** [11] - 752:24, 753:1, 753:9, 753:15, 763:25, 764:20, 766:9, 766:13, 768:7, 768:12, 771:20
**CAGWIN** [2] - 753:4, 839:10
**calculate** [1] - 837:8
**calculated** [3] - 702:16, 750:1, 837:13
**calculates** [1] - 760:10
**calculating** [1] - 768:15
**calculation** [5] - 703:2, 704:10, 704:14, 719:25, 749:24
**calculations** [1] - 720:4
**calm** [1] - 731:23
**cancel** [1] - 812:12
**canceled** [1] - 639:18
**cancer** [14] - 652:19, 672:12, 672:16, 672:23, 672:24, 673:1, 673:6, 683:11, 684:20, 685:3, 685:25, 717:7, 717:11
**cannot** [4] - 704:3, 750:16, 801:17, 830:14
**capable** [1] - 796:22
**care** [15] - 677:15, 711:16, 711:21,

731:12, 740:5, 755:13, 766:1, 780:19, 782:17, 782:24, 783:16, 785:1, 788:25, 794:11, 804:15
**cared** [2] - 706:4, 831:3
**career** [1] - 743:16
**carefully** [1] - 819:21
**caring** [1] - 711:5
**case** [32] - 639:12, 643:11, 645:23, 671:6, 672:20, 681:4, 686:22, 686:23, 687:1, 729:2, 735:8, 735:11, 752:1, 752:3, 762:1, 771:25, 772:11, 773:6, 773:9, 773:11, 799:21, 801:24, 813:9, 816:17, 818:2, 819:6, 822:1, 831:12, 831:17, 833:25, 838:4
**cases** [4] - 739:11, 822:4, 829:20, 834:12
**cash** [3] - 696:13, 696:14, 701:8
**categorized** [2] - 760:8, 761:2
**categorizing** [1] - 761:1
**category** [1] - 757:5
**caught** [1] - 788:7
**CAUSE** [1] - 637:11
**cc** [1] - 710:2
**cc'd** [1] - 716:25
**ceiling** [1] - 767:12
**Center** [1] - 774:9
**center** [4] - 775:10, 778:10, 783:15, 802:18
**centers** [2] - 664:6, 718:24
**certain** [13] - 644:21, 647:14, 676:15, 676:16, 677:1, 677:8, 677:14, 681:7, 685:20, 714:20, 714:21, 776:17, 796:8
**certainly** [2] - 773:4, 830:20
**certification** [12] - 731:12, 731:19, 780:19, 782:17, 782:24, 783:16, 784:7, 785:1, 788:25, 795:22, 802:8, 823:4
**certified** [5] - 731:20, 740:3, 740:14, 740:19, 764:7
**cetera** [7] - 677:13, 717:25, 720:18, 830:10, 831:4
**CFO** [1] - 753:20
**CFR** [1] - 827:13
**chain** [2] - 712:17, 716:21
**chairman** [2] - 649:4, 679:4
**challenge** [4] - 657:5, 698:9, 714:5, 718:13
**challenges** [2] - 647:9, 714:8
**chance** [2] - 673:19, 777:1
**change** [13] - 646:8, 659:11, 662:6, 673:12, 703:20, 725:11, 730:10, 736:23, 741:3, 760:22, 795:16, 807:15, 807:16
**changed** [1] - 791:20
**changes** [1] - 739:15
**changing** [3] - 663:2, 811:4, 837:15
**charge** [15] - 639:9, 641:7, 647:13, 664:13, 694:15, 699:9, 710:13, 742:7, 807:3, 819:13, 833:18, 834:2, 834:15, 834:20, 838:16

**Charron** [14] - 651:24, 651:25, 652:4, 652:14, 654:1, 654:5, 656:17, 670:7, 670:24, 674:10, 687:6, 717:17, 717:23
**chart** [4] - 814:21, 814:24, 815:17, 816:13
**chase** [1] - 668:5
**check** [6] - 642:16, 701:8, 706:3, 762:5, 771:4, 808:2
**checked** [1] - 710:18
**checks** [6] - 695:5, 695:13, 695:24, 696:1, 696:3, 696:14
**chief** [5] - 753:25, 764:2, 764:9, 764:24, 767:14
**choice** [4] - 686:25, 744:10, 760:11, 772:7
**choose** [1] - 652:8
**chooses** [1] - 758:1
**Christine** [1] - 718:24
**Christmas** [2] - 684:9, 684:13
**Christmastime** [1] - 685:13
**CIANFICHI** [1] - 638:6
**circle** [1] - 790:14
**circled** [1] - 790:16
**Circuit** [4] - 734:24, 735:5, 739:7, 816:1
**circumstances** [4] - 643:3, 643:4, 826:8, 831:18
**City** [1] - 834:13
**CIVIL** [1] - 637:11
**Civil** [1] - 639:4
**claim** [38] - 687:15, 690:1, 690:2, 701:22, 705:10, 724:9, 725:4, 729:12, 733:7, 733:8, 734:18, 734:20, 734:25, 735:11, 736:3, 736:5, 736:7, 736:20, 738:3, 738:20, 739:2, 739:5, 739:8, 739:19, 739:25, 740:2, 740:6, 741:7, 778:13, 788:2, 789:24, 795:5, 798:7, 820:10, 820:13, 820:23, 820:24, 821:22
**claiming** [6] - 673:25, 729:10, 731:3, 736:10, 738:23, 739:18
**claims** [9] - 650:9, 686:24, 723:12, 729:8, 729:10, 735:11, 775:1, 789:23, 800:11
**clarification** [2] - 667:25, 774:13
**clarify** [4] - 665:20, 727:11, 789:11, 799:20
**clean** [3] - 719:3, 767:24, 768:1
**clear** [4] - 733:22, 734:24, 742:19, 826:19
**CLERK** [1] - 739:10
**clerk** [1] - 735:8
**client** [2] - 726:4, 810:21
**clients** [2] - 798:12, 835:9
**cliff** [1] - 686:13
**close** [7] - 702:8, 762:15, 770:9, 773:25, 813:22, 813:23, 833:16
**closed** [3] - 795:5, 795:7, 795:14
**clouds** [1] - 801:23
**clover** [1] - 663:25
**coach** [1] - 659:10

**code** [1] - 829:24
**coffee** [1] - 639:21
**cognizable** [2] - 738:10, 739:14
**collateral** [1] - 815:21
**colleague** [1] - 816:8
**colleagues** [2] - 768:2, 792:9
**collect** [1] - 778:13
**collectively** [1] - 669:3
**Collectively** [1] - 772:17
**colloquy** [1] - 752:16
**color** [1] - 649:25
**column** [1] - 763:5
**combination** [2] - 644:4, 667:24
**combine** [1] - 762:18
**combined** [2] - 704:17, 722:23
**comfortable** [1] - 836:21
**coming** [8] - 644:21, 665:19, 691:18, 763:12, 805:11, 826:13, 835:1, 835:5
**comment** [2] - 657:24, 743:9
**comments** [10] - 649:18, 658:2, 658:4, 658:20, 659:6, 659:7, 659:8, 660:5, 660:10
**commingled** [1] - 698:13
**communicate** [3] - 659:23, 682:21, 705:17
**communicated** [1] - 714:20
**communicating** [2] - 683:19, 787:5
**communication** [1] - 710:3
**communications** [1] - 675:22
**community** [1] - 760:13
**companies** [8] - 661:20, 663:7, 663:14, 769:4, 770:3, 770:5, 771:12, 811:24
**company** [49] - 642:16, 642:25, 643:22, 644:25, 645:10, 647:2, 647:5, 647:14, 652:16, 652:25, 653:12, 654:3, 654:6, 655:13, 655:20, 655:21, 661:25, 662:8, 662:15, 663:6, 664:16, 669:13, 669:16, 696:19, 718:12, 718:14, 719:2, 719:13, 743:22, 744:12, 756:7, 758:5, 758:7, 758:8, 766:1, 768:21, 769:4, 769:8, 771:11, 811:8, 811:15, 811:19, 811:24, 815:19, 817:6, 830:6, 830:8, 837:15
**compared** [1] - 648:10
**compensable** [1] - 737:12
**compensation** [2] - 651:19, 758:6, 775:16
**compiled** [1] - 674:24
**complain** [1] - 654:21
**complete** [9] - 697:10, 698:3, 699:4, 718:25, 749:15, 752:2, 763:11, 780:25, 837:24
**completed** [5] - 677:9, 773:10, 780:18, 782:20, 784:8
**completion** [1] - 781:2
**complex** [4] - 698:6, 698:13, 729:10, 800:17
**complicated** [3] - 816:20, 830:25, 834:12
**complications** [2] - 681:19, 683:4

**complies** [1] - 780:20
**compliment** [1] - 711:5
**Computer** [1] - 638:17
**Computer-aided** [1] - 638:17
**computerized** [1] - 638:16
**concede** [1] - 820:16
**concept** [2] - 647:12, 649:19
**concepts** [2] - 647:18, 663:14
**concern** [1] - 684:8
**concerned** [6] - 681:6, 681:10, 685:24, 708:1, 741:5, 834:8
**concerning** [4] - 650:9, 675:19, 705:7, 723:11
**concerns** [1] - 809:15
**conclude** [1] - 818:25
**conclusion** [2] - 782:1, 792:6
**condition** [9] - 778:8, 781:10, 781:20, 783:25, 794:9, 796:3, 796:6, 796:10, 796:13
**conditions** [4] - 736:23, 739:15, 781:3, 796:6
**conduct** [1] - 796:4
**confer** [1] - 768:2
**conferences** [1] - 652:8
**confirmed** [4] - 789:24, 790:18, 828:3, 829:10
**confirming** [2] - 790:17, 791:7
**conflict** [1] - 659:22
**confused** [2] - 712:25, 792:25
**confusing** [4] - 673:16, 801:10, 801:11, 815:22
**confusion** [2] - 714:1, 733:6, 735:10
**connected** [3] - 642:1, 808:5, 808:7
**connecting** [1] - 810:1
**connection** [5] - 764:22, 765:9, 782:10, 785:3, 787:6
**connections** [2] - 718:9, 811:13
**consequences** [2] - 738:14, 738:25
**consider** [6] - 657:8, 792:6, 796:15, 808:8, 829:24, 834:5
**considerations** [1] - 809:21
**considered** [5] - 653:22, 659:20, 761:13, 793:1, 796:15
**consistent** [3] - 718:7, 718:12, 798:23
**consolidate** [1] - 718:11
**constant** [1] - 676:24
**constantly** [2] - 756:8, 756:10
**constructed** [1] - 687:1
**constructively** [1] - 660:16
**construed** [1] - 804:2
**consult** [2] - 792:8, 816:8
**consultant** [4] - 703:24, 704:1, 704:7, 766:15
**consulting** [8] - 643:13, 645:17, 663:7, 663:9, 663:12, 702:3, 721:20, 745:9
**contacted** [1] - 784:22
**contentions** [1] - 733:10
**contesting** [2] - 820:17, 820:21
**context** [2] - 680:22, 681:24

**continually** [1] - 755:22
**continue** [15] - 639:21, 640:7, 656:14, 677:7, 680:15, 680:21, 693:19, 718:11, 733:5, 735:24, 758:22, 792:19, 820:2, 820:5, 822:7
**Continued** [4] - 638:1, 677:17, 769:9, 806:4
**continued** [14] - 663:12, 669:24, 697:22, 698:16, 699:24, 720:21, 729:18, 730:4, 741:11, 770:14, 792:16, 792:18, 800:19, 840:1
**continuing** [1] - 791:21
**Continuing** [5] - 745:8, 747:6, 748:5, 755:7, 759:20
**Continuously** [1] - 796:2
**contract** [8] - 641:6, 643:21, 644:16, 696:20, 766:22, 812:5, 812:9, 812:12
**contracts** [2] - 643:6, 644:15
**contrary** [1] - 656:6
**contributing** [1] - 676:22
**contributor** [1] - 666:22
**control** [3] - 818:2, 838:10, 838:12
**controlled** [1] - 665:11
**controls** [4] - 771:3, 771:5, 771:13
**conversation** [16] - 644:19, 647:10, 651:24, 651:25, 652:24, 653:10, 655:11, 655:19, 656:21, 672:8, 677:7, 717:17, 809:12, 809:16, 809:17, 822:8
**conversations** [9] - 654:23, 655:12, 670:6, 684:14, 716:2, 718:1, 719:9, 744:9, 809:19
**conversion** [1] - 749:25
**COOPER** [1] - 638:6
**cooperated** [1] - 744:1
**copied** [2] - 748:6, 748:23
**copy** [2] - 711:7, 759:14
**copying** [2] - 711:6, 787:19
**Cornell** [1] - 639:18
**corporate** [1] - 648:22
**corporation** [3] - 651:17, 653:17, 654:1
**CORPORATION** [1] - 637:7
**Corporation** [2] - 638:4, 638:9
**correct** [54] - 641:7, 641:17, 641:21, 644:12, 652:20, 676:1, 690:4, 700:2, 702:21, 717:8, 729:13, 729:15, 738:7, 739:6, 753:16, 753:17, 756:23, 757:4, 757:14, 757:20, 757:25, 758:21, 759:22, 759:23, 760:20, 760:23, 761:3, 761:6, 763:19, 764:4, 765:24, 766:17, 767:13, 768:18, 770:7, 770:8, 771:4, 782:22, 783:21, 789:1, 789:5, 794:16, 795:2, 800:9, 803:13, 811:12, 812:23, 821:12, 821:20, 823:13, 824:2, 825:14, 827:8, 831:9
**Correct** [13] - 732:15, 737:7, 770:19, 770:21, 776:22, 782:23, 789:2, 789:17, 794:19, 800:2, 800:13, 801:3, 801:20
**correctly** [2] - 735:12, 764:2
**corresponded** [1] - 782:11

**correspondence** [1] - 723:11
**cost** [14] - 661:14, 700:1, 700:5, 755:15, 755:22, 756:6, 756:10, 757:24, 761:23, 762:2, 762:7, 811:7, 812:13
**Cost** [1] - 755:9
**cost-saving** [1] - 661:14
**costing** [1] - 812:9
**costly** [3] - 811:2, 811:3, 811:6
**costs** [3] - 757:16, 759:1, 812:22
**councils** [1] - 649:4
**counsel** [5] - 639:5, 640:12, 686:25, 687:1, 699:7
**Counsel** [2] - 652:7, 671:15
**Counselor** [1] - 704:12
**count** [8] - 685:11, 714:5, 714:21, 769:2, 769:3, 809:21, 823:15, 835:16
**counts** [2] - 714:12, 718:14
**County** [2] - 834:12, 835:15
**couple** [12] - 651:12, 652:8, 652:9, 652:21, 657:3, 698:14, 750:8, 757:1, 768:9, 779:2, 805:22, 830:19
**course** [5] - 666:25, 686:21, 699:6, 783:14, 811:3
**Court** [5] - 637:20, 638:14, 638:14, 726:5, 816:2
**COURT** [512] - 637:1, 639:7, 639:16, 639:19, 640:7, 641:24, 645:22, 646:1, 646:12, 646:14, 650:4, 650:11, 651:2, 652:6, 652:17, 652:23, 653:7, 653:20, 653:24, 654:4, 654:9, 654:12, 654:14, 654:17, 654:21, 654:25, 655:3, 655:5, 655:7, 655:10, 655:15, 655:23, 656:2, 656:4, 656:7, 656:9, 657:7, 657:19, 657:22, 658:4, 658:7, 658:12, 658:14, 658:16, 660:2, 660:6, 660:10, 660:12, 660:16, 660:5, 666:8, 667:25, 668:11, 668:13, 668:18, 668:21, 668:23, 668:25, 669:12, 669:19, 670:1, 670:16, 670:21, 671:4, 671:12, 671:18, 671:22, 673:11, 673:18, 674:15, 674:17, 675:2, 675:4, 675:11, 675:14, 675:23, 676:1, 678:16, 679:18, 679:21, 679:23, 679:25, 680:2, 687:13, 687:16, 687:19, 687:22, 688:2, 688:4, 688:7, 688:10, 688:13, 688:20, 688:23, 689:2, 689:5, 689:9, 689:13, 689:17, 689:20, 689:23, 694:14, 694:20, 694:22, 695:7, 695:10, 696:1, 696:3, 696:5, 696:7, 696:14, 696:17, 696:23, 697:1, 697:3, 697:9, 698:2, 699:3, 699:17, 699:20, 699:22, 700:3, 700:7, 700:14, 700:18, 700:25, 701:3, 701:6, 701:11, 701:13, 701:17, 702:25, 703:4, 703:9, 703:12, 706:7, 706:9, 706:24, 707:1, 707:4, 707:6, 707:8, 707:10, 709:14, 709:19, 710:15, 710:19, 710:22, 710:25, 711:2, 711:10, 711:21, 711:24, 712:1, 712:4, 712:14, 713:10, 713:13, 713:16, 713:18, 715:9,

716:17, 716:19, 720:13, 722:7, 722:9, 722:12, 722:14, 722:20, 723:13, 723:16, 723:21, 724:17, 725:20, 725:23, 726:7, 726:9, 726:15, 726:21, 726:24, 727:2, 727:7, 727:18, 727:20, 727:25, 728:6, 728:9, 728:11, 728:16, 728:18, 728:23, 728:25, 729:7, 729:15, 729:17, 729:22, 730:5, 730:8, 730:13, 730:16, 730:18, 730:21, 731:3, 731:9, 731:14, 731:20, 731:23, 732:3, 732:6, 732:9, 732:14, 732:18, 732:22, 733:4, 733:19, 733:22, 734:4, 734:8, 734:10, 734:16, 734:22, 734:24, 735:5, 735:8, 735:21, 736:2, 736:14, 736:17, 736:20, 736:25, 737:5, 737:8, 737:14, 737:19, 737:22, 737:25, 738:8, 738:19, 739:2, 739:6, 739:13, 739:17, 739:23, 740:2, 740:5, 740:10, 740:12, 740:15, 740:18, 740:23, 741:4, 742:5, 742:15, 742:23, 742:25, 743:2, 743:12, 743:18, 743:25, 744:12, 744:15, 744:23, 745:1, 745:3, 745:17, 746:2, 746:7, 746:10, 746:13, 746:16, 746:18, 746:20, 746:22, 746:25, 747:3, 747:12, 747:16, 747:21, 747:23, 747:25, 748:11, 748:18, 748:20, 749:18, 749:21, 750:6, 750:17, 750:20, 751:2, 751:12, 751:15, 751:17, 751:19, 751:22, 752:1, 752:7, 752:15, 752:21, 752:23, 753:11, 754:4, 754:7, 754:10, 754:12, 754:17, 754:20, 754:22, 755:3, 755:13, 755:19, 756:2, 756:4, 756:15, 756:19, 756:21, 759:6, 759:8, 762:22, 763:21, 764:16, 766:6, 768:4, 768:8, 771:17, 771:21, 771:23, 772:4, 772:6, 772:10, 772:14, 772:17, 772:20, 772:23, 773:1, 773:5, 773:25, 774:11, 775:2, 775:4, 775:25, 776:2, 777:2, 777:19, 777:21, 778:23, 778:25, 779:4, 779:6, 779:10, 779:12, 779:15, 779:19, 779:21, 779:25, 783:8, 783:11, 784:13, 784:17, 785:18, 785:24, 786:3, 791:6, 792:10, 792:13, 792:15, 792:21, 792:23, 792:25, 793:5, 793:8, 793:13, 793:15, 793:19, 793:23, 797:25, 798:3, 799:17, 799:19, 799:24, 800:3, 800:5, 800:9, 800:14, 800:19, 800:23, 801:1, 801:4, 801:7, 801:10, 801:16, 801:19, 801:21, 802:23, 803:3, 803:8, 803:22, 803:25, 804:5, 804:9, 804:11, 804:14, 812:18, 812:21, 812:24, 813:4, 813:7, 813:9, 813:12, 813:18, 813:21, 813:24, 814:2, 814:5, 814:15, 815:2, 815:4, 815:7, 815:9, 815:14, 815:20, 816:1, 816:6, 816:10, 816:16, 816:24, 817:14, 817:16, 817:19, 817:22, 818:6, 818:10, 818:18, 818:22, 818:24, 819:4, 820:4, 820:10, 820:13,

820:16, 820:22, 821:2, 821:5, 821:10, 821:13, 821:17, 821:21, 821:24, 822:7, 822:11, 822:16, 822:23, 822:25, 823:7, 823:11, 823:15, 823:18, 823:21, 824:1, 824:3, 824:6, 824:9, 824:14, 824:18, 824:20, 824:25, 825:4, 825:10, 825:13, 825:15, 825:21, 825:23, 826:1, 826:4, 826:7, 826:11, 826:14, 826:21, 827:1, 827:3, 827:9, 827:18, 828:1, 828:5, 828:10, 828:15, 828:17, 828:22, 828:24, 829:2, 829:14, 830:17, 830:21, 830:24, 831:10, 832:6, 832:10, 832:18, 833:2, 833:14, 835:24, 836:5, 836:10, 836:13, 836:16, 836:25, 837:10, 837:18, 837:20, 838:4, 838:6, 838:9, 838:15
**court** [6] - 639:1, 698:1, 726:10, 726:18, 742:3, 820:2
**Court's** [1] - 832:8
**courtesy** [1] - 787:10
**Courthouse** [1] - 637:5
**COURTROOM** [28] - 639:4, 639:23, 640:1, 640:4, 658:10, 658:13, 679:13, 679:15, 679:24, 685:8, 689:6, 689:8, 695:9, 697:19, 729:4, 742:12, 742:14, 746:19, 753:1, 753:7, 753:10, 759:7, 773:18, 773:21, 804:22, 805:4, 805:8, 819:24
**courtroom** [8] - 640:3, 697:21, 699:2, 729:3, 742:13, 787:14, 820:1, 835:11
**cover** [2] - 709:16, 780:4
**coverage** [1] - 735:20
**covered** [2] - 735:12, 791:25
**covering** [1] - 714:3
**covers** [1] - 692:17
**CPA** [1] - 764:7
**create** [1] - 765:1
**cried** [1] - 684:2
**criteria** [2] - 778:17, 796:10
**criticisms** [2] - 660:5, 660:23
**CRM** [1] - 811:14
**CROSS** [9] - 640:19, 699:23, 763:23, 794:2, 817:3, 839:6, 839:12, 839:17, 839:21
**cross** [7] - 640:8, 640:12, 665:21, 723:17, 728:22, 752:13, 762:11
**cross-examination** [2] - 640:12, 723:17
**CROSS-EXAMINATION** [9] - 640:19, 699:23, 763:23, 794:2, 817:3, 839:6, 839:12, 839:17, 839:21
**crunching** [1] - 833:16
**cued** [1] - 665:8
**culture** [8] - 646:8, 662:2, 662:6, 663:3, 664:9, 666:1, 703:20, 837:15
**cumulative** [1] - 815:5
**cup** [1] - 742:9
**curious** [1] - 730:21
**current** [10] - 690:21, 690:25, 692:7, 692:18, 712:11, 774:6, 805:24,

813:10, 813:13
**cut** [4] - 664:11, 668:4, 737:10, 812:22

# D

**D-127** [1] - 712:12
**D-36** [4] - 764:15, 764:17, 765:8, 840:15
**D-63** [5] - 766:5, 766:6, 766:7, 766:9, 840:16
**D123** [4] - 778:22, 778:23, 779:5, 780:3
**D154** [4] - 731:2, 779:8, 780:18, 782:2
**D157** [4] - 779:11, 779:12, 779:14, 785:7
**D188** [2] - 779:22
**D191** [1] - 779:20
**D193** [1] - 779:18
**daily** [2] - 677:10, 776:17
**Dallas** [1] - 637:17
**damage** [2] - 836:11, 836:13
**damages** [10] - 662:4, 700:2, 700:10, 700:15, 719:25, 749:22, 751:14, 837:6, 837:17
**Dan** [9] - 656:16, 657:2, 657:4, 669:25, 687:6, 717:17, 718:1, 718:16
**darker** [1] - 686:6
**DATA** [1] - 637:7
**data** [3] - 760:6, 790:23, 800:5
**Data** [66] - 638:4, 638:9, 639:5, 642:6, 648:1, 649:11, 659:17, 662:18, 663:4, 666:23, 688:17, 704:16, 704:22, 715:5, 720:2, 720:8, 721:12, 722:6, 723:4, 745:20, 753:15, 754:4, 754:7, 756:12, 756:24, 758:9, 759:21, 763:7, 763:11, 763:17, 764:3, 764:10, 765:8, 766:11, 766:15, 767:14, 767:24, 770:9, 774:9, 774:11, 774:22, 775:8, 776:9, 776:10, 777:6, 781:19, 782:21, 788:12, 792:4, 795:16, 797:22, 798:15, 805:16, 806:1, 810:22, 811:11, 811:12, 811:13, 812:2, 812:10, 812:12, 812:16, 813:15, 814:3, 814:7, 819:12
**Data's** [5] - 755:8, 761:7, 764:19, 791:25, 798:9
**Data/Fiserv** [1] - 774:14
**date** [73] - 642:12, 651:23, 656:24, 657:2, 690:21, 692:6, 692:18, 693:13, 693:20, 705:12, 721:6, 730:1, 730:2, 730:23, 731:4, 736:18, 743:7, 746:14, 747:2, 748:2, 748:22, 749:17, 755:2, 759:11, 764:18, 766:8, 778:15, 783:8, 784:4, 785:11, 785:19, 785:21, 787:16, 789:22, 789:24, 790:10, 790:12, 790:18, 790:23, 790:24, 790:25, 791:3, 791:10, 791:14, 793:6, 793:8, 793:13, 793:24, 793:25, 795:10, 798:21, 798:22, 799:1, 800:20, 820:8, 820:13, 820:18, 821:4, 821:11, 823:24, 825:9, 825:11, 828:1, 828:7, 829:4, 829:7, 829:11, 831:14, 833:6, 833:8, 835:4

**dated** [4] - 712:8, 717:5, 724:23, 724:24
**dates** [14] - 642:10, 642:13, 642:19, 690:19, 735:16, 735:19, 783:6, 784:2, 790:22, 795:22, 801:25, 820:24, 825:21
**David** [4] - 715:12, 715:14, 715:17, 715:18
**DAVID** [1] - 637:21
**day-to-day** [1] - 760:16
**days** [13] - 651:12, 676:19, 677:5, 678:9, 683:8, 683:11, 683:20, 684:14, 685:12, 785:25, 797:12, 830:13, 836:16
**deadline** [1] - 708:14
**deal** [9] - 676:23, 678:19, 683:12, 721:19, 736:14, 741:6, 759:1, 836:20
**dealing** [2] - 676:2, 826:14
**deals** [1] - 690:15
**debt** [1] - 662:1
**December** [17] - 683:2, 684:9, 692:6, 709:8, 720:6, 730:14, 736:18, 747:8, 749:19, 802:22, 828:11, 828:18, 828:20, 829:4, 829:5, 830:15, 832:24
**decide** [11] - 726:16, 731:9, 733:13, 733:14, 831:13, 831:15, 833:6, 833:8, 837:6, 838:9, 838:10
**decided** [5] - 645:15, 649:16, 733:18, 801:24, 835:17
**deciphering** [1] - 714:8
**decision** [4] - 670:11, 730:10, 739:9, 809:24
**decisions** [4] - 659:23, 682:4, 707:16, 743:10
**declare** [1] - 780:25
**declined** [2] - 758:25, 769:3
**dedicated** [1] - 682:15
**deducting** [1] - 722:1
**deduction** [1] - 693:3
**defendant** [5] - 730:22, 732:2, 750:9, 817:19, 822:3
**Defendant** [1] - 695:6
**defendant's** [7] - 688:18, 713:12, 731:1, 732:4, 752:3, 773:9, 822:12
**Defendant's** [31] - 650:14, 715:7, 721:3, 722:3, 723:20, 724:15, 724:23, 725:17, 727:23, 727:25, 728:7, 745:22, 764:17, 766:7, 776:3, 777:1, 777:5, 777:13, 777:16, 777:23, 781:17, 782:16, 782:25, 786:14, 790:1, 791:13, 794:21, 794:22, 840:15, 840:16
**defendants** [7] - 637:9, 687:4, 711:15, 732:9, 732:13, 818:12, 838:3
**Defendants** [4] - 638:3, 638:3, 638:8, 775:23
**Defense** [68] - 679:6, 679:21, 679:24, 680:3, 685:5, 689:4, 689:9, 689:23, 689:25, 695:11, 706:6, 706:7, 706:9, 706:11, 709:18, 709:20, 711:9, 711:11, 711:12, 712:3, 712:5, 712:6,

712:12, 712:15, 713:9, 713:13,
713:19, 715:10, 715:11, 716:15,
716:20, 720:11, 720:15, 722:21,
723:23, 724:19, 728:10, 776:4, 777:4,
777:22, 779:7, 779:17, 779:23,
779:24, 814:23, 840:18, 840:19,
840:20, 840:21, 840:22, 840:23,
840:24, 840:25, 841:1, 841:2, 841:3,
841:4, 841:5, 841:6, 841:7, 841:8,
841:9, 841:10, 841:11, 841:12,
841:13, 841:14, 841:15

**defense** [1] - 640:12
**define** [2] - 794:4, 794:6
**defined** [5] - 760:12, 761:14, 784:9,
784:11, 796:3
**definitely** [3] - 713:12, 722:17, 826:21
**Definitely** [1] - 722:13
**definition** [3] - 681:21, 706:2, 725:18
**definitions** [1] - 760:12
**degree** [2] - 643:8, 808:10
**degrees** [1] - 657:17
**deliver** [2] - 807:9, 811:20
**delivered** [1] - 824:12
**delivery** [1] - 664:4
**demotions** [1] - 659:25
**denied** [4] - 705:13, 736:11, 736:21,
737:16
**denigrating** [1] - 835:11
**denying** [2] - 735:14, 735:17
**department** [13] - 647:7, 647:17,
674:25, 714:13, 760:10, 761:16,
774:10, 775:17, 802:11, 802:12,
802:20, 807:11, 810:9
**Department** [2] - 767:8, 780:20
**departments** [2] - 655:13, 661:7
**deploy** [1] - 811:2
**deposed** [3] - 673:15, 673:17, 758:9
**deposit** [1] - 696:1
**deposition** [26] - 642:21, 647:23, 656:5,
656:7, 656:11, 657:7, 660:3, 661:12,
670:24, 671:8, 671:16, 671:18,
671:20, 673:12, 713:11, 752:4, 752:8,
752:14, 754:9, 762:24, 773:7, 773:11,
818:3, 818:25, 834:6, 835:19
**depositions** [4] - 751:25, 772:12,
819:15, 836:4
**Depreciation** [1] - 760:18
**deprived** [1] - 705:5
**DEPUTY** [28] - 639:4, 639:23, 640:1,
640:4, 658:10, 658:13, 679:13,
679:15, 679:24, 685:8, 689:6, 689:8,
695:9, 697:19, 729:4, 742:12, 742:14,
746:19, 753:1, 753:7, 753:10, 759:7,
773:18, 773:21, 804:22, 805:4, 805:8,
819:24
**describe** [1] - 676:4
**described** [3] - 653:10, 660:21, 661:24
**describing** [1] - 673:22
**description** [2] - 680:24, 797:23
**design** [1] - 807:9

**designate** [16] - 827:19, 827:20, 827:22,
828:5, 828:9, 828:10, 828:24, 829:15,
829:16, 829:19, 830:3, 832:15,
832:19, 832:25, 833:3
**designated** [15] - 794:6, 827:24, 828:1,
828:7, 828:11, 828:18, 828:22,
829:13, 829:22, 830:2, 831:5, 831:18,
832:3, 832:18, 832:24
**designation** [4] - 796:16, 820:18,
827:13, 828:17
**desk** [1] - 802:18
**desperate** [1] - 770:12
**detail** [1] - 704:3
**details** [2] - 703:8, 783:2
**determination** [5] - 783:17, 783:23,
799:11, 799:13, 831:19
**determine** [3] - 761:12, 783:3, 796:9
**determined** [4] - 783:24, 788:18,
790:11, 815:19
**determining** [1] - 830:8
**develop** [3] - 651:4, 664:22, 807:9
**developed** [4] - 666:25, 675:17, 811:12,
811:13
**development** [1] - 811:9
**diagnosed** [2] - 652:19, 717:7
**diagnosis** [1] - 796:8
**difference** [7] - 733:19, 733:21, 733:23,
760:2, 801:11, 814:13, 832:23
**different** [16] - 643:17, 644:24, 648:6,
654:2, 655:8, 662:15, 662:16, 662:17,
664:16, 667:14, 667:19, 676:13,
678:10, 704:2, 746:3, 761:19
**differently** [1] - 714:17
**difficult** [3] - 683:4, 683:6, 683:8
**difficulties** [2] - 661:24, 809:2
**DILORENZO** [8] - 638:11, 743:11,
751:3, 751:5, 751:10, 751:14, 751:16,
839:8
**DiLorenzo** [148] - 639:16, 639:17,
640:13, 640:14, 640:20, 645:25,
646:4, 646:5, 646:21, 650:8, 650:13,
652:11, 653:3, 653:9, 653:21, 653:25,
655:18, 655:25, 656:3, 656:5, 656:8,
656:10, 657:12, 657:25, 658:6, 658:8,
658:11, 658:15, 658:18, 660:4,
660:20, 670:23, 671:7, 671:24,
673:21, 674:19, 675:2, 675:3, 675:9,
675:12, 675:16, 676:3, 678:1, 679:13,
679:17, 679:19, 679:22, 680:1, 680:4,
682:3, 685:7, 687:14, 687:18, 688:20,
688:22, 689:1, 689:3, 689:11, 689:14,
689:18, 689:22, 694:18, 694:21,
695:5, 695:8, 697:2, 697:4, 697:6,
699:14, 699:15, 699:24, 700:4, 700:9,
700:12, 700:18, 700:22, 701:9,
701:12, 701:14, 703:6, 703:11, 706:5,
706:8, 709:16, 711:9, 712:3, 712:12,
713:8, 713:11, 713:15, 713:17, 715:7,
716:15, 716:18, 720:10, 721:1, 722:2,
722:8, 722:10, 722:13, 722:17,

722:22, 723:15, 723:19, 723:24,
724:14, 724:20, 725:16, 726:1,
726:12, 726:19, 727:1, 727:4, 727:9,
727:23, 728:4, 728:7, 728:13, 728:17,
731:8, 732:16, 735:9, 735:10, 736:10,
736:16, 740:3, 740:7, 740:11, 740:14,
740:16, 740:21, 751:2, 815:24, 816:4,
824:17, 827:15, 836:9, 836:11,
836:14, 836:25, 837:9, 837:11,
837:19, 837:25, 838:2, 838:5, 838:7,
839:6
**dime** [1] - 686:17
**diminished** [2] - 736:6
**diminishment** [1] - 738:9
**dinner** [3] - 650:1, 650:2, 650:5
**direct** [5] - 658:25, 659:4, 664:5,
665:20, 677:15, 752:12
**DIRECT** [6] - 753:13, 774:2, 805:9,
839:11, 839:16, 839:20
**direction** [1] - 677:15
**directly** [2] - 712:22, 784:11
**director** [7] - 665:18, 667:8, 713:21,
806:1, 807:6, 813:14
**Director** [1] - 805:15
**disabilities** [2] - 729:24, 776:15
**Disabilities** [6] - 704:21, 775:18,
776:12, 777:6, 777:14, 792:2
**Disability** [1] - 775:14
**disability** [55] - 669:10, 669:13, 669:16,
669:20, 670:2, 670:5, 671:15, 677:11,
684:6, 692:12, 694:10, 695:12,
695:23, 696:12, 696:15, 700:24,
701:1, 701:8, 704:25, 705:7, 705:23,
705:25, 712:23, 712:24, 713:3, 713:5,
723:12, 724:9, 725:4, 739:16, 739:22,
750:10, 750:11, 787:11, 788:4, 788:5,
788:13, 788:17, 789:20, 789:23,
789:25, 790:10, 790:19, 798:7,
798:17, 798:21, 799:1, 799:3, 799:5,
799:7, 799:10, 799:12, 801:17, 801:18
**disabled** [5] - 670:17, 696:8, 731:22,
777:10, 788:18
**disagree** [5] - 660:12, 661:17, 668:19,
673:18, 701:19
**disagreed** [1] - 661:16
**disbanded** [1] - 667:13
**discharge** [1] - 654:22
**discharged** [2] - 801:17, 833:11
**disclose** [2] - 760:6, 798:6
**discounted** [4] - 701:24, 703:19, 703:25
**discovered** [1] - 696:19
**discrepancy** [1] - 725:18
**discriminate** [1] - 776:10
**discriminated** [1] - 736:4
**discrimination** [2] - 729:23, 736:8
**discuss** [1] - 685:19
**discussing** [2] - 678:25, 749:22
**discussion** [4] - 706:19, 713:25, 733:5,
833:15
**discussions** [4] - 652:9, 654:4, 654:7,

670:7
**disenfranchised** [1] - 649:21
**disjointed** [1] - 673:16
**dismissed** [1] - 669:5
**distance** [2] - 772:21, 804:18
**distant** [1] - 742:8
**distracted** [1] - 694:14
**distraught** [1] - 683:15
**distressed** [1] - 683:21
**distressing** [1] - 683:10
**distribution** [3] - 690:25, 692:3, 692:22
**DISTRICT** [3] - 637:1, 637:1, 637:12
**divide** [1] - 659:11
**division** [1] - 665:18
**doctor** [33] - 676:6, 677:4, 683:3, 683:24, 685:3, 696:9, 707:22, 707:24, 708:25, 709:3, 709:11, 731:13, 731:20, 740:3, 740:8, 740:14, 740:19, 782:18, 783:6, 784:8, 784:14, 787:23, 797:23, 798:2, 798:23, 802:9, 803:18, 826:23, 830:11, 830:16, 832:25, 833:1, 833:3
**doctor's** [6] - 731:19, 733:11, 802:8, 823:3, 824:23, 826:4
**doctors** [4] - 677:6, 795:20, 795:23, 832:2
**document** [12] - 658:9, 691:5, 724:16, 726:5, 726:13, 726:19, 742:21, 781:6, 781:8, 781:13, 784:5, 794:22
**documentation** [1] - 659:21
**documents** [16] - 675:6, 677:13, 690:14, 692:7, 693:24, 694:12, 694:18, 750:14, 750:15, 796:17, 796:18, 797:1, 802:24, 804:7, 804:9, 804:11
**done** [17] - 639:12, 654:16, 657:14, 661:18, 665:17, 666:9, 674:21, 676:16, 686:17, 690:2, 730:25, 762:15, 771:14, 783:20, 811:9, 811:11, 837:23
**door** [1] - 664:9
**down** [29] - 639:9, 642:16, 642:25, 647:10, 647:17, 648:8, 667:11, 684:11, 688:24, 690:25, 704:8, 706:20, 713:24, 729:5, 729:6, 731:23, 732:3, 741:7, 751:19, 755:16, 761:25, 771:21, 816:21, 817:14, 824:1, 825:21, 826:15, 835:25, 836:2
**Dr** [5] - 685:24, 707:21, 782:18, 782:21, 785:2
**draft** [3] - 833:20, 834:20, 838:16
**drag** [1] - 676:23
**drainage** [1] - 683:4
**draw** [1] - 668:1
**drink** [1] - 639:20
**drive** [1] - 819:21
**Drive** [1] - 724:3
**driven** [1] - 664:19
**drove** [1] - 663:14
**due** [3] - 717:1, 757:24, 778:15
**duly** [4] - 640:17, 753:4, 773:16, 805:1

**duplicative** [2] - 689:20, 815:4
**duration** [2] - 778:20, 790:13
**during** [21] - 649:18, 649:24, 678:3, 678:21, 678:22, 683:1, 685:6, 694:5, 694:9, 694:10, 699:6, 700:24, 700:25, 717:23, 730:3, 744:23, 758:25, 769:2, 808:8, 810:1, 811:18
**During** [1] - 771:2
**duties** [5] - 764:9, 764:12, 774:18, 783:14, 807:6
**dynamic** [1] - 837:4

## E

**E-mail** [1] - 638:15
**e-mail** [55] - 642:3, 642:4, 677:2, 680:9, 684:6, 705:6, 705:8, 705:9, 705:11, 705:14, 706:12, 706:17, 708:3, 709:21, 711:13, 712:7, 712:16, 713:24, 713:25, 714:11, 715:12, 715:13, 725:13, 725:14, 726:22, 726:24, 727:5, 727:8, 727:10, 727:17, 727:18, 727:20, 735:22, 736:14, 736:21, 737:11, 737:16, 745:23, 745:24, 746:5, 747:7, 747:12, 747:16, 748:6, 748:23, 786:10, 786:17, 786:25, 787:18, 787:20, 788:3, 794:25, 802:17
**e-mails** [3] - 676:24, 716:21, 746:7
**early** [5] - 651:21, 676:19, 709:10, 810:25, 814:12
**earned** [1] - 720:5
**earnings** [2] - 703:20, 704:7, 720:1, 720:7, 760:21
**Earnings** [1] - 760:17
**ears** [1] - 675:15
**easier** [1] - 701:14
**EASTERN** [1] - 637:1
**easy** [4] - 681:8, 681:9, 802:4, 821:25
**EBITDA** [6] - 760:14, 760:17, 760:22, 760:24, 761:2, 761:10
**economically** [1] - 643:7
**edit** [2] - 795:15
**edits** [1] - 795:16
**educational** [1] - 819:12
**EEO** [1] - 776:13
**effect** [2] - 642:11, 735:19
**effective** [8] - 693:10, 791:19, 793:17, 793:21, 807:12, 825:8, 825:16, 826:19
**efforts** [1] - 835:9
**Eidelman** [3] - 772:20, 822:12, 835:2
**EIDELMAN** [114] - 638:5, 639:15, 731:1, 731:6, 731:11, 731:18, 731:22, 731:25, 733:1, 752:6, 752:9, 759:12, 759:16, 763:22, 763:24, 768:2, 768:6, 771:16, 771:19, 772:2, 772:5, 772:22, 772:25, 773:4, 773:12, 774:3, 774:12, 775:6, 775:23, 776:1, 776:24, 777:3, 777:20, 778:21, 778:24, 779:2, 779:5, 779:8, 779:11, 779:14, 779:18,

779:20, 779:22, 780:1, 780:2, 783:13, 784:20, 786:5, 792:8, 792:11, 793:17, 793:22, 793:25, 799:16, 803:6, 804:21, 805:10, 807:1, 813:2, 813:6, 813:8, 813:10, 814:6, 814:18, 815:3, 815:6, 815:8, 816:8, 816:12, 817:21, 818:19, 818:23, 822:15, 822:20, 822:24, 823:2, 823:10, 823:14, 823:16, 823:20, 823:23, 824:2, 824:5, 824:8, 824:16, 824:19, 825:6, 825:11, 825:14, 825:19, 825:22, 825:25, 826:3, 826:20, 827:8, 827:16, 827:24, 828:2, 828:7, 828:13, 828:16, 829:3, 830:5, 830:20, 830:23, 831:9, 832:5, 832:8, 832:12, 832:22, 833:12, 839:12, 839:16, 839:20
**eight** [1] - 793:22
**either** [3] - 640:9, 665:1, 669:11
**EJ** [1] - 674:9
**elaborate** [1] - 777:15
**electronically** [1] - 676:14
**eligibility** [4] - 791:25, 797:5, 797:6, 797:13
**Eligibility** [1] - 797:7
**eligible** [2] - 694:10, 830:14
**eliminate** [1] - 755:24
**eliminated** [1] - 762:6
**Elmo** [1] - 814:19
**embedded** [1] - 666:17
**emceed** [1] - 650:2
**emceeing** [2] - 649:17, 650:21
**Emory** [1] - 706:19
**emotionally** [1] - 683:10
**employed** [5] - 774:14, 805:12, 814:7, 825:8, 825:17
**employee** [20] - 645:15, 651:14, 669:3, 753:15, 761:22, 782:3, 782:7, 782:15, 792:5, 794:7, 794:9, 795:20, 796:18, 803:14, 808:22, 827:21, 829:16, 829:17, 829:19, 829:21
**employee's** [2] - 791:2, 803:12
**employees** [22] - 651:15, 706:4, 756:17, 758:4, 758:13, 758:20, 761:18, 762:3, 763:4, 763:16, 765:5, 766:2, 767:21, 770:6, 781:15, 781:18, 781:19, 792:1, 796:23, 811:20, 811:21, 815:12
**employer** [5] - 791:1, 827:18, 827:19, 829:14, 829:21
**employer's** [1] - 829:18
**employment** [11] - 662:5, 730:11, 738:9, 774:25, 776:11, 793:9, 793:25, 811:18, 825:7, 825:9, 825:12
**Employment** [2] - 776:5, 776:9
**encountered** [1] - 809:3
**end** [34] - 641:2, 641:3, 644:21, 669:3, 679:2, 682:8, 682:17, 691:22, 693:13, 693:15, 702:16, 720:3, 734:2, 734:3, 734:9, 734:13, 749:10, 754:3, 763:1, 764:5, 764:6, 784:2, 793:6, 799:1, 799:22, 811:13, 819:19,

820:19, 825:8, 832:6, 835:10

**ended** [9] - 649:17, 721:25, 734:6, 734:13, 734:14, 734:17, 797:15, 821:11

**ending** [3] - 721:5, 734:7, 797:12

**engaged** [2] - 643:5, 678:22

**engineering** [2] - 661:22, 667:15

**enormous** [1] - 647:4

**ensure** [4] - 719:4, 759:25, 778:17, 782:15

**enter** [1] - 804:6

**entered** [3] - 699:1, 749:12, 802:17

**entering** [1] - 742:12

**Enterprise** [1] - 650:17

**enterprise** [1] - 769:8

**enters** [2] - 640:3, 742:13

**entire** [8] - 645:19, 647:5, 663:18, 665:21, 676:12, 705:13, 720:2, 796:9

**entitled** [17] - 674:3, 700:16, 700:20, 701:3, 701:7, 703:1, 732:9, 732:10, 734:4, 734:10, 734:16, 734:18, 755:9, 800:14, 801:12, 801:16, 817:1

**entitlement** [1] - 793:6

**entitlements** [2] - 781:15, 799:22

**Equal** [2] - 776:5, 776:9

**equate** [1] - 651:8

**equivalent** [1] - 673:24

**Ernst** [3] - 767:17, 767:18, 767:25

**erroneously** [1] - 668:7

**escrow** [1] - 695:25

**esophagus** [1] - 708:1

**ESQ** [6] - 637:17, 637:21, 638:5, 638:6, 638:6, 638:11

**essence** [4] - 646:18, 647:15, 652:25, 655:3

**essential** [3] - 646:16, 705:1, 777:11

**essentially** [4] - 809:22, 810:17, 810:18, 811:16

**Essentially** [1] - 776:10

**established** [1] - 716:5

**estimated** [1] - 662:4

**et** [10] - 637:7, 638:4, 638:9, 677:13, 717:25, 720:18, 830:10, 831:4

**evaluate** [3] - 755:22, 778:17, 796:9

**evaluates** [1] - 788:14

**evaluating** [1] - 756:8

**evaluation** [1] - 791:21

**evenings** [1] - 650:1

**evenly** [1] - 751:7

**event** [4] - 765:23, 767:20, 768:12, 833:7

**events** [4] - 756:12, 762:9, 762:10, 832:2

**eventually** [2] - 715:23, 837:21

**everywhere** [1] - 647:8

**evidence** [124] - 656:4, 657:10, 658:7, 658:9, 658:13, 658:14, 658:17, 679:15, 679:16, 679:19, 679:25, 680:2, 680:3, 685:6, 687:10, 688:16,

689:4, 689:15, 689:19, 689:24, 689:25, 690:15, 695:7, 695:10, 695:11, 706:6, 706:11, 709:18, 709:19, 709:20, 711:10, 711:11, 712:4, 712:5, 712:6, 712:13, 712:14, 712:15, 713:8, 713:10, 713:14, 713:16, 713:18, 713:19, 715:8, 715:9, 715:11, 716:16, 716:19, 716:20, 720:16, 721:4, 722:14, 722:21, 723:19, 723:23, 724:15, 724:19, 725:16, 725:23, 725:24, 726:1, 726:25, 727:2, 727:21, 727:24, 728:1, 728:5, 728:6, 728:9, 728:10, 740:5, 742:23, 743:1, 743:2, 743:4, 743:6, 746:16, 746:22, 746:23, 746:25, 747:1, 747:23, 747:25, 748:1, 748:18, 748:20, 748:21, 754:20, 754:25, 755:1, 759:6, 759:8, 759:10, 762:23, 764:15, 764:17, 766:7, 775:25, 776:4, 776:25, 777:2, 777:4, 777:17, 777:18, 777:22, 779:1, 779:7, 779:8, 779:11, 779:12, 779:13, 779:14, 779:17, 779:18, 779:21, 779:23, 779:24, 779:25, 802:24, 804:14, 816:18, 822:3

**EWING** [1] - 638:3

**exact** [2] - 703:7, 829:12

**exactly** [5] - 653:4, 657:2, 664:23, 696:16, 703:18

**examination** [3] - 640:8, 640:12, 723:17

**EXAMINATION** [26] - 640:19, 699:23, 742:16, 745:6, 747:4, 748:3, 751:4, 753:13, 755:5, 759:18, 763:23, 768:10, 774:2, 794:2, 805:9, 817:3, 839:6, 839:7, 839:8, 839:11, 839:12, 839:13, 839:16, 839:17, 839:20, 839:21

**examined** [4] - 640:17, 753:5, 773:16, 805:1

**example** [5] - 644:11, 659:15, 662:10, 709:25, 796:12

**exceeds** [1] - 651:11

**Except** [1] - 731:11

**except** [1] - 735:17

**excess** [1] - 755:25

**exchange** [1] - 786:10

**exclude** [2] - 760:14, 760:15

**excuse** [3] - 713:13, 808:22, 809:14

**excused** [3] - 771:22, 804:20, 817:15

**executed** [1] - 755:23

**executive** [1] - 782:6

**executives** [1] - 647:7

**exercise** [1] - 714:23

**exercised** [1] - 745:16

**exhausted** [3] - 800:16, 800:18, 803:9

**exhaustion** [1] - 791:20

**exhibit** [34] - 650:14, 688:15, 688:18, 689:7, 691:9, 694:19, 694:20, 694:21, 721:3, 722:3, 723:20, 724:15, 724:23, 725:17, 727:24, 727:25, 728:8, 733:11, 762:21, 776:3, 777:1, 777:5,

777:16, 777:23, 781:17, 782:16, 782:25, 786:14, 790:1, 791:13, 794:21, 794:22, 803:11

**EXHIBIT** [1] - 840:3

**Exhibit** [107] - 658:6, 658:11, 658:17, 679:6, 679:21, 679:24, 680:3, 685:5, 688:17, 689:4, 689:9, 689:15, 689:17, 689:24, 689:25, 695:6, 695:11, 706:6, 706:7, 706:9, 706:11, 709:18, 709:20, 711:9, 711:11, 711:12, 712:3, 712:5, 712:7, 712:12, 712:15, 713:9, 713:13, 713:19, 715:7, 715:10, 715:11, 716:15, 716:20, 720:11, 720:15, 722:21, 723:2, 723:3, 723:23, 724:19, 728:10, 742:22, 743:6, 745:22, 747:1, 748:1, 748:21, 754:15, 754:18, 754:24, 755:1, 759:5, 759:8, 759:10, 759:12, 764:17, 766:7, 776:4, 777:4, 777:19, 777:22, 779:7, 779:17, 779:23, 779:24, 802:16, 803:11, 804:13, 814:23, 840:5, 840:6, 840:7, 840:8, 840:9, 840:10, 840:11, 840:15, 840:16, 840:18, 840:19, 840:20, 840:21, 840:22, 840:23, 840:24, 840:25, 841:1, 841:2, 841:3, 841:4, 841:5, 841:6, 841:7, 841:8, 841:9, 841:10, 841:11, 841:12, 841:13, 841:14, 841:15

**exhibits** [10] - 728:2, 778:25, 815:5, 816:17, 819:11, 822:1, 822:2, 830:18, 831:22, 835:14

**exist** [1] - 714:1

**existed** [1] - 814:24

**existing** [1] - 644:3

**exit** [1] - 768:21

**exited** [2] - 697:20, 819:25

**exiting** [1] - 718:14

**exits** [1] - 729:3

**expand** [1] - 718:2

**expanding** [1] - 718:5

**expectations** [1] - 653:13

**expected** [2] - 656:14, 709:1

**Expense** [4] - 757:6, 757:8, 757:21, 758:24

**expense** [16] - 653:13, 653:23, 756:7, 756:24, 757:3, 758:2, 758:7, 758:23, 760:4, 760:9, 760:16, 760:21, 760:22, 760:24, 765:15, 765:25

**expenses** [5] - 756:7, 756:8, 757:9, 757:13, 758:3, 758:12, 758:18, 760:3

**experience** [2] - 661:4, 663:5

**expert** [5] - 674:16, 688:1, 700:12, 713:2, 837:3

**expertise** [1] - 708:1

**expiration** [3] - 642:22, 642:23, 800:20

**Expiration** [1] - 642:24

**expire** [1] - 785:25

**expired** [12] - 791:24, 792:16, 800:11, 823:13, 823:25, 824:22, 826:9, 826:10, 826:12, 826:22, 827:6, 833:10

**expires** [1] - 786:1
**Explain** [1] - 669:4
**explain** [11] - 646:14, 664:23, 670:3, 696:23, 701:6, 701:13, 704:23, 752:10, 797:17, 797:20, 831:23
**explained** [6] - 645:22, 655:24, 670:21, 688:10, 697:1, 703:4
**explaining** [1] - 673:23
**explanation** [2] - 646:17, 703:6
**explanatory** [1] - 651:6
**extend** [1] - 787:23
**extensive** [1] - 790:21
**external** [3] - 811:10, 811:19, 817:6
**extremely** [1] - 683:8
**eyeballs** [1] - 817:25

### F

**faced** [1] - 661:25
**facilities** [1] - 755:25
**facility** [1] - 761:25
**fact** [16] - 641:19, 656:4, 663:25, 681:10, 701:14, 705:15, 729:23, 731:11, 737:12, 737:15, 738:8, 790:21, 826:21, 827:10, 830:12, 835:13
**factor** [1] - 838:11
**facts** [12] - 675:4, 675:5, 675:8, 687:14, 687:20, 688:10, 783:2, 803:1, 803:22, 826:17, 832:14
**factual** [2] - 831:13, 833:12
**factually** [2] - 804:1, 833:7
**fails** [1] - 659:9
**failure** [1] - 829:18
**fair** [3] - 644:22, 682:3, 763:15
**fairly** [3] - 664:3, 697:7, 758:4
**faith** [1] - 675:18
**fall** [1] - 656:25
**familiar** [11] - 661:12, 757:6, 764:19, 765:6, 776:5, 777:5, 777:23, 809:16, 809:17, 814:20, 827:14
**Family** [14] - 686:23, 687:11, 690:3, 775:13, 777:24, 778:5, 780:20, 783:4, 783:18, 785:24, 794:6, 795:25, 798:8, 798:9
**family** [3] - 744:22, 794:8, 794:10
**family's** [1] - 686:1
**far** [4] - 741:5, 814:16, 834:8, 836:7
**fast** [2] - 683:25, 779:3
**faster** [5] - 676:22, 684:7, 708:25, 709:4, 709:13
**fatal** [2] - 659:8, 659:20
**father** [1] - 745:3
**FD** [1] - 659:15
**February** [17] - 642:16, 693:14, 693:15, 693:20, 694:24, 720:3, 721:5, 724:23, 762:25, 763:1, 793:18, 793:21, 793:23, 800:6, 825:10, 825:25, 826:19
**fee** [3] - 641:8, 644:11, 644:12
**fees** [3] - 702:3, 703:24, 704:1

**fell** [1] - 684:3
**felt** [5] - 653:10, 673:15, 683:13, 706:2, 718:10
**few** [3] - 709:16, 795:13, 819:8
**field** [2] - 744:8, 811:5
**Fifty** [1] - 804:14
**Fifty-two** [1] - 804:14
**figure** [2] - 645:1, 729:9
**figured** [1] - 683:12
**filings** [3] - 760:7, 764:11, 765:12
**fill** [3] - 665:10, 708:17, 778:15
**filled** [2] - 705:22, 782:17
**fills** [3] - 712:23, 713:4, 784:6
**final** [3] - 644:17, 645:14, 662:12
**finally** [2] - 706:20, 707:12
**finance** [3] - 753:20, 760:10, 761:16
**finances** [1] - 685:23
**financial** [8] - 661:21, 661:24, 662:20, 662:23, 663:11, 667:15, 767:18, 767:22
**fine** [6] - 657:7, 673:20, 685:4, 719:15, 822:23, 834:2
**finish** [4] - 694:18, 699:12, 723:16, 834:6
**finished** [2] - 772:8, 773:3
**fired** [1] - 671:9
**firing** [1] - 743:10
**firm** [4] - 679:5, 721:20, 767:16, 767:25
**firms** [1] - 834:9
**First** [73] - 638:4, 638:9, 639:5, 642:6, 648:1, 649:11, 659:17, 662:18, 663:4, 666:23, 688:17, 704:16, 704:21, 715:5, 720:2, 720:8, 721:12, 722:5, 722:20, 723:4, 745:20, 753:15, 754:4, 754:7, 755:8, 756:12, 756:24, 758:9, 759:21, 761:7, 763:7, 763:11, 763:17, 764:3, 764:10, 764:19, 765:8, 766:11, 766:15, 767:14, 767:24, 770:9, 774:9, 774:11, 774:14, 774:22, 775:8, 776:9, 776:10, 777:6, 781:19, 782:21, 788:12, 791:25, 792:4, 795:16, 797:22, 798:9, 798:15, 805:16, 806:1, 810:22, 811:11, 811:13, 812:2, 812:9, 812:12, 812:16, 813:15, 814:3, 814:7, 819:12
**FIRST** [1] - 637:7
**first** [51] - 642:12, 643:4, 647:3, 658:25, 659:7, 671:19, 671:20, 673:16, 681:23, 683:7, 684:2, 690:15, 691:19, 692:10, 714:15, 715:20, 720:12, 720:13, 720:15, 722:7, 722:12, 722:15, 722:16, 722:17, 738:16, 749:14, 750:3, 753:4, 770:13, 773:16, 774:24, 783:10, 784:4, 784:13, 785:19, 797:4, 798:5, 799:20, 800:10, 805:1, 807:14, 818:14, 820:7, 821:6, 822:18, 822:22, 823:2, 829:11, 841:4
**Fiserv** [8] - 754:4, 754:8, 759:2, 774:11, 775:8, 805:13, 805:16, 813:16
**fissures** [2] - 683:14, 707:25

**fit** [1] - 664:21
**Five** [1] - 723:15
**five** [5] - 663:8, 728:24, 770:11, 770:22, 783:21
**five-year** [1] - 770:22
**fix** [2] - 659:11, 718:15, 718:17
**fixed** [6] - 643:20, 653:13, 653:23, 670:13, 683:15, 719:10
**fixing** [1] - 670:11
**FLA** [1] - 786:7
**flaw** [2] - 659:20, 681:13
**flaws** [1] - 659:8
**fleshes** [1] - 833:4
**flew** [1] - 733:3
**flip** [1] - 714:15
**Floor** [1] - 638:10
**flow** [1] - 650:25
**fluctuates** [1] - 721:23
**flying** [1] - 664:9
**FMLA** [53] - 645:24, 669:9, 672:4, 725:6, 734:3, 735:16, 735:18, 739:10, 739:12, 749:14, 775:14, 781:14, 781:16, 790:25, 791:1, 791:3, 791:14, 791:18, 791:20, 791:24, 792:6, 792:15, 793:7, 794:17, 796:15, 797:5, 797:16, 798:12, 798:14, 798:16, 798:19, 799:9, 799:13, 799:20, 799:22, 800:11, 800:15, 800:20, 800:23, 801:12, 801:15, 801:25, 821:10, 821:22, 822:13, 823:13, 824:21, 826:8, 827:6, 827:20, 829:20, 829:22, 830:15
**focus** [2] - 708:21, 742:7
**focused** [2] - 668:3, 676:15
**folks** [5] - 657:8, 699:3, 801:22, 811:22, 817:24
**follow** [3] - 646:17, 669:8, 726:7
**followed** [2] - 687:1, 688:11
**following** [3] - 705:9, 786:2, 807:24
**follows** [4] - 640:18, 753:5, 773:17, 805:2
**foot** [1] - 702:15
**FOR** [1] - 837:1
**force** [18] - 651:13, 661:13, 663:21, 664:5, 668:6, 672:3, 672:11, 719:23, 735:12, 761:21, 765:4, 765:5, 765:16, 765:19, 766:3, 818:17, 818:21, 836:1
**forced** [10] - 690:3, 730:6, 730:9, 734:21, 734:25, 739:13, 739:18, 739:23, 740:12, 741:1
**forces** [1] - 668:19
**forcing** [6] - 735:3, 738:17, 738:20, 739:4, 739:8, 739:21
**foreclose** [1] - 833:9
**forever** [2] - 645:2, 746:11
**forgot** [1] - 694:24
**form** [14] - 780:13, 780:23, 781:5, 781:12, 782:20, 783:2, 784:7, 796:7, 796:9, 797:10, 798:4, 798:13, 802:10
**Form** [1] - 755:8

**formal** [3] - 645:7, 645:20, 682:22
**formality** [2] - 641:10, 641:15
**forms** [4] - 705:7, 780:9, 780:10, 781:18
**forth** [2] - 676:20, 676:24
**forward** [8] - 663:15, 683:13, 703:22, 710:2, 721:19, 809:25, 830:9, 835:19
**forwarded** [2] - 705:8, 748:7
**four** [6] - 679:12, 680:11, 681:1, 685:12, 754:1, 825:16
**fourth** [2] - 749:16, 749:18
**frame** [1] - 826:8
**Frank** [1] - 770:11
**frank** [2] - 706:21, 707:12
**Frankly** [1] - 662:18
**FREDERIC** [1] - 637:12
**free** [2] - 639:20, 819:5
**frequently** [2] - 649:24, 809:10
**Fricke** [2] - 646:23, 648:7
**Friday** [1] - 637:7
**friends** [1] - 644:22
**front** [6] - 672:21, 702:8, 716:22, 722:4, 758:2, 809:23
**frozen** [1] - 669:21
**fruitions** [1] - 762:2
**full** [14] - 643:22, 679:11, 680:10, 680:18, 681:17, 685:12, 690:9, 690:10, 691:12, 710:6, 710:23, 749:10, 780:8, 830:7
**full-time** [7] - 643:22, 679:11, 680:10, 690:9, 690:10, 710:6, 710:23
**fully** [1] - 738:4
**fun** [1] - 822:1
**function** [4] - 653:16, 753:21, 774:23, 811:16
**functional** [2] - 670:10, 738:5
**functions** [3] - 705:1, 774:25, 777:11
**future** [3] - 662:5, 742:8, 766:22
**fuzzy** [1] - 837:2

## G

**GAAP** [1] - 760:12
**game** [2] - 699:3, 834:5
**games** [1] - 817:23
**GARY** [1] - 638:5
**GBS** [2] - 753:20, 753:21
**general** [2] - 798:13, 832:1
**Generally** [1] - 803:14
**generally** [2] - 762:12, 793:3
**generated** [1] - 744:21
**Georgia** [2] - 724:3, 782:9
**GILLIAN** [1] - 638:6
**Gita** [2] - 706:13, 706:14
**given** [10] - 648:4, 660:23, 660:24, 735:24, 744:25, 745:1, 745:19, 775:8, 775:20, 797:19
**glass** [1] - 751:19
**globally** [1] - 647:7
**glove** [1] - 782:15

**goal** [1] - 664:7
**goals** [1] - 762:16
**grant** [1] - 697:16
**grateful** [1] - 835:9
**great** [6] - 659:12, 659:25, 710:1, 721:19, 835:7, 837:21
**greater** [2] - 681:21, 757:11
**gritty** [1] - 700:19
**gross** [2] - 691:25, 722:24
**group** [34] - 646:22, 648:10, 648:13, 648:16, 661:2, 661:5, 663:17, 664:19, 665:24, 666:15, 667:6, 667:11, 667:13, 667:22, 668:7, 669:22, 715:21, 717:12, 718:22, 719:1, 805:21, 807:13, 808:18, 808:20, 808:22, 808:23, 809:4, 810:11, 811:18, 811:20, 813:15, 814:9, 815:13, 815:17
**Group** [2] - 766:12, 766:23
**groups** [3] - 716:8, 717:18, 718:18
**grow** [2] - 758:8, 769:7
**growth** [2] - 714:4, 770:4
**guard** [1] - 788:7
**guess** [12] - 715:3, 721:11, 729:24, 736:5, 738:10, 739:4, 752:20, 758:10, 793:20, 821:22, 831:13, 833:9
**guessing** [1] - 721:15
**guts** [1] - 834:16
**guy** [6] - 674:11, 674:17, 715:15, 744:12, 832:7, 832:20
**guys** [1] - 710:14

## H

**Hack** [7] - 652:3, 652:4, 658:22, 714:24, 749:1, 749:4, 809:24
**Hagerstown** [1] - 718:23
**half** [4] - 652:12, 772:19, 819:2, 834:22
**hand** [6] - 658:19, 753:3, 755:16, 773:19, 801:12, 804:23
**handle** [5] - 659:22, 775:17, 782:5, 782:7, 834:11
**hands** [2] - 645:20, 688:19
**happy** [1] - 686:15
**hard** [9] - 682:10, 682:15, 682:18, 711:4, 754:12, 813:25, 822:5, 835:8, 835:13
**harder** [1] - 807:19
**hardest** [1] - 807:20
**hardship** [1] - 793:4
**harm** [3] - 689:23, 705:14, 829:19
**Harrison** [1] - 685:24
**head** [9] - 714:5, 714:12, 714:21, 718:14, 740:23, 769:2, 769:3, 809:21, 818:15
**heading** [1] - 653:17
**heads** [3] - 647:7, 769:3, 769:4
**heal** [4] - 676:21, 677:6, 707:16, 708:2, 709:7, 709:13
**healed** [2] - 677:5, 709:4

**healing** [1] - 683:3
**health** [14] - 731:12, 778:8, 780:19, 782:17, 782:24, 783:16, 783:25, 785:1, 788:25, 794:8, 796:3, 796:5, 796:6, 796:10
**healthy** [1] - 682:11
**hear** [9] - 641:12, 668:18, 675:13, 687:19, 700:15, 717:21, 726:15, 732:7, 732:8
**heard** [23] - 641:11, 646:2, 651:12, 661:23, 663:19, 665:22, 667:3, 667:5, 667:7, 674:9, 675:14, 683:2, 684:2, 690:1, 700:13, 705:4, 743:13, 807:10, 808:5, 810:13, 816:4, 818:22, 821:7
**hearing** [1] - 667:10
**heart** [1] - 813:9
**heck** [2] - 682:24, 682:25
**held** [2] - 753:22, 768:5
**Hello** [2] - 640:21, 774:5
**help** [20] - 664:14, 664:17, 665:1, 685:23, 686:1, 707:15, 707:16, 708:17, 712:18, 713:1, 713:6, 714:8, 744:7, 744:10, 744:13, 758:6, 802:18, 808:25, 809:4, 811:19
**helped** [9] - 649:13, 676:21, 684:7, 708:25, 709:2, 711:18, 711:23, 712:1, 712:2
**helpful** [1] - 742:6
**helping** [1] - 742:7
**helps** [1] - 708:24
**Herculean** [1] - 738:6
**herein** [1] - 640:16
**hesitated** [1] - 726:13
**hi** [1] - 753:15
**high** [6] - 652:15, 669:3, 719:22, 745:14, 835:10, 835:16
**high-end** [2] - 669:3, 835:10
**higher** [4] - 692:24, 693:6, 719:18, 782:7
**highest** [2] - 651:14, 717:13
**highlighted** [2] - 659:6, 659:7
**himself** [2] - 645:22, 655:24
**hire** [8] - 664:21, 665:10, 715:2, 762:3, 762:25, 763:2, 763:3, 763:17
**hired** [11] - 646:7, 646:10, 646:23, 646:25, 663:23, 716:10, 744:6, 805:18, 805:20, 807:14
**hires** [3] - 649:8, 763:6, 763:12
**hiring** [2] - 665:10, 743:10
**hit** [1] - 837:12
**Hoefer** [1] - 717:1
**hold** [2] - 659:9, 662:12
**holes** [1] - 663:5
**home** [5] - 679:12, 680:11, 684:25, 712:21, 819:5
**honest** [3] - 706:17, 706:21, 707:12
**Honor** [91] - 640:14, 645:25, 646:4, 655:25, 656:3, 656:5, 671:24, 675:3, 678:15, 680:4, 687:14, 687:18, 688:22, 689:1, 689:12, 689:14,

694:12, 695:6, 697:2, 697:7, 699:16,
700:22, 701:14, 706:5, 706:8, 706:23,
713:15, 716:15, 720:10, 722:2, 722:8,
722:10, 722:18, 723:15, 723:19,
724:14, 725:16, 726:2, 727:23,
728:17, 728:21, 731:6, 732:1, 732:17,
735:12, 740:3, 740:17, 742:19,
747:11, 748:19, 751:1, 751:16,
751:18, 751:24, 752:6, 753:12,
759:12, 764:15, 768:6, 771:16, 772:2,
773:12, 776:24, 778:21, 799:16,
803:6, 804:6, 813:2, 813:20, 815:24,
816:4, 816:9, 817:18, 818:19, 821:3,
822:20, 823:24, 825:20, 826:3,
826:20, 827:8, 827:15, 827:16,
827:17, 828:13, 829:3, 832:8, 832:22,
836:9, 838:2, 838:14
**HONORABLE** [1] - 637:12
**hook** [1] - 705:18
**hope** [2] - 728:4, 818:9
**hopefully** [2] - 819:10, 834:18
**Hopefully** [1] - 802:4
**hospital** [9] - 676:8, 685:12, 729:19,
731:4, 796:13, 830:3, 830:22, 831:1,
832:7
**hospitalized** [1] - 831:6
**hour** [8] - 649:22, 649:23, 726:16,
772:19, 819:2, 819:14, 834:22, 838:16
**hours** [10] - 678:2, 678:5, 678:6, 679:12,
680:11, 681:1, 681:6, 682:5, 686:17
**housekeeping** [1] - 742:20
**HR** [11] - 674:1, 714:8, 763:9, 774:7,
774:8, 774:24, 782:8, 802:18, 808:24,
809:1
**HRSC** [1] - 774:16
**human** [8] - 676:22, 718:21, 765:15,
774:22, 775:10, 778:10, 782:13,
783:15

## I

**idea** [11] - 649:20, 662:22, 674:2, 674:5,
674:8, 675:20, 692:16, 695:23,
718:11, 727:15, 833:24
**identical** [1] - 708:20
**identify** [2] - 766:10, 780:7
**illness** [1] - 730:11
**imagine** [1] - 831:15
**immediately** [3] - 665:4, 722:5, 723:3
**Immediately** [1] - 794:25
**impact** [4] - 659:14, 760:8, 776:19,
787:13
**impacted** [1] - 766:2
**impeachment** [1] - 657:8
**implemented** [2] - 817:8, 817:11
**important** [2] - 804:10, 835:6
**impossible** [1] - 681:11
**impressed** [1] - 837:4
**improperly** [6] - 669:17, 675:18, 687:21,
687:23, 688:8, 690:2

**improve** [2] - 660:19, 770:15
**incapacitated** [8] - 731:13, 740:9,
784:7, 795:25, 796:14, 796:20,
796:24, 798:25
**incapacities** [1] - 796:6
**incapacity** [6] - 784:3, 784:4, 784:9,
785:21, 795:23, 796:4
**include** [4] - 659:24, 669:14, 720:5,
775:13
**included** [18] - 644:9, 644:10, 644:11,
644:12, 666:13, 668:7, 668:8, 668:13,
672:3, 672:11, 673:3, 696:20, 701:12,
721:18, 743:24, 756:17, 757:8, 765:12
**including** [11] - 657:17, 667:4, 675:1,
684:1, 714:12, 718:21, 756:11,
764:25, 767:19, 770:5, 815:13
**income** [16] - 680:15, 680:18, 680:21,
681:20, 702:10, 720:1, 720:18,
722:24, 738:10, 744:18, 744:20,
744:21, 744:25, 760:14, 761:4, 761:10
**inconsistencies** [2] - 698:8, 733:6
**inconsistent** [2] - 656:1, 657:9
**increasing** [1] - 704:1
**incredibly** [1] - 837:14
**incur** [2] - 758:1, 758:2
**indeed** [1] - 789:24
**indefinite** [1] - 792:23
**indeterminate** [1] - 793:1
**INDEX** [2] - 839:1, 840:1
**indicate** [6] - 687:20, 766:20, 784:6,
786:20, 788:24, 815:17
**indicated** [7] - 642:5, 715:21, 783:6,
784:3, 786:1, 786:10, 788:5
**indicates** [4] - 675:21, 687:10, 785:10
**indicating** [1] - 684:19
**indication** [1] - 800:6
**individual** [8] - 687:3, 702:15, 711:15,
740:8, 776:16, 776:17, 778:9, 838:3
**individuals** [6] - 769:6, 776:15, 778:7,
778:11, 780:6, 780:9
**inferences** [1] - 668:2
**influence** [1] - 732:24
**info** [1] - 787:22
**informal** [1] - 682:23
**information** [20] - 645:9, 663:1, 675:21,
750:13, 760:6, 778:13, 778:16, 780:6,
780:17, 782:20, 783:16, 786:12,
791:2, 791:7, 795:17, 798:6, 809:23,
823:5, 829:9, 834:1
**informed** [1] - 790:24
**initial** [2] - 823:3, 831:16
**initiate** [1] - 778:13
**initiative** [6] - 758:19, 760:6, 762:16,
765:21, 770:21, 812:13
**Initiatives** [1] - 755:10
**initiatives** [4] - 755:23, 756:9, 760:15,
762:20
**injury** [1] - 829:19
**Innelli** [2] - 697:13, 698:2
**inoperable** [2] - 684:20, 685:25

**input** [1] - 714:9
**inside** [6] - 663:25, 666:17, 745:9,
761:7, 761:10, 771:3
**instead** [3] - 659:11, 680:25, 760:9
**instructions** [1] - 802:1
**integrate** [1] - 798:6
**integrated** [1] - 666:19
**integration** [1] - 759:1
**intellectual** [6] - 641:8, 644:1, 644:8,
644:16, 644:17, 696:18
**intelligent** [1] - 834:2
**intent** [2] - 714:7, 716:10
**intention** [1] - 696:10
**interact** [2] - 807:23, 808:12
**interactions** [1] - 808:1
**interest** [2] - 702:4, 837:8
**Interest** [1] - 760:17
**interim** [6] - 663:16, 715:16, 715:22,
717:3, 814:8
**internal** [2] - 771:3, 771:10
**internally** [2] - 812:15, 812:17
**interns** [1] - 649:7
**interpretation** [1] - 727:16
**introduce** [3] - 647:6, 689:3, 720:11
**introducing** [1] - 649:17
**introduction** [1] - 650:20
**invest** [2] - 758:7, 770:4
**invested** [1] - 721:11
**investigation** [1] - 642:24
**investments** [1] - 770:7
**investor** [1] - 760:13
**invoice** [12] - 642:10, 642:20, 643:4,
644:17, 645:1, 645:14, 767:4, 767:7,
771:2, 771:4, 771:8
**invoices** [1] - 766:23
**involved** [14] - 648:23, 659:13, 716:2,
716:22, 758:20, 767:20, 774:8,
778:10, 781:21, 782:3, 793:12,
798:14, 808:17, 808:20
**iPad** [1] - 811:16
**IPO** [3] - 749:24, 750:1, 750:3
**issue** [15] - 647:13, 651:4, 653:5, 669:1,
704:6, 733:18, 735:22, 738:1, 778:18,
827:10, 831:15, 832:11, 832:12,
832:13, 833:5
**issued** [2] - 685:21, 785:5, 785:7
**issues** [5] - 668:4, 698:5, 698:6, 708:24,
819:8
**issuing** [1] - 710:22
**italics** [1] - 784:11
**itself** [3] - 741:2, 796:7, 796:13

## J

**Jackson** [1] - 674:9
**January** [48] - 672:4, 676:7, 693:15,
709:10, 724:24, 734:15, 746:14,
763:1, 786:3, 786:18, 787:9, 788:23,
791:14, 793:14, 793:15, 793:19,
795:2, 795:5, 795:8, 799:6, 800:1,

800:7, 800:12, 800:15, 821:11, 821:15, 821:18, 823:13, 824:1, 824:4, 824:11, 824:13, 824:14, 824:15, 825:5, 825:18, 825:23, 826:1, 826:18, 826:22, 826:23, 826:25, 827:1, 828:2, 828:12, 829:10
**Jeff** [5] - 658:22, 714:23, 749:1, 749:4, 809:24
**Jeffrey** [1] - 749:2
**Jennifer** [4] - 725:14, 773:12, 773:23, 787:19
**JENNIFER** [3] - 773:15, 773:23, 839:15
**job** [24] - 648:9, 648:15, 654:5, 654:21, 659:25, 663:18, 663:20, 665:16, 669:11, 674:1, 674:10, 698:11, 705:2, 776:20, 776:22, 778:7, 783:14, 797:23, 801:4, 813:22, 819:10, 825:24, 826:2
**jobs** [3] - 661:10, 667:18, 758:6
**Joe** [21] - 643:5, 644:19, 644:21, 644:23, 645:6, 645:7, 645:19, 646:25, 647:2, 647:11, 681:6, 682:4, 682:5, 682:7, 682:21, 685:19, 696:21, 717:23, 743:9, 743:21, 744:1
**Johnson** [13] - 687:4, 711:13, 712:7, 712:16, 713:20, 747:7, 747:13, 782:11, 784:22, 808:20, 809:2, 809:13, 810:5
**join** [1] - 805:12
**joined** [2] - 770:11, 807:4
**joke** [1] - 709:5
**Judge** [17] - 639:15, 640:23, 731:11, 731:18, 739:10, 744:14, 766:5, 774:13, 775:23, 776:1, 779:2, 780:1, 784:1, 813:6, 815:6, 822:15, 833:13
**JUDGE** [1] - 637:12
**judge** [5] - 673:22, 698:5, 717:10, 777:18, 816:19
**Judge's** [1] - 674:20
**judgment** [1] - 644:25
**Julie** [6] - 659:2, 709:25, 807:10, 809:13, 810:6, 810:7
**July** [4] - 805:17, 805:25, 806:1, 807:19
**jumped** [1] - 786:24
**juncture** [1] - 709:12
**juror** [3] - 640:1, 697:13, 819:21
**jurors** [8] - 639:7, 639:21, 728:25, 742:5, 746:8, 803:3, 816:18, 820:4
**jury** [47] - 639:1, 668:1, 669:4, 670:3, 671:6, 672:22, 675:6, 689:11, 697:20, 698:1, 698:2, 699:1, 728:1, 731:9, 731:14, 732:7, 733:13, 733:14, 739:23, 740:10, 740:15, 742:12, 743:14, 744:2, 752:11, 752:16, 784:12, 801:11, 802:24, 816:25, 819:5, 819:25, 820:2, 820:23, 822:2, 831:13, 831:20, 833:6, 833:25, 834:21, 835:25, 836:18, 836:20, 837:6, 837:20, 838:7, 838:9
**Jury** [3] - 640:3, 729:3, 742:13

---

**JURY** [2] - 637:11, 637:12
**justified** [1] - 645:12
**justify** [2] - 652:16, 718:4
**Justin** [12] - 658:25, 667:5, 709:25, 713:20, 713:23, 714:22, 716:11, 744:5, 744:6, 744:7, 804:21, 805:6
**JUSTIN** [3] - 804:25, 805:6, 839:19

## K

**Kathi** [1] - 818:14
**Kathleen** [1] - 715:14
**Keep** [1] - 773:21
**keep** [4] - 664:7, 664:10, 684:15, 690:4
**keeping** [3] - 664:8, 670:12
**Kelly** [5] - 659:2, 709:25, 807:10, 809:13, 810:7
**Kelly's** [1] - 667:10
**kept** [3] - 669:3, 696:23, 801:4
**key** [1] - 649:18
**killing** [3] - 670:13, 679:14, 680:11
**Kim** [2] - 717:1
**kind** [5] - 648:8, 649:17, 698:13, 701:20, 761:24
**kinds** [1] - 761:19
**KING** [2] - 638:8
**knocking** [1] - 836:21
**knowing** [1] - 688:4
**knowledge** [6] - 710:4, 791:6, 817:7, 817:10, 831:8, 831:17
**known** [1] - 776:15
**knows** [2] - 682:19, 743:3

## L

**labor** [2] - 832:4, 835:3
**Labor** [2] - 639:17, 780:21
**lack** [1] - 659:21
**lady** [1] - 657:18
**laid** [2] - 661:10, 717:12
**laptop** [1] - 808:6
**large** [8] - 661:8, 664:12, 667:22, 674:25, 758:23, 759:2, 769:4
**Larger** [1] - 661:9
**largest** [1] - 718:21
**Larsen** [1] - 718:24
**Last** [1] - 781:13
**last** [30] - 651:12, 694:24, 695:5, 721:6, 724:7, 725:3, 728:7, 747:8, 748:9, 748:13, 748:25, 749:4, 753:22, 754:3, 783:21, 793:25, 794:20, 799:25, 802:21, 803:12, 803:14, 803:15, 804:3, 804:4, 815:7, 815:8, 816:12, 825:9, 825:11, 833:21
**lasted** [1] - 685:2
**late** [2] - 799:4, 810:25
**latitude** [1] - 650:12
**law** [24] - 668:16, 668:17, 673:22, 674:2, 688:5, 688:11, 697:15, 703:10, 731:15, 734:5, 735:6, 740:19, 802:1,

---

832:4, 832:10, 832:11, 832:12, 832:13, 833:5, 833:8, 834:9, 835:3, 835:15
**LAW** [2] - 637:14, 739:10
**lawful** [3] - 801:2, 801:8, 801:19
**lawfully** [3] - 820:25, 823:8, 823:11
**laws** [1] - 669:9
**lawsuit** [1] - 701:4
**lawyer** [5] - 646:17, 687:24, 688:2, 688:11, 778:5
**lawyering** [2] - 835:8, 835:10
**lawyers** [4] - 688:13, 693:24, 729:2, 819:7
**lay** [2] - 687:12, 700:11
**layers** [1] - 765:4
**laymen's** [1] - 704:24
**layoff** [1] - 674:22
**lead** [3] - 809:4, 814:8
**leader** [1] - 659:12
**leaders** [4] - 663:13, 763:4, 763:15, 807:8
**leadership** [2] - 714:1, 718:6
**leads** [1] - 813:15
**learn** [2] - 716:11, 834:14
**learned** [1] - 715:5
**learning** [2] - 811:19, 817:6
**least** [5] - 698:3, 722:4, 781:13, 833:24, 835:6
**leave** [218] - 651:23, 663:17, 665:16, 670:7, 671:9, 672:4, 673:3, 673:8, 673:9, 673:10, 684:6, 687:24, 690:13, 690:18, 691:19, 692:12, 692:25, 694:5, 695:3, 697:13, 697:16, 708:5, 708:6, 717:11, 725:6, 729:11, 729:12, 729:13, 729:18, 729:20, 729:22, 730:3, 730:4, 730:5, 730:7, 730:9, 730:14, 730:16, 730:19, 730:22, 731:4, 731:10, 731:17, 731:21, 731:24, 732:22, 733:7, 733:8, 733:15, 733:17, 733:20, 733:24, 733:25, 734:5, 734:11, 734:12, 734:14, 734:17, 734:19, 734:21, 734:25, 735:3, 735:13, 735:21, 735:23, 735:25, 736:2, 736:4, 736:7, 736:11, 736:12, 736:16, 736:17, 736:19, 736:21, 736:25, 737:1, 737:5, 737:6, 737:8, 737:12, 737:15, 737:17, 737:19, 737:20, 737:23, 738:2, 738:4, 738:6, 738:8, 738:13, 738:17, 738:20, 738:21, 738:24, 739:4, 739:8, 739:14, 739:19, 739:20, 739:21, 739:24, 740:13, 741:1, 761:22, 774:20, 774:25, 775:9, 775:15, 778:9, 778:12, 778:17, 778:20, 780:7, 780:11, 780:24, 781:1, 781:18, 781:21, 781:25, 782:3, 782:10, 782:13, 783:4, 783:5, 783:10, 784:13, 784:17, 785:4, 785:5, 785:10, 785:19, 786:7, 787:6, 787:16, 788:22, 791:10, 791:21, 792:2, 792:5, 793:1, 794:4, 794:5,

794:6, 794:13, 794:15, 794:18,
797:12, 797:18, 798:16, 798:19,
798:21, 799:1, 799:13, 799:20,
800:10, 800:14, 801:12, 802:11,
802:12, 802:19, 807:24, 808:18,
808:22, 814:25, 818:7, 820:7, 820:10,
820:12, 820:13, 820:16, 820:20,
820:25, 821:6, 821:19, 822:6, 822:13,
822:19, 822:22, 823:5, 823:8, 823:11,
823:12, 826:9, 826:10, 826:12,
826:22, 827:4, 827:11, 827:19,
827:20, 827:22, 827:25, 828:3, 829:5,
829:7, 829:13, 829:15, 829:16,
829:19, 829:20, 829:21, 829:22,
830:7, 830:11, 831:5, 831:14, 831:15,
833:10, 834:21, 836:8, 838:17
**Leave** [20] - 686:24, 687:11, 690:3,
748:8, 748:9, 748:12, 748:13, 748:24,
775:14, 777:24, 778:6, 780:20, 783:4,
783:18, 785:24, 794:7, 796:1, 798:8,
798:10
**leaves** [4] - 751:21, 775:12, 775:13,
804:16
**Lebenthal** [13] - 641:3, 641:6, 641:19,
643:25, 644:5, 644:7, 644:11, 644:20,
645:3, 645:4, 645:23, 646:3
**left** [15] - 648:7, 648:17, 648:21, 651:21,
662:19, 665:25, 667:6, 688:2, 717:23,
720:2, 735:18, 804:18, 821:19
**legal** [9] - 688:1, 699:7, 699:10, 729:8,
732:19, 732:23, 740:16, 740:18,
740:23
**legally** [2] - 739:7, 831:16
**legitimate** [7] - 660:5, 660:8, 660:9,
675:22, 836:1
**LEHR** [1] - 638:3
**length** [1] - 685:25
**lengthy** [1] - 762:19
**less** [3] - 702:2, 737:10, 750:5
**Lessen** [1] - 713:21
**letter** [18] - 723:25, 724:21, 728:14,
728:16, 730:3, 780:4, 785:5, 785:7,
786:1, 791:11, 791:14, 791:17,
820:18, 824:3, 824:10, 826:5, 828:21,
829:7
**letters** [3] - 750:9, 831:10, 832:2
**level** [7] - 647:14, 702:15, 713:25,
719:22, 761:20, 774:24, 782:7
**levels** [1] - 758:7
**life** [4] - 639:15, 661:6, 671:20, 673:17
**lift** [1] - 801:22
**light** [1] - 700:23
**line** [5] - 656:12, 665:8, 702:6, 787:17,
798:5
**Link** [1] - 795:10
**Links** [1] - 789:22
**list** [4] - 669:2, 676:2, 714:11, 714:12
**listed** [1] - 763:1
**Listen** [3] - 652:7, 657:22, 771:23
**listen** [5] - 676:18, 682:21, 688:23,

707:4, 834:4
**listening** [1] - 682:6
**lists** [5] - 674:24, 675:17, 675:22,
675:23, 675:24
**litigated** [1] - 817:24
**litigation** [2] - 681:4, 757:11
**litigator** [1] - 639:13
**live** [7] - 681:20, 751:23, 752:2, 771:24,
772:8, 817:17, 817:19
**lives** [1] - 651:7
**living** [2] - 681:16, 776:18
**LLC** [1] - 745:9
**LLP** [1] - 638:3
**load** [3] - 662:1, 714:16
**located** [1] - 775:2
**location** [4] - 662:3, 724:22, 761:25,
762:3
**logical** [1] - 832:23
**logically** [1] - 831:23
**long-term** [6] - 695:12, 695:23, 696:12,
696:15, 750:10, 788:13
**look** [30] - 642:25, 650:14, 661:19,
661:22, 670:25, 675:6, 675:7, 681:8,
685:9, 689:9, 690:14, 694:14, 706:9,
711:12, 712:6, 731:2, 735:7, 738:3,
795:7, 811:25, 816:13, 816:16,
826:14, 829:15, 833:4, 833:22,
834:15, 835:19, 836:16, 837:22
**looked** [11] - 789:23, 790:4, 790:6,
794:23, 795:11, 795:12, 802:9,
815:18, 816:14, 816:15
**looking** [5] - 670:10, 678:10, 714:9,
756:10, 818:16
**looks** [7] - 658:21, 690:20, 693:1, 693:2,
714:14, 715:12, 724:21
**lose** [1] - 665:2
**losing** [1] - 770:13
**lost** [3] - 667:18, 705:10, 770:12
**LOUIS** [1] - 638:11
**love** [2] - 685:14
**loved** [1] - 645:20
**low** [3] - 692:14, 744:23, 811:2
**LTD** [1] - 695:20
**luck** [1] - 822:3
**lucky** [2] - 684:4, 684:15
**Lunch** [1] - 741:10
**lunch** [9] - 639:10, 697:11, 698:4, 699:4,
723:13, 728:25, 741:9, 822:21, 831:17
**lymph** [3] - 684:21, 685:2, 685:24

---

## M

**Madison** [1] - 638:9
**mail** [58] - 638:15, 642:3, 642:4, 677:2,
680:9, 684:6, 705:6, 705:8, 705:9,
705:11, 705:14, 706:12, 706:17,
708:3, 709:21, 711:13, 712:7, 712:16,
713:24, 713:25, 714:11, 715:12,
715:13, 725:13, 725:14, 726:22,
726:24, 727:5, 727:8, 727:10, 727:17,

727:18, 727:20, 735:22, 736:14,
736:21, 737:11, 737:16, 745:23,
745:24, 746:5, 747:7, 747:12, 747:16,
748:6, 748:23, 778:14, 785:17,
786:10, 786:17, 786:25, 787:18,
787:20, 788:3, 794:25, 802:17
**mailed** [1] - 791:11
**mails** [3] - 676:24, 716:21, 746:7
**maintain** [1] - 811:3
**man** [5] - 670:14, 684:3, 684:15, 686:19,
686:20
**manage** [2] - 774:20, 798:12
**management** [16] - 647:15, 647:17,
661:4, 665:8, 665:11, 676:25, 755:15,
755:24, 758:1, 771:7, 802:11, 802:12,
802:19, 814:13, 814:14, 823:5
**Management** [7] - 748:8, 748:9, 748:12,
748:13, 748:24, 755:10
**Manager** [1] - 774:7
**manager** [20] - 657:17, 658:22, 659:8,
659:13, 748:24, 749:1, 774:10,
774:16, 774:19, 778:19, 782:5,
783:15, 788:2, 803:12, 803:16,
805:24, 807:11, 807:13, 811:18, 814:8
**managers** [2] - 717:13, 765:16
**managing** [5] - 648:9, 661:1, 663:21,
665:23, 810:8
**March** [9] - 642:11, 701:21, 702:1,
717:5, 720:4, 720:5, 766:15, 812:5,
812:7
**marching** [1] - 836:7
**Marilyn** [3] - 786:25, 787:1, 787:3
**Marino** [6] - 650:20, 685:18, 708:4,
708:20, 765:14, 780:4
**Marino's** [2] - 684:8, 685:6
**mark** [4] - 764:14, 815:10, 815:16,
816:14
**marked** [4] - 764:17, 766:7, 766:9,
777:16
**Maryland** [1] - 638:5
**master** [1] - 762:25
**masters** [1] - 661:21
**match** [3] - 644:20, 645:4, 798:22
**matched** [1] - 761:17
**math** [1] - 719:14
**Matt** [2] - 752:24, 753:9
**MATT** [2] - 753:4, 839:10
**matter** [12] - 651:7, 670:16, 737:1,
740:19, 740:21, 742:20, 781:22,
800:21, 830:2, 831:13, 832:10, 835:3
**matters** [4] - 699:7, 699:10, 732:20,
732:23
**maximum** [1] - 790:13
**McKinney** [1] - 637:16
**mean** [21] - 642:3, 680:22, 680:23,
682:17, 683:2, 686:17, 708:23,
712:10, 749:23, 756:6, 767:1, 788:16,
788:17, 789:14, 796:25, 797:1,
830:24, 832:7, 832:9, 837:1, 837:15
**meaning** [3] - 718:2, 749:18, 828:14

**means** [22] - 642:4, 651:5, 660:9, 674:2, 680:19, 680:20, 680:23, 681:20, 681:21, 703:9, 704:23, 715:5, 755:21, 756:1, 756:3, 756:5, 757:18, 757:19, 784:7, 790:23, 801:1, 823:12
**meant** [1] - 727:15
**meantime** [1] - 819:14
**measures** [4] - 760:12, 760:13, 761:13, 761:14
**medical** [41] - 682:25, 708:24, 729:11, 729:12, 729:13, 729:18, 729:19, 729:22, 729:24, 730:5, 730:9, 730:14, 730:16, 730:18, 730:22, 731:4, 731:10, 731:16, 731:21, 731:24, 733:7, 733:8, 733:15, 733:20, 733:24, 733:25, 734:5, 734:11, 734:16, 735:21, 735:24, 736:2, 736:7, 737:6, 780:15, 780:16, 781:10, 781:20, 783:2, 790:21, 796:8
**Medical** [14] - 686:24, 687:11, 690:3, 775:13, 777:24, 778:5, 780:20, 783:4, 783:18, 785:24, 794:7, 795:25, 798:8, 798:9
**medically** [2] - 790:24, 792:5
**medication** [1] - 796:12
**medications** [1] - 712:10
**medicine** [1] - 740:21
**meds** [1] - 712:9
**meet** [3] - 647:6, 647:19, 729:1
**meeting** [6] - 639:17, 639:18, 653:11, 653:12, 676:11, 763:8
**meetings** [3] - 649:5, 650:25, 676:18
**meets** [2] - 778:17, 796:10
**member** [2] - 794:8, 794:10
**members** [2] - 659:22, 819:4
**memorize** [1] - 833:23
**memory** [1] - 671:12
**mental** [2] - 683:1, 683:22
**mentioned** [5] - 643:24, 662:2, 676:10, 693:19, 709:5
**mentor** [1] - 682:8
**merged** [1] - 754:4
**merger** [1] - 759:2
**message** [5] - 647:5, 647:11, 680:14, 682:19, 685:9
**messages** [6] - 678:23, 679:7, 679:20, 681:4, 684:19, 686:11
**messaging** [5] - 648:22, 666:16, 678:14, 718:7, 718:12
**Met** [2] - 789:22, 795:10
**methodology** [2] - 702:21, 811:23
**MetLife** [36] - 695:12, 723:11, 723:25, 724:21, 750:9, 750:11, 750:13, 750:21, 780:13, 780:16, 787:16, 788:2, 788:4, 788:14, 788:18, 788:21, 789:20, 790:4, 790:6, 790:9, 790:10, 790:15, 790:18, 790:21, 791:7, 794:20, 794:24, 798:4, 798:6, 798:9, 798:14, 798:24, 802:13, 802:14, 802:15, 803:20

**MetLife's** [1] - 799:11
**MICHAEL** [1] - 638:6
**Michael** [1] - 706:19
**microphone** [1] - 774:1
**middle** [4] - 678:4, 734:14, 734:15, 807:18
**might** [6] - 683:16, 713:8, 761:13, 761:24, 775:12, 787:20
**military** [1] - 775:15
**million** [22] - 674:25, 704:18, 757:12, 757:13, 757:15, 757:17, 757:18, 757:21, 757:22, 757:24, 758:1, 758:3, 765:17, 765:21, 765:22, 766:4, 768:12, 768:20, 768:24, 811:10, 812:11
**mind** [3] - 718:4, 718:17, 830:25
**mind-set** [1] - 718:17
**mine** [2] - 683:12, 719:3
**Minus** [1] - 723:6
**minute** [1] - 744:9
**minutes** [9] - 680:15, 697:7, 697:8, 723:15, 728:24, 772:16, 772:18, 803:7, 804:18
**mischaracterization** [1] - 818:20
**miss** [1] - 738:5
**missed** [1] - 710:25
**missing** [6] - 786:21, 786:22, 788:10, 788:24, 789:3, 789:4
**mistake** [4] - 692:14, 693:2, 722:11, 749:23
**mixed** [1] - 644:14
**Moffitt** [1] - 685:24
**Monday** [8] - 705:9, 785:12, 813:1, 816:25, 819:14, 819:23, 834:18, 834:19
**money** [20] - 644:3, 651:8, 655:1, 664:11, 680:23, 681:14, 681:20, 696:24, 700:16, 700:20, 701:4, 701:7, 720:5, 721:19, 737:10, 742:22, 745:4, 758:8, 769:7, 770:12, 770:13, 814:3
**monitor** [3] - 762:1, 768:23, 769:1
**monitoring** [1] - 705:8
**month** [9] - 641:7, 642:7, 701:10, 702:17, 702:18, 718:4, 721:4, 721:25, 775:11
**monthly** [1] - 644:12
**months** [9] - 652:22, 666:25, 683:1, 683:25, 684:1, 686:7, 703:22, 704:3, 768:21
**morning** [5] - 640:22, 808:15, 819:14, 819:23, 834:18
**Most** [1] - 661:6
**most** [4] - 758:14, 758:17, 763:14, 835:9
**mostly** [1] - 812:13
**motion** [2] - 751:10, 837:16
**Move** [1] - 652:10
**move** [12] - 646:16, 650:12, 666:6, 669:4, 726:2, 775:23, 777:3, 777:18, 778:21, 814:17, 814:18, 816:11
**moved** [2] - 805:22, 805:23

**moves** [1] - 659:24
**moving** [3] - 710:2, 710:3, 710:9
**MR** [419] - 639:15, 639:17, 640:14, 640:20, 645:25, 646:4, 646:5, 646:21, 650:8, 650:13, 652:11, 653:3, 653:9, 653:21, 653:25, 655:18, 655:25, 656:3, 656:5, 656:8, 656:10, 657:12, 657:25, 658:6, 658:8, 658:11, 658:15, 658:18, 660:4, 660:20, 666:11, 670:23, 671:7, 671:24, 673:21, 674:19, 675:3, 675:9, 675:12, 675:16, 676:3, 678:1, 679:17, 679:19, 679:22, 680:1, 680:4, 682:2, 682:3, 685:7, 687:12, 687:14, 687:18, 688:22, 689:1, 689:3, 689:7, 689:11, 689:14, 689:18, 689:22, 694:12, 694:18, 694:21, 695:5, 695:8, 697:2, 697:6, 699:15, 699:24, 700:4, 700:9, 700:11, 700:12, 700:22, 701:9, 701:12, 701:14, 703:6, 703:11, 706:5, 706:8, 706:23, 709:16, 711:9, 712:3, 712:12, 713:8, 713:11, 713:15, 713:17, 715:7, 716:15, 716:18, 720:10, 721:1, 722:2, 722:8, 722:10, 722:13, 722:17, 722:22, 723:15, 723:19, 723:24, 724:14, 724:20, 725:16, 725:21, 726:1, 726:3, 726:8, 726:10, 726:12, 727:1, 727:4, 727:9, 727:23, 728:4, 728:7, 728:13, 728:17, 728:21, 728:24, 729:14, 729:16, 729:21, 730:1, 730:6, 730:10, 730:15, 730:17, 730:20, 730:24, 731:1, 731:6, 731:8, 731:11, 731:18, 731:22, 732:1, 732:1, 732:4, 732:7, 732:12, 732:15, 732:16, 732:21, 732:24, 733:1, 733:17, 733:21, 734:2, 734:6, 734:9, 734:12, 734:20, 734:23, 735:3, 735:7, 735:10, 736:1, 736:9, 736:10, 736:16, 736:19, 736:22, 737:3, 737:7, 737:13, 737:18, 737:21, 737:24, 738:7, 738:15, 739:1, 739:4, 739:11, 739:15, 739:21, 740:1, 740:3, 740:7, 740:11, 740:14, 740:16, 740:21, 741:3, 742:17, 742:19, 742:24, 743:1, 743:11, 745:7, 746:6, 746:14, 746:17, 746:21, 746:24, 747:5, 747:22, 747:24, 748:4, 748:17, 748:19, 751:1, 751:3, 751:5, 751:10, 751:14, 751:16, 751:18, 751:24, 752:4, 752:6, 752:9, 752:20, 752:22, 752:24, 753:12, 753:14, 754:11, 754:15, 754:19, 754:21, 755:6, 756:3, 757:23, 759:4, 759:12, 759:14, 759:16, 759:17, 759:19, 763:20, 763:22, 763:24, 768:2, 768:6, 768:9, 768:11, 770:1, 771:16, 771:18, 771:19, 772:1, 772:2, 772:5, 772:9, 772:12, 772:15, 772:18, 772:22, 772:25, 773:4, 773:12, 774:3, 774:12, 775:6, 775:23, 776:1, 776:24, 777:3, 777:20, 778:21, 778:24, 779:2, 779:5, 779:8, 779:11, 779:14, 779:18,

779:20, 779:22, 780:1, 780:2, 783:13, 784:20, 786:5, 791:5, 792:8, 792:11, 792:14, 793:14, 793:16, 793:17, 793:22, 793:25, 794:3, 799:16, 802:7, 803:2, 803:6, 803:10, 803:24, 804:6, 804:10, 804:13, 804:21, 805:10, 807:1, 813:2, 813:6, 813:8, 813:10, 814:6, 814:18, 815:3, 815:6, 815:8, 815:24, 816:4, 816:8, 816:12, 816:23, 817:2, 817:4, 817:13, 817:18, 817:21, 818:5, 818:9, 818:14, 818:19, 818:23, 819:2, 820:9, 820:12, 820:15, 820:17, 821:1, 821:3, 821:9, 821:12, 821:15, 821:20, 821:23, 822:5, 822:15, 822:20, 822:24, 823:2, 823:10, 823:14, 823:16, 823:20, 823:23, 824:2, 824:5, 824:8, 824:12, 824:16, 824:17, 824:19, 824:23, 825:3, 825:6, 825:11, 825:14, 825:19, 825:22, 825:25, 826:3, 826:6, 826:9, 826:12, 826:20, 826:25, 827:2, 827:8, 827:15, 827:16, 827:17, 827:24, 828:2, 828:7, 828:9, 828:11, 828:13, 828:16, 828:20, 828:23, 829:1, 829:3, 830:5, 830:20, 830:23, 831:9, 832:5, 832:8, 832:12, 832:22, 833:12, 835:22, 836:3, 836:9, 836:11, 836:14, 836:24, 837:7, 837:9, 837:11, 837:19, 837:25, 838:1, 838:2, 838:5, 838:7, 838:14, 839:6, 839:7, 839:8, 839:11, 839:12, 839:13, 839:16, 839:17, 839:20, 839:21
**multi** [1] - 838:11
**multi-factor** [1] - 838:11
**multiple** [3] - 649:9, 774:24, 796:14
**Multiple** [1] - 663:7
**mumble** [2] - 688:20, 754:13
**mumbles** [2] - 688:24, 688:25
**mumbling** [1] - 754:10
**must** [5] - 651:8, 682:14, 687:2, 725:1, 794:8
**mutually** [1] - 829:21

# N

**name** [11] - 649:6, 662:8, 674:24, 685:20, 685:21, 706:13, 706:18, 753:8, 773:22, 796:25, 805:4
**named** [2] - 657:18, 732:12
**nature** [5] - 744:2, 757:10, 757:11, 763:10, 808:1
**near** [1] - 734:7
**Nebraska** [1] - 775:3
**necessarily** [5] - 667:13, 672:24, 710:8, 796:25, 804:7
**necessary** [3] - 778:13, 778:14, 835:20
**need** [42] - 640:23, 640:24, 646:17, 650:4, 678:16, 680:15, 680:20, 681:20, 685:19, 685:23, 686:1, 700:19, 706:21, 707:12, 715:2, 724:2,

724:7, 725:2, 735:22, 743:12, 748:24, 750:6, 752:14, 767:10, 776:8, 776:22, 777:10, 781:3, 796:14, 803:25, 804:7, 804:9, 804:13, 812:14, 812:22, 812:25, 815:4, 815:14, 815:22, 816:24, 830:9
**needed** [11] - 643:6, 664:9, 705:1, 713:6, 743:22, 744:7, 783:7, 808:25, 809:25, 811:16, 833:2
**needing** [1] - 680:23
**needs** [10] - 664:21, 731:2, 778:15, 794:11, 810:14, 810:16, 810:22, 811:7, 811:12, 817:5
**negative** [3] - 722:24, 723:2, 723:4
**neighborhood** [1] - 725:10
**net** [4] - 691:1, 760:14, 761:4, 761:10
**neutral** [1] - 679:6
**never** [22] - 641:11, 645:7, 645:12, 645:20, 661:11, 669:12, 669:16, 670:24, 672:8, 683:21, 684:2, 695:25, 709:12, 710:25, 715:15, 729:13, 729:17, 749:5, 750:15, 830:1, 831:5, 831:18
**Never** [1] - 654:24
**new** [14] - 649:8, 664:22, 762:2, 762:3, 762:24, 763:2, 763:3, 763:6, 763:12, 763:16, 763:17, 791:2, 811:25
**NEW** [1] - 637:1
**New** [7] - 637:5, 637:21, 638:10, 648:5, 786:18, 834:13
**next** [35] - 665:9, 677:17, 680:14, 685:11, 685:16, 691:5, 691:8, 691:15, 691:25, 692:17, 693:4, 697:22, 698:16, 707:14, 709:15, 711:2, 711:24, 720:21, 727:22, 741:11, 743:12, 744:4, 744:15, 747:21, 749:21, 750:20, 751:22, 755:20, 768:21, 769:9, 785:2, 806:4, 809:22, 815:14
**Next** [10] - 650:6, 653:7, 653:20, 653:24, 654:17, 657:24, 659:20, 675:14, 804:5, 804:19
**nice** [1] - 833:19
**night** [1] - 678:5
**nitty** [1] - 700:19
**Nobody** [1] - 672:14
**node** [1] - 685:25
**nodes** [2] - 684:21, 685:2
**non** [2] - 670:10, 760:12
**non-functional** [1] - 670:10
**non-GAAP** [1] - 760:12
**normal** [9] - 677:5, 678:19, 760:4, 760:9, 760:15, 760:21, 760:22, 760:24, 796:4
**normally** [2] - 711:7, 830:13
**north** [1] - 811:10
**note** [5] - 714:22, 824:23, 832:24, 833:1, 833:2
**noted** [1] - 639:2
**notes** [2] - 678:13, 701:15

**nothing** [4] - 645:6, 681:11, 703:13, 798:11
**Nothing** [1] - 675:15
**notice** [14] - 693:9, 693:18, 730:25, 797:7, 797:13, 825:1, 825:4, 825:6, 825:17, 826:18, 827:7, 827:21, 829:17
**noticed** [1] - 671:19
**notification** [5] - 725:7, 725:11, 793:19, 797:5, 800:6
**Notified** [1] - 793:14
**notified** [2] - 793:15, 829:5
**notify** [1] - 791:9
**November** [47] - 678:8, 683:2, 684:9, 684:17, 686:6, 691:19, 691:20, 691:22, 709:8, 709:22, 725:9, 730:2, 730:6, 730:15, 730:16, 730:23, 730:24, 733:8, 733:18, 734:9, 734:13, 734:14, 734:17, 736:13, 737:15, 737:20, 738:13, 738:22, 739:18, 739:24, 740:25, 749:10, 749:18, 791:20, 792:16, 793:6, 796:19, 797:8, 799:22, 809:14, 820:7, 820:12, 820:16, 820:24, 821:8, 830:9
**nth** [1] - 643:8
**number** [37] - 640:2, 652:7, 658:10, 661:1, 664:21, 668:25, 678:22, 678:25, 689:7, 690:20, 697:13, 699:6, 702:10, 702:11, 702:12, 702:23, 709:22, 713:11, 719:9, 722:24, 723:2, 723:4, 751:6, 755:23, 761:2, 761:4, 766:18, 767:8, 767:10, 768:13, 768:17, 770:25, 776:11, 808:2, 810:9, 819:21
**numbers** [15] - 691:9, 691:16, 692:11, 702:15, 702:17, 702:18, 702:21, 704:17, 731:3, 733:11, 744:18, 745:13, 760:10, 761:7, 836:18

# O

**oath** [1] - 640:5
**objected** [1] - 727:2
**objection** [25] - 672:7, 679:22, 680:2, 682:2, 687:12, 689:23, 706:10, 706:23, 713:18, 723:21, 724:17, 725:24, 733:1, 743:3, 743:11, 746:23, 748:20, 754:23, 754:24, 759:9, 762:22, 776:2, 779:15, 814:15, 816:5
**Objection** [2] - 672:13, 791:5
**obtain** [1] - 790:22
**obviously** [1] - 648:25
**occur** [1] - 814:11
**occurred** [4] - 718:9, 756:12, 765:4, 767:20
**October** [31] - 678:8, 679:8, 680:7, 683:2, 712:8, 724:10, 725:7, 783:10, 783:11, 784:1, 784:14, 785:19, 785:20, 785:23, 799:24, 799:25, 800:10, 820:18, 821:4, 821:6, 821:8, 821:10, 822:18, 823:1, 823:2, 823:8,

823:12, 823:19, 823:22, 823:23, 826:22, 827:11, 828:12, 828:19, 832:6, 832:20
**odd** [1] - 803:15
**OF** [3] - 637:1, 637:11, 637:14
**offer** [16] - 644:20, 679:19, 689:18, 703:13, 706:5, 709:18, 712:12, 715:7, 716:15, 722:2, 723:19, 724:15, 725:16, 726:1, 727:23, 815:24
**offered** [3] - 674:4, 674:7, 725:23
**offerings** [1] - 818:11
**offhand** [1] - 793:10
**office** [7] - 750:24, 763:4, 782:9, 782:21, 804:4, 808:15, 823:6
**OFFICE** [1] - 637:14
**officer** [7] - 753:24, 753:25, 764:3, 764:10, 764:24, 765:15, 767:15
**Official** [1] - 638:14
**official** [3] - 785:19, 793:23, 825:17
**offset** [3] - 702:12, 704:9, 837:13
**offsetting** [1] - 644:2
**often** [3] - 659:13, 808:12, 809:6
**old** [3] - 698:15, 709:15, 762:3
**Omaha** [4] - 648:4, 715:18, 718:23, 775:3
**once** [5] - 665:9, 666:23, 706:3, 716:7, 808:14, 820:6
**Once** [3] - 644:19, 646:11, 778:16
**one** [110] - 639:19, 641:9, 647:2, 650:15, 653:4, 657:5, 658:22, 659:20, 662:10, 663:6, 664:10, 665:1, 665:17, 665:18, 666:15, 668:15, 670:18, 677:6, 679:10, 679:18, 679:23, 682:14, 683:24, 685:16, 685:17, 685:18, 688:18, 689:5, 689:13, 689:16, 690:2, 690:15, 690:20, 691:15, 691:19, 691:25, 692:7, 693:3, 694:17, 694:22, 695:15, 695:17, 703:7, 703:15, 711:15, 712:17, 715:9, 716:10, 718:6, 723:14, 724:22, 724:23, 725:2, 728:7, 731:11, 735:11, 735:14, 738:5, 741:6, 741:8, 745:23, 745:24, 746:9, 748:16, 751:3, 752:13, 762:10, 762:17, 762:21, 764:11, 764:25, 768:3, 772:13, 772:18, 775:22, 777:12, 777:17, 777:18, 780:9, 780:10, 780:18, 795:15, 799:15, 801:12, 802:8, 803:8, 808:2, 815:7, 815:8, 816:9, 816:10, 816:23, 817:2, 817:8, 818:14, 818:16, 820:22, 821:5, 822:15, 822:16, 823:9, 830:24, 831:12, 835:22, 836:3, 836:9
**One** [5] - 722:14, 731:2, 731:23, 772:4, 772:15
**one's** [1] - 713:20
**ones** [3] - 649:3, 679:7, 685:11
**ongoing** [2] - 664:16, 761:23
**Open** [2] - 639:1, 698:1
**open** [6] - 665:6, 715:2, 742:3, 801:4, 820:2, 833:15

**opening** [2] - 690:1, 690:12
**operated** [3] - 738:4, 738:24, 831:2
**Operating** [5] - 757:6, 757:8, 757:13, 757:21, 758:24
**operating** [4] - 647:8, 756:24, 757:3, 757:9
**operation** [6] - 676:6, 678:9, 685:17, 709:9, 727:13, 789:13
**operations** [1] - 819:12
**Operations** [1] - 774:7
**opinion** [2] - 676:21, 768:1
**opportunities** [1] - 770:4
**opportunity** [4] - 646:1, 649:20, 807:23, 833:22
**Opportunity** [2] - 776:5, 776:9
**Options** [1] - 721:11
**options** [5] - 685:19, 704:13, 704:15, 749:24, 749:25
**order** [9] - 642:11, 684:21, 766:11, 766:14, 767:6, 767:10, 770:24, 794:12, 799:12
**orders** [2] - 710:22, 770:24
**ordinary** [1] - 783:14
**Ording** [4] - 663:16, 674:1, 814:7, 814:25
**Ording's** [1] - 814:14
**organization** [13] - 665:17, 666:4, 666:20, 669:15, 713:22, 716:7, 716:12, 718:18, 774:21, 798:24, 800:21, 807:4
**organizational** [4] - 814:20, 814:24, 815:17, 816:13
**orientation** [3] - 762:25, 763:2, 763:3
**orientations** [1] - 763:17
**original** [3] - 648:15, 716:14, 802:8
**originally** [2] - 725:8, 758:14
**otherwise** [1] - 740:7
**outset** [1] - 800:11
**outside** [2] - 767:15, 767:25
**overall** [4] - 659:15, 716:12, 761:12, 769:2
**overhead** [2] - 653:17, 653:18
**overnight** [1] - 796:12
**overruled** [1] - 706:24
**oversaw** [1] - 781:25
**overtried** [1] - 822:4
**overview** [2] - 763:6, 781:15
**overwhelming** [1] - 816:18
**own** [10] - 649:2, 710:21, 731:13, 738:21, 781:10, 781:20, 788:13, 790:23, 835:12
**owned** [2] - 647:16, 647:17

---
## P
---

**P.C** [2] - 637:14, 637:18
**p.m** [8] - 697:21, 699:1, 741:10, 742:13, 819:25, 822:9, 822:10, 838:18
**P.O** [1] - 767:8
**package** [3] - 701:21, 780:6, 809:23

**packet** [2] - 781:17, 797:8
**PAGE** [1] - 839:3
**Page** [3] - 656:11, 671:25, 755:9
**page** [31] - 656:12, 658:1, 659:6, 677:17, 679:6, 691:8, 692:17, 697:22, 698:16, 714:11, 714:15, 716:22, 720:12, 720:13, 720:15, 720:21, 721:3, 722:4, 722:7, 722:12, 722:15, 722:16, 722:17, 722:20, 724:15, 741:11, 769:9, 781:6, 790:2, 806:4, 841:4
**pages** [1] - 757:1
**paid** [17] - 644:8, 651:14, 690:9, 692:10, 693:13, 694:9, 695:20, 702:3, 717:13, 738:1, 741:1, 745:15, 766:24, 767:5, 767:9, 767:11, 775:15
**paper** [2] - 702:8, 802:25
**papers** [6] - 677:12, 708:8, 712:18, 712:23, 713:3, 713:5
**paperwork** [11] - 678:10, 705:22, 730:25, 749:15, 778:14, 782:10, 784:22, 787:7, 830:11, 830:12, 830:14
**Pardon** [1] - 726:9
**parental** [1] - 775:15
**Part** [1] - 735:10
**part** [22] - 645:18, 650:25, 663:20, 664:3, 667:15, 669:14, 669:21, 670:2, 670:4, 674:25, 684:11, 694:21, 699:12, 718:24, 764:9, 771:24, 772:11, 773:9, 780:10, 790:16, 807:20
**participate** [1] - 683:18
**particular** [3] - 643:11, 705:12, 765:22
**particularly** [1] - 750:18
**parties** [3] - 639:5, 732:10, 742:4
**partner** [2] - 714:4, 808:24
**partners** [3] - 664:4, 665:2, 714:6
**party** [4] - 683:9, 683:21, 684:9, 684:13
**passed** [2] - 647:16, 667:14, 667:18
**past** [4] - 662:5, 663:5, 755:22, 773:2
**Patel** [2] - 706:13, 706:14
**patient** [3] - 784:3, 798:25, 833:18
**pattern** [1] - 758:22
**Paul** [1] - 739:9
**Paula** [2] - 713:21, 713:23
**pause** [1] - 768:5
**pay** [30] - 642:6, 643:21, 681:17, 690:10, 691:1, 691:13, 691:25, 692:6, 692:14, 692:18, 692:24, 693:7, 693:13, 693:20, 693:22, 694:2, 694:8, 694:10, 695:2, 702:2, 721:5, 736:6, 749:6, 749:8, 749:10, 771:1, 787:13, 787:21, 788:14, 836:17
**Payable** [1] - 767:8
**payable** [2] - 770:25, 771:4
**payday** [1] - 690:15
**paying** [3] - 651:18, 726:15, 768:25
**payment** [10] - 644:13, 644:15, 691:9, 692:11, 692:18, 693:4, 694:24, 721:6, 770:23, 787:23
**payments** [8] - 688:17, 700:23, 700:24,

700:25, 701:9, 701:11, 705:24, 757:19
**payroll** [4] - 690:14, 693:14, 774:25, 830:7
**people** [58] - 647:21, 648:1, 648:5, 649:7, 649:21, 652:6, 657:16, 658:2, 658:20, 659:5, 659:8, 659:10, 663:12, 663:13, 663:23, 664:1, 664:6, 664:21, 665:3, 665:5, 666:3, 666:9, 666:24, 667:11, 667:12, 667:18, 674:6, 675:18, 676:7, 678:13, 683:16, 684:4, 708:24, 709:22, 710:1, 711:5, 714:12, 715:2, 718:14, 719:5, 738:6, 743:22, 752:18, 758:3, 763:15, 768:16, 772:7, 772:20, 775:7, 775:9, 775:20, 782:21, 809:1, 810:5, 835:8
**per** [2] - 721:25, 775:11
**percent** [11] - 648:14, 701:23, 701:24, 701:25, 702:4, 703:25, 717:12, 719:12, 719:14, 719:16, 776:23
**percentage** [3] - 648:9, 758:25, 759:3
**perfectly** [1] - 817:1
**perform** [2] - 776:18, 777:10
**performance** [2] - 658:16, 761:12
**perhaps** [1] - 833:7
**Perhaps** [1] - 659:20
**period** [23] - 643:1, 678:3, 685:2, 691:1, 691:15, 692:17, 694:2, 694:5, 695:21, 701:21, 721:5, 730:4, 738:3, 762:19, 769:2, 770:22, 786:7, 792:23, 793:1, 793:3, 808:9, 810:2, 823:12
**periods** [3] - 758:10, 758:11, 762:11
**permission** [1] - 676:17
**permissive** [1] - 834:10
**permit** [1] - 726:5
**person** [5] - 660:1, 674:1, 792:25, 801:16, 804:17
**personal** [7] - 684:21, 685:10, 705:8, 706:2, 808:3, 817:7, 817:10
**personally** [1] - 808:2
**perspective** [2] - 773:4, 832:23
**philosophy** [1] - 661:16
**phone** [1] - 750:12
**physical** [2] - 683:1, 683:23
**physician** [9] - 776:19, 778:15, 780:16, 784:2, 784:3, 784:6, 786:20, 788:23
**physician's** [1] - 781:11
**pick** [1] - 652:8
**piece** [3] - 665:23, 703:15, 703:16
**pity** [2] - 683:8, 683:20
**place** [8] - 649:19, 663:12, 664:10, 669:8, 670:8, 684:3, 766:14, 807:21
**placed** [1] - 729:11
**places** [2] - 643:19, 648:6
**Plaintiff** [7] - 637:4, 637:15, 637:19, 640:16, 658:17, 753:4, 840:5
**plaintiff** [9] - 640:11, 672:21, 746:8, 773:10, 781:22, 823:5, 824:18, 836:12
**Plaintiff's** [30] - 658:6, 658:11, 688:16, 689:15, 689:17, 713:9, 742:22, 743:6, 746:15, 746:21, 747:1, 747:22, 748:1,

748:17, 748:21, 754:15, 754:17, 755:1, 759:4, 759:8, 759:10, 762:21, 802:16, 803:11, 840:6, 840:7, 840:8, 840:9, 840:10, 840:11
**plaintiff's** [3] - 688:15, 771:25, 773:6
**Plaintiffs** [1] - 637:14
**plan** [7] - 699:3, 761:12, 761:14, 781:1, 788:18, 818:20, 834:5
**planning** [4] - 706:22, 707:13, 809:21, 809:22
**plans** [4] - 714:4, 714:16, 761:8, 818:17
**play** [2] - 685:13, 817:23
**player** [1] - 743:25
**pleased** [1] - 686:10
**PLLC** [1] - 638:8
**plugged** [1] - 704:2
**Plumeri** [16] - 641:11, 641:16, 646:25, 647:24, 648:17, 649:1, 651:21, 651:25, 665:25, 678:23, 679:20, 680:9, 681:25, 684:24, 743:9, 817:10
**Plumeri's** [1] - 679:8
**plus** [2] - 702:2, 756:14
**pneumonia** [1] - 677:4
**podcasts** [1] - 639:20
**point** [15] - 642:2, 656:22, 676:13, 725:6, 725:11, 732:21, 751:10, 763:11, 786:6, 788:10, 788:19, 817:25, 825:7, 832:15
**points** [2] - 735:12, 743:15
**policies** [2] - 763:10, 764:25
**policy** [17] - 759:16, 759:24, 765:1, 765:8, 775:15, 776:6, 776:9, 776:13, 777:6, 777:8, 777:12, 777:24, 778:1, 791:25, 800:21, 801:13
**Policy** [3] - 759:22, 764:20, 764:23
**poor** [2] - 688:21, 688:23
**portal** [10] - 789:22, 790:4, 790:6, 790:9, 790:10, 790:15, 794:21, 794:24, 795:10, 795:19
**portion** [3] - 663:22, 758:24, 759:3
**posed** [1] - 726:3
**position** [38] - 646:6, 665:7, 669:13, 669:15, 669:20, 669:21, 669:22, 670:1, 670:17, 670:19, 673:24, 674:13, 729:20, 730:13, 730:19, 731:2, 731:7, 731:16, 731:23, 738:6, 740:25, 762:5, 762:6, 805:25, 813:11, 813:13, 821:13, 822:12, 822:14, 822:25, 823:8, 824:14, 824:20, 828:19, 832:9, 832:20, 838:7
**positions** [4] - 674:3, 674:7, 733:22, 824:12
**possibility** [1] - 683:17
**possible** [4] - 641:13, 660:17, 677:10, 804:5
**possibly** [1] - 710:10
**Postal** [1] - 785:17
**postponed** [1] - 717:2
**potentially** [2] - 649:7, 773:6
**practice** [2] - 792:4, 793:5

**practices** [1] - 798:10
**practicing** [1] - 835:15
**Pratt** [1] - 638:4
**pre** [1] - 775:8
**pre-Fiserv** [1] - 775:8
**preceded** [1] - 812:20
**precludes** [1] - 835:3
**prefer** [1] - 712:21
**premise** [1] - 661:17
**preparation** [1] - 790:16
**prepared** [2] - 792:18, 834:24
**prescription** [1] - 796:12
**present** [17] - 639:1, 639:6, 698:1, 699:9, 701:23, 701:24, 742:4, 752:5, 763:5, 763:9, 772:11, 806:2, 810:21, 817:20, 819:9, 820:3, 831:12
**presentation** [3] - 649:18, 649:23, 667:2
**presentations** [2] - 649:8, 650:1
**presented** [5] - 641:9, 641:14, 661:18, 744:17, 784:5
**presenting** [1] - 698:14
**president** [3] - 663:16, 782:13, 807:3
**pressure** [1] - 819:18
**pressured** [1] - 653:11
**pretext** [2] - 835:23, 835:24
**pretty** [4] - 683:10, 719:3, 728:21, 833:24
**previous** [1] - 643:17
**previously** [5] - 640:17, 791:11, 828:8, 828:9, 829:6
**price** [6] - 642:6, 647:12, 651:4, 651:11, 651:17, 651:18, 651:20, 653:5, 704:15, 749:24, 749:25
**Primerica** [1] - 743:21
**principal** [1] - 822:16
**print** [3] - 795:9, 795:10, 795:12
**priorities** [1] - 665:9
**priority** [1] - 665:9
**privacy** [1] - 720:12
**private** [1] - 645:9
**privy** [1] - 802:14
**proactively** [1] - 711:16
**problem** [6] - 683:12, 697:16, 702:19, 752:7, 822:13, 831:25
**problems** [1] - 813:21
**procedure** [2] - 771:10, 792:4
**proceed** [1] - 714:23
**proceeded** [2] - 725:22, 726:4
**proceedings** [4] - 768:5, 819:20, 820:2, 838:18
**Proceedings** [1] - 638:16
**process** [13] - 645:19, 659:24, 661:13, 663:12, 665:6, 676:21, 718:11, 767:4, 774:20, 778:10, 798:14, 799:4, 829:4
**processing** [1] - 781:21
**produced** [3] - 638:17, 693:9, 726:19
**product** [2] - 651:11, 663:24
**productivity** [1] - 654:25
**products** [4] - 810:9, 810:12, 810:13,

811:4
**profitable** [2] - 769:8, 770:16
**program** [8] - 649:6, 649:11, 649:22, 664:22, 705:16, 761:24, 810:17, 836:15
**programs** [1] - 788:13
**project** [1] - 704:1
**projected** [4] - 703:20, 704:7, 761:15, 765:18
**projection** [1] - 837:14
**projections** [3] - 703:21, 722:1, 761:17
**projects** [7] - 659:14, 664:16, 664:18, 676:13, 677:8, 678:11, 762:13
**prolix** [3] - 815:22, 816:20, 818:1
**promised** [1] - 803:3
**promoted** [2] - 715:18, 743:23
**pronouncing** [1] - 706:13
**proof** [2] - 663:3, 815:25
**properly** [2] - 688:7, 759:25
**properties** [1] - 644:8
**property** [5] - 641:8, 644:1, 644:16, 644:18, 696:18
**proposal** [9] - 641:4, 641:7, 641:20, 642:15, 643:25, 644:7, 645:3, 645:5, 645:11
**proposed** [2] - 833:18, 834:15
**protected** [3] - 645:21, 740:9, 778:19
**protecting** [2] - 710:11, 711:3
**protection** [1] - 778:7
**protections** [1] - 829:20
**protocol** [1] - 828:14
**proud** [1] - 667:1
**prove** [2] - 675:24, 822:5
**provide** [4] - 777:9, 797:22, 800:20, 810:19
**provided** [11] - 643:25, 766:22, 767:3, 771:6, 783:5, 783:10, 793:11, 803:18, 812:14, 829:17, 829:18
**provider** [7] - 731:12, 780:19, 782:17, 782:25, 783:17, 785:2, 789:1
**provides** [4] - 778:6, 778:7, 798:23, 798:24
**providing** [2] - 758:5, 778:11
**provision** [4] - 643:25, 644:15, 829:24, 835:2
**provisions** [2] - 781:2, 832:4
**public** [8] - 661:18, 704:15, 704:16, 750:4, 764:7, 764:11, 765:12, 771:11
**pull** [3] - 755:11, 755:13, 819:13
**pulled** [2] - 795:9, 795:13
**purchase** [7] - 642:11, 766:11, 766:14, 767:6, 767:10, 770:23, 770:24
**purpose** [3] - 759:24, 780:14, 791:17
**purposes** [4] - 657:8, 790:19, 800:23, 800:24
**pursuant** [3] - 765:11, 767:5, 829:6
**pushed** [1] - 791:19
**put** [40] - 649:13, 649:14, 649:19, 651:13, 663:12, 665:12, 680:2,

684:11, 684:12, 684:21, 688:16, 688:19, 690:13, 690:15, 691:18, 693:14, 693:24, 694:4, 695:2, 702:5, 708:5, 714:21, 719:22, 726:25, 727:1, 728:1, 729:12, 736:16, 738:2, 742:10, 766:14, 779:1, 779:4, 779:13, 798:4, 809:23, 817:21, 819:18, 835:9, 835:14
**putting** [1] - 718:5

## Q

**qualified** [11] - 674:12, 674:15, 740:8, 740:12, 740:20, 776:15, 776:16, 777:9, 778:7, 783:18, 783:25
**qualifies** [1] - 783:3
**qualify** [1] - 829:20
**qualifying** [2] - 794:8, 794:10
**quarter** [2] - 749:16, 749:18
**quarterly** [4] - 661:19, 661:22, 758:10, 758:11
**quarters** [3] - 758:12, 758:14, 758:17
**questioned** [1] - 651:10
**questioning** [2] - 697:5, 813:5
**questions** [33] - 650:11, 664:1, 668:2, 672:1, 673:16, 676:20, 677:1, 694:17, 694:22, 728:12, 728:17, 728:19, 728:23, 750:8, 763:20, 763:21, 765:3, 768:7, 771:19, 783:3, 792:11, 796:7, 803:8, 803:23, 804:12, 810:18, 814:5, 815:23, 816:7, 816:10, 816:22, 830:19
**quick** [2] - 666:6, 748:16
**Quickly** [1] - 805:20
**quickly** [4] - 688:19, 697:7, 744:16, 803:6
**quite** [6] - 677:11, 792:14, 792:24, 793:11, 801:14, 809:6

## R

**rails** [1] - 834:9
**raise** [3] - 753:2, 773:18, 804:23
**ramifications** [1] - 694:6
**rapidly** [3] - 677:6, 708:2, 710:9
**rate** [2] - 702:4, 704:11
**rated** [1] - 660:22
**rather** [3] - 819:18, 827:4, 836:19
**re** [1] - 699:1
**re-entered** [1] - 699:1
**reach** [3] - 780:16, 787:9, 807:19
**reached** [3] - 641:21, 641:22, 787:10, 803:20
**reacted** [1] - 686:10
**reaction** [1] - 831:16
**read** [38] - 647:23, 657:7, 660:3, 671:5, 671:6, 671:13, 671:18, 671:23, 673:20, 677:12, 678:12, 701:17, 707:3, 707:11, 707:12, 726:8, 726:10, 726:18, 726:20, 727:8, 728:2, 735:6, 743:4, 746:7, 746:13, 747:10, 747:12, 747:16, 751:25, 752:4, 756:2, 772:12,

773:7, 781:3, 784:12, 787:17, 794:25, 818:3
**reading** [4] - 677:11, 677:13, 752:7, 773:11
**reads** [2] - 727:21
**readvised** [1] - 791:12
**ready** [4] - 694:16, 723:18, 824:10, 824:15
**real** [5] - 665:14, 706:21, 707:13, 748:16, 819:8
**really** [12] - 646:18, 661:22, 666:19, 667:1, 676:21, 683:17, 789:7, 808:2, 813:24, 827:10, 835:20, 837:2
**reason** [14] - 673:6, 674:21, 681:14, 701:4, 717:16, 777:8, 783:24, 801:2, 801:8, 801:9, 801:19, 828:6, 829:3, 831:4
**reasonable** [5] - 697:14, 704:20, 776:14, 777:9, 838:7
**reasons** [5] - 664:11, 682:14, 697:14, 716:10, 830:1
**receive** [12] - 651:9, 708:6, 728:14, 728:16, 767:24, 780:7, 781:15, 782:16, 783:15, 787:12, 798:16, 798:19
**RECEIVED** [1] - 840:3
**received** [43] - 658:17, 680:3, 689:25, 695:11, 695:13, 700:23, 702:2, 705:24, 706:11, 709:20, 711:11, 712:5, 712:15, 713:19, 715:11, 715:13, 716:20, 720:15, 722:21, 723:11, 723:23, 724:19, 728:10, 743:6, 747:1, 747:18, 748:1, 748:21, 749:14, 755:1, 759:10, 768:1, 776:4, 777:4, 777:22, 779:7, 779:17, 779:23, 779:24, 782:24, 787:11, 788:9, 797:12
**receives** [2] - 791:2, 802:15
**receiving** [1] - 785:1
**recess** [4] - 697:12, 697:21, 741:10, 822:9
**recognize** [1] - 695:12
**recollection** [1] - 720:17
**recommendation** [2] - 752:9, 810:20
**recommendations** [1] - 811:4
**reconvene** [1] - 741:9
**record** [8] - 726:20, 753:8, 805:5, 822:11, 837:16, 837:22, 837:24, 838:8
**recorded** [1] - 638:16
**records** [3] - 724:7, 786:20, 788:23
**recovered** [1] - 683:25
**recovering** [1] - 681:18
**recovery** [1] - 685:12
**RECROSS** [2] - 751:4, 839:8
**recruited** [1] - 645:8
**recuperate** [1] - 684:7
**recurring** [1] - 685:3
**redirect** [1] - 742:15
**REDIRECT** [4] - 742:16, 768:10, 839:7, 839:13
**reduce** [5] - 667:14, 668:19, 669:14,

760:21, 760:24
**reduced** [2] - 670:18, 688:25
**reduction** [15] - 651:13, 668:6, 672:3, 672:11, 686:12, 719:23, 743:16, 743:23, 761:21, 765:3, 765:5, 765:16, 765:19, 766:2, 836:1
**reductions** [3] - 661:13, 818:17, 818:20
**reference** [4] - 713:25, 714:6, 714:25, 776:12
**referenced** [1] - 658:8
**referred** [1] - 767:19
**referring** [1] - 788:25
**refilled** [1] - 762:7
**refined** [1] - 819:9
**reflection** [2] - 657:3, 657:4
**refreshes** [1] - 720:17
**refund** [1] - 644:3
**regardless** [2] - 670:2, 741:1
**regional** [1] - 649:5
**regular** [4] - 692:11, 692:24, 693:7, 693:22
**regularly** [1] - 782:11
**regulation** [5] - 827:9, 827:12, 828:17, 829:6, 829:12
**regulations** [3] - 780:21, 791:1, 830:13
**rehiring** [1] - 768:24
**reinvest** [1] - 769:7
**relate** [4] - 649:18, 661:1, 735:16, 735:17
**related** [5] - 758:12, 758:18, 759:2, 774:20, 804:8
**relates** [1] - 650:8
**relation** [1] - 776:11
**relationship** [8] - 644:23, 651:10, 665:3, 682:22, 744:3, 808:3, 813:22, 813:23
**relationships** [1] - 644:3
**relative** [1] - 762:3
**relax** [1] - 751:20
**release** [5] - 780:15, 781:9, 781:11, 793:11
**relevancy** [1] - 650:8
**relevant** [6] - 650:7, 769:6, 814:17, 816:17, 818:10, 836:6
**relied** [3] - 703:12, 799:11, 803:21
**rely** [3] - 790:22, 795:22, 803:16
**Remain** [2] - 773:18, 804:22
**remain** [1] - 753:2
**remarkable** [1] - 683:25
**remember** [38] - 641:4, 641:22, 642:13, 642:15, 642:20, 643:2, 649:6, 651:15, 651:23, 652:17, 653:13, 657:2, 661:14, 671:9, 671:21, 678:9, 678:23, 690:19, 693:10, 693:20, 702:14, 703:19, 704:3, 704:11, 714:7, 714:19, 717:13, 720:3, 720:9, 724:12, 724:25, 745:22, 747:20, 747:21, 749:11, 749:14, 793:10
**remind** [1] - 640:4
**render** [1] - 796:13
**rendered** [2] - 654:2, 655:21

**repair** [1] - 685:11
**repetitious** [1] - 743:12
**replacement** [1] - 717:2
**replacements** [1] - 650:9
**report** [5] - 658:25, 659:4, 664:15, 676:11, 717:25
**reported** [2] - 652:4, 658:22
**reporter** [4] - 688:23, 726:8, 726:10, 726:18
**Reporter** [2] - 638:14, 638:14
**reporting** [3] - 661:7, 662:21, 818:23
**reports** [5] - 661:19, 661:22, 665:21, 677:15, 710:9
**representing** [1] - 795:11
**reps** [1] - 659:24
**req** [2] - 665:6, 665:7
**reqs** [1] - 715:2
**request** [9] - 665:1, 665:12, 700:10, 700:14, 732:18, 798:7, 807:9, 815:10, 815:16
**requested** [2] - 664:17, 673:9
**requesting** [4] - 665:4, 708:10, 781:1, 791:22
**requests** [3] - 664:20, 665:11, 807:8
**require** [2] - 760:5, 781:10
**required** [4] - 715:1, 739:20, 827:19, 829:15
**requirement** [3] - 665:7, 669:9, 771:7
**requires** [4] - 775:9, 781:6, 796:7, 796:8
**research** [2] - 641:19, 790:22
**researching** [1] - 654:15
**reserved** [1] - 759:13
**resources** [6] - 718:21, 765:15, 774:22, 778:10, 782:13, 783:15
**respect** [7] - 686:23, 704:6, 767:5, 792:1, 818:11, 835:8, 835:13
**respecting** [1] - 762:4
**respond** [3] - 664:20, 683:5, 789:12
**responds** [3] - 715:15, 789:7, 789:13
**response** [5] - 727:10, 747:13, 788:3, 788:21, 789:15
**responsibilities** [21] - 647:4, 648:7, 666:12, 669:25, 677:16, 710:17, 710:21, 716:4, 716:6, 716:13, 737:10, 738:9, 753:19, 764:9, 764:12, 774:18, 781:14, 797:9, 797:14, 797:19, 807:6
**responsibility** [12] - 648:11, 654:8, 654:10, 654:14, 665:23, 676:12, 706:2, 716:12, 717:19, 718:3, 780:24, 830:12
**responsible** [4] - 753:20, 764:10, 764:24, 778:1
**responsive** [2] - 639:8, 807:12
**restate** [1] - 647:15
**restraints** [1] - 717:1
**restrictions** [3] - 693:11, 693:18, 696:9
**restructure** [2] - 669:15, 758:5
**restructures** [1] - 758:17
**Restructuring** [4] - 755:9, 759:21,

764:19, 764:23
**restructuring** [29] - 755:15, 755:23, 756:9, 756:11, 756:12, 757:10, 757:15, 758:2, 758:12, 758:18, 758:23, 759:16, 759:25, 760:3, 760:5, 760:9, 760:15, 760:25, 761:2, 761:5, 761:16, 761:17, 762:9, 765:6, 765:8, 765:9, 765:12, 765:22, 767:20
**restructurings** [1] - 761:20
**result** [5] - 655:19, 662:12, 724:8, 767:24, 783:23
**results** [1] - 765:11
**resumes** [1] - 639:25
**retirement** [3] - 706:22, 707:13, 709:5
**retroactive** [2] - 827:13, 829:8
**Retroactively** [1] - 797:15
**retroactively** [7] - 695:20, 790:24, 791:10, 827:20, 829:13, 829:16, 829:22
**return** [18] - 676:6, 693:9, 693:17, 696:8, 702:12, 721:8, 722:23, 762:4, 778:16, 781:1, 781:9, 781:11, 792:6, 793:11, 824:12, 824:24, 825:1, 832:21
**returned** [2] - 693:17, 696:19, 820:20
**returning** [1] - 669:7
**returns** [5] - 720:6, 722:4, 744:16, 744:17, 762:7
**revenue** [2] - 653:12
**review** [5] - 657:14, 658:1, 658:16, 660:21, 767:21
**reviewed** [1] - 783:2
**revised** [1] - 791:13
**Rhonda** [11] - 687:4, 708:17, 711:13, 712:16, 713:20, 714:4, 747:7, 747:13, 747:19, 748:7, 748:12, 782:11, 784:21, 808:20, 808:24, 809:2, 809:13, 809:17, 809:19
**Rhonda's** [2] - 714:1, 714:8
**Richardson** [7] - 811:22, 811:23, 812:1, 812:2, 812:4, 812:12, 812:15
**rid** [1] - 812:5
**RIF** [3] - 761:20, 762:5, 835:23
**RIFs** [1] - 762:9
**right-hand** [2] - 658:19, 755:16
**rights** [8] - 781:14, 797:9, 797:13, 797:18, 820:19, 824:21, 827:6, 833:10
**Rise** [1] - 639:4
**rise** [3] - 697:19, 742:12, 819:24
**Rivka** [1] - 638:14
**RivkaTeich@gmail.com** [1] - 638:15
**road** [1] - 648:25
**Robin** [4] - 663:16, 665:13, 673:25, 814:7
**Rogers** [3] - 707:18, 707:20, 707:21
**role** [5] - 656:14, 764:22, 781:24, 805:23, 805:24
**rolling** [1] - 811:25
**room** [4] - 732:5, 732:10, 732:11, 732:22
**rotate** [1] - 763:4

**rough** [1] - 756:24
**roughly** [2] - 678:2, 757:1
**rounded** [3] - 751:8, 751:12
**rounding** [1] - 751:9
**rules** [3] - 669:8, 760:1, 760:5
**ruling** [1] - 816:21
**rulings** [1] - 818:11
**run** [4] - 710:14, 715:18, 756:7, 762:13
**running** [1] - 808:18
**Ruth** [1] - 788:1

## S

**S-T-A-M-E-Y** [1] - 805:7
**salaries** [1] - 768:14
**salary** [17] - 651:19, 652:15, 652:16, 653:18, 654:18, 668:14, 669:14, 675:1, 703:23, 719:12, 720:18, 743:16, 743:23, 765:15, 765:17, 768:13, 768:15
**sales** [47] - 646:8, 646:22, 648:10, 648:16, 651:11, 656:15, 659:14, 661:2, 661:5, 663:17, 663:21, 663:23, 664:5, 665:14, 665:16, 665:17, 665:22, 665:24, 666:1, 666:3, 666:12, 666:13, 666:18, 666:19, 713:22, 716:7, 744:8, 744:11, 805:21, 805:22, 805:23, 807:3, 807:11, 808:20, 808:23, 810:10, 811:20, 811:22, 811:23, 811:25, 813:15, 814:8, 815:12, 815:16, 815:17
**Sales** [1] - 663:22
**sample** [1] - 781:12
**Santa** [1] - 685:13
**sat** [1] - 649:16
**Saturday** [2] - 705:6, 785:13
**SAUL** [1] - 638:3
**save** [2] - 675:2, 769:7
**Save** [3] - 653:7, 739:23, 803:23
**saved** [3] - 645:21, 768:12, 768:24
**saving** [1] - 661:14
**savings** [12] - 675:1, 761:15, 761:22, 765:15, 765:18, 765:21, 765:25, 768:19, 770:2, 770:4, 770:6
**saw** [6] - 670:13, 670:14, 684:10, 684:16, 684:24, 709:3
**scenario** [1] - 833:13
**schedule** [6] - 707:15, 709:8, 762:25, 763:11, 763:13, 763:14
**scheduled** [1] - 821:15
**schedules** [1] - 763:17
**scheduling** [1] - 763:18
**SCHOENECK** [1] - 638:8
**school** [1] - 796:5
**scope** [1] - 659:25
**screen** [5] - 776:6, 780:8, 795:9, 795:10, 795:13
**search** [1] - 717:2
**seat** [3] - 753:7, 773:21, 805:4
**seated** [2] - 729:4, 742:14

**SEC** [1] - 760:6
**second** [22] - 671:4, 678:21, 679:23, 689:5, 689:13, 703:15, 703:16, 710:15, 714:11, 715:9, 722:14, 731:23, 735:14, 755:15, 768:3, 772:4, 790:1, 816:9, 820:22, 821:5, 824:9, 830:24
**Second** [3] - 734:24, 735:5, 739:7
**Section** [1] - 639:17
**section** [3] - 755:8, 829:18, 832:1
**security** [1] - 686:1
**see** [72] - 642:22, 655:13, 658:19, 659:4, 659:5, 659:7, 677:7, 679:9, 680:5, 680:12, 680:16, 690:16, 690:22, 691:6, 691:16, 691:20, 691:23, 692:1, 692:9, 692:18, 694:25, 697:17, 698:7, 699:4, 699:5, 699:13, 699:14, 701:15, 705:20, 706:10, 706:22, 706:25, 707:1, 707:5, 707:6, 707:8, 711:13, 711:17, 720:17, 720:19, 721:2, 722:25, 723:25, 724:11, 724:12, 724:24, 725:4, 725:18, 727:6, 728:18, 739:2, 747:14, 754:22, 755:17, 761:16, 761:21, 774:1, 775:25, 777:1, 784:12, 786:15, 787:24, 790:2, 790:14, 795:14, 802:3, 819:16, 819:23, 833:4, 834:20, 837:20, 838:13
**seem** [1] - 832:3
**sees** [3] - 707:10, 727:7, 755:19
**segment** [1] - 753:21
**selected** [1] - 674:22
**self** [1] - 651:6
**self-explanatory** [1] - 651:6
**sell** [3] - 663:24, 663:25
**Selling** [1] - 650:17
**send** [14] - 665:3, 677:13, 682:18, 684:18, 712:17, 727:10, 727:17, 767:7, 780:10, 785:14, 785:16, 798:11, 802:9, 802:14
**sending** [3] - 681:3, 725:13, 791:17
**SENIOR** [1] - 637:12
**senior** [8] - 647:7, 647:14, 665:8, 665:11, 676:25, 698:10, 763:15, 807:3
**sense** [9] - 643:22, 647:8, 647:9, 681:12, 697:4, 718:6, 739:17, 811:6, 832:1
**sensitive** [1] - 808:25
**sent** [18] - 676:13, 680:14, 685:9, 686:4, 686:11, 705:6, 727:18, 730:2, 747:7, 747:12, 780:9, 781:18, 788:22, 791:14, 797:8, 797:9, 797:11, 829:7
**separate** [4] - 738:1, 761:24, 762:13, 762:20
**separately** [1] - 644:8
**September** [56] - 637:7, 676:5, 678:8, 683:2, 701:22, 702:1, 703:22, 724:8, 724:9, 725:3, 725:4, 730:1, 731:17, 731:18, 731:24, 733:15, 733:18, 733:24, 734:13, 734:17, 738:13, 746:4, 750:22, 750:23, 783:8, 784:24,

790:11, 799:8, 799:21, 800:10, 807:21, 807:22, 822:13, 822:22, 823:17, 827:5, 827:6, 827:11, 828:25, 829:11, 830:7, 830:22, 831:1, 831:5, 831:14, 832:4, 832:6, 832:16, 832:18, 832:19, 832:25, 833:5, 833:8, 835:4, 838:19
**sequester** [1] - 732:18
**sequestration** [1] - 732:16
**series** [2] - 642:18, 664:1
**serious** [11] - 678:13, 681:18, 683:17, 778:8, 783:25, 794:8, 796:3, 796:5, 796:6, 796:10, 831:7
**seriously** [1] - 655:15
**serves** [1] - 774:24
**service** [5] - 651:10, 664:16, 666:13, 771:5, 802:18
**Service** [1] - 774:8
**services** [9] - 651:18, 766:22, 767:3, 774:22, 775:10, 778:10, 783:15, 798:7, 812:14
**servicing** [5] - 664:5, 670:8, 670:9, 718:13, 718:24
**SESSION** [1] - 742:1
**sessions** [1] - 763:13
**set** [4] - 642:5, 718:17, 808:7, 836:18
**setting** [1] - 702:3
**settlements** [1] - 757:11
**seven** [15] - 640:2, 646:9, 662:4, 662:9, 662:11, 662:12, 662:18, 663:2, 663:4, 666:2, 703:16, 703:20, 783:21, 797:12, 837:14
**Seventy** [1] - 648:13
**several** [4] - 666:24, 666:25, 677:12, 796:7
**severance** [3] - 757:18, 760:16, 765:25
**shaded** [1] - 679:7
**shambles** [1] - 718:25
**shape** [1] - 742:7
**Sharon** [1] - 749:3
**SHAWN** [2] - 637:14, 637:17
**Shawn** [1] - 735:18
**Shearer** [20] - 728:18, 729:9, 735:19, 742:6, 742:15, 751:17, 751:22, 752:10, 752:15, 753:11, 764:11, 764:14, 765:3, 768:8, 792:13, 802:23, 803:9, 817:21, 820:6, 834:6
**SHEARER** [148] - 637:14, 637:17, 706:23, 728:21, 728:24, 729:14, 729:16, 729:21, 730:1, 730:6, 730:10, 730:15, 730:17, 730:20, 730:24, 733:17, 733:21, 734:2, 734:6, 734:9, 734:12, 734:20, 734:23, 735:3, 735:7, 736:1, 736:9, 736:19, 736:22, 737:3, 737:7, 737:13, 737:18, 737:21, 737:24, 738:7, 738:15, 739:1, 739:4, 739:11, 739:15, 739:21, 740:1, 741:3, 742:17, 742:19, 742:24, 743:1, 745:7, 746:6, 746:14, 746:17, 746:21, 746:24, 747:5, 747:22, 747:24, 748:4,

748:17, 748:19, 751:1, 751:18,
751:24, 752:4, 752:20, 752:22,
752:24, 753:12, 753:14, 754:11,
754:15, 754:19, 754:21, 755:6, 756:3,
757:23, 759:4, 759:14, 759:17,
759:19, 763:20, 768:9, 768:11, 770:1,
771:18, 772:1, 772:9, 772:12, 772:15,
772:18, 791:5, 792:14, 793:14,
793:16, 794:3, 802:7, 803:2, 803:10,
803:24, 804:6, 804:10, 804:13,
816:23, 817:2, 817:4, 817:13, 817:18,
818:5, 818:9, 818:14, 819:2, 820:9,
820:12, 820:15, 820:17, 821:1, 821:3,
821:9, 821:12, 821:15, 821:20,
821:23, 822:5, 824:12, 824:23, 825:3,
826:6, 826:9, 826:12, 826:25, 827:2,
827:17, 828:9, 828:11, 828:20,
828:23, 829:1, 835:22, 836:3, 836:24,
837:7, 838:1, 838:14, 839:7, 839:11,
839:13, 839:17, 839:21
**shearer** [1] - 698:9
**Shearer's** [1] - 813:4
**Shearson** [2] - 661:6, 662:10
**shook** [1] - 645:20
**short** [18] - 643:20, 661:14, 685:2,
715:22, 750:10, 752:13, 772:12,
787:11, 788:4, 788:13, 788:16,
790:19, 798:16, 798:19, 798:21,
799:7, 799:12, 810:17
**Short** [5] - 715:12, 715:14, 715:17,
715:18
**short-term** [11] - 661:14, 715:22,
750:10, 787:11, 788:4, 790:19,
798:16, 798:19, 798:21, 799:7, 799:12
**shortly** [1] - 796:18
**shorts** [1] - 788:5
**show** [13] - 644:7, 644:14, 650:23,
658:1, 658:5, 685:5, 689:11, 694:2,
694:24, 724:7, 754:17, 786:14, 790:1
**showed** [5] - 674:24, 750:9, 764:11,
764:14, 777:12
**showing** [3] - 726:13, 749:8, 766:9
**Showing** [2] - 777:16, 782:2
**shown** [1] - 798:4
**shows** [8] - 647:24, 648:25, 649:1,
649:2, 691:9, 702:13, 721:4, 789:22
**shutting** [1] - 761:25
**side** [10] - 640:10, 658:19, 667:23,
670:9, 714:8, 714:15, 715:24, 718:13,
744:11, 755:16
**sign** [6] - 708:12, 771:7, 781:4, 796:17,
796:25
**signature** [2] - 767:11, 781:7
**signatures** [1] - 796:21
**signed** [5] - 646:7, 694:8, 708:8, 796:18,
797:2
**significant** [2] - 668:3, 719:3
**significantly** [1] - 758:23
**signs** [1] - 780:15
**similar** [6] - 669:11, 708:4, 708:19,

771:13, 777:12
**Simple** [1] - 662:16
**simple** [1] - 742:9
**simplify** [1] - 728:5
**simply** [1] - 768:15
**simultaneous** [1] - 737:3
**simultaneously** [1] - 736:12
**Sit** [1] - 732:3
**site** [2] - 665:3, 789:20
**sitting** [1] - 683:11
**situation** [4] - 641:6, 653:4, 762:6,
808:25
**situations** [2] - 762:1, 762:18
**six** [4] - 677:5, 685:12, 783:21, 825:9
**size** [1] - 667:14
**skills** [2] - 811:23, 811:25
**slowed** [1] - 648:8
**slowly** [1] - 721:22
**small** [2] - 664:3, 744:18
**smart** [2] - 698:6, 729:9
**Smith** [1] - 662:10
**socialization** [1] - 714:23
**socialize** [2] - 715:2, 715:4
**society** [1] - 676:23
**Software** [1] - 674:11
**software** [9] - 674:16, 674:17, 701:21,
702:3, 702:16, 702:20, 703:25,
810:17, 811:7
**sole** [1] - 666:22
**solution** [1] - 810:20
**Solutions** [1] - 650:17
**someone** [5] - 707:25, 714:19, 768:25,
770:24, 809:24
**sometimes** [4] - 644:7, 644:8, 644:10,
659:23, 762:16, 822:4
**Sometimes** [2] - 644:10, 659:22
**someway** [1] - 644:20
**somewhat** [1] - 836:6
**somewhere** [4] - 725:10, 749:19,
807:18, 807:19
**son** [9] - 644:9, 645:16, 645:17, 681:10,
744:22, 744:25, 745:1, 745:4, 745:17
**sons** [1] - 721:20
**soothe** [1] - 682:6
**sorry** [27] - 639:11, 642:14, 642:19,
642:23, 657:21, 679:17, 679:20,
680:4, 687:18, 688:22, 689:15,
691:20, 699:21, 702:14, 702:15,
702:17, 704:3, 704:12, 711:25, 720:9,
722:10, 722:18, 744:23, 749:17,
824:19, 825:22, 828:16
**Sorry** [1] - 675:3
**sort** [9] - 698:6, 698:14, 733:12, 736:5,
816:16, 819:8, 834:10
**sorted** [1] - 733:6
**sorts** [2] - 831:2, 831:17
**sounded** [1] - 683:6
**sounds** [2] - 757:14, 809:17
**spans** [1] - 765:4

**spare** [1] - 831:20
**speaker** [2] - 649:24, 763:1
**Speaking** [1] - 784:21
**speaking** [2] - 650:17, 833:21
**special** [2] - 644:15, 782:6
**specialist** [1] - 715:19
**specific** [3] - 643:25, 704:4, 777:13
**specifically** [2] - 703:1, 837:5
**spectrum** [1] - 665:21
**speculative** [2] - 837:2, 837:14
**speech** [2] - 684:1, 709:12
**speeches** [2] - 649:10, 666:22
**speed** [1] - 709:7
**spell** [2] - 753:8, 773:22
**spend** [2] - 677:12, 766:21
**spending** [4] - 648:6, 651:7, 651:8
**spent** [4] - 643:1, 677:9, 767:2, 835:17
**Spent** [1] - 805:22
**spoken** [1] - 835:21
**spokesperson** [1] - 666:16
**spouse** [1] - 787:4
**spread** [1] - 684:20
**spreadsheet** [1] - 664:15
**spreadsheets** [2] - 818:15, 836:5
**staff** [2] - 676:18, 683:19, 684:14
**staffing** [1] - 664:18
**stage** [1] - 699:8
**Stamey** [12] - 658:25, 667:6, 709:25,
713:20, 744:5, 744:6, 804:21, 805:6,
805:11, 814:20, 815:10, 815:16
**STAMEY** [2] - 804:25, 839:19
**stand** [10] - 639:24, 639:25, 650:2,
672:21, 751:21, 752:25, 753:2,
773:14, 804:22, 804:24
**standard** [4] - 771:10, 781:17, 782:2,
792:4
**standards** [1] - 659:9
**standing** [3] - 753:2, 773:18, 804:23
**start** [21] - 640:7, 647:2, 647:10, 656:23,
670:10, 735:11, 762:16, 785:11,
786:15, 786:21, 786:22, 788:24,
789:3, 789:4, 790:12, 791:3, 805:16,
820:18, 822:17, 827:5, 831:6
**started** [33] - 641:10, 643:1, 645:2,
648:4, 662:13, 678:9, 684:10, 703:21,
709:7, 709:8, 720:4, 733:17, 734:12,
770:14, 799:12, 799:13, 799:21,
799:24, 800:10, 820:12, 820:14,
822:13, 823:16, 823:18, 823:23,
823:24, 827:5, 827:11, 827:25, 828:3,
829:6, 829:7
**starting** [9] - 718:8, 724:9, 725:4,
730:14, 731:24, 733:15, 733:24,
738:21, 830:7
**Stasha** [1] - 657:18
**state** [3] - 753:8, 773:22, 776:14
**State** [1] - 805:4
**statement** [6] - 657:20, 657:23, 682:3,
690:1, 690:12, 789:21

**statements** [2] - 767:18, 767:22
**states** [1] - 794:7
**STATES** [2] - 637:1, 637:12
**States** [1] - 637:5
**status** [6] - 664:15, 676:11, 698:10, 795:5, 795:7, 795:14
**statute** [1] - 740:9
**statutes** [3] - 687:11, 687:21, 687:23
**stay** [9] - 657:22, 705:15, 792:1, 796:12, 808:5, 808:7, 813:1, 816:24, 830:7
**stayed** [5] - 668:14, 669:13, 669:20, 704:9, 825:8
**staying** [3] - 676:15, 679:12, 680:11
**steam** [1] - 707:14
**stenography** [1] - 638:16
**step** [7] - 714:3, 729:5, 751:19, 771:21, 785:3, 816:21, 817:14
**steps** [3] - 729:6, 788:6, 791:8
**Steve** [11] - 659:12, 659:22, 659:24, 715:15, 787:1, 789:10, 803:20, 807:2, 807:20, 809:23, 814:25
**Steve's** [3] - 659:8, 717:2, 787:4
**STEVEN** [3] - 637:3, 640:15, 839:5
**Steven** [6] - 637:15, 637:19, 781:22, 787:18, 805:18, 805:25
**still** [23] - 640:1, 640:5, 646:23, 648:22, 666:15, 679:4, 691:12, 698:11, 699:11, 700:12, 701:3, 705:19, 706:2, 708:12, 710:22, 736:7, 752:1, 759:2, 812:2, 821:18, 826:7, 834:14, 838:2
**stipulate** [1] - 690:19
**Stock** [1] - 721:10
**stock** [10] - 686:13, 704:13, 704:14, 721:9, 721:12, 745:16, 745:19, 749:23, 749:25, 750:4
**stop** [14] - 640:25, 671:22, 697:2, 730:12, 745:23, 754:10, 754:12, 786:13, 789:15, 808:15, 810:24, 811:1, 812:4, 828:15
**Stop** [1] - 671:22
**stopped** [13] - 663:11, 725:14, 727:11, 727:14, 750:21, 786:11, 788:10, 789:11, 789:16, 789:19, 790:7, 795:1, 828:3
**stopping** [1] - 829:11
**straight** [1] - 821:25
**strategy** [4] - 659:15, 687:5, 719:11, 809:25
**streaming** [1] - 647:10
**streamline** [2] - 755:24, 756:10
**Street** [4] - 637:20, 638:4, 661:13, 837:8
**stress** [3] - 708:23, 708:24, 709:15
**strike** [2] - 757:23, 837:16
**structure** [1] - 756:11
**struggles** [1] - 659:12
**stubs** [1] - 749:6
**stuff** [5] - 656:19, 671:21, 677:3, 705:21, 717:24
**style** [4] - 814:14, 835:12
**subdivision** [1] - 827:13

**submit** [1] - 658:2
**submitted** [3] - 642:9, 645:14, 658:20
**submitting** [3] - 642:9, 642:15, 642:20
**subordinates** [1] - 657:16
**subsequent** [1] - 800:20
**subsequently** [1] - 762:6
**substantive** [2] - 657:10, 834:4
**subtracted** [1] - 703:24
**successor** [3] - 656:16, 716:3, 716:4
**successorship** [1] - 716:2
**sudden** [1] - 648:6
**sue** [1] - 686:22
**suffer** [1] - 738:14
**suffered** [2] - 705:10, 738:25
**sufficient** [2] - 697:14, 722:9
**Suffolk** [2] - 834:12, 835:15
**Suite** [1] - 637:20
**sum** [2] - 834:18, 834:24
**summarizes** [1] - 706:18
**summary** [2] - 702:22, 702:25
**summation** [2] - 653:7, 675:7
**summations** [3] - 656:2, 803:23, 819:16
**Sunday** [1] - 785:13
**supervise** [1] - 648:17
**supervision** [1] - 813:19
**suppliers** [1] - 755:25
**support** [2] - 687:15, 774:24
**supports** [1] - 663:1
**supposed** [1] - 705:23
**surgery** [20] - 681:18, 685:11, 686:8, 691:12, 730:2, 745:24, 784:24, 807:20, 807:21, 807:24, 808:10, 808:13, 808:14, 808:17, 808:19, 809:9, 809:10, 809:11, 830:10, 831:7
**surprise** [2] - 667:10, 788:6
**surprised** [1] - 677:6
**suspect** [1] - 694:16
**sustained** [2] - 687:13, 814:15
**Sustained** [5] - 653:24, 655:23, 771:17, 799:17, 799:19
**swath** [1] - 664:12
**sworn** [2] - 640:17, 753:5
**sworn/affirmed** [2] - 773:16, 805:1
**system** [4] - 705:14, 705:17, 710:3, 714:21
**systems** [1] - 664:4

**T**

**talents** [1] - 835:11
**talks** [1] - 685:16
**Tamarisk** [1] - 724:3
**tangential** [2] - 812:24, 815:21
**tangentially** [1] - 814:17
**target** [1] - 719:22
**tax** [7] - 702:12, 720:6, 721:8, 722:4, 722:23, 744:16, 744:17
**taxes** [1] - 760:18
**tea** [2] - 698:14, 742:9

**teach** [1] - 651:4
**team** [13] - 651:1, 659:9, 659:12, 659:21, 676:9, 676:10, 676:12, 676:25, 709:23, 743:25, 780:10, 802:20, 803:20
**tear** [1] - 663:24
**technical** [2] - 705:18, 706:1
**technically** [1] - 773:9
**technology** [2] - 705:3, 705:21
**Teich** [1] - 638:14
**Telephone** [1] - 638:15
**template** [1] - 798:11
**ten** [12] - 678:5, 678:6, 680:25, 717:12, 721:22, 756:14, 756:15, 756:16, 772:16, 803:7, 810:18
**Ten** [2] - 721:24, 772:18
**tend** [1] - 837:1
**tends** [1] - 659:11
**tenth** [1] - 793:11
**TEP** [1] - 684:12
**term** [21] - 661:14, 695:12, 695:23, 696:12, 696:15, 715:5, 715:22, 750:10, 787:11, 788:4, 788:5, 788:13, 788:16, 788:17, 790:19, 798:16, 798:19, 798:21, 799:7, 799:12
**terminate** [3] - 758:3, 769:6, 801:1
**terminated** [15] - 671:14, 672:3, 672:11, 672:16, 672:22, 673:7, 729:24, 768:16, 770:6, 801:7, 824:6, 824:21, 825:4, 825:15
**terminating** [1] - 761:18
**termination** [15] - 700:1, 700:5, 758:13, 758:20, 760:3, 762:10, 793:8, 793:12, 793:13, 793:24, 800:5, 800:6, 825:4, 826:18, 827:7
**terminations** [3] - 756:17, 757:24, 770:2
**terms** [16] - 686:11, 703:9, 704:24, 705:18, 717:24, 730:11, 730:12, 736:23, 739:15, 744:18, 778:11, 781:3, 788:17, 801:25, 808:21, 826:17
**terrible** [2] - 662:1, 664:8
**terribly** [1] - 818:10
**test** [2] - 682:25, 838:11
**testified** [28] - 640:17, 640:18, 644:9, 645:16, 649:9, 655:23, 661:12, 666:16, 667:17, 670:24, 671:8, 675:18, 681:10, 685:18, 699:25, 703:3, 704:19, 717:10, 739:22, 743:13, 743:14, 753:5, 773:17, 780:5, 794:22, 805:1, 808:5, 823:6
**testify** [2] - 642:18, 733:3, 804:18, 837:3
**testifying** [1] - 671:4
**testimonial** [1] - 699:12
**testimony** [61] - 641:2, 641:4, 643:2, 643:24, 644:6, 651:12, 651:15, 653:14, 655:3, 661:14, 661:23, 665:22, 667:3, 667:5, 667:10, 671:10, 674:9, 675:10, 675:13, 675:14, 676:4, 681:23, 681:24, 683:3, 685:6, 697:10, 698:3, 700:4, 700:7, 700:15, 703:10,

716:1, 716:6, 717:14, 717:19, 732:20,
732:25, 733:12, 751:11, 751:14,
752:2, 752:14, 765:14, 773:7, 773:11,
803:9, 807:10, 807:13, 809:12, 815:2,
818:3, 818:25, 819:11, 830:6, 831:2,
832:16, 834:6, 836:11, 836:13,
837:12, 837:16
**Texas** [1] - 637:17
**text** [10] - 642:3, 676:19, 678:14,
678:22, 679:7, 679:20, 681:4, 682:19,
684:18, 686:11
**thanking** [1] - 711:15
**Thanksgiving** [1] - 734:7
**THE** [650] - 637:12, 637:14, 639:4,
639:7, 639:16, 639:19, 640:6, 640:7,
641:24, 645:22, 646:1, 646:12,
646:13, 646:14, 646:20, 650:4,
650:11, 651:2, 652:6, 652:17, 652:18,
652:23, 653:2, 653:7, 653:20, 653:24,
654:4, 654:7, 654:9, 654:11, 654:12,
654:13, 654:14, 654:15, 654:17,
654:20, 654:21, 654:24, 654:25,
655:2, 655:3, 655:4, 655:5, 655:6,
655:7, 655:9, 655:10, 655:12, 655:15,
655:17, 655:23, 656:2, 656:4, 656:7,
656:9, 657:7, 657:19, 657:21, 657:22,
658:4, 658:7, 658:12, 658:14, 658:16,
660:2, 660:6, 660:10, 660:11, 660:12,
660:14, 660:16, 660:18, 666:5, 666:8,
667:25, 668:10, 668:11, 668:12,
668:13, 668:16, 668:18, 668:20,
668:21, 668:22, 668:23, 668:24,
668:25, 669:5, 669:12, 669:18,
669:19, 669:24, 670:1, 670:6, 670:16,
670:20, 670:21, 671:4, 671:12,
671:17, 671:18, 671:19, 671:22,
673:11, 673:14, 673:18, 673:20,
674:15, 674:16, 674:17, 674:18,
675:2, 675:4, 675:11, 675:14, 675:23,
676:1, 678:15, 678:16, 678:18,
679:13, 679:15, 679:18, 679:21,
679:23, 679:24, 679:25, 680:2, 685:8,
687:13, 687:16, 687:19, 687:22,
688:1, 688:2, 688:3, 688:4, 688:6,
688:7, 688:9, 688:10, 688:12, 688:13,
688:20, 688:23, 689:2, 689:5, 689:6,
689:8, 689:9, 689:13, 689:17, 689:20,
689:23, 694:14, 694:20, 694:22,
695:7, 695:9, 695:10, 696:1, 696:2,
696:3, 696:4, 696:5, 696:6, 696:7,
696:14, 696:16, 696:17, 696:23,
696:25, 697:1, 697:3, 697:9, 697:19,
698:2, 699:3, 699:17, 699:19, 699:20,
699:21, 699:22, 700:3, 700:7, 700:14,
700:17, 700:18, 700:25, 701:2, 701:3,
701:5, 701:6, 701:11, 701:13, 701:17,
702:25, 703:3, 703:4, 703:5, 703:9,
703:12, 703:14, 706:7, 706:9, 706:24,
707:1, 707:4, 707:6, 707:7, 707:8,
707:9, 707:10, 709:14, 709:19,

710:15, 710:17, 710:19, 710:21,
710:22, 710:24, 710:25, 711:1, 711:2,
711:10, 711:21, 711:23, 711:24,
712:1, 712:4, 712:14, 713:10, 713:13,
713:16, 713:18, 715:9, 716:17,
716:19, 720:13, 722:7, 722:9, 722:12,
722:14, 722:20, 723:13, 723:16,
723:18, 723:21, 724:17, 725:20,
725:23, 726:7, 726:9, 726:15, 726:21,
726:23, 726:24, 727:2, 727:7, 727:18,
727:19, 727:20, 727:25, 728:6, 728:9,
728:11, 728:16, 728:18, 728:23,
728:25, 729:7, 729:15, 729:17,
729:22, 730:5, 730:8, 730:13, 730:16,
730:18, 730:21, 731:3, 731:9, 731:14,
731:20, 731:23, 732:3, 732:6, 732:9,
732:14, 732:18, 732:22, 733:4,
733:19, 733:22, 734:4, 734:8, 734:10,
734:16, 734:22, 734:24, 735:5, 735:8,
735:21, 736:2, 736:14, 736:17,
736:20, 736:25, 737:5, 737:8, 737:14,
737:19, 737:22, 737:25, 738:8,
738:19, 739:2, 739:6, 739:10, 739:13,
739:17, 739:23, 740:2, 740:5, 740:10,
740:12, 740:15, 740:18, 740:23,
741:4, 742:5, 742:15, 742:23, 742:25,
743:2, 743:12, 743:18, 743:25,
744:12, 744:14, 744:15, 744:23,
744:25, 745:1, 745:2, 745:3, 745:5,
745:17, 745:18, 746:2, 746:7, 746:10,
746:12, 746:13, 746:16, 746:18,
746:20, 746:22, 746:25, 747:3,
747:10, 747:12, 747:14, 747:16,
747:17, 747:21, 747:23, 747:25,
748:11, 748:18, 748:20, 749:18,
749:20, 749:21, 750:6, 750:17,
750:19, 750:20, 751:2, 751:12,
751:15, 751:17, 751:19, 751:22,
752:1, 752:7, 752:15, 752:21, 752:23,
753:6, 753:9, 753:11, 754:4, 754:6,
754:7, 754:8, 754:10, 754:12, 754:17,
754:20, 754:22, 755:3, 755:13,
755:19, 756:2, 756:4, 756:5, 756:15,
756:16, 756:19, 756:20, 756:21,
759:6, 759:8, 762:22, 763:21, 764:16,
766:6, 768:4, 768:8, 771:17, 771:21,
771:23, 772:4, 772:6, 772:10, 772:14,
772:17, 772:20, 772:23, 773:1, 773:5,
773:20, 773:23, 773:25, 774:11,
775:2, 775:3, 775:4, 775:5, 775:25,
776:2, 777:2, 777:19, 777:21, 778:23,
778:25, 779:4, 779:6, 779:10, 779:12,
779:15, 779:19, 779:21, 779:25,
783:8, 783:9, 783:11, 783:12, 784:13,
784:15, 784:17, 784:18, 785:18,
785:21, 785:24, 786:1, 786:3, 786:4,
791:6, 792:10, 792:13, 792:15,
792:18, 792:21, 792:22, 792:23,
792:24, 792:25, 793:3, 793:5, 793:7,
793:8, 793:10, 793:13, 793:15,
793:19, 793:23, 797:25, 798:1, 798:3,

799:17, 799:19, 799:23, 799:24,
800:2, 800:3, 800:4, 800:5, 800:8,
800:9, 800:13, 800:14, 800:16,
800:19, 800:22, 800:23, 800:25,
801:1, 801:3, 801:4, 801:6, 801:7,
801:9, 801:10, 801:14, 801:16,
801:18, 801:19, 801:20, 801:21,
802:23, 803:3, 803:8, 803:22, 803:25,
804:5, 804:9, 804:11, 804:14, 805:3,
805:6, 812:18, 812:20, 812:21,
812:23, 812:24, 813:4, 813:7, 813:9,
813:12, 813:18, 813:20, 813:21,
813:23, 813:24, 814:1, 814:2, 814:4,
814:5, 814:15, 815:2, 815:4, 815:7,
815:9, 815:14, 815:20, 816:1, 816:6,
816:10, 816:16, 816:24, 817:14,
817:16, 817:19, 817:22, 818:6,
818:10, 818:18, 818:22, 818:24,
819:4, 819:24, 820:4, 820:10, 820:13,
820:16, 820:22, 821:2, 821:5, 821:10,
821:13, 821:17, 821:21, 821:24,
822:7, 822:11, 822:16, 822:23,
822:25, 823:7, 823:11, 823:15,
823:18, 823:21, 824:1, 824:3, 824:6,
824:9, 824:14, 824:18, 824:20,
824:25, 825:4, 825:10, 825:13,
825:15, 825:21, 825:23, 826:1, 826:4,
826:7, 826:11, 826:14, 826:21, 827:1,
827:3, 827:9, 827:18, 828:1, 828:5,
828:10, 828:15, 828:17, 828:22,
828:24, 829:2, 829:14, 830:17,
830:21, 830:24, 831:10, 832:6,
832:10, 832:18, 833:2, 833:14,
835:24, 836:5, 836:10, 836:13,
836:16, 836:25, 837:10, 837:18,
837:20, 838:4, 838:6, 838:9, 838:15
**theirs** [2] - 719:6, 719:8
**theme** [1] - 651:3
**themselves** [1] - 694:13
**Theoretically** [2] - 736:5, 740:6
**theoretically** [2] - 737:11, 738:11
**theory** [5] - 734:22, 738:22, 740:24,
814:17, 816:17
**therapist** [2] - 684:1, 709:12
**Theresa** [1] - 810:6
**They've** [1] - 739:22
**they've** [2] - 639:8, 709:12
**thinking** [4] - 681:3, 684:15, 831:21,
835:11
**Third** [1] - 659:4
**thoughts** [1] - 716:14
**thousands** [1] - 802:24
**three** [21] - 674:24, 676:12, 679:12,
680:11, 680:15, 681:1, 683:8, 683:11,
683:20, 686:7, 686:13, 704:17,
724:15, 733:2, 755:22, 758:10, 769:3,
770:13, 812:11, 825:16, 830:16
**three-page** [1] - 724:15
**throat** [1] - 707:25
**throughout** [3] - 676:12, 718:12, 763:14

throwing [2] - 645:18, 698:7
tightened [1] - 771:13
Time-wise [1] - 652:2
time-wise [1] - 639:10
timeline [1] - 738:16
timelines [1] - 826:17
timely [1] - 829:18
tips [1] - 720:18
title [6] - 753:18, 753:20, 755:15, 774:6, 805:14
titles [1] - 753:22
today [15] - 639:12, 663:19, 699:12, 703:7, 704:5, 712:18, 733:3, 805:12, 817:17, 817:20, 819:1, 819:19, 834:21, 835:21
together [9] - 649:13, 649:14, 685:23, 742:11, 762:14, 762:15, 762:18, 802:3, 819:13
tons [2] - 728:1, 815:5
Tony [18] - 648:23, 649:1, 649:3, 649:13, 649:19, 650:20, 659:17, 667:4, 673:9, 681:9, 685:14, 686:10, 693:19, 708:4, 708:18, 730:2
Tony's [1] - 649:11
took [24] - 648:7, 655:15, 660:16, 662:8, 662:11, 662:12, 663:8, 663:14, 667:6, 669:7, 670:11, 671:9, 671:15, 686:25, 710:15, 715:21, 718:1, 737:10, 743:23, 785:3, 790:23, 807:21, 814:7, 814:25
tool [1] - 811:14
top [11] - 648:1, 664:13, 685:9, 690:20, 690:21, 701:25, 717:13, 719:12, 765:16, 767:21, 830:17
toss [1] - 837:22
tossed [1] - 836:17
total [5] - 756:7, 765:21, 765:22, 766:18, 812:11
totally [1] - 682:22, 796:20, 796:24
touch [2] - 707:17, 834:13
towards [1] - 835:23
town [2] - 733:3, 752:11
track [5] - 761:15, 761:16, 761:21, 762:19, 833:20
tracking [1] - 761:20
train [1] - 663:23
trained [1] - 663:13
trainer [1] - 744:8
training [51] - 646:22, 648:10, 648:13, 648:16, 648:24, 653:16, 655:13, 656:15, 659:16, 659:17, 661:2, 661:5, 661:7, 663:21, 663:22, 665:2, 665:15, 665:17, 665:24, 666:3, 666:18, 666:20, 670:8, 713:22, 715:19, 715:24, 716:4, 716:7, 718:2, 718:18, 718:22, 744:7, 763:13, 805:15, 805:21, 805:23, 807:4, 807:9, 807:11, 808:20, 808:23, 810:10, 811:20, 811:25, 813:14, 813:15, 814:9, 815:13, 815:17

Transcript [1] - 638:16
TRANSCRIPT [1] - 637:11
Transcription [1] - 638:17
transferred [2] - 667:23, 685:20
transformation [10] - 646:8, 659:14, 662:2, 662:23, 665:15, 665:16, 665:23, 666:1, 666:3, 716:9
transition [2] - 663:9, 717:23
travel [1] - 763:15
traveling [1] - 647:19
treat [1] - 813:4
treated [3] - 687:20, 687:22, 688:7
treating [1] - 778:15
treatment [2] - 760:2, 782:15
treatments [1] - 796:14
trial [5] - 639:5, 639:21, 699:8, 699:13, 790:16, 818:25
TRIAL [1] - 637:11
tried [6] - 642:3, 655:7, 655:16, 674:23, 835:13
trigger [1] - 833:6
trouble [1] - 810:1
Trudy [1] - 749:2
true [5] - 656:16, 660:1, 664:23, 671:16, 681:25
truncate [1] - 813:4
truncating [1] - 773:6
trust [1] - 645:9
trusted [2] - 643:8, 644:25
trusting [1] - 677:15
truth [2] - 682:20, 830:2
try [16] - 639:9, 639:20, 665:10, 667:25, 668:2, 697:9, 697:10, 698:14, 716:11, 723:16, 733:4, 733:12, 746:2, 798:20, 808:6, 822:1
trying [27] - 644:19, 646:18, 651:3, 652:8, 681:7, 682:6, 698:9, 717:18, 718:8, 719:3, 720:11, 721:23, 726:2, 726:4, 756:3, 762:17, 787:6, 801:24, 809:22, 813:6, 814:2, 817:23, 818:25, 824:22, 831:23, 834:14
Tuesday [1] - 834:23
tuning [1] - 834:2
turn [7] - 752:12, 770:14, 772:23, 773:8, 780:3, 786:23, 811:19
turnaround [1] - 662:18, 662:20, 748:7
turned [3] - 662:22, 662:23, 824:23
turnover [2] - 719:1, 719:2
turns [1] - 709:15
Twenty [1] - 793:22
Twenty-eight [1] - 793:22
two [28] - 644:14, 650:3, 652:12, 667:24, 678:9, 679:1, 687:21, 691:1, 691:8, 691:15, 692:7, 694:17, 694:22, 722:5, 753:22, 762:19, 763:14, 763:18, 772:2, 772:12, 772:15, 781:6, 792:16, 803:8, 804:14, 805:24, 816:10
two-and-a-half [1] - 652:12
two-week [1] - 691:1

type [6] - 645:11, 649:5, 699:8, 737:9, 780:25, 837:23
types [2] - 775:1, 775:12
typically [4] - 650:18, 782:5, 808:25, 809:20

# U

U.S [2] - 777:5, 777:24
UBS [2] - 663:8, 663:11
ultimately [1] - 835:24
unable [7] - 776:18, 790:22, 792:6, 794:10, 796:4
unavailable [1] - 809:3
Under [4] - 785:24, 793:5, 793:7, 800:25
under [63] - 640:5, 667:8, 687:21, 687:23, 688:4, 690:21, 704:20, 714:1, 718:6, 718:24, 725:2, 729:10, 730:8, 731:22, 734:2, 734:5, 734:18, 734:20, 734:22, 734:25, 735:18, 738:20, 739:5, 739:8, 739:11, 739:13, 739:20, 740:9, 740:25, 760:1, 766:22, 775:13, 775:17, 781:14, 781:16, 783:4, 791:3, 791:22, 791:23, 792:2, 792:7, 794:6, 797:5, 798:5, 798:7, 798:9, 800:15, 801:5, 801:12, 801:13, 801:16, 805:25, 807:2, 819:18, 821:22, 823:12, 826:8, 827:23, 828:17, 831:25, 832:5, 833:13, 838:11
undergoing [1] - 831:7
Underneath [1] - 724:2
underneath [3] - 655:14, 784:11, 813:19
underperforming [1] - 659:21
understood [6] - 644:6, 647:15, 684:8, 701:20, 705:23, 789:14
undertake [1] - 642:22
undisputed [1] - 832:14
undue [2] - 793:4, 819:18
unemployment [1] - 775:1
unit [4] - 664:14, 665:1, 665:12, 791:22
UNITED [2] - 637:1, 637:12
United [1] - 637:5
units [3] - 664:19, 667:15, 667:19
Unless [2] - 776:21, 801:7
unless [7] - 666:2, 697:3, 714:16, 797:24, 801:2, 801:17, 825:5
unpaid [2] - 690:13, 694:4, 694:6
unsigned [1] - 780:4
unusual [2] - 673:23, 782:12
unvested [1] - 704:14
up [51] - 644:14, 644:20, 645:18, 646:18, 649:17, 650:3, 650:23, 665:8, 668:25, 672:21, 675:20, 678:4, 687:24, 688:2, 691:18, 693:2, 697:7, 699:14, 702:16, 704:8, 705:19, 714:4, 719:3, 721:22, 721:25, 726:7, 742:19, 744:5, 748:16, 751:6, 754:11, 755:11, 755:13, 758:2, 766:21, 766:24, 767:12, 768:17, 771:13, 773:22, 787:17, 788:9, 797:15, 797:24, 798:5,

808:7, 816:1, 817:24, 834:6, 834:18, 834:24
**update** [2] - 763:9, 811:3
**UPS** [1] - 663:10
**utilization** [1] - 811:2

## V

**V-O-Y-C-H-E-S-K-E** [1] - 773:24
**validate** [1] - 771:5
**valuation** [1] - 750:3
**value** [16] - 647:13, 651:5, 651:9, 651:11, 652:16, 653:6, 654:2, 654:3, 654:6, 655:20, 657:4, 701:24, 758:8
**various** [2] - 750:15, 796:14
**vendor** [3] - 767:7, 811:10, 811:24
**verbal** [1] - 643:6
**verdict** [1] - 837:22
**verge** [1] - 770:10
**verify** [4] - 748:24, 795:23, 803:12, 803:14
**versus** [4] - 654:3, 665:15, 760:3, 815:18, 816:14
**vested** [1] - 686:12
**vesting** [1] - 686:13
**veteran** [1] - 837:7
**viable** [2] - 734:25, 740:6
**vice** [4] - 663:16, 679:4, 782:12, 807:3
**videoconference** [1] - 705:20
**view** [2] - 654:2, 795:18
**view-only** [1] - 795:18
**violate** [1] - 720:11
**violated** [2] - 687:11, 738:17
**violating** [1] - 794:17
**violation** [1] - 741:2
**virtually** [2] - 705:17, 756:18
**visit** [1] - 685:10
**visited** [1] - 831:3
**voice** [2] - 683:7, 773:21
**voluntarily** [1] - 743:17
**VOYCHESKE** [2] - 773:15, 839:15
**Voycheske** [18] - 725:15, 727:6, 773:13, 773:24, 774:4, 776:25, 777:23, 780:3, 780:23, 781:8, 786:6, 786:15, 787:19, 792:12, 794:4, 803:7, 804:15, 823:6

## W

**W-2s** [1] - 720:19
**wages** [1] - 720:18
**Wait** [1] - 671:4
**wait** [3] - 710:15, 824:9, 838:15
**waiting** [2] - 640:1, 686:13
**wake** [1] - 678:4
**walk** [2] - 684:10, 835:10
**Wall** [2] - 661:13, 837:8
**walls** [1] - 802:25
**wants** [4] - 700:18, 703:1, 772:5, 773:7
**ward** [1] - 683:11
**Ward** [1] - 810:6

**warned** [1] - 668:2
**wastes** [1] - 743:3
**watch** [1] - 639:19
**watched** [1] - 661:21
**watching** [2] - 683:11, 752:16
**water** [1] - 751:20
**ways** [2] - 756:10, 831:12
**weakness** [1] - 659:21
**Wednesday** [1] - 714:16
**week** [6] - 643:1, 648:6, 663:19, 691:1, 819:5, 819:20
**weekend** [7] - 639:11, 639:13, 828:21, 833:19, 833:23
**weekly** [2] - 664:15, 676:10
**weeks** [18] - 685:12, 734:2, 734:5, 734:7, 763:14, 763:18, 792:16, 795:13, 800:17, 823:12, 823:15, 825:9, 825:16, 830:16
**welcomed** [1] - 793:20
**whatsoever** [1] - 702:24
**WHEREUPON** [6] - 697:20, 699:1, 817:15, 819:25, 822:9, 838:18
**white** [3] - 782:15, 801:15, 802:3
**white-glove** [1] - 782:15
**whole** [3] - 639:11, 837:4
**wife** [4] - 684:22, 712:21
**wife's** [2] - 685:20, 787:20
**willing** [3] - 824:4, 834:4, 835:10
**wise** [2] - 639:10, 652:2
**wish** [3] - 703:13, 771:24, 772:11
**Witness** [3] - 751:21, 752:25, 773:14, 804:24
**witness** [30] - 639:24, 639:25, 640:4, 640:9, 640:16, 687:12, 700:11, 728:12, 729:6, 751:21, 752:5, 752:19, 752:25, 753:2, 753:11, 754:14, 771:22, 773:14, 773:15, 803:5, 804:1, 804:12, 804:19, 804:20, 804:22, 804:24, 804:25, 815:23, 816:7, 817:15
**WITNESS** [127] - 640:6, 646:13, 646:20, 652:18, 653:2, 654:7, 654:11, 654:13, 654:15, 654:20, 654:24, 655:2, 655:4, 655:6, 655:9, 655:12, 655:17, 657:21, 660:11, 660:14, 660:18, 668:10, 668:12, 668:16, 668:20, 668:22, 668:24, 669:5, 669:18, 669:24, 670:6, 670:20, 671:17, 671:19, 673:14, 673:20, 674:16, 674:18, 678:15, 678:18, 688:1, 688:3, 688:6, 688:9, 688:12, 696:2, 696:4, 696:6, 696:16, 696:25, 699:19, 699:21, 700:17, 701:2, 701:5, 703:3, 703:5, 703:14, 707:7, 707:9, 710:17, 710:21, 710:24, 711:1, 711:23, 723:18, 726:23, 727:19, 744:14, 744:25, 745:2, 745:5, 745:18, 746:12, 747:10, 747:14, 747:17, 749:20, 750:19, 753:6, 753:9, 754:6, 754:8, 756:5, 756:16, 756:20, 773:20, 773:23, 775:3, 775:5, 783:9, 783:12, 784:15, 784:18, 785:21,

786:1, 786:4, 792:18, 792:22, 792:24, 793:3, 793:7, 793:10, 798:1, 799:23, 800:2, 800:4, 800:8, 800:13, 800:16, 800:22, 800:25, 801:3, 801:6, 801:9, 801:14, 801:18, 801:20, 805:3, 805:6, 812:20, 812:23, 813:20, 813:23, 814:1, 814:4, 839:3
**witnesses** [19] - 640:10, 705:4, 705:5, 732:4, 732:8, 732:14, 732:20, 733:3, 751:23, 752:11, 752:14, 771:24, 772:3, 772:8, 773:2, 773:8, 817:17, 817:20, 832:16
**wondered** [1] - 683:9
**wonderful** [2] - 670:11, 685:10
**words** [2] - 647:16, 789:4
**worker** [1] - 682:15
**worker's** [1] - 775:16
**world** [3] - 647:19, 663:11, 718:6
**worldwide** [1] - 676:12
**worried** [3] - 682:5, 682:10, 735:22
**worry** [3] - 678:18, 682:1, 697:18
**worrying** [1] - 707:15
**worse** [5] - 684:18, 684:19, 719:1, 719:6, 719:8
**worst** [2] - 684:11, 684:16
**worth** [4] - 643:17, 654:3, 662:4, 750:5
**wrap** [2] - 697:7, 699:14
**wrestle** [3] - 639:9, 836:18, 838:12
**write** [2] - 727:12, 750:12
**writes** [3] - 712:20, 715:13, 715:14
**writing** [2] - 688:25, 811:15
**written** [2] - 643:11, 643:13
**wrote** [5] - 786:25, 824:1, 824:3, 826:23, 827:1

## Y

**year** [21] - 656:18, 690:21, 702:12, 704:1, 717:7, 719:4, 720:2, 720:7, 721:6, 721:7, 721:24, 723:8, 728:3, 745:14, 754:3, 763:14, 770:22, 786:2, 805:23, 809:20, 809:22
**years** [46] - 642:1, 643:5, 643:8, 643:10, 643:17, 643:19, 644:23, 645:13, 646:9, 652:7, 652:12, 662:9, 662:11, 662:12, 662:19, 663:2, 663:4, 663:8, 666:2, 682:12, 682:17, 682:19, 686:13, 703:17, 703:20, 709:14, 721:18, 722:5, 722:18, 723:8, 744:24, 745:15, 745:21, 753:23, 754:1, 754:2, 755:23, 770:11, 770:12, 770:13, 783:21, 805:22, 805:24, 812:11, 834:12, 837:14
**Years** [1] - 786:18
**years'** [1] - 662:4
**Yesterday** [1] - 660:21
**yesterday** [26] - 640:23, 641:2, 643:24, 657:13, 658:8, 661:23, 667:11, 674:23, 675:5, 688:16, 693:25, 699:25, 700:4, 701:16, 703:3, 703:4,

703:8, 703:18, 704:4, 704:6, 704:19, 716:1, 745:11, 765:14, 807:10, 809:12
**YORK** [1] - 637:1
**York** [6] - 637:5, 637:21, 638:10, 648:5, 834:13
**Young** [3] - 767:17, 767:18, 767:25
**yourself** [4] - 660:22, 660:23, 713:1, 815:13

## Z

**Zeitlin** [1] - 752:10
**ZEITLIN** [20] - 637:18, 637:21, 666:11, 682:2, 687:12, 689:7, 694:12, 700:11, 725:21, 726:3, 726:8, 726:10, 732:1, 732:4, 732:7, 732:12, 732:15, 732:21, 732:24